GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:   (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**DECLARATION OF ERIC MONEK ANDERSON IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND AMENDED MOTION TO SEAL EXHIBITS TO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERTS**

Judge:  Hon. Anthony J. Battaglia

Date:    March 27, 2025
Time:    2:00 p.m.
Crtrm.:  4A

[4664718.2]

DECL. OF ERIC MONEK ANDERSON ISO PLAINTIFFS' NOTICE OF MOTION AND AMENDED MOTION TO SEAL EXHIBITS TO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERTS

1    I, Eric Monek Anderson, declare:

2    1.    I am an attorney duly admitted to practice before this Court. I am a

3    lawyer in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for

4    Plaintiffs and the Certified Class and Subclasses. I have personal knowledge of the

5    facts set forth herein, and if called as a witness, I could competently so testify. I

6    make this declaration in support of Plaintiffs' Amended Motion to File Under Seal

7    Exhibits to Plaintiffs' Motion to Exclude Opinions of Defendants' Experts

8    ("Amended Motion").

9    2.    Pursuant to the Court's orders, Dkts. 823, 830, Plaintiffs are filing an

10   amended motion to seal information filed with Plaintiffs' Motion to Exclude

11   Opinions of Defendants' Experts, Dkt. 779, all of which was attached to the

12   Declaration of Van Swearingen in Support of Plaintiffs' Motion to Exclude

13   Opinions of Defendants' Experts ("Swearingen Decl."). Dkts. 779-2, 779-3, 779-4.

14   3.    Staff at my firm have confirmed that the motion to seal complies with

15   Electronic Case Filing Administrative Policies and Procedures Manual Section 2(j).

16   4.    Along with the Amended Motion, Plaintiffs are filing revised public

17   versions of the exhibits to the Swearingen Declaration that Plaintiffs originally

18   sought to seal, with redactions where Plaintiffs seek such redactions. A true and

19   correct copy of the revised public versions of the exhibits is attached hereto as

20   **Exhibit 1**.

21   I declare under penalty of perjury under the laws of the United States of

22   America that the foregoing is true and correct, and that this declaration is executed

23   at San Francisco, California this 14th day of March, 2025.

24

25                                              */s/ Eric Monek Anderson*

26                                              Eric Monek Anderson

27

28

# EXHIBIT 1

# EXHIBIT A
# (Redacted)

Ex. A-1

***DUNSMORE V. COUNTY OF SAN DIEGO SHERIFF'S DEPARTMENT***
**EXPERT WITNESS MEDICAL REPORT OF OWEN J. MURRAY, D.O.**

## Section 1: Experience and Qualifications

I am a board-certified physician in the field of Family Practice.  I have considerable expertise in correctional healthcare with more than 29 years of experience in correctional medicine.  For the past 25 years, I have worked for the University of Texas Medical Branch (UTMB) Offender Health Services Program. Currently, I serve as the Vice President of Offender Health Services in which capacity I am responsible for ensuring the provision of all medical, mental health, and dental services for approximately 100,000 adult offenders in the Texas Department of Criminal Justice (TDCJ) state jails and prisons (approximately 80% of the state's correctional facility population), as well the delivery of such services to juvenile offenders in the Texas Juvenile Justice Department (TJJD) facilities. I oversee a staff of approximately 3,500 healthcare and clinical support employees located at more than 100 correctional facilities throughout the State of Texas.

Before joining UTMB in 1995, I served as a Divisional Medical Director of Chicago's Cook County Jail and several correctional facilities operated by the Illinois Department of Corrections. In addition, I have served as a healthcare consultant for several correctional systems, including the California and Arizona Departments of Corrections. I currently serve as a Commissioner for Accreditation for the American Correctional Association (ACA).

In my role as Vice President of Offender Health Services for UTMB Correctional Managed Care (CMC), I have significant experience evaluating the management of infectious disease, to include COVID-19, in the correctional setting, consistent with standards and guidance promulgated by the American Correctional Association and the U.S. Centers for Disease Control and Prevention (CDC). My curriculum vitae (CV) is attached as **Appendix A.**

## Section 2: Materials Reviewed

The materials provided to me for review can be found in **Appendix B.**

## Section 3: Overview

A comprehensive assessment of SDSO was conducted to gather data needed to address the following allegations in the Plaintiffs' complaint:

1. *Jail defendants systematically fail to maintain sufficient numbers of health care professionals, resulting in deficient care.*

2. *The Sheriff's Department's custody staff interfere with and undermine the delivery of care by health care professionals.*

3. *The Sheriff's Department's inadequate screening and intake process fails to identify and treat medical care problems of newly arriving incarcerated people.*

4. *The Sheriff's Department fails to provide adequate medical care, including MAT, for incarcerated people with substance use disorder.*

1

**Ex. A-2**

5.  *The Sheriff's Department fails to provide adequate medical care for incarcerated people entering the jail under the influence of alcohol and drugs.*

6.  *The Sheriff's Department fails to continue medically necessary medications and treatments for incarcerated people upon their arrival at the jail, resulting in long delays and patient harm.*

7.  *The Sheriff's Department does not provide incarcerated people with a reliable and timely way to alert health care staff of their medical needs.*

8.  *The Sheriff's Department fails to maintain adequate, accurate, and complete medical records, which compromises the delivery of care.*

9.  *Jail defendants lack sufficient contracts with community providers to provide adequate medical care to incarcerated people.*

10. *The Sheriff's Department fails to provide constitutionally required confidentiality in the delivery of medical care.*

11. *The Sheriff's Department fails to provide adequate diagnostic care to incarcerated people, including failing to appropriately refer incarcerated people to outside specialists when necessary.*

12. *The Sheriff's Department fails to provide incarcerated people with medically required eyeglasses.*

13. *The Sheriff's Department fails to provide necessary or adequate follow-up medical treatment to incarcerated people.*

14. *The Sheriff's Department fails to provide adequate discharge planning services and medication for incarcerated people being released from the jail.*

15. *The Sheriff's Department fails to maintain adequate QA/QI processes to ensure appropriate and timely medical care.*


### Section 4: Methodology

I reviewed the material provided by counsel.  I spoke with Dr. Peter Freedland on July 5, 2024 and had a phone conversation with Dr. Nas Rafi, CHP SDSO Medical Director, on Wednesday, August 7, 2024.  Additionally, I reviewed the medical records of the named Plaintiffs to determine the accuracy and veracity of their complaints.

A facility inspection was conducted on March 18, 19, and 20, 2024.  Given the scope of the audit and the breadth of the San Diego Sheriff's Office (SDSO) healthcare program, I was joined by subject matter experts in the areas of nursing services, pharmacy, medical records, and administration.

- Mr. Kirk Abbott (nursing services) - CV can be found in **Appendix C**.
- Dr. Melanie Roberts (pharmacy and medical records) - CV can be found in **Appendix D**.

**Ex. A-3**

- Mr. Kelly Coates (administration) -CV can be found in **Appendix E**.

In addition to the on-site inspection, randomly selected medical records were audited to validate various critical processes and performance. These audits included the following: intake, nurse sick call, initial health assessment, intake medications, non-formulary medications, chronic care, laboratory, radiology, and sub-specialty clinics.


## Section 5: Facilities

The San Diego County jails are facilities operated by the SDSO and designed to house individuals who have been arrested and are awaiting trial and sentencing or who are serving short-term state sentences. On March 18, 19, and 20, accompanied by SDSO staff, including Ms. Serina Rognlien-Hood, I toured all facilities comprising the SDSO.

On the days of our inspection, the jails had a combined total population of approximately 4,323. At each facility, we asked to see typical housing units, recreation areas, and medical clinics. We also observed the intake process. At each facility, we were accompanied by several members of the SDSO facility leadership, and we spoke with medical personnel whom we encountered on the tour. We did not speak with any incarcerated persons (IPs).

From the ample evidence visible on the tours and through conversations we had with security and healthcare staff, I found no evidence the SDSO is deliberately indifferent to the health, safety, or medical needs of its incarcerated population.

George Bailey Detention Facility (GBDF)
We toured the GBDF on March 20, 2024. While on site, we observed the medical clinic, six incarcerated person housing units, the transfer area, administrative separation, and medical observation area. When IPs enter GBDF, they have already been screened and classified, so there is no booking area at that facility.

Las Colinas Detention and Reentry Facility (LCDRF)
We toured the LCDRF on March 18, 2024. It is the primary intake center for incarcerated females. While on site, we observed the following areas: medical clinic, housing, administration, intake, and medical observation housing. As part of the medical clinic, we observed the gynecology, dental, and optometry space. We spoke briefly to the on-duty gynecologist and dental hygienist who gave us an informal account of their job description and responsibilities.

Of particular note at the LCDRF was the "open booking" intake setup. We witnessed incarcerated females seated in an open area. They progressed through medical screening and booking without being moved to holding cells. Telephones and restrooms were available while the incarcerated women waited to be booked. Another aspect of note at the LCDRF was the "direct supervision" staffing model. We observed that sworn staff is generally stationed within the housing unit at an administrative desk area, not in a separate secured room.

Vista Detention Facility (VDF)
We toured the VDF on March 19, 2024. The incarcerated person population at the VDF primarily comprises individuals awaiting court proceedings. While on site, we observed the following areas: booking/receiving, medical observation, medical clinic, dental, Enhanced Observation Housing

**Ex. A-4**

(EOH), Medication-Assisted Treatment (MAT) module, indoor recreation, incarcerated person housing, and administrative separation.

<u>San Diego Central Jail (SDCJ)</u>
We toured the SDCJ on March 19, 2024.  While on site, we observed the following areas:  medical clinic, incarcerated person housing, booking/receiving, medical observation, mental health, dental, administrative separation, mental health programming, and work spaces for jail staff.  The SDCJ is the only facility with on-site dialysis, and we noted several dialysis beds in the medical clinic space.

<u>East Mesa Reentry Facility (EMRF)</u>
We toured the EMRF on March 20, 2024.  While on site, we observed the following areas:  clinic, incarcerated person housing, mental health, and recreation.   In addition, we observed one of the classrooms and the administrative offices.  While on tour, we witnessed several incarcerated workers doing grounds maintenance as part of the EMRF Landscaping Program.

<u>Rock Mountain Detention Facility (RMDF)</u>
We toured the RMDF on March 20, 2024.  The jail is undergoing major renovation.  In a number of the rooms at the RMDF, we observed large medical equipment and office furniture in the process of being unwrapped and prepared for use.  While on site, we toured the only operational housing unit in use at this time, the medical clinic, and recreation areas.

<u>South Bay Detention Facility (SBDF)</u>
We toured the SBDF on March 20, 2024.  It is a non-booking facility with detention area located under the courthouse.  Many of the incarcerated persons at this facility are awaiting court proceedings.  While on site, we observed incarcerated person housing, medical, and recreation areas.


**Section 6: Scope of Assessment**
The facility inspections and subsequent document and medical record review focused on evaluating multiple components of care delivery that have been identified by correctional healthcare experts as essential for an adequate healthcare delivery system:

- Staffing
    - Nursing
    - Providers
    - Healthcare New Employee Orientation
- Healthcare Services
    - Nursing
        - Intake
        - Nurse Sick Call
        - Infection Control
        - Infirmary Care – Medical Observations Beds (MOB)
    - Chronic Care
    - Ancillary
        - Laboratory
        - Radiology and Medical Imaging
    - Hospital and Specialty Care

**Ex. A-5**

- o Dietary
- o Optometry
- o Wellness Rounds
- o Discharge Planning
- Pharmacy Services
  - o Overview of Pharmacy Services
  - o Discharge Medications
  - o MAT Services
- Quality Management
  - o Policy & Procedure
  - o Quality Assurance
- Records Management
  - o Clinical Documentation and Workflow
  - o Interoperability and Customizations
- Records Review
- Additional Information
  - o National Commission on Correctional Health Care (NCCHC) Standards Compliance Assessment
  - o Mortality Data
  - o Response to Plaintiffs' Reference Citations

Staffing

We evaluated specific elements of staffing which included a review of the medical organizational structure, staffing plan, staffing levels, and training.  These elements were organized into the following sections: Nursing, Providers, Healthcare New Employee Orientation.

Healthcare Services

We evaluated the adequacy and quality of the following services: Nursing (including intake, nurse sick call, infection control, and infirmary care), Chronic Care, Ancillary (including laboratory, radiology, and medical imaging), Hospital and Specialty Care, Dietary, Optometry, Wellness Rounds, and Discharge Planning.

Pharmacy Services

We reviewed the pharmacy services which included discharge medications and MAT.  Also reviewed was the maintenance of controlled substances, distribution and dispensing of medications, medication stock, disposal of pharmaceutical waste, and the medication administration process.

Quality Management

We reviewed SDSO's Policy and Procedure and its Quality Assessment and Quality Improvement (QA/QI) program.

Records Management

We evaluated the functionality and capability of TechCare, the electronic health record (EHR) currently in use at the SDSO.  TechCare is a comprehensive EHR software system tailored specifically to the needs of correctional facilities and is consistent with both community and correctional standards for health information documentation.  This information is provided in the

**Ex. A-6**

following two sections: Clinical Documentation and Workflow and Interoperability and Customizations.

Records Review
Medical record review was required in multiple areas to validate the efficiency, effectiveness, and quality of a particular healthcare activity such as chronic care management. For all chart analyses, a random selection methodology was employed to best represent the population, eliminate bias, facilitate inference, and enhance credibility. The medical records were copied in their entirety and provided in PDF format.  Medical record reviews covered the following areas: nursing sick call, intake process, nursing initial health assessment, non-formulary requests, laboratory order timeliness, provider quality of care, and Plaintiffs' medical care.

Additional Information
We conducted a review of the National Commission on Correctional Health Care (NCCHC) Standards Compliance Assessment as well as relevant mortality data.


**Section 7: Findings**
The findings of this report reveal key insights that significantly contribute to understanding the underlying issues and opportunities related to the medical care services provided at SDSO.

Staffing
The review includes findings in regards to staffing for nursing, providers, and healthcare new employee orientation.

*Nursing*
A strategically structured nurse staffing model forms the cornerstone of delivering high-quality care, playing a pivotal role in patient safety, satisfaction, and overall healthcare outcomes.  Adequate nurse staffing ensures that healthcare facilities can maintain optimal nurse ratios which are critical for monitoring patient conditions, administering medications promptly, and responding swiftly to emergencies.  When nurses are not overwhelmed by excessive workloads, they can provide comprehensive assessments, implement care plans effectively, and engage in patient education, all of which contribute to better patient outcomes and enhanced recovery.  Moreover, a well-staffed nursing team promotes continuity of care, reduces the risk of medical errors, and fosters a supportive environment where nurses can deliver compassionate, personalized care.  By investing in a substantial nursing staffing model, healthcare organizations not only prioritize patient safety and satisfaction but also support the professional growth and job satisfaction of their nursing staff, ultimately leading to improved overall healthcare quality and efficiency.

The SDSO utilizes a robust, predominantly RN-based staffing model, which is atypical for county jails primarily due to significant labor costs associated with RNs.  The SDSO does utilize licensed vocational nurses (LVN) in a restricted scope of practice, primarily centered on aiding in medication administration and performing tasks that require lower-level nursing skills.  This staffing approach ensures that highly skilled RNs are at the forefront of patient care delivery.  Due to their advanced education and training, RNs contribute significant clinical expertise, critical thinking skills, and holistic care approaches to this healthcare program, thereby raising the standard of nursing care beyond what is typically observed in many correctional healthcare programs.  Nursing coverage is achieved with a hybrid shift matrix of 8hour and 12-hour shifts.

**Ex. A-7**

Nursing care delivery models define how nurses organize and distribute work with the purpose of providing efficient care in a particular healthcare environment.

The current nursing care delivery model employed by the SDSO Nursing Leadership group is a functional team nursing care delivery concept.  The team nursing model with assigned patient care areas is designed to ensure continuity and efficiency in healthcare delivery by organizing nursing teams around specific patient care areas.  In this model, RNs lead a team that includes RNs, LVNs, and nursing assistants (NA).  Each team is responsible for a designated group of IPs within a unit or area, allowing them to develop familiarity with IPs' needs, baselines, and care plans.  This approach facilitates personalized care and enhances patient outcomes by ensuring consistent nursing presence and continuity throughout the patient's stay.  RNs oversee the coordination of care, delegate tasks according to each team member's capabilities, and collaborate closely with other healthcare disciplines to address complex patient needs comprehensively.  By assigning specific patient care areas to nursing teams, the team nursing model promotes effective communication, shared accountability, and a supportive work environment where healthcare providers can collaborate efficiently to meet the diverse healthcare needs of their incarcerated population.

Nursing leadership is provided under the direction of the Deputy Director of Residential Inpatient Care Facilities who is an RN.  Frontline supervision is provided by Supervising RNs.  The following chart is an overview of all allocated SDSO's Nursing Department positions as well as vacancy rates from January 2024 through April 2024.

### San Diego Sheriff Department - Nursing Services Staff Allocations

| | | Supervising Registered Nurse | Registered Nurse | Licensed Vocational Nurse | Certified Nurse Assistant |
|---|---|---|---|---|---|
| Allocated | | 27 | 238 | 94 | 20 |
| Vacant | Jan-24 | 9 | 49 | 34 | 3 |
| | Feb-24 | 9 | 51 | 32 | 3 |
| | Mar-24 | 9 | 50 | 32 | 3 |
| | Apr-24 | 14 | 47 | 36 | 3 |
| | | 10.25 | 49.25 | 33.5 | 3 |
| | | 37.96% | 20.69% | 35.64% | 15.00% |

| Average Vacancy Per Skill Mix | |
|---|---|
| Average Vacancy (%) | |
| Overall Vacancy (%) By Month | |
| Jan-24 Feb-24 | 25.07% |
| | 25.07% |
| Mar-24 | 24.80% |
| Apr-24 | 26.39% |

During this timeframe, the average nursing vacancy rate of approximately 25% at the SDSO is generally similar to or slightly lower than that of other healthcare facilities in Southern California which typically range from 20% to 30% depending on the location and type of facility.  It is noteworthy that historically, nursing vacancy rates in correctional healthcare settings tend to surpass those in the surrounding community healthcare settings.  The trending vacancy rate observed at the SDSO signifies a comparatively healthy nurse staffing scenario.  This lends itself to

**Ex. A-8**

improved continuity of care, reduced workload burden on current staff, better patient outcomes, and a more stable healthcare environment overall.

SDSO Nursing Leadership employs various staffing tools to address licensed vacancy rates, including overtime and supplemental agency staffing resources.  When a staffing challenge arises, overtime is offered in advance as an incentive for coverage.  For longer-term vacancies or regular interval coverage needs, SDSO utilizes the services of United Nursing International Healthcare Recruiters "Uni" to provide licensed agency nurses for the mission critical positions.  Due to the complexity of the SDSO medical program, agency staff are assigned specific task-oriented roles to minimize orientation time and maximize their effectiveness.  These measures ensure that IPs' care remains uninterrupted, and that the nursing workforce is supported, particularly during periods of increased demand or long-term staff vacancies.

*Providers*
The SDSO operates a hybrid model of healthcare delivery. Currently, the SDSO is responsible for nurse staffing, as noted above, as well as the ancillary support staff for Information Technology (IT) and case management. NaphCare Pharmacy, located in Birmingham, Alabama, is responsible for dental and mental health staffing, the MAT program, Utilization Review (UR), and pharmacy. Correctional Healthcare Partners (CHP) is responsible for all on-site medical provider services.

I spoke with Dr. Freedland on July 5, 2024, after having reviewed both his deposition and the new CHP contract which commenced on June 1, 2024. The new contract with CHP, which had previously been a sub-contractor to NaphCare, was implemented at the behest of the county in an effort for the SDSO to have more direct accountability for the on-site provider services. To that end, the SDSO has increased the provider coverage from 11.8 to 28.4 Full-Time Employees (FTE) or 472 coverage hours per week to 1096 hours per week. The CHP contracted staffing hours can be found in **Appendix F.**  This monumental change represents a greater than 100% increase in the volume of provider coverage at the SDSO facilities.

*Healthcare New Employee Orientation (NEO)*
A comprehensive NEO program is crucial for correctional healthcare professionals particularly transitioning from non-correctional settings to correctional healthcare positions.  Such a program serves multiple vital purposes.  Firstly, it familiarizes new hires with the unique operational and security protocols specific to the correctional facility, ensuring they understand the environment's nuances and safety measures.  This knowledge is essential for maintaining a secure and controlled healthcare environment.  Secondly, the orientation program educates healthcare professionals about the diverse patient population within correctional facilities.  It emphasizes the importance of cultural sensitivity, confidentiality, and respectful care delivery in a setting where patients may have complex medical, mental health, and social needs.  Understanding these aspects of correctional healthcare fosters empathy and enhances the quality of care provided.

Moreover, a robust orientation equips healthcare professionals with the knowledge of legal and ethical considerations inherent to correctional healthcare.  It ensures adherence to regulatory requirements, such as confidentiality laws and incarcerated person rights, safeguarding both patient well-being and professional integrity.  Furthermore, the orientation program facilitates the integration of new employees into interdisciplinary teams within correctional facilities.  This collaboration is essential for coordinated patient care and effective communication across different departments all with unique missions of their own.

**Ex. A-9**

Upon reviewing the SDSO's NEO process, including its timelines and structured syllabus, it was observed that their NEO process not only incorporates all these essential elements highlighted above, but frequently surpasses the standards seen in healthcare staff orientations across correctional facilities nationwide.  New hires undergo a comprehensive four-week classroom orientation that covers all facets of correctional healthcare, including simulated clinical activities and skills competency validations. This is followed by targeted on-site orientation with a designated preceptor.  In-service training extends beyond new hire orientation with annual topics offered throughout the year to emphasize critical program subjects.

<u>Healthcare Services</u>
The following services were reviewed and evaluated: Nursing Services, Ancillary Services, Hospital and Specialty Services, Chronic Care Services, and Optometry Services.

*Nursing Services*
The nursing service findings have been consolidated into the following: Intake, Nurse Sick Call, Infection Control, and Infirmary Care.

**Intake**
The intake screening process of newly incarcerated individuals upon arrival to a correctional facility holds significant importance in both clinical and operational contexts.  This initial assessment serves as a critical opportunity to gather essential information about the incarcerated individual's medical history, mental health status, and any immediate healthcare needs.  It allows healthcare providers to identify and address acute medical conditions or emergencies promptly, ensuring the safety and well-being of the incarcerated population as well as that of the staff.  Moreover, intake screenings provide valuable insights into chronic health conditions, substance use disorders, and infectious diseases that may require ongoing management or treatment within the correctional facility.  Beyond medical considerations, these assessments also play a pivotal role in identifying mental health issues such as depression, anxiety, and or suicidal ideation, which require specialized care and intervention.  By conducting thorough intake screenings, correctional healthcare providers can establish a baseline for each incarcerated individual's health status, initiate appropriate plans of care, and facilitate continuity of care throughout their incarceration.  This proactive approach not only supports the health and safety of incarcerated individuals but also contributes to the overall management and efficiency of the healthcare delivery system within the correctional setting.

As the first step in the intake process at all three intake processing locations (VDF, SDCJ, and LCDRF), IPs are scanned with the TEK 84 Intercept body scanner which is the latest body scanning technology system.  This advanced system is utilized to scan most IPs (unless medically contraindicated such as pregnancy) and their belongings to identify and prevent the introduction of contraband such as weapons, drugs, or other prohibited items into the SDSO correctional facilities.

The intake process is conducted with the SDSO's TechCare EHR.  The TechCare EHR platform utilizes multiple efficiencies by automatically generating follow-up reminders and appointments based on user responses, ensuring timely and appropriate access to healthcare.  Furthermore, the intake documentation module assists healthcare staff by guiding them through a series of predefined assessments, ensuring consistency and continuity of care for IPs.

The RN responsible for intake processing initiates the triage assessment for all individuals brought in for booking by local law enforcement to ascertain their jail admission medical clearance eligibility

9

**Ex. A-10**

or "Gate Refusal." This process ensures that all individuals are medically stable before commencing the formal intake screening procedure. Individuals meeting the criteria for Gate Refusal are not admitted. Instead, they are directed to the Emergency Department to undergo evaluation and treatment if indicated to obtain medical clearance.

The subsequent step of the intake process at the SDSO involves receiving screening during which IPs undergo a structured medical inquiry and observation process. This aims to pinpoint potential emergent and routine medical, mental health, and substance abuse concerns for further focused assessment and ongoing treatment. Immediate and routine referrals are arranged for further evaluation based on the assessment and observation findings conducted by RNs.

The RN also functions as the "Gatekeeper" in the absence of an on-site Qualified Mental Health Provider (QMHP), a role designated by the SDSO. In this capacity, the RN's assessment findings address immediate medical needs, mental health concerns, and suicide risks, ensuring that IPs receive appropriate medical attention and are placed in safe housing based on their health status. At the SDSO, color-coded passes on booking slips and wristbands are utilized to provide universally understood visual cues to both sworn custody staff and health services staff. Upon identifying a mental health concern, such as potential self-harm or suicide risk, the Gatekeeper determines placement into one of the Detention Safety Programs housing options, which include Safety Cells, Enhanced Observation Housing, PSU, and Medical Observation Cells. This process is communicated verbally in real-time and reinforced with the visual priority cues through color-coded passes and wristbands.

Housing options offer varying levels of observation and enhanced healthcare services. For IPs actively engaging in self-harm or assaultive behaviors, Safety Cells provide a therapeutic environment with padded walls and minimal fixtures to eliminate objects that could be used for self-injury. IPs with significant mental health concerns are placed under constant direct observation, ensuring continuous monitoring and immediate care. Enhanced observation housing is used for IPs requiring closer supervision, offering a more secure and supportive environment. These measures ensure that vulnerable IPs receive the necessary care and attention, mitigating risks and promoting overall safety within the facility.

As part of the receiving screening process, all IPs are screened and tested for tuberculosis (TB) and female IPs undergo pregnancy testing. IPs have the option to test for COVID-19 and influenza (as seasonally appropriate). Urine drug screening is also at their discretion. Additionally, COVID-19 and influenza vaccinations are offered to all IPs (as seasonally appropriate).

The receiving screening process at SDSO evaluates the past and present substance use of each IP. Individuals identified with current substance use or with positive drug screen urinalysis results are promptly assessed utilizing the "Detox Screening Tool" and are referred for monitoring of withdrawal symptoms as well as medical drug detoxification, as medically indicated. Withdrawal symptoms are assessed at a minimum of once daily utilizing withdraw assessment tools which include the Clinical Institute Withdrawal Assessment (CIWA) and/or the Clinical Opiate Withdrawal Scale (COWS). RNs complete the appropriate withdrawal assessment tool(s) and refer each assessment for review by the on-site medical provider or on-call medical provider, StatCare, for review, feedback, and/or orders.

Of clinical note, both the CIWA and COWS are widely recognized and utilized tools in the field of addiction medicine and psychiatry. The CIWA is a validated tool used extensively in clinical

10

**Ex. A-11**

settings to assess the severity of alcohol withdrawal syndrome. Comprising of ten items that evaluate symptoms such as agitation, anxiety, tremor, and nausea, the CIWA provides a structured approach for healthcare providers to monitor and manage patients undergoing alcohol detoxification. By quantifying withdrawal symptoms, the CIWA helps guide treatment decisions, including the initiation and titration of medications to alleviate symptoms and prevent complications associated with severe alcohol withdrawal. Its widespread adoption in both research and clinical practice underscores its reliability and utility in ensuring safe and effective management of alcohol withdrawal syndrome.

The COWS is a widely recognized assessment tool utilized in healthcare settings to evaluate the severity of withdrawal symptoms in patients withdrawing from opioids. Developed to provide a standardized approach, the COWS consists of eleven items that assess symptoms such as sweating, pupil size, bone or joint aches, and gastrointestinal upset. By quantifying these symptoms, healthcare providers can determine the appropriate course of treatment and medication management to alleviate withdrawal discomfort and facilitate the detoxification process. The COWS is valued for its reliability and validity in clinical practice, assisting healthcare professionals in making informed decisions to support patients through the challenges of opioid withdrawal. Its structured assessment format ensures consistency in evaluating withdrawal severity, contributing to more effective and personalized patient care strategies.

The SDSO's comprehensive TB screening process is recognized as a model of best practice within the correctional environment. This model includes both symptom screening and radiology screening using Chest X-rays (CXR). Typically, CXRs are interpreted by a radiologist, and the results are communicated to the SDSO medical staff within 4 to 6 hours. IPs with CXR results indicating suspected TB undergo additional laboratory testing with a QuantiFERON-TB Gold test. Pregnant IPs receive precautions to minimize radiation exposure and undergo a purified protein derivative skin test (PPD) instead of a CXR. IPs showing Tuberculosis (TB) symptoms or with positive CXR or PPD results are promptly isolated in negative pressure rooms and undergo definitive confirmatory testing with sputum cultures.

Pharmaceutical treatment is then initiated as medically indicated. During the SDSO's intake process, IPs are informed about the availability of health services, including how to access emergency and nonemergency care. IPs are also educated on how to request their healthcare information and informed about their right to file a grievance if they are dissatisfied with the healthcare services received. Following this, a comprehensive IP orientation video is shown multiple times daily in both English and Spanish. This video offers a detailed overview of information about the SDSO jail operations, its programs, and the rules and regulations that IPs will encounter during their confinement. Additionally, it provides supplementary information about healthcare services while reinforcing what was discussed during intake.

Upon completion of the intake process, all IPs are scheduled within 14 days from intake for an initial health assessment. These assessments serve as the foundation for ongoing healthcare provision and ensure that IPs receive timely and appropriate medical care and attention while in custody. These comprehensive health history and physical exam assessments are conducted by a RNs. IPs are referred to a medical provider for further evaluation of any positive assessment findings.

A random selection process was initiated to audit 75 IP health records from a pool of 121 records. See **Appendix G**. The audit aimed to evaluate compliance with the SDSO's intake screening process, focusing on several key aspects: confirming the time elapsed from booking into the facility

**Ex. A-12**

to the nurse's intake screening assessment; ensuring all positive screening findings were appropriately referred for further evaluation; and verifying that chronic and critical medications identified at intake were reconciled accurately.  As a secondary component of this audit, the same 75 IP health records were reviewed to ascertain if the initial health assessment, which includes a health history and physical examination, was performed with 14 days from initial intake date. See **Appendix H.**

The audit findings reflect that IPs typically received their intake receiving screening evaluations by nursing staff in less than one hour from their booking time.  Furthermore, 96% of the 75 records audited demonstrated compliance with all the elements detailed above.  Similarly, the secondary audit showed a high level of compliance among IPs who stayed in custody for 14 days or more.  Of the 75 records audited, only 11 involved stays of 14 days or longer, and all required initial health assessments were completed within this time frame.  Given the typically transient nature of the jail population, most IPs were released from custody well before reaching the 14-day mark.

The SDSO excelled in both facets of this comprehensive audit, highlighting their successful implementation of and commitment to rigorous healthcare procedures they have enacted.  These results underscore their dedication to ensuring prompt, thorough, and consistent intake receiving screenings and initial health assessments for their patient population.

**Nurse Sick Call**

In correctional healthcare environments, the nurse sick call process plays a crucial role in ensuring the well-being of incarcerated individuals.  This structured system allows incarcerated persons to request medical attention for various health concerns, ranging from minor ailments to more serious conditions. By promptly addressing these requests through nurse triage and evaluation, the sick call process helps mitigate potential health risks within the confined setting of a correctional facility. Early detection and intervention can prevent the escalation of health issues, reduce the spread of communicable diseases, and promote overall incarcerated person health and safety.  Moreover, the nurse sick call process fosters trust and communication between healthcare providers and incarcerated individuals, supporting a therapeutic environment where healthcare needs are addressed in a timely and respectful manner.  This process not only fulfills ethical and legal obligations to provide healthcare to all individuals but also contributes to the broader goals of rehabilitation and reintegration by promoting continuity of care and addressing health disparities among incarcerated populations.

The IPs within the SDSO jail system have the ability to access sick call seven days a week (including holidays) via submission of an SDSO Health Care Request (Form-212). To ensure the privacy of health information, IPs place the forms in locked, red medical sick call boxes which are located in the housing common areas.  Healthcare staff collects the Health Care Request forms daily and date stamp upon receipt.  Within 24 hours of receiving the health care request form, an RN conducts a triage. Urgent healthcare complaints are promptly identified for immediate evaluation while routine, non-urgent medical issues are scheduled within 24 hours for a face-to-face physical assessment with an RN.  Mental health service requests are directed to Mental Health for review and follow-up after triage.

During the face-to-face assessment with the RN, the IP is evaluated and treated in accordance with the appropriate Standard Nursing Procedures protocol, based on their symptoms. Complaints that are considered beyond the scope of practice of the RN or fall outside of a Standard Nursing Procedures protocol are referred to a medical provider for further evaluation and treatment.

**Ex. A-13**

A random selection process was undertaken involving 25 IP records selected from a pool of 120 to verify the timely access to care for nurse sick call requests.  See **Appendix I**. This audit aimed to validate that IPs who submitted healthcare requests received prompt attention, with nursing staff triaging each request within 24 hours.  Furthermore, the audit assessed whether RNs completed face-to-face encounters within 24 hours from the initial triage, addressing patient needs promptly and effectively.  Additionally, the audit confirmed whether necessary referrals were made based on clinical indications, thus ensuring comprehensive and timely healthcare delivery within the facility.

Out of the 25 IP charts audited, 24 were found to be fully compliant, with only one chart showing noncompliance.  The non-compliant case was identified as having been triaged outside the 24-hour timeframe from receipt of the healthcare request form.  The patient was scheduled to be seen at 48 hours for a complaint of right shoulder pain.  However, this particular patient refused treatment.  A subsequent review of the medical records showed that the IP had no particular negative outcome associated with his refusal.

This resulted in an overall audit score of 96% compliance with the SDSO's nurse sick call procedures which highlights their solid processes implemented to ensure that their healthcare program provides timely and comprehensive healthcare services to its IP population.

**Infection Control**
Infection control practices are paramount in a jail environment to safeguard the health and well-being of both incarcerated individuals and staff.  Due to the close quarters and frequent interactions among these individuals, jails are susceptible to the rapid spread of infectious diseases.  Effective infection control measures and timely identification and isolation of infectious cases are crucial in preventing transmission and outbreaks.

As emphasized throughout this document, particularly with their intake processes, the SDSO has implemented all the necessary elements for a thorough and effective infectious and communicable disease surveillance program.  Monitoring and case management of these program components are provided by a team consisting of a Supervising RN and two additional RNs under a shared service model for the entire program.  This staff is further augmented by the County's Medical Liaison Unit which provides additional resources in the management of occupational and bloodborne pathogen exposures.  Further surveillance activities include regular weekly ectoparasite inspections and monthly environmental health inspections conducted by the nursing department.

**Infirmary Care – Medical Observation Beds (MOB)**
MOBs play a crucial role in the healthcare system of jails by providing a controlled environment for monitoring incarcerated individuals who require close medical attention or observation.  These beds are specifically designed to accommodate incarcerated individuals with acute medical conditions, mental health crises, or those recovering from medical procedures.  By placing incarcerated individuals in MOBs, the healthcare team can closely monitor their vital signs, administer medications, and promptly address any emergent health issues.  This proactive approach not only ensures the safety and wellbeing of incarcerated individuals but also helps prevent escalation of medical emergencies that could otherwise strain resources or lead to more serious complications or off-site trips to area hospitals.  Moreover, MOBs facilitate continuity of care within the jail's healthcare system, allowing for timely interventions and appropriate medical

13

**Ex. A-14**

management tailored to the unique needs of the incarcerated population. Thus, these beds are indispensable in supporting the overall health and safety objectives of a large county jail system.

The SDSO has strategically positioned a strong complement of 113 MOBs in four of its seven locations countywide. As part of this complement of MOBs, 23 rooms are equipped with negative pressure systems, specifically used to house IPs with infectious diseases transmitted through airborne means, thereby preventing their spread. Furthermore, two rooms are equipped with positive pressure systems, a unique and rare capability in jail medical programs. Positive pressure rooms are utilized for patients with compromised immune systems by creating an environment where air pressure inside the room is higher than outside, preventing the entry of airborne contaminants and maintaining sterility. utilized for patients with compromised immune systems.

The breakdown of MOBs within the SDSO system is as follows:
- The VDF has total of 15 MOBs (including five negative pressure rooms)
- The LCDRF has a total of 22 MOBs (including five negative pressure rooms and one positive pressure room)
- The GBDF has a total of 59 MOBs (including eight negative pressure rooms)
- The SDCJ has a total of 17 MOBs (including five negative pressure rooms and one positive pressure room)

The SDSO is in the process of refining their patient acuity rating system which evaluates the severity of an IP's medical conditions on a scale from one to three, where one indicates the highest acuity and three the lowest. These acuity parameters consider factors such as vital signs, diagnosis, and necessary treatments, and will aid healthcare providers in prioritizing and efficiently allocating resources.

Admission to MOBs generally necessitates orders from medical providers, though RNs can admit IPs for up to 24 hours of observation. In these instances, SDSO procedures mandate that the provider conducts a face-to-face encounter and assessment of the IP for continued admission. Medical providers are responsible for discharging patients from MOBs. Case management of MOB and IPs is provided by SDSO nursing leadership with multidisciplinary team meetings as medically indicated.

Documentation requirements in MOBs meet expected standards of care and encompass mandatory admission notes for both providers and nursing staff. Ongoing nursing assessments, including vital signs, and provider assessments are conducted based on the acuity rating of the IP. The TechCare EHR system includes prompts and mandatory fields to ensure consistency and continuity in assessments and notes conducted by their healthcare staff.

*Chronic Care*
County jails are the entry point for all sentences making it a crucial setting to identify and treat chronic conditions. As mentioned, jail represents a unique opportunity to provide care to a population who may have previously neglected their healthcare. Compared to people residing in the community, incarcerated individuals are more likely to have a chronic condition, with hypertension being the most common one. For individuals entering jail who are already on chronic care medications, jails must have processes in place to order these medications to prevent interruptions in treatment. A total of 81 medical records for IPs with chronic care conditions were reviewed to assess the quality of care being provided and to determine if the standard of care was

**Ex. A-15**

met. See **Appendix J**. The records were reviewed outside of the EHR; therefore, the full functionality of the SDSO EHR system could not be discerned.

When an IP is booked into the SDSO, an RN immediately conducts a receiving screening. During this screening, the IP is assessed for any known chronic medical conditions, and current medications are identified through Surescripts. After the RN conducts the receiving screening at the time of booking, a provider, either one onsite or one available 24/7 through StatCare, places orders to continue the IP's medications for chronic medical conditions. There was strong evidence in the records reviewed that the process of ordering medications at intake occurs promptly, preventing any lapses in therapy. The intake provider also places orders to monitor chronic conditions such as blood pressure checks for patients with hypertension or finger-stick checks for patients with diabetes. The records also reflected that this process ensured close monitoring of new intakes with chronic medical conditions.

Chronic care visits are conducted at regular intervals based on the level of disease control. Suggested lab orders are included in the chronic care template. Outside of scheduled chronic care visits, the providers review vital signs and lab results, including finger-stick checks, and adjust the IP's individualized treatment plans as clinically indicated. In the medical records reviewed, documentation demonstrated that the providers adjusted medications even outside of chronic care appointments based on the IP's current level of disease control. Records showed that RNs, advanced practice providers, and physicians addressed sick call requests. StatCare providers were important in promptly addressing some of the sick call requests.

If the IP has a medical condition that requires specialized knowledge or treatment beyond what can be provided by the jail medical staff, the provider refers the IP to a specialist. The medical records contained multiple specialty referrals for patients requiring a higher level of care. Examples of these referrals included: an Ear, Nose, and Throat (ENT) referral for unilateral hearing loss; an ophthalmology referral to screen a patient for diabetic retinopathy; and a cardiology referral for a patient who reported a history of heart disease. Furthermore, there was documentation indicating that diagnostic imaging was ordered which included: an MRI to evaluate an IP's shoulder pain; an abdominal ultrasound to evaluate an IP's abdominal pain; and a venous doppler to rule out a deep vein thrombosis (DVT). Upon return from a specialist appointment, the records are obtained and reviewed by the jail medical provider usually within one day. Any treatment recommended by the specialist is initiated. The records reviewed had documentation to support that this process worked exceptionally well. Specialists' notes were being reviewed, and recommended treatments were ordered.

Overall, the providers were attentive to the chronic care conditions of the IP records reviewed. The standard of care was followed in 93% of cases reviewed. In the remaining 7% of cases, there were minor deviations from the standard of care. These were predominately related to not adhering to the latest clinical practice guidelines for a condition, rather than creating any direct harm to an IP. Improving the standard of care is an ongoing process for all healthcare organizations as medical knowledge and guidelines are constantly evolving.

During my conversation with Dr. Freedland on July 5, 2024, he indicated that CHP is in the process of developing Disease Management Guidelines (DMG) to help standardize chronic care management. Additionally, he said that the EHR chronic care templates are being considered for revision to facilitate treatment goals. Overall, there was evidence of high-quality care being provided to the IPs in the SDSO.

**Ex. A-16**

*Ancillary Services*
SDSO has on-site resources for all IPs that support the level of health care providers order for both diagnostic studies and related ancillary services. Such services include, but not limited to, laboratory, radiology, dietary, optometry, dialysis, and woman's health clinic to include OB-Gyn evaluations. Appropriate access to ancillary services is an integral component of a high functioning correctional healthcare system.

**Laboratory**
Laboratory diagnostics are a critical element in clinical diagnosis and management. NaphCare contracts with Quest Diagnostics for laboratory services. Providers document lab orders, both STAT and routine, in the IP's electronic health record. Orders are documented by nursing and the IP is scheduled for specimen collection. Specimens are prepared and placed in a designated area of the facility where they are retrieved by Quest and processed.

Study results are documented in report format and electronically imported into the IP's medical record. These results are also immediately available to providers and all authorized clinical support staff. Critical lab results are called into the facility and the on-site nurse is responsible for contacting the provider or StatCare for intervention as necessary. A review of randomly selected records of incarcerated persons in the SDSO jails demonstrated that orders for labs were processed in a timely manner, results were completed and made readily available, and reviewed by clinical staff. The average time from specimen submission to results returned to the medical record was 1.5 days. This turnaround time is consistent with the community and industry standards.



**Radiology and Medical Imaging**
On-site radiology services are available to all SDSO IPs. Each intake unit has a radiology equipment and a radiology technician to perform chest radiography for TB screening as well as routine diagnostic studies. NaphCare Radiology provides mobile diagnostic radiology service that travels to all SDSO facilities. If IPs have an emergent radiology need, they are referred to the local emergency room.

Ex. A-17

All radiographic studies are sent for professional interpretation by a radiologist. Results are received by facility healthcare staff and scanned into the incarcerated persons' EHR. Similar to critical lab results, all emergent abnormal radiographic findings are phoned into the facility. Facility nursing staff is responsible for contacting the on-call provider or StatCare to ensure appropriate follow-up care is ordered. A review of randomly selected records of incarcerated persons in the SDSO jails demonstrated that orders for radiology studies were processed in a timely manner, results were completed and made readily available, and reviewed by clinical staff. The average time from study completion to report availability was approximately 23 hours. This turnaround time is consistent with the community and industry standards.



### Hospital and Specialty Care

Many IPs enter jail with untreated or poorly managed medical conditions, including chronic diseases like diabetes, hypertension, and heart disease. Their care needs extend beyond primary care management and require specialist intervention, from services such as orthopedic surgery, cardiology, and gastroenterology. Access to specialty and hospital care ensures these conditions are appropriately managed, preventing complications, and promoting better health outcomes. Additionally, in the event of medical emergencies, immediate access to hospital care can be lifesaving. Conditions such as heart attacks, strokes, severe infections, or traumatic injuries require rapid and advanced medical interventions that cannot be provided within the jail. Timely access to hospital and specialty care services are essential for a high functioning correctional healthcare system as per the NCCHC and the ACA standards.

The SDSO contracts with NaphCare for management of sub-specialty and hospital services. NaphCare utilizes contracts with the University of California San Diego, as well as several independent practitioners to provide specialty services locally. See **Appendix K**. Additionally, NaphCare provides telehealth specialty consultations in endocrinology, dermatology, cardiology, dentistry, infectious disease, orthopedics, and nephrology for clinically appropriate patients.

17

Obstetrics care is provided by Dr. Lali Reddy, who works two days per week at LCDRF. Additionally, Dr. Nazret Weldeghiorgis provides full-time optometry care at SDSO facilities.

The following list of specialty services was provided to SDSO IPs during March 2023 to April 2024.

| Specialty Clinics Services Completed from March 2023 to April 2024* | | |
|---|---|---|
| Allergy Clinic | Infectious Disease | Prosthetics & Orthotics |
| Breast Clinic | Infusion Center | Pulmonology |
| Burn Clinic | Interventional Radiology | Radiology |
| Cardiology | Laboratory | Radiology CT SCAN |
| Cardiology- Electrophysiology | Nephrology | Radiology- Interventional |
| Cardiothoracic | Neurology | Radiology- Mammography |
| Corp Dental Consultant | Neurosurgery | Radiology- MRI |
| Corp Endocrine Consultant | Nuclear Med | Radiology- PET Scan |
| Corp Infect Disease Consultant | Obstetrics | Radiology- Ultrasound |
| Corp Nephrology Consultant | Obstetrics- High Risk | Rheumatology |
| Corp Orthopedic Consultant | Oculoplastic | Sleep Clinic |
| CT Chest | Oncology/Hematology | Surgery- Colorectal |
| Dermatology | Ophthalmology | Surgery- General |
| DME | Ophthalmology- Cornea Clinic | Surgery- Oral Maxillofacial |
| Echocardiogram | Optometry | Surgery- Outpatient |
| Electrophysiology Clinic | Orthopedics | Surgery- Vascular |
| Endocrinology | Orthopedics- Hand | Tele-Psych |
| ENT (Ear, Nose, Throat) | Orthopedics- Spine | Therapy- Rehab |
| Gastroenterology | Orthopedics- Trauma | Therapy- Speech Therapy |
| GYN Oncology | Other (see comments) | Therapy-Occup Therapy |
| Gynecology | Pain Management | Therapy-Physical therapy |
| Heart Station | Planned Parenthood | Trauma |
| Hepatology | Plastic Surgery Resident | Urology |
| HNS (Head & Neck) | Plastics | Wound Care |
| HIV Clinic/Infectious Disease | Podiatry | |

*Includes offsite, onsite, and telemedicine

SDSO completed 2,664 sub-specialty referrals between March 2023 to April 2024. All emergent consultations are sent to the local emergency room to ensure timely care for critical services. The average time from consult origination to completion is approximately 25 days. The majority of off-site specialty care is delivered at University of California San Diego (UCSD) East campus with the rest being delivered at Tri-City Hospital. In discussion with Dr. Nas Rafi, CHP Medical Director and

Ex. A-19

San Diego resident, she indicated that in her personal and professional experience this time frame for subspecialty access was comparable to what existed in the community.

| Completed Specialty Appointment Access Timeframes (May 2023 to April 2024) | | | |
|---|---|---|---|
| Modality | Total Number | Order to Appt (Avg. # Days) | Order to Completion (Avg. # Days) |
| Offsite | 1290 | 35.3 | 45.2 |
| Telemedicine | 237 | 26.7 | 40.4 |
| Onsite | 1137 | 14.1 | 18.9 |
| All Completed Specialty Appts | 2664 | 25.3 | 33.6 |

In addition to the sub-specialty care services noted above, SDSO contracts for Hospital Guard Units (HGU) to ensure appropriate clinical bed space is available for high acuity medical patients:

- UCSD Health East Campus Medical Center (formerly known as Alvarado)
- Tri-City Hospital

These units are contained within the hospital facilities and are used specifically for IPs. They have designated SDSO correctional officers that provide security.

UCSD Health East Campus Medical Center has a total of ten custody beds on the 4th floor that are shared with California Department of Corrections and Rehabilitation (CDCR). SDSO is allocated eight beds and if CDCR is not utilizing their beds, SDSO can have access to ten beds. Currently, the custody floor at UCSD Health East Campus is not being utilized.

The Tri-City Hospital HGU, located on the 3rd floor of the facility, provides up nine beds for SDSO use.

It is evident from the specialty care data provided from the medical record reviews, and corroborated by Drs. Rafi and Freedland, that SDSO has enough contracted sub-specialty, diagnostic care resources, and high acuity medical beds to provide adequate and timely access to specialty care for IPs requiring those services.

**Dietary**
Therapeutic diets can be ordered by SDSO medical providers.  An updated list of all incarcerated persons who have been ordered a therapeutic diet is provided to the jail food service office to facilitate proper meal preparation.  The SDSO has a licensed dietitian that reviews all menus and ensures food services plans meals appropriately.  The list of incarcerated persons approved for therapeutic diets was readily available upon the facility inspection.

**Optometry**
Providing prescription eyeglasses is an important part of any correctional healthcare delivery system. Corrective lenses address visual conditions such as myopia (nearsightedness), hyperopia (farsightedness), and astigmatism. Access to prescription eyewear significantly improves the quality of life for incarcerated persons, allowing them to read, write, and participate in educational and vocational programs.

SDSO provides timely access to optometry and other ophthalmologic services. SDSO contracts with multiple eye care specialists to ensure that the IP population has access to necessary services and corrective lenses. Below is the list of specific vision specialty providers contracted through NaphCare.

| Company | Services |
|---|---|
| Institutional Eye Care, LLC | Vision services |
| National Eye Care | Eye care services |
| Retina Center of San Diego | Medical and surgical retina care |

In addition to the above-mentioned off-site resources, SDSO employs a full-time optometrist to ensure timely access to refractive services. IPs who require reading glasses, can obtain them through the sick call process. SDSO nursing staff are able to distribute reading glasses as clinically indicated to all IPs.

The number of prescription eyeglasses provided to IPs was reviewed for calendar year 2023 and year to date through June 2024. The increase in prescription eyeglasses increases significantly in February coinciding with the addition of the SDSO optometrist.



It is abundantly evident from the data provided that SDSO supplies IPs with medically required eyeglasses.

**Wellness Rounds**

The SDSO has created a leadership-driven multidisciplinary team that makes weekly rounds in Administrative Separation (AdSep). These rounds occur 52 weeks a year. This practice called "Wellness Rounds" is a correctional health best practice. The Wellness Rounds team will individually walk to each IP's cell, attempt to engage the IP, ask the IP if they need anything, and encourage them to exit their cell. The team utilizes trained IPs to clean the cell and remove refuse or food items, and perform additional cleaning as required. The IP's cell is assessed by custody and mental health staff. The IP's medical and mental status, clinical functioning, and activities of daily living are assessed by medical and mental health staff.

The Wellness Rounds Team consists of Individuals from the following:
    i.    mental health
    ii.   medical (typically the jail facility nursing leadership)
    iii.  counselor staff (in particular, the counselor staff focus on helping the IP obtain reading materials, answer any questions or concerns and assist with any court related issues or concerns, questions re: discharge planning, and follow-up)
    iv.  sworn staff
    v.   JPMU (jail population management unit) designee who is available to address classification and housing issues
    vi.  2-3 IP trustees (to remove trash and used items and to sweep the cell)

Wellness rounds can enhance IPs' health by ensuring regular monitoring, early detection of issues, and more personalized care. SDSO's proactive approach can lead to better overall health outcomes, increased safety, and reduced emergency situations.

**Discharge Planning**
Medical and mental health discharge planning is critical in correctional settings because incarcerated individuals often have complex health needs, including chronic medical conditions, mental health disorders, and substance use issues. Many IPs have not received adequate healthcare in the community prior to incarceration, so bridging the gap to ensure continuity of care by connecting individuals with community resources, healthcare providers, and social services, can improve clinical outcomes. Many IPs have communicable diseases such as HIV, or Hepatitis C and availability of medications is critical in helping maintain continuity of care for these populations, thereby reducing public health risk.

The SDSO Reentry Services Division (RSD) has a robust discharge planning program that ensures IPs have resources available to them upon discharge from SDSO. According to a deposition dated April 23, 2024, with Patricia Ceballos, the Reentry Services Manager for SDSO, each SDSO facility has counselors that are responsible for case management and linking IPs to community-based organizations. In total, SDSO has approximately 40 correctional counselors spread across the seven facilities. Programs and services are offered in either a group setting or one-on-one.

RSD assists with transitional care for IPs that self-refer or are referred by SDSO medical and mental health staff. RSD will then make appropriate referrals to community-based agencies and partners. According to Bridget Wright, a Program Coordinator at RSD, they provide referrals and linkage to services including Substance Use Disorder Treatment Programs, Housing, Behavioral Health Services (including counseling, medication management), Vocational Support Services, Human Trafficking Survivor Services, and Family Supportive Services.

RSD also has a partnership with Health and Human Services Administration (HHSA) to provide services to the IPs who are undergoing MAT therapy or who have other behavioral health needs. In addition, as part of a new initiative to provide better coordination with the California's Medicaid health care program, Medi-Cal, they are working with community-based organizations to provide behavioral health services for those IPs that are eligible for Medi-Cal.

The MSD ensures that all dialysis patients have services available to them when they are discharged from SDSO. MSD is also responsible for ensuring that discharge medications are coordinated with local pharmacies. IPs are provided with a prescription card upon discharge with

**Ex. A-22**

instructions on how to obtain a 30-day supply of their medications from a local retail pharmacy. Prescriptions for chronic medications and the remaining supply of acute medications such as antibiotics are transferred to a local pharmacy, billed to the county, and picked up by the IP after release. In addition, all IPs are provided with a Narcan voucher which can be redeemed at one of several local pharmacies along with instructions for use.

Below is an example of a patient Prescription Card for discharge medications.



Discharge planning is challenging in the jail environment, due to the brief length of stays and the immediacy of which IPs are released from the facility. Despite those challenges SDSO RSD and MSD work together in a coordinated effort to ensure that IPs can access social and medical services in the community in a timely manner.

Pharmacy Services
The review of pharmacy services is presented in the following sections: Overview of Pharmacy Services, Discharge Medications, and MAT Services.

*Overview of Pharmacy Services*
Pharmacy services at the SDSO are provided by NaphCare. Included NaphCare services are medication distribution and management, clinical support, formulary management, and quality assurance. TechCare, the pharmacy management system for ordering and receipt of medications, is integrated into the NaphCare EHR.

The SDSO Medical Services Division (MSD) Policy D.1.1, Pharmaceutical Operations, was reviewed and found to be adequate with a few omissions. Pharmacy policy should address Pharmacy & Therapeutics (P&T) Committee structure and function, drug formulary process, back-up pharmacy services, drug recalls, adverse drug reaction reporting, records management, medication room inspections, timeframes for ordering and administration of medications, disposal of pharmaceuticals, and basic standards for safe administration of intravenous therapy. However, while on tour of the facilities, processes for these missing policy items were observed to be in place.

The SDSO facilities follow the NaphCare formulary which is the same formulary used across all NaphCare contracts. Contract-specific formulary exceptions are allowed; however, they are not commonly in place as the NaphCare formulary provides a comprehensive offering of medications spanning all major therapeutic classes. The formulary adequately covers the population served while balancing cost, safety, and efficacy. Any provider may request a medication be added to the formulary by submitting an official request with rationale. Nonformulary medications are accessible through a nonformulary request process where prescribers enter an order in TechCare along with justification for use. A NaphCare clinical pharmacist reviews the request and, if approved, the

22

medication is dispensed within 48 hours.  Should the nonformulary medication request be denied, the decision may be appealed to the local NaphCare Medical Director who has final review authority. A review of 35 nonformulary requests for 20 patients showed all requests were approved within 24 hours.  See **Appendix L**. The average time from request to administration was 0.87 days with a range of 15 minutes to 4.88 days. The longest duration was for a long-acting injectable antipsychotic.

NaphCare has a corporate P&T Committee which meets monthly. There is also a local SDSO P&T Committee which meets quarterly. The local P&T Committee is a multidisciplinary, multiagency committee established in June 2023 and consists of both NaphCare and SDSO MSD members. Meeting content consists of formulary changes, policy and protocol updates, drug shortage information, new drug approvals, and miscellaneous medication-related issues. The SDSO MSD Quality Improvement Committee (QIC) is a separate committee which meets quarterly and reviews drug utilization trends, medication administration audits, medication errors, medication-related occurrence reports, and pharmacy inspection reports.

Medications are administered by LVNs. A pharmacy technologist is utilized to manage medication rooms at the larger facilities. A NaphCare pharmacist is available 24/7 for issues or medication-related questions. At new employee orientation and periodically, training is provided on the following: patient confidentiality; medication-related P&P; the emergency back-up pharmacy, Surescripts; Electronic Medication Administration Record (eMAR); and TechCare.

Electronic medication order entry and medication administration occurs through integration with the TechCare. Medications are filled as stock in unit dose blister cards.  Over-the-counter medications are supplied in bulk bottles.  Orders placed by 4:00 PM CST are received the following business day. Critical medications not in stock are available through a back-up pharmacy contract and can be accessed upon local prescriber approval. The SDSO also has access to sterile compounded medications should they be needed.

The TechCare EHR has a provider work queue which identifies IP medication orders that are soon to expire. This queue is managed by providers, and medications are reordered as medically necessary. Nursing staff serves as a back-up and sends renewal requests within TechCare as expiring orders are identified during medication administration rounds.

Medications are stored in designated, secure medication rooms at each facility. Medication storage areas are maintained by LVNs and RNs with oversight by a pharmacy technician. Access is controlled by a key management system.  Non-authorized staff are not allowed entry. It was observed that medications were stored under proper conditions and temperature.  Medication storage areas were observed to be adequately stocked, clean, neat, and secure. Emergency medications were readily available to staff. The rooms were furnished with refrigerators and locked cabinets for controlled substances. Controlled substance logs were noted and maintained. Medication storage areas are audited monthly by local nursing leadership and quarterly by a NaphCare contracted pharmacist.

As noted, medications are administered by LVNs and in some instances, RNs, exceeding the standard for medication administration. Medications are administered using NaphCare's integrated eMAR which includes barcode medication administration to ensure the five patient rights (right patient, medication, dose, route, and time). The SDSO has a defined policy which allows specific medications to be selfcarry such as inhalers, over-the-counter medications, nitroglycerin, topicals,

**Ex. A-24**

and oral contraceptives. Medications are administered at standard administration times based on prescribing frequency at 8:00 AM, 1:00 PM, 5:00 PM, and 8:00 PM.

Quality assurance processes are essential to ensure the safety and efficacy of pharmacy services within correctional facilities. The SDSO conducts several routine quality measures to include: a monthly medication room inspection by nurse supervisors; quarterly pharmacist inspections; and medication administration audits. The SDSO also performs audits of medications not administered (missed doses) in order to identify the most common reasons for missed doses such as patient refusals, unavailability of medication, or an IP court appearance. A review of quarterly pharmacist inspections for the most recent two quarters revealed minor findings with three exceptions. The VDF was found to have a malfunctioning lock on the controlled substance storage box which was noted on repeat inspection. There were also two controlled substance discrepancies noted, one at the VDF on the May 2024 inspection report and one at the LCDRF on the December 2023 inspection report. No discrepancies were found on the LCDRF follow-up inspection in February 2024. Vista also had a repeat finding of expired controlled substance medications. This was discussed with staff and has been addressed.

Medication administration audits provide an opportunity to identify training needs and ensure best practices are followed for accurate and safe administration of medication. Each nurse is observed during a medication pass at least biannually along with a review of documentation of administration records. Findings and corrective action plans are reviewed at the quarterly QIC Committee meeting.

A process is in place at the SDSO for reporting medication errors and adverse events. Per policy, when a medication error occurs in a facility, the medication nurse communicates the error to the supervising nurse or designee and a Risk Occurrence Form is completed. The supervising nurse investigates and notifies a physician. A summary of errors, pertinent findings and corrective actions implemented from the investigation are presented at the quarterly QIC Committee meeting. Controlled substance discrepancies are also reported using the Risk Occurrence Form.

*Discharge Medications*
IPs are provided with a prescription card upon discharge with instructions on how to obtain a 30-day supply of their medications from a local retail pharmacy. Prescriptions for chronic medications and the remaining supply of acute medications such as antibiotics are transferred to a local pharmacy, billed to the county, and picked up by the IP after release. In addition, as part of the intake process, IPs are provided with a Narcan voucher which can be redeemed at one of several local pharmacies along with instructions for use.

*MAT Services*
MAT is an important approach to treating substance use disorder (SUD), particularly opioid addiction. It combines medication treatment with counseling and behavioral therapies to provide a comprehensive approach to treatment. Medications such as methadone, buprenorphine, and naltrexone are commonly used to help individuals manage withdrawal symptoms, reduce cravings, and prevent relapse. MAT has been shown effective in reducing illicit opioid use, overdose deaths, criminal activity, and transmission of infectious diseases like Human Immunodeficiency Virus (HIV) and hepatitis. It also helps improve social functioning and overall quality of life for individuals struggling with addiction. IPs are screened for Opioid Use Disorder (OUD) at intake and considered for initiation or continuation of medication based on findings. In addition, IPs may request initiation of treatment at any point during their incarceration.

**Ex. A-25**

IPs receiving treatment for OUD at the time of incarceration are offered continuation of their medication, often in partnership with their Opioid Treatment Program (OTP) in the community when possible. IPs identified with OUD during their incarceration not currently on treatment are offered induction therapy. Maintenance treatment is continued throughout incarceration and upon discharge. IPs receive a 30day supply of medication as well as a list of community resources to help facilitate continuity of care and reduce the risk of relapse and overdose after release. The most utilized medication for OUD by the SDSO MSD is buprenorphine and naloxone (Suboxone). IPs on medication for OUD are flagged in TechCare as "MAT" for identification and reporting purposes. Naloxone kits are available within the jail facilities for treatment of opioid overdose and IPs with a history of OUD receive a naloxone voucher prior to release.

IPs are offered a combination of pharmacologic and psychosocial treatment. An IP's decision to refuse psychosocial treatment does not preclude pharmacological treatment. These individuals continue to receive medication management for OUD and are designated as part of the Medication for Opioid Use Disorder (MOUD) program.

NaphCare provides MAT services. There are a total of seven providers dedicated to the MAT program: two nurse practitioners and one physician who manage medication; and four mental health staff who provide therapy. Mental health staff meets with MAT patients for individual therapy. Group therapy is currently available at VDF and LCDRF; however, programs are in development at GBDF and SDCJ and expected to be in place by August 2024. There is one dedicated housing module at VDF.

**Reported MAT Numbers on May 7, 2024**

| Location | MAT* | MOUD** | BUP*** |
|----------|------|--------|--------|
| SDSO | 10 | 70 | 154 |
| GBDF | 70 | 278 | 322 |
| VDF | 49 | 60 | 119 |
| VDF-LW6 | 18 | 0 | 10 |
| LCDRF | 40 | 15 | 77 |
| RMDF | 6 | 13 | 24 |
| **Totals** | **193** | **436** | **706** |

*MAT:    Represents patients receiving both medication and counseling/behavioral therapy.
**MOUD: Represents patients receiving medication for OUD but have declined the counseling/behavioral therapy component.
***BUP: Represents both MAT and MOUD patients, as well as individuals on buprenorphine for detox management. These individuals are awaiting a face-to-face visit with a MAT provider where they will be asked if they would like to participate in the MAT program.

Ex. A-26

**2024 Year-to-Date MAT Numbers Per TechCare as of April 30, 2024**

| Program / Service | Number of Incarcerated Person Patients |
|---|---|
| MAT | 1078 |
| MOUD | 740 |
| Buprenorphine | 2331 |

The SDSO has made significant progress enacting steps to provide access to and continuity of treatment for OUD, including dedicated positions for MAT/MOUD programs. The volume of patients on treatment provides evidence of the SDSO's commitment to treating OUD. The SDSO MSD is currently working to draft policies, treatment guidelines, training, standardized note templates, and an improved flagging system. Recommendations would also include the establishment of a CQI program for monitoring the MAT/MOUD program for ongoing improvement.

Quality Management
We reviewed SDSO's Policy and Procedure and its Quality Assessment and Quality Improvement (QA/QI) program.

*Policy and Procedure (P&P)*
Policy and Procedure are the foundation upon which healthcare organizations are built and quality of care is managed. They streamline and standardize daily operational activities, allowing a healthcare organization to run efficiently. P&P are unique to each organization and tailored to fit specific goals and outcomes.

Without these documents, organizations would struggle to provide clarity when dealing with issues and activities that are critical to health and safety, legal liabilities, and regulatory requirements. To support these efforts, an organization's system for managing policies needs to empower staff to seamlessly create, edit, and share P&P.

P&P management varies from one organization – and industry – to another. Policy management in healthcare is vital to the function of an organization, as it sets a general plan of action to guide desired outcomes and serves as a fundamental guideline to help make clinical and human resource decisions. The National Commission on Correctional Healthcare (NCCHC) publishes benchmark standards with the intent of improving jail and prison health services delivery. The standards address general areas such as: governance and administration; health promotion, safety, and disease prevention; personnel and training; ancillary health care services; patient care and treatment; special needs and services; and medical-legal issues. The standards are divided into "essential" and "important." The essential standards are focused on health, safety, and patient welfare, critical components of a correctional healthcare delivery system.

The NCCHC Standard J-A-05 is titled *Policy and Procedures* and is an essential standard. Compliance indicators with this standard include:
- Healthcare policies are site specific.
- Healthcare policies are reviewed at least annually by the medical and administrative directors.
- Documentation of this review includes signatures by both individuals and the date of the review.
- Health staff review P&P anytime they are revised or new policies are introduced.

26

Ex. A-27

- Other policies such as those for custody, kitchen, industries, and healthcare vendor or other contractors, do not conflict with healthcare policies.
- The manual or compilation of P&P are accessible to staff.

The ACA also have a mandatory expected practice regarding *Policy and Procedure Manuals*: 5-ACI1A-12-14.

Currently, the SDSO has over one hundred policies in the medical services operations manual and its nursing procedures. These P&P are readily available to staff via an electronic link and in hard copy binders. Once all policies and applicable procedures reviews are completed, they will remain on an annual review process unless changes in the standard of care dictate action be taken sooner than established review cycle. The SDSO has utilized agency process directives and training bulletins to ensure consistent practice while the P&P were undergoing review and revision.

The SDSO MSD has transitioned to the TechCare EHR and is in the process of finishing a complete review of its current P&P manual. This is critical to ensure that the appropriate data outputs such as intake, chronic care, MAT, infirmary encounters, medication administration, nursing treatments, and vital signs are captured reliably. These data outputs are the basis of audit tools which will help drive standardization, compliance, and adherence to policy. Additionally, this data will be used by the SDSO to evaluate productivity and efficiency.

The timeline for completion of the SDSO health services P&P manual is September 2024.

*Quality Assurance (QA)*
QA in correctional healthcare is important for numerous reasons:
1. Incarcerated persons often have higher rates of chronic illnesses, mental health issues, and infectious diseases compared to the general population. QA helps ensure these health issues are managed effectively. QA can lead to early detection and treatment of health issues, reducing the need for more significant emergency care and hospitalizations.
2. QA can reduce the risk of outbreaks of infectious diseases, which can compromise the safety and security of both incarcerated persons and staff.
3. QA ensures that healthcare services are consistent and meet established standards, reducing variability and improving overall care quality.
4. QA processes involve regular review and improvement of healthcare services, ensuring that facilities adapt to new medical knowledge, technologies, and best practices.
5. QA programs create a framework for accountability, ensuring that healthcare providers meet their responsibilities and that there is oversight of their performance.

Recognizing the operational importance of an effective QA program and its position as an Essential standard with NCCHC, SDSO has been in the process of revamping its QA program. The SDSO Quality Assurance/Quality Improvement (QA/QI) committee is currently made up of the following members:

1. Chief Medical Officer
2. Director of Nursing
3. Medical Administrative Officer
4. Program Director, Mental Health
5. Chief, Health Information Management
6. Captain, ADA

27

**Ex. A-28**

7. Administrative Sergeant
8. Health Services Administrator, NaphCare
9. Mental Health Program Director, NaphCare
10. Supervising Nurses, LCDRF, VDF, SDCJ, GBDF, RMDF
11. Supervising Nurse, Infection Control
12. Supervising Nurse, Training
13. Supervising Nurse Recruitment
14. Supervising Nurse, AMLS/PHTLS Coordinator
15. Supervising Nurse, ADA and Managed Care
16. Supervising Nurse, Policy and QI
17. Infection Control
18. Chief Mental Health Clinicians, SDCJ, VDF, LCRDF, GBDF
19. Chief Mental Health Clinician, MAT
20. Administrative Analyst, MAT

The membership of the SDSO QA/QI committee is inclusive and consistent with correctional health care industry standards. The QA/QI committee is scheduled to meet quarterly and holds an annual recap meeting in January. The QA/QI committee is currently overseen by Rex Padilla RN.

SDSO provided exemplar agendas and minutes from previous QA/QI meetings, which demonstrated that SDSO is monitoring appropriate and meaningful metrics and processes.  See **Appendix M**.  Below are examples of some of SDSO QA/QI current efforts:

1. System Occurrence Reports
   a. IP death
   b. Self-harm incidents
   c. Medication errors
2. Grievances
3. MAT Program
4. ADA Unit
5. Operations Manual
6. Policy and Procedures
7. Facility Specific CQI Studies
   a. Nursing protocol vital sign documentation
   b. Continuity of Care Diagnostic Process
   c. Timeliness of Face to Face Nurse Encounter
   d. Timeliness of Receiving Screening
8. ADA Updates
9. Managed Care Group
   a. Case management issues
10. Training
    a. Man-down response
    b. Monthly newsletters

The SDSO QA/QI minutes reviewed in addition to conversations with SDSO QA/QI members, demonstrated that there are ongoing QA/QI studies and that relevant data is being collected to evaluate performance and assist in guiding future direction. SDSO is correctly making a commitment to utilizing the reporting capabilities of TechCare to facilitate timely and complete data

**Ex. A-29**

collection to evaluate performance and progress. SDSO does have and maintain an adequate QA/QI processes to ensure IPs have appropriate and timely medical care.

<u>Record Management</u>
In September 2019, the SDSO implemented the NaphCare EHR, TechCare, the comprehensive EHR software system tailored specifically to the needs of correctional facilities. TechCare is certified by the Office of the National Coordinator for Health Information Technology (ONC) – Authorized Certification Bodies (ACB) and meets all functional requirements of an EHR as well as privacy and security standards set by ONC. In addition, NaphCare has completed a Service Organization Control (SOC) 2 Type II Audit further demonstrating rigorous safety and security standards. TechCare provides a comprehensive platform for managing patient health information, facilitating clinical workflow and decision making, and promoting quality care.

*Clinical Documentation and Workflow*
Correctional EHRs are uniquely designed to track the healthcare needs of incarcerated persons from intake to release. Within TechCare, work queues track completion of various clinical tasks such as booking, detox management, off-site management, sick call, and TB workup. Staff-specific queues help ensure nursing, providers, and pharmacy complete tasks within established time frames such as medication reorders and clinic appointments. Each activity can be monitored in real-time and audited for compliance.

Within a patient chart, the dashboard feature provides a holistic view of the patient's current health status in a single snapshot including a list of recent visits, current medications, recent diagnostics (lab/CXR), and problems. From this dashboard, the user can launch specific records by clicking on the category such as sick calls, progress notes, nurse protocols, immunizations, eMAR, off-site consults, or behavioral health notes.

Standardized note templates and forms help to ensure best practice in documentation and consistency of care, decrease documentation time, and improve ease of chart review. The SDSO has customized templates for over 40 note types including chronic care, mental health assessments, receiving screening, and administrative separation assessments. In addition, there are standardized nurse protocol templates for the most common conditions.

TechCare has built-in automation and clinical decision support features which can trigger an action and/or recommendation based upon selections made within a note template. These actions can include automatically scheduling an appointment, adding a condition to the problem list, or triggering completion of a form. This functionality helps to ensure critical functions are not missed. A few of the automations within the receiving screening note are listed below:

- If any predetermined conditions are selected, completion of a Gate Refusal form will be triggered.
- If a chronic condition or mental health problem is selected on the form, the condition will be added to the problem list and associated appointments will automatically be scheduled.
- If TB workup is selected, the patient is added to the TB work queue and a medical chart review is automatically scheduled.
- Selecting the Surescripts button within the note will automatically request a Surescripts medication verification report.
- If any preidentified signs of serious mental illness are selected, the screener will be alerted and the patient will be added to the gatekeeping queue.

29

**Ex. A-30**

- If any substance abuse screening questions are answered "yes," the screener is prompted to complete a comprehensive detox screening form. Based on answers selected on the comprehensive detox screening, a COWS/CIWA forms may be triggered for completion.
- The COWS/CIWA forms also have built-in clinical decision support tools.  Based on final scoring, a recommended course of action is presented to the user based upon established protocols.

*Interoperability and Customizations*

Interoperability is the ability of computer systems or software to exchange and make use of information. This is achieved by creating an interface between the two systems, enabling the disparate systems to operate on the same data.  In healthcare, this allows for real-time access to comprehensive health information, improving efficiency, accuracy, and clinical decision making. TechCare has key interfaces with the jail management system, lab, radiology, and Surescripts. Where interfaces are not available, such as off-site hospital and specialty care, clinical documentation is scanned or uploaded to TechCare.  Further, TechCare offers the ability to customize components of the EHR to the specific needs of the institution.  Approximately 86 customization requests have been submitted to TechCare and completed. See **Appendix N.**  In addition, TechCare pushes out upgrades every two months. Customer support is available 24/7.

The ability to generate reports and analyze data is imperative for monitoring compliance, improving healthcare outcomes, identifying trends, and informing quality improvement initiatives.  TechCare provides a robust reporting and analytics platform.  Reports are available on demand or can be scheduled.  A list of reports can be found in **Appendix O**.  Description of reports available and those in use are kept on this platform once received.

Healthcare staff undergo training on TechCare, health records P&P, Health Insurance Portability and Accountability Act (HIPAA), protected health information (PHI), and information security upon hire and annually.  A confidentiality agreement must be signed by all employees on an annual basis.

Records Review

Medical record review was required in multiple areas to validate the efficiency, effectiveness, and quality of a particular healthcare activity such as chronic care management and findings can be found in the following corresponding sections of this report: Nursing (intake, nursing sick call, heath history and physical) and Chronic Care.  The chart reviews can be found in **Appendices G, I, H, and J**.

Additional Information

To gain a further understanding of the SDSO's current healthcare delivery system, data from the NCCHC Standards Compliance Assessment and relevant Mortality Data were reviewed.

*NCCHC Accreditation*

NCCHC is not a requirement for jails in the United States.  In fact, most jails in the United States do not have NCCHC accreditation.  SDSO's continued pursuit of these standards is a testament to their dedication to providing quality care.

In 2017, NCCHC Resources Inc. (NRI), at the request of the SDSO, was selected to provide guidance to the Department regarding how to accomplish NCCHC accreditation. The NRI team reviewed SDCJ, GBCF, LCDRF, and VDF in early January of 2017. At that time, NCCHC had 40

**Ex. A-31**

Essential standards and 27 Important of which 100% of the Essential and 85% of the Important were required to be met for accreditation.

The results of NRI's review demonstrated that SDSO was found to be compliant with 31% (26/38) of the Essential and 24% (6/25) of Important standards. These 2017 findings are used extensively by Plaintiffs to support their allegations that SDSO is not currently providing adequate healthcare. In October of 2019, SDSO continued its intention to attain NCCHC accreditation by undertaking a self-review of its healthcare delivery program against the 2018 revised NCCHC Jail standards (See **Appendix P**).  Improvement was noted in many areas and there was recognition that activities were ongoing to attain compliance in the future.

Given the visibility that the 2017 NRI review has in the Dunsmore litigation, our team, experienced with the NCCHC accreditation process, thought it appropriate to evaluate SDSO's compliance with the current NCCHC 2018 Standards for Health Services in Jails.

Compliance with each standard was determined through information obtained on facility inspections, medical record reviews, interviews with SDSO healthcare and sworn staff, review of healthcare policy procedure, institutional directives, training bulletins, and observation of health care delivery.

The results of the review demonstrated that SDSO was found to be compliant with 93% (33/39) of the Essential and 100% (20/20) of the Important 2018 Standards as is shown below.

**J-A-01 Access to Care – *Essential***
Standard:  Inmates have access to care for their serious medical, dental, and mental health needs.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-A-02 Responsible Health Authority – *Essential***
Standard:  The responsible health authority (RHA) ensures that the facility maintains a coordinated system for health care delivery.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-A-03 Medical Autonomy – *Essential***
Standard: Health care decisions are made by qualified health care professionals for clinical purposes. Conclusion:  SDSO meets the compliance indicators for this standard.

**J-A-04 Administrative Meetings and Reports – *Essential***
Standard:  The facility's health and correctional administrators coordinate the health care delivery system through joint monitoring, planning, and problem resolution. Conclusion: SDSO meets the compliance indicators for this standard.

**J-A-05 Policies and Procedures – *Essential***
Standard:  The responsible health authority (RHA) ensures that health care policies and procedures are developed, documented, and readily available to the staff.
Conclusion:  SDSO leadership is currently working on revision of all its healthcare policy and procedure manuals to be inclusive of the many program enhancements that have been made to date and believe they are on track to meet the compliance indicators for this standard.

**Ex. A-32**

**J-A-06 Continuous Quality Improvement Program – *Essential***
Standard: A continuous quality improvement (CQI) program monitors and improves health care delivered in the facility.
Conclusion: While SDSO has made progress in this area, they continue to actively work on expanding their CQI program monitors to meet all the compliance indicators for this standard.

**J-A-07 Privacy of Care – *Important***
Standard: Health care encounters and exchanges of information remain private.
Conclusion: SDSO meets the compliance indicators for this standard.

**J-A-08 Health Records – *Essential***
Standard: A confidential health record is created and maintained using a standardized format.
Conclusion: SDSO meets the compliance indicators for this standard.

**J-A-9 Procedure in the Event of an Inmate Death – *Important***
Standard: The responsible health authority conducts a thorough review of all deaths in custody in an effort to improve care and prevent future deaths.
Conclusion: SDSO meets the compliance indicators for this standard.

**J-A-10 Grievance Mechanism for Health Complaints – *Important***
Standard: The facility protects a patient's right to disagree with or question the health care system.
Conclusion: SDSO meets the compliance indicators for this standard.

**J-B-01 Healthy Lifestyle Promotion – *Important***
Standard: Health care policies, procedures, and practices emphasize health promotion, wellness, and recovery.
Conclusion: SDSO meets the compliance indicators for this standard.

**J-B-02 Infectious Disease Prevention and Control – *Essential***
Standard: There is a comprehensive institutional program that includes surveillance, prevention, and control of communicable disease.
Conclusion: SDSO meets the compliance indicators for this standard.

**J-B-03 Clinical Preventive Services – *Essential***
Standard: Incarcerated persons are provided with clinical preventive services as medically indicated. Conclusion: SDSO meets the compliance indicators for this standard.

**J-B-04 Medical Surveillance of Inmate Workers – *Important***
Standard: The health and safety of the inmate worker populations are protected.
Conclusion: SDSO meets the compliance indicators for this standard.

**J-B-05 Suicide Prevention and Intervention – *Essential***
Standard: Suicides are prevented when possible by implementing prevention efforts and intervention. Conclusion: SDSO meets the compliance indicators for this standard.

**J-B-06 Contraception – *Important***
Standard: Contraception is made available as clinically indicated.
Conclusion: SDSO meets the compliance indicators for this standard.

Ex. A-33

**J-B-07 Communication on Patients' Health Needs – *Essential***
Standard:  Communication occurs between the facility administration and treating health staff regarding inmates' significant health needs that must be considered in classification decisions in order to preserve the health and safety of that inmate, other inmates, or staff.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-B-08 Patient Safety – *Important***
Standard:  Facility staff implement systems to reduce risk and prevent harm to patients.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-B-09 Staff Safety – *Important***
Standard:  Facility staff implement measures to ensure a safe environment.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-C-01 Credentials – *Essential***
Standard:  The facility's qualified health care professionals are legally eligible to perform their clinical duties.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-C-02 Clinical Performance Enhancement – *Important***
Standard:  Individuals delivering patient care are reviewed through a clinical performance enhancement process.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-C-03 Professional Development – *Essential***
Standard:  The facility's qualified health care professionals maintain current clinical knowledge and skills.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-C-04 Health Training for Correctional Officers – *Essential***
Standard:  Correctional officers are trained to recognize the need to refer an inmate to a qualified health care professional.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-C-05 Medication Administration Training – *Essential***
Standard:  Personnel who administer or deliver prescription medication are appropriately trained.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-C-06 Inmate Workers – *Essential***
Standard:  Health services are provided by health staff and not inmate workers.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-C-07 Staffing – *Important***
Standard:  The responsible health authority (RHA) ensures sufficient numbers and types of health staff to care for the inmate population.
Conclusion:  SDSO meets the compliance indicators for this standard.

**Ex. A-34**

**J-C-08 Health Care Liaison – *Important***
Standard:  Health care services continue to be coordinated via a health care liaison when qualified health care professionals are not available for an extended period of time. Conclusion:  SDSO meets the compliance indicators for this standard.

**J-C-09 Orientation for Health Staff – *Important***
Standard:  Health staff are properly acclimated to work in the correctional environment and understand their roles and responsibilities.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-D-01 Pharmaceutical Operations – *Essential***
Standard:  Pharmaceutical operations meet the needs of the facility and conform to legal requirements. Conclusion:  SDSO meets the compliance indicators for this standard.

**J-D-02 Medication Services – *Essential***
Standard:  Medications are provided in a timely, safe, and sufficient manner.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-D-03 Clinical Space, Equipment, and Supplies – *Important***
Standard:  Sufficient and suitable space, supplies, and equipment are available for the facility's medical, dental, and mental health services.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-D-04 On-Site Diagnostic Services – *Important***
Standard:  The facility provides the necessary on-site diagnostic services for patient care.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-D-05 Medical Diets – *Essential***
Standard:  Medical diets are provided that enhance patients' health.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-D-06 Patient Escort – *Important***
Standard:  The facility staff ensure that patients can meet scheduled health care appointments.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-D-07 Emergency Services and Response Plan – *Essential***
Standard:  Planning for emergency health care ensures that all staff are prepared to effectively respond during emergencies.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-D-08 Hospital and Specialty Care – *Essential***
Standard:  Hospitalization and specialty care are available to patients who need these services.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-E-01 Information on Health Services – *Essential***
Standard:  Upon arrival at the facility, inmates are informed of the availability of health care services and how to access them.
Conclusion:  SDSO meets the compliance indicators for this standard.

**Ex. A-35**

**J-E-02 Receiving Screening – *Essential***
Standard:  Screening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met.
Conclusion:  While the current receiving screening templates used by SDSO adequately address the essential components of this standard, modifications are required to achieve full compliance. Specifically, the form needs to include the screener's personal observations of the IPs as well as additional process monitoring to ensure the safety and effectiveness of the process.

**J-E-03 Transfer Screening – *Essential***
Standard:  Inmates who are transferred within the same correctional system continue to receive appropriate health services.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-E-04 Initial Health Assessment – *Essential***
Standard:  Inmates receive initial health assessments.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-E-05 Mental Health Screening and Evaluation – *Essential***
Standard:  Mental health screening is performed to ensure that urgent mental health needs are met. Conclusion:  SDSO meets the compliance indicators for this standard.

**J-E-06 Oral Care – *Essential***
Standard:  Inmates' dental needs are addressed.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-E-07 Nonemergency Health Care Requests and Services – *Essential***
Standard:  Inmates' nonemergent health care needs are met.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-E-08 Nursing Assessment Protocols and Procedures – *Important***
Standard:  Nursing assessment protocols and procedures are appropriate to the level of competency and preparation of the nursing personnel and comply with the relevant state practice acts. Conclusion:  SDSO meets the compliance indicators for this standard.

**J-E-09 Continuity, Coordination, and Quality of Care during Incarceration – *Essential***
Standard:  Patient medical, dental, and mental health care is coordinated and monitored from admission to discharge.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-E-10 Discharge Planning – *Essential***
Standard:  Discharge planning is provided for inmates with serious health needs whose release is imminent.
Conclusion:  SDSO meets the compliance indicators for this standard.

**Ex. A-36**

**J-F-01 Patients with Chronic Disease and Other Special Needs – *Essential***
Standard:  Patients with chronic disease, other significant health conditions, and disabilities receive ongoing multidisciplinary care aligned with evidence-based standards. Conclusion: SDSO meets the compliance indicators for this standard.

**J-F-02 Infirmary-Level Care – Essential**
Standard:  Infirmary-level care, when provided, is appropriate to meet the health care needs of patients. Conclusion:  SDSO meets the compliance indicators for this standard.

**J-F-03 Mental Health Services – *Essential***
Standard:  Mental health services are available for all inmates who require them.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-F-04 Medically Supervised Withdrawal and Treatment – *Essential***
Standard:  Inmates who are intoxicated or undergoing withdrawal are appropriately managed and treated.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-F-05 Counseling and Care of the Pregnant Inmate – *Essential***
Standard:  Pregnant inmates are given comprehensive counseling and care in accordance with national standards and their expressed desires regarding their pregnancies. Conclusion:  SDSO meets the compliance indicators for this standard.

**J-F-06 Response to Sexual Abuse – *Essential***
Standard:  Facility staff ensure that victims of sexual abuse receive appropriate intervention.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-F-07 Care for the Terminally Ill – *Important***
Standard:  The facility addresses the needs of terminally ill inmates, including protecting their rights regarding end-of-life decisions.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-G-01 Restraint and Seclusion – *Essential***
Standard:  The Responsible Health Authority (RHA) ensures that when restraints are used for clinical or custody reasons, the inmate is not harmed by the intervention. Conclusion:  SDSO meets the compliance indicators for this standard.

**J-G-02 Segregated Inmates – *Essential***
Standard:  Any practice of segregation should not adversely affect an inmate's health.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-G-03 Emergency Psychotropic Medication – *Essential***
Standard:  Health staff follow policies developed for the emergency use of forced psychotropic medications as governed by the laws applicable in the jurisdiction.
Conclusion:  SDSO meets the compliance indicators for this standard.

**Ex. A-37**

**J-G-04 Therapeutic Relationship, Forensic Information, and Disciplinary Actions –** *Important*
Standard:  Health staff protect the integrity of the therapeutic partnership with their patients.
Conclusion:  SDSO meets the compliance indicators for this standard.

**J-G-05 Informed Consent and Right to Refuse –** *Important*
Standard:  Inmates have the right to make informed decisions regarding health care, including the
right to refuse care.
Conclusion:  SDSO meets the compliance indicators for this standard

**J-G-06 Medical and Other Research –** *Important*
Standard:  Biomedical, behavioral, or other research using inmates as subjects is consistent
with established ethical, medical, legal, and regulatory standards for human research.
Conclusion:  SDSO meets the compliance indicators for this standard.



The three essential standards that were deemed to be non-compliant were:

**1. J-A-05 Policies and Procedures**
Standard: The responsible health authority (RHA) ensures that health care policies and
procedures are developed, documented, and readily available to the staff.
Conclusion:  SDSO leadership is currently working on a revision of all its healthcare policy
and procedure manuals to be inclusive of the many program enhancements that have been
made to date. The policies and procedure revision should be completed by September
2024.

**2. J-A-06 Continuous Quality Improvement Program (CQI)**
Standard: A continuous quality (CQI) program monitors and improves health care delivered
in the facility.

37

Conclusion:  SDSO has made progress in this area and are continuing to actively work on expanding their CQI program monitors to meet all the compliance indicators necessary for this standard.

**3. J-E-02 Receiving Screening**

Standard: Screening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met.

Conclusion:  While the current receiving screening templates utilized by SDSO address the most essential components of this standard, they do not encompass all elements outlined in the compliance indicators. Specifically, the standard requires additional input on the intake screener's personal observations of the IP and SDSO needs to finalize its intake auditing process, which is nearing completion.

It is evident that there is both intention and commitment on the part of SDSO to obtain NCCHC accreditation. This is evidenced not only in our discussion with SDSO healthcare and Sheriff's staff but also in the current contract with CHP, requiring CHP to follow the most recent NCCHC standards in the performance of the work requirements.

SDSO has benefitted from both its 2017 and 2019 NCCHC assessments of its healthcare delivery system's ability to comply with NCCHC standards. SDSO is knowledgeable of the three NCCHC standards that require additional attention and is working diligently to attain programmatic compliance.

Mortality Data

SDSO deaths in custody has been a metric central in the evolution of the Dunsmore litigation. In 2022 the San Diego County Citizens' Law Enforcement Review Board (CLERB) contracted with Analytica Consulting (AC) to analyze in-custody death data over the prior ten years. AC's report and the historical in-custody death data are used, in part, to support the Plaintiffs' claim that SDSO has a broken healthcare delivery system, and it is this broken system that is responsible for the increased death rates compared to other comparably sized California municipalities.

Comparing in-custody mortality rates across different counties is at the very least a challenging biostatistical analysis. It is complicated for reasons such as:

- **Variability in Reporting Standards**: Different jurisdictions may have varying standards and practices for reporting deaths, leading to inconsistencies in data.
- **Population Differences**: The demographics, health status, and behavior of incarcerated populations can differ significantly between jails, affecting mortality rates.
- **Cause of Death Classification**: The classification of causes of death may not be consistent, with some jurisdictions providing more detailed information than others.
- **Size and Type of Facility:** The size and type of facility (e.g., county jail vs. state prison) can influence mortality rates, making comparisons difficult.
- **Duration of Incarceration**: The length of time individuals spend in jail can vary, affecting exposure to health risks and the likelihood of death occurring while incarcerated.
- **Policy and Administrative Differences**: Different policies and administrative practices, such as the handling of medical emergencies, can impact mortality rates.
- **Underreporting and Delays**: There may be underreporting or delays in reporting deaths, which can skew data and make comparisons inaccurate. In addition to the above, in-

**Ex. A-39**

custody mortality is a broad non-specific indicator that at best is an indirect measure of
health system efficacy, and not a direct measure of quality.



The AC report when reviewed has some significant potential confounders:

1. It is not clear whether mortality was captured and assessed in a consistent way across all
   compared county jail systems.

2. It is not clear whether county jail population denominators were captured in a consistent
   way across all systems.

3. It is not clear if expected rates for each county jail (based on the county-wide mortality
   rates) were generated by applying the age, race, gender structure of each county jail
   population.

4. As the investigators note, data on physical health, mental health, substance use disorder,
   homelessness were not available.  It is possible that an increased differential (on any of
   these factors) between the San Diego County jail and the San Diego general population
   could have partially driven the increased excess deaths observed in San Diego County jail
   population.

5. In general, it is not clear whether the observed excess deaths in the San Diego County jail
   system reflect a selection process that resulted in a greater contrast in baseline poor health
   between the county jail and the general population (compared to the other counties
   examined) or were related to correctional health care.

The chart above reflects in-custody deaths from 2006 through 2024, including that period
encompassing the COVID-19 pandemic (2020-2022).

In-custody deaths reached a high in 2022 with 19 deaths as SDSO was emerging from the COVID-
19 pandemic and have been declining since that time. In 2024 there have been a total of 7 in-
custody deaths to date. There have been five non-homicide, non-suicide in-custody deaths in
2024. These medical records were provided and reviewed. See **Appendix Q**. Additionally, I

**Ex. A-40**

discussed the subject of in-custody deaths with Dr. Rafi and Dr. Freedland, to gain their understanding and perspective.

Dr. Rafi was candid about the SDSO program changes and creation that have had a positive impact on the number of in-custody deaths. She discussed the creation of the MAT program, use of Surescripts, StatCare, enhanced intake process, and the availability of provider coverage as contributing significantly to the decrease in in-custody mortality. She noted that in-custody deaths are a metric that she and Dr. Freedland monitor and review closely. Dr. Freedland noted, that with CHP now directly contracting with SDSO, all mortality reviews would be done on site. These on-site reviews will provide the opportunity for better contextual understanding, examination of team dynamics, and immediate access to necessary information.

In-custody mortality is an important metric that should be reviewed in all jail healthcare systems. However, it can neither be used to singularly determine the adequacy of a correctional healthcare delivery system nor be compared to other jails without the necessary due diligence.

<u>Response to Plaintiffs' Reference Citations</u>
The Dunsmore litigation is predicated on an SDSO healthcare delivery system that may have existed many years ago, not on the SDSO healthcare delivery system that exists today. To support its allegations, the Plaintiffs' complaint relies on references from the 2017 NCCHC Technical Assistance Report, a controversial analysis of death rates in California jails, a 2022 California State Auditor Report, a multitude of *San Diego Union Tribune* articles, and the often erroneous, self-reported healthcare complaints from former IPs. See **Appendix R**. The Plaintiffs provide no contemporary data or information regarding the current SDSO healthcare delivery system to support their contentions. The summary of the number of references is shown below.

**Data Summary of the Number of References to  CA State Audit, NCCHC Report, and San Diego Union-Tribune (SD Trib) in Dunsmore Complaint**

| PUBLICATION | TOTAL NUMBER OF REFERENCES |
|---|---|
| CA State Audit (2022) | 18 |
| NCCHC Report (2017) | 39 |
| San Diego Union-Tribune Articles | 53 |
| **TOTAL** | **110** |

Our review of the SDSO healthcare delivery system demonstrated unequivocally that the SDSO is providing a level and quality of healthcare that is consistent with and, in many aspects, exceeds community standards. There is a clear and definite commitment on the part of the SDSO to ensure that timely and quality healthcare is available to all IPs within their jail facilities. There was no evidence of any deliberate indifference by the SDSO to the needs of the healthcare delivery system or the IPs in its care. In fact, we found just the opposite.  There are multiple examples of new programs being created, such as MAT, expanded provider coverage, and providing discharge medications, that focus solely on improving IP healthcare services at the SDSO.

The healthcare system currently being operated by the SDSO is not consistent with the Plaintiffs' allegations. Below is a brief synopsis, based upon our thorough program review, that counter the claims made by the Plaintiffs.

Ex. A-41

**Section 7: Plaintiffs' Allegations**

1. *Jail defendants systematically fail to maintain sufficient numbers of health care professionals, resulting in deficient care.*
   Response: **FALSE**
   The SDSO has sufficient numbers of providers and nurses to deliver appropriate healthcare. The current provider staffing of 28.4 full-time equivalents (FTE) is more than adequate to meet the healthcare needs of the jail population. The medical record reviews of both medical and nursing services did not demonstrate deficient care.

2. *The Sheriff's Department's custody staff interfere with and undermine the delivery of care by health care professionals*
   Response: **FALSE**
   The SDSO custody staff is responsible for institutional security and safety. The security and healthcare staff we spoke to indicated that there are occasions when it is necessary for the medical and security departments to discuss the care and custody of a particular IP. Every effort is made to provide the care necessary for each patient in a manner that is safe for the IP and staff. This challenge is not unique to SDSO and is evident in all U.S. jails.

3. *The Sheriff's Department's inadequate screening and intake process fails to identify and treat medical care problems of newly arriving incarcerated people.*
   Response: **FALSE**
   The inspection of the current intake and screening process revealed that the SDSO practices meet or exceed an acceptable correctional standard. The SDSO utilizes the latest in body scanning technology to detect contraband such as drugs. There is a Gate Refusal process that diverts high acuity patients to the emergency room. TechCare offers an intake platform that provides consistency of care and facilitates the handling of future medical appointments. TechCare interfaces with Surescripts to ensure accurate identification of an IP's current medications. Best practice TB screening with chest radiography, urine pregnancy and drug screening, and appropriate COVID/influenza testing are all provided during the intake process. IPs identified with substance use histories are evaluated and are monitored using COWS/CIWA.

4. *The Sheriff's Department fails to provide adequate medical care including, medication assisted treatment (MAT) for incarcerated people with substance use disorder.*
   Response: **FALSE**
   NaphCare currently provides comprehensive MAT treatment for SDSO IPs to include maintenance and induction therapy. The review of current pharmacy data demonstrated that May 7, 2020, there were 193 patients on MAT (medication and counseling), 436 on MOUD (medication only), and 77 on buprenorphine for detox management.

5. *The Sheriff's Department fails to provide adequate medical care for incarcerated people entering the jail under the influence of alcohol and drugs.*
   Response: **FALSE**
   As described above (#2 and #3), the current SDSO intake process adequately assesses and dispositions IPs entering the jail under the influence of alcohol and drugs.

**Ex. A-42**

6. *The Sheriff's Department fails to continue medically necessary medications and treatments for incarcerated people upon their arrival at the jail, resulting in long delays and patient harm.*

Response: **FALSE**

During the receiving screening process, nursing staff conduct a medication history to identify immediate medication needs. The TechCare EHR is interfaced with Surescripts, a health information technology company which operates a nationwide health information exchange network connecting pharmacies, healthcare providers, and benefit managers. Surescripts securely connects to an IP's medication history stored in the databases of community pharmacies and pharmacy benefit managers. This allows SDSO staff to verify medication history quickly and easily. If Surescripts does not return any prescription findings and an IP reports they are currently taking a medication, jail staff will attempt to verify this information by contacting the IP's pharmacy or provider directly.  There was no evidence to suggest that there were long delays or patient harm due to lack of pharmaceutical continuity.

7. *The Sheriff's Department does not provide incarcerated people with a reliable and timely way to alert health care staff of their medical needs.*

Response: **FALSE**

IPs are informed during the intake process on how to access emergent and routine healthcare. IPs are also educated on how to request their healthcare information and informed about their right to file a grievance if they are dissatisfied with the healthcare services received.  A comprehensive IP orientation video is shown multiple times daily in both English and Spanish. This video offers a detailed overview of information about the SDSO jail operations, its programs, and the rules and regulations that IPs will encounter during their confinement. Additionally, it provides supplementary information about healthcare services, while reinforcing what was discussed during intake.

The SDSO has a sick call process consistent with most jails in this country that utilizes a Health Care Request form that an IP can place in a locked, secure, red box to ensure privacy. These SCR forms are retrieved daily and triaged by nursing staff with IP appointments made based upon the acuity of the complaint. According to Dr. Freedland, most non-urgent patients are typically seen within one to two days after nursing triage. Emergent and urgent patient concerns are seen that day. IPs can also notify security or a healthcare team member out on the unit if they require urgent or emergent assistance.

8. *The Sheriff's Department fails to maintain adequate, accurate, and complete medical records, which compromises the delivery of care.*

Response: **FALSE**

The SDSO utilizes an industry standard EHR, TechCare, to maintain adequate, accurate, and complete medical records on the IPs in their custody. The SDSO is able to, and routinely customizes, TechCare to best meet their clinical, process, and reporting needs.

9. *Jail defendants lack sufficient contracts with community providers to provide adequate medical care to incarcerated people.*

Response: **FALSE**

The SDSO, through its contract with NaphCare, has sufficient contractual relationships with hospitals and sub-specialty providers to adequately meet the needs of their IP population.

**Ex. A-43**

Dr. Freedland expressed no current concerns regarding availability and access to necessary hospital and specialty care services.

10. *The Sheriff's Department fails to provide constitutionally required confidentiality in the delivery of medical care.*
Response: **FALSE**
It is unclear what is meant by "constitutionally required" confidentiality.  However, to the greatest extent possible, the SDSO attempts to balance the need for IP confidentiality and access to care. Dr. Freedland highlighted that his providers track down clinic No-shows in the housing unit to ensure that if an IP needs care, they have access to it. The multi-disciplinary Wellness Rounds provided by the SDSO reflect this same commitment. In either situation, the IP is asked if they are comfortable discussing their needs in a non-confidential setting. If the IP has privacy concerns, then provisions are made to provide the encounter in a confidential setting. The efforts made by the SDSO to ensure access to care is laudable and represents one of the many unique challenges in providing care in a correctional setting.

11. *The Sheriff's Department fails to provide adequate diagnostic care to incarcerated people, including failing to appropriately refer incarcerated people to outside specialists when necessary.*
Response: **FALSE**
The sub-specialty and hospital care utilization, medical record review, and discussion with Dr. Freedland all indicate that the SDSO has access to sufficient internal and external diagnostic services necessary for the care of their IPs.

12. *The Sheriff's Department fails to provide incarcerated people with medically required eyeglasses.*
Response: **FALSE**
The SDSO has contracts in place for the provision of optometry services and medically-required glasses. Nursing staff at all the SDSO facilities indicated that they provide reading glasses to all IPs as necessary at the time they are seen.

13. *The Sheriff's Department fails to provide necessary or adequate follow-up medical treatment to incarcerated persons.*
Response: **FALSE**
The medical record reviews for both nursing and providers indicated that IPs receive timely follow-up care. Dr. Freeland ensures that all patients scheduled for providers are seen that day. StatCare is available to nursing staff 24/7 for all IPs that may require additional intervention.

14. *The Sheriff's Department fails to provide adequate discharge planning services and medication for incarcerated people being released from the jail.*
Response: **FALSE**
RSD provides appropriate medical and mental health discharge planning. IPs can self-refer, or an IP can be referred by either medical or mental health. RSD provides referrals and linkage to services including Substance Use Disorder Treatment Programs, Housing, Behavioral Health Services (including counseling, medication management, etc.), Vocational Support Services, Human Trafficking Survivor Services, and Family Supportive Services. RSD partners with HHSA to assist IPs with MAT or mental health needs. In

**Ex. A-44**

addition, SDSO helps IPs sign up for Medi-Cal and Medicare, as well as obtain a California state ID.

Additionally, SDSO provides continuity of medication for all IPs upon discharge. A prescription card with all current medications is provided to each IP upon discharge with instructions on how to obtain a 30-day supply of their medications from a local retail pharmacy. Additionally, IPs are provided a Narcan voucher which can be filled at a local retail pharmacy. Formal discharge planning is challenging in a jail setting due to the rapid turnover of IPs. The SDSO attempts to make care connections for IPs that are enrolled in a community MAT program.

15. *The Sheriff's Department fails to maintain adequate quality assurance/Quality improvement processes to ensure appropriate and timely medical care.*
Response: **FALSE**
It is evident from the documents reviewed and conversations with SDSO medical and security leadership that SDSO does maintain an adequate QA/QI program. The agenda for the August 5, 2024 QA/QI meeting demonstrates that appropriate identification, data collection, and process improvement activities are ongoing.

The SDSO has a defined QA/QI program which is in a process of evolution. The SDSO is finalizing their P&P manual, which upon completion in September 2024, will be the basis for QA/QI activities. Additionally, the SDSO is appropriately attempting to utilize TechCare to the greatest extent possible as the data source for their monitoring initiatives. There were numerous examples where the SDSO QA/QI process had led to improved care and efficiency as demonstrated in the intake process, MAT program, Gatekeeper protocol, and Wellness rounds.

## Section 8: Conclusion
SDSO is committed to providing the best possible healthcare to the IPs in its facilities. This commitment is embodied by the recently signed contract with CHP that more than doubles on-site provider coverage. SDSO has adequate RN and LVN staffing, an industry standard EHR and pharmacy distribution system, as well as adequate community hospital and sub-specialty care resources. SDSO has a comprehensive MAT program.

The random chart reviews demonstrated high functioning and effective intake and nurse sick call processes. Provider chronic care was timely and consistent with a community standard of care. The current SDSO healthcare delivery system is neither indifferent nor insensitive to the medical needs of its IP patients. Since the publication of the 2017 NCCHC Technical Assistance Report, the SDSO has worked tirelessly to create a healthcare system based upon increasing access to care and the quality of care of care being provided. The current program, based upon our assessment, is at a point where NCCHC accreditation is a realistic consideration.

I reserve the right to update my opinions upon receipt of new information.

Dated: August 21, 2024

_____
Owen J. Murray, D.O., M.B.A.

**Ex. A-45**

**Appendix F**

**CHP Full-Time Employee Contracted Staffing Hours**

## CONFIDENTIAL - FOR COUNSEL ONLY

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT C – PRICING SCHEDULE

1. **Invoicing**

   1.1. Contractor shall submit invoices monthly in an acceptable format. Charges shall be in accordance with the rate as proposed and agreed upon in the approved pricing schedule.

   1.2. Contractor shall forward invoices monthly in appropriate formats along with backup documentation for the services provided to Incarcerated Persons. Invoices shall be sent for payment processing to the Sheriff's Department Medical Services Admin/Claims Unit at the following address:

   > San Diego Sheriff's Department
   > Medical Services Division Administrative Support Unit
   > 5530 Overland Ave, Suite 370
   > San Diego, CA 92123

   1.3. Monthly payment shall be computed based upon a fixed rate.

   1.4. Contractor and the Sheriff shall agree to the following reimbursement schedule for overtime rendered:

   1.4.1. Payable in hourly basis at 1.5 (one point five) times per hour for the time that exceeds the regularly scheduled hours.

**TOTAL ESTIMATED COSTS (ALL FACILITIES)**

| Initial Term: June 1, 2024 through May 31, 2025 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $21,890,000 |
| Administration | 80 | 2 | $700,000 |
| Total | 1176 | 30.4 | $22,590,000 |

| Option Period 1: June 1, 2025 through May 31, 2026 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $22,546,700 |
| Administration | 80 | 2 | $721,000 |
| Total | 1176 | 30.4 | $23,267,700 |

CONFIDENTIAL - FOR COUNSEL ONLY    SD 1579731

Ex. A-46

**CONFIDENTIAL - FOR COUNSEL ONLY**

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT C – PRICING SCHEDULE

| Option Period 2: June 1, 2026 through May 31, 2027 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $23,223,101 |
| Administration | 80 | 2 | $742,630 |
| Total | 1176 | 30.4 | $23,965,731 |

| Option Period 3: June 1, 2027 through May 31, 2028 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $23,919,794 |
| Administration | 80 | 2 | $764,909 |
| Total | 1176 | 30.4 | $24,684,703 |

| Option Period 4: June 1, 2028 through May 31, 2029 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $24,637,338 |
| Administration | 80 | 2 | $787,856 |
| Total | 1176 | 30.4 | $25,425,244 |

| Option Period 5: June 1, 2029 through May 31, 2030 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $25,376,509 |
| Administration | 80 | 2 | $811,492 |
| Total | 1176 | 30.4 | $26,188,001 |

**CONFIDENTIAL - FOR COUNSEL ONLY**    SD 1579732

Ex. A-47

## CONFIDENTIAL - FOR COUNSEL ONLY

COUNTY CONTRACT NUMBER 571418
COUNTY OF SAN DIEGO, SHERIFF'S DEPARTMENT
AGREEMENT WITH CORRECTIONAL HEALTHCARE PARTNERS, INC. FOR
ON-SITE CLINICAL SERVICES
EXHIBIT C – PRICING SCHEDULE

| Option Period 6: June 1, 2030 through May 31, 2031 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $26,137,805 |
| Administration | 80 | 2 | $835,837 |
| Total | 1176 | 30.4 | $26,973,641 |

| Option Period 7: June 1, 2031 through May 31, 2032 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $26,921,939 |
| Administration | 80 | 2 | $860,912 |
| Total | 1176 | 30.4 | $27,782,851 |

| Option Period 8: June 1, 2032 through May 31, 2033 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $27,729,597 |
| Administration | 80 | 2 | $886,739 |
| Total | 1176 | 30.4 | $28,616,336 |

| Option Period 9: June 1, 2033 through May 31, 2034 | | | |
|---|---|---|---|
| Position | Hours Per Week | FTE | Total Costs |
| Personnel | 1096 | 28.4 | $28,561,485 |
| Administration | 80 | 2 | $913,341 |
| Total | 1176 | 30.4 | $29,474,826 |

## CONFIDENTIAL - FOR COUNSEL ONLY     SD 1579733

154

Ex. A-48

**Appendix G**

# *AUDIT WORKSHEET - Intake Screening*

Sample Size   75                    Facility: San Diego SD

**Total Pool:** 121

| SDSO # | PATIENT'S NAME | Time lapse from booking to receiving screening? | All positive screening findings appropriately referred and subsequent evaluations completed? | Chronic care/critical meds identifed on screening and continued | COMMENTS |
|---|---|---|---|---|---|
| | | **Hours Lapsed** | **Yes/No** | **Yes/No** | |
| 1 | ██ | **<1 hour** | Yes | Yes | |
| 2 | ██ | **<1 hour** | Yes | Yes | |
| 3 | ██ | **<2 hours** | Yes | Yes | |
| 4 | ██ | **<1 hour** | Yes | Yes | |
| 5 | ██ | **<1 hour** | Yes | Yes | |
| 6 | ██ | **<1 hour** | Yes | Yes | |
| 7 | ██ | **<1 hour** | Yes | Yes | |
| 8 | ██ | **<1 hour** | Yes | Yes | |
| 9 | ██ | **<1 hour** | Yes | Yes | |
| 10 | ██ | **<2 hours** | Yes | Yes | |
| 11 | ██ | **<1 hour** | Yes | Yes | |
| 12 | ██ | **<1 hour** | Yes | Yes | |
| 13 | ██ | **<1 hour** | Yes | Yes | |
| 14 | ██ | **<2 hours** | Yes | Yes | |
| 15 | ██ | **<1 hour** | Yes | Yes | |
| 16 | ██ | **<1 hour** | Yes | Yes | |
| 17 | ██ | **<1 hour** | Yes | Yes | |

155

**Ex. A-49**

| | | | | | | |
|---|---|---|---|---|---|---|
| 18 | ███ | ██████ | <2 hours | Yes | Yes | |
| 19 | ███ | █████ | <2 hours | Yes | Yes | |
| 20 | ███ | ███████ | <1 hour | Yes | Yes | |
| 21 | ███ | ██████ | <1 hour | Yes | Yes | |
| 22 | ███ | ████████ | <1 hour | Yes | Yes | |
| 23 | ███ | ████████ | <1 hour | Yes | Yes | |
| 24 | ███ | ███████ | <1 hour | Yes | Yes | |
| 25 | ███ | █████ | <1 hour | Yes | Yes | |
| 26 | ███ | ████████ | <1 hour | Yes | Yes | |
| 27 | ███ | █████ | <1 hour | Yes | Yes | |
| 28 | ███ | ██████ | <2 hours | No | No | Medical clearing <2 hrs no receiving screen - released same day |
| 29 | ██████████ | | <2 hours | Yes | Yes | |
| 30 | ███ | ██████ | <1 hour | Yes | Yes | |
| 31 | ███ | ███████ | <2 hours | Yes | Yes | |
| 32 | ███ | ██████ | <2 hours | Yes | Yes | |
| 33 | █████████ | | <1 hour | Yes | Yes | |
| 34 | ███ | █████ | <1 hour | Yes | Yes | |
| 35 | █████████ | | <1 hour | Yes | Yes | |
| 36 | ███ | █████ | <1 hour | Yes | Yes | |
| 37 | ███ | █████ | <1 hour | Yes | Yes | |
| 38 | ███ | ██████ | <1 hour | Yes | Yes | |
| 39 | ███ | ███████ | <1 hour | Yes | Yes | |
| 40 | ███ | ███████ | <1 hour | Yes | Yes | |
| 41 | ███ | ███████ | <1 hour | Yes | Yes | |
| 42 | ███ | ██████ | <1 hour | Yes | Yes | |
| 43 | ███ | ██████ | <1 hour | Yes | Yes | |
| 44 | ███ | ███████ | <1 hour | Yes | Yes | |
| 45 | ███ | ███████ | <2 hours | Yes | Yes | |
| 46 | ███ | ███████ | <1 hour | Yes | Yes | |
| 47 | ███ | ███████ | <1 hour | Yes | Yes | |
| 48 | ███ | ██████ | <1 hour | Yes | Yes | |

156

**Ex. A-50**

| 49 | ███ | ███ | <1 hour | Yes | Yes | |
| 50 | ███ | ███ | <1 hour | Yes | Yes | |
| 51 | ███ | ███ | <1 hour | Yes | Yes | |
| 52 | ███ | ███ | <1 hour | Yes | Yes | |
| 53 | ███ | ███ | <1 hour | Yes | Yes | |
| 54 | ███ | ███ | <2 hours | Yes | Yes | |
| 55 | ███ | ███ | <1 hour | Yes | Yes | |
| 56 | ███████ | | <1 hour | Yes | No | No HTN follow up |
| 57 | ███ | ███ | <1 hour | Yes | Yes | |
| 58 | ███ | ███ | <1 hour | Yes | Yes | |
| 59 | ███ | ███ | <2 hours | Yes | Yes | |
| 60 | ███ | ███ | <1 hour | Yes | Yes | |
| 61 | ███ | ███ | <1 hour | Yes | Yes | |
| 62 | ███ | ███ | <1 hour | Yes | Yes | |
| 63 | ███ | ███ | <1 hour | Yes | Yes | |
| 64 | ███ | ███ | <1 hour | Yes | Yes | |
| 65 | ███ | ███ | <2 hours | Yes | Yes | |
| 66 | ███████ | | <1 hour | Yes | Yes | |
| 67 | ███ | ███ | <1 hour | Yes | No | No MH Follow up |
| 68 | ███ | ███ | <1 hour | Yes | Yes | |
| 69 | ███ | ███ | <1 hour | Yes | Yes | |
| 70 | ███ | ███ | <1 hour | Yes | Yes | |
| 71 | ███ | ███ | <1 hour | Yes | Yes | |
| 72 | ███ | ███ | <1 hour | Yes | Yes | |
| 73 | ███ | ███ | <1 hour | Yes | Yes | |
| 74 | ███ | ███ | <1 hour | Yes | Yes | |
| 75 | ███ | ███ | <1 hour | Yes | Yes | |

**# Compliant 72**          **# Non-Compliant 3**          **% Compliant 96%**

157

**Ex. A-51**

**Appendix H**

## *AUDIT WORKSHEET - Intake H&P*

Sample Size                                    Facility

75                     San Diego SD

:

Total Pool: 121

| SDSO # | PATIENT'S NAME | Booking Date | Release Date | Days In Custody | H&P Date | H&P Completed 14 days or less from booking? | Compliant? | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| 1 | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 2 | | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 3 | | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 4 | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 5 | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 6 | | 1/2/24 | 1/2/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 7 | | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 8 | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 9 | | 1/1/24 | In Custody | In Custody | 1/8/24 | Yes | Yes | |
| 10 | ' | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 11 | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 12 | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 13 | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |

158

**Ex. A-52**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 14 | ■■■ | ■■■■ | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 15 | ■■■ | ■■■■ | 1/1/24 | 1/4/24 | 4 | N/A | N/A | Yes | Released within 14day threshold |
| 16 | ■■■ | ■■■■ | 1/2/24 | 1/2/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 17 | ■■■ | ■■■■ | 1/2/24 | 1/4/24 | 3 | N/A | N/A | Yes | Released within 14day threshold |
| 18 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 19 | ■■■■■■■ | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 20 | ■■■ | ■■■■ | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 21 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 22 | ■■■ | ■■■■ | 1/1/24 | 1/9/24 | 9 | N/A | N/A | Yes | Released within 14day threshold |
| 23 | ■■■ | ■■■■ | 1/1/24 | 2/26/24 | 57 | 1/8/24 | Yes | Yes | |
| 24 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 25 | ■■■ | ■■■■ | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 26 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 27 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 28 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 29 | ■■■ | ■■■■ | 1/1/24 | 1/4/24 | 4 | N/A | N/A | Yes | Released within 14day threshold |
| 30 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 31 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 32 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 33 | ■■■ | ■■■■ | 1/1/24 | In Custody | In Custody | 1/15/24 | Yes | Yes | |
| 34 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 35 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 36 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 37 | ■■■ | ■■■■ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |

**Ex. A-53**

| 38 | ▮ | ▮ | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 39 | ▮ | ▮ | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 40 | ▮ | ▮ | 1/2/24 | 1/2/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 41 | ▮ | ▮ | 1/2/24 | 1/2/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 42 | ▮ | ▮ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 43 | ▮ | ▮ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 44 | ▮ | ▮ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 45 | ▮ | ▮ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 46 | ▮ | ▮ | 1/1/24 | 1/16/24 | 16 | 1/8/24 | Yes | Yes | |
| 47 | ▮ | ▮ | 1/1/24 | 4/6/24 | 97 | 1/9/24 | Yes | Yes | |
| 48 | ▮ | ▮ | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 49 | ▮ | ▮ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 50 | ▮ | ▮ | 1/1/24 | 3/31/24 | 91 | **None Found** | **No** | **No** | |
| 51 | ▮ | ▮ | 1/1/24 | 1/5/24 | 5 | N/A | N/A | Yes | Released within 14day threshold |
| 52 | ▮ | ▮ | 1/1/24 | 1/4/24 | 4 | N/A | N/A | Yes | Released within 14day threshold |
| 53 | ▮ | ▮ | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 54 | ▮ | ▮ | 1/1/24 | 3/15/24 | 75 | 1/11/24 | Yes | Yes | |
| 55 | ▮ | ▮ | 1/2/24 | 1/2/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 56 | ▮ | ▮ | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 57 | ▮ | ▮ | 1/1/24 | 4/3/24 | 94 | 1/8/24 | Yes | Yes | |
| 58 | ▮ | ▮ | 1/1/24 | 3/21/24 | 81 | **None Found** | **No** | **No** | |
| 59 | ▮ | ▮ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 60 | ▮ | ▮ | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |

160

**Ex. A-54**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 61 | | | 1/2/24 | 1/2/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 62 | | | 1/2/24 | 1/2/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 63 | | | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 64 | | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 65 | | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 66 | | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 67 | | | 1/1/24 | 1/5/24 | 5 | Refused | N/A | Yes | |
| 68 | | | 1/1/24 | In Custody | In Custody | 1/15/24 | Yes | Yes | |
| 69 | | | 1/1/24 | 1/2/24 | 2 | N/A | N/A | Yes | Released within 14day threshold |
| 70 | | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 71 | | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 72 | | | 1/1/24 | 1/24/24 | 24 | 1/15/24 | Yes | Yes | |
| 73 | | | 1/1/24 | 1/4/24 | 4 | 1/1/24 | Yes | Yes | |
| 74 | | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |
| 75 | | | 1/1/24 | 1/1/24 | 1 | N/A | N/A | Yes | Released within 14day threshold |

**# Compliant: 73**      **# Non-Compliant: 2**      **% Compliant: 97%**

**Ex. A-55**

**Appendix I**

# *AUDIT WORKSHEET - Nursing Sick Call*

Sample Size

25 | San Diego SD

Facility:

Total Pool: 120

| SDSO # | PATIENT'S NAME | Did nursing triage the Health Care Form (J-212) within 24 hours of reciept date? | Did the RN complete a face to face physical assessment within 24 hours of triage date/time? | All Referrals made as appropriate to (Medical, MH, Dental) | COMMENTS |
|---|---|---|---|---|---|
|  |  | **Yes/No** | **Yes/No** | **Yes/No** |  |
| 1 | ▮ | Yes | Yes | Yes | J-212 (p 143), Appt (p 121) |
| 2 | ▮ | Yes | Yes | Yes | J-212 (p94), Appt & Referral (p 1011-1012) |
| 3 | ▮ | Yes | Yes | Yes | J-212 (p84, Appt & Referral (p297) |
| 4 | ▮ | Yes | Yes | Yes | J-212 (p38), Appt (p28) |
| 5 | ▮ | Yes | Yes | Yes | J-212 (p159), Appt & Referral (p433) |
| 6 | ▮ | Yes | Yes | Yes | J-212 (p53), Appt & Referral (p396) |
| 7 | ▮ | Yes | Yes | Yes | J-212 (p167), Appt (p223) |
| 8 | ▮ | Yes | Yes | Yes | J-212 (p23), Appt & Referral (p17) |
| 9 | ▮ | Yes | Yes | Yes | J-212 (p89), Appt (p319) |
| 10 | ▮ | Yes | Yes | Yes | J-212 (p76), Appt (p144) |
| 11 | ▮ | Yes | Yes | Yes | J-212 (p67), Appt & Referral (p196) |
| 12 | ▮ | Yes | Yes | Yes | J-212 (p29), Appt (p18) |

162

**Ex. A-56**

| 13 | ███ | ███ | Yes | Yes | Yes | J-212 (p110), Appt (p40) |
| 14 | ███ | ███ | Yes | Yes | Yes | J-212 (p80), Appt (705) |
| 15 | ███ | ███ | Yes | Yes | Yes | J-212 (41), Appt (p39), referral (p 426) |
| 16 | ███ | ███ | Yes | Yes | Yes | J-212 (p64), Appt (p 321) |
| 17 | ███ | ███ | Yes | Yes | Yes | J-212 (p34) Appt (p140), Referral (p111) |
| 18 | ███ | ███ | Yes | Yes | Yes | J-212 (p43), Appt (p41), Referral (p215) |
| 19 | ███ | ███ A | Yes | Yes | Yes | J-212 (p72), Appt (p55) |
| 20 | ███ | ███ | Yes | Yes | Yes | J-212 (p133), Appt (p94) |
| 21 | ███ | ███ | Yes | Yes | Yes | J-212 (p46), Appt (p70) |
| 22 | ███ | ███ | No | No | Yes | J-212 (p50), Appt (p21) face to face >24 hrs, pt refused |
| 23 | ███ | ███ | Yes | Yes | Yes | J-212 (p15), Appt (p128) |
| 24 | ███ | ███ | Yes | Yes | Yes | J-212 (p37), Appt (p35) |
| 25 | ███ | ███ | Yes | Yes | Yes | J-212 (p 36), Appt (p62), Referral (p746) |

**# Compliant: 24**          **# Non-Compliant: 1**          **% Compliant: 96%**

163

**Ex. A-57**

## Appendix J

### Medical Record Reviews – IPs with Chronic Care Conditions

**1. Patient:** ███████████████
Booking Number: ████████████
Dates Reviewed: ██/23 - ██/24
Reviewer: Stephen Boone, M.D.

Summary of Care

██-year-old male with history of hypertension and obesity.

Mr. ████████ presented with stage 2 hypertension for which combination antihypertensive medications were recommended. He was agreeable only to amlodipine monotherapy despite counseling. His blood pressure remained above goal, though did improve with this regimen. He had BP checks and follow-up visits at appropriate time intervals.

Mr. ████████ was treated for multiple skin and soft tissue abscesses during the review period. He received timely treatment, including incision and drainage and culture-directed antibiotics, along with appropriate wound care and follow-up visits. His refusal of blood sampling prevented testing for underlying disease risk factors (e.g. DM).

Mr. ████████ refused blood draws on multiple occasions and thus screening lab studies were not able to be completed.

Conclusion
Meets Standard of Care

**2. Patient:** ███████████████
Booking Number: ████████████
Dates Reviewed: ██/22 - ██/24
Reviewer: Stephen Boone, M.D.

Summary of Care

██-year-old male with history of insulin-dependent diabetes mellitus, hypertension and obesity.

Mr. ████████ presented with poorly controlled IDDM (A1C 10%) and a history of poor adherence to prescribed medications. He was prescribed metformin, glipizide, and insulin glargine. Despite frequent counseling, he demonstrated variable adherence to diabetes medications and carb-restricted diet while in custody. However, in spite of intermittent refusals, he did achieve improved glycemic control as evidenced by a significant reduction in A1C from 10% to 7.9% (██/2023). He was treated with lisinopril for hypertension and for prevention of diabetic nephropathy. He was treated with atorvastatin for hyperlipidemia and ASCVD risk-reduction per guidelines.

Conclusion
Meets Standard of Care

Ex. A-58

**3. Patient:** ███████
Booking Number: ████████
Dates Reviewed: ███ 24 - ██/24
Reviewer: Stephen Boone, M.D.

Summary of Care

██-year-old male with history of HIV and atopic dermatitis. Upon intake, Mr. ████ reported a history of HIV with nonadherence to retroviral therapy for over 1 year. Intake medical staff ordered appropriate HIV-related laboratory studies, including HIV genotype and Lymphocyte Subset panel, in addition to other STD screening tests. He was referred to Infectious Disease specialists and started on standard of care antiretroviral therapy. He also underwent routine recommended screening for LTBI, Covid, Diabetes, Dyslipidemia, Hypertension, and review of selected immunizations (flu, Tdap, hep A).

*Missing Documentation/Opportunities:*
The available medical records did not include screening for Hepatitis A or Hepatitis B immunity, nor an inquiry regarding pneumococcal vaccination. This might represent a missed opportunity to offer these respective immunizations; alternatively, this documentation may simply not have been included in the records provided for review.

Conclusion
Meets Standard of Care

**4. Patient:** ██████
Booking Number: ████████
Dates Reviewed: ██/23 - ██/24
Reviewer: Stephen Boone, M.D.

Summary of Care

██-year-old male with history of hypertension. He entered medical care with untreated and uncontrolled hypertension (171/104). His blood pressure was managed initially with losartan and counseling on lifestyle modifications. Hydrochlorothiazide was later added for persistently elevated blood pressure. He had follow-up visits at appropriate intervals, including blood pressure checks and appropriate lab testing. It is noted he periodically refused medical checks and recommended medications; however, he did achieve improved blood pressure control with these interventions. He was also diagnosed with dyslipidemia and associated elevated cardiovascular risk, for which atorvastatin was appropriately prescribed.  It appears he also dealt with mild depressive symptoms, which were well-managed with talk therapy, exercise, and other healthy coping skills.

*Missing Documentation/Opportunities:*
The available medical records did not include screening for Hepatitis A or Hepatitis B immunity, nor an inquiry regarding pneumococcal vaccination. This patient may also have benefitted from screening for obstructive sleep apnea based on presence of risk factors (male sex, elevated BMI, and presence of hypertension). This might represent a missed opportunity to offer these respective screenings and treatments; alternatively, this documentation may simply not have been included in the records provided for review.

Conclusion
Meets Standard of Care

Ex. A-59

**5. Patient:** ███████████

Booking Number: ████████
Dates Reviewed: ██/22 - ██/22 and ██/24 - ██/24
Reviewer: Stephen Boone, M.D.

Summary of Care

This patient is a ██-year-old male with hypertension. He was booked into the Vista Detention Facility on ████████ 2022. About a month later, he was transferred to CDCR. He then transferred back to jail on ████████ 2024. Just prior to his transfer back to jail, he reported being told he had hypertension. His BP was elevated when he arrived to the jail, and he was started on lisinopril. His BP was subsequently monitored, and the NP increased the dose of the lisinopril after noting high BP readings.

Conclusion
Meets Standard of Care

When the patient arrived back to jail in ████ 2024, the medical staff focused on his elevated blood pressure and promptly started him on antihypertensive medication. There was evidence of shared decision making between the patient and the NP.

**6. Patient:** ███████████

Booking Number: ████████
Dates Reviewed: ██/23 - ██/24
Reviewer: Stephen Boone, M.D.

Summary of Care

██-year-old man with history of morbid obesity, heart failure with preserved ejection fraction, OSA, previously treated HCV, and opiate use disorder.

Mr. ████████ was seen regularly by an MD and NP during his incarceration for chronic care and episodic care needs. Provider documentation was thorough and complete with detailed assessments and plans. Despite reported history of hypertension, his blood pressure was consistently well controlled without medications. He had no clinical signs or symptoms of heart failure during the review period. He was provided with CPAP machine and associated DME for his OSA. He lost a significant amount of weight during this time period with diet and exercise. He was treated with suboxone for OUD as part of the MAT program. His chronic neuropathic pain was treated with gabapentin primarily and sparing doses of opiates when needed. He dealt with intermittent constipation, likely secondary to suboxone, for which he received appropriate examinations, testing, medications, and counseling. He had appropriate screening laboratory studies.

Conclusion
Met Standard of Care

**7. Patient:** ███████████
Booking Number: ████████

166

**Ex. A-60**

Dates Reviewed: ▮/21- -▮/24
Reviewer: Stephen Boone, M.D.

Summary of Care

▮-year-old man with history of hypertension, hypercholesterolemia, hypothyroidism, BPH, and mood disorder, as well as previous subdural hematoma s/p craniotomy (2021).
In review of provided medical records, there do not appear to have been significant complicated chronic care needs. However, documentation regarding assessments and treatment plan for hypertension is generally quite poor. Hypertension was treated with combination therapy including metoprolol, losartan and amlodipine, though it's difficult to determine if/when dosages were adjusted without sorting through hundreds of pages of the MAR. The progress notes provide minimal detail in the assessment/plan sections, particularly in regard to documentation of current and previous medications, dosage adjustments, treatment goals, medical decision making, etc. A sample of blood pressure measurements and respective dates are listed below. It appears blood pressure was poorly-controlled overall.

▮/23 – 165/72
▮/23 – 211/104
▮/23 – 152/77
▮/23 – 187/89 – Assessment: "HTN"; No "plan" related to HTN
▮/23 – NP visit for HTN. No vitals included. Plan for weekly BP checks.
▮/23 – 146/86
▮/23 –162/92
▮/22 – 189/x
▮/22 – 167/84

Additionally, in ▮▮▮ 2023, Mr. ▮▮▮ had an EKG completed which was interpreted as atrial fibrillation by a nurse practitioner. The EKG was not available for review. The NP mentions a plan for cardiology referral, however, there is no subsequent notation of A-fib or notes regarding this referral in the provided medical records, nor are subsequent EKG reports are found.

He did have appropriate screening lab studies including lipids, BMP, A1C, and TSH.

Hypothyroidism was treated with levothyroxine. A baseline TSH was obtained ▮/2022, though no followup levels are found. Hyperlipidemia and associated elevated cardiovascular risk was treated with atorvastatin. BPH was treated with finasteride.

A sample of uncomplicated episodic care visits were reviewed:

Episodic Care:
▮/2023 – Otitis externa – Topical antibiotic, NSAIDs
▮2022 – uncomplicated cellulitis lower extremity – Keflex, Bactrim
▮/2022 – strep pharyngitis – amoxicillin

Conclusion
Does Not Meet Standard of Care

Although poorly controlled hypertension alone would not merit a review of substandard care, there is insufficient documentation regarding the diagnostic and treatment plan despite poor control for the

Ex. A-61

duration of the review period. There was insufficient documentation and follow-up for the atrial fibrillation diagnosis. TSH should have been monitored at least annually while on levothyroxine, particularly in this patient with uncontrolled hypertension and new atrial fibrillation.

**8. Patient:** ███████████
Booking Number: ██████████
Dates Reviewed: ██ /22 - ██ /24
Reviewer: Stephen Boone, M.D.

Summary of Care
██ -year-old male with history of unspecified mood disorder.

He was followed closely by psychiatry during his incarceration for mood disorder and psychosis NOS. He was treated primarily with ziprasidone and psychotherapy.

Multiple refusals for healthcare visits, labs and vital sign checks are documented throughout the medical records.

He was treated for cellulitis of the right foot associated with a friction blister. He was followed closely by medical staff during this period with good documentation of wound healing, along with photographs demonstrating healing.

He did not appear to have any significant chronic medical care needs during review period.

Conclusion
Meets Standard of Care

**9. Patient:** ███████████
Booking Number: ██████████
Dates Reviewed: ██ /22 - ██ /24
Reviewer: Stephen Boone, M.D.

Summary of Care
██ -year-old male with history of hypertension, seizure disorder, and chronic neck and back pain, and chronic knee pain.

Mr. ███████ presented with uncontrolled/untreated hypertension at intake. He was started on firstline antihypertensives with treatment goals per established guidelines (JNC 8). He received timely blood pressure checks, medication titration, and had orders for relevant screening laboratory studies, such as CMP, lipid panel, TSH, A1C. There are multiple notations of patient refusing blood draws throughout the medical record and thus no lab results are found in provided documentation.

He was continued on phenytoin and gabapentin for seizure disorder. He was seen in sick call on 8/10 after reportedly having a seizure that morning in the context of poor adherence to phenytoin. He had an appropriate physical exam, including neurologic exam and evaluation for injuries.

He had history of chronic back pain and radiculopathy. Outside medical records appear to have been obtained and reviewed in timely fashion. He was continued on gabapentin and OTC analgesics. He received counseling regarding the nature of chronic pain and advised on the importance of movement and stretching. He was also referred to a pain management specialist. Pain management advised an MRI of the C/L spine, along with physical therapy, and an increased dose of gabapentin, all of which were ordered. MRI C/L spine was refused by patient.

In the setting of chronic knee pain and unsteady gait, he underwent a disability assessment, was provided with an assistive device (cane) and a lower bunk. It appears a wheelchair was also made available for intermittent long-distance travel if needed. Per multiple subsequent nursing notes, he was able to perform ADLS independently without assistance.

In ▇▇▇▇ 2023, a small soft tissue mass was noted on examination of right knee. An ultrasound revealed a small echogenic mass and a subsequent MRI was suggestive of a benign mass.

He was followed by psychiatry during this time period with regularly scheduled visits for mood disorder. He was intermittently adherent with recommended medications despite counseling on appropriate use.

Conclusion
Meets Standard of Care


**10. Patient:** ▇▇▇▇▇▇▇▇▇
Booking Number: ▇▇▇▇▇▇
Dates Reviewed: ▇▇ /23 - ▇▇ /24
Reviewer: Stephen Boone, M.D.

Summary of Care
▇▇ -year-old female with medical history of ▇▇▇▇▇▇▇▇▇ headache, hypothyroidism, polytrauma and multiple musculoskeletal injuries and chronic back pain, mental health history of mood disorder, anxiety, stimulant disorder, and PTSD.

Ms. ▇▇▇▇▇ hypertension was managed with appropriate antihypertensive therapy with gradual titration and monitoring at timely intervals. She achieved target blood pressures with combination lisinopril and HCTZ. She was continued on levothyroxine for hypothyroidism with TSH monitoring. Her chronic pain was managed with multimodal non-opiate therapy including acetaminophen, ibuprofen, and gabapentin.  Her screening laboratory studies were normal (CMP, CBC, TSH, HIV, Hep Panel).

Ms. ▇▇▇▇ was followed by psychiatry for unspecified mood disorder, stimulant use disorder, anxiety and PTSD. She was prescribed psychoactive medications with appropriate counseling on risks, benefits, and alternatives. Her mental health medications were titrated and adjusted at timely intervals with regularly scheduled psychiatric visits. She also received regular psychotherapy/counseling. There appears to have been significant improvement in her mood and sleep with these interventions.

Conclusion
Meets Standard of Care


**11. Patient:** ▇▇▇▇▇▇▇▇

Ex. A-63

Booking Number: ███████
Dates Reviewed: ██/23 - ██/24
Reviewer: Stephen Boone, M.D.

<u>Summary of Care</u>

██-year-old female with history of seizure disorder, possible psychogenic non-epileptic seizures, diabetes mellitus, substance use disorder (amphetamines and opiates), and mood/anxiety disorder.

Her seizure disorder was generally well-controlled on multiple antiepileptics, including Keppra, Topamax, and Lacosamide, with rare breakthrough seizures. There were also reports of episodes of total body shaking with preserved consciousness that appeared to be non-epileptic in nature. In ███ 2024, she was sent to the hospital for multiple seizure-like episodes in the setting of medication nonadherence. She was hospitalized in observation status and followed by neurology service with continuation of antiepileptic therapy and underwent EEG and brain MRI.

It appears her diabetes was primarily managed with diet and did not require medications. Her index A1C was 7.8% in ██████████ 2023 with subsequent A1C measurements of 5.8% (██2024) and 5.9% (██2024).

Ms. ███████ was followed closely by psychiatry during her stay. She was treated with Zoloft for depression/anxiety, Vistaril for anxiety, Topamax for mood stabilization, and prazosin for nightmares. Ms. ███████ was also enrolled in the MAT program and treated with suboxone for OUD.

<u>Conclusion</u>
Meets Standard of Care


**12. Patient:** ███████████
Booking Number: ███████
Dates Reviewed: ██/23 - ██/24
Reviewer: Stephen Boone, M.D.

<u>Summary of Care</u>

██-year-old male with history of abdominal hernia, anxiety, hypertension, GERD with esophagitis, and abdominal hernia.

Mr.███ hypertension was treated with lisinopril with good blood pressure control. He had appropriate periodic blood pressure checks and relevant laboratory monitoring. His abnormal lipids were managed with a statin, with appropriate discussion of risks and benefits based on his cardiovascular risk profile. His GERD was managed with long-term proton pump inhibitor therapy per previous GI recommendations. His abdominal hernia was stable without evidence of complication and thus did not require surgical correction during his incarceration.

He was followed closely by psychiatry and mental health counselors for anxiety and depressed mood. He received multimodal therapy, including psychotropic medications: mirtazapine and Vistaril.

<u>Conclusion</u>
Meets Standard of Care

**Ex. A-64**

**13. Patient:** ███████
Booking Number: ████
Dates Reviewed: ██/23 - ██/24
Reviewer: Stephen Boone, M.D.

Summary of Care

██-year-old man with apparent history of hypertension, GERD, and BPH.

Intake Screening: ██/23 notes history of HTN, BPH, GERD
Denies SUD or illicit substance use > 20 years
BP 169/74
Meds verified with Surescripts and ordered: Meloxicam, Atorvastatin, ferrous sulfate, omeprazole, terazosin, Losartan
"Chronic Care follow-up appointment as scheduled"
██/2023: MDSC with MD - Low Back Pain, Sciatica – Prednisone, Tramadol, Cyclobenzaprine
██/2023: Addendum by MD mentions compliance with suboxone and plan for dose titration. (No mention of suboxone elsewhere and not found in MAR)

██/23: MDSC – f/u visit with NP; LBP improving

Chronic Care Visit (NP): ██/24
This appears to be the initial chronic care visit which occurred over 5 months after intake screening.
EKG, UA, TSH, CMP, CBC, Lipids ordered – Normal/near normal results

Conclusion
Meets Standards of Care

Mr. ████ has been in the San Diego Jail for approximately 6 months at the time of this review. He has been seen for his first chronic care visit. He was noted to have multiple chronic medical conditions at intake in ██████ 2023, and his community medications were continued upon arrival to the jail. One of these medications, ferrous sulfate, was later appropriately discontinued when it was no longer indicated.

**14. Patient:** ███████
Booking Number: ████
Dates Reviewed: ██/23 - ██/24
Reviewer: Stephen Boone, M.D.

Summary of Care

██-year-old male with medical history of obesity, hypertension, hyperlipidemia, pre-diabetes, GERD and BPH. He was treated with the following medications: Losartan, Atorvastatin, Tamsulosin, Metformin and Omeprazole.

Mr. ████ had consistent chronic care visits at timely intervals, as well as appropriate laboratory screening studies (e.g. A1C, Lipids, TSH and BMP). His blood pressure appears to have been generally well managed and at, or near, treatment targets at the majority of clinician visits. When blood pressure was elevated, short term follow-up checks were performed. Total cholesterol and

LDL were well controlled and he was treated with an appropriately dosed moderate intensity statin based upon his cardiovascular disease risk factors.

*Opportunities/ Missing Documentation:*
There was no mention in the medical record of "obesity" or "elevated BMI", despite a documented weight of 268 lbs and a BMI of 37. Counseling regarding weight loss strategies and the health benefits of weight loss and exercise should be provided. Screening for obesity-related comorbid conditions, specifically OSA, should also be considered.

Laboratory testing in ▮▮▮▮ 2023 was notable for mild normocytic anemia (Hgb 11.5, MCV 88). I found no documentation of this lab result by a clinician and no subsequent testing.

Conclusion
Meets Standard of Care

**15. Patient:** ▮▮▮▮▮▮
Booking Number: ▮▮▮▮
Dates Reviewed: ▮ /23 - ▮ /24
Reviewer: Stephen Boone, M.D.

Summary of Care
▮▮-year-old male with history of hypertension, hyperlipidemia, BPH, chronic back pain/sciatica, and unspecified mood disorder and substance use disorder.

Mr. ▮▮▮▮ presented with uncontrolled hypertension which was well-managed with gradual titration of first-line antihypertensive agents along with appropriate laboratory monitoring and timely blood pressure checks.

He was treated with gabapentin for chronic back pain with sciatica, tamsulosin for BPH, and atorvastatin for hyperlipidemia. Additionally, it was recognized that he had history of inappropriate opiate use and he was enrolled in the MAT program and treated with suboxone.

He had recently undergone colorectal and prostate cancer screening with colonoscopy and PSA/MRI, respectively. He was provided with standard immunizations.

Conclusion
Meets Standards of Care

**16. Patient:** ▮▮▮▮▮▮
Booking Number: ▮▮▮▮
Dates Reviewed: ▮ /23 - ▮ 24
Reviewer: Stephen Boone, M.D.

Summary of Care
▮▮-year-old male with history of mood disorder, polysubstance use disorder including opiate use disorder, and chronic back pain with neuropathy.

**Ex. A-66**

Mr. ███ underwent routine recommended screening for LTBI, Covid, Diabetes, Dyslipidemia, Hypertension, and review of selected immunizations

Upon intake in ███ of 2023, it was recognized that Mr. ███ was at risk for complicated withdrawal from alcohol, benzodiazepines, and opiates. An appropriate care plan was instituted including CIWA assessments and symptom triggered diazepam as needed, along with other supportive care measures. Additionally, Suboxone was initiated for opiate withdrawal per protocol and he entered into MAT (medication assisted treatment) program which included regular clinician visits, medication management and counseling. Following a transient suboxone dose reduction due to concerns for diversion, the suboxone dose was gradually titrated upwards to target. He received education regarding the community MAT program and how to coordinate care upon release.

In addition to suboxone, his chronic pain was managed with gabapentin and acetaminophen.

Mr. ███ received consistent mental health care including psychiatrist visits and wellness checks. He was treated with quetiapine for mood and insomnia, along with adjunctive gabapentin and melatonin. His treatment plan included discussions regarding the risks, benefits, and alternatives for medications and other treatment options. He had appropriate laboratory monitoring per established protocols.

Conclusion
Meets Standard of Care


**17. Patient:** ████████
Booking Number: ████
Dates Reviewed: ███/22 - ███/23
Reviewer: Stephen Boone, M.D.

Summary of Care
██-year-old male with history of mood disorder (NOS), alcohol use disorder, and diabetes.

Mr. ███ received consistent mental health care including psychiatrist visits and wellness checks. He was treated primarily with ziprasidone and quetiapine for mood and cognitive symptoms, along with paroxetine for mood and anxiety. His treatment plan included discussions regarding the risks, benefits, and alternatives for medications and other treatment options. He had appropriate laboratory monitoring per established protocols.

Mr. ███ diabetes and hypertriglyceridemia was well managed with metformin and gemfibrozil. He had appropriate lab monitoring and associated screening tests, such as monitoring of hemoglobin A1C, renal function and lipids.

*Opportunities/Missing Documentation:*
A complete and detailed medical H&P is not found.

A faxed report of outside medical records appears to have been received on ███ 2022 which includes results from a sleep study, along with BPAP titration, which confirmed a diagnosis of

173

**Ex. A-67**

Severe Obstructive Sleep Apnea and a recommend positive airway pressure treatment plan with BPAP 17/13 cm H2O.
A brief MD note on ██/2022 notes the diagnosis of OSA from the outside report, however, nowhere else in the provided medical records is there mention of OSA or provision of CPAP/BPAP for treatment.

It's not clear from the medical record if Mr. ██████ had a diagnosis of Diabetes vs Prediabetes. Hemoglobin A1C measurements were in the "prediabetes range", however this was in the setting of treatment with metformin. Clinician documentation regarding diabetes history is scant, though at least one physician progress note (██/22) does include a diagnosis of "DM Type 2". It is thus difficult to determine if appropriate diabetes related screenings, such as annual eye exam, foot exams, and urine proteinuria testing, were indicated and provided.

Conclusion
Does Not Meet Standard of Care

Owing to the lack of documentation and treatment of known severe obstructive sleep apnea, as well as limited, or absent, documentation of screening for diabetic complications such as annual dilated fundoscopic exams, annual foot exams, and proteinuria screening, this does not meet standard of care.


**18. Patient:** ███████████
Booking Number: 2███████
Dates Reviewed: ██/23 - ██/24
Reviewer: Stephen Boone, M.D.


Summary of Care
██-year-old male with history of Hypertension, BPH, Migraine, Psychosis NOS, and Polysubstance use disorder.

Mr. ██████ received comprehensive psychiatric care including regular visits with psychiatry and mental health clinicians. He was treated with Zyprexa, Lexapro, Remeron, and prazosin with appropriate dose titration and monitoring.

Mr. ██████ had well controlled hypertension with Losartan as his primary antihypertensive agent.

In ██████ 2024, he was found to have modestly elevated liver enzymes for which subsequent testing revealed chronic hepatitis C viral infection. Appropriate labs and imaging studies (abdominal ultrasound) were obtained and the patient was referred to infectious disease specialist for consideration of HCV treatment.

For his opiate use disorder, he enrolled in the MAT program in ████████ 2023 and was treated with daily suboxone per protocol.

*Opportunities/Missing Documentation:*
Among the 442 pages of medical records provided dating from ██████ 2023 to ██ 2024, there does not appear to be a comprehensive history and physical exam completed by a physician or PA/NP. Is is noted than an initial health assessment was completed by an RN and then "signed off"

174

**Ex. A-68**

by a physician. It appears his first true chronic medical care visit with a physician didn't occur until ████ 2024, and the physician addressed only hypertension. There was no mention of other known diagnoses (BPH, Migraine, Opiate Use Disorder) or medications, etc.

Chronic Hepatitis C (HCV) infection was diagnosed after noting abnormal liver profile results. In light of the high prevalence of HCV among incarcerated patients, the Sheriff's Department should strongly consider universal opt-out screening for Hepatitis C.

A CBC performed on █24 was notable for mild anemia (Hemoglobin 11.8, MCV 89). There is no indication that this result was acknowledged by a qualified medical professional and thus no subsequent investigations performed (at least through the end of the review period in ██ 2024).

Conclusion
Meets Standard of Care


**19. Patient:** ████████
Booking Number: ██████
Dates Reviewed: ██/21 - ██/23
Reviewer: Stephen Boone, M.D.

Summary of Care
██-year-old male with history of hypertension, allergic rhinitis, and GERD.

Hypertension was well managed with medications. Blood pressure checks occurred at timely intervals and therapy was appropriate modified when indicated. He was treated initially with lisinopril but developed a dry cough which prompted a change to amlodipine. Losartan was later added a second agent. Allergic rhinitis was treated with fluticasone nasal spray and loratadine when needed. GERD was treated with appropriate antacids when needed.

Comprehensive laboratory screening tests, including CBC, CMP, Lipids, TSH, and PSA were generally unremarkable.

Multiple periodic sick visits were provided upon request for minor complaints such as skin dryness, tinea cruris, headache, musculoskeletal pain, trouble sleeping, etc.

He was seen on multiple occasions for foot rash that was appropriately managed with local wound care measures, hygienic counseling, and antimicrobials when needed.

In ████ 2022, he was evaluated for right upper quadrant pain by a nurse practitioner who provided analgesics and appropriately obtained labs and an abdominal ultrasound which were unrevealing. His symptoms spontaneously improved.

Conclusion
Meets Standard of Care


**20. Patient:** ████████

Booking Number: ████
Dates Reviewed: ██ /23 - ██ /24
Reviewer: Stephen Boone, M.D.

<u>Summary of Care</u>

██ -year-old male with significant psychiatric history who was admitted to the SDCJ after a nine month stay at the State hospital. Psychiatric diagnoses included: Unspecified psychosis, Unspecified mood disorder, Combination drug use, and Non-compliance to Treatment. He was provided with intensive psychiatric care, combination antpsychotic medications with frequent psychiatry and behavioral health clinician visits.

He had no other significant chronic health care needs. He received standard medical screening tests and periodic sick care visits for minor health complaints. He underwent appropriate laboratory monitoring for a patient on psychotropic medications. Labs were periodically notable for mild hyponatremia and mild metabolic acidosis in the setting of excessive water intake (psychogenic polydipsia). This was appropriately managed with oral electrolyte containing fluids, free water restriction protocol, and short-term follow up lab studies.

<u>Conclusion</u>
Meets Standard of Care

**21. Patient:** ████████
Booking Number: 2██████
Dates Reviewed: ██ /23 - ██ /24
Reviewer: Stephen Boone, M.D.

<u>Summary of Care</u>

██ -year-old male with history of hypertension, methamphetamine use disorder, and mood disorder.

Mr. ████ had minimal chronic medical care needs documented during the reviewed time period. His blood pressure appears to have been well-controlled with once daily hydrochlorothiazide and lisinopril.

His mood disorder was managed by psychiatry with follow-up visits at timely intervals.

*Opportunities/Missing Documentation:*
A comprehensive H&P or progress note by a physician/APP is not found in the provided documentation. The medical history and provision of chronic care appears to rely heavily on an initial nursing intake assessment.

It is notable that Mr. ████ weighed 354 lbs with a BMI of 46. However, there is no documentation of obesity or other notation regarding markedly elevated BMI.
Although Mr. ████ had some lab studies done at an outside facility just prior to booking, there are no results found for Lipid screening. A basic metabolic panel should also have been obtained subsequent to initiating treatment with HCTZ and Lisinopril. There is mention of sleeping difficulty in psychiatry notes, which may be related to psychiatric illness, but this patient also should be screened for obstructive sleep apnea.

**Ex. A-70**

Conclusion
Meets Standard of Care


**22. Patient:** ███████████
Booking Number: ████████████
Dates Reviewed: ███/22 - ██/24
Reviewer: Stephen Boone, M.D.

Summary of Care
██-year-old male with hypertension, diabetes mellitus, and glaucoma. Previous medical records were obtained and reviewed in timely fashion upon intake. Diabetes was well-controlled as evidenced as blood glucose measurements and serial hemoglobin A1C <7.5%. Hypertension and hyperlipidemia were treated with losartan and atorvastatin, respectively. Glaucoma was managed with timolol eye drops. He received appropriate preventative care, including vaccinations for Covid-19 and influenza.

During his stay, he also reported subacute/chronic shoulder pain for which he received an appropriate physical exam, diagnostic testing (x-ray), and conservative management with NSAIDs and targeted exercises. He was also treated for minor cellulitis of the foot with appropriate antibiotics and wound care.

Conclusion
Meets Standards of Care


**23. Patient:** ███████████
Booking Number: ████████████
Dates Reviewed: ███/21 - ██/24
Reviewer: Stephen Boone, MD

Summary of Care
██-year-old male with hypertension and chronic back pain.

His chronic back pain, without neurologic signs, symptoms, or other "red flag" features was managed appropriately with NSAIDs and acetaminophen as needed and counseling on conservative treatment measures including exercises and stretching.

Modestly elevated blood pressure was also managed appropriately, initially with non-medicinal management and serial BP checks, and then later with initiation of antihypertensives. Related and indicated lab tests were obtained and reviewed.

He acquired mild Covid-19 disease in ██████████ 2021. He was treated with appropriate supportive care measures and quarantined per guidelines without complication.

He suffered a small laceration to his left foot while exercising in ██████ 2024, for which he received appropriate initial wound care management, referral to the ED for laceration repair with sutures, and subsequent ongoing wound care.

177

Ex. A-71

Conclusion
Meets Standard of Care

**24. Patient:** █████████
Booking Number: ████████
Dates Reviewed: ██/23 - ██/24
Reviewer: Stephen Boone, MD

Summary of Care
██-year-old male with medical history of diabetes, hypertension, methamphetamine use disorder, chronic ankle pain s/p ankle fusion, chronic shoulder pain, and prior abdominal hernia repair. Psychiatric history also notable for anxiety and psychosis NOS.

Regarding diabetes mellitus, Mr. ████ was on a weekly GLP1-agonist in the community setting which is a non-formulary medication. He was appropriately treated with metformin as first-line therapy, along with a statin to reduce the risk of cardiovascular disease per guidelines. Metformin was later changed to glipizide per patient request. His hemoglobin A1C% measurements demonstrated excellent glycemic control. Hypertension was well managed with losartan monotherapy.

He was referred to Orthopedic surgery for chronic shoulder pain. He was diagnosed with osteoarthritis and subacromial bursitis for which conservative therapy, including NSAIDs and physical therapy, were advised.

Mr. ████ was followed by psychiatry and mental health clinicians for management of mood disorder and insomnia. He was treated with Abilify and mirtazapine, with appropriate follow-up and monitoring.

Conclusion
Meets Standard of Care

**25. Patient:** ████████
Booking Number: ████████
Dates Reviewed: ██/23 - ██/24
Reviewer: Stephen Boone, M.D.

Summary of Care
██-year-old male with history of substance use disorder (methamphetamines, opiates, cocaine) and hypertension.

Mr. ██████ entered custody in the setting of heavy, recent opiate use requiring supervised detoxification and management per opiate withdrawal protocol. He was then enrolled in the MAT program, which included treatment with suboxone along with regular therapy and coaching sessions. He additionally was noted have multiple extremity wounds at various stages of healing upon presentation related to his substance use disorder. He appears to have received appropriate and consistent wound care, including antibiotic ointment, dressing changes, and monitoring.

His hypertension was generally well managed, initially with amlodipine, and then later switched to lisinopril due to edema. Relevant labs were monitored, including basic metabolic panel, A1C, and lipids.

He was provided with vaccination for influenza and shingles upon request. He declined covid vaccination.

*Opportunities/Missing Documentation:*
I was unable to find evidence of screening for Hepatitis C or HIV in this high-risk patient (IV drug use history). Although immunization protocols appear to include Tdap and hepatitis A, I was not able to find documentation of these immunizations or evidence of immunity.

Similar to other charts reviewed, I was unable to find a complete H&P by a physician or mid-level provider.

Conclusion
Meets Standard of Care


**26. Name:** 
Booking Number:
Dates Reviewed:      /23 -      /24
Reviewer: Erin Freeman, PA-C


Summary of Care
This patient is a   -year-old male booked into San Diego Central Jail on             2023. He reported a history of hypertension but was not on medication for it. The physician saw the patient on      2023, for a chronic care appointment. His blood pressure was 139/81, and the other two blood pressures that had been recorded since his booking were 136/88 and 158/83. The assessment was well controlled BP and no additional BP checks were ordered until         2024 when twice-weekly BP checks were ordered by another clinician. He did not have any lab work.
The patient was wheelchair-bound secondary to a remote gunshot wound to his lumbar spine. Because of this, he had routine ADA assessments. He also had evaluations by an optometrist and physical therapist and is pending consultation with a neurologist at the time of this review.

Conclusion
Meets Standard of Care

Different blood pressure goals exist depending on the organization or association. Based on HEDIS (Healthcare Effectiveness Data Information Set) goals, the patient's blood pressure was controlled without pharmaceutical treatment. The medical department monitored his blood pressure closely to make certain that the patient did not require antihypertensive medication. He received appropriate and timely medical care.


**27. Patient:**
Booking Number:
Dates Reviewed:      /22 -      /24

179

Ex. A-73

Reviewer: Erin Freeman, PA-C

<u>Summary of Care</u>

This patient is a ▉-year-old male booked into the San Diego County Jail on ▉ 2022. He reported a history of hypertension but was on no medication. For the first few months, his blood pressure (BP) was monitored with periodic BP checks and provider chart reviews. In ▉ 2022, he was started on hydrochlorothiazide 25mg for Stage 1 hypertension. This was later changed to lisinopril 10 mg daily after the patient complained of frequent urination. After additional monitoring of his blood pressure, the dose of lisinopril was increased to 20mg daily. His blood pressure continued to be closely monitored with the majority of blood pressure readings at goal. His cholesterol was also checked a few times as part of routine care for his hypertension. The medical providers addressed the patient's cholesterol levels with him, which only required non-pharmacological treatment. He had a total of 5 chronic care visits during his two-year sentence.

In addition to closely watching the patient's blood pressure, the medical staff also monitored his glucose and weight. The medical providers took note of the patient's body mass index (BMI) of 41 and extensively documented that the patient was counseled on lifestyle changes for weight loss. The medical provider screened the patient for diabetes with a hemoglobin A1C. With a result of 6%, the patient was considered pre-diabetic. This was addressed with the patient, and the test was repeated 3 months later with a slightly lower result of 5.9%.

In addition to the care he received for his chronic conditions, he also received appropriate care for his sick call complaints. For a persistent penile rash, he had a consultation with a urologist. Upon discharge from the jail, his medications were processed for him to receive them in the community.

<u>Conclusion</u>

Meets Standard of Care

This patient received exceptional medical care during his 2 years in jail. His blood pressure, weight, hemoglobin A1C, and cholesterol were closely monitored by medical staff. The patient was kept abreast of his health and any treatment changes. The medical care provided to the patient indisputably met the standard of care.

**28. Patient:** ▉

Booking Number: ▉

Dates Reviewed: ▉ /23 - ▉ /24

Reviewer: Erin Freeman, PA-C

<u>Summary of Care</u>

This is a ▉-year-old male who was booked into the Rock Mountain Detention Facility on ▉ 2023. The immediate concern at intake was managing the patient's alcohol withdrawal. The patient reported a history of HIV and was on Symtuza (darunavir/cobicistat/emtricitabine/tenofovir alafenamide) which was ordered at booking. He received this medication every day except for the doses refused by the patient.

He had the appropriate chronic care lab work for an HIV+ positive patient, including a comprehensive metabolic panel, hepatitis panel, and lipid panel. His CD4 count was over 1500 when first checked in ▉ 2023, and his viral load remained < 20 copies, indicating viral suppression. In addition to

the two chronic care appointments he has had for his HIV, he has received episodic care for his sick call complaints. He received specialist care from optometry and ophthalmology and is pending evaluation by an infectious disease specialist.

Conclusion
Meets Standard of Care

The patient has received acceptable care for his HIV. He was prescribed antiretroviral therapy and had no lapses in his medication. He was seen in the chronic care clinic and had lab work to confirm viral suppression. The only recommendation would be to order these HIV labs at intake to assess the CD4 count and viral load. Antiretroviral medications are costly and vital to HIV management, so it is essential to promptly confirm with a viral load that the medications are effective. The medical staff at the jail provided the standard of care for his chronic medical condition.

**29. Patient:** ▮▮▮
Booking Number: ▮▮▮
Dates Reviewed: ▮▮/23 - ▮▮/24
Reviewer: Erin Freeman, PA-C

Summary of Care
This is a ▮-year-old patient who was booked into George Bailey Detention Facility on ▮▮ 2023. He had the following chronic conditions: type 2 diabetes, hypertension, hyperlipidemia, and cardiovascular disease (CVD). The patient was diagnosed with CVD when he had a cerebrovascular accident (CVA), or stroke, in ▮▮ 2023. The medical staff obtained and reviewed the medical records from this hospitalization to confirm he was on the correct medications. After inpatient treatment, he received rehabilitation, but upon arriving at the jail, he still had left hemiplegia. Thus, a cane was issued.

The patient was non-compliant with his chronic care medications. He has refused almost half the dosages of his antihypertensive medication losartan (Cozaar) in the past few months. While most of his blood pressure readings were at goal for secondary CVD prevention, some of his blood pressures were slightly elevated which could have been attributed to his medication non-compliance. He was also noncompliant with his atorvastatin (Lipitor) 40mg, a cholesterol-lowering medication, and clopidogrel (Plavix) 75mg, an antiplatelet medication, both prescribed for secondary prevention of CVD.

The patient was prescribed a multi-drug regimen for his diabetes including po (by mouth) medications and insulin, including both long-acting insulin and short-acting insulin. While his hemoglobin A1C was 7.8%, which was at goal for his age, he had labile blood glucose levels. The majority of his blood glucose readings were elevated. Even in the records from his hospitalization for his CVA, the clinician noted that his blood sugars were "extremely high." However, when he was placed in a medical observation bed after a near syncopal event, his blood glucose levels improved. The clinician even had to decrease his insulin dose after a few low glucose readings. He is due for a repeat hemoglobin A1C at the time of this review. He did not have sick call requests on record and did not require specialty care.

Conclusion
Meets Standard of Care

Ex. A-75

This █-year-old male is a complicated patient with multiple comorbidities and nonadherence to medical treatment. The medical staff at the jail has been attentive to his glucose levels with frequent reviews of his finger-stick readings and subsequent adjustments to his treatment regimen. This reviewer recommends that a clinician meet with the patient to determine his underlying reasons for treatment refusals. Nevertheless, the medical staff has followed the standard of care.

**30. Patient:** ███████
Booking Number: ██████
Dates Reviewed: █/23 - ██24
Reviewer: Erin Freeman, PA-C

Summary of Care

This is a █-year-old male currently incarcerated in the San Diego County Jail. At intake on ████ 2023, he reported a history of asthma and hypertension. Initially, he was placed under close watch for concerns that he may go through alcohol withdrawal, but this did not occur.

His asthma was controlled without medications. At intake, weekly blood pressure checks were ordered to monitor his blood pressure then after a few blood pressures were recorded above goal, he was started on hydrochlorothiazide 12.5mg in the morning. The dose was increased to 25mg soon after for better blood pressure control, and amlodipine 5mg was added a few months prior to this review. The patient has multiple refusals for blood pressure checks and doses of his antihypertensives. His compliance did increase when the physician changed the timing of his dose from AM to PM. It is unclear if his blood pressure is currently under control because the patient has refused his scheduled blood pressure checks over the past few months.

In addition to receiving care for his chronic conditions, he also has received episodic care for a headache, dry skin, axillary furuncles, for which he refused some of his antibiotic dosages, and unilateral knee pain, for which he refused an x-ray. He received specialist care from optometry and ophthalmology. He had an electrocardiogram and routine labs; however, there was no lipid panel found in the chart.

Conclusion
Meets Standard of Care

Although the patient did not have a lipid panel completed at the time of this review, it had been ordered and was pending collection. Overall, the patient's medical care is in line with the standard of care despite his multiple refusals for medication and blood pressure checks.

Reference: 2017 ACC/AHA/AAPA/ABC/ACPM/AGS/APhA/ASH/ASPC/NMA/PCNA Guideline for the Prevention, Detection, Evaluation, and Management of High Blood Pressure in Adults: A Report of the American College of Cardiology/American Heart Association Task Force on Clinical Practice Guidelines. *J Am Coll Cardiol* 2018;71:e127-e248.

**31. Patient:** ███████
Booking Number: ████████1
Dates Reviewed: █/22 - █/24
Reviewer: Erin Freeman, PA-C

Ex. A-76

Summary of Care

This is a ▉-year-old male booked into the San Diego County Jail in ▉ 2022. He reported a history of hypertension and hyperlipidemia at intake. Records of his filled prescriptions from the past 6 months were obtained from CVS which included atenolol 25mg and lisinopril 10mg for his hypertension, rosuvastatin for his hyperlipidemia, and allopurinol for gout. These medications were ordered for him at intake except for atorvastatin as a formulary substitution for rosuvastatin. A few days after arrival, the patient reported that he could not take the lisinopril because he reacted to it despite his pharmacy records indicating he was taking it in the community. There was no elaboration as to the self-reported reaction, and the patient continued to take the medication.

His chronic care clinic visits for his hypertension and hyperlipidemia were in ▉ 2022, ▉ 2023, and ▉ 2024. His cholesterol was controlled with an LDL cholesterol of 62,[1] and his blood pressures ranged from systolic readings of 101 to 152 and diastolic readings of 72 to 91 with the majority of readings at goal.[2] His kidney function, glucose, and uric acid were within normal limits.

The patient was also started on aspirin 81mg after reporting a history of coronary artery bypass graft surgery. He also received as-needed NSAIDs for acute gout episodes and headaches. He was issued a cane for an antalgic gait secondary to chronic knee pain; thus, he had periodic ADA assessments. He has not required specialist care at the time of this review, and he has received a dental evaluation and dental cleaning.

Conclusion
Meets Standard of Care

The patient's hypertension, hyperlipidemia, coronary artery disease, gout, and musculoskeletal complaints have been addressed appropriately by the medical staff. The medical record reflects that the medical staff is closely monitoring the patient's chronic care conditions. His hypertension and hyperlipidemia are well-controlled based on current treatment guidelines from the American Heart Association and American College of Cardiology.[1,2]

References:
1) Grundy SM, Stone NJ, Bailey AL, et al. 2018 AHA/ACC/AACVPR/AAPA/ABC/ACPM/ADA/AGS/APhA/ASPC/NLA/PCNA Guideline on the Management of Blood Cholesterol: Executive Summary: A Report of the American College of Cardiology/American Heart Association Task Force on Clinical Practice Guidelines [published correction appears in J Am Coll Cardiol. 2019 Jun 25;73(24):3234-3237]. *J Am Coll Cardiol*. 2019;73(24):3168-3209. doi:10.1016/j.jacc.2018.11.002

2) Whelton PK, Carey RM, Aronow WS, et al. 2017 ACC/AHA/AAPA/ABC/ACPM/AGS/APhA/ASH/ASPC/NMA/PCNA Guideline for the Prevention, Detection, Evaluation, and Management of High Blood Pressure in Adults: A Report of the American College of Cardiology/American Heart Association Task Force on Clinical Practice Guidelines [published correction appears in Hypertension. 2018 Jun;71(6):e140-e144]. *Hypertension*. 2018;71(6):e13-e115. doi:10.1161/HYP.0000000000000065

**32. Patient:** ▉
Booking Number: ▉

Ex. A-77

Dates Reviewed: ██/23 - ██/24
Reviewer: Erin Freeman, PA-C

Summary of Care

This patient is a ██-year-old male housed at the George Bailey Detention Facility since his booking in ██ 2023. He reported a history of asthma and hypertension at his intake screening. His asthma remained controlled without medications. For his hypertension, the provider started him on amlodipine 5mg daily. Despite multiple refusals for this medication, his blood pressure remained controlled with the highest recorded reading of 133/91. His annual chronic care appointment took place on ███████ 2023. At that time, he had a normal EKG and labs except for mildly elevated liver function tests. The provider then ordered a hepatitis panel which was negative. The liver function test elevation could have been attributed to his alcohol abuse just before incarceration because the labs had normalized when repeated in ██████ 2023. He did not require specialist care, and his sick call requests were addressed appropriately for shoulder pain and wrist pain which was confirmed by ultrasound to be due to a ganglion cyst. On ██████ 2024, the patient was medically cleared by an RN for transfer to the Rocky Mountain Detention Facility.

Conclusion

Meets Standard of Care

The patient had multiple refusals for amlodipine, his blood pressure medication. His blood pressure was checked regularly, and his readings were at goal. No concerns were identified with his care which was in line with jail and community-based standards.

**33. Patient:** ████████

Booking Number: ██████
Dates Reviewed: ██/23 - ██/24
Reviewer: Erin Freeman, PA-C

Summary of Care

This patient is a ██-year-old male booked into the San Diego County Sheriff's Department on ███████, 2023. He had class III, or extreme, obesity with a BMI of 47 at intake which decreased to 42 the following year. He reported a history of hypertension with a blood pressure of 149/95 at booking. The clinician prescribed him amlodipine 5mg which was increased to 10mg the following month. He had regular blood pressure checks. The NP later added a combination antihypertensive medication, lisinopril-hydrochlorothiazide, to achieve better control of his hypertension.

After the patient reported a family history of diabetes, the NP ordered a hemoglobin A1C. His hemoglobin A1Cs of 6.9% and 6.6% confirmed the diagnosis of Type 2 diabetes. He was prescribed metformin 500mg once daily and a low carbohydrate diet. By ██████ 2024, his diabetes was wellcontrolled with an A1C of 5.8%. His LDL was 128 mg/dL when he was diagnosed with diabetes and decreased to 104 mg/dL 6 months later. The patient was not on cholesterol-lowering medication.

In addition to his chronic care diagnoses management, he was also treated for his sick call complaints. The clinicians ordered imaging and referred the patient to specialists as clinically indicated. The patient had an MRI of his right shoulder and received specialist care from ENT for unilateral hearing loss and from two different orthopedic surgeons for right upper extremity pain.

184

**Ex. A-78**

Conclusion
Meets Standard of Care

The patient entered the jail with obesity and hypertension. The NP identified the patient as being at risk for diabetes, and his hemoglobin A1C confirmed the diagnosis. The appropriate treatment was prescribed which decreased his A1C to a normal level. These actions were in line with the standard of care for diagnosing and treating type 2 diabetes. However, his obesity, hypertension, and diabetes put him at risk for atherosclerotic cardiovascular disease (ASCVD). The standard of care for primary prevention of ASCVD would be to start at least a moderate-intensity statin; however, this was not done. His hypertension was relatively well-controlled as a diabetic with a goal BP of <130/80. While the majority of his medical management met the standard of care, the patient would have benefited from beginning a statin.


**34. Patient:** ███████████████
Booking Number: ███████████
Dates Reviewed: █ /22 - █ /24
Reviewer: Erin Freeman, PA-C

Summary of Care
This is a ██ -year-old male booked into the George Bailey Detention Facility on ███████ 2022. He reported a history of hypertension, hyperlipidemia, and diabetes. His community prescription log was obtained, and his home medications were resumed. He has had chronic care appointments every 3-6 months.

For his hyperlipidemia, he was prescribed atorvastatin (Lipitor) 40mg. He refused his initial cholesterol labs in ███ 2023. In ███ 2023, his LDL cholesterol was 79 mg/dL, close to the goal for a diabetic patient. When checked in ███ 2024, the collection time was in the afternoon, so it was likely not a fasting specimen which can negatively impact lipid panel results. The lab did not report his LDL cholesterol reading because his triglycerides were elevated at 418 mg/dL.

He was originally prescribed the antihypertensive medication he took in the community including metoprolol, lisinopril, and amlodipine. The physician changed his lisinopril to lisinopril-hydrochlorothiazide when his blood pressure was noted to be above goal. The dosage was also later increased to achieve better control of his hypertension.

Upon entry into jail, the patient's hemoglobin A1C was 8%. He was prescribed sitagliptin (Januvia), metformin, and glipizide. After a year in jail, it had decreased to 6.4% indicating his diabetes was wellcontrolled. Despite no change in medications, his A1C did increase just before this review, and the physician ordered sliding-scale insulin. When the patient reported that he was told he needed eye surgery, his ophthalmology records were obtained which noted a history of diabetic retinopathy. He was referred to a retina specialist whom the patient saw just a few weeks later. The ophthalmologist treated the patient with an intravitreal injection followed by pan-retinal photocoagulation laser two weeks later.

Conclusion
Meets Standard of Care

Ex. A-79

The medical staff followed the standard of care when managing this patient's chronic care conditions. The appropriate medications were prescribed with no lapses between prescriptions. He also received specialist care for his diabetic retinopathy, an ophthalmic complication of his diabetes that developed before incarceration. The current state of his hypertension is unable to be assessed because the vitals sign log was not included in the received medical records; however, it is documented that the patient's blood pressure was checked routinely. The clinicians reviewed the blood pressure readings and made adjustments to his medications, all in line with the standard of care for hypertension.

**35. Patient:** ████████████
Booking Number: ████████
Dates Reviewed: ██23 - ██/24
Reviewer: Erin Freeman, PA-C

Summary of Care
This is a ██-year-old male who was booked into Central Jail in ████████ 2023. At intake, he reported using an albuterol inhaler 5 to 6 times per day for his asthma. His albuterol inhaler was ordered along with the other medications he reported taking in the community: Singulair (montelukast) and Claritin (loratadine) which was later changed to Zyrtec (cetrizine). The physician saw the patient for a chronic care appointment in ████████ 2023. Although a peak flow measurement was not located in the medical record, the MD documented that the patient was not requiring or using his as-needed albuterol inhaler indicating his asthma was controlled. The patient did not require specialist care.

Conclusion
Meets Standard of Care

While a peak flow measurement was not found in his medical record, the patient's asthma was documented as stable. He did not require any emergent medical care. did not submit any sick call requests complaining of asthma symptoms, and did not need specialist care. He is receiving appropriate care for his asthma.

**36. Patient:** ████████████
Booking Number: ████████
Dates Reviewed: ██/21 - ██/24
Reviewer: Erin Freeman, PA-C

Summary of Care
This is a ██-year-old male who was booked into the Vista Detention Facility in ████ 2021. He was later transferred to the East Mesa Reentry Facility (EMRF). He reported a history of COPD at intake and was on a Combivent (ipratropium/albuterol) inhaler and an albuterol rescue inhaler. He was prescribed Spiriva (tiotropium), the formulary substitute for his Combivent, and albuterol inhalers. One year later, the patient began refusing the Spriva inhaler. It was replaced with a COPD maintenance inhaler Advair which contains an inhaled corticosteroid (fluticasone) and a long-acting beta-agonist (salmetrol). His COPD has remained stable with only one moderate exacerbation treated with a short course of prednisone and as-needed nebulizer treatments.

The patient did not report hypertension at intake, and his CVS prescription record did not include antihypertensive medication. However, the jail later received his medical records from the VA which

revealed that he had a history of hypertension and hyperlipidemia and was on hydrochlorothiazide, lisinopril, atorvastatin, and a low dose aspirin. These medications were ordered for him in ███ 2021 upon reviewing the VA records. He had regular blood pressure checks scheduled but refused several of these appointments. His lisinopril was increased from 10mg to 20mg a few months ago for tighter BP control. His blood pressure is still a little above goal, so it is anticipated that his lisinopril will be increased again to 40mg at his next visit.

He first had labs drawn in ███ 2023. He was found to have pre-diabetes with a hemoglobin A1C of 6.4%. The NP ordered metformin 500mg once daily. He was eventually diagnosed with type 2 diabetes when his repeat A1C was 8.5%. His metformin was increased to 1000mg twice a day, and subsequent blood sugars were 111-178 mg/dL. He is due soon for a repeat A1C to monitor his response to treatment.

He was prescribed atorvastatin 20mg in ███ 2021 after noting in his VA medical records that he was on this medication. He took this medication until ███ 2023 when his prescription expired. His cholesterol was first checked on ███, 2024. His triglycerides were a little over 1,000, so his LDL cholesterol could not be accurately measured. Given that the collection time was recorded in the pm, it is possible that this was a non-fasting specimen which could have increased the triglycerides. In addition to the care he received for his chronic conditions of hyperlipidemia, hypertension, COPD, and diabetes, he also was evaluated by an optometrist for glasses and a urologist for elevated PSA. At the time of this review, he is pending an MRI of his prostate as recommended by the urologist in ███ 2024.

Conclusion
Meets Standard of Care

It is clear that the medical team is closely observing his blood pressure and blood glucose and making adjustments in his medications for tighter control. He is on appropriate medications for his conditions based on national guidelines. The only concerns are that his atorvastatin prescription expired without immediate renewal and that he did not have routine lab work completed initially for his chronic conditions. It is recommended that these labs be ordered at the first chronic care appointment.

**37. Patient:** ████████████
Booking Number: ███████
Dates Reviewed: ███ /23 - ███ /24
Reviewer: Erin Freeman, PA-C

Summary of Care
This is a ██-year-old male booked into Vista Detention Facility on ███████ 2023. He reported a history of HIV at intake but was not on antiretroviral medication. At intake, the NP ordered HIV labs including a viral genotype, CD4 count, and a viral load (VL). His genotype revealed a wild-type virus (no drug-resistant mutations), VL of 12,400 copies, and a CD4 count of 187, indicating that he had AIDS. Within a few weeks of intake, the patient had his consultation with the infectious disease physician who started him on Epzicom (abacavir and lamivudine), Tivicay (dolutegravir), and thrice weekly Bactrim. A non-formulary request for the Tivicay was placed. He refused the first few doses of this medication but then was compliant. He saw the infectious disease physician again on ███████ 2024, who noted that the patient's Tivicay prescription had expired on ███████. The provider

submitted a new non-formulary request, and the medication was reordered the following day. A repeat VL on █████, 2024, was 41 copies and CD4 count had increased to 225, indicating a positive response to treatment. He also had an unremarkable comprehensive metabolic panel, complete blood count, and acute hepatitis panel. Moving forward, his labs will be done every 6 months per the infectious disease physician's recommendation.

In addition to the medical care, he has received for his HIV/AIDS, the patient also was referred in ████ 2024 to a general surgeon for evaluation of a soft tissue mass on his lower extremity. The record does not reflect the status of this referral or appointment. He also received a cane for impaired mobility secondary to remote injuries sustained in a motor vehicle accident. His accident also caused blindness in his right eye which he covered with a patch. Given his use of a cane and unilateral vision, he had an ADA functional assessment monthly. He also received an evaluation by a dentist and a dental cleaning by a hygienist.

Conclusion
Meets Standard of Care

It is important for the jail to have processes in place to ensure chronic care medications do not expire. This is particularly important in HIV patients whose virus can mutate leading to drug resistance. The medical staff did quickly rectify the issue of the patient's medications expiring, and it did not occur again during the period reviewed. He had two acute hepatitis panels checked with his routine lab work in ████ 2023 and ████ 2024; however, it would be helpful if his hepatitis A and B antibodies were also checked to determine immunity and vaccinate as indicated based on the results. Overall, the patient received appropriate care for his chronic medical condition. Given that the nonformulary approval expired during the holidays in late 2023/early 2024, it is recommended that the jail medical staff consider indefinite approvals for non-formulary anti-retroviral medications to allow for multiple refills. Making this change will lessen the chance of an HIV patient missing their medication.

**38. Patient:** ████
Booking Number: ████
Dates Reviewed: ████/23 - ████/24
Reviewer: Erin Freeman, PA-C

Summary of Care
This is a █-year-old male booked into the Vista Detention Facility on ████ 2023. The patient reported a history of hypertension and asthma. His blood pressure at booking was at goal at 137/89. The patient signed a release of information for his pharmacy and clinic, but both responded that they did not have a patient by that name and DOB. Blood pressure checks were ordered, and a few days later on a routine check, his BP was 184/132. The patient was immediately sent to the local emergency department, and he was discharged with prescriptions for amlodipine, lisinopril, atorvastatin, and aspirin. His blood pressure was checked multiple times with appropriate adjustments in his medications. His last BP on record is 129/78 indicating that his hypertension was controlled.

The patient later shared that he had two coronary artery stents placed after a myocardial infarction years ago. Therefore, he was on aspirin and a high-intensity statin for secondary prevention. His LDL cholesterol was only 38 mg/dL in ████ 2023, at the goal for a high-risk patient based on the latest guidelines.[1] When his cholesterol was rechecked, his triglycerides were over 400, so an accurate LDL

reading could not be reported. However, it was likely a non-fasting specimen based on the documented collection time in the evening.

The patient's asthma was controlled with just an albuterol rescue inhaler. His highest peak flow reading was 320. His chest x-ray was unremarkable. He refused the COVID-19 and influenza vaccines but agreed to the Hepatitis A vaccine.

Conclusion
Meets Standard of Care

The patient was engaged in his medical care and compliant with his medication. The patient even expressed his gratitude to the medical team in a sick call request stating "I sincerely appreciate the care I have been receiving." He received the standard of care for hypertension, coronary artery disease, and asthma. The only recommendation is that the lab results within the EHR should include a wet signature or e-signature.

Reference:
1) Grundy SM, Stone NJ, Bailey AL, et al. 2018
AHA/ACC/AACVPR/AAPA/ABC/ACPM/ADA/AGS/APhA/ASPC/NLA/PCNA Guideline on the Management of Blood Cholesterol: Executive Summary: A Report of the American College of Cardiology/American Heart Association Task Force on Clinical Practice Guidelines [published correction appears in J Am Coll Cardiol. 2019 Jun 25;73(24):3234-3237]. *J Am Coll Cardiol.* 2019;73(24):3168-3209. doi:10.1016/j.jacc.2018.11.002

**39. Patient:** ▮▮▮▮▮
Booking Number: ▮▮▮▮▮
Dates Reviewed: ▮▮▮/2021 - ▮▮▮/24
Reviewer: Erin Freeman, PA-C

Summary of Care
This patient is a ▮▮-year-old male booked into Vista Detention Facility on ▮▮▮▮ 2021, at the age of 68. At intake, he reported a history of hypertension, hyperlipidemia, and GERD. He had chronic care appointments for these conditions, but his blood pressure was also monitored outside of these visits. He was prescribed Losartan 25mg which was increased to 50mg a few weeks after intake. His BP remained at goal with the last BP on record at the time of this review being 121/70 on ▮▮▮▮, 2024. His hyperlipidemia was controlled on Atorvastatin 20mg daily. His LDL was 99 mg/dL in 2022, but he refused his most recently ordered lipid panel in 2024. He took both famotidine and omeprazole for his GERD.

The patient has received specialty care during his incarceration from neurology, gastroenterology, and dermatology. Before his arrest, he was followed by a neurologist for dizziness, and the jail arranged for follow-up care with his established neurologist. The neurologist had recommended lamotrigine for an abnormal EEG, but the patient refused to take this medication even after counseling by the jail physician. He was referred to ENT by the neurologist for vertigo, but the patient refused this appointment. He was also referred to a gastroenterologist after reporting dysphagia and a history of an esophageal stricture requiring dilation. He has had a total of two EGDs and a normal esophageal motility study during this incarceration. He was also referred to a dermatologist for lesions on his external ear. Biopsies were taken, and both lesions were benign.

Conclusion
Meets Standard of Care
The jail medical staff made all necessary specialty referrals and ensured all testing and procedures were completed. The patient received appropriate follow-ups, blood work, and treatment for his chronic conditions. The management of his chronic conditions met the standard of care.

**40.Patient:** 
Booking Number:
Dates Reviewed:         /23 -      /24
Reviewer: Erin Freeman, PA-C

Summary of Care
This is a   -year-old male booked into Central Jail on          , 2023. On the intake assessment, he did not report any chronic conditions or medications, but a few days later, he reported a history of epilepsy for which he took phenytoin. He would obtain his phenytoin from Mexico and was unable to recall the exact dosage. At the jail, he was prescribed phenytoin and levetiracetam. These antiepileptic medications were titrated appropriately. He was sent emergently a few times to the local hospital for seizures, but he has not required emergency care since          2023 when he signed out of the emergency department against medical advice. The patient is still reporting unwitnessed absence seizures, so he is pending a consultation with a neurologist.

The patient was also noted to have hyperlipidemia on routine labs in       2023. His triglycerides were 447 mg/dL, so the LDL cholesterol was not reported. Diabetes, a known secondary cause of hypertriglyceridemia, was ruled out. The NP started the patient on atorvastatin 40 mg and aspirin 81 mg. His lipids have not been rechecked since he began lipid-lowering medication. He was seen in the chronic care clinic in          2024, but his hyperlipidemia was not addressed.

In addition to a pending neurology appointment, the patient also has a pending optometry appointment. He also saw an otolaryngologist for a nasal fracture after an altercation and underwent a closed septoplasty with turbinate reduction in          2024. With regard to imaging, he had an ultrasound of a soft tissue mass which was determined to be a lipoma. The patient also had CT scans in the emergency department, one of which revealed a possible cerebral infarct.

Conclusion
Does Not Meet Standard of Care

While the management of his epilepsy met the standard of care, the management of his hyperlipidemia lacked follow-up care. After initiating statin therapy, a repeat lipid panel should be checked in 4-12 weeks. There is no documentation to suggest hyperlipidemia was addressed during his most recent chronic care appointment. Adequate management of this patient's hyperlipidemia is particularly important given the CT finding of a probable small infarct. Aggressive management of his cholesterol is important to prevent additional ischemic attacks. For the aforementioned reasons, the management of his hyperlipidemia did not meet the standard of care.

**41. Name:**
Booking Number:
Dates Reviewed:         /23 -      /24

Ex. A-84

Reviewer: Erin Freeman, PA-C

Summary of Care
This patient is a ██-year-old male who was released from the San Diego Jail on ████████ 2023, but was booked back into jail by that afternoon. During his arrest, he was tased, so at booking he was sent to the emergency department for clearance. The patient had a known diagnosis of epilepsy with a history of status epilepticus. His anticonvulsant medication regimen included levetiracetam (Keppra), lacosamide (Vimpat), and valproic acid (Depakote). He was housed in a medical observation bed with close monitoring by the nursing staff including documentation of his condition at least twice a day. There were no lapses in his medication administration, and he remained seizure free during the dates reviewed.

Conclusion
Meets Standard of Care

Despite having a history of status epilepticus, patient's seizure disorder has remained well-controlled during this incarceration. He was compliant with his three anticonvulsants with no lapses in therapy. The management of his seizure disorder meets the standard of care.

**42. Name:** ██████████
Booking Number: ██████████
Dates Reviewed: ████/2021 - ████/2024
Reviewer: Erin Freeman, PA-C

Summary of Care
This is a ██ year-old male who was booked into the George Bailey Detention Facility on ████████ 2021. The patient reported a lengthy history of seizures secondary to a traumatic brain injury as a teenager. He was prescribed phenytoin at intake which he also took in the community. The physician referred him to neurology for the management of his seizure disorder, but the patient refused his appointment. He was referred again to the neurologist, but the appointment was pending at the time of this review.

While he infrequently refused his phenytoin, his phenytoin levels were low, even undetectable at one point. Nurses did make note of instances in which the patient was witnessed walking away with his medication instead of taking it in front of the pill window leading one to question if he was possibly misusing the phenytoin. He was sent to the emergency department twice for having a seizure. One of the seizures was likely attributed to the patient refusing his phenytoin a few days earlier. The patient was also diagnosed with hypertension by the NP in ██████ 2023. Unfortunately, the patient refused treatment for this problem.

In addition to the management of his chronic seizure disorder, he received timely care for his sick call requests, including dental-related complaints addressed by the dentist. Also, the NP noted that he had anisocoria after being involved in an altercation. After workup by an ophthalmologist and then a retina specialist, he was diagnosed with lattice degeneration of the retina and treated with laser therapy. In addition to being sent to the local hospital for seizures, he was also sent emergently to the hospital to rule out testicular torsion, to evaluate injuries sustained in an altercation, and to receive care for a finger fracture.

**Ex. A-85**

Conclusion
Meets Standard of Care

The patient received excellent medical care. He received phenytoin for his seizures, and the jail provided emergency care to the patient when it was needed. His blood pressure did fluctuate, but the provider did not neglect to treat him with an antihypertensive medication when his blood pressure readings were consistently elevated. The patient refused the medication, and it was eventually discontinued. He received dental care at the unit and medical care from an ophthalmologist and an orthopedic surgeon. The medical care he received met the standard of care for seizure disorder management.

**43. Patient:** ███████████
Booking Number: ████████
Dates Reviewed: ███ /22 - ███ /24
Reviewer: Erin Freeman, PA-C

Summary of Care
This is a ██-year-old male who was booked into George Bailey Detention Facility on ████████ 2022, where he is currently housed. It is clear from the medical record that this is a challenging patient. He is housed in administrative separation and is described in the medical record as hostile and aggressive even making verbal threats of physical harm toward the medical staff. The patient has over 700 refusals for care including blood glucose checks, insulin, chronic care appointments, and medication.

The jail was aware from a previous incarceration that the patient had type 2 diabetes, so they prescribed metformin and lisinopril at intake; however, the patient refused the lisinopril. Except for a few elevated readings, his blood pressure has remained well-controlled. The patient refused multiple chronic care appointments for his diabetes until he agreed to be seen in ████ 2023. He was subsequently scheduled for a chronic care appointment approximately every 3 months. However, the patient would refuse all of his lab work presenting a challenge to staff to manage his diabetes and to detect any new medical conditions. He did agree to have his hemoglobin A1C checked in ████ 2023, and the result was 8.7%. He was already on the maximum dose of metformin, so the medical provider started the patient on long-acting insulin. The provider also added shorting-acting regular insulin dosed on a sliding scale. The medical providers have continued to make adjustments in his insulin therapy despite the difficulties of managing diabetes in a patient refusing glucose checks and insulin.

Conclusion
Meets Standard of Care

The patient has received appropriate treatment for his type 2 diabetes with both oral medication (metformin) and insulin (short-acting and long-acting). Despite the patient's challenging behavior and refusals of medical care, the medical record reflects that the medical staff has been attentive to his medical needs. Overall, this patient is receiving excellent medical care at George Bailey.

**44. Patient:** ███████████
Booking Number: ████████
Dates Reviewed: ████ /23 - ████ /24
Reviewer: Erin Freeman, PA-C

Ex. A-86

Summary of Care

This is a ██-year-old male who transferred to Central Jail from North County Behavioral Health on ████, 2023. He arrived with a diagnosis of schizophrenia on olanzapine 10mg daily and a diagnosis of hypertension on metoprolol 25mg daily with a blood pressure of 145/93. However, the patient refused multiple doses of his metoprolol and refused his lab work. The physician reviewed the patient's routine blood pressure checks and noted that his BP readings were low. The physician decreased the metoprolol from 25mg to 12.5mg daily and eventually discontinued the medication when the patient was hypotensive. At the time of this review, the jail medical staff is monitoring his blood pressure while the patient is off medication.

Conclusion
Meets Standard of Care

The patient entered Central Jail with a diagnosis of hypertension. His antihypertensive medication, metoprolol, was eventually discontinued due to low BP readings. The standard of care was met.


**45. Patient:** ████████
Booking Number: ████████
Dates Reviewed: ████ /23 - ████ /24
Reviewer: Jennifer Humphreys, FNP

Summary of Care

██-year-old male who was booked into the South Bay Detention Facility on ████ 2023 where he is currently housed. Receiving screening indicate that he has an allergy to wheat listed. He reports asthma and seizures as current medical diagnosis, but was not actively taking medications when he was booked. He claims that his last seizure was the day before arrest. He was started on Albuterol, Fluticasone-Salmeterol and Incruse Ellipta Inhalation on ████ /23 for his asthma. He was also started on Keppra twice daily and issued a low bunk for his seizures at the same time.  He had a chronic care appointment on ████ /23 for his asthma and seizures. His chronic clinic note indicated good disease control. Left leg weakness was noted on chronic care visit, and reports of chronic low back pain made by patient. He reported that he was supposed to have surgery on his foot before incarceration, but was then arrested. A left ankle x-ray was completed in ████ 2023 and was normal. He was then referred to ortho and refused that appointment in ████ 2024.  He requested and was issued an ankle splint. Ibuprofen and Tylenol were requested and prescribed several times for reported ankle and chronic back pain. He has over 120 refusals for sick calls, appointments, ortho appointments and medicine refusals while at South Bay Detention Facility.

Conclusion
Meets Standard of Care

This patient received appropriate care for his chronic issues, asthma and seizures and was seen in a timely manner for a chronic care appointment. He also received appropriate care for additional complaints of back pain and ankle pain, and was prescribed pain medications, given splints, and had xrays. He was referred to ortho for ongoing ankle concerns and he refused that follow up appointment. Overall, this patient received excellent medical care when he was at the South Bay Detention Facility.

**Ex. A-87**

**46. Patient:** <span style="background:black">████</span>
Booking Number: <span style="background:black">████</span>
Dates Reviewed: <span style="background:black">████</span>/22 - <span style="background:black">████</span>/24
Reviewer: Jennifer Humphreys, FNP

Summary of Care

This ██-year-old male was booked into Vista Detention Facility on ████/22. Booking intake paperwork indicate that patient has hypertension and diabetes with blood sugar over 250, no current medication, no known drug allergies, wears prescription glasses that he does have. His blood pressure was elevated at booking and was 168/81. His blood sugar at booking was 325. ROI for Kaiser Escondida records signed on 1██/22. TB chest x-ray done on ████/22 and was negative. Glucose checks were initiated and sliding scale Regular insulin started on ████/22, as well as blood pressure checks. Phone verification of patient's current medication included Metformin 1000mg twice daily, Glipizide 20mg twice daily, and Lisinopril 10mg once daily, and these were restarted on ████/22. Labs were drawn on ████/22- HgbA1c is 8.4; labs also drawn on ████/22 and lipids WNL, CMP WNL with exception of mildly elevated glucose at 122: TSH WNL.

On ████/22, his chronic care visit was completed. BP is 131/69, well controlled per notes. Weekly BP checks ordered.  Diabetes- good disease control with weekly BS and sliding scale insulin. He is very compliant taking medications with a few refusals noted in his chart for the duration of his incarceration. He did refuse labs on ██24.

He did have more than 10 complaints for skin concerns, including redness, itching, rash, jock itch, pimples, and abscesses during his incarceration. Sick calls were submitted and then seen by nursing staff or providers, if indicated. Treatment included antifungal creams, Benadryl, Diflucan, Hydrocortisone, as well as Bactrim and Doxycycline when antibiotics were indicated.

He complained of right inguinal hernia pain in ████████████ 2023 and a Truss hernia belt was given. No further complaints of hernia pain after Truss belt was issued.

Conclusion
Meets Standard of Care

The patient has received appropriate treatment for his type 2 diabetes, with both oral medication (Metformin and Glipizide), blood glucose monitoring, and insulin (short-acting). He has also received appropriate treatment for his hypertension. His additional medical complaints for skin concerns and hernia pain were addressed appropriately and in a timely manner. His medical record reflects that the medical staff has been attentive to his medical needs. Overall, this patient is receiving excellent medical care at Vista Detention Facility.

**47. Patient:** <span style="background:black">████</span> **(CCC patient)** Booking Number: <span style="background:black">████</span>
Dates Reviewed: <span style="background:black">████</span>/22 - <span style="background:black">████</span>/24
Reviewer: Jane Leonardson, M.D.

Summary of Care

Mr. ███ was a ██ y/o Hispanic male, who presented to the jail with a history of hypertension on no medication and drug addiction (heroin, fentanyl, and methamphetamine) and with hx of withdrawal symptoms in the past. He was placed on amlodipine upon intake and had lisinopril added on ██/2023 and was compliant to his medication.

Mr. ███' blood pressure control was good after the addition of the lisinopril. Prior to the addition of the lisinopril, Mr. ███ had borderline elevated systolic and diastolic blood pressure readings on a regular basis. After the addition of lisinopril, the average blood pressure readings for Mr. ███ were systolic in the 110s to 130s and diastolic in the 70s to 80s. Mr. ███ had baseline blood tests that were normal (except for a borderline increased TSH) and had one documented chronic clinic visit on ███ 2023. There is a refusal of an appointment with a NP in the chart without a date, so that could have been for a chronic clinic appointment.

Mr. ███ had many visits with mental health with the Medication Assisted Treatment program for his opioid addiction yet refused his suboxone/naltrexone the vast majority of the time. He complained of restlessness and sleep disorder but did not take his suboxone. He also complained of constipation despite not taking his suboxone, and was treated for this.
 Mr. ███ submitted 18 sick call requests and all were responded to. He refused treatment hundreds of times during his incarceration. The refusals were frequently for his medications, but also for BP checks and appointments.

Mr. ███ was seen by the dentist for pain in a cracked tooth and was offered an extraction (the tooth was not salvageable). He originally opted to take Tylenol for the pain and later accepted the extraction.

<u>Conclusion</u>
**Meets Standard of Care**

Mr. ███ received acceptable care and had a desirable result for blood pressure control. He had a large number of visits with mental health professionals and was offered Suboxone/Naltrexone for his opioid dependence, but largely refused treatment. Mr. ███ had definitive treatment for a cracked, nonsalvageable tooth.

**48. Patient:** ██████████

Booking Number: ██████     Dates
Reviewed:     ███/23  -  ███/24
Reviewer: Jane Leonardson, M.D.

<u>Summary of Care</u>
Mr. ███ was a ██ y/o male at the time of his arrest and intake to the San Diego County Jail. He presented to the jail intoxicated and belligerent and with a history of a possible head injury, so he was taken to the hospital for clearance prior to returning to the jail, where he was then placed in a detox cell. He had reportedly been using methamphetamine, cannabis, crack cocaine, fentanyl and alcohol. He underwent detox.

Mr. ███s intake interview was on ███ 2023 and he reported having a history of HTN and asthma. He was unsure what he had taken for either, but thought he had taken lisinopril in the past. His Surescripts profile did not show any recent medications. Mr. ███ blood pressure was 167/119 upon arrival for medical clearance and StatCare started him on amlodipine 5 mg qd. Nothing was ordered for Mr. ███ asthma until later in his stay. In early ███, the patient's blood pressure was noted to be

**Ex. A-89**

under poor control and his amlodipine was increased to 10 mg qd.  It appears that he was quite compliant to his amlodipine throughout the period reviewed.

Mr. ███s chronic clinic visits took place in late ███2023 and in late ██████2024.  There are no vital signs on either note.  There is no history taken for frequency of asthmatic symptoms, history of severity of asthma or for target organ damage for hypertension.  In fact, ████████ had had an episode of chest pain that resolved with nitroglycerin earlier in the month, but that is not mentioned or discussed.  There is no peak flow taken for a baseline reading for the asthma.  Even though assorted BP readings are found in some notes (usually nursing notes), there is no vital signs flow sheet in these materials.  The blood pressure readings are rarely in the normal range, but the level of disease control is listed in the Chronic Clinic Notes as "control is good".

In late J██████ 2024, when Mr. ████ had his second CCC visit, albuterol was ordered because he was found to have wheezing on auscultation.  There is no discussion of the frequency of asthma symptoms.

Mr. ████ had multiple episodic complaints, including chronic hip and knee pain, for which he was xrayed and received pain medications.  He was placed on NSAIDS even though it is noted that he had a history of ulcer disease.  There is also a notation that because Mr. ████ reported an Aspirin allergy, he should not be put on an NSAID, which is an erroneous statement.

Mr. ████ was placed on iron replacement therapy for a low ferritin level despite having a normal blood count and indices and normal iron studies.
Mr. ████ had repeated visits for a problem with moving his distal fifth digit on his right hand, yet there is not an exam of his passive or active range of motion.  He underwent x-rays and was splinted without a diagnosis of what sounds like a mallet finger.

Mr. ████ requested to be checked for any cancer he should be checked for and a stool guiaic kit was issued and a PSA ordered.  There was no counseling accompanying the PSA and routine PSA testing is no longer recommended by the USPSTF.

Conclusion
Does Not Meet Standard of Care

Mr. ████ had rare normal blood pressure readings despite compliance to amlodipine yet was continued on the same dose and regimen.  Follow up was disjointed and monitoring of his blood pressure was haphazard.

There is a lack of proper and necessary history gathered for both hypertension and asthma.  Asthma, in particular, requires history to be taken in order to classify the severity and determine if the patient should be on an inhaled steroid.  This was never done.

Mr. ████s chest discomfort was a bit troublesome, but even if it had not been cardiac in origin, there should have been some questions about whether he had ever had any heart trouble in association with hypertension and with the drug use.

"Care" that should not be given, was given.  This patient should not have been treated with iron replacement and the nurse practitioner should be counseled.  It is also important that the providers start to document pertinent history and physical findings.  Both are very rare.

**Ex. A-90**

I am encouraged that Mr. ████ underwent colon cancer screening, but he had to request it, which is less encouraging. I think the USPSTF's recommendations for health maintenance and cancer screening should be made policy and implemented and the USPSTFs stance on prostate cancer screening should be clear—PSA tests are not routinely recommended at this time.

I continue to find the electronic health record's inclusion of instructions for the user in notes making it difficult to discern what was ordered. I have not seen any evidence of an order module in this record. It is also difficult to follow the care without a current medication list and with older and newer orders included on the copies received. I am concerned that one or two of the nurse practitioners are copypasting physical exams, as evidenced by somewhat comprehensive physical exams done for minor complaints like "I can" move the end of my pinky finger." It is difficult to believe that the items documented in the physical exam were performed. An abdominal exam is not usually conducted on patients with a minor hand injury. Lastly, vital signs should be taken and documented for every patient visit.

**49. Patient:** ████████
Booking Number: ████████ Dates
Reviewed: ████ /22 - ████ /24
Reviewer: Jane Leonardson, M.D.

Summary of Care
Mr. ████████ was a ████ y/o male at the time of his admission. He was admitted to the jail from the hospital, as he had suffered injuries at the time of arrest due to being thrown from a vehicle. He had had a pneumothorax, fractured ribs, a suggestion of a dissection of a carotid artery and neck strain.

Mr. ████████ was cared for well at the jail for his injuries and was also referred to the behavioral health department for sleeping difficulty and anxiety, for which he received psychiatric medication. As a part of the use of psychiatric medication, Mr. ████████ has some labs checked on ████ /2023, including a lipid profile, which showed a total cholesterol of 207, LDL 128, HDL 48 and triglycerides 193 (it is not clear if this was a fasting specimen).

On ████ /2023, the patient was documented to have hyperlipidemia and referred for a chronic care visit. The chronic care visit occurred on ████ /2023. The diagnosis of hyperlipidemia was discussed with treatment options and the patient opted to try lifestyle changes and forgo treatment. Follow-up lab tests were ordered annually.

Mr. ████████ had various sick call complaints during this time period, which were all addressed appropriately and promptly. He also had an episode of syncope, thought due to mild dehydration, for which he was sent to the local ED, evaluated, received fluids and was returned to the jail.

Conclusion
Meets Standard of Care

Mr. ████████ lipid results were not alarming at all, but it appears that there was a significant delay in the performance of chronic clinic (several months). The patient may not have been aware that his cholesterol may be an issue until several months later. Also, there was no 10-year cardiovascular risk score documented on the chronic clinic note. It is very likely that the patient's 10-year cardiovascular risk score was far too low to suggest he should be treated with statins.

Therefore, I suggest that Mr. ████'s chronic clinic care meets standards.  It would be more complete to have a risk score documented and to have chronic clinic occurring within 30 days of the recognition of a new chronic clinic diagnosis.


**50. Patient:** ████████████
Booking Number: ████████
Dates Reviewed: ████/23 - ████/24
Reviewer: Jane Leonardson, M.D.

Summary of Care

████████████ was a ██ y/o transgender female with known HIV and HCV, and recent treatment for syphilis, brought to the jail for admission on ████████, 2023.  She had previous admissions and was known to the facility.

Mr. ████ was found to meet the criteria for Opioid Use Disorder shortly after arrival and was enrolled in the MAT program after he underwent a detox period.  She was largely non-compliant to his Buprenorphine treatment starting in ████████ 2023.

Mr. ████ also was begun on SSRI, prazosin and Vistaril after a psych evaluation in ████████ 2023.  As a part of that evaluation, labs were drawn, including lipids, which were very mildly elevated.

Mr. ████ submitted over 20 sick call requests for diet changes, lab draws, URI symptoms, hormone treatment for Gender Dysphoria, body aches and weight checks, and all were seen and responded to in an appropriate time period and manner.  He was referred to a dietician and for gender dysphoria evaluation by the staff evaluating him for his complaints.

At one point, Mr. ████ was admitted to the local ED for mild dehydration and syncope, which improved with fluids.  She also had COVID in ████████ 2023, for which she was quarantined and recovered.

Mr. ████ was evaluated shortly after admission for his HIV, by a provider, who seems, according to reference in other notes, to be in contact with the Infectious Disease clinic.  This provider clearly had access to Mr. ████'s records in the free world or from his previous incarceration at the jail.  This physician recommended medication for HIV and requested follow-up labs in ████████ 2028.  The provider did not address the HCV infection, but the patient's FIB4 score was calculated on ████/2024, and it is noted that the Infectious Disease specialist did not request treatment consideration.

Mr. ████ was compliant to his HIV medication.  Follow-up HIV, HCV and syphilis labs in ████████ 2024 showed a high CD4 count, but his VL was not undetectable.  His HCV labs at this time showed very active disease with an elevated HCV Viral Load and mildly elevated transaminases.  His liver function tests were in the normal range and his alpha-fetoprotein was normal.

Mr. ████ syphilis tests showed a four-fold decrease from pre-treatment values, but despite that, there is reference to treatment with oral penicillin because of a nationwide shortage of benzathine penicillin.

Conclusion

Meets Standard of Care

This complicated patient received a large amount of care for both episodic complaints, psychiatric complaints, Opioid Use Disorder (with detox), allied healthcare visits (MAT program, dietician) and with the medical team.

Her HIV was managed by an infectious disease specialist, who was contacted by the nurse practitioner.  Her chronic HCV infection was not an urgent issue, and labs for this problem may have been available to the medical staff in the old chart, but these labs are not mentioned by the staff who saw her at the beginning of her incarceration.  My only suggestion would be that the HCV should have been addressed earlier in the stay, with documentation if labs were not needed at that time, but this likely did not affect the treatment of the HCV.

**51. Patient:** ▮▮▮▮▮▮
Booking Number: ▮▮▮▮▮▮ Dates
Reviewed: ▮▮/23 - ▮▮/24
Reviewer: Jane Leonardson, M.D.

Summary of Care
Mr. ▮▮▮▮ was ▮▮ at the time of his incarceration on ▮▮/2023.  He was brought to the jail from the local hospital ED.  He was taken to the ED because the arresting officer thought he had ingested an unknown substance.  He was given Narcan and cleared at the ED. Mr. ▮▮▮▮ underwent a medical screen at the time of his intake and was started on Keppra for his seizure disorder.

Mr. ▮▮▮▮ had a hx of past psychiatric hospitalization and seizures.  He reported that he used fentanyl 5 days per week but had been on suboxone in the past.

Mr. ▮▮▮▮ was initially placed in detox, which went without incident.  He was then placed on suboxone and was followed by the MAT program.

Mr. ▮▮▮▮ was seen by psychiatry and by QMHPs and was diagnosed with a mood disorder, schizophrenia and depression.  He was treated with Zyprexa, Cogentin and Lexapro during his stay and had no problems that are noted.

Mr. ▮▮▮▮ episodic care was effective.  He requested a clipper shave pass, c/o athlete's foot, a scrape on his foot, sleep complaints and wanting reading glasses. All his requests were responded to promptly.

Mr. ▮▮▮▮ had a chronic clinic appointment on ▮▮/2023 and was found to be under good control. Keppra was continued.  Labs that are appropriate and recommended for a patient with a seizure disorder were ordered.  Mr. ▮▮▮▮ had no reported seizures during the period of time documented in the chart.

Conclusion
Meets Standard of Care

Mr. ▮▮▮▮ seizure disorder, opiate use disorder and psychiatric conditions were all under good control and his episodic care was well-addressed.

**52. Patient:** ██████████████
Booking Number: ████████  Dates
Reviewed: ████ /23 - ████ /24
Reviewer: Jane Leonardson, M.D.

Summary of Care

Mr. ████████ was a ████ y/o male who was admitted to the SDCJ on ████████ 2023. He reported a history of mental health problems (mood d/o), a history of drug and alcohol use, and a history of HTN and diabetes.

Initially, Mr. ████████ was placed in detox because he had reported that he had a history of withdrawal. He did well and was released from detox after the initial period of time.

Mr. ████████ was followed closely by both psychiatric staff and by QMHPs. He was seen frequently and was placed on medications for psychosis and for depression/anxiety and for sleep difficulty.

Mr. ████████ was started on metformin, sliding scale regular insulin, and amlodipine for his hypertension and diabetes. He was quite compliant to this regimen and his A1c was in acceptable range. His blood pressure readings were inconsistent.

Mr. ████████ free world records, which were documented as reviewed by the MD, revealed that in 2021 he was diagnosed with heart failure with low ejection fraction. He had been on an ARB and spironolactone for this. Nothing was mentioned about this when the chart was reviewed, but Mr. ████████ also had no complaints about edema or shortness of breath while at the SDCJ.

Mr. ████████ was started on ASA at one point, without explanation seen in the chart. He was also started on iron at the time that a CBC came back with a normal hemoglobin, but with mild microcytosis.

Mr. ████████ had a knee injury while he was incarcerated at the jail and was placed on both ibuprofen and meloxicam. It is clear from the notes that this was done intentionally. Also, he was on ASA at the same time.

Conclusion
Does Not Meet Standard of Care

Mr. ████████ blood pressure readings were volatile, and he should have had more attention to this. His blood pressure is rarely even mentioned. He should have also been started on an ACEI or an ARB for his hypertension, since he has diabetes. There is even more indication when the history of heart failure with low ejection fraction is considered.

The history of heart failure is mentioned in one note where the provider is reviewing outside records, but this does not prompt any follow-up for this problem or any adjustment in the medications (either for the diabetes or hypertension).

Mr. ████████ diabetes was stable and his A1c was in a desirable range, but ideally medications for diabetes and the prevention of heart failure would have been used, and they were not. Also, there is

**Ex. A-94**

no evidence that he ever had a retinal exam (even by a facility physician) or a foot exam, despite having an in-person visit with providers.

There is also no evidence that any health maintenance was offered, such as vaccines or cancer screening.

I am also especially concerned at the use of two NSAIDs simultaneously while the patient is on ASA. The provider's note specifically acknowledges that the patient is on two NSAIDs with Tylenol and then he opts to discontinue the Tylenol.

It is also unusual to start iron for only mild microcytosis without anemia and especially when there are not even iron levels done.

The patient's psychiatric care appears to be well-considered and he received adequate attention for his psychiatric problems.

## 53. Patient: ██████████
Booking Number: █████████ Dates
Reviewed: ████/23 - ████/24
Reviewer: Jane Leonardson, M.D.

### Summary of Care
Mr. ██████ was a ██ y/o male who was incarcerated on ████/2023. He presented with a history of HTN, hyperlipidemia, and Type II DM. His free world medications were amlodipine, metformin, losartan and atorvastatin. These were continued at the jail.

Mr. ██████ had excellent glucose control and BP control while he was incarcerated. He was seen in person 2 months after his intake for his chronic clinic problems, and care was continued as ordered. The care was initiated at the time of intake through a chart review process.

Baseline labs were drawn approximately 2 months after intake and showed an A1c-7.1 and a lipid profile significant for elevated triglycerides and decrease HDL. It is not clear if this specimen was drawn in a fasting state.

There were no follow up labs done 6 months after the baseline set, despite orders for them to be done every 6 months. There is no documentation of a cardiac risk score. A fundoscopic exam and foot exams were also ordered and not documented in the time period reviewed.

Mr. ██████ was offered a COVID vaccine at the time of intake and he refused it. There is no evidence that he was offered or evaluated for eligibility for other vaccines. Mr. ██████ had a positive COVID test with URI symptoms in ████ 2023. He recovered without incident.

Mr. ██████ was seen in sick call several times for complaints of dry skin, dry lips and left shoulder pain. All these complaints were addressed effectively and within an acceptable time period.

Mr. ██████ was not on psych medication during his incarceration but was followed closely by the mental health department. He participated in group therapy and dog therapy.

Ex. A-95

Mr. ▮▮▮ requested that he have a dental annual examination and to have his teeth cleaned.  Both were performed and Mr. ▮▮▮ was found to be in good health.

Conclusion
Meets Standard of Care

Mr. ▮▮▮ chronic care diagnoses were well-managed, however, the follow-up labs, fundoscopic exam and foot exam were not done.  Mr. ▮▮▮ also was not offered vaccines that are indicated for diabetic patients.  It is possible that there was a record of these being up to date and that this record is not in the set of records available to me.

**54. Patient:** ▮▮▮▮▮
Booking Number: ▮▮▮▮ Dates
Reviewed: ▮▮▮ /23 - ▮▮ /24
Reviewer: Jane Leonardson, M.D.

Summary of Care
Mr. ▮▮▮ was a ▮▮ y/o male at the time of intake to the jail on ▮▮▮▮▮ 2023.  He arrived with a fractured clavicle, scabies, open sores, needle marks and abscesses.  He gave a history of having psychiatric illness and of hypertension and hyperlipidemia.  His Surescripts prescription list did not show recent medications, so his medications from his previous incarceration were reordered.  These medications were amlodipine, atorvastatin, gabapentin, levothyroxine, olanzapine, and sertraline.  Old records revealed a diagnosis of hypothyroidism.

Mr. ▮▮▮ was isolated due to having scabies and was seen frequently by both MH workers and by psychiatry.  His medications were adjusted.  He was diagnosed with Paranoid Schizophrenia and Opioid Use Disorder.  He was enrolled in the MAT program and was compliant.

Mr. ▮▮▮ was seen for his chronic illnesses and fair control was noted. His blood pressure readings ranged from normal to borderline elevated with systolic readings in the 140s.

Mr. ▮▮▮ had some episodic complaints while incarcerated, including shoulder pain, pain with being cuffed and needing reading glasses. All were addressed.

Conclusion
Meets Standard of Care

Mr. ▮▮▮ was a complicated patient who refused his lab work. This made the management of his hypothyroidism and hyperlipidemia impossible.

**55. Patient:** ▮▮▮▮▮
Booking Number: ▮▮▮▮▮ Dates
Reviewed: ▮▮▮ /22 - ▮▮ /24
Reviewer: Jane Leonardson, M.D.

Summary of Care

**Ex. A-96**

Mr. ▮▮▮▮ was a ▮ y/o male at the time he was admitted to the SDCJ on ▮▮ .2022.  He reported at that time that he had Hyperlipidemia, Hypertension and Diabetes and that he took Lisinopril/HCTZ, Metformin and Atorvastatin.  Initially, all were ordered except the lisinopril.  The lisinopril was ordered on ▮▮▮ 2022.

Mr. ▮▮▮▮ had his routine baseline labs for his chronic clinic problems, and all was stable.  His blood sugar ran in an excellent range and his blood pressures were a little high, but he did not tolerate running them lower.

He experienced two syncopal episodes in ▮▮▮ 2022 and was sent to the hospital, where he had testing to look for possible MI and for occlusion of his carotids.  This workup was negative.  He refused an MRI of the brain as follow up, but saw a neurologist later in his stay, who recommended starting low dose ASA.  It is discussed at this time that he may have had early dementia.

Mr. ▮▮▮▮ experienced a coccyx fracture when he fell with his syncopal episodes and was treated with Tylenol and meloxicam.  He then experienced a significant GI bleed in ▮▮▮ 2023, was admitted and had extensive testing, including EGD, and colonoscopy.  His colonoscopy revealed extensive diverticuli and internal hemorrhoids, but no active bleeding.  He was transfused several units of PRBCs.  His EGD also did not reveal a source of bleeding.  He was returned to jail.  His blood loss was thought secondary to hemorrhoidal bleeding.  It appears to me that ▮▮▮▮▮▮ was still receiving Meloxicam at this time.

Mr. ▮▮▮▮ hemoglobin levels were followed frequently and gradually increased on iron therapy until he had another episode of GI bleeding in mid-▮▮ 2023.  He required repeated transfusion during this hospitalization and had repeat EGD and colonoscopy, as well as tagged red blood cell studies, which were inconclusive.  He was found to have a couple of vascular malformations in the colon, which were addressed, but continued to have significant bleeding, requiring transfusion.

Mr. ▮▮▮▮ ultimately was determined to have continued hemorrhoidal bleeding and underwent a hemorrhoidectomy.  This procedure was successful and he was allowed to return to jail in early ▮▮▮▮ 2023, where he remained stable.

Mr. ▮▮▮▮ was followed closely by the mental health department during his stay.  He was felt to be high risk for self-harm due to this being the first time he was incarcerated and because his charges were very serious and carried the potential for a long sentence.  He received frequent wellness checks with QMHPs during this time.

Mr. ▮▮▮▮ was seen frequently and promptly in sick call for various problems, which were usually reported by his wife.  These problems include bleeding from the rectum, pain, problems with toenails, problems with his shoes, fungus infection of the feet and for c/o about his eyes (outside records revealed he had been diagnosed with macular degeneration.

Conclusion
Meets Standard of Care

Mr. ▮▮▮▮ chronic clinic problems were well controlled, for the most part.  His blood pressure was a little higher than normal, but the fact that he had had syncope requiring hospitalization probably leads one to conclude that he would not tolerate tight blood pressure control.  There is evidence in the chart that Mr. ▮▮▮▮ was offered the preventive care treatment which is standard for diabetic patients

203

**Ex. A-97**

(retina check and foot exam). He was seen by optometry during the stay and a retina check was performed. There is no documentation that he had a foot exam. I did not see an offer for a pneumovax in this chart.

Mr. ███████ experienced life-threatening bleeding during this incarceration and received excellent care. I would have liked to see the meloxicam discontinued, however.

**56. Patient:** ████████
Booking Number: ████████ Dates
Reviewed: ████/23 - ████/24
Reviewer: Jane Leonardson, M.D.

Summary of Care
Mr. ████ was ██ y/o at the time of his admission to the SDCJ. He reported a history of Hypertension and Diabetes at the time of admission. His blood sugar upon arrival was so elevated, that he was refused admission until it could be lowered. He was admitted once his blood sugar was found to be 310. Mr. ████ was started on Metformin and atorvastatin and amlodipine at the time of admission. He ran extremely high blood sugars at the beginning of his stay and, in response, within a week of admission, Glargine was added and glipizide was added. His Hb A1c drawn 9 days after admission was >14 (off the scale).

Over the course of his say, the glargine was up-titrated and novolog was added. Mr. ████ refused a very large proportion of all of his medication except the atorvastatin, and despite repeated counseling, he never became very compliant.

Over the course of Mr. ████ stay, his A1c was lowered first to 7.4 and then went up to 8.3 with worsening compliance. Efforts were made to adjust Mr. ████ medication, but Mr. ████ refused his medication so often, it would have been difficult to tell how the medication and dosing were performing at the current levels.

Conclusion
Meets Standard of Care

While there are continued deficits in charting, such as an absence of vital signs on the clinic notes and a lack of mentioning all of the patient's chronic clinic problems, and a lack of having a complete list of medications on the clinic notes, the actual care delivered to the patient (or, in this case, the effort to deliver care, since the patient refused so much of the care), seems adequate.

Efforts were made to counsel the patient on the importance of taking his medication and on desirable dietary practices, and this is well-documented. The patient's repeated refusals are well-documented with hundreds of pages of refusals in the chart.

It would be desirable to document efforts at preventive health care, such as a diabetic foot exam or a retinal exam. These are not mentioned, and with patients who are expected to stay for at least a year, as in this case, I would recommend that this type of care be offered. I would also document the effort to deliver vaccinations that a patient like Mr. ████ should be offered.

204

**Ex. A-98**

**57. Patient:** ███████████
Booking Number: ███████ Dates
Reviewed: ████/23 - ████/24
Reviewer: Jane Leonardson, M.D.

Summary of Care

Mr. ███████ was a ████ y/o male at the time of intake to the county jail. He arrived with a reported history of HIV for 25 years and stated that he had been on Biktarvy for many years and had been compliant. His medication was not found on Sure Scripts, so it was not immediately started.

Mr. ███████ also reported that he had been hospitalized at UCSD hospital in ████ 2023. For MRSA/MRSA pneumonia. This history resulted in Mr. ████████ being isolated for a period of time.

Mr. Stengel was started on Biktarvy on ████/2023. It appears he was very compliant to the medication. His Tcell count upon arrival to the jail was greater than 1000. His viral load was unknown because the original tube was not accepted at the lab and he repeatedly refused to have more blood tests drawn. He was not referred to the infectious disease specialist due to the absence of the HIV viral load. Mr. ███████ was seen by a physician on ████/2023 for his HIV, but there were no vital signs or significant physical exam on the note. Despite repeated refusals of his lab redraw, there is no evidence that Mr. ████████ was ever counseled by a physician on the importance of getting his bloodwork done.

Regardless, Mr. ████████ received his medication for his HIV, was compliant, and did very well in that regard.

Mr. ███████ was enrolled in the MAT program early in his stay and was followed by the MAT staff for that care. He was compliant to his suboxone.

Mr. ███████ had anxiety and sleep problems while he was at the jail. He saw the psychiatrist and was started on medications for anxiety and sleep induction.

Mr. ███████ had episodic complaints during this period of time, including dandruff, swelling of jaw and tooth pain, heartburn, wanting a snack, wanting suboxone increased and constipation. All were appropriately managed and seen in an acceptable timeframe.

Conclusion
Meets Standard of Care

I would suggest that vital signs are done with all visits, that a more extensive (but targeted) physical exam be done for chronic clinic problems, and that chronic refusal of important treatment are responded to with documented counseling from the provider.

**58. Patient:** ███████████
Booking Number: ███████ Dates
Reviewed: ████/22 - ████/24
Reviewer: Jane Leonardson, M.D.

Summary of Care

205

Ex. A-99

Mr. ███ was a ██ y/o male at the time of his detention at the San Diego County Jail.  He arrived with a markedly elevated blood pressure and was not accepted at the jail until he was evaluated and treated at a hospital.  When he arrived back at the jail, his blood pressure was still elevated, but not as much.

Mr. ███ was placed on Amlodipine and did not consistently take it.  He was sent to StatCare for elevated blood pressure at one point and they started a protocol of clonidine given bid x 5 days.  He was seen frequently for elevated blood pressure readings and for counseling on poor compliance.  At this point he had been placed on nifedipine, ACEI/ARB and HCTZ.

Mr. ███ blood pressure became extremely low at one point and he was sent to the hospital.  It seems this occurred because psychiatry added Prazosin (a drug well-known for causing low blood pressure) for nightmares.

Mr. ███ was seen by psychiatry for difficulty sleeping and anxiety.  He was appointed frequently, but frequently refused to be seen.  It does appear he was compliant to his psychiatry medications.

Mr. ███ suffered a dental abscess during his admission, which was thought to be a skin infection of the face, at first.  He was admitted to the hospital and treated for sepsis, where a CT demonstrated an infection that was likely of dental origin.  He was placed on antibiotics and returned to the facility, where he was put on Augmentin.  There is no evidence that dental saw him for routine evaluation for possible extraction.

When the dental department did see Mr. ███, an extraction was offered and he refused.  He accepted antibiotics and pain medication.

Mr. ███ appears to have had a very elevated set of lipids that were not acted upon while at the jail.  However, his lipids appear to be in a completely normal range while at the hospital.

Conclusion
Meets Standard of Care – with some reservations

Mr. ███ had uncontrolled hypertension during the vast majority of his incarceration.  Much of the reason for this is likely to be his non-compliance to appropriate medication.  There are hundreds and hundreds of medication refusals in his chart.

I am, however, concerned about what appears to be a StatCare protocol that causes patients with elevated blood pressure readings to be placed on clonidine.  This is ill advised and slows the progress to an effective blood pressure regimen, since it does not allow the follow-up provider the ability to determine if a proper medication dose increase or addition of a new, recommended drug is accomplishing control.  Rapid lowering of blood pressure without emergent symptoms is not recommended and clonidine is not a recommended drug.

I also want to point out that the lack of an accurate medication list on all notes (and vital signs on all notes) is detrimental to patient care.  It is very difficult to tell what the patient has ordered and it is easy to overlook that somebody else has ordered a drug like prazosin, which is a very obvious cause of an extremely low blood pressure.

**Ex. A-100**

In Mr. ▮▮▮'s case I also feel that the lack of dental follow-up upon return from the free-world hospital with sepsis due to a dental infection is a missed opportunity for treatment and that he should have been offered an extraction much earlier in the course of his stay.

**59. Patient:** ▮▮▮▮▮▮▮▮
Booking Number: ▮▮▮▮▮▮     Dates
Reviewed: ▮▮▮/23 - ▮▮▮/24
Reviewer: Jane Leonardson, M.D.

Summary of Care

Mr. ▮▮▮ was a ▮ y/o at the time of his intake into the San Diego County Jail on ▮▮▮▮, 2023. He had been transferred from the California Department of Corrections and Rehabilitation. It is noted in the intake nursing interview that he had HTN, hyperlipidemia, that he had been on Suboxone treatment. Mr. ▮▮▮ was sent to StatCare.

StatCare noted that the patient had not brought a CPAP with him. It is noted in the StatCare note that there were no meds listed, but it is unclear where the StatCare provider was looking for a list. The StatCare provider did not have vital signs on the note and ordered a detox regimen that was discontinued later in the day when the suboxone dose was verified and a urine drug screen verified that Mr. ▮▮▮ only had suboxone in his system. Orders were written for Aspirin, Atorvastatin, Losartan, and Metoprolol, which match the transfer information from CDCR found in the Mr. ▮▮▮s reviewed chart.

Mr. ▮▮▮ chart was reviewed the next day and HTN, OUD and hx of sleep apnea were noted. It was also noted that the transfer paperwork said nothing about having a CPAP machine. Mr. ▮▮▮ was also listed as having depression and his psychiatric medications from CDCR were continued. There is no note of the Ischemic Heart Disease or asthma listed on the transfer paperwork or of the hyperlipidemia mentioned on the nursing interview. The transfer form from CDCR was not initialed or marked as having been reviewed by anyone.

On ▮▮▮ 2023, Mr. ▮▮▮ underwent the intake physical with the MD. His BP is listed as 153/87. No changes are made and there is no history obtained about why Mr. ▮▮▮ is on Aspirin or about potential target organ damage.

Mr. ▮▮▮ remained on the same medication regimen during his entire stay (the non-psychiatric medications), except his dose of suboxone was decreased when it was documented that he had been cheeking his medication. He frequently refused his medications and his blood pressure checks.

Mr. ▮▮▮ had a few episodic complaints during the time period reviewed. Among these were fungus in the toenail and asking for a CPAP machine. Mr. ▮▮▮ refused to sign a release of information for the sleep study he reported having had previously. He also was involved in an altercation and was seen for assorted scratches and bruises. Mr. ▮▮▮ had an episode of hematuria, flank pain radiating to testicle during the time period reviewed. He was seen for this complaint and a testicular ultrasound was ordered (and was normal).

There is one note in the chart titled as a Chronic Clinic visit on ▮▮▮.2023. There are no vital signs listed on the note and no questions about symptoms or history of target organ damage. The medications are not listed and the HTN and HLD are the only problems listed to be seen on that day.

Ex. A-101

Labs for his chronic medical problems were not done until ███ 2024, approximately 7 months after his arrival at the jail. His labs looked fine except for a pre-diabetes level of HbA1c.

Conclusion
Meets Standard of Care – with some reservations

Mr. ███ chronic medical problems identified at SD County Jail were HTN and HLD. An unverified history of sleep apnea is mentioned in notes, but the asthma and heart disease, which are mentioned on the transfer form are not mentioned. There is no history taken at the jail to elicit whether Mr. ███ had had symptoms or history of target organ damage (namely ischemic heart disease). Mr. ███ was on Aspirin and I believe there should have been some interest in why he was on aspirin.

That said, Mr. ███ lipids looked well-controlled (although that is not known until 7 months into his stay) and his blood pressure was borderline, but uninterpretable, since he often refused his medication.

I have another issue with his episodic care. Mr. ███ gave a classic history of having a kidney stone, yet nobody who saw him ever mentioned that potential diagnosis. After his pain continued for a while, a useless testicular ultrasound was ordered instead of the proper test, which would have been a renal ultrasound.

I commend the jail on their attention to opioid use disorder and their documentation of refusals.


**60. Patient:** ███████████

Booking Number: ███████ Dates
Reviewed: ███/23 - ███/24
Reviewer: Jane Leonardson, M.D.

Summary of Care
Ms. ███████ was a ███ y/o female who arrived at the San Diego County Jail on ███ 2023. She reported having a history of HIV, HTN and Asthma. She reported that she was on Biktarvy, which was ordered at the time of intake and to which she was extremely compliant during her incarceration. She also received her albuterol and loratadine at the time of intake. Ms. ███ was found to be COVID-19 positive upon intake and was quarantined, per protocol.

A chart review was conducted within a week of her arrival to look at Ms. ███ BP control. The note states that the patient was on amlodipine in the FW, but that she was taken off her med because her pressure was well-controlled. There were no BP readings or other vital signs on this note and none were referenced in the note.

Over the course of her stay, Ms. ███ appears to have been started on HCTZ for her hypertension, but I do not see the order for this in provider notes. She had multiple blood pressure readings, some of them high enough to have caused a call to the provider, and some which were high enough to have activated a protocol that involves giving several days of clonidine. Over the course of Ms. ███ stay, 33 BP readings are documented and 31 are abnormal. At least one of the normal readings was when she was on clonidine for a few days.

208

There are 3 chronic clinic notes in the chart, and one seems to be a chart review. None of them has vital signs performed and none mention what the blood pressure readings are. These notes mention that control of blood pressure is good. The chart review was done during the time that the patient is receiving Clonidine for a few days and the note does not mention this. None of the notes mentioned the Hydrochlorothiazide that is listed in the MAR.

The patient's HIV seems to be addressed with the Biktarvy and labs showed a CD4 above 200 and undetectable viral load done in ████ 2023. Her baseline labs upon arrival at the jail were refused because she had just had labwork done in the FW. These labs were obtained and reviewed.

The patient's asthma symptoms were well-attended and stable.

Of great concern is the fact that the patient arrived with outside records showing a hemoglobin of 11.9 with a low MCV and 1.5 months later it was 11.1, with an MCV of 73. Also, old records showed a high globulin fraction, which was not mentioned in any notes. A repeat CMP showed again a high globulin fraction, which is mentioned in a clinic note, but nothing is done to evaluate it. No workup is done for the worsening microcytic anemia or thrombocytopenia that shows on the patient's labwork.

Ms. ████ has multiple complaints of body pain, for which an extra mattress and Bengay are given. There is no mention of an examination or that any consideration might have been given to a potentially ominous cause for the pain. No mention is made of the microcytic anemia and the patient's need for a work up for that.

Conclusion
Does Not Meet Standard of Care

Ms. ████ blood pressure has never been controlled during this period of time and the use of shortterm clonidine should not be protocol. There is no evidence that any effort was made on the part of the provider to look at the blood pressure readings, no vital signs documented on the provider notes and no evidence that medications were being reviewed during provider visits.

The HIV and asthma care were adequate.

I have grave concerns about the attention that was not given to this 53y/o woman's worsening microcytic anemia and elevated globulin fraction. The patient should have had a workup for both. Myeloma is certainly a consideration with her persistent complaints of back and body pain, as well. This 53y/o patient should also be scheduled for colon cancer screening and the anemia should be worked up to see if it is due to iron-deficiency or chronic inflammation.

I suggest vital signs be taken and documented at every visit. I suggest that a medication list that is accurate should be displayed on every patient-related visit.

**61. Patient:** ████
Booking Number: ████
Dates Reviewed: ████ /23 - ████ /24
Reviewer: John Pulvino, P.A.

209

**Ex. A-103**

Summary of Care
██/23 – Mr. ████████ arrival at the jail. An intake assessment was completed by a provider identifying hypertension as a chronic problem. Mr. ████ was started on his FW medications amlodipine, HCTZ, Losartan, and clonidine. He was scheduled for follow up.
██/23 – Seen in provider sick call for eczema. Medication provided.
██/23 – Mr. ████ requested a "pancreatic" diet. Dietician recommended a cardiac diet.
██/23 – Mr. ████ refused a scheduled health assessment.
██23 – Seen by provider. CVS FW medication list arrived. Mr. ████ was already on medication for his HTN. Started on gabapentin for chronic back pain.
██/23 – Provider visit for back pain. Patient already taking NSAID and gabapentin.
██/23 – Seen by provider for joint pain and eczema. Continue current treatment, added triamcinolone cream.
██23 - CCC. HTN in good control.
██/23 – Seen by provider for chronic conditions. Stable, continue current care.
██/23 – Provider visit for back pain. Xrays reviewed. Degenerative joint disease L4-L5. ANA titer 1:320.
██/23 – Rheumatology referral
██/23 – Rheumatology follow up. Recommended Tylenol and topical anti-inflammatory cream.
Review of 3 pages of blood pressure readings from ████/23 to ████/24 show good control.

Conclusion
Meets Standard of Care

Mr.████ was promptly evaluated on intake for chronic conditions and treated immediately. He was seen frequently for HTN, chronic eczema and chronic back pain. His HTN was controlled well. Mr. ████ was provided appropriate treatment for his medical conditions.

**62. Patient:** ████████

Booking Number: ████████
Dates Reviewed: ████/23 - ████/24
Reviewer: John Pulvino, P.A.

Summary of Care
Mr. ████ was received at the county jail on ████/23. A provider intake assessment was completed the same day and he was noted to have a history of hypertension. He was started on Norvasc and scheduled for blood pressure checks and a provider follow up. He was evaluated on ████/23 by a provider and it was documented that his blood pressure was trending down and to continue the current treatment with Norvasc. On ████/23 he was involved in an altercation and he was seen on this date and ████/23 to assess his injuries. His blood pressure was marginally elevated at that time. Mr. ████ refused a chronic clinic appointment on ████/23. On ████/23 a provider requested a review due to multiple refusals for Mr. ████'s blood pressure medication. The Norvasc prescription was changed to the evening in hopes that the patient's compliance would be better.
Mr. ████'s chronic care for his blood pressure control was a challenge for the medical staff. He was frequently non-compliant with his medication and routinely refused provider appointments. The medical staff scheduled blood pressure checks throughout his incarceration as a way of tracking his BP control. Despite these difficulties, a review of his blood pressure log shows variable but mostly acceptable control.

Conclusion

Meets Standard of Care

Mr. ██ was promptly assessed on arrival at the jail and he was started on medication for chronic hypertension on the day of his intake.  His chronic care was challenging due to medication and appointment refusals however his overall blood pressure control was acceptable.  The medical team continued to follow him despite these challenges and his overall care was good.

**63. Patient:** ██████████
Booking Number: ██████████
Dates Reviewed: ████/23 - ████/24
Reviewer: John Pulvino, P.A.

Summary of Care
██/23 – Intake, STAT Care intake assessment:  Asthma, COPD, s/p lumbar fusion 1998, hypertension, GERD, depression.  Mr. ██ was a transfer from Florida corrections.  He was begun on atorvastatin, lisinopril, HCTZ, pantoprazole, albuterol inhaler, ibuprofen and trazadone.
██/23 – NP note.  Follow up STAT Care intake assessment.  Ordered lumbar and right knee Xray, cane, wheelchair for long distances and an ADA assessment.  A walker was also ordered on ██/23.
██/23 - Xray reviewed- multilevel lumbar DJD.
██/23 – NP BP check review. BP stable, continue current medication.
██/23 – MH telepsychiatry- added Abilify and adjusted trazadone dosing.
██/23 – NP evaluation for fulltime WC request.
██/23 – Provider EKG review.
██/23 – Chronic Care Clinic.  Patient is stable, continue current treatment.
██/23 – Provider evaluation for toenail infection
██/23 – MH follow up- medication adjustment
██/23 – Provider follow up for toenail infection
██/23 – Provider follow up.  Mr. ██ stated a history of brain surgery and requested oxycodone for headaches.  A ROI for the FW neuro was completed.
██/23 – Provider follow up for neuro ROI.  No record of a neuro procedure at the FW facility. Neuro referral was initiated.
██/23 – Head CT ordered and Imitrex was started.  (head CT results were normal)
██/23 – Stated difficulty sleeping, a history of skin cancer.  A ROI to the FW dermatologist was completed and a referral for a sleep study was also completed.
██/23 – Sleep study completed.  Normal PAO2 throughout.
██/23 – MH follow up.  Adjusted medication
██/23 – Provider review of optometry visit.  Tobradex was ordered for blepharitis.
██/23- MH follow up.  Continue current treatment
██/23 – Mr. ██ requested hearing Aids.  An Audiology referral was completed.
██/24 – MH follow up.  Medications adjusted.
██/24 – Provider visit for arthritis and low hemoglobin.  Continue current treatment and repeat CBC.
██/24 – Chronic Care Clinic.  Hypertension stable.  Mr. ██ complained of dizziness.  He was found to have an ear wax impaction and he was treated with debrox.
██/24 – Seen by provider and a dermatology referral was completed for continued complaints of skin rash.

Conclusion

211

**Ex. A-105**

Meets Standard of Care

Mr. ▮ was promptly evaluated on intake for chronic conditions and treated immediately. His medication from his previous facility was continued. He was seen frequently for HTN, chronic back pain, headaches and skin complaints. His HTN was controlled well and his multiple other complaints were addressed and referrals to appropriate specialists were initiated. Mr. ▮ was provided appropriate treatment for his medical conditions.

**64. Patient:** ▮
Booking Number: ▮
Dates Reviewed: ▮/20 - ▮/24
Reviewer: John Pulvino, P.A.

Summary of Care

▮/20 – Intake assessment. Hypertension noted however Mr. ▮ refused medication and blood pressure monitoring.
Routine chronic care clinics were scheduled and Mr. ▮ was counseled and he was not interested in treatment for his chronic hypertension. There were many attempts to provide care for his hypertension however he refused all intervention efforts.

Conclusion
Meets Standard of Care

Mr. ▮ was diagnosed with hypertension during intake and he gave a history of elevated blood pressure in the FW which he treated "naturally". Multiple attempts in chronic care clinics, nursing visits and provider visits throughout his incarceration were made to address his elevated blood pressure. All attempts were met with refusals. He was seen for several acute issues including URI symptoms, swollen ankle, shoulder pain and rashes and treated appropriately. This was a difficult patient to care for however all facility providers and nursing staff continued to encourage compliance during his incarceration without success.

**65. Patient:** ▮
Booking Number: ▮
Dates Reviewed: ▮/23 - ▮/24
Reviewer: John Pulvino, P.A.

Summary of Care

▮/23 – StatCare intake assessment. Diagnosed with Hypertension and Diabetes. Blood pressure and blood sugar were both elevated on arrival. Intake medications were insulin, HCTZ, Losartan, glipizide and atorvastatin. During intake Mr. ▮ refused insulin.
Mr. ▮ was documented to be significantly non-compliant with diabetes medication and to a lesser extent with blood pressure medication throughout the period of review. He was seen very frequently to address elevated blood sugar values and elevated blood pressure. Medication adjustments were frequent. He was seen by a provider 39 times between ▮/23 and ▮/24 specifically to address elevated blood sugar values, elevated blood pressure and non-compliance with medication, provider visits and diet. Mr. ▮ was followed very closely by the facility medical



**Ex. A-106**

staff with laboratory (frequently refused), attempted blood sugar and blood pressure monitoring (also frequently refused) and provider visits.

Conclusion
Meets Standard of Care

Mr. ███████ has significant diabetes and hypertension and the facility medical staff are extremely attentive to his disease control. They attempt to monitor his status and provide appropriate treatment adjustments in the face of chronic non-compliance. They provide excellent continuity of care.

**66. Patient:** ████████
Booking Number: ███████
Dates Reviewed: ███ /23 - ███ /24
Reviewer: John Pulvino, P.A.

Summary of Care
███ /23 – StatCare intake assessment completed. Diagnosed with hypertension and started on amlodipine and weekly blood pressure checks were ordered.
███ /23 – Provider review of FW ER records prior to book in. No action required.
███ /24 – provider visit for BLE swelling. Amlodipine was discontinued and lisinopril was started. Subsequent lower extremity ultrasound was negative for DVT.
███ /24 – Chronic care clinic- blood pressure was controlled. Continue current treatment.

Conclusion
Meets Standard of Care

Mr. ███████ arrived on ███ /23 with a diagnosis of hypertension. His status was monitored frequently and his blood pressure was well controlled. He was followed in chronic care clinic at appropriate intervals and his medication was adjusted as needed. Mr. ███████ blood pressure control was not complicated and he was seen and treated appropriately for his disease including blood pressure monitoring, medication adjustments and lab monitoring.

**67. Patient:** ████████
Booking Number: ███████
Dates Reviewed: ███ /21 - ███ /24
Reviewer: John Pulvino, P.A.

Summary of Care
███ /21 – Jail intake assessment. Admitted to MOB. Mr. ███ is a ██ y/o HM with an extensive history of coronary artery disease with stent placement, congestive heart failure, hypertension, diabetes and obesity (BMI 43). The most recent cardiac event was ███ /20 with LAD and circumflex stent placement. A dual chamber ICD was placed ███ /21. His ejection fraction was 25% on admission. He was seen daily during his incarceration by nursing and provider staff in the MOB with close attention to his multiple medications (atorvastatin, brilinta, bumetanide, Entresto, metformin, metoprolol, nitroglycerine, omeprazole, sildenafil, Xopenex inhaler, apixaban, gabapentin and Jardiance) in concert with cardiology partners.

He was seen in the emergency room sixteen times during his incarceration for chest pain. He had repeat echocardiograms (showed increased EF), several ICD interrogations, and a repeat coronary artery catheterization in 2024 showing stable stents with no new lesions. He was hospitalized four times to investigate his chest pain. All cardiology evaluations, ER visits and hospitalizations found stable CAD and CHF and medication adjustments were made throughout his incarceration consistent with his changing needs.

He was seen in the sleep lab and diagnosed with significant obstructive sleep apnea and CPAP was supplied. He was also evaluated in ophthalmology to rule out diabetic retinopathy. Mr. ███ complained of calf Pin on two occasions and doppler ultrasounds were completed and ruled out DVT.

Conclusion
Meets Standard of Care

Mr. ███ has an extensive history of CAD and CHF complicated by obesity and diabetes. His significant medical needs were recognized on intake and he was housed in the MOB during his incarceration where he had daily access to nursing and provider staff. His complex needs were reevaluated frequently and medication adjustments were frequent and appropriate for his condition. The medical staff approached his care cautiously and sought higher levels of care frequently due to his significant risk and symptoms. Mr. ███ care was very timely, appropriate and effective.


**68. Patient:** ███
Booking Number: ███
Dates Reviewed: ███ /23 - ███ /24
Reviewer: John Pulvino, P.A.


Summary of Care
███ /23 – STATCare intake assessment. Diagnosed with hypertension. Started on labetolol and atorvastatin. BP checks scheduled.
███ /23 – Refused follow up for hypertension.
███ /23 – chronic care clinic. Patient stated history of AAA repair ███ /22. Records requested.
███ /23 – AAA repair records reviewed and referral for chest CTA was completed.
███ /23 – C-spine Xray ordered for neck pain.
███ /23 – Seen for skin rash
███ /23 – Refused chronic clinic.
███ /24 – provider follow up. Importance of tight blood pressure control due to history of AAA repair.
███ /24 – Chronic care clinic. Blood pressure medication adjusted.
███ /24 – BP medication adjusted.
███ /24 – BP review. Stable.
███ /24 – BP medication adjusted.
███ /24 – Follow up BP control
███ /24 – Chronic care clinic. Continue current care.
███ /24 – Provider BP check
███ /24 – CTA of abdomen and MRI of abdomen and pelvis completed. No acute needs. Follow up with vascular surgery.
███ /24 – Anemia, refused Fecal occult blood test.
███ /24 – Provider follow up AAA assessment.
███ /24 – Chronic care follow-up



█████/24 – Mr. ██████████ refused vascular surgery follow up

Conclusion
Meets Standard of Care

Mr. ██████████ arrived on ██████/23 with a diagnosis of hypertension. He was also found to have a history of AAA repair on ██████/22 and was quickly referred for follow up imaging and vascular surgery specialty care. The medical staff recognized the need for tight blood pressure control and he was seen very frequently with multiple medication adjustments. The medical staff responded quickly and appropriately to Mr. ██████████ needs and did an excellent job of following his progress.

**69. Patient:** ██████████████
Booking Number: ████████████
Dates Reviewed: ███████/23 - ██████/24
Reviewer: John Pulvino, P.A.

Summary of Care
████/23 – STAT Care intake assessment. On ████/23 Mr. ████████ fell from a ladder in the FW and was treated and cleared for arrest at the VA hospital with a recommendation for a follow up head CT scan. He was noted to have hypertension and seizure disorder on intake and he was started on amlodipine and levetiracetam.
████/23 – There was a high level of concern given his recent fall history and SDH and a referral for a CT and neurosurgery follow up was initiated.
████/23 – CT results reviewed and Mr. ████████ was immediately sent to the ER. A craniotomy and SDH evacuation were performed on █████/23 at a FW hospital.
He was placed in the MOB due to equilibrium issues and being a high fall risk.
All recommendations of the FW neurosurgeon were followed and completed timely including imaging, follow up appointments and anticoagulation.
The remainder of the available records include several minor acute problems including a toe nail avulsion, leg cramps and a cyst on his back. The medical staff were very attentive and all acute problems were treated timely.

Conclusion
Meets Standard of Care

Mr. ████████ arrived on ████/23 with a diagnosis of hypertension and seizure disorder. His status was monitored frequently and his blood pressure was well controlled. Due to his fall and SDH just prior to incarceration he was at serious risk of complications. The medical staff had a high level of concern and provided appropriate follow up and care. He was followed in chronic care clinic at appropriate intervals and his medication was adjusted as needed. The care Mr. ████████ received was appropriate and timely for his acute and chronic conditions.

**70. Patient:** █████████████
Booking Number: ████████████
Dates Reviewed: ███████/22 - ██████/24
Reviewer: John Pulvino, P.A.

Ex. A-109

Summary of Care

██ /22 – StatCare intake assessment.  Mr. ██████ was referred to the ER from booking.  He was admitted to a local hospital with left fractured rib with pneumothorax and lower extremity DVT.  On return he was started on amlodipine and Eliquis.

██ /22 – Hospital records were reviewed again and above was confirmed.

Mr. ██████ was monitored frequently for his chronic conditions both in the MOB and in formal chronic acre clinics on ██ /22, ██ /23, ██ /23, and ██ /24.

During his incarceration he developed BLE edema suspected to be from venous insufficiency and he was treated symptomatically.  Repeat doppler ultrasound studies of his BLE were done three times during his incarceration to rule out any further DVTs.  He was continued on anticoagulation therapy and he was evaluated by hematology for their recommendations.  He was also treated for lower extremity cellulitis on the facility and as an inpatient in a FW hospital.

Conclusion
Meets Standard of Care

Mr. ██████ arrived on ██ /22 with a diagnosis of hypertension, s/p DVT and pneumothorax.  His status was monitored frequently and his blood pressure was controlled with frequent follow up and medication adjustments despite his frequent refusal of blood pressure checks.  The medical staff was very diligent in assessing his continued lower extremity edema in light of his history of DVT.  He was seen routinely in chronic care clinic as well as MOB rounds for his blood pressure control and ongoing lower extremity edema.  The medical care was appropriate and very timely.


**71. Patient:** ██████████
Booking Number: ██████
Dates Reviewed: ██ /23 - ██ /24
Reviewer: John Pulvino, P.A.


Summary of Care

On ██ /23, Mr. ██████ was received at the county jail.  A provider intake assessment was completed the same day and he was identified as having chronic hypertension.  He was started on Norvasc and scheduled for BP checks and a provider follow up.  Mr. ██████ was followed in chronic care clinic as well as frequent provider visits for BP checks, lab evaluations, and acute complaints.  There was routine attention to his hypertension treatment including medication changes and adjustments.  Acute complaints were addressed appropriately and very timely.

Conclusion
Meets Standard of Care

Mr. ██████ was promptly evaluated on intake for chronic conditions and treated immediately.  He was seen frequently for his HTN diagnosis and there was a high level of attention to his chronic disease control.  Mr. ██████ was provided appropriate and timely treatment for his acute and chronic medical conditions.

Ex. A-110

**72. Patient:** ███████████
Booking Number: ███████
Dates Reviewed: ████/22 - ████/24
Reviewer: John Pulvino, P.A.

Summary of Care
Ms. ████ was received at the county jail on ████/22.  A provider intake assessment was completed on the day of arrival.  She was diagnosed with chronic hypertension and started on hydrochlorothiazide.  She also has a history of craniotomy and cerebral aneurysm clipping on ████/22 at Scripps medical center.

During her incarceration she was followed closely for her hypertension with frequent blood pressure checks and provider visits with medication adjustments.  Formal chronic care notes were every 6 months however she was seen frequently between these CCC visits and her blood pressure was well controlled.

Ms. ████ also had several other medical problems during this period which were monitored and treated.  During the initial period of incarceration, she complained of daily headaches.  She was referred to neurosurgery for evaluation, a brain CT was completed and all findings were without acute changes and no intervention was recommended by the neurosurgeon.  In ██████ 2023 she began to have bilateral eye pain for which she was promptly referred to ophthalmology and treated for retinal lattice degeneration with photocoagulation. In ████████ 2023 she had right foot swelling and she was referred for x-rays and venous doppler studies all of which were normal and the swelling resolved.

Conclusion:
Meets Standard of Care

Ms. ████ was evaluated on the day of intake for chronic conditions and found to have a history of hypertension and was begun on medication the same day. She was followed in CCC at appropriate intervals and her blood pressure was well controlled.  Several acute problems that arose were assessed and promptly treated.  Ms. ████ received excellent care while in the jail.

**73. Patient:** ███████████
Booking Number: ███████
Dates Reviewed: ████/23 - ████/24
Reviewer: John Pulvino, P.A.

Summary of Care
Mr. ████ was received at the county jail on ████/23.  A provider intake assessment was completed the same day and he was identified as having chronic asthma, diabetes and BPH.  He was started on an Alvesco inhaler, montelukast, albuterol, tamsulosin, atorvastatin and glipizide.  He was scheduled for blood sugar checks and a provider follow up.  He was also seen by a provider on ████/23 due to a positive alcohol abuse history screen and started on an alcohol withdrawal prophylaxis medication protocol. ████████████ was evaluated by nursing and providers for several weeks for signs of withdrawal.

After providing a late history of heroin abuse, he was promptly started on MAT with suboxone treatment on ████/24. Mr. ████ admitted only to alcohol abuse during the intake screen.

217

**Ex. A-111**

He was seen and treated promptly for acute problems as they arose throughout the review period.

Conclusion
Meets Standard of Care

Mr. ████ was promptly evaluated on intake for chronic conditions and treated immediately.  He was seen frequently for his HTN diagnosis and there was a high level of attention to his chronic disease control.  Mr. ████ was provided appropriate and timely treatment for his acute and chronic medical conditions.

**74. Patient:** ████████
Booking Number: ████████
Dates Reviewed: ████/22 - ████/24
Reviewer: John Pulvino, P.A.

Summary of Care
████ – Mr. ████ arrival at the jail.  An intake assessment was completed by a provider identifying hypertension, diabetes and CAD as chronic problems.  Mr. ████ was started on his FW medications Novolin R, metformin, spironolactone, Losartan, glipizide, atorvastatin, Lasix, metoprolol, and gabapentin.  It was also noted that he had future appointments for cardiology, a venous doppler, a pacemaker interrogation and an ABI.  Referrals were completed for these visits/procedures during the intake review.
████/22 – Labs were reviewed by a provider with follow up lab scheduled.
████/22 – The completed venous doppler and arterial studies were reviewed.  No DVT was found and the arterial studies showed mild to moderate BLE arterial disease.  The results were sent to the cardiologist for review.
████/22 – Blood sugar checks were reviewed and adjusted.
████/22 – Provider chronic care clinic.  Continue current treatment ████/22 – Physician requested special shoes.
████/22 – Mr. ████ back from cardiologist appointment.  Reviewed by StatCare provider. Recommendations from Cardio were to continue the current treatment and schedule an echocardiogram.  The Echo was ordered.
████/22 – Physician appointment.  Referred to ophthalmology for diabetic retinopathy screening.
████/22 - Seen by StatCare provider.  Mr. ████ was sent to the ER for chest pain.
████/22 – Return from hospital reviewed by StatCare provider.  Diagnosed with nephrolithiasis and gall bladder disease.  Recommended discharge medications were ordered.
████/22 – Provider follow up post hospitalization.  The discharge recommendation was conservative treatment due to history of heart disease.  Flomax and Pyridium were continued
████/22 – NP follow up post hospitalization.  Continue current treatment.
████/22 – Physician review of ophthalmology appointment.  No diabetic retinopathy found.
████/22 – NP note. Mr. ████ refused cardiology follow up.  Cario was rescheduled.
████/23 - Mr. ████ refused cardio again and was again rescheduled.
████/23 – Seen in provider chronic care clinic.  Continue current treatment.
████/23 – Provider review of cardio appointment on ████/23. Recommendation was to continue current treatment.
████/23 - Provider referral for cardio follow up.
████/23 – Provider follow up from ████/23 cardio clinic.  Cardio recommendations were to continue current treatment.
████/23 – seen by provider and a knee brace was requested and provided.

218

**Ex. A-112**

███/23 – Seen by provider in chronic clinic.  Mr. ██████ was stable and the orders were to continue current treatment.

███/24 – Seen by provider in chronic clinic.  Continue current treatment.

███/24 – Cardio appointment review.  AICD functioning properly, recommendation to continue current treatment.

Conclusion
Meets Standard of Care

Mr. ██████ was promptly evaluated on intake for chronic conditions and he was treated immediately including free world medications and referrals to specialty clinics.  He was seen frequently for his diabetes and cardiovascular disease.  His HTN was controlled well.  He was followed in CCC at 6month intervals as well as frequent provider visits between CCC clinics.  He was followed by cardiology routinely and completed appropriate studies for his cardiovascular disease.  Mr. ██████ was provided excellent treatment for his medical conditions.

75. Patient: ████████████
Booking Number: ████████████
Dates Reviewed: ████/23 – ████/24
Reviewer: John Pulvino, P.A.

Summary of Care
███/23- Intake assessment completed.  History of asthma and elevated lipids.  Peak flow ordered and he was started on atorvastatin.

███/23 - Peak Flow was normal.  Mr. ██████ stated that he did not use an inhaler in the FW.  No other history of a chronic condition was given.

Mr. ██████ was followed routinely in chronic care clinic and there were no documented episodes of respiratory symptoms.  He was also started and monitored for MAT treatment.

Conclusion
Meets Standard of Care

Mr. ██████ arrived on ████/23 with a diagnosis of asthma and hyperlipidemia.  He had no history of treatment for asthma in the FW.  His lipids were elevated and treated appropriately.  He was seen routinely in chronic care clinic as well as MAT monitoring.  Mr. ██████ had an uncomplicated incarceration medically and he was treated appropriately and timely.

**76. Patient:** ████████████
Booking Number: ████████████
Dates Reviewed: ████/23 - ████/24
Reviewer: John Pulvino, P.A.

Summary of Care
███/23- Intake assessment completed.  ██y/o AM.  History of HIV treated with Biktarvy.  Records show non-compliance in FW.  Hold medication until HIV labs are completed.  Refer to infectious disease clinic with lab results.

███/23 – Follow up intake assessment.  Continue current plan



/23 – States history of shigella treated with cipro in recent past. Stated continued symptoms. Stool culture ordered.

/23 – Biktarvy ordered.

/23 – Cipro started for GI complaints

/23 – Treated with PCN for reactive RPR

From this point Mr. ▇▇▇ was seen 3-6 times per month with multiple consistent complaints including, neuropathy, hearing loss, rectal leakage, foot drop, decreased vision, ear pain, kidney stones, needing MAT, FB in rectum, renal diet, religious diet. He was referred and seen by infectious disease, ENT, audiology, gastroenterology. He received treatment his HIV disease, Hepatitis C, ear pain, he received hearing aids, he had rectal foreign bodies surgically removed, he had a lumbar puncture to rule out neurosyphilis, he was evaluated multiple time for subjective foot drop. Mr. ▇▇▇ was seen often and all of his complaints were addressed thoroughly.

Conclusion
Meets Standard of Care

Mr. ▇▇▇ arrived on ▇▇▇ /23 with a diagnosis of HIV positive. His past history was reviewed and treatment plans were guided by current needs, medical history and specialist recommendations. The medical staff were very attentive to his numerous complaints and were liberal with ordering specialty consultations. There care was very thorough and timely.

**77. Patient:** ▇▇▇
Booking Number: ▇▇▇
Dates Reviewed: ▇▇▇ /23 - ▇▇▇ /24
Reviewer: John Pulvino, P.A.

Summary of Care

/23- StatCare intake assessment. Asthma and hypertension and albuterol inhaler, amlodipine and HCTZ were continued from the FW.

/23 – Provider visit to discuss poor compliance with blood pressure medication and BP checks.

/23 – Follow up compliance, patient has improved compliance for both medication and BP checks

/23 – Ms. ▇▇▇ claims a history of borderline diabetes and requests metformin. Blood sugar checks were ordered. The results showed occasional minimal blood sugar elevation and diet control was recommended.

/23 – HgbA1c was ordered however the patient refused the lab draw. This also included a CMP and CBC.

/23 – Ms. ▇▇▇ stated a history of umbilical hernia. She was noted to be s/p C-section with minimally bulging umbilical hernia. An abdominal binder and abdominal US were ordered. The US was normal.

/23 – Lab draw was refused.

/23 – Ms. ▇▇▇ stated a history of SVT and that she was having palpitations. SVT was confirmed by EKG and a beta blocker was started. She was placed in MOB for observation while the beta blocker was started.

/24 – Ms. ▇▇▇ stated a history of sleep apnea with CPAP use. After evaluation she denied current apnea symptoms. ▇▇▇ /24- - Evaluated for BLE rash

24 – Counseled again about poor medication compliance

Conclusion

Meets Standard of Care

Ms. ███████ arrived on ███ /23 and was assessed and diagnosed with hypertension and asthma. She was immediately continued on her FW medications and blood pressure checks were ordered. She was followed regularly for her chronic problems and acute issued were managed timely. When additional chronic problems were identified they were monitored and treated appropriately. Overall Ms. ███████ 's medical care was appropriate and timely.


## 78. Patient: ███████████

Booking Number: ████████
Dates Reviewed: ███ /23 - ███ /24
Reviewer: John Pulvino, P.A.

### Summary of Care

Ms. ███████ was received at the county jail on ███ /23. A provider intake assessment was completed the same day and she did not have a history of chronic disease other than chronic bilateral hip pain. She gave a history of bilateral hip replacement in 2015 and 2016. FW records were requested but could not be found. She gave a history of treatment with Percocet tid for many years. Ms. ███████ was started on an opiate withdrawal protocol during intake due to her long history of opiate use. She was treated throughout her incarceration with various NSAIDs for her hip pain. The providers saw her very frequently for this pain and were diligent about trying different medications at varying doses. During her intake process Ms. ███████ was noted to have an elevated blood pressure for which she was put on frequent BP checks and amlodipine was started on ███ /23 after careful screening. The amlodipine dose was increased after continued monitoring. She was followed in chronic clinic regularly for her hypertension.

On ████████ 2024 she began having abdominal pain for which she was seen very frequently and evaluated with lab, abdominal ultrasound and 3 ER visits. She was diagnosed with gastritis/duodenitis and provided appropriate treatment.

### Conclusion
Meets Standard of Care

Ms. ███████ was promptly evaluated on intake for chronic conditions and found to have an elevated blood pressure. Given no history of treatment for hypertension she was assessed and found in fact to have a diagnosis of hypertension and began treatment. She was followed carefully for her hip and abdominal pain and received appropriate treatment. Ms. ███████ received appropriate assessment and care while incarcerated in the jail.


## 79. Patient: ███████████

Booking Number: ████████
Dates Reviewed: ███ /23 - ███ /24
Reviewer: John Pulvino, P.A.

### Summary of Care

███ /21 – Intake assessment - Hypertension. Amlodipine, lisinopril and metoprolol were continued from FW records. Blood pressure checks were ordered.

Ex. A-115

█/22 – Blood pressure checks reviewed.  Continue current treatment.
█/22 – Mr. ███ refused his lisinopril.
█/22 – Follow up HTN.  Stable on medication.  Labs and EKG were ordered.  His EKG was normal.
█/22 – Diagnoses with GERD
█/22 – Chronic care clinic.  HTN stable
█/23 - Chronic care clinic.  HTN stable
█/23 - Chronic care clinic.  HTN stable
█/23- Chronic care clinic.  HTN stable
█/23 – Lipids minimally elevated.  Repeat in 6 months
█/23 – Sent to the ER for chest pain.  Dx was non-cardiac chest pain
█/23 – Follow up ER visit.  Medication adjusted.
████/23 – BP checks reviewed.  HTN stable.
█/23 - Chronic care clinic.  HTN stable
█/23 – Treated for headache.
█/23 – Chronic care clinic.  HTN stable.
█/23 – Requesting treatment for opioid.  MAT initiated.
, ███/23 – MAT follow up.
█/22 – MAT medication adjusted.
█/23 – GERD.  Repeat EKG was normal.
█/24 – MAT follow up.
█/24 - Chronic care clinic.  HTN stable

Conclusion
Meets Standard of Care

Mr. ████ was a ██ y/o HM who arrived on ███/21 and was assessed and diagnosed with hypertension.  He was immediately continued on her FW medications and blood pressure checks were ordered.  He was followed regularly for her chronic problems and acute issued were managed timely.  When additional chronic problems were identified they were monitored and treated appropriately. MAT was initiated and monitored frequently. Overall Mr. ████ medical care was appropriate and timely.


**80. Patient:** ██████████
Booking Number: ████████
Dates Reviewed: ████/23 - ████/24
Reviewer: John Pulvino, P.A.

Summary of Care
Mr. ████████ was received at the county jail on ███/23.  A provider intake assessment was completed the same day and he was identified as having chronic hypertension with a negative history of current medication treatment.  He was started on amlodipine, atorvastatin and aspirin.  He was scheduled for blood pressure checks and a provider follow up.  He was seen by a provider on ███/23 and his hypertension was well controlled.  He was seen for HTN in a chronic care clinic on ███/23 and he was noted to have good blood pressure control.  He refused a provider follow up on ███/24.  There were multiple occurrences of medication refusals, primarily atorvastatin. His chronic disease care was uneventful and in reviewing his blood pressure log he was in good control.

Conclusion
Meets Standard of Care

**Ex. A-116**

Mr. ▮▮▮▮ was promptly evaluated on intake for chronic conditions and treated immediately. He was seen at appropriate intervals for his HTN diagnosis and his blood pressure was well controlled. Mr. ▮▮▮▮ was provided appropriate and timely treatment for his chronic medical condition.

**81. Patient:** ▮▮▮▮
Booking Number: ▮▮▮▮
Dates Reviewed: ▮▮ /21 - ▮▮ /24
Reviewer: John Pulvino, P.A.

Summary of Care

▮▮ /21 – Mr. ▮▮▮▮ was brought to booking however he was "gate refused" due to elevated blood pressure. Complete notes of this occurrence are not available for review however there is a mention in a nursing note of clonidine administered.

▮▮ /21 – Mr. ▮▮▮▮ was evaluated by the provider and diagnosed with hypertension. Mr. ▮▮▮▮ stated that he does not take medication in the FW for hypertension. He was started on amlodipine and B P checks were initiated.

▮ /21 – BP reviewed. Continue current medication.
▮ /21 – BP reviewed. HCTZ added.
▮ /21 – BP at goal
▮ /21 – BP at goal
▮ /22 – BP reviewed. Stable
▮ /22 – Refused chronic clinic
▮ /22 - Chronic care clinic. Continue treatment.
▮ /22 – BP review. Added lisinopril.
▮ /22 - Chronic care clinic. Continue current care.
▮ /22 – BP check. Better control.
▮ /22 – BP at goal.
▮ /22 – Mr. ▮▮▮▮ refused BP medication. Counseled.
▮ /22 – BP not controlled. Compliance addressed.
▮ /22 - Chronic care clinic. Continue current care.
▮ /22 – BP check. Continue current treatment.
▮ /22 - Chronic care clinic. Continue current care.
▮ /23 – Chronic care clinic. Evaluate elevated heart rate reported by patient. EKG NSR with HR 78.
▮ /23 – Vitals reviewed. Normal
▮ /23 - Chronic care clinic. Continue current care.
▮ /24 – Chronic care clinic. Continue current care.
▮ /24 – Follow up HTN. Mr. ▮▮▮▮ refuses amlodipine. EKG repeated and was normal

Conclusion
Meets Standard of Care

Mr. ▮▮▮▮ arrived on 7/1/21 with custody however he was refused for routine intake due to an elevated blood pressure. Notes discuss treatment with clonidine prior to the routine intake process. Once his blood pressure stabilized, he was begun on amlodipine for his chronic hypertension and he followed the normal intake pathway. Mr. ▮▮▮▮ had some issues with non-compliance with medication, blood pressure checks and lab work during his incarceration but the health care staff were

223

**Ex. A-117**

able to maintain a reasonable blood pressure through frequent monitoring, medication adjustments and frequent clinic appointments.  His care was appropriate and timely.

**Ex. A-118**

**Appendix K**

**NaphCare List of Specialty Contractors**
**San Diego Sheriff's Office**
**July 8, 2024**

| Company | Services |
|---|---|
| Advantage Ambulance, Inc | Medical Transport Services |
| Aircare Ambulance | Medical Transport Services |
| Alvarado Hospital Medical Center | Acute Care Hospital |
| Correctional Healthcare Partners, Inc | On-site physician and mid-level provider staffing |
| Hanger Clinic | Prosthetic and orthotic care |
| Harmony Dental Group Dental | Dental services |
| Hussein Abdulhadi, MD | Pain Medicine Specialist |
| Ian Purcell, MD | Neurology services |
| Institutional Eye Care, LLC | Vision services |
| Kenneth Wells, DPM | Podiatry |
| La Mesa Cardiac Center | Cardiology |
| Millennium Diagnostic Imaging Services, Inc. | Mobile Ultrasound and Diagnostic Imaging |
| National DME San Diego | Durable medical equipment and related services |
| National Eye Care | Eye care services |
| Pacific Endocrinology Evaluation | Endocrinology |
| Paradise Valley Hospital | Acute Care Hospital |
| Pearlmax Oral Surgery | Oral and maxillofacial surgical services |
| Quest Diagnostics Clinical laboratory | Lab services |
| Radiation Oncology Network of Southern California | Radiation oncology services |
| Retina Center of San Diego | Medical and surgical retina care |
| Roderick Comunale, MD | Nephrology services |
| Sasha Salloum, MD | Vascular surgery |
| SKYMD Dermatologist | Dermatology services |
| Stephen Dent, MD | Nephrologist |
| Synergy Orthopedics Specialist, Inc. | Orthopedic services |
| The Shores Post Acute | Post acute care rehabilitation |
| UCSD Medical Center and UCSD Medical Group | Primary care specialty services |

**Ex. A-119**

**Appendix L**

## NON-FORMULARY MEDICATION REVIEW

| Patient # | Name | Booking g # | Booking Date | Release Date | Date of Request | Date Ordered | Date of Approval | Date First Administered | Drug Name | Comment | Notes | Days from Req to Admin | Approp riate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | 5/8/24 2:06 PM | Not Specified | 5/18/24 12:12 PM | 5/18/24 8:00 AM | None | 5/18/24 5:31 PM | Ensure | Statcare note 5/18/24: refer ensure via medical chart review and BMI WNL per statcare | | 0.22 | Yes |
| 1 | | ? | | 4/15/2024 | 4/9/24 3:59 PM | 4/9/24 8:00 PM | 4/10/24 7:27 AM | 4/9/24 10:23 PM | Ensure | | | 0.27 | Yes |
| 1 | | | 5/8/24 2:06 PM | Not Specified | 5/11/24 9:25 AM | 5/11/24 8:00 AM | 5/13/24 10:30 AM | 5/11/24 8:19 PM | Gabapentin 100mg | | | 0.45 | Yes |
| 2 | | | 5/29/24 7:31 PM | Not Specified | 5/29/24 9:21 PM | 6/1/24 8:00 AM | None | 6/1/24 8:00 AM | Gabapentin 100mg | | | 2.44 | Yes |
| 3 | | | 5/25/24 11:16 PM | 5/26/24 3:35 PM | 5/26/24 1:15 AM | 5/26/24 8:00 AM | RELEASED PRIOR TO | RELEASED PRIOR TO | Bupropion 100mg | | | | Yes |
| 4 | | | 5/29/24 8:38 PM | 5/30/24 8:23 AM | 5/30/24 12:58 AM | 6/1/24 8:00 AM | 5/30/24 8:23 AM | RELEASED PRIOR TO | Gabapentin 300mg | | | | Yes |
| 5 | | | 9/26/23 6:42 AM | Not Specified | 4/28/24 1:34 PM | 4/28/24 1:33 PM | None | 4/28/24 8:10 AM | Gavilyte-C | | | -0.22 | Yes |
| 5 | | | 9/26/23 8:42 AM | Not Specified | 5/11/24 5:03 PM | 5/11/24 12:00 AM | 5/13/24 10:30 AM | 5/11/24 5:42 PM | Enema | | | 0.03 | Yes |
| 5 | | | 9/26/23 8:42 AM | Not Specified | 5/14/24 10:10 AM | 5/14/24 8:00 PM | 5/14/24 10:15 AM | 5/14/24 8:00 PM | Ensure | | | 0.41 | Yes |
| 6 | | | 9/26/23 8:42 AM | Not Specified | 12/20/2023 8:55 AM | 12/21/23 10:20 AM | None | 12/21/23 8:49 AM | Probiotic | | | 1.00 | Yes |

Ex. A-120

| | | | | | | Recommend continuing IV ceftriaxone until the time of discharge at which time he can transition to oral penicillin or cefadroxil 1g po bid to complete 14 days of therapy, through 12/18. | 3 day delay? Uncertain when he returned from hospital and if he completed 14 days prior to return. | Appears so but missing details |
|---|---|---|---|---|---|---|---|---|
| 9/26/23 8:42 AM | 12/18/23 10:20 AM | 12/21/23 8:00 AM | None | 12/21/23 8:49 AM | Cefadroxil 500 mg | | 2.94 | |
| 9/26/23 8:42 AM | Not Specified 12/20/23 7:11 PM | 12/20/24 8:00 PM | 12/21/23 11:12 AM | 12/20/2024 8:00PM | Boost | | | Yes |
| 9/26/23 8:42 AM | Not Specified 12/18/23 10:25 PM | 12/21/24 8:00 AM | 12/19/23 5:29 AM | Substituted with Probiotic | Lactobacillus Probiotic | Substituted with Probiotic | | Yes |
| 5/10/2024 11:09 | Not Specified 5/11/24 1:34 AM | 5/13/24 8:00 AM | None | RELEASED PRIOR TO | Gabapentin 300mg | | | Yes |
| 5/27/24 12:23 AM | Not Specified 5/27/24 8:23 AM | 5/27/27 8:00 AM | 5/28/24 11:15 AM | 5/27/24 10:11 AM | dapagliflozin 10mg | | 0.07 | Yes |
| 5/27/24 12:23 AM | Not Specified 5/27/24 12:29 AM | None | None | None | Farxiga 10mg | Duplicate | | Yes |

227



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 8 | 5/5/2024 5:53PM | 5/25/2024 | 5/6/2024 5:52AM | 5/6/24 11:59 PM | 5/6/24 8:32 AM | None | Levonorgestrel 1.5mg | Not Administered Plan B 5/6/2024 8:00 AM - Noted not in stock - does not appear to have been administered - exceeded timeline for Plan B vs event, documentation of MH issue and no sexual assault occurred - questionable event and timeframe. | RELEASE SUMMARY D/C Medicin Chart Review 5/24/2024 5:53 PM. Notes in chart that aripiprazole and hydroxyzine were sent to InMedrx as release orders. 5/24/2024 7:23 PM | Yes |
| 9 | 5/26/24 3:48 AM | 5/26/2024 15:06 | 5/26/24 4:24 AM | 5/26/24 8:00 AM | None | 5/26/24 8:00 AM | Farxiga 5mg | | 0.15 | Yes |
| 10 | 5/11/24 9:27 AM | 5/16/2024 0:07 | 5/11/24 10:38 AM | 5/11/24 8:00 AM | 5/13/24 11:14 | 5/13/24 8:00 AM | Gabapentin | | 1.89 | Yes |
| 11 | 5/8/24 9:06 AM | 5/15/2024 11:43 | 5/9/24 9:33 AM | 5/11/24 11:00 AM | 5/9/24 9:45 AM | 5/11/24 10:38 PM | Gabapentin | | 2.55 | Yes |

Ex. A-122

| # | Date | 5/26/24 12:40 PM | 5/26/2024 3:29 AM | 5/26/2024 8AM | None | RELEASED PRIOR TO | Edarbydor | | Yes |
|---|---|---|---|---|---|---|---|---|---|
| 12 | 26/24 41 AM | 5/26/24 12:40 PM | 5/26/2024 3:29 AM | 5/26/2024 8AM | None | RELEASED PRIOR TO | Edarbydor | | Yes |
| 13 | 12/24 52 AM | 5/16/24 7:41 AM | 5/13/24 12:26 AM | 5/13/24 8:00 AM | 5/13/24 6:58 AM | 5/13/24 8:00 AM | Briviact | 0.32 | Yes |
| 13 | 12/24 52 AM | 5/16/24 7:41 AM | 5/13/24 12:26 AM | 5/13/24 8:00 AM | 5/13/24 6:58 AM | 5/13/24 8:00 AM | Phenobarbita l | 0.32 | Yes |
| 13 | 12/24 52 AM | 5/16/24 7:41 AM | 5/13/24 12:26 AM | 5/13/24 8:00 AM | 5/13/24 6:56 AM | 5/13/24 8:00 AM | Clobazam | 0.32 | Yes |
| 14 | 15/22 21 PM | Not Specified | 5/1/24 3:08 PM | 5/1/24 3:00 PM | 5/2/24 8:33 AM | 5/1/24 8:16 PM | Acet/Codeine #3 | 0.21 | Yes |
| 15 | 17/24 56 PM | Not Specified | 5/23/24 1:31 PM | 5/23/24 8:00 PM | 5/24/24 10:44 AM | 5/23/24 8:00 PM | Paliperidone ER 9mg | 0.27 | Yes |
| 15 | 17/24 56 PM | Not Specified | 5/12/24 10:06 AM | 5/12/24 8:00 PM | 5/13/24 10:22 PM | 5/12/24 6:08 PM | Paliperidone ER 6mg | 0.33 | Yes |
| 15 | 17/24 56 PM | Not Specified | 5/6/24 11:11 AM | 5/6/24 8:00 AM | 5/6/24 12:19 AM | 5/6/24 8:00 PM | Glucerna | 0.37 | Yes |
| 15 | 17/24 56 PM | Not Specified | 5/23/24 10:26 AM | 5/23/24 8:00 PM | 5/23/24 10:30 AM | 5/23/24 8:00 PM | Semglee | 0.40 | Yes |
| 15 | 17/24 56 PM | Not Specified | 5/30/24 3:16 PM | 6/3/24 3:15 PM | None | 6/4/24 12:21 PM | Invega Sus | 4.88 | Yes |
| 15 | 17/24 56 PM | Not Specified | 5/14/24 6:31 AM | 5/14/24 6:35 AM | 5/14/24 7:51 AM | None | Fluphenazine Inj — PRN agitation; never administered | | Yes |
| 16 | 5/24 38 AM | Not Specified | 5/2/24 2:06 AM | 5/2/24 12:00 AM | 5/2/24 5:34 AM | 5/2/24 2:20 AM | Mylanta | 0.01 | Yes |
| 17 | 26/24 41 PM | Not Specified | 5/14/24 3:51 PM | 5/14/24 8:00 PM | 5/15/24 7:45 AM | 5/14/24 9:15 PM | Gabapentin | 0.22 | Yes |
| 17 | 26/24 41 PM | Not Specified | 5/19/24 6:06 AM | 5/19/24 3:00 PM | None | 5/19/24 3:00 PM | Semglee | 0.37 | Yes |

| | | Not Specified | 5/27/24 12:41 AM | 5/17/24 | 5/29/24 8:00 AM | 5/28/24 8:11 AM | 5/29/24 9:52 AM | Anti fungal powder | 2.38 | Yes |
|---|---|---|---|---|---|---|---|---|---|---|
| 18 | 5/24/2024 18:34 | | | | | | | | | |
| 19 | 5/16/2024 22:48 | 5/17/24 9:09 AM | | 5/17/24 3:24 AM | None | None | RELEASED PRIOR TO | Gabapentin | | Yes |
| 20 | 5/21/2024 12:14AM | 5/22/24 1:42 PM | | 5/20/24 3:55 PM | 5/22/24 8:00 AM | 5/21/24 5:25 AM | RELEASED PRIOR TO | Gabapentin | | Yes |
| | | | | | | | | | 0.87 | |

35 Total Nonforms for 20 Patients

16 NFs administered prior to approval

5 NFs administered with no approval

Time From Request to Administration

20 were < 1 day

Range 15 min to 4.8 days

Average 0.87 days

230

Ex. A-124

**Appendix M**

 MSD CQI Committee Meeting
Date: August 5th, 2024
Location: **County Operations Center MSD Main Conference Room Suite #341**

_____

Chairperson(s): Marla Lopez, Rex Padilla
Called to Order:

Invited:  See Attendance Roster

_____

I.     **Call to Order**
    A.  Called to order by:
II.     **Approval of Meeting Minutes (January 23, 2024)**
III.     **Old Business**
IV.     **Budget/Utilization Summary (Jorge Morales)**
V.     **HIM (Margarita Bonaparte)**
    A.  Mortality Review
    B.  Critical Incident Review
    C.  JIMS/TechCare Records
VI.     **Mental Health Services (Dianne Garcia)**
VII.     **JBCT (NaphCare)**
VIII.     **EASS (Liberty Healthcare Corporation)**
IX.     **Standard CQI Updates (Facility SRN's)**
    A.  Top 10 High Risk
    B.  Audits
    C.  Review of STATS/Trends
        1. Grievances
        2. IW Surveillance Program
        3. Services provided=MDSC/RNSC/24 Hour Face to Face/Labs/EKG's
        4. ER Send Outs/Occurrence Reports **(SRN Rex Padilla)**
    D.  CQI Studies
    E.  Infection Control **(SRN Travis Anderson)**
    F.  Case Management **(SRN Travis Anderson)**
    G.  MAT **(NaphCare)**
    H.  Pharmacy **(NaphCare)**
X.     **New Business**
XI.     **Projects/items due next meeting**
XII.     **Next Meeting Date: October 14, 2024**
XIII.     **Adjournment**

231

**Ex. A-125**

**Appendix N**

**TechCare Requests Customizations for SDSO 2022 to May 30, 2024**

| Title | Acct/Dept |
|---|---|
| Updated the Insulin Sliding Scale Standard Values | San Diego County, CA (EHR) |
| Updated "DC Flags on Release" SQL Agent Job to Exclude "Conservatorship" Flag and "Covid-19 Recovered" Flag from DC Upon Release | San Diego County, CA (EHR) |
| Deployed Updates to JIMS Mapping to Include "Cleared for South Bay" Flag | San Diego County, CA (EHR) |
| Updated Verbiage on ER Referral Form | San Diego County, CA (EHR) |
| Deployed Housing Filters for "Alvarado Medical" | San Diego County, CA (EHR) |
| Removed Patients from Nurses Queue > Immunizations Due Tab | San Diego County, CA (EHR) |
| Dandruff care protocol fix time for automated order | San Diego County, CA (EHR) |
| Deployed Updates to "EOH" and "Safety Cell" Admissions Management Types to Include Mental Health Progress Note as an "Add Note" Option | San Diego County, CA (EHR) |
| Deployed "MAT Interest" Admissions Management Type (Admission, Tracking and Discharge Controlled via Progress Note) | San Diego County, CA (EHR) |
| Deployed "CNA" Progress Note User Type | San Diego County, CA (EHR) |
| Deployed "MAT" Flag and Updated "JIMS_TO_TECHCARE_FLAG_MAPPINGS" to Interface MAT Flag to JIMS | San Diego County, CA (EHR) |
| Deployed Updates to "Segregation" Admissions Management Queue, "Ad-Seg" Flag and Related Functionality | San Diego County, CA (EHR) |
| Deployed Updates to "Chief Complaint" Section and "Destination" Section of "ER Referral" Form | San Diego County, CA (EHR) |
| Deployed "AA/Medical Records" Appointment Type | San Diego County, CA (Comprehensive) |
| Deployed "1370.01 - Misdemeanor" Flag | San Diego County, CA (EHR) |
| Deployed Updates to "Mental Health Screening" Form and "Columbia Suicide Screening" Form to Remove "Suicide Watch" InsertFlag Form Actions | San Diego County, CA (EHR) |
| Deployed "Hunger Strike" Form and Admissions Management Type | San Diego County, CA (Comprehensive) |

232

**Ex. A-126**

| | |
|---|---|
| Deployed Updates to "Infectious Disease Case" SSRS Report | San Diego County, CA (EHR) |
| Deployed Updates to "TB Chest X-Ray Result Needed" Tab in Nurse's Queue to Only Show Active Patients - TechCare 4.5 | San Diego County, CA (EHR) |

| | |
|---|---|
| Deployed Updates to "Lice" Flags to Remove Variants | San Diego County, CA (EHR) |
| Deployed "Physical Assessment" Form and Related Functionality | San Diego County, CA (Comprehensive) |
| Deployed Housing Module for "RMDF" Facility | San Diego County, CA (EHR) |
| Deployed Updates to "TB Chest X-ray" Functionality to Save Results to History Window as "TB Chest X-ray" as Opposed to "PPD" | San Diego County, CA (EHR) |
| Deployed Updates to "Grievances" Queue to Include Patient Filters (First Name, Last Name, Unique ID, Booking Number) | San Diego County, CA (EHR) |
| Deployed "MAT" Admission Management Types and Appointment Types | San Diego County, CA (Comprehensive) |
| Deployed Updates to "JBCT Treatment Plan" Form to Load Last Answer for All Questions | San Diego County, CA (Comprehensive) |
| Removed "Direct Message" Tab from Nurse's Queue | San Diego County, CA (Comprehensive) |
| Deployed Updates to "Segregation" Admissions Management Queue, "Ad-Seg" Flag and Related Functionality | San Diego (Corporate Office) |
| Deployed "State Hospital History" Flag and Related Functionality | San Diego County, CA (EHR) |
| Deployed Updates to ForensicCare Forms to Hide Them from Forms Window | San Diego County, CA (Comprehensive) |
| Deployed "LTBI" Flag | San Diego County, CA (EHR) |
| Deployed Updates to TechCare to Account for "RMDF" Facility | San Diego County, CA (EHR) |
| Deployed "ADA" Flags and JIMS Mappings | San Diego County, CA (EHR) |
| Deployed "DC Admission Management on Release" SQL Agent Job to Discharge Patients from Admission Management Queues After 24 Hours (Excluding ER Sendout and Hospital Admission) | San Diego County, CA (EHR) |

**Ex. A-127**

| | |
|---|---|
| Deployed "Co-Signing" Queue | San Diego County, CA (EHR) |
| Deployed "Alternate Plan" to Offsite Status Types and Offsite Hospital Status Types with Associated Functionality | San Diego County, CA (Comprehensive) |
| Deployed Updates to "TechCare HSR" Reports to Include Rock Mountain (RMDF) | San Diego County, CA (Comprehensive) |
| Deployed Updates to "ER Referral" Form Destination ER/Hospital Dropdown | San Diego County, CA (EHR) |
| Deploy Job to DC Admission Management 24 hrs After Release (Excluding ER Sendout, Hospital Admission and Group Notes) | San Diego County, CA (EHR) |
| Deployed "ADA" Flags and JIMS Mappings | San Diego County, CA (EHR) |
| Build and Deploy Lab Interface (StarLIMS - Public Health Lab) | San Diego County, CA (EHR) |
| Deployed Additional Updates to "ADA" Flags | San Diego County, CA (EHR) |
| Deployed New Report - OffSite Status Detail | San Diego County, CA (Comprehensive) |
| Deactivated Sleep Disturbance Care Protocol | San Diego County, CA (EHR) |
| Deployed Additional Updates to "ADA" Flags | San Diego County, CA (EHR) |
| Deployed Updates to "Medical Clearance" and "Receiving Screening" Forms to Account for Updated ADA Processes | San Diego County, CA (EHR) |
| Deployed "Initial Psychiatry Sick Call" Appointment Type and "Initial QMHP" Appointment Type | San Diego County, CA (EHR) |
| Deployed "ADA Functional Assessment" Form | San Diego County, CA (EHR) |
| Update Form Category for "Psychiatric Evaluation" and "Psychiatric Progress Note" Forms | San Diego County, CA (Comprehensive) |
| Deployed Updates to "Offsite Watch List" Report to Include Column for "Housing Location" | San Diego County, CA (EHR) |
| Deployed Updates to "Psychiatric Progress Note" to Disable the "Forensic Psychiatric Progress Note" Checkbox (4.5) | San Diego County, CA (Comprehensive) |
| Update the Provider Chart Review Report | San Diego County, CA (Comprehensive) |

**Ex. A-128**

| | |
|---|---|
| Deployed "Scanned EASS Psychiatry Note" and "Scanned EASS Record" Document Types | San Diego County, CA (EHR) |
| Deployed "C. diff" and "RSV" Flags; As Well As Renamed "MRSA/VRE/c.Diff" Flag to "MDRO" | San Diego County, CA (EHR) |
| Deployed Updates to "Forensic Psychiatric Evaluation" and "Forensic Psychiatric Progress Note" Forms to Have Them Display in TechCare 4.5 and 5.0 | San Diego County, CA (Comprehensive) |
| Deployed Updates to "JBCT Contact Note" Form to Include Contact Note Option for "SRA" | San Diego County, CA (Comprehensive) |
| Deployed Additional Updates to "Receiving Screening" and "Medical Clearance" Forms to Remove Special Need Flags | San Diego County, CA (EHR) |

| | |
|---|---|
| Deployed "Optometry" Appointment Type | San Diego County, CA (Comprehensive) |
| Addressed Issues with "Nurses Queue > Pending Release" Tab and Added Checkbox for "SUD Meds" - 4.5 | San Diego County, CA (Comprehensive) |
| Deployed "Dental Appointment" Report | San Diego County, CA (Comprehensive) |
| Deployed "Corporate Cardiology Consultant", "Corporate Dermatology Consultant" and "Corporate OBGYN Consultant" to OFF_SITE_SPECIALTY_TYPES | San Diego County, CA (Comprehensive) |
| Deployed Updates to "Infectious Disease Case" SSRS Report | San Diego County, CA (EHR) |
| Deployed "MOUD" Flag (Category: Special Needs) | San Diego County, CA (EHR) |
| Discharge Prescription Interface - InMed | San Diego County, CA (EHR) |
| Rename "Discharge Planning" Appointment Type to "Do Not Use" | San Diego County, CA (Comprehensive) |
| Deployed "Release Med" Option on Drug Order | San Diego County, CA (Comprehensive) |
| Deployed Updates to "JBCT Discharge Summary" Form | San Diego County, CA (Comprehensive) |
| Deploy "Monthly ForensicCARE Form Statistics" Report | San Diego County, CA (Comprehensive) |

**Ex. A-129**

| | |
|---|---|
| Deployed Updates to "Chief Complaint" Section of ER Referral Form | San Diego County, CA (EHR) |
| Renamed "Psychiatry Sick Call" Appointment Type to "Psychiatric Provider Follow-Up" | San Diego County, CA (Comprehensive) |
| Deployed Updates to "Past Due Sick Calls" Report to Include "Initial Psychiatry Sick Call" Appointment Types | San Diego County, CA (Comprehensive) |
| Deployed Updates to "Progress Note User Types" to Account for ADA Processes | San Diego County, CA (EHR) |
| Removed "Optometry" Off Site Specialty Type | San Diego County, CA (Comprehensive) |
| Deployed Updated Scanned Document Types for 2024/R2 | San Diego County, CA (Comprehensive) |
| Deployed Updates to "Suicide Watch" Tracking on Daily Reports, Monthly Reports and Stats Dashboard | San Diego County, CA (Comprehensive) |
| Removed JIMS Hazard Mapping for "State Hospital Returnee" Flag | San Diego County, CA (EHR) |
| New Report: Dental Appointments Completed | San Diego County, CA (Comprehensive) |
| Deployed "JIMS_TO_TECHCARE_FLAG_MAPPING" for Methadone | San Diego County, CA (EHR) |
| Master Ticket: Dental Process Updates | San Diego County, CA (Comprehensive) |
| Deployed Updated Off-Site Specialty Types relating to dental process | San Diego County, CA (Comprehensive) |
| Deployed Updated Appointment Types relating to dental process | San Diego County, CA (Comprehensive) |
| Deployed Updated Forms relating to dental process | San Diego County, CA (Comprehensive) |
| Implemented Mandatory Submission of "Dental" Form and/or "Comment Box" for Specific Dental Appointment Completions and Refusals | San Diego County, CA (Comprehensive) |

**Ex. A-130**

| | |
|---|---|
| Deployed New Reports Related To Dental Processes | San Diego County, CA (Comprehensive) |
| Deployed Updates to "Nurses Queue > Pending Release" to Remove Pending Release Date Column | San Diego County, CA (Comprehensive) |
| Master Ticket: Deployed Updates to Dental Processes | San Diego County, CA (Comprehensive) |

**Ex. A-131**

**Appendix O**

**TechCare Standard Report List as of 7/22/2024**

- AB109
    - Admission Management Stats – AB109 Active
    - Medication Administration – All – AB109 Active
    - Records (Completed) Stats - AB109Active
    - Sick Call Completed by Appointment Type - AB109
    - Sick Call Completed by Appointment Type - AB109 (Distinct)

- Administrative
    - Access by Device
    - Access by Role
    - Access Discharged Patient
    - Active Users
    - All Activity by Event Name
    - Audit Event Statistics
    - Cancelled Grievances
    - Closed Grievances
    - Disabled Accounts
    - Duplicate Booking Numbers
    - Excessive Chart Opens by Role
    - Excessive Patient Searches by Role
    - Last Recorded Login by User ID
    - Length of Stay >45 Days within 1 year period
    - Merged Records - Detail
    - Moved Documents
    - Number of Chart Opens by User
    - Open Grievances
    - Password Policy Changes
    - Printed Records
    - Record Review
    - Records Printed By User
    - Roles and Rights Report
    - Security Activity Detail
    - Total Events Per Day
    - User Account Changes
    - User Activity by Day
    - User Inactivity - Account Disabled
    - User Profile Changes
    - Users

- Behavioral Health
    - BH Prescreening Totals by User
    - BH Segregation Length of Stay • Historical
    - Mental Health Clients releasing from jail (SED) in 7 days
    - Mental Health Flag with Segregation Admit
    - Mental Health Sick Calls
    - Percentage of All Requests for Mental Health Care Seen within 24Hours
    - Percentage of All Requests for Mental Health Care Seen within 5 Days
    - Psychiatric Provider - Urgent 24Hour Referrals (#15) - Detail
    - Psychiatric Provider - Urgent 24Hour Referrals (#15) - Summary
    - Referrals to Mental Health
    - Safety Cell Length of Stay - Current
    - Safety Cell Length of Stay - Historical

238

**Ex. A-132**

- SMI Classification
- Suicide Notes Totals
- Transitional Patients in Progress

- Chronic Care
  - Active Chronic Care Counts
  - Chronic Care Visits Performed
  - Overdue Chronic Care Appointments

- ForensicCARE
  - ForensicCARE Form Statistics Report

- Lab
  - Completed Non-Formulary Lab Orders
  - Diagnostics - Orders with Result Received
  - HIV
  - Lab Compliance Report
  - Lab Orders by Inmate
  - Lab Orders by Type
  - Lab Results by Inmate
  - Lab Results by Type
  - Lab Specimens Submitted
  - Radiology Compliance Report
  - Scheduled Labs for Quest
  - Scheduled X-rays - Not Resulted
  - Scheduled X-rays - Resulted
  - Syphilis

- Medication/Pharmacy
  - Active KOP Medication Orders
  - Active Obsolete Drug Orders
  - Active Psychiatric Medication Orders
  - Administered Drug Totals
  - Administered Drug Totals - Psychiatric
  - CAIR Immunization Report
  - Drug Administrations – Non-Standard Types with Reason
  - Essential Medication Administration
  - Frameworks Floor Stock Orders
  - Frameworks Orders
  - HIV Med Administrations by Patient
  - HIV Med Report
  - Immunization Administrations by Patient
  - Influenza CAIR Report
  - Influenza Vaccine Report
  - Injections Administered
  - Med Adminiatrations Not Documented
  - Med Administrations Not Documented (without PRN)
  - Med Administrations Other than 'Administered'
  - Medication Administration by Facility
  - Medication Administration Stock Utilization
  - Medication Administrations - All
  - Medication Administrations - Medical and Mental Health Medications
  - Medication Administrations - Mental Health Medications Only
  - Medication Order Date and First Dose Administered
  - Medication Refusals
  - Medications - Given (Detail)

239

**Ex. A-133**

- o   Medications - Given (Summary)
- o   Medications - Not Given - Stat (Summary)
- o   Medications with lapses
- o   Mental Health Medication Report
- o   Mental Health Meds Refused
- o   MFR - Medications Administered Within 3 Days
- o   Missed Meds
- o   Non-Formulary Drug Requests
- o   OBOP - Drug Administration
- o   OBOP – Drug Order Info
- o   'Other' Medication Administrations
- o   Patient Days on Medications
- o   Patient Diagnoses Receiving Psych Meds
- o   Patients Receiving Injectables
- o   Pharmacy - 10Day Estimate (Still Under Review)
- o   Pharmacy – Pending Pharmacy Delivery
- o   Pharmacy - Total Patients Administered HIV Meds
- o   Profile Review Totals
- o   Reconciled Med Report
- o   TechCare Med Orders (Pharmacy Queue)
- o   Total Patients Administered HIV Medications
- o   Total Patients Administered Medications
- o   Total Patients Administered Psychiatric Medications
- o   Unrenewed Medications

- Patient Encounter/Screenings
  - o   Active Patient Physical Assessment Dates
  - o   Active Sick Calls
  - o   Annual Dental Exams Due/Overdue
  - o   Annual Dental Exams Overdue
  - o   Annual Health Assessment Overdue
  - o   Annual Physical Assessment Overdue
  - o   Annual Physical Assessments Performed
  - o   Call for Immunizations
  - o   Cancelled Sick Calls
  - o   Cerner Community Behavior Health (CCBH) Report
  - o   Completed Sick Calls
  - o   Dental Appointment
  - o   Dental Appointments Completed
  - o   Dental Statistics (Detail)
  - o   Emergency Calls (Mandowns)
  - o   FIB-4 Score
  - o   Health Assessment Detail
  - o   Mental Health Clients not seen in 60 days
  - o   MFR Medically Refused - Stat
  - o   Missed H&JP (5 days)
  - o   No Show Sick Calls
  - o   Opiate Detox: Protocols Enacted
  - o   Patients Missing Health Assessment
  - o   Patients Missing Physical Assessment
  - o   Patients Seen For Dental Sick Call Appointments
  - o   Patients Seen For Medical Sick Call and Various Others
  - o   Patients Sent to Emergency Department
  - o   Patients Who Have Received a MH Evaluation
  - o   Patients Who Have Received a MH Screening
  - o   RN Sick Calls Scheduled

240

**Ex. A-134**

- o   Screening Review
- o   Sick Calls Canceled by User
- o   Sick Calls Completed – Nurse

- Patient Flags
  - o   Active Patients with Mental Health Flags
  - o   ADA
  - o   Asthma
  - o   Chicken Pox
  - o   CIWA
  - o   CIWA-B
  - o   COWS
  - o   Gonorrhea
  - o   Herpes
  - o   HIV/ AIDS
  - o   Measles
  - o   Medical Authorizations
  - o   Mental Health Clients with PSU flag in the last 30 days
  - o   Patients assigned Safety Cell flag
  - o   Pregnancy
  - o   Prejail Check
  - o   Private Insurance

- Patient Rosters
  - o   Diet Changes/ Additions Within Last 24 Hours
  - o   Diets
  - o   Diets (Historical)
  - o   Diets Expiring within next 7 days
  - o   In Custody Patient Roster
  - o   In Custody Patients by Facility
  - o   Out-of-Custody Patient Roster
  - o   Patient Search by Release Date
  - o   Patients Needing Release Protocol
  - o   Patients With Communicable Diseases in Isolation in the Jail
  - o   Patients with Court Date and 8 a.m. Medications

- PPD/TB
  - o   Annual PPD Due
  - o   Patients Missing PPD
  - o   Positive PPD
  - o   PPD Implanted
  - o   PPD Missing Reading
  - o   PPD Refused
  - o   PPD To Be Given
  - o   PPD To Be Read
  - o   TB Chest X-Ray

- Staffing
  - o   Attached Documents
  - o   eMAR Documentation Counts by User
  - o   Medical Provider SOAP Notes
  - o   Notes Report
  - o   Nurse Chart Review
  - o   Nursing Protocol Usage
  - o   Prescreening Totals by User
  - o   Prescreening/Intake Totals by User

241

**Ex. A-135**

- o   Provider Med Order Counts
- o   Provider Productivity
- o   Provider SOAP Notes
- o   Staff Productivity

- Statistics
  - o   Admissions Management Details
  - o   Admissions Management Entries
  - o   Admissions Management Statistics
  - o   Forms Completed
  - o   Kitchen Physicals Completed
  - o   Number of Health Care Requests Triaged the Same Day as Collection
  - o   Number Who Received Visits with Provider within 14 Calendar Days of Receipt of Form
  - o   Nursing Assessments Completed
  - o   Nursing Protocols Completed
  - o   Patients Hospital Emergencies
  - o   Patients Who Attempted Suicide
  - o   Percentage of All Requests For Healthcare Seen within 24 Hours
  - o   Percentage of All Requests For Healthcare Seen within 5 Days
  - o   Percentage of Healthcare Requests Triaged within 24 hours
  - o   Progress Notes Completed
  - o   Provider Chart Review Report
  - o   Receiving Screenings Completed
  - o   Receiving Screenings Completed by Facility
  - o   Safety Cells Checked
  - o   Sick Calls Completed Counts
  - o   Sobering Cells Checked

- Treatments
  - o   Blood Glucose Checks and Insulin Sliding Scale
  - o   Boost
  - o   BP Checks
  - o   Cool Compress
  - o   Cool Fluids/ Electrolyte Solution
  - o   Eye Rinses
  - o   Free Text Treatments
  - o   Ice and Ice Pack
  - o   Lice & Scabies
  - o   Narcotics
  - o   Neuro Checks
  - o   Other
  - o   Patients Receiving Wound Management
  - o   Salt Packs and Salt Water Gargles
  - o   Vital Signs
  - o   Warm Compress
  - o   Weight Checks
  - o   Wound Care and Wound Irrigation

- UM Management
  - o   ER Provider Sendouts
  - o   ER Provider Sendouts – San Diego
  - o   Hospitalization Priority
  - o   Missing Medical Records
  - o   Off Site/On Site Reports
  - o   Offsite Appointments on NICs
  - o   Offsite Transfer Reports

**Ex. A-136**

- o  Offsite Watch List
- o  Off Site/On Site wo Appointment

- TCare SQL SRS Reports
    - o  Active Inmates by Drug Category
    - o  Infectious Disease Flags
    - o  Onsite Appointments
    - o  Selected Vision Flags
    - o  Cancelled Appointments
    - o  Refused Appointments
    - o  Inmate Housing History
    - o  Completed Appointments
    - o  Selected Active Flags
    - o  Psych Meds Due for Release
    - o  COWS CIWA Active Flags
    - o  COWS CIWA Due for Release

243

**Ex. A-137**

**Appendix P**

## 2019 NCCHC Standards Review
## SDSO Self-Assessment of Compliance

In January, 2017, the San Diego County Sheriff's Department contracted with the National Commission on Correctional Health Care (NCCHC) to conduct a technical review of our jails' medical and mental health delivery to compare our current model to their national standards. This review culminated in a report to the Sheriff's Department identifying several areas of improvement needing to be addressed to meet the NCCHC standards. We used this report, as well as the NCCHC "Standards for Health Services in Jails" book, to develop an implementation plan to start the process of moving toward gaining accreditation from NCCHC. NCCHC updated and revised their standards in 2018 and we adapted our implementation plan to the new standards. We have worked to steadily enhance our medical and mental health service delivery. Below are the descriptions of the standards and where we are in the implementation process, as of October 14, 2019.

NCCHC STANDARDS

SECTION A – GOVERNANCE AND ADMINISTRATION

1. **J-A-01   Access to Care –**

   *Inmates have access to care for their serious medical, dental, and mental health needs.*

   The Sheriff's Department has always provided access to medical and mental health care. Policy and procedure changes, including the triaging of medical sick call requests and scheduling follow-up appointments, were made to ensure the compliance indicators for this standard are being met. We currently meet all compliance indicators for this standard.

2. **J-A-02   Responsible Health Authority –**

   *The responsible health authority (RHA) ensures that the facility maintains a coordinated system for health care delivery.*

   After further consultation with NCCHC, we have designated the Chief Medical Officer (CMO) as the Responsible Health Authority (RHA) and the individual facility Supervising Registered Nurses (SRN) act as his designee. The policy has been updated to meet the compliance indicators for this standard.

3. **J-A-03   Medical Autonomy –**

   **Health care decisions are made by qualified health care professionals for clinical purposes.**

   The Sheriff's Department met all the compliance indicators for this standard. No further recommendations were provided.

4. **J-A-04   Administrative Meetings and Reports –**

   **The facility's health and correctional administrators coordinate the health care delivery system through joint monitoring, planning, and problem resolution.**

Ex. A-138

Each facility conducts a Patient Care Coordinating Committee (PCCC) meeting monthly where statistics are shared and problems solved. In addition, bi-weekly Multi-Disciplinary Group (MDG) meetings are held to share information about patient needs, care, and follow up. Policy and procedure for the standardization of these meetings was written and is in place. We currently meet all compliance indicators for this standard.

5.  **J-A-05  Policies and Procedures –**

    **The responsible health authority (RHA) ensures that health care policies and procedures are developed, documented, and readily available to the staff.**

    The Medical Services Division is undergoing a complete policy and procedure review process to ensure all required NCCHC standards are covered. The requirement that the policies be site specific will follow the review. The Chief Medical Officer is responsible to review all policy and procedure. This process is ongoing.

6.  **J-A-06  Continuous Quality Improvement Program –**

    **A continuous quality improvement (CQI) program monitors and improves health care delivered in the facility.**

    The Sheriff's Department has a Quality Improvement Committee that meets quarterly. The committee chairperson is developing a process to comply with all compliance indictors. Policy revisions are being drafted. This process is ongoing.

7.  **J-A-07  Privacy of Care –**

    **Health care encounters and exchanges of information remain private.**

    The Sheriff's Department meets many of the compliance indicators for this standard. A capital improvement project is slated for the Vista Detention Facility to add private interview space at intake. All other facilities allow for private interview space currently.

8.  **J-A-08  Health Records –**
    **A confidential health record is created and maintained** using a standardized format.

    The Sheriff's Department met all the compliance indicators for this standard. No further recommendations were provided.

9.  **J-A-09  Procedure in the Event of an Inmate Death –**

    **The responsible health authority conducts a thorough review of all deaths in custody in an effort to improve care and prevent future deaths.**

Ex. A-139

The Sheriff's Department conducts several levels of review following an inmate death. There is a mortality review completed by the Chief Medical Officer, an administrative review at the Patient Care Coordinating Committee meeting, a review by the Critical Incident Review Board, and a clinical suicide report following a completed suicide.  Policy was put in place and we currently meet all compliance indicators for this standard.

10. **J-A-10  Grievance Process for Heath Care Complaints** –

**The facility protects a patient's right to disagree with or question the health care system.**

The Sheriff's Department maintains a robust grievance process that is documented in Policy and Procedure.  This policy meets all the compliance indicators to meet the NCCHC standard.

SECTION B – HEALTH PROMOTION, SAFETY, AND DISEASE PREVENTION

11. **J-B-01   Health Lifestyle Promotion** –

**Health care policies, procedures, and practices emphasize health promotion, wellness, and recovery.**

The Sheriff's Department meets the compliance indicators for this standard.

12. **J-B-02   Infectious Disease Prevention and Control** –

**There is a comprehensive institutional program that includes surveillance, prevention, and control of communicable disease.**

The Sheriff's Department employs an Infection Control Nurse (ICN) who works under the direction of our Managed Care Unit.  The ICN is a member of the quality assurance committee and participates in all issues related to infection control.  The ICN is currently finalizing the Department's Infection Control Plan that will be reviewed by the Chief Medical Officer.  This process is ongoing.

13. **J-B-03   Clinical Preventive Services** –

**Inmates are provided with clinical preventive services as medically indicated.**

The Sheriff's Department meets many of the compliance indicators for this standard.  The completion of this process is dependent on the development of the preventative services program by the Chief Medical Officer, policy and procedure changes and the application of resources.

14. **J-B-04   Medical Surveillance of Inmate Workers** –

**The health and safety of the inmate worker populations are protected.**

**Ex. A-140**

Occupational injury or exposure of inmate workers was added to the monthly Patient Coordination Care Committee agenda. Documentation of injuries is being entered into the health record. The Quality Assurance committee will review and discuss steps in prevention and education for the inmate worker program. The Sheriff's Department is revamping its inmate worker orientation and training to include education on the prevention of illness and injury due to the health hazards they may experience while performing their duties. This committee is currently in the process of completing the training and education for the inmate worker population. This process is ongoing.

15. **J-B-05  Suicide Prevention and Intervention –**

**Suicides are prevented when possible by implementing prevention efforts and intervention.**

The Sheriff's Department has been diligently working toward improving our prevention and intervention efforts. The department has created and implemented curriculum on suicide detection and prevention which is required training for all sworn, professional and contracted staff to attend. The department revised policies to reflect national standards and added specific questions in our receiving screening to flag inmates with the potential for suicidal ideations or in need of acute mental health treatment. The department is compliant with the indicators in this standard.

16. **J-B-06  Contraception –**

**Contraception is made available as clinically indicated.**

A procedure has been developed for continuing birth control and providing emergency contraceptives at our female facilities. Policy for this standard has been drafted and once completed will satisfy full compliance with this standard.

17. **J-B-07  Communication on Patient's Health Needs –**

**Communication occurs between the facility administration and treating health staff regarding inmates' significant health needs that must be considered in classification decisions in order to preserve the health and safety of that inmate, other inmates, or staff.**

The Sheriff's Department met all the compliance indicators for this standard. No further recommendations were provided.

18. **J-B-08  Patient Safety –**

**Facility staff implement systems to reduce risk and prevent harm to patients.**

The Sheriff's Department's Medical Services Division went through a complete change in medication dispensing in the effort to prevent adverse clinical events. The division started a

Process Improvement Team to discuss improving systems and maintaining a safe environment for patients.

19. **J-B-09   Staff Safety –**

**Facility staff implement measures to ensure a safe environment.**

The Sheriff's Department has always been dedicated to providing a safe and healthy environment for its staff. The department continually evaluates methods to improve staff safety. A recent example of this is improving radio communication coverage for medical and mental health staff. This aids in their overall awareness of facility operations as well as improves communication and response in the event of an emergency. The department meets all compliance indicators for this standard.

SECTION C – PERSONNEL AND TRAINING

20. **J-C-01   Credentials –**

**The facility's qualified health care professionals are legally eligible to perform their clinical duties.**

The Sheriff's Department met all the compliance indicators for this standard. No further recommendations were provided.

21. **J-C-02   Clinical Performance Enhancement –**

**Individuals delivering patient care are reviewed through a clinical performance enhancement process.**

A peer review process was implemented in 2018 for Sheriff's nursing staff. Our Chief Medical Officer is in the process of implementing a peer review process for both our Medical and Psychiatric contract providers. This process is ongoing.

22. **J-C-03   Professional Development –**

**The facility's qualified health care professionals maintain current clinical knowledge and skills.**

The Sheriff's Department met all the compliance indicators for this standard. No further recommendations were provided.

23. **J-C-04   Health Training for correctional Officers –**

**Ex. A-142**

Correctional officers are trained to recognize the need to refer an inmate to a qualified health care professional.

Training for sworn staff was developed and incorporated in the Detention Services Bureau annual training plan. Health related training for all sworn staff that works with inmates is required every two years. The department meets all compliance indicators for this standard.

24. **J-C-05   Medication Administration Training –**

Personnel who administer or deliver prescription medication are appropriately trained.

New nursing staff members receive an orientation to medication administration during their new employee orientation. They are taught how to navigate the electronic health record for this function and are introduced to policies surrounding medication administration. The orientation to medication administration continues at the facility level. The department meets all compliance indicators for this standard.

25. **J-C-06   Inmate Workers –**

Health services are provided by health staff and not inmate workers.

The Sheriff's Department met all the compliance indicators for this standard. No further recommendations were provided.

26. **J-C-07   Staffing –**

The responsible health authority (RHA) ensures sufficient numbers and types of health staff to care for the inmate population.

The Sheriff's Department conducted a staffing study and workload analysis which was submitted for approval.

27. **J-C-08   Health Care Liaison –**

Health care services continue to be coordinated via a health care liaison when qualified health care professionals are not available for an extended period of time.

The Sheriff's Department maintains full time staffing of health care professionals, therefore this standard is not applicable.

28. **J-C-09   Orientation for Health Staff –**

Health staff are properly acclimated to work in the correctional environment and understand their roles and responsibilities.

All new health staff receives a basic orientation from the Medical Services Training Unit prior to their assignment in a detention facility related to the overall Medical Services Division, safety & security and electronic health record. In depth training continues at the facility level covering all functional areas based on job classification. The department meets all compliance indicators for this standard.

SECTION D – ANCILLARY HEALTH CARE SERVICES

29. **J-D-01  Pharmaceutical Operations –**

**Pharmaceutical operations meet the needs of the facility and conform to legal requirements.**

The Sheriff's Department's contract supplier of medication complies with the NCCHC standards for the administration of medications. Medications are packaged as patient specific in unit dose which assists with inventory and control and minimizes potential for errors. The department is continuing to review our processes to meet all compliance indicators for this standard.

30. **J-D-02  Medication Services-**

*Medications are provided in a timely, safe, and sufficient manner.*

The Medical Services Division policy is currently being revised which identifies expected timeframes from ordering to administration of medication. Contingency plans are also in place for time sensitive medication ordering. Notifications are currently being made to the prescriber of any impending expiration of orders. The department already had established policies regarding all prescription medications administered or delivered as well as procedures to ensure continuity of medication services. This process is ongoing.

31. **J-D-03    Clinic Space, Equipment, and Supplies-**

*Sufficient and suitable space, supplies, and equipment are available for the facility's medical, dental, and mental health services.*

The Sheriff's Department met all compliance indicators for this standard.  No further recommendations were provided.

32. **J-D-04    On-Site Diagnostic Services-**

*The facility provides the necessary on-site diagnostic services for patient care.*

The Medical Services Division requires documentation that contracted on-site diagnostic services are certified and licensed to provide that service. The division created procedure and calibration manuals for all equipment to include protocols for the calibration of testing devices to ensure accuracy. The Sheriff's Department maintains a supply of diagnostic supplies such as, multiple-test dipstick urinalysis, finger-stick blood glucose tests, peak flow meters and

**Ex. A-144**

pregnancy test kits. Policy for this standard is currently being drafted and once completed will satisfy full compliance with this standard.

33. **J-D-05    Medical Diets-**
**Medical diets are provided that enhance patients' health.**

The Sheriff's Department met all compliance indicators for this standard. No further recommendations were provided.

34. **J-D-06    Patient Escort-**

*The facility staff ensure that patients can meet scheduled health care appointments.*

The Sheriff's Department met all compliance indicators for this standard. No further recommendations were provided.

35. **J-D-07    Emergency Services and Response Plan –**

*Planning for emergency health care ensures that all staff are prepared to effectively respond during emergencies.*

The Sheriff's Department met all compliance indicators for this standard. No further recommendations were provided.

36. **J-D-08    Hospital and Specialty Care –**

*Hospitalization and specialty care are available to patients who need these services.*

The Sheriff's Department met all compliance indictors for this standard. No further recommendations were provided.

SECTION E- PATIENT CARE AND TREATMENT

37. **J-E-01    Information on Health Services-**

*Upon arrival at the facility, inmates are informed of the availability of health care services and how to access them.*

The Sheriff's Department shows an inmate orientation video once a day to ensure inmates are informed of the facilities health care services and how to access these services. Signage and inmate handbooks are being finalized to allow for additional information on resources and how to access them. This process is ongoing.

**Ex. A-145**

38. **J-E-02    Receiving Screening-**

*Screening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met.*

The Sheriff's Department has always utilized a comprehensive medical and mental health intake screening process. The implementation of the new electronic health record now allows for more efficient screening which complies with this standard.

39. **J-E-03    Transfer Screening-**

*Inmates who are transferred within the same correctional system continue to receive appropriate health services.*

Medical staff reviews each transferred inmate's health record or summary to ensure continuity of care and medications. The electronic health record assists with tracking and allows compliance with this standard.

40. **J-E-04    Initial Health Assessment-**

*Inmates receive initial health assessments.*

This standard will require expanded contractual staffing to ensure a full clinical follow up can be completed on each inmate within 14 days of their initial booking. This process is ongoing.

41. **J-E-05    Mental Health Screening and Evaluation-**

*Mental health screening is performed to ensure that urgent mental health needs are met.*

A comprehensive mental health screening is conducted during receiving screening. Inmates identified with mental health needs are referred to a qualified mental health professional for further evaluation. Patients who require acute mental health services beyond  those available on-site are transferred to an appropriate facility. This process is ongoing.

42. **J-E-06    Oral Care-**

*Inmates' dental needs are addressed.*

Oral care is currently provided by a licensed dentist to inmates when clinically indicated. The department is working toward screening every inmate within 14 days of admission as well as an oral examination within 12 months of admission into custody. Both of these standards require the addition of contractual staffing/hours. This process is ongoing.

43. **J-E-07    Nonemergency Health care Requests and Services-**

Ex. A-146

## Appendix Q

## Medical Record Reviews of 2024 In-Custody Deaths (Non-homicide/suicide).

### 1. Patient: Mitchell, Chase
Booking Number: 24724484
Date of Death: 7/15/2024
Cause of Death: Presumed septic shock secondary to skin infection
Manner of Death: Natural
Autopsy Provided: Not completed

Summary
53-year-old male booked into the San Diego County Jail on June 13, 2024. He was uncooperative with the intake process, refusing to answer questions. He had no known chronic medical conditions but had a past mental health diagnosis of schizophrenia. The only sick call he submitted was a request for reading glasses. At his initial psychiatric visit on July 4th, he reported having an increased appetite, but by July 13th, it was noted that he had not been eating and had lost 25 lbs since intake. He was sent to the local hospital the following day. He had a back abscess with surrounding cellulitis and was diagnosed with sepsis. An emergent incision and drainage in the operating room confirmed a necrotizing soft tissue infection. His condition quickly deteriorated and despite the hospital's best efforts, he passed away on July 15, 2024.

### 2. Patient: Woodford, Richard
Booking Number: 24726250
Date of Death: 6/26/2024 Cause
of Death: Pending
Manner of Death: Pending
Autopsy Provided: Not completed

Summary
42-year-old male booked into the San Diego County Jail on June 25, 2024, reporting a recent use of Fentanyl that morning. His vitals were stable at intake screening. His COWS scores were 1 at intake then 10 about 18 hours later then 5 about 24 hours after intake. On June 26, 2024, at 1754, medical was notified of a man down. Narcan was given, CPR initiated, and an AED was applied but no shock was advised. EMS arrived just a few minutes after 911 was called. Life-saving efforts were continued, and EMS consulted with the medical director who pronounced the patient deceased.

### 3. Patient: Almajid, Majid
Booking Number: 23751645
Date of Death: 5/5/2024
Cause of Death: Pending
Manner of Death: Pending
Autopsy Provided: Not completed

Summary

253

**Ex. A-147**

38-year-old male booked into the jail on San Diego County Jail on December 20, 2023. He had no chronic medical conditions but reported using THC in the past and on the day of booking. The majority of his complaints were mental health-related and ████████████. He refused routine lab work. On May 5, 2024, medical was called for a man down. CPR was in progress upon the medical staff's arrival. Multiple doses of Narcan were given. He already had some livor mortis and rigor mortis. Care was transferred to EMS upon arrival, and the patient was pronounced deceased a few minutes later.

### 4. Patient: Vili, Liutoa

Booking Number: 23725430
Date of Death: 2/4/2024
Cause of Death: Pending
Manner of Death: Pending
Autopsy Provided: Not completed

Summary

54-year-old male booked into the San Diego County Jail on June 26, 2023, with a history of schizophrenia. He utilized a wheelchair due to difficulty ambulating secondary to ████████████. He was noted to have ██████████████████████████████████. Shortly after intake, he reported bilateral lower extremity wounds for one year and had regular wound care by nursing while in jail. A wound culture in October 2023 was positive for MRSA and pseudomonas aeruginosa and was treated with Bactrim and Ciprofloxacin. He was then hospitalized in November 2023 for recurrent vomiting, dysphagia, and hypernatremia. His esophagus was dilated during an EGD when an esophageal stricture was found. On January 30, 2024, he reported trouble breathing, back pain, and chest pain. His blood pressure was 94/70 with a heart rate of 68, respiration rate of 20, and temperature of 95.9. His left lower extremity wound was noted to be foul-smelling. A physician also assessed the patient on this date. He then began refusing dressing changes starting on February 1st. On February 4, 2024, he was being transported to the medical clinic in a wheelchair for altered mental status when he became unresponsive, apneic, and pulseless. EMS transported him to the local hospital where he was pronounced deceased in the emergency department.

Given the worsening of his wound, decrease in pulse pressure, and low body temperature on January 30, 2024, in hindsight, he may have been developing bacteremia or even sepsis. Unfortunately, he refused his wound care in the clinic the following days when nursing could have taken note of an acute worsening of his condition.

### 5. Patient: Wolf, Eric

Booking Number: 23729949
Date of Death: 1/5/2024
Cause of Death: Acute fentanyl and diphenhydramine intoxication
Manner of Death: Accident
Autopsy Provided: Yes

Summary

33-year-old male booked into the San Diego County Jail with schizophrenia. During his incarceration, he voiced delusional thoughts, drank his urine, and ate his feces reporting it made him "feel alive, like

reverse osmosis." He refused his medications except ▮▮▮▮▮▮▮ which was court-ordered. On January 5, 2024, the medical staff responded to a man down. Cardiopulmonary resuscitation was attempted until EMS contacted their medical director who pronounced death. An autopsy was performed, and according to the report, a white powdery substance, bindle, and "tooter" were found on the desk in the cell. The medical examiner determined the cause of death to be acute fentanyl and diphenhydramine intoxication, and the manner of death was accidental.

255

**Ex. A-149**

## **Appendix R**

**Data Summary of the Number of References to**

**CA State Audit, NCCHC Report, and San Diego Union-Tribune (SD Trib) in Dunsmore Complaint**

| Footnote # | Page # | Reference | | | |
|---|---|---|---|---|---|
| 1 | 10 | CA State Audit | | | |
| 2 | 10 | CA State Audit | | | |
| 3 | 10 | CA State Audit | | | |
| 4 | 11 | SD Trib | | | |
| 5 | 12 | SD Trib | | | |
| 6 | 12 | SD Trib | | | |
| 11 | 17 | SD Trib | | | |
| 13 | 18 | SD Trib | | | |
| 15 | 26 | NCCHC Report | | | |
| 16 | 26 | CA State Audit | | | |
| 17 | 28 | SD Trib | | | |
| 18 | 28 | NCCHC Report | | | |
| 19 | 28 | SD Trib | | | |
| 22 | 32 | SD Trib | | | |
| 23 | 32 | CA State Audit | | | |
| 24 | 34 | NCCHC Report | | | |
| 33 | 40 | NCCHC Report | | | |
| 34 | 41 | SD Trib | | | |
| 35 | 41 | SD Trib | | | |
| 37 | 42 | SD Trib | | | |
| 38 | 42 | SD Trib | | | |
| 39 | 42 | SD Trib | | | |
| 40 | 43 | NCCHC Report | | | |
| 41 | 43 | NCCHC Report | | | |
| 44 | 48 | NCCHC Report | | | |
| 45 | 48 | NCCHC Report | | | |
| 46 | 48 | NCCHC Report | | | |
| 47 | 48 | CA State Audit | | | |
| 48 | 48 | CA State Audit | | | |
| 51 | 53 | NCCHC Report | | | |
| 52 | 53 | NCCHC Report | | | |
| 53 | 53 | NCCHC Report | | | |
| 54 | 55 | NCCHC Report | | | |
| 55 | 55 | NCCHC Report | 56 | 61 | NCCHC Report |
| 57 | 61 | NCCHC Report | | | |
| 59 | 62 | NCCHC Report | | | |
| 60 | 62 | NCCHC Report | | | |
| 62 | 63 | NCCHC Report | | | |
| 64 | 64 | NCCHC Report | | | |
| 65 | 65 | NCCHC Report | | | |
| 66 | 65 | NCCHC Report | | | |
| 67 | 65 | NCCHC Report | | | |

**Ex. A-150**

| | | |
|---|---|---|
| 73 | 67 | CA State Audit |
| 75 | 69 | NCCHC Report |
| 76 | 69 | CA State Audit |
| 77 | 70 | SD Trib |
| 79 | 70 | SD Trib |
| 80 | 71 | NCCHC Report |
| 81 | 71 | NCCHC Report |
| 82 | 71 | NCCHC Report |
| 92 | 76 | NCCHC Report |
| 95 | 78 | NCCHC Report |
| 99 | 85 | SD Trib |
| 100 | 85 | SD Trib |
| 101 | 85 | SD Trib |
| 102 | 87 | NCCHC Report |
| 121 | 94 | SD Trib |
| 126 | 98 | SD Trib 127 |
| 98 | SD Trib | |
| 128 | 99 | NCCHC Report |
| 130 | 100 | SD Trib |
| 132 | 100 | NCCHC Report |
| 139 | 102 | CA State Audit |
| 140 | 104 | NCCHC Report |
| 141 | 106 | SD Trib |
| 142 | 108 | NCCHC Report |
| 151 | 134 | SD Trib |
| 152 | 135 | NCCHC Report |
| 154 | 145 | SD Trib 155 |
| 145 | SD Trib | |
| 156 | 145 | SD Trib 157 |
| 147 | SD Trib | |
| 158 | 148 | SD Trib |
| 159 | 148 | SD Trib 163    149    SD Trib |
| 166 | 150 | SD Trib 167 |
| 151 | SD Trib | |
| 168 | 151 | SD Trib 170 |
| 152 | SD Trib | |
| 174 | 153 | SD Trib |
| 178 | 153 | SD Trib |
| 179 | 154 | SD Trib |
| 181 | 156 | SD Trib 182 |
| 156 | SD Trib | |
| 183 | 156 | CA State Audit 189 |
| 161 | CA State Audit | |
| 190 | 161 | CA State Audit |
| 192 | 163 | SD Trib |
| 193 | 163 | SD Trib |
| 194 | 164 | SD Trib |
| 195 | 164 | CA State Audit |

257

**Ex. A-151**

| | | |
|---|---|---|
| 196 | 165 | SD Trib |
| 197 | 165 | SD Trib |
| 200 | 167 | CA State Audit |
| 201 | 167 | CA State Audit |
| 202 | 167 | SD Trib |
| 203 | 168 | CA State Audit |
| 204 | 168 | CA State Audit |
| 205 | 169 | NCCHC Report |
| 206 | 170 | NCCHC Report |
| 207 | 172 | NCCHC Report |
| 208 | 172 | NCCHC Report |
| 209 | 174 | SD Trib |
| 216 | 175 | CA State Audit |
| 217 | 176 | SD Trib |
| 218 | 176 | SD Trib |
| 219 | 176 | SD Trib |
| 225 | 178 | SD Trib |
| 244 | 195 | SD Trib |
| 245 | 196 | SD Trib |

**DATA SUMMARY**

| PUBLICATION | TOTAL NUMBER OF REFERENCES |
|---|---|
| CA State Audit | 18 |
| NCCHC Report | 39 |
| San Diego Union-Tribune | 53 |
| **TOTAL** | **110** |

**Ex. A-152**

# EXHIBIT B
## (Redacted)

Ex. B-153

### *DUNSMORE V. COUNTY OF SAN DIEGO SHERIFF'S DEPARTMENT*
### EXPERT WITNESS MENTAL HEALTH REPORT OF JOSEPH V. PENN, MD, CCHP-MH, LFAPA

## Section 1: Experience and Qualifications

Although my attached *Curriculum Vitae* (**Appendix A**) includes additional details of my education and experience, as well as a list of all my publications, a summary of my most relevant qualifications follows.

I am a board-certified psychiatric physician based in Conroe, Texas, with extensive training and experience in forensic, general, and child and adolescent psychiatry. I hold triple board certifications from the American Board of Psychiatry and Neurology (ABPN), an affiliate of the American Board of Medical Specialties (ABMS). With over twenty-five years of dedicated service in the field, my career encompasses a broad spectrum of roles in clinical, administrative, research, consultation, and educational settings, primarily focusing on correctional psychiatry.

My forensic psychiatric expertise extends to various civil and criminal matters involving correctional institutions, including jails, prisons, juvenile detention centers, and U.S. Immigration and Customs Enforcement (ICE) facilities. I have served as an expert witness in diverse capacities—court-appointed, plaintiff's expert, defense expert, prosecution expert—and am committed to maintaining objectivity and honesty in all forensic evaluations.

I completed my medical education at the University of Texas Medical Branch (UTMB) in Galveston, Texas, graduating in 1992. My specialized training includes four years of general psychiatry at Brown University, followed by two years of child and adolescent psychiatry at Brown University, and one year of forensic psychiatry at Yale University.

Since 1999, I have concentrated my efforts in correctional psychiatry, providing clinical care and administrative leadership within detention facilities, jails, and prisons. I have maintained certification as a Certified Correctional Health Professional-Mental Health (CCHP-MH) since 2004, a credential awarded by the National Commission on Correctional Health Care (NCCHC), which necessitates passing a rigorous national examination and demonstrating ongoing proficiency in correctional health. This certification requires continuous education, unrestricted medical licensure, and annual re-certification, ensuring my knowledge and skills remain current.

I stay current in the evaluation, diagnosis, and treatment of psychiatric conditions through ongoing ABPN Maintenance of Certification (MOC) requirements in general, child and adolescent, and forensic psychiatry and annual Continuing Medical Education (CME) requirements. My expertise spans both correctional and non-correctional settings, supported by leadership roles in organizations such as the American Academy of Psychiatry and the Law (AAPL), the American Psychiatric Association (APA), the American College of Psychiatrists (ACOP), and the International Association for Correctional and Forensic Psychology (IACFP), among others.

Since 2008, I've been the Director of Mental Health Services at UTMB Correctional Managed Care (CMC), overseeing psychiatric and mental health care for:

- Adult Incarcerated persons: 80% of Texas state jail and prison populations (approximately 110,000 individuals)
- Juvenile Offenders: Psychiatric services for 700 youths in Texas Juvenile Justice Department (TJJD) state juvenile facilities

- Supplemental Psychiatric Services: Telepsychiatry for county jails and short-term detention centers across Texas

In my role, I manage approximately 350 psychiatrists and other mental health professionals in correctional settings, balancing clinical and administrative responsibilities. I review and co-sign charts for psychiatric providers, conduct peer reviews, and handle crisis management orders and controlled substance medication orders and renewals. I also authorize the use of seclusion and restraint, prescribe and adjust psychotropic medications, and perform diagnostic evaluations of complex patient cases.

I provide both direct clinical care and administrative support, oversight, quality assurance, supervision, and leadership.  The following are representative examples:

1. Review and Co-Signature of Charts: Ensure that at least 10% of charts from psychiatric nurse practitioners and physician assistants, Advanced Practice Providers (APPs), are reviewed and co-signed, ensuring compliance with standards and quality of care.

2. Peer Reviews: Conduct evaluations of other psychiatrists and APPs to maintain high standards and foster professional development.

3. Crisis Management Orders: Issue orders for managing incarcerated persons in acute crisis, clinical deterioration, or posing risks of harm to self or others, ensuring timely and appropriate interventions.

4. Seclusion and Restraint Orders: Authorize the use or discontinuation of seclusion and restraint, balancing patient safety and ethical considerations.

5. Medication Management: Prescribe, adjust, or reorder psychotropic medications and make behavioral treatment recommendations to the care team.

6. Diagnostic Evaluation and Consultation: Provide diagnostic evaluations or second opinions on incarcerated patients from TDCJ (Texas Department of Criminal Justice) and TJJD (Texas Juvenile Justice Department), either in person or via telepsychiatry.

7. Multidisciplinary Care Team Participation: Engage in meetings with multidisciplinary teams to manage complex cases and determine appropriate placement, transfer, and other clinical actions.

8. Direct Clinical Oversight: Oversee and make decisions regarding the care of TJJD youth and TDCJ incarcerated persons as needed, ensuring effective and ethical treatment.

9. Mental Health Policies: Develop, review, and approve mental health policies to ensure they are up-to-date and aligned with best practices.

10. Pharmacy and Therapeutics Committee Input: Contribute to systemwide committees on psychotropic medication and non-psychotropic formulary decisions and disease management guidelines.

11. Non-Formulary Medication Requests: Review and decide on requests for non-formulary psychotropic medications, ensuring appropriate use and adherence to policies.

12. On-Call Duties: Provide after-hours and weekend coverage for psychiatric emergencies, ensuring continuous care availability.

**Ex. B-155**

13. Direct Patient Care: Deliver direct psychiatric care as required, addressing patient needs and managing complex cases.

In summary, I have direct "real world" experience actually working in (as opposed to being exclusively a plaintiff's expert or outside monitor) in all aspects of mental health care within state prison and other correctional settings.

With over twenty-five years of clinical and administrative experience across various correctional settings, I possess extensive expertise in implementing and managing suicide prevention protocols similar to "watch cells" and Enhanced Observation Housing (EOH). My background includes developing and reviewing mental health policies, issuing crisis management orders, and working closely with both nursing and custody staff. This hands-on experience with suicide watch procedures and high-risk individuals equips me well to address and evaluate the concerns related to the SDSO's practices.

As outlined in my CV, I have served as the acting clinical director on multiple occasions, overseeing the evaluation, treatment, and clinical disposition of patients in crisis at two dedicated inpatient TDCJ psychiatric facilities: the Wayne Scott Unit in Richmond and the Skyview Unit in Rusk, Texas. Currently, I continue to provide direct clinical oversight and collaborate with psychiatric, mental health, and custody staff at these facilities, each of which accommodates over 500 patients. I am actively involved in patient referrals, admissions, transfers, and discharges across the state's three TDCJ inpatient psychiatric units, including the Montford Unit in Lubbock, and in deciding on civil commitment proceedings when necessary.

In my clinical role, I perform both on-site and telepsychiatric evaluations and treatment management of high profile and more complicated patient IPs within our juvenile and adult correctional systems statewide.  I also have direct experience in the clinical decision-making, management and ultimate decisions to accept or transfer certain higher needs incarcerated youths across TJJD state school units, Mental Health Treatment Programs (MHP), Crisis Stabilization Units (CSU) and State of Texas state psychiatric hospitals when needed.  I consult and oversee the evaluation and management of particularly complicated patients with mental health disorders and co-occurring medical diseases across TDCJ outpatient units, TDCJ inpatient/behavioral health prison units, and medical/psychiatric "med psych" patients housed in TDCJ medical infirmary prison units, undergoing dialysis, pregnant females with mental disorders, and other patients.  I also am directly involved in the referral and acceptance of patient transfers from TDCJ Hospital Galveston (HG), our specialty medical surgical hospital (this is a maximum-security prison unit, on the grounds of the UTMB academic medical center and medical school and other UTMB complex hospitals in Galveston, Texas (HG is the only one of its kind in the United States).

I have extensive experience managing state prison incarcerated persons with complex medical and psychiatric conditions requiring advanced care. This includes oversight of "med psych" and neurocognitive disorders, skilled nursing, and long-term care. During the COVID-19 pandemic, I provided psychiatric oversight at a Houston hospital for state prison patients, managing their psychotropic medications and consulting with medical teams on-site and via telephone.

I have extensive experience in providing psychiatric evaluation and treatment for individuals with acute or chronic mental health needs, including Serious Mental Illness (SMI), across various settings. This includes state jails, prisons, county jails, Substance Abuse Felony Punishment programs, and Intermediate Sanction Facilities in Texas. I am skilled in treating adult state incarcerated persons with substance abuse issues and comorbid mental disorders. My recent work also includes providing mental health care for undocumented migrants in South Texas under Operation Lone Star. Additionally, I have previously overseen psychiatric services at Federal Bureau of Prisons units and several county jails in Texas.

3

Ex. B-156

I have extensive experience ensuring access to mental health care and continuity of care for juveniles and adults in restrictive housing settings. I regularly conduct psychiatric evaluations and recommend treatment strategies to address potential mental health issues. My expertise includes consulting on national best practices for mental health and suicide prevention in correctional settings. I have written expert reports, testified in depositions and trials, and published on topics such as suicide prevention, self-harm behaviors, and the standard of care in correctional suicides. Additionally, I played a key role in developing and expanding five mental health diversion programs for incarcerated persons previously in restrictive housing in Texas. I have also published and presented on correctional mental health and suicide prevention, including the evaluation and treatment of transgender incarcerated persons, at various state, national, and international conferences.

I have extensive experience in evaluating and treating special populations in carceral settings, including those with ADHD, disruptive behavior disorders, severe self-harm, intellectual developmental disorders, and neurocognitive issues. I oversee psychiatric services at the TDCJ Hodge DDP program and the Valley Crain DDP program, which support incarcerated persons with developmental disabilities and adaptive impairments.

Nationally, I have contributed to task forces and committees, publishing peer-reviewed statements and guidelines on psychotropic medication use in correctional settings. I oversee disease management guidelines, clinical protocols, and psychotropic medication decisions for state prisons, county jails, and juvenile facilities. My expertise includes evaluating and treating serious mental illnesses, such as schizophrenia, bipolar disorder, and severe depressive disorders, as well as ADHD, disruptive behavior disorders, PTSD, and anxiety. With over twenty-five years of clinical and administrative experience, I maintain current knowledge of the mental health needs of individuals with SMI and co-occurring substance disorders across various correctional settings.

In my current role, I serve on the Executive Operations Council of UTMB CMC, the Pharmacy and Therapeutics Committee (formerly Chair), and other joint UTMB CMC and TDCJ Health Services committees. I am also a gubernatorial appointee to the Advisory Committee for the Texas Correctional Office for IPs with Medical or Mental Impairments (TCOOMMI). As the immediate Past Chair of the Joint Mental Health Work Group and Co-Chair of the Gender Dysphoria Work Group, I bring extensive knowledge and experience in providing psychiatric and mental health care to incarcerated individuals and special populations.

I have published extensively on topics related to correctional mental health, including the care of females, youth, and geriatric incarcerated persons, as well as issues like recidivism, continuity of care, and suicide prevention. Recent notable works include contributions to the *Oxford Textbook of Correctional Psychiatry* and *Kaplan and Sadock's Comprehensive Textbook of Psychiatry*. I have also authored key resource documents for the *Journal of the American Academy of Psychiatry and the Law* on prescribing practices in correctional settings and juvenile justice. Additionally, I serve as a reviewer for scientific journals, including the *Journal of Correctional Health Care*, and have experience evaluating the scientific merit and methodology of manuscripts in the field.

I have held significant leadership roles within organized psychiatry and medicine, including appointments to various councils, committees, and task forces. My contributions span multiple national and international organizations, such as the American Psychiatric Association (APA), American Academy of Child and Adolescent Psychiatry (AACAP), American Academy of Psychiatry and the Law (AAPL), the International Association for Correctional and Forensic Psychology (IACFP), and the American College of Correctional Physicians (AACP).

4

I have served as an appointed member of the APA Council on Psychiatry and Law, past chair of the APA Council on Children, Adolescents, and Their Families, and have held positions as AAPL Councilor, co-chair of the AAPL Correctional Forensic Psychiatry Committee, and past chair of the AAPL Suicidology Committee. Additionally, I am currently the AAPL representative to the NCCHC Board of Directors and have served two terms as Chair of the NCCHC Board of Directors.

I have provided healthcare consulting services to various correctional systems, including state prison systems such as California, Arizona, Vermont, Rhode Island, and North Carolina, as well as county jails like Sacramento County Jail, Yolo County Jail, and Rio Cosumnes Correctional Center. I have also served as an expert on transgender incarcerated persons with gender dysphoria for several state departments of corrections and as a Technical Assistance Project Consultant for the U.S. Department of Justice, U.S. Marshals Service, National Institute of Corrections, and National Institute of Mental Health. My consulting work has included assisting New York County Jails, ICE detainees, and providing resources to Puerto Rico and Colorado.

I have completed specialized training and served as a physician surveyor for the National Commission on Correctional Health Care (NCCHC), which accredits health care in jails, prisons, juvenile facilities, and opioid treatment programs. I have surveyed major metropolitan county jails and ICE facilities nationwide. As a past chair and current member of the NCCHC accreditation committee[1], I have contributed to revising health care standards, including those for jails, prisons, mental health services, and juvenile facilities, with a leadership role in revising the Juvenile Health Standards.

I served on the NCCHC task forces that revised the standards for jails in 2014 and prisons in 2018. Currently, I am on the task forces for NCCHC Mental Health Standards and Prison Health Standards. This involvement highlights my up-to-date knowledge of national correctional health care standards and my direct engagement in providing psychiatric and mental health care to both juvenile and adult incarcerated populations.

I have led the creation of resource documents and position statements in correctional psychiatry for major organizations including the American Psychiatric Association and the American Academy of Psychiatry and the Law. As a past president of the Texas Society of Psychiatric Physicians, I remain active in state-level advocacy, including testifying at the Texas State Capitol on psychiatric and mental health issues.

I am triple board-certified in forensic psychiatry, general adult psychiatry, and child and adolescent psychiatry, and I fulfill ongoing CME and MOC requirements to maintain this status. I have served as a board examiner and on committees for the American Board of Psychiatry and Neurology (ABPN), including roles on the general psychiatry recertification committee and the forensic psychiatry committee. Currently, I serve on the ABPN Forensic Psychiatry Maintenance of Certification committee.

I stay actively engaged with correctional and non-correctional health professionals across the U.S. and internationally. I regularly attend and present at conferences organized by the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA). My involvement extends to committees and task forces with the American Psychiatric Association (APA), American Academy of Psychiatry and the Law (AAPL), and American Academy of Child and Adolescent Psychiatry (AACAP), focusing on adult and juvenile correctional health, suicide prevention, and the development of correctional standards and position statements.

---

[1] To avoid any appearance of a conflict of interest arising from my retention in this matter, although NCCHC utilizes a blind review for initial accreditation and re-accreditation reviews of facilities, should the SDSO undergo any future NCCHC accreditation application or review(s),  I would recuse myself from all accreditation committee review, discussion, and voting decisions.

Ex. B-158

In addition to my leadership roles, I previously served on the Behavioral Health and Health Care committees of the American Correctional Association (ACA), which accredits correctional facilities nationwide. I am also a past board member of the American College of Correctional Physicians. I have toured jails, prisons, and treatment programs across the U.S. and have been invited to consult and tour carceral facilities in Guatemala and England.

I frequently provide input on the review and revision of correctional health policies and practices, focusing on access to care, continuity of care, and efficient psychiatric and mental health services in jails, prisons, and other correctional settings. My expertise extends to special populations, including elderly incarcerated persons, females, and transgender individuals with or without gender dysphoria. I have extensive experience in addressing mental health and psychiatric needs in restrictive housing settings and developing best practices for suicide prevention in both juvenile and adult correctional environments. Additionally, I have testified as an expert witness in state and federal courts, provided consultation during mediation, and served as a correctional mental health consultant for John Allen and Associates and the Moss Group.

I am a Clinical Professor in the Department of Psychiatry and Behavioral Sciences at UTMB in Galveston, Texas, and was previously a Clinical Associate Professor at Brown University's Warren Alpert Medical School. I provide clinical supervision to psychiatrists, psychiatric nurse practitioners, physician assistants, and trainees. I also deliver grand rounds, lectures, and training on correctional psychiatry topics at medical schools, residency and fellowship programs, and professional organizations. My lectures cover various topics, including correctional mental health care, standards of care, transgender issues, and suicide prevention, and I am frequently invited to speak nationally and internationally.

Since 1998, I have been qualified as an Expert Witness in State and Federal Courts in Forensic, Child and Adolescent, and Correctional Psychiatry. I have provided expert opinions on standards of care in jails, prisons, and juvenile facilities, as well as on the use of psychotropic medications, psychological harm, PTSD, suicide, suicide prevention, suicide risk assessment, seclusion, and restraint.

From 2013 to 2014, I served as a Correctional Psychiatric Consultant to the Special Master in the *Coleman v. Brown* CDCR case. From 2017 to 2019, I consulted for the California Attorney General's Office on staffing for mental health professionals, telepsychiatry, and improving healthcare delivery within the California Department of Corrections and Rehabilitation (CDCR). I conducted site evaluations of CDCR facilities, including restrictive housing units and specialty programs, focusing on access to and continuity of care. Recently, I have also consulted on CDCR's use of telepsychiatry and telepsychology.

Since 1998, I have conducted numerous evaluations and site tours of state prisons in Rhode Island, Vermont, Texas, California, and Arizona, including high-security restrictive housing units and Death Row settings. My experience has given me insight into various custody, classification, and housing levels, and the movement of incarcerated individuals for medical, mental health, and other activities. While not an expert in general correctional custody issues, I have a strong understanding of how correctional custody impacts mental health care delivery in these environments.

I have extensive daily involvement in ensuring access to mental health and psychiatric care across all custody levels in the Texas state prison system, including restrictive housing and cases involving suicide prevention, self-harm risks, and hunger strikes. My expertise encompasses intake screening, mental health assessments, and best practice evaluation and treatment modalities in correctional settings. With over twenty-five years of dedicated experience in correctional psychiatry, both in direct patient care and consultative roles, I am uniquely qualified to provide expert opinions on psychiatric services within correctional environments.

**Ex. B-159**

Although I have extensive state and national correctional health experience, I have no current or past affiliations with the SDSO County Jail, its named defendants, or other SDSO facility staff, whether in correctional custody, contracted healthcare, or administrative roles, aside from my current role as a psychiatric and mental health consultant to John Allen and Associates.

My state medical and federal Drug Enforcement Agency (DEA) licenses are current and on file with the appropriate authorities. I hold a full and unrestricted medical license to practice in Texas. I previously held full and unrestricted licenses in Rhode Island, Massachusetts, and Connecticut, but these are now lapsed or inactive as I currently practice exclusively in Texas.

A list of my depositions and trial testimony is attached (**Appendix B**).

With over 25 years of experience in direct patient care and mental health care administration across various correctional settings, along with maintaining triple board certification in general adult psychiatry, child and adolescent psychiatry, and forensic psychiatry, I am well-qualified to assess the standard of care concerning the psychiatric and mental health treatment services provided by SDSO, NaphCare, and other county and contracted mental health care staff across SDSO County Jail facilities.

In my role as a correctional and forensic psychiatrist providing consultation and expert opinions in litigation, I strive to maintain impartiality by balancing my work between serving as a court-appointed expert, plaintiff's expert, and defense expert whenever possible.

## Section 2. Overview

This *Dunsmore v. San Diego County* litigation involves the San Diego County Sheriff's Office Detention Services Bureau, and medical and mental health contractors for various San Diego County Jails regarding incarcerated persons (IPs) who allege the following mental health claims:

1. The Sheriff's Department fails to adequately identify and track incarcerated people in need of mental health care.

2. Jail defendants fail to maintain sufficient number of qualified mental health professionals to meet the current need for mental health treatment at the jail.

3. The Sheriff's Department custody staff improperly control clinical mental health care decisions, which undermines delivery of care by mental health professionals.

4. Jail defendants fail to continue incarcerated people's mental health medications they were taking prior to detention.

5. The Sheriff's Department fails to provide incarcerated people with timely access to mental health care.

6. The Sheriff's Department lacks an adequate system for providing mental health treatment to incarcerated people with ongoing mental illness.

7. The Sheriff's Department fails to provide confidential mental health care in adequate physical spaces.

Ex. B-160

8. The Sheriff's Department houses incarcerated people at risk of suicide in punitive isolation unit that put them at unnecessary and undue risk of further decompensation and harm.

9. The Sheriff's Department lacks adequate policies and procedures to identify, treat, track, and supervise incarcerated people at risk of suicide.
   - The Sheriff's Department fails to adequately identify incarcerated people at risk for suicide.
   - The Sheriff's Department fails to adequately monitor incarcerated persons at risk of suicide.
   - The Sheriff's Department fails to provide adequate follow-up care for incarcerated people released from suicide precautions.

10. The Sheriff's Department fails to provide adequate care to incarcerated people with acute mental health needs.

11. The Sheriff's Department discriminates and unfairly punishes incarcerated people with mental illness in its housing placements.

12. The Sheriff's Department fails to provide incarcerated people with adequate mental health discharge planning and resources.

The following comprehensive assessment of the mental health and psychiatric services provided within various SDSO facilities under the current contracted healthcare provider, NaphCare, was conducted at the request of Defendants. I completed an independent forensic and correctional psychiatric review of the following:

- current mental health practices
- intake health screening and procedures
- mental health and psychiatric evaluation and treatment services
- psychotropic medications
- mental health policies and procedures
- staffing
- suicide prevention
- audits and compliance reports
- medical records
- IPs' access to mental health and psychiatric care

**Section 3. Basis for Opinions, Documents Reviewed, Information Obtained, and Methodology**
I formed opinions regarding the allegations against the SDSO based upon my review of the following:

1. All materials provided for review (**Appendix C**)

2. Interviews of various SDSO mental health, nursing, medical, legal staff, and sworn custody staff

3. Tours of SDSO facilities, observation of healthcare activities and custody staff interactions with a focus on mental health care, access to care, and continuity of care

Each of my opinions is detailed below and is based upon my review of the documents mentioned above, my tours and collateral interviews of SDSO staff, and my years of training and experience. All of my opinions are to a reasonable degree of medical and psychiatric certainty.

**Ex. B-161**

In an attempt to examine the overall mental health quality of care available to IPs in SDSO facilities, I employed the following methodology:

1. I reviewed the medical and mental health charts of all named IP plaintiffs: Darryl Dunsmore, Christopher Norwood, Ernest Archuleta, Gustavo Sepulveda, Jesse Olivares, Michael James Taylor, Laura Susan Zoerner, Reanne Susanne Levy, Andree Andrade, James Clark, Tony Ray Edwards, and Josue Lopez.

2. To expand the scope of the mental health quality of care review beyond the named plaintiffs, I conducted an additional focused review of psychiatric and mental health records for current or former SDSO incarcerated persons. This review was crucial for evaluating the efficiency, effectiveness, and quality of specific mental health and psychiatric activities, including suicide risk assessments, initial screenings, diagnostic evaluations, psychotropic medication practices, and laboratory monitoring.

   A random selection methodology was used to ensure a representative sample, minimize bias, facilitate accurate inferences, and enhance the credibility of the findings. The medical records were copied in their entirety and provided in PDF format.

3. To assist with the extensive individual chart reviews required for my expert report, I engaged three board-certified correctional forensic psychiatrists—Natasha Cervantes, M.D., Joseph Baskin, M.D., and Ariana Nesbit Huselid, M.D. Each psychiatrist has completed a four-year general psychiatry residency and an additional one-year forensic psychiatry fellowship, and is board-certified in both general and forensic psychiatry. They currently work in or have recent experience in jail correctional systems as treating psychiatrists, not solely in forensic roles.

   None of these consultants are employed by the SDSO or currently works in California. To maintain objectivity, I instructed them to independently review a representative sample of randomly selected medical charts without prior knowledge of the SDSO litigation details, specific allegations, or any individual patient outcomes. Each consultant reviewed different files, ensuring no overlap in facility responsibility. I did not provide any input or guidance on their findings. **Appendix D** contains the case summaries, comments, and findings from each consulting psychiatrist.

   In summary, the quality of care, access to, and continuity of mental health services for SDSO incarcerated persons were assessed through medical record reviews conducted by three independent, board-certified forensic psychiatry consultants, each with a combined 23 years of correctional psychiatry experience. Their individual summaries, comments, and findings were reviewed and incorporated into my overall analysis and expert opinions.

4. I toured all of the SDSO County Jail facilities in March 2024:
   - Las Colinas Detention and Reentry Facility (LCDRF), Santee, California, on March 18, 2024
   - San Diego Central Jail (SDCJ), San Diego, California, on March 19, 2024
   - Vista Detention Facility (VDF), Vista, California, on March 19, 2024
   - George Bailey Detention Facility (GBDF), San Diego, California, on March 20, 2024
   - Rock Mountain Detention Facility (RMDF), Chula Vista, California, on March 20, 2024
   - South Bay Detention Facility (SBDF), Chula Vista, California, on March 20, 2024
   - East Mesa Reentry Facility (EMRF), San Diego, California, on March 20, 2024

Before each facility tour, I met with the respective custody and healthcare leadership in a group setting. During the tours, I observed the intake processes at Central Jail (males only), Las Colinas (females only),

9

**Ex. B-162**

and Vista (both males and females). I also toured the inpatient psychiatric units, including the Psychiatric Stabilization Unit (PSU) at Central Jail and the equivalent unit at Las Colinas.

Importantly, both inpatient psychiatric units were individually inspected by an independent auditor or team of auditors from the County of San Diego Health and Human Services Agency, Behavioral Health Services (BHS). Both units, the Central Jail PSU and the Las Colinas PSU, successfully achieved their respective LPS (Lanterman-Petris-Short Act) designation certificates. They are both designated as LPS Facility Type, Acute Psychiatric Units by the County of San Diego Health and Human Services, Behavioral Health Services.

According to a letter from Luke Bermann, PhD, Director of Behavioral Health Services for the County of San Diego, dated 5/24/2022 (**Appendix E**), the San Diego Central Jail Psychiatric Stabilization Unit (PSU) underwent a County of San Diego LPS site review on 3/30/2022. The "Mental Health Plan" which covers various aspects including staffing, physical environment, admissions criteria, facility practices, reporting requirements, seclusion and restraint practices, aftercare and discharge, policies regarding minors, ECT (electroconvulsive therapy) requirements, and minimum staffing ratios was also reviewed.

The PSU was found to be in compliance, and retains its County of San Diego LPS Designation Certificate, valid through 3/30/2025. The below certificate designation identifies the Central Jail PSU as an "acute psychiatric unit" with a program bed capacity of 30.



## LANTERMAN-PETRIS-SHORT (LPS) DESIGNATION CERTIFICATE

In accordance with applicable provisions of the California Welfare and Institutions Code Sections 5000 et seq. and its rules and regulations, the Behavioral Health Director of the County of San Diego hereby issues LPS designation to:

| LPS Designated Program | San Diego Central Jail PSU, 1173 Front Street, San Diego, CA 92101 |
|---|---|
| Program Bed Capacity | 30 |
| LPS Review Date | 03/30/2022 |
| LPS Effective Date | 03/30/2022 |
| LPS Expiration Date | 03/30/2025 |
| LPS Facility Type | Acute Psychiatric Unit |

This certification is evidence that program has completed all requirements for LPS designation. This certification is not transferable. This certification may be revoked for non-compliance with applicable LPS laws and regulations or at anytime at the discretion of the Behavioral Health Director of the County of San Diego. Certificate shall remain on site at facility and available at request.

Lynetta Devereaux, Chief Mental Health Clinician
Rebecca Kloker, MD - Administrator

Luke Bergmann, Ph.D., Director
Behavioral Health Services (BHS)
County of San Diego, Health and Human Services Agency

LPS Facility Authorized Representative

**10**

Ex. B-163

According to the LPS Designation Certificate, the County of San Diego, Behavioral Health Services conducted a LPS (Lanterman-Petris-Short Act) site review of the Las Colinas Detention Facility Psychiatric Stabilization Unit (PSU) for females on 6/29/2021. The review confirmed that the unit remained in compliance. The Las Colinas Detention Facility's PSU successfully retained its County of San Diego LPS Designation Certificate, valid through 6/29/2024. I understand from Melissa Quiroz, SDSO mental health director, that the County of San Diego, Behavioral Health Services, recently conducted an onsite review and re-certified the Las Colinas Detention Facility as an LPS acute psychiatric unit.  SDSO is awaiting the final certificate demonstrating this certification.  The below certificate designates the Las Colinas Detention Facility as an "acute psychiatric unit" with a "program bed capacity of 32."



I also confirmed with Melissa Quiroz, Mental Health Director, that there is clinical stability, coordination, and cohesion regarding the staffing, training, and onboarding of psychiatric nursing leadership functions in the PSU. For example, the Central Jail PSU has one charge nurse per team per shift, totaling four charge nurses. These nurses often transition from relief work to permanent roles based on their experience and interest in the PSU. The PSU charge nurses gain valuable knowledge through direct onsite experience and additional mental health training, such as suicide prevention. Each team also includes one or two relief charge nurses who can step in when a primary charge nurse is unavailable.

Ex. B-164

I also toured the Enhanced Observation Housing (EOH) and watch cells at the Central Jail and George Bailey facilities. My focus included restrictive housing areas, the jail-based competency restoration program at the Central Jail, specialized mental health treatment programs such as the inpatient Psychiatric Stabilization Unit (PSU) at both the Central Jail and Las Colinas, medical clinic areas, and high-custody housing. I observed group therapy activities involving male IPs in the inpatient psychiatric unit and in a dual diagnosis treatment program at the Central Jail. Throughout and after the tour, I had the opportunity to ask additional, individualized questions of sworn custody staff, SDSO contractors, and County and NaphCare healthcare staff.

During these tours, I conducted a physical inspection of the intake and reception areas, housing areas, and individual cells. I also observed day areas, recreation areas—with a focus on higher custody recreation areas—medical, dental, and mental health clinic areas. Additionally, I toured educational facilities, unit medical records departments, and administrative support office spaces. My focus was on areas with higher custody levels, including special observation areas and "watch cells" where IPs were monitored under various suicide prevention observation levels.

Although I toured all SDSO facilities, I concentrated on those housing IPs on psychotropic medications, those on the mental health caseload, and those placed in Enhanced Observation Housing (EOH) or Administrative Separation (Ad Sep). My focus also included inpatient psychiatric units at the Central Jail and Las Colinas facility, as well as other IPs receiving mental health services across SDSO facilities.

I observed various SDSO correctional and healthcare staff interacting with individual IPs in different settings, including housing pods, restrictive housing units (Ad Sep), and clinic areas. The custody staff I interviewed expressed satisfaction with the access to, availability of, and coverage by mental health services. They consistently reported that they could promptly contact mental health staff, usually the lead clinician, via phone, email, or messaging platforms to address concerns about an IP. For urgent issues, mental health staff aimed to assess the IP on the same day; for non-urgent matters, assessments were conducted the following day. Custody staff also noted that mental health professionals are readily available for consultations on managing IPs who exhibit signs of clinical deterioration.

I also conducted mental health focused follow-up tours of two SDSO facilities in May 2024:

- George Bailey Detention Facility, San Diego, California, on May 29, 2024,
- Central Jail, San Diego, California, on May 30, 2024.

During these focused tours, I specifically examined the use of watch cells (EOH) and "mental health wellness rounds" in Ad Sep, as detailed further in my report. I concentrated on the delivery of mental health services to IPs housed in restrictive housing units. My observations included group recreational activities in the Psychiatric Stabilization Unit (PSU) at the Central Jail, the administration of forced psychotropic medications, the jail-based competency restoration program, group therapy and other psychoeducational activities, and various psychiatric and specialty programs for IPs. Additionally, I spent time interviewing psychiatric, psychology, recreational therapy, and sworn custody staff.

I observed the forced administration of antipsychotic medications to two IPs at the Central Jail who had court Riese orders (similar to Keyhea orders in state prison) for their treatment but had continued to refuse voluntary compliance. While I did not review their medical charts, I gathered from healthcare staff that both cases involved persistent refusal to take the prescribed medications. I was impressed by the advance preparation, the patience displayed, and the effective interdisciplinary communication among custody, nursing, and mental health care staff. Efforts were clearly made to minimize disruption to other IPs and the unit environment. Both events were videotaped in their entirety, and the medication administrations were carried out safely and efficiently, with no evidence of injury to the IPs, nursing or

**Ex. B-165**

custody staff, or other IPs. I also interviewed the lead custody and nursing staff involved in the administration.

A significant number of custody staff were called away from other unit activities while overseeing the forced medication process, including its implementation, application, and subsequent briefing and documentation. Despite this, several custody staff were promptly available afterward to supervise a recreational group therapy session conducted by a full-time recreational therapist. This session took place outdoors in the recreation area adjacent to the inpatient psychiatric unit.

I was impressed by the patience, professionalism, and creativity demonstrated by the recreational therapist. Her ability to engage IPs with severe mental illnesses in the activity, rather than allowing them to remain inactive in their cells, was noteworthy. The IPs participated actively, visibly smiling and laughing, and interacting in a therapeutically beneficial manner. Despite their varying physical coordination and abilities, each IP was encouraged to participate and engage, showcasing the therapist's skill in motivating and supporting them.

I also had the opportunity to interview a variety of facility employees, including various levels of sworn custody staff, SDSO contract staff, unit psychiatrists and other psychiatric providers (nurse practitioners), facility mental health leads, lead psychologists, nursing, medical, pharmacy and mental health staff.  Most notably, I spoke with the following individuals:

1. Sgt. Rita Diaz, SDSO Classification Jail Population Management Unit (JPMU)
2. Melissa Quiroz, LMFT, SDSO Mental Health Director
3. Serina Rognlien-Hood, Chief Nursing Officer, SDSO
4. Anya Nevarez, LCSW, Chief Mental Health Clinician, George Bailey Detention Facility, East Mesa Reentry Facility, South Bay, and Rock Mountain
5. Chantel Enriquez, LPCC, Chief Mental Health Clinician, Central Jail
6. Alejandra Carbajal, LMFT, Chief Mental Health Clinician, Central Jail
7. Elvia Escobar, LMFT, Mental Health Clinician, George Bailey Detention Facility
8. Brook Anarde, LCSW, Program Manager, Jail Based Competency Restoration Program, Central Jail
9. David Mullen LMFT, Chief Mental Health Clinician, Las Colinas
10. Lynneta Deverereaux, Chief Mental Health Clinician, Vista
11. Arielle Payes, Psy.D., NaphCare Mental Health Director, San Diego County Jail Contracted Facilities (I understand that Dr. Payes oversees all NaphCare psychiatric and mental health services to all SDSO facilities)
12. Patricia Ceballos, Reentry Services Manager regarding discharge planning

I was not permitted to interview any individual IPs, due to their representation.

I directly observed consistent examples of access to care and continuity of care throughout the above on-site tours.  I also verified practices, policies, and procedures and scenarios with the staff listed above. I interviewed  sworn custody, contract, medical, nursing, and mental healthcare staff at various SDSO facilities.  In summary, I was able to conclude that SDSO is committed to providing quality mental health care to the IPs in their charge.

## Section 4. Timely Identification and Tracking of IPs in Need of Mental Health Care

The plaintiffs allege that the Sheriff's department fails to identify and track IPs in need of mental health care. However, this claim is refuted by the established practices and policies at SDSO facilities, which I

Ex. B-166

observed and corroborated through interviews with custody, nursing, medical, and mental health staff during my onsite tours.

IPs with pre-existing mental health issues are identified through several mechanisms. If mental health concerns are noted during an arrest, police officers can choose to transport the individual to a local hospital's emergency department for further evaluation and treatment before taking them to the SDSO booking center. This process ensures that individuals with immediate mental health needs receive appropriate care before their arrival at SDSO facilities.

At the time of arrival at the SDSO intake and booking facilities, including the Central Jail, Las Colinas, or the Vista Detention Facility, the arresting and transporting SDSO officers remain onsite during the intake process. This practice ensures effective communication between police officers and jail deputies as the IP is brought into the sallyport and intake booking area. This practice is considered a best practice, unlike in many other detention settings where officers might drop off an IP without sharing relevant concerns or remaining onsite.

During booking, if any IP exhibits changes in mental status, signs of intoxication, substance influence, psychosis, disorientation, or other acute medical or mental health issues, this information is promptly communicated to the SDSO booking deputies. The deputies then relay this information to the intake registered nurse. At the SDSO facilities receiving new intakes—Central Jail, Las Colinas, and Vista Detention Facility—there is 24-hour staffing by registered nurses to ensure immediate and appropriate response to any such concerns.

Mental health staff are present onsite 24/7 at the intake and booking facilities—Central Jail, Las Colinas, and Vista Detention Facility—to provide urgent and non-emergent mental health assessments and consultations. Mental health staff act as gatekeepers, responsible for screening, evaluating, and triaging acute mental health needs.

If a mental health staff member, or a nurse functioning as a gatekeeper after hours, identifies an IP as at risk for self-harm or suicide, the IP is placed on "watch status." This status requires custody staff to perform unpredictable checks at intervals not exceeding 15 minutes. Alternatively, if the IP is not at imminent risk or actively engaging in self-harm, they are placed in Enhanced Observation Housing (EOH).

Nursing staff, specifically registered nurses (RNs), also serve as mental health "Gatekeepers" when a Qualified Mental Health Provider is not onsite. In this role, RNs assess both immediate medical needs and mental health concerns, including suicide risks. They ensure that IPs receive appropriate care for urgent medical and mental health issues and are placed in safe housing according to their health status.

At the SDSO County Jail, the "Gatekeeper" role is crucial for managing mental health concerns. This role utilizes color-coded passes on booking slips and wristbands to provide clear and immediate visual cues to both custody and health services staff. These visual indicators facilitate the quick identification of individuals with mental health issues. When a potential risk, such as self-harm or suicide, is identified, the Gatekeeper decides on the appropriate housing from options like Safety Cells, Enhanced Observation Housing, Psychiatric Stabilization Unit (PSU), or Medical Observation Cells. This decision is communicated verbally in real-time and reinforced by the color-coded visual cues.

The SDSO employs a comprehensive electronic medical record system, Tech Care, which integrates documentation across various healthcare disciplines including nursing, medical, mental health, psychiatry, and dental. This system allows SDSO health care staff to access and review each incarcerated person's medical chart for current or past psychiatric diagnoses and psychotropic

14

medication histories. Psychiatric diagnoses are recorded using standardized criteria from the American Psychiatric Association's DSM and are included in a problem list within the EMR. Melissa Quiroz, the mental health director, confirmed that both she and other mental health, medical, or nursing staff can quickly access these records through Tech Care to retrieve information about psychiatric conditions and medication statuses.

New mental health intake screenings, assessments, and psychiatric evaluations and follow-up mental health and psychiatric appointments and subsequent evaluations are scheduled via reminders in this SDSO systemwide EMR.

The SDSO has implemented several additional strategies and functionality across their Jail Incarcerated person Management System (JIMS) to directly track and share information with nursing, medical, and mental health staff.  The SDSO county mental health staff and contracted NaphCare staff thus have an ability to identify and track IPs that are in need of additional mental health care and follow-up.  There are numerous examples of how IPs with mental disorders are identified and tracked for further mental health follow-up and monitoring and access to care and continuity of care:

1.  IPs who have engaged in past suicide attempts receive "flags (alerts in the EMR system)"

2.  IPs who have been conserved, have conservator letters, guardianship and the like receive flags.

3.  IPs who have been determined PC 1370, found by a Court to be incompetent to stand trial (IST), receive flags.

4.  IPs with intellectual impairments and developmental disorders also receive "flags."   This is described later in more detail.

5.  IPs who at the time of intake are identified to have mental health needs receive "flags" in the EMR.

6.  IPs who have a history of being a 1368 or 1370 CST (Competency to Stand Trial), and have been adjudicated with a finding of incompetency to stand trial, similarly receive "flags."

7.  IPs with a history of chronic care such as being SMI (Serious Mental Illness) receive "flags" in the EMR system.

8.  5150 IPs who have required involuntary, forced, or court ordered antipsychotic medication treatment, also receive "flags."

**Ex. B-168**

9. There is an additional list of medical, mental health, and other reasons for "flags." Please refer to the document "Techcare Flag Name" (**Appendix F**) It is important to note that there may be flags for various reasons or indications. Examples of mental health flags include serious mental illness (SMI), mental health chronic care, delirium, dementia, substance related disorders, psychotic disorders, mood disorders, anxiety disorders, adjustment disorders, personality disorders, developmental disability/mental retardation, and other psychiatric disorders. Other flag examples include: suicide watch, violent incarcerated person, alcohol detoxification, pregnancy, juvenile, sober cell, safety cell, and various chronic medical illnesses such as thyroid disease or infectious and communicable diseases such as HIV, HIV/AIDS, hepatitis B and C, syphilis and other sexually transmitted diseases, tuberculosis, scabies, lice. Importantly, these flags are automated in the JIMS system and may include an auto-trigger to sworn custody, nursing, medical, and mental health staff.

10. SDSO also utilizes "trip sheets." Trip sheets are a separate document listing individual IP's and the referral source and custody and health care and housing needs without including specific details or diagnoses regarding protected health information (PHI). Trip sheets are sent to the SDSO to inform the receiving SDSO staff that IPs who are being sent to the Central Jail (or another intake unit) from state hospitals (e.g., for example after an IP who was sent to a state hospital due to being found incompetent to stand trial (CST), whose competence has now been restored) or due to other clinical issues that resulted in a transfer for inpatient state psychiatric hospitalization. The following are other examples where information is sent via "trip sheets" from the sending facility or outside system to the SDSO:

  a. IPs who have been recently incarcerated in the California Department of Corrections and Rehabilitation (CDCR), and in particular those who have received an EOP (enhanced outpatient program) designation or identifier thereby indicating that they were receiving intensive mental health and psychiatric services while in the CDCR;

  b. CDCR IPs recently housed in the CDCR R.J. Donovan Facility (e.g., a specialized CDCR psychiatric/behavioral health facility for CDCR state prison IPs) or any other CDCR IP who is coming back to County Jail for a new court hearing.

  c. Transfer IPs from the California Department of State Hospitals (DSH) system. These IPs were previously determined to be not competent to stand trial, were then transferred to a California state hospital, and they have now been recently restored and determined by a Court to now be competent to stand trial (CST).

11. I learned that the California Department of Psychiatric Services (DPS) and California Health and Human Services Agency (HHSA) utilize the Cerner electronic medical record, and that these records are shared with SDSO health care staff and scanned/uploaded into the SDSO EMR.

**Ex. B-169**

12. The above IPs with mental health flags from CDCR or DHS or other outside agencies are expected to be sent to the SDCJ with "trip sheets," and copies of recent mental health records such as psychiatric evaluations and current psychotropic medications, doses and schedules. I also understand that there is an expectation that there will be additional phone discussion between health care staff prior to acceptance and transfer and that there will be a series of additional email communications re: these individuals who are returning back to SDSO from any outside mental health referral sources.

The described examples illustrate SDSO's effective internal communication regarding an IP's mental health and healthcare needs. Beyond internal mechanisms, SDSO has established external tracking systems, such as lists for outpatient stepdown, current watch status, and awaiting PSU admission. When an IP requires a change in clinical services or a higher level of care, their name is added to these lists by mental health, nursing, or other healthcare staff. This information is shared with custody staff to facilitate appropriate moves to different units, housing areas, or treatment programs.

Lastly, the SDSO has implemented several additional safeguards in order to ensure the timely identification of individuals with mental health histories and need for follow-up:

1. Any IPs who are returned from any California state hospitals are automatically placed into OPSD (outpatient stepdown) housing observation level as an enhanced level of supervision and monitoring and they receive additional clinical treatment planning and safeguards and mental health referral and evaluation.

2. IPs who have a current 1368*, 1370* or 5150* designation (e.g., various California mental health statutes and state regulations) are indicated with a flag in the system.

3. State hospital returnees (who were admitted to a California DSH state hospital for competency evaluation and restoration and are now being returned to SDSO, for example GBDF) receive a "flag" notification (alert) in the electronic health record.

4. These flags are added by the UR (Utilization Review) COC (County Operations Center) staff in order to ensure that these IPs are easily identifiable.

IPs who present with possible intellectual impairments or identify themselves as "RCC clients" during booking are flagged for special consideration. The SDSO booking staff will obtain contact information for the RCC (Regional Center of San Diego) case manager to ensure coordination and access to appropriate support and services for individuals with intellectual and developmental disabilities.

SDSO maintains a policy of assessing all IPs, regardless of prior mental health history, for mental health evaluation and treatment services if they show signs of new mental health issues, disruptive behaviors, or threats of self-harm or harm to others. During booking and intake, IPs are informed about how to request mental health services and access support, including the use of sick call requests and assistance for communication issues.

17

**Ex. B-170**

I personally observed an emergency "man down" response by custody and health care staff in action during my SDSO central jail tour on 5/30/24. I was touring the inpatient psychiatric unit, and there was an intercom announcement of a man down in the booking area. Numerous nursing, medical, and custody staff immediately responded to what was determined to be an IP on the floor in the post booking area. The IP was unconscious and appeared to be experiencing an opioid overdose, presumed fentanyl overdose. This IP was being held with a few other IPs in a post-booking cell. I noted that custody staff were already onsite in the cell, they had already escorted the other incarcerated persons out of the holding cell in the post-booking area (I learned later that these IPs would undergo additional medical evaluation to rule out possible opioid ingestion or contamination), custody staff gave immediate report to nursing staff that they had already administered two vials of Narcan intranasally to the unconscious IP, had already contacted rescue (e.g., 911) and were opening additional containers of Narcan.

I observed nursing staff emergency responders arrive immediately with the jump bag. Nursing staff worked as a team communicating in a timely manner regarding vital signs collection and documentation, establishing and administering IV fluids, placement of EKG leads and an AED (automatic external defibrillator) and protecting the IP's airway (to avoid vomiting and aspiration), and continued assessment and reporting of blood pressure, pulse, and respirations. The San Diego fire department and paramedics arrived within minutes (I learned from SDSO staff that their station is nearby to the SDSO Central Jail). SDSO nursing and custody staff gave verbal report to the Fire and Paramedic rescue staff. A decision was made to place the IP on a stretcher. The patient's vital signs were stable, and now stabilized, a decision was made to immediately transport the IP to a local ED.

The IP who had the apparent opioid overdose was transported off-site to a local ED via rescue. I then spoke with a SDSO medical staff member who responded to the incident. This individual, an emergency medicine physician with thirty years of experience, commended the response of the SDSO custody and healthcare staff. He noted, "They did a great job," and described their actions as "spot on." He emphasized that there was nothing more for him or others to do, as the incident was handled efficiently and without delays. The physician confirmed that the response team managed the situation so effectively that he did not need to intervene further. The IP, who had experienced a presumed opioid overdose, recovered quickly with no resulting morbidity or mortality.

During my facility tours and interviews with various custody staff, I confirmed that any time sworn staff (Sheriff's detention staff) identify an IP exhibiting acute medical needs, such as signs of illicit substance ingestion and overdose, or any severe mental health symptoms like unusual speech, behavior, or interactions with staff or other IPs, they have the authority to take immediate action. This includes transporting the IP to the clinic area for assessment by a qualified mental health professional (QMHP), or placing the IP in a watch cell if they are actively self-harming, suicidal, or homicidal, or in Enhanced Observation Housing (EOH) where they are evaluated by mental health staff. It could also include calling 911 if an EMT or hospital transport appears warranted.

With regard to licensing of mental health staff, all qualified mental health professionals (QMHP) serving as mental health clinicians must be fully independently licensed professionals according to California's licensing entities, such as the Board of Psychology, the Board of Marriage and Family Therapists, the Board of Professional Counselors, or the Board of Social Workers. They cannot be pre-licensed or in a master's-level training phase.

Mental health staff are available on-site 24/7 at both the Central Jail and Las Colinas facility to address any acute mental health needs. According to my interview with Melissa Quiroz on July 18, 2024, there is also a current goal to establish 24-hour on-site mental health staffing at the Vista Detention Facility.

Ex. B-171

Regarding intersystem transfers, when an IP undergoes intake and booking at the Central Jail and is subsequently transferred to George Bailey Detention Facility (GBDF), the mental health staffing is organized as follows:

At GBDF, mental health staff are present from 6 AM until 10:30 PM every day. Since GBDF does not handle new intakes, it does not require 24-hour mental health staffing. However, nursing staff are available around the clock at GBDF. From 10:30 PM until the next morning at 6 AM, when mental health staff are not on site, the nursing staff assume responsibility for any mental health gate-keeping roles. This includes addressing immediate mental health concerns and coordinating with the on-call mental health and psychiatric providers if necessary.

For after-hours and weekend needs, there is always an on-call mental health and psychiatric provider available to support any mental health issues that may arise during these times. This system ensures that mental health needs are continuously monitored and managed effectively, even outside of regular office hours.

SDSO has implemented a classification system that effectively helps both custody and mental health staff identify incarcerated persons with mental health needs. According to interviews with Sgt. Rita Diaz from the Jail Population Management Unit (JPMU) and Melissa Quiroz, the mental health director, SDSO prioritizes housing for incarcerated persons on the mental health caseload or those taking psychotropic medications in facilities equipped with the necessary medical and mental health services.

Incarcerated persons who develop mental health issues while in non-specialized facilities are promptly referred to mental health staff for evaluation. If treatment needs are identified, mental health staff coordinate with custody and classification to transfer the incarcerated person to a facility with the appropriate mental health capabilities. This system ensures that incarcerated persons with mental health needs are housed in facilities designed to offer efficient mental health and psychiatric services. By clustering incarcerated persons with mental health needs in specific facilities, SDSO enhances custody supervision, access to clinical staff, treatment planning, and case coordination.

In summary, when an incarcerated person is identified with an acute or chronic mental disorder, SDSO employs a collaborative approach between custody and healthcare staff to ensure the IP is placed in a facility equipped to address their mental health evaluation and treatment needs. The decision-making process considers the IP's mental health symptoms, functioning, and clinical acuity, while healthcare assessments and recommendations are integrated with security and safety considerations. Both correctional and healthcare staff contribute to decisions regarding unit and housing placement to ensure comprehensive care and safety.

At all SDSO facilities, custody, nursing, and medical staff can refer an incarcerated person to mental health staff for evaluation and treatment at any time. There is effective collaboration and communication among disciplines, with both custody and nursing staff noting that SDSO mental health staff are readily accessible and responsive to acute referrals. Mental health staff have prompt access to onsite psychiatrists, psychiatric nurse practitioners, and telepsychiatric providers as needed.

## Section 5. Response to Allegations

*Response to Allegation 1:*
*SDSO Maintains Adequate Numbers and Types of Mental Health Staff to Meet the Current Need for Mental Health Treatment at SDSO Facilities*

**Ex. B-172**

The success of any correctional system heavily relies on a well-staffed and well-trained core group of qualified mental health professionals. Recruiting and retaining a consistent multidisciplinary team of bachelor's, master's, and doctoral level mental health professionals, along with psychiatric advanced practice providers (APPs) such as nurse practitioners and psychiatrists (MD or DO), is essential. This multidisciplinary approach, mirroring community mental health practices, is particularly effective given the complex needs of incarcerated individuals (IPs).

From my tours, staff interviews, and observations of interactions between IPs and mental health staff, it was clear that the current mental health team is working effectively. They provide timely access to care at intake, maintain continuity of care, and establish community linkages for IPs before their release or transfer to state prisons or other placements.

Regarding any claims that SDSO does not meet recommended staffing ratios for mental health staff, it's important to recognize that there are no national correctional health requirements or guidelines for mental health staffing levels in jails or prisons. Consequently, establishing objective staffing standards that apply universally is not feasible. The jails may not act with deliberate indifference to IPs' health or safety, and my evaluation of the facilities, interviews of staff, and review of records found the SD County jails are well above this constitutionally minimal standard.

Staffing levels in correctional settings should be evaluated based on the clinical determination of whether adequate mental health services are provided by the available staff. This means that the adequacy of staffing is determined by whether the care meets established standards rather than by adhering to a specific numerical ratio.  According to the NCCHC Standards for Health Services in Jails, 2018 Jail Standard, J-C-07, page 60, "Staffing," is defined, the responsible health authority (RHA) ensures sufficient numbers and types of health staff to care for the incarcerated person population."

There are no universally accepted or empirically validated staffing plans, ratios, or recommendations for mental health and psychiatric staff within correctional settings. Staffing decisions should be made based on the clinical needs of the population served, considering the unique requirements of each facility, county, or state.

The SDSO employs a diverse, multidisciplinary team of professionals, including master's level social workers, licensed marriage and family therapists, recreational therapists, psychiatric nurses, and other healthcare staff to deliver mental health services. During my tours of the SDSO facilities, I observed that many of the incarcerated persons (IPs) were Hispanic. I was particularly impressed to note that several of the master's level mental health and nursing staff were fluent in Spanish, bilingual and bicultural. This ability to communicate effectively in Spanish, as well as English, ensures that IPs could receive care in their preferred language, which facilitates better understanding and engagement in their treatment.

The contracted healthcare provider, NaphCare, employs or has access to additional contracted psychiatrists, psychologists, and psychiatric nurse practitioners. Given San Diego's status as a major metropolitan area, there is significant competition for mental health professionals, both within and outside of correctional settings. This competition is heightened by a national shortage of psychiatrists, particularly in California, which further strains the recruitment and retention of these professionals.

Notable competitors in the region include the County of San Diego, local mental health centers, the California Department of Corrections and Rehabilitation (CDCR), ICE facilities, the San Diego Veteran Affairs (VA) system, UC San Diego, and Kaiser Permanente. These organizations offer comparable or more attractive salary packages and working conditions. Additionally, many of these employers provide opportunities for telecommuting, part-time work, and virtual tele-mental health services, which can be

Ex. B-173

more appealing compared to the demands and safety concerns associated with working onsite in a busy county jail facility.

<u>**Mental Health Staffing**</u>
**Non-Psychiatrist Staffing**
The SDSO utilizes dedicated county-employed mental health staff for behavioral health evaluation and treatment services.  These mental health staff provide all mental health evaluation and treatment services to IPs at all SDSO facilities.  I understand from Melissa Quiroz and Anya Nevarez that the mental health leadership significantly increased their mental health staffing positions as reflected by documents, "Mental Health Master Staffing Plan, dated March 17, 2022," (**Appendix G**) and most recently, "Mental Health Master Staffing Plan, dated June 13, 2024 (**Appendix H**).  The SDSO has demonstrated their commitment to increasing their funding and salary support for qualified mental health professional (QMHP) staffing.  In 2022, they had 34 budgeted full time equivalent positions (FTE), and now they have 79 budgeted FTE's.  The majority of these masters level mental health positions are independently licensed.  In order to recruit and retain staff, there are also opportunities for post graduate students to obtain their clinical hours and experience under the supervision of licensed QMHP's and become future SDSO employed mental health staff.  This is a best practice within correctional settings.

I reviewed the above documents as well as the most current status report, "Mental Health Personnel Status Report, dated July 23, 2024 (**Appendix I**).

As of 7/23/24, there appear to be a few mental health personnel vacancies, specifically the following:
   a. 6 mental health clinician vacancies at Rock Mountain Detention Facility (I understand this facility is currently undergoing significant construction and is currently depopulated),
   b. 2 mental health clinician vacancies at Vista Detention Facility.
   c. There are also a few mental health case management clinician vacancies:
       • 1 at George Bailey Detention Facility,
       • 1 at Las Colinas Detention Regional Facility,
       • 2 at San Diego Central Jail, and
       • 2 at Vista Detention Facility.

Despite these staffing vacancies, there were no discernible delays in care nor any identifiable impediments in SDSO IP patients' access to and continuity of mental health care.

The county-employed mental health staff consist of master's level and independently licensed professionals, including licensed mental health clinicians (LMHCs), licensed marriage and family therapists (LMFTs), and licensed clinical social workers (LCSWs). In addition to these licensed professionals, there are several unlicensed mental health staff who are working toward their clinical licensure under the supervision of licensed staff members. These unlicensed staff are restricted from performing certain functions as specified by mental health policies, such as removing individuals from suicide watch precautions. Currently, there are 15 unlicensed staff members, with 12 actively pursuing their licensure while under direct clinical supervision from licensed staff. This is a best practice within correctional settings and a tremendous opportunity for recruitment and retention of qualified mental health professionals.

NaphCare separately employs several psychiatrists, psychiatric nurse practitioners, doctoral level psychologists, mental health professionals, a discharge planner, and mental health technicians.

Ex. B-174

According to the 6/13/2024 mental health master staffing plan, Naphcare was able to successfully employ and staff a total of six psychiatrists, three psychiatric nurse practitioners, three psychologists, two mental health professionals, one discharge planner, and two mental health technicians.  According to my 8/19/2024 interview of  Arielle Payes, PsyD, NaphCare mental health director for San Diego County Jail, NaphCare currently employs eight psychiatrists (a combination of full and part time and telepsychiatry), ten psychiatric nurse practitioners (full-time) and ten PRN (as needed) to address mental health and psychiatric sick call requests in a timely manner.  There are now two full time NaphCare dedicated mental health discharge planners who work directly with SMI, PSU, Outpatient Step Down IPs, and any other IP that requires mental health aftercare follow up, to determine aftercare discharge planning and post release plans.  These discharge planners may receive referrals in person or via email from clinicians assigned to the modules, correctional counselors, medical staff, and/or via IP generated requests.  Examples of referrals include IP's who require ACT (assertive community treatment) referrals, CARE (Community Assistance and Recovery Empowerment) or any other IPs who may lack stable housing, mental health, and substance abuse treatment services upon release from the SDSO.

**Discharge planning:**
The SDSO maintains a reentry services department with 2 FTE's (full-time equivalent) discharge planner positions. The SDSO provides continuity of psychotropic and non-psychotropic medication(s) for all IPs upon discharge. A prescription card (described later in this report) with all current medications, is provided to each IP upon discharge with instructions on how to obtain a 30-day supply of their medications from a local retail pharmacy. Additionally, IPs are provided a Narcan voucher which can be filled at a local retail pharmacy. Formal discharge planning is particularly challenging in a jail setting due to the rapid turnover of IPs. SDSO attempts to make care connections for IPs with SMI (Serious Mental Illness), and other mental health community needs.  SDSO also attempts to make connections for individuals with mental illnesses that are enrolled in a community MAT program.

**Psychiatrist and Psychiatric Provider Staffing**
NaphCare employs psychiatrists and advanced psychiatric advanced practice providers (APP's), specifically psychiatric nurse practitioners.  The NaphCare contracted psychiatrists and psychiatric nurse practitioners provide a combination of onsite evaluation and treatment, specifically in the Central Jail Psychiatric Stabilization Unit (PSU) and the female PSU at Las Colinas, in person inpatient and outpatient diagnostic evaluations, psychotropic medication assessments, and medication monitoring.  There is also the capability for supplemental telepsychiatry delivery to various SDSO facilities, which is a best practice within correctional settings.  Both medical staff and psychiatrists are available by phone for emergencies afterhours and on weekends.  Licensed mental health staff and psychiatric providers are available for emergencies and for case consultation with masters level behavioral health staff, nursing, and medical staff.  The psychiatrists and psychologists and mental health staff that were interviewed onsite were very skilled and knowledgeable.  Several of them had prior CDCR state prison experience versus other large county jail facility experience.

Due to the national shortage of psychiatrists and other qualified mental health professionals, coupled with the challenges associated with working in correctional settings, the demand for mental health professionals in these environments often exceeds their availability. To address this gap, jails and state prison systems across the country have increasingly turned to psychiatric mid-level providers, such as psychiatric nurse practitioners and physician assistants, to enhance psychiatric care. These psychiatric advanced practice providers (APPs) play a crucial role in delivering high-quality psychiatric evaluation, treatment, and medication management.

Ex. B-175

NaphCare, the contracted healthcare provider for the SDSO, employs several experienced psychiatric nurse practitioners, who are integral in meeting the psychiatric needs of incarcerated persons. These psychiatric APPs, alongside psychiatrists, offer comprehensive psychiatric evaluations, psychotropic medication management, and both onsite and telepsychiatric services. While psychiatric APPs are generally easier to recruit and less costly than psychiatrists, it is evident that psychiatrists are still available and utilized for clinical supervision and the management of complex patient cases when needed.

Due to staffing shortages in custody staffing following the COVID-19 pandemic and related issues with custody escorts, there have been challenges in transporting incarcerated persons to mental health clinics. To address these difficulties, mental health clinicians, psychologists, psychiatric nurse practitioners, and psychiatrists have adapted by providing services directly within the incarcerated persons' housing units. This includes visiting patients in their individual cells or meeting with them in day rooms or recreational areas; some units also have a small but private clinic or office space. This flexible approach helps ensure that incarcerated persons continue to receive necessary mental health evaluations and treatment despite logistical challenges.

**Afterhours and weekend mental health and psychiatric coverage**
Mental health and psychiatric evaluations and treatments at SDSO facilities are primarily conducted during weekdays. However, there is additional coverage on weekends and afterhours, particularly for new intakes and incarcerated persons presenting with acute mental health issues or suicide risks, specifically at the three intake facilities: Central Jail, Las Colinas, and Vista. On weekends, mental health clinicians or psychiatrists must review every detainee on suicide watch on both Saturday and Sunday. Only psychiatrists or licensed mental health staff, either independently or in consultation with other mental health professionals, are authorized to make decisions regarding the stepdown or removal of an incarcerated person from watch status or Enhanced Observation Housing (EOH).

**Mental health and psychiatric administrative leadership and oversight**
Clinical supervision, communication, and reporting structures within the SDSO system are well-defined across different employers. For instance, county-employed mental health staff, including social workers and therapists, operate under the supervision of Melissa Quiroz, the mental health clinical administrative director. In contrast, NaphCare psychiatric providers and psychologists report to a separate regional mental health services administrator within NaphCare.

Despite this distinction in reporting lines, Melissa Quiroz and NaphCare's mental health leadership maintain effective collaboration. They engage in ongoing dialogue and participate together in facility meetings, medical staff meetings, and other administrative functions such as policy review, peer review, and clinical case reviews. This ensures coordinated care and consistent standards across the different mental health services provided within the SDSO facilities.

Expanding the use of telepsychiatry and telemental health services within the SDSO system offers promising opportunities to enhance mental health care delivery. Currently, the primary model focuses on onsite psychiatric and mental health services, but integrating telehealth solutions could address challenges such as staffing shortages, lockdowns, or other disruptions.

Telepsychiatry can improve accessibility and flexibility by providing mental health services across various SDSO facility locations throughout the county. This approach could help maintain continuity of care during pandemics or infectious disease outbreaks that restrict onsite access.

Additionally, telehealth can be used for a range of services, including mental health sick calls, initial and follow-up psychiatric evaluations, urgent chart reviews, psychotropic medication management, and

**Ex. B-176**

suicide risk assessments. This capability can streamline access to qualified mental health professionals, improving response times and ensuring consistent care even when onsite staff availability is limited.

The adaptability of telepsychiatry allows for quick adjustments to changes in facility operations or health crises, offering an extra layer of support when traditional onsite services are disrupted. Integrating telepsychiatry and telemental health could significantly enhance the SDSO's ability to deliver comprehensive and timely mental health care, ultimately improving overall service delivery and patient outcomes.

It is my professional opinion that the current psychiatric and mental health staffing, available and offered mental health services of the above [availability of licensed and qualified and non-licensed mental health staff, social workers, licensed marriage and family therapists (LMFT), recreational therapists, psychologists, psychiatric nurse practitioners and psychiatrists] and availability of individual and group therapy for clinically appropriate IP patients and psychotropic medication treatment are well within the generally accepted standards for psychiatric and mental healthcare in a jail setting.  It is also my professional opinion that NaphCare recruits and employs qualified Mental Health Professionals.  They follow SDSO and NaphCare policies and procedures, and they practice within their state licensure requirements.

The staffing level at SDSO ensures that medical and mental health services are accessible whenever an IP requests them or is identified as needing them. This includes handling urgent cases such as suicidal or homicidal behavior, psychotic symptoms, or impairments in daily living activities. In my professional assessment, NaphCare, the current contracted mental health services vendor for SDSO, has a sufficient and appropriately varied team of mental health professionals. According to the National Commission on Correctional Health Care (NCCHC), a well-structured staffing plan should outline the required full-time equivalent coverage, detail current staffing levels and vacancies, and describe strategies to ensure full coverage even when positions are unfilled—such as through the use of temporary or part-time staff. SDSO's staffing strategy effectively addresses these requirements, including instances where existing staff take on additional shifts to cover vacancies.

It is important to acknowledge that the COVID-19 pandemic has significantly impacted staffing levels across all sectors, including correctional health care, due to increased absences and the growing mental health needs of the population. Despite these challenges, SDSO's approach to staffing and the quality of care provided by NaphCare reflect a strong commitment to meeting the mental health needs of IPs effectively.

Through its contracted health care vendor, NaphCare, the SDSO employs an array of qualified mental health professionals at the various SDSO facilities including:

- mental health senior and regional directors (LMFT and LCSW masters level)
- staff psychiatrists
- staff psychiatric nurse practitioners
- staff psychologists (doctoral level)
- other master's level clinicians include: master's level licensed clinical social workers (LCSW), licensed marriage and family therapists (LMFT), and licensed professional counselors (LPCC). These are all licensed by the California State Board of Behavioral Sciences.
- Additional case managers/case workers and recreational therapists (for psychiatric units and mental health caseload units)
- other pre-licensed master's level mental health clinicians (being supervised by a licensed mental health clinician pending accumulation of hours)

Ex. B-177

- psychiatric nurses

NaphCare and SDSO have proactively addressed the challenges of recruiting and retaining mental health staff in a correctional setting. Given the geographical and desirability issues often associated with jails and prisons, including their locations in less desirable or remote areas, the recruitment and retention of qualified mental health professionals can be particularly challenging. Additionally, systemic issues such as gaps in strategic planning, communication, and human resources, as well as safety concerns and the stigma associated with working in correctional environments, further complicate these efforts.

To overcome these challenges, SDSO has implemented a strategic recruitment incentive: a significant hazardous pay increase of twenty percent. This financial incentive is designed to make positions more attractive and competitive, especially for master's level mental health professionals. By offering salaries that surpass those of comparable positions within the San Diego County Health and Human Services Agency (HHSA), SDSO enhances its ability to attract qualified staff who might otherwise prefer non-correctional settings.

These efforts reflect SDSO's commitment to building a robust and capable mental health workforce, addressing the unique needs of its population, and ensuring the delivery of high-quality mental health services within the correctional system.

Most correctional mental health systems nationally mirror private and public mental health systems (Vas, state hospitals, and mental health centers) and largely rely and emphasize a behavioral team approach to patients with serious mental illness. In other words, case workers, case managers, social workers, bachelors and masters level licensed professional counselors and psychologists, and doctoral level psychology staff, psychiatric physicians, psychiatric nurse practitioners, physician assistants, and other staff work in a collaborative team approach to address treatment needs.

The use and staffing of psychiatric nursing, as implemented by NaphCare in specific locations within the SDSO County Jail, exemplify best practices in correctional healthcare and often exceed standard care protocols. In many correctional facilities, psychotropic medications are dispensed at pill windows by less specialized pharmacy technicians or non-nursing staff. However, psychiatric nurses bring a specialized skill set to the table, including in-depth training on mental illnesses, psychotropic medications, and their potential side effects.

Psychiatric nurses are adept at educating incarcerated persons about their medications, including the intended effects, possible side effects, and strategies for managing these effects. They emphasize the importance of medication compliance and provide guidance on seeking help when needed. Their expertise is particularly valuable in handling incarcerated persons with chronic mental disorders or serious mental illness (SMI), where the complexity of medication management is greater.

These nurses play a crucial role in working with incarcerated persons who are medication non-compliant, especially those requiring forced antipsychotic medication or long-acting injectable (LAI) antipsychotics. Their specialized background equips them to handle these situations more effectively than non-psychiatric nurses, who may lack similar training and experience.

The therapeutic relationships that psychiatric nurses build with incarcerated persons, including those who are particularly distrustful, are vital. By fostering trust and encouraging compliance with court-ordered antipsychotic medications, they can significantly reduce the risk of agitation, assaultive behaviors, and other incidents that may necessitate physical interventions. This not only enhances the safety and well-being of the incarcerated persons but also minimizes risks to staff and reduces the need for forceful measures.

Ex. B-178

In my professional opinion, NaphCare, the contracted healthcare provider for SDSO, maintains more than adequate staffing levels of psychiatrists, psychologists, and psychiatric nurse practitioners to meet the mental health needs of SDSO incarcerated persons with mental disorders and serious mental illnesses. Mental health and psychiatric staff are readily available during regular working hours, and the additional telepsychiatry services further expand access to care.

Emergency psychiatric and psychological services are available around the clock, seven days a week at the intake facilities, specifically the Central Jail and Vista Facility. These facilities also ensure that there is at least 24-hour coverage by nursing and medical staff. This continuous coverage is crucial for addressing incarcerated persons with comorbid medical conditions, as well as for promptly assessing and treating incarcerated persons who engage in self-harm or require urgent and emergent medical attention.

Moreover, mental health staff are present on-site every weekday, with round-the-clock coverage at both the SDSO Main Jail and Vista Facility. Additional staff are available on weekends as needed, and there are arrangements for cross-covering or coming in for special clinical needs or cases. A psychiatrist or psychiatric provider is on-call 24/7, throughout the year, ensuring continuous availability. Mental health staff can also be reached by phone after hours and on weekends when necessary.

The Sure Scripts program enhances the continuity of care for new intake IPs who are on psychotropic medications. This program facilitates the provision of bridge medications until the incarcerated persons can be scheduled for a psychiatric evaluation, usually within 14 days or less. This structured and multi-layered approach to mental health staffing and care delivery effectively supports the diverse needs of the incarcerated person population.

In summary, it is my professional opinion that mental health and psychiatric provider staffing levels at SDSO are sufficient and comport with the correctional standard of care.

*Response to Allegation 2:*
*SDSO Sheriff's Custody Staff Does Not Control Mental Health Care Staff's Clinical Decisions and it assists in the Delivery of Care by Mental Health Professionals.*
Various mental health and nursing staff consistently denied any instances where custody staff interfered with, impeded, or improperly controlled clinical decision-making related to incarcerated persons with mental health needs. While there may have been isolated cases in the past, interviews and observations suggest that custody staff do not currently engage in such behaviors. Overall, it appears that custody staff do not improperly influence or question medical, nursing, or mental health clinical decisions but instead do their best to facilitate care.

Across various SDSO facilities, NaphCare employs a multidisciplinary approach to incarcerated person mental health care, emphasizing the importance of collaboration and effective communication between mental health and custody staff. This teamwork enhances the delivery of quality clinical services. At SDSO, mental health clinicians, nurses, and other healthcare professionals work closely with custody personnel to ensure the provision of safe and effective services to incarcerated persons. Coordinating their efforts to identify incarcerated persons with mental illness and respond appropriately is a crucial aspect of the system's approach, and such collaborative efforts are evident throughout the SDSO system.

There are several notable examples that refute the allegations of interference in clinical decision-making by custody staff. During my observations of Ad Sep Wellness Rounds, I witnessed clear evidence of partnership, collaboration, and mutual respect among custody staff, reentry staff, medical personnel, and

mental health care providers. Interviews with numerous staff members, including sworn officers, captains, lieutenants, and JPMU personnel across various SDSO facilities, confirmed that custody staff do not attempt to override or improperly control health care decisions. Additionally, I verified that health care input is actively included and considered in classification, disciplinary reviews, and SPFRT (safety cell placements). I also witnessed custody staff help a recreational therapist on short notice in order to make a group therapy session occur in OPSD when staff were already diverted for an incident.

*Response to Allegation 3:*
*SDSO Jail Defendants Make Efforts to Continue IP's Mental Health Medications They Were Taking Prior to Detention*
At SDSO, the initiation of psychotropic medication treatment for new intake IPs occurs as clinically indicated. During the intake process, IPs are informed about the availability of both emergency and non-emergency medical and mental health services. They are educated on how to access their healthcare information and are made aware of their right to file a grievance if they are dissatisfied with the care received. They are asked about medication they were taking and any diagnoses/ medical issues.

Following an informational briefing, IPs are shown a comprehensive orientation video (which is repeated multiple times daily in holding cell and intake areas and dayrooms in both English and Spanish). This video provides an extensive overview of SDSO's jail operations, programs, and the rules and regulations that IPs will encounter during their confinement. It also includes detailed information about healthcare services, reinforcing what was covered during the initial intake and ensuring that IPs have a clear understanding of available medical and mental health resources.

During my interviews with nursing, medical, and mental health staff across various SDSO facilities, I found that the identification and continuation of psychotropic medications prescribed in the community prior to an IP's arrival at SDSO are well-managed. At the time of intake and gatekeeping, nursing staff at Central Jail, the Vista Detention Facility, and other facilities within the SDSO system routinely use the Surescripts system to electronically verify any self-reported or community-prescribed psychotropic medications. Surescripts is also used to find any other medications the IP was taking prior to arrest, even if not reported.  Urinalysis testing is also available to find out what is in the IP's system.

Surescripts is a nationwide health information network utilized in California and other states. It supports electronic prescribing and the secure exchange of health information between healthcare providers, pharmacies, and payers. By providing services such as medication history sharing, prescription routing, and clinical messaging, Surescripts enhances patient safety, improves prescribing accuracy, and streamlines the prescription process. This system ensures that healthcare providers have access to up-to-date information on a patient's medications and other relevant health data, which facilitates better-informed clinical decisions and continuity of care for IPs.  This includes the ability to search all pharmacies in the entire county of San Diego.  This is a best practice within any jail system.

Once a current or recent psychotropic medication prescription is verified, the medications are ordered promptly, typically on the same day of intake, through Stat Care medical providers. Pharmacy services are managed by NaphCare Pharmacy, which operates out of Birmingham, Alabama. NaphCare Pharmacy supports correctional facilities across 17 states, offering a range of services including medication distribution and management, clinical support, formulary management, and quality assurance.

The pharmacy management system for ordering and receiving medications is integrated into NaphCare's electronic health record (EHR) system, TechCare®. This integration ensures a seamless process for

**Ex. B-180**

managing and tracking medication orders, contributing to the efficient provision of psychiatric care and continuity of treatment for IPs.

Medications are administered by LVNs. A pharmacy technologist is utilized to manage medication rooms at the larger facilities. A NaphCare pharmacist is available 24/7 for issues or medication related questions. Training on confidentiality, medication related policy and procedures, emergency back-up pharmacy, Surescripts®, eMAR, and TechCare® is provided at new employee orientation and periodically.

**STATCare**
StatCare is a specialized division within NaphCare, which currently provides MAT, mental health, and utilization management services to SDSO. StatCare specifically focuses on offering urgent and emergent healthcare services. StatCare provides:

1. **24/7 Availability**: STATCare operates around the clock, providing immediate medical consultation and support to SDSO facilities whenever urgent care is needed. This immediate support includes medication management for chronic care or MAT patients upon intake or during their time in SDSO.
2. **Telehealth Services**: STATCare leverages telehealth technology to connect on-site medical staff with NaphCare's team of board-certified emergency medicine physicians. This allows for rapid diagnosis and treatment recommendations without the need to transport patients offsite.
3. **Emergency Response**: STATCare provides immediate guidance during medical emergencies, helping to stabilize patients and determine whether further medical intervention is required.
4. **Comprehensive Support**: STATCare supports a wide range of urgent medical needs, including but not limited to, trauma, cardiac events, respiratory issues, and infectious diseases.
5. **Integration with On-Site Care**: STATCare works closely with the on-site medical teams at correctional facilities, ensuring a seamless integration of urgent care services with ongoing patient care.

Overall, NaphCare's STATCare operation aims to enhance the quality of urgent medical care in SDSO, improving patient outcomes, and optimizing the use of resources. The SDSO staff was highly laudatory of the service STATCare provides in their health delivery system.

STATCare medical providers typically issue an initial order for psychotropic medications, including instructions on dosage, duration, refills, and the schedule. This order is intended to bridge the period until a SDSO County Jail psychiatrist or psychiatric provider can evaluate the IP's medication regimen. The duration for initial "bridge" psychotropic medication dosing, provided by Stat Care based on available information, usually ranges from two days to two weeks. This practice ensures continuity of care and is recognized as a best practice in correctional settings, allowing for the immediate management of psychiatric symptoms while awaiting a comprehensive evaluation by a specialized provider.

Based on my review, SDSO utilizes a comprehensive team of licensed and qualified mental health professionals, including both county-employed and contractor staff through NaphCare. This team includes medical, nursing, psychiatric mental health, and pharmacy services professionals, all supported by a robust and effective systemwide electronic medical record system and electronic prescribing capabilities. The integrated approach and established policies enable the proper prescribing, dispensing, delivering, and managing of clinically indicated psychotropic medication regimens for SDSO IPs. This system adheres to accepted correctional health policies, procedures, and practices, ensuring effective and continuous care for individuals in custody.

Ex. B-181

NaphCare has their own central pharmacy, NaphCare Pharmacy located in Birmingham, Alabama for mail ordering, packaging, and supplying medications to various facilities.  Upon arrival at various SDSO facilities, there are pharmacy staff which sort and organize the medications which are then dispensed to IP's by qualified health care staff.  The SDSO intake facilities are well-stocked with a broad array of psychotropic medications. During my tour of the pharmacy areas, I observed a substantial inventory of various classes, types, and doses of psychotropic medications available on-site. This approach aligns with standard correctional health care practices used nationwide. My experience with similar practices in both the State of Rhode Island and the State of Texas—one of the largest state prison systems in the U.S.—reinforces the effectiveness of this model. Additionally, for non-clinical urgent medication needs, there is an established mechanism to quickly obtain necessary medications through designated local community pharmacies.

In my professional opinion, the policies, procedures, and standards implemented by SDSO for verifying recent mental health treatments—particularly those involving psychotropic and pharmacotherapy, past psychiatric diagnoses, and treatment histories—represent best practices in correctional health care. The approach taken by SDSO, including the verification and corroboration of prior psychotropic treatments and the initiation of psychotropic medication when clinically indicated upon an IP's admission, transfer, or while housed within the system, exceeds generally accepted practices in the field.

I acknowledge that occasional missed doses of psychotropic medication can occur. Factors contributing to this include the large volume of prescriptions within the incarcerated person population, the high turnover rate in a large metropolitan jail system, and the challenges posed by the geographical layout of the San Diego County Jail system. Additionally, issues such as the movement of incarcerated persons for court appearances, meetings with attorneys, transfers between units, restrictions during lockdowns, and other transportation or classification challenges can impact medication administration. These factors are further complicated by the ongoing effects of the post-COVID pandemic.

It is important to note that periodic national shortages of psychotropic medications can lead to unplanned supply-chain disruptions, making certain medications temporarily unavailable from pharmaceutical manufacturers. Despite these challenges and the inherent imperfections in any correctional or general health system, I found no evidence indicating that any isolated incidents of missed psychotropic medication doses at SDSO led to immediate or delayed clinical decompensation or further issues. There were no documented instances of undue delays resulting in self-harm, suicide attempts, completed suicides, or serious harm to incarcerated persons due to these medication delays.

In summary, my review confirmed that the SDSO maintains an effective medication management system across its facilities. There were no delays or deficiencies in patient care that violated generally accepted standards for a county jail facility. The system effectively supports both outpatient and inpatient mental health services, including the timely identification and referral of incarcerated persons with acute or chronic mental health needs, serious mental illness (SMI), or those requiring psychotropic medication treatment. Even incarcerated persons with no immediate clinical needs, except for recent psychotropic medication treatment, are appropriately referred for follow-up mental health and psychiatric evaluation and care.

I did not find any delays in the prescribing or delivery of psychotropic medications, nor in the provision of mental health treatment for new intake incarcerated persons at SDSO. Based on my review of records, the time frames for screening, referral, psychiatric evaluation, verbal or in-person medication orders, and obtaining informed consent were all within the standard of care for correctional psychiatry. The processes for verifying medication details, ordering, filling, dispensing, and administering medications were clinically appropriate and consistently implemented across various SDSO facilities.

Ex. B-182

In summary, SDSO's systems for identifying incarcerated persons who were recently prescribed psychotropic medications, as well as for administering and distributing these medications, meet or exceed both correctional health and community standards of care. Therefore, it is my professional opinion that SDSO maintains an adequate and effective psychotropic medication administration and distribution system.

I find that the policies, procedures, and protocols for administering psychotropic medications at SDSO align with the generally accepted practices for a county jail facility. Documentation indicates that psychotropic medications are administered by trained medical staff who are qualified to dispense these medications. The use of formulary medications, as well as the approval process for non-formulary medications, adheres to national correctional standards.

*Response to Allegation 4:*
*The Sheriff's Department Provides IPs With Timely Access Mental Health Care*
According to the NCCHC Standards for Health Services in Jails, 2018, Jail Standard J-A-01, page 3, Access to care is defined, "access to care means that, in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment and receives care that is ordered."

As detailed elsewhere in this report, twenty-four-hour nursing staffing is maintained at the three intake facilities. Dedicated Registered Nurses (RNs) are assigned to play a critical role during the intake process, ensuring that individuals with acute or chronic mental health issues, risks of suicide or self-harm, recent psychotropic medication treatments, or other mental health needs are appropriately screened and referred for further evaluation. These RNs provide additional wristbands for visual identification or arrange for special housing, such as a safety cell, to manage these individuals in a clinically appropriate and timely manner.

This nursing assessment process occurs around the clock at the Central Jail, Las Colinas, and the Vista Detention Facility. While nurses perform gatekeeping functions, their role is not intended to impede or delay access to medical or mental health services. Instead, it ensures that individuals receive timely and appropriate care based on their needs.

To clarify further, Registered Nurses (RNs) at the intake facilities are primarily responsible for assessing whether a new intake person (IP) is medically safe and stable from both a medical and mental health perspective to proceed with the booking and intake process. If an IP is deemed to require further evaluation, they are promptly transported offsite to a local emergency department for comprehensive medical or psychiatric assessment and clearance.

Mental health staff confirmed that qualified mental health professionals are available around the clock at all three intake facilities—Central Jail, Las Colinas Detention Facility, and Vista Detention Facility. These staff members are ready to address any mental health needs that arise during the intake process or thereafter.

As previously discussed in this report, Registered Nurses (RNs) at SDSO facilities, especially in the absence of an onsite qualified mental health professional, serve a critical role as mental health "Gatekeepers." This role is integral to the SDSO system's operations. In their capacity as Gatekeepers, RNs conduct assessments to address immediate medical needs, mental health concerns, and suicide risks. They ensure that IPs receive timely and appropriate medical attention and are placed in safe housing based on their assessed health status.

At the Central Jail, which handles the highest volume of new intakes, the Gatekeeper role has a strong emphasis on mental health. To facilitate this, the gatekeeping nursing staff use color-coded passes on

**Ex. B-183**

booking slips and wristbands. These visual indicators help provide clear and universally understood cues for both sworn custody staff and health services personnel, ensuring that IPs with identified needs are properly managed and supported throughout the intake process.

Upon identifying a mental health concern, such as potential self-harm or suicide risk, the RN functioning as a "Gatekeeper" assigns a color-coded pass to the IP. This pass helps determine the appropriate custody placement within the Detention Safety Programs housing options, which include Safety Cells, Enhanced Observation Housing (EOH), Psychiatric Stabilization Unit (PSU), and Medical Observation Cells. This placement process is communicated verbally in real-time and is supported by visual priority cues, including color-coded passes and wristbands, to ensure all staff are aware of the IP's status and needs.

In addition, nursing staff conduct a query of a county-wide data system to review recent psychotropic and non-psychotropic medications. This is particularly crucial when an IP has been prescribed medications like steroids, antibiotics, or other drugs requiring specific administration times or durations. Access to this comprehensive data system is a best practice in jail correctional health, as it allows for accurate verification of medication histories, which is essential for maintaining continuity of care and addressing patient safety risks. This process is especially valuable for IPs who may struggle to recall their medication history or provide reliable information about their medication schedules.

When a new IP arrives at the SDSO Main Jail or the Vista facility, or if an IP with a history of prior detentions undergoes the intake process, their current and previous medical and mental health records are accessible throughout their time in the SDSO system. In addition, should there be any past or recent mental health or medical records from a psychiatric hospital, state hospital, or the SDCR, these records could be similarly accessed by mental health and medical staff. This ensures that all relevant medical and mental health information is available during screening and ongoing care.

As outlined earlier in this report, if SDSO custody staff observe any concerning signs related to an IP's mental health during intake or throughout incarceration—such as unusual speech, behavior, or impairments in daily activities—they have the protocol to refer the IP to mental health staff. Both custody and mental health staff, based on interviews, affirmed that mental health staff respond promptly to these referrals, addressing emergency issues immediately and non-urgent matters on the same day. This responsiveness was corroborated by the random sample chart review.

In my professional opinion, SDSO demonstrates a robust and timely approach to mental health screening for IPs upon their admission to intake facilities. The system ensures that every IP receives a comprehensive mental health evaluation upon entry, with subsequent screenings and evaluations conducted when an IP is transferred between SDSO facilities.

Mental health services include timely re-evaluation and referrals to psychiatric professionals when clinically indicated. IPs have access to submit health services requests concerning mental health issues, psychotropic medication side effects, or concerns about medication effectiveness. They can also request changes to their psychotropic medication regimen.

The S'SO's sick call triage process is clinically appropriate and ensures that IPs are referred to qualified mental health professionals as needed. This system supports effective management of mental health needs and medication adjustments, reflecting a commitment to maintaining high standards of mental health care.

Based on my review, psychiatric and behavioral health services are readily available across all SDSO facilities. The system demonstrates a strong focus on several critical areas. The triage of sick call

Ex. B-184

requests is handled effectively, ensuring that mental health needs are promptly prioritized. There is a robust approach to suicide prevention, including early identification and management of at-risk individuals. Crisis stabilization is addressed with immediate support during mental health crises. Additionally, the initiation, continuation, and adjustment of psychotropic medications are managed in a timely and appropriate manner. Overall, SDSO appears to provide timely and high-quality psychiatric and behavioral health care.

Through my review, I determined that incarcerated persons presenting with current mental health needs are promptly referred to and receive timely mental health services. It is evident that only mental health professionals are authorized to remove incarcerated persons from suicide watch, which aligns with best practices in the field. Additionally, there is a clear standardization in the processes for mental health screening, evaluation, referral, and follow-up. Opportunities exist for targeted behavioral health interventions and psychoeducational programs, as well as ongoing mental health and nursing follow-ups. Custody staff also provide consistent monitoring for incarcerated persons placed in safety cells or those exhibiting self-harm, suicide attempts, or other disruptive behaviors that result in disciplinary issues.

**Mental Health Group Therapies**

I was particularly impressed by the efforts to provide a variety of group therapies aimed at incarcerated persons with serious mental illness (SMI) and co-occurring substance use disorders. Implementing group therapy in a jail setting presents unique challenges, including legal and confidentiality issues, as well as the need for specific safeguards. For instance, many incarcerated persons are pre-trial and awaiting the resolution of their legal cases. This context raises concerns about potential disclosures during therapy sessions that could impact an incarcerated person's legal defense or the safety and security of the facility.

I observed two different group therapy sessions designed for incarcerated persons with serious mental illness (SMI) and co-occurring substance use disorders. The group therapy leaders and their chosen modalities were clinically appropriate, maintaining proper roles and boundaries in accordance with both correctional and community standards of care. Custody staff were present peripherally to ensure the safety of mental health staff and incarcerated persons, but they did not interfere with or disrupt the therapeutic processes.

I was particularly impressed by the variety of psychotherapeutic group activities offered. These sessions included educational components focusing on psychoeducation, medication management, understanding mental illness, and addressing stress related to incarceration and pending legal issues. The breadth and diversity of these activities reflect a well-rounded approach to meeting the complex needs of the incarcerated person population.

**Multidisciplinary Treatment Team Meetings**

During my tours of the Ad Sep (Administrative Separation) units at the George Bailey Detention Facility, I observed a multidisciplinary classification review and treatment team meeting. This meeting included nursing, custody, classification, and mental health professionals, including direct care therapists and mental health leadership. The purpose was to discuss complicated or problematic patients, and it was clear that mental health clinicians were well-versed in implementing clinically appropriate treatments.
The services provided included psychotherapy, psychoeducation, and targeted psychotropic medication management, all delivered by qualified mental health staff. These professionals demonstrated familiarity with ongoing continuing education in therapies such as Cognitive Behavioral Therapy (CBT) and Dialectical Behavior Therapy (DBT), particularly for issues like self-harm or self-injury. This approach contrasts with some national practices in jail and prison settings, where there is often an overreliance on psychotropic medication with limited non-medication interventions.

In the SDSO system, I found a well-balanced approach that integrates psychotherapy with psychotropic medications. This balance ensures that treatment for serious mental illness (SMI) is both clinically appropriate and comprehensive, addressing both therapeutic and medication needs.

**Onsite Psychiatric Stabilization Units and Treatment Programs**
Further countering the claim, the SDSO provides a diverse array of mental health treatment units, including specialized inpatient psychiatric units at the SDSO Main Jail for male IPs and the Las Colinas facility for female IPs. Both of these facilities have earned LPS certification from the County of San Diego Department of Health Services, recognizing them as accredited psychiatric units.

In these units, particularly the Psychiatric Stabilization Units (PSU), incarcerated persons with serious mental illness (SMI) are encouraged to participate in a range of therapeutic activities. During my tours of the PSU, I observed firsthand the commitment of mental health, nursing, recreational therapy, and custody staff in engaging this treatment-resistant population through various out-of-cell activities.

The weekly schedules provided reflect that IPs in the PSU are actively involved in creative and recreational therapy, not merely confined to their cells. This engagement demonstrates a proactive approach to addressing their mental health needs, contrasting with any claims suggesting a lack of therapeutic intervention or reliance solely on psychotropic medications.

The Mental Health/Behavioral Health programs offered across various SDSO facilities are summarized below:

Ex. B-186

**Mental Health/Behavioral Health Program Summaries**

- **Psychiatric Stabilization Unit (PSU/WPSU):** An LPS (Lanterman-Petris-Short) licensed facility is one that offers a 24-hour psychiatric program for voluntary and involuntary mental health treatment. PSU is a LPS certified acute care psychiatric unit whose services are available in the Sheriff's Department located at the San Diego Central Jail and the Las Colinas Detention and Reentry Facility.

- **Outpatient Step Down (OPSD):** A specialized mental health housing unit within our facility, designed to house patients with mental illness who are most at-risk for stigma and/or victimization from higher functioning patients in our criminal justice system. These patients experience serious, and often chronic, mental illness, but their level of care remains below the threshold of PSU (inpatient) level of care. Many of our identified OPSD patients have a history of multiple LPS admissions in the community, IMD placements, 1368/1370, EOP while at CDCR, Regional Center Clients and/or PSU admissions. Some are connected or have a history of being connected with Assertive Community Treatment (ACT) or county case management agencies. However, these alone are not always the qualifying factors for placement. The module has assigned QMHPs who are primarily responsible for their mental health care/monitoring. The patients assigned to OPSD essentially are unable to maintain their safety in the community without a higher-level of mental health services and support in place and may require assistance with discharge planning.

- **Jail Base Competency Treatment (JBCT):** A specialized treatment program for patients who have been accused of felony crimes and are deemed incompetent to stand trial (IST) by the courts. This program is designed to provide care, treatment, and services to assist patients in achieving competency in the jail, rather than waiting for a DSH bed to become available. Patients who are not restored to competency at the time that their bed becomes available at DSH can then be transferred for continued restoration services.

- **Early Access Stabilization Services (EASS):** EASS is a specialized treatment program for IST defendants that provides them with early access to enhanced treatment services while the individual is in jail awaiting placement into a state hospital or JBCT program. A primary goal of the EASS program is to evaluate patients, stabilize them psychiatrically, and provide treatment with individualized medication therapy. Once stabilized, individuals can transition into a competency restoration program at an inpatient level with having already received some restoration services prior to entry into a state hospital or JBCT program. The EASS program includes weekly psychiatric appointments, daily nursing services, weekly counseling, and psychological assessments.

- **Medication Assisted Treatment Program (MAT):** A specialized behavioral health treatment programming module for those who meet the DSM-V criteria for opioid use disorder. The goal of the program is to mitigate overdose, promote recovery, reduce recidivism, and support a healthy lifestyle. This is a program of intensive services such as weekly individual therapy, group therapy and medication management. MAT program participants are also linked to outside community services to prepare for release.

- **Outpatient Mental Health Services:** Incarcerated persons who meet the clinical need for ongoing mental health follow up services with Mental Health Clinicians and psychiatry within their current housing assignment. These patients engage with mental health staff for psychiatric medication management, individual therapy, group therapy and crisis intervention.

**Onsite Jail-Based Competency Restoration Treatment Program**

The SDSO offers a distinctive and high-quality forensic program, featuring a dedicated jail-based Competency to Stand Trial (CST) restoration evaluation and treatment services program located within the San Diego Central Jail in San Diego, California. This program represents a significant resource for both San Diego County and the State of California, enhancing the efficiency and capacity for providing timely referrals, admissions, and treatment interventions aimed at restoring competency to stand trial. It also facilitates the diagnosis, evaluation, and treatment of individuals with mental disorders.

California faces a notable shortage of state hospital CST bed capacity, and this limitation has led to documented litigation issues in the past. Before the establishment of the innovative jail-based CST program, there were frequent delays in the referral and transfer of individuals requiring court-ordered inpatient CST restoration services. The onsite CST program at the San Diego Central Jail addresses these challenges by mitigating potential delays—some of which could extend to months—associated with transfers to and from state hospitals. This setup helps maintain continuity of care and reduces the risk of interruptions in psychotropic medication regimens, thereby offering a more streamlined and effective approach to managing individuals with competency-related needs.

Having a Competency to Stand Trial (CST) restoration treatment program located onsite at the Central Jail, along with other specialized mental health treatment programs, is a significant strength for both the jail system and the County. This onsite CST program is a considerable advantage, as it eliminates the need to transfer all incarcerated persons to state hospitals—transfers which often involve long wait times and potential disruptions in continuity of care. By providing these services within the county jail, the program reduces the risks associated with medication discontinuity and the challenges of managing care during transitions between facilities. This approach enhances the efficiency and effectiveness of mental health treatment for individuals facing competency issues, offering a streamlined and integrated solution to address their needs.

**Outpatient Step Down (OPSD) Program**

Any custody, medical, nursing, psychiatric provider, or qualified mental health professional may refer any IP to the OPSD program. The below OPSD checklist is completed by a mental health clinician or other qualified mental health professional:

**Ex. B-188**

Facility: _____   Referring QMHP:_____   Date: _____

## OPSD Referral Checklist

Patient Name: _____   Booking Number: _____

*Patient is not required to meet ALL criteria to be referred to OPSD. Please consult with your supervisor if patient does not appear to meet substantial criteria.*

**Place a check mark next to applicable criteria to determine appropriateness for OPSD:**

**Diagnosis (Current/past/suspected)**
- ☐ Schizoaffective Disorder or Schizophrenia
- ☐ Bipolar Disorder
- ☐ Cognitive impairment (TBI, dementia, etc.)
- ☐ Autism or other spectrum disorders
- ☐ Significant intellectual disability (with RCC or not)
- ☐ Other diagnosis: _____

**Personal Hygiene/Grooming**
- ☐ Limited hygiene and grooming
- ☐ Naked most times in cell
- ☐ Unwilling/unable to shower w/o prompting
- ☐ Unkempt/Malodorous
- ☐ Soiled clothing
- ☐ Wearing clothes inappropriately
- ☐ Other ADL concerns:
  _____

**Cell Hygiene**
- ☐ Trash/food/clothing on floor
- ☐ Soiled bedding/mattress
- ☐ Items stuffed into toilet
- ☐ Flooding cell

**Communication and Socialization**
- ☐ Unable/unwilling to verbalize needs
- ☐ Mute or Catatonic
- ☐ Difficulty following directives
- ☐ Impulsive or intrusive behaviors
- ☐ Inability to engage in appropriate social interactions
- ☐ Other impairments due to overt symptoms:
  _____

**Housing**
- ☐ Multiple unsuccessful mainline housing attempts
- ☐ Regularly disrupting milieu (e.g., loudly responding to internal stimuli)
- ☐ Challenged with advocating for personal needs
- ☐ Prone to victimization due to impairments

☐ **OPSD placement recommended**
☐ **OPSD placement deferred**

[ Submit Form ]

The following is a description of OPSD and PSU Programming opportunities for IPs in the OPSD or PSU. This demonstrates the SDSO and QMHP's commitment and organized efforts to provide out of cell group activities and group therapy activities.

**Ex. B-189**

**Outpatient Step Down (OPSD) and Psychiatric Stabilization Unit (PSU) Programming**

- Group programming is currently happening in three areas of the facility: PSU, OPSD and 4th floor mainline housing.

- PSU facilitates community meetings 4x per week by the Recreational Therapist (RT) in the morning. The RT also facilitates a recreational group in the afternoons varying in activities including Karaoke, drawing, bowling, exercise and gardening.

- The PSU clinicians facilitates at least one psycho educational group per week in addition to meeting with every patient individually.
  - Group topics
    - Anxiety coping skills
    - communication and expressing feelings
    - positive affirmations
    - sleep hygiene

- OPSD programming occurs where IP's are able to join in a group and socialize. We have two assigned OPSD clinicians alternate as group facilitators. The RT also facilitates a group in OPSD weekly.
  - Group Topics
    - Process Group
    - Emotions Management
    - Socialization (interpersonal relationships)

- Groups in mainline on the 4th floor are facilitated by the mental health case management clinicians (MHCMC: pre-licensed MH clinician, master's level). Each MHCMC facilitates a weekly group regarding a specific topic for about 6-8 weeks. This allows the 4th floor to attend two different groups per week.
  - Group topics
    - Interpersonal Effectiveness
    - Depression Management/coping skills
    - Anger Management/coping skills
    - Anxiety Management/coping skills
    - PTSD Management/coping skills

- The assigned clinicians utilize incentive items (cookies, hygiene products, etc.) to encourage/maintain progression in the specialty modules including PSU, OPSD and AdSep.

- Animal/pet therapy is conducted in collaboration with volunteer group "Love on a Leash". LOAL brings in several support animals to engage with our PSU, OPSD and AdSep patients. The patients are able to engage with the animals and

- We have Discharge Planners at both of our main male and female booking facilities. The DC planners collaborate with our Reentry Services Division (RSD) to ensure successful community linkages occur seamlessly.

**Ex. B-190**

**Outpatient Mental Health Services**

Based on a review of a random sample of mental health charts, it is evident that SDSO delivers appropriate continuity of care and adheres to clinically ordered and suitable mental health and psychiatric treatment services. Specifically, with regard to intake evaluations, follow-ups, and the frequency of mental health encounters, SDSO meets the correctional standard of care for individuals on the mental health caseload. This includes those on psychotropic medications requiring psychiatric evaluation and follow-up, as well as individuals in restrictive housing settings, including health and welfare checks. Access to mental health care services is in alignment with established correctional standards.

In conclusion, it is my professional opinion that there is adequate access to care by qualified mental health professionals within SDSO.

Individuals demonstrating clinical deterioration, mental symptoms, problematic behaviors, clinical impairments, declines in daily living activities, self-injurious behaviors, suicidal ideations, or suicide attempts are triaged by nursing or mental health care staff. These individuals are then referred to mental health professionals in accordance with the correctional health standard of care.

The implementation of a systemwide electronic medical record (EMR) system has significantly improved access to patient data, including mental health records, laboratory results, medication lists, and allergies. This advancement meets the standard of care, as it allows nursing, mental health, and other healthcare staff to access and share relevant patient information in real time, marking a notable improvement over traditional hard copy documents.

NaphCare healthcare staff effectively utilize the EMR system in a consistent and clinically appropriate manner. They generate essential mental health documents, including the Intake Mental Health Screening, "Gatekeeper" Nursing and Medical Intake Screening, and progress notes. The use of these documents across a multisite jail system aligns with the correctional mental health standard of care.
The EMR system comprehensively includes crucial mental health and clinical history, such as suicide attempts, suicidal ideation, mood, other mental health symptoms, psychiatric treatment history, and psychotropic medication history. Additionally, it allows for the inclusion of freehand documentation, ensuring a thorough and flexible approach to patient care.

The SDSO facilities offer a comprehensive range of mental health services to individuals in custody, including on-site crisis intervention, psychotropic medication management, and both on-site and telepsychiatric diagnostic evaluations and re-evaluations by psychiatrists and psychiatric midlevel professionals. There is substantial evidence of effective teamwork, collaboration, and communication among correctional, nursing, medical, and mental health staff. Significant efforts are made to identify individuals with mental health issues, providing timely referrals, evaluations, and follow-ups as clinically indicated.

In my professional opinion, there is a consistent and effective continuity of mental healthcare throughout incarceration, during unit transfers, and leading up to eventual release.

**Treatment Plans & Timely Communication.**

In preparing this report, I reviewed numerous medical records for individuals in custody at SDSO. The records demonstrate that SDSO provides comprehensive treatment plans, ensures timely communication, and coordinates multidisciplinary care among psychiatric and mental health staff, nursing staff, medical providers, and custody staff. This level of care is consistent with correctional standards and significantly mitigates the risk of harm to individuals, as well as reducing the likelihood of clinical deterioration or decompensation.

Ex. B-191

In short-term jail settings, developing and refining targeted treatment plans for patients with mental health conditions can be challenging. However, based on my review of the SDSO system, chart reviews, and interviews with mental health staff, it is clear that SDSO staff make sincere efforts to address patients' issues, build on their strengths, involve them in their treatment development, and employ various strategies to prevent relapse.

In my review of SDSO medical and mental health records, I found them well-organized by section and category, making them easily accessible even without NaphCare EMR training. The records demonstrated a timely response, evaluation, and treatment of medical and mental health requests from individuals in custody. There was a clear pattern of patient-centered treatment planning, including efforts to obtain informed consent, detailed treatment plans, and thorough documentation of all mental health and psychiatric encounters.

While no EMR system is perfect, especially in correctional settings, the existing EMR at SDSO shows significant improvements. Feedback from healthcare and administrative staff on potential improvements is valuable, but the current system already provides accessible links to vital signs, medication orders, lab results, treatment plans, and prior encounters. This integration means there is no justification for mental health clinicians, psychiatric providers, or mid-level practitioners to duplicate information, which was more common with paper charts.

Based on my record review and interviews with NaphCare and SDSO staff, there is clear evidence of ongoing multidisciplinary, individualized treatment planning tailored to the acuity and complexity of each patient. Additionally, the EMR records I reviewed include documented treatment planning and psychoeducation.

Treatment planning should focus on the process rather than extensive documentation. Although there are no specific correctional standards for the duration or amount of treatment planning documentation, the SDSO mental health classification and EMR system effectively supports access to care and continuity. The system allows for additional detail in complex cases, ensuring appropriate and individualized care.

In summary, it is my professional opinion that the SDSO provides IPs with timely access and a continuum of multidisciplinary mental health services.

*Response to Allegation 5:*
*The Sheriff's Department Provides a Robust Mental Health Delivery System and Is Able to Provide Timely Access to Care and Mental Health Treatment to IPs with Ongoing Mental Illness*

**Continuum and Scope of Behavioral Health Services:**

Despite claims of inadequate mental health services, my review found that psychotropic medication prescription, administration, monitoring, and additional laboratory testing meet both correctional and community standards. The SDSO's classification and housing system is robust, ensuring individual assessments for mental health placement, treatment needs, supervision, and privileges. There was no evidence of excessive seclusion or restraint. For court-ordered involuntary antipsychotic medications, I verified that extensive efforts were made by nursing, mental health, and custody staff to encourage voluntary compliance before resorting to forced medication administration.  The two involuntary medication instances I observed also demonstrated that the custody staff used every effort to gain

compliance without any use of force; they were able to simply hold the person(s) while the medical personnel administered a shot.

I also confirmed that there is ample new deputy and health care staff training and refresher training regarding a variety of mental health and substance use disorder, management of opioid overdose, and in particular suicide prevention training materials. Melissa Quiroz, mental health director, provided several examples of SDSO Training Bulletins including the following:

1. Mental Health Clinic Appointment Types, dated 5/14/2024
2. Outpatient Stepdown Program (OPSD), dated 3/28/2024
3. NETRMS Self-Harm Incident Reporting and Review, dated 10/28/2020
4. Documenting 5150 Applications – Qualified Mental Health Professionals, dated 3/28/2024
5. ADA Cognitive Assessment – Mental Health, dated 5/31/2024
6. Ad Sep Weekly Check Tracking, dated 9/1/2023
7. Cosigning Queue for QMHP Case Managers, dated 1/16/2024
8. In Custody Suicide Attempt Flag, dated 3/28/2024
9. Managing Sick Calls – QMHP, dated 6/12/2024
10. MDG (Multi-Disciplinary Group) Meeting, dated 10/1/2022

SDSO provides a comprehensive range of jail-based behavioral health services, including mental health screening, intake assessments, suicide risk evaluations, and follow-up after suicide watch removal. For those incarcerated long-term, mental health follow-ups are tailored to clinical acuity and need. Mental health staff offer ongoing suicide precaution measures, such as rounding, supportive interventions, and referrals to psychiatrists and psychiatric nurse practitioners for further evaluation and medication adjustments. SDSO mental health staff are accessible through face-to-face interactions, phone calls, emails, and other electronic communications.

1. Any SDSO custody, medical, or mental health care staff may place an IP identified to be at current risk for self-harm or suicide attempt. Importantly, only QMHP's, and not custody or medical staff may "clear" (e.g. remove) IPs from watch status.
2. There are coordinated multi-disciplinary treatment team efforts to identify and intervene whenever any IP is determined to be IST (Incompetent to Stand Trial) and receiving California DSHS (Department of State Health Services) EASS (Early Access Stabilization Services).
3. One example includes the SDSO mental health treatment team's efforts to initiate IMO (Involuntary Medication Orders) for IPs who are gravely disabled and presenting as being IST, as opposed to delaying antipsychotic medication treatment.
4. I understand that Liberty Health Care is the contracted DSHS vendor that provides implementation and assistance with EASS for SDSO IPs. These Liberty Health Care PSU charge nurses help facilitate treatment interventions for IPs with SMI's and IST at the Central Jail, Las Colinas, and George Bailey Detention Facilities.
5. Short-term individual therapy is offered to IPs with adjustment and depressive disorders and other situational issues.
6. SDSO mental health staff periodically round on IPs housed in "watch cells," EOH, and the psychiatric stabilization unit.
7. In the SDSO any staff member (custody, medical, or mental health) can place an IP on suicide watch precautions, and any behavioral health staff member can evaluate a jail incarcerated person on suicide watch. There is an established practice that only a mental health master's level clinician has the ability and authority to recommend the removal of an IP from a suicide

Ex. B-193

watch. This mirrors practices within community settings, or non-correctional systems, where any qualified mental health professional may remove someone from a suicide watch, occasionally with additional case consultation when clinically indicated from a psychiatrist or psychiatric advanced practice provider (APP) nurse practitioner.

8. SDSO mental health staff have created and implement several specialized treatment modalities or interventions designated for jail detainees with: schizophrenia and other chronic psychotic disorders, (SMI), dual diagnosis (SMI with co-occurring substance use disorders), or special populations (juveniles, pregnant females, transgender/gender dysphoria, individuals with intellectual impairments, or individuals with dementia, neurocognitive or head injuries).

9. As in most short-term, rapid turnover jail settings, group therapy is particularly challenging. Furthermore, group therapy has been severely impacted in jails and prisons nationally during the COVID-19 pandemic to avoid the spread of disease. These groups appear to be rebounding in the county jails.

10. Based on chart reviews and via chart reviews, it was clear that the psychiatrists and psychiatric APP's demonstrated the requisite clinical familiarity, knowledge, and comfort in prescribing anti-psychotic and other psychotropic medication treatments for jail IP patients as standing agents, emergency psychotropic medications, and that they implemented the use of other medications (e.g., Benadryl or Cogentin, Beta blockers) or dose adjustments when an IP developed antipsychotic medication related side effects.

11. The use of involuntary (compelled or forced) standing antipsychotic medications is particularly complicated within a short-term jail setting. During numerous interviews with nursing and mental health care staff across the state, and also as spelled out in NaphCare SDSO policy, I learned that if and when there is a clinical question involving the clinical necessity, consideration of the clinical necessity and/or appropriateness of forced antipsychotic medications, or the need to begin to pursue this process with due process protections for IP patients who may be subjected to involuntary administration of psychotropic mediations (when clinically indicated as a means of treating psychiatric illness or urgently reducing harm, dangerousness, or severe violence towards self or others), that the NaphCare treating psychiatrists who have offices near the Psychiatric Stabilization Unit (PSU) are readily available to discuss by phone, or alternatively, an on call psychiatrist or psychiatric provider is available 24 hours per day, 365 days per year, even afterhours and on weekends. I understand this same process to be in place for orders of emergency clinical seclusion or restraint. The NCCHC Essential Standard J-G-03, page 133 (NCCHC Standards for Health Services in Jail–) - Emergency Psychotropic Medication, requires that health staff follow policies developed for the emergency use of force psychotropic medication as governed by the laws applicable in the jurisdiction.

**Accessibility of Inpatient Mental Health Treatment.**

At SDSO, there is a comprehensive continuum of care that includes access to intensive inpatient mental health services. When clinically indicated, IPs are promptly referred and transferred to the inpatient units at the Central Jail (for males) and Las Colinas (for females). These referrals are handled in a timely manner, with immediate action taken when necessary. NaphCare inpatient psychiatric and mental health staff, along with SDSO custody and administration leaders, collaborate as needed to prioritize and manage inpatient referrals.

IPs who are admitted to an Inpatient Treatment Program (which are programs licensed by the local San Diego County Department of Health Services) are provided several inpatient services. Specifically, they receive at least one daily evaluation by a psychiatrist, and at least one daily check-in by a QMHP.

In my professional opinion, the inpatient intensive mental health care and treatment services provided at the specially designated, independently licensed facilities at the Central Jail and Las Colinas meet or exceed the standard of care.

**Availability of An Onsite Jail Based Competency to Stand Trial Restoration Program**
This is described earlier in this report.

**Widespread Availability of Educational and Therapeutic Programming**
The SDSO offers a diverse range of educational and therapeutic group programming for its IP population. This programming includes topics such as anger management, anxiety, mindfulness, coping with incarceration, grief support, post-release planning, medication education, parenting, journaling, self-care, and many other areas.

I reviewed various schedules, outlines, and lists of the group activities (both therapeutic and education) offered by SDSO and find them to be appropriate and proper for the treatment of IPs on the mental health caseload.  Group programming is organized and offered through various forms.  Group psychotherapy is facilitated by qualified mental health professionals, as is the standard of care.  The groups are properly facilitated by qualified mental health professionals and are offered on a frequent basis (examples are provided earlier in this report).  There are a variety of other educational groups that might include group leader involvement from custody staff alone or paired with a mental health professional.  It is unnecessary for a qualified mental health provider to facilitate all groups.

Ideally, individual and group counseling, self-help groups, residential programs, and clinical management are well-coordinated. Policies and procedures clearly define the roles and collaborative areas of the treatment and healthcare teams. Community self-help initiatives, like Alcoholics Anonymous and Narcotics Anonymous, can serve as valuable supplements or alternatives to staff-provided counseling.

Like other county jail systems, SDSO must remain vigilant against infectious diseases such as tuberculosis, drug-resistant tuberculosis, and COVID-19. During the recent COVID-19 pandemic, SDSO reduced group therapy and out-of-cell time as part of public health measures recommended by the CDC and local health departments. These measures were not punitive but aimed at minimizing COVID-19 spread, especially given the medical and mental health vulnerabilities of many IPs. In the post-pandemic period, SDSO continues to implement effective medical quarantining and cohorting to mitigate transmission risks and closely monitor new intakes.

Lastly, SDSO mental health staff, if not bilingual and bicultural, have access to professional interpreter and sign-language services. This ensures that language interpretation is consistently provided as needed during mental health treatment encounters for non-English-speaking IPs and those with other disabilities.

In summary, there is clear evidence of a comprehensive continuum of mental health services at SDSO, including psychiatric evaluation, re-evaluation, individual diagnostic assessments, psychotropic medication treatment (when clinically indicated), and treatment planning. This involves real-time, in-person coordination and multidisciplinary planning among mental health, medical, custody deputies, counselors, JPMU (classification), and other staff across various custody levels and all seven SDSO County Jail facilities. This includes the following areas:

**Ex. B-195**

- Booking/intake
- General population housing
- IPs who require MOB (medical observation or infirmary bed) housing
- EASS (Early Access and Stabilization Services)
- Outpatient Stepdown (OPSD)
- IPs in the Competency to Stand Trial Restoration Program (JBCT)
- IPs in the PSU (psychiatric stabilization unit)

*Response to Allegation 6:*
*The Sheriff's Department Provides Opportunities for Confidential Mental Health Care Encounters in Adequate Physical Spaces*

SDSO mental health staff conduct cell-front encounters and in-person assessments in confidential settings when clinically indicated. They perform focused mental health evaluations for IPs on suicide watch "n "Watch Cel"s," Enhanced Housing Observation (EOH), or other watch statuses. In my professional opinion, this practice is clinically appropriate.

From a mental health and psychiatric perspective, cell-front encounters for individuals on suicide watch or other watch statuses do not inherently increase the risk of self-harm. The primary goal is to ensure safety, monitor for self-injury or suicide attempts, and assess the need for continued watch status and monitoring frequency. Extended diagnostic interviews or psychotherapy are not the focus during these encounters; rather, the aim is to maintain safety and evaluate ongoing risk and daily functioning.

If a patient on suicide watch or other watch status shows clinical deterioration, further self-harm, or suicide attempts, nursing and mental health staff will re-evaluate the patient. This re-evaluation aims to identify additional behavioral management strategies, treatment plans, programming, and possible interventions, including the transfer to a higher level of care such as an inpatient psychiatric unit, medical clinic (for self-harm), or other clinical management. The ultimate goal is to provide the least restrictive environment that remains clinically appropriate, with frequent assessments to determine if continued watch status is justified.

Some may argue that individuals on watch status should exclusively be seen in private, confidential settings to avoid risks associated with cell-front encounters. However, this is a complex clinical decision that must balance safety concerns with practical considerations. Conducting assessments in a private setting involves additional custody, escort, and safety measures. Even with stringent supervision, there is a risk that an individual on suicide watch could access objects that could be used for self-harm or suicide attempts. Therefore, the decision to conduct cell-front encounters or private assessments involves evaluating these risks and ensuring the overall safety and effectiveness of the mental health care provided.

**Privacy & Confidentiality in Mental Health Encounters.**
According to the NCCHC Important Standard – Jail-A-07, page 17 (NCCHC 2018 Standards for Health Services in Jails) – Privacy of Care, health care encounters and information exchanges must remain private. The NCCHC acknowledges that ensuring privacy can be challenging when triaging health complaints at an IP's cell, in segregated or supermax housing, or during intake interviews. When cell-side triage or intake interviews are necessary, health staff are expected to take extra precautions to

**Ex. B-196**

promote private communication. The most recent report for all SDSO complexes should detail how these standards are met.

In my professional opinion, SDSO IPs are provided private meeting spaces to maintain confidentiality during mental health encounters. Confirmations from mental health and custody staff during my March and May 2024 tours support this. If an IP refuses this setting, mental health staff seek to understand the reasons and, if symptoms suggest a psychotic disorder, increase monitoring. They may refer the patient for a detailed mental health evaluation, consider a psychiatric assessment, and adjust the monitoring frequency. If necessary, the patient may be transferred to the inpatient psychiatric stabilization unit. These practices align with correctional standards and aim to ensure the safety of IPs, especially those on watch.

*Response to Allegation 7:*
*The Sheriff's Department Does Not House IPs at Risk of Suicide in Punitive Isolation: Strategies Are Employed to Avoid Unnecessary and Undue Risk of Decompensation and Harm*

Contrary to some concerns, I found that IPs with recurrent behavioral problems are provided appropriate access to mental health treatment. SDSO IPs with severe personality or impulse control disorders who engage in recurrent problem behaviors, such as staff assaults or rule violations, receive proper care and continuity of treatment from NaphCare and County mental health staff. This care aligns with correctional standards and addresses the needs of treatment-refusing or refractory IPs.

Based on my review of records and interviews with NaphCare and County mental health staff, there is a strong, concerted effort to assess each IP's strengths, weaknesses, and diagnostic needs. NaphCare staff effectively address both Axis I psychiatric disorders and adjustment disorders related to situational stressors, demonstrating a clear understanding of complexities such as comorbid impulse control and personality disorders. Importantly, there is no financial incentive affecting decisions about IP placement on the mental health caseload or referrals for further evaluation and medication.

As is common in jail and prison settings, SDSO has a significant number of IPs with severe personality disorders and/or significant impulse control issues. These individuals often struggle with adhering to rules and interacting in a pro-social manner, leading to behaviors such as assaults or self-injury. Based on my record review, interviews, and facility tours, it is evident that SDSO provides accessible mental health treatment services for IPs with severe personality disorders and impulse control disorders.

'Ps' choices to engage in offered individual and group therapy, adhere to medication regimens, or avoid problematic behaviors are ultimately beyond external control. In my professional opinion, NaphCare mental health staff make commendable efforts to provide access to and continuity of care for treatment-refusing or refractory IPs. This is demonstrated by their outreach efforts, including bringing refusing IPs to medical for consultations and obtaining written refusals and/or documenting refusals when necessary. Additionally, mental health or nursing staff will conduct cell-side visits when transport is not possible. Such practices, which go beyond typical community standards of care, demonstrate a strong commitment to patient engagement and care.

**Administrative Separation (aka "Ad Sep")**
When possible, SDSO strives to house IPs in the least restrictive settings. However, due to the serious risks posed by a small population of IPs who repeatedly violate institutional rules through assaultive behaviors, SDSO custody staff implement Ad Sep, a restrictive housing level. This measure is used for select IPs who present significant threats to other IPs, custody, and healthcare staff. Ad Sep is applied only after other, less restrictive housing and supervision efforts have failed. It is commonly utilized in

44

**Ex. B-197**

correctional systems for individuals who belong to security threat groups (STG), such as gangs, and who exhibit extreme aggression and assaultive behavior.

To mitigate risks while housed in Ad Sep, there are robust medical and mental health safeguards in place. Sworn staff (deputies) will contact nursing staff, who are available 24/7, to check for any medical or mental health contraindications for an IP being housed in Ad Sep. Nursing and mental health staff review the IP's EMR medical records to identify any relevant diagnoses, issues, and treatments. This ensures that all potential medical or mental health concerns are addressed promptly, contributing to the overall safety and appropriateness of housing decisions.

As soon as placed in Ad Sep, nursing will perform a nursing assessment to identify any possible medical or mental health contraindications to placement in Ad Sep.  A QMHP will also evaluate the IP in Ad Sep as soon as clinically indicated but not longer than one week after placement into Ad Sep.  I verified with Melissa Quiroz, SDSO mental health director, that the average duration is within two days.  In summary, IP's placed into Ad Sep are evaluated by a QMHP within 24-48 hours of any IPs' placement into the unit. In Ad Sep, nursing staff conduct assessments 2-3 times per week and each time psychotropic or non-psychotropic medications are administered. Psychotropic medications may include daily doses or long-acting injectables. Mental health services continue with psychiatric evaluations, re-evaluations, and targeted programming such as individual counseling and therapeutic activities. IPs undergo a Classification review every 7 days. When an IP shows behavioral stability and improved conformity, a team effort involving custody staff, sworn deputies, and the JPMU (Jail Population Management Unit) is made to transition the IP to a less restrictive setting with increased privileges.

## Cell Extraction
When an IP exhibits problem behaviors and may require a cell extraction, sworn staff immediately contact mental health staff if the IP does not respond to verbal directives or other interventions. Mental health staff are involved to conduct evaluations and provide behavioral de-escalation in efforts to avoid the need for a cell extraction. These collaborative efforts can last from one to several hours. Sworn staff report that mental health staff are consistently responsive and assist in these situations. Additionally, the implementation of weekly multidisciplinary wellness checks has led to a significant reduction in the use of force.

## SDSO's Limited Use of Ad Sep "Segregated" Confinement of IPs with Mental Illness Comports with the Standard of Care
The term "solitary confinement" is indeed subject to debate, and scientific literature on its effects remains limited. The Colorado study, conducted from 2007-2010, stands out as a rigorous and peer-reviewed investigation into long-term segregation. Contrary to some hypotheses, its findings have sparked significant discussion and challenge existing views, including those of Mr. Haney. This study, published in *The Journal of the American Academy of Psychiatry and the Law* and reviewed by Maureen O'Keefe in 2017, remains one of the most established sources on this topic.

In my professional opinion, SDSO custody and NaphCare health care staff effectively collaborate to identify and address the needs of individuals at risk. Despite placement in Ad Sep restrictive housing, IPs continue to have access to comprehensive medical and mental health care. Routine assessments are conducted to monitor for any medical or psychiatric issues, with additional mental health treatment provided to those exhibiting problem behaviors due to mental disorders. Health care staff actively work to prevent clinical deterioration by recommending alternative housing arrangements when necessary.
In my professional opinion, there is effective and timely communication between mental health and custody staff at SDSO. Custody staff frequently consult with mental health professionals regarding challenging cases, disciplinary housing, and treatment planning for difficult IPs. This collaboration

**Ex. B-198**

exemplifies strong collegiality and partnership, ensuring that clinical and security concerns are addressed promptly.

These practices align with correctional standards of care, as outlined in the SDSO Policy, "Segregated Incarcerated persons," G.2.1, last approved 11/4/2022. I understand from Melissa Quiroz that a revised policy is currently under review. This policy and SDSO custody, medical and mental health care practices and procedures ensure that IPs in Ad Sep restrictive housing are screened for mental disorders, serious mental illness, and self-injurious or suicidal behaviors, and are monitored for clinical deterioration. Custody staff can request medical or mental health evaluations at any time should they identify any behavioral problems or problems with activities of daily living.

Nursing and mental health staff conduct timely and appropriate rounding within these restrictive settings and provide therapeutic and educational programming in classroom environments. IPs prescribed psychotropic medications are reassessed promptly if they demonstrate non-compliance, with ongoing monitoring by both health care and custody staff. These safeguards effectively mitigate the risk of worsening mental illness and support the overall well-being of the IPs.

In summary, it is my professional opinion that SDSO effectively minimizes prolonged restrictive housing for IPs with mental disorders. Both custody and health care staff actively work to prevent the placement of IPs with serious mental illness (SMI) or other mental disorders in Ad Sep restrictive housing when there is a risk of harm. If such placement occurs, SDSO ensures the provision of in-cell and out-of-cell therapeutic activities, structured mental health treatment, and adequate unstructured out-of-cell time. NaphCare mental health staff collaborates closely with administrative custody staff to maximize access to appropriate programming and recreational activities for these individuals.

*Response to Allegation 8:*
*The SDSO Sheriff's Office Has Adequate Policies and Procedures to Identify, Treat, Track, and Supervise IPs at Risk for Suicide and Provides Clinically Appropriate Mental Health and Psychiatric Services to SDSO IPs Who are Potentially Suicidal and/or Engaging in Self-Harm*

Similar to other correctional facilities, the SDSO has experienced several instances of completed suicides among its incarcerated person population in recent years. According to the "SDSD County Sheriff's Department In-Custody Deaths – Detention Services Bureau Manner of Death: Suicide from January 1, 2019 through April 1, 2024," there have been ten reported suicides during this period. All individuals who completed suicides were male.

Nine of these suicides were carried out by asphyxiation, while one was completed through water intoxication. The distribution of these incidents across facilities shows that two occurred at the George Bailey Detention Facility, two at the Vista Detention Facility, and six at the Central Jail.

This data highlights the persistent challenge of managing mental health within a correctional environment and emphasizes the critical need for ongoing enhancements in mental health services, monitoring, and preventive measures to address and reduce the risk of incarcerated person suicides.

**The Sheriff's department adequately screens and identifies IPs at risk for suicide**
During intake, if an IP is identified as having current suicide risks, recent self-harm or suicide attempts, or is actively self-harming or expressing suicidal or homicidal ideation, they are immediately placed into a safety cell under <u>continuous monitoring</u> by sworn custody staff. Trained custody staff can initiate this placement to ensure immediate safety without waiting for mental health or medical staff. However, a Qualified Mental Health Professional (QMHP) must assess the IP within 45 minutes of placement and

Ex. B-199

continue to conduct evaluations every 4 hours to monitor and address the individual's mental health needs.

The safety cell is a specially designed padded cell intended to minimize injury risks for IPs who might engage in self-harm behaviors, such as punching walls or head banging. It is used for very short-term periods to ensure immediate safety and is not intended as a permanent or long-term housing solution. The cell's padded walls and minimal fixtures are specifically designed to reduce opportunities for self-injury. IPs with significant mental health concerns are placed under constant direct observation, ensuring continuous monitoring and immediate care. Enhanced observation housing is employed for IPs needing closer supervision, providing a more secure and supportive environment. These measures collectively ensure that at-risk or vulnerable IPs receive the necessary care and attention, helping to mitigate risks and promote overall safety within the facility.

The IP is provided with suicide garments to maintain basic human dignity while in the safety cell. To mitigate the risk of self-harm and prevent the use of ligature points, the safety cell is devoid of items such as beds, toilets, or sinks. Once a Qualified Mental Health Professional (QMHP) determines that the IP no longer poses an imminent risk of self-harm, the IP's housing assignment and level of supervision are adjusted from the safety cell to Enhanced Observation Housing (EOH). This transition involves an individual clinical assessment by the QMHP, followed by direct communication with sworn custody staff. In EOH, the IP is subject to random, unpredictable checks every 15 minutes to ensure continued safety and supervision.

**The Sheriff's Department adequately monitors IPs at risk of suicide**
Any new intake or individual identified at any time as being at risk of self-harm is promptly referred to mental health staff or a designated "gatekeeper" within mental health or nursing. During my observation of mental health wellness rounds in restrictive housing, IPs were informed that they could alert custody staff of any developing suicidal ideation by pressing the intercom button in their cell. I personally tested one of these cell buttons and had a brief exchange with the unit custody staff, who responded immediately. Incarcerated persons were also encouraged to communicate any mental health concerns or urgent requests for mental health involvement by pressing the button, informing custody staff, or submitting a written sick call request. I was informed that no cells are populated by IPs unless they have a functioning intercom button, and I observed several cells out of service for this reason or other issues (one cell had a broken window and was awaiting repair).

**The Sheriff's Department provides adequate mental health follow-up care for IPs released from suicide precautions**
By established mental health policy there is an established and expected frequency when someone is being stepped down from suicide watch.  Once released from suicide watch the IP must receive an evaluation by a QMHP within 24 hours.  Mental health staff continue to follow and monitor this IP for the duration of their SDSO incarceration.  The IP is also reassessed by custody, medical, discharge planning, and mental health staff during wellness checks.

**How do SDSO Suicides Compare to Other Jails?**
The United States Department of Justice, Bureau of Justice Statistics, routinely collects, compiles, and reports on in-custody deaths including those by suicide.  The most recent report released in October 2021 reveals a nationwide long-term trend of increasing suicides in all custodial environments.  Longer term facilities such as state prisons tend to have lower rates because the population is more stable and has less turnover.

**Ex. B-200**







Source:  Carson, E. Ann (October 2021), Suicide in Local Jails, State and Federal Prisons, 2000-2019 – Statistical Tables, at 1-2  (Bureau of Justice Statistics (BJS) Report).

Moreover, as detailed in the SDSO suicide prevention policy, MSD.S.10, SDSO ensures proper training and regular refresher courses for staff on suicide prevention. Additionally, SDSO conducts three-minute man-down drills at least once a month on each shift, which enhances preparedness and reduces risk by simulating emergency scenarios. This training is crucial for both custody and healthcare staff to effectively manage emergencies and ensure the safety of the IP population. Importantly, all healthcare and custody staff are required to maintain CPR certification, further supporting their readiness to respond to critical situations.

The success of these efforts is reflected in a low number of completed suicides.  The SDSO has also implemented an additional mental health services department independent evaluation of any self-harm versus potential suicide attempt.  This data is generated in the NET REMS system.  Each incident of any

IP who is reported to have engaged in any act of self-harm or possible suicide attempt is reviewed by a Mental Health Chief. An individualized clinical determination by a QMHP leader is made whether the incident was a true suicide attempt versus non-suicidal self-harm. As the below chart indicates, from January 1, 2019 to April 1, 2024 there has been a low number of completed suicides. I also note that there has been no concentration of completed suicides at any particular SDSO Complex (or custody level). I also verified during an interview on 8/19/2024 with Melissa Quiroz, SDSO Mental Health Director, that there have been no completed suicides to date (8/19/2024) subsequent to the last suicide on 7/29/2023.

**SDSO County Sheriff's Department**
**In-Custody Deaths- Detention Services Bureau**
**Manner of Death: Suicide**
**January 1, 2019 to April 1, 2024**

| Date of Death | Name | Facility | Gender | Manner of Death | Cause of Death | Book# | JIMS# |
|---|---|---|---|---|---|---|---|
| 03/18/19 | Ortiz, Ivan | SDSO | Male | Suicide | Anoxic-ischemic encephalopathy due to: Resuscitated cardiorespiratory arrest due to: Asphyxia due to: Plastic bag secured over head and neck | 181362 17 | 4004 2952 8 |
| 08/26/19 | Lopez, Julio Ortiz | VDF | Male | Suicide | Choking | 197531 66 | 4003 8828 8 |
| 10/26/19 | Ralph, Don John | SDSO | Male | Suicide | Asphyxia due to: Occlusion of airway by sock | 197576 37 | 1000 8002 0 |
| 05/17/20 | Morton, Joseph Earl | VDF | Male | Suicide | Hanging | 209214 78 | 4004 5327 6 |
| 06/09/20 | Fonseca, Spiros Stavros | SDSO | Male | Suicide | Asphyxia due to: Hanging | 209239 74 | 4002 5675 9 |
| 05/30/21 | Marroquin, Lester | SDSO | Male | Suicide | Acute water intoxication | 209483 92 | 4004 0122 1 |
| 10/17/21 | Hernandez, Rafael | SDSO | Male | Suicide | Hanging | 209417 23 | 1000 8438 3 |

49

| 08/16/22 | Settles, Matthew | G B DF | M ale | Suicide | Asphyxia by hanging | 227 230 27 | 4004 7642 8 |
|---|---|---|---|---|---|---|---|
| 06/28/23 | Ornelas, Pedro III | S D S O | M ale | Suicide | Anoxic-ischemic encephalopathy due to: Resuscitated cardiopulmonary arrest due to: Asphyxia due to: hanging | 237 239 27 | 4003 3768 2 |
| 07/29/23 | McDowell, Jonathan | G B DF | M ale | Preliminary Autopsy Suicide | Asphyxia due to hanging | 237 071 19 | 4004 7967 1 |

**Jail Suicides: Conclusions**

In summary, it is my professional opinion that SDSO provides clinically appropriate mental health and psychiatric evaluation, crisis stabilization, supportive psychotherapy, and other treatment services to IPs who are potentially suicidal or at high risk for imminent self-harm. This mental health care meets both correctional and community standards. In the rare event of a suicide, SDSO conducts psychological autopsies, administrative suicide reviews, and morbidity and mortality reviews to assess contributing factors and enhance prevention practices. I confirmed that both the county and the contracted health NaphCare conduct independent suicide and medical, natural deaths, or substance use related death reviews, morbidity and mortality reviews, and these are conducted in a timely manner. SDSO demonstrates a commitment to timely and effective suicide prevention efforts.

*Response to Allegation 9:*
*The Sheriff's Department Provides Adequate care to IPs with Acute Mental Health Needs*

After a mental health assessment, JPMU classification staff will determine the most appropriate housing for the individual, whether it be PSU, watch status, EOH, protective custody, general population, or outpatient stepdown. Mental health staff will continue to perform evaluations and re-evaluations. Psychotropic medications will be maintained as prescribed, with ongoing assessments by a psychiatric provider. If an individual with a history of RCC involvement or an unidentified intellectual developmental disorder shows deterioration or engages in problem behavior, they will receive timely mental health assessments and treatment planning. The specific timeframe for these assessments is typically outlined in the facility's policy.

**The Delivery of Mental Health Care Within SDSO is not Systemically Deficient.**

The NCCHC Essential Standard that addresses mental health services in correctional settings is **J-A-04: Mental Health Services**. According to this standard, the immediate objective of mental health treatment in a correctional setting is to alleviate symptoms of mental disorders and prevent relapses, thereby sustaining the patients' ability to function safely within their environment. This standard emphasizes the importance of providing effective mental health care to help individuals manage their conditions and remain stable within the correctional facility.

Based upon my review of the items outlined in this report, my tours of the various SDSO facilities, and interviews with the individuals described above, it is my professional opinion that the mental health treatment provided to IPs incarcerated within SDSO facilities meets or exceeds correctional and community mental health standards. It is also my opinion that the policies, procedures, standards, and practices utilized by SDSO and NaphCare, exceed generally accepted standards for jails. In particular,

**Ex. B-203**

there are clinically appropriate referral processes and procedures in place, with an opportunity for continuous quality improvement. Further, there are adequate, qualified, trained mental health professionals to provide clinically appropriate access to care and to support the mental health needs of the prisoners.

In my professional opinion, the Policies, Procedures, and Standards utilized by SDSO, including Department Orders and the Mental Health Technical Manual, are designed to mitigate risks and ensure the well-being of incarcerated individuals across various housing settings. SDSO implements thorough mental health assessments and ongoing monitoring to address individuals at risk of self-harm or mental health deterioration. Safety cells, equipped with padded walls and minimal fixtures, are used for short-term purposes to ensure immediate safety, after which individuals are transitioned to less restrictive environments like Enhanced Observation Housing (EOH).

Continuous mental health care is provided, including psychotropic medications and therapeutic programming, with close collaboration between mental health and custody staff to address clinical needs effectively. Regular training and drills, including suicide prevention and CPR certification, prepare staff for emergencies and help reduce risks. When crises arise, mental health and custody staff work together to provide immediate intervention and avoid more restrictive measures when possible. Psychological autopsies and reviews are conducted to learn from incidents and refine prevention practices. Overall, SDSO's approach aligns with correctional standards and aims to minimize undue risk while addressing the needs of those in custody.

The following are examples of specific mental health policies, procedures, and practices that I have observed and confirmed during my tours, interviews with staff, and review of existing policies, and additional verification with mental health leadership:

- mental healthcare
- mental healthcare staffing
- medical record organization
- medication system
- monitoring of prisoners taking psychotropic medication
- monitoring of psychotropic medication therapeutic levels and side effects
- access to medical and mental healthcare
- mental health programming
- inpatient care
- treatment plan
- heat precaution
- suicide prevention
- confinement of prisoners with mental illness
- use of chemical agents with prisoners with mental illness
- use of telepsychiatry
- monitoring and oversight
- overall access to mental health services

Based on my review, it is my professional opinion that the Policies, Procedures, and Standards implemented by SDSO align with generally accepted standards for jails. SDSO has established clinically appropriate referral processes and procedures that ensure access to care and support for the mental health needs of incarcerated individuals. Additionally, there are opportunities for continuous quality improvement, and the facility is staffed with qualified and trained mental health professionals who provide appropriate and effective mental health care.

51

**Ex. B-204**

Based on my assessment, the Policies, Procedures, and Standards utilized by SDSO for mental healthcare, including staffing, medical record organization, medication management, and access to care, are consistent with national correctional health standards. The systems in place for monitoring and managing psychotropic medications, mental health programming, inpatient care, and suicide prevention, as well as the management of confinement settings such as Ad Sep, do not present an undue risk of harm to incarcerated individuals. The current practices and protocols align with established national standards of care.

*Response to Allegation 10:*
*The Sheriff's Department Does Not Discriminate and Unfairly Punish IPs with Mental Illness in Housing Placements*

As detailed in my report, the housing options and decision-making processes related to Ad Sep are not punitive but are designed to address the specific health and safety needs of individuals. For example, Safety Cells are utilized to create a therapeutic environment with padded walls and minimal fixtures, reducing the risk of self-injury for those actively engaging in self-harm or assaultive behaviors. When an individual is placed in a Safety Cell, there is a well-defined policy requiring unpredictable checks by custody staff, along with additional nursing and mental health evaluations.

If an individual presents with or develops significant mental health concerns, they may be moved to Enhanced Observation Housing (EOH). EOH provides a more secure and supportive environment for those needing closer supervision but not necessarily constant, 24-hour observation. For individuals who continue to attempt self-harm or engage in injurious behaviors while in Safety Cells or EOH, there is an option for constant, direct observation to ensure continuous monitoring and immediate care.

These therapeutic interventions and safety measures are implemented to ensure that vulnerable individuals receive appropriate care, mitigate risks to themselves and others, and enhance overall safety within the facility. They are not intended as forms of punishment but as necessary steps to promote health and safety.

When IPs with disciplinary infractions, STG affiliations, or histories of violence require placement into Ad Sep, numerous safeguards are implemented to identify and address medical and mental health needs. These include regular assessments by medical and mental health staff, timely evaluations to detect any health or psychiatric concerns, and ongoing monitoring to ensure that appropriate care is provided. This process aims to address and mitigate any potential risks, ensuring that the health and safety of the IPs are prioritized while they are in restrictive housing.

**Wellness Rounds**
As noted earlier, several best practices for mental health and sworn staff have been identified. Over the past two years, a leadership-driven effort has been in place involving a weekly practice known as "Wellness Rounds." This practice, a recognized standard in correctional mental health settings, operates year-round, including during holidays.

During these Wellness Rounds, a multidisciplinary team enters a specific Ad Sep restrictive housing pod. The team walks individually to each IP's cell, engages with the IPs, and asks if they need any assistance. They encourage the IPs to exit their cells if appropriate and oversee the cleaning of cells by trained IPs, performing additional cleaning as needed. The team assesses the IP's cell condition, mental status, clinical functioning, and daily living activities.

**Ex. B-205**

The Wellness Rounds team includes custody staff, responsible for security and safety; mental health staff, who conduct assessments and provide support; medical staff, who monitor physical health; and classification or JPUM staff, who evaluate housing status and make necessary adjustments. This coordinated effort aims to support the well-being of IPs, ensuring a safe, clean, and responsive environment. The Wellness Round teams include:

- mental health
- medical (typically the jail facility nursing leadership)
- counselor staff.  In particular, the counselor staff focus on helping the IP obtain reading materials, answer any questions or concerns and assist with any court related issues or concerns, questions re: discharge planning (this is described in greater detail later in this report) and follow-up
- sworn staff
- other administrative staff
- JPMU (jail population management unit) designee who is available to address classification and housing issues
- 2-3 IP trustees.  Their role is to stand by to remove trash, used items, and sweep the cell to keep the cell clean

In several high-custody Ad Sep housing settings, I observed interactions between custody, medical, mental health care, and counselor staff with IPs. Staff conducted themselves in a calm, professional, and compassionate manner, demonstrating a therapeutic approach in their interactions. Nursing staff were seen administering medications, organizing medication blister packs, and meticulously documenting their clinical activities across different housing areas. Additionally, I reviewed various watch logs and confirmed that these logs were completed promptly and in accordance with established policy.

*Response to Allegation 11:*
*The Sheriff's Department Provides IPs with Adequate Mental Health Discharge Planning and Resources*

There is clear evidence of effective treatment planning, timely communication, and multidisciplinary coordination among psychiatric and mental health staff, nursing staff, medical providers, and custody staff. This coordinated approach significantly mitigates the risk of harm to SDSO IP patients, helping to prevent self-injury, reduce risks to others, and address clinical deterioration effectively.

**Discharge Planning, Care Coordination, Community Mental Health, and Psychotropic Medication Continuity Post Release**
Recidivism refers to the recurring cycle where individuals move from homelessness to arrest, followed by detention in county jail, court appearances, potential further detention, and community release. If they fail to appear in court, they are violated and re-detained, perpetuating the cycle.

Regarding discharge planning, aftercare, and case disposition, SDSO utilizes discharge planning and case coordination and implements best practices to secure housing, medical and mental health treatment resources for individuals soon to be released or at the time of release.

The "counselor" case manager plays a crucial role in connecting individuals with community resources such as housing, shelters, domestic violence services, substance abuse treatment, and halfway houses. They also arrange medical and mental health follow-ups for those with serious mental illness (SMI). Established linkages and partnerships with community services support successful post-release planning and aftercare, which can effectively reduce recidivism and its associated fiscal impact.

**Ex. B-206**

**Discharge Medications**

Upon discharge, IPs receive a prescription card along with instructions for obtaining a 30-day supply of their psychotropic and non-psychotropic medications from a local retail pharmacy. This is described in more detail earlier in this report. Prescriptions for chronic psychotropic medications, ongoing care conditions, and any remaining acute medications, such as antibiotics, are transferred to a local pharmacy, billed to the county, and can be picked up by the IP after release. Additionally, during the release process, IPs are given a Narcan voucher redeemable at several local pharmacies, complete with usage instructions. Free Narcan is also available in the public lobbies of the county jails. This approach highlights a significant public health initiative by SDSO, aiming to ensure continuity of care and support successful reentry, ultimately helping to prevent the cycle of re-incarceration.

Example Patient Prescription Card



# Section 6. Mental Health Quality of Care Review Summary

*Random Sample Chart Reviews*

As outlined in the methodology section of this report, to manage the extensive volume of individual chart reviews and meet the accelerated timeline for completing my expert report, I enlisted the expertise of three practicing correctional forensic psychiatrist consultants: Natasha Cervantes, M.D., Joseph Baskin, M.D., and Ariana Nesbit Huselid, M.D. Each of these consultants has completed a general psychiatry residency and a forensic psychiatry fellowship and currently works in, or has recent experience in, jail correctional systems as a clinical treating psychiatrist, rather than solely performing forensic evaluations related to competency or other criminal matters. Importantly, none of these consultants is employed by SDSO County Jail or works in California.

To ensure an objective review process, these consultants were blinded to the current litigation involving SDSO County Jail. They had no prior knowledge of the specific allegations against the SDSO County Jail, the named plaintiffs, or any other details related to the individual IPs whose charts they reviewed. Additionally, files were assigned randomly so that no single consultant was responsible for reviewing charts from any specific SDSO County Jail facility exclusively. I did not provide any input or instructions to these consultants regarding their observations or findings—whether favorable or unfavorable—either before or after they conducted their reviews.

I reviewed the case summaries, comments, and findings from each of these consultants and incorporated their evaluations into my analysis and expert opinions. In summary, the quality of care, access to, and continuity of mental health care at each SDSO County Jail facility was assessed by these three independent consultants, who collectively bring 25 years of cumulative experience in jail-based correctional psychiatry.

**Ex. B-207**

The random chart reviews revealed a well-functioning and effective mental health intake and sick call process. Suicide risk assessments were carried out promptly and efficiently. Qualified mental health staff were actively involved in individual treatment planning and interventions at various care levels. Psychiatric care provided was timely and aligned with community standards.

*Additional Chart Reviews of Named Plaintiffs*

I conducted individual chart reviews for each named plaintiff: Darryl Dunsmore, Christopher Norwood, Ernest Archuleta, Gustavo Sepulveda, Jesse Olivares, Michael James Taylor, Laura Susan Zoerner, Reanne Susanne Levy, Andree Andrade, James Clark, Tony Ray Edwards, and Josue Lopez. My review confirmed that each received clinically appropriate mental health and psychiatric evaluations and treatment services. I did not identify any deficiencies in the jail-based mental health evaluation, psychiatric evaluation, or treatment services provided to these individuals, nor did I find evidence of any adverse effects on their overall level of functioning.

## Section 7. Summary of Conclusions and Opinions

All of my conclusions and opinions are stated with a reasonable degree of medical, psychiatric, and mental health certainty. It is important to note that the allegations in the Complaint (and all its iterations) related to Darryl Dunsmore and the current litigation are based on an SDSO mental healthcare delivery system that may have been relevant in past years but does not reflect the current practices. The plaintiffs' complaints predominantly rely on sources such as the 2017 NCCHC Technical Assistance Report, controversial analyses of death rates in California jails that fail to account for the turnover rate, the 2022 California State Auditor Report, various San Diego Union-Tribune articles, and occasionally erroneous self-reported complaints from former incarcerated persons (such as those filed in support of Plaintiffs' first Motion for Preliminary Injunction). These sources do not include contemporary data or evidence about the current state of the mental healthcare delivery system at SDSO.

My independent review of the current SDSO mental healthcare delivery system shows that SDSO provides a high level of care that meets and often exceeds community standards. SDSO demonstrates a strong commitment to offering timely and quality mental health and psychiatric care, including psychotropic medication treatment when needed. There is no evidence of deliberate indifference towards the needs of the mental healthcare system or the IPs in their care. On the contrary, SDSO shows significant improvements with increased mental health staffing, jail-based competency restoration, multidisciplinary wellness rounds in restrictive housing, and structured therapeutic activities for IPs with serious mental illness. SDSO has implemented various early access and treatment interventions, including new mental health programs like MAT, expanded psychiatric provider coverage, and access to a thirty-day supply of psychotropic and non-psychotropic discharge medications, all aimed at enhancing IP mental healthcare services.

The healthcare system currently being operated by the SDSO is not consistent with the plaintiff's multiple allegations. Below is a brief synopsis, based upon my thorough mental health and psychiatric program review, that counter the claims made by the plaintiffs:

## Plaintiffs' Allegations

1.  The Sheriff's Department fails to adequately identify and track incarcerated people in need of mental health care.
    Response: **FALSE**

The inspection of the current intake and screening process at SDSO shows that their practices align with or exceed acceptable correctional standards. SDSO employs advanced body scanning technology to

**Ex. B-208**

detect contraband, mitigating serious public health risks associated with drug overdoses. A Gate Refusal process is in place to divert high-acuity patients to local emergency departments. Both nursing and mental health staff are available 24/7 at all intake facilities. TechCare is used to ensure consistency of care and manage future medical appointments, interfacing with SureScripts for accurate medication identification. The intake process includes comprehensive mental health screenings, verification of psychotropic medications, suicide risk assessments, and appropriate safety monitoring. Additionally, individuals with substance use histories are evaluated and monitored using COWS/CIWA.

SDSO uses TechCare, an industry-standard electronic health record system, to maintain thorough and accurate medical and mental health records for IPs. The system is regularly customized to 'eet SDSO's specific clinical, process, and reporting requirements.

2.  Jail defendants fail to maintain sufficient number of qualified mental health professionals to meet the current need for mental health treatment at the jail.
    Response: **FALSE**

SDSO has a robust and well-staffed mental health team, including licensed doctoral-level psychologists, licensed master's level social workers, professional counselors, marriage and family therapists, recreational therapists, psychiatrists, psychiatric nurse practitioners, and psychiatric nurses. The current staffing of psychiatric providers, including MDs, DOs, and FNPs, is more than sufficient to address the psychiatric healthcare needs of the jail population. The review of medical records related to psychiatric and mental health services did not reveal any deficiencies in care.

3.  The Sheriff's Department custody staff improperly control clinical mental health care decisions, which undermines delivery of care by mental health professionals.
    Response: **FALSE**

SDSO custody staff, tasked with maintaining institutional security and safety, work collaboratively with mental health professionals for a variety of reasons. These include decisions about emergency psychotropic medication administration, handling disciplinary incidents linked to mental disorders, and determining placements within safety cells, EOH, and restrictive housing. The goal is to ensure that each IP receives necessary care in a manner that maintains both their safety and that of the staff. This collaboration, which is common across US jails, does not involve improper interference with clinical decision-making or undermine mental health care delivery.

4.  Jail defendants fail to continue incarcerated people's mental health medications they were taking prior to detention.
    Response: **FALSE**

During the receiving screening process, nursing staff carry out a comprehensive medication history to address immediate medication needs. The TechCare® electronic health record system is integrated with Surescripts®, a nationwide health information exchange network that connects pharmacies, healthcare providers, and benefit managers. This integration allows SDSO staff to quickly and securely access an IP's medication history from community pharmacies and pharmacy benefit managers. If Surescripts® does not return prescription data, SDSO staff will make additional efforts to verify the medication information by contacting the IP's pharmacy or provider directly. There is no evidence of significant delays or patient harm related to pharmaceutical continuity. Furthermore, StatCare medical providers are available around the clock to prescribe any necessary psychotropic medications, ensuring continuous support and intervention as needed.

**Ex. B-209**

5. The Sheriff's Department fails to provide incarcerated people with timely access to mental health care.
   Response: **FALSE**

6. The Sheriff's Department lacks an adequate system for providing mental health treatment to incarcerated people with ongoing mental illness.
   Response: **FALSE**

During intake, IPs are informed about accessing both emergent and routine mental health care. They receive education on how to request their healthcare information and the process for filing grievances if they are dissatisfied with the medical or mental healthcare services. A comprehensive orientation video, available in both English and Spanish, is shown multiple times daily. This video provides an overview of SDSO jail operations, its programs, rules, and regulations, and reinforces details about healthcare services discussed during intake.

The SDSO employs a mental health sick call process that aligns with practices observed in many jails across the country. This process includes a Sick Call Request (SCR) form (Form-212) that IPs can submit confidentially into a locked red box. These forms are collected daily and reviewed by nursing staff, who schedule appointments based on the urgency of the complaints. Non-urgent cases are typically addressed within one to two days after triage, while urgent and emergent concerns are prioritized and addressed on the same day. IPs can also alert security or healthcare staff directly if they require immediate assistance. Security staff confirmed that they can contact mental health professionals or escort IPs to the mental health clinic area for evaluation if acute mental health issues arise. Mental health services are available 24 hours a day at all three intake facilities, and mental health and psychiatric services are accessible during afterhours and weekends. Overall, there is always a mental health clinician or psychiatric provider available for consultation, case prioritization, or emergency evaluations, whether on-site or via phone.

7. The Sheriff's Department fails to provide confidential mental health care in adequate physical spaces.
   Response: **FALSE**

The term "constitutionally required" confidentiality may not be clearly defined, but SDSO strives to balance IP confidentiality with the necessity of providing adequate care and addressing risks to the IP, other IPs, custody, and healthcare staff. Melissa Quiroz and other mental health leaders emphasized their proactive approach to ensure IPs with mental health needs are given access to confidential care. They personally follow up with IPs who miss appointments to guarantee they receive the care they need in a confidential setting. The multi-disciplinary Wellness Rounds further exemplify this commitment, offering opportunities to discuss mental health needs and address privacy concerns. If an IP expresses discomfort about discussing their issues in a non-confidential setting, SDSO makes arrangements for a private encounter. These efforts highlight SDSO's dedication to providing care while navigating the inherent challenges of a correctional environment.

8. The Sheriff's Department houses incarcerated people at risk of suicide in punitive isolation unit that put them at unnecessary and undue risk of further decompensation and harm.
   Response: **FALSE**

Ex. B-210

Watch cells and Enhanced Observation Housing (EOH) are not punitive isolation units but are designed for short-term, closely monitored care of IPs who are at imminent risk of self-harm or suicide. Their use is strictly for maintaining safety and preventing severe harm, not for punishment. Clear protocols for nursing, mental health, and custody staff are in place, with multiple safeguards and defined monitoring and clinical expectations for IPs in these settings.

9. The Sheriff's Department lacks adequate policies and procedures to identify, treat, track, and supervise incarcerated people at risk of suicide.
   a. The Sheriff's Department fails to adequately identify incarcerated people at risk for suicide.
   b. The Sheriff's Department fails to adequately monitor incarcerated persons at risk of suicide.
   c. The Sheriff's Department fails to provide adequate follow-up care for incarcerated people released from suicide precautions.
   Response: **FALSE**

The SDSO has established a Quality Assurance (QA) and Quality Improvement (QI) mental health program, which is currently evolving. The department is in the process of finalizing its mental health and health policy and procedure manual, set for completion in September 2024, which will guide QA/QI activities. SDSO is effectively leveraging TechCare as a data source for monitoring mental health and psychiatric initiatives. The QA/QI process has already led to improvements in various areas, including the intake process, Medication-Assisted Treatment (MAT) program, Gatekeeper system, and Wellness Rounds.

10. The Sheriff's Department fails to provide adequate care to incarcerated people with acute mental health needs.
    Response: **FALSE**

The SDSO intake process effectively provides timely and thorough assessments, including clinical intake screenings, nursing and mental health evaluations, and suicide risk assessments. This process ensures appropriate dispositions for individuals with acute or chronic mental health needs, as well as those under the influence of alcohol or drugs.

11. The Sheriff's Department discriminates and unfairly punishes incarcerated people with mental illness in its housing placements.
    Response: **FALSE**

The SDSO Classification Jail Population Management Unit (JPMU) handles custody and classification issues, including dealing with individuals who are violent, violate rules, or are members of security threat groups. The SDSO's approach to managing these individuals does not involve punishing those with mental illness unfairly. Instead, their practices focus on maintaining institutional security and safety without resorting to punitive measures for those with mental health conditions.

Various factors may lead to certain individuals being placed in restrictive housing, regardless of whether they have mental disorders. When an individual shows acute mental health deterioration, potentially linked to a disciplinary infraction, SDSO custody staff collaborate closely with mental health care staff. The goal is to transition the individual to a higher level of mental health care if needed, such as the psychiatric stabilization inpatient unit. As observed during my participation in multidisciplinary meetings

Ex. B-211

at the George Bailey Detention Facility, there is a coordinated effort to manage and potentially relocate individuals with mental health concerns to less restrictive environments whenever feasible.

Custody needs often necessitate discussions between medical and security departments about an individual's care and custody. This includes decisions on emergency psychotropic medication, handling disciplinary issues linked to mental disorders, and managing placements in safety cells, enhanced observation housing, or restrictive settings. The aim is always to provide necessary care in a safe manner for both the individual and staff, ideally at the least restrictive level possible. This approach is a common challenge across jails in the U.S.

12. The Sheriff's Department fails to provide incarcerated people with adequate mental health discharge planning and resources.
Response: **FALSE**

The SDSO ensures appropriate continuity of psychotropic and non-psychotropic medications and discharge planning resources in particular for individuals with SMI.  The SDSO medical department and contracted mental health provider NaphCare staff electronically generate prescription orders to local San Diego area pharmacies via an index card.  This is also referred to as a prescription card (an example of this card is cited earlier in this report).  Of particular importance in order to improve continuity of care for soon-to-released IPs, regardless of their ability to pay for medications, **all discharge medications are provided at no cost to all IPs.  In summary, all IPs are able obtain a 30-day medication supply from a local pharmacy (bolded for emphasis)**. SDSO previously provided a two-week supply of discharge medications.

The SDSO has also implemented robust discharge planning efforts by hiring dedicated staff and providing a variety of discharge planning resources.  This occurs despite the challenges of the high turnover of the IP population across the different SDSO facilities.  Narcan vouchers are similarly available.  SDSO supports connections to community MAT programs and provides comprehensive MAT treatment for IPs with co-occurring mental health and substance use disorders. This includes a combination of individual and group therapies. Current data indicates a significant number of IPs receiving both medication and counseling for MAT, reflecting adherence to correctional and community standards of care. The review of current pharmacy data demonstrated that on 5/7/2024 there were 193 patients on MAT (medication and counseling), 436 on MOUD (medication only), and 77 on buprenorphine for detox management.

## Section 8. Conclusion

The statements, conclusions, and opinions expressed are grounded in my extensive background, which spans over three decades of experience in correctional health care. This includes direct patient care, clinical and administrative oversight within the TDCJ system and various Texas county jails, national correctional health consulting, and technical assistance work. My expertise has been shaped by this broad experience and the detailed review of relevant information as outlined.

It is my professional opinion that clinically appropriate mental health and psychiatric evaluation and treatment services were, and continue to be, available to each of the named Plaintiffs, as well as to current and former (and future) SDSO IPs. I did not find any evidence of a lack of appropriate jail-based mental health evaluations, psychiatric evaluations, treatment services, or any resulting detrimental effect on their overall level of functioning.

The SDSO is dedicated to providing high-quality psychiatric and mental healthcare to IPs. This commitment is reflected in the increase of mental health staff and the provision of 24-hour onsite mental

Ex. B-212

health staffing across its intake facilities. The SDSO has sufficient mental health and psychiatric provider staffing, an advanced EHR system, and effective pharmacy distribution. The random chart reviews and those of named plaintiffs show that the mental health intake and sick call processes are functioning effectively, with psychiatric care and psychotropic medication practices meeting or exceeding community standards.

The SDSO's current healthcare delivery system demonstrates a clear commitment to addressing the mental health and overall healthcare needs of its IPs. Since the 2017 NCCHC Technical Assistance Report, SDSO has made substantial efforts to enhance psychiatric and mental health services, prioritize patient safety, reduce morbidity and mortality, and provide high-quality care.

In addition to providing quality mental health and psychiatric services, as well as other healthcare services to the named plaintiffs and other IPs, it is my professional opinion that the SDSO's Policies, Procedures, and Standards align with generally accepted practices for jails, both for individuals with and without mental illness. These Policies, Procedures, and Standards, along with their implementation by both custody staff and the current contracted medical and mental health vendor, NaphCare, adhere to nationally accepted, state, and county practices. They are carried out with due consideration for care, custody, and control, and demonstrate no deliberate indifference to the psychiatric and/or mental health needs of these IPs.

I reserve the right to revisit and revise the conclusions and opinions stated herein based on newly acquired information or other evidence which may be presented to me at some later date.

**THIS SPACE IS INTENTIONALLY LEFT BLANK**

**SIGNATURE PAGE TO FOLLOW**

**Ex. B-213**

I, Joseph V. Penn, MD, pursuant to 28 U.S.C. § 1746, declare that the foregoing is true and correct.

This the _____, day of _____
Joseph V. Penn, MD, CCHP-MH LFAPA

**Ex. B-214**

## Appendix A



# JOSEPH PENN
## MD, CCHP-MH, LFAPA

## EDUCATION

**FELLOWSHIP – FORENSIC PSYCHIATRY**
Department of Psychiatry
Yale University, Connecticut | 1998-1999

**RESIDENCY – CHILD & ADOLESCENT PSYCHIATRY**
Department of Psychiatry & Human Behavior
Brown University, Rhode Island | 1996-1998

**RESIDENCY – GENERAL PSYCHIATRY CHIEF RESIDENT**
Department of Psychiatry & Human Behavior
Brown University, Rhode Island | 1992-1996

**MEDICAL DOCTOR**
University of Texas at Medical Branch | 1992

**BACHELOR OF SCIENCE IN BIOLOGY**
University of the Incarnate Word
San Antonio, Texas| 1987

## LICENSES & CERTIFICATIONS

- **MEDICAL LICENSE**
  Rhode Island No. 8849 | 1983
- **MEDICAL LICENSE**
  Connecticut No. 36678 | 1998
- **MEDICAL LICENSE**
  Texas No. K7081 | 1999
- **MEDICAL LICENSE**
  Massachusetts No. 161086 | 1999

## WORK EXPERIENCE

**DIRECTOR OF MENTAL HEALTH SERVICES**
University of Texas Medical Branch—Correctional Managed Care | 2008-Present

**DIRECTOR OF CHILD & ADOLESCENT FORENSIC PSYCHIATRY**
Rhode Island Hospital | Lifespan Health System | 1999-2008

## CONSULTING EXPERIENCE

**JOSEPH PENN MD & FORENSIC ASSOCIATES, LLC, OWNER**
Conroe, Texas | 2022-Present

- NRI, Ponce and Villalba Juvenile Correctional Detention Centers, Ponce, Puerto Rico, and Villalba, Puerto Rico
- NRI, Colorado Department of Human Services, Division of Youth Services, Secure Youth Centers, State of Colorado
- Sacramento County Commissioners and Sacramento County Jails and Other Surrounding County Jails (John Allen and Associates)
- *Coleman v. Brown, Governor of California, et al*, United States Court of Appeals, Ninth Circuit, Pasadena, California
- Division of Health Services, Arizona Department of Corrections, Phoenix, Arizona
- Juvenile Justice Commission (JJC) State of New Jersey, and the University of Medicine and Dentistry of New Jersey (UMDNJ)-University Behavioral HealthCare/University Correctional HealthCare, Trenton, New Jersey
- Polk County Juvenile Detention Center/Polk County Jail, Bartow, Florida
- Office of the Attorney General, Providence, Rhode Island
- National Commission on Correctional Health Care, US Immigration and Customs Enforcement (ICE) San Diego Contract Detention Facility, San Diego, California
- Technical Assistance Project Consultant, National Commission on Correctional Health Care, Idaho Department of Corrections
- Vermont Department of Corrections (John Allen and Associates)
- Office of the Attorney General, Providence, Rhode Island
- Agency for Health Research and Quality's (AHRQ) Effective Health Care (EHC) Program

A complete list of consultancy projects available upon request.

## CONTACT INFORMATION

**Ex. B-215**



# JOSEPH PENN

## MD, CCHP-MH, LFAPA

## LICENSES & CERTIFICATIONS CONTINUED

**DIPLOMATE**
American Board of Psychiatry & Neurology
No. 43847 | 1997

**ADDITIONAL CERTIFICATION**
Child and Adolescent Psychiatry
No. 4583 | 1998

**ADDITIONAL CERTIFICATION**
Forensic Psychiatry
No. 1438 | 1998

**CCHP-MH**
National Commission on Correctional Health
Care | 2004

**RECERTIFICATION**
American Board of Psychiatry & Neurology
No. 43847 | 2007

**RECERTIFICATION**
American Board of Psychiatry & Neurology
No. 1438 | 2013

**RECERTIFICATION**
American Board of Psychiatry & Neurology
No. 43847 | 2017

**RECERTIFICATION**
**ADDITIONAL CERTIFICATION**
Child and Adolescent Psychiatry
American Board of Psychiatry & Neurology
No. 4583 | 2017

**CERTIFIED COMPLIANCE WITH STANDARDS**
Child and Adolescent Psychiatry
Forensic Psychiatry
American Board of Psychiatry & Neurology
2022-2024

## CONSULTING EXPERIENCE CONTINUED

SENIOR ASSOCIATE, MENTAL HEALTH
J Allen & Associates—Correctional Healthcare Management | 2014 - Present

- **California Department of Corrections and Rehabilitation (CDCR)**
  Participated in a multi-site comprehensive assessment of CDCR's mental health programs providing systems analysis and recommendations.

- **California Multi-County Mental Health Project**
  Participated in conducting a feasibility assessment for several large county jails looking at the creation of a shared consolidated centralized mental health facility.

- **Wake County, North Carolina**
  Participated as part of a 5-member team that has assisted Wake County for the past 3 years. This ongoing project has included staffing study, policy, and procedure rewrite and the development of an offender health plan.

- **State of Kentucky**
  Served as the team leader of a 5-member team assisting the state with an assessment of, and recommendation for improvement of the state's Juvenile Detention program.

- **San Diego County Sheriff's Department**
  Working with the San Diego County Sheriff's Department and their outside counsel in defense of a class-action lawsuit, *Dunsmore v. San Diego County Sheriff's Department*, related to medical, dental, and mental health services

## PUBLICATIONS & PROGRAMS

**PEER REVIEWED PUBLICATIONS**
A complete list of 29 Peer Reviewed Publications available upon request.

**NON-PEER REVIEWED PUBLICATIONS**
A complete list of 30 Non-Peer Reviewed Publications available upon request.

**ABSTRACTS**
A complete list of 42 Abstracts available upon request.

**PAPERS & CONTINUING EDUCATION PROGRAMS**
A complete list of 189 Papers & Continuing Education Programs available upon request.

Ex. B-216

## Appendix B

### Joseph V. Penn, MD CCHP FAPA
### Testimony

Revised 1/3/2024

### 2023

State of Texas v. Josiah Perez, 296th District Court of Collin County, McKinney, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Inmates

Kanautica Zayre-Brown v. The North Carolina Department of Public Safety, et al., United States District Court for the Western District of North Carolina, Access to Sexual Reassignment Surgery (A/K/A gender affirming genital surgery)

Bobbie Lee Haverkamp A/K/A David Allen Haverkamp v. Lannette Linthicum, MD, et al. United States District Court for the Southern District of Texas, Corpus Christi Division, Access to Sexual Reassignment Surgery (A/K/A gender affirming genital surgery), 30(b)6 witness

State of Texas v. James Antwone Acy, Criminal District Court 4 of Dallas County, Dallas, Texas, General Practices and Procedures for Providing Mental Health Services to Texas Department of Criminal Justice (TDCJ) Inmates

Carrie Roth-Walker, individually, and on behalf of the Statutory Beneficiaries of Branden Roth, deceased v. Christopher Nanos, Sheriff of Pima County; Pima County, Wellpath, et al; Jail Inmate on Jail Inmate Assault Resulting in Death

### 2022

John Rapp, in his Personal Capacity and as Personal Representative of the Estate of Nicholas Rapp v. NaphCare, Inc., Kitsap County, et al.; Jail Suicide

Mariah M. Walters, as Personal Representative of the Estate of Elizabeth Najar v. Board of County Commissioners of Chaves County, New Mexico and CorrHealth, LLC d/b/a CorrHealth LLC, Jail Suicide

G.H., et al., v. Eric S. Hall, Florida Department of Juvenile Justice and Secretary of the Department of Juvenile Justice, et al., United States District Court, Northern District of Florida, Risk of Mental Harm to Detained Juveniles Housed in Behavioral Confinement While in State of Florida Juvenile Detention Centers

G.H., et al., v. Eric S. Hall, Florida Department of Juvenile Justice and Secretary of the Department of Juvenile Justice, et al., United States District Court, Northern District of Florida, Risk of Mental Harm to Detained Juveniles Housed in Behavioral Confinement While in State of Florida Juvenile Detention Centers

Ex. B-217

## Appendix C

### Materials Reviewed

| DATE SENT | DESCRIPTION | FOLDER | SUB-FOLDER | SUB-SUB FOLDER |
|---|---|---|---|---|
| 3/26/2024 | 001. Consolidated Healthcare Delivery Contract. No. 566117. 042622. 001.pdf | 20231220 NaphCare Produced Documents [password | 20231002 | |
| 3/26/2024 | 001. Consolidated Healthcare Delivery Contract. No. 566117. 042622. 001.pdf | NAPHCARE006 | | |
| 3/26/2024 | 002. Electronic Medical Records System Agreement. Contract No. 558056. Redacted. 080218.pdf | 20231220 NaphCare Produced Documents [password | 20231002 | |
| 3/26/2024 | 002. Electronic Medical Records System Agreement. Contract No. 558056. Redacted. 080218.pdf | NAPHCARE006 | | |
| 3/26/2024 | 003. Dept of Purchasing and Contracting. Contract No. 558056. Amen 1. 012420.pdf | 20231220 NaphCare Produced Documents [password | 20231002 | |
| 3/26/2024 | 003. Dept of Purchasing and Contracting. Contract No. 558056. Amen 1. 012420.pdf | NAPHCARE006 | | |
| 3/26/2024 | 004. Language Line Services, Inc. Contract with Naphcare.032019.pdf | 20231220 NaphCare Produced Documents [password | 20231002 | |
| 3/26/2024 | 004. Language Line Services, Inc. Contract with Naphcare.032019.pdf | NAPHCARE006 | | |
| 3/26/2024 | 005. Laboratory Services Agreement Between NaphCare of SD and Quest Diagnostics. 052722.pdf | 20231220 NaphCare Produced Documents [password | 20231002 | |
| 3/26/2024 | 005. Laboratory Services Agreement Between NaphCare of SD and Quest Diagnostics. 052722.pdf | NAPHCARE006 | | |

Ex. B-218

| | | | |
|---|---|---|---|
| 3/26/2024 | 006 Laboratory Services Agreement. Amendment. 082222.pdf | 20231220 NaphCare Produced Documents [password ██████████ | 20231002 |
| 3/26/2024 | 006 Laboratory Services Agreement. Amendment. 082222.pdf | NAPHCARE006 | |
| 3/26/2024 | 007. Pharmacy Auditor Professional Services Agreement. Redacted.pdf | 20231220 NaphCare Produced Documents [password ██████████ | 20231002 |
| 3/26/2024 | 007. Pharmacy Auditor Professional Services Agreement. Redacted.pdf | NAPHCARE006 | |
| 3/26/2024 | 008. Consolidated Healthcare Delivery Contract. No 566117. 042622. 002.pdf | 20231220 NaphCare Produced Documents [password ██████████ | 20231002 |
| 3/26/2024 | 008. Consolidated Healthcare Delivery Contract. No 566117. 042622. 002.pdf | NAPHCARE006 | |
| 3/26/2024 | 009. COSD Health Care Policy and Procedure Manual.pdf | 20231220 NaphCare Produced Documents [password ██████████ | 20231002 |
| 3/26/2024 | 009. COSD Health Care Policy and Procedure Manual.pdf | NAPHCARE006 | |
| 3/26/2024 | 010. Naphcare and COSD Health Care Policy and Procedure Manual.060122.pdf | 20231220 NaphCare Produced Documents [password ██████████ | 20231002 |
| 3/26/2024 | 010. Naphcare and COSD Health Care Policy and Procedure Manual.060122.pdf | NAPHCARE006 | |
| 3/26/2024 | 011. Naphcare, Inc. Record Retention Schedule Policy.2021.pdf | 20231220 NaphCare Produced Documents [password ██████████ | 20231002 |
| 3/26/2024 | 011. Naphcare, Inc. Record Retention Schedule Policy.2021.pdf | NAPHCARE006 | |

Ex. B-219

| 3/26/2024 | 012. Naphcare and COSD Health Care Policy and Procedure Manual.060122. 002.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 012. Naphcare and COSD Health Care Policy and Procedure Manual.060122. 002.pdf | NAPHCARE006 | |
| 3/26/2024 | 013. Naphcare Full San Diego P–cy Manual-- With Site Addendums.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 013. Naphcare Full San Diego P–cy Manual-- With Site Addendums.pdf | NAPHCARE006 | |
| 3/26/2024 | 014. Naphcare Corres. re COSD Request for Proposal' of Sheriff's Dept Consolidated Health Care Delivery.071921.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 014. Naphcare Corres. re COSD Request for Proposal' of Sheriff's Dept Consolidated Health Care Delivery.071921.pdf | NAPHCARE006 | |
| 3/26/2024 | 015. CoSD Corres. re COSD Request f– Proposa's-- Sheriff's Dept Consolidated Health Care Delivery.040521.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 015. CoSD Corres. re COSD Request f– Proposa's-- Sheriff's Dept Consolidated Health Care Delivery.040521.pdf | NAPHCARE006 | |
| 3/26/2024 | 016. CoSD Corres. re Request f– Proposals-- Addendum No. 04. 041621.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 016. CoSD Corres. re Request f– Proposals-- Addendum No. 04. 041621.pdf | NAPHCARE006 | |
| 3/26/2024 | 017. COSD Request for Proposals. Attach A. Statement of Objectives. Addendum 5.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |

**Ex. B-220**

| 3/26/2024 | 017. COSD Request for Proposals. Attach A. Statement of Objectives. Addendum 5.pdf | NAPHCARE006 | |
| 3/26/2024 | 018. CoSD Corres. re Request f–Proposals--Addendum 7. 043021.pdf | 20231220 NaphCare Produced Documents [password ▇▇▇▇▇ | 20231002 |
| 3/26/2024 | 018. CoSD Corres. re Request f–Proposals--Addendum 7. 043021.pdf | NAPHCARE006 | |
| 3/26/2024 | 019. CoSD Corres. re Request f–Proposals--Addendum 8. 051221.pdf | 20231220 NaphCare Produced Documents [password ▇▇▇▇▇ | 20231002 |
| 3/26/2024 | 019. CoSD Corres. re Request f–Proposals--Addeundum 8. 051221.pdf | NAPHCARE006 | |
| 3/26/2024 | 020. Naphcare Utilization Management Policy. 2023.pdf | 20231220 NaphCare Produced Documents [password ▇▇▇▇▇ | 20231002 |
| 3/26/2024 | 020. Naphcare Utilization Management Policy. 2023.pdf | NAPHCARE006 | |
| 3/26/2024 | 021. Email Corr. re SDCJ Folder. 091823.pdf | 20231220 NaphCare Produced Documents [password ▇▇▇▇▇ | 20231002 |
| 3/26/2024 | 021. Email Corr. re SDCJ Folder. 091823.pdf | NAPHCARE006 | |
| 3/26/2024 | 022. Email Corr. re Sharefile Acitivity Notification. 061423.pdf | 20231220 NaphCare Produced Documents [password ▇▇▇▇▇ | 20231002 |
| 3/26/2024 | 022. Email Corr. re Sharefile Acitivity Notification. 061423.pdf | NAPHCARE006 | |
| 3/26/2024 | 023. Email Corr. re NCCHS Folders Sample. 061423.pdf | 20231220 NaphCare Produced Documents [password ▇▇▇▇▇ | 20231002 |

Ex. B-221

| | | | |
|---|---|---|---|
| 3/26/2024 | 023. Email Corr. re NCCHS Folders Sample. 061423.pdf | NAPHCARE006 | |
| 3/26/2024 | 024. Email Corr. re Medical Services Share Folder. 061623.pdf | 20231220 NaphCare Produced Documents [password 8f2OGWqq4$] | 20231002 |
| 3/26/2024 | 024. Email Corr. re Medical Services Share Folder. 061623.pdf | NAPHCARE006 | |
| 3/26/2024 | 025. Email Corr. re ShareFile Confirmation Email. 061523.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 025. Email Corr. re ShareFile Confirmation Email. 061523.pdf | NAPHCARE006 | |
| 3/26/2024 | 026. Email Corr. re Sharefile Folder. 061623.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 026. Email Corr. re Sharefile Folder. 061623.pdf | NAPHCARE006 | |
| 3/26/2024 | 027. Email Corr. re Policies. 061523.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 027. Email Corr. re Policies. 061523.pdf | NAPHCARE006 | |
| 3/26/2024 | 028. Email Corr. re File Request. 061423.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 028. Email Corr. re File Request. 061423.pdf | NAPHCARE006 | |
| 3/26/2024 | 029. Email Corr. re Section A. 061323.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |

Ex. B-222

| 3/26/2024 | 029. Email Corr. re Section A. 061323.pdf | NAPHCARE006 | |
| 3/26/2024 | 030. Email Corr. re SD P&P. 060823.pdf | 20231220 NaphCare Produced Documents [password ▮▮▮▮ | 20231002 |
| 3/26/2024 | 030. Email Corr. re SD P&P. 060823.pdf | NAPHCARE006 | |
| 3/26/2024 | 031. Email Corr. re SD P&P. 060723. 001.pdf | 20231220 NaphCare Produced Documents [password ▮▮▮▮ | 20231002 |
| 3/26/2024 | 031. Email Corr. re SD P&P. 060723. 001.pdf | NAPHCARE006 | |
| 3/26/2024 | 032. Email Corr. re SD P&P. 060723. 002.pdf | 20231220 NaphCare Produced Documents [password ▮▮▮▮ | 20231002 |
| 3/26/2024 | 032. Email Corr. re SD P&P. 060723. 002.pdf | NAPHCARE006 | |
| 5/9/2024 | 03-27-24-ZoernerDeposition.pdf | | |
| 3/26/2024 | 033. Email Corr. re SD P&P. 060723. 003.pdf | 20231220 NaphCare Produced Documents [password ▮▮▮▮ | 20231002 |
| 3/26/2024 | 033. Email Corr. re SD P&P. 060723. 003.pdf | NAPHCARE006 | |
| 3/26/2024 | 034. Email Corr. re SD P&P. 060723. 004.pdf | 20231220 NaphCare Produced Documents [password ▮▮▮▮ | 20231002 |
| 3/26/2024 | 034. Email Corr. re SD P&P. 060723. 004.pdf | NAPHCARE006 | |
| 3/26/2024 | 035. Email Corr. re NCCHC Folders Sample. 051523.pdf | 20231220 NaphCare Produced Documents | 20231002 |

Ex. B-223

| | | [password | |
|---|---|---|---|
| 3/26/2024 | 035. Email Corr. re NCCHC Folders Sample. 051523.pdf | NAPHCARE006 | |
| 3/26/2024 | 036. Email Corr. re SD P&P. 061823.pdf | 20231220 NaphCare Produced Documents [password ▮▮▮ | 20231002 |
| 3/26/2024 | 036. Email Corr. re SD P&P. 061823.pdf | NAPHCARE006 | |
| 3/26/2024 | 037. Redacted Sick Calls.pdf | 20231220 NaphCare Produced Documents [password ▮▮▮ | 20231002 |
| 3/26/2024 | 037. Redacted Sick Calls.pdf | NAPHCARE006 | |
| 3/26/2024 | 038. Time Detail. Employee Borquez, Randolph Anthony. 010123-091423.pdf | 20231220 NaphCare Produced Documents [password ▮▮▮ | 20231002 |
| 3/26/2024 | 038. Time Detail. Employee Borquez, Randolph Anthony. 010123-091423.pdf | NAPHCARE006 | |
| 3/26/2024 | 039. Time Detail. Employee Patel, Divya. 010123-091423.pdf | 20231220 NaphCare Produced Documents [password ▮▮▮ | 20231002 |
| 3/26/2024 | 039. Time Detail. Employee Patel, Divya. 010123-091423.pdf | NAPHCARE006 | |
| 3/26/2024 | 040. Time Detail. Employee Polanco, Justin D. 010123-091423.pdf | 20231220 NaphCare Produced Documents [password ▮▮▮ | 20231002 |
| 3/26/2024 | 040. Time Detail. Employee Polanco, Justin D. 010123-091423.pdf | NAPHCARE006 | |
| 3/26/2024 | 041. Time Detail. Employee Epps-Robbins, DeAndra Colette.010123-091423.pdf | 20231220 NaphCare Produced Documents | 20231002 |

Ex. B-224

| | | | |
|---|---|---|---|
| | | [password ██████ | |
| 3/26/2024 | 041. Time Detail. Employee Epps-Robbins, DeAndra Colette.010123-091423.pdf | NAPHCARE006 | |
| 3/26/2024 | 042. Time Detail. Employee Panganiban, Destiny Monique.010123-091423.pdf | 20231220 NaphCare Produced Documents [password ██████ | 20231002 |
| 3/26/2024 | 042. Time Detail. Employee Panganiban, Destiny Monique.010123-091423.pdf | NAPHCARE006 | |
| 3/26/2024 | 043. Dental Equipment.pdf | 20231220 NaphCare Produced Documents [password ██████ | 20231002 |
| 3/26/2024 | 043. Dental Equipment.pdf | NAPHCARE006 | |
| 3/26/2024 | 044. Naphcare, Inc. Pharmacist Inspection report. San Diego Central. Redacted.2022.pdf | 20231220 NaphCare Produced Documents [password ██████ | 20231002 |
| 3/26/2024 | 044. Naphcare, Inc. Pharmacist Inspection report. San Diego Central. Redacted.2022.pdf | NAPHCARE006 | |
| 3/26/2024 | 045. Naphcare, Inc. Pharmacist Inspection Report. San Diego Central. Redacted.2023.pd | NAPHCARE006 | |
| 3/26/2024 | 045. Naphcare, Inc. Pharmacist Inspection Report. San Diego Central. Redacted.2023.pdf | 20231220 NaphCare Produced Documents [password ██████ | 20231002 |
| 3/26/2024 | 046. Naphcare, Inc. Pharmacist Inspection Report. Vista. Redacted. 2022.pdf | 20231220 NaphCare Produced Documents [password ██████ | 20231002 |
| 3/26/2024 | 046. Naphcare, Inc. Pharmacist Inspection Report. Vista. Redacted. 2022.pdf | NAPHCARE006 | |

Ex. B-225

| 3/26/2024 | 047. Naphcare, Inc. Pharmacist Inspection Report. Vista. Redacted. 2023.pdf | 20231220 NaphCare Produced Documents [password ████████ | 20231002 |
| 3/26/2024 | 047. Naphcare, Inc. Pharmacist Inspection Report. Vista. Redacted. 2023.pdf | NAPHCARE006 | |
| 3/26/2024 | 048. Naphcare, Inc. Pharmacist Inspection Report. East Mesa. Redacted. 2022.pdf | 20231220 NaphCare Produced Documents [password ████████ | 20231002 |
| 3/26/2024 | 048. Naphcare, Inc. Pharmacist Inspection Report. East Mesa. Redacted. 2022.pdf | NAPHCARE006 | |
| 3/26/2024 | 049. Naphcare, Inc. Pharmacist Inspection Report. East Mesa. Redacted. 2023.pdf | 20231220 NaphCare Produced Documents [password ████████ | 20231002 |
| 3/26/2024 | 049. Naphcare, Inc. Pharmacist Inspection Report. East Mesa. Redacted. 2023.pdf | NAPHCARE006 | |
| 3/26/2024 | 050. Naphcare, Inc. Pharmacist Inspection Report. George Bailey. Redacted. 2022.pdf | 20231220 NaphCare Produced Documents [password ████████ | 20231002 |
| 3/26/2024 | 050. Naphcare, Inc. Pharmacist Inspection Report. George Bailey. Redacted. 2022.pdf | NAPHCARE006 | |
| 3/26/2024 | 051. Naphcare, Inc. Pharmacist Inspection Report. George Bailey. Redacted. 2023.pdf | 20231220 NaphCare Produced Documents [password ████████ | 20231002 |
| 3/26/2024 | 051. Naphcare, Inc. Pharmacist Inspection Report. George Bailey. Redacted. 2023.pdf | NAPHCARE006 | |
| 3/26/2024 | 052. Naphcare, Inc. Pharmacist Inspection Report. Los Colinas. Redacted. 2022.pdf | 20231220 NaphCare Produced Documents [password ████████ | 20231002 |

**Ex. B-226**

| | | | |
|---|---|---|---|
| 3/26/2024 | 052. Naphcare, Inc. Pharmacist Inspection Report. Los Colinas. Redacted. 2022.pdf | NAPHCARE006 | |
| 3/26/2024 | 053. Naphcare, Inc. Pharmacist Inspection Report. Los Colinas. Redacted. 2023.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 053. Naphcare, Inc. Pharmacist Inspection Report. Los Colinas. Redacted. 2023.pdf | NAPHCARE006 | |
| 3/26/2024 | 054. Dates of Incarceration.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 054. Dates of Incarceration.pdf | NAPHCARE006 | |
| 3/26/2024 | 055. HSR Infection Control. San Diego. 01.22-12.22.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 055. HSR Infection Control. San Diego. 01.22-12.22.pdf | NAPHCARE006 | |
| 3/26/2024 | 056. HSR Infection Control. San Diefo. 01.23-07.23.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 056. HSR Infection Control. San Diefo. 01.23-07.23.pdf | NAPHCARE006 | |
| 3/26/2024 | 057. Time Detail Report. CA San Diego.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 057. Time Detail Report. CA San Diego.pdf | NAPHCARE006 | |
| 3/26/2024 | 058. San Diego Naphcare Roster.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |

Ex. B-227

| 3/26/2024 | 058. San Diego Naphcare Roster.pdf | NAPHCARE006 | |
|---|---|---|---|
| 3/26/2024 | 059. San Diego Full Report. 010122-present.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 059. San Diego Full Report. 010122-present.pdf | NAPHCARE006 | |
| 3/26/2024 | 060. Dental Appointments Report. Redacted.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231002 |
| 3/26/2024 | 060. Dental Appointments Report. Redacted.pdf | NAPHCARE006 | |
| 3/26/2024 | 066. Employee Discipline Report. Redacted. 110422.pdf | NAPHCARE006 | |
| 3/26/2024 | 067. Naphcare Master Staff Roster.pdf | NAPHCARE006 | |
| 3/26/2024 | 068. Time Detail Report. CA SD. 06.2022-09.2023.pdf | NAPHCARE006 | |
| 3/26/2024 | 069. SD Dental Extractions with Facility.2023.pdf | NAPHCARE006 | |
| 3/26/2024 | 070. Columbia Suicide Screening Form. Central Jail.pdf | NAPHCARE006 | |
| 3/26/2024 | 071. Health Assessment Form. Central Jail.pdf | NAPHCARE006 | |
| 3/26/2024 | 072. W-PSU Transfer Discharge Form. Central Jail.pdf | NAPHCARE006 | |
| 3/26/2024 | 073. Mental Health Screening Form. Central Jail.pdf | NAPHCARE006 | |
| 3/26/2024 | 074. Dental Form. Central Jail.pdf | NAPHCARE006 | |
| 3/26/2024 | 075. San Diego Naphcare Roster. 69A.pdf | NAPHCARE006 | |
| 3/26/2024 | 076. SD Full Report. 010122 to Present.pdf | NAPHCARE006 | |

Ex. B-228

| | | |
|---|---|---|
| 3/26/2024 | 077. Time Detail Report. CA San Diego.pdf | NAPHCARE006 |
| 3/26/2024 | 078. RN Care Protocols.pdf | NAPHCARE006 |
| 3/26/2024 | 079. MH Care Protocols.pdf | NAPHCARE006 |
| 3/26/2024 | 080. LPN Care Protocols.pdf | NAPHCARE006 |
| 3/26/2024 | 081. Health Care Policy and Procedure Manual.pdf | NAPHCARE006 |
| 3/26/2024 | 082. NaphCare Org. Chart for SD.pdf | NAPHCARE006 |
| 3/26/2024 | 083. Mental Health Rehab Specialist JD.pdf | NAPHCARE006 |
| 3/26/2024 | 084. Mental Health Proffessional JD.pdf | NAPHCARE006 |
| 3/26/2024 | 085. Mental Health Discharge Planner JD.pdf | NAPHCARE006 |
| 3/26/2024 | 086. Mental Health Director JD.pdf | NAPHCARE006 |
| 3/26/2024 | 087. Limited Radiology Technologist JD.pdf | NAPHCARE006 |
| 3/26/2024 | 088. Health Services Admin JD.pdf | NAPHCARE006 |
| 3/26/2024 | 089. Limited Radiology Technologist JD.pdf | NAPHCARE006 |
| 3/26/2024 | 090. Health Services Admin JD.pdf | NAPHCARE006 |
| 3/26/2024 | 091. Dentist JD.pdf | NAPHCARE006 |
| 3/26/2024 | 092. Dental Assistant JD.pdf | NAPHCARE006 |
| 3/26/2024 | 093. Corporate Psych Nurse Practitioner JD.pdf | NAPHCARE006 |
| 3/26/2024 | 094. Corporate Physician Assistance JD.pdf | NAPHCARE006 |
| 3/26/2024 | 095. Corporate Nurse Practitioner JD.pdf | NAPHCARE006 |

Ex. B-229

| | | |
|---|---|---|
| 3/26/2024 | 096. Corporate Clinical Auditor I JD.pdf | NAPHCARE006 |
| 3/26/2024 | 097. Behavioral Mental Health Technician JD.pdf | NAPHCARE006 |
| 3/26/2024 | 098. Admin Assistant JD.pdf | NAPHCARE006 |
| 3/26/2024 | 099. Medication Order Date and First Dose Administered.pdf | NAPHCARE006 |
| 3/26/2024 | 100. ER Provider Sendouts.pdf | NAPHCARE006 |
| 3/26/2024 | 101. Offsite Status Detail.pdf | NAPHCARE006 |
| 3/26/2024 | 102. Peer Review One. 051023.pdf | NAPHCARE006 |
| 3/26/2024 | 103. Peer Review Two. 051923.pdf | NAPHCARE006 |
| 3/26/2024 | 104. Peer Review Three. 052323.pdf | NAPHCARE006 |
| 3/26/2024 | 105. Peer Review Four. 051523.pdf | NAPHCARE006 |
| 3/26/2024 | 106. Peer Review Five. 051423.pdf | NAPHCARE006 |
| 3/26/2024 | 107. Peer Review Six. 051523.pdf | NAPHCARE006 |
| 3/26/2024 | 108. Peer Review Seven. 052423.pdf | NAPHCARE006 |
| 3/26/2024 | 109. Peer Review Eight. 052323.pdf | NAPHCARE006 |
| 3/26/2024 | 110. Peer Review Nine. 052223.pdf | NAPHCARE006 |
| 3/26/2024 | 111. Peer Review Ten.pdf | NAPHCARE006 |
| 3/26/2024 | 112. SD Naphcare Roster. Unredacted. NAPHCARE031057.xlsx | NAPHCARE006 |
| 3/26/2024 | 113. Completed Sick Calls. 090723. Unredacted. NAPHCARE031058.csv | NAPHCARE006 |
| 3/26/2024 | 114. ER Provider Sendouts. 121923. Unredacted. NAPHCARE031059.xlsx | NAPHCARE006 |

| | | | |
|---|---|---|---|
| 3/26/2024 | 115. Medication Order Date and First Dose Administered. Unredacted. NAPHCARE031060.xlsx | NAPHCARE006 | |
| 3/26/2024 | 116. Naphcare mater Staff Roster. Unredacted. NAPHCARE031061.xlsx | NAPHCARE006 | |
| 3/26/2024 | 117. Offsite Status Detail. 010324. Unredacted. NAPHCARE031062.xlsx | NAPHCARE006 | |
| 3/26/2024 | 118. Offsite Watch List. 060122-121923. Unredacted. NAPHCARE031063.xlsx | NAPHCARE006 | |
| 3/26/2024 | 119. SD Dental Extractions with facility for 2023. Unredacted. NAPHCARE031064.xlsx | NAPHCARE006 | |
| 3/26/2024 | 120. Health Care Policy & Proce–ure Manual - SD.081623.pdf | NAPHCARE006 | |
| 3/26/2024 | 121. Approvals of CQI Manual.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 122. County Contract with Naphcare. 021623. SD_122597.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 123. CQI Meetings. 2022-2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 124. Dental Instrument Inventory. 2022.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 125. Dental Instrument Inventory. 2023. 002.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 126. Dental Instrument Inventory. 2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 127. Infection Control Approval Page. 2020.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 128. Infection Control Manual.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 129. Infection Control Meeting. 2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 130. Infectious Disease Report. 2022.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 131. Infectious Disease Report. 2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 132. Jail Commander Daily Report. Central Jail. 2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |

Ex. B-231

| 3/26/2024 | 133. Monthly Transport Logs. 2022.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
|---|---|---|---|
| 3/26/2024 | 134. Monthly Transport Logs. 2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 135. MSD Quality Improvement Committee Meeting Minutes. 101723.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 136. NaphCare Staff Daily Report. Central Jail. 2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 137. SD Sheriff Medical Diet Manual. 2022-2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 138. SDCJ MHC Meeting Agenda and Roster. 10.2022-01.2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 139. SDCJ MHC Monthy Meetings. 2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 140. Sterilization Log and Spore Counts. 2022.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 141. Sterilization Log and Spore Counts. 2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 142. Suicide and Self-Harm Behavior Case Report. BLANK.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 143. TechCare Monthly Reports. HSR. 10.2022-11.2023.pdf | NAPHCARE008 | RRFP.0001 Ex A List. 022324 |
| 3/26/2024 | 144. 2-2-ACCESS TO CARE AO1-FORMAT.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 145. 2-3-MEDICAL AUTONOMY A03 FORMAT.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 146. 2023.04.24 Letter to Assistant Sheriff Adams-Hydar.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 5/15/2024 | 147. 2023.05.05 NaphCare response to Corrective Action Notice. | | |
| 3/26/2024 | 147. 2023.05.05 NaphCare response to Corrective Action Notice.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 5/15/2024 | 148. 2023.05.19 NaphCare response to Corrective Action Notice | | |
| 3/26/2024 | 148. 2023.05.19 NaphCare response to Corrective Action Notice.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 5/15/2024 | 149. 2023.05.24 NaphCare Response Letter to Corrective Action Notice | | |

**Ex. B-232**

| | | | |
|---|---|---|---|
| 3/26/2024 | 149. 2023.05.24 NaphCare Response Letter to Corrective Action Notice .pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 150. 2023.05.24 xA–tachment B - QMHP License Copies-_redacted.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 151. 2023.05.24 xA–tachment C - San Diego MH License Spreadsheet.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 152. 2023.05.24 xAttachment'D- NaphCare's Reports.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 153. 2023.06.06-EASS SDCJ Coordination.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 5/15/2024 | 154. 2023.06.16 NaphCare Status Update  Regarding Corrective Action Notice | | |
| 3/26/2024 | 154. 2023.06.16 NaphCare Status Update Regarding Corrective Action Notice.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 5/15/2024 | 155. 2023.08.25 NaphCare Status Update  Regarding Corrective Action Notice | | |
| 3/26/2024 | 155. 2023.08.25 NaphCare Status Update Regarding Corrective Action Notice.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 5/15/2024 | 156. 2023.09.29 NaphCare Status Update  Regarding Corrective Action Notice | | |
| 3/26/2024 | 156. 2023.09.29 NaphCare Status Update Regarding Corrective Action Notice.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 157.–2023.10.13 - San Diego StatCare Providers.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 5/15/2024 | 158. 2023.10.19 NaphCare Status Update  Regarding Corrective Action Notice | | |
| 3/26/2024 | 158. 2023.10.19 NaphCare Status Update Regarding Corrective Action Notice.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 5/15/2024 | 159. 2023.11.03 NaphCare Status Update  Regarding Corrective Action Notice | | |
| 3/26/2024 | 159. 2023.11.03 NaphCare Status Update Regarding Corrective Action Notice.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 160. 2023.12.5 NaphCare Letter re Radiology Services.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 161. 2023.12.7 NaphCare Letter to the SDSD Regarding Tamper Proof Prison Wheeelchairs.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |

Ex. B-233

| 3/26/2024 | 162. 2023.12.8 NaphCare Status Update Regarding Corrective Action Notice.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
|---|---|---|---|
| 3/26/2024 | 163. 2023.12.8 xCDCR Root Canal treatment guidelines112023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 164. 2023.12.18 NaphCare Letter to the SDSD Regarding Root Canals.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 165. 2023.12.20 Proposed Plan for Discharge Medications.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 166. 2023.12.27 NaphCare Letter to the SDSD Regarding Dental Audit.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 167. 2023.12.29 NaphCare Letter to the SDSD Regarding Dental Sick Call Report Nov 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 168. 2023.12.29 xDec. 2023 Completed Dental Sick Call Report.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 5/15/2024 | 169. 5661–7 Naphcare - Corrective Action Notice (CAN)_08.17.2023 | | |
| 3/26/2024 | 169. 5661–7 Naphcare - Corrective Action Notice (CAN)_08.17.2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 5/15/2024 | 170. 5661–7 Naphcare - Corrective Action Notice (CAN)_09.08.2023 | | |
| 3/26/2024 | 170. 5661–7 Naphcare - Corrective Action Notice (CAN)_09.08.2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 171. Attendance Roster. BLANK.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 172. Blank Dental Form.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 173. Blank Health Assessment Form.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 174. Blank Mental Health Screening form.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 175. Blank MH evaluation form.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 176. Blank Psychiatric Evaluation form.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 177. Blank Psychiatric Progress notes.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |

Ex. B-234

| | | | |
|---|---|---|---|
| 3/26/2024 | 178. Blank Receiving Screen Form.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 179. Blank Refusal to Accept Medical Care-Treatment. Spanish.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 180. Blank Refusal to Accept Medical Care-Treatment.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 181. Blank Specific informed Consent Spanish.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 182. Blank Specific informed Consent.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 183. Blank. Specific informed Consent Spanish.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 184. Blank. Specific informed Consent.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 185. Corrective Action Notice (CAN) Naphcare 56611 4-27-23..pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 186. Corrective Action Notice (CAN) Naphcare 56611 5-12-23.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 187. Dental Hygiene Patient Education.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 188. Dental Peer Review 1.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 189. Dental Peer Review 2.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 190. Dental Screening Training.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 191. ED Sendouts-December 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 192. ER log-June. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 193. ER send out log-October 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 194. ER sendout log-July. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 195. ER sendouts- April. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 196. ER sendouts- August. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |

Ex. B-235

| 3/26/2024 | 197. ER sendouts- December. 2022.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 198. ER sendouts- February. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 199. ER sendouts- November. 2022.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 200. ER sendouts- November. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 201. ER sendouts- October. 2022.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 4/3/2024 | 2016.02.29-First Aid Session –escription - Prop A PDF.pdf | | |
| 4/3/2024 | 2017.02.01-EXPANDED COURSE OUTLINE34.pdf | | |
| 4/3/2024 | 2017.02.01-First Aid Lesson #1.pdf | | |
| 4/3/2024 | 2017.02.01-First Aid Lesson #2.pdf | | |
| 4/3/2024 | 2017.02.01-First Aid Lesson #3.pdf | | |
| 4/3/2024 | 2017.02.01-First Aid Lesson #4.pdf | | |
| 4/3/2024 | 2017.02.01-First Aid Lesson #5.pdf | | |
| 4/3/2024 | 2017.02.01-First Aid Lesson #6.pdf | | |
| 3/26/2024 | 202. ER sendouts- September. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 4/3/2024 | 2020-05-01 PSU Orientation Outline.pdf | | |
| 4/3/2024 | 2020-05-15 Class 8.2 Medical Emergencies LESSON PLAN .pdf | | |
| 4/3/2024 | 2020-05-15 Class 8.3 -Medical Legal Issues LESSON PLAN.pdf | | |
| 4/3/2024 | 2020-12-01 PSU orientation Lesson Plan.pdf | | |
| 4/3/2024 | 2020-12-1– Class 8.1 - Medical Issues and Universal Precautions LESSON PLAN .pdf | | |

Ex. B-236

| | | | |
|---|---|---|---|
| 4/3/2024 | 2021-08-23–Class 20.7 - SUICIDE PREVENTION LESSON PLAN (BSCC APPROVED).pdf | | |
| 5/23/2024 | 2023.06.15 San Diego P&T Meeting Minutes | Pharmacy and Therapeutics Meetings | 6.15.23 |
| 5/23/2024 | 2023.08.28 Presentation San Diego | Pharmacy and Therapeutics Meetings | 8.28.23 |
| 5/23/2024 | 2023.08.28 San Diego P&T Meeting Minutes | Pharmacy and Therapeutics Meetings | 8.28.23 |
| 5/23/2024 | 2023.12.07 San Diego P&T Meeting Minutes | Pharmacy and Therapeutics Meetings | 12.7.23 |
| 5/23/2024 | 2023.12.07 SD Presentation | Pharmacy and Therapeutics Meetings | 12.7.23 |
| 4/3/2024 | 2023-06-30 CPR OUTLINE.pdf | | |
| 4/3/2024 | 2023-06-30 DTN CPR Lesson Plan.pdf | | |
| 5/23/2024 | 2024.03.12 P&T Meeting Minutes | Pharmacy and Therapeutics Meetings | 3.12.24 |
| 5/23/2024 | 2024.03.12 P&T Meet–ng Minutes - Addendum | Pharmacy and Therapeutics Meetings | 3.12.24 |
| 5/23/2024 | 2024.03.12 San Diego Presentation | Pharmacy and Therapeutics Meetings | 3.12.24 |
| 7/3/2024 | –2024.05.05 - ███████ | | |
| 4/3/2024 | 2024-01-16 Suicide Detection & Prevention LESSON PLAN.pdf | | |
| 4/5/2024 | 2024-01-16 Suicide Detection and Prevention Course.pdf | | |
| 5/23/2024 | 2024-NEO Training Book (Presentation Packet) | NEO curriculum | |
| 3/26/2024 | 203. ER Sendouts-January. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 204. ER sendouts-March. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 205. ER sendouts-May. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |

**Ex. B-237**

| | | | |
|---|---|---|---|
| 3/26/2024 | 205. RN Care Protocols.pdf | NAPHCARE004 | |
| 3/26/2024 | 206. ER sendouts-September. 2022.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 206. MH Care Protocols.pdf | NAPHCARE004 | |
| 3/26/2024 | 207. Health Care Policy & Procedure Manual. Rock Mountain.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 207. LPN Care Protocols.pdf | NAPHCARE004 | |
| 3/26/2024 | 208. Health Care Policy & Procedure Manual. South Bay.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 208. Health Care Policy and Procedure Manual.pdf | NAPHCARE004 | |
| 3/26/2024 | 209. Health Care Policy and Procedure Manual.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 210. Infection Control Report. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 211. JBCT Notice of Bypass Letters.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 212. List of Speciality Providers. 100422.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 213. Mede-Waste BPA Pricing.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 214. Medi-Waste. 05-2021-042026.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 215. Mental Health ER log-September. 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 216. NaphCare_Stats.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 217. Nursing Protocol Manual.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 218. offsite appointments-November.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 219. Offsite log-October 2023.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 220. Receiving Screening Form. BLANK.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |

**Ex. B-238**

| 3/26/2024 | 221. Right of Refusal and Informed Consent Forms. BLANK.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
|---|---|---|---|
| 3/26/2024 | 222. SDCJ-Off Site Clinics-October. 2022.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 223. Staff Meeting 03.02.23.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 224. x-ray Certificate.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 225. Blank Sick Call Form.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 226. 2023- Monthly Report. NAPHCARE0036025.xlsx | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 227. off site –ppointmens - February 2023. NAPHCARE0036026.xlsx | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 228. off site a–pointments - August. 2023. NAPHCARE0036027.csv | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 229. off site a–pointments - July. 2023. NAPHCARE0036028.xlsx | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 230. Off site Clinics  April 2023. NAPHCARE0036029.csv | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 231. Off site Clinics  May 2023. NAPHCARE0036030.csv | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 232. Off site Clinics Jan 2023. NAPHCARE0036031.csv | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 233. Off site Clinics March 2023. NAPHCARE0036032.csv | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 234. Offsite a–pointments - June. 2023. NAPHCARE0036033.xlsx | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 235. offsite a–p  eptember - september. 2023. NAPHCARE0036034.csv | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 236. Offsite Clinics-December 2023. NAPHCARE0036035.xlsx | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 237. Off-Site Visits. DEC-2022. NAPHCARE0036036.xlsx | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 238. Off-Site Visits. NOV-2022. NAPHCARE0036037.xlsx | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 239. San Diego Full Report_Selected Trainings. NAPHCARE0036038.xlsx | NAPHCARE008 | Supp. RRFP. 008. 022724 |

**Ex. B-239**

| 3/26/2024 | 240. vista sterilization documents.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 3/26/2024 | 241. EAST MESA STERLIZATION REPORT DOCUMENTS.pdf | NAPHCARE008 | Supp. RRFP. 008. 022724 |
| 7/3/2024 | 3 Day–ICD Review - ██████ | | |
| 7/3/2024 | 3 Day–ICD Review - ████ | | |
| 7/3/2024 | 3 Day–ICD Review - ██████ | | |
| 7/3/2024 | 3 Day–ICD Review - █████ | | |
| 3/26/2024 | 324. MSD Leadership Meeting Agenda. 122923.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 325. Formulary. 2022.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 326. Formulary. 2023.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 327. Renewal of Overland FAC0005188 final. 112023.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 5/9/2024 | 3-27-2024 ██████ (N.██████) CONFIDENTIAL.pdf | | |
| 5/9/2024 | 3-27-2024 ██████ EXHIBIT A CONFIDENTIAL.pdf | | |
| 5/9/2024 | 3-27-2024 ██████ EXHIBIT C CONFIDENTIAL.pdf | | |
| 5/9/2024 | 3-27-2024 ██████ EXHIBIT E CONFIDENTIAL.pdf | | |
| 3/26/2024 | 328. Proposed Plan for Discharge Medications. 122023.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 329. ████ 1725A.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 330. ██████ for Jail Bas–d Programs - SIR.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 331. ██████ pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 332. Non-Formulary Request.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |

Ex. B-240

| 3/26/2024 | 333. Radiation Machine Registration (GBDF-FAC00051808) expires 01-31-2024.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
|---|---|---|---|
| 3/26/2024 | 334. Radiation Machine Registration (GBDF-FAC00085302) expires 07-31-2024.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 335. Radiation Machine Registration (LCDRF-FAC00085303) expires 07-31-2024.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 336. Radiation Machine Registration (SDCJ-FAC00085304) expires 07-31-2024.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 337. Radiation Machine Registration (VDF-FAC00085305) expires 07-31-2024.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | ███████████████ for Jail Based Programs .pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 339. San Diego-NaphCare Contract 563996- inc in later agrmnt.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 340. Abbo, Michael.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 341. Allara, Jack.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 342. Anarde, Brooke.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 343. Ancho, Kristoffer.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 344. Anderson, Lauren.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 345. Anthony, Sharon.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 346. Arganda, Daniel.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 347. Bahramzi, Noor.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 348. Balingit, Jason.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 349. Barnes, Sophia.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 350. Barrajero,Obel.pdf | NAPHCARE009 | Supp. RRFP. 010. 031124 |

**Ex. B-241**

| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 351. Baun, Mary Jane.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 352. Beaston, Lacey.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 353. Benjestorf, Suzanne.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 354. Bilash, Timothy.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 355. Bobo, Jerry.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 356. Bongard, Chris.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 357. Borquez, Randolph.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 358. Brassett, Noel.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 359. Bueno, Angela.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 360. Bunch, Freddie.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 361. Carlton, Sharmila.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 362. Central May 2022.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 363. Central May 2023.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 364. Central November 2022.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 365. Central November 2023.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 366. Christensen,David.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 367. Cornejo, Emiliza.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 368. Cruz, Anthony.pdf | | |
| 3/26/2024 | | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| | 369. Dai, Nhi.pdf | | |

Ex. B-242

| | | |
|---|---|---|
| 3/26/2024 | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 370. Damavandi, Noor.pdf | | |
| 3/26/2024 | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 371. Deilgat, Jaclyn.pdf | | |
| 3/26/2024 | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 372. Dirick, Cecile.pdf | | |
| 3/26/2024 | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 373. Duffey, Astinne.pdf | | |
| 3/26/2024 | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 374. Enworom, Ozioma.pdf | | |
| 3/26/2024 | NAPHCARE009 | Supp. RRFP. 010. 031124 |
| 375. Epps-Robbins, DeAndra.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 376. Evans, Miranda.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 377. Farr, Vickie.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 378. Farrier, Dawn.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 379. Farrier, Michael.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 380. Freeland, Peter.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 381. Fuller-Christie, Jennifer.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 382. Galaviz, Daniella.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 383. Gallardo, Fernanda.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 384. Garcia, Alejandro.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 385. George Bailey 2022.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 386. George Bailey 2023.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 387. Gill, John.pdf | | |
| 3/26/2024 | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 388. Gomez, Connie.pdf | | |

Ex. B-243

| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 389. Grani, Shelley.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 390. Green, Kaitlyn.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 391. Guico, Demetrio.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 392. Hamilton, Tina.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 393. Hays, Austin.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 394. Hazelwood, Lisa.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 395. Hernandez, Luis.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 396. Hoskins, Marisa.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 397. Hurley, Teresa.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 398. Jackson, Desmond.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 399. Jibril, Deanah.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 400. Joachim, James.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 401. John, Katrina.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 402. Johnson, Angeline.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 403. Johnson, Christopher.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 404. Kahl, Nicholas.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 405. Keiling, Miriam.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 406. Kile, Jeffrey.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 407. Kistler, Jonathan.pdf | | |

Ex. B-244

| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 408. Kutas, Robert.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 409. Lake, Benjamin.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 410. Langham, Kathryn.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 411. Larson, Lindsay.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 412. Las Colinas 2022.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 413. Las Colinas 2023.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 414. Lee, Arim.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 415. Leon, Arturo.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 416. Lingad, Jeff.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 417. Liu, Joseph.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 418. Love, Vicki.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 419. Megert, Sonya.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 420. Mendenwald, Janet.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 421. Mian, Jan.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 422. Miles, Lauralyn.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 423. Milla, Jeremias.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 424. Mims, Emily.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 425. Molina, Joseph.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 426. Nizamani, Saifullah.pdf | | |

Ex. B-245

| | | | |
|---|---|---|---|
| 3/26/2024 | 426. SD Dental Extractions with Facility.2023.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231116 |
| 3/26/2024 | 427. Noh, Kyung.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 428. Oates, Kira.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 429. Panganiban, Destiny.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 430. Columbia Suicide Screening Form. Central Jail.pdf | 20231220 NaphCare Produced Documents [password ███████ ] | 20231213 |
| 3/26/2024 | 430. Patel, Divya.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 431. Health Assessment Form. Central Jail.pdf | 20231220 NaphCare Produced Documents [password ███████ | 20231213 |
| 3/26/2024 | 431. Patsner, Bruce.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 432. Payne, Tiffany.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 432. W-PSU Transfer Discharge Form. Central Jail.pdf | 20231220 NaphCare Produced Documents [password ███████ ] | 20231213 |
| 3/26/2024 | 433. Mental Health Screening Form. Central Jail.pdf | 20231220 NaphCare Produced Documents [password ███████ ] | 20231213 |
| 3/26/2024 | 433. Polanco, Justin.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 434. Dental Form. Central Jail.pdf | 20231220 NaphCare Produced Documents | 20231213 |

| | | [password ████████ ] | |
|---|---|---|---|
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 434. Quilon, Anthony.pdf | | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 435. Rafi, Nas.pdf | | |
| 3/26/2024 | 435. San Diego Naphcare Roster. 69A.pdf | 20231220 NaphCare Produced Documents [password ████████ ] | 20231213 |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 436. Ram, Rana.pdf | | |
| 3/26/2024 | 436. SD Full Report. 010122 to Present.pdf | 20231220 NaphCare Produced Documents [password ████████ ] | 20231213 |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 437. Razzouki, Anita.pdf | | |
| 3/26/2024 | 437. Time Detail Report. CA San Diego.pdf | 20231220 NaphCare Produced Documents [password ████████ ] | 20231213 |
| 3/26/2024 | 438. NaphCare Org. Chart for SD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 438. Reddy, Lali.pdf | | |
| 3/26/2024 | 439. Mental Health Rehab Specialist JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 439. Reeder, Lyshone.pdf | | |
| 3/26/2024 | 440. Mental Health Proffesional JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 440. Reisdorf, Sonia.pdf | | |
| 3/26/2024 | 441. Mental Health Discharge Planner JD.pdf | NAPHCARE004 | |

Ex. B-247

| | | | |
|---|---|---|---|
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 441. Reza, Matthew.pdf | | |
| 3/26/2024 | 442. Mental Health Director JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 442. Robinson, Ashley.pdf | | |
| 3/26/2024 | 443. Limited Radiology Technologist JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 443. Robinson, Rebecca.pdf | | |
| 3/26/2024 | 444. Health Services Admin JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 444. Rodriguez, Angela.pdf | | |
| 3/26/2024 | 445. Limited Radiology Technologist JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 445. Romero, Jessica.pdf | | |
| 3/26/2024 | 446. Health Services Admin JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 446. Roos, Jessica.pdf | | |
| 3/26/2024 | 447. Dentist JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 447. Rosati, Nicholas.pdf | | |
| 3/26/2024 | 448. Dental Assistant JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 448. Rosete, Nicolas.pdf | | |
| 3/26/2024 | 449. Corporate Psych Nurse Practitioner JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 449. Seabron, Tabitha.pdf | | |
| 3/26/2024 | 450. Corporate Physician Assistance JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 450. Simon, Nakia.pdf | | |

Ex. B-248

| | | | |
|---|---|---|---|
| 3/26/2024 | 451. Corporate Nurse Practitioner JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 451. South Bay 2022.pdf | | |
| 3/26/2024 | 452. Corporate Clinical Auditor I JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 452. South Bay 2023.pdf | | |
| 3/26/2024 | 453. Behavioral Mental Health Technician JD.pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 453. Storozhenko, Galina.pdf | | |
| 3/26/2024 | 454. Admin Assistant JD .pdf | NAPHCARE004 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 454. Sullivan, Christine.pdf | | |
| 3/26/2024 | 455. Medication Order Date and First Dose Administered.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 455. Theron Wells.pdf | | |
| 3/26/2024 | 456. ER Provider Sendouts.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 456. Thompson, Stacy.pdf | | |
| 3/26/2024 | 457. Offsite Status Detail.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 457. Torres, Daniella.pdf | | |
| 3/26/2024 | 458. Peer Review One. 051023.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 458. Torres, Tiffany.pdf | | |
| 3/26/2024 | 459. Peer Review Two. 051923.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 459. Trinidad, Juancho.pdf | | |
| 3/26/2024 | 460. Peer Review Three. 052323.pdf | NAPHCARE005 | |

Ex. B-249

| | | | |
|---|---|---|---|
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 460. Uriarte, Nathalie.pdf | | |
| 3/26/2024 | 461. Peer Review Four. 051523.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 461. Vista 2022.pdf | | |
| 3/26/2024 | 462. Peer Review Five. 051423.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 462. Vista 2023.pdf | | |
| 3/26/2024 | 463. Peer Review Six. 051523.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 463. Wallace, Matthew.pdf | | |
| 3/26/2024 | 464. Peer Review Seven. 052423.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 464. Wojtasiewicz, Julie.pdf | | |
| 3/26/2024 | 465. Peer Review Eight. 052323.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 465. Wycoco, Frederick.pdf | | |
| 3/26/2024 | 466. Peer Review Nine. 052223.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 466. Zilberman, Gordon.pdf | | |
| 3/26/2024 | 467. Peer Review Ten.pdf | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 467. TechCare 1st Quarter Report.pdf | | |
| 3/26/2024 | 468. SD Naphcare Roster. Unredacted. NAPHCARE031057.xlsx | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 468. TechCare 3rd Quarter Report.pdf | | |
| 3/26/2024 | 469. Completed Sick Calls. 090723. Unredacted. NAPHCARE031058.csv | NAPHCARE005 | |
| 3/26/2024 | | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| | 469. TechCare 2nd Quarter Report.pdf | | |

Ex. B-250

| 3/26/2024 | 470. ER Provider Sendouts. 121923. Unredacted. NAPHCARE031059.xlsx | NAPHCARE005 | |
| 3/26/2024 | 470. TechCare 4th Quarter Report.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 471. Complete offsite July 2023. NAPHCARE037996.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 471. Medication Order Date and First Dose Administered. Unredacted. NAPHCARE031060.xlsx | NAPHCARE005 | |
| 3/26/2024 | 472. Completed Hospital send out Nov 2023_with location. NAPHCARE037997.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 472. Naphcare mater Staff Roster. Unredacted. NAPHCARE031061.xlsx | NAPHCARE005 | |
| 3/26/2024 | 473. Completed Hospital Send outs Oct 2023. NAPHCARE037998.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 473. Offsite Status Detail. 010324. Unredacted. NAPHCARE031062.xlsx | NAPHCARE005 | |
| 3/26/2024 | 474. Completed Hospital Send outs Dec 2023. NAPHCARE037999.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 474. Offsite Watch List. 060122-121923. Unredacted. NAPHCARE031063.xlsx | NAPHCARE005 | |
| 3/26/2024 | 475. Completed offsite Aug 2023. NAPHCARE038000.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 475. SD Dental Extractions with facility for 2023. Unredacted. NAPHCARE031064.xlsx | NAPHCARE005 | |
| 3/26/2024 | 476. Completed Offsite Dec 2023. NAPHCARE038001.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 477. Completed Offsite Nov 2023. NAPHCARE038002.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 478. Completed Offsites Oct 2023. NAPHCARE038003.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 479. Completed Onsite Aug 2023. NAPHCARE038004.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 480. Completed Onsite Dec 2023. NAPHCARE038005.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 481. Completed Onsite Nov 2023. NAPHCARE038006.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |

Ex. B-251

| | | | |
|---|---|---|---|
| 3/26/2024 | 482. Completed Onsites Oct 2023. NAPHCARE038007.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 483. Completed Telehealth Aug 2023. NAPHCARE038008.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 484. Completed Telehealth Oct 2023. NAPHCARE038009.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 485. Copy of SD JBCT December 2023 SIR Log. NAPHCARE038010.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 486. Copy of –ime Detail - CA San Diego. NAPHCARE038011.xls | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 487. Dental Appointment Report. NAPHCARE038012.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 488. Hospital Send outs September 2023. NAPHCARE038013.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 489. July 2023 Completed onsites. NAPHCARE038014.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 490. Offsite Report September 2023. NAPHCARE038015.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 491. Onsite Report September 2023. NAPHCARE038016.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 492. repor–_SAN DIEGO - REQUISITION HX. NAPHCARE038017.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 493. San Diego Full Report_Selected Trainings. NAPHCARE038018.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 494. Telehealth Report September 2023. NAPHCARE038019.xlsx | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 495– Emails Re - EXTERNAL _ER Sendou– Discharge - Admitted to Hospital.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 496– Emails Re - EXTERNAL _ER Sendou– Discharge - Returned to Facility.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 497– Emails Re - EXTERNAL _ER Sendout Discharge.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 498– Emails Re - EXTERNAL _ER Sendout.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 499. EXTERNAL _hospital report 7 26 2023.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |

Ex. B-252

| 3/26/2024 | 500. EXTERNAL _hospital report 8 23 2023.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
|---|---|---|---|
| 3/26/2024 | 501. Fwd_ _EXTERNAL__MSD Leadership Meeting.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 502. RE EXTERNAL_MSD Leadership Follow-up.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 503. Re EXTERNAL_Optometry Services.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 3/26/2024 | 504. TechCare Daily Email Report for 1 27 2024 7 00 03 AM.pdf | NAPHCARE006 | Supp. RRFP. 010. 031124 |
| 4/25/2024 | ABDULHAFEEZ, MUSLAH 24700105.pdf | Intake | |
| 5/14/2024 | ███████████████ | Mental Health | |
| 5/15/2024 | ███████████████ | Mental Health | |
| 5/7/2024 | ███████████████.pdf | Nurse Sick Calls | |
| 5/23/2024 | Adams-Hydar, Theresa | Depositions | |
| 4/12/2024 | Adsep Template for MHC.pdf | April 10, 2024 | |
| 4/25/2024 | ███████████████ | Chronic Care | |
| 5/23/2024 | Aguinaldo, Michelle | Depositions | |
| 5/14/2024 | ███████████████ | Chronic Care | |
| 5/15/2024 | ███████████████ | Chronic Care | |
| 5/7/2024 | ███████████████.pdf | Nurse Sick Calls | |
| 4/25/2024 | ███████████████.pdf | Intake | |
| 5/23/2024 | Alonso, Jennifer, LCSW | Depositions | |
| 5/14/2024 | ███████████████ | Chronic Care | |

**Ex. B-253**

| 5/15/2024 | ███████████ | Chronic Care | |
|---|---|---|---|
| 5/23/2024 | Alto Peer rev_01202024 | Question #2 Peer Reviews | Additional MH Items- Dunsmore |
| 5/23/2024 | Alvarado, Isaac, Sgt | Depositions | |
| 5/23/2024 | Alvarado, Michael | Depositions | |
| 5/14/2024 | ███████████ | Chronic Care | |
| 5/15/2024 | ███████████ | Chronic Care | |
| 4/25/2024 | ███████████.pdf | Intake | |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls | |
| 4/25/2024 | ███████████ ███████.pdf | Intake | |
| 6/11/2024 | ███████████ | Sample of non-formulary records | |
| 6/25/2024 | Andr–de, Andree - Plaintiff | Depositions | |
| 4/25/2024 | ███████████.pdf | Intake | |
| 5/14/2024 | ███████████7836 | Mental Health | |
| 5/15/2024 | ███████████ | Mental Health | |
| 5/14/2024 | ███████████ | Mental Health | |
| 5/15/2024 | ███████████ | Mental Health | |
| 5/15/2024 | Archul–ta, Ernest - Plaintiff | Depositions | |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls | |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls | |

Ex. B-254



| Date | | Category |
|---|---|---|
| 5/14/2024 | | Chronic Care |
| 5/15/2024 | | Chronic Care |
| 5/7/2024 | .pdf | Nurse Sick Calls |
| 6/11/2024 | | Sample of non-formulary records |
| 4/19/2024 | A–tachment E - PERT Outline (2) | |
| 5/7/2024 | .pdf | Nurse Sick Calls |
| 4/25/2024 | .pdf | Intake |
| 5/7/2024 | pdf | Nurse Sick Calls |
| 5/7/2024 | .pdf | Nurse Sick Calls |
| 5/14/2024 | | Mental Health |
| 5/15/2024 | | Mental Health |
| 5/7/2024 | .pdf | Nurse Sick Calls |
| 4/25/2024 | pdf | Intake |
| 6/25/2024 | Bark–ey, Justin - NaphCare | Depositions |
| 5/14/2024 | | Chronic Care |
| 5/15/2024 | | Chronic Care |
| 5/23/2024 | Barragan, Michael | Depositions |
| 4/25/2024 | .pdf | Intake |
| 4/25/2024 | .pdf | Intake |

Ex. B-255



| 4/25/2024 | ████████████.pdf | Intake |
| 4/25/2024 | ████████████.pdf | Intake |
| 4/25/2024 | ████████████.pdf | Intake |
| 5/7/2024 | ██████████████.pdf | Nurse Sick Calls |
| 5/23/2024 | Bennett, Darren Scott | Depositions |
| 5/7/2024 | ███████████ | Chronic Care |
| 5/14/2024 | ████████ | Mental Health |
| 5/15/2024 | ████████ | Mental Health |
| 4/12/2024 | BH Assessment.pdf | April 10, 2024 |
| 4/12/2024 | BH Mental Health Acuity Level.pdf | April 10, 2024 |
| 4/25/2024 | ███████████.pdf | Intake |
| 5/23/2024 | Bibel, Kyle | Depositions |
| 5/7/2024 | ██████████ | Chronic Care |
| 4/25/2024 | ████████████.pdf | Nurse Sick Calls |
| 5/14/2024 | ████████394 | Mental Health |
| 5/15/2024 | █████████ | Mental Health |
| 5/23/2024 | Blackwell, David, Lt | Depositions |
| 4/25/2024 | ████████████.pdf | Intake |
| 5/7/2024 | ██████████ | Chronic Care |

**Ex. B-256**



| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 4/25/2024 | ████████████.pdf | Intake |
| 5/14/2024 | ███████████ | Dental |
| 5/15/2024 | ███████████ | Dental |
| 5/23/2024 | Bourgeois, Brendan, Lt | Depositions |
| 4/25/2024 | ████████████.pdf | Intake |
| 5/7/2024 | ███████████ | Chronic Care |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 5/14/2024 | ███ ████████ | Chronic Care |
| 5/15/2024 | ███████████ | Chronic Care |
| 6/25/2024 | Brown, Eric | Depositions |
| 5/7/2024 | ███████████ | Chronic Care |
| 5/7/2024 | ███████████ | Chronic Care |
| 5/14/2024 | ███████████ | Dental |

**Ex. B-257**



| Date | File | Category |
|---|---|---|
| 5/15/2024 | ███████████ | Dental |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 5/23/2024 | Buchanan, Chris, Commander | Depositions |
| 5/7/2024 | ███████████ | Chronic Care |
| 4/25/2024 | ████████████.pdf | Intake |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 5/7/2024 | ███████████ | Chronic Care |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ████████████.pdf | Nurse Sick Calls |
| 5/14/2024 | ███████████ | Dental |
| 5/15/2024 | ███████████ | Dental |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |

Ex. B-258



| 5/14/2024 | ████████████ | Mental Health |
| 5/15/2024 | ████████████ | Mental Health |
| 5/7/2024 | ██████████ | Chronic Care |
| 4/25/2024 | ██████████.pdf | Intake |
| 4/25/2024 | ███████████.pdf | Intake |
| 5/14/2024 | ████████████ | Mental Health |
| 5/15/2024 | ████████████ | Mental Health |
| 5/7/2024 | █████████.pdf | Nurse Sick Calls |
| 5/23/2024 | Ceballos, Patricia | Depositions |
| 5/7/2024 | █████████.pdf | Nurse Sick Calls |
| 5/23/2024 | Central.SanDiego Dual Release Card Final | Patient Pharmacy Cards |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 4/25/2024 | █████████.pdf | Intake |
| 5/7/2024 | ████████████ | Chronic Care |
| 6/11/2024 | ███████████ | Sample of non-formulary records |
| 5/7/2024 | ██████████ | Chronic Care |
| 6/11/2024 | CJ 052324 | Pharmacy inspections |
| 6/11/2024 | CJ 111623 | Pharmacy inspections |
| 5/23/2024 | Clark, James | Depositions |

Ex. B-259

| 5/7/2024 | ███████████.pdf | Nurse Sick Calls |
|---|---|---|
| 5/23/2024 | Cole, Livian, Lt | Depositions |
| 4/25/2024 | ███████████ | Chronic Care |
| 4/25/2024 | ███████████.pdf | Intake |
| 4/15/2024 | COM List.pdf | |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls |
| 4/12/2024 | Copy of Chronic Care Patients-6mos.xlsx | April 9, 2024 |
| 4/12/2024 | Copy of List of intake Jan- Mar 2024.xlsx | April 9, 2024 |
| 4/12/2024 | Copy of RNSC completed 1_1 to 3_31.xlsx | April 9, 2024 |
| 6/11/2024 | Copy of TechCare Requests Customizations for San Diego 2022 to current as of 05.30.24 does not include pending tickets | |
| 4/25/2024 | ███████████.pdf | Intake |
| 4/25/2024 | ███████████.pdf | Intake |
| 4/25/2024 | ███████████.pdf | Intake |
| 7/2/2024 | COSD In-Cus–ody Deaths - Suicide | |
| 4/25/2024 | ███████████ | Chronic Care |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls |

**Ex. B-260**

| 5/7/2024 | ████████████.pdf | Nurse Sick Calls | |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls | |
| 4/25/2024 | ███████████.pdf | Intake | |
| 4/25/2024 | ██████████ | Chronic Care | |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls | |
| 6/11/2024 | D.1.1 Pharmacuetical Operations | | |
| 5/23/2024 | Daniel Peer Review(2) 2023 | Question #2 Peer Reviews | Additional MH Items-Dunsmore |
| 4/25/2024 | ████████████.pdf | Intake | |
| 4/25/2024 | ████████████.pdf | Intake | |
| 5/14/2024 | ██████████ | Mental Health | |
| 5/15/2024 | ██████████ | Mental Health | |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls | |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls | |
| 4/25/2024 | ██████████ | Chronic Care | |
| 5/14/2024 | ██████████ | Mental Health | |
| 5/15/2024 | ██████████ | Mental Health | |
| 4/5/2024 | Defendant Amended Response t' Pla'ntiffs' RFP's | | |
| 4/5/2024 | Defendants Request to RFP Set Six | | |
| 4/12/2024 | Dental 0923_0324.xlsx | April 9, 2024 | |

**Ex. B-261**

| 4/25/2024 | DENTAL Records Pull List.xlsx | Dental | |
| 4/25/2024 | Dental_Forms-4-22-2024.xlsx | Dental | |
| 4/25/2024 | DENTAL_PROGRESS_NOTES-4-22-24.xlsx | Dental | |
| 4/25/2024 | DENTAL_SICK_CALLS-4-22-24.xlsx | Dental | |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls | |
| 5/23/2024 | Diana K. Peer review 1.19.2024 | Question #2 Peer Reviews | Additional MH Items-Dunsmore |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls | |
| 4/25/2024 | ████████████.pdf | Intake | |
| 4/25/2024 | ████████████.pdf | Intake | |
| 5/14/2024 | ████████████ | Mental Health | |
| 5/15/2024 | ████████████ | Mental Health | |
| 5/23/2024 | Diaz, Rita, Sgt | Depositions | |
| 4/25/2024 | ████████████ | Chronic Care | |
| 5/23/2024 | –Document A - Medication Pass V.1.0 updated 1.2.24 | Annual Training | |
| 5/23/2024 | –Document A - Medication Pass V.1.0 updated 1.2.24 | NEO curriculum | |
| 5/23/2024 | Document Request 5.7.2024 | | |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls | |
| 6/11/2024 | ████████████ | Sample of non-formulary records | |
| 4/5/2024 | DSB NetRMS Self-Harm Tracking Report 3.25.2024.xlsx | | |

Ex. B-262



| 4/25/2024 | ███████████ | Chronic Care |
| 5/14/2024 | ███████████ | Dental |
| 5/15/2024 | ███████████ | Dental |
| 6/11/2024 | ███████████ | Sample of non-formulary records |
| 4/25/2024 | ██████████████.pdf | Intake |
| 6/25/2024 | Dunsm–re, Darryl - Plaintiff | Depositions |
| 4/25/2024 | ███████████ | Mental Health |
| 4/25/2024 | ██████████.pdf | Intake |
| 6/25/2024 | Edward–, Tony Ray - Plaintiff | Depositions |
| 4/25/2024 | ████████████ | Chronic Care |
| 5/14/2024 | ███████████ | Chronic Care |
| 5/15/2024 | ██████████ | Chronic Care |
| 5/7/2024 | ███████████ | Chronic Care |
| 6/11/2024 | EM122123 | Pharmacy inspections |
| 3/26/2024 | Employee Discipline Report. Redacted. 110422.pdf | 20231220 NaphCare Produced Documents [password ███████] | 20231116 |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ██████████.pdf | Intake |

Ex. B-263



| 5/7/2024 | ██████████ .pdf | Nurse Sick Calls | | |
| 4/25/2024 | ██████████ .pdf | Intake | | |
| 5/14/2024 | ██████████ | Mental Health | | |
| 5/15/2024 | ██████████ | Mental Health | | |
| 4/25/2024 | ██████████ .pdf | Intake | | |
| 6/11/2024 | ██████████ | Sample of non-formulary records | | |
| 5/23/2024 | Evangelina Peer Review 2023 (003) | Question #2 Peer Reviews | Additional MH Items-Dunsmore | |
| 5/7/2024 | ██████████ .pdf | Nurse Sick Calls | | |
| 5/23/2024 | Evans, Christine, MD | Depositions | | |
| 5/7/2024 | ██████████ | Chronic Care | | |
| 5/14/2024 | ██████████ | Mental Health | | |
| 5/15/2024 | ██████████ | Mental Health | | |
| 5/14/2024 | ██████████ | Mental Health | | |
| 5/15/2024 | ██████████ | Mental Health | | |
| 3/26/2024 | F-03 Behavioral Consultation.docx | 20231220 NaphCare Produced Documents [password ████] | 20231002 | 36. Attachments |
| 3/26/2024 | F-03 Mental Health Programs and Residential Units.docx | 20231220 NaphCare Produced Documents [password ████] | 20231002 | 36. Attachments |

**Ex. B-264**



| 3/26/2024 | F-03 Mental Health Services.docx | | 20231220 NaphCare Produced Documents [password | 20231002 | 36. Attachments |
| 5/7/2024 | | | Chronic Care | | |
| 5/7/2024 | | | Chronic Care | | |
| 5/7/2024 | | .pdf | Nurse Sick Calls | | |
| 5/7/2024 | | | Chronic Care | | |
| 5/7/2024 | | .pdf | Nurse Sick Calls | | |
| 5/14/2024 | | | Chronic Care | | |
| 5/15/2024 | | | Chronic Care | | |
| 5/14/2024 | | | Dental | | |
| 5/15/2024 | | | Dental | | |
| 4/25/2024 | | .pdf | Intake | | |
| 6/25/2024 | | | Dental Charts Request (Medical Experts) | | |
| 5/7/2024 | | .pdf | Nurse Sick Calls | | |
| 4/25/2024 | | .pdf | Intake | | |
| 5/14/2024 | | | Dental | | |
| 5/15/2024 | | | Dental | | |
| 5/14/2024 | | | Chronic Care | | |

Ex. B-265



| 5/15/2024 | ███████████ | Chronic Care |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls |
| 6/28/2024 | Freeland, Dr. Peter Jay | |
| 4/25/2024 | ███████████.pdf | Intake |
| 4/3/2024 | FW_ Tri-City Clinics.msg | |
| 5/23/2024 | FY2324 Confidentiality Agreement-HIPAA Yearly Training | HIPPA and HER |
| 5/23/2024 | FY2425 Confidentiality Agreement-HIPAA Yearly Training | Annual Training |
| 5/23/2024 | FY2425 Confidentiality Agreement-HIPAA Yearly Training | Confidentiality & HIPPA |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 4/25/2024 | ███████████.pdf | Intake |
| 4/25/2024 | ███████████.pdf | Intake |
| 4/25/2024 | ███████████.pdf | Intake |
| 5/14/2024 | ███████████ | Dental |
| 5/15/2024 | ███████████ | Dental |
| 5/14/2024 | ███████████ | Chronic Care |
| 5/15/2024 | ███████████ | Chronic Care |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |

Ex. B-266



| 6/11/2024 | GB 031524 | Pharmacy inspections | |
| 6/11/2024 | GB122123 | Pharmacy inspections | |
| 5/23/2024 | GBDF 2023 Peer Reviews | Question #2 Peer Reviews | Additional MH Items-Dunsmore |
| 5/23/2024 | GeorgeBailey.SanDiego Dual Release Card updated 4.25.24 | | |
| 4/25/2024 | ██████████████.pdf | Intake | |
| 5/14/2024 | █████████████ | Mental Health | |
| 5/15/2024 | █████████████ | Mental Health | |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls | |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | |
| 4/25/2024 | █████████████.pdf | Intake | |
| 4/25/2024 | █████████████.pdf | Intake | |
| 4/25/2024 | █████████████.pdf | Intake | |
| 5/7/2024 | █████████████.pdf | Nurse Sick Calls | |
| 5/14/2024 | ████████████ | Chronic Care | |
| 5/15/2024 | ████████████ | Chronic Care | |
| 6/11/2024 | ████████████ | Sample of non-formulary records | |
| 5/7/2024 | █████████████.pdf | Nurse Sick Calls | |
| 5/14/2024 | ██████████ | Mental Health | |
| 5/15/2024 | ███████████ | Mental Health | |

Ex. B-267



| 6/11/2024 | ███████████████ | Sample of non-formulary records |
| 4/25/2024 | ████████████ .pdf | Intake |
| 5/7/2024 | ████████████ .pdf | Nurse Sick Calls |
| 5/7/2024 | ████████████ .pdf | Nurse Sick Calls |
| 6/11/2024 | grievance log 0101_0430 | |
| 5/7/2024 | ███████████ pdf | Nurse Sick Calls |
| 5/14/2024 | ████████████ | Dental |
| 5/15/2024 | ███████████ | Dental |
| 4/25/2024 | ███████████ pdf | Dental |
| 4/25/2024 | ████████████ .pdf | Intake |
| 4/25/2024 | ████████████ .pdf | Intake |
| 5/7/2024 | █████████████ .pdf | Nurse Sick Calls |
| 5/14/2024 | █████████ | Mental Health |
| 5/15/2024 | █████████ | Mental Health |
| 5/14/2024 | ██████████ | Chronic Care |
| 5/15/2024 | ███████████ | Chronic Care |
| 4/25/2024 | ███████████ .pdf | Intake |
| 5/23/2024 | Halsey Peer Review 2023 | Question #2 Peer Reviews   Additional MH Items-Dunsmore |

Ex. B-268

| 5/14/2024 | ███████████ | Mental Health | | |
| 5/15/2024 | ███████████ | Mental Health | | |
| 5/14/2024 | ██████████ | Mental Health | | |
| 5/15/2024 | ██████████ | Mental Health | | |
| 5/14/2024 | █████████████ | Chronic Care | | |
| 5/15/2024 | █████████████ | Chronic Care | | |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | | |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - East Bay.pdf | 20231220 NaphCare Produced Documents [password ████] | 20231002 | 33. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - East Mesa (1).pdf | 20231220 NaphCare Produced Documents [password ████] | 20231002 | 34. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - East Mesa.pdf | NAPHCARE006 | Attachments | 033. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - East Mesa.pdf | NAPHCARE006 | Attachments | 034. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - George Bailey.pdf | 20231220 NaphCare Produced Documents [password ████] | 20231002 | 33. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - George Bailey.pdf | 20231220 NaphCare Produced Documents [password ████] | 20231002 | 34. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - George Bailey.pdf | NAPHCARE006 | Attachments | 033. Attachments |

Ex. B-269

| | | | |
|---|---|---|---|
| 3/26/2024 | Health Care Policy & Proce–ure Manual - George Bailey.pdf | NAPHCARE006 | Attachments | 033. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - George Bailey.pdf | NAPHCARE006 | Attachments | 034. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - Rock Mountain.pd | 20231220 NaphCare Produced Documents [password ██████ | 20231002 | 34. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - Rock Mountain.pdf | 20231220 NaphCare Produced Documents [password ██████ | 20231002 | 32. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - Rock Mountain.pdf | NAPHCARE006 | Attachments | 032. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - Rock Mountain.pdf | NAPHCARE006 | Attachments | 034. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - SDCJ.pdf | 20231220 NaphCare Produced Documents [password ██████ | 20231002 | 33. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - SDCJ.pdf | 20231220 NaphCare Produced Documents [password ██████ | 20231002 | 34. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - SDCJ.pdf | NAPHCARE006 | Attachments | 034. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - South Bay.pdf | 20231220 NaphCare Produced Documents [password ██████ | 20231002 | 32. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - South Bay.pdf | 20231220 NaphCare Produced Documents [password ██████ ] | 20231002 | 34. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - South Bay.pdf | NAPHCARE006 | Attachments | 032. Attachments |

Ex. B-270

| 3/26/2024 | Health Care Policy & Proce–ure Manual - South Bay.pdf | NAPHCARE006 | Attachments | 034. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - Vista.pdf | 20231220 NaphCare Produced Documents [password ▇▇▇] | 20231002 | 31. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - Vista.pdf | 20231220 NaphCare Produced Documents [password ▇▇▇] | 20231002 | 34. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - Vista.pdf | NAPHCARE006 | Attachments | 031. Attachments |
| 3/26/2024 | Health Care Policy & Proce–ure Manual - Vista.pdf | NAPHCARE006 | Attachments | 034. Attachments |
| 3/26/2024 | Health Care Policy & Procedure Manual-Las Colinas.pdf | 20231220 NaphCare Produced Documents [password ▇▇▇] | 20231002 | 31. Attachments |
| 3/26/2024 | Health Care Policy & Procedure Manual-Las Colinas.pdf | NAPHCARE006 | Attachments | 031. Attachments |
| 5/14/2024 | ▇▇▇ | Mental Health | | |
| 5/15/2024 | ▇▇▇ | Mental Health | | |
| 5/14/2024 | ▇▇▇ | Chronic Care | | |
| 5/15/2024 | ▇▇▇ | Chronic Care | | |
| 4/25/2024 | ▇▇▇.pdf | Intake | | |
| 5/14/2024 | ▇▇▇ | Mental Health | | |
| 5/15/2024 | ▇▇▇ | Mental Health | | |
| 5/14/2024 | ▇▇▇ | Chronic Care | | |

Ex. B-271



| 5/15/2024 | | Chronic Care |
| 4/25/2024 | .pdf | Intake |
| 5/14/2024 | | Chronic Care |
| 5/15/2024 | | Chronic Care |
| 4/25/2024 | .pdf | Intake |
| 6/11/2024 | | Sample of non-formulary records |
| 5/14/2024 | | Dental |
| 5/15/2024 | | Dental |
| 5/14/2024 | | Mental Health |
| 5/15/2024 | | Mental Health |
| 4/25/2024 | .pdf | Nurse Sick Calls |
| 5/7/2024 | .pdf | Nurse Sick Calls |
| 5/23/2024 | HIPAA Training- New Employee Orientation | HIPPA and HER |
| 5/14/2024 | | Dental |
| 5/15/2024 | | Dental |
| 5/23/2024 | Hodgkins, Chris | Depositions |
| 5/14/2024 | | Mental Health |
| 5/15/2024 | | Mental Health |
| 5/7/2024 | .pdf | Nurse Sick Calls |

Ex. B-272



| 4/25/2024 | ████████████.pdf | Intake |
| 4/25/2024 | ████████████.pdf | Intake |
| 6/25/2024 | ██████████ | Dental Charts Request (Medical Experts) |
| 5/14/2024 | ██████████ | Chronic Care |
| 5/15/2024 | █████████ | Chronic Care |
| 5/7/2024 | █████████.pdf | Nurse Sick Calls |
| 4/25/2024 | █████████.pdf | Intake |
| 4/25/2024 | █████████.pdf | Intake |
| 5/14/2024 | █████████ | Mental Health |
| 5/15/2024 | ████████ | Mental Health |
| 4/25/2024 | █████████.pdf | Intake |
| 5/13/2024 | Institutional Eye Care.pdf | |
| 4/25/2024 | INTAKE Records Pull List.xlsx | Intake |
| 4/25/2024 | ████████.pdf | Intake |
| 4/12/2024 | ISP Assessment.pdf | April 10, 2024 |
| 4/12/2024 | ISP Assessment-Follow Up.pdf | April 10, 2024 |
| 4/12/2024 | j01.pdf | April 10, 2024 |
| 5/23/2024 | j03 | |
| 4/3/2024 | j04.pdf | |

**Ex. B-273**

| | | |
|---|---|---|
| 4/12/2024 | j05.pdf | April 10, 2024 |
| 5/23/2024 | J-19A Safety Sobering Observation Log | |
| 4/12/2024 | J212.pdf | April 10, 2024 |
| 4/3/2024 | J-350 Voluntary Gender Identification Preference.pdf | |
| 4/25/2024 | ██████████.pdf | Intake |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ██████████.pdf | Intake |
| 6/11/2024 | Jail Formulary | |
| 5/14/2024 | ██████████ | Chronic Care |
| 5/15/2024 | ██████████ | Chronic Care |
| 5/23/2024 | Janine Peer Review 2023 (004) | Question #2 Peer Reviews |
| 5/23/2024 | Jasmine Peer Review 2023 | Question #2 Peer Reviews |
| 4/3/2024 | JBCT Schedules.pdf | |
| 5/23/2024 | Jensen, Matthew, Sgt | Depositions |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ██████████.pdf | Intake |
| 5/14/2024 | ██████████ | Chronic Care |
| 5/15/2024 | ██████████ | Chronic Care |

Additional MH Items-Dunsmore (appears for the two Peer Review entries dated 5/23/2024)

Ex. B-274

| 6/11/2024 | ███████████ | Sample of non-formulary records | |
| 5/23/2024 | Johns, Jesse, Captain | Depositions | |
| 5/14/2024 | ███████████ | Mental Health | |
| 5/15/2024 | ███████████ | Mental Health | |
| 5/14/2024 | ███████████ | Chronic Care | |
| 5/15/2024 | ███████████ | Chronic Care | |
| 5/14/2024 | ███████████ | Chronic Care | |
| 5/15/2024 | ███████████ | Chronic Care | |
| 5/23/2024 | Jonathan Peer Review 2023(2) | Question #2 Peer Reviews | Additional MH Items-Dunsmore |
| 5/14/2024 | ███████████ | Mental Health | |
| 5/15/2024 | ███████████ | Mental Health | |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls | |
| 5/14/2024 | ███████████ | Mental Health | |
| 5/15/2024 | ███████████ | Mental Health | |
| 4/25/2024 | ███████████.pdf | Intake | |
| 4/25/2024 | ███████████.pdf | Intake | |
| 5/23/2024 | Kathleen Peer Review 2023 (003) | Question #2 Peer Reviews | Additional MH Items-Dunsmore |
| 5/14/2024 | ███████████ | Mental Health | |

**Ex. B-275**

| 5/15/2024 | ██████████████ | Mental Health | |
| 4/25/2024 | ██████████████.pdf | Intake | |
| 5/14/2024 | ████████████ | Chronic Care | |
| 5/15/2024 | ████████████ | Chronic Care | |
| 5/14/2024 | ████████████ | Chronic Care | |
| 5/15/2024 | ████████████ | Chronic Care | |
| 5/14/2024 | ██████████████ | Dental | |
| 5/15/2024 | ██████████████ | Dental | |
| 4/25/2024 | ██████████████.pdf | Intake | |
| 5/23/2024 | Kristina and Jacqueline Peer Reviews 2023 | Question #2 Peer Reviews | Additional MH Items- Dunsmore |
| 5/14/2024 | ████████████ | Dental | |
| 5/15/2024 | ████████████ | Dental | |
| 5/14/2024 | ████████████ | Chronic Care | |
| 5/15/2024 | ████████████ | Chronic Care | |
| 5/7/2024 | ██████████████.pdf | Nurse Sick Calls | |
| 5/14/2024 | ████████████ | Chronic Care | |
| 5/14/2024 | ████████████ | Chronic Care | |
| 5/15/2024 | ████████████ | Chronic Care | |
| 5/23/2024 | LasColinas.SanDiego Dual Release Card Final | | |

Ex. B-276



| Date | Description | Category |
|---|---|---|
| 5/15/2024 | ███████████ | Chronic Care |
| 4/25/2024 | ██████████.pdf | Intake |
| 4/3/2024 | Legal Request SelfHarm and Suicides 3.29.24.xlsx | |
| 5/14/2024 | ███████████ | Chronic Care |
| 5/15/2024 | ███████████ | Chronic Care |
| 5/15/2024 | L–vy, Reanne - Plaintiff | Depositions |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ██████████.pdf | Intake |
| 5/14/2024 | ███████████ | Chronic Care |
| 5/15/2024 | ███████████ | Chronic Care |
| 4/25/2024 | ██████████.pdf | Intake |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 6/25/2024 | ███████████ | Dental Charts Request (Medical Experts) |
| 4/25/2024 | ██████ Dunsmore combined 04182024.pdf | Dental |
| 6/25/2024 | Lopez Leon, Diana | Depositions |
| 4/25/2024 | ██████████.pdf | Intake |
| 5/15/2024 | L–pez, Josue - Plaintiff | Depositions |

Ex. B-277



| 4/25/2024 | ███████████.pdf | Intake |
| 4/25/2024 | █████████.pdf | Intake |
| 5/14/2024 | ████████ | Chronic Care |
| 5/15/2024 | ████████ | Chronic Care |
| 4/25/2024 | ██████████.pdf | Intake |
| 5/14/2024 | ████████ | Mental Health |
| 5/15/2024 | ████████ | Mental Health |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 5/14/2024 | ████████ | Mental Health |
| 5/15/2024 | ████████ | Mental Health |
| 4/25/2024 | ██████████.pdf | Intake |
| 4/25/2024 | █████████.pdf | Intake |
| 4/25/2024 | █████████.pdf | Intake |
| 4/25/2024 | ████████ | Chronic Care |
| 4/25/2024 | ███████████.pdf | Intake |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 5/14/2024 | ████████ | Mental Health |
| 5/15/2024 | ████████ | Mental Health |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |

125

**Ex. B-278**



| 4/25/2024 | ██████████ | Chronic Care |
| 5/7/2024 | ████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ████████.pdf | Intake |
| 5/7/2024 | ████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ████████.pdf | Intake |
| 4/25/2024 | ██████████ | Chronic Care |
| 5/7/2024 | ████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ██████████ | Chronic Care |
| 5/15/2024 | MAT client letters | |
| 5/23/2024 | MAT Numbers 4.30.24 (5.7.24) | MAT_MOUD Numbers |
| 4/25/2024 | ████████pdf | Intake |
| 5/7/2024 | ████████.pdf | Nurse Sick Calls |
| 6/25/2024 | ████████ | Dental Charts Request (Medical Experts) |
| 5/14/2024 | ████████ | Dental |
| 5/15/2024 | ████████ | Dental |
| 4/25/2024 | ████████ | Chronic Care |
| 5/14/2024 | ████████ | Mental Health |
| 5/15/2024 | ████████ | Mental Health |
| 4/25/2024 | ████████.pdf | Intake |

Ex. B-279

| Date | Title | Category | Subcategory | Year |
|---|---|---|---|---|
| 6/11/2024 | ██████████████████ | Sample of non-formulary records | | |
| 6/11/2024 | Med Room Inspection April  2024 | Pharmacy inspections | | |
| 6/11/2024 | Med Room Inspection FEB 2024 | Pharmacy inspections | | |
| 6/11/2024 | Med Room Inspection JAN 2024 | Pharmacy inspections | | |
| 6/11/2024 | Med Room Inspection MAR 2024 | Pharmacy inspections | | |
| 5/23/2024 | Medina, Ruben (PMK) | Depositions | | |
| 5/23/2024 | Medina, Ruben, Lt | Depositions | | |
| 5/14/2024 | ████████████ | Mental Health | | |
| 5/15/2024 | ████████████ | Mental Health | | |
| 4/25/2024 | ██████████████.pdf | Nurse Sick Calls | | |
| 5/7/2024 | ██████████████.pdf | Nurse Sick Calls | | |
| 4/25/2024 | █████████████.pdf | Intake | | |
| 4/25/2024 | ██████████████.pdf | Intake | | |
| 5/23/2024 | Mental Health Master Staffing Plan April 2021 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2021 |
| 5/23/2024 | Mental Health Master Staffing Plan Aug 2022 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2022 |
| 5/23/2024 | Mental Health Master Staffing Plan Dec 2022 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2022 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective APR 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |

**Ex. B-280**

| 5/23/2024 | Mental Health Master Staffing Plan Effective April 2024 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2024 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective AUG 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective DEC 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective FEB 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective February 2024 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2024 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective JAN 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective January 2024 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2024 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective JUL 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective JUN 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective MAR 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective March 2024 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2024 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective MAY 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective NOV 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |

Ex. B-281

| | | | |
|---|---|---|---|
| 5/23/2024 | Mental Health Master Staffing Plan Effective OCT 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2023 |
| 5/23/2024 | Mental Health Master Staffing Plan Effective SEP 2023 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2024 |
| 5/23/2024 | Mental Health Master Staffing Plan Jan 2019 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2019 |
| 5/23/2024 | Mental Health Master Staffing Plan Jul 2021 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2021 |
| 5/23/2024 | Mental Health Master Staffing Plan March 2022 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2022 |
| 5/23/2024 | Mental Health Master Staffing Plan May 2021 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2021 |
| 5/23/2024 | Mental Health Master Staffing Plan Nov 2019 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2020 |
| 5/23/2024 | Mental Health Master Staffing Plan Sept 2022 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2022 |
| 5/23/2024 | Mental Health Master Staffing Plan Sept 28 2020 | Question #6 Staffing Reports 2019 to 2024 | MH Master Staffing Plan 2019 to 2024 Reports | 2020 |
| 4/12/2024 | Mental Health Progress Note.pdf | April 10, 2024 | | |
| 4/12/2024 | Mental Health Screening.pdf | April 10, 2024 | | |
| 4/12/2024 | Mental Status Examination.pdf | April 10, 2024 | | |
| 5/14/2024 | ███████████ | Chronic Care | | |
| 5/15/2024 | ███████████ | Chronic Care | | |
| 4/25/2024 | ███████████ | Chronic Care | | |

**Ex. B-282**

| | | | |
|---|---|---|---|
| 5/7/2024 | ███████████pdf | Nurse Sick Calls | |
| 6/11/2024 | █████████████ | Sample of non-formulary records | |
| 5/23/2024 | MH Delivery System Flow Chart-draft 8.25.2023 | Question #2 Peer Reviews | Additional MH Items-Dunsmore |
| 4/15/2024 | MHC Flags BK 4.4.24 1500.xlsx | | |
| 5/23/2024 | MHC Position numbers 4-23-24 VACANCIES 27 | Question #6 Staffing Reports 2019 to 2024 | |
| 5/23/2024 | Michael Peer Review 2023 | Question #2 Peer Reviews | Additional MH Items-Dunsmore |
| 4/25/2024 | █████████████.pdf | Intake | |
| 4/25/2024 | █████████ | Chronic Care | |
| 5/14/2024 | █████████ | Mental Health | |
| 5/15/2024 | █████████ | Mental Health | |
| 5/14/2024 | ████████████ | Mental Health | |
| 5/15/2024 | ████████████ | Mental Health | |
| 6/11/2024 | ██████████ | Sample of non-formulary records | |
| 6/11/2024 | MOB | | |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls | |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls | |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | |
| 5/23/2024 | Monica Peer Review 2023 | Question #2 Peer Reviews | Additional MH Items-Dunsmore |

**Ex. B-283**



| Date | File | Category |
|---|---|---|
| 4/25/2024 | ████████████.pdf | Intake |
| 5/15/2024 | Montgomery, Jon, MD | Depositions |
| 5/14/2024 | ████████████ | Mental Health |
| 5/15/2024 | ████████████ | Mental Health |
| 4/25/2024 | ████████████ | Chronic Care |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 5/14/2024 | ████████████ | Mental Health |
| 5/15/2024 | ████████████ | Mental Health |
| 6/11/2024 | ████████████ | Sample of non-formulary records |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 6/25/2024 | Mortality Report 01.01.2017-06.20.2024 | |
| 5/14/2024 | ████████████ | Mental Health |
| 5/15/2024 | ████████████ | Mental Health |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 4/12/2024 | MSD E.2.1.pdf | April 10, 2024 |
| 4/12/2024 | MSD G.3.1.pdf | April 10, 2024 |

Ex. B-284

| 4/12/2024 | MSD G.3.2.pdf | April 10, 2024 |
| 6/18/2024 | MSD OT (CY 2023) | |
| 4/12/2024 | msdC10.pdf | April 10, 2024 |
| 5/23/2024 | msdH01 HIPAA1 Minimum Necessary Uses and Disclosures | HIPPA and HER |
| 4/12/2024 | msdP08.pdf | April 10, 2024 |
| 4/12/2024 | msdP13.pdf | April 10, 2024 |
| 4/12/2024 | msdP15.pdf | April 10, 2024 |
| 4/12/2024 | msdP16.pdf | April 10, 2024 |
| 4/12/2024 | msdP17.pdf | April 10, 2024 |
| 4/12/2024 | msdP19.pdf | April 10, 2024 |
| 4/12/2024 | msdS10.pdf | April 10, 2024 |
| 5/14/2024 | ██████████ | Dental |
| 5/15/2024 | ██████████ | Dental |
| 4/25/2024 | ██████████.pdf | Intake |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 5/14/2024 | ██████████ | Mental Health |
| 5/15/2024 | ██████████ | Mental Health |
| 5/14/2024 | ██████████ | Dental |
| 5/15/2024 | ██████████ | Dental |

**Ex. B-285**



| 4/25/2024 | ███████████ | Chronic Care | |
| 3/26/2024 | Naphcare Master Staff Roster.pdf | 20231220 NaphCare Produced Documents [password ████████] | 20231116 |
| 5/13/2024 | National Eye Care.pdf | | |
| 4/25/2024 | ██████████.pdf | Intake | |
| 5/23/2024 | NEO Lesson Plans | NEO curriculum | |
| 4/25/2024 | ██████████.pdf | Intake | |
| 4/25/2024 | █████████.pdf | Nurse Sick Calls | |
| 4/25/2024 | ██████████ | Chronic Care | |
| 4/25/2024 | ██████████.pdf | Nurse Sick Calls | |
| 6/25/2024 | –ix, Angela - NaphCare | Depositions | |
| 5/15/2024 | –ix, Angela— NaphCare - PMK | Depositions | |
| 4/25/2024 | ██████████.pdf | Intake | |
| 7/2/2024 | Norwood Christopher | Depositions | |
| 4/25/2024 | ██████████ | Chronic Care | |
| 5/7/2024 | NURSE SICK CALL Records Pull List.xlsx | Nurse Sick Calls | |
| 6/11/2024 | Nursing Services Organization Chart | | |
| 5/14/2024 | ██████████ | Mental Health | |
| 5/15/2024 | ██████████ | Mental Health | |

**Ex. B-286**



| 4/25/2024 | ████████████████ .pdf | Intake | |
| 7/2/2024 | Olivares, Jesse | Depositions | |
| 5/14/2024 | ████████████████ | Mental Health | |
| 5/15/2024 | ████████████████ | Mental Health | |
| 5/7/2024 | ████████████████ .pdf | Nurse Sick Calls | |
| 5/14/2024 | ████████████ | Dental | |
| 5/15/2024 | ████████████ | Dental | |
| 5/7/2024 | ████████████████ .pdf | Nurse Sick Calls | |
| 4/25/2024 | ████████████████ .pdf | Intake | |
| 5/7/2024 | ████████████████ .pdf | Nurse Sick Calls | |
| 4/25/2024 | ████████████ | Chronic Care | |
| 5/14/2024 | ████████████ | Mental Health | |
| 5/15/2024 | ████████████ | Mental Health | |
| 4/3/2024 | P&P i47 (Wristbands).pdf | | |
| 5/7/2024 | ████████████ .pdf | Nurse Sick Calls | |
| 5/7/2024 | ████████████████ .pdf | Nurse Sick Calls | |
| 4/25/2024 | ████████████████ .pdf | Intake | |
| 5/23/2024 | Pamela Peer Review 2023 | Question #2 Peer Reviews | Additional MH Items-Dunsmore |
| 4/25/2024 | ████████████████ .pdf | Intake | |

**Ex. B-287**



| 4/25/2024 | ████████████ pdf | Intake | |
| 5/14/2024 | ████████████ | Mental Health | |
| 5/15/2024 | ████████████ | Mental Health | |
| 4/25/2024 | ████████████ | Chronic Care | |
| 5/7/2024 | ████████████ .pdf | Nurse Sick Calls | 5/7/2024 |
| 5/14/2024 | ████████████ | Mental Health | 5/14/2024 |
| 5/15/2024 | ████████████ | Mental Health | 5/15/2024 |
| 4/25/2024 | ████████████ .pdf | Intake | 4/25/2024 |
| 5/14/2024 | ████████████ | Mental Health | 5/14/2024 |
| 5/15/2024 | ████████████ | Mental Health | 5/15/2024 |
| 4/19/2024 | PERT Tips (February 2018) | | 4/19/2024 |
| 4/19/2024 | PERT Training Bulletin_2010 | | 4/19/2024 |
| 6/11/2024 | Ph–rm Ins–ect —Qtly - Jan - Mar | Pharmacy inspections | 6/11/2024 |
| 6/11/2024 | Ph–rm Ins–ect - Qtly - Oct-Dec | Pharmacy inspections | 6/11/2024 |
| 4/25/2024 | ████████████ .pdf | Intake | 4/25/2024 |
| 4/25/2024 | ████████████ .pdf | Intake | 4/25/2024 |
| 6/11/2024 | Pimentel, Casondra | Sample of non-formulary records | 6/11/2024 |
| 5/14/2024 | ████████████ | Mental Health | 5/14/2024 |
| 5/15/2024 | ████████████ | Mental Health | 5/15/2024 |

Ex. B-288

| 5/23/2024 | Plater Peer Review 2023 | Question #2 Peer Reviews | Additional MH Items-Dunsmore | 5/23/2024 |
|---|---|---|---|---|
| 4/19/2024 | POLICY 23_PERT | | | 4/19/2024 |
| 4/25/2024 | ████████████████ | Chronic Care | | 4/25/2024 |
| 4/25/2024 | ████████████████ | Chronic Care | | 4/25/2024 |
| 4/25/2024 | ████████████ | Chronic Care | | 4/25/2024 |
| 4/25/2024 | █████████████pdf | Nurse Sick Calls | | 4/25/2024 |
| 5/14/2024 | ████████████████ | Mental Health | | 5/14/2024 |
| 5/15/2024 | ████████████████ | Mental Health | | 5/15/2024 |
| 4/5/2024 | PP 2023-02-07 Suicide Detection and Prevention Course 2HOUR - upd–ted 5-—23 - Copy - 10-2.pdf | | | 4/5/2024 |
| 5/23–2024 | PREA - ProStaff Training Bulletin (January 2024) | Annual Training | | 5/23/2024 |
| 4/25/2024 | ████████████ | Chronic Care | | 4/25/2024 |
| 5/14/2024 | ████████████████ | Dental | | 5/14/2024 |
| 5/15/2024 | ████████████████ | Dental | | 5/15/2024 |
| 4/19/2024 | Prison Run Trip Sheet Wednesday | | | 4/19/2024 |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls | | 5/7/2024 |
| 4/25/2024 | ████████████ | Chronic Care | | 4/25/2024 |
| 5/14/2024 | ████████████████ | Dental | | 5/14/2024 |
| 5/15/2024 | ████████████████ | Dental | | 5/15/2024 |

136

Ex. B-289

| | | | |
|---|---|---|---|
| 5/23/2024 | Programs and Classes rev 11-2023 | | 5/23/2024 |
| 4/12/2024 | Psychiatric Evaluation.pdf | April 10, 2024 | 4/12/2024 |
| 4/12/2024 | Psychiatric Progress Note.pdf | April 10, 2024 | 4/12/2024 |
| 4/12/2024 | Psychosocial Assessment.pdf | April 10, 2024 | 4/12/2024 |
| 5/13/2024 | Q#1 Requests Submitted 02_2024.csv | | 5/13/2024 |
| 5/13/2024 | Q#2ALCDF OB-IP TRACKING 040824.xlsx | | 5/13/2024 |
| 4/3/2024 | q07.pdf | | 4/3/2024 |
| 5/23/2024 | QAQI Meeting Minutes 4.28.22, 8.11.22, 10.31.22, 1.25.23 | QAQI meeting minutes | 5/23/2024 |
| 4/12/2024 | QMHP Progress Note.pdf | April 10, 2024 | 4/12/2024 |
| 5/23/2024 | Question #1 MH Delivery System Flow Chart Jan 2024 Draft | | 5/23/2024 |
| 5/23/2024 | Question #7 PSU Wait times | | 5/23/2024 |
| 4/25/2024 | ███████████ | Chronic Care | 4/25/2024 |
| 4/25/2024 | ███████████ | Intake | 4/25/2024 |
| 5/23/2024 | Quiroz, Melissa | Depositions | 5/23/2024 |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | 5/7/2024 |
| 5/23/2024 | Ralph, Christina | Depositions | 5/23/2024 |
| 5/7/2024 | ██████████ | Chronic Care | 5/7/2024 |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | 5/7/2024 |
| 4/25/2024 | ██████████.pdf | Nurse Sick Calls | 4/25/2024 |

**Ex. B-290**

| Date | Title | Category | Sub-category | Date |
|---|---|---|---|---|
| 5/14/2024 | ███████████ | Mental Health | | 5/14/2024 |
| 5/15/2024 | ███████████ | Mental Health | | 5/15/2024 |
| 5/14/2024 | ███████████ | Mental Health | | 5/14/2024 |
| 5/15/2024 | ███████████ | Mental Health | | 5/15/2024 |
| 4/25/2024 | ██████████.pdf | Intake | | 4/25/2024 |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | | 5/7/2024 |
| 5/23/2024 | Reentry Needs Checklist (fill-in) | | | 5/23/2024 |
| 5/23/2024 | R–entry Plan - Non-MS (Fill-in) | | | 5/23/2024 |
| 5/23/2024 | RESPIRATORY PROTECTION ANNUAL TRAINING IS A VIDEO TRAINING DONE THROUGH LMS | Annual Training | | 5/23/2024 |
| 5/14/2024 | ███████████ | Mental Health | | 5/14/2024 |
| 5/15/2024 | ███████████ | Mental Health | | 5/15/2024 |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | | 5/7/2024 |
| 5/7/2024 | ███████████ | Chronic Care | | 5/7/2024 |
| 5/23/2024 | Richard Peer Review 2023 | Question #2 Peer Reviews | Additional MH Items- Dunsmore | 5/23/2024 |
| 6/11/2024 | RM 031524 | Pharmacy inspections | | 6/11/2024 |
| 6/11/2024 | RM122123 | Pharmacy inspections | | 6/11/2024 |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | | 5/7/2024 |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | | 5/7/2024 |

Ex. B-291

| | | | |
|---|---|---|---|
| 5/7/2024 | █████████ .pdf | Nurse Sick Calls | 5/7/2024 |
| 5/7/2024 | █████████ .pdf | Nurse Sick Calls | 5/7/2024 |
| 5/7/2024 | ████████ .pdf | Nurse Sick Calls | 5/7/2024 |
| 5/7/2024 | █████████ .pdf | Nurse Sick Calls | 5/7/2024 |
| 4/25/2024 | █████████ .pdf | Nurse Sick Calls | 4/25/2024 |
| 4/25/2024 | █████████ .pdf | Intake | 4/25/2024 |
| 5/7/2024 | █████████ .pdf | Nurse Sick Calls | 5/7/2024 |
| 4/25/2024 | █████████ pdf | Intake | 4/25/2024 |
| 4/25/2024 | █████████ .pdf | Intake | 4/25/2024 |
| 4/25/2024 | █████████ .pdf | Intake | 4/25/2024 |
| 5/14/2024 | █████████ | Dental | 5/14/2024 |
| 5/15/2024 | █████████ | Dental | 5/15/2024 |
| 5/23/2024 | Rognlien-Hood, Serina (Head of Nursing) | Depositions | 5/23/2024 |
| 5/14/2024 | █████████ | Mental Health | 5/14/2024 |
| 5/15/2024 | █████████ | Mental Health | 5/15/2024 |
| 5/7/2024 | █████████ | Chronic Care | 5/7/2024 |
| 5/7/2024 | ████████ .pdf | Nurse Sick Calls | 5/7/2024 |
| 5/23/2024 | RSD Resource Flyer | | 5/23/2024 |
| 5/7/2024 | █████████ .pdf | Nurse Sick Calls | 5/7/2024 |

Ex. B-292

| 4/25/2024 | ████████ .pdf | Intake | 4/25/2024 |
| 5/14/2024 | ████████ | Dental | 5/14/2024 |
| 5/15/2024 | ████████ | Dental | 5/15/2024 |
| 5/15/2024 | ████ letter | | 5/15/2024 |
| 5/7/2024 | ████████ .pdf | Nurse Sick Calls | 5/7/2024 |
| 5/7/2024 | ████████ | Chronic Care | 5/7/2024 |
| 4/25/2024 | ████████ .pdf | Intake | 4/25/2024 |
| 5/14/2024 | ████████ | Mental Health | 5/14/2024 |
| 5/15/2024 | ████████ | Mental Health | 5/15/2024 |
| 5/7/2024 | ████████ | Chronic Care | 5/7/2024 |
| 4/25/2024 | ████████ .pdf | Intake | 4/25/2024 |
| 4/25/2024 | ████████ .pdf | Intake | 4/25/2024 |
| 5/7/2024 | ████████ | Chronic Care | 5/7/2024 |
| 5/14/2024 | ████████ | Dental | 5/14/2024 |
| 5/15/2024 | ████████ | Dental | 5/15/2024 |
| 3/26/2024 | San Diego Full Report..xlsx | NAPHCARE007 | 3/26/2024 |
| 5/23/2024 | San Diego Proposed Formulary 03.2024 | Pharmacy and Therapeutics Meetings 3.12.24 | 5/23/2024 |
| 5/7/2024 | ████████ | Chronic Care | 5/7/2024 |
| 4/25/2024 | ████████ | Chronic Care | 4/25/2024 |

**Ex. B-293**

| 4/25/2024 | ███████████.pdf | Intake | 4/25/2024 |
| 4/25/2024 | ███████████.pdf | Intake | 4/25/2024 |
| 4/25/2024 | ███████████.pdf | Intake | 4/25/2024 |
| 6/11/2024 | ███████████ | Sample of non-formulary records | 6/11/2024 |
| 5/14/2024 | ███████████ | Mental Health | 5/14/2024 |
| 5/15/2024 | ███████████ | Mental Health | 5/15/2024 |
| 4/25/2024 | ███████████ | Chronic Care | 4/25/2024 |
| 4/25/2024 | ███████████ | Chronic Care | 4/25/2024 |
| 4/25/2024 | ███████████ | Chronic Care | 4/25/2024 |
| 5/7/2024 | ███████████ | Chronic Care | 5/7/2024 |
| 6/11/2024 | SB 032124 | Pharmacy inspections | 6/11/2024 |
| 6/11/2024 | sb 112023 | Pharmacy inspections | 6/11/2024 |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls | 5/7/2024 |
| 6/7/2024 | SD 02–635-026057 - CONFIDENTIAL s4-28-2023 | | 6/7/2024 |
| 6/7/2024 | SD 02–058-026060 - CONFIDENTIAL s4-28-2023 | | 6/7/2024 |
| 4/5/2024 | SD 027070-027084 s4-28-2023.pdf | | 4/5/2024 |
| 4/5/2024 | SD 027085 s4-28-2023.pdf | | 4/5/2024 |
| 4/5/2024 | SD 027086-027115 s4-28-2023.pdf | | 4/5/2024 |
| 4/5/2024 | SD 027116-027134 s4-28-2023.pdf | | 4/5/2024 |

Ex. B-294

| | | | |
|---|---|---|---|
| 4/5/2024 | SD 040899-041021 s5-24-2023.pdf | | 4/5/2024 |
| 4/5/2024 | SD 050244-050254 EMAIL FW_ Review of Suicide Prevention Polici– s_Redacted - Req. 23 .pdf | | 4/5/2024 |
| 4/5/2024 | SD 050255-050441 Lindsay Hayes Training Curriculum and Pr–gram Guide - Suicide Detection and–Prevention - Req. 23.pdf | | 4/5/2024 |
| 4/5/2024 | SD 050442-050606 Suicide Detection & Prevention POWERPOI–T 5-1-2020 - Req. 23.pdf | | 4/5/2024 |
| 4/5/2024 | SD 097886-097913 RFP 39 MSD Positions and Staffing.pdf | | 4/5/2024 |
| 4/5/2024 | SD 097914-098196 RFP 40 MSD Rosters.pdf | | 4/5/2024 |
| 4/5/2024 | SD 098197-099678 RFP 42 MSD Contracts.pdf | | 4/5/2024 |
| 4/5/2024 | SD–110407.pdf - SD113830.pdf | Dunsmore Beg Bates SD_110407.zip | 4/5/2024 |
| 4/5/2024 | SD 114288 CONFIDENTIAL.xlsx | | 4/5/2024 |
| 4/5/2024 | SD 114289-114290.pdf | RFP 97 | 4/5/2024 |
| 4/5/2024 | SD 114291-114297.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114298-114301.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114302.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114303-114306.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114307-114309.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114310-114312.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114313-114314.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114315-114318.pdf | | 4/5/2024 |

Ex. B-295

| 4/5/2024 | SD 114319.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114320-114327.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114335 CONFIDENTIAL.xlsx | RFP 101 | 4/5/2024 |
| 4/5/2024 | SD 114336 CONFIDENTIAL.csv | | 4/5/2024 |
| 4/5/2024 | SD 114337-114347.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114348-114362.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114363-114374.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114375-114395.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114396.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114397-114398.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114399-114432.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114433-114462.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114463-114464.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114465-14466.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114467-114497.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114498-114502.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114503-114510.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114511-114512.pdf | | 4/5/2024 |
| 4/5/2024 | SD 114513.pdf | | 4/5/2024 |

Ex. B-296

| | | |
|---|---|---|
| 4/5/2024 | SD 114514-114515.pdf | 4/5/2024 |
| 4/5/2024 | SD 114516-114523.pdf | 4/5/2024 |
| 4/5/2024 | SD 114524-114529.pdf | 4/5/2024 |
| 4/5/2024 | SD 114530-114542.pdf | 4/5/2024 |
| 4/5/2024 | SD 114543-114555.pdf | 4/5/2024 |
| 4/5/2024 | SD 114556-114560 CONFIDENTIAL.pdf | 4/5/2024 |
| 4/5/2024 | SD 114561-114578.pdf | 4/5/2024 |
| 4/5/2024 | SD 114579-114599.pdf | 4/5/2024 |
| 4/5/2024 | SD 114600-114619.pdf | 4/5/2024 |
| 4/5/2024 | SD 115339 CONFIDENTIAL Sick calls Cancelled Refused.xlsx | RFP 105 | 4/5/2024 |
| 4/5/2024 | SD 115339 CONFIDENTIAL Sick calls Cancelled Refused.xlsx | RFP 106 | 4/5/2024 |
| 4/5/2024 | SD 115341 CONFIDENTIAL.xlsx | RFP 107 | 4/5/2024 |
| 4/5/2024 | SD 115342-115354.pdf | 4/5/2024 |
| 4/5/2024 | SD 115355-115386.pdf | 4/5/2024 |
| 4/5/2024 | SD 115387-115392.pdf | 4/5/2024 |
| 4/5/2024 | SD 115393-115397.pdf | 4/5/2024 |
| 4/5/2024 | SD 115398-115405.pdf | 4/5/2024 |
| 4/5/2024 | SD 115406.pdf | 4/5/2024 |
| 4/5/2024 | SD 115407-115428.pdf | 4/5/2024 |

Ex. B-297

| | | | |
|---|---|---|---|
| 4/5/2024 | SD 115429-115434.pdf | | 4/5/2024 |
| 4/5/2024 | SD 115435 CONFID–NTIAL.xlsx - SD 115438 CONFIDENTIAL.xlsx | RFP 109 | 4/5/2024 |
| 4/5/2024 | SD 115444 CONFID–NTIAL.xlsx - SD 115445 CONFIDENTIAL.xlsx | RFP 112 | 4/5/2024 |
| 4/5/2024 | SD 115446–115447.pdf - SD 115453-115454.pdf | RFP 112 | 4/5/2024 |
| 4/5/2024 | SD 115455-115510 CONFI–ENTIAL.pdf - SD 115511-115583 CONFIDENTIAL.pdf | RFP 112 | 4/5/2024 |
| 4/5/2024 | SD 115584 CONFID–NTIAL.xlsx - SD 115585 CONFIDENTIAL.xlsx | RFP 113 | 4/5/2024 |
| 4/5/2024 | SD 115586–115588.pdf - SD 115598.pdf | RFP 114 | 4/5/2024 |
| 4/5/2024 | SD 115611 CONFIDENTIAL.csv | RFP 125 | 4/5/2024 |
| 4/5/2024 | SD 115612-115682 CONFIDENTIAL.pdf | | 4/5/2024 |
| 4/5/2024 | SD 115683-115684.pdf | RFP 130 | 4/5/2024 |
| 4/5/2024 | SD 115685-115687.pdf | | 4/5/2024 |
| 4/5/2024 | SD 115689-115696.pdf | RFP 138 | 4/5/2024 |
| 4/5/2024 | SD 115697-115699.pdf | | 4/5/2024 |
| 4/5/2024 | SD 115700-115701.pdf | | 4/5/2024 |
| 4/5/2024 | SD 1517083 CONFIDENTIAL (RFP 33).csv | | 4/5/2024 |
| 4/5/2024 | SD 1526134-1526763 CONFIDENTIAL Andrade, Andre Medical Records re BW7634.pdf | | 4/5/2024 |
| 4/5/2024 | SD 1526812-1526829 CONFIDENTIAL Archuleta, Ernest Medical Records re BP0418.pdf | | 4/5/2024 |
| 4/5/2024 | SD 1527100-1529815 CONFIDENTIAL Dunsmore, Darryl Medical Records re AD6237 from 2017-03-02 to 2017-12-31.pdf | | |

Ex. B-298

| | |
|---|---|
| 4/5/2024 | SD 1529816-1531511 CONFIDENTIAL Dunsmore, Darryl Medical Records re AD6237 from 2018.pdf |
| 4/5/2024 | SD 1531512-1536082 CONFIDENTIAL Dunsmore, Darryl Medical Records re AD6237 from 2019-2020.pdf |
| 4/5/2024 | SD 1536083-1539362 CONFIDENTIAL Dunsmore, Darryl Medical Records re AD6237 from 2021.pdf |
| 4/5/2024 | SD 1539363-1543510 CONFIDENTIAL Dunsmore, Darryl Medical Records re AD6237 from 2022.pdf |
| 4/5/2024 | SD 1543511-1551023 CONFIDENTIAL Dunsmore, Darryl Medical Records re AD6237 from 2023.pdf |
| 4/5/2024 | SD 1551024-1552165 CONFIDENTIAL Dunsmore, Darryl Medical Records re AD6237 from 2024-01-01 to 2024-03-06.pdf |
| 4/5/2024 | SD 1552345-1552371 CONFIDENTIAL Landers, Lisa Medical Records re W32854.pdf |
| 4/5/2024 | SD 1552663-1552685 CONFIDENTIAL Nelson, Christopher Medical Records re F29557.pdf |
| 4/5/2024 | SD 1552795-1552820 CONFIDENTIAL Olivares, Jesse Medical Records re P96278 CA Out of State Correctional Facility.pdf |
| 4/5/2024 | SD 1552821-1552887 CONFIDENTIAL Olivares, Jesse Medical Records re P96278 CCF Private Facilities.pdf |
| 4/5/2024 | SD 1552888-1552959 CONFIDENTIAL Olivares, Jesse Medical Records re P96278 CCHCS.pdf |
| 4/5/2024 | SD 1552960-1553277 CONFIDENTIAL Olivares, Jesse Medical Records re P96278 High Desert State Prison.pdf |
| 4/5/2024 | SD 1553278-1553525 CONFIDENTIAL Olivares, Jesse Medical Records re P96278 Wasco State Prison.pdf |
| 4/5/2024 | SD 1553796-1556099 CONFIDEN'IAL Andrade's medical records up to 12-12-2022.pdf |
| 4/5/2024 | SD 1556100-1556614 CONFID'NTIAL Clark's medical records up to 5-4-2022.pdf |
| 4/5/2024 | SD 1556615-1557231 CONFID'NTIAL Clark's medical records up to 12-22-2022.pdf |

**Ex. B-299**

| | | | |
|---|---|---|---|
| 4/5/2024 | SD 1557232-1558178 CONFIDEN'IAL Landers' medical records up to 12-12-2022.pdf | | |
| 4/5/2024 | SD 1558179-1559480 CONFID'NTIAL Lopez's medical records up to 3-22-2022.pdf | | |
| 4/5/2024 | SD 1559481-1560019 CONFIDENTI'L Sepulveda's medical records up to 12-9-2022.pdf | | |
| 4/5/2024 | SD 1560020-1561802 CONFIDEN'IAL Zoerner's medical records up to 3-22-2022.pdf | | |
| 4/10/2024 | SD 1561810 CONFI–ENTIAL.pdf - SD 1571077 CONFIDENTIAL.pdf | 2024-04-10 Plaintiff Additional CDC Medical Records to Expert | |
| 4/9/2024 | SD 1564565-1564718 CONFIDENTIAL | | |
| 4/9/2024 | SD 1564719-1566055 CONFIDENTIAL.pdf | | |
| 4/9/2024 | SD 1566056-1567381 CONFIDENTIAL.pdf | | |
| 4/9/2024 | SD 1567382-1567436 CONFIDENTIAL.pdf | | |
| 4/9/2024 | SD 1567437-1570666 CONFIDENTIAL.pdf | | |
| 4/9/2024 | SD 1570667-1571077 CONFIDENTIAL.pdf | | |
| 4/10/2024 | SD 1571078 CONFI–ENTIAL.mov - SD 1571099 CONFIDENTIAL.mov | 2024-04-10 Plaintiff Additional CDC Medical Records to Expert | 024-04-10 (S) SD 1571078-1572149 CONFIDENTIAL Additional RFP 12 | Videos ▮▮ ▮▮ SD 1571078-1571099 CONFIDENTIAL |
| 4/10/2024 | SD 1571100 CONFI–ENTIAL.MP3 - SD 1571141 CONFIDENTIAL.MP3 | 2024-04-10 Plaintiff Additional CDC Medical Records to Expert | 024-04-10 (S) SD 1571078-1572149 CONFIDENTIAL Additional RFP 11 | Audio ▮▮ ▮▮ SD 1571100-1571141 CONFIDENTIAL |
| 4/10/2024 | SD 1571142 CONFI–ENTIAL.pdf - SD 1572149 CONFIDENTIAL.pdf | 2024-04-10 Plaintiff Additional CDC Medical Records to Expert | 024-04-10 (S) SD 1571078-1572149 CONFIDENTIAL Additional RFP 13 | |

Ex. B-300

| | | |
|---|---|---|
| 4/19/2024 | SD 1575044-1575270 CONFIDENTIAL Zoerner Updated Medical Records 7-2023 to present | |
| 4/19/2024 | SD 1575271-1575331 CONFIDENTIAL Zoerner Medication Log | |
| 5/15/2024 | SD 1576003-1576736 CONFIDENTIAL TaylorMichael, BE3914 -SQ {Outpt}-83865195 | |
| 5/15/2024 | SD 1576737-1577154 CONFIDENTIAL TaylorMichael BE3914 -WSP {Outpt}-83558807 | |
| 5/15/2024 | SD 1577155-1577177 CONFIDENTIAL TaylorMichael BE3914 -SACCO {Outpt}-83560002 | |
| 5/15/2024 | SD 1577178-1578746 CONFIDENTIAL TaylorMichael, BE3914 -CRC {Outpt}-83558960 | |
| 5/15/2024 | SD 1578747-1578983 CONFIDENTIAL TaylorMichael, BE3914 -CIM {Outpt}-83560478 | |
| 5/15/2024 | SD 1578984-1579006 CONFIDENTIAL TaylorMichael, BE3914 -CRC {Outpt}-83560585 | |
| 4/5/2024 | SD–110165.pdf - SD_110401.pdf | Dunsmore Beg Bates SD_110165.zip April 10, 2024 |
| 4/12/2024 | SDSD Current IN Custody Population 4.10.24 0833.xlsx | |
| 5/13/2024 | Select MSD Policies.pdf | |
| 6/25/2024 | Sepulve–a, Gustavo - Plaintiff | Depositions |
| 6/11/2024 | ████████████████ | Sample of non-formulary records |
| 5/15/2024 | ███████ letter_page 1 | |
| 5/15/2024 | ███████ letter_page 2 | |
| 5/14/2024 | ██████████ | Mental Health |
| 5/15/2024 | ██████████ | Mental Health |
| 4/25/2024 | ██████████ | Chronic Care |

**Ex. B-301**



| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 5/14/2024 | ██████████ | Mental Health |
| 5/15/2024 | ██████████ | Mental Health |
| 4/25/2024 | █████████pdf | Intake |
| 4/25/2024 | █████████████.pdf | Nurse Sick Calls |
| 4/25/2024 | █████████ | Chronic Care |
| 5/14/2024 | ███████████ | Dental |
| 5/15/2024 | ███████████ | Dental |
| 5/14/2024 | █████████ | Mental Health |
| 5/15/2024 | █████████ | Mental Health |
| 4/25/2024 | ███████████ | Chronic Care |
| 5/14/2024 | ███████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 4/25/2024 | █████████ | Mental Health |
| 5/14/2024 | ██████████ | Dental |
| 5/15/2024 | █████████ | Dental |
| 5/7/2024 | Specialty Appointments 5.1.24 | Sub-Specialty |
| 4/12/2024 | Specialty Care.csv | April 9, 2024 |

**Ex. B-302**



| Date | File | Category |
|---|---|---|
| 5/7/2024 | ██████████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ██████████████ | Chronic Care |
| 4/15/2024 | SPHP List.pdf | |
| 4/25/2024 | ██████████████.pdf | Intake |
| 4/25/2024 | ██████████ | Chronic Care |
| 4/25/2024 | ██████████████ | Chronic Care |
| 4/25/2024 | ██████████████ | Chronic Care |
| 5/14/2024 | ██████████████ | Mental Health |
| 5/15/2024 | ██████████████ | Mental Health |
| 5/14/2024 | ██████████████ | Mental Health |
| 5/15/2024 | ██████████████ | Mental Health |
| 4/25/2024 | ██████████████ | Chronic Care |
| 5/7/2024 | ██████████████.pdf | Nurse Sick Calls |
| 5/14/2024 | ██████████████ | Mental Health |
| 5/15/2024 | ██████████████ | Mental Health |
| 6/25/2024 | ██████████████ | Dental Charts Request (Medical Experts) |
| 4/25/2024 | ██████████████.pdf | Nurse Sick Calls |
| 5/15/2024 | Tayl–r, Michael - Plaintiff | Depositions |
| 5/23/2024 | TechCare Guide_Intake Packet | NEO curriculum |

**Ex. B-303**

| 5/23/2024 | TechCare Lesson Plans | NEO curriculum | |
|---|---|---|---|
| 6/11/2024 | TechCare Monthly Report 1023_0324 | | |
| 5/14/2024 | ██████████ | Mental Health | |
| 5/15/2024 | ██████████ | Mental Health | |
| 6/11/2024 | ██████████ | Sample of non-formulary records | |
| 4/25/2024 | ██████████ | Chronic Care | |
| 5/23/2024 | Theresa Peer Review 2023 | Question #2 Peer Reviews | Additional MH Items-Dunsmore |
| 5/14/2024 | ██████████ | Mental Health | |
| 5/15/2024 | ██████████ | Mental Health | |
| 4/25/2024 | ██████████ | Chronic Care | |
| 5/14/2024 | ██████████ | Mental Health | |
| 5/15/2024 | ██████████ | Mental Health | |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | |
| 3/26/2024 | Time Detail Report. CA SD. 06.2022-09.2023.pdf | 20231220 NaphCare Produced Documents [password ████] | 20231116 |
| 5/14/2024 | ██████████ | Mental Health | |
| 5/15/2024 | ██████████ | Mental Health | |
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls | |

Ex. B-304

| 4/25/2024 | ███████████ | Chronic Care |
| 4/25/2024 | ███████████ | Chronic Care |
| 5/23/2024 | Torres, Abigale, Deputy Chief, PMK | Depositions |
| 4/25/2024 | ███████████ | Chronic Care |
| 5/14/2024 | ███████████ | Dental |
| 5/15/2024 | ███████████ | Dental |
| 4/25/2024 | ███████████.pdf | Intake |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ███████████.pdf | Intake |
| 5/7/2024 | ███████████.pdf | Nurse Sick Calls |
| 7/3/2024 | Ureports2024-00049 | |
| 5/23/2024 | VACANCY TEMPLATE 01112024 | Overall nursing vacany rate |
| 5/23/2024 | VACANCY TEMPLATE 01262024 | Overall nursing vacany rate |
| 5/23/2024 | VACANCY TEMPLATE 02092024 | Overall nursing vacany rate |
| 5/23/2024 | VACANCY TEMPLATE 02232024 | Overall nursing vacany rate |
| 5/23/2024 | VACANCY TEMPLATE 03082024 | Overall nursing vacany rate |
| 5/23/2024 | VACANCY TEMPLATE 04052024 | Overall nursing vacany rate |
| 5/13/2024 | VACANCY TEMPLATE 04052024.docx | |
| 4/25/2024 | ███████████.pdf | Intake |

Ex. B-305



| 5/7/2024 | ██████████████ .pdf | Nurse Sick Calls | |
| 4/25/2024 | ████████ pdf | Intake | |
| 4/25/2024 | ██████████ | Chronic Care | |
| 6/11/2024 | ██████████ | Sample of non-formulary records | |
| 4/25/2024 | ██████████████ .pdf | Intake | |
| 5/14/2024 | ██████████ | Dental | |
| 5/15/2024 | ██████████ | Dental | |
| 5/23/2024 | Veronica Peer Review 2023 -Signed1 | Question #2 Peer Reviews | Additional MH Items-Dunsmore |
| 4/25/2024 | ██████████ | Chronic Care | |
| 5/14/2024 | ██████████ | Mental Health | |
| 5/15/2024 | ██████████ | Mental Health | |
| 5/13/2024 | Vision Specialists of CA.pdf | | |
| 6/11/2024 | Vista 030624 | Pharmacy inspections | |
| 6/11/2024 | Vista 051624 | Pharmacy inspections | |
| 6/11/2024 | vista 120623 | Pharmacy inspections | |
| 5/23/2024 | Vista.SanDiego Dual Release Card Final | | |
| 5/7/2024 | ██████████████ .pdf | Nurse Sick Calls | |
| 4/25/2024 | ██████████████ .pdf | Intake | |
| 5/7/2024 | ██████████████ .pdf | Nurse Sick Calls | |

Ex. B-306

| | | |
|---|---|---|
| 4/25/2024 | ███████████ | Chronic Care |
| 5/7/2024 | ████████████.pdf | Nurse Sick Calls |
| 4/25/2024 | ███████████ | Chronic Care |
| 5/23/2024 | Watts, Shane, Captain | Depositions |
| 5/7/2024 | █████████.pdf | Nurse Sick Calls |
| 5/14/2024 | ██████████ | Mental Health |
| 5/15/2024 | ███████████ | Mental Health |
| 4/25/2024 | ██████████.pdf | Intake |
| 4/25/2024 | ██████████ | Chronic Care |
| 4/25/2024 | ██████████ | Chronic Care |
| 5/23/2024 | Williamson, Derek, Lt | Depositions |
| 4/25/2024 | ██████████ | Chronic Care |
| 4/25/2024 | ████████████.pdf | Intake |
| 4/12/2024 | WPSU Group Progress Note.pdf | April 10, 2024 |
| 4/12/2024 | WPSU Transfer and Discharge.pdf | April 10, 2024 |
| 4/3/2024 | Wristbands (1).pdf | |
| 4/25/2024 | █████████.pdf | Intake |
| 6/11/2024 | Year End Review Meeting QI Minutes Year End Review  Jan 25 2023 | |
| 4/25/2024 | █████████.pdf | Intake |

**Ex. B-307**



| Date | | Category |
|---|---|---|
| 5/7/2024 | ██████████.pdf | Nurse Sick Calls |
| 4/25/2024 | z mar ███ .pdf | Dental |
| 5/14/2024 | ██████████ | Mental Health |
| 5/15/2024 | ██████████ | Mental Health |
| 6/11/2024 | ██████████ | Sample of non-formulary records |
| 4/25/2024 | ██████████.pdf | Intake |
| 5/23/2024 | Zoerner, Laura | Depositions |
| 4/25/2024 | ████████ | Chronic Care |
| 5/14/2024 | ████████ | Mental Health |
| 5/15/2024 | ████████ | Mental Health |
| 5/7/2024 | ████████.pdf | Nurse Sick Calls |

Other: Description of SDSO Reentry Programs and Classes

**Ex. B-308**

**Appendix D**

**Mental Health/Psychiatric Case Summaries**

**1. Jail Incarcerated Person (IP) Record Number:** ██████ -
Name of IP: ████████████ r
Date of Review:  June 9, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Good screen process and allocation of resources for characterologically disturbed IP
+ Good process for assessing and treating suicidal gestures as maladaptive cries for help.
-  Too many instances of "cut and paste" (usually same provider for her own notes, but they offer nothing new in way of information or interval history).
- I'm curious about interaction between MH and Addiction Services – I don't see a lot of references to the MAT team and their assessments in the MH notes.

**2. Jail Incarcerated Person (IP) Record Number:** ██████ -
Name of IP: ██████
Date of Review:  May 28, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Good screen, excellent documentation of refusals.  Appears they had good patience for his needs and he made it through jail well cared for.

**3. Jail Incarcerated Person (IP) Record Number:** ██████ -
Name of IP: ██████
Date of Review:  May 29, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Ex. B-309**

**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Good multidisciplinary approach when in ADSEP
- He has 8 different psych med appointments.  Initial 3 with the same provider then five different providers subsequently. It does not appear anything untoward was done or happened, but lack of continuity of care with same provider can lead to unintended consequences.


**4. Jail Incarcerated Person (IP) Record Number:**  ████  _
Name of IP: ██████████
Date of Review    :  June 3, 2024
Reviewer:  Joseph Baskin, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Very thorough LMFT – Jasmine Angel (███/2023)
+ Good handoffs when suicidal
+Responsive to MH counseling needs


**5. Jail Incarcerated Person (IP) Record Number:**  ████  -
Name of IP: ██████████
Date of Review    :  June 3, 2024
Reviewer:  Joseph Baskin, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Dr. Anderson did initial psych eval and handed off to NP's.  With Decompensation, Dr. Anderson resumed care and was methodical and conscientious in following through on difficult case.


**6. Jail Incarcerated Person (IP) Record Number:**  ████  -
Name of IP: ██████████
Date of Review:  June 4, 2024
Reviewer:  Joseph Baskin, MD

**Ex. B-310**

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ LMFT's took steps to improve very poor hygiene ████ /2024)
+ Very difficult case, managed well
+ Lots of attempts to provide care to IP who had very poor insight and quite sick
+ Multiples evaluations for competency with conflicting data proving how difficult a case this was.

**7. Jail Incarcerated Person (IP) Record Number:**  ████
Name of IP:  ████
Date of Review:  June 6, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+  The care was good and reasonable. Lots of attempts to address his needs both meds/counseling.
-  There is a lack of continuity with the psych providers. This patient saw 5 different prescribers. Each was appropriate and reported on interval history since colleague assessed, but there are inherent problems with this approach such as failure to spot patterns, slow rapport process, and limit splitting.

**8. Jail Incarcerated Person (IP) Record Number:**  ████
Name of IP:  ████
Date of Review:  June 6, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Aggressive monitoring and treatment of very ill and complicated IP.  Transfers to/from hospital and PSU.  Very thorough job by all.

Ex. B-311

**9. Jail Incarcerated Person (IP) Record Number:** ███████ -
Name of IP: ███████
Date of Review:  June 9, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ A difficult intake, presented delusional and suicidal. Manage well, assessed, followed closely.
+ Remained delusional, refusing medication – followed closely.
- Care good, but I again make mention of the many providers which breaks continuity. IP had no insight, so verbal reports not accurate.  The same provider over time can mark this better and develop better interventions.

**10. Jail Incarcerated Person (IP) Record Number:** ███████ -
Name of IP: ███████
Date of Review:  June 9, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs**:**
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Good care. Good follow up after assessment.

**11. Jail Incarcerated Person (IP) Record Number:** ███████ -
Name of IP: ███████
Date of Review:  June 9, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Good f/u from MHC; great consistency from LMFT Reynoso

Ex. B-312

+ Consistently with one psych provider (Anderson) then went to several NP's; less consistent after that, but good overall care for this IP both meds and counseling.


**12. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ███████

Date of Review:  June 9, 2024

Reviewer:  Joseph Baskin, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

+ Good follow through by LCSW Menendez especially through trial and up to sentencing.

+ Consistent care from psych provider (Hamilton NP).

+ Appropriate response to diverting behavior.


**13. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ███████

Date of Review:  June 10, 2024

Reviewer:  Joseph Baskin, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

+ Good care, good f/u, reasonable treatment

Note – 2 different set of records, from 2016-2019 (not SD jail), then 2019-2024; Very high user of medical services

+ Very high anxiety, followed well by MH all around

+/-  Psych providers did good job following but, again, the handoffs to several different providers causes continuity of care issues.  NO lapses in reasonable care, but exacerbates problems in the highly anxious and demanding IP.


**14. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ███████

Date of Review:  June 10, 2024

Reviewer:  Joseph Baskin, MD

**Ex. B-313**

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

+ Good care and f/u while in ADSEP for high level charges, difficult case

+ Initially wasn't amenable to psychotropics, so LMFT's followed closely and providers maintained contact to check for changes in openness to meds

+ Psych NP Ancho worked to develop rapport and recommended psychotherapy while unmedicated.

Note – An outside provider introduced an inappropriate confound and layer of complexity

- This IP goes for one year without medications, then rapidly grows to 5 different meds including 2 sleepers (quetiapine/trazodone).   Relationship with jail providers interfered by outside (dubious) provider who introduced the demand for polypharmacy.  Here's an instance where a single provider developing rapport might have proved more valuable to IP in giving meds longer trials and avoiding polypharmacy.

**15. Jail Incarcerated Person (IP) Record Number:** ████████ -

Name of IP: ████████████

Date of Review:  June 16, 2024

Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

+ Straightforward management of anxiety and adjustment in an incompletely forthcoming IP who was not 100% compliant with meds.  Good job.

**16. Jail Incarcerated Person (IP) Record Number:** ████████ -

Name of IP: ████████████

Date of Review:  June 16, 2024

Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

+ Early positive screening and appropriate immediate tx planning for suicidality (PSU)

Ex. B-314

+ Good documentation and d/c from PSU (IP resistant due to own fears likely due to charges).
+ IP made classification more complex with a sense of safety that prompted manipulative threats to avoid certain jail areas.  Staff handled it well.

**17. Jail Incarcerated Person (IP) Record Number:** ███████ -
Name of IP: ███████
Date of Review:  June 16, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Difficult case. Shot multiple times by police at time of arrest, hospitalized 2 months prior to intake at jail.  During arrest made suicidal threats.  Screeners erred on the side of caution as being possibly suicidal despite his denials.  Received good screening and psych/counseling care.
+ As an aside, good medical care as well for complex multiple extremity wounds and care needs.

**18. Jail Incarcerated Person (IP) Record Number:** ███████ -
Name of IP: ███████
Date of Review:  June 16, 2024
Reviewer: Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ No issues.  Ambivalent about medications. Introduced transgender issue that was well addressed.  Good care and follow up.
Noted – Psych had good discussion about MAT and diversion documented in assessment.

**19. Jail Incarcerated Person (IP) Record Number:** ███████ -
Name of IP: ███████
Date of Review:  June 16, 2024
Reviewer:  Joseph Baskin, MD

Ex. B-315

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Psych NP Hamilton on ▮▮▮▮▮▮▮, 2023 detailed the issues with this IP.  Significant hx of CD, on MAT from prison.  However, frequent issues with diversion.  Near constant requests for increasing all medications with habituating potential (Subutex, clonidine, gabapentin).  In this instance the multiple psych providers puts situation at risk for greater splitting and difficulty with limit setting. NP Hamilton laid out the issues well in her note of ▮▮▮▮▮▮▮ 2023 in a cogent and appropriate way.  However, other providers followed up, including the primary psychiatrist, Dr. Liu, and resumed/continued their own plans.  NOTHING untoward happened to the IP and all decisions were within reasonable guidelines, but I lament the increased difficulty when dealing with severe CD coupled with ASPD and its attendant risks regarding medications.


**20. Jail Incarcerated Person (IP) Record Number:** ▮▮▮▮▮ .
Name of IP: ▮▮▮▮▮▮▮▮▮
Date of Review:  June 16, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Care was good throughout.  Not complicated IP who didn't want care for the first two years of incarceration.  Seen regularly by MH for counseling through ADSEP and after losing mother (died of MI in Mississippi) even when he was highly ambivalent about wanting mental health care.  Additionally, NP Hamilton saw him consistently and provided good prescriber care.


**21. Jail Incarcerated Person (IP) Record Number:** ▮▮▮▮▮ .
Name of IP: ▮▮▮▮▮▮▮▮▮▮
Date of Review:  June 17, 2024
Reviewer:  Joseph Baskin MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

**Ex. B-316**

+ Very difficult IP.  Extremely high user of medical services - >500 pages of grievances and sick call requests, most for medical.  During treatment with psychiatry, highly ambivalent and demanding, at times refusing medications, other times demanding.  Prescribers and SW attended dutifully throughout lengthy incarceration (> 5 years).
+/-  IP experienced no untoward events and would have proven difficult regardless, but greater consistency with one prescriber could reduce (likely saw turnover not through the fault of the jail, but the length of time he was incarcerated).

**22. Jail Incarcerated Person (IP) Record Number:** ███████ .
Name of IP: ████████
Date of Review:  June 18, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ 1370 IST.  I got to view how staff handles someone ultimately non-competent to stand trial.  Good initial identification and intensive treatment. Then handoff to forensic staff who further stabilized IP with the power of the court behind their efforts.

**23. Jail Incarcerated Person (IP) Record Number:** ███████ .
Name of IP: ████████
Date of Review:  June 18, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ A very high user of medical services coupled with depression/anxiety and characterological issues. Well assessed and followed, good documentation.

**24. Jail Incarcerated Person (IP) Record Number:** ███████ .
Name of IP: ████████
Date of Review:  June 18, 2024
Reviewer:  Joseph Baskin, MD

**Ex. B-317**

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

+ Initially denies treatment, then engages. Very thorough assessments and care. Good engagement with medical needs, checking levels and labs.

+ As an aside this was a difficult medical patient and from the chart it looks like they provided extensive care for his medical needs. MH needs were less, but equally attended.


 **25. Jail Incarcerated Person (IP) Record Number:** ██████ -

Name of IP: ██████

Date of Review: June 19, 2024

Reviewer:  Joseph Baskin, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

+ A case very emblematic of the process at the jail. Exceptionally difficult IP with profound psychosis who stopped eating due to paranoid ideation. The entire jail staff monitored the IP quite well. From vitals, to I/O's (specific to meals), medications, and lab management – everything was done diligently to get patient through the situation. Specifically Nizamani, forensic psychiatrist, did a great job (collaborating with other psych providers and MH counselors, group leaders) to document efforts to address psychosis and adjacent issues. Was in PSU for much of his jail intake.


**26. Jail Incarcerated Person (IP) Record Number:** ██████ -

Name of IP: ██████

Date of Review   : June 2, 2024

Reviewer:  Joseph Baskin, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

+ The mental health counselors followed closely and were diligent.

+ When someone is in ADSEP they have a good protocol

+They also responded well when he had bad news about his father

Ex. B-318

- Inconsistency regarding who saw for medication management (5 different providers)
- This gentleman had a severe TBI age 14, subsequent encephalomalacia of frontal lobe, noted seizure disorder. The 1st mention of this by psych provider is his 5th (NP Anthony) who does an excellent and thorough review, makes good recs, and never sees patient again. The NP who followed made no mention of those recs and proceeded on own plan of care (not inappropriate, but lacking continuity).
- limited discussion about consequences of cheeking/diversion.  There is appropriate action, though.
-No mention of role of CD and its impact on anxiety and tendency to divert.


**27. Jail Incarcerated Person (IP) Record Number:** ⬛⬛⬛⬛ -
Name of IP: ⬛⬛⬛⬛
Date of Review: June 19, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ Very good job with a difficult IP.  Returned from hospital after being stabilized for 6 months, on medications, then suspected of self-discontinuing meds and decompensating.  Monitored closely and judiciously, appropriate actions taken to address (movement towards possible IMO).  Psychiatric team worked will with the forensic team in a problematic case and IP improved.


**28. Jail Incarcerated Person (IP) Record Number:** ⬛⬛⬛⬛ -
Name of IP: ⬛⬛⬛⬛
Date of Review:  June 19, 2024
Reviewer:  Joseph Baskin, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
+ This case highlighted the process for putting someone in EOH (DSP) and how they are monitored and treated.  No issues – left EOH and was managed well by Hamilton, NP and the MH staff.


**29. Jail Incarcerated Person (IP) Record Number:** ⬛⬛⬛⬛
Name of IP: ⬛⬛⬛⬛

**Ex. B-319**

Date of Review:  June 16, 2024
Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
IP intake was ███/23 and she was promptly seen by an LCSW the same day, IP requested trazodone. IP not on current meds, reported taking trazodone "in 2022."
Not clear if any med verification done. Was started on trazodone 100 mg qhs and was then written up for med hoarding in late ██████ 2024. Despite this, trazodone increased by PNP and psychiatrist  Also complained of excessive AM sedation.  Later reported taking trazodone "on the outside " 350 mg qhs.  Trazodone increased to up to 300 mg qhs. Benadyl also added, seemingly at IP request and "for allergies" despite IP having other allergy medications ordered.
IP had subsequent episodes of medication hoarding on ███ and ███/24, prompting crushing/floating of meds.
This appears to be treatment of insomnia primarily, as IP refused most doses of fluoxetine when this was finally recommended ███/24. Would not have started or continued high dose trazodone and Benadryl long term in correctional setting given the presentation and problems documented.

**30. Jail Incarcerated Person (IP) Record Number:**  ██████
Name of IP: ██████████
Date of Review:  May 28 and June 7, 2024
Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Incarcerated person was booked ███20 and was appropriately placed on a heightened observation level due to seriousness of charges (drove off cliff with children) and some depressive symptoms and received initial health screen by a psychologist ███/20 and was seen by a PNP by ███ for an initial evaluation.  Pt had no significant past psychiatric history, no hospitalizations, no past medications prescribed, had substance abuse history and had very serious charges. He was seen often (at least weekly, often more frequently) by Mental Health Counselors, therapists or technicians.
I had concerns with the initial PNP's (Christopher Kagay) decision-making, given this context ███  and diagnoses:

F32.9 Depressive disorder unspecified
R/O F29
F43.20 Adjustment d/o F19.2 Combination substance use d/o **PNP Kagay documents pt is having AH, (which in this reviewer's opinion seem highly questionable). He prescribes Remeron 30 mg and Abilify 5 mg qhs and follows up in 1 week.**
█████/20- Kagay documents ongoing depression and anxiety but "no longer reporting AH". Diagnoses are unchanged. Kagay prescribes Prozac 10 mg and increases remeron to 45 mg qhs and continues Abilify 5 mg qd with follow up 3-4 weeks __
Concerns: starting dose and escalation rate of remeron is too rapid and increased risk for side effects, particularly when there isn't even a well- defined diagnosis. need for sga is questionable and no baseline labs (cmp, fasting lipids) referenced or ordered (pt also overweight (268 lb, 6' 5" bmi 31.8 on intake), weight checks not ordered or referenced moving forward despite being on remeron, a known weight-gaining medication- poor choice for first line tx in this pt) and abilify
Janet Medenwald-Hogg Psychiatrist evaluated defendant on █████/2020.
She seems to elicit PTSD symptoms, problems with sleep, but still references AH and diagnoses:
F32.9 Depressive disorder unspecified, F19.20 Combination drug use (cocaine, xanax), F43.1 post-traumatic stress disorder, and Grief
She documented she reviewed current medications and discussed alternatives. "Discussed serotinergic (sic) syndrome risk with the combination of medications he is on and alterations. Discussed the traumatic nature of his symptoms, reduced mirtazapine to 30 mg qhs, increased fluoxetine to 20 mg po qd and add prazosin 1 mg qhs" and plan to follow up in 1 wk—she appears to realize the remeron dose escalation was too rapid (although also adds second antidepressant more appropriate for ptsd, but with no cle intent to titrate remeron downward further)
PNP Christopher Kagay saw pt on█████2020. Pt not sleeping and seeking Adderall.  Documents "no AH," Passive death wish, anxiety and depression, recommends an increased dose of Abilify "for better mood regulation" and increases dose to 10 mg qd. Serotonin syndrome risks discussed again.
Neither prescriber documents sga-specific risks
█████/20 Kathryn Langham Psychiatrist now documents multiple refusals of Prozac and Abilify and discontinues both. Keeps Remeron and Prazosin
Kagay █████/20- reports compliance but ongoing depression and anxiety and started Venlafaxine ER 75mg qd
Kathryn Langham Psychiatrist █████/2020 She continued Venlafaxine ER 75mg PO QD Prazosin 1mg PO
- d/c'd Remeron, restarted Abilify 10mg for mood symptoms and started trial of trazodone 50mg qHS for sleep
Kagay █████/20- main complaint seems to be lack of sleep and "morning med wearing off" and documents plan to increase Venlafaxine ER to 150mg PO QD and Increased Trazodone to 100mg PO QHS
Kathryn Langham Psychiatrist █████/2021- despite def reporting overall improvement and acknowledging many problems are likely situational, documents plan to increase Venlafaxine ER to 225mg PO QD, continued Trazodone to 100mg PO QHS Prazosin 1mg PO QHS and Abilify 10mg PO QD
Roberta Maixner PNP █████/21. As pt appeared to be doing well, documented no intent to change meds, but also "Though last progress note states that venlafaxine was to be increased

**Ex. B-321**



to 225mg qdaily from 150mg daily; it appears that it is currently being ordered at 75mg"—it appears that somehow, 2 venlafaxine dose increase orders ▮▮ /20 and ▮▮ /21 were either not entered or missed Ordered labs (first since intake) and  monthly weights.  MARs in chart do not document this was done monthly (page 1998-1999)

Jerry Bobo, Psychiatrist ▮▮ /2021 documents "Abilify 10 mg qam, Prazosin 1 mg qhs, Trazodone 100 mg Qhs and Effexor 75 mg Qam, no any med SE and defendant appearing to be doing well on the meds", makes no changes, follow up 3 months

Kat Balingit PNP ▮▮ /2021 "Rev'd lipid panel ▮▮ .21, noted elevated triglycerides, & cholesterol. A1c WNL 5.0." (first reference to anyone reviewing labs, despite def being on sga and remeron for over a year) re-ordered labs.

Kat Balingit PNP ▮▮ /2021 Rev'd labs drawn on ▮▮ .21 elevated lipids noted (lab report shows triglycerides are now over 400, significantly higher than in ▮▮ 2021- 225 mg/dl), CMP, A1c, CBC, TSH nl.

Tina Hamilton PNP ▮▮ /21 "[Defendant] reports intent to stop medication to go to fire (?) camp.

Discussed importance of not stopping and to take since they are helping his symptoms. Reports tolerating medication; will continue current orders." Of note this note and ▮▮ have an error in effexor dose which is listed as 5 mg, although not likely to result in actual medication error given it doesn't exist in 5 mg doses)

Subsequent visits q 8-12 weeks

Hamilton PNP ▮▮ /22- "Defendant reports some shaking of his hand, DW Pt possible akathisia from Abilify." Def declined meds to address. Abilify continued unchanged.

▮▮ /23 QUEST lab report (no labs since ▮▮ /21) triglycerides still elevated 281 mg/dl

Summary of concerns:

- lack of diagnostic clarification
- use of sga without appropriate indication or justification
- starting doses and rate of dose increase of medications by np kagay too rapid and potentially unsafe
- choice of antidepressant (remeron) not ideal for oveweight patient
- lack of informed consent for sga use
- labs to monitor for sga side effects not timely ordered, abnormal results did not trigger any treatment modification

More of an observation than serious concern:

- Multiple refusals of medication, particularly trazodone in 2024. at some point, this should have been made prn, or frankly just discontinued as it was intending to treat sleep and had been prescribed for an extended period.  i also note that the times of many of the refusal forms for hs meds are timed between midnight and 4 am and state "patient refused to sign." unclear if the time on those forms reflects a late entry of some sort in the emr, or is contemporaneous to the actual time of the med refusal; if hs meds are being passed at those very late hours with significant variation from day-to-day
- Actual mars seem to have time stamps anywhere from shortly before 8 pm med to almost 12 am (time varies by several hours) which would seem to not promote good sleep hygiene. "8 am" meds have "administered" time stamps sometimes well into the afternoon (1-2 pm). mars and refusal sheets often have very different time stamps for the same date/med pass refusal.


**31. Jail Incarcerated Person (IP) Record Number:** ▮▮▮▮

Name of IP: ████████████████

Date of Review:  May 27, 2024

Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes   X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Mental health care was rendered in a timely manner.  Booking date was ████/22. First MH contact was ████/22. There were no fewer than 27 visits with Mental health counselors and Psychiatric NPs through ████/24, with pt being seen at least monthly by mental health staff, in addition to being referred to dual diagnosis groups.

IP never seen by a psychiatrist, however.

IP appeared arrived into custody on very low/subtherapeutic doses of 2 SGAs (Abilify 5 mg and Seroquel 100 mg qhs) and a reported dx of schizophrenia but little hx or symptomatology to support this ("dark shadows", "hearing negative voices talking about charges and wife.") and unclear verification or record request to verify dx. Pt had history of stimulant and hallucinogenic drug use. No paranoia, no disorganization noted. Pt also only partially compliant with low doses and no significant decompensation noted in custody.  Meds were continued unchanged for months, and seroquel was even increased up to 200 mg ████/2022 for vague symptoms and poor sleep, despite pt already being obese (243 lb on intake) AND gaining 40 lb in custody (282 by ████/24- BMI of 44) and having hypercholesterolemia on 2 lab draws, mild LFT elevations on second labs (████ '23 and ████ '24). Despite this, no consideration at any point for increasing Abilify instead of Seroquel (if there was truly concern for psychosis) or just discontinuing meds completely on an extended basis.  Pt also requested to DC meds completely at one point, suggesting not a critical need.

An enormous amount of time and resources was spent on a patient with questionable dx and likely no need for psychiatric medication, who likely experienced metabolic syndrome as a side effect.  An evaluation by a psychiatrist and/or more collateral information may have clarified actual treatment needs.

**32. Jail Incarcerated Person (IP) Record Number:  ████████████**

Name of IP: ████████████████████.

Date of Review:  June 13, 2024

Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Ex. B-323

Intake ▮▮/23. Mental health evaluation by ▮▮/23, seen twice a month to monthly by mostly LCSW, some psychologist visits and groups as well. Offered medications for insomnia and PTSD symptoms by PNP starting ▮▮/22. IP had numerous side effects, ultimately elected not to take any psychiatric medications.


**33. Jail Incarcerated Person (IP) Record Number:** ▮▮▮▮▮
Name of IP: ▮▮▮▮▮▮▮▮
Date of Review:  June 18, 2024
Reviewer:  Ana Natasha Cervantes, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Booking date for IP was ▮▮/21. Had screening done same day. No immediate MH needs identified. Behavioral Health Assessment done ▮▮/21. IP reported wanting something for sleep, later complained of depression.  Several of the mental health counselors noted that they used a deputy to help interpret, as IP was Spanish-speaking.  This is not usually considered best practice. Other evaluators used telepsychiatry (silent on whether language service was part of that) and one psychologist specifically indicated she interviewed IP in Spanish, IP's native language.
Psychiatric services were eventually offered and continued at appropriate intervals.


**34. Jail Incarcerated Person (IP) Record Number:** ▮▮▮▮▮
Name of IP: ▮▮▮▮▮▮▮▮
Date of Review:  June 14, 2024
Reviewer:  Ana Natasha Cervantes, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
IP intake was ▮▮/23. Seen by mental health LMFT after about 2 weeks, as no immediate MH needs identified, pt had last filled medications 6 months prior. Of note, the only substance abuse IP noted was methamphetamine for 25 yrs, MJ and some alcohol.  NO opiates mentioned. Hx of multiple prior incarcerations.
IP requested to e started on Wellbutrin (specifically) for depression "only thing that works"  This was started (with warning about diversion)  IP requested several times to receive XR, "non-

Ex. B-324

crushed". Dose increased (IR) to 150 bid. Selectively compliant. Grieved that other incarcerated persons receive XR formulation.

IP started on MAT around ████ 2023. NO documented past history of opiate use disorder. IP placed multiple sick call slips threatening to use opiates "if and when" they arrive in the facility. Buprenorphine increased to 16 mg for "cravings" (not noted for the first few months of incarceration). and to "save my life"

IP also making numerous other requests for "high protein diet due to weight loss" (no significant weight loss documented) "new glasses due to broken frame (frame not broken), change from IR to XL Wellbutrin despite being told repeatedly not an option in this setting. Then demanding different prescriber.

IP presents, per chart review, as a person at high risk for diverting abusable substances, long carceral history, likely aware of "street value" of having such medications available.

I would have obtained and referenced past charts and any prior documentation of actual opiate use disorder, as IP did NOT disclose this at intake, and later self-report of supposed very high use within the last 12 months appears to be primary, if not sole reason for initiating MAT. Regarding Wellbutrin, would have considered requiring alternative trial of something else first, particularly since IP also c/o "anxiety".

If still staying with rx of Wellbutrin IR, would have considered 8 am and 4 pm dosing. Crushed Wellbutrin at 8 pm was likely not helping with sleep or anxiety, which prompted requests for "anxiety meds" and "sleep meds" (Vistaril). Also, Wellbutrin and Vistaril both started on ██/23, and Vistaril dose was 100 mg po bid from the start, which is quite high and not usual starting dose. (may have been noted to be error as it appears MAR only has this dose for about a week) Would have considered changing the timing of Wellbutrin IR to am and 4 pm (rather than 8 am and 8 pm)


**35. Jail Incarcerated Person (IP) Record Number:** ████████
Name of IP: ████████
Date of Review:  May 28, 2024
Reviewer:  Ana Natasha Cervantes, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
IP was booked ██/2020 in ISP.  Was seen by ██/20 by a psychologist and mental health care counselor. Risk assessments were performed frequently during initial days of incarceration. Due to certain risk factors, was kept in ISP to prevent self-harm. IP was seen on a regular basis, including by psychiatry and PNP. No long-term medication needs were noted. It appeared IP wanted medication to help primarily to help him sleep more. Selectively compliant with medication for anxiety (only taking nighttime doses of buspar, for example). Also often refused doses of Remeron, the main reason for giving this medication appeared to be off-label to help with sleep as no serious symptoms of depression or severe anxiety noted.

Ex. B-325

 Although at times the length of time between MH visits were much longer than noted in providers' notes, it is clear from the documentation that IP refused many visits as well (at least 19 between █/21 and █/24), so the access to care was there, but rejected by IP, and mental health needs also did not appear serious.

**36. Jail Incarcerated Person (IP) Record Number:** ████████
Name of IP: ████████
Date of Review:  June 22, 2024
Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Intake was █/21. Mental health needs were not immediately identified; however, IP began demonstrating paranoia and delusions surrounding case by █/21. Seen by PNP ██ █ 2022. IP refused to consider psychiatric medication. Refused some visits with mental health professionals, but ultimately they did try to see him at appropriate intervals. Demonstrated paranoia toward family. IP found IST, ordered to competency restoration. Seen weekly by psychiatrist on that unit, several reasonable medications were tried.  At one point did develop dystonia and was sent to ER to manage.  Eventually complied with antipsychotic medications and improved and found competent. Appropriate Labs were obtained ██/23.
Although IP was prescribed Elavil, that was being ordered by neurology for post-assault headaches.

**36. Jail Incarcerated Person (IP) Record Number:** ████████
Name of IP: ████████
Date of Review:  May 27, 2024
Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
No concerns. There were no acute psychiatric issues. Prior hx of cutting behavior, on razor restriction. Pt was on no chronic psychiatric medications and only requested something to help with sleep. Only medication prescribed was Melatonin. Was seen by a psychiatrist one time, but

Ex. B-326

no active psychiatric sx noted, or psychiatric dx (other than hx of alcohol abuse) or medication given.


**38. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ███████████

Date of Review: June 22, 2024

Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Intake ███ 23. Ht █████ lb, BMI ███  (no other subsequent weight or labs)

No immediate MH needs identified, denied SI, or history of self-harm and suicide attempts, last psychiatric meds over a year before, denied substance use on intake.

Seen by PNP by ███/24. History not very compelling for bipolar, and DOCUMENTED outpt rx hx only trazodone and low dose Neurontin, but "maybe on depakote and Zyprexa". IP also admits to substance (opiate and stimulant use apparently) and places request to be on MAT Dx Bipolar disorder, started on Seroquel 100 mg for 1 wk then increased to 10 mg and Vistaril 25 mg po bid for anxiety.  In the next 7 months, pt seen only by PNPs (multiple) MDs may have done chart review (some dose adjustments) other medications added for relatively mild symptoms included Trazodone, Zyprexa (up to 10 mg qhs) buspar 7.5 mg bid and Neurontin "for anxiety and mood adjunct." Then Remeron 15 mg.  IP selectively compliant to due to excessive sedation.  No labs or weights ordered or referenced despite SGA use.  Hard to justify using SGAs and associated side effects given history and presentation. Everything prescribed seems to be geared toward sleep and situational anxiety.  Antipsychotics seemed wholly unnecessary in this case and generally poor choices of meds for minor symptoms. All selected meds highly abused in carceral settings.


**39. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ████████████

Date of Review: June 21-22, 2024

Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Ex. B-327

This file represents a lengthy incarceration that includes 2 separate medical record files. Intake date was ███████ 2017. IP was ████ in and weighed ████ lbs on intake. He was seen by psychiatrist by ██████ 2017. There had been no immediate mental health issues identified at intake.

IP reported a long history of depression and alluded to being on medication in the past. Due to some reports of depression, IP was prescribed Prozac 20 mg and Zyprexa 5 mg QHS. It should be noted that the IP's report of "voices" apparently interpreted as psychosis, was questionable at best throughout this incarceration.

What follows is a lengthy incarceration record of 7 years where there are hundreds of pages of sick calls, complaints, and grievances, selective medication refusals by IP, and IP requests to be placed on numerous medications (most of which are heavily abused in carceral settings and known to be the case even as far back as 2017). This included being prescribed Elavil in 2017 by medical providers for chronic back pain. The doses of psychiatric medications were increased to very high doses. In addition to Prozac and Zyprexa, psychiatrists added Buspar and Remeron (despite IP being borderline obese) for IP complaints of insomnia and anxiety. Weights and labs were not ordered and/or documented during the first two years of incarceration or were not included with the record. The 1st chart ends on or about September 6, 2019. I did not see any labs or documented weight checks in psychiatric notes. There was a chart note dated ███████ 2017 indicating that the IP said he had stopped Prozac one week prior due to headaches and sexual side effects. Effexor 75 mg was started in its place.

Of particular concern was a pattern of IP hoarding medications. This was documented repeatedly. Of significant concern was one incident on ███████, 2017 where he was found to have had two zip lock bags with approximately 250 pills of various medications, which were not specified as to what they were but were described as current medications. At the time that this was discovered, he was prescribed Elavil 100 mg twice a day, Prozac 80 mg a day, Buspar 30 mg twice a day, and Remeron 15 mg a day.

Following this massive 250-pill discovery, some medications were discontinued, but most psychiatric medications were continued and even increased significantly over the next few months (Effexor up to 300 mg a day and Remeron 60 mg a day) for complaints of depression and anxiety, all while being prescribed Elavil 100 mg twice a day for chronic back pain.

There were no labs documenting an amitriptyline level, nor were any lab orders or results referenced in any of the psychiatric notes. There were no EKGs referenced, either. Ironically, IP's tendency to hoard medications rather than take them as prescribed may have been life-saving, as he was being prescribed a tricyclic in combination with SSRI/SNRI in a quantity sufficient to cause death, whether it be intentional or unintentional, with no monitoring of drug levels/EKG to ensure safe dosing.

By ████ 2018, the IP was requesting Wellbutrin (despite complaining of anxiety). This was started in combination with Remeron and Buspar while Effexor was lowered. Numerous requests for higher doses followed, despite several additional subsequent notes documenting IP hoarding medications including in ███████, ██████ and ███████ of 2018 and twice in ██████ of 2019. While at times medications would be discontinued briefly, IP would request for them to be re-instated and it appeared that because there were at least 10 different prescribers assigned to the IP, and it is possible that they were unfamiliar with his history, the medications would be restarted, often ordered non-crushed (after IP would complain), despite the history of repeated hoarding.

Ex. B-328

Notes regarding medication hoarding were also found in ███ and ████ of 2019. This included hoarding of medical medications (Prilosec, Bactrim, Tylenol) and Wellbutrin. IP would refuse to take medications if they were crushed and on a couple of occasions threatened hunger strikes if he was forced to take medications in crushed form, which were brief in duration and not life-threatening.

The second medical record (started approx. ████████ 2019) did have some labs, which indicated that by ██████ 2021, IP's Hg A1C was borderline at 6.0 and his weight got up to 295 lb, documented on ██████ 2021 (in a nursing note). IP also had elevated triglycerides and low HDL cholesterol. Although Zyprexa was discontinued in ███ 2017, Remeron was added at the same time.

IP later requested to be placed on Seroquel, and despite subsequent diversion of this medication as well, was maintained on this until the end of the record that's available -which is ██████ 2024- "for mood and insomnia"). IP's psychiatric diagnoses have remained vague. And despite having periods of time where he would refuse to take medications because they were being crushed (and was also noted to try to snort crushed Wellbutrin or dispose of the cup with crushed meds in the trash rather than taking them).

Despite there being weeks in a row of refusing antipsychotics, no convincing psychotic symptoms were ever noted. At no time was a decision made to discontinue his psychiatric medications completely and re-evaluate the actual need for them. There are also several notes documenting the IP trying to "cheek" or divert gabapentin, as well as suboxone (which he was started on in 2023 when the MAT program was expanded).

Overall, this chart is concerning for inappropriate and dangerous prescribing of psychiatric medications  without appropriate monitoring, and furthermore, were not ideal choices for long-term use in an IP with a documented history of obesity, dyslipidemia, sleep apnea, borderline HgAlc, and extensive history of medication diversion.


**40. Jail Incarcerated Person (IP) Record Number:** ██████
Name of IP:  ████████████████████
Date of Review:  June 11, 2024
Reviewer:  Ana Natasha Cervantes, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
Yes  X
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Intake ███/23. Seen by LPCC ███/23, PNP by ███/23 (there did not appear to be an urgent need to see prescriber immediately on intake ) medications and appropriate labs were ordered by PNP ███/23, based on MSE and history.
Multiple medication refusals by IP for meds and clinic visits, and testing, so things were ordered appropriately but documented as rejected by IP.

**41. Jail Incarcerated Person (IP) Record Number:** ███████
Name of IP: ████████████████
Date of Review: May 26, 2024
Reviewer: Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
MH Visits were rendered in a timely manner.  IP was booked ██/23 (transgender male to female)
Seen by psychiatrist ██/23
Psychiatric medication (olanzapine 5 mg qhs) had been bridged after verifying it was being taken outpatient, however, it was not an active script based on last fill date (███/23) Psychiatrist questioned the nature of the psychosis, consideration to it possibly being substance abuse related, as pt had hx of methamphetamine use and positive tox on intake. Appropriate labs were ordered and resulted by ███/23.  Increased Triglycerides noted.
 Seen by PNP ███/23 Olanzapine increased to 7.5 mg qhs and Lexapro 5 mg qd started, although clinical indication seemed weak, no attempt to clarify current symptoms (no other MH professionals had noted psychosis or concerns for MDD or severe anxiety)
No further labs were ordered after dose increase, did not see weight monitoring documented.
Subsequent PNP visits on ████/23, ██/24, ██/24 AIMS documented at most visits, which is appropriate. However, does not appear to have thorough reassessment of IP need to have Lexapro or olanzapine prescribed long-term.
Also, during health assessment done ███/23, urine pregnancy test was ordered (and possibly cervical CA screening q 3 years). This was unnecessary as this is a biological MALE.


**42. Jail Incarcerated Person (IP) Record Number:** ███████
Name of IP: ██████████████
Date of Review:  May 26, 2024
Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Care was generally rendered in a timely manner.  The patient reported anxiety and insomnia concerns about 2 months into her incarceration, but later reported some anxiety preceded incarceration.

Ex. B-330

She was diagnosed with Generalized Anxiety Disorder and seen only by NPs (at least 3 different ones).  She was prescribed 3 different SSRIs, diphenhydramine, hydroxyzine and melatonin in the 8 months of mental health treatment records available, and was only partially compliant with all, yet continued to request numerous sick visits with "psychiatry."

She never saw a psychiatrist to better clarify her diagnosis after "failing" 3 SSRIs and several sleep medications and seeing 3 PNPs. PTSD should have been considered as she intermittently reported nightmares but was never assessed in-depth for other possible PTSD symptoms.

Alternatively, it also appears that sleep became her main focus, and MSE were unremarkable for other psychiatric concerns, so it is possible that SSRIs were never truly needed, and if this was the case and her only concern, there were a lot of visits/time devoted to address a symptom that, in isolation, is usually not managed with long-term medications in carceral settings.

Additionally, many of the NP notes (at least ████/23, ████/23, ████/23. ████/23, ████/23, ████/23) indicate that deputies were used to translate for the encounters for this Spanish-speaking patient.  Using deputies to translate/interpret for patients is generally discouraged but was routinely done here. The patient did have mental health counselors that were fluent in Spanish, which was a positive.


**43. Jail Incarcerated Person (IP) Record Number:** ██████
Name of IP: ████████████
Date of Review:  June 14, 2024
Reviewer:  Ana Natasha Cervantes, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
IP intake was ████/21 and was seen by MH almost immediately, by more than one person, to determine housing based on risk factors.  No immediate medication needs. Once IP requested to see prescribers, he was seen timely, and appropriate medications prescribed although IP was selectively compliant (suspect priority was primarily sleep meds).  There was a gap between approx ████/22 and ████/23 where there appeared to be no face-to-face MH contact but it appears it was attempted and IP refused.


**44. Jail Incarcerated Person (IP) Record Number:** ██████
Name of IP: ████████████
Date of Review:  June 13, 2024
Reviewer:  Ana Natasha Cervantes, MD

Ex. B-331

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Booked in ▓▓▓ /23 and received almost immediate evaluation for mental health (was a return from psychiatric hospital after competency restoration). Dx with unspecified psychosis. Seen by LMFT on weekly to q 2-week frequency.  Saw psychiatrist ▓▓▓ /23.

Refused bloodwork.  Follow up was combination of psychiatrists and PNPs

I had a specific concern with PNP A. Quilon who noted patient was preoccupied with weight gain on olanzapine 15 mg po bid (states 10 lb weight gain on this med, but no sheet with weight tracking found) On ▓▓▓ /23, PNP Quilon stopped (no titration) olanzapine 15 mg po bid and substituted for ziprasidone 40 mg po bid "with 35 calorie snack if compliant with medication" There were at least 18 follow up visits with various Mental health care providers following this and no psychosis or objective manic symptoms were noted.  However, ziprasidone 40 mg bid is **not** an equivalent dose to olanzapine 15 mg po bid and "35 calorie snack" does nothing to enhance absorption of ziprasidone, as several hundred calories are required for maximum absorption. This was a risky medication change which *could* have resulted in psychotic symptoms re-emerging.

Additionally, pt requested Wellbutrin for depression. Psychiatrist dc'd Buspar and started Wellbutrin. Almost immediately after starting, IP complained of sleep problems and "feeling manic". There were also numerous refusals of the initial extended-release formulation initially ordered with patient requesting the instant release form.  Wellbutrin was eventually changed to instant release and ordered crushed. However, it does call into question whether this medication was being mis-used.

**45. Jail Incarcerated Person (IP) Record Number:**  ▓▓▓▓▓▓

Name of IP:  ▓▓▓▓▓▓

Date of Review:  May 27, 2024

Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Mental health care was generally rendered in a timely fashion once actually started.  Booking date was Friday ▓▓ 23, first mental health contact attempt was ▓▓ (pt in court), there was also a refusal for initial psychiatric evaluation ▓▓ , and another attempt ▓ that could not be completed due to lockdown. 1st meds "offered" ▓▓ /23 per PNP note, however, not actually ordered, which is my only concern.  Unlikely that IP would have agreed to take voluntarily, but

**Ex. B-332**

given presentation, perhaps should have been ordered (antipsychotics finally ordered ███ , but no med compliance until after sell order by the court on ██ ) to clearly document need, and follow up should have been scheduled/proposed sooner than 4 weeks documented by PNP in ███ /23 note (it did wind up being sooner, unclear from chart how this was decided).

Pt then had competency hearing and involuntary medication order, and was seen at least weekly for psychiatric contact when transferred to JCBT. IP was eventually stabilized on high doses of antipsychotics (combination of 3).

Clozapine was appropriately considered and discussed with IP but ultimately rejected as an option due to IP not believing he could comply with blood draws.

**46. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ████████████

Date of Review: June 18, 2024

Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

IP intake was ███ /23. Seen almost immediately by mental health care and by PNP a week later. Ips reported symptoms were auditory and visual hallucinations that were not typical of those in psychotic disorders, and mental health counselors repeatedly questioned as IP did not appear to be responding to internal stimuli.

Past records were also in the file and noted treatment with low dose antipsychotics for reported hallucinations that were also not typical of true hallucinations, however  SSD application was in process at that time, suggesting some secondary gain to procuring dx. IP also reported relief of hallucinations at very low dose Geodon (20 mg po bid) and did not tolerate increase to 20 mg/40 mg.  Furthermore, there were notes of prior diversion of this med. There was no indication of delusions or thought disorganization or that the "voices" were impairing him in some way. IP much more preoccupied about physical complaints, being placed on MAT and high doses of gabapentin as evidenced by numerous sick call requests.

Although not assessing MAT, I note that pt denied history of opiate use on two initial intakes. Records show he was on MAT previously but also that pain management practice did not want IP on maintenance opiates for his back pain and noted history of tramadol misuse in past. Also did not admit to meth use initially, later reported using prior to incarceration.  Substance induced mood/psychosis should have been in differential.

In summary, need for long-term antipsychotic use (one that allows IP to have a 350 cal snack twice a day) was highly questionable. Never seen by a psychiatrist.  Only PNP

**47. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ██████████

Ex. B-333

Date of Review:  June 11, 2024
Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Intake ███ /23. No mental health history identified or symptoms noted.  Evaluate by LMT on ███ /2 and ███ - unclear what prompted mental health to become involved (did have competency evaluation order at some point), but after symptoms were noted by LMFT, IP was referred to a prescriber, who appropriately recommended an antipsychotic, but IP refused (eventually, IP required hospitalization)

The only concerns I have re: PNP Benjamin was that on ███ 23 he notes the IP presented with "another IP to help communicate." If this was another IP used to interpret, this would not be best practices as it does not keep the interview confidential and accuracy cannot be ensued. Additionally, PNP Benjamin ordered Zyprexa zydis with and order "snack to be given" with it, which is not necessary for this particular medication.

**48. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ███████

Date of Review:  June 7, 2024

Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Intake and mental health referrals were timely

Community medications were bridged on intake

Outside records were appropriately requested and referenced, labs were noted and used to determine when to order labs in the jail Treatment was continued (although diagnosis might be questionable based on outside records)

Standard labs ordered on recommended schedule, but patient refused blood draws.

**49. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ███████

Date of Review:  June 19, 2024

Reviewer:  Ana Natasha Cervantes, MD

**Ex. B-334**

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Intake was ███/23 with no immediate mental health needs identified, no current psychiatric medications prescribed, and questionable substance use history as IP was not forthcoming and refused intake urine tox. Of note, IP was also 5' 10" 297 lb. with a BMI of 42.6. IP was never seen by a psychiatrist, nor does it appear the chart was reviewed. He appears to be charged with serious drug charges involving large quantities of narcotics.

Additional history obtained by RNs and MH counselors indicate that it was IP's first incarceration, and IP said his sister committed suicide 4 days prior to him coming to jail (while he was on the phone with her), and that he had not taken medication recently because he had been in Mexico.

Mental health treatment records were requested. Fax time stamp indicates they were either sent or received on ███/23 at 9:59 AM. This was the same date IP was evaluated by PNP Hamilton, whose note is dated 11:32 am. Given the time the records from Mission City were sent and/or received, it is highly unlikely PNP Hamilton saw these prior to meeting with IP and they are not referenced in that day's note, and there are chart entries indicating these records were being requested but it was never noted she reviewed them. Those records show that the IP's last documented outpatient visit was ██████ 2020 (over two years prior) and medications prescribed at that time by a DNP were Adderall, Propranolol, Xanax, Topamax and Zoloft. PNP Hamilton seemingly took the IP at his word that he was diagnosed with Bipolar disorder and previously prescribed Depakote, Zyprexa and Seroquel and, despite the absence of any current significant symptoms other than those that would be expected given the IP's situation, she decided to start all three of these simultaneously -VPA 250 mg bid, Zyprexa 5 mg qhs, Seroquel 50 mg qhs "for mood and insomnia"  plus Vistaril 25 mg po bid "for anxiety."  She diagnosed Bipolar disorder but obtained no history as to how these medications came to be prescribed or what specific symptoms they intended to treat.

IP was partially compliant with all these medications from almost the start of their being prescribed.  IP was also found to be hoarding large numbers of all of these medication in ███ 2023. Despite this, no significant mental health symptoms are noted by anyone.  Rather than prompting a re-evaluation of their need and/or discontinuation, the VPA was changed to liquid and the Seroquel and Zyprexa were ordered crushed and floated/observed.

A note from a counselor on ███/23 indicates "IP often misses AM VPA due to oversleeping"  Despite this, Zyprexa and Seroquel qhs are continued.

Despite initially denying substance use, significant substance use history emerges from pt, however questionable accuracy (it is not noted in outpt records for example) and pt at one point was placed on MAT (although later asked to be taken off so he could be a trustee.)

Labs to check levels of VPA, CMP and lipid profiles were ordered, as recommended, for mood stabilizers and SGAs. However, PNP Hamilton did not use best practices in choosing her treatment in a correctional setting due to all of the following:

**Ex. B-335**

- Starting IP on FOUR medications simultaneously when there were no clear psychiatric symptoms to target (no mania, clinical depression or psychosis) and failing to consider the impact of situational circumstances were (death of sister, substance use, first incarceration, serious charges) which could explain what few symptoms there.
- Two of those (Seroquel and Zyprexa are redundant). The dose of Seroquel in particular would not address anything other than insomnia, which should not be managed with SGAs, or with long-term medication of any kind in carceral settings if unrelated to a mental illness.
- Furthermore, three of those medications (Seroquel, Zyprexa and Vistaril) are often diverted in carceral settings (and WERE, in this case).
- Additionally, PNP Hamilton prescribed VPA, Zyprexa and Seroquel despite IP being obese with a BMI of 42.6 on intake and IP having an abnormal lipid profile ██/23 showing elevated Total Cholesterol/LDL.
- PNP Hamilton failed to order regular weight checks (only three weights were documented during the incarceration time frame examined). In fact, by ███████ 2023, IP had gained an additional 16 lb. and was now 313 lb. Zyprexa, Seroquel and Depakote are all known to contribute to weight gain and metabolic syndrome. The risks and side effects of these medications in this IP likely outweighed any benefit.

**50. Jail Incarcerated Person (IP) Record Number:** ████████
Name of IP: ████████████████
Date of Review:  June 17, 2024
Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
IP Seen by PNP Quilon on ██/23 and restarted prior regimen of prescribed medication, however, it was 12 days after IP was in the jail, and re-starting Zyprexa 10 mg qhs, lithium carbonate 900 mg qhs, Cymbalta 20 mg qd, amantadine 100 mg bid, and Benadryl 25 mg qhs after at least 12 days (possibly longer) of IP being on no medication  is aggressive.  PNP Quilon also saw IP on ██/23 after medications started. Under hx and MSE IP is described as disorganized, rambling speech, covering ears on occasion, internally preoccupied and non-sensical, however, under impressions PNP Quilon wrote "There are no signs of hallucinations, bizarre behavior or any other psychotic symptoms" which is completely the opposite. This is either bad copy-paste documentation or PNP Quilon cannot identify obvious psychotic symptoms.
Antipsychotic was finally titrated upward more aggressively once care was transferred to a forensic psychiatrist (presumably on a unit for competency restoration?
IP was hospitalized medically from ████-██/24 and I noted in the hospital records attached to the correctional record that the hospital's medication list had the IP's dose of Zyprexa as only 20

mg when by that time, his dose was 40 mg. The lithium was also divided tid rather than a single 900 mg qhs dose

**51. Jail Incarcerated Person (IP) Record Number:** ███████
Name of IP: ███████████
Date of Review:  June 14, 2024
Reviewer:  Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
IP intake was ████/22. ████████████████.
CSSS was done, no immediate mental health needs identified.  Denied any past MH hx. Placed in detox due to significant alcohol hx. Seen by counselors every other week to every month on average.  Seen by PNP starting ████/22. Chart notes not compelling for need to start antidepressants, but 3 were tried over a period of 5 month, in addition to anti-anxiety medication. IP either did not take any doses or took minimal starting/subtherapeutic doses and c/o side effects or stated his wife told him not to take, with exception of Vistaril, which was ordered PRN. Pt was seen and tx offered, but IP rejected, leading to a lot of unnecessary refusal notes being signed.

**52. Jail Incarcerated Person (IP) Record Number:** ███████
Name of IP: ███████████
Date of Review:  June 13, 2024
Reviewer: Ana Natasha Cervantes, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Intake ████/23.
No immediate mental health concerns. IP requested MH a few months into incarceration. Requested very specific medications (Seroquel and Wellbutrin) was not initially provided these and told high risk of diversion.  IP then found to be diverting MAT on numerous occasions in ██████ 2023.  Despite this, after repeated incarcerated person requests (including verbiage of "deliberate indifference" and "cruel and unusual punishment" was later started on and provided Wellbutrin and was noted to attempt to walk away with this medication on at least one occasion.

Ex. B-337

Given this IP's repeated diversion behavior, would have considered not continuing this particular antidepressant.


**53. Jail Incarcerated Person (IP) Record Number:** ▮▮▮▮
Name of IP: ▮▮▮▮▮▮
Date of Review:  June 18, 2024
Reviewer:  Ana Natasha Cervantes, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Highly complex patient with intake ▮▮▮/21 through at least ▮▮▮/24 in the jail, after a 7-month hospitalization in Atascadero State Hospital where he was ultimately deemed to have little probability of competency restoration. On permanent conservatorship. Transferred to jail on complex regimen of psychiatric medications requiring frequent monitoring which was done appropriately including:
Clozapine CBCs and levels
Lithium and Depakote levels and other associated bloodwork
Labs, water restriction protocol and weight checks to monitor psychogenic polydipsia
HgA1C and Lipid profiles (there were notes that indicated awareness of elevated blood sugar, IP did not appear to reach the threshold for medication management of metabolic syndrome, but it was being followed; though not explicitly mentioned in progress note, this was clearly manifesting in the past year.
Medications were changed very little, but what changes were made seemed reasonable. IP remained chronically psychotic with occasional violent outbursts. Hospital records in the file indicate significant institutional violence.
IP was seen at least weekly by both a psychiatrist and a MH counselor, as well as having weekly team meetings to discuss the case.
Contacts were frequent, attempts were made to provide individual counseling (despite IP's mental state often not being conducive to this).  Medication refusals were almost a non-issue (mostly atropine for sialorrhea).
Total file size 10,606 pages.


**54. Jail Incarcerated Person (IP) Record Number:** ▮▮▮▮
Name of IP: ▮▮▮▮▮▮▮
Date of Review:  June 16, 2024
Reviewer:  Ana Natasha Cervantes, MD

Ex. B-338

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Intake for IP was ███/23, and there was prior history that was referenced.  Very dense chart with numerous placements ISP for threats of self-harm.  IP was seen promptly; however, I did not notice much difference among all the suicide risk assessments, suggesting a "cut and paste" for much of the documentation. IP appeared to threaten self-harm to manipulate housing. Despite the psychologists and psychiatrists identifying manipulative behavior and no clear indications to obtain select medications (opiates, gabapentin, artane, for example) as well as numerous instances of suspected med diversion, these continued to be prescribed often at high doses.


**55. Jail Incarcerated Person (IP) Record Number:  ███████**
Name of IP: ███████████
Date of Review:  06/23/2024
Reviewer:  Ariana Huselid, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes**
**No  X**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall good care with several lapses related to his initial haloperidol prescription:
- On ████/2022, Mr. ███████ requests to speak to a psychaitric prescriber about "Elavil, Remeron, buspar, Haldol.'" On the request, he also writes, "Scripps Mercy 'Hillcrest.'"
- On ████/2022, Mr. ███████ sees a Jason Balingit, Psychiatric NP. Mr. Balingit writes that Mr. ███████ reports a history of benefitting from haloperidol and buspirone. Mr. Balingit does not indicate whether he asked Mr. ███████ what doses of these medications he has taken in the past or indicate that he is aware that Mr. ███████ suggested three days prior that he has received psychiatric care at Scripps Mercy Hillcrest (where he may be able to find out more information about  his prior medication regimen). Mr. Balingit prescribes haloperidol 10mg HS and buspirone 10mg BID and plans to follow-up in six weeks. This is a high dose of haloperidol to start someone on—especially without benztropine/diphenhydramine—and without knowing what dose(s) they have previously taken. This would be appropriate prescribing if Mr. ███████ reported, say, that he had previously taken Haldol 20mg daily without issues in the past; however, I do not have evidence that he specified these details.
- On ██/█/2022, Mr. ███████ is sent to Alvarado Hospital Emergency Room for "probable EPS on Haldol." The discharge summary from Alvarado Hospital notes that Mr. ███████ likely had a dystonic reaction, prescribes him diphenhydramine 50mg Q6H PRN dystonic reaction, and writes that he should "ask your doctor about these medications: buspirone and haloperidol."

- When Mr. █████ returns to jail, he is continued on haloperidol.
- On ████/2022, Mr. █████ sends in a Health Care Request that says, "D/c Haldol because causes twist tongue. Can't breath [sic]…" There is no evidence that Mr. █████ is scheduled for a Psych CC in response to this.
- On ████/2022, Medical MD Joseph Molina writes, "Dystolic [sic] reaction in the setting of Haldol…Plan: psych evaluation as soon as possible given dystonic reactions in setting of Haldol."
- Between ████/2022 and ████/2023, Mr. █████ sends in nine health care requests/grievances about needing to see a psychiatrist.
-Mr. █████ is not seen by a psychiatrist until ████ 2023. In her note that day, Dr. Katherine Langham writes, "Wants to switch to Geodon. Stiffness and dystonia on Haldol." I am very concerned that he didn't see a prescriber for more than two months and was continued on haloperidol—ESPECIALLY without standing Cogentin/Benadryl—after his ER trip for dystonia on ████/2022.

Potentially in the jail's defense:

- In a grievance dated ████/2023, █████ writes, "Was scheduled to see (Dr. Tina) psych Dr. for review of meds. I asked to be placed back on my Effexor. She denied. I want to speak with different psych doctor on my next monthly interview." From my chart review, the only prescriber Mr. █████ saw before ████ 2023 was Jason Balingit on ████/2022. I searched the record for "Tina," and there is a Psych NP named "Tina," but I do not have evidence that he met with her before ████/2023. Is it possible that he did meet with "Tina" after his ER trip on ████/2022 and this was simply missing from the record?? It is also interesting that he refers to "monthly interview[s]" but, as far as I can tell, he went two months without seeing a prescriber.
- In a note date ████/2023, Grace Cecilio, RN writes, "When ip was asked about his request to d/d [sic] Haldol, per ip no need, problem now resolved." I'm glad that he wasn't continuing to express concern about his haloperidol prescription; however, the psychiatric prescribers still should have discontinued it/met with him about alternative medications after his dystonic reaction on ████/2022.


**56. Jail Incarcerated Person (IP) Record Number:** █████
Name of IP: █████
Date of Review:  06/23-6/25/24
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Generally, very solid care, very close follow-up by the MHCs (often being seen multiple times a week due to h/o ISP and being in AdSeg).

Generally good follow-up by the psychiatric prescriber with one exception: he went from ██/2021 until ██/2021 without being seen. The Psych NP who saw him on ██/2021 wanted him to be followed-up with in 10 wks. There is a chance there is a refusal buried somewhere in the chart, but I didn't see it.

My only real concern is regarding expiring medications:

- Mr. ████'s risperidone expired on ██/2021. On ██/2021 he wrote, "My medication was discontinue [sic]." On ██/2022, a psychologist writes that his risperidone "stopped coming about 2 days ago." It was restarted on ██/2021.
- Mr. ████'s mirtazapine expired on ██/2021 and was refilled via Psych CC on ██/2021 after Mr. ████ reported to a psychologist on ██/2021 that he was no longer receiving it.
- On ██/2021, Grace Ceilio, RN writes that Mr. ████'s risperidone order expired on ██/2021 but was reordered ██/2021.
- On ██/2024, Mr. ████ submits a Health Care Request, "Medication expire [sic]." On ██/2024, a Psychiatric NP writes that Mr. ████ states that his mirtazapine expired. A review of the MAR indicates that his mirtazapine expired on ██/2024 and was not restarted until this appointment on ██/2024.

**57. Jail Incarcerated Person (IP) Record Number: ████**

Name of IP: ████

Date of Review:  06/23/2024

Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes**

**No  X**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Generally good care, but some significant lapses/concerns:

- Mr. ████ is placed in EOH from booking on ██/22 after endorsing SI with a plan to choke himself in the setting of a history of recent suicide attempts/self-harm and serious charges (involving sexual relations with children). He is also a ████████ and this is his first incarceration. In EOH, he tells the MHCs multiple times that he wants to be started on psychotropic medications, but as far as I can tell, he is not scheduled to see a prescriber until ██/22. To note, he refuses this appointment because he has since learned that he is going to receive a court-ordered psychiatric assessment and wants to wait to start medications until this evaluation is over. However, over a month to see a prescriber is too long for someone this high risk.
- Similarly, Richard Gilbert, MHC, clears Mr. ████ from EOH on ██/22 and indicates that he should be seen again in one week. I think that this is too long given his risk of suicide. From reviewing other charts, it is not uncommon for individuals to be seen within 24-72hrs after

**Ex. B-341**

being released from EOH (24hr and 72hr follow-ups are even available as checkboxes on these assessment forms).

- Most concerningly, I do not see notes from any mental health providers between the time Mr. ▓ is cleared from EOH on ▓/22 and a BH Assessment/ISP Follow-up with Leslee Buluran, LCSW on ▓/22.
- Mr. ▓' psychotropic medications expire several times:
  - On ▓/22, Mr. ▓ writes a Sick Call Request to "Renew Zoloft Prescription." On ▓/22, a LCSW writes, "Pt reported that Zoloft recently expired and is requesting to continue the medication." Finally, on ▓/22, there is a Psych CC to refill Zoloft. In the jail's defense, Mr. ▓ had been scheduled for a Psych SC on ▓/22, but he refused this appointment. If he hadn't refused this appointment, the prescriber likely would have noticed that his Zoloft was about to expire. However, given that I've seen many other examples of expiring medications in other charts, there does seem to be a systems issue.
  - On ▓/22, Jason Balingit, Psych NP notes that Mr. ▓' Trazodone has expired since his last appointment. The MAR indicates that his prescription ended on ▓/22 (just under one month prior to this being caught).
- On ▓/23, Mr. ▓ writes a Sick Call Request "to increase my 50mg of Zoloft to 100mg." On ▓/23, Psychiatrist Kathryn Langham sees Mr. ▓ and writes that he endorses depression and passive suicidal ideation "most days." She does not adjust his dose of sertraline and does not explain why.

## 58. Jail Incarcerated Person (IP) Record Number: ▓

Name of IP: ▓
Date of Review: 06/22/2024
Reviewer: Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall solid care over the course of almost 5yrs. My primary concern is regarding several medication expirations:

- In a note dated ▓/2020, the psychiatrist writes, ""We discussed about restarting Zoloft since it expired on ▓/2020, but pt says he's doing fine…[and doesn't want to restart Zoloft]."
- In a note dated ▓/2021, Megan Baker, MHC writes, "Pt rescheduled for sooner ISP follow up due to pt being without his psych meds for 15 days. Pts medications expired on ▓/21. This provider discovered this on ▓/21 and scheduled pt for a Psych Chart Check where his medications were newed [sic]. Pt was seen for follow up psych sc on ▓/21 and restarted on his Cogentin and Haldol [via Psych CC on ▓/21]." In a note

dated ▆▆/2021, the psychiatrist writes, "[medication] stopped ▆▆/21 and was reordered but not checked in."

- A Psych Chart Check dated ▆▆/2020 reads, "Benztropine 2mg BID expired. Ordered benztropine 1mg PO BID."

There were also some strange decisions made by the JBCT psychiatrists regarding Mr. ▆▆'s haloperidol dosing and plans/responses to haloperidol levels. It is unclear why Mr. ▆▆'s haloperidol level was initially checked (he wasn't particularly symptomatic and seemed to be tolerating increasing doses of haloperidol up to 30mg HS):

- JBCT psychiatrist Daniel Brockett increases Mr. ▆▆'s haloperidol from a total daily dose of 20mg to a total daily dose of 30mg between ▆▆/21 and ▆▆/21. In the midst of raising his dose, Dr. ▆▆ orders a haloperidol level on ▆▆/21. However, Mr. ▆▆ refuses to have this level drawn until ▆▆/22, when it comes back elevated at 20 ng/ml.

Dr. Nizamani's summary of events (from multiple progress notes) is below:

*He was started on LAI Haldol Dec.; received initial dose of 100 mgs on ▆▆/2022 and full maintenance dose of 200 mgs ▆▆/2022.*
*He had high Haldol serum level on ▆▆/2022 [on 30mg total daily dose]. Repeat level on ▆▆/2022 was 40 ng/ml (range 5-15.)*
*He did not show any objective signs and denied any rigidity, tremors, confusion, difficulty swallowing or any other EPS/dystonic symptoms.*
*Given high plasma level; oral and LAI Haldol were discontinued. Repeat Haldol level on ▆▆/2022 was 9 ng/ml.*
*He has been restarted on oral Haldol 5 mgs AM as well as Haldol Dec 200 mgs q 4 weeks. Received last scheduled dose on ▆▆/2022.*

### 59. Jail Incarcerated Person (IP) Record Number: ▆▆

Name of IP: ▆▆
Date of Review: 06/21/2024
Reviewer: Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes X**
**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall good care. My primary concern is how long it took him to see a psychiatric prescriber for the first time. He was booked on ▆▆/2021, and told a psychologist, James Fix, that he was prescribed lorazepam and "something for sleep" in the community. Dr. Fix indicates that he should be referred to Psych SC in one week. However, Mr. ▆▆ is not seen by a psychiatric prescriber until ▆▆ 2021. In the meantime, Mr. ▆▆ places multiple health care requests/grievances (dated ▆▆, ▆▆, ▆▆, ▆▆, ▆▆, ▆▆, ▆▆) requesting—then begging—to see a prescriber. On ▆▆/21, he writes, "I'm feeling scared and dangerous because I need my meds...Please Help Urgent!"

Once he is seen on ███/21, he is followed closely (e.g., next appointment is on ███/21) for anxiety and insomnia.

**60. Jail Incarcerated Person (IP) Record Number:** ███████
Name of IP: ██████████
Date of Review:  06/21/2024
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall good care. This patient was admitted to the JBCT program on ███/2023, and was still there at the time these records were faxed over. For some reason I only had notes from the JBCT psychiatrist to review. If other records are available, I'm happy to review them, too.

**61. Jail Incarcerated Person (IP) Record Number:** ███████
Name of IP: █████████
Date of Review:  06/21/2024
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall, really nice care. I liked that he saw a QMHP on the day of booking due to his mental health, how he was seen again when placed in AdSeg on ███/2022, and the very solid risk assessment documentation by the LPCC on ███/2024 and ███/2024 when he endorsed passive SI. Two soft concerns that I would frame as not ideal, but not below the standard of care:
- On ███/2023, Mr. ██████ sees a LMFT for a Wellness Check and reports, "no issues." Under "Return to Clinic," the LMFT checks, "No appointment indicated." Given his history of multiple suicide attempts, mood/personality/possible psychotic disorder, lack of current psychotropic medications, and court date the next day (███/2023) for an attempted first-degree murder charge, I would have wanted to see him again *sometime*. That being said, I'm really just concerned by how this documentation looks. He isn't neglected by mental health services; he is seen again by a Psych NP on ███/2024.

Ex. B-344

- On ▆▆/2023, Mr. ▆▆ writes a request for health care: "I need to speak to a mental health counselor." This written request is logged in the Sick Call list on ▆▆/2023, he is scheduled to see an LMFT originally on ▆▆/2023, but this is pushed back until ▆▆/2023. I think this is a reasonable (~2-3wk) but not ideal delay, given that we did not know why he needed to see a mental health counselor, and given his history of suicide attempts.

**62. Jail Incarcerated Person (IP) Record Number:** ▆▆▆▆
Name of IP: ▆▆▆▆
Date of Review: 06/27/2024
Reviewer: Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Solid care. No concerns.

**63. Jail Incarcerated Person (IP) Record Number:** ▆▆▆▆
Name of IP: ▆▆▆▆
Date of Review: 06/15/2024
Reviewer: Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X (with a couple of concerns noted below)**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall, Mr. ▆▆ has received good care over his nine-year incarceration (2015-2024). One thing in particular that stood out to me in this chart (compared to some of the others that I reviewed) was how, often, when Mr. ▆▆ refused to come to his "Psych Sick Call" appointments, someone (credentials not identified; I suspect a masters-level clinician, but do not know for sure) goes to check in on him. For example, this happened on ▆▆/2016 and ▆▆/2018, with the clinician documenting why he refused, a brief mental status exam, and noting that there are no acute safety concerns. I get the sense from reviewing more recent incarcerations that this practice has since stopped, but it was really nice to see here!
A couple of concerns:
- There were a number of times when medications expired and Mr. ▆▆ went several days without receiving them. For example:

- o After three hospitalizations at Tricity for cellulitis/abscesses, Mr. ███'s Effexor XR is not restarted. The first hospitalization is from ███/2017-███/2017, the second is from ███/2018-███/2018, and the third is from ███/2018-███/2018. Effexor XR is listed in the discharge summaries from each of these hospitalizations; however, within days of each discharge, Mr. ███ reports (either to a clinician or in a written "Health Care Request") that Effexor XR was never restarted after his hospitalizations and that he is worried that he is going to go into withdrawal if it is not restarted soon. I am not sure why this prescription falls through the cracks each time.
- o On ███/2019, a Psych Chart Check is requested to "please renew Depakote and Remeron…Meds suddenly expired…Reason: Error." On ███/2019, a separate note is entered, "Pls renew Venlafaxine 75mg ER and Depakote if applicable. Expired 11/23/19." It is unclear why these medications "suddenly" expired. On ███/2019, a LMFT writes that Mr. ███ says that he is "going through withdrawal from his psych meds and asks they be restarted. Worried about being off meds too long."
- o In a Psychiatric Progress Note dated ███/2021, the psychiatric NP notes that Mr. ███'s Trazodone expired ███/2021. The Psychiatric NP restarts this medication.
- o On ███/2022, Mr. ███ sends an Incarcerated person Grievance: "Did not renew Effexor. Have severe withdrawal symptoms—sadness, crying spells, bad thoughts." Mr. ███'s Effexor is renewed two days later during a Psych Chart Check dated ███/2022.
- o On ███/2023, Mr. ███ sends a Health Care Request stating, "Please renew Depakote (Valproic Acid)." On ███/2023, he sends another Health Care Request stating, "Please renew DEPAKOTE…having difficulty sleeping—feel like starting to go manic." This is renewed in a Psychiatric Chart Check on ███/2023.
- o Other "Psych Chart Checks" were entered to renew expired psychotropic medications (e.g., on ███/2021 and ███/2021).
- On ███/2016, in a Psychiatric Progress Note, Dr. Jonathon Howlett notes that Mr. ███ endorses symptoms of depression and raises his Effexor XR to 75mg daily. Dr. Howlett does a lovely job documenting how he advises Mr. ███ of the risk of mania, and what symptoms he should be watching for. However, Dr. Howlett does not acknowledge that Mr. ███'s Effexor XR was decreased by another prescriber on ███/2016 due to high blood pressure.
- On ███/2016, there is a Psych Chart Check that notes that Mr. ███ is ordered to receive Effexor XR 75mg daily. However, he had been seen by a prescriber on ███/2016, who intended to increase his Effexor XR to 112.5mg QAM. That order was never put in.

### 64. Jail Incarcerated Person (IP) Record Number: ███

Name of IP: ███
Date of Review: 06/10/2024-06/12/2024
Reviewer: Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes X**

**Ex. B-346**

**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall good care. This was a patient who was booked on ██/23, admitted to PSU for psychotic decompensation in the setting of medication non-adherence from ██/23-██/23, then transferred directly to the JBCT program, where he stayed from ██/23-██/24 (restored to capacity). So he had a lot of close eyes on him, and overall decision-making re: patient movements, filing for involuntary medications, adjusting medications, checking labs/weights/EKGs, assessing/managing unusual behavior (e.g., eating Styrofoam cups) were all very solid.
My only concerns relate to a couple of things I noticed in psychiatrist Jonathan Kistler's notes in ██████ 2024:

- In his Forensic Psychiatric Progress Note dated ██/24, Dr. Kistler writes, ""He said…he is hearing 'voices' telling him to harm himself. He says he doesn't feel at risk of harm to himself, but the voices are telling him to do so." Dr. Kistler does not further explore his risk of harm to himself, and there is no documented discussion about coping skills/what to do if he does develop urges to follow voices documented, etc. There isn't much in the way of a risk assessment documented, and he does not make any changes to the plan of care. This may have had a therapeutic encounter, and it may have been reasonable to continue the current plan of care (e.g., he was on solid doses of two antipsychotics), but his reasoning wasn't spelled out, and the note reads as though this was just glossed over.
- In late-March through April 2024, Mr. ██████ starts intermittently refusing his psychotropic medications. However, Dr. Kistler's Forensic Psychiatric Progress Notes dated ██/2024, ██/2024, and ██/2024 do not make any mention if this.


**65. Jail Incarcerated Person (IP) Record Number:** ████████
Name of IP: ████████████
Date of Review:  06/10/2024
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall, very good care. There were a couple of times where I wish he was seen by a psychiatric prescriber earlier. For example, on ████/23, he tells a LCSW that he wants to see a psychiatrist again because he is more depressed, and his next Psych SC appointment at that time is scheduled for ████24 (it had been spaced out because, at that time, he was just taking melatonin for sleep after Remeron was discontinued on ████/23). This appointment is not moved up in response to this report of increased depression. However, at the ████/24 appointment, no med changes are made because he indicates that he only wants Wellbutrin, which he also said during his ██████/23 appointment. I have to wonder whether the LCSW and

prescriber suspected that he was just focused on obtaining Wellbutrin, and therefore did not move the appointment up. In any case, this was the most concerning delay I saw, and even this I think is consistent with community standards.

In fact, I was mostly impressed by the number of times he was seen by (or scheduled to be seen by) mental health clinicians/prescribers. This is despite being relatively low-risk (no history of mental health disorders prior to incarceration, and just mild-moderate anxiety/depression while incarcerated), and despite there being several stretches (e.g., ██/22-██/22) when he either refuses to meet with mental health clinicians/prescribers or tells them that he has no mental health concerns.

**66. Jail Incarcerated Person (IP) Record Number:** ████████
Name of IP: ████████████
Date of Review:  06/08/2024
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X (mostly, see comments below)**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Generally good, thoughtful, responsive care with a couple of concerns:

- On ██/2023, Jason Balingit, Psych NP completes a chart check and writes, "EKG reviewed. QTc 465. Will decrease Seroquel to 200mg PO BID and decrease Serouqel [sic, likely means Prozac] to 60mg PO qAM. Will discuss at next psych sick call schedule." It is unclear when he believed the next Psych Sick Call visit was going to be, but Mr. Hammad is not seen by a psychiatric prescriber again until ██/23. Between these two dates, Mr. ████████ sends multiple requests asking why someone reduced his medications and begging for them to be restarted. For example, on ██/23, he indicates that he is sending his fifth request and says, "need medicine to help me sleep please. How many requests?" On ██/23 he writes, "Need to see psych doc for meds, no appointment since a month or more and you reduced my meds why?" It is my opinion that this gap in care (given medication change without communication to the patient) is too long.

- On ██/23, Psychiatrist Kathryn Langham meets with Mr. ████████ He asks to resume his prior psychiatric medications at their prior doses, and Dr. Langham fulfills this request by increasing his Prozac back to 80mg daily, increasing his Seroquel back to 400mg BID, continuing his Trazodone at 300mg HS, increasing his Prazosin to 2mg HS, continuing Vistaril 50mg BID, and increasing his melatonin to 5mg HS. She does not mention his prolonged QTC on ██/2023, indicate that she understands why NP Balingit decreased his medications, or orders an EKG (although she writes that he does consent to labs).

- On ██/23, Mr. ████████'s EKG shows a QTc of 483. On ██/23, Psychiatrist Kathryn Langham writes in a chart check, "EKG from ██ reviewed. Noted abnormality 'probably inferior infarct'…no change to current treatment record at this time." She does not acknowledge the prolonged QTc, which is concerning given that he remains on several

**Ex. B-348**

medications (e.g., Seroquel, Trazodone) that can cause prolonged QTc. Note that Dr. Langham's management of his prolonged QTc is isolated. Over the course of Mr. ███████'s incarceration, the Psych NPs appropriately responded to his (often) prolonged QTc. For example, on ███/23, in a Psych NP Chart Check, an EKG with a QTc of 512 was reviewed, and the Psych NP decreased Seroquel, notified medical, rechecked an EKG, and followed-up in-person one week later (when Abilify was increased, but no change was made to Trazodone/Seroquel dose; note that QTc was 436 at that time). There are a couple of times when I would have been more aggressive with regards to decreasing his QTc-prolonging meds (e.g., see ███/24 Psych NP note when QTc is ███ and he is kept on Seroquel 100mg HS); however, unlike in Dr. Langham's ███/23 chart check, the risk is acknowledged, and it is my opinion that they are practicing within the standard of care.

**67. Jail Incarcerated Person (IP) Record Number:** ████████
Name of IP: ███████████
Date of Review:  06/09/2024
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall, this individual was provided very good care. He was seen extremely frequently despite being minimally cooperative and never considered high risk (if interested, I have a list of all mental health visits with very brief descriptions of them). Out of my 9-page summary of visits with mental health providers, I only have the below concerns:

- In a Psychiatric Progress Note dated ███/23, Psych NP Noorsaba Bahramzi indicates that Mr. ███████ has been "compliant with medications" and that he does not have any side effects. However, notes from mental health clinicians from the preceding months, as well as the MAR, indicate that he was only intermittently adherent to his Zyprexa, Zoloft, and Melatonin leading up to this Psych NP visit on ███/23. NP Bahramzi does not explore these refusals with him, and she increases the doses of his medications (which doesn't make sense if he is rarely taking them). In this note, she also writes that he endorses CAH to bang his head, but does not explore whether he has considered/actually acted on these CAH (although she does indicate that he does not endorse SI).

- In the above note dated ███/23, the NP Bahramzi writes that there should be a follow-up in 1 month. However, after the 10/6/23 Psych NP visit, he is not seen by a psychiatric prescriber until ███/24. Other clinicians' notes allude to there being a psychiatric appointment scheduled for ███/23, and the "Sick Call" list at the beginning of the record review also alludes to this, as well as him *potentially* refusing a psychiatry sick call on ███/23. However, it is unclear exactly what happened or if I am interpreting this correctly:

*Psychiatry Sick Call, Scheduled Date* ▓ */2023. LDS* ▓ */23; inreased dosage; 4-6 wk f/u
During rounds reports refusing meds due to SE (headaches and makes him sleepy) Refused by*
▓ *on* ▓ */2023.*

- In an "AdSep Template for MHC" dated ▓/2023, Elvia Escobar, LMFT writes that Mr. ▓ asks to meet confidentially but Ms. Escobar says that she is unable to due to AdSep "regulations/restrictions." In a "BH Mental Health Acuity Level" dated ▓ 24, Mr. ▓ once again asks to meet in a confidential setting for privacy, but Ms. Escobar writes that her "Plan" is, "continue to be monitored cellside." This may have been completely out of Ms. Escobar's control, but I question this blanket requirement to see incarcerated persons cellside when they are in AdSep. When I worked there, I recall that we could see AdSep incarcerated persons confidentially if their behavior had been appropriate, and as far as I can tell, Mr. ▓ had been in good behavioral control. He reports taking an overdose of Zoloft on ▓/24, so it doesn't look great that the jail was unable to meet his request to be seen confidentially in the weeks leading up to this overdose.

- In a QMHC Progress Note dated ▓/24, Zairhey Perez, APCC writes that Mr. ▓ reports that he took 6-10 Zoloft pills "because he was depressed." Mr. Perez alerts medical and Mr. ▓ is sent out to an ED for medical clearance. Mr. Perez writes that Mr. ▓ denies suicidal ideation at the time, but he does not document any exploration of Mr. ▓'s decision to take the overdose (Was this a suicide attempt? Did he believe this was lethal? Where did he get these pills from? Are there more pills where these came from? Etc.). When Mr. ▓ returns from the ER on ▓, Theresa Palafox, LPCC writes in a "Gatekeeper Discharge Note," "Per note on ▓/24 IP denied thoughts, intent or plans of SI/HI. IP reported a hx of current ongoing depression." Ms. Palafox checks, "Discharge from Gatekeeping Only," does not document her own in-person assessment of Mr. ▓, and does not suggest admission to EOH or Safety Cell. It may have been a reasonable decision not to admit him to EOH/Safety Cell, but neither of these notes provide a sufficient risk assessment or explanation of clinical decision-making for me to be able to determine this. I am also concerned that Ms. Palafox did not see him, herself, given that Mr. Perez had not documented an adequate suicide risk assessment (or elaboration on what happened leading up to the overdose). For context, over his 5yr incarceration, Mr. ▓ repeatedly endorses then retracts SI, saying that he only endorsed SI to move to a new housing module. Given this, I wonder whether these clinicians doubt that he actually took a Zoloft overdose. However, this is speculative, and their reasoning should have been documented.

### 68. Jail Incarcerated Person (IP) Record Number: ▓

Name of IP: ▓
Date of Review:  06/08/2024
Reviewer: Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes**

**No   X (mostly yes, but with timeliness problems noted below)**

**Ex. B-350**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

I'm impressed by the practice of completing an AIMS exam during each medication visit (not unique to this chart), as well as the overall quality of documentation by the mental health clinicians and psychiatrists/psych NPs. They consistently provide good descriptions of their conversations with the patient, thoughtfully explain their reasoning, and are tight in their documentation of medication informed consent/risk assessment/etc. I also like their practice of scheduling q2wk check-ins with mental health clinicians for anyone who is returning to the jail after competency restoration, as well as same-day then q1week check-ins for anyone placed in administrative segregation. I also think that their practice of tracking court dates is a particular strength.

One of my concerns is how long this patient went at times between seeing any mental health practitioner, mostly due to refusals. One stretch occurred between ███/2022 and ███/2023. During this interval, he refused visits from QMHPs four times, and once from a psychiatrist. More concerning was a stretch between a QMHP visit on ███/23 and an ACSW visit on ███/23. During this interval, he did not see any mental health practitioners, but refused 13 mental health appointments. Prior to this long stretch without being seen, he had been refusing his psychotropic medications and reporting paranoia about his food. I am concerned that no one attempted to see him cellside.

Similarly, although less drastically, he is seen by a Psych NP on ███/23, refuses a Psych NP appointment on ███/23, and is not seen again by a psychiatric prescriber until ███/23. He is seen by mental health clinicians (non-prescribers) during this interval, who indicate that he is not doing well (e.g., a ███/23 note says that he has not been taking his medications or eating because he thinks his medications and food are poisoned). In an "AdSeg Template for MHC" dated ███/2023, Psychologist Lauralyn Miles writes, "Pt continues to be non-compliant to all psych meds. Psych providers have been informed previously…Sent email to psych NPs and scheduled chart check in tech care (given pt's noncompliance to psych medication)."

There is also a lapse in psychiatric prescriber appointments between ███/2024 and ███/2024. On ███/2024, Psychiatric NP Kristoffer Ancho makes several medication changes and writes in the body of the note that he should follow-up in "2 weeks (priority due to acuity) for med response/tolerability or sooner if needed." Later in the note, under "Follow-up," NP Ancho checks a box next to "other." Mr. ███ does not see a psychiatric prescriber again until ███/2024. On ███/2024, a QMHP writes that Mr. ███ endorses a "big body cramp sometimes at night," so the QMHP schedules a "chart check [for] psych." This is speculative, but I wonder based on this series of events whether he had fallen off of the psychiatric prescriber schedule altogether because Psych NP Ancho checked "other" under follow-up, and the scheduler did not read that Psych NP Ancho wanted to see him back in 2wks.

**69. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ███████
Date of Review: 06/08/2024
Reviewer: Ariana Huselid, MD

Ex. B-351

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Generally adequate-good care. The most concerning thing I noticed was that, in a QMHP Progress Note dated ▮▮▮/2023, Tevin Heyward, ACSW writes that Mr. ▮▮▮▮ (who has been incarcerated since ▮▮/23 for the first time on a first-degree murder charge) reports "profound sadness," anxiety, neuroveg symptoms, SI without plan/intent, AH (no CAH), and "paranoia." ACSW Heyward notes that Mr. ▮▮▮▮ has been non-adherent with his medications. His plan is to follow-up with him in 3-6 weeks, which I believe is too long to wait given his new SI and numerous suicide risk factors. A refusal note indicates that Mr. ▮▮▮▮ then refuses his follow-up appointment on ▮▮▮/2023. I do not see evidence that a cell-side visit was attempted. He is then seen on ▮▮▮/2023 (5.5wks after first reporting SI).


**70. Jail Incarcerated Person (IP) Record Number:**  ▮▮▮▮▮

Name of IP:  ▮▮▮▮▮▮▮▮

Date of Review:  06/20/2024

Reviewer:  Ariana Huselid, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Overall good care. Mr. ▮▮▮▮ had a prolonged QTc and the psychiatric prescribers overall were responsive and thoughtful about his management (see in particular a note by Psych NP Noel Brassett dated ▮▮▮/2023, where she describes discussing his case with an internal medicine physician, how they agree to continue his psych meds until he sees cardiology, etc.). However, there were a couple of concerns related to this:

- It is unclear what happened with Mr. ▮▮▮▮ first EKG (when it happened, what it showed, etc.). A note by RN Glisher Valente dated ▮▮▮/2023 suggests that Mr. ▮▮▮▮ had an EKG done this day and that it was "Reviewed by NP Balingit." However, a Psych CC note by Jason Balingit that same day suggests that Mr. ▮▮▮▮ refused his EKG. In Psych NP notes dated ▮▮▮/2023 and ▮▮▮/2023, an EKG is not mentioned, and the prescribers increase his olanzapine from 5->15mg HS over these two visits. In a note dated ▮▮▮/2023, Sharon Anthony, Psych NP indicates that he had an EKG on ▮▮▮/2023 with a QTc of 486. Sharon Anthony, Psych NP does not discuss this finding. She continues his olanzapine at 15mg HS. It is unclear whether this EKG truly was done on ▮▮▮/2023 given that there is a printout of an EKG in the record with a QTc of 486 and a handwritten date of "▮▮▮ 2023." So, I am not sure whether the Psych NPs on ▮▮▮/2023 and ▮▮▮/2023 actually had

**Ex. B-352**

evidence of a prolonged QTc available to review. Nevertheless, Sharon Anthony should have addressed this on █████/2023.

- On █████/2024, Psychiatrist Peter Farrell increases Mr. █████' olanzapine to 10mg HS. Mr. ████████' olanzapine had been decreased in 2023 to 2.5mg HS given his prolonged QTc. Although it is possible that this would have been a reasonable management decision to make in conjunction with cardiology/medicine, there is no indication from Dr. Farrell's note that he was aware of Mr. ██████ history of prolonged QTc.

One other concern:

- On █████/2023, a LCSW speaks with Mr. ████████' sister for collateral and his sister provides the LCSW with a list of medications that Mr. ███████ is supposed to be taking with their doses (lurasidone, gabapentin, fluoxetine, hydroxyzine). On █████/2023, Mr. ████████ sees Benjamin Lake, Psych NP, who starts olanzapine, mirtazapine, benztropine, and a one-time dose of lorazepam for "severe anxiety." There is no indication that Mr. Lake was aware of this collateral/Mr. ████████' home medications. To Mr. Lake's credit, he indicates that he wants to follow-up with Mr. ███████ in one week, which is excellent, very close follow-up for someone who is symptomatic but not particularly acute.


**71. Jail Incarcerated Person (IP) Record Number:** ████████
Name of IP:  ████████████
Date of Review:  06/26/2024
Reviewer:  Ariana Huselid, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Good care. Ideally the Psych NP who started her on escitalopram and olanzapine on █████/2023 would have noticed that her QTc was 465 on █████/2023 (note: her initial psych eval did not occur until █████/2023). However, this was a 37yo woman, and it isn't the standard of care to check an EKG on a young person before starting low-dose, potentially QTc prolonging meds. However, this was a bit unfortunate because on █████/2024, a psychiatrist orders an EKG to "monitor QTc," and her repeat EKG showed a QTc of 465, which is one of the reasons why her olanzapine and escitalopram were discontinued.


**72. Jail Incarcerated Person (IP) Record Number:** ████████
Name of IP:  ████████████
Date of Review:  06/17/2024
Reviewer:  Ariana Huselid, MD

Ex. B-353

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Good care. No concerns. Excellent job (like I've seen in other charts) getting records from recent hospitalizations as soon as the incarcerated person/patient is booked, and restarting meds ASAP.

**73. Jail Incarcerated Person (IP) Record Number:** ▇▇▇▇▇
Name of IP: ▇▇▇▇▇▇▇
Date of Review:  06/18/2024
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Good care. Just one concern:
Mr. ▇▇▇▇ is booked on ▇▇▇/2023. That same day, his pharmacy records are sent over, which indicate that he last received Aristada 1064mg on ▇▇▇/2023. Under "Sick Calls," next to "▇▇▇/2023," a QMHP appointment is scheduled with the reason, "Schizophrenia, pt report abilify injection x3 weeks ago." His first psychiatric prescriber appointment is on ▇▇▇/2023 with Benjamin Lake, Psych NP. Under "Previous Psychiatric Medications," Mr. Lake writes, "No." Mr. Lake also writes, "IP request Seroquel and Depakote" and does not indicate that he has a history of taking aripiprazole. He starts VPA and quetiapine. Not a horrible outcome, but it does not appear that Mr. Lake reviewed Mr. ▇▇▇▇▇' outpatient medications.

**74. Jail Incarcerated Person (IP) Record Number:** ▇▇▇▇▇
Name of IP: ▇▇▇▇▇▇▇
Date of Review:  06/17/2024
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes  X**
**No**

**Ex. B-354**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Good care. No concerns. Like the vast majority of charts I've reviewed, I was particularly impressed with the way that the prescribers track labs, weights, AIMS, medication consents, last doses of depot antipsychotics, etc. Also not unique to this chart, they did a very nice job gathering collateral records from outpatient providers.

**75. Jail Incarcerated Person (IP) Record Number:** ▮▮▮
Name of IP: ▮▮▮
Date of Review:  06/15/2024
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall good care. Only concern is that there is another example in this chart of psych meds accidentally expiring. On ▮▮▮/2023, psychiatrist Theron Wells writes "Vistaril dose for sleep expired ▮▮▮."  Mr. ▮▮▮ states that he is sleeping well, so Vistaril is not restarted.

**76. Jail Incarcerated Person (IP) Record Number:** ▮▮▮
Name of IP: ▮▮▮
Date of Review:  06/15/2024
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes  X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Solid care overall. There were some especially good psychiatry notes (e.g., ▮▮▮/2023). I also like that it is the policy that all incarcerated persons/patients returning from competency restoration programs ("State Hospital Returnees") are seen at least once every two weeks (see MHC note dated ▮▮▮/2023). It was also nice to see that the clinicians who saw him every other week usually evaluated his medication adherence (both by looking at the MAR and asking him about it). For example, on ▮▮▮2023, the LPCC asks him why he refused medications once ("too sleepy" to get up for AM meds).
No concerns.

**Ex. B-355**

**77. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ███████

Date of Review: 06/15/2024

Reviewer: Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes**  X

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Solid care for this individual who was minimally engaged in care, and yet frequently seen and housed on OPSD. Only two concerns noted:

- Mr. ███ is prescribed olanzapine throughout the majority of his incarceration ███ 2021-Present). This is a medication he has previously done well on. The psychiatrist who first sees him on ███/21 restarts olanzapine and notes that he "does not consent to labs" at that visit. I think that it is reasonable not to order labs at that time, and I can understand why it was never the prescribers' primary concerns (given his intermittent adherence) to get labs, but it isn't good that labs do not end up being ordered until ██/█/2023.

- In a LMFT note dated ███/22, the clinician notes that Mr. ██████ should be "refer[red] to Psych MD for PSU eval." However, he is not seen by a prescriber (Psych NP) until ███/23. I wouldn't be surprised if the LMFT has a side-bar conversation with a psychiatrist about this and they decide together that he probably doesn't meet criteria for involuntary commitment, but it doesn't look good.

- In a Psych NP note dated ███/23, Matthew Reza notes that Mr. ██████ is disorganized and he restarts olanzapine 5mg HS. He indicates that his plan is to follow-up with Mr. ██████ in 2 months. It is my opinion that 2 months is too long to wait to see someone who was just restarted on an antipsychotic—especially at a dose lower than what he has previously required—who is psychotic.

**78. Jail Incarcerated Person (IP) Record Number:** ███████

Name of IP: ███████

Date of Review: 06/16/2024

Reviewer: Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:

**Yes**  X

**No**

**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**

Ex. B-356

Overall, very good care. One thing I liked in particular was that he was scheduled to see mental health providers after returning from court due to the seriousness of his charges (murder). One example of that is on ████/2023.

After Mr. ████████ is booked on ████/2023, he reports to an RN that he needs quetiapine and Trazodone, two medications he used to take when in juvenile hall, for depression and insomnia. The RN schedules him to see a "QMHC" and a psychiatric prescriber. It is very impressive given the lack of obvious acuity (e.g., no psychotic symptoms or SI/HI are documented by the RN) that he is seen the same day (████/2023) by Galina Storozhenko, QMHP. I also think that it is reasonable that he is not scheduled to see a psychiatric prescriber, given the lack of acuity/safety concerns, until ████/2023. However, it is hard to see all of his grievances/health care requests to see a psychiatrist and start medications between ████/2023 and ████/2023 (when he actually refuses the ████/2023 psychiatric evaluation…!). Ideally they would have bumped up his appointment given the number of health care requests/grievances he sent, but I do not think that this fell below the standard of care.

One concern that I have, which I noted in another chart, is regarding expiring meds. This only happened once for Mr. ████████: Trazodone expired on ████/2023 and this is not caught until ████/2023 when he tells a LMFT at an appointment. It is restarted that same day via Psych Chart Check.

One other more subjective concern I have is regarding the psychiatric prescribing decisions made by Dr. Jan on ████/2023. Dr. Jan notes that Mr. ████████ endorses "mood fluctuations, poor sleep, anxiety, intrusive thoughts." She adds that he has only ever been prescribed Trazodone and Seroquel in the past. She does not document any concerns regarding current/historical mania or psychosis. She diagnosis Mr. ████████ with "Mood NOS" and starts him on Trazodone 150mg HS and Abilify 10mg daily for "mood, cognitive symptoms." It is unclear why she started him on an antipsychotic (at a relatively hefty dose, too) rather than an antidepressant given his symptoms and her diagnosis. This is definitely not first-line treatment.


**79. Jail Incarcerated Person (IP) Record Number:** ████████
Name of IP: ████████
Date of Review:  06/26/2024
Reviewer: Ariana Huselid, MD


This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Good care. No concerns. I particularly liked the coordination that started on ████/2024, when a call from Mr. ████s sister was transferred to a LCSW. Mr. ████s sister said that he had written her a letter endorsing SI. He is seen immediately by a LCSW, who writes that he is future-oriented and does not endorse current SI, but has thought about potentially taking his life if he loses his case. It is set up so that he is seen gatekeeper Berenis Gonzalez, LPCC, on ████/2024 after returning from court.

**80. Jail Incarcerated Person (IP) Record Number:** ███████
Name of IP: ██████████████
Date of Review:  06/26/2024
Reviewer:  Ariana Huselid, MD

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Solid management; uncomplicated case (mild depression/anxiety/insomnia).


**81. Jail Incarcerated Person (IP) Record Number:** ███████
Name of IP: ███████
Date of Review:  06/25/2024
Reviewer:  Ariana Huselid

This incarcerated person had access to care (e.g., *access to care means that, in a timely manner, seen by a qualified MH professional, is rendered a clinical judgment, and receives MH care that is ordered*) for their serious or non-serious mental health needs:
**Yes   X**
**No**
**Describe any particular strengths or "best practices" versus deficiencies/concerns with psychiatric and/or MH care rendered or not rendered in timely manner:**
Overall good care. I really like that the OPSD unit offers recreational therapy/music groups. My only concern is that Mr. ███'s olanzapine expired on ████/2023. This was not caught until ████/2023, when noticed by Jacqueline Hid, LMFT. It was restarted the same day (████/2023). Mr. ███ was doing fine on ████/2023, but given that he had just returned as from Napa State Hospital for competency restoration, this could have been very consequential (if he deteriorated and had to go back).

Ex. B-358

**Appendix E**



## County of San Diego

NICK MACCHIONE, FACHE
AGENCY DIRECTOR

**HEALTH AND HUMAN SERVICES AGENCY**
BEHAVIORAL HEALTH SERVICES
3255 CAMINO DEL RIO SOUTH, MAIL STOP P-531
SAN DIEGO, CA 92108-3806
(619) 563-2700 • FAX (619) 563-2705

LUKE BERGMANN, Ph.D.
DIRECTOR, BEHAVIORAL HEALTH SERVICES

May 24, 2022

Rebecca Kloker, MD Administrator
Lynetta Devereaux, Chief Mental Health Clinician
San Diego Central Jail Psychiatric Stabilization Unit
1173 Front Street
San Diego, CA 92101

Dear Rebecca Kloker:

This letter is to confirm San Diego Central Jail Psychiatric Stabilization Unit's compliance with The County of San Diego's LPS site review of 3/30/2022. As a result, your facility has retained LPS Designation for its psychiatric stabilization unit through 3/30/2025. Attached is the County of San Diego's LPS Designation Certificate which is valid through 3/30/2025.

In accordance with the LPS Designation Guidelines and Processes for Facilities within San Diego County, routine site review for redesignation will take place in three years, prior to the LPS Designation expiration date. Please be advised that LPS Designation is not transferable and any changes that may significantly affect your facility's conformance with the criteria for LPS Designation may require successful completion of a focused site review prior to your redesignation period.

Sincerely,

LUKE BERGMANN, Ph.D., Director
Behavioral Health Services

Cc:
Michael Krelstein, MD, Clinical Director, Behavioral Health Services
Mike Phillips, Esq., Senior Director of Patient Advocacy and Housing Services, Jewish Family Service
Tabatha Lang, MFT, Quality Improvement Unit Administrator, Behavioral Health Services
Heather Parson, LMFT, Behavioral Health Program Coordinator, MHP Quality Management
Danielle Rhinesmith, LMFT, Quality Management Supervisor
Michelle Hemmings, PsyD, Quality Management Specialist

Ex. B-359

# Appendix F

## TechCare Flag Mapping 03/21/24 Without Notes

| TC_ID | TECHCARE FLAG NAME | JIMS_ID | JIMS_NAME | FLAG TYPE | FLAG TYPE | SEND_TO JIMS | SEND_TO TECHCARE | |
|---|---|---|---|---|---|---|---|---|
| 1 | Chart Created | | | | | | | |
| 2 | HIV | CMC | CHRONIC MEDICAL CONDITION | Z | MEDALERT | Yes | Yes | |
| 2 | HIV/AIDS | CL.STANDAR | STANDARD PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 3 | Hepatitis C | CL.STANDAR | STANDARD PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 4 | Syphilis | CL.STANDAR | STANDARD PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 5 | TB-Active | CL.AIRBORN | AIRBORNE PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| ~~9~~ | ~~Lice Body~~ | | | | | | | Variants removed for Oct 2023 release |
| 10 | Obesity | | | | | | | |
| 11 | Hepatitis B | CL.STANDAR | STANDARD PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| ~~12~~ | ~~Lice Head~~ | | | | | | | Variants removed for Oct 2023 release |
| 13 | MDRO (former MRSA/VRE/c.Diff) | CL.CONTA | CONTACT PRECAUTIONS | M | INSTRUCTION | Yes | No | name change for April 2024 |
| 14 | Hepatitis A | CL.STANDAR | STANDARD PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 15 | Scabies | CL.CONTA | CONTACT PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| ~~16~~ | ~~Lice Pubic~~ | | | | | | | Variants removed for Oct 2023 release |
| 17 | Herpes | CL.CONTA | CONTACT PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 19 | Chlamydia | CL.STANDAR | STANDARD PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 21 | Drug Detox | H.COWS/CIW | COW/CIWA | M | INSTRUCTION | Yes | Yes | |
| 22 | Asthma | CMC | CHRONIC MEDICAL CONDITION | Z | MEDALERT | Yes | Yes | |
| 23 | Diabetes | CMC | CHRONIC MEDICAL CONDITION | Z | MEDALERT | Yes | Yes | |
| 24 | Hypertension | CMC | CHRONIC MEDICAL CONDITION | Z | MEDALERT | Yes | Yes | |

Ex. B-360

| 26 | Seizures | CMC | CHRONIC MEDICAL CONDITION | Z | MEDALERT | Yes | Yes |
|----|----------|-----|---------------------------|---|----------|-----|-----|
| 26 | Seizures | CL.SEIZD/O | SEIZURE DISORDER | M | INSTRUCTION | Yes | Yes |
| 27 | Cancer | | | | | | |
| 29 | Pregnancy | | | | | | |
| 30 | Thyroid Disease | | | | | | |
| 33 | Sober Cell | | | | | | |
| 34 | Safety Cell | | | | | | |
| 38 | Hyperlipidemia | | | | INACTIVE | | |
| 39 | Serious Mental Illness | | | | | | |
| 40 | Anemia | | | | | | |
| 41 | CAD/CHF/Valve Disease | | | | INACTIVE | | |
| 42 | Cirrhosis | | | | | | |
| 43 | COPD/Emphysema | | | | | | |
| 44 | GI | | | | | | |
| 45 | Kidney Disease | | | | | | |
| 46 | Chronic Pain | CPM | CHRONIC PAIN MANAGEMENT | Z | MEDALERT | Yes | Yes |
| 47 | Stroke | | | | | | |
| 48 | Transplant | | | | | | |
| 49 | Migraines/Chronic Headaches | | | | | | |
| 50 | EtOH Detox | | | | | | |
| 52 | Suicide Watch | | | | | | |
| 53 | Violent Inmate | | | | | | |
| 54 | Emergency Transport | | | | | | |
| 55 | Dialysis | CMC | CHRONIC MEDICAL CONDITION | Z | MEDALERT | Yes | Yes |
| 55 | Dialysis | H. DIAL | DIALYSIS | M | INSTRUCTION | Yes | Yes |
| 56 | Observation | | | | | | |
| 64 | TB-Inactive | | | | | | |
| 65 | GC | | | | | | |
| 66 | Trichomoniasis | | | | | | |
| 67 | HPV | | | | | | |
| 68 | UTI | | | | | | |
| 69 | Nausea/Vomiting | | | | | | |
| 70 | Diarrhea | | | | | | |
| 71 | Allergy/Sinus | | | | | | |
| 72 | Juvenile | | | | | | |
| 73 | Federal Inmate | FED | FEDERAL INMATE OR HOLD | H | HAZARD | No | Yes |

Ex. B-361

| 74 | Guardian/Power of Attorney | | | | | | |
| 75 | Special Notice | | | | | | |
| 76 | US Marshall | | | | | | |
| 77 | State Inmate | SHC | STATE HOSPITAL COMMIT | H | HAZARD | No | Yes |
| 78 | Single Cell | | | | | | |
| 79 | Handicap Cell | | | | | | |
| 83 | CIWA | H.CIWA | CIWA | M | INSTRUCTION | Yes | Yes |
| 85 | Delirium and Dementia and Amnestic and Other Cognitive Disorders | | | | | | |
| 86 | Substance Related Disorders | | | | | | |
| 87 | Psychotic Disorders | CMC | CHRONIC MEDICAL CONDITION | Z | MEDALERT | Yes | Yes |
| 87 | Psychotic Disorders | PSY | PSYCH | Z | MEDALERT | Yes | Yes |
| 88 | Mood Disorders | CMC | CHRONIC MEDICAL CONDITION | Z | MEDALERT | Yes | Yes |
| 89 | Anxiety Disorders | | | | | | |
| 90 | Adjustment Disorders | | | | | | |
| 91 | Personality Disorders | | | | | | |
| 92 | Developmental Disability/Mental Retardation | | | | | | |
| 93 | Other Psychiatric Disorders | PSY | PSYCH | Z | MEDALERT | Yes | Yes |
| 94 | Inmate Death | | | | | | |
| 95 | MRSA | CL.CONTA | CONTACT PRECAUTIONS | M | INSTRUCTION | Yes | No |
| 96 | COWS | H.COWS | COWS | M | INSTRUCTION | Yes | Yes |
| 97 | Mental Health Chronic Care | | | | | | |
| 98 | Smoking Status: Current everyday smoker (Recode 1) | | | | | | |

209

Ex. B-362



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 99 | Smoking Status: Current some day smoker (Recode 2) | | | | | | |
| 100 | Smoking Status: Former smoker (Recode 3) | | | INACTIVE | | | |
| 101 | Smoking Status: Never smoker (Recode 4) | | | | | | |
| 102 | Smoking Status: Smoker, current status unknown (Recode 5) | | | | | | |
| 103 | Smoking Status: Unknown if ever smoked (Recode 9) | | | | | | |
| 105 | Abrasion | | | | | | added 1/26/24 (unsure when this was added exactly but did not exist in the |
| 106 | Acne | | | | | | |
| 107 | Athletes Foot | | | | | | |
| 108 | Back Pain | | | | | | |
| 109 | Blisters | | | | | | |
| 110 | Boils | | | | | | |
| 111 | Burns | | | | | | |
| 112 | Callus | | | | | | |
| 113 | Chest pain | | | | | | |
| 114 | Chest Pain Pleuritic | | | | | | |
| 115 | Chest Pain Inflam | | | | | | |
| 116 | Cold | | | | | | |
| 117 | Constipation | | | | | | |
| 118 | Contusions | | | | | | |
| 119 | Cough | | | | | | |

210

Ex. B-363

| 120 | Pubic Crabs | | | | | | |
|---|---|---|---|---|---|---|---|
| 121 | Dandruff | | | | | | |
| 123 | Ear Wax | | | | | | |
| 124 | Eye Foreign Body | | | | | | |
| 125 | Earache | | | | | | |
| 126 | Gas | | | | | | |
| 127 | Genital Warts | | | | | | |
| 128 | Grievance | | | | | | |
| 129 | Gonorrhea | CL.STANDAR | STANDARD PRECAUTIONS | M | INSTRUCTION | Yes | No |
| 130 | Hay Fever | | | | | | |
| 132 | Heat Exhaustion | | | | | | |
| 133 | Hemorrhoids | | | | | | |
| 134 | Indigestion | | | | | | |
| 135 | Jock Itch | | | | | | |
| 136 | Lacerations | | | | | | |
| 137 | Lice | CL.CONTA | CONTACT PRECAUTIONS | M | INSTRUCTION | Yes | No |
| 138 | Menstrual Cramps | | | | | | |
| 139 | Muscle Strain | | | | | | |
| 140 | NGU | | | | | | |
| 142 | Nose Bleed | | | | | | |
| 143 | PMS | | | | | | |
| 144 | Sore Throat | | | | | | |
| 145 | Sprain | | | | | | added 1/10/24 for Dec release |
| 146 | Toothache | | | | | | |
| 147 | Vaginal Discharge | | | | | | |
| 148 | Vaginitis | | | | | | |
| 149 | High BMI | | | | | | |
| 150 | Low BMI | | | | | | |
| 151 | Exempt From Meaningful Use | | | | | | |
| 152 | Private Insurance | | | | | | |
| 153 | High Risk for Medication Abuse | CL.HRMA | High Risk for Medication Abuse | M | INSTRUCTION | Yes | Yes |
| 154 | Arrhythmia | | | | | | |
| 155 | CAD | | | | | | |
| 156 | CHF | | | | | | |

Ex. B-364

| 157 | Valvular Disease | | | | | | |
| 158 | Dyslipidemia | | | | | | |
| 159 | Tuberculosis | CL.AIRBORN | AIRBORNE PRECAUTIONS | M | INSTRUCTION | Yes | No |
| 159 | Tuberculosis | CMC | CHRONIC MEDICAL CONDITION | Z | MEDALERT | Yes | Yes |
| 160 | Alcohol Liver Disease | | | | | | |
| 161 | Inflammatory Bowel Disease | | | | | | |
| 162 | Dementia | | | | | | |
| 163 | CNS Injury | | | | | | |
| 164 | Bleeding or Coagulation Disorders | | | | | | |
| 165 | Other Chronic Care | CMC | CHRONIC MEDICAL CONDITION | Z | MEDALERT | Yes | Yes |
| 168 | Sickle Cell Disease | | | | | | |
| 183 | Aetna | | | | | | |
| 184 | Amerigroup | | | | | | |
| 185 | Anthem | | | | | | |
| 186 | BCBS | | | | | | |
| 187 | Blue Shield | | | | | | |
| 188 | Cigna | | | | | | |
| 191 | Kaiser | | | | | | |
| 192 | Medi-Cal | | | | | | |
| 193 | Network | | | | | | |
| 194 | Optima | | | | | | |
| 195 | Other Insurance | | | | | | |
| 198 | United HealthCare | | | | | | |
| 200 | AB109 | AB109 | AB109 | N | NON MEDICAL | Yes | Yes |
| 205 | Medicaid | | | | | | |
| 206 | Amenorrhea | | | | | | |
| 207 | Anaphylaxis | | | | | | |
| 208 | Avulsions | | | | | | |
| 209 | Breast Mass | | | | | | |
| 210 | Bulimia | | | | | | |
| 211 | Foreign Body of the Ear | | | | | | |
| 212 | Fracture | | | | | | |
| 213 | Gastroesophageal Reflux Disease | | | | | | |

212

Ex. B-365

| 214 | Head Injury | | | | | | |
| 215 | Heart Murmur | | | | | | |
| 216 | Hiatal Hernias | | | | | | |
| 217 | Otitis Externa | | | | | | |
| 218 | Otitis Media | | | | | | |
| 219 | Pelvic Inflammatory Disease | | | | | | |
| 220 | Pinworm | | | | | | |
| 221 | Punctures | | | | | | |
| 222 | Scrotal Swelling | | | | | | |
| 223 | Spider Bites | | | | | | |
| 224 | Stings | | | | | | |
| 225 | Sty | | | | | | |
| 226 | Thrush | | | | | | |
| 227 | Tinea Captis | | | | | | |
| 228 | Tinea Corporis | | | | | | |
| 229 | Tinea Cruris | | | | | | |
| 230 | Tinea Pedis | | | | | | |
| 231 | Tinea Versicolor | | | | | | |
| 232 | Vaginal Yeast Infection | | | | | | |
| 233 | Camp Fire Program | | | | | | |
| 234 | Fire Camp | FAC16 | Fire Camp | N | NON MEDICAL | Yes | Yes |
| 235 | Anticoagulation | | | | | | |
| 236 | Armstrong | | | | | | |
| 237 | ASL | | | | | | |
| 238 | Assistive Device | S. ORTHASS | ASSISTIVE DEVICE | M | INSTRUCTION | Yes | Yes |
| 239 | Blind | | | | INACTIVE | | |
| 240 | Cane | S.ORTH.CA | CANE | M | INSTRUCTION | Yes | Yes |
| 241 | Chain Restriction | DRC | DAYROOM WAIST AND LEG CHAINS | H | HAZARD | No | Yes |
| 242 | Cotton Blanket | S. COT.BLA | COTTON BLANKET | M | INSTRUCTION | Yes | Yes |
| 243 | Dental Appliances | S.DENTBRAC | DENTAL BRACE | M | INSTRUCTION | Yes | Yes |
| 243 | Dental Appliances | S.DENTRET | DENTAL RETAINERS | M | INSTRUCTION | Yes | Yes |
| 244 | Dentures | | | | | | |
| 245 | Developmentally Disabled | CL.DEV DEL | DEVELOPMENTAL DELAY | M | INSTRUCTION | Yes | No |
| 246 | Do not Use for Work | NIW | NOT TO BE HIRED AS INMATE WORKER | H | HAZARD | No | Yes |
| 247 | Egg Crate Mattress | | | | | | |

213

| 248 | Extra Blanket | S. EX.BLAN | EXTRA BLANKET | M | INSTRUCTION | Yes | Yes | |
|-----|---------------|------------|---------------|---|-------------|-----|-----|---|
| 249 | Extra Mattress | S. EX.MATT | EXTRA MATTRESS | M | INSTRUCTION | Yes | Yes | |
| 250 | Hard of Hearing (Orig. Hearing Impaired ) | X. HEARING | HEARING DEFICIT/DEAF | M | INSTRUCTION | Yes | Yes | Rename 8/10/23 |
| 251 | Interpreter Services | | | | | | | |
| 252 | Isolation | | | | | | | |
| 253 | Latex Allergy | | | | | | | |
| 254 | Lithium | | | | | | | |
| 255 | Lower Bunk | H. L.BUNK | LOWER BUNK | M | INSTRUCTION | Yes | Yes | |
| 256 | Lower Tier | H. L.TIER | LOWER TIER | M | INSTRUCTION | Yes | Yes | |
| 257 | Medicinal Diet | | | | | | | |
| 258 | No Heavy Lifting | | | | | | | |
| 259 | Off Work | | | | | | | |
| 260 | Ok for Kitchen Work | H. OKKW | OK FOR KITCHEN WORK | M | INSTRUCTION | Yes | Yes | |
| 261 | Orange Shoes | S.MEDOSHOE | MEDICAL SHOES | M | INSTRUCTION | Yes | Yes | |
| 262 | Pills to KOP | | | | | | | |
| 263 | PREA | X.PREA | PREA | M | INSTRUCTION | Yes | Yes | |
| 264 | Pregnant Inmate | CL.PREGNAN | PREGNANT | M | INSTRUCTION | Yes | Yes | |
| 265 | Prescription Eyewear | S. P.GLAS | PRESCRIPTION GLASSES | M | INSTRUCTION | Yes | Yes | |
| 266 | Prosthetic Devices | | | | | | | |
| 267 | Prosthetics | S.ORTHPRO | Prosthetics | M | INSTRUCTION | Yes | Yes | |
| 268 | Rescue Inhaler | CL.RESCUEI | Rescue Inhaler | M | INSTRUCTION | Yes | Yes | |
| 269 | Seriously Functionally Impaired | | | | | | | |
| 270 | Sheltered Housing | | | | | | | |
| 271 | Special Discharge Plan | | | | | | | |
| 272 | Speech Impediment | X.SPEECH | Speech Impediment | M | INSTRUCTION | Yes | Yes | |
| 273 | Suicide Attempt | | | | | | | |
| 274 | Sweat Shirt | S. SWEATSH | SWEATSHIRT | M | INSTRUCTION | Yes | Yes | |
| 276 | Trauma Informed | | | | | | | |
| 277 | TTY/TDD Access | | | | | | | |
| 278 | Universal Precautions | UP | UNIVERSAL PRECAUTIONS | S | SPECIAL CONDITION | No | Yes | |

214

| 279 | Vision Impaired | X.VISION | Vision Impaired | M | INSTRUCTION | Yes | Yes | |
| 280 | Crutches | S.ORTH.CRU | CRUTCHES | M | INSTRUCTION | Yes | Yes | |
| 281 | Wheelchair | S.ORTH.WHE | WHEELCHAIR | M | INSTRUCTION | Yes | Yes | |
| 282 | ~~ADA Special Needs~~ | ~~CL.ADASP~~ | ~~ADA Special Needs~~ | ~~M~~ | ~~INSTRUCTION~~ | ~~Yes~~ | ~~Yes~~ | Disabled 8/4/23 |
| 284 | Liberty | | | | | | | |
| 285 | MH Review | | | | | | | |
| 286 | General Population | N/A | | | | | | |
| 287 | Protective Custody | P/C | PROTECTIVE CUSTODY | H | HAZARD | No | Yes | |
| 289 | Civil | | | | | | | |
| 290 | UPT (Urine Pregnancy Test) Needed | | | | | | | |
| 291 | Walker | | | | INACTIVE | | | |
| 292 | Behavioral Health Services | | | | | | | |
| 293 | Acute | | | | | | | |
| 294 | Severe | | | | | | | |
| 295 | Moderately Severe | | | | | | | |
| 296 | Moderate | | | | | | | |
| 297 | Mild | | | | | | | |
| 298 | Minimal | | | | | | | |
| 299 | Shingles (Herpes Zoster) ++ | CL.AIRBORN | AIRBORNE PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 299 | Shingles (Herpes Zoster) ++ | CL.CONTA | CONTACT PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 300 | Impetigo | CL.CONTA | CONTACT PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 301 | Meningitis | CL.DROPLET | DROPLET PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 302 | Mumps | CL.DROPLET | DROPLET PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 303 | Pneumonia | CL.DROPLET | DROPLET PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 304 | Influenza | CL.DROPLET | DROPLET PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 305 | Streptococcal Pharyngitis | CL.DROPLET | DROPLET PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 306 | Measles | CL.AIRBORN | AIRBORNE PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 307 | Chickenpox (Variccella) | CL.AIRBORN | AIRBORNE PRECAUTIONS | M | INSTRUCTION | Yes | No | |

Ex. B-368

| 308 | Health Processing | CL.HEALTHP | Health Processing | M | INSTRUCTION | Yes | Yes | |
| 309 | Not Fit for Jail | NFFJ | Not Fit For Jail | N | NON MEDICAL | Yes | Yes | |
| 310 | Splint | S.ORTH.SP | SPLINT | M | INSTRUCTION | Yes | Yes | |
| 311 | TB Workup | CL.AIRBORN | AIRBORNE PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| 312 | Test Patient | | | | | | | |
| 313 | ADA Learning | ADL | ADA LEARNING DISABILITY | A | ALERT | Yes | Yes | Disabled 8/4/23 |
| 313 | ADA Learning | CL.ADL | ADA LEARNING | A | INSTRUCTION | Yes | Yes | Disabled 8/4/23 |
| 314 | ADA Mobility | ADM | ADA MOBILITY INSTRUCTIONS | A | ALERT | Yes | Yes | added 8/4 |
| 314 | ADA Mobility | CL.ADM | ADA MOBILITY | M to A 8/4/23 | INSTRUCTION | Yes | Yes | updated to "Alert" flag category 8/4 |
| 315 | ADL RCC | RCC | REGIONAL CENTER CLIENT | A | ALERT | Yes | No | Mapping removed 2023? |
| 316 | AD-SEP | 9 | AD SEP | A | ALERT | Yes | Yes | |
| 316 | AD-SEP | ADS | ADMINSTRATIVE SEPARATION | H | HAZARD | No | Yes | |
| 317 | Communications | | | | | | | |
| 318 | Conservatorship | CON | Conservatorship | M | INSTRUCTION | Yes | No | |
| 318 | Conservatorship | CON | CONSERVATORSHIP | Z | MEDALERT | Yes | No | |
| 319 | Gender Identity | | | | | | | |
| 320 | Deaf (old: Hearing) | CL.ADD | DEAF | M | INSTRUCTION | Yes | No | Rename 8/10/23 |
| 321 | History of ISP | PSA | History of ISP | A | ALERT | Yes | Yes | |
| 322 | History of JBCT | JBC | JBCT History | H | HAZARD | No | Yes | |
| 323 | In Custody Suicide Attempt | H.ISA | IN-CUST SUICIDE ATT | M | INSTRUCTION | Yes | Yes | |
| 323 | In Custody Suicide Attempt | ISA | IN-CUSTODY SUICIDE ATTEMPT | A | ALERT | Yes | Yes | |
| 324 | Infirmary/MOB | H.MOB | MOB | M | INSTRUCTION | Yes | No | |
| 325 | Inmate Safety Program | H.COWS/CIW | Inmate Safety Program | H | HAZARD | No | Yes | |
| 326 | JBCT | H.JBCT | ACTIVE JBCT PATIENT | M | INSTRUCTION | Yes | Yes | |

Ex. B-369

| 327 | Lower Bunk/Lower Tier | H. L.BU/TI | LOWER BUNK AND TIER | M | INSTRUCTION | Yes | Yes |
|---|---|---|---|---|---|---|---|
| 328 | Med ISO | CL.CONTA | CONTACT PRECAUTIONS | M | INSTRUCTION | Yes | No |
| 328 | Med ISO | CL.RESP | RESP. ISOLATION | M | INSTRUCTION | Yes | Yes |
| 329 | Med Mainline | H.MEDMAIN | MEDICAL MAINLINE | M | INSTRUCTION | Yes | Yes |
| 330 | MOB | H.MOB | MOB | M | INSTRUCTION | Yes | No |
| 331 | No EMRF | H. NO EMRF | NO EMRF | M | INSTRUCTION | Yes | Yes |
| 332 | No Fac 8 | H. NO FAC8 | NO FACILITY 8 | M | INSTRUCTION | Yes | Yes |
| 332 | No Fac 8 | FC8 | NO TRANSFER TO FAC8 | H | HAZARD | No | Yes |
| 333 | No SBDF | H. NO SBDF | NO SBDF | M | INSTRUCTION | Yes | Yes |
| 333 | No SBDF | SBD | NO TRANSFER TO SBDF | H | HAZARD | No | Yes |
| 335 | OPSD | H.OPSDU | OP STEP DOWN UNIT | M | INSTRUCTION | Yes | Yes |
| 336 | Pending Out of Jail Transfer | POJT | OUT OF JAIL TRANSFER | M | INSTRUCTION | Yes | Yes |
| 336 | Pending Out of Jail Transfer | POTJ | Patient Out of Jail Transfer | N | NON MEDICAL | Yes | Yes |
| 337 | Previous Suicide Attempt | PSA | Previous Suicide Attempt | A | ALERT | Yes | Yes |
| 338 | PSU | PSU | PSU/WPSU | H | HAZARD | No | No. removed as of |
| 338 | PSU | H.PSU/WPSU | PSU/WPSU | M | INSTRUCTION | Yes | Yes |
| 339 | No Razor | S.NO RAZOR | NO RAZOR | M | INSTRUCTION | Yes | No |
| 341 | Sobering Cell | | | | | | |
| 342 | State Hospital Returnee | STATE HOSP | STATE HOSPITAL | M | INSTRUCTION | Yes | Yes |
| 342 | State Hospital Returnee | SHR | STATE HOSPITAL RETURNEE | H | HAZARD | No | Yes |
| 343 | TB Chest X-ray - Pending Review | H.TBREV | TB CXR PENDING REVIE | M | INSTRUCTION | Yes | Yes |
| 344 | TB Negative | | | | | | |
| 345 | Visual | | | | | | |
| 346 | CIWA-B | H.CIWA B | CIWA B | M | INSTRUCTION | Yes | Yes |
| 347 | I/W Lay In | T. LAY IN | I/W LAY IN | M | INSTRUCTION | Yes | Yes |
| 348 | Self-Harm | SHM | Self-Harm | H | HAZARD | No | Yes |
| 349 | History of PSU | H.HPSU | History of PSU | M | INSTRUCTION | Yes | Yes |
| 350 | Mental Health Hold | | | | | | |
| 352 | Suicide Risk | 3 | Suicide Risk | A | ALERT | Yes | Yes |
| 353 | Intake QMHP | H.IQMHP | INTAKE QMHP | M | INSTRUCTION | Yes | Yes |
| 354 | DNR - Do Not Resuscitate | CL.DNR | DNR | M | INSTRUCTION | Yes | Yes |

Ex. B-370

| 355 | Rental Equipment | S. RENTAL | RENTAL EQUIPMENT | M | INSTRUCTION | Yes | Yes | |
| 356 | Transgender - Male Gender | TGM | Gender Identity- Transgender Male | H | HAZARD | No | Yes | |
| 357 | Transgender - Female | TGF | Gender Identity- Transgender Female | H | HAZARD | No | Yes | |
| 358 | Transgender - Non-Binary | TGX | Gender Identity- Transgender Non-Binary | H | HAZARD | No | Yes | |
| 359 | 1368-Mental Competency Hearing | MCH | 1368-Mental Competency Hearing | M | INSTRUCTION | Yes | Yes | added in 2023? |
| 360 | TENDER AGE - YOUNG OR OLD | AGE | TENDER AGE - YOUNG OR OLD | H | HAZARD | No | Yes | |
| 361 | NO TRANSFER TO CAMPS | CMP | NO TRANSFER TO CAMPS | H | HAZARD | No | Yes | |
| 362 | CHILD VICTIM | CV | CHILD VICTIM | H | HAZARD | No | Yes | |
| 363 | NO TRANSFER TO EMDF | EMD | NO TRANSFER TO EMDF | H | HAZARD | No | Yes | |
| 364 | ELIGIBLE SUBSTANCE TREATMENT | EST | ELIGIBLE SUBSTANCE TREATMENT | H | HAZARD | No | Yes | |
| 365 | GASSING HISTORY | GAS | GASSING HISTORY | H | HAZARD | No | Yes | |
| 366 | NO TRANSFER TO GBDF | GBD | NO TRANSFER TO GBDF | H | HAZARD | No | Yes | |
| 367 | HIGH RISK TRANSPORT | HRT | HIGH RISK TRANSPORT | H | HAZARD | No | Yes | |
| 368 | MEDICAL TRANSFER RESTRICTIONS | MED | MEDICAL TRANSFER RESTRICTIONS | H | HAZARD | No | Yes | |
| 369 | DO NOT TRANSFER | NON | DO NOT TRANSFER | H | HAZARD | No | No | |
| 370 | NO TRANSFER TO SDCJ | SDC | NO TRANSFER TO SDCJ | H | HAZARD | No | Yes | |
| 371 | NO TRANSFER TO VDF | VDF | NO TRANSFER TO VDF | H | HAZARD | No | Yes | |
| 372 | INMATE WORKER | WKR | INMATE WORKER | H | HAZARD | No | Yes | |
| 374 | NAME ALERT | NAM | NAME ALERT | Z | MEDALERT | Yes | Yes | |
| 375 | NON-COMPLIANCE | NON | NON-COMPLIANCE | Z | MEDALERT | Yes | No | |
| 376 | PRIOR ALLERGY TEST RESULT NEGATIVE | PAT | PRIOR ALLERGY TEST RESULT NEGATIVE | Z | MEDALERT | Yes | Yes | |

Ex. B-371

| 377 | REFUSED LAB DRAW - REGULAR DIET ORDERED | RLD | REFUSED LAB DRAW - REGULAR DIET ORDERED | Z | MEDALERT | Yes | Yes |
| 378 | SPECIAL MEDICAL CONDITION | CL.SMC | Special Medical Condition | M | INSTRUCTION | Yes | Yes |
| 378 | SPECIAL MEDICAL CONDITION | SMC | SPECIAL MEDICAL CONDITION | Z | MEDALERT | Yes | Yes |
| 379 | INTK QMHP COMPLETED | H.IQMHPC | INTK QMHP COMPLETED | M | INSTRUCTION | Yes | No |
| 380 | PATIENT LOCKED | | | | | | |
| 381 | ABDOMINAL BINDER | S. ABD BIN | ABDOMINAL BINDER | M | INSTRUCTION | Yes | Yes |
| 382 | ACE WRAP | S.ORTH.ACE | ACE WRAP | M | INSTRUCTION | Yes | Yes |
| 383 | AMPUTEE | P.AMPUTEE | AMPUTEE | M | INSTRUCTION | Yes | Yes |
| 384 | ATHLETIC SUPPORTER | S. ATH.SUP | ATHLETIC SUPPORTER | M | INSTRUCTION | Yes | Yes |
| 385 | BLIND | X.BLIND | BLIND | M | INSTRUCTION | Yes | Yes |
| 386 | BLIND-TAPPING CANE | X.BLIND CA | BLIND-TAPPING CANE | M | INSTRUCTION | Yes | Yes |
| 387 | BRACE | S.ORTH.BR | BRACE | M | INSTRUCTION | Yes | Yes |
| 388 | BRAS @GBDF | S.BRAS-GBD | BRAS @GBDF | M | INSTRUCTION | Yes | Yes |
| 389 | CAST | S.ORTH.C | CAST | M | INSTRUCTION | Yes | Yes |
| 390 | CERVICAL COLLAR | S.ORTH.CER | CERVICAL COLLAR | M | INSTRUCTION | Yes | Yes |
| 391 | CLEARED FOR EMRF | H. CL EMRF | CLEARED FOR EMRF | M | INSTRUCTION | Yes | Yes |
| 392 | CLEARED FOR FAC 8 | H. CL FAC | CLEARED FOR FAC 8 | M | INSTRUCTION | Yes | Yes |
| 393 | CLEARED FOR I/W | T.CLEARED | CLEARED FOR I/W | M | INSTRUCTION | Yes | Yes |
| 394 | CLIPPER SHAVES | S. CLIP | CLIPPER SHAVES | M | INSTRUCTION | Yes | Yes |
| 395 | COLOR BLINDNESS | X. VISUAL | COLOR BLINDNESS | M | INSTRUCTION | Yes | Yes |
| 396 | CONTACT LENSES | S.CONTACTS | CONTACT LENSES | M | INSTRUCTION | Yes | Yes |
| 397 | C-PAP | S.C-PAP | C-PAP | M | INSTRUCTION | Yes | Yes |
| 398 | DENTURES | S.DENTDEN | DENTURES | M | INSTRUCTION | Yes | Yes |
| 399 | EYE PATCH | S.EYEPATCH | EYE PATCH | M | INSTRUCTION | Yes | Yes |
| 400 | FALL PRECAUTIONS | X.FALLPREC | FALL PRECAUTIONS | M | INSTRUCTION | Yes | Yes |
| 401 | HEARING AID | P. H.AID | HEARING AID | M | INSTRUCTION | Yes | Yes |
| 402 | HEEL SUPPORT | S.ORTH.HEE | HEEL SUPPORT | M | INSTRUCTION | Yes | Yes |
| 403 | I/W DENIED | T.I/W DENI | I/W DENIED | M | INSTRUCTION | Yes | Yes |

Ex. B-372

| 404 | INCONTINENCE PAD | S.INCONTPA | INCONTINENCE PAD | M | INSTRUCTION | Yes | Yes | |
| 405 | INSULIN PUMP | S.INSULIN | INSULIN PUMP | M | INSTRUCTION | Yes | Yes | |
| 406 | INTERMITTENT W-CHAIR | S.ORTH.W.A | INTERMITTENT W-CHAIR | M | INSTRUCTION | Yes | Yes | |
| 407 | LCDRF ONLY | H. LCDRF | LCDRF ONLY | M | INSTRUCTION | Yes | Yes | |
| 408 | METHADONE CLINIC PT. | H. METHADO | METHADONE CLINIC PT. | M | INSTRUCTION | Yes | Yes | |
| 409 | NEEDS HELP READING | H. NHR | NEEDS HELP READING | M | INSTRUCTION | Yes | Yes | |
| 410 | NEEDS HELP WRITING | X.WRITING | NEEDS HELP WRITING | M | INSTRUCTION | Yes | Yes | |
| 411 | NO CUFF TO SHUNT ARM | NO CUFF | NO CUFF TO SHUNT ARM | M | INSTRUCTION | Yes | Yes | |
| 412 | OK FOR EMRF/FAC8/SBD | H. CL OK | OK FOR EMRF/FAC8/SBD | M | INSTRUCTION | Yes | Yes | |
| 413 | PACEMAKER | S.PACEM | PACEMAKER | M | INSTRUCTION | Yes | Yes | |
| 414 | PERSONAL BRA | S.PERSBRA | PERSONAL BRA | M | INSTRUCTION | Yes | Yes | |
| 415 | POST PARTUM(6 WEEKS) | CL.POST PA | POST PARTUM(6 WEEKS) | M | INSTRUCTION | Yes | Yes | |
| 416 | PROSTHESES - EYE | P. ART.YE | PROSTHESES - EYE | M | INSTRUCTION | Yes | Yes | |
| 417 | PROSTHESES - LIMB | P.ARTLIM | PROSTHESES - LIMB | M | INSTRUCTION | Yes | Yes | |
| 418 | PROSTHETICS | S. ORTHPRO | PROSTHETICS | M | INSTRUCTION | Yes | Yes | |
| 419 | ROLL UP I/W | T.ROLL UP | ROLL UP I/W | M | INSTRUCTION | Yes | Yes | |
| 420 | SCARF | S.SCARF | SCARF | M | INSTRUCTION | Yes | Yes | |
| 421 | SLING | S.ORTH.SL | SLING | M | INSTRUCTION | Yes | Yes | |
| 422 | SPECIAL CUFFING | S.CUFF | SPECIAL CUFFING | M | INSTRUCTION | Yes | Yes | |
| 423 | TED HOSE | S.ORTH.TED | TED HOSE | M | INSTRUCTION | Yes | Yes | |
| 424 | TENS UNIT | S.TENS | TENS UNIT | M | INSTRUCTION | Yes | Yes | |
| 425 | TRANSFER MEDICATIONS | SPECIALMED | TRANSFER MEDICATIONS | M | INSTRUCTION | Yes | Yes | |
| 426 | VETERAN | CL. VET. | VETERAN | M | INSTRUCTION | Yes | Yes | |
| 427 | WALKER | S.ORTH.WAL | WALKER | M | INSTRUCTION | Yes | Yes | |
| 428 | WIRED JAW | S.DENTWIIR | WIRED JAW | M | INSTRUCTION | Yes | Yes | |
| 429 | Green Band | GB | GREEN BAND | H | HAZARD | No | Yes | |
| 430 | CLEARED FOR SBDF | H. CL SBDF | CLEARED FOR SBDF | M | INSTRUCTION | Yes | No | added around Dec |
| 432 | Razor Restriction - JIMS | RZR | RAZOR RESTRICTION | H | HAZARD | No | Yes | |
| 433 | Wheelchair - JIMS | WC | WHEELCHAIR | S | SPECIAL CONDITION | No | Yes | |

| 433 | Wheelchair - JIMS | WCH | WHEELCHAIR | H | HAZARD | No | Yes |
|---|---|---|---|---|---|---|---|
| 434 | Low Bunk and/or Tier REFUSED | H. L/T REF | LOWBUNK/TIER REFUSED | M | INSTRUCTION | Yes | Yes |
| 435 | COVID-19 | CL.COVID19 | COVID-19 | M | INSTRUCTION | Yes | Yes |
| 436 | PX UNDER INVESTIGATIGATION | CL.PUI | PX UNDER INVESTIGATIGATION | M | INSTRUCTION | Yes | Yes |
| 437 | GENERIC 1 | CL.GEN1 | GENERIC 1 | M | INSTRUCTION | Yes | Yes |
| 438 | COVID 19 Recovered | CL.GEN2 | GENERIC 2 | M | INSTRUCTION | Yes | Yes |
| 439 | GENERIC 3 | CL.GEN3 | GENERIC 3 | M | INSTRUCTION | Yes | Yes |
| 440 | COVID 19 Vaccinated | CL.GEN4 | GENERIC 4 | M | INSTRUCTION | Yes | Yes |
| 441 | Pending TB Assessment | CL.GEN5 | PENDING TB SCREENING | M | INSTRUCTION | Yes | Yes |
| 442 | Suspected PUI Case | CL.SPUI | SUSPECTED PUI CASE | M | INSTRUCTION | Yes | Yes |
| 443 | PH COVID-19 Test Negative | | | | | | |
| 444 | Assaultive | ASL | ASSAULTIVE TO STAFF/INMATES | H | HAZARD | No | Yes |
| 445 | Contact Tracing | | | | | | |
| 446 | Negative Rapid COVID 19 Test | | | | | | |
| 447 | Rapid Test COVID 19 Positive | | | | | | |
| 500 | CLEARED FOR EMRF/FAC 8 | | | | | | |
| 600 | 1370 | CL.1370 | 1370 | M | INSTRUCTION | Yes | Yes |
| 601 | 1370.01 - Misdemeanor | | | | | | |
| 999 | Unmapped Diagnosis Exists in JIMS | | | | | | |
| 1000 | Weekender | WKDR | Weekender | M | INSTRUCTION | No | Yes |
| 1001 | Naltrexone/Vivitrol | | | | | | |
| 1015 | Walker/Crutches | | | | INACTIVE | | |
| 1016 | Not Eligible for KOP | CL.NOTKOP | Not Eligible for KOP | M | INSTRUCTION | Yes | Yes |
| 1017 | KOP Program | CL.KOP | KOP Program | M | INSTRUCTION | Yes | Yes |
| #### | Methadone | H. METHA | METHADONE | M | INSTRUCTION | Yes | No |
| #### | Buprenorphine | | | | | | |

Ex. B-374

| #### | MAT | H.MAT | MED ASSIST TREATMENT | M | INSTRUCTION | Yes | No | Added for April 2023 |
|---|---|---|---|---|---|---|---|---|
| #### | COVID Vaccination - Refused | | | | | | | |
| #### | ADA Cognitive/Learning | CL.ADC | ADA Cognitive Learn | A | INSTRUCTION | Yes | No | Added 8/4/23;renamed from ADA Conginitive to current |
| #### | CLEARED FOR RMDF | H.CL RMDF | CLEARED FOR RMDF | M | INSTRUCTION | Yes | No | |
| #### | C. diff | CL.CONTA | CONTACT PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| #### | RSV | CL.DROPLET | CONTACT PRECAUTIONS | M | INSTRUCTION | Yes | No | |
| | ADA Hearing | CL.ADH | ADA Hearing | A | INSTRUCTION | Yes | No | Added |
| | ADA Medical | CL.ADMED | ADA Medical | A | INSTRUCTION | Yes | No | Added |
| | ADA Vision | CL.ADV | ADA Vision | A | INSTRUCTION | Yes | No | Disabled 8/4/23 |
| | does not trigger flag | WKE | Weekender | H | HAZARD | No | no | |
| | MOUD | H.MOUD | MOUD | M | INSTRUCTION | YES | NO | Added Feb 2024 |
| | No RMDF | H. NO RMDF | NO RMDF | A | INSTRUCTION | Yes | No | Added around |
| | State Hospital History | | | | | | | added Jan 2024 (Dec 2023 |

Ex. B-375

## Appendix G

### Mental Health Master Staffing Plan

**SDCJ (24/7)**

| SDSO | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| MCH 1 - AM | VACANT | | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 |
| MCH 2 - AM | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | | |
| MHC 3 - PSU | | | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | |
| MCH 4 - OPSD (4/12) | | | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | |
| MHC 5 - Mid | | | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 |
| MHC 6 - Mid | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | | |
| MHC 7 - PM | VACANT | | | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 |
| MHC 8 - PM | VACANT | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 | | |
| MHC-AM/GK (TAD) | M | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | |

| Contract Provider | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| PSU | | | 8am-4pm | 8am-4pm | 8am-4pm | 8am-4pm | 8am-4pm | |
| PSU | | 8am-12pm | | | | | | 8am-12pm |
| Psych OP | | | | 8am-6pm | 8am-6pm | 8am-6pm | 8am-6pm | |
| Psych OP | | | 8am-4pm | 9am-5pm | 9am-5pm | 9am-5pm | | |
| PhD AdSeg | VACANT | | | 2pm-10pm | 2pm-10pm | 2pm-10pm | 2pm-10pm | 2pm-10pm |
| PhD GK PM | | | 2pm-10pm | | | | | 2pm-10pm* |
| PhD GK PM | | | 2pm-10pm | 2pm-10pm | 2pm-10pm | 2pm-10pm | 2pm-10pm | |
| PhD GK Night | VACANT | 9pm-7am | | | | 9pm-7am | 9pm-7am | 9pm-7am |

**VDF (24/7)**

| SDSO | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| MHC 1 - AM | | | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 |
| MHC 2 - AM | | 0600-1430 | 0600-1430 | 0730-1600 | 0730-1600 | 0730-1600 | | |
| MHC 3 - Mid | | | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 |
| MHC 4 - Mid | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1200-2030 | | |
| MHC 5 - PM | | | | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 |
| MHC 6 - PM | | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 | | |

| Contract Provider | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| Psych OP | VACANT | | 10am-8pm | 10am-8pm | 10am-8pm | 10am-8pm | | |
| Psych OP (tele) | | | | | | | 8am-4pm | |
| Psych OP (tele) | | | | | | | | 7am-1pm |
| PhD GK AM | | | | | | | | 7am-11am |
| PhD GK AM | | 7am-11am | | | | | | |
| PhD GK PM | | | 7am-3pm | 1pm-9pm | 12pm-8pm | | 8am-4pm | |
| PhD GK PM | | | 12pm-8pm | | | | | |

**LCDRF (24/7)**

| SDSO | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| MHC 1 - AM | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | | |
| MHC 2 - AM | | | | 0900-1730 | 0900-1730 | 0900-1730 | 0600-1430 | 0600-1430 |
| MHC 3 - PSU | | | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | |
| MHC 4 - Mid | | | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 |
| MHC 5 - Mid | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | | |
| MHC 6 - PM | VACANT | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 | | |
| MHC 7 - PM | VACANT | | | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 | 2130-0600 |

| Contract Provider | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| OP Psychiatrist | | | 0800-1800 | 0800-1800 | 0800-1800 | 0800-1800 | | |
| OP Psychiatrist | | 0600-1000 | | | | | | 0600-1000 |
| PSU Psychiatrist | | | 0900-1700 | 0900-1700 | 0900-1700 | 0900-1700 | 0900-1700 | |
| PhD GK | | | 1000-2200 | 1100-2200 | 1000-1600 | 1100-2200 | | |
| PhD GK | | 1300-2200 | | | | | 1200-2200 | |
| PhD GK AM | | 0800-1300 | | | | | | |

Rev. March 17, 2022

Ex. B-376

## Appendix H

## Mental Health Master Staffing Plan

**SDCJ (24/7) — 27**

**SDSO**

| Position | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| Chief MHC | | | 0700-1530 | 0700-1530 | 0700-1530 | 0700-1530 | 0700-1530 | |
| Chief MHC | | | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | |
| MHC 1 - AM | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | | |
| MHC 2 - AM | | | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 |
| MHC 3 - AM | | 1000-1830 | 100-1830 | 0600-1430 | 0600-1430 | 0600-1430 | | |
| MHC 4 - PM | | | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 |
| MHC 5 - PM | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | | |
| MHC 6 - PM | | | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 |
| MHC 7 - NOC | | 2000-0630 | 2000-0630 | 2000-0630 | 2000-0630 | | | |
| MHC 8 - NOC | VACANT | | | 2000-0630 | 2000-0630 | 2000-0630 | 2000-0630 | 2000-0630 |
| MHC OPSD | | | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 |
| MHC OPSD | | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | | |
| MHC PSU | | | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | |
| MH CMC - AM | | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | | |
| MH CMC - MID | | | | 1000-1830 | 1000-1830 | 1000-1830 | 1000-1830 | 1000-1830 |
| RT-PSU/OPSD | | | 0730-1600 | 0730-1600 | 0730-1600 | 0730-1600 | 0730-1600 | |

**NAPHCARE — 11**

| Contract Provider | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| Psychiatrists PSU | | | | | 0900-2000 | 0900-2000 | 0900-2000 | 0900-2000 |
| Psychiatrists PSU/PRN | | 0800 - 1600 | 0800 - 1600 | | | | | |
| Psychiatrists (T) | | | | | | | | 0800 - 1600 |
| Psychiatrists (T) | | | | 0800 - 1600 | 0800 - 1600 | 0800 - 1600 | | |
| Psychiatrists | | | 0630-1700 | 0630-1700 | | 0630-1700 | 0630-1700 | |
| Psychologists | | | 0600-1700 | 0600-1700 | 0600-1700 | 0600-1700 | | |
| Psych NP OP | | 0600 - 1630 | | | | 0600 - 1630 | 0600 - 1630 | 0600 - 1630 |
| Psych NP OP | | | 0600 - 1630 | 0600 - 1630 | 0600 - 1630 | 0600 - 1630 | | |
| Mental Health Professional | | | 0630-1530 | 0630-1530 | 0630-1530 | 0630-1530 | 0630-1530 | |
| Mental Health Professional | | | 1330 - 2200 | 1330 - 2200 | 1330 - 2200 | 1330 - 2200 | 1330 - 2200 | |
| Discharge Planner | | | | 0630 - 1700 | 0630 - 1700 | 0630 - 1700 | 0630 - 1700 | |

**VDF (24/7) — 87**

**SDSO — 11**

| Position | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| Chief MHC | | | 0900-1730 | 0900-1730 | 0900-1730 | 0900-1730 | 0900-1730 | |
| MHC 1 - AM | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | | |
| MHC 2 - AM | | | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 |
| MHC 3 - PM | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | | |
| MHC 4 - PM | VACANT | | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 |
| MHC 5 -NOC | | 2000-0630 | 2000-0630 | 2000-0630 | 2000-0630 | | | |
| MHC 6 -NOC | | | | | 2000-0630 | 2000-0630 | 2000-0630 | 2000-0630 |
| MHC 7 - TAD COC-MSD | | | 0700-1530 | 0700-1530 | 0700-1530 | 0700-1530 | 0700-1530 | |
| MHC 8 - MAT | | | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | |
| MH CMC | VACANT | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | | |
| MH CMC | | | | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 |

**NAPHCARE — 76**

| Contract Provider | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| Psychiatrists | | | | | | | 0800 - 1600 | 0800 - 1600 |
| Psychologist | | | | | | | 0800 - 1630 | 0800 - 1630 |
| Psychologist | | | | | 0630 - 1700 | 0630 - 1700 | 0630 - 1700 | 0630 - 1700 |
| Psych NP OP | | | 0600 - 1630 | 0600 - 1630 | 0600 - 1630 | 0600 - 1630 | | |
| Mental Health Technician | | | 0600 - 1600 | 0600 - 1600 | 0600 - 1600 | 0600 - 1600 | | |

**LCDRF (24/7) — 21**

**SDSO — 12**

| Position | Name | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|
| Chief MHC | | | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | 0800-1630 | |
| MHC 1 - AM | | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | 0600-1430 | | |
| MHC 2 - AM | | | | 0900-1730 | 0900-1730 | 0900-1730 | 0600-1430 | 0600-1430 |
| MHC 3 - PM | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | | |
| MHC 4 - PM | | | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 |
| MHC 5 -NOC | | | | | 2000-0630 | 2000-0630 | 2000-0630 | 2000-0630 |
| MHC 6 -NOC | VACANT | 2000-0630 | 2000-0630 | 2000-0630 | 2000-0630 | | | |
| MHC 7 - PSU | | | 0800-1430 | 0800-1430 | 0800-1430 | 0800-1430 | 0800-1430 | |
| MH CMC - PM | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | | |
| MH CMC - PM | | | | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 | 1400-2230 |

6/13/2024

Ex. B-377

**Appendix I**

## SAN DIEGO COUNTY SHERIFFS MENTAL HEALTH PERSONNEL STATUS REPORT

| Job Classification / FACILITY | Chief MHD | | | | MHC | | | | MH CMC | | | | BHPC | | | | UROIS | | | | Rec Thera | | | | MHD | | | | Totals Per Facility | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Auth | Assigned | Vac | % | Auth | Assigned | Vac | % | Auth | Assi | Vac | % | Auth | Assigned | Vac | % | Auth | Assigned | Vac | % | Auth | Assigned | Vac | % | Auth | Assigned | Vac | % | Auth | Assigned | Vac | % |
| GBDF | 1 | 1 | 0 | 100% | 7 | 7 | 0 | 100% | 4 | 3 | 1 | 75% | | | | | | | | | | | | | | | | | 12 | 11 | 1 | 92% |
| LCDRF | 1 | 1 | 0 | 100% | 6 | 6 | 0 | 100% | 4 | 3 | 1 | 75% | | | | | | | | | 1 | 0 | 1 | 0% | | | | | 12 | 10 | 2 | 83% |
| RMDF | 1 | 1 | 0 | 100% | 6 | 0 | 6 | 0% | | | | | | | | | | | | | | | | | | | | | 7 | 1 | 6 | 14% |
| SDCJ | 2 | 2 | 0 | 100% | 10 | 10 | 0 | 100% | 4 | 2 | 2 | 50% | | | | | | | | | 1 | 1 | 0 | 100% | | | | | 17 | 15 | 2 | 88% |
| VDF | 1 | 1 | 0 | 100% | 9 | 7 | 2 | 78% | 3 | 1 | 2 | 33% | | | | | | | | | | | | | | | | | 13 | 9 | 4 | 69% |
| COC | | | | | 13 | 0 | 13 | 0% | | | | | 1 | 1 | 0 | 100% | 2 | 2 | 0 | 100% | | | | | 1 | 1 | 0 | 100% | 17 | 4 | 13 | 24% |
| TOTALS | 6 | 6 | 0 | 100% | 51 | 30 | 21 | 59% | 15 | 9 | 6 | 60% | 1 | 1 | 0 | 100% | 2 | 2 | 0 | 100% | 2 | 1 | 1 | 50% | 1 | 1 | 0 | 100% | 78 | 50 | 28 | 64% |

## Classification requirements:

| | | |
|---|---|---|
| *MHD | Mental Health Director | Master's Level - License by the Board of Behavioral Science of California |
| *Chief MHC | Chief Mental Health Clinician | Master's Level - License by the Board of Behavioral Science of California |
| *MHC | Mental Health Clinician | Master's Level - License by the Board of Behavioral Science of California |
| *MH CMC | Mental Health Case Management Clinician | Master's Level - License by the Board of Behavioral Science of California |
| *BHPC | Behavioral Health Program Coordinator | Master's Level - Pre-License by the Board of Behavioral Science of California |
| *UROIS | Utilization Review Quality Improvement Specialist | Master's Level - License by the Board of Behavioral Science of California |
| *Rec Thera | Recreational Therapist | California Board of Recreation Therapy Certification (CBRTC), or the National Council for Therapeutic Recreation Certification (NCTRC) |

225

**Ex. B-378**

# EXHIBIT C
## (Redacted)

Ex. C-379

***DUNSMORE V. COUNTY OF SAN DIEGO SHERIFF'S DEPARTMENT***
**EXPERT WITNESS DENTAL REPORT OF SCOTT E. REINECKE, D.D.S.**

### Section 1: Experience and Qualifications

I am a regionally licensed general dentist based in Texas.  I have considerable expertise in correctional healthcare, with 30 total years of experience in dentistry.  Specifically, for the past 26 years, I have worked for the University of Texas Medical Branch (UTMB) Offender Health Services Program.  I currently serve as the Region IV Dental Director for Correctional Managed Care and the Youth Health Services Dental Director for the Texas Juvenile Justice Department (TJJD).  I am responsible for ensuring the provision of all dental services for approximately 18,000 adult incarcerated persons in the Texas Department of Criminal Justice (TDCJ) state jails and prisons, as well the delivery of such services to juvenile offenders in TJJD facilities.  I oversee a staff of 50 employees located at 18 correctional facilities throughout the state of Texas.

Before joining UTMB in 1998, and through June 2023, I also owned three private practices around San Antonio, served as a policy development contributor with the Texas Oral Health Coalition, and lectured on dental diagnostics, oral surgery, and pathology.  My curriculum vitae is attached as **Appendix A**.

### Section 2: Materials Reviewed

A list of the documents and materials reviewed in preparation of this report is attached as **Appendix B**.  In addition, the dental records for each SDSO incarcerated person (IP) discussed in this report have been personally reviewed.

A review of Assistant Sheriff Theresa Adams's deposition from April 17, 2024, was completed.  This deposition specifically referenced the timing for treatment, preventive measures (cleanings), and root canals (endodontics), which was one of the referred procedures.  The deposition of Jon Montgomery, M.D., Medical Director for the SDSO, taken on April 24, 2024, was also reviewed.  This deposition addressed the fact that arbitrary delays in care, as demonstrated by root canal therapy, had been resolved.   Dr. Montgomery also stated that NaphCare is reviewing staffing levels, utilization, charting, documentation, and hygiene services.

### Section 3: Overview

The seven facilities of the San Diego Sheriff's Office (SDSO) maintain a process whereby incarcerated persons have ready access to on-site dental care through NaphCare, the SDSO's contracted healthcare provider.  At the time of my visit to the facilities, there were four total dentists, two hygienists, and two dental assistants in place to provide care to approximately 4000 incarcerated persons.  Routine requests for care generally are seen within 7-14 days of sick call receipt.  Urgent and emergent requests are dispositioned within 24 hours by nursing staff and then routed for appropriate treatment, either on site or via the referral process to an external provider.  Services include preventive, restorative, endodontic, fixed and removeable prosthetics, and oral surgery.  These services are part of a comprehensive multi-disciplinary team effort to deliver consistent and meaningful care to the incarcerated population.  Clinic hours are 6:30 AM to 3:00 PM, Monday through Friday, and some dental staff also provide coverage on weekends.  In cases that are deemed outside the realm of standard services, a referral process is in place to ensure that all necessary care is provided in a timely manner.  Two general practice groups and two oral surgery groups are under contract for these referrals.  NaphCare's Dental Director, Dr. Kuntal Pandit, completes monthly chart reviews on every

**Ex. C-380**

dentist and an annual quality of care assessment.  On Fridays of each week, the SDSO has a Zoom meeting with all clinical staff.


**Section 4: Methodology**

An evaluation was requested to determine whether the overall delivery of dental care to IPs in the custody of the SDSO is constitutionally adequate and meets the standard of care.  To do so, site visits were conducted, staff were interviewed, three conference calls were held with local dentists and the NaphCare Dental Director, and chart entries and associated documents were reviewed.  Staff interviews were conducted without the presence of senior leadership to promote free discussion.  A random selection of IP charts was requested to assess treatment for various conditions, appropriate referrals, episodic care, and documentation.  An analysis of this data was conducted from the perspective of the systemic delivery of healthcare, including certain outcome measures found useful for comparing across populations.


**Section 5: Facilities**

On March 27 and 28, 2024, all seven SDSO facilities were comprehensively toured.  The facilities included the following:

- East Mesa Reentry Facility (EMRF)
- George Bailey Detention Facility (GBDF)
- Las Colinas Detention and Reentry Facility (LCDRF)
- Rock Mountain Detention Facility (RMDF)
- San Diego Central Jail (SDCJ)
- South Bay Detention Facility (SBDF)
- Vista Detention Facility (VDF)


**Section 6: Scope of Assessment**

In the timeframe that spanned March 29, 2024, through May 31, 2024, all aspects of the dental program and a pool of charts were reviewed.  As part of the review and analysis, it was sought to determine if a pattern existed that represented accessibility to care and continuity of that care.

The review focused on evaluating the following components of dental care that have been identified by correctional healthcare experts as essential for the adequate delivery of dental services:

- Staffing
- Access to Care
- Dental Services Provided
- Physical Space
- Quality Monitoring
- Records Management
- Records Review

For each of these components, the adequacy of dental care both from a system perspective and at the facility level was assessed.

2

**Ex. C-381**

Staffing

Healthcare delivery is dependent upon having adequate and qualified dental professionals. The evaluation of this component included a review of the department's organizational structure, current staffing plan, and ratio to incarcerated person population. I spoke with available members of the facility leadership teams, which were each Directors of Nursing (DON). During the walkthroughs, interviews took place with Divya Patel, D.D.S., Claudia Pascua, R.D.H., and Edward Balandres, R.D.H. I spoke with Justin Polanco, D.D.S. via phone.

Currently, there are four total dentists, including two new hires. There are also two dental hygienists and two dental assistants on staff. All staff travel to different facilities over the course of each week. Two more hygienist positions are being added and NaphCare is evaluating the need for two additional assistants, as well.

Access to Care

Every correctional healthcare system is only as valuable as its ability to address and treat all levels of dental care in a timely manner. I reviewed the sick call process, timeframe to be seen for all priorities of need, emergency care, referral process and services, and patient education offered. Dental needs identified that required referral to an off-site specialty provider were documented and scheduled in a timely manner.

Dental Services Provided

General dentistry is provided to all IPs, to include oral healthcare instruction, preventive services (gross scales and prophies), restorative services (fillings and crowns), endodontics (root canals, referred to off-site provider), prosthodontics (dentures), and oral surgery (completed both on site and via off-site referral).

Physical Space

An assessment of the adequacy of the physical space for providing dental care and the associated equipment was conducted. Each facility visited had adequate space and equipment to deliver dental care. The RMDF is currently undergoing construction upgrades and has only one wing populated. Any equipment that was inoperable had been allocated for replacement.

Quality Monitoring

Quality assurance monitoring is a necessary process for every healthcare system to ensure consistent and adequate delivery of care. The quality monitoring for all providers who serve at the seven SDSO facilities is appropriate. Dr. Pandit performs monthly chart reviews and an annual quality review on each dental provider.

Records Management

The current TechCare electronic health record in use at SDSO is a suitable vehicle to record and track dental healthcare encounters.

Records Review

A review of randomly selected dental records, taken from a pool of all relevant facilities, were reviewed for completeness, fluidity, accuracy, and in a manner that demonstrated continuity of care within an acceptable time frame.

Reviewing baseline diagnostic, preventive, and other direct dental care is necessary to establish a consistent process for evaluation and treatment of dental needs within any correctional healthcare

Ex. C-382

system.   A thorough review of a random selection of dental records provides insight as to the accuracy and completeness of what is being reported by healthcare staff and to validate quality metrics used in the system.

A random review of 10 dental patient records from a pool of 27 was performed across all SDSO facilities.  This sampling approach is likely to have yielded a reasonable representative sample, according to Dr. Jacques Baillargeon, the Director of Epidemiology and Outcomes Research in the Division of Correctional Managed Care and a Senior Epidemiologist in the Office of Biostatistics at UTMB.  Consultation with an epidemiologist regarding sampling methodology is relied upon by experts.

The dental records were reviewed and evaluated in three areas:
- Quality of Documentation
- Quality and Continuity of Care
- Timeliness of Care

Each chart entry was evaluated considering all three factors.  While care may not have been perfect in all instances, the intended review was to determine if fluidity and continuity of care was the norm.  Dental chart reviews can be found in **Appendix C**.


## Section 7: Summary of Findings

Chart audits revealed that while documentation was present, it was typically not comprehensive in nature, nor did it represent a fluid sequence of assessment, diagnosis, and treatment.  This may be a result of a charting system that is not full-spectrum, relies too much on a "check the box" format, or is not user-friendly.  Overall, entries were succinct, but they would benefit from more detail.  Referrals and refusals were documented but would also benefit from more detail.  There were inherent time gaps of approximately 5 to 65 days between triage/screening and definitive diagnosis and/or treatment.  While continuity of care appeared to be documentable, it is difficult to follow.  A referral system is in place, but there is not consistency with transfer or return documents available for each off-site specialty visit.


## Section 8: Quality Assurance

It is imperative that quality monitoring be in place to ensure that dental care being delivered is both timely and appropriate.  Additionally, the dental care must result in the desired health outcome.  Dr. Pandit explained in our interview that he completes monthly chart audits and an annual quality outcome audit on each provider.


## Section 9: Plaintiffs' Allegations

The response for each allegation is as follows:

1. *Jail Defendants maintain insufficient numbers of dental professionals to provide minimally adequate care.*

Response: **FALSE**

**Ex. C-383**

The SDSO does maintain a sufficient number of dental professionals to provide adequate dental services to the IPs in its care.  The existing ratio of dentist to patients is not significantly different than what is common in the community at large.  The SDSO has added additional dentists and hygienists to NaphCare's staffing matrix to ensure timely access to dental evaluations, cleanings, and follow-up care. The Plaintiffs' allegations are based on the 2017 National Commission on Correctional Health Care (NCCHC) Technical Assistance Report, which no longer bears relevance in 2024.

*2. The Sheriff's Department fails to adequately train and supervise their staff to ensure that dental care is provided on a timely basis.*

Response: **FALSE**

The SDSO, through its dental service provider, does adequately train and supervise their dental staff regarding timely provision of dental services.  My conversations with Dr. Pandit and the facility dental staff provided clear and direct evidence that all SDSO dental staff understood the importance of dental access to care.  My experience in the community serves as basis for this determination, in that all healthcare providers and support staff, regardless of field or specialty, hold patient needs and care as paramount tenets of their profession.

*3. The Sheriff's Department fails to provide minimally adequate dental treatment to incarcerated people.*

Response: **FALSE**

It is evident in the dental records I reviewed, as well as the specialty referral data, that the SDSO, through NaphCare, has access to and provides adequate dental treatment to the incarcerated population.  In fact, in those cases deemed to require necessary referrals to maintain oral masticatory function, referrals are made to outside providers, including oral surgery, endodontics, and prosthodontics.

*4. The Sheriff's Department's policies and procedures for preventive dental care are inadequate.*

Response: **FALSE**

The SDSO provides IPs with annual dental cleanings.  See response to Allegation #5 for additional information.

*5. The Sheriff's Department does not affirmatively schedule people for timely preventative dental care or regular examinations.*

Response: **FALSE**

The SDSO does provide access to annual teeth cleanings, as stated clearly by Assistant Sheriff Adams-Hydar.  Historically, annual teeth cleanings are not a service most jails routinely provide due to the abbreviated time patients remain in the facility.  AB109 lengthened that time for a certain portion of the SDSO IPs, and when that was recognized, the SDSO made staffing changes to ensure access to those services.

**Ex. C-384**

*6. The Sheriff's Department does not tell people that they can request preventative care.*

Response: **FALSE**

The SDSO does provide education on available dental services to all IPs upon intake.


**<u>Section 10: Conclusion</u>**

In my professional opinion, the SDSO has the necessary physical plant, infrastructure, staff, and equipment to deliver adequate dental care that aligns with community standard. All dental staff I spoke with were entirely professional and dedicated to providing the best care possible for the patients in their charge. New positions, both already in place and planned, will further enhance the accessibility and delivery of dental care. The existing ratio of dentist to patients is not significantly different than what is common in the community at large.

The interviews conducted with SDSO dental and healthcare staff revealed that the facility management teams, and support staff were comprised of exceptionally dedicated people who were committed to doing the absolute best for their patients. Each member was passionate about ensuring that every patient received quality care.

SDSO through its vendor NaphCare is providing industry and community standard dental services at each facility.

**Ex. C-385**

**Appendix C**

**1. Patient:** ███████████
Facility: RMDF
Booking Number: Unknown
Dates Reviewed: ████/23 - ████/23
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ███████ requested dental care on ████/23 with a chief complaint (CC) of "I haven't had teeth cleaned in four years and they are dirty." On ████/23, he had an appointment created to see dental. He was seen by the dentist on ████/23 and had a panographic film taken and was scheduled for a cleaning. On ████/23, he submitted another request for a cleaning. On 1████/23, his prophy (cleaning) was completed. On that same day, he submitted another request, with a CC of "I am here for me cleaning. I do not want any other work done. No pain." He was subsequently seen by Dr. Patel, who diagnosed caries on teeth #18, #30, and #31. Tooth #18 was also diagnosed with a fracture. The treatment plan included restorations for teeth #30 and #31, and a root canal and crown for #18. Options for tooth #18 were listed as extraction, no treatment, or wait until release and be seen by private dentist. The delay average for requests for care was 15 days. No urgent or immediate needs were ever identified.

**2. Patient:** ███████████
Facility: GBDF
Booking Number: Unknown
Dates Reviewed: ████/23 - ████/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ██████ requested dental care on ████/23 with a CC of "Tooth pain on lower left and gums bleed." He was seen that same day and scheduled for a gross debridement. He submitted a second request on ████/24, with a CC of "Lower left tooth cavity." He was scheduled to see dental and was seen by Dr. Polanco on ████/24, at which time teeth #18 and #31 were diagnosed with caries. He received his gross debridement on ████/24 and was rescheduled for restorations.

**3. Patient:** ███████████
Facility: GBDF
Booking Number: ██████████
Dates Reviewed: ████/23 - ████/23
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ██████ saw Dr. Borquez on ████/23 for an annual exam and had a panograph taken. He had no complaint of pain. Recurrent caries was diagnosed on tooth #2. No suction was available, so he was scheduled to have the tooth restored. He was seen by Dr. Patel on ████/23, at which time he reported that he had no pain and did not want tooth #2 filled.

**4. Patient:** ███████████
Facility: Unknown

95

Booking Number: ███████
Dates Reviewed: ███ /23 - ███ /23
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ███████ requested dental care on ███ /23 with a CC of "Dental pain, see dentist". He was seen by nursing and given pain meds and scheduled with the dentist. He was seen by Dr. Polanco on ███ /23. A panograph was taken and tooth #16 was diagnosed as having gross caries to the pulp. The suction was not working so he was given pain meds and scheduled to have tooth #16 extracted. On ███ /23, Mr. ███████ was seen by Dr. Polanco and had tooth #15 removed due to gross decay/root remnants only. Tooth #16 remained on the treatment plan. The tooth removed was likely #16, based upon review of the panograph. Confusion is a result of teeth #12, #13, and #14 being missing.

**5. Patient:** ███████
Facility: GBDF
Booking Number: ███████
Dates Reviewed: ███ /23 - ███ /24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ███████ was seen by nursing on ███ /23 with a CC of "Abscess around molars." He was scheduled to see dental. On ███ /24, he came in to see Dr. Polanco but refused all treatment.

**6. Patient:** ███████
Facility: GBDF
Booking Number: ███████
Dates Reviewed: ███ /23 - ███ /24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ███████ had a panograph taken on ███ /23. He submitted a request for dental care on ███ /23 with a CC of "Need fillings on right side, missing crown." He submitted a second request ███ /24 with a CC of "Cap in tooth fell out." He saw Dr. Polanco on ███ /24 and stated, "broken tooth, I want to remove it." Dr. Polanco extracted tooth #31 that day. On ███ /24, Mr. ███████ saw the hygienist, Ms. Pascua, and received a gross scale. She noted that tooth #19 was fractured. She rescheduled Mr. ███████ to be seen by the dentist. On ███ 24, Mr. ███████ was seen by Dr. Polanco and he completed a composite restoration on tooth #19. A panograph was done on ███ /24.

**7. Patient:** ███████
Facility: GBDF
Booking Number: ███████
Dates Reviewed: ███ /21 - ███ /22
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ███████ submitted a request to see dental for a toothache on 1███ /21. He was seen by Dr. Polanco on ███ /21, had a panograph taken, and was diagnosed with gross caries on tooth #19. He

**Ex. C-387**

was given antibiotics and pain meds and scheduled for the extraction of tooth #19. Tooth #19 was extracted on ████/21 by Dr. Polanco. Mr. ████ submitted requests for care on ████/22, ████/22, and ████/22 with CCs of "Tooth hurts bad", Get tooth pulled ASAP", and "Tooth pulled." He was in court on ████ 22. Tooth #2 was diagnosed as being grossly carious and was extracted on ████ 22 by Dr. Polanco. Radiographic evidence supports the extraction of teeth #2 and #19.

**8. Patient:** ████████████
Facility: GBDF
Booking Number: ████████
Dates Reviewed: ████/24 - ████/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care
Mr. ████ submitted requests to see dental for different toothaches on ████/24, ████/24, ████ 24, and ████/24. His CCs were "Very bad toothache, needs to be pulled ASAP" and "Tooth pain due to partial denture." He was seen by Dr. Polanco on ████/24 and had tooth #13 extracted. He was seen again by Dr. Polanco on ████/24 and had tooth #29 extracted. He was then scheduled for a gross debridement. Radiographic evidence supports the extraction of teeth #13 and #29.

**9. Patient:** ████████████
Facility: GBDF
Booking Number: ████████
Dates Reviewed: ████/24 - ████/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care
Mr. ████ submitted multiple requests to see dental for a toothache on ████/24, ████/24, ████/24, and ████/24. His CCs were "Tooth is killing me. May I see the dentist" and "I'm in a lot of pain and my mouth hurts," and "Tooth is killing me, can't sleep." He was seen by the hygienist, Ms. Pascua, for a gross scale on ████/24 and had a panograph taken. Dr. Polanco extracted tooth #30 on ████/24.

**10. Patient:** ████████████
Facility: GBDF
Booking Number: ████████
Dates Reviewed: ████/24 - ████/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care
Mr. ████ was seen by the hygienist, Ms. Pascua, on ████/24 for a panograph. He was then scheduled to see the dentist. On ████/24, Mr. ████ was seen by Dr. Polanco with a CC of "My tooth broke." Tooth #19 was deemed non-restorable due to gross caries to the pulp. Acetaminophen was prescribed and Mr. ████ was scheduled to have tooth #19 extracted. On ████/24, the hygienist, Mr. Belandres, documented that Mr. ████ refused to report to dental for a cleaning. On ████/24, the hygienist, Ms. Pascua, documented that Mr. ████ refused to report to dental for a cleaning. On ████/24, Dr. Polanco documented that Mr. ████ refused to report to dental for the extraction of tooth #19. On ████/24, the hygienist, Ms. Pascua, documented that Mr. ████ refused to report to dental for a cleaning.

**11. Patient:** ████████████
Facility: VDF

**Ex. C-388**

Booking Number: ██████
Dates Reviewed: ██████/24 - ██████/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ████ was seen on 2/13/24 via sick call request with a CC of "Here for a filling" by Dr. Patel for a resin filling on tooth #27. At this appointment, a referral was made for a root canal on tooth #27, as the caries noted on the tooth approximated the pulp tissue upon excavation. On ████/24, Dr. Polanco saw Mr. ████ via sick call request with a CC of "When is my root canal?" At this appointment, Dr. Polanco informed Mr. ████ that his referral appointment was pending. On ████/24, Mr. ████ was seen by the hygienist, Ms. Pascua, for a full mouth debridement. The root canal and crown prep on tooth #27 apparently occurred between ████/24 and ████/24. On ████/24, Mr. Ford was seen by Dr. Polanco via sick call request with a CC of "Get my crown." Dr. Polanco confirmed with Mr. ████ that his referral for crown cementation was pending. Remaining treatment from the CTP includes RCT or extraction of teeth #20, #29, and #30.

**12. Patient:** ████████
Facility: GBDF
Booking Number: ██████
Dates Reviewed: ██████/24 - ██████/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ████ was seen off site by Marc Dentico-Olin, M.D., D.M.D., of Oral and Maxillofacial Surgery (OMFS), following an altercation during which Mr. ████ mandible was fractured bilaterally. Retention screws were placed to support stabilization hardware. Mr. ████ submitted two separate sick call requests, on ████/24 and ████/24, both inquiring if it was time to have the screws removed. On ████/24, Mr. ████ was seen by Dr. Patel for an intake exam. A panograph was taken at that appointment, wax was given to the patient to cover the screws intraorally, and an off-site referral was placed. On ████/24, Mr. ████ received a full mouth debridement by Ms. Pascua, the Registered Dental Hygienist (RDH). An off-site visit occurred on ████/24, and Mr. ████ was seen by Dr. Brian Mudd. On ████/24, Mr. ████ was seen via sick call request with a CC of "Need new referral to see Dr. Mudd." At this appointment, Dr. Patel gave more wax to Mr. ████ and made the new referral, which is pending.

**13. Patient:** ████████
Facility: RMDF
Booking Number: ██████
Dates Reviewed: ██████/24 - ██████/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ████ was preliminarily described as being edentulous and having a cleft palate, but no prostheses. On ████/24, he was seen by Dr. Patel via sick call request with a CC of "Abscess and swelling upper right, cleft palate, and metal in my mouth." A panograph was taken at this appointment and Dr. Patel noted that teeth #22-27 were still present subgingivally as root remnants and she listed them as planned extractions in the CTP. At this time, she also entered an off-site referral to OMFS. Mr. ████ was seen off site by OMFS, Brian Mudd, M.D., D.M.D., at Tri City Oral Surgery, and removal of the oral hardware was recommended at that time. On ████/24, Dr. Mudd removed all the hardware in Mr. ████ 's mouth. On ████/24, Dr. Polanco saw Mr. ████ as a follow up and noted that the swelling from

98

**Ex. C-389**

surgery was diminishing. A post-op visit was scheduled to be evaluated for dentures and on 6/4/24, Mr. ███ refused a sick call exam appointment.

**14. Patient:** ███████████
Facility: SDCJ
Booking Number: ████████
Dates Reviewed: ████/23 - ████/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ████████ was seen on ████/23 by Dr. Patel via sick call request with a CC of "Need cavities fixed, they hurt." At this appointment, Dr. Patel diagnosed complete impactions of teeth #1 and #32 and distal caries in tooth #31. Two Periapical (PA) x-rays and one Bitewing x-ray (BWX) radiograph were done. Mr. ████████ refused any treatment at this time but an off-site referral to OMFS was made. Mr. ████████ saw Dr. Brian Mudd on ████24. At that appointment, teeth #1, #31, and #32 were planned for extraction, as well as a bone graft. I was unable to locate any chart documentation that a second appointment with Dr. Mudd took place or Mr. ████████ refused. On ████/24, Mr. ████████ was seen via sick call request by Dr. Patel with a CC of "I need another referral for surgery". A panograph was taken and a second off-site referral to OMFS was made. No subsequent documentation could be found.

**15. Patient:** ████████████
Facility: SDCJ
Booking Number: ████████
Dates Reviewed: ████/24 - ████/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ████████ was seen via sick call request with a CC of "My guns hurt" by Mr. Belandres, the RDH, on ████/24. He was noted as being deaf and mute and edentulous. On ████/24, Mr. ████████ was seen via sick call request with a CC of "I want dentures" by Dr. Patel. An off-site referral for upper and lower dentures was made. On ████/24, Dr. Pandit approved the referral and scheduled an appointment with We Care Dental for ████/24. On ████/24, Mr. ████████ was seen at We Care Dental and had initial impressions done for upper and lower dentures. The next appointment for bite registration is pending.

**16. Patient:** ████████████
Facility: VDF
Booking Number: ████████
Dates Reviewed: ████/23 - ████/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ████████ was seen on ████/2023 by Dr. Patel via sick call request with a CC of "My dentures are loose and it's hard to eat." Dr. Patel noted that the patient is fully edentulous and has complete upper and lower dentures. A panograph was taken and reviewed. No abnormality was reported. Dr. Patel also noted that the patient had very poor oral hygiene and both dentures had plaque and calculus. Both dentures were deemed to be poorly fitting. Dr. Patel placed Fixodent in both dentures. She noted that a prescription for Fixodent was in the patient's medication profile. She recommended both

**Ex. C-390**

dentures have a hard reline or be remade completely. Mr. ▮▮▮▮ submitted sick call requests on ▮▮/23, ▮▮/23, ▮▮/24, ▮▮/24, ▮▮/24, and ▮▮/24 with CCs consistently stating his "dentures are loose," "plate is cracked and needs to be fixed," and "plate is loose, need teeth glue." He was scheduled for a sick call exam with Ms. Pascua, the RDH, on ▮▮/24 but did not report to the appointment because he was in court. Nursing saw him on ▮▮/24 for a sick call exam with a CC of "Need teeth glue" and he was given Fixodent.

### 17. Patient: ▮▮▮▮▮▮▮▮▮
Facility: SDCJ
Booking Number: ▮▮▮▮▮
Dates Reviewed: ▮▮/24 - ▮▮/24
Reviewer: Scott Reinecke, D.D.S.

#### Summary of Care
Mr. ▮▮▮▮ was seen on ▮▮/24 by Dr. Polanco via intake screening referral with a CC of "My filling came out." Tooth #19 was reported have a missing filling on the buccal surface. The dental assistant did not report to work on this day, so Dr. Polanco scheduled Mr. ▮▮▮▮ for a filling on tooth #19. He was released on ▮▮/24.

### 18. Patient: ▮▮▮▮▮▮▮▮
Facility: SDCJ
Booking Number: ▮▮▮▮▮
Dates Reviewed: ▮▮/22 - ▮▮/24
Reviewer: Scott Reinecke, D.D.S.

#### Summary of Care
Mr. ▮▮▮▮▮ was seen on ▮▮/22 by Dr. Polanco for an initial exam. The patient stated, "My tooth hurts" and pointed to tooth #18. Dr. Polanco identified tooth #18 as being periodontally involved and scheduled its extraction. On ▮▮/22, he was seen again by Dr. Polanco for a sick call exam with a CC of "Bottom tooth is good, but the top tooth hurts." A periapical radiograph was taken of teeth #14 and #15 and both teeth were deemed restorable. The patient declined the extraction of #18 at this appointment and elected to wait for private care to treat teeth #14 and #15. He was seen again on ▮▮/23 by Dr. Polanco with a CC of "My filling came out." A panograph was taken and #18 was determined to be grossly carious with an apical radiolucency and needing extraction. Mr. ▮▮▮▮▮ elected to have no treatment at this time. He was seen again on ▮▮/24 by Dr. Polanco via Screening referral with a CC of "My filling came out" and again on ▮▮/24 via sick call exam, with a CC of "Bottom tooth swelling, want it removed." Tooth #31 was identified as being root remnants. A signed consent was completed and tooth #31 was extracted. On ▮▮/24, Mr. Belandres, the RDH, scheduled Mr. ▮▮▮▮▮ as a sick call exam for a cleaning. He missed the appointment due to back spasms. On ▮▮/24, he was seen as a sick call exam and has two BWX radiographs and a periapical taken and received a full mouth debridement by Mr. Belandres.

### 19. Patient: ▮▮▮▮▮▮▮
Facility: GBDF
Booking Number: ▮▮▮▮▮
Dates Reviewed: ▮▮/24 - ▮▮/24
Reviewer: Scott Reinecke, D.D.S.

Ex. C-391

<u>Summary of Care</u>

Mr. ███ submitted a sick call request with a CC of "Broken tooth hurts" on ███/24 and again on
███/24. He was scheduled for a screening with Ms. Pascua, the RDH, on ███/24 and he refused the
appointment. He was scheduled again for ███/24 with Dr. Polanco but he refused on this date, as well.

**20. Patient:** ████████

Facility: GBDF
Booking Number: ████████
Dates Reviewed: ███/24 - ███/24
Reviewer: Scott Reinecke, D.D.S.

<u>Summary of Care</u>

Mr. ███ submitted a sick call request on ███/24 with a CC of "Dental pain, gum swelling" and was seen
by nursing on ███/24. At this time, Dr. Polanco started the patient on antibiotics. On ███/24, the
patient was seen by Dr. Polanco and stated, "my teeth are breaking into pieces." A panograph was
taken and teeth #3 and #5 were deemed non-restorable. The patient was given analgesics and
scheduled for extractions. On ███/24 and again on ███24, Mr. ███ refused treatment.

**21. Patient:** ████████

Facility: SDCJ
Booking Number: ████████
Dates Reviewed: ███/23 - ███/24
Reviewer: Scott Reinecke, D.D.S.

<u>Summary of Care</u>

Mr. ███ submitted a sick call request and was seen by nursing on ███/23 with a CC of "Pain to left
upper molar." He already had pain medications and was referred to dental. On ███/23, he submitted
another sick call request with a CC of "I need to see the dentist." Dr. Polanco saw the patient on
███/24. The patient had a CC that day of "Broken teeth hurt." Dr. Polanco observed retained roots #17
and #18. No dental assistant was available that day, so Dr. Polanco prescribed antibiotics and pain
medication and rescheduled Mr. ███ for the extractions of teeth #17 and #18. Dr. Patel saw the
patient on ███/24. He had a CC that day of "I'm in pain on the lower left and I didn't get the antibiotics."
Again, there was no dental assistant at work that day. Dr. Patel prescribed antibiotics and scheduled
Mr. ███ for extractions. On ███/24, Dr. Patel saw the patient, took a panographic radiograph, and
noted that teeth #3, #4, #12, #17, and #20 all were not restorable and required extraction. Teeth #5
and #6 were deemed to be restorable. She extracted teeth #3 and #4 on this date at the patient's
request. Mr. ███ was rescheduled for restorations and extractions.

**22. Patient:** ████████

Facility: SDCJ
Booking Number: ████████
Dates Reviewed: ███/24 - ███/24
Reviewer: Scott Reinecke, D.D.S.

<u>Summary of Care</u>

Mr. ███ submitted a sick call request on ███/24 and was seen by nursing on ███/24 with a CC of
"Pain to left upper molar, see the dentist." Nursing reported no urgent need and referred to dental.
Patient was seen by Ms. Pascua, the RDH, and a panograph radiograph was taken. She referred the

patient to the dentist. On ███/24, the patient was seen by Dr. Polanco and had a CC of "My teeth are sensitive." Dr. Polanco diagnosed generalized periodontitis and scheduled a gross debridement. The patient refused his debridement appointment on ███/24.

**23. Patient:** ███████████
Facility: SDCJ
Booking Number: ███████████
Dates Reviewed: ███/23 - ███/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ████████ submitted a Healthcare Request (HCR) on ███/23 and was seen the next day by nursing. His CC was "Chipped upper right molar." An appointment with dental was created and he was given ibuprofen (IBU) and instructed to submit another request if his condition persisted. On ███ 23, he submitted another HCR with a CC of "Back molar hurts." He was again seen by nursing, stating his "lower molar hurts" and was given IBU and acetaminophen (ACETO). On ███/23, he submitted another HCR and was seen by nursing, stating his "right lower molar chipped." On ███/23, he submitted an HCR with a cc of "Toothache" and was told he was scheduled with dental. On ███ 24 he submitted an HCR with a CC of "Tooth hurting bad, bleeding, face swollen, see dentist" and was scheduled for a dental appointment. On ███/24, he submitted another HCR with a CC of "Tooth been hurting, been three months." On ███/24, Mr. ████████ was seen by Mr. Belandres, the RDH, and a panograph was taken. Mr. ████████ complained of "lower right molar is sensitive to hot and cold" on this day. Mr. Belandres noted root remnants on teeth #5 and #12. He scheduled an appointment with the dentist for an exam and evaluation of teeth #1, #2, #17, and #32. On ███/24, Mr. Belandres completed a debridement and referred the patient to the dentist.

**24. Patient:** ███████████
Facility: SDCJ
Booking Number: ███████████
Dates Reviewed: ███/23 - ███/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Mr. ████████ submitted an HCR on ███/23 with a CC of "Need dentures." He was seen by Dr. Polanco on ███/24 as a sick call and patient stated, "The deputy stepped on my dentures and threw them away." Upon examination, cancer screening was normal, and no other abnormalities were noted. Dr. Polanco gave instructions to contact a private dentist upon release. On ███/24, Mr. ████████ was seen by Dr. Patel, again reporting that "Deputy broke my dentures and threw them away." Dr. Patel also instructed the patient to seek treatment by a private dentist upon release.

**25. Patient:** ███████████
Facility: SDCJ
Booking Number: ███████████
Dates Reviewed: ███/23 - ███/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care

Ex. C-393



Mr. ▮▮▮ submitted an HCR on ▮▮/23 with a CC of "I have a cavity on my tooth, lot of pain." He was seen by nursing on ▮▮/23 and ▮▮/23 and had dental appointments scheduled. He submitted another HCR on ▮▮/23 with a CC of "Dentist follow up." On ▮▮/23, Dr. Polanco saw the patient for a checkup and exam, but no Registered Dental Assistant (RDA) was in the clinic that day. On ▮▮/23, the RDA. Ms. Epps-Robbins, took a panograph and referred the patient to the dentist. Dr. Polanco saw the patient on ▮▮/23 and the patient stated, "Tooth has a cavity, don't want it pulled, need meds." Tooth #30 was deemed restorable, but the patient declined any treatment on this day. He submitted HCRs on ▮▮/23 with a CC of "Tooth hurts when cold hits it" and ▮▮/23 with a CC of "Dental pain." Patient was seen by nursing on ▮▮/23. No evidence of swelling, infection, or limited opening was noted at that time. On ▮▮/23, Dr. Patel saw the patient and diagnosed recurrent caries on tooth #30. The patient declined treatment on this day and was given pain medication. Mr. ▮▮▮ submitted an HCR on ▮▮/24 with a CC of "Pain on tooth when I eat or drink cold water." On ▮▮/24, the patient was seen by Mr. Belandres, the RDH, for a cleaning. The patient was scheduled with the dentist for evaluation of tooth #30. The patient submitted an HCR and was seen by nursing on ▮▮/24 with a CC of "Pain lower right molar since last year". No swelling, infection, or limited opening was documented, and the patient was scheduled with dental. On ▮▮/24, the patient was seen by Mr. Belandres, the RDH, and stated, "Lower right tooth hurts when I chew." Tooth #30 was identified as having caries and the patient was scheduled to see the dentist.

**26. Patient:** ▮▮▮
Facility: SDCJ
Booking Number: ▮▮▮
Dates Reviewed: ▮▮/23 - ▮▮/23
Reviewer: Scott Reinecke, D.D.S.

Summary of Care
Mr. ▮▮▮ had a receiving screening done on ▮▮/23 and was given oral hygiene instructions. He was seen by nursing on 1▮▮/23 and stated, "Toothache front teeth and lower left molar." No swelling, infection, or limited opening was observed. Pain meds were given. He submitted an HCR on ▮▮/23 with a CC of "Severe toothache for weeks" and was seen by nursing on ▮▮/23. No treatment was rendered on this day. On ▮▮/23, the patient was seen by Dr. Polanco. He stated, "Teeth hurt, want to remove them." A panograph was taken and non-restorable caries were diagnosed on teeth #12, #14, and #29. Antibiotics and pain meds were prescribed and the extraction of #29 was scheduled. On ▮▮▮ 23, the extraction appointment was canceled due to the incarcerated person being released.

**27. Patient:** ▮▮▮
Facility: GBDF
Booking Number: ▮▮▮
Dates Reviewed: ▮▮/21 - ▮▮/24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care
Mr. ▮▮▮ had a receival screening completed on ▮▮/21, at which time he was given oral hygiene instructions. On ▮▮/22, he had an initial exam with Dr. Patel. No treatment needs were identified at this time and Mr. ▮▮▮ had no dental complaints. On ▮▮/24, ▮▮▮ saw Ms. Pascua, the RDH, and received a prophy and fluoride. He stated his bite was off at this appointment and he was subsequently referred to the dentist for evaluation of a misaligned bite. On ▮▮/24, Mr. ▮▮▮ refused to report to the dental department for his appointment.

Ex. C-394

**28. Patient:** ██████████
Facility: SDCJ
Booking Number: ██████
Dates Reviewed: ██ /23 - ██ /24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care
Mr. ██████ had a receival screening completed on ██ /23, at which time he was given oral hygiene instructions. He was seen by nursing on ██ /23 for a CC of "Lower left molar cracked." He was given IBU and scheduled for a dental appointment. His appointment was canceled upon his release on ██ /24.

**29. Patient:** ██████████
Facility: SDCJ
Booking Number: ██████
Dates Reviewed: ██ /23 - ██ /24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care
Mr. ██████ had receival screenings completed on ██ /23 and ██ /24, at which time he was given oral hygiene instructions. He reported to dental on ██ /23 for an appointment, but then refused to be seen. He was released on ██ /24.

**30. Patient:** ██████████
Facility: GBDF
Booking Number: ██████
Dates Reviewed: ██ /23 - ██ /24
Reviewer: Scott Reinecke, D.D.S.

Summary of Care
Mr. ████████ submitted HCRs on ██ /23 and ██ /23 with CCs of "Pain to upper left tooth and it's loose" and "Pain, need tooth pulled." He refused nursing sick call appointments on ██ /23 and ██ /23. He submitted another HCR on ██ /24 with a CC of "Upper tooth loose, needs pulled." He refused the nursing sick call appointment on ██ /24. He was then seen on ██ /24 as a nursing sick call for a CC of "See dentist, loose tooth" and was scheduled to see the dentist. Dr. Patel saw the patient on ██ 24, diagnosed tooth #13 with an apical radiolucency and severe periodontal involvement with mobility. The tooth was extracted at this appointment. On ██ /24, the patient was seen by Ms. Pascua, the RDH, and had a full mouth debridement. He was scheduled to return to dental for evaluation of his other teeth. He refused his dental appointment on ██ /24.

104

# EXHIBIT D
## (Redacted)

Ex. D-396

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, AND LAURA ZOERNER | Case No.: 3:20-cv-00406-AJB-DDL |
| Plaintiffs, | |
| vs. | |
| SAN DIEGO COUNTY SHERIFF'S OFFICE, COUNTY OF SAN DIEGO, AND SAN DIEGO COUNTY PROBATION DEPARTMENT, | |
| Defendants | |

## EXPERT REPORT OF LENARD VARE

**Ex. D-397**

# TABLE OF CONTENTS

| SECTION | TITLE | PAGE |
|---|---|---|
| I | Background and Introduction | 3 |
| II | Origin of Activity and Methodology | 4 |
| III | Specific Allegations Considered in this Report | 7 |
| IV | Discussion | 10 |
| V | Opinions and Rationale | 18 |
| | ➢ Opinion 1 | 19 |
| | ➢ Opinion 2 | 40 |
| | ➢ Opinion 3 | 44 |
| | ➢ Opinion 4 | 50 |
| | ➢ Opinion 5 | 63 |
| | ➢ Opinion 6 | 70 |
| | ➢ Opinion 7 | 83 |
| | ➢ Opinion 8 | 89 |
| | ➢ Opinion 9 | 95 |
| | ➢ Opinion 10 | 105 |
| | ➢ Opinion 11 | 110 |
| | ➢ Opinion 12 | 114 |
| | ➢ Opinion 13 | 120 |
| | ➢ Opinion 14 | 128 |
| VI | Inspections and Reports by External Agencies | 140 |
| | A. BSCC Inspections | 140 |
| | B. Grand Jury Reports | 142 |
| | C. CLERB Reports | 147 |
| APPENDIX A | Materials Reviewed | 156 |
| APPENDIX B | Qualifications as a Corrections Consultant and Expert | 163 |
| APPENDIX C | Expert Testimony | 169 |
| APPENDIX D | Fee Schedule | 171 |

**Ex. D-398**

## I.     BACKGROUND AND INTRODUCTION

I was asked by counsel for the defendants to review the above-stated case and provide expert opinions related to my expertise in jail management and operations. I have had the opportunity to review all the documents provided to me related to this matter and have formed opinions based upon my knowledge, education, expertise, and experience in managing correctional facilities and jail and prison populations. I reserve the right to supplement my opinions if new facts become available and I am asked to consider additional materials after this report has been submitted.

My opinions in this case are based on my education, training, and experience working in jails and prisons for over 26 years. My expertise as a corrections consultant and expert is detailed in Appendix B of this report. I have been a senior warden at three state prisons in the state of Nevada and have worked at all levels of classifications including both male and female correctional institutions. I have experience working in minimum custody and community corrections facilities to maximum custody institutions with individuals on death-row.

I also served as the jail director and corrections administrator over the Napa County Department of Corrections for 10 years before retiring from public service in 2018. As the jail administrator, I was responsible for all operational matters including overseeing safety and security, managing classification and programs, and overseeing staff training and standards, and reported directly to the County Board of Supervisors. My responsibilities included the overall management of the

**Ex. D-399**

jail, ensuring policy and procedures were in place and confirming that staff were following established guidelines. I was responsible for overseeing contracts with the health department and contracted medical and mental health providers.

I hold a bachelor's degree in criminal justice administration and a master's degree in justice management. I have served as an adjunct criminal justice professor for six years and have been involved in training various sheriff's and probation departments. Over the course of my career, I have provided training to staff on numerous corrections-related topics at corrections officer academies. Additionally, I have provided numerous training courses to various sheriff's and probation agencies in classification, population management, and suicide prevention.

I have considerable experience in the topic of deaths in-custody, and suicidal deaths in-custody, conducing suicide/death investigations and homicide investigations in a correctional setting and overseeing Critical Incident Teams following deaths in custody. I have been retained by both the plaintiffs and the defendants in jail and prison litigation cases in over two dozen states as a corrections expert for the past six years.

## II.    <u>ORIGIN OF ACTIVITY AND METHODOLOGY</u>

I started work on this case in April 2024 after speaking with counsel for the defendants. I was asked to review the plaintiffs' operative complaint, evidence, and to offer opinions on specific areas within my scope of expertise.

I approach the review of a case from the standpoint of acceptable standards as they relate to policies and procedures, mandates and/or the law, and, where reasonable and appropriate, best practices from my years of experience in corrections. If called to testify, I would be able to competently offer testimony related to this matter as a corrections expert and consultant. My opinions are formed based on my education, knowledge, and experience, the review of materials provided to me, and my own supplemental research, as necessary.

The focus of my examination is on the following topics:

    A.  Classification and housing

    B.  Safety and security

    C.  Grievances

    D.  Access to law library

Plaintiffs' Third Amended Complaint includes numerous claims related to conditions of confinement at the San Diego County jail facilities. I have not been asked to opine on the claims related to dental, medical, and mental health care. I am also not providing opinions on the ADA claim, the environmental conditions claim, or the claim of racially disproportionate stops and arrests/ incarceration. However, I may form opinions on topics related to my specific areas of expertise ancillary to the above claims. For example, the topic of corrections deputies' operational responses to individuals who are provided with medical and/or mental health care may fall in my area of expertise. Similarly, I may comment on custody issues that intersect on other topics such as corrections deputies restricting access

**Ex. D-401**

to mobility devices that pose a safety risk or making housing assignment decisions for mobility-impaired individuals.

I have relied on various documents provided by defense counsel and/or online which include deposition transcripts, departmental policies, and written reports. Additionally, I conducted site visits to each of the seven jail facilities in the County between April 23 and April 27, 2024. During these visits, I met with members of the Sheriff's jail staff and was able to observe jail operations.

I have also visited the jail facilities in San Diego on previous occasions while working as a jail commander in Napa, CA between 2008 and 2018. I formerly toured the San Diego County jail facilities to physically see the jail facilities, classification process, and housing areas. While part of the California Jail Program Association (CJPA), I also visited San Diego County jails on several occasions.

The emphasis of my review in this case is on the appropriateness of the classification process and housing of incarcerated persons at the San Diego County jail facilities, adherence to reasonable safety standards, and compliance with policies and procedures. I will also consider safety and security concerns including appropriate classification and housing of individuals based on risk factors, responses to emergencies, steps taken to address security concerns such as narcotics interdiction, contraband control, and protective custody housing. I will review staff training approaches, professional development, staff adherence to standards of professional conduct, and the measures taken by the agency to ensure that staff are compliant with agency rules and regulations.

**Ex. D-402**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

## III.   SPECIFIC ALLEGATIONS CONSIDERED IN THIS REPORT

The Plaintiffs' operative complaint includes numerous allegations that are outside the scope of my expertise. I address herein the following allegations:

### Cause of Action #1

a)  Failure to provide minimally adequate mental health care.

b)  The policies and procedures related to identifying and managing suicidal individuals are inadequate.

c)  The Sheriff's Office fails to maintain appropriate time limits on stays in "safety cells" and the uses the Enhanced Observation Housing (EOH) cells inappropriately.

### Cause of Action #2

a)  Custody staff regularly orders placement of incarcerated persons into the EOH by overruling mental health staff's clinical judgment.

b)  The Sheriff's Office's organizational chart shows that sworn custody staff oversees the entire medical division, including mental health staff and contractors.

### Cause of Action #3

a)  Custody staff fail to respond promptly or adequately to emergency aid calls.

b)  The Sheriff's Office's classification process is flawed because it places individuals charged with minor, low-level offenses in cells with violent incarcerated persons, compromising their safety.

**Ex. D-403**

## Cause of Action #4

   a) The Jail fails to prevent and detect drug contraband, leading to significant overdose incidents.

## Cause of Action #5

   a) The Sheriff's Office fails to provide adequate Medication-Assisted Treatment (MAT) for incarcerated persons with substance abuse disorders.

## Cause of Action #6

   a) The Sheriff's Office failed to maintain functional video cameras, intercoms, and elevators in critical areas of the Jail, compromising incarcerated persons' safety.

## Cause of Action #7

   a) The Sheriff's Office fails to equip all jail facilities with body scanners, properly maintain existing scanners, or adequately train staff in their use.

   b) There is no requirement for scanning everyone entering the jail, including staff, contractors, or visitors.

   c) The Sheriff's Office's contraband screening policies for incoming individuals and staff are inadequate.

## Cause of Action #8

   a) The Sheriff's Office fails to conduct timely and adequate safety checks and does not respond promptly to individuals in distress.

   b) Staff fail to respond quickly to violent incidents, allowing security lapses that endanger incarcerated persons.

**Ex. D-404**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

c)   The Sheriff's Office has not implemented safety check audit systems across
all jail facilities.

## Cause of Action #9

a)   The Sheriff's Office does not adequately train staff in proper classification
procedures, leading to unsafe housing assignments.

b)   The Sheriff's Office's classification process, which considers factors like
criminal charges, gang affiliation, race, and history of violence, is inadequate.

## Cause of Action #10

a)   The Sheriff's Office excludes individuals in protective custody from being
housed in the outpatient stepdown (OPSD) unit, even when OPSD placement
is clinically recommended. Those designated as protective custody are
excluded due to their protective custody status.

## Cause of Action #11

a)   The Sheriff's Office's staffing shortages limited the ability of staff to respond
to emergencies creating safety concerns.

## Cause of Action #12

a)   The Sheriff's Office denies incarcerated individuals reasonable and justified
access to confidential communications with their attorneys.

b)   Although there is a policy allowing unlimited telephone access to attorneys,
staff frequently fail to notify incarcerated persons about professional call
requests from their attorneys.

**Ex. D-405**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

## Cause of Action #13

    a) The Sheriff's Office fails to provide adequate reentry programming and planning for individuals released from jail.

The following allegation appears under the heading: *The Sheriff's Office Lacks an Effective Procedure for Incarcerated People to Request Reasonable Disability Accommodations*. I have not been asked to consider ADA-related accommodations or serve as an ADA expert. However, a section of this allegation deals with grievance procedures employed by the San Diego County Sheriff's Office and grievances and their handling are within my scope of examination. The following are the specific allegations regarding grievances that I will consider in my review.

## Cause of Action #14

    a) The Sheriff's Office's policies for tracking and responding to grievances are deficient.

    b) Although policies state that grievances can be handed directly to staff and receive a receipt, in practice, staff often refuse to accept them directly, instead instructing incarcerated persons to place grievances in a box without any way to retain proof of submission.

## IV.    DISCUSSION

As a former warden in the State of Nevada and having served as the Director over Napa County jail, I have had the opportunity to visit hundreds of correctional facilities throughout my career, I am well-versed in the various protocols used by corrections agencies to maintain safety and security. Based on my experience and

**Ex. D-406**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

my review of the evidence, I can ascertain that operation of a large jail system like San Diego County is an exceedingly complex and challenging task. Jails are constantly faced with issues regarding gangs, gang violence, contraband, drugs, weapons, etc., and staff is trained to address these threats through various means.

Typically, the corrections staff have been found culpable in situations where the staff fails to protect an incarcerated person if the staff knows of and disregards an excessive risk to the individual' health or safety. This was established in *Farmer v. Brennan, 511 U.S. 825, 837* (1994). The method of establishing whether a corrections official is deliberately indifferent to the risks posed by an incarcerated person requires proving both an objective and a subjective component. *"First, the harm to which the prisoner was exposed must be an objectively serious one." Gevas v. McLaughlin, 798 F.3d 475, 480* (7th Cir. 2015). *Second, "the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'"* Id. (quoting *Farmer, 511 U.S. at 837*).

Corrections agencies address risk issues in housing incarcerated persons by relying heavily on objective classification. Incarcerated persons are classified to maintain safety and security, with those of similar classifications housed together in one unit. By assigning individuals of similar risk levels to the same units, provided they have not been previously identified as enemies, corrections staff can house and program incarcerated persons together. This approach allows staff to

**Ex. D-407**

respond appropriately to the needs of the entire unit, whether it is designated as minimum, medium, or maximum custody housing. The evidence in this case suggests that all the named plaintiffs met the criteria for maximum custody housing and were appropriately screened and classified.

Administrative segregation, administrative separation, and other special housing units are classification categories used to separate certain individuals from the general population. These areas are designated for housing individuals who pose significant threats to the safety and security of others or themselves. This includes individuals attempting to escape, those involved in homicides, riots, threats, intimidation, sexually assaultive behavior, and those who have assaulted others, and those who might pose a substantial danger to themselves. The primary purpose of these secure areas is to protect vulnerable individuals and maintain control over the jail's safety and security needs. From my review of this case, several of the plaintiffs met the criteria to be placed into protective custody housing.

Jails have long utilized classification management tools in the operation of Protective Custody (PC) housing units. These units are designed to house individuals who need protection and are at considerable risk

of victimization if placed in the general population. The reasons for placement in a PC unit vary widely. Based on my experience, such placements often occur when individuals have provided confidential information to law enforcement, engaged in activities contrary to the rules of their gang memberships, been convicted of crimes

**Ex. D-408**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

like child abuse or child murder, are transgender and fear victimization, are gang dropouts, or have been assaulted and/or victimized by other incarcerated persons.

In this case, there have been allegations related to a variety of topics including staffing shortages, grievances, access for attorney-client meetings, classification, safety cell placements, and access to programs and services. One of the allegations in this complaint is the assignment of the obligation and culpability to interdict all drugs, 100% of the time, completely on staff without considering the evidence that most of the narcotics coming into the jails is through the actions of incarcerated persons.

The San Francisco Sheriff's Department managed six county jails in the San Francisco Bay Area, collectively processing approximately 50,000 individuals annually through booking and processing procedures. Notably, San Diego County booking numbers are like San Francisco County's booking numbers. In 2008, an issue arose when Sheriff Hennessey implemented a policy mandating strip searches for all arrestees entering the general jail population. This was done to proactively deter the introduction of narcotics into the County's jails. This blanket strip search policy faced legal challenges, leading to a class action lawsuit alleging violations of the Fourth Amendment rights of those searched. The district court ruled against the policy, denying Sheriff Hennessey qualified immunity.

**Ex. D-409**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

On appeal, the Ninth Circuit court reversed the district court's decision and stated[1]:

> "A detention facility is a unique place fraught with serious security dangers. **Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence**." *Bell v. Wolfish* (1979). Indeed, "**attempts to introduce drugs and other contraband into [prison] premises ... is one of the most perplexing problems of prisons**." *Hudson v. Palmer* (1984); *see Overton v. Bazzetta* (2003) ("**Drug smuggling and drug use in prison are intractable problems**."); *Block v. Rutherford* (1984) ("**We can take judicial notice that the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country**."). San Francisco's six county jails are no exception: They struggle with a serious, ongoing problem of drugs, weapons, and other contraband being smuggled into jail facilities."

From my experience working in correctional facilities, as well as knowledge gained from visiting dozens of jails and prisons around the country, San Diego County is faced with similar challenges as the jails in San Francisco County regarding efforts by individuals to bring contraband and drugs into the facilities. San Diego County has attempted to address these issues through various measures,

---

[1] *Bull v. City and County of San Francisco*, 595 F.3d 964, 966 (9th Cir. 2010)

**Ex. D-410**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

including regular searches, intelligence gathering, the use of drug dogs, body scanners, and the use of mail scanning equipment.

Another component of this lawsuit deals with the classification management system and the use of JIMS (Jail Information Management System). In San Diego, the current version of JIMS was implemented in 2002 and is based on an outdated client-server platform with no current vendor support. Since its creation, technology has significantly advanced. Modernizing or replacing the system is challenging due to the need to meet the unique requirements of the criminal justice system and the county's ecosystem. Currently, the San Diego County Sheriff's Office is considering various options for replacing JIMS. I was informed that a Request for Proposals was currently being drafted for a new Jail Management System.[2]

In my personal experience when I was the director of the Department of Corrections in Napa County, I also considered utilizing various outside vendors to purchase programs that would assist in the classification processes. After discussions with local law enforcement agencies, the Public Defender, the District Attorney, and County Probation Chief, along with the local courts, the decision was made against using outside vendors. The reason for this was that each of the other agencies also had a portion of the classification system that they used for pre-booking purposes, communication with the courts system, and post-release by

---

[2] Request for Statement of Qualifications. RFSQ 12586  - Jail Management System
*https://buynet.sdcounty.ca.gov/Solicitations/SolicitationDetail.aspx?SolicitationID=2961092&AID=1&RegUser=Guest*

**Ex. D-411**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

agencies such as probation and law enforcement in looking up individuals and their history of incarceration. Going with an outside vendor meant that not only would the jails system need replacement, but the process would also require us to integrate with the systems that were independent of the jail system used by other agencies. Since this was not a viable option, the County decided to build the criminal justice information management system that would integrate with all the other agencies. Over a course of three years, we were able to successfully build and implement this during my time at the Napa County Department of Corrections.

From my experience, the process of replacing any jail information management system is extremely time consuming and proper implementation can take months to years to complete. The current system in San Diego appears to be functional even though there may be issues that have been identified by staff. It may be prudent to consider running the current system in parallel with beta testing the new system. This is what we did in Napa County before everyone felt comfortable moving entirely to the new system.

The issues with video cameras and intercoms have also been discussed in this lawsuit. These two systems are especially important in modern corrections, and they are helpful in reducing incidents and improving responses to incidents. They are also frequently damaged and broken deliberately in a jail environment by incarcerated persons. In my experience, most of the damage I found with cameras and intercoms were caused by incarcerated individuals. It is important to note that cameras and intercom systems are expensive to repair and replace and many jails

**Ex. D-412**

are limited to what they can spend based on approval by the elected County Board of Supervisors. It may be completely outside of the capability of some jails to make technological improvements unless they are funded adequately.

Finally, it is important to note the severe impact of the Covid-19 pandemic on corrections facilities around the nation. During the pandemic, staffing shortages occurred nationwide as staff fell ill or died from illness. Entire housing units and correctional facilities had to be placed under quarantine. The *Sheriff's Infection Control Productivity Report (January – June 2021)* shows that as of June 30, 2021, the County jails had seen a total of 1,291 covid positive incarcerated individuals. 15,658 individuals had been tested at housing and intake for Covid-19 screening as of that date. 19,594 individuals had refused to be assessed for Covid-19 during intake.[3] The data from 2022 and 2023 shows that the number of Covid-19 positive cases increased to 2,834 incarcerated persons.[4] These individuals tested positive either at intake or after they were brought into custody and housed in the jails. These numbers had severe impacts on jail operations. Symptomatic individuals who refused to be tested would have clogged up the intake process creating bottlenecks as the department tried to manage the spread of the disease inside its jails.

Based on the extreme nature of the pandemic and the unusual set of circumstances that the San Diego County Sheriff's Office was faced with in running

---

[3] SD_1519374
[4] SD_1519331

**Ex. D-413**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

its jails during the peak of Covid-19 between 2020 and 2022, it is not that difficult to imagine that there would have been incredible challenges that the staff had to deal with daily.

## V.    OPINIONS AND RATIONALE

Plaintiffs' Third Amended Complaint dated November 18, 2022, includes several allegations related to conditions of confinement and jail operations against the San Diego County Sheriff's Office. My examination is focused on the specific allegations from the complaint related to my areas of expertise. These include - Classification and housing; Safety and security; Grievances; and Access to law library.

My opinions will not include ADA related concerns, medical and mental health treatment, and other environmental issues that have been raised in the complaint. I am not a medical or mental health expert, and I will not consider the services provided to incarcerated persons from a medical or mental health perspective.

I considered the various statements made by plaintiffs and County deponents in analyzing each of the allegations within my scope of expertise as well as reviewing applicable policies and procedures as they relate to each of the allegations.

Based on a thorough evaluation of materials and my personal observations from conducting the tour of all San Diego County jail facilities, I have formed the following opinions regarding this case. These are my opinions thus far and I reserve the right to change them if presented with new facts or additional information. My opinions are not meant to invade the role of the factfinder to determine the ultimate issues in this case.

**Ex. D-414**

## Opinion 1:

**a) The suicide prevention policies as well as policies related to managing suicidal individuals at San Diego County jails are appropriate in identifying and addressing the concerns related to incarcerated persons.**

Plaintiffs have criticized the County's suicide prevention policies and practices. According to the complaint, the jail maintains many deadly policies and practices, particularly the dangerous misuse of isolation. Plaintiffs claim that the Sheriff's Office fails to maintain appropriate time limits on stays in "safety cells" and enhanced observation cells, where incarcerated people are stripped of their clothes and denied access to programs and social contact.

## San Diego County policies related to suicide prevention

I reviewed the policies related to suicides and the use of safety cells and found these to be appropriate and consistent with the types of policies I have seen in other jails with a comprehensive approach to addressing suicide prevention in jails. The following are the applicable policies that address these issues.

- ### Policy J.5 – Suicide Prevention Practices for Incarcerated Persons & Detentions Safety Program

Incarcerated individuals deemed at risk of self-harm or suicide are evaluated for placement in Detention Safety Program (DSP) housing. Sworn staff must promptly alert health staff and the watch commander of any individual posing a danger to themselves or others or unable to care for themselves. Suicide risk assessments for

**Ex. D-415**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

DSP housing are conducted by the facility gatekeeper, typically a Qualified Mental Health Provider (QMHP) or designated substitute. DSP housing options aim to provide intervention, close observation, and assessment for individuals at elevated suicide risk.

Based on the above policy, custody staff are required to alert health staff immediately upon someone's placement into the specialty housing after they have been considered as a suicide risk. Only qualified mental health providers can conduct suicide risk assessments once an individual has been initially placed into a designated area for evaluation.

The process of removing clothing from someone claiming to be suicidal or being assessed as an individual with an elevated risk for self-harm and placing them into a suicide smock or safety smock is the best approach to remove the possibility of them using their clothing as instruments to complete their intended plan of self-harm. Individuals in jails around the country have successfully committed suicides using their clothing either by creating a hanging or strangulation device or by swallowing articles of clothing leading to death. There is no punitive action or violation of anyone's rights when staff are following the best practices in addressing such issues.

   ▪ **Policy J.4 – Enhanced Observation Housing (EOH)**

Incarcerated individuals identified as at risk for suicide, but not requiring placement in safety cells, are temporarily housed in the Evaluation Observation Housing (EOH) within the Detentions Safety Program (DSP). EOH serves the

**Ex. D-416**

purpose of providing closer observation and assessment for determining permanent housing. Sworn staff must monitor individuals in EOH closely, with checks at random intervals not exceeding 15 minutes, and document these observations in the Jail Information Management System (JIMS).

The above policy clearly explains that the EOH classification is a temporary assignment as someone who was previously at a higher risk for suicide is reduced to a lesser risk housing, albeit with sufficient monitoring and checks to ensure that the individual can be safely considered for regular housing at some point. The EOH policy requires direct observation at random intervals and welfare checks that are not separated by more than 15 minutes. A nurse is required to evaluate all individuals placed into EOH within 30 minutes of placement and follow up evaluations are done every 24 hours. Within 24 hours of placement, all individuals in EOH are also given a mental health evaluation by a QMHP. Only mental health personnel may decide whether someone must remain in the EOH or be rehoused.

- **Policy M.4 – Suicide Prevention and Focused Response**

The Suicide Prevention and Focused Response (SPFR) team, in collaboration with the Medical Services Division is responsible for the development and implementation of a training program focused on mental health issues to cover the identification of suicidal individuals and strategies for intervention. Additionally, the SPFR team acts as auditors, reviewing suicide prevention practices and related incidents to ensure adherence to policies, procedures, and standards.

The above policy requires the tracking of all incidents of self-harm and attempted suicide as well as medical procedures performed by staff to meet national standards. This policy ensures that each occurrence of suicide attempt at the San Diego County jail facilities is reviewed for appropriateness of response by staff.

- **Policy I.64 – Safety Checks: Housing and Holding Areas of Incarcerated Persons**

Safety checks are mandatory and minimum intervals between checks are established by policy, based on classification and risk factors. The Office has an ongoing process for auding safety checks on a regular basis.

- **Policy I.21 – Housing Unit Area Activity Log**

The policy dictates that accurate logs are maintained in compliance with California Title 15 requirements. Special housing and bed requirements are noted at the beginning of each shift including identifying persons with any prior suicide attempts and housing them with others. Sergeants and lieutenants are required to audit the logs on each shift.

- **Policy J.1 – Safety Cells: Definition and Use**

Safety cell placements must result in an evaluation by a QMHP within 12 hours of placement and removal of an individual from this status can only occur with authorization from the QMPH. In exigent circumstances, if the watch commander maintains a person in the safety cell or removes them for transport to an emergency department, the decision by the watch commander must be justified in writing by the watch commander in an incident report.

**Ex. D-418**

I found no reasoning that would justify the use of the jail's comprehensive suicide prevention policies and practices to be described by the plaintiffs to be "*deadly*." The plaintiffs are mischaracterizing the very policies and practices that are used to save lives of incarcerated individuals in San Diego jails.

The placement of individuals in a safety cell is done to reduce immediate concerns of self-harming behavior and the continued placement of individuals is accomplished only with the approval and authorization of qualified mental health professionals.

**b)  The use of safety cells devoid of furniture and any items that can be used by a potentially suicidal individual to harm themselves is standard practice in correctional facilities across the United States and does not create any constitutional deprivation of incarcerated persons' rights.**

The use of Enhanced Observation Housing (EOH) to place persons deemed to have suicide risk is appropriate. The requirement to place suicidal individuals in a safety smock is a common course of action in dealing with self-harming behavior throughout correctional agencies in the U.S.

The plaintiffs in this case made several statements in their deposition testimonies along with available jail records and medical/mental health documentation that indicates several of the named plaintiffs in this case presented themselves as being suicidal and wanting to engage in self-harming behavior. On the other hand, some named plaintiffs had mental health issues but did not require

**Ex. D-419**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

placement into enhanced observation and were treated via mental health appointments. This indicates that individuals are placed on suicide watch under enhanced observation only when they are at risk of self-harm.

I considered the **deposition testimony of Aseel Ross**, who worked as a licensed mental health clinician in February 2021 and moved to the *AdSep* (Administrative Separation) unit in January 2022. Her duties included triaging and assessing incarcerated persons, especially those with suicidal ideations. (*Ross deposition, Pages 13–14.*) Ross provided mental health services in various jail settings, including part-time work at the Psychiatric Stabilization Unit (PSU) as well as making referrals for individuals to go to PSU. (*Id., 17.*) Ross also worked in the Enhanced Observation Housing (EOH) and served as a gatekeeper, assessing incarcerated persons for EOH admission and retention. The gatekeeper role involved facility-wide evaluations for suicidal or homicidal ideations. (*Id., 18–19*)

According to Ross, EOH and safety cells are used to protect individuals at risk of self-harm. Ross explained that placement in these units provides clinical benefits, such as preventing access to methods of self-harm and offering mental health support. Reassessments for EOH occur every 12 to 24 hours, and individuals need two low-risk assessments to be cleared from EOH. (*Ibid., 91-92*)

Ross noted that safety measures like taking away clothes are necessary to prevent self-harm. She acknowledged that placing suicidal individuals in a safety suit was clinically appropriate and is important to reduce harm. Ross was not aware of any individuals from her time working at the jail who were less comfortable

**Ex. D-420**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

sharing thoughts about self-harm or suicide because they did not want to be placed in the EOH or safety cell setting. (*Ibid., 94*)

Ross compared EOH to the 5150 processes in community mental health facilities, highlighting similarities in intervention as both EOH and 5150 placements are required for immediate intervention because the individuals are going to harm themselves. (*Ibid., 96*)

**c) Staff responses have been appropriate and within policy when dealing with individuals considered by mental health staff to be suicidal. I found no instances in my examination of the records that suggested that any of the plaintiffs (or other IPs) were placed on suicide watch without sound justification.**

I do not find evidence to support the plaintiffs' claim that jail defendants have acted with deliberate indifference by failing to provide incarcerated people with access to minimally adequate mental health care. I also do not find evidence suggesting that failures in assessing and addressing suicide risks have led to an inordinate number of suicides in the jail.

During my facility tours I learned that if an incarcerated person is placed in Administrative Separation, a weekly review is conducted to consider whether continued placement in this area is warranted. The JPMU staff conducts an evaluation regarding continued placement once a week. Additionally, a joint committee conducts a weekly review regarding continued placement. As an example, during my tour of the Las Colinas facility, I observed the joint committee

**Ex. D-421**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

standing outside the door where a patient was housed attempting to speak with her. The group included a sergeant, a classification deputy, a reentry services staff member, a mental health staff member, and someone from the medical staff.

Safety checks are conducted once per hour. In the Medical Observation Unit (MOB), and the Psychiatric Stabilization Unit (PSU), visual observation is conducted once every 30 minutes by sworn staff. Individuals who present themselves as self-harming and suicidal are placed in the Detention Safety Program suicide watch housing and visually observed twice every 30 minutes. Additionally, they are also seen every four hours by both medical and mental health staff.

I also inspected the Enhanced Outpatient Housing (EOH) at the Central Jail where individuals having suicidal ideations are placed. These people are closely monitored by medical, mental health, and custody personnel.

As part of my examination of this case, I requested data regarding the exact number of incidents in which incarcerated persons were engaged in behaviors that were recorded as self-harming and the number of attempted suicide incidents. Based on the records produced, the following data provides perspective into the issue of suicide attempts and instances of self-harm – which are not necessarily suicidal.[5] The data produced is agency-wide and includes all the County's jail facilities.

---

[5] DSB NetRMS Self-Harm Tracking Report 3.25.2024

**Ex. D-422**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

| Year | Total Self-Harm Incidents including Attempted Suicides | Attempted Suicides Only |
|------|-------------------------------------------------------|-------------------------|
| 2021 | 299 | 56 |
| 2022 | 272 | 41 |
| 2023 | 286 | 22 |

### *Figure 2*

Between 2021 and 2023, five incarcerated people committed suicide inside San Diego County jails.[6] At the same time, based on the above data, 857 individuals in the care and custody of the San Diego County jails were prevented from further harming themselves or completing their suicidal intent over the three-year period.

While it is tragic when any human being dies due to suicide, in the scope of understanding the totality of the circumstances, it is important to recognize the size of the population that the jails are dealing with on an annual basis. The following are the total booking numbers as well as average jail population across all San Diego County jails[7]:

| Year | Total number of individuals booked | Average jail population by year |
|------|-----------------------------------|--------------------------------|
| 2021 | 48,283 | 3,927 |
| 2022 | 50,705 | 4,055 |
| 2023 | 50,169 | 3,971 |

### *Figure 3*

---

[6] COSD In-Custody Deaths - January 1, 2021, to June 30, 2024
[7] San Diego County Sheriff's website – Jail Data / Reports.
*https://www.sdsheriff.gov/resources/jail-population-data*

**Ex. D-423**

I considered the various statements made by the plaintiffs during their deposition testimony related to their own individual experiences with mental health, suicidal ideations, and the treatments they received while in the care and custody of the San Diego County Sheriff's jail facilities.

**Plaintiff Dunsmore** was asked if he had been diagnosed with mental health issues. Dunsmore reported being diagnosed with mental health issues, including schizophrenia and delusions, and mentioned that his mental health issues have been ongoing and challenging to diagnose. Dunsmore stated, *"I've been diagnosed with suffering from a grave disability and suffering from a web of delusions and constant psychiatric diagnoses and then recanting of those diagnoses."* (*Dunsmore deposition – Page 172.*) Dunsmore discussed his mental health issues, stating that he has been to Patton State Hospital and other hospitals (Alvarado and Paradise Valley Hospital) for mental health evaluations and treatments. (*Id.*)

Dunsmore reported the following in a declaration document (*Dunsmore Deposition Exhibit A*) dated March 30, 2022:

> *"On August 16, 2018, I booked into San Diego Central Jail. I came from CDCR and was there for resentencing of my original conviction. I was housed in a Medical Observation Bed (MOB) because of my medical conditions.*
>
> *During the first few weeks of my time at the jail, I was managing in the MOB unit. Because I was able to receive more assistance and attention for my physical and medical conditions in the medical unit, my symptoms from AS (Ankylosing*

**Ex. D-424**

*Spondylitis) lessened. I was able to be somewhat mobile and exercise out on the yard.*

*On September 12, 2018, the jail suddenly confiscated my wheelchair and special spoon. The floor staff informed me that on September 4, 2018, the jail had captured a video of me exercising out on the yard and walking around.* **Staff discharged me from the MOB on September 12, 2018. I told staff that I was suicidal upon learning of my discharge.**

*Staff transferred me to the Enhanced Observation Housing (EOH). I stayed in EOH for five or six days. EOH cells are solitary confinement cells for incarcerated people at risk of self-harm or suicide. Clinical and custody staff are supposed to conduct routine welfare checks every 15 minutes. The jail denied me my property and clothes. I covered myself with a safety garment.*

*I often made a mess in the cell when I tried to use it, sometimes urinating and defecating on the ground. I refused the food brought to me for those five or six days I was in the EOH. During that time, the room smelt like urine and was filled with trash and dirtied toilet paper.*

*Suddenly the jail discharged me from the EOH cell and transferred me back to CDCR on or around September 19, 2018."*

During his deposition testimony, Dunsmore was asked about an incident report related to the time he was housed in the EOH cell when he refused instructions from a deputy to move to an empty cell so that his cell could be cleaned. According to the report, the deputy was unable to get Dunsmore to comply and Dunsmore

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

remained on the floor as jail workers cleaned his cell. (*Dunsmore deposition – Page 107.)* Dunsmore was asked why he had been placed into the EOH cell from the MOB area of the jail. He responded, "*I probably just pronounced that I was a harm and self-risk most likely.*" (*Id.,111.*) Later in his deposition Dunsmore was asked if he had been feeling suicidal on the date that he reported thoughts of self-harm. Dunsmore said, "*I would have been feeling like I wanted to die and was capable of self-injury or death to myself.*" (*Id.,171*)

**Plaintiff Andrade** testified in his deposition that **he had experienced suicidal thoughts in the past and attempted suicide on several occasions, including overdosing on psychiatric medications and attempting to hang himself.** (*Andrade deposition – Pages 87 – 88.*) Andrade described suffering from depression during his incarceration between June and October 2022. (*Id.,159.*)

Andrade was asked about being housed in an EOH cell in August 2022 for a duration of about 36 hours. He stated that he was placed in a safety smock that could not be torn to pieces because it is made of rough material. He complained that staff left the light on inside the cell continuously and an officer kept coming every 15 minutes. He believed this to be a form of harassment because he was woken up every 15 minutes. (*Id.,167 – 168.*) Andrade stated that he thought that his placement in the EOH, having to wear a safety smock, and having a deputy checking on him every 15 minutes was a form of torture. (*Id.,176.*)

Andrade said that he told mental health staff that he was not suicidal to be placed out of EOH. When asked if he was feeling suicidal at the time he told mental

**Ex. D-426**

health staff that he was not suicidal, Andrade responded that he could not recall. (*Id.,175.*)

Andrade reported feeling depressed and hopeless during a follow-up after being released from EOH. He said that a mental health staff comes by to speak with individuals once they have been moved out of the EOH cell. He initially refused to talk to mental health personnel but later spoke with the mental health staff after about a week or two. (*Id.,172.*)

**Plaintiff Archuleta** stated in his deposition that he was meeting with a psychologist named Dr. Smerud prior to July 2021. In the Third Amended Complaint, Archuleta claimed to have experienced a deterioration in his mental health after Dr. Smerud left her job sometime in July 2021. (*Archuleta deposition – Pages 98 – 100.*) He later admitted that the mental health counseling that he received at the jail had been helping him for a time. (*Id.,101.*)

Archuleta stated that there were confidentiality issues during mental health clinician visits because they occurred in locations where a correctional deputy or staff member would be present in the vicinity. He then said that of the five to six times he had meetings with mental health staff, three of those meetings occurred in a confidential setting without a deputy present in the psych unit on the sixth floor. (*Id.,161-163.*) When asked if he understood that the deputy escorting mental health staff during cell-side visits was there to protect the staff member from a potentially violent incarcerated person, Archuleta said, *"Well, I think it was most obvious the deputy's there for security."* (*Id.,167, Line 1-2.*)

**Ex. D-427**

Archuleta was asked about clinician's notes from August 1, 2019, from a visit at the mental health clinic. Although he could not recall the meeting, Archuleta's medical notes stated that he told the clinician that he was ███████████████ ███████████████████████████. At the time, Archuleta denied having had any thoughts of self-harm or homicidal ideation. (*Id.,220-222.*) He denied having a history of psychological disorders such as bipolar disorder and schizophrenia. (*Id.,224.*)

**Plaintiff Clark** testified that he had a lengthy history of suicide attempts starting in the California Youth Authority at the age of 16 or 17 when he tried to hang himself. (*Clark deposition, Page 191.*) He had been taking mental health medications since he was 15 or 16 years old. Clark reported having suicidal thoughts and attempts prior to his 2021 incarceration. He had attempted suicide while on the streets before his incarceration in 2021 (*Id.,133*). **Clark again attempted suicide prior to his arrest on April 23, 2023, by** ███████████ ███████████ (*Id.,44 - 45*).

Initially, Clark did not inform the jail staff about his suicidal thoughts on the first day but did so after a couple of days. He mentioned to a nurse at his cell door that he was feeling suicidal and requested to see a psychologist due to racing thoughts and seeing things (*Id.,136*).

**Plaintiff Edwards** reported in his deposition testimony that he had numerous suicide attempts starting at the age of 12. He said that he informed San Diego County jail staff of his past suicide attempts. He could not recall if he had

**Ex. D-428**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

affirmatively informed someone at the jail between 2019 and 2022 that he felt like he wanted to commit suicide immediately. **According to Edwards, sometime in either 2020 or 2021, he** ███████████ **while in San Diego County jail to commit suicide**. (*Edwards deposition – Pages 156 – 159.*) He was rescued by the sheriff's deputies at the jail. According to Edwards, *"I woke up with like 13 deputies around me, medical and I guess they gave me five Narcans and brought me back. And then they sent me to the emergency room."* (*Id.,157.*) Edwards admitted that he did not inform anyone of his suicidal intent before the incident.

Edwards estimated that between July 2021 and August 2022, he might have seen a mental health clinician at the jail between one to two times each week. (*Id.,153.*)

**Plaintiff Levy** stated in her deposition that she had been diagnosed with anxiety, ADHD, and depression and taking various medications, including Wellbutrin, to treat her depression while incarcerated (*Levy deposition – Pages 59 - 60*). Her diagnosis of PTSD occurred around January 2022. (*Id., 61.*) Levy denied having a history of suicide attempts.

**Plaintiff Lopez** is hearing impaired and communication at the jail between Lopez and mental health staff occurred with the assistance of an ASL interpreter deputy. The deposition testimony was also provided with an ASL interpreter present during the proceeding. Lopez was asked about his medical and booking records and asked to review a document. (*Lopez deposition, Exhibit A.*) Specifically, Lopez was asked about the page in the record ending in 5859. According to this

**Ex. D-429**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

document, Psychologist Matthew Berlin conducted an ISP (Inmate Safety Program

– *See Policy J.1 – Safety Cells*) on October 8, 2019. Berlin wanted to review Lopez

for temporary placement in a safety cell. Per policy, Berlin could review Lopez's risk

for suicide even when Lopez might not be exhibiting active self-harming behaviors.

Lopez admitted to a mental health professional that he was hearing his cousin's

voice in his head telling him that she was going to kill him for the things he had

done. When asked if he recalled saying that to the mental health staff, Lopez stated

that he did make that statement. (*Id., 92.*)

Berlin noted that the reason for his referral for further mental health

assessment was because Lopez was booked into jail for sexual intercourse with a

child under ten years old and engaging in lewd and lascivious acts with a child

under 14 years of age. **The severity of charges, Lopez's first time being in jail,**

**along with a report of possible suicidal ideation from two weeks prior**

**prompted the mental health assessment.** Lopez denied feeling suicidal during

his intake. (*Lopez deposition, pages 71 – 76.*) He was placed into EOH by Berlin.

(*Id., 56.*)

**Plaintiff Norwood** had a history of mental health issues, and he was

committed to a mental health facility on a 5150 Welfare and Institutions Code[8] hold

---

[8] 2023 California Code Welfare and Institutions Code – WIC - Division 5 – Community Mental
Health Services - Detention of Mentally Disordered Persons for Evaluation and Treatment
Section 5150.

**Ex. D-430**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

at the Grossmont hospital in San Diego County sometime between 2010 and 2015.

Norwood admitted that he had been placed at the hospital due to an attempted

suicide. (*Norwood deposition, Pages 116 – 117.*) He was subsequently taken to

another facility called Sharp Mesa Vista for a second suicide attempt. (*Id., 118.*)

Norwood ████████████ on July 17, 2021. He recalled waking up in a

hospital. Norwood filed a grievance on September 22, 2021, in which he reported

after he had ████████████ at the jail, staff did chest compressions to save

his life and he suffered broken ribs during this process.[9] He admitted to having

████████████ while at the jail between June 2021 and February

2022. (*Id., 86 – 88.*)

   **Plaintiff Olivares** was booked into San Diego County jail on October 28, 2021.

He attempted suicide on the date of his arrest while he was still being processed at

intake. He had been in custody at the jail for approximately 20 minutes at that

time. (*Olivares deposition, Pages 77 – 78.*) Olivares decided to stop eating and go on

a hunger strike in January 2022. He was seen by a mental health professional and

the mental health staff determined that Olivares should be placed in the Inmate

Safety Program. He was interviewed in a medical clinic room, and he informed

mental health staff that he was not going to change his mind about his decision. He

even reported that he had told his family and friends and made peace with them.

He was then placed in an EOH cell. Mental health staff then notified the charge

---

[9] SD 076085 – Norwood Deposition, Exhibit E

**Ex. D-431**

nurse, the sergeant, and the lieutenant. (*Id., 99 – 101.*) Olivares was again placed into EOH in February 2022 after he informed staff that he was on his second hunger strike. He reported filling out a sick call slip informing staff of his hunger strike. (*Id., 109.*)

**Plaintiff Sepulveda** reported that he had been diagnosed with schizoaffective disorder and was on medications to manage his mental health. He reported that when he is not following his medication protocols, he has had various concerns including auditory hallucinations, delusions of grandeur, feelings of people trying to conspire against him. (*Sepulveda deposition, page 196.*) Sepulveda had been placed in a mental health hospital in Atascadero, California from August 12, 2020, to February 25, 2021. (*Id., 133.*)

Sepulveda reported that he was concerned about overdosing on fentanyl while he was at the jail because he had become addicted to fentanyl and could not stop █████████. He submitted a written request and said, "*I am afraid I'm going to overdose and die.*" (*Id., 166.*)

Sepulveda was asked about a medical report which stated, in part:

> *Patient does not present to be a danger to self or others or gravely disabled. Patient vouching for his safety.* **Patient states he will inform staff if suicidal. Patient agrees with plan.** *Patient presents with ongoing stressor related anxiety in context of* ███████████ *regularly while in jail. Incarceration, legal case, and psychosocial stressors." (Id., 210.)*

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Sepulveda was asked about another report in which he told medical staff that he was in a fair mood, could concentrate and that he was not suicidal. (*Id., 212.*)

Sepulveda was not placed in EOH or suicide watch because he did not present himself as someone engaged in thoughts of self-harm.

**Plaintiff Taylor** reported in the Third Amended Complaint about a suicidal ideation during booking on July 19, 2022, when he asked to see mental health staff immediately because he was suicidal. In another incident, Taylor filed a request on July 28, 2022, reporting extreme anxiety and depression.

Taylor described his interactions with mental health clinicians during his incarceration at George Bailey. He remembered being taken to a different part of the jail, often referred to as administrative segregation, to see a clinician. These visits sometimes occurred via video conference, and he recalled only two such visits, with one being canceled. (*Taylor deposition - 117-118.*) He estimated that he met with mental health personnel between five and ten times during his incarceration but could not recall specific details. Taylor also mentioned that he did not feel able to discuss his mental health openly due to the lack of confidentiality. (*Id.,118 -119.*)

Taylor confirmed he had received a diagnosis of major depressive disorder and had been prescribed medication, including Remeron and Celexa, during his previous incarcerations. He noted that the medications helped him sleep, which he found beneficial. (*Id.,155 -156.*)

**Plaintiff Zoerner** reported in her deposition that she had been diagnosed with Bipolar I, schizoaffective disorder, major depression, and severe PTSD since she

**Ex. D-433**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

was 21 years old (*Zoerner deposition - Page 26*). She had previously accepted an alternative sentencing program from the mental health court to avoid prison, which included drug and alcohol rehabilitation and wraparound mental health care. (*Id., 24.*)

Zoerner discussed her history with various psychiatric medications, including Lamictal, Prozac, Elavil, and Buspar, which she found effective for her mood and anxiety (*Id., 126-127*). She experienced a psychotic break likely due to the discontinuation of her psych medications after June 20, 2021. (*Id., 212-213*).

Zoerner highlighted the impact of alleged inadequate medical care and accommodations on her mental health, describing instances where her requests for medical assistance were ignored, leading to self-harming behaviors like banging her head against a window. (*Id., 117.*) She reported that she had a history of self-harm. The following section appears in Zoerner's deposition in which medical staff's chronological notes were discussed and Zoerner was questioned regarding the incident. (*Id., 120.*)

The note, as read on record in the deposition states:

***"Gatekeeper was called from 4A-HU for a possibly ISP placement due to patient self-harming, banging her head on the door. It was UOF, use of force, to get her to stop self-harming. Patient was pinned...on the floor as she was bleeding from her face due to head banging.*** *While attempting her to stop self-harming she was spitting on the deputies. Patient was placed in a gurney strapped and spit mask on. Patient was transported to MOB, medical*

**Ex. D-434**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

*observation, in a gurney to be seen by medical cleared and SC, initials, was*

*recommended at this time by GK, gatekeeper."*

Zoerner claimed to not remember the above incident.

Zoerner described her feelings of depression and hopelessness due to persistent

dental pain and perceived neglect, which led to extreme actions such as requesting

"man down" in the dayroom to get attention for her dental needs (*Id.*, *145-146*). She

discussed incidents of self-harming behavior, including banging her head against a

window and a glass window until bleeding. (*Id.*, *117; 130-132*). She also discussed

being placed in Enhanced Observation Housing (EOH) after verbalizing suicidal

and homicidal ideation to a psychiatrist at the jail. (*Id.*, *149-150*).

Zoerner emphasized that her head-banging behavior was sometimes a response

to not receiving emergency medical responses, rather than solely due to a psychotic

break. (*Id.*, *223-225*.) Zoerner was questioned about a medical record dated June 25,

2021. The note described Zoerner's headbanging behavior and her frustration over

receiving Tramadol only three times a day instead of four. According to records,

Zoerner banged her head so hard that she suffered a large hematoma to her

forehead, and she had to be sent out to the emergency department to be evaluated

for intercranial injuries. A CT scan of her head was normal. The following day, she

expressed to medical staff that she was apologetic and could not explain why she

had acted that way. (*Id.*,*180-183*.)

Zoerner described that staff placed her in a safety smock on multiple occasions

following her efforts to cause self-harm using personal items like a razor blade and

**Ex. D-435**

straws. (*Id., 217-218.*) Zoerner described the importance of safety smocks in preventing self-harm and understood the reasons for the use of safety smocks. (*Id., 218.*)

## Opinion 2:

**a) Plaintiffs' allegation that the San Diego County Sheriff's Office custody staff improperly controls clinical mental health care decisions, which undermines the delivery of care by mental health professionals is not supported by facts.**

Plaintiffs have used the Sheriff's Office's organizational chart, which shows that sworn custody staff in the chain-of-command structure appear to be overseeing the entire medical division, including mental health staff and contractors. This chain-of-command structure is not unlike the charts used in numerous agencies across the United States and does not imply that custody staff are able to make medical or mental health decisions or override the decisions of qualified medical and mental health staff.

The allegation raised by the plaintiffs is completely without merit. In city governments, the elected mayor supervises the chief of police even though the mayor is not a peace officer. In state governments, the governor is the commander of the state national guard even though the governor is not a member of the armed forces. The governor's cabinet in California includes directors of Health and Human Services, and the mental health facilities operated by the Department of State Hospitals. Governor Gavin Newsom is neither a physician nor a psychiatrist, yet he

**Ex. D-436**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

is elected by the people of the state to provide leadership to numerous public agencies including those that provide medical and mental health services.

As a former prison warden, I operated multiple correctional facilities where I have the overall responsibility of managing the prisons I was assigned to oversee. I was the highest-ranking officer in the facility and all operational and programming units were under my command. The medical services unit had medical doctors, registered nurses, and medical assistants. Although the medical unit was indicated under the chain-of-command to be under the position of the deputy warden of programs, neither I nor the deputy warden who reported directly to me had any authority over medical decisions. The same structure held true for the mental health division which had its own chain-of-command and assigned personnel who were the only individuals who could make mental health decisions for incarcerated individuals.

The chain-of-command structure only applied to matters of safety and security. As an example, the medical director would send in a request to have a radiologist come to the facility and custody staff would conduct the background screening and authorize the visit. The medical director and the mental health services director would have to send me requests for vacation with information on how their positions would be covered during their absence from the institution.

The medical personnel were required to adhere to safety protocols and not engage in conduct that could breach security. From my experience, a nurse was placed under investigation and subsequently arrested for having furnished a cell

**Ex. D-437**

phone to an individual and helping him escape from prison. These types of incidents resulted in custody personnel having authority over medical and mental health staff specifically in areas related to institutional safety and security, and that is how the chain-of-command is represented in the staffing charts.

### b) There is no evidence that suggests that custody personnel are overriding medical and mental health decisions.

The sheriff is the duly elected individual placed in that role by the decision of the voters in the county. Although sheriff's designees have command and authority over the various detention facilities, there is no evidence that medical or mental health personnel are not making medical and mental health decisions independently.

Plaintiffs allege that, as a matter of policy and practice, custody staff frequently overrules the clinical judgment of mental health staff and orders the placement of incarcerated individuals into Enhanced Observation Housing (EOH). This is not accurate. Based on the testimony provided by Aseel Ross, the decision to keep someone in EOH or safety cell is clinically indicated and designed to reduce harm. Custody staff can refer IPs for potential placement on suicide watch, however, and they are encouraged to refer persons threatening self-harm.

Melissa Quiroz, who serves as the Group Program Manager (*also referred to as the Sheriff's Mental Health Director)* testified that the decisions on whether individuals are placed in a safety cell, or the EOH unit is made by clinicians. Clinicians also determine that the individuals must be placed in safety smocks. (*Quiroz deposition, Page 144.*)

**Ex. D-438**

The only time a watch commander may overrule the clinical judgement of mental health staff is during exigent circumstances which must be justified in writing by the watch commander. Such exigencies are common in jails where a riot or homicide or hostage situation may force staff to be moved to areas to deal with emergencies which may delay responses in fulfilling the orders of mental health professionals. This is in no way a customary practice and cannot be considered as something that occurs on a routine basis.

## Opinion 3:

a) **Plaintiffs' contention that the staff exhibits deliberate indifference by failing to ensure the safety and security of incarcerated individuals is not supported by facts.**

Although plaintiffs allege that custody staff do not respond promptly or adequately to emergency aid calls, plaintiffs' deposition statements provided evidence of immediate staff response in various incidents related to suicidal ideations and in certain cases, placement into protective custody due to security concerns.

Some of the plaintiffs were charged with or had a history of sex offense crimes which would not have allowed their placement into low-level general population housing because they could have become victimized by other individuals.

Plaintiffs fail to consider that even if someone were arrested on the charge of a probation violation, the underlying process of classification and housing must

**Ex. D-439**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

consider the severity of their past offenses, criminal sophistication, and overall risk assessment.

**b) Plaintiffs believe that the Sheriff's Office's classification process is flawed because it places individuals charged with minor, low-level offenses in cells with violent incarcerated persons, compromising their safety. There is no evidence of this from my review of the records.**

Some of the plaintiffs are individuals with serious and violent criminal history and their background and charges do not correspond with a classification of minor or low-level housing. These plaintiffs, due to their serious and violent criminal history, cannot claim to be improperly classified as if they were charged with low-level offenses.

San Diego County jails use objective classification criteria to determine the appropriate housing and programming needs of every individual brought into custody. The process of classification is ongoing throughout the incarcerated persons stay at the jail. Classification changes can occur if individuals request protective custody or are deemed to be in danger because of their continued placement in a particular area of the jail. Examples include some of the plaintiffs in this case who had to be removed from their housing units because of the nature of their criminal charges for their own safety. In other instances, some of the plaintiffs were reclassified and moved based on concerns related to their mental health based on their verbal statements or observations of staff.

**Ex. D-440**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Deputies assigned to the jail classification team are selected through an interview process and the classification unit assignment lasts for four years. Classification deputies, in addition to their regular training in corrections, receive between 21 and 28 additional days of training specific to classification-related topics.

From my observation of the jail classification process at the Central Jail, I was informed that the classification of individuals goes from levels one through six. Levels one, two, and three are considered lower custody housing whereas levels four, five and six are higher custody individuals with level six being the highest risk classification. Individuals with high custody status who are either assaultive or pose an escape risk are classified as *"greenbanders"* and their jail uniform identifies them as high custody based on their green uniforms and wrist bands. Greenbanders are classified to a minimum level V due to their higher custody.

I observed that at the Central Jail, medical staff conduct multiple screenings on individuals during intake. After the first screening, which is conducted on the first floor, an additional screening occurs on the second floor. Once the individuals have been screened by medical and an X-ray has been taken to ensure that they do not have tuberculosis, they are then cleared to be seen by classification staff. The classification interview is done face to face with an individual sitting across the desk from the classification deputy answering a variety of questions. During my jail tours, I reviewed the classification questions and noted that these were like the

**Ex. D-441**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

types of questions that are in use in dozens of facilities around the country with which I am familiar.

The policy related to classification is noted as **Policy R.1 – Incarcerated Person Classification**. According to this policy, the Jail Population Management Unit (JPMU) is responsible for conducting classification assessments, assigning classifications, and housing for all incarcerated persons. Initial classification is based on factors such as booking charges, criminal history, medical and psychiatric conditions, and information gathered during interviews with the individual. Each person is then placed in the most suitable housing location based on their classification.

From my review of the plaintiffs' depositions and exhibits, I gathered the following information.

**Plaintiff Andrade** had served time in maximum custody prison in Pelican Bay, California for 28 months. He had a prior conviction of forgery and first-degree burglary. He had a second-degree commercial burglary conviction for which he served time at Folsom prison. He was also convicted of assault with a deadly weapon or force likely to cause great bodily injury. (*Andrade deposition, Pages 26–32.*) At the time of the deposition, he was serving a prison sentence at the California Institution for Men in Chino.

**Plaintiff Archuleta** had prior convictions for discharging a firearm at an occupied vehicle, a home invasion robbery, and a felon in possession of a firearm. Archuleta served a 13-year prison sentence at the R.J. Donovan prison in

**Ex. D-442**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

California. (*Archuleta deposition, Pages 30–34.*) He also served some of his sentence at the Tehachapi prison and at Corcoran.

**Plaintiff Clark** had prior felony convictions for burglaries, robberies, and drug possession. Clark testified that he had multiple felony convictions for failing to register as a sex offender. Clark admitted that he was required under California penal code 290 to register as a sex offender for the remainder of his life. (*Clark deposition, Pages 26–32.*) From my time working as a jail administrator in Napa County, California, I am aware that the lifetime registration is a requirement for Tier 3 sex offenders, which is the most serious level for such cases.

**Plaintiff Dunsmore** had previously been sentenced to prison for five years in New Mexico for being a felon in possession and transportation of a firearm. At the time of his deposition, Dunsmore was at the California Healthcare Facility prison in Stockton. Dunsmore had prior convictions for burglaries, auto theft, and escape from custody. ███████████████████████████████████████████ ████████████. (*Dunsmore deposition, Pages 43–48.*)

**Plaintiff Edwards** had prior convictions for first degree burglary and arson. He was also arrested ███████████████████████████. Edwards reported that he had previously been sentenced to 12 years and eight months in state prison. (*Edwards deposition, Pages 49–52.*)

**Plaintiff Levy** was previously sentenced on identity theft charges involving multiple victims for which she was sentenced to seven years and eight months prison commitment. Additionally, Levy had convictions for commercial burglary,

**Ex. D-443**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

and an escape from prison charge while assigned to a CDCR fire camp. Levy was arrested in 2018 in Ohio on a fugitive warrant from San Diego County. Levy stated that she was not a violent offender, but she was considered high risk for escape. (*Levy deposition, Pages 46-52.*)

**Plaintiff Lopez** has serious felony charges for sexual intercourse with a child under 10 years old as well as lewd and lascivious acts with a child under 14. (*Lopez deposition, Pages 79 – 80.*) Due to the nature of Lopez's charges, he was immediately placed in protective custody from the day he arrived at the Vista jail on October 8, 2019, until December 12, 2019. (*Id., 53, 94.*)

**Plaintiff Norwood** has two separate prison sentences for causing great bodily injury or death with a hit and run incident as well as possession and sales of narcotics. (*Norwood deposition, Page 35.*) Arrest records show that Norwood sold fentanyl to an undercover DEA agent. (*Ibid., 45*) He also had an arrest for possession of a firearm because he was prohibited from owning a firearm. (*Ibid., 43*)

**Plaintiff Olivares** had previously served a 16-year sentence for robbery and rape. (*Olivares deposition, Page 27.*) He had been in protective custody housing while incarcerated at the state prison. He was maintained in PC status while in San Diego jails. (*Id., 157.*) Olivares was required to register as a sex offender upon his release from CDCR custody. ████████████████████

██████████ (*Id., 35.*) Olivares' criminal charges include kidnapping, armed robbery, and corporal injury to a spouse. (*Id., 59–60.*)

**Ex. D-444**

**Plaintiff Sepulveda** had convictions related to attempted murder, and five charges of assaults with a semiautomatic firearm. He had been sentenced to a term of 21 years in prison. (*Sepulveda deposition, Pages 14-20.*)

**Plaintiff Taylor** was incarcerated most recently for burglary and making terrorist threats. He recalled during his deposition that he had been convicted of other charges including robbery, and domestic violence. Taylor was formerly sentenced to a prison term of 14 years and four months. He had been sent to prison a total of four times. (*Taylor deposition, Pages 28–31.*) ███████████████

██████████████████████████████. Taylor initially wanted to be placed in the general population and did not believe that his safety was at risk. However, he later came to believe that other Black incarcerated persons were telling people that Taylor had *bad charges.*[10] Taylor requested protective custody and was interviewed by detectives immediately after being placed into Administrative Separation. He was then moved into protective custody. (*Id., 149–151.*)

**Plaintiff Zoerner** had prior arrest and conviction related to a robbery charge for which she was sentenced to four years. (*Zoerner deposition, Page 23.*) Zoerner discussed convictions related to forgery and burglary. She was arrested on a charge

---

[10] *Crimes against children, rapes, sexual assaults, etc. are considered by other prisoners to be "bad charges" in jails and prisons often resulting in individuals charged with these crimes to be placed in protective custody housing.*

**Ex. D-445**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

of exhibiting a deadly weapon, not a firearm, and resisting an executive officer. (*Id.,*
*48.*)

I could not find any of the deposed plaintiffs who could be considered as low-
level, minimum custody individuals. Therefore, the allegation of the Sheriff's
Office's classification process being flawed as it places individuals charged with
minor, low-level offenses in cells with violent incarcerated persons, compromising
their safety is unfounded since none of the plaintiffs mentioned in this section could
have fit the criteria as low-level offenders. On the contrary, charges such as armed
robbery, rape, sexual assault of a child, attempted murder, and escapes would
automatically be considered high-risk and result in housing that would minimally
be at the level of medium custody, if not maximum custody, depending on risk
assessments conducted by the classification unit. Further, even beyond the named
Plaintiffs, I found no evidence that the Sheriff's Office places low-level offenders
with violent offenders. The classification system used by the Sheriff's Office is
designed to place IPs together who will be compatible or at least able to room
together peacefully.

**Opinion 4:**

   **a) Plaintiffs claim that the San Diego County Sheriff's Office fails to**
   **adequately detect and prevent drug contraband within the jail is not**
   **supported by facts. The drug interdiction methods used by the jail**
   **are comprehensive and ongoing. The policies related to drug**

**Ex. D-446**

**detection and interdiction are adequate and exceed those of many correctional facilities.**

Despite the inordinate amount of effort taken to interdict drugs, jails across the nation have experienced increases in illicit narcotics. San Diego County is no different in this regard because of the high rates of addiction in the arrested population to serious drugs such as heroin, cocaine, methamphetamines, and fentanyl. There is no evidence that the agency is not proactively addressing this issue on a continuous basis.

Plaintiffs have alleged that the Sheriff's Office's policies and practices for detecting and preventing contraband are inadequate and criticize the jail for not using body-worn cameras[11] and sufficient audiovisual surveillance to mitigate the entry of contraband. Plaintiffs pointed out that there were 204 suspected opiate overdoses reported in 2021 and 180 overdoses for the year 2022. Plaintiffs argue that the Sheriff's Office has not sufficiently protected incarcerated individuals from access to dangerous drugs like fentanyl and other contraband.

**San Diego County policies related to narcotics interdiction**

I reviewed the policies related to the various methods used by the jail to control the flow of narcotics. I found these to be appropriate and comprehensive in addressing narcotics interdiction in jails.

---

[11] In fact, the SDSO has begun rolling out BWC in the jail facilities since the Complaint was filed.

**Ex. D-447**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

- **Policy I.50 – Body Scanner and X-Rays**

The Sheriff's Office utilizes body scans to detect contraband hidden on someone's person. There are limitations on how the equipment is used, staff training regarding its use, and the number of times one person can be scanned using this equipment on an annual basis.[12]

- **Policy I.58 – Urinalysis Testing**

The use of urinalysis testing is designed to randomly select incarcerated individuals for drug testing monthly to address concerns related to narcotics inside the jails and to control such contraband.

- **Policy J.8 – Contraband Watch**

Individuals suspected of concealing contraband within their body, as determined by health staff to pose a non-life-threatening risk, are placed on contraband watch until it is reasonably determined that the individual is no longer in possession of the contraband items.

- **Policy I.87 – Detention Canine Program**

The Sheriff's Office uses canines to assist with searches for contraband. Although the canine teams are assigned to East Mesa and Las Colinas facilities, they are used agency wide in searches for contraband at all other jail facilities.

---

[12] *According the Tek84 website, the Intercept scanner in use at San Diego County jails can scan a single individual up to 1,000 times per year on the lowest setting. The highest setting, which produces the best images reduces the number of allowable scans to 125 per year.*
*https://www.tek84.com/intercept/*

**Ex. D-448**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

- **Policy M.47 – Suspected Opioid Overdose**

In the event an incarcerated person shows signs of a suspected opioid overdose, staff are required to promptly administer naloxone. Sworn and health staff must provide care and monitor the individual's condition until paramedics arrive to take over medical care. Incarcerated persons are also able to use Naloxone to assist other individuals suspected of experiencing symptoms of opioid overdose. Naloxone is available to IPs in each dayroom and holding cell.

Plaintiffs have presented selective evidence to show the total numbers of overdose incidents inside San Diego County jails. The true picture of the issue with narcotics and interdiction efforts must include a review of additional data regarding the Sheriff's Office's efforts to address this problem.

I visited the intake and booking areas starting from the vehicle sally port where arrestees are first brought into the jail facility by several law enforcement agencies. The sally port has a body scanner machine (Tek84 Intercept) which is used to scan new arrestees for contraband. I was able to visually observe a deputy using the equipment at the Central Jail and was informed that staff received specific training in this equipment prior to being allowed to operate it. Specific deputies are assigned to this post instead of rotating so that they are familiar with its operations and interpretation of the scans.

The scanner is like equipment that might be found in an airport where the person being scanned does not need to be on a movable platform and is only required to stand for a few seconds on the equipment for the process to be

**Ex. D-449**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

completed. Previously, the jail relied on the use of a scanner called the Soter RS,
which includes a moving platform. The Soter RS equipment is not ideal in
situations where someone is under the influence of drugs or alcohol and unable to
stand unassisted because of the danger of falling on the moving platform. I was
informed that the new Tek84 Intercept equipment was found to be more effective
because it did not have movable parts.

The Mail Processing Center (MPC) for the entire County jail system is in Las
Colinas. Each piece of mail coming into the jail addressed to incarcerated persons is
inspected and searched for contraband including narcotics. Electronic testing of
mail is done using the Fisher Scientific TruNarc Narcotics Analyzer machine.[13]
According the Fisher Scientific's website:

> *The global drug problem is increasing, with trafficking of methamphetamines,
> heroin, and emerging threats like fentanyl, and carfentanil, impacting
> communities worldwide. Law enforcement officials need to quickly identify
> suspected narcotics in the field to help keep drugs, and drug dealers, off the
> streets.*
>
> *…TruNarc Handheld Narcotics Analyzer enables officers, customs, border
> control, and other personnel to scan more than 530 suspected controlled
> substances in a single, definitive test. With this handheld drug detector,*

---

[13] https://www.fishersci.com/shop/products/trunarc-handheld-narcotics-analyzer-6/p-7228743

**Ex. D-450**

*narcotics, stimulants, depressants, hallucinogens, and analgesics are easily*
*identified using lab-proven Raman spectroscopy.*

One of the tasks that the MPC staff performed was to verify that the letters marked as legal mail were in fact confidential and privileged correspondence. In speaking with the staff assigned to the MPC, I was informed that they had identified numerous pieces of correspondence that were marked as legal mail but were not sent from an attorney and contained drugs and other contraband. The staff spoke of the high volume of attempted narcotics introduction that had been prevented because of the use of the TruNarc technology.

The agency utilizes canines as drug sniffing dogs to assist with narcotics interdiction. The dogs have been used in parking lots and in housing units in all the County's jails along with visiting areas and visitor parking lots. I was informed that vehicles belonging to visitors in the parking lot at one facility had recently been discovered to contain drugs and weapons. The dogs used in the jails are not bite trained and are only used to sniff for contraband.

The **2022/2023 San Diego County Grand Jury Inspection Report** *(See Section VI., B)* noted that drugs often entered jails when incarcerated individuals returned from court appearances, medical appointments, work assignments, or other events requiring them to leave secure areas. Additionally, contraband could be exchanged during visits with family, attorneys, or other guests if there was no barrier between the incarcerated person and the visitor.

**Ex. D-451**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

During jail tours, the Grand Jury observed the management of incoming mail and small packages. The Las Colinas facility serves as the central mail processing center for all San Diego County jails. While there is one small package x-ray scanner available for scanning small packages entering the jails, the Grand Jury found it is not suitable for rapid scanning of letter-type mail. Special negative pressure tables are utilized by sworn staff wearing masks, gloves, and gowns to open suspicious letters and check for drugs. Additionally, an ultraviolet (UV) lamp is available for detecting stains and discoloration, particularly substances applied to letters and greeting cards.

The observations reported in the Grand Jury's report were consistent with my inspection of the Las Colinas facility and the central mail processing area of the jail.

**b) There is a comprehensive process in place to prevent and interdict contraband, including narcotics, by staff, contractors, and visitors.**

Former Assistant Sheriff Theresa Adams-Hydar stated in her deposition that jail staff undergo randomized urinalysis testing. The County Risk Management team is responsible for randomly selecting staff members for these tests. Additionally, Sheriff's transportation deputies are subjected to more frequent drug testing due to their responsibility for driving incarcerated persons. (*Adams-Hydar deposition, Page 108.*)

Captain Shane Watts formerly supervised the Detentions Investigations Unit (DIU) and was deposed regarding the Sheriff's Office's policies, procedures, and practices relating to drug overdose deaths.

**Ex. D-452**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Captain Watts was asked by the plaintiffs' counsel about the potential for staff bringing narcotics into the institution. Captain Watts said that the Sheriff's Office attempts to isolate and identify all the possible ways narcotics enter the jail facilities. Both professional and sworn staff could potentially be compromised. The agency developed an informant program using confidential informants from within the incarcerated population. The primary goal of this program is to quickly identify if any staff members engage in smuggling narcotics into the jails. (*Watts deposition, Page 9.*) Watts said that the agency uses canine units to perform unscheduled searches within the sworn and professional staff's work areas. These searches are unannounced, and if one of the dogs alerts the handlers of contraband, an investigation would start immediately. Watts stated that jail telephone calls are monitored and any discussions on these recordings related to staff (or IPs) engaged in bringing in illegal substances would be investigated. (*Id.,10.*)

**On July 11, 2024, San Diego County Sheriff Kelly A. Martinez announced the implementation of a new contraband and narcotics screening process for all personnel assigned to jails, contractors and anyone with business in County detention facilities.**[14] According to the Sheriff's news release, more than 70% of arrestees entering the jail facilities in San Diego are found with some type of illicit substance in their system. In 2023, CNIT seized 48 weapons, and 16 weapons have been found so far in 2024. More than 500

---

[14] *https://www.sdsheriff.gov/Home/Components/News/News/2836/16*

**Ex. D-453**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

grams of fentanyl and other dangerous drugs have been interdicted this year. According to the news release:

> *"To protect the security of our detention facilities, details of the screening process, locations, times and frequency will not be disclosed. Screenings will be randomized across facilities to ensure the effectiveness."*

Lieutenant Brenden Bourgeois testified that while working on the Contraband Narcotic Interdiction Team, he and his team were successful in intercepting large quantities of drugs from entering the jails. He reported that two milligrams of the drug fentanyl constitutes a lethal dose. According to Bourgeois, in one year his team interdicted 750 grams of fentanyl from entering the facility, saving numerous lives. (*Bourgeois deposition, Page 9.*)

Bourgeois acknowledged that the rollout of programs like MAT and Narcan contributed to reducing overdose incidents. (*Id., 12.*)

There is a comprehensive response already in place to curb the amount of narcotics coming into the jails. Unfortunately, despite their best efforts, the San Diego County jail staff frequently encounters arrestees and incarcerated persons who continue to find ways to introduce narcotics into the jails. The San Diego County jails are near the border with Mexico, on the drug corridor, and citizens outside the jails face similar problems with drug importation.

I considered the **data provided by Detention Investigation Unit (DIU)** regarding overall incidents at the jail as well as the overall drug seizures per year for all of San Diego County's jails. The data covered the years 2022 through April

**Ex. D-454**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

2024 and provided a comprehensive perspective of the magnitude of the problem

that the Sheriff's Office is faced with in addressing this issue. For the purposes of

this report, I have only considered data for the complete years of 2022 and 2023.

The following is the data produced by (DIU).[15]

### Overall Incidents per Year | All Detentions Facility
#### 2022 – 2024 YTD (Jan-Apr)

| ALL FACILITIES | 2022 | 2023 | 2024 (Jan-Apr) |
|---|---|---|---|
| IP vs IP Assault | 1320 | 1248 | 345 |
| IP vs Sworn Assault | 215 | 196 | 80 |
| IP vs Non-Sworn Assault | 9 | 14 | 5 |
| Alcohol Incidents | 300 | 249 | 46 |
| Drug Incidents | 445 | 469 | 136 |
| Weapon | 90 | 97 | 31 |

### Overall Drug Seizures per Year | All Detentions Facility
#### 2022 – 2024 YTD (Jan-Apr)

| Drug Type (in Grams) | 2022 | 2023 | 2024 |
|---|---|---|---|
| Meth | 699.68 | 899.45 | 271.68 |
| Marijuana | 332.67 | 545.06 | 192.59 |
| Fentanyl (Powder & Pills) | 954.74 | 1270.03 | 149.53 |
| Unk Subst | 41.70 | 125.42 | 47.00 |
| Cocaine | 17.11 | 31.86 | 31.17 |
| Heroin | 72.57 | 402.36 | 29.02 |
| Suboxone Strips | 48.02 | 71.50 | 19.83 |
| Cont Pills in Gms | 229.31 | 85.20 | 3.85 |
| Other Controlled | 2.93 | 13.53 | 0.00 |
| Spice/Ecstasy/ MDMA | 0.10 | 0.00 | 0.00 |
| Total | 2398.83 | 3444.41 | 744.67 |

Data Source: NetRMS. Includes vetted data for all detention facilities.
*When a case contains multiple seizure categories [ex: Drugs, Drug Paraphernalia] each applicable seizure category type is counted once separately within a single case. Drug seizure totals do not include DIU seizures, only facility totals.

Prepared By: Sr. CIA Lopez, DIU
Prepared On: 5/6/24

***Figure 4***

---

[15] Facility Stats_2022-2024YTD_050624

**Ex. D-455**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Based on this data, staff were engaged in 445 drug interdiction events in 2022

and 469 events in 2023. 2,398 grams of drugs including dangerous substances such

as fentanyl, cocaine, methamphetamines, and heroin were seized in 2022. In 2023,

there was in increase in narcotics interdiction with 3,444 grams of drugs seized.

**<u>Many of the named plaintiffs themselves are noted to be severely</u>**

**<u>addicted to drugs and have engaged in illegally obtaining and possessing</u>**

**<u>narcotics.</u>**



**Plaintiff Andrade** admitted during his deposition that he had ███████

████████████ to commit suicide. (*Andrade deposition – Page 88.*) Andrade's

jail intake document indicated an affirmative response to ████████

██████████. (*Id.,105.*)

**Plaintiff Archuleta** was charged with being in possession of a controlled

substance at the time of his arrest in July 2019. (*Archuleta deposition – Page 222.*)

He had a history of ████████████████████. (*Id.*)

**Plaintiff Clark** had previously attempted suicide by overdosing on drugs. Clark

was a diabetic and on insulin and a drug called Metformin. He reported that he

refused to take his prescription medication for diabetes during the first two weeks

following his arrest because he was withdrawing from narcotics, and he was

concerned that mixing his diabetic medications with the narcotics could be fatal.

(*Clark deposition, Page 186.*)

**Plaintiff Edwards** had reported to staff during his booking process that he had

███████████████████████████████████. (Edwards

**Ex. D-456**

deposition, Pages 84–85.) Edwards reported that in 2020 or 2021, he ████████

████████ at the jail to commit suicide and was rescued by deputies who used five

doses of Narcan to revive him and save his life. (*Id., 157.*)

**Plaintiff Levy** reported that she habitually used drugs to suppress her issues

with depression and mental health. (*Levy deposition, Page 136.*) She reported using

████████████████████████████████████████

████████ (*Id., 42.*) She reported using ███████████████████████

████████. (*Id., 100.*)

**Plaintiff Norwood** reported ██████████████████████ it while in

San Diego County jail. (*Norwood deposition., Pages 86–88.*) He reported that he was

addicted to methamphetamines, opiates including heroin and fentanyl (*Id., 68-69.*)

**Plaintiff Sepulveda** said that he was an alcoholic until the time of his arrest in

October 2017. Since the time of his arrest, he had █████████████████████

████████████████████. He estimated that while in jail, he had █████████████

███████████████████████████████████████████. (*Sepulveda*

*deposition, Pages 140–143.*)

Sepulveda reported that he ████████████████████████████████████████.

He said that he also ████████████████████████████████. (*Id., 144.*)

Sepulveda discovered that another individual in the unit overdosed on fentanyl

causing his heart to stop while ████████████████████████. Medical staff

rescued the other incarcerated person and Sepulveda found out that the Oxycodone

contained fentanyl. When asked why he had not informed staff about where the

**Ex. D-457**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Oxycodone mixed with fentanyl was coming from, Sepulveda said, "*No…because you just don't wanna be… you don't wanna be that guy. You don't wanna be the snitch.*" (*Id., 145.*)

**Plaintiff Taylor** was asked specifically about his claim along with the other plaintiffs that he was not protected from fentanyl and other contraband while in jail. Other than stating that he was previously addicted to methamphetamines, Taylor refused to answer and asserted his Fifth Amendment rights upon advice of his attorney. (*Taylor deposition, Pages 159–161.*) Taylor's refusal to respond to questions directly related to the use of drugs and exposure to drugs creates doubts regarding whether he was impacted by such events at all.

**Plaintiff Zoerner** had ███████████████████████████. (*Zoerner deposition, Page 31.*) Her booking document from May 4, 2021, indicated that Zoerner suffered from a drug use disorder. (*Id., 120.*) She was noted to have a strong history of drug-seeking behavior. (*Id., 131.*) She had also attempted to take her own life using drugs in the past. (*Id., 217.*)

While I recognize that Plaintiffs' counsel represents all incarcerated persons at the San Diego County jails and not just the named Plaintiffs, they are representative of the population. Many of the incarcerated persons have a history of drug use and/or are addicted and actively drug-seeking, which makes staff efforts to prevent illicit drugs from entering the facilities more difficult. In my opinion, the County has strong programs in place to interdict drugs, find/recover drugs in the jails, and treat individuals with addiction issues.

**Ex. D-458**

**Opinion 5:**

a) **Plaintiffs' claims that the Sheriff's Office failed to provide adequate medical care including medicated assisted treatment for incarcerated persons with substance abuse disorders is inaccurate.**

My review of the evidence shows that the County is engaged in providing substance abuse treatment options to individuals suffering from addiction. The Medication-Assisted Treatment (MAT) provides screening of individuals at the time of booking and then provides them with resources through medical providers to alleviate withdrawal symptoms and provide ongoing treatment.

My opinion in this section is not focused on the treatment itself and I have not considered whether MAT is medically necessary or appropriate as I am not a medical expert. This opinion only considers the existence of treatment programs and whether incarcerated persons have access to such services.

I reviewed the San Diego County Sheriff's public website which included a media release statement posted on August 16, 2022, titled *New Jail Improvements*.[16]

The following section is from this media release:

"*The San Diego County Sheriff's Office is committed to keeping individuals in our custody safe. That commitment includes keeping drugs out of the jails. Drug interdiction depends upon technology, which includes the use of body scanners.*

---

[16] *https://www.sdsheriff.gov/Home/Components/News/News/1413/*

**Ex. D-459**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

*The San Diego Medical Examiner's preliminary data shows more than 1,300 accidental overdose deaths in San Diego County in 2021. The data also shows there were 812 accidental overdose deaths involving fentanyl in 2021. That marks an 867% increase (or an additional 728 deaths) since 2016. The Sheriff's Office is seeing the same trend in the increase of drug overdoses in county jails as in the general population of San Diego County.*

*We have instituted several changes as part of our immediate plan toward improved drug intervention and health care in the jails. In June 2022, we began a more thorough assessment of every individual during the booking process. We have instituted urine screenings at intake. Those results are showing a disproportionate number of people coming into our custody are using illicit drugs.*

*We are identifying better ways to manage a population that may be under the influence of illicit drugs and experiencing withdrawal symptoms. People in custody at all county jails now have access to self-deploy Naloxone, a lifesaving medication to help prevent overdoses.*

*Our intake assessment includes screening to identify individuals who are at risk of withdrawal from drugs or alcohol.* **_We will soon incorporate scoring based on the Clinical Institute Withdrawal Assessment Alcohol Scale (CIWA) and Clinical Opiate Withdrawal Scale (COWS)._**[17] *This scoring will allow for better treatment and management of withdrawal symptoms.*

---

[17] This scoring system using CIWA/ COWS is currently in place.

**Ex. D-460**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

### _This is all part of the expansion of the Medication-Assisted Treatment (MAT) in our detention facilities."_

As described in the above section, the San Diego County jail system is faced with enormous challenges resulting from an addiction crisis in the community. When overwhelmingly large numbers of individuals are being arrested with addiction issues and narcotics-related crimes, it is obvious to see that these individuals will continue to attempt to get drugs and smuggle drugs into the jail to maintain their addiction.

The CIWA and COWS protocols described in the Sheriff's website results in identification of individuals who are experiencing alcohol and opiate withdrawals. Once identified, these people are provided with medication and treatment to undergo withdrawal symptoms under the care of medical staff. I was provided with a sample report of CIWA and COWS participants for seven- month period from January to July 2021.[18] The following chart shows the total number of incarcerated persons receiving CIWA and COWS services by individual jail facilities. Although the data provided was broken down by month, I have combined the numbers to provide seven-month totals.

---

[18] SD_1519326

**Ex. D-461**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

## CIWA/COWS Patients - January to July 2021

| Facility | Number of CIWA patients | Number of COWS patients |
|---|---|---|
| East Mesa | 213 | 273 |
| Vista | 1355 | 1390 |
| South Bay | 210 | 260 |
| Las Colinas | 759 | 705 |
| George Bailey | 1450 | 1569 |
| Central | 1948 | 1819 |
| Facility-8 | 103 | 112 |
| Totals for all jails | 6,038 | 6,128 |

### *Figure 5*

The monthly average of individuals across all San Diego County jails receiving CIWA related services was 863. The number of individuals on COWS services was 875 per month. The numbers of IPs in the MAT program currently are far larger.

Records indicate that in 2021, the total numbers of individuals booked into the San Diego County jails was 48,283.[19] Dividing this number by 12 provides the average number of bookings per month for a total of approximately 4,024 individuals booked into custody each month.

Comparing the monthly booking averages with the numbers of individuals being provided CIWA/COWS services, approximately 21% of all arrests each month leads to CIWA placements and 22% of all arrests results in COWS services being initiated. This is suggestive of a proactive program to identify and provide treatment to all individuals who meet alcohol and opiate withdrawal criteria at the

---

[19] San Diego County Sheriff's website – Jail Data / Reports.
*https://www.sdsheriff.gov/resources/jail-population-data*

**Ex. D-462**

time of booking at the San Diego County jails.

By implementing the MAT program, the jails are screening individuals at the point of entry through drug testing, body scanners, and assessments for providing medications to help treat those who need medical intervention. Sheriff's Mental Health Director Melissa Quiroz reported in her deposition that MAT provides both medication and treatment along with therapeutic interventions. (*Quiroz deposition, Page 33*)

I was provided with copies of several hand-written letters from incarcerated persons[20] who had participated in the MAT program and had positively benefited from the experience. I have highlighted some of these letters in this section.

The following are sections from the handwritten documents were transcribed for readability:

**Letter 1**

> *"I didn't know what to expect when I first came into this program. My mentality at first was here goes another drug program for the books, but this one was different. I actually paid attention for the first time and took this serious. I felt Dianna and Becky cared for my relapse prevention and both went out their way to give me life skills and triggers coping skills to help me stop my drug use. I want to thank you Becky and Dianna and all the staff involved in this MAT program. I think it will help others like me in coping with drugs outside when released…"*

---

[20] MAT Client Letters

**Ex. D-463**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

## Letter 2

"When I first got locked up and started the MAT program, I believed I had zero chance at ever changing my life. I had given up on myself. I first thought this program was a way for the city and the sheriff to "save face," to say that they are doing something about the opiate epidemic. I think now that this program is an opportunity for us to work on ourselves and learn to think differently, to avoid situations that end up with us in jail or worse. The best thing about this program for me is that the program does not force-feed "AA" or "twelve steps" down our throats. Thank you to the MAT staff and deputies, especially Maddox and Crawley, who always treat everyone with dignity and respect. It means everything to me. Thank you. Before the program, I barely talked to my mom, now we talk every day. If I keep doing what I'm supposed to and I stay clean, my future looks bright. I hope to be able to make a life for myself that's worth living, instead of slowly killing myself…"

## Letter 3

"First and foremost, I'd like to thank Becky for setting this up and giving me the opportunity to participate. I'd also like to thank Deputy Maddox and Crawley for the advice, the support, and for treating me like a human. I think the best part of the program while I was there was getting out of our cells and the interactions with staff. When I first got here, I thought the program would help me learn new coping skills and pass time. I think the program is to help addicts with their addictions by putting them in a recovery environment / mindset. I think Becky was very helpful, showing me to let go of things I can't control. I also appreciated Adam helping me through a hard time. The biggest thing I've learned is my control issue and not to give in to my impulsivity. When I get out of here, I plan on taking things one day at a time…"

**Ex. D-464**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

### Letter 4

"Dear MAT program, thank you for letting me be a part of this program, giving me a chance to fulfill some of my goals. At the start of this, I overcame my bitterness and fear that nobody would take this seriously. I have measureless love for drugs and irrational fear that I will never be able to stop using them… I want my family and self-respect back… I want to feel worthy of love, to gain emotional awareness so that I can stop taking advantage of the people that love me… Although I feel disenchanted when it comes to recovery, I will remain teachable because I believe the universe is unfolding as it should. To never give up on myself, to maintain my sight exceeding my grasp, to prove to myself and everyone else that I can do this. Thank you to the group for opening my eyes to everything meaningful and meaningless in my life. I plan on finishing this program and even though even though I will exercise caution, I will not let that blind me from what virtue there is and strive for high ideals and become the person my family needs."

### Letter 5[21] *(included the name of the incarcerated person – ██████ ████)*

"I just want to say thank you for everything you did for me. I was homeless with no family or friends and was going nowhere but an early grave or incarcerated for a very long time, doing drugs and committing crimes every day. When I first came in here I thought it was a punishment and I was angry, but I've come around to see that it's an opportunity to change myself and my life for the better. You all have done a lot to take great care of me during my stay and I'm very grateful for your help and kindness and going out of your way to help me get better. You all have a very important job to help

---

[21] Letter 5 – ██████████ Letter – This letter was handwritten on a Stationery form and was transcribed for readability.

**Ex. D-465**

*people get back up when they're at their lowest point and that means a lot.*
*Even if most don't appreciate it, I do. You all gave me an opportunity that has*
*given me hope that I can change and live happily, and I can't thank you*
*enough. Even though I plan to never come back here, I wish the best for all of*
*you. Thank you again and goodbye."*

These letters are only a sample of the five people who completed the MAT
program. There are many more successful candidates from this program. The
experiences and sentiments expressed by program participants in the letters
written to staff provide direct evidence about the accomplishments of the program.

## Opinion 6:

a) **There is no evidence suggesting that the plaintiffs were impacted by**
   **any alleged lack of video coverage in the jail or that custody staff**
   **failed to provide timely aid. Additionally, there is no evidence**
   **suggesting that the functionality of elevators or intercoms created**
   **any safety concerns as the jail has procedures in place to address**
   **such concerns.**

Although there are times when video cameras may require repair, there are
hundreds of video surveillance cameras throughout the County's jails from my
personal observations during jail tours. I examined the cells where individuals are
placed for their own safety and noted that these cells are monitored with deputies
conducting visual checks every 15 minutes in addition to the cells being video
monitored on a continuous basis. I was informed that the camera systems at the
jails were being upgraded and modernized. Video audits of the jail operations (and

**Ex. D-466**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

specifically the safety checks) are performed on each team. All individuals placed into the EOH or safety cells are required to be visually observed by a shift supervisor and the watch commander on each shift. This supervisory review also includes verification of checks done by deputies as reported on the observation logs. Audits of safety checks are sometimes done via review of the video surveillance recordings.

During my tour of the jail facilities in San Diego County, I noticed video surveillance cameras throughout the jail corridors and the public areas. Certain areas are not monitored due to privacy requirements such as areas with toilets or bathrooms and these portions of the jail were not covered with cameras, which was appropriate.

Some of the County's jails are old with linear style designs that require the use of a lot of cameras to eliminate blind spots. I noticed more cameras in these facilities. Other facilities with open yards and modern direct supervision housing had cameras that could view larger areas with fewer cameras. This is largely because of the open-concept design and not indicative of a lack of cameras.

During my jail inspection of the Central Jail, I observed intercom terminals in both the dayrooms and inside the housing unit cells. I was informed that the jail's policy mandates that individuals cannot be housed in cells with malfunctioning intercoms. Once staff are notified of faulty intercoms, the incarcerated individuals are relocated to different cells and the cell is put out of service until the intercom is repaired.

**Ex. D-467**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

At the Vista facility, I inspected the administrative separation areas. I found that the E-1 module, which consists of seven Administrative Separation cells, has remained vacant for a year due to non-functional intercoms. I was informed that the facility's practice is to not house individuals in cells without working intercoms.

I considered the deposition of former San Diego County Assistant Sheriff Theresa Adams-Hydar, who served over the detentions division during her tenure. According to Adams-Hydar, the commanders and captains instructed staff to not house incarcerated persons in cells which were found to have defective intercoms. This was the customary practice at the jails. (*Adams-Hydar deposition, Page 58.*) Adams-Hydar reported that sometimes the intercoms were broken by incarcerated persons and sometimes they broke because they were old, or the equipment malfunctioned. However, the goal was to always fix the equipment as soon as possible. (*Id., 65.*)

Commander Christina Ralph reported in her deposition that if intercoms were down in certain areas of the jail, then staff were required to conduct more frequent checks of those areas. Safety checks were augmented on a temporary basis because of malfunctioning intercoms. (*Ralph deposition, Page 145.*)

During my tour of the County jails, I was informed that the agency has a policy of always using video cameras during planned use-of-force incidents and preserves video evidence in the event of a complaint or anticipated litigation. I also observed that new cameras were installed in certain areas to enhance security and reduce blind spots at the Central jail. Some older cameras were replaced with modern

**Ex. D-468**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

equipment, and others are scheduled to be replaced over time. Regarding the

camera equipment, Adams-Hydar said, *"Whenever a camera is dysfunctional, we*

*absolutely will go towards fixing it as soon as possible. There are occasions where*

*some of the facilities are older, and it takes longer for parts… I know that cameras*

*break from time to time, like they do in every local life. And I know that when*

*cameras would break, they would fix them."* (*Id., 50.*)

I considered the deposition testimony of Captain Jesse Johns. Johns was asked

about elevators in the Central jail facility. He explained that there are two

dedicated elevators used for the incarcerated population. These elevators operate on

floors one to nine. There are two other elevators that are for staff use. (*Johns*

*deposition, Page 80.*) If one of the IP elevators is out of service, a staff elevator can

temporarily be designated to carry incarcerated persons to assist. At the time of his

deposition, Johns was aware of one staff elevator that was down for repairs. Johns

stated that the facility is in the process of renovating the motors on the elevators.

He explained that one elevator is taken offline for repairs while the other one

remains functional. Once the first elevator is repaired, then the second one is taken

down so that work can be completed on it. If staff finds that they do not want to

wait for an elevator, they use the stairs between the floors. (*Id., 81-83.*)

The records show that only one of the plaintiffs was allegedly required to use the

stairs to get to a visit because the elevator was down on that date. This is far from

the crisis that the plaintiffs' complaint has alleged. It is reasonable to assume that

sometimes elevators inside buildings will require maintenance and repairs. This is

**Ex. D-469**

not the fault of the Sheriff's Office, and no one is deliberately creating the issue with elevators. Based on Captain Johns' testimony, and the lack of actual evidence that any incarcerated persons were harmed because of the elevators being down, the complaint related to elevators lacks merit.

**b) Plaintiffs' allegation that the Sheriff's Office's policies and practices are inadequate because the jail fails to employ body-worn cameras lacks merit and is not supported by evidence.**

Plaintiffs' allegation does not consider the fact that the use of body-worn cameras inside correctional facilities is a recent development and San Diego County is progressing at a rapid pace to equip staff with body-worn cameras. Most jails and prisons across the nation do not use such equipment currently. The implementation of this technology is relatively recent, and the San Diego County jail has taken steps to incorporate the use of body-worn cameras as quickly as practicable.

I inquired about the availability of body-worn cams after noticing some deputies wearing them during my tour of the San Diego County jails. I learned that several staff members had been trained to use body-worn cameras, and the agency was in the process of rolling out additional cameras. The goal is to have all jail facilities equipped with operational body-worn cameras. Once trained, staff are expected to keep their cameras on when managing various situations in the jail. However, they have the discretion to turn off the cameras during strip searches or when someone is receiving medical care.

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Prior to my retirement from public service in 2018, I had been working on testing out various body-worn cameras at my jail in Napa County. The process was new and the topic of using this equipment was discussed in various jail management meetings. Previously, it was more common to see body-worn cameras being used by law enforcement outside of correctional facilities. The primary concerns were related to the privacy of incarcerated individuals who may be in their living areas, using the bathrooms, taking showers, and changing clothes, etc. Additionally, there were concerns related to cross-gender supervision, medical and mental health visits, and both clothed and unclothed searches. Jail commanders were concerned about potential litigation issues related to the improper use of body-worn cameras and the training requirements that must be considered before such equipment could be deployed.

I currently work in over two dozen states doing jail and prison litigation related consulting. I have found that most jails and prisons do not employ body-worn cameras to date and the deployment of this technology is ongoing and will take several years before it becomes available in most correctional agencies. However, San Diego County jails are ahead of the curve and have begun implementing BWC.

## San Diego County policies related to intercoms, video surveillance cameras, and body-worn cameras

I reviewed the policies related to intercoms and video surveillance. I found these to be appropriate and comprehensive in addressing security issues in jails. I have both worked in and/or toured many jails and prisons in the United States and in

**Ex. D-471**

other countries. The use of video surveillance and intercoms is much more common in the United States than in other nations. Within the United States there are many jails and prisons without any intercom systems at all and where only a handful of cameras are available creating serious issues with visual blind spots. I found the San Diego policies and the use of intercoms and video surveillance to be one of the best from my professional knowledge and experience on these topics. The following are the applicable policies that address these issues.

- **<u>Policy I.2 – Intercom Systems</u>**

The County jail facilities are equipped with intercom systems to allow for two-way communication between staff and incarcerated persons. Staff are required to respond to calls for assistance from incarcerated individuals. Intercoms are in areas accessible by incarcerated persons. Staff are prohibited, by policy, from routinely muting or silencing intercoms. Staff are required to check the intercoms at the start of each shift. The policy requires staff to respond to any call for emergencies or incidents that requires a response.

- **<u>Policy I.19 – Security Video Systems</u>**

The County jail facilities are equipped with surveillance video cameras to maintain safety and security. The cameras are used for movement control and monitoring. The policy requires staff to inspect the video equipment on each shift to ensure proper functioning. There is a process in place to track issues and request repairs as needed.

**Ex. D-472**

- ■ **Policy I.20 – Supplemental Guidelines for Detentions: Body Worn Cameras (BWC)**

The Sheriff's Office has deployed body worn cameras in its jail facilities with deputies being allowed the use of the recording devices after they have been trained. Individual deputies cannot delete video recordings. Unintentional recordings may only be deleted through a request to the Video Analysis Unit (VAU) sergeant who will review the recording and forward it to the VAU lieutenant. A recording may only be deleted after the VAU lieutenant or designee has given final approval.

I considered the various statements made by the plaintiffs during their deposition testimony related to this opinion.

**Plaintiff Andrade** reported being in two fights while housed at a San Diego County jail facility. He claimed that he was fighting alone against six incarcerated persons for 15 minutes in the day room area of the seventh floor at the Central Jail. He reported that he was skilled at fighting from being in prison a lot. (*Andrade deposition, Pages 185-186*.) He admitted that there were cameras in the area where the fight occurred. He even discusses conversations he had regarding deputies observing him via video surveillance. Andrade stated that there were no instances where he participated in a single altercation at the jail that did not have video surveillance equipment. (*Id., 187*.) Andrade had no issues related to jail intercoms or elevators.

**Ex. D-473**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

**Plaintiff Archuleta** stated that he had heard of someone being sexually assaulted by another incarcerated person who might have been mentally ill. Although Archuleta had not seen the assault because it allegedly occurred in another cell away from where he was located, he reported that he discovered that it had been a sexual assault after deputies pulled individuals out of their cells to be interviewed. He claimed that he had a working intercom in his cell, and he pressed it to contact staff. (*Archuleta deposition, Pages 248–249.*) Surveillance cameras are not in cells for reasons of privacy.

Archuleta did not elaborate on whether staff responded back to him or if other incarcerated people in other cells were also pushing the buttons to inform staff at the same time. He said, *"…one of the inmates must have gotten through to the deputies because they pulled the guy that raped the kid out of there so – and then they did an investigation. They pulled us out one by one."* (*Id., 250.*)

The fact that staff pulled out the alleged victim and then interviewed others is indicative of staff responding to the incident and supports the idea that staff were following policy and providing aid as needed. Archuleta provides further evidence of the intercom system working himself when he surmised that one of the other incarcerated persons likely got through to alert the deputies.

Archuleta's deposition included discussion regarding a grievance he filed because he claimed to have not received medical attention after he fell from a stairwell. The incident was caught on video camera and the surveillance footage showed the

**Ex. D-474**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

deputy rushing to Archuleta's aid and breaking his fall and then taking him to be seen by medical. (*Id., 178–179*)

Archuleta reported that on one occasion, he had to take a flight of stairs because a deputy informed him that the elevator was broken. (*Id., 150.*) This claim was not able to be verified independently.

**Plaintiff Clark** provided no specific events in which he was personally impacted by the alleged functionality of the intercom systems. He could only discuss an incident in a dorm housing area where one incarcerated person had a seizure. He claimed that there were three intercom buttons on each of the two floors in the dorm and according to Clark, some of these buttons were not working and people were banging on the walls and yelling to get staff's attention. (*Clark deposition, Pages 211–214.*) Clark was never personally impacted by any issues with elevators. He could only estimate that it took staff additional time to get to the unit where the incarcerated person had the seizure because they must come up to the area using elevators. (*Id., 215.*)

Clark did not personally press each of the six intercoms and his testimony appears to make suppositions about the functionality of the intercoms in that dorm. Clark could not provide the name of the individual who had the seizure and did not have a specific date when the incident occurred. Clark had no incidents noted regarding video surveillance equipment in his deposition testimony.

**Plaintiff Dunsmore** reported that he had been transferred to a psychiatric unit at the jail on or around September 14, 2018. Dunsmore stated that there were video

**Ex. D-475**

cameras present. (Dunsmore deposition, Pages 97–99,) According to Dunsmore, *"If this is true there should be corresponding video because the room had video in it. All my rooms did."* (*Id.,100.*)

Dunsmore suffered no incidents related to the functionality of the jail elevators or intercom buttons. He could not provide a single instance where he was harmed because the intercom system was malfunctioning. He reported being housed in three to five different rooms in the MOB area between 2019 and April 2021. He reported that the toilet call buttons always worked. He could recall one room where the intercom next to his bed did not work (*Id., 135–136.*)

**Plaintiff Olivares** had no personal issues related to problems with video surveillance equipment or elevators. Olivares did report in his deposition testimony that he spoke with a deputy over the intercom in his cell regarding a meeting with his attorney. (*Olivares deposition, Page 152.*) He also reported that a deputy spoke with him over the intercom when he informed staff that he was going on a hunger strike. (*Id., 122.*)

**Plaintiff Sepulveda** had no personal issues that occurred due to problems with video surveillance equipment. Sepulveda alleged that while housed at the George Bailey and Vista jails, he became aware that deputies working in the towers did not respond to intercom calls. He reported that he never filed any grievances regarding this because during the first two years of his incarceration, he was in a different mindset. (*Sepulveda deposition, Pages 236–237.*)

Sepulveda suffered no incidents related to the functionality of the jail elevators.

**Ex. D-476**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

He recalled an incident when he suffered a fall inside his cell. He initially said that deputies never responded to his cell. Then he said they did come to his cell with a wheelchair to get him out. (*Id., 52.*) Sepulveda could not recall how the staff came to know about the injury. He did have an intercom inside his cell but could not recall if he did use the button to summon aid.

Sepulveda said that there was a fight occurring in another cell and he along with other individuals housed in the unit pressed the intercom buttons to get staff to respond. Sepulveda was not personally involved in the fight and was secure in a different cell. He claimed that it was general practice to have enough people pushing the buttons to get the tower to respond.[22] (*Id., 219-220.*)

**Plaintiff Taylor** had no personal issues that occurred due to problems with video surveillance equipment. Taylor suffered no incidents related to the functionality of the jail elevators.

Taylor reported that on October 26, 2022, while housed in protective custody classification a cellmate attacked him. He recalled pressing the intercom button and the deputy responded by asking him what his emergency was. Staff then removed

---

[22] *From having worked in jails and prisons in control room areas where I had to personally respond to intercom calls from incarcerated persons, it would be impossible to respond to multiple individuals at the same time. During an emergency, once staff is informed that a particular cell requires staff response, the control officers would begin the process of calling for all available personnel and then manage the opening and closing of cell doors, closing the day rooms, and getting individuals back into their cells. They might not be able to answer every intercom call button during a period of critical response.*

**Ex. D-477**

Taylor from the cell, and investigators interviewed him regarding the incident. (*Taylor deposition, Pages 135–139.*)

**Plaintiff Zoerner** had no personal issues that occurred due to problems with video surveillance equipment. Zoerner suffered no incidents related to the functionality of the jail elevators.

Zoerner was asked about an incident report dated May 15, 2021, when she had used the intercom system to call the deputy and yell about the lights being left on in the housing unit. She then called again and requested to be locked down for the day. Another incident report indicated that Zoerner pushed the intercom button on June 29, 2022, and began to make incomprehensible statements to the deputy. (*Zoerner deposition, Pages 230–231.*)

Zoerner's records at the jail also include booking data under her family name of Grubbs. A report dated July 1, 2022, showed that Grubbs/Zoerner had called staff using the intercom to inform them that there was going to be an earthquake and that she was informed of this by aliens. When deputies attempted to speak with her via the intercom, she became agitated and began to bang her head inside the cell door. A mental health professional then evaluated her. (*Id., 232–233.*)  This is noted because the intercom worked properly and triggered a response.

**Plaintiffs Edwards, Levy, Lopez, and Norwood** did not have any reported incidents related to the use of intercom buttons, the jail elevators, or the functionality of video cameras at the jail. I found these systems to be functional at

**Ex. D-478**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

the jails, with plans for upgrades/improvements, and no evidence of the County
being deliberately indifferent to IP safety or other needs.

**Opinion 7:**

    **a) Plaintiffs' assertion that the Sheriff's Office fails to equip all
facilities with body scanners, properly maintain the existing
scanners, adequately train staff on their use, or mandate the
scanning of everyone entering Jail is inaccurate.**

Plaintiffs assert that the Sheriff's Office's policies for screening incoming
individuals and staff for contraband are insufficient. Plaintiffs have not provided
any evidence that substantiates such claims. The presence of narcotics and
contraband in jail facilities is a ubiquitous situation in all jails and prisons in the
United States. The fact that incarcerated persons occasionally succeed in smuggling
contraband items is not indicative of a system that is not taking deliberate steps to
prevent such events.

Plaintiffs have complained that the Sheriff's Office does not conduct body scans
of staff, contractors, or visitors. Although it is true that staff are not subject to body
scans, there is no reasonable justification for conducting regular body scans on
sworn peace officers and persons who are cleared by the Sheriff's Office's
background check process and have incentive to retain their job, badge, and
integrity. As noted above in this report, if intelligence indicates suspicion of a staff
member possibly bringing in drugs, additional steps are taken.

**Ex. D-479**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

A new process announced by the Sheriff's Office on July 11, 2024, creates a randomized screening process for screening of all personnel assigned to jails, contractors, and anyone with business in County detention facilities. This includes the use of a metal detector, bag screening, and the use of drug detection dogs.[23]

During my visits to the San Diego County jails, I noted the presence of body scanner equipment at each of the facilities. Facilities designated as intake facilities are the only ones where new arrestees are processed and there are modern body scanner machines adjacent to the sally port areas. The San Diego jail facilities also included body scanner equipment (*Soter RS*) that I have found to be in use in several other jails and prisons in the United States. I was informed that because the Soter RS equipment had a moving platform, staff found it difficult to use when persons are under the influence of alcohol or drugs because they had to remain standing still during the scan. The sally port areas at intake facilities are equipped with body scanner machines (*Tek84 Intercept*) used to scan new arrestees for contraband. I observed a deputy using the equipment and was informed that staff receive specific training on this equipment before being allowed to operate it.

Lieutenant Brenden Bourgeois testified that that all jail facilities have scanners, which are in good working order and use up-to-date software. (*Bourgeois deposition, Page 21.*) Former Assistant Sheriff Theresa Adams-Hydar stated in her deposition that staff at the jail responsible for operating the scanners were trained by the

---

[23] Directive #2407-02 Contraband Screening

**Ex. D-480**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

vendor and they were required to undergo continuous training as needed. (*Adams-Hydar deposition, Page 114.*)

b) **There are various steps being taken to control the introduction of narcotics and other contraband into the San Diego County jails. The current process of addressing narcotics detection and interdiction is comprehensive and appropriate.**

The Detention Investigation Unit (DIU) addresses issues related to gangs, narcotics, and intelligence gathering. The Contraband Narcotics Interdiction team (CNIT) specifically works on gathering intelligence and addressing security concerns related to narcotics entering the facility.

Additionally, there is a Mail Processing Center (MPC) at the Las Colinas facility where all incoming mail is processed using narcotics detection machines and scanned to ensure it does not contain drugs or other contraband. No mail is directly received at any of the jails without first being processed at the Las Colinas facility.

One of the tasks performed by the Mail Processing Center (MPC) staff is to verify that letters marked as legal mail are truly confidential and privileged correspondence. During discussions with MPC staff, I learned that they had identified numerous pieces of correspondence marked as legal mail that were not sent from attorneys and contained drugs and other contraband. The staff emphasized the high volume of attempted narcotics introduction that had been prevented thanks to the use of TruNarc technology to sort out mail items containing narcotics.

**Ex. D-481**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

During her deposition, Adams-Hydar was asked about high-volume mail scanning equipment as recommended by the Grand Jury in their report. Adams-Hydar reported conducting an extensive search for such equipment and found that there was nothing in the market that could currently identify specific drugs using a high-volume scanner. She reported that the process at the jail was robust using a combination of intelligence gathering, visual inspection of the mail by trained deputies, use of canines to sniff out narcotics, and using the existing technology. (*Id., 111-112.*)

The agency employs drug-sniffing canines to assist with narcotics interdiction. These dogs are used in parking lots, housing units, visiting areas, and visitor parking lots across all County jails. The canines used in the jails are not bite-trained; they are solely trained to sniff for contraband.

The complaint regarding whether all sworn staff should be subjected to body scans along with every single visitor and contractor is not supported by evidence that doing so would reduce the flow of narcotics being smuggled into the facility particularly because most of the narcotics are being brought into the jails by incarcerated individuals either on their person or through mail. There are logistical issues that would prevent the implementation of such a process on a regular basis. Deputies who are carrying assorted items on their duty belts and wearing protective vests and other safety items would be forced to remove each item prior to a body scan. This would take so much additional time that staff would not be able to report to their duty-assignments on time.

**Ex. D-482**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

According to Lieutenant Bourgeois, if the Sheriff's Office were to regularly scan non-incarcerated persons before they are allowed to enter the facility, the process could lead to various complex issues. He stated that sometimes a gas bubble could show up on a person's scan leading to suspicion that the individual is carrying drugs. Incarcerated persons would then require placement into a cell where they would have to undergo supervised bowel movement. This would be impossible to do with non-incarcerated vendors, contractors, and professional visitors. The only option in these situations would be for the sheriff's staff to deny entry and state that the individual cannot return until they produce a clean scan. The logistical impact of this can be enormous. (*Bourgeois deposition, Page 17–18.*) Bourgeois stated, *"I haven't encountered lots of staff or people bringing in drugs. Where I've encountered thousands of incarcerated persons bringing in drugs."* He stated that in his 16 years with the agency, he was only aware of a couple of instances where staff engaged in bringing in drugs. He said, *"...through experience daily, incarcerated persons are trying to bring drugs in, because they profit from it, and they use it." (Id., 19.)*

As suggested in the plaintiffs' operative complaint, the proposed scans would also involve contractors, medical, and mental health personnel and even attorneys who are attempting to meet with their incarcerated clients. This would potentially create many more issues in getting people through the entry doors on time.

Notwithstanding my concerns related to creating potential bottlenecks in attempting to bring in staff, contractors, and visitors into the jails, on July 11, 2024, San Diego County Sheriff Kelly A. Martinez announced a new screening process for

**Ex. D-483**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

contraband and narcotics for all jail personnel, contractors, and visitors to County
detention facilities. To maintain security, details of the screening process, including
locations, times, and frequency, will remain undisclosed and screenings will be
randomized. I believe that a randomized approach to screening staff is logistically a
better option than regular, daily screenings of each individual employee, visitor,
and contractor. The process includes screening for contraband using metal
detectors, bag screening, and the use of drug dogs.[24]

Adams-Hydar stated in her deposition that staff at the jail were subject to
randomized urinalysis testing. County Risk Management randomly selected a group
of staff for testing. Sheriff's transportation deputies were tested for drugs more
frequently because they were responsible for driving incarcerated persons. (*Ibid.,
108*)

Adams-Hydar was asked about staff being in possession of illegal drugs on jail
property. She reported that in the past three years, there was one solitary incident
in which a jail deputy's vehicle in the parking lot, removed from the jail facility, was
targeted by a narcotics' canine unit. Subsequently, the deputy was arrested and
went through the normal criminal proceedings. (*Id., 101–103.*)

Other than creating a red herring issue by diverting attention from the actual
issue of incarcerated individuals being primarily responsible for the narcotics

---

[24]San Diego County Sheriff's Office – News Release – New Jail Screening Process.
*https://www.sdsheriff.gov/Home/Components/News/News/2836/514?npage=2*

**Ex. D-484**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

introduction and use, as evidenced by the numerous statements made by many of the plaintiffs in their depositions regarding the severity of their drug usage, the complaint focuses on a non-issue that has no relevance to this case.

**Opinion 8:**

a) **The San Diego County Sheriff's policies related to safety checks as well as personal observations from my touring of the various jails indicates that the Sheriff's Office has adequate policies and practices to address the safety concerns of incarcerated persons. Safety checks occur in each of the jails and staff respond appropriately to individuals in distress.**

Based on the deposition testimony of some of the plaintiffs in this case, I found no instances when they were personally involved in violent incidents where staff failed to intervene appropriately. On the contrary, staff responses were immediate when plaintiffs required placement in suicide watch and during incidents when some incarcerated individuals needed emergency medical response due to drug overdoses. Based on my observations, deposition testimony, and the County's policies, safety checks are done appropriately. Additionally, there is an adequate process for the safety checks to be audited and lapses in checks are addressed appropriately.

From my observations during the jail tours, safety checks are conducted once an hour at all jail facilities. Visual observations are conducted every 30 minutes by sworn staff in the Medical Observation Unit (MOB) and the Psychiatric

**Ex. D-485**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Stabilization Unit (PSU). Individuals under suicide watch are visually observed twice every 30 minutes. Additionally, they are seen every four hours by both medical and mental health staff.

At George Bailey, individuals placed in the Enhanced Observation Housing (EOH), or safety cells are visually checked by a shift supervisor and the watch commander during each shift. This supervisory review includes confirming the checks recorded by deputies in the observation logs. Additionally, safety checks are sometimes audited through reviews of video surveillance recordings.

I considered an Excel spreadsheet provided to me which showed several supervisory audits that were conducted during 2021.[25] The process is thorough and transparent with deficiencies noted as well as comments from the supervisory staff on the steps taken to address the issues. The documentation includes identifying cameras that may be malfunctioning or areas that were not lit properly. In instances where the supervisor found that a deputy had not stopped at every cell to observe the incarcerated individual, supervisory staff met with the deputy and/or emailed them reminding them about the established policy and the requirement to adhere to the Sheriff's Office rules.

---

[25] SD_1519297

**Ex. D-486**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

## San Diego County policies related safety checks

- ### Policy I.64 – Safety Checks: Housing and Holding Areas of Incarcerated Persons

During safety checks, sworn staff physically enter each housing module to observe incarcerated individuals for signs of medical distress, trauma, or criminal activity. In cell-style modules, they stop at or enter each cell to observe the occupants. In dormitory-style modules, they walk by each bunk to ensure they can see each person.

The facility commander assigns a sworn supervisor to review safety checks in housing or holding areas. This supervisor reviews safety checks from one complete shift for each team monthly. Each facility outlines a schedule of locations and the month of review. JIMS Area Activity Logs and corresponding video footage are used for reviewing safety checks, when available.

- ### Policy I.52 – Sobering Cells

The procedure aims to ensure the safety and well-being of individuals held in sobering cells, providing regular monitoring, assessments, and appropriate responses to any medical or mental health concerns that arise. Sworn staff must observe individuals in sobering cells every 20 to 30 minutes and document their behavior and observation times on the J-19A form. The on-coming watch commander reviews these observations and the individual's condition at the start of each shift, documenting their review by signing the J-19A form with their initials, date, and time.

**Ex. D-487**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

A **BSCC targeted inspection** (*See Section VI., A*) at the Vista Detention facility on February 29, 2024, reviewed compliance with Title 15 – Section 1027.5 safety checks, restraint device use, medical assessments for restrained individuals, continuous visual observation, and access to exercise and recreation time. BSCC staff confirmed with incarcerated persons that they received the required exercise and recreation times. The inspection found no noncompliance with Title 15 or Title 24 Minimum Standards.

**An unannounced inspection was also conducted on March 1, 2024, by the BSCC** at the Rock Mountain facility. The inspection reviewed Title 15 – Section 1027.5 required safety checks for all individuals, including those in safety cells and sobering cells. The BSCC inspection found no items of noncompliance with Title 15 Minimum Standards.

Lieutenant David Blackwell said during his deposition that as part of policy, supervisory review of safety logs was required at each of the facilities, twice per shift. (*Blackwell deposition, Page 20.*) Blackwell reported that actual safety cell checks were not logged into the JIMS. These were documented on paper logs next to the cell doors. (*Id., 22.*)

Commander Christina Ralph reported in her deposition that supervisory staff were required to review safety check logs for accuracy. According to Ralph, whenever supervisory staff discovered a discrepancy and suspected that a deputy had logged in a safety check without conducting the check, the supervisor sent a request to the Internal Affairs unit for investigation. She was aware of a few

**Ex. D-488**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

instances when such events occurred. The consequences of a sustained charge based on the investigation could result in written reprimand, pay reduction, suspension, reassignment from position, and termination from employment. (*Ralph deposition, Pages 154–157.*)

I found that many of the plaintiffs reported that they had benefited from San Diego County staff's quick responses to medical and mental health emergencies.

**Plaintiff Norwood** overdosed ███████ on July 17, 2021, and recalled waking up in a hospital. On September 22, 2021, he filed a grievance reporting that after his ███████████ at the jail, staff performed chest compressions to save his life, resulting in broken ribs. This is often a consequence of CPR, but Norwood's life was saved by the staff response.

**Plaintiff Edwards** reported that in 2020 or 2021, he ████████████ at the jail in a suicide attempt. Deputies rescued him by administering five doses of Narcan to revive and save his life. But for the timely intervention of deputies who saved their lives, Norwood and Edwards may not have survived the incidents.

**Plaintiff Sepulveda** reported information regarding another incarcerated person who had been saved from a potentially fatal fentanyl overdose event by staff intervention.

**Plaintiff Dunsmore** expressed suicidal thoughts to staff and was immediately placed in Enhanced Observation Housing (EOH) and visually checked every 15 minutes while he was under suicide watch for a duration of between five and six days.

**Ex. D-489**

**Plaintiff Andrade** was placed under suicide watch observation for 36 hours in August 2022 after expressing suicidal ideation.

**Plaintiff Lopez** was placed under suicide watch observation after a mental health professional conducted an assessment and determined that Lopez was at risk for self-harm.

**Plaintiff Olivares** had multiple placements into the Inmate Safety Program after he informed staff that he had gone on hunger strikes and displayed self-harming behavior. Olivares was placed into EOH for his own safety.

**Plaintiff Zoerner** had multiple EOH placements from her aggressive self-harming behavior by violently banging her head against the cell door and glass window causing injuries. Staff responded to all such events and protected Zoerner from self-harm.

Based on the above information, plaintiffs were never allowed to be at risk because staff intervened appropriately and in a timely manner to each instance of self-harming behavior. None of the plaintiffs reported being involved in fights or being assaulted by other incarcerated persons and therefore did not suffer any injuries. There is no evidence that plaintiffs can rely on to show that they were harmed in any way due to any alleged lapses in safety checks. Apart from these individual plaintiffs, the County's policies and practices are constitutionally adequate to protect the safety of incarcerated persons, as described in more detail above.

**Ex. D-490**

**Opinion 9:**

**a) The Sheriff's Office adequately classifies and assigns people to appropriate housing locations where they can be safe from injury and violence. The Sheriff's Office relies on objective classification and considers various risk factors and needs assessments.**

The San Diego County classification process is objective, and individuals are assigned appropriately to the various jails based on their classification criteria. Plaintiffs claim that the Sheriff's Office fails to train classification staff on how to properly classify people and to keep them safe is not based on facts. There is no evidence suggesting that any of the named plaintiffs were misclassified or that incarcerated persons in general are misclassified. From my review of records, each of the plaintiffs were placed in appropriate housing based on their risk factors at the time of assignment. This is due to the classification system and policies in place, and extensive training of JPMU staff.

According to **Policy R.1 – Incarcerated Person Classification**, the Jail Population Management Unit (JPMU) is tasked with conducting classification assessments, assigning classifications, and determining housing for all incarcerated individuals. The initial classification process considers factors such as booking charges, criminal history, medical and psychiatric conditions, and information gathered during interviews with the person. Based on this classification, each incarcerated individual is placed in the most appropriate housing location.

**Ex. D-491**

In addition to Policy R.1, the following policies apply to classification of incarcerated persons:

- **Policy R.3 - Incarcerated Person Classification Code – Descriptor Definitions**

This policy identifies the various classification levels based on risk factors and distinguishes the criteria for minimum, low, medium, high, maximum, and high maximum custody assignments.

- **Policy D.9 – Detention Operation Training**

Each deputy assigned to work in detentions is required to complete two phases of in-service training that can last between 42 and 49 days. This in-service training is in addition to the corrections academy that is required for all corrections officers or deputies in the state of California.

- **Policy J.3 – Separation: Definition and Use**

The separation of incarcerated persons is done only when necessary for safety, security, or investigative purposes. The policy aims to ensure that the separation of incarcerated persons is conducted fairly and without discrimination.

- **Policy R.11 – Incarcerated Person Facility Assignment Criteria**

The criteria for housing assignments as detailed in the above policy outlines the programs, services, and risk factors considered for determining placement into specific jail facilities in the County. These include consideration of booking charges, criminal history, prior prison commitments, medical and mental health services, administrative separation, and protective custody needs.

**Ex. D-492**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

**b) The Jail Population Management Unit (JPMU) deputies assigned to classification are selected and trained to meet agency standards. Staff assigned to classification are adequately trained and this has resulted in proper housing and assignments for incarcerated persons.**

The JPMU classification deputies at the San Diego County Jail undergo a comprehensive selection and training process to ensure they are well-prepared for their roles. Deputies assigned to the jail classification team are selected through a rigorous interview process. This ensures that only those who meet specific criteria and demonstrate the necessary skills and aptitude are chosen for the classification unit. Once selected, deputies are assigned to the classification unit for a period of four years. This extended assignment period helps in building expertise and consistency within the unit.

Before becoming classification deputies, these individuals already receive the standard training required for all corrections officers. This foundational training covers the essential skills and knowledge needed to work in a correctional environment. In addition to their regular training, classification deputies receive an extra 28 days of specialized training focused on classification-related topics.

From my personal observations during the jail visits, I noted the classification of individuals at the Central Jail is categorized from levels I through VI. Levels I, II, and III are considered lower custody, indicating a lower risk and fewer restrictions. Levels IV, V, and VI indicate higher risk, with level VI being the highest risk

**Ex. D-493**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

classification. Individuals with a high custody status are often referred to as "greenbanders," identified by their green uniforms and wristbands, which signify their high custody status.

The classification interview at the Central Jail, which is an intake facility, is conducted face-to-face, with the individual sitting across the desk from the classification deputy and answering a variety of questions. These questions resemble those used in dozens of facilities across the country, ensuring a standardized approach to classification.

Rita Diaz, who serves as the JPMU sergeant, reported that initial classification takes place at the intake facilities - Las Colinas, Vista, and Central, but reclassification can occur at any facility. She stated that there is no designated confidential space for classification interviews, and it is up to the classification officers to find a secluded area when necessary.[26] Written guidelines exist only for interviewing transgender, intersex, and nonbinary individuals in a confidential area to establish search preferences. Reclassifications occur based on a report generated four times a day and every 45 days. The four-times-daily report flags individuals with changes in charges, sentencing, or behavior, prompting immediate reclassification. The 45-day report ensures regular evaluation of classification, with

---

[26] *The Central Jail does have a specific classification area that should be considered confidential and is accessible to classification staff that wish to use it.*

**Ex. D-494**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

about 20 to 30 individuals typically reclassified daily. (*Diaz deposition, Pages 43-45.*)

According to Diaz, if an individual's charges are reduced, their classification level is adjusted immediately, and they are moved to appropriate housing. Diaz reported that the process occurs within minutes and does not take longer than a day. (*Id., 47–48.*)

Diaz explained that incarcerated individuals are classified as soon as possible after booking but before being assigned to a housing area, with no specific timeline required by policy. The average time to classify an individual ranges from 6 to 10 hours for compliant individuals but can be longer for those under the influence or displaying suicidal behavior. While it sometimes takes more than a day or two to complete the classification process, it is not common for the process to exceed two days. Diaz estimated that about 10% of individuals might take more than two days to classify, and around 30% might take more than one day. During the classification period, individuals are held in booking holding cells, which are not considered housing. (*Id., 27-30.*)

Exceptional care is taken to provide appropriate assignments to persons with special needs. As an example, although the George Bailey jail houses classification levels One through Six, the facility does not house transgender individuals due to the design of the shower areas, which do not provide sufficient levels of privacy for transgender persons.

**Ex. D-495**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Another example of the care taken by classification includes the Vista facility, which houses individuals with medical challenges, those under psychiatric care, an administrative separation unit, and defendants facing high-publicity trials. The Vista facility also includes a unique program dedicated to incarcerated individuals who are former members of the United States military, in collaboration with the U.S. Department of Veterans Affairs. This veterans' module is a dedicated housing unit designed to assist incarcerated veterans with in-custody programs and services aimed at reducing recidivism.

The Las Colinas facility only houses women and serves as the main jail and intake facility for females in San Diego County. The facility houses classification Levels I through VI and includes Administrative Segregation and Administrative Separation areas. Intake and booking are conducted similarly to the Central Jail, with medical staff administering an initial questionnaire to determine if someone should be accepted into the jail. If needed, mental health staff are contacted for further evaluation. Classification staff then perform in-person classification interviews to determine appropriate housing. If an incarcerated person is placed in Administrative Separation, a weekly review is conducted to assess whether continued placement in this area is warranted. JPMU staff conducts an evaluation every Sunday to review the necessity of continued placement in Administrative Separation.

According to information I gathered from speaking with various JPMU staff, each incarcerated person in the County jail system is reviewed on paper every 45

**Ex. D-496**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

days to ensure appropriate classification. If a new event occurs, such as a court hearing, transfer, or incident requiring a change in classification, the staff conducts in-person reviews sooner than the 45-day interval to adjust classifications and housing assignments accordingly. The review process involves checking an individual's records, which includes looking into any disciplinary issues, court orders, changes in sentences, and medical or mental health-related classification adjustments. Reclassification may occur after a court appearance or if there is a need for different housing based on factors such as disciplinary actions and institutional conduct.

JPMU and other staff rely on the agency-wide Jail Information Management System (JIMS) to enter and find information related to incarcerated persons. JPMU enters classification related information into the system. According to Captain Kyle Bibel, the JPMU staff decides where an incarcerated person must be housed. (*Bibel deposition, Page 75.*) Medical staff determines whether an incarcerated person requires a lower bunk and/or a lower tier designation.

Captain Bibel reported that JPMU staff is responsible for the overall population management at the jail. They consider whether the incarcerated person is suitable for placement in a certain area and then if there are open beds available. The housing deputies in the units then determine the specific cell and module assignment. The housing deputies meet newly assigned individuals for a face-to-face conversation to determine the best placement. The housing deputies use JIMS to find information related to the incarcerated persons including specific

**Ex. D-497**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

requirements like lower bed and lower tier assignments. (*Id., 111-113.*) Deputies do not have the ability to override a lower bunk, lower tier designations. (*Id., 123.*)

Lieutenant Matthew Jensen reported that the JIMS includes a section under each incarcerated person's information titled *Hazards and Instructions*. This section is used to alert staff if an incarcerated person is in custody on a third-strike offense, has maximum custody classification of "green-bander," is not allowed possession of razors, etc. The section also includes but is not limited to information regarding someone who may be deaf or hearing impaired. (*Jensen deposition, Page 124.*)

I considered an Excel document titled *TechCare Flag Mapping* which provides over 200 JIMS codes for various housing and classification needs. Under the various Americans with Disability Act (ADA) categories, I found individual codes for someone who required mobility assistance, learning disabilities, or vision-related accommodations. Someone using crutches had an individual code, as did someone experiencing drug detox or a person receiving dialysis treatment. This indicates that the Sheriff's Office classification includes a review of numerous factors that must be considered in determining the most appropriate housing assignments.

Finally, regarding the classification of the individual plaintiffs in this case, I could not find a single plaintiff who had been deposed that could be considered appropriate for classification levels under maximum and high maximum.

**Plaintiff Andrade's** previous stay in maximum custody in prison along with his convictions for assault with a deadly weapon and other criminal history would place him at level V – maximum custody.

**Ex. D-498**

**Plaintiff Archuleta's** violent criminal history including convictions for discharging a firearm at an occupied vehicle, a home invasion robbery, and a felon in possession of a firearm as well as his prior prison sentence would place him at level V – maximum custody.

**Plaintiff Clark's** prior convictions related to burglaries, robberies, and drug possession and prior prison terms would have made him appropriate for a level V – maximum custody classification. Clark's 290 registration as a sex offender is publicly available information and because of this, he should have been placed into protective custody classification. The only time when someone should be considered for general population assignment with a prior sex offense charge if the individual voluntarily wishes to be assigned to general population and classification staff determines that this can be accomplished in a safe manner.

**Plaintiff Dunsmore** had prior convictions for burglaries, auto theft, and escape from custody. He had done prison terms in New Mexico and California. Dunsmore would have been appropriate for a level V – maximum custody classification.

**Plaintiff Edwards** had prior convictions for first degree burglary and arson previously been sentenced to state prison making him appropriate for level V – maximum custody classification.

**Plaintiff Levy** had a prior prison commitment and had escaped from prison. She had been a fugitive and although she was not a violent offender, she had a higher risk of escape, making her appropriate for level V – maximum custody classification.

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

**Plaintiff Lopez** was facing serious felony charges for sexual intercourse with a child under 10 years old and lewd and lascivious acts with a child under 14. Lopez would have been considered a high maximum custody individual because of the high-profile nature of his case. He should have been placed into protective custody because his charges would have most likely resulted in him being violently attacked by other incarcerated persons.

**Plaintiff Norwood's** prior prison sentences, criminal sophistication, and crimes related to drug sales would have resulted in him being classified to level V – maximum custody.

**Plaintiff Olivares'** prison sentence for kidnapping, armed robbery, and rape would have made him appropriate for level V – maximum custody classification. Olivares was also a 290 registrant, and this information would have been publicly available. Coupled with his prior prison sentence records indicating that he had been in protective custody, he would have been best housed as a protective custody individual at San Diego County jail.

**Plaintiff Sepulveda's** attempted murder conviction and accompanying prison sentence along with other serious charges including violent felonies would have made him eligible for level V – maximum custody classification.

**Plaintiff Taylor** had prior prison sentences for convictions related to robbery and domestic violence. He had a record for violent assaults, rape, and sexual battery. Taylor would have been appropriate for level V – maximum custody classification. Although he wanted to be housed in general population, he became

**Ex. D-500**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

concerned about other incarcerated persons finding out about his sex offenses and requested to be moved into protective custody.

**Plaintiff Zoerner** had a conviction related to a robbery charge and was sentenced to prison for four years. She had violent charges related to exhibiting a deadly weapon and resisting an executive officer. She would have been appropriate for level V – maximum custody classification.

Based on the review of each of the deposed plaintiffs' criminal history and the resultant classification, I do not find that any of them were misclassified. This supports the opinion that the process of classification at the San Diego County jail facilities is proper and considers institutional safety and security in housing decisions.

## Opinion 10:

a) **Plaintiffs' allegation that the Sheriff's Office excludes people designated as protective custody from housing in the Out-Patient Step Down ("OPSD") unit lacks merit because it does not consider the complexity of classification related issues in managing the safety and security of individuals in protective custody.**

Based on the deposition testimony of some of the plaintiffs, there is no indication that any of them claimed they were denied access to OPSD while they were under protective custody. The evidence shows that none of the plaintiffs who requested protective custody had any issues with that designation and classification. The notion that protective custody individuals should be placed into an area with others

**Ex. D-501**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

who might pose a significant threat to their safety is dangerous and simply unreasonable.

The allegation most likely resulted from statements made by a former employee named Jennifer Alonso. Alonso worked as a mental health clinician, primarily serving the Outpatient Step Down (OPSD) units designed for incarcerated persons with serious mental illnesses. Alonso was asked about her description of a blanket exclusion from OPSD for people who were otherwise clinically appropriate for that placement because they were in protective custody. Alonso claimed that the protective custody patients had to be housed with other protective custody individuals who were not in the OPSD program. She disagreed with this process. When asked if she knew that persons in protective custody are often in that classification because of the threats they might face from gangs or the fact that they may have cooperated with the police, Alonso felt that no one in OPSD posed any form of harm to protective custody individuals. (*Alonso deposition, Pages 85–87.*)

Alonso stated the following in her testimony:

> "*So, in OP Step Down, the inmates are so severely impaired that they do not politic, if you will. They don't know the difference between -- they're not -- they don't, they don't operate that way. They're too impaired to operate that way. So they don't really identify somebody as a sex offender or, oh, you were in this gang. They're too impaired to do that. So that to me I didn't feel like that was any risk because those people are barely meeting their basic needs. They're not capable really of doing that type of jail politicking.*" (*Id., 87.*)

**Ex. D-502**

It is important to note that Alonso had never previously worked in a jail facility before working in a correctional environment at the San Diego County jails. Her statements regarding the severe threats posed to individuals who are in protective custody is based on a lack of understanding regarding how dangerous it can be for someone such as Plaintiff Lopez who might be attacked or killed by other incarcerated persons because of ███████████████████. Plaintiffs Clark, Olivares, and Taylor are all convicted of sex offenses and placing any of these individuals in housing units with incarcerated individuals without considering the severity of the threats they may face because of their prior criminal history would be disastrous. Safety has to be a paramount consideration in jails.

Alonso admitted that some of the individuals who were in OPSD could graduate back to the general population. (*Id., 88.*) The only way that someone in OPSD could return to the general population would be after they had gained competency and were no longer dealing with the mental impairment that caused them to be in OPSD. The fact that at least some people in OPSD could show cognitive improvement suggests that they could potentially identify someone who might be a sex offender once they had regained competency, and then pose a threat to those individuals creating a safety and security issue.

Alonso's weak arguments suggesting the protective custody individuals could assuredly be allowed into the OPSD because the other participants were so diminished in capacity that they did not pose a threat is irrational, naive and not based on factual data. At best, it was a hunch that such a placement would work.

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

The worst-case scenario – following Alonso's unproven hunch would have severely jeopardized the lives of individuals in protective custody and created significant safety risks to some incarcerated individuals. Alonso wanted corrections personnel to implement a practice that flies in the face of good correctional policy and appears to be unhappy that her ideas were not adopted.

Alonso had provided a declaration statement in which she had mentioned that custody staff are, by policy and practice, engaged in overruling mental health clinicians. When asked about specific examples of this occurring, Alonso expressed that on one occasion, a lieutenant decided that a patient should not be moved due to safety reasons after the patient assaulted a deputy. According to Alonso, she did not think the lieutenant was lying about the patient assaulting a deputy. The lieutenant told her that the patient was unpredictable and that created a safety issue. Nonetheless, Alonso felt that accommodating the patient was appropriate even though he was assaultive. (*Id., 60–61.*)

Alonso did not provide a specific timeline when the above issue occurred with the lieutenant. It is possible that it occurred prior to changes being made regarding this issue. Sheriff's Mental Health Director Melissa Quiroz acknowledged historical issues where custody staff's involvement with clinicians may have been tense. She said, "*I can think of times when there may have been some tension between, you know, a clinician trying to advocate for what they felt was recommended and a sworn staff member having a difference of opinion.*" (*Quiroz deposition, Page 59.*)

**Ex. D-504**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

However, these concerns have been addressed by rewriting policies to prioritize clinical opinions. Quiroz said:

> "...in February of 2019, the policy was rewritten about how we utilize safety cells and enhanced observation, and with that change in language in the policy it really pushed the clinical opinion right to the top. So, with that implementation what we now see is a drastic safety cell placement decline. So, the clinicians need to weigh in, and they're the ones placing. No longer are the days of a sworn individual gets to say who goes into the safety cell or EOH." (*Id., 60.*)

There are other concerns related to Alonso's conduct that question her motive. Alonso was disciplined twice while employed with the County. In the first incident resulting in discipline, she fell asleep when she was required to provide constant observation of one female patient inside the psychiatric unit. From my experience, constant observation is only required when someone is an imminent threat for self-harm and needs to the watched on a continuous basis. She was also disciplined for being tardy, which is a lesser offense. (*Id., 23.*)

Alonso secretly photographed cells of incarcerated individuals to show that they were dirty. She used her personal cell phone to take the photographs. (*Id., 79–80.*) One cell was vacant, and the other cell had incarcerated persons inside it. From my review of the San Diego County Sheriff's policy on cell phone use,[27] the following

---

[27] San Diego County Sheriff's Office – Procedure Section 7 – Communications – 7.4: Cellular Phone / Other Wireless Electronic Devices *https://www.sdsheriff.gov/home/showpublisheddocument/8298*

**Ex. D-505**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

statement appears in policy: _Personal wireless devices will not be authorized nor
supported for departmental use_. In addition to the violation of policy by using a

personal cell phone, Alonso also violated policy by taking photographs that included

incarcerated persons inside the cell.

Alonso admitted that one of the cells she photographed with the door open was

because it was getting ready to be cleaned. (*Id., 81*.) Other than showing the photos

on her cell phone to her supervisor in mental health (and perhaps providing them to

Plaintiffs' counsel), she never reported any concerns she might have had with the

cleanliness of the cells to any of the sworn staff members.

## Opinion 11:

Plaintiffs have made a number of statements in the operative complaint about a

variety of events that were either caused by or worsened by the issue of staffing

shortages. I do not find this to be true. Staff shortages are largely covered by the

use of overtime and other measures as described below.

**a) The San Diego County Sheriff's Office been diligent and working
hard to address staffing shortages at the jail with the use of
overtime. Additionally, I found no evidence from any of the
plaintiffs' deposition testimony suggesting that any of them were
ever impacted personally by staffing shortages.**

The topic of staffing is covered under **Policy C.1 – Minimum Staffing**, which

states that each facility has a minimum staffing level that is defined and considers

operational requirements to maintain safety and security. The facility commander

**Ex. D-506**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

or their designee is responsible for ensuring that there are always sufficient staff on duty, capable of responding promptly in the event of an emergency.

There are no specific incidents provided by the plaintiffs in their complaint where a lack of staffing resulted in them being denied care. In several cases, plaintiffs were rescued by staff who responded with urgency to attempted suicides, self-harm behavior, and drug overdoses. There are no examples of plaintiffs suffering a loss that was directly attributable to staffing shortages.

Former Assistant Sheriff Adams-Hydar was asked if insufficient staffing levels impaired the ability of custody staff to respond to emergencies; she stated that it did not. Deputies respond to emergencies as they normally would, locking down their housing units and running to the scene of the emergency. Adams-Hydar had never witnessed an emergency where there was a lack of deputies and/or medical staff present, as confirmed by her personal experience and video footage from body-worn cameras. She found that deputies respond effectively to emergencies by locking down the housing units and having a designated deputy stay there while others manage the situation. Law enforcement is well-trained to respond to emergencies, and they do it without hesitation. (*Adams-Hydar deposition, Pages 140–141.*)

From my experience, staffing shortages in law enforcement and corrections have been an issue for decades. I am aware of some agencies in other states where corrections officers are paid wages so low that they must work second jobs to make ends meet. In other agencies, staff reported that they left their corrections jobs

**Ex. D-507**

because working as a server or cashier paid better wages. San Diego is not one of these types of agencies. Staff pay is not the primary issue for staffing shortages.

I have toured many prisons and jails in the United States and in other countries. Recruitment and retention are a concern everywhere. Better jobs in the private sector, erosion of public safety retirement benefits, negative perceptions around law enforcement and corrections professions, and the actual risks to personal safety are all factors that have impacted hiring in jails and prisons.

I do not know of a single agency in the country that was not impacted between 2020 and 2022 due to Covid-19. This is a well-known fact and almost every jail and prison in the U.S. was faced with methods to reduce the incarcerated persons population considering staff falling ill and dying during the pandemic.

I was informed that during the COVID-19 pandemic, staffing in San Diego County jails was impacted due to staff illnesses. However, this issue has been resolved over time. The jail can fill overtime needs with POST-certified patrol deputies on an as-needed basis. Deputies who work outside the jail as patrol officers have typically been trained in the jail for 24 to 28 months before being assigned to community patrol, making them capable of filling staffing needs at the jail. Additionally, overtime opportunities are available for sergeants and lieutenants, allowing them to work in positions typically covered by deputies. This further assists in addressing staffing shortages.

Commander Christina Ralph stated the following in her deposition testimony:

**Ex. D-508**

*"We're always reaching out for overtime to fill those staffing positions. If there
is an overage of staff at another facility, they call the other facilities and ask if
staff can come over and fill some of those positions as well." (Ralph deposition,
Page 54.)*

Commander Ralph's statement provides one solution that the Sheriff's Office is
using to alleviate the issue of staffing. She also reported that a vacancy rate of 10%
at any of the jails does not indicate that those positions are not being filled daily.
(*Id., 65.*)

Sheriff's Human Resources Administrator Michael Alvarado stated that staffing
shortages in nursing occurred due to Covid, staff moving to positions outside of the
Sheriff's Office, and retirements. (*Alvarado deposition, Page 20.*) Alvarado reported
that significant efforts were made by partnering with various local colleges,
universities, and trade schools to improve hiring positions in the nursing field. He
discussed recruitment staff recently attending the graduation ceremony for
registered nurses at Southwestern, actively participating in numerous job fairs, and
collaborating with the County and our unions to develop recruiting incentives.
These initiatives are aimed to attract individuals to work for the County of San
Diego and the Sheriff's Office, particularly within the medical services division. (*Id.,
24.*)

According to Alvarado, the application process for new applicants has been made
easier and more accessible through the development of a new sheriff's hiring app
that allows applicants to apply for positions directly from their phones, learn about

**Ex. D-509**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

new job openings, and submit their applications on the spot. This app has streamlined the process, making it much more convenient for applicants. (*Id., 25.*) Additionally, a 10% premium was added to the pay for nursing staff to create an additional incentive for recruitment. (*Id., 27.*)

## Opinion 12:

a) **There is no evidence that the Sheriff's Office unreasonably and unjustifiably denied incarcerated people access to confidential communications with their attorneys.**

I considered the Sheriff's Office's policies related to legal services for incarcerated individuals. These are identified as follows:

- **Policy N.7 – In Propria Persona Status (Pro Per Incarcerated Persons)**

Pro Per privileges are exclusively granted for criminal cases; civil, juvenile, and family law cases do not qualify unless granted by the court. Pro Per status ceases upon sentencing or conclusion of confinement conditions in the trial court.

- **Policy N.6 – Conditions of Confinement Incarcerated Persons**

All facilities must ensure fair and equal treatment for self-represented incarcerated individuals involved in "conditions of confinement" actions. These individuals are not classified as "Pro-Per" and are allowed to access legal resources through Legal Research Associates (LRA) requests. Conditions of confinement incarcerated people will be allowed two LRA requests per month.

**Ex. D-510**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

- **Policy N.5 – Access to Courts/ Attorneys/ Legal Advice**

Staff shall ensure that incarcerated persons have access to courts and legal counsel. All incarcerated people have the availability of unlimited collect telephone use for communication with their attorneys. Incarcerated persons shall have access to courts and legal counsel including confidential correspondence with courts and any member of the State Bar, and confidential consultation with attorneys.

The **San Diego County Sheriff's Office procedure – 6.105 Audio/Video Recorder Use Requirements** section includes the private nature of attorney-client communications. According to this procedure:

> *"Department employees shall not eavesdrop on or record any confidential communications between a person in custody, and his/her attorney, doctor, or clergy. Department employees shall not eavesdrop on or record the conversation of any person in custody after indicating that the conversation will be confidential."*

In his deposition testimony, Captain Derek Williamson was asked how staff ensure that attorney-client telephone calls are confidential. Williamson reported that the phones used by incarcerated individuals are monitored, and there are no separate phones for attorney calls. The same phones are used for both regular and attorney calls. Calls to attorneys, doctors, or others with privileged communication are not monitored if they have been designated as private. If a call is not to a privatized number, a prompt informs the caller that the conversation is being recorded. Privileged numbers are submitted to the detention investigations unit to

**Ex. D-511**

be entered into a system that ensures these communications remain private.

(*Williamson deposition, Page 41.*)

From my experience, the process explained by Captain Williamson is consistent with the process that I have experienced in many agencies.

**b) Plaintiffs' allegation that the Sheriff's Office staff frequently fails to notify incarcerated people about professional call requests from their attorneys is not supported by evidence.**

Lieutenant David Blackwell stated in his deposition that the Sheriff's Office does not keep reports on attorney callbacks or the wait times for attorneys after checking in to see their clients. However, they do have logs that track access to the law library by incarcerated individuals, which can be pulled to verify specific instances of attendance. (*Blackwell deposition, Page 33.*)

The topic of attorney call backs was brought up in several of the depositions. This allegation requires some perspective. As discussed earlier in this report, the jail booking data shows that between approximately 48,000 and 50,000 persons are booked into San Diego County jails each year based on data from 2021 through 2023. Hypothetically, if each of these bookings resulted in just one phone call from a criminal defense attorney, the jail would be faced with over 132 attorney calls per day. In some cases, these numbers could be much higher. It would be unreasonable to require that the Sheriff's Office staff log each of these phone calls without even knowing that the call originated from an attorney's office and then track this information. The jails receive hundreds of phone calls daily from family members,

**Ex. D-512**

service providers, law enforcement agencies, and other sources. It would create an unnecessary burden to have to write down each of the phone calls and I have never seen this practice in any of the agencies I am familiar with.

From my experience running a jail, there were some rare occasions on which the jail staff might have missed relaying the information resulting in the attorneys calling back and making the same request again. Plaintiffs have not shown how this issue is widespread and systemic. I have done a lot of work on behalf of plaintiffs' attorneys in other states, and I know dozens of defense attorneys around the country. From my professional experience, criminal defense counsel tends to become very unhappy with a lack of contact with their clients. This usually results in formal complaints and letters to the Sheriff or the agency director. I have not seen evidence in this case from a group of attorneys not connected with this case who have made any complaints regarding this issue. Other than the statements made by some of the plaintiffs, there is not much evidence indicating that this is a problematic issue.

Commander Christina Ralph was asked about times when attorneys might have to wait for an extended period to be able to see their clients. She acknowledged that various incidents within jail facilities can cause delays in meetings and visits, including critical incidents and the overall business of the facility. She had heard of delays in social visits and attorney-client meetings. She stated that the operations at the facility are standard, and efforts are made to manage them in a timely manner. However, emergencies and other uncontrollable events can cause delays. She emphasized the importance of managing daily operations effectively despite

**Ex. D-513**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

these challenges. Commander Ralph also affirmed the importance of incarcerated

individuals being able to speak confidentially with their attorneys and

acknowledged that it is the Sheriff's Office's responsibility to facilitate these

meetings. However, she noted that the Sheriff's Office must also ensure the safety

and security of the facility, which can sometimes affect the process. (*Ralph*

*deposition, Pages 40–41.*)

I agree with the statements made by Commander Ralph. I know that during the

Covid-19 pandemic, many limitations had to be enacted including limiting the

number of persons who could be in the same room to ensure social distancing. This

would have an impact on attorneys waiting to see their incarcerated clients. In

other situations, such as a jail riot or homicide, the emergency nature of the

incidents would dictate the amount of movement that can be allowed with

incarcerated persons, which would also limit the speed with which attorneys are

allowed to meet with their clients. These unpredictable events are a part of jail and

prison life and from my professional experience, attorneys providing services to this

population are generally aware of such concerns.

As a former jail administrator in Napa County, I frequently met with private

defense attorneys and public defender attorneys who had concerns about access to

their clients. While every effort was made to accommodate those concerns including

the option of conducting attorney-client visits via video visitation, many attorneys

preferred to wait to accomplish an in-person meeting rather than use video

visitation technology.

**Ex. D-514**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Commander Ralph was asked if the spaces provided for attorneys to meet with their clients were private if the visits were held in an area that had an incomplete wall between two visiting rooms. She responded that it would depend on whether any other people were present in the area. (*Id., 43.*)

From my experience, the physical layout of the visiting room space is not important. As an example, in some of my previous facilities, I allowed attorneys to visit with their incarcerated clients inside a large dining hall area that could seat 200 people. No one was in the dining hall other than the attorney and the client. A corrections officer was posted several feet away from the meeting location to provide security and transport the incarcerated individual to and from the meeting. It is more important that the meeting is private regardless of which location in the facility the meeting occurs.

**c) I find that access to law library services could be improved and the current process of using the services of Legal Research Associates (LRA) should be enhanced to provide additional access; however, they meet constitutional and title 15 minimum standards.**

The use of an offsite law library service has become more common in recent years in jails and prisons across the nation. Primarily, this allows incarcerated individuals to have greater access to legal materials because they are not limited to the physical constraints and security concerns created by having to move individuals of varying classifications in and out of the library space. Having a defined area for law library service for all incarcerated persons can slow down

**Ex. D-515**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

access as staff must move people to and from their housing units. Additionally, individuals may not be able to access the law library at the same time because they do not meet the classification criteria to be in the same location. This occurs when incarcerated persons have gang affiliations, or have been identified as protective custody, or they have known enemies within the jail system. Due to these concerns, many correctional institutions are now utilizing offsite law library services such as LRA.

I considered the limitation that is currently in place on the number of LRA requests that can be provided per month to individuals who are not Pro-Per and are only allowed two LRA requests per month. I have spoken with counsel regarding this, and I have been informed that the County is open to considering changes to this process to allow greater access to LRA requests. However, the current policies on law library access are constitutionally adequate.

## Opinion 13:

a) **Plaintiffs' allegation that the Sheriff's Office does not provide adequate reentry programming or planning for people being released from jail is not supported by evidence. I found that the reentry and pre-release processes at the San Diego County jails were comprehensive and appropriate.**

Whereas plaintiffs have claimed that incarcerated people are not provided with adequate resources to ensure that they have access to employment, housing, medical care, and other basic needs once released from jail, there are ample services

**Ex. D-516**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

provided which exceed many other counties. Further, as reported in the earlier opinions, all plaintiffs deposed in this case should have been classified as maximum custody individuals who would not have qualified for many of the reentry services. Most of the named plaintiffs are currently in state prison, some are facing lengthy sentences, some have prior escape charges, and some are convicted sex offenders. All these factors would have limited access to community-based programs and services. This specific allegation may not apply to any of the named plaintiffs based on my review of their criminal records. None of the deposed plaintiffs have shown how they were discriminated against or denied access to behavioral services, or not allowed to participate in reentry services. Nor did I find the services/ policies to be discriminatory or inadequate in general.

I considered the policy related to reentry services for incarcerated individuals.

- **Policy E.1 – Philosophy, Goals and Definitions – County Parole and Alternative Custody Unit (CPAC)**

The County relies on various alternatives to custody programs to promote safer reintegration back into the community from a detention setting.

I reviewed the **2018/2019 Grand Jury Inspection Report** (*See Section VI. B*), which highlighted several programs addressing the needs of individuals with mental health issues facing incarceration. A Behavioral Health Court was utilized to divert individuals into counseling and psychiatric services, with some being placed on probation instead of serving jail time. Additionally, the Sheriff's Office implemented the Programming for Reentry, Support, and Stability (PROGRESS)

**Ex. D-517**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

initiative to identify incarcerated individuals who could be better served in treatment programs rather than remaining in custody. The executive summary from the Grand Jury's report said, *"The Grand Jury was impressed by the programs for rehabilitation and reentry for inmates returning to society."*

Former Assistant Sheriff Theresa Adams-Hydar stated in her deposition that the San Diego Sheriff's Office is a leader in reentry services within the correctional environment, with Las Colinas being one of the top reentry facilities in the state and nation. Leaders from large jails across the country had come to visit Las Colinas, highlighting it as a model for reentry. East Mesa has also been a prominent reentry facility for over 20 years. The department offers numerous reentry programs, emphasizing their strong commitment to reentry services. (*Adams-Hydar deposition, Page 262.*)

Reentry Services Manager Patricia Ceballos reported that she oversaw programs and services in all seven of the County's jails. The reentry services division is responsible for various programs and services, including handling all incarcerated persons' request forms related to reentry on different topics. The counselors engage in reentry planning, case management, and linking individuals to community-based organizations. The division partners with a range of these organizations, acting as liaisons to bring in additional services such as group activities or one-on-one support. Additionally, the staff facilitates all faith-based or religious services across all seven detention reentry facilities. According to Ceballos, there were over 130 staff assigned agency-wide to provide reentry services. She reported that the

**Ex. D-518**

staffing vacancies were less than 10 positions across all facilities. (*Ceballos deposition, Pages 7–9.*)

Ceballos reported that even incarcerated persons housed in Administrative Separation units could receive reentry services. There are group and individual programs available for this group of people. (*Id., 10–11.*)

According to Ceballos, approximately 5,000 individuals participated in one or more reentry interventions over a one-year period. These interventions go beyond basic interactions, involving individuals who are enrolled in programs or classes. Participants are actively engaged in ongoing programs and services, such as college courses, education courses, and vocational courses. (*Id., 13.*)

Commander Christina Ralph reported in her deposition that Reentry Services provided in-person interpretation using American Sign Language (ASL) for hearing impaired persons. (*Ralph deposition, Page 198.*) According to Ralph, Reentry Services were responsible for education programs at all the jail facilities and religious services were under the Reentry umbrella. According to Commander Ralph, Reentry Services has been assisting individuals with ADA needs for years, providing resources such as large-print documents and magnifying products. They have also fulfilled requests for ASL interpreters during classes and other programs. ASL interpreters have been provided for testing and other necessary assistance. Reentry Services is part of the ADA Unit and actively identifies available programs and services at each facility to ensure accessibility for individuals with disabilities across all facilities. (*Id., 203–204.*)

**Ex. D-519**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Per the Detentions P&P, an incarcerated person classified as Administrative Separation is monitored/reviewed every seven days to assess their continued need to be in this type of housing/classification. The seven-day review is documented by sworn staff in JIMS, and comments are entered into each incarcerated persons' JIMS history to describe the need for continued separated housing.

From my jail inspection tours, I found that Reentry services were engaged in all the facilities in various capacities. At the Las Colinas facility, I observed a group of staff which included a sergeant, classification deputy, reentry services staff, mental health staff, and medical staff interacting with a patient performing a wellness check.

I spoke with reentry staff and was informed that they assist incarcerated persons with obtaining California Identification cards through the DMV. High School classes and equivalency tests are provided, with modern classroom facilities featuring computer workstations and study areas. The classrooms display photos of students who have passed their exams. There are dedicated areas for a Reading Lab and Life Skills programs.

Las Colinas also offers a vocational sewing and screen print program, teaching practical skills using commercial sewing machines. Participants make uniforms, napkins, face coverings, dolls, toys, and other items. An indoor/outdoor horticultural program teaches incarcerated individuals to raise fruit and vegetables, with a female deputy assisting participants. These programs assist in reentry by providing skills to find employment upon release from custody.

**Ex. D-520**

The Reentry Services staff at the George Bailey facility is responsible for handling programming and legal requests from incarcerated individuals.

The East Mesa facility is heavily focused on rehabilitation and reentry programs. It recently hosted a job fair where local employers interviewed incarcerated individuals. The facility also partners with a local public school to provide high school classes, featuring modern classrooms with computer workstations and photos of students in caps and gowns.

Café Moto, which operates a program at Las Colinas, also offers a similar program at East Mesa, where staff can purchase coffee beverages. The incarcerated persons trained as baristas are then able to find gainful employment with Café Moto upon release from jail. The East Mesa facility provides an extensive list of programs and services, including assistance with obtaining California Identification cards, job applications, and securing Medicare eligibility while still in custody.

The current reentry programming at Rock Mountain includes preparation for High School equivalency testing and evidence-based programs such as Thinking for Change (T4C), a men's trauma group, and a course titled "Art of Inclusive Communication" provided by the National Conflict Resolution Center (NCRC). These programs are conducted in group settings for individuals classified at level four.

For those classified at Level V, interactive workbooks are provided. High school education is available through an agreement with Grossmont Adult Education. Incarcerated individuals can also participate in a course to obtain their Food

Handler's card. Additionally, Healthy Relations of California offers an Anger Management program.

There is no evidence that any of the deposed plaintiffs (or other IPs) were denied reentry services if they made such requests. The type of service would depend on the need. Programs provided through Reentry Services are comprehensive and plaintiffs were able to take advantage of programs if they wished to do so. None of the programs are mandatory and incarcerated persons must voluntarily want to attend these programs. However, there must be some justification for certain services. It would be pointless to aid in getting employment and housing related services if someone is in the process of going to prison for a lengthy period. High School equivalency programs are available to everyone as well as many diverse types of programs that can be accessed via correspondence.

The Sheriff's Office also uses an alternative-to-custody program referred to as the County Parole and Alternative Custody (CPAC) program. According to Commander Christopher Buchanan, incarcerated individuals are approved or disapproved for programs by the county parole board. Home detention, which involves electronic monitoring with an ankle band, is available based on charges and risk assessments. The pretrial services component of CPAC allows the court to request home detention for individuals, with the Sheriff's Office conducting risk assessments to determine eligibility. There is no limit to the number of spots available for home detention or county parole; eligibility is based on criteria, court recommendations, and parole board approvals. (*Buchanan deposition, Page 10.*)

**Ex. D-522**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Commander Buchanan was asked why there were no incarcerated persons participating in the fire camp programs under CPAC. Buchanan stated that the fire camp program is run by the CDCR (California Department of Corrections and Rehabilitation). Incarcerated individuals can apply for fire camp, and the agency actively screens and identifies eligible candidates. However, the final decision on whether an individual goes to fire camp is made by the CDCR, and the agency does not have control over the selection process beyond the initial screening. (*Id., 13.*)

I have extensive experience with fire camps, having served as a corrections officer managing incarcerated persons on wildland and forest fires during my time with the Nevada Department of Corrections. I also managed several fire camps during my tenure. Fire camp participants are required to be in exceptionally good physical condition due to the rigorous nature of their jobs. The testing and selection for such positions is like what firefighters may go through having to walk and run through forested terrain with forty pounds of weighted backpack for 1.5 miles within a specific time. Prior escapees from custody, sex offenders, persons on protective custody, and persons with violent criminal history, and current criminal charges considered to be serious are not eligible for fire camps. Additionally, these individuals must be cleared both medically and for mental health before they can be considered for such assignments. From my evaluation, none of the named plaintiffs in this case would have qualified for fire camps and the questions related to why high-custody level people were not considered for fire camps is nothing more than a fishing expedition.

**Ex. D-523**

**Opinion 14:**

a) **Plaintiffs' allegation that the Sheriff's Office lacks adequate policies and procedures for responding to grievances is not supported by facts.**

I considered the Sheriff's Office's policy related to grievances for incarcerated individuals.

▪ **Policy N.1 – Grievance Procedure**

The Sheriff's Office's comprehensive policy and procedure for grievances include three levels of grievances to include appeals to supervisory and management staff if the incarcerated persons are unsatisfied with the grievance response. Grievances can be turned in directly to staff or they can be submitted via secured boxes placed in the individual housing units. Incarcerated individuals can utilize the grievance procedure regardless of their disciplinary status, housing location, or classification.

Each facility must ensure that provisions are made for individuals who are not fluent in English, have disabilities, low literacy levels, are elderly, or are mentally ill, so they can access the grievance procedure.

Incarcerated individuals may submit written grievances directly to deputies or other employees at any time when they are in an authorized area. Unless there are exigent circumstances, any deputy or staff member presented with a written grievance must accept it.

By policy, the San Diego County Sheriff's Office allows for incarcerated persons to file "Emergency Grievances" if they are at substantial risk of imminent sexual

**Ex. D-524**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

abuse. Such grievances are required to be immediately forwarded to the watch commander or their designee.

**b) Plaintiffs allege that although the Sheriff's Office's written policies provide that people can physically hand grievances to a staff member and receive a receipt, in practice staff often refuse to accept grievance forms directly. Depending upon the situation, this may be accurate in some instances. However, Plaintiffs claim that the Sheriff's Office has deficient policies for tracking and responding to grievances is not supported by evidence.**

From my personal observation, I noticed the presence of grievance boxes located throughout each of the jail facilities. There is no reason why any of plaintiffs could not have used these boxes.

Plaintiffs allege that despite the written policies, in practice staff often refuse to accept grievance forms directly. I do not disagree that this may occur in some instances. However, I do not find it improper for staff to not always accept these grievances by hand because they may be engaged in other duties such as conducting movement of incarcerated persons, counts, safety checks, delivering meals, and escorting medical and mental health personnel. In many instances, it would not be practical to accept the grievances while engaged in other functions.

I believe that the wording in the policy does not consider the various types of tasks that deputies might be engaged in, that are not necessarily exigent in nature, but would make it difficult for them to stop what they are doing to handle grievance

**Ex. D-525**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

forms. It would be my recommendation that the policy language is amended, or a process change should be implemented.

When I was working as a prison warden, I required that my classification team visited each of the housing units daily and announce that they were there to collect grievance forms in person. This was in addition to providing locked boxes for individuals to file grievances. When I took over as the jail administrator over Napa County, I implemented a similar process by having the Assistant Director over the programs unit personally go to each housing unit to collect grievances or assign a designee to perform this task. In my experience, this alleviated the concerns from corrections officers having to stop performing security-related duties to address grievances.

Staff members who are the subject of a grievance are not permitted to handle the grievance form or review the document. This is another reason for not mandating deputies from having to accept the grievances because in many instances, the grievance might be filed against them.

Despite plaintiffs' allegations regarding deputies refusing to accept their grievances, the evidence that I considered provides a different narrative. I found that in every instance involving grievances filed by the various plaintiffs who were deposed in this case, there were records that showed that staff consistently signed the grievance forms and processed the documents appropriately. The following section details the information I considered regarding grievances.

**Ex. D-526**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

**Plaintiff Andrade** stated during his deposition that based on his understanding of the County's grievance process, an incarcerated person requests a grievance form from medical or custody staff, fills it out, and submits it to an officer for their signature. The officer would then place a copy of the form into the grievance box or receipt box. The officer typically handled placing the grievance into the appropriate box. (*Andrade deposition, Page 114.*) Andrade reported that he had used the grievance box to submit grievances himself without requiring staff assistance. (*Id., 115.*)

**Plaintiff Archuleta** claimed that his grievance forms along with several other incarcerated person's grievances were being thrown away by staff. (Archuleta deposition, Page 130.) Archuleta was asked about a grievance he filed on October 27, 2019.[28] The grievance form includes a JIMS entry date of October 30, 2019. Archuleta claimed in the grievance that he fell down the stairs after he had a visit. He stated that because of his disability, he was not supposed to climb up and down the stairs and he was using a wheelchair during that time. He claimed that a deputy threatened him and told him not to report the injury to medical staff.

A response was provided to Archuleta. An investigation had been done which included the review of surveillance footage of the incident. The response stated that Archuleta did have a visit on August 5, 2019, and he was seen on camera walking up to the stairwell pushing the wheelchair as a walker. He gave the wheelchair to

---

[28] Archuleta deposition, Exhibit F (SD 1497845)

**Ex. D-527**

the deputy and without hesitation walked up the stairs. After the visit ended, Archuleta was observed walking down the stairs holding the railing. A deputy was escorting him and holding onto Archuleta. Halfway down the stairs, Archuleta began his fall and a second deputy who was at the bottom of the stairs rushed up the stairs and broke his fall. Both deputies then assisted Archuleta to the floor and had him lay down. Medical staff evaluated Archuleta on the same date. The incident was logged into JIMS by the deputy on August 6, 2019.

The grievance response stated that Archuleta was found to be untruthful. During his deposition, Archuleta denied ever seeing the response to his grievance.

**Plaintiff Clark** stated in his deposition that he has been on the medical floor of the County jail since 2009 and has filed a total of five grievances during this time. He claims that he has not received any responses to these grievances. He said that no one has followed up or addressed the grievances, whether it be medical staff or custody staff. Additionally, he had never seen a written response to a grievance, either for himself or for anyone else who was incarcerated. (*Clark deposition, Page 124.*) Clark was provided with records that showed that he had filed a total of seven grievances with three grievances in 2010, one grievance each in 2011, 2015, 2016, and the final one in February 2022. The last grievance was related to Clark requesting games and playing cards and getting a response from staff. (*Id., 246.*)

Clark stated that he had filed other grievances but could not recall exactly when those occurred. However, when asked about specific events regarding allegations that his wheelchair was broken and him lying on the floor and catching a cold,

**Ex. D-528**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

Clark stated that he had not filed a grievance for this issue. (*Id., 240.*) Clark did not file a grievance about not receiving his orthotic shoes or eyeglasses. He stated that staff accommodated him before he got to file a grievance. (*Id., 237.*) He also did not file grievances when he felt he had a need for an emergency sick call. (*Id., 156.*)

**Plaintiff Dunsmore** reported that he had received blank grievance forms from staff at the jail. (*Dunsmore deposition, Page 72.*) A review of Dunsmore's grievances[29] show that he filed grievances on the following dates: February 8, 2020; February 9, 2020; three grievances on February 14, 2020; February 23, 2020; March 23, 2020; August 26, 2020; two grievances on March 27, 2020; March 28, 2020; and November 27, 2020. In each of the above grievances, staff signed the documents acknowledging acceptance indicating that Dunsmore was able to hand-deliver these grievance forms, in each instance, to a corrections staff member.

**Plaintiff Edwards** reported that he had both filed grievances and received responses to his grievances while at the San Diego County jail. (*Edwards deposition, Page 53.*) Edwards was asked if he had ever experienced situations where deputies refused to provide him with blank grievance forms. Edwards said:

*"I've had deputies at one point in time tell me that they'll get it when they're done with whatever they're doing but you might have to remind them a couple times because they're so busy. But other than that, I've never had one tell me straight out no." (Id., 56.)*

---

[29] Dunsmore deposition, Exhibit O

**Ex. D-529**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

**Plaintiff Levy** stated in her deposition that she was aware of the grievance process and made the following statement regarding her experience with the grievance process:

> *"The reason for denial usually depends on whatever the grievance is about, but they tell me to take it -- I think it's three levels of appeals."*

> *So, I put in the grievance. It goes to the sergeant. They put in a grievance number. The sergeant sees if -- this is to my memory. Like I tried my best to forget about that place. And just -- anyway, the sergeant documents it, comes up with the solution or tells me whether he or she can help me or not and gives me the grievance back.*

> *If I am not happy with that solution or I want to appeal it, I take it to the next level. I believe it goes to the lieutenant after that. And then after the lieutenant I believe there's one more appeal process that goes to the -- to the captain, I think."*
> (*Levy deposition, Page 203.*)

I considered the grievance forms filed by Levy.[30] There were seven grievances filed and each of them was entered into JIMS with a number attached to the grievance along with the responses from staff.

**Plaintiff Lopez** did not have any concerns that were discussed related to the grievance process during his time at the San Diego County jail.

---

[30] Levy deposition, Exhibit H

**Ex. D-530**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

**Plaintiff Norwood** filed one grievance form on September 22, 2021.[31] The grievance was signed and dated by a staff member.

**Plaintiff Olivares** stated in his deposition that while he was housed at George Bailey approximately in mid-2022, there had been an issue with the air conditioning system not working. Olivares stated that he and other incarcerated persons filed grievances regarding this issue. (*Olivares deposition, Pages 89–90.*) Olivares said, *"Actually a corporal from the Sheriff's Office came around and passed out grievances to everybody."* (*Id., 90.*)

Olivares stated that he filed a single complaint on one grievance form for issues he had related to medical, mental health, and living conditions. Olivares said that a corporal signed the grievance and provided him with a carbon copy of it. (*Id., 128.*)

**Plaintiff Sepulveda's** jail records[32] show that he filed grievances while at the San Diego County jail on the following dates: August 22, 2019, April 11, 2020; May 11, 2022; and October 14, 2022. In each of these instances, the grievance form includes the signature of a staff member accepting the grievance indicating that the grievances were hand-delivered to the staff by Sepulveda.

**Plaintiff Taylor** reported that he could not recall filing a grievance for an employee allegedly breaking his glasses on March 29, 2022. (*Taylor deposition, Page 81.*) He stated that he did not file a grievance against a deputy after the deputy

---

[31] Norwood deposition, Exhibit E
[32] Sepulveda, Gustavo (EXHIBIT B, D, E, F) Deposition Transcript 4-30-2024

**Ex. D-531**

called Taylor a *"piece of shit."* (*Id., 131.*)

Taylor recalled instances when he physically handed grievance forms to deputies. He reported that it usually occurred after they were locked up and right before count time. He stated that he would hand the grievance to the deputies either through the food tray slot or from the little crack on the side of the cell door. (*Id., 187–188.*) Taylor explained that there was a med-box and a grievance box at the same location in all the modules that he had been housed in. (*Id., 190.*)

Plaintiffs' Third Amended Complaint document, paragraph 277 states the following:

> *"On November 7, 2022, Plaintiff TAYLOR submitted a grievance by placing the form in the designated box in his housing unit. Shortly thereafter, Taylor witnessed a deputy take the grievance out of the box and throw it into a trash can."*

Taylor was asked about the above incident. He made the following statement:

> *"They were passing out commissary. And one of the officers came in, went to the grievance box like they usually do. I think it was a sergeant. I'm not -- I don't remember. I think it was a sergeant. Got my complaint out of the box, came over by the commissary where they were passing out the commissary at the end of the stairs, at the bottom of the stairs and there's a trash can right there. They crumpled up my grievance and threw it in the trash right there so -- and I was in the --I was in the bottom floor dorm right by the stairs."* (*Taylor deposition, Page 193.*)

**Ex. D-532**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

The evidence shows that the statement made in the plaintiffs' complaint and Taylor's own statement regarding his grievance being thrown away by a sergeant are inaccurate. The following is a section from Taylor's grievance form dated November 7, 2022.



**Figure 6**

**Ex. D-533**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

A staff member signed the document along with the date of November 7, 2022.[33] The document serves as evidence of Taylor hand delivering the grievance to a staff member who signed and dated the document before providing a copy back to Taylor.

**Plaintiff Zoerner's** records did not include copies of prior grievances that she filed. She stated in her interrogatory response that that she had filed a grievance on or around October 16, 2021. A response to the grievance stated that Zoerner's grievance was in-fact a request, not a grievance. She claims to have appealed this and never received a response.[34] During her deposition, Zoerner reported that the grievance was related to her needing to see a dentist and she had been scheduled for a dental appointment on May 25, 2021, which was then rescheduled. The dentist saw her on June 8, 2021, and removed an abscessed tooth. (*Zoerner deposition, Pages 138–139.*) Based on the timeline of the events, the issue may have been resolved before the grievance process could be completed.

Commander Christina Ralph reported in her deposition that it was standard operating procedure for supervisors to review and audit grievance responses. (*Ralph deposition, Page 164.*) Ralph reported that there are always pencils available for incarcerated individuals and the grievance forms are in all housing modules or they can be requested from sworn staff at any time. (*Id., 219.*) When an incarcerated person hands a grievance to a deputy, the receipt of the grievance is logged on the

---

[33] Taylor deposition Exhibit F – Grievance form dated November 7, 2022
[34] Zoerner deposition Exhibit B – Zoerner's Responses to Defendants First Set of Special Interrogatories

**Ex. D-534**

form, and a receipt from the triplicate form is given to the individual as a receipt.

Additionally, the grievance forms are input into the JIMS for tracking. (*Id., 220–*

*221.*)

Captain Kyle Bibel reported in his deposition that ADA related facility-wide

improvements included lowering the grievance boxes in the housing modules to

allow access for persons using wheelchairs. (*Bibel deposition, Page 146.*) Bibel

reported that the locked grievance boxes could only be accessed by someone with a

rank of sergeant or above. (Id., 204.) Searches for grievances in the JIMS system

can be done by booking number, grievance number, and possibly other criteria. The

main methods mentioned are by booking number and grievance number. (*Id., 214.*)

_____ End of Section _____

**Ex. D-535**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

## VI.   INSPECTIONS AND REPORTS BY EXTERNAL AGENCIES

### A.   California Board of State and Community Corrections (BSCC)

I considered the BSCC reports related to San Diego County jails that were provided for my review. The following are from the most recent inspections conducted by the BSCC.

➢ **A pre-opening inspection of House 1 at the Rock Mountain facility was conducted by the BSCC on June 6, 2023.** The BSCC found items of noncompliance in the design requirements of the vacant facility at the time of the inspection. The specific concern was related to suicide hazards being present in the form of potential ligature points around cell light fixtures and with restroom door handles. The concern was corrected and, in a letter, dated July 10, 2023, <u>BSCC noted that a follow-up inspection showed that the noncompliant items had been corrected to the satisfaction of Title 24 – Minimum Standards for Local Detention Facilities.</u>[35]

➢ **The 2023-2024 Biennial Inspection Cycle – Initial Inspection Report dated September 14, 2023,** noted items of noncompliance related to agency wide policy language that the BSCC found to be inconsistent with Title 15 standards. A corrective action plan was required in response to BSCC's findings. The corrective

---

[35] BSCC letter dated July 10, 2023 – <u>County of San Diego County Sheriff's Rock Mountain Detention Facility BSCC Plan Review Number 073-4432.01</u>

**Ex. D-536**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

action plan was completed and submitted to the BSCC on October 13, 2023.[36] In a letter dated November 21, 2023, BSCC informed Sheriff Kelly Martinez that a comprehensive inspection was completed of the agency between September 6, 2023, and September 13, 2023. <u>All Title 15 noncompliant policy-related issues had been corrected</u>.[37]

➢ **A targeted inspection was conducted on February 29, 2024, by the BSCC at the Vista Detention facility**. The inspection included an examination of Title 15 – Section 1027.5 required safety checks of all individuals being held at the facility, review of safety checks in the safety cells, and sobering cells. The inspection reviewed the use of restraint devices, the use of the restraint chair, the availability of medical assessments when someone is placed in restraint devices, the use of continuous visual observation at least twice every 30 minutes, access to exercise and out of cell time to include seven hours of recreation time and opportunities to exercise three hours each week. The inspection included BSCC staff speaking with incarcerated persons and receiving confirmation that they were being given at least the minimally required exercise and recreation times. <u>The BSCC inspection found no items of noncompliance with Title 15 Minimum Standards.</u>

---

[36] San Diego County Sheriff's Division of Inspectional Services letter to BSCC dated October 13, 2023 – <u>San Diego County Sheriff's – Detention Facilities Corrective Action Plan</u>

[37] BSCC letter dated November 21, 2023 – <u>Update on 2023-2024 Comprehensive Inspection, San Diego County Detention Facilities</u>

**Ex. D-537**

<u>No items of noncompliance were identified with Title 24 Minimum Standards
related to the physical plant and living area space evaluation.</u>[38]

➢ **An unannounced inspection was conducted on March 1, 2024, by the
BSCC**[39] at the Rock Mountain facility. The inspection included an examination of
Title 15 – Section 1027.5 required safety checks of all individuals being held at the
facility, review of safety checks in the safety cells, and sobering cells. <u>The BSCC
inspection found no items of noncompliance with Title 15 Minimum Standards.</u>

## B. <u>GRAND JURY INSPECTIONS</u>

Plaintiffs' operative complaint includes references to past San Diego County
Grand Jury inspections and reports. For the purposes of my examination of this
case, I considered the various documents referenced in addition to conducting
independent research to obtain publicly available Grand Jury reports online.

➢ <u>**2018/2019 San Diego County Grand Jury Inspection Report**</u>.[40]

The Grand Jury reviewed several key documents and resources, including
California Code of Regulations Title 15, which outlines minimum standards for local
detention facilities; Board of State and Community Corrections (BSCC) inspection

─────────────────────

[38] BSCC letter dated March 8, 2024 – <u>2023-2024 Targeted Inspection, Penal Code Section 6031,
Welfare & Institutions Code Section 209, San Diego County, Vista Detention Facility</u>

[39] BSCC letter dated April 4, 2024 – <u>2023-2024 Unannounced Inspection, Penal Code Section 6031,
Welfare & Institutions Code Section 209, San Diego County, Rock Mountain Detention Facility</u>

[40] San Diego County Grand Jury, "San Diego County Detention Facilities: Inspection Report and
Inmate Mental Health," May 28, 2019.
*https://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2018-
2019/DetentionFacilitiesReport.pdf*

**Ex. D-538**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

reports for each facility; San Diego County Sheriff's Office Detention Services

Manual of Policies and Procedures; Detention Facility Fact Sheets provided for each

detention facility; and reports from national and local community mental health

resources, as well as relevant media accounts. These materials served as valuable

sources of information for the Grand Jury's assessment of detention facility

operations and compliance with standards and regulations. The inspection required

that the Grand Jury visits each of the County jail facilities.

The executive summary from the Grand Jury's report stated the following:

*In general, the Grand Jury found that the facilities were clean, and, from our*

*observation, the staff appeared to be following established procedures. The Grand*

*Jury saw no evidence of inmate mistreatment. Inmates had access to medical, dental,*

*and mental health care at most locations. At some locations, access to care was only*

*available based on the schedule of provider visits to that facility.*

*This year the Grand Jury focused on mental health issues in jails including the*

*issue of suicides. Both adult and juvenile facilities were inspected. The Grand Jury*

*was impressed by the programs for rehabilitation and reentry for inmates returning*

*to society. The Grand Jury recommends that further efforts be made to identify that*

*part of the inmate population that would benefit from mental health treatment*

*rather than incarceration.*

The Grand Jury noted that since the passage of California Assembly Bill 109

(AB 109), also known as the Public Safety Realignment, the jail population numbers

had been declining due to several voter-approved changes to California law making

**Ex. D-539**

many previously filed felony crimes now being charged as misdemeanors and allowing more individuals to be placed on probation or alternative to custody programs.

The Grand Jury also noted that AB 109 redirected certain categories of felons to serve their sentences in county jails instead of state prisons. This meant that individuals who would traditionally have been sentenced to state prison for most nonviolent or non-sexual felonies are now housed in county jails.

The report found that several programs were in use at San Diego County to address the needs of those persons with mental health issues who were facing incarceration. A Behavioral Health Court was being used to divert persons into counseling and psychiatric services and some individuals were being placed on probation instead of jail. The Sheriff's Office was using *Programming for Reentry, Support and Stability* (PROGRESS) to incarcerated individuals who could be better served in treatment programs rather than in custody.

The Grand Jury reported that San Diego County had high suicide rates and referred to an April 2018 report published by a non-profit agency known as Disability Rights California (DRC). The Grand Jury noted that the Sheriff's Office had put new measures in place to better identify and monitor suicidal individuals.

**Ex. D-540**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

I examined the report that was published by DRC[41] and found the following section from the report to be of importance.

*The Grand Jury recognized a number of steps the Sheriff's Office has taken in response to the inmate suicide crisis, including the addition of EOH units, Safety Cells (which, as we discuss later, are essentially small, empty padded rooms), and medical isolation cells, with related updates to policies and procedures. At the same time, the Grand Jury found that the Sheriff's Office continues to have inadequate suicide prevention training for jail staff, problematic gaps in personnel, and deficiencies in oversight. The Grand Jury concluded that "increased efforts in suicide prevention are required."*

*On June 29, 2017, Sheriff Gore filed a Response to the Grand Jury's report. He promised a comprehensive suicide prevention policy, additional suicide prevention training, and formation of a Suicide Prevention Response & Improvement Team (SPRIT) to update policies and oversee staff training. Through our investigation, we are convinced that the Sheriff's Office has begun to take the issue of suicide prevention seriously.*

---

[41] Disability Rights California (April 2018). *https://www.disabilityrightsca.org/system/files/file-attachments/SDsuicideReport.pdf*

**Ex. D-541**

➤ **2022/2023 San Diego County Grand Jury Inspection Report**[42]

The 2022/2023 Grand Jury decided to investigate the methods to lower the rate of jail deaths in San Diego County's jails. As part of this investigation, the Grand Jury visited each of the seven jail facilities and toured various sections of the jails including intake/holding, medical facilities, housing modules, classrooms, visiting areas, food preparation areas, mail receipt and sorting, sobering cells, safety cells, and exercise areas.

The Grand Jury cited data from the California Department of Justice noting that 89% of the deaths occurring in San Diego jails were attributed to drug overdoses. The report noted the following from Sheriff's Office published document[43] related to narcotics interdiction efforts inside the County jails:

*"During calendar years 2020 and 2021, Sheriff's Office employees in the jails responded to 314 incidents of suspected opioid overdose and deployed 848 doses of NARCAN (an opioid antagonist) saving hundreds of lives."*

The Grand Jury reported that drugs commonly entered jails when incarcerated persons returned to the facility from court appearances, medical appointments, work assignments, or any other events that necessitated their departure from

---

[42] San Diego County Grand Jury Report (June 6, 2023).
*https://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2022-2023/Drugs,%20Contraband,%20and%20the%20Use%20of%20High-Tech%20Scanning%20Tech%20in%20SD%20Jails.pdf*

[43] *https://www.sdsheriff.gov/home/showpublisheddocument/4717/637794797354130000*

Ex. D-542

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

secure areas. Additionally, contraband could be exchanged during visits with family, attorneys, or other guests if there was no barrier between the incarcerated person and the visitor.

The report considered a study conducted by the U.S. Department of Justice – Office of Justice Programs (OJP) titled *Detecting and Managing Drug Contraband*.[44] The report cited the OJP study which stated:

*"Opioid analogs, synthetic cannabinoids, and synthetic cathinones can be liquefied and sprayed onto inconspicuous items, such as dried plant material, and paper products, such as mail, or disguised as common products such as candy or toiletries, and therefore can be trafficked surreptitiously."*

## C. CITIZENS LAW ENFORCEMENT REVIEW BOARD (CLERB)

Plaintiffs' operative complaint makes several references to the findings of CLERB to cite various concerns related to San Diego County jails. Primarily, the plaintiffs have claimed that CLERB has not inspected the jail in its nearly three decades in existence and the Board lacks the authority to investigate the conduct of jail medical staff. Additionally, the plaintiffs' complaint alleges that CLERB investigators rely on evidence from the Sheriff's Office during its investigation. The complaint referred to a State Audit Report that found that CLERB's reports to the Board of Supervisors did not include any significant discussion or analysis that

_____

[44] *https://www.ojp.gov/pdffiles1/nij/grants/302135.pdf*

**Ex. D-543**

might point to deficiencies in the Sheriff's Office's policies or practices.
Furthermore, the complaint alleges that CLERB cannot interview any medical staff,
and custody staff can choose to refuse to meet with CLERB.

CLERB maintains a webpage which identifies its purpose and the types of
complaints or concerns that it investigates.[45] The following sections appear on
CLERB's website:

*San Diego County voters established the Citizens' Law Enforcement Review
Board (CLERB) in 1990 to independently and impartially investigate citizen
complaints against San Diego County Sheriff's deputies and probation officers. The
Review Board is composed of eleven volunteers from the County's five Supervisory
Districts. Members are not affiliated with the Sheriff's Office, Probation Department,
or the County of San Diego. Review Board members are nominated by the County's
Chief Administrative Officer and appointed by the Board of Supervisors. The Review
Board currently is supported by nine County employees: an Executive Officer, Special
Supervising Investigator, five Special Investigators, an Administrative Analyst, and
an Administrative Assistant.*

*The County's Charter Section 606 charges the Review Board with receiving,
reviewing, and investigating complaints about the conduct of peace officers
performing their duties while employed by the Sheriff's Office or the Probation*

---

[45] Citizens' Law Enforcement Review Board Website
*https://www.sandiegocounty.gov/content/sdc/clerb/faqs/faqs_page.html*

**Ex. D-544**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

*Department. The Review Board also investigates deaths that arise out of, or in connection with, the actions of these peace officers, regardless of whether a complaint is filed. The Review Board makes advisory findings on complaints and recommendations for policy and procedure changes to the Sheriff, Chief Probation Officer, and the Board of Supervisors. The focus of the Review Board is fact-finding, not advocacy for complainants or peace officers. The Review Board also publishes meeting agendas, minutes, summary, and statistical reports and provides "early warning reports" to the Sheriff and Chief Probation Officer.*

According to CLERB's Rules and Regulations document (Revised May 2021)[46], Section 6: Cooperation and Coordination -

*In the discharge of its duties, CLERB shall receive complete and prompt cooperation from all officers and employees of the County. CLERB and other public officers, including the Sheriff, the District Attorney, and the Grand Jury, shall coordinate their activities so that the other public officers and CLERB can fully and properly perform their respective duties.*

*Such cooperation shall include responding to written questions during the investigation, appearing at and answering questions during interviews, appearing at and answering questions during hearings, assisting with access to physical evidence, and cooperation with any other relevant investigation procedures.*

---

[46] Citizens' Law Enforcement Review Board Rules and Regulations -
*https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/Rules-Regs/CLERB%20Rules%20%26%20Regs-Effective%20May%2018%2c%202021.pdf*

**Ex. D-545**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

The Executive Officer or designee of CLERB has the power to subpoena and require the attendance of witnesses and the production of documents pertaining to its investigations and the power to administer oaths.

In my examination of the plaintiffs' complaint document, I noted that the plaintiffs have pointed to instances in which CLERB's findings have been against the actions of deputies, and there have been cases in which CLERB has reported concerns with Sheriff's Office's policies. There are numerous examples provided by the plaintiffs demonstrating CLERB's findings that were not in support of the Sheriff's Office. These examples provided by the plaintiffs appear to identify CLERB as a standalone Board that has made independent findings which are not influenced by the Sheriff's Office. The following are some examples of cases cited in the plaintiff's complaint:

- In 2017, the Citizens' Law Enforcement Review Board (CLERB) found that jail staff failed to promptly place Bruce Stucki on an alcohol withdrawal protocol, despite his arrest for public intoxication and known alcohol dependence. Two days after booking, Stucki was found "hallucinating in his cell," and medication to ease alcohol withdrawal symptoms was finally administered. Unfortunately, the intervention came too late, and Stucki died several hours later.[47]

_____

[47] Third Amended Complaint – Page 41

**Ex. D-546**

- In January 2022, CLERB found that Anthony Chon died after two deputies failed to adequately respond to his requests for medical assistance.[48]

- In separate cases in 2016 and 2018, CLERB found that custody staff failed to respond to grievances.[49]

- In 2018, CLERB found that a person who should have been placed in protective custody was inappropriately placed in general population mainline housing. The individual was attacked by his cellmate.[50]

- In 2019, CLERB found that Jail staff improperly placed someone classified as protective custody in the law library with other people from the general mainline population, which put the person's safety at undue risk.[51]

- In 2020, a transgender individual was incorrectly classified and placed in cell with three men. One of the men attacked the transgender person. CLERB sustained several misconduct findings against custody staff and noted systemic deficiencies in the Sheriff's Office's policies.[52]

- CLERB found that two deputies failed to administer life-saving measures to someone dying of a fentanyl overdose in 2020.

---

[48] Third Amended Complaint – Page 51
[49] Third Amended Complaint – Page 135
[50] Third Amended Complaint – Page 149
[51] Third Amended Complaint – Page 150
[52] Third Amended Complaint – Pages 148 - 149

**Ex. D-547**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

- ▪ In 2021, CLERB found that a deputy failed to conduct appropriate safety checks on someone who then died from an overdose.[53]

I reviewed the 2021 Annual Report issued by CLERB.[54] From this report, I gathered that plaintiffs' assertion that CLERB cannot interview medical staff is supported by statements made in the annual report.

When investigating in-custody deaths or allegations of misconduct, questions often arise regarding the standard of care provided by medical and mental health providers in detention facilities. However, CLERB does not have authority over medical staff, who are typically non-sworn and sometimes contract personnel. This lack of authority over San Diego County Sheriff's Office non-sworn staff, particularly medical personnel, has been a concern for CLERB members. Notwithstanding the concerns of CLERB members, the primary issue with this allegation is that CLERB does not have authority over medical personnel and this jurisdictional limitation is not determined by the Sheriff's Office.

From my experience, quarterly quality assurance and quality control meetings are common in jails where contracted medical staff provides services to incarcerated individuals. These quarterly meetings include executive staff from the Sheriff's Office, County Executive Officer, County Counsel, Risk Management, and

---

[53] Third Amended Complaint – Page 153
[54] CLERB 2021 Annual Report -
*https://www.sandiegocounty.gov/content/dam/sdc/clerb/docs/2022-documents/annual-reports/2021-Annual-Report.pdf*

**Ex. D-548**

Environmental Health staff. These meetings are intended to address issues related to in-custody deaths or allegations of misconduct. I participated in these meetings as the representative from the jail while serving as the jail administrator in Napa County, California. I am not aware of any independent citizens' review boards that have the authority to determine standards of medical and mental health care as they are not qualified medical or mental health professionals.

**Plaintiffs' claim that CLERB has not inspected the jail is not entirely accurate. CLERB has conducted site visits as part of specific investigations that it has conducted into various events. CLERB has always had the authority to conduct jail inspections. I reviewed the video recording of the February 13, 2024, CLERB meeting. Mr. Paul Parker, the Executive Officer of CLERB, stated that they had a staff member who was able to perform jail inspections, but could not find a suitable person to backfill the role. Due to staffing shortages at CLERB, the jail inspections could not be conducted.**[55]

The plaintiffs' complaint alleges that CLERB has failed to point out significant deficiencies in the Sheriff's Office's policies. However, in my review of the 2021 Annual Report, CLERB reported that in the calendar year 2021, it made six policy recommendations to the Sheriff's Office regarding deaths in custody, and these were

---

[55] CLERB's Monthly Meeting. February 13, 2024.
*https://www.youtube.com/watch?v=Q2ynB2PeDdk*

**Ex. D-549**

all implemented. Four other recommendations were not accepted. Two other recommendations were under review with the Sheriff's Office and one recommendation was under review by the Probation Department. This demonstrates CLERB can and does make recommendations.

The complaint has alleged that deputies can refuse to meet with CLERB during an investigation. Some of CLERB's concerns about interviewing peace officers are related to the protections offered under the *California Public Safety Officers Procedural Bill of Rights Act* (POBRA).[56] The rules under current state law provides certain protections during investigations of peace officers. According to CLERB's 2021 Annual Report -

*A major tenet of civilian oversight is transparency. Unfortunately, California has some of the most restrictive laws pertaining to investigations into allegations of misconduct against peace officers. As such, CLERB continues to conduct case discussions behind closed doors, thus creating a veil of secrecy that erodes public trust in the independent oversight process. In 2021, the County's Legislative Program supported increased transparency in civilian oversight of peace officers.*

Although CLERB may have the support of the County's legislative program to increase transparency of civilian oversight in peace officer investigations, it is inconsequential until the California legislature decides to consider changes to the

---

[56] California Public Safety Officers Procedural Bill of Rights Act – California Government Code, Section 3300.

**Ex. D-550**

*Dunsmore v. County of San Diego*
*Report of Lenard Vare*

existing law on this topic. Without changes to the rights afforded to peace officers, the investigations into the conduct of peace officers must be carried out in accordance with POBRA rules.

CLERB's 2021 Annual Report shows that the Board has been very busy investigating cases. The following information is from this report:

- In 2020, CLERB received 116 new cases for investigation. In 2021, there was a 12% increase with 130 new cases for investigation.

- In 2021, there were 66 complaints related to Sheriff's law enforcement and 58 complaints related to detentions.

- In 2020, CLERB closed 91 cases and in 2021, 90 cases were closed. 23 cases in 2020 were death cases as compared to 17 in 2021.

- Of the 90 cases in 2021, only 10 of them resulted in sustained findings. In 2020, the number of sustained findings was 12.

- CLERB staff referred 91 callers (potential complainants) to other departments or agencies because CLERB did not have authority in those matters.

------------------------END OF SECTION------------------------

Respectfully submitted,



Lenard Vare


August 21, 2024

**Ex. D-551**