# EXHIBIT 1
# (Volume II)

# EXHIBIT N
# (Redacted)

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br><br>       v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>              Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**EXPERT REPORT OF PABLO STEWART, M.D.**<br><br>Judge:      Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner |

# TABLE OF CONTENTS

**Page**

EDUCATION AND QUALIFICATIONS ................................................................ 1

METHODOLOGY ................................................................................................... 5

FINDINGS ............................................................................................................... 8

I.    FINDING #1: THE SAN DIEGO COUNTY JAIL'S SYSTEM FAILS
      TO ADEQUATELY IDENTIFY AND TRACK INCARCERATED
      PEOPLE WITH SERIOUS MENTAL HEALTH CARE NEEDS ................... 8

    A.    The Jail's Mental Health Screening System Falls Short with
      Respect to Identifying and Addressing Suicide Risk. ........................... 8

    B.    The Jail's Mental Health Screening System Is Deficient and
      Ineffective in Identifying and Ensuring Treatment for *Non-
      Suicide-Related*—but Still Very Serious—Mental Health
      Treatment Needs. ................................................................................. 10

    C.    The Jail System Fails to Review and Consider Important
      Information—*Including what Is Maintained by the County
      Itself*—About Newly Arriving Patients. .............................................. 13

    D.    It Is a Further and Very Serious Problem that the Jail Lacks an
      Adequate Screening Tool to Assess Incarcerated People for
      Intellectual Disability and to Determine Related Treatment and
      Adaptive Support Needs. ..................................................................... 14

    E.    There Is Insufficient Confidentiality During the Mental Health
      Screening Process. .............................................................................. 15

    F.    Patient Examples of Deficient Intake Screening Practices Putting
      People at Substantial Risk of Serious Harm. ...................................... 16

II.   FINDING #2: THE JAIL'S SYSTEM FAILS TO TIMELY AND
      ADEQUATELY PROVIDE ESSENTIAL MEDICATIONS TO
      PEOPLE WITH MENTAL HEALTH TREATMENT NEEDS ................... 18

    A.    Psychiatric Prescribing Practices and Supervision in the San
      Diego County Jail System Fall Far Short of the Standard of Care,
      Resulting in Serious Treatment Failures and Putting Patients at
      Substantial Risk of Harm. ................................................................... 18

    B.    There Are Serious Systemic Failures to Continue Clinically
      Necessary Medication for People with Mental Health Treatment
      Needs *When They Arrive at the Jail*. ................................................... 21

    C.    There Are Serious Systemic Failures in Medication Management
      and Psychiatric Care *During the Period of a Patient's
      Incarceration* ........................................................................................ 23

    D.    The Jail System Fails to Ensure Adequate Medication Continuity

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

for Patients *Who Are Being Released from Custody.* ...........................25

E.   Patient Examples of Deficient Psychiatric Practices Putting People at Substantial Risk of Serious Harm. .........................26

III.   FINDING #3: THE SAN DIEGO COUNTY JAIL FAILS TO PROVIDE PEOPLE WITH SERIOUS MENTAL ILLNESS WITH TIMELY ACCESS TO ADEQUATE TREATMENT, CAUSING UNDUE SUFFERING AND PUTTING PEOPLE AT UNNECESSARY AND SUBSTANTIAL RISK OF HARM. ......................34

A.   The Jail's Lack of an Adequate Levels of Mental Health Care System and the Lack of Individualized Treatment Based on Clinical Needs Are Major Deficiencies. ..............................34

B.   The Jail System Fails to Provide Timely or Minimally Adequate Acute, Inpatient Mental Health Care (Psychiatric Services Unit). .......39

C.   The Jail System Fails to Provide Minimally Adequate Outpatient Level of Care to Patients, Resulting in Serious and Preventable Decompensation and Other Harms. .........................48

D.   The Jail System Erects Improper Barriers for Patients to Timely Access Clinically Necessary Mental Health Care and Placement. .......57

IV.   FINDING #4: THE JAIL'S SYSTEM OF SOLITARY CONFINEMENT PUTS AN EXTRAORDINARILY HIGH NUMBER OF PEOPLE WITH MENTAL HEALTH NEEDS AT UNNECESSARY AND SERIOUS RISK OF HARM. ...................................62

A.   Conditions in San Diego County Jail's Administrative Separation Units Constitute Some of the Harshest, Most Restrictive Forms of Solitary Confinement I Have Ever Witnessed in a Jail System. .......65

1.   Central Jail Administrative Separation ........................66

2.   George Bailey Administrative Separation ...................68

3.   Las Colinas Administrative Separation ......................75

B.   People with Serious Mental Illness Are Placed in Administrative Segregation Without Consideration of Mental Health Input, Putting Them at Substantial Risk of Serious Harm. ...........................76

C.   The San Diego County Jail's System, Through Its Deficient Policies and Practices, Places a Disproportionately High Number of People with Serious Mental Illness in Administrative Separation, with Devastating Effects. ...................................83

D.   The San Diego County Jail's System of Administrative Separation and Solitary Confinement-Type Conditions Puts People with Mental Health Needs at a Substantial Risk of Death, Including by Suicide. ...................................88

V.   FINDING #5: THE SAN DIEGO COUNTY JAIL'S SYSTEM FOR

SUICIDE PREVENTION IS DEFICIENT, FAILS TO PROTECT PEOPLE WITH SERIOUS MENTAL HEALTH NEEDS, AND CAUSES SERIOUS HARM. ...................................................................... 101

A.   The Jail's "Detention Safety Program" Is Inadequate and Dangerously Outside the Norm of Clinically Adequate Jail Systems for Suicide Prevention. ........................................... 102

B.   The San Diego County Jail's Detention Safety Program Placements for Patients in Psychiatric Crisis Are Harsh, Extraordinarily Restrictive, and Often Clinically Counterproductive ...................................................... 106

    1.   The San Diego County Jail System's Use of "Safety Cells" Is Inhumane and Dangerous. ........................... 106

    2.   The San Diego County Jail System's Use of Enhanced Observation Housing Cells Are Punitive, Clinically Counterproductive, and Dangerous. ........................... 109

    3.   Blanket Custodial Restrictions on Clothing, Bedding, Property, and Privileges for Patients on Suicide Precautions Does Not Meet the Standard of Care and Is Harmful. ...................................................... 113

C.   There Is a Dangerous Lack of Adequate Monitoring and Supervision for People at Heightened Risk of Suicide. ...................... 115

    1.   Lack of Constant Observation for High-Risk Suicidal Patients When Clinically Indicated. ........................... 115

    2.   Jail Staff Continue to Conduct Inadequate Safety Checks in Solitary Confinement-Type Conditions, Putting People at Substantial Risk of Serious Harm. ........................... 117

D.   There Remain Grave Concerns about Dangerous "Attachment Points" that Can Be Used for Hanging in High-Risk Housing Areas. ...................................................... 122

E.   The San Diego County Jail's Suicide and Mental Health-Related Death Review and Quality Improvement Processes Are Deficient. ...................................................... 124

VI.   FINDING #6: MENTAL HEALTH CARE STAFFING AND THE SYSTEM'S STAFFING STRUCTURE ARE INSUFFICIENT TO MEET THE MENTAL HEALTH TREATMENT NEEDS OF THE SAN DIEGO COUNTY JAIL'S INCARCERATED POPULATION. ........ 128

A.   There Is Inadequate Staffing to Meet the Mental Health Treatment Needs of the Jail Population. ........................... 128

B.   The Jail System's Mental Health Staffing Structure Is Dysfunctional and Fails to Ensure Adequate Mental Health Treatment Delivery for the Jail Population. ........................... 134

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

VII.   FINDING #7: THE JAIL FAILS TO PROVIDE NECESSARY
       CONFIDENTIALITY FOR MENTAL HEALTH TREATMENT,
       UNDERMINING THE DELIVERY OF MENTAL HEALTH CARE........ 142

VIII.  FINDING #8: JAIL CUSTODY STAFF EXERT IMPROPER AND
       DANGEROUS CONTROL OVER CLINICAL MENTAL HEALTH
       CARE DECISIONS. ................................................................... 146

IX.    FINDING #9: THE JAIL'S SYSTEM IMPROPERLY AND
       DANGEROUSLY PUNISHES PEOPLE WITH SERIOUS MENTAL
       HEALTH TREATMENT NEEDS OR INTELLECTUAL
       DISABILITY............................................................................ 152

X.     FINDING #10: SAN DIEGO COUNTY JAIL OPERATES A
       SYSTEM THAT DISCRIMINATES AGAINST PEOPLE WITH
       MENTAL HEALTH AND INTELLECTUAL DISABILITIES. ................ 155

XI.    FINDING #11: THE JAIL'S SYSTEM FAILS TO PROVIDE
       ADEQUATE MENTAL HEALTH DISCHARGE PLANNING
       SERVICES, PUTTING PEOPLE AT RISK OF HARM AND
       REPEATED INCARCERATIONS................................................. 156

XII.   CONCLUSION ...................................................................... 160

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

I, Pablo Stewart, M.D., declare:

1.     I am a board-certified Attending Psychiatrist and Clinical Professor at the University of Hawaii, John A. Burns School of Medicine.  A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit A**.  My background and experiences relevant to my expert testimony in this proceeding are set forth below.

## EDUCATION AND QUALIFICATIONS

2.     In 1973, I earned a Bachelor of Science Degree at the United States Naval Academy in Annapolis, Maryland.  In 1982, I received my Doctor of Medicine from the University of California San Francisco (UCSF), School of Medicine.  In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment to public sector psychiatry and was selected as the Outstanding Psychiatric Resident by the graduating class of the UCSF, School of Medicine.  In 1985-1986, I served as the Chief Resident of the UCSF Department of Psychiatry at San Francisco General Hospital.

3.     Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illness in correctional and other institutional contexts.  In my work, I have specialized in community and correctional treatment programs for individuals with chronic and serious mental illness, as well as substance use and related disorders.

4.     I have extensive experience managing, monitoring, and reforming mental health systems in detention settings.  From 2016 to 2022, I served as the federal court-appointed monitor in *Rasho v. Baldwin* (C.D. Ill.), a class case involving the provision of mental health care to the incarcerated population of the Illinois Department of Corrections.  I have also been the federal court-appointed expert monitor in *Madrid v. Gomez* (N.D. Cal.) and *Gates v. Deukmejian* (E.D. Cal.), two cases that addressed the use of solitary confinement placements and treatment of people with mental health needs in California prison facilities.

5.     Between 1986 and 1990, I was the Senior Attending Psychiatrist for the

Forensic Unit of UCSF, which was located at San Francisco General Hospital. In that capacity, I had administrative and clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City and County of San Francisco. My duties in that position included advising the San Francisco City Attorney on issues pertaining to forensic psychiatry.

6. Between July 1998 and February 2004, I served as a psychiatric consultant to the National Council on Crime and Delinquency (NCCD) and subsequently for the Institute on Crime, Justice and Corrections at Washington University (when it took over monitoring responsibilities from NCCD) in their efforts to monitor juvenile detention and treatment facilities operated by the State of Georgia. In that case, I monitored an Agreement between the United States Department of Justice and the State of Georgia designed to improve the quality of care in its juvenile detention facilities. The Agreement encompassed mental health care, medical care, educational services, and treatment programs.

7. In 2007 and 2008, I prepared expert statements and testified before the court and the three-judge panel in the *Coleman/Plata* overcrowding litigation. My expert report in that case was cited twice in the United States Supreme Court decision upholding the three-judge court's imposition of an order requiring California to reduce overcrowding to address constitutional violations. *Brown v. Plata*, 563 U.S. 493, 519 n.6, 522 (2011). I have served as an expert in several federal court class action cases regarding mental health care in jails and prisons, including *Hernandez, et al. v. County of Monterey* (N.D. Cal.), *Coleman v. Brown* (E.D. Cal.), *Parsons v. Ryan* (D. Ariz.), and *Graves v. Arpaio* (D. Ariz.).

8. I have designed and taught courses in correctional psychiatry at UCSF. I have also designed and taught courses on the protocols for identifying and treating psychiatric patients and have supervised psychiatric residents in teaching hospitals. I have worked closely with local, state and federal governmental bodies to design and present educational programs about psychiatry, substance use, and preventative

1  medicine.

2       9.     I have presented numerous papers before mental health professionals,

3  prosecuting and criminal defense attorneys, probation officers, and judges, and have

4  published in professional and peer-reviewed journals on topics including prison

5  mental health services, dual diagnosis, mental illness, alcohol and drug use, and the

6  treatment of substance use disorders.  These presentations and publications include:

7  "Alcohol and Other Drugs and the Courts" (2010), "The Mentally-Ill Offender in

8  Reentry Courts" (2010); "Mental Health Aspects of Diminished Capacity and

9  Competency" (2007); "Methamphetamine-Induced Dual Diagnosis Issues" (2006);

10  "Proper Assessment of Drug Court Clients" (2006); "Classification of High Risk

11  and Special Management Prisoners, A National Assessment of Current Practices"

12  (2004); "Cultural Considerations in Working with the Latino Patient" (2002);

13  "Psychiatric Complications of the Methamphetamine Abuser" (2001); "The

14  Assessment, Diagnosis, and Treatment of the Patient with Multiple Disorders"

15  (2001); "Managing People of Different Pathologies in Mental Health Courts"

16  (2000); "Model for Health Appraisal for Minors Entering Detention" (2000); "Co-

17  Occurring Disorders: Substance Abuse and Mental Health" (2000); "The Dual-

18  Diagnosed Client" (2000); "Psychiatric Assessment in the Criminal Justice Setting,

19  Learning to Detect Malingering" (1999); "Working With the Substance Abuser in

20  the Criminal Justice System" (1999); "Mental Illness and Drug Abuse" (1999);

21  "Alcoholism: Practical Approaches to Diagnosis and Treatment" (1999); "Criminal

22  Justice and Substance Abuse" (1999); "Impulse Control Disorders" (1999); "Major

23  Depressive Disorder" (1999); "Substance Abuse and Major Depressive Disorder"

24  (1999); "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment

25  Planning for the Dually Diagnosed" (1998); "Assessment and Treatment of the High

26  Risk Offender" (1999); "Assessment of Substance Abuse" (1995); "Attention

27  Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues"

28  (1994); and "Psychiatry, Homelessness, and Serious Mental Illness" (1994).

10.     I have been asked to provide my opinion in this case regarding the policies and practices of San Diego County, the San Diego County Sheriff's Department, and their contractors and agents as they relate to the provision of mental health care and practices impacting incarcerated people with mental health needs in the San Diego County Jail system (the "Jail").

11.     I previously submitted expert declarations in this case on specific matters related to the delivery of mental health care and Jail policies and conditions impacting people with mental health and other conditions.  Dkt. 119-7, Dkt. 162-4. For those declarations, I reviewed numerous investigation and other reports, Jail policies and procedures, and several people's written testimony, among other things. My findings and opinions in those declarations are incorporated by reference into this declaration and, where appropriate, expanded upon based on the additional information I have gathered since.

12.     In the last four years, I have provided expert testimony at trial or by deposition in the following cases:

- *Parsons, et al v. Shin* (District Court, Phoenix, AZ, November 3, 2021)
- *Ashoor Rasho et al. v. Director John Baldwin* (District Court, Peoria, Illinois, February 1, 2022)
- *Joseph O'Malley v. Hawaii Department of Safety* (Superior Court, Honolulu, HI, February 3, 2022)
- *Barrientos v. Core Civic* (Deposition) (April 14, 2022)
- *State of Missouri v. Marvin Rice* (11DE-CR00590-2) (Superior Court, Clark County, MO, March 31, 2022)
- *United States v. Jason Solatario Brown* (District Court, Guam, January 6, 2023)
- *Daniels v. Jeffreys* (Deposition) (March 1, 2023)
- *Washington v. Essex, Banyas* (Deposition) (November 9, 2023)
- *State of Idaho v. John Cody Hart* (McCall, Idaho, December 4, 2023)

13.     I am charging $400 per hour for my time working on this matter.  For deposition or in-court testimony, I have a four-hour minimum with rate of $600 per

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  hour and a full-day rate of $4,000.

2  <center>**METHODOLOGY**</center>

3      14.    I visited San Diego Jail facilities on February 6, 7 and 8, 2024. During

4  the visit, I toured the San Diego Central Jail Facility (Central Jail), the George

5  Bailey Facility (George Bailey) and the Los Colinas Detention Facility (Las

6  Colinas) (collectively, the "Facilities," "Jail Facilities") along with other experts and

7  Plaintiffs' attorneys. At these Facilities, I visited several housing units, intake areas,

8  health care clinic areas, health care staff work spaces, pharmacy areas, and other

9  locations inside these Jail Facilities. During the three days, I was able to

10 communicate with scores of patients and spoke with County staff. Health care

11 contractor staff (e.g., NaphCare) consistently refused to speak with me. I also

12 reviewed several hundred photographs taken during the tour. (The photographs are

13 date-stamped as February 2023, but they were taken during my site visit in February

14 2024.)

15     15.    Over my career, I estimate that I have conducted well over two hundred

16 inspections of detention facilities, including as a party's designated expert and a

17 court-appointed expert monitor. My tour activities at San Diego County Jail

18 (hereinafter the "Jail") are generally consistent with the methodology I have used in

19 touring other detention facilities.

20     16.    After the tour, I reviewed dozens of patient health care charts chosen by

21 San Diego County as being representative of the following categories:

22         a.    People who submitted 3 or more sick call requests for mental

23 health care;

24         b.    People who requested confidential mental health encounters;

25         c.    People who were placed in a safety cell for 24 hours or longer;

26         d.    People who were placed in an EOH cell for 48 hours or longer;

27         e.    People who were assessed as suicidal at the time they were

28 booked into the jail;

<center>5</center>

1      f.     People who have been admitted for hospitalization outside of the

2  jail following a suicide attempt/incident of serious self-harm at the jail;

3      g.     People who were housed in the PSU at Central Jail for 48 hours

4  or longer;

5      h.     People who were housed in the PSU at Las Colinas Jail for 48

6  hours or longer;

7      i.     People who were housed in administrative segregation cells for

8  48 hours or longer on the fifth or sixth floors at Central Jail who have also spent

9  time in PSU;

10     j.     People who were housed in administrative segregation cells for

11 48 hours or longer on the fifth or sixth floors at Central Jail who have also spent

12 time in OPSD; and

13     k.     People with the following illnesses: 1) schizophrenia, 2) bipolar

14 disorder, 3) anxiety, and 4) depression.

15     17.    I also reviewed patient records from several incarcerated patients with

16 whom I interacted during my tour of the Jail Facilities.

17     18.    There were significant problems with the health care records I received

18 that made the process of reviewing them more tedious, difficult, and time-

19 consuming.  For example, in some patient records, certain letters were oddly

20 missing.  While I was generally able to discern what was being stated in the records,

21 this made it more difficult and time-consuming for me to complete my review.

22 Likewise, in several records, the file had been formatted in such a way that I could

23 not conduct text searches.  Again, I was generally able to complete my reviews and

24 find specific key records, but the review process was more difficult and time-

25 consuming than my usual expert review processes, where records are text-

26 searchable.

27     19.    In this case, given the enormity of the records, data, and materials to be

28 reviewed, I utilized the assistance of a psychiatrist colleague, who also has

1  experience in jail mental health care, to review records and case materials in this

2  matter.  The reviews conducted by this colleague were all done under my

3  supervision.  I frequently utilize this sort of assistance in conducting large detention

4  mental health care system assessments, as it is helpful to make my review process

5  more efficient and effective.  My analysis is ultimately done independently and all

6  findings contained in this report are my own.

7       20.    The materials I reviewed in preparing my opinions and findings are

8  listed in **Exhibit B**.

9       21.    In forming my opinions and findings, I look to the general (or

10  community) standard of care in the treatment of people with serious mental illness.

11  I also look to the National Commission on Correctional Health Care (NCCHC)

12  standards, which offer useful guidance for a jail health care system seeking to

13  provide appropriate care to patients in custody.  But a jail system's compliance with

14  NCCHC standards, including to warrant NCCHC accreditation, does not

15  automatically demonstrate a system that provides minimally adequate mental health

16  care nor compliance with constitutional requirements.  An expert evaluating

17  conditions, treatment, policies, procedures, and other essential aspects of a detention

18  facility would be remiss if they relied exclusively on NCCHC standards.

19       22.    It is notable, however, that, despite what I understand to be years of

20  discussion by San Diego County Jail leadership about earning NCCHC

21  accreditation, the San Diego County Jail has *not* secured such accreditation.  As

22  discussed in this report, multiple NCCHC recommendations—*dating back to*

23  *2017*—regarding how to fix deficiencies in the Jail's mental health care system have

24  still not been implemented.  This fact, to be sure, raises concern as to the adequacy

25  of this Jail's mental health care system.

26       23.    My opinions are informed by extensive data, information, and

27  observation, and have a reasonable degree of medical certainty based on the

28  evidence outlined above.  I reserve the right to modify my opinions in the light of

1  new additional information that is provided to me in the future.

2  **FINDINGS**

3  **I.    FINDING #1: THE SAN DIEGO COUNTY JAIL'S SYSTEM FAILS TO ADEQUATELY IDENTIFY AND TRACK INCARCERATED PEOPLE WITH SERIOUS MENTAL HEALTH CARE NEEDS.**

4

5      24.    Based on my tour and review of policies, records, and other relevant

6  materials, it is clear that the Jail's current system fails to adequately identify and

7  track incarcerated people with serious mental health care needs. This systemic

8  deficiency puts incarcerated people at substantial risk of serious harm.

9      25.    I toured the intake health care screening areas and procedures at Central

10  Jail and Las Colinas. Several aspects raised great concern for me. I observed a

11  screening process that was not designed to effectively triage and ensure timely,

12  adequate treatment for people with mental health needs. There are also deficiencies

13  in the system that prevent adequate identification of mental health needs throughout

14  the period of incarcerated people's detention.

15      **A.    The Jail's Mental Health Screening System Falls Short with Respect to Identifying and Addressing Suicide Risk.**

16

17      26.    There are several deficient aspects of the Jail system's process for

18  identifying and addressing suicide risk. During our site visit, intake nursing staff

19  shared that she did not know of a standardized suicide risk assessment tool she was

20  supposed to use. Intake nursing staff noted a few self-populating questions on the

21  screen about suicide risk and suicide history, but they could not explain how the tool

22  is used to trigger a mental health referral. Nor is there adequate guidance provided

23  to staff on how to use the risk assessment tool (including, when to make a referral)

24  in the San Diego County Sheriff's Department Medical Services Division policies,

25  including *Mental Health Screen and Evaluation* (MSD.E.5.1, SD_117427) and

26  *Suicide Prevention & Patient Safety Program* (MSD.S.10, SD_117715).

27      27.    In 2018, nationally recognized suicide prevention expert Lindsay Hayes

28  in fact "strongly recommended" that the County reconsider its use of the Columbia-

Suicide Severity Rating Scale (C-SSRS) during its intake screening process, noting that its "effectiveness remains questionable."  The Jail rejected this recommendation and continues to use the C-SSRS for its mental health intake screening.  San Diego County Response to Lindsay Hayes' Report at 3, DUNSMORE 0117148.  A few additional screening questions have been added, but the result is not an effective screening tool.  What the Jail system needs is a validated suicide risk assessment tool that is appropriately tailored to ensure accurate identification of suicide risk and to facilitate an appropriate response.

28.     Based on my tour and review of records and other relevant materials, and even beyond the problematic suicide risk assessment tool, the Jail's mental health screening process fails to ensure timely and adequate treatment for people at risk of suicide.  This failure manifests itself in several ways.  Most significantly, by policy and in the practices I can discern, the identification of a person's elevated suicide risk does *not* lead to any treatment planning or meaningful treatment services.  Remarkably, Medical Services Division policy S.10, *Suicide Prevention & Patient Safety Program*, which flows in large part from the mental health screening procedures, makes no mention of any treatment planning and only the most glancing of references to mental health treatment at all.  SD_117715.  (This issue is discussed further in Finding #5, below (Suicide Prevention Failures).)

29.     Also of great consequence, by policy and in practice, the mental health screening process is deeply ineffective in ensuring that a patient with serious mental health needs—including someone who may be at heightened risk of suicide— has timely access to psychiatric services (including medication) that are clinically necessary for their well-being.  (This issue is discussed further in Finding #2, below (Psychiatric Care Failures).)

30.     At the present time, the Jail system's mental health screening procedures fail to adequately identify and treat patients at risk of suicide, putting patients at substantial risk of serious harm.

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

**B.      The Jail's Mental Health Screening System Is Deficient and Ineffective in Identifying and Ensuring Treatment for _Non_-Suicide-Related—but Still Very Serious—Mental Health Treatment Needs.**

31.      The San Diego County Jail system appears to place extreme focus on people who may be at risk of suicide.  This is in some respects understandable, given that San Diego County Jail has been found to have an exceedingly high rate and number of suicides as compared to other county jail systems, with a suicide rate of more than 1.5 times the national average from 2011 to 2020 (with nearly 40 suicides during that time period), and several more suicides since 2021.  Many outside groups have raised grave concerns about suicides in San Diego County Jail. _See_ California State Auditor, _San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody_, Feb. 3, 2022 ("2022 California State Auditor Report"),  DUNSMORE0117710; Lindsay Hayes's _Report on Suicide Prevention Practices Within The San Diego County Jail System_, June 22, 2018 ("2018 Hayes Suicide Prevention Report" or "Hayes Report"), DUNSMORE0117148; Disability Rights, California's _Suicides in San Diego County Jail: A System Failing People with Mental Illness,_ April 2018 ("2018 DRC Report" or "DRC Report"), DUNSMORE0124942.

32.      At the same time, based on my review, I have very serious concern about the Jail's system of identifying and providing timely assessment and treatment to patients with serious psychiatric problems but who are _not_ a suicide risk.

33.      During my site visit, I asked Jail leadership and intake screening staff about this non-suicidal patient population.  I was informed that the intake mental health screening focuses on suicidality.  If the intake nurse determines that a person is at risk for suicide, they will refer that person to a "gatekeeper."  The "gatekeeper" is a mental health professional (except when it is a nurse because there is not a mental health clinician available) who is supposed to then conduct an initial suicide risk assessment, but _not_ a comprehensive mental health assessment.  As confirmed with "gatekeeper" staff with whom I spoke, that initial suicide risk assessment, by

1   policy and in practice, serves to ensure only evaluation of a patient for placement on

2   suicide precautions (*i.e.*, placement in a safety cell, Enhanced Observation Housing,

3   or the Psychiatric Services Unit's observation cells), *not* for clinically necessary

4   mental health treatment. The "gatekeeper" is, by policy, serving a limited function

5   as crisis intervention specialist for suicidal behavior only. I am not aware of this

6   sort of extremely limited "gatekeeper" role in any other detention system, and based

7   on my review of this system, I find that its design leads to failures in mental health

8   care delivery.

9        34.    Under Medical Services Division policy E.5.1, patients "who yield

10  positive mental health screenings" at intake "will be required to have a follow up

11  with a [Qualified Mental health Professional] within 30 days when clinically

12  indicated." SD_059881. This policy fails to comply with one of the most basic

13  NCCHC standards—that is, that patients receive a comprehensive mental health

14  intake within 14 days of booking. This deficiency was identified in 2017, but

15  remains unremedied today. NCCHC Report at 20, 53, 87, 121,

16  DUNSMORE0260618. By policy, when intake nursing staff determine at intake

17  that an incarcerated person should be referred for further mental health evaluation,

18  follow-up is only required within *30 days*. It is further a major problem that there is

19  no directive for a much more expedited timeline for clinically urgent cases.

20       35.    The consequences of the Jail's delays in *comprehensive* mental health

21  screening can be deadly. The 2022 California State Auditor Report identified eight

22  (8) recent in-custody deaths where the individual "had serious medical or mental

23  health needs that health staff did not identify or communicate to detention staff at

24  intake." 2022 California State Auditor Report at 20, DUNSMORE0117710. In one

25  case, an intake nurse referred an arriving incarcerated person for mental health

26  services, and the person made an urgent request for mental health services the next

27  day. That request was denied because a referral was in process. Two days later, the

28  person died by suicide, having never seen a mental health professional. *Id.* at 23.

36.      In my review of records, I observed case after case in which patients with serious and urgent mental health treatment needs did not receive a comprehensive mental health evaluation—and just as serious, did not receive an appropriate psychiatric assessment—for extended periods of time (*i.e.*, several weeks and even months).  This failure to timely address *urgent* non-suicide-related mental health needs when identified puts this Jail system at odds with other detention systems that provide more appropriate mental health care, and puts people in San Diego County Jails at substantial risk of serious harm.

37.      **Overall, I am very concerned about the insufficient and untimely involvement of mental health professionals in the mental health screening process.**  In 2022, the California State Auditor recommended that the Jail "revise its intake screening policy to require mental health professionals to perform its mental health evaluations.  These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody." *Id.* at 54.  This recommendation has gone unheeded.  In 2023, San Diego County published a *Progress Report: Update on State Audit*, in which it acknowledged that this recommendation had not been implemented.  The County noted that it was "moving toward providing 24-hour mental health care in the facilities, including the availability of mental health professionals during the intake process at the receiving facilities." Progress Report at 5, SD_184479.  But initial mental health screening is still done by non-mental health staff, with referrals to prompt secondary assessment generally done only where the intake nurse identifies a possible suicide risk.  This is an inadequate mental health screening procedure.  It nearly assures that there will be delays in identification and treatment of serious mental health needs, and—based on my review—is causing serious ongoing harm through denials of clinically adequate and timely care.

38.      The Jail's mental health coordinator acknowledged that the Jail does not track or look at how many people actually receive the comprehensive mental

1  health evaluation or on what timeline.  Quiroz PMK Dep. at 46-47.

2      39.    It consistently takes far too long for patients with serious psychiatric

3  medication needs to see a psychiatric prescriber, which is absolutely essential to

4  ensure that appropriate medication is continued or initiated, and that any medication

5  regimen that is implemented meets the patient's clinical situation. Significant

6  improvement is needed to ensure that people with mental health needs (including

7  those who are not current suicide risks) receive timely evaluation and treatment.

8      40.    County leadership appears to share my concern about untimely

9  assessments for newly incarcerated patients.  In May 2024, the Jail's mental health

10  coordinator, Ms. Quiroz, testified about how the County itself identified concerns

11  about the timeliness of psychiatry contacts for patients arriving at the Jail:

12      Q: [I]s your team concerned about timeliness of initial psychiatry
       contacts with patients?

13      …

14      A: We want them seen as soon as possible, and there's times we may
       feel that it's not soon enough.

15

16  Quiroz PMK Dep. at 111.

17      **C.    The Jail System Fails to Review and Consider Important
             Information—*Including what Is Maintained by the County Itself*—**

18      **About Newly Arriving Patients.**

19      41.    The 2022 California State Auditor Report recommended that the

20  County "create a policy requiring health staff to review and consider each

21  individual's medical and mental health history from the county health system during

22  the intake screening process."  DUNSMORE0117710.  This recommendation has

23  gone unimplemented.

24      42.    In 2023, the County responded, "Unlike many other counties, San

25  Diego does not have a coordinated county health system or shared electronic health

26  care records system.  As a result, we cannot meet this recommendation as written."

27  Progress Report at 5, SD_184479.  The Progress Report notes that in April 2021,

28  nearly one year *prior to* the 2022 California State Auditor Report, certain Jail mental

1    health staff were granted "read-only" access to County health system records for Jail
2    patients. *Id.*

3        43.    Ms. Quiroz, the County's Person-Most-Knowledgeable on Jail Mental
4    Health Care issues, confirmed that there remains no policy or written expectation
5    that intake nurses review and consider patients' medical and mental health history
6    from the county health system during the intake screening process, and that it
7    appears that intake nurses continue to rely on self-reporting of mental health history.
8    Quiroz PMK Dep. at 98-99. (The lieutenant with us during my February 2024 site
9    visit stated that he thinks the County is "looking into" this issue, but no changes
10   were anticipated at that time.)

11       44.    Based on my professional experience, this response and the current
12   policy are inadequate.  The State Auditor's recommendation should be fully
13   implemented.  Specifically, to ensure adequate screening and continuity of mental
14   health care, all health care staff conducting intake screening at the Jail must have
15   access to an arriving patient's medical and mental health history that is available in
16   the County health system records, and must be required to review and consider that
17   information during the intake screening process.  Where the County may have
18   relevant treatment information about a patient (as in the County's behavioral health
19   system), it is not sufficient to rely on a patient's self-reporting, or to rely on
20   subsequent mental health staff interactions with a patient that may not timely occur.

**D.    It Is a Further and Very Serious Problem that the Jail Lacks an Adequate Screening Tool to Assess Incarcerated People for Intellectual Disability and to Determine Related Treatment and Adaptive Support Needs.**

24       45.    The San Diego County Jail does not have an adequate system for
25   identifying people with an intellectual disability and related needs.

26       46.    The intake screening has a single question on the topic, asking: "Are
27   you a client of the regional center for the developmentally disabled, or have you
28   been in special educational classes in school?"  Quiroz Dep. Exhibit 2, Exhibit B at

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

12. (The inquiry itself—which is a compound question—is ironically exactly the sort of question that is inadvisable and ineffective for a person with an intellectual disability.) This screening is insufficient to identify people with intellectual disabilities and their individual treatment or adaptive support needs.

47. I am aware of other California systems, including Orange County Jail, Sacramento County Jail, and California's state prisons, that have a far more thoughtful—and effective—screening procedure for intellectual disabilities. This deficiency has existed in the San Diego County Jail for years, as the 2017 NCCHC Report found the Jail non-compliant with the NCCHC standard to have an adequate screening for intellectual disability. NCCHC Report at 35, 136, DUNSMORE002016. The 2023 death of Roselee Bartolacci, discussed later in this report, speaks directly to how failures in identifying and addressing intellectual disability needs leads to horrific, and preventable, results.

### E. There Is Insufficient Confidentiality During the Mental Health Screening Process.

48. In my observation of the intake process, I was concerned to see the lack confidentiality provided for the initial screening. At Central Jail, the health care intake booth requires the patient to sit on one side of a window, several feet from the intake nurse. Several law enforcement staff from the community and the Jail stand approximately five (5) feet behind the patient. While having law enforcement available to *visually* observe an individual during intake health screening makes sense for security, the Central Jail's health care intake screening arrangement fails to provide adequate *auditory* privacy, as law enforcement can hear the patient discuss sensitive health care information with the nurse. This set-up undermines the sharing of important mental health information. It is inconsistent with other detention settings that I am aware of, which provide adequate auditory privacy during the intake process while ensuring appropriate safety and security. Based on my records review, interviews with staff and patients, and the testimony of Jail mental health

staff, clinical encounters, including mental health screening, are very frequently conducted without adequate confidentiality such that the validity of the screening is undermined.

49.     This deficiency was identified years ago, in the 2017 NCCHC Technical Assistance Report for the San Diego County Jail at 8-9, 43, 109, which found the Jail out of compliance with NCCHC patient confidentiality requirements:

> J-A-09 Privacy of Care (I).  **Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy.  By custody policy, the officers feel they need to be within arm's length of a patient in the clinic.  This compromises privacy and may prevent a provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis.**

> Recommendations:  **The areas of privacy and confidentiality of care need to be addressed.**  [NCCHC Compliance Indicators] require that procedures be put in place to assure confidentiality when health care is being delivered and discussed.  These are not met.

DUNSMORE0260618. The failure to provide adequate confidentiality for intake mental health screening continues today.

**F.     Patient Examples of Deficient Intake Screening Practices Putting People at Substantial Risk of Serious Harm.**

50.     Deficiencies in the mental health intake screening system matter greatly, and many patients at the San Diego County Jail have been put at substantial risk of serious harm as a result.  The recent in-custody suicide death of Pedro Ornelas, who I review in more detail in Section II.E, below, is an egregious example. Following his arrival at the Jail, he repeatedly requested to see a psychiatrist to "get back on my medications"—requests that were *never* addressed through initial screening or subsequent processes.  I offer additional examples here:

51.     ███████████     This patient has a psychiatric history of Bipolar Disorder, Anxiety, Adjustment Disorder, and PTSD.  He was initially booked at the Jail in ██████ 2023.  He was seen for a nonconfidential mental health assessment *approximately 23 days later*.  Despite his extensive mental health treatment and psychiatric history, he was *never* seen by a psychiatric practitioner during this

detention.  He was rebooked at the Jail in ███████ 2024.  Seventeen days later, he submitted a request for psychiatric help, stating "I'[m] having bad anxiety not having no motivation for nothing not even for taking showers."  He finally received a mental health wellness check *21 days after his arrival*, with current symptoms of "depression/anxiety."  Remarkably, he was again not referred to for psychiatric appointment, and there is no indication that even the delayed mental health encounter led to provision of clinically indicated care.  The screening and treatment in this case was delayed and entirely inadequate, and the patient's mental health and well-being were harmed as a result.

52.    ███████████    This patient was booked at the Jail in █████ 2023, having a history of mental illness and current treatment needs.  Based on my review, he needed an immediate referral for a comprehensive mental health assessment and psychiatric evaluation.  He instead received a "BH-MH Acuity Level" as "Moderate" several days later.  He was not seen by a psychiatric prescriber for another two weeks after that, and his condition got worse as a result.  Allowing someone to deteriorate makes treating that patient more difficult to treat.  When the prescriber finally saw the patient, he started him on a substantial dose of antipsychotic medication.  The standard of care requires that when such a medication regimen is implemented, the patient should receive a follow-up psychiatric assessment within one (1) week.  In this case, the patient was not seen for five (5) weeks.  (Demonstrating the lack of an adequate system of care, he was then seen by two different psychiatric nurse practitioners on back-to-back days.  It is clear from the record that the second nurse practitioner was not aware that the patient was seen the day before.)  During this extended delay in necessary psychiatric follow-up, the patient had multiple documented incidents of medication non-adherence.  The records indicate that neither the mental health clinicians doing wellness checks (generally at cell-front) nor the prescribers took meaningful steps to address the medication adherence issue.  (It was generally not mentioned at all.)

1   This case illustrates the frequent deficiencies I observed with respect to screening

2   people with mental illness at intake, excessive delays in mental health and

3   psychiatric evaluations and care, delays in initiating clinically indicated psychiatric

4   care, and untimely, poorly coordinated, and inadequate psychiatric follow-up care.

5   **II.    FINDING #2: THE JAIL'S SYSTEM FAILS TO TIMELY AND
       ADEQUATELY PROVIDE ESSENTIAL MEDICATIONS TO PEOPLE
6       WITH MENTAL HEALTH TREATMENT NEEDS.**

7       53.    As a psychiatrist with experience working in and evaluating numerous

8   detention systems, I am extremely concerned about the deficiencies I have observed

9   with respect to the San Diego County Jail's system for provision of essential

10  medications to people with mental health treatment needs.  Failures and delays in

11  the provision of medications and psychiatric care put patients in this Jail system at

12  substantial risk of serious harm, including in the following ways.

13      **A.    Psychiatric Prescribing Practices and Supervision in the San Diego
            County Jail System Fall Far Short of the Standard of Care,
14          Resulting in Serious Treatment Failures and Putting Patients at
            Substantial Risk of Harm.**

15

16      54.    In the San Diego County Jail system, psychiatrists, psychiatric nurse

17  practitioners, and psychologists have for years been hired by private health care

18  contracting companies.  They are not County employees.  In contrast, most or all

19  mental health clinicians (master's level social workers or marriage/family therapists)

20  are County employees.  This odd breakdown—which is exceedingly rare in jail or

21  prison mental health systems—is deeply problematic, as it tends to compromise care

22  coordination across disciplines, cause dangerous disconnects in supervision and

23  quality assurance, and lead to adverse systemic and individual patient outcomes.

24  (This problem is discussed further in Finding #6.B.) I observed each of these sorts of

25  problems in the San Diego County Jail system as it relates to psychiatric care.

26      55.    Jail mental health staff shared with me during my Jail site visits that

27  psychiatric prescribers have little to no interaction with County-employed clinicians,

28  with the possible exception being in the acute care Psychiatric Service Units.  This

1  lack of coordination is an enormous problem.

2      56.     During my site visits, I requested to speak with a psychiatric prescriber

3  at each Jail facility.  Every time, the psychiatric prescribers refused to speak with

4  me.  County staff and legal counsel explained to me that because the psychiatric

5  prescribers were employed by a private health care contractor (NaphCare), the

6  County had no authority to have them speak with me.  This seems to me to be an

7  illustration of one aspect of the deficient mental health system at San Diego County

8  Jail—that is, the convoluted and disconnected staffing structure leads to convoluted,

9  disconnected, and ultimately deficient practices and harmful outcomes for patients.

10     57.     Based on my review of records and interviews with staff and patients, it

11 is beyond question that psychiatric prescribing practices at the San Diego County

12 Jail fall below the standard of care and put patients at substantial risk of serious

13 harm.  I include illustrative examples below; they are a few among many deficiency-

14 ridden cases that I reviewed for this case.

15     58.     Based on my review, the County is well aware of many deficiencies

16 with the system of psychiatric care at the Jail, which remain unresolved.  Examples

17 of deficits that have been identified in recent County documentation, *see* Quiroz

18 PMK Dep. at Exhibit 10, Sheriff's Department Corrective Action Notice, Dec. 1,

19 2023, include the following serious systemic failures that must be remedied:

20  • **Lack of participation by psychiatry in Continuous Quality
       Improvement (CQI) meetings and activities.**  CQI activities that
21     consistently include psychiatry are an essential component of operating
       an adequate jail mental health care system.  Psychiatry providers do not
22     participate meaningfully (and at times, do not participate at all) in CQI
       meetings and efforts.  This is a major and persistent deficit in this
23     system, as the Jail mental health coordinator acknowledged.  *See*
       Quiroz PMK Dep. at 187 ("I don't know that it's been fully resolved,
24     but it … [d]oes probably need to work towards improvement."); *id.* at
       188 ("Q: Has there been a quarterly meeting where all the necessary
25     NaphCare staff members are present? A. Not consistently.").

26  • **Lack of documented peer review process for psychiatric
       prescribers.**  I have observed pervasive deficiencies in patient record
27     review with respect to psychiatric prescribing practices.  Given these
       deficiencies, it is unacceptable that there are not effective peer review
28     processes in place for psychiatric prescribers.  The Jail Mental Health

coordinator confirms that the County has failed to take steps to ensure that this problem is addressed. *See* Quiroz PMK Dep. at 190-91 ("I can't be for certain that they're not doing peer reviews. It's nothing that they hand back to us. I mean, if they do the peer reviews it's something that they're keeping records of on their own."); *id.* at 100-01 (no County employee or entity responsible for determining whether NaphCare's peer review process is adequate).

- **Lack of clinical oversight of psychiatric prescribers (especially psychiatric nurse practitioners) working at the Jail.** I observed that a substantial proportion of the pervasive deficiencies in psychiatric practices were the result of sub-standard practice among psychiatric nurse practitioners at the Jail. The Jail mental health coordinator confirmed that, in leadership meetings, the Jail's chief medical officer (Dr. Montgomery) has shared concerns about adequacy of clinical oversight for psychiatric nurse practitioners at the Jail and the impact on medication management for the Jail's mental health population. *See* Quiroz PMK Dep. at 192 & 198 ("it's still a concern").

- **Inadequate psychiatric prescriber treatment practices.** Through my review, I observed time and again foundational deficiencies in psychiatric care practices: (1) the lack of appropriate confidentiality during psychiatric appointments, which undermines the exchange of sensitive information necessary to care; (2) untimely psychiatric evaluation; (3) untimely psychiatric follow-up consistent with the standard of care, including when medication is initiated, in cases of medication non-adherence, and when a patient's condition worsens; (4) improperly aggressive prescribing practices (*e.g.*, excessive starting doses, multiple concurrent medication changes, polypharmacy with inadequate attention to patient needs). These deficiencies are noted in my individual case reviews and other sections of this report.

59.     The 2017 NCCHC report criticized the San Diego County Jail's psychiatry care practices and failure to "manage … appropriately" patients who had serious needs but were not presently "psychotic and/or gravely disabled":

A review of the patterns of psychotropic medication prescriptions indicated that 31% of all prescriptions in the system in 2015 and 2016 were for antipsychotic medications, when the population of inmates with psychotic disorders is likely to be 5-10%. This is not consistent with prescription practices and mental illness management in other facilities in the United States, and suggests a disproportionate focus on those with psychotic disorders, even when the severity and acuity of those disorders is taken into consideration.

NCCHC Report, DUNSMORE0260618 at 35.

60.     This finding, from 2017, is unfortunately consistent with practices that I observed at San Diego County Jail in 2024. I observed many patients with clear histories of serious mental illness and complex psychiatric care whose medication

1    needs were ignored or insufficiently monitored at the Jail.  These patients in many

2    cases had active psychiatric symptoms but where not presenting as "psychotic

3    and/or gravely disabled."  But after a period of delays and failures in psychiatric

4    care at the Jail, many of them decompensated significantly, even to the point of

5    *becoming* acutely psychotic, gravely disabled, and suicidal.

6        61.    My review reveals serious failures in psychiatric medication practices

7    at all stages of a patient's detention—upon arrival, during their detention, and as

8    part of discharge planning.  Each stage is discussed in turn below.

9    **B.    There Are Serious Systemic Failures to Continue Clinically
           Necessary Medication for People with Mental Health Treatment
10           Needs *When They Arrive at the Jail*.**

11       62.    The Jail does not reliably or effectively continue necessary psychiatric

12   medication for newly-detained patients who were receiving care in the community

13   prior to their detention.  Any disruption of psychiatric medications can be dangerous

14   for a number of reasons.  First, individuals who take prescribed medication to

15   control their mental illness often decompensate if their medication is interrupted.

16   This can lead to worsening symptoms and risk of suicide.  Second, a disruption of

17   prescribed psychiatric medication can actually exacerbate the underlying mental

18   illness by altering brain physiology and causing an expansion of foci in the brain of

19   the condition at issue.  This is called the "kindling phenomenon."  Finally, because

20   disruption of medication can cause a worsening of the underlying condition, it can

21   also make it more difficult to treat a patient's mental illness moving forward.

22       63.    The problem of medication discontinuity for newly arrived patients has

23   been longstanding at San Diego County Jail.  The NCCHC report found, back in

24   2017, that incarcerated people who enter the Jail with active prescriptions for

25   psychotropic medication "frequently" do not have their medication continued in a

26   timely manner.  The NCCHC Report documents the concern that such failures

27   "result[] in instability and risk for the inmate, for custody staff and for the facility."

28   NCCHC Report at 35.

64.     To this day, patients who were taking prescribed psychiatric medication prior to their incarceration in this system are forced to wait several days, and even weeks, before they are restarted on their medication.  Some patients who are prescribed psychiatric medications at the Jail frequently wait far too long for those medications to arrive and actually be initiated.  Without their medication, incarcerated people decompensate, leading to psychosis, suicide attempts, and incidents of serious self-harm that are preventable.

65.     The County has been well aware of this serious deficiency for some time.  The issue was identified in a Corrective Action Notice (CAN) sent by the County to NaphCare, dated April 28, 2023, stating that NaphCare "failed to restart medications for patients reassigned from the California Department of State Hospital."  NAPHCARE034831.  In the County's March 4, 2024 Corrective Action Notice, no documented corrective action to remedy this deficiency is noted, yet the County states, without analysis: "NaphCare has appeared to resolve pharmacy … medication issues."  SD_1572610.  My records review and site inspection strongly indicate that the problem of failing to continue arriving patients on their medication persists on a wide scale.  Patients ████████████, ███████████ and ████████ ███, which I describe in this report, are all recent cases showing that deficiencies continue to put patients at unnecessary risk of harm.  SD_876917-877210.

66.     The standard of care calls for each person who was taking psychiatric medications in the community or with prescriptions during prior incarcerations to be automatically referred for evaluation by a prescriber, with that evaluation occurring in a timely manner, including on an urgent or emergent basis if clinically indicated.

67.     The failure to continue or timely start a person on clinically necessary psychiatric medications when they arrive at the Jail is exceedingly dangerous and must be remedied as soon as possible.  The 2023 suicides of Pedro Ornelas and Jonathan McDowell, each of which had unacceptable delays in the provision of medication upon arrival, demonstrate the dire consequences of such failures.

**C.     There Are Serious Systemic Failures in Medication Management and Psychiatric Care *During the Period of a Patient's Incarceration*.**

68.     I observed numerous examples that the Jail system fails to meet minimally adequate standards with respect to medication management and psychiatric care *during* a patient's period of incarceration, including excessive delays in follow-up by psychiatric prescribers, deficient prescribing practices, quality assurance failures, poor side effect management, and lack of follow-up for patients with poor medication adherence.

69.     The delays in psychiatric care for patients in detention at the Jail remain enormous.  The County is well aware of the problem.  A December 2023 Sheriff's Department Corrective Action Notice to NaphCare, the then-private contractor responsible for psychiatry, documented a persistent psychiatric sick call backlog, resulting in psychiatric care delays.  It noted that "periodic blitzes are done 3-4 months, with no solution to maintain the rising number of sick calls."  In April 2023, there were 785 pending psychiatry appointments.  Despite the corrective action notice issued at that time, there remained 530 psychiatric pending psychiatry appointments in November 2023, with an average wait time of 18 days.  Quiroz PMK Dep. at Exhibit 10, Sheriff's Department Corrective Action Notice, Dec. 1, 2023.

70.     The Jail mental health coordinator testified in May 2024 that delays in access to psychiatry care remain a "key deficiency area":

> Q. [F]rom mental health's side of things what are the key deficiency areas for [the contracted health care provider company]?
>
> A: Psychiatry sick call, that would be key.
>
> Q: Can you say more about what's deficient …?
>
> A: The volume of pending appointments.

Quiroz PMK Dep. at 186.

71.     I share the County's concern regarding the practice of

psychiatric/medication referrals being processed in such a way that a psychiatric prescriber will not timely see a patient when clinically necessary. Repeatedly in the records, I observed Jail patients requiring a psychiatric prescriber appointment, only for no appointment to be conducted—or scheduled—for weeks or even months at a time. In many cases, such a patient with urgent medication management needs will be scheduled only to see a mental health staff member who is not licensed to prescribe. This is a completely inappropriate and dangerous practice, as it means that urgent medication management needs are not timely addressed.

72.     The Jail's mental health coordinator states it more bluntly: "[W]e're seeing that they're not scheduling the psych si[ck] call for on-site provider to see them, whereas they schedule for a master's level clinician. And that's our concern, is that I [as a non-prescribing clinician] can't really do anything about the meds." Quiroz PMK Dep. at 114-15.

73.     Yet another policy and practice deficiency that urgently requires remediation is the Jail system's failure to act in cases of medication non-adherence—that is, when a patient refuses or misses psychiatric medication doses. Refusals and missed doses demand attention and intervention for people with serious mental illness. Missed medications *cannot* be ignored. Patients may refuse psychiatric medications due to concerns about side effects, efficacy, and a wide range of other reasons that require attention and resolution. Medication non-adherence may also indicate mental health decompensation and the need for other treatment interventions or a higher level of care.

74.     Through my patient records reviews and interviews of patients, I found numerous cases where people with serious mental illness missed multiple doses, often over an extended period of time, without adequate notice to and follow up by the psychiatric prescriber. This is a clinically inadequate and dangerous practice. And troublingly, it is a deficient practice that is *consistent* with the current deficient Jail health care policy. MSD Policy C.5.1 (Medication Administration) contains a

1    short, entirely inadequate section on "Missing Medications" (Section VIII). This

2    section states "The medical provider is contacted if a patient misses any doses of the

3    following medications for any reason." But the medication list contains only *one*

4    psychiatric medication (Clozaril) for which a missed medication would trigger a

5    referral to the prescriber. The standard of care requires that a psychiatric provider in

6    a detention setting be alerted (and timely respond) when their patients refuse or miss

7    a wide range of psychiatric medications (and all psychotropic medications)—not

8    just Clozaril. SD_117401.

9        75.    The policy and practice at the San Diego County Jail must change. In a

10   well-functioning jail mental health system, the policy and practice regarding missed

11   psychiatric medications would be roughly as follows: "The psychiatric provider

12   must be alerted if their patient misses three doses in a row and/or three doses over a

13   seven-day period of *any* psychotropic medication [and other identified psychiatric

14   medications]. The psychiatric provider shall immediately schedule an appointment

15   with the patient to determine the reason behind these missing doses and implement a

16   plan to ensure an appropriate medication regimen and medication adherence."

17   Based on the policy and my assessment of practice through records review, San

18   Diego County Jail does not come close to meeting this standard.

19   **D.    The Jail System Fails to Ensure Adequate Medication Continuity
     for Patients *Who Are Being Released from Custody*.**

20

21       76.    Medication continuity for patients being released is a critically

22   important component of operating an adequate Jail mental health system. Patients

23   leaving the jail must be provided with discharge planning adequate to ensure that

24   they have access to the medications, linkages, and care they need to avoid gaps in

25   medication and other psychiatric care.

26       77.    The NCCHC standards require that jail discharge planning include

27   mental health staff taking necessary steps to "Arrange for a reasonable supply of

28   current medications" (MH-E-10). In my records review, I observed cases of patients

1   with serious psychiatric medication needs not receiving this sort of discharge

2   planning, and without documentation indicating that they were provided access to a

3   reasonable supply of their medications when released.

4        78.    The County is aware of the deficiency with respect to inadequate

5   discharge planning.  Ms. Quiroz, the County's Person-Most-Knowledgeable on Jail

6   Mental Health Care issues, testified in May 2024 that, with the Jail's current

7   discharge planning staff serving incarcerated persons – including the approximately

8   1,600 (or more) mental health caseload patients – "we do need more" staffing to

9   meet the need.  Troublingly, Ms. Quiroz stated that the County did not have

10  sufficient data to know how many discharge planners were necessary to meet patient

11  needs, noting only that "more is certainly better."  Quiroz PMK Dep. at 171-72.

12       79.    Angela Nix, the vice president of nursing for NaphCare, testified in

13  June 2024 that NaphCare is "developing" a role for discharge planning staff, but

14  things remain quite uncertain with respect to medication.  She stated that NaphCare

15  staff "wouldn't be the ones to call in the medication, and they wouldn't be the ones

16  to give the patient medicines in the jail before they leave. … They wouldn't be

17  responsible for handing off their medications."  She also said that she "do[es]n't

18  know what involvement the [County staff] nurses have to that."  Nix Dep. at 72, 77.

19  (Jail mental health coordinator Melissa Quiroz made no mention in her deposition as

20  to a County nursing role in discharge planning.)  The lack of coordination and the

21  lack of a clear procedure enhance my concern about the inadequate system for

22  discharge planning, particularly as to ensuring that patients have uninterrupted

23  access to their psychiatric medications.

24       80.    My concerns about inadequate discharge planning are discussed further

25  in Finding #11, below.

26  **E.      Patient Examples of Deficient Psychiatric Practices Putting People
          at Substantial Risk of Serious Harm.**

27

28       81.    Through my interviews with patients at the Jail and patient records

1  review, I identified several examples illustrating what strongly appears to be

2  systemically deficient system with respect to medication management and

3  psychiatric care.  It is apparent to me that these patients were placed at very

4  substantial risk of harm, and in nearly every case was actually harmed by these

5  treatment failures.  For example:

6      82.  **Suicide of Pedro Ornelas (June 2023)**:  Mr. Ornelas was a 27-year-

7  old man who died by suicide while in custody at San Diego Central Jail, after

8  spending nearly two weeks without necessary attention paid to his obvious

9  psychiatric treatment needs or necessary monitoring.  He was booked on June 16,

10  2023, with the initial screening indicating no mental health history.  This was an

11  appalling and consequential screening failure.  Records from a previous

12  incarceration at the Jail showed ██████████████████████████████████

13  █████████████████████████  Still, on June 17, 2023, Mr. Ornelas made two

14  separate requests to see a psychiatrist to "get back on my medications," a likely

15  reference to his being on psychotropic medications in the community.  These

16  requests were *never* addressed: the staff portion of the forms were never completed,

17  and mental health staff never assessed him.

18      83.  Ten (10) days later, on June 27, 2023, Mr. Ornelas was found hanging

19  by a makeshift noose in his cell with no pulse.  Medical staff performed CPR and

20  transferred him to University of California San Diego Medical Center, where he was

21  found to have anoxic brain injury and passed away.

22      84.  Mr. Ornelas' death may have been preventable with access to mental

23  health services for proper evaluation of suicide risk factors and starting (or, more

24  likely, restarting) his clinically indicated psychotropic medications.  Furthermore,

25  records indicate that Central Jail Module 4A housed incarcerated persons in pre-

26  arraignment and "as a precaution, incarcerated persons are given the green safety

27  blankets upon being housed," indicating a concern for suicide risk.  Yet, there is no

28  indication that further individual screening for additional precautions or enhanced

1    monitoring was done, which would have been appropriate for someone like

2    Mr. Ornelas.

3         85.    In the post-death clinical review, NaphCare's "Recommendations for

4    Modifications in Protocol, Procedure, or Approach to Patient Health Care

5    Management Resulting from this Review," contains only the following phrase:

6    "Closer Psychiatric follow-up/care."  NAPHCARE041765-041767;

7    NAPHCARE041768-041772; NAPHCARE041773-041777.  For a case where there

8    was *zero* psychiatric care provided despite documented psychiatric history available

9    to Jail staff and multiple requests for such care, this finding is a gross

10   understatement.  Even more concerning, in other patient records covering the period

11   since this death, these sorts of deficiencies—failures to check a new patient's

12   history, failures to timely respond to requests for psychiatric care, inadequate

13   psychiatric follow-up, etc.—all persist with extreme frequency.

14        86.    ███████████    This patient, who had a history of mood and

15   adjustment disorders and trauma, as well as a suicide attempt in the last six months,

16   requested to see a psychiatrist repeatedly over a multi-week period at the Jail, with

17   substantial and increasing urgency.  He arrived at the Jail on ████████ 2024.  After

18   not being continued on medications following intake, he submitted a string of

19   requests, stating:

20        ███/24: "I would like to see mental health doctor & therapists"

21        ███/24: "Request to see mental health doctor and psych doctor"

22        On ████████ 2024, he received a behavioral health assessment from a

23   clinician.  The clinician documented that the patient had anxiety and depression,

24   racing thoughts, difficulty concentrating, issues with sleep, trouble falling asleep,

25   and nightmares.  The patient "started to tear up and stated 'I am just trying to be

26   better.'" At this time, he was being provided no medications to help him with his

27   mental health symptoms.  The clinician referred the patient to psychiatry.  But

28   psychiatry did not see him, and so he continued to submit requests:

■/24: "Request to see psych doctor not able to sleep or rest because nxiety and depression at times"

■/24: "Request for therapist check-up (ASAP)"

■/24: "Request for psych eval (ASAP) & mental health doc / ession & anxiety is keeping me up.  Cannot sleep"

■/24: "Request to see psych doctor, unable to sleep and deep anxiety"

■/24: "Request to see psych doctor"

■/24: "Request to see mental health doctor"

■/24: "Requesting for psych eval and mental health doc.  Depression anxiety is keeping me up.  Cannot sleep."

■/24: "Request to see psych doctor for diagnoses (ASAP)"

SD_876917-877210.

87.    During this period of time, no psychiatric prescriber made or attempted contact with the patient.  Finally, on ■■■■, 2024, the patient was seen by a psychiatric nurse practitioner.  *What follows illustrates some of the grave concerns I have about the psychiatric prescribing practices, and lack of supervision over psychiatric nurse practitioners at the Jail.*  At that visit, he was started on four medications (lamotrigine [mood stabilizer] with dose increase every 14 days, buspirone [anxiolytic], hydroxyzine [anxiolytic], and trazodone [antidepressant and sedative]), most of which he had not taken before.  A prudent practitioner would not start more than two new medications simultaneously, as each medication comes with its own side effects and drug interactions that need to be monitored carefully.  If such aggressive prescribing is called for, its indication should be clearly documented, but there was no explanation in the records for how or why these medications were selected.  Of equal concern, the patient was scheduled for a psychiatric follow-up in four weeks, which is far too long, especially with the prescribed medications that require close monitoring due to rare but dangerous adverse effects like Stevens-Johnson Syndrome that can result in multiorgan failure and death.  The standard of care under such circumstances calls for psychiatric

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

follow-up in no more than one week.  The Jail violated that standard of care four times over.

88. ███████████     This patient was initially screened as not having any medications during the booking process on ███████████ 2023 but informed a nurse two days later that he was prescribed outpatient psychiatric medications.  It took four more days for Jail staff to verify the currently prescribed medications with an outside pharmacy.  Even then, the patient was made to wait approximately four more weeks to be seen for an initial psychiatric evaluation on ████████, 2024. During this five-week waiting period, the patient wrote nine (9) mental health sick call requests asking for his medications to be restarted due to his experiencing significant symptoms of anxiety, depression, and difficulty with sleep.  The records review raised additional serious concern as to the psychiatric prescriber (a) assigning what I would consider an arbitrary diagnosis that does not match the documented symptoms, and (b) the unexplained failure to restart the patient on his previous mediation regimen (that was reportedly effective) with a very different medication regimen that was a poor match for the patient's symptoms.

89. ████████████████     This patient has a history of serious mood and psychotic disorders and a recent state psychiatric hospital placement.  He arrived at the Jail with symptoms of psychosis and recently prescribed medication.  He was not seen by a psychiatric provider for five (5) days, during which time he had an unacceptable and dangerous break in psychiatric medication.  Of additional concern, there were subsequently excessive and clinically inappropriate delays in psychiatric follow-up appointments, of approximately six (6) and five (5) weeks, respectively. Very nearly all psychiatric and clinical encounters were non-confidential and, based on my review, clinically inadequate to address this patient's treatment needs.

90. ████████████     This patient had recently returned from the state psychiatric hospital when I evaluated him in February 2024.  He was on multiple psychiatric medications and was observed to be depressed, anxious and possibly

psychotic.  It took four (4) days for him to see a psychiatric prescriber when he
arrived at the Jail in ███████ 2023, and he was seen by a psychiatric provider only
six (6) times over nearly five (5) months, even as his medications were modified
multiple times and his symptoms persisted.  Of even greater concern, the psychiatric
progress notes from multiple appointments were verbatim identical, including what
purportedly occurred during the appointment, what the patient said, and how he
presented.  In my experience, this is evidence of a "cut and paste" note that ignores
the actual current clinical condition of the patient.  This is considered an
unacceptable and dangerous practice in detention settings where I work and also in
the community.  This patient put in a psychiatric sick call request in ██████
2023, and was not seen for nearly four (4) weeks.  The records show delays in
restarting prescribed medications, a lack of monitoring of medication side effects,
improper follow-up regarding medication compliance, and general inadequacy in
psychiatric care delivery.

91.    ███████████    This patient was booked at the Jail in ███████ 2023 with
a history of community psychiatric treatment, including with prescribed medication.
No psychiatric provider saw the patient for more than a month after his arrival at the
Jail.  At that visit, it was apparent that the medication regimen was not meeting the
patient's needs, and the prescriber changed the medications.  No follow-up was done
for another seven (7) weeks.  The standard of care under such circumstances calls
for psychiatric follow-up within one week.  The Jail exceeded that standard seven
times over.  Of further concern, the psychiatric follow-ups were repeatedly done at
cell-side with a deputy present, which is a violation of confidentiality and, based on
my interview with this patient, served to undermine his ability to communicate with
the provider about his condition and concerns.

92.    ████████████    This patient expressed to me serious concerns
about the lack of mental health care he was receiving.  A major complaint was that
he is rarely seen by his psychiatric provider even though he is prescribed

psychotropic medications.  A review of his record confirms this fact.  Following his

"initial psychiatric evaluation" in ██████ 2022, he was not seen by a psychiatric

provider for nine (9) months.  When he was finally seen in ████ 2023, he was

experiencing auditory hallucinations.  Following that psychiatric appointment up

until I met with him in February 2024, he was being seen only once every two

months, even as his medications were being adjusted to manage active psychiatric

symptoms.  These gaps in care greatly exceed multiple standards of care in the jail

setting—including the maximum allowable time between *routine* psychiatric visits

being 30 days, and the maximum allowable time for psychiatric follow-up after

initiation of medication or dose adjustment being one (1) week.

93.  ████████████████  This young patient has substance use history

and several serious psychiatric diagnoses for which he was prescribed psychotropic

medications.  Yet, based on the records reviewed, he had not been seen by a

psychiatric prescriber in the more than seven (7) weeks he had been in custody at

the Jail.  He was being seen only by a clinician who did not have licensure to do

medication management.  It is very troubling that the intake screening and mental

health tracking system failed to ensure that this high-needs patient would be timely

seen by a psychiatric prescriber.

94.  ████████████  This female has a history of Schizoaffective Disorder,

bipolar type and diabetes which has been controlled by the use of oral agents.  When

she arrived at the Jail in ████ 2024, she was noted to be psychotic.  Her blood

glucose levels were consistently elevated over the next several weeks, evidencing

difficulty with diabetes management.  For such a patient with psychosis and poorly

controlled diabetes, it is critically important that a psychiatric prescriber exercise

care in the choice of antipsychotic medication.  In this case, there is no indication in

the records that the psychiatric prescriber was aware of or considered this important

treatment issue.  She consistently prescribed the antipsychotic, Zyprexa, which is the

biggest culprit among all of the second generation antipsychotics for contributing to

problems with elevated blood glucose for people with diabetes.  This represents very bad care that does not meet the community standard of care.  I was also very troubled to see that, even after this patient required placement in the Psychiatric Services Unit, her contacts with both the clinician and the psychiatric prescriber were consistently at cell-front without appropriate confidentiality.  There is no record of meaningful individual or group therapy provided to this patient, despite such treatment being clinically appropriate for her.

95.  ███████████     This patient has a history of anxiety, depression, and prior in-custody suicide attempt, but none of this was noted during initial screening when he was booked in ███ 2023.  It was not until four weeks after booking that he was finally seen for a behavioral health assessment (only after he requested it) and seen by a psychiatric nurse practitioner.  He was prescribed sedating, antidepressant medication, but had no follow-up for another seven (7) weeks.  This is far beyond the community standard of follow-up in no more than one week after initiation of a medication.  During this time, it was apparent the medication regimen was not meeting the patient's needs: while meeting with a non-prescribing clinician weeks after starting the medications, he reported continued psychiatric symptoms and "restlessness in my legs"—likely restless leg syndrome, a known side effect that warrants attention.  It is unclear if this information was ever communicated to the prescriber, and no action was taken until he was finally seen again in mid-October.  He was started on another antidepressant medication and had the initial medication adjusted, with again no follow-up until seven (7) weeks later.  A prudent prescriber would have discontinued the initial medication given the development of side effects and to reduce drug-drug interactions.  Based on pharmacy records, the patient ended up receiving both medications daily; after several weeks of taking the combination, he developed "erections during inappropriate times," which were likely signs of priapism, a dangerous side effect of both these medications that can cause permanent damage to penile tissue.  Not only is this evidence of irresponsible

1  prescribing and poor monitoring, but just as concerning is the lack of documentation

2  or acknowledgement of the risk for priapism after the patient was finally seen again

3  in December.  These failures further illustrate the lack of adequate supervision of

4  nurse practitioner prescribers at the Jail.

5  **III.    FINDING #3: THE SAN DIEGO COUNTY JAIL FAILS TO PROVIDE**
   **PEOPLE WITH SERIOUS MENTAL ILLNESS WITH TIMELY**
6  **ACCESS TO ADEQUATE TREATMENT, CAUSING UNDUE**
   **SUFFERING AND PUTTING PEOPLE AT UNNECESSARY AND**
7  **SUBSTANTIAL RISK OF HARM.**

8       96.    The San Diego County Jail mental health treatment system is deficient

9  in several significant ways that put patients at substantial risk of serious harm.  As I

10 observed during my site visits and through review of records and other materials,

11 those harms are real, tangible, and ongoing for large numbers of people with mental

12 health needs who are incarcerated at the Jail.

13      **A.    The Jail's Lack of an Adequate Levels of Mental Health Care**
        **System and the Lack of Individualized Treatment Based on**
14      **Clinical Needs Are Major Deficiencies.**

15      97.    Provision of an effective "levels of care" system, with clinically

16 indicated treatment and services provided for each level of care, is an essential

17 component to ensuring adequate mental health care to Jail patients with mental

18 health needs.  A levels of care system is necessary to assess an incarcerated person's

19 treatment needs and then to provide clinical interventions that match those treatment

20 needs.  Such a system requires the utilization of written, individualized treatment

21 plans for incarcerated patients requiring mental health care.  It also requires the

22 provision of individualized medication management and sufficient, structured

23 therapy and counseling, in individual and group settings as clinically indicated.

24      98.    Multiple people and entities, inside and outside of the Jail system, have

25 made this clear to San Diego County.  But to date, the Jail has failed to implement

26 an effective levels of care system, failed to provide clinically adequate treatment

27 planning, and failed to deliver clinically necessary treatment services to address

28

1   patients' needs.

2        99.    The 2018 DRC Report was appropriately critical of the Jail's lack of

3   adequate structured mental health treatment services across the patient population,

4   noting that "only when [incarcerated people] reach the point of engaging in acts of

5   self-harm or having an acute breakdown do they receive an enhanced level of care.

6   Such a system is cruel and counterproductive[.]"  The DRC Report found that

7   incarcerated people "remain in harsh, non-therapeutic settings without adequate

8   treatment until their condition deteriorates."  DRC Report at 17,

9   DUNSMORE0124942-0125012.  The DRC Report recommended that Jail staff

10  prepare and follow a written, individualized treatment plan for each incarcerated

11  person requiring mental health care.  *Id.* at 27.  The DRC Report also found that

12  many people with mental health needs "expressed to us an interest in group or

13  individual out-of-cell therapeutic activities."  One patient asked to discontinue his

14  medication and try counseling, but instead "mental health staff increased his

15  medication dosage and ignored his request for counseling."  *Id.* at 23.

16       100.   The 2017 NCCHC Report similarly found that the Jail's mental health

17  system at the Jail reflects a "disproportionate focus on those with psychotic

18  disorders" and neglect of "other, less severely mentally ill inmates."  NCCHC

19  Report, DUNSMORE0260618 at 35, 67, 101.

20       101.   Dr. Homer Venters, the former medical director at Rikers Island in

21  New York City, recommended a levels of mental health care system to San Diego

22  County in 2020.  *See* Community Oriented Correctional Health Services (COCHS)

23  Report to Dorothy Thrush, Chief Operating Officer Office of Public Safety, San

24  Diego County (Mar. 30, 2020), DUNSMORE0115368-0115394.  Dr. Venters

25  recommended to that the Jail implement a levels of care system to meet the needs of

26  incarcerated people with mental illness:

27       [P]atients with serious mental illness in the jail setting benefit from
         engagement with  multiple types of therapy, including one-on-one talk
28       therapy, psychiatric care with medication management, nursing

support, group therapy, art and movement therapy. These approaches increase engagement in health services and decrease injuries from use of force incidents. Most large jails benefit from more than one level or type of enhanced mental health housing area, and the ability to deliver care on these units relies on clear distinctions about the profile of patients who will be housed on these units, and the training and roles of the health and security staff. For patients who require higher levels of care for mental health crisis, those who are psychotic or acutely suicidal, best practices include assessment for referral to hospital inpatient care. Within the jail setting, two levels of housing are beneficial for patients with signs and symptoms of serious mental illness. A high-level unit that replicates much of the features of inpatient settings, including use of psychiatric technicians, multiple modalities of mental health services (individual, group, art, movement) and nursing and medical support is beneficial for patients with the most serious concerns. A step-down unit that allows for increased support and structure for patients who are more stable, but not able to be safe in general population settings is also important. While these units may be comprised of cell or dorm housing units, neither of them is operated as a lock-in unit, meaning that patients are not to be confined to cells for most of the day. An important feature of these units is that when patients express suicidal thoughts or engage in self-harm, the primary response does not involve them being locked into a cell, whether the cell is labelled as a suicide watch or safety cell.

102. In October 2018, clinical leadership employed at the Jail gave a presentation to Jail command staff proposing a levels of care system for mental health care. Dr. Christine Evans, the then-Jail Medical Director, spearheaded this effort. She rightly describes her "dismay and disappointment" that "the Jail's Command staff declined to implement the proposal I developed, or any other Mental Health and Medical levels-of-care system." Evans Decl. at 2, Dkt. 119-10.

103. Based on my review of records and other relevant materials, the San Diego County Jail system still lacks an adequate levels of mental health care system, still lacks adequate treatment planning, and still lacks provision of clinically necessary care to patients consistent with individual treatment needs.

104. The County's 2023 *Progress Report: Update on State Audit* responded to a similar recommendation from the State Auditor regarding utilization of a "mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody." The County deemed it "not feasible," with no indication that a levels of care system would be implemented.

Progress Report, SD_184479 at 5.  Ms. Quiroz, the County's mental health care person-most-knowledgeable, testified that a levels of mental health care system had been "considered" by Jail leadership, and that they were aware that other nearby counties, including Orange and San Bernardino, have implemented such systems. She stated that such a system "could be useful" but that, as of May 2024, there was no "policy or expectation" for mental health staff to assign mental health acuity or care level for patients.  Quiroz PMK Dep. at 87-88.

105.   One effect—and apparent *reason*—that the Jail has rejected this repeatedly made recommendation for a levels of mental health care system is that the system does not, and cannot, know the patient population's actual mental health service needs and the Jail's deficit in meeting those needs.  Ms. Quiroz testified that implementation of a mental health "acuity rating system will drastically impact [the Jail Population Management Unit] and highlight the need for hundreds if not thousands of mental health beds."  Quiroz PMK Dep. at 90.

106.   I have reviewed the Jail's "Mental Health Acuity Level" form.  The form prompts mental health staff to assign the *MH Acuity Level* for a patient with options of "acute," "severe," "moderately severe," "moderate," "mild," "minimal," or "none.  There is also a blank field where a clinician may provide clinical recommendations.  The acuity level designations are not standard, not intuitive, and confusing.  The Jail's policies fail to offer guidelines for mental health staff to assign an appropriate *MH Acuity Level*.  The designations are of no apparent utility in planning or providing mental health care.  In my review of individual patient records, I observed great variability in how the form is used and even if it is completed at all.  Quite frequently, no acuity level is marked.  In some cases, the acuity level designation is obviously inappropriate.  In one case, a clinician marked an MH Acuity Level of "minimal " for a patient identified as having symptoms of florid psychosis.

107.   The lack of usefulness of the *MH Acuity Levels* form was confirmed by

1  the Jail's mental health coordinator, who testified that, in practice, "there is no

2  [mental health] acuity rating scale right now."  Quiroz PMK Dep. at 84-85.  She

3  went on:

4        Q: Is there a policy or an expectation that those boxes indicating level
         of acuity level be checked by mental health providers?

5        A: No.  That was something that was part of TechCare that kind of just
6        came with the package.

7  Quiroz PMK Dep. at 87.

8        108.   Based on my professional experience, the Jail's failure to implement a

9  functional mental health acuity and level of care system, and its failure to accurately

10  assess mental health service needs, are a recipe for continued systemic failure in its

11  mental health system.

12        109.   The lack of individualized treatment planning at the Jail is of similar

13  and serious concern.  Jail mental health clinician Aseel Ross, who worked at George

14  Bailey through late 2023, testified that "everybody should have a treatment plan."

15  She described how mental health staff documents as best they can, things like "the

16  way we rescheduled them, what we followed up on … you know, we are going to

17  follow up on coping skills, or we are going to follow up on making sure he showers

18  next time.  But we didn't have a specific document that said treatment plan."  Ross

19  Dep. at 60-61.

20        110.   Ms. Ross, who was assigned to patients in Administrative Separation

21  units, in fact proposed to Jail mental health leadership (including Ms. Quiroz) that

22  structured individualized treatment plans be implemented for patients; she even

23  submitted a template for such plans.  The Jail did *not* implement her proposal, or

24  any other individualized treatment planning for Administrative Separation patients.

25  Ms. Ross testified that, based on her clinical experience, individualized treatment

26  plans should be provided to mental health patients at the Jail, including in

27  Administrative Separation, Outpatient Stepdown Units, and the Psychiatric Services

28  Units.  Ross Dep. at 60-65.

111.   Ms. Quiroz, the Jail mental health care coordinator, testified that "it could be helpful" for mental health staff to use an "individualized treatment plan that is a freestanding document."  She stated that she had not seen examples from other Jail system that had implemented individualized treatment plans in mental health patients' records, but that "it would be useful to see one."  Quiroz PMK Dep. at 258.

112.   Based on my professional experience, the implementation of individualized treatment plans for the mental health population is a critical necessity for the provision of clinically adequate care to incarcerated patients at San Diego County Jail.

### B.    The Jail System Fails to Provide Timely or Minimally Adequate Acute, Inpatient Mental Health Care (Psychiatric Services Unit).

113.   When a patient is experiencing acute psychiatric symptoms for which inpatient care is clinically indicated, it is essential that such care be provided timely, in a clinically appropriate setting, and with clinically indicated services.  The San Diego County Jail fails on each of these points.

114.   According to the Jail's policies, the Psychiatric Services Units at Central (for males) and Las Colinas (for females) are intended to provide an inpatient level of care to incarcerated people requiring the most intensive mental health care.

115.   Unlike other psychiatric hospitals in San Diego County (and across the state), the Jail's PSU facilities are *not* a licensed by the State as Section 5150 psychiatric facility; instead, they receive only a County "certification" to operate as they do.  Quiroz PMK Dep. at 74-75.  It is concerning that there is less State oversight and the absence of accountability through licensure for these PSU facilities, as compared to licensed inpatient psychiatric facilities that exist elsewhere.

116.   In any event, it is my assessment that the Jail's Psychiatric Service

1   Units fail to provide timely and clinically necessary care to incarcerated patients in

2   need of acute mental health care.  Through my direct observations, interviews, and

3   document review, I observed insufficient therapeutic treatment programming,

4   concerning medication management practices, and practices in these units that fall

5   below the standard of care.

6          117.   When we walked through the Central Jail Psychiatric Services Unit

7   ("PSU") during the February 2024 site visit, the dayroom was empty and the unit at

8   first looked completely devoid of staff. (Eventually, the recreation therapist

9   appeared to speak with us.  She explained that she is the primary mental health staff

10  member for PSU patients, and is only assigned to the unit four days per week.)

11         118.   The PSU at Central Jail does not resemble a psychiatric hospital in any

12  manner.  The standard of care for a psychiatric hospital calls for patients to be seen

13  *daily* by their psychiatrist and clinician. Patients in this PSU receive roughly weekly

14  visits from a psychiatrist and a mental health clinician.  By contrast, in the

15  Sacramento County Jail acute psychiatric unit, policy requires that all patients are

16  provided a *daily out-of-cell* contact with a clinician (Licensed Clinical Social

17  Worker) and a *daily out-of-cell* contact with attending psychiatric prescriber.  The

18  treatment in the San Diego County Jail PSU falls below minimum standards.

19         119.   In the Central Jail PSU, there are two group therapy sessions (each

20  about one hour) scheduled five days per week.  However, approximately half or

21  more of the patients are not permitted to participate in group therapy at all.  For

22  some, they are permitted just one hour out of their cell for unstructured time in the

23  dayroom each day.  The cells for these patients were in some cases filled with trash

24  and food detritus like empty milk cartons.

25         120.   For patients in one the four PSU "Observation Cells," they are

26  essentially on 24/7 lockdown.  These patients receive no meaningful mental health

27  treatment.  I observed the four patients in these Observation Cells, and they were all

28  extremely decompensated.  The area reeked of urine and feces.  Staff in the unit told

us that these patients were "too unstable" to receive treatment. This complete lack of treatment concerns me greatly.



*Inside a Central Jail Psychiatric Services Unit Observation Cell, filled with food trash and debris from multiple meals, the patient lying on floor covered completely by a blanket (SD_983474)*

121. The structured and group mental health programming in the PSU again falls below minimum standards. By contrast, in the Sacramento County Jail acute psychiatric unit, policy requires that all patients are offered at least three (3) one-hour group therapy sessions per day, at least five (5) days per week, and at least ten (10) hours of structured out-of-cell activities per week.

122. I am aware of the well-publicized case of Ivan Ortiz, who in 2019 died by suicide in a Central Jail PSU Observation Cell after a deputy, in violation of policy, left a plastic bag in Ortiz's cell. Mr. Ortiz used the plastic bag to suffocate himself to death. *San Diego County pays $1M to family in inmate death, pushing year's payouts past $14M*, *San Diego Union-Tribune*, June 12, 2021. It is difficult to discern any enhancements to the delivery of mental health treatment for PSU Observation Cell patients that have been made in the five years since Mr. Ortiz died.

123. The men in these PSU Observation Cells lie on the floor, nearly naked. (The below photograph shows a man deprived of his clothes in the PSU, using a roll

of toilet paper to rest his head on the floor.)



*Mental health patient lying on the floor in the inpatient Psychiatric Services Unit*

124. There are also serious issues regarding treatment in the Women's PSU at Las Colinas. Dr. Christine Evans, a psychiatrist who ran the Women's Psychiatric Services Unit (WPSU) at Las Colinas, testified about multiple deficiencies she encountered in that unit in 2021, with her efforts to remedy those deficiencies stymied by Jail leadership:

> I had routinely observed our daily Patient-to-Clinical Staff/Nursing ratios significantly exceed the maximum ratios per State regulations, due to staffing shortages. This problem resulted in our nursing staff being overloaded and increased the risk of critical clinical care oversights and errors. In addition to staffing shortages on WPSU, the rigid Classification and Housing policies at the Custody level restricted my options for providing safe and appropriate dispositions for my WPSU patients who no longer required inpatient care. As such, the WPSU unit routinely held more patients than the unit was staffed to safely manage. I communicated these concerns on multiple occasions to the Chief Clinician at Las Colinas Detention and Re-entry facility, and was informed that no action would be taken. As such, I determined that I could not continue to be the provider of record under these conditions and tendered my resignation.

Evans Decl. ¶ 11, Dkt. 119-10.

125. I observed these same sorts of deficiencies in the Women's PSU in 2024. In my discussion with the mental health clinician assigned to the Women's PSU unit, I found her to be organized, diligent, and well-meaning. She reported that

she "tries" to see the WPSU patients daily and "attempts" to have a daily group, but system challenges meant that she could not ensure that such clinical interactions occurred on a consistent basis.  She reported that time constraints meant that most of her individual clinical contacts with PSU patients are done non-confidentially at cell-side, and that the one group therapy session she tries to facilitate is often canceled due to custody staff shortages.  She also expressed concern about patients cycling in and out of the PSU, noting that many patients discharge directly to Administrative Separation, only to "get more symptomatic again" and have to return to the PSU. She also reported that custody staff in some cases overrule a clinical recommendation for a PSU patient to discharge to the Outpatient Stepdown (OPSD) unit, instead placing the person in Administrative Separation.

126.    Overall, the Jail system's PSUs provide nothing like the mental health treatment and therapeutic milieu that is provided to in an acute psychiatric hospital. Patients are not provided clinically necessary individual or group treatment, or sufficient and meaningful opportunities for socialization in a therapeutic milieu.

127.    Based on my records review and interactions with patients and staff, I was also troubled to observe that the more acute someone's mental health symptoms, the less treatment (and the more isolation) they seemed to get.

128.    There are further serious problems with the *timeliness* of access to inpatient PSU care in the Jail system.  On the day we toured, the Central PSU psychiatrist reported that there is "always a wait list" of acutely ill patients requiring PSU placement.  The County's Person-Most-Knowledgeable on Mental Health Care confirmed that it continues to be the case that people identified as requiring PSU placement have to wait for the "recommended clinical placement" because there is not capacity in the PSU. Quiroz PMK Dep. at 70-71.  George Bailey mental health clinician Aseel Ross testified that she was aware of patients waiting for a PSU placement **for more than one month**.  During that time, patients are not receiving mental health treatment; she described them as simply being "observed by nurses.

1    There is more frequent checkups." Ross Dep. at 89-90.  These are dangerous delays

2    in the provision of acute mental health care.

3        129.   San Diego County Jail incarcerated patients with acute or inpatient

4    *mental health* needs are, by policy and practice, treated with less seriousness and

5    less urgency compared with patients with acute or inpatient *medical* needs.  Jail staff

6    confirmed that there is a process for someone with unmet medical needs that require

7    inpatient care to be sent out to a hospital to get those medical needs addressed.  In

8    contrast, for someone with acute psychiatric symptoms, there is no option for Jail

9    mental health staff to send them out to a licensed inpatient psychiatric facility, to

10   ensure timely provision of care.  Such patients "will just wait until a PSU spot

11   opens" and "sometimes they remain in AdSep until we get availability for a bed."

12   Ross Dep. at 90-91, 163.

13       130.   Ms. Ross testified that, based on her experience as a clinician treating

14   mental health patients at George Bailey, she believes that the PSU referral process

15   requires improvement: "Whenever I place someone under a 5150 hold … they are

16   supposed to be sent to the PSU. I think it would be beneficial to have a faster track

17   to PSU, no wait to PSU, like a 5150 would be in a community setting."  Ross Dep.

18   at 160. I agree.

19       131.   The delays and waitlists for PSU placement, and the clinically

20   inadequate treatment and conditions in San Diego County Jail PSUs, are dangerous

21   and do not meet standards of mental health care both in the community and in

22   detention settings.

23       132.   The PSU deficiencies have direct and profoundly negative impact on

24   individual patient care and outcomes.  For example:

25   **Death of Roselee Bartolacci (May 2023)**

26       133.   The horrific and tragic death of Ms. Bartolacci last year illustrates

27   numerous systemic failures in the Jail's mental health system, including in the PSU,

28   which is supposed to provide care to people with acute treatment needs.  Although

the full records of this in-custody death have not been made available to me, I was able to review details about Ms. Bartolacci's condition and course of treatment at the Jail. Sadly, those details are remarkably consistent with the deficient care that I observed in my records review and tour interviews for other acutely ill patients in the Jail's PSUs. Ms. Bartolacci had an extensive history of intellectual disability (functioning at the level of an eight-year-old) and chronic symptoms of schizoaffective disorder that severely limited her ability to care for herself. Yet she appeared to live a healthy, stable life under the care of her mother.

134. On April 6, 2023, she was arrested and booked at the Jail after her family sought help while she was having a psychotic episode. She spent the first several days in solitary confinement, a Las Colinas Administrative Separation cell. She refused psychiatric medications, food, and liquids, and she languished in an isolation cell that was dirty and full of trash. To be sure, this solitary confinement placement was clinically harmful, contraindicated, and likely traumatic. Ms. Bartolacci was unable to communicate her needs given her intellectual disability complicated by untreated psychosis. She was then placed in the Women's Psychiatric Stabilization Unit (WPSU), where she continued to decompensate. Health care and custody staff repeatedly noted that her cell was filthy, malodorous, and covered in food, urine and feces. She continued to refuse food and medication.

135. On or about April 26, 2023, she fainted and hit her head, leading to medical hospitalization, where she was found to be suffering from acute renal failure, hypokalemia (low potassium), hyponatremia (low sodium levels in blood); severe-protein calorie malnutrition, sepsis, transaminitis (elevated liver enzymes), acute metabolic encephalopathy (confusion caused by underlying medical illness), and a urinary tract infection. The admitting emergency room doctor noted that she "had a high probability of imminent or life-threatening deterioration." She was treated at the outside hospital for 14 days, during which her health was reported to improve until she was discharged back to Las Colinas in a stable condition.

1    136.   Her condition again deteriorated at the Jail, requiring two more hospital

2    visits over the next few weeks.  Confined in a cell with poor conditions and no

3    therapeutic programming, her decline was acknowledged by psychiatry, prompting a

4    referral for temporary conservatorship on May 18, 2023, and discussion about

5    appropriate placement in the community pending court approval.  Unfortunately,

6    without clinically necessary treatment at the Jail, Ms. Bartolacci did not make it to

7    her next court date.

8    137.   On or about May 23, 2023, she was placed back in the Jail's PSU. Her

9    condition deteriorated rapidly, and she stopped taking all medications, food and

10    liquids.  Jail staff in the PSU failed to follow even their own policies on caring for

11    such a high-risk psychiatric patient, including failing to conduct vital checks and

12    monitor for weight loss.

13    138.   Late on May 28, 2023, Ms. Bartolacci was found cold and

14    unresponsive in her filthy PSU cell, and was pronounced dead a few hours later.  In

15    the six (6) weeks between her arrival at the Jail and her death, she had lost more

16    than 40 pounds.

17    █████████████

18    139.   This ███-year-old female has a history of Schizoaffective Disorder,

19    bipolar type and diabetes.  When she arrived at the Jail in ██████ 2024, she was

20    noted to be psychotic.  She was placed in the Las Colinas Women's Psychiatric

21    Services Unit due to the severity of her psychotic symptoms.  Her diabetes was

22    poorly managed, with her consistently having elevated blood glucose levels.  Of

23    significant concern, and as discussed in Finding #2, medical records indicate that the

24    psychiatric prescriber at the Jail did not consider this information, and prescribed

25    Zyprexa, a second generation antipsychotic medication well known to cause

26    elevated blood glucose levels.  A review of the medical notes shows that the risks of

27    using Zyprexa were not considered for this patient with poorly managed diabetes,

28    evidencing very poor care that does not meet the community standard of care.

140.   Her mental health care in the Women's PSU was scant and generally deficient.  In the weeks after her PSU admission in late ███ 2024, her treatment consisted of only weekly wellness checks, the majority of which were conducted at cell-side without confidentiality.  Psychiatry check-ins were conducted infrequently, without confidentiality, and at cell-side. (The standard of care for such a patient is daily confidential clinical encounters with a psychiatric prescriber.)  The records indicate that no meaningful individual or group therapy was provided.  This case illustrates the inadequacy of the Jail's PSU to deliver clinically indicated and necessary mental health care to patient with acute mental health needs.

███████

141.   This young woman has an extensive psychiatric history, and in fact was in an inpatient unit at Sharp Grossmont Behavioral Unit, on a Section 5250 involuntary psychiatric hold for grave disability, at the time the police arrested her and booked her at Las Colinas.  Due to her recent history of a suicide attempt, she received a "gatekeeping" assessment from a mental health clinician.  Of note, this assessment documented her inpatient placement prior to arrest, her diagnoses, and treatment needs.  She presented as psychotic and manic, yet the gatekeeper found only: "ISP [Inmate Safety Program] placement not indicated, refer to classification." This is so wrong, and reflected serious systemic dysfunction.

142.   This patient had been hospitalized for grave disability and had active psychotic symptoms.  She should have immediately received a psychiatric evaluation and been placed in the PSU. When she received a psychiatric evaluation, the psychiatrist confirmed her diagnoses and her medications from the community, but did nothing to place her at a higher level of care such as PSU.

143.   Over the next several weeks, she was housed in a General Population overflow unit, and did not receive any mental health care except medication.  A mental health clinician conducted short, non-confidential cell-front check-ins just two times in more than five weeks.  Psychiatry care was also inadequate during this

1   time, with improper delays in follow-up for new medications.

2       144.   When I encountered this patient, she was manifestly ill and in need of

3   acute level of care.  I shared my concerns with Jail staff who were with us during the

4   site visit.  This patient should have been receiving acute inpatient care, and should

5   have been seen far more frequently and in an appropriate, confidential setting.  The

6   Jail failed to provide treatment necessary to meet her mental health needs.

7       **C.    The Jail System Fails to Provide Minimally Adequate Outpatient
          Level of Care to Patients, Resulting in Serious and Preventable**
8       **Decompensation and Other Harms.**

9       145.   In my May 2, 2022 declaration, based on review of policies, reports,

10  and other documents, I found that San Diego County Jail lacks a structured mental

11  health treatment program that delivers an enhanced outpatient level of care, with

12  treatment modalities like confidential individual talk therapy, nursing support, group

13  therapy, art therapy, and recreation therapy, as Dr. Venters recommended to the

14  County in 2020.

15      146.   The recommendation for an effective outpatient mental health program

16  that meets the clinical needs of the incarcerated patient population goes back even

17  further, including to 2018, when Disability Rights California found:

18          The lack of access to mental health treatment activities and appropriate
            levels of care [in San Diego County Jails] violates minimum standards
19          of care for inmates with mental health needs.  The National
            Commission on Correctional Health Care has adopted a standard
20          requiring that "[r]egardless of facility size or type, basic on-site
            outpatient [mental health] services include, at a minimum, individual
21          counseling, group counseling and psychosocial/ psychoeducational
            programs" (citing NCCHC Standards for Health Services in Jails
22          (2014), Standard J-G-04.39).

23  DRC Report, DUNSMORE0124942 at 23.  The DRC Report, based on subject

24  matter expert findings and recommendations, urged San Diego County to implement

25  an effective outpatient mental health program:

26          Specifically, the DRC Experts recommend creation of an
            "intermediate" level of mental health care, with sufficient capacity to
27          ensure timely access for those individuals who need enhanced
            treatment programming.  The program would serve patients "stepping
28          down" from Safety Cell, EOH, or PSU admissions, as well as patients

with a mental health condition that makes it difficult for them to function in a general population jail setting. The program would require a substantial increase in mental health clinician staffing to provide a structured treatment program that includes individual and group therapy to meet the clinical needs of the inmate population.

…

DRC strongly encourages the County to implement an enhanced and structured outpatient treatment program. It would have enormous benefit with respect to the safety and well-being of inmates, jail operations, and reentry efforts. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.

DRC Report at 24-25.

147.   Today, six years later, the San Diego County operates a few Outpatient Step Down (OPSD) units. When I reviewed declarations and policies about these units in 2022, I discerned that the OPSD "does not appear to provide an adequate structured treatment program to patients." May 2, 2022 Stewart Decl. ¶ 54.

148.   I conducted site visits of the OPSD units at Central Jail and Las Colinas in February 2024. Having now conducted an in-person observation of the OPSD units, interacted with OPSD patients and staff, and reviewed additional records, it is even more clear to me that San Diego County Jail has failed to implement an enhanced and structured outpatient mental health treatment program with sufficient capacity or staffing to provide clinically necessary treatment to the mental health population. This failure puts an exceedingly large number of incarcerated patients at substantial risk of serious harm, including decompensation, worsening psychiatric symptoms, psychosis, self-harm, and suicide.

149.   In the OPSD units at Central Jail, the levels of acuity and treatment needs are staggeringly high, and the OPSD "program" is grossly insufficient to meet the clinical needs of the patient population.

150.   In Central Jail's 6C OPSD unit, patients reportedly get more out-of-cell time in the dayroom than patients in the other two OPSD units at the Jail. They had recently started being provided two one-hour group therapy sessions on Fridays. I was informed that a psychiatric prescriber conducts monthly, generally non-

confidential cell-front visits with the OPSD patients.  Patients and staff shared with me that individual clinical appointments, especially confidential ones, are quite rare.

151.    In the 6C OPSD unit, I interviewed approximately nine (9) patients. All of them were very ill with major mental illnesses such as Schizophrenia, Bipolar Disorder and Schizoaffective Disorder.  Many of the patients showed symptoms of acute psychosis.  Each of them clearly needed a higher level of mental health than what they were getting in this unit.

152.    In the 6B OPSD unit, custody staff did not allow me to interview patients in the dayroom, telling us that everyone was "too unstable."  This was inconsistent with how I have interacted with patients in other detention system's outpatient mental health units, where I regularly meet with patients face-to-face, unless individualized security concerns require otherwise.  I attempted to engage and observed several chronically mentally ill patients who were responding to internal stimuli and showing overt signs of serious mental illness, including paranoia, delusional thinking, and mood instability.  Again, each of them clearly needed a higher level of mental health care than what they were getting in this unit.

153.    During the OPSD 6B/6C unit visits, we spoke with a deputy who had been assigned to the OPSD for the last few years.  He seemed committed to helping the OPSD patient population as best he could.  He shared that he never received specialized training on working with people with serious mental illness.  He said, "I just learn from watching, and talking to people like Jennifer Alonso," the clinician who worked in OPSD until 2022 and has provided testimony in this case.  The deputy stated that he thought it would be good for OPSD deputies to get additional specialized training to help them do their jobs in that unit. (This was concerning to hear, including given that the Jail's mental health coordinator, Ms. Quiroz, claims that deputies assigned to OPSD are supposed to receive additional specialized mental health training.  Quiroz PMK Dep. at 266.)

154.    Additional specialized mental health training for deputies assigned to

mental health units is essential, and to my knowledge, relatively common practice in other Jail systems.  It should absolutely be done in in this Jail system, too.

155.   In the 7C OPSD unit, I was shocked to find one of the most acutely psychotic jail populations I have ever seen outside of an inpatient care unit; nearly everyone in the unit had manifest psychosis.  Staff and patients confirmed that there is no treatment programming in the unit, and that each patient is permitted out of his cell, by himself, for just one hour per day.

156.   The cells and the general unit areas of Central Jail OPSD units were filthy, unsanitary, and filled with debris.  The below photographs from Central Jail's OPSD, taken a few years ago, demonstrate how these cells are often covered in trash and not fit for human habitation, let alone for incarcerated people with grave mental health needs.

 

*Inside Cells from Outpatient Stepdown Unit for People with Serious Mental Illness*

157.   We took additional photographs of the same OPSD units during our February 2024 site visit, with conditions as bad as or worse as compared with the images from a few years earlier.

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1
2
3
4
5
6
7
8
9



*The Central Jail Outpatient Stepdown Unit (Module 7C) floor outside of Jail cells,
with trash and debris covering the floor (SC_983498)*

10
11
12
13
14
15
16
17
18
19
20
21



22
23

*Inside a filthy Jail cell in the Central Jail Mental Health Outpatient Stepdown Unit (Module 7C), with the
patient-detainee completely under a blanket on the top bunk.  The detainee has no personal items in his
cell, which is completely barren except for some food trash.*

24
25
26
27
28



*Inside a Central Jail Mental Health Outpatient Stepdown Unit (Module 7C) cell with food trash and rolled up mattress. There is clothing or a towel in the toilet.*

158.   This is *not* a therapeutic mental health program unit—it operates as a solitary confinement unit specifically designated for people with serious and active mental illness.  I have previously discussed the now widely accepted fact that people with mental illness placed in solitary confinement-type conditions are distinctively vulnerable to deterioration and decompensation that worsen their mental health condition, intensify symptoms, and put them at substantial risk of psychosis, self-harm, and suicide. 5/2/22 Stewart Decl. Dkt. 119-7, ¶¶ 24-33. Such concerns strongly apply to these OPSD units.

159.   In all, the lack of meaningful treatment and harsh conditions of confinement in the male OPSD units at Central are shockingly bad—no better (and in some respects even worse) than the description of the unit provided by long-time OPSD clinician Jennifer Alonso in 2022:

> Many patients in OPSD experience hallucinations, delusions, and other symptoms of mental illness.…
>
> As a mental health clinician for the OPSD units at Central Jail, I carried a caseload of between approximately 140 and 160 patients.  This patient caseload was so large that it was impossible to deliver anything remotely close to adequate mental health care given the needs of this population.  Based on my experience and clinical knowledge, I believe a caseload of no more than approximately 60-70 patients would be appropriate for clinicians providing care to the OPSD population.

When I started as a mental health clinician for the OPSD units, I was told that I would have the opportunity to develop a program with multiple treatment modalities, including structured therapeutic group programs and individualized one-to-one therapy. However, given the overwhelming caseload, lack of resources, and lack of confidential treatment space, it was never possible for me, or any other clinician, to provide these sorts of care on a consistent basis or to meet the clinical needs of our patients.

. . . On April 23, 2022, I worked my last day as a mental health clinician at the Jail. My decision to stop working at the Jail was one of the hardest decisions of my life. I care deeply for my patients. I have observed my patients decompensate, suffer in what can only be described as filthy, inhumane conditions, and in some cases, die by suicide. My patients were subjected to terrible conditions and put at risk of great harm every day, and I felt powerless to give them the care they need and deserve.

Alonso Decl., Dkt. 119-11, ¶¶ 9-13.

160.   I also visited the female OPSD unit at Las Colinas, and was again troubled by the inadequate treatment provided there. The clinician on that unit was impressive both in her clinical skills and her commitment to her patients. She explained that the patients in the unit receive a weekly, non-confidential clinical visit, and that one group session is provided to a maximum of ten (10) patients. That meant that if there were more than ten (10) patients housed in the OPSD unit at Las Colinas, some women could not participate in the one weekly group session due to capacity limitations. Higher-security OPSD patients ("green banders") were not permitted to attend group sessions unless sufficient custody staff were available to provide security; the clinician shared that custody staff unavailability was a frequent problem that negatively impacted mental health care programming.

161.   I asked the OPSD clinician at Las Colinas if any improvements were needed with respect to her program. She responded, "We need more ways of bringing people in. . . I don't get many referrals." She shared that given what she knows about the female patient population's mental health needs, "we should have a full unit" (roughly 22 patients) all the time. This fact is concerning, both because it reflects the recognition that there are women who need placement in a structured

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1    mental health program that are not in OPSD *and also* because the current OPSD

2    program is not equipped to provide structured mental health programming sufficient

3    to meet patient needs.

4        162.   More than six years after Disability Rights California recommended a

5    structured outpatient treatment program, with sufficient mental health staffing

6    resources for individual and group treatment, to meet the clinical needs of the Jail

7    patient population, San Diego County Jail has not implemented that

8    recommendation.  But it is essential to patient well-being, and it absolutely can be

9    done.

10       163.   In fact, Jail staff have a model they can use *from inside their own jail*

11   *facilities.*  The California Department of State Hospitals funds and oversees a Jail

12   Based Competency Treatment (JBCT) program for up to 30 people in the 6D unit at

13   the San Diego County's Central Jail.  I spoke extensively with the JBCT program

14   director.  Unlike the County's OPSD units, the DSH-funded and -overseen JBCT

15   program operates more like a true clinical outpatient mental health unit.  All the

16   patients in the unit are out of their cells engaging in normal socialization activities

17   during the day.  Tables had puzzles laid out, some of which the patients had

18   successfully completed together.  JBCT patients get approximately ten (10) hours of

19   programming *per day* (structured and unstructured), including four (4) hours of

20   structured group treatment.  There are 2.5 FTE psychiatrists assigned to the unit,

21   with confidential psychiatry appointments for all patients at least weekly.  Two

22   clinicians assigned to the unit (with caseloads less than one-quarter as compared to

23   the OPSD units) meet with every patient individually every day, with a structured

24   confidential session at least weekly.  Additional educators and psych nurse staffing

25   resources support the treatment program as well.  There are two assigned deputies

26   who have received specialized mental health training.  The JBCT program director

27   stated it to me simply: "The program works."  The County is well aware of the

28   positive results of the program, as mental health coordinator Melissa Quiroz

1   testified:

2       Q.   Is it your impression that JBCT participation for some patients
        reduces suicidality?

3

4       A.   Addressing the mental health concerns, for sure.

        Q.   And JBCT participation leads to improvement in patients' daily
5       functioning and activities of daily living?

6       A.   Yes.

7       …

8       Q.   [T]here's many aspects of that JBCT unit that is [] general mental
        health care-type activities?

9
        A.   Yes.  They have those.
10

11  Quiroz PMK Dep. at 238-39.

12      164.   Sadly, staff at Central Jail were also aware that patients discharging

13  from the JBCT program (as when the criminal court finds them "restored" and

14  therefore competent to stand trial) return to other San Diego County Jail units—

15  including OPSD units—where the treatment program is a tiny fraction of what is

16  provided in the JBCT. Staff shared that it was not uncommon for patients recently

17  "restored" in JBCT to decompensate in the OPSD or other Jail units, with a new

18  onset of psychiatric symptoms and even a new finding that they are "incompetent to

19  stand trial" (essentially *undoing* the success of the JBCT program).

20      165.   Other jail and prison systems do far better in providing this necessary

21  level of outpatient mental health care.  For example, Sacramento County Jail

22  implemented an "Intensive Outpatient Program" in 2017, which has expanded since

23  that time to better meet the treatment needs of the Jail system's mental health

24  population.  The services provided in those programs include at least weekly one-to-

25  one, out-of-cell clinical contacts, ten (10) hours per week of structured therapeutic

26  activities, multi-disciplinary team meetings, care coordination with treatment

27  partners, treatment planning, crisis intervention, psychiatric medication

28  management, psychoeducation, and increased collaboration with custody to address

housing challenges, discipline and other issues.  Outcome studies to assess efficacy of the program have been remarkable.  In one study looking at 100 patients served, the County found that its Intensive Outpatient Program resulted in:

- A 61% decrease in disciplinary write-ups
- A 64% decrease in emergent referrals
- A 67% decrease in Acute Inpatient admissions

166.   I am aware that other county jail systems have also implemented, or are implementing, enhanced outpatient mental health programs with positive results. Examples includes Alameda County, Orange County, and Santa Barbara County. This sort of programming is long overdue—and desperately needed—in San Diego County Jail.

## D.   The Jail System Erects Improper Barriers for Patients to Timely Access Clinically Necessary Mental Health Care and Placement.

167.   One of the most basic principles with respect to the standards of care for provision of mental health care, including in the Jail setting, is that a person should be provided mental health care placement and treatment consistent with their individual *clinical* needs.  The San Diego County Jail system fails terribly in enacting this basic principle, in ways that are unsupportable, dangerous, and outside the norms I have observed in other Jail systems.

168.   In my May 2022 declaration, I described my very serious concerns about the Jail's custodial blanket ban policy against Outpatient Step Down Program (OPSD) placement for people classified as "protective custody" with mental health housing needs. 5/2/22 Stewart Decl., Dkt. 119-7, ¶¶ 51-65.  Jail mental health staff, including Dr. Evans and Ms. Alonso, have raised urgent concerns about this Jail's policy preventing people classified as "protective custody" from OPSD housing units.  While the OPSD can and must provide more and better treatment for patients who need enhanced outpatient treatment, such a blanket exclusion is unjustifiable and unconscionable.

169.   The 2022 death of Derek Baker is an example of how this policy causes the worst of harms, as Ms. Alonso describes:

> Mr. Baker had mental illness and was found clinically appropriate for OPSD housing.  However, because he was also deemed "Protective Custody," custody staff did not allow him to be housed in one of the OPSD housing units at the Jail.  Instead, he was put in a cell with another Protective Custody individual who did not have serious mental illness (that is, he did not meet OPSD clinical criteria) and was in custody based on allegations that he had assaulted and critically injured an elderly store clerk.  The cellmate violently assaulted Mr. Baker, who died from those injuries on March 29, 2022.

Alonso Decl., Dkt. 119-11, ¶¶ 38; *see also id.* ¶¶ 39-40 ("I, along with my mental health staff colleagues, had asked that Jail Command staff change their policy so that people like Mr. Baker could be placed in the OPSD unit, which is safer and clinically appropriate for them. …  At least one Command-level staff member stated that the circumstances leading up to Mr. Baker's death concerned him. But the Command staff told me that they had no plan to change policy or practice on this issue.").

170.   Another incarcerated person who was in the unit when Mr. Baker was killed offers a chilling description of what happened to Mr. Baker.  Gustavo Sepulveda recalls in his declaration:

> I heard an altercation in cell 5 through the wall in my cell.  It sounded like the two guys were fighting.  A little while later, I heard someone in the cell next to me say "man down, man down" …. It was silent for a bit longer, and then I heard grunting and the sound of impact over and over again.  It sounded like a person's body or head being hit against an object like the ground or wall over and over again.  The sound was bone-chilling.  The sound stopped for a bit, and then resumed.  After a few more minutes, I heard [the man] call to another incarcerated person in the dayroom, and say something like, "go tell the cops that I killed my cellie."

171.   More than two years later, the policy remains unchanged, even as the Jail's mental health coordinator has found that such change in policy would be "useful" and "good."  Quiroz PMK Dep. at 64-65 (Quiroz: … "there is not an identified outpatient step-down PC mod per se.  There is not that."  Q: "Do you think that that sort of module would be useful to have?" A: "It would be useful."  Q:

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1   And the objective of it would be to ensure that people who both need outpatient

2   step-down and are designated as protective custody can get that level of service?" A:

3   "That would be good.").  Jail clinician Aseel Ross also has observed multiple

4   protective custody patients who were excluded from the outpatient mental health

5   unit, and stated that this was something that needs to change:

> Q. [T]he mental health unit identified someone who was protective custody and said that person will not be allowed to receive placement in the outpatient stepdown unit?

> A. Yes.

> Q. Do you have an example of your -- in your head of a patient who needed at least that level of care who didn't receive it as a result of that decision?

> A. Yes.

> Q. More than one?

> A. Yes.

> Q. Any other examples of policies and procedures related to the mental health system at the jail that, based on your experience, you think needed improvement?

> A. The same thing.  Access to care for OP stepdown, PSU.

Ross Dep. at 172-73.

18      172.   Based on my site visit and review of materials in this case, it is clear

19   that there are numerous "Protective Custody"-designated incarcerated people for

20   whom structured outpatient mental health programming is clinically necessary.  I

21   note here that many people with intellectual disabilities are commonly designated as

22   Protective Custody.  It is extremely concerning that these individuals are, by policy

23   and practice, generally excluded from enhanced outpatient mental health treatment

24   and placement.  At least one patient with an intellectual disability shared with us

25   during the Jail inspections that staff informed him that he was being held in

26   Administrative Separation indefinitely because of his intellectual disability.

27      173.   The Jail must revise its policies, procedures, practices, and training to

28   ensure that mental health staff have primary authority in determining the placement

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

of an incarcerated person with mental illness in a mental health-designated program or housing unit, including Outpatient Step Down (OPSD), without any custodial blanket exclusions or other interference with clinical judgment.

174.   Another improper systemic barrier preventing patients from receiving clinically necessary mental health treatment is the Jail system's decision to exclude patients classified as Administrative Separation from accessing structured outpatient program placement, including OPSD.

175.   It bears emphasizing that Administrative Separation units in this Jail system are filled with people with serious mental illness and manifest psychiatric symptoms.  The clinical need for treatment among these individuals is overwhelming.  Meanwhile, the solitary confinement-type conditions contribute to further mental health deterioration and decompensation and put people with serious mental illness at substantial risk of psychosis, self-harm, and suicide.

176.   Making the problem even worse is that the Jail system essentially blocks access to structured outpatient mental health treatment for people designated as Administrative Separation.  Aseel Ross, the mental health clinician assigned to the George Bailey Administrative Separation units until late last year, recommended that structured treatment programming be provided in the Administrative Separation units, starting with at least two hours per day for each person.  She explained that the programmatic goals of this treatment program included to "reduce the risk of decompensation, "increase people's stability with respect to their mental health condition," "increase socialization opportunities," "help prepare patients to step down out of the AdSep setting," and "prepare patients for successful reentry upon release from the jail."  At the time she left her job at the Jail in late 2023, the proposal had gone nowhere.  Ross Dep. at 122-27.

177.   There remains almost no structured mental health programming in the Administrative Separation units, which based on my review, clearly do not have conditions conducive to a structured treatment housing unit.  When asked whether it

1  could be useful to create such a unit to serve this patient population, the mental

2  health coordinator testified that her team had explored the issue and determined that

3  it "is something that is worth doing."  Quiroz PMK Dep. at 68-69.

4          178.   During my jail visits, I learned that there is now a group session offered

5  about once per week to a very small group of incarcerated persons in Administrative

6  Separation at George Bailey, conducted with each participant placed alone in side-

7  by-side cages outside the housing unit.  At Las Colinas, a psychiatric technician

8  recently began providing a single treatment group to female incarcerated persons in

9  Administrative Separation at Las Colinas either weekly or biweekly, with

10  individuals remaining alone in their cells and forced to participate through an open

11  food port slot in the door.  These sessions do not meet the standard of care for the

12  patient population in Administrative Separation I observed, given (among other

13  things) the infrequency, the limited number of patients served, and the requirement

14  that participation be from inside a cell or cage, with no opportunity for normal social

15  interaction.

16          179.   In my review of individual patient cases and records, I found other

17  examples of improper barriers to the provision of clinically necessary care.  For

18  example, I encountered patients who reported that they were excluded from certain

19  placements, including OPSD, because they were deemed "jumper risks."  (The

20  men's OPSD units, for example, have two tiers.)  One man with serious mental

21  health needs was moved to a medical dorm after he stated a plan to jump from the

22  second tier (███████████████).  Based on my assessment of his records and in-

23  person presentation, he required structured mental health treatment, which was not

24  available or provided to him in the medical dorm.

25          180.   Another patient, ███████████████ had complex treatment needs

26  that can be met with clinically appropriate care, but that were quite clearly not being

27  met by the Jail's mental health system.  This transgender woman had a history of

28  self-harm and suicidal ideations associated with poor distress tolerance and

1    emotional dysregulation.  I have overseen treatment for patients with a similar

2    profile in jail settings.  Key elements of treating this sort of patient include setting

3    boundaries, developing a behavioral and/or safety plan, and structured

4    psychotherapy, carried out with a *consistent* treatment team.  For this patient, mental

5    health records show that she had seven (7) different psychiatric prescribers (1 MD, 6

6    NPs) across 8 psychiatry encounters. There is no evidence that she ever received

7    consistent therapy tailored to addressing her specific mental health needs.  She was

8    not placed in OPSD, possibly due to her transgender status, and instead was housed

9    in a highly restrictive setting where the isolation served to exacerbate her symptoms

10   further.  She was extremely reactive with limited engagement each time she met

11   with a new provider, diverted medications, and went on a hunger strike.  These

12   behaviors can be addressed with clinically adequate care, which she did not receive.

13       181.   *Ultimately, these improper barriers to clinically necessary mental*

14   *health treatment do **not** allow for an effective or proactive treatment system, but*

15   *rather a **crisis-response system***, where large numbers of patients are denied

16   essential care until they reach the point that they decompensate and become acutely

17   psychotic, suicidal, and/or gravely disabled.  Only then are mental health staff

18   provided the authority and resources to provide (at least in some cases) clinically

19   indicated treatment.  The result to incarcerated patients with unmet mental health

20   needs is serious and preventable harm to incarcerated patients, and the risk of such

21   harm constantly looming.

22   **IV.   FINDING #4: THE JAIL'S SYSTEM OF SOLITARY CONFINEMENT
         PUTS AN EXTRAORDINARILY HIGH NUMBER OF PEOPLE WITH
23       MENTAL HEALTH NEEDS AT UNNECESSARY AND SERIOUS
         RISK OF HARM.**

24
25       182.   In my previous declaration in this case, I described the now widely

     accepted reality that people with mental illness placed in solitary confinement-type
26
     conditions are exceedingly vulnerable to deterioration and decompensation of their
27
     mental health condition, intensify their symptoms, and put them at substantial risk of
28

1   psychosis, self-harm, and suicide.  May 2, 2022 Stewart Decl., Dkt. 119-7, ¶¶ 24-33.

2        183.   I am informed that not long ago, the San Diego County Jail renamed its

3   "Administrative Segregation" (or "Ad Seg") units to be called "Administrative

4   Separation" (or "Ad Sep") units.  Other than changing the word "segregation" to

5   "separation" in policy, I can discern no meaningful change in conditions or

6   operations in these units since the name change.  Neither can mental health staff

7   working in those units.  *See* Ross Dep. at 121 ("Q: And do you know the reason for

8   the change in the name? … A: No, I don't.  Q: … Were you aware of any policy

9   changes with respect to those units that went with the change of the name? A. No,

10  not that I'm aware of.  No."); Alonso Decl. ¶ 19.  Accordingly, in this declaration, I

11  use "Administrative Segregation" and "Administrative Separation" interchangeably.

12       184.   Having reviewed declarations, policies, reports, and other relevant

13  documents provided to me, and also having visited several Administrative

14  Separation housing units in the San Diego County Jails, I can confirm that these

15  units constitute solitary confinement-type conditions, including as has been defined

16  by the United States Department of Justice (U.S. DOJ).  *Report and*

17  *Recommendations Concerning the Use of Restrictive Housing* at 3 (Jan. 2016),

18  available at https://www.justice.gov/archives/dag/file/815551/download (restrictive

19  housing-type segregation is characterized by (1) "Removal from the general inmate

20  population, whether voluntary or involuntary"; (2) "Placement in a locked room or

21  cell, whether alone or with another inmate"; and (3) "Inability to leave the room or

22  cell for the vast majority of the day, typically 22 hours or more").

23       185.   Such conditions can cause serious psychological and other harms to

24  any person, and they are exceedingly dangerous for people with mental health

25  conditions.  The United States Department of Justice has recommended that

26  "Generally, inmates with serious mental illness (SMI) should not be placed in

27  restrictive housing."  *Id.* at 99-100.  It provides detailed guidance as to the rare

28  circumstances under which a person with serious mental illness may be placed in

segservation-type housing:

- An inmate with SMI should not be placed in restrictive housing, unless:

    - The inmate presents such an immediate and serious danger that there is no reasonable alternative; or

    - A qualified mental health practitioner determines:

        - That such placement is not contraindicated;

        - That the inmate is not a suicide risk;

        - That the inmate does not have active psychotic symptoms; and

        - In disciplinary circumstances, that lack of responsibility for the misconduct due to mental illness or mitigating factors related to the mental illness do not contraindicate disciplinary segregation.

- Inmates with SMI who are diverted from restrictive housing should be placed in a clinically appropriate alternative form of housing, such as a secure mental health unit or other residential psychology treatment program.

*Id.* at 99-100.

186.    The U.S. DOJ's guidance is consistent with the practices I have observed in well-functioning detention systems.  Mental health staff in a functioning jail system are required by policy and practice to screen people in advance of a prospective placement in solitary confinement-type housing, to identify those people for whom such placement is clinically contraindicated, and to prevent such placement if such confinement is clinically contraindicated.

187.    I am deeply troubled by San Diego County Jails' widespread use of solitary confinement-type housing for incarcerated persons with serious mental illness, with conditions that are extraordinarily restrictive, harsh, and damaging to a person's mental health—particularly for someone with preexisting serious mental illness.  San Diego County Jail's system does not come close to complying with the guidance set forth by the U.S. DOJ, NCCHC standards, or recommendations that have been made repeatedly by parties inside and outside of the County.  My inspection of the Jail system's solitary confinement-type units, my interactions with

1   incarcerated persons with serious mental illness in those units, and my review of

2   records and documents all point to the conclusion that the San Diego County Jail's

3   system of Administrative Separation has caused, and currently is causing, serious

4   and unjustified harm on a broad scale.

**A.   Conditions in San Diego County Jail's Administrative Separation Units Constitute Some of the Harshest, Most Restrictive Forms of Solitary Confinement I Have Ever Witnessed in a Jail System.**

7   188.   I must begin with a description of the conditions I observed during my

8   recent in-person visit to the San Diego County Jail Administrative Separation units.

9   There was striking commonality in Administrative Separation units across all Jail

10  Facilities.  The conditions were consistently harsh and restrictive in ways that put

11  people with mental health needs at substantial risk of serious harm.  The units failed

12  to provide mental health treatment or supports that were urgently and clearly

13  necessary to meet the needs of what is a remarkably mentally ill population.  The

14  experience of people in these units was one of severe isolation, with inadequate

15  access to recreation, socialization, and out-of-cell time.

16  189.   With respect to out-of-cell time, the units I visited do not come close to

17  complying with California state law regulations regarding minimum out-of-cell

18  time.  State law regulations require that jails ensure "policies and procedures for a

19  minimum of 10 hours of out of cell time distributed over a period of seven days to

20  include: (1) an opportunity for three hours of exercise.  And (2) an opportunity for

21  seven hours of recreation."  Cal. Code Regs. tit. 15, § 1065. (The vast majority of

22  people in San Diego County Jails' Administrative Separation are placed there

23  indefinitely for "administrative" reasons, though some are there serving a

24  disciplinary sanction.)  San Diego County Jail Administrative Separation units I

25  observed do *not* meet this requirement.  It is important to note that even this

26  regulatory minimum constitutes solitary confinement-type conditions according to

27  U.S. DOJ and other standards.

28  190.   Other Jail systems provide significantly more out-of-cell opportunities

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

and other activities (such as electronic tablets with programming) that reduce the level of isolation. San Diego County Jail should provide more out-of-cell and other activities, including electronic tablets, across its system to provide some relief to the serious mental health risks associated with this level of isolation.

191.    For people with mental health needs in particular, the extreme level of isolation and restriction in San Diego County Jail solitary confinement units is exceedingly dangerous.

### 1.    Central Jail Administrative Separation

192.    At Central Jail, the Administrative Separation units I observed generally had no incarcerated person outside of their cells in the dayroom.  Every cell door was closed shut.  No staff were in the units to monitor or engage with the segregated population.  Due to the time constraints of our Central Jail visit, I was unable to interview individuals housed in these units.  Central Jail mental health clinician Jennifer Alonso has described the horrifically unsanitary, debris-filled cells in these units.  Such conditions strongly evidence that (a) individuals in these cells have a mental health condition and potentially other disabilities that prevent them from taking care of their own basic daily needs, and (b) neither Jail mental health staff or custody staff are providing necessary monitoring, treatment, and supports for these individuals.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Filthy, trash-filled Central Jail Ad-Seg cell that housed patient with mental illness*



*Central Jail Ad-Seg cell holding patient with no property, trash strewn across floor*

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

## 2.    George Bailey Administrative Separation

193.    At George Bailey, conditions in the Administrative Separation units were shocking. The units were filled with people with serious mental illness and active symptoms.  In Administrative Separation Module 5C, I met with approximately nine (9) detainees.  All of them were very ill with major mental illnesses such as Schizophrenia, Bipolar Disorder and Schizoaffective Disorder. Many of the patients were acutely psychotic and very agitated.  They all required a higher level of mental health care than what was available in this unit.  I spoke with a deputy who explained that he has been working in the unit for a long time.  The detainees knew him well, and he knew several of them well.  When we asked him if he had observed people with mental health needs, he told us quite frankly, "people here are very sick."

194.    Through my conversations with individual detainees, the Administrative Separation deputy, and other staff, I learned that conditions in this unit (as in the other Administrative Separation units) were extraordinarily restrictive and isolating.  Individuals in this unit were allowed outside their cell once every other day—for a period of less than 60 minutes. (Most reported that, on the days they got out of their cell at all, it was for 45 minutes or less.)  Individuals have no normal human contact with any other person, even when they are allowed out of their cell.  In fact, the incarcerated people reported, and the unit deputy confirmed, that the Administrative Separation dayroom (*i.e.*, the large area with tables and seating inside the unit) is *not* used at all.  Each person comes out, by themselves, and is escorted (in handcuffs, as a blanket rule and regardless of their recent or current behavior) to a small caged area, about 12-feet-by-12-feet, that is adjacent and connected to a small shower area and another cell that is essentially identical to their own cell.  The caged area has a hands-free phone and is otherwise completely empty.  Because no one is allowed in the dayroom, a person cannot even converse with another incarcerated person through their cell door; the lack of human contact

is extreme.  To be sure, this level of restriction and isolation is outside the norms of even the most restrictive solitary confinement units I have seen in other systems.

195.   In my experience, this sort of arrangement, with the restrictive housing dayroom going essentially unused, and with a makeshift caged area being the only "out-of-cell" area in the housing unit, is exceedingly rare.  The below photographs, taken in February 2024, show this caged area and a portion of the Administrative Separation dayroom at George Bailey:





EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**



196.    Many people explained to me that they decline this "out-of-cell" time in the small caged area, as it offers no space or opportunity for exercise, socialization, or other meaningful activity.  For these people, this means that they are locked alone in their small cell 24 hours per day, every day.  Many people had not showered for extended periods.  Their mental health was suffering immensely. People arrived in this unit with serious mental health needs that were not being met, and their conditions were worsening, with symptoms such as paranoia, delusional thinking, and mood instability.  Aseel Ross, the mental health clinician assigned to the George Bailey Administrative Separation units, confirmed seeing incarcerated persons decompensate due to these conditions.  Ross Dep. at 55, 58-59.

197.    Inside many Administrative Separation cells, there was food detritus and debris that had accumulated over several days.  In my experience, the accumulation of such debris indicates that a person's psychological and/or cognitive condition may be deteriorated and require clinical attention.  It also creates unsanitary living conditions, as food rots, for example.  Two illustrative photographs of George Bailey Administrative Separation cells are below:





198.   There are multiple Administrative Separation units at George Bailey (including Modules 5A, 5B, and 5C).  I observed and learned about operations in

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  each of them.  Each unit had similar conditions, and each one was extraordinarily

2  harsh, restrictive, and isolating in ways that put people detained there at

3  unacceptable risk of harm.

4    199. Access to "recreation" for people in the George Bailey Administrative

5  Separation units ranges from extremely limited to non-existent.  There is one

6  concrete recreation "yard" serving multiple Administrative Separation units housing

7  scores of people, with no more than ten (10) permitted to go there at a time.  And

8  when they do go there, they are each placed alone inside another cage, once again

9  preventing them from engaging in any sort of meaningful exercise and social

10  activity.  Photographs of the George Bailey Administrative Separation recreation

11  "yard" are below:



27  *George Bailey Administrative Separation recreation "yard" - Incarcerated people are not permitted in the*

28  *central area, and are instead placed alone in individual cages along the perimeter, both for "recreation"*
*and "group therapy."*

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**



*Inside an Administrative Separation Outdoor "Yard" Cell, where people are placed alone for "outdoor recreation" and "group therapy."*

200.   Only a fraction of people in the unit ever actually go to the recreation "yard." One man with serious mental illness had been placed in the Administrative Separation unit following what was almost certainly a psychotic episode, during which he flooded his living area and then ran around in circles in the dayroom. When I met with him, he had been in Administrative Separation for three (3) weeks. When I asked him if he had gotten to the recreation yard, he said: "I didn't even know there was a rec yard for this housing unit." He reported that he had had one shower in the last three weeks.

201.   ████████ spoke cogently with me about his experience in the Administrative Separation unit. He said access to the recreation area was offered no

more than one or two times per week, and not at all some weeks (if there is rain, or a custody staffing shortage, for example) He shared that he used to go to the yard, but now mostly refuses because he hated the recreation yard cages. He compared them negatively to even the most restrictive settings in the California state prison system, where he said that the caged yards allowed for access to sunlight. Here, "you can't even get the sun on you" because the cages are fully covered. He saw no physical, psychological, or other benefit to going from his small cell to a small covered cage in the concrete "recreation yard" area.

202.    During my February 2024 visit, I learned that mental health treatment was nearly non-existent in the George Bailey Administrative Separation units. There are two clinicians assigned to the Administrative Separation units—a recent increase from one clinician. Policy requires that they conduct only a weekly cell-front visit to each person for people in these units. (People returning from the state psychiatric hospital get one additional clinical contact each week, I was told.)

203.    The mental health clinician assigned to the Administrative Separation units explained to me that confidential, out-of-cell clinical contacts were rare. She estimated that she did about 5-7 out-of-cell clinical contacts per week, and that they generally occur only if a patient requests it *and* the recreation yard is open *and* a custody escort is available so that they can use one of the cages as the setting for the appointment. She explained that the vast majority of mental health contacts were at cell-front, and entailed just a few questions about how a person was sleeping, feeling, etc.—what she called "quick things." She acknowledged that many people were sick, and doing poorly, stating plainly that her "patients don't do well when they are isolated."

204.    Structured treatment in the Administrative Separation units was extremely minimal and, based on my observation of the population, does not come close to meeting basic clinical needs. I was told that, about six weeks before my visit, a psychiatric technician had started doing one group therapy session every

other week in one of the Administrative Separation units, with each patient participating from inside their own cell, with the food slot open. The mental health clinician reported that she conducts a group therapy session one day per week for another of the units, with each participating patient placed alone in a cage on the unit's recreation yard. (The session was cancelled the week of my visit.) No more than ten (10) patients are permitted to participate. Based on my experience with group therapy in the detentions setting, it is clear that this is a very clinically inadequate treatment setting. The clinician must use a microphone so that patients can hear her from inside their individual cages. There is no way that patients can hear each other speak from one cage to another or appreciate non-verbal cues, undermining the process of group therapy. Most patients reported little benefit to attending the sessions. In fact, the clinician acknowledged that they had reduced this group session offering from two cohorts to one cohort, with attendance usually no more than seven (7) patients. She explained, "it's hard to motivate patients to come." In my experience, such low participation reflects deficiencies in the treatment setting and structure. In other jail systems with group treatment conducted in a more therapeutic milieu, participation is much higher.

### 3.    Las Colinas Administrative Separation

205.    Conditions for women in Las Colinas's Administrative Separation unit were similarly restrictive and problematic. The unit is filled with people with mental illness, who receive little out-of-cell time and almost no treatment. A psychiatric technician provides a weekly non-confidential, cell-side visit that entails only the most rudimentary check-in about the patient's symptoms, whether they are eating, whether they are showering, and/or how medications are working.

206.    Structured treatment is extremely limited in the Las Colinas Administrative Separation housing areas. There is no regular clinical contacts with qualified mental health providers unless there is a specific mental health referral submitted. I was informed that the psychiatric technician runs a weekly or biweekly

group therapy session, with all Administrative Separation patients remaining in their own cells with food ports open, negatively affecting the opportunity for meaningful interaction during the sessions.  The psychiatric technician shared with us that it is "challenging" to have everyone in their cell for the sessions: "I have to yell pretty loud."  The photographs below show the Administrative Separation unit and the area where staff indicated these group therapy sessions occur.

### B.     People with Serious Mental Illness Are Placed in Administrative Segregation Without Consideration of Mental Health Input, Putting Them at Substantial Risk of Serious Harm.

207.   In my May 2022 declaration, I noted a major deficiency stemming from San Diego County Jail's written policies that give custody staff sole authority regarding placement of people in Administrative Segregation, a housing status where people are confined to their cells for nearly the entire day with conditions that constitute solitary confinement.  I found that the Jail's policy and practice was



*Women's Administrative Separation unit*
*Las Colinas*



*Women's Administrative Separation cell*
*with window of cell door shattered.*

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**



*Inside an empty cell, Las Colinas*

"inconsistent with NCCHC and other modern correctional mental health standards in ways that put patients at substantial risk of serious harm."  May 2022 Stewart Decl., Dkt. 119-7, ¶ 39.

208.   The NCCHC Standards for Mental Health Services in Correctional Facilities' Standard MH-E-07 (Segregated Inmates) makes clear, for example, that for a patient being placed in segregation, it is necessary that "mental health staff reviews the inmate's mental health record to determine ***whether existing mental health needs contraindicate the placement*** [in segregation] or require accommodation" (emphasis added).

209.   Since my May 2022 finding that San Diego County Jail's policy on this issue was "grossly deficient" (May 2022 Stewart Decl., Dkt. 119-7, ¶ 34), the San Diego County Sheriff's Department revised its Detention Services Bureau (DSB) Policy J.3 (Separation: Definition and Use) in November 2023, including to change all usages of "Segregation" to "Separation."  (This, once again, is a cosmetic change, with no apparent substance behind it.)  The policy revision does nothing meaningful to remedy the problem I identified.  The policy still fails to require mental health clinical input to decide whether a person with mental illness or risk factors for suicide may safely be placed in Administrative Separation units.  The

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

policy, then and now, states only:

> Upon placement of an inmate into administrative segregation housing or pre-disciplinary housing, sworn staff shall notify the facility charge nurse of the placement. A qualified health care professional will review the inmate's health record. If existing medical, dental or mental health needs require accommodation, sworn staff will be notified.

DSB Policy J.3 § II(E).

210.   It is worth noting that the policy specifically omits any reference to a mental health clinical determination as "whether existing mental health needs contraindicate the placement" in segregation, as specifically required by NCCHC standards.

211.   As I noted in May 2022, San Diego County Jail's "policy fails to protect people who would be placed at substantial risk of serious harm in Administrative Segregation housing, for several consequential reasons: (1) the policy fails to direct that the treating clinician (who knows the patient) provide input; (2) it fails to direct the patient's *current* mental health condition be considered (relying only on a record review); and most importantly, (3) it makes no mention of a clinical assessment as to whether Administrative Segregation is contraindicated or whether the patient would be at heightened risk of suicide or other harm in segregation. The clinician's role is extremely and inappropriately limited." May 2022 Stewart Decl., Dkt. 119-7, ¶ 34. "The decision about a person's Administrative Segregation placement lies exclusively with custody staff." *Id.*

212.   The November 2023 policy revision includes a passage that seems to acknowledge the grave risks that people with serious mental illness (and intellectual disabilities) face in these solitary confinement units:

> If after placement in separation, mental health or medical staff determine that an individual has serious mental illness or an intellectual disability, they shall be removed from disciplinary separation immediately upon this determination.

DSB Policy J.3 § II(G)

213.   But this passage does *not* address my concern or the grave risks that

1    people in San Diego County Jails face today.

2        214.   First, the standard of care is for such a clinical determination to be

3    made *before* someone is placed in solitary confinement-type housing.  This policy

4    amounts to a directive of "solitary confinement now, assessment for mental illness

5    later."

6        215.   Second, the passage covers only "disciplinary separation" for reasons I

7    cannot understand.  By policy, Administrative Separation is used for "incarcerated

8    persons who are classified for safety and/or security reasons, are pending

9    disciplinary action or for investigative purposes."  Only a small number of people I

10   observed in Administrative Separation were there for documented "disciplinary"

11   purposes.  Most were there indefinitely for vague "safety or security" reasons.

12   Again, the standard of care, including as recognized by the U.S. DOJ, is that, as a

13   general matter, *no* person with serious mental illness should be placed in these sorts

14   of units.

15       216.   Third, and most significantly, based on my visit to the Jail

16   Administrative Separation units and my related review, it is abundantly clear that

17   this policy has been implemented in a way that mental health and custody staff all

18   understand—and *expect*—that people with serious mental illness will be placed—

19   and *remain*—in these solitary confinement-type units.  As noted above, a custody

20   deputy assigned to the George Bailey Administrative Separation units shared with

21   me that "people here are very sick."  We asked the Chief Mental Health Clinician at

22   George Bailey if she had data showing how many people with serious mental illness

23   were currently housed in Administrative Separation.  She checked, and reported that

24   there were 19 people identified as having serious mental illness in Administrative

25   Separation that day.  (A clinician assigned to the units acknowledged that there were

26   still more people with "symptoms we need to watch.")  No staff member seemed to

27   believe that the Jail's policy required removal of people with identified serious

28   mental illness from Administrative Separation.

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

217.    During my February 2024 visit to several of the Jail's Administrative Separation units, I interviewed many people who were very sick and psychologically deteriorating.  My on-site interviews and subsequent review of patient records indicated that staff were not taking necessary action to help these individuals.  I spoke with one incarcerated person, ███████████ in Administrative Separation who shared with me that he was extremely suicidal.  I had to alert staff to his situation; this man was moved to Enhanced Observation Housing, where I saw him a few hours later.

218.    The Jail's Medical Services Division Policy G.2.1 (Segregated Inmates) was also updated since my May 2022 declaration criticized its content. The current version (revised November 2022) remains entirely deficient. SD_0117443-0117444.  The policy continues to direct that custody staff place people in the Administrative Separation units prior to any assessment by mental health staff.  Custody staff must only notify a nurse about such a placement, with health staff (not mental health staff, as NCCHC standards require) then performing a chart review to determine if the individual requires an "accommodation." SD_0117443.  This does not meet the standard of care and clinically appropriate practice in detention settings.  People with a history of mental illness or suicide risk should be evaluated by mental health staff *before* such placement, including with a *face-to-face* evaluation, to determine if their current condition and profile makes such a placement clinically contraindicated and dangerous.

219.    Even when a patient is actively deteriorating in Administrative Separation, the policy directs only that "Health staff will promptly identify and inform custody staff of inmates who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of failing health."  SD_0117444.  As I have previously described, the most favorable reading of the policy is that clinical staff only take any action when a person is noticeably "deteriorating" and their health is "failing" to warrant an emergency acute mental health or medical

placement.  Without *preventative* protections, this is a dangerous and inappropriate jail mental health care practice: adequate Jail mental health care requires processes to *prevent* avoidable decompensation and other harms, not merely to respond to mental health crises that may have been caused by the isolation conditions.

220.   Jail Medical Policy G.2.1 ("Segregated Inmates") continues to contain a notation that it is "in compliance with" National Commission on Correctional Health Care (NCCHC) standards (citing NCCHC J-G-02).  This notation is misleading, as the policy fails to comply with NCCHC *Standard MH-E-07 (Essential): Segregated Inmates*, which requires that mental health staff take steps to "determine ***whether existing mental health needs contraindicate the placement*** [in segregation]."  That is to say, the Sheriff's Department health care policy (like its custody policy) does *not* meet NCCHC standards regarding consideration of a patient's mental health prior to solitary confinement placement.  The Jail's policy instead creates substantial risks of serious harm to vulnerable people, including those with mental health and intellectual disabilities.

221.   This deficiency was identified long ago.  In January 2017, the NCCHC's Technical Assistance Report for the San Diego County Sheriff's Department ("NCCHC Report") found that the Jail's "mental health staff does not [] screen inmates for any contraindications to placement in segregation, which is an NCCHC requirement."  NCCHC Report, DUNSMORE0260618 at 101; *see also id.* at 36, 68, 102, 136.

222.   The 2018 Hayes Suicide Prevention Report also recommended that the Jail act to prevent the placement of people with mental health conditions in Segregation housing when clinically contraindicated.  Mr. Hayes wrote: "Given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, ***it is strongly recommended that medical personnel review the medical section of [the Jail Information Management System] to determine whether existing medical***

1    ***and/or mental health needs contraindicate the placement*** or require

2    accommodation." 2018 Hayes Suicide Prevention Report, DUNSMORE0117148 at

3    70-71 (emphasis added). His report notes that this recommendation is consistent

4    with NCCHC Standards. *Id.* at 20.

5      223. The Sheriff's Department's public response to Mr. Hayes' report on

6    this topic was disappointing: "Business processes are being developed, and policies

7    are being updated, to provide for real time notification to Qualified Mental Health

8    Providers so assessments can be accomplished in a timely manner." *Id.* at 6. The

9    response completely ignores Mr. Hayes' recommendation (and the NCCHC

10    standard) that clinicians should provide input as to whether an Administrative

11    Segregation placement (or housing with similar restrictions) is contraindicated for a

12    patient due to mental health or other needs.

13      224. Ms. Alonso, who worked at the Jail for three years up until April 2022,

14    testified that the Jail's mental health co-coordinator made a "specific

15    recommendation to the Sheriff's Department to stop putting people with mental

16    illness in the solitary confinement-type Ad-Seg units," but that "Sheriff's

17    Department Command staff refused to implement this recommendation." Alonso

18    Decl., Dkt. 119-11, ¶ 21. She described how custody staff dictate solitary

19    confinement placement without consideration of a person's mental illness or

20    whether such placement is clinically contraindicated:

> 21    I received an email from custody staff about one of my patients who was experiencing significant psychiatric symptoms. The email stated
> 22    that the line custody staff thought my patient should be transferred to Ad-Seg housing. No reason was provided. The placement appeared
> 23    arbitrary and more for the custody staff's convenience than the security or well-being of anyone. No one asked me for my clinical input;
> 24    custody staff simply directed me to modify the patient's record (removing the patient's OPSD status) so that custody could move the
> 25    man into Ad-Seg. Similar incidents happen multiple times each month. My fellow mental health colleagues and I have been conditioned
> 26    through our interactions with custody staff not to question such custody directives.

27

28    Alonso Decl., Dkt. 119-11, ¶ 23.

225.   Likewise, Dr. Evans, the former Medical Director and Chief Psychiatrist at the Jail, describes how clinical input was regularly ignored, and how she "saw many people being placed into Administrative Segregation when clinicians knew and made known that such a placement would be harmful."  Evans Decl. ¶ 20.

226.   It is clear that this dangerous practice, of placing—and retaining—people in solitary confinement-type Administrative Separation units without consideration of whether their current mental health condition and needs contraindicate the placement, continues today.  *See* Quiroz PMK Depo. at 250-51 (noting there is still no mental health clinical assessment done for a person being placed in Administrative Separation, with clinical issues something that can be discussed at staff meetings that occur every two weeks); Ross Dep. at 43 ("Q: … Have there been examples in your experience where you made a recommendation that somebody be removed from AdSep based on their mental health where classification says, no, they need to remain in AdSep and they so remain? A. Yes. Q. Do you have any examples that come to mind? A. Yeah."). I strongly recommend that this policy and practice be changed to align with modern standards.

**C.    The San Diego County Jail's System, Through Its Deficient Policies and Practices, Places a Disproportionately High Number of People with Serious Mental Illness in Administrative Separation, with Devastating Effects.**

227.   While the above-described failure of the San Diego County Jail System to prevent the dangerous placement of Administrative Separation placement when clinically contraindicated is a grave concern, the systemic deficiency runs even deeper.  In my review of policies, practices, and patients' actual experiences, I observed a deeply disturbing trend of people with serious mental illness being placed in Administrative Separation at a disproportionately high rate, with devastating effects on their mental health, safety, and well-being.  Several policies and systemic practices contribute to this problem.

228.   **People with serious mental illness are placed in Administrative**

1   **Separation based on behaviors from the past (including manifestations of their**

2   **mental illness), not based on their actual current behavior and profile.** This

3   practice puts people at unnecessary risk of serious harm. For example:

4   ████████████████████

5   229.   During my February 2024 visit to the George Bailey Administrative

6   Separation unit, I encountered a patient with serious mental illness who was in acute

7   distress. He had been involved in a physical altercation during a previous jail

8   detention, leading to an Administrative Separation placement until his release from

9   custody in ██████ 2023. When he returned to custody in ██████ 2024, he was

10  automatically placed back in Administrative Separation. (This fact was confirmed

11  by staff with us during the tour.)

12  230.   Mr. ████████ had been in Administrative Separation unit for a few

13  weeks when I met with him. The Jail had failed to continue him on psychiatric

14  medications he was taking prior to his arrest. Based on my interactions with him, it

15  was apparent that he had decompensated greatly in Administrative Separation, was

16  in very acute distress, and was suicidal. I promptly informed staff with us on our

17  tour about my observation and grave concern. Later that day, I again encountered

18  Mr. ██████, who had been moved to an Enhanced Observation Housing unit. Mr.

19  ████████ begged not be put back in Administrative Separation, saying with

20  desperation "I am going to be good from now on. I'm trying to be cool, be good. I

21  miss my family. I can't be in Ad Sep anymore."

22  231.   A lieutenant with us on the tour intervened and told us that he would

23  work to have Mr. ████████ reclassified so that he would not be put back in

24  Administrative Separation. The lieutenant confirmed that it is "not uncommon for

25  initial placements to be in Ad Sep" based on Administrative Separation placements

26  during past jail detentions, regardless of current behaviors or mental health needs.

27  This was quite worrying to hear.

28  232.   When I later reviewed this man's mental health records, I was deeply

1  concerned to see that, within a couple days of this incident, the Jail had in fact

2  returned this patient to Administrative Separation. (The records had no mention of

3  any new security issue; he appears instead to have been returned to Administrative

4  Separation simply because that was his already-assigned housing.) This was

5  shocking and outrageous from a clinical perspective. This is an enormously high-

6  risk patient to place in solitary confinement. According to the records, right before

7  he was returned to solitary confinement, a clinician saw him at cell-front, noting:

> "[H]e presents as tearful and apologetic, stating, 'I want to behave, I want to do well, can you take me out of Adsep?' [Patient] endorsed feelings of depression related to being in custody, and requested to meet with the psychiatrist, 'I think I need stronger meds.' ... 'I want to shower, can you call my probation officer[]? Tell her that I don't want to be here.' [Patient]'s concerns were processed and validated."

12  233.   Mr. ████ was later seen by a psychiatric provider, who documented

13  that he had a history of suicide attempts, had signs and symptoms of "depression

14  'yes' 10/10, persistent low feeling, lonely, hopeless, low energy, anhedonia,

15  worthless 'kinda', feeling of guilt," of "mania/hypomania racing thoughts,

16  distractibility," and "anxiety yes! 10/10." He was noted as being "mildly unkempt,"

17  with his cell being "messy" with "debris scattered about."

18  234.   Neither the clinician nor the psychiatric provider documented any

19  consideration as to whether Administrative Separation placement is clinically

20  contraindicated, or whether an alternative treatment setting was appropriate. This is

21  a striking demonstration of a Jail mental health system that ignores patients'

22  treatment needs and obvious risks of harm, including suicide.

23  235.   A week later, Mr. ████ was still in Administrative Separation,

24  seemingly getting worse, and still at enormous risk of further decompensation and

25  suicide. The clinician did a non-confidential cell-front check-in, and wrote:

> [Patient] walked toward his door to meet with the writer and repeatedly stated, 'I don't want to be in Adsep.] [Patient] seems to lack understanding about the reasons that led to his Adsep placement, he claimed to be struggling with the isolation and being lockdown most part of the day. ... [Patient] proceeded to report, "I miss my mom, I

*don't want to be here" while he broke down crying when he mentioned missing his mother. [Patient] reported he had court yesterday and was not satisfied with the outcome, "the judge wants to send me to prison...can you take me out of Adsep ... can you pray for me?" ...*

*At the end of the encounter, [Patient] was informed that he might or might not be considered for an alternate placement in OPSD, SDCJ, contingent upon his psychiatric and behavioral history being reviewed.*

236.   As I continued reviewing this patient's records, I saw *no* documentation that an "alternate placement in OPSD" was considered, or even that his "psychiatric and behavioral history" was reviewed for such consideration.  Instead, a week later, he received his next cell-side visit, where the mental health staff person noted:

*[Patient] endorsed feelings of sadness and loneliness related to being in Adsep/custody ... [Patient] voiced his feelings of frustration after learning he will not be admitted into a different program in CJ. [Patient]'s concerns were processed and validated, and he was informed he will continue to receive supportive services as needed and per his request.*

237.   The treatment "plan" for this patient read, in full: *"Continue to be monitored cellside."*

238.   This patient was at an extreme risk of serious harm, including suicide, when I observed him during my visit.  Despite reassurance from Jail staff that the issue would be addressed (including through a more appropriate, *non-*Administrative Separation placement), it was not.  And the records strongly indicate that there was no clinical justification for the continued Administrative Separation placement or the lack of meaningful therapeutic intervention.  The Jail system's policy and practices placed—and kept—this patient in a situation where he was at extraordinary and unjustifiable risk of harm.

239.   I met with this patient with a history of serious mental illness who had been held in Administrative Separation for the approximately four months since he was booked at the Jail.  He was last at San Diego County Jail ten years earlier, in 2013.  That year, staff reportedly found him with something they considered to be a

1  weapon, and placed him in Administrative Segregation, where he remained for a

2  few weeks before transferring to California state prison to serve a sentence of seven

3  (7) years.  In state prison, Mr. ███ reportedly was housed in mainline general

4  population.  He had been released and living in the community for about three years,

5  until this detention began.  He was having a very difficult time coping in

6  Administrative Separation, and was not getting psychiatric medications that he had

7  long been taking by prescription.

8      240.  I can discern no legitimate justification for keeping this patient in

9  Administrative Separation.  My review strongly indicates that he was placed at

10  unnecessary risk of mental health decompensation and harm as a result.

11      241.  I encountered many people with serious mental illness who were placed

12  directly into Administrative Separation after stays in a psychiatric hospital or the

13  Jail's acute care Psychiatric Services Unit, even when they had a history of

14  decompensation in Administrative Separation.  This deficient practice serves to

15  undermine the treatment and stabilization provided to that patient in the hospital or

16  acute care setting.  It commonly leads to a cycle of decompensation and puts people

17  at substantial risk of serious harm.  For example:

18  █████████████

19      242.  █████████████ has diagnosed serious mental illness for which she

20  takes medication.  When she first came into custody, she was put in Administrative

21  Separation at Las Colinas.  Her mental health worsened there, and she spent an

22  extended period in the acute care Psychiatric Services Unit.  Having been deemed

23  Incompetent to Stand Trial in her criminal case, she was then transferred to the state

24  psychiatric hospital, where she received treatment in a therapeutic setting allowing

25  her to interact with others and participate in structured treatment daily.  She

26  described that she did well and "liked being able to talk to [hospital] staff and other

27  patients," and her psychiatric condition improved.

28      243.  When I met with her, she had just a few days earlier been returned to

[4541606.8]                                    87                      Case No. 3:20-cv-00406-AJB-DDL
EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

San Diego County Jail.  The Jail had placed her *back* in Administrative Separation, where she had previously decompensated and where she now was again feeling isolated and having a difficult time coping.  She was demonstrating active signs of psychosis.  Based on my review, the Administrative Separation placement was clinically contraindicated and likely to cause unnecessary harm to this patient.

244.    █████████'s placement in Administrative Separation was similarly problematic.  She reported that she had spent the last approximately eight years in a state psychiatric hospital while designated as Not Guilty by Reason of Insanity in her criminal court case.  At the state psychiatric hospital, she was housed in a five-woman dorm setting, where she did well interacting with others, and her mental health condition was generally stable.

245.    She had recently been returned to San Diego County Jail for court proceedings, and was placed directly into Administration Separation.  She was being held in a severely isolated setting, confined to her cell all day except one hour when she was allowed out of her cell all alone.  Her condition seemed quite fragile and I had concern as to whether she was experiencing psychotic symptoms in this highly restrictive unit.  She described to me how difficult it was to be there, saying: "They are longer days here."

**D.    The San Diego County Jail's System of Administrative Separation and Solitary Confinement-Type Conditions Puts People with Mental Health Needs at a Substantial Risk of Death, Including by Suicide.**

246.    The enormously elevated risk of suicide for people—particularly, people with mental health needs—in solitary confinement units is well-established.  The San Diego County Jail's system of Administrative Separation and solitary confinement-type conditions is among the most dangerous examples I have ever seen.  The significant number of suicides and other deaths that have occurred in these units demonstrate the exceedingly high risk to which the Jail system exposes

people with mental health needs.  And it is important to note that those deaths represent just the *tip of the iceberg* in terms of the scope of the harms and risks of harm resulting from the Jail system's current policy and practices, as demonstrated by some of the case examples described above.

247.   Yet the issue of suicides and other deaths in San Diego County Jail Administrative Separation units demands attention and action.  The problem has been going on for years.

248.   The DRC Report found that at least six people killed themselves at the Jail between 2014 and 2016 while in segregation units.  The DRC Report described one person who committed suicide after spending six consecutive weeks in administrative segregation, and four months overall.  The person's medical record indicated that staff failed to notice the significant mental health issues the person developed while in segregation and took no action to address the risk.  Another person with mental illness committed suicide in administrative segregation after waiting days to see mental health staff and being denied out-of-cell time.  DRC called for the Jail "take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances."  DRC Report, DUNSMORE0124942 at 32.

249.   Suicide prevention expert Lindsay Hayes also noted "the strong association between inmate suicide and segregation housing" and urged the San Diego County Jail to ensure that mental health staff timely evaluate whether solitary confinement placements are contraindicated based on the person's individual mental health needs, and to act against such dangerous placements.

250.   In 2018, the DRC Report and the Hayes Suicide Prevention Report offered meaningful and important recommendations for how San Diego County Jail should address the large number of deaths in the solitary confinement units.  I would urge the County to implement those recommendations in full.  Having reviewed

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

policy and practices, patient records, and other materials in this case, it is beyond question that, as of now, a staggeringly high number of people with serious mental illness are being placed at unacceptable risk of suicide through imposition of the unnecessary and brutally harsh conditions in Administrative Separation.

251.   I provide a review here of only a small sample of deaths that have occurred in those Administrative Separation units.  Some of these deaths were deemed as suicides, but all of them illustrate the unacceptable risk of harm that these units create for people with mental illness.  These cases are particularly horrific in their outcomes, but the circumstances and Jail practices involved in these cases are pervasive in the San Diego County Jail system.

**Suicide of Matthew Settles, July 2023 (Administrative Separation)**

252.   Mr. Settles had long history of serious mental illness and died by suicide while in custody at San Diego County Jail, having been denied minimally adequate treatment of his psychosis and while housed under solitary confinement-type conditions in the Administrative Separation unit at George Bailey.  In that unit, Jail staff's monitoring of his condition and safety was entirely inadequate, which directly contributed to his death.  Mr. Settles' mental illness and instability were described by his mother, who said that he was the "kindest most gentle and helpful young man and then rapidly becomes very frightening," specifically when he was struggling with medication adherence.  He had a history of several near-fatal suicide attempts and often required conservatorship and inpatient psychiatric treatment to stabilize his condition.

253.   On June 3, 2022, while in inpatient care at the San Diego County psychiatric hospital, Mr. Settles impulsively attacked another patient.  He was arrested and booked into San Diego Central Jail.  Despite his complex history and psychiatric hospitalization immediately prior to his arrival at the Jail, he did not receive a psychiatric evaluation and was instead placed in Enhanced Observation Housing without being restarted on antipsychotic medications.  A few days later, he

1   was housed with two cellmates.  The next day, a roommate tied a towel around

2   Mr. Settles' neck and slammed his head against the ground multiple times.

3   Mr. Settles sustained significant head injuries requiring 49 stitches and

4   hospitalization for several days.  At this stage, Mr. Settles should have been housed

5   in a safe, inpatient setting with greater supervision and proper psychiatric care.  This

6   did not occur.  He was discharged from the outside hospital and returned to the Jail.

7   Two weeks later, he was *still* waiting for a psychiatric evaluation and clinically

8   indicated medication.  Showing symptoms of psychosis and decompensation, he got

9   into an altercation with a deputy.  He was placed in Administrative Separation

10  housing, where he remained until he died by suicide a few weeks later.

11      254.   Mr. Settles *finally* received an *initial* psychiatric evaluation at the Jail

12  on July 23, 2022, almost seven weeks after his booking date.  This is an

13  unacceptable delay that negatively impacted his condition.  Mr. Settles was then

14  confined in an intensely isolated Administrative Separation setting.  He was offered

15  no therapeutic programming and remained in his cell essentially around the clock.

16  His condition worsened greatly: he became socially withdrawn, disheveled and

17  disorganized, had poor hygiene, demonstrated impaired judgment, and repeatedly

18  refused medications.

19      255.   As I discussed in my May 2022 declaration (at Paragraphs 85-105),

20  inadequate safety checks are a major deficiency in this Jail's system.  The safety

21  checks on the day of Mr. Settles death (more than a year after my declaration) were

22  notably out-of-compliance even with the Jail's existing safety check protocols,

23  which Suicide Prevention expert Lindsay Hayes, the State Auditor, and Disability

24  Rights California had all found were themselves dangerously inadequate even when

25  followed.  Mr. Settles was found with a shirt wrapped around his neck, hanging

26  from the top bunk of his cell.

27      256.   It is hard to overstate just how deficient the Jail's mental health

28  treatment was or how dangerous the conditions were leading up to Mr. Settles'

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

suicide.  Again, Mr. Settles was receiving *inpatient psychiatric care* immediately prior to his arrival, had a history of self-harm and suicide attempts, and was showing obvious signs of worsening psychotic symptoms.  He should *not* have been housed in the solitary confinement-type conditions of Administrative Separation.  The Jail further failed to provide him clinically necessary psychiatric care, therapeutic treatment, and monitoring for safety, culminating in his suicide.  This death was foreseeable and preventable, and demonstrates both the mental health system failures of San Diego County Jail and the extraordinary danger of its Administrative Separation housing practices for people with serious mental illness.

257.   Just as concerning was the lack of post-suicide debriefing with the mental health team or necessary corrective action after Mr. Settles' death.  George Bailey mental health clinician Aseel Ross confirmed that no one from leadership ever reached out to her to debrief the situation, that there were no corrective action plans that she was aware of, and that there no revisions to the Administrative Separation policies or procedures that resulted in the wake of Mr. Settles death.  Ross Dep. at 136-137.

**Suicide of Jonathan McDowell, July 2023 (Administrative Separation)**

258.   Mr. McDowell was found hanging in his cell in Administrative Separation (George Bailey) on July 19, 2023, five months after he arrived at the Jail on February 20, 2023.  He was found unresponsive and pulseless in his solitary confinement cell; medical personnel revived him enough to send him out to a community hospital, where was pronounced dead a few days later.  When he arrived at the Jail, there were numerous identified indicators that he had serious mental health treatment needs.  He had a history of a "mood disorder" for which he had been receiving treatment in the community.  ████████████████████ ██████████████████████████████.

259.   At intake, Mr. McDowell reported feeling hopeless/helpless but denied suicidality.  Within a few days, he reported to staff that he was experiencing anxiety,

1  depression, insomnia, and hopelessness, and fearing the onset of a "mental

2  breakdown." Yet it still took nearly three weeks for the Jail to provide

3  Mr. McDowell a full behavioral health assessment. By this time, he was reporting

4  experiencing auditory hallucinations. He was referred for a psychiatric evaluation

5  on March 10, 2023, but the first time a psychiatric provider attempted to see him

6  was not until the end of April. Records show that Mr. McDowell did not see the

7  provider at that time, however, and did not get any psychiatric evaluation at the Jail

8  until June 2, 2023, three and a half months after he came into custody. This is an

9  unacceptable delay in psychiatric care for this sort of patient.

10      260.  Mr. McDowell then finally started receiving medications—a complex

11  combination of mood stabilizer, tranquilizer, and antidepressant Duloxetine. He

12  was scheduled for a psychiatric follow-up two months later (in August 2023). Such

13  a timeline for follow-up is clinically unacceptable; a psychiatry follow-up should

14  have happened within one week for this patient. The medication regimen was

15  clearly not working for him, and he refused medications at least 40 times between

16  June 2 and his suicide attempt on July 19. No follow-up occurred: Mr. McDowell

17  had died by suicide before the scheduled psychiatry follow-up date arrived. With

18  respect to other mental health interventions, he was being seen only once per month

19  by a clinician, with no meaningful treatment provided.

20      261.  Mr. McDowell's condition deteriorated further, and on or about July 9,

21  2024, custody staff changed his placement to Administrative Separation, putting him

22  on a "Lockdown/Disciplinary Separation" status, according to records. A mental

23  health clinician met with him, and he reported a very high stress level, stating: "I'm

24  stressed to the gills." He said that he had been trying with his psychiatric

25  medication but that "it's not working out." His description was specific and deeply

26  concerning, explaining that the medications caused him to see lights and stars that

27  were "like an electrical storm." The clinician's final assessment was shocking in its

28  disregard for Mr. McDowell's well-being and need for urgent psychiatric care,

1  stating only "Pt will continue to receive weekly wellness checks while in

2  Disciplinary Separation." He was seen by a mental health clinician just a few more

3  times over the next approximately six (6) weeks, including on the day he hanged

4  himself.

5      262.  On July 19, 2023, a clinician who reportedly had never interacted with

6  Mr. McDowell before, conducted a cursory and inadequate cell-front wellness

7  check. She documented that she could not observe the cell's condition because

8  "food port open thus unable to see fully into cell," and that McDowell "declined

9  services when asked if he had any MH questions/concerns ('no' and gestured hand

10 in 'no' fashion)." She noted that "[Patient] is not fully compliant with medications,

11 more refusal than administrations." No follow-up treatment or planning is

12 documented. In fact, the line for the next mental health clinician visit is noted as

13 "7/18/23" (which was in the past).

14     263.  Mr. McDowell was found hanging in his cell, with torn clothing tied

15 around his neck, later that July 19 morning.

16     264.  This is a very egregious case. The patient had to wait for over three

17 months to be seen by a psychiatric provider despite clear and documented indicators

18 showing that this was an urgent case. I have grave concerns about the complex

19 medication combination that was prescribed, and even graver concerns that there

20 was no psychiatric follow-up to see how the patient was doing. He was doing very

21 poorly, with concerning side effects, continued symptoms, and problems with

22 medication adherence; nobody did anything about it. The patient was placed in a

23 dangerously restrictive solitary confinement setting, where he further deteriorated

24 and did not receive clinically necessary monitoring or treatment. Based on my

25 review, this was a preventable death where the mental health treatment fell below

26 the standard of care, and the solitary confinement conditions imposed an

27 unacceptable risk.

28     265.  The post-death review of this suicide is deeply troubling, insofar as it

1  fails to identify, or seek to address, the many systemic failures involved in this case.

2  For example, in the NaphCare clinical review of McDowell's death, under

3  "Recommendations for Modifications in Protocol, Procedure, or Approach to

4  Patient Health Care Management Resulting from this Review," it states only the

5  following: "Closer Psychiatric follow-up/care."  I could find nothing in the post-

6  death investigation by the County or NaphCare that suggested a recognition that the

7  Administrative Separation placement for this man was dangerous or problematic, or

8  that necessary corrective action would be taken.  These sorts of tragic outcomes will

9  almost certainly continue to occur, unnecessarily, until the deficiencies I (and

10  others) have identified are remedied.

11  **Death of Lonnie Rupard, March 2022 (Administrative Separation)**

12  　　　266.　This 46 year old man with serious mental illness died a horrible death

13  in a Central Jail Administrative Separation unit.  According to the findings of the

14  Medical Examiner, the cause of death was pneumonia, malnutrition and dehydration

15  in the context of ***neglected schizophrenia***.  Quite notably, the manner of death is

16  listed as ***Homicide***.  This patient had a long history of a psychotic-level mental

17  disorder which had a documented response to medications in the past.  The patient

18  did not receive any psychiatric medications for the three months he spent at the Jail

19  leading up to his death.

20  　　　267.　Mr. Rupard was arrested on December 19, 2021.  The autopsy report

21  stated that he was to be seen for a psychiatric sick call the next day, although I could

22  not locate this note in the medical record.  The autopsy report, however, states

23  "patient refused psychiatric evaluation."  This does not meet the standard of care for

24  this sort of patient.  The psychiatric provider is still obligated to evaluate the patient

25  whether the patient is cooperative or not.  (In fact, I found many clinical encounter

26  records where mental health staff noted only "Unable to Assess.") A skilled

27  psychiatrist or clinician can glean a lot of information about the patient by

28  observation and through the nature of the patient's refusal.  They can (and should)

observe the hygiene of the patient and the cell, as well as speak with custody and nursing staff that have interacted with the patient. Simply documenting "refusal" is unacceptable. The following week, two more initial psychiatric evaluations were scheduled and canceled (December 24 and 28) for Mr. Rupard, with the following note: "Patient was scheduled for an initial evaluation on (SIC), however due to time constraints, patient was unable to be seen. Patient will be rescheduled for psychiatric sick call." This further delay is also unacceptable.

268.    Finally, on December 29, 2021, Mr. Rupard was seen at cell front. The patient was described as being shirtless in his cell, irritable and surrounded by empty food trays. He rambled incoherently, and was yelling and verbally aggressive. The psychiatric provider noted in the record "no signs/symptoms of patient being a danger to self/danger to others." I agree that the patient was not overtly an immediate danger to self. There was much evidence, however, that he was gravely disabled and required urgent treatment intervention, which did not occur.

269.    The next psychiatric appointment was scheduled for more than a month later, on February 2, 2022. The note indicates that the patient "refused" and was rescheduled for February 16, 2022, 16 days later. (The record shows that he was not seen until February 22, when there is only a cursory evaluation done at cell-front.) There is a troubling lack of urgency, even as the records indicate that this patient's condition was greatly decompensated and worsening.

270.    On March 14, 2022, the patient was seen by a court-ordered psychiatrist to assess his competency to proceed with his criminal case proceedings. That psychiatrist noted that the patient's cell was dirty with trash on the floor as well as feces in the toilet. There were food containers thrown about the cell. The patient was emaciated. The psychiatrist recommended that the patient receive involuntary psychiatric medications. Still, there is no indication of any action being taken.

271.    On March 17, 2022, Mr. Rupard was found unresponsive in his cell. Resuscitation efforts were employed unsuccessfully. The autopsy found that he had

1  lost fifty pounds during his three-month stay at the Jail.

2      272.   Jail clinician Jennifer Alonso testified as to how Mr. Rupard ended up

3  in solitary confinement ("Ad-Seg") housing despite her raising serious concerns

4  about his situation and well-being:

> Another patient who died after being moved to Ad-Seg by custody staff without input from myself or other mental health clinicians was Lonnie Rupard.  Mr. Rupard had a mental health condition that had made him psychotic and erratic.  He had been placed on my OPSD caseload.  After he tried to sharpen an object to that could be used as a weapon, I told custody staff that I was concerned about the situation.  Custody staff then moved him into an Ad-Seg "overflow" unit at the Jail.  (Ad-Seg units are frequently filled to capacity, leading to custody staff operating other housing units as Ad-Seg "overflow" units.)  Although I did have concern about his remaining in the OPSD unit with my other OPSD patients, I did not believe that Ad-Seg was a clinically appropriate placement for him.  However, I knew that custody staff had exclusive authority regarding the Ad-Seg placement and that I could not advocate for another housing option.  Really, Mr. Rupard needed placement in a structured therapeutic outpatient setting that provided sufficient security; such a unit does not exist at Central Jail.
>
> Once he was in Ad-Seg, Mr. Rupard was no longer on my OPSD caseload.  I recall that the clinician assigned to the Ad-Seg unit was so overwhelmed with her caseload and other clinical duties that she was unable to see Mr. Rupard as frequently as was needed.  My understanding is that Mr. Rupard refused his medications and food while in Ad Seg.  Feces were present all over his cell and the toilet, and food trays and trash were strewn everywhere.
>
> Mr. Rupard died while still in Ad-Seg, having lost a significant amount of his body weight and in a medically compromised condition, about two months after he was placed there.  **Custody staff never consulted with me about whether solitary confinement would put Mr. Rupard at risk of harm.  I knew that, by policy and practice, I had no authority or avenue to recommend against his Ad-Seg placement.**
>
> Mr. Rupard's experience as a person with mental illness held in the Jail's Ad-Seg housing units is not unusual.  I have observed many people with mental illness decompensate in Ad-Seg.  They smear feces on the walls and cell door windows, and their cells become horrifically filthy.  Custody staff regularly stand by and watch this happen.

25  Alonso Decl., Dkt 119-11, ¶¶ 27-30.

26      273.   Instead of working to prevent placement of people with mental illness

27  or at risk of decompensation in Administrative Segregation (or Administrative

28  Separation) unless absolutely necessary, the Jail places patients like Mr. Rupard in

solitary confinement-type setting without regard to mental health-related risks and without critically necessary treatment. This practice is outside the accepted norms of the correctional mental health care community, and places people at substantial risk of serious harm.

274. The lack of treatment provided to Mr. Rupard is staggering. He was placed in solitary confinement despite clear clinical contraindications and need for a higher level of care. He was never taken out of his cell for any of his mental health or psychiatric contacts. All encounters were done cell-side. The psychiatric staff never considered or took steps to use involuntary psychiatric medications while this man was starving to death. Based on my review, this was an avoidable death if proper psychiatric care had been provided in an appropriate treatment setting.

**Suicide of Lester Marroquin, May 2021 (Administrative Separation)**

275. Mr. Marroquin was a 35-year-old man with schizophrenia spectrum disorder who died by suicide after drowning himself in the toilet of his Central Jail Administrative Separation cell. He struggled with severe auditory hallucinations telling him that his mother was in danger. Throughout his incarcerations, he was frequently placed in safety cells and enhanced observation for self-harm and aggression driven by these symptoms. When he arrived at the Jail in December 2020, Mr. Marroquin was visibly tormented and yelling "I know what you are doing to my mom. I know that you have her. I heard her." His mother called the jail to warn them about his suicidality and the importance of restarting his medications. Mr. Marroquin had an extensive history of suicidality; during his incarceration in the Jail, he was placed in safety cells 11 times and had been housed in the Jail's Enhanced Observation Housing (EOH) unit 17 times.

276. On December 22, 2020, Mr. Marroquin choked himself related to concern for his mother, prompting a psychiatric evaluation during which he expressed, "I don't know what's wrong, I'm hearing my mom calling my name, I'm just not feeling safe." He went on to engage in numerous self-harm behaviors,

including biting himself and head-banging.  Speaking with his mother on the phone was very grounding and therapeutic for him, but this was regularly denied to him when he was placed in safety cells and Enhanced Observation Housing, where phone calls are prohibited or heavily restricted.  In other words, the Jail's response to his decompensation and suicidality included further or complete *restriction* on a key therapeutic intervention known to help him.

277.   Mr. Marroquin's mother communicated concerns to the Jail about how the denial of phone calls added to her son's psychological distress, and stated that his current behaviors were decompensated compared to how he was in the community.  Based on the records, it is unclear why such an ill individual was not promptly transferred to a higher level of care where he would be provided closer monitoring, therapeutic engagement with the care team, and other interventions to address his symptoms and immediate safety concerns.

278.   After three months of this, during which time he was placed in Administrative Separation, Mr. Marroquin was finally admitted to the Psychiatric Stabilization Unit (PSU) on March 28, 2021.  He remained paranoid and focused on self-harm, shifting primarily to submerging his head in the toilet.  On April 5, 2021, he was discharged from the PSU and sent back to the same Administrative Separation unit where he had done so poorly.  He continued his pattern of self-harm, frequently transitioning between Administrative Separation, safety cells, and Enhanced Observation Housing—in none of these settings did he receive meaningful mental health treatment or support.  He remained consumed by his auditory hallucinations urging him to drown himself and drink toilet water or his mother would die, and staff noted multiple incidents of seeing him placing his head in the toilet.

279.   On May 28, 2021, Mr. Marroquin reported suicidal ideations and was placed in a safety cell with step down to Enhanced Observation.  On the morning of May 30, 2021, staff sent him back to Administrative Separation, without any

1 consultation with psychiatric team members who were familiar with his recent

2 behavioral patterns.  This re-placement in Administrative Separation was clinically

3 contraindicated, and it was inappropriate that it would occur without mental health

4 consultation.  He was placed on hourly safety checks (which is standard practice in

5 this Jail system, despite numerous recommendations that safety checks be done

6 twice as often in Administrative Separation).  Given his recent active self-harming

7 behaviors, there was significantly high risk for suicide and these safety checks

8 should have been more frequent for him.  He was last noted alive at 3:05PM, then

9 found unconscious during the next safety check at 3:59PM. He died from water

10 intoxication likely caused by drowning in the toilet of his cell.

11     280.    Jail clinician Jennifer Alonso testified to her first-hand experience with

12 Mr. Marroquin and the circumstances of his death, which matches my assessment of

13 this case:

> I have seen how these Ad-Seg placements, with no clinical input from mental health staff and no mechanism for clinicians like me to protect our at-risk patients, have deadly consequences.
>
> For example, my patient, Lester Marroquin, died by suicide in an Ad-Seg cell on May 30, 2021.  Mr. Marroquin had a significant history of mental illness and had repeatedly attempted suicide and engaged in acts of serious self-harm.  He had decompensated while held in an Ad-Seg placement to the point that staff placed him on suicide precautions in a psychiatric observation cell.  I was asked to meet with him while he was being held in the psychiatric observation cell, which I did several times.  (Those clinical contacts were done at cell-front, with other patients in cells just a few feet away.)  He was struggling a great deal.  He had fears about being sent to prison, was hearing voices, was smearing his own feces in his cell, and was sticking his head in the toilet.  On Sunday, May 30, a day I was not working, Mr. Marroquin was removed from the psychiatric observation cell, and custody staff moved him back into Ad-Seg.  No one informed me about custody staff moving Mr. Marroquin back into the Ad-Seg housing where he had previously decompensated, and I was not consulted about whether it was clinically safe for him to be returned to Ad-Seg following his removal from psychiatric observation.  That same day, Mr. Marroquin banged his head several times, placed his head in the toilet of his Ad-Seg cell, and finally died of acute water intoxication.  I still cry when I think about what happened to Mr. Marroquin; he should not have died.

27 Alonso Decl. ¶¶ 27-30.

28     281.    Mr. Marroquin's death was manifestly foreseeable and, with

appropriate mental health treatment and placement in an appropriate, non-isolation treatment setting, his death could also have been prevented. In my experience, this sort of egregious case would (and should) lead to a Jail system making significant changes to its policy and practices with respect to use of solitary confinement for people with serious mental illness or suicide risk. I can discern no such significant changes in the San Diego County Jail system in the wake of, or any time since, Mr. Marroquin's death.

**Suicide of Matthew Godfrey, November 2019 (Administrative Separation)**

282. Matthew Godfrey, a man with serious mental illness, died in a Central Jail Administrative Segregation cell that was filthy. He was found with torn clothing around his neck and a rope in his pants. The harmful effects of isolation on Mr. Godfrey's mental health were manifest from the condition in which he died. He was wearing five pairs of underwear and three pairs of socks. Although Jail medical staff initially reported Godfrey's death as a suicide, the medical examiner determined he died from a heart condition. According to the medical examiner's report, Godfrey's cell "was dirty and unkempt with paper waste and food debris strewn along the walls and floor."

283. Whatever the true or official cause of death, there can be no doubt that the isolating and terribly harsh solitary confinement conditions combined with the lack of treatment played a significant and even determinative role in Mr. Godfrey's death.

**V.     FINDING #5: THE SAN DIEGO COUNTY JAIL'S SYSTEM FOR SUICIDE PREVENTION IS DEFICIENT, FAILS TO PROTECT PEOPLE WITH SERIOUS MENTAL HEALTH NEEDS, AND CAUSES SERIOUS HARM.**

284. I am aware that San Diego County Jail has received much attention for the high number of suicides and mental health-related deaths over the last fifteen years, including from the California State Auditor in its February 2022 report, from Analytica Consulting for the San Diego Citizens' Law Enforcement Review Board

in its April 2022 report, from Disability Rights California in its April 2018 report, from national suicide prevention expert Lindsay Hayes in his 2018 report, from the San Diego Union-Tribune in its *Dying Behind Bars* reporting series in 2019, and more.

285.   I am aware of what is an extraordinarily high number of suicides and mental health-related deaths that have occurred in San Diego County Jail over the last several years.  My assessment for this case, however, does not rely on the quantity of such deaths, but rather the Jail's policies, practices, and procedures, including those that relate to suicide prevention.  It is my assessment that those policies, practices, and procedures are deficient in ways that have contributed to many in-custody deaths and that continue to put large numbers of incarcerated people at substantial and unnecessary risk of suicide.

286.   It must first be said that, until the deficiencies identified elsewhere in this report are remedied, these risks to incarcerated people will remain unacceptably high.  For instance, an adequate jail suicide prevention system requires: an effective mental health screening system (Finding #1), appropriate and timely psychiatric medication management practices (Finding #2), clinically appropriate inpatient and outpatient mental health treatment programming with system capacity to meet the needs of the population (Finding #3), and the elimination of the dangerous use of solitary confinement-type conditions that put people at risk of decompensation and suicide (Finding #4).

287.   Below I address additional suicide prevention-related deficiencies identified through my assessment of the San Diego County Jail system.

**A.    The Jail's "Detention Safety Program" Is Inadequate and Dangerously Outside the Norm of Clinically Adequate Jail Systems for Suicide Prevention.**

288.   In Finding #1, I describe deficiencies in the Jail's initial mental health screening system with respect to identifying and addressing suicide risk.  But even in cases where the general mental health screening or referral system do identify

1   potential suicide risk in a person in San Diego County Jail, there are significant

2   deficiencies in how that person is then treated.

3       289.   The Jail's "Detention Safety Program" (also referred to as "DSP" or

4   "Inmate Safety Program" or "ISP") begins with the use of a "gatekeeper," who is

5   (usually) a mental health professional charged with conducting an initial suicide risk

6   assessment for people that other staff identify as being a potential suicide risk.

7   During my Jail Facilities visit, I spoke with staff who serve in this "gatekeeper" role.

8   I learned that the "gatekeeper" evaluations are *not* comprehensive mental health

9   evaluations.  The "gatekeeper" assessment, by policy and practice, serves only to

10  evaluate a person for placement on suicide precautions, *not* to determine clinically

11  indicated mental health treatment.  It focuses on whether a patient is suicidal and

12  requires placement in a Detention Safety Program unit – specifically, a "safety cell,"

13  Enhanced Observation Housing (EOH), or a Psychiatric Services Unit Mental

14  Health Observation cell.  Notably, as discussed elsewhere in this report, meaningful

15  mental health treatment is not provided in *any* of these placements.  This is a serious

16  deficiency, as addressing suicidality effectively *requires* providing clinically

17  indicated treatment.

18      290.   The gatekeepers whom I interviewed acknowledged that they generally

19  play no role in identifying treatment and mental health program placement needs.

20  One clinician stated that he cannot provide a "direct route" to the Outpatient

21  Stepdown Unit unless the patient had previously been housed there.  Such a policy

22  is deeply undermining of the objective to keep people at risk of suicide safe.  A

23  person coming off of suicide precautions should be promptly transitioned to the

24  appropriate mental health placement and level of care.  But what I saw, time and

25  again, were patients who had become suicidal in a particular placement (commonly,

26  Administrative Separation), then spent a period of time on suicide precautions, only

27  to be discharged back to the same placement where they had become suicidal, with

28  no adjustment in their treatment plan or program.  This is a recipe for disaster for

1    people at elevated risk of decompensation, self-harm, or suicide.

2    291.    The "gatekeeper" assessment is meant to determine "Current Suicide

3    Risk Acuity"— using a "high" or "low" designation—which seems to carry great

4    weight in determining whether a particular suicide precautions placement is needed.

5    In my review of records, I found great variability in the extent to which

6    "gatekeeper" staff discussed the reasoning for a "Current Suicide Risk Acuity"

7    determination, and a lack of documentation sufficient to ensure consistency and

8    quality of these assessments.  My records review revealed that people were placed

9    on, or cleared from, suicide precautions in the Detention Safety Program without

10   sufficient clinical justification.

11   292.    A lack of guidance – or, more specifically, circular guidance – in the

12   Jail policy (MSD.S.10 – Suicide Prevention & Patient Safety Program) likely

13   contributes to this problem.  The policy states:

14   Suicide risk designation is defined as follows:

15       1. Acute low risk – the patient is currently deemed at low
     imminent risk of suicide ….

16       2. Acute high risk – the patient is currently deemed at imminent

17   high risk for suicide …

18   MSD.S.10, SD_117715.

19   293.    Both the Hayes report and the DRC Report make important

20   recommendations on how to address deficiencies in this Detention Safety Program

21   system, including removal of the vague low/high risk designations and replacement

22   with a more appropriate observation system.  Many of those recommendations were

23   not implemented or only partially implemented by the San Diego County Jail

24   leadership.

25   294.    For example, Mr. Hayes recommended that a person's initiation or

26   continuation on suicide precautions should be based on *current* suicide risk

27   (Recommendation #23).  The Jail declined to implement this recommendation, and

28   policy and practice continue to require that a person receive "two consecutive low

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

risk designations," spaced out over as long as 24 hours, in order to be removed from Detention Safety Program suicide precautions.  As discussed below, suicide precaution placements in safety cells or Enhanced Observation Housing are extremely restrictive. To keep a person in such placements beyond the period their level of risk warrants is clinically problematic: doing so sends a message to a patient that if they report suicidality, they will face restrictive conditions for extended periods and in ways that seem punitive.  What I heard from patients again and again is that they refrain from reporting suicidal thoughts for fear of punitive-feeling restrictions and conditions in the Detention Safety Program.  This increases rather than decreases suicide risk and detainee safety.

295.   It is also problematic that there is no policy expectation that "gatekeeper" suicide risk assessments be done confidentially.  Quiroz PMK Dep. at 167 ("It does not specifically state in the policy that [the suicide risk assessment] must occur in a confidential location.").  In reviewing the mental health records system, I observed that there is no place on the "Gatekeeper" clinical form to document whether a suicide risk assessment was done confidentially, and I generally saw no such information documented.  To ensure an adequate suicide risk assessment, it is essential that they be done confidentially, absent specific circumstances where it is not possible based on current individualized security concerns.

296.   Inadequate supervision and treatment after a patient is discharged from suicide precautions is another major concern.  Again, the "gatekeeper" who removes a person from suicide precautions generally plays no role in facilitating clinically indicated supervision and treatment after that.  Clearance from suicide precautions should come with a thorough clinical assessment to guide implementation of an individualized treatment plan.  This San Diego County Jail's failure to do this, by policy and practice, puts people at substantial risk of serious harm.

297.   Take the recent case of ███████ a man with a psychiatric and

1  suicide attempt history.  He arrived at the Jail in ███ 2023, at which time the

2  "gatekeeper" found him to be extremely distressed, tearful, endorsing suicidal

3  thoughts, and withdrawn when asked about how he might hurt himself.  He was

4  placed in the Detention Safety Program, in an Enhanced Observation Housing unit.

5  He was cleared from suicide precautions by mental health staff the next day when he

6  reported that his symptoms had resolved.  He was referred to custody classification

7  staff for housing, without a clear treatment plan in place.  Follow-up with mental

8  health was recommended to occur within 24 hours, but based on my review, no such

9  follow-up occurred.  Given Mr. ███'s initial level of distress, rapid turnaround, and

10  other factors in his psychiatric history that put him at elevated risk, it would have

11  been prudent to implement enhanced monitoring and prompt clinical assessment,

12  but this did not occur.  Within a couple days of being cleared from suicide

13  precautions, and without mental health treatment in place, Mr. ███ jumped off the

14  top tier of his housing module, fell an estimated 20 feet, landed on the cement floor,

15  and was found in a pool of his own blood.  He was transported to the hospital with

16  extensive injuries, including pelvic, facial, and rib fractures, kidney, liver, and lung

17  lacerations, and traumatic brain injury.  SD_965918-966805.

**B.     The San Diego County Jail's Detention Safety Program Placements for Patients in Psychiatric Crisis Are Harsh, Extraordinarily Restrictive, and Often Clinically Counterproductive.**

**1.     The San Diego County Jail System's Use of "Safety Cells" Is Inhumane and Dangerous.**

298.   In 2018, Disability Rights California described the conditions and procedures of "safety cells" as follows:

> These Safety Cells are extraordinarily harsh settings.  They are small, windowless rooms with rubberized walls.  There is no furniture or bedding, leaving the individual to sit or lie on the floor.  Safety Cell doors contain a food slot and a small viewing window that faces a hallway.  Cells have a ceiling light that is illuminated 24/7, and a camera for remote observation by custody staff.

> The cells are completely barren, with no sink, toilet, or running water. Inmates defecate and urinate in a grate on the ground.  In June 2017, a

> Grand Jury evaluation of jail conditions found a "very strong" smell of urine surrounding the Safety Cells.
>
> Inmates placed in these Safety Cells are stripped naked and given only a "safety smock" made from heavy tear-free material fastened with straps or Velcro. The garment is open at the bottom, and no underwear is provided. Inmates receive no books or any other personal property while in a Safety Cell.
>
> Placements in a Safety Cell are approved by the Watch Commander, in consultation with medical staff. An initial medical assessment must be done within 30 minutes after medical staff is notified. Department policies require observation of inmates placed in Safety Cells by custody staff at least twice every 30-minute period and by medical staff every four (4) hours. The jail's policy is for a mental health consultation to occur within 12 hours of placement, and a medical evaluation every 24 hours.
>
> There is no time limit for how long an inmate may be kept in a Safety Cell.

DRC Report at 19, DUNSMORE012942.

299.  The DRC report recommended that the Jail "[g]reatly reduce the use of 'Safety Cells' for individuals with mental health needs. Inmates placed in Safety Cells as a result of behaviors related to mental health symptoms should not be housed there for longer than six (6) hours. At that point, if there is no less restrictive housing appropriate, they should be considered for placement in inpatient care (including the PSU)." *Id*. at 32. Mr. Hayes concurred in the six-hour time limit recommendation. Hayes Report at 71, DUNSMORE0117148. The County declined to implement this, or any other, time limit on safety cell placement.

300.  Little has changed since 2018. Safety cell conditions appear the same. Although the County reports that safety cell use has decreased in recent years, I observed many cases of people being placed in safety cells, sometimes for extended periods of time. The policy on safety cell use has not meaningfully changed since the 2018 DRC Report. There is still no time limit. I strongly urge the Jail to implement the DRC and Hayes recommendation that no one be held in a safety cell beyond six (6) hours. If a patient is still an acute risk of suicide at that time, they should be moved to an inpatient placement where clinically indicated treatment and

[4541606.8]

1  supervision are provided.

2      301.  Safety cell conditions remain very concerning.  During my site

3  inspection, I observed the safety cells at Central Jail.  In three cells, there was

4  standing water in the bottom of the grate in the floor (where people must defecate





*San Diego County Central Jail "Safety Cell"*
*for People at High-Risk of Suicide*

*Central Jail Safety Cell floor grate*
*(with standing liquid not drained),*
*where people in crisis must urinate and defecate*

19  and urinate); it appeared that they were not draining properly, creating a real

20  sanitation concern.  Photos taken from my observation are provided here.

21      302.  Conditions are so harsh in the safety cells that people deny having

22  suicidal thoughts to avoid being placed in them, or to get out of them.  The Jail

23  mental health coordinator stated that the safety cells "don't lend themselves well to

24  a therapeutic environment."  Quiroz PMK Dep. at 68.  I agree, and would add that

25  the conditions in these safety cells are in general *counter*-therapeutic.

26      303.  The recent case of ██████████ illustrates how damaging and

27  counter-therapeutic a safety cell placement can be for a patient in San Diego County

28  Jail.  This young woman, with a well-known history of serious mental illness, was

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

placed in a safety cell soon after being booked in ████ 2024, due to disorganized behaviors and agitation secondary to uncontrolled psychosis.  For approximately 48 hours, she remained in the safety cell naked, smearing feces and menstrual blood on the walls.  While some of her behaviors were attributed to psychosis, when staff interviewed her through the food flap in the cell door, she emphasized distress from needing "to be let out to shower, use the bathroom, and be with other people."  Staff documented that she was "naked standing facing the wall dancing, making incoherent statements.  Her cell was messy, she sm[ea]red her drink, water or menstrual blood because it was red all over, her food was smeared on the floor.  She did not eat anything.  She refused her breakfast and did the same thing with lunch.  She continues to seem[] to be manic, unable to follow directions.  Refusing to eat or drink, refusing meds, refusing to vouch for her safety. [P]er sworn, she is getting worse … she pee[d] o[n] the floor all over her cell."  Even after this observation, she remained isolated in the safety cell for more than 24 additional hours.  When she was finally transferred to the Psychiatric Services Unit, she described how "I was in the safety cell for several days on my period so I am dirty and I have not been able to shower.  They kept giving me water which affects my period but I was trying to hold it in." Ms. ████ 's treatment needs were not met while the was in the safety cell, and she should have promptly been provided an acute inpatient level of care instead.

### 2. The San Diego County Jail System's Use of Enhanced Observation Housing Cells Are Punitive, Clinically Counterproductive, and Dangerous.

304.    Both Lindsay Hayes and DRC expressed concerns about the Enhanced Outpatient Housing (EOH) units in San Diego County Jail in 2018.  The DRC Report described these units in 2018 like this:

> Even though EOH inmates, in contrast to inmates in Safety Cells, generally have access to a toilet, they too endure conditions of extreme isolation and deprivation.
>
> We observed and met with several inmates in EOH units.  Consistent

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

with County policy, all clothes and underwear are taken away, and inmates receive a safety smock, two blankets, and shower shoes. However, we reviewed multiple records documenting that EOH inmates were left naked, with no safety smock, and in some cases not even provided a blanket. Some are forced to sleep on a thin mat placed on the floor. Many inmates complained about being cold, even with the smock and blankets.

Inmates have no access to personal property, television, recreation yard time, or visits from family. Inmates in the EOH units eat from paper trays and a paper safety spoon, and in some cases are restricted to eating without any utensil.

Inmates in the EOH units with individual cells complained about extremely limited time outside their cell and excessive isolation.

Mental health staff appear to recognize the extreme conditions in the EOH units. In one inmate's chart we reviewed, a psychiatrist recommended that the facility "discontinue EOH as the isolation is inhumane and likely to compromise [this inmate] Women's EOH Cell in Medical Isolation (Las Colinas) psychologically." We learned that some inmates deny having suicidal thoughts so they can get out of the EOH unit, or avoid placement there, given the harsh conditions.

DRC Report at 21-22, DUNSMORE01249242-0125012.

305. Little has changed in the EOH units since 2018. Conditions in these units remain defined by extreme isolation and deprivation. Everyone in the unit is stripped of their clothes and made to wear a safety smock, the heavy garment that is open at the bottom and provides little modesty. (Thankfully, we observed some people in the EOH units having access to a book, and we saw one man in EOH (photo below) who was permitted to use the phone to speak with his loved ones.) There was no sign that patients had any opportunity for normal human in-person interactions with others; they were completely isolated.



*Man in "Safety Smock" in Central Jail's Enhanced Observation Housing" Unit for People at Risk of Suicide, Alone in the Dayroom, Sitting on the Floor and Talking to Loved One on the Phone.*

306.    Suicide prevention expert Lindsay Hayes criticized these conditions in 2018, calling them "overly restrictive and seemingly punitive" and "harsher than for those [people] on segregation status." He stated that isolation "not only escalates the inmate's sense of alienation, but also further serves to remove the individual from proper staff supervision." He noted "the real possibility that [EOH] measures were contributing to an inmate's debilitating mental illness." He also observed that visits with mental health staff were non-confidential and cell-side. 2018 Hayes Report at 40-42, DUNSMORE0115368.

307.    On the day of our visit at Central Jail, there were four (4) patients in the EOH unit. The floor staff told me that "several people were cleared" shortly before we arrived. A deputy who worked regularly in the unit told me there is an average of 7-to-8 people in the EOH unit on a given day. He told me the EOH census reaches as high as 14 patients with some frequency.

308.    I spoke with two patients in the EOH unit. Each man showed signs of very serious mental illness. They reported that they were receiving medications but

1  no other forms of mental health treatment, which was clearly clinically indicated.

2      309.  My review of other individual cases with extended EOH placements

3  revealed significant concerns regarding access to necessary care. One transgender

4  patient, ███████████ had numerous episodes of self-harm and suicidal

5  ideations while at the Jail, partly due to poor distress tolerance but exacerbated by

6  the poor conditions and isolation in custody. She was repeatedly placed on

7  extensive lockdowns and in safety cells and EOH cells, where she had no access to

8  out-of-cell activities or opportunities to interact with others. Records show that she

9  frequently endorsed suicidal ideations knowing it would trigger additional mental

10  health assessments that might provide her with space to express her frustrations and

11  even to "get out of my cell a little." She shared with mental health staff that she

12  made suicidal statements "so that they will let me talk to somebody." This patient's

13  experience speaks strongly to the need to provide meaningful mental health

14  treatment, rather than further isolation and restriction as seen in the EOH units and

15  safety cells.

16      310.  Another man, ███████████ was placed in EOH and referred to the

17  Detention Safety Program in ███████ 2024, based on various factors including this

18  being his first time in jail, past trauma, and other stressors. He disclosed

19  intermittent passive suicidal thoughts but no specific plan or desire to harm himself,

20  and he did not exhibit dangerous behaviors. He did not demonstrate imminent risk

21  to self or others, but a decision was still made to place him in the highly restrictive

22  EOH unit. This decision was not clinically justified, and the automatic, extreme

23  restrictions that come with EOH placement, such as removal of clothing and loss of

24  out-of-cell activities, almost certainly served to further exacerbate his distress.

25      311.  During my site visit, I met with ███████████ a patient in an

26  EOH unit at Las Colinas. (Unlike the Central EOH unit's celled housing, this was a

27  small dorm setting, with a couple of women in the unit on the day I visited.) She

28  reported how she was previously put in a safety cell, where she lay in a pool of her

own urine for a period of time. She was upset about her highly restrictive and harsh EOH and safety cell placements, and also about not receiving psychiatric care despite her history of taking psychiatric medication. According to her records, she was not seen by a psychiatric provider for ten (10) days after she arrived at the Jail. (I met with her on Day 6.) During this 10-day period, she bounced between EOH, a safety cell, and a community hospital emergency department for swallowing a staple. She engaged in other suicidal gestures as well. While she clearly needed a high level of supervision for suicide precautions, it is unacceptable that she did not see a psychiatric provider for so long while she presented in this way. When she finally saw a provider, she was started on psychiatric medications, according to the records. It is my assessment that her suicidality could have been avoided or mitigated if she had received timely psychiatric care. Yet the Jail's system imposed exceedingly harsh restrictions to prevent suicide while also *delaying* the psychiatric care necessary to actually treat her condition.

### 3. Blanket Custodial Restrictions on Clothing, Bedding, Property, and Privileges for Patients on Suicide Precautions Does Not Meet the Standard of Care and Is Harmful.

312.   Blanket custodial restrictions that harm people with serious mental health needs are pervasive in the San Diego County Jail system. This is particularly true, and harmful, in the context of the Jail's suicide prevention-related policies and practices. I discuss this issue further in Finding #8, below.

313.   As the Jail mental health coordinator confirmed, the provision of regular clothing and bedding for people on suicide precautions is based entirely on custodial policy, with no consideration given to individualized clinical judgment. Quiroz PMK Dep. at 146, 153-54. Ms. Quiroz confirmed that the denial of "routine privileges" like family visits, telephone calls, and recreation, are entirely the purview of custody staff. Quiroz PMK Dep. at 156 ("That all happens outside of the clinical world. … [T]hat's in the very custody world if -- when somebody is allowed a visit, when somebody is allowed phone calls, recreation and how those

1  happen throughout the facility.").

2      314.   Remarkably, Jail leadership are well aware that the standard of care is

3  for these clothing, bedding, property, and privilege decisions *to be based on clinical*

4  *judgment*, not custodial directives.  A draft policy, dated June 2022, that Ms. Quiroz

5  described as an "attempt of merging a Naphcare policy with existing San Diego

6  policy," lays out a procedure on this topic that is generally consistent with the

7  standard of care for treatment of people at risk of suicide in the Jail setting.

8  (Ms. Quiroz stated that the policy "is not in place at this time" at the Jail, and that no

9  County staff have been trained on it.)  Quiroz PMK Dep. at 151-52.  Still, quoting

10 from this *unimplemented* policy here is useful, as it provides a starting point for San

11 Diego County Jail to remedy its deficient practices and to provide clinically

12 appropriate care and conditions to people placed on suicide precautions:

13          *Suicide Precautions:*

14          ...

15          **b) All clinical decisions regarding the removal of a patient's clothing,**
           **bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and**
16         **privileges shall be commensurate with the level of suicide risk as**
           **determined on a case-by-case basis by a qualified mental health**
17         **professional and documented in TechCare**.  *This does not apply to*
           *custody-ordered restrictions, only clinically ordered restrictions.*

18         **c) If a qualified mental health professional determines that a**
19         **patient's clothing needs to be removed** *for reasons of safety, health*
           *staff will not restrict the use of a safety smock and safety blanket.*

20
           **1) Restoration of clothing and other items are clinically**
21         **assessed by the mental health professional** *with each evaluation*
           *completed at least every 24 hours.*

22

23 Quiroz PMK Dep. Ex. 8 (B-05 Suicide Prevention and Intervention) (emphases

24 added).

25      315.   A review of patient ███████████████'s records illustrate the harm

26 of custody-driven, blanket-restriction-based policies that fail to consider

27 individualized clinical information.  When Ms. ███████ came into custody in

28 ██████ 2022, she was placed on medical observation for substance withdrawal.  Two

1    days later, she was seen standing on her sink, which prompted concern from

2    deputies.  When they checked on her, she attempted to leave the cell which resulted

3    in use of force and being placed on green-bander (high restriction) status.  She was

4    moved to a safety cell and then Enhanced Observation Housing, where she tried to

5    jump off a sink four days later.  When asked about her behaviors, she shared having

6    suicidal thoughts and worsening depression primarily driven by the restrictive nature

7    of her environment, including physical isolation, no regular access to showers ("I

8    want to take a shower and be able to wear clothes"), and not being able to call her

9    mother who was her main support ("I was upset because I have not been allowed to

10   make a phone call.  I want to call my mom.").  While the basis for the medical

11   observation, safety cell, and EOH placements was to ensure this patient's safety, the

12   restrictions that came with these settings were counterproductive, as they led to

13   exacerbation of her suicidality and mental health symptoms.

14        316.    The provision of clothing, bedding, possessions, and privileges for

15   people on suicide precautions should be commensurate with their current condition

16   and suicide risk, as determined by individualized clinical judgment (with custodial

17   input as appropriate).  Suicide prevention expert Lindsay Hayes and Disability

18   Rights California each made detailed recommendations on this topic in their 2018

19   reports about San Diego County Jail.  Hayes Report Recommendations 17 & 18,

20   DUNSMORE0117148; DRC Report Recommendation 12, DUNSMORE0124942.

21   These recommendations, along with the other recommendations in those

22   comprehensive reports, should be *fully* implemented without delay to address the

23   very serious and harmful policies and practices that persist in the Jail to this day.

**C.    There Is a Dangerous Lack of Adequate Monitoring and
        Supervision for People at Heightened Risk of Suicide.**

**1.    Lack of Constant Observation for High-Risk Suicidal
        Patients When Clinically Indicated.**

27        317.    It is well established that some people at acute and high suicide risk

28   will require *constant* observation for a period of time to ensure their safety.  Suicide

prevention expert Lindsay Hayes "strongly recommended" that the San Diego County Jail provide this level of observation whenever clinically indicated. Hayes Report Recommendation 20, DUNSMORE0117148. The 2018 DRC Report found that "the [San Diego County Sheriff's] Department's policies lack sufficient clarity about the levels of risk and the levels of observation specified for each level of risk. The policy should provide for **constant observation** of inmates at high risk whenever clinically indicated." DRC Report at Appx. A, p.17, DUNSMORE0124942. The 2017 NCCHC Report (at 100) also criticized the Jail's system's "extremely limited use of one-on-one monitoring, or what is identified as constant watch in NCCHC standards." DUNSMORE0260618.

318.  Today, according to staff, constant observation for acutely suicidal patients is available only in the Psychiatric Services Units observation cells at Central Jail and Las Colinas. And as one Central Jail psychiatrist shared with me, there is "always" a waitlist for those observation cells. This was also confirmed by Jail mental health clinician Aseel Ross, who observed patients waiting as long as a month after being referred for placement in the Psychiatric Services Unit. Ross Dep at 89-90. The policy and practice in this Jail must be for constant observation to readily and promptly provided for patients across the system whenever clinically indicated.

319.  The risk of harm to incarcerated people with acute suicidality when adequate monitoring and supervision are not provided is substantial. In 2018, DRC "observed video footage of one troubling suicide attempt in an Enhanced Observation Housing (EOH) Unit … . Inmates are monitored by overhead video camera and per Department policy, should receive in-person checks at least once every 15 minutes. The video shows the inmate standing naked on the cell's desk, praying and preparing to jump, for over 14 minutes. He then dove head-first onto the floor. Four more minutes passed before custody staff appeared and summoned emergency medical care." 2018 DRC Report at 15, DUNSMORE0124942.

**2. Jail Staff Continue to Conduct Inadequate Safety Checks in Solitary Confinement-Type Conditions, Putting People at Substantial Risk of Serious Harm.**

320.   In my May 2022 declaration (¶¶ 33-40), I described a key deficiency with respect to the provision of safety checks to monitor and ensure the safety and well-being of incarcerated people at heightened risk of harm, particularly in the Administrative Separation and other solitary confinement-type units.

321.   It is well established that, given the high incidence of suicide attempts and other medical or mental health emergencies in the jail setting, the practice of conducting appropriate "safety checks" is essential to protect human life.  Safety checks entail direct observation of each individual to ensure that they are alive and to check for signs of medical or psychiatric distress.

322.   The standard of care for safety checks is also well established, specifically for solitary confinement-type housing units like those I observed at San Diego County Jail Administrative Separation units.  In recognition of the risks posed to people in solitary confinement-type units, it is the standard that safety checks in such units occur twice every hour at intervals no longer than 30 minutes at unpredictable and intermittent times.  The American Correctional Association advises the practice that "[a]ll special management (segregation) inmates are personally observed by a correctional officer at least every 30 minutes on an irregular schedule" Standard 4-ALDF-2A-52, American Correctional Association (2004), Performance-Based Standards for Adult Local Detention Facilities, 4th Edition, Lanham, MD.

323.   The San Diego County Jail has failed to implement this basic, common-sense practice that can save lives.  Pursuant to San Diego Sheriff's Department policy I.64, custody staff conduct safety checks in Administrative Separation just once every hour, the same frequency as occurs in general population housing units, and half as often as the recommended frequency.

324.   The San Diego County Jail policy for conducting safety checks in

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  Administrative Separation only hourly, rather than at least every 30 minutes at

2  staggered intervals, places people in great danger, especially people with mental

3  illness, at risk of suicide, or with risk factors for drug/alcohol withdrawal or

4  overdose.

5      325.   Having visited the Jail facilities and several Administrative Separation

6  units, my concerns have now multiplied.  First, these units are among the harshest,

7  most restrictive solitary confinement units I have ever observed.  *See* Finding #4,

8  above.  The suicides of Mr. McDowell and Mr. Settles demonstrate that these units

9  remain exceedingly dangerous.  Second, I observed several deputies conducting

10 their hourly (not twice-hourly) safety checks, and those checks were far too rapid,

11 cursory, and insufficient to serve their purpose – to meaningfully observe a person

12 to ensure they are alive and safe.  These checks must be frequent and they must be

13 done right.

14     326.   Other outside evaluators have, over and over and over again, found that

15 the safety check policies and practices in San Diego County Jail are out of

16 compliance with minimum standards, in ways that put people with serious mental

17 illness at substantial risk of serious harm.

18     327.   First, **Lindsay Hayes, national suicide prevention expert who**

19 **reviewed the Jail's system in 2018:** "Given the strong association between inmate

20 suicide and segregation housing and consistent with national correctional standards,

21 it is strongly recommended that [San Diego County Jail] DSB officials give strong

22 consideration to increasing deputy rounds of such housing units from 60-minute to

23 30- minute intervals."  Hayes Report, DUNSMORE0117148-0117247, at 57 (citing

24 American Correctional Association standard).  The Sheriff's Department rejected

25 the recommendation: "This recommendation has been implemented," it wrote, *but*

26 *only* insofar as the "Sheriff Department has given strong consideration to increasing

27 deputy rounds of restricted housing units from 60 minutes to 30 minute intervals.

28 However, given the challenges regarding the physical layout of jail facilities, the

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    numbers of inmates, and care necessary to properly conduct these checks, the

2    Department has determined that it would not be feasible at this time to make this

3    change." County Response to Hayes Report at 12.

4        328.    Second, **the California State Auditor, February 2022**: "Sworn staff

5    did not always adequately check on incarcerated individuals.  Some individuals

6    were found hours after their deaths, negating the opportunity for lifesaving

7    measures" California State Auditor Report at 19. "Based on our review of video

8    surveillance footage, we observed multiple instances of sworn staff who spent no

9    more than one second glancing into an individual's cell, sometimes without

10   breaking stride as they walked through the housing module …. Staff later

11   discovered individuals unresponsive in their cells, some with signs of having died

12   several hours earlier, as detention staff described some of these individuals as stiff

13   and cold to the touch. … In another example, the Sheriff's Department's records

14   indicate that a deputy did not perform a required safety check in a housing area, in

15   part because of poor communication between this deputy and the station deputy.

16   One hour after the deputy should have performed this check, sworn staff found an

17   individual in this housing area unresponsive after attempting suicide.  A physician

18   pronounced this individual deceased at the scene after staff and paramedics were

19   unsuccessful at saving the individual's life. …  [A] safety check that does not

20   involve any meaningful observation of an individual is ineffective and

21   inadequate. … The assistant sheriff of detentions indicated that the department has

22   an informal process for assessing the quality of safety checks, which can include

23   watching video footage.  However, the Sheriff's Department has not documented

24   this assessment process in its policy, and establishing an informal practice does not

25   ensure that each facility's management team will consistently verify the quality of

26   safety checks." *Id.* at 25-26.

27       329.    Third, the **San Diego County Citizens' Law Enforcement Review**

28   **Board (CLERB), regarding Death of Joseph Carroll Horsey, December 24,**

**2017:** CLERB's investigation revealed that, during the initial body examination at the scene, Mr. Horsey's body had undergone postmortem changes that suggested that he had been dead for hours before he was discovered. Resuscitative efforts were impractical as rigor mortis and livor mortis had already set in when his body was found by staff. In this case, a custody deputy documented that all safety checks were logged. However, the jail surveillance video recordings showed sworn staff and nursing personnel walking by the module, versus physically entering the unit to observe each inmate for obvious signs of medical distress. Jail surveillance video recordings did not reveal any deputy entering the module to conduct safety checks as required.

330. And again, the **San Diego County Citizens' Law Enforcement Review Board (CLERB), regarding Death of Blake Edward Wilson, January 26, 2020**: CLERB reviewed jail surveillance video, and found that the custody deputy looked into the cell of Mr. Wilson for approximately one second during a safety check. CLERB found the safety check prior to Mr. Wilson's body being discovered "was not sufficient or long enough" to adequately conduct a safety check.

331. <u>Fourth</u>, **Disability Rights California, April 2018**: DRC reviewed video footage of individuals who died in custody. The DRC clinical experts described their findings: "Inadequate security/welfare checks (also known as 'proof of life checks') were observed via video review in a number of cases in which inmates died by suicide. In at least one case, hourly safety checks were not completed pursuant to Jail policy during the time period the inmate died by suicide. In video and record reviews of at least three inmates who died, checks were completed inadequately – either not completed timely or in manner that failed to meaningfully assess the welfare of the inmate. For instance, in one case, the video showed two deputies enter the housing unit and separate to allow one to check the upper tier and one the lower. The deputies completed their checks of 40 cells in 17

seconds, far too quickly to complete meaningful checks.  The deputy checking the upper tier did not stop except at the first cell and did not appear to take enough time to establish that the inmates in each cell were alive and safe." DRC Report, DUNSMORE0124942-0125012, Appendix A at 15-16.

332.   These findings by other entities were noted in my May 2022 declaration in this case.  And yet, the deficient policy and practices persist today.  In August 2022, six months after the State Auditor Report's scathing findings on inadequate safety checks, **Matthew Settles** – a man who was arrested at an inpatient psychiatric hospital and soon thereafter placed in an Administrative Separation cell at the Jail, where he severely decompensated – died by suicide, with the Jail's own findings that at the time a deputy discovered his body hanging in his cell, it had been *more than 1 hour and 15 minutes* since the last safety check (as confirmed by post-mortem video surveillance review).  Emergency medical staff arrived too late to conduct life-saving measures for Mr. Settles.

333.   I am aware that other county jail systems have committed to conducting safety checks for all people in solitary confinement-type housing at least every 30 minutes, at staggered intervals, with timely documentation and regular auditing by supervisory staff for quality assurance purposes.  Examples include Los Angeles County, Sacramento County, Santa Barbara County, and Orange County, among others.  California Department of Corrections and Rehabilitation (CDCR) segregation housing has also implemented this practice.

334.   Quality assurance audits with appropriate accountability measures must also be in place to ensure that Jail staff are conducting meaningful observation of each incarcerated person.  The Jail must track when a unit's safety checks start and when they are completed as part of its quality assurance protocols.

335.   San Diego County Jail's policy and practices relating to safety checks remain deficient, people have died as a result, and more people will remain at risk of death and other serious harm until this deficiency is remedied.

### D.    There Remain Grave Concerns about Dangerous "Attachment Points" that Can Be Used for Hanging in High-Risk Housing Areas.

336.   As part of an adequate suicide prevention program in jail system, it is important to remove and address physical plant hazards that may facilitate a person's suicide, particularly in high-risk settings like solitary confinement units, acute and outpatient mental health units, and mental health observation units.  I understand that Lindsay Hayes and others have strongly encouraged San Diego County to address this issue, including by retrofitting housing areas to remove "attachment points" that a suicidal person can use to hang oneself.  During my site visits, I observed the product of several such retrofits to remove attachment points that can be used for self-hanging in certain housing areas.  This is a positive development.

337.   I did, however, observe high-risk housing areas that appear to have features that can be used as attachment points for hanging.  Often, this was due to uncompleted maintenance and the poor conditions of the facility.  Maybe most notably, I observed old metal panels on the ceiling of the safety cells at Central Jail that have become separated from the ceiling surface.  In my experience, these gaps can be – and have been – used by suicidal detainees trying to hang themselves.

338.   I strongly urge San Diego County to conduct an audit – including an update of any audits previously completed – to ensure that there are not dangerous attachment points in housing areas that can be used for hanging oneself, particularly in high-risk areas of the Jail facilities.  Suicide prevention expert Lindsay Hayes has developed guidance for completion of such an audit, which may be used as a starting point.

1
2
3
4
5
6
7
8
9



*Panels separated from ceiling of Central Jail Safety Cell,*
*creating potential "attachment point" suicide hazards.*

339.   I further have concern that San Diego County Jail has not implemented important recommendations from its own Critical Incident Review Board.  Take the May 2020 death of **Joseph Morton**, a man who made suicidal statements on several occasions after being taken into custody.  He was placed in the Enhanced Observation Housing unit and was subsequently returned to general population housing.  Five days later, he was found hanging in his cell, having used a blanket that was tied around the upper bunk of his cell.  The Critical Incident Review Board reviewed the case and recommended ███████████████████ ███████████████████████████████ The County declined to implement the recommendation, ███████████████ ███████████████████████████ ████████████████████████████████ ███████████████████████████████ ██████████████████████████████ ████████████████████████████████ ███████████████████████████ █████████████

340.   While recognizing ████████████████████████ ███████████, this response is deeply concerning.  The response does nothing to

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1   address the real (and, in Mr. Morton's case, realized) fatal risk of people discharging

2   from suicide precautions. The Jail commander makes no mention that clinical

3   judgment would or should be used to ensure safe housing placements for people

4   discharging from suicide precautions. And as I have previously discussed, it is very

5   concerning that the Jail commander's response accepts as a seemingly immutable

6   fact that administrative segregation housing is "████████████████████████

7   ████████████████."

8           **E.      The San Diego County Jail's Suicide and Mental Health-Related
                      Death Review and Quality Improvement Processes Are Deficient.**
9

10          341.   A well-functioning jail mental health care system must have a quality

11  improvement program designed to identify problems, implement and monitor

12  corrective action, and study its effectiveness. This includes meaningful and

13  coordinated review of in-custody suicides and mental health-related deaths. The

14  death review process at San Diego County Jail, including for suicide and mental

15  health-related deaths, has significant gaps and repeated failures in documentation

16  and in substance. This deficiency dates back several years, as noted in the 2018

17  DRC Report, which found that the Jail system "does not have a functioning quality

18  improvement program. … there is a need for improved quality improvement

19  processes regarding mental health/suicide risk screening, clinical assessments,

20  individual suicide and suicide attempt reviews, and other aspects of a correctional

21  mental health care and suicide prevention program." DRC Report,

22  DUNSMORE0124942-0125012 at Appx. A p.24. Such deficiencies persist.

23          342.   Mr. Barkley, a NaphCare Person-Most-Knowledgeable witness,

24  recently testified that autopsies are not always completed. Barkley NaphCare Dep.

25  at 23-24. He acknowledged that portions of psychological autopsies that should

26  have been filled out for recent San Diego County Jail suicides were left blank. *Id.* at

27  20-47. Such gaps in death review procedures are consistent with my findings in

28  reviewing suicide and mental health-related death reviews.

343.   There is a lack of an effective quality improvement process relating to suicide prevention and other issues regarding in-custody deaths.  Assistant Sheriff Theresa Adams-Hydar confirmed as much:

> Q: Was there a specific discussion about bringing down the in-custody deaths and how to do that? Was there, for example, a task force or a committee designed to come up with that approach?
>
> A: A task force?  No.  A committee?  No.  Just we're running our bureau.  There wasn't any group focused specifically on in-custody deaths.

Adams-Hydar Dep. at 49.

344.   The mental health-related death of **Lonnie Rupard,** described earlier in this report, offers insight into the lack of commitment to sufficient quality improvement in the wake of in-custody deaths.  After his death, Jail leadership described implementing a "multidisciplinary" wellness check practice for high-risk detainees: "They go to – cell by cell by cell and, essentially, knock on the cell, talk to the incarcerated person:· 'Hey, how are you doing? How are you feeling? Do you -- would like to see a nurse today? Do you want to see a mental health professional? Is there anything that you have going on?'" Adams-Hydar Dep. at 47-48.  This practice has some promise, but has never made its way into Jail policy or quality assurance processes.  Adams-Hydar explained why the Jail leadership chose not to do so:

> Adams-Hydar: So it's not in policy.  It's something that was a directive and above and beyond.  It's not even a Title 15 requirement for the State.  It's something very unique to San Diego Sheriff's Department that we started to take care of our population.
>
> Q: Why was it not ensconced in a policy?
>
> A: Because it's above and beyond the requirement for what we need to do.
>
> …
>
> Q: Is there a log of wellness checks that's kept?
>
> A: As far as I know, they're putting them in our JIMS, or Jail Information Management System.  And I think the drop-down is "Wellness Check."

1      Q: And are those being audited to ensure that the wellness checks are
2  actually conducted?

    A: There's no need for an audit because they're not mandated by state
3  law or policy and procedure.

4  Adams-Hydar Dep. at 83-84.  In my experience, this sort of remedial action—

5  without policy or auditing to ensure implementation—is not an effective method to

6  correct systemic deficiencies related to something as serious as the issue of suicide

7  prevention.

8      345.   Nor does the independent Civilian Law Enforcement Review Board

9  (CLERB) in-custody death review process effectively and comprehensively identify

10  deficiencies for Jail suicides, and thus cannot be relied upon to facilitate necessary

11  improvements.  This stems in substantial part from the limited jurisdiction of

12  CLERB—most obviously, the fact that health care staff, operations, and records are

13  all beyond CLERB's investigative jurisdiction.  CLERB's review, as designed,

14  looks only at custody staff conduct and custodial operations.  What this means is

15  that CLERB is, by its own design, missing half the story in every death.  Meaningful

16  identification and remediation of systemic deficiencies behind in-custody suicides

17  and other mental health-related deaths is therefore impossible.

18      346.   The recent suicide of Mr. Ornelas, discussed earlier in this report,

19  illustrates this well.  In CLERB's investigative findings, it found that "there was no

20  evidence to indicate that either Ornelas, nor his cellmates, nor anyone else had

21  informed jail staff that Ornelas was suicidal.  It was unknown to jail staff that

22  Ornelas was struggling with mental health issues … it did not appear that staff was

23  aware of his current suicidal ideations."  But Ornelas in fact submitted two separate

24  health care requests for mental health support, including to get back on psychiatric

25  medications.  Jail *health care* staff thus almost certainly knew, and certainly should

26  have known, about Mr. Ornelas's mental health issues and struggles.  Further, my

27  records review reveals that mental health staff failed to complete a comprehensive

28  behavioral health assessment for Mr. Orneles, and the assessment that was done

overlooked his psychiatric history, his history of a suicide attempt, and current apparent distress.  The failure to complete an adequate mental health assessment is a major deficiency related to this case, and one that CLERB lacks jurisdiction to explore.

347.   I am not the first to recognize that CLERB oversight, in its current design, is unable to identify and remediate serious problems at the Jail.  Following a 2020 CLERB investigation that found "no evidence" of custody staff misconduct in the mental health-related death of Paul Silva, based on its very curtailed access to relevant records and data, a federal judge found that "although [San Diego County] has established a board to investigate the widely known problem of in-custody deaths, it has also failed to enable the board to carry out its stated responsibilities." Lawsuits prompt questions about civilian oversight of San Diego Sheriff's Department, *San Diego Union-Tribune*, Apr. 11, 2021.  CLERB's long-time executive director, Paul Parker, stated that CLERB's lack of jurisdiction over jail health care operations made it "difficult for CLERB to thoroughly investigate deaths and transparently report on deaths."  He stated publicly, "Our hands are tied." Sheriff's Review Board Reverses Course, Finds Deputy Violated Policies in Inmate Death, *San Diego Union-Tribune*, Feb. 11, 2021; Lawsuits prompt questions about civilian oversight of San Diego Sheriff's Department, *San Diego Union-Tribune*, Apr. 11, 2021.

348.   Maybe most concerning is that the San Diego County Jail mental health leadership does *not* consider CLERB in-custody death reviews or findings.  *See* Quiroz PMK Dep. at 124-25 ("Q: I'm just asking if county jail mental health leadership have a practice of considering CLERB reviews of in-custody deaths? A: No.").

349.   Based on my experience, a jail system without adequate death review and quality improvement processes related to suicide prevention is destined to see the same failures recur time and again, with more deaths and serious harms

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  resulting.  The San Diego County Jail is currently one of those jail systems.

2      350.   Throughout this report, I provide my analysis of several in-custody

3  suicides and mental health-related deaths, including for Mr. Settles, Mr. Ornelas,

4  Mr. Marroquin, Mr. McDowell, Mr. Rupard, and Ms. Bartolacci, among others.

5  These deaths, and the many others that have been reviewed by outside experts and

6  organizations, demonstrate that the same deficiencies in suicide prevention are being

7  repeated in case after case.  I strongly recommend that San Diego County Jail fully

8  implement the expert recommendations that have been made over the years

9  regarding suicide prevention, and ensure that effective oversight and quality

10  improvement mechanisms are in place.

**VI.   FINDING #6: MENTAL HEALTH CARE STAFFING AND THE
SYSTEM'S STAFFING STRUCTURE ARE INSUFFICIENT TO
MEET THE MENTAL HEALTH TREATMENT NEEDS OF THE SAN
DIEGO COUNTY JAIL'S INCARCERATED POPULATION.**

14      351.   I have serious concerns about the lack of sufficient mental health care

15  staffing to meet the treatment needs of the San Diego County Jail population.  I have

16  further serious concerns about what strongly appears to be a dysfunctional and

17  ineffective staffing structure that serves to impede systemic improvements to the

18  mental health care delivery system.

**A.   There Is Inadequate Staffing to Meet the Mental Health Treatment
Needs of the Jail Population.**

21      352.   In a jail system like this one that is so lacking in adequate treatment

22  programming to meet the needs of the population, one nearly always sees severe

23  staffing deficits, both in custody staff and health care professional staff.  Such

24  staffing deficits in San Diego County Jail contribute greatly to the existing

25  deficiencies in mental health care delivery.

26      353.   Adequate custody staff is necessary to provide, for example, escorts of

27  patients to appropriate treatment spaces where they can receive confidential and

28  clinically indicated care.  In San Diego County Jail, my records reviews and

1    discussions with patients and staff reveal that the exceedingly high rate of non-

2    confidential clinical contacts is substantially the result of inadequate custody staff

3    available for escorts.

4        354.   Adequate custody staff is also necessary to facilitate structured

5    treatment programming – such as group therapy and other recreational or

6    socialization activities.  I heard from mental health staff and patients about mental

7    health programming commonly being canceled or curtailed due to lack of available

8    custody staff as well. *See, e.g.*, Paragraph 125, above.

9        355.   There is further a very large deficit in mental health staff given the

10   number of incarcerated patients with serious treatment needs and the acuity of their

11   conditions in this system.

12       356.   Former Jail clinician Jennifer Alonso testified to the overwhelming

13   patient caseload she was required to carry, and how that prevented her from

14   providing adequate clinical contacts and the sort of structured treatment she knew

15   was needed for her patients:

16       As a mental health clinician for the OPSD units at Central Jail, I carried
         a caseload of between approximately 140 and 160 patients.  This
17       patient caseload was so large that it was impossible to deliver anything
         remotely close to adequate mental health care given the needs of this
18       population.  Based on my experience and clinical knowledge, I believe
         a caseload of no more than approximately 60-70 patients would be
19       appropriate for clinicians providing care to the OPSD population.

20       When I started as a mental health clinician for the OPSD units, I was
         told that I would have the opportunity to develop a program with
21       multiple treatment modalities, including structured therapeutic group
         programs and individualized one-to-one therapy.  However, given the
22       overwhelming caseload, lack of resources, and lack of confidential
         treatment space, it was never possible for me, or any other clinician, to
23       provide these sorts of care on a consistent basis or to meet the clinical
         needs of our patients.

24

25   Alonso Decl., Dkt. 119-11, ¶¶ 10-11.

26       357.   Administrative Separation clinician Aseel Ross explained that she

27   could provide individual clinical care to an absolute "max" of 13 patients on a given

28   day, and less than that if any of the patients had more acute mental health needs.

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Ross Dep. at 16-17.  Ms. Ross proposed to implement a treatment program in Administrative Separation units – specifically, two hours of structured therapeutic activity each day.  She spoke with supervisory staff about the program, including the need for additional mental health staffing resources for implementation.  *Id.* at 123-24.  While her supervisor supported the program and plan, it was not approved by leadership, and had not been implemented when she left her job at the Jail in late 2023.  *Id.* at 125-26 ("[T]he leadership is what we were waiting for . . . . I didn't get a response.").

358.   When I visited the Jail in February 2024, there remained a lack of clinically appropriate treatment programming across the system, including in the Administrative Separation units, the Outpatient Stepdown units, and the Psychiatric Services Units.  As discussed in Finding #3, above, I learned of a few hours of treatment programming that had very recently been added in outpatient units (*i.e.*, 1-2 hours *per week* for a small fraction of patients in certain units).  Staff repeatedly told me that they recognize the need to add more treatment programming to meet the needs of the patient population, something that could not happen without more staffing resources.

359.   The Department of State Hospitals-run Jail Based Competency Treatment (JBCT) Program at the Jail, discussed in Finding #3, offers a far more appropriately staffed program, delivering ten (10) hours of programming *per day* (structured and unstructured), including four (4) hours of structured group treatment.  That unit, with up to 30 patients, is covered by 2.5 full-time-equivalent psychiatrists, two clinicians (with caseloads less than one-quarter as compared to the OPSD units), additional educators and psychiatric nurse staffing resources two assigned duties who have received specialized mental health training.  As noted earlier, the JBCT program director told me that "the program works."  The contrast between this Department of State Hospitals-overseen JBCT program and the many other Jail housing units where I saw acutely (and essentially untreated) mentally ill patients,

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

was stark.  A key distinction was the level of staffing in JBCT as compared with everywhere else in the Jail system.  That is to say, San Diego County should be well aware of a staffing model for a mental health unit that can meet patient treatment needs; there is one in their own Jail Facilities.  It is true that this JBCT program is operated by the California Department of State Hospitals, but there is no reason that similar staffing and program resources cannot be provided to patients with mental illness across the Jail system – including in the Administrative Separation units, the Outpatient Stepdown units, and the Psychiatric Services Units.  In fact, based on my review, that sort of staffing and program resources is *essential* to providing adequate mental health care to the Jail population.

360.   I am far from the first to identify this deficiency.  In 2017, the NCCHC found that NCCHC Standard J-G-04 (Basic Mental Health Services) was not being met in the San Diego Jail system.  Its report explained: "Mental health does not provide adequate individual counseling or group counseling, and does not coordinate mental health, medical and substance abuse treatment."  It went on: "There is an insufficient number of mental health professionals in the facility to meet the needs of those who are mentally ill, but do not have what is classified as a severe and persistent mental illness (such as bipolar disorder or schizophrenia).  The number of mental health clinics in the facility is insufficient to meet the needs, and individual or group therapy rarely occurs due to the shortage of therapists."  2017 NCCHC Report, DUNSMORE0260618 at 35-36.

361.   In 2023, the San Diego County Grand Jury found that "[t]here is an insufficient number of mental health clinicians to provide appropriate basic on-site mental health services, as defined by NCCHC accreditation standards."  The Sheriff's Department "disagree[d] partially" with this finding, stating that "[i]t is a true statement that the San Diego Sheriff's Department does not currently meet accreditation standards as it applies to mental health" while stating that "this is not attributable to the fact that there is an insufficient number of staff providing

1   services."  The Department did state that it "is seeking to hire more mental health

2   professionals in order to streamline workloads and provide proactive mental health

3   programs for our population."  Quiroz Dep. Ex. 9, *2022/2023 Grand Jury Response*

4   *- Crisis in Treatment Access for Incompetent to Stand Trail Incarcerated Persons in*

5   *the County Jails* at 8-9, July 10, 2023.

6       362.   Yet another major issue area is the delays in responding to mental

7   health care service requests.  When a patient with mental illness feels their

8   symptoms worsening or requiring additional treatment, they are told to submit a

9   health care (or sick call) request form.  Because they are incarcerated, they cannot

10  simply go to a hospital or mental health clinic, or even call their treatment provider.

11  They must rely on the Jail's "sick call" system to respond to their requests in a

12  timely and adequate manner.  In my records review and interviews, I found repeated

13  examples of patients submitting mental health care service requests and receiving no

14  response for weeks.  I reviewed County records showing long wait times for patients

15  to be seen for a mental health concern.  Patients submit repeated, and increasingly

16  desperate, requests for care.  Patients are at risk of decompensation, and even

17  suicide, when these sorts of delays occur.

18      363.   Jail mental health coordinator Ms. Quiroz wrote in July 2023 about

19  how the sick call request backlog and treatment delays in the Jail's system, and she

20  testified in May 2024 about how such delays "illustrate that we have an

21  overwhelmed system and we need help."  Quiroz PMK Dep. at 270-71 & Ex. 14.  A

22  Jail system like this one, which has chronic sick call request backlogs and treatment

23  delays, may try to address such problems through a periodic "blitz" effort to reduce

24  the backlog.  In my experience, such "blitz" efforts, at best, only temporarily

25  mitigate the problem.  The San Diego County Jail system will continue to see

26  backlogs for mental health care until staffing is commensurate with the Jail

27  population's treatment needs.

28      364.   The resulting harms are significant, and appear in many of the case

reviews provided in this report. One example is Mr. Ornelas, who submitted multiple written requests to see psychiatric staff and get back on his medications; these requests were never processed or addressed. Mr. Ornelas died by suicide before mental health staff ever came to see him.

365. Based on my review of the Jail's mental health population, current conditions, and currently available treatment services, it is my strong opinion that understaffing is a major contributor to dangerous failures to provide clinically necessary mental health care to meet existing needs.

366. Another major mental health staffing deficit is in psychiatry. In Finding #2, I discussed my grave concerns about deficiencies in psychiatric care and medication management for incarcerated patients with mental illness. A significant contributor to these deficiencies is severe understaffing of psychiatric prescribers (psychiatrists and psychiatric nurse practitioners) who, unlike the Jail's clinicians (e.g., social workers and marriage family therapists (MFTs)), are hired and employed by a private health care contractor (*i.e.*, NaphCare or Correctional Healthcare Partners).

367. Jail leadership has issued corrective action notices to the contractor Naphcare regarding psychiatric care untimeliness, noting hundreds of pending psychiatry appointments and wait times of several weeks. Ms. Quiroz testified that delays in access to psychiatry care remain a "key deficiency area," noting that the "volume of pending appointments" is a problem. Quiroz PMK Dep. at 186.

368. Where patients face barriers to clinically necessary mental treatment, a jail's mental health care system operates as a *crisis-response system.* When – as is the case in San Diego County Jail – there is insufficient staffing to provide clinically indicated treatment services, to ensure timely responses to mental health requests and referrals, and to provide timely psychiatric care, patients are placed at substantial risk of preventable and serious harm. Patients will often decompensate and become acutely psychotic, suicidal, and/or gravely disabled. At that point,

already-strapped staffing resources must be diverted to provide emergency interventions.  This results in a kind of doom loop, where insufficient staffing and resources to meet patient needs leads to higher acuity in the population and greater treatment needs, which leads to further failure to deliver needed treatment.  And on and on.

369.   Based on my assessment, I strongly recommend that San Diego County Jail conduct an independent and comprehensive mental health treatment needs and staffing assessment.  The assessment must be based on a service delivery model that includes provision of clinically necessary treatment services and programming at all levels of mental health care.

**B.  The Jail System's Mental Health Staffing Structure Is Dysfunctional and Fails to Ensure Adequate Mental Health Treatment Delivery for the Jail Population.**

370.   A well-functioning jail mental health care system requires effective coordination across all staff and health care disciplines.  San Diego County Jail is, in several respects, uniquely dysfunctional in this regard.  I strongly recommend that San Diego County take proactive steps to address this structural deficiency that is negatively impacting patient care and creating impediments to important systemic improvements.

371.   First, as I discussed in my previous declaration, the San Diego County Jail's organizational chart reveals a foundational deficiency in the delivery of mental health care (and health care more generally).  The organizational chart for Jail operations makes clear that mental health (and medical) leadership report directly to a Jail Captain and the Sheriff's Command team.  This organizational structure is inconsistent with modern correctional psychiatric practices and is extremely problematic.

372.   Clinical staff and leadership should have their own, separate chain of supervision, allowing them to work *side-by-side* with custody staff and leadership. The majority of medium-to-large California county jail systems of which I am aware

have adopted a structure whereby mental health (and medical) staff do not report directly to custody leadership; rather, they report to medical and mental health leadership.  Such a structure is essential to operating an adequate jail mental health care system in which health care professionals have ultimate authority over health care policy, and can work collaboratively with sworn staff to ensure that patients' clinical needs are met.  As the chart below shows, San Diego County is an outlier with respect to its organizational structure by putting Sheriff's Command staff above (and not in partnership with) Mental Health Care staff.

**Examples of Health Care Agencies Operating the Jail Mental Health Care System Alongside the Sheriff's Department, Not as a Sheriff's Department "Medical Services Division" that Reports to Sheriff's Command Staff**

| County Jail System | Agency Overseeing Provision of Jail Mental Health Care |
|---|---|
| Contra Costa County | Contra Costa County Health Services |
| Los Angeles County | Department of Health Services |
| Orange County | Orange County Health Care Services |
| Riverside County | Public Health and Behavioral Health |
| Sacramento County | Department of Health Services |
| San Francisco County | Department of Public Health |
| Santa Clara County | County of Santa Clara Health System |
| San Diego County | *San Diego Sheriff's Department* (Medical Services Division) |

373.   Based on my review, it is apparent that the San Diego County Jail's structure with the Sheriff's Department employing, supervising, and directing mental health care staff, policies, and procedures has contributed to several of the systemic deficiencies I have identified.  This includes the custody-dominated Administrative Separation practices where large numbers of people with serious mental illness are being put at risk (Finding #4), the many ways that Jail custody

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  staff exert improper control over clinical mental health care decisions (Findings #5,

2  #8), and the lack of mental health input in disciplinary procedures (Finding #9).

3       374.   Second, the San Diego County Jail's mental health staffing structure

4  itself creates bizarre and self-defeating barriers to operation of a functional mental

5  health care delivery system.  The Jail has an unusual staffing structure, where

6  disciplines like nurses and mental health clinicians (*e.g.*, social workers and

7  marriage family therapists (MFTs)) are employed by the Sheriff's Department,

8  while disciplines like psychologists, psychiatrists, and psychiatric nurse practitioners

9  are employed by an outside contractor (*e.g.*, NaphCare or Correctional Healthcare

10 Partners).  More significant than it being unusual, this structure is very problematic.

11      375.   Based on my interviews and review of records and policies, I am

12 extremely concerned about the lack of supervision and coordination in this Jail's

13 mental health care system.  For example, the County-employed clinicians (social

14 workers and MFTs) should be – but are not – supervised by higher-level mental

15 health care professionals like psychologists or psychiatrists.  Quiroz PMK Dep. at

16 26-27.  This is inconsistent with the standard of care for a mental health care system.

17      376.   One long-time Jail clinician told me during my Jail visit that clinicians'

18 interactions with psychiatrists and psychologists are extremely limited, with the

19 possible exception of in the Psychiatric Services Unit (PSU).  Clinicians are

20 generally supervised by other clinicians.  For example, the Las Colinas Chief Mental

21 Health Clinician who supervises all clinical staff is an MFT. The two chiefs at

22 Central Jail are an MFT and master's-level correctional counselor.  Ms. Quiroz, the

23 system's Jail mental health coordinator, is also an MFT.  In my conversations with

24 clinician staff, it was apparent that they have insufficient communications with

25 psychologists or psychiatric prescribers, including because those contracted staff

26 members operate outside County supervision. (The NaphCare staff uniformly

27 refused to speak with me during my Jail site visits.)  Again, this structure creates

28 significant gaps in supervision and coordination of care.  All mental health staff

1  should be working hand-in-hand to ensure appropriate treatment planning and

2  delivery.  In this system, clinicians and prescribers are far too siloed, contributing to

3  delayed care, inadequate care, and adverse patient outcomes like the many detailed

4  in this report.

5       377.   With the artificial separation between, on the one hand, psychiatric

6  prescribers and mental health clinicians (who, by licensure, cannot prescribe

7  medications or do medication management), there are significant gaps in treatment.

8  Staff shared with me, and Ms. Quiroz testified about (Quiroz PMK Dep. at 194-96),

9  concerns regarding how patients needing medication management are being

10  scheduled to see non-prescribing clinicians, which creates unnecessary work and

11  dangerous delays in accessing psychiatric care.

12       378.   The structural division of mental health care staff across Sheriff's

13  Department and private contractor staff also contributes to inconsistent training on

14  policies and procedures.  This is a major problem: all mental health care staff should

15  be required to receive the same training on a Jail's policies and procedures, to

16  ensure consistency and coordination of care.  But NaphCare-employed

17  psychologists, psychiatrists, and psychiatric nurse practitioners are not required to

18  participate in mental health training that is provided to Sheriff's Department-

19  employed mental health staff, as Ms. Quiroz explained:

> Q. Do the Naphcare staff that we've been talking about receive that eight-hour [Sheriff's Department mental health] training?
>
> A. I don't know that any have been completed for sure, but they are invited.  They are not excluded from those training.
>
> Q: Are they required to attend?
>
> …
>
> A: I don't know that Naphcare requires them to attend our training, but we offer it to them.  We want them to be there.  It's available to them.
>
> Q: It's available.  The county doesn't require it; the county makes it available.  Is that a correct statement?
>
> …

1   A: Yeah. I -- I don't have a way to – I don't supervise them, so I guess
2   the county does not – they'd probably have to write that into the
    contract or something. I don't know that it's written in the contract.

3   Quiroz PMK Dep. at 52-53.

4       379. Correctional Healthcare Partners (CHP), which I understand contracts

5   with the County to provide additional health care staff at the Jail, do not provide

6   mental health care training to the Jail staff it employs. The CHP president Peter

7   Freedland, testified that, under the current contract with the County, there were

8   plans to do further training of contractor medical staff, but when asked whether

9   there would be a mental health component to the training, he responded, "We don't

10  do mental illness. So I would probably say no." Freedland Dep. at 133-34. Once

11  again, this shows how the fractured the San Diego County Jail system, with so many

12  different entities often working in siloes, contributes to a dysfunctional and

13  ineffective system of mental health care delivery.

14      380. Even on something as consequential as suicide prevention procedures,

15  it appears that Sheriff's Department-employed mental health clinicians and

16  NaphCare-employed mental health providers are not trained to be on the same page:

17      Q: How are the Naphcare staff trained on the [San Diego County Jail's]
        inmate safety program?
18
19      A: I believe they have their own suicide detection/prevention type of
        courses within Naphcare University. I personally have not seen that. I
        don't have access to that part.
20
21  Quiroz PMK Dep. at 48.

22      381. A related major concern relates to coordination in mental health policy

23  and its implementation. I understand that NaphCare was retained as a San Diego

24  County Jail contractor more than two years ago, in 2022. I further understand that

25  there was an expectation that NaphCare and San Diego County would work to

26  coordinate and align and their policies as applied to San Diego County Jail's mental

27  health care system (and health care system more generally). More than two years

28  later, this still has not occurred, as Ms. Quiroz explained:

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

> We were hoping that when we brought on Naphcare that they would have that for us, and they do have their policies, and they are written to the standards. The challenge becomes that we're a hybrid model because we have county employees and Naphcare employees. The policies don't interchange as seamlessly as we thought they might.

Quiroz PMK Dep. at 132. The County still has no "firm date" as to when policy alignment might be completed. *Id.*

382. During my review, it was confusing to read the Sheriff's Department's mental health-related policies and also the NaphCare policies that the County produced. In some respects, the NaphCare policies, as written, better align with the standard of care for Jail mental health care – for example, as to suicide observation protocols (*see* Finding #5.B.3). My interviews with County-employed clinicians, however, clarified that they have received no training on the NaphCare policies. What remains deeply concerning is that it is unclear whether and how NaphCare-employed Jail mental health staff are trained. The Jail mental health coordinator's testimony added to my concern:

> Q: Is anybody trained on this [NaphCare] policy at the jail? Naphcare staff?
>
> [Defendants' counsel]: Calls for speculation as to Naphcare.
>
> A: Yeah. I don't know if they are.
>
> Q: Do any county employees get trained on this policy?
>
> A: No, no.
>
> …
>
> Q: Are any of these mental health-related policies from Naphcare in place[,] fully implemented at the jail?
>
> A: No.

Quiroz PMK Dep. at 152-53.

383. It is absolutely essential that policies and training be consistent across all mental health care disciplines. The structural barriers between Sheriff's Department-employed mental health staff and contractor-employed mental health

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

staff must be addressed, with the objective of a coordinated system for mental health delivery that aligns with the standard of care.

384.    Finally, I found the quality review and quality improvement processes in San Diego County Jail's mental health system to be lacking.  The National Commission on Correctional Health Care (NCCHC) provides a clear statement on the importance of these processes:

**NCCHC Standard  MH-A-06 (essential) – Continuous Quality Improvement Program**

**Discussion:** The intent of this standard is to ensure that a facility uses a structured process to find areas in the mental health care delivery system that need improvement, and that when such areas are found, staff develop and implement strategies for improvement.  One of the benefits of a successful CQI program is that problems can be identified early and strategies developed for their resolution before they worsen.  All mental health care delivery systems, regardless of size, can benefit from a well-designed CQI program.

One essential element of quality improvement is the monitoring of high-risk, high-volume, or problem-prone aspects of mental health care provided to patients.

Areas to be studied can also be identified using the data that are regularly monitored (see MH-A-04 Administrative Meetings and Reports) and patient safety systems (see MH-B-02 Patient Safety).  Success in compliance with this standard is not measured by the number of studies done but by the relevance of the studies and effectiveness of corrective action.

NCCHC Standards for Mental Health Services in Correction Facilities Standard MH-A-6.

385.    The County's December 2023 Corrective Action Notice identifies continuous quality improvement as a problem area as related to NaphCare and mental health care at the Jail; it states simply: "No quarterly meetings have been set or established."  SD120696.  The Jail mental health coordinator confirms that this remains an issue that "need[s] work toward improvement."  Quiroz PMK Dep. 187-88 (Quiroz: "As far as the – making sure that [NaphCare staff are] there, you know, just making sure that they're present for the meeting to make sure that they're engaging.  That would be, you know, the desire of the county.  We want to make

1  sure that they're engaging with us.  Q: Has there been a quarterly meeting where all

2  the necessary Naphcare staff members are present? A: Not consistently.").

3        386.  Relatedly, as described in Finding #2, above, there are serious problems

4  related to inadequate supervision of psychiatric nurse practitioners, and a lack of

5  quality improvement mechanisms to address deficient medication management

6  practices.  Many individual cases I reviewed strongly indicate that dangerously

7  inadequate prescribing practices recur again and again in this system.  Jail health

8  care leadership share this current and ongoing concern about insufficient  clinical

9  oversight.  Quiroz PMK Dep. at 192.

10        387.  It is also apparent that there is a problematic peer review process for

11  NaphCare-employed staff, with insufficient oversight by the County.  As

12  Ms. Quiroz explained:

13        Q: [W]hat is the status of peer review by Naphcare?

14        A: Yeah.  I can't be for certain that they're not doing peer reviews.· It's
        nothing that they hand back to us [the County]. I mean, if they do the
15        peer reviews it's something that they're keeping records of on their
        own.  No, it's not necessarily, here's what we did.
16

17  Quiroz PMK Dep. at 190; *see also* 12/1/23 Sheriff's Department Corrective Action

18  Notice to NaphCare, SD_120697 (Peer Reviews are "Not being done.").

19        388.  Ultimately, the structural and staffing deficiencies in the San Diego

20  County Jail mental health care system must be addressed in order to achieve an

21  adequate system of care.  Private contractors like NaphCare, Correctional

22  Healthcare Partners, or any other for-profit jail health care services company may

23  have a role in such a system, but this system will remain dangerously inadequate

24  until a coordinated structure with adequate, transparent oversight is implemented. In

25  short, without effective quality assurance procedures, the system will continue to

26  repeat its past failures and deficiencies.

27

28

## VII. FINDING #7: THE JAIL FAILS TO PROVIDE NECESSARY CONFIDENTIALITY FOR MENTAL HEALTH TREATMENT, UNDERMINING THE DELIVERY OF MENTAL HEALTH CARE.

389.   In my May 2022 declaration (¶¶ 77-84), I relied on staff and patient testimony, along with multiple external reports, in finding that the lack of confidentiality during the vast majority of clinical mental health contacts in the San Diego County Jail undermines mental health care for incarcerated patients in the system.  Having now conducted an extensive review of patient records and additional materials in this case, interviewed dozens of incarcerated people with serious mental illness at multiple San Diego County Jail facilities, and conducted my on-site observations of Jail operations, I am even more concerned about how this deficiency prevents the delivery of adequate mental health care and puts people at substantial risk of serious harm every day.

390.   As I have previously described, patient candor is an essential aspect of effective clinical interaction.  A patient cannot reasonably be expected to communicate openly when clinical interactions occur in a non-private, non-confidential setting where other people can hear what is being discussed.  Clinical contacts conducted in such a setting, including mental health assessments in which patients are asked to communicate sensitive and personal information to the mental health clinicians, are likely to be incomplete and inadequate because of the patient's understandable reluctance to speak candidly.  Many incarcerated patients I interviewed raised this very concern with me, and explained how they did not fully communicate with mental health staff about their symptoms, suicidality, medication side effects, and other clinical issues because they did not want custody staff or other incarcerated people to hear these things.

391.   Confidential mental health contacts are the standard of care, both in the community and in detention settings.  The failure to provide sufficient confidential treatment puts people at substantial risk of serious harm by hindering their ability to share information and to receive adequate treatment.  An adequate system of care in

1  the jail setting requires the provision of a private, confidential setting for patients to

2  communicate openly with their clinician or other care provider.

3      392.   A general policy and practice to provide private, confidential clinical

4  assessments and treatment does *not* mean compromising the safety of staff or

5  anyone else.  To be sure, the provision of adequate treatment of serious mental

6  illness (with appropriate confidentiality) will serve to *increase* safety: good care

7  serves to reduce psychosis-induced behaviors and to keep patients' conditions more

8  stable.  And in a jail system where confidential clinical contacts are the expectation,

9  there will be appropriate safeguards, including the use of *individualized* assessments

10  – based on both clinical and custodial input – to determine when a particular patient

11  cannot safely be seen in a confidential setting.  Such circumstances can, and must,

12  be appropriately documented, reviewed for quality assurance purposes, and inform

13  treatment planning and delivery moving forward.  In short, a jail system should not

14  choose between necessary confidentiality and safety.  They go hand in hand.

15      393.   As I noted in my May 2022 declaration, the Sheriff's Department has

16  been aware of this deficiency for years.  The January 2017 NCCHC Technical

17  Assistance Report for the San Diego County Sheriff's Department contains findings

18  on the lack of confidentiality in clinical encounters that are highly critical:

> J-A-09  Privacy of Care (I).  **Clinical encounters and discussion of patient information do not always occur in auditory and/or visual privacy.  By custody policy, the officers feel they need to be within arm's length of a patient in the clinic.  This compromises privacy and may prevent a provider or nurse from obtaining an inmate's full description of his or her problem to make a diagnosis.**  Health staff understands that a patient's security status may require the presence of a custody officer.  But when a patient is cooperative, privacy should be maintained.  **Mental health staff mentioned that they often conduct interviews through the glass windows in doors, and they can be overheard by staff or other inmates.**
>
> …
>
> Recommendations: **The areas of privacy and confidentiality of care need to be addressed.** [NCCHC Compliance Indicators] require that procedures be put in place to assure confidentiality when health care is being delivered and discussed.  These are not met.

NCCHC Report, DUNSMORE0260618 at 8-9 (emphases added); *see also id.* at 43, 109.

394.   Based on my assessment, I am aware of no meaningful improvements in this area in the seven (7) years since the NCCHC issued its finding about inadequate confidentiality for mental health contacts at San Diego County Jail.

395.   In my review of patient records, I identified a very problematic policy and practice deficiency that makes this issue even worse – that is, the use of the label "Semi-Confidential." I observed an area of the mental health care chart (called "Encounter Setting") where mental health staff are supposed to indicate whether a particular mental health appointment was done in a confidential setting. One check box is "Confidential" and another is "Non-Confidential." But there is also a third check box labeled "Semi-Confidential."

396.   "Semi-Confidential" is *not* a clinical term I am familiar with, and it is not consistent with the standard of care. Yet, it appears frequently in Jail patient records. Through my review of records and interviews of Jail mental health staff and patients, I learned that "Semi-Confidential" is often selected for clinical contacts conducted at cell-front (where a deputy and other detainees in neighboring units can overhear), or in areas where one or more deputies are standing a few steps away and able to hear the conversation. Confidentiality is absolute; it either exists or it does not – there is no middle ground. These so-called "Semi-Confidential" encounters breach patient privacy and are, in effect, *Non*-Confidential.

397.   I randomly selected a patient (████████ with documented psychosis, depression, and other mental health diagnoses with whom I met in February 2024 while he was housed in an OPSD unit at Central Jail. In his records, I observed 24 mental health staff encounters. In the record for 18 of those encounters (75%), staff marked that the encounter was "Semi-Confidential." The other 6 (25%) were marked as "Non-Confidential." Zero encounters were marked

as "Confidential."  I then reviewed notes for the "Semi-Confidential" encounters, a sample of which follows:

- "QMHP [Qualified Mental Health Provider] met with IP [Inmate-Patient] cell side and a deputy [] was present and stood behind QMHP."

- "Met with IP cell side.  Deputy [] was behind QMHP. Cellside interaction due to module lockdown."

- "[Patient] seen at med window in 3A housing unit with Deputy [] present."

- "[Patient] seen at med window with Deputies [ ] and [ ] present."

398.    Again, these encounters are in no way confidential clinical contacts. And they are not "Semi-Confidential" clinical contacts (a concept that does not exist in mental health practice standards).  These are *Non-Confidential* clinical contacts.

399.    The jail mental health coordinator's testimony confirms that the Jail system's leadership recognizes that "Semi-Confidentiality" is not an accepted, or acceptable, concept, yet it remains in the Jail's daily practices:

Q. … What does semi-confidential mean?

…

A.    Maybe the doors – I'm speculating. … There's no definition as what that means.

Q.    Is there any guidance provided to clinicians as to when to check the semi-confidential contact box [in the clinical note]?

A: No. …  So the clinicians sometimes check that I believe, but there's no definition that – it's really the determination of what they believe is semi-confidential.  There's not a definition.

Quiroz PMK Dep. at 249-250.

400.    The case of Patient ▮▮▮▮▮ offers a helpful illustration of how non-confidential clinical encounters harm patients.  This young woman came in to San Diego County Jail detention without a previously documented psychiatric history, but she was presenting with new onset psychosis.  Prior to her arrest, her family noted that she was guarded and paranoid, likely a manifestation of psychosis.

1   This paranoia persisted throughout her time in custody and contributed to suspicion

2   towards the mental health team that made it difficult to build rapport and engage

3   with her.  Her mental health visits were consistently documented as being "Semi-

4   Confidential" or "Non-Confidential" – generally, at the cell door with custody staff

5   present.  Ms. ████ was already extremely paranoid due to uncontrolled psychosis,

6   and she refused to engage with the care team during cell-front visits with custody

7   staff present, which likely further contributed to her feeling watched or monitored.

8   Such violation of clinician-patient confidentiality in this sort of case adds a layer of

9   complexity that impairs a clinician's ability to engage with the patient.  Ms. ████

10  in fact requested to speak privately during a mental health visit in ████ 2023

11  and was informed it could be arranged, but it does not appear this ever happened; no

12  subsequent mental health visits were marked as confidential.  Ms. ████'s lack of

13  engagement with mental health staff due to paranoia persisted, which ultimately

14  delayed and impaired her receiving necessary psychiatric care.

15       401.   To address this clinically deficient policy and practice, the Sheriff's

16  Department must ensure that all mental health clinical contacts and intake

17  interviews between incarcerated people and mental health professionals, including

18  mental health clinicians, psychologists, and psychiatrists, are conducted in a

19  confidential setting.

20  **VIII.  FINDING #8: JAIL CUSTODY STAFF EXERT IMPROPER AND**

21  **DANGEROUS CONTROL OVER CLINICAL MENTAL HEALTH CARE DECISIONS.**

22       402.   In my May 2022 declaration, I identified multiple practices by which

23  Jail custody staff improperly control and direct the placement and treatment of

24  people with serious mental health needs, in ways that are inconsistent with the

25  standard of care and that put people at substantial risk of serious harm.  May 2022

26  Decl., Dkt. 119-7, ¶¶ 17-76.  As discussed in this report, none of those issues have

27  been remedied.  See, for example, Finding 3.D (continued improper custodial

28  blanket ban policies preventing access to Outpatient Step Down Program (OPSD));

Finding 4.B (continued custody-driven placements in solitary confinement units without necessary consideration of mental health input).  These policies and practices continue to put people with mental illness at substantial risk of serious harm.

403.    As another example, the 2018 DRC Report found that custody staff "unilaterally place patients in the PSU's 'observation units,' which amount to a solitary confinement setting without access to the PSU's treatment programming"— even when mental health staff make contrary clinical recommendations.  DRC Report, DUNSMORE0124942-0125012 at 20-21.

404.    I found that custody staff in this Jail system improperly exercise control over a range of decisions for which clinical input is necessary but ignored.  The continued placement of patient ███████████ in Administrative Separation, (*see* Finding 4) despite clear clinical contraindications, and the string of custody-controlled decisions on the placement and conditions of Lester Marroquin leading up to his horrible suicide in a solitary confinement cell (where he banged his head several times, placed his head in the toilet, and finally died of acute water intoxication) offer just two examples.

405.    The use of restraints on people with serious mental illness offers another example of the improper control of custody staff where clinical input is needed.  During my site visits, staff explained to me that a practice in this Jail system is to place an actively self-harming patient in a restraint chair that is located inside of a safety cell.  I was shown where this occurs.

406.    A restraint chair is a device in which a person is strapped down, with locking mechanisms on multiple parts of the body (*e.g.*, wrists, ankles, torso, lap).  While some detention systems use this sort of device, it is essential that it be used only with appropriate clinical input and in ways that minimize trauma to the patient and maximize preservation of the patient's dignity.

407.    I was informed that, at San Diego County Jail, a patient's placement in

the restraint chair and their eventual removal from the restraint chair are exclusively

"custody decisions."  The Jail mental health coordinator confirmed that placement

of psychiatric patients in a restraint chair is entirely a custody function, testifying to

clinical staff's lack of a role in such processes:

> Quiroz: I mean, we've witnessed people in a restraint chair.  We're not necessarily the ones determining when they're getting out of that chair.  You know, we're not -- they're not calling us for that reason, to say, should this person be removed.
>
> [I]t's not common that we see somebody -- that we are going to assess somebody in a [restraint] chair.  It is not common.
>
> Q: … [D]o you think it's important for clinicians to be involved when a restraint like a restraint chair is used on somebody who may be manifesting mental illness?
>
> A: Although I think it's important for a clinician, I think a psychiatrist should be -- I mean, if somebody's in a restraint chair I think we should probably get an M.D. level involved.
>
> …
>
> Q: You're not aware of any policy right now for an M.D. level staff member to get involved in a certain way when someone is placed in a restraint chair by custody?
>
> A: No.

Quiroz PMK Dep. at 72-74.

408.   The essentially complete control by custody staff over restraint chair

placement and removal decisions, in policy and in practice, is a dangerous prospect

for people with serious mental illness.  The consequence is that custody staff are

likely managing many urgent or emergent mental health cases through use of

restraints and without appropriate clinical involvement.  This is a problem that must

be fixed, and that suggests a culture and policy of custody staff exerting improper

control in mental health cases. (The March 2024 in-custody death of Abdul Kamara

highlights the potentially deadly risks of custody-driven uses of restraints for people

with serious medical and/or mental health needs.  According to law enforcement

reporting, Mr. Kamara, a 29-year old man, was found crawling around a parking lot

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

with no shirt and no shoes after leaving a hospitalization.  Sheriff's Department staff
placed him in a restraint device called the "WRAP" soon after his arrest, which was
followed by a sudden medical emergency that ended with Mr. Kamara's death.  *See*
News Release, Update on San Diego Sheriff In-Custody Death Investigation,
Mar. 11, 2024.)

409.    Through my review, it is clear that custody staff make all sorts of
decisions without clinical input – and in many cases, *in spite of* contrary clinical
input.  I spoke with mental health leadership and staff during my site visits, and
consistently heard that custody staff have complete control over decisions like
where a patient is housed after a period on suicide precautions or in the acute mental
health care unit.  One supervisory mental health clinician stated directly that mental
health staff play no role in such decisions, neither assessing nor sharing clinical
contraindications for certain housing like Administrative Separation.  One clinician
told me that she was aware of cases in which custody "overrule" clinical referrals of
her patients to mental health housing (*e.g.*, Outpatient Stepdown Unit).

410.    Mental health staff who spoke with me acknowledged that custody staff
commonly override clinical decisions, stating that they are left to do the best they
can to provide whatever treatment they can in such a setting.  Some were troubled
by this fact while others seemed resigned to it as an unchangeable reality.

411.    The inappropriate control of custody staff over placement and other
decisions impacting patients' health care needs showed up in several individual case
reviews.  For example:

███████████████████

412.    This patient had symptoms of psychosis as well as an intellectual
disability.  His psychosis was sometimes complicated by exaggeration of symptoms,
which added a layer of complexity to his care that Jail mental health care staff
struggled to manage.  The failure to adequately control his psychiatric symptoms
also complicated provision of medical care for a serious hand wound that he

1   sustained during his arrest.  When he was arrested, custody staff placed him in a

2   "sobering cell," noting that he was "under the influence of unknown substance" due

3   to erratic and uncooperative behaviors.  The mental health team was never consulted

4   to determine whether this clinical placement was clinically appropriate; in fact, a

5   psychiatric evaluation would have revealed that these behaviors were likely due to

6   psychiatric illness rather than substance intoxication.  The absence of substances in

7   the patient's system was later confirmed through drug screening done when he was

8   sent to the hospital for treatment of his hand wound; the hospital care team made

9   note of his active psychosis.  Yet after discharge from the hospital, custody staff put

10  this patient *back* into a sobering cell due to disorganized behaviors and poor

11  engagement that they continued to perceive as a result of active substance use.

12  Clinical input should have been gathered and utilized to ensure adequate treatment

13  of this patient's mental health condition; this did not occur.

14       413.   My concern for Mr. ████████'s care increased when reviewing his

15  hospitalization at Scripps Mercy Hospital for a suicide attempt.  Custody staff

16  accompanying him pulled the trauma service physician aside to ask, "why patient

17  was still in the hospital and being transferred to an inpatient psych facility when

18  [George] Bailey has a psych department," stating that the patient was faking his

19  symptoms to get into a specific housing.  First, it is inappropriate for custody staff to

20  intervene in treatment in this manner.  Based on my review, there is no

21  documentation that establishes that Mr. ████████ was malingering here.  But even

22  if it were a factor, the custody staff's commentary shows a dangerous lack of

23  understanding that malingering in patients with serious mental illness is often a

24  manifestation of their psychiatric condition that should be treated and not dismissed.

25       414.   The inappropriate control of custody staff over what should be

26  clinically driven decisions in this Jail system extends to its suicide prevention

27  policies and practices.  As suicide prevention expert Lindsay Hayes, Disability

28  Rights California, and others have urged, decisions about what property and

privileges can safely be provided to people identified as at risk of self-harm should be informed substantially by individualized *clinical* judgment.  *See* Finding #5.B.3. Yet San Diego County Jail persists in its policy and practice that anyone placed on suicide precautions in the Enhanced Outpatient Housing unit or a safety cell be, for example, denied all clothing and placed in safety smock.  Quiroz PMK Dep. at 145-50.  The Jail mental health coordinator, Ms. Quiroz, acknowledged that implementing an individualized clinical assessment regarding denial of clothing for a person at risk of suicide was something that does not occur in this system but "could be considered." *Id.*  She confirmed that other important privileges are also managed "outside of the clinical world" even for people at risk of suicide or self-harm:

> Q: For people in the safety program, in an EOH or safety cell, are they able to have family visits based on individualized clinical assessment that it's safe?

> A: That all happens outside of the clinical world. … [T]hat's in the very custody world if -- when somebody is allowed a visit, when somebody is allowed phone calls, recreation and how those happen throughout the facility.

Quiroz PMK Dep. at 156.

415.   Based on my experience and expertise, the Jail's policy and practice of custody controlling these decisions must change immediately, for several reasons, including: (1) patients are deterred from reporting suicidality if they know that they will face automatic punitive deprivations if they do; (2) good clinical care and basic human dignity require that patients be treated in the least restrictive setting appropriate to their needs, particularly when they are at heightened risk; and (3) a jail system where custodial policies subvert clinical judgment is one where people with mental health needs are placed at undue and substantial risk of serious harm.

416.   As just one example, the suicide of Mr. Marroquin, discussed above, demonstrates the extraordinary harm done when there are blanket custodial policies that apply to people with mental illness or at risk of suicide.  In that case, when

Mr. Marroquin was placed on suicide precautions (safety cell or Enhanced Observation Housing), the basic provision of family phone calls were heavily restricted and even prohibited for him, due to the blanket custody protocols. But contact with his mother had well-documented clinical benefit, including to reduce suicidality. The custody-driven denial of family contact in this case illustrates why a jail's response to suicide risk should be clinically driven based on individualized assessments, not based on custody-dominated protocols. As Mr. Marroquin's mental health decompensated, the custody-driven restrictions served only to make things worse in the period leading up to his suicide.

417. A custodial blanket denial of property, privileges, or clothing – without individualized clinical assessment and input – has no place in a minimally adequate jail suicide prevention or mental health care system. Having custody staff make decisions about mental health care places incarcerated people at risk of serious harm. In this system, custody operations and administrative convenience trump the clinical judgment of mental health professionals in ways that are very dangerous.

## IX. FINDING #9: THE JAIL'S SYSTEM IMPROPERLY AND DANGEROUSLY PUNISHES PEOPLE WITH SERIOUS MENTAL HEALTH TREATMENT NEEDS OR INTELLECTUAL DISABILITY.

418. When I review a detention system's mental health-related policies and procedures, I pay careful attention as to whether and how the system imposes its disciplinary procedures on people with mental illness. There are many reasons why this is a critically important issue.

419. First, a person with mental illness and/or with an intellectual disability should not be punished for behaviors that are a manifestation of their mental illness or disability. For example, a person should not be punished for self-harming behavior when they are suicidal, nor for behaviors that technically violate jail rules when they are a product of the person's psychosis, paranoia, delusions, or other psychiatric symptoms. A person should not be punished for failing to follow directions or rules when such failure is related to their intellectual disability or

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  cognitive limitations.  Such practices are unfair, clinically misguided,

2  discriminatory, and ultimately harmful.

3      420.   Second, a person with mental illness and/or with an intellectual

4  disability should not be subjected to punishments that are clinically contraindicated

5  or potentially harmful based on their particular clinical or disability needs.  A person

6  with mental illness should not be denied an activity that is an important aspect of

7  their treatment.  For some, access to phone calls or visits from loved ones is

8  clinically important to their coping or general mental health condition; such access

9  should not be taken away as punishment, absent extraordinary circumstances.  For

10 many, placement in isolating conditions can increase suicidality and do great harm

11 to their mental health condition; such a placement should not be used for

12 punishment where this is the case.

13     421.   It is important to note that these principles do *not* mean that

14 incarcerated people with mental illness and/or an intellectual disability cannot be

15 subject to disciplinary measures; they do not get a free pass, and safety need not be

16 compromised.  What these principles do mean is that there must be appropriate

17 clinical input gathered, documented, and meaningfully considered in situations

18 where such a person may face discipline.

19     422.   Mental health clinicians must have meaningful and timely input into

20 the disciplinary process.  A licensed mental health professional should evaluate a

21 person with mental illness and/or an intellectual disability, or a person showing

22 signs suggesting potential mental illness.  This must include a records review and a

23 face-to-face assessment, as close to the incident as possible.  The role of the licensed

24 mental health professional is to determine whether there are mental health- or

25 disability-related factors contributing to the alleged misbehavior, the efficacy of

26 disciplinary measures versus alternative interventions, whether certain punishments

27 are clinically contraindicated, and whether adjustments to the person's treatment

28 plan are necessary.  Many systems do this effectively, with a licensed mental health

professional documenting clinical input that classification or disciplinary staff meaningfully consider. Such input must be considered prior to any disciplinary action being imposed. There must also be appropriate accommodations and assistance provided to a person with mental illness and/or an intellectual disability during all disciplinary procedures that take place, to ensure their due process rights and a meaningful opportunity to participate in those procedures.

423. Based on my review of policy and other materials in this case, it is clear that the San Diego County Jail has failed to implement policies and procedures to ensure that clinical input is gathered, documented, and meaningfully considered in disciplinary or classification procedures involving violations of jail rules. The Jail mental health coordinator confirmed that there is no such policy, practice, or documentation system in place. Quiroz PMK Dep. at 179.

424. In systems that fail to implement such policies and procedures, it is exceedingly common to see a high proportion of people with mental illness and/or an intellectual disability end up in administrative segregation and other highly restrictive settings. This is consistent with what I have observed in the San Diego County Jail system. As discussed in Finding #4, such over-representation of this population in Administrative Separation and isolation-type settings is dangerous and deeply concerning. The case of ████████ is illustrative of this systemic deficiency in San Diego County Jail.

████████

425. Mr. ████ has a history of serious mental illness. Upon his arrival in ████ 2024, it was apparent he was quite mentally ill. He was uncooperative with the intake staff and difficult to manage due to his increased energy, grandiose delusions, and rapid speech which are all signs of mania likely due to uncontrolled symptoms of his mental illness. Deputies described him as "very up and down", "yelling and hostile," and with "random mood swings … unpredictable as he goes from calm to aggressive." While I agree that these behaviors are concerning, they

were indicative of worsening mental illness and need for an urgent psychiatric evaluation.  Instead, the deputies confined him to his cell.  He was also placed in disciplinary seclusion by deputies on three (3) occasions in ████ and ████ 2024 for "disrespecting staff."  Although details about these seclusions are not clearly documented in the records, based on my review of other records around that time, his behaviors were very likely driven by uncontrolled mental illness.  It was not until one month after his arrival—and being placed in conditions consistent with solitary confinement where his symptoms persisted—that he finally received a psychiatric evaluation and started receiving treatment.  This patient's behavior should have received a clinical response. Instead, it was met with custody-driven disciplinary action that was likely harmful and counterproductive given this patient's treatment needs.

426.   On the matter of imposing discipline for people with mental health needs and/or intellectual disabilities, San Diego County Jail is far behind other jail and prison systems in California, including Alameda County Jail, Contra Costa County Jail, Orange County Jail, Sacramento County Jail, San Bernardino County Jail, Santa Barbara County Jail, Yuba County Jail, and the CDCR state prison system.  The San Diego County Jail system should implement policies and procedures consistent with what is described above immediately.

## X.    FINDING #10: SAN DIEGO COUNTY JAIL OPERATES A SYSTEM THAT DISCRIMINATES AGAINST PEOPLE WITH MENTAL HEALTH AND INTELLECTUAL DISABILITIES.

427.   The San Diego County Jail operates a system that unfairly and harmfully discriminates against people with mental health and intellectual disabilities. I provide a few examples of this below.

428.   As discussed in Finding #4, people with these disabilities are over-represented in Administrative Separation or other isolation settings, which raises very serious concerns that: (1) they are *not* being held in the least restrictive setting appropriate to their individual needs and circumstances; (2) they are held in more

1   restrictive setting *because of* their disability; and (3) they are being denied access to
2   services, programs, and activities that similarly situated, non-disabled individuals
3   receive – including classes, recreation, job opportunities, and more.

4       429.   As discussed in Finding #9, people with mental health and intellectual
5   disabilities face unfair and discriminatory treatment in the disciplinary procedures at
6   the Jail, in many resulting their being punished for behaviors that are a manifestation
7   of their disability.  The disciplinary procedures and practices at the Jail also fail to
8   provide necessary accommodations to people with mental health or intellectual
9   disabilities, both during the disciplinary process and in the administration of
10  punishments.

11      430.   Based on my review, including my Jail site visits and interviews with
12  staff and incarcerated persons, I have found that people with mental health and
13  intellectual disabilities are denied opportunities and meaningful access to a range of
14  programs, services, and activities across the system.  People in Outpatient Stepdown
15  units, for example, do not have access to program and work opportunities that they
16  would if they did not have a mental health disability.  This restricted access is based
17  on blanket rules (*e.g.*, restrictions in the OPSD units), not individualized
18  assessments to ensure meaningful access to opportunities consistent with individual
19  clinical and security needs.  I understand that the Jail system has recently begun to
20  reform its disability accommodations system, and emphasize that any reforms must
21  include people with mental health and intellectual disabilities.

22  **XI.   FINDING #11: THE JAIL'S SYSTEM FAILS TO PROVIDE**
       **ADEQUATE MENTAL HEALTH DISCHARGE PLANNING**
23     **SERVICES, PUTTING PEOPLE AT RISK OF HARM AND**
       **REPEATED INCARCERATIONS.**
24

25      431.   In a functional jail mental health care system, there will be discharge
26  planning staff and services sufficient to meet the needs of incarcerated people upon
27  their release. Such discharge planning services must to ensure medication and
28  treatment continuity, linkages to community-based service providers, and resources

EXPERT REPORT OF PABLO STEWART, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  to prevent people with mental health needs from a substantial risk of serious harm

2  upon release.

3      432.   As discussed in Finding #2.D, there are serious deficiencies in ensuring

4  adequate discharge planning for people with mental illness, specifically related to

5  ensuring adequate medication continuity.

6      433.   Deficiencies in the area of discharge planning go back years.  In 2017,

7  the NCCHC Technical Assistance Report found that NCCHC Discharge Planning

8  standards are "Not Met for Mental Health" at the San Diego County Jail.  The

9  NCCHC Report (at 23) stated that the "discharge planning process varies, depending

10 on the patient and the community services [that] are identified.  There is no formal

11 plan documented in the chart for prison inmates.  Mental health patients who need a

12 community referral are instructed to have the community pharmacy coordinate with

13 the jail so that the patient is provided with a 10-day prescription."  The NCCHC

14 Report recommended improvements to discharge planning, including that "Mental

15 health staff … should document their plans for discharge" (at 24).  The NCCHC

16 Report's finding (at 36) makes the deficiency plain: "Mental health does not provide

17 discharge planning and it was reported that there is insufficient discharge planning

18 for all inmates."

19     434.   As discussed earlier in this report, the County is well aware of this

20 deficiency, and it has not taken the necessary steps to fix the problem.  Ms. Quiroz,

21 the Jail mental health coordinator, acknowledged that the County needs more

22 staffing to meet the discharge planning needs for the mental health population at the

23 Jail.  She testified that the Jail has not done a "needs assessment to determine what

24 staffing resources are necessary people with these disabilities to meet discharge

25 planning needs of the [seriously mentally ill] population."  She stated that "we do

26 need more" mental health discharge planning staffing resources, but when asked

27 whether she was confident that the Jail's staffing plans will be sufficient to meet the

28 needs of the discharging mental health population, she responded that "it's

challenging without the data to know," but "more is certainly better." Quiroz PMK Dep. at 171-72.

435.    This testimony, along with my review of policies, records, and other relevant materials, make clear that the Jail has not allocated adequate resources or attention to discharge planning for the Jail's incarcerated mental health population. This failure means that patients being released from the Jail will reenter the community without the services, medications, and other linkages they need, and thus be put at substantial risk of serious harm.

436.    My review of patient records confirms that discharge planning remains an area of serious deficiency. While the mental health encounter forms do contain a check box referencing "Discharge Planning/Resources" as an "intervention," and have a few other discharge-related check boxes, the records I reviewed consistently show that mental health staff are not providing or documenting substantial, or even minimally adequate, discharge planning services.

437.    Take the case of ███████████ a high-needs mental health patient discussed earlier in this report. Records show that in ██████ 2023, he requested discharge planning assistance at least twice in the weeks prior to his release from the Jail. The discharge (or reentry) services provided, according to the records, fall far short of the standard of care. In ████ 2023, Mr. ████████ requested discharge planning assistance. A mental health encounter note checks "Discharge Planning/Resources" but documents only that "[clinician] to provide re-entry packet later through sworn staff." In ██████ 2023, a few days before his projected release date, the patient again requested help preparing for discharge. The mental health encounter note is again disturbingly sparse on such discharge planning assistance, stating only: "[Inmate-Patient] requested and was provided MAT program information for El Cajon. IP was aware of pending status with RCC and current Medi-Cal." There is no indication that a community-based follow-up psychiatric appointment was arranged.

438.   Of additional concern, this patient had a history of being treated with multiple psychiatric medications.  The last time he was seen by a psychiatric prescriber prior to his ███ 2023 discharge was in ███ 2023, when the prescriber noted that they discussed "potential complications as a result of an abrupt cessation once a certain dose has been reached for certain meds, the need to continue routine meds even if pt. starts to feel better, and to report any questions/concerns."  I could discern nothing in the records to indicate that psychiatric staff met with the patient again prior to his discharge or took necessary steps to ensure that he would have timely access to clinically appropriate medications when he was released.  This patient was back in custody just a few months later, with active mental health symptoms and reporting that "I have thoughts of wanting to hurt myself."  (As discussed earlier in this report, despite all of this, this patient was placed in Administrative Separation—an exceedingly dangerous placement for him.)  This case is one among the many I reviewed where adequate discharge planning was nowhere to be seen.

439.   As a mental health system, it is counterproductive, harmful, and dangerous to have insufficient discharge planning staff, services, and resources in place to meet the needs of the mental health population.  Other jail and prison systems have implemented far better discharge planning systems for their mental health population.  As one point of comparison, the California prison system has long provided people with a 30-day supply of medication and recently increased that to a 60-day supply of medication at release.  Other county jail systems provide coordinated discharge planning processes with steps to better ensure medication continuity and service linkages upon release.  San Diego County Jail must significantly improve this aspect of its mental health care system to meet basic patient needs.

//

//

## XII.  CONCLUSION

440.  In my more than 35 years evaluating and working in detention facilities, I have come across very few, if any, mental health care systems so lacking in effective systems and levels of care to meet the needs of the incarcerated mental health population and protect people from serious harm.  In light of the problems discussed above, concerted remedial action by the County is urgently needed.

441.  The information and opinions contained in this report are based on evidence, documentation, and/or observations available to me.  I reserve the right to modify or expand these opinions should additional information become available to me.  The information contained in this report and the accompanying exhibits are a fair and accurate representation of the subject of my anticipated testimony in this case.

Date:  AUGUST 19 , 2024

Pablo Stewart, M.D.

EXPERT REPORT OF PABLO STEWART, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

# EXHIBIT O
# (Redacted)

1   GAY C. GRUNFELD – 121944          CHRISTOPHER M. YOUNG – 163319
    VAN SWEARINGEN – 259809          ISABELLA NEAL – 328323
2   MICHAEL FREEDMAN – 262850        OLIVER KIEFER – 332830
    ERIC MONEK ANDERSON – 320934     DLA PIPER LLP (US)
3   HANNAH M. CHARTOFF – 324529      4365 Executive Drive, Suite 1100
    BEN HOLSTON – 341439             San Diego, California  92121-2133
4   ROSEN BIEN                       Telephone:  (858) 677-1400
    GALVAN & GRUNFELD LLP            Facsimile:   (858) 677-1401
5   101 Mission Street, Sixth Floor  christopher.young@dlapiper.com
    San Francisco, California  94105-1738   isabella.neal@dlapiper.com
6   Telephone:  (415) 433-6830       oliver.kiefer@dlapiper.com
    Facsimile:   (415) 433-7104
7   ggrunfeld@rbgg.com
    vswearingen@rbgg.com
8   mfreedman@rbgg.com
    eanderson@rbgg.com
9   hchartoff@rbgg.com
    bholston@rbgg.com
10
    AARON J. FISCHER – 247391
11  LAW OFFICE OF
    AARON J. FISCHER
12  1400 Shattuck Square Suite 12 - #344
    Berkeley, California  94709
13  Telephone:  (510) 806-7366
    Facsimile:   (510) 694-6314
14  ajf@aaronfischerlaw.com

15  Attorneys for Plaintiffs and the
    Certified Class and Subclasses
16

17              UNITED STATES DISTRICT COURT

18            SOUTHERN DISTRICT OF CALIFORNIA

19  DARRYL DUNSMORE, ANDREE          Case No. 3:20-cv-00406-AJB-DDL
    ANDRADE, ERNEST ARCHULETA,
20  JAMES CLARK, ANTHONY EDWARDS,    **REBUTTAL EXPERT REPORT**
    REANNA LEVY, JOSUE LOPEZ,        **OF PABLO STEWART**
21  CHRISTOPHER NORWOOD, JESSE
    OLIVARES, GUSTAVO SEPULVEDA,     Judge:      Hon. Anthony J. Battaglia
22  MICHAEL TAYLOR, and LAURA        Magistrate: Hon. David D. Leshner
    ZOERNER, on behalf of themselves and all
23  others similarly situated,       Trial Date: None Set

                    Plaintiffs,
24
            v.
25  SAN DIEGO COUNTY SHERIFF'S
    DEPARTMENT, COUNTY OF SAN
26  DIEGO, SAN DIEGO COUNTY
    PROBATION DEPARTMENT, and DOES
27  1 to 20, inclusive,
                    Defendants.
28

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................... 1

II.    RESPONSE TO THE REPORT OF LENARD VARE ....................... 1

       A.    Mr. Vare's Opinion Suggesting that the Jail's Suicide Prevention
             Policies and Procedures Are Appropriate Is Incomplete and Ill-
             Informed. ................................................................................. 1

       B.    Mr. Vare's Opinion Dismissing Serious Concerns About
             Improper Custody Staff Interference with Mental Health Care
             Decisions Is Incomplete and Based on Irrelevant Analogies. ......... 5

       C.    Mr. Vare's Opinion that There are No Deficiencies with Respect
             to Safety Checks Ignores the Repeated Findings of Deficiencies
             by Multiple Independent Factfinders. ........................................ 10

       D.    Mr. Vare's Opinion Regarding the Outpatient Step-Down
             (OPSD) Program's Exclusion of Protective Custody Patients
             Misses the Point and Ignores County Leadership's Recognition
             of this Deficit. ........................................................................ 12

III.   RESPONSE TO THE REPORT OF JOSEPH PENN ..................... 14

       A.    Dr. Penn's Review Completely Ignores Jail Suicides and Mental
             Health-Related Deaths that Have Occurred in San Diego County
             Jail, which Is a Fundamental Flaw in His Methodology. .............. 15

       B.    Dr. Penn's Methodology, Findings, and Opinions Are Confusing
             and Unreliable Due to His Use of "Copy-and-Paste" Passages
             from His Reports from Other Cases and Correctional Mental
             Health Systems. ...................................................................... 17

       C.    Dr. Penn's Opinion that the Jails' Practices and Policies Ensure
             that Patients in Need of Mental Health Care Are Appropriately
             Identified and Tracked Is Not Supported By Facts. .................... 20

       D.    Dr. Penn's Opinion that the San Diego County Jail System
             Maintains Adequate Mental Health Staff to Meet the
             Incarcerated Population's Needs Ignores Well-Established and
             Readily Acknowledged Facts that the System Does *Not* Have
             Sufficient Staffing Resources. ................................................. 25

       E.    Dr. Penn's Opinion that San Diego County Jail Custody Staff Do
             Not Interfere with Mental Health Care Staff's Clinical Decisions
             Is Not Supported by the Facts. ................................................ 30

       F.    Dr. Penn's Opinion that San Diego County Jail Has an Adequate
             Psychiatric Medication System to Meet Patient Needs Is Not
             Supported by the Facts, Including Those in His Own Report. ........ 34

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

G.    Dr. Penn's Opinion that San Diego County Jail Provides Patients with Timely Access to Mental Health Care and a "Robust Mental Health Delivery System" Ignores the Realities of this Extremely Inadequate System. .................................................. 42

     1.    There Are Serious Deficiencies with Respect to the Timeliness of Mental Health Care at the San Diego County Jail. ................................................................ 42

     2.    There Are Serious Deficiencies with Respect to the Adequacy of Mental Health Care and Treatment Programming at the San Diego County Jail. ...................... 46

H.    Dr. Penn's Opinion that San Diego County Jail "Provides Opportunities for Confidential Mental Health Care Encounters in Adequate Physical Spaces" Is Contradicted by the Facts, Including Statements by the Sheriff Herself. ........................ 51

I.    Dr. Penn's Opinion that San Diego County Jail Does Not House Patients at Risk of Suicide in Punitive Isolation and that "Strategies Are Employed to Avoid Unnecessary and Undue Risk of Decompensation and Harm" Is Not Supported by the Facts of the Jail's Operations. .............................................. 56

J.    Dr. Penn's Opinion that the San Diego County Jail System Has an Adequate Suicide Prevention System Is Inconsistent with the Facts, and His Analysis Omits Critical Information. .......................... 65

K.    Dr. Penn's Opinion that the Sheriff's Department Does Not Discriminate and Unfairly Punish People with Mental Illness Is Contradicted by the County's Own Staff and Its Own Experts. .......... 72

L.    Dr. Penn's Opinion that the "Sheriff's Department Provides IPs with Adequate Mental Health Discharge Planning and Resources" Is Not Supported by the Facts and Is Contradicted by the County's Own Jail Mental Health Coordinator. ........................... 73

IV.    CONCLUSION ............................................................ 75

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

## I.     INTRODUCTION

I, Pablo Stewart, declare:

1.     I was asked to review and analyze the opinions and conclusions expressed in the August 21, 2024, Expert Reports of Joseph Penn and Lenard Vare, and to opine whether those reports cause a change in my opinions or conclusions as set forth in my August 19, 2024 expert report in this matter (hereinafter "Stewart Report"), and to provide my opinions as to those reports.

2.     I have reviewed and analyzed the opinions in the expert reports noted above.  Neither the opinions nor conclusions outlined in those reports cause me to change any of the opinions or conclusions stated in my expert report dated August 19, 2024.

3.     The opinions expressed in this rebuttal report are based on information that has been made available to me.  Should new information become available to me in the future, I reserve the right to analyze that information and revise my opinions and/or conclusions.

## II.     RESPONSE TO THE REPORT OF LENARD VARE

4.     I reviewed Defendants' expert Lenard Vare's report, dated August 21, 2024.  As set forth below, I strongly disagree with many of the opinions Mr. Vare offers in his report (hereinafter "Vare Report").

### A.     Mr. Vare's Opinion Suggesting that the Jail's Suicide Prevention Policies and Procedures Are Appropriate Is Incomplete and Ill-Informed.

5.     Mr. Vare writes that the "suicide prevention policies as well as policies related to managing suicidal individuals at San Diego County jails are appropriate in identifying and addressing the concerns related to incarcerated persons."  Vare Report at 19-40 (Opinion 1). I strongly disagree with this opinion, and note a few important ways that Mr. Vare's analysis is incomplete and ill-informed.

6.     Mr. Vare's opinion does not mention, and appears not to be informed by, critically important sources of data—including the findings and

1    recommendations of suicide prevention expert Lindsay Hayes and the findings and

2    recommendations of the clinical and investigative team that issued Disability Rights

3    California's report, *Suicides in San Diego County Jail:  A System Failing People*

4    *with Mental Illness*, among other detailed reports on suicide prevention-related

5    deficiencies as I set forth in my report.  Stewart Report ¶¶ 284-350.

6        7.    Nor is Mr. Vare's assessment based on analysis of any of the

7    approximately 40-plus suicides that have occurred among incarcerated people at San

8    Diego County Jail in recent years.  In determining the adequacy of a jail system's

9    suicide prevention policies and practices, it is essential to look at individual critical

10   incidents – including completed suicides and serious suicide attempts – and to

11   explore whether and to what extent systemic deficiencies are in evidence.  I engaged

12   in such an assessment in my August 2024 report; Mr. Vare has not done so.

13       8.    I was surprised and troubled to see the statistical data that Mr. Vare

14   relies upon to support his opinion that the San Diego County Jail's suicide

15   prevention policies and practices are "appropriate."  Specifically, he includes this

16   chart (Vare Report at 27):

| Year | Total Self-Harm Incidents including Attempted Suicides | Attempted Suicides Only |
|------|--------------------------------------------------------|-------------------------|
| 2021 | 299 | 56 |
| 2022 | 272 | 41 |
| 2023 | 286 | 22 |

23       9.    The County has stated to DRC that it began utilizing new definitions

24   for "Suicide Attempt" and "Non-Suicidal Self Injury" in 2017.  Under these

25   definitions, the County determined that just 10 of the 73 incidents reported as

26   "Suicide Attempts" were in fact suicide attempts under the new definition.  DRC

27   Report at 5.

28       10.   Mr. Vare writes that, during the 2021-2023 time period, there were five

(5) completed suicides in San Diego County Jails.  He then contrasts that number with the "857 individuals" reflected in the above chart's "Total Self-Harm Incidents including Attempted Suicides" column who "were prevented from further harming themselves or completing their suicidal intent over the three-year period."  Vare Report at 27.  This statement is nonsensical and a misrepresentation of this data.

11.     To begin with, Mr. Vare's statement is factually incorrect.  There are individuals almost certainly reflected on this chart who in fact *did* further harm themselves and even committed suicide during this three-year period.  Take, for example, Mr. Marroquin, whose May 2021 suicide I describe in detail in my report.  Stewart Report ¶¶ 275-281.  Mr. Marroquin was placed in safety cells and enhanced observation cells for serious self-harm incidents resulting from auditory hallucinations and other acute psychiatric symptoms in the early months of 2021.  Mr. Marroquin was then placed in a clinically inappropriate and dangerous solitary confinement cell, where he died by suicide.  His self-harm/suicide attempt incidents in 2021 are (or should be) reflected on Mr. Vare's chart.  Mr. Vare's claiming that those incidents are evidence of an adequate jail suicide prevention system is deeply wrong-headed.  Mr. Marroquin's death was a terrible failure with respect to both mental health treatment and suicide prevention.  His earlier suicide attempts and self-harm incidents do not demonstrate success; they underscore the system's deficiencies.

12.     Mr. McDowell's egregious case is another example of a suicide attempt in 2023 and was followed by his placement in solitary confinement without necessary psychiatric treatment for several weeks leading up to his suicide, is another example.  Stewart Report ¶¶ 258-265.  Mr. Vare's statement would have one consider Mr. McDowell's suicide attempt to be evidence of systemic success (notwithstanding that the Jail then put Mr. McDowell in even greater danger and denied him care, leading to his completed suicide).  It is in fact the opposite – evidence of a system that places people with serious mental illness at grave and

1   unacceptable risk.

2       13.    The goal of an adequate suicide prevention system is not merely to

3   prevent people who engage in self-harm or attempt suicide from dying.  The goal

4   must also be to proactively identify and treat serious mental illness and suicide risk,

5   to reduce suicidality, and to *prevent* self-harm and suicide attempt incidents.  In this

6   three-year span, in addition to the completed in-jail suicides, the chart shows that at

7   least 119 people attempted suicide, and at least 857 people engaged in self-harm,

8   including the suicide attempts.  **This finding of such a large number of**

9   **incarcerated people engaging in self-harming behavior in this Jail is very**

10   **significant, and serves only to increase my concern.**  These data highlight the

11   desperate need for improved psychiatric care and mental health treatment as well as

12   more clinically appropriate settings for people who are now clearly at great risk in

13   the San Diego County Jail.

14       14.    The numbers of attempted suicides in 2021, 2022, 2023, as reflected in

15   Mr. Vare's chart, are substantial, and appear to be significantly higher as compared

16   to a few years earlier – in 2017, another year for which the County has provided

17   suicide attempt data.  In Disability Rights California's 2018 report on suicides in

18   San Diego County Jail, the County reported that there were ten (10) incidents

19   meeting the Jail's definition of "Suicide Attempt" between January 2017 and mid-

20   September 2017 (8½ months), or about one per month.  DRC Report at 5.

21   Mr. Vare's data show that by 2021, there were 56 attempted suicides over a 12-

22   month period (almost 5 suicide attempts per month), a huge increase that continued

23   at least through 2022 (41 attempted suicides over a 12-month period, or 3½ suicide

24   attempts per month).

25       15.    Mr. Vare's discussion of the plaintiffs in this case offers no evidence

26   that the Jail's suicide prevention policies and practices are appropriate.  In fact,

27   Mr. Vare's own descriptions of the plaintiffs' experiences raise serious concern.  For

28   example, the case of Plaintiff Olivares is extremely alarming with respect to suicide

prevention protocols, as Mr. Vare recounts:

> Olivares decided to stop eating and go on a hunger strike in January 2022. He was seen by a mental health professional and the mental health staff determined that Olivares should be placed in the Inmate Safety Program. He was interviewed in a medical clinic room, and he informed mental health staff that he was not going to change his mind about his decision. He even reported that he had told his family and friends and made peace with them. He was then placed in an EOH cell. . . . Olivares was again placed into EOH in February 2022 after he informed staff that he was on his second hunger strike.

Vare Report at 35-36.

16.     The County's response to this patient's decision to go on a hunger strike makes no sense. In Enhanced Observation Housing (EOH), all patients are denied clothing, placed in a safety smock, and denied various personal belongings and activities (*e.g.*, family visits). None of these deprivations address Mr. Olivares' clinical needs related to an intended hunger strike. (Removal of clothing and placement in a safety smock is clinically indicated when a person demonstrates a risk of hanging themselves of strangling themselves with their clothing. A safety smock is not indicated for a potential hunger strike.) In my experience, placing someone with serious mental health needs in a highly restrictive setting with such deprivations in this kind of situation is clinically countertherapeutic and can feel punitive. It does not serve to treat or meaningfully address a patient's suicidality or mental health needs.

17.     Nothing in Mr. Vare's discussion of suicide prevention policies and practices directly addresses, or changes, the detailed findings of systemic deficiencies in my August 2024 report.

**B.     Mr. Vare's Opinion Dismissing Serious Concerns About Improper Custody Staff Interference with Mental Health Care Decisions Is Incomplete and Based on Irrelevant Analogies.**

18.     Mr. Vare writes that Plaintiffs' allegations that "custody staff improperly controls clinical mental health care decisions" are "completely without merit." Vare Report at 40-43 (Opinion 2). Mr. Vare's opinion is remarkably incomplete and relies on irrelevant analogies regarding other government systems.

19.     Mr. Vare first dismisses the real and consequential structural deficiency in the Jail's organizational structure, whereby San Diego County Jail health care staff and leadership report directly to a Jail Captain and the Sheriff's Command team.  I describe in my report how San Diego County Jail's organizational structure is inconsistent with modern correctional psychiatric practices and is extremely problematic, especially when contrasted with the organizational structures that exist in other medium and large county jail systems in California where jail medical and mental health care staff are overseen by the county's respective health services agencies – including in the Counties of Los Angeles, Orange, Riverside, Sacramento, San Francisco, and Santa Clara.  *See* Stewart Report ¶¶ 370-388. Mr. Vare's dismissal of this concern is confusing and off-topic, as he states:

> In city governments, the elected mayor supervises the chief of police even though the mayor is not a peace officer.  In state governments, the governor is the commander of the state national guard even though the governor is not a member of the armed forces.  The governor's cabinet in California includes directors of Health and Human Services, and the mental health facilities operated by the Department of State Hospitals. Governor Gavin Newsom is neither a physician nor a psychiatrist, yet he is elected by the people of the state to provide leadership to numerous public agencies including those that provide medical and mental health services.

Vare Report at 40-41.

20.     These supposed analogies offer no insight on this important issue. Mr. Vare then offers his background as a former state prison warden, noting that the medical and mental health directors in the state prison system would "send me requests for vacation," among other things.  This analogy is also not relevant to a local jail system like San Diego County's, *where there are numerous examples of custody staff and leadership making policy and practice decisions that should be in the purview of mental health professionals and clinical leadership* – including as to improper custodial blanket ban policies preventing access to the Outpatient Step Down Program (OPSD) for patients when clinically indicated (Stewart Report Finding 3.D.) and improper custody-driven placements in solitary confinement

1  without consideration of mental health input (Stewart Report Finding 4.B).

2       21.    Mr. Vare then states that "there is no evidence that medical or mental

3  health personnel are not making medical and mental health decisions

4  independently." Vare Report at 42. But the County's own witnesses demonstrate

5  that it *is* the case that custody staff, by policy and practice, are making what should

6  be clinical determinations without clinicians' involvement.

7       22.    For example, take San Diego County Jail's policies and procedures

8  regarding placement of patients in a restraint chair inside a safety cell. The

9  placement and removal of a patient with mental illness in a restraint chair *should* be

10  based on clinical, not custody, determinations. But it was made very clear to me

11  that such decisions in this Jail system are exclusively "custody decisions." *See*

12  Stewart Report ¶¶ 405-408. The Jail's own mental health coordinator (Ms. Quiroz)

13  testified that she thinks it is important that mental health professionals be involved

14  in these uses of a restraint chair, and *that they are not*:

15 
16     Ms. Quiroz: I mean, we've witnessed people in a restraint chair. We're not necessarily the ones determining when they're getting out of that chair. You know, we're not -- they're not calling us for that reason, to say, should this person be removed.

17 
18     …

19     [I]t's not common that we see somebody -- that we are going to assess somebody in a [restraint] chair. It is not common.

20     Q: … [D]o you think it's important for clinicians to be involved when a
21     restraint like a restraint chair is used on somebody who may be manifesting mental illness?

22     A: Although I think it's important for a clinician, I think a psychiatrist should
23     be -- I mean, if somebody's in a restraint chair I think we should probably get an M.D. level involved.

24     …

25     Q: You're not aware of any policy right now for an M.D. level staff member
26     to get involved in a certain way when someone is placed in a restraint chair by custody?

27     A: No.

28  Quiroz PMK Dep. at 72-74.

23.     As a second example, take the San Diego County Jail's failure to follow U.S. DOJ guidance making clear that a person with serious mental illness "should not be placed in restrictive housing [like the San Diego County Jail's Administrative Separation units], unless:

- The inmate presents such an immediate and serious danger that there is no reasonable alternative; or

- A qualified mental health practitioner determines:

- That such placement is not contraindicated;

- That the inmate is not a suicide risk;

- That the inmate does not have active psychotic symptoms; and

- In disciplinary circumstances, that lack of responsibility for the misconduct due to mental illness or mitigating factors related to the mental illness do not contraindicate disciplinary segregation."

Stewart Report ¶¶ 184-186 (quoting and discussing U.S. DOJ guidance); *see also* NCCHC Standards for Mental Health Services in Correctional Facilities' Standard MH-E-07 (Segregated Inmates) (For a patient being placed in segregation, it is necessary that "mental health staff reviews the inmate's mental health record to determine ***whether existing mental health needs contraindicate the placement*** [in segregation] or require accommodation" (emphasis added)).

24.     Based on my on-site observations, patient interviews, and review of individual records, it is beyond question that the dangerous practice of placing – and retaining – people in solitary confinement-type Administrative Separation units without consideration of whether their current mental health condition and needs contraindicate the placement, is pervasive in the San Diego County Jail system. Stewart Report ¶¶ 207-226.  Jail leadership and staff testimony confirm that this is true.  *See* Quiroz PMK Depo. at 250-51 (noting there is no mental health clinical assessment done for a person being placed in Administrative Separation, with clinical issues something that can be discussed late at staff meetings that occur every two weeks); Ross Dep. at 43 ("Q: … Have there been examples in your experience

where you made a recommendation that somebody be removed from AdSep based on their mental health where classification says, no, they need to remain in AdSep and they so remain?  A: Yes.  Q: Do you have any examples that come to mind?  A: Yeah.").

25.    A third example, also unaddressed by Mr. Vare in his report, is the blanket *custodial* restrictions on clothing, bedding, property, and privileges for patients on suicide precautions.  By policy and in practice, there is no clinical judgment or input that goes into making these decisions in the San Diego County Jail – a considerable deviation from modern correctional standards.  Stewart Report ¶¶ 312-316; *see also* Quiroz PMK Dep. at 156 ("That all happens outside of the clinical world. … [T]hat's in the very custody world.").

26.    On this topic, Mr. Vare in fact misrepresents the testimony of Jail mental health director Melissa Quiroz.  Mr. Vare writes that Ms. Quiroz testified that "[c]linicians also determine that the individuals must be placed in safety smocks" (p. 42).  This is *not* accurate.  *See* Quiroz PMK Depo. at 145 ("Q: You're confident that the practice is that ***there's no clinical judgment exercised as to whether a person is placed in a safety smock*** once they go into a safety cell or an EOH?  **A: Yeah**.")  (emphasis added).

27.    A draft policy that would help to remedy this serious deficiency was considered by Jail leadership more than two years ago, but the County has declined to implement it.  Stewart Report ¶ 314 (quoting draft policy and citing Ms. Quiroz's testimony that the policy "is not in place at this time").

28.    In my patient chart reviews and individual interviews, I found repeated instances where custody staff, by policy and in practice, improperly interfere with important clinical determinations regarding treatment, placement, and conditions for incarcerated people with serious mental illness in the San Diego County Jail.  *See, e.g.*, the alarming case of Patient ███████████ an illustrative but by no means outlier case.  Stewart Report ¶¶ 229-238.  Such instances put patients at substantial

1   risk of serious harm, including needless suffering and even death.

2        29.    I strongly disagree with Mr. Vare's opinion that there is no improper

3   custody staff interference with mental health clinical decisions in the San Diego

4   County Jail system.  His opinion is not rooted in fact, and it is at odds with Jail

5   leadership's own testimony and policies.  Nothing in Mr. Vare's report changes my

6   detailed findings and opinions on the Jail's systemic deficiencies in this area.

7        **C.     Mr. Vare's Opinion that There are No Deficiencies with Respect to
            Safety Checks Ignores the Repeated Findings of Deficiencies by
8            Multiple Independent Factfinders.**

9        30.    Mr. Vare writes that "safety checks are done appropriately" in the San

10  Diego County Jail system, and that "there is an adequate process for the safety

11  checks to be audited and lapses in checks are addressed appropriately."  Vare Report

12  at 89-94 (Opinion 8).  I strongly disagree.  Mr. Vare appears to ignore entirely the

13  repeated findings that inadequate safety checks are a major deficiency in this Jail's

14  system, by nationally recognized Suicide Prevention expert Lindsay Hayes, the

15  California State Auditor, Disability Rights California, and the San Diego County

16  Citizens' Law Enforcement Review Board (CLERB).  *See* Stewart Decl. ¶¶ 320-

17  335.

18       31.    It was puzzling to see that Mr. Vare found that the County's auditing

19  system for safety checks was "thorough and transparent" (Vare Report at 90) based

20  on review of "an Excel spreadsheet provided to me which showed several

21  supervisory audits that were conducted *during 2021*" (emphasis added).  It was in

22  2022 that the California State Auditor found terrible deficiencies both in the

23  observed safety check practices themselves ("Based on our review of video

24  surveillance footage, we observed multiple instances of sworn staff who spent no

25  more than one second glancing into an individual's cell, sometimes without

26  breaking stride as they walked through the housing module . . . .") and in the

27  adequacy of auditing those checks ("The assistant sheriff of detentions indicated that

28  the department has an *informal process* for assessing the quality of safety checks,

1   which can include watching video footage.  However, the Sheriff's Department has

2   not documented this assessment process in its policy, and *establishing an informal*

3   *practice does not ensure that each facility's management team will consistently*

4   *verify the quality of safety checks*.") (emphases added).  2022 California State

5   Auditor Report at 25-26.

6         32.    Mr. Vare says nothing of the many in-custody deaths that have

7   occurred where subsequent findings revealed inadequate safety checks that very

8   likely contributed to the deaths (including Mr. Horsey (2017), Mr. Wilson (2020),

9   and Mr. Settles (2022)).  *See* Stewart Report ¶¶ 329-332.  In my experience working

10  in and monitoring jail and prison systems, a *single* in-custody death involving

11  deficient safety check procedures would lead to concerted corrective action to

12  ensure that such deficiencies do not recur.  The San Diego County Jail system has

13  had *multiple* in-custody deaths with deficient safety check findings, along with

14  numerous outside experts and investigating bodies issuing strong recommendations

15  to address the issue.  Yet the deficiencies persist.  Mr. Vare's stamp of approval in

16  this area, without any reference to these facts, is disturbing and wrong.

17        33.    Mr. Vare also provides no opinion regarding another key deficit in the

18  San Diego County Jail's safety check policies and procedures – that is, the need to

19  align with the modern practice of 30-minute (rather than hourly) checks in

20  Administrate Separation-type housing units.  *See* Stewart Decl. ¶ 322 (citing the

21  American Correctional Association's standard on this point), ¶ 327 (Suicide

22  Prevention expert consultant Lindsay Hayes "strongly recommended" that San

23  Diego County Jail implement 30-minute checks), ¶ 333 (citing other California jail

24  systems that have implement 30-minute checks in solitary confinement-type

25  housing), ¶ 279 (Marroquin suicide by water intoxication, body found after 54

26  minutes between Administrative Separation safety checks), ¶ 332 (Settles suicide,

27  body found after 75 minutes between Administrative Separation safety checks).

28        34.    My opinion remains that the Jail staff and system currently conduct

1    inadequate safety checks, and that the County continues (in policy and procedure) to

2    fail to conduct the appropriate 30-minute safety checks in Administrative

3    Separation, all of which place people at substantial risk of serious harm, including

4    death.

5         35.    Nothing in Mr. Vare's discussion of safety check policies and practices

6    directly addresses, or changes, my detailed findings of deficiencies on this topic.

7         **D.    Mr. Vare's Opinion Regarding the Outpatient Step-Down (OPSD)
         Program's Exclusion of Protective Custody Patients Misses the

8         Point and Ignores County Leadership's Recognition of this Deficit.**

9         36.    Mr. Vare writes that "Plaintiffs' allegation that the Sheriff's Office

10   excludes people designated as protective custody from housing in the Out-Patient

11   Step Down ('OPSD') unit lacks merit because it does not consider the complexity of

12   classification related issues in managing the safety and security of individuals in

13   protective custody."  Vare Report at 105-110 (Opinion 10).  Mr. Vare has missed

14   the point here entirely, and even ignores the County's own person-most-

15   knowledgeable (its Jail mental health coordinator) on this subject.

16        37.    It is a basic principle with respect to mental health standards of care,

17   including in the jail setting, that a person should be provided mental health care

18   placement and treatment consistent with their individual *clinical* needs.  In a

19   functioning jail mental health care system, a patient with serious mental illness is

20   not provided safety *or* adequate mental health care.  They are provided safety *and*

21   adequate mental health care.

22        38.    San Diego County Jail fails in this regard.  Through its blanket ban

23   policy, the Jail excludes people designated as Protective Custody from OPSD

24   placement, the *only* mental health program available across the Jail population

25   outside of the inpatient Psychiatric Services Unit, which is reserved for people who

26   are acutely psychotic and meet Section 5150 involuntary hospitalization criteria.

27        39.    It is a common practice for a jail system to override classification

28   designations like "General Population" or "Protective Custody" when a person

1   requires a mental health treatment bed. (San Diego County itself appears to do this

2   once a person is so acutely ill that they require inpatient PSU level of care.) In other

3   jail systems, custody staff continue to conduct appropriate housing assessments to

4   ensure against an unsafe placement, and they do so based on individualized security

5   assessments, not simply based on a patient's existing classification designation. San

6   Diego County Jail does *not* follow this practice, which has the effect of preventing

7   Protective Custody-designated patients from accessing OPSD care. This policy-

8   driven denial of care is dangerous and concerning.

9          40.    But even in a jail system where a re-classification to "mental health"

10   does not occur for patients with serious mental illness, enhanced mental health

11   outpatient placements can and must be provided to all patients who need them, both

12   among the General Population and the Protective Custody population. This is

13   accomplished rather simply. In San Diego County Jail, there would be enhanced

14   mental health units designated as OPSD-General Population, and separate enhanced

15   mental health units designated as OPSD-Protective Custody. *There is, in short, no*

16   *excuse for a system that denies enhanced mental health program placement to all*

17   *Protective Custody patients.*

18          41.    Mr. Vare is also wrong to emphasize only the risk of placing a

19   Protective Custody patient in a mental health unit with General Population patients.

20   It is also unacceptably dangerous to *exclude* Protective Custody patients with

21   serious mental illness from the appropriate mental health placement, both because

22   they are denied clinically necessary treatment and also because they may be

23   vulnerable to harm and victimization being housed with people who do not have

24   mental illness. The risks can be deadly, as I recount in my report regarding the

25   brutal death of **Derek Baker**, a man with serious mental illness who was found

26   clinically appropriate for OPSD housing in San Diego County Jail but excluded

27   because he was "Protective Custody." He was then violently murdered by another

28   Protective Custody individual who did not have serious mental illness. Stewart

1  Report ¶¶ 169-170.

2        42.    It is quite disturbing that Mr. Vare has no concern about this systemic

3  deficiency, even as the Jail system's own mental health coordinator has stated that

4  the creation of an OPSD-Protective Custody unit would be "useful" and "good."

5  Quiroz PMK Dep. at 64-65 (Quiroz: … "there is not an identified outpatient step-

6  down PC mod per se.  There is not that."  Q: "Do you think that that sort of module

7  would be useful to have?"  A: "It would be useful."  Q: "And the objective of it

8  would be to ensure that people who both need outpatient step-down and are

9  designated as protective custody can get that level of service?"  A: "That would be

10  good.").  This remains a systemic deficiency that is harming people with serious

11  mental illness, and it must be addressed.

12  **III.    RESPONSE TO THE REPORT OF JOSEPH PENN**

13        43.    I have reviewed the Defendants' expert Joseph Penn's report, undated

14  and unsigned, but produced on August 21, 2024 (hereinafter "Penn Report").

15        44.    In Dr. Penn's report, he states that a "random selection methodology"

16  was used to conduct a review of psychiatric and mental health records.  Penn Report

17  at 9.  He does not explain what this methodology was, and so I am not clear as to

18  how these patient records were selected.  He writes that he enlisted three practicing

19  correctional forensic psychiatrist consultants (Natasha Cervantes, M.D., Joseph

20  Baskin, M.D., and Ariana Nesbit Huselid, M.D.) to review these records.  *Id.*

21  Dr. Penn states that he reviewed their case summaries and incorporated their

22  evaluations into his analysis and opinions.  *See* Penn Report Appendix D (at 156-

23  205).

24        45.    These three designated reviewers provided summaries for more than 80

25  past or current San Diego County Jail patients.  Almost *none* of them were patients

26  whose records were provided to me for my previous report.  I am informed that the

27  records previously provided to me were chosen by San Diego County as being

28  representative of particular categories that I developed consistent with my

1   methodology in this case.  *See* Stewart Report ¶ 16.

2        46.    To complete my rebuttal report, it was important that I have the

3   opportunity to conduct my own assessment of the case records that were reviewed

4   by Dr. Penn's three designated reviewers.  The County did not produce, and I

5   therefore did not receive, these records until approximately September 21, 2024, one

6   month after the initial expert reports were produced in this case.

7        47.    These records are voluminous, and required extensive time and effort to

8   review.  As with my previous report, I utilized the assistance of a psychiatrist

9   colleague who has experience in jail mental health care, to review patient records.

10  The reviews conducted by this colleague were done under my supervision, as is my

11  frequent practice when conducting large detention mental health care system

12  assessments.  My analysis is ultimately done independently and all findings

13  contained in this report are my own.

14       48.    I cannot discern how Dr. Penn incorporated the findings of his three

15  designated reviewers (Appendix D) into his report.  He does not reference a single

16  patient record review in his own report narrative.

17       49.    More importantly, as discussed throughout this report, I observed that

18  many findings by Dr. Penn's three designated reviewers are in direct contradiction

19  with Dr. Penn's opinions and conclusions.

20       50.    As set forth below, I disagree with the opinions that Dr. Penn has

21  offered in his report.  Nothing in his report changes any of my findings or

22  conclusions.  In many respects, his report only raises my concerns about the

23  systemic failures and inadequacies of the San Diego County Jail's mental health

24  care system.

25       **A.    Dr. Penn's Review Completely Ignores Jail Suicides and Mental
             Health-Related Deaths that Have Occurred in San Diego County
26           Jail, which Is a Fundamental Flaw in His Methodology.**

27       51.    In my decades of experience evaluating correctional mental health care

28  systems, a core component of my work is to look closely at sentinel events (*i.e.*,

incidents that result in death or severe harm to a patient) – most specifically, suicides and other mental health-related deaths. Such a review is foundational and essential to doing a proper assessment as to the adequacy of a correctional mental health care system.

52. I was thus shocked to see that, as confirmed in Dr. Penn's Report Appendix C ("Materials Reviewed"), Dr. Penn did not review records from any suicides or other mental health-related deaths. Nor did his designated reviewers provide any mention or analysis of any of such deaths. This is a glaring omission in Dr. Penn's methodology as a mental health professional claiming to assess the functioning of a mental health system. This is especially relevant in this case, where San Diego County Jail has had scores of suicides and other mental health-related deaths in recent years. It is critical to examine those cases, to identify any individual deficiencies or recurring problems that indicate a need for systemic remedial action. Remarkably, Dr. Penn's assessment does not include a specific analysis of any completed suicide and other mental health-related death. The failure to do so falls below what I understand to be accepted practice for the evaluation of a jail's mental health care and suicide prevention system.

53. Dr. Penn includes only a chart listing ten in-custody suicides at the Jail, dating from March 2019 to July 2023. Penn Report at 49-50. I reviewed the records and reports of several of those deaths, providing detailed analyses in my previous report. Dr. Penn did not provide analysis on a single one.

54. I similarly found it puzzling and troubling that Dr. Penn gave a passing grade to the County and its health care contractor NaphCare on their suicide death review processes. Penn Report at 50 ("In the rare event of a suicide, SDSO conducts psychological autopsies, administrative suicide reviews, and morbidity and mortality reviews to assess contributing factors and enhance prevention practices. I confirmed that both the county and the contracted health NaphCare conduct independent suicide and medical, natural deaths, or substance use related death

1    reviews, morbidity and mortality reviews, and these are conducted in a timely

2    manner.").  Dr. Penn's "Materials Reviewed" list (Appendix C) does not appear to

3    contain a single psychological autopsy, administrative suicide review, or morbidity

4    and mortality review.  He does not discuss the details of any suicide death review in

5    his report.  I cannot tell how Dr. Penn reached his conclusion as to appropriate

6    timeliness, much less quality, of these death reviews.

7         55.    In contrast, my analysis included extensive records from many San

8    Diego County Jail suicides and mental health-related deaths.  I provide specific

9    examples of deficiencies in the post-death review processes.  *See, e.g.*, Stewart

10   Report ¶ 265 (McDowell suicide); *id.* ¶¶ 341-342 (NaphCare PMK witness

11   testimony that psychological autopsies are not always completed, with portions

12   often left completely blank); *id.* ¶ 348 (San Diego County Jail mental health care

13   leadership concedes that they do *not* consider CLERB in-custody death reviews or

14   findings at all).

15        56.    Reviewing sentinel events – such as deaths in custody – is not only

16   standard practice but also a vital step in evaluating a system's effectiveness in

17   ensuring the safety and welfare of both incarcerated people and staff.  This is why

18   my assessment includes a detailed review of these events – to gain insight into the

19   system's strengths and weaknesses.  In contrast, Dr. Penn listed a few such incidents

20   in a chart but does not address any of them further.  His omission raises serious

21   concerns about the depth of his analysis and the accuracy of his conclusions.

22        **B.    Dr. Penn's Methodology, Findings, and Opinions Are Confusing
              and Unreliable Due to His Use of "Copy-and-Paste" Passages from**

23            **His Reports from Other Cases and Correctional Mental Health
              Systems.**

24

25        57.    As should be clear by the discussion below, my findings and opinions

26   are starkly different from those of Dr. Penn.  I emphasize that my findings and

27   opinions are based on a specific analysis of *this* San Diego County Jail system.

28   Upon close review, however, it is apparent that Dr. Penn's findings and opinions

1    may not be.  I am familiar with Dr. Penn's expert work from other litigations,

2    including in the statewide Arizona prisons class litigation (*Jensen v. Shinn*), where I

3    have served as plaintiffs' class expert and Dr. Penn served as defendants' expert.

4    My experience in that case provides me some insight regarding Dr. Penn's San

5    Diego County Jail report, which copy-and-pastes significant findings and opinions

6    from his Arizona report in ways that are inapplicable at best and, more often,

7    factually inaccurate.

8         58.    For example, I was confused to read this finding on involuntary

9    antipsychotic medications and clinical restraints from Dr. Penn's report:

10       During numerous interviews with nursing and mental health care staff
         across the state, and also as spelled out in NaphCare SDSO policy, I
11       learned that if and when there is a clinical question involving the
         clinical necessity, consideration of the clinical necessity and/or
12       appropriateness of forced antipsychotic medications, or the need to
         begin to pursue this process with due process protections for IP patients
13       who may be subjected to involuntary administration of psychotropic
         mediations (when clinically indicated as a means of treating psychiatric
14       illness or urgently reducing harm, dangerousness, or severe violence
         towards self or others), that the NaphCare treating psychiatrists who
15       have offices near the Psychiatric Stabilization Unit (PSU) are readily
         available to discuss by phone, or alternatively, an on call psychiatrist or
16       psychiatric provider is available 24 hours per day, 365 days per year,
         even after hours and on weekends. **I understand this same process to**
17       **be in place for orders of emergency clinical seclusion or restraint.**

18   Penn Report at 41 (emphasis added).

19        59.    I was confused by Dr. Penn's factual finding that clinical restraints use

20   at the Jail entail significant involvement of clinical and psychiatric staff.  As I

21   learned during my tours and as was confirmed by Ms. Quiroz, this is not the case at

22   San Diego County Jail.  Quiroz PMK Dep. at 72-74 ("Ms. Quiroz:  I mean, we've

23   witnessed people in a restraint chair.  We're not necessarily the ones determining

24   when they're getting out of that chair.  You know, we're not -- they're not calling us

25   for that reason, to say, should this person be removed.  [I]t's not common that we

26   see somebody -- that we are going to assess somebody in a [restraint] chair.  It is not

27   common.  Q: … [D]o you think it's important for clinicians to be involved when a

28   restraint like a restraint chair is used on somebody who may be manifesting mental

1  illness?  A: Although I think it's important for a clinician, I think a psychiatrist

2  should be -- I mean, if somebody's in a restraint chair I think we should probably

3  get an M.D. level involved. … Q: You're not aware of any policy right now for an

4  M.D. level staff member to get involved in a certain way when someone is placed in

5  a restraint chair by custody?  A: No.").

6       60.    I notice that Dr. Penn's first sentence states that he based his opinions

7  on "numerous interviews with nursing and mental health care staff **across the**

8  **state**."  Penn Report at 41.  This "across the state" reference makes no sense in the

9  context of an expert assessment of San Diego *County* Jail.  I then looked back at

10  Dr. Penn's testimony in the Arizona statewide prisons case, and found that Dr. Penn

11  had made this exact factual finding, with the same wording (changing only the name

12  of the detention system and mental health system provider):

13       220. During numerous interviews with nursing and mental health care

14       staff **across the state**, and also as spelled out in Centurion and Arizona
         DOC policy, I learned that if and when there is a clinical question

15       involving the clinical necessity, consideration of the clinical necessity
         and/or appropriateness of PMRB, or the need to begin to pursue this

16       process with due process protections for inmate patients who may be
         subjected to involuntary administration of psychotropic mediations

17       (when clinically indicated as a means of treating psychiatric illness or
         urgently reducing harm, dangerousness, or severe violence towards self

18       or others), that Dr. Carr (or his designee) are readily available to
         discuss by phone, or alternatively, an on call psychiatrist is available 24

19       hours per day, 365 days per year, even afterhours and on weekends.  **I**
         **understand this same process to be in place for orders of seclusion**
         **or restraint.**

20

21  Joseph Penn Expert Report, *Jensen v. Shinn*, No. 2:12-cv-00601-ROS (D. Ariz.),

22  Dkt. 4172 at 76 (¶ 220) (emphasis added).  (Note that both passages also misspell

23  "medications" as "mediations.")  Dr. Penn's asserted finding in the context of the

24  San Diego County Jail system is inconsistent with the facts and evidence.

25       61.    This is not the only example of what appears to be Dr. Penn's "copy-

26  and-paste" from another report regarding a separate and very different correctional

27  mental health care system.  In Dr. Penn's report in this case, he states:

28       The following are examples of specific mental health policies,

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

procedures, and practices that I have observed and confirmed during my tours, interviews with staff, and review of existing policies, and additional verification with mental health leadership:

- mental healthcare
- mental healthcare staffing
- medical record organization
- medication system
- monitoring of prisoners taking psychotropic medication
- monitoring of psychotropic medication therapeutic levels and side effects
- access to medical and mental healthcare
- mental health programming
- inpatient care
- treatment plan
- **heat precaution**
- suicide prevention
- confinement of prisoners with mental illness
- **use of chemical agents with prisoners with mental illness**
- use of telepsychiatry
- monitoring and oversight
- overall access to mental health services

Penn Report at 51 (emphasis added).

62.     This list is *identical* to the list of areas he claimed to have reviewed in the Arizona state prisons litigation.  Joseph Penn Expert Report, *Jensen v. Shinn*, No. 2:12-cv-00601-ROS (D. Ariz.), Dkt. 4172 at 34-35 (¶ 103).  But this list makes little sense in the context of San Diego County Jail's system, where to my knowledge, there are no policies or procedures regarding topics like "heat precaution" or "use of chemical agents with prisoners with mental illness." Dr. Penn's "copy-and-paste" practice of presenting an expert's methodology and conclusions, across substantially different cases and correctional mental health systems, makes it difficult for one to know what in this report actually relates to San Diego County Jail and what has been mechanically copied from other cases.

63.     Nevertheless, I am able to critically assess Dr. Penn's opinions and conclusions, and present my strong disagreement with them, as set forth below.

**C.     Dr. Penn's Opinion that the Jails' Practices and Policies Ensure that Patients in Need of Mental Health Care Are Appropriately Identified and Tracked Is Not Supported By Facts.**

64.     Dr. Penn opines that any claim that the "Sheriff's department fails to

1    identify and track IPs in need of mental health care . . . is refuted by the established

2    practices and policies at SDSO facilities, which I observed and corroborated through

3    interviews with custody, nursing, medical, and mental health staff during my onsite

4    tours." Penn Report at 13-14. He goes on to state that various staff members

5    explained to him how things are supposed to work, including through intake

6    screening, "gatekeeping," mental health "flags," and "trip sheets." None of his

7    discussion changes my strong opinion that San Diego County Jail's system fails to

8    adequately identify and track incarcerated people with serious mental health needs.

9        65.    Remarkably, Dr. Penn states that he formed his opinion based only on

10    his observations and staff interviews "during [his] onsite tours." Penn Report at 14.

11    He makes no reference to considering any individual patient assessments or records

12    review. The only individual patient mentioned in this entire section of the report is a

13    man who he observed experiencing an apparent opioid overdose. *Id.* at 18.

14        66.    In my report, I describe horrific examples of identification and tracking

15    failures, some of which led to a patient's avoidable death. For example, take

16    **Roselee Bartolacci**, whose intellectual disabilities were not identified, contributing

17    to her May 2023 in-custody death after she was placed in solitary confinement and

18    lost more than 40 pounds in just six (6) weeks, without appropriate intervention or

19    treatment. Stewart Report ¶¶ 133-138. Or another example, the suicide of **Pedro**

20    **Ornelas** in June 2023. Mr. Ornelas's initial screening inexplicably identified no

21    mental health history, despite records from a previous incarceration at the Jail

22    showing prior mental health diagnoses, a considerable medication history, and past

23    treatment in the community. His requests to "get back on my medications" went

24    unanswered, and he died by hanging ten days after he arrived at the Jail. These

25    identification failures are staggering and demand systemic remedial action. Stewart

26    Report ¶¶ 82-85.

27        67.    Failures in *tracking* people with serious mental health treatment needs

28    are also pervasive in the San Diego County Jail system. In my report, I describe one

1    patient who was prescribed psychotropic medications and then not seen by a

2    psychiatric provider *for nine (9) months*.  When he was finally seen in ███ 2023, he

3    was experiencing auditory hallucinations.  This is a significant, consequential, and

4    harmful failure in tracking and follow-up for a patient with serious mental illness.

5    *See* Stewart Report ¶ 92.  I found that, by policy and practice, the San Diego County

6    Jail system consistently fails to meet the standard of care for tracking and follow-up

7    with people requiring psychiatric treatment – including extreme violations of the

8    maximum allowable time between *routine* psychiatric visits (30 days), and the

9    maximum allowable time for psychiatric follow-up after initiation of medication or

10    dose adjustment (one week).  *See* Stewart Report ¶¶ 86-87, 91-92, 95, 260

11    (individual examples of such failures).

12        68.     I also examined records from the individual patients whose Dr. Penn's

13    designated reviewers looked at, as he appends to his report (Appendix D).  There are

14    multiple examples in those patient records of very similar identification and tracking

15    failures:

16        69.     ███████████ (Penn Report at 189-190):  The psychiatric reviewer

17    stated that her "primary concern is regarding several medication expirations."  She

18    described how the Jail system lost track of the patient's prescribed medication

19    needs, leading to the patient "being without his psych meds for 15 days" due to the

20    systems tracking deficiency.

21        70.     ███████████ (Penn Report at 159):  This patient had an extensive

22    history of psychiatric treatment needs, and presented as psychotic with

23    hallucinations and delusional thought content while in jail.  Psychiatric staff first

24    engaged in grossly inadequate follow-up with the patient when he had poor

25    medication adherence.  When he was prescribed an antipsychotic medication, he

26    showed consistent compliance with the medication for five days, until records show

27    he stopped receiving it simply because "Medication was not available."  The

28    documentation provided by the various mental health staff did not meet the standard

1  of care.  The clinical notes failed to identify a diagnosis, demonstrated a failure to

2  coordinate between the clinicians and psychiatric prescribers, and evidenced no

3  effort to track and improve medication adherence.  All of these issues are systemic

4  in nature and place this patient and others at substantial risk of serious harm.

5     71.    ████████████  (Penn Report at 165-166):  This patient had a history

6  of a severe traumatic brain injury (TBI) when he was a young teenager, with

7  subsequent diagnosis of a seizure disorder.  The designated reviewer (Dr. Baskin)

8  correctly summarizes that the "1st mention of this [TBI history and seizure disorder]

9  by psych provider is his 5th (NP Anthony) who does an excellent and thorough

10 review, makes good recs, and never sees patient again.  The NP who followed made

11 no mention of those recs and proceeded on own plan of care (not inappropriate, but

12 lacking continuity)."  This is a remarkable failure.  Mr. ███████'s very serious

13 medical and mental health history was not identified until he was seen by a *fifth*

14 psychiatric provider at the Jail.  This provider was the first to adjust the patient's

15 medications to address the risk of seizures.  Records review shows that this did not

16 occur until the patient had been at the Jail *for eight (8) months*.  And, as Dr. Baskin

17 notes, the *sixth* psychiatric provider then *ignored* this critical diagnostic information

18 and "proceeded on own plan of care" which was "lacking continuity."  These are

19 gross failures of both identification *and* tracking that put this patient at enormous

20 risk of irreparable harm from medication-induced seizures.

21    72.    ████████████  (Penn Report at 170):  This patient was treated with

22 two different antipsychotics over a period of nearly two years at the Jail, and as

23 Dr. Penn's designated reviewer Dr. Cervantes notes, he was "never seen by a

24 psychiatrist."  Dr. Cervantes notes that there was "unclear verification or record

25 request to verify [his diagnosis]."  And she is appropriately critical of the fact that

26 the nurse practitioners who saw him failed to identify or properly address the serious

27 risks of the medication regimen.  I agree with her finding that this patient "likely

28 experienced metabolic syndrome as a side effect" and that "[a]n evaluation by a

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  psychiatrist and/or more collateral information may have clarified actual treatment

2  needs." These failures of identification and proper tracking led to care that fell well

3  below any acceptable standard of care, in ways that placed the patient at

4  extraordinary risks, including of a diabetic crisis and a myocardial infarction. The

5  deficient care of this patient over nearly two years screams out for immediate

6  systemic intervention.

7      73.    Dr. Penn's report does not contain a specific analysis of the Jail's

8  mental health screening system or protocols. My report provides detailed findings

9  that the screening policies and procedures are deficient in identifying patients'

10 mental health care needs. Stewart Report ¶¶ 26-47.

11     74.    I am, of course, not the first person to identify alarming deficiencies in

12 this area. The 2022 California State Auditor Report identified eight (8) recent in-

13 custody deaths where the individual "had serious medical or mental health needs

14 that health staff did not identify or communicate to detention staff at intake." 2022

15 California State Auditor Report at 20, DUNSMORE0117735.

16     75.    The County itself has acknowledged that its system falls short in this

17 area, and it is strange that Dr. Penn simply ignores that fact. The 2022 California

18 State Auditor Report recommended, in order to address systemic problems with the

19 Jail's mental health need identification system, that the County "create a policy

20 requiring health staff to review and consider each individual's medical and mental

21 health history from the county health system during the intake screening process."

22 DUNSMORE0117769. The County publicly confirmed in 2023 that this deficit

23 exists, and acknowledged that other county jail systems have taken the necessary

24 steps to implement such a practice, stating: "*Unlike many other counties, San Diego*

25 *does not have a coordinated county health system or shared electronic health care*

26 *records system. As a result, we cannot meet this recommendation as written*."

27 Progress Report at 5, SD_184479 (emphasis added); *see also* Quiroz PMK Dep. at

28 98-99 (noting that the County has no "policy or written expectation that intake

1   nurses review the [County behavioral health] system as part of the intake process,

2   instead "relying on self-reporting by the new arrival").  The failure to address this

3   deficiency puts patients at risk of harm every day.

4        76.    Based on my personal observations, discussions with staff, review of

5   testimony, policies, and reports, and my review of individual patient records, it

6   remains my strong opinion that the Jail's system fails to adequately identify and

7   track incarcerated people with serious mental health care needs, in ways that are

8   systemic and that put incarcerated people at substantial risk of serious harm.

9    **D.    Dr. Penn's Opinion that the San Diego County Jail System
        Maintains Adequate Mental Health Staff to Meet the Incarcerated**

10   **Population's Needs Ignores Well-Established and Readily
        Acknowledged Facts that the System Does *Not* Have Sufficient**

11   **Staffing Resources.**

12       77.    Dr. Penn opines that "mental health and psychiatric provider staffing

13  levels at [San Diego Sheriff's Office] are sufficient and comport with the

14  correctional standard of care."  Penn Report at 26 (with narrative at 19-26).  I

15  strongly disagree with this opinion, which is contradicted by well-established and

16  readily acknowledged facts that the system does *not* have sufficient mental health

17  staffing resources.

18       78.    Even when Dr. Penn acknowledges staffing shortages, including 14

19  mental health clinician vacancies, he states blithely (and without analysis of the Jail

20  population's mental health service needs):  "Despite these staffing vacancies, there

21  were no discernible delays in care nor any identifiable impediments in SDSO IP

22  patients' access to and continuity of mental health care."  Penn Report at 21.  Given

23  the Jail's recent overall count of 26 mental health clinicians, *see* Quiroz PMK Dep.

24  at 30, the 14 unfilled positions amount to a vacancy rate of approximately 35%.

25  This is notable, consequential, and points to insufficient staffing to deliver necessary

26  mental health care.

27       79.    Instead of looking at what treatment programming is needed for the

28  population and what staffing is required to meet that need, Dr. Penn relies on

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  abstract and ephemeral language that is of little use in assessing whether the Jail

2  system has sufficient staffing resources to provide adequate mental health care for

3  its population.  He writes:

4      Staffing levels in correctional settings should be evaluated based on the
   clinical determination of whether adequate mental health services are

5      provided by the available staff.  This means that the adequacy of
   staffing is determined by whether the care meets established standards

6      rather than by adhering to a specific numerical ratio.  According to the
   NCCHC Standards for Health Services in Jails, 2018 Jail Standard, J-

7      C-07, page 60, "Staffing," is defined, the responsible health authority
   (RHA) ensures sufficient numbers and types of health staff to care for

8      the incarcerated person population.

9      There are no universally accepted or empirically validated staffing
   plans, ratios, or recommendations for mental health and psychiatric

10     staff within correctional settings.  Staffing decisions should be made
   based on the clinical needs of the population served, considering the

11     unique requirements of each facility, county, or state.

12 Penn Report at 20.

13       80.     In my report, I relied on San Diego County Jail *system-specific* findings

14 that point directly to staffing deficits that negatively impact the delivery of clinically

15 necessary mental health treatment for the San Diego County Jail's patient

16 population.  Stewart Report ¶¶ 351-388, 432-435.

17       81.     I agree with Dr. Penn that the Jail must come up with an adequate

18 staffing plan to meet the specific clinical needs of its mental health population and

19 unique requirements of its system.  However, as discussed in my report, the San

20 Diego County Jail has failed to conduct and implement an appropriate mental health

21 program needs assessment.  Given the Jail's mental health population, current

22 conditions, and currently available treatment services, it is my strong opinion that

23 understaffing is a major contributor to dangerous failures to provide clinically

24 necessary mental health care to meet existing treatment needs.

25       82.     There are still additional findings of mental health staffing deficiencies,

26 *confirmed by San Diego County itself*.  For example:

27     ➢    In 2023, the San Diego County Grand Jury found that "[t]here is an
   insufficient number of mental health clinicians to provide appropriate

28     basic on-site mental health services, as defined by NCCHC

accreditation standards." The Sheriff's Department "disagree[d] partially" with this finding, stating that "[i]t is a true statement that the San Diego Sheriff's Department does not currently meet accreditation standards as it applies to mental health" while stating that "this is not attributable to the fact that there is an insufficient number of staff providing services." The Department did state that it "is seeking to hire more mental health professionals in order to streamline workloads and provide proactive mental health programs for our population." Quiroz Dep. Ex. 9, *2022/2023 Grand Jury Response-Crisis in Treatment Access for Incompetent to Stand Trail Incarcerated Persons in the County Jails* at 8-9, July 10, 2023.

➢ A December 2023 Sheriff's Department Corrective Action Notice documented a persistent psychiatric sick call backlog, resulting in significant psychiatric care delays. It noted that "periodic blitzes are done 3-4 months, **with no solution to maintain the rising number of sick calls**." Quiroz PMK Dep. Ex. 10, at 17 (emphasis added).

➢ The Jail mental health coordinator Ms. Quiroz wrote in July 2023 about the sick call request backlog and treatment delays in the Jail's system, and she testified in May 2024 about how these things "illustrate that **we have an overwhelmed system and we all need help**." Quiroz PMK Dep. at 270-71 & Ex. 14 (emphasis added).

➢ Jail leadership have issued corrective action notices to the contractor NaphCare regarding psychiatric care untimeliness, noting hundreds of pending psychiatry appointments and wait times of several weeks. Ms. Quiroz testified just recently that **delays in access to psychiatry care remain a "key deficiency area," noting that the "volume of pending appointments" is a problem**. Quiroz PMK Dep. at 186.

➢ Ms. Quiroz testified that the Jail's current discharge planning staff does not meet the needs of the approximately 1,600 (or more) mental health caseload patients in the Jail system, noting **"we do need more" staffing resources** and that the County did not have sufficient data to know how many discharge planners were necessary to meet patient needs, noting only that "[m]ore is certainly better." Quiroz PMK Dep. at 171-72 (emphasis added).

83. Dr. Penn's statement that he could find "no discernible delays in care nor any identifiable impediments in SDSO IP patients' access to and continuity of mental health care" (Penn Report at 21) is simply not supported by the facts, as set forth in my report. *See* Stewart Report ¶¶ 69-95 (discussion of clinically inappropriate delays in psychiatric care, including many examples), ¶ 254 (lengthy delay for initial psychiatric evaluation for **Mr. Settles**, who subsequently died by suicide in 2022); ¶ 259 (unacceptable delay in psychiatric care for **Mr. McDowell**, who subsequently died by suicide in 2023); ¶ 267

1 (**Mr. Rupard**'s initial mental evaluation canceled two times with note that "due

2 to time constraints, patient was unable to be seen," which was followed by

3 acute psychiatric decompensation that ended with his starving to death without

4 Jail health care staff's intervention).

5      84.    Still more examples of insufficient mental health staffing having

6 serious negative impacts on mental health care delivery can be drawn from the

7 patient cases summarized by the designated reviewers in Dr. Penn's own report:

8      85.    ████████ (Penn Report at 191-192): Dr. Huselid describes a

9 delay in access to care for Mr. ████, who had a history of suicide attempts, had

10 endorsed suicidal ideations, and was being housed in Administrative

11 Separation. She noted that Mr. ████ wrote a health care request stating: "I

12 need to speak to a mental health counselor." This request was not even logged

13 for 4 days, then scheduled to be seen 14 days later, and then "pushed back" for

14 another 6 days. She found of this 24-day wait to see a mental health clinician:

15 "I think this is a reasonable (~2-3wk) but not ideal delay, given that we did not

16 know why he needed to see a mental health counselor, and given his history of

17 suicide attempts." Based on my experience as a jail psychiatrist, this delay was

18 far more serious than "not ideal." For this sort of patient with serious mental

19 health needs housed in an exceedingly high-risk Administrative Separation

20 setting, it is dangerous and unacceptable. Based on my review in this case,

21 staffing shortages play a substantial role in these access-to-care delays, which

22 put patients at substantial risk of serious harm.

23      86.    There is a further and troubling staffing-related deficiency that comes

24 up repeatedly in the record reviews conducted by Dr. Penn's designees. That is, the

25 lack of continuity of care with a treatment provider. Dr. Baskin notes that this is an

26 issue in many cases. Penn Report at 158 ("There is a lack of continuity with the

27 psych providers. This patient saw 5 different prescribers. . . . [T]here are inherent

28 problems with this approach such as failure to spot patterns, slow rapport process,

1    and limit splitting"); *id.* 159 ("I again make mention of the many providers which

2    breaks continuity.  IP had no insight, so verbal reports not accurate.  The same

3    provider over time can mark this better and develop better interventions."); *id.* at

4    160 ("again, the handoffs to several different providers causes continuity of care

5    issues"); *id.* at 165-166 (5 different providers caused "inconsistency" and failures to

6    track and address TBI and seizure disorder).  Dr. Cervantes identified the same

7    systemic issue and how it negatively impacts care.  *Id.* at 174-175 ("it appeared that

8    because there were at least 10 different prescribers assigned to the IP, and it is

9    possible that they were unfamiliar with his history," medication orders were

10   deficient).

11         87.    In my experience, a major contributing factor to this kind of

12   inconsistency in mental health and psychiatric treatment for patients is staffing

13   deficiencies – usually a combination of structural deficiencies and staffing

14   shortages.  Both are clearly on display in San Diego County Jail's mental health care

15   system.

16         88.    Dr. Penn makes an additional finding that is factually misleading (if not

17   wholly incorrect) and warrants mention.  He found that the Jail system requires that

18   all mental health professionals be licensed (Penn Report at 18, italics mine):

19         With regard to licensing of mental health staff, all qualified mental
           health professionals (QMHP) serving as mental health clinicians must
20         be fully independently licensed professionals according to California's
           licensing entities, such as the Board of Psychology, the Board of
21         Marriage and Family Therapists, the Board of Professional Counselors,
           or the Board of Social Workers.  They cannot be pre-licensed or in a
22         master's-level training phase.

23         89.    I am uncertain as to Dr. Penn's basis for this finding, but it is

24   inaccurate based on my review.  The Jail mental health coordinator,

25   Ms. Quiroz, recently testified that there are at least 10 mental health staff

26   members who are "prelicensed" and working as "mental health clinical case

27   managers."  When asked what these pre-licensed staff members' duties entail,

28   Ms. Quiroz testified, "They're similar to a clinician."  Quiroz PMK Dep. at 30-

31; *see also id.* at 42 (noting that there is a pre-licensed psychologist working at the intake screening at Las Colinas). Dr. Penn's finding that mental health staff "cannot be pre-licensed" in this Jail system is factually incorrect.

90. It is strange that Dr. Penn finds that mental health clinicians "cannot be pre-licensed or in a master's-level training phase" at the San Diego County Jail and subsequently contradicts himself in a nearby section of his report, where he includes a mental health program description that specifically mentions that a "pre-licensed MH clinician" is in charge of facilitating treatment groups on the Fourth floor at the Central Jail. Penn Report at 37. His assessment methodology and analysis of the facts here are quite problematic.

91. While the use of pre-licensed mental health staff can be clinically impactful in a Jail system, there must be adequate supervision and other processes. Dr. Penn clearly has not done the necessary analysis of how these pre-licensed staff are utilized or supervised. My report, however, raises extremely serious concerns regarding the lack of supervision during delivery of mental health care in this Jail system. *See* Stewart Report ¶¶ 54-61 (inadequate supervision of psychiatric nurse practitioner); *id.* ¶ 375 ("I am extremely concerned about the lack of supervision and coordination in this Jail's mental health care system. For example, the County-employed clinicians (social workers and MFTs) should be – but are not – supervised by higher-level mental health care professionals like psychologists or psychiatrists. . . . This is inconsistent with the standard of care for a mental health care system.").

**E.    Dr. Penn's Opinion that San Diego County Jail Custody Staff Do Not Interfere with Mental Health Care Staff's Clinical Decisions Is Not Supported by the Facts.**

92. Dr. Penn opines that the Jail's "custody staff does not control mental health care staff's clinical decisions and it assists in the delivery of care by mental health professionals." Penn Report at 26. He acknowledges that "there may have been isolated cases in the past" where such interference occurred, *id.*, but brushes

1    off those cases without discussion.

2        93.    This section of Dr. Penn's report runs about half of a page, but it does

3    require a response.  He relies solely on custody staff interviews ("sworn officers,

4    captains, lieutenants, and JPMU personnel") to "confirm[] that custody staff do not

5    attempt to override or improperly control health care decisions."  Penn Report at 27.

6    While he mentions that "various mental health and nursing staff consistently denied

7    any instances where custody staff interfered with, impeded, or improperly controlled

8    clinical decision-making related to incarcerated persons with mental health needs"

9    (*id.* at 26), he does not indicate that he conducted interviews with mental health care

10   staff as he did with custody staff.  In fact, as discussed below, mental health care

11   staff and leadership consistently acknowledge such custodial interference.

12       94.    Dr. Penn's statement that he "verified that health care input is actively

13   included and considered in [1] classification, [2] disciplinary reviews, and

14   [3] SPFRT (safety cell placements)" is factually inaccurate and quite incomplete.

15   *See* Penn Report at 27.  I address each claim in turn.

16       95.    First, Dr. Penn ignores that nearly every Jail mental health staff

17   member who has provided testimony in this case reports that the practice of custody

18   staff overruling clinical staff regarding **housing and classification decisions** occurs

19   with frequency:

20       ➢    **Jail Clinician Aseel Ross (Dep. at 43):**

21           *Q: ... Have there been examples in your experience where you made a
            recommendation that somebody be removed from AdSep based on their
22          mental health where classification says, no, they need to remain in
            AdSep and they so remain?*

23           *A. Yes.*

24           *Q. Do you have any examples that come to mind?*

25           *A. Yeah.*

26       ➢    **Jail Psychiatrist and Medical Director Christine Evans (Decl. ¶ 20,
            Dkt. 119-10):**

27

28           *I saw many people being placed into Administrative Segregation when*

*clinicians knew and made known that such a placement would be harmful.*

➤ **Jail Clinician Jennifer Alonso (Decl. ¶¶ 21, 23, Dkt. 119-11)**

*[T]he Jail system's mental health co-coordinator (who hired me to work in the OPSD units) made a specific recommendation to the Sheriff's Department to stop putting people with mental illness in the solitary confinement-type Ad-Seg units, given the risks to their psychological and physical well-being there. My understanding is that the Sheriff's Department Command staff refused to implement this recommendation.*

*I received an email from custody staff about one of my patients who was experiencing significant psychiatric symptoms. The email stated that the line custody staff thought my patient should be transferred to Ad-Seg housing. No reason was provided. The placement appeared arbitrary and more for the custody staff's convenience than the security or well-being of anyone. No one asked me for my clinical input; custody staff simply directed me to modify the patient's record (removing the patient's OPSD status) so that custody could move the man into Ad-Seg. Similar incidents happen multiple times each month."*

➤ **Jail Mental Health Coordinator (and County's Person-Most-Knowledgeable) Melissa Quiroz (PMK Dep. at 59)**

*Q: [H]istorically has there been a problem in the San Diego County Jail for deputies to overrule clinicians on housing placements for people with mental illness?*

*A: I don't have the exact language, but I can think of times when there may have been some tension between, you know, a clinician trying to advocate for what they felt was recommended and a sworn staff member having a difference of opinion.*

*Q: Have clinicians come to you with those concerns?*

*A: Yes.*

*Q: Sounds like that's something that you care about deeply and want to have addressed, is that correct?*

*A: Yes, absolutely.*

96.    Further findings on custodial interference with housing and program placements for people with serious mental illness are discussed in my previous report.  Stewart Report ¶¶ 167-181.

97.    Second, Dr. Penn is simply wrong that mental health staff provide input regarding **disciplinary reviews**.  *See* Stewart Report ¶¶ 427-430.  The Jail's own

1  person-most-knowledge confirmed that there are no policies or procedures at the Jail

2  for mental health care staff to provide input regarding disciplinary processes.

3  Quiroz PMK Dep. at 178-79 ("Q: Does mental health staff play any role in the

4  administration of discipline for people with serious mental illness? A:No, [they] do

5  not."). And another of the County's own experts who looked closely at this issue

6  made a finding directly in contradiction to Dr. Penn's statement on this point:

7    ***The SDCSO does not have a process for a clinician to provide his/her
     professional recommendations*** (e.g., whether the incarcerated person

8    fully understood the nature of his/her actions at the time of the
     disciplinary charge and alleged actions) ***to the hearing official so they***

9    ***can give consideration to the recommendations prior to ruling on the***
     ***charge and issuing any sanctions.*** The SDCSO should develop

10   policies and a process for clinicians to provide their professional
     recommendations regarding the incarcerated persons understanding of

11   their actions and for the hearing official to consider the clinical input of
     sanctions that should be avoided based on the clinician's assessment.

12

13 Defs.' Expert Report of Julian Martinez at 75 (emphasis added).

14    98.    Third, Dr. Penn is wrong that mental health staff provide input

15 regarding critical aspects of **safety cell placements and suicide precaution**

16 **processes.** In fact, mental health staff fail to provide such clinical input on these

17 matters in ways that are *not* consistent with the standard of care and represent a

18 considerable deviation from modern correctional standards. Stewart Report ¶¶ 312-

19 316. The Jail's mental health coordinator confirmed this fact. Quiroz PMK Dep. at

20 156 (noting that restrictions clothing, bedding, property, and privileges for patients

21 on suicide precautions "all happens outside of the clinical world. . . . [T]hat's in the

22 very custody world.").

23    99.    Again, the patient cases discussed in Dr. Penn's own report contradict

24 his own finding that custody practices do not interfere with the provision of mental

25 health treatment. For example, in my review of patient ███████ (discussed

26 in Penn Report at 196-197), I found repeated instances when this patient was denied

27 access to appropriate clinical care. To provide just a few examples: (1) in ██

28 2023, a nurse notes that they could not perform an EKG "d/t [due to] security

1   reason"; (2) in ▓▓▓▓ 2024, the day of a reported medication overdose by

2   Mr. ▓▓▓▓, a nurse notes that they were "unable to perform healthcare assessment

3   at this time due to patient's housing situation.  Per floor deputy, due to safety

4   concerns, patient cannot come out of the cell"; (3) in ▓▓▓▓ 2024, a telepsychiatry

5   appointment was not performed due to "security risk." In each instance, there is *no*

6   documented explanation as to any individualized safety or security concern that

7   would justify the denial of clinically indicated treatment.  In at least one instance,

8   the denial of an appointment due to a vague "security risk" is (inaccurately) marked

9   as a patient "refusal."  Based on my review of this patient's experience and my other

10  observations in this system, it is very likely that blanket custodial policies and

11  practices caused these custodial interferences with the provision of necessary care.

12      100.   My opinion that Jail custody staff exert improper and dangerous control

13  over clinical mental health care decisions, as stated in Finding #8 in my report

14  (¶¶ 402-417) and in Section II.B., above, is unchanged.

15      **F.     Dr. Penn's Opinion that San Diego County Jail Has an Adequate**

16      **Psychiatric Medication System to Meet Patient Needs Is Not Supported by the Facts, Including Those in His Own Report.**

17      101.   Dr. Penn opines that the Jail "maintains an effective medication

18  management system across its facilities" and that its "systems for identifying

19  incarcerated persons who were recently prescribed psychotropic medications, as

20  well as for administering and distributing these medications, meet or exceed both

21  correctional health and community standards of care."  Penn Report at 29-30.  These

22  conclusions are inconsistent with the available evidence, including factual findings

23  and cases reviewed in Dr. Penn's own report.

24      102.   First, I take strong issue with Dr. Penn's statement that there is no

25  evidence of "delays in the prescribing or delivery of psychotropic medications, nor

26  in the provision of mental health treatment for new intake incarcerated persons at

27  SDSO."  Penn Report at 29.

28      103.   In my review of patient records, I identified numerous cases where

1   psychiatric medications were delayed for newly arrived incarcerated patients, where

2   medications were interrupted due to systemic failures (and without exercise of

3   clinical judgment), and where there was inadequate follow-up by psychiatric

4   providers for people on medication.  I provide many individual case examples in

5   Finding #2 of my August 21, 2024 report.  Stewart Report ¶¶ 53-95.

6       104.   Dr. Penn does state:  "I acknowledge that occasional missed doses of

7   psychotropic medication can occur."  Penn Report at 29.  But his own expert

8   reviewer Dr. Huselid, determined that the issue was far more than "occasional,"

9   stating in Dr. Penn's report:  "I've seen many [] examples of expiring medications in

10  [patient] charts, **there does seem to be a systems issue."** *Id.* at 189 (emphasis

11  added).

12      105.   The Sheriff's Department's Corrective Action Notices and other reports

13  from just this past year identify serious, pervasive, and persistent deficiencies with

14  respect to the Jail's system for provision of psychiatric medication to the

15  incarcerated population.  Ms. Quiroz, the Jail's mental health coordinator, has

16  confirmed that these deficiencies remain, including:

> ➢ **There is a persistent psychiatric sick call backlog, resulting in psychiatric care delays.**  The Sheriff's Department's Corrective Action Notice documented that "periodic blitzes are done 3-4 months, with no solution to maintain the rising number of sick calls."  Quiroz PMK Dep. Ex. 10 at 17 (Sheriff's Department Corrective Action Notice, Dec. 1, 2023); *see also* Quiroz PMK Dep. at 186 (as of May 2024, describing delays in access to psychiatry care as a "key deficiency area" given the high "volume of pending appointments).

> ➢ **Psychiatry providers do not participate meaningfully (or at all) in essential Continuous Quality Improvement (CQI) activities.**  Quiroz PMK Dep. at 187 ("I don't know that it's been fully resolved, but it … [d]oes probably need to work towards improvement.").

> ➢ **There is no documented peer review process for psychiatric prescribers.**  Quiroz PMK Dep. at 190-91 ("I can't be for certain that they're not doing peer reviews.  It's nothing that they hand back to us. I mean, if they do the peer reviews it's something that they're keeping records of on their own."); *id.* at 100-01 (there is no County employee or entity who is responsible for determining whether NaphCare's peer review process is adequate).

> ➢ **There is insufficient clinical oversight of psychiatric prescribers**

**(especially psychiatric nurse practitioners).**  Quiroz PMK Dep. at 192 & 198 (confirming that the Jail's chief medical officer, Dr. Montgomery, has shared concerns about adequacy of clinical oversight for psychiatric nurse practitioners at the Jail and the impact on medication management for the mental health population, and stating "it's still a concern").

➢ **The Jail regularly fails to provide *timely* psychiatric evaluations for newly incarcerated patients.**  Quiroz PMK Dep. at 111 ("Q: [I]s your team concerned about timeliness of initial psychiatry contacts with patients? … A: We want them seen as soon as possible, and there's times we may feel that it's not soon enough.").

106.    Second, I strongly disagree with Dr. Penn's statements that there is "no evidence indicating that any isolated incidents of missed psychotropic medication doses at SDSO led to immediate or delayed clinical decompensation or further issues" and that there are "no documented instances of undue delays resulting in self-harm, suicide attempts, completed suicides, or serious harm to incarcerated persons due to these medication delays."  Penn Report at 29.

107.    I have discussed in detail the horrific and preventable suicides of **Pedro Ornelas** and **Jonathan McDowell** in 2023.  Stewart Report ¶¶ 82-85 (Mr. Ornelas, a man with an extensive mental health and medication history who twice submitted requests to see a psychiatrist to "get back on my medications" but was never seen or started on medications in the nearly two weeks leading up to his suicide); *id.* ¶¶ 258-265 (Mr. McDowell, a man with history of psychiatric medication needs, who reported that he feared he was having a "mental breakdown" and auditory hallucinations, yet was not started on his psychiatric medication for three and half months, then received no clinical follow-up despite reporting that "I'm stressed to the gills" and that his medication regimen was "not working out" and that he was seeing lights and stars "like an electrical storm," and was instead placed in solitary confinement and never again seen by a psychiatric prescriber over the next six weeks leading up to his suicide).

108.    Even beyond the cases where people have died after being denied clinically necessary psychiatric treatment, it is my assessment that a very large

1   number of people are being made to suffer needlessly due to widespread delays and

2   failures in with respect to psychiatric medication practices in this Jail system.  The

3   case of ██████████ who was made to wait for three desperate weeks to see a

4   psychiatric prescriber even as he submitted at least 10 requests for help and reported

5   increasingly alarming symptoms and, according to one clinician, "started to tear up

6   and stated 'I am just trying to be better,'" is one such example.  (Mr. ██████'s case

7   illustrates extremely serious problems with psychiatric prescribing practices, and the

8   lack of supervision over psychiatric nurse practitioners, at the Jail.)  Stewart Report

9   ¶¶ 86-87.

10      109.   Further remarkable is that individual cases in *in Dr. Penn's own report*

11   reveal systemic psychiatric treatment deficiencies that contradict Dr. Penn's

12   opinions.  For example:

13      110.   ████████████ (Penn Report at 186-187):  Dr. Penn's designated

14   reviewer, Dr. Huselid, found "several lapses" related to Mr. ██████'s psychiatric

15   medication needs, such that he did not have "access to care (e.g., access to care

16   means that, in a timely manner, seen by a qualified MH professional, is rendered a

17   clinical judgment, and receives MH care that is ordered) for [his] . . . mental health

18   needs."  I have also now reviewed Mr. ██████'s records, and agree that the care

19   was deficient.  Mr.██████, who had a history of psychosis, submitted multiple

20   requests to get psychiatric help for hallucinations and anxiety.  However, he was not

21   seen for an initial evaluation until nearly three weeks after his arrival, when he was

22   prescribed a medication regimen that was very problematic.  According to

23   Dr. Penn's designated reviewer, Dr. Huselid, the prescription was "*a high dose of*

24   *haloperidol to start someone on . . . and without knowing what doses they have*

25   *previously taken.*"  Penn Report at 186.  The treatment prescribed carried an

26   unreasonable risk of serious side effects, which in fact manifest in the weeks that

27   followed, including jerking involuntary movements, tongue protrusion, and

28   vomiting.  These side effects prompted an emergency hospital visit where dystonia

1   (a known side effect of the medication) was suspected.  When he was sent back to

2   the Jail, it was very important to monitor him closely and discontinue haloperidol, a

3   request that Mr. ██████ made himself in a sick call request asking that his

4   medication be modified "because [it] causes twist tongue, can't breath [sic]."  Yet

5   he was continued on the *same* medication and had no psychiatric appointment for

6   two months, during which period (as noted by Dr. Huselid) he submitted no less

7   than "nine health care requests/grievances about needing to see a psychiatrist."

8   Dr. Huselid concluded:  "**I am very concerned that he didn't see a prescriber for**

9   **more than two months** and was continued on haloperidol—ESPECIALLY without

10  standing Cogentin/Benadryl—after his ER trip for dystonia."  Penn Report at 187

11  (bold added).  This case indicates not just poor clinical decisions by psychiatric

12  prescribers (who, as noted above, do not receive adequate supervision) but also a

13  dangerous failure to respond when dangerous side effects and clearly articulated

14  concerns are raised.  This case raises alarming systemic – and not just individual –

15  issues with treatment in this Jail system.

16      111. ██████ (Penn Report at 205):  This man with diagnosed

17  schizophrenia was a state psychiatric hospital returnee whose condition had been

18  stabilized on antipsychotic medication.  As described by Dr. Huselid, Dr. Penn's

19  designated reviewer, his prescription expired without any action take for nearly four

20  weeks, which she found to have been concerning "given that [the patient] had just

21  returned from Napa State Hospital for competency restoration, [as] this could have

22  been very consequential (if he deteriorated and had to go back)."  This medication

23  failure stems from systemic tracking and follow-up deficiencies, and puts patients at

24  entirely unnecessary and inexcusable risk of harm.

25      112. ██████ (Penn Report at 167-169):  Dr. Penn's designated

26  reviewer, Dr. Cervantes, identified several deficiencies in the psychiatric care of this

27  patient.  She noted that the "starting dose and escalation rate" of the antipsychotic

28  medication (Remeron) was "too rapid and increased risk for side effects, particularly

1  when there isn't even a well-defined diagnosis." She noted the failure to conduct

2  baseline lab tests and weight checks, which were clearly clinically indicated due to

3  the patient's high Body Mass Index. My review of this patient's records confirm

4  these failures and the serious risks to the patient. When lab tests were done and

5  revealed abnormal results, there is no indication of medication review or

6  modification, indicating serious deficiencies in medication management and

7  psychiatric follow-up. This patient's course of treatment did not meet the standard

8  of care.

9       113.  ███████  (Penn Report at 174): Dr. Penn's designated reviewer,

10  Dr. Cervantes, strongly criticized the psychiatric nurse practitioners who treated

11  Mr. ███. I agree with Dr. Cervantes's assessment, and note that this again speaks

12  to the systemic failure to appropriately supervise psychiatric nurse practitioners

13  who, based on my review of many patient cases, provide horribly inadequate

14  psychiatric care. Here, Dr. Cervantes found that the medication regimen was

15  "wholly unnecessary in this case and generally poor choices of meds" given the

16  patient's presentation. This case is especially egregious insofar as this patient was

17  unnecessarily subjected to the potentially serious side effects of the antipsychotic

18  medication prescribed without clinical justification.

19       114.  ███████  (Penn Report at 160-161): Dr. Penn's designated

20  reviewer, Dr. Baskin, noted significant concerns with the prescribing practices in

21  this case. He noted that the patient "goes for one year without medications, then

22  rapidly grows to 5 different meds including 2 sleepers (quetiapine/trazodone)." He

23  noted that the Jail's psychiatric providers allowed for an "inappropriate confound

24  and layer of complexity" and that this is "an instance where a single provider

25  developing rapport might have proved more valuable to IP in giving meds longer

26  trials and avoiding polypharmacy." I also reviewed this case, and I agree with the

27  concerns about the poor treatment provided. I was in fact shocked by what I found.

28  This was a dangerous polypharmacological situation that does not come close to

meeting the standard of care. The Jail's psychiatric providers started multiple medications without an appropriate evaluation of what this patient actually required. I also note that a treating psychiatrist failed to take steps to remove this patient from Administrative Separation housing after it became clear that the conditions there were contributing to her mental breakdown. (This, of course, is another systemic problem I have previously discussed and discuss further later in this report.) In all, I have not encountered anything like this case in my over 40 years of work as a correctional psychiatrist. This case is a giant red flag calling for systemic remedial action.

115. ████████ (Penn Report at 171-172): This case, reviewed by Dr. Cervantes, reveals serious and consequential deficiencies in the provision of psychiatric care. Dr. Cervantes noted several serious problems with the psychiatric treatment provided to this patient, including: (1) the use of psychiatric medication in the absence of legitimate clinical indication; (2) the provision of potentially abusable and divertible medications without clinical justification; and (3) the use of medication for opiate withdrawal in the absence of a history of opiate use. These are serious lapses in the psychiatric standard of care and place patients at substantial risk of serious harm. This case, including Dr. Cervantes's findings, further confirms my opinion that there is an unacceptable lack of supervision of psychiatric nurse practitioners in this Jail's system, leading to pervasive and dangerous deficiencies in the provision of care.

116. ████████ (Penn Report at 187-188): This case, reviewed by Dr. Huselid, reveals repeated instances of essential psychiatric medications being allowed to expire without timely reordering, causing unacceptable gaps in treatment, including as recently as ████ 2024, when, as documented by Dr. Huselid, the patient "submits a Health Care Request, 'Medication expire [sic],'" which was followed by a further 19-day gap in treatment before his medication was restarted (for a total of 3 weeks without provision of clinically indicated medication).

117.  Dr. Penn's reviewers found even more problems with psychiatric care, including "continuity of care issues," "inappropriate and dangerous prescribing," "risky medication change," and more:

➢  ████████████ (Penn Report at 160):  "[T]he handoffs to several ders causes continuity of care issues."

➢  ████████████ (Penn Report at 176):  "Overall, this chart is ppropriate and dangerous prescribing of psychiatric medications without appropriate monitoring."

➢  ████████████ (Penn Report at 179):  Psychiatric Nurse Practitioner edication change which *could* have resulted in psychotic symptoms re-emerging."

➢  ████████████ (Penn Report at 182):  Psychiatric Nurse Practitioner practices in choosing her treatment in a correctional setting" for several listed reasons, and failed "to order regular weight checks (only three weights were do ████████ uring the incarceration time frame examined).  In fact, by ████████ 2023, IP had gained an additional 16 lb. and was now 313 ████ Seroquel and Depakote are all known to contribute to weight gain and metabolic syndrome.  The risks and side effects of these medications in this IP likely outweighed any benefit."

118.  The number of cases with deficient psychiatric care that Dr. Penn's own designated reviewers found in their record reviews, combined with the pervasive deficiencies I found in my assessment, amount to unambiguous alarm regarding the systemic failures in psychiatric care in the San Diego County Jail system.  I simply cannot understand how Dr. Penn can opine that this Jail "maintains an effective medication management system across its facilities" or that there are "no documented instances of undue delays resulting in self-harm, suicide attempts, completed suicides, or serious harm to incarcerated persons due to these medication delays."  *See* Penn Report at 29.  **Again, Dr. Penn's *own* report states that there are "many [] examples of expiring medications in [] charts" such that "there does seem to be a systems issue."** *Id.* at 189.

119.  Records directly contradict Dr. Penn's finding that there are "no documented instances of undue delays" resulting in harm.  Take the case of ████████████ a patient I reviewed as part of my assessment in this case.

1  Mr. ███ was denied his psychiatric medication for two months after his

2  prescription was allowed to expire, during which time he became very delusional

3  and unable to have a coherent conversation.  A psychiatrist treating him documented

4  that Mr. ███ had "decompensated in the context of medications expiring after

5  last visit."  This is a clear and documented example of a patient denied clinically

6  appropriate medication management who suffered needlessly as a result.  Dr. Penn's

7  finding is troubling in its disregard of this case and many others like it.

8      120.   This is a systemic failure that demands action.  The preventable deaths

9  of Mr. Ornelas, Mr. McDowell, and Mr. Rupard, all of whom decompensated after

10  being denied clinically appropriate psychiatric care until they died by suicide

11  (Ornelas, McDowell) or starvation (Rupard), represent what I consider to be the tip

12  of the iceberg regarding the serious harm that patients at this Jail have faced and

13  continue to face.

14      **G.    Dr. Penn's Opinion that San Diego County Jail Provides Patients
            with Timely Access to Mental Health Care and a "Robust Mental**

15      **Health Delivery System" Ignores the Realities of this Extremely
            Inadequate System.**

16

17      121.   I strongly disagree with Dr. Penn's opinions that "incarcerated persons

18  presenting with current mental health needs are promptly referred to and receive

19  timely mental health services," and that the Jail provides a "robust mental health

20  delivery system and is able to provide timely access to care and mental health

21  treatment to [patients] with ongoing mental illness."  Penn Report at 30-43; *see also*

22  *id.* at 50-52 (Dr. Penn's opinion that "The Delivery of Mental Health Care Within

23  SDSO is not Systemically Deficient.").

24          **1.    There Are Serious Deficiencies with Respect to the
                Timeliness of Mental Health Care at the San Diego County**

25          **Jail.**

26      122.   With respect to the ***timeliness*** of mental health services, Dr. Penn

27  simply ignores the extensive evidence, and the County's own documentation, that

28  the system is defined by large mental health care backlogs and unacceptable delays

1   in access to clinically necessary care.  Examples include the following:

2          123.   First, the County documented a **persistent psychiatric appointment**

3   **backlog**, resulting in psychiatric care delays.  The County noted that "periodic

4   blitzes are done 3-4 months, with no solution to maintain the rising number of sick

5   calls."  In April 2023, there were 785 pending psychiatry appointments.  Despite the

6   County's corrective action notice issued at that time, there remained 530 psychiatric

7   pending psychiatry appointments in November 2023, with an average wait time of

8   18 days.  Quiroz PMK Dep. Ex. 10 (Sheriff's Department Corrective Action Notice,

9   Dec. 1, 2023).  The Jail mental health coordinator identified this is as "key

10  deficiency area" as recently as May 2024.  Quiroz PMK Dep. at 186.

11         124.   Second, the County has documented **severe sick call request backlogs**

12  and treatment delays, with the Jail mental health coordinator explaining that such

13  delays "illustrate that we have an overwhelmed system and we all need help."

14  Quiroz PMK Dep. at 270-71 & Ex. 14.

15         125.   Third, Dr. Penn's *own* designated reviewers identify (again, as set forth

16  in his own expert report) a large number of cases with **unacceptable delays in the**

17  **provision of mental health and psychiatric care.**  *See, e.g.*:

18      ➢   Penn Report at 187 ("**I am very concerned that [patient] didn't see a**
            **prescriber for more than two months** and was continued on
19          haloperidol—ESPECIALLY wit████standing Cogentin/Benadryl—
            after his ER trip for dystonia on ████/2022.") (emphasis added).
20

21      ➢   Penn Report at 195 (patient "sends multiple requests [over 2 ½ month
            period] asking why someone reduced h██ medications and begging for
22          them to be restarted.  For example, on ███/23, he indicates that he is
            sending his fifth request and says, ██ ██edicine to help me sleep
23          please.  How many requests?' On ███/23 he writes, 'Need to see psych
            doc for meds, no appointment sinc███ month or more and you reduced
24          my meds why?' **It is my opinion that this gap in care (given**
            **medication change without communication to the patient) is too**
25          **long.**") (emphasis added).

26      ➢   Penn Report at 190 (**"My primary concern is how long it took him to**
            **see a psychiatric prescriber for the first time. . . .** [The psychologist]
27          indicates that he should be referred to Psych SC in one week.
            However, [patient] is not seen by a psychiatric prescriber [for more
            than one month].  In the me████████████████████████re
28          requests/grievances (dated ██████████████

[4571315.3]                                  43                 Case No. 3:20-cv-00406-AJB-DDL

1    requesting—then begging—to see a prescriber. . . . he writes, **'I'm
2    feeling scared and dangerous because I need my meds…Please
     Help Urgent!'**") (emphasis added).

3    ➢ Penn Rep ███ 203 ("In a LMFT note dated ███/22, the clinician notes
     that Mr. █████ should be 'refer[red] to Psyc██ D for PS██ eval.'
4    However ███ not seen by a prescriber (Psych NP) until ██/23. . . .
     **[It] doesn't look good.**") (emphasis added).

5

6    126.   Fourth, my report details the evidence of **dangerously untimely access**

7    **to inpatient (PSU) mental health care** in the Jail system.  This deficiency was

8    confirmed by a PSU psychiatrist, who told me during my site visit that there is

9    "always a wait list" of acutely ill patients requiring PSU placement.  Stewart Report

10   ¶ 128.  Ms. Quiroz also confirmed this fact.  Quiroz PMK Dep. at 70-71.  Aseel

11   Ross, who served as an Administrative Separation clinician, testified that she was

12   aware of patients waiting for a PSU placement *for more than one month*.  Ross

13   Dep. at 89-90.  The lack of timely access to an inpatient level of care placement is

14   well established, and it puts patients at substantial risk of serious harm, including

15   further decompensation, self-harm, and suicide.

16   127.   My records review confirms the persistence of these extreme access-to-

17   care delays for patients who need acute mental health placement and care.  As

18   additional examples:

19   ███████████████

20   128.   This patient with serious mental illness was placed at Central Jail after

21   receiving inpatient treatment at the Department of State Hospitals.  Without the

22   continued level of care he needed (and that had helped him to stabilize on

23   medication at the state hospital), he became nonadherent to medications at the Jail

24   and was placed in Administrative Separation, where he continued to decompensate

25   in that highly restrictive setting where meaningful mental health treatment is

26   essentially non-existent.  A psychiatry team saw him in ██████ 2023, and

27   observed him talking to himself, naked in his cell, and unable to engage in

28   conversation.

129.  He continued to decompensate to the point of grave disability as demonstrated by him being, as documented in the record, "**constantly fully naked inside his cell and eating his own feces … flooding his cell with water mixed with fecal materials … neglecting self-care, and persistent symptoms of paranoid delusions**."   A full 11 days after the psychiatry team saw him, he was finally referred to the PSU for acute level of care.  But there was no PSU bed available.  The patient was kept in Administrative Separation, where his symptoms continued to worsen, for another 20 days until he was finally placed in the PSU.  This is an enormous, harmful, and dangerous delay in the provision of a clinically indicated acute mental health care placement.

130.  This patient with serious mental illness and a severe movement disorder arrived at the Jail in ███████████ 2023 and was placed in Administrative Separation—an isolation placement that is extremely dangerous for a person with this patient's mental health profile and needs.  When he was seen for an initial psychiatric evaluation, he was clearly decompensated, appearing "labile and unpredictable … avoidant, impulsive, bizarre, paranoid, suspicious," "disheveled and unkempt."  Further adding to the concern, the psychiatric nurse practitioner who performed this evaluation recommended follow-up in four weeks, which is far too long for a patient this acutely ill and with such poor insight.  Fortunately, another psychiatric provider recognized several days later that this patient needed a higher level of care and recommended transfer to the PSU.  But no PSU beds were available.

131.  Mr. ██████ remained in Administrative Separation for several more weeks.  Mental health staff observed his continued decompensation and poor self-care ("he is very disheveled with food on his face, his clothes, his bed, etc."; "[he is] disorganized, agitated … paranoid and lacks any insight into his current psychiatric condition") until he was placed in the PSU in ███████████ approximately 30 days

1   after inpatient care was clinically indicated.  This is another example of an

2   unacceptable, harmful, and dangerous delay in the provision of a clinically indicated

3   acute care placement.

4           **2.      There Are Serious Deficiencies with Respect to the Adequacy**
            **of Mental Health Care and Treatment Programming at the**

5           **San Diego County Jail.**

6           132.   With respect to Dr. Penn's opinion that the San Diego County Jail has a

7   "robust mental health delivery system" that is "not systemically deficient," his

8   discussion is incomplete and does not in any way change my conclusion that this

9   system denies people with serious mental illness access to **adequate mental health**

10  **treatment**, causing undue suffering and putting people at unnecessary and

11  substantial risk of harm.  I provide examples of Dr. Penn's problematic findings

12  below.

13          133.   Dr. Penn's assessment that "Mental Health Group Therapies" and other

14  clinical activities are provided consistent with the treatment needs of the Jail

15  population ignores critical deficiencies, and is at odds with the assessments of the

16  Jail's mental health coordinator and the Sheriff herself.  Dr. Penn's report does

17  confirm that PSU clinicians provide as little as "one psycho educational group per

18  week" and just one clinical "meeting with every patient individually" each week.

19  Penn Report at 37.  This exceedingly limited amount of treatment is inadequate for

20  the needs of this population.

21          134.   I am also aware that approximately half or more of the patients in the

22  Central PSU are not permitted to participate in any group therapy *at all*, with several

23  patients essentially on 24/7 lockdown with no meaningful mental health treatment at

24  all.

25          135.   Dr. Penn's statement on PSU treatment ("The weekly schedules

26  provided reflect that IPs in the PSU are actively involved in creative and

27  recreational therapy, not merely confined to their cells" (Penn Report at 33)) does

28  not account for the reality that these activities are extremely limited, are not

facilitated by clinicians (but rather a recreational therapist), and completely exclude a substantial proportion of PSU patients who are in fact confined to their cells.

136.    In contrast, Sacramento County Jail's acute inpatient psychiatric unit's policy and program schedule is designed to provide what more closely approximates clinically appropriate clinical care, with clinician-facilitated treatment group offered for at least three (3) hours per day, along with a daily out-of-cell contact with a clinician and a daily out-of-cell contact with a psychiatric prescriber. *See* Stewart Report ¶ 118.

137.    The same major deficiencies exist in the Outpatient Stepdown units, which Dr. Penn's report acknowledges provide no more than two group treatment hours per week (Penn Report at 37), though I was informed on my site visit that some of these units do not receive any group treatment programming at all (and are on nearly round-the-clock isolation lockdown).  Dr. Penn does not provide any analysis that would support his finding that OPSD treatment is clinically adequate.

138.    In my report, I discuss in detail how, given the staggeringly high levels of acuity and treatment needs among the OPSD population, OPSD treatment programming is grossly insufficient to meet the clinical needs of the patient population. *See* Stewart Report ¶¶ 145-161.

139.    In addition to the insufficient programming in OPSD units, there is also terribly inadequate capacity – that is to say, there are not enough OPSD program spots to meet the needs of the seriously mentally ill population.  Ms. Quiroz estimated that, if an appropriate mental health acuity rating system was implemented at the jail, it would "highlight the need for hundreds if not thousands of mental health beds."  Quiroz PMK Dep. at 90-93 & Ex. 4.

140.    San Diego County Sheriff Martinez also recently acknowledged the deficits with respect to mental health treatment programming.  On October 2, 2024, she presented at the San Diego County Citizens' Law Enforcement Review Board meeting, stating:  "We also think that group therapy is useful in some instances and

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  some other things that we don't always have accommodations for currently in our

2  structure."  Sheriff Martinez, CLERB Regular Meeting, Oct. 2, 2024 (video at

3  1:01:00, available at https://youtu.be/4vXcub2VXTc?t=3640).

4      141.    The San Diego County Jail's failure to provide adequate mental health

5  treatment to patients with serious mental illness puts patients at risk and causes

6  unnecessary harm.  One case assessed by Dr. Penn's designated reviewer offers

7  considerable insight here.

8  █████████

9      142.    Dr. Huselid finds that the Jail failed to provide this patient "access to

10  care" for his mental health needs, including "lapses" in the provision of treatment.

11  Penn Report at 197-198.  I also reviewed this patient's records.  Mr. ████  has

12  diagnosed serious mental illness.  He was stabilized through treatment and a

13  complex medication regimen to manage his severe psychotic symptoms in the Jail

14  Based Competency Treatment (JBCT) Program that is run by the Department of

15  State Hospitals (DSH).  As I discussed in my previous report, the JBCT unit has a

16  mental health program with robust staffing and treatment programming, and it

17  shows positive results.  The problem, as I stated, is that once a patient discharges

18  from the DSH-run JBCT program and is placed in other San Diego County Jail units

19  (where the treatment program is a tiny fraction of what is provided in the JBCT),

20  patients are denied the care they need and decompensate as a result, with a new

21  onset of psychiatric symptoms and even a new finding that they are "incompetent to

22  stand trial" (essentially *undoing* the success of the JBCT program).  Stewart Report

23  ¶¶ 163-164.  Mr. ████ appears to be one such example.

24      143.    After being discharged from the JBCT program, Mr. ████'s auditory

25  and visual hallucinations worsened, with voices urging him to do things or making

26  negative statements, as noted by a psychologist.  Despite these signs of

27  decompensation, the psychiatric prescribers were not notified, with a many-month

28  gap in psychiatric follow-up that should have occurred much sooner.  Mr. ████'s

1  care was further complicated when, in his decompensated state, he started refusing

2  clinical contacts and medications over a seven-month period.  Shockingly, during

3  this seven-month period, he had only had two psychiatric appointments.  As

4  Dr. Huselid notes, "one of my concerns is how long this patient went at times

5  between seeing any mental health practitioner."  She found that "he had been

6  refusing his psychotropic medications and reporting paranoia about his food.  I am

7  concerned that no one attempted to see him cellside."  Penn Report at 198.

8  Mr. ██████ finally resumed his medications but continued to have uncontrolled

9  auditory and visual hallucinations.

10     144.   Earlier this year, there was another very significant gap in care for

11  Mr. ██████, when mental health staff documented that Mr. ██████ should be seen "in 2

12  weeks (priority due to acuity)," yet he was lost to follow-up for almost three months.

13  Penn Report at 198.  These gaps in care highlight systemic issues in tracking and

14  providing clinically necessary psychiatric care for patients.  The contrast between

15  how Mr. ██████'s mental illness was managed in the DSH-operated JBCT program

16  (with its daily mental health programming and frequent psychiatric care) and how he

17  decompensated so severely in San Diego County Jail's system after discharging

18  from JBCT makes plain the serious inadequacy of the Jail's mental health care

19  system, and the harm such inadequacy causes.

20     145.   The evidence of severe mental health programming deficits in this

21  system, combined with the statements by Jail leadership and the Sheriff herself,

22  directly contradict Dr. Penn's conclusion that there is "widespread availability of

23  educational and therapeutic programming" in this system.  Penn Report at 42.  There

24  is nothing close to enough mental health treatment beds and program capacity to

25  meet the mental health population's treatment needs.  It is troubling that Dr. Penn

26  ignores all the evidence and statements pointing at this reality.

27     146.   I further strongly disagree that this Jail system conducts adequate

28  multidisciplinary treatment team meetings and provides "ongoing multidisciplinary,

individualized treatment planning." Penn Report at 32, 38-39. I discuss the basis for my opinions on this subject in detail in my report. Stewart Report ¶¶ 97-112.

147. Individual case records that I reviewed consistently demonstrate that the Jail's mental health system fails to ensure that patients receive clinically appropriate, individualized treatment planning that includes appropriate level of care determinations, provision of individualized medication management, and structured therapy and counseling as clinically indicated. In fact, mental health staff testimony confirms that individualized treatment planning with an appropriate level of care or acuity rating system does not exist. (Again, Ms. Quiroz testified that the County was reluctant to do this because it would "highlight the need for hundreds if not thousands of mental health beds." Quiroz PMK Dep. at 90.)

148. Ms. Ross, the clinician assigned to patients in Administrative Separation units, proposed to Jail leadership the implementation of a structured individualized treatment planning process for patients; she testified that such a practice "was not implemented." Ross Dep. at 64. Ms. Quiroz testified that "it could be helpful" for mental health staff to use an "individualized treatment plan that's a freestanding document" but such a practice was not in place. Quiroz PMK Dep. at 258.

149. It is curious that Dr. Penn concluded that the treatment planning process in the San Diego County Jail system is adequate. His finding is quite specific in its language, but it is in fact copied nearly verbatim from his Arizona state prisons expert testimony (with only the name of the detention system changed). Here is what he opined in his Arizona expert report:

> **Treatment Plans & Timely Communication:** In preparation of this report, I reviewed numerous ADCRR inmate medical records. In my view, ADCRR provides comprehensive treatment plans, timely communication, and multidisciplinary coordinated care between psychiatric and mental health staff, nursing staff, medical providers, and custody staff. Such records are kept in accordance with the correctional standard of care. This significantly reduces the risk of an inmate's risk of harm to self or others."

1  Joseph Penn Expert Report, *Jensen v. Shinn* (D. Ariz.), Dkt. 4172 at 55 (¶ 152).

2      150.   Here is what he opined in his San Diego County Jail expert report:

3  **Treatment Plans & Timely Communication.**

4  In preparing this report, I reviewed numerous medical records for
   individuals in custody at SDSO.  The records demonstrate that SDSO
5  provides comprehensive treatment plans, ensures timely
   communication, and coordinates multidisciplinary care among
6  psychiatric and mental health staff, nursing staff, medical providers,
   and custody staff.  This level of care is consistent with correctional
7  standards and significantly mitigates the risk of harm to
   individuals . . . .

8

9  Penn Report at 38.

10     151.   Nothing in Dr. Penn's analysis changes my opinion that the San Diego

11 County Jail's mental health system fails to provide timely, clinically adequate, or

12 appropriately individualized mental health treatment to patients with serious mental

13 illness.

14     **H.    Dr. Penn's Opinion that San Diego County Jail "Provides
              Opportunities for Confidential Mental Health Care Encounters in**
15            **Adequate Physical Spaces" Is Contradicted by the Facts, Including
              Statements by the Sheriff Herself.**
16

17     152.   Dr. Penn states that "[i]n my professional opinion, SDSO IPs are

18 provided private meeting spaces to maintain confidentiality during mental health

19 encounters."  Penn Report at 43-44.  As I have described, the lack of confidentiality

20 during clinical mental health contacts at the San Diego County Jail is pervasive and

21 undermines the provision of mental health care for patients.  Nothing in Dr. Penn's

22 report changes my opinion.

23     153.   Dr. Penn's discussion on this topic is very short, and provides little

24 insight into how he reached his conclusion.  More importantly, this opinion is

25 directly contradicted by (1) Dr. Penn's own designated reviewers, (2) the Jail's

26 mental health coordinator and person-most-knowledgeable on these topics, and

27 (3) the San Diego County Sheriff herself.

28     154.   First, Dr. Penn's designated reviewer, Dr. Huselid, finds evidence that

1   confidential clinical contacts are not provided at the San Diego County Jail *by*

2   *policy*. She discusses this in some detail in the review of patient ████████

3   Penn Report at 196-97. She documents that a recent instance in which the clinician

4   documents that Mr. █████ "asks to meet confidentially but [the clinician] says that

5   she is unable to due to AdSep 'regulations/restrictions.'" Two weeks later,

6   "Mr. █████ once again asks to meet in a confidential setting for privacy, but [the

7   clinician] writes that her 'Plan' is, 'continue to be monitored cellside.'" The expert

8   reviewer states, "I question this blanket requirement to see incarcerated persons

9   cellside when they are in AdSep," noting that when she worked as a jail clinician,

10  she would see such patients confidentially. She further notes that "as far as I can

11  tell, Mr. █████ had been in good behavioral control." Based on his mental health

12  needs, including a medication overdose that occurred soon after these non-

13  confidential contacts, Dr. Huselid concludes that "**it doesn't look great that the jail**

14  **was unable to meet his request to be seen confidentially**." Penn Report at 197

15  (emphasis added). I agree with Dr. Huselid's assessment and conclusion.

16          155.   I repeat here what I state in my previous report about how the provision

17  of appropriate confidentiality for mental health care does *not* mean compromising

18  the safety of staff or anyone else:

19          To be sure, the provision of adequate treatment of serious mental
        illness (with appropriate confidentiality) will serve to *increase* safety:
20      good care serves to reduce psychosis-induced behaviors and to keep
        patients' conditions more stable. And in a jail system where
21      confidential clinical contacts are the expectation, there will be
        appropriate safeguards, including the use of *individualized* assessments
22      – based on both clinical and custodial input – to determine when a
        particular patient cannot safely be seen in a confidential setting. Such
23      circumstances can, and must, be appropriately documented, reviewed
        for quality assurance purposes, and inform treatment planning and
24      delivery moving forward. **In short, a jail system should not choose**
        **between necessary confidentiality and safety. They go hand in**
25      **hand.**

26  Stewart Report ¶ 392 (bold emphasis added).

27          156.   My patient reviews confirm the very serious and consequential

28  deficiency of failing to provide adequate confidentiality for clinical contacts.

1    Stewart Report ¶¶ 397-401.  As a further example:

2        157.    ████████    This man arrived at the Jail in ████ 2023.  The intake

3    screening failed to identify chronic mental health needs and his suicide risk history.

4    A review of records from his previous incarceration, however, would have clearly

5    revealed a history of mental illness that included suicidal ideations.  About one week

6    after his arrival at the Jail, he received a behavioral assessment in which the

7    clinician stated:  **IP reported history of past suicide attempts but was not asked**

8    **for details due to not being able to offer a confidential setting.**  (He was not

9    seen for nearly three more weeks for an initial psychiatric evaluation.)  This is very

10   serious, unacceptable, and dangerous.  The clinician documents here that the patient

11   reported a history of suicide attempts, and that more information could not be

12   gathered because the Jail was not "able to offer a confidential setting" to discuss

13   such sensitive information.  This is a glaring example of the failure to provide for

14   confidential mental health contacts, but it is by no means unusual in San Diego

15   County's Jail system.

16       158.   Dr. Penn's designated reviewers found still more examples where

17   mental health patients were not provided confidentiality consistent with the standard

18   of care.  In addition to the widespread and even (as Dr. Huselid describes) "blanket"

19   restrictions on confidential contacts in some settings at the Jail, there were examples

20   where the failure to provide appropriate language interpreters led to the denial of

21   confidentiality and appropriate care.  *See, e.g.*, Penn Report at 171 (**Patient** ███:

22   "Several of the mental health counselors noted that they used a deputy to help

23   interpret, as IP was Spanish-speaking.  This is not usually considered best

24   practice."); *id.* at 177-78 (**Patient** ████:  "[M]any of the NP notes (at least

25   ███/23, ███/23, ███/23, ████/23, ███/23, 1██/23) indicate that deputies were

26   used to translate for the encounters for this Spanish speaking patient.  Using

27   deputies to translate/interpret for patients is generally discouraged but was routinely

28   done here."); *id.* at 180-81 (**Patient** ████:  psychiatric provider documents that

1   another incarcerated person being called to "help communicate" and noting that

2   using another incarcerated person "to interpret . . . would not be best practices as it

3   does not keep the interview confidential and accuracy cannot be ensu[r]ed").

4        159.   Let me be clear:  the use of custody staff for translation for a patient's

5   mental health care contacts is strictly prohibited under the standard of care, absent

6   the most serious of emergencies.  This practice breaks the core principles of

7   confidentiality.  If the jail does not have mental health staff who can communicate

8   with a patient in their preferred language, then a confidential interpretation service

9   *must* be utilized.

10       160.   Second, Jail mental health coordinator Melissa Quiroz has agreed in her

11  testimony that maximizing auditory privacy for clinical contacts is an important

12  goal.  Quiroz PMK Dep. at 78.  And she acknowledged that clinicians working at

13  the Jail have "expressed concern about [the] lack of confidentiality with cell-front

14  interactions with their patients." *Id.* at 77.  She further confirmed that it remains the

15  case to this day that clinical contacts occur at cell-front and in spaces where custody

16  deputies can overhear the conversation, while dismissing the concern because in her

17  "experience usually they're not interested." *Id.* at 78-79.  She did, however, agree

18  that the patients could have concern about the presence of custody deputies when

19  they are meeting with a mental health staff member:

20       Q: [J]ust from the patient's standpoint do you think that they may still
         have the concern that a deputy is standing nearby and can overhear
21       what they're saying to their clinician?

22       …

23       A: I think a patient could possibly feel that way, but I don't know -- no
         patient has told me, hey, make that person go away.  I think that they
24       understand that that deputy can't go away.

25  *Id.* at 79.

26       161.   Ms. Quiroz also confirmed that additional space and staffing resources

27  to provide confidential clinical contacts would be helpful:

28       Q: If there were more space and staffing resources, would the jail

mental health [staff] be providing more one-to-one clinical contacts in confidential settings?

A: Phrased in that way, having more deputy assistance and having more clinical space, we would definitely be utilizing it.

*Id.* at 80-81.

162.   Third, San Diego County Sheriff Martinez acknowledged that there is a lack of confidential clinical space in the San Diego County Jail system, less than one month ago.  On October 2, 2024, she presented at the San Diego County Citizens' Law Enforcement Review Board (CLERB) meeting.  When asked about what improvements the Jail needs to work on regarding people with mental health needs, she stated:

> One of the auditor recommendations which we agree with is that **there's not enough private spaces at intake for people to share personal information or have those private conversations with a mental health professional**.  We've expanded that a little bit at the Vista Jail that was where we had the largest problem and we hope with new construction and some of the other improvements to our facilities, we can build spaces where there's more safe space and treatment areas for individuals who have, who have that need.
>
> …
>
> Where we're at now, what's left really of the implementation of the audit recommendations are infrastructure  … the one thing, the therapeutic space for mental health, a lot of that's going to take infrastructure and funding for the construction work.

Sheriff Martinez, CLERB Regular Meeting, Oct. 2, 2024 (video at 1:01:00 and 1:09:00, available at https://www.youtube.com/watch?v=4vXcub2VXTc).

163.   Dr. Penn's opinion that the San Diego County Jail provides confidential mental health care in adequate physical spaces is at odds with my findings, his own designated reviewers' findings as stated in his report, the County's Jail mental health coordinator's testimony, and the Sheriff herself.  This is a systemic deficiency that must be remedied, through appropriate policies and procedures, specific training, allocation of adequate clinical and custody/escort staffing, and provision of adequate clinical space.

/ / /

I.    **Dr. Penn's Opinion that San Diego County Jail Does Not House Patients at Risk of Suicide in Punitive Isolation and that "Strategies Are Employed to Avoid Unnecessary and Undue Risk of Decompensation and Harm" Is Not Supported by the Facts of the Jail's Operations.**

164.    Dr. Penn provides numerous statements about the Jail's systemic use of solitary confinement housing for people with mental illness.  Penn Report at 44-46.  It is very difficult to tell what specific facts or information he relies on in reaching his opinions, as all are set forth in conclusory fashion.  For purposes of this rebuttal report, I provide examples where Dr. Penn's statements are factually incorrect and/or extremely misleading.

165.    First, Dr. Penn asserts:  "To mitigate risks while housed in Ad Sep, there are robust medical and mental health safeguards in place."  Penn Report at 45.  He states that health care staff are asked to "to check for any medical or mental health contraindications for an IP being housed in Ad Sep. . . .  This ensures that all potential medical or mental health concerns are addressed promptly, contributing to the overall safety and appropriateness of housing decisions."  *Id.*  This finding is inaccurate, both in terms of policy and actual practice.  *See* Stewart Report ¶¶ 207-226.

166.    The National Commission on Correctional Health Care (NCCHC) evaluated San Diego County Jail and specifically found that the Jail's "mental health staff does not [] screen inmates for any contraindications to placement in segregation, which is an NCCHC requirement."  *Id.* ¶ 221.  The Jail's policy continues to omit the practice standard required by the NCCHC, *id.* ¶ 210, and the Jail mental health coordinator confirmed that it remains the policy and practice that there is no mental health clinical assessment done for a person being placed in Administrative Separation to identify whether there are mental health contraindications for a person being housed in Administrative Separation.  Quiroz PMK Depo. at 250-251.  Dr. Penn's report is factually incorrect in this regard.

167.    Dr. Penn further ignores the many examples of people with serious

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1   mental illness being placed and retained in Administrative Separation despite clear

2   evidence that such placement was clinically contraindicated and dangerous,

3   including several deaths that resulted.  *See, e.g.*, Stewart Report ¶¶ 266-274 (Rupard

4   death, determined to be a "homicide" due to "neglected schizophrenia" after patient

5   was placed and retained in Administrative Separation despite clinical

6   contraindications), ¶¶ 275-281 (Marroquin death following re-placement in isolation

7   after suicide precautions, with no clinical input considered), ¶¶ 282-283 (Godfrey

8   death following manifest deterioration in isolation).  I provide several additional

9   individual examples in my report, all of which entail enormous and undue harm to

10  patients.  *Id.* ¶¶ 229-238 (███████), ¶¶ 239-241 (████), ¶¶ 242-243 (████████).

11        168.   Dr. Penn also provides a confusing discussion as to whether and when a

12  qualified mental health professional (QMHP) will see a patient placed in

13  Administrative Separation.  He writes that the policy is for a QMHP to see the

14  patient "not longer than one week after placement into Ad Sep."  Penn Report at 45.

15  He then states that Ms. Quiroz told him that the "average duration is within two

16  days."  Without providing any data or case examples to confirm Ms. Quiroz's

17  statement, he then misrepresents the statement by concluding:  "In summary, IP's

18  placed into Ad Sep are evaluated by a QMHP within 24-48 hours of any IPs'

19  placement into the unit."  *Id.*

20        169.   To be clear, this makes no sense.  The basis of this conclusion is a

21  general policy that states such an evaluation must occur within one week, and a staff

22  member's unverified statement that the "average" time is two days (meaning that,

23  for some number of people, the actual time is longer than two days).  Dr. Penn's

24  conclusion then introduces a new "fact" that the evaluation is actually completed

25  "within 24-48 hours" of Administrative Separation placement.

26        170.   To be sure, even Dr. Penn's misrepresented "fact" about the San Diego

27  County Jail's practice (evaluation 24-48 hours after isolation placement) puts this

28  Jail system in a state of non-compliance with United States Department of Justice

standards and the generally accepted standard of care for a jail system's placement of people with serious mental illness in isolation, which require that a clinician assess a patient with serious mental illness **before** they are placed in Administrative Separation to prevent undue risk and actual harm.

171.   I have found repeated examples of patients placed in extraordinarily harsh, isolating, and punitive-feeling settings that harmed their mental health and resulted in serious harm, including suicides and other deaths.

**Administrative Separation**

172.   I have previously discussed the staggeringly high number of patients with serious mental illness being housed in the enormously restrictive and anti-therapeutic Administrative Separation.  *See* Stewart Report ¶¶ 182-283 (harmful conditions and consequences for patients in Administrative Separation/solitary confinement).  Here is yet another example, from Dr. Penn's own report.

█████████████ **(Penn Report at 157-158)**

173.   Dr. Penn's designated reviewer provides an extremely brief assessment, noting that a clinician "took steps to improve very poor hygiene" on one day in ████ 2024," finding this to be a "[v]ery difficult case, managed well," and indicating that this patient "had very poor insight and [was] quite sick."  Having reviewed this patient's records, my strong assessment is that this case's challenges stem from systemic treatment failures and the long-term placement of an extremely mentally ill patient in solitary confinement **for more than four years** without anything close to clinically adequate mental health treatment.  This patient reported intermittent psychotic symptoms, such as hallucinations and paranoia, which appear to have complicated and prolonged his criminal legal proceedings.  He was hospitalized twice at Patton State Hospital related to competency proceedings.

174.   While at the Jail, he spent more than four years in the solitary confinement conditions of Administrative Separation, where he was not managed with the appropriate level of psychiatric treatment, monitoring, and assessment.

175.   I found no evidence in his records showing development and implementation of a treatment plan with multidisciplinary collaboration, which is essential for addressing a patient with this level of complexity.  Much of his psychiatric care was delivered by nurse practitioners with inadequate supervision given the complexity of this case.  Due to these various factors, he received unnecessary treatments based on his self-reported symptoms.  For instance, he was started on medication for "mood and energy" with no evidence of a diagnoses to support this treatment.  Another time, his antipsychotic dosage was increased after he reported psychotic symptoms to a telepsychiatrist who had seen him only once, despite a psychologist familiar with his history finding no signs of psychosis in a recent assessment.  A psychiatrist, Dr. Badre, stated that this patient "would be best served by staying in the state hospital during his proceedings … to prevent the erroneous accumulation of notes by providers who are not familiar with his history." Instead, he remained in a solitary confinement setting – again, for more than four years – where he did not receive clinically appropriate treatment.

176.   It is very difficult to understand how Dr. Penn's report, which claims to consider the experience of this person with serious mental illness, subjected to more than four years in Administrative Separation without meaningful or clinically necessary mental health treatment, can conclude that "it is my professional opinion that SDSO effectively minimizes prolonged restrictive housing for IPs with mental disorders."  Penn Report at 46.  I strongly disagree with Dr. Penn's finding, and nothing in his report changes my opinions on this topic.

**"Wellness Rounds" in Administrative Separation**

177.   Dr. Penn describes the "Wellness Rounds" that the Jail has reportedly begun to implement.  These are described as a "weekly practice" by which "a multidisciplinary team enters a specific Ad Sep restrictive housing pod" and "walks individually to each IP's cell, engages with the IPs, and asks if they need any assistance.  They encourage the IPs to exit their cells if appropriate and oversee the

cleaning of cells by trained IPs, performing additional cleaning as needed. The team assesses the IP's cell condition, mental status, clinical functioning, and daily living activities." Penn Report at 52. It is my assessment that this reported practice does *not* address the very serious harms and risks of harm inflicted on people with serious mental illness who are housed in the Jail's Administrative Separation units.

178. Dr. Penn states that the "Wellness Rounds" practice has been in place for two years, but it is oddly not memorialized or described in the Jail's health care policy regarding Administrative Separation patients (Medical Services Division MSD Policy G.2.1). *See* Quiroz PMK Dep. at 259 (confirming that MSD Policy G.2.1 is the only "policy document[] or directive[] that [is] foundational to understanding MSD's policies for segregated inmates" and that no NaphCare policy regarding segregated inmates has been implemented). Without any written policy or directive regarding Wellness Rounds, any such *ad hoc* practice gives me little confidence in its efficacy to ensure adequate evaluation, treatment, and supervision of people with serious mental illness in Administrative Separation units.

179. I am glad to hear that Wellness Rounds, even as an unwritten practice, might be something happening in the San Diego County Jail system. Given the extraordinary acuity of mental illness I observed among so many patients in the Administrative Separation units, the level of isolation there, and the overall lack of meaningful activity and treatment, *any* additional observation of and engagement with these patients is a good thing.

180. But to be clear, these "Wellness Rounds" do *not* mitigate my grave concerns about the harmful conditions and lack of treatment in Administrative Separation units. These "Wellness Rounds" do *not* provide for clinician-patient confidentiality, are *not* a meaningful clinical contact, are *extraordinarily limited* in their use as a mental health evaluation tool, and do *not* constitute meaningful treatment. By their design and in their implementation, these Wellness Rounds do *not* provide the mental health treatment and clinical interventions that the patients

1    with serious mental illness so clearly need.

2        181.   Based on my in-person observations and review of records, Wellness

3    Rounds – to the extent they are occurring – are not achieving the stated goal of

4    ensuring appropriate cleanliness in people's cells. I observed Administrative

5    Separation cells housing people with serious mental illness that were extremely

6    filthy and cluttered with trash in the cell. Many cells reeked of urine and feces.

7    Two years of Wellness Rounds do not seem to have addressed this serious issue,

8    which is both inhumane and unacceptable from a basic sanitation perspective.

9        182.   In my review of patient records, I analyzed the documentation of

10   Wellness Rounds. In the aggregate, the Wellness Rounds are superficial in the

11   issues that they address and clinically unhelpful. I did not find evidence of

12   meaningful multidisciplinary collaboration. There is also great variability in the

13   way Wellness Rounds are documented, which is a reflection of this being an *ad hoc*

14   practice. Attendance of different disciplines is quite variable. Significantly, the

15   privately contracted (NaphCare) mental health staff (*i.e.*, psychologists, nurse

16   practitioners, psychiatrists) do not participate in these rounds – that is, the one

17   consistency that I do see is that psychiatry is not involved.

18       183.   The Wellness Rounds, as documented, provide no clinically significant

19   interventions. Often, they are simply an opportunity for a patient to complain about

20   the long waits they are facing to be seen by a psychiatric provider, a reflection of the

21   very problematic backlogs for psychiatry appointments and mental health sick call

22   requests. Patient records of the Wellness Rounds do not include meaningful

23   assessment or clinical interventions.

24       184.   Despite Dr. Penn's assertion that the Wellness Rounds team

25   "encourage[s] the IPs to exit their cells if appropriate and oversee the cleaning of

26   cells by trained IPs, performing additional cleaning as needed," I found that the

27   documentation consistently makes no reference to patients exiting their cells or

28   being assisted with necessary cell cleaning.

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

185.   As one example, ████████ who I discuss earlier in this report, was provided a Wellness Round in ████████ 2023.  As noted in my earlier discussion of this patient, during this time period, Mr. ████ was clearly decompensated, appearing "labile and unpredictable … avoidant, impulsive, bizarre, paranoid, suspicious," "disheveled and unkempt."  At the time of this Wellness Round, he was in fact waiting for a placement in the acute care Psychiatric Services Unit.  The documentation of the Wellness Round states:

> Writer participated in wellness rounds with multidisciplinary team members including CNA, facility admin sworn staff, and reentry services correctional counselors.  IP reported he has been eating.  This writer tried to engage IP in conversation and IP continued to shake his head and finger.  Writer observed empty food trays and debris in his cell.  IP denied to clean his cell.  IP did not want new clothes when writer asked and walked away from cell door yelling.

186.   This brief note illustrates the extremely limited purpose and impact of Wellness Rounds.  The clinician observes that the patient's cell is filled with debris and that the patient is demonstrating symptoms of mental illness.  This Wellness Round was entirely unhelpful for a patient who had been identified as being very decompensated and requiring a higher level of care.  It is remarkable that the Wellness Round team does not acknowledge that this patient was waiting for an acute care bed, and that it took no apparent steps to expedite such a placement.

187.   In sum, it is my strong opinion that "Wellness Rounds" do not address the harsh, dangerous, and countertherapeutic conditions in Administrative Separation units that put large numbers of patients with serious mental illness at risk every day.

**EOH, Safety Cells, and PSU Observation Cells**

188.   I have discussed at length the exceedingly harmful conditions and clinically inappropriate use of Enhanced Observation Housing (EOH) cells, safety cells, and PSU Observation Cells in the San Diego County Jail system.  Stewart Report ¶¶ 288-316 (EOH and safety cells); *id.* ¶¶ 120-123 (PSU Observation Cells).

189.   Dr. Penn's report has very little to say regarding the exceedingly harsh

1   conditions in and practices around these extremely restrictive placements, other than

2   to conclude – without analysis – that "Watch cells and Enhanced Observation

3   Housing (EOH) are not punitive isolation units but are designed for short-term,

4   closely monitored care of IPs who are at imminent risk of self-harm or suicide.

5   Their use is strictly for maintaining safety and preventing severe harm, not for

6   punishment." Penn Report at 68. I strongly disagree with Dr. Penn's finding that

7   these exceedingly harsh and punitive-feeling placements are clinically appropriate,

8   much less effective at "preventing severe harm." Below are additional examples of

9   patients I reviewed who were placed at unacceptable risk and in fact harmed by

10  placement in these settings.

11  ████████████████████

12       190.   This patient had a near-fatal suicide attempt while in custody at the Jail

13  in ██████. His records show that, due to this history, custody staff frequently made

14  the unilateral decision (without appropriate clinical input) to place him in

15  observation cells with severe restrictions on his property, privileges, and daily

16  activities. Mr. ██████████ himself expressed, "I don't deserve to be treated like this,

17  this is totally unfair" as he denied any suicidal ideations. At other times,

18  Mr. ████████ did require enhanced monitoring, as when he engaged in self-harm

19  triggered by poor distress tolerance and other signs of mental illness. He would be

20  placed in the safety cell or EOH cell to ensure his physical safety, but these

21  environments were so isolating and restrictive, and devoid of any meaningful

22  therapeutic treatment, that it is no surprise that Mr. ██████████ perceived these

23  placements as punishment, which only led to further agitation and poor engagement

24  with the care team.

25       191.   In my professional opinion, more therapeutic treatment settings and the

26  provision of meaningful treatment would have been far more effective in treating

27  this patient's mental illness, addressing his self-harming behaviors and psychiatric

28  symptoms, and mitigating unnecessary distress and harm to him in the process.

1 ██████████

2      192.   This patient has a psychiatric history of serious mental illness, and

3 experienced multiple traumatic and harmful medical and psychiatric incidents at the

4 Jail that could have been prevented if he was provided timely access to mental

5 health services and was placed in a more therapeutic setting.  Instead, he was

6 subjected to what amounted to punitive and anti-therapeutic conditions of

7 confinement that made things far worse, not better, for him.

8      193.   When he arrived at the Jail in ██████ 2023 with a significant psychiatric

9 history, he was not seen by a psychiatric provider for approximately one month.

10 Before he ever received a psychiatric evaluation, he tried to hang himself in his cell,

11 requiring overnight hospitalization.  Subsequent evaluation found that his suicide

12 attempt was driven by command-type auditory hallucinations that instructed him to

13 hurt himself.  This suicide attempt could have been prevented if the patient was

14 assessed sooner and received appropriate treatment for his psychosis.

15      194.   After ██████████ 's suicide attempt and return from the hospital, he

16 was placed in EOH, the extremely restrictive setting that I criticized in my previous

17 report.  Stewart Report ¶¶ 304-311.  In that setting, he reported trouble breathing

18 and lethargy requiring closer medication monitoring.  He was moved to a medical

19 observation cell, but was irritable due to feeling like his reported physical symptoms

20 were misinterpreted by nursing team which led him verbalizing expletives towards

21 staff.  In response, the medical team moved the patient back to EOH.  (It was later

22 determined that the patient had COVID, which likely contributed to his shortness of

23 breath and agitation.)  This move seemed punitive as there were no behaviors

24 indicating an imminent risk to self or others.  Further suggesting that this placement

25 to the extremely restrictive EOH unit was punitive rather clinically-based, the

26 Detention Safety Program clinical team was not even informed or called to assess

27 the patient to determine the safest housing option.  After he tested positive for

28 COVID, he was placed in medical isolation, where he did not receive any visits

from the mental health team.  Within a few days, he was found in his cell with a noose around his neck, and again requiring overnight hospitalization.  Upon his return to the Jail, he reported to a psychiatric provider that the source of his distress was primarily driven by feeling stigmatized for his mental health symptoms and the punitive environment in EOH.

195.   I found it deeply troubling to then see that, when Mr. ██████ was next booked at the Jail in ████████ 2023 for a parole violation, he disclosed his history of hanging himself but (according to the records) did not indicate any current suicidal ideations with plan or any other behaviors suggesting imminent safety concerns.  Despite the fact that there was no clinical indication for it, he was placed back in EOH, the enormously restrictive and punitive-feeling setting that had contributed to the increased distress culminating in his last suicide attempt at the Jail.

196.   These cases, and so many others I have reviewed, illustrate how the San Diego County Jail's system denies clinically appropriate care, imposes clinically contraindicated, punitive-feeling, unduly harsh conditions for people with serious mental illness, and imposes avoidable harm and risks of harm to patients' physical safety and psychological well-being.

**J.    Dr. Penn's Opinion that the San Diego County Jail System Has an Adequate Suicide Prevention System Is Inconsistent with the Facts, and His Analysis Omits Critical Information.**

197.   Dr. Penn opines that the "SDSO Sheriff's Office [sic] has adequate policies and procedures to identify, treat, track, and supervise IPs at risk for suicide and provides clinically appropriate mental health and psychiatric services to SDSO IPs who are potentially suicidal and/or engaging in self-harm."  Penn Report at 46-50.  I strongly disagree with this opinion and have grave concerns about Dr. Penn's analysis and methodology in reaching such an opinion.

198.   First, it must be reiterated that Dr. Penn did not review materials pertaining to *any* in-custody suicide or mental health-related death.  His analysis is

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    limited to extremely general data that offers little insight into the adequacy of the
2    suicide prevention system at the San Diego County Jail.  Penn Report at 46 ("All
3    individuals who completed suicides were male."; "Nine of these suicides were
4    carried out by asphyxiation, while one was completed through water intoxication.";
5    "The distribution of these incidents across facilities shows that two occurred at the
6    George Bailey Detention Facility, two at the Vista Detention Facility, and six at the
7    Central Jail.").

8         199.   Dr. Penn makes the factually inaccurate statement that "there has been
9    no concentration of completed suicides at any particular SDSO Complex (or custody
10   level)."  Penn Report at 49.  This appears to be another example of a direct copy-
11   and-paste finding from Dr. Penn's Arizona prisons case expert testimony, where he
12   stated:  "There is no concentration of completed suicides at any particular ADCRR
13   Complex (or custody level)."  Joseph Penn Expert Report, *Jensen v. Shinn*, No.
14   2:12-cv-00601-ROS (D. Ariz.), Dkt. 4172 at 83 (¶ 233).  His finding is identical in
15   the two cases (with only the name of the detention system changed from "ADCRR"
16   to "SDSO").

17        200.   This finding may have been accurate in the Arizona prison system, but
18   it is *not* accurate in this case.  Dr. Penn's own report (at 46, 49-50) indicates that,
19   across San Diego County's 7 jail facilities, since 2019, **60% of completed suicides**
20   **have occurred at Central Jail.**  His data does not include still other horrific and
21   most certainly mental health-related deaths at Central Jail during that time period.
22   *See, e.g.*, Stewart Report ¶¶ 266-274 (Rupard death by pneumonia, malnutrition, and
23   dehydration in the wake of extreme and untreated psychiatric decompensation at
24   Central Jail, ruled a "homicide" due to "neglected schizophrenia"); *id.* ¶¶ 169-170
25   (Baker death by homicide at Central Jail, after he was excluded from clinically
26   appropriate mental health placement and was instead housed in a cell with a violent
27   cellmate without mental illness).  Dr. Penn's finding here is inconsistent with the
28   facts, and even his own data.

**Inadequate Suicide Risk Screening**

201.   I strongly disagree with Dr. Penn's finding that "the Sheriff's department adequately screens and identifies IPs at risk for suicide." Penn Report at 46.  Here, it is notable that Dr. Penn does not consider the findings of deficiency that have been documented by other independent parties about San Diego County Jail's suicide prevention policies, procedures, and practices.  Stewart Report ¶¶ 26-30 (describing my own findings of deficiency regarding suicide risk screening and findings made by nationally recognized jail suicide prevention expert Lindsay Hayes); DRC Report Appendix A at 6 ("Of the twelve (12) San Diego County Jail inmates who died by suicide from December 2014 through 2016, we identified a number of problems with the initial suicide risk screening and referral process. . . . One particularly troubling case stood out.  The inmate had a diagnosis of bipolar disorder and was screened, but even though he demonstrated signs and symptoms of florid psychosis and mania, he was not referred for evaluation and admission to the Psychiatric Security Unit.  He was placed in a Safety Cell, was later released to general population, and died on Day Six of his confinement while still floridly psychotic and manic, despite a request to custodial staff earlier in the day for safety cell placement.  Jail staff did not complete a separate assessment of suicide risk despite this inmate's extreme mental state and need for evaluation and treatment.").

202.   Through my assessment, I considered these previous findings of deficiencies by other reviewers.  I concluded that these deficiencies have not been remedied and remain prevalent in this Jail system.

203.   Dr. Penn does not consider these findings at all.  Dr. Penn's designated reviewers *did* find deficiencies in suicide risk screening, a fact with which his report's findings and opinions do not engage.  *See, e.g.*, Penn Report at 186 (Designated expert reviewer finding "I did not notice much difference among all the suicide risk assessments, suggesting a 'cut and paste' for much of the documentation.").

**Inadequate Monitoring of Patients at Risk of Suicide**

204.    I strongly disagree with Dr. Penn's opinion that "the Sheriff's Department adequately monitors IPs at risk of suicide." Penn Report at 47.  The primary basis for this finding, according to Dr. Penn's discussion, appears to be that incarcerated people are "informed that they could alert custody staff of any developing suicidal ideation by pressing the intercom button in their cell" and are "encouraged to communicate any mental health concerns or urgent requests for mental health involvement by pressing the button, informing custody staff, or submitting a written sick call request." *Id.*  These practices do not remotely constitute an adequate system of monitoring patients at high risk of suicide in a jail setting.  Numerous case examples and systemic deficiencies inform my strong disagreement with Dr. Penn's conclusion.

205.    Here, Dr. Penn's choice not to review any of the suicides or mental health-related deaths that have occurred in the San Diego County Jail is notable. For example, take the horrific death of Ivan Ortiz, who died by suicide in a Central Jail PSU Observation Cell.  In Mr. Ortiz's case, a deputy left a plastic bag in Ortiz's cell and staff failed to adequately monitor him despite his placement in what the Jail system considers to be its *most intensive* level of mental health observation.  *See* Stewart Report ¶ 122.

206.    Deficiencies in the monitoring of high-risk suicidal patients persist to this day.  The San Diego County Jail has refused to implement the repeatedly recommended practice of "constant observation" for high-risk suicidal patients.  *See* Stewart Report ¶¶ 317-319 (describing how this practice was recommended by national suicide prevention expert Lindsay Hayes following his assessment of the Jail in 2018, Disability Rights California's similar recommendation to the Jail in 2018, and NCCHC's criticism of the Jail on this topic in 2017).

207.    Dr. Penn's opinion is also wrong insofar as it ignores the serious deficiencies in the Jail's system of "safety checks" for patients in settings known to

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

house patients at elevated risk of suicide. These deficiencies have been documented repeatedly by outside auditors, consultants, and investigating bodies, and have been shown to have played a role in multiple suicides that have occurred in the San Diego County Jail system. Stewart Report ¶¶ 320-335. This is a notable omission in Dr. Penn's assessment.

**Inadequate Mental Health Follow-up for Patients at High Risk of Suicide**

208.   I strongly disagree with Dr. Penn's opinion that "the Sheriff's Department provides adequate mental health follow-up care for IPs released from suicide precautions." Penn Report at 47.

209.   Here again, Dr. Penn's choice not to review any of the suicides or mental health-related deaths that have occurred in the San Diego County Jail skews his assessment. There are multiple suicide deaths that strongly indicate deficiencies with respect to mental health follow-up care. *See e.g.*, Stewart Report ¶¶ 82-85 (Ornelas 2023 suicide where Jail health care contractor NaphCare's death review asserts need for "Closer Psychiatric follow-up/care"); *id.* ¶¶ 258-265 (McDowell 2023 suicide in which patient reporting "mental breakdown" and having auditory hallucinations not seen by psychiatric provider for 3 ½ months, with no follow-up done in the six weeks leading up to his suicide Jail health care contractor NaphCare's death review asserts need for "Closer Psychiatric follow-up/care"); *id.* ¶ 297 (patient placed in Enhanced Observation Housing unit, cleared from suicide precautions with recommendation for mental health follow-up within 24 hours, but patient is not seen for two days, at which time he jumped off the top tier of his housing module, fell an estimated 20 feet, landed on the cement floor, and was found in a pool of his own blood, suffering pelvic, facial, and rib fractures, kidney, liver, and lung lacerations, and traumatic brain injury).

210.   Patient cases reviewed by Dr. Penn's own designated reviewers illustrate similar and further systemic deficiencies in the San Diego County Jail's system for identifying, monitoring, treating, and conducting necessary follow-up for

1    patients at high risk of suicide.  For example:

2    ███████████ **(Penn Report at 188-189)**

3        211.    Mr. █████'s case illustrates several aspects of the Jail's deficient suicide

4    prevention and mental health care system, including delays in psychiatric care,

5    failures to order timely suicide risk follow-up, failures to even timely complete the

6    untimely scheduled follow-up, and medication continuity failures.  Dr. Penn's

7    designated reviewer, Dr. Huselid, notes "significant lapses/concerns" with the care

8    that this patient received, concluding that the Jail failed to provide him "access to

9    care" for his mental health needs and suicide risk.

10        212.    When this patient arrived at the Jail, he reported suicidal ideations with

11   a plan.  The booking nurse scheduled a psychiatric appointment and was referred to

12   the Detention Safety Program.  The psychiatric appointment did not occur for five

13   weeks.  I agree with Dr. Huselid's finding here:  "[O]ver a month to see a prescriber

14   is too long for someone this high risk."  When he was discharged from the Detention

15   Safety Program, a follow-up appointment was ordered for one week later.  Again,

16   Dr. Huselid accurately concludes:  "I think that this [one-week follow-up] is too

17   long given his risk of suicide."  But the actual follow-up was much worse than even

18   the inappropriately ordered follow-up, with the patient going almost *four weeks* until

19   he was seen again.  Timely follow-up for a person discharging from suicide

20   precautions in a jail setting is essential.  This is an example of an unacceptable and

21   dangerous delay for such follow-up.

22        213.    Dr. Huselid further found that this patient's psychiatric medications

23   expired at least twice.  She noted that this was not an isolated incident:  "[G]iven

24   that I've seen many other examples of expiring medications in other charts, there

25   does seem to be a systems issue."

26   ███████████ **(Penn Report at 196-197)**

27        214.    The care of this patient, who I discuss elsewhere in this report

28   regarding other significant treatment failures, illustrates the alarming failures in the

suicide prevention system in the San Diego County Jail system. This patient was started on antidepressant medication that must be taken consistently, and it is standard practice to ensure adherence to medications before adjusting dosage. He initially adhered to taking the medication, but began refusing in ███ 2023. His care was deeply complicated by being seen by five different nurse practitioners across six appointments, who appear to have different assessment styles and prescribing practices. This negatively impacts continuity of care and clinical engagement, particularly for this kind of patient.

215. The lack of monitoring culminated in an incident on in ███ 2024, when the patient overdosed on pills and needed to be sent to the emergency room for medical evaluation. Shockingly, and as noted by Dr. Penn's designated reviewer, Dr. Huselid, there was minimal documentation and insufficient clinical intervention upon his return to the Jail. A prudent psychiatric prescriber would urgently follow up with this patient to address the overdose and ensure appropriate medication management moving forward. The only action taken was a psychiatrist chart review several days after the incident, and an order that medications be crushed. The patient was not seen by a psychiatric prescriber until a full month after his overdose. This is an unacceptable and dangerous failure to follow up with a patient with a high suicide risk, and a case example where the Jail did not meet the standard of care.

216. Dr. Penn does not address the serious deficiencies in treatment and suicide prevention in these patient cases, or in any other patient cases. He fails to review, and ignores altogether, critical incidents like in-custody suicide deaths and serious suicide attempts. This is a consequential and glaring omission, as the above examples demonstrate. Nothing in his report changes my opinion on this topic. The patient cases assessed by Dr. Penn's designated reviewers only elevate my concern about the systemic suicide prevention-related failures in this Jail system.

/ / /

**K.    Dr. Penn's Opinion that the Sheriff's Department Does Not Discriminate and Unfairly Punish People with Mental Illness Is Contradicted by the County's Own Staff and Its Own Experts.**

217.    I strongly disagree with Dr. Penn's opinion that the "Sheriff's Department does not discriminate and unfairly punish IPs with mental illness in housing placements." Penn Report at 52. His analysis does not reference any data, records review, or other specific materials on which such an opinion should be based.

218.    As mentioned earlier in this report, Dr. Penn's opinion on this topic is directly contradicted by the Jail's own mental health leadership, who confirm that there are no policies or procedures at the Jail for mental health care staff to provide input regarding disciplinary processes. *Compare* Penn Report at 58 ("When an individual shows acute mental health deterioration, potentially linked to a disciplinary infraction, SDSO custody staff collaborate closely with mental health care staff" *with* Quiroz PMK Dep. at 178 ("Q: Does mental health staff play any role in the administration of discipline for people with serious mental illness? A:No").

219.    The involvement of mental health staff in disciplinary procedures for people with mental health needs is an essential practice for any jail system to avoid the wrongful discrimination and unfair (and potentially dangerous) punishment of people with mental illness for behaviors that are manifestation of their mental health disability. San Diego County Jail fails to have such a policy, procedure, or practice.

220.    As I have noted, the County's own expert on disability discrimination issues looked closely at this issue, and made a finding directly in contradiction to Dr. Penn's statement on this point:

> ***The SDCSO does not have a process for a clinician to provide his/her professional recommendations*** (e.g., whether the incarcerated person fully understood the nature of his/her actions at the time of the disciplinary charge and alleged actions) ***to the hearing official so they can give consideration to the recommendations prior to ruling on the charge and issuing any sanctions.*** The SDCSO should develop policies and a process for clinicians to provide their professional recommendations regarding the incarcerated persons understanding of their actions and for the hearing official to consider the clinical input of

1  sanctions that should be avoided based on the clinician's assessment.

2  Defs.' Expert Report of Julian Martinez at 75 (emphasis added).

3  221.  Nothing in Dr. Penn's report changes my strong opinion that the San

4  Diego County Jail improperly and dangerously punishes people with serious mental

5  health treatment needs or an intellectual disability.  Stewart Report ¶¶ 418-424.

6  222.  An additional note is warranted here.  During my on-site tours of the

7  San Diego County Jail facilities, I observed very clearly that the Administrative

8  Separation isolation units are filled, to an overwhelming extent, with people who

9  showed signs of serious mental illness.  My review of records strongly indicates that

10  people with serious mental illness are placed into Administrative Separation

11  isolation units for reasons directly related to their mental illness and the symptoms

12  of their illness.  This practice directly contravenes the standard of care, along with

13  the guidance of the United States Department of Justice on this topic.  Stewart

14  Report ¶¶ 184-186 (discussing DOJ guidance that an "inmate with [serious mental

15  illness] should not be placed in restrictive housing" except in specific exceptional

16  circumstances).

17  **L.    Dr. Penn's Opinion that the "Sheriff's Department Provides IPs
18          with Adequate Mental Health Discharge Planning and Resources"
        Is Not Supported by the Facts and Is Contradicted by the County's
19          Own Jail Mental Health Coordinator.**

20  223.  Dr. Penn's opinion that the Jail has implemented adequate discharge

21  planning services is not supported by the facts in this case.  Penn Report at 53-54.

22  My report describes in some detail the deficiencies with respect to this aspect of the

23  Jail's inadequate mental health care system.  Stewart Report ¶¶ 431-439.

24  224.  Most significantly, the Jail's mental health coordinator agrees that "we

25  do need more" mental health discharge planning staffing resources to meet the needs

26  of the Jail mental health population.  She testified that the County has not done a

27  "needs assessment to determine what staffing resources are necessary" to meet

28  discharge planning needs of the seriously mentally ill population, and that while

1    "it's challenging without the data to know," she could say that "more [discharge
2    planning staff] is certainly better."  Quiroz PMK Dep. at 171-172.

3        225.   My review of patient records revealed that discharge planning services
4    are extremely limited to the point that the basic clinical needs of the Jail's seriously
5    mentally ill population are not being met.  There is insufficient discharge planning
6    to ensure that patients have continuity of psychiatric medications and mental health
7    services, with appropriate and effective linkages to community service providers –
8    which are essential to adequate discharge planning in a jail system.

9        226.   The example of patient ████████████████ is an illustrative one.  His
10   discharge planning records indicate that he "was provided [Medication Assisted
11   Treatment] program information," and was "aware of pending status with RCC
12   [Rehabilitation Care Coordination] and current Medi-Cal."  There is *no* indication of
13   proactive efforts to ensure actual and timely linkages to community service
14   providers or access to care upon release.  Stewart Report ¶¶ 437-438.  This is
15   inadequate and constitutes a failure in the provision of care.

16       227.   I can discern no meaningful involvement of the County's Behavioral
17   Health Services or Public Health Services agencies in discharge planning of
18   incarcerated patients at San Diego County Jail.  This is in stark contrast to
19   comparable and nearby County systems—like that of Orange County, Los Angeles
20   County, and Santa Barbara County—in which the county mental health and public
21   health agencies play a significantly more active role in discharge planning for
22   patients in jail detention.  Effective coordination between a jail system and the
23   county mental health and public health agencies on the subject of discharge planning
24   for people with serious mental illness is a critically important practice, to ensure that
25   people have timely and meaningful access to the services they need when they are
26   released from detention.  This is an area on which San Diego County must improve
27   through multi-agency collaboration and coordination.
28   / / /

REBUTTAL EXPERT REPORT OF PABLO STEWART
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    ## IV.    CONCLUSION

2        228.    The information and opinions contained in this report are based on

3    evidence, documentation, and/or observations available to me.  I reserve the right to

4    modify or expand these opinions should additional information become available to

5    me.  The information contained in this report is a fair and accurate representation of

6    the subject of my anticipated testimony in this case.

7

8    Dated:  October **31**, 2024

        Pablo Stewart, M.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT P
# (Redacted)

1  GAY C. GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  ERIC MONEK ANDERSON – 320934
   HANNAH M. CHARTOFF – 324529
3  BEN HOLSTON – 341439
   ROSEN BIEN
4  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
5  San Francisco, California 94105-1738
   Telephone: (415) 433-6830
6  Facsimile: (415) 433-7104
   ggrunfeld@rbgg.com
7  vswearingen@rbgg.com
   eanderson@rbgg.com
8  hchartoff@rbgg.com
   bholston@rbgg.com
9
   AARON J. FISCHER – 247391
10 LAW OFFICE OF
   AARON J. FISCHER
11 1400 Shattuck Square Suite 12 - #344
   Berkeley, California 94709
12 Telephone: (510) 806-7366
   Facsimile: (510) 694-6314
13 ajf@aaronfischerlaw.com

14 Attorneys for Plaintiffs and the
   Certified Class and Subclasses

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

15

16                   UNITED STATES DISTRICT COURT

17                  SOUTHERN DISTRICT OF CALIFORNIA

18 DARRYL DUNSMORE, ANDREE
   ANDRADE, ERNEST ARCHULETA,
19 JAMES CLARK, ANTHONY EDWARDS,
   LISA LANDERS, REANNA LEVY,
20 JOSUE LOPEZ, CHRISTOPHER
   NELSON, CHRISTOPHER NORWOOD,
21 JESSE OLIVARES, GUSTAVO
   SEPULVEDA, MICHAEL TAYLOR, and
22 LAURA ZOERNER, on behalf of
   themselves and all others similarly situated,

23                 Plaintiffs,

24        v.

25 SAN DIEGO COUNTY SHERIFF'S
   DEPARTMENT, COUNTY OF SAN
26 DIEGO, SAN DIEGO COUNTY
   PROBATION DEPARTMENT, and DOES
27 1 to 20, inclusive,

                   Defendants.

28

Case No. 3:20-cv-00406-AJB-DDL

**EXPERT REPORT OF
JEFFREY E. KELLER, M.D.**

Judge:       Hon. Anthony J. Battaglia
Magistrate: Hon. David D. Leshner

Trial Date: None Set

[4448212.31]

Case No. 3:20-cv-00406-AJB-DDL

# TABLE OF CONTENTS

**Page**

EDUCATION AND QUALIFICATIONS ...................................................... 1

SUMMARY OF OPINIONS ....................................................................... 3

METHODOLOGY ...................................................................................... 6

BACKGROUND ......................................................................................... 8

I.   Multiple Expert Entities Have Reported on the Inadequate Healthcare
     at the Jail .......................................................................................... 8

II.  The Sheriff's Department's Contracts with Multiple Private Companies
     to Provide Healthcare at the Jail ..................................................... 17

     A.   Background on NaphCare ........................................................ 17

     B.   NaphCare's 2022 Contract with San Diego County ............... 21

     C.   The Sheriff's Department Continued to Work With, and Pay,
          NaphCare, Despite Knowing That NaphCare Was Not Living Up
          to Its Contractual Obligations ................................................ 21

     D.   The Sheriff's Department Recently Contracted with Correctional
          Healthcare Partners to Provide Additional Health Care Staff ...... 24

OPINIONS ................................................................................................ 25

I.   Inadequate Medical Care at the Jail Has Resulted in Preventable Deaths ...... 26

     A.   The Jail's Flawed Mortality Review Process .......................... 28

     B.   NaphCare's Flawed Mortality Review Process ....................... 30

     C.   Case Studies of Deaths at the Jail Demonstrate Substandard Care ...... 35

          1.   Patricia Adamson (23706155), Died May 3, 2023 .............. 36

          2.   Raymond Dix (22737506), Died September 13, 2022 .......... 42

          3.   Vianna Granillo (22728152), Died July 13, 2022 ............... 45

          4.   Abdiel Sarabia (21118298), Died July 22, 2022 ................. 48

          5.   Aaron Bonin (22736636), Died November 1, 2022 ............. 51

          6.   Roselee Bartolacci (23713442), Died May 29, 2023 .......... 54

          7.   Erica Wahlberg (22726497), Died July 2, 2022 ................. 60

     D.   Repeated Root Causes of Death in These Case Studies .......... 64

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

E.     Additional Deaths in the Jail .................................................... 65

II.   The Sheriff's Department's Inadequate Screening and Intake Process
      Fails to Identify and Treat Medical Care Problems of Newly Arriving
      Incarcerated People, Placing Them at Substantial Risk of Significant
      Harm ............................................................................................ 69

      A.     Step One:  Medical Clearance ........................................... 71

      B.     Step Two:  Receiving Screening ........................................ 72

      C.     Step Three:  Second Stage Nursing Evaluation ................. 73

      D.     Step Four:  14-Day Health Assessment ............................ 74

III.  The Sheriff's Department Fails to Continue Medically Necessary
      Medications and Treatments for Incarcerated People Upon Their
      Arrival at the Jail or Transfer Between Jail Facilities, Placing Them at
      Substantial Risk of Serious Harm ............................................... 82

      A.     Continuing Medical Necessary Medications After Booking ............... 82

      B.     Continuing Medically Necessary Treatment After Booking ............... 89

IV.   The Sheriff's Department Does Not Provide Incarcerated People with a
      Reliable and Timely Way to Alert Health Care Staff of Their Medical
      Needs, Placing Them at Substantial Risk of Serious Harm ........................... 93

      A.     The Sheriff's Department Lacks an Effective Process for
             Submission, Tracking, and Scheduling of Sick Calls ........................... 95

      B.     Even When Medical Requests Received and Processed, They
             Are Often Not Timely or Adequately Addressed ............................ 101

      C.     Grievances Are Often Ignored or Not Answered Satisfactorily ......... 105

      D.     The Sheriff's Department Lacks an Effective Alert System for
             Medical Emergencies .......................................................... 108

      E.     The Sheriff's Department Lacks a Working System for Ensuring
             that People with Mental Illness or Other Communication
             Difficulties Receive Medical Care ........................................... 111

V.    The Sheriff's Department Improperly Documents "Refusals" of
      Medical Care, Resulting in the Denial of Care to Incarcerated People,
      and Placing Them at Substantial Risk of Serious Harm ........................... 113

VI.   The Sheriff's Department Routinely Attempts to Provide Medical Care
      Without Examining Patients or By Asking Medical Staff to Operate
      Outside Their Scope of Practice, Placing Incarcerated People at
      Substantial Risk of Serious Harm ............................................... 124

      A.     The Jail Misuses STATCare, Employing Midlevel Practitioners
             in Remote Locations to Cover for, Supplement, and Replace On-
             Site Medical Practitioners. ................................................... 127

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

B.   Jail Medical Practitioners Provide Care to Incarcerated Patients Without Proper Examination. ........................................... 133

C.   Registered Nurses Operate Outside Their Scope of Practice at the Jail .......................................................................................... 134

VII.   The Sheriff's Department Lacks Sufficient Contracts with Hospitals and Offsite Providers and Lacks Proper Referral Processes to Provide Adequate Medical Care to Incarcerated People, Placing Them at Substantial Risk of Serious Harm ................................................. 136

VIII.   The Sheriff's Department Fails to Provide Adequate Diagnostic and Chronic Care to Incarcerated People and Provides Inadequate Treatment for Several Common Medical Conditions, Placing Them at Substantial Risk of Serious Harm .............................................. 148

A.   Diagnostic Care ..................................................................... 149

B.   Chronic Care ......................................................................... 152

C.   Inadequate Treatment of Common Medical Conditions.................... 154

1.   Hepatitis C ("HCV")............................................. 155

2.   Type 2 Diabetes ..................................................... 160

3.   Hernias ................................................................... 168

4.   Latent Tuberculosis ("LTB")................................. 175

5.   Sexually Transmitted Infections ("STIs") ............. 177

6.   Asthma ................................................................... 182

IX.   The Sheriff's Department Fails to Provide Medically Necessary Vision Care.......................................................................................... 188

A.   The Sheriff's Department Fails to Screen or Evaluate People for Eye Diseases, Even Those Who Self-Identify as High Risk ............. 188

B.   The Sheriff's Department Fails to Timely and Adequately Address Incarcerated People's Visual Acuity Problems ................. 190

1.   There Are Numerous Barriers Preventing People From Timely Receiving Eye Glasses ................................. 190

2.   The Jail Lacks Adequate Policies and Procedures to Ensure IPs Have Access to Distance Glasses.......................... 191

X.   Custody Staff Interfere with the Provision of Care by Health Care Staff in the Jail, Including by Compromising Patient Confidentiality, Which Puts Patients at Substantial Risk of Serious Harm......................................... 197

XI.   The Sheriff's Department Fails to Maintain Adequate, Accurate, and Complete Medical Records, Which Compromises the Delivery of Care ..... 203

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

XII.   The Sheriff's Department Fails to Provide Necessary or Adequate
       Follow-Up Medical Treatment to Incarcerated People ................................ 210

XIII.  The Sheriff's Department Fails to Provide Adequate Discharge
       Planning Services and Medication for Incarcerated People Being
       Released from the Jail ................................................................................ 216

       A.   Coordinating Ongoing Medical Care with Outside Agencies ........... 219

       B.   Discharge Medications .................................................................... 221

       C.   Patient Instructions ........................................................................ 223

       D.   Documentation and Information Transfer. ........................................ 224

XIV.   The Sheriff's Department Fails to Maintain Adequate Quality
       Assurance/Quality Improvement Processes to Ensure Appropriate and
       Timely Medical Care .................................................................................. 225

       A.   The Jail's Policies Are Not Sufficiently Clear, Allowing Staff to
            Escape Accountability ..................................................................... 228

       B.   The Sheriff's Department Does Not Provide Adequate Training,
            Meaning that Some Staff May Not Know the Governing Policy ....... 230

       C.   The Sheriff's Department Does Not Track or Analyze the Right
            Data to Ensure that Adequate Medical Care Is Provided ................. 231

       D.   The Sheriff's Department's Peer Review Process for Medical
            Staff Is Inadequate ......................................................................... 233

XV.    The Sheriff's Department Systematically Fails to Maintain Sufficient
       Numbers of Health Care Professionals, Resulting in Deficient Care .......... 234

       A.   The Jail Has Experienced a Shortage of Healthcare Staff for
            Several Years .................................................................................. 234

       B.   The New Contract with CHP Will Not Solve the Jail's Problems ..... 240

            1.   Ongoing Nursing Shortage ....................................................... 241

            2.   Instability Created by Private Correctional Healthcare
                 Providers ................................................................................. 242

            3.   Siloed Medical Care Between NaphCare and CHP ................. 246

            4.   Deficiencies in New CHP Contract .......................................... 247

CONCLUSION .......................................................................................................... 249

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    I, Jeffrey E. Keller, M.D., declare:

2    1.    I am a physician licensed to practice medicine in the State of Idaho,
3    with a particular focus on correctional medicine. I am also a businessperson with
4    significant knowledge about the private correctional healthcare industry. I am
5    currently the President of the American College of Correctional Physicians
6    ("ACCP"). The ACCP is the only international membership organization
7    committed to the professional development and fellowship of doctors and mid-level
8    practitioners who practice in the field of correctional medicine—*i.e.*, providing
9    medical care to patients incarcerated or confined in jails, prisons, and juvenile
10   facilities. A true and correct copy of my *curriculum vitae* is attached hereto as
11   **Exhibit A**. My background and experiences relevant to my expert testimony in this
12   proceeding are set forth below.

13                **EDUCATION AND QUALIFICATIONS**

14   2.    I received my medical degree from the University of Utah in 1985. I
15   began my career as a residency trained emergency physician. I practiced for 25
16   years at an Emergency Department in a busy Level-2 Trauma Center. The majority
17   of my professional medical career has been focused on correctional healthcare,
18   including both the clinical and business aspects of providing medical care to
19   incarcerated persons confined in jail and prison facilities.

20   3.    I have significant business experience in the private correctional
21   healthcare industry. When I use the term private correctional healthcare industry, I
22   am referring to profit-seeking companies, like NaphCare, Inc. and its many
23   competitors, whose business model centers on contracting with states, counties, and
24   other municipalities to provide healthcare to incarcerated or confined citizens in
25   return for money from which the companies endeavor to earn profits for their
26   owners.

27   4.    From 1997 to 2021, I was the President and Medical Director of a
28   company called Badger Medical PA. Badger Medical PA was a for-profit jail

1    medical company that provided medical and mental health services to people

2    incarcerated in 17 Idaho jails and juvenile facilities.  As CEO and Medical Director

3    of this company, I was responsible not only for overseeing medical care to

4    incarcerated people but also for overseeing all business components of the company,

5    including gaining and keeping contracts, making budgets, overseeing and

6    controlling costs, and running the company with the goal of maintaining a profitable

7    business while, at the same time, providing quality correctional healthcare that met

8    the company's contractual commitments.  I also supervised all medical care, wrote

9    policies and procedures, oversaw quality improvement programs, and provided

10   direct clinical care to patients in jails until I retired from clinical practice in 2021.

11          5.     I am also the former Chief Medical Officer ("CMO") of a correctional

12   company called Centurion, LLC.  I was CMO of Centurion from 2013 to 2018.

13   Centurion is one of the nation's largest for-profit correctional medical companies.

14   As CMO for Centurion, I supervised medical services for tens of thousands of

15   incarcerated people in Massachusetts, Tennessee, Minnesota, Mississippi, Vermont,

16   Florida, and New Mexico where Centurion had contracts.  As CMO for Centurion, I

17   also supervised Centurion's Quality Assurance Program, wrote medical guidelines

18   for people incarcerated in prisons in states serviced by Centurion, and regularly

19   interacted with Centurion upper-level management about issues relating to

20   budgeting and other matters relating to Centurion's obligations to provide quality

21   correctional healthcare and fulfilling the company's contracts while, at the same

22   time, seeking to maintain profitable operations.

23          6.     I am currently a consultant in the correctional medical industry.  I

24   consult with both public entities and private entities on issues that include setting

25   and maintaining realistic budgets for providing acceptable healthcare for

26   incarcerated people.  Throughout my experience, up to and including the present

27   time, I have regularly interacted with upper managers of private correctional

28   healthcare companies.  I am very familiar with the industry as a whole based on my

1  personal business experience and my regular interaction with leaders and managers

2  of these companies.

3      7.    The opinions set forth in this report are based on my own training,

4  research, and experience as a Board-Certified Emergency Medicine Physician and

5  as a long-standing correctional physician.

6      8.    I am Board Certified in Emergency Medicine through 2028.  I have

7  been elected to be a Fellow of the American College of Emergency Physicians.  I

8  have also been elected to be a Fellow of the American College of Correctional

9  Physicians.  As noted above, I currently serve as the President of ACCP.  I have

10 lectured and published frequently on the practice of Correctional Medicine,

11 including a book entitled *The Best of Jail Medicine:  An Introduction to*

12 *Correctional Medicine*.

## SUMMARY OF OPINIONS

14     9.    It is my opinion, based on a reasonable degree of certainty, that

15 inadequate medical care at the Jail has resulted in preventable deaths and will

16 continue to result in preventable deaths, because the Jail does not have adequate

17 mortality and morbidity review procedures.

18     10.    It is my opinion, based on a reasonable degree of certainty, that the

19 Sheriff's Department's screening and intake process is inadequate and fails to

20 identify and treat medical care problems of newly arriving incarcerated people.  This

21 systemic failure, which in my opinion is a root cause of the Jail's high mortality and

22 morbidity rates, places incarcerated people at substantial risk of serious harm.

23     11.    It is my opinion, based on a reasonable degree of certainty, that the

24 Sheriff's Department fails to continue medically necessary medications and

25 treatments after people are booked into the Jail, placing incarcerated people at a

26 substantial risk of serious harm.  The Sheriff's Department also fails to ensure

27 continuity of care after patients return from off-site hospitalizations and medical

28 visits, placing incarcerated people at substantial risk of serious harm.  This systemic

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    failure is, in my opinion, a root cause of the Jail's high mortality and morbidity

2    rates.

3       12. It is my opinion, based on a reasonable degree of certainty, that the

4    Sheriff's Department does not provide incarcerated people with a reliable and timely

5    way to alert health care staff of their medical needs—whether emergent, urgent, or

6    routine—placing incarcerated people at a substantial risk of serious harm.  This lack

7    of communication with incarcerated people in need of medical care is particularly

8    challenging and dangerous for people with serious mental illness and developmental

9    disabilities, who are more even more likely to have their medical needs neglected

10    and suffer serious harm, including death.  This systemic failure is, in my opinion, a

11    root cause of the Jail's high mortality and morbidity rates.

12       13. It is my opinion, based on a reasonable degree of certainty, that the

13    Sheriff's Department improperly documents "refusals" of medical care, resulting in

14    the denial of care to incarcerated people and placing them at a substantial risk of

15    serious harm.  This systemic failure is, in my opinion, a root cause of the Jail's high

16    mortality and morbidity rates.

17       14. It is my opinion, based on a reasonable degree of certainty, that the

18    Sheriff's Department does not provide adequate examination of patients before

19    prescribing treatments, either because the practitioners providing care are

20    exclusively remote (rather than on-site) or because on-site practitioners do not

21    perform physical examinations, placing incarcerated people at a substantial risk of

22    serious harm.  In addition, it is my opinion that the Sheriff's Department relies on

23    nurses to operate outside their scope of practice to provide care, also placing

24    incarcerated people at a substantial risk of serious harm.  This systemic failure is, in

25    my opinion, a root cause of the Jail's high mortality and morbidity rates.

26       15. It is my opinion, based on a reasonable degree of certainty, that the

27    Sheriff's Department uses inappropriate processes to refer or deny outside medical

28    appointments and lacks sufficient contracts with outside providers for specialty

medical care, placing incarcerated people at a substantial risk of serious harm.

16.     It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department provides inadequate diagnostic and chronic care to incarcerated people and provides inappropriate care for a number of common medical conditions, placing incarcerated people at a substantial risk of serious harm. This systemic failure is, in my opinion, a root cause of the Jail's high mortality and morbidity rates.

17.     It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department fails to provide medically necessary vision care, placing incarcerated people at a substantial risk of serious harm.

18.     It is my opinion, based on a reasonable degree of certainty, that custody staff routinely interfere with the provision of healthcare, including by denying incarcerated people confidentiality in their interactions with healthcare providers, which places incarcerated people at a substantial risk of serious harm.

19.     It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department fails to maintain adequate, accurate, and complete medical records, compromising the delivery of healthcare and placing incarcerated people at a substantial risk of serious harm.

20.     It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department does not provide adequate discharge planning to people being released from custody, placing incarcerated people at a substantial risk of serious harm.

21.     It is my opinion, based on a reasonable degree of certainty, that the Sheriff's Department does not conduct adequate continuous quality improvement programs, meaning that critical errors (including but not limited to those described in this Report) go unaddressed, placing incarcerated people at a substantial risk of serious harm.

22.     It is my opinion, based on a reasonable degree of certainty, that the

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  Sheriff's Department has failed to maintain adequate levels of healthcare staff

2  relative to the incarcerated population, placing incarcerated people at a substantial

3  risk of serious harm.  This systemic failure is, in my opinion, a root cause of the

4  Jail's high mortality and morbidity rates.

5                                    **METHODOLOGY**

6        23.    I was asked by the attorneys representing the Plaintiffs in this case to

7  render an opinion as to the health care system, the general medical conditions, and

8  the adequacy of the medical care offered to the people incarcerated at the San Diego

9  County Jail (the "Jail").

10       24.    Prior to visiting three of the Jail facilities, I reviewed documents

11  pertinent to my objective.  These included the sections of the Third Amended

12  Complaint dealing with medical care, previous audits and inspections done of the

13  jail since 2017, contracts negotiated by San Diego County dealing with medical

14  care, and various other reports dealing with CQI, contract compliance, etc.

15       25.    I visited the Jail on February 6 through 8, 2024.  During the visit, I

16  toured the Central Jail, George Bailey Detention Facility ("George Bailey"), and Las

17  Colinas Detention and Reentry Facility ("Las Colinas").  At these facilities, I visited

18  medical housing units, intake units, medical clinics, a pharmacy, lab and storage

19  areas, and other housing units.  During the three days, I was able to speak briefly

20  with approximately 50 patients.  I also reviewed over 500 photographs taken during

21  the tour.  However, I was unable to interview many of the medical staff members

22  that I would have liked to.  Three different nurses at the Jail told me that "I was told

23  by my supervisor not to answer any of your questions," or "I was told not to talk to

24  you."

25       26.    After the tour, I reviewed 80 patient charts chosen by Defendants as

26  being representative of the following medical categories:  patients with opioid use

27  disorder (5), patients on opioid withdrawal protocols (5), patients with alcohol

28  withdrawal protocols (5), patients with HIV (5), patients with Hepatitis C (5),

1    patients with Type 2 Diabetes(5), patients with hypertension(5), patients with cancer

2    (5), patients who received gynecological care (5), emergency room referrals (5),

3    patients who had submitted five or more requests for medical care (5), patients

4    housed in medical overflow segregation cells (5), patients on dialysis (5), patients

5    receiving orthopedic care (5), and optometry referrals (5). I also reviewed seven

6    patient charts of individuals with whom I spoke during my inspection of the Jail.

7    Many of the charts I received had technical issues that made them difficult to read.

8    In particular, the records, which were in some cases thousands of pages long, were

9    not text searchable, even after attempts to OCR them. In addition, the charts were

10   generally missing all lowercase letter Is and Ls. I was unable to review a complete

11   set of grievances (and their associated responses) relating to medical care, though

12   some grievances were produced within the charts described above.

13        27.    A complete list of the materials I reviewed is attached hereto as

14   **Exhibit B**.

15        28.    I compared and contrasted my findings with accepted standards of

16   correctional medical care found in the following published guidelines and source

17   material: the National Commission on Correctional Health Care ("NCCHC");

18   published guidelines from nationally recognized medical specialty groups, such as

19   The American Society of Addiction Medicine, the American Diabetic Association,

20   American Association for the Study of Liver Diseases, and the Infectious Diseases

21   Society of America; standard medical textbooks, such as *Uptodate*; and San Diego

22   specific reports, including the NCCHC "Technical Assistance Report" com-

23   missioned by the Jail in 2017 and Dr. Homer Venters' "Review of Best Practices for

24   Jail Operations for San Diego County" commissioned by the Jail in 2020.

25        29.    I also relied on my own training, research and experience.

26        30.    I am receiving compensation at a rate of $250.00 per hour plus

27   expenses for this work.

28        31.    My opinions have a reasonable degree of medical certainty based on

1    the evidence outlined above.  The information contained in this report and the

2    accompanying exhibits are a fair and accurate representation of the subject of my

3    anticipated testimony in this case.  I reserve the right to modify my opinions in the

4    light of new, additional information.

5                                    **BACKGROUND**

6    **I.    Multiple Expert Entities Have Reported on the Inadequate Healthcare at
          the Jail**

7

8            32.    The San Diego Sheriff's Department ("Sheriff's Department") has been

9    on notice for several years that people in its custody are not receiving adequate

10   healthcare.  Multiple reports issued by organizations with expertise in correctional

11   medicine have documented practices in the Jail which fall below accepted standards

12   and jeopardize the health and safety of incarcerated people.  I found the following

13   reports and findings to be especially significant.

14           33.    In January of 2017, the Sheriff's Department received a technical

15   assistance report from the NCCHC.  NCCHC Report, January 2017,

16   DUNSMORE0260620.  The NCCHC is a leading nonprofit organization that

17   publishes correctional healthcare standards and accredits jails or prisons that meet

18   those standards.  DUNSMORE0260621.  Jails and prisons often seek technical

19   assistance from the NCCHC as a preliminary step towards accreditation.  A team

20   from the NCCHC visited four Jail facilities in San Diego:  Central Jail, George

21   Bailey, Las Colinas, and Vista Detention Facility.  DUNSMORE0260620.  During

22   its audit, the NCCHC documented dozens of failures to meet what it describes as

23   "essential" or "important" standards for the delivery of medical care to incarcerated

24   people.  DUNSMORE0260621-22.  Seven years after this report, the Jail is still not

25   accredited by the NCCHC.  The most important NCCHC findings and

26   recommendations are described below.

27           34.    First, the NCCHC documented that people who arrived at a Jail facility

28   with significant health conditions were often not identified or treated in a timely

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    manner.  For example, individuals booked into Central Jail sometimes did not

2    receive a full medical screening for several hours, placing those with unidentified

3    conditions at risk of a health "crisis."  DUNSMORE0260636.  None of the facilities

4    conducted initial health assessments during the first two weeks of incarceration to

5    further identify individuals in need of treatment.  DUNSMORE0260637, 0260671,

6    0260704, 0260738.  And auditors found little evidence that medical staff were

7    reviewing the charts of incarcerated people transferred from one jail facility to

8    another to ensure continuity of care.  DUNSMORE0260637, 0260670, 0260704,

9    0260738.

10        35.    Second, incarcerated people who themselves requested medical

11    attention were not seen and treated in a timely matter.  The NCCHC described

12    understaffing at the Jail and a resulting "serious" backlog of hundreds of medical

13    requests which had not been answered with a face-to-face evaluation by a medical

14    professional.  DUNSMORE0260658, 0260672-73, 0260706.  Nurses attempted to

15    manage this backlog by assigning triage levels to patients based only on the

16    symptoms they reported on their sick call slips.  DUNSMORE0260639, 0260672-

17    73, 0260706, 0260739-40.  The NCCHC warned that this is a dangerous practice

18    because seemingly minor symptoms may signify an urgent condition which would

19    not be identified without a face-to-face assessment.  *Id.*  The average wait time for

20    such an assessment far exceeded the NCCHC standard of 48 hours.  *Id.*  Patients

21    were waiting an average of eight days to see a nurse (with some waiting 12-18 days)

22    and an average of five days to see a physician (with some waiting 8-12 days).  *Id.*

23    Further delays occurred in some instances when there were not enough deputies to

24    escort patients to appointments.  DUNSMORE0260640, 0260672-74.  And even

25    after patients were seen and treatments were prescribed, there were delays in

26    administering essential medications to those who were new to the facility or who

27    were on lockdown.  DUNSMORE0260623, 0260633-34, 0260657, 0260667-68,

28    0260700-01.

36.     Third, the NCCHC documented that care was too often delivered by nurses acting outside the scope of their license.  Nurses were called on to make diagnoses, create care plans, prescribe medications, and administer prescription-strength doses of over-the-counter medications without physician oversight.  *See, e.g.*, DUNSMORE0260634, 0260636, 0260640-41, 0260667, 0260678, 0260701, 0260707.  Nurses were even tasked with diagnosing and ordering medications for some chronic diseases, which the NCCHC described as "not an acceptable practice."  DUNSMORE0260643.  The NCCHC also noted that the way nurses administered medications—by pulling the doses from larger stock bottles without pharmacist or provider oversight—was a "serious and a violation of the Nurse Practice Act."  DUNSMORE0260634.

37.     Fourth, patients with both acute and chronic conditions received sporadic care, often only seeing medical staff for follow-up appointments and monitoring of their condition if they themselves initiated a visit.  DUNSMORE0260641, 0260674, 0260708, 0260741-42.  This is problematic because providers—not incarcerated people—are in the best position to know when and how a chronic condition should be monitored.  There were no guidelines in place to ensure consistent and quality treatment of patients with any chronic disease besides hypertension.  DUNSMORE0260643, 0260676, 0260710, 0260743-44.  And there was little to no documented discharge planning for individuals with known release dates to ensure that they understood how to receive the medical care they needed in the community.  DUNSMORE0260641-42, 0260675, 0260708, 0260742.

38.     Fifth, the Jail lacked systems which would allow medical staff to identify and correct deficiencies with individual providers or the system of care as a whole.  Medical grievances were mixed in with other grievances, making it difficult to identify trends in complaints.  DUNSMORE0260627, 0260661, 0260694, 0260728.  Health staff were not informed of the results of death reviews.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  DUNSMORE0260627, 0260661, 0260694, 0260727-28.  And there was no peer

2  review process whereby the work of individual clinicians could be reviewed by

3  others trained in their field.  DUNSMORE0260630, 0260664, 0260697 0260730.

4      39.    Other deficiencies also resulted in incarcerated people receiving

5  substandard care.  Clinical encounters often occurred in non-confidential spaces,

6  which the NCCHC warned could lead to less thorough and accurate assessments.

7  DUNSMORE0260626-23, 0260661, 0260693-94, 0260727.  There was no policy

8  ensuring that healthcare staff were present for refusals of care so that they could

9  counsel patients appropriately about the consequences of not attending a medical

10  appointment.  DUNSMORE0260650, 0260684, 0260717-18, 0260751.  And nurses

11  did not adequately document the condition of incarcerated people whom they

12  checked on in segregation.  DUNSMORE0260640, 0260673, 0260706-07, 0260740-

13  41.

14      40.    In short, the NCCHC report made clear that the Sheriff's Department

15  failed to meet standards that were essential for accreditation and, more importantly,

16  for the provision of adequate healthcare to those in its custody.

17      41.    On March 20, 2020, three years after the NCCHC documented

18  significant issues with the healthcare system at the Jail, Darryl Dunsmore filed his

19  lawsuit, which he later amended to allege that the medical care he received at the

20  Jail was not constitutionally adequate.  *See Dunsmore v. California, et al.*, Case No.

21  3:20-cv-00406-AJB-WVG, Dkt. No. 19.  In his First Amended Complaint,

22  Mr. Dunsmore asserted that his medical diet and diabetic insulin injections had been

23  discontinued when he transferred to the Jail from the California Health Care

24  Facility.  *See id.* at 3.  Mr. Dunsmore's complaint as well as the ongoing high death

25  rate illustrated that many of the deficiencies which the NCCHC described had gone

26  uncorrected, placing the health and lives of incarcerated people at risk.

27      42.    On March 30, 2020, Dr. Homer Venters, then president of the nonprofit

28  technical assistance organization Community Oriented Correctional Health Services,

provided the County of San Diego (the "County") with further recommendations on ways to improve healthcare delivery at the Jail.  Venters Report, March 30, 2020, SD_215361.  This document was prepared at the County's request for the express purpose of "reduc[ing] the rate of mortality and morbidity in the San Diego Jail system." SD_215379.  Dr. Venters conducted a literature review and met with staff at the jail before preparing his recommendations.  SD_215362.

43.    Dr. Venters' report reiterated the importance of several best practices, such as identifying health conditions early through a thorough intake, making immediate referrals to providers for further evaluation when an urgent issue is identified, SD_215369-72, and ensuring that medications are ordered by a physician or mid-level provider and delivered in a timely manner, SD_215374.  Other recommendations addressed the need for monitoring the effectiveness of the healthcare system.  Dr. Venters suggested using an electronic medical record to track and evaluate performance, reviewing "sentinel events" such as "deaths, injuries, and self-harm," "surveying staff and patients about their engagement with the correctional health service," including enforceable performance standards in contracts with vendors, and possibly enlisting independent agencies to further monitor performance.  SD_215364-67.

44.    As the Venters Report shows, the County was aware of a need to reduce morbidity and mortality and was advised four years ago of several ways to accomplish this goal.

45.    On February 3, 2022, the California State Auditor issued a report of its investigation into the alarming number of deaths that occurred in the Jail from 2006 to 2020.  California State Auditor Report ("State Audit"), February 2022, SD_174794.  The State Audit confirmed that the Jail had a higher rate of suicides and natural deaths (which can include deaths where deficient medical care is a factor) than jails in any other comparable county in the State.  SD_174812-13.  This remained true even taking into account adjustments based on jail population size and

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

number of bookings.  *Id.*  The State Audit showed that the Jail's mortality rate remained high even after the NCCHC's 2017 warning of serious deficiencies in the Jail's healthcare system.  SD_174811.

46.     The State Audit also included an in-depth review of 30 in-custody deaths, with an emphasis on cases that occurred between 2016 and 2020. SD_174815.  It concluded that "deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals" had "likely contributed to in-custody deaths" and that the Sheriff's Department had "not consistently taken meaningful action when such deaths have occurred."  SD_174794.  I discuss some of the more specific State Audit findings below.

47.     First, the State Audit found that "[i]n at least eight of the 30 cases … individuals had serious medical or mental health needs that heath staff did not identify or communicate to detention staff at intake."  SD_174816-17.  Possibly as a result, "[f]ive of these individuals died within four days of their arrest."  *Id.*

48.     Second, the State Audit found that medical staff failed to respond appropriately to some incarcerated persons' repeated requests for help during the weeks preceding their deaths.  SD_174818.  In two illustrative cases, individuals reported worsening symptoms "over the course of one to three weeks" but were only evaluated by a nurse and not a physician.  *Id.*  These individuals eventually died of the conditions that jail staff failed to adequately assess and treat.  *Id.*  The State Audit also observed that some individuals were not receiving essential care because they refused appointments.  SD_174820-21.  Like the NCCHC, it recommended that health staff be present for refusals so that they could counsel patients.  *Id.*

49.     Third, the State Audit identified cases where sworn and medical staff failed to appropriately respond to medical emergencies.  Deputies often conducted cursory safety checks on the jail population and therefore potentially missed signs of medical distress.  SD_174821-23.  Oftentimes, incarcerated people were dead for several hours before a deputy realized something was wrong.  *Id.*  In several

1   instances where deputies did realize that a person was unresponsive or otherwise in

2   distress, they "did not perform or delayed lifesaving measures" like CPR.

3   SD_174824.  Medical staff also took too long to arrive and assist deputies.

4   SD_174824-25.  The State Audit emphasized that minutes can make a difference to

5   survival during a medical emergency, SD_174283-84, and noted that a fifteen

6   minute delay in one case was "detrimental to the individual's likelihood of

7   survival."  SD_174825.

8          50.     Finally, the State Audit found that following these deaths, "[t]he

9   Sheriff's Department has not responded … in a manner that demonstrates its

10  commitment to improving health and safety at its detention facilities."  SD_174830.

11  For example, although the Sheriff's Department had a policy requiring that its top

12  medical staff review all deaths "to determine the appropriateness of clinical care"

13  that the decedent had received, "the Sheriff's Department did not sufficiently

14  document the results or recommendations from its 30-day medical reviews."

15  SD_174831.  The Sheriff's Department's Critical Incident Review Board ("CIRB")

16  did not examine any deaths deemed "natural" by the medical examiner to determine

17  whether deficient medical care could have been a factor.  SD_174834.  And

18  although the internal affairs unit has the power to investigate both sworn and

19  medical staff, it looked into only four of the thirty cases the State Audit reviewed.

20  SD_174835.  This was despite "a number of potential violations or concerns in some

21  of the other 26 cases that could justify further investigation."  *Id.*  The lack of

22  internal review mechanisms was particularly concerning because the County's

23  Citizen Law Enforcement Review Board ("CLERB") has been stymied in its efforts

24  to independently gather evidence about deaths at the jail.  SD_174839-44.

25         51.     In response to the State Audit, the Sheriff's Department attacked the

26  report's death count methodology and claimed that there was no evidence its

27  policies or practices contributed to high mortality in its facilities.  San Diego

28  Sheriff's Preliminary Comment on State Audit, January 14, 2022, SD_174883-84,

174893-97.  The Sheriff's Department implied that deaths were inevitable without acknowledging the role of longstanding issues highlighted by the State Audit, like the inappropriate use of nurses to direct patient care.  SD_174893-94.  The Sheriff's Department also disputed the qualifications of the auditors, comparing their expertise unfavorably to that of the NCCHC, while failing to mention that the NCCHC had raised similar concerns in its own audit five years earlier.  SD_174889-92.  After disputing the State Audit's findings, the Sheriff agreed that it should implement many of the Audit's key recommendations, but provided few details on when or how this would occur.  SD_174902-09.

52.    On February 9, 2022, Mr. Dunsmore was joined by seven other individuals in filing the Second Amended Class Action Complaint for Declaratory and Injunctive Relief ("SAC") in this case, Dkt. No. 81, converting the individual case into a class action.  The class action complaint asserted, among other things, that the Jail failed to provide adequate medical care in violation of the 8th and 14th Amendments of the United States Constitution and Article 1, Sections 7 and 17 of the California Constitution.  At the time the SAC was filed, Defendants were managing their healthcare system through Correctional Healthcare Partners, Inc. ("CHP") and Tri-City Medical Center.  The SAC alleged a number of deficiencies in the provision of medical care, including the failure to maintain sufficient numbers of adequately trained healthcare professionals, the ability of custody staff to interfere with and undermine the healthcare professionals, inadequate screening and intake processes, inadequate care of people with substance use disorders and those experiencing withdrawal, the failure to continue medically necessary medications and treatments upon arrival, the lack of any timely or reliable way to alert healthcare staff of medical needs, the failure to maintain adequate, accurate, and complete medical records, the lack of sufficient contracts with community providers for outside medical care, the lack of confidential spaces for medical care and adequate diagnostic care, the lack of referrals to outside specialists when necessary, the lack

1    of medically necessary eyeglasses, inadequate follow-up healthcare, inadequate

2    discharge instructions and medication, and the failure to maintain an adequate

3    quality assurance and quality improvement process. *See* SAC at pp. 29-65. The

4    operative Third Amended Complaint, filed November 18, 2022, Dkt. No. 231, has

5    similar allegations to the SAC. I understand that this case was later certified into a

6    class action on behalf of all adults who are or will be incarcerated in any of the San

7    Diego County Jail facilities.

8        53.    A few months after the SAC was filed, that the County entered into a

9    contract for Jail medical care with the private medical provider NaphCare. I have

10   reviewed the June 2022 NaphCare contract and its February 2024 amendment as

11   part of my work in this case and discuss them later in this report.

12       54.    In February 2023, the Sheriff's Department released its Progress Report

13   Update on the State Audit. The Sheriff's Department claimed to be making changes

14   in response to the State Audit's findings and recommendations. Progress Report:

15   Update on State Jail Audit, February 2023, SD_184480-82. But the Sheriff's

16   Department has in fact failed to implement many policies and practices which the

17   State Audit advised could reduce mortality in the jail. For example, the Sheriff's

18   Department claimed that nurses were conducting face-to-face evaluations within 24

19   hours of receiving a request for medical services as of December 2022. *Id.*

20   SD_184484. The Sheriff's Department also claimed that it was requiring medical

21   staff to counsel patients who refused a medical appointment and sign off on the

22   refusal. SD_184485. However, as discussed elsewhere in this report, a review of

23   medical records produced by the Jail shows that staff are not implementing either of

24   these changes.

25       55.    In sum, multiple experts and entities—the NCCHC, Dr. Venters, and

26   the State Audit—have pointed out the systemic failures in the Jail's healthcare

27   system. As explained throughout this Report, it is my opinion that those problems

28   and others persist.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

## II.    The Sheriff's Department's Contracts with Multiple Private Companies to Provide Healthcare at the Jail

56.    In the face of the many deaths, the State Audit, and this class action, the County decided to change private healthcare providers.  On April 26, 2022, the County signed a contract with NaphCare to provide healthcare at its seven jail facilities.  County Contract No. 566117, April 26, 2022, NAPHCARE000001.  The contract is for five years with another five-year renewal term, for an amount not to exceed $620,778,261.65.  *See* NAPHCARE000023.

### A.    Background on NaphCare

57.    NaphCare signed its first contract to provide comprehensive health care services in Alabama in 2001.  NaphCare currently provides medical services to more than 100,000 incarcerated persons in 32 states.[1]  The company has more than $300 million in annual revenues and 2,000-plus employees.[2]

58.    In 2020, a Reuters investigation revealed that jails where NaphCare provided health care had the highest death rates in the nation over a three-year period.[3]  Since then, according to federal court records, NaphCare has been sued for medical neglect over 100 times.[4]  While some government entities have renewed

---

[1] *See* John Washington, *Pima County has docked NaphCare $3.1 million for jail medical deficiencies* ("Pima County Docking NaphCare"), ARIZONA LUMINARIA, Aug. 9, 2023, https://azluminaria.org/2023/08/09/jail-deaths-pima-county-docking-naphcare/.

[2] *See* Erica Wright, *Humble Beginnings for Local Firm that Offers Correctional Health Care*, THE BIRMINGHAM TIMES, May 28, 2020, https://www.birminghamtimes.com/2020/05/humble-beginnings-for-local-firm-that-offers-correctional-health-care/.

[3] *See* Jason Szep et al., *Special Report: U.S. Jails Are Outsourcing Medical Care—and the Death Toll Is Rising* ("Special Report"), REUTERS, Oct. 26, 2020, https://www.reuters.com/article/us-usa-jails-privatization-special-repor/special-report-u-s-jails-are-outsourcing-medical-care-and-the-death-toll-is-rising-idUSKBN27B1DH/

[4] Chamian Cruz, *Fulton Extends Contract with Jail's Medical Provider Amid Allegations of Medical Neglect* ("Fulton Extends Contract"), WABE, Jun. 28, 2023, https://www.wabe.org/fulton-extends-contract-with-jails-medical-provider-amid-allegations-of-medical-neglect/.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  contracts with NaphCare despite the lawsuits and deaths, others have terminated

2  their contracts.

3      59.    Alabama is one such example.  In 2001, when Alabama's correctional

4  facilities healthcare provider raised the bill from $26 million per year to $38-$46

5  million per year, the state sought bids for another provider.  NaphCare won the

6  contract with a bid of $30 million.  NaphCare had never before provided

7  comprehensive care to a state prison system, so "[c]ritics immediately questioned

8  how NaphCare could possibly provide adequate health care for 25,000 prisoners for

9  $30 million and still make a profit."[5]

10      60.    Numerous lawsuits followed.  Incarcerated individuals at Alabama's

11  Tutwiler Prison for Women named NaphCare as a defendant in a class action suit,

12  alleging long delays in health care services, dangerous lapses in providing

13  prescription medication, and a severe shortage of qualified medical personnel.

14  Another lawsuit challenged the medical care NaphCare provided to incarcerated

15  persons with HIV at Alabama's Limestone facility, where the death rate among

16  incarcerated persons with HIV was twice the national rate.  *Id*.  Another class action

17  suit challenged the health care provided to individuals with serious mental illness;

18  "[a]mong the most serious complaints in the suit include prisoners lying in beds

19  unable to control their bowels that sometimes go for hours without being changed or

20  cleaned."  *See* NaphCare in Alabama.

21      61.    In 2003, an Alabama state audit concluded that NaphCare was

22  supplying "dangerous and extremely poor quality health care."  *Id*.  Amid the

23  lawsuits, the audit, and $6.9 million in cost overruns caused by off-site medical

24  visits, Alabama canceled NaphCare's contract in 2003.[6]

25  ───────────────

26  [5] *See* Lonnie Burton, *The Deadly Health Services of Naphcare in Alabama*
   ("NaphCare in Alabama"), PRISON LEGAL NEWS, October 15, 2023,
27  https://www.prisonlegalnews.org/news/2003/oct/15/the-deadly-health-services-of-naphcare-in-alabama/; *see also* Special Report; Fulton Extends Contract.

28  [6] *See* Casey Turner, *Sick for a Decade: Alabama's Prison Health Care Continues to Face Scrutiny*, AL.COM, Nov. 22, 2014,

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1    62.    A similarly dire outcome occurred in Gwinnett County Jail in

2   Lawrenceville, Georgia.[7]  And in 2022, after at least three deaths in 15 months, the

3   Onondaga County Jail decided not to renew its contract with NaphCare.[8]

4    63.    NaphCare is still providing health care to the Arizona prison system

5   which has been the subject of extensive litigation and found to be unconstitutional.

6   *See Jensen et al. v. Thornell et al.*, No. CV-12-00601-PHX-ROS, 2023 WL 2838040

7   (D. Ariz. April 7, 2023).  NaphCare has also been roundly criticized for its staffing

8   shortages and medical request backlogs at the Pima County Jail in Arizona.  For

9   example, a former NaphCare employee at Pima County jail said they were often

10  behind in responding to "kites" (medical requests).  The employee said, "it got to the

11  point where we were from 300 to 1,800 deep in the queue."[9]

12   64.    As described above, NaphCare got its first contract in Alabama

13  correctional facilities by bidding ridiculously low.  Whereas the average state spent

14  $2,500 to $3,000 per incarcerated individual per year in 2001, under the terms of

15  NaphCare's bid, Alabama was going to spend a little over $1,000.  *See* NaphCare in

16  Alabama.

17   65.    Relatedly, in 2015, weeks after winning the renewal bidding process

18  for a contract with Suffolk County, NaphCare claimed it had underbid and wanted to

19

20

21  https://www.al.com/news/2014/11/sick_for_a_decade_alabamas_inm.html.

22  [7] *See* Randy Travis, *Lawsuit: Jail Medical Contractor Ignored Treatable Illness that
    Led to Inmate's Death*, FOX 5 ATLANTA, Apr. 17, 2023,

23  https://www.fox5atlanta.com/news/deion-strayhon-gwinnett-county-jail-death-
    lawsuit.

24  [8] *See* Chris Libonati, *Onondaga county jail gets different health care provider after
    report finds 'serious' issues*, CENTRAL CURRENT, Dec. 21, 2022,

25  https://centralcurrent.org/onondaga-county-gets-different-health-care-provider-after-
    report-finds-serious-issues/.

26  [9] John Washington, *Medical care in Pima County jail is dangerously delayed as
    pleas for help are ignored and mismanaged, say inmates and employees* ("Medical

27  Care in Pima County Dangerously Delayed"), ARIZONA LUMINARIA, Apr. 19, 2023.
    https://azluminaria.org/2023/04/19/medical-care-in-pima-county-jail-is-

28  dangerously-delayed-say-inmates-and-employees/.

1   renegotiate its contract—the sheriff's office denied the request.[10]

2       66.    In June 2021, NaphCare agreed to pay nearly $700,000 to settle a False

3   Claims Act case the United States government brought against NaphCare, alleging

4   that the company submitted inflated claims for evaluation and management services

5   at BOP's Terre Haute, Indiana, facility between January 2014 and June 2020.  The

6   United States alleged that when certain physicians did not indicate the type of

7   service performed on onsite visit sheets, NaphCare charged the government for

8   higher-level services than were provided.[11]

9       67.    The 2022 contract with Arizona allowed NaphCare a profit of $1.095 in

10  the prisoner per day cost.  "A 25,000 prisoner population would therefore generate

11  an annual profit for NaphCare of $9,991,875."[12]

12      68.    NaphCare has faced staffing shortages.  For example, in Pima County

13  from February 2022 to April 2023, NaphCare was understaffed for hundreds of

14  hours for medical care positions, including for Registered Nurse Supervisor (271

15  hours short), Licensed Practical Nurse (2,463 hours short), Psychiatric Nurse

16  Practitioner (114 hours short), and Psychiatric Registered Nurse (653 hours short).

17  *See* Pima County Docking NaphCare.

18      69.    Consistent with concerns about understaffing, I have also been made

19  aware of a number of claims that NaphCare provided substandard medical care.  For

20  example, in February 2022, Pima County's audits found that NaphCare had

21  ────────────────

22  [10] *See* Beth Healy and Christine Willmsen, *Pain And Profits: Sheriffs Hand Off
    Inmate Care To Private Health Companies* ("Jail Health Companies Profit"),

23  WBUR, March 24, 2020, https://www.wbur.org/news/2020/03/24/jail-health-
    companies-profit-sheriffs-watch.

24  [11] *See* U.S. Department of Justice, *Prison Health Care Provider Naphcare Agrees to
    Settle False Claims Act Allegations*, June 25, 2023,

25  https://www.justice.gov/opa/pr/prison-health-care-provider-naphcare-agrees-settle-
    false-claims-act-allegations.

26  [12] *See* Jimmy Jenkins, *Health Care Company Expects to Earn Nearly $10 Million in
    Annual Profits from AZ Prisons Contract*, ARIZONA REPUBLIC, June 2, 2022,

27  https://www.azcentral.com/story/news/local/arizona-health/2022/06/02/correctional-
    health-care-company-expects-earn-nearly-10-million-annual-profits-arizona-

28  prisons-contr/7491553001/.

1  "appropriately managed" only one of the 22 people who were undergoing

2  withdrawal.  That same month, the county gave NaphCare a score of 5%, or five on

3  a scale of 100, for dealing with withdrawals.  *See* Pima County Docking NaphCare.

4  One former staff member said "the NaphCare standard is to supply opioid addiction

5  medication for a maximum of three days, if it's given at all."  *See* Medical Care in

6  Pima County Dangerously Delayed.

7          **B.    NaphCare's 2022 Contract with San Diego County**

8          70.    Notwithstanding the problematic incentives of privatized correctional

9  medical care in general, San Diego chose NaphCare to provide comprehensive

10  healthcare services at the Jail.  *See* Contract No. 566117.  Under the contract,

11  NaphCare receives approximately $60 million per year and is supposed to provide

12  comprehensive mental and medical health care, medication assisted treatment

13  ("MAT"), dental care, discharge treatment training, specialty services and outside

14  referrals, and discharge planning to people incarcerated at the Jail.  NaphCare

15  subcontracted physicians, physician's assistants, and nurse practitioners to the

16  previous medical contractor, CHP.[13]  *See* Contract, NaphCare of San Diego LLC

17  Agreement with Correctional Healthcare Partners, Inc. for on-site Physician and

18  Mid-Level Provider Staffing, effective June 1, 2022, NAPHCARE040868-040878.

19          **C.    The Sheriff's Department Continued to Work With, and Pay,
20                  NaphCare, Despite Knowing That NaphCare Was Not Living Up
                    to Its Contractual Obligations**

21          71.    The underbidding, understaffing, and requests for more money that

22  have characterized NaphCare's operations elsewhere, as detailed above, have hurt

23  NaphCare's performance in San Diego as well.  Beginning in 2023, the Sheriff's

24

---

25  [13] The history of private contractors at the Jail is complex.  For example, Coast
26  Correctional Management Group ("Coast") used to provide physicians and mid-
    levels, followed by CHP, and then NaphCare—now this is done by a combination of
    NaphCare and CHP plus County nurses.  When asked how many of the
27  approximately 30 prisons and jails NaphCare serves have a similarly hybrid model
    in which nursing is separately managed, NaphCare representative Angela Nix
28  replied that only one other did.  Nix II Tr. at 74:11-15.

Department issued a series of Corrective Action Notices ("CANs") to NaphCare pointing out multiple failures in its delivery of health care to incarcerated people. In total, I am aware of several CANs being issued and updated before discovery in this case closed. NaphCare responded to these, and CAN meetings were held in an attempt to solve the problem. Freedland Tr. at 156-160. However, NaphCare's Rule 30(b)(6) witness, Angela Nix, testified that the Sheriff's Department has never approached NaphCare about a reduction in payment for its contractual violations, Nix II Tr. at 62-63, notwithstanding that the contract allows the withholding of funds for failure to perform.[14]

72.    As far as I can tell, the CANs begin on April 28, 2023; as of that date the County criticized NaphCare for having $9.3 million of unpaid bills due to hospitals, with $4.6 million of that past the 30-day threshold. *See, e.g.*, SD_120686. According to the CAN, "Due to a lack of payment, some community providers do not want to see or accept our patients." Among the many other deficiencies noted by the CANs are the following: a lack of gynecologists at Las Colinas, failure to provide MAT, relying on unlicensed staff, failing to replace or repair medical equipment, understaffing of medical and dental providers, failure to create policies and procedures that comply with NCCHC standards, and the lack of M&M and CQI review. *See* SD_1572154; *see also* Freedland Tr. at 161:4-169:10. The lack of adequate obstetrical and gynecological care at Las Colinas was of particular concern to Dr. Montgomery. *See* SD_120627.

73.    Dr. Montgomery acknowledged in a May 26, 2023 email to Sheriff's Department administrators that "[i]t has been shown that far more staff members are needed than [NaphCare] initially estimated" to "meet the clinical demand."

---

[14] *See* NaphCare Contract § 4.1.7, NAPHCARE000007; *see also* Jeff McDonald, *Repeated failures by San Diego County jail health provider prompt sheriff to order it to fix deficiencies*, SAN DIEGO UNION-TRIBUNE, April 2, 2024, https://www.sandiegouniontribune.com/2024/03/31/repeated-failures-by-san-diego-county-jail-health-provider-prompt-sheriff-to-order-it-to-fix-deficiencies/.

Dr. Montgomery further suggested that NaphCare had been staffing at an "arbitrary level." SD_227522.  He stated:  "Naphcare has gone through the RFP process … not once, but twice.  They have familiarity with California, as they have already been engaged with several Counties.  They have been performing services in San Diego for a year.  They know, or should have known, that the number of pro-offered staff positions would be inadequate to meet the clinical demand … a fact that has been borne out by the growing MH/BH clinical backlog."  SD_227522.  Dr. Montgomery also said:  "The staffing model is wrong and requires fixing.  It appears that we can either force Naphcare to hire staff to meet demand, do it ourselves (carve out clinical services from the contract), or find more money to pay for the services."  SD_227522.

74.     Dr. Montgomery further stated:  "My point is … the staffing matrix needs to be elevated as a significant point of contention in the CAN/CURE process in order to elicit some form of response or action.  We can discuss how we wish to proceed internally, but I think we need to elevate it to the Friday meetings and introduce the concept that Naphcare is responsible for clinical performance and completion, not staffing to an arbitrary level."  SD_227522.

75.     In these internal discussions and in CAN meetings with and notices to NaphCare, the County expressed increasing frustration with its new contract.  Concerns included a lack of radiology staffing, sick-call backlogs associated with CHP departures, and failures to get outside specialty care for patients.  By the end of 2023, the County decided to put out a new bid for medical services—even though it had signed what should have been a comprehensive five-year contract with NaphCare in April 2022.  Dr. Freedland testified that he was forced to provide a physician at Rock Mountain without any pay for months.  Freedland Tr. at 115:17-120:18.  He also testified that, in the summer or fall of 2023, many staff left his employ due to stress.  *Id.* at 102:6-103:16.

76.     While the bids for the new medical services contract were pending,

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    NaphCare negotiated an increase in funding for itself.  Contract, County of San

2    Diego – Department of Purchasing and Contracting, Amendment, Contract 566117

3    with NaphCare, Inc. Modification 01, February 1, 2024 (NAPHCARE040852-

4    040862).  This contract amendment added over $24 million in payments to

5    NaphCare.  Nix II Tr. at 59:25-61:5.  I discuss the cycle of bidding low and then

6    renegotiating more payments in more detail below.

7         **D.      The Sheriff's Department Recently Contracted with Correctional
               Healthcare Partners to Provide Additional Health Care Staff**

8

9         77.     In around April or May 2024, I learned that the County had awarded a

10   new medical services contract to CHP—the very entity that was subcontracting with

11   NaphCare for medical services.[15]  The new contract increases the County's annual

12   spending on physicians and nurse practitioners in the Jail from approximately $8.3

13   million to $22.6 million per year, though I understand that Dr. Freedland's bid asked

14   for $27 million worth of medical care providers.

15        78.     CHP was founded by Peter J. Freedland M.D., a former executive at

16   Coast Correctional Medical Group (sometimes referred to as "Coast").  Coast was

17   the County's previous medical provider.  Coast had been sued multiple times while

18   delivering healthcare services to the Jail, including in connection with the tragic

19   preventable deaths of Elisa Serna and Michael Wilson.  Coast was replaced by CHP

20   through a contract with the Sheriff in 2020—a $24 million deal that spanned three

21   years; this contract was later superseded by the NaphCare-CHP subcontract.  I have

22   some concerns that the very entity that has been providing substandard medical care

23   at the Jail for the last four years is somehow supposed to bring it into constitutional

24   compliance now.

25        79.     The contract that the Sheriff's Department recently negotiated with

26   CHP is specific in what its objective is:  "Contractor shall provide the services

27   _____

28   [15] I did not receive a copy of this contract, which states it is effective June 28, 2024,
     until July of this year.

described herein to accomplish the following goal: provide on-site Health Care Providers for primary care and urgent care at specified County detention facilities." *See* CHP 2024 Contract, p. 20. The contract increased physician and midlevel staffing at the Jail facilities by almost 300%. For example, medical practitioner staffing at the Central Facility increased from 124 hours a week to 336 hours a week. Las Colinas staffing increased from 84 hours a week to 242 hours per week. And staffing at the George Bailey facility increased from 84 hours per week to 196 hours per week. While this is good news for the incarcerated patients at the Jail, this increase in staffing alone will not, in my opinion, be sufficient to solve the Jail's medical problems.

## OPINIONS

80.    Seven years after the NCCHC Report finding the Sheriff's Department policies and practices put the health and lives of incarcerated people at risk, two years after the State Audit concluded that the "Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody," and scores of deaths and poor outcomes later, the Sheriff has failed to take sufficient corrective action necessary to prevent further unnecessary suffering or death in its jails.

81.    In light of the State Audit's damning conclusion, I would have expected the Sheriff's Department to have done its own detailed internal medical investigation into the excessive deaths in an attempt to find one or more other root causes of this problem. I have seen no evidence that the Sheriff's Department made any such investigation or came to any conclusions about potential root causes.

82.    In fact, testimony from the medical contractors who provide healthcare at the Jail indicates that the Sheriff's Department has not discussed with them any need to reduce in-custody deaths or asked them their opinions about ways to reduce in-custody deaths. Dr. Peter Freedland, the Chief Executive Officer at CHP, which staffs the onsite medical practitioners at the Jail, stated in his deposition: "I've

1   heard that there was an audit, but I have not read it."  Freedland Tr. at 47:11-12.

2   When asked, "Have you been asked to make any recommendations to the County

3   about how to lower the death rate, medically, at the jail?"  Dr. Freedland responded,

4   "No one has asked me specifically, how do we do this."  *Id.* at 74:2-3.  Similarly,

5   Angela Nix, testifying as a Rule 30(b)(6) witness on behalf of NaphCare, testified

6   that she had met with Sheriff Kelly Martinez on approximately three or four

7   occasions to discuss the NaphCare contract, but could not recall discussing the need

8   to reduce the high death rate at the Jail.  Nix II Tr. at 18:18-22.

9        83.    This is astounding to me.  Why would the Sheriff's Department not

10   immediately launch an "all hands on deck" investigation into the causes and

11   potential solutions of this critically important high death rate after the State Audit so

12   publicly pointed it out?  Why not publish the results of an extensive internal

13   investigation along with a detailed plan on how to reduce the death rate?

14       84.    In February of 2023, the Sheriff's Department did publish a response to

15   the State Audit entitled "Progress Report: Update on State Jail Audit."  In it, the

16   Sheriff's Department indicated that it disagreed with the conclusions of the Audit in

17   some respects but claimed to be attempting to implement the changes recommended

18   within the original Audit.

19       85.    In my opinion, the Sheriff's Department has failed to implement most

20   of the changes mentioned in their Progress Report, and it has failed to address the

21   many flaws in its healthcare delivery system that have been pointed out repeatedly

22   in the last several years, by the NCCHC and Dr. Venters, in addition to the State

23   Audit.  As a result, people incarcerated in the Jail have died preventable deaths, and

24   those still in the Jail are subjected to risk of serious harm from the denial of

25   appropriate healthcare.

26  **I.    Inadequate Medical Care at the Jail Has Resulted in Preventable Deaths**

27       86.    It is my opinion, based on a reasonable degree of certainty, that

28   inadequate medical care at the Jail has resulted in preventative deaths and will

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1   continue to result in preventative deaths, in part because the Jail does not have

2   adequate mortality and morbidity review procedures.

3       87.    It is important here not to "miss the forest because of the trees."  The

4   conclusion of the initial State Audit was that the San Diego Jail has an excessively

5   high death rate among its incarcerated population.  In determining how the Sheriff's

6   Department is doing in response to the State Audit report, we need to look at the

7   incarcerated death rate since the Audit was released.

8       88.    In fact, the death rate among people incarcerated at the San Diego jail

9   has significantly *increased* since the time period discussed in the report.  The State

10  Audit reviewed statistics from 2006 to 2020 and determined the overall death rate at

11  the Jail to be **2.39 deaths per 1,000 people**, with the rates in individual years

12  ranging of a low of 1.57 in 2012 to a high of 3.0 in 2014.  SD_174856.  Since then,

13  from January 2021 through December 2023, the Jail has reported 50 in-custody

14  deaths.[16]  The Jail reported an Average Daily Population ("ADP") of 3,984 during

15  these three years, which calculates to a death rate of **4.18 deaths per 1,000 per**

16  **year**.  Broken down by year, the death rate was **4.5 deaths per 1,000 in 2021** (18

17  deaths, with ADP 3,987), **4.75 deaths per 1,000 in 2022** (19 deaths, with ADP

18  4,055), and **3.27 deaths per 1,000 in 2023** (13 deaths, with ADP 3,971).

19      89.    In fact, all three years exceed not only the average for the years 2006 to

20  2020, but also exceed the death rate of the worst year, 2014, which was 3.0 deaths

21  per 1,000 ADP.

22      90.    Based on my review of documents, including but not limited to medical

23  records and mortality reviews, my inspections of Jail facilities, and interviews with

24  patients and providers, it is my opinion that the healthcare delivery system at the Jail

25  harms many patients and places all incarcerated people at a substantial risk of

26  serious harm.  The Sheriff's Department clearly has not taken significant steps to

27

28  [16] The ADP and in-custody death numbers are pulled from:
    https://www.sdsheriff.gov/resources/transparency-reports.

1   reduce the death rate; the Jail death rates have gotten worse since the State Audit.

2   The problems with the Jail's healthcare system have resulted in permanent harm to

3   patients, including avoidable deaths.

4          91.    The starting place in any attempt to reduce the Jail's astounding death

5   rate would be an analysis of *every* death to see if certain patterns emerge that point

6   to serious shortcomings in the Jail's healthcare system leading to excessive deaths

7   so that appropriate reforms of the system can be undertaken.  However, the Jail's

8   mortality review process is so flawed that no such reforms are likely to be

9   implemented.  And, unsurprisingly given these failures, people have continued to

10  die avoidable deaths in the San Diego County Jail.

11         **A.    The Jail's Flawed Mortality Review Process**

12         92.    All hospitals and most large medical practices have a mechanism for

13  review of deaths of patients in their care, known as Mortality and Morbidity

14  ("M&M") committees.  M&M committees investigate deaths (mortality) and also

15  investigate unexpected severe adverse events that do not lead to death but

16  nevertheless cause unexpected harm, suffering, and/or permanent problems

17  (morbidity).[17]

18         93.    The goal of an M&M program is to identify medical errors that led to

19  the adverse outcome, so that those errors can be avoided in the future.  In any

20  individual M&M review, the most important of these identified errors is termed the

21  "root cause."  The root cause can be either a human error, *e.g.*, when an individual

22  physician or nurse makes a significant medical mistake, or a systemic problem, *e.g.*,

23  technical problems in the medical record, lack of appropriate policies and

24  procedures, etc.  When human error is identified, an M&M committee can direct

25  that medical professionals be trained and incompetent performers dismissed.  When

26  systemic issues are identified, an M&M committee can direct that policies and

27  ───────────────

28  [17] These unexpected negative outcomes are also sometimes termed "Sentinel
Events."

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1   procedures be updated and improved.  The overall goal, of course, is to learn from

2   past mistakes in order to prevent future bad patient outcomes.

3       94.    M&M reviews typically occur in two stages.  First, a standing

4   committee of physicians, nurses, and administrators identifies and analyzes all

5   deaths and adverse outcomes and prepares important cases, such as all unexpected

6   deaths, for presentation.  Second, a meeting occurs where the standing committee's

7   findings are discussed *with the medical staff who were involved in care of the*

8   *patient*.  M&M reviews usually result in some type of action plan to improve patient

9   care.

10      95.    The NCCHC Technical Assistance Report, Venters Report, and State

11  Audit each directed the Sheriff's Department to improve its M&M process.

12  NCCHC emphasized that "[t]reating and general health staff *must* be informed of

13  [mortality] review findings," which reportedly had not been occurring at the time of

14  their investigation.  DUNSMORE0260627.  Dr. Venters directed that:  "The review

15  of sentinel events including deaths, injuries and self-harm is also an important best

16  practice in reducing mortality and morbidity in jail settings, and these reviews and

17  their corrective action plans can be included in the service-wide quality meetings."

18  SD_215365.  And, the State Audit concluded that the Sheriff's Department's

19  "reviews of in-custody deaths have been insufficient and have not consistently led to

20  significant corrective action."  SD_174794.

21      96.    When Dr. Montgomery was asked in his deposition:  "So following an

22  in-custody death there's still some type of review done by medical, nursing, and

23  sworn.  Is that accurate?"  He answered "Yes."  Montgomery I Tr. at 16:4-7.  He

24  clarified that he himself does the medical review, the Director of Nursing (Serina

25  Rognlien-Hood at the time) does a separate nursing evaluation, and one of the jail

26  Lieutenants does a review of the actions of sworn staff.  *Id.* at 16:18-19:1.  Per

27  Dr. Montgomery, all of these are independent and uncoordinated.  They also are

28  informal, in that there is no written record that summarizes all of these reviews and

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  what conclusions were reached.

2      97.     The Sheriff's Department does have a standing Critical Incident

3  Review Board ("CIRB") that reviews in-custody deaths, but these reviews are

4  prepared and presented by a non-medically trained security officer to the largely

5  non-medically trained people who sit on the committee.  Based on the documents I

6  reviewed, it appears that no physician involved in the care of the patient is even in

7  attendance.  There is no significant critique of the medical decision making and

8  identification of medical mistakes presented to the CIRB.  And the CIRB does not

9  appear to make suggestions for improvement of the medical program at the Jail.

10      98.     As an example, the CIRB met on September 20, 2023 to review the

11  death of Raymond Dix (Mr. Dix's death is discussed in detail below).  SD_1030408.



12  ████████████████████████████████ SD_1030412.[18] ████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████" SD_1030409. ███

15  ██████████████████████ SD_1030409-1030410. ███████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████ *Id.* ████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████ After the presentation, "████████

21  ████████████████████████████" SD_1030410.  Clearly, the

22  CIRB reviews, which lack any meaningful medical evidence or analysis, are not a

23  substitute for legitimate M&M.

24      **B.     NaphCare's Flawed Mortality Review Process**

25      99.     Instead, the Sheriff's Department has contracted the main responsibility

26

27  [18] As discussed in more detail later in this Report, the term "medical practitioner"
    applies to doctors and nurse practitioners, but it does not include nurses, including
28  Director of Nursing Ms. Rognlien-Hood who did attend this meeting.

for M&M reviews to NaphCare.  NaphCare's contract requires NaphCare to conduct a "thorough clinical mortality review" for "[a]ll patient deaths," including "a review of the incident and preceding treatment, a root cause analysis, review of relevant procedures and documentation, pertinent service reports, and recommendations for corrective action."  County Contract No. 566117, §§ 2.3.47.4, 2.3.47.5, 2.3.47.7. The contract also calls for NaphCare to establish the process for identifying Sentinel events and performing a Root Cause Analysis for Sentinel Events.  *Id*., §§ 2.3.47.9, 2.3.47.10.  "The goal for critical incident analysis is to solve problems before they escalate and prevent future problems through promotion of a risk avoidance attitude among the healthcare staff."  *Id*., § 2.3.47.13.

100.    On their face, this contract complies with the recommendations of the State Auditor, the NCCHC, and Dr. Venters.  In addition, NaphCare has a policy, called A-09, Procedure in the Event of Patient Death.  NAPHCARE000735 *et seq*.

101.    However, it is my opinion that NaphCare does not fulfill those obligations in practice, based on my review of the NaphCare mortality reviews and minutes from the 2022 and 2023 M&M committee meetings.

102.    For one thing, death summaries, by contract, are supposed to be compiled by "[t]he advanced clinical provider in the patient's overall treatment." County Contract No. 566117, § 2.3.47.12.  However, the death summaries in the reviews I saw were prepared by CHP's medical director, Dr. Nas Rafi, and NaphCare's Health Services Administrator ("HSA"), Michael Farrier, neither of whom directly interacted with the majority of these patients.  The cases are then reviewed by Dr. Elliott Wade, NaphCare's Regional Medical Director of the Western States.  Dr. Wade is based in Las Vegas.  Dr. Wade's review and recommendations are then sent to the NaphCare Clinical Mortality Review Committee.

103.    The Clinical Mortality Reviews are held in Birmingham, Alabama by the NaphCare M&M Review Committee.  No members of NaphCare M&M Review

Committee are from the San Diego Jail.  The attendees instead are from NaphCare

corporate.  Dr. Freedland testified that he has never participated in the M&M

reviews for the San Diego Jail, although he would be a logical choice to be on such

a committee, as would the Sheriff's Department's Chief Medical Officer, Dr. Jon

Montgomery.  The CHP Medical Director of the Jail, Dr. Rafi, prepares death

summaries but otherwise does not participate in death reviews.  Freedland Tr. at 73.

104.   As one example, the NaphCare M&M committee that convened in

Birmingham, Alabama on October 16, 2023 consisted of the following NaphCare

employees:  Dr. Rita Armitage, Physician/Ophthalmologist; Crystal Alexander,

Director of Utilization Management; Dr. Jeffery Alvarez, Chief Medical Officer;

Justin Barkley, Chief Legal Officer; Hannah Burgess, Vice President of Psychiatric

Services; Marsha Burgess, Senior Vice President, Clinical Operations; Brad Cain,

CEO NCF, Inc.; Jane Dickerson, Director of Pharmacy – 3rd Party Operations;

Dr. Emily Feely, Corporate Nephrologist; Darrelle Knight, Chief Pharmacist;

Dr. Jerry McLane, Corporate Medical Director, Eastern States; Candice Sherman,

Senior Corporate Counsel – Litigation; Dr. Amber Simpler, Executive Director of

Behavioral Health Research; Hannah Stokes, Corporate Counsel; Seetal Tejura,

General Counsel – Litigation; Dr. Stuart Tieszen, Chief Medical Officer, Behavioral

Health; Dr. Elliot Wade, Corporate Medical Director, Western States; Honey Lee

Walker, Legal Nurse; and Kayla Washington, Corporate Counsel – Operations.

Based on my review of the documents, these attendees appear to be typical.  No one

from the Sheriff's Department or CHP attends.

105.   Notably, at each of these Committee meetings, the committee reviews

deaths from NaphCare contracts around the country.  San Diego cases are a small

fraction of those considered.  For example, on October 16, 2023, twelve cases were

discussed, only one was from San Diego.  NAPHCARE041856-041859.

106.   When a San Diego case is considered, the M&M Committee usually

simply notes Dr. Wade's conclusions and does not review the death in detail.  This

1    may be a time consideration since they are reviewing cases from all over the

2    country. Occasionally, the committee will review a San Diego death in detail. In

3    these cases, a detailed timeline of the patient's medical and psychiatric care is

4    presented in a series of slides. Based on my review of the documents, I am not sure

5    how these cases are chosen. Notably, the cases reviewed in detail do not necessarily

6    include those in which Dr. Rafi or Dr. Wade made recommendations; some of the

7    detailed reviews are for cases where Dr. Wade has concluded that "[n]o action

8    recommended."

9        107.   By far the most common conclusion from the NaphCare M&M

10    committee on the San Diego deaths was "No action recommended." This happens

11    even when Dr. Rafi has recommended something in her death summary. The

12    NaphCare M&M committee routinely disregards Dr. Rafi's recommendations. In

13    fact, based on my review of the documents, I am not sure they are aware of them.

14        108.   The case of Keith Galenbach, who died in the Jail on September 28,

15    2023, is informative in this regard. Notably, the NaphCare M&M committee did not

16    do a detailed review (of the type I described above) of Mr. Galenbach's death.

17        109.   Dr. Nas Rafi and HSA Michael Farrier each prepared a death summary

18    about Mr. Galenbach. Dr. Rafi concluded:

19        A more thorough, comprehensive evaluation of the cause of syncope in
          the Emergency Department may have prevented the event. Syncope is
20        an extremely high risk event for this patient given his age and multiple
          co-morbidities and he would have greatly benefited from an
21        admission/more thorough work up to rule out intracranial or cardiac
          causes of syncope.
22

23    NAPHCARE041867. HSA Michael Farrier did a separate Death Summary the next

24    day, including different pertinent details about the case than Dr. Rafi. Michael

25    Farrier made no recommendations. NAPHCARE041862.

26        110.   Yet, Dr. Wade, despite allegedly reviewing these summaries,

27    recommended "no quality improvement measures." NAPHCARE041854. He

28    apparently disagreed with Dr. Rafi's conclusions or, alternatively, did not read them.

111.    The NaphCare M&M Committee reviewed the case on October 16, 2023.  This was not one of the few cases presented in detail, meaning there was a single slide in the presentation for that date, with minimal information.  The slide stated:  "This event was reviewed by Dr. Elliot Wade, and no quality improvement measures are/were recommended."  *Id.*  Based on this presentation, it appears that Dr. Rafi's recommendations were also not seen by the NaphCare M&M Committee.

112.    If Dr. Rafi's recommendations were seen, they were apparently disregarded, as the M&M Committee's conclusion does not reference them.  Rather, the M&M committee's conclusion regarding the Galenbach case was: "Though not related to this patient's death, it has come to the committee's attention that specific policies on management of insulin pumps need to be established by San Diego County and communicated to STATCare, so they can be prepared to address patients with these medical devices."

113.    Notably, I did not find any reference to updates in the NaphCare Policies and Procedures, the County Operations Manuals, any Medical Directive Bulletins, or any training for medical staff relating to insulin pumps.  This may be because, when Dr. Wade recommends no further action, NaphCare does not share its conclusions about San Diego deaths with the Jail.  This was admitted in deposition testimony by NaphCare's Chief Legal Officer Justin Barkley on March 20, 2024.  Barkley Tr. at 29:24-30:6.

114.    Nor does it appear that any of the internal analyses conducted by Sheriff's Department staff such as those done by Dr. Montgomery and Ms. Rognlien-Hood were communicated to the NaphCare M&M Committee.

115.    While the M&M Committee meetings about deaths (mortality) at the San Diego County Jail are inadequate, it is worth noting that the morbidity analyses—*i.e.*, analyses of adverse outcomes or sentinel events—do not appear to be happening *at all*.  I also saw no tracking of sentinel events in CQI reports.

116.    Importantly, the only mention of M&M in the new contract that the

County negotiated with CHP occurs at section 7.5: "Contractor shall designate a Physician … to collaborate with the Sheriff's CMO, or Sheriff's designee, in the following areas: … 7.5.1.3. Morbidity and Mortality (M&M)." SD_1579723. In other words, the M&M review process will continue to be managed by NaphCare, as the "Sheriff's designee."

117. In summary, the Sheriff's Department—either on its own or through its contractor—is not performing M&M reviews in a manner that complies with the standard of care done in the community, or with the recommendations of the NCCHC, Dr. Venters, or the State Audit.

118. A proper M&M review at the Jail would have the following characteristics:

- The Sheriff's Department would track Deaths but would also track other serious medical bad outcomes (Sentinel Events) via the CQI program. This is not being done presently.

- Death summaries would be prepared within seven days by an "advanced clinical provider in the patient's overall treatment," as required in the NaphCare contract.

- Deaths and Sentinel morbidity events would be investigated by a multidisciplinary M&M committee based in San Diego and consisting of San Diego Jail practitioners, nurses and security staff. There would be no need for separate uncoordinated investigations.

- Sheriff's Department M&M Committee conclusions would be shared with medical staff involved in the care of the patient in question.

- Sheriff's Department M&M Committee would make and carry out recommendations for improvements in Jail Policies and Procedures.

## C. Case Studies of Deaths at the Jail Demonstrate Substandard Care

119. The below section of this report presents several case studies that show both how the Sheriff's Department's medical failures led to avoidable patient deaths and how the Jail's inadequate mortality review process failed to make needed changes following those deaths.

120. I selected this particular subset of deaths to review because the NaphCare M&M Committee minutes for each of these cases reflect that a more

1   detailed review, *i.e.*, more than a single slide presentation, was conducted.[19]  I also

2   reviewed these cases to determine whether these deaths were preventable and, if so,

3   what the root cause(s) of these deaths were.  In this section, I compare my

4   impressions of these deaths with the official reports from the NaphCare M&M

5   Committee.

### 1.   Patricia Adamson (23706155), Died May 3, 2023

### (a)   Events Preceding Death

8   121.   Patricia Adamson was booked February 13, 2023 at the age of 63.  She

9   was placed in a sobering cell but was uncooperative.  On February 15, 2023, she

10  was noted to be vomiting dark brown emesis—the brown color is usually caused by

11  blood.  Dr. Ram appropriately sent her to the hospital, where she was admitted for

12  two days.  SD_705053.

13  122.   At the hospital, she was confirmed to have hematemesis (vomiting

14  blood) and anemia.  Her initial Hemoglobin blood count was 15; the next day, it was

15  11.9, probably indicative of substantial blood loss.  SD_356707.  Hematemesis is

16  most commonly caused by a bleeding duodenal ulcer (an erosion in the lining of the

17  intestine just past the stomach).  The normal course of action at this point would be

18  to do an EGD,[20] also called an "endoscopy," which means using a scope to look into

19  the stomach and duodenum and cauterizing the ulcer (if one is found) to prevent

20  further bleeding.  The gastroenterologist at the hospital did not want to do this,

21  which I believe was a medical mistake.  In my clinical experience as an emergency

22  physician for 25 years, essentially all cases of hematemesis with substantial blood

23  loss result in an EGD being performed.  Instead, Ms. Adamson was sent back to the

---

[19] This report does not address deaths caused by homicide (*e.g.*, Raymond Vogelman), overdose/withdrawal (*e.g.*, Joshua Fosbinder, Lazaro Alvarez, William Schuck), or suicide (*e.g.*, Pedro Ornejas).  I leave these deaths to Plaintiffs' other experts to address in their reports.  However, I note that I have overseen the care of many patients with withdrawal in jails, and it is my opinion that no one should die of withdrawal.

[20] EGD stands for EsophagoGastoDuodenoscopy.

1  Jail with a prescription for Protonix, a medication to reduce stomach acid and help

2  heal ulcers.

3      123.   Once back at the Jail, Dr. Christensen reviewed the hospital records on

4  February 20, 2023 but did not summarize them, did not see Ms. Adamson

5  personally, and created no ongoing care plan including no plan for check-ups.

6  SD_705067.  NP Lacey Beaston did a brief summary of the hospital records in a

7  chart note on February 23, 2023.  She specifically noted the anemia and the hospital

8  plan to transfuse Ms. Adamson if her hemoglobin fell too much.  NP Beaston also

9  noted the hospital discharge prescription of Protonix.  However, NP Beaston made

10  no other treatment plan for Ms. Adamson.  She ordered no labs to check hemoglobin

11  levels, and no scheduled check ups.  SD_705124.  Ms. Adamson was also diagnosed

12  by Jail psychiatry as having schizoaffective disorder.  SD_705005.

13      124.   According to the Jail's records, Ms. Adamson repeatedly refused her

14  Protonix and other medications and also refused to sign the refusal form at least

15  sixty-nine (69) times.  SD_705730–SD_705799.  These refusals were only signed

16  by security staff and were not witnessed by the nurse as required by the Sheriff's

17  Department Medical Services Division Operations Manual ("MSD Operations

18  Manual") or NaphCare's Policies and Procedures ("NaphCare P&P").  *See* MSD

19  Operations Manual, No. D.1.1.B; *see also* NaphCare P&P, Nos. D.02.3 and 4

20  (NAPHCARE001141).

21      125.   Ms. Adamson repeatedly requested a liquid diet because she stated that

22  eating solid foods made her feel ill.  SD_705205, 705403, 705476.  She complained

23  intermittently of abdominal pain.  SD_705302, SD_705537.  On April 4, 2023,

24  Psychiatrist Lauren Anderson noted:  "She endorses early satiety, bloating, and

25  nausea.  She states "I am trying to eat more of the solid foods but it is difficult."

26  SD_705529.  Dr. Anderson submitted a referral asking if a medical practitioner

27  would see Ms. Adamson to "consider GI referral."

28      126.   On April 12, 2023, in response to Dr. Anderson's request,

1  Ms. Adamson was seen by NP Teresa Hurley for "ongoing early satiety, bloating,

2  and nausea when eating solid foods; consider GI referral." SD_705537.

3  Ms. Adamson also told NP Hurley she had rectal bleeding which she assumed was

4  from hemorrhoids.  NP Hurley diagnosed constipation and abdominal bloating.  NP

5  Hurley did no examination, including no examination to confirm the presence of

6  hemorrhoids and/or rectal bleeding.  NP Hurley noted that Ms. Adamson had had a

7  GI consult during her recent hospitalization, but not the fact that GI had declined to

8  do an endoscopy nor that Ms. Adamson was anemic from blood loss at the time of

9  discharge.  NP Hurley did not order any labs and did not refer Ms. Adamson to a GI

10  specialist.  SD_705537.

11      127.   Ms. Adamson continued to complain of abdominal symptoms.  She was

12  seen again by a Sonya Megert, NP, on April 29, 2023 for "ongoing early satiety,

13  nausea, and bloating" that had been going on for "months."  NP Megert saw

14  Ms. Adamson for this complaint at her cell rather than in the medical area, checked

15  no vital signs, did no abdominal examination, and ordered no labs or x-rays—

16  despite the fact that this was an elderly woman who had been hospitalized for

17  similar symptoms two months before.  NP Megert instead ordered Fiberlax, having

18  evidently made the diagnosis of constipation but not documenting any basis for this

19  diagnosis.  SD_705690.

20      128.   On May 2, 2023, a "STATCare Progress Note" stated:  "Pt. complained

21  of vomiting since after breakfast.  Requesting medication for vomiting."  The

22  STATCare practitioner performed "No clinical assessment … on this patient" but

23  ordered the antinausea drug Zofran.  SD_705692.

24      129.   The next day, May 3, 2023, Doreen Marasigan RN asked for

25  Ms. Adamson to be sent to medical "for report of vomiting."  The RN was told that

26  "[t]here is no deputy to assist me at this time."  SD_705692.

27      130.   About an hour later, psychiatrist Lauren Anderson found Ms. Adamson

28  severely ill.  Deputies took her to the shower, where she vomited blood and became

1   unresponsive.  During resuscitation attempts, a "constant stream of coffee ground

2   (bloody) emesis was coming from her mouth."  Resuscitation attempts were

3   unsuccessful, and Ms. Adamson died on May 3, 2023.  SD_705692.  I have not seen

4   an autopsy report for Ms. Adamson.

5                        **(b)     Jail's Analysis of This Death**

6        131.   Dr. Rafi noted in her death summary of this case: "A comprehensive

7   evaluation by the hospital with a full treatment plan of this patient's presenting

8   complaint of hematemesis, for which she was admitted, may have aided in treatment

9   of her underlying disorder.  She was discharged with a diagnosis of hematemesis,

10  without an underlying cause, with a plan that there was no current indication for

11  EGD (endoscopy) or no recommendation for repeat labs or GI follow-up as

12  outpatient in a high risk 63-year old female with history of substance use disorder

13  and psychiatric conditions."  NAPHCARE041694.  In other words, Dr. Rafi faulted

14  the hospital for not doing the correct procedure, an endoscopy, and not preparing an

15  appropriate after-care plan.  I agree with this summary, as far as it goes.  Of course,

16  there was nothing stopping the medical staff at the Jail from ordering an outpatient

17  endoscopy, appropriate follow up labs and other after-care plans themselves.

18       132.   The NaphCare M&M presentation reported that Ms. Adamson had no

19  interactions with medical from her discharge from the hospital on February 18, 2023

20  until April 29, 2023.  NAPHCARE041667, pp 7-12.  However, Ms. Adamson had

21  several interactions in this time that were important, such as the visit with a Nurse

22  Practitioner on April 13, 2023 with the specific question of whether a GI consult

23  (for an endoscopy) should be ordered.  Her repeated complaints of inability to eat

24  solid foods, bloating, and abdominal pain should have triggered a more thorough

25  work up especially considering the fact that Ms. Adamson was a frail elderly

26  woman.

27       133.   After reviewing this case, the NaphCare M&M Committee wrote

28  "Quality Improvement Plan: Committee reviewed and found care and treatment to

1    ████████" NAPHCARE041678.

2            **(c)    My Analysis of This Death**

3        134.   I strongly disagree with the M&M Committee's assessment.  I find

4   Dr. Rafi's conclusion that the hospital did a poor job accurate; however, Dr. Rafi did

5   not critique the performance of her own medical team after Ms. Adamson returned

6   from the hospital.

7        135.   I find numerous gross medical errors in the medical care provided to

8   Ms. Adamson once she returned to the Jail.  This was an elderly woman who had

9   had a two-day stay at the hospital for vomiting blood along with documented

10  anemia, indicating significant blood loss.  Upon her return to the Jail, she should

11  have been automatically seen face-to-face by a medical practitioner and had an

12  ongoing care plan established.  This did not happen.

13       136.   While Dr. Rafi is correct that an endoscopy should have been

14  conducted at the hospital, there was nothing preventing the Jail physicians from

15  arranging an outpatient endoscopy upon Ms. Adamson's return to the Jail and

16  creating a treatment plan with follow-up evaluations and labs, especially when she

17  repeatedly complained of ongoing symptoms.  The Jail medical staff should have

18  (a) advocated on her behalf in the hospital to have the endoscopy done before she

19  was discharged or (b) arranged the endoscopy and follow-up care plan themselves.

20  They did neither.  They should have scheduled medical wellness checks and done

21  follow up labs.  Moreover, both Dr. Rafi and the M&M committee did not express

22  any concern over the fact that no ongoing treatment plan was created.

23       137.   The nurse practitioner who saw Ms. Adamson on April 12, 2023,

24  specifically to "consider GI referral" did no physical examination even though

25  Ms. Adamson complained of rectal bleeding from hemorrhoids.  Rectal bleeding can

26  also be caused by a bleeding duodenal ulcer.  Let's say that the NP had done a rectal

27  exam and found no hemorrhoids but did find obvious rectal bleeding.  Would that

28  have been important information?  Of course it would, which is why it is essential to

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1   do a physical examination in such patients.

2        138.   The NP also did not review the medical records from Ms. Adamson's

3   recent hospitalization thoroughly enough to note that Ms. Adamson had had a

4   significant documented blood loss.  She ordered no blood test to determine if the

5   anemia from blood loss was ongoing, especially in light of the fact that

6   Ms. Adamson was complaining about bleeding from the rectum.  The NP had been

7   prompted to refer Ms. Adamson to a GI specialist for an endoscopy but declined to

8   do so.  This NP made several serious medical mistakes including not doing a

9   physical examination, not reviewing medical records thoroughly, making diagnoses

10  (constipation) without basis, and not realizing that Ms. Adamson should see a GI

11  doctor for an endoscopy even when this was pointed out.  In my opinion, this

12  interaction violated the medical standard of care.

13       139.   The nurse practitioner who visited Ms. Adamson at her cell on

14  April 29, 2023 also violated the medical standard of care.  This nurse practitioner

15  did not take vital signs, performed no examination, and performed no diagnostic

16  tests.  The medical standard of care for an elderly woman, recently hospitalized for

17  hematemesis and now with similar abdominal complaints, must include the taking of

18  vital signs, an abdominal examination, and diagnostic studies, such as labs and

19  imaging studies.  The nurse practitioner did none of this and instead appeared to

20  diagnose Ms. Adamson with constipation without documenting any basis for

21  making this diagnosis.

22       140.   When Ms. Adamson continued to complain of vomiting, STATCare

23  ordered anti-nausea medications again without any examination or labs.  All of this

24  was poor medical care.

25       141.   Finally, the registered nurse who wanted to see Ms. Adamson on

26  May 3, 2023 was told "No" because of no deputy availability—in other words,

27  security short-staffing negatively impacting medical care.  These issues were

28  ignored by CHP's Dr. Rafi and the NaphCare Corporate death review.

142.   Ms. Adamson's death was, in my opinion, preventable.  Had she received appropriate evaluation and care at the Jail, she more likely than not would have survived.

### 2.     Raymond Dix (22737506), Died September 13, 2022

#### (a)     Events Preceding Death

143.   Raymond Dix was booked on September 6, 2022, at the age of 56.  He had a medical history that included congestive heart failure, chronic atrial fibrillation, hypertension, COPD, and others.  He was taking multiple medications for these conditions.  He was sent to the hospital for a clearance prior to incarceration, but returned the same day.

144.   On September 7, 2022, during his medical screening, Mr. Dix was noted by the nurse to have "profuse sweating."  Mr. Dix asked to see a medical practitioner about his history of atrial fibrillation and what he felt were abnormal vital signs.  He was not scheduled to see a practitioner.  SD_002714.

145.   On September 8, 2022, Katrina John, MD reviewed Mr. Dix's admission chest x-ray because it was abnormal, showing an enlarged heart.  The physician noted that this was "consistent" with Mr. Dix's cardiac history and wrote: "Patient needs to see a medical provider if he is experiencing chest pain, dizziness, shortness of breath, altered mental status."  The physician did not see Mr. Dix herself and did not note that Mr. Dix had already requested to see a practitioner. SD_002715.

146.   On September 9, 2022, a nurse practitioner reviewed Mr. Dix's September 6, 2022 hospital record, but did not see Mr. Dix personally.  SD_002715.

147.   On September 10, 2022, a nurse practitioner went to Mr. Dix's cell. The totality of the physical exam was "Pt. seen moving arms and legs in bunk. Unlabored respiratory effort."  The nurse practitioner did not check vital signs, and did no examination of Mr. Dix's lungs, heart, or anything else.  Mr. Dix reportedly refused an examination, probably related to the fact that the security staff had to

1    wake him up for the nurse practitioner visit.  SD_002715.

2        148.   From September 7 through September 13, Mr. Dix reportedly refused

3    some of his medications.  SD_002841, SD_002840, SD_002842, SD_002844.

4    These refusals, along with the refusal to sign the refusal form, were witnessed only

5    by security staff, not nurses, and Mr. Dix received no counselling about these

6    refusals of essential medications.  *See* SD_002746-002761.[21]

7        149.   On September 12, 2022, Mr. Dix complained of being dizzy and was

8    seen in the medical clinic by a registered nurse.  Mr. Dix thought that his dizziness

9    was due to a low blood sugar, however, his blood sugar was normal at 127.  He did

10   have an abnormally low heart rate of 59, especially taking into consideration his

11   history of atrial fibrillation, which typically causes rapid heart rate.  The registered

12   nurse did not call a medical provider about his symptoms despite the instructions of

13   the medical doctor on September 8, 2022 that Mr. Dix was to see a medical provider

14   if he reported dizziness.  The nurse treated him by giving him a snack and some

15   water and told him to keep drinking water.  In other words, the registered nurse

16   made a diagnosis that Mr. Dix's dizziness was due to dehydration or not eating and

17   had nothing to do with his heart.  SD_002716.

18       150.   Five days later, on September 13, 2022, Mr. Dix was found down.

19   Resuscitation was attempted but was unsuccessful.  He was pronounced dead at the

20   hospital.  SD_002717.  An autopsy determined that Mr. Dix had died of

21   "Atherosclerotic and Hypertensive Cardiovascular Disease."  SD_050219.

22                    **(b)    Jail's Analysis of This Death**

23       151.   I have not seen the death summary prepared by Dr. Rafi.  However, I

24   reviewed a summary prepared by Dr. Montgomery.  Dr. Montgomery noted that two

25   of Mr. Dix's medications, Farxiga and Anoro Ellipta, had been determined to be

26

27   _____

28   [21] I critique the Jail's approach to reported refusals in more detail later in this
     Report.

1  nonformulary by NaphCare and therefore not approved for his use.

2  Dr. Montgomery also noted that Mr. Dix had been identified as having alcohol

3  abuse disorder but had never been monitored with alcohol withdrawal scoring or

4  offered treatment for this.  I agree with Dr. Montgomery that these both were serious

5  problems with the care that Mr. Dix had received at the Jail.  SD_055188.

6      152.   As far as I can tell, Dr. Montgomery's observations were not shared

7  with the NaphCare M&M Committee.  After reviewing the case, the NaphCare

8  M&M committee had no critique and no recommendations.  NAPHCARE041499-

9  041507.

10          **(c)     My Analysis of This Death**

11     153.   To my review, Mr. Dix's death was preventable.  There are four glaring

12  problems with the medical management that may have contributed to his death at

13  the Jail.

14     154.   First, two of Mr. Dix's medications were inappropriately discontinued

15  at booking because they were non-formulary.  Farxiga is a drug used to treat both

16  Type 2 Diabetes and congestive heart failure.  Anoro Ellipta contains two

17  bronchodilators used to treat chronic lung disease (COPD).  Requests for

18  authorization of these non-formulary medications were sent in.  *See* SD_055186.

19  Mr. Dix received one dose of  Farxiga seven days after he was booked; he never

20  received the Anoro Ellipta prescription.  In my opinion, not receiving those

21  medications for six days may have contributed to his death on September 13, 2022.

22  I also note that arbitrarily discontinuing those medications simply because they were

23  non-formulary violated NaphCare's contractual obligations: "the formulary shall

24  allow medical practitioners and psychiatrists to follow generally accepted clinical

25  practice patterns in their medical management of incarcerated individual patients,"

26  and, "[c]ontractor typically approves non-formulary orders."  Contract § 2.3.30.35,

27  SD_125283.

28     155.   Second, Mr. Dix was never examined by a Jail medical practitioner

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

during his incarceration even though he had a significant heart history, asked to see a doctor and had concerning symptoms. The visit by a nurse practitioner to his cell is problematic in several ways—including, but not limited to, her failure to take vital signs. In the end, no practitioner ever did a significant medical evaluation of Mr. Dix during his incarceration.

156.   Third, Mr. Dix's multiple "refusals" of critical heart medications were not witnessed by an RN, and he was not counselled about his refusals of critical heart medications as required by MSD Operations Manual No. D.1.1.

157.   Fourth, the registered nurse who evaluated Mr. Dix on September 12, 2022 acted as if they were a practitioner. But registered nurses have a different, more limited scope of practice than practitioners. The registered nurse did not fill out one of the Nursing Evaluation Protocol forms. And, in fact, there is no form for nurses to do an evaluation of "dizziness" in the setting of heart disease and dysrhythmias. Given his medical history and symptoms, Mr. Dix should have been seen urgently by a practitioner. He should have had a medical work up including an EKG and labs. If this could not be done at the jail due to understaffing, Mr. Dix should have been sent to the Emergency Room on September 12, 2022. Had this happened, more likely than not, Mr. Dix would have survived.

158.   The NaphCare M&M committee apparently ignored each of these problems when they stated that they had no recommendations from this review.

### 3.    Vianna Granillo (22728152), Died July 13, 2022

#### (a)    Events Preceding Death

159.   Vianna Granillo was booked on July 8, 2022, at the age of 25. At booking, she reported suffering from opioid use disorder and diabetes. She was started on opioid withdrawal three days after she was booked; in other words, she had untreated opioid withdrawal for three days. She was checked by a registered nurse on July 11, 2022 and reported to the registered nurse that she felt "like shit." "I've been here for days and I only got these meds (buprenorphine) now."

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  SD_003469.  On July 12, 2022, she was found unresponsive.  This was initially

2  assumed to be due to opioid overdose, and she received nine doses of Narcan with

3  no effect.  CPR and bag ventilation with oxygen were started 12 minutes after she

4  was found unresponsive and pulseless.

5      160.  At the hospital, Ms. Granillo was found to have a large amount of air in

6  her abdomen (pneumoperitoneum).  SD_249171.  She died shortly after arrival at

7  the hospital.

8      161.  An autopsy performed July 4, 2022 concluded that Ms. Granillo died of

9  "septic shock, due to pneumoperitoneum with spillage of gastric/enteric contents

10  due to perforated prepyloric ulcer."  SD_061710.

11      162.  Gastric (stomach) ulcers are caused by stomach acid and bacteria eating

12  the lining of the stomach near where it connects to the intestines.  Most patients with

13  gastric ulcers have symptoms of "heartburn" and upper abdominal pain.  Untreated

14  gastric ulcers can sometimes erode through the entire thickness of the stomach and

15  perforate into the abdominal cavity.  This is a devastating complication because

16  stomach acid, bacteria, and other bowel contents spill into the pristine environment

17  of the abdominal cavity causing peritonitis (inflammation of the lining of the

18  abdominal cavity).  *Peritonitis is an intensely painful condition.*  Over time, the

19  peritonitis worsens, the gastrointestinal system stops functioning, and other organs,

20  such as the kidneys, fail.  Patients with bowel perforation and peritonitis typically

21  have severe pain.  Over time, as they get sicker, such patients can develop

22  abdominal infections and, eventually, low blood pressure and septic shock.

23      163.  There is always a period of time, usually days, between the rupture of

24  the ulcer into the abdominal cavity and death, during which the patient experiences

25  severe pain.

26        **(b)    The Jail's Analysis of This Death**

27      164.  In her death summary, Dr. Rafi was concerned with delay in beginning

28  CPR and other resuscitation after Ms. Granillo was found unresponsive and

1  pulseless.  SD_055302.  Dr. Montgomery noted that Ms. Granillo already exhibited

2  rigor mortis and livor mortis when found, indicating that she had been dead for

3  some time before she was found.  Dr. Montgomery also noted two errors in the

4  resuscitation attempt: that no AED was used and that there was a delay in O2

5  delivery.  *Id.*

6      165.   I do not know if the NaphCare M&M committee saw either of those

7  reports and recommendations.  If they did, they discounted them.  The NaphCare

8  M&M Committee's only conclusion was "Dr. Wade will speak with DON regarding

9  Narcan education."  NAPHCARE041420.  However, I do not see why nine (9)

10  doses of Narcan was insufficient in Ms. Granillo's resuscitation attempt or how

11  Narcan education would have saved Ms. Granillo.

12              **(c)     My Analysis of This Death**

13      166.   I have the following observations based on my review of this case.

14  First, Dr. Rafi was right that waiting ten minutes to begin CPR and oxygen

15  ventilations of a patient found down and pulseless is much too long.  The M&M

16  Committee did not mention this, despite the recommendation being in Dr. Rafi's

17  death summary.  As with Mr. Galenbach's death review, I am again forced to

18  wonder whether Dr. Rafi's recommendations were reviewed by the committee at all.

19      167.   Second, the NaphCare M&M Committee is supposed to reconsider

20  death cases once the autopsy report is available if the autopsy sheds new light on the

21  patient's death, such as in this case.  *See* Barkley Tr. at 24:23-25.  However, I have

22  seen no record that the M&M committee reviewed Ms. Granillo's autopsy report.

23      168.   Since a rupture of a gastric ulcer invariably causes intense pain and

24  since there is a length of time, usually days, between the rupture and the

25  development of infection, septic shock and death, it is likely that Ms. Granillo knew

26  that something catastrophic had happened to her.  Most likely, she would have

27  attempted to notify staff of her distress.  However, as discussed later in this Report,

28  the emergency intercom buttons in the Jail frequently do not work.

### 4.     Abdiel Sarabia (21118298), Died July 22, 2022

#### (a)     Events Preceding Death

169.   Mr. Sarabia was booked on May 24, 2021, at the age of 35.  During booking, staff noted that he had hypertension and opioid use disorder.  Lisinopril, a medication to treat hypertension, was prescribed for him the next day without any practitioner seeing him.  He was not scheduled for blood pressure checks or hypertension chronic care visits.

170.   On July 8, 2021, nurse practitioner Frederick Wycoco "cancelled" Mr. Sarabia's diagnosis of hypertension.  "Reason: not on meds, BP normotensive," meaning his blood pressure was normal.  SD_011457.  However, Mr. Sarabia was taking lisinopril for blood pressure and continued to take it until he died.  SD_011907.  Also, Mr. Sarabia's blood pressure was not normal.  His blood pressure was elevated at 141/84 on June 3, 2021, and it was elevated again at 153/77 on June 18, 2021.  SD_011588; SD_011487.

171.   On October 16, 2021, blood labs were drawn on Mr. Sarabia, which showed a markedly elevated level of triglycerides at 932 (normal is less than 150), elevated cholesterol test of non-HDL cholesterol at 157 (therapeutic goal of less than 100), and an elevated Thyroid Stimulating Hormone (TSH) indicating the possibility of hypothyroidism.  Mr. Sarabia had other abnormal labs, too, such as elevated liver tests indicating liver damage.  SD_011629.

172.   No one reviewed these labs until a psychiatric Nurse Practitioner noted the elevated triglyceride and TSH levels *four months later* and notified the medical practitioners to look at the labs.  SD_011546.  At that point, Joseph Molina, MD, reviewed the labs on February 8, 2022 and ordered fenofibrate, a medication for high triglyceride levels.  Dr. Molina did not address the abnormal thyroid test, although it was mentioned on the task list in TechCare.  He did not address the other lipid abnormalities or elevated liver enzymes.  He also did not see Mr. Sarabia in person.  SD_011551.  In fact, no Jail medical practitioner ever saw Mr. Sarabia to

1    discuss any of this.

2        173.    Mr. Sarabia's medical records document at least forty eight (48)

3    refusals of prescribed medications over the course of his incarceration.  None of his

4    refusals (or his refusals to sign the refusal form) were witnessed by a nurse.  *See*

5    SD_011655-011703.  I see no evidence that he was counselled about these refusals

6    in accordance with the MSD Operations Manual or NaphCare P&P.  *See* MSD

7    Operations Manual No. D.1.1.B; *see also* NaphCare P&P Nos. D.02.3 and 4,

8    NAPHCARE001152.

9        174.    On May 20, 2022, Mr. Sarabia was seen by a registered nurse due to

10   the complaint of "hard time breathing."  His shortness of breath was so intense that

11   he used another person's albuterol inhaler despite not having a history of asthma.

12   Vital signs at this visit included an abnormally high blood pressure of 157/104 and

13   an abnormal heart rate of 125.  SD_011583.

14       175.    The same day, he was seen by nurse practitioner Frederick Wycoco.

15   NP Wycoco did not repeat Mr. Sarabia's vital signs.  NP Wycoco did an EKG that

16   he interpreted as "sinus tachycardia."  (I cannot find this EKG in the records).  NP

17   Wycoco noted "Elevated BP without diagnosis of HTN" (hypertension), despite the

18   fact that the diagnosis of hypertension was in Mr. Sarabia's history.  NP Wycoco

19   attributed Mr. Sarabia's elevated BP and heart rate to "Likely albuterol induced."  In

20   other words, NP Wycoco thought these symptoms were caused by the fact that

21   Mr. Sarabia had used someone else's inhaler.  NP Wycoco diagnosed a muscle

22   strain and muscle spasm and prescribed Flexeril and "Deep breathing exercises."

23   SD_011584.

24       176.    On May 21, 2022, Mr. Sarabia was seen at his cell by Joseph Molina,

25   MD to reassess "HR elevated during (last) assessment."  Dr. Molina did not repeat

26   any vital signs, including the heart rate.  He did no examination.  SD_011585.

27       177.    Mr. Sarabia was not seen again by any other medical personnel before

28   his death.

178.   On July 22, 2022, Mr. Sarabia was found unresponsive, not breathing and without a pulse.  His arms were "rigid and fixed," indicating that he had rigor mortis and so had been dead for some time.  NAPHCARE041401.

179.   An autopsy concluded that Mr. Sarabia died of "Hypertensive Cardiovascular disease" and that a contributing factor was "hypothyroidism." SD_001362.

### (b)    The Jail's Analysis of This Death

180.   The NaphCare M&M committee reviewed this case on August 15, 2022.  The only action that they initiated was "Dr. Wade will speak with site regarding need to have refusals signed by patients."  Otherwise, they found no fault with the care provided to Mr. Sarabia.

### (c)    My Analysis of This Death

181.   I disagree.  I believe that this was a potentially preventable death. Potential contributing "root causes" include the following:

- Mr. Sarabia had hypertension.  It was uncontrolled by 5mg of Lisinopril once a day.  This is a tiny dose; the typical minimal dose given to an adult hypertensive patient is at least 10 mg a day. Nevertheless, this dose failed to control his blood pressure as evidenced by high blood pressure readings on many occasions and especially on May 20, 2022.

- NP Wycoco discontinued Mr. Sarabia's diagnosis of hypertension even though he had multiple high blood pressure readings and was on a blood pressure medication.  That led NP Wycoco ten months later to write that Mr. Sarabia had a high blood pressure without a diagnosis of hypertension—not true.

- Mr. Sarabia's medical record contains forty-eight refusal forms, all of which say that Mr. Sarabia not only refused his medication but also refused to sign the refusal form.  None of these was witnessed by a nurse.  I question whether this is credible.  Did Mr. Sarabia really refuse all of these medications when offered?  Did he really refuse to sign the form when offered the opportunity to do so?  Or was something else going on here?  Nobody from medical ever took the time to ask why he was refusing medications (if this was even true) or to counsel Mr. Sarabia that his medications were important.

- The medical staff failed to confirm that Mr. Sarabia's elevated blood pressure and heart rate on May 20, 2022 ever improved back to normal. I suspect that they did not.

- NP Wycoco wrote that taking albuterol (an inhaler) caused Mr. Sarabia's high blood pressure and heart rate. In my experience as an emergency physician, this is extremely unlikely.

- NP Wycoco and Dr. Molina failed consider that Mr. Sarabia's chest pain and shortness of breath while exercising on May 20, 2022 might well have been anginal-type heart pain. Had they considered this, they would likely have done a work up consisting of an EKG and repeat vital signs and observation or simply have sent Mr. Sarabia to the emergency room.

- The opportunity to diagnose and treat Mr. Sarabia's hypothyroidism—which the autopsy determined to be a contributing factor in his death—presented itself on October 16, 2021 in the form of an abnormal thyroid test. It was never investigated or treated either then or four months later when a psychiatric nurse practitioner alerted the medical staff of their oversight. The abnormal blood test was simply ignored.

- A very high "non-HP lipid" level was evident in Mr. Sarabia's October 16, 2021 labs. High lipid levels such as these increase the risk of cardiovascular disease. The lab form itself indicated the need to treat this abnormality. Mr. Sarabia should have been treated with a statin lipid lowering medication that would have reduced his risk for atherosclerotic heart disease. However, like the abnormal thyroid test, this abnormal lab test was ignored, and the opportunity to treat Mr. Sarabia with a statin drug was lost.

182.  Most people who have a cardiac event like the one that killed Mr. Sarabia have severe crushing chest pain and shortness of breath for minutes or even hours before they succumb. It is likely that Mr. Sarabia knew that he was having a medical crisis before he died but likely had no way to alert security or medical staff of this emergency because the emergency intercom buttons in the cells do not work. I note that he was not found after his death until lividity had set in—a process that usually takes hours, indicating that no one checked on him for a prolonged period of time.

183.  In my opinion, more likely than not, had Mr. Sarabia received appropriate medical care while he was incarcerated in the Jail, he would not have died on July 22, 2022.

### 5.    Aaron Bonin (22736636), Died November 1, 2022

#### (a)    Events Preceding Death

184.  Aaron Bonin was booked on September 1, 2022, at the age of 43. After

1    booking, he was immediately admitted to the medical observation unit for multiple

2    medical and psychiatric problems, most notably end stage renal failure requiring

3    dialysis.  He was also taking medications to treat HIV infection.

4          185.   Mr. Bonin reportedly refused to take his many medications on at least

5    21 occasions (see, for example, the Medication Administration Record for

6    Darunavir, an anti-HIV drug).  He also reportedly always refused to sign the refusal

7    form.  No nurse ever witnessed these refusals.  SD_002267-002287, SD_002293.

8    Per the MSD Operations Manual No. D.1.1, he should have been counselled for

9    these refusals of essential medications.  However, I see no indication that these

10   counselling sessions occurred.

11         186.   On October 20, 2022, Mr. Bonin was found to have a critically high

12   potassium level (hyperkalemia).  SD_002075, SD_002237-39.  This is important

13   because potassium is a critical element in heart function.  High potassium levels can

14   cause the heart to suddenly stop beating effectively (called fibrillation) which leads

15   to death.  Mr. Bonin's potassium level was rechecked the following day, when it

16   was even higher; so high, in fact, as to be immediately life threatening.  *Id.*  This

17   was noted by a medical doctor, who discussed the need for immediate full dialysis

18   to reduce the potassium to a normal level with the dialysis nurse.  However, the

19   dialysis nurse discontinued dialysis early:  "Pt strongly insisted to stop the

20   treatment."  SD_002504.  From that moment until his cardiac arrest two days later,

21   Mr. Bonin was not seen by a practitioner or any other medical staff member to ask

22   why he was refusing full dialysis and discuss why that dialysis session was

23   particularly important.  SD_002075-76.  His potassium level was never rechecked

24   after the aborted dialysis.  Mr. Bonin had a cardiac arrest on October 24, 2022,

25   determined at the hospital to be due to very high potassium levels.  He died one

26   week later, on November 1, 2022.

27         187.   Mr. Bonin's autopsy report concluded that Mr. Bonin had died of "End

28   stage renal disease" and "Hypertensive and atherosclerotic cardiovascular disease."

However, the immediate cause of the initial cardiac arrest was clearly hyperkalemia, as was evidenced by the EMT records and the emergency department resuscitation. This fact was not mentioned in the autopsy.  SD_055144.

### (b)    The Jail's Analysis of This Death

188.    Dr. Montgomery's evaluation noted the concern with Mr. Bonin's dangerously high potassium levels on October 20 and October 21, 2022 and the abnormally short dialysis on October 22, 2022.  SD_055139-055141. Dr. Montgomery also noted that the hospital had diagnosed the cause of Mr. Bonin's cardiac arrest as being hyperkalemia.  Dr. Montgomery was also concerned about Mr. Bonin's multiple refusals of dialysis.  SD_055143.  I have not seen the review completed by Dr. Rafi or the NaphCare Health Services Administrator Mr. Farrier.

189.    Mr. Bonin's death was reviewed at the NaphCare Mortality and Morbidity Committee meeting on November 21, 2022.  NaphCare 041596.  The only Quality Improvement Plan offered by the M&M committee was "Dr. Wade, Darrell Knight, and Felicia Self are working with site regarding backup pharmacy education."  NAPHCARE041630.  I do not see why back up pharmacy issues would be considered important in Mr. Bonin's death.

### (c)    My Analysis of This Death

190.    In my opinion, this was a preventable death.

191.    Mr. Bonin experienced the initial cardiac arrest due to hyperkalemia (high potassium levels).  Hyperkalemia is a condition that all dialysis patients are at risk to develop.  The treatment for life-threatening hyperkalemia in someone with kidney failure is immediate dialysis.  However, Mr. Bonin's dialysis was discontinued early, and his potassium level was not checked again until after his cardiac arrest.

192.    The root causes of Mr. Bonin's preventable death included:

- Mr. Bonin's medical record contains at least twenty-one (21) refusal forms, all of which say that Mr. Bonin refused his medications and also refused to sign the refusal form.  None of these was witnessed by a

nurse.  I question whether this is credible.  Did Mr. Bonin really refuse all of these medications when offered?  Did he really refuse to sign the form when offered the opportunity to do so?  Or was something else going on here?  Nobody from medical ever took the time to ask Mr. Bonin why he was refusing or to counsel Mr. Bonin that his medications were important.

• Dr. Montgomery noted several refusals of dialysis that were not appropriately documented in the medical record.

• Lack of adherence to the policy of a face-to-face interaction with a practitioner following a refusal of a critical medical therapy.  The dialysis on October 21, 2022 was such a critical therapy because Mr. Bonin's Potassium level was so high.  Mr. Bonin may not have understood how important that particular dialysis was.  Had that counselling session occurred, Mr. Bonin more likely than not would have survived.

• Lack of communication between medical professionals.  Since the dialysis nurse knew that that dialysis was critical due to Mr. Bonin's dangerously high potassium level, when the dialysis was terminated early, the nurse should have communicated that fact to the physician.  Had that been done, Mr. Bonin likely would have survived.

• A repeat potassium level should have been done either the same day or the day after the aborted dialysis to determine what Mr. Bonin's potassium level was.  That potassium level should have been obtained even if Mr. Bonin had had a complete dialysis but especially more so after an aborted dialysis.

• Had that level been drawn, Mr. Bonin likely would not have died.

### 6.    Roselee Bartolacci (23713442), Died May 29, 2023

#### (a)    Events Preceding Death

193.    Ms. Bartolacci was booked April 6, 2023, at the age of 32.  At admission, she weighed 250 pounds.  SD_711592.  Ms. Bartolacci had severe mental illness that resulted in a lack of self-care, as described on April 11, 2023 by this psychiatric admission note: "she is seen in her cell, which is dirty and littered with trash.  Shaking while sitting naked on the cell floor, sucking on her finger.  Her clothes are scattered on the floor and appear to be covered in her feces."  This is corroborated by several nursing notes describing her appalling lack of self-care.  One example:  Registered Nurse Dennis DelRio documented on April 14, 2023 "Dried feces on her body and face.  Blankets are soaked with urine."  SD_711687.

194.    Ms. Bartolacci's main medical problem was that she ate and drank very

1    little.  She also was noted on several occasions to be vomiting.  *See, e.g.*,

2    SD_711704.  Dr. David Christensen prescribed the anti-nausea medication Zofran

3    for her on April 14, 2023 without seeing her.  SD_711698.

4        195.   NP Teresa Hurley went to Ms. Bartolacci's cell on April 15, 2023 and

5    noted her to be "naked/dirty" and actively vomiting.  SD_711703.

6        196.   Ms. Bartolacci reportedly "refused" a medical doctor evaluation from

7    Dr. Connie Orem on April 18, 2023 at her cell.  Dr. Orem noted that she had done

8    only a "[l]imited exam due to evaluation from cell door per request of deputy for

9    personal safety."  SD_711732.  No vital signs were done.  Notably, multiple notes in

10   Ms. Bartolacci's records from this time period state that "she is ***not*** physically

11   aggressive."  SD_711778; *see also* SD_711715 ("verbally aggressive but not

12   physically aggressive towards staff").  I therefore do not understand why Dr. Orem

13   could not enter Ms. Bartolacci's cell "for personal safety" reasons.

14       197.

15       198.   On April 26, 2023, the psychiatrist noted that "Pt has been lethargic,

16   laying on the floor of cell with minimal po (oral) intake," *i.e.*, she had little intake of

17   food or water.  The psychiatrist (*not the medical staff*) initiated a transfer to the

18   hospital, where Ms. Bartolacci was diagnosed with acute renal failure with tubular

19   necrosis (which is caused by severe dehydration), severe protein calorie

20   malnutrition, sepsis, and cardiac rhythm problems, among others.  Importantly, at

21   the hospital, Ms. Bartolacci weighed 217 pounds, SD_712599, representing a weight

22   loss of 33 pounds in 20 days.  Ms. Bartolacci was very sick; sick enough to require a

23   two week stay at the hospital to recover.

24       199.   Ms. Bartolacci returned to the Jail on May 10, 2023.  NP Lacey

25   Beaston reviewed her hospital records the day before.  NP Beaston noted that

26   Ms. Bartolacci had been anemic at the hospital and recommended "repeat labs to

27   ensure (hemoglobin) levels are not dropping."  SD_711873.  However, repeat labs

28   were never drawn at the Jail

1      200.   One day after she returned from the hospital, Ms. Bartolacci was

2  noticed again to be vomiting and not eating.  Dr. Christensen ordered the anti-

3  nausea medicine Zofran.  SD_711886.

4      201.   On May 11, 2023, a registered nurse "noted bilateral hand/feet

5  swelling.  Reported this to nurse practitioner Hurley." SD_711887.  I do not see any

6  indication that a practitioner ever addressed this concern.

7      202.   On May 18, 2023, Ms. Bartolacci was seen by Dr. Orem, who noted

8  "poor po intake, concern for dehydration renal failure, electrolyte abnormality."

9  SD_711906.  Dr. Orem sent Ms. Bartolacci back to the emergency room due to

10  concerns about "possible hydration and nutrition."  "Pt has not ate or drank fluids

11  for the past 48 hours.  Refusing all care.  Has a foul smelling urine that is dark

12  brown." SD_299696.

13      203.   The ER doctor noted that Ms. Bartolacci was "covered in urine and

14  feces" SD_595490.  CT scan and labs were normal.  Ms. Bartolacci was not

15  weighed at the emergency room.  Because her labs at that time were normal, she

16  was discharged from the hospital back to the Jail the same day, May 18, 2023.

17      204.   On May 24, 2023, a progress note from Dr. Christensen stated "Given

18  my inability to examine the patient, obtain vital signs or follow reliable I/O [intake

19  out], I am unable to assess her hydration status.  If patient is 5150 and unable to

20  refuse care, then obtaining (labs) would be helpful."  "I will order above labs.  It

21  will be incumbent upon the psychiatry team to determine if UOF [use of force] is

22  indicated to obtain them." SD_711982.  I see no evidence that the mandate for the

23  psychiatry team to determine whether a use of force should be initiated for the

24  purpose of obtaining labs was ever communicated to the psychiatry team.

25      205.   On May 24, 2023, Ms. Bartolacci was "force medicated" and "required

26  use of force by tac team." SD_711988; *see also* SD_711983.  This would have been

27  a great time to draw the labs that Dr. Christensen wanted, but no labs were drawn,

28  probably because the psychiatry team had never been told of Dr. Christensen's

1   order.

2       206.   On May 25, 2023, a dietician recommended weighing Ms. Bartolacci,

3   stating, "IP has no current weight since bk weight.  Please consider weight check."

4   SD_711989.  This recommendation was ignored.  No attempt was made to weigh

5   Ms. Bartolacci.  SD_711988.

6       207.   On May 29, 2023, Ms. Bartolacci was found unresponsive and without

7   a pulse.  CPR and other resuscitation efforts failed, and she was declared dead.[22]

8                    **(b)     The Jail's Analysis of This Death**

9       208.   On May 30, 2023, Dr. Rafi prepared a death summary but made no

10  recommendations.  NAPHCARE041734.  However, Dr. Rafi did not mention the

11  fact that Ms. Bartolacci had been hospitalized for ten days one month before she

12  died, which, to my mind, was critically important information.

13      209.   NaphCare's Health Services Administrator Mr. Ferrier also prepared a

14  death summary in which he noted "patient had history of sparse food and liquid

---

[22] An autopsy was done on Ms. Bartolacci by Debra Berry, MD on May 30, 2023.
Her death was determined to be "Complications of dilated cardiomyopathy" with
the contributing factor of "obesity."  The diagnosis of dilated cardiomyopathy was
based on "Dilatation of the right (5.6 cm) and left (5.5 cm) ventricles of the heart."
The term "obesity" was based on a weight at death of 210 pounds.  This is a
troubling autopsy result for a couple of reasons.

First, when Ms. Bartolacci was hospitalized one month before her death, she had a
cardiac work up including an echocardiogram done on May 1, 2023.  The
echocardiogram showed no dilated cardiomyopathy.  Specifically, the
echocardiogram report states "The left ventricle is normal size" and "The right
ventricle is normal size."  SD_595140.  The cardiologist who reviewed this noted
"The echocardiogram is reassuring.  SD_595140.  If Ms. Bartolacci did not have
dilated cardiomyopathy on May 1, 2023, but died of it on May 29, 2023, how did
she develop this lethal medical problem in four weeks?  I suspect that Dr. Berry did
not know that Ms. Bartolacci had been hospitalized for two weeks within a month of
dying or that she had had a cardiac work up at that time.

Second, Dr. Berry did not note in her autopsy report that Ms. Bartolacci had
weighed 250 pounds when she was booked on April 6th.  She therefore had a
documented weight loss of 40 pounds in less than two months.  Could that have
contributed to her death?  Dr. Berry does not say, probably because she did not
know about the profound weight loss.

In my opinion, the autopsy result does not excuse the medical management errors
made by the Jail medical team, as I describe here.

1  intake and medication refusals." Mr. Ferrier also made no recommendations.

2  NAPHCARE041728.

3      210.   The NaphCare M&M committee reviewed this case in detail on

4  June 19, 2023. NAPHCARE041703. I do not know if they saw either death review;

5  if they did, they did not mention it. The only recommendation of the NaphCare

6  M&M Committee was Quality Improvement Plan: "Seetal Tejura, Dr. Wade, and

7  Dr. Kelly to participate in a meeting with HSA & possibly San Diego County

8  corrections regarding documentation and monitoring of patients receiving ████

9  injections." NAPHCARE041718.

10     211.   Although documentation and monitoring of patients receiving ████

11 injections is important, I do not see how this was a Root Cause or even an important

12 factor in Ms. Bartolacci's death.

13              **(c)    My Analysis of This Death**

14     212.   In my opinion, Ms. Bartolacci's death was preventable. In fact, I find

15 Ms. Bartolacci's case to be is a particularly egregious case of medical neglect. All

16 the elements of collective neglect and inaction are present.

17     213.   First, the failure to track her weight. No one noted that Ms. Bartolacci

18 had lost 33 pounds between the time she was admitted to the jail and when she was

19 admitted to the hospital 20 days later. She was never weighed again at the Jail after

20 returning from the hospital on May 10, 2023, despite the recommendation of the

21 dietician that she be weighed. Had this been done, Ms. Bartolacci's ongoing

22 starvation may have been noticed. If it had been and a corrective care plan

23 incorporated into her overall treatment plan, Ms. Bartolacci may have survived.

24     214.   Second, the lack of communication between the medical and mental

25 health teams. Caring for complex patients with both psychiatric and medical

26 problems is difficult and requires communication, usually at a weekly case

27 conference to discuss the difficult patient and create a comprehensive care plan.

28 This was never done for Ms. Bartolacci. As an important example, Dr. Christensen

never communicated with the attending psychiatrist on May 24, 2023 that he needed lab work to be drawn to evaluate Ms. Bartolacci's medical status. I note that the hospital ERs never had any difficulty drawing any needed labs or obtaining needed imaging studies like a head CT. Likely, no psychiatrist ever read Dr. Christensen's note that "It will be incumbent upon the psychiatry team to determine if UOF is indicated to obtain" labs. Had that note been read or if Dr. Christensen had called the psychiatrist to discuss the case and need for labs, those labs would have been drawn, abnormalities noted, and Ms. Bartolacci may have survived.

215.   Third, the failure to advise or intervene following refusals of necessary care. To refuse necessary medical care, patients must be cognitively able to understand why the medical test was ordered, and what the potential risks are of not having that test. In my opinion, Ms. Bartolacci was clearly unable to meet this cognitive hurdle. I again note that the emergency room personnel did not have any problems obtaining necessary diagnostic labs.

216.   Fourth, the failure to examine the patient. During Ms. Bartolacci's entire stay, no medical practitioner ever examined her. Medications like Zofran were prescribed for her without any examination. This violated the medical standard of care.

217.   Fifth, the lack follow-through. For example, on May 10, 2023, NP Beaston recommended "repeat labs to ensure (hemoglobin) levels are not dropping." This was never done. On May 11, 2023, a registered nurse "noted bilateral hand/feet swelling." Bilateral hand and feel swelling can be an important finding and a "red flag" of a serious underlying hydration or electrolyte problem. However, although the abnormal swelling was reported to a Nurse Practitioner, no practitioner ever examined Ms. Bartolacci or even addressed this finding in any way.

218.   Overall, the medical staff documented her medical decline and death without significantly intervening—with the exceptions of sending Ms. Bartolacci to the hospital in April and on May 18, 2024. In my opinion, this was death by

1    medical neglect.

2        219.   Ms. Bartolacci's death is particularly disturbing in light of the

3    similarities to the death of another patient, Lonnie Rupard, who died at the San

4    Diego Central Jail on March 17, 2022.  *See* SD_025987-026008.  Mr. Rupard was a

5    46-year-old male, booked at the San Diego Central Jail on December 19, 2021.

6    During intake, his weight was 165 pounds.  His initial psychiatry sick call

7    evaluation progress note reported that he had a history of unspecified Schizophrenia

8    and other psychotic disorders.  Mr. Rupard's weight at autopsy was 105 pounds and

9    the forensic pathologist described him as "cachectic," meaning affected by extreme

10   weight loss and muscle wasting.  This indicates that Mr. Rupard had lost 60 pounds

11   from the time of arrest until his death three months later.  The medical examiner's

12   report also documents that malnutrition and dehydration in the setting of neglected

13   Schizophrenia as contributing factors in Mr. Rupard's death.  Despite Mr. Rupard's

14   mental health problems, he was permitted to remain in his cell without any medical

15   intervention while he lost 60 pounds between the time of his arrest and date of

16   death.  It is unclear if medical/mental health staff even observed that he was losing

17   weight between December 19, 2021, and their last progress/sick call note on

18   February 22, 2022.  According to medical records, Mr. Rupard was not seen by

19   medical/mental health staff between February 23, 2022, and his date of death,

20   March 17, 2022.  In the autopsy report the medical examiner wrote, "Ultimately this

21   decedent was dependent upon others for the care; therefore, the manner of death is

22   classified as homicide."

23       220.   Mr. Rupard's case is clearly very similar to Ms. Bartolacci's case.  Yet

24   the Jail apparently learned no lessons from Mr. Rupard's case—as they allowed

25   another patient, Ms. Bartolacci, to die under similar circumstances.

26          **7.       Erica Wahlberg (22726497), Died July 2, 2022**

27                  **(a)       Events Preceding Death**

28       221.   Erica Wahlberg was booked into the Jail on June 27, 2022, at around

1  3:00 p.m., at the age of 41.  Ms. Wahlberg had a past history of uncontrolled

2  hypertension, known from previous Jail stays.

3      222.   At her Medical Clearance, Ms. Wahlberg was found to have a blood

4  pressure of 169/119.  Her urine drug screen was positive for fentanyl,

5  methamphetamine, and MDMA (Ecstasy).  SD_014720.  MSD Operations Manual

6  No. E.2.1 ("Receiving Screening") states that an "Elevated diastolic blood pressure

7  of (equal or greater than) 120" will result in a gate refusal, which means the person

8  must be sent to the emergency room without being admitted into the Jail.

9  Ms. Wahlberg's diastolic blood pressure was recorded at 119, just one point under

10  the cut-off for a gate refusal.  SD_014683.  In other words, had Ms. Wahlberg's

11  blood pressure been one point higher, she would have been sent immediately to the

12  emergency room.

13      223.   Later the same day, Ms. Wahlberg was seen by a registered nurse

14  whose evaluation "noted elevated blood pressure but asymptomatic, also with

15  multiple positive drug test results."  This RN did not remeasure Ms. Wahlberg's

16  blood pressure, though this is standard in any medical setting to see how the blood

17  pressure is trending over time.  SD_014704.

18      224.   Just over an hour after she was booked, a STATCare nurse practitioner

19  ordered five days' worth of blood pressure checks and "Clonidine 0.1mg po BID."

20  Clonidine is a medication used in this circumstance to treat high blood pressure.

21  SD_014707.  Ms. Wahlberg reportedly refused to take any of her evening

22  medications, including clonidine, when they were offered to her at 8:26 p.m.

23  SD_014708.  The refusal form leaves blank the reason for the refusal.  SD_014740.

24      225.   On June 28, 2022 at 12:32 a.m., Ms. Wahlberg's blood pressure was

25  164/107.  A STATCare Corporate physician's assistant ordered Buprenorphine but

26  no other treatment for hypertension and did not address high blood pressure.

27  SD_014708.

28      226.   On June 28, 2022 about 2:15 a.m., Ms. Wahlberg's blood pressure was

1  higher at 174/121, and she was noted to be "sweating, drowsy but arousable."  She

2  was given buprenorphine and clonidine.  The nurse did not contact a practitioner.

3  SD_014710.

4       227.   Later that day, Ms. Wahlberg's blood pressure was higher still at

5  171/136 (SD_014714), and it was noted that "the patient has further decompensated

6  with altered mental status."  A STATCare nurse practitioner authorized a transfer to

7  the emergency room at around 3:55 a.m.  SD_014712.

8       228.   At the hospital, Ms. Wahlberg was noted to be "significantly

9  hypertensive" and had admitted methamphetamine use.  She was treated with Ativan

10  and a labetalol drip for her hypertension (Labetalol given by intravenous drip is a

11  medication used to treat blood pressures so high as to constitute a medical

12  emergency).  SD_014751.  At around 5:35 a.m., Ms. Wahlberg went into cardiac

13  arrest.  SD_014753.  She was transferred to the ICU.  Despite efforts at treatment in

14  the ICU, she deteriorated over several days and was declared dead on July 2, 2022.

15       229.   On June 30, 2022, Dr. Christensen reviewed Ms. Wahlberg's blood

16  pressure readings: "BP reviewed.  Essential HTN.  Lisinopril ordered."  However, at

17  that time, Ms. Wahlberg was dying in the ICU.  SD_014713.

18       230.   Ms. Wahlberg's autopsy report listed the cause of death as "Acute

19  Fentanyl … and methamphetamine intoxication."  SD_050229.

20            **(b)**     **The Jail's Analysis of This Death**

21       231.   Dr. Rafi made no pertinent recommendations in her Death Review.

22  NAPHCARE041358.

23       232.   The NaphCare M&M Committee reviewed Ms. Wahlberg's case on

24  July 18, 2022.  They also had no recommendations.

25            **(c)**     **My Analysis of This Death**

26       233.   In my opinion, Ms. Wahlberg's death was preventable.  Several

27  mistakes in medical management were made.  These mistakes should have been

28  identified by the M&M Review process and acted on to ensure that they would not

1   be repeated in the future.

2       234.   First, Ms. Wahlberg should have been sent to the ER at 2:15 a.m., when

3   her blood pressure was 174/121, and she was "sweating" with an altered mental

4   status.  This blood pressure and presentation at booking (less than 12 hours

5   previously) should have resulted in a Gate Refusal.  However, the nurse did not

6   contact a practitioner at that time or at 2:15 a.m.  This was a medical mistake.  Since

7   time is important in resuscitating patients like Ms. Wahlberg, it is possible that she

8   may have survived had she been sent to the Emergency Room at 2:15 a.m. rather

9   than approximately two hours later.

10      235.   Second, Ms. Wahlberg's very high blood pressure readings were

11  medically mismanaged.  Ms. Wahlberg had a very high blood pressure at booking

12  and throughout her time at the Jail.  The therapy prescribed for this, clonidine 0.1mg

13  po BID was clearly ineffective in lowering her blood pressure.  This is not

14  surprising since clonidine is a poor blood pressure medication.  The hypertension

15  guidelines of the America Heart Association do not recommend clonidine as a first

16  line option for treating hypertension or even a second line option.  It is a "last line"

17  agent.  *See* Guideline-Driven Management of Hypertension, An Evidence-Based

18  Update.  American Heart Association, p. 44.  There are several reasons that

19  clonidine is a poor choice for blood pressure management, but one especially

20  important reason in the case of Ms. Wahlberg is that clonidine has a short half life.

21  If used as a blood pressure medication, it needs to be given four times a day.  Giving

22  it twice a day results in its effects wearing off at around four to six hours—resulting

23  in rebound hypertension for the next six hours until it is given again.  First line

24  medications for high blood pressures are (1) Calcium channel blockers like

25  amlodipine, (2) ACE inhibitors/ARBs like lisinopril or losartan , and (3) Thiazide

26  diuretics like Hydrochlorothiazide (HCTZ).  With especially high blood pressures

27  like Ms. Wahlberg's, proper medical therapy would be to begin two of these three,

28  such as lisinopril and HCTZ, which are conveniently packaged together in a single

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    pill that is on the NaphCare formulary.  NAPHCARE037056.

2        236.    Third, no medical practitioner ever examined Ms. Wahlberg at the Jail

3    face-to-face.  She was clearly very sick, barely missing the criteria for a Gate

4    Refusal by 1 point (her diastolic blood pressure was 119, where 120 would have

5    mandated a gate refusal).  There was a practitioner on-site at that time (3:00 p.m.).

6    That practitioner should have seen Ms. Wahlberg.  However, the Jail's practice is to

7    rely on remote STATCare practitioners rather than those practitioners who are on

8    site.  As discussed later in this Report, I believe that the Jail over-relies on

9    STATCare to the detriment of some patients, like Ms. Wahlberg.

10        237.    Finally, Dr. Christensen reviewed Ms. Wahlberg's blood pressures and

11    ordered lisinopril for her on June 30, 2022.  However, Ms. Wahlberg had been

12    hospitalized for two days at that point.  This points to communication problems

13    within the electronic medical records, TechCare.  How is it that Dr. Christensen was

14    not automatically notified that Ms. Wahlberg was in the hospital?  This was not a

15    factor in her death, but it did point to a weakness in the electronic medical record

16    that could have been identified by the M&M Committee and potentially fixed.

17        **D.    Repeated Root Causes of Death in These Case Studies**

18        238.    I identified several root causes that appear again and again in these

19    seven cases.  These include:

20            a.    Patients who were clearly ill were not ever examined by a

21    medical practitioner during their stay at the Jail.

22            b.    Practitioners do medical evaluations at the patient's housing cell

23    instead of seeing the patient in the medical clinic.  As a result, the practitioners do

24    inadequate evaluations.

25            c.    Practitioners order medications and diagnose medical conditions

26    without seeing or examining the patient.

27            d.    Reported refusals are a big problem in the Jail that leads to

28    inadequate medical care.  Nurses do not witness refusals when the patients allegedly

refuse to sign the refusal form.  They rely on security staff, in violation of Sheriff's Department Policies and Procedures.  Medical staff accept refusals from patients who are not competent to refuse necessary medical care and do not follow the Jail's own policies and procedures regarding counselling patients who refuse necessary medical care.

e.    Communication errors have resulted in unnecessary medical deterioration of patients.  This includes communication errors between nurses and practitioners, between practitioners and other practitioners, between medical and mental health staff, between medical staff and security staff.

f.    When patients go to the hospital and return, the Jail medical staff do not adequately review the hospital records, and do not create a care plan for the returning patient based on the hospital findings and recommendations.

239.   Notably, many of these observations are not new.  For example, the Jail's problem of inappropriately documenting refusals has been noted by multiple experts and entities in reports since 2017.  However, the Jail still has not fixed this problem, nor do they even appear to register it as a root cause of these deaths.  As a result of the Jail's persistent failures to address these known problems, preventable deaths continue to occur.

**E.    Additional Deaths in the Jail**

240.   In addition to the deaths I studied and described above, I am aware of a number of deaths at the Jail reported in the press and to the Citizens Law Enforcement Review Board.[23]

a.    In March 2023, **Hayden Schuck**, age 22, died in Central Jail approximately five days after his booking.  Although his blood pressure and pulse rate were abnormally high at intake, Mr. Schuck was placed in a temporary holding cell for nearly five days without medical attention.  He was removed for his

---

[23] These summaries are based on the news articles cited herein, not on my own analysis of the medical records.

1  arraignment, during which Mr. Schuck was unable to confirm his name or date of

2  birth and fell to the floor multiple times.  Nevertheless, upon return to the jail, he

3  was placed in a single occupancy cell and found unresponsive the following

4  morning.  Mr. Schuck's family has filed a lawsuit.[24]

5          b.      In February 2023, **Gilbert Gil** died in a holding cell at Vista

6  Detention Facility within 20 hours of intake.  Mr. Gil was arrested on suspicion of

7  being under the influence.  His family says early on-set dementia and diabetes

8  caused his erratic behavior.  At intake, Mr. Gil was unable to sign paperwork.  His

9  blood sugar was found to very high.  He was given insulin and placed in a holding

10 cell because the sobering cell was occupied.  No one checked on him in the fourteen

11 hours between when he was given the insulin and when he was found unresponsive

12 in his cell.  His daughters filed a wrongful death lawsuit in May 2023.[25]

13         c.      In April 2022, **Jarrell Lacy** died in Central Jail.  Mr. Lacy was

14 suffering shortness of breath in his cell for 30 to 45 minutes before deputies

15 responded.  A nurse was in the process of alerting medical staff of the need for an

16 emergency room transport, but Lacy was instead returned to his cell via wheelchair

17 and found unresponsive minutes later.[26]

18         d.      In July 2021, **Saxon Rodriguez**, age 22, died at Central Jail four

19

---

20 [24] Kelly Davis, *What happened before Hayden Schuck, 22, died in San Diego jail?*
21 *Family's lawsuit says warning signs were missed*,  SAN DIEGO UNION-TRIBUNE,
   May 4, 2023.  https://www.sandiegouniontribune.com/news/watchdog/story/2023-
22 05-04/hayden-schuck-death-lawsuit-jail.

23 [25] Kelly Davis, *Despite known medical problems, 67-year-old was ignored for hours*
   *before he died in Vista jail, lawsuit argues*,  SAN DIEGO UNION-TRIBUNE,  May 19,
   2023.  https://www.sandiegouniontribune.com/news/watchdog/story/2023-05-
24 19/despite-known-medical-problems-67-year-old-was-ignored-for-hours-before-he-
   died-in-vista-jail-lawsuit-argues.

25 [26] Jeff McDonald, *Minutes before dying in jail, man was sent back to cell instead of*
26 *ER, independent probe finds*,  SAN DIEGO UNION-TRIBUNE,  October 17, 2023.
   https://www.sandiegouniontribune.com/2023/10/17/minutes-before-dying-in-jail-
27 man-was-sent-back-to-cell-instead-of-er-independent-probe-
   finds/#:~:text=Minutes%20before%20dying%20in%20jail,jail%20in%20Downtown
   %20San%20Diego.&text=Minutes%20before%20dying%20Jerrell%20Dwayne%20Lacy,the
28 %20results%20of%20his%20electrocardiogram.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    days after his arrest.  The CLERB report concluded "there is no doubt that

2    Rodriguez, while as an incarcerated person in the custody and under the care of the

3    Sheriff's Department, acquired and took fentanyl and methamphetamine, which

4    resulted in his death."  One to two hours elapsed between when deputies last saw

5    Mr. Rodriguez alive and when he has found unresponsive in his bunk.  According to

6    the autopsy report, medical staff believed there was a chance he could have been

7    revived.[27]

8         e.    In January 2021, **Omar Moreno Arroyo** died at Central Jail

9    hours after his arrest.  During booking, Arroyo underwent a body scan to determine

10   if he had ingested anything improper.  The results of the scan appeared to show an

11   anomaly, but the deputy did not appear to review the results, nor did he order a

12   secondary scan.  Had the material been identified as an illicit substance, Arroyo

13   would have been placed under closer observation.  Instead, Arroyo was placed in a

14   cell where more than an hour elapsed between when he collapsed and when deputies

15   found him.  The autopsy revealed he died from an airway obstruction with acute

16   methamphetamine intoxication as a contributing factor.  His family filed a wrongful

17   death lawsuit.[28]

18        f.    In February 2019, 32-year-old **Michael Wilson** died in the

19   custody of the San Diego Sheriff's Department.  Despite the Sheriff's Department's

20   undisputed awareness of his medical condition, and Mr. Wilson's need for four

21   necessary heart medications, Mr. Wilson died of congestive heart failure after Jail

22   staff failed to administer the required medications to Mr. Wilson.  *See Estate of*

23

24   ─────────────────────

25   [27] Kelly Davis, *Oversight Board Blames Overdose Death on Sheriff's Department Failure to Keep Drugs out of Jails*, SAN DIEGO UNION-TRIBUNE,  Dec. 15, 2022.
26   https://www.sandiegouniontribune.com/news/watchdog/story/2022-12-15/saxon-rodriguez-jail-death-drugs-clerb.

27   [28] Kelly Davis and Jeff McDonald, *Four sheriff's deputies faulted in San Diego County jail death*, SAN DIEGO UNION-TRIBUNE, March 8, 2022.
28   https://www.sandiegouniontribune.com/news/watchdog/story/2022-03-08/four-sheriffs-deputies-faulted-in-san-diego-county-jail-death-l.

1  *Michael Wilson v. County of San Diego*, S.D. Cal. No. 3:20-cv-00457-RBGM-DEB.

2          g.      In November 2019, **Elisa Serna** died at Las Colinas Detention

3  Facility.  Upon booking, Ms. Serna reported that she was addicted to heroin and

4  alcohol and that she had used drugs two hours prior.  Initially, despite vomiting for

5  multiple consecutive days, Ms. Serna was not placed on withdrawal protocol.  Four

6  days after booking, she was transferred to a medical observation bed and given

7  medication for her withdrawal.  Two jail personnel watched as she suffered a

8  seizure, struck her head and fell unconscious onto the floor of her cell.  They left the

9  cell without providing any medical treatment.  Ms. Serna died shortly thereafter.

10          h.      Ms. Serna's death was the subject of two unsuccessful criminal

11  prosecutions.  Her family's wrongful death lawsuit resulted in the largest wrongful

12  death settlement ever approved by the San Diego County Board of Supervisors, $15

13  million, plus promises by the County to change the way it addresses withdrawal.[29]

14      241.   Multiple other lawsuits are still pending against the Jail seeking

15  damages for deliberate indifference, including by the families of Roselee Bartolacci,

16  Brandon Yates, Michael Wilson, and Lonnie Rupard.[30]

17      242.   As these individual deaths illustrate, despite being the subject of

18  scrutiny for several years, the Jail's system for the delivery of medical care is still

19  broken.

20  / / /

21  / / /

22  / / /

23

24  _____

[29] *See* Jeff McDonald, *San Diego County settles Elisa Serna jail death lawsuit for
25  $15 million, and limited federal oversight*, SAN DIEGO UNION-TRIBUNE, July 2, 2024
     https://www.sandiegouniontribune.com/2024/07/01/san-diego-county-settles-elisa-
26  serna-jail-death-lawsuit-for-15-million-and-limited-federal-oversight/.

[30] Jeff McDonald, *After record $15 million settlement, San Diego County still
27  confronts a slew of other jail-death lawsuits*, SAN DIEGO UNION-TRIBUNE, July 7,
     2024 https://www.sandiegouniontribune.com/2024/07/07/after-record-15-million-
28  settlement-san-diego-county-still-confronts-a-slew-of-other-jail-death-lawsuits/.

**II.**  **The Sheriff's Department's Inadequate Screening and Intake Process Fails to Identify and Treat Medical Care Problems of Newly Arriving Incarcerated People, Placing Them at Substantial Risk of Significant Harm**

243.   It is my opinion that the Sheriff's Department fails to timely and adequately identify and treat the medical issues of newly arriving incarcerated people during the screening and intake process, and it fails to adequately train or supervise intake staff to do the same.

244.   The accepted *minimum* standard for the evaluation of the health needs of newly booked incarcerated people is laid out in the NCCHC's *Standards for Health Services in Jails*.

245.   These standards require first: a medical evaluation of patients at booking to establish whether they are medically able to be incarcerated and what urgent health care needs they have.  Second, a more thorough Health Assessment should be done within 14 days of incarceration at the latest.

246.   It is worth emphasizing that these are minimal standards designed for small jails that do not have medical personnel on site 24/7.  Large jails that have medical personnel onsite 24/7 should aspire to do more than the minimal standards designed for small jails.  In particular, it is my opinion that waiting 14 days to do a health assessment is not appropriate and constitutes substandard care in a jail with medical staff onsite 24/7.

247.   Unfortunately, the San Diego Jail has consistently failed to comply with even the bare minimal requirements of the Standard of Care.

248.   There are three sets of policies and procedures for intake screening and health assessments in the Jail: the MSD Operations Manual on "Receiving Screening" (No. E.2.1); the Sheriff's Department Detention Services Bureau policies and procedures on "Receiving Screening" (DSB P&P M.9); and NaphCare's policies and procedures on "Receiving Screening" and an "Initial

1  Health Assessment."  NaphCare  P&P E-02, E-04.[31]

2      249.   The NaphCare Contract has similar provisions.  Section 2.3.2.1 of that

3  contract states: "This Health Assessment will typically be completed during the

4  intake process for each patient and will always be completed within 14 days."  But

5  based on my chart review, as discussed below, the Health Assessment is never

6  completed during the intake process and is regularly not completed within 14 days

7  around of the time.  Section 2.3.2.4 of the contract refers to some patients having a

8  Health Assessment completed by a medical practitioner.  This does not ever happen

9  per my review.  The NaphCare contract, section 2.3.1.1, also states:  "Patients with

10  chronic illnesses will be identified during the Receiving Screening and enrolled in a

11  chronic care clinic."  This rarely happens based on my review of charts.

12      250.   As explained above, the fact that different policies and procedures

13  apply to different Jail staff, and that there is confusion as to whether or how these

14  policies and procedures conflict, contributes to significant dysfunction in the Jail's

15  health care system.  For example, the Detention Services Bureau policy states that

16  "[c]ertain types of medications" that someone has with them at the time of their

17  arrest "may be allowed into the detention facility with prior approval from health

18  staff."  DUNSMORE0039683.  However, the Medical Services Division policy does

19  not provide *any* indication that medications in the arrestee's possession might be

20  allowed into the facility, or what standards healthcare staff should apply when

21  deciding whether to approve a medication; the policy states only:  "An inventory of

22  the individual's prescription medication (if any) will be completed by the RN and

23  stored in the individual's property."  MSD Operations Manual No. E.2.1, November

24  4, 2022, SD_027121.  Similarly, although the NaphCare policy requires that a

25  patient's receiving screening include "[o]bservation of … lesions, jaundice, rashes,

26

27  [31] Some versions of NaphCare's "Health Care Policy & Procedure Manual,"
   including the version as of August 30, 2023, omit Policy E-02 ("Receiving
28  Screening").

1  infestations, bruises, scars, tattoos, and needle marks or other indications of drug

2  abuse," NaphCare P&P E-02, February 23, 2022, NAPHCARE001178, the Medical

3  Services Division policy requires "observation and a physical assessment" only "if

4  necessary." MSD Operations Manual No. E.2.1, Section II.B, May 11, 2022,

5  SD_367461.

6      251.  The documents I reviewed show that the medical intake process at the

7  Jail in practice can be divided into four parts. Three of the four have a

8  corresponding form in TechCare consisting mainly of check boxes. I found

9  problems with the Sheriff's Department's practices at each step of the process.

10      **A.  Step One:  Medical Clearance**

11      252.  The first part of the intake process is "medical clearance," in which an

12  RN evaluates the incoming arrestee to see if they are medically able to be admitted

13  to the jail. The Sheriff's Department Operations Manual Medical Services Division

14  defines "Medical Clearance" as "a documented clinical assessment of medical,

15  dental, and mental status before an individual is admitted into the facility." MSD

16  Operations Manual, No. E.2.1, November 4, 2022, SD_000343. The Operations

17  Manual lists several conditions and findings (such as abnormal vital signs) that must

18  be sent to the hospital emergency department before further evaluation is done.

19  SD_000344. This process is guided by the short "medical clearance" form in

20  TechCare that the RN on duty fills out. NaphCare P&P, A-08, May 29, 2023,

21  NAPHCARE000715. In that form, the RN must measure vital signs and ask about

22  specific incidents which would trigger a need for an ER visit prior to incarceration.

23  If the RN determines that the patient must go to the hospital ER first for an urgent

24  evaluation of a medical condition, this is called a "gate refusal."

25      253.  The RN also has the option of referring the patient directly to a

26  sobering cell or to the Inmate Safety Program ("ISP") before the patient proceeds to

27  a receiving screening. While there are written guidelines in the MSD Operations

28  Manual and the NaphCare policies and procedures about when to issue a "gate

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

refusal," I have seen no specific policies and procedures about the criteria that must be met for a patient to skip the receiving screen and go directly to a sobering cell or ISP. This, evidently, is left to the discretion of nursing.

**B.    Step Two:  Receiving Screening**

254.   If the patient passes the medical clearance, the same RN who did the medical clearance performs a "receiving screening." The receiving screening consists of more questions about the patient's medical history, mental health history, and medications. The patient's answers are documented by checking boxes on the "receiving screening" form in the electronic medical record. The receiving screening does not entail any significant physical examination. At the end of the receiving screen, the RN can refer the patient for a "second stage nursing evaluation," send the patient to a sobering cell, or "clear to classification." I have seen no specific policies and procedures about what triggers each of these outcomes; the decision appears to rely mostly on the RN's discretion.

255.   The reliance on nursing discretion in the first two steps of the intake process is problematic. It is problematic because anything that is left solely to discretion without adequate training or guidance in written policy invariably leads different nurses to make different decisions. This in turn leads to patients who should receive the same care instead receiving different care depending on who happens to see them. It can harm patients when certain nurses exercise poor judgement, whether because they have not been adequately trained, have no guidance in written policy, or are just having a bad day. In addition, I have seen no mechanism set forth in policies and procedures to track the performance or decisions of nursing staff.

256.   Further, the referral for a second stage nursing evaluation is made by simply checking a box on the "receiving screening" form. I saw nothing on the form requiring nurses to identify exactly why a second stage evaluation had been ordered, which will lead to a lack of sufficient documented information for nurses

1  conducting second stage evaluations.  A haphazard system of communication like

2  this can lead to confusion about why the patient needs to be seen, and so lead to

3  poor medical care.

4  **C.    Step Three:  Second Stage Nursing Evaluation**

5  257.   After the receiving screen, some patients go through the "second stage

6  nursing evaluation."  This typically is conducted by a different RN than the one who

7  completed the medical clearance and receiving screen, and who is supposed to have

8  more time to ask follow up questions about positive answers to the receiving

9  screening, such as details about medications and medical problems.  The second

10 stage nurse *may* conduct a physical examination, but is not required that they do so.

11 The second stage nurses do not consistently document why a patient is referred for a

12 second stage evaluation, nor is there a TechCare form for RNs to complete at this

13 stage.  Rather, the nurse completing the second stage evaluation documents the

14 evaluation in a SOAP note.

15 258.   The "Second Stage Nursing Evaluation" is not mentioned by name in

16 the Sheriff's Department Operations Manual, but may be referenced in E.2.1.V

17 NURSE ASSESSMENT PROTOCOL.  MSD Operations Manual, No. E.2.1,

18 Section V, November 4, 2022, SD_000348.  However, the Nurse Assessment

19 Protocol requires that the nurse "[p]erform a focused physical assessment based on

20 the individual's clinical presentation," and this happens rarely in Second Stage

21 Nursing Evaluations.

22 259.   For example, my review of the records showed that RN Maria Tamayo

23 did the Receiving Screening on patient ███████ on ███████ 2023.  San Diego

24 County Sheriff's Department, Receiving Screening, ███████ 2023, SD_747298.

25 RN Tamayo referred Mr. ██████ for a Second Stage Nursing Evaluation, but there is

26 no indication of why this referral was made.  *Id.*  SD_747321.  Whatever the reason

27 was, the Second Stage Nursing Evaluation did not occur because it was "cancelled

28 due to earlier scheduled appointment."  *Id.*

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

260.   The second stage nurse is also responsible for communicating with a practitioner to get medications approved.  This is exclusively done electronically via STATCare using remote practitioners elsewhere in the country.  If contacted, the remote STATCare practitioner fills out a "STATCare Intake Assessment and Orders" form.  This form has dropdown menus with checkboxes for orders for various conditions.  At the end of the second stage evaluation, medical patients are sent to a sobering cell or other housing.  At this point, the nurse may schedule the patient on for a future evaluation by a practitioner (*e.g.*, a doctor, nurse practitioner or physician assistant), or not, at the nurse's discretion.

**D.      Step Four:  14-Day Health Assessment**

261.   The fourth stage of the intake process is the "health assessment."  This evaluation is also done by an RN.  The minimal standard of care under the NCCHC standards requires that the Health Assessment be done within 14 days *at the latest*. However, that 14-day grace period is meant for small jails without 24/7 medical personnel.  In my opinion, jails with 24/7 availability of medical personnel should not delay the full Health Assessment for 14 days.

262.   The NCCHC Technical Assistance Report recommended that the Jail take either a "full population assessment" approach, which requires a health assessment within 14 days, or an "individual population assessment" approach, which requires a health assessment within two days of the initial booking.  NCCHC Technical Assistance Report, DUNSMORE0260637-0638.  Dr. Homer Venters acknowledged that these two approaches were available, but noted that "jail systems that take a public health approach" conduct an assessment "routine[ly] for every newly admitted patient at the time of intake."  Venters Report, SD_214372.  He further explained that "wait[ing] up to 14 days" for this full assessment "generally results in at least half of all people admitted to the jail leaving without this encounter."  SD_215361.  I agree that performing an individual health assessment for every incarcerated person as part of the initial booking would be a far superior

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

process to ensure adequate care for incarcerated people, who, as a group, are more likely to have medical issues that require provider intervention than the general population.

263.   When I was a jail medical director, we conducted the health assessment as soon as possible, usually within one to three days in the larger facilities and within seven days in the small facilities.

264.   Other jails comparable in size to the San Diego Jail do the health assessment at booking.  One example is the Salt Lake County jail in Salt Lake City, Utah.

265.   However, the Sheriff's Department has chosen not to take the "public health approach" outlined by Dr. Venters and instead to defer a full health assessments for 14 days.  This is not a best medical practice.  I cannot imagine a reasonable medical basis for the Sheriff's Department's decision to wait for 14 days (or longer) before doing a health assessment.  In my opinion, that decision more likely than not was not made for cost-saving reasons.

266.   Unfortunately, the Sheriff's Department has failed to adequately meet even this minimal 14-day standard.  The NCCHC Technical Assistance Report emphasized the importance of the timeliness of a full health assessment, stating that it "will typically be completed during the intake process and will *always* be completed within 14 days."  This sentence is repeated verbatim in the County's contract with NaphCare, NAPHCARE000567, and Dr. Montgomery confirmed it is a "great standard" that "provides great care for [] patients."  Montgomery II Tr. at 146:2-3.

267.   The Sheriff's Department has failed to implement this standard properly.  Although it is the Jail's "goal" to try to complete the health assessment within 14 days of booking, this is not set forth in any written policies and procedures.  Montgomery II Tr. at 145:15-146:9; Rognlien-Hood Tr. at 26:12-28:21. Further, health care staff frequently fail to perform a health assessment within 14

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

days after a patient is booked in the Jail, and, of course, many patients are released before they receive a full health assessment.  Ms. Rognlien-Hood testified that when she became the Director of Nursing, she made it a priority to try to get the health assessments done within 14 days.  This emphasis began, per her testimony, in March of 2023.  Rognlien-Hood Tr. at 27:4-8  Dr. Montgomery confirmed that it "remains to be seen" how frequently the Sheriff's Department is able to timely complete the health assessments.  Montgomery II Tr. at 146:4-9.  Ms. Rognlien-Hood and Dr. Montgomery could not provide clear estimates of how frequently the health assessments in fact are completed within 14 days, but suggested the compliance rate could be as low as 75 – 80 percent.  (Rognlien-Hood Tr. at 100:4-10; Montgomery II Tr. at 146:10-25).

268.    This means many patients are being missed.  My review showed cases where health assessments were completed after the 14-day mark, for example: ████ ████ was booked ████████ 2023, and staff did not complete her initial health assessment until ████████ 2023.  SD_781311.  ██████████████ was booked on ████████████ 2023, and staff did not complete his initial health assessment until ████████ 2023.  SD_759408.  ██████████ was booked on ████████ 2021, and staff did not complete his *initial* health assessment until ████████ 2023, more than two years later.  SD_776280.

269.    As with many aspects of the deficient health care in the Jail, understaffing appears to be a significant reason for the failure to complete health assessments within fourteen days.  Ms. Rognlien-Hood communicated to her supervisors on February 22, 2023 that "[m]eeting this standard [for 14-day health assessments] will … just take the manpower," including sworn staff "be[ing] efficient."  Email from Serina Rognlien-Hood to Carl Darnell et al., February 22, 2023, SD_375921-23.  The Jail has been developing a "workflow" to meet this standard since at least 2022 and still routinely fails to meet it.  SD_375922.

270.    There are several problems with this multi-step intake process.  First,

1   even under the Sheriff's Department's "goal" program of completing a health

2   assessment within 14-days—which is not currently happening—at no point is every

3   incarcerated person examined by a practitioner as part of the intake process. Rather,

4   at each step of the assessment described above, the examination is conducted by an

5   RN. Almost all practitioner involvement in intake is done electronically through

6   STATCare.

7       271.    The NCCHC Technical Assistance Report recommended that nurses

8   complete the initial Health Assessment on all patients "soon after booking" as part

9   of the Second Stage Nursing evaluation. SD_060170-71. Dr. Venters similarly

10  recommended that all patients with a significant medical history (in other words, all

11  patients currently referred for a second stage evaluation) be seen in person by a

12  medical practitioner. SD_215371-72. I agree with this recommendation, but that is

13  not what the Jail does as a matter of policy or practice. According to the County's

14  contract with NaphCare, patients are to be evaluated based on medical information

15  obtained during the receiving screening as to the medical necessity of conducting a

16  health assessment by a provider. Contract No. 566117, § 2.3.2.4,

17  NAPHCARE000567-68. In the approximately 80 charts I reviewed, I did not see a

18  single instance of a medical practitioner doing an in-person examination of a patient

19  during intake. I also identified several patients who should have been seen face-to-

20  face by a medical practitioner based on their medical problems and complaints, but

21  were not seen. One example is Raymond Dix (22737506), who was admitted to the

22  Jail on September 6, 2022. Mr. Dix had a medical history that included congestive

23  heart failure, chronic atrial fibrillation, hypertension, COPD and others. He died in

24  custody on September 13, 2022. He never had a full Health Assessment done. He

25  was never examined by a medical practitioner. A second example is ███████

26  (███████ who was booked on ███████ 2023. Despite a history of type 2

27  diabetes and being inappropriately placed on insulin, Mr. ███ was never examined

28  by a medical practitioner.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

272.   Rather, as explained, the only involvement of medical practitioners during the intake process in the vast majority of cases is electronic, relying on STATCare practitioners working elsewhere in the country.  Experts from the NCCHC, Dr. Venters, and now I, agree that this intake system is sub-optimal.

273.   Medical practitioners who actually see and talk to incoming patients with medical problems would be able to assess problems and prescribe appropriate treatment and formulate a treatment plan with a degree of competency and thoroughness that is lacking in the current system.  Nurses do not have the training or expertise to provide comprehensive care in this context, and the STATCare practitioners elsewhere in the country cannot act with the required degree of competence since they never talk to their patients or examine them.  They rely instead on drop-down menus in TechCare that often are not a good fit for the individual patient under consideration.  It is no wonder that so many mistakes are made that would not be made if on-site practitioners talked to and personally examined their patients just as is done everywhere in medical practice outside of the Jail.

274.   Second, although the second stage nurse evaluation is the *de facto* final step in the intake process (given that the 14-day health assessment is not occurring as planned, nor is it described in any policy), I did not identify anything in the Jail's policies and procedures setting forth how the second stage evaluations should be done.  These are treated like a Nurse Sick Call clinic visit.  But a second stage evaluation is not a nurse sick call clinic, nor do the nurses treat it as such.  For example, they do not typically fill out a Standardized Nursing Procedure Form.  Instead, the Second Stage Evaluation is an opportunity to take more time to delve more deeply into a patient's medical history, by doing a more detailed history and conducting a physical examination.  The fact that a patient can go through this entire process and never have a physical examination done, no matter how significant their medical problems are, is a significant lapse.  Dr. Venters gives an example of how a patient with asthma should have an examination of the lungs and a peak flow test

1    done as part of the booking process.  SD_215361.  This is not done now as part of

2    the Jail booking process.

3        275.    A Second Stage Nursing Evaluation should not be documented on a

4    SOAP note.  Many patients referred for a Second Stage Evaluation have multiple

5    medical issues that need to be evaluated.  A SOAP note is designed to document a

6    response to one problem or complaint.  The Second Stage Evaluation should be

7    guided by both a formal Policy and Procedure in the Sheriff's Department's MSD

8    Operations Manual and a specific form that guides the evaluation process.  Neither

9    exist at present.

10       276.    Third, in my review of presentations from CQI meetings, I did not

11   identify any CQI data on Second Stage Evaluations.  This suggests to me that there

12   is no significant training for or supervision over this important process.  Supervision

13   is critical because Second Stage Evaluations, which are done on patients with signi-

14   ficant health problems, are performed by nurses, not medical practitioners.  Since

15   the Sheriff's Department chose to ignore Dr. Venters' advice to have these patients

16   seen face-to-face by a practitioner, practitioners should supervise the process and

17   CQI should closely follow the functionality of the Second Stage program, but

18   neither occurs now.  It is important to note here that although STATCare

19   practitioners sometimes participate in the Second Stage Evaluations, they do NOT

20   supervise this process.

21       277.    The failure to timely complete these initial health assessments poses a

22   significant risk of harm to incarcerated individuals and falls below the standard of

23   care.  For example, the Sheriff's Department's substandard care at intake has

24   resulted in deaths of incarcerated people and high costs for San Diego taxpayers.  As

25   just one example, in May 2024, the family of Ronnie Sandoval was awarded $1.8

26   million from a federal jury that faulted Sheriff's Department's nursing staff for

27   failing to prevent Mr. Sandoval from a fatal overdose in February 2014.  The jury

28   found that Mr. Sandoval was sweating profusely through an hours long booking

1    process, but the Jail's nurses did not properly respond to his condition.  Jeff

2    McDonald, *Jury Awards $1.8 Million to Family of Man Who Died in San Diego*

3    *County Jail 10 Years Ago*, SAN DIEGO UNION-TRIBUNE, May 3, 2024.

4        278.   The practice of delaying a full Health Assessment to 14 days or longer

5    carries with it substantial risks of harm to incarcerated patients.  It is inevitable that

6    the cursory history and minimal physical exam done at the Receiving Screening will

7    miss substantial medical problems, both acute and chronic.  Some patients are then

8    referred for a Second Stage Evaluation, but this is unstandardized and sporadic.  At

9    its best, the Second Stage Evaluation will also miss or underestimate the presence of

10   medical problems that a thorough Health Evaluation would find.  Dr. Venters'

11   description of how asthma should be handled during the booking process is a great

12   example.  SD_215361.

13       279.   Medical problems missed by a substandard booking process and a

14   delayed full health assessment will inevitably get worse and only be realized later

15   when the patient's health deteriorates.

16       280.   Delaying a complete health assessment for 14 days would never happen

17   in any outside medical institution.  Patients newly admitted to a hospital, a nursing

18   home, or a psychiatric hospital do not have to wait 14 days (and longer) for a full

19   health assessment.  It is not hard to speculate on what would happen to their

20   mortality and morbidity statistics if these institutions did delay a full health

21   assessment for two weeks or longer!

22       281.   The only advantage to delaying the full health assessment for 14 days is

23   that the Sheriff's Department then must do fewer of them—*i.e.*, because "at least

24   half of all people admitted to jail leav[e] without" an assessment since they are

25   booked and released after fewer than 14 days—and therefore the Sheriff's

26   Department saves the time and money required to do a Health Assessment on these

27   patients.  *See* Venters' Report, SD_215372.  However, delaying the health

28   assessments saves little time or manpower in reality because the Sheriff's

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Department already does an abbreviated health evaluation during the receiving screen and the second stage evaluation. To add the few extra questions and exam required to complete a full health assessment would require less incremental resources than the Sheriff's Department now expends on tracking and transporting patients 14 days after intake, as well as the cost of "catching up" programs when the County falls behind, and patients are missed. There are also high medical costs of missing potential diagnoses and treatments of short-term detainees.

282.    Moreover, many individuals return to the Jail repeatedly. From a medical perspective, not doing a full health assessment on individuals incarcerated for even short periods of time is a missed opportunity to find and treat medical problems before the patient returns to the Jail later with worse medical problems. In the long run, this missed opportunity will create more difficulty for the Sheriff's Department when they must play catch-up later. Even if not re-incarcerated, these individuals are members of the San Diego community and may place demands on community resources like emergency rooms and clinics if their health concerns are not addressed sooner rather than later.

283.    In summary, the Sheriff's Department's does not currently have a functioning system that ensures all incarcerated people receive a health assessment within fourteen days. And, even if the medical intake system were functioning as the Sheriff's Department claims it should—*i.e.*, with an assessment conducted by an RN within fourteen days, that system would still fall below the standard of care and place incarcerated people at risk. The Sheriff's "goal" for the system is insufficient because the ideal time for an incoming patient to receive a full face-to-face medical assessment by nurses and medical practitioners is during the booking process, not later. The NCCHC Technical Report and Homer Venters both emphasized this.

284.    This is important: In my opinion and based on a reasonable degree of certainty, if the Sheriff's Department instituted a health assessment at booking utilizing nurses and medical practitioners as the NCCHC and Dr. Venters

1  recommended, the mortality and morbidity at the Jail would decrease.  The systemic

2  inadequacy of health assessments is, in my opinion, one Root Cause of the Jail's

3  high Mortality and Morbidity problem.

**III.    The Sheriff's Department Fails to Continue Medically Necessary Medications and Treatments for Incarcerated People Upon Their Arrival at the Jail or Transfer Between Jail Facilities, Placing Them at Substantial Risk of Serious Harm**

7  285.   "Continuity of medical care" means that an incarcerated patient's

8  prescribed medications and treatments are continued without interruption at each

9  stage of that person's incarceration.  In particular, continuity of care requires that,

10  when a patient is booked into the jail, the medications and treatments they had been

11  receiving in the community should be continued.[32]

12  286.   Continuity of prescribed medications can be of critical importance to a

13  person's health.  Missing doses of essential medications can harm fragile patients.

14  As Dr. Venters stressed in his report, "[a]ccess to appropriate medications in a

15  clinically appropriate timeframe" helps "reduc[e] mortality and morbidity in jail

16  settings," and it is therefore a best practice to "provide several tools for ensuring

17  continuity of medications in jail," "start[ing] with … health staff who screen

18  patients before entry to the jail."  SD_215374.

19  287.   Plaintiffs have alleged in their Third Amended Complaint that the

20  Sheriff's Department fails to provide continuity of medical care to people after they

21  are booked into the Jail.  Dkt. 231 ¶ 58.  As explained in more detail below, I agree.

**A.    Continuing Medical Necessary Medications After Booking**

23  288.   The basic principle of continuity of prescribed medications is this:  All

24  medications that patients were receiving before their arrest and incarceration should

25  be continued at a minimum until they are seen face-to-face by a medical

---

[32] These principles also apply when a patient returns from the hospital to the jail and when a patient is discharged from the jail, so that they can receive medication and therapy in the community.  Those issues are discussed later in this Report.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1   practitioner.  These medications "bridge" the gap between a patient's arrival and the
2   first time they see a medical provider face-to-face and so are often called "bridge
3   medications."  Once a medical practitioner sees the patient face-to-face, the
4   prescribed medications can be changed as per the practitioner's medical judgment.
5   NaphCare's policy manual for San Diego acknowledges this principle: "Patients
6   entering the facility on prescription medication continue to receive the medication in
7   a timely fashion as prescribed, or acceptable alternative medications are provided as
8   medically indicated unless contraindicated by their medical condition."
9   NAPHCARE000843.  But, as explained in more detail below, that does not appear
10  to happen in practice.

11      289.   The biggest problem many jails have during the process of continuing
12  medications is verifying what are (and are not) current prescriptions, because they
13  must contact outside pharmacies to request faxed copies of active prescriptions.

14      290.   The Jail does not have this problem due to the availability of
15  Surescripts.  Nurses at the Jail can instantly verify current prescriptions within the
16  state of California by accessing this database.  The Jail also has the advantage of
17  having an in-house pharmacy at its intake facilities so that most verified medications
18  can be dispensed immediately.

19      291.   In its contract with NaphCare, the Sheriff's Department laid out a
20  standard for continuing medication of a newly booked incarcerated person:
21  "Validated medications need to be restarted within 12 hours unless the use of
22  specialized pharmacies is required.  Any delay in starting medications should be due
23  to the validation process, not identifying/routing the request to a provider."  Contract
24  No, 566117, § 2.3.30.8, SD_125280-125281.  Since the Jail has Surescripts and an
25  in-house pharmacy, the 12-hour standard is generous.  For the vast majority of
26  patients and medications, it should take less than 12 hours to access a currently
27  prescribed medication list, send this list to the in-house pharmacy, and have the
28  medications filled and dispensed.

1    292.    In practice, based on my review of records, NaphCare mandates two

2    additional steps between the verification of outside medications via Surescripts and

3    the filling of those prescriptions by the in-house pharmacy: First, the prescriptions

4    are sent to a STATCare practitioner for approval.  Second, if the patient has been

5    taking medications not on the NaphCare formulary, these must be approved via the

6    NaphCare non-formulary process before they are filled.

7    293.    These steps are not required by the NaphCare contract (which states

8    only that this "validation" process must not delay the process of med continuity over

9    12 hours).  *Id*.  This extra step of requiring the review and approval of a STATCare

10    practitioner and the non-formulary approval are also not mentioned in either the

11    Sheriff's Department MSD Operations Manual or in NaphCare's Health Policies

12    and Procedures for San Diego.

13    294.    However, these steps can be a problem if used inappropriately to

14    enforce the NaphCare formulary and therefore deny people needed medications that

15    fall outside the formulary.  A "formulary" is a list of medications that are

16    preauthorized to be prescribed.  Formulary medications tend to be inexpensive.

17    "Non-formulary" medications require authorization before they can be prescribed.

18    Non-formulary medications tend to be expensive.  The process of seeking

19    authorization for a non-formulary medication is similar to the Utilization

20    Management process for seeking permission for an offsite consultation, discussed

21    later in this Report.  In order for a patient to receive a non-formulary medication, the

22    prescribing practitioner, including STATCare practitioners, must fill out a non-

23    formulary medication authorization form and send it in for approval or denial.  The

24    person who approves or denies authorization for non-formulary drugs can be a

25    pharmacist, a physician, a midlevel practitioner, or even an RN.  The practitioner

26    asking for approval for a non-formulary drug typically does not know who is

27    making the yes-or-no decision.  The prescribing practitioner and the person

28    approving or denying the request generally do not collaborate.  Evidently, this

1  approval process for non-formulary medications is enforced even for medications

2  the patient was taking prior to being booked.  In my experience, the number one

3  reason for a formulary in most medical systems is to save money.  Non-formulary

4  drugs are usually expensive drugs.

5      295.   Even if non-formulary meds are eventually approved, the verification

6  process can take days during which time the patients are not receiving these

7  medications.  This delay can and does harm patients.

8      296.   The Sheriff's Department, through its contract with NaphCare, requires

9  NaphCare to "maintain[] and enforc[e]" a drug formulary, which shall "allow[]

10  medical practitioners and psychiatrists to follow generally accepted clinical practice

11  patterns in their medical management of incarcerated individual patients." *Id.* at

12  §§2.3.30.32, 2.3.30.35, SD_125283.  The contract also requires that NaphCare

13  "typically approve[] non-formulary orders." *Id.* at § 2.3.30.35, SD_125283.

14  Finally, under the contract, "[r]ecords of non-formulary requests and responses shall

15  be maintained," *id.* at § 2.3.30.34, SD_125283, and reported in "Standard

16  Management Reports," *id.* at § 2.3.29.3, SD_125278.

17      297.   While there are legitimate reasons to substitute less expensive drugs for

18  more expensive drugs if the two drugs are therapeutically equivalent, jail drug

19  formularies should not prohibit the use of any legitimate medication simply based

20  on its cost.  Miraculous new medications that represent a huge improvement in

21  medical care are always expensive.  A good example are the new antiviral agents

22  used to treat hepatitis C.  They are miraculous—curing hepatitis C in greater than

23  95% of patients with minimal side effects in just a few weeks.  However, they are

24  expensive.  Antivirals used to treat Hepatitis C are not included in the NaphCare

25  2023 formulary.  *See* NAPHCARE037047.  Expense cannot be a reason to deny

26  incarcerated patients medically indicated medications.

27      298.   Documents I reviewed reveal that, in practice (and likely because of

28  this formulary "extra step") the Sheriff's Department is not continuing incarcerated

1  people's medications in a timely manner and not continuing legitimately prescribed

2  medications.

3    299.  The Sheriff's Department knows this is a problem.  In fact, the

4  Sheriff's Department mentioned this very practice in the Corrective Action Notice

5  ("CAN") sent to NaphCare, dated April 28, 2023, which stated that NaphCare had

6  "failed to restart medications for patients reassigned from the California Department

7  of State Hospitals."  NAPHCARE034831.  However, as of the December 8, 2023

8  CAN response, NaphCare had still not provided any specific information regarding

9  medications for patients reassigned from the California Department of State

10  Hospitals.  SD_1572354.  As of the March 4, 2024 CAN response, the most recent

11  one I have seen, there is a general statement that "Naphcare has appeared to resolve

12  pharmacy and discharge medication issues," but no details about the Department of

13  State Hospitals patient issue.  SD_1572610.

14    300.  The documents I reviewed include examples of incarcerated patients

15  who were harmed by the Jail's failure to continue their medications after booking.

16  One example is Raymond Dix, who, as discussed in detail above, was booked on

17  September 6, 2022 and died on September 13, 2022.  Mr. Dix had a medical history

18  that included congestive heart failure, chronic atrial fibrillation, hypertension,

19  chronic lung disease (COPD), and others.  SD_055186.  Mr. Dix was taking

20  multiple medications, and Surescripts confirmed that he was compliant in the

21  community taking his medications.  SD_055188.  When the STATCare practitioner

22  reviewed Mr. Dix's medication list, two were determined to be non-formulary and

23  were not ordered: Farxiga and Anoro Ellipta.  SD_055186.  Farxiga is a drug used to

24  treat both Type 2 Diabetes and congestive heart failure.  Anoro Ellipta contains two

25  bronchodilators used to treat COPD.  Requests for authorization of these non-

26  formulary medications were sent in.  *Id.*  Mr. Dix received one dose of Farxiga

27  seven days after he was booked; he never received the Anoro Ellipta prescription

28  during his incarceration.  SD_002836-002838.  An autopsy showed that Mr. Dix

1  died on September 13, 2022 of "[a]therosclerotic and hypertensive cardiovascular

2  disease," SD_050219, also called a heart attack.

3      301.   As explained above, not receiving those medications for six days may

4  have contributed to Mr. Dix's death.  I also note that arbitrarily discontinuing those

5  medications simply because they were non-formulary violated NaphCare's

6  contractual obligations: "the formulary shall allow medical practitioners and

7  psychiatrists to follow generally accepted clinical practice patterns in their medical

8  management of incarcerated individual patients," and "[c]ontractor typically

9  approves non-formulary orders."  Contract No. 566117, § 2.3.30.35, SD_125283.

10     302.   Another patient who experienced this problem is ███████████

11 (███████), who was booked on ███████████ 2023.  Mr. ██████ reported during his

12 receiving screening that he was a diabetic.  SD_791079.  Surescripts showed an

13 active prescription for Mounjaro, a medication used to treat Type 2 Diabetes.

14 SD_791379.  Nh Ngoc Da, Corp PA, did a remote STATCare review of a "Nurse

15 Alert" which stated "Surescripts pt was taking Mounjaro (a GLP-1 diabetic

16 medication) injections for DM, please advise."  SD_791100.  PA Ngoc Da

17 responded:  "[T]h[i]s med [i]s nonformu[l]ary. w[ill] order [i]nsu[li]n s[li]d[i]ng

18 sca[l]e."  *Id.*  Insulin is not a direct substitute for Mounjaro.  It is a totally different

19 medication with a different mechanism of action and different indications for

20 prescription.  There is no indication that Mr. ██████ had ever been on insulin before.

21 *See id.*  PA Ngoc Da ordered this without knowing a history or any labs, such as an

22 A1C.  *Id.*  Nobody told Mr. ██████ why his Mounjaro prescription had been

23 discontinued or why insulin had been ordered.  *See id.*  According to a note from NP

24 Chr[i]st[i]ne Su[lli]van on ███████████ 2023, Mr. ██████ had been on Mounjaro

25 weekly, but it was "NA [not available] wh[il]e [i]ncarcerated."  SD_791102.  He,

26 rightly, complained.  *E.g.*, SD_791631, SD_791635 (Sick Call Requests).  On

27 ███████████ 2023, as a result of his request to speak with a doctor about his

28 diabetes, Mr. ██████ was seen by Frederick Wycoco NP.  SD_791116.  NP Wycoco

wrote, "He [i]s ask[i]ng for mounjaro…. He sa[i]d he does not want [i]nsu[li]n ….
W[ill] order g[li]p[i]z[i]de 5mg qd …. Mounjaro [i]s not formu[l]ary." *Id.*
Glipizide is also a totally different medication with a different mechanism of action,
different indications for prescription and also not appropriate as a direct substitution
for Mounjaro. In my opinion, Mr. ███████ case was mismanaged to the point of
medical malpractice. I discuss Mr. ███████ case and the standard of care of diabetes
in more detail in another section of this report. Suffice it to say here that
discontinuing a legitimate outside prescription without seeing the patient and
without a medical indication violates continuity of care and is in violation of
NaphCare's contract. Further, in my opinion, substituting sliding scale insulin for
Mounjaro constituted medical malpractice.

303. Another example is ███████████ (████████), a diabetic who had
been prescribed the long-acting insulin Lantus before coming to jail. Ms. ████████
was booked on █████████2024. On the day of her booking, 2024, a STATCare
Intake Assessment and Orders form was completed for her by NP Juancho Trinidad.
SD_790711. This form explicitly prohibits the continuation of long-acting insulins,
such as Lantus, with the following language: "**All long-acting insulins will be
substituted with Novolin N BID at an equivalent dose unless there is
documented evidence that the patient cannot or should not be transitioned**."
SD_790712 (emphasis in original). Accordingly, NP Trinidad discontinued
Ms. ███████ Lantus prescription and instead ordered short acting insulin dosed
according to a sliding scale. *Id.* In my opinion, this mandate to substitute any long-
acting insulin for Novolin N BID contravenes the term of NaphCare's contract,
which states that NaphCare must "typically approve[] non-formulary orders."
Contract No. 566117, § 2.3.30.35, SD_125283. NaphCare's contract also states that
any substitution of a formulary medication for a non-formulary medication shall
"follow generally accepted clinical practice patterns in their medical management of
incarcerated individual patients." *Id.* The wholesale discontinuation of long-acting

1   insulins by substituting short acting insulin on a sliding scale is not a "generally

2   accepted clinical practice pattern."  *See Diabetes Management in Detention*

3   *Facilities: A Statement of the American Diabetes Association*, 47 DIABETES CARE

4   544-555 (2024).

5           **B.     Continuing Medically Necessary Treatment After Booking**

6       304.   Besides medications, many newly booked patients have prescribed

7   medical therapies and treatments scheduled in the community, which also should be

8   honored during incarceration as part of continuity of care.  Examples include

9   dialysis, cancer chemotherapy, infusion therapy for autoimmune disease, previously

10  scheduled surgeries (even if they are elective), physical and occupational therapy,

11  and other previously scheduled follow-up appointments and consultations.

12      305.   All of these medical obligations should be honored by the jail medical

13  services.  One of the duties of the RNs who do the receiving screening is to find out

14  about these medical obligations.  Patients who have pending medical appointments

15  and therapies should then be quickly referred to a medical practitioner and to

16  scheduling to arrange for patient transportation to these appointments.  The care

17  plan to continue these off-site obligations should also be discussed with the patient

18  so she/he understands what is happening.

19      306.   While I understand that there are security requirements surrounding

20  these offsite visits, security concerns do not negate the Jail's obligations to

21  continuity of medical care.

22      307.   Unfortunately, this Jail abrogates its responsibility for this type of

23  continuity of care.

24      308.   As one example, retired FBI Agent ███████ contacted the Sheriff's

25  Department in █████ 2021 about his incarcerated son, ████████████, who

26  "suffer[ed] from diabetes induced retinopathy" and required "medically prescribed

27  weekly laser treatments," which if missed would "certainly result in vison loss."

28  SD_118455.  According to █████ father, from his █████ 2021 booking at the Jail

to ███████ 2021 (between seven and eight weeks), ████ had "already missed eight required appointments with his retina specialist since the beginning of the current incarceration." *Id.* "Thus far, ████ has not had any laser surgeries since his incarceration. Would you consider this to be an appropriate standard of care?" SD_118456. As Mr. ████ implies, this conduct falls well below the standard of care.

309. Another example of the Jail's failure to provide continuity of care for medical treatments is the case of ████████████ (██████████). In the fall of 2022, Mr. ███████ had been diagnosed with a malignant carcinoid tumor of his right lung. Medical Records of ███████████ as of ████████ 2023, p. 109 of 595. He was scheduled to have surgery to have the cancer removed on ████████ 2023. *Id.* at p. 407. Mr. ███████ was booked into the San Diego Jail on ████████ 2022. *Id.* at p. 11. ████████ 2022, Mr. ███████ wife and brother both called the jail to inform them that Mr. ████ had cancer and "is scheduled for an important surgery at Kaiser in January." *Id.* at p. 551. The same day (████████ 2022) Mr. ███████ medical records from Kaiser were received by the Jail, with the diagnosis of "malignant carcinoid tumor of the right lung" printed in bold font on the first page. *Id.* at p. 109. A TechCare task was entered for a medical practitioner to review these records. *Id.* at p. 533. On ████████ 2022, Mr. ███████ was seen by Nurse Practitioner Nicholas Kahl, who wrote:

> h/o lung cancer (pt unsure of which type) and due have surgery at Kaiser today (████) but was booked on ████ Need to f/u on ROI and reestablish cancer care as he will be incarcerated for a year.

*Id.* at p. 552. NP Kahl obviously did not review the medical records that had already been received. Those records, and the report from Mr. ████ wife already recorded in Mr. ███████ medical record, should have been enough for NP Kahl to see that the surgery was not that day but was instead scheduled the next

1   month.  In any case, NP Kahl's plan was "ROI for Kaiser sent, waiting for records

2   to arrive for review."  *Id.*  On ████████ 2022, Dr. Joseph Molina wrote:

3   "[K]aiser records reviewed.  [R]eferral placed for surgery reevaluation."  *Id.* at p.

4   555.  Dr. Molina wrote no summary of the medical records in the medical record.

5   *Id.*  He did not comment on the already scheduled surgical date of ████████ 2023.

6   *Id.*  On ████████ 2023, Mr. ████████ was again seen by Dr. Molina.  *Id.* at p. 557.

7   Dr. Molina noted that "R lung confirmed via biopsy (Kaiser records scanned for

8   reference)" and that Mr. ████████ was supposed to have surgery in ████ 2023.

9   *Id.*  However, Dr. Molina wrote that the referral he had requested two weeks earlier

10   was still "pending authorization."  *Id.* at p. 558.  On ████████2023, the Jail

11   received a "COURT ORDER for Defendant to be seen by Jail MD regarding

12   medical condition."  *Id.* at p. 559.  As a result of this court order, Mr. ████████

13   was seen on ████████ 2023 by Nurse Practitioner Frederick Wycoco.  *Id.*  NP

14   Wycoco wrote a reasonably good summary of Mr. ████████ Kaiser medical

15   records, in which he noted that Mr. ████████ had had a complete work up and had

16   been scheduled for surgery to remove the tumor on that very day, ████████ 2023.

17   *Id.* at pp. 559-561.  Mr. ████████ was admitted to the MOB ████████2023, *Id.* at

18   p. 459.  NP Wycoco noted that all of the records, including "surgeon consult, and

19   PFT" (pulmonary function testing) results had been "sent to Naphcare for review for

20   thoracic surgeon."  *Id.* at p. 561.  NP Wycoco also asked NaphCare Utilization

21   Management (who is responsible for offsite referrals, described in more detail later

22   in this Report) to "expedite" the review.  *Id.*[33]

23

24   ---

[33] NAPHCARE026024 is a spreadsheet of NaphCare Utilization Management
requests.  Mr. ████████r is listed 201 times on this spreadsheet (from line 18,062 to
line 18,263).  According to this spreadsheet, the NaphCare UM program first
received the request for Mr. ████████ to see a cardiothoracic surgeon on ████████
2023 and that the request was approved a day later, on ████████ 2023 (see lines
18,098–18,105).  This is not credible based on the medical record, which, as
described above, show that the Jail was on notice of Mr. ████████'s need for
surgery as of ████████ 2022, and that Dr. Molina requested a referral on
████████ 2022.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

310.   On ████████ 2023, Mr. ████████ was seen again by court order: "COURT Order- Defense request to be released from Custody to have surgery without objection is denied.  Defendant is to be evaluated by jail medical regarding condition with conditions before next hearing." *Id.* at pp. 570-571.  At this meeting, NP Wycoco informed Mr. ████████ that "he has a pending scheduling appt with surgery (requested expedited thoracic surgery since ██/2023 for this medically necessary surgery)." *Id.* at p. 571.  On ████████ 2023, NP Wycoco responded to a Court Order to "review records form Kaiser per Court Order scanned on ██23." *Id.* at p. 576.  NP Wycoco noted he had already reviewed those records on ████████ 2023 and "pt already referred to specialists." *Id.*  On ████████ 2023, NP Wycoco recorded that "UCSD is requesting referral for pulmonology." *Id.*  NP Wycoco submitted an inquiry about the referral to "case management." *Id.* p. 576.  On ████████ 2023, Mr. ████████ was seen by Dr. Molina again by court order. *Id.* at pp. 576-577.  Mr. ████████ was "wondering when he will see the surgeon regarding his tumor." *Id.* at p. 577.  Dr. Molina again documented that "specialist evaluation upcoming …  I notified patient I have little to no control regarding specialist follow ups." *Id.*  In the end, Mr. ████████ finally had the surgery to remove his cancer on ████████ 2023.  Medical Records of ████████ ████████ as of ████████ 2023, p. 814 of 2164.  By then, the tumor had grown considerably and Mr. ████████ had a documented weight loss of 39 pounds. *Id.* at pp. 819, 1442.  The surgery finally occurred only after the direct intervention by the Chair of the San Diego County Supervisors, Nora Vargas, in ████ 2023, SD_652956-652959, and after the San Diego Union Tribune published an article about Mr. ████████ case on July 23, 2023.[34]

311.   In my opinion, the delay of this critical surgery was entirely

---

[34] Jeff McDonald, *"'I'm in a little disbelief': Diagnose with a tumor just before going to jail, La Mesa man fights for long-delayed surgery,"* SAN DIEGO UNION-TRIBUNE (July 23, 2023).

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  unnecessary, likely subjected Mr. ███████ to unnecessary pain, and placed him at

2  a great risk of harm—given that his tumor had grown considerably over the six

3  months he waited and that he had lost nearly 40 pounds.  Of course, the larger the

4  tumor is, the harder it is to remove surgically and the greater the likelihood of

5  complications.  The surgery would have been less difficult to perform and would

6  have had less likelihood of complications had it been done when originally

7  scheduled.

8      312.    What should have been done in Mr. ███████ case is clear.

9  Mr. ███████ arrived at the Jail a month before his scheduled surgery.  That is

10  plenty of time to arrange for continuity of that essential care.  Soon after

11  Mr. ███████ arrived at the Jail, someone from the Sheriff's Department (perhaps

12  the Jail Medical Director or Dr. Molina) should have called Dr. ███████

13  surgeon directly to coordinate care.  Mr. ███████ should have had his surgery, as

14  scheduled, on ███████ 2023.  If the surgery had to be rescheduled because of

15  security concerns, it should have been shortly thereafter and with the knowledge and

16  approval of his surgeon.  No Corporate Utilization Management system was needed.

17  In fact, given that Mr. ███████ was a Kaiser (HMO) patient, his surgery had

18  surely already been vetted by the outside UM program associated with his care.

19      313.    In summary, the Jail fails to continue medically necessary medication

20  and treatment for people after they are booked into the Jail, in violation of the

21  standard of care.  This places incarcerated people at risk of harm, including death,

22  (such as Raymond Dix) and unnecessary pain and suffering (such as ███████

23  ███████).

24  **IV.  The Sheriff's Department Does Not Provide Incarcerated People with a
       Reliable and Timely Way to Alert Health Care Staff of Their Medical**

25  **Needs, Placing Them at Substantial Risk of Serious Harm**

26      314.    It is my opinion that the Sheriff's Department lacks adequate policies

27  and practices to reliably and timely respond to incarcerated people who alert health

28  care staff of medical needs, which is a necessary component of any correctional

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  medical system.  Absent such a functioning system, the Jail's medical system

2  inherently falls below the accepted standard of care.

3      315.   To meet standards of care in a jail system like this one, incarcerated

4  people must be able to communicate their medical needs to health care staff—

5  including routine, urgent, and emergent medical issues—and be assured that those

6  needs will be addressed in a timely manner.  Due to the size of the Jail population,

7  and therefore the expected volume of medical requests, the Sheriff's Department

8  must have robust, functioning systems for (a) collecting and triaging incarcerated

9  person medical requests; (b) conducting timely in-person nursing evaluations of

10  people requesting medical care; (c) reviewing and responding to grievances

11  incarcerated people submit about their medical care; (d) identifying and responding

12  to medical emergencies in the Jail; and (e) identifying and communicating with

13  people with mental illness who may be unable to advocate for their own medical

14  care.

15      316.   The Sheriff's Department's own policies and procedures regarding

16  "Access to Care" require that incarcerated people "have access to care for their

17  serious medical … needs."  MSD Operations Manual, A.1.1.  According to that

18  policy:  "*Access to care* means that, in a timely manner, a patient is seen by a

19  qualified health care professional, is rendered a clinical judgment, and receives care

20  that is ordered."  *Id*.  These procedures further provide examples of "unreasonable

21  barrier[s]" to care, including "[b]eing [an] understaffed or poorly organized system

22  whereby care cannot be provided in a timely manner" and "[h]aving a utilization

23  review process that inappropriately delays or denies specialty care."  *Id*.

24      317.   Based on my review of Jail policies and procedures, my review of

25  charts and other documents, and my conversations with incarcerated patients, it

26  appears that the Jail has four ways for patients to alert health care staff of their

27  medical needs:  (i) emergency buttons or intercoms; (ii) sick calls; (iii) grievances;

28  and (iv) face-to-face interactions with health care or custody staff.

318.   In policy and practice, it is apparent to me that these do not function to respond to the needs of people incarcerated in the Jail.  My review of documents and my interviews with Jail staff and incarcerated patients during my inspection of the Jail showed many substantial problems with the Jail's system for requesting medical care.  This places incarcerated people at risk of serious harm.  Clearly, if an incarcerated patient is unable to effectively notify staff of a medical problem, that problem will not be addressed, or will be addressed belatedly, and the patient could suffer harm as a result.

### A.    The Sheriff's Department Lacks an Effective Process for Submission, Tracking, and Scheduling of Sick Calls

319.   Incarcerated people must be able to request medical care via requests that are processed, tracked, and scheduled for appointments in an organized and effective manner.

320.   In the community, people have multiple ways to seek medical attention for themselves or others.  If they think they have an emergency, they can call for an ambulance or go directly to a hospital emergency room.  If they have an urgent medical condition, they can go to an urgent care clinic or a walk-in clinic at a doctor's office that does not require an appointment.  If they have a non-urgent medical condition, they can make an appointment with a medical practitioner.[35]

321.   Jails should provide incarcerated patients with the same opportunities.  Since incarcerated patients cannot go themselves to a hospital, call an ambulance, or make an appointment at an outside doctor's office, the standard of care requires that jails provide incarcerated patients the following functional mechanisms to alert staff

---

[35] People in the community may also be scheduled for regular check-ups even if they are feeling well, especially if they have chronic medical conditions such as diabetes or are elderly. Many screening lab tests and x-rays are done at such check-ups. People in the Jail with chronic medical problems should also receive scheduled check-ups where routine monitoring labs, x-rays, and examinations are performed and medication is renewed—even if the patient feels well.  I discuss the standard of care for chronic care appointments and the Jail's failure to meet that standard later in this Report.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

based on the urgency of their medical needs:

322.    First, when incarcerated patients have a medical emergency, such as a seizure, a severe fall, a stroke or a heart attack, they must have a way to immediately notify staff of this emergency.  This is usually accommodated by having an emergency call button in each patient's cell or housing unit.  (I discuss the Jail's emergency response system in more detail in a later subsection).

323.    Second, when incarcerated patients have acute medical issues, such as rashes, vomiting, headache, etc., they must be able to notify medical staff of their symptoms and the urgency of their medical need.  Jails commonly ask patients to fill out a medical request form when they have non-emergency medical symptoms or issues.  Since written medical requests include both urgent and nonurgent issues, these must be triaged by medical staff in a timely manner and urgent complaints evaluated in a timely manner (usually within 24 hours).[36]  Jail policies and procedures must take into account the fact that many incarcerated patients have difficulty or are unable to communicate their medical needs in writing, *e.g.*, those with developmental or mental health disabilities or those who do not speak English or Spanish, to communicate their medical needs.  This should include the ability to verbally request medical care from custody or medical staff, who will then enter the request into the medical system and initiate the 24 hour face-to-face evaluation.

324.    Third, custody and other jail staff, including mental health staff, must be able to submit requests for medical care on behalf of patients they are concerned about.  These should be entered into the system as if the patient had made the request themselves, and should initiate a 24 hour face-to-face evaluation just like a patient-generated medical request.  This is particularly important, for example, for

---

[36] Many jails now allow incarcerated people to submit such requests electronically, *e.g.*, through a tablet, which may be preferable because medical requests written on paper can be easily lost or misplaced and it is harder to document when such a written request has been triaged or when the patient was seen for this particular complaint by a medical practitioner.  Electronic submission of these requests automatically keeps track of all requests and when the requests were attended to.

1  developmentally disabled patients, patients with dementia, and severely mentally ill

2  patients.  These patients, by nature of their illness, may have impaired reasoning,

3  diminished insight into their medical condition, and/or paranoia that leaves them

4  less able to communicate their medical needs.  Jails are likely to have many such

5  patients, they must therefore have systems in place to check on those individuals.

6       325.   Fourth, family members, attorneys, and other interested parties also

7  must be able to initiate medical evaluations of incarcerated people.  These requests

8  must be considered as equivalent of the patient herself submitting the request and so

9  also immediately trigger the 24 hour face-to-face evaluation.

10      326.   The San Diego County Sheriff's Department policies provide a

11 minimal description regarding the medical request process.  Medical Services

12 Division Operations Manual section MSD.S.3 first provides general guidance that

13 "[a]ny patient with a medical, dental, mental health or developmental disability may

14 be identified by self, deputy, medical staff, family, attorney or advocate referral."  In

15 terms of how a request is made, it states that:  "Patients shall request routine sick

16 call by completing one (1) Sick Call Request Form" which are then placed by the

17 patient into a "locked medical (red) box."  MSD.S.3 Procedure Part III.  These

18 forms are to be gathered "daily by designated health staff" and reviewed; each

19 patient is to be seen face-to-face by an RN within 24 hours "of receiving requests."

20 *Id.*

21      327.   Section MSD.S.3 further states that, "[i]n the event a RN refers a

22 patient to sick call, there will be documentation in the electronic medical record

23 substantiating the reasons for the referral."  *Id.*  However, there is no guidance

24 regarding how to document referrals by security staff, clergy, family, LVNs, and

25 any number of other people who may want to make such a referral.

26      328.   Regarding non-written requests for medical care, the MSD Operations

27 Manual explains that "[p]atients with an urgent medical complaint may be referred

28 to health staff at any time."  *Id.* at Part IV.  However, there is no guidance regarding

1  how patients who have difficulty in writing, *e.g.*, those with cognitive disabilities

2  and those with mental health issues, can submit non-urgent requests for medical

3  care.

4      329.  Detention Services Policy M.15 (for custody staff) is similar, it

5  explains that "[s]ick call requests are deposited by the incarcerated person into the

6  secure medical mailbox," and that "health staff is responsible for collecting the sick

7  call request … each night."  Notably, Policy M.15 does not include a 24-hour face-

8  to-face requirement.

9      330.  Based on my interviews with Sheriff's Department staff during my

10  inspection of the Jail, I understand that, in practice, the Sheriff's Department still

11  requires incarcerated people to submit all in writing.  Patients who report medical

12  problems are told to fill out a medical request form.  The incarcerated person must

13  fill out the medical request form (Form J-212) and place it in a box located in the

14  housing unit.  Of course, not all of them do so—perhaps because they struggle with

15  writing or have a mental health issue—meaning that opportunities to treat medical

16  problems are then lost.

17      331.  Once submitted, the requests are picked up by a medical staff member

18  (usually an LVN) and taken to the medical offices.  The requests are then reviewed

19  by a registered nurse, who time stamps them and sorts and triages them, to the

20  extent possible.  A nurse I interviewed during my inspection reported that

21  sometimes she was not able to complete her triage of all requests the same day

22  because there are so many.  The stack of that day's medical requests is then

23  transferred to the RN responsible for doing a Face-to-Face assessment with each

24  patient within 24 hours.  After seeing the patient, this nurse makes a follow-up

25  appointment for sick call, if the RN deems it necessary.

26      332.  This process has several problems and inefficiencies that make it

27  inadequate to provide incarcerated people with care that meets medical standards.

28      333.  First, many incarcerated people have difficulty with a system requiring

written requests. This includes those who do not speak English or Spanish, those with cognitive disabilities, mentally ill patients, and many others. I was unable to find this issue addressed (at all) in either the MSD Operations Manual or NaphCare's Policies and Procedures. Similarly, submission of a physical written request form can be daunting for patients who are only allowed out of their cells for a small amount of time daily.

334.    Documents I reviewed suggest that some staff refuse to accept requests for medical care unless they are written. For example, in July 2022, a member of Sheriff's Department staff named Alejandra Carbajal reported to the head of mental health, Melissa Quiroz, that she had "seen [nursing staff] with [her] own eyes, give a [sick call] to an [incarcerated person] [complaining of] an annal [sic] infection willing to show the nurse on the spot … and the nurse just continued to hand [her] the [sick call] slip." SD_194081. Because of this practice, Ms. Carbajal believed that nursing staff was "doing [the] bare minimum for inmates." *Id.* I tend to agree with Ms. Carbajal in this regard. In my opinion, the limitation of requiring a physical, written request is a major oversight, which could result in some incarcerated people being unable to request medical care.

335.    Second, the MSD Operations Manual does not explain how medical care referrals from custody staff or from others outside the Jail, *e.g.*, family members or attorneys, should be documented and processed. For example, if a family member calls and states that a particular patient has an unmet health care problem, how is this documented in the medical record? Who takes this information and enters it into the system as an official medical request that will trigger a face-to-face evaluation? The MSD Operations Manual is silent on this, and without a policy on how a family concern turns into a formal request for medical care, family member concerns can and are ignored, resulting in their frustration in trying to get health care for their oved ones. This also can result in harm to the patient, who does not receive the necessary health care that the family is trying to arrange.

336.    According to patients I interviewed during my inspection of the Jail, incarcerated people sometimes attempt to inform the nurses who pass out medication about an urgent medical problem.  However, those patients report that, rather than promptly contacting the sick call nurses or physicians on duty, medication pass nurses often dismiss the person's request and instruct them to fill out a sick call request, which delays their access to care.  Similarly, I was told that when incarcerated people inform custody staff about a medical problem, custody staff again often dismiss the person's request and instruct them to fill out a sick call request rather than notifying medical immediately about an urgent problem.

337.    Third, the medical request process is not standardized across the various Jail facilities.  As an example, during my tour of the Jail, I learned that some facilities keep a copy of the medical requests in a binder whereas others do not.  This discrepancy in practices makes it difficult to track systemwide trends through CQI; medical requests that are kept organized are amenable to CQI review, while unorganized medical requests are not.  This lack of standardization across facilities would be remedied if the policies were more explicit.  Similarly, it appeared to me that there was confusion about when precisely in the triage process the medical request form was scanned and placed within the patient's chart.  Again, this lack of clarity may lead to errors, including the possibility of some sick call requests falling through the cracks.  For example, if a request is scanned into the chart too early, does that mean the appointment has already been completed?  If different staff have different expectations for when a request form is supposed to be scanned, this can lead to confusion.

338.    Fourth, according to the interviews I conducted during my tour of the Jail, some nurses doing triage eliminated sick call requests that they felt were redundant.  In other words, if the nurse believed that a patient had already submitted a request on a particular issue, they would simply eliminate that request.  This, again, creates a risk of health care needs slipping through the cracks, for example, if

1  the issue was not exactly the same as the prior request.  Also, repeated written

2  requests often indicate the urgency of the problem.  The patient may be indicating,

3  via repeated requests, that this is an urgent matter that should be dealt with

4  promptly.

5        339.   Fifth, according to my interviews, sometimes, nurses responded to the

6  requests in writing at the bottom of the J-212 medical request form, returned the

7  form to the patient, and that was the end of the matter.  This results in no clinical

8  encounter with the patient, which is what the patient asked for, and is outside of

9  normal process of recording patient interactions in SOAP notes in the electronic

10  medical record.

11        340.   Finally, as noted above, my interviews of Jail staff indicated that it was

12  common for there to be so many sick call requests that it was not possible to triage

13  them in a single day, leading to backlogs.  As of her deposition, Ms. Rognlien-Hood

14  testified that there was a backlog of 300 medical requests.  Rognlien-Hood Tr. at

15  196:16-23.

16        341.   In summary, the Jail system for patients to request medical care works

17  as intended only some of the time.  Other times, the request is lost in the paper

18  shuffle of hundreds of requests a day, is never acted on, is not entered into the

19  system, etc.  Many of the incarcerated patients I interviewed expressed frustration

20  with the inefficiency of this system.  And, depending on what complaint "falls

21  through the cracks," this system certainly can cause medical harm.

22        **B.    Even When Medical Requests Received and Processed, They Are
          Often Not Timely or Adequately Addressed**

23

24        342.   Once a request for medical care is received by the Jail, the person

25  complaining of a medical problem should be seen face-to-face, so that health care

26  staff can decide whether the patient has a medical issue that is urgent (for example,

27  bladder or sinus infections or a painful rash like shingles) or not-urgent (for

28  example, longstanding musculoskeletal pain or a non-painful skin lesion).

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

343.  At this face-to-face meeting, as in any medical encounter, vital signs should be taken.  They give vital information needed to properly triage "urgent" from "non-urgent" requests.  As an example, a patient complaining of a headache with a very high blood pressure of 190/120 should be triaged as urgent.  Without the blood pressure, a complaint of a headache may be triaged non-urgent.  Similarly, a patient complaining of back pain with a very high heart rate of 130 should be triaged as urgent.  Without the heart rate, a complaint of back pain may be triaged as non-urgent.  Vital signs take literally about a minute to perform, during which time the nurse could be conversing with the patient.

344.  In response to the State Audit's February 2022 conclusion that the "San Diego County Sheriff's Department … has failed to adequately prevent and respond to deaths of individuals in its custody," the Sheriff's Department announced that it was implementing a process of "doing face-to-face assessments (of patients) within 24-hours of receipt of a request for medical services at the (jail) facilities." SD_184484; Rognlien-Hood Tr. 87:6-10, 87:24-88:4.  Similarly, NaphCare recommended that when patients submit sick calls complaining of clinical symptoms, nursing staff see them face-to-face within 24 hours to triage the request. Rognlien-Hood Tr. 87:6-10, 87:24-88:4.

345.  The MSD Operations Manual requires that, as part of the triage process, patients who submitted sick calls should be seen face-to-face by an RN within 24 hours of the request being received.  MSD.S.3.

346.  However, in actual practice, the Jail gives the nurses 24 hours from the time of receipt to triage medical requests and another 24 hours to do the face-to-face evaluation from the time the request was triaged.  This timeline is laid out in a September 2023 CQI report conducted at Central Jail in which 10 charts were reviewed for the "following key indicators:" "1. The sick call slip is initialed and dated with the date that it was received. 2. Sick call is triaged within 24 hours of receipt. 3. A Face-to-Face assessment is conducted within 24 hours of triage. 4. A

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  referral is made for sick calls that require further evaluation." SD_729828. The

2  compliance for the face-to-face assessment in this study was 10%. The overall

3  compliance 50%.

4      347.  Neither the MSD Operations Manual nor NaphCare's Policies and

5  Procedures define how face-to-face evaluations should be conducted, *e.g.*, whether

6  vital signs should be taken.

7      348.  It should be noted that as of 2017 the NCCHC requirement was "that a

8  qualified health professional has a face-to-face encounter with the patient within 48

9  hours of receiving requests with a clinical symptom." DUNSMORE0260639.[37]

10  Thus, the Sheriff's Department set an ambitious standard for itself with its 24-hour

11  face-to-face requirement in its policies, but in actual practice, according to the CQI

12  indicator above, is trying to achieve a 48 hour standard.

13      349.  However, the Sheriff's Department has not been able to meet either the

14  24-hour standard or 48-hour standard for face-to-face assessments. Rognlien-Hood

15  Tr. 87:11-14, 88:8-10, 90:15-92:18. Ms. Rognlien-Hood testified: "Q. And does

16  the 24 hour face to face for clinical symptoms always happen as a matter of

17  practice? A. No." *Id.* at 89:8-10.

18      350.  This testimony is confirmed by documents I reviewed. A QA/QI report

19  from July 2023 stated that at George Bailey, with regard to the "[t]imeliness of 24

20  face to face," the Sheriff's Department was "averaging 45-50% of the threshold of

21  90%." SD_114412. Timeliness of sick call responses at Central Jail was no better,

22  with the Sheriff's Department reporting that "[c]ompliance indicators have slowly

23  been declining since implementation. Overall compliance has fallen from 76% to

24  50%." SD_114467. The Sheriff's Department was well-aware of the lack of timely

25  sick call responses, stating in that July 2023 QA/QI presentation that its corrective

26  action plan would include "continu[ing] to work on triaging sick call slips" and

27  ───────────────

28  [37] As of 2018, the NCCHC updated this guidance so that a 24 hour face-to-face is required.

1  "[a]nswer[ing] in a timely manner."  SD_114467.  Nevertheless, based on

2  Ms. Rognlien-Hood's testimony, it appears that the delays persisted.

3      351.  At least part of the problem appears to be the lack of sufficient nursing

4  staff to complete these face-to-face assessments.  Ms. Rognlien-Hood wrote in 2023

5  that "24-hour face to face is hard to accomplish due to the sheer volume and

6  manpower needed to accomplish this both on the medical and sworn side."

7  SD_375922.

8      352.  After being seen by the nurse, incarcerated patients must then wait even

9  more to be seen by a medical practitioner.  The average wait to see a medical

10 practitioner is around 15 days according to Sheriff's Department data from July

11 2023.  SD_114495.  Notably, this is over twice as long as the NCCHC reported in

12 2017.  And, of course, half of all incarcerated people who need to see a practitioner

13 wait *longer* than 15 days, and sometimes much longer.  Patients I interviewed

14 commonly told me about waiting for weeks to be seen for serious medical concerns.

15 When they put in a second or third request raising their medical concerns again and

16 asking why the process is taking so long, they report that those requests are often

17 ignored by nurses.  This was confirmed by a nurse assigned face-to-face duty at

18 Central Jail, with whom I spoke during the inspection.  She stated that repetitious

19 medical requests were ignored, in an attempt to make the face-to-face task list more

20 manageable.  In my review of patient charts, I found many examples of requests for

21 medical care that were not triaged by a nurse for many days or, in some cases,

22 weeks.  As one example of this, ███████████ submitted a grievance on ██████ 2022

23 that stated:  "I [have] been requesting some kind of treatment for the fungi I have on

24 my feet for more than 6 weeks and haven't gotten any response back."  SD_817006.

25 Of course, a delay of well over a month to treat an infection can certainly allow that

26 infection to fester and worsen and even potentially spread.  Delay always increases

27 the likelihood of some medical conditions getting worse and patients suffering as a

28 result.

353.    NaphCare has exacerbated the Sheriff's Department's failures to respond to sick call.  According to a February 22, 2023 email and attachment from Ms. Rognlien-Hood, NaphCare's training regarding 24 hour face-to-faces created "confusion."  SD_375922.  Specifically, when training Sheriff's Department staff, NaphCare's Vice President of Nursing "stressed … that vitals must be done for all medical concerns during the face to face," but NaphCare's Chief Medical Officer separately wrote that this was not necessarily the case, although he "would not [] give us direction on when to do them and not do them."  *Id.*  This is poor training.

354.    In summary, the Jail set a standard for itself of having an RN see each patient within 24 hours of the receipt of a request for medical care.  At some point, they began to allow 24 hours for triage of medical requests and another 24 hours for a face-to-face encounter.  Either way, the Jail has not been able to meet its own standard.  The Jail has attempted to cover this inadequacy with various questionable measures, such as not taking vital signs, but, in the end, the program does not work, leaving patients at risk of harm.

**C.    Grievances Are Often Ignored or Not Answered Satisfactorily**

355.    Unlike patients in the community, incarcerated patients are unable to choose a medical care provider on their own.  Incarcerated patients similarly are unable to switch medical providers if they feel that their medical needs are not being met.  Their only alternative is to make a formal complaint in the form of a grievance.  The grievance process is an opportunity for the patient to point out what they perceive as deficiencies in their medical care and an opportunity for the jail medical staff to improve medical care by learning about problems that may have fallen through the cracks or been unaddressed due to deficiencies within the medical system.

356.    For that reason, grievances are an essential part of medical care for the incarcerated.  As the NCCHC Technical Assistance Report stated:  "The goal [of the grievance program] is to solve patient complaints … as soon as they become

known." DUNSMORE0260627. Grievances about medical care should, like simple medical requests, also usually be addressed with a face-to-face evaluation. In fact, in my opinion, a face-to-face discussion of medical grievances is essential to a satisfactory resolution.

357. The MSD Operations Manual has a lengthy section on "Grievance Procedures," which emphasizes that grievances should be responded to in writing within seven days. MSD.G.1. Under that policy: "The staff member delivering the response to the inmate will have the inmate sign and date one copy of the response." If the patient is not satisfied with the response, "the staff will be directed in writing by the patient through successive levels of command until resolution is obtained, or the Medical Administrator reviews the grievance." Each of these levels must be completed within ten days. "The decision of the administrator is final."

358. The next section of the Grievance Procedures discusses how patient grievances may be administratively relabeled as "Personnel Complaints." The Detention Services Bureau (custody-side) grievance policy, No. N.1, is similar, though it also lists further ways a grievance can be administratively relabeled, for example, as a "request." Importantly, if a grievance is relabeled as a "request," "[n]o entry in JIMS is required."

359. The Sheriff's Department's grievance forms also contain a box in the response area that states, "This is not a grievance." Other than discussing the difference between a medical grievance and a personnel complaint or request, the Sheriff's Department's policies does not provide guidance for the frequent practice of relabeling a grievance as "not a grievance." For example, Policy N.1 states that a grievance can address "Medical/Mental Health care," but does not explain in what circumstance a grievance about medical care should be relabeled as a request. Since there is no written guidance on when to do this, it is left to the reviewing RNs judgment (or whim) as to when to do this.

360. In practice, I understand that, in the Jail, grievances are often ignored or

1   not answered satisfactorily.  During my inspection of the Jail, I interviewed many

2   patients who told me that they have received no response to medical grievances they

3   submitted.  No response, of course, violates the MSD Operations Manual, which

4   includes detailed instructions and timelines for grievances.

5        361.   Further, the Sheriff's Department's CQI reports provide little

6   meaningful information about grievances other than listing the ostensible number of

7   grievances per quarter.  *See, e.g.*, MSD QA/QI Meeting, July 18, 2023, SD_114475.

8   CQI data on grievances should contain: (a) the average length of time before a

9   response is issued to the patient; (b) how many grievances were answered late; (c)

10  what percentage escalated to each level up to the Medical Administrator; and (d)

11  what the resolution was for each grievance.  But none of this information is

12  contained in the Sheriff's Department CQI reports on grievances.  *See id.*

13       362.   There are several problems with the grievance system in both policy

14  and practice.  First, the Sheriff's Department Operations Manual Section MSD.G.1

15  requires no face-to-face interaction with the patient who wrote the grievance.

16  Written grievances contain only a short summary of what the patient thinks the

17  problem is.  Seeing the patient in person allows the patient to voice their concerns in

18  more detail.  It also allows the person responding to explain medical issues that

19  perhaps the patient does not understand.

20       363.   Second, grievances should never be arbitrarily relabeled as something

21  else except by the patients themselves.  This also makes grievance statistics

22  unreliable since it is not known how many were arbitrarily relabeled as not a

23  grievance.  Relabeling grievances is also potentially a mechanism to manipulate

24  statistics to make them appear more favorable than they really are.  Not allowing

25  grievances to be relabeled removes this bias.  In the Jail, however, patients often

26  receive responses with the "this is not a grievance" box checked.  Ms. Rognlien-

27  Hood admitted that this happens in her deposition.  Rognlien-Hood Tr. 206:12-24.

28  While most grievances were not included in the patient records sent to me, several

1    were included and marked as "This is not a grievance." As one example, █████

2    ███████ wrote a grievance attempting to contest the discontinuation of his suboxone

3    medication on ██████████ 2022. SD_820924. In response, the Jail checked the

4    boxes for "This submission is not a grievance" and "It is an inmate request … (No

5    entry in JIMS …)." *Id.*

6         364.   This practice appears to artificially deflate the number of grievances

7    received the Jail. As an example, the "TechCare Monthly Report" for Central Jail

8    for the months of January, February and March, 2023, says that a total of six (6)

9    medical grievances were filed over those three months out of an average daily

10   population of 750. NAPHCARE031601. In my experience, this is not credible and

11   is more likely the result of arbitrarily relabeling grievances as something else.

12        365.   Third, the Jail's failure to analyze grievances substantively during the

13   CQI process means that the Jail does not know how many of the grievances were

14   justified and pointed out true deficiencies in medical care or Jail medical processes.

15   The grievance process should be viewed as an opportunity for improvement, not as a

16   nuisance to be swept under the rug. It should allow patients to point out problems of

17   medical care that they see from their end.

18        366.   Finally, during my tour of Central Jail, a nursing supervisor there told

19   me that patient grievances are taken directly to the nursing supervisors. The nurses

20   and the practitioners are not informed of them even if they are named. In my

21   opinion, this is wrong.

22        367.   In summary, the Jail grievance system does not work as it should.

23   Some grievances are ignored, in violation of policy. Many grievances are arbitrarily

24   relabeled as "not a grievance." Grievances are not tracked in a meaningful manner

25   by the CQI process.

26   **D.    The Sheriff's Department Lacks an Effective Alert System for
         Medical Emergencies**

27

28        368.   Outside of jail, people who have a medical emergency can either call an

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1   ambulance (which usually responds in minutes) or go themselves to a hospital

2   emergency department.  Incarcerated patients cannot do either.  Jails must have

3   some other system that allows incarcerated patients to get emergency medical care.

4   This involves two steps: (1) ensuring that incarcerated people can effectively notify

5   security staff that they are experiencing a medical emergency, and (2) ensuring that

6   the jail security and medical staff will respond in order to get emergency care to the

7   patient.

8       369.   Incarcerated people must have a reliable way to alert security and

9   medical staff when they experience medical emergencies, so that staff can respond

10  immediately.  Failure to provide an emergency alert mechanism—and to ensure that

11  staff respond immediately—can lead to preventable in-custody deaths.  As

12  explained above, the February 2022 State Audit identified cases in which where

13  deputies did realize that a person was unresponsive or otherwise in distress and

14  therefore "did not perform or delayed lifesaving measures" like CPR.  SD_174824-

15  25.

16      370.   I understand that Plaintiffs' other expert(s) will opine in greater detail

17  about emergency buttons and intercoms.  However, because this issue is critical to

18  the provision of medical care in the Jail, I also address it here, with a focus on the

19  medical perspective, in particular, the MSD Operations Manual regarding

20  emergency medical communications from patients using the intercom in their cells.

21      371.   Most correctional facilities I am aware of have emergency buttons and

22  intercom in the cells and housing units, which incarcerated people can use to alert

23  staff of medical emergencies.  Jail policies should also explain—for various types of

24  medical emergencies—exactly what response should occur, by whom, and within

25  what time frame.  Such common medical emergencies include:  "I think I'm having

26  a stroke!"; "I can't wake my cell mate up!"; "My cell mate fell and hit her head.  It

27  looks bad."; "I can't breathe!"; and "My cell mate is having a seizure!"

28      372.   Yet, the MSD Operations Manual does not contain any guidance

regarding emergency medical communications from patients using the intercom in their cells.  The Operations Manual does contain MSD.M.1 "Medical Emergencies." Although MSD.M.1 contains much information about what security and medical staff should do when notified of an emergency, it does not address how incarcerated people notify staff of an emergency and nothing about the need for functional emergency call buttons.

373.   In practice, the "emergency" buttons and intercoms in the cells at the Jail also frequently do not work.  During my inspection of the Jail, three different patients demonstrated this fact to me by pushing the buttons in their cells with no effect.  I observed many other emergency buttons to be always fully depressed and so clearly not in working order.  This is a serious issue in that a patient experiencing an emergency medical condition cannot alert security or medical personnel, nor can their cell or dorm mates.

374.   For example, the July 2022 death of Abdiel Sarabia, who, as noted above, appears to have been dead for some time before his body was discovered in the Jail, suggests that the Sheriff's Department is unable to identify people experiencing a medical emergency.  It is probable that Mr. Sarabia and many others knew that they were having a medical emergency for some time before they died but were unable to notify staff because of non-functioning emergency buttons.

375.   Documents I reviewed suggest that the Sheriff's Department fails to train staff properly regarding physician responses to emergencies.  In an email dated February 22, 2023, then Director of Nursing Rognlien-Hood, reported that "ER training has confused the staff" because NaphCare stated in one training that STATCare should be used for emergent issues, and stated in another training that on-site providers should be used."  SD_375921.  Ms. Rognlien-Hood claimed the later procedure, if followed, would burden on-site providers."  *Id.*  Confusion about who should respond to an on-site emergency (seizures, trauma, unconsciousness) can certainly harm incarcerated patients if an essential medical provider fails to

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

show up, thinking "STATCare has it!"  Examples include patients needing life-saving airway placement or patients needing life-saving medications administered immediately.

**E.    The Sheriff's Department Lacks a Working System for Ensuring that People with Mental Illness or Other Communication Difficulties Receive Medical Care.**

376.    The problems described above are even more significant for incarcerated people with mental illness.  Mentally ill patients get the same medical problems as anyone else.  Mentally ill patients have heart attacks.  Mentally ill patients get cancer.  Mentally ill patients get infections.

377.    Mental illness and medical problems interact in important ways.  First, because of difficulty with thought processes, paranoia, and other aspects of mental health disability, mentally ill patients sometimes lack insight into their own medical needs and also do not communicate well when they are having medical symptoms, even severe symptoms.  More effort is often necessary to make medical diagnoses in the mentally ill.

378.    A second way that mental illness can affect medical problems occurs because psychiatric medications frequently have side effects that manifest as significant medical problems.  For example, haloperidone frequently causes disabling muscle stiffness; risperidone is notorious for occasionally causing gynecomastia (breast growth in men); olanzapine increases the risk for diabetes.  All incarcerated mentally ill patients should be followed by the medical team because mental health professionals do not have the training or experience to recognize significant medical side effects from psychiatric medications.

379.    Third, mental illness itself can lead to medical problems.  Severely mentally ill patients may become sick from not eating or from eating inappropriate things.  Mentally ill patients may harm themselves and cause injury.  Mentally ill patients can develop skin lesions from lack of self-care.  These problems need to be recognized and treated by the medical team.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

380.   Finally, medical problems can mimic mental illness and vice versa.  For example, infections can cause a disordered mental state that can be confused with psychosis.  Sometimes it can be difficult to determine whether an incoherent patient is acutely psychotic or rather is delirious from an infection, meth intoxication, or substance withdrawal.  For all these reasons, it is impossible to totally separate medical issues from mental health issues.

381.   The medical standard of care requires that medical personnel and mental health personnel at a jail communicate with each other, to ensure that mentally ill patients do not have their other—*i.e.*, physical—medical problems neglected.  Specifically, **jails must have a clear plan for the addressing the healthcare needs incarcerated patients who are not fully able to communicate those needs on a formal medical request.**  A system to ensure medical care for patients such as these has three components.

382.   First, such patients must be identified.  This can be done by placing these patients on a "Chronic Care" or "Special Needs" list such as those used to identify other patients with chronic health needs (*e.g.*, diabetics or those with physical disabilities).

383.   Second, jails must have a policy or guideline in place that details what special care will be provided to these patients.  These guidelines must include "wellness checks" by both medical and mental health professionals.  Such patients should not be required to write their requests for medical care.  Referrals to the medical clinic can be made verbally, by any staff member who is concerned about the patient, and by family members.

384.   In fact, such patients must receive extra scrutiny and care at every stage of incarceration.  Since they sometimes cannot or will not give medical information at intake, information may need to be gathered from other sources, such as old records, outside providers, or family.  Since such patients sometimes do not care for themselves properly, custodial and medical staff need to be vigilant that these

1  patients bathe, eat, and sleep properly.  Since such patients often do not

2  communicate well that they are having medical symptoms, medical staff must

3  frequently check on them and specifically ask about their well-being.

4      385.   As a rule, patients who are unable or unwilling to advocate for

5  themselves must receive **more** frequent medical checkups, not **fewer**.

6      386.   It is clear that this Jail does not provide sufficient medical checkups for

7  people with mental illness and communication challenges.  One needs to look no

8  further than the deaths of Lonnie Rupard and Roselee Bartolacci, described above,

9  as evidence of this.  The Forensic Pathologist who performed the autopsy on Lonnie

10  Rupard opined that he died due to medical neglect and ruled the death a homicide.

11  Ms. Bartolacci's case was strikingly similar to Mr. Rupard's.  Both patients had

12  significant mental illness that impacted their ability to request and accept medical

13  care.

14  **V.  The Sheriff's Department Improperly Documents "Refusals" of Medical
    Care, Resulting in the Denial of Care to Incarcerated People, and Placing
15  Them at Substantial Risk of Serious Harm**

16      387.   It is my opinion that the Sheriff's Department does not appropriately

17  document refusals of medical care by incarcerated people.  In fact, based on my

18  review of documents in this case, it is my opinion that Sheriff's Department staff

19  frequently record that a patient has "refused" to attend a medical appointment, even

20  though the patient was never informed or offered the opportunity to attend the

21  appointment in the first place.  This practice has the effect of denying medical care

22  to incarcerated people and therefore places them at a risk of serious harm.

23      388.   In general, Jail patients have the right to refuse medical care.  However,

24  such refusals must be appropriately documented.  As the NCCHC Technical

25  Assistance Report explains:  "[t]he standard practice is that all refusals need to be

26  made with a health staff in attendance to counsel the patient as to the possible health

27  outcomes of a refusal of care.  A deputy can be the second witness signature when

28  the inmate refuses to sign the refusal form."  DUNSMORE 0260650.

1   389.   Of course, it should go without saying that staff should not sign a form
2   indicating that an incarcerated patient has refused a medical appointment unless and
3   until the patient has been informed about their appointment, has been counseled on
4   the possible risks of refusing care, and has affirmatively stated that they do not want
5   to receive that care.

6   390.   The State Audit identified the Sheriff's Department policies on refusals
7   as a potential factor in the extraordinarily high death rate at the Jail: "we identified
8   several instances in which sworn staff were the only witnesses when incarcerated
9   individuals refused to sign the refusals.  Because follow-up care is important, it is
10  critical that the desire to refuse care be shared with health staff who are in a better
11  position to ask appropriate questions, explain the adverse consequences to health
12  that may occur as a result of the refusal, and assess whether an individual has critical
13  health needs that should be addressed."  SD_174820-21.  The Audit recommended
14  that the Sheriff's Department "[r]evise its policy to require that a member of its
15  health staff witness and sign the refusal form when an individual declines to accept
16  necessary health care."  SD_174851.

17  391.   When the Sheriff's Department responded one year later, their Progress
18  Report: Update on State Jail Audit stated that they were complying with the
19  Auditor's recommendation about refusals: "In the event a patient refuses prescribed
20  medication, the nurse will counsel them on the potential impact and try to convince
21  them to take the prescribed medication."  SD_184485.  In the case of refusals of a
22  medical appointment, "[t]he patient will be counseled by medical staff, which may
23  include a provider or nurse, regarding the potential effects on their health of missing
24  the appointment and try to convince them to attend."  *Id*.

25  392.   However, after reviewing medical records and hundreds of medication
26  refusal forms, I can state confidently that the Sheriff's Department does not meet
27  this standard in either policy or practice.

28  393.   MSD Operations Manual Policy D.1.1 states that a patient who refuses

1    either medication or treatment is required to "sign a refusal form … including the

2    medication/dose or treatment and witness signature."  However, "[i]f Patient refuses

3    to sign Refusal form, two (2) witnesses, i.e. licensed nursing personnel and Deputy

4    shall sign the Refusal form …."  *Id.*  And, "[a]fter three (3) consecutive refusals of

5    all other medication(s)/treatments, patients are counseled by licensed nursing

6    personnel and scheduled for provider chart check to determine if

7    medication/treatment will continue to be offered."  *Id.*  I note that this policy differs

8    from what the Sheriff's Department stated that they were doing in their Update to

9    the Audit.

10       394.    On its face, this procedure falls below the standard of care because it

11   does not require health care staff to be present until a patient has refused care three

12   consecutive times.  Instead, the policy would allow for any two witnesses—

13   including two deputies—to witness the patient's refusal.  Allowing a refusal to be

14   documented without a healthcare staff member present is problematic because it

15   means that the incarcerated patient does not receive an appropriate advisal of the

16   risks of refusal before refusing.  By requiring the patient to refuse three times before

17   receiving any counsel about the risk of refusals, incarcerated people may end up

18   refusing without full awareness of the benefits of the medication, and, as a result, be

19   delayed in receiving necessary medical care.

20       395.    Notably, there is a separate policy governing the refusal of offsite and

21   specialty clinic appointments, which *is* adequate.  Under MSD Operations Manual

22   Policy MSD.R.5, a patient who refuses an offsite or specialty clinic appoint is

23   provided a "risk and benefit counseling … by nursing staff as soon as possible

24   following notification of patient's refusal."  And, the refusing patient's physician is

25   instructed to "discuss" with the patient "the reason for the off-site referral and …

26   include the benefit to them versus the medical risk of not going to the appointment."

27   *Id.*

28       396.    If patients are not properly counseled regarding refusals of offsite care,

1   it can compromise medical care in several ways.  The Jail's health care staff should

2   make referrals for offsite care only when clinically-indicated, and the failure to

3   ensure the patient receives this care can and will have a detrimental effect on patient

4   health.  Further, in my experience, cancelling appointments can strain the Jail's

5   relationship with offsite specialists, who usually must make special arrangements

6   for such visits and cannot see other patients in the time set aside for the patient who

7   refuses.  It is in the best interest of current and future patients in the Jail that refusals

8   are kept to a minimum.

9       397.   However, as explained in more detail below, this policy does not

10  appear to be followed.  My review of documents indicates that, even if the Sheriff's

11  Department's policies for refusals were appropriate, in practice, the Sheriff's

12  Department does not appropriately document refusals.

13      398.   After reviewing hundreds of medication refusal forms, I can state

14  confidently that custody staff alone are involved in almost all patient refusals of

15  medications, lab draws, clinic visits, and off-site visits.  Nurses are rarely present for

16  these interactions.  Rather, custody staff state that they have spoken to the patient,

17  the patient refused care, and also has refused to sign the refusal form.  Then, a nurse

18  and the custody officer (or two custody officers) sign the refusal form, even though

19  the nurse did not personally witness the refusal.

20      399.   As just one example of many, the medication refusal form for a patient

21  named ███████ (███████), dated ███████2023, and signed by custody and

22  nursing staff, simply states that a medication was "'refused' per deputy."  In other

23  words, this notation indicates that the supposed patient refusal was communicated

24  only to the deputy, and the nurse who signed the refusal form was told *by the deputy*

25  that Ms. ███████ had refused the appointment.  *See* SD_781379.

26  / / /

27  / / /

28  / / /

**I understand this can lead to serious consequences, including the possibility of death.**

☐ I hereby refuse to accept prescribed diet for my allergy. I understand this can lead to serious consequences, including the possibility of death.

**I understand that I am taking this action against medical advice and I have been informed of the risk to my health as a result of my action. I accept the full consequences of my action that is contrary to the recommendation of the medical, psychiatric or dental staff treating my case. I hereby release the San Diego County Sheriff's Department Detention Facilities Medical Services from all responsibility for any unfavorable or ill results which I understand may happen as a consequence of my refusal to accept this medical treatment.**

Reason for Refusal:

"Refused" per Deputy

Signature of Patient / Firma de paciente:

☑ Patient refused to sign this form / El paciente se negó a firmar este formulario

400.   Most of the refusal forms I reviewed looked like this—with the "per deputy" notation indicating that a deputy had stated that the patient refused.  In my experience, this is problematic.  Deputies are busy and sometimes infer that patients are refusing their medications when in fact, they are not.

401.   A second example involves a patient named ████████ (████████).  On ████████ 2022, Ms. ████████ was seen at her cell by Dr. Rana Ram in response to complaints of dizziness for the prior two weeks.  Dr. Ram ordered labs.  SD_748165.  Later that day, a nurse made the following note: "Patient call for blood draw.  Per deputy #0474 patient refused."  SD_748165.  On ████████ 2022, Ms. ████████ was seen at her cell by Dr. David Christensen to "re-evaluate dizziness/fatigue."  Dr. Christensen ordered an EKG in addition to the labs.  SD_748164.  Ms. ████████ then reportedly refused to go to medical for the EKG three times.  The first time, a nursing note stated:  "Called Pt at the housing but refused to come to Medical Clinic.  Refusal form signed by the Pt. herself without any reason."  SD_748164.  The second time, a nursing note stated, "Pt was called for EKG, declined and also declined to sign refusal form witnessed/signed by

Dep. #4122 & Dep.#0395." The third time, a nursing note stated: "Called housing deputy to bring pa. to medical for EKG. Per deputy, pt. refused. Refusal witnessed by deputy 3454. Refused 3X already." SD_748163. Later that day, a Nurse Practitioner wrote, "pt may refuse recommended medical treatment," and discontinued the lab and EKG orders. SD_748163. In violation of the Sheriff's Department's policies and procedures, no medical personnel witnessed any of these refusals or counseled the patient. This has the potential to adversely affect medical care because the labs and EKG ordered were important in elucidating the cause of Ms. ██████ symptoms. Dizziness and fatigue can be symptoms of serious medical pathology, including (to give just two examples), heart problems and cancer. Moreover, the notes makes little sense. Why would Ms. ██████ refuse lab tests and a simple EKG test three times without providing a reason? Medical personnel should see patients like Ms. ██████ to assess her condition and the reason for any refusal.

402. A third example involves ████████████ (██████ whose case is discussed in more detail in the section on diabetic care. As explained there, Mr. ██████—who is not supposed to receive insulin—was nonetheless prescribed insulin and refused it for months. Health care staff did not provide him with counseling despite his many months' worth of refusals:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

| Patient: ███ | | DOB: ███ | Sex: M ███ | | Class: 3 Race: B |
|---|---|---|---|---|---|
| Housing ███ | | Court Date: | | Type: |
| Status: ACTIVE | | Booking Date: ███ | | Proj. Rel: ███ |

**NovoLIN R Injection 100 UNIT/ML Solution** ███ 2023 3:00:00 PM - ███ 2023 2:59:00 PM Molina, Joseph MD
Inject 1 unit(s) twice a day for diabetics subcutaneous y for 30 day(s). Dispense 60 so ution. 2 Refi (s). *Insu in S iding Sca e Standard.
Profi e On y
A ergies:

| A erg es: |
|---|
| No Known Drug A ergy, No Known Food A ergy |

| | Jan 12 | Jan 13 | Jan 14 | Jan 15 | Jan 16 | Jan 17 | Jan 18 | Jan 19 | Jan 20 | Jan 21 | Jan 22 | Jan 23 | Jan 24 | Jan 25 | Jan 26 | Jan 27 | Jan 28 | Jan 29 | Jan 30 | Jan 31 | Feb 1 | Feb 2 | Feb 3 | Feb 4 | Feb 5 | Feb 6 | Feb 7 | Feb 8 | Feb 9 | Feb 10 | Feb 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Hours** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 0330 | | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R |
| 1500 | R | R | R | R | R | R | R | R | R | R | | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R | R |

*See* SD_815346.

403.   A string of refusals like this can adversely impact health care in the Jail simply by occupying time, both from health care and custody staff, who are supposed to fill out a refusal form after each refusal.  Further, insulin is an important medication.  If insulin is essential to this patient's health, health care staff must follow clinical standards of care, and visit with the patient often to see why he is refusing and to assess how he is doing medically despite the refusals.  If insulin is not essential to this patient's medical care (as was the case here), then a medical practitioner should have discontinued it and documented this appropriately.

404.   Another example involves a patient named ███ (███). A refusal form showed that he refused a blood pressure check on ███ 2022. SD_816935.  The reason for refusal states "refused to come take am med and to sign refusal with no given reason."  *See* SD_816936.  There is no evidence Mr. ███ knew he was refusing a blood pressure check and not just his morning medication. Many other allegedly refused blood pressure checks in Mr. ███ records were documented "per deputy."  On ███ 2023, a deputy "entered the module to inform patient … [and] returned and reported patient refused BP check." SD_816292.  The same reason for refusal was written on ███ 2024 and

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1 ████████ 2024.  *See* SD_816282, SD_816278.  In all, at least 90 of Mr. ████████

2 refusals of blood pressure checks and medication were "per deputy."

3      405.   Another example involves a patient named ████████

4 (████████).  He allegedly refused medication "per deputy" on at least ten occasions.

5 For example, he allegedly refused to take his Lexapro on ████████ 2023, and

6 the reason for refusal simply states "'Refused' per Deputy … assisting med. pass."

7 SD_759457.  He allegedly refused Lexapro again on ████████ 2023, and the

8 reason for refusal was "Per deputy 4338 patient refused medication."  SD_759462.

9 On ████████ 2023 he allegedly refused to take Lexapro and "refused to see

10 nurse per deputy."  *See* SD_759471.  No actual reason for Mr. ████████ alleged

11 refusals was written.

12      406.   Still another example is the tragic death of 32-year-old Michael Wilson

13 at the Jail.  According to documents I received regarding *Estate of Michael Wilson*

14 *v. County of San Diego*, Case No. 3:20-cv-0457 (RDR-BMD), Mr. Wilson died in

15 custody February 14, 2019 due to acute congestive heart failure, causing fluid to

16 accumulate in his body.  Mr. Wilson was on four medications for his heart condition

17 and was admitted to the Jail with a Court Order that medical staff pay special

18 attention to his medical needs.  Mr. Wilson also had a history of bipolar

19 schizophrenia.  Dr. Freedland in his deposition stated that the patient declined an

20 examination.  Given the patient's serious health conditions including his mental

21 illness, more should have been done to examine the patient and ensure he received

22 life-saving heart medications.

23      407.   In addition, the testimony of multiple named plaintiffs in this case

24 suggests that at least some of the refusals documented in patients' medical records

25 are inaccurate.  For example, named Plaintiff Ernest Archuleta, in response to a

26 question about the medication refusals in his medical records, stated:  "[I]f you

27 weren't your cell and [medical staff] pass by, they would call that a refusal… I don't

28 remember ever signing anything to refuse my meds."  Archuleta Tr. at 187:16-20;

1   *see also id.* at 188:9-22 ("I wouldn't refuse [my medication]."). Similarly, named

2   Plaintiff Michael Taylor, when asked about a grievance response that purportedly

3   said he had "refused to go to an optometrist appointment," responded: "I would

4   never have denied to go to an optometrist appointment." Taylor Tr. at 210:10-16;

5   *see also id.* at 252:15-253:3 (Q: "Did you refuse visual acuity assessments during

6   housing rounds?" … A: "No … I would have never refused. … I would have never

7   refused an optometrist or any kind of vision anything.").

8       408.   Documents produced by the Sheriff's Department about offsite medical

9   appointments are similarly concerning in regards to refusals. A spreadsheet

10  reflecting offsite appointments between June 1, 2023 and November 29, 2023 listed

11  432 completed appointments and 95 "refused" appointments. *See*

12  NAPHCARE026024.

13      409.   In my experience, that almost 20 percent of all patients scheduled for

14  offsite medical appointments would refuse to go is astounding—and not credible. In

15  my 25-year career practicing medicine in jails, I cannot recall any patients who

16  refused to go to an offsite appointment—zero. Something is thus deeply wrong with

17  the Sheriff's Department statistics.

18      410.   The Sheriff's Department's policies and procedures require that each of

19  these patients who refuse offsite transport to be counseled face-to-face by a

20  physician. The Sheriff's Department said that they were doing counselling in such

21  cases in their Progress Report: Update on State Audit. SD_184485. However, I see

22  no documentation in the medical records I reviewed that such face-to-face physician

23  counseling occurred for most of these refusals. I also did not review any evidence

24  showing that the extremely high rate of refusals of offsite care was formally

25  investigated by the Sheriff's Department.

26      411.   Refusals of medical care are particularly concerning when the

27  incarcerated patient is someone with mental illness or an intellectual or

28  developmental disability. As explained above, mental illness can lead to people

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  lacking insight into their medical condition and also being unable to communicate

2  their medical needs.  Critically, because of paranoia and difficulty with

3  communication, mentally ill patients sometimes refuse appropriate and even

4  essential medical care.  When mentally ill patients do refuse necessary medical care,

5  serious efforts should be made to:

6          a.      Find out why the patient is refusing.  Sometimes, the reason for

7  the refusal is simple to deal with (for example, a patient who does not want to take a

8  medication in the morning because it makes him sleepy, but will take it willingly in

9  the evening).

10         b.      Determine whether the mentally ill patient is competent to make

11  the refusal.

12         c.      Plan for follow up.  Mentally ill patients are often ambivalent,

13  which means that if they refuse necessary medical care today, they may not refuse

14  tomorrow.

15      412.   The MSD Operations Manual does not adequately address the special

16  needs of patients with cognitive disabilities or mental health problems that might

17  impact their ability to withhold consent.  The NaphCare Policy and Procedure

18  Manual does mention this issue in general terms in D-02 Medication Services—

19  Refusal or Non-adherence:  "Patient refusal of medication and treatment requires

20  additional intervention and education by treating staff and take into account the

21  medical and mental health status of the individual patient."  This implies rather than

22  states the truth that patients with cognitive or mental health disabilities need *more*

23  care and attention, not *less*.

24      413.   In practice, the Jail does not ensure that patients with these kind of

25  mental health or developmental disabilities are in fact receiving care.  This failure

26  has led to preventable deaths, including the death of Roselee Bartolacci as described

27  above.  An additional example is Teresita Tuazon, a type 2 diabetic who was booked

28  on September 4, 2021.  SD_337258.  Ms. Tuazon also had severe mental illness,

1 which led her at times to severe self-neglect, requiring admission into the

2 Psychiatric Stabilization Unit. *See* CLERB Report, SD_050607. She died on

3 September 28, 2021 from "complications of Diabetes Mellitus." *See* Autopsy

4 report, SD_055072. A contributing factor to her death was the fact that she had

5 refused to take her prescribed insulin or other diabetic medications for three days

6 prior to her death and six of the last ten days.



Patient: TUAZON, TERESITA M    #:400257958 (21134134)    Class:4
DOB: ███ 960 (Age=62)    Sex:F    Race:F
Housing: ----    Court Date:    Type:
Status: NOT ACTIVE    Booking Date:9/4/2021 4:59:31 PM PDT    Release:9/28/2021 8:10:00 PM

Lantus Subcutaneous 100 UNIT/ML Solution 9/11/2021 9:00:00 PM - 10/10/2021 11:59:59 PM Ram, Rana DO
Inject 10 unit(s) beneath the skin DIABETIC BEDTIME for 30 day(s). Dispense 300 solution. 0 Refill(s) *ATE Profile Only
Allergies:
Allergies:
Penicillin

| Hours | Sep 11 | Sep 12 | Sep 13 | Sep 14 | Sep 15 | Sep 16 | Sep 17 | Sep 18 | Sep 19 | Sep 20 | Sep 21 | Sep 22 | Sep 23 | Sep 24 | Sep 25 | Sep 26 | Sep 27 | Sep 28 | Sep 29 | Sep 30 | Oct 1 | Oct 2 | Oct 3 | Oct 4 | Oct 5 | Oct 6 | Oct 7 | Oct 8 | Oct 9 | Oct 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2100 | X | X | X | X | X | X | X | R | X | R | X | X | R | X | R | R | R | | | | | | | | | | | | | |

Not Administered - Refused - Doreen Marasigan RN - 9/27/2021 9:00:00 PM
Not Administered - Refused - Shannon Keene RN - 9/26/2021 9:00:00 PM
Not Administered - Refused - Ana Adraneda RN - 9/25/2021 9:00:00 PM
Administered - Ana Adraneda RN - 9/24/2021 9:00:00 PM
Not Administered - Refused - Espergene Manalo LVN - 9/23/2021 10:56:37 PM
Administered - Grace Leonor RN - 9/22/2021 10:27:28 PM
Administered - Julie Baliwan RN - 9/21/2021 8:26:44 PM
Not Administered - Refused - Julie Baliwan RN - 9/20/2021 9:00:00 PM
Administered - Johana Guansing RN - 9/19/2021 7:59:36 PM
Not Administered - Refused - Hazel Camama RN - 9/18/2021 9:50:58 PM

19 *See* CLERB Report SD_050607.

20     414. From my review of her medical records, Ms. Tuazon received no extra

21 attention, care, or counselling because of these refusals. This was a preventable

22 death.

23     415. In conclusion, how the Sheriff's Department deals with refusals of

24 medical care in actual practice (1) violates their own Policies and Procedures, (2) is

25 different than what was promised in the 2023 Progress Report: Update on State

26 Audit, and (3) violates the medical standard of care. The Sheriff's Department's

27 poor performance on patient refusals has led to patient harm and even deaths. In my

28 opinion, the Sheriff's Department's flawed response to patient refusals of medical

1    care is one of the root causes of the exceptionally high death rate the Jail has.

2    **VI.    The Sheriff's Department Routinely Attempts to Provide Medical Care
Without Examining Patients or By Asking Medical Staff to Operate
Outside Their Scope of Practice, Placing Incarcerated People at
Substantial Risk of Serious Harm**

5    416.    It is a basic principle of medicine that, before providing treatment, a

physician must examine her patient.  In particular, a medical practitioner must

conduct a physical examination of the patient including the area of complaint,

checking the patient's vital signs, and, if appropriate, ordering lab tests and imaging

studies.

10    417.    Without the physical examination or checking the vital signs, the

practitioner is missing essential information needed to be accurate and provide

appropriate treatment and is, essentially, "flying blind."  Inevitably, a practitioner

who omits the patient's medical evaluation will make critical mistakes.  As an

example, when a patient complains of shortness of breath, it makes a difference

whether the practitioner finds wheezing or stridor (airway obstruction) or rales (fluid

in the lungs) or if there is little air movement at all.  Each finding requires a different

medical response.  Without an exam, practitioners can harm patients by assuming

the wrong cause of a symptom and prescribing the wrong treatment.

19    418.    Based on that examination, labs, and patient history, the medical

practitioner will make a diagnosis and care plan.

21    419.    Critically, the term "medical practitioner" means a physician, nurse

practitioner ("NP"), or physician assistant ("PA").  PAs, while practitioners, still

must be supervised by a physician licensed in the relevant state and must conduct

only those tasks formally delegated by the supervising physician.

25    420.    Other medical staff, including registered nurses ("RNs"), licensed

vocational nurses ("LVNs"), and medical assistants are not "practitioners."

Although they assist practitioners by gathering data (like histories, vital signs, etc.),

they cannot make diagnoses, prescribe medication, or make ongoing treatment

1  plans.  Those activities are beyond their scope of practice.

2      421.   There are two special instances in the community where a practitioner

3  will not see or examine a patient in person during the medical encounter.  The first

4  is when practitioners are on-call.  The second is during a telehealth visit.  Both are

5  worth discussing in more detail.

6      422.   In the community, hospitals, nursing homes, and other residential

7  medical centers may not have medical practitioners on site 24/7.  When a

8  practitioner is not on site, there may be one on-call, whereby they receive phone

9  calls from nurses whenever patients experience medical problems that cannot wait

10  until the practitioner returns to the facility in the morning.  Calls to an on-call

11  practitioner are typically made via a telephone, and the case is discussed.  In these

12  instances, nurses should have a specific policy to rely on that states what

13  information to have available for the practitioner.  The nurse then asks the necessary

14  questions, and the practitioner answers the questions.  This exchange must then be

15  documented in the medical record.  In almost all cases, the practitioner will then see

16  the patient face-to-face when they are next in the facility again.

17      423.   Telehealth is another example of remote medical practice.  In

18  telemedicine, the patient and the practitioner interact with each other via video

19  conferencing, telephone, or other electronic method.  In a telehealth visit,

20  practitioners must meet the same standard of care that they would if they were

21  seeing the patient face-to-face in their office.  Generally, that means that an

22  appropriate prior examination would have occurred by a practitioner (even if not the

23  one meeting the patient via telehealth).  And, critically, during a telehealth

24  appointment, the patient and provider are able to communicate *directly* about the

25  patient's symptoms and concerns.  In other words, unlike the on-call practitioner

26  example, there is no nurse acting as an intermediary.  All practitioners of telehealth

27  should possess the necessary licenses required to practice medicine in the patient's

28  state.  This includes the appropriate medical license and a DEA license if the

1   practitioner prescribes controlled substances, like narcotics or benzodiazepines.

2       424.   In contrast to on-call and telehealth practices, which require a patient

3   examination, is the inappropriate practice of internet prescribing.  This is when a

4   person who wants a certain medication (for example, Viagra) fills out a form online

5   which is then sent to a medical practitioner who writes the prescription.  The

6   practitioner has never seen the patient, nor is there a direct conversation between the

7   patient and practitioner.  The only interaction has been the electronic form that the

8   patient filled out.  The patient does not even know who the practitioner authorizing

9   the prescription is.  In this instance, there has been no "appropriate prior

10  examination."

11      425.   Nurses are often involved in both on-call practitioner and telehealth

12  encounters.  It may be tempting for the remote practitioner to allow the nurse who is

13  physically present with the patient more latitude than he should have.  As an

14  example, a nurse could contact the practitioner in a telehealth encounter and say,

15  "this patient has a UTI and should get a prescription for the antibiotic Bactrim."  A

16  practitioner who simply says "OK" and writes the Bactrim prescription engages in

17  the practice of "delegation."  The practitioner has inappropriately delegated to the

18  nurse her authority to diagnose and prescribe.  This would be, in effect, the nurse

19  again acting outside the scope of practice.

20      426.   Based on my review of documents, it is my opinion that the Sheriff's

21  Office fails to uphold each of these principles.  Medical care at the Jail is routinely

22  provided without sufficient examinations by practitioners located off-site who

23  cannot examine the patients themselves, or by nurses or other professionals acting

24  outside of the scope of their practice.  The PAs who routinely conduct remote care at

25  the Jail via STATCare are not adequately supervised by a Jail physician.  Each of

26  these practices places incarcerated people at a substantial risk of harm, and in fact

27  has harmed many.

28

1   **A.    The Jail Misuses STATCare, Employing Midlevel Practitioners in Remote Locations to Cover for, Supplement, and Replace On-Site Medical Practitioners.**

2

3    427.   "STATCare" is a NaphCare program in which nurses at the Jail

4   communicate with and receive orders from a mid-level medical practitioner

5   employed by NaphCare.  STATCare practitioners consist of NPs and PAs, but as far

6   as I can tell, no physicians.  *See* Barkley Tr. at 56:16-25.  STATCare practitioners

7   never physically practice at the Jail (in contrast to an on-call physician at a hospital,

8   for example, who practices in person during the week, but is on-call over the

9   weekend).  Indeed, STATCare providers are usually not even physically present in

10  California—they reside elsewhere in the country, *e.g.*, Nevada and Alabama.

11  STATCare practitioners respond to medical questions from nurses at NaphCare

12  facilities all over the country, not just the Jail.  In effect, STATCare attempts to fill

13  the role of an on-call medical provider without ever appearing in person.

14   428.   The NaphCare Health Care Policy & Procedure Manual—Full San

15  Diego Policy Manual (*With Site Addendums*) June 1, 2022, hardly mentions

16  STATCare.  *See* NAPHCARE001541.  The MSD Operations Manual mentions

17  STATCare only in relation to the treatment of patients experiencing alcohol

18  withdrawal.  *See* § MSD.A.3.  Neither manual defines the appropriate (or

19  inappropriate) use of STATCare practitioners, leaving unanswered questions like:

20  When should Jail nurses call them?  When should they instead talk to practitioners

21  physically present at the Jail?  As a general matter, the P&P manuals do not say.

22  The absence of guidance in the P&P manuals is surprising given the ubiquitousness

23  of STATCare in the medical records.  STATCare practitioners were involved in

24  every medical chart I reviewed, usually multiple times.

25   429.   While nurses on the ground at the Jail can talk to a STATCare provider

26  by phone, I understand that, in practice, nurses typically rely on instant messaging or

27  email-like communications with STATCare providers via NaphCare's electronic

28  medical record system, TechCare.  Ms. Rognlien-Hood described STATCare

1  interactions as basically "a messenger system."  Rognlien-Hood Tr. at 62:10-12.

2       430.   Ms. Rognlien-Hood described STATCare's duties as including:

3  (1) ordering medications at intake for newly booked patients, and (2) addressing

4  urgent medical concerns, like an infection, that need to be started on antibiotics

5  immediately.  Rognlien-Hood Tr. at 233:13-34:2.  These are two typical functions

6  for any on-call medical provider.

7       431.   In practice, STATCare is actually used for many other medical

8  indications, as well, not typically handled by on-call practitioners.  These include:

9            a.     Reviewing patient medical records from a hospital visit.  Medical

10  Record of Rosalee Bartolacci, May 10,  2023 SD_711881, 711885.

11           b.     Chronic care management of a patient with chronic hepatitis C

12  and cirrhosis who had been booked six months earlier.  Incident Review, Death of

13  Robert Vogelman, SD_055946.

14           c.     Determining if patients have type 1 or type 2 diabetes.

15  Montgomery II Tr. at 233:3-8.  (In fact, it is often difficult to determine whether

16  patients have type 1 or type 2 diabetes and a remote midlevel clinician certainly

17  does not have that ability.)

18           d.     Acting as gatekeepers to face-to-face evaluations with on-site

19  medical practitioners.  Montgomery II Tr. at 148:9-49:25, 230:14-32:5.

20           e.     Evaluating patients for HIV and sexually transmitted diseases

21  Medical Record of ████████████ for Booking ████████ ████████ 2024, at p.

22  489.

23           f.     Evaluating complaints of hernia and ordering a truss.  Medical

24  Record of ████████████ for Booking ████████ ████████ 2022, at p. 151.

25           g.     Evaluating a complaint of hemorrhoids and ordering hemorrhoid

26  medication.  Medical Record of ████████ ████████2023, SD_791105.

27           h.     Deciding whether patients can be admitted to the MOB or

28  housed elsewhere.  Medical Record of ████████, ████████2022, SD_746366.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1             i.      Interpreting EKGs.  SD_754746, SD_754764. (EKG

2 interpretation is tricky even for a Board-certified emergency physician.  I do not

3 know what training, if any, STATCare midlevels have had on the subject or how

4 good they are at this skill.)

5        432.   Each of the above decisions made by a remote STATCare practitioner

6 is a medical evaluation, which instead should have been done by an on-site

7 practitioner.  It may be the case that this overreliance on STATCare is due to the

8 absence of P&P to guide appropriate use of STATCare.  However, documents I

9 reviewed suggest that the Sheriff's Department has a policy of pushing nurses to use

10 STATCare instead of turning to onsite practitioners.  A February 3, 2023 email and

11 attachment from Sheriff's Department staff member Travis Anderson to

12 Ms. Rognlien-Hood contains an "audit" of the medical doctor sick call waiting list,

13 focused on identifying examples that, according to policy, "should have" gone to

14 STATCare instead.  SD_320376-320382.  For example, ███████████

15 (██████████), who had recently returned from the emergency room for a rash, was

16 seen by a nurse who noted:  "Rash getting larger and with some clear discharge.

17 Moved to L eye and pt had vision changes to blurry."  SD_320377.  According to

18 the auditor, who appears to have made notes in highlighted in yellow, "StatCare

19 should have been notified and not a MDSC."  *Id.*  An examination of the face and

20 eye of the patient is critical in a case such as this.  STATCare cannot do such an

21 examination.

22        433.   STATCare evaluations of Jail patients are necessarily limited compared

23 to what an on-site practitioner could do.  Because they are remote, STATCare

24 providers plainly cannot conduct a physical examination prior to providing

25 treatment.  Nor do they ever speak or communicate directly with the patient, unlike

26 in a telehealth visit.  STATCare providers have access to whatever Jail medical

27 records are present in TechCare, but little else.  Yet, the Sheriff's Department's

28 nurses use STATCare rather than calling the local on-call medical practitioner

employed by CHP.  In fact, the nurses contact the remote STATCare practitioners even when there are medical practitioners present at the Jail.  Rognlien-Hood Tr. at 62:6-63:3, 76:17-77:19.

434.    Troublingly, not all of the STATCare practitioners who have provided care to patients at the Jail had appropriate California and DEA licenses.  This became an issue (of course) when this was discovered by the Sheriff's Department administration at which time NaphCare was instructed to get appropriate licensure for STATCare practitioners.  A May 26, 2023 email from Dr. Montgomery to Christopher Miedico states:  "It is worth noting that SDSD initiated the conversation regarding staffing, and inquired about the licensure and registry of NaphCare employees.  We are relieved that NaphCare has followed through to ensure that their employees are now registered with the State."  SD_227522.  Based on Dr. Montgomery's email, it appears that there is ineffective Sheriff's Department oversight of STATCare practitioners to ensure that they are correctly licensed; this is left to NaphCare to do.

435.    Dr. Montgomery's email from May 2023 also mentions the fact that Sheriff's Department administrators were unsure about who actually supervises STATCare practitioners:  "there is some discussion about who would actually be serving as their [STATCare's] supervisor."  *Id.*  It appears that there is no Sheriff's Department oversight of the STATCare practitioners or STATCare activities.  Each STATCare practitioner has a supervising physician within the NaphCare corporate structure.  *See* NAPHCARE034704.  For example, STATCare NP Juancho Trinidad's supervising physician is Dr. Elliott Wade, the NaphCare regional medical director for Western States.  *Id.*  The STATCare program is supervised overall by NP Martha Burgess, the NaphCare Senior Vice President of Clinical Operations. Freedland Tr. at 183:15-23.  Similarly, Dr. Freedland testified that CHP's new contract with the county provides no oversight of the STATCare practitioners, even by the CHP Medical Director at the Jail.  *Id.* at 178:5-7.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

436.   Similarly, neither the Sheriff's Department nor CHP appear to have oversight of the medical policies and procedures that guide STATCare practitioners. Instead of providing guidance regarding how to address various medical conditions, they allow STATCare practitioners to rely on drop-down menus to see medical options for the various medical conditions, such as hypertension and diabetes.  I discuss the guidelines in these drop down menus in more detail later, but suffice it to say here that they are questionable medically and certainly not in concordance with the medical practice of the CHP practitioners.

437.   STATCare activities are also not tracked in any meaningful way by the Sheriff's Department CQI monitoring.  For example, how often were STATCare practitioners called about chronic care issues?  How many labs did they order?  How many times did STATCare review medical records of patients sent off site?  Does anyone evaluate the accuracy of their EKG interpretation?  Based on my review of CQI documents, these metrics (or any other STATCare metric) are not monitored and evaluated as part of the Sheriff's Department CQI program.

438.   Unless they need someone who can perform the normal functions of an on-call practitioner, *i.e.*, to be available when there is no practitioner present at the Jail, it makes little sense for a nurse to contact a STATCare midlevel practitioner who lives in, say, Alabama, about an acutely ill patient at the Jail, rather than call a practitioner (who may be a physician) who is physically present at the Jail.  There is no way that a STATCare midlevel practitioner contacted electronically can be as effective as an on-site practitioner, because plainly a remote practitioner is completely unable to conduct a physical examination of the patient and must rely solely on the information transmitted via TechCare versus seeing and hearing the patient.

439.   Given these challenges, remote practitioners inevitably will make mistakes.  Indeed, the problem of remote STATCare practitioners making medical mistakes comes up over and again in my review of medical charts.  A particularly

1  bad example is the deficient care that STATCare provided to ███████████.

2  Mr. █████████ is a type 2 diabetic, who, after a second stage nursing evaluation,

3  was referred to Juancho Trinidad, a STATCare Nurse Practitioner based in Las

4  Vegas.  *See* SD_815566.  On ████████████ 2022, NP Trinidad reviewed this

5  message from the onsite nursing evaluation:  "NIDDM, BS 293, asymptomatic,

6  reports last dose of metformin last night."  *Id.*, SD_815587-89.  Without any other

7  history, labs, and certainly without examining Mr. █████████ NP Trinidad

8  ordered "Insulin Sliding scale (Regular) TID x 15 days."  SD_815587-89.  NP

9  Trinidad also ordered "Provider chart review for glucose readings in 5 days."  *Id.*

10 There was no referral for an in-person evaluation by a site-based medical provider.

11 *See id.*  As discussed further in the section on diabetic care, the STATCare provider

12 incorrectly prescribed insulin to this type 2 diabetic.  The treatment provided to

13 Mr. █████████ was incompetent, inappropriate on many levels—including that his

14 medication was changed without any labs, examination, or discussion with MR.

15 █████████ and potentially life-threatening.

16     440.   Because STATCare practitioners are not accountable to the Jail's

17 medical director, gross medical mistakes such as those that occurred with

18 Mr. █████████ are not noticed, not addressed, and not corrected.  STATCare

19 practitioners who make such mistakes will continue to make them in the absence of

20 oversight and corrective action.

21     441.   In my opinion, the Sheriff's Department has likely embraced the use of

22 STATCare rather than onsite practitioners as a way to save on costs and to reduce

23 the work-load of onsite practitioners, who are overworked due to understaffing.

24 However, this practice has seriously compromised patient care.  Although the

25 Sheriff's Department has signed a new contract to expand the numbers of

26 practitioners available onsite, there is no indication that the Sheriff's Department

27 will cease its inappropriate use of STATCare.  As a result, there is no guarantee that

28 the Sheriff's Department will end this dangerous practice.

**B.     Jail Medical Practitioners Provide Care to Incarcerated Patients Without Proper Examination.**

442.    Even when patients are treated by on-site practitioners at the Jail, my review of the records indicates that there is no guarantee that on-site practitioners will see or examine the patient before providing treatment.  This practice falls below the standard of care.

443.    For example, my review of the records indicates that cell-side clinical encounters commonly omitted vital signs.  Examples abound in the records I reviewed.  Here are just a few: NP Sonia Megert's ▮▮▮▮▮ 2024 evaluation of ▮▮▮▮▮▮▮ SD_814760-61; MD Joseph Molina's ▮▮▮▮ 2023 evaluation of ▮▮▮▮▮ SD_816437; MD Joseph Molina's ▮▮▮▮▮ 2022 evaluation of ▮▮▮▮▮ SD_798727; and NP Teresa Hurley's ▮▮▮▮▮ 2023 evaluation of ▮▮▮▮▮ SD_813216-17.

444.    The practice of omitting vital signs during patient evaluations is so ubiquitous that one can pick any almost any patient chart, search for "MD note," "NP note," or "RN note," and the vital sign section of the encounter notes will often be blank.  This is poor medical practice that does not occur during patient encounters in the community.  Vital signs are called "vital" for a reason.  Vital sign abnormalities are often the earliest signs of a gravely ill patient.  Not taking vital signs does not save very much time, either.  It takes only around 60 second to obtain a set of vital signs during which time one can continue to converse with the patient.

445.    My review of the records indicates that practitioners also often fail to obtain a full patient history and fail to perform an adequate physical exam, for example of an abdomen or heart.  Such practices may save time, but fall below the standard of care and could lead to serious risks of harm.  Inevitably, the missing information can be critical to making a correct diagnosis and therefore providing correct treatments.  If the condition is life threatening, this omission could lead to an avoidable death.

446. One example is ████████ (████████). Mr. ████████ complained of having a hernia and requested that he be referred to a surgeon for repair. He was seen at his cell on ████████ 2023 by a NP who did not conduct an examination of the hernia but nevertheless informed Mr. ████████ that "as long as it is reduc[e]able, it is not emergent even if it will not remain reduced." SD_787868-69. Later the same day, Mr. ████████ submitted a medical request stating "I would like a second opinion about my hernia from a Doctor, not a Nurse. Thank You." SD_788163. He was seen at his cell on ████████ 2023 by NP Stacy Thompson. SD_787871. NP Thompson also did not perform a physical examination of the hernia (writing "GU deferred due to location") but approved a truss for Mr. ████████ *Id.*

447. There is no indication in the records I have that any medical practitioner ever examined Mr. ████████ hernia. This is concerning because, as explained in more detail below, hernias should generally be treated with surgery and can cause debilitating pain if left untreated for too long. For a practitioner to provide "treatment" for a hernia without examining it is below the standard of care.

**C.    Registered Nurses Operate Outside Their Scope of Practice at the Jail**

448. In my review of the records, I found numerous examples of registered nurses performing outside the scope if their practice, *e.g.*, ordering labs or making diagnoses. This is below the standard of care and may even be against the law.

449. One example is patient ████████ (████████ Ms. ████████ was a ██-year-old woman with documented heart disease. SD_754291. On ████████ 2023, Ms. ████████ was seen by RN Maria Germono for complaints of chest pain. SD_754076-80. RN Germono filled out a "Chest Pain (Non-Acute)" form, which documented that Ms. ████████ had the cardiac risk factors of age and hypertension and was hypertensive at that moment. *Id.* RN Germono documented that Ms. ████████ had moderate left sided chest pain with nausea/vomiting. *Id.* RN

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  Germono performed an EKG. RN Germono sent the EKG to STATCare

2  practitioner Nh Ngoc Da PA, who wrote "EKG similar to ██23 EKG," but did not

3  document that the EKG was, in fact, not normal or in what ways it was not normal.

4  SD_75746. PA Da did not interact with RN Germono in any other way about this

5  case; he only commented on the EKG. RN Germono diagnosed "acid reflux" and

6  "anxiety." SD_754079. RN Germono did not immediately refer Ms. ██████ to an

7  on-site medical practitioner. RN Doreen Marasigan similarly did a chest pain

8  evaluation of Ms. ██████ including an EKG with STATCare interpretation, on

9  ██████████ 2023. SD_754099-103. This could have been a catastrophic

10 outcome. Here is a patient with known heart disease complaining of chest pain.

11 Almost all such patients should go to the ER for a cardiac work up. The RNs

12 collectively misjudged Ms. ██████ risk for a bad outcome, did work-ups outside of

13 their scope of practice that they were not competent to do, made inappropriate

14 diagnoses, and provided inadequate follow-up.

15      450.  A second similar example is ██████████ (██████████) who was seen

16 by RN Ju_e H_aro (letters missing in medical record) on ██████████ 2021 for

17 complaints of chest pain and shortness of breath. SD_785880-81. The RN

18 documented normal vital signs, normal heart sounds, and normal chest sounds. *Id.*

19 The RN did an EKG which she interpreted as "normal; sinus rhythm." *Id.* The RN

20 diagnosed "muscular strain" and gave Mr. ██████ ibuprofen for discomfort. *Id.*

21 She did not refer Mr. ██████ to be seen by a medical practitioner and, as far as I

22 could determine in his medical record, Mr. ██████ was never evaluated by a

23 medical practitioner for this complaint. The RN should have immediately referred

24 this case to a practitioner. In this case, RN H_aro did a physical examination of the

25 heart and lungs, ordered a, EKG diagnostic test, interpreted that test, made a

26 diagnosis, and prescribed a treatment. Ordering and interpreting diagnostics tests

27 and making diagnoses are outside the scope of nurse's practice and therefore did not

28 meet the medical standard of care.

451.   In summary, the regular practices of the medical staff at the Jail include practices that do not conform to the medical standard of care and, over time, can and do lead to patient harm.  These include (1) using STATCare midlevel practitioners in roles that they are not suited to, since they are remote and cannot interact with patients; (2) allowing STATCare practitioners to practice separately from the rest of the Jail medical practitioners, utilizing different leadership, oversight and protocols; (3) failing to ensure that on-site jail practitioners take vital signs and perform complete examinations of patients; and (4) allowing nurses to practice above and outside of their scope of practice.  It is my opinion that these practices place incarcerated people at a substantial risk of serious harm.

**VII.   The Sheriff's Department Lacks Sufficient Contracts with Hospitals and Offsite Providers and Lacks Proper Referral Processes to Provide Adequate Medical Care to Incarcerated People, Placing Them at Substantial Risk of Serious Harm**

452.   It is my opinion that the Sheriff's Department's entire system for providing incarcerated people with adequate offsite health care falls below medical standards.  Specifically, the Sheriff's Department also does not ensure that its contractors apply appropriate utilization management ("UM") processes to secure care for all patients who need it.  In addition, the Sheriff's Department fails to maintain sufficient contracts with community medical providers to allow Jail medical providers to refer incarcerated people with chronic and emergent medical needs to those community providers when the Jail medical units are full or do not have the resources to provide necessary treatment.

453.   Offsite medical treatment is essential to the healthcare of a large number of incarcerated patients with complex medical needs that cannot be met with onsite medical services.  The list of examples is large but broadly falls into four categories.

454.   **Surgery.**  Many incarcerated medical patients need surgical care. Incarcerated patients suffer from the same diseases and ailments requiring surgery

1   as patients in the outside community, ranging from complex brain surgeries to

2   simpler, but still necessary, hernia repairs, appendectomies, and orthopedic

3   procedures.  Surgeons must often be consulted to determine the proper role of

4   surgery in a particular patient's care.  Surgeons must be allowed to follow up after

5   surgery in a manner that they deem proper.

6        455.  **Medical specialties.**  Many patients have complex medical problems

7   that require the expertise of medical specialists such as oncologists, neurologists,

8   cardiologists, rheumatologists, and many others.  General practice physicians and

9   midlevel NPs and PAs simply do not have the training or practice expertise to be

10   able to, say, prescribe cancer chemotherapy or therapy for a myriad of other

11   complicated medical patients.[38]  Just as is done in outside medicine, referrals to the

12   specialist are essential to optimal medical care.  When the advice of a specialist is

13   sought, it is important that that advice be followed.

14        456.  **Diagnostics**.  The list of diagnostic procedures that must be done off-

15   site includes MRIs, cardiac stress tests, PET scans, and many others.

16        457.  **Medical therapies.**  Physical and occupational therapy are excellent

17   examples of the type of medical therapy that is often not available within a

18   correctional facility but is necessary to the medical well-being of a patient.  Other

19   examples include providing cancer chemotherapy, radiation therapy, and

20   rheumatological infusion therapy that must be done off-site.

21        458.  Before an incarcerated patient can be seen for any one of the above

22   outside appointments at the Jail, their request must be approved through NaphCare's

23   UM process.  UM arose in the context of Health Maintenance Organizations

24   ("HMOs") and health insurance companies (I term this "Corporate UM").  The

25

---

26  [38] Note that the category of prescribing specialty care is distinct from the actual
27  giving of specialty treatments.  For example, a patient with cancer may need to go to
both an oncologist, who will prescribe the best chemotherapy, and to separate
28  appointments for the chemotherapy infusions.  Those are two distinct, but equally
important, outside referrals.

purpose of Corporate UM is to control medical costs. UM does this by requiring pre-approval from the HMO or insurance company before they will pay for certain expensive medical procedures or medications. HMOs and insurance companies approve or deny medical requests based on a set of evidence-based guidelines.[39] HMOs and insurers most commonly use nurses to evaluate incoming medical requests, who compare the requests to the company's guidelines, then either approve or deny each request.

459.   Corporate UM has been criticized on the following grounds.

a.   HMOs and insurance companies have a financial incentive to deny requests. The UM department of an HMO or a medical insurance company is a substantial part of the corporate structure with hundreds of employees and the requisite offices, computers, technology, etc., meaning that it is very expensive to administer. It only makes sense to pay all of this money if the Corporate UM program can deny or inhibit enough medical requests to make the endeavor worthwhile.

b.   In many cases, Corporate UM creates barriers to good medical care rather than encouraging good medical care.

c.   The UM process of submitting a request and waiting for a reply is time-consuming. Filling out the requisite paperwork to request permission for a medical claim takes a great amount of time from the medical practitioner and her staff. Waiting for a reply can take literally weeks. This process imposes a large financial burden on the medical practices submitting these claims.

d.   Denials are often perceived as nonsensical. And, once again, it takes a great deal of time to submit a request to reconsider.

e.   The process is bureaucratic and opaque. When a request is

---

[39] The most used sets of guidelines are propriety products called Interqual and the Milliman Care Guidelines. Because they are propriety, they are not easily available for outside review.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  denied, it is often hard for the requesting practitioner to know why.

2     460.   Correctional facilities, such as the Jail, do not belong to an HMO and
3  do not use traditional health insurance companies to pay for health care for their
4  incarcerated populations.  Nevertheless, many companies that provide medical
5  services to correctional facilities (like NaphCare) have adopted the system of
6  Corporate UM.  The ostensible reason is to control medical costs.  They often hire
7  nurses with experience in Corporate UM to set up correctional UM programs
8  modelled after a typical HMO.

9     461.   There are problems with this, though, because Corporate UM is
10  designed for a system and patients who are quite different from incarcerated
11  patients.  One important difference is that a patient in the free world with an
12  HMO—unlike an incarcerated patient—has the opportunity to seek the medical care
13  they need outside the HMO.  If the HMO denies, say an MRI or a particular
14  medication, the patient has the right to get the MRI or the medication anyway and
15  pay for it personally.  An incarcerated patient has no such option; if a jail's UM
16  process denies a patient a procedure or a medication, then the patient simply will not
17  get that care.

18     462.   Another important difference is the scale of operation.  HMOs and
19  health insurance companies may have millions of members and tens of thousands of
20  medical practitioners.  Communications in such a large system must be written and
21  formal.  For example, if a primary care practitioner (one of tens of thousands in the
22  program) wants to order an MRI for one of her patients, she must submit paperwork
23  to the patient's insurance company explaining the need for the procedure.  Days or
24  weeks later, someone—most likely a nurse—will review the request (along with
25  thousands of other requests that arrived at the same time) and either approve or deny
26  payment for the procedure based on the HMO's pre-established guidelines.
27  Critically, the medical practitioner and the UM reviewer do not know each other.
28  They are unable to discuss the request or collaborate in any way.  If the practitioner

1   does not understand the reason behind a denial, she is unable to ask the UM nurse

2   for clarification.  In fact, she will never know which of the many UM nurses

3   employed by the insurance company handled her request.  In the end, Corporate UM

4   processes are impersonal, anonymous, and bureaucratic.  The entire process can take

5   days or weeks.  It is expensive on both ends.  The practitioner submitting the request

6   must bear the cost of the time and salaries of her and her employees to write out,

7   submit and keep track of these UM requests.  The HMO or insurance company, on

8   their end, has to pay the salaries of all of their reviewers plus the necessary

9   technology.

10      463.   In contrast, the Jail only has approximately 4,000 patients, (relatively)

11   few medical practitioners, and only one Medical Director.  In such a small setting, it

12   makes little sense to use the bureaucratic, anonymous, opaque and expensive

13   Corporate UM model.  Instead, the UM process in a jail should be local and

14   collaborative, with the goal of ensuring that patients receive appropriate medical

15   treatment in a timely manner.  A primary care practitioner at the Jail who wants to

16   order an MRI for one of her patients should not have to fill out a formal request

17   form and send it to Alabama to be approved or denied by an anonymous reviewer.

18   Instead, requests for an MRI or anything else should be reviewed by a supervising

19   physician at the Jail who the ordering practitioner knows, such as the Jail's medical

20   director or a physician assigned to UM duty.  The ordering practitioner and the

21   reviewer at the Jail should be able to talk the case over.  If the UM reviewer at the

22   Jail thinks an MRI is not warranted, she should discuss the case with the ordering

23   practitioner, explain why, and jointly create a reasonable care plan for that patient.

24   In other words, the UM process at a correctional facility should be a collaboration

25   between colleagues to ensure that appropriate medical care is provided.

26      464.   The Sheriff's Department has instead chosen to use the bureaucratic

27   method of Corporate UM by sending requests for medical care to NaphCare's

28   Corporate UM Department.  In my opinion, this is time consuming, wasteful of

1  resources, and expensive, and it results in inappropriate denials of medical care that

2  harms patients.  MSD Operations Manual No. MSD.R.2 spells out how the UM

3  process works in the Jail:

4          a.     Site practitioners must complete an "Off-Site/Consult Request"

5  form.

6          b.     The requests are then reviewed for approval or denial by the

7  Managed Care Group  "and a disposition for appropriateness will be determined by

8  a physician reviewer utilizing evidence-based criteria."  (Although the Operations

9  Manual specifies that these reviews are done by a physician, my understanding is

10  that, like other corporate UM systems, nurses do the majority of the UM work, only

11  referring to a mid-level practitioners to authorize a denial.  Physicians are not a

12  regular part of the NaphCare UM Team, but may be consulted for "particular

13  patients."  Nix I Tr. at 223:5-24.

14          c.     And, whether the referral is approved or not "will be

15  communicated to the referring provider."

16      465.   This is a Corporate UM model.  It is anonymous, opaque, bureaucratic,

17  time consuming, expensive, wasteful, and unnecessary.  As Ms. Rognlien-Hood

18  described it:  "[W]e're at the mercy of whoever NaphCare has contracted with to

19  get" outside appointments.  Rognlien-Hood Tr. at 36:4-5.

20      466.   Based on my experience with similar programs, I anticipate that, as

21  with any Corporate UM program, NaphCare's program is resource intensive and

22  therefore expensive.  It only makes financial sense for NaphCare to run such a

23  program if they deny more medical treatments than the cost of running the program.

24  From the perspective of the Sheriff's Department, the cost of nurses and

25  practitioners submitting these forms and keeping track of hundreds of replies is also

26  time consuming and expensive.

27      467.   The MSD Operations Manual's explanation of the UM process is not

28  entirely consistent with the County's contract with NaphCare, which envisions a

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1   "discuss[ion]" of non-emergent service requests among the NaphCare onsite

2   medical director, designated site staff, the Chief Medical Officer or designee, and a

3   "dedicated utilization nurse," as well as "progress notes documented in TechCare."

4   County Contract No. 566117, § 2.3.16.5. The MSD Operations Manual does not

5   provide for any such "discuss[ion]," and I have seen no evidence of those meetings

6   in progress notes of the charts I reviewed.

7       468.   In my opinion, by utilizing a method of Corporate UM administered by

8   NaphCare, the Sheriff's Department's policy for referring patients to offsite

9   providers is inadequate to treat the needs of patients and therefore places

10   incarcerated people at risk of serious harm.

11      469.   This UM structure violates other directives of MSD Operations

12   Manual, in particular, No. A.1.1 ("Access to Care"), which prohibits "[h]aving a

13   utilization review process that inappropriately delays or denies specialty care" and

14   "[p]ermitting unreasonable delays before patients are seen by prescribing providers

15   or outside consultants to obtain necessary diagnostic work or treatment for their

16   serious health needs."

17      470.   In practice, the NaphCare UM program denies requests for offsite care

18   at an unacceptably high rate—so much so that the County began raising concerns

19   about the denial rate as early as late 2022. Rognlien-Hood Tr. at 158:6-22. For

20   example, Ms. Rognlien-Hood testified that people who need physical or

21   occupational therapy were frequently denied outside appointments and directed

22   instead "to do certain exercises." *Id.* at 160:4-13. However, she explained, it was

23   often not possible for the patient to complete those exercises while they were

24   incarcerated, both due to limitations in the facility and the lack of anyone "to teach

25   [the patient] these exercises." *Id.* This practice—denying an outside appointment

26   but failing to provide a feasible alternative plan—is not commensurate with the

27   standard of care.

28      471.   Even when outside referrals are approved by NaphCare, the inefficient

UM system creates delays in patients receiving care. Rognlien-Hood Tr. at 115:20-116:12. As Ms. Rognlien-Hood testified, prior to contracting with NaphCare, if an outside referral was recommended, "it happened. It got approved." *Id.* at 115:15-16. In contrast, the system now includes "a lot of steps that [Ms. Rognlien-Hood] think[s] are unnecessary"; describing these many steps, Ms. Rognlien-Hood stated that there is a lot of "approved, authorized, pending scheduling." *Id.* at 115:16-19. As Ms. Rognlien-Hood stated in a February 22, 2023 email: "Case management ha[s] been a disaster," "due to the process change to get appointments approved." Email and attachment from S. Rognlien-Hood to C. Darnell et al., February 22, 2023, SD_375922.

472.   This concern was echoed by Physician Connie Orem, who I interviewed while touring the Las Colinas facility. When I asked Dr. Orem, "if you could make one change to improve healthcare [at the Jail], what would it be?" She replied, "more funding" so that the Jail could pay for therapy she would like to provide to patients. In her experience, "referrals take forever or are not approved."

473.   An example of a bureaucratic problem that resulted in delayed care is the case of ███████████. During Mr. ███████████ 2023 receiving screening, a nurse noted that Mr. ███████ had a "deform[i]ty at upper [l]eft side of mouth, teeth po[i]nt[i]ng [i]nward" following an assault. SD_873245. On ███ ██ a nurse noted that Mr. ███████ was in pain and having difficulty chewing and swallowing due to the injury. SD_873259-60 (Progress Note). According to the email correspondence between the Sheriff's Department and NaphCare, an expedited referral to an oral surgeon was submitted, which indicates that the request was "approved" by "Corp UM" on ████████ 2023, and "authorized" on ████████, 2023, with an "appointment pending." Email from E. Arroyo to OMS Scheduler et al., ████████ 2023, SD_351217. The reason for the expedited referral is stated as: "infection and loss of jaw use." *Id.* However, the emails show that no progress was made on this request for weeks, with repeated emails from the Sheriff's Department

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  to NaphCare asking for update.  SD_351210-16.  As the Supervising Detention's

2  Nurse stated in a ▒▒▒▒ 2023 email: "This patient has been waiting for surgery

3  since ▒▒▒▒ and seeing as it is now ▒▒▒▒ we have been waiting several months for

4  this patient to receive his care.  I really don't want this to come back to us as a delay

5  in care."  Email from B. Rafail to E. Arroyo et al., ▒▒▒▒ 2023, SD_351209.

6  Mr. ▒▒▒▒ finally received surgery for his facial injury on ▒▒▒▒ 2023.

7  SD_873962.  I agree with Supervising Nurse Ms. Rafail that this constitutes an

8  unacceptable delay in medical care.

9      474.   Another example is patient ▒▒▒▒ (▒▒▒▒).  Before

10  Ms. ▒▒▒▒ was incarcerated on ▒▒▒▒ 2023, she had had a complete evaluation

11  of spinal stenosis in her neck by a neurosurgeon.  She had received spinal injections

12  for pain and was scheduled to discuss surgical options.  Ms. ▒▒▒▒ informed the jail

13  that she needed a neck fusion on ▒▒▒▒ 2023:  "I was told by my lawyer to

14  request an operation that is necessary.  My neck needs fusing."  SD_755507.  "I'm

15  in chronic pain."  A request to have Ms. ▒▒▒▒ see a neurosurgeon, sent on ▒▒▒▒

16  ▒▒ 2023, was denied.  SD_755889.  Dr. David Christensen resubmitted a request for

17  a neurosurgical consult on ▒▒▒▒ 2023.  SD_755893.  Ms. ▒▒▒▒ had a repeat

18  MRI of her neck done on ▒▒▒▒ 2023, and a CT on ▒▒▒▒ 2023.  SD_755667.

19  Yet another neurosurgical consult was submitted on ▒▒▒▒ 2023.

20  SD_755916.  Ms. ▒▒▒▒ was scheduled for neurosurgery in ▒▒▒▒ of 2024.

21  SD_755917, but was released from the Jail before then.  In my opinion, this delay of

22  medical care was unnecessary and unacceptable.  What should have been done:

23  when Jail medical personnel learned on ▒▒▒▒ 2023 that Ms. ▒▒▒▒ had been

24  seeing a neurosurgeon and was at the stage of having surgery, someone from the Jail

25  (the Medical Director or Dr. Christensen, perhaps) should have called her outside

26  neurosurgeon to coordinate care and facilitate whatever medical care had already

27  been scheduled.  Starting over with a new neurosurgical consult (denied the first

28  time) and a new work up just served to delay a necessary surgery by nine months,

1   and subjected Ms. ███ to unnecessary pain.

2       475.   In addition to the delays in patient care from the UM system, it is

3   apparent from the documents that I reviewed that, since NaphCare began its

4   operations in the Jail and assumed responsibility for outside referrals, the Jail has

5   suffered a loss of medical contracts and strained relationships with outside medical

6   specialty groups and hospitals.  That strain on relationships with outside providers

7   poses a serious risk of harm to incarcerated people.  As Ms. Rognlien-Hood testi-

8   fied, the Sheriff's Department used to "have a good rapport with our local hospitals,

9   and then NaphCare did things a little different …."  Rognlien-Hood Tr. at 116:15-

10  17.  Those "hiccups"—as Ms. Rognlien-Hood put it—may harm patients, because

11  "community partners [may] get frustrated and not see our patients."  *Id.* at 117:4-7.

12      476.   Indeed, that is exactly what happened when NaphCare took over.  In its

13  Corrective Action Notice ("CAN") to NaphCare, the Sheriff's Department

14  explained:  "As of April 17, 2023, there are $9.3 million dollars of unpaid bills due

15  to hospitals.  Of the total outstanding claims, $4.6 million dollars are past due the

16  30-day threshold.  ***Due to lack of payment, some community providers do not want***

17  ***to see or accept our patients***, which include, but not limited to:  Podiatry (Oxford),

18  Alvarado, Vibra, Kindred."  SD_1572586 (emphasis added).

19      477.   In a May 26, 2023 email, Dr. Montgomery indicated that he had yet to

20  receive confirmation that the issue was resolved:  "We need documentation from the

21  community facilities/hospitals showing claims/bills paid."  Email & Attachment

22  from J. Montgomery to C. Miedico et al., May 26, 2023, SD_227523; *see also*

23  SD_227524 ("Need some proof regarding resolution with hospitals").

24  Dr. Montgomery also noted that NaphCare's failures were particularly problematic

25  for high risk patients, for whom NaphCare had no plan "for risk

26  mitigation/housing."  SD_227526.  He explained that NaphCare had completely

27  failed to address "long term care sites" and would "do everything possible to avoid

28  placing patients in a LTAC."  *Id.*

478.   Documents from late October 2023 suggest that the relationships with outside providers had not been fully repaired nearly six months later, despite assertions that the contracts had been fully paid, *see* Rognlien-Hood Tr. at 150:9-10. For example, in email correspondence about an incarcerated person at Kindred— one of the providers referenced in the original CAN as having hesitations about treating Jail patients—the Sheriff's Department Medical Services Administrator, Christopher Miedico, referenced the possibility of a "contractual dispute" between NaphCare and Kindred.  Email from C. Miedico to J. Montgomery et al., October 31, 2023, SD_335430.  Moreover, Dr. Montgomery expressed concern that the patient may have been delayed in receiving a PEG tube, which, according to Dr. Montgomery, "was a needed procedure a week ago."  *Id.*; *see also* SD_335431 ("This has gone on too long."); SD_335434 ("This most recent email seemed to indicate some issue regarding PEG tube placement… which should have been handled several days ago.").

479.   PEG tubes are feeding tubes that are surgically implanted so that the tube comes out of the abdomen.  They are used to feed patients who, for many possible reasons, cannot swallow or use their esophagus.  PEG tubes must receive regular maintenance to make sure that they remain clean and do not get clogged up with feeding liquids.  They must be replaced periodically.  Not performing appropriate care and not replacing PEG tubes when necessary can certainly harm patients who are dependent on their PEG tube for nutrition.

480.   Nor had these relationships been repaired by late November 2023. Email correspondence about another patient's referral to a gastroenterology clinic reveals substantial confusion about where the patient could be evaluated.  Although the referral was submitted on November 15, 2023, NaphCare and Sheriff's Department staff were still attempting to figure out whether an appointment could be scheduled as of November 29, 2023.  Email from D. Williams to M. Farrier et al., November 29, 2023, SD_350248-350254.  Although the appointment was

apparently scheduled for Alvarado Hospital, the appointment had to be canceled because the hospital did "not have a contract with NaphCare," which apparently was a "surprise[]" to those scheduling the appointment. Email from B. Nelson to MSD Managed Care Group, November 29, 2023, SD_350243. NaphCare then responded to state that this was "a misunderstanding," and they were "in contact with the hospital" to correct it. SD_350241. Despite multiple emails on November 30, the day the appointment was supposed to be scheduled, NaphCare and the Jail were unable to make the appointment happen. SD_350232-350238. Sheriff's Department staff instead discussed bringing the patient to the emergency department instead, but again confusion reigned. SD_350226-350227 ("This is not what we were told. Maybe we should just hold off …"). In her deposition, Ms. Rognlien-Hood explained that the patient was brought to the emergency room to see a different doctor, but that doctor "would not admit her," so the patient had to be returned to the Jail. Rognlien-Hood Tr. at 148:20-149:4. The patient ultimately did not receive treatment until either January or February of 2024—over a month later. *Id.* at 149:5-8 (treatment was within 45 day of Ms. Rognlien-Hood's February 14, 2024 deposition). As Ms. Rognlien-Hood put it: "This is a mess!!!!!!" Email from S. Rognlien-Hood to M. Farrier, November 29, 2023, SD_349895.

481. It is also worth noting that the Sheriff's Department's CQI program (discussed in more detail later in this Report) does not contain adequate information about the progression and health of the off-site referral process. When a CQI program considers specialty consultations and off site medical care, the CQI reports should contain analysis and information about gaps in current contracted off-site specialists; the UM process, including the average time taken to get UM approval and the percentage not approved, broken down by specialty; the average wait times for appointments with each particular specialist; and problems encountered in making and keeping these appointments, such as the reason for all missed or rescheduled appointments.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

482.   However, none of this information is contained in the Sheriff's Department CQI reports that I reviewed.  Instead, these reports give only bland statistics of how many off-site appointments were completed in a given month, and occasionally how many were cancelled due to refusals, discharges, etc.  These CQI statistics are gravely limited and suggest to me that the Sheriff's Department does not itself have a clear picture of the health of its offsite referral process and how it can be improved.

483.   To be sure, the off-site referral process is one of the more challenging aspects of carceral medical care, but it can also be of critical importance to patient health.  That is why CQI analysis is essential.  Without proper CQI, there is no opportunity to find and fix problems before they impact patient care and patients are harmed.

484.   In summary, the system of off-site referrals at the Jail is broken.  The UM process is wasteful and inefficient.  The essential relationships between the County and community health providers has been strained.  The Jail does not appropriately evaluate these problems in its CQI program.  And, as a result of these many systemic failures, incarcerated people's medical care is delayed and denied, placing them at risk of serious harm.

**VIII. The Sheriff's Department Fails to Provide Adequate Diagnostic and Chronic Care to Incarcerated People and Provides Inadequate Treatment for Several Common Medical Conditions, Placing Them at Substantial Risk of Serious Harm**

485.   In their Third Amended Complaint, Plaintiffs allege that the Sheriff's Department fails to order medically necessary diagnostic care in a timely manner, resulting in an unreasonable risk of harm to incarcerated people.  Dkt. 231 at ¶ 104.  Based on my review of the documents and as described in more detail below, I agree.  It is also my opinion that the Sheriff's Department does not have an adequate system for chronic care and provides inadequate care—including but not limited to diagnostic and chronic care—for several of the medical conditions that are most

1  common among the incarcerated population.

2  **A.    Diagnostic Care**

3  486.   Diagnostic care refers to those laboratory tests and imaging studies that

4  must be done to accurately diagnose and assess patient medical conditions.

5  Examples of commonly ordered laboratory tests are complete blood counts,

6  urinalyses, and comprehensive metabolic panels that include tests to measure

7  electrolytes (such as potassium and sodium), kidney function, liver function, and

8  nutritional status.  Examples of commonly ordered imaging studies are chest x-rays,

9  extremity x-rays, computerized tomography (CT) scans, and electrocardiograms

10  (EKG).

11  487.   Diagnostic tests are needed to accurately diagnose many acute medical

12  complaints, such as infections and heart problems.  Diagnostic tests are also needed

13  for chronic care, such as routine chronic care labs to check the status of diabetes or

14  the progression of kidney disease.  Diagnostic tests are critical to patient health.

15  They are often essential to making timely, accurate diagnoses and to monitoring the

16  progression of chronic diseases.

17  488.   The appropriate process of using diagnostic tests in the medical process

18  includes several steps, all of which should be documented in the medical record.

19  First, diagnostic tests must be ordered by a *medical practitioner*; this responsibility

20  should not be delegated to nurses.  Second, the test must be completed, *e.g.*, blood in

21  drawn, x-rays are run, etc.  Third, the test result must be interpreted by a medical

22  practitioner (preferably by the practitioner who ordered the test); again, this

23  responsibility should not be delegated to a nurse.  Fourth, the practitioner must

24  determine what changes, if any, will be made in the patient's overall care plan based

25  on the diagnostic test results.  Finally, the patient must be informed of the test

26  results and the changes in care, if any.

27  489.   Each of these steps is important.  If necessary diagnostic tests are not

28  ordered, findings and diagnoses will be missed and patients will be harmed.  If

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  diagnostic tests are ordered but not reviewed—or reviewed but the significance of

2  the labs are not noticed—again, findings and diagnoses will be missed and patients

3  will be harmed.

4      490.  The policies and procedures of the Jail should address the proper way

5  to order, interpret, and document the results of diagnostic tests.  The MSD

6  Operations Manual is silent on this subject except for addressing patient refusals of

7  lab tests.  *See* MSD Operations Manual No. MSD.R.5.VII (2022).  NaphCare's

8  Policy and Procedures address this by stating that "[d]iagnostic tests will be

9  reviewed by the clinician in a timely manner," without defining "timely," NaphCare

10  P&P, E-9.8; "[t]reatment plans are to be modified as clinically indicated by

11  diagnostic tests," *id.*, E-9.9; at that the tests and plans will be "discussed with the

12  patient," *id.*, E-9.9.  NAPHCARE 031275.  NaphCare's P&P Manual does not

13  discuss minimal standards for documentation.

14      491.  The NCCHC Technical Assistance Report found the Jail deficient in

15  reviewing diagnostic studies, recording them in the chart, and communicating

16  results with the patients.  DUNSMORE 0260641 (discussing lack of compliance

17  with NCCHC standard J-E-12).

18      492.  My review of patient records also shows that critical study results are

19  not reviewed.  One example is ▉▉▉▉▉ (▉▉▉▉▉).  Mr. ▉▉▉▉ asked to

20  be tested for sexually transmitted diseases.  RN Jamee Barrera wrote that the "STD

21  labs completed" on ▉▉▉ 2022.  SD_782038.  On ▉▉▉ 2022, the lab results

22  returned, showing that Mr. ▉▉▉ had tested positive for syphilis.  SD_782079.

23  But there is no indication that a medical practitioner ever reviewed the positive

24  syphilis test.  *Id.*  Mr. ▉▉▉ was released from the Jail on ▉▉▉ 2022,

25  SD_1575334, without this positive test being addressed or communicated to him.

26  Mr. ▉▉▉ was rebooked into the Jail ten months later, in ▉▉▉ of 2023.  *Id.*

27  On ▉▉▉ 2023, NP Frederick Wycoco finally addressed the positive syphilis

28  screen.  SD_782042.  RN Maria Ugaban had noted the day prior that Mr. ▉▉▉

1  syphilis test was positive on ██████ 2022 "but syphilis was not addressed at that

2  time because pt was released." *Id.* Had Mr. ████████ not returned to the Jail, that

3  positive test would never have been noted and dealt with; in the interim,

4  Mr. ████████ could have suffered negative health effects and spread the disease to

5  others.

6      493.  Another example is Abdiel Sarabia (21118298), a patient who died on

7  July 22, 2022 of "Hypertensive cardiovascular disease," with hypothyroidism as a

8  contributing factor. Autopsy Report, SD_001362. On October 16, 2021, blood labs

9  were drawn on Mr. Sarabia which showed a markedly elevated level of triglycerides

10  at 932 (normal is less than 150), elevated cholesterol test of non-HDL cholesterol at

11  157 (therapeutic goal of less than 100) and an elevated Thyroid Stimulating

12  Hormone indicating the possibility of hypothyroidism. SD_011633-34. Mr. Sarabia

13  had other abnormal labs, too, such as elevated liver tests indicating liver damage.

14  *Id.* No one reviewed these labs at the time.

15      494.  *Four months later*, on February 1, 2022, a psychiatric nurse practitioner

16  noted the elevated triglyceride and TSH levels and referred Mr. Sarabia to medical.

17  SD_011546-47. Once notified, Joseph Molina, MD, reviewed the labs on February

18  8, 2022 and ordered fenofibrate, a medication for high triglyceride levels. However,

19  Dr. Molina still did not address the abnormal thyroid test, the other lipid

20  abnormalities, or the elevated liver enzymes. He did not discuss the results with

21  Mr. Sarabia in person. SD_011551. Mr. Sarabia's abnormal thyroid levels—which

22  the autopsy determined were a contributing factor in his death—were never

23  addressed over the several months Mr. Sarabia was incarcerated.

24      495.  ████ ████████ (████████) blood test results dated ████████

25  2023 showed an extremely low platelet levels among other lab abnormalities

26  associated with chronic hepatitis C infection. SD_814796. I can find no note that

27  anyone reviewed those labs or noted his particularly low platelet level.

28      496.  The fact that lab reviews are not documented properly and discussed

with patients was corroborated by a CQI review, which reported, "This quality improvement study focuses on provider follow-up after ordering of labs, diagnostic studies or specialty consults/referrals to identify whether results are being reviewed by providers and discussed with patients.  In May [2023], SBDF achieved 28% overall compliance.  In June, compliance was 16%."  CQI Review PowerPoint, July 18, 2023, SD_114489.  This is an abysmally low compliance rate.

497.   The Sheriff's Department's failure to review diagnostic testing places incarcerated people at risk of serious harm, because it allows their medical conditions to worsen.  The consequences of this can include death, as it was for Mr. Sarabia.

**B.     Chronic Care**

498.   Inside and outside the correctional setting, people have conditions that require regular medical visits, even if they are not experiencing any acute or urgent symptoms caused by the underlying medical condition.  One example is diabetes.  People with diabetes should be evaluated by a medical professional at regular intervals for a check-up in order to confirm that their condition is being managed appropriately.  These chronic care appointments are distinct from any urgent medical care a person might need if they begin to experience acute symptoms from their underlying condition.

499.   The medical standard of care for the frequency of chronic care appointments and what should happen at those appointments (*i.e.*, what labs should be checked) are set forth by well-recognized medical guidelines issued by medical specialist societies.[40]

500.   Even though a chronic care appointment does not necessarily treat an urgent or acute problem, it is nonetheless important to a patient's health, and failing

---

[40] As one example, *see* Daniel L. Larber et al., *Diabetes Management in Detention Facilities:  A Statement of the American Diabetes Association*, 47 DIABETES CARE 544 (2024).

to provide such appointments can place a patient at a serious risk of harm. These clinics have the specific goal of monitoring a patient's condition over time. Often, even though a patient feels well, their condition has deteriorated in a way that should be addressed with a new medical treatment plan. For example, consider a hypothetical patient with type 2 diabetes. Although she feels well, she may be suffering from diabetic retinal disease, which is asymptomatic at first, but could lead to blindness, if untreated. Absent a chronic care appointment, she would miss a referral to an ophthalmologist for treatment.

501. The Jail has a long history of failing to provide appropriate chronic care for its patients. The NCCHC Technical Assistance Report listed numerous criticisms of aspects of chronic care. The NCCHC noted that the Jail lacked chronic care guidelines for several chronic diseases, including seizures, diabetes, asthma, and many others. DUNSMORE 0260643 (discussing lack of compliance with NCCHC standard J-G-01). They stated that "[c]hronic disease services must be developed," and patients with chronic diseases "monitored according to [a] protocol" developed based on accepted national standards. *Id.*

502. Perhaps in response to negative assessment, the 2022 contract that the Sheriff's Department negotiated with NaphCare devoted an entire section of the Statement of Work to a "Chronic Care Program" that required NaphCare to establish chronic care protocols and chronic care clinics. Contract No. 56117, § 2.3.11, NAPHCARE000580-81. These chronic care clinics must comply "with standards established for the care and treatment of chronic illnesses." *Id.* § 2.3.11.6. These clinics were to be scheduled for each patient with a chronic disease, at a minimum, within "approximately one month" of admission. *Id.* § 2.3.11.10. In addition, TechCare lists several of recommendations for chronic care at the end of its Health Assessment form. *See* NAPHCARE034787-88.

503. However, in practice, NaphCare has not met this obligation of their contract as far as I can tell. The Jail's provision of chronic care falls below the

standard of care.  Testifying on behalf of the Sheriff's Department, Dr. Montgomery explained that as of the date of his deposition, there is no separate chronic care clinic.  Montgomery II Tr. at 119:15-18.  Instead, the Jail was "using an acute care setting to manage chronic appointment types."  *Id.* at 119:19-20.  According to Dr. Montgomery, this practice of "using chronic appointments in an acute-care setting would certainly be less efficient and could potentially reduce the speed or effect a delay in getting a patient aligned with the community."  *Id.* at 121:20-22.  It is my impression that some chronic care appointments are occurring, but many of the charts I reviewed show patients are not scheduled appropriately for chronic care.

504.   Dr. Montgomery also testified that one of the goals of the Sheriff's Department's new contract with CHP was to "create a separate chronic care clinic," which in turn would "allow for a longer time frame for the patient/physician encounter to accommodate all chronic-care needs and requests."  Montgomery II Tr. at 119:22-120:8.  However, this is not expressly laid out in the new CHP contract, which merely states, under the definition of "Clinic":  "Provisions are made for both scheduled appointments for addressing chronic care issues and same-day appointments for acute issues."  Contract No. 571418, Agreement With Correctional Healthcare Partners Inc § 5.5.8, SD_1579719.  For his part, Dr. Freedland stated in his deposition that he was "aware" of the NCCHC requirement for chronic care clinics but was unable (or unwilling) to state which national standards he would follow in developing chronic care guidelines.  Freedland Tr. at 171:9-15.

505.   From this testimony, and the relative lack of chronic care appointments in the charts I reviewed, it is my opinion that the chronic care system at the Jail remains inadequate, putting incarcerated people at risk of harm.

## C.   Inadequate Treatment of Common Medical Conditions

506.   My review of documents also revealed inadequacies in treatment of multiple conditions that are common in the incarcerated population:  hepatitis C, type 2 diabetes, hernias, latent tuberculosis, sexually transmitted infections, and

1  asthma.

2              1.    **Hepatitis C ("HCV")**

3      507.   HCV is a virus that infects liver cells.  HCV is an infectious disease

4  spread blood-to-blood, most commonly by sharing needles between persons

5  injecting heroin, meth, or other drugs of abuse.  Up to 85% of people infected by

6  HCV develop chronic infections.  These people never clear the virus from their

7  blood and so are infectious to other people for the remainder of their lives or until

8  they are treated and cured.  Over time, HCV causes liver disease (termed fibrosis)

9  and the death of liver cells (termed cirrhosis); it can ultimately lead to liver cancer

10  (hepatocellular carcinoma), the need for liver transplant, or death.

11      508.   Although most patients with chronic HCV infection are asymptomatic

12  until their liver disease has progressed to a moderate-severe stage, those patients

13  remain infections and can transmit the virus to other individuals in the community.

14  Diagnosis of chronic HCV infection is made through simple lab tests.

15      509.   Chronic HCV can be treated with antiviral drugs, which will totally

16  eradicate HCV in over 95% of patients, essentially curing them of the disease

17  (although the liver damage they have already sustained may not be entirely

18  reversible).  HCV antiviral drugs are remarkable in that they are easy to administer

19  as pills taken once a day for 8-12 weeks, and they cause very few side effects.

20  There is no need for lab monitoring during therapy.  There is no need for

21  consultations with infectious disease specialists or liver specialists in most patients.

22      510.   The standard of care for HCV in correctional facilities includes the

23  following key points.[41]  First, jails should implement opt-out testing for HCV,

24  
_____

25  [41] The standard of care for patients suffering from chronic HCV infection can be
found in several places, including standard medical textbooks (such as the online
26  textbook Uptodate) and guidelines published by specialty organizations.  Probably
the most cited and respected of these guidelines is *HCV Guidance:*
27  *Recommendations for Testing, Managing, and Treating Hepatitis C* published
jointly by the American Association for the Study of Liver Diseases (AASLD) and
28  the Infectious Diseases Society of America (IDSA). This guideline contains a
section that specifically addresses care for incarcerated patients: *HCV Testing and*

1  meaning that incarcerated people are automatically tested for HCV unless they

2  choose not to be.  The opposite is "opt-in" testing, in which people must request a

3  test.  Second, all people who test positive for HCV and are expected to be in the Jail

4  for at least 10 weeks should receive the (essentially curative) antiviral treatment

5  noted above.  Ideally, even people who may be released sooner than 10 weeks

6  should receive antiviral treatment and, if necessary, be connected to a community

7  healthcare provider who can continue the treatment after release.  In any case,

8  treatment should not be dependent on the patient's level of liver damage.  Finally,

9  people with HCV should receive counseling about the infection and be provided

10  linkage to follow-up community healthcare for evaluation of liver disease and

11  treatment upon release.

12      511.   However, my review of patient charts and my interviews of

13  incarcerated patients during my jail tour show that the Jail is not following this

14  guidance.

15      512.   The Jail does not do opt-out testing for HCV infection, despite having a

16  large percentage of patients with risk factors for HCV infection.  The Jail instead

17  does only opt-in HCV testing.  Opt-in testing is dependent on patients knowing that

18  they might have Hepatitis C and that they have the right to request the test.

19  However, the Jail does not adequately inform incarcerated patients that HCV testing

20  is available to anyone who wants it.  Of course, patients who do not know about

21  HCV testing will not request it.  Choosing to test patients for HCV infection only

22  when they request testing and failing to inform patients of their right to ask for this

23  test does not make any sense from a medical perspective.  It only makes sense as a

24  way of minimizing the number of HCV cases found in order to save money by not

25  having to treat them.  By choosing this method of screening, the Jail is missing

26  many patients who have chronic HCV infections that could be cured by treatment.

27

28  *Treatment in Correctional Settings* (Dec. 19, 2023)  [hereinafter *HCV Treatment in Corrections*], https://www.hcvguidelines.org/unique-populations/correctional.

1   Since they were not discovered and not treated, these patients will continue to

2   deteriorate over time and continue to infect others.

3       513.   The Jail also denies treatment to many patients who they know are

4   suffering from HCV, based on the misguided principle that only patients with at

5   least moderate liver damage should receive treatment.  I understand that the Jail has

6   a document referred to in medical records as "Physician's Treatment Guide [PTG]

7   for Hepatitis C," also known as "PTG.H.9."  *See, e.g.*, Medical Record of ███

8   ███████ SD_781828.  Although I understand that Plaintiffs' counsel asked for all

9   Jail policies, including those governing medical care, I have not seen PTG.H.9 and

10  am not aware that the Sheriff's Department provided it.  In fact, the "PTG" is barely

11  referenced in the MSD Operations Manual, and it appears that at least some portion

12  of section H of the PTG has been "archived" since at least November 2022.  *See*

13  Policy MSD.H.14 (noting that PTG.H.3 has been archived).  Practitioners in the Jail

14  should not be providing care based on an archived treatment guide.

15      514.   However, in at least some cases, medical practitioners appear to rely on

16  this PTG and, consistent with that guidance, provide treatment for HCV only if

17  patients have at least a moderate to severe degree of liver damage.  This was the

18  case, for example, with ██████████████, whose treatment was deferred on

19  ██████████ 2023, SD_754905, and ███████████, whose treatment was

20  deferred on ██████ 2023 and ██████ 2023, despite his request to resume HCV

21  medications and his statement that he was receiving HCV treatment at another

22  facility, SD_782060-61.  As far as I can tell, unless a patient has advanced liver

23  fibrosis, the Sheriff's Department will refuse to provide HCV treatment.

24      515.   This makes no sense medically.  Modern antiviral treatment for HCV

25  will cure greater than 95% of patients, does not take very long (8 weeks), has few

26  side effects, and requires minimal monitoring.  Treatment also does not usually

27  require consultation with a liver or infectious disease specialist.  Treatment is so

28  simple and so effective that the CDC encourages primary care doctors to treat most

HCV patients themselves rather than referring to a specialist.  *See, e.g.*, Richard R. Andrews, *Family Physicians Can Manage Adults with Hepatitis C*, 98 AM. FAM. PHYSICIAN 413, 413 (2018).

516.   Denying patients with chronic HCV infection a cure until they get sicker (and can infect more people) unquestionably violates the standard of care, which is to treat everybody who will be incarcerated for "sufficient time" (approximately ten weeks or longer).  *See HCV Treatment in Corrections*, *supra* at 2.  Denying infected patients a cure until their liver is more damaged only makes sense if the goal is to save money by denying necessary medical care.

517.   I have also seen no evidence that the Jail meets the other standard of care elements:  HCV patients not given counseling while they are in the Jail, nor are they connected to community healthcare providers upon their release.  Ideally, the Jail would have identified a specific community partner who has the funding and resources to treat discharged Jail patients with HCV infection, including planning for patients who are uninsured.  The Jail could and should work with San Deigo County Health and Human Services to create a plan for HCV patients without insurance who are discharged without treatment.  However, I have not seen any evidence that such a community partner has been identified.

518.   Examples of patients who were denied medical treatment for chronic HCV infection contrary to the medical standard of care include:

519.   ███████ (███████) was seen on ███████ 2023 by Nas Rafi MD, who wrote, "pt. requesting hep c treatment.  His fib4 is 0.69 indicating low level fibrosis, so no indication for tx [treatment] based on county guidelines."  Medical Record of ███████ from Booking ███████, at p. 483.  Mr. ███████ was seen again during the same incarceration on ███████ 2023 by NP Nicolaus Rosete, who wrote, "30 yo [year old] male pmhx [past medical history of] Hep C, reports having diagnosis for 13 years, he is requesting treatment … FIB4 calculation is 0.98.  Informed patient he is unlikely to have advanced liver fibrosis based on

1  score" and denied Mr. ███ treatment. *Id.* at pp. 484-85. NP Rosete did not

2  address the fact that Mr. ███ Fib-4 score (which measures the degree of liver

3  damage) had worsened from 0.69 to 0.98 in two months. This indicates that

4  Mr. ███ had rapidly progressing liver damage due to his HCV infection.

5  Denying him appropriate care meant that his liver would continue to deteriorate and

6  that he would remain infectious to other people.

7      520.   ███ (███) was seen on ███ 2023 by

8  NP Frederick Wycoco, who wrote "Fib4 score = 0.51 High likelihood of low stage

9  fibrosis. Per SDSD policy PTG.H9: Defer Hepatitis C treatment at this time."

10  SD_754905.

11      521.   ███ (███) requested treatment for HCV infection

12  and was seen on ███ 2023 by NP Ozoma Enworom, who wrote "Informed IP

13  FIB score 0.60 and that per SD Sheriff current guidelines treatment is deferred."

14  SD_782061.

15      522.   ███ (███) submitted a sick call request for

16  treatment for HCV infection on ███ 2023. SD_772844. A handwritten

17  response on Section 2 of the Sick Cal form states "Per provider, your level did not

18  meet the criteria for treatment." *Id.*

19      523.   ███ (███) was seen on ███ 2022 by David

20  Christensen MD because for HCV infection counseling. Medical Record,

21  SD_800289. Dr. Christensen wrote "I discussed the patient's labs with her. Her

22  FIB4 = 0.37. She does not meet Hep C treatment criteria." *Id.*

23      524.   In essence, the Jail medical providers are telling these patients: "We

24  have a medication that could cure you of your deadly HCV infection quickly and

25  easily. But we have decided that we will not give it to you until more of your liver

26  is diseased and you are sicker." It is important to keep in mind that each of these

27  patients is infectious and can transmit this deadly disease to others. In the end, the

28  Sheriff's Department is deliberately withholding treatment for patients with a

1   serious medical illness that could be quickly and easily cured.

2       525.   This policy of denying treatment to patients who the Jail knows have a

3   serious progressive disease contrary to the medical standard of care, apparently

4   because they are not sick enough, places these patients at a risk of serious harm.

5                   **2.    Type 2 Diabetes**

6       526.   The Jail fails to provide patients with type 2 diabetes with care

7   consistent with national standards.

8       527.   Type 2 diabetes is a progressive disease in which patients develop

9   resistance to the effects of the hormone insulin that they produce.  In contrast to type

10  1 diabetes, in which patients produce no insulin and must be given insulin to

11  survive, patients with type 2 diabetes initially have plenty of insulin—their insulin

12  levels may indeed be abnormally high.  Their problem is insulin resistance, meaning

13  that their insulin does not work as effectively as it should.  The result of insulin

14  resistance is abnormally high blood sugars.  Over time, the elevated blood sugar

15  causes many serious health problems, including kidney failure, heart disease,

16  neuropathy (nerve damage), retinal disease, and many more.

17      528.   The treatment of type 2 diabetes differs considerably from that of type

18  1 diabetes.  Insulin is usually not used to treat type 2 diabetics early in their disease

19  for two reasons:  (1) patients with type 2 diabetes have plenty of their own insulin

20  (their insulin levels may even be high), and (2) they are insulin resistant, meaning

21  that giving them more insulin has little effect.  After about 20 years of having this

22  disease, type 2 diabetics' insulin levels tend to fall below normal levels and, at that

23  time, insulin therapy should begin.  Before that, there are many other medications

24  that can be used effectively to treat type 2 diabetes.  An appropriate diet is also

25  important in the management of type 2 diabetes.

26      529.   The standard of care for type 2 diabetes in correctional facilities

27

28

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

includes the following key elements.[42]  First, type 2 diabetics should have a complete medical history taken, as well as a comprehensive intake physical examination, including a retinal exam, cardiac exam, peripheral pulses, foot exam, and neurological exam.  They should also have a number of labs taken as part of intake, including but not limited to a Hemoglobin AIC blood test ("A1C"), which is the most important diagnostic test to follow the progress and status of type 2 diabetes.  Second, as noted above, insulin is not the primary medication required for many adults with type 2 diabetes.  Insulin should generally be used only for people with an AIC of over 10%.  And, when insulin is necessary, so-called "sliding scale" insulin is expressly discouraged.  Finally, patients with type 2 diabetes should receive dietary and lifestyle counselling.

530.   My review of patient charts and my interviews of incarcerated patients during my inspection show that the Jail is not following this guidance and is, instead, providing poor medical care to diabetic patients.  In particular:  the Jail does not conduct recommended physical exams or labs in a timely manner; discontinues long-acting insulins as a matter of course and instead prescribes sliding scale insulin; changes patients' medications without consulting them; and provides minimal, if any, diabetic counselling to type 2 diabetic patients.

531.   One particularly troubling fact is that the Jail's formulary does not include (and therefore essentially prohibits the use of—see discussion of formularies earlier in this Report) some legitimate diabetic drugs and encourages irresponsible substitutions.  In particular, the Jail requires STATCare practitioners to irresponsibly

---

[42] The standard of medical care for patients suffering from Type 2 DM can be found in several places, including standard medical textbooks (such as the online textbook Uptodate), and guidelines published by specialty organizations. Probably the most cited and respected of these guidelines for DM is the American Diabetes Association, *Standards of Care in Diabetes* (2023) [hereinafter *ADA Standards of Care*], https://diabetesjournals.org/care/issue/46/Supplement_1. The American Diabetes Association recently released guidelines specific to management of diabetes in correctional settings. Larber, *Diabetes Management in Detention Facilities*, *supra*.

discontinue long-acting insulins on newly admitted patients taking them.  The STATCare Intake and Order Form contains this statement:  "**All long-acting insulins will be substituted with Novolin N BID at an equivalent dose unless there is documented evidence that the patient cannot or should not be transitioned**."  *E.g.*, SD_790712.  Novolin N (a short acting insulin) is given exclusively via a sliding scale.  The STATCare Intake and Order Form allows STATCare practitioners only one way to prescribe it:  "Insulin Sliding Scale (Standard) BID x 30 days."

532.    All of this deviates so severely from the guidelines of the American Diabetic Association, that, in my opinion, it constitutes medical malpractice.

533.    The records I reviewed suggest that the Sheriff's Department has good reason to know that this guidance for treatment of diabetes is inadequate and dangerous.  In September 2021, two people with type 2 diabetes died in the Jail: John Wright, died September 16, 2021, Autopsy Report, SD_001427; and Teresita Tuazon, died September 28, 2021, Autopsy Report, SD_055905.  Both Mr. Wright and Ms. Tuazon died of type 2 diabetes complications that take days to develop, meaning Jail staff should have noticed their abnormal blood sugar levels over that period and intervened to save their lives.

534.    Those two preventable diabetic deaths within two weeks of each other no doubt led Dr. Montgomery to, on December 3, 2021, issue "Medical Directive: #7 – Internal Transition of Care for the Management of All Patients with Diabetes." SD_169026-27.  This Medical Directive required:  "All identified diabetic patients will be scheduled for an in-person assessment by a qualified healthcare practitioner (Physician/clinician) within 72 hours."  *Id.*  "Nursing staff will request dietary consultation in Techcare and order a STAT basic chemistry panel and HgA1c to have test results available at the medical encounter."  *Id.*  "Medical clinicians are expected to initiate a treatment plan, to include considerations for medications, periodicity of glucose checks, and provision for continued evaluation/additional

encounters for chronic care follow up." *Id.* And, a "sliding scale is used for initial stabilization, but the sliding scale is not designed or intended for ongoing clinical management." *Id.*

535. In my opinion, each of these is excellent clinical practice that conforms to the medical standard of care as set forth by the American Diabetic Association.

536. However, nine months later, on August 16, 2022, Dr. Montgomery issued Medical Directive 7A, which **rescinded** Medical Directive 7. SD_375927. Medical Directive 7A basically put diabetic management in the hands of the STATCare practitioners, leading the Jail to its current, inadequate treatment as described above.

537. With the stroke of a pen, in-person evaluations with on-site practitioners were out and remote diabetic management by STATCare was in. Sliding scales were again permitted for "ongoing clinical management." Treatment plans for diabetics were optional. And (per the STATCare mandates noted above) all long-acting insulins were to be discontinued at booking. Further, the NaphCare guidance cited in Directive 7A contains no information about proper management of Type 2 Diabetes. All of this was a departure from the American Diabetic Association Guidelines and failed to meet the standard of care.

538. In his deposition, Dr. Montgomery stated that the "reason" he rescinded the excellent provisions in Medical Directive 7 "was due to NaphCare's arrival" and the "introduction of StatCare," which is no excuse for abandoning the appropriate standard of care. Montgomery II Tr. at 229:16-21.

539. The following cases exemplify the Jail's mismanagement of type 2 diabetes:

540. ███████ (███████) is a type 2 diabetic. At his ███████ 2022 booking, RN Elizabeth Miller noted that Mr. ███████ had non-insulin dependent diabetes mellitus with "BS 293, asymptomatic, reports last dose of metformin was last night." SD_815566. This case was referred to

1   STATCare NP Juancho Trinidad, who reviewed RN Miller's message and, without

2   any other history, labs, and certainly without examining Mr. ███████ ordered

3   "Insulin Sliding scale (Regular) TID x 15 days." SD_815587-89. NP Trinidad

4   made no referral for an in-person evaluation by a site medical provider. *Id.*

5   Mr. ████████ was rightfully confused about why he had been prescribed insulin.

6   On ███████ 2022, Mr. ██████████ wrote "I've never had insulin injection

7   before." SD_815922. He was seen by RN Grace Ceclio, who noted that she

8   "[e]xplained importance of getting insulin, made aware of risk and benefits of

9   refusing insulin. Pt. refused. IP requesting to see a medical provider." SD_815922.

10  On ████████ 2023, NP Frederick Wycoco reviewed Mr. █████████ blood

11  sugars in the medical record and noticed that Mr. █████████ had been refusing his

12  blood glucose checks. NP Wycoco made no attempt to see Mr. █████████ and did

13  not schedule him to be seen by another medical practitioner. SD_815922. On

14  ████████ 2023, Mr. █████████ refused to allow a blood draw for a Hemoglobin

15  A1C. SD_815923-24.

16      541.   Because he had refused his A1C lab test, on ███████ 2023, Jospeh

17  Molina MD saw Mr. █████████ at his cell. Dr. Molina wrote, "Patient states he

18  just does not want to take medications. He knows he has diabetes. He doesn't have

19  continuous follow up with a doctor on the outside. He does not know what an A1C

20  is. He was prescribed metformin previously and it was a discharge medication from

21  the hospital." *Id.* Dr. Molina did no vital signs and no physical examination, noting

22  only that Mr. ████████ appeared to have a "normal affect." Dr. Molina did not

23  explain to Mr. █████████ why insulin had been prescribed for him. Instead, he

24  noted "I advised patient to take medications—patient understands. Continue

25  offering medications." Mr. █████████ then simply began refusing insulin. He

26  refused insulin the rest of the time he was at the jail. *See* SD_815924-36. The

27  LVNs had to fill out a refusal form every time, which was a monumental waste of

28  their time. When he was discharged from the jail on ████████ 2023, he was given

1  a prescription for needles and for insulin that he had never taken, did not want, and

2  should never have been prescribed in the first place.  *See* SD_815605.

3  542.  Mr. ███████ treatment fell below the standard of care in

4  numerous ways:  he was inappropriately prescribed insulin without a medical

5  indication; he was inappropriately prescribed short acting insulin and placed on a

6  sliding scale; he was not seen or examined by the practitioner who put him on

7  insulin; he never received an appropriate physical examination or lab studies; and he

8  was not allowed to have informed consent and input into his own therapy.

9  543.  ███████ (███████) was booked on ███████ 2023.

10  SD_791077-84.  At his receiving screening, done by RN Wenyon Boyd, he stated

11  that he was a diabetic.  *Id.*  No blood sugar was checked, and he was not referred for

12  a second stage nursing evaluation.  *Id.*  The same day, Nh Ngoc Da, Corp PA, did a

13  remote STATCare review of a "Nurse Alert" which stated "Surescripts pt claims

14  taking Mounjaro [a GLP-1 diabetic medication] injection for DM, please advise."

15  SD_791100.  PA Ngoc Da responded: "[T]his med is nonformulary.  Will order

16  insulin sliding scale." *Id.*  There is no indication that Mr. ███████ had been on insulin

17  before.  PA Ngoc Da ordered this without reviewing a medical history or any labs,

18  such as an A1C.  *Id.*  NP Nicholas Kahl then did a provider chart review on

19  ███████ 2023.  SD_791101.  NP Kahl did not see Mr. ███████ but did order

20  diabetic labs.  *Id.*  Mr. ███████ labs showed an A1C of 6.1, which is too low for a

21  diagnosis of diabetes.  SD_791179.  (A diagnosis of type 2 diabetes cannot be made

22  until the A1C is greater than 6.5.  An A1C of 5.7 or below is normal.  A1Cs between

23  5.8 – 6.5 are termed "pre-diabetes," which is usually treated with diet, exercise, and

24  weight loss—not drugs.)  NP Stacey Thompson reviewed Mr. ███████ labs on

25  ███████ 2023 and wrote "Labs reviewed."  SD_791102.  NP Thomson did not

26  mention the A1C result.  *Id.*  On ███████ 2023, NP Christine Sullivan also

27  reviewed Mr. ███████ labs:  "Reviewed labs done ███████ 2023 and A1C 6.1

28  in PRE-DM [pre-diabetes mellitus] range so for now his metformin 1000 mg/day is

fine." SD_791102.  NP Sullivan evidently did not notice that Mr. ███ had been
prescribed insulin on a sliding scale.  Mr. ███ labs were repeated on ████████
2023, and his Hemoglobin A1C was 6.2, still too low to justify a diagnosis of
diabetes.  SD_791181.

544.  On ██████████ 2023, as a result of his request to speak with a doctor
about his diabetes, Mr. ████ was seen by NP Frederick Wycoco.  NP Wycoco
wrote, "He is asking for Mounjaro. … He said he does not want insulin. …  Will
order glipizide 5mg qd. … Mounjaro is not formulary."  SD_791117.  NP Wycoco
evidently did not notice that Mr. ████ had been prescribed and was receiving
insulin on a sliding scale.  Glipizide, in any case, was an inappropriate prescription
for a patient with an A1C below 6.5.  Mr. ████ continued to ask for resumption of
his Mounjaro prescription.  On ██████ 2024, Mr. ████ was seen by Joseph
Molina MD, who wrote "pt is wondering why he can't get mounjaro."  SD_791123.
"Reviewed labs with patient, reassured pt with order f/u [follow up] A1C glucose
checks ordered."  *Id.*  This A1C was drawn on ████████ 2024 and was 6.0, well
below the threshold of 6.5 for a diagnosis of type 2 diabetes and near normal (5.7
and below).  SD_791186.  Despite his objections, Mr. ████ continued to be offered
insulin injections as late as January 2024.  SD_791659.

545.  Mr. ████ treatment was below the standard of care reveals the
following failures:  his verified prescription for Mounjaro was discontinued because
it was not on the Jail formulary; he received no significant diabetic counselling; he
had no blood sugar test done at his receiving screening; he was inappropriately
prescribed short-acting insulin without a medical indication; he was inappropriately
placed on a sliding scale; he never received an appropriate physical examination;
and he was not allowed to have informed consent and input into his own therapy.

546.  ████████████ (████████) is a type 2 diabetic who reported
during her receiving screen on ████████2024 that she was taking Lantus 15 units
once a day.  SD_790711.  That same day, STATCare NP Juancho Trinidad

discontinued the prescription for Lantus and substituted short-acting insulin via a sliding scale, as the STATCare Intake Assessment and Orders required him to do. SD_790712.  NP Teresa Hurley reinstated appropriate long-acting insulin orders on ████████ 2024 after a chart review disclosed that Ms. ████████ blood sugars were very high. SD_790691.  NP Hurley did not examine Ms. ████████ at this time or schedule her for a chronic care visit.  *Id.*

547.   Ms. ████████ treatment was below the standard of care in the following ways: the records I have for Ms. ████████ indicate that no A1C or other labs were ever ordered or drawn, *see* SD_790687-790695; no practitioner ever did an appropriate physical examination; Ms. ████████ received no diabetic counselling; her verified Lantus prescription was discontinued; and she was placed inappropriately on a sliding scale of short acting insulin.

548.   The Sheriff's Department also does not provide diabetic patients with medically required retinal examinations.[43]  As noted above, patients with type 2 diabetes should be given a retinal examination.

549.   If annual exams show no evidence of retinopathy and blood glucose levels are at goal, screenings can be done every 1–2 years.  However, if any level of diabetic retinopathy is detected, yearly examinations are essential, and more frequent exams are needed if retinopathy progresses or poses a threat to vision.

550.   My review of the charts of several diabetic patients shows that none of this is being done.  *E.g.,* ████████ (████████); ████████ (████████); ████████ (████████); ████████ (████████); and ████████ (████████).

551.   In conclusion, the care of type 2 diabetic patients in the Jail does not meet the standard of care set forth by the American Diabetes Association.  Diabetics

---

[43] The standard of eye care for patients with type 2 diabetes is also laid out in the American Diabetic Association Guidelines. *See* Larber, *Diabetes Management in Detention Facilities*, *supra.*

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  are not evaluated and examined by a health care practitioner at intake or during the

2  health assessment.  Prescribing is done, rather, by midlevel practitioners working

3  remotely who are contacted electronically.  This failure to meet the standard of care

4  has caused patient harm in the past and will continue to cause patient harm in the

5  future.

### 3.    Hernias

7       552.    The Sheriff's Department routinely fails to diagnose and treat

8  incarcerated patients with inguinal (groin) hernias in compliance with the medical

9  standard of care and recognized published treatment guidelines.

10      553.    Inguinal hernias arise when the muscular wall of the abdomen weakens

11  and allows the underlying abdominal contents to bulge out.  When hernias are small,

12  only abdominal fat bulges out of the hernia.  However, without treatment, hernias

13  get larger over time.  As they get bigger, more abdominal tissue can bulge through

14  the opening, and it becomes harder to push the abdominal contents back into the

15  abdomen (called "reducing" the hernia).  Sometimes, abdominal contents cannot be

16  reduced.  This is termed "incarceration" of the hernia and is a surgical emergency,

17  because the bulging abdominal contents can be squeezed by the hernia opening so

18  tightly that the tissue dies, causing serious harm to the patient.  "Uncomplicated'

19  hernias are small and cause no significant problems for the patient.  "Complicated"

20  hernias do cause problems, such as debilitating pain or interference with daily life.

21      554.    The standard of care for hernia patients requires that patients be given

22  the option for surgical treatment of the hernia.[44]  Delaying a surgical repair is

_____

[44] The standard of medical care for patients with inguinal and/or umbilical hernias can be found in many places, including standard medical textbooks as well as guidelines published by surgical specialty organizations.  I referred to two such references as establishing the medical standard of care for hernias.  The first was HerniaSurge Grp.. *International Guidelines for Groin Hernia Management*, 22 HERNIA 1 (2018).  The second was the medical textbook UPTODATE. David C. Brooks, *Overview of Treatment for Inguinal and Femoral Hernia in Adults*, *in* UPTODATE (Michael Rosen et al eds), https://www.uptodate.com/contents/overview-of-treatment-for-inguinal-and-femoral-hernia-in-adults.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

appropriate *only* if (a) the hernia is asymptomatic or minimally symptomatic *and* the patient, after having been counseled of the risks of delaying surgery, choses to do so; or (b) the patient is pregnant.

555.    *Uptodate* provides the following flowchart:



556.    Although a truss, or hernia belt, may be helpful in certain situations, their use is generally discouraged, because there is insufficient evidence to prove their efficacy.  In addition, inappropriate use of a truss may harm abdominal contents in a hernia sac or complicate subsequent surgical repair.

557.    Neither the Sheriff's Department policies and procedures manual nor the NaphCare policy manual contains any guidance regarding the treatment of hernias.  *See MSD Operations Manual*, *supra*; NaphCare Policy & Procedure Manual, September 2022, NAPHCARE 031065-373.

558.    In practice, my review of patient charts and my interviews with incarcerated patients during my inspection of the Jail show that the Sheriff's

Department is following none of the guidance outline above.  First, based on my review of individual medical records, it is my opinion that the Jail has an unwritten institutional policy to deny surgical treatment of hernias, even in severe cases.  Indeed, the records reflect that Sheriff's Department medical staff have told patients that hernias are not repaired by policy on multiple occasions from 2017 to 2023.  It is my understanding that surgery for hernias is never approved or even considered unless the patient has a surgical emergency.  Even patients with persistent debilitating pain from hernias are refused surgical repair of their hernias.  Second, practitioners routinely diagnose and prescribe treatment for hernias without ever examining the hernia.  Third, practitioners in the Jail frequently prescribe trusses for patients with hernias without examining them and irrespective of whether the patients find the trusses helpful.

559.   In fact, during my inspection of the Jail, I observed two patients with hernias who stated the Jail medical staff refused to repair them.  One was ██████ ██████ (DOB ██████ 1955).  Although sitting in a wheelchair, Mr. ██████ had a basketball sized right inguinal hernia visible beneath his clothes.  Mr. ██████ stated he had submitted multiple requests and grievances but "they're not helping me."  The second was ██████████ (DOB ██████ 1972), who lifted up his shirt to show me a grapefruit-sized umbilical hernia.  He said, "They won't repair that."  I later learned that Mr. ██ was booked on ██████ 2023, meaning that he had been in the Jail for about seven months when I saw him.

560.   The following are examples of patients whose records I reviewed and who were denied appropriate care for their hernias:

561.   **Michael Taylor** (17122758), a named plaintiff in this case, informed the Jail medical staff that he has a right sided inguinal hernia when he was booked on April 11, 2017.  Medical Record, DUNSMORE 0071323.  The next day, medical staff noted, "IP with groin hernia for 1 month.  IP looking to have surgery ASAP."  DUNSMORE 0071347.  He was seen by a medical practitioner, on April 16, 2017

who noted that Mr. Taylor was already scheduled to have the hernia repaired at Scripps Mercy Hospital.  DUNSMORE 0071348.  However, the medical plan was for Mr. Taylor to "notify medical" if the hernia got worse.  *Id.*  Mr. Taylor told a nurse that his hernia was "increasing in size and discomfort" on April 18, 2017.  DUNSMORE 0071350.  The nurse told him "this nurse would schedule pt to see MD."  *Id.*  However, the MD did not see him, and instead asked to get his outside medical records.  *Id.*  On May 25, 2017, Mr. Taylor reported that "[m]y hernia has gotten so bad I can no longer poop."  DUNSMORE 0071358-59.  He was given an "athletic supporter" and a prescription for a laxative.  *Id.*  Although he continued to complain of hernia pain and associated constipation throughout his period of incarceration, he was never offered surgical repair of his hernia.  This violated the standard of care.

562.  ██████████ (████████):  On ██████████ 2019, Mr. ████████ reported to a nurse that he was experiencing nausea and had vomited repeatedly and that he had suffered an inguinal hernia a year prior.  Medical Record of ████ ████ at p. 166 of 1072.  The nurse also documented that Mr. ████████ experienced "10/10 shooting pain when moving and during palpation."  *Id.*  On ██████████ 2019, Registered Nurse Cesar Felarca completed an ER Referral form, noting that Mr. ████ had a "right inguinal hernia with increased swelling and episodes of vomiting x 10 since" the night before and sending him to the hospital.  *Id.* at p. 88.  Dr. Montgomery was the referring practitioner.

563.  At the hospital, the ER doctor was able to reduce the hernia.  When Mr. ████ returned to the Jail, he reported, "They manually pushed it back in and gave me a shot."  *Id.* at p. 170.  "They said it had a knot and if I didn't get it pushed in I would have died."  (I do not have a copy of the ER report.)  On ██████████ 2019, Registered Nurse Shirley Equipado wrote that Mr. ████ was "[r]equesting to see the MD to be evaluated re: hernia problem, R groin."  *Id.* at pp. 173-74.  On ██████████ 2019, Mr. ████ again requested to have his hernia evaluated by a

doctor. *Id.* at p. 58. On ███████ 2020, Mr. ███████ once again requested to be seen, noting: "Hernia sticking out bad. Hurts. Already went to the hospital here." *Id.* at p. 328.

564. On ███████ 2020, Mr. ███████ was finally seen by a doctor in the Jail about his hernia for the first time. Dr. Nas Rafi wrote that Mr. ███████ was "requesting [an] inguinal hernia repair." *Id.* at pp. 180-81. However, Dr. Rafi did not examine Mr. ███████ hernia. *Id.* Instead, she wrote "discussed that there is no Indication for hernia repair in the setting of asymptomatic reducible hernia." *Id.* This ignored the fact that Mr. ███████ had been sent to the hospital for an incarcerated hernia and had complained of hernia pain multiple times in the previous four months, including after his return from the hospital.

565. Mr. ███████ continued to complain of pain, including in a sick call request form dated ███████ 2020, in which he stated: "Need a hernia belt / get it checked out." *Id.* at p. 329.

566. On ███████ 2020, NP Rodalyn Ulep-Brown approved a hernia belt for Mr. ███████ without seeing or examining him. *Id.* at pp. 184-86. Mr. ███████ never did receive surgery repair of his hernia while incarcerated.

567. ███████ (███████): On ███████ 2023, Mr. ███████ was scheduled to be seen by a Sheriff's Department practitioner after he complained that he had a hernia in his right groin for one month, with a pain level of 5 out of 10. Medical Record, SD_787864. Mr. ███████ was seen that day by NP Lacey Beaston, who made the following notes: "Pt states his main concern is that he wants to get his hernia repaired," and "he states it will no longer stay reduced when he pushes it back in." SD_787869. NP Beaston did not examine Mr. ███████ hernia but informed him that "as long as it is reducable it is not emergent even if it will not remain reduced." *Id.* She denied Mr. ███████ request for surgery. *Id.*

568. Mr. ███████ subsequently wrote: "I would like a second opinion about my hernia from a doctor, not nurse. Thank you." SD_788163. He received no

1 response to this request.

2     569.  On ███████ 2023, Mr. ███████ requested pain medication due to

3 "extreme pain [in his] groin area" from the hernia. SD_787870-71. That day, NP

4 Stacy Thompson wrote that Mr. ███████ was "requesting a truss for his right

5 inguinal hernia" since no repair had been offered. *Id.* NP Thompson approved this

6 request despite not examining Mr. ███████ *Id.*

7     570.  On ███████ 2023, health care staff notified STATCare that

8 Mr. ███████ was having abdominal pain from his hernia. SD_787843-44.

9 Katherine O'Neal Corp NP, responded, "Determine if family is able to bring truss

10 for support," despite the fact that Mr. ███████ already had a truss. *Id.* Otherwise,

11 NP O'Neal approved Tylenol and Ibuprofen for Mr. ███████ *Id.*

12     571.  On ███████ 2023, RN Pooja Mita saw Mr. ███████ for "several

13 complaints regarding having a hernia and not receiving his psych meds."

14 SD_787874-95. Mr. ███████ was upset that his hernia complaints were being

15 ignored. *Id.* RN Mita "re-educated pt regarding importance of wearing truss." *Id.*

16     572.  Mr. ███████ was never referred for a surgical evaluation of his hernia.

17 *See id.* SD_787945-46 (discharge summary prepared ███████ 2023).

18     573.  ███████ (███████): Mr. ███████ complained of bilateral

19 inguinal hernias throughout several incarcerations beginning in 2020 and continuing

20 into 2024. He was seen by a nurse on multiple occasions, but never received

21 adequate treatment for his condition. For example, Mr. ███████ was seen by RN

22 Andrea Medina on ███████ 2022, who wrote that Mr. ███████ reported his

23 "hernia really hurts. I should get surgery on it." Medical Record of ███████

24 from Booking ███████, at pp. 151-52. RN Medina noted a "large left inguinal

25 hernia" and alerted STATCare. *Id.*

26     574.  In response, STATCare NP Juancho Trinidad wrote that Mr. ███████

27 had complained of "excruciating pain to left lower [abdomen]; claiming to have a

28 hernia…. No clinical assessment performed on this patient." *Id.* NP Trinidad only

1    ordered an "IBU, colace, and hernia belt/scrotal support." *Id.*  NP Trinidad

2    performed no examination of Mr. █████ and did not know if his hernia had any

3    complicating factors. *Id.*

4        575.   On █████2022, NP Nicholas Kahl visited Mr. █████ at his cell

5    due to complaints of abdominal pain from a distended abdominal hernia.  NP Kahl

6    wrote "bring pt to clinic for exam and to attempt manual reduction of the hernia."

7    *Id.* at p. 153.

8        576.   The next day, Mr. █████ was seen at the clinic by NP Emiliza

9    Comejo.  *Id.* at pp. 154-55.  However, NP Comejo did not examine the hernia and

10   did not attempt any manual reduction.  Instead NP Comejo only noted that

11   Mr. █████ had "bulging" in his "[l]eft groin."  NP Comejo wrote that she

12   "encouraged him to use [a] [t]russ," but Mr. █████ reported that this made him

13   more uncomfortable.  *Id.*  In the end, NP Comejo told Mr. █████ to notify

14   medical if he became worse and did nothing else.  *Id.*

15       577.   Mr. █████ continued to complain of hernia pain.  As just one

16   example, he was seen by RN Matthew Duenskie on █████2022 for hernia

17   pain that RN Duenskie incorrectly documented on a "Muskuloskeletal pain/strain"

18   form.  Medical Record of █████ from Booking █████, at p. 61.

19       578.   Mr. █████ has continued to have hernia problems throughout 2023

20   and into 2024, which were treated only with hernia belts.

21       579.   These four examples demonstrate patients who have hernias that met

22   the medical standard for surgical intervention, but were not properly evaluated or

23   treated in the Jail.  None of these patients (except Mr. Taylor in 2017) was examined

24   by a medical practitioner.  All the patients' requests for surgery were denied.  The

25   patients' complaints of pain and disability were ignored.  Hernia belts (trusses) were

26   prescribed by practitioners who had never examined the patient.  Neither the

27   Sheriff's Department nor NaphCare has any written guidelines or policy for hernia

28   evaluation and treatment—at least, that I have seen.  However, there appears to be

1    an unwritten policy that patients with hernias are not to be referred to a surgeon.

2    This violates the medical standard of care, and incarcerated patients have suffered as

3    a result.

4                    **4.    Latent Tuberculosis ("LTB")**

5        580.    The Jail fails to provide appropriate screening and treatment for people

6    infected with LTB.

7        581.    Tuberculosis is an infection with a more complicated course than most

8    other infections.  Patients usually are exposed to tuberculosis by breathing the

9    infectious agent into their lungs.  After a brief illness like a chest cold, the

10   tuberculosis organism goes into a latent state.  After a period that can last years, the

11   tuberculosis organism reemerges and becomes an active infection.  Patients with

12   active tuberculosis are seriously ill and can infect others by coughing out

13   tuberculosis organisms that other people inhale into their lungs.  Tuberculosis is a

14   serious illness that can cause debilitation and death.

15       582.    The Jail has a program in place to find patients with *active* tuberculosis

16   infections by doing a chest x-ray, which will show typical tuberculosis lesions in

17   patients with active tuberculosis.  Patients then can be isolated and treated.

18       583.    However, the CDC recommends that jails should also have a program

19   in place to diagnose *latent* tuberculosis infection in patients at high risk for LTB,

20   such as injection drug users.  The goal is to find and treat patients with LTB and

21   cure them before the disease becomes active, causing serious illness and infecting

22   other people.

23       584.    Screening high risk patients for LTB is relatively simple.  Screening

24   can be done as a two-step skin test or a simple one-step blood test.

25       585.    In addition, the CDC recommends that jails should test for LTB

26   annually for all employees and for anyone incarcerated in the jail for greater than

27

28

1  one year.[45]

2      586.   Dr. Venters recommended that the Jail begin testing for latent TB

3  infection in 2020.  SD_215390.

4      587.   The NaphCare contract requires NaphCare to provide "TB screening,

5  evaluation and treatment … in accordance with NCCHC and CDC

6  recommendations," which would include screening for LTB.  Contract No. 566117,

7  *supra* § 2.3.2.3.  My review of patient charts and my interviews of incarcerated

8  patients during my inspection show that the Jail is following neither of these

9  recommendations.

10     588.    I found no instance in the cases I reviewed where a high-risk patient

11 was tested or treated for LTB.  High risk patients include injection drug users, which

12 includes most patients treated by the Jail for opioid withdrawal.

13     589.   Per CDC guidelines, the Jail should do LTB testing in high risk

14 individuals at booking and every year thereafter.  However, the Jail, by policy, does

15 not even consider doing testing for LTB until the patient has been incarcerated for a

16 minimum of two years (*see* the TechCare Health Assessment, which states that LTB

17 screening frequency is "every two years.").

18     590.   It makes no sense medically to ignore the CDC guidelines for testing

19 high risk patients for LTB, especially since the test (especially the one-step blood

20 test) is quick and easy.  It only makes sense to ignore these CDC guidelines if the

21 goal is to save money by not providing appropriate medical care.

22

---

23 [45] The Standard of Care for the screening and treatment of tuberculosis in

24 incarcerated populations can be found in several places, including standard medical
   textbooks (such as the online textbook Uptodate), and guidelines published by
   specialty organizations. Probably the most cited and respected of these guidelines

25 for tuberculosis is Centers for Disease Control, *Prevention and Control of*
   *Tuberculosis in Correctional and Detention Facilities:  Recommendations from*

26 *CDC* (2006), (https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5509a1.htm.  This
   guideline  has been endorsed by the National Commission on Correctional Health

27 Care (NCCHC), the American Correctional Association, and the Advisory Council
   for the Elimination of Tuberculosis.  According to this guideline, the San Diego Jail

28 would be categorized by the CDC as a "nonminimal TB risk facility."

591.   When LTB is identified, the standard of care is to treat these patients with appropriate antibiotics to eradicate the infection.  However, according to its policy, the Jail does not do this.

592.   The MSD Operations Manual Tuberculosis (TB) Program states that treatment for LTB will be offered to patients only if "[e]xpected length of stay 6 months or greater."  MSD Operations Manual § MSD.T.3 VI(B).  The Manual does not state why the County would not treat everyone with a positive test for LTB.  *Id.* It makes no medical sense to not treat these patients who have a serious infection.  It only makes sense if the goal is to save money by not providing necessary medical care.

593.   MSD.T.3 allows patients who do have LTB to remain undiagnosed and untreated.  This policy violates the medical standard of care and has undoubtedly led to cases of active TB that could have been prevented had the Jail followed the CDC recommendations.

### 5.    Sexually Transmitted Infections ("STIs")

594.   It is my opinion that the Sheriff's Department fails to screen for STIs commensurate with national standards.

595.   It is important to screen and treat STIs.  STIs are communicable diseases that can easily spread from person to person through sexual contact.  Many jail patients do not have easy access to regular healthcare services outside of the jail. They also may not be aware that they are infected.  Undiagnosed and untreated STIs can lead to serious health complications, such as infertility, pelvic inflammatory disease, and HIV.  Screening and treating STIs in the jail would improve the overall health of patients.[46]

596.   As explained above in the section on HCV, jails can adopt either an

---

[46] Of course, the Sheriff's Department's screening and treating STIs in jail patients would have the additional benefit of preventing the spread of these infections in the broader San Diego community when patients are released.

"opt-out" screening program, in which all patients are automatically screened unless they refuse, and an "opt-in" screening program in which screening is performed only if the patient requests it. Although STI screening guidelines vary depending on gender and sexual activities, key recommendations include:[47]

597. **Syphilis.** Screen for syphilis in all patients (men and women) at increased risk (history of incarceration, transactional sex work, geography, race/ethnicity, methamphetamine use).

598. **HIV.** Screen annually if at risk. Test if patient is seeking evaluation and treatment for STIs.

599. **Hepatitis C.** Screen everyone at least once and repeat test for high-risk individuals. Screen all pregnant women.

600. **Chlamydia/Gonorrhea**. For men, conduct routine screening in correctional settings because they are high-prevalence settings. For women, screen annually if sexually active and under 25. For those over 25 screen if at increased risk (prior infection, more than one sexual partner in the past year, suspicion that a recent partner had concurrent partners, new sexual partner in past three months, illicit drug use, or transactional sex in the past year, among other factors). Rescreen for reinfection approximately three months after treatment.[48]

601. My review of documents, including patient charts and my interviews of incarcerated patients during my inspection of the Jail show that the Sheriff's

---

[47] The medical standard for screening for sexually transmitted diseases (STDs) can be found in several places, including standard medical textbooks (such as the online textbook UpToDate), and guidelines published by specialty organizations. The California Department of Public Health has published an excellent guideline that conforms with the U.S. Preventive Services Task Force. Infectious Disease Society of America, and California Department of Public Health (CDPH) Sexually Transmitted Diseases Control Branch (STDCB); *see also* Cal. Dep't of Pub. Health, *California Sexually Transmitted Infections*, CA.gov (Nov. 17, 2023), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/California-STI-Screening-Recommendations.aspx.

[48] *See California Sexually Transmitted Infections (STI) Screening Recommendations 2021*, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/California-STI-Screening-Recommendations.aspx.

1    Department is not compliant with that standard of care.

2        602.    The Sheriff's Department conducts STI screening on an opt-in basis.

3    This is clear from the Preventative Screening section of the Health Assessment form

4    in TechCare states explicitly that STD screening is done "upon request" only.

GENDER: Male and Female

AGE: All

PREVENTATIVE SCREENING: STD Screening

PROVIDER ORDERS:

FREQUENCY: Upon request

9        603.    However, "opt-in" programs cannot be effective unless patients are

10   informed of their right to have STI screening done.  I have seen no evidence of any

11   effort to inform patients of this program.

12       604.    Choosing to only screen patients for STIs when they request screening

13   and then failing to inform patients of their right to request screening does not make

14   any sense from a medical perspective.  It only makes sense as a way of minimizing

15   the number of STI screens done in order to save money by not doing them.

16       605.    In addition, Jail practitioners do not do physical examinations of

17   patients requesting screening for STIs—even when patients request a physical

18   examination.  Without a physical examination, medical practitioners cannot find

19   critical evidence of STIs that can only be found by examination, such as herpes,

20   genital warts, trichomonas, syphilitic ulcers, discharge, swollen lymph glands,

21   ectoparasites (like pubic lice), and rashes.  Since the practitioners are not doing

22   these exams, they are not finding these infections.  As a result, not only are patients

23   being harmed by not being treated, other people are also at risk of being harmed by

24   being infected by these patients.  Not doing a physical examination of patients

25   complaining of STIs violates the medical standard of care and causes harm to

26   patients and others.

27       606.    Examples of this substandard care include:

28       607.    ██████ (██████):  On ██████ 2024, PA Juancho Trinidad

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1   posted a STATCare note that Mr. ███ had "concerns [about] sexually transmitted

2   disease(s) and request[ed] further work-up." Medical Record of ████████ from

3   Booking ████, at p. 463. He then wrote that "[n]o clinical assessment [was]

4   performed on this patient. … Check for GC/Chlamydia, syphilis, hepatitis and HIV.

5   FU [follow up] MDSC [MD sick call] prn [as needed]." *Id.* Mr. ███ tests were

6   all normal. *Id.* at pp. 474-75. However, as he acknowledged in his note, NP

7   Trinidad did not talk to Mr. ███ and did no examination looking for signs of other

8   potential STDs. No other practitioner ever saw Mr. ███ face-to-face as a result of

9   this request. This violated the medical standard of care. I saw no documentation

10  indicating that anyone ever reviewed the STI lab tests or communicated the findings

11  to Mr. ███ In fact, two weeks after his negative tests, Mr. ███ made another

12  request for STD testing, suggested he was unaware of the results. *Id.* at p. 874.

13      608.   ████████████ (██████): On ██████ 2024,

14  Ms. ███ wrote a medical request asking for an HIV test and STI panel. Medical

15  record of ████████ from Booking ████, at p. 896. The next day, NP

16  Daniel Swink wrote a STATCare note that reiterated that Ms. ███ had "concerns

17  [about] sexually transmitted disease(s) and request[ed] further workup." *Id.* at p.

18  489. NP Swink ordered laboratory tests for GC/chlamydia, syphilis, and HIV. *Id.*

19  "If suspect trich or BV, treat empirically." *Id.* NP Swink did not talk to

20  Ms. ███ or perform an exam, *id.*, which violated the medical standard of care.

21  NP Swink's order delegated diagnosis and treatment of "trich or BV," though such

22  delegation is inappropriate, as explained earlier in this Report. Trichomonas

23  infection (trich) and bacterial vaginosis (BV) are usually diagnosed during a pelvic

24  examination. I cannot find any record of Ms. ███ having a pelvic examination

25  or testing for BV or trich. I cannot find in Ms. ███ chart any lab test results for

26  HIV, syphilis, gonorrhea or chlamydia. (Ms. ███ did have lab tests that

27  confirmed that she had chronic HCV infection. *Id.* at p. 518.). I cannot find any

28  refusal form or mention of a refusal for these tests. It appears that they were never

drawn. For all of these tests not to have been done and then for no one to notice that they were not done violated the medical standard of care.

609. ██████████ (██████): On ████████ 2022, Mr. ██████ requested an evaluation for "bumps on penis." SD_781892. On ████████ 2022, Mr. ██████ again requested STD testing. *Id.* NP Nicholas Kahl ordered an STD screen but did not examine Mr. ████████ SD_782037. On ████████ 2022, Mr. ██████ was seen for the "bumps on penis" complaint by RN Romeo DeGuzman. *Id.* RN DeGuzman wrote "C/O (complaining of) penile wart. 'I want the doctor to see it.'" *Id.* But RN DeGuzman did not refer Mr. ████████ to see a practitioner. *Id.* He wrote instead "Encouraged good hygiene and proper hand washing. Instructed to notify staff for any changes." *Id.* No medical practitioner ever examined Mr. ████████ for this complaint. This violated the medical standard of care. Genital warts are treatable. The standard of care would have been to treat Mr. ██████ for this. Genital warts are also transmissible to others. By not treating Mr. ██████ genital wart, other people may have contracted genital warts from Mr. ██████

610. On ██████ 2022, RN Jamee Barrera wrote "STD labs completed" for Mr. ████████ SD_782038. However, there is no note that these labs were ever reviewed by a practitioner. In fact, the labs were positive for positive for syphilis. *Id.*, SD_782079. The positive syphilis result was dutifully reported to the Health Department on ████████ 2022, *id.*, but no medical practitioner documented the results of Mr. ██████ positive test for a syphilis infection. Since the syphilis infection was never noted, no one from the Jail made any attempt to contact Mr. ██████ (who had been released) to inform him of his positive syphilis test.

611. Mr. ████████ returned to the Jail in ██████ 2023. On ██████████, 2023 and again on ████████ Mr. ████████ requested STD testing. *Id.* at SD_781893. On ████████ 2023, a positive RPR Syphilis screen returned. SD_782087. On ████████ 2023, NP Frederick Wycoco finally addressed the

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  positive syphilis screen.  SD_782042-43.  A nurse noted that Mr. ███ syphilis

2  test was positive on ███ 2022 "but syphilis was not addressed [at] that time

3  because pt was released."  *Id.*

4      612.   In conclusion, the Jail does not follow the standard of care set out by

5  the California Department of Public Health for the screening of STIs.  Instead of the

6  recommended opt-out screening, the Jail offers opt-in screening, but without

7  informing patients of their right to request STI screening.  Positive screening results

8  are sometimes ignored.  This violates the standard of care and harms patients.

9              **6.    Asthma**

10     613.   It is my opinion that the Sheriff's Department fails to treat asthma

11  consistent with the standard of care, placing patients at a substantial risk of serious

12  harm.

13     614.   Asthma is an episodic disease of the lungs in which an environmental

14  trigger causes constriction of lung passages and increased production of mucous,

15  both of which restrict air movement.  Asthma causes wheezing and shortness of

16  breath, and it ranges in severity from mild and easy to treat to severe enough to

17  cause death.[49]

18     615.   Providers can diagnose asthma through a combination of patient

19  history, physical examination, and bedside tests, the simplest of which is a handheld

20  peak flow meter.  A diagnosis of probable asthma can be made based upon history

21  alone, provided the patient has typical symptoms that respond promptly and

22  completely to therapy.  However, bedside handheld instruments for evaluating

23  asthma complaints should be readily available at the Jail and should be used each

24  and every time an asthma patient is evaluated by a Registered Nurse or a

25

26  [49] The standard of care for patients suffering from asthma can be found in several
   places, including standard medical textbooks (such as the online textbook Uptodate),
27  and guidelines published by specialty organizations. For the sake of simplicity, I
   chose to refer to standards of care laid out by the medical textbook UPTODATE. *See*
28  *Asthma*, UPTODATE, https://www.uptodate.com/contents/table-of-contents/allergy-
   and-immunology/asthma.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

practitioner. This was recommended by the NCCHC Technical Support document in 2017. DUNSMORE 0260635. Importantly, because of the episodic nature of asthma—*i.e.*, an asthmatic patient might not have symptoms all the time, but might still require medication—providers should not dismiss a diagnosis simply because a patient is asymptomatic at the time of examination.

616. The treatment of asthma depends on the severity of the patient's symptoms in the past and current examination and beside testing. The simplest treatment is a "rescue inhaler," usually albuterol, that patients use when they have an asthma attack. All patients with asthma should have immediate access to such an inhaler. When patients have many asthma attacks, other medications are added in stepwise fashion, including inhaled steroids, long-acting bronchodilators, and others. Well respected guidelines discuss the proper way to prescribe each of these therapies in a step-wise fashion along with guidance on when to refer to a pulmonologist, how frequently to schedule chronic care visits, etc.

617. Finally, effective asthma management requires a preventive approach, with regularly scheduled chronic care visits during which symptoms and pulmonary function are assessed, control of exposure to asthma triggers and impact of comorbid conditions reviewed, medications adjusted, and ongoing education provided.

618. Both the 2017 NCCHC Technical Assistance Report and Dr. Venters' 2020 Best Practices identified problems with asthma diagnosis and therapy provided to incarcerated patients at the Jail. The NCCHC noted: "Our chart reviews indicated there were no recorded peak flow meter tests for asthma patients. This should be part of routine chronic care for asthma and COPD patients." DUNSMORE 0260635. NCCHC also found that besides for hypertension there were "no other chronic disease guidelines to guide providers," including no guidelines for asthma as would be required by the NCCHC. DUNSMORE 0260643. Dr. Venters recommended that during health assessments, patients should

1  "have some brief or focused physical examination also performed, such as

2  auscultation of lungs and peak flow testing for patients who report asthma."

3  SD_215371.

4      619.   Despite the recommendation from the NCCHC in 2017 that the Jail

5  have an asthma guideline for medical providers, it still to this date has no adequate

6  written asthma guideline for practitioners.  The Sheriff's Department does have a

7  guideline for nurses to assess patients reporting acute asthma attacks.  Sheriff's

8  Department, *Standardized Nursing Procedure* § SNP.A.6 (2020).  In the

9  community, patients reporting to an ER, urgent care center, or practitioner's office

10  complaining of difficulty breathing due to asthma would always be seen by a

11  medical practitioner.  However, SNP.A.6 allows nurses to decide who is sick

12  enough to refer to a practitioner and who is not.  They act as gatekeepers to

13  practitioner access.  For patients with "acute respiratory distress," SNP.A.6 allows

14  the nurses to administer an inhaled bronchodilator.  Nurses may call a practitioner if

15  they think the call is warranted.  Such calls are made more-or-less exclusively to

16  remote STATCare practitioners who are not able to examine the patient.

17      620.   STATCare practitioners have a dropdown menu of options they are

18  allowed to prescribe for asthma.  The STATCare treatment options are nebulized

19  albuterol or albuterol multi-dose inhaler.  However, besides the bronchodilator

20  albuterol, there are other essential therapies for asthma, including inhaled steroids,

21  long acting bronchodilators, and MAST cell stabilizing drugs.  These options are not

22  available to the STATCare practitioners, who cannot examine asthma patients

23  anyway since they live remotely.  STATCare practitioners may refer patients to be

24  seen by onsite medical practitioners.  STATCare practitioners also have the option

25  of discontinuing asthma treatments and even eliminating the diagnosis of asthma

26  entirely from a patient's medical record if they wish.

27      621.   I have seen no other guidelines for asthma care for medical

28  practitioners at the Jail, whether remote STATCare practitioners or onsite

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

practitioners.  This is curious, because such guidelines are readily available in medical textbooks like UpToDate and from specialty organizations whose guidance is available online.[50]  This is a problem because asthma is a complicated disease and most practitioners cannot remember the appropriate tests, treatments, and follow-up recommendations for various patients.  Without guidelines, asthma patients tend to be under evaluated, undertreated and many are harmed.

622.   In the end, my review of documents, including patient charts and my interviews of incarcerated patients during my inspection of the Jail, show that the Sheriff's Department does not comply with the standard of care for asthma therapy:

623.   ████████████ (████████):  Mr. ██████ reported a history of asthma at his receiving screening on ████████ 2023. SD_749433.  The history of asthma was referred to PA Nhi Ngoc Dai via STATCare.  PA Dai ordered an albuterol inhaler for Mr. ████████ use but did not examine Mr. ████████ nor did he or anyone else perform any bedside tests, such as a peak flow meter reading. SD_749447-48.  The next day, NP Stacy Thompson discontinued the diagnosis of asthma and Mr. ████████ access to an albuterol inhaler: "Pt with no documented hx of asthma and has no meds noted in community.  Albuterol dc'd."  SD_749444.  NP Thompson did not talk to Mr. ████████ examine him, perform any bedside diagnostic testing, or schedule Mr. ████████ for any future assessments prior to the discontinuation.  Asthma is an episodic disease and jail patients may not have had easy access to medical care in the community.  To discontinue an inexpensive rescue inhaler and further to eliminate the diagnosis from a patient's chart without an examination or bedside pulmonary tests violated the standard of medical care.

624.   ████████████ (████████):  Mr. ████████ reported a history of asthma when he was booked on ████████ 2022.  Mr. ████████ was seen on

---

[50] *See, e.g.*, Nat'l Heart, Lung, and Blood Inst., *Asthma Management: Updated Guidelines from the National Heaty, Lung, and blood Institute*, 104 AM. FAM. PHYSICIAN 531 (2021), https://www.aafp.org/pubs/afp/issues/2021/1100/p531.pdf.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1    ██████████ 2022 by NP Nicholas Kahl.  NP Kahl noted the history of asthma and

2    that Mr. ████████ was requesting access to a rescue inhaler.  NP Kahl prescribe a

3    Xopenex inhaler that Mr. ████████ was allowed to keep with him at all times.

4    SD_782035.  A task for a chronic care visit for asthma was scheduled for ████████,

5    2022, but had not been completed as of his release in ██████  During a subsequent

6    booking, Dr. Rafi did not see Mr. ████████ examine him, or do any asthma testing.

7    Instead she wrote a note stating:  "Asthma cancelled … Reason no [history of]

8    active asthma requiring recent md use in community."  Mr. ████████ prescription

9    for a rescue inhaler was discontinued.  SD_781893.  There is no indication that

10   Mr. ████████ was scheduled for any future asthma assessments.

11        625.   On ████████ 2023, Mr. ████████ submitted a sick call request for an

12   "emergency inhaler," stating that he had asthma, was "having trouble breathing,"

13   and had already requested an inhaler once before.  SD_781893.  RN Vanessa

14   Rimando referred this request to STATCare without obtaining any history, doing

15   any physical examination or doing bedside testing.  *Id.*  On the same day,

16   STATCare PA Juancho Trinidad ordered a "formulary equivalent" to Xopenex

17   which was the generic bronchodilator albuterol.  SD_782044.  PA Trinidad did not

18   talk to Mr. ████████ do any physical examination, or perform any bedside tests.

19   *Id.*  NP Trinidad also did not schedule Mr. ████████ for any future chronic care

20   clinics.

21        626.   ████████████████ (████████):  On ████████ 2024, Mr. ████████

22   submitted a sick call request stating that he had "bad asthma" and "need[ed] [an]

23   inhaler.  SD_837817.  There is no indication that Mr. ████████ was seen by a nurse or

24   a practitioner for this complaint or that an asthma inhaler was ordered before he was

25   released from the Jail 10 days later.

26        627.   Jail policy requires a face-to-face visit from an RN within 24 hours of

27   submitting a medical request, such as this one.  This did not occur.  The medical

28   standard of care requires any patient stating that they have a disease that can cause

sudden death, like asthma, to be seen as soon as possible by a medical practitioner. This did not happen either.

628.  ██████████ (██████):  On ██████ 2023, a Registered Nurse completing Mr. ██████ receiving screen wrote that he had asthma and was using an albuterol inhaler.  An albuterol inhaler was subsequently ordered for him.  SD_991335.  One month later, on ██████ 2023, the diagnosis of asthma and the albuterol prescription were both cancelled by NP Frederick Wycoco, with the stated reason being "no use of md, no [history of] asthma, no record in surescript." *Id.*  There is no indication that NP Wycoco talked to Mr. ██████ examined him, or did any testing prior to issuing this order.

629.  Each of these examples falls below the standard of care and places the patient a risk of harm.  Acute asthma attacks can be sudden and severe.  Sometime, patients do not have time to submit a medical request form.  Without appropriate therapy already prescribed, patients can be harmed and even die from untreated asthma attacks.

630.  The fact that three different practitioners (including the Jail Medical Director, Dr. Rafi), discontinued albuterol prescriptions on three different patients indicates to me that this was an unwritten practice of NaphCare to decrease the number of albuterol inhalers prescribed.  I suspect, but have no direct evidence, that these three practitioners were told not to authorize asthma treatment for patients who stated that they had asthma but had no current asthma prescriptions in the community.  This practice makes sense if the goal was to save NaphCare money, but it does not make sense medically.

631.  In conclusion, the Jail fails to provide appropriate asthma screening and treatment to their incarcerated patients, placing them at substantial risk of serious harm.  NaphCare appears to have inappropriately instructed practitioners not to prescribe asthma treatment for patients who stated that they had asthma but had no current asthma prescriptions in the community.  The Sheriff's Department has failed

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  to create guidelines asthma chronic care.  The Sheriff's Department's guidelines for

2  acute asthma care (SNP.A.3) is inappropriate and does not meet the community

3  standard of care.

## IX.    The Sheriff's Department Fails to Provide Medically Necessary Vision Care

6      632.   In my opinion, the Sheriff's Department fails to: (1) screen and

7  evaluate patients for eye disease (even for patients at increased risk for eye disease);

8  and (2) timely provide incarcerated people with medically necessary eyecare and

9  prescribed eyeglasses.  These failures result in substandard care of those with vision

10  care needs.

### A.    The Sheriff's Department Fails to Screen or Evaluate People for Eye Diseases, Even Those Who Self-Identify as High Risk

13     633.   Many incarcerated patients have medical conditions of the eye that

14  require medical evaluations and care.[51]  Examples include cataracts, glaucoma,

15  keratoconus, and diabetic retinopathy.  The Jail has an obligation to evaluate and

16  treat eye diseases in accordance with national standards and with the standard of

17  care in the community.  However, the Jail appears to ignore the eye health of its

18  patients who have eye diseases or are at risk for eye disease.

19     634.   Glaucoma is the most common cause of irreversible blindness

20  worldwide.  Many patients with glaucoma are asymptomatic early in the course of

21  disease, given the often slowly progressive nature of the condition.  Therefore,

22  screening of higher-risk patients is essential to minimize vision loss and prevent

---

[51] A note about definitions:  Optometrists are eye doctors who evaluate and treat most eye diseases.  Optometrists evaluate vision deficits and prescribe glasses to correct those deficits.  Ophthalmologists are eye surgeons.  Ophthalmologists usually do not prescribe eyeglasses; rather, they take care of more complex eye problems.  At the Jail, almost all of the referrals for eye/vision evaluations should be to an optometrist first, unless the patient has a known surgical problem.  I refer to optometrists in this report except when it is clear that an ophthalmologist must be involved.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  blindness.[52]  The standard of care for glaucoma screening is that people with
2  diabetes, a family history of glaucoma, or African American and/or Hispanic people
3  should be screened at age 40, and that all people age 55 and older should be
4  screened annually.[53]

5      635.  All people receive a screening eye exam to look for glaucoma,
6  cataracts, retinopathy and other eye diseases beginning at age forty and every 1 to 3
7  years after age 55.  People with known eye disease such as keratoconus or diabetic
8  retinopathy should continue any previously scheduled specialist appointments and
9  screening examinations that had been recommended by their outside vision
10 specialist before they became incarcerated.

11     636.  Unfortunately, the Jail does not provide any recommended eye
12 screening, even for patients who are at high risk of eye disease and request
13 screenings and/or exams.  There is no mention eye health in the MSD Operations
14 Manual or NaphCare's Policies and Procedures.  The NaphCare Health Assessment
15 Form lists several Preventative Screening considerations at the end of its Health
16 Assessment Form for consideration by the RN doing the exam.  However, there is
17 no reference to preventative or comprehensive eye exams based on age or other risk
18 factors as there should be per national standards.

19     637.  The Sheriff's Department fails to provide eye evaluations even to
20 patients who notified Jail staff about their glaucoma.  For example, ███████████
21 (████████), reported glaucoma and cataracts at booking.  SD_802998.  I searched
22 his 3,707 page medical chart using keywords such as cataract, glaucoma,
23 optometrist, retina, and Snellen.  It appears that Mr. ████████ was never evaluated for

24

25 ─────────────────
   [52] Elaine Han et al.. *Community Vision Screening*. Glaucoma Today 28. 28 (January
26 2019), https://assets.bmctoday.net/glaucomatoday/pdfs/0119GT_SF_Lee.pdf..
   [53] *Primary open-angle glaucoma suspect PPP 2020*.  American Academy of
27 Ophthalmology. (2021, October 6).  Retrieved August 15, 2024, from
   https://www.aao.org/preferred-practice-pattern/primary-open-angle-glaucoma-
28 suspect-ppp.

1    glaucoma or cataracts by a medical provider.  His vision was never tested using the

2    standard Snellen Eye Chart.  He was never referred to an optometrist for a

3    comprehensive eye exam.  This violated the standard of medical care for these

4    conditions.

5          638.   And, as explained in the section above regarding diabetes care, the

6    Sheriff's Department also fails to provide diabetic patients with appropriate eye

7    exams.

8    **B.    The Sheriff's Department Fails to Timely and Adequately Address Incarcerated People's Visual Accuity Problems**

9

10         639.   Visual acuity problems are another area of deficiency within the Jail.

11   There are two type of visual acuity problems.  People with farsightedness

12   (hyperopia) can see distant objects well but have difficulty with close vision, *e.g.*,

13   reading.  People with nearsightedness (myopia) can see close objects but have

14   difficulty with more distant vision.  Many patients, especially the elderly, have both

15   problems.

16         **1.    There Are Numerous Barriers Preventing People From Timely Receiving Eye Glasses**

17

18         640.   Some vision acuity problems can be addressed with simple,

19   inexpensive reading glasses.  Reading glasses are important for incarcerated patients

20   so that they have the ability to read:  (1) legal documents; (2) the many forms and

21   signs that the Jail requires them to attend to; (3) educational materials that the Jail

22   provides, for example, the many handouts available in the medical department; and

23   (4) other materials for program participation, education, and recreation.  Reading

24   glasses improve the quality of incarcerated life for those who need them.

25         641.   In the community, people who need reading glasses do not have to see

26   a health care professional.  Anyone can buy reading glasses of various strengths at

27   any drug store or grocery store.  The proper reading glasses are those that make

28   reading most comfortable for the person.  In other words, the person needing

1   reading glasses participates in choosing the correct strength for themselves.

2       642.   However, the Jail requires patients who need reading glasses to submit

3   a medical request.  Such patients are then scheduled to see a nurse, who acts as a

4   "gatekeeper" to decide who may receive reading glasses and who may not.  It may

5   take days or even weeks for this visit to occur.  I have not seen a policy or procedure

6   that lays out what should occur at this meeting, or what the criteria are for the nurse

7   to say approve or deny reading glasses or what strength reading glasses they

8   approve.  In practice, leaving these decisions to nurses' discretion leads to some

9   people waiting long periods to receive reading glasses, and other people receiving

10  the wrong level for their needs.

11      643.   The arbitrariness of this system is exemplified by patient ███████

12  ███████ (███████).  On ███████ 2022, RN Ellen Lastrella approved 3.0

13  reading glasses for Mr. ███████ SD_797036.  But on ███████ 2023, a

14  different nurse, RN Arlene Edusada, approved much weaker 1.5 reading glasses for

15  the same patient.  SD_797016.

16      644.   Besides taking an unnecessarily long time for a patient who needs

17  reading glasses to get them, this system is a waste of the RNs time.  When RNs

18  cannot complete everything they are supposed to do in a shift (like complete all of

19  the 24 hour face-to-face assessments), why are they wasting time being gatekeepers

20  for reading glasses?  Reading glasses are quite inexpensive.  I suspect that if the Jail

21  performed a time-cost analysis they would find that the cost of a pair of reading

22  glasses is much less expensive than the cost of paying the nurses' salary to see a

23  patient who has requested reading glasses.

24          **2.     The Jail Lacks Adequate Policies and Procedures to Ensure
            IPs Have Access to Distance Glasses**

25

26      645.   Glasses to improve distance vision are a different matter than simple

27  reading glasses because they require a prescription based on the evaluation of an

28  optometrist using sophisticated equipment to measure visual deficits and provide the

1   right compensation in the glasses.  At every visit, optometrists should routinely

2   screen for all of the medical conditions mentioned earlier, such as glaucoma,

3   cataracts and retinal problems.

4       646.   Distance correction is important for many jail patients for many

5   reasons, including the ability to: (1) read the signs the Sheriff's Department posts on

6   the walls and expects incarcerated people to abide by; (2) see what is happening in a

7   dorm area or exercise area for safety and in order to avoid trouble; (3) see facial

8   expressions of fellow incarcerated people, security staff and medical personnel for

9   important non-verbal communication; and (4) see chalkboards, television programs,

10  and other far away media for recreation and education.  Distance vision glasses

11  dramatically improve the quality of incarcerated life for those who need them.

12      647.   On the outside, patients who need distance correction can themselves

13  make an appointment with an optometrist.

14      648.   There are several substantial problems in the system for providing

15  incarcerated patients with needed distance eyeglasses at the Jail.

16      649.   First, neither the Sheriff's Department nor NaphCare has any written

17  policies or procedures specifically related to vision complaints, eye complaints, how

18  and when to provide glasses, or when to refer a patient to an optometrist.  Neither

19  the MSD Operations Manual or the NaphCare P&P Manual give the nurses any

20  instructions on how they should evaluate these patients or what the criteria are for a

21  nurse to approve the referral to the optometrist.  Therefore, the nurses, who are

22  acting as gatekeepers, have no written guidance.  They also have no oversight.  No

23  one (as far as I could tell) ever reviews and critiques nursing eye assessments.  Eye

24  assessments are not followed in any meaningful way in the Jail CQI statistics.

25      650.   Second, the RN evaluation usually consists of the nurse administering a

26  Snellen test for distance vision.  Based on the Snellen results, the nurse can approve

27  the referral to an optometrist or deny it based on their own discretion or whim.

28  However, the Snellen test is not a good way to deny someone access to an

optometrist for the following reasons: (1) patients can artificially improve their scores by squinting, leaning, or simply knowing the letters on the chart; (2) Snellen results are also influenced by lighting, distance, and distractions (while patients may have a good Snellen score because the lighting was perfect and there were no distractions in the medical clinic, they may need glasses in their dimly lit housing unit); (3) many patients with a perfect Snellen score (those over the age of 40, with hypertension, or with diabetes) may still need to see an optometrist for a screening exam; (4) penalizing patients for having a good Snellen score (*i.e.*, not allowing them to see an optometrist) encourages patients to give unreliable Snellen results; (5) failing to provide guidance to gatekeeper nurses ensures uneven results; and (6) Snellen tests take nursing time that could be put to better use filling in other yawning gaps in nursing performance, such as 24-hour face-to-face evaluations. In the end, nurses and even primary care medical providers do not have the expertise to evaluate the validity of distance vision complaints. Optometrists do. Therefore, in most cases, incarcerated people complaining of distance vision issues should be referred to an optometrist without the need for this arbitrary gatekeeper screening test.

651.   Third, there are substantial delays built into the process of obtaining eyeglasses. At the outset, when an incarcerated patient asks for glasses or asks to see the optometrist, they are required to fill out a medical request form. They are then scheduled to see an RN. This wait can be days or weeks based on my chart review; the Jail does not track this specific statistic in their CQI reports. Notably, this does not happen in the community. If the gatekeeper nurse does approve a visit to the optometrist, the wait to see an optometrist is often several weeks, and sometimes the referral is never completed. Such waits were at times exacerbated by the fact that NaphCare had problems contracting with an offsite optometry group. As explained earlier in this Report, due to NaphCare's failure to pay outside providers, the Jail's relationships with some outside providers were strained.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  SD_1572585.

2      652.   Fourth, NaphCare required all referrals to an optometrist to go through

3  their UM review process, resulting in additional delays and irrational denials.  By

4  practice, all optometry referrals were sent to the UM nurses in Alabama, who either

5  approved the referral or denied it.  Many of the denials contained this as a reason for

6  denial:  "Patient is not in custody for a year.  Resubmit after a year."  Rognlien-

7  Hood Tr. at 158:25-159:11.  Where this requirement came from is a mystery to me.

8  In my opinion, if a patient has a medical or accommodation need for eyeglasses at

9  one year, they had that same need at day one.  NaphCare's Policy and Procedure

10  manual lists eyeglasses as an "Aid to Impairment" along with crutches and

11  wheelchairs.  NAPHCARE001877.  Yet when a patient needs a wheelchair,

12  NaphCare does not deny the request because "patient is not in custody for a year."

13  In order to work around this problem of optometry referrals being inappropriately

14  denied by NaphCare, the Sheriff's Department eventually hired its own optometrist

15  separate from its contracted services with NaphCare.  Rognlien-Hood Tr. at 156:2-5.

16  This program is new enough that I have no data on what impact this has had on the

17  problem of vison evaluations, vision care, and eyeglass prescription.

18      653.   Finally, there are additional and substantial delays between the

19  prescription of eyeglasses by an optometrist and the receipt of the eyeglasses by the

20  patient.  Most jails have a contractual relationship with a company that specializes in

21  providing glasses to incarcerated patients.  In my experience, such companies take

22  only a couple of weeks between the receipt of a prescription and the delivery of

23  eyeglasses.  I have seen nothing that indicates which entity the Sheriff's

24  Department/NaphCare has contracted with to actually create the prescribed

25  eyeglasses, or any timeline that they must abide by.  Notably, the Sheriff's

26  Department's CQI process does not track the average length of time between an

27  optometry appointment and the receipt of the prescribed eyeglasses, and makes no

28  effort to improve its performance.

654.   There is substantial evidence of delays in providing vision glasses to patients who need them.  The Sheriff's Department contracted with NaphCare in June 2022 for the provision of optometry services.  County Contract No. 566117, § 2.3.19.2.  In its April 28, 2023 Corrective Action Notice, the Sheriff's Department stated that NaphCare was out of compliance with this provision of the contract, highlighting an "eye glass backlog," but for months, allowed the problem to go unresolved.  On September 13, 2023, the Sheriff's Department's Medical Services Administrator, Chris Miedico, wrote to NaphCare's Health Services Administrator, Dr. Michael Farrier, about a "concern with the wait times for the arrival of prescription glasses once a patient has been examined by the optometrist," which could be "upwards of two months."  NAPHCARE039577.  I agree with Mr. Miedico that this turn-around time is "neither acceptable nor reasonable."  *Id*.  Dr. Farrier acknowledged that there had been "inordinate delays" and assured that eyeglass deliveries would be expedited.  *Id*.  On November 9, 2023, Mr. Miedico again wrote to Dr. Farrier asking for updates regarding the potential for sub-contracting with a company that could provide necessary optometry services.  NAPCHARE039575.

655.   Prescribed eyeglasses and/or contact lenses are a medical necessity for many incarcerated people, which means the denial of such optometry services can have a serious and widespread negative impact on incarcerated people in the Jail.  I found many examples of this in the patient charts I reviewed.

656.   One example is █████████ (█████████), an incarcerated person who submitted a request for optometry care on ██████ 2023, stating "I would like to please be seen by optometrist due to poor vs [vision] keep bumping into things." SD_782225.  The request was stamped "received" almost six weeks later, on ████ ██ 2023.  Mr. █████████ was seen by a nurse and then an NP for this request on █████ 2023 and stated that he could not see any letters at a distance of 20 feet. SD_782054-782055.  Mr. █████████ was seen again by a Registered Nurse and Nurse Practitioner on ██████ 2023, when he again raised concerns about his poor

1  vision.  SD_782064.  He was finally examined by an optometrist on ▮▮▮▮ 2023.

2  SD_782239.  The optometrist diagnosed astigmatism and myopia.  *Id.*

3  Mr. ▮▮▮▮ received prescribed eyeglasses on ▮▮▮▮ 2023, more than five

4  months after his request for medical care for his vision.  SD_782064.

5      657.   As another example, on ▮▮▮▮ 2023, ▮▮▮▮

6  (▮▮▮▮) submitted a request for a vision check:  "I need seeing plz and thank

7  you."  SD_747797.  A note on the request form states, "patient with pending RNSC

8  to eval for glasses."  *Id.*  It does not appear that there was any face-to-face

9  evaluation in response to this request.  SD_747539-40.  On ▮▮▮▮ 2023,

10  Mr. ▮▮▮▮ submitted another medical request:  "I would like to have my eyes

11  checked and get glasses please and thank you."  SD_747787.  Again, there was no

12  face-to-face evaluation.  *See* SD_747538-39.  On ▮▮▮▮ 2023, Mr. ▮▮▮▮

13  submitted a grievance stating that he had been waiting for an optometry appointment

14  but it had not been scheduled.  SD_747780.  On ▮▮▮▮ 2024, Mr. ▮▮▮▮

15  stated on a medical request form that he needed an eye exam because he "ha[d] a

16  stigmatism in one [eye] and … [is] near sighted."  SD_747772.  On ▮▮▮▮

17  2024, three months after he first submitted a grievance regarding his vision needs,

18  RN Marissa Barisan administered a near-vision acuity test to Mr. ▮▮▮▮ gave

19  him 1.5 reading glasses, and the matter was considered settled.  SD_747537.  This,

20  however, is not what Mr. ▮▮▮▮ initially asked for.  Mr. ▮▮▮▮ mentioned

21  astigmatism and nearsightedness, which were never evaluated since his distance

22  vision was never checked and he was never referred to an optometrist.  Further, this

23  delay in the provision of even over-the-counter reading classes indicates substandard

24  care, as they should be readily available and freely provided to individuals like

25  Mr. ▮▮▮▮

26      658.   In summary, the Jail program for giving necessary vison correction to

27  incarcerated patients is in disarray and the Jail fails in its duty to provide these

28  necessary services to its patients.  Several recommendations flow from this finding.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

The Jail should have specific policies and procedures on how vision evaluation, optometry referrals, and eyeglass prescriptions will happen.  Nurses and corporate UM officers should not be gatekeepers who deny patients access to vision care from an optometrist based on bogus criteria.  Patients must be able to see an optometrist in a timely manner, and prescription glasses should be delivered in a timely manner.

**X.    Custody Staff Interfere with the Provision of Care by Health Care Staff in the Jail, Including by Compromising Patient Confidentiality, Which Puts Patients at Substantial Risk of Serious Harm**

659.    The NCCHC requires that health care staff have "autonomy" from custody staff when it comes to patient care.  In particular, the NCCHC standard requires health care staff and the institutional authority address any policies and procedures that deny direct medical orders, including ones that interfere with the delivery of, the access to, or the quality of health care services deemed necessary by the Health Services Administrator and/or the advanced clinical provider.  *Id.*

660.    It is my opinion that the Jail fails to meet this standard.  In particular, custody staff as a matter of course deny incarcerated people the opportunity to meet confidentially with health care providers, either by requiring that patient meetings take place outside the clinic or by requiring custody staff to be present during clinical appointments.

661.    The Jail's policies and procedures provide that health care providers must have "autonomy … in clinical decision making."  MSD Operations Manual No. A.3.1 Medical Autonomy.  Qualified health care professionals are to "collaborate with custody staff in implementing the plan of care safely and timely" "[a]s needed," but the Jail's procedures are clear that "[u]ltimately, the qualified health provider is responsible for the appropriate management of the patient."  *Id.*  Custody staff must "support[] the implementation of clinical decisions and aid[] in facilitating necessary housing transfers."  *Id.*

662.    While these policies and procedures generally are appropriate, in practice, custody staff regularly violate the Jail's policies and procedures requiring

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

autonomy in clinical decision-making and patient access to health care. Both Dr. Montgomery and Ms. Rognlien-Hood confirmed that custody staff frequently interfere with the provision of health care in the Jail. Dr. Montgomery stated that he "agree[d]" with Plaintiffs' allegations in this case that custody staff "work[] out[side the] scope" of their duties, impeding on the work of health care staff, and provided myriad examples: custody staff arbitrarily cancelled the quarantining of incarcerated people at intake during the COVID-19 pandemic; get involved in decision-making processes between the Jail's medical clinic and the courts; prevent medical staff from providing medications to incarcerated people during lockdowns; and tried to force the Sheriff's Department to accept NaphCare's policies and procedures without question in an attempt to indemnify the County. SD_120011, SD_120015. Dr. Montgomery reported to Sheriff's Department staff that there was a "large disconnect between sworn and health staff" with respect to the use of body scanners, observing that sworn staff order x-rays of patients without consulting with medical staff. SD_212920, SD_212921. I agree with Dr. Montgomery that this practice is problematic, because it results in a lack of proper evaluation, documentation, and follow-up for patients who are at high risk of negative outcomes due to potential abnormalities in their body scans. *Id.*

663.    Ms. Rognlien-Hood provided testimony about custody staff interfering in nursing staff's provision of care to incarcerated people, confirming that custody staff at times deny health care staff to see particular patients who they deem too dangerous. Rognlien-Hood Tr. at 143:1-5. This is problematic for several reasons. First, patients deemed hostile and uncooperative commonly have medical or psychiatric issues that are causing or exacerbating their behavior. Examples from my own experience include patients who are delirious from infections or withdrawal; patients cranky due to pain, shortness of breath, or other medical symptoms; and patients who have had strokes. Second, hostile, uncooperative patients become ill just like any other group of patients and may need medical

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

attention for important medical problems.  In my experience, patients sometimes are hostile to custody staff but not to medical personnel who they perceive as wanting to help them.  Often, a patient hostile to custody staff is cooperative when receiving medical care.  Finally, there are ways of safely restraining uncooperative patients to allow medical evaluation.  If custody staff think a patient is potentially dangerous to medical staff, the proper course of action is to create an action plan for how to get necessary medical care to the patient.

664.   Ms. Rognlien-Hood also was asked in her deposition whether any health care staff had expressed having issues with the involvement of custody staff in the health care administration or decision-making.  Ms. Rognlien-Hood answered affirmatively and offered as an example that health care staff may want to put a patient into the "detention safety program" and "sworn won't put them in there," and vice-versa.  *Id*. at 140:8-19.  Another example cited by Ms. Rognlien-Hood was the process for "send outs," or when a patient is sent out of the Jail for medical care. *Id*. at 141:17-24.  She testified that "[a] nurse will say 'I need this patient to go out,' and sworn doesn't feel they need to go out." *Id.*  These examples impede patients' access to care, placing them at risk.

665.   Custody staff's involvement in health care decisions at the Jail is particularly pronounced when it comes to confidentiality of medical encounters.  It is my opinion that the Sheriff's Department categorically do not provide incarcerated people with adequate confidentiality during medical encounters.

666.   It is a tenant of the medical profession that patients have a right to reasonable privacy and confidentiality during their encounters with health care professionals.  This standard is important because it facilitates sharing of important medical information between patients and providers regarding concerns, symptoms, behaviors, diagnoses, and treatment—details that patients might be embarrassed or unwilling to share if they were to be overheard by someone else.

667.   In the community, confidentiality is achieved by having medical

1  encounters occur in a room specifically designed for private medical encounters.

2  Another important way that medical professionals in the community ensure

3  confidentiality is by excluding any extraneous people from witnessing or

4  overhearing the medical encounter.

5       668.   Incarcerated patients are no different than patients on the outside, who

6  may be reluctant to discuss intimate details of their medical problems in front of

7  non-medical staff.  Indeed, the possibility that patients might be unwilling or

8  embarrassed to describe their medical concerns outside a confidential environment

9  is likely even higher in the correctional setting, where patients may have the

10  impression that, if other incarcerated people know about their medical concern, they

11  could be perceived as weak, subject to ridicule, or even at risk of violence or other

12  victimization.  In my experience, incarcerated patients may be at risk of violence if

13  other incarcerated people know that they have certain medical issues, such as HIV,

14  or issues perceived as being transmittable, such as infections and rashes.  They may

15  be at risk of victimization if they are perceived as weak or have private information

16  that they do not want shared with others.

17       669.   The NCCHC 2018 Standards for Health Services in Jails addresses

18  confidentiality and privacy in section J-A-07, Privacy of Care.  This standard

19  provides "[i]t is essential that in nonemergency situations all protected health

20  information be protected from discovery or access.  This means that no

21  conversations concerning a patient's health status, diagnosis, or treatment should be

22  conducted in areas where they can be overheard by other inmates, staff, or

23  visitors….  Health stuff must ensure that all encounters with exchanges of health

24  information, starting with the receiving screening, remain private and that a patient's

25  dignity is protected.  Such efforts foster necessary and candid conversation between

26  the patient and health staff."

27       670.   NCCHC's 2017 Technical Assistance Report regarding the Jail's

28  compliance with NCCHC's standards found that the Jail was not in compliance with

NCCHC's privacy and confidentiality standards: "The areas of privacy and confidentiality of care need to be addressed. … procedures [must] be put in place to assure confidentiality when health care is being delivered and discussed." DUNSMORE0260627.

671.   Although the Sheriff's Department has a goal of complying with NCCHC's standards, and assuring appropriate privacy and confidentiality of incarcerated patients would seem to me to be "low hanging fruit" that would be relatively easy to implement, as far as I can tell, the Jail has made no effort to comply with the NCCHC's privacy standards.

672.   While the Sheriff's Department must consider security concerns related to the administration of health care, the need for security does not take away the obligation to ensure privacy and confidentiality for the patient.

673.   The San Diego Sheriff's Department routinely compromises the confidentiality of incarcerated patients.  Based on my review of charts and discussions with incarcerated people during my inspections of three Jail facilities, it is evident that most clinical encounters take place in or near the patient's cell-front rather than in private medical rooms designed for this purpose.  For example:

674.   ███████████ (████████) was examined by a nurse practitioner at his cell door on ██████2022 for testicular pain, SD_821714-15, and again on ████ ██ 2023 when he was seen at his cell door for painful urination, SD_821689.

675.   █████████████ (████████) was examined by a nurse practitioner at his cell door on ████████2024 for a hand infection, SD_772666.

676.   ████████████ (████████) was examined by a nurse practitioner at his cell door on ██████████ 2023 for a headache, SD_749590.

677.   █████████████ (████████) was examined by a nurse practitioner at his cell door on ██████████ 2022 for shoulder pain, SD_796606-07.

678.   ███████████ (████████) was examined by a nurse practitioner at his cell door on ████████2023 for a complex foot infection, SD_788746.

679.  And, ███████████ (█████████) was examined by a nurse
practitioner at his cell door on ██████ 2022 for hip pain, SD_773765.

680.  I could go on and on.  The practice of doing most medical evaluations
in the patient's housing unit rather than in the medical suite is pervasive.

681.  Performing a medical evaluation at a patient's cell door means
numerous other people, including other incarcerated people and staff, can see and/or
hear the encounter.  Many patients will not feel comfortable speaking openly with
health care staff or participating in such necessary physical exams for fear of
embarrassment, abuse, or retaliation by those who can see and hear the encounter.

682.  According to the Sheriff's Department's policies, deputies are also
present "when incarcerated persons are being evaluated and/or treated by facility
health staff or contract providers."  DSB Policy M.15, II.C.  Email correspondence
between Serina Rognlien-Hood and Christopher Miedico confirms that incarcerated
people are not asked for their consent to have a deputy present during their medical
evaluations.  SD_375953-375954.

683.  Deposition testimony also establishes that, even when incarcerated
people are escorted to the medical clinic for an appointment, custody staff are *in the
room* for the entire appointment.  Rognlien-Hood Tr. at 259:21-260:3.  She
confirmed that custody staff can see a patient while they are being treated and can
hear the substance of conversations during these appointments.  *Id.* at 259:21-260:7.
She also agreed that this can compromise patient privacy with respect to health care.
*Id.* at 260:8-261:1.  Similarly, Dr. Peter Freedland of CHP, with whom the County
just signed another contract for additional medical services, testified that "there's
always a deputy" present during medical appointments, even in the medical clinic.
Freedland Tr. at 113:1-3.

684.  In my opinion, there is no reason that appointments for *every* patient—
regardless of security classification level—must be attended by a deputy.  Many
other jails have privacy policies and procedures that protect incarcerated patient's

1     rights while also ensuring security.

2          685.   One common way that other jails ensure privacy is by having at all

3     times at least two medical professionals in the medical exam room with the patient,

4     such as a practitioner and a nurse, or an RN and an LVN.  Security is nearby but out

5     of earshot of normal volume conversations, so that they can respond quickly if staff

6     raises their voice to indicate there is a problem.  Jail policies and procedures can lay

7     out different security procedures for those patients who Jail staff have individually

8     identified as having special security issues warranting custody staff being within a

9     closer proximity to the medical encounter.

10         686.   In conclusion, the Sheriff's Department knows that they are not

11    complying with NCCHC or industry standards to preserve patient privacy and

12    confidentiality.  This can harm patients by making them fearful to disclose

13    potentially embarrassing medical complaints in front of security staff and other

14    incarcerated people.

15    **XI.   The Sheriff's Department Fails to Maintain Adequate, Accurate, and
        Complete Medical Records, Which Compromises the Delivery of Care**

16

17         687.   In my opinion, the Sheriff's Department lacks adequate recordkeeping

18    processes, which undermines care for incarcerated people.

19         688.   The standard of care requires that meticulous medical records be kept

20    on every patient and of every encounter with medical personnel.  Medical records

21    can be handwritten, but most medical systems now use electronic medical records

22    ("EMR").  The essential attributes of an EMR are (i) simplicity, (ii) efficiency,

23    (iii) confidentiality, (iv) searchability, and (v) report generation.  Of course, it is also

24    essential that information input into the EMR is both accurate and complete.

25         689.   The NCCHC 2018 Standards for Health Services in Jails discusses the

26    minimal standards for medical records in "Health Records" (J-A-08).

27         690.   The EMR serves an important function in any system that delivers

28    medical care.  Complete, accurate, easy to access medical records are a necessary

1    component to ensure that an individual receives consistent care. For example, it
2    enables a practitioner who is seeing a patient for the first time to learn what care the
3    Jail previously provided to the patient or why the patient was referred to the
4    practitioner in the first place. A functioning EMR also enables practitioners to
5    monitor an individual patient's health trends overtime, *e.g.*, whether someone's
6    blood pressure has increased since they were booked into the Jail. The EMR is also
7    a critical tool for tracking systemwide trends within the Jail.

8        691.    The Sheriff's Department maintains an EMR for incarcerated people
9    using a system called "TechCare." TechCare is a proprietary product of NaphCare,
10   and the primary method for medical recordkeeping in the Jail. I am aware that
11   Plaintiffs' counsel sought for me to inspect TechCare, but I was not able to do so.
12   Nevertheless, it is my opinion based on the documents I have reviewed that the
13   system has many problems.

14       692.    Leaving aside the wisdom of using the technology of a company that
15   recently lost a portion of its medical contract with the County, my review of records
16   has shown serious deficiencies in TechCare's functionality.

17       693.    TechCare lacks simplicity and efficiency because, among other issues,
18   it has no list of all medical events (including but not limited to sick calls, lab draws,
19   etc.) by date and does not list discharge dates or many other important events related
20   to an incarcerated person's health. These features are important because they allow
21   medical staff to quickly and easily know exactly what is going on with a particular
22   patient, such as the patient had an x-ray but the reading has not returned or the
23   practitioner saw the patient but not everything she ordered has been done yet, etc.

24       694.    TechCare also is lacking in searchability. Ms. Rognlien-Hood testified
25   that "sometimes finding … information [in TechCare] is not user friendly."
26   Rognlien-Hood Tr. at 231:13. Searchability is important because medical records
27   can be long and dense, sometimes many thousands of pages long. It may be
28   important to know, for example, if a patient has had a certain vaccine, or what a test

done last month showed, or what the patient's weight was the last time they were in jail. Without a functioning search tool, it can take a lot of time to find very important information. If that important information cannot be found, medical care can suffer and patients can be harmed. As an example, if I cannot find out what a patient weighed the last time he was in jail, I might not realize that he has gained 75 pounds in 8 months, which should be investigated medically.

695. As one example, ████████████ came to the Jail directly from the UCSD hospital, where he was for two days prior to his incarceration. SD_873242-49. In the receiving screening form for Mr. ████████ a nurse noted: "rece[i]ved paperwork from UCSD." *Id.* However, in a Progress Note written only two days later, a nurse noted: "No d[i]scharge paperwork from UCSD ava[il]ab[l]e." SD_873259.

696. Another example is that of ████████████, discussed in detail above. Even though Mr. ████████ medical records had been received from Kaiser on ████████ 2022, and a TechCare task for review of those records had been created, when a nurse practitioner saw Mr. ████████ on ████████ 2022, he documented a plan to send an "ROI for Kaiser … waiting for records to arrive for review. Medical Records of ████████████ as of ████████ 2023, pp. 109, 533, 552 of 595. An easy to use record system would make it obvious that those records had already been received.

697. Another example is the case of ████████████, also discussed in detail above. On ████████ 2022, Dr. Christensen completed a task in TechCare to review Ms. ████████'s blood pressures. He did so and prescribed a medication for hypertension. However, at that time, Ms. ████████ had been hospitalized in the Intensive Care Unit for two days. That fact should have been apparent to Dr. Christensen in the EMR.

698. Further, TechCare's reporting capabilities also appear to be substandard. Ms. Rognlien-Hood admitted that some TechCare reports cannot be

run "easily … because of the way TechCare is set up." *Id*. at 89:8-90:7. This impacts the provision of care. Ms. Rognlien-Hood testified that the frequency with which she runs certain critical reports regarding health care operations depends on her workload because running the reports is "very time consuming." *Id*. at 90:8-14. When reports are run, they are often inaccurate, possibly because TechCare pulls information from sources that are not being used by staff to document patient information. *Id*. at 248:13-249:5.

699.    Dr. Freedland also testified that he is not a fan of TechCare: "I think there's a lot of good medical EMRs out there that could potentially benefit the [Jail] system more so than TechCare." Freedland Tr. at 32:6-8. Dr. Freedland stated "I'm not sure how it [TechCare] was created. There is a not a lot of ease of use." *Id.* at 32:11-13.

700.    The Sheriff's Department was aware of serious issues with TechCare that would impede the provision of proper health care in the Jail, but these issues went unresolved for months if not years. The Sheriff's Department also raised issues with NaphCare at various meetings. For example, Sheriff's Department staff raised questions about inaccuracies in TechCare reporting at Medical Audit Committee meetings, and NaphCare representatives repeatedly stated that they would get answers, but did not do so. Rognlien-Hood Tr. at 244:10-246:1. Additional TechCare issues were raised in the Corrective Action Notices issued to NaphCare by the Sheriff's Department. The Corrective Action Notice issued May 12, 2023 stated that NaphCare was "releasing new TechCare builds without providing advanced notice of the changes or training to County Clinical Staff," resulting in some county staff being "faced with screens and cues they [know] nothing about and have no idea how to complete." NAPHCARE034756. This, according to the Sheriff's Department, "can lead to information being entered into the system that is not followed up [on] creating potential liability to the county." *Id.* I agree that this problem of information being entered into a medical record without

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

clear steps for follow up can have serious consequences for patient care, and should have been addressed immediately. Instead, the issue appeared in Correct Action Notices for months, and the most recent one I have reviewed simply says NaphCare is "responsive to all related IT concerns" without further detail. SD_1572607.

701. Similarly, I found multiple examples in the medical record of abnormal study results being neglected by the Jail's healthcare staff. The standard of care when any study is ordered is for a medical practitioner (usually the one who ordered the study) to interpret the results (normal/not normal), create a care plan based on the interpretation (if necessary), and communicate the results and the new care plan to the patient. All three steps should be documented in the medical record. And, in a good medical recordkeeping tool, these follow-ups would be triggered automatically. However, it is clear these follow-ups are not occurring; the Sheriff's Department did a CQI study to determine whether this standard of care was being met and found abysmal compliance ranging from 16% to 36% between May 2023 and September 2023. SD_114411.

702. The discussion of diagnostic care earlier in this Report highlights several examples of abnormal test results that were ignored, but which should have been followed up on as a matter of course—and which a robust EMR would have required such a review.

703. In addition to the problems with TechCare's functionality—which the Sheriff's Department has failed to correct despite knowing about them for months—medical records and other documents produced by the Sheriff's Department suggest that staff do not always provide complete documentation of encounters with incarcerated people.

704. For example, Aaron Bonin, whose in-custody death is discussed in detail above, was an incarcerated patient on dialysis for end-stage kidney failure. Before going into cardiac arrest due to his very high potassium level on October 24, 2022, Mr. Bonin was noted as having high potassium levels on October 20 and

1  October 21.  SD_002075, SD_002237-39.  The treatment for someone, like

2  Mr. Bonin, who has kidney failure and high potassium is dialysis.  However, a nurse

3  the Jail discontinued the dialysis Mr. Bonin's dialysis early, writing: "Pt strongly

4  insisted to stop the treatment."  SD_002504.  Troublingly, the Jail's analysis of

5  Mr. Bonin's death, which I understand was written by Dr. Montgomery, notes that

6  the recordkeeping about Mr. Bonin's dialysis treatment was poor.  SD_055143.

7  Dr. Montgomery wrote:  "Appears that approximately 10 events that were not

8  scanned in/recorded … Unclear if the lack of documented treatment record could be

9  considered a refusal.  While the patient has a recorded history of frequently refusing

10  medications, there are not that many instances of a recorded refusal of dialysis." *Id.*

11  From the moment that Mr. Bonin supposedly refused dialysis until the cardiac arrest

12  that ultimately killed him, Mr. Bonin was not seen by a practitioner or any other

13  medical staff member to ask why he was refusing dialysis and to inform him why

14  that dialysis session was particularly important.  *See* SD_002075-76.  In addition,

15  according to Dr. Montgomery, it is not even clear from his medical record whether

16  Mr. Bonin had in fact refused dialysis.  Had these incidents more clearly

17  documented, and if the Jail's recordkeeping system had the ability to flag critical lab

18  results and require practitioner sign-off on refusal of critical treatments, Mr. Bonin's

19  death could have been prevented.

20       705.    As another example, which is alleged in the Third Amended

21  Complaint, Plaintiff Andree Andrade suffered multiple concussions while in the Jail,

22  both from falling out of his upper bunk and from being assaulted.  After an initial

23  fall from his bunk in June 2022, he was sent to the hospital and informed by medical

24  staff at the hospital that he sustained a concussion.  His discharge instructions also

25  include a highlighted section for "concussion" under "injury specific instructions."

26  DUNSMORE0065484-95.  However, Andrade's progress notes make no reference

27  to the concussion.  DUNSMORE0065226-28.  A concussion is a brain injury that is

28  not trivial.  It is very important that concussion patients be treated according to

1  standard concussion protocols whether they are high school football players or

2  patients in a jail.  What should have happened when Mr. Andrade returned from the

3  hospital was for a practitioner to have reviewed the hospital discharge diagnosis and

4  create a treatment plan.  A robust EMR would force this to happen.  Similarly, only

5  days after his first hospital visit, Mr. Andrade was assaulted and again taken to the

6  hospital, where hospital staff again noted that his chief complaint was

7  "concussion/head pain" and again provided him with specific discharge instructions

8  for "concussion."  DUNSMORE0065533-42.  Again, Mr. Andrade's progress notes

9  make no reference to the possible concussion.  DUNSMORE0065233-34.  Based on

10  my review of the records, it appears that no one properly reviewed the hospital notes

11  and no one created an ongoing treatment plan.  This was essential medical history

12  that was ignored.

13  706.   Complete and accurate reporting in TechCare is particularly important

14  for patients who are transferred between Jail facilities.  Both the MSD Operations

15  Manual and NaphCare's Policies and Procedures indicate that the Jail relies almost

16  exclusively on TechCare for continuity of care when an incarcerated person is

17  transferred between two facilities within the Jail.  *See* MSD Operations Manual

18  MSD.M.4, Part V (outlining procedures "[i]n the event that a paper record exists");

19  NaphCare P&P, E-03, NAPHCARE031248 ("A Transfer Summary form should be

20  completed if continuity is not clearly maintained within TechCare from one facility

21  to the next.").  And, based on the charts I have reviewed, in practice, transfer

22  summary forms are rarely filled out.

23  707.   As explained above, there are substantial flaws with TechCare and the

24  Sheriff's Department's completion of TechCare documentation, leading to likely

25  gaps in care.  Without appropriate documentation, when a patient moves to a new

26  facility, the new nurses and medical practitioners have to reconstruct the patient's

27  history by reading the patient's entire chart.  This takes time and effort, and

28  invariably, important things will be missed in some patients during the handoff.

708.   Sheriff's Department nursing staff also have voiced concerns about "receiv[ing] transfers with no or inadequate follow-up or second stage [medical evaluation] scheduled." SD_213483.  Health care staff at intake facilities should initiate care at the time of screening, so that when patients are transferred to other facilities, which I understand can happen frequently and with little notice, the receiving facility can properly treat them.  Otherwise, the failure to initiate proper care at intake can have ripple effects and interfere with continuity of care.

## XII.   The Sheriff's Department Fails to Provide Necessary or Adequate Follow-Up Medical Treatment to Incarcerated People

709.   In my opinion, the Sheriff's Department fails to provide follow-up care to incarcerated people who are sent for medical care outside the Jail—either to the emergency room or for a specialist appointment—thus placing incarcerated people at a substantial risk of serious harm.

710.   Appropriate medical care often requires follow-up—in both the community and the correctional setting.  Jail patients are frequently sent for medical care and evaluation outside of the jail.  Examples include:  being admitted to the hospital; being sent to the emergency department for some type of urgent evaluation; being sent for a consultation with a medical specialist outside of the jail, such as an orthopedist, a cardiologist or a neurologist; being sent for some type of diagnostic study that cannot be done in the jail, such as an MRI, echocardiogram or EEG; or being sent for some type of treatment or therapy that cannot be done as the jail, such as physical therapy, infusions for autoimmune disease or radiation treatments for cancer.

711.   When jail patients return from any of these off-site appointments, the findings and recommendations made during the off-site appointment must be incorporated into the patient's medical record and the overall medical treatment plan at the jail.  This process is often termed "medical follow-up."  The following hypothetical cases are given as examples.

1          a.     A patient returns from the emergency department having been

2 diagnosed with a broken arm and the recommendation that the patient see an

3 orthopedist within two weeks so that proper healing of the fracture can be assessed.

4          b.     A patient returns after having an CT done, which showed a brain

5 mass.  The radiologist recommends an MRI be done.

6          c.     A patient returns from being hospitalized for dehydration and

7 renal failure and is recommended to have follow-up labs and monitoring.

8          d.     A patient returns from an appointment with a rheumatologist,

9 who would like to see the patient again in one month.

10 712.  "Follow-up" means assuring that these recommendations are followed

11 and that necessary communications with the outside entity occur.

12 713.  The underlying principles and processes for follow-up care are similar

13 to intake and continuity of care issues, discussed earlier in this Report.  Patients

14 return from outside medical visits with new diagnoses, new medications, and new

15 recommendations for medical treatment.  Therefore, just as a jail must evaluate an

16 incarcerated person's medical condition at booking so that the jail can be sure the

17 patient's care is continued, the jail must ensure that all important findings,

18 diagnoses, and recommendations from off-site visits are entered into the medical

19 record and incorporated into the patient's health care plan.

20 714.  The first (and perhaps most essential) part of follow-up after an outside

21 medical visit is to review the medical records from the outside visit and summarize

22 the important findings into the patient's medical record.  This is essential because

23 outside medical records may be hundreds of pages long and often not easily

24 assessed or read by other medical professionals at the jail.  This review and

25 summary of outside medical records should contain the following basic information:

26          a.     Who reviewed the records (usually a medical practitioner).

27          b.     What were the discharge diagnoses and major findings.

28          c.     What studies were done and what did they show.

1    d. Are any diagnostic studies or treatments recommended for the

2 future? Who will schedule these?

3    e. When will the patient be seen by jail medical staff?

4   715. In addition, a jail medical professional should speak with the patient

5 face-to-face to ascertain their understanding of the important findings and what

6 should be scheduled in the future.

7   716. However, the MSD Operations Manual Medical Division says nothing

8 about the appropriate steps to take when patients return after receiving offsite care.

9 NaphCare's Health Care Policy and Procedure Manual No. A-08 says only that

10 "[o]ff-site health care and emergency treatment referral and discharge summaries"

11 should be contained within the patient's health record in TechCare.

12 NAPHCARE001577.

13   717. In my opinion, this lack of guidance on what is expected of Jail medical

14 staff when patients return from offsite care leads to inadequate documentation and

15 poor medical care that can (and does) harm patients.

16   718. In my review of medical records, I found that the basic principles of

17 documentation of outside medical records, continuity of care, and appropriate follow

18 up simply do not occur very often at the Jail.

19   719. Many times, no review of the outside medical records was recorded at

20 all.  For example, patient ▉▉▉▉▉ was sent to the ER when she had a seizure

21 during a court proceeding on ▉▉▉ 2023.  SD_810597.  There is no indication that

22 her ER record was even reviewed, and it was never summarized in her records.

23   720. In other cases, the records were simply noted as "reviewed," but none

24 of the essential information outlined above was entered into the medical record.

25   721. The deaths of Patricia Adamson and Roselee Bartolacci, described in

26 more detail earlier in this Report, are tragic examples of these failings at the Jail.

27   722. Ms. Adamson was hospitalized for two days from February 15, 2023 to

28 February 17, 2023 due to hematemesis, *i.e.*, throwing up blood, which is most

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

commonly caused by an ulcer in the stomach or duodenum.  SD_705066.  Dr. David Christensen wrote in Ms. Adamson's progress notes on February 20, 2023 that "[h]ospital records [were] reviewed," SD_705067, but made no summary of the medical care provided at the hospital and created no ongoing care and treatment plan for hematemesis/ulcers.  NP Lacey Beaston did a brief summary of the hospital records in a chart note on February 23, 2023.  SD_705124.  She specifically noted the anemia and the hospital plan to transfuse Ms. Adamson if her hemoglobin fell too much.  *Id.*  NP Beaston also noted the hospital discharge prescription of Protonix.  *Id.*  However, NP Beaston made no other treatment plan.  She ordered no labs to check hemoglobin levels, and no scheduled check ups.

723.   Perhaps because there was no easily accessible summary of the medical records and no treatment plan, when Ms. Adamson began shortly thereafter to have other abdominal symptoms commonly associated with ulcers ("early satiety, nausea and bloating") the nurse practitioner who saw her on April 29, 2023 did not mention her hospitalization two months previously and did not consider the possibility of an ulcer.  SD_705537.  Four days later, Ms. Adamson died of a perforated gastric ulcer.

724.   In my opinion, not appropriately reviewing Ms. Adamson's medical record and not developing a medical care plan based on her hospital findings were important contributing factors in her death.  She went to the hospital due to the complications of ulcers.  She died three months later from the complications of ulcers that had been ignored at the Jail in the intervening three months.

725.   Ms. Bartolacci was hospitalized for thirteen days from April 26, 2023 to May 10, 2023, with serious, life-threatening problems, including malnutrition, dehydration, acute renal failure, sepsis, hypokalemia, anemia, cardiac dysrhythmias, and more.  SD_711885.  While she was in the hospital, many diagnostic studies were done, including ultrasounds, cardiac studies, and x-rays, many of which were abnormal.  SD_712354-56.  Ms. Bartolacci also had severely abnormal metabolic labs, such as a critically low potassium level.  She was so sick that she required 13

1    days in the hospital to recover.

2        726.    However, when she returned to the Jail on May 10, 2023, a STATCare

3    practitioner, Chelsea Lowery, Corp NP, wrote only "Hospital d/c summary

4    reviewed." SD_711885.  She wrote nothing else.  None of the essential elements of

5    several days of hospitalization was summarized.

6        727.    NP Lowery did schedule an MD Sick call visit for Ms. Bartolacci, but,

7    when that visit occurred two days later, Dr. David Christensen appears not to have

8    seen the hospital records at all.  He wrote nothing about them.  Instead,

9    Dr. Christensen, wrote that the patient "refused provider eval." *Id.* at p. 298.

10   Nothing further was scheduled.  There was certainly no treatment plan incorporating

11   what was learned about Ms. Bartolacci's frail medical condition during her 13 days

12   in the hospital.  Ms. Bartolacci died approximately two weeks later.

13       728.    In my opinion, not appropriately reviewing Ms. Bartolacci's medical

14   record after her 13-day stay at the hospital and not developing a medical care plan

15   based on this review were important contributing factors in her death from the same

16   problems that had been treated at the hospital, namely malnutrition, dehydration,

17   and hypokalemia.

18       729.    Another example is ▆▆▆▆▆ (▆▆▆▆▆), a ▆▆ year old woman

19   with a documented history of coronary artery disease, who had, as a result, been

20   treated with a coronary stent.  SD_754185-88.  At her booking on ▆▆▆▆▆ 2023,

21   Ms. ▆▆▆▆ was sent to the hospital.  She refused evaluation at the hospital but was

22   nevertheless cleared and returned to the Jail the same evening.  SD_754188.  On

23   ▆▆▆▆▆ 2023, Dr. David Christensen noted "Scripps ▆▆ after visit summary

24   reviewed," but he did not provide a summary of what had occurred.  SD_754732.

25   On ▆▆▆▆ 2023, Ms. ▆▆▆▆ was again sent to the hospital for chest pain.

26   SD_754219-20.  She was admitted and had EKGs (all abnormal), SD_754213; a

27   cardiac stress test done (that was interpreted as "nondiagnostic"), SD_754212; and

28   labs which showed "stage 3 chronic kidney disease," SD_754208.  The discharge

1  papers sent back to the Jail with Ms. ██████ included the findings of her

2  echocardiogram: "Conclusion Left ventricular systolic function is severely

3  decreased.  LVEF [left ventricular ejection fraction] is 25%"—anything below 30%

4  is severely abnormal—"Moderate to severe mitral regurgitation.  Severe tricuspid

5  regurgitation.  There is severe pulmonary hypertension."  SD_754215.  In other

6  words, Ms. ██████ had been diagnosed with severe, life-threatening heart disease

7  and moderate kidney disease.

8      730.   She returned to the Jail on ██████████ 2023.  The next day, NP Lacey

9  Beaston noted that Ms. ██████ "had a cardiac work up including labs and an echo"

10  but evidently did not look at the echocardiogram report nor did she note the

11  diagnosis of stage three kidney disease.  SD_754738.  Ms. ██████ continued to

12  complain of chest pain thereafter and was evaluated by nurses, who sent EKGs to

13  STATCare midlevel practitioners for interpretation.  SD_754746, SD_754739.  The

14  severely abnormal echocardiogram was finally noted four weeks later, on ████████

15  ██ 2023, by NP Beaston.  SD_754749.  It took another month to get UM

16  permission for a cardiology consult, which finally occurred via telemedicine on

17  ██████████ 2023.  SD_754755.  Ms. ██████ was finally sent to the hospital for a

18  cardiology evaluation on ██████████ 2023, SD_754764, and ██████████ 2023.

19  SD_754772.  At the ██████████ 2023 visit, the hospital conducted another

20  echocardiogram and determined that the first echocardiogram was actually not

21  Ms. ██████ but had been mistakenly included in her chart.  The severely abnormal

22  echocardiogram attributed to Ms. ██████ should have been identified far sooner than

23  three weeks later.  Had it been a real finding, Ms. ██████ could easily have died

24  within those three weeks.

25      731.   In summary, the Sheriff's Department has no Policy or Procedure for

26  ensuring appropriate follow-up and continuity of care after Jail patients return from

27  outside medical appointments.  Because of this, appropriate follow-up and

28  continuity of care does not occur.  This leads to patient harm, including death.

**XIII. The Sheriff's Department Fails to Provide Adequate Discharge Planning Services and Medication for Incarcerated People Being Released from the Jail**

732.    In my opinion, the Sheriff's Department lacks adequate discharge planning services to ensure the health care of individuals being released from the Jail.  Discharge planning from a jail is essential because these patients, who suddenly have no or limited options for medical care once released, are liable to have their health seriously deteriorate without that care.  Without care, many of these people will return to the Jail.  Without community resources for medical care, they will return to the Jail in worse shape than they were before.  From a public health perspective, these patients return to the larger San Diego community.  Their problems receiving proper health care will result in worsening community problems, ranging from transmission of communicable diseases that were not treated to overburdening first responder and emergency room resources in the community because they have nowhere else to go.  For those of us who have practiced jail medical care, the problem of slow deterioration of incarcerated and formerly incarcerated patient health over time due to lack of resources is a common experience.

733.    The standard of care for discharge planning in a jail is similar, if not identical, to the standard for discharge planning in the community.  In the community, there is a standard of care as to the responsibilities of the medical staff when a patient is being discharged from a hospital, a nursing home, or any other inpatient facility.  The medical staff has the responsibility to ensure *continuity of medical care* after the patient leaves the facility.  One can find the essentials of this standard of care in many places.  For the purposes of this report, I used the online medical textbook *Uptodate*, and specifically, the chapter "Hospital discharge and readmission" written by E. Alper, et al.  *Uptodate* states that "[d]ischarge planning is the development of an individualized discharge plan for the patient, prior to leaving the hospital, to ensure that patients are discharged … with provision of

adequate post-discharge services." Based on my experience practicing medicine in carceral settings, this is the appropriate standard of care in the Jail as well.

734. Per *Uptodate*, elements of discharge planning include "[p]lanning and coordinating with whatever entity will take over medical care after discharge." This includes "communication between the [facility] and the clinic or medical practitioner that will take over care after discharge"; ensuring the "clinic or medical provider [] receive[s] the jail medical record"; considering whether the patient "ha[s] a family or other sources of medical support"; "[m]edication reconciliation, which includes determining what medications the patient is to take after discharge and how the patient will get them"; and providing the patient with instructions about their main medical problems, as well as what to do and who to see if these problems arise. *Uptodate*, Hospital Discharge and Readmission, Alper, et al., Feb 3, 2023. Based on my own knowledge and experience, this is an appropriate standard of care.

735. The Jail has a poor track record with regard to discharge planning. In 2017, the NCCHC Technical Assistance Report concluded that "there was no evidence of [discharge planning] in the medical records we reviewed [at the Jail]." DUNSMORE0260675.

736. The Jail's policies regarding discharge planning are minimal, providing guidance only about providing medication upon release. NaphCare Policy & Procedure Manual, E-10 Discharge Planning, June 1, 2022, SD_073589; MSD Operations Manual D.1.1, Pharmaceutical Operations § IX. Discharge Medications.

737. This lack of adequate policies and procedures relating to discharge planning guarantees failure of the program. As with every other Department function, the Sheriff's Department must lay out the standards of discharge planning that they expect from their employees and contractors. Discharge pharmaceuticals is just one part of the discharge process. Discharge planning must take into account, for example, disabilities. Alarmingly, I understand the Sheriff's Department released a person with a mobility disability from Central Jail at close to midnight on

1   May 31, 2024 without his wheelchair, underscoring the harm that can occur if
2   specific discharge planning policies are not in place.  Declaration of James Clark,
3   June 12, 2024.  Discharge planning must also consider ongoing medical treatments.
4   How will the patient continue cancer treatments after release?  If a patient is
5   released before receiving a scheduled surgery, what does that patient need to do
6   now? Having no policies about these and many other discharge considerations
7   means that Jail patients will inevitably be harmed when necessary medical and
8   social needs are not met.  The medication discharge policy is also insufficient, as
9   explained in more detail below.

10      738.   Rather, the Sheriff's Department attempted to rectify its poor
11  performance regarding discharge planning by hiring NaphCare as the primary
12  provider of health care services in June 2022.  Specifically, the County's contract
13  with NaphCare states that the County and NaphCare "shall implement a system of
14  discharge planning per the NCCHC standard."  Contract No. 566117, ,
15  NAPHCARE000568.  It also says the County and NaphCare must "ensure all
16  discharge planning activities are documented using Techcare," and moreover, the
17  "Release/Discharge Summary screen shall be used to provide medical information
18  to the patient, medical facility or another state prison system."
19  NAPHCARE000569.

20      739.   I understand that the Sheriff's Department is renegotiating much of its
21  contract with NaphCare, and, as of July 1, 2024, and contracted with CHP for
22  provision of on-site medical care, including "Discharge of Patients."  Contract No.
23  571418, SD_1579722.  However, Dr. Freedland testified that "We're [CHP] not
24  typically involved in the discharge process."  Freedland Tr. at 149:19-20.  It appears
25  that NaphCare will remain fully in charge of the discharge planning program.

26      740.   My review of documents has demonstrated that the Sheriff's
27  Department has not implemented a comprehensive system of discharge planning, it
28  failed to ensure that NaphCare implement such a system, and it has not taken

sufficient steps to remedy those flaws in its new contract with CHP.  The Sheriff's
Department thus fails to meet the standard of care regarding discharge planning.

### A.    Coordinating Ongoing Medical Care with Outside Agencies

741.    The County is responsible for ensuring that there is a system in place to
plan and coordinate continued patient care with outside agencies.  As noted above,
however, there are no San Diego County policies requiring that any such
coordination occur.

742.    The County's contract with NaphCare provides that "[a]s part of
discharge planning, case managers, medical and mental healthcare professionals
shall help arrange follow-up appointments for the patient."  Country Contract No.
566117, NAPHCARE000569; *see also id.* ("Case managers and Contractor [will]
arrange an appointment prior to release."); NAPHCARE000568 ("[D]isposition
choices include referrals for case management[.]"); *id.* (requiring "[t]he
development of a plan to address key issues such as continued medical and mental
healthcare, housing, medical insurance, transportation, Social Security Disability,
and employment").

743.    NaphCare employs two discharge planners for the Jail, but the scope of
their duties had yet to be determined as of June 2024—two years after the contract
was signed.  In her June 7, 2024 deposition, Angela Nix, testifying on behalf of
NaphCare, stated that the job duties of the two discharge planners were "currently
[being] develop[ed]."  Nix II Tr. at 78:6-7.  In particular, "we are working with the
County to decide how those particular positions are going to function, if it's going to
be a clinical discharge planner, or someone that is more of a clerical or
administrative [sic]."  *Id.* at 77:18-22.  Ms. Rognlien-Hood similarly testified that
implementation of discharge planning in conjunction with NaphCare was "still a
work in progress."  Rognlien-Hood Tr. at 250:2-7.  Dr. Montgomery echoed these
sentiments, testifying, "I'm unclear what NaphCare's discharge planners are
actually doing."  Montgomery II Tr. at 265:25-266-1.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

744.    To the extent that the NaphCare discharge planners' work—if they have even started—is be governed by NaphCare's existing policies and procedures regarding discharge planning, those fall far short of what is required in the contract. Notably, the policies and procedures imply that incarcerated patients must specifically ask for discharge planning in order to receive it, stating that "[p]atients who are aware in advance of their release date may inform health staff" who will then begin discharge planning, such as a provider "review[ing] the medications and determin[ing] which medications need to provided and for what duration." NaphCare Policy & Procedure Manual,  E-10 Discharge Planning, NAPHCARE000932.  The NaphCare policies and procedures also state that appointments and resource information are not provided to everyone, but rather, are "made available to the patient upon his/her discharge from the facility and appointments made when possible." *Id.*  The term "when possible" seems to allow NaphCare an excuse anytime they fail to provide appropriate discharge planning. Given that there are only two discharge planners in comparison to thousands of people that are discharged every month (the Jail's average daily population is approximately 4,000 people, but the Jail regularly books that many people or more each month), it is likely that it will frequently not be "possible" for the two discharge planners to arrange continuity of care for everyone.

745.    The NaphCare policies and procedures fall short of the standard of care.  There is no mention of any forward planning of continuity of medical or mental health care for patients who need this upon release.  There is no plan to coordinate medical care with community clinics that would be willing to see former Jail patients.  There is no consideration of their obligations toward patients with disabilities when these patients leave the Jail.  Instead, the Jail has put the onus on the patient to inform the Jail staff that they would like help coordinating their medical care after discharge.  No outside entity requires this.  No hospital will fail to do discharge planning because the patient did not ask for it.  Again, requiring

1  patients to ask for discharge planning seems to be a subtle way to deny them this

2  service and to excuse the fact that NaphCare did not provide this service.

3      746.  Nor does it appear that CHP will be taking over the discharge planning

4  function at the Jails.  Although the new contract generally states that CHP will be

5  responsible for "Discharge of Patients," SD_1579722, there is no language in the

6  CHP contract requiring them to set up a discharge system, as there is in NaphCare's

7  contract.  And, as Dr. Freedland testified in his deposition, "we're not typically

8  involved in the discharge process."  Freedland Tr. at 149:19-20.  In other words,

9  CHP is unlikely to have an already developed discharge planning model that could

10  be implemented in San Diego.

11      747.  In practice, discharge planning is, in fact, not occurring at the Jail.

12  Dr. Montgomery confirmed this at his deposition, testifying that the Sheriff's

13  Department does not have policies or practices for systematically providing

14  incarcerated individuals with comprehensive discharge planning related to their

15  health care.  Montgomery II Tr. at 254:17-257:7.  Rather, such care—which

16  includes things like referring individuals to offsite clinics for continued care or

17  connecting individuals with community health resources—may occur on an ad hoc

18  basis if Dr. Montgomery or Ms. Rognlien-Hood happen to be notified by another

19  agency like the County's probation office.  *Id.* at 257:3-7.

20      **B.     Discharge Medications**

21      748.  With respect to discharge medication, the Sheriff's Department's

22  policies and procedures require that incarcerated people receive only a 10-day

23  supply of medication, and only for certain limited medications, defined vaguely as

24  "critical medications."  MSD D.1.1 § IX(A).  Although Dr. Montgomery testified

25  that the Jail provides individuals of 30-day supplies of all medications now, this is

26  not set forth in official policy.  Montgomery II Tr. at 259:22-24.

27      749.  The fact that there is no official policy requiring provision of 30-day

28  supply is important because the Sheriff's Department cannot hold people

1   responsible if they fail to adhere to it.  In addition, without a formal policy, actual

2   practice can eventually devolve to the discretion of whether the clinician that sends

3   the prescription personally thinks a certain medication is "critical."  NaphCare's

4   policies and procedures demonstrate the haphazard nature of the discharge

5   medication policy in the Jail, stating that "[p]atients who are aware in advance of

6   their release date may inform health staff.  The provider will then review the

7   medications and determine which medications need to provided and for what

8   duration."  NaphCare P&P, E-10 Discharge Planning,  NAPHCARE000932.

9   Without written guidance as to what is or is not a "needed" medication, different

10  providers will inevitably make different decisions so that some patients will receive

11  certain medications upon discharge and others will not.  The language also indicates

12  that the provider only has to do this if the patient requests this in advance.

13       750.   As recently as December 29, 2023, the Sheriff's Department was still

14  discussing how to implement a process to ensure continuity of medication after

15  release, indicating challenges still exist and the Jail has not adequately addressed the

16  issue.  MSD Leadership Meeting, Agenda, December 29, 2023,

17  NAPHCARE037026.

18       751.   The Sheriff's Department also had problems ensuring continuation of

19  Suboxone prescriptions for individuals receiving MAT upon discharge.  In

20  November 2023, for example, pharmacies required "prior authorization" from a

21  physician to release 30-day prescriptions to discharged individuals due to a

22  disagreement with NaphCare, resulting in medication delays.  Email from Kelly

23  Donahue to Kathy Myers et. al., November 30, 2023, SD_661566.

24       752.   For patients requiring medication following release, these issues can be

25  very harmful.  For example, on ███████████ 2023, Sheriff's Department medical

26  staff requested a MAT medication for ████████████████, who was scheduled to

27  be released on ██████████ 2023.  Email from RN Stephen Yi to Dr. Elliot Wade and

28  Dr. Nas Rafi, ████████████ 2023, SD_364617-18.  However, no prescription had

1  been issued by the date of Mr. ███████ release, causing him to miss a dose and go

2  into withdrawal.  SD_364617.

3    753.   More importantly, real discharge planning would attempt to address the

4  problem of how patients will get their medications *after* 10 or 30 days.  If a patient

5  has no prescriber to reorder prescriptions and no insurance or money to pay for

6  prescriptions, giving them 10 or 30 days' worth of medications is just kicking the

7  can down the road.  Inclusive discharge planning thinks of what will happen later.

8  The Sheriff's Department does not come close to doing so with respect to discharge

9  medications.

10    **C.    Patient Instructions**

11    754.   The County is responsible for ensuring that NaphCare complies with its

12  contractual obligations to provide patients at discharge with "educational

13  information regarding their specific illness and the importance of follow-up

14  appointments and medication continuity, from a healthcare provider."

15  NAPHCARE000569.  The patient also should "receive[] a comprehensive packet

16  that contains essential community resources."  *Id.*  However, NaphCare policies and

17  procedures state that this only occurs "[s]hould the health care staff be notified prior

18  to a patient's discharge."  NaphCare P&P, E-10 Discharge Planning,

19  NAPHCARE000932.

20    755.   In practice, judging by the lack of documentation in the dozens of

21  records I reviewed of individuals who had been discharged from the Jail at least

22  once, few patients receive any packet providing information about community

23  resources.  Even if they do, and the practice is just not documented, I am not aware

24  of any evidence regarding exactly how any patient can access these resources if they

25  lack money, insurance, the ability to travel, disabilities that would interfere with

26  reading the material, etc.  In the end, simply handing an information packet to some

27  (but not all) incarcerated people at discharge is not adequate discharge planning.

28

**D.    Documentation and Information Transfer.**

756.    NaphCare's policies and procedures further state that "[a]ll discharge planning, including medical and mental health referrals, is to be documented in the patient's health record."  NaphCare P&P, E-10 Discharge Planning, NAPHCARE000933.  I found no record of any discharge planning in the patient records I reviewed.  This means that either no discharge planning occurred, or the Jail failed to comply with policies and procedures regarding documentation.

757.    With respect to information transfer, NaphCare's policies and procedures simply state that a "release summary is available in Techcare for assistance in discharge planning, especially in those patients discharges to another correctional facility."  NAPHCARE000933.  The County's contract with NaphCare goes further as to what is required, stating that the "Release/Discharge Summary screen shall be used to provide medical information to the patient, medical facility, or another state prison system."  County Contract No. 566117, NAPHCARE000569. I saw this screen completed in only a few (no more than 10 percent) of the charts I reviewed.  Where this summary screen was completed, there was no indication why it was generated in those cases but not others, or who the summary was sent to.  The County's contract with NaphCare states that the summary screen "shall be used to provide medical information to the patient," but there is no explanation as to how a departing patient requests a copy or how it is provided when requested. *Id.*  There is also no mention in the policies and procedures of how an outside medical clinic should request a copy of this summary screen.

758.    The evidence I reviewed also shows a clear lack of training on how to prepare for discharge of incarcerated people with serious medical concerns so that such individuals can continue their medical care without dangerous interruption. There is often complete confusion among staff leading up to a discharge.  Emails from April and May of 2023 regarding discharge medications for an incarcerated person with diabetes demonstrate that even Dr. Montgomery, Ms. Rognlien-Hood,

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

and Brandy Rafail, a Supervising Detentions Nurse, were ignorant about the Sheriff's Department's policies related to discharge medication.  Emails between Brandy Rafail, Serina Rognlien-Hood, and Jon Montgomery et. al., April 28, 2023 to May 1, 2023, SD_371720-22.  The emails indicate that Ms. Rognlien-Hood had previously told providers that the Sheriff's Department did not and could not provide critical medications except for "ones that ask," and after confirming that she was supposed to provide the medications to all incarcerated people, Ms. Rafail responded with surprise.  SD_371720.

759.  Another example of harm stemming from the Jail's inadequate discharge planning policies and practices is an incarcerated person named ███████████, who was kept in custody for an extra week because the Jail could not provide him with an inhaler at discharge.  Email from Christopher Miedico to Charles Cinnamo et al., March 9, 2023, SD_555896.

760.  Discharge statistics are not tracked in the SDSD's CQI program as they should be.  As one example, I have seen no statistics on how many discharge prescriptions are actually picked up by the patient versus how many patients never pick up their discharge prescriptions.

\* \* \*

761.  The Jail's lack of adequate discharge planning policies and practices places incarcerated people at a substantial risk of harm.

**XIV.  The Sheriff's Department Fails to Maintain Adequate Quality Assurance/Quality Improvement Processes to Ensure Appropriate and Timely Medical Care**

762.  Continuous Quality Improvement ("CQI") is the process of ensuring that medical care within a particular system is adequate, appropriate, and meets the medical standard of care.

763.  A robust CQI program is critical to any healthcare institution— especially one with hundreds of staff working in tandem every day.  The point of CQI is to allow leadership in a large institution to ensure that all the different actors

1  in the system are following policy and that those policies are working toward the

2  goal of providing appropriate medical care.  In a large institution, having adequate

3  policies is necessary to ensure that healthcare is provided consistent with the

4  standard of care; however, good policies are not sufficient to ensure good care.  In

5  addition, the institution must ensure that staff are trained on those policies.  It must

6  ensure that statistics are kept on whether those policies are being followed.  It must

7  analyze those statistics to understand where medical care has fallen short of the

8  standard.  And, it must implement changes, including by holding staff accountable,

9  when the standard of care is not met.

10    764.   All hospitals and other large outside medical programs, like HMOs,

11  have a CQI program.  Likewise, NCCHC considers a CQI Program "essential" for

12  their accreditation.  The NCCHC Standards for Health Services in Jails devotes five

13  full pages to CQI.  *See* J-A-06.  The 2017 NCCHC Technical Assistance Report was

14  critical of the Jail's CQI program.  They recommended establishing "monitoring

15  activities and thresholds for studies," completing both process and outcome studies

16  and evaluating the effectiveness of the CQI program annually.

17  DUNSMORE026025-26.  And, in 2020, Dr. Venters devoted an entire section of his

18  report on his recommendations for improving the Jail's CQI program.  SD_215363-

19  67.

20    765.   The contract that the Sheriff's Department signed with NaphCare in

21  April 2022 requires a CQI program and has a long list of requirements for that

22  program beginning at section 2.3.26.  See NAPHCARE000052.

23    766.   In my experience and in my opinion, CQI should include the following

24  elements:

25    767.   **Policies and Procedures.**  The first part of a CQI program is defining

26  standards for medical practice and what is minimal acceptable care.  This is usually

27  a manual of formal policies and procedures or less formal written guidelines.  The

28  manual should be updated at least yearly.  Clear and precise policies are critical

1   because, without them, it is impossible to hold staff accountable for failing to follow

2   the policy.

3       768.   **Training**.  Medical and security personnel must be trained so that they

4   know how the overall system works and what their role is.  There must be training

5   when the person is hired; periodic ongoing training that covers any changes in the

6   overall health delivery program (such as changes in policies and procedures); and

7   extra training in any weak areas as they are discovered.

8       769.   **Competency Review.**  The CQI program must evaluate the

9   performance of medical employees to ensure competency.  This is usually done by

10  the use of two types of performance reviews.  The first is a peer review.  A peer is

11  someone with the same training performing the same job as the person being

12  reviewed, *e.g.* a physician reviews a physician, a nurse practitioner reviews a nurse

13  practitioner, an LVN reviews an LVN, etc.  The peer reviews a random sampling of

14  patient charts (usually ten) and writes an evaluation of performance.  The second

15  performance review is that of a supervisor evaluating the performance of someone

16  they supervise, *e.g.* the Medical Director evaluates a physician's performance, a

17  Nursing Supervisor evaluates an RN's performance, and a Supervising Physician

18  evaluates a physician Assistant's performance.  Both types of performance reviews

19  should occur at least yearly.

20      770.   **Statistics.**  The CQI program must gather and disseminate meaningful

21  statistics.  These statistics should be reviewed and analyzed periodically (usually

22  monthly) to identify important trends and problems.

23      771.   **Studies.**  The CQI program should do periodic (usually quarterly) pre-

24  defined intensive studies of specific health care issues.  The NCCHC defines two

25  types of CQI studies: Process Studies, in which a health care process is evaluated for

26  efficacy and efficiency, and Outcome Studies, in which a health care outcome (*e.g.*,

27  normal blood pressures in a patient being treated for hypertension) are evaluated.

28      772.   **Investigations.**  Significant bad patient outcomes such as deaths should

1  be formally investigated to try to determine one or more root causes of the bad

2  event.  In a hospital, this is the role of the M&M Committee.  As discussed above,

3  the Jail likewise should have a committee to investigate deaths and sentinel events

4  to improve health care in the form of training, changes in programs, discipline, etc.

5  773.  My review of the CQI program at the Jail found significant problems.

6  **A.  The Jail's Policies Are Not Sufficiently Clear, Allowing Staff to Escape Accountability**

7

8  774.  There are multiple sets of policies that appear to govern health care at

9  the Jail:  the MSD Operations Manual, NaphCare's policies and procedures, plus the

10  dropdown menus in STATCare, just to name a few.  It should go without saying that

11  these dueling policies can cause confusion for the individual healthcare provider,

12  who may not know which guidance to follow in a particular situation.

13  775.   For example, the Sheriff's Department contract with NaphCare

14  requires "continuity for patients on pharmacologic therapy," NAPHCARE000039,

15  and states that "Contractor typically approves non-formulary orders,"

16  NAPHCARE00006.  However, NaphCare in fact discontinues long-acting insulins

17  at booking as part of the "STATCare Intake Assessment and Orders," which

18  contains this directive to the STATCare practitioners:  **"All long-acting insulins**

19  **will be substituted with Novolin N BID at an equivalent dose unless there is**

20  **documented evidence that the patient cannot or should not be transitioned."**

21  *See, e.g.*, SD_790712.  These directives are contradictory and therefore confusing.

22  776.  In addition, the existence of multiple competing policies may also make

23  it difficult to hold a staff member accountable who is not following the right policy.

24  For example, if a STATCare practitioner chooses to continue a patient's long acting

25  insulin, in accordance with the Sheriff's Department's directive of continuity of

26  care, will they be subject to discipline from NaphCare for disobeying the directive

27  that "All long-acting insulins will be substituted?"

28  777.  This potential for confusion—and inability to hold staff accountable—

1  is also the reason that an institution's policies need to be updated regularly to reflect

2  actual practice expectations.

3      778.   The Sheriff's Department, however, does not regularly issue formally

4  updated policies.  With the exception of two policy sections regarding pregnant

5  incarcerated people, to my knowledge, the MSD Operation Manual has not been

6  updated since 2022.  One example of a policy that appears not to have been updated

7  appropriately in the Operations Manual is MSD.W.2 Wound Care Management, last

8  updated on January 4, 2022.  This guideline states that "On site collaboration is key

9  to the success of the program and includes the facility physicians, registered nurse

10  practitioners (RNP), nursing supervisor, charge nurses and nursing staff."  *Id.*

11  However, from my review of patient charts, it appears that most wound management

12  decisions are made by remote STATCare practitioners based on photographs sent to

13  them.  This guideline does not mention STATCare and so is outdated, since

14  STATCare appears to have taken over most wound management.  Other medical

15  treatment guidelines have been referred to (and relied on) by Jail practitioners which

16  are not included in the copy of the Operations Manual sent to me, such as PTG.H9,

17  which evidently is a Hepatitis C treatment guideline.  SD_754905.

18      779.   As former-Commander of Operations Christina Ralph testified, the

19  Sheriff's Department knows that they need "to update all of the policies and

20  procedures to move towards the NCCHC accreditation."  Ralph II Tr. at 47:10-12.

21  Similarly, the NCCHC Technical Report was critical of the Jail for not having

22  chronic disease treatment guidelines.  DUNSMORE0260676-77.  The Sheriff's

23  Department contract with NaphCare required the development of these guidelines.

24  NAPHCARE000039.  Yet I understand that such guidelines are still not available at

25  the Jail.

26      780.   Instead of revising its Operations Manual, it is the norm for the

27  Sheriff's Department to issue a "training bulletin" (or similar informal

28  announcement) of a new policy.  In effect, the Sheriff's Department then expects

staff to know that what is written in the Operations Manual is incorrect and to rely on the Training Bulletin instead.

781.   A good example of this is when, in response to two deaths from complications of diabetes within two weeks, Dr. Montgomery issued Medical Directive: #7 – "Internal Transition of Care for the Management of All Patients with Diabetes" on December 3, 2021.  SD_169026.  Dr. Montgomery then rescinded Medical Directive #7 with Medical Directive #7A, issued on August 16, 2022. SD_3759270.  Medical staff were expected to follow these medical directives even though I see no indication that the underlying Operations Manual and Policies and Procedures had changed.

## B.    The Sheriff's Department Does Not Provide Adequate Training, Meaning that Some Staff May Not Know the Governing Policy

782.   Dr. Venters stated in his recommendations that:  "Appropriate training of correctional health and security staff represents a best practice for reducing mortality and morbidity among incarcerated people. … [O]ngoing, regular training is also required for health and security staff."  SD_215373.  The NCCHC agrees. Indeed, training was mentioned 166 times in the 2017 Technical Assistance Report with several recommendations for improved training and documentation of training for security and health staff.

783.   Despite this, essential training is still not being performed on a consistent basis.  As part of its contract with the County, NaphCare was to provide training to all staff, including County staff and even non-medical staff.  *See* § 2.5, NAPHCARE000086-87.  While NaphCare has produced training materials as part of this case, I do not have specific information showing that nurses, mid-levels, and physicians are being trained regularly and on the correct topics.  *See* Nix II Tr. at 28:4-29:10, 37:7-47:4.  In fact, Angela Nix, NaphCare's 30(b)(6) witness, did not "know what [the County's] timeline for training and education is for their staff."  *Id.* at 28:1-2.

784.   Ms. Rognlien-Hood testified in her deposition that NaphCare's new employee orientation "didn't do an adequate job."  *See* Rognlien-Hood Tr. at 121:1-7.  She also stated in an email on February 22, 2023  that:  "Naphcare's training thus far have been pointless"; "[n]o classroom/book training has been given"; and "[t]raining has confused the staff."  SD_375922.

785.   Dr. Freedland, who just won a bid to provide physicians and mid-level providers at the Jail through his company CHP, testified that he did not know if NaphCare's training included a requirement that physicians ask patients if they mind if a deputy is present during their care.  Freedland Tr. at 112:15-18.  Dr. Freedland also testified that once his new contract was in place, he would hire a "full-time trainer … to … make sure the staff was trained properly, and have them sign off they are trained properly."  *Id*. at 133:6-22.  Since the contract did not start until July, I do not have access to any new training that will be provided by the CHP trainer.  But Dr. Freedland said the new training would not include how to handle mentally ill patients who refuse treatment.  *Id*. at 134:2-15.  Given the cases I have seen in this Jail, including but not limited to those described in this Report, that omission is unfortunate.

## C.    The Sheriff's Department Does Not Track or Analyze the Right Data to Ensure that Adequate Medical Care Is Provided

786.   Statistics are powerful tools to improve the quality of medical care in a system—as long as the right statistics are tracked and the statistics are properly analyzed.  In some cases, the Sheriff's Department does not track the right statistics, as noted throughout this Report.  For example, the CQI evaluation of off-site specialty consultations and other off-site medical care, should contain information about current contracted off-site specialists; the average time taken to get UM approval and the percentage not approved (broken down by specialty); the average wait times for appointments with each particular specialist; and problems encountered in making and keeping these appointments, such as the reason for all

1    missed or rescheduled appointments.

2        787.   However, CQI reports about off-site appointments that I reviewed did

3    not contain this information.  I was able to read only how many off-site

4    appointments were completed in a given month, and occasionally how many were

5    cancelled due to refusals, or discharges, etc.  But, as explained earlier in this Report,

6    these CQI reports did not give me an accurate reading of the health of the off-site

7    program.

8        788.   Another example of a missing basic CQI statistic is the number (and

9    percentage) of patients who fail to pick up their prescriptions from the pharmacy

10   after discharge.

11       789.   The Sheriff's Department CQI program tracks in custody deaths, but as

12   I point out elsewhere in this Report, the Sheriff's Department CIRB process is

13   inadequate, and I have not seen any statistics presented about morbidity events (also

14   called sentinel events, *i.e.*, a serious bad patient outcome that does not result in

15   death).  A good example of a sentinel event that would be tracked at a hospital

16   would be Diabetic Ketoacidosis ("DKA").  DKA is caused by very high blood

17   sugars that cause the diabetic patient to lose water and become profoundly

18   dehydrated and also results in the patient's blood to become seriously acidotic.

19   DKA usually occurs over several days.  If a hospitalized diabetic patient develops

20   DKA, administrators at the hospital would ask themselves "How did this happen?

21   How did we miss this developing for days?"  The DKA is therefore a sentinel event

22   that triggers an investigation.  Similarly, any diabetic who becomes sick enough to

23   need to be admitted to the hospital should be classified as a sentinel event and

24   investigated.  However, I have seen no evidence that DKA or any other sentinel

25   event is tracked in the Jail.

26       790.   Also, the statistics the Jail does collect are not properly analyzed.  One

27   CQI report documented that almost 20 percent of all patients scheduled for offsite

28   medical appointments over a six month period refused to go to the appointment.

NAPHCARE026024.  As explained earlier in this Report, this statistic is not credible on its face, but the point here is that this striking statistic was not flagged for investigation.  The important question is:  why does the Sheriff's Department have a refusal rate of 20% for off-site medical care that the patients themselves supposedly want?  This would be an easy CQI study to do.  Simply pick a random sample of refusals and interview the patients.  But I do not see any evidence that this study has been done.

791.   NaphCare's 30(b)(6) witness Angela Nix stated that she did not "know specific CQI programs at the site level at San Diego."  *See* Nix II Tr. at 34:9-10.  Ms. Nix also did know if CQI is discussed at site level meetings.  *Id*. at 34:14-16.  Ms. Nix further testified that although she had attended 8 to 12 of San Diego's patient care coordination committee meetings, she could not recall any discussion of improvement or recommended changes.  *Id*. at 35:7-13.  Since the NaphCare contract calls for NaphCare to provide CQI and training, this testimony is worrisome.

### D.     The Sheriff's Department's Peer Review Process for Medical Staff Is Inadequate

792.   Peer reviews are an important component for ensuring that medical staff are performing competently.  As the NCCHC 2017 Technical Assistance audit pointed out in 2017, peer reviews should be completed yearly.  DUNSMORE0260697.

793.   Although peer reviews (as well as "Focused Professional Practice Evaluations" and "Ongoing Professional Practice Evaluations") were required by NaphCare's original contract, § 2.3.27.1, NAPHCARE000055, NaphCare has not been reliably completing them.  In a May 26, 2023, email, Dr. Montgomery implied not only that NaphCare had not been doing Peer Reviews as required by their contract, but also that NaphCare did not seem to understand what a Peer Review was.  SD_227522.

794.   Even as of October 17, 2023, it is not clear that NaphCare had implemented a full Peer Review program.  The Sheriff's Department had pointed this out in its Corrective Action Notice.  SD_1572597.

795.   In conclusion, none of the elements that I would expect to see in an adequate CQI program are present in the Jail's medical system at this time.  If CQI is inadequate, mistakes—particularly repeated systemic mistakes like those I have identified throughout this Report—are missed.  That places incarcerated people at risk of harm.

## XV.   The Sheriff's Department Systematically Fails to Maintain Sufficient Numbers of Health Care Professionals, Resulting in Deficient Care

796.   Plaintiffs' Third Amended Complaint alleges that the Sheriff's Department has an "insufficient number of health care professional to provide minimally adequate care to the approximately 4,000 incarcerated people in the Jail." Dkt. 231 at ¶ 42.  Based on my review of the records and inspection of Jail facilities, I agree, and it is my opinion that the Jail's inadequate health care staffing ratios is a major contributing factor to the many failures outlined earlier in this report.  The recently negotiated contract with CHP will not solve these problems.

### A.   The Jail Has Experienced a Shortage of Healthcare Staff for Several Years

797.   The Sheriff's Department's systemic failures to provide adequate medical care to incarcerated people are myriad:  initial health assessments for newly booked incarcerated people are delayed or missed entirely, *supra* at Part II; sick call requests are ignored or responded to days later, *supra* at Part IV; patients are documented as having "refused" appointments without being informed of the appointment or counseled about the risks of refusal, *supra* at Part V; vital signs and other physical examinations are not completed, *supra* at Part VI; and medical care is provided by remote providers or nurses acting outside the scope of their practice, *supra* at Part VI, to name a few.  Chronic understaffing contributes to all of these

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

problems.

798.   My review of the records in this case shows that the Sheriff's Department knows—and has known—that additional medical staff are necessary to provide adequate care at the Jail.  This chronic staffing shortage persists at all levels: nurses, mid-level practitioners, and physicians.

799.   According to Dr. Montgomery, as of March 30, 2021, the Jail "has experienced a chronic staffing shortage for decades."  SD_172496.  Indeed, a funding "priority list" for the Medical Services Division, dated August 9, 2019, explains that additional funding for 47 full-time equivalent ("FTE") RN positions and 34 LVN positions was needed "to bring MSD to appropriate staffing levels to meet current and future program needs, including for intake, medication coordination, and other critical functions.  FY 20-25 Five-Year Financial Forecast – Priority List, August 9, 2019, SD_057768.  A presentation regarding the FY 2021 – 2022 financials for the Medical Services Division shows that the Sheriffs' Department's own staff had a 39% vacancy rate for budgeted positions, including 92 vacant positions in the nursing unit.  QA/QI Financials Presentation, SD_395977.The Jail's contract with NaphCare in 2022 did not remedy the Jail's persistent staffing problem.  As Dr. Montgomery stated in a May 26, 2023 email: "It has been shown that far more staff members are needed than [NaphCare] initially estimated."  SD_227522.

800.   Administrators for the Sheriff's Department and NaphCare have admitted to these staffing inadequacies.  Ms. Rognlien-Hood spoke extensively in her deposition of the problems the Jail has had with understaffing and shortages in nursing staffing, including listing the many ways that Jail has been forced to try to compensate for those shortfalls:   (1) overtime; (2) nursing supervisors working clinical duties instead of their own supervisory work; (3) having "off-site" personnel help with triage; (4) rotating nurses from facilities less understaffed to facilities more understaffed; and (5) hiring Certified Nurse Assistants ("CNAs").  Rognlien-

1  Hood Tr. at 55:6-56:20, 67:19-69:5.  In the end, the Jail simply has been forced to

2  try to get as much done as possible with fewer nurses.  Kenneth Jones also

3  acknowledged understaffing among nurses, admitting that understaffing impacted

4  care, including blood draws and other labs.  Jones Tr. at 129:17-133:7.  Despite

5  acknowledging understaffing, Mr. Jones could not recall every commissioning a

6  study to evaluate the extent of nursing understaffing.  *Id.*

7        801.   As just one example of medical staff shortages in the Jail, a schedule of

8  shifts at Central Jail on July 1, 2023 showed 9 out of 20 nurses assigned to work

9  were absent with "no replacement."  SD_726781.  The unfilled shifts included two

10  of three RN sick call nurses and both MOB nurses.  SD_726781.  This was not an

11  unusual situation.  On July 16, 2023, 10 of 21 nursing shifts at Central Jail were

12  unfilled, including both receiving nurses, both RN sick call nurses, and both MOB

13  nurses.  SD_726809.

14        802.   Ms. Rognlien-Hood also testified that the Jail had approximately 30

15  RN and 40 LVN vacancies as of February 14, 2024, Rognlien-Hood Tr. at 52:22-

16  53:3,  and that historically, the number of vacant nursing staff positions had been in

17  the "high 50s," *id.* at 53:16-22.  This testimony is at least consistent with, and may

18  even downplay, the actual number of vacancies evidenced by the documents I

19  reviewed.  For example, Sheriff's Department data shows as of November 1, 2023,

20  there were approximately 108 vacant nursing positions across various the Jail

21  facilities.  SD_114288.  In a presentation regarding the 2021-2022 fiscal year budget

22  for the Medical Services Division, the Sheriff's Department reported 92 vacant

23  positions in its nursing unit.  SD_395975.  In its fiscal year 2020-2025 financial

24  forecast, the Sheriff's Department admitted there were not "appropriate [nursing]

25  staff levels to meet current and future program needs" and that nurses were required

26  to perform administrative tasks that took them away from their critical job duties.

27  SD_057768.  As of November 1, 2023, 32% of the authorized healthcare positions

28  within the Jail were vacant—including nursing vacancies across multiple Jail

1  facilities.  Healthcare, Authorized Positions as of 11/1/2023, SD_114288.

2      803.   Nor has the Jail been able to retain the medical staff that it does have.

3  An internal Sheriff's Office "Naphcare Briefing" dated April 24, 2023 states that

4  there has been "Unprecedented 1 MD separation every month since Naphcare

5  contract awarded."  SD_152275-152276.  In addition, CHP had "Lost 3 NPs

6  already" and "CHP stated (more) layoffs are imminent."  *Id.*  In addition, "Gap

7  created in OBGYN services by not hiring timely (6 weeks), SDSD had to hire locum

8  tenens (UNI) for several weeks."  *Id.*  NaphCare compounded this problem by

9  refusing to provide medical oversight for the UNI nurse practitioner.  Further

10  evidence of <u>excessive</u> turnover is found in CQI staffing reports, which show that the

11  number of nurses leaving employment at the jail exceeds the new hires.  See, for

12  example, SD_114481, which shows a net loss of 8 nurses for the three-month period

13  covered by the study.

14      804.   The Sheriff's Department has tried to compensate for being chronically

15  short staffed at the nursing position by requiring mandatory overtime.[54]  The current

16  system still relies heavily on overtime shifts to cover for being chronically short

17  staffed, as I noticed during my tour of the Central Jail on February 6, 2024.  On that

18  day, the nursing duty board showed around 50% of nursing positions filled with

19  overtime workers.  The habitual use of overtime, whether mandatory or not, is bad

20  in the long run because it eats into home life and can lead to increased anxiety,

21  depression, fatigue and sleeplessness.  In hospitals, nurses working too many hours

22  have been shown to have decreased short-term memory and make more medical

23  mistakes.[55]  Overtime has also been found to increase job dissatisfaction among

---

[54]  It eventually discontinued the use of the word "mandatory" overtime in order to "boost morale."  Rognlien-Hood Tr. at 57:11-17.

[55]  T. Bell et. al. *Fatigue in nurses and medication administration errors: A scoping review.*  J. CLIN. NURS. 2023 Sep.;32(17-18):5445-5460.

M. Watanabe et al., *The effect of quality of overtime work on nurses' mental health and work engagement*, J. NURS. MANAG. 2018 Sep;26(6):679-688.

1    nurses and increase burn-out and turnover.  You can fill staffing shortages with

2    overtime in the short term, but in the long term, overtime will result in more nurses

3    burning out and leaving, which leaves you even shorter-staffed in the long term.

4        805.   The County also tries to compensate for work backlogs caused by short

5    staffing by having nurses in supervisory positions work clinical shifts.  Ms.

6    Rognlien-Hood herself has done this.  *E.g.*,  Health Assessment Form, ██████

7    ██████  ██████ 2023, SD_781311.  This is not a good solution for being short

8    staffed.  If supervisors are working busy clinical shifts, they cannot perform their

9    supervisory jobs and supervisory tasks also do not get done.

10       806.   At one point, the Sheriff's Department even considered having sworn

11   staff fill medical positions to compensate for these staffing shortages.  In a

12   November 22, 2021 memoranda from a lieutenant in the Detention Support Division

13   to now-Sheriff, then-Undersheriff, Kelly Martinez, the Sheriff's Department set

14   forth its dangerous and misguided plan in the event the medical services division

15   suffered a "staffing loss that places services at risk," stating that it might "trigger

16   sworn staff being utilized for the distribution of medication."  SD_651265.  The fact

17   that the Sheriff's Department even felt like she needed to come up with a plan to

18   rescue the nursing staff is itself evidence of serious nursing staffing issues.

19   However, while well intentioned, this is a bad idea.  Officers are not trained, would

20   have no idea what they are doing and would inevitably make serious mistakes

21   resulting in medical harm to patients.  Such a plan would never be considered in a

22   hospital.  No hospital would ever allow any non-medical staff (like security or

23   housekeeping) to pass meds because they were short staffed on nurses.

24       807.   Ms. Rognlien-Hood noted in her deposition that the Sheriff's

25   Department began hiring CNAs around early 2023 in another attempt to ease the

26   burden of RN understaffing.  Rognlien-Hood Tr. at 55:23-56:2.  CNAs are not

27   nurses.  They have little training, and in hospitals and nursing homes, are used for

28   non-medical tasks such as transporting patients, feeding and bathing patients,

1  changing bedding, etc.  CNAs can indeed have a role in patient care, but they are not
2  qualified to do patient examinations or evaluations like RNs do.

3      808.  Ms. Rognlien-Hood envisioned CNAs doing jobs that nurses were
4  doing but that did not require nursing skills, such as picking up Medical Request
5  Forms from the lock-boxes.  Rognlien-Hood Tr. at 189:8-13.  However, it is evident
6  from my review that CNAs duties are creeping into duties that are inappropriate for
7  them.  As an example, ████████████ was rounded on by CNAs instead of nurses on
8  ████████████████ 2023.  SD_785988-785989.  CNA Dhameera Fields took
9  vital signs on patient ██████████ on ██████████ 2024 and wrote "Abnormal
10  Vitals Signs/Readings Informed Nurse 7404 per protocol.  Pulse 130."  SD_822177.
11  I have not seen the protocol that CNA Fields referred to.  Also, despite using CNAs
12  for various duties in lieu of nurses since early 2023, I have not seen any Sheriff's
13  Department job description for CNAs, nor any policy and procedure on what
14  specific duties the CNAs are taking over from the nurses, who supervises the CNAs,
15  and how using them affects the Staffing Matrix.

16      809.  In addition, like medical staff, custody staff is chronically short-staffed,
17  which negatively impacts medical operations.  Ms. Rognlien-Hood acknowledged
18  this issue in her deposition, stating that she receives reports from providers that
19  "[c]linic was slow [on a particular day] because they didn't have deputy staff to
20  bring everybody on the list to them."  Rognlien-Hood Tr. at 75:19-21.  Ms.
21  Rognlien-Hood also testified that due to a chronic lack of custody staff during the
22  day, health care staff were forced to change the times of blood draws to the
23  evenings, which is not the ideal time to draw blood.  *Id.* at 70:9-23.  Medical clinics
24  are sometimes outright cancelled due to "sworn availability."  Medical Services
25  Division QA QI Meeting, October 17, 2023, p. 20; *see also* SD_114467 (noting
26  "missed clinic appointments" due to "unavailability of escorts"); SD_278070 ("26
27  deputies down, no deputy for medical this AM").  The Sheriff's Department's
28  inability to transport incarcerated people to medical appointments due to staffing

1    shortages prevents health care staff from treating patients, which precludes

2    administration of care that meets medical standards.

3    810.    Dr. Montgomery discussed renegotiating NaphCare's contract to

4    increase staffing in February 2024.  Montgomery II Tr. at 285:7-13.  This was

5    apparently unsuccessful, as Dr. Freedland admitted in his deposition that physician

6    and midlevel staffing levels were too low, Freedland Tr. at 162:15-163-4.  I

7    understand that staffing issue to be  the main reason that the Sheriff's Department

8    negotiated a new contract with Dr. Freedland's company CHP to provide

9    significantly more onsite medical practitioner coverage.  As explained below, that

10   contract will not rectify the inadequacies of medical care at the Jail.

11   **B.    The New Contract with CHP Will Not Solve the Jail's Problems**

12   811.    The County's recent contract with CHP is designed to "provide on-site

13   Health Care Providers for primary care and urgent care at specified County

14   detention facilities."  SD_1578715.  Notably, the contract increased physician and

15   midlevel staffing at the Jail by almost 300%.  It also increased the County's annual

16   spending on physicians and nurse practitioners in the Jail from approximately $8.3

17   million to $22.6 million per year.

18   812.    This increase could be beneficial to the class members since it amounts

19   to an almost tripling of the previous annual spend.  It is also an acknowledgment

20   that the County was woefully underspending before and short-staffed previously.

21   813.    However, it is worth notable that that CHP's bid for the new contract

22   envisioned even *more* staff, which Dr. Freedland explained was the amount that he

23   thought would "work" "best."  Freedland Tr. at 126:2-3.  CHP's bid would have

24   added 41.2 full-time equivalent practitioner positions across the seven Jail facilities.

25   SD_1579755-1579760.  The ultimate contract added only 28.4 full-time equivalent

26   "personnel" positions and 2 administration positions.  SD_1579731.

27   814.    Even setting aside this disparity between what Dr. Freedland thought

28   would be enough to "work" and what the Sheriff's Department ultimately agreed to,

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

based on my knowledge of this Jail and my experience in correctional medicine in general, I have doubts that this new contract will solve the Jail's problems for four reasons. First, the new contract does not address the nursing staff shortage. Second, the very nature of private correctional health contractors leaves them unstable. Third, this contract fractures medical care into silos, each apparently acting independently from each other. Fourth, even on its face, this contract leaves several deficiencies in the Jail's delivery of medical care in place and will accentuate other problems.

### 1.     Ongoing Nursing Shortage

815.   As explained above, it is indisputable that the Jail is facing a nursing shortage. But the new contract with CHP adds no nurses (nurses at the Jail are employed directly by the County), and therefore cannot solve this problem.

816.   Nurses are essential at every stage of a patient's interaction with medical services at the Jail—just as they are essential at every stage in every outside medical clinic, office and emergency department. In the Jail, Registered Nurses do the Receiving Screen and the Intake screen. RNs do the Second Stage Evaluation. RNs do withdrawal assessments. LVNs pass all medications. RNs triage medical requests and do the face-to-face evaluations. RNs are essential for the proper function of sick call. RNs do most of the work when patients are discharged. And I am only scratching the surface. There are few other categories of employees who can step in and assist the nurses with their work when they are short staffed. Security cannot do nursing work.

817.   These nursing shortages have already had serious consequences for patient care. As an example of the pressures that experienced nurses feel due to short staffing, RN Marisol Gomez-Mercado sent an email to Union Representative Jaime Medina on August 7, 2023 with the subject, "Insufficient staff at LCDRF," stating: "I am sure you are aware of the staff shortage at LCDRF, including on 8/6/23…. I am requesting to not be assigned (as M1 or P1) as I recognize the

1    expectations of duties are unrealistic and jeopardize the safety of patients and

2    myself.  Last night I was assigned to cover P1, P2 and Gatekeeping."  SD_235886

3    The response from Union Representative Jaime Medina stated, "[y]es, I am aware of

4    the short staffing issues at the Sheriff's Department."  SD_235886.  He instructed

5    RN Gomez-Medina on how to submit an "Assignment Despite Objection Form."

6    SD_235886.  The pressure of trying to maintain operations while short staffed is

7    very stressful on the health care staff who are working and trying to do the work of

8    two (or three) staff members day after day.  Such stress inevitably contributes to

9    even more turnover.

10        818.   I have seen no indication that additional nurses are being hired for the

11   Jail.  Absent additional nurses, many of the Jail's health care problems will remain.

### 2.    Instability Created by Private Correctional Healthcare Providers

14        819.   As indicated in the section above and described in the Background

15   section of this Report, the healthcare delivery at this Jail has been subject to multiple

16   changing, and at times overlapping and confusing, contracts with private healthcare

17   providers over the past several years.

18        820.   It is my opinion that this kind of instability is a hallmark of the private

19   correctional healthcare industry,[56] particularly in comparison to the business of

20   providing medical care in the United States *outside* the jail or prison context.  This

21   instability has historically resulted in "revolving door" contracts, boom and bust

22   cycles, and frequent corporate failures and bankruptcies.  In my opinion, the only

23   guaranteed way to avoid these revolving door contracts, which risk creating

---

[56] This industry includes a number of large correctional healthcare companies with multi-state operations, as well as mid-size companies with regional operations. These companies have included companies such as Corizon (until recently, one of the largest for-profit correctional healthcare companies) as well as companies known as Wellpath, TurnKey, NaphCare, Advanced Correctional Healthcare, Southern Health Partners, Centurion, and Wexford Health Services, among others. Many smaller companies also exist, whose operations are more geographically limited.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  confusion and therefore gaps and potential harm to patients, is for correctional

2  medicine to be run directly by the government.

3      821.   Unlike healthcare delivery systems outside of prisons and jails, nearly

4  all correctional medical systems (which are run by state and local governments)

5  have a set dollar amount of money budgeted for medical care for incarcerated

6  people.  In order for a private correctional healthcare company to gain a contract

7  with a state or local government, the company must submit a bid, most often

8  through a competitive bidding process in response to a government Request for

9  Proposal, as both NaphCare and CHP did here.  Contracts are generally awarded to

10  the lowest or near-lowest bidder.  Once the contract is obtained, the amount of

11  money that can be charged for the duration of the contract is pre-set.

12      822.   In order to make a profit, therefore, a correctional healthcare company

13  must create a budget where its anticipated expenses are less than the contractual

14  payments.  The problem, however, is that these budgets are inherently difficult to

15  predict.  If the company's expenses unexpectedly rise  (*e.g.*, unanticipated increased

16  costs for attracting and retaining qualified medical professionals), the company

17  cannot automatically pass these unanticipated expenses on to the County.  It must

18  fulfill the terms of the contract for the contract's duration at a loss—unless it can

19  convince the County to re-negotiate the contract.   This model is unlike the business

20  of providing medical care outside the jail and prison context, where if a hospital has

21  to spend more than anticipated, it can bill that excess to its patients and recover the

22  unanticipated costs.

23      823.   To win a typical 5-10 year contract to provide medical services in

24  corrections, a company must parse its bid to the lowest feasible amount—and

25  sometimes even an unfeasible amount.  Otherwise, that company will never win any

26  bids.  However, the bidding process is risky.  Medical costs have historically risen

27  faster than inflation.  Unanticipated medical events like the COVID pandemic and

28  the opioid crisis can overwhelm a budget.  A company that tries to mitigate its risk

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

by bidding higher to fully account for the uncertain future will often lose the bid to the company that did not plan for such events and so bid less.  A won contract can easily turn into a long-term money loser for the company.

824.  Correctional healthcare companies also must compete for nurses, physicians, and other medical staff with outside hospitals, clinics, and private medical practices.  Correctional medicine is a more difficult job than working at other outside practices and so should be compensated at a substantially higher rate.  However, this basic fact has not generally been acknowledged by correctional medicine companies, with the result that they offer salaries too low to consistently attract qualified medical professionals.  Working at an outside hospital or clinic often offers better pay, better working conditions, and less stress.  As a result, most correctional medical companies that I am aware of are seriously short staffed and have high rates of turnover among their medical professionals.

825.  In addition, most jails and prisons also have significant staff shortages of correctional officers, and this impacts medical costs.  If there are not enough officers to transport incarcerated people, then medical appointments must be rescheduled, which has significant costs.  Facility wide "lock-downs" similarly impact the delivery of medical care.  Jail and prison overcrowding makes it more difficult to provide medical care and thereby increases costs.  All of this also increases stress and dissatisfaction among the health care staff and leads, again, to turnover and short-staffing.

826.  A correctional medicine company that has bid a particular contract too low to be profitable has three options:  invoke the termination clause of the contract and simply walk away; ask for an increase in funding from the county or state; or provide substandard medical care.  Since many (maybe even most, in my experience) initial bids are too low, either from ignorance, bad luck or by design, asking for more money before the end of the contract is very common.  And when the for-profit company asks for more money than their original contract, the implicit

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1    threat of just walking away from the contract—leaving a prison or jail without *any*

2    healthcare system in place—hangs over the negotiations.

3        827.   Of course, once the company has been awarded enough money to make

4    the enterprise profitable, other correctional medicine companies will notice and will

5    promise to do the same job for less when given the opportunity.  And the cycle of

6    "bid low, ask for more money, get replaced by a new company" repeats itself.

7        828.   The result has been chronic instability in the for-profit correctional

8    medicine industry.  It is a rare jail or prison that has had a single contracted medical

9    provider for, say, twenty-plus years.  Stability like that is noticed and coveted.

10   There will be no shortage of companies offering to do the same job for less money.

11       829.   More commonly, local and state governments have a revolving door of

12   medical contractors over the years.  My home state of Idaho is a case in point.  Since

13   privatizing medical services in the state in 1996, five separate companies have held

14   the Idaho DOC contract.

15       830.   Instability has also been true at the Jail that is the subject of this case,

16   where, in just a few years, COAST held the medical contract, then CHP, then

17   NaphCare, and now CHP/NaphCare together.  To think that the CHP/NaphCare

18   hybrid will solve the Jail's myriad problems is naïve, in my view.  More likely, the

19   County will, in the future, fire one or both and turn to a different for-profit medical

20   provider, as have many other counties and states before them.

21       831.   This brings up the underlying question:  Why is the San Diego County

22   Sheriff's Department contracting with for-profit companies to provide medical

23   services at all?  Many jails, including large jails, have not privatized their medical

24   services.  The ostensible reason for privatization is this statement at the beginning of

25   both the NaphCare contract and the new CHP contract:  "The Chief Administrative

26   Officer made a determination that Contractor can perform the services more

27   economically and efficiently than the County, pursuant to Section 703.10 of the

28   County Charter."  NAPHCARE000001; SD_1579624.

EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

832. I am highly skeptical of this statement. I am not aware of any literature, research, or other evidence that shows that jails using for-profit medical companies operate "more economically and efficiently" than jails that do not. If there is any written documentation of the Chief Administrative Officer's "determination," I would like to see the logic and research behind this decision.

833. Although there are advantages and disadvantages of using for-profit correctional medicine companies versus keeping medical care within the County, I believe that, overall, the reverse is true. The Sheriff's Department could operate the Jail medical program more economically and efficiently itself with the added benefit that medical operations would be more stable.

### 3.    Siloed Medical Care Between NaphCare and CHP

834. Even setting aside my concerns with the instability of private correctional contractors, the truncated and siloed nature of healthcare delivery at the Jail under this system is likely to create confusion among staff and harm patients.

835. A well-run healthcare system has clear lines of responsibility and centralized control of all elements of that system. Clarifying who is in charge of healthcare is an essential step towards San Diego's creation of a healthcare system that provides adequate care for incarcerated persons.

836. As I understand it, the Jail now has three independent "silos" of healthcare delivery in the Jail: (1) CHP medical practitioners; (2) NaphCare practitioners (including mental health, dental, medication assisted treatment for opiate use disorder, STATCare) and training; and (3) Sheriff's Department employees, such as the nurses, and medical supervisors such as Dr. Montgomery.

837. It is not immediately clear to me who is supposed to report to whom in this system. According to an email from the Sheriff's Department to the *Union-Tribune* newspaper regarding this three-way responsibility:

> **Please explain the division of labor between NaphCare and CHP, and how will the medical director delineate two different contractors? Who answers to whom, and is that a model any other**

**jail facilities use?**

> a.    NaphCare still has overall responsibility for healthcare of our incarcerated population.  CHP will be the exclusive provider for on-site clinical services and licensed healthcare practitioners, including doctors and nurse practitioners.  CHP will manage and direct the physicians and nurse practitioners and will be giving clinical direction to our internal nursing staff as part of the comprehensive healthcare model.  Naphcare will continue to manage and provide direction to all other services in the jail system.  CHP, NaphCare and SDSO staff will continue to work collaboratively to provide comprehensive healthcare services in our jail facilities.

838.   To me, this sounds like gobbledygook.  And it fails to resolve critical questions, particularly around the use of STATCare, which I understand will still be in place at the Jail, making diagnoses, ordering tests, and prescribing medications independently from the CHP practitioners.  *See* Freedland Tr. at 178:3-7 (CHP has no oversight over STATCare).  As explained earlier in this Report, documents I reviewed showed STATCare practitioners repeatedly failing to meet the standard of care for patients in the Jail.  The new CHP contract does not make clear how—or even if—CHP's practitioners can correct those errors.

839.   Indeed, some medical records I reviewed suggest that nurses in the Jail contact STATCare asking for *permission* to have an on-site practitioner see patients.  *See, e.g.*, ██████████ Medical Record, SD_754743 ("Can I schedule onsite provider to see [Ms. ████████]?").  In effect, NaphCare providers working remotely will have the power to gatekeep patients from CHP practitioners on the ground in the Jail.  More clarity is needed for this to be a functioning healthcare system.

### 4.    Deficiencies in New CHP Contract

840.   The new CHP contract also leaves in place several concerning practices highlighted throughout this report.

841.   It does not make any changes to the deficient M&M process, which has thus far largely failed to address the root causes of the many deaths at the Jail,  *see supra* at Part I.   The new contract does not require CHP to conduct any on-site

1  M&M reviews at the Jail.  Freedland Tr. at 130:16-131:1.

2       842.   The contract does not address chronic care either, *see supra* at Part

3  VIII.  Chronic care is only mentioned once in the contract, in the definition of what

4  "clinic" means.  SD_1579719.   But CHP is specifically not responsible for

5  developing chronic care guidelines defining how often various chronic care clinics

6  should be held and what should be routinely done during chronic care clinic visits.

7  *Id.*  Presumably, NaphCare retains the obligation to develop and implement chronic

8  care guidelines.  Therefore, NaphCare will again decide who is scheduled for CHP

9  practitioners to see.

10       843.   Notably, although CHP is required to provide a full time "Specialty

11  Physician" at Central Jail under the contract, SD_1579716, it does not specify what

12  kind of specialist (endocrinologist? dermatologist? orthopedist?) or if multiple

13  specialists can work part time to fulfill the 40 your per week requirement. There is

14  also no indication  whether this unidentified "specialty physician" will provide a

15  solution for the Jail's persistent failure to provide meaningful chronic care.  *See id.*

16  And, it is not clear whether this specialist will have any authority over STATCare,

17  in order to correct, for example, STATCare's dangerous and substandard treatment

18  of type 2 diabetes.

19       844.   The contract also leaves NaphCare in charge of the medical formulary

20  and Utilization Management ("UM"), the flaws in which are described earlier in this

21  Report, *see supra* at Part VII.  CHP will continue to have no say in formulary and

22  UM processes, despite the fact that CHP practitioners have expressed dissatisfaction

23  with both processes.  *See, e.g.*, Freedland Tr. at 39:19-40:14; Dr. Orem interview

24  during Jail inspection.

25       845.   The contract is also silent about where the clinics will take place and

26  minimum requirements for what should happen at those clinic visits.  It  thus leaves

27  in place the current bad habits of practitioners doing "clinic visits" at the patient's

28  cell and not doing a physical examination or vital signs.  It similarly will not correct

1   the problem of practitioners making diagnoses and prescriptions without examining

2   the patient at all. *See supra* at Part VI.

3       846.   Finally, the contract requires CHP practitioners to attend certain

4   County sponsored training, *e.g.*, orientation, SD_1579722, but it does not require

5   CHP to provide any training to its own employees, nurses, or custody staff.

6       847.   In summary, the CHP contract does not attempt to correct or even

7   address several deficiencies in medical care at the Jail, as raised in this Report.

8                              **CONCLUSION**

9       848.   Based on a reasonable degree of certainty, it is my opinion that the

10  healthcare delivery system in the Jail suffers from a number of systemic flaws,

11  which place incarcerated people at a substantial risk of serious harm. These flaws

12  are not new. The Sheriff's Department has been repeatedly informed of these issues

13  in reports from the NCCHC, Dr. Venters, and the State Audit, going back to at least

14  2017. The Sheriff's Department has nonetheless failed to correct these problems

15  and continually fails even to identify these errors in their M&M and CQI processes.

16  None of the changes the Sheriff's Department has made or claims to be making so

17  far are likely to solve these problems. Therefore, these failures will therefore likely

18  lead to more bad outcomes, including deaths of incarcerated people.

19      The information and opinions contained in this report are based on evidence,

20  documentation, and/or observations available to me. I reserve the right to modify or

21  expand these opinions should additional information become available to me. The

22  information contained in this report and the accompanying exhibits are a fair and

23  accurate representation of the subject of my anticipated testimony in this case.

24

25  Dated: August 21, 2024

26                                    Jeffrey E. Keller, M.D.

27

28

# EXHIBIT Q
# (Redacted)

1   GAY C. GRUNFELD – 121944
    VAN SWEARINGEN – 259809
2   PRIYAH KAUL – 307956
    ERIC MONEK ANDERSON – 320934
3   HANNAH M. CHARTOFF – 324529
    BEN HOLSTON – 341439
4   ROSEN BIEN
    GALVAN & GRUNFELD LLP
5   101 Mission Street, Sixth Floor
    San Francisco, California  94105-1738
6   Telephone:   (415) 433-6830
    Facsimile:    (415) 433-7104
7   ggrunfeld@rbgg.com
    vswearingen@rbgg.com
8   pkaul@rbgg.com
    eanderson@rbgg.com
9   hchartoff@rbgg.com
    bholston@rbgg.com
10
    AARON J. FISCHER – 247391
11  LAW OFFICE OF
    AARON J. FISCHER
12  1400 Shattuck Square Suite 12 - #344
    Berkeley, California  94709
13  Telephone:  (510) 806-7366
    Facsimile:   (510) 694-6314
14  ajf@aaronfischerlaw.com

15  Attorneys for Plaintiffs and the
    Certified Class and Subclasses

    CHRISTOPHER M. YOUNG – 163319
    ISABELLA NEAL – 328323
    OLIVER KIEFER – 332830
    DLA PIPER LLP (US)
    4365 Executive Drive, Suite 1100
    San Diego, California  92121-2133
    Telephone:  (858) 677-1400
    Facsimile:   (858) 677-1401
    christopher.young@dlapiper.com
    isabella.neal@dlapiper.com
    oliver.kiefer@dlapiper.com

16

17                     UNITED STATES DISTRICT COURT

18                   SOUTHERN DISTRICT OF CALIFORNIA

19   DARRYL DUNSMORE, ANDREE
     ANDRADE, ERNEST ARCHULETA,
20   JAMES CLARK, ANTHONY EDWARDS,
     LISA LANDERS, REANNA LEVY,
21   JOSUE LOPEZ, CHRISTOPHER
     NELSON, CHRISTOPHER NORWOOD,
22   JESSE OLIVARES, GUSTAVO
     SEPULVEDA, MICHAEL TAYLOR, and
23   LAURA ZOERNER, on behalf of
     themselves and all others similarly situated,
24            Plaintiffs,
25        v.
     SAN DIEGO COUNTY SHERIFF'S
26   DEPARTMENT, COUNTY OF SAN
     DIEGO, SAN DIEGO COUNTY
27   PROBATION DEPARTMENT, and DOES
     1 to 20, inclusive,
28            Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.**

Judge:        Hon. Anthony J. Battaglia
Magistrate: Hon. David D. Leshner

Trial Date: None Set

[4598005.1]

# TABLE OF CONTENTS

Page

I.      Dr. Murray has limited experience working in jail settings and has not done so since the 1990s. .................................................................. 2

II.     Dr. Murray offered opinions about the adequacy of the Jail medical system without speaking to incarcerated people. ............................... 3

III.    Dr. Murray offered opinions about the adequacy of the Jail medical system without conducting a substantive review of any in-custody deaths. ...................................................................................... 4

        A.      For the three 2024 deaths I reviewed, one was likely preventable, another may have been preventable, and I lack sufficient information to offer an opinion regarding the third. ........................ 7

                1.      Chase Mitchell – 24724484 ...................................... 8

                2.      Liutoa Vili – 23725430 ............................................ 11

                3.      Majid Almajid – 23751645 ...................................... 13

        B.      Newly available documents regarding two other deaths at the Jail reflect serious problems with the care provided at the Jail and the Jail's reporting of in-custody deaths. ........................................ 17

                1.      Keith Bach – 23739381 ............................................ 17

                        (a)     Background Regarding Type 1 Diabetes ......... 18

                        (b)     Summary of Medical Care ............................... 19

                        (c)     Opinions ........................................................ 22

                2.      Jose Cervantes Conejo ............................................ 26

IV.     Dr. Murray's opinions regarding the death rate at the Jail are misleading and unsupported by evidence. ...................................... 28

V.      The audit of chronic care that Dr. Murray's team performed is methodologically and substantively flawed. .................................. 31

VI.     Dr. Murray's audit of intake and Health Assessments is methodologically and substantively flawed. .................................. 40

VII.    Dr. Murray's audit of nursing sick calls is methodologically and substantively flawed. .................................................................. 44

VIII.   Dr. Murray's analysis of the timeliness of lab, x-ray, and test results ignores the Jail's repeated and documented failures to timely review those results ................................................................................ 49

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

IX.    Dr. Murray agrees with several criticisms of the medical system alleged in the *Dunsmore* complaint and found in my report. ...................................... 50

X.     Dr. Murray does not address the substantial problems in the Jail's medical system related to purported refusals of treatment by class members. ................................................................................................. 52

XI.    Dr. Murray admits that the County has many nursing vacancies, did not offer an opinion on whether the County has sufficient nursing staff, and ignored evidence that the County does not. .................................................... 53

XII.   Dr. Murray did not offer any opinion on the adequacy of provider/practitioner staffing ..................................................................... 55

XIII.  Dr. Murray acknowledges that some nurses working in the Jail do not receive new employee orientation ....................................................... 56

XIV.   Dr. Murray does not address how the lack of adequate custody staff negatively impacts care for patients. .................................................... 56

XV.    Dr. Murray misrepresents the problems the Jail has with the continuity of medically-necessary medications and treatments. ....................... 57

XVI.   Dr. Murray's opinion that incarcerated patients have adequate means for alerting medical staff of their needs is not consistent with the evidence I have reviewed. ...................................................................... 58

XVII.  Dr. Murray's opinion that the Jail has an adequate system for diagnosing and treating infectious diseases is not consistent with the evidence I have reviewed. ...................................................................... 59

XVIII. Dr. Murray's opinion that the Jail offers sufficient access to specialty care is not consistent with the evidence I have reviewed. ........................... 60

XIX.   Dr. Murray's opinion that the Jail maintains confidentiality of patient medical encounters is not consistent with the evidence I have reviewed. ...... 61

XX.    Dr. Murray's opinion that "all" patients receive adequate follow up care is not consistent with the evidence I have reviewed. ....................... 62

XXI.   Dr. Murray's conclusion that the Jail provides adequate discharge planning is flawed ............................................................................ 63

XXII.  The faux-NCCHC evaluation performed by Dr. Murray and his team is suspect, does not include adequate explanation of the ratings, and is not consistent with the evidence I reviewed. ........................................... 65

       A.    J-A-02 Responsible Health Authority – *Essential* Standard: The responsible health authority (RHA) ensures that the facility maintains a coordinated system for health care delivery. ................... 67

       B.    J-A-07 Privacy of Care – *Important* .................................... 68

       C.    J-A-9 Procedure in the Event of an Inmate Death – *Important* ........... 68

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1
2

D.    J-F-01 Patients with Chronic Disease and Other Special Needs –
*Essential* ...................................................................................... 68

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1.     I previously issued a Rule 26 Report, submitted on August 21, 2024.  I make this Rule 26 Rebuttal Report to address certain opinions set forth in the Expert Report of Owen J. Murray, DO, dated August 21, 2024 ("Murray Report").

2.     I am a physician with substantial experience in correctional medicine, both as a medical provider and as the Chief Medical Officer for Centurion, a correctional medical company.  A full description of my experience and my curriculum vitae are included in my initial report.

3.     According to Dr. Murray's report, the San Diego Sheriff's Office ("SDSO") retained Dr. Murray to prepare an expert witness report to evaluate the allegations in the *Dunsmore* class action lawsuit related to medical services at the San Diego County Jail ("Jail").  According to his report, Dr. Murray and a team of several other individuals reviewed medical records and data provided to them by defense counsel, visited seven Jail facilities, and interviewed Dr. Freedland, CEO and Chief Medical Officer of Correctional Health Partners ("CHP"), and Dr. Nas Rafi, Medical Director of CHP operations at the Jail.  Following his review, Dr. Murray opined that all of the Plaintiffs' allegations in *Dunsmore* regarding the problems with the medical system at the Jail are "false."  Murray Report at 41-44. He concluded that "[t]he current SDSO healthcare delivery system is neither indifferent nor insensitive to the medical needs of its [incarcerated person] patients." *Id.* at 44.

4.     As set forth below, I disagree with Dr. Murray's ultimate opinion regarding the adequacy of the medical care provided to incarcerated people in the Jail.  As I set forth in my initial report and as I explain below, the medical system at the Jail places incarcerated people at a substantial risk of serious harm.  Moreover, I disagree with many of the opinions Dr. Murray offered in his report regarding the adequacy of specific parts of the medical system at the Jail.

/ / /

/ / /

## I. Dr. Murray has limited experience working in jail settings and has not done so since the 1990s.

5. The ideal qualifications for someone performing a comprehensive survey of a county jail's medical program would be clinical and supervisory experience in a county jail setting. According to his own description of his experience, Dr. Murray has not worked at a jail since he was an administrator at the Cook County Jail in the 1990s.[1] Since 2009, Dr. Murray has been a senior administrator within the Texas prison system. Similarly, none of the other three individuals with resumes included within Dr. Murray's report list jail experience in their resumes. *See* Murray Report at 146-51. Kirk Abbott has been a nursing administrator in the Texas Prison system since 2000. Melanie Roberts has been a staff pharmacist in the Texas Prison system since 2001. Kelly Coates appears to be an administrator for the medical system for the Texas state prison system, but has never worked in a jail and has no medical training.

6. While prisons and jails are similar in some respects (both house incarcerated persons), they are also different in many significant ways. Most patients arriving at a jail enter the jail directly from the community. Many jail patients have not been receiving regular medical care in the community prior to arriving at a jail. As a result, jails must evaluate incarcerated people quickly and accurately and be ready to provide immediate treatment for a wide variety of urgent,

---

[1] On his CV, Dr. Murray indicates that, in his role as the Senior Vice President for the Offender Health Services at the University of Texas Medical Branch Correctional Managed Care, he is "[r]esponsible for ensuring the provision of all medical, mental health, and dental services for approximately 100,000 adult offenders in Texas Department of Criminal Justice state jails and prisons." Murray Report at 45. My understanding is that the "state jails" to which Dr. Murray refers only confine "adult felony offenders who are sentenced" to those jails. *See* Texas Department of Criminal Justice, *Prison and Jail Operations*, https://www.tdcj.texas.gov/divisions/cid/prison_jail_ops.html. As such, though those facilities are referred to as "jails," they are different from the San Diego County Jail and other jails in which I have worked in that they do not confine unsentenced criminal detainees who are coming to the facility straight from the community.

1   acute, and chronic medical problems, such as withdrawal from alcohol, opiates, and

2   other substances, chronic diseases such as diabetes, infections, and many other

3   medical conditions.  On the other hand, most incarcerated people arriving at a prison

4   are not arriving from the community.  Most have been incarcerated in a jail for some

5   period of time before arriving at the prison.  This distinction is important in a few

6   respects.  First, because individuals arriving at prison have generally already been in

7   a jail, they usually have already had any medical conditions diagnosed and received

8   treatment for those conditions.  As a result, people arriving at prison are much less

9   likely to be suffering from out-of-control chronic or acute medical conditions.

10  Second, because drugs and alcohol are less available in jails than in the community,

11  individuals arriving at prison are much less likely to be experiencing withdrawal.

12          7.      Another important difference between jails and prisons is that patients

13  typically stay for a short period of time in a jail—on average around a month—

14  whereas patients in prison typically are incarcerated in a prison for at least a year

15  and usually much longer. Consequently, it is much more important for a jail to

16  maintain communication and continuity of care with outside medical practitioners

17  who were taking care of a patient before they came to jail and will be caring for

18  them again once they leave jail.

19  **II.     Dr. Murray offered opinions about the adequacy of the Jail medical
            system without speaking to incarcerated people.**

20

21          8.      Dr. Murray's report does not indicate that he spoke with any

22  incarcerated people in the Jail.  Plaintiffs' counsel has informed me that Plaintiffs

23  agreed that Defendants' experts, including Dr. Murray, could speak with

24  incarcerated people in the Jail so long as Plaintiffs' counsel was present for the

25  conversations.  The fact that Dr. Murray did not speak with any incarcerated people,

26  despite the opportunity to do so, undermines his opinions.  Such interviews are an

27  essential component of any review of a healthcare system because they provide an

28  understanding of the system from the perspective of patients.  For example, when

1  the National Commission on Correctional Health Care ("NCCHC") evaluates a

2  facility, it interviews a substantial number of incarcerated people.  NCCHC Report,

3  January 2017, DUNSMORE0260623.

4  **III.    Dr. Murray offered opinions about the adequacy of the Jail medical**
        **system without conducting a substantive review of any in-custody deaths.**

5

6  9.    As I discussed at length in my initial report, one of the most critical

7  functions of any health care system, but especially a correctional health care system,

8  is to carefully review any in-custody deaths "to identify medical errors that led to

9  adverse outcomes ... so that those errors can be avoided in the future."  Keller

10  Report ¶ 92.  This type of review is especially important for the Jail.  In recent

11  years, the County been the subject of multiple, high profile wrongful death lawsuits

12  and four reports critical of the healthcare system and/or high death rate in the Jail:

13  one by Homer Venters, one by NCCHC, one by the State Auditor, and one by

14  Analytica Consulting.  *See* NCCHC Report; Venters Report, March 2020,

15  SD_215361; California State Auditor Report ("State Auditor's Report"), February

16  2022, SD_174794; Analytica Consulting Report ("Analytica Report"),

17  DUNSMORE0116319.

18  10.    It is my opinion that any systematic review of a correctional health care

19  system must closely review any in-custody deaths, as those adverse outcomes

20  provide important information regarding the adequacy of care.  The existence of

21  preventable deaths, especially multiple preventable deaths, is an important indicator

22  that the health care system is not providing adequate care.  In my opinion, any

23  review of a correctional medical system that does not examine in-custody deaths is

24  foundationally flawed.

25  11.    In my report, I examined a number of deaths that occurred at the Jail

26  and found that problems with the medical system contributed or caused many of the

27  deaths.  Keller Report ¶¶ 86-242.  I discussed seven deaths from 2022 and 2023 at

28  length.  *Id.* ¶¶ 119-237.  I then discussed how the problems I found with the medical

care provided to the decedents reflected numerous systemic problems with the healthcare system at the Jail, including that medical staff failed to examine very sick people, conducted evaluations at cell front, ordered medications and diagnosed patients without seeing them, failed to adequately communicate with each other, and failed to continue care plans when people return from the hospital. *Id.* ¶¶ 238-39. My findings related to these in-custody deaths formed one of the pillars of my overall conclusion that the medical system at the Jail exposes incarcerated people to a substantial risk of serious harm, including death.

12.     Dr. Murray did not offer any opinions regarding any in-custody deaths in his report. Defendants provided Dr. Murray with medical records for five individuals who died in 2024 while in custody at the Jail from non-homicide/non-suicide causes. Murray Report at 39. Dr. Murray claims that "[t]hese medical records were ... reviewed," though he does not indicate by whom. *Id.* at 39. Dr. Murray attached as Appendix Q to his report short summaries for each of the deaths. Notably, however, Dr. Murray did not provide any analysis regarding whether the medical care provided to these five individuals before they died met the standard of care. He also did not opine on whether the deaths were preventable, whether any deficiencies in the Jail healthcare system were factors in the deaths, or whether the Jail should have made any changes to its medical system in response to the deaths.

13.     Dr. Murray did not mention, let alone review or analyze, any deaths that occurred prior to 2024.[2] His Appendix B, which lists all of the materials he was provided for review, also does not list any records for any of the individuals who died in-custody prior to 2024.

---

[2] The only opinion that Dr. Murray offers related to mortality at the Jail is to question whether the data regarding the Jail's mortality rate are accurate. My response to Dr. Murray's opinions regarding the mortality rate is below. *See* Section IV, *infra*.

14.     Because Dr. Murray did not offer any opinions regarding in-custody deaths at the Jail, it is my opinion that his opinions regarding the adequacy of care in the system are fundamentally flawed and unreliable.  Put simply, any review of any medical system that does not consider whether the system performed adequately in situations where patients died is worthless or nearly so.  It is not possible to understand the strengths and weaknesses of a medical system without understanding what happened when patients being cared for in the system have died.  Dr. Murray's failure to review any of the in-custody deaths at the Jail is particularly egregious given that in-custody deaths are at the very core of the allegations and evidence in this case.  The words "death" and "deaths" appear over 100 times in the Third Amended Complaint.  The State Auditor's Report, which was cited extensively by Plaintiffs in the Third Amended Complaint, concluded, based on a review of 30 in-custody deaths, that "deficiencies with how the Sheriff's Department provides care for ... incarcerated individuals ... likely contributed to in-custody deaths." SD_174794.  Dr. Murray himself acknowledged that in-custody deaths are important, stating in his report that "[i]n-custody mortality is an important metric that should be reviewed in all jail healthcare systems."  Murray Report at 40. Though he wrote this statement in the context of a discussion of the mortality rate at the Jail rather than as part of an analysis of any specific deaths, it shows that he knows that in-custody deaths are central to this case and relevant to the evaluation of the adequacy of healthcare systems.

15.     The Joint Commission of Accreditation of Health Organizations ("Joint Commission"), an organization that evaluates hospitals, provides a model for how to perform investigations into whether poor or inadequate medical care contributed to a death and whether the death was preventable.  The Joint Commission has a guideline for evaluating deaths or other sentinel events called the Framework for Root Cause Analysis and Corrective Actions, which is available at https://www.jointcommission.org/-/media/tjc/documents/resources/patient-safety-

topics/sentinel-event/rca_framework_101017.pdf.  The Joint Commission does not determine whether inadequate medical care contributed to a death by simply looking at hospital systems—for example, determining whether there is an emergency department, whether the inpatient floors are staffed with nurses, or what the average lab turnaround time is.  When investigating deaths, they look in detail at those specific cases to determine whether poor emergency department care, short staffing, lab problems, or any other system failures contributed to the deaths.  To this end, the Root Cause Analysis includes 24 questions, many of which include sub-questions, to determine whether the system contributed to the specific sentinel event, such as a death.

16.    It is my opinion that Dr. Murray and his team cannot opine that the Jail has no systemic problems without evaluating the medical care provided to patients who died while in the Jail.  To have not evaluated the deaths at all is a fatal flaw in Dr. Murray's methodology that negates his entire thesis.

**A.    For the three 2024 deaths I reviewed, one was likely preventable, another may have been preventable, and I lack sufficient information to offer an opinion regarding the third.**

17.    In or around September 21, 2024, Plaintiffs' counsel provided me with the medical records for the five deaths summarized in Appendix Q of Dr. Murray's report.  These records were not available to me at the time I wrote my initial report.  A full list of the materials I considered for this report (all of which I reviewed after the disclosure of my initial report on August 21, 2024) is attached hereto as Appendix C.

18.    My understanding is that Plaintiffs' expert on substance use disorders will be offering opinions regarding two of those deaths (the deaths of Eric Wolf and Richard Woodford); I therefore offer no opinion related to Mr. Wolf and Mr. Woodford's deaths.  For the remaining three deaths, I offer the following opinions, explained in more detail below.  First, it is my opinion that Chase Mitchell's death from sepsis was potentially preventable.  Moreover, it is my

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

opinion that problems with the medical system that I identified in my initial report caused, at least in part, his death.  Second, since I have not been provided with the cause of death for Liutoa Vili, I am unable to opine regarding whether his death was preventable.  That said, the care he received in the days preceding his death for a serious leg infection fell below the standard of care and it is therefore possible that Mr. Vili's death was preventable and caused, at least in part, by the substandard care.  Third, I am unable to offer an opinion regarding the death of Majid Almajid, as his medical records do not include a cause of death.  I can opine, however, that the care he received in the Jail for a back injury did not meet the standard of care.

### 1.     Chase Mitchell – 24724484

19.     Mr. Mitchell's medical records show that he died of sepsis on July 15, 2024, after surgery and treatment at the hospital were unable to address an infected abscess on his back.  In my opinion, Mr. Mitchell's death was likely preventable.

20.     Mr. Mitchell's Medical Clearance was done on June 13, 2024.  His vital signs were normal.  Mitchell Med. Rcd.[3] at 2.  He was reported as being "uncooperative, yelling, not answering questions." *Id.* at 3.  Most of the Receiving Screening was left blank.  *Id.* at 5.  Mr. Mitchell weighed 150 lbs.  *Id.* at 26. Mr. Mitchell was reported as refusing a Health Assessment the same day.  *Id.* at 58, 66.  On June 13, 2024, Mr. Mitchell's reportedly refused a Second Stage Nurse Evaluation.  *Id.* at 23.[4]

---

[3] For nearly all of the medical files that I reviewed that Defendants produced for Dr. Murray's report, there was one medical file for each individual.  Throughout this report, I cite to the corresponding records using the person's last name.  The page numbers indicate the page number of the PDF.

[4] Mr. Mitchell's refusals were inappropriately handled.  I discussed the problems with refusals in my report and how the SDSO inadequate and inappropriate refusal policies can and do harm patients.  Mr. Mitchell is another example of this.  When Mr. Mitchell came to the jail on June 13, 2024, he was agitated and uncooperative. In this state, he refused a Health Assessment when it was offered.  However, that does not mean that he would refuse a Health Assessment forever.  In fact, Mr. Mitchell is documented as being cooperative with examinations and medical care as soon as a few days later.  But the medical staff never tried again to do a Health Assessment.  I note that Mr. Mitchell never had a physical examination by a

21.     On July 4, 2024, he was diagnosed by mental health care staff as having schizophrenia, though he refused to take medicine. *Id.* at 34, 39, 41, 53.

22.     On July 3, 2024, Jasmine Angel MHC did a wellness check. *Id.* at 68. She stated "IP was amenable to talk at his cell door." *Id.* He appeared well groomed and was eating.

23.     On July 7, 2024, Mr. Mitchell "den[ied] health concerns" during a wellness check. *Id.* at 56.

24.     On July 13, 2024 at 11:13 p.m., Kyra Whited, a remote STATCare practitioner, wrote "nurse called with reports of looking clammy by custody staff and responding to que[stions] but not very talkative. nurse reports BP 96/66 sitting, 91/62 standing. no abnormal findings on neurological exam reported. does report 25 lb wt loss in one month."[5] *Id.* at 56. Mr. Mitchell's weight at this visit was 126 lbs., confirming his report of weight loss. This extreme weight loss alone should have set off alarm bells. After all, Mr. Rupard and Ms. Bartolacci, discussed in my initial report, also died after losing a large amount of weight. *See* Keller Report ¶¶ 193-220.

25.     On that same day, Martha Burgess, STATCare NP wrote to "keep pt in medical, PO fluids, Boost TID" as well as neuro checks. *Id.* at 56. At no point on that date was Mr. Mitchell examined in person by a medical practitioner.

26.     On July 14, 2024 at 6:13 a.m., RN Baluca wrote that Mr. Mitchell was transferred to M2 for observation. *Id.* at 56.

27.     On July 14, 2024 (documented at 9:30 a.m., although the encounter was earlier than 9:00 a.m.), RN Anil Kumar saw Mr. Mitchell for a complaint of a headache. She documented this on a Headache Nursing Protocol form. *Id.* at 27.

---

medical practitioner the entire time he was incarcerated.

[5] The nurse who called STATcare did not write any note that appears in Mr. Mitchell's file.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1   She did not record any vital signs.  RN Kumar ordered acetaminophen for

2   Mr. Mitchell.  She appropriately referred Mr. Mitchell to be seen immediately by a

3   practitioner.  *Id.* at 28.

4         28.    At 9:00 a.m., NP Christine Sullivan saw Mr. Mitchell, and noted that

5   he was dyspneic, weak, and tachycardic.  She suspected that Mr. Mitchell was

6   dehydrated and appropriately sent Mr. Mitchell to the hospital.  *Id.* at 57.

7         29.    At the hospital, Mr. Mitchell was noted to have "cellulitis on his back

8   and an abscess that is partially open and actively draining."  *Id.* at 110.  He also was

9   found to have septic shock.  Mr. Mitchell had surgery to drain his abscesses and

10  then was sent to the ICU, but died on July 15, 2024 from sepsis.  *Id.* at 117.

11        30.    **In my opinion, Mr. Mitchell's death was likely preventable**.  The

12  nurse's findings on July 13, 2024—that Mr. Mitchell had lost 25 pounds in a month

13  and was suffering from serious symptoms, including hypotension, after reporting

14  only six days earlier that he had no medical concerns—should have resulted in

15  either an urgent, in-person physical examination by a medical practitioner (which

16  likely would have identified the open and draining abscess on his back and then

17  resulted in emergency transportation to the hospital) or immediate transportation of

18  Mr. Mitchell to the hospital.  Neither of those occurred.  One reason a physical

19  examination did not occur at the Jail is because of the County's reliance on remote

20  STATCare practitioners, who cannot perform physical examinations because they

21  are not present at the Jail.  Here, the RN who identified some of Mr. Mitchell's

22  symptoms contacted a STATCare practitioner, who then entered orders for

23  treatment without examining Mr. Mitchell.  That decision to treat Mr. Mitchell

24  without an evaluation did not meet the standard of care and likely contributed to his

25  death.

26        31.    Because the Jail, on July 13, 2024, neither examined Mr. Mitchell nor

27  sent him to the hospital, the diagnosis of Mr. Mitchell's abscess and related sepsis

28  was delayed by a significant number of hours.  Had the abscess and infection been

1   diagnosed earlier, it is possible that the infection would have responded to surgery

2   and treatment and that Mr. Mitchell would have survived.

3                **2.      Liutoa Vili – 23725430**

4        32.    The medical records for Mr. Vili indicate that, on February 4, 2024,

5   while being wheeled to medical, Mr. Vili slumped over and fell out of his

6   wheelchair.  He was unresponsive, apneic, and pulseless.  Vili Med. Rcd. at 272.

7   CPR was started, as well as ACLS when the paramedics arrived.  *Id.*  Mr. Vili was

8   transferred to the hospital where he was declared dead.  *Id.*  Neither the paramedic

9   transport records nor the hospital records for this event are included in the records

10   provided to me.  I also do not have access to the autopsy report.

11        33.    Without knowing the autopsy results, including the cause of death, I

12   cannot say whether Mr. Vili's death was preventable.  I can, however, opine that

13   much of the care he received for a chronic leg infection, including care in the days

14   leading up to his death, fell below the standard of care.  It is therefore possible that

15   Mr. Vili's death was preventable and caused by substandard care at the Jail.

16        34.    Mr. Vili had chronic venous insufficiency of the legs with skin

17   breakdown and a recurrent infected leg ulcer.  This was a complicated ulcer.  It

18   became infected, was treated with antibiotics and local wound care, improved, then

19   recurred through two cycles leading up to January of 2024.  Vili Med. Rcd. at 232-

20   269. Mr. Vili was treated with frequent local wound care, wound cultures and

21   antibiotics.  *Id.*  For reasons unclear, this complicated, serious infected leg ulcer did

22   not result in a detailed work up and specialty consultation.  Specifically, no one

23   seems to have considered that Mr. Vili might have a more serious underlying septic

24   process, such as osteomyelitis, deep abscess, or fasciitis.  Further work up that could

25   have been done included 1.  Blood tests:  C-reactive protein (CRP) and Erythrocyte

26   sedimentation rates (ESR) and blood cultures looking for systemic sepsis.  2.

27   Imaging: ultrasound looking for deep fluid collections, plain x-rays and CT/MRI to

28   look for osteomyelitis (bone infection).  Finally, referral to a hospital wound care

1  clinic for more advanced wound care, such as surgical debridement, was never
2  considered.

3      35.    The last cycle of worsening of the infection began about six weeks
4  before Mr. Vili died.  On December 19, 2023, RN Vivona wrote "wounds to left leg
5  healed and scabbed."  *Id.* at 264.  Mr. Vili's next wound check occurred on
6  December 28, 2023.  RN Stephanie Yee found that the wounds had again worsened:
7  "Old Band-aids removed.  Areas cleansed with Anasept spray, pat dry, and photos
8  obtained revealing beefy, red, raised wounds, more significant on right calf than
9  left." *Id.* at 266.  RN Yee did local wound care as had been done the preceding four
10 months.

11     36.    On December 29, 2023, RN John Wyatt wrote "Patient has sores to
12 back of lower extremities bilaterally." *Id.*  On December 30, 2023, NP Matthew
13 Wallace reviewed photos of the wounds and ordered wound care. *Id.*  Wound care
14 was done every other day through January 2024. *Id.* at 22.

15     37.    On January 30, 2024, RN Yee wrote that Mr. Vili was brought to clinic
16 for "'trouble breathing,' back pain and chest pain."  She also noted that "while in
17 clinic, [a] foul smelling open wound [was] discovered on left lateral lower leg." *Id.*
18 at 269.  Mr. Vili's vital signs showed him to be hypotensive at 94/70. *Id.* at 38.

19     38.    Dr. James Veltmeyer saw Mr. Vili and wrote that Mr. Vili was "thin,
20 possibly under nourished."  Mr. Vili had a tender 2 cm painful ulcer.  Dr. Veltmeyer
21 assumed "LLE ulcer-likely infected with staph pyogenes vs mrsa" and he started
22 Bactrim (the third course of Bactrim Mr. Vili had taken, *id.* at 242, 262).  Most
23 importantly, Dr. Veltmeyer noted that Mr. Vili was hypotensive but assumed that
24 this was due to hypertension meds and stated "vitals stable." *Id.* at 269.  However,
25 Mr. Vili's low blood pressure was not stable per his blood pressure log, which
26 showed readings of 129/88 and 133/83 on January 25, 2024, but of 94/70 on
27 January 30, 2024. *Id.* at 38.

28     39.    Dr. Veltmeyer's decision not to send Mr. Vili to the hospital was a

1  medical mistake.  Mr. Vili had multiple co-morbid conditions, including renal

2  insufficiency and venous stasis, and had experienced a recurring leg infection for

3  months.  He presented sick and malnourished and had abnormal vital signs.  He

4  should have been sent to the ER at this point.  At a minimum, his status should have

5  been reassessed and his vital signs remeasured.  Dr. Veltmeyer did write for "daily

6  wound care with wet to dry daily dressings."  *Id.* at 269.  However, there is no note

7  indicating that Mr. Vili was assessed again by medical personnel before he died five

8  days later (other than notes that the dressing changes were "administered" by LVNs

9  through the morning of February 1, 2024).  *Id.* at 29.  Mr. Vili had five subsequent

10  "refusals" of dressing changes, but his dressing was changed the morning of

11  February 4, 2024, about 3 hours before he died.  *Id.*

12       40.    In my opinion the care for Mr. Vili's leg infection fell below the

13  standard of care in the following ways:

14       •    Mr. Vili had a recurrent infection of his leg.  It did improve with

15            antibiotic treatment, but when it recurred and then recurred a second

16            time, the medical practitioners should have intensified their diagnostic

17            and therapeutic efforts.  They should have considered labs and imaging

18            studies looking for osteomyelitis, fasciitis, or deep abscesses.

19            Alternatively, they could have referred Mr. Vili to a hospital wound

20            clinic for a consultation, including whether surgical debridement should

21            be done.

22       •    On January 30, 2024, Mr. Vili was found to be ill appearing with a

23            "foul-smelling" wound and he was hypotensive.  He should have either

24            been sent to the hospital or have been reassessed by a medical

25            practitioner with repeat vital signs within a short period of time.  The

26            Jail did neither of those things.  He then died five days later.

27       **3.    Majid Almajid – 23751645**

28       41.    The medical records for Mr. Almajid indicate that on May 5, 2024,

staff found him unresponsive and pulseless. Almajid Med. Rcd. at 26, 106. NP Wycoco wrote: "Skin color appeared to be pale to mottled/purplish/cyanotic on his chest, cold" and "arms/lower extremities were stiff, fingernails cyanotic. During the CPR, the arms/fingers stayed on their position." *Id.* at 26. By this description, Mr. Almajid already had rigor mortis and livor mortis indicating he had been dead for some time before he was discovered.

42.    Without knowing the autopsy results or the cause of Mr. Almajid's death, I cannot say whether his death was preventable.

43.    From my review of his records, however, I can say that the treatment he received for lower back pain fell below the standard of care.

44.    Mr. Almajid had his Medical Clearance and Receiving Screening done on December 20, 2023. *Id.* at 12, 14. He reported piriformis syndrome (which causes buttock and posterior hip pain) and sciatica as his medical problems. *Id.* at 17. He reported no substance abuse issues.

45.    Mr. Almajid had a 2nd stage nursing evaluation done the next day, December 21, 2023. He again reported sciatica treated with a back brace. Mr. Almajid asked for ibuprofen. *Id.* at 24, 108. This was the last time Mr. Almajid had his vital signs checked. *Id.* at 162.

46.    Mr. Almajid was scheduled for a doctor chronic care visit on December 23, 2023, but on the scheduled day, NP Nicholas Kahl did not see him; instead, NP Kahl requested old records and approved "Motrin & Tylenol prn." *Id.* at 24, 25.

- NP Kahl should have seen Mr. Almajid in person. He did not know what Mr. Almajid meant by the term "sciatica." Sciatica is understood in the medical community to mean pain in the hip and leg caused by compression of a nerve root in the spine. But the term "sciatica" is also used by lay people to mean "severe back pain." Either way, this could be a serious medical condition. It is true that having Mr. Almajid's old records would help. But doing a thorough physical examination would

help more and could be done immediately.  NP Kahl did not know what was going on with Mr. Almajid without an examination.

- There is no evidence that old records were ever ordered, received, or reviewed.  It appears that NP Kahl's order to obtain old records was ignored.

47.     On January 3, 2024, Mr. Almajid reportedly refused to have a Health Assessment done.  *Id.* at 91.  However, only one deputy witnessed the refusal and the refusal to sign the refusal form.  *Id.* at 95, 100.  The same day, Mr. Almajid wrote a Health Care Request stating "Sciatica pain and discomfort.  Please help me. I need to see doctor ASAP."  *Id.* at 223.  It makes no sense for Mr. Almajid to request to see a doctor "ASAP" and then refuse a medical evaluation.  I question the legitimacy of this "refusal."  In addition, the Jail appears to have ignored the request, as I see no response to this request in his chart, not even a face-to-face visit with an RN.

48.     On January 10, 2024, Mr. Almajid wrote, "My sciatica is getting worse . . . need more pain meds."  *Id.* at 255.

49.     On January 15, 2024, NP Frederick Wycoco responded to Mr. Almajid's January 10, 2024 sick call slip simply by renewing his ibuprofen.  *Id.* at 25.  He did not conduct a visit with or examine Mr. Almajid.  NP Wycoco should have seen Mr. Almajid face-to-face and done a thorough physical examination. Again, Mr. Almajid had been using the term "sciatica" ever since he was booked. But did he mean that he had documented compression of a nerve root in his spine, or did he just mean severe chronic back pain?  NP Wycoco did not know.  Nobody had obtained old records.  Nobody had done any medical examination of Mr. Almajid. Worsening symptoms due to a compression of a nerve root in the spine can require urgent surgery.  And back pain can be a symptom of many serious medical problems, such as cancer, aortic dissection, compression fractures, infections, and more.  NP Wycoco could not say that Mr. Almajid did not have any of these serious

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

problems, because he did not examine him.  This was a serious medical mistake.

50.    On February 6, 2024, Mr. Almajid wrote a Health Care Request that stated, "I want to be removed from the lower bunk chrono." *Id.* at 226.  The Jail scheduled him for a doctor chronic care visit and noted "Pt would like to be removed from lower bunk chrono.  Pt with continuous complaints of back pain.  Pls review chart." *Id.* at 25.

51.    On February 16, 2024, NP Wycoco again failed to meet the standard of care by continuing the lower bunk designation (against Mr. Almajid's request) without conducting a visit with or examining Mr. Almajid.  *Id.* at 25.

52.    On May 5, 2024, Mr. Almajid died in the Jail, as described above.

53.    Collectively, the care provided to Mr. Almajid for his back pain fell below the standard of care.  He arrived at the jail complaining of "sciatica," which is a vague medical term that can mean different things to different people.  No one ever established what work up had been done prior to incarceration, what diagnosis Mr. Almajid had been given, or what therapies had been prescribed in the past.  No one ever conducted a physical examination of Mr. Almajid over the course of 4.5 months despite repeated complaints of worsening and continuous back pain.  All of the following are examples of medical mismanagement in his case:

- NP Kahl did no examination of Mr. Almajid on December 23, 2023 to determine what, exactly, was the source of his chronic back pain.

- NP Kahl ordered old records on December 23, 2023, but this order was ignored.

- On January 3, 2024, Mr. Almajid wrote a Health Care Request that said, "Sciatica pain and discomfort.  Please help me.  I need to see doctor ASAP."  This was ignored.

- On January 10, 2024, Mr. Almajid wrote a Health Care Request that said "My sciatica is getting worse."  No nurse saw him face-to-face. NP Wycoco did no examination.

- On February 16, 2024, NP Wycoco received notification that Mr. Almajid had "continuous complaints of back pain." Again, NP Wycoco did not see Mr. Almajid to find out what was going on nor did he do a physical examination.

- Mr. Almajid refused to have a Health Assessment on January 3, 2024, as reported by security staff. This is not credible since this is the same day that Mr. Almajid wrote "I need to see doctor ASAP."

**B.** **Newly available documents regarding two other deaths at the Jail reflect serious problems with the care provided at the Jail and the Jail's reporting of in-custody deaths.**

54. Below, I provide opinions regarding two additional in-custody deaths. These two deaths, one of which I discussed in my initial report, both reveal extraordinarily serious problems with the medical system in the Jail. I am presenting opinions regarding these deaths now because documents relevant to these deaths have become available since I issued my initial report.

**1.     Keith Bach – 23739381**

55. Mr. Bach died on September 28, 2023. I previously discussed the death of Keith Bach in my initial report in the context of failures of the Jail's morbidity and mortality reviews. Keller Report ¶¶ 108-114. I opined that the death review conducted by NaphCare was deficient for multiple reasons. *Id.* At the time that I issued my initial report (August 21, 2024), the County had not yet completed its investigation into his death and therefore the autopsy report was not available to me. On September 18, 2024, the Coroner for San Diego County released the autopsy report. Thereafter, Plaintiffs provided it to me.

56. The information contained in the coroner's report is shocking. As discussed in more detail below, the coroner's report includes information which establishes that Mr. Bach's death was 100 percent preventable. Even more troublingly, the coroner found that the care that the County provided to Mr. Bach was so deficient that the coroner classified the death as a homicide. Bach Coroner's

1   Report at PDF 5, 8.  I offer no opinion on whether the death was, in fact, a

2   homicide.  But, having now reviewed the medical records for Mr. Bach, I fully agree

3   that his death was preventable.

4                    (a)     **Background Regarding Type 1 Diabetes**

5          57.     Mr. Bach died from complications related to his Type 1 diabetes.  Type

6   1 diabetics make no insulin and so, unlike Type 2 diabetics, they need insulin to

7   survive.  The Standard of Care for the treatment of Type 1 diabetics is found in

8   Diabetes Management in Detention Facilities:  A Statement of the American

9   Diabetic Association.[6]  Some of the relevant ADA standards pertinent to Mr. Bach's

10  case are:

11      •    Within 24 hours "[i]ndividuals diagnosed with diabetes should

12           promptly undergo a comprehensive medical history review and

13           physical examination by a health care professional" *Id.* at 545 (Intake

14           Screening).

15      •    Individuals with insulin pumps "should retain uninterrupted access to

16           these tools upon their introduction to the detention system." *Id.*  Insulin

17           pumps work by infusing a steady supply of insulin all the time.  This is

18           called the "basal" insulin, which Type 1 diabetics need for their basic

19           metabolism, even if they do not eat.  Patients with an insulin pump can

20           then trigger the pump to give them additional boluses of insulin every

21           time they eat.  This is called "prandial" insulin, meaning insulin needed

22           to metabolize their food.

23      •    If patients are not using an insulin pump, "[p]eople with type 1 diabetes

24           should be treated with a daily injection of long-acting basal insulin plus

25   _____

26  [6] Daniel L. Larber et al., *Diabetes Management in Detention Facilities: A Statement
    of the American Diabetes Association*, 47 Diabetes Care 544 (2024) ("Diabetes in
27  Detention"); American Diabetes Association, *Diabetes Management in Detention
    Facilities: Position Statement* (2021).  The 2024 standards do not differ materially
28  from the 2021 standards as cited in this report.

1     rapid-acting prandial insulin at mealtimes." *Id.* at 548 (Medications).

2     Type 1 diabetics need long-acting basal insulin even if they do not eat.

3     (Examples of long-acting insulins are Lantus and Semglee.  They are

4     usually dosed once a day).  The short-acting prandial insulin is only

5     given at mealtimes.  The amount of prandial insulin taken by a Type 1

6     diabetic for each meal varies depending on the amount of

7     carbohydrates in that particular meal.  Type 1 diabetics are practiced in

8     calculating the number of carbohydrates in a particular meal and

9     calculating the units of insulin they need to metabolize those

10    carbohydrates.  The correct dosage will vary with each meal and will

11    also vary if the patient decides not to eat the entire meal.

12  •   "Insulin omission [in a type 1 diabetic] can lead to severe metabolic

13    decompensation, including DKA [Diabetic Ketoacidosis]." *Id.* at 545

14    (Intake Screening).

15              **(b)     Summary of Medical Care**

16         58.    Mr. Bach was booked into the Jail on September 26, 2023 after two

17   trips to the ER to be assessed for hyperglycemia and syncope.  His receiving screen

18   was done at 3:12 a.m.  SD_711406.

19         59.    A remote STATCare NP, Katherine O'Neal, did Mr. Bach's STATCare

20   Intake Assessment and Orders at 3:49 a.m.  She was informed that Mr. Bach had a

21   continuous Glucose Monitor (CGM), an insulin pump and that his blood sugar was

22   123.  SD_711423.  NP O'Neal ordered "continue insulin pump for now."

23   SD_711424.  NP O'Neal also wrote an addendum at 4:10 a.m. that stated "Pt.

24   reports his current meds via insulin pump be consumed tomorrow morning around

25   8:00 AM."  SD_711480.  The Medical Examiner interprets this to mean that the

26   pump would be empty on September 27, 2023 at 8:00 a.m., but it makes more sense

27   to me if the pump was empty much earlier than this.  I believe Mr. Bach meant that

28   his insulin pump would be empty that upcoming morning, September 26, 2023.

60.     On September 26, 2023, at 12:42 p.m., NP Nicholas Kahl visited with Mr. Bach "in Holding Cell."  Mr. Bach requested 12 units of insulin prior to lunch. If Mr. Bach's insulin pump was full, he could have dosed himself with the 12 units of insulin.  Since he asked NP Kahl for insulin, either the pump was already empty or nearly so.  NP Kahl also wrote "records reviewed confirms pt on insulin pump." SD_711487.  However, if NP Kahl had asked Mr. Bach about his insulin pump instead of looking at the medical records, Mr. Bach could have told him the same thing he told others, that his pump was almost empty.  NP Kahl ordered "Novolin R (a short acting insulin)10 units with each meal."  SD_711488.  How NP Kahl chose this dose is puzzling to me.  It is totally inappropriate for a Type 1 Diabetic, since the prandial dose should vary with each meal depending on the amount of carbohydrates in that meal and how many of the carbohydrates are eaten.

61.     Instead, NP Kahl should have done one of two things.  He should have refilled Mr. Bach's insulin pump with insulin (which Mr. Bach could then have used to manage his own diabetes without having to ask the nurses for insulin) or he should have converted Mr. Bach to "a daily injection of long-acting basal insulin plus rapid-acting prandial insulin at mealtimes."  Diabetes in Detention at 548.  He did neither.  NP Kahl did schedule Mr. Bach for an MDCC (Medical Doctor Chronic Care) visit the next day.  SD_711488.  This visit never occurred.

62.     On September 26, 2023 at 6:53 p.m., Ana Gonzalez RN wrote "Blood sugar checked at 1305.  Blood sugar was 128 mg/dl.  Withheld insulin.  NP notified."  *Id.*  This decision, to withhold insulin based on a blood sugar of 123, makes no sense for a Type 1 Diabetic like Mr. Bach.  Type 1 diabetics need short acting insulin boluses when they eat based on the amount of carbohydrates in that meal.  Type 1 diabetic patients need short acting insulin to cover their meals even if their blood sugar is in the normal range.  As I discussed in my initial report, the Jail does not have any Disease Management Guideline for Type 1 Diabetes that a nurse or a NP could refer to in order to understand how to treat a Type 1 Diabetic.

63.    On September 27, 2023, at 12:42 a.m., RN Gemechu Bulti wrote "Current BS is 322 mg/dl.  Patient refused the scheduled dose of 10 units of regular insulin and is requesting 20 units instead.  Statcare alert sent." *Id.*  The most likely reason that Mr. Bach's blood sugar spiked so dramatically at this time was that his insulin pump was empty and no longer delivering any basal insulin.

64.    NP O'Neal answered this alert at 1:37 a.m.  NP O'Neal wrote "[n]oted patient continues to have insulin pump and checks blood sugars 8 times a day." SD_711427.  However, this cannot be true.  Mr. Bach's insulin pump must have been empty or close to empty at this time, otherwise, he could have bolused himself with insulin in his pump and would not have needed to ask the nurse for insulin.  NP O'Neal refused Mr. Bach's request for 20 units and authorized only 10 instead. *Id.*

65.    RN Bulti gave Mr. Bach those 10 units at 1:51 a.m. *Id.*; SD_711393. That was the last dose of insulin Mr. Bach received prior to his death.

66.    On September 28, 2023 at 4:54 a.m., LVN Evangeline Pedrozo wrote that Mr. Bach refused all his medications.  There are actually three refusal forms in Mr. Bach's medical record.  On September 27, 2023 at 11:34 p.m., Mr. Bach reportedly refused to take the medication atorvastatin and also refused to sign the refusal form as witnessed by two deputies.  SD_711481.  On September 28, 2023 at 1:34 a.m., Mr. Bach reportedly refused to allow his blood sugar to be checked and also refused to sign the refusal form as witnessed by two deputies.  SD_711484.  On September 28, 2023 at 4:48 a.m., Mr. Bach reportedly refused to take multiple medications and also refused to sign the refusal form as witnessed by two deputies. SD_711485.

67.    These refusal forms are extremely suspicious.  This last refusal form at 4:48 a.m. was timestamped forty minutes after Mr. Bach had been declared dead at 4:09 a.m.  Bach Coroner's Report at PDF 3.  It therefore is very likely (if not certain) that the deputies completed this refusal form without actually witnessing Mr. Bach refuse care.  The other two refusals from earlier in the night are also

1    suspicious.  During the very period that the first two refusals allegedly occurred,

2    "[a]ccording to sheriff's investigation, he (Mr. Bach) was reported to have asked

3    multiple deputies on numerous occasions for insulin.  During mealtimes, Mr. Bach

4    gave his food to fellow inmates, as he did not want to eat if he did not have access to

5    insulin.  Additionally, other inmates were attempting to assist Mr. Bach in

6    requesting insulin by pointing out to deputies that the alarm on Mr. Bach's insulin

7    pump was sounding and that the pump was empty."  Bach Coroner's Report at

8    PDF 7.  I therefore find that these refusal forms are not credible because it is

9    unlikely that Mr. Bach was attempting to get medical attention but also refusing his

10    medications.

11        68.    On September 28, 2023 at 3:40 a.m., Mr. Bach was found

12    unresponsive, not breathing and with no pulse.  *Id.* at PDF 3.  CPR and ACLS

13    resuscitation were attempted but Mr. Bach was pronounced dead at the scene at 4:09

14    a.m.  *Id.*

15        69.    An autopsy was performed on September 28, 2023 by Melanie Estrella,

16    DO, Deputy Medical Examiner.  *Id.* at PDF 2-4.  Nearly a year later, Dr. Estrella

17    concluded in the autopsy report that the cause of Mr. Bach's death was "Diabetic

18    Ketoacidosis" and the Manner of Death was "Homicide."  *Id.* at PDF 5, 8.

19                        **(c)    Opinions**

20        70.    In my opinion, Mr. Bach's death was preventable.  Medical staff

21    violated the ADA standards of care for the treatment of Type 1 Diabetes on several

22    occasions.

23        71.    Mr. Bach never received "comprehensive medical history review and

24    physical examination by a health care professional."  NP Kahl did see him in his

25    holding cell the day he was booked, but did not obtain or document a

26    comprehensive medical history and did not perform a comprehensive physical

27    examination.  Most of the medical decision-making done in the case of Mr. Bach

28    was done by a remote STATCare NP, who also did not perform a comprehensive

1  medical history review and, of course, did not perform an examination of Mr. Bach.

2      72.    Mr. Bach was not allowed "uninterrupted access" to his insulin pump.

3  He informed the medical staff that his insulin pump was low and would soon run out

4  of insulin.  According to the Medical Examiner, he repeatedly attempted to notify

5  staff of his need for insulin, with no success.  The correct response would have been

6  to refill the pump with insulin.  This would have been easy to do.  Since it was not

7  done, the insulin pump ran out of insulin sometime before his blood sugar was

8  measured at 322 mg/dl. The pump running out of insulin was the most likely

9  explanation of why Mr. Bach's blood sugar spiked so dramatically.

10      73.    If the Jail medical practitioners intended to transition Mr. Bach off of

11  his insulin pump and prescribe instead "a daily injection of long-acting basal insulin

12  plus rapid-acting prandial insulin at mealtimes," the correct course of action would

13  have been to do this: Ask Mr. Bach how much total insulin he gave himself using

14  the insulin pump each day, on average. Half of this total daily dose should be given

15  as long-acting insulin.  The other half is given as short-acting prandial insulin

16  divided between three meals.  However, neither the STATCare NP nor NP Kahl at

17  the Jail made any attempt to do this.

18      74.    Besides allowing Mr. Bach's basal insulin need to go unmet, the Jail

19  practitioners also underdosed his prandial insulin needs.  We know this because

20  Mr. Bach asked for more short-acting prandial insulin on two occasions.  The most

21  important of these was when he asked for 20 units of insulin in the early morning

22  hours of September 27, 2023.  There was no reason to refuse this request.  Mr. Bach

23  had historically done an excellent job of managing his own diabetes (Bach

24  Coroner's Report at 6), which the Jail practitioners would have known had they

25  obtained a "comprehensive medical history."  The other occasion when short-acting

26  prandial insulin was inappropriately withheld was on September 26, 2023, when RN

27  Gonzalez did not give Mr. Bach his scheduled dose of 10 units because his blood

28  sugar was 128 mg/dl.  But Type 1 diabetics need their prandial insulin to metabolize

1  their meals even if their blood sugar is normal.

2      75.    These missteps by the Jail—allowing Mr. Bach's insulin pump to go

3  dry, not giving him any long-acting basal insulin, and underdosing his prandial

4  insulin needs—resulted in "insulin omission" which led to "severe metabolic

5  decompensation, including" diabetic ketoacidosis.  Diabetes in Detention at 545.  In

6  Mr. Bach's case, the diabetic ketoacidosis resulted in his death.  Bach Coroner's

7  Report at 4.

8      76.    In my opinion, an important factor that contributed to Mr. Bach's death

9  was the fact that the Jail did not have any Disease Management Guideline for the

10  treatment of Type 1 Diabetes. Had they had such a guideline, the Jail practitioners

11  and the Jail nurses might have known how to appropriately manage Type 1 Diabetes

12  and not made the many mistakes that resulted in Mr. Bach's death.

13      77.    Had Mr. Bach received medical treatment conforming to the ADA

14  Standards, he, more likely than not, would not have died.

15      78.    In my opinion, the Jail medical practitioners showed gross

16  incompetence in the care of Mr. Bach and violated the medical standard of care.

17  Crucially, as confirmed by the coroner, their failures caused Mr. Bach's death:

18      Review of outpatient medical records clearly indicates that Mr. Bach
19      had demonstrable knowledge in managing his diabetes; however, as an
    inmate, he became reliant on the medical services provided by the jail
20      for continued management of his condition.  Following insufficient
    insulin administration while in custody, Mr. Bach developed diabetic
21      ketoacidosis and died.  This occurred despite medical records
    containing documentation of his medical condition, insulin
22      requirements, when his pump would be depleted of insulin, and
    multiple unanswered requests for insulin by Mr. Bach and fellow
23      inmates.  The death is due to complications of a natural disease.
    However considering the inaction (i.e., neglect) characterizing the
24      events leading to inadequate care while incarcerated of Mr. Bach's
    health conditions and ultimately his death, the manner of death is
    classified as **homicide**.

25

26  Bach Coroner's Report at PDF 8.

27      79.    Though I express no opinion on whether his death was, in fact, a

28  homicide, I agree with the coroner's description regarding how the deficiencies in

care caused Mr. Bach's death. Mr. Bach had a common medical condition. Had he received minimally adequate care—namely, being provided with insulin—he likely would not have died. No person in a correctional setting who is willing to comply with care and to accept insulin should ever die from diabetic ketoacidosis. That Mr. Bach died, despite his efforts to notify medical staff of his need for insulin, is shocking. In my opinion, any system in which such a death occurred suffers from serious, systemic problems that put incarcerated people at a substantial risk of serious harm.

80.    In addition, the new information contained in the coroner's report makes the problems with the morbidity and mortality reporting for Mr. Bach's death, which I discussed in my initial report, even more concerning. *See* Keller Report ¶¶ 108-114. Following Mr. Bach's death, the NaphCare M&M Committee wrote: "Though not related to this patient's death, it has come to the committee's attention that specific policies on management of insulin pumps need to be established by San Diego County and communicated to STATCare, so they can be prepared to address patients with these medical devices." NAPHCARE041858. First, it is very troubling that the NaphCare M&M Committee, which should be looking critically at all in-custody deaths in order to identify where staff made mistakes (if any), concluded that Mr. Bach's death was not related to the management of his insulin pump. The coroner found the exact opposite. This failing of the M&M Committee suggests that it did not conduct a thorough investigation. Second, given the direct connection between the lack of chronic care guidelines for Type 1 diabetes and Mr. Bach's death, the Jail should have created such guidelines on an urgent basis. Yet, as of the date of Dr. Murray's report (August 21, 2024), nearly a year after Mr. Bach's death, the Jail still did not have in place any chronic care or disease guidelines. The County's failure in this respect suggest that it does not take seriously its obligation to care for incarcerated people.

/ / /

## 2. Jose Cervantes Conejo

81.    I have also been provided with the outside medical records for Mr. Cervantes Conejo, who died at Palomar Medical Center on April 12, 2024 from facial and head trauma he experienced at the Jail approximately three hours after he was booked on March 29, 2024.[7]  These records were not available to me prior to the issuance of my initial report.  From the medical records provided to me, which do not include Mr. Cervantes Conejo's Jail medical records, it is not possible for me to opine regarding whether Mr. Cervantes Conejo's death was preventable.

82.    What is notable about Mr. Cervantes Conejo's death, however, is that it is not included on the SDSO website listing in-custody deaths.  *See* https://www.sdsheriff.gov/resources/transparency-reports (accessed on October 27, 2024).  The website lists seven in-custody deaths in SDSO facilities in 2024, but does not list Mr. Cervantes Conejo's death.

83.    The fact that Mr. Cervantes Conejo's death is not listed as an in-custody death is troubling and throws into question the Jail's reporting on in-custody deaths, an issue central to the *Dunsmore* lawsuit.  Mr. Cervantes Conejo died from injuries he suffered at the Jail while he was in the custody of the SDSO.  The federal Death in Custody Reporting Act, 34 U.S.C. § 60105, requires states to report to the U.S. Attorney General, "information regarding the death of any person who is detained, under arrest, or is in the process of being arrested, ... or is incarcerated at a municipal or county jail ...."  The Bureau of Justice Assistance of the U.S. Department of Justice has published a document entitled "Death in Custody

---

[7] *See, e.g.*, Cervantes Conejo Government Claim at PDF 62 ("Patient is a 44-year-old male brought from Vista jail where he was intoxicated and subsequently noticed on the ground with several episodes of nausea and vomiting."); *id.* at PDF 80 ("[Patient] presents to the ED as a trauma code activation from jail for evaluation of head injury with vomiting and altered mental status.  Per EMS, patient was intoxicated in his jail cell after being arrested.  He was reportedly verbal and responsive upon arrest.  Three hours into his arrest, police found the patient on the floor with altered mental status and was vomiting, prompting them to activate EMS.").

1   Reporting Act: Reporting Guidance and Frequently Asked Questions," which was

2   revised in October 2024 and is available at https://bja.ojp.gov/funding/performance-

3   measures/DCRA-Reporting-Guidance-FAQs.pdf.  The Guidance includes the

4   following frequently asked question:  "If an inmate is transferred to a medical

5   facility and dies there, not in a correctional facility, is that reportable?  Yes.  If the

6   incarcerated person, absent the medical condition, would have been in prison at the

7   time of death, it counts as a reportable death.  Although the person was not

8   physically in a correctional facility at the time of death, the death is still one of an

9   incarcerated individual."  *Id.* at 7.  Accordingly, Mr. Cervantes Conejo's death

10  should be considered an in-custody death.

84.     The County's failure to count Mr. Cervantes Conejo's death as an in-

12  custody death is problematic in a number of respects.  First, it raises the question of

13  whether the County has failed to count other in-custody deaths when people were

14  injured or became ill at the Jail but did not die in the Jail.  Second, Dr. Murray

15  opines that the death rate at the Jail is trending in the right direction in 2024.  But

16  that rate would be higher if Mr. Cervantes Conejo's death was included in the count

17  of in-custody deaths.

85.     I also have some concerns about the care that Mr. Cervantes Conejo

19  received at the Jail in the few hours he was there.  Labs at the ER showed

20  Mr. Cervantes Conejo's blood alcohol to be very high, at 324 mg/dL.  Cervantes

21  Conejo Government Claim at PDF 109.  Imaging showed a skull fracture, an orbital

22  fracture, and both subarachnoid hemorrhage and subdural hemorrhages around the

23  brain.  This was described as a "high complexity comprehensive trauma."  *Id.* at 63.

86.     Mr. Cervantes Conejo was admitted to the ICU.  Several specialists

25  consulted on his care, including a trauma surgeon, a neurosurgeon, intensive care

26  specialist, and later, a palliative care specialist.  *Id.* at 65, 66.

87.     Despite intensive medical care, Mr. Cervantes Conejo died on April 12,

28  2024.  The Summary of his hospital care included this statement: "[p]er trauma and

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1   neurosurgery assessment and documentation the extent of injury is not compatible

2   with a simple fall and seemed more traumatic however the events leading to it are

3   unclear" *Id.* at 65, 66.

4        88.    Mr. Cervantes Conejo's medical records from the hospital also raise

5   serious questions about why the Jail accepted him in the first place.  Mr. Cervantes

6   Conejo had a very high blood alcohol level (324 mg/dL) when he arrived at the

7   hospital.  *Id.* at 109.  Blood alcohol levels that high typically indicate that a person

8   may have alcohol poisoning, which is a potentially life-threatening condition.

9   Notably, Mr. Cervantes Conejo's blood alcohol level was likely even higher at the

10   time he was booked into the Jail, as his body processed some of the alcohol in his

11   system in the time between when he was booked and when hospital staff drew his

12   blood to run the test three hours later.  Nursing staff at the Jail also informed the

13   hospital staff that Mr. Cervantes Conejo was "disoriented" when he was booked into

14   the Jail.  *Id.* at 98.  Given this information, it seems to me that the Jail should have

15   refused to accept Mr. Cervantes Conejo and transferred him immediately to the

16   hospital.  Had the Jail done so, he may not have suffered the injuries that appear to

17   have caused his death.

18   **IV.   Dr. Murray's opinions regarding the death rate at the Jail are misleading
19        and unsupported by evidence.**

20        89.    On February 3, 2022, the California State Auditor issued a report of its

21   investigation into the alarming number of deaths that occurred in the Jail from 2006

22   to 2020.  State Auditor's Report.  The State Auditor's Report confirmed that the Jail

23   had a higher rate of suicides and natural deaths (which can include deaths where

24   deficient medical care is a factor) than jails in any other comparable county in

25   California.  SD_174812-13.  The average death rate at the Jail in those years was

26   2.39 deaths per 1,000 incarcerated persons.  SD_174856.

27        90.    Dr. Murray correctly points out that "[i]n 2022, the San Diego County

28   Citizen's Law Enforcement Review Board ('CLERB') contracted with Analytica

1   Consulting ... to analyze in-custody death data over the prior ten years." Murray

2   Report at 38. Dr. Murray does not discuss the findings of the Analytica report,

3   which corroborated the State Auditor's Report. The findings of the report included

4   that "total deaths in San Diego Jails surpass the deaths expected based on the

5   county's mortality rates," DUNSMORE0116321; that "[t]he number of excess

6   deaths resulting from the actual and expected death difference is the highest in San

7   Diego County" than any other comparable county in California, *id.*; and that "San

8   Diego County is the only county with a statistically significant number of excess

9   deaths," DUNSMORE0116322.

10       91.     Dr. Murray suggests that the findings of the Analytica report may not

11  be accurate because of "some significant potential confounders." Murray Report

12  at 39. Nothing in Dr. Murray's description of his educational and professional

13  background or his CV suggests that he has the expertise to analyze a complex data

14  analysis like the one performed by Analytica. Even assuming he had that expertise,

15  Dr. Murray's short criticisms of the Analytica study make little sense and/or have no

16  basis.

17       92.     First, Dr. Murray states that "[i]t is not clear whether mortality was

18  captured and assessed in a consistent way across all compared county jail systems."

19  *Id.* at 39. The report, however, makes clear that the authors relied on data collected

20  by the California Board of State and Community Corrections ("BSCC") and the

21  California Department of Justice. DUNSMORE0116325, 116331. Dr. Murray has

22  not identified any specific issues with the data collection. His criticism is therefore

23  nothing more than conjecture.

24       93.     Second, Dr. Murray writes that "[i]t is not clear whether county jail

25  population denominators were captured in a consistent way across all systems."

26  Murray Report at 39. Dr. Murray does not identify to what "denominators" he is

27  referring. And again, Dr. Murray's criticism is nothing more than conjecture, as he

28  has not presented any evidence to support that the data was reported or collected

1    inconsistently across counties.

2        94.     Third, Dr. Murray writes that "[i]t is not clear if expected rates for each

3    county jail (based on the county-wide mortality rates) were generated by applying

4    the age, race, gender structure of each county jail population." *Id.* at 39.  But it

5    appears that the Analytica authors did exactly that.  DUNSMORE0116331, 116339.

6        95.     Fourth, Dr. Murray writes that "[a]s the investigators note, data on

7    physical health, mental health, substance use disorder, homelessness were not

8    available.  It is possible that an increased differential (on any of these factors)

9    between the San Diego County jail and the San Diego general population could have

10   partially driven the increased excess deaths observed in San Diego County jail

11   population."  Murray Report at 39.  Dr. Murray is correct that the Analytica authors

12   acknowledge these limitations.  DUNSMORE0116339.  But Dr. Murray has not

13   provided any evidence to suggest that those limitations actually impacted the results

14   of the study.  Moreover, those limitations existed for all of the counties that

15   Analytica evaluated.

16       96.     Lastly, Dr. Murray writes that "[i]n general, it is not clear whether the

17   observed excess deaths in the San Diego County jail system reflect a selection

18   process that resulted in a greater contrast in baseline poor health between the county

19   jail and the general population (compared to the other counties examined) or were

20   related to correctional health care."  Murray Report at 39.  This criticism is accurate,

21   but misses the point and is not supported by any evidence.  The authors of the study

22   concede that they were not attempting to explain why there were disparities among

23   counties.  DUNSMORE0116339 ("While our research has delineated the differences

24   in deaths among county jails, we have yet to explain *why* they are different.").  It is

25   therefore possible, as I interpret Dr. Murray as suggesting, that the jail population in

26   San Diego County has a worse level of baseline health, compared to the population

27   in the community, than the jail populations in other counties.  But again, Dr. Murray

28   has not presented any evidence to support his conjecture.

97.     In my opinion, none of Dr. Murray's criticisms of the Analytica study undermine its conclusion that San Diego County was the only large county in California where the deaths in the jail exceeded expected deaths by a statistically significant amount.

98.     Later in his report, Dr. Murray writes that "[i]n-custody deaths reached a high in 2022 with 19 deaths as SDSO was emerging from the COVID-19 pandemic and have been declining since that time."  Murray Report at 40.  This statement is misleading.  Though deaths in the Jail have declined in 2022 and 2023, they remain at extremely high levels.  As discussed above, the California State Auditor found that the Jail's death rate for 2006-2020 of 2.39 per 1,000 incarcerated people was very high.  SD_174856.  The death rates in the subsequent years have greatly exceeded that average:  4.5 deaths per 1,000 in 2021; 4.75 deaths per 1,000 in 2022; and 3.27 deaths per 1,000 in 2023.  Keller Report ¶ 88.  Dr. Murray discusses only the trend, not the quantity, which remains high.

99.     Dr. Murray also neglects to mention that the State Auditor's Report did not just examine the death rate.  The Auditor also reviewed 30 in-custody deaths, with an emphasis on cases that occurred between 2016 and 2020.  SD_174815.  It concluded that "deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals" had "likely contributed to in-custody deaths" and that the SDSO had "not consistently taken meaningful action when such deaths have occurred."  SD_174794.  Accordingly, I disagree with Dr. Murray's opinion that the death rate in the Jail (a) has not been calculated correctly and (b) does not reflect problems with the healthcare system.

V.    **The audit of chronic care that Dr. Murray's team performed is methodologically and substantively flawed.**

100.    Dr. Murray's team reviewed 81 medical records for incarcerated people "with chronic care conditions ... to assess the quality of care being provided and to determine if the standard of care was met."  Murray Report at 14-15.  From this

review, Dr. Murray concluded that "[o]verall, there was evidence of high-quality care being provided to the IPs in the SDSO." *Id.* at 15.  He further concluded that "[p]rovider chronic care was timely and consistent with a community standard of care." *Id.* at 44.

101.   I did not receive the complete set of the 81 records reviewed by Dr. Murray until September 21, 2024. They were quite voluminous and I began reviewing them immediately.  The medical files I reviewed averaged many hundreds of pages long and some files were over a thousand pages.  On average, each file required at least half a day of work to review and write up my analysis.  I had hoped to receive these records directly in TechCare, which I believe would have been more efficient, but was informed I could not have access.  Under the circumstances, given the November 1, 2024, deadline for rebuttal reports, I was able to review 19 of the records.  As described below, this was sufficient to conclude that Dr. Murray's opinions are flawed.

102.   In my opinion, Dr. Murray's medical record review of the care provided to patients with chronic illnesses, who are the sickest and most difficult to treat in the Jail, is at the center of his report.  As I explain below, Dr. Murray's purported audit suffers from serious methodological problems.  Moreover, I disagree substantively with the findings of the review that the care provided to 75 of 81 class members (93%) met the standard of care.  Murray Report at 15 & Appendix J.  I therefore also disagree with Dr. Murray's overarching conclusions about the quality of the chronic care at the Jail.  *Id.* at 15, 44.

103.   Dr. Murray presents the findings from the review of each of the 81 records in Appendix J.  Dr. Murray does not appear to have reviewed the medical files himself; each file includes the name for a "Reviewer" followed by the one of five names:  Stephen Boone, MD. (Patients 1-25); Erin Freeman, PA-C (Patients 26-44); Jennifer Humphreys, FNP (Patients 45-46); Jane Leonardson, MD (Patients 47-60); and John Pulvino, PA (Patients 61-81).  *See Id.* at 164-224.  For each file, the

1  reviewer indicated whether the care provided by the County "Meets Standard of

2  Care," "Does Not Meet Standard of Care," or "Meets Standard of Care – with some

3  reservations."

4      104.   Even before I reviewed some of the 81 medical files, I had concerns

5  regarding the quality of the reviews conducted by the reviewers.

6      105.   First, Dr. Murray did not share the qualifications for the five reviewers

7  who conducted the audit.  It is therefore not apparent that they are generally

8  qualified to determine whether the care provided to a patient met the standard of

9  care or specifically qualified to offer such opinions regarding care provided in a

10  correctional environment.

11      106.   Second, Dr. Murray did not indicate how the 81 files were selected or

12  by whom or with what criteria.

13      107.   Third, it is not clear in all cases what "standard of care" the reviewers

14  used when evaluating the care.  Though some reviewers did include that information

15  for some patients, *see, e.g.*, Patients 30, 31, most of the reviewers did not include

16  reference to any specific standards of care.  The absence of reference to specific

17  standards of care is problematic in at least two respects.  First, the conclusions of the

18  reviewers are not tethered to a documented standard of care and therefore are liable

19  to vary from person to person.  Also, practitioners who are poorly educated or who

20  have not kept up with changes in medical knowledge may provide care outside of

21  recognized appropriate boundaries.  For example, for my report, the Standard of

22  Care for Type 2 Diabetes that I used was *Diabetes Management in Detention*

23  *Facilities: A Statement of the American Diabetes Association* (referred to elsewhere

24  as "Diabetes in Detention").  None of the reviewers stated what standard for diabetic

25  management they were using.  Second, if the reviewers were not using agreed-upon,

26  documented standards of care for their reviews, it becomes more likely that different

27  reviewers would reach different conclusions regarding the care provided to the same

28  patient.

108.   Fourth, since the SDSO does not have Disease Management Guidelines or Chronic Care templates, *see* Murray Report at 15; Keller Report ¶¶ 501-505, the reviewers could not determine whether the County followed its own policies for providing chronic care, as there were no policies to follow.  In my report, I explained why such policies are critical in a correctional environment.

109.   Sixth, it is not clear to me that Dr. Murray's reviewers understand the policies and processes for providing medical care at the Jail.  Accordingly, it is not clear that they evaluated whether the care the Jail provided was consistent with the Jail's policies and processes.

110.   Beyond these methodological problems, I found significant issues with Dr. Murray's reviewers' substantive conclusions regarding whether the care the Jail provided to class members met the standard of care.  I reviewed 19 of the 81 files which, in my opinion, was a sufficient sample to draw conclusions regarding the remaining reviews.  I used the following process to select the files for review.  First, at the time that Dr. Murray submitted his report on August 21, 2024, I already had partial medical files for ████ ████ (████████ and ████ ████████ (████ that covered their treatment through ████ 2023, so I reviewed those two files first.  After Defendants produced the 81 files to Plaintiffs, I first reviewed updated records for Mr. ████ and Mr. ████████ that extended through ████ 2024.  I then randomly selected one of the two files reviewed by Jennifer Humphreys, FNP (Patients 45-46).  I then selected 4 files for each of the other 4 reviewers, using a random number generator to determine which of the specific files I would review.

111.   My review of the medical files confirmed my pre-review concerns and revealed other serious problems.  In Appendix A, I have provided detailed analysis of the 19 medical records I reviewed.

112.   First, for nearly all of the files I reviewed, I disagreed with the ultimate conclusion drawn by Dr. Murray's reviewers.  The reviewers concluded that the care

1  the Jail provided met the standard of care for 18 of the class members.[8]  I only

2  agreed with Dr. Murray's reviewers with respect to the care provided to 2 of those

3  class members.  For the other 16 class members, I concluded that the care provided

4  by the Jail did not meet the standard of care.

5      113.   These failures by the County to meet the standard of care are very

6  concerning.  In some instances, they resulted in harm to incarcerated people.  The

7  most egregious of these cases include:

8  • ███████ – When he was booked into the Jail, he was in the middle

9     of a prostate cancer work up.  The Jail failed to provide continuity of

10    care for this critical evaluation for a potentially deadly disease.

11 • ██████ – The Jail denied him, for months, an essential

12    gastrointestinal medication prescribed by a specialist, despite

13    Mr. █████ protests and deterioration of his condition.

14 • ███████ – At intake, the Jail failed to continue 2 out of 3

15    diabetes medications, which caused Mr. █████ diabetic control to

16    deteriorate immediately.  Moreover, the Jail never provided appropriate

17    treatment to Mr. █████ for diabetes.  And the Jail made a serious

18    medical error in judgment when it failed to send him to the hospital,

19    after an incident when he passed out and was incontinent.

20 • ████████ – The Jail failed to treat appropriately and bring under

21    control his diabetes and hypertension.

22 My detailed reviews of the medical files for these individuals are in Appendix A.

23     114.   Even the cases where the failures did not result in tangible, immediate

24 harm to class member reflect serious problems with the system.  Standards of care

25 exist to ensure that medical professionals provide appropriate treatment to patients

26 _____

27 [8] For one of these class members, █████ the reviewer concluded that the care
provided by the Jail met the standa   c   with some reservations." *See* Murray

28 Report at 209.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  and do not expose their patients to unnecessary risk.  A system that consistently

2  provides care to patients that falls below the standard of care, like the Jail's system,

3  necessarily exposes those patients to a substantial risk of serious harm.  Not every

4  failure to meet the standard will result in harm.  But each failure presents a real risk.

5  Accordingly, it is my opinion that the medical records that Dr. Murray's reviewers

6  reviewed reflect a system that places patients at a substantial risk of serious harm.

7        115.   Second, the reviews conducted by Dr. Murray's reviewers were

8  generally of poor quality, were superficial, and often contained factual errors.  *See,*

9  *e.g.*, Appendix A, ████ (reviewer indicated that a practitioner performed an intake

10  physical when actually an RN performed the physical, which was then

11  countersigned by a doctor); Appendix A, ████ (reviewer indicated that an

12  ultrasound was performed to address a hernia, when it was actually to evaluate gall

13  stones, and that the ultrasound was normal even though the ultrasound report is not

14  in the medical file and the results are not discussed anywhere in the record);

15  Appendix A, ████ (reviewer indicated that doctor changed prescription from

16  metformin to glipizide at the class member's request, but the class member was

17  actually requesting to be placed on a different drug (Mounjaro)); Appendix A,

18  ████ (reviewer indicated that class member refused an appointment when

19  record showed the class member did not refuse, but was at work).

20        116.   Third, because I randomly selected which files to review, it is likely

21  that the same problems I identified—reviewers finding that the standard of care was

22  met when it was not, conducting superficial reviews, and making factual errors—

23  exist in many of the files I did not review.  It is therefore my opinion that the

24  chronic care audit that Dr. Murray included in his report—in which his reviewers

25  concluded that the care the Jail provided met the standard of care in 93% of the

26  cases—is unreliable.  It is therefore also my opinion that any conclusions that

27  Dr. Murray drew from the chronic care audit are also unreliable.

28        117.   Fourth, in reviewing the medical files, I identified problems with care

1   that were consistent with my findings offered in my initial report.  Accordingly,

2   these medical files provide additional evidence of the serious problems with medical

3   care at the Jail.  Specifically, the medical files revealed problems with:

4   • Failures to continue medications class members were taking in the

5     community – *See* Appendix A, ███ (diabetes medications); ███

6     (same); Wilson (asthma medication); ███ (GERD medication).  *See*

7     *also* Keller Report ¶¶ 285-303.  In nearly all of these cases, the Jail

8     removed the class member from a medication he was taking in the

9     community because it was not on the NaphCare formulary and then

10    prescribed a less effective medication.

11  • Failures to continue treatments that class members were receiving in

12    the community – *See* Appendix A, ███ (treatment for retinal disease,

13    MRI for prostate cancer, colonoscopy); ███ (referred to

14    gastrointestinal specialist for treatment of GERD but was never seen

15    over many months).  *See also* Keller Report ¶¶ 304-312.

16  • Failures of the sick call process to address class members' medical

17    concerns – *See* Appendix A, ███ (no response to request for C-PAP

18    or, in alternative, sleep study for sleep apnea); ███ (substantial

19    delays in responding to health requests).  *See also* Keller Report

20    ¶¶ 319-367.

21  • Alleged refusals of care, including refusals being witnessed only by

22    custody staff and inadequate counseling of class members regarding the

23    risks of refusals – *See* Appendix A, ███ ███ ███

24    ███ ███ ███ *See also* Keller Report ¶¶ 387-415.

25  • Failures to conduct any or an adequate physical examinations of

26    patients when necessary to provide them with appropriate treatment,

27    including instances where no examination occurred because STATCare

28    practitioners were providing care remotely – *See* Appendix A,

████ ████ ██ █████ ████ ██ *See also* Keller
Report ¶¶ 416-417, 433, 442-47, 541-42, 546-47.

- Nurses providing care outside of their scope of practice – *See* Appendix
  A, ██████ *See also* Keller Report ¶¶ 448-451.

- Failures to conduct diagnostic testing or to review the results of
  diagnostic testing – *See* Appendix A, ████ █████ ███████ *See
  also* Keller Report ¶¶ 486-497.

- Non-existent or incomplete discharge planning – *See* Appendix A,
  █████ *See also* Keller Report ¶¶ 732-761.

- Inadequate custody staffing interfering with medical care – *See*
  Appendix A, █████ *See also* Keller Report ¶¶ 659-664.

- Failures to perform Health Assessments within 14 days of booking and
  after a year in the Jail – *See* Appendix A, █████ ███████ ██████
  █████ █████ ██████. *See also* Keller Report ¶¶ 261-284.

- Lack of confidentiality in medical visits – *See* Appendix A,
  ██████ *See also* Keller Report ¶¶ 665-686.

- Failures to gather vitals signs at visits, including visits for hypertension
  – *See* Appendix A, ███████ ███████ █████; █████ *See also*
  Keller Report ¶¶ 416-417, 443-44.

- Failures to conduct a face-to-face interview with a class member within
  48 hours of submission of a health care request. *See* Appendix A,
  ██████ ████ ██████ *See also* Keller Report ¶¶ 342-354.

- Failures to provide appropriate follow-up care/chronic care – *See*
  Appendix A, █████ (no follow up care to determine whether leg
  swelling resolved with change of medication); █████ (no chronic
  care for hypertension, diabetes over 1.5 years; no follow up A1C every
  3 months); █████ (no chronic care or repeat labs for seizures);
  █████ (no follow-up A1C; no referral for dilated retinal exam); █

(referred to be seen by a gastrointestinal specialist in █████ 2023, but still had not been seen by the end of the medical record in ███ 2024). *See also* Keller Report ¶¶ 709-731.

118.    In his report, Dr. Murray opined that in the cases where his reviewers found the Jail had not met the standard of care, "there were minor deviations from the standard of care." Murray Report at 15. I disagree with this opinion from Dr. Murray. The failures I noted above are serious problems, not "minor deviations from the standard of care."

119.    The medical files also reflected serious substantive problems with the care that the Jail provides to class members for many common chronic conditions, including:

- Hypertension – *See* Appendix A, ██████ ██████ ████ ██████ █████ ████ ███ ██████ █████; ████████ ██████ *See also* Keller Report ¶¶ 181, 235.

- Diabetes – *See* Appendix A, █████ ███████ ██████ █████ ██████ ██████. *See also* Keller Report ¶¶ 526-551.

- Hernias – *See* Appendix A, █████████ *See also* Keller Report ¶¶ 552-579.

- Asthma – *See* Appendix A, ██████ ██████; █████ *See also* Keller Report ¶¶ 613-630.

- Hepatitis-C screening – *See* Appendix A, ██████ █████ ██████ ██████ *See also* Keller Report ¶¶ 507-525.

120.    My detailed findings with respect to my review of the 19 medical files I reviewed are contained in Appendix A to this report.

121.    In sum, it is my opinion that the medical files I reviewed serve as strong evidence (in addition to evidence cited elsewhere in this report and in my initial report) that, on a systemic basis, the Jail exposes class members with chronic conditions to a substantial risk of serious harm.

**VI.    Dr. Murray's audit of intake and Health Assessments is methodologically and substantively flawed.**

122.    In his report, Dr. Murray opined:

The intake screening process of newly incarcerated individuals upon arrival to a correctional facility holds significant importance in both clinical and operational contexts. This initial assessment serves as a critical opportunity to gather essential information about the incarcerated individual's medical history, mental health status, and any immediate healthcare needs.  It allows healthcare providers to identify and address acute medical conditions or emergencies promptly, ensuring the safety and well-being of the incarcerated population as well as that of the staff.  Moreover, intake screenings provide valuable insights into chronic health conditions, substance use disorders, and infectious diseases that may require ongoing management or treatment within the correctional facility.  Beyond medical considerations, these assessments also play a pivotal role in identifying mental health issues such as depression, anxiety, and or suicidal ideation, which require specialized care and intervention.  By conducting thorough intake screenings, correctional healthcare providers can establish a baseline for each incarcerated individual's health status, initiate appropriate plans of care, and facilitate continuity of care throughout their incarceration.  This proactive approach not only supports the health and safety of incarcerated individuals but also contributes to the overall management and efficiency of the healthcare delivery system within the correctional setting.

Murray Report at 9.  I agree with Dr. Murray about the critical importance of an adequate medical intake process at a jail.

123.    To evaluate the intake process at the Jail, Dr. Murray's team audited 75 patient charts to determine the time from booking to intake screening, whether patients were "appropriately referred and subsequent evaluations [were] completed," whether "Chronic care/critical meds [were] identified on screening and continued," and whether the Health Assessment was performed within 14 days.  *Id.* at 11-12 & Appendices G, I.  Results are given in a yes/no table with no explanations.

124.    Dr. Murray's audit is methodologically deficient in a number of respects.

125.    First, Dr. Murray did not provide any definition for how he determined whether a patient was, at intake, "appropriately referred and subsequent evaluations completed."

126.   Second, he similarly did not provide a definition for how he determined "whether Chronic care/critical meds identified on screening and continued."  For example, would he consider a medication appropriately continued if, as the County frequently does, a STATCare midlevel practitioner substitutes formulary medications for non-formulary medications without an examination or discussion with the patient?  This is not, in my opinion, an appropriate process.  I identified cases in my report where non-formulary medications were inappropriately withheld pending approval through the non-formulary review process.  Keller Report ¶ 154 (discussing death of Raymond Dix).  I identified in my report cases where inappropriate substitutions of medications were made at booking, including the case of ███ ████ where sliding scale insulin was inappropriately substituted for the non-formulary medication Mounjaro.  Keller Report ¶¶ 302, 543-45; *see also* Section V, *supra*.

127.   Third, all of the charts reviewed by Dr. Murray for Appendix G (intake) appear to be for people who were booked into the Jail on January 1, 2024.[9] For two separate reasons, it is my opinion that an audit looking only at people booked into the Jail on January 1, 2024 provides little, if any, information regarding whether the intake process functions properly at the Jail.  First, at a basic level, any such audit should examine how the intake process functioned on multiple days, not on a single day.  An audit that looks at a single day will only measure whether the system worked on that day, not whether the system works in general.  Second, in my experience working in jails, January 1 is a very poor day on which to conduct an audit because it is New Year's Day.  The people being booked into a jail on that day

---

[9] Appendix G does not indicate the date on which the 75 listed individuals were booked into the Jail.  Appendix H does, however, list the date on which the 75 listed individuals were booked into the Jail.  All of the people listed in Appendix H were booked into the Jail on January 1, 2024.  The list of people in Appendix H is identical to the list of people in Appendix G.  I therefore believe that the people listed in Appendix G, who are the same as the ones listed in Appendix H, were all booked into the Jail on January 1, 2024.

are not representative of typical days, as they tend to include a higher percentage of people arrested for misbehavior on New Year's Eve, including a higher percentage of people arrested for minor offenses.  In addition, because jails know that January 1 will be a day with a high volume of bookings, they tend to staff the jails accordingly.  As a result, a jail's success or failure processing intakes on January 1 of any year is not likely to be reflective of its success or failure at other times of the year.

128.     Fourth, it appears that very few of the people whose files Dr. Murray reviewed for the audit of intake screening remained in the Jail for any real period of time.  Thirty-six people were released on January 1, 2024, the same day that they were booked into the Jail; 20 were released on January 2, 2024, the day after they were booked into the Jail; and 5 were released on January 4, 2024.  Only 14 of the individuals whose records Dr. Murray reviewed remained in the Jail until January 5, 2024 or longer.  The short period of time that most of the individuals spent in the Jail undermines Dr. Murray's findings.  One of the items that Dr. Murray audited was whether "[a]ll positive screening findings [were] appropriately referred and subsequent evaluations completed."  Murray Report at 155.  Dr. Murray found that the Jail met this undefined standard for all but one of the 75 individuals.  But for the 36 individuals who were released on the same day they were booked and the additional 20 who were released the following day, it is extremely unlikely that any "subsequent evaluations were completed."  To conclude that this item was satisfied for these individuals is therefore misleading.

129.     Fifth, Appendix G and Appendix H both indicate that Dr. Murray selected 75 files to review out of a pool of 121 files.  Dr. Murray provides no explanation for how the 121 files were selected, how he determined to review only 75 files, or how those 75 files were selected.

130.     Sixth, in Appendix H, Dr. Murray concludes that the County met its obligation to conduct a Health Assessment within 14 days of booking in 73 of the 75

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    case files he reviewed.  This analysis is misleading, as 64 of the individuals were

2    released **before** they spent 14 days in the Jail and therefore the 14-day Health

3    Assessment deadline was not triggered.  For the remaining 11, Dr. Murray

4    concludes that "all required initial health assessments were completed within this

5    time frame." *Id.* at 12.  His own report, however, indicates otherwise, as two of the

6    11 individuals never had a 14-day assessment. *Id.* at 160.  Also, five patients

7    reportedly refused to have a health assessment done (████████ ████ ████████ ████████

8    and ████ ████████ Besides the overarching problem of refusals in the Jail in

9    general, it is inappropriate to count these five refusals as evidence that "all required

10   initial health assessments were completed within this time frame."

11        131.   I discussed in my report that both the 2017 NCCHC team and Homer

12   Venters encouraged the SDSO to do the full Health Assessment at booking.

13   Dr. Venters went further to recommend that any patient with a significant health

14   history be seen be a medical practitioner as part of the intake Health Assessment.

15   SD_215371.  No other resident health facility, such as hospitals or nursing homes,

16   delay doing an initial health assessment for 14 days.  The NCCHC requires prisons

17   to do their initial health assessments within six (6) days.  The fact that the SDSO has

18   chosen to ignore the advice of Dr. Venters is simply bad medical care.  Dr. Murray,

19   by accepting the 14-day deadline, should not excuse this.

20        132.   Seventh, Dr. Murray's results regarding the 14-day Health Assessment

21   are not consistent with medical files I reviewed for my initial report.  Following my

22   instructions, Plaintiffs' counsel entered information from the medical files regarding

23   64 bookings—all lasting at least 14 days—from dates throughout 2023 and 2024.[10]

24

---

25   [10] I instructed Plaintiffs' counsel to use the spreadsheet provided by Defendants at
     SD_1575334, which shows the booking and release dates of incarcerated people
26   whose records were produced to Plaintiffs.  I instructed them to look only at
     bookings between January 1, 2023 and January 15, 2024; the latter limitation is
27   because Plaintiffs initially received medical records only through the end of January
     2024.  After eliminating all bookings shorter than 14 days and those outside that
28   date range, 208 bookings remained.  I then instructed Plaintiffs' counsel to enter
     information for every third entry, excepting the six bookings for which I was unable

1   The results of this analysis are contained in Appendix B to this report.  Of those 64

2   bookings, only 38 (or 59%) were "compliant," meaning they received or were

3   documented as having refused an initial health assessment within fourteen days.  As

4   I stated in my initial report and in this rebuttal report, I have grave concerns about

5   the validity of the Jail's process for refusals.  However, even assuming that the 15

6   refusals in this sample of 64 were valid, the Jail is only in compliance with its 14-

7   day standard 59% of the time.  In addition to these findings, I also found instances

8   of non-compliance with the Health Assessment policy in my review of medical files

9   for class members with chronic illnesses.  *See* Section V, *supra*.

10  **VII.   Dr. Murray's audit of nursing sick calls is methodologically and
         substantively flawed.**

12      133.   Dr. Murray purported to conduct an audit to "verify the timely access to

13  care for nurse sick call requests" as well as "whether necessary referrals were made

14  based on clinical indications."  Murray Report at 13 & Appendix I.  The audit

15  results are given in a yes/no fashion regarding whether the triage was done within 24

16  hours, whether the face-to-face evaluation was done within an additional 24 hours,

17  and whether "all referrals [were] made as appropriate."  *Id.*, Appendix I.

18  Dr. Murray did not define the standards he used to decide whether a referral was

19  "appropriate."

20      134.   For his audit, Dr. Murray appears to have picked medical files for 25

21  individuals out of a pool of 120 files.  *Id.*, Appendix I.  Dr. Murray does not provide

22  any explanation for how he selected the 25 files for review.  For each of the 25 files

23  Dr. Murray selected, he then reviewed a single sick call slip and related follow up,

24  even though nearly all of the files contained more than one sick call slip.  *Id.*; *see* ¶¶

25  136-139, *infra*.  Dr. Murray does not provide any explanation for how he selected

26

27  ───────────────

28  to find medical records.  The end result was 64 individual bookings.  After I
    received the information from Plaintiffs' counsel, I checked it for accuracy.

1  which sick call slip and related follow up to review.  Dr. Murray found that the Jail

2  met the review standards for all but one of the sick call slips he reviewed.  Murray

3  Report, Appendix I.

4       135.   In my opinion, these methodological problems with Dr. Murray's

5  review undermine the results of his audit of the sick call system.  In particular, the

6  fact that he only reviewed one sick call slip for each file, without providing any

7  explanation for his process for selecting the sick call slip, is very problematic.

8  Without a pre-defined selection process, it is possible that Dr. Murray cherry-picked

9  sick call slips for which the Jail was compliant with its own procedures.  As I

10  discussed in my report, Ms. Rognlien-Hood, the Deputy Director who supervises the

11  Directors of Nursing, testified in February 14, 2024 that the Jail routinely fails to

12  meet the 24-hour face-to-face standard.  *See* Keller Report ¶ 349 (citing Rognlien-

13  Hood Tr. 87:11-14, 88:8-10, 89:8-10, 90:15-92:18); *see also* Keller Report ¶ 351

14  (citing SD_375922, in which Ms. Rognlien-Hood wrote that the face-to-face

15  requirement was "hard to accomplish" because of the medical and custody staffing

16  necessary to meet it).  Similarly, the County's own audit in July 2023 found only

17  45-50% compliance with face-to-face evaluation requirement.  *See* Keller Report

18  ¶ 350 (citing SD_114412, SD_114467).  The regular failure to meet face-to-face

19  within 24 hours was confirmed to me by a nurse at Central Jail during my

20  inspection.

21       136.   Indeed, when I reviewed sick call slips and related follow up in the

22  same files that Dr. Murray reviewed, I found substantial delays and non-compliance

23  with the County's own policies.

24       137.   First, the vast majority of the 25 charts included in Dr. Murray's audit

25  contain multiple sick call requests, not all of which were timely addressed.  For

26  example, ███████████ submitted a sick call request not included in Dr. Murray's

27  audit that was dated ███████ 2023 and marked received by the Jail on

28  ███████ 2023.  In the request, Mr. ████ wrote "very pain much" in his

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  knees and requested a knee brace. ████ Med. Rcd. at 78. The face-to-face

2  appointment with a nurse did not happen until ████ 2024—a month later. *Id.*

3  at 201 (████ 2024 1:14:05 p.m. RN Note). And, in the same RN Note from

4  ████ the nurse noted that she also completed a face-to-face for a sick call

5  request that Mr. ████ had submitted even earlier, on ████ 2023. *Id.*

6      138.  As another example, an RN note in ████ ████ records states that a

7  sick call request regarding neck and shoulder pain was received by the Jail on

8  ████ 2023,[11] but the complaint was not triaged until ████ 2023—three

9  weeks later. ████ Med. Rcd. at 471 ("24 Hr Face to Face completed within 24

10  hours- No").

11      139.  As another example, ████ ████ submitted a sick call request on

12  ████ 2023 that was not included in Dr. Murray's audit. The request was

13  marked received by the Jail on ████ 2023, reporting: "I've been vomiting

14  contin[u]ously today. I feel dehydrated." ████ Med Rcd. at 125. According to

15  the bottom (response) portion of the sick call form, Mr. ████ was not seen before

16  his release on ████ 2023. *Id.*; *see also id.* at 67 (sick call summary, showing

17  triage appointment cancelled due to release).

18      140.  Second, even as to the sick call requests that Dr. Murray did evaluate

19  (one per class member listed on the chart), Appendix I is not accurate. A review of

20  the records cited in Appendix I shows that, in at least some examples, the sick call

21  requests cited by Dr. Murray as having being triaged and seen face-to-face by a

22  nurse within 24 hours (indicated by a "Yes" in Appendix I) were not actually triaged

23  within 24 hours. For example, in Row 9 of Appendix I, Dr. Murray concludes that

24  ████ ████ was visited by a nurse within 24 hours of receipt of the sick call

25

26  [11] Although no sick call request appears in Mr. ████ reco█ h at
date, the chart does contain e submitt . on 2023, marked received on ████ 2023, stating: "I am once bo the

27  condition of my hou ase help. My health care request went

28  unanswered." ████ Med. Rcd. at 158.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  request that appears on page 89 of his medical records. However, Mr. ███████

2  medical records say the exact opposite. Page 319 of his medical records—which

3  Dr. Murray cites as proof of compliance—states: "24 Hr Face to Face completed

4  within 24 hours: NO // Date of receipt – ████ 24 // Date of Completion- ████ 24."

5  ███████      Med. Rcd. at 319 (████████ 2024 2:41:46 p.m. PST RN Note). As

6  another example, Row 11 of Appendix I states that that Mr. ██████ was visited by a

7  nurse within 24 hours of receipt of the sick call request that appears on page 67 of

8  his medical records ("I have an ab[s]cess on my right upper flank. I need to be seen

9  ASAP and get medications."). However, that sick call request was marked received

10 by the Jail on ██████ 2024, and Mr. ██████ was not seen for a face-to-face until

11 ██████ 2024. ██████ Med. Rcd. at 67. Page 196 of his medical records—which

12 Dr. Murray cites as proof of compliance—actually reflects non-compliance: "Date

13 of receipt: ██████ 24 @ 1726 // Date of Completion: ██████ 24."

14      141.   Finally, and most troublingly, there are multiple entries in these

15 medical records that state that nursing staff "cancelled" sick call triage appointments

16 simply because no face-to-face appointment had happened within 24 hours. For

17 example, the sick call summary page of ████ ████████ medical records reflect

18 multiple sick call requests (dated received on ████████ ████████ and

19 ████████ 2023), regarding pain in his feet and legs and requesting a different

20 pair of shoes. ████████ Med. Rcd. at 49. Each of these requests is marked as

21 "Cancelled … Reason: Over 24 hrs" by RN Ellen Tanacio on ████████ 2023.

22 *Id.* Although the original sick call requests do not appear in the chart, there are

23 grievances submitted by Mr. ██████ on this topic, in particular: On ████████

24 2023, he submitted a grievance that he's "been in pain for the last several weeks. I

25 have a pinched nerve … I'm requesting medical attention," *id.* at 115, and in a

26 grievance marked received on ████████ 2023, he stated that he's "been

27 requesting shoes … to no avail. … Why? What's taking so long?" *Id.* at 104.

28 Mr. ██████ was seen by a nurse (after submitting yet another sick call request on

1   this topic) on ███████████ 2023, more than a month after he first requested help

2   with the issue.  *Id.* at 325.

3      142.   Another example appears in the sick call summary portion of ███████

4   ███████ medical records.  A ████████████ 2023 imported sick call triage entry read:

5   "Date of Receipt – ███████ @ 7:22 Date of Completion – Chief Complaint –

6   thinks he has lice Disposition – Cancelled by ellen.tanacio on ██████ 2023 Reason:

7   Over 24 hrs." ██████  Med. Rcd. at 73.  I do not see a scan of the original sick call

8   request in the chart, nor is there any reference to lice in the RN Progress Notes,

9   suggesting that Mr. ██████ was never evaluated for lice despite his complaint.

10     143.   Another example is ████ █████ (Appendix I, Row 16).  Dr. Murray

11   noted with approval that Ms. █████ ███████ 2024 sick call request regarding

12   the dosage of her "transgender shots," marked received by the Jail on █████████

13   2024, was triaged by a nurse the same day.  *See* █████ Med. Rcd. at 64 (sick call

14   request), 320-21 (████████ 2024 7:02:08 p.m. RN Note).  However, Ms. ██████

15   had previously submitted multiple other requests regarding the dosage of that

16   medication.  According to the sick call summary portion of Ms. ██████ medical

17   record, the Jail received a request from Ms. ██████ to "increase 'transgender pills'"

18   on ████████ 2024 at 5:53 p.m.; however, this sick call request was "[c]ancelled"

19   on ████████ 2024, with the stated reason:  "More than 24 hrs."  *Id.* at 55.  I

20   understand this to mean that the sick call request was deleted—and never even

21   referred to a provider—because the Jail failed to conduct a face-to-face assessment

22   within 24 hours of receipt of the sick call request.  Although no request form dated

23   ████████ 2024 appears in Ms. ██████ medical records, another request form on

24   the same topic, which is marked received by the Jail on █████████ 2024, states:

25   "[T]his is the second one I put in."  *Id.* at 65.  This suggests to me that the ████████

26   █, 2024 request form was discarded because it was not triaged within 24 hours.

27     144.   If, as these records suggest, the Jail is disregarding sick call requests if

28   medical staff fail to comply with policy for a face-to-face interview within 24 hours

1  of receipt, that would be extremely troubling.  All sick call requests should be

2  addressed.

3        145.  Lastly, I note one additional issue ignored by Dr. Murray.  He does not

4  mention that the MSD Operations Manual requires this face-to-face assessment

5  within 24 hours, not 48 hours.  SD_065584.  The SDSO reaffirmed this 24-hour

6  standard for a face-to-face assessment in its response to the California Audit.

7  SD_729828, SD_184484.

8  **VIII.  Dr. Murray's analysis of the timeliness of lab, x-ray, and test results
         ignores the Jail's repeated and documented failures to timely review
9        those results**

10       146.  Dr. Murray states that his review showed that "[t]he average time from

11 (lab) specimen submission to results returned to the medical record was 1.5 days."

12 Murray Report at 16 . Similarly, he reported that "[t]he average time from (x-ray)

13 study completion to report availability was approximately 23 hours."  *Id.* at 17.

14 Dr. Murray opines that these timeframes suggest that the healthcare system is

15 working properly.  *Id.*

16       147.  While I agree that those timeframes for obtaining results of labs and x-

17 rays are acceptable, Dr. Murray's analysis ignores another essential step in the

18 process for using diagnostics to treat patients.  Dr. Murray did not look at the

19 amount of time from the receipt of study results to the time that a practitioner

20 interpreted the results and then, if necessary, developed a treatment plan.

21 Dr. Murray also did not assess whether the reviews and interpretation were

22 appropriately documented in the medical record.  Finally, Dr. Murray did not assess

23 how long it took until the study results were communicated to the patients.

24       148.  In fact, the Jail's own internal documentation shows that the review,

25 documentation, and communication of study results has been particularly

26 problematic.  SD_114489.  Moreover, in my report, I discuss a number of cases in

27 which the lack of appropriate review, documentation, and communication of lab

28 results resulted in actual or a risk of serious harm to patients.  Keller Report ¶¶ 150-

152, 180, 207-208.  Lastly, my review of medical files for some of chronic care patients discussed in Dr. Murray's report reveal failures to review test results.  *See* paragraph 117, *supra*.

## IX.    Dr. Murray agrees with several criticisms of the medical system alleged in the *Dunsmore* complaint and found in my report.

149.   Dr. Murray admits that SDSO has no Disease Management Guidelines, including guidelines for Chronic Care.  Murray Report at 15.  Dr. Murray excuses this lapse by saying that Dr. Freedland has promised that "CHP is in the process of developing Disease Management Guidelines (DMG) to help standardize chronic care management." *Id.*  Additionally, according to Dr. Murray, Dr. Freedland said that the EHR chronic care templates are "being considered for revision to facilitate treatment goals." *Id.*  This statement ignores the fact that the SDSO has known about the lack of chronic disease guidelines since at least 2017, when the NCCHC Report repeatedly pointed this out.  DUNSMORE0260643, 0260676, 0260710, 0260743-44.  Dr. Murray also does not mention that NaphCare's 2022 contract required NaphCare to develop chronic disease management guidelines, which NaphCare has failed to do.  DUNSMORE0117611-12 (County Contract 566117) ("Naphcare Contract").  Dr. Murray also does not discuss that the contract with CHP does not obligate CHP to create chronic disease management guidelines.  DUNSMORE0118502 (County Contract 563402) ("CHP Contract").  And even if CHP does create chronic disease guidelines (and I am not aware of any evidence that this has yet occurred), CHP has no way to enforce compliance with their guidelines on the NaphCare practitioners, specifically the STATCare midlevel practitioners who are providing remote care.  Also, Dr. Freedland's statement to Dr. Murray that chronic disease templates are "being considered," Murray Report at 15, is an admission that the SDSO does not have such templates now.  As I discussed in my initial report, problems with chronic care treatment were widespread in the medical records I reviewed.  Keller Report ¶¶ 506-631.  In addition, as I discussed

1   above, the medical files regarding chronic care that Dr. Murray's contractors

2   reviewed, some of which I have now reviewed as well, reflect widespread failures to

3   treat the many common chronic conditions, including hypertension and diabetes.

4   *See* paragraph 119, *supra*.  As but one example, Mr. Bach's death may have been

5   prevented had the Jail had in place disease management guidelines for type 1

6   diabetes.  *See* Section III.B.1, *supra*.  In my opinion, the lack of chronic care

7   guidelines at the Jail is one reason why the Jail frequently fails to provide clinically-

8   appropriate chronic care treatment to incarcerated people in the Jail.  These failures

9   place incarcerated people at a substantial risk of serious harm.

10      150.    Dr. Murray notes that the NCCHC Standard J-A-05 requires that

11  "[h]ealthcare policies are reviewed annually by the medical and administrative

12  directors."  Murray Report at 26.  Dr. Murray claims that the SDSO "is in the

13  process of finishing a complete review of its current P&P manual" and that "[t]he

14  timeline for completion of the SDSO health services P&P manual is September

15  2024."  *Id.* at 27.  Dr. Murray states that "[o]nce all policies and applicable

16  procedures reviews are completed, they will remain on an annual review process."

17  *Id.*  Dr. Murray does not provide any basis for this speculation.  He also fails to

18  mention NaphCare's role in this revision, even though generating medical P&Ps is

19  part of their contractual requirements.  *See, e.g.*, DUNSMORE0116596  (NaphCare

20  Contract at 2.1.1), DUNSMORE0117598 (NaphCare Contract at 2.3.2.1).  And,

21  since any Policy and Procedure Manual must include Disease Management and

22  Chronic Care Guidelines, CHP should be involved in any effort to rewrite P&Ps.

23  But Dr. Murray does not mention CHP in this role.

24      151.    Dr. Murray admits that the SDSO CQI program is not compliant with

25  NCCHC requirements.  Murray Report at 32.  As an example, Dr. Murray notes no

26  CQI monitoring of the MOUD program.  *Id.* at 26.  I agree with this assessment.

27  Dr. Murray does not define in exactly what way he feels the CQI program is

28  deficient.  I discuss problems with the SDSO CQI processes in my report.  Keller

1  Report ¶¶ 762-795.

2      152.   Dr. Murray admits that the Receiving Screen being done at the Jail is

3  inadequate.  Murray Report at 35.  As I discuss at length in my initial report, I agree

4  with this assessment.  Keller Report ¶¶ 243-284.  Dr. Murray criticizes the current

5  Receiving Screening for lacking "the screener's personal observations" and

6  "additional process monitoring."  Murray Report at 35.

7      153.   Dr. Murray approvingly quotes Dr. Freedland that the current system of

8  death reviews will be improved because "with CHP ... directly contracting with

9  SDSO, all mortality reviews would be done on site."  *Id.* at 40.  He further quotes

10  Dr. Freedland as stating that "[t]hese on-site reviews will provide the opportunity

11  for better contextual understanding, examination of team dynamics, and immediate

12  access to necessary information," which, of course, implies that the current system

13  of doing death reviews lacks these features.  *Id.*  The problem with Dr. Freedland

14  and CHP fixing a broken Mortality and Morbidity Review system is that CHP's

15  contract does not mention any responsibility for death reviews.  *See generally*

16  SD_1579715-26 (no discussion of responsibility for implementing new M&M

17  review system).  As far as I am aware, NaphCare still has the responsibility for the

18  M&M process at the Jail, per its contract.  *See* DUNSMORE0117647-48 (Naphcare

19  Contract at 2.3.47.5).  Dr. Murray also does not discuss how this future CHP M&M

20  model would work.  I agree that the SDSO's current system of doing remote death

21  reviews is poor.  I discussed this in detail in my report.  Keller Report ¶ 30.

22  **X.    Dr. Murray does not address the substantial problems in the Jail's**
23  **medical system related to purported refusals of treatment by class**
   **members.**

24      154.   In my initial report, I wrote at length regarding serious problems at the

25  Jail regarding the policies and processes in place for when incarcerated people

26  refuse medical treatment.  As I explained, "it is my opinion that Sheriff's

27  Department staff frequently record that a patient has 'refused' to attend a medical

28  appointment, even though the patient was never informed or offered the opportunity

to attend the appointment in the first place. This practice has the effect of denying medical care to incarcerated people and therefore places them at a risk of serious harm." Keller Report ¶ 387. I offered this opinion based, *inter alia*, on my review of refusal forms in medical files, nearly all of which were signed only by two custody officers with no indication that any medical personnel informed the class members of the risks of declining treatment and on reports from named plaintiffs and other class members that officers record refusals when class members have not refused treatment. *Id.* ¶¶ 387-426.

155. In the medical file for Mr. Bach, whose death I discuss in detail above, *see* Section III.B.1, ¶ 67 *supra*, I have now found what appears to be ironclad evidence that staff at the Jail record refusals of treatment when incarcerated people have not actually refused. As I explained above, Mr. Bach's file includes a refusal of medication form timestamped at 4:48 a.m. The form is signed by two deputies, who claim that Mr. Bach refused to sign the form. However, Mr. Bach was pronounced dead at 4:09 a.m., nearly 40 minutes before the officers completed this refusal form. This form therefore strongly suggests that the deputies did not even attempt to determine whether Mr. Bach wanted to take his medication and simply marked him as a refusal.

156. In his report, Dr. Murray does not address the refusal policy and its problematic implementation. I find this troubling, as the chronic care files his reviewers examined contain many hundreds of refusals that should have been relevant to Dr. Murray's analysis because they have a substantial impact on medical care.

**XI. Dr. Murray admits that the County has many nursing vacancies, did not offer an opinion on whether the County has sufficient nursing staff, and ignored evidence that the County does not.**

157. Dr. Murray wrote:

When nurses are not overwhelmed by excessive workloads, they can provide comprehensive assessments, implement care plans effectively, and engage in patient education, all of which contribute to better patient

outcomes and enhanced recovery.  Moreover, a well-staffed nursing team promotes continuity of care, reduces the risk of medical errors, and fosters a supportive environment where nurses can deliver compassionate, personalized care.  By investing in a substantial nursing staffing model, healthcare organizations not only prioritize patient safety and satisfaction but also support the professional growth and job satisfaction of their nursing staff, ultimately leading to improved overall healthcare quality and efficiency.

Murray Report at 6.  I agree with these statements.

158.    In evaluating the adequacy of staffing in a medical system, it is critical to look at two components: (1) the number of authorized positions and (2) whether those positions are filled.

159.    Nowhere in his report does Dr. Murray state that the number of authorized nursing staff positions at the Jail are sufficient to ensure adequate care for patients.  Dr. Murray did not conduct any staffing analysis or cite to any staffing analyses conducted by the County.  As far as I am aware, no such analysis of the current nursing staff needs exists—it is sorely needed.  In addition, Dr. Murray did not independently address any of the evidence I cite in my report—including deposition testimony and other evidence—about the inadequate quantity of authorized nursing positions.  *See* Keller Report ¶¶ 799-800, 802, 810.

160.    The closest Dr. Murray gets to offering an opinion on whether the County has sufficient authorized nursing positions is to state that, by using overtime and contract nurses, the County "ensure[s] that IPs' care remains uninterrupted, and that the nursing workforce is supported, particularly during periods of increased demand or long-term staff vacancies."  Murray Report at 8.  But if the only way that the Jail can provide adequate care is through overtime and contract nurses, the system is not working properly.  Dr. Murray admits that nurses who are "overwhelmed by excessive workloads"—which would include nurses required to work substantial overtime—have difficulty providing adequate care.  *Id.* at 6.  When staff are "overwhelmed," it results in disrupted and incomplete medical processes, stress on both nursing staff and patients and ultimately, poor medical care, and

1  patient harm.

2      161.   Dr. Murray also admits that, "due to the complexity of the SDSO

3  medical program," the contract nurses are limited in the tasks they can perform. *Id.*

4  at 8 (the contract nurses "are assigned specific task-oriented roles to minimize

5  orientation time"). The contract nurses therefore cannot be a solution to the Jail's

6  failure to hire and retain adequate nursing staff.

7      162.   Meanwhile, Dr. Murray admits that the Jail has an "average nursing

8  vacancy rate of approximately 25%." *Id.* at 7. I have not independently verified

9  Dr. Murray's calculations. As I discuss in my report, however, the vacancy rates

10  have been higher in the recent past. *See* Keller Report ¶¶ 799, 802 (92 vacant

11  positions in nursing unit as of November 1, 2023, citing SD_114288). Dr. Murray

12  excuses the 25% nursing vacancy rate he calculated as "generally similar" to other

13  healthcare facilities in Southern California. Murray Report at 7. Even if true (and

14  Dr. Murray has not produced any citation to support this assertion), it is irrelevant.

15  A nursing vacancy rate of 25% negatively impacts patient care at the Jail and is a

16  problem that the SDSO could fix if it chose to do so. Dr. Murray admits as much by

17  explaining that the Jail is required to resort to overtime and contract nurses to fill

18  shifts.

19      163.   It remains my opinion that SDSO has insufficient authorized nursing

20  positions, has too many vacancies in nursing positions, and relies too heavily on

21  overtime and contract staff to fill shifts. Keller Report ¶¶ 815-18.

22  **XII.  Dr. Murray did not offer any opinion on the adequacy of**
       **provider/practitioner staffing.**
23

24      164.   In his report, Dr. Murray notes that the County has increased its

25  provider/practitioner staffing levels. Murray Report at 8. Though Dr. Murray

26  commented on the scope of the increase, Dr. Murray did not opine that these new

27  levels of provider/practitioner staffing are adequate or provide any detail regarding

28  when and where these staff are deployed or their level of licensure (e.g., physician

or nurse practitioner).  Dr. Murray did not conduct any staffing analysis or cite to any staffing analyses conducted by the County.  As far as I am aware, no such staffing analysis exists.

## XIII. Dr. Murray acknowledges that some nurses working in the Jail do not receive new employee orientation.

165.   Dr. Murray opined that a "comprehensive" new employee orientation "is crucial for correctional healthcare professionals particularly transitioning from non-correctional settings to correctional healthcare positions." *Id.* at 8.  According to Dr. Murray, such a program is also important because it "equips healthcare professionals with the knowledge of legal and ethical considerations inherent to correctional healthcare" and "facilitates the integration of new employees into interdisciplinary teams within correctional facilities." *Id.*  I agree with Dr. Murray about the importance of a strong new employee orientation program.

166.   Crucially, however, elsewhere in his report, he admits that at least some health care staff help to treat patients without receiving the full new employee orientation.  As discussed above, it appears that the contract nurses from United Nursing International Healthcare Recruiters ("UNI") do not receive some or all of the new employee orientation.  *Id.* at 8 (explaining that contract nurses only perform certain tasks "to minimize orientation time").  Having health care staff treat patients without receiving the orientation is concerning for all of the reasons that Dr. Murray stated in his report.

## XIV. Dr. Murray does not address how the lack of adequate custody staff negatively impacts care for patients.

167.   According to Dr. Murray, Plaintiffs alleged that "[t]he Sheriff's Department's custody staff interfere with and undermine the delivery of care by health care professionals." *Id.* at 41.  In response, Dr. Murray wrote: "The security and healthcare staff we spoke to indicated that there are occasions when it is necessary for the medical and security departments to discuss the care and custody

of a particular IP." *Id.*  This sentence is disingenuous because it implies (1) that these discussions actually take place each and every time there is a conflict between security concerns and medical concerns; (2) that these discussions resolve the disagreement about in the delivery of health care; and (3) that medical has an equal say in these discussions rather than being overruled by custody staff.  Moreover, it does not address the evidence that I discuss in my initial report that shows that custody staff routinely interfere with medical care in ways that cause harm to incarcerated people.  Keller Report ¶¶ 659-86.  I found additional evidence of this problem in the chronic care medical records discussed in Dr. Murray's report.  *See* paragraph 117, *supra.*

## XV.   Dr. Murray misrepresents the problems the Jail has with the continuity of medically-necessary medications and treatments.

168.   In his report, Dr. Murray discusses the benefits of the Surescripts system, which allows the County to electronically verify class members' prescription medications in the community.  Murray Report at 41.  Surescripts is a valuable tool.  However, Dr. Murray does not address the fact that once medications are verified through Surescripts, the Jail requires two additional steps before any patient receives their medications: The medications must be approved by a STATCare practitioner and then any nonformulary medications must go through the nonformulary review process.  *See* Keller Report ¶¶ 292-303.  As I discussed in my initial report, these unnecessary processes, which delay care, contributed to the death of Raymond Dix.  Keller Report ¶ 154.  I also identified problems with continuity of medication and, in particular, approval of non-formulary medications, in my review of the chronic care files.  *See* paragraph 117, *supra.*

169.   In addition, Dr. Murray does not address another, equally important component of continuity of care: continuity of medical treatments that patients were undergoing prior to coming to jail.  Like requiring use of the non-formulary process before allowing continuity of medications, the SDSO requires review by the

1    NaphCare Utilization Management (UM) process before allowing scheduled

2    medical treatments to take place.  DUNSMORE0117617 (NaphCare Contract at

3    2.3.16.4).  I discussed problems with this in my initial report.  Keller Report ¶¶ 309-

4    312, 458-484.  I also identified problems with continuity of medical treatment in my

5    review of the chronic care files.  *See* paragraph 117, *supra.*

6        170.    Finally, Dr. Murray did not review the process for continuity of care

7    after off-site medical visits.  This requires a practitioner to review the off-site

8    medical records and create a treatment plan incorporating the diagnoses, studies and

9    prescriptions from the off-site visit.  This does not happen at the Jail, as exemplified

10   by the case of ████████ ████████ which I discuss in my initial report.  Keller

11   Report ¶¶ 309-312.  Another example is ████████ ████ discussed in Appendix A.

12   **XVI.  Dr. Murray's opinion that incarcerated patients have adequate means
         for alerting medical staff of their needs is not consistent with the evidence
13       I have reviewed.**

14       171.    Dr. Murray opines that SDSO provides incarcerated people with a

15   reliable and timely way to alert health care staff of their medical needs.  Murray

16   Report at 42.  I disagree with Dr. Murray's opinion, as the evidence I have reviewed

17   suggests that incarcerated people often cannot obtain timely attention for their

18   medical issues.

19       172.    First, as I explained in my report, incarcerated people must have a way

20   to communicate emergent medical needs, such as a heart attack, a stroke or severe

21   injuries.  This is done in many jails by having an emergency button in the housing

22   units.  However, as I detailed in my report, these intercoms at the Jail do not always

23   work, leaving incarcerated patients with no way of alerting staff of a medical

24   emergency.  Keller Report ¶¶ 370-374.  Dr. Murray does not address the problems

25   with these intercoms, which are discussed at length in Plaintiffs' Third Amended

26   Complaint.  Dkt. 231 ¶¶ 93, 330-32, 334.

27       173.    Second, as I discussed in my report, the Jail must have a mechanism for

28   patients with disabilities, mental illness and/or language barriers to request and

1  receive medical care.  Keller Report ¶ 323.  Such patients often cannot effectively

2  utilize a system of written requests.  There is ample evidence that the Jail has failed

3  these patients, as exemplified by the case of Roselee Bartolacci.  Keller Report ¶¶

4  193-218.  Dr. Murray does not address these failings of the system.

5          174.   Third, even the written medical request system used by the jail does not

6  function properly, as evidenced by the Jail's own statistics.  These written requests

7  are supposed to be triaged within 24 hours and then each patient is to be seen face-

8  to-face by a nurse within another 24 hours.  As I discussed in my report, this system

9  does not work, partly because of the chronic nursing shortage.  Keller Report

10  ¶¶ 349-50 (citing SD_114412, SD_114467, Rognlien-Hood Tr. 89:8-10).  In my

11  review of the chronic care medical records (which Dr. Murray's consultants

12  purported to review) and in my review of Dr. Murray's sick call audit, I identified

13  additional instances where the Jail failed to respond to sick call requests in a timely

14  manner.  *See* Sections VII, *supra.*

15          175.   Fourth, nurses act as gatekeepers to incarcerated patient access to

16  practitioners. If a patient wants to see a medical practitioner about a particular

17  complaint, and would see a medical practitioner in the outside world, the gatekeeper

18  nurse may make the decision to not allow the patient access to the practitioner.  I

19  discussed the problems with this system in my initial report.  *See* Keller Report ¶¶

20  430(d), 619.

21  **XVII. Dr. Murray's opinion that the Jail has an adequate system for diagnosing
       and treating infectious diseases is not consistent with the evidence I have
22     reviewed.**

23          176.   Dr. Murray states, "[a]s emphasized throughout this document,

24  particularly with their intake processes, the SDSO has implemented all the necessary

25  elements for a thorough and effective infectious and communicable disease

26  surveillance program."  Murray Report at 13.  Dr. Murray cites no statistics to show

27  that the system is effective.  In my report, I cited several infectious diseases for

28  which the SDSO is not screening and is not offering treatment in violation of the

1   standard of care.  These include:

2       177.  Chronic Hepatitis C Infection (Hep C).  The SDSO does not offer opt-

3   out screening for Hep C per national standards and as was recommended by

4   Dr. Venters.  Keller Report at ¶¶ 507-525.  I cite several cases in my initial report

5   where patients with known Hep C infections were denied treatment in violation of

6   national standards of care.  *Id.*

7       178.  Sexually Transmitted Infections (STIs).  As I discussed in my report,

8   NaphCare is required by their contract to have an STI clinic, but they have never set

9   this up.  Keller Report at ¶¶ 594-612.  This

10      179.  Latent Tuberculosis Infection (LTBI).  Dr. Murray opines that "all IPs

11  are screened and tested for tuberculosis (TB)."  Murray Report at 10.  National

12  standards require screening for LTBI in all at risk patients.  The SDSO does not

13  screen for LTBI until patients have been incarcerated for two years.  Then, if a

14  patient with LTBI is identified, the SDSO does not offer treatment unless the patient

15  will be incarcerated for six months.  This violates national standards requiring the

16  screening of at-risk individuals and treating patients identified as having LTBI when

17  found.  Keller Report ¶¶ 581-593.

18  **XVIII. Dr. Murray's opinion that the Jail offers sufficient access to specialty
    care is not consistent with the evidence I have reviewed.**

19

20      180.  In his report, Dr. Murray wrote: "[i]t is evident from the specialty care

21  data provided from the medical record reviews, and corroborated by Drs. Rafi and

22  Freedland, that SDSO has enough contracted sub-specialty, diagnostic care

23  resources, and high acuity medical beds to provide adequate and timely access to

24  specialty care for IPs requiring those services."  Murray Report at 19.

25      181.  The evidence I have reviewed suggests that access to specialists is not

26  timely and adequate.  *See* Keller Report at ¶¶ 470-484.  In addition, the case of Mr.

27  ███████ who was referred to a gastrointestinal specialist for treatment of GERD but

28  never saw one over a period of six months, shows substantial delays in access to

1  specialist care.  *See* Appendix A.

2  **XIX.  Dr. Murray's opinion that the Jail maintains confidentiality of patient
     medical encounters is not consistent with the evidence I have reviewed.**

3

4  182.   Dr. Murray opines that the SDSO does provide confidential medical

5  care to "the greatest extent possible."  Murray Report at 43.  He identifies two

6  circumstances—when staff speak with class members cell front because they

7  refused an appointment and where the multi-disciplinary team conducts Wellness

8  Rounds at cell front—to highlight how the County "attempts to balance the need for

9  IP confidentiality and access to care."  *Id.*  He further reports that if any class

10 member expressed confidentiality concerns during those types of encounters, the

11 County would see them in a confidential setting.  *Id.*

12 183.   I disagree with Dr. Murray's opinion that the County properly protects

13 the confidentiality of medical encounters.  Dr. Murray's opinion on this topic does

14 not appear to have involved any review of patients' charts.  In my review of charts, I

15 found most cell-side encounters did not record that the patient gave consent to a

16 non-confidential encounter.  For example, none of the cases of cell-side encounters I

17 mention in my report in paragraphs 675-679 contain any mention of the patient

18 being asked for consent for the cell-side visit.  Moreover, in a system where it can

19 be so difficult for incarcerated people to timely access care, incarcerated people

20 likely feel tremendous pressure to accept non-confidential encounters rather than to

21 lose their opportunity to receive care.  Patients should not be forced to choose

22 between confidentiality and receiving care.

23 184.   My review of charts showed healthcare staff conducting visits for

24 intimate, private medical concerns—such as sexually transmitted diseases, inguinal

25 hernias and hemorrhoids—at patients' cell doors.  Keller Report ¶¶ 675-79.  Even if

26 the patient consented, this is not appropriate.  One example is the case of ▮▮▮▮

27 ▮▮▮▮▮ which I discussed in my report.  Keller Report ¶¶ 567-72.  And my

28 conversations with incarcerated people revealed that much of the healthcare being

1    provided at the Jail occurs at cell front, which is not confidential.

2    **XX.  Dr. Murray's opinion that "all" patients receive adequate follow up care**
         **is not consistent with the evidence I have reviewed.**

3

4        185.    Dr. Murray opines that "the medical record reviews for both nursing

5    and providers indicated that IPs receive timely follow-up care."  Murray Report at

6    43.  As I described in my initial report and in my review of some of the chronic care

7    patients' medical files that Dr. Murray reviewed, the County often fails to provide

8    appropriate follow up care when people return from seeing outside specialists.

9    Keller Report ¶ 304-313; *see* paragraph 117, *supra*.  I therefore disagree with

10   Dr. Murray that the medical records establish that the Jail provides adequate follow-

11   up care.

12       186.    In what appear to be related findings, Dr. Murray explains that

13   Dr. Freedland, according to Dr. Murray, stated that the County "ensures that all

14   patients scheduled for providers are seen that day"; and that "StatCare is available to

15   nursing staff 24/7 for all IPs that may require additional intervention."  Murray

16   Report at 43.

17       187.    It is unclear what Dr. Murray means with respect to his statement about

18   Dr. Freedland or how it relates to follow-up care.  Perhaps Dr. Murray is stating that

19   all patients who see an outside medical specialist are seen by onsite staff on the

20   same day after they return to the Jail.  If so, the medical files do not reflect that this

21   is occurring.  Alternatively, if Dr. Murray is stating that all patients who are

22   scheduled to see a provider at the Jail are seen by a provider on that same day, that

23   has no bearing on whether the Jail provides adequate follow-up care.  In addition,

24   the Jail's own CQI has documented the wait to see a provider as greater than 14

25   days.  SD_114495.  Moreover, as I discussed in my report, CHP practitioners are not

26   in charge of scheduling their own clinics.  The Jail has gatekeepers in place who

27   decide which patients get to see a practitioner and which do not.  The STATCare

28   midlevel practitioners are one level of such gatekeepers.  Nurses contact STATCare

1  "for permission" for an on-site practitioner to see a patient.  *See* SD_754743;

2  Appendix A, ███████  ███████  Another level of gatekeepers are the nurses themselves.

3  Dr. Murray admits this when he refers to the nurses seeing, diagnosing, and treating

4  patients in accordance with check-box protocols that NaphCare developed.  Murray

5  Report at 30.  Such patients are not scheduled to see a practitioner.

6  188.  The fact that STATCare is available 24/7 could, in theory, assist in

7  ensuring patients receive appropriate follow up care following off-site medical

8  appointments.  However, the medical files I reviewed contained serious problems

9  with follow-up care, notwithstanding the availability of STATCare.

10  **XXI.  Dr. Murray's conclusion that the Jail provides adequate discharge
    planning is flawed.**

11

12  189.  In my report, I discussed the importance of a functioning discharge

13  planning process and the serious problems with Defendants' system.  The many

14  problems include, but are not limited to: a lack of adequate policies regarding

15  discharge planning; the failure of NaphCare—which is obligated, pursuant to its

16  contract with the County, to implement a system of discharge planning that is

17  consistent with NCCHC standards—to actually implement a system more than two

18  years after the effective date of the contract; the failure to create a system that

19  arranges for follow-up appointments for patients; NaphCare's failure to set forth job

20  duties for the two people it has hired as discharge planners; the fact that, given the

21  census in the Jail, two discharge planners are not sufficient to conduct adequate

22  discharge planning; the fact that the system requires incarcerated people to request

23  discharge planning, rather than providing it as a matter of course; the fact that

24  discharge planning is not actually being provided to class members; the fact that the

25  Jail now claims to provide a 30-day supply of discharge medications to class

26  members, but has no official policy to enforce that practice; the failure to provide

27  the vast majority of class members with discharge instructions; and the failure of the

28  Jail to track any statistics regarding the provision of discharge services.

190.    In Dr. Murray's report, he similarly opined that "[m]edical and mental health discharge planning is critical in correctional settings because incarcerated individuals often have complex health needs, including chronic medical conditions, mental health disorders, and substance use issues." Murray Report at 21. He then concluded that the County "ensure[s] that IPs can access social and medical services in the community in a timely manner." *Id.* at 22.

191.    Dr. Murray's opinion is flawed and contradicted by the evidence I reviewed. Dr. Murray does not discuss any of the medical system policies (or lack thereof) related to discharge planning. Instead, he focuses most of his discussion on the Sheriff's Office's Reentry Services Division. But that Division is operated by custody staff and does not and could not perform any medical functions related to discharge planning. He touts the 30-day supply of medication, but does not acknowledge that there are no policies formalizing that practice. He notes that the County sometimes helps people who are receiving MAT or dialysis or have behavioral health needs. But he ignores all of the other conditions that class members have that require effective discharge planning. He does not mention the two discharge planners employed by NaphCare (who still do not have defined job duties), let alone opine regarding whether that staffing level is sufficient given the thousands of people who are discharged from the Jail each month. And his opinion regarding the adequacy of the discharge planning system at the Jail does appear to rest upon the review of any medical records; in contrast, my opinions were based upon my review of many dozens of medical files, which reflected a near-total absence of discharge planning.

192.    In addition, I have been provided with a declaration from class member James Clark that is dated September 2, 2024. In it, Mr. Clark states that on the two occasions he was released from custody at the Jail in 2024, the Jail released him without any prescription drugs or prescription card. He states that, because he was not provided with a prescription medications or a prescription card, "I was unable to

1  obtain the medications I need in the free world." Clark Declaration ¶ 3. This

2  declaration suggests that the Jail is not following its own policies regarding

3  providing individuals released from the Jail with access to prescription medications.

4  **XXII. The faux-NCCHC evaluation performed by Dr. Murray and his team is suspect, does not include adequate explanation of the ratings, and is not consistent with the evidence I reviewed.**

5

6  193.    In his report, Dr. Murray stated that his "team, experienced with the

7  NCCHC accreditation process, thought it appropriate to evaluate SDSO's

8  compliance with the current NCCHC 2018 standards for Health Services in Jails."

9  Murray Report at 31. Dr. Murray's team concluded that SDSO was "compliant with

10  93% (33[sic][12]/39) of the Essential and 100% (20/20) of the Important 2018

11  Standards." *Id.* Dr. Murray asserted that his team's findings were based on

12  "information obtained on facility inspections, medical record reviews, interviews

13  with SDSO healthcare and sworn staff, review of healthcare policy procedure,

14  institutional directives, training bulletins, and observation of health care delivery."

15  *Id.*

16  194.    As a starting point, however, Dr. Murray concedes that the Jail would

17  again fail an NCCHC survey, if it was done today, because the Jail did not meet

18  three essential standards. I agree that the Jail would fail a real NCCHC assessment

19  if it was held right now.

20  195.    In addition, there are a number of serious problems with Dr. Murray's

21  "faux" NCCHC review.

22  196.    First, though he claims his team was "experienced with the NCCHC

23  accreditation process," the CVs for his three consultants do not mention any

24  experience with the NCCHC accreditation process. Dr. Murray's CV states that he

25  was certified by the NCCHC as a "Correctional Health Professional" from 1996-

26

27  [12] Dr. Murray, in the quoted portion, indicates that the Jail met 33 of 39 Essential standards. In his actual analysis, however, he determined that the Jail complied with 36 of 39 Essential standards. Murray Report at 31-38.

28

1   2000, but he has no association with NCCHC listed since 2000.  Instead,

2   Dr. Murray's experience is with the ACA, the NCCHC's rival in the correctional

3   health care accreditation market.

4           197.   Second, Dr. Murray's review did not include a number of essential

5   components of an NCCHC accreditation survey.  He and his team did not interview

6   any incarcerated people, even though they had the opportunity to do so.  He and his

7   team did not interview the site Health Services Administrator (Angela Nix); the

8   SDSO medical director (Dr. Montgomery); the Deputy Director supervisor of the

9   Directors of Nursing (Serina Rognlien-Hood), or any of the Directors of Nursing

10  themselves.  In contrast, when NCCHC conducted its review in 2017 (and found

11  that the County was compliant with only 31% of Essential and 24% of Important

12  standards), it interviewed the staff members occupying those positions.

13  DUNSMORE0260623 (NCCHC Report at 6) ("We interviewed the jail commander,

14  command staff with the sheriff, responsible physician, director of nursing, CQI

15  nurse, infection control/training nurse, psychiatrist, psychologist, mental health

16  clinicians, dentist, medical records clerk, 11 health staff, six COs, and 11 inmates

17  selected at random.").

18          198.   Third, Dr. Murray's conclusions regarding each of the standards

19  includes no analysis.  He simply states for all but three of the essential standards that

20  the Jail complies with the standard because it meets all of the compliance indicators

21  for each of the standards.  But Dr. Murray does not list any of the compliance

22  indicators, nor his basis for concluding that the Jail met the indicators.  His

23  conclusions that the Jail complies with various standards are therefore completely

24  untethered from the actual NCCHC standards and the compliance indicators that

25  underlie them.  He and his team did not show any of their work, which makes it

26  impossible to determine the basis they had for deciding regarding compliance.

27          199.   Because Dr. Murray's faux-NCCHC review is so methodologically

28  flawed, I will not attempt to address each of his purported findings.  I can say,

1    however, that some of his findings of compliance are surprising to me given the

2    evidence I have reviewed.  Examples include:

3    **A.    J-A-02 Responsible Health Authority – *Essential* Standard: The**
        **responsible health authority (RHA) ensures that the facility**
4       **maintains a coordinated system for health care delivery.**

5        200.    Dr. Murray concluded that the Jail met this standard.  I disagree.  Since

6    the NCCHC found in 2017 that the Jail had not complied with this standard, the

7    SDSO has fragmented health care to the point that there is no longer "a coordinated

8    system for health care delivery."  Instead, the Jail now has three independent "silos."

9    1. The SDSO nurses and medical administrators, including Dr. Montgomery, and

10   Serina Rognlien-Hood.  2. NaphCare, which supplies the STATCare midlevel

11   practitioners, the mental health personnel, and the MOUD practitioners.  NaphCare

12   also has responsibility for the medical Policies and Procedures, Chronic Care

13   Guidelines, enforcement of the non-formulary process and the Utilization

14   Management process, and Mortality and Morbidity committee, among others.  3.

15   Correctional Health Partners, which supplies the on-site physicians and midlevel

16   practitioners, including the Jail medical director.  There is now even less of a

17   "coordinated system for health care delivery" than in 2017 when the Jail failed to

18   meet this standard.

19       201.    From what I can tell, all three silos at the Jail overlap.  CHP

20   practitioners and NaphCare practitioners independently make diagnoses and

21   prescribe treatments to patients.  CHP has no authority to supervise NaphCare

22   practitioners and vice-versa.  In the case of a death, Dr. Montgomery, SDSO

23   security and the SDSO Director of Nursing conduct some kind of death reviews.

24   Separately, NaphCare, by contract, runs the formal Mortality and Morbidity

25   committee.  Dr. Freedland (per Dr. Murray's report) wants CHP to do their own on-

26   site death reviews, all of which are or will be uncoordinated.  Murray Report at 40.

27   As another example of fragmentation, Dr. Murray states that Dr. Freedland is

28   developing Disease Management Guidelines, *id.* at 15, but Dr. Freedland has no

1  authority to enforce those guidelines on the NaphCare practitioners and this project

2  is not included in the scope of work for the CHP contract.

3  **B.  J-A-07 Privacy of Care – *Important***

4  202.  Dr. Murray concludes that the Jail meets this standard, which requires

5  that "[h]ealth care encounters and exchanges of information remain in private." *Id.*

6  at 32.  However, the NCCHC Report in 2017 pointed out that "The areas of privacy

7  and confidentiality of care need to be addressed."  DUNSMORE0260627.  As far as

8  I am aware, the SDSO has not changed *any* of its privacy practices since then.  As I

9  discussed in my initial report and above, much of the care in the Jail is improperly

10  provided in non-confidential settings.

11  **C.  J-A-9 Procedure in the Event of an Inmate Death – *Important***

12  203.  Dr. Murray concluded that the Jail "conducts a thorough review of all

13  deaths in custody in an effort to improve care and prevent future deaths."  Murray

14  Report at 32.  I have pointed out in my initial report that the death review process at

15  the SDSO is seriously flawed.  Keller Report ¶¶ 86-239.  My further discussion of

16  the death of Mr. Bach in this report reinforces my initial opinions; that the Jail took

17  no steps following his preventable death from diabetic ketoacidosis suggests that the

18  CQI process for death reviews at the Jail is profoundly broken.  *See* Section III.B.1,

19  *supra*; Keller Report ¶¶ 108-114.  Dr. Murray implicitly acknowledges problems

20  with the death review process by explaining that CHP will be doing on-site death

21  reviews in the future.  This change suggests that the County recognized that the

22  reviews conducted by NaphCare are not adequate.  I therefore find it not credible

23  that Dr. Murray concluded that the Jail satisfied this standard.

24  **D.  J-F-01 Patients with Chronic Disease and Other Special Needs –**
      ***Essential***

25

26  204.  Dr. Murray opined that the Jail met this standard, which requires that

27  "[p]atients with chronic disease, other significant health conditions, and disabilities

28  receive ongoing multidisciplinary care aligned with evidence-based standards."

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  Murray Report at 36.  However, the NCCHC criticized the Jail in 2017 for not

2  having chronic disease guidelines or policies and procedures for a chronic disease

3  program.  DUNSMORE0260643-0260644.  Dr. Murray admits in his report that the

4  SDSO still does not have these essential documents.  Murray Report at 15.  In my

5  initial report, I discussed serious inadequacies in how the Jail practitioners deal with

6  Asthma and Type 2 Diabetes.  Keller Report ¶¶ 526-551, 613-631.  I also identified

7  many problems with chronic care, including for asthma, diabetes, and hypertension,

8  in my review of the chronic care files, discussed above.

9       205.  The opinions contained in this rebuttal are based on the documents,

10  evidence, and/or observations made available to me to date.  I reserve the right to

11  revise or expand my opinions should additional information become available to me.

12  Together with my report disclosed on August 21, 2024, the information contained in

13  this report and the accompanying appendices are a fair and accurate representation

14  of the subject of my anticipated testimony in this case.

15

16

17  Dated:  November 1, 2024

18                                                    Jeffrey E. Keller, M.D.

19

20

21

22

23

24

25

26

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

# Appendix A

**APPENDIX A**

**Reviews of Chronic Care Medical Records**

A.    ███  ███  **– Patient 29[1] –** ███

1.    PA-C Freedman reviewed the medical record for ███  ███ and concluded that his care met the standard of care.  She wrote:

> This ██-year-old male is a complicated patient with multiple comorbidities and nonadherence to medical treatment.  The medical staff at the jail has been attentive to his glucose levels with frequent reviews of his finger-stick readings and subsequent adjustments to his treatment regimen.  This reviewer recommends that a clinician meet with the patient to determine his underlying reasons for treatment refusals.  Nevertheless, the medical staff has followed the standard of care.

Murray Report at 181-82.

2.    I disagree with PA-C Freeman's conclusion.  In my opinion, the care received by Mr. ███ did not meet the standard of care.

3.    *Type 2 Diabetes –* I am comparing the Type 2 Diabetes Treatment provided to Mr. ███ with the American Diabetes Association ("ADA") standards for detention facilities.[2]  Mr. ███ had his Receiving Screen done on ███ 2023, ███ Med. Rcd. at 4, and a second level RN evaluation by Stephanie Yee, RN, that stated "Takes Lantus, Novolog, and Januvia," *id.* at 88, 89.  RN Yee verified the exact dose of Lantus (30 units BID), Novolog (6 units with meals) and Januvia (Janumet 50mg/1000mg BID).  *Id.* at 89, 90.  These medications and dosage were reviewed the same day by STATCare NP Emily Mimms.  NP Mimms wrote "Converted Lantus to Novolin N."  *Id.* at 25.  She did this because the STATCare Intake Assessment and Orders form says in bold font: "**\*All long-acting insulins**

---

[1] The patient number refers to the numbering used in Dr. Murray's Appendix J.  *See* Murray Report at 164-223.

[2] Daniel L. Larber et al., *Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association*, 47 Diabetes Care 544 (2024) ("Diabetes in Detention").

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1   **will be substituted with Novolin N BID at an equivalent dose unless there is**

2   **documented evidence that the patient cannot or should not be transitioned[.]**"

3   *Id.* at 24.  NP Mimms, then discontinued the Lantus and instead wrote for an insulin

4   sliding scale to be used twice a day instead of the three times a day Mr. ███ had

5   been getting his Novolin before.  *Id.* at 25.  NP Mimms also discontinued (or failed

6   to authorize) the Januvia prescription, probably because it is not on the NaphCare

7   formulary.  NAPHCARE037051 at 5.

8       4.      These decisions were not consistent with the standard of care.

9   Stopping Januvia and Lantus violated the ADA standard of "[m]edications . . .

10  should be continued without interruption upon entry into the detention setting."

11  Diabetes in Detention at 545.  Using the twice a day sliding scale violated the ADA

12  standard that "[t]he sole use of sliding-scale insulin is strongly discouraged."  *Id.* at

13  549.

14      5.      Not surprisingly, since 2 of his 3 diabetic medications had been

15  discontinued, Mr. ███ had a string of very high blood sugars over the next

16  several days. ███ Med. Rcd. at 91-97.

17      6.      On ███ 2023, Mr. ███ labs were checked and his A1C

18  was 7.8.  *Id.* at 209.  Since the A1C reflects the average blood sugar over the

19  previous 3 months or so, this result reflects Mr. ███ level of control on the

20  outside but it does not reflect the care he was receiving in the jail.  Mr. ███

21  should have had another A1C in 3-6 months.  However, diabetic labs were never

22  repeated the rest of the time he was incarcerated (more than 7 months).

23      7.      On ███ 2023, NP Nicholas Kahl reviewed the outside

24  medical records from Paradise ███ Hospital, where Mr. ███ had been

25  hospitalized in ███ due to a stroke.  NP Kahl noted that Mr. ███ had been

26  discharged taking 35 units of Lantus once a day.  *Id.* at 97.  According to the

27  Medication Administration Record (MAR), a long-acting insulin Semglee

28  (equivalent to Lantus) was started on ███ 2023. ███ Med. Rcd.

1  at 1111; NAPHCARE031060, line 248309.  Mr. ███ blood sugars did not

2  improve significantly and, on ███████ 2023, NP Frederick Wycoco increased

3  the Semglee dose to 38 units once a day.  ███ Med. Rcd. at 101.  On ███████

4  2023, NP Wycoco noted that Mr. █████ diabetes was still "uncontrolled" and

5  started the oral diabetic medication glipizide.  *Id.* at 105.  According to the ADA

6  standard,[3] glipizide was not an appropriate medication.  The Diabetes Standards

7  have several recommendations for adjunctive diabetes medications, but glipizide is

8  not one of them.  *See* Diabetes Standards at S166, S167.  Instead, the Diabetes

9  Standards recommend the addition of "combination therapy with a GLP-1 RA[.]"

10  *Id.* at S1658.

11         8.      The next blood sugar evaluation was done by NP Wycoco on

12  ███████ 2023.  Mr. ███████ blood sugars had improved but he had also had

13  several hypoglycemic (low blood sugar) events.  Multiple hypoglycemic events are

14  also a sign of poor diabetic control.  NP Wycoco decreased Mr. █████ Semglee

15  dose.  ███ Med. Rcd. at 148.  On ██████ 2024, NP responded to a very high

16  blood sugar of 412 by doubling the dose of glipizide.  *Id.* at 175.  On ████ 2024,

17  NP Wycoco judged Mr. █████ diabetes "mostly controlled."  *Id.* at 187.

18  Immediately after this, Mr. █████ blood sugars were 291, 307, 377, 427, 347 etc.

19  I would not judge that to be at all well-controlled.  I would know for sure how well

20  controlled Mr. █████ diabetes was if he had had a repeat A1C done.  Mr. █████

21  reportedly refused to have repeat labs done but the Jail practitioners made little

22  effort to convince him to have these done.  For example, on ███████ 2023,

23  Mr. █████ was admitted to the MOB.  That would have been a great time to get

24

---

25  [3] American Diabetes Association Professional Practice Committee, *Pharmacologic

26  Approaches to Glycemic Treatment*: Standards of Care in Diabetes–2024, 47
   Diabetes Care S158 (2024) ("Diabetes Standards"); American Diabetes Association,

27  *Standards of Medical Care in Diabetes – 2022 Abridged for Primary Care
   Providers*, 40 Clinical Diabetes 10 (2022).  The 2024 standards do not differ

28  materially from the 2022 standards as cited in this report.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  labs, but none were ordered.

2      9.    In addition to these deficiencies, the jail medical staff also failed to

3  meet the standard of care as laid out by the American Diabetes Association in the

4  following ways.  First, the ADA requires a physical examination by a medical

5  practitioner within 2 weeks of admission.  *See* Diabetes in Detention at 545.  The

6  first examination by a medical practitioner was by James Joachim, MD on

7  ██████ 2023, six weeks after Mr. ██████ arrived at the jail.  ██████ Med. Rcd.

8  at 278.  Also, Dr. Joachim documented no foot examination or a retinal examination

9  as required by the ADA.  Diabetes in Detention at 546.  Second, Mr. ██████ was

10 never referred to an optometrist for a dilated retinal exam as required by the ADA

11 Standards.  *Id.* at 550; ██████ Med. Rcd. at 8.  Third, no communications with

12 Mr. ██████ outside medical provider is documented to facilitate discharge

13 planning.  ██████ Med. Rcd. at 11.

14     10.   *Acute care* – On ██████ 2023, Mr. ██████ was admitted to the

15 MOB following an episode where he reported dizziness, "passed out 'couple of

16 seconds[,]'" fell and injured himself, and lost continence of his bowels.  ██████

17 Med. Rcd. at 124, 125.  His vital signs were abnormal and an EKG done soon

18 thereafter was abnormal.  (There are no EKGs included in the records sent to me so

19 I could not review the accuracy of the EKG interpretation).  A STATCare

20 practitioner admitted Mr. ██████ to the MOB and ordered Gatorade "for hydration

21 BID," *id.* at 79, evidently after diagnosing Mr. ██████ with dehydration despite not

22 having examined him.  This was inappropriate care.  Mr. ██████ was an elderly man

23 with known cardiovascular disease, a previous stroke, and poorly controlled diabetes

24 who passed out and lost bowel continence.  In my opinion, he should have been sent

25 to the hospital.  As it was, no labs, imaging, or any other work up was done in the

26 MOB except for observation and the abnormal EKG.  In my opinion, this acute care

27 provided to Mr. ██████ did not meet the standard of care.

28     11.   I discussed in my report the immense problems the SDSO has with

1  patient refusals of medical care and how these negatively impact medical care and

2  harm patients.  Mr. ███ has approximately 300 refusal forms in his chart.  There

3  is no evidence of counseling in his medical record.  His refusals clearly negatively

4  impacted his medical care.

5      12.    Lastly, on ███████ 2024, RN Alexis Lagasca posted: "Unable to

6  see patient for diabetic check due to no available deputy per Deputy 4724.  Called

7  multiple times." ██████  Med. Rcd. at 169.  This is another example of security

8  staffing issues negatively impacting patient care.[4]

9  **B.    ████ ████ – Patient 33 – ██████**

10      13.    PA-C Freeman reviewed Mr. █████ medical record and concluded that

11  his care met the standard of care.  PA-C Freeman wrote:

12  The patient entered the jail with obesity and hypertension.  The NP
    identified the patient as being at risk for diabetes, and his hemoglobin
13  A1C confirmed the diagnosis.  The appropriate treatment was
    prescribed which decreased his A1C to a normal level.  These actions
14  were in line with the standard of care for diagnosing and treating type 2
    diabetes.  However, his obesity, hypertension, and diabetes put him at
15  risk for atherosclerotic cardiovascular disease (ASCVD).  The standard
    of care for primary prevention of ASCVD would be to start at least a
16  moderate-intensity statin; however, this was not done.

17  His hypertension was relatively well-controlled as a diabetic with a
    goal BP of <130/80.  While the majority of his medical management
18  met the standard of care, the patient would have benefited from
    beginning a statin.

19

20  Murray Report at 184-85.

21      14.    I disagree with PA-C Freeman's conclusion.  In my opinion, the care

22  provided to Mr. ███ did not meet the standard of care in certain respects.

23      15.    *Hypertension* – Mr. ████ received his Medical Clearance and Receiving

24  Screening on ██████ 2023.  He reported a history of asthma and hypertension.

25  ████ Med. Rcd. at 15-16.  He was hypertensive at intake and amlodipine (Norvasc)

26

27  _____
    [4] I agree with PA-C Freeman that the care that Mr. ███ received for his
28  hypertension complied with the standard of care.

1   was begun.  *Id.* at 74.  Eventually, amlodipine was increased, and later,

2   HCTZ/lisinopril was added.  *Id.* at 284.  Despite these changes in medications,

3   Mr. ▮▮▮▮ blood pressures were never fully controlled.  His blood pressures at each

4   of his chronic care visits was elevated: 153/73 on ▮▮▮▮ 2023, *id.* at 275; 159/72

5   on ▮▮▮▮▮ 2023, *id.* at 280; and 142/78 on ▮▮▮▮▮▮ 2023, *id.* at 29.  Per

6   AHA/ACC guidelines,[5] the target goal for blood pressure is <130/80.  *See, e.g.*,

7   AHA/ACC Guidelines at 1277, 1290, 1304.  Despite not being close to this goal, NP

8   Sonya Megert judged Mr. ▮▮▮▮ level of hypertensive disease control as "good."  *Id.*

9   at 292.  I disagree.  The AHA/ACC Guidelines contain strategies for the treatment

10  of persistent hypertension despite triple medication therapy.  AHA/ACC Guidelines

11  at 1298.  The hypertension treatment provided to Mr. ▮▮▮ did not meet the standard

12  of care since the Jail practitioners never prescribed the next step recommended by

13  the AHA/ACC Guidelines.

14      16.    *Type 2 Diabetes* – The Jail practitioners did well to diagnose Mr. ▮▮▮

15  with Type 2 Diabetes and appropriately treated him with metformin.  Treatment

16  efficacy was confirmed by falling A1C measurements.  However, the Jail failed to

17  follow a number of the other diabetes standards:

18          a.  "People with type 2 diabetes should be screened for diabetic

19              retinopathy by a comprehensive dilated eye examination at the time of

20              their diabetes diagnosis."  Diabetes in Detention at 550.  This was not

21              done.

22          b.  A comprehensive foot examination was not done.  Diabetes in

23              Detention at 549.

24          c.  I agree with PA Freeman that "The standard of care for primary

25

26  ---
    [5] ACC/AHA/AAPA/ABC/ACPM/AGS/APhA/ASH/ASPC/NMA/PCNA, *2017*

27  *Guideline for the Prevention, Detection, Evaluation, and Management of High*
    *Blood Pressure in Adults: Executive Summary*, Hypertension 1269 (2018)

28  ("AHA/ACC Guidelines").

prevention of ASCVD would be to start at least a moderate-intensity statin; however, this was not done."  Murray Report at 185.

17.    For these reasons, the treatment provided to Mr. ███ for his Type 2 diabetes met the Diabetes in Detention standards for glucose control but did not meet the other standards mentioned.

18.    *Torn rotator cuff* – The care the Jail provided to Mr. ███ for his torn rotator cuff also did not meet the standard of care.  Mr. ███ had an MRI that showed a tear in his rotator cuff.  ███ Med. Rcd. at 436.  Such tears are treated either with surgical repair or physical therapy.[6]  The Jail did not offer either to Mr. ███

**C.    ██████ ████ – Patient 64 – ██████**

19.    PA Pulvino reviewed Mr. ██████ medical record and concluded that the care he received met the standard of care.  PA Pulvino wrote:

> Mr. ████ was diagnosed with hypertension during intake and he gave a his ████ elevated blood pressure in the FW which he treated "naturally."  Multiple attempts in chronic care clinics, nursing visits and provider visits throughout his incarceration were made to address his elevated blood pressure.  All attempts were met with refusals.  He was seen for several acute issues including URI symptoms, swollen ankle, shoulder pain and rashes and treated appropriately.  This was a difficult patient to care for however all facility providers and nursing staff continued to encourage compliance during his incarceration without success.

Murray Report at 212.

20.    Mr. ████ did not receive appropriate therapy to treat his hypertension.  It is true, however, that Mr. ██████ refusals of care contributed to the problem.

21.    Mr. ████ arrived at the Jail on ██████ 2020 where he was cooperative with a Medical Clearance and a Receiving Screening.  He reported that he had hypertension and his blood pressure was high at 161/91.  Mr. ██████

---

[6] UpToDate, *Management of Rotator Cuff Tears*.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Health Assessment was done on ███████ 2023, 3.5 years after he arrived. I see no evidence in Mr. ███████ records that anyone ever attempted to do a Health Assessment before this.

22. Lisinopril was ordered to treat Mr. ███████ blood pressure but he refused to take it. On ███████ 2020, Gerardo Villegas RN documented Mr. ███████ as saying "I don't need medication for high blood pressure, never had. I treated with natural supplements. I don't like to take medications for anything at all. I also don't need blood test nor EKG, cause I feel well." RN Villegas wrote "Patient was counseled today the risk of non-compliance with HTN treatment, but cont to decline. He refuses all care with speech/attitude very adamant, as mentioned above." ███████ Sick Calls at 14. Mr. ███████ continued to refuse treatment for hypertension throughout his incarceration. He had several blood pressures documented; some were very high such as 193/107 measured on ███████ 2020. *Id.* at 21. There is no blood pressure chart for Mr. ███████ in the medical records available for my review. However, there are many recorded blood pressures that indicate that his blood pressure remained out of control throughout his incarceration.

23. PA Pulvino is correct that refusals were an important part of Mr. ███████ medical record. The term "refusal" appears a staggering 1,848 times in his medical record. There are hundreds of refusal forms. However, PA Pulvino's statement that "all attempts were met with refusal" is incorrect. Mr. ███████ did not always refuse medical care. He allowed labs to be drawn on ███████ 2021. He was willingly seen for chronic care on ███████ 2020, ███████ 2022, ███████ 2022, ███████ 2023, ███████ 2023, ███████ 2023 and ███████ 2024. He actually took lisinopril on a couple of occasions. ███████ MAR Rcd. at 75.

24. The Standard of Care for hypertension is to improve the patient's blood pressure until it meets the treatment goal. Mr. ███████ did not receive recommended medical therapy and his blood pressure was not controlled throughout his

1  incarceration.  The reason for this was Mr. ███████ persistent refusal of necessary

2  medical therapy.

3      25.     I wrote in my report that refusals of necessary medical care is a major

4  problem in the SDSO and that the failure of the refusal system causes patient harm.

5  Mr. ██████ case is another example.

6  **D.    ████████ ███ – Patient 46 – ████████**

7      26.     NP Jennifer Humphreys reviewed the medical record for ██████

8  ████████ and concluded that his care met the standard of care.  She wrote:

> The patient has received appropriate treatment for his type 2 diabetes,
> with both oral medication (Metformin and Glipizide), blood glucose
> monitoring, and insulin (short-acting).  He has also received
> appropriate treatment for his hypertension.  His additional medical
> complaints for skin concerns and hernia pain were addressed
> appropriately and in a timely manner.  His medical record reflects that
> the medical staff has been attentive to his medical needs.  Overall, this
> patient is receiving excellent medical care at Vista Detention Facility.

Murray Report at 194.

15     27.     I disagree with NP Humphreys's conclusion.  In my opinion, the care

16  received by Mr. ████████ for his diabetes, hypertension, and hernia did not meet

17  the standard of care.

18     28.     *Type 2 Diabetes* – As mentioned above, the standard of care I am

19  applying is Diabetes in Detention.

20     29.     At his receiving screening, Mr. ████████ reported a history of Type 2

21  diabetes.  His initial blood glucose was so high (358) that Mr. ████████ was sent

22  to the Emergency Department.  ████████ Med. Forms[7] at 54.  Upon return, his

23  blood sugar was still very high at 325 (p. 51).  Based on this, the remote STATCare

24  PA ordered an Insulin Sliding scale.  (51) As I mentioned in my report, this violates

25  the ADA standard of care, which states that "[t]he sole use of sliding scale insulin is

---

[7] Defendants produced two medical records for Mr. ████████ one with his sick
c████████d one with his other medical reco████████ sick call slip file as
"████████ Sick Call" and the other file as "████████ Med. Forms."

1  strongly discouraged." Diabetes in Detention at 549. Instead, "[s]election of
2  medications for treatment of people with type 2 diabetes should be in accordance
3  with the current ADA Standards of Care." *Id.* at 548. The 2024 Abridged ADA
4  Standards of Care for Primary Care Professionals also state that "[t]reatment with a
5  glucagon-like peptide 1 (GLP-1) receptor agonist or a dual glucose-dependent
6  insulinotropic polypeptide (GIP)/ GLP-1 receptor agonist is preferred before insulin
7  therapy[.]"[8] However, none of these agents are available on the NaphCare
8  formulary. If insulin is going to be used for a patient such as Mr. ██████ it
9  should start with the use of a long-acting insulin. If this fails to achieve treatment
10 goals, short acting insulin can be added three times a day with meals. However,
11 NaphCare specifically forbids the use of long-acting insulins by their STATCare
12 midlevel practitioners with this statement printed in bold in the STATCare Intake
13 Assessment and Order form: "**\*All long-acting insulins will be substituted with
14 Novolin N BID at an equivalent dose unless there is documented evidence that
15 the patient cannot or should not be transitioned[.]**" ██████ Med. Forms
16 at 52.

17     30.   After the initial failure to prescribe appropriate treatment for
18 Mr. ██████ the Jail continued to mismanage and fail to properly evaluate his
19 diabetes. The sliding-scale insulin and the other medications prescribed for him
20 (metformin and glipizide) did not control his diabetes. On ██████ 2022,
21 Mr. ██████ Hemoglobin A1C was measured as 8.4 % (normal < 5.7).
22 ██████ Sick Calls at 61. On ██████ 2022, Mr. ██████ had a chronic
23 care visit with Stacy Thompson NP, who pronounced his level of diabetes control as
24 "good." ██████ Med. Forms at 153. An A1C reading of 8.4% is *not* good

25

26 ───────────────
[8] American Diabetes Association Primary Care Advisory Group, *Section 9:
27 Pharmacologic Approaches to Glycemic Treatment: Standards of Care in
Diabetes—2024 Abridged for Primary Care Professionals*, 42 Clin. Diabetes 206
28 (2024) ("Abridged Diabetes Standards").

control of type 2 diabetes.  Good control is usually defined as an A1C of <7.0.

31.    Although Mr. ███████ remained incarcerated at the Jail for the next year and a half, there are no other follow up labs or chronic care visits in the records I reviewed.  These should have been done at least twice in that period.  This lapse violates NaphCare's own guideline printed in their Chronic Care form requiring a repeat A1C "every 3 months if HgbA1c > 8.0." ███████ Med. Forms at 154.

32.    FNP Humphries states that Mr. ███████ refused labs on ███████ 2024, but I cannot find record of this in the records provided to me.

33.    Finally, Mr. ███████ was never referred for a dilated eye exam to check for retinopathy, as required by the ADA standards.

34.    Based on these failures, it is my opinion that the care provided for Mr. ███████ Type 2 Diabetes did not meet the standard of care.

35.    *Hypertension* – Mr. ███████ high blood pressures were never well controlled during his incarceration at the jail.  There is no blood pressure log in the records sent for my review, but he was repeatedly noted to have excessively high blood pressures.  Examples include:

- 181/62 on ███████ 2022, ███████ Sick Calls at 56
- Systolic blood pressure of 182 on ███████ 2023, *id.* at 17
- 200/90 on ███████ 2023, *id.* at 15

36.    STATCare practitioners ordered clonidine 0.1mg BID for five days on two occasions: ███████ 2022, ███████ MAR Rcd. 133, and ███████ 2023, *id.* at 55.  As I have pointed out in my initial report, the use of clonidine is discouraged by the AHA/ACC Guidelines.  Keller Report ¶ 235 (citing Robert M. Carey, *Guideline-Driven Management of Hypertension: An Evidence-Based Update*, American Heart Ass'n (2022), at 44 ("AHA Guidelines Update")).  Also, by using an *inappropriate* therapy for blood pressure control, the practitioners failed to use the *appropriate* therapies as recommended in the American Heart Association.  The "First Line " medications for hypertension are calcium channel blockers, thiazide

1  diuretics and ACE inhibitors/ARBs instead of short-term clonidine (which the

2  American Heart Association calls a "last-line" agent, the Jail practitioners should

3  have started one or even two of the first-line medications).  AHA Guidelines Update

4  at 44.  Based on these failures, it is my opinion that the care provided for

5  Mr. ███████ hypertension did not meet the standard of care.

6         37.    *Hernia* – On ██████ 2023, Mr. ██████ complained of a

7  baseball-sized right inguinal hernia that caused "pain with exertion." ███████

8  Sick Calls at 10.  A remote STATCare practitioner ordered a truss without doing

9  any examination of the hernia.  *Id.* at 10.  An NP saw Mr. ██████ on ████████

10  2023, but also did not examine the hernia.  *Id.* at 9.

11         38.    As I wrote in my report, the standard of care treatment for an inguinal

12  hernia is 1.  To do a physical examination of the patient's hernia, and 2. Obtain a

13  surgical consultation to consider surgery to repair the hernia.  The use of a truss is

14  discouraged because there is no evidence that trusses are effective in the long term

15  and because they can damage the hernia sac.  Accordingly, it is my opinion that the

16  care provided for Mr. ██████ hernia did not meet the standard of care.

17         **E.    ██████ ██████ – Patient 9 – ██████**

18         39.    Dr. Boone reviewed Mr. ██████ medical record.  Dr. Boone

19  noted that Mr. ██████ had hypertension, a seizure disorder, chronic back pain

20  and radiculopathy, chronic knee pain, and a mood disorder.  Murray Report at 168-

21  169.  Dr. Boone opined that the care that the Jail provided to Mr. ██████ over a

22  20-months period (██ 2022-██ 2024) met the standard of care.  *Id.* at 169.

23         40.    Having reviewed Mr. ██████ medical records, I strongly disagree

24  for a number of reasons.

25         41.    First, the Jail made numerous mistakes in treating Mr. ██████

26  hypertension.  The care that Mr. ██████ received deviated substantially from

27

28

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

the JNC-8 Hypertension Guidelines[9] (which are nearly ten years old and which Dr. Boone applied to determine whether the Jail met the standard of care), as well as more recent guidelines, such as the AHA Guidelines Update.

1. On ███ 2022, Mr. ███████ had a markedly elevated blood pressure of 181/112 and he was symptomatic with the complaint of dizziness. Nurses appropriately referred Mr. ███████ to be seen by a practitioner. NP Nicholas Kahl went to see Mr. ███████ for this complaint in his cell rather than in the medical clinic. NP Kahl did not recheck a blood pressure and did no physical examination at this visit. NP Kahl noted that Mr. ███████ had already been prescribed the hypertension drug hydrochlorothiazide (HCTZ on ███ 2022) but did not prescribe anything further. SD_760686. JNC-8 and AHA Guidelines Update, however, both recommend that patients with very high blood pressures be treated with two drugs, such as HCTZ *plus* another agent. JNC-8 Guidelines at 1-2; AHA Guidelines Update at 45.

2. On ███ 2022, STATCare NP Justin Oden was notified about a diastolic blood pressure of 112 (the systolic blood pressure is not recorded). SD_760985; SD_760986. NP Oden diagnosed "uncontrolled hypertension" and prescribed "clonidine 0.1mg BID prn x 5 days." But, as I discussed in my report, the use of clonidine is heavily discouraged by the AHA/ACC Guidelines because it is a poor blood pressure agent and can cause rebound hypertension. Keller Report ¶ 235; AHA/ACC Guidelines at 1289. JNC-8 and the AHA/ACC Guidelines both recommend that rather than prescribing clonidine, providers should increase the dosage of the medications a patient is already taking or add another agent. JNC-8 Guidelines at 1-2; AHA/ACC Guidelines at 1289. As I noted previously, JNC-8 and AHA guidelines both

---

[9] Carrie Armstrong, *JNC 8 Guidelines for the Management of Hypertension in Adults*, 90 American Family Physician (2014) ("JNC-8 Guidelines").

recommend that patients with very high blood pressures be treated with two drugs, such as HCTZ *plus* another agent.  NP Oden, then, made two mistakes: (a) He prescribed five days-worth of clonidine, which he should not have done; and (b) he did not do the right thing, which would have been to increase the dose of the antihypertensives Mr. ███████ was already taking, or add another agent, as per guideline recommendations.

3.  After these two encounters during which providers failed to follow the relevant guidelines, Mr. ███████ blood pressures remained high. SD_760757.

4.  On ███████ 2022, NP Comejo started Mr. ███████ on a second blood pressure medication, amlodipine.  NP Comejo appropriately noted that the goal for Mr. ███████ was to reduce his blood pressure to less than 130/80, which is the BP goal recommended by the AHA/ACC Guidelines. SD_760989.

5.  On ███████ 2022, NP Comejo stopped Mr. ███████ HCTZ because she thought it was causing Mr. ███████ to have dry eyes.  SD_760990.  NP Comejo did not check a blood pressure at that visit.  However, she knew that his blood pressure was not controlled.  SD_760989.  JNC-8 and the AHA Guidelines Update recommend substituting a blood pressure agent from a different class if one is going to stop HCTZ so that the patient with uncontrolled blood pressure remains on dual therapy.  JNC-8 Guidelines at 2; AHA Guidelines Update at 44.  NP Comejo did not do this, and instead simply discontinued the HCTZ.  The next day, on ███████ 2022, Mr. ███████ complained "requesting to know why his BP meds have been DC (discontinued)."  SD_760738.  The BP log confirms that after the discontinuation of the HCTZ, his BP increased to 153/107 (very high) on ███████ 2022.  SD_760757.

6.  On ███████ 2022, Mr. ███████ was seen by NP Kahl for a generalized

Chronic Care visit, which included hypertension.  NP Kahl, did not obtain a

blood pressure measurement for this visit.  SD_761522.  Nevertheless, NP

Kahl stated that his blood pressure was "well controlled," SD_761523,

despite the fact that a review of Mr. ███████ blood pressure log shows

that it was not well controlled.  SD_760757.

| 8/10/2022 4:44:14 AM | 158 / 99 | 97.5 | 91 | 18 | 0ft 0in | NAlb | 97 | 5 | NA | 0 |
| 8/18/2022 1:28:47 PM | 169 / 95 | 0 | 99 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 119.67 |
| 8/19/2022 10:08:05 PM | 134 / 85 | NA | 86 | 18 | 0ft 0in | NAlb | NA | NA | NA | 0 |
| 8/19/2022 10:08:05 PM | 134 / 85 | NA | 86 | 18 | 0ft 0in | NAlb | NA | NA | NA | 0 |

The next time Mr. ███████ Blood pressure was checked after this

appointment, on ███████ 2022, it was very high at 160/104.

7. On ███████ 2022, Mr. ███████ was seen by Jeffrey Kile, MD, for a

generalized Chronic Care visit.  Dr. Kile measured Mr. ███████ blood

pressure as 139/76 (goal <130/80) and concluded that control of

Mr. ███████ blood pressure was "good."  SD_761709.  This conclusion

ignores that the blood pressure at this very visit was over the goal of 130/80.

Also, the previous two blood pressures reported on Mr. ███████ blood

pressure log, including one reading just two weeks prior, were very high.

SD_760758.

| ██2022 1:52:31 PM | 163 / 88 | 0 | 86 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 113 |
| ██2022 1:51:18 PM | 166 / 107 | 0 | 0 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 126.67 |

8. On ███████ 2023, Mr. ███████ was seen by Katrina John, MD.  His blood

pressure on that day was 159/88.  Despite this blood pressure reading being

very high, Dr. John described his blood pressure control as "fair" and made

no changes in his treatment regimen.  SD_762246.

9. On ███████ 2023, Mr. ███████ had a generalized Chronic Care visit

with ███ Molina, MD. Health care staff did not obtain a blood pressure

reading for this visit.  Nonetheless, Dr. Molina described Mr. ███████

blood pressure control as "good."  SD_762448.  Dr. Molina's conclusion is

not consistent with the blood pressure readings taken just prior to this

appointment, which showed Mr. ████████ still had very high blood

pressure:

| 2023 3:02:59 PM | 144 / 79 | 0 | 78 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 100.67 |
| 2023 3:18:56 PM | 158 / 86 | 0 | 0 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 110 |
| 2023 1:38:58 PM | 151 / 97 | 0 | 0 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 115 |

SD_760762.

10. The chart provided to me by Plaintiffs' counsel does not contain a blood

pressure log.  However, Mr. ████████ blood pressure is recorded as being

very high at 163/103 on ████████ 2024, ████████ Med. Rcd. at 8, and

167/95 on ████████ 2024, *id.* at 9.  Mr. ████████ blood pressures were

clearly still not well controlled.

11.  In my opinion, the care that Mr. ████████ received for his hypertension

did not meet the standard of care.  Providers did not follow the JNC-8 and

AHA/ACC Guidelines and never got Mr. ████████ hypertension under

control.  Interestingly, in his analysis, Dr. Boone never says that

Mr. ████████ blood pressure was controlled.

42.    In addition to the inadequate treatment of Mr. ████████

hypertension, Mr. ████████ medical record reflects numerous other systemic

problems in the Jail health care system that I discussed in my report.  Examples

include:

1.  Mr. ████████ requests for medical care seldom resulted in face-to-face

visits within 24 hours.

| complaint | location | Date submitted | Date completed | difference |
|---|---|---|---|---|
| Legs cramp and go numb | **SD 760755** | ██/24 | ██ 24 | 11 days |
| Sleepless nights and chronic pain | **SD 760753** | ██ 23 | ██ 23 | 57 days |
| Requesting ingrown toenails be clipped | **SD 760753** | ██ 23 | ██ 23 | 69 days |

[4598679.1]

16

Case No. 3:20-cv-00406-AJB-DDL

| Unable to reach toes due to back disorder | | | | |
|---|---|---|---|---|
| Chronic pain needs are not being met | **SD 760753** | ███ 23 | ███ 23 | 12 days |
| Chronic itch in genitals | **SD 760743** | ███ 22 | ███ 23 | 57 days |
| Fell off top bunk and hit head | **SD 760748** | ███ /23 | ███ 23 | 50 days |
| Swelling and numbness in legs | **SD 760741** | ███ 22 | ███ 22 | 19 days |

2. Medical practitioners neglected vital signs and did not do appropriate physical examinations when seeing Mr. ███████  For example, NP Borrajero saw Mr. ██████ on ██████ 2022 for a complaint of abdominal pain. NP Borrajero did not obtain any vital signs and did not examine Mr. ███████ abdomen. SD_760681.

3. Practitioners frequently evaluated Mr. ████████ at his cell instead of at the medical clinic. *See* SD_761010; SD_760984.

4. RNs practiced above their scope of practice by doing evaluations for chest pain—which included ordering and interpreting EKGs—and evaluations for abdominal pain without involving medical practitioners. *See* SD_760876; SD_760902.

5. Nurses did not witness Mr. ████████ medication and treatment refusals. There are 703 Medication Refusal forms in Mr. ████████ chart. Almost all of these are signed by two security officers who also assert that Mr. ████████ refused to sign the refusal form. Few were witnessed by a nurse. On at least one occasion, Mr. ████████ denied having refused proffered care. SD_760982.

6. Mr. ████████ never had a Health Assessment. Mr. ████████ was incarcerated from ██████ 2022 into ██████ 2024. The Jail should have conducted at least two Health Assessments for Mr. ███████ one within

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

14 days of ███████ 2022 and one after he had been incarcerated for one year. I was unable to find either Health Assessment in the medical record.

**F.     ███████ ███████ – Patient 10 – ███████**

43.     Dr. Boone reviewed the medical record for Ms. ███████ and concluded that the care the Jail provided to him for her many conditions—hypertension, chronic headaches, hypothyroidism, polytrauma and multiple musculoskeletal injuries, chronic back pain, mood disorder, anxiety, stimulant disorder, and PTSD— met the standard of care. Murray Report at 169.

44.     I disagree with Dr. Boone's conclusions. In my opinion, the treatment that Ms. ███████ received for hypertension and for hypothyroidism (which, as I discuss below, she likely did not have) did not meet the standard of care.

45.     *Hypertension* - I am comparing the treatment provided to Ms. ███████ to the AHA/ACC Guidelines. The treatment goal is a blood pressure less than 130/80. I am attaching as a reference an easy-to-use hypertension treatment chart published by the AHA ("AHA Treatment Algorithm").[10]

---

[10]



**PHARMACOLOGICAL TREATMENT OF HYPERTENSION**

Agree (patient and clinician) on BP goal

First-line therapeutic classes
• CCB* and/or
• ACEI or ARB and/or
• Thiazide-like** or thiazide diuretic

Monthly visits until BP goal achieved
• Measure (minimum 2 readings in am & pm 3 d/week), record and report home BP readings at each office visit.
• Use fixed-dose drug combinations and 90-day prescription refills if possible
• If BP not at goal, assess for social barriers and non-adherence to treatment.
• Dose-titrate and/or add another first-line agent from a different class if needed to achieve goal.

Second-line therapeutic classes
• β-blocker (first-line only in IHD and HF)
• MRA (preferred in low renin states and resistant HT)
• α₁-antagonist
• Direct vasodilator (use with diuretic and β-blocker)
• K⁺-sparing diuretic (minimally effective in BP reduction)
• Loop diuretic (preferred in CKD with GFR < 30, in symptomatic HF and when using potent direct vasodilator minoxidil)
• Central α₂-agonist (last-line due to CNS effects and potential for hypertensive crisis on withdrawal)

Whelton PK et. al. *Hypertension* 2018;71:e13-e115

46.     Ms. ▇▇▇ blood pressure was very high at 172/94 on her Medical Clearance done on ▇▇▇ 2023. ▇▇▇ Med. Rcd. at 76.  She reported that she had hypertension on her Receiving Screening.  *Id.* at 80.  Despite this, STATCare PA Nhi Ngoc Dai ordered no treatment for hypertension when he did the STATCare Intake Assessment and Orders.  *Id.* at 98, 99.  This lack of treatment did not meet the standard of care.  Per AHA/ACC Guidelines, Ms. ▇▇▇ should have been started on hypertension therapy.  With a blood pressure as high as 172/94 and a history of hypertension, dual therapy should have been started.

47.     On ▇▇▇ 2023, Ms. ▇▇▇ complained of chest pain and had a blood pressure of 194/118.  *Id.* at 431.  She was seen in the medical clinic by NP Lacey Beaston.  NP Beaston appropriately referred her to the ER by ambulance.  *Id.* at 432.  Ms. ▇▇▇ blood pressure at the ER was initially 182/101.  *Id.* at 197. She was treated there with multiple doses of clonidine and she was discharged with the diagnoses of Hypertensive Urgency and Nonspecific Chest pain.  She was discharged with a prescription for the blood pressure medication lisinopril.  *Id.* at 199.

48.     Ms. ▇▇▇ was seen the next day, ▇▇▇ 2023 by NP Beaston, who ordered lisinopril 10mg a day.  *Id.* at 434.  On ▇▇▇ 2023, Ms. ▇▇▇ was noted to have a diastolic blood pressure of 105 and was seen by NP Lacey Beaston.  NP Beaston doubled the dose of lisinopril to 20mg a day.  *Id.* at 435, 436. Three hours later, Ms. ▇▇▇ blood pressure was still high, 151/103, and NP Hurley ordered a dose of clonidine and "clonidine 0.1 mg prn with parameter."  *Id.* at 437.  This care also did not meet the standard of care.  According to the ACA/ACC Guidelines, clonidine is an inappropriate agent to be prescribed. Clonidine is a "last line" agent.  AHA/ACC Guidelines at 1289; *see also* AHA Treatment Algorithm.  An appropriate escalation of therapy would have been to add a second first-line hypertensive agent, such as hydrochlorothiazide (HCTZ), to the lisinopril prescription.

49.    On ████████ 2023, a psychiatric NP prescribed prazosin as a psychiatric medication for Ms. ████████ Med. Rcd. at 504.  Prazosin is also an hypertension therapy, but is a "second-line" line agent.  On ████████ 2023, In response to continued very high blood pressures, NP Hurley increased the lisinopril dose to 30mg a day.  *Id.* at 445.

50.    On ████████ 2023, Ms. ████████ had a hypertension chronic care visit with Hurley.  NP Hurley increased the dose of lisinopril to 40mg a day and judged the degree of blood pressure control as "good."  *Id.* at 400, 402.  There is no vital sign log in the record from that visit, but Ms. ████████ herself kept a record of her blood pressures that does not show anywhere close to good control.  *Id.* at 231.



51.    On ████████ 2023, in response to ongoing very high blood

pressures, *id.* at 231-232, STATCare NP Jorge-Menjivar doubled the dose of clonidine being given and added the blood pressure medication hydralazine to be given twice a day. *Id.* at 446, 448. According to the AHA/ACC Guidelines, hydralazine is a "second line" agent that causes tachycardia and water retention. It should always be prescribed along with a Beta-blocker and a diuretic pill. NP Jorge-Menjivar prescribed neither. AHA Treatment Algorithm. NP Jorge-Menjivar failed to notice (or failed to document) that he knew Ms. ███ was also taking the anti-hypertensive agent prazosin that had been prescribed by psychiatry. ███ Med. Rcd. at 446.

52. On ███████ 2023, Ms. █████ reported that she had been having hand tremors sever since she started taking hydralazine. NP Hurley stopped the hydralazine and appropriately ordered HCTZ instead. *Id.* at 450, 451.

53. On ███████ 2023, psychiatry doubled the dose of prazosin Ms. █████ was taking. *Id.* at 538. On ██████ 2023, psychiatry discontinued prazosin. *Id.* at 562.

54. On ██████ 2024, Ms. █████ was seen by Connie Orem MD in an MD clinic for the complaint of a dry cough. No blood pressure was measured. Dr. Orem acknowledged the possibility that the cough could be caused by lisinopril—a dry cough is a common side effect of lisinopril. Dr. Orem did not change Ms. █████ prescription to an equivalent medication without that side effect. *Id.* at 488.

55. There is no blood pressure log in the records provided to me. Some of the subsequent blood pressures recorded in the notes were normal and some were high, such as a blood pressure of 167/90 on ██████ 2024, *id.* at 492, and 142/85 on ██████ 2024, *id.* at 494, that indicate to me that her blood pressure control was not ideal.

56. On █████ 2024, Ms. █████ had a hypertension chronic care visit. No blood pressure was taken. NP Hurley judged the level of blood pressure control

1   to be "good." *Id.* at 417, 421.  In my opinion, it is not consistent with the standard
2   of care to not take a blood pressure reading for a medical visit intended to address
3   hypertension.

4        57.     Ultimately, Ms. ███████ blood pressures came under reasonable
5   control (with exceptions noted above).  However, her treatment did not meet the
6   standard of care because, as noted above:

7   - No medications were prescribed at booking despite a report of
8     hypertension and a very high blood pressure.

9   - Jail practitioners used "second-line" and "last-line" agents, such as
10    clonidine and hydralazine rather than recommended "first-line therapeutic
11    classes."  Ms. ██████ did not see significant improvement in her blood
12    pressures until the first line medication HCTZ was added to lisinopril.

13  - The STATCare practitioner failed to prescribe the required ancillary
14    medications of a beta-blocker and a diuretic when prescribing hydralazine.

15       58.     *Hypothyroidism* – Dr. Boone stated in his write up for Ms. ██████ that
16  "[s]he was continued on levothyroxine for hypothyroidism."  Murray Report at 169.
17  This is not true.  Ms. ██████ did not report hypothyroidism at her Receiving
18  Screening, ██████ Med. Rcd. at 80, 81, nor did the STATCare Intake Assessment
19  and Orders mention hypothyroidism or levothyroxine, *id.* at 99.  The first time
20  hypothyroidism was mentioned in the chart is on ████████ 2023, nearly a
21  month after she was booked into the Jail, when Ms. ██████ was seen by NP
22  Beaston, who wrote "Patient is also requesting to have labs to test her thyroid and
23  states she was on levothyroxine prior to coming to jail." *Id.* at 439.  The Surescripts
24  report for Ms. ██████ did not, however, include any active prescription for
25  levothyroxine. *Id.* at 504.  Nevertheless, instead of waiting for the results of the
26  thyroid screening tests, NP Beaston ordered levothyroxine 75mg a day. *Id.* at 440.
27  Crucially, when the Thyroid Stimulating Hormone (TSH) was drawn 36 hours later,
28

1  on ███████ 2023, it showed that Ms. █████ did not have hypothyroidism.[11]

2  *Id.* at 630.  The next time Ms. █████ had labs drawn was █████ 2024 and no

3  TSH was measured.  *Id.* at 642.  Ms. █████ continued to take levothyroxine for the

4  entirety of her incarceration.

5      59.    This care fell below the standard of care because it appears that

6  Ms. █████ was treated with medication for hypothyroidism for many months when

7  she did not, in fact, have hypothyroidism.  Since the Surescripts report did not show

8  any active levothyroxine prescription for Ms. █████ NP Beaston should have

9  waited for the labs to return before ordering the drug.  And when Ms. █████ TSH

10 was found to be normal two days later, NP Beaston should have known and then

11 communicated to Ms. █████ that she did not have hypothyroidism.  NP Beaston

12 also should have discontinued the prescription.  This inaccurate diagnosis gave the

13 Ms. █████ erroneous belief that she has hypothyroidism with all of the unnecessary

14 concern and anxiety that any chronic medical diagnosis generates. Also, the

15 unnecessary treatment placed Ms. █████ at risk of experiencing the drug's side

16 effects, which include suppressing the function of her own thyroid gland, weight

17 gain, headaches, leg cramps, change in menstrual cycle, hair loss and others.

18     **G.    ████ ██████ – Patient 12 – ███████**

19     60.    Dr. Boone reviewed the medical record for Mr. ████ and concluded that

20 the care provided met the standard of care.  Dr. Boone found that the Jail provided

21 appropriate treatment for, among other things, Mr. ████ hypertension, Gastro-

22 esophageal Reflux Disease ("GERD"), abnormal lipids, and mental health issues.

23 Murray Report at 170.

24     61.    I agree that the care provided for Mr. ████ hypertension and hernia

25

26 ───────────────────────

[11] When the TSH was drawn, Ms. █████ had already received two doses of

27 levothyroxine.  However, it usuall███████ several weeks for levothyroxine to
stabilize an abnormal TSH.  One and ½ days and two doses of levothyroxine would

28 not be enough to change an abnormal TSH test to normal.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  met the standard of care.  In my opinion, however, the treatment provided to him for

2  GERD and asthma did not meet the standard of care.

3      62.   *GERD* – The Jail failed to provide appropriate and timely treatment for

4  Mr. ███ GERD, causing him unnecessary pain and suffering.  Surescripts verified

5  that Mr. ███ was prescribed dexlansoprazole (Dexilant) for GERD.  ███ Med.

6  Rcd. at 208.  However, dexlansoprazole is not on the NaphCare formulary, so the

7  STATCare practitioner who reviewed Mr. ███ current meds in Surescripts

8  discontinued dexlansoprazole and substituted omeprazole.  *Id.* at 1161.  Almost

9  immediately, Mr. ███ began to complain of GERD symptoms on ███ 2023,

10 ███ 2023, ███ 2023.  *Id.* at 841.  In response, Mr. ███ was given Tums

11 antacids to use in addition to omeprazole.  *Id.* at 115.

12     63.   On ███ 2023, Mr. ███ requested doubling the dose of omeprazole.

13 *Id.* at 841.  This request was denied.  On ███ 2023, Mr. ███ complained that

14 GERD symptoms were making it hard for him to sleep.  *Id.* at 841.  Mr. ███

15 continued to complain of unrelenting GERD symptoms.  On ███ 2023, he

16 requested Dexilant.  *Id.* at 843.  This request was denied by Dr. Rafi.  *Id.* at 857.

17     64.   On ███ 2023, he requested to see a physician about GERD

18 instead of an NP.  *Id.*  On ███ 2023, NP Christine Sullivan discontinued

19 omeprazole and ordered pantoprazole and famotidine.  For the first time, records

20 from Mr. ███ outside GI specialist, Dr. Mathew Viernes, were requested on

21 ███ 2023.  *Id.* at 844.  On the same day, NP Stacy Thompson wrote a

22 short note about reviewing these records that stated that Mr. ███ last endoscopy

23 was in 2020 and showed inflammation of the esophagus.  *Id.* at 859.

24     65.   On ███ 2023, Mr. ███ wrote: "NEED MD

25 APPOINTMENT-PLEASE CONFIRM WHEN AVAILABLE."  He reported that

26 his GERD pain was 10/10.  *Id.* at 844.  On ███ 2023, a nurse asked

27 STATCare for permission for Mr. ███ to see a physician.  *Id.* at 844.  On

28 ███ 2023, STATCare stated they had reviewed old medical records (no

1   summary) and gave permission for Mr. ████ to see a physician "regarding severe

2   GERD s/s." *Id.* at 845.

3       66.    On ████████ 2023, Mr. ████ asked for two mattresses so he could

4   elevate his head at night to alleviate his GERD symptoms.  This was denied.  *Id.*

5   at 868.  On ████████ 2023, Mr. ████ asked when he would get to see a physician.

6   *Id.* at 846.  On ████████ 2023, STATCare discontinued pantoprazole and

7   restarted omeprazole.  *Id.* at 863.  On ████████ Milk of Magnesia was added to

8   Mr. ████'s GERD treatments.  *Id.* at 864.

9       67.    On ████████ 2023, NP Nicholas Kahl reviewed Mr. ████ outside

10  medical records, which confirmed a diagnosis chronic esophagitis, GERD, and

11  Barrett's esophagus. NP Kahl placed a referral for Mr. ████ to see a GI specialist.

12  *Id.* at 864.  Mr. ████ continued to complain of ongoing GERD pain.  On

13  ████████ 2023, Mr. ████ requested an extra blanket to elevate his head.  This

14  was approved.  *Id.* at 870.  On ████████ 2023, a note stated "worsening

15  abdominal pain due to GERD claimed current treatment regimen are ineffective.  IP

16  is requesting to have extra mattress and demanding to see the doctor right away.  IP

17  was threatening, stating he will go mandown." *Id.* at 870.

18      68.    On ████████ 2023, NP Frederick Wycoco switched from

19  omeprazole back to pantoprazole. *Id.* at 871.

20      69.    On ████████ 2023, Dr. Molina approved a second mattress and

21  finally ordered dexlansoprazole. ████ Med. Rcd. at 873.  On ████████ 2024,

22  nearly a month later, STATCare NP Sophia Barnes wrote that dexlansoprazole had

23  not yet arrived.  *Id.* at 877.  It was first given on ████████ 2024, more than three

24  months after it was ordered. ████ MAR Rcd. at 27)  On ████████ Mr. ████ saw

25  Dr. Molina about increasing GERD symptoms at night that Mr. ████ felt were

26  causing asthma attacks.  Dr. Molina wrote to "expedite f/u with gastroenterology."

27  ████ Med. Rcd. at 890.  Mr. ████ had still not seen a gastroenterologist as of

28  ████████ 2024, the date the medical records produced to me ended.

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

70.    In my opinion, the care provided to Mr. ▆ for gastro-esophageal disease did not meet the standard of care.

- His outside prescription for dexlansoprazole was discontinued inappropriately at booking.

- Multiple medication trials failed before Mr. ▆ was re-prescribed dexlansoprazole seven months later.  Mr. ▆ improved on dexlansoprazole, which he should have been on the entire time.

- Outside medical records were not requested for three months.  No one ever called Mr. ▆ outside GI specialist to coordinate care.

- A request for Mr. ▆ to see a GI specialist was made on ▆▆▆ 2023.  Mr. ▆ had still not seen a GI specialist as of ▆▆ 2024.

71.    *Asthma* – Dr. Boone did not opine on the care provided to Mr. ▆ for his asthma.  In my opinion, that care did not meet the standard of care.  At intake, staff did not take a peak flow measurement.  Then, even though staff confirmed through Surescripts that Mr. ▆ was prescribed a rescue inhaler in the community, the STATCare practitioner who did the Intake Assessment and Orders did not allow Mr. ▆ to have a KOP ("keep on person") rescue inhaler.  Instead, the practitioner authorized the nurses to give albuterol nebulizer treatments when requested.  Mr. ▆ asked for these treatments three times in the next four weeks and several times in ▆ 2023.  To discontinue an active KOP rescue inhaler prescription without an examination of the patient by a medical practitioner violated the standard of care.  Asthma attacks can be sudden and severe enough that patients do not have the opportunity to alert nurses to their distress.  Patients must have the ability to treat themselves in an emergency.

72.    Then, on ▆▆▆ 2023, Mr. ▆ wrote a medical request "[n]eed inhaler to clear lungs." *Id.* at 861.  He was scheduled to see a practitioner.  However, Nicolaus Rosete NP declined to see Mr. ▆ for this request because Mr. ▆ had seen Dr. Rafi the day before for a different medical problem. *Id.*

1  at 861.  This makes no sense to me, since Dr. Rafi's note says nothing about asthma.

2  Nevertheless, Mr. ███ request for a rescue inhaler was ignored.

3      73.  On ███ 2024, Mr. ███ had an asthma attack.  RN Kathy Jordan

4  noted wheezing and gave Mr. ███ an albuterol nebulizer treatment.  She also did

5  three peak flow measurements which were markedly abnormal.  *Id.* at 199.  Two

6  days later, on ███ 2024, Mr. ███ was seen by Dr. ███ Molina for an

7  asthma chronic care appointment.  Dr. Molina measured no peak flows.  Dr. Molina

8  finally prescribed a KOP rescue inhaler.  *Id.* at 834, 838.  This was appropriate, but

9  should have been provided when Mr. ███ was booked.  However, per the asthma

10  treatment guidelines I discussed in my report, Dr. Molina should have also

11  prescribed an inhaled steroid.  On ███ 2024, Mr. ███ stated that the rescue

12  inhaler was not helping enough; he was using his inhaler up to ten times a night.  *Id.*

13  at 851.  In the records that I reviewed, which end on ███ 2024, there was no

14  response to this request.

15      74.  It is my opinion that, for the reasons set forth above, the care provided

16  for Mr. ███ asthma did not meet the standard of care.

17      **H.**  ███ ███ **– Patient 71 –** ███

18      75.  John Pulvino, PA, reviewed Mr. ███ medical file for

19  Dr. Murray.  PA Pulvino concluded that Mr. ███ care met the standard of

20  care.  He wrote:

21  On ███ 23, Mr. ███ was received at the county jail.  A provider
   inta███ sessmen ███ mpleted the same day and he was identified as

22  having chronic hypertension.  He was started ███ asc and scheduled
   for BP checks and a provider follow up.  Mr. ███ was followed in

23  chronic care clinic as well as frequent provide ███ or BP checks, lab
   evaluations, and acute complaints.  There was routine attention to his

24  hypertension treatment including medication changes and adjustments.
   Acute complaints were addressed appropriately and very timely.

25

26  Murray Report at 216.

27      76.  I disagree with PA Pulvino's conclusion.  Based on my review, the care

28  provided to Mr. ███ did not meet the standard of care.

1. PA Pulvino does not define what medical standard of care he is using to compare Mr. ██████'s treatment to. I am using the AHA/ACC Guidelines.

2. As a starting point, the SDSO should have Chronic Disease Management Guidelines for PA Pulvino to refer to but, despite being recommended by the NCCHC in 2017 and by Dr. Venters, and required by NaphCare's contract with the SDSO, none have yet been developed. These are especially important for midlevel practitioners, like PA Pulvino, who do not have as much training as physicians.

3. PA Pulvino states that "A provider assessment was completed the same day [as Mr. ██████ Receiving Screening, ████ 2023] and he was identified as having chronic hypertension." This statement implies that Mr. ██████ was seen face-to-face by a medical practitioner. That was not the case. PA Pulvino was referring to a remote STATCare practitioner (in this case, based in Las Vegas) who ordered the blood pressure medication Norvasc based on Mr. ██████ intake blood pressure. ██████ Med. Rcd. at 65, 66. The medical standard of care requires Mr. ██████ to also receive a complete physical examination with particular attention paid to the cardiovascular system. AHA/ACC Guidelines at 1281; AHA Treatment Algorithm. The STATCare NP could not do this since he was in Las Vegas at the time. A face-to-face examination by a practitioner at the time of booking for all patients with chronic diseases such as hypertension, was recommended by the 2017 NCCHC team and Dr. Venters, but is still not being done.

4. The first time Mr. ██████ saw a practitioner face-to-face was on ██████ 2023, though not for chronic hypertension but instead because Mr. ██████ complained of leg swelling. At that time, Dr. Michael Abbo confirmed bilateral leg swelling but did no other physical examination, such as a heart or lung examination. Dr. Abbo discontinued Norvasc and prescribed losartan for hypertension instead. ██████ Med. Rcd. at 46. Even

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

though Dr. Abbo felt the need to change Mr. ███ prescription based on his finding of bilateral leg swelling, no medical practitioner ever documented looking at Mr. ███ legs again to document whether this symptom resolved or not.

5. On ███ 2023, Dr. James Veltmeyer wrote "HTN well controlled on losartan." *Id.* However, the blood pressure goal for patients with chronic hypertension per the AHA/ACC Guidelines is <130/80. Applying this benchmark, Mr. ███ blood pressure was not "well-controlled."

| ███/2023 11:53:43 PM | 154 / 99 |
|---|---|
| ███2023 1:36:42 PM | 159 / 98 |
| ███2023 11:35:38 PM | 134 / 84 |
| ███2023 8:44:15 AM | 136 / 85 |
| ███2023 11:02:17 AM | 132 / 88 |
| ███2023 9:03:37 AM | 146 / 83 |
| ███/2023 11:07:32 | 150 / 91 |

███ Med. Rcd. at 35.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

6. In fact, using the AHA/ACC Guidelines, Mr. ▮▮▮ blood pressures were never well controlled during his incarceration.

| | |
|---|---|
| ▮▮2024 4:37:59 PM | 141 / 85 |
| ▮▮2024 9:11:34 PM | 158 / 94 |
| ▮2024 9:31:52 AM | 153 / 96 |
| ▮2024 8:38:37 AM | 142 / 96 |
| ▮2024 9:09:01 PM | 158 / 88 |
| ▮2024 1:35:56 PM | 126 / 77 |
| /2024 10:02:17 PM | 133 / 84 |
| ▮2024 5:33:15 PM | 160 / 73 |
| /2024 9:06:44 AM | 134 / 83 |

*Id.*

**I.    ▮▮▮  ▮▮▮ – Patient 19 – ▮▮▮**

77.    Dr. Boone reviewed Mr. ▮▮▮ medical record and concluded that the care he received met the standard of care. He concluded, among other findings, that the Jail provided appropriate care for hypertension, allergic rhinitis, and GERD; that the Jail provided appropriate laboratory screening tests that were unremarkable; that the Jail provided appropriate sick call visits; and Mr. ▮▮▮ "[h]ypertension was well managed with medications." Murray Report at 175.

78.    I disagree with Dr. Boone's conclusion. In my opinion, at least some of the care provided to Mr. ▮▮▮ did not meet the standard of care.

79.    *Hypertension* – Mr. ▮▮▮ had his receiving screen done on ▮▮▮ 2021. His diagnosis of hypertension was identified and his outside prescription of

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ▮/2021 4:56:14 PM | 152 / 87 | 98.5 | 77 | 16 | 0ft 0in | NA lb | 98 | NA | NA | 0 |
| ▮2021 3:41:11 PM | 157 / 89 | 98.7 | 71 | 18 | 0ft 0in | NA lb | 97 | NA | NA | 0 |
| ▮2021 1:56:45 PM | 140 / 84 | 97.8 | 94 | 18 | 0ft 0in | 0 lb | 99 | NA | NA | 102.67 |
| ▮2021 5:03:30 PM | 149 / 94 | 98.1 | 66 | 16 | 0ft 0in | 0 lb | 99 | NA | NA | 112.33 |
| ▮2021 1:11:32 PM | 177 / 88 | 98.6 | 92 | 16 | 0ft 0in | NA lb | 98 | NA | NA | 0 |
| ▮2021 1:53:11 PM | 152 / 93 | 0 | 67 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 112.67 |
| ▮2021 1:53:42 PM | 152 / 93 | 0 | 67 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 112.67 |
| ▮2021 1:54:05 PM | 152 / 93 | 0 | 67 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 112.67 |
| ▮2021 1:37:19 PM | 152 / 91 | NA | 80 | 17 | 0ft 0in | 0 lb | 0 | NA | NA | 111.33 |
| ▮▮2022 8:59:00 AM | NA / NA | NA | NA | 18 | 0ft 0in | NA lb | NA | NA | NA | NA |

1  lisinopril was continued without interruption.  He did not have good control of his

2  blood pressure for the first seven months of his incarceration.  ▓▓▓ Med. Rcd.

3  at 39.

4        80.    Nobody commented on Mr. ▓▓▓ elevated blood pressure until he

5  was seen on ▓▓▓ 2022 by ▓▓▓ Molina, MD, because of a complaint of cough.

6  Dr. Molina correctly noted that chronic dry cough is a common side effect of

7  lisinopril, stopped the lisinopril and started a different blood pressure medication,

8  amlodipine. *Id.* at 163, 164.  Mr. ▓▓▓ blood pressures immediately improved.

9        81.    On ▓▓▓ 2022, Mr. ▓▓▓ was seen for his first Hypertension

10 Chronic Care visit by Stacy Thompson, NP.  NP Thompson increased his dose of

11 amlodipine. *Id.* at 452.  Mr. ▓▓▓ then had a chronic care visit on ▓▓▓ 2023

12 (*id.* at 538), ▓▓▓ 2023 (*id.* at 543), ▓▓▓ 2023 (*id.* at 557), and

13 ▓▓▓ 2023 (*id.* at 568).  Losartan was added as a second agent for



| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ▓2022 2:55:11 PM | 104 / 72 | 0 | 0 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 82.67 |
| ▓2022 1:39:17 PM | 136 / 84 | 0 | 99 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 101.33 |
| ▓2022 1:06:24 PM | 113 / 79 | 0 | 0 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 90.33 |
| ▓2022 10:31:43 AM | 122 / 86 | 0 | 79 | 0 | 0ft 0in | 0 lb | 0 | NA | NA | 98 |

17 hypertension on ▓▓▓ 2023.  *Id.* at 326.  Mr. ▓▓▓ had labs drawn on

18 ▓▓▓ 2022, ▓▓▓ 2022, ▓▓▓ 2022, and ▓▓▓ 2023.

19        82.    In my opinion, the Jail did not meet the standard of care for

20 hypertension for the first 11 months of Mr. ▓▓▓ incarceration.  Thereafter, the Jail

21 met the standard of care.

22        83.    I discussed Hepatitis C screening in my report.  Mr. ▓▓▓ should have

23 been screened for Hepatitis C infection when he first had labs drawn unless he

24 specifically opted out.  Not performing this screen violated the standard of care.

25        84.    I also note that Mr. ▓▓▓ never received a Health Assessment during

26 his incarceration..

27    **J.    ▓▓▓ ▓▓▓ – Patient 53 – ▓▓▓**

28        85.    Dr. Leonardson reviewed Mr. ▓▓▓ medical record and concluded

[4598679.1]

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    that the care he received for hypertension, hyperlipidemia, and diabetes mellitus met

2    the standard of care.  Dr. Leonardson wrote:

> Mr. ███ chronic care diagnoses were well-managed, however, the
> follo ███ bs, fundoscopic exam and foot exam were not done.
> Mr. ███ also was not offered vaccines that are indicated for diabetic
> patie ███ is possible that there was a record of these being up to date
> and that this record is not in the set of records available to me.

6    Murray Report at 201-02.

7        86.    I agree with the problems with Mr. ███ care identified by

8    Dr. Leonardson.  I disagree, however, with Dr. Leonardson's conclusion that the

9    care provided to Mr. ███ for his diabetes met the standard of care.  In some

10   respects, Mr. ███ was treated appropriately; in others, his care did not meet the

11   standard of care.

12       87.    At booking, Mr. ███ only diabetic medication, Metformin, was

13   verified through Surescripts and appropriately continued. ███ Med. Rcd. at 179.

14   Mr. ███ had a chronic care visit on ███ 2023.  *Id.* at 201.  His A1C on ███

15   2023 was 7.1 (goal of <7.0) which is good control.  *Id.* at 170.  However, since the

16   A1C measures average blood glucose levels over the previous 3 months, and

17   Mr. ███ had only been incarcerated for 6 weeks, this A1C needed to be repeated.

18   This was not ordered.  Dr. Leonardson wrote "Mr. ███ had excellent glucose

19   control . . . while he was incarcerated."  Murray Report at 201.  Without a repeat

20   A1C, it is not possible to know this for sure.  His blood sugar log does, however,

21   show his blood sugar under control for most of his incarceration. ███ Med. Rcd.

22   at 29.  Nevertheless, I agree with Dr. Leonardson that Mr. ███ was also not

23   offered a foot exam or retinal screening as he should have been.  I agree with

24   Dr. Leonardson that "There is no evidence that he was offered or evaluated for

25   eligibility for other vaccines."  Mr. ███ also did not receive opt-out Hepatitis C

26   screening.

27   **K.** ███ ███ **– Patient 54 –** ███

28       88.    Dr. Leonardson reviewed Mr. ███ medical record and concluded

1  that the care the Jail provided to him for a fractured clavicle, hypertension,

2  hyperlipidemia, and opioid use disorder, hypothyroidism, psychiatric illness met the

3  standard of care.  She wrote: "Mr. ████ was a complicated patient who refused

4  his lab work.  This made the management of his hypothyroidism and hyperlipidemia

5  impossible."  Murray Report at 202.

6          89.    I disagree with Dr. Leonardson's conclusion.  In my opinion, the

7  treatment he received for hypertension and the prescription of levothyroxine (a

8  hypothyroidism medication) did not meet the standard of care.

9          90.    *Hypertension* – Mr. ████ was taking no medications at the time he

10  was booked into the Jail on ████ 2023.  Previous diagnoses of

11  hyperlipidemia and hypertension are marked on his Receiving Screening.  ████

12  Med. Rcd. at 15.  The STATCare practitioner who did his Intake Orders wrote to

13  "restart meds from last incarceration."  *Id.* at 244.  There is no documentation as to

14  when the last incarceration was.  The meds restarted were amlodipine, atorvastatin,

15  and levothyroxine.  *Id.* at 375, 377, 381.

16          91.    Mr. ████ was seen for a hypertension chronic care visit on

17  ████ 2023, where Dr. Molina judged his level of hypertension control as

18  "fair."  ████ Med. Rcd. at 277.  Using the American Heart

19  Association/American College of Cardiology hypertension treatment goal of

20  <130/80, Mr. ████ blood pressure was never well controlled during his

21  incarceration.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

| | |
|---|---|
| 2023 2:45:51 PM | 147 / 92 |
| 2023 11:06:43 AM | 144 / 92 |
| 2023 1:46:47 PM | 141 / 86 |
| 2023 2:04:12 PM | NA / NA |
| /2023 4:32:04 PM | NA / NA |
| 2023 4:32:25 PM | NA / NA |
| 2023 10:02:28 AM | 0 / 0 |
| 2023 2:33:15 PM | NA / NA |
| /2024 1:52:46 PM | 143 / 83 |

92.    Because his blood pressure was never at goal, the AHA/ACC Guidelines recommend an escalation of blood pressure medications. This could have been done by increasing his amlodipine dose from 5mg to 10mg a day, or by adding a second agent, such as HCTZ 12.5 mg. Neither was done. For this reason, the treatment provided fell below the standard of care.

93.    *Prescription of levothyroxine* – The Jail prescribed a drug, levothyroxine, for Mr. ▇▇▇ at intake because, during his most recent prior incarceration, he received the same medication. It is not clear from my review of his medical record, however, that there was any reason to prescribe the drug for Mr. ▇▇▇

94.    Levothyroxine is typically used to treat hypothyroidism. It is, however, sometimes overprescribed.[12] Levothyroxine can have a number of side effects, including, *inter alia*, chest pain, difficulty breathing, fatigue, fainting, fever, nausea, and tremors, though the dosage prescribed for Mr. ▇▇▇ was unlikely to cause serious side effects. In any event, as with any medication, it should not be prescribed for a patient unless it is needed to treat a condition, the benefits of the drug outweigh the risks, and the patient provides informed consent.

---

[12] American Thyroid Association, *Hypothyroidism: Is Levothyroxine Therapy Overused?*, 12:4 Clinical Thyroidology for the Public (2019).

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

95.     Mr. ███ did not mention hypothyroidism as one of his diagnoses at the receiving screening. ███ Med. Rcd. at 15. The word "hypothyroidism" is mentioned only once in his entire chart in a task for a Medical Doctor Sick Call. *Id.* at 22. (Relatedly, I do not see anywhere in the medical file that a doctor ever saw Mr. ███ I assume that the diagnosis of hypothyroidism was inferred from the fact that levothyroxine was one of the medications started from his past incarceration. However, as I mentioned above, levothyroxine is sometimes overprescribed. From the file, there is no indication that the STATCare practitioner knew why levothyroxine had been prescribed before.

96.     Given this uncertainty and the drug's side effects, the Jail should have, before prescribing levothyroxine, taken steps to determine whether Mr. ███ had a condition warranting administration of the drug. Medical staff could have performed a chart review of the medical records from Mr. ███ last incarceration to determine why levothyroxine was prescribed. Alternatively, the Jail could have performed routine thyroid blood tests. The Jail did neither of these things.[13] Accordingly, by prescribing levothyroxine without confirming whether Mr. ███ had any condition warranting receipt of the medication, the care provided to Mr. ███ did not meet the standard of care.[14]

---

[13] Th███ id order such a test approximately thr███ fter he w███ked. Mr. ███ reportedly refused the blood test on ███ 2023. ███ Med. Rcd. ███ When asked if the lab draw should be ███ e , Dr. M███ rote "*Patient has the right to refuse medical evaluation and/or treatment. If patient has signed the refusal form I am comfortable with patient refusing lab wo███ need to reschedule if patient refused.*" *Id.* This was a medical mistake. Mr. ███ did not refuse a lot of medical requests. No one told him why blood labs important. No one asked why he refused this blood draw or if he would be willing to allow his blood to be drawn another time. He may have allowed the blood to be drawn another time, especially if medical staff explained to him the reason for the blood draw.

[14] In addition, Mr. ███ was a heroin/fentanyl user. ███ Med. Rcd. at 37, 305. As mentioned ███ report, the standard of ███ nt who is at high risk for chronic infectious diseases, such as Mr. ███ is that he should receive opt-out testing for Hepatitis C, HIV, and Latent ███ osis infection. This was not done. Nor is there any documentation that Mr. ███ was ever told that he could

1       **L.**      ███████ ███████ **– Patient 41 –** ███████

2       97.    PA-C Erin Freeman reviewed the medical record for ███████ ███████

3  and concluded that his care met the standard of care.  She wrote: "Despite having a

4  history of status epilepticus, patient's seizure disorder has remained well-controlled

5  during this incarceration.  He was compliant with his three anticonvulsants with no

6  lapses in therapy."  Murray Report at 190-91.

7       98.    I agree with PA Freeman that, overall, the care provided for

8  Mr. ███████ seizure disorder met the standard of care.  That said, his care was

9  not without problems.  First, although Mr. ███████ submitted willingly to both

10 the Medical Clearance and Receiving Screening, RN Calderon wrote that

11 Mr. ███████ refused a full Health Assessment the same day. ███████ Med.

12 Rcd. at 205.  This refusal was unwitnessed by another person.  I find this curious

13 and not particularly credible.  In any case, no one ever attempted again to do a

14 Health Assessment even though Mr. ███████ was conveniently housed in the

15 MOB.  Second, Mr. ███████ should have had a chronic care visit including

16 checking on seizure medication levels within six months of seeing a doctor one day

17 after he was booked into the Jail.  Neither the chronic care visit nor the labs were

18 ever done.

19      **M.**      ███████ ███████ **– Patient 77 –** ███████

20      99.    PA Pulvino reviewed the medical record for ███████ ███████ and

21 concluded that her care met the standard of care.  He wrote: "Ms. ███████ arrived

22 on ███████ 2023 and was assessed and diagnosed with hypertension and asthma.

23 She was immediately continued on her FW medications and blood pressure checks

24 were ordered.  She was followed regularly for her chronic problems and acute issued

25 were managed timely.  When additional chronic problems were identified they were

26 monitored and treated appropriately.  Overall Ms. ███████ medical care was

27      ————————————————

28 have any of these tests done by request.

1  appropriate and timely." Murray Report at 220-21.

2      100.   I disagree with PA Pulvino's conclusion.  In my opinion, the care

3  received by Ms. ▇▇▇▇ did not meet the standard of care.

4      101.   *Asthma* – I discussed the Standard of Care for asthma in some detail in

5  my initial report.  The Jail complied with parts of the standard of care by prescribing

6  her an albuterol rescue inhaler and allowing her to keep her rescue inhaler on her

7  person.  However, the standard of care for asthma requires bedside peak flow tests at

8  booking and at each chronic care visit.  The NCCHC Report specifically

9  recommended that these tests be conducted, DUNSMORE0260635, as did the

10  Venters Report, SD_21537.  Such tests did not occur for Ms. ▇▇▇▇  I note

11  especially the asthma chronic care visit that Ms. ▇▇▇▇ had with Dr. David

12  Christensen on ▇▇▇▇ 2024. ▇▇▇▇ Med. Rcd. at 303.  The chronic care form

13  has a space for 3 "Peak Expiratory Flow" measurements.  These were left blank. *Id.*

14  at 306.  The vital signs were also left blank.  Finally, the SDSO should have Asthma

15  Chronic Disease Management guidelines but does not.  Accordingly, the asthma

16  care provided to Ms. ▇▇▇▇ did not fully meet the standard of care.

17      102.   *Review of ultrasound* – Ms. ▇▇▇▇ had an abdominal ultrasound

18  performed on ▇▇▇▇ 2023 to look for gall stones (not to evaluate her umbilical

19  hernia as PA Pulvino thought.  This is another example of a factual error in the

20  reports). *Id.* at 31, 32.  PA Pulvino states that this ultrasound was normal.

21  However, the ultrasound report is not present in the records sent to me.  More

22  importantly, I can see no place in the medical record where the ultrasound results

23  were mentioned in a chart note or discussed with Ms. ▇▇▇▇  I discussed in my

24  report the problem of study results not being reviewed, interpreted and reported.

25      103.   *Refusals of care* – I discussed in my report the immense problem the

26  SDSO has with patient refusals of medical care and how these negatively impact

27  medical care and harm patients.  Ms. ▇▇▇▇ chart provides another example.

28  There are around 290 refusal forms in Ms. ▇▇▇▇ chart.  Two in particular are

1  worth mentioning.  Ms. ████ was appropriately scheduled for blood labs.  She

2  reportedly refused the blood draw on ████ 2023.  However, the refusal—as

3  well as the refusal to sign the refusal form—was witnessed only by two deputies.

4  ████ Med. Rcd. at 62.  This refusal should have generated a counseling session

5  with a medical provider, and this was scheduled with Dr. Christensen on

6  ████ 2023.  However, Dr. Christensen did not see Ms. ████ or perform

7  any counselling.  He wrote only "You may cancel the labs." *Id.* at 32.  Less than a

8  month later, Ms. ████ was admitted to the MOB due to an episode of Paroxysmal

9  Supra Ventricular Tachycardia (PSVT).  *Id.* at 33.  (I am unable to verify the

10 diagnosis because the EKGs taken then are not in the records I received.)  Staff in

11 the MOB should have spoken with Ms. ████ about the importance of those lab

12 tests and drawn the blood for them, but did not do so.  Similarly, PA Pulvino

13 erroneously states that Ms. ████ was counseled about poor medical compliance

14 on ████ 2024.  However, this counselling session never occurred.  NP Teresa

15 Hurley did not talk to Ms. ████ she simple discontinued a number of prescribed

16 treatments.  *Id.* at 40.  All of this is another example of how the refusal system at the

17 SDSO is broken.

18      104.  *Hypertension* – Ms. ████ outside blood pressure medications were

19 appropriately continued when she was booked.  However, her blood pressures were

20 never well controlled compared to the American Heart Association/American

21 College of Cardiology standards, good control being <130/80.  As an example, the

22 last three blood pressures recorded in Ms. ████ blood pressure log were:

| ████ 2024 1:17:12 PM | 143 / 70 |
| ████ 2024 1:31:00 PM | 151 / 75 |
| ████ 2024 1:39:09 PM | 151 / 75 |

27 ████ Med. Rcd. at 46.

28      105.  Soon after these three blood pressures, Ms. ████ had a hypertension

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1  chronic care visit with Dr. Christensen on ███████ 2024.  *Id.* at 303.

2  Dr. Christensen did not measure a blood pressure at this hypertension chronic care

3  visit.  No adjustments were made to Ms. ███████ blood pressure medications.

4  Dr. Christensen did not discuss the previously missed labs nor reorder them.  In my

5  opinion, since Ms. ███████ blood pressure was never controlled and no effort was

6  made to adjust her medications to improve her blood pressure control, the care

7  provided for Ms. ███████ hypertension did not meet the standard of care.

8      106.  In addition to these problems, I also found no Health Assessment in

9  Ms. ███████ chart.

10     107.  Lastly, there are also multiple examples of long delays between a

11 Health Request and a face-to-face assessment.  Examples include:

12    • Health request for eczema cream submitted ███████ 2023 completed

13      ███████ 2023, ███████ Med. Rcd. at 22;

14    • Repeat Health request for eczema cream submitted ███████ 2023,

15      completed ███████ 2023, *id.* at 22;

16    • Health request for asthma and hernia submitted ███████ 2023 completed

17      ███████ 2023, *id.* at 22;

18    • Health request "req to be checked for heart disease, waking up gasping"

19      submitted ███████ 2023 completed ███████ 2023, *id.* at 23.

20  **N.   ███████ ███████ – Patient 22 – ███████**

21     108.  Dr. Boone reviewed Mr. ███████ medical record and concluded that the

22 care provided to him met the standard of care.  Dr. Boone found that the care

23 provided to Mr. ███████ met the standard of care because the Jail obtained and

24 reviewed prior medical records; provided treatment that controlled his diabetes;

25 provided medication for hypertension and hyperlipidemia; properly managed his

26 glaucoma; and appropriately addressed complaints of shoulder pain.  Murray Report

27 at 177.

28     109.  I disagree with Dr. Boone.  In some respects, Mr. ███████ care met the

1  standard of care, but in other respects, the care provided to Mr. ▇▇▇ did not meet

2  the standard of care.

3       110.  *Elevated PSA* – The PSA is a screening test for prostate cancer.

4  Dr. Boone did not mention the fact that Mr. ▇▇▇ had an elevated PSA test result at

5  the Jail on ▇▇▇▇ 2024.  This was noted by NP Nicolaus Rosete: "PSA 8.74,

6  reviewed providers notes, persistently elevated with 2 negative biopsies, no new

7  orders."  *Id.* at 33.  It is true that Mr. ▇▇▇ had had a history of multiple elevated

8  PSAs and was being followed by a Kaiser urologist.  However, what NP Rosete

9  failed to notice (as did NP Stacy Thompson who reviewed the Kaiser records on

10  ▇▇▇▇ 2024, *id.* at 32, and NP Nicholas Kahl who reviewed the Kaiser records

11  on ▇▇▇▇ 2023, *id.* at 30) is that Mr. ▇▇▇ Kaiser urologist was so concerned

12  by his persistent elevated PSA and another test that showed that Mr. ▇▇▇ had a

13  "37% chance of detecting prostate cancer on repeat Bx [biopsy]" that she had

14  ordered an MRI of the prostate on ▇▇▇▇ 2022 shortly before Mr. ▇▇▇ was

15  incarcerated.  *Id.* at 413.  This MRI had not been done before he was incarcerated.

16  *Id.* at 413, 415, 418.  No one from the Jail ever contacted Dr. Cogain to coordinate

17  care nor did anyone schedule the MRI.  The medical care provided to Mr. ▇▇▇ for

18  his elevated PSA and the possibility that he has prostate cancer did not meet the

19  standard of care and also violated the principle of continuity of care that I discussed

20  in my report.

21       111.  *Glaucoma* – Mr. ▇▇▇ prescription for Timolol eye drops was

22  appropriately continued when he arrived at the jail.  However, review of his Kaiser

23  Permanente records shows that he had been scheduled for an appointment with his

24  outside ophthalmologist in ▇▇▇▇ 2022.  *Id.* at 336.  Not only was this

25  appointment not kept, the Jail never referred Mr. ▇▇▇ to an ophthalmologist or

26  optometrist for an eye check-up throughout the 15-months he was incarcerated.  The

27  lack of continuity of care and the lack of appropriate follow up care for Mr. ▇▇▇

28  retinal disease did not meet the standard of medical care.

112.   *Preventative care* – Kaiser Permanente records show that Mr. ███ was overdue for a colonoscopy to screen for colon cancer.   ███ Med. Rcd. at 342.  He had been scheduled to see a gastroenterologist to have this done. *Id.* at 407.  The Jail medical staff did not contact the gastroenterologist to coordinate care, nor did they schedule a colonoscopy or other method of screening for colon cancer.

113.   The jail also did not screen Mr. ███ for Hepatitis C despite recommendations for opt-out screening of all incarcerated people as well as the fact that Mr. ███ had elevated liver enzymes when his labs were checked on ███ 2023 (███ Med. Rcd. at 85), which was an independent reason to screen him for hepatitis C.  The lack of attention to these two preventative care issues did not conform to the standard of medical care.

114.   *Diabetes* – The Jail performed a receiving screening on ███ 2022. ███ Med. Rcd. at 4.  His only prescription was metformin, which was ordered on ███ 2022. *Id.* at 565.  Dr. Rafi also ordered an insulin sliding scale for Mr. ███ although he had never been on insulin before. *Id.* at 543.  The sliding scale insulin order violated the standards of care found in Diabetes in Detention:  "The sole use of sliding-scale insulin is strongly discouraged."  Diabetes in Detention at 549.  Mr. ███ diabetes remained in good control throughout his incarceration, as evidenced by his A1C results, measured on ███ 2023, ███ Med. Rcd. at 85, and ███ 2024, *id.* at 89.

115.   Finally, the Jail never performed a Health Assessment for Mr. ███ during his incarceration.  This violated the SDSO Operations Manual Policies and Procedures.

**O.    ███ ███ – Patient 24 – ███**

116.   Dr. Boone reviewed Mr. ███ medical record.  Dr. Boone noted that Mr. ███ was a "56-year-old male with medical history of diabetes, hypertension, methamphetamine use disorder, chronic ankle pain s/p ankle fusion, chronic shoulder pain, and prior abdominal hernia repair."  Murray Report at 178.  Among

1  his findings, Dr. Boone wrote:

2      Regarding diabetes mellitus, Mr. ███ was on a weekly GLP1-agonist
       in the community setting which is ███ n-formulary medication.  He was
3      appropriately treated with metformin as first-line therapy, along with a
       statin to reduce the risk of cardiovascular disease per guidelines.
4      Metformin was later changed to glipizide per patient request.  His
       hemoglobin A1C% measurements demonstrated excellent glycemic
5      control.  Hypertension was well managed with losartan monotherapy.

6  *Id.*  Dr. Boone concluded this care met the standard of care.  *Id.*  Dr. Boone does not

7  state what standard of care he used to evaluate Mr. ███ care.

8      117.  I disagree with Dr. Boone.  As I explained in my initial report, the care

9  that Mr. ███ received did not meet the standard of care in a number of respects.

10  *See* Keller Report ¶¶ 271, 302, 543-545.  The problems with his care included the

11  following:

12          1.     Despite his significant medical history, he was never seen by a

13                 medical practitioner during the intake process or at his 14-day

14                 assessment.  Keller Report ¶ 271.

15          2.     The County discontinued his documented prescription for

16                 Mounjaro, a diabetes medication, because Mounjaro was non-

17                 formulary.  Instead, a STATCare NP placed Mr. ███ on sliding

18                 scale insulin without evaluating him, confirming he had ever

19                 taken insulin, obtaining any labs (such as an A1C), or even

20                 notifying him of the change in prescription.  When Mr. ███

21                 complained, he was treated with metformin, sliding scale insulin

22                 and then glipizide.  As I explain in my report, metformin, sliding

23                 scale insulin and glipizide are not direct substitutes for and do

24                 not have the same mechanisms for action as Mounjaro.

25                 Moreover, discontinuing a person's medication simply because it

26                 is not on the formulary and especially without evaluating the

27                 person is not consistent with the standard of care.  Keller Report

28                 ¶ 302, 543.

118.   In addition, Dr. Boone misrepresented the contents of the medical file. Dr. Boone stated that "Metformin was later changed to glipizide per patient request." Murray Report at 178. But the medical record indicates that Mr. █████ requested that he receive Mounjaro, not metformin. *See* SD_791117. Mr. █████ continued to complain about not receiving his prescription for Mounjaro well into 2024. ████ Med. Rcd. at 27, 31, 53, 55, 72. Dr. Molina wrote on █████ 2024 "[M]ounjaro is not formulary so [I] am unable to order it currently." ████ Med. Rcd. p. 75.

**P.**    █████████  █████████ **– Patient 80 –** █████████

119.   PA Pulvino reviewed Mr. █████████ medical record and concluded that the care provided to him for hypertension met the standard of care. PA Pulvino found, *inter alia*, that "[h]is chronic disease care was uneventful and in reviewing his blood pressure log he was in good control." Murray Report at 222-23.

120.   I disagree with PA Pulvino. In my opinion, the care provided to Mr. █████████ for his hypertension did not meet the standard of care.

121.   Mr. █████████ is 62 with a history of a stroke. According to the AHA Guidelines Update, the goal should be for Mr. █████████ to have a systolic blood pressure of <130: "For older adults with hypertension, intensive treatment with an SBP target 110-130 mmHg substantially lowers the incidence of CVD events over standard treatment with a target 130-150 mm Hg. In addition, intensive BP lowering may prevent or at least partially arrest cognitive decline with aging." AHA Guidelines Update at 56.

122.   Mr. █████████ was noted to be hypertensive, with a blood pressure of 150/88, at his Medical Clearance. █████████ Med. Rcd. at 2. He reported that he had not been taking his prescribed medications on the outside. *Id.* at 41. The STATCare practitioner appropriately started Mr. █████████ on amlodipine (Norvasc), atorvastatin and aspirin. *Id.* at 42, 43. Mr. █████████ was still hypertensive, 141/87, when his Health Assessment was done on █████ 2023. *Id.*

at 44.

123. Mr. ███████ labs were done on ███████ 2023. *Id.* at 38, 39. I can see no evidence that anyone ever reviewed or interpreted them.

124. On ███████ 2023, he was evaluated by NP Nicolaus Rosete to work as a trustee in the Jail. *Id.* at 25. NP Rosete did not record a blood pressure in his log at that visit, but his trustee assessment form indicates that his blood pressure at that time was 166/99. *Id.* at 159.

125. Mr. ███████ was seen for a hypertension chronic care visit on ███████ 2023 by NP Stacy Thompson. NP Thompson measured a blood pressure of 147/77. *Id.* at 83. His blood pressure log showed only one recent blood pressure at goal.

| Date/Time | BP |
| --- | --- |
| ██/2023 10:37:24 AM | 143 / 99 |
| ██/2023 10:17:20 AM | 175 / 73 |
| ██/2023 9:47:42 AM | 115 / 81 |
| ██/2023 1:39:40 PM | 135 / 74 |
| ██2023 9:27:00 AM | 147 / 77 |
| ██/2023 10:17:49 AM | 147 / 77 |

*Id.* at 31. Nevertheless, NP Thompson judged Mr. ███████ blood pressure control to be "good." *Id.* at 86. Blood pressures after this visit remained high.

| Date/Time | BP |
| --- | --- |
| ██/2023 12:43:54 PM | 143 / 71 |
| ██/2023 1:52:53 PM | 150 / 77 |
| ██/2023 2:19:35 PM | 143 / 81 |
| ██/2023 2:15:27 PM | 149 / 75 |
| ██/2023 10:30:11 AM | 154 / 76 |
| ██/2023 1:21:33 PM | 144 / 78 |
| ██/2023 9:31:23 AM | 153 / 81 |
| ██/2023 12:52:51 PM | 143 / 77 |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

*Id.* at 31.  Because of his age and his history of cardiovascular disease, Mr. ███████ should have had an EKG done, but I see no evidence that this occurred.

126.   On ███████ 2024, Mr. ███████ requested a cardiac diet.  *Id.* at 27.  He should have, however, been provided a cardiac diet from the beginning.

127.   PA Pulvino states that Mr. ███████ "He refused a provider follow up on ███ 24."  This is not true.  Dr. Molina did write "*I witnessed deputy 4552 go to patient and ask [if] they would like evaluation by the doctor.  Despite my efforts, the patient refused.*"  *Id.* at 28.  However, Dr. Molina followed this with an addendum "*correction.  pt did not refuse.  pt at work --r/s (reschedule) appt.*"  *Id.* at 29.  I cannot find evidence that the appointment was rescheduled.  Mr. ███████ did not see a medical practitioner again.

128.   In my opinion, the hypertension care provided to Mr. ███████ did not meet the standard of care.

- Mr. ███████ blood pressures improved over the course of his incarceration but they were never fully controlled.  Because his blood pressure was never at goal, the AHA/ACC Hypertension Standards recommend an escalation of blood pressure medications.  This was not done.
- Mr. ███████ never had an EKG done.
- He was not offered a cardiac diet until he himself requested one on ███████ 2024.

129.   PA Pulvino rightly notes the multitude of medication refusals (37, by my count).  I discussed the problem that the Jail has with medical refusals and how this can harm patients.  Mr. ███████ is another example.  Most of his refusals were not witnessed by medical staff:  they were witnessed by security staff only.

**Q.     ████ ████ – Patient 59 – ███████**

130.   Dr. Leonardson reviewed Mr. ████ medical file and concluded that

1  the care provided to Mr. ███ met the standard of care "with some reservations."

2  Murray Report at 208. She wrote:

> Mr. ███ chronic medical problems identified at SD County Jail
> were ███ and HLD. An unverified history of sleep apnea is
> mentioned in notes, but the asthma and heart disease, which are
> mentioned on the transfer form are no ███ntioned. There is no history
> taken at the jail to elicit whether Mr. ███ had had symptoms or
> histo ███ target organ damage (name ███ chemic heart disease).
> Mr. ███ was on Aspirin and I believe there shou ███ e been some
> inter ███ why he was on aspirin. That said, Mr. ███ lipids looked
> well-controlled (although that is not known until ███ ns into his
> stay) and his blood pressure was borderline, but uninterpretable, since
> he often refused his medication.
>
> I have another issue with his episodic care. Mr. ███ gave a classic
> history of having a kidney stone, yet nobody wh ███ him ever
> mentioned that potential diagnosis. After his pain continued for a
> while, a useless testicular ultrasound was ordered instead of the proper
> test, which would have been a renal ultrasound. I commend the jail on
> their attention to opioid use disorder and their documentation of
> refusals.

13  *Id.* at 208.

14  131. I agree with Dr. Leonardson's criticisms of the care provided to

15  Mr. ███ namely that there was inadequate chronic care treatment for his

16  hypertension, hyperlipidemia, asthma, and heart disease and that the Jail likely

17  failed to diagnose a kidney stone. I disagree with her ultimate conclusion, however,

18  as it is my opinion that the care provided to Mr. ███ did not meet the standard of

19  care.

20  132. Most notably, it is my opinion that the care (or lack thereof) provided

21  to Mr. ███ for his potential sleep apnea did not meet the standard of care.

22  Mr. ███ was transferred from the Victorville prison facility. During his receiving

23  screen on ███ 2023, Mr. ███ reported that he had sleep apnea and had been

24  using a CPAP machine at the prison. ███ Med. Rcd. at 1154. Mr. ███ signed a

25  Release of Information form, *id.* at 198, and the prison records were ordered

26  specifically to check for CPAP prescription, *id.* at 26. On ███ 2023,

27  Mr. ███ submitted a medical request that stated "I have sleep apnea I was

28  diagnosed at Vista Detention in 2017 or 18 if its not valid I need a sleep study

1   because my apnea is very bad." *Id.* at 23, 1189.  I do not see that Mr. ███ had any

2   face-to-face meeting with a nurse or any practitioner evaluation of this request. ███

3   ███████ 2023, Mr. ████ submitted another Health Care Request for a sleep

4   study. *id.* at 1180.  A handwritten response on the bottom of this request states

5   "Duplicate.  Already Sched for Imp sick tri[a]ge."  Again, there was no face-to-face

6   evaluation by a nurse and no practitioner evaluated the request.  On ██████████

7   2023, Mr. █████ submitted a third Health Care request that stated "I have sleep

8   apnea & I need a sleep study done.  Please." *Id.* at 1182.  This also is marked

9   "duplicate from ████ 23."  All of these were ignored.  On ██████ 2024, Mr. ████

10  submitted his fourth health care request, which stated "I have sleep apnea & I have

11  previously been prescribed a CPAP."  In the Action Taken section of this health

12  form is written "Sched for Imp triage waiting for prison records" and "refer to

13  provider-sick call." *Id.* at 1190.  Interestingly, Mr. ██████ first health care request

14  dated █████████ 2023 was then also marked as "Triage MDCC ███/2024." *Id.*

15  at 1189.  On ████████ 2024, Dr. ██████ Molina wrote a chart note that stated "chart

16  reviewed, Pt requesting for CPAP machine." *Id.* at 37.  Dr. Molina asked to get

17  records (which had already been requested eight months previously) or "schedule

18  patient for overnight sleep study."  The next note was written by a CNA on

19  ██████████ 2024 that stated that Mr. ██████ refused to sign an ROI form.  Mr. █████ is

20  quoted as saying that there was no need for him to sign an ROI because his original

21  sleep study had been done at the San Diego Jail Vista facility. *Id.* at 38.  In addition,

22  Mr. █████ had already signed an ROI previously, anyway. *Id.* at 198.  This "refusal"

23  ended the matter.  The Jail never provided him with a C-PAP or conducted a sleep

24  study.  This care did not meet the standard of care.  I am using as my standard of

25  care Lewis R. Kline, *Clinical Presentation and Diagnosis of Obstructive Sleep*

26  *Apnea in Adults*, UpToDate (2024).  Like any other medical complaint, the proper

27  course begins with a medical practitioner meeting the patient, obtaining a history,

28  and conducting a physical examination.  In Mr. ██████ case, no medical practitioner

1    ever spoke with Mr. ███ face-to-face about sleep apnea or did a physical

2    examination—over the course of eight months.  Sleep apnea is diagnosed with a

3    sleep study test—the very thing that Mr. ███ had been requesting.  This is not a

4    difficult test to schedule or conduct.  Since, over the course of eight months, no

5    medical practitioner examined Mr. ███ or even talked to him, and no sleep study

6    was done even though Dr. Molina ordered one and Mr. ███ repeatedly requested

7    one, the standard of care was not met in this case.

8        133.   In addition, Mr. ███ file reflects problems with refusals of care and

9    medication.  I count 933 refusal forms in Mr. ███ chart.  Almost all of these are

10   signed by two deputies.  I see no counseling as required by SDSO Policy.  I

11   discussed in my report the immense problem that the SDSO has with refusals and

12   how these negatively impact medical care.  Keller Report ¶¶ 387, 388.

13       134.   Finally, Dr. Leonardson's review is not factually accurate.

14   Dr. Leonardson wrote, "On ███.2023, Mr. ███ underwent the intake physical with

15   the MD."  Murray Report at 207.  This is incorrect.  On ███ 2023, Mr. ███

16   had his Health Assessment done by an RN.  ███ Med. Rcd. at 201.  The form was

17   countersigned three hours later by an MD, but the MD was not present.  In fact, I do

18   not see anywhere in Mr. ███ file that a medical practitioner ever completed a

19   physical examination.  I agree with Dr. Leonardson that the one Chronic Care visit

20   was seriously inadequate.

21   **R.    ███████ – Patient 43 – ███████**

22       135.   PA-C Freeman reviewed Mr. ███ medical record and concluded

23   that the care provided to him met the standard of care.  She wrote: "The patient has

24   received appropriate treatment for his type 2 diabetes with both oral medication

25   (metformin) and insulin (short-acting and long-acting).  Despite the patient's

26   challenging behavior and refusals of medical care, the medical record reflects that

27   the medical staff has been attentive to his medical needs.  Overall, this patient is

28   receiving excellent medical care at George Bailey."  Murray Report at 192.

1    136.   I disagree with PA-C's conclusion. The care provided to him did not

2  meet the standard of care.

3    137.   *Type 2 Diabetes* – I am comparing the care provided to Mr. ████

4  with Diabetes in Detention.

5    138.   Mr. ████ received his medical clearance on ████ 2022. He

6  informed the nurse performing the Receiving Screening that he had Type 2 Diabetes

7  and took metformin for this. ████ Med. Rcd. at 8. The STATCare practitioner

8  ordered metformin and glipizide to treat diabetes as well as blood sugar checks. *Id.*

9  at 22. Mr. ████ objected to the glipizide prescription and it was quickly

10  discontinued. *Id.*

11    139.   Mr. ████ did have many refusals of proffered medical care, but his

12  primary complaint was with taking metformin. *Id.* at 2674. He accepted blood

13  sugar checks frequently enough for the medical staff to know that his blood sugars

14  were not well controlled. *Id.* at 722-33.

15    140.   On ████ 2023, Mr. ████ allowed staff to draw blood for an

16  A1C. *Id.* at 749. The result was high, at 8.7. *Id.* at 741. (No other labs were

17  performed on this blood sample, even though the ADA standards of care require

18  other blood tests to assess progression of diabetic kidney disease, among others.) In

19  response to the high A1C, NP Matthew Wallace began long acting insulin Semglee

20  (10 units once a day) and short acting insulin Novolog using NaphCare's standard

21  sliding scale to determine dosing. *Id.* at 37-39.

22    141.   This decision to start Mr. ████ on insulin was not consistent with

23  the standard of care. The ADA standards state, "[s]election of medications for

24  treatment of people with type 2 diabetes should be in accordance with the current

25  ADA Standards of Care (see Fig. 9.3 in Section 9, 'Pharmacologic Approaches to

26  Glycemic Treatment).'" Diabetes in Detention at 548. This standard recommends

27  the introduction of insulin "when A1C or blood glucose levels are very high (i.e.,

28  A1C >10% [>85 mmol/mol] or blood glucose ≥ 300 mg/dL [≥ 16.7 mmol/L])."

1  Diabetes Standards at S165.  Mr. ███████ A1C was less than 10 and his blood

2  sugars had been less than 300.  Insulin should not have been prescribed at this point.

3      142.   In addition, the ADA standards state, "[r]eliance on insulin sliding

4  scales is ineffective and potentially dangerous, and it is strongly discouraged."

5  ADA Detention Facilities at 549.  NP Wallace's use of a sliding scale violated this

6  standard.  Instead of insulin, the ADA recommendation for a patient such as

7  Mr. ███████ is as follows: "In adults with type 2 diabetes, a GLP-1 RA, including a

8  dual glucose-dependent insulintropic polypeptide (GIP) and GLP-1 RA, is preferred

9  to insulin[.]"  Diabetes Standards at S165 (Pharmacologic Therapy for Adults with

10  Type 2 Diabetes, 9.23.).  Glucagon-like peptide 1 receptor agonists (GLP-1s)

11  include several brands, such as Byetta, Wegovy, Ozempic and others.  However,

12  none of these agents are on the NaphCare formulary (NAPHCARE037047 at 5).

13  Per ADA standards, "the use of medications with low potential for hypoglycemia

14  (biguanides, dipeptidyl peptidase 4 inhibitors, glucagon-like peptide 1 receptor

15  agonist, and SGLT2i) is recommended (before insulin)."  Diabetes in Detention at

16  548.  None of these agents are on the NaphCare formulary either, except the

17  biguanide metformin, which Mr. ███████ was already taking.  NAPHCARE037047

18  at 5.

19      143.   Jail practitioners increased Mr. ███████ Semglee dose on ███████ 2023,

20  ███████ Med. Rcd. at 66, ███████ 2023, *id.* at 98, and ███████ 2024, *id.*

21  at 133.  These increases were made despite the fact that Mr. ███████ was refusing

22  to take Semglee far more often than he was taking it.  *Id.* at 2493, 2519, 2556, 2568,

23  2589.  His compliance with Semglee did improve markedly in 2024.  *Id.* at 2429,

24  2486.

25      144.   Despite these increases, Mr. ███████ blood sugar control worsened

26  over the course of his incarceration.

27  / / /

28  / / /

145.  Early blood sugar log (*id.* at 733):

| | |
|---|---|
| ███ 2023 10:01:19 AM | 128 |
| █ 2022 11:42:26 AM | 156 |
| ███ 2022 12:23:05 PM | 158 |
| ███ 2022 11:43:18 AM | 176 |
| ███ 2022 11:43:03 AM | 176 |

146.  Late blood sugar log (*id.* at 722):

| | |
|---|---|
| ███ 2024 11:12:58 PM | 315 |
| ███ 2024 9:04:27 PM | 423 |
| ███ 2024 3:00:00 PM | 400 |
| ███ 2024 3:00:00 PM | 305 |
| ███ 2024 3:00:00 PM | 349 |

147.  Mr. ███ reportedly refused a lab draw ███ 2023. ███ Med. Rcd. at 89. The only refusal form with that date is blank and signed by two security officers. *Id.* at 1433. I see no evidence that anyone ever tried to repeat an A1C otherwise, even in 2024 when Mr. ███ was mostly compliant with his medical treatments.

148.  Mr. ███ was never referred to an optometrist for retinal screening.

149.  In my opinion, the medical care provided to Mr. ███ did NOT meet the standard of care.

- Sliding scale insulin was used, contrary to standards.
- Recommended medications were not offered.
- Only one A1C was obtained and other screening labs were never done.
- Mr. ███ was not referred to optometry for a retinal screening.
- Mr. ███ level of diabetic control worsened during his incarceration. The practitioners should have noticed this worsening trend and increased therapy in a stepwise fashion as laid out in the ADA standards. Had they done this, Mr. ███ diabetic control likely would not have deteriorated.

1    150.   Lastly, I note that Mr. ███████ never received a Health Assessment.  I

2  do not find evidence in his chart that anyone ever attempted to do either an initial

3  Health Assessment nor a Health Assessment at one year.

4    **S.       ███████████████ – Patient 60 – ███████**

5    151.   Dr. Leonardson reviewed Ms. ███████ medical record and concluded

6  that the care she received for her hypertension and anemia did not meet the standard

7  of care.  Murray Report at 208, 209.  She wrote:

8    Ms. ███████ blood pressure has never been controlled during this
    perio   █  e and the use of short-term clonidine should not be
9    protocol. There is no evidence that any effort was made on the part of
    the provider to look at the blood pressure readings, no vital signs
10   documented on the provider notes and no evidence that medications
    were being reviewed during provider visits.

11
    The HIV and asthma care were adequate.
12
    ██ have grave concerns about the attention that was not given to this
13   █ y/o woman's worsening microcytic anemia and elevated globulin
    ██ ction.  The patient should have had a workup for both.  Myeloma is
14   certainly a consideration with her persistent complaints of back and
    body pain, as well.
15
    This █ y/o patient should also be scheduled for colon cancer screening
16   and t█ anemia should be worked up to see if it is due to iron-
    deficiency or chronic inflammation.
17
    I suggest vital signs be taken and documented at every visit.  I suggest
18   that a medication list that is accurate should be displayed on every
    patient-related visit.
19

20    152.   I agree with Dr. Leonardson's conclusion that there were serious

21  problems with the care provided to Ms. ███████  I also identified additional

22  problems with the care she received for asthma.  Ms. ███████ arrived at the Jail on

23  ███████ 2023 taking Wixela for asthma.  ███████ Med. Rcd. at 464.  Wixela is a

24  combination product containing a inhaled steroid (fluticasone) and a long-acting

25  bronchodilator (salmeterol). However, Wixela was not continued by the STATCare

26  practitioner who reviewed her transfer medications.  He did order an albuterol

27  rescue inhaler.  *Id.* at 327.  On ███████ 2023, Rana Ram MD ordered Wixela, *id.*

28  at 28, but it evidently was denied by the nonformulary review process.  Stopping

1  Wixela at admission before Ms. ███ had been examined by a medical

2  practitioner violated the medical standard of care.  Rejecting Wixela after it had

3  been ordered by a physician who had examined Ms. ███ also violated the

4  medical standard of care.  In addition, I discussed in my report that the standard of

5  care for asthma requires a minimum of bedside peak flow testing at admission and at

6  each chronic care visit.  The NCCHC Report emphasized this.  The Jail never

7  performed this test for Ms. ███

# Appendix B

# APPENDIX B

## Analysis of 14-day Health Assessments from Medical Records

| JIMS | Booknum | Book date | Release date | Health Assessment | Compliant | Bates Number | Comments |
|------|---------|-----------|--------------|-------------------|-----------|--------------|----------|
| ███ | ███ | ███ | ███ | None Found | No | SD_843430 | |
| | | | | | | | |
| | | | ███ | None Found | No | SD_753161 | |
| | | | ███ | | | | |
| | | | ███ | ███ | Yes | SD_939221 | Refused |
| | | | | | | | |
| | | | ███ | ███ | Yes | SD_1003418 | Refused |
| | | | ███ | | | | |
| | | | | ███ | Yes | SD_842274 | |
| | | | ███ | | | | |
| | | | ███ | None Found | No | SD_837236 | |
| | | | | | | | |
| | | | | ███ | Yes | SD_876917 | Refused |
| | | | ███ | | | | |
| | | | | | | | Refused in previous booking |
| ███ | ███ | ███ | ███ | None Found | No | SD_915237 | |
| ███ | ███ | ███ | ███ | | | | |
| | | | | | | | Assessed in previous booking |
| ███ | ███ | ███ | | None Found | No | SD_832302 | |
| | | | | | | | |
| | | | | ███ | Yes | SD_822321 | |
| | | | | | | | |
| | | | | ███ | Yes | SD_1003727 | Refused |
| | | | ███ | | | | |
| | | | ███ | ███ | Yes | SD_1025003 | Refused |
| | | | | | | | |
| | | | ███ | | No | SD_827395 | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ██████ | ██████ | ██████ | ████ | | | | |
| ██████ | ██████ | ██████ | | | | | |
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_801436 | Assessed in previous booking |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_1011685 | Assessed in previous booking |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_899687 | |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | | ████ | No | SD_875817 | |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | ████ | Yes | SD_749422 | |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | ████ | Yes | SD_770622 | Refused |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_953169 | Assessed in previous booking |
| ██████ | ██████ | ██████ | | | | | |
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_979059 | Assessed in previous booking |
| ██████ | ██████ | ██████ | | | | | |
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_947096 | Refused in previous booking |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_861201 | Refused in previous booking |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | ████ | Yes | SD_947096 | Refused |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | ████ | Yes | SD_827865 | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | ▮ | ▮ | ▮ | | | | |
| 2 | ▮ | ▮ | ▮ | ▮ | ▮ | Yes | SD_777718 | |
| 3 | ▮ | ▮ | ▮ | ▮ | | | | |
| 4 | ▮ | ▮ | ▮ | ▮ | ▮ | Yes | SD_796574 | |
| 5 | ▮ | ▮ | ▮ | ▮ | | | | |
| 6 | ▮ | ▮ | ▮ | | ▮ | Yes | SD_784016 | |
| 7 | ▮ | ▮ | ▮ | ▮ | | | | |
| 8 | ▮ | ▮ | ▮ | ▮ | None Found | No | SD_1014113 | |
| 9 | ▮ | ▮ | ▮ | ▮ | | | | |
| 10 | ▮ | ▮ | ▮ | ▮ | ▮ | Yes | SD_899224 | |
| 11 | ▮ | ▮ | ▮ | | | | | |
| 12 | ▮ | ▮ | ▮ | ▮ | None Found | No | SD_970129 | Assessed in previous booking |
| 13 | ▮ | ▮ | ▮ | ▮ | | | | |
| 14 | ▮ | ▮ | ▮ | ▮ | ▮ | Yes | SD_840606 | Refused |
| 15 | ▮ | ▮ | ▮ | ▮ | | | | |
| 16 | ▮ | ▮ | ▮ | ▮ | ▮ | Yes | SD_924890 | |
| 17 | ▮ | ▮ | ▮ | ▮ | | | | |
| 18 | ▮ | ▮ | ▮ | ▮ | ▮ | No | SD_951075 | Refused |
| 19 | ▮ | ▮ | ▮ | ▮ | | | | |
| 20 | ▮ | ▮ | ▮ | ▮ | ▮ | Yes | SD_754819 | |
| 21 | ▮ | ▮ | ▮ | ▮ | | | | |
| 22 | ▮ | ▮ | ▮ | ▮ | | | NO MED REC FOUND | |
| 23 | ▮ | ▮ | ▮ | ▮ | | | | |
| 24 | ▮ | ▮ | ▮ | ▮ | ▮ | Yes | SD_779409 | |
| 25 | ▮ | ▮ | ▮ | ▮ | | | | |
| 26 | ▮ | ▮ | ▮ | ▮ | ▮ | Yes | SD_785857 | |
| 27 | ▮ | ▮ | ▮ | ▮ | | | | |
| 28 | ▮ | ▮ | ▮ | ▮ | ▮ | Yes | SD_955818 | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██ | ██ | Yes | SD_939221 | |
| ██ | ██ | ██ | ██ | | | | |
| ██ | ██ | ██ | ██ | ██ | Yes | SD_1018658 | Refused |
| ██ | ██ | ██ | | | | | |
| ██ | ██ | ██ | ██ | ██ | No | SD_843900 | |
| ██ | ██ | ██ | | | | | |
| ██ | ██ | ██ | ██ | ██ | Yes | SD_921916 | |
| ██ | ██ | ██ | | | | | |
| ██ | ██ | ██ | | ██ | Yes | SD_823398 | Refused |
| ██ | ██ | ██ | ██ | | | | |
| ██ | ██ | ██ | ██ | ██ | Yes | SD_930404 | |
| ██ | ██ | ██ | ██ | | | | |
| ██ | ██ | ██ | ██ | | | NO MED REC FOUND | |
| ██ | ██ | ██ | | | | | |
| ██ | ██ | ██ | | ██ | Yes | SD_774452 | Refused |
| ██ | ██ | ██ | ██ | | | | |
| ██ | ██ | ██ | ██ | | | NO MED REC FOUND | |
| ██ | ██ | ██ | | | | | |
| ██ | ██ | ██ | ██ | ██ | Yes | SD_801436 | |
| ██ | ██ | ██ | | | | | |
| ██ | ██ | ██ | ██ | ██ | Yes | SD_923281 | |
| ██ | ██ | ██ | ██ | | | | |
| ██ | ██ | ██ | | | | NO MED REC FOUND | |
| ██ | ██ | ██ | ██ | | | | |
| ██ | ██ | ██ | ██ | ██ | Yes | SD_782303 | |
| ██ | ██ | ██ | ██ | | | | |
| ██ | ██ | ██ | | | | NO MED REC FOUND | |
| ██ | ██ | ██ | ██ | | | | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | 4/13/2023 | Yes | SD_914590 | |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | ███ | | ██ | Yes | SD_887341 | Refused |
| ███ | ███ | ███ | ███ | | | | |
| ███ | ███ | ███ | ███ | | ██ | Yes | SD_997358 | Refused |
| ███ | ███ | ███ | ███ | | | | |
| ███ | ███ | ███ | | ███ | 3/28/2023 | Yes | SD_999974 | |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | ██ | Yes | SD_1025003 | |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | ██ | Yes | SD_808906 | |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | ██ | Yes | SD_832302 | |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | ██ | Yes | SD_915237 | Refused |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | None Found | No | SD_953169 | Assessed in prior booking |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | ██ | No | SD_1021371 | Assessed in future booking |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | None Found | No | SD_897686 | Assessed in future booking |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | None Found | No | SD_788688 | |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | None Found | No | SD_931265 | |
| ███ | ███ | ███ | | ███ | | | |
| ███ | ███ | ███ | | ███ | ██ | No | SD_781065 | |
| ███ | ███ | ███ | | ███ | | | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_1006475 | |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | None Found | No | SD_840606 | Refused in future booking |
| ██████ | ██████ | ██████ | ██████ | | | | |
| ██████ | ██████ | ██████ | ██████ | | | NO MED REC FOUND | |
| ██████ | ██████ | ██████ | ██████ | | | | |

REBUTTAL EXPERT REPORT OF JEFFREY E. KELLER, M.D.
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

# Appendix C

**Index of Documents Reviewed by Jeffrey Keller Since August 21, 2024**

Claim against the County of San Diego by Guadalupe Conejo Ramirez, for the March 28, 2024 death of her son, Jose Ramon Cervantes Conejo, while incarcerated in Vista Detention Facility, includes: Medical Records from Palomar Medical Center and Death Certificate (issued April 25, 2024), September 19, 2024

County Contract Number 549675, Amended and Restated Agreement with Tri-City Medical Center for Hospital Inpatient and Outpatient Specialty Medical Services for Inmates, October 30, 2020

Declaration of James Clark, September 2, 2024

Defendants' Expert Disclosures, Expert Report of Owen J. Murray Attached as Exhibit E, August 21, 2024

Email Chain from Melanie Menear to NaphCare HSAs, DONs, Subject: Article about Grievance Response's[sic], October 22, 2020, CONFIDENTIAL (SD_397330-397331)

Email from Gay Grunfeld to Jeff Keller, Subject: Dunsmore; Mr. Conejo's Government Claim, October 3, 2024

Jeff McDonald, Kelly Davis, In 5 years since investigation, little progress in stopping deaths in San Diego County jails, *San Diego Union-Tribune*, September 29, 2024

Jeffrey Keller MD, Grievance Responses PLUS Sample Grievance Guideline, *Jail Medicine*, January 30, 2019, CONFIDENTIAL (SD_397332-397335)

Jennifer Sherman, Aaron Fischer, Opinion: Failure to provide insulin to inmate was reckless and deadly, *San Diego Union-Tribune*, October 8, 2024

Kelly Davis, Jeff McDonald, In unusual rebuke of sheriff, medical examiner rules diabetic man's jail death a homicide by neglect, *San Diego Union-Tribune*, September 19, 2024

Kelly Davis, Jeff McDonald, Sheriff introduces new jail safety efforts, and faces critics, in first oversight-board appearance and in-depth interview, *San Diego Union-Tribune*, October 6, 2024

Medical Examiner's Report, with Autopsy and Toxicology Reports, of Keith Bach

Medical Records of ███████, April 29, 2024

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Medical Records of ████████████, April 20, 2024, CONFIDENTIAL[1]

Medical Records of ████████████, April 19, 2024

Medical Records of ███████, April 22, 2024

Medical Records of █████████, April 29, 2024

Medical Records of █████████, April 22, 2024, CONFIDENTIAL

Medical Records of █████████, April 19, 2024

Medical Records of █████████, April 24, 2024

Medical Records of █████████, April 29, 2024

Medical Records of ████████████, April 19, 2024

Medical Records of █████████, April 22, 2024

Medical Records of █████████, April 19, 2024

Medical Records of █████████, April 23, 2024

Medical Records of ████████████, April 24, 2024, CONFIDENTIAL

Medical Records of █████████, April 19, 2024

Medical Records of █████████, April 29, 2024

Medical Records of █████████, April 23, 2024 (2 files)

Medical Records of █████████, April 19, 2024

Medical Records of ████████ April 29, 2024

---

[1] On September 20 and 26, 2024, Defendants produced certain medical records for the first time. None of these records were bates-stamped or marked Confidential under the Amended Protective Order in this case. Some of the medical records had San Diego County Sheriff's Department Health Information Management cover sheets stating that the information being disclosed contain confidential information. Those are indicated on this index as "Confidential," without prejudice to Plaintiffs' view that the content of these records may be disclosed if the names of the individuals and other identifying information are redacted.

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Medical Records of ███████████, April 18, 2024, CONFIDENTIAL

Medical Records of ███████████████, April 19, 2024

Medical Records of █████████████, April 19, 2024

Medical Records of █████████████, April 22, 2024, CONFIDENTIAL

Medical Records of ███████████████, April 24, 2024

Medical Records of █████████████, April 29, 2024

Medical Records of █████████████, April 19, 2024

Medical Records of █████████████, April 23, 2024

Medical Records of █████████████, April 23, 2024 (2 files)

Medical Records of █████████████, April 19, 2024

Medical Records of ███████████████, April 23, 2024 (3 files)

Medical Records of ███████████████, April 22, 2024

Medical Records of ███████████, April 19, 2024

Medical Records of █████████████, April 24, 2024, CONFIDENTIAL

Medical Records of █████████████, April 24, 2024

Medical Records of █████████████, April 22, 2024

Medical Records of █████████████, April 25, 2024

Medical Records of ███████████████, April 20, 2024, CONFIDENTIAL

Medical Records of █████████████, April 25, 2024, CONFIDENTIAL

Medical Records of █████████████, April 29, 2024

Medical Records of ███████████████, April 18, 2024, CONFIDENTIAL

Medical Records of █████████████, July 30, 2024, CONFIDENTIAL

Medical Records of ███████████████, April 29, 2024

Medical Records of █████████████████, April 24, 2024 (3 files)

3

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Medical Records of ███████████, April 29, 2024

Medical Records of ███████████, April 22, 2024

Medical Records of ████████████, April 19, 2024

Medical Records of █████████████, April 29, 2024

Medical Records of ██████████, April 22, 2024

Medical Records of ████████████ April 24, 2024 (3 files)

Medical Records of █████████, April 22, 2024

Medical Records of ███████████, April 22, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of ██████████, April 19, 2024, CONFIDENTIAL

Medical Records of ████████, April 29, 2024

Medical Records of ██████████, April 29, 2024

Medical Records of ██████████, April 23, 2024, CONFIDENTIAL

Medical Records of ██████████, April 18, 2024, CONFIDENTIAL

Medical Records of █████████, April 20, 2024, CONFIDENTIAL

Medical Records of ██████████, April 19, 2024

Medical Records of █████████, April 23, 2024 (3 files)

Medical Records of ██████████, April 20, 2024, CONFIDENTIAL

Medical Records of █████████, April 23, 2024 (2 files)

Medical Records of █████████, April 29, 2024

Medical Records of ███████████, April 22, 2024, CONFIDENTIAL

Medical Records of █████████, April 29, 2024

Medical Records of █████████, April 29, 2024

Medical Records of █████████ April 19, 2024

4

CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

[4556372.2]

Medical Records of ███████████, April 23, 2024

Medical Records of ███████████, April 29, 2024

Medical Records of █████████, April 22, 2024

Medical Records of █████████, April 19, 2024

Medical Records of █████████, April 20, 2024, CONFIDENTIAL

Medical Records of █████████, April 29, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of █████████, April 22, 2024

Medical Records of ███████, April 19, 2024

Medical Records of ████████, April 22, 2024

Medical Records of █████████, April 25, 2024

Medical Records of ██████████, April 23, 2024

Medical Records of █████████, April 19, 2024

Medical Records of ██████████, April 25, 2024, CONFIDENTIAL

Medical Records of █████████, April 29, 2024

Medical Records of ████████, April 29, 2024

Medical Records of █████████, April 29, 2024

Medical Records of ██████████, April 29, 2024

Medical Records of █████████, April 24, 2024, CONFIDENTIAL

Medical Records of █████████, April 22, 2024

Medical Records of ███████, April 19, 2024

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 23, 2024

Medical Records of █████████, April 29, 2024

5

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Medical Records of ████████, April 19, 2024

Medical Records of ██████, July 30, 2024, CONFIDENTIAL

Medical Records of ███████, April 29, 2024

Medical Records of ███████, April 19, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 19, 2024

Medical Records of █████████, April 18, 2024, CONFIDENTIAL

Medical Records of ███████, April 29, 2024

Medical Records of ███████, April 29, 2024

Medical Records of ███████, April 23-24, 2024 (3 files)

Medical Records of ██████, April 24, 2024

Medical Records of █████████, April 24, 2024

Medical Records of ██████████, April 25, 2024 (4 files)

Medical Records of ███████, April 20, 2024, CONFIDENTIAL

Medical Records of ████████, April 25, 2024 (7 files)

Medical Records of █████████, April 20, 2024, CONFIDENTIAL

Medical Records of █████████, April 20, 2024, CONFIDENTIAL

Medical Records of ███████, April 29, 2024

Medical Records of ████████, April 29, 2024

Medical Records of █████████, April 29, 2024

Medical Records of ████████, April 19, 2024

Medical Records of █████████, April 25, 2024 (6 files)

Medical Records of ████████, April 22, 2024

Medical Records of ████████, April 19, 2024

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 25, 2024 (7 files)

Medical Records of ████████, April 22, 2024

Medical Records of ████████, April 22, 2024, CONFIDENTIAL

Medical Records of ████████, April 24, 2024, CONFIDENTIAL

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 22, 2024, CONFIDENTIAL

Medical Records of ████████, April 23, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 18, 2024, CONFIDENTIAL

Medical Records of ████████, April 25, 2024 (6 files)

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 22, 2024, CONFIDENTIAL

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 20, 2024, CONFIDENTIAL

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 24, 2024

Medical Records of ████████, April 25, 2024 (7 files)

Medical Records of ████████, April 24, 2024, CONFIDENTIAL

7

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Medical Records of ██████████, April 25, 2024 (7 files)

Medical Records of ██████████, April 19, 2024, CONFIDENTIAL

Medical Records of ██████████, April 22, 2024

Medical Records of ██████████, April 25, 2024 (7 files)

Medical Records of ██████████, April 20, 2024, CONFIDENTIAL

Medical Records of █████████, April 19, 2024

Medical Records of ████████████, April 22, 2024

Medical Records of █████████, April 29, 2024

Medical Records of ██████████, April 25, 2024 (7 files)

Medical Records of █████████, April 24, 2024, CONFIDENTIAL

Medical Records of █████████, April 25, 2024

Medical Records of ████████, April 29, 2024

Medical Records of █████████, April 29, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of █████████, April 22, 2024, CONFIDENTIAL

Medical Records of ██████████, April 19, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of █████████, April 29, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of █████████, April 29, 2024

Medical Records of █████████, April 19, 2024

Medical Records of ██████████, April 23, 2024

Medical Records of █████████, April 19, 2024

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Medical Records of ██████████, April 25, 2024, CONFIDENTIAL

Medical Records of ██████████, April 19, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of ██████████, April 29, 2024

Medical Records of ██████████, April 22, 2024

Medical Records of ██████████, April 25, 2024 (3 files)

Medical Records of ██████████, April 22, 2024

Medical Records of ██████████, April 29, 2024

Medical Records of ██████████, April 29, 2024

Medical Records of ██████████, April 22, 2024

Medical Records of ██████████ April 22, 2024, CONFIDENTIAL

Medical Records of ██████████, May 3, 2024, CONFIDENTIAL

Medical Records of ██████████, April 23, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of ██████████, April 23, 2024, CONFIDENTIAL

Medical Records of ██████████, April 29, 2024

Medical Records of ██████████, April 29, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of ██████████, April 25, 2024, CONFIDENTIAL

Medical Records of ██████████, April 29, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of ██████████, April 29, 2024

Medical Records of ██████████, April 18, 2024, CONFIDENTIAL

Medical Records of ██████████, April 22, 2024, CONFIDENTIAL

9

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Medical Records of ████████, April 23, 2024, CONFIDENTIAL

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ██████, April 19, 2024, CONFIDENTIAL

Medical Records of ███████, April 24, 2024

Medical Records of ████████, April 23, 2024, CONFIDENTIAL

Medical Records of ███████, April 19, 2024

Medical Records of ████████, April 18, 2024, CONFIDENTIAL

Medical Records of ███████, April 19, 2024

Medical Records of █████████, April 19, 2024

Medical Records of ███████, April 29, 2024

Medical Records of ███████, April 29, 2024

Medical Records of ████████, April 23, 2024

Medical Records of ███████, April 29, 2024

Medical Records of █████████, April 19, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 18, 2024, CONFIDENTIAL

Medical Records of █████████, April 19, 2024, CONFIDENTIAL

Medical Records of █████████, April 23, 2024, CONFIDENTIAL

Medical Records of ████████, April 29, 2024

Medical Records of █████████, April 22, 2024

Medical Records of ███████, April 19, 2024

Medical Records of █████████, April 19, 2024

10
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Medical Records of █████████, April 22, 2024

Medical Records of ███████, July 30, 2024, CONFIDENTIAL

Medical Records of ████████, April 19, 2024

Medical Records of █████████, April 24, 2024

Medical Records of ███████, April 22, 2024, CONFIDENTIAL

Medical Records of ████████, April 24, 2024, CONFIDENTIAL

Medical Records of █████████, April 22, 2024

Medical Records of ████████, July 30, 2024, CONFIDENTIAL

Medical Records of █████████, April 25, 2024

Medical Records of ██████, April 29, 2024

Medical Records of ██████████, April 19, 2024, CONFIDENTIAL

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 19, 2024

Medical Records of ██████████, April 23, 2024, CONFIDENTIAL

Medical Records of ████████, April 29, 2024

Medical Records of █████████, April 29, 2024

Medical Records of █████████, April 29, 2024

Medical Records of ████████, April 18-23, 2024 (6 files)

Medical Records of ███████, April 29, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████ April 19, 2024

Medical Records of █████████, April 29, 2024

Medical Records of ████████, April 19, 2024

Medical Records of █████████, April 25, 2024 (7 files)

11

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Medical Records of ██████████, April 29, 2024

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 23, 2024, CONFIDENTIAL

Medical Records of ████████, April 22, 2024

Medical Records of ███████, April 29, 2024

Medical Records of █████████, April 25, 2024 (4 files)

Medical Records of ███████, April 29, 2024

Medical Records of ████████, April 22, 2024, CONFIDENTIAL

Medical Records of █████████, April 22, 2024, CONFIDENTIAL

Medical Records of █████████, April 23, 2024, CONFIDENTIAL

Medical Records of ████████, April 22, 2024

Medical Records of █████████, April 29, 2024

Medical Records of ████████, April 18, 2024, CONFIDENTIAL

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 24, 2024

Medical Records of █████████, April 19, 2024

Medical Records of █████████, April 18, 2024, CONFIDENTIAL

Medical Records of ███████, April 19, 2024

Medical Records of ███████ April 19, 2024

Medical Records of ███████, April 19, 2024

Medical Records of █████████ April 22, 2024

Medical Records of ███████, April 19, 2024

Medical Records of █████████, April 25, 2024 (7 files)

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Medical Records of ████████, April 25, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 25, 2024

Medical Records of ████████, April 25, 2024

Medical Records of ████████ April 25, 2024 (7 files)

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 22, 2024, CONFIDENTIAL

Medical Records of ████████ April 18, 2024, CONFIDENTIAL

Medical Records of ████████, April 22, 2024

Medical Records of ████████, April 23, 2024, CONFIDENTIAL

Medical Records of ████████, April 22, 2024, CONFIDENTIAL

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 23, 2024, CONFIDENTIAL

Medical Records of ████████, April 19, 2024

Medical Records of ████████, April 23, 2024

Medical Records of ████████, April 22, 2024, CONFIDENTIAL

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 22, 2024

Medical Records of ████████, April 18, 2024, CONFIDENTIAL

Medical Records of ████████, April 20, 2024, CONFIDENTIAL

Medical Records of ████████, April 25, 2024, CONFIDENTIAL

Medical Records of ████████, April 22, 2024

13

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Medical Records of ███████████ April 19, 2024

Medical Records of █████████████, April 29, 2024

Medical Records of █████████████, April 19, 2024

Medical Records of ████████████, April 29, 2024

Medical Records of ███████████████, July 30, 2024, CONFIDENTIAL

Medical Records of ███████████, April 29, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of ████████████, April 19, 2024

Medical Records of ████████████, April 24, 2024, CONFIDENTIAL

Medical Records of ████████████, April 22, 2024, CONFIDENTIAL

Medical Records of ███████████, April 22, 2024, CONFIDENTIAL

Medical Records of █████████████, April 20, 2024, CONFIDENTIAL

Medical Records of █████████████, April 19, 2024, CONFIDENTIAL

Medical Records of ████████████, April 19, 2024

Medical Records of ████████████, April 29, 2024

Medical Records of █████████████, April 24, 2024, CONFIDENTIAL

Medical Records of ████████████, April 19, 2024

Medical Records of ████████████, April 19, 2024

Medical Records of ████████████, April 29, 2024

Medical Records of ████████████, April 29, 2024

Medical Records of ████████████, April 19, 2024

Medical Records of ████████████, April 19, 2024

Medical Records of █████████████, April 18, 2024, CONFIDENTIAL

Medical Records of █████████████, April 24-26, 2024 (7 files)

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Medical Records of ███████████, April 22, 2024

Medical Records of ███████████, April 29, 2024

Medical Records of ███████████, April 19, 2024

Medical Records of ███████████, April 29, 2024

Medical Records of █████████, April 19, 2024

Medical Records of █████████, April 19, 2024

Medical Records of ███████████, April 24-25, 2024 (7 files)

Medical Records of █████████, April 19, 2024

Medical Records of █████████, April 19, 2024

Medical Records of ███████████, April 29, 2024

Medical Records of ██████████, April 19, 2024

Medical Records of ███████████, April 22, 2024

Medical Records of ██████████, April 25, 2024 (6 files)

Medical Records of ██████████, April 20, 2024, CONFIDENTIAL

Medical Records of █████████, April 29, 2024

Medical Records of ██████████, April 23, 2024

Medical Records of █████████, April 29, 2024

Medical Records of █████████, April 29, 2024

Medical Records of █████████, April 29, 2024

Medical Records of ██████████, April 18, 2024 (2 files)

Medical Records of █████████, April 19, 2024

Medical Records of ██████████, April 23, 2024, CONFIDENTIAL

Medical Records of ███████████, April 19, 2024

Medical Records of █████████, April 29, 2024

15

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

Medical Records of ██████████, April 22, 2024, CONFIDENTIAL

Medical Records of ██████████, April 29, 2024

Medical Records of ████████, April 22, 2024

Medical Records of █████████, April 22, 2024

Medical Records of █████████, April 22, 2024

Medical Records of ████████, April 24, 2024, CONFIDENTIAL

Medical Records of ████████, April 22, 2024

Medical Records of ████████, April 25, 2024

Medical Records of ███████████, April 19, 2024

Medical Records of █████████, April 19, 2024

Medical Records of █████████, April 22, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 25, 2024

Medical Records of █████████, April 22, 2024

Medical Records of ████████, April 19, 2024, CONFIDENTIAL

Medical Records of ████████, April 29, 2024

Medical Records of █████████, April 19, 2024

Medical Records of ████████, April 22, 2024

Medical Records of ████████, April 29, 2024

Medical Records of ████████, April 22, 2024, CONFIDENTIAL

Notes taken by Owen Murray re Deposition Transcript of Angela Nix

Notes taken by Owen Murray re Deposition Transcript of Serina Rognlien-Hood

Notes taken by Owen Murray re Deposition Transcript of Jon Montgomery, MD

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

Notes taken by Owen Murray re Deposition Transcript of Dr. Peter Jay Freedland, CONFIDENTIAL

Notes taken by Owen Murray re Deposition Transcripts of Christine Evans, M.D. and Theresa Adams-Hydar

PowerPoint Presentation of San Diego County Sheriff's Department Review of In Custody Death of Eric Wolf

Spreadsheet of Intake Records Pull List

Spreadsheet of Nurse Sick Call Records Pull List

Spreadsheet of Review of 14-day Health Assessment Compliance

U.S. Department of Justice, Bureau of Justice Assistance, "Death in Custody Reporting Act: Reporting Guidance and Frequently Asked Questions," available at https://bja.ojp.gov/funding/performance-measures/DCRA-Reporting-Guidance-FAQs.pdf

**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

[4556372.2]

# EXHIBIT R

GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile: (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone: (858) 677-1400
Facsimile: (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive, <br><br> Defendants. | Case No. 3:20-cv-00406-AJB-DDL <br><br> **EXPERT REPORT OF JAY D. SHULMAN** <br><br> Judge: Hon. Anthony J. Battaglia <br> Magistrate: Hon. David D. Leshner |

[4472186.19]

EXPERT REPORT OF JAY D. SHULMAN
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

# TABLE OF CONTENTS

**Page**

EDUCATION AND QUALIFICATIONS ............................................................ 1

    A.    Clinical, Management, and Academic Experience ................................ 1

    B.    Correctional Dentistry Experience.................................................. 2

BACKGROUND & SUMMARY OF OPINIONS ...................................... 3

    A.    Inadequate Urgent Care ..................................................... 4

    B.    Inadequate Routine Care .................................................... 5

    C.    Inadequate Dentist Staffing................................................. 5

    D.    Inadequate Program Monitoring ...................................... 5

STANDARDS FOR CORRECTIONAL DENTAL CARE........................................ 6

    A.    Correctional Organizations ................................................. 6

    B.    Dental Organizations........................................................ 8

    C.    Regulatory Organizations / Institutions ................................. 9

    D.    United States Department of Justice ("DOJ") ...................... 10

    E.    California Department of Corrections and Rehabilitation
        ("CDCR")................................................................. 11

    F.    Scientific and Correctional Literature.................................. 12

METHODOLOGY ...................................................................... 12

    A.    Site Visits .................................................................... 13

    B.    Chart Reviews ............................................................... 14

        1.    Selection of Dental Records ................................. 15

        2.    Calculation of Wait Times................................... 16

    C.    San Diego County Jail Population ....................................... 21

OPINIONS................................................................................ 23

    A.    Untimely Urgent Care ..................................................... 24

        1.    Untimely Onsite Treatment for Painful Conditions .................. 26

        2.    Untimely and Denied Offsite Treatment for Painful
            Conditions.................................................... 35

B.    Inadequate Routine Care ...................................................................... 39

    1.    Inadequate Initial and Annual Examinations ............................ 41

    2.    Inadequate Diagnosis and Treatment of Dental Caries ............. 47

    3.    Inadequate Diagnosis and Treatment of Periodontal
Disease ...................................................................................... 51

    4.    Inadequate Preventative Care ..................................................... 53

    5.    Inadequate Endodontic Treatment ............................................. 54

C.    Inadequate Dentist Staffing .................................................................. 56

D.    Inadequate Program Monitoring and Oversight .................................. 61

    1.    Dental Charting ......................................................................... 62

    2.    Peer Review ............................................................................... 66

    3.    Dental Director .......................................................................... 69

    4.    Continuous Quality Improvement ("CQI") ............................... 69

CONCLUSION .................................................................................................. 74

**EXPERT REPORT OF JAY D. SHULMAN**
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    members who sought dental care during their incarceration in the Jail.

2        54.    I also reviewed ten charts of incarcerated people based on interviews I

3    performed in the housing areas during the inspections.  I introduced myself and

4    asked if they would like to talk to me about any dental issues.  I asked those who

5    had issues if they would consent to my reviewing their dental chart.

6                **2.    Calculation of Wait Times**

7        55.    As explained in more detail below, the standard of care requires people

8    complaining of pain to be evaluated *by a dentist* within the following time frames:

9            a.    Incarcerated people complaining of a toothache should be **seen**

10   **by a dentist within 3 business days**, unless they have been started on antibiotics,

11   are experiencing severe pain, or their pain cannot be managed by analgesics, in

12   which case they should be **seen by a dentist the next business day**.

13           b.    Incarcerated people referred to an oral surgeon for the extraction

14   of infected teeth should have the teeth extracted **within three weeks**.

15       56.    For each dental record I reviewed, I calculated the number of days

16   between a person requesting dental care and being seen by the dentist.  My focus in

17   reviewing the records was therefore on sick call request slips regarding dental

18   issues, forms memorializing the outcome of dental examinations, progress notes and

19   sick call summary entries related to dental issues, and offsite consultants' treatment

20   plans and operative notes.  I assume that I have been provided with the complete set

21   of records for each individual, *i.e.*, that I was able to see all records that the

22   examining dentist had at the time of treatment.  I also reviewed all x-rays that were

23   present.[23]

24

25   _____

26   [23] Only panoramic x-rays were present in the charts I reviewed.  The panoramic x-rays taken at the Jail did not have the dates on which they were taken.  Notably, Defendants in this litigation represented that all x-rays taken had been produced to Plaintiffs' counsel.  Email from E. Pappy to H. Chartoff, May 17, 2024.  However, in at least one instance, there is reference to a bitewing x-ray taken by Dr. Patel, which is not present in the chart I reviewed.  SD 842916 – 842921.

57.    In assessing timeliness, I started the "clock" on the date recorded by the incarcerated person on the sick call request slip describing the painful condition.  If that date was not legible, I used the date stamped by the Sheriff's Department as the day the sick call request was received.  If another part of the medical record, *e.g.*, the sick call summary or progress notes, indicated that the incarcerated person had a dental complaint related to pain and the sick call request was not in the chart, I used that date on the other record as the start date.

58.    I stopped the clock when the incarcerated person was seen by a dentist to assess the problem—irrespective of the treatment provided (if any)—the date on which the person was documented as having refused the dentist appointment, the date the incarcerated person was discharged, or the date on which the chart was pulled for production.[24]

59.    Notably, based on the documents I have reviewed, I have some skepticism that the Sheriff's Department is appropriately documenting refusals, *i.e.*, that incarcerated people are not refusing dental appointments, but are merely not being told that they had the appointment.  As noted throughout Exhibit C, nearly all the refusal forms I saw were not signed by the incarcerated person, or even signed by healthcare staff.  Rather, they were signed by deputies only.  In addition, Plaintiff Ernest Archuleta reported in his deposition that several of the "refusals" in his own medical record were not correct, and he had not actually refused medical care or treatment as his record reflected.  *See* Archuleta Tr. at 187:9-18.  It should go without saying that failing to alert incarcerated persons with a painful dental condition that they have an appointment with a dentist and therefore denying that person the opportunity for treatment falls below the standard of care.

---

[24] Most of the incarcerated persons who submitted sick call requests stating pain were triaged by nurses and provided with analgesics or referred to a nurse practitioner to evaluate a possible infection.  In many cases, the nurses did not make a referral to dental sick call.  However, a nurse appointment is not a substitute for evaluation by a *dentist*.

60.    However, for purposes of calculating the timeliness of the Jail's dental care, this report assumes that each of these refusals was valid.  As explained below and in Exhibit C, even with that assumption, urgent dental care appointments in the Jail are rarely timely.  To the extent that "refused" appointments were not truly refused by the patient, this report is therefore an **understatement** of the true wait time for dental care in the Jail.  Similarly, when an incarcerated individual was discharged with an open urgent care request, I used the individual's discharge date as the endpoint of the timeliness calculation.  As with refused appointments, these discharge dates **understate** the true wait time—had the person remained in the Jail's custody, the clock would have kept running until they received treatment.  Notably, 22 percent of all endpoints were calculated based on a discharge date, rather than a treatment date (*see* Table 1, Col. E).  In other words, a significant portion of the requests for urgent care made in these records were simply never answered by a dentist; the patient complaining of pain was simply released, after waiting in pain for far longer than the standard of care would dictate.

61.    To determine timeliness of offsite consultations, I calculated the time between when the referral was initiated and the surgery was completed.  However, when relevant, I also note the time when, in my opinion (based on reviewing the chart and x-rays), the referral should have been initiated.

62.    I report the median wait time because the median (rather than the mean) is a robust and resistant estimate of the population and is particularly useful when a distribution is not symmetrical as is this one, since there are more long wait times than short wait times.  The median is less influenced by these outliers than the mean.[25]

63.    I reviewed 55 charts; 45 selected by the Defendants' counsel, and 10

---

[25] Reigleman RK and Hirsch RP, 2nd ed. Studying a study and testing a test. How to read the medical literature. Little Brown & Company, 1989.

EXPERT REPORT OF JAY D. SHULMAN
CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY

1  selected based on cellside interviews with incarcerated persons.

2      64.    The Table below summarizes my findings.

| Table 1. Summary of Chart Review - Urgent Care Provided Onsite | | | | | |
|---|---|---|---|---|---|
| **Defendants' Selections** | | | | **My Selections** | **All Charts** |
| | **Offsite Referrals** | **Requested Services** | **All Defendants' Selections** | | |
| | A | B | C | D | E |
| Number of Charts | 21 | 24 | 45 | 10 | 55 |
| Number of Urgent Care Wait Times Calculated | 85 | 74 | 159 | 21 | 199 |
| Median Wait Time (Days) | 22 | 25 | 24 | 23 | 24 |
| Number of Documented Refusals | 4 | 12 | 16 | 6 | 22 |
| Number of Imputed Endpoints | 13 | 23 | 36 | 8 | 44 |
| Imputed Endpoints (%) | 15.3 | 31.1 | 22.6 | 20.0 | 22.0 |
| Untimely (>3 Business Days) Wait Times | 71 | 67 | 138 | 38 | 176 |
| Untimely (> 3 Business Days Wait Times (%) | 83.5 | 90.5 | 86.8 | 95.0 | 88.4 |

EXPERT REPORT OF JAY D. SHULMAN
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

| Table 1. Summary of Chart Review - Urgent Care Provided Onsite | | | | | |
|---|---|---|---|---|---|
| Defendants' Selections | | | | Mv Selections | All Charts |
| | Offsite Referrals | Requested Services | All Defendants' Selections | | |
| Untimely (>7 Days) | 69 | 65 | 134 | 36 | 170 |
| Untimely (>7 Days) (%) | 81.2 | 87.8 | 84.3 | 90.0 | 85.4 |

65.     The 45 charts provided by the Defendants represent 159 dental visits for urgent care or open treatment requests that were pending when the incarcerated person was discharged or the chart was pulled,[26] of which 85 were from the referral group and 74 were from the requested dental services group.[27]  The median wait time for these urgent care dental visits was 24 days.  The median wait time for dental visits in the outside referral group was 22 days, while that of the patients who requested dental care was 25 days.  The 10 charts I selected represent 21 urgent dental visits, for which the median wait time was 23 days.  The median urgent care wait time for all 55 charts reviewed was 24 days, for 199 total appointments.

66.     Of the 199 onsite urgent care appointments (across all 55 charts) for which wait times were calculated, 176 (88.4%) were untimely; that is, outside the 3 business day window.  Even using the 7-day "standard" suggested by NaphCare, *see*

---

[26] There were 36 (22.6%) such occurrences where the computed wait time represented underestimates.

[27] Several of the wait times were calculated using the date the chart was copied as the endpoint.

EXPERT REPORT OF JAY D. SHULMAN
**CONFIDENTIAL & CONFIDENTIAL – FOR COUNSEL ONLY**

1    SD 1572589, 170 (85.4%) would be untimely.[28]

2        67.    Of the 21 charts in the offsite referral group, 15 documented completed

3    surgery, and 6 endpoints were imputed.  While most of the referrals were made by

4    dentists, four were made by physicians.  The median time to completion of surgery

5    was 94 days.[29]

6    **C.    San Diego County Jail Population**

7        68.    The *Criminal Justice Realignment Act of 2011* made significant

8    changes to the sentencing and supervision of persons convicted of felony offenses;

9    one the most significant changes being the place where the sentence for certain

10   crimes is to be served.  Couzens and Bigelow, p. 6.[30]  As a result, the populations of

11   county jails and the median sentence lengths have increased, turning transitory jails

12   into hybrid jail/prison facilities.  For example, I am aware of at least one individual

13   serving a fifteen-year sentence in the San Diego County Jail.[31]  The provision of

14   dental care in county jails has been substantially impacted since 2011 since the

15   longer sentences carry with them a responsibility for providing more comprehensive

16   care.

17       69.    Prior to realignment, it was not unusual for dental care provided to

18   people incarcerated in jails to be restricted to treating conditions associated with

19   pain (*i.e.*, urgent care), while treatment for non-painful conditions (*i.e.*, routine care)

20   was not provided.  However, people incarcerated for a longer stays require a larger

21   array of dental services.  Consequently, jails must be prepared to provide longer-

22

23   _____

24   [28] It is notable that there is only a 3 percentage point difference in untimely urgent
     care appointments between categories.

25   [29] It is notable that referrals made by the medical department led to more timely
     surgery because these referrals were generally to hospital emergency departments

26   which bypassed the cumbersome NaphCare utilization management process.

27   [30] Couzens, J. R., & Bigelow, T. A. (2017). *Felony sentencing after realignment*.
     Retrieved August 13, 2024 from
     *www.courts.ca.gov/partners/documents/felony_sentencing.pdf.*

28   [31] *See* San Diego Who's In Jail search of Pedro Rodriguez.

# EXHIBIT T

<div align="center">

**EXPERT OPINION**
**Brian L. Withrow, Ph.D.**
**Dunsmore, et. al.  v. San Diego County Sheriff's Department et. al.**
**Case 3:20—cv-00406-AJB-DDL**

</div>

**Scope of opinion**

The primary purpose of this expert opinion is to determine whether a pattern or practice of racial discrimination might exist within the routine enforcement activities of the San Diego County Sheriff's Office.  This report contains a statistical analysis of the data describing these activities from the same data sets provided to the plaintiffs in this case.  More importantly, this opinion focuses on the generally accepted methodological processes and procedures that are the bases for statistical analysis.

**Summary of Expert's Background**

Dr. Brian L. Withrow is a Professor of Criminal Justice at Texas State University.  Prior to joining the Texas State University faculty in 2009, Brian was an Associate Professor and Director of Forensic Sciences at Wichita State University.  While at Wichita State, Dr. Withrow served one term as Mayor of Bel Aire Kansas.  From 1993 to 1999, Dr. Withrow managed a police leadership development program at Sam Houston State University in Huntsville Texas.

Prior to his scholarly career Brian worked for the Texas Department of Public Safety.  He started in 1981 as a State Trooper in a rural part of the Texas Panhandle.  During the 13 years Brian was at DPS he promoted to the rank of Training Officer, Inspector and finally Bureau Manager at the Austin headquarters.

Brian earned his Bachelor of Arts degree in Criminal Justice from Stephen F. Austin State University in 1981, his Master's of Public Administration from Southwest Texas State University in 1993, and his Doctor of Philosophy in Criminal Justice from Sam Houston State University in 1999.

Dr. Withrow is one of the nation's leading experts on the racial profiling controversy.  He has authored three books and numerous articles and reports on this controversy.  He is regularly asked to provide technical and litigation assistance on racial profiling issues to police departments throughout the nation.   Dr. Withrow's research methods textbook (Research Methods in Crime and Justice, Second Edition (2016), Routledge Publishing) is used extensively throughout the United States and in other countries.  In 2018, he coauthored a popular textbook on ethics (Police Ethics: The Corruption of Noble Cause, Fourth Edition (2018), Routledge Publishing) with Michael A. Caldero and Jeffrey C. Dailey.

No additional exhibits, other than the statistical analyses within this report, have been developed or are intended to be used in this case.  Dr. Withrow has testified numerous times in court or sat for depositions, the latest being two cases in 2009.   His regular rate for analyzing data to identify potential patterns of racial discrimination is $300.00 per hour.  His regular rate for appearing as a witness in courtroom testimony or at a deposition is $500.00 per hour.

1

**Questions of Racial Discrimination or Disparate Impact**

How racial discrimination (e.g. profiling) is defined within the context of routine police operations is important to our analysis and not unlike our use of the criminal code that defines the elements of a crime.  For example, in most cases a charge of driving while intoxicated requires that the driver be intoxicated and operating a motor vehicle on a public road.  Some states allow DWI charges to go forward if the driver is operating a motor vehicle in a public place, like a parking lot.  The point is that the State must prove all elements of the crime beyond a reasonable doubt before a verdict of guilty can be reached.

There are two competing definitions of racial profiling.  The first definition is offered by Ramirez, McDevitt, & Farrell, 2000:3.  Throughout the research literature, it is the most commonly used type of definition:

> …any police-initiated action that relies on the race, ethnicity, or national origin rather than the behavior of an individual or information that leads the police to a particular individual who has been identified as being, or having been, engaged in criminal activity.

This is a *conceptual* definition of racial profiling.  To sustain an allegation of racial profiling the accuser must be able to prove that:

- The police officers were aware of an individual's race or ethnicity prior to initiating the stops, and
- The police officers used this information as a reason for initiating a stop.

The other type of definition is offered by Lamberth (1994:4) as:

> …implied as when minorities are stopped at disproportionately higher rates than they are represented within the benchmark that indicates the proportional racial representation of actual roadway users.

This is often called an *operational* definition of racial profiling.  Using this definition to prove racial profiling requires only that the percentage of stops involving members from a particular race or ethnic group is higher than they are represented in a measure of the driving population (Withrow, 2006).

Both types of definitions have their places within the breadth of racial profiling research.  However, both are dependent upon a valid (i.e. accurate) and reliable (i.e. consistent) measure of the proportional representation of individuals (by race or ethnicity) at risk of being contacted by a police officer.  Within this research agenda, these measures are commonly called benchmarks.  In a later section, a more thorough discussion of the advantages and disadvantages of the various benchmarking strategies used by racial profiling researchers is offered.

2

Ex. T-1560

**How California Defines Racial Discrimination (Racial Profiling) in Routine Police Operations**

There appear to be two legal definitions of racial profiling in California law. The first comes from Chapter 684 and defines racial profiling as "the practice of detaining a suspect based on a broad set of criteria which casts suspicion on an entire class of people without any individualized suspicion of the particular person being stopped."  The second comes from Assembly Bill 953, Section 4(e) as follows.

> (e) "Racial or identity profiling," for purposes of this section, is the consideration of, or reliance on, to any degree, actual or perceived race, color, ethnicity, national origin, age, religion, gender identity or expression, sexual orientation, or mental or physical disability in deciding which persons to subject to a stop or in deciding upon the scope or substance of law enforcement activities following a stop, except that an officer may consider or rely on characteristics listed in a specific suspect description. The activities include, but are not limited to, traffic or pedestrian stops, or actions during a stop, such as asking questions, frisks, consensual and nonconsensual searches of a person or any property, seizing any property, removing vehicle occupants during a traffic stop, issuing a citation, and making an arrest.

Both of these definitions are conceptual, meaning that, at the very least, prior knowledge of an individual's race or ethnicity by the police officer is necessary to sustain an accusation of racial discrimination (e.g. profiling).

**Methodological Challenges to Proving Racial Discrimination in Routine Police Operations**

The challenge to proving racial discrimination in routine police operations is much more methodological than analytical.  Success, and to some degree effectiveness, in this area of research requires a strong understanding of how data are collected and, perhaps more importantly, how data are used to define the behavior of police officers.

*Estimating the Population of Individuals at Risk of Police Interaction (benchmarks)*

Data on the race/ethnicity of individuals involved in police interactions are rather meaningless unless they are compared to a measure of the proportional representation of individuals by race and ethnicity that are exposed to routine police observation.  For example, if the police report that twenty percent of the contacts they initiate involve Black drivers while only ten percent of the individuals exposed to routine police observation are Black one might conclude that Black individuals are over-represented. Another researcher may use this finding to conclude that Black individuals are routinely targeted by the police department.

Unfortunately, measuring the population of individuals at risk of routine police observation is incredibly challenging.  Throughout the history of racial profiling research, five benchmarking strategies have emerged.

3

Ex. T-1561

Population based benchmarks are by far the most commonly used. Most are based on the racial/ethnic proportions within the residential population as reported or estimated by the United States Bureau of the Census or other authoritative sources. If the police stop data contain information on all individuals (including juveniles) who may come in contact with the police, then the researcher should use the entire population of the community (Withrow 2002, 2006). Some researchers only use the estimated population of licensed drivers (Smith and Petrocelli 2001). And a few researchers adjust the population using weighting factors like vehicle ownership (Rojek, Rosenfeld, and Decker 2004) or population centers within metropolitan area (Novak 2004).

While readily available to researchers, residential population benchmarks have four key disadvantages.

1. They do not include the transient population – people who drive into or through a community but do not live in the community.
2. They do not account for differential exposure to police observation based on where people live, where the police are assigned and how much people drive.
3. They do not account for other factors (e.g. occupation, age, gender) that affect driving frequency.
4. The historic underreporting of some racial/ethnic minorities may skew the population estimates.

Field observation based benchmarks are developed by systematically observing drivers in traffic at and during randomly selected locations and times. Most studies attempt to record the race, ethnicity, gender and age of the observed drivers (Police Foundation 2003). In addition, some researchers attempt to identify the drivers (also by race/ethnicity, age and gender) who are observed violating the traffic law, and therefore more likely to be stopped (Lamberth 1994). One research team even used digital cameras and speed detection technology to record images of drivers and their speed (Lange, Blackman, and Johnson 2001). Field observation benchmarks are then compared to the police stop data that is collected at or near where the benchmarks are collected.

While field observation benchmarks address many of the shortcomings of benchmarks based on the residential population, they do have five key disadvantages.

1. Very expensive and time consuming to collect.
2. Potentially unreliable (inconsistent) and invalid (inaccurate) in low light, high volume and high speed locations.
3. Limits generalizability of the study's results to the observation site.
4. Difficult to associate the benchmark with a relevant portion of the police stop data because stops may not occur where the violations are observed and vice versa.
5. There is scant evidence within the research that police officers are able to determine the race or ethnicity of an individual prior to making the decision to initiate a contact.

4

**Ex. T-1562**

Accident records are used extensively by traffic engineers and automobile insurance companies to develop risk factors among drivers (Alpert, Smith, and Dunham 2003). This is one reason why young drivers pay high automobile insurance rates. In racial profiling research the focus is on the not-at-fault drivers in two vehicle accidents. The Washington State Patrol (2001) introduced this technique to the racial profiling research agenda. The logic of this benchmarking strategy is based on two factors. First, from the not-at-fault drivers' perspectives an accident is a near random event. An appropriate sample of these events provides insight into the race, ethnicity, gender and age of the actual driving population. Second, individuals who drive more often are more at risk of being involved in an accident. Third, individuals who drive more frequently are also more at risk of being observed by a police officer. So accident records based benchmarks naturally include a weighting factor for driving frequency.

Here again, benchmarks based on accident records do provide some additional insight. However, there are three key disadvantages.

1. There are no empirical studies that have validated the accuracy of this estimate.
2. In many jurisdictions, accident records do not include the race/ethnicity of the not-at-fault driver.
3. It is difficult to determine which driver is truly not-at-fault.

One of the newest strategies is called the Veil of Darkness analysis. This strategy assumes that during the intertwilight time (i.e. at night) police officers are less able to see the race or ethnicity of a driver prior to the stop and are therefore less able to initiate a stop based on *racial animus*. This analytical technique was first developed in the late 1960's (Black, 1971; Black & Reiss, 1970; LaFave, 1965, Reiss, 1971). It was later developed for use in racial profiling research by Engel & Calnon, 2004; Grogger and Ridgeway, 2006, Smith & Petrocelli, 2001, Smith et al, 2004, Smith et al, 2017, and Withrow, 2006).

While it would seem this strategy would overcome some of the measurement challenges of previous benchmarking strategies, it is not at all clear that it is as effective as proposed (Stacey & Bonner, 2020). Taniguchi, et al, 2017 finds when omitting stops between sunset and the end of civil twilight that the officers' ability to identify race did not influence who was being stopped (see also Oakland Police Department, 2004). Other researchers express concerns about the inability of this strategy to account for seasonal differences in the length of the intertwilight time (Ridgeway, 2009, Worden, et al, 2012, Taniguchi et al, 2017). Other researchers are critical of this strategy because it does not account for variations in ambient lighting (Horrace & Rohlin, 2016).

A final strategy that deserves some mention here, because it may provide more insight within this particular research context, is called an internal benchmark. This strategy compares the stops among similarly situated police officers in an attempt to identify specific officers that appear to be exhibiting troublesome behaviors. For example, a single officer reporting that thirty percent of the stops he makes involve Black drivers might warrant further administrative scrutiny

5

**Ex. T-1563**

if other similarly situated officers only report ten percent of the stops they make involve Black drivers. Of course the key to this strategy lies in identifying similarly situated officers. This means, at minimum, identifying officers that are assigned to work in the same neighborhoods or beats, at the same time of day or night, and having the same enforcement assignment. This method was first proposed as a means to identify officers with potential problematic behaviors (Walker, et al 2001). Later, Withrow, Dailey and Jackson (2008) demonstrated the effectiveness of this strategy within a racial profiling context.

An internal benchmarking strategy may overcome many of the measurement challenges of benchmarks developed from sources external to actual police activity. However, there are a few caveats associated with the use of this benchmarking strategy.

1. There are multiple ways to define 'similarly situated'.
2. Because police officers are assigned and then reassigned frequently (even within a single shift) it is difficult to determine which other officers are similarly situated.
3. Documentation of how officers are assigned is often difficult to obtain and often completely nonexistent.
4. Assignments to a particular location, time, type of enforcement activity, etc. does not preclude an officer from initiating a contact outside of his/her immediate work assignment.

*Limitations of Available Data*

Data and information related to traffic stops and police interactions do not typically include sufficient information to measure important variations in the contexts of situations. Many of these contextual features are known to influence police officer decision making. Context matters in racial profiling research because knowing the context of an event provides a more informed means of evaluating the legitimacy of an officer's behavior. Measuring the contexts of stops is incredibly challenging, given the near limitless number of possible factors that could happen and likely influence a police officer's decisions. For example, many traffic stop data sets contain variables that attempt to describe the reason for the stop. Usually the attributes for this variable are limited to broad categories like 'traffic violation' 'equipment violation' etc. Because of this it should come as no surprise that the vast majority of reported reasons for the stop are 'traffic violations'. Unfortunately, this reported reason overlooks important contextual clues that might explain an officer's motivation for initiating the stop, namely the relative severity of the alleged violation. For example, it is likely that a police officer is more motivated to initiate a stop for speeding in an active school zone than in a rural interstate highway.

Only a few data sets actually ask officers to report whether or not they knew an individual's race/ethnicity prior to making the decision to initiate a contact. Even if they do ask, the percentage of contacts wherein the officer reports knowing an individual's race or ethnicity prior to making an enforcement decision is very small, usually about five percent. The omission of a variable describing what the officer knew about the individual prior to the decision to initiate a contact is curious given the importance of this information to the definition of racial profiling. Many states, including California, define racial profiling conceptually. This means that in order

6

for an allegation of racial profiling to be sustained one must, at minimum, demonstrate the officer's awareness of an individual's race/ethnicity prior to making the decision to initiate an enforcement contact. Simply put, it is not possible to legitimately accuse an officer of racial discrimination without first establishing the officer's awareness of an individual's race or ethnicity.

Most data sets used in this research do not do a very good job of establishing the 'order of events' in police contacts. Perhaps the most glaring omission is in the variable indicating whether the officer used force during the contact. Absent in this regard is any indication of how or why this force occurred. This restricts the analysis because it is unclear whether the force used was (on the part of the officer) proactive or reactive. An officer's proactive use of force deserves considerable attention from both the analysis as well as agency administrators. On the other hand, when an officer uses force reactively or as a defense to force initiated by the individual contacted it is a much different thing. Second, these data sets seldom consider the differential ways in which local departments define force. Many departments use, as a matter of policy, an instrument called a 'continuum of force'. Levels of force are arranged on these continuums with respect to their potential seriousness. Of course, the use of deadly force is placed at the top of the continuum because it is the most serious form of force. The variation among departments occurs at the bottom of the continuum, i.e. the least intrusive level of force. Some departments include verbal commands from an officer to a citizen as an 'entry' level of force. Other departments do not consider verbal commands as force and instead begin the continuum at the point where physical force is used.

Finally, one of the fundamental limitations of police contact data exists in the level at which important variables are measured. A substantial portion of police contact data is collected at the nominal level of measurement, the least precise level of measurement. The attributes of a nominally measured variable are nothing more than labels. They cannot be arranged into any logical format. The race of the individual contacted is an example. The attributes of this variable are typically 'White', "Hispanic', 'Black', 'Asian', 'American Indian', 'Pacific Islander', etc. Gender (male, female, non-binary, etc.), Reason for the stop (traffic violation, equipment violation, etc.), Search (yes, no), Contraband seized (yes, no) and other variable are examples. Data collected at the nominal level restricts the analytical options for researchers. It is difficult, if not impossible, to use nominal variables in advanced inferential statistical techniques. These higher level statistical techniques are essential for measuring (mathematically) the relative influence of each factor to the outcome of a contact. Instead, analysts are forced to use basic descriptive statistics like measures of central tendency or cross tabulations which do not accurately control the potential for statistical error.

*The misapplication of classic probability*

Racial profiling research reports often contain various phrases suggesting a probabilistic outcome. Phrases like, "Asian drivers are underrepresented in stops", Black drivers are overrepresented in stops", "Hispanic residents are searched at a higher rate than expected or anticipated", and "Black drivers are more than twice as likely to be involved in physical

Ex. T-1565

confrontation with the police".   These statements likely come from a common misunderstanding of a popular statistical technique called the Classic Probability Model.  This model proposes that the probability of any outcome can be calculated by dividing its possible frequency of occurrence by the total number of possible occurrences.  Probability is always expressed in decimal form.

**Number of desired outcomes/Number of total possible outcomes**

Using this model one can estimate the probability of rolling a '2' on a single die.  There is only one '2' on a single die and there are a total of six possible outcomes.

**Number of 2's on a single die/Total number of possible outcomes on a single die**

**(1/6) = 0.167**

All statistical models have associated assumptions (i.e. rules) that regulate when they can be used as well as how their results should be interpreted.  Most importantly, one of the key assumptions for the Classic Probability Model, as well as the inferential statistical models upon which are based, is random selection.  In order for these statistical models to be reliable all possible outcomes must be equally possible.  In the example above, all of the six outcomes of a roll of a single die must be equally possible.  No loaded dice.  Formally, all possible outcomes must have an equal and nonzero chance of happening.

For the Classic Probability Model and other inferential statistics to work as intended in a study of police stops, one must assume that all individuals within the population (however defined) have an equal and nonzero chance of being stopped.  We know this is not the case.  Nothing happens randomly (in the scientific sense of the word) in police operations.  For example, people that live in neighborhoods from which emanate high numbers of calls for service are inadvertently subjected to higher levels of routine police observation.  As a result these individuals are at a higher risk of being stopped.  Other factors, like age, gender, driving frequency, etc. play a role in reducing the randomness within the process by which individuals are 'selected' into the 'sample' of drivers that are stopped.

*Causality*

An allegation that something is the cause of something else is easily adjudicated in the physical sciences where concepts and change can be measured empirically.  For example, if we hypothesize that a baseball hit by a wooden bat swung at a particular angle and with a particular amount of force is likely to result in a home run at Fenway Park in Boston, then we can actually test this.  Determining causal relationships in social science research is more difficult.  The concepts measured in social science research often do not lend themselves well to empirical measure.  Luckily, social researchers agree on a general rule that defines a causal relationship.

In order to confirm that any factor is the cause of any other factor a researcher must establish three things.  The first is temporal order.  This simply means that the cause must precede the

8

**Ex. T-1566**

effect. The second condition is correlation. The relationship between an alleged cause and effect must be consistent and demonstrable. Third, the researcher must remove all plausible alternative explanations. If other plausible alternative explanations remain then the original allegation of a causal relationship is determined spurious (i.e. false).

This series of causal rules is a generally agreed upon standard in social research (Withrow, 2016) and it is recognized as legitimate in court rulings (see for example, *US v. Alcaraz-Arellano*, 2006). An allegation of racial profiling alleges that a police officer initiates a stop based a *racial animus* towards an individual because of that individual's race or ethnicity. In order to establish that race is the actual cause (or even a motivation) for a stop we must demonstrate that the officer knew the driver's race *prior* to the stop and was motivated by *racial animus*. Racial profiling data sets typically do not measure whether the officers know the race of drivers prior to the stop. Racial profiling researchers cannot establish a correlation between the races of individuals stopped and the races of individuals available to be stopped. And finally, racial profiling research almost never attempts to eliminate plausible alternative explanations for an alleged disparity with respect to race or ethnicity.

*Differential levels of discretion in searches*

Police officers conduct numerous types of searchers. Each type of search is predicated by a reason, or justification, that primarily reflects an officer's level of discretion. For this reason, it is important to separate the analyses of various types of searches based on the officer's level of discretion.

Police officers have the lowest level of discretion, approaching none, while conducting *inventory* and *incident to an arrest* searches. Inventory searches typically occur when an individual's personal property is seized and intended for impoundment. The most notable example is when an individual must abandon a vehicle in a public place, often following the arrest of the owner. Typically, the police take possession of these vehicles and have them towed to an impound lot for safekeeping. Prior to this, the police conduct a search of the vehicle. Although evidence of criminal behavior from this type of search is usually admissible, the primary purpose of this type of search is to protect the department and the towing company from being accused of stealing personal property. Searches incident to arrest involve searches of persons who are arrested by the police. These searches are limited to the body and immediate area around the arrestee. Here again, evidence of criminal behavior found during these searches is likely admissible, but the primary purpose of these searches is officer safety. For example, these searches reduce the possibility that an armed arrestee will be placed in a patrol car and taken to the county jail. The common feature of these types of searches is that the officers have no discretion in whether or not they conduct these searches. They are required by either department policy, city ordinance and/or standard police procedure.

Police officers have limited discretion in *probable cause*, *search warrant*, *plain view* and *exigent circumstances* types of searches. All of these types of searches require the officer to articulate or present evidence that criminal activity is occurring or has occurred and that the search is likely to produce this evidence of this activity. This is essential in order to insure the admissibility of any

9

evidence seized. In these types of searches, discretion is defined primarily by an officer's adherence to an often sworn obligation to enforce the law. While it is possible for an officer to simply ignore evidence of criminal activity, doing so would be a violation of this obligation and may be considered malfeasance.

Police officers have the highest level of discretion while conducting *consent* searches. These types of searches require no articulation of probable cause or any other level of proof. All that is needed is for the person searched to agree to be searched. These types of searches deserve the most scrutiny within this research agenda. Consent searches, while an important enforcement tool in some situations, have a potential for abuse that can be considerable. They are seldom documented and happen well outside the purview of supervision. Beyond this, consent searches should attract the attention of police administrators and leaders. Typically, these searches do not produce evidence of criminal activity. They can be time consuming. Perhaps more importantly, consent searches are often perceived as little more than a way to 'hassle' individuals. This appears to be true within the racial and ethnic minority communities.

*Interactions not initiated by the police*

Not all interactions are initiated by the police. As a general rule, a police officer has substantially less discretion to initiate a contact when dispatched to a call for service than when he or she initiates a contact. As a result, analysis of contacts between police officers and individuals should be limited to the contacts that are initiated by the police officer.

It is possible that the race or ethnicity of an individual involved in a contact may play a role in whether or not the contact with a police officer was discretionary or not. For example, in 2022 the Racial & Identity Profiling Advisory Board published its Annual Report. The data in this report came from contacts reported to them occurring in calendar year 2020. Appendix A of this report contains a table reporting that 94.1 percent of all contacts are discretionary and that 5.9 percent are initiated by a call for service (RIPA, 2022).

A closer look at the data set reveals an important pattern. Overall, 16.5 percent of all stops involved a Black individual. Officer initiated stops involving Black individuals represent 15.8 percent of all stops. Yet, 27.2 percent of all calls for service involve a Black individual. Conversely, overall 40.4 percent of all stops involved a Hispanic individual. Officer initiated stops involving Hispanic individuals represent 40.8 percent of all stops. Yet, 34.4 percent of all call for service stops involved a Hispanic individual (Withrow, 2022).

Preliminarily, it appears that the over representation of call for service stops involving Black individuals might be explained by historically higher levels of victimization within the Black community. Even so, this analysis provides further support that the focus of racial discrimination inquiries into police contacts should focus primarily on the contacts that are initiated by the police.

*The importance of being informed of routine police systems and practices*

The statistical analysis of any behavior requires a strong knowledge of the systems and process by which the behavior is influenced. For example, John Lambert who in 1994 published the first

10

**Ex. T-1568**

major study in the racial profiling research agenda, discovered that a very high proportion of traffic stops on the I-95 Turnpike in New Hersey did not result in the issuance of a citation. However, the overwhelming majority of these stops did include a consent search. Nothing in these data actually explained this anomaly. So, he conducted interviews with the troopers. He learned that the New Jersey State Patrol's reward systems gave considerable weight to drug seizures. Troopers that seized a large amounts of illicit drugs were often rewarded and even promoted within the organization faster than those that did not. From this he deduced that the internal reward system may have inadvertently encouraged Troopers to use drug courier profiles to improve the probability that they would seize illicit drugs during a traffic stop. Many of the drug courier profiles at the time were heavily weighted on characteristics that increased the Troopers' attentiveness toward racial and ethnic minorities.

The lack of knowledge about police systems and practices can also thwart an honest analysis of how the police behave. For example, in his analysis of the 2022 RIPA Board report, Withrow made the following conclusion.

> The RIPA Board's analysis of searches and search discovery rates are particularly confounding. The analysts use different portions of the data set and created artificial categories of searches. These artificial categories are not consistent with routine police systems and practices or with professional standards and ethical behavior. This however, is only one example of a more fundamental problem throughout various parts of the analysis. Variables that could be used to explain the justification for officer behaviors or to understand more about the contexts of the stops are not included the data set (Withrow, 2022).

**Analysis**

Two independent analyses were conducted. The first is based on data collected by San Diego Sheriff's Office employees and maintained locally by the San Diego Sheriff's Office. Generally, these data are part of the department's internal information system (i.e. computer assisted dispatch) with which they evaluate various aspects of its performance. It is important, however, to recognize that data on stops, arrests and the incarceration of persons is not necessarily directly related to activity specific to the San Diego Sheriff's Office. Other police agencies working within San Diego County initiate stops, make arrests, and deliver individuals to be incarcerated in the San Diego County Jail.

The second analysis is based on data collected by employees of the San Diego Sheriff's Office in compliance with the Racial and Identity Profiling Act of 2015. These data are submitted to the California Department of Justice for analysis and eventually become part of a statewide report on racial and identity profiling. There is an important limitation associated with this particular dataset that is relevant to this particular analysis. The California Department of Justice instructs officers to report their perception of an individual's race or ethnicity. Occasionally, it can be difficult to know an individual's actual race or ethnicity. Furthermore, there is no mechanism by which the races of individuals contacted can be verified.

Ex. T-1569

Finally, it is important to remember throughout that very little correspondence between these two datasets exists. Each dataset has its own reporting rules, definitions of variables and the intended use of their analyses.

*Arrests by race, ethnicity, disposition, beat, and place of arrest*

Using a data set containing 99,412 cases analyses of contacts by beat, officer identification, offense, city, disposition and race were conducted to identify potential patterns of racial disparity or discrimination. To prepare for this analysis a new variable was created from the original variable describing the individual's race. The data in its raw form contains variables that also describe nationality as well as race or ethnicity, e.g. Japanese versus Asian. This new variable considers four races and ethnicities – Black, Hispanic, Other and White (see Table 1).

**Table 1. Abbreviated race/ethnic categories in arrests, San Diego Sheriff's Office CY 2021-2023.**

| Race/Ethnicity | Frequency | Percent |
|---|---|---|
| Black | 10052 | 10.1 |
| Hispanic | 38118 | 38.3 |
| Other | 5965 | 6.0 |
| White | 45277 | 45.5 |
| **Totals** | **99412** | **100** |

A review of this table indicates that Asian, Middle Eastern, Native Hawaiian or Pacific Islander, Other and Unknown races collectively represent a very small percentage of the individuals arrested by the San Diego Sheriff's Office. This enables the analysis to focus on the races and ethnicities that are typically the subject of racial profiling research.

For comparative purposes Tables 2 and 3 reflect the proportional representation by race and ethnicity of the residential population in San Diego County. The latest estimates (July 1, 2023) from the U.S. Census Bureau provide the following results regarding the race of residents in San Diego County (see Table 2).

**Table 2. U.S. Census Bureau for residents by race, San Diego County, California.**

| Race category | Percent |
|---|---|
| White alone | 74 |
| Black or African American alone | 5.5 |
| American Indian and Alaska Native alone | 1.4 |
| Asian alone | 13.4 |
| Native Hawaiian and other Pacific Islander alone | 0.6 |
| Two or More Races | 5.1 |
| **Total** | **100** |

12

**Ex. T-1570**

It is important to remember that the U.S. Census Bureau defines 'Hispanic or Latino' as an ethnic category, rather than a race category. The same source indicates the following with respect to Hispanic and non-Hispanic individuals (see Table 3).

**Table 3.  U.S. Census Bureau residents by ethnicity, San Diego County, California.**

| Ethnic Category | Percent |
|---|---|
| Hispanic or Latino | 34.9 |
| White alone, not Hispanic or Latino | 43.1 |

This comparison produces the following findings.

- Black individuals represent 5.5 percent of the residential population and 10.1 percent of the individuals arrested.
- Hispanic individuals represent 34.9 percent of the residential population and 38.3 percent of the individuals arrested.
- White alone (race category) individuals represent 74 percent of the residential population and 45.5 percent of the individuals arrested.
- White alone, not Hispanic or Latino (ethnicity category) individuals represent 43.1 percent of the residential population and 45.5 percent of the individuals arrested.

It would appear from this data that:

- Black individuals are overrepresented in arrests when compared to the residential population estimates.
- Hispanic individuals are slightly overrepresented in arrests when compared to the residential population estimates.
- White alone (race category) individuals are underrepresented in arrest when compared to the residential population estimates, by race.
- White alone, not Hispanic or Latino (ethnic category) individuals are slightly overrepresented in arrests when compared to the residential population estimates, by ethnicity.

Similar patterns of overrepresentation become even more pronounced when the disposition (felony or misdemeanor) of the arrest is compared by race and ethnic categories. Felony (adult) dispositions represent 39 percent of all dispositions. Misdemeanor (adult) dispositions represent 32.4 percent of all dispositions.

- Black individuals represent 10.1 percent of all persons arrested;
  - 11.7 percent of the felony dispositions, and
  - 8.2 percent of the misdemeanor dispositions.
- Hispanic individuals represent 38.3 percent of all persons arrested;
  - 41.4 percent of the felony dispositions, and
  - 40.2 percent of the misdemeanor dispositions.
- White individuals represent 45.5 percent of all persons arrested;
  - 40.5 percent of the felony dispositions, and

13

**Ex. T-1571**

    ○  46.7 percent of the misdemeanor dispositions (see Table 4).

**Table 4. Level of disposition by race and ethnicity in arrests, San Diego Sheriff's Office CY 2021-2023.**

| Level of Disposition | Percent Black | Percent Hispanic | Percent Other | Percent White |
|---|---|---|---|---|
| Felony (Adult) | 11.7 | 41.4 | 6.4 | 40.5 |
| Misdemeanor (Adult) | 8.2 | 40.4 | 4.7 | 46.7 |

This data set contains a variable indicating the beat wherein the arrest happened. There are 348 distinct beats reported in this data set. It is likely that some of the beat numbers may be data entry errors. There appears to be no pattern or practice of racial discrimination within this particular part of the analysis.

An arbitrary standard was created for each of the main racial and ethnic groups within this data set. The proportional representations for each racial and ethnic group were multiplied by 1.5. This arbitrary standard is used as an indicator of potential overrepresentation. For example, 10.1 percent of all people arrested are Black individuals. This percentage (10.1 percent) times 1.5 equals 15.15 (see Table 5). When a beat exceeds this percentage of Black individuals arrested the analysis suggests an overrepresentation may be present. A similar arbitrary standard was used by Lambert in 1994.

**Table 5. Arbitrary standard for potential racial discrimination.**

| Racial/Ethnic Group | Overall percentage representation of all people arrested | Overall percentage x 1.5 |
|---|---|---|
| Black | 10.1 | 15.15 |
| Hispanic | 38.3 | 57.15 |
| White | 45.5 | 68.25 |

Using these arbitrary standards the analysis revealed that;

- Black individuals are overrepresented in 42 of the 348 beats,
- Hispanic individuals are overrepresented in 39 of the 348 beats, and
- White individuals are overrepresented in 64 of the 348 beats.

This analysis cannot confirm the existence of a pattern and practice of racial discrimination. Additionally with respect to the assumptions of statistical modeling, these findings cannot be significant because many of the cell sizes are very small. Doing this would conflate the level of error. For example, in at least three of the beats Black, Hispanic and White individuals represent 100 percent of the arrests. These beats only report 2, 2, and 1 arrests, respectively. Furthermore, the population estimates of these beats were not available to the analyst. It is likely that the beats containing an inordinately high percentages of individuals of a particular race being arrested also are principally populated by the same race (see table in Appendix A).

14

Ex. T-1572

An analysis of the age of individuals reveals that the mean age of arrestees is 37.3 years. A more viable measure of central tendency, given the standard deviation (12.3 years), is either the median (35.0 years) or mode (32 years). The relative youth of the individuals in this data set is consistent with criminological research indicating a consistently strong negative correlation between age and criminal behavior. Younger people commit a disproportionately higher percentage of crime when compared to their proportion within the general population.

A review of the data set focusing on the place where the arrest happened reveals that arrestees came from 176 communities, some from out of state (see Appendix B). As we know, sheriff's departments have very little control over this. In many cases they are obligated to receive legally arrested persons into their jails.

*Racial and Identity Profiling Board data*

In 2015, the State of California established the Racial and Identity Profiling (RIPA) Board within the California Department of Justice. Beginning in 2018, RIPA began collecting extensive data on contacts between police officers and individuals throughout California. Each year in January the RIPA Board publishes its report. The following analysis used these data from 2020-2023 reported by the San Diego Sheriff's Office (SDSO) to RIPA to identify possible areas of racial overrepresentation.

During this four year period the SDSO conducted 112,978 contacts. A little over half of the individuals contacted are White and about a third of the individuals are Hispanic (see Table 6).

**Table 6. Contacts by race, San Diego Sheriff's Office CY 2020-2023.**

| Race category | Number | Percent |
|---|---|---|
| White | 56648 | 50.14 |
| Hispanic/Latino | 36797 | 32.57 |
| Black/African-American | 7074 | 6.26 |
| Asian | 4279 | 3.79 |
| Middle Eastern or South Asian | 3700 | 3.27 |
| Pacific Islander | 993 | 0.88 |
| Native American | 622 | 0.55 |
| Multiracial | 2865 | 2.54 |
| Total | 112978 | 100 |

This analysis reveals that;
- Black individuals represent 6.26 percent of all contacts and 5.5 percent of the residential population, suggesting a slight overrepresentation.
- Hispanic individuals represent 32.57 percent of all contacts and 34.9 percent of the residential population, suggesting a slight underrepresentation.
- White alone individuals (race category) represent 50.14 percent of all contacts and 74 percent of the residential population, suggesting an underrepresentation.
- White alone, not Hispanic or Latino (ethnic category) represent 50.14 percent of all contacts and 43.1 percent of the residential population, suggesting an overrepresentation.

15

**Ex. T-1573**

The majority (66.15 percent) of the individuals contacted are male and about one-third (33.22 percent) are female.  The remaining are Transgendered Man/Boy (0.40 percent), Transgendered Woman/Girl (0.16 percent) and Gender Non-conforming (1.07 percent).

The majority (52.80 percent) of the individuals contacted are between the ages of 25 to 44 years of age.  Individuals between the ages of 18-24 years represent 12.99 percent of individuals contacted.  Individuals between the ages of 45-54 years represent 16.93 percent of individuals contacted.

Generally, the most common reasons for a stop are;

- Traffic violation
- Reasonable suspicion
- Known to be on Parole/Probation
- Consensual Encounter
- Knowledge (of the officer) of an outstanding arrest warrant

Often patterns of racial/ethnic overrepresentation are revealed when the reason for the stop is evaluated within each racial or ethnic group.  Because of the breadth of the 'Traffic violation' category, it is not possible to identify a pattern with respect to race or ethnicity.  This attribute contains literally hundreds of individual offenses.  It is likely most of the traffic violations are speeding, but many may be related to turning, signaling, equipment, or registration violations.  As a result, it is not possible to evaluate the relative severity of an alleged violation with the race or ethnicity of an individual.

The most insightful category is 'Reasonable suspicion'.  Black individuals, at 28.61 percent, represent the highest frequency of contacts predicated on reasonable suspicion.  The data do not include other, and often important, contextual factors that are known to create reasonable suspicion (e.g. time of day, location, etc.) (see Table 7).

**Table 7.  Reason for the contact by race, San Diego Sheriff's Office CY 2020-2023.**

| Reason for Contact | Percent White | Percent Hispanic | Percent Black | Percent Asian | Percent Middle Eastern | Percent Pacific Islander | Percent Multiracial | Percent Native American |
|---|---|---|---|---|---|---|---|---|
| **Traffic violation** | 74.12 | 70.47 | 64.37 | 87.17 | 89.93 | 76.72 | 83.24 | 54.37 |
| **Reasonable suspicion** | 20.03 | 22.08 | 28.61 | 10.22 | 9.12 | 17.81 | 13.61 | 32.95 |
| **Know parolee/probationer** | 2.60 | 3.95 | 3.05 | 0.87 | 0.42 | 2.94 | 1.47 | 5.93 |
| **Consensual encounter** | 1.46 | 1.59 | 1.43 | 0.73 | 0.16 | 1.21 | 0.45 | 2.47 |
| **Knowledge of outstanding arrest warrant** | 1.78 | 1.92 | 2.54 | 1.01 | 0.37 | 1.32 | 1.22 | 4.28 |
| **Totals** | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

16

**Ex. T-1574**

How stops end is also an important category for identifying patterns of racial or ethnic overrepresentation. Most stops (41.52 percent) in San Diego County end with the issuance of a citation. The next highest percentage (27.05 percent) is a warning.

Two attributes within the results of the stop variable are important for identifying patterns of racial and ethnic overrepresentation. First, stops ending with no action can be an indicator. A contact ending with no official response can be a legitimate stop. Some contacts involve welfare checks, motorists assist, and other legitimate public safety activities that have no real enforcement purpose. However, when the percentage of stops ending with no action is inordinately high (as a percentage of outcomes) for racial and ethnic minorities this could be an indicator of police misconduct. In this instance, contacts involving Native American individuals (17.25 percent) and Black individuals (10.37 percent) appear to have the highest percentages of contacts ending in no action. The higher percentage of contacts ending in no action for Native American individuals is likely due to the relatively low number of contacts for these individuals. The slightly higher percentage of contacts ending in no action for Black individuals cannot be explained within the confines of this dataset.

Second, contacts resulting in an arrest in the absence of a warrant are important primarily for understanding how an arrest affects other stop events particularly inventory and pursuant to an arrest searches. Contacts resulting in arrest without a warrant appear to be higher for Native American (14.77 percent) and Black (9.62 percent) individuals. Contacts ending in an arrest with a warrant appear to be higher for Native American (5.41 percent) and Black (3.29 percent) individuals, albeit only slightly for Black individuals. There is no information within this data set to explain why contacts involving Black individuals tend to result in a higher percentage of arrests. A further investigation into these individual cases would be necessary. With respect to arrests involving Native American individuals, their total contacts represent a very small percentage of the total contacts. This means that a slight numerical increase in the number of arrests involving Native American individuals can have a profound effect on their proportional representation in this category (see Table 8).

**Table 8. Results of the contact by race, San Diego Sheriff's Office CY 2020-2023.**

| Results of Contact | Percent White | Percent Hispanic | Percent Black | Percent Asian | Percent Middle Eastern | Percent Pacific Islander | Percent Multiracial | Percent Native American |
|---|---|---|---|---|---|---|---|---|
| Citation for infraction | 44.85 | 41.10 | 30.33 | 51.94 | 57.08 | 43.53 | 69.49 | 15.06 |
| Warning | 25.53 | 27.12 | 31.68 | 29.35 | 29.08 | 29.12 | 16.41 | 29.09 |
| No Action | 7.66 | 8.81 | 10.37 | 7.32 | 6.12 | 7.91 | 3.02 | 17.25 |
| Arrest w/o Warrant | 6.71 | 7.92 | 9.62 | 3.88 | 2.62 | 7.07 | 4.19 | 14.77 |
| Field Interview | 6.38 | 7.94 | 8.30 | 2.97 | 2.39 | 6.05 | 2.78 | 9.50 |
| Infield cite/release | 4.00 | 4.14 | 3.96 | 2.09 | 1.23 | 2.79 | 1.20 | 5.26 |
| Psychiatric Hold | 1.85 | 0.92 | 2.47 | 1.49 | 0.98 | 1.67 | 1.26 | 3.65 |
| Arrest w/ Warrant | 3.01 | 2.05 | 3.29 | 0.97 | 0.48 | 1.86 | 1.65 | 5.41 |
| **Totals** | **100** | **100** | **100** | **100** | **100** | **100** | **100** | **100** |

Ex. T-1575

Searches, and in particular consent searches, are one of the most controversial issues in racial profiling research. Consent searches are highly discretionary in that they require no establishment of proof. A consent search can happen merely because a police officer desires to conduct a search. All that is needed in order to satisfy the provision of the Fourth Amendment is the permission of the individual searched.

The dataset contains a broad range of bases for a search. The most common (29.44 percent) basis for a search is incident to an arrest. These searches, along with inventory searches, are often required by local policy and the demands of officer safety. They are not discretionary from the officer's perspective. The second most common bases for a search are as a condition of parole/probation (24.23 percent) and consent given (23.59 percent). California allows police officers to conduct searches of certain individuals that are on parole, probation or mandatory supervision. In a close third, searches based on consent given represent 23.59 percent of all search bases (see Table 9).

**Table 9.  Bases for a search, San Diego Sheriff's Office CY 2020-2023.**

| Basis for search | Percent |
|---|---|
| Cond. of parole/probation | 24.23 |
| Incident to arrest | 29.44 |
| Consent given | 23.59 |
| Officer/Others safety | 8.73 |
| Visible contraband | 3.82 |
| Suspected weapons | 2.37 |
| Evidence of crime | 2.31 |
| Vehicle inventory | 2.83 |
| Odor of contraband | 0.74 |
| Search warrant | 0.99 |
| Canine detection | 0.68 |
| Exigent circumstances | 0.26 |
| **Total** | **100** |

Occasionally, when the bases (i.e. justification) for a search are analyzed within racial and ethnic categories a pattern of overrepresentation is revealed. This analysis reveals no patterns consistent with racial or ethnic discrimination within the basis for a search (see Table 10)

**Table 10.  Basis for search by race, San Diego Sheriff's Office CY 2020-2023.**

| Basis for Search | Percent White | Percent Hispanic | Percent Black | Percent Asian | Percent Middle Eastern | Percent Pacific Islander | Percent Multiracial | Percent Native American |
|---|---|---|---|---|---|---|---|---|
| Cond. of parole/probation | 25.86 | 22.57 | 23.69 | 15.58 | 16.90 | 28.05 | 23.89 | 22.31 |
| Incident to arrest | 28.95 | 29.03 | 32.84 | 36.62 | 36.62 | 27.44 | 26.96 | 30.00 |
| Consent given | 23.19 | 24.00 | 21.65 | 24.94 | 20.66 | 26.83 | 23.21 | 18.46 |
| Officer/Others safety | 9.17 | 9.15 | 9.49 | 8.57 | 11.74 | 7.32 | 8.53 | 12.31 |
| Visible contraband | 4.31 | 3.44 | 2.95 | 2.86 | 1.88 | 3.66 | 4.78 | 3.46 |
| Suspected weapons | 2.19 | 2.58 | 2.22 | 1.82 | 4.23 | 3.05 | 2.39 | 5.00 |

18

**Ex. T-1576**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Evidence of crime | 2.53 | 2.15 | 2.10 | 2.60 | 0.94 | 1.83 | 3.07 | 4.62 |
| Vehicle inventory | 1.99 | 3.84 | 2.16 | 1.56 | 2.82 | 0.61 | 4.44 | 1.54 |
| Odor of contraband | 0.48 | 0.94 | 0.80 | 1.82 | 0.00 | 1.22 | 1.37 | 1.54 |
| Search warrant | 0.74 | 0.99 | 1.14 | 2.86 | 3.76 | 0.00 | 1.37 | 0.38 |
| Canine detection | 0.32 | 1.06 | 0.57 | 0.52 | 0.47 | 0.00 | 0.00 | 0.38 |
| Exigent circumstances | 0.27 | 0.27 | 0.40 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Totals** | **100** | **100** | **100** | **100** | **100** | **100** | **100** | **100** |

## Summary of Key Findings

As mentioned previously the two analyses within this expert opinion are based on two different datasets. The data in one set is collected and maintained locally and principally represents arrests made by the San Diego County Sheriff's Office. The data in the other set (RIPA) is collected and transmitted to the California Department of Justice in compliance with the Racial and Identity Profiling Act of 2015. This data set primarily contains contacts between individuals and deputies from the San Diego County Sheriff's Office.

The analysis of the local data set reveals that;

- Black and Hispanic individuals may be overrepresented in arrests when compared to their proportions within the residential population.
- Black individuals are overrepresented in cases disposed as felonies and underrepresented in cases disposed as misdemeanors.
- Hispanic individuals are slightly overrepresented in cases disposed as felonies and misdemeanors.
- This analysis cannot confirm an overrepresentation of arrests is present inside beats.

The analysis of the Racial and Identity Profiling data set reveals that;

- Black individuals are slightly overrepresented in contacts when compared to their proportion within the residential population.
- Hispanic individuals are slightly underrepresented in contacts when compared to their proportion within the residential population.
- Black individuals represent the highest proportions of contacts predicted by reasonable suspicion.
- Native American and Black individuals represent the highest proportion of contacts ending in no action.
- Native American and Black individuals represent the highest proportions of contacts ending in an arrest with an outstanding warrant. For Native American individuals this overrepresentation is likely explain by the relatively low number of stops involving Native American individuals. Black individuals are only slightly overrepresented.
- There is no consistent pattern or practice of racial bias with respect to the bases (reasons) for a search.

19

**Ex. T-1577**

**Conclusion**

There are substantial limitations within this analysis.  The analysis revealed several patterns wherein some racial and ethnic minorities might be overrepresented in some routine police operations.  However, none of these analyses can establish that this overrepresentation is caused by an individual's race or ethnicity.  In short, the datasets provided do not provide sufficient detail to confirm a pattern and practice of racial discrimination within the enforcement activities San Diego Sheriff's Office.  Further investigation, including the collection of corroborating evidence, is necessary in order to identify active patterns and practices of racial discrimination.  Many of these investigations should be conducted at the individual officer level.

The only independent variable (i.e. cause) used in most of these analysis is the race or ethnicity of individuals.  One would anticipate some preliminary evidence of over- or underrepresentation when using a single variable (i.e. race/ethnicity) upon which to base comparisons.  Indeed there are numerous other independent variables that need to be considered before confirming a pattern and practice of racial discrimination.  Glaringly absent in these data sets are any variables that are known to affect the outcome of a police/citizen interaction.  For example, neither of these analyses can measure the differential levels of police activity between patrol districts, beats or neighborhoods.  Often police resources (e.g. patrol officers) are assigned to work in areas wherein there is a demand for their services (e.g. higher calls for service).  Sometimes these areas are principally populated by racial and ethnic minorities.  As a result the individuals that live in these neighborhoods are inadvertently subjected to higher levels of routine police observation.  Contract cities (which contract with the Sheriff's Office) may also ask for additional officers to be assigned in areas with more crime and/or calls for service. This, in turn, may result in a disproportionately higher probability for a contact and eventually the issuance of a citation or an arrest.

Finally, neither of the datasets used in this analysis collects what is likely the most important variable – whether the officer *knew* the race or ethnicity of an individual prior to making the decision to stop.  The term "racial profiling" in California includes the phrase "…reliance on, to any degree, actual or perceived race…"  This means that, at minimum, the dataset must contain a variable measuring whether an officer is aware of an individual's race prior to initiating the stop as compared to after the stop.  Some statewide data collection protocols (notably Texas) include this variable.  Although even when it is completed the percentage of contacts wherein the officer is aware of an individual's race prior to the stop is very small (5.5 percent). This suggests support for the anecdotal evidence that very few officers are actually cognizant of this information.

*Brian L. Withrow*

20

**Ex. T-1578**

# EXHIBIT U

Ex. U-1579

IN THE UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br>　　　　Plaintiffs,<br><br>v.<br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES<br>1 to 20, inclusive,<br>　　　　Defendants. | Case No. 3:20-cv-00406-AJB-DD |

# <u>EXPERT REPORT OF HENRIETTA L PETERS</u>

**Ex. U-1580**

I, Henrietta L Peters, am an adult over 18 years of age and would be competent to testify if called as a witness in this matter. I hold the position of Supervisory, Compliance Enforcement Officer with the Nevada Department of Corrections.  I have expertise in environmental health and safety both as a regulator and subject matter expert, addressing both occupational and public health aspects.

**ASSIGNMENT**

I have been retained by Burke, Williams & Sorensen, LLP in the matter of *Darryl Dunsmore et al v. San Diego County, et al*. in the United States District Court, Southern District of California, to opine regarding allegations made by Plaintiffs in the referenced litigation about environmental health and safety conditions at the jail. I conducted in person inspections on March 11-14, 2024.  I was given access to all areas I requested to see, and I was able to ask all questions I had of staff.

**SUMMARY OF OPINION**

Generally, the San Diego County Sheriff's Office Detention Facilities are of average or above average condition for adult local detention facilities in the areas of environmental health and safety.  There are issues that can be corrected with additional training but based upon my observations and discussions with staff, the existing policies and practices provide a solid foundation.  It is important to note that staff at each detention facility have made significant efforts to enhance sanitation across the county since the initial date of the complaint in this matter, taking very seriously from my observation, areas that needed improvement. I found no evidence that the County or its jail staff are deliberately indifferent to the health or safety of incarcerated persons, with

1

**Ex. U-1581**

respect to the cleanliness and sanitation of the facilities, and to the contrary, I found them to be responsive, open and accepting of best practices.

**QUALIFICATIONS**

As set forth in Exhibit A, I have a Bachelor of Science in Biology from Tuskegee University and a Master of Public Administration in Environmental Management from Jacksonville State University. Environmental Health and Safety related certifications and continuing education courses include:

- Certified Environmental Safety and Compliance Officer, National Registry of Environmental Professionals

- ServSafe® Instructor/Proctor, National Restaurant Association

- Radiation Safety Officer, Nevada Technical Associates, Inc.

- Nevada Safety and Health Practitioner, NV OSHA

- Incident Management/Command System, FEMA Emergency Management Institute

I was previously employed as an Environmental Manager with the Alabama Department of Corrections for 11 years, where I was the Department's liaison in ensuring that all environmental procedures are conducted in compliance with State, Federal and local environmental regulations. My division was responsible for conducting internal audits of the correctional facilities for environmental health and safety issues for maintenance, food safety and environmental compliance. During my employment, I was responsible for 15 major and 12 minor/community work centers, as well as 15 contracted county jails.

I was also employed by the Alabama Department of Public Health as a Senior, Public Health Environmentalist, Supervisor of Onsite Program, which included duties

2

**Ex. U-1582**

such as permitting individual onsite disposal systems, large subdivision approvals, as well as performing evaluation of food, lodging and body art establishments, schools, county jails, state correctional facilities, and solid waste facilities.

A copy of my current resume is attached as Appendix A to this report.

I reserve the right to supplement this expert report based on any additional work that I may be asked to do, or any additional materials received.

**DOCUMENTS REVIEWED**

As part of my assignment, I have reviewed the Third Amended Complaint filed by the Plaintiffs in this case.  Additionally, I have reviewed several background documents, to include policies, procedures, environmental reports and current vendor contracts.  A complete list of the documents reviewed by me for this report is shown in Appendix B.

**BACKGROUND**

The San Diego County Sheriff's Office oversees seven detention facilities, with three serving dual functions of processing and housing incarcerated individuals, and the remaining four designated for housing post-booking.  This Environmental Health and Safety review covers all seven detention facilities operated by the San Diego County Sherriff's Office and the Central Production Center which oversees food processing and laundry services.

The Department's facilities offer various types of housing tailored to the specific needs of incarcerated individuals.  Each type of housing unit was inspected:

3

**Ex. U-1583**

- **Safety Cell/Enhanced Observation Housing**: These are temporary units designed for maximum safety, eliminating features that could cause self-harm. They are suitable for individuals who are self-harming, aggressive, or suicidal, with staff monitoring at random intervals.

- **Medical Observation Beds**: For incarcerated persons requiring frequent medical attention, these beds are situated near the nursing stations for hourly monitoring.

- **Single Occupancy Housing**: Isolated cells for incarcerated persons separated from the general population for safety, security, or pending disciplinary hearings.

- **Mainline Housing**: General population housing for incarcerated individuals without the need for single occupancy due to security, medical, or mental health concerns.

**GENERAL AND BIO-HAZARD SANITATION**

Overall, all of the facilities were clean, with only minor incidents observed during the site visits. There was no evidence of active rodents or pests. Birds were seen in the outside courtyard areas and inside fenced walkways which is normal, but none were observed inside the housing areas.

The HSAT (Healthcare Service Assistant Training) Program is a very thorough training initiative provided by the San Diego County Sheriff's Office. This program offers extensive training to Incarcerated Person (IP) workers in bio-hazard cleaning and sanitation. At Central Jail, the HSAT program includes one instructor, ten IP workers, and one IP worker deputy. At George Bailey, the program includes six IP workers and one IP worker deputy.

4

**Ex. U-1584**

The current Healthcare Service Assistant Training (HSAT) program is an excellent program that covers custodial maintenance equipment and techniques to maintain the cleanliness of healthcare facilities and meet regulatory standards.  The two detention facilities with this program exhibit a higher level of cleanliness and the training should be extended to the remaining facilities to assist with enhanced bio-hazard cleaning and sanitation. The remaining facilities are overall clean and in good condition but instituting the HSAT program at all facilities would benefit staff and IP's.

During my site visits, Clean Harbors provided cleaning services for the Central Jail. However, since the initial draft of this report, Captain Jesse Johns informed me that starting the week of August 26, 2024, Clean Harbors' services will only be retained for large incidents or specialized cleanings due to extraordinary circumstances. Going forward, daily cleanings will be handled by IP workers, some of whom have received training or are currently participating in the HSAT program. After reviewing the contract, I find the contracted services appropriate, and I consider the new cleaning plans to be equally or even more effective than the work previously done by Clean Harbors. Clean Harbors services remain available for all detention facilities, by request.

The garbage compactor areas should receive a more detailed cleaning. Although some cleaning is evident, I recommend a more thorough regimen. I suggest incorporating a weekly cleaning assignment for the garbage compactors when they are removed for disposal. This practice helps eliminate collected trash underneath, reducing rodents, pests, and other public health nuisances.

5

**Ex. U-1585**

Recyclable products are transported to outside disposal areas, but I recommend a more frequent removal schedule to avoid attracting pests. All recyclables should be stored away from the building to prevent creating harborage for pests.

I observed grease bins (outside tallow containers) that require more frequent cleaning to prevent pests attracted by wasted grease. I also recommend creating a containment area for all grease bins using sand to absorb any wasted grease. The sand mixture can then be properly disposed of as solid waste.

The HSAT (Healthcare Service Assistant Training) Program is a very thorough training initiative provided by the San Diego County Sheriff's Office. This program offers extensive training to Incarcerated Person (IP) workers in bio-hazard cleaning and sanitation. At Central Jail, the HSAT program includes one instructor, ten IP workers, and one IP worker deputy. At George Bailey, the program includes six IP workers and one IP worker deputy.

The current Healthcare Service Assistant Training (HSAT) program is an excellent program that covers custodial maintenance equipment and techniques to maintain the cleanliness of healthcare facilities and meet regulatory standards.  The two detention facilities with this program exhibit a higher level of cleanliness and the training could be extended to the remaining facilities to assist with enhanced bio-hazard cleaning and sanitation. The remaining facilities are overall clean and in good condition but instituting the HSAT program at all facilities would benefit staff and IP's.

Bio-hazard clean-up kits are readily available throughout the department. Based upon my questioning, staff members are well-informed about their proper usage to prevent the spread of disease. These single-use kits include necessary personal protective

6

equipment (PPE), solidifiers, and waste disposal containers, all of which comply with the requirements set by the Occupational Safety and Health Administration (OSHA).

All the facilities have designated hygiene days, typically on weekends, which require thorough inspections of all living areas and cells/dorms. For example, Central Jail schedules hygiene days on Saturdays, Las Colinas on Fridays and Saturdays, and Vista on Saturdays and Sundays. The facilities were overall hygienic and appropriately sanitized, but I do recommend general surface cleaning be performed daily when areas are empty, with a focus on highly soiled areas such as toilet areas.

## PEST MANAGEMENT

I found the facilities to be fairly clean and for the most part free of vermin and insects. Birds have access to inner walkways, including segregation recreation yards. To reduce bird entry and prevent roosting, it is important to discourage the feeding of birds, whether intentional by Incarcerated Persons (IPs) or unintentional due to food waste around the facility. It is important to note that in the State of California, it is generally illegal to remove or destroy active bird nests, as they are protected under both federal and state laws. Therefore, the Sheriff's Office can consider additional methods to include using netting, spikes, and audio deterrents such as noise makers or sparrow/crow distress calls.

During site visits, pest management rodent bait stations were observed and opened for my verification of activity. The rodent bait stations are placed throughout all areas, and the vendor notes in their technical report if additional boxes are suggested due to increased activity. The placement of rodent bait stations is normal in facilities of similar size, to prevent vermin from outside fields from entering.

7

The presence of sewer flies in the shower area of Vista Detention Facility suggests a need for drain cleaning, such as enzyme removal or high-power jetting. Regular maintenance is crucial to prevent infestations, especially in older buildings with excessive organic material buildup.

**AIR QUALITY**

In shower areas, during the inspection no active mold growth was observed, indicated by the absence of outward growth on surfaces such as walls and cellulose ceiling tiles. Occasional water damage, possibly from leaks or HVAC condensation, was noted. It is recommended that these issues be addressed through remediation efforts, including leak repairs, to prevent mold spore spread.

Evidence of IPs covering vents with paper items was observed in several areas and can be identified as a contributing cause to any ventilation issues within the facility. This practice can impede air circulation and should be discouraged to maintain proper airflow and cleaned on a regular basis. I didn't observe any specific issues as a result of IP's covering air vents, but air flow must be maintained to mitigate the spread of infectious disease.

Overall, the filters, sprinkler heads, and other areas prone to dust collection were free of dust. However, I did notice some filters and sprinkler heads with excessive dust, which can pose health and fire hazards. To maintain cleanliness and functionality, the existing proper and regular cleaning methods should be used to clean the dust on all these surfaces.

8

**Ex. U-1588**

During the site visit, the maintenance supervisor and his team at each facility demonstrated both knowledge and responsiveness. They promptly took corrective actions when areas were identified or arranged repair calls, often addressing issues immediately.

## HAZARDOUS COMMUNICATION/CHEMICAL SANITATION

Chemical container labeling is crucial for safety. I found some secondary containers used by the Incarcerated Population (IP) for chemicals in living areas that were improperly labeled. Ensuring proper labeling of chemicals within the facilities, particularly secondary container labels as mandated by OSHA, is essential. I discussed this with the staff during my inspections, and they were open and receptive to making the necessary changes to ensure proper labeling.

I reviewed with the staff that containers for chemicals must be specifically designed for chemicals, cleanable, and properly labeled. This information was received openly, with a positive intent to make the necessary corrections.

The facilities have Safety Data Sheets (SDS) which are adequate, but they should be updated to the Global Harmonized System (GHS). SDS books were available, but they should be placed in areas where chemicals are stored, mixed, and dispensed for easier access than presently exists. Copies of SDS should also be available in the medical area and shift office for emergencies.

I observed that some chemicals at a few facilities were stored in outside storage areas. While this is not uncommon, it's important to note that extreme temperature conditions can compromise the effectiveness of chemicals stored outdoors. To maintain

9

**Ex. U-1589**

their efficacy, it is recommended to store these chemicals in temperature-controlled environments. I shared these recommendations with the staff, who were open and receptive, and they expressed their intent to implement these changes.

The facilities have a chemical inventory management system, which is essential, but I recommend making it more robust. This includes that chemicals must be marked with their purchase date to prioritize the use of older supplies before newer ones, following the First-in, First-out method. It is important to adhere to the manufacturer's suggested shelf life, which is generally up to two years. These recommendations were again discussed with and well received by staff.

I observed some diluted chemicals with no indication of creation date. The effectiveness of diluted chemicals generally lasts 24 hours. Therefore, chemicals at dilution stations should be mixed daily to maintain their effectiveness. These recommendations were met with openness and an intent to implement.

I was made aware that Plaintiffs assert that overcrowding exists in the facilities leading to environmental health issues. During the site visits, I did not observe any overcrowding within the detention facilities. Several multiple occupancy areas/mainline housing areas were observed, some with triple bunk bed options but these did not create poor environmental conditions based upon my inspection and observations. I understand that the Office has a long-term plan that will allow the transition from triple to two-man bunk beds but again, I do not view the fact of or timing of this process affecting environmental conditions based upon my personal observations.

Ex. U-1590

**PLUMBING/ELECTRICAL**

The plumbing and electrical systems at each of the facilities were not contributing to any health or safety issues based upon my observations. I observed the use of one extension cord in one facility, which I was advised was temporary. Regulations typically require that extension cords be used safely and not as a permanent solution; minimum of 90 days and there was no indication that this cord was being used on anything other than a temporary basis. I did not observe any exposed, energized wiring in any of the facilities.

Otherwise, toilets and shower facilities appeared to be in working order, with no insects or other indicia of problems and I did not observe any backed up toilets or otherwise non-functioning plumbing.

**LAUNDRY SERVICES/LINEN EXCHANGE**

Laundry operations are managed by the Central Production Center, which provides laundry services for all male facilities with a one-to-one clothing exchange system. Las Colinas handles the laundry for all female clothing items, also utilizing a one-to-one clothing exchange. The laundry operations are good overall with the need for some additional cleaning procedures for laundry carts.

Laundry cart maintenance is an important aspect of operations. My understanding is that laundry carts are cleaned after each use, but my observation of stains and grime indicates the need for a more thorough cleaning with soap, water, and sanitizer. Las Colinas addresses this issue effectively by using an automatic cart washing machine that can deep clean and sanitize the carts. I discussed my concerns with the staff, who

11

Ex. U-1591

were open and receptive to implementing a better cleaning process at the other facilities.

Facility upgrades are underway at Central Jail, where the laundry area is being enhanced with the installation of three new washers and three new dryers. These additions are intended to supplement the laundry services provided by the Central Production Center. The new laundry area was not operational at the time of inspection.

Footwear issuance includes both new and recycled plastic footwear, which are cleaned and laundered before being redistributed to the general population, following proper procedures. Additionally, proper protocols are in place for handling laundry contaminated with bloodborne pathogens and vectors such as scabies, ensuring hygiene and safety.

Property storage involves placing items in paper bags inside black zipped laundry storage bags. If there is a suspicion of lice, scabies, or biohazard contamination, the items are placed in plastic bags within the black zipped bags and tagged externally for identification. This system ensures proper handling of property storage.

The clothing allotment for incarcerated persons (IPs) includes two sets of color-coded uniforms (one worn) and two sets of undergarments, referred to as "White Rolls." For males, this includes a towel, socks, underwear, and a t-shirt. For females, it includes a towel, bra, socks, underwear, a gown, and a t-shirt. IP workers receive the same clothing allotment as the general population, with laundering services provided daily.  The number of items distributed, and the frequency of laundering is all appropriate.

12

**Ex. U-1592**

During my inspections, the laundry staff members were knowledgeable and eager to provide information. I discussed with the laundry manager at CPC the possibility of using the automatic laundry cart washer for all county-wide carts. This would help prevent cross-contamination between soiled carts and clean linen and, if not too burdensome in terms of transport, would be the best cleaning option. If this is not feasible, hand cleaning, as previously mentioned, is the next best option. The CPC manager expressed openness to presenting this idea to County Leadership for review.

**CONCLUSION**

According to my review, as discussed in this report, I believe that the San Diego County Sheriff's Office Detention Facilities perform at an average level compared to other adult local detention facilities in terms of environmental health and safety. There are no systemic issues which demonstrate a callous or indifferent attitude toward creating a clean and health environment for Incarcerated Persons.  To the contrary, San Diego County Sheriff's Office leadership and staff members have taken an active role in improving the sanitation, which is visible at each facility and were very receptive to my questions, commentary and suggestions during my inspections and after.  By actively addressing the observations outlined in this report, I am confident that ongoing improvements will yield successful results.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

Dated: August 21, 2024

13

**Ex. U-1593**

# EXHIBIT W

## (Redacted)

Ex. W-1612

# Deposition Transcript

Case Number: 3:20-CV-00406-AJB-DDL

Date: November 12, 2024

In the matter of:

## DUNSMORE, et al. v SAN DIEGO COUNTY SHERIFF'S DEPT, et al.

## Owen J. Murray, D.O., MBA

**CERTIFIED COPY**

Reported by:
Cherie J. Anderson



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

Ex. W-1613

1        UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF CALIFORNIA
2            3:20-CV-00406-AJB-DDL

3                   - - -

4

DARRYL DUNSMORE, ANDREE ANDRADE, :
5  ERNEST ARCHULETA, JAMES CLARK,    :
ANTHONY EDWARDS, REANNA LEVY,     :
6  JOSUE LOPEZ, CHRISTOPHER NORWOOD,:
JESSE OLIVARES, GUSTAVO           :
7  SEPULVEDA, MICHAEL TAYLOR, and   :
LAURA ZOERNER, on behalf of       :
8  themselves and all others        :
similarly situated,               :
9                                    :
          Plaintiffs,               :
10                                   :
           vs.                      :
11                                   :
SAN DIEGO COUNTY SHERIFF'S        :
12  DEPARTMENT, COUNTY OF SAN DIEGO, :
SAN DIEGO COUNTY PROBATION        :
13  DEPARTMENT, and DOES 1 TO 20,    :
inclusive,                        :
14                                   :
          Defendants.               :
15  _____

16     DEPOSITION OF OWEN J. MURRAY, D.O., MBA
   _____
17
DATE TAKEN:      Tuesday, November 12, 2024
18
TIME BEGAN:      9:12 a.m. Pacific
19
TIME ENDED:      5:31 p.m. Pacific
20
LOCATION:        Conducted via videoconference
21

22  REPORTED BY:     Cherie J. Anderson, RMR, RPR, CRR
                    Steno
23                  315 West 9th Street, Suite 807
                    Los Angeles, CA  90015
24                  (310) 573-8380
                    NV FIRM# 108F
25

Ex. W-1614

```
 1      A    No.  That's me.

 2      Q    What about Mortality Data?

 3      A    Me.

 4      Q    What about the section Response to Plaintiffs'

 5   Referenced Citations?

 6      A    That's me.

 7      Q    And then section 7, Plaintiffs' Allegations?

 8      A    That's me.

 9      Q    And the Conclusion?

10      A    Mine.

11      Q    Okay.  Have you worked with -- is this the

12   first time that you've worked with these people in a

13   medical system review project like this?

14      A    I believe it's the first time I've worked with

15   Dr. Roberts on a project like this.  With Mr. Coates

16   and with Mr. Abbott, we worked on -- it wasn't

17   related to litigation, but we worked on a jail

18   project in Donohue/Raleigh/Durham at the Wake County

19   Jail.

20      Q    And, for the parts of the reports that you --

21   for the parts of the report that you indicated they

22   helped you with, did they write first drafts of those

23   sections?

24      A    They did.

25      Q    And then what process did you go through with
```

Ex. W-1615

1    yourself?

2        A    I did -- I reviewed them to see what format

3    they were in and what they looked like.  I did not do

4    a review of the record as -- as my -- the consultants

5    did.

6        Q    When you say -- I believe you said you

7    reviewed them -- the format of them.  What do you

8    mean by that?

9        A    Just I wanted to see what they looked like and

10   what the consultants were actually getting so I had a

11   better understanding if they asked about a question

12   or -- so I just wanted to see what it is they would

13   be looking at.

14       Q    But you didn't substantively review the

15   records to determine the care provided -- sorry.

16            You didn't substantively review the records to

17   evaluate the care provided to the patients, did you?

18       A    I did not, no.

19       Q    And your report lists five individuals as

20   reviewers of the medical files.  Right?

21       A    Correct.

22       Q    Dr. Stephen Boone.  Right?

23       A    Correct.

24       Q    PAC Erin Freeman?

25       A    Correct.

**Ex. W-1616**

1    Q    FNP Jennifer Humphries?

2    A    Correct.

3    Q    Dr. Jane Leonardson?

4    A    Correct.

5    Q    And PA John Pulvino?

6    A    Correct.

7    Q    Who are those people?

8    A    Well, I'll start with Dr. Leonardson.

9  Dr. Leonardson has worked for Correctional Managed

10 Care.  She's a Board-certified internist who started

11 with me, actually, in the county jail in Chicago and

12 has worked in multiple TDCJ facilities.  Her current

13 role -- she's now since retired from CMC, but she was

14 our chief medical information officer when she left,

15 and she now is -- she has her own consulting business

16 and is involved in correctional healthcare activities

17 outside of CMC now.

18        John Pulvino:  He's a PA.  He's been here

19 30 years.  He's over -- he's the director of quality

20 and outcomes and has worked, as I said, in the TDCJ

21 and then started with Correctional Managed Care when

22 it began in September of '94.

23        Erin Freeman has been with Correctional

24 Managed Care for 15 years.  She's over our

25 utilization review department.

**Ex. W-1617**

OWEN J. MURRAY, D.O., MBA
NOVEMBER 12, 2024

JOB NO. 1220572

1          And Stephen Boone is an ER physician, not

2     associated with CMC.  He's a Board-certified ER

3     guy -- doctor that works for UT Houston, and he's on

4     the faculty there.

5          And then Ms. Humphries is a nurse practitioner

6     who's been with CMC for the last few years, and she

7     has some experience in the past with doing legal

8     reviews in the nursing area, and she was just added

9     for this particular activity.

10     Q    And how did you -- did you choose those five

11     people to work with you?

12     A    I did, yes.

13     Q    And how did you choose those five to work with

14     you?

15     A    I've worked with them in the past on other

16     similar activities.

17     Q    And by "similar activities," you mean

18     reviewing medical files to determine whether care met

19     the standard of care?

20     A    Correct.

21     Q    Have they worked on [sic] you in other -- to

22     help you produce other expert litigation reports?

23     A    They have.

24     Q    You testified that you didn't review the

25     substance of the files.  Right?

**Ex. W-1618**

1    A    Correct.

2    Q    They are the ones who reviewed the substance

3    of the files.  Correct?

4    A    Correct.

5    Q    [Inaudible].

6         Who assigned them which medical files they

7    should review?

8    A    Erin Freeman did that.

9    Q    Was she the supervisor of this project?

10   A    She was my assistant in delegating and

11   distributing the workload.

12   Q    How did -- do you know how she decided to whom

13   to assign each medical file?

14   A    I think she just took the random assortment of

15   charts as they came in and assigned them that way.

16   Q    There was, as I saw it, an unequal assignment

17   of charts.  One of people reviewed as few as two, and

18   some others reviewed 25 or 26.  Do you know how that

19   happened?  Do you know how that happened?

20   A    It was just based on their time and

21   availability.

22   Q    Is that why FNP Humphries only reviewed two

23   files?

24   A    Correct.

25   Q    For each of the files, the reviewers wrote a

**Ex. W-1619**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
1   summary.  Right?

2       A    Correct.

3       Q    And, for each file, they offered an opinion

4   regarding whether the care the jail provided to the

5   person met the standard of care.  Right?

6       A    Correct.

7       Q    When medical professionals use this term,

8   "standard of care," what do they mean?

9       A    Well, in this situation, the standard of care

10  is a care standard that -- that each individual has

11  based on their personal experience and their

12  professional education as to the entirety of the care

13  that was provided, because one of the reasons we

14  actually pull chronic care charts is those are

15  patients who have a high likelihood of having

16  multiple encounters with the healthcare system.

17          And so that's a good pool of population --

18  pool of patients to pull so that you can be able to

19  view not only the chronic care, but their episodic

20  care, their use of lab, their use of x-ray, their use

21  of subspecialty care.

22          So the standard of care is -- is a subjective

23  standard based on those individuals' experience and

24  professional background.

25      Q    So that sounds like that's the standard of
```

Ex. W-1620

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
1   care that they applied here.  I asked a slightly
2   different question, which is, when medical
3   professionals use the term "standard of care," what
4   do they mean?
5       A   I don't know.
6           MS. COLEMAN:  Objection.  Vague.
7       Q   Have you heard the term "standard of care"
8   before?
9       A   I've heard it.
10      Q   Is it -- is it frequently used in medicine?
11      A   It is.
12      Q   But you don't know what it means?
13      A   I don't.
14          MS. COLEMAN:  Objection.  Misstates his
15     testimony.  Vague.
16      A   Again, I think it's a term of art, but I don't
17  really know what people mean when they say it.
18      Q   Do you know what your five reviewers think the
19  term standard of review -- I'm sorry -- "standard of
20  care" means?
21      A   We discussed -- we discussed how we were going
22  to approach reviewing the records and what was going
23  to go into how they subjectively scored those
24  records.
25      Q   And what did you discuss?  What was the --
```

**Ex. W-1621**

OWEN J. MURRAY, D.O., MBA                                        JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   well, who -- who set forth the parameters for what
 2   the standard of care would be?
 3      A   Well, as I said, there is no standard of care
 4   as you're looking at the totality of services that
 5   we're looking at.  There's not a book that I can go
 6   to that's going to say that when I look at chronic
 7   care and their episodic care and their use of lab and
 8   their pharmaceutical choice and the delivery of all
 9   of that -- there's no book that says, this meets the
10   standard or it doesn't meet the standard.
11          So it really comes down to, based on your
12   professional experience and your background, did the
13   totality of that care, in your opinion, fall within a
14   reasonable level of care for -- in this situation,
15   for a patient of San Diego County -- San Diego Jail.
16      Q   You just said that the standard of care would
17   be based on a person's experience and background.  Is
18   that right?
19      A   Correct.
20      Q   People have different levels of experience.
21   Right?
22      A   Correct.
23      Q   And they have different backgrounds.  Right?
24      A   Correct.
25      Q   Does that mean the standard of care could be
```

Ex. W-1622

1    different for the -- for different people?

2        A    I think it could.

3        Q    Do you think the standard of care was

4    different for your reviewers, given that they have

5    different backgrounds and experience?

6            MS. COLEMAN:  Objection.  Vague.  Compound.

7      Calls for speculation.

8        A    As I said, I don't -- again, there is no

9    standard of care.  When you're talking a standard, it

10   really is a subjective review of the record that

11   they're looking at.  So there is no standard to

12   compare it to.

13       Q    I guess we should be really precise here.

14   When you're saying the standard of care, are we

15   talking about the standard of care for treating a

16   specific condition or the standard of care more

17   generally for a person overall or something else?

18       A    I'm -- I -- I would object to the word

19   "standard" because that would imply I could go read

20   about it in some book and find out what that standard

21   is, and this -- this is not -- this is the art of

22   medicine.  It's -- you know, you have to take in the

23   totality of what goes on and did it meet a reasonable

24   level of care for that patient.

25       Q    Well, in your report, you're the one who used

Ex. W-1623

```
 1       Q    But there are standards to determine whether
 2  the care someone receives for a specific condition or
 3  disease meets the standard of care.  Right?
 4            MS. COLEMAN:  Objection.  Vague.  Compound.
 5       A    For a specific disease, yes, there are many
 6  standards.  Correct.
 7       Q    And some of them are published.  Right?
 8       A    Some are; correct.
 9       Q    And some medical professionals use those
10  published standards to determine whether the care
11  someone received for those specific conditions met
12  the standard of care.  Right?
13       A    They might.
14       Q    And so, in that context, a published standard
15  of care provides a written objective standard by
16  which to measure someone's care.  Right?
17       A    A particular element.  It could.
18       Q    But that's not what your reviewers did.
19  Right?
20       A    Our reviewers did decide and did use some
21  references to standards where they thought were
22  appropriate; but, again, as I said, the review of
23  these records is unique, and I'm not aware, other
24  than what we might see here in our own system where
25  you didn't do a review of the entirety of the record
```

**Ex. W-1624**

```
1          And all of that went into the determination of
2     whether it met our standard or not.
3        Q    But -- I understand that's what they looked
4     at.  What was the standard?
5        A    Well, the standard --
6          MS. COLEMAN:  Objection.
7        A    The standard is a subjective standard.  Did
8     all of those things -- I guess my analogy would be
9     like a test score.  Like, there are 100 points.
10    If -- if you got 80 or above, then that met the
11    standard.  If you got less than 80, then it didn't.
12       Q    Well, but there isn't any scoring here.
13    Right?
14       A    The scoring is subjective.
15       Q    Okay.  So what I'm trying to understand is,
16    where was the line drawn?  How did you define the
17    line between 79 and 80 in your analogy?
18          MS. COLEMAN:  Compound.  Asked and answered.
19       A    Well, as I said, that -- that is the
20    subjective part of these reviews is that that was
21    left to the reviewer to determine whether or not it
22    was, you know, an 81 or a 79.
23       Q    And I think you previously testified that was
24    based on their experience.  Right?
25       A    Experience and their professional degree.
```

Ex. W-1625

1    either meets the standard of care or doesn't meet the

2    standard of care.  Right?

3        A    That is correct.

4        Q    You said you did it in California.  In what

5    context?

6        A    I would have to look back.  I believe we

7    reviewed -- actually, I think we re-reviewed

8    Plaintiffs' records in regard to their complaints.  I

9    don't -- I don't think we did necessarily the same

10   thing we did here in California, other than reviewing

11   records that the plaintiffs had reviewed.

12       Q    So the instructions to the reviewers was to

13   look at the overall care.  Right?

14       A    Is that -- I thought -- yes.  Correct.

15       Q    Sorry.

16       A    So sorry.  I thought there was more.

17       Q    And to use their experience and background to

18   determine if the care met the standard of care.  Is

19   that right?

20       A    Met our standard.  Correct.

21       Q    And, again, I'm just having some trouble

22   understanding.  What is your standard of care?

23       A    As I said, it is a subjective -- and I just go

24   back to, it is -- it is not a standard, since I can't

25   point to anything.  It is, did they make a score of

**Ex. W-1626**

1    Q   I have more questions about that.  Under the

2    standard of care, as you defined it, for the review,

3    if one area of care was terrible for a patient but

4    the other areas of care were adequate, would the care

5    meet the standard of care?

6    A   It could.

7    Q   Now, the opinions expressed in your -- sorry.

8    The opinions in your report are your opinions.

9    Right?

10   A   Correct.

11   Q   Are the opinions regarding whether the

12   standard of care was met for the individual patients

13   in Appendix J, are those your opinions as well?

14   A   Well, they're the individual reviewers', whose

15   opinions I trust.

16   Q   But, again, you didn't review the file

17   substantively to confirm whether you agree with their

18   conclusions that the standard of care was met.

19   Right?

20       MS. COLEMAN:  Asked and answered.

21   A   No.  I did not review the medical record

22   files.

23   Q   Is it possible that you might have disagreed

24   with one of the reviewers about whether the standard

25   of care had been met?

**Ex. W-1627**

OWEN J. MURRAY, D.O., MBA                                              JOB NO. 1220572
NOVEMBER 12, 2024

1    Q   And, again, even if the diabetic care was

2    terrible, you said just now that it's possible that

3    the overall care met the standard of care.  Correct?

4    A   It is possible; yes.

5    Q   In that circumstance, where, let's say, one

6    type of care was very bad and the rest of the care

7    was adequate, how would you decide if the care met

8    the standard of care?

9         MS. COLEMAN:  Objection.  Incomplete

10    hypothetical.  Overly broad.  Calls for

11    speculation.

12    A   As I said, we would have to go through -- I

13    would have to review the chart that we would be

14    talking about and -- and come to my conclusion.  As I

15    said, this standard of care is a subjective standard.

16    Q   Is it possible that the -- I want to stick

17    with this hypothetical for a second.  Let's assume,

18    again, that there's -- one area of care was terrible,

19    but the other areas of care were adequate.  Is it

20    possible that the care may not have met the standard

21    of care in that case?

22         MS. COLEMAN:  Objection.  Vague.  Incomplete

23    hypothetical.  Lacks foundation.

24    A   Again, help me understand -- again, we're

25    using the term "standard," and I'm using the term the

**Ex. W-1628**

1    Q    Sure.

2         MS. COLEMAN:  Can you ask it in a

3    nonnegative?

4    Q    I'll move on.

5         Does it meet the standard of care not to

6    conduct a physical examination for someone being

7    evaluated for abdominal pain?

8         MS. COLEMAN:  Objection.  Vague.  Incomplete

9    hypothetical.

10   A    Again, it would depend on the particular

11   medical record being reviewed and the entire context

12   of the record.

13   Q    Does it meet the standard of care to evaluate

14   someone for abdominal pain without obtaining vital

15   signs?

16        MS. COLEMAN:  Objection.  Vague.  Incomplete

17   hypothetical.

18   A    Again, to the extent that that occurred and

19   the records reviewed, the reviewer would -- would

20   take that into consideration in their scoring.

21   Q    You mentioned scoring just now.  Right?

22   A    Correct.

23   Q    But, again, there was no scale here.  Right?

24   There's no score?

25   A    No.  I gave you the kind of anecdote, or the

**Ex. W-1629**

1  example, of a test trying to look at a score of 80

2  and -- but it is subjective.

3      Q   Did you provide that instruction to the

4  reviewers that, you know, so long as the care

5  received a score of 80 or better, you should score it

6  as meeting the standard of care?

7      A   I gave them that analogy.

8      Q   That exact analogy?

9      A   Yeah.  As I said, kind of look at it as a

10  test; did they score above 80?  80 or above.

11     Q   And did you provide them with any guidance for

12  how they were supposed to score it, how they were

13  supposed to give it a number?

14     A   No.

15     Q   We touched on this briefly, but you know, you

16  said you reviewed Dr. Keller's rebuttal report and

17  the portion of his report where he discussed 19 of

18  the medical files that your reviewers reviewed.

19  Right?

20     A   Correct.  I did read that; yes.

21     Q   And a number of those -- for a number of those

22  medical files, your reviewer concluded that the care

23  met the standard of care.  Right?

24     A   Correct.  Met our standard.  Correct.

25     Q   And Dr. Keller concluded that the care

1      Q   And, again, you said you read Dr. Keller's

2   rebuttal report.  Right?

3      A   I did.

4      Q   I can show this to you if you need it, but I'm

5   going to quote it to you accurately.  If it's

6   important for you to see it, I'll pull it up for you,

7   but on page 4 of his report he wrote, quote, "One of

8   the most critical functions of any healthcare system,

9   but especially a correctional healthcare system, is

10   to carefully review any in-custody deaths to identify

11   medical errors that led to adverse outcomes so that

12   those errors can be avoided in the future."

13         Do you agree with that statement?

14          MS. COLEMAN:  Objection.  Overly broad and

15     assumes the deaths are medical.

16      A   Yeah.  I mean, I agree that looking at

17   mortality in jails or prisons is part of what you

18   should do in a quality assurance program.  Yes.

19      Q   And why is that part of something that you

20   should do in a quality assurance program?

21      A   Because it's -- a death is a sentinel event,

22   and so looking at a sentinel event to look back to

23   see if there were some things that potentially could

24   be modified or changed -- I think, as I said, it's a

25   reasonable thing to do within the context of a

**Ex. W-1631**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1     Q    Did you review any materials related to the
 2   M&M committee?
 3     A    I did not, no.
 4     Q    Did anyone else on your team review materials
 5   related to the M&M committee?
 6     A    No.
 7     Q    Why not?
 8     A    We were told how it worked, and that was
 9   sufficient.
10     Q    So you didn't see how it was working in
11   practice.  Right?
12     A    We didn't attend the meeting; no.
13     Q    You didn't look at any of the written reports.
14   Right?
15     A    No, we did not.
16     Q    You didn't look at whether it was making
17   appropriate conclusions with respect to whether
18   deaths were preventable or not, did you?
19     A    We didn't do that, no.
20     Q    You didn't review whether they were making
21   appropriate recommendations for changes to address
22   any problems they found in the deaths, did you?
23     A    No.
24     Q    You didn't review whether the County
25   implemented any of those recommendations, did you?
```

**Ex. W-1632**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1      A    No.

 2      Q    In your report on -- on page 39, you indicated

 3   that there have been five non-homicide, non-suicide

 4   in-custody deaths in 2024.  Right?

 5      A    Correct.

 6      Q    And you further indicate that you received

 7   medical records for all five of those individuals.

 8   Right?

 9      A    We did.

10      Q    And you wrote on page 39 of your report -- and

11   let me take you there just so you can see it -- that

12   the five medical records were provided and reviewed.

13   Do you see that at the bottom?

14      A    Uh-huh.

15      Q    Did you review the files?

16      A    No.

17      Q    Who reviewed them?

18      A    Erin Freeman.

19      Q    Did you review any M&M committee materials for

20   those deaths?

21      A    No.

22      Q    Did you ask for any M&M materials for those

23   deaths?

24      A    No.

25      Q    Why not?
```

**Ex. W-1633**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1      Q    And you said the reason you did not was

2   because it was not part of your review.  Is that

3   right?

4           MS. COLEMAN:  Asked and answered.

5      A    We wanted -- we wanted to ensure that there

6   was an M&M committee, and we were told, and verified,

7   that it was, and we did not do anything beyond that.

8      Q    Why not?

9      A    Because it wasn't part of our review.

10     Q    Why wasn't it part of your review?  That's

11  what I'm trying to understand.

12     A    Again, I didn't feel that -- all I want to do

13  is validate that it existed.  And, to the extent that

14  that actually played into our overall issue was -- is

15  there reasonable care being provided at the jail?

16  That was all I needed to find out was, they had an

17  M&M committee.

18     Q    And not whether the M&M committee was doing a

19  good job.  Is that right?

20          MS. COLEMAN:  Asked and answered.

21   Argumentative.

22     A    Yeah.  I wasn't there to debate the -- merits

23  of their particular M&M committee.

24     Q    Well, I believe you testified that an M&M

25  committee is an important part of an adequate medical

Ex. W-1634

```
 1  system -- sorry -- an adequate QI system.  Isn't that
 2  right?
 3     A   Correct.
 4     Q   Does it not matter whether the M&M committee
 5  is doing a good job?
 6        MS. COLEMAN:  Objection.  Argumentative.
 7     Asked and answered.
 8     A   As I said, we were told it existed, and that
 9  was sufficient for myself.
10     Q   Who told you that it existed?
11     A   I mean, Dr. Freedman.  We heard it from
12  several different sources that there was an M&M
13  committee as well as I think -- I certainly knew
14  there -- because there was obviously concern about
15  how the M&M committee was operating and where these
16  mortality death reviews were done, whether they were
17  on-site or not on-site.
18        And my only concern was, were they being done?
19  And the answer was, yes.
20     Q   Turning back to the summaries in Appendix Q,
21  none of those summaries include any analysis of
22  whether the deaths were preventable.  Right?
23     A   Correct.
24     Q   And none of those summaries include any
25  analysis of whether there were errors in medical
```

Ex. W-1635

OWEN J. MURRAY, D.O., MBA                              JOB NO. 1220572
NOVEMBER 12, 2024

1    care.  Right?

2        A    Correct.  They were simply the summaries and

3    the reviews.

4        Q    And none of those summaries included an

5    analysis of whether better care could have prolonged

6    the person's life.  Right?

7        A    No.  Correct.

8        Q    And none of the summaries include any

9    recommendations for changes to the medical system

10   that might be warranted in light of the -- what's

11   shown in the medical file, do they?

12       A    No.

13       Q    Did you review medical records for any other

14   in-custody deaths -- sorry -- for any in-custody

15   deaths other than the five from 2024?

16       A    That's it.

17       Q    Earlier today, Counsel for Defendants produced

18   an email from you to, I believe it's, Susan Coleman,

19   requesting on August 30th, after Dr. Keller's

20   report was produced, that you receive certain medical

21   files.

22            Do you remember writing that email?

23       A    Yes, I think I do.

24       Q    And do you recall that that email requested

25   medical records for seven individuals who Dr. Keller

Ex. W-1636

OWEN J. MURRAY, D.O., MBA                                              JOB NO. 1220572
NOVEMBER 12, 2024

```
 1      the record?

 2              MR. FREEDMAN:  Sure.  This is the rebuttal

 3      expert report of Jeffrey Keller from

 4      November 1st, 2024.

 5  BY MR. FREEDMAN:

 6      Q   Dr. Murray, have you seen this before?

 7      A   I have.

 8      Q   I'll blow it up a little bit for you.  Let me

 9   know if you need me to scroll down.

10      A   Keep going, please.  Okay.  Keep going.  Okay.

11   Keep going.  Okay.  Keep reading.  Okay.

12      Q   Again, Dr. Keller opined that Mr. Mitchell's

13   death from sepsis was likely preventable.

14          Do you agree with Dr. Keller's conclusion?

15      A   I can't agree or disagree.  I didn't review

16   the record.

17      Q   You said you -- I just want to make sure I

18   have this right:  You said you did not review

19   Dr. Ramsey's rebuttal report.  Is that correct?

20      A   Who?

21      Q   She's the substance use disorder expert for

22   Plaintiffs.

23      A   No.  I'm not a substance use disorder expert,

24   so no, I did not read -- review that.

25      Q   Did you review Dr. Keller's discussion of the
```

**Ex. W-1637**

OWEN J. MURRAY, D.O., MBA                                JOB NO. 1220572
NOVEMBER 12, 2024

1    you see that at the bottom there?

2        A    I do.

3        Q    And this is Appendix H.  Right?

4        A    Correct.

5        Q    And this is the audit worksheet that I believe

6    you testified the NP who was working with you

7    completed regarding the 14-day health and physical.

8    Is that right?

9        A    No.  That was Mr. Abbott.

10       Q    Apologies.  And Mr. Abbott is an RN.  Did I

11   use the wrong acronym there?

12       A    He is an RN; correct.

13       Q    And Mr. Abbott is the one who reviewed the

14   files for this audit.  Right?

15       A    Correct.

16       Q    Did you give him instructions for how to

17   conduct the audit?

18       A    No.  He knows how to conduct this audit.

19       Q    And how do you know he knows how to conduct

20   this audit?

21       A    Because we did this audit in the jails that we

22   ran and Kirk was responsible for those jails.

23       Q    And, in looking at the appendix, did

24   Mr. Abbott collect the relevant data points in order

25   to be able to perform this audit?

Ex. W-1638

OWEN J. MURRAY, D.O., MBA                                              JOB NO. 1220572
NOVEMBER 12, 2024

1   audit?

2       A    Correct.

3       Q    Who selected the 75 medical files for the

4   audit?

5       A    Kirk did.

6       Q    How did he select them?

7       A    I believe he did the same thing:  kind of a

8   random number.

9       Q    Do you know that to be true or are you

10  speculating?

11      A    As I said, I believe that to be true.

12      Q    That doesn't quite answer the question.  Do

13  you know he did it that way or are you guessing?

14          MS. COLEMAN:  Objection.  Compound.  Asked

15    and answered.

16      A    Yeah.  As I said, I -- I can only say, I

17  believe that to be true.  I know that he was -- that

18  he would have applied his statistically appropriate

19  methodology to his selection.

20      Q    And why do you believe that to be the case?

21      A    Well, because I know that this form that he's

22  using is a form that we use in our jail audits; and I

23  know that Kirk knows how to perform these; and I know

24  that he knows that you have to do it in a

25  statistically correct manner.

Ex. W-1639

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1          So, as I said, I have confidence.  I'm not
 2    sure exactly what methodology he used, but I am
 3    confident that Kirk used a statistically appropriate
 4    methodology to determine the 75 charts he pulled from
 5    the 121.
 6      Q   Only 11 people in this audit remained in the
 7    jail for 14 days.  Right?
 8      A   Correct.
 9      Q   I'm going to go back now to page 12 of your
10    report.  12.  And do you see the sentence I've
11    highlighted there?
12      A   Yes.
13      Q   It says, quote, "Of the 75 records audited,
14    only 11 involved stays of 14 days or longer, and all
15    required initial health assessments were completed
16    within this time frame."
17          Right?
18      A   Correct.
19      Q   All right.  Now I'm going to go back.  This is
20    still the audit here, Appendix H.  Do you see that?
21      A   I do.
22      Q   And then I'm going to point your attention to
23    Rows 50 and 58.
24      A   Okay.
25      Q   Do you see those?
```

**Ex. W-1640**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1      A    Right.

 2      Q    And Row 50 shows someone who was in the jail

 3   for 91 days.  Right?

 4      A    Correct.

 5      Q    And there were -- no 14-day health assessment

 6   was found in his file.  Right?

 7      A    Correct.

 8      Q    And Row 58 shows someone who was in the jail

 9   for 81 days.  Right?

10      A    Right.

11      Q    And, again, no health and physical in the

12   file.  Right?

13      A    It appears to say so, yes.

14      Q    So that -- would you agree that those are two

15   examples where the jail did not comply with its own

16   policies?

17      A    I don't know.  I would have to ask Kirk about

18   those two.  I don't know why he didn't explain those.

19      Q    Well, you said you had a lot of faith in

20   Mr. Abbott that he both knows how to do this and

21   enters the information correctly.  Right?

22      A    Correct.

23      Q    And he's entered information here indicating

24   that the jail did not comply with policy with respect

25   to these two individuals.  Right?
```

**Ex. W-1641**

OWEN J. MURRAY, D.O., MBA                                JOB NO. 1220572
NOVEMBER 12, 2024

 1   whether the system was working during that very

 2   narrow time period in January 2024?

 3       A    I guess that would be the conclusion:  that it

 4   was working that day on that particular time.  It was

 5   a spot check.  Yes.

 6       Q    All right.  I'm going to switch over to

 7   discussing Appendix G, the intake -- the intake

 8   audit.

 9       A    Okay.

10       Q    Let's see.  Having a little trouble here.

11            I'm now on page 155 of your report.  Do you

12   see that, Dr. Murray?

13       A    I do.  Yeah.

14       Q    And this is Appendix G, Audit Worksheet Intake

15   Screening.  Right?

16       A    Uh-huh.

17       Q    And I think you testified before that

18   Mr. Abbott is the one who completed this audit.

19   Right?

20       A    Correct.

21       Q    And, again, that you did not review the

22   underlying medical records to determine whether the

23   information he put into the worksheet was accurate.

24   Right?

25       A    That is correct.

**Ex. W-1642**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    Q    The 75 files reviewed for Appendix G appear to

2    be identical to the files in Appendix H.  Is that

3    right?

4    A    You are correct.

5    Q    Appendix G did include the booking date for

6    the individuals, but Appendix -- sorry.  I think I

7    said that backwards.  Appendix H includes the booking

8    date for the individuals, but Appendix G does not.

9         Is the booking date that's reflected for the

10   individuals in Appendix H the same booking date as

11   the people in Appendix G?

12   A    Yes.

13   Q    This audit looked at three metrics.  Right?

14   A    Correct.

15   Q    The first metric is, quote, "Time lapse from

16   booking to receiving screening," end quote.  Right?

17   A    Correct.

18   Q    What is that metric looking at?

19   A    From when they're -- well, I mean, you know

20   the process.  So when they're brought into the jail,

21   accepted, to when they actually get their receiving

22   screening, that initial first step.

23   Q    The second metric is, quote, "All positive

24   screening findings appropriately referred and

25   subsequent evaluations completed," end quote.

**Ex. W-1643**

OWEN J. MURRAY, D.O., MBA
NOVEMBER 12, 2024

JOB NO. 1220572

1      What is this metric measuring?

2    A   That means that if -- that if there was

3  anything in terms of mental health referrals or

4  emergent referrals that those were done -- that

5  they're appropriately referred and the evaluations

6  are completed.

7    Q   Did you provide Mr. Abbott any instructions

8  for how to determine whether this metric was

9  satisfied?

10   A   No.

11   Q   Did you set forth -- were you the one who

12 established this metric?

13   A   No.  Mr. Abbott established that metric.

14   Q   And do you know how Mr. Abbott determined

15 whether findings were appropriately referred?

16   A   He reviewed through the medical record.

17   Q   What does it mean for something to be -- for a

18 finding to be appropriately referred?

19   A   Like, say mental health:  that a mental health

20 screening was done.  So talked about suicide ideation

21 based on mental health.

22   Q   Got it.  So it means if something is

23 identified on the receiving screening that warrants

24 referral, a referral occurred.  Is that right?

25   A   Correct.

**Ex. W-1644**

```
 1   subsequent evaluations were completed?

 2      A   Well, as I said, they probably weren't -- I

 3   mean, I don't know what was -- what was ordered, but

 4   if it was -- if the referral was made, then, as I

 5   said, he checked to see that it was done.  Like the

 6   mental health evaluation:  If they were suicidal,

 7   then that would be in there.

 8      Q   Did Mr. Abbott consider this metric satisfied

 9   if a referral was made but the person was released

10   before the scheduled evaluation?

11      A   Well, as I said, I believe that if they were

12   released before the evaluation, within one day -- I

13   would have to talk with him about how he did that.

14      Q   So you don't know the answer to that about --

15      A   I don't know, as I said, how he handled -- how

16   he handled those.  I do -- as I said, I know that

17   when there was a referral made, then he did track

18   that through the medical record.  I didn't ask him

19   about -- I didn't ask him about how he managed those

20   patients who were gone and something was ordered and

21   they did not necessarily receive it, because I'm not

22   sure how they would get it if they weren't there.

23      Q   The third metric here is, Chronic

24   Care/Critical Meds Identified on Screening and

25   Continued.
```

**Ex. W-1645**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

1    Q    Is it important for a correctional medical

2    system to timely address sick-call requests?

3    A    Yes.

4    Q    Why?

5    A    Well, I mean, when a patient is requesting

6    care, there needs to be a time set so that that care

7    can be provided.  NCCHC and ACA both state when that

8    is, and so, as I said, I think it's important to be

9    able to see patients' routine healthcare in a timely

10   fashion and at least triage it from a nurse

11   perspective and then refer as necessary and have

12   standards around those processes.

13   Q    And is it also true that the sick-call-request

14   process provides a really important way for

15   incarcerated people to seek care.  Right?

16   A    Correct.  It is the cornerstone of access.

17   Q    Now, I think you testified previously, the

18   files that went into this audit -- Mr. Abbott

19   reviewed those.  Right?

20   A    He did.

21   Q    And you did not review those files to confirm

22   that the information that Mr. Abbott entered into

23   the -- entered into the worksheet here were accurate.

24   Right?

25   A    Correct.

**Ex. W-1646**

```
 1   complaint.
 2      Q    Medical files for patients at the jail often
 3   contain multiple sick-call requests, don't they?
 4      A    Correct.
 5      Q    It appears for this audit, though, that
 6   Mr. Abbott only looked at one sick-call slip per
 7   person.  Right?
 8      A    True.
 9      Q    Did you tell him to do that?
10      A    No.  As I said, he -- he did that on his own.
11   He discusses what we would do here in Texas.
12      Q    Do you know how he chose among multiple
13   sick-call requests in these medical files?
14      A    I would have to ask him which ones he chose.
15      Q    So you do not know.  Right?
16      A    I don't know, no.
17      Q    Is it possible that Mr. Abbott could have
18   cherry-picked sick-call slips where the jail
19   satisfied the metric?
20          MS. COLEMAN:  Objection.  Argumentative.
21    Assumes facts.
22      A    No.  He did not -- he did not cherry-pick
23   sick-call slips.
24      Q    How do you know that?
25      A    Because I know Kirk Abbott and that he
```

**Ex. W-1647**

 1   would -- would not do that.  He wouldn't do that

 2   here.  He wouldn't do that there.  He has no interest

 3   in, one way or the other, how they do on the audit

 4   other than just doing the audit as he would normally

 5   do it.

 6          So I know Kirk Abbott to be aboveboard and

 7   would never cherry-pick to try to create a false

 8   impression of what's going on.

 9     Q   But, again, you have no idea how he chose

10   among multiple sick-call slips in the files.  Right?

11     A   I don't know.  I certainly can ask him and

12   find out for you.

13     Q   All right.  Take a look at Row 9 of this

14   appendix.  Do you see that?

15     A   I do.

16     Q   It indicates that the face-to-face assessment

17   occurred within 24 hours of triage.  Right?

18     A   Correct.

19     Q   And it cites to page 89 of the medical record

20   for the sick-call request.  Right?

21     A   Correct.

22     Q   And it cites to page 319 for proof of

23   compliance with the face-to-face requirement.  Right?

24     A   Correct.

25     Q   If you have a -- I'm going to put up a new

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1    doesn't it?

 2       A    Was there another sick-call slip?

 3       Q    As far as I am aware, there are no other

 4    sick-call slips, and that one appears to match both

 5    the date of receipt and the date in the complaint as

 6    what we just looked at.  Doesn't it?

 7            MS. COLEMAN:  Counsel, assumes facts.  You're

 8       not showing us the one that says it was completed.

 9            MR. FREEDMAN:  Which one would you like me to

10       show, Susan?  I'm happy to show it.

11            MS. COLEMAN:  Well, right now you're showing

12       the sick call, but you're not showing the other

13       document that you referenced.

14            MR. FREEDMAN:  No.  I showed page 89, which

15       we confirmed showed that he had a complaint of

16       excessive skin or ingrown hair; and then we've

17       shown this document showing how it was resolved.

18            MS. COLEMAN:  You showed the grievance and

19       then the resolution.

20    BY MR. FREEDMAN:

21       Q    Well, Dr. Murray, let me ask you a question:

22    Do you think these documents reflect compliance with

23    the policy?

24            MS. COLEMAN:  Objection.  Vague.  Overly

25       broad.
```

**Ex. W-1649**

OWEN J. MURRAY, D.O., MBA
NOVEMBER 12, 2024
JOB NO. 1220572

```
 1     A   Yeah.  I don't know.  As I said, I don't -- I
 2   go -- we're going back to Kirk Abbott's review of
 3   this particular one and saying it's compliant.
 4   Correct?
 5     Q   He said it was compliant.  Right?
 6     A   Correct.  And so, as I said, I would have to
 7   discuss with him, was this the particular one he
 8   looked at?  Because, if I'm looking at this, I would
 9   agree; it does seem like there are two different sets
10   of dates there that would say it's not compliant.
11     Q   All right.  Let's take a look at Row -- I'm
12   going to stop sharing this file.  Let's take a look
13   at Row 11 of Appendix I.
14     A   What page have we got now?
15     Q   We are on page 162 of Appendix I.
16     A   Okay.
17     Q   You know what, I'm going to have to come back
18   to the Row 11 questions because I don't have the
19   Row 11 medical files at the ready, but we'll do it in
20   a bit.
21     A   Okay.  Is that Row 11,       --
22     Q   Booking number         .
23     A   Where -- and you're on page what?
24     Q   162.
25     A   -62.
```

Ex. W-1650

OWEN J. MURRAY, D.O., MBA                                   JOB NO. 1220572
NOVEMBER 12, 2024

```
 1      Q   So do you think Row 11 is an error on the
 2   worksheet?
 3      A   I don't know.
 4      Q   Well, we're looking at the source document
 5   right here, so how can you not know whether it's an
 6   error?
 7           MS. COLEMAN:  Argumentative.
 8      A   As I said, I don't know.  I mean, what I know
 9   is that, as I said, I would need to get Kirk Abbott
10   to look at that to tell me how he came up with that
11   assessment.  Was he looking at the same thing?  I
12   don't know.
13      Q   He's pointing us to page 67 -- right -- in
14   his -- in his -- on Appendix I.  He said look at
15   page 67.  Right?
16      A   [Inaudible].
17      Q   Right?
18      A   Yeah.  Yeah.
19      Q   And it appears to show on its face
20   noncompliance with the policy.  Right?
21      A   Correct.  As I said, it would appear that way.
22      Q   If you were -- let me put it this way:  If you
23   were completing Row 11 on this chart, what -- would
24   you put yes or no in the 24-hour assessment column?
25      A   I guess I would -- if I'm looking at this, if
```

**Ex. W-1651**

1    I'm looking at what is on my screen right now,

2    page 67.

3         Q    And what would you put?  Would you put yes or

4    no?

5         A    It would seem like the answer would be no,

6    so -- but, again, I know Kirk Abbott wouldn't make

7    that mistake, so I'm not sure what Kirk Abbott was

8    looking at, even though we're talking about this

9    particular document right here.

10        Q    Well, he pointed us to two pages.  The other

11   one is 196.  Why don't we take a look at 196 to see

12   if that provides some different information?

13        A    I guess now I'm looking like, are we talking

14   about the exact same exhibits?  I mean, all the

15   paginations and everything else, are these the exact

16   same?  I don't know.

17        Q    Well, I can represent to you that this is what

18   was produced to us as one of the files that was

19   included in the sick-call audit.

20        A    Okay.  I don't know.  As I said, I don't know

21   how to explain how he came up with yes and this being

22   the source document.

23        Q    Okay.  Does the fact that we've identified two

24   of the rows on this chart where you're having trouble

25   understanding how Mr. Abbott -- how this source

Ex. W-1652

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

 1   your opinions overall in those areas.  So I think,
 2   with the intake process, you said your opinion that
 3   the intake process was functioning properly was based
 4   on the spot check, the chronic care files, and your
 5   conversations with staff.  Is that right?
 6       A    And our tour and review -- and review and
 7   discussion with staff there; correct.
 8       Q    Anything other than those sources of
 9   information?
10       A    No.  I think that was -- that's it.
11       Q    All right.  For the 14-day health assessment,
12   can you tell me what your conclusions that it is
13   working properly are based on?
14       A    The spot check and our discussions with --
15   with staff.
16       Q    Anything else?
17       A    No.  That's it.
18       Q    And then, for your conclusions regarding
19   whether the sick-call-request process is functioning
20   properly, can you tell me what the basis for your
21   opinion was there?
22       A    Again, the chronic -- the chart reviews, the
23   spot check, and our conversations with staff.
24       Q    Anything else?
25       A    That's it.

Ex. W-1653

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   face-to-face assessment didn't occur within 24 hours?

 2      A   I don't know if they specifically looked at

 3   the time frame; they were looking at the -- the

 4   referral, the treatment that was provided by the

 5   nurse.

 6      Q   And I don't think I asked this earlier:  With

 7   the chronic care reviewers, did you provide them with

 8   the policies -- medical policies of the jail?

 9      A   No.

10      Q   In your report, you also analyzed the

11   timeliness of lab x-ray and test results.  Right?

12      A   Correct.

13      Q   And you concluded that the jail was obtaining

14   results on timelines consistent with community and

15   industry standards.  Right?

16      A   Correct.

17      Q   Did you review the amount of time between when

18   the jail received results and when staff at the jail

19   reviewed those results?

20      A   We did not, no.

21      Q   Did you look at the amount of time between

22   when the jail received results and, if necessary,

23   took action in response to those results?

24      A   We did not in that -- we did not do a spot

25   audit of that, no.
```

**Ex. W-1654**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1      Q   Did you review whether results were
 2   appropriately documented in the medical records?
 3      A   We did not do a spot check of that, although
 4   those were elements in the chronic care review as
 5   well.
 6      Q   What is a continuous quality improvement
 7   program?
 8      A   Well, it's a -- it's a multidisciplinary
 9   group.  I mean, you're talking about as it relates to
10   corrections or just in general?
11      Q   In general.
12      A   Again, it's typically a multidisciplinary
13   group that comes together to look at processes
14   primarily and to determine if the processes are
15   working, and, if they're not working, based on
16   whatever audit or review, then what might need to
17   occur to improve those processes and their outcomes.
18      Q   Is it an important feature of a correctional
19   healthcare system?
20      A   I would agree.
21      Q   You concluded on page 32 of your report that
22   the jail would not meet the NCCHC standard for
23   continuous quality improvement, which requires that a
24   facility have, quote, "a continuous quality
25   improvement program that monitors and improves
```

Ex. W-1655

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

 1   discussed with all of the relevant parties the

 2   processes ongoing at the jail.

 3       Q    And then also Appendix L -- right? -- formed a

 4   basis for an opinion about the formulary?

 5       A    About the non-formulary piece?  Yes.

 6       Q    I'm sorry.  I misspoke.

 7       A    Yes, about the non-formulary piece.

 8       Q    Did you do anything to confirm the information

 9   in this part of the report?

10       A    I mean, other than I was with her when she was

11   asking her questions in the pharmacy to the pharmacy

12   techs and how the process worked and we'd talk

13   about -- we talked about that.  So, I mean, I was

14   there during her questioning and kind of heard what

15   she had to say.  I was on a phone call with her with

16   the NaphCare pharmacist.

17           I don't know if I did anything else with her

18   in regard to this particular piece.

19       Q    Are the opinions offered on pages 22, 23, and

20   24 your opinions?

21       A    Yeah.

22       Q    Is it -- did you and your team look at

23   refusals of care as part of your review of the

24   medical system?

25       A    Only to the extent that they occurred in the

**Ex. W-1656**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1   chart reviews, the chronic care reviews.

 2      Q   Did you look at the jail's policies with

 3   respect to refusals and the documentation of

 4   refusals?

 5      A   I looked at their old policies and -- but I

 6   have not seen their new policies.

 7      Q   Dr. Keller reported that the policy allows for

 8   documentation of refusals of care without any

 9   healthcare staff members present.  Is that concerning

10   to you?

11          MS. COLEMAN:  Objection.  Vague to

12     concerning.

13      A   Well, again, I guess it really depends on what

14   type of care is being refused.

15      Q   If it was a blanket policy that allows all

16   care to be refused without all healthcare staff

17   present, would that be problematic?

18      A   No, because I think that would not satisfy

19   NCCHC because I think NCCHC says the refusals for

20   patients with serious medical problems need to be

21   done in conjunction with healthcare.

22          So -- so, as I said, if it was some blanket

23   policy, you know, that -- I mean, if it -- if there

24   was -- there should be an exclusion for patients who

25   have serious medical problems.
```

**Ex. W-1657**

 1    Q    Each NCCHC standard has one or more compliance

 2  indicators.  Right?

 3    A    Correct.

 4    Q    In your analysis, you did not list out any of

 5  the compliance indicators.  Right?

 6    A    No.  As I said, this -- this was just a

 7  general review of the standards based on what I lined

 8  out there, what we had seen, what we had reviewed,

 9  who we had talked to.  So, as I said, I mean, it

10  wasn't faux, but we didn't get into all of the

11  standards laying out all of the particulars of each

12  one.

13    Q    And you did not list the evidence that

14  supported your findings for specific indicators, did

15  you?

16    A    No, other than to the extent that it could be

17  generated out of what we've done.  But, no, it was

18  not -- we didn't lay out the evidence.

19    Q    Give me one moment.

20         All right.  I'm going to introduce a new

21  exhibit.  Dr. Murray, this is the report that you

22  brought with you today that your counsel later sent

23  to us during the deposition.

24         Do you have up on the screen the -- the final

25  report that we've been talking about today?

**Ex. W-1658**

OWEN J. MURRAY, D.O., MBA                                    JOB NO. 1220572
NOVEMBER 12, 2024

```
 1                    CERTIFICATE OF REPORTER

 2

 3           I, Cherie J. Anderson, Registered Merit
     Reporter, Registered Professional Reporter, Certified
 4   Realtime Reporter, and Notary Public for the State of
     North Carolina at Large, do hereby certify:
 5           That the foregoing deposition was taken
     remotely before me on the date and at the time and
 6   location stated on page 1 of this transcript; that the
     deponent was duly sworn to testify to the truth, the
 7   whole truth, and nothing but the truth; that the
     testimony of the deponent and all objections made at
 8   the time of the examination were recorded
     stenographically by me and were thereafter
 9   transcribed; that the foregoing deposition as typed is
     a true, accurate, and complete record of the testimony
10   of the deponent and of all objections made at the time
     of the examination to the best of my ability.
11           I further certify that I am neither related
     to nor counsel for any party to the cause pending or
12   interested in the events thereof.
             Witness my hand, I have hereunto affixed my
13   official seal on this 12th day of November 2024, at
     Wilmington, New Hanover County, North Carolina.

14

15

16

17

18

19

20

21

22                   _____
                     Cherie J. Anderson, RMR, CRR
23                   My Commission expires
                     December 22, 2026
24

25
```

Ex. W-1659

# EXHIBIT X

# Deposition Transcript

Case Number: 3:20-cv-00406-AJB-DDL
Date: November 18, 2024

In the matter of:

## DUNSMORE, et al. v SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, et al.

## Joseph V. Penn, M.D., CCHP-MH, LFAPA

**CERTIFIED COPY**

Reported by:
Michelle L. Goehring



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

Ex. X-1661

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                JOB NO. 1220564
NOVEMBER 18, 2024

```
 1            UNITED STATES DISTRICT COURT

 2          SOUTHERN DISTRICT OF CALIFORNIA

 3                    -  -  -
    DARRYL DUNSMORE, ANDREE    )
 4  ANDRADE, ERNEST            ) Case No.
    ARCHULETA, JAMES CLARK,    ) 3:20-cv-00406-AJB-DDL
 5  ANTHONY EDWARDS, TEANNA    )
    LEVY, JOSUE LOPEZ,         )
 6  CHRISTOPHER NORWOOD,       ) REMOTE VIDEOTAPED
    JESSE OLIVARES, GUSTAVO    ) DEPOSITION OF
 7  SEPULVEDA, MICHAEL         ) JOSEPH V. PENN, M.D.,
    TAYLOR, and LAURA          ) CCHP-MH, LFAPA
 8  ZOERNER, on behalf of      )
    themselves and others      ) Filed on Behalf of the
 9  similarly situated,        ) Plaintiffs
                               )
10                             ) Counsel of Record For
            Plaintiffs,        ) This Party:
11                             )
                                 Aaron J. Fischer, Esq.
12                               Law Offices of Aaron J.
                                 Fischer
13       -vs-                    1400 Shattuck Square
                                 Suite 12 - #344
14                               Berkeley, CA 94709

15
    SAN DIEGO COUNTY
16  SHERIFF'S DEPARTMENT,
    COUNTY OF SAN DIEGO,
17  SAN DIEGO COUNTY
    PROBATION DEPARTMENT,
18  and DOES 1 to 20,
    inclusive,
19
20       Defendants.

21

22

23                    -  -  -
24
       REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
25     WITHOUT AUTHORIZATION FROM THE CERTIFYING
       AGENCY
```

Ex. X-1662

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   that?

 2         A.     Yes.

 3         Q.     You have.  Okay.  Did you do a

 4   review like that to identify whether or not

 5   there are any issues with the mental health

 6   care provided in a patient's case for any of

 7   these in-custody deaths?

 8         A.     I didn't feel that this was my role

 9   in this particular matter.  I was looking at

10   more of a global or system-wide.  I have done

11   individual analyses, both for the plaintiff

12   and/or for the defense, in individual deaths,

13   either seclusion or restraint death or a

14   suicide death or a homicide death or other

15   death, medication-related death, in-custody.

16              But for the purposes of this

17   litigation and my role, I didn't believe that I

18   needed to go into that level of detail.  I was

19   more looking at the overall number of suicides

20   per year.  That's the methodology in which I

21   applied.

22         Q.     When you have done those reviews of

23   individual deaths in custody, do you sometimes

24   find that there were issues in the provision of

25   care for the individual who died?

**Ex. X-1663**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1        Q.    Okay.  Did you review any

 2   psychological autopsies in your review of this

 3   matter?

 4        A.    No.  But I would be happy to.

 5   Again, because of the time frame involved, I

 6   think I did request copies of all of these

 7   documents but I don't recall receiving them to

 8   date.

 9        Q.    Okay.  Did you review any

10   administrative suicide reviews in the course of

11   your review in this matter?

12        A.    Not to date, no.

13        Q.    Did you review any morbidity and

14   mortality reviews in the course of your

15   assessment in this matter?

16        A.    Not to date.  That is correct.

17        Q.    So when you say that SDSO conducts

18   any of these things, how do you know that?

19        A.    From interviewing several

20   individuals, both Melissa Quiroz, the mental

21   health director, interviewing the custody

22   staff, and I also interviewed the nursing

23   director -- I'm blanking on her name right now,

24   but I think she's listed in my report.

25        Q.    Okay.

**Ex. X-1664**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                JOB NO. 1220564
NOVEMBER 18, 2024

1       A.    I also spoke with Mandy -- and I

2    can't pronounce her last name, but it's a

3    really long last name.  It began with a K.

4    Kamphoefner or something like that.

5             So I interviewed several individuals

6    and asked them specifically what do you do when

7    there's a suicide and what are the practices

8    and steps taken, and everyone basically

9    provided me that information and they referred

10   to their policies and procedures and also NCCHC

11   standards.

12      Q.    Were you able to reach an opinion as

13   to the adequacy of the psychological autopsies

14   that had been conducted by SDSO?

15      A.    I did not review any to date.  So I

16   don't have an opinion about the adequacy of the

17   psychological autopsies.

18      Q.    Same question for administrative

19   suicide reviews.  Do you have any opinion as to

20   the adequacy of those reviews?

21      A.    It would be the same response.  I

22   have not reviewed them to date and so I don't

23   have an opinion.

24      Q.    Okay.  And same question for the

25   morbidity and mortality reviews.  Were you able

**Ex. X-1665**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                          JOB NO. 1220564
NOVEMBER 18, 2024

 1   to reach any opinion as to the adequacy of

 2   those reviews done by SDSO?

 3        A.    No, because I had not reviewed them.

 4   So I do not have an opinion.

 5        Q.    Okay.  You also write -- I'm going

 6   to try to get it to you in right spot on the

 7   page -- oh, it's the next sentence.

 8             It says, "I confirmed that both the

 9   county and the contracted health NaphCare

10   conduct independent suicide and medical,

11   natural deaths, or substance use related death

12   reviews, morbidity and mortality reviews, and

13   these are conducted in a timely manner."

14             Do you see that there?

15        A.    Yes.

16        Q.    Why is it important that the health

17   care provider and NaphCare provide these

18   reviews?

19        A.    So what I would say is in any jail

20   or prison or other setting, correctional

21   setting or even an ICE facility setting, the

22   health care provider or vendor, you want them

23   reviewing their health care staff.

24             It would be inappropriate for

25   custody staff to be determining whether the

Ex. X-1666

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                          JOB NO. 1220564
NOVEMBER 18, 2024

1    medical or nursing or mental health practices

2    or policies or procedures were followed.

3              So mental health would review mental

4    health.  Nursing would review nursing.  Medical

5    review medical.  Custody review custody.

6              So it's entirely appropriate for the

7    contracted health care provider, NaphCare,

8    review their own health care staff's actions or

9    inactions.

10        Q.    Okay.  Did you review any NaphCare

11   death reviews?  This is the term that you used

12   in your report.

13        A.    Not to date, no.

14        Q.    Okay.  Are you able to opine as to

15   the adequacy of the NaphCare death reviews?

16        A.    Without an opportunity to review

17   them, I don't have an opinion at this time.

18        Q.    Did you review any NaphCare

19   morbidity and mortality reviews?

20        A.    Not to date, no.

21        Q.    And are you able to opine as to the

22   adequacy of the morbidity and mortality reviews

23   conducted by NaphCare in the San Diego County

24   Jail?

25        A.    No, I'm not.  I don't have an

**Ex. X-1667**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                   JOB NO. 1220564
NOVEMBER 18, 2024

 1   opinion at this time.

 2        Q.    You went on to say, "These are

 3   conducted in a timely manner."

 4             How do you know that they are

 5   conducted in a timely manner?

 6        A.    I'm sorry.  Where are you, please?

 7        Q.    At the end of that same sentence.

 8        A.    Oh, I see it.  Thank you.

 9             Based on the information that

10   Melissa Quiroz and Amanda or Mandy Kamphoefner

11   and the other staff communicated to me.

12        Q.    Okay.  But you did not review any of

13   those reviews to confirm timeliness?

14        A.    That's correct.

15        Q.    How quickly did they tell you that

16   these reviews are completed?

17        A.    I don't recall.

18        Q.    How quickly would you expect them to

19   be completed to be considered timely?

20        A.    It would depend.  Part of the issue

21   with any autopsy is it could take several

22   months, up to six months or longer for the

23   toxicology results to come back.  So a coroner,

24   a pathologist can typically review an autopsy

25   within a few weeks.

Ex. X-1668

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    methodology before?

2         A.    So I started to use a methodology

3    when I was a part of the Coleman team, which is

4    to follow -- to better understand what the

5    questions were, who was asking the questions,

6    and to understand the existing team, if you

7    will.

8              And similarly with Arizona, I was

9    consulted by a private law firm that was

10   defending the state, TOC -- or it's ADCRR, I

11   think, is the correct acronym.

12             But, yes, I used the same type of

13   methodology of trying to, one, identify what

14   the questions were, can I answer the questions.

15   Two, what's the scope and time frame.  Three,

16   what facility tours would be necessary and for

17   how long.  Four, who at the facilities do I

18   want to talk to and where -- what parts of the

19   facility do I want to focus in on.  Five, the

20   opportunity to have a record review and

21   document review.

22             Six, in a perfect review I would be

23   able to interview or evaluate the plaintiffs.

24   But, as I understand, I was specifically

25   prohibited in this case from being able to

**Ex. X-1669**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   interview any or evaluate any of the -- either

 2   the named Plaintiffs or the class of

 3   individuals in the San Diego County Jail.

 4           And then I would also have asked --

 5   and I applied this methodology to be able to

 6   have a statistically significant sample, a

 7   random sample of inmate chats to review to look

 8   at the quality of care.  And then based on all

 9   of that, it's possible I would ask for

10   additional supplemental information.

11           But that's the same methodology that

12   I applied in the Arizona litigation as I

13   applied in this San Diego case.

14       Q.    Okay.  Are there -- who told you

15   that you were prohibited from speaking with

16   patients at the jail?

17       A.    I'm sorry.  When you say patients,

18   I'm not sure --

19       Q.    Incarcerated patients at the jail.

20       A.    So as I understand it, everyone in

21   the jail is an incarcerated individual.  But if

22   they're under care and treatment, they would

23   become a patient.  So that's -- sorry.

24           I don't mean to quibble.  I just

25   want to make sure I can answer your question

**Ex. X-1670**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    a bad outcome or negative event.

2              But if there was an negative event,

3    then, obviously, someone could bring a claim,

4    either to state or federal court and either

5    say, you know, malpractice or it was deliberate

6    indifference or some other claim.

7         Q.    Are there any respects, when you use

8    the correctional standard of care there on 26,

9    that that correctional standard of care would

10   be below the community standard of care for San

11   Diego County?

12        A.    No, I think -- and to clarify my

13   response.  Again, I'm not an attorney, but what

14   I understand is that inmates or incarcerated

15   persons, they have a constitutional right to

16   adequate health care and, therefore, they're a

17   protected class.  And if you provide less than

18   a community standard of care, then there is a

19   risk of being sued in state or federal court.

20        Q.    Okay.  When analyzing whether a jail

21   health care system has sufficient staffing,

22   like this one in San Diego County, are you

23   looking at both the number of authorized

24   positions as well as filled positions?

25        A.    I did look at that and I also looked

**Ex. X-1671**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

 1  at other variables also.

 2       Q.    Okay.  When you were looking at any

 3  point in time whether a system has adequate

 4  staffing, as in this case, did you look at the

 5  number of authorized positions or filled

 6  positions?

 7       A.    I looked at both, and I also looked

 8  at many other variables.

 9       Q.    Okay.  Did you conduct a mental

10  health care staffing analysis for your report

11  in this case?

12       A.    No, I did not.  I was not asking to

13  do that nor did I feel it was necessary.  So,

14  no, I did not conduct a staffing analysis.

15       Q.    So on what basis did you find that

16  the mental health care staffing levels at SDSO

17  are sufficient and comport with the

18  correctional standard of care?

19       A.    So I based it on several variables.

20  One, my knowledge and awareness of the ACA

21  standards, the American Correctional

22  Association.

23            Two, the National Commission on

24  Correctional Health Care standards.  Actually

25  being accredited by the ACA, the American

Ex. X-1672

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                           JOB NO. 1220564
NOVEMBER 18, 2024

 1   Correctional Association in Texas.  My work 20

 2   plus years in jails, prisons, and correctional

 3   facilities.

 4              My education and training, and

 5   actually my consulting to NCCHC both as a

 6   physician surveyor, as a NCCHC-certified

 7   correctional health professional, and also as a

 8   consultant to the consulting arm of NCCHC NRI

 9   and additionally my expert work.

10              And, lastly, my work on the NCCHC

11   accreditation committee where we review

12   facilities that are applying for accreditation.

13        Q.    Okay.  That's great.

14              On what -- that's your expertise and

15   your background.  On what facts and data did

16   you rely to make your conclusion that the SDSO

17   system has adequate mental health staffing

18   levels to meet the standard of care?

19        A.    So I think I testified to this

20   earlier.  I reviewed all the medical charts

21   from the named Plaintiffs.  I looked at

22   sick-call requests.  I looked at the mental

23   health notes that were written, the mental

24   health evaluations, suicide precautions, the

25   totality of all of the medical record

**Ex. X-1673**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    documentation.

2              I also interviewed numerous of the

3    staff, of custody and mental health staff, as

4    noted in my report.  And I frankly -- I pinged

5    the custody staff and I said, "Okay.  If you

6    have an issue, how quick can you get mental

7    health to see them?"  And they said,

8    "Instantaneous.  I'll either bring the patient

9    down to the clinic or I'll call them on my

10   walkie-talkie.  And if they are available,

11   they'll come right away.  If they are tied up

12   with something, they'll be down whenever they

13   can as soon as possible."

14             I also verified with Melissa Quiroz

15   that three of the intake facilities -- Vista,

16   Los Colinas, and the Central Jail -- have

17   24-hour onsite, 7 days a week onsite mental

18   health staff, in addition to after hours,

19   on-call, and weekend coverage.

20             I looked at -- the specific data

21   that I reviewed was the staffing reporting, the

22   vacancies.  I interviewed Melissa Quiroz and

23   asked her specifically, "How do you cross-cover

24   when you have vacancies?"  I also asked that of

25   each and every mental health chief that I

**Ex. X-1674**

 1   interviewed, and it's detailed in my report.

 2   "What do you do if you have staff out?  Who

 3   covers?  What do you do?"

 4              So based on that data of knowing the

 5   full-time equivalence, both of the county

 6   employees -- the county mental health employees

 7   and the NaphCare employees, that's how I was

 8   able to determine -- I'm sorry.

 9              I also interviewed the NaphCare

10   mental health director.  I'm sorry.  I'm

11   blanking on her name.  It's in my report.  So

12   same thing, I asked specifically, "What do you

13   do when you're short on nurse practitioners or

14   psychologists or psychiatrists?"

15              So based on all of that data, that's

16   how I came to that opinion.

17      Q.    Okay.  With respect to the data,

18   numerical data on mental health staffing, fair

19   to say that you relied on the Mental Health

20   Master Staffing Plan?  I'll direct you to

21   Page 21 of your report.  It may help us.

22              That first full paragraph, it makes

23   reference to the Mental Health Master Staffing

24   Plan dated March 17, 2022, Appendix G.  And

25   most recently Mental Health Master Staffing

**Ex. X-1675**

 1   Plan dated June 13, 2024, Appendix H.

 2            Did you rely on those two documents

 3   to assess the adequacy of mental health

 4   staffing?

 5       A.    Yes.

 6                 (Deposition Exhibit No. 3 was

 7   marked for identification.)

 8   BY ATTORNEY FISCHER:

 9       Q.    Okay.  I'm going to pull those

10   because I have a few questions.  You're welcome

11   to look at them in your report.  They're

12   Appendix G and H.  They're almost at the very

13   back.

14            I'm also going to introduce them as

15   separate exhibits just for some ease of

16   reference.  That is Exhibit 3.

17                 ATTORNEY FISCHER:

18   Ms. Coleman, do you have a copy in front of

19   you?  Do you want me to present?  What is

20   easiest for you?

21                 ATTORNEY COLEMAN:  Yeah.  That

22   would be easier.

23                 ATTORNEY FISCHER:  Present.

24   Okay.  And I promise to make it bigger.

25            How does that look to folks?

Ex. X-1676

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1              ATTORNEY COLEMAN:  We can see

2    it, but we can't hear you now.

3    BY ATTORNEY FISCHER:

4        Q.    Okay.  It's a two-page document.

5    The first is Appendix G, Mental Health Master

6    Staffing Plan.  At the bottom of that, G, it

7    says "Revised March 17, 2022."

8              Do you see that, Dr. Penn?

9        A.    Yes.

10       Q.    And then Appendix H is Page 2 of the

11   exhibit, Mental Health Master Staffing Plan --

12   I'll scroll to the bottom -- it's dated

13   6/13/2024.

14       A.    Yes.

15       Q.    So I want to start in your report --

16   I'm sorry to have you toggle back and forth,

17   Dr. Penn.  Please bear with me -- it summarizes

18   in your report, in that same paragraph on

19   Page 21, "In 2022, they had 34 budgeted

20   full-time equivalent positions (FTE), and now

21   they have 79 budgeted FTE's."

22             Do you see that there?

23       A.    Yes.

24       Q.    Based on your review, do you have an

25   opinion as to whether the full-time equivalent

**Ex. X-1677**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

```
1    mental health staffing in 2022 was adequate to
2    meet the needs of the mental health population?
3         A.    No, I don't have an opinion.  I
4    think I looked at -- as I testified to earlier,
5    I was trying to look here and now,
6    cross-sectionally, like a snapshot, a Polaroid.
7    So I didn't spend a lot of time looking at the
8    past.
9         Q.    Got it.
10        A.    I mean, I looked at that as a
11   variable, but I really focused on here and now,
12   is access to care being met, is continuity of
13   care being met, are individuals that are
14   suicidal or have any sick call requests, are
15   they being seen by mental health staff and are
16   psych providers evaluating, diagnosing, and
17   prescribing meds.  That's what I looked at here
18   and now.
19        Q.    Got it.
20        A.    So I don't really have -- I'm not
21   really prepared to testify if, yes or no, that
22   met the standard.
23              I will say that it's almost a
24   doubling of their staffing, so that's
25   impressive.  That's great.
```

**Ex. X-1678**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

 1  analysis, would you suggest that they include
 2  psychiatric nurses in that analysis?
 3       A.    I'm sorry.  When you say "they," who
 4  are you referring to?
 5       Q.    San Diego County.
 6       A.    It couldn't hurt.  I mean, I think
 7  that's actually not a bad move.  That would be
 8  useful.
 9       Q.    Also on here -- just scrolling back
10  up -- Ms. Coleman, you'll tell me to blow if up
11  if I need to -- the first line is SDCJ, which I
12  understand to be central jail.  And then it has
13  SDSO and NaphCare positions.  And then about
14  halfway down it has VDF, Vista Detention
15  Facility.  And then it lists SDSO and NaphCare
16  positions.  And then there's LCDRF, which I
17  understand to be Los Colinas Detention Reentry
18  Facility and it has some positions there.
19            I would have expected you to look at
20  all facility schedules and staffing plans, but
21  that's not included here.
22            Do you know whether you were able
23  to -- did you look at the entire systems mental
24  health staffing plan?
25       A.    I don't recall.  What I understand

**Ex. X-1679**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   is that some of the other facilities that I

 2   toured are more work release programs and

 3   different things.  One facility is closed.  I

 4   think the Mountain Canyon or Rock Canyon or

 5   something like that is closed or it's being

 6   remodeled.  I actually did tour where they are

 7   remodeling.

 8              So short answer to your question is

 9   this is what I reviewed based on where the

10   majority of individuals are that are on the

11   mental health caseload that have a mental

12   health diagnosis or are on medications.

13              I understand that there's a tracking

14   mechanism to identify individuals that might be

15   on a noncaseload unit that might need

16   counseling but are not necessarily on psych

17   meds.  So that's how I kind of interpreted

18   this.  That is the data with regard to the

19   mental health caseload at specific units.

20       Q.    Would it have been helpful to your

21   overall system assessment to have the mental

22   health staffing plan for all facilities?

23       A.    Sure.  It couldn't have hurt.

24       Q.    Yeah.  So, like, George Bailey, it

25   would have been helpful to have the mental

**Ex. X-1680**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                              JOB NO. 1220564
NOVEMBER 18, 2024

 1  health staffing plan for that facility to
 2  consider as part of your review?
 3      A.    Well, I think I went to George
 4  Bailey twice and I interviewed the custody
 5  staff and the mental health staff and the
 6  mental health chief, and I toured the facility
 7  and I watched rounds.
 8          And based on all of that in its
 9  totality, I was able to determine that there
10  was adequate mental health staff to meet the
11  mental health needs of the facility.
12      Q.    Would it have also been helpful to
13  have also seen the mental health staffing plan
14  for that facility?
15      A.    Sure.  For completeness sake, it
16  couldn't have hurt.
17              (Deposition Exhibit No. 4 was
18  marked for identification.)
19  BY ATTORNEY FISCHER:
20      Q.    I'm going to -- stick right where
21  you are.  Just flip the page for me, Dr. Penn.
22  The final appendix in your report is
23  Appendix I.  I'm going to introduce that as
24  it's own exhibit.
25          You'll confirm that that's the case,

Ex. X-1681

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   but that's what I'm going to be talking about

 2   next.  I'm going to introduce it as Exhibit 4?

 3                ATTORNEY FISCHER:

 4   Ms. Coleman, before you object, I am going to

 5   increase the size.

 6                Does that look okay, Ms. Coleman?

 7                ATTORNEY COLEMAN:  Thank you.

 8   BY ATTORNEY FISCHER:

 9      Q.    So this, according to your report,

10   is the San Diego County Sheriff's Mental Health

11   Personnel Status Report.  And on Page 21 of

12   your report, Dr. Penn, you indicate this is

13   dated July 23, 2024.

14                Do I have that correct?

15      A.    I'm sorry.  What page of my report?

16      Q.    21.  It's not dated on the exhibit,

17   unfortunately.

18      A.    That's right.  July 23, 2024.

19      Q.    Okay.  And you relied on this status

20   report in reaching your conclusion; correct?

21      A.    It was one of the data points that I

22   reviewed, yes.

23      Q.    And this only includes the county

24   staffing mental health staff, not the NaphCare

25   staffing; correct?

Ex. X-1682

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                     JOB NO. 1220564
NOVEMBER 18, 2024

1      A.    That's what I understand under the

2   contract, that's correct.   Mental health staff

3   are funded through and are employees of the

4   sheriff's office.

5      Q.    Would it have been helpful for you

6   to review the personnel staff report for

7   NaphCare mental health professionals?

8      A.    Sure.   I would be happy to review

9   it.

10     Q.    But you don't recall reviewing that

11  for purposes of this report?

12     A.    I remember interviewing the mental

13  health director -- I think it's referenced in

14  my report -- for NaphCare, Arielle Payes,

15  P-A-Y-E-S.   I interviewed her.   I don't recall

16  the exact date.   I think it was maybe a few

17  days before my report was due.

18           I spoke to her as recently as mid to

19  late August.   I spoke with -- I interviewed her

20  directly and asked her about staffing and

21  vacancies.

22           So I agree.   I can see the point

23  that I don't have the actual data, but I did

24  speak directly with her and she's overseeing

25  all of that on a daily basis.

**Ex. X-1683**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1      Q.     Understood.  Would it be helpful to

2   have the personnel status report for the

3   NaphCare mental health staff, the psychiatrist

4   and the psychiatric nurse practitioners, in

5   forming your opinion?

6      A.     Certainly.

7      Q.     Okay.  Did you do any analysis of

8   the custody staffing as it applies to the

9   delivery of mental health care?

10     A.     No, I did not.

11     Q.     Is having adequate custody staff an

12  important component to the delivery of mental

13  health care in a jail system?

14     A.     It's possible it can be.

15     Q.     Okay.  Do you recall whether

16  Ms. Quiroz raised with you any concerns about

17  custody shortage impacting delivery of care?

18     A.     Yes, I vaguely recall.  I don't know

19  if I cited that in my report.  But I do recall

20  for certain almost every facility across the

21  country during COVID and immediately after

22  COVID struggled with correctional officer

23  shortages.  So that's kind of a ubiquitous

24  issue.

25     Q.     But do you recall Ms. Quiroz

Ex. X-1684

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                JOB NO. 1220564
NOVEMBER 18, 2024

 1   in a timely manner.

 2              To the best of my ability of my

 3   review, I did not identify any mental health

 4   sequelae, such as a suicide or death or other

 5   psychiatric harm or damage, from any of these

 6   chart reviews.

 7        Q.    Okay.  So let's just go over the

 8   issues that you looked at in completing your

 9   assessment of these 12 patient records.

10              You said that you looked at

11   responses to sick-call slips?

12        A.    No.  I looked at more than that.  I

13   looked at their medical charts.  I looked at

14   their allergies, their past medical history,

15   their past psychiatric history, their substance

16   abuse history, their social history, their

17   educational history.  I looked at kind of all

18   their psychosocial variables, their family

19   history.  Anything that was documented in the

20   chart, I reviewed.

21              And in particular, their psychiatric

22   diagnoses, their treatment in the community,

23   their medications.  The timeliness of them if

24   they came into the jail, either from the

25   CDCR -- many of them were in the CDCR

**Ex. X-1685**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    the medications reviewed and prescribed in a
2    timely manner if and when clinically indicated.
3    And then if they developed side effects or
4    problems, were they seen by psychiatric
5    providers in a timely manner and were the
6    findings documented.
7              And based on my review, in totality,
8    my opinion is that the mental health evaluation
9    and treatment rendered to the named Plaintiffs
10   met the correctional standard of care.
11        Q.    Did you look at whether people were
12   appropriately housed --
13        A.    No.
14        Q.    -- based on their mental health
15   needs?
16        A.    No.  The problem was the records
17   that I reviewed were medical and mental health.
18   They didn't include -- they weren't inclusive
19   of housing or custody placement.
20             Again, I don't consider myself to be
21   a custody expert.  So I think that I would be
22   very exhausted to try to identify what cell
23   housing area they were in.  So, no, I did not
24   conduct that type of analysis.
25             I only looked at the access to

**Ex. X-1686**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

1   mental health care and the continuity of care

2   of mental health care in particular.

3       Q.   Did you look at whether they were

4   appropriately housed based on their level of

5   care needs?

6       A.   So I'm not sure if you're trying to

7   ask me if I thought it was an appropriate -- if

8   somebody needed to be inpatient, the PSU, the

9   psychiatric stabilization unit or not, yes, I

10  think I did look at that.  If someone was

11  suicidal, were they in a safety cell or were

12  they in an advanced observation housing.  Yes.

13  And so I did look at those.

14          In my opinion, yes, whatever --

15  whatever situational variables arose to make

16  them suicidal or make them unsafe, they were

17  evaluated and managed in a safe manner and I

18  didn't find any evidence of bad outcomes.

19      Q.   Did you -- okay.  On No. 2 on the

20  page it says --

21          ATTORNEY COLEMAN:  Can't hear

22  you again.

23  BY ATTORNEY FISCHER:

24      Q.   On No. 2 on the page, Page 9,

25  Dr. Penn, it says, "To expand the scope of the

**Ex. X-1687**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                JOB NO. 1220564
NOVEMBER 18, 2024

 1   mental health quality of care review beyond the

 2   named plaintiffs, I conducted an additional

 3   focused review of psychiatric and mental health

 4   records for current or former SDSO incarcerated

 5   persons."

 6              How many of those charts -- other

 7   chart reviews did you complete?

 8        A.    So that was the -- the ones -- the

 9   helpers.  I enlisted the help of three --

10   again, because of the timeline -- the dead

11   lines involved and the massive number of cases.

12   That's the additional focus review of the -- I

13   think it was a sample of 80.  And so that leads

14   to No. 3.  That's how -- that was that

15   particular review.

16        Q.    I see.  So you did not conduct the

17   additional focus reviews of any other records

18   beyond the 12 named Plaintiffs; correct?

19        A.    That's fair.

20        Q.    Okay.  Did you at any point review

21   the records -- strike that.

22                    ATTORNEY COLEMAN:  Can't hear

23   you again.

24   BY ATTORNEY FISCHER:

25        Q.    We'll talk about the three helpers

**Ex. X-1688**

 1   or the three reviewers that you enlisted to do

 2   these chart reviews.

 3              Did you review any records that they

 4   reviewed?

 5        A.    No.  I did not have enough time to

 6   do that.  If I had additional time, I would

 7   have done that.  I would have reviewed each and

 8   every case that they found an issue or concern

 9   with, but, frankly, I ran out of time so I did

10   not have time to do that.

11        Q.    Okay.  Fair to say that you relied

12   on their expertise to draw conclusions as to

13   those 80 or so patients?

14        A.    I did.  But I also made it a point

15   to reach out to each of them individually and I

16   queried them on their findings.

17              So I relied upon their written

18   summaries that they sent me, but I also made it

19   a point -- after Pablo Stewart wrote his

20   rebuttal report, I reached out to each of them,

21   Dr. Baskin, Dr. Huselid, and Dr. Cervantes, and

22   specifically asked them, one, did Dr. Pablo

23   Stewart accurately summarize or write your

24   quote or list your findings accurately.  And

25   pretty much 95 percent were correct.  There was

Ex. X-1689

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                JOB NO. 1220564
NOVEMBER 18, 2024

1    Exhibit 5.

2                 This is Exhibit 5.  Do you see that

3    there, Dr. Penn?

4        A.    Would you mind scrolling up a bit?

5    Yes.  That's the document that I had Kathleen

6    Al-Basit send to all of the psychiatric

7    helpers.

8        Q.    Got it.  Did you send any other

9    written materials to the psychiatric helpers?

10       A.    No.

11       Q.    Okay.  Did you provide any other

12   written guidance to the psychiatric helpers as

13   to what they were supposed to review?

14       A.    No.

15       Q.    Did the psychiatric helpers tour any

16   of the facilities at San Diego County Jail?

17       A.    No.

18       Q.    Did the psychiatric helpers review

19   any policies and procedures in place at San

20   Diego County Jail?

21       A.    No.

22       Q.    Just -- on that one, the reviewers

23   were not able to determine whether policy was

24   followed in the cases they reviewed; is that

25   correct?

**Ex. X-1690**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

```
 1   me, please let me know that; okay?
 2        A.    Thank you.
 3        Q.    Did the three psychiatric helpers
 4   assist you with drafting any portion of your
 5   report?
 6        A.    No.
 7        Q.    Did they read your report?
 8        A.    No.
 9        Q.    Okay.  Did you review the summaries
10   from their patient reviews?
11        A.    Yes.
12        Q.    Did you make any edits to their
13   summaries?
14        A.    No.
15        Q.    Did you ask them to make any edits
16   to their summaries?
17        A.    No.
18        Q.    So the summaries that are in your
19   report by the psychiatric helpers are an exact
20   match to what was submitted by those
21   psychiatric helpers, as far as you know?
22        A.    That's correct.  Yes.
23        Q.    How many times did you speak with
24   the psychiatric helpers prior to submitting
25   your August 2024 report?
```

**Ex. X-1691**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1        A.    Once.  We had one meeting, a Teams

 2    meeting where I showed them, via virtual share

 3    screen, I showed them the document and reviewed

 4    the task at hand and that was it.  It was

 5    probably less than a 20-minute meeting.

 6        Q.    Okay.  And you didn't speak with

 7    them again after that meeting up until the date

 8    you submitted your August 2024 report; is that

 9    correct?

10        A.    So what happened was after the Pablo

11    Stewart rebuttal where Pablo Stewart had

12    included some of the helpers' notes, I reached

13    out to them as a group and asked them, one, if

14    Pablo Stewart's transcription of their findings

15    was accurate.

16            And then, two, to comment if it was

17    mischaracterized any way or taken out of

18    context.

19            And, three, if it was, in their

20    opinion, even taking into consideration that

21    there was a delay or problem or issue with the

22    patient or inmate seriously at risk or did they

23    experience harm.  And that was the only

24    communication I had with them.

25            One of them, Dr. Cervantes, reached

**Ex. X-1692**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                     JOB NO. 1220564
NOVEMBER 18, 2024

1   out to me, asked me if she should review other

2   helpers, Dr. Huselid and Dr. Baskin.  And I

3   said no, just respond regarding your reviews.

4   So that was the only communication that I had

5   with them.

6           Q.    And that was -- other than that

7   first 20-minute call, that call to discuss

8   Dr. Stewart's rebuttal report, was the only

9   time you spoken with these three psychiatric

10  helpers about this case?

11          A.    Just to clarify, Dr. Cervantes had

12  reached out to me separately and asked, "Am I

13  supposed to review Dr. Huselid's and

14  Dr. Baskin's," so that was just a discussion --

15  a telephone discussion between her.  And I

16  said, "No.  Just stick to your review."

17          Q.    Understood.  So there was the first

18  initial 20-minute meeting when you gave them

19  the overview of the task, the group discussion

20  of the Pablo Stewart rebuttal report --

21          A.    No -- oh, I'm sorry.

22          Q.    -- I'm sorry.  Of the initial

23  report.  And then the rebuttal report.  I just

24  want to get the timeline down of when you spoke

25  with them.  Let's just go through it one by

**Ex. X-1693**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   one.

 2             So you spoke with them for

 3   20 minutes to give the initial assignment;

 4   correct?

 5        A.    Correct.  Back in June, something

 6   like that.  June -- after I had done my tours.

 7   It was like early to mid June.

 8        Q.    And you didn't have any

 9   communication with them up to the date you

10   submitted your August 2024 report; is that

11   correct?

12        A.    That's correct.

13        Q.    And then Dr. Stewart submitted his

14   report in November and there was no

15   communication between August and September

16   between you and the psychiatric helpers?

17        A.    That's correct.

18        Q.    And then after Dr. Stewart submitted

19   his November report, you had that one phone

20   call with one of the psychiatric helpers, and

21   then a call with all three psychiatric helpers;

22   is that correct?

23        A.    No.  There was no follow-up call

24   with them.  The only meeting I had with them

25   was the initial call back in June.

**Ex. X-1694**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                        JOB NO. 1220564
NOVEMBER 18, 2024

1      Q.    Okay.  But they -- so they responded

2   in writing to those three questions that you

3   asked?

4      A.    They responded via e-mail.  That's

5   fair.  And I think Susan Coleman is CC'd on all

6   of those.

7                ATTORNEY FISCHER:  So we would

8   request to be able to see those, Ms. Coleman.

9                ATTORNEY COLEMAN:  Those what?

10               ATTORNEY FISCHER:  Those

11  e-mails from the three psychiatric helpers to

12  Dr. Penn, as just testified.

13  BY ATTORNEY FISCHER:

14     Q.    Dr. Penn, did you ever -- in that

15  initial 20-minute meeting, did you ever discuss

16  with the psychiatric helpers anything about the

17  standard of care that would be applied to their

18  reviews?

19     A.    No.  I mean, that form is basically

20  what I reviewed with them.  I explained it, you

21  know, just kind of discussing based on NCCHC

22  and they're all familiar with NCCHC.  So that

23  was pretty much it.

24     Q.    Got it.  Did you discuss with them,

25  during that call, whether to use community

**Ex. X-1695**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   standards of care or correctional standards of
 2   care?
 3        A.    No.  Like I testified earlier, I
 4   just had them review that document and say can
 5   you -- this is the only question being posed to
 6   you and I want you to be -- I was trying to
 7   strive for transparency.
 8             Do you think the care was
 9   appropriate and adequate, access to care and
10   continuity of care, and I didn't get into
11   standards of care or that sort of thing.
12        Q.    So I want to go back to that -- so
13   it sounds like that one-page exhibit,
14   Exhibit 5, is the entirety of the direction to
15   psychiatric helpers from you; is that fair to
16   say?
17        A.    Yes.
18        Q.    Okay.  Based on that direction, do
19   you believe that the access to care inquiry on
20   that form considers the adequacy of mental
21   health care provided to each patient?
22        A.    Yes.
23        Q.    Can you explain what you mean by
24   that, access to care and adequacy of care are
25   the same thing?

**Ex. X-1696**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    not using custody staff, provided they have

2    appropriate training on confidentiality and

3    privacy of information.

4    BY ATTORNEY FISCHER:

5         Q.    Okay.   In the cases that were

6    identified by the psychiatric helper where

7    Spanish-speaking deputies were used to

8    translate for encounters with Spanish-speaking

9    patients, did you confirm that NCCHC standards

10   were followed?

11        A.    No.   Because the facility is not

12   NCCHC accredited, so it wouldn't be appropriate

13   to apply those standards.   No.

14        Q.    I see.   Did you confirm that they --

15   the deputies that were providing the

16   translation received the training on

17   confidentiality that you just described?

18        A.    No, I did not.

19        Q.    Did you do any follow-up to see if

20   the standard of care was adhered to in these

21   cases where deputies were used to translate for

22   the encounters of Spanish-speaking patients

23   with their clinicians?

24        A.    No, I did not.

25        Q.    Okay.   Do you recall one of the

**Ex. X-1697**

1   placement?

2       A.    I recall reading some allegation

3   about that, but I don't have -- I don't

4   consider myself to be an expert in custody or

5   classification or housing or placement.  And I

6   would defer to, you know, custody or custody

7   expert or custody leadership to make those

8   determinations.

9       Q.    Okay.  So you don't have an opinion

10  on that particular custodial exclusion?

11      A.    Well, what I would say is it would

12  be up to the mental health staff and the mental

13  health leadership.  If there's a patient that

14  they think would benefit from OPSD, outpatient

15  stepdown, but that person has a protective

16  custody indicator or -- again, everything is a

17  partnership behind bars.

18          So if they think clinically it's

19  indicated, they probably should go and meet

20  with the custody leadership and try to clarify

21  what they can do to advocate for that patient.

22          As we sit here today, I don't know

23  how many times that's occurred or if that's

24  something that occurs routinely.  But I did not

25  investigate that in my analysis.

**Ex. X-1698**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

```
 1                    ATTORNEY COLEMAN:  You trailed
 2   off at the end.
 3                    ATTORNEY FISCHER:  In any Ad
 4   Sep units.
 5                    ATTORNEY COLEMAN:  Did you
 6   hear him, Dr. Penn?
 7                    THE WITNESS:  Yes.  So, no, I
 8   did not form any opinions.  I can say group
 9   therapy in Ad Sep settings is inherently
10   challenging because the individuals that are in
11   Ad Sep are typically security threat groups and
12   gangs.  And so if there are confirmed enemies
13   of each other, putting them in a room together,
14   you really have to be -- and, again, I'm not
15   custody but I'm telling you from my
16   experience -- so I'm aware.  We've done a lot
17   in Texas to provide opportunity for group
18   therapy for restrictive housing for Ad Sep --
19   administrative separation inmates.  But, again,
20   we're comparing apples and oranges.  You're
21   talking about jail, pre-trial detainees versus
22   state prisoners that are post conviction and
23   are now sentenced for years in the prison
24   systems.
25                    So the short answer to your question
```

**Ex. X-1699**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                JOB NO. 1220564
NOVEMBER 18, 2024

 1   is there are certainly opportunities to do

 2   group therapy, but, at the end of the day, you

 3   need to ensure safety for the staff and the

 4   inmates.  So it's complicated, I guess, is my

 5   short response.

 6   BY ATTORNEY FISCHER:

 7        Q.   Did you assess what percentage of

 8   the restrictive housing population are gang

 9   members in San Diego County Jail?

10        A.   No.

11        Q.   Did you ask for that data?

12        A.   No, I did not.

13                  ATTORNEY COLEMAN:  Assumes

14   facts that don't exist.

15   BY ATTORNEY FISCHER:

16        Q.   Did you review out-of-cell logs for

17   the restrictive housing units or Ad Sep units

18   in San Diego County Jail?

19        A.   I'm not a custody expert, so I

20   wouldn't routinely review that sort of

21   documentation as part of a mental health

22   psychiatric evaluation.  So, no, I did not do

23   that in this case.

24        Q.   Did you do any review as to the

25   proportion of restrictive housing detainees who

**Ex. X-1700**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                          JOB NO. 1220564
NOVEMBER 18, 2024

1        Q.    You were not asked to evaluate the

2    practice of safety checks in restrictive

3    housing units in San Diego County Jail?

4        A.    As I testified to earlier, my job

5    was to look at the entire system with regard to

6    access to mental health care, psychiatric care,

7    and continuity of care and whatever mental

8    health precautions and treatment is afforded to

9    the jail inmates while they're incarcerated.

10            But, no, I did not undertake a

11   specific review of safety checks in Ad Sep.

12       Q.    Okay.  I believe you said that you

13   observed intake screening process while you

14   were on site at the jails; is that correct?

15       A.    At the intake -- as I understand it,

16   there's only three facilities that do

17   intakes -- I'm sorry.  Not intakes -- new

18   intakes.  I understand that inmates or

19   incarcerated persons can move from facility to

20   facility.  But as far as -- when you're saying

21   "intake screening," are you referring to

22   someone coming in from police or coming in from

23   another state hospital or another community

24   setting and they're coming into the facility?

25       Q.    Let's go to your report.

**Ex. X-1701**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                        JOB NO. 1220564
NOVEMBER 18, 2024

1    A.    I observed mental health staff

2   performing a gatekeeper assessment or

3   evaluation of a new intake.  But I didn't

4   observe it in its entirety.

5         I just saw the mental health staff,

6   who had already previously been introduced, and

7   I watched her to begin the assessment.

8    Q.    Can you go to Page 31 of your

9   report, Dr. Penn?

10   A.    Page 31.

11   Q.    Okay.  Four paragraphs up from the

12   bottom, the paragraph starts with, "In my

13   professional opinion."

14         Do you see that there?

15   A.    Yes.

16   Q.    During the second sentence you

17   write, "The system ensures that every IP

18   receives a comprehensive evaluation upon entry,

19   with subsequent screenings and evaluations

20   conducted when an IP is transferred between

21   SDSO facilities."

22         Is that your opinion?

23   A.    Actually, that's a typo.  It should

24   be mental health assessment.  It should not

25   be -- because evaluation implies a

Ex. X-1702

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    comprehensive evaluation.

2            That actually should be a

3    comprehensive mental health assessment.

4        Q.    That's why I'm asking.  So that

5    statement, as written there, is not accurate;

6    is that correct?

7        A.    Correct.  It could be screening or

8    assessment or triage.  I mean, different

9    systems use different terminology.  Appraisal

10   is another term that we use in Texas.  But they

11   all refer to the same:  Screening, assessment,

12   appraisal, but they are differentiated between

13   an evaluation.  So that's actually a typo and I

14   apologize for that.

15       Q.    Based on your experience and

16   expertise, Dr. Penn, do you think it's

17   important that the new intake process at a jail

18   include a review of the patient's mental health

19   care history?

20       A.    When possible, yes.

21       Q.    Okay.  And why is that the case?

22       A.    Well, because some inmates or --

23   sorry -- incarcerated persons are not reliable.

24   Some incarcerated persons are under the

25   influence.  They're either intoxicated or under

Ex. X-1703

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1        A.    I don't recall that.

 2        Q.    Okay.   Earlier today, Dr. Penn, you

 3   indicated that you had not reviewed the report

 4   of Plaintiffs' substance use expert of

 5   Dr. Kelly Ramsey; do you recall that?

 6        A.    That's correct.

 7        Q.    Is there a reason why you did not

 8   review her reports?

 9        A.    You said Plaintiffs' expert?

10        Q.    Plaintiffs' expert on substance use.

11   Dr. Kelly Ramsey.

12              ATTORNEY COLEMAN:  Assumes

13   facts that he was provided it.

14              THE WITNESS:  Correct.  I was

15   not aware, first of all, that she was a

16   retained expert.  No. 2, I don't know who she

17   is.  Three, I would have gladly reviewed her

18   report if it would have been furnished me.  But

19   it was not furnished to me, so I didn't know to

20   ask because I didn't know that she was a

21   plaintiff's expert in this case.

22   BY ATTORNEY FISCHER:

23        Q.    Do you consider yourself an expert

24   on substance use issues in jail facilities?

25              ATTORNEY COLEMAN:  Objection,

**Ex. X-1704**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1    vague.

 2                    THE WITNESS:  I'm not sure I

 3    know what you mean by substance-abuse issues

 4    and then jail facilities.

 5    BY ATTORNEY FISCHER:

 6        Q.    I'll take --

 7                    ATTORNEY COLEMAN:  Counsel,

 8    are you referring to the MAT program?

 9    BY ATTORNEY FISCHER:

10        Q.    I'm referring to any aspects of

11    substance use treatment in jail facilities.

12    I'm not quite sure how to define jail

13    facilities, Doctor, and I'm sort of wracking my

14    brain.

15        A.    Sorry.  You asked me substance-abuse

16    issues.  I'm not sure I know what you mean by

17    that.

18        Q.    Substance use treatment issues in

19    jail facilities, do you consider yourself an

20    expert on that topic?

21        A.    So I can't answer that yes or no.

22    What I can say is as part of my training in

23    psychiatry, specifically general psychiatry,

24    four year in general psychiatry, I had to spend

25    several months doing rotations in alcohol,

**Ex. X-1705**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                        JOB NO. 1220564
NOVEMBER 18, 2024

 1   benzodiazepine, opioids and other substance

 2   dependance and withdrawal.

 3            And I actually have managed patients

 4   who were going through withdrawal.  I've

 5   treated patients who were substance involved

 6   both inpatient and outpatient.  I did not

 7   pursue a subsequent fellowship in addiction

 8   psychiatry.  There's a specialty you can do.

 9            So I have general familiarity with

10   the evaluation, diagnosis, and management of

11   various intoxication, dependence, withdrawal,

12   and general familiarity with things such as

13   M-A-T and M-O-U-D, and how to manage those

14   within a jail or prison or juvenile

15   correctional or ICE facility.

16            And in particular, during my work

17   with Operation Loan Star, we've been dealing

18   with a lot of opioid withdrawal and management

19   of that.

20            As we sit here today, I would not

21   call myself an expert in addiction psychiatry,

22   but I do have the requisite knowledge of the

23   evaluation, diagnosis, treatment of substance

24   use disorders in correctional settings.

25       Q.   Did you share with counsel for the

**Ex. X-1706**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                    JOB NO. 1220564
NOVEMBER 18, 2024

```
 1   county that you have this background in
 2   substance use treatment in detention
 3   facilities?
 4        A.    Did I share that with counsel?  I
 5   didn't understand the question.  Sorry.
 6        Q.    Yes.  Did you share that information
 7   with counsel for the county?
 8        A.    I don't believe so.  I think this is
 9   the first time it's come up.
10        Q.    Okay.  Was there any discussion
11   about substance use treatments -- strike that.
12             Did you read the third amended
13   complaint in the case?
14        A.    I don't recall.  I recall reading a
15   complaint, but I don't remember if I read all
16   the complaints.
17        Q.    Okay.  Do you know if you've read
18   the operative complaint that was filed in this
19   case?
20        A.    Again, I read a lot of things.  If
21   you could draw my attention, show me the
22   document, I would be happy to try to answer
23   your question.  But as we sit here, I don't
24   know what you're referring to as operative
25   complaint.
```

**Ex. X-1707**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                                JOB NO. 1220564
NOVEMBER 18, 2024

 1      Q.    Let me ask it in a different way

 2   just to try -- did you review the allegations

 3   set forth by Plaintiffs in this case?

 4      A.    Yes.

 5      Q.    Okay.  And did you observe that

 6   there were some substance use-related

 7   allegations -- or substance use

 8   treatment-related allegations in this case?

 9      A.    Yes.

10      Q.    And did you share with county for

11   the counsel that you have expertise in that

12   area?

13                   ATTORNEY COLEMAN:  Asked and

14   answered.  Also you said county for the counsel

15   instead of counsel for the county.

16                   ATTORNEY FISCHER:  Thank you,

17   Ms. Coleman.

18   BY ATTORNEY FISCHER:

19      Q.    Did you share that with counsel for

20   the county?

21      A.    So I was never asked if I was a

22   substance-abuse expert or if I had knowledge or

23   background in that.

24            The way we define -- again, I

25   believe I've testified to this earlier.  I did

**Ex. X-1708**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    this as part of a multidisciplinary consulting

2    group from John Allen and Associates.

3            We have medical, nursing, pharmacy,

4    psychiatry.  We had several different

5    representatives.  I believe Dr. Murray was

6    going to handle the medical and the substance

7    use.  So I did not look into that in any great

8    detail.  So, no, I don't have any opinions

9    about that at this time.

10        Q.    Okay.  I do have one question just

11   to go a bit deeper on this.  Page 56 of your

12   report.  Near the top of Page 56, Dr. Penn, the

13   first paragraph, last sentence, it begins,

14   "Additionally."

15            It reads, "Additionally, individuals

16   with substance use histories are evaluated and

17   monitored using COWS/CIWA."  That's

18   C-O-W-S/C-I-W-A.

19            Do you see that there?

20        A.    Yes.

21        Q.    Is that your opinion in this case?

22        A.    Yes.

23        Q.    And first of all, what is your

24   understanding of the standard of care for the

25   appropriate frequency of COWS monitoring

**Ex. X-1709**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    specifically?

2         A.    So when you say "standard of care,"

3    if you can clarify what you're referring to?

4         Q.    I'm asking what your understanding

5    of the standard of care for the appropriate

6    frequency of COWS monitoring specifically is.

7                   ATTORNEY COLEMAN:  Well,

8    objection, vague.  For what category of

9    persons?

10   BY ATTORNEY FISCHER:

11        Q.    Go ahead, Dr. Penn.

12        A.    So I would draw your attention in my

13   response to the NCCHC.  They have -- and I'm an

14   author in all of these in the jail and prison

15   standards -- sorry -- the jail standards, the

16   prison standards, opioid treatment facility

17   standards, juvenile standards, and the mental

18   health standards.

19                   In all of those there is a standard

20   with regard to an individual who comes in to a

21   correctional facility or carceral setting.

22   Should they be substance-dependent or be at

23   risk for substance-dependent, they should

24   undergo evaluation and monitoring depending on

25   what substance.

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                              JOB NO. 1220564
NOVEMBER 18, 2024

1              If it's alcohol, then, obviously

2     CIWA, Clinical Institute Withdraw Assessment.

3     If it's opioids, then COWS or CINA is another

4     one that's often used, the Clinical Institute

5     Narcotic Assessment, or COWS, Clinical Opioid

6     Withdrawal Scale.  And symptomatic relief is

7     provided.

8              But I don't believe the NCCHC -- and

9     I have the standards here in front of me.  I'm

10    happy to look at them -- they don't have any

11    prescriptive thing to tell you the frequency.

12    They just say, "per clinical practice," or "as

13    clinically indicated."

14             So the NCCHC standards don't say

15    must be within an hour or you must put everyone

16    on M-A-T or M-O-U-D treatment.  It's more

17    permissive if it's individually determined by

18    the evaluating and treating health care staff.

19        Q.    Do you have any opinion, based on

20    your experience and expertise, as to what the

21    appropriate frequency of COWS monitoring

22    specifically would be?  Any guidance that you

23    can provide?

24        A.    So it would be up to the medical

25    leadership of the facility, based on their

**Ex. X-1711**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

1    direct clinical involvement with patients.

2              So there's different types of

3    opioids -- opioids and benzos and alcohol and

4    systems, so it would -- it would be clinically

5    determined by the facility staff and their

6    capabilities.

7              If they have the ability to monitor

8    someone in a medical infirmary or if

9    alternatively they just put them in a detox

10   room, like, a dorm setting, I would say all of

11   that is going to be dependent on custody,

12   staffing, nursing availability.  If you have

13   12-hour nursing or 24-hour nursing, it would --

14   it would all be clinically dependent on those

15   different safeguards in place that you have.

16             Some facilities won't do any kind of

17   detox.  They'll send everyone off site.  So it

18   really depends of the complexity of the

19   patient.  If they have a history of, say,

20   alcohol withdrawal seizures or they have

21   delirium tremens, DTs, then the facility might

22   elect to send them off site to an emergency

23   room.

24             So what I would say is there is no

25   absolute you should do it this way.  It's

**Ex. X-1712**

JOSEPH V. PENN, M.D., CCHP-MH, LFAPA                    JOB NO. 1220564
NOVEMBER 18, 2024

 1   determined by the medical leadership of the

 2   facility.  That would be my opinion.

 3        Q.    Did you conduct any evaluation of

 4   the San Diego County Jails' housed monitoring

 5   policy and its implementation?

 6        A.    I asked the intake nursing staff of

 7   how they determined of who -- how they screened

 8   for substance abuse and dependence and how --

 9   where those individuals are housed and placed.

10   I also toured the medical facility.

11            But, no, I did not do a detailed,

12   deep dive into COWS and CIWA and detox

13   protocols for the jail.  I referred that to Dr.

14   Murray, my colleague.

15        Q.    Okay.  Page 59.

16                  ATTORNEY COLEMAN:  What did

17   you say?

18                  ATTORNEY FISCHER:  Page 59.

19   BY ATTORNEY FISCHER:

20        Q.    You say in the middle of the page,

21   Dr. Penn -- the third line of the middle

22   paragraph it states, "The SDSO supports

23   connections to community MAT programs and

24   provides comprehensive MAT treatment for IPs

25   with co-occurring mental health and substance

**Ex. X-1713**

```
1   COMMONWEALTH OF PENNSYLVANIA          )
                                          ) SS
2   COUNTY OF ALLEGHENY                   )

3                   CERTIFICATE

4        I, Michelle Goehring, a notary public in
    and for the Commonwealth of Pennsylvania, do
5   hereby certify that the witness, DR. Joseph
    PENN, was by me first duly sworn to testify the
6   truth, the whole truth, and nothing but the
    truth; that the foregoing deposition was taken
7   at the time and place stated herein; and that
    the said deposition was recorded
8   stenographically by me and then reduced to
    typewriting under my direction, and constitutes
9   a true record of the testimony given by said
    witness.
10
         I further certify that I am not a
11  relative, employee or attorney of any of the
    parties, or a relative or employee of either
12  counsel, and that I am in no way interested
    directly or indirectly in this action.
13

14       IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office this 4th day
15  of December, 2024.

16

17       /S/Michelle L. Goehring, Notary Public
18  Court Reporter
    My Commission Expires: July 12, 2025
19  Commission No. 1317058.

20

21

22

23

24

25
```

Ex. X-1714

# EXHIBIT Z

## (Redacted)

Ex. Y-1715



CERTIFIED
COPY

**Ex. Y-1716**

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3   DARRYL DUNSMORE, ANDREE              )
    ANDRADE, ERNEST ARCHULETA,          )
4   JAMES CLARK, ANTHONY EDWARDS,       )
    REANNA LEVY, JOSUE LOPEZ,           )
5   CHRISTOPHER NORWOOD, JESSE          )
    OLIVARES, GUSTAVO SEPULVEDA,        )
6   MICHAEL TAYLOR, and LAURA           )
    ZOERNER, on behalf of themselves    )
7   And all others similarly situated,  )
                                        )
8                 Plaintiffs,           )
                                        )
9        v.                             )
                                        )
10  SAN DIEGO COUNTY SHERIFF'S          )
    DEPARTMENT, COUNTY OF SAN           )
11  DIEGO, SAN DIEGO COUNTY             )
    PROBATION DEPARTMENT, and DOES      )
12  1 to 20, inclusive,                 )
                                        )
13                Defendants.           )

14  Case No. 3:20-cv-00406-AJB-DDL

15

16        DEPOSITION OF SCOTT E. REINECKE, DDS

17

18           DATE: November 8th, 2024

19              TIME: 9:00 a.m.

20       LOCATION: Via Zoom Video Conference

21

22

23

24

25

Ex. Y-1717

1    missing.

2           THE COURT REPORTER:  Yeah, exactly.  That's

3    right.  Yeah.  I mean, I'll remind you so I have an

4    answer, you know?

5           All right.  Let me just get the last question

6    here.  One second.  Okay.

7                    (Court reporter read back.)

8           THE COURT REPORTER:  Are those -- I'm sorry.

9           MS. CHARTOFF:  That's okay.  Why don't I -- I'll

10   just take it again.  Yeah, don't worry about it.

11   BY MS. CHARTOFF:

12      Q.   So, Dr. Reinecke, consistent with your

13   resume, your CV here, you've been a practicing dentist

14   in the community through 2023, is that correct?

15      A.   That is correct.

16      Q.   And do you have -- in the community, do you

17   have a standard of care or timeframe that you require

18   patients complaining of pain to be seen by a dentist?

19      A.   No.

20      Q.   Would -- if a patient called your office

21   complaining of pain, how quickly -- how quickly would

22   you try to make an appointment to see them?

23      A.   I would try to see them as soon as

24   possible.  It may not be same-day.

25      Q.   Would you wait 10 days to see a patient

**Ex. Y-1718**

1    assess?

2        A.    I really wasn't given specific guidance on

3    that.  I believe my perspective was to be as fresh as

4    possible.

5        Q.    Did you have any impression about dental

6    care at the San Diego County jails before you were

7    retained in this case?

8        A.    Absolutely not.

9        Q.    So we -- you said you visited facilities

10   and you reviewed charts.  Did you review policies or

11   procedures?

12       A.    I did not.

13       Q.    Why not?

14       A.    They were not provided to me.

15       Q.    Did you ask for them to be provided to you?

16       A.    I did.

17       Q.    Did you review any other documents?

18       A.    Besides charts, you mean?

19       Q.    Correct.  Besides charts.

20       A.    No.

21       Q.    You reviewed the dental schedule that was

22   sent this week that was produced to us earlier today, is

23   that right?

24       A.    Yes.

25       Q.    Is that the first dental schedule that

**Ex. Y-1719**

1    guard.

2            Q.    Did you -- who did you ask for the patient

3    charts?

4            A.    That's a good question.  I believe it was a

5    response to a group email that may have had 10 or 12

6    people on it.  So I didn't like, you know, point at

7    somebody asking.

8            Q.    And the people on that email, were they

9    defense counsel who you understood you were asking the

10   charts for?

11           MS. COLEMAN:  Assumes facts.

12           THE WITNESS:  I feel certain it was my team.

13   So, in other words, the other expert witnesses', you

14   know, common email.  And then Susan may have been on

15   there.  A couple of other individuals may have been on

16   there.  I just don't recall.  This was months ago.

17   BY MS. CHARTOFF:

18           Q.    Did you email with anyone other than

19   defense counsel about this expert report?

20           A.    I believe the only person would have been

21   Dr. Murray.

22           Q.    If there are emails with Dr. Murray that do

23   not include counsel, we would like to see those.  So you

24   asked for -- you asked for 30 charts in particular when

25   you made this request?

**Ex. Y-1720**

1          A.    My answer is that that is the window that

2     has been established.  I am not in a position to

3     determine if that is acceptable, but that's the window

4     that has been established.  It's based upon the number

5     of people requesting care, the availability of staff,

6     probably a handful of other variables.  I can't say if

7     it's acceptable, though.

8          Q.    So you're not in a position to opine on

9     what the appropriate wait time is for someone to be seen

10    by a dentist?

11         MS. COLEMAN:  Objection, vague.

12         THE WITNESS:  Or a request of cleaning.  Oh,

13    sorry.

14         MS. COLEMAN:  Go ahead.

15         THE WITNESS:  If the request was cleaning, as

16    you have used as an example, no, I cannot opine on that

17    timeframe.

18    BY MS. CHARTOFF:

19         Q.    Can you opine on the appropriate timeframe

20    before someone needs to be seen by a dentist who is

21    complaining of pain?  The patient is complaining of

22    pain, to be clear.

23         MS. COLEMAN:  Objection, incomplete

24    hypothetical, vague as to the pain.

25         THE WITNESS:  As a healthcare provider, I would

**Ex. Y-1721**

1    prefer that that be sooner than later, without saying a

2    day.  So I can't say three days.  I can't say five days.

3    I would say somebody who is complaining of pain should

4    be seen sooner than someone who is not complaining of

5    pain.

6    BY MS. CHARTOFF:

7         Q.    But you do not actually have an opinion on

8    what the standard should be in terms of -- in that

9    regard?

10        A.    I would say my opinion, again, is sooner

11   than later without an established timeframe, because

12   every single circumstance has different variables.

13        So if I were to say for Clinic A in Malaysia, it

14   should be three days, and I don't know what happens on a

15   day-to-day basis, that would be unprofessional of me to

16   suggest that three days is appropriate.

17        If we were to compare that to a place where I

18   would physically work on a day-to-day basis, and I know

19   what the variables are, I could tell you with experience

20   and conviction what the delay should be because I know

21   what I could control and what I cannot.

22        So in this particular instance, I would have to

23   be onsite for two weeks at one place to kind of have a

24   feel for what could be controlled and what could not.

25   So I cannot say what's appropriate there as far as a

**Ex. Y-1722**

 1   delay.

 2         Q.   So it's your testimony that you are unable

 3   to opine on what the appropriate timeframe is in San

 4   Diego for someone complaining of pain to be seen by a

 5   dentist?

 6         MS. COLEMAN:  Misstates his testimony,

 7   incomplete hypothetical.

 8         THE WITNESS:  That's correct.  I do not feel I

 9   am able to opine on that, because I do not have enough

10   information.

11   BY MS. CHARTOFF:

12         Q.   When you were reviewing the chart

13   reviews -- I want to turn to page four of your report.

14   This is in the top section above where it says, "Section

15   7, Summary of Findings."

16         A.   I don't know why I can't find that.

17   Summary of findings.  Let me close this.  Stand by a

18   moment.  Let me open up another one and see.  I think

19   this may have been a draft.

20         MS. CHARTOFF:  Okay.  You know, we've been going

21   for about a little over an hour now.  Why don't we get

22   back on at 1:20.

23         We'll go off the record, Dara, and take a break.

24         You can make sure you have the correct -- I want

25   you to have the correct document in front of you,

Ex. Y-1723

1          THE WITNESS:  I would characterize it as trying

2     to view everything as a conglomeration of information

3     because I knew that there was a likelihood that there

4     would be differences in those.

5          Well, let me see here.  What are the three

6     categories?  Quality of documentation -- yeah.

7          So I knew going in that there was going to be

8     differences because I would expect that of any review.

9     You're not going to see the exact same thing every

10    single time across facilities and across providers.

11         So I was really looking at this to kind of get a

12    sense as to if there were timeframes that were for the

13    most part hit, even though I didn't expect 100 percent.

14    I wouldn't expect that with anybody.  So I hope that

15    characterizes what I was looking for.

16         Q.   Did you have a standard of care in mind

17    that you would expect to see in each of these charts?

18         MS. COLEMAN:  Objection, vague, compound.

19         THE WITNESS:  I would say, ideally, I would like

20    to see that once diagnosed, a condition that required

21    treatment was seen or addressed or referred within a

22    timeframe that was not grossly outside what a standard

23    would be.

24         And, again, the standard is in flux.  You know,

25    you have numbers, but we don't know all the variables on

**Ex. Y-1724**

 1   site.

 2   BY MS. CHARTOFF:

 3       Q.   Were you also looking to see whether a

 4   diagnosis was made in a timely manner?

 5       A.   Yes.

 6       Q.   And for each chart, did you document

 7   whether the care was in fact provided timely?

 8       A.   Did you say for each part?

 9       Q.   For each chart, excuse me.

10       A.   Oh, for each chart?  No.

11       Q.   So let's turn to Appendix C of your report,

12   which is the chart section.  It starts on page 95.

13       THE COURT REPORTER:  B, as in boy or D, as in

14   David?

15       MS. CHARTOFF:  C, as in cat.

16       THE COURT REPORTER:  Oh, C.  Okay.  Really off.

17   Thank you.  Sorry about that.

18       MS. CHARTOFF:  All good.

19       THE WITNESS:  Okay.  So, Hannah, I don't have

20   what you're referring to.  I don't have a document

21   that's that length.

22   BY MS. CHARTOFF:

23       Q.   You don't have the Appendix C portion of

24   your report in front of you?

25       MR. FISCHER:  Can you put it back up on screen,

**Ex. Y-1725**

```
1            A.    It's possible.

2            Q.    And at present, what is your opinion about

3    Mr. ██████' medical care?

4            MS. COLEMAN:  Asked and answered.

5            THE WITNESS:  My opinion is I don't have enough

6    information.

7    BY MS. CHARTOFF:

8            Q.    So if it were true that Mr. ██████ waited

9    four months between being seen by a nurse and being seen

10   by a dentist, what would your opinion about the quality

11   of care provided to him be?

12           MS. COLEMAN:  Asked and answered.

13           THE WITNESS:  He should have been -- okay.  Go

14   ahead.  I'm sorry, Susan.

15           MS. COLEMAN:  Incomplete hypothetical.

16           Go ahead.

17           THE WITNESS:  Based on the limited information

18   that I have, and if that is in fact the timeframe given

19   an option, I would like him to have been seen quicker

20   than four months.

21   BY MS. CHARTOFF:

22           Q.    So four months is not an acceptable wait in

23   your opinion?

24           A.    I cannot answer that with any certainty

25   because I feel I don't have enough information.
```

**Ex. Y-1726**

1    literally, that person doing the assessment has not been

2    present.

3            MS. CHARTOFF:  Okay.  Let's take a break.  Let's

4    go off the record.  It's 2:06, and why don't we come

5    back on at 2:20.

6            So that's 4:20 for you, Dr. Reinecke.

7            THE COURT REPORTER:  How long are we taking?

8            MS. CHARTOFF:  14 minutes, just to make it

9    round.

10                      (Brief recess.)

11           MS. CHARTOFF:  So 2:21.  Okay.  All right.  Back

12   on the record.

13   BY MS. CHARTOFF:

14           Q.   All right.  Dr. Reinecke, I want to make

15   one last -- just to make sure I understand with these

16   chart reviews.  Your opinion is that based on the

17   information you have received to date and that you

18   reviewed, you are not able to opine on whether those 30

19   patients were treated within the standard of care?

20           MS. COLEMAN:  Objection, misstates his

21   testimony.  He said individually versus as a whole.

22           Go ahead.

23           THE WITNESS:  I would have to request for a more

24   clear understanding of standard of care because there's

25   variations depending on who you talk to.

1          So which standard of care are you using as a

2     reference?  Because there is no policy and procedure

3     that I've seen.  So you have to give me an example of a

4     standard of care.

5     BY MS. CHARTOFF:

6          Q.   In your -- okay.  So, fair.  Your opinion

7     is that you haven't reviewed the policies and

8     procedures, so you are not able, based on the

9     information you have here today, to confirm whether the

10    treatment provided in these individual instances was

11    consistent with the policies and procedures at the San

12    Diego County Jail?

13         A.   That is true.

14         Q.   And you aren't able to opine on the quality

15    of care provided in each of these individual cases

16    because -- based on the information that you have

17    reviewed?

18         MS. COLEMAN:  Objection, compound, overly broad,

19    incomplete hypothetical.

20         THE WITNESS:  Okay.  So I would not say that the

21    question is entirely accurate.  I can opine.  I can

22    opine on anything, to be honest with you.

23         But the bottom line is, if, you know, everybody

24    can have an opinion, but for an opinion to have actual

25    value, you have to have something upon which it is based

1    and it has to be inside of a spectrum of knowns.

2           So, in this particular instance, I can opine my

3    personal belief on whether something was done within a

4    certain timeframe or done appropriately, et cetera, et

5    cetera.  But because I don't have intimate knowledge of

6    the variables and the impasses associated with the

7    information we're reviewing, my opinion, as well as

8    Dr. Schulman's, does not really carry a lot of weight.

9           I can opine, and I can opine, and I can opine.

10   I can only look at what I've got that's available to me.

11   So I'd like to say I'm an expert.  In fact, I know I'm

12   an expert.  That's not even a question.

13          But I can only add value when I have all the

14   information available to me.  So to say I can opine,

15   absolutely, I can.

16          Really, the question comes down to, do you want

17   just personal opinion?  That's one thing.  Or do you

18   want something based on fact?  And I think that, as we

19   all know, law is based in fact.

20          So, there's things missing for me to opine based

21   in fact.  So, all of these reviews, all the chart

22   reviews, are based on information I had available to me,

23   and there are definitely things missing.

24   BY MS. CHARTOFF:

25          Q.   And based on the information available to

Ex. Y-1729

1    you, can you opine as to whether these individuals

2    received adequate care up to your standard of practice?

3              MS. COLEMAN:  Objection, compound.

4              THE WITNESS:  Again -- yeah, that's compound.

5    So, me, personally, I would say that on occasion, yes;

6    and on occasion, no.  I've seen examples of both within

7    these 30 charts.

8    BY MS. CHARTOFF:

9         Q.   I want to turn to what we were just looking

10   at as Exhibit 4, which is what you sent to us today as

11   your report.

12              In the conclusion section, starting on page 15,

13   it reads, "In my professional opinion, SDCJ has the

14   necessary physical plant infrastructure, staff, and

15   equipment to deliver minimally adequate dental care that

16   aligns with community standard."

17              Is that your opinion?

18        A.   Based on my visit, yes.

19        Q.   And this should have been included in your

20   final report?

21        A.   I'm sorry.  Say that again.

22        Q.   This sentence is correctly included in your

23   expert report?

24        A.   Yes, I wrote that.  Yes.

25        Q.   "All dental staff I spoke with were

Ex. Y-1730

1        Q.   So your understanding -- I know you're just

2   looking at this for the first time, but this 1.4

3   dentist -- excuse me -- FTEs, that's lower than the 1.8

4   dentist FTEs that we just spoke about as being

5   sufficient.  So does this change your opinion on whether

6   dentist staffing is sufficient at the San Diego County

7   Jail?

8        A.   No, it does not, because this is simply one

9   week in a given month.  So I would have to look at an

10  expanded window, at least one month, to determine an

11  actual FTE allocation.

12       Q.   Did you ask for staffing plans reflecting a

13  month?

14       A.   I did not.

15       Q.   And in your report -- just a moment.

16       In your opinion, I want to ask about the role of

17  dental assistants now.  So what does a dental assistant

18  do generally?

19       A.   That's going to add some time, so I'm going

20  to try to abbreviate as best as possible.

21       They do everything, with the exception of the

22  delivery of direct dental care, because legally they

23  cannot.  So some things -- they assist the dentist,

24  obviously; chairside procedures; take radiographs; set

25  up and take down instrumentation; sterilize instruments

**Ex. Y-1731**

1    outside -- did you rely on any industry standards in

2    assessing the adequacy of dental care in this case?

3            MS. COLEMAN:  Objection, vague.

4            THE WITNESS:  So, again, there has been

5    significant discussion on what actual industry standards

6    are in the field of dentistry.

7            Generally, it's going to be this subjective

8    analysis of where do we get a ratio, which we've already

9    talked about.  That's the big one, is what the ratio is.

10   And then another one is if you're presented with a

11   particular type of diagnosis, what should you do.

12           So I would like to say that, yes, there is

13   kind of that standard that floats around in your head,

14   where if you see something, you're like, okay, well,

15   that's within a realm of what I would consider

16   acceptable.

17           But there is significant discussion routinely.

18   I mean, I'm sure for years and years and years before I

19   was born, there has been discussion as to what is a true

20   standard.  And I believe with all of my being that there

21   is no one true standard that can be applied to the

22   dental profession.

23   BY MS. CHARTOFF:

24       Q.  Are there -- I understand that.  Are there

25   kind of main sources that you look to when -- even if

1          Q.    And did you consider the NCCHC standards on
2    oral care services in drafting your report?
3          A.    I did not.  But I know Dr. Shulman is --
4    he's got that under his wing.  He believes very heavily
5    in NCCHC.
6          Q.    Why didn't you consider the NCCHC
7    standards?
8          A.    It's a guideline.  It cannot be applied
9    across all parameters.
10         Q.    You mentioned the American Dental
11   Association before.  Are you familiar with the ADA, the
12   CDT codes, I believe they're called?  Do you use them?
13         CDT, Dara.
14         Do you use them in your private -- did you use
15   them in private practice when you were in private
16   practice?
17         A.    Every dentist, unfortunately, must in order
18   to get paid by insurance companies.
19         Q.    So you're familiar with ADA code D0150?
20         A.    I believe that is a treatment plan code.
21         Q.    Initial examination and treatment plan?
22   Yeah, yeah.  Does the jail provide -- the San Diego
23   County Jail -- provide initial examinations within the
24   definition of ADA code D0150?
25         A.    I don't think I can answer that with

1    So I saw evidence of referrals and it may have not been

2    for crown and bridge.  It may have been for endo, which

3    is root canal or prosthodontics, which is dentures.  But

4    I did see evidence of referrals being entered and taking

5    place.

6          Q.    But you can't recall at this moment,

7    whether any of the referrals you reviewed were actually

8    for crown and bridge?

9          MS. COLEMAN:  Objection, vague.  Do you mean the

10   charts you reviewed?  Because you said referrals.

11   BY MS. CHARTOFF:

12         Q.    You can still answer, Doctor.

13         A.    So referrals, I don't recall.  No.

14         Q.    And did you do anything else to verify

15   Dr. Pandit's statement that those services are provided?

16         A.    Besides looking at charts?  No.

17         Q.    Okay.  Because you didn't look -- you

18   didn't have an opportunity to look at the policies and

19   procedures, right?

20         A.    Correct.

21         Q.    And did you see any evidence of periodontal

22   diagnosis being done at the jail?

23         A.    Yes.

24         Q.    What evidence did you see of that?

25         A.    I saw it in the charting in the odontogram

1    for me to comment.

2    BY MS. CHARTOFF:

3            Q.   So, based on this document, you're not able

4    to comment on whether the staffing -- dental staffing at

5    the jail, more broadly, is adequate?

6            A.   That is correct.

7            Q.   So I want to talk about quality assurance

8    now.  We spoke hours and hours ago now, it seems, about

9    the quality assurance processes that are employed at the

10   UTMB-CMC system.  Are those all necessary quality

11   assurance processes in your view?

12           A.   Yes.

13           Q.   And that's -- just to go back through them,

14   those are site audits and chart audits and peer review

15   and monthly reports on timeliness.  And is there

16   anything else I'm missing that you think is a necessary

17   quality assurance process?

18           A.   Okay.  So both questions, yes, I think that

19   that's necessary.  And second, I don't think there's

20   anything missing.

21           Q.   And turning to San Diego, your opinion is,

22   as I understand it, is that the quality monitoring at

23   the San Diego County Jail facilities is appropriate,

24   correct?

25           A.   My response was based on what Dr. Pandit

**Ex. Y-1735**

1    told me, because I did not see any evidence of that.  So

2    he reported he did annual reviews.  If that's true, then

3    that's a component.

4         And, again, you can't really compare what we do

5    here to what they do there, but that's a component.  So

6    if that's true, it could be considered adequate if it's

7    comprehensive enough.

8         Q.   And did you ask to see those documents?

9         A.   I did not.

10        Q.   And I want to talk about records management

11   also.  I'm looking for the section in the report, the

12   report you provided today to direct you to.  Is your

13   opinion -- so actually I'll just direct now I finally

14   found the page.  Thanks for bearing with me.  I'm on

15   page 13, PDF page 13.

16        A.   Okay.  I don't have a page 13, do I?  Do I

17   have a 13?  Oh, I do.  Okay.  Hold on.  13 -- 16.

18        Q.   The paragraph below, it says, "Summary of

19   Findings," right above "Section 4, Quality Assurance".

20        A.   Got it.

21        Q.   Start at the second sentence, which starts

22   at the very end of line 2.  "This may be a result of a

23   charting system that is not full spectrum, relies too

24   much on a check-the-box format, or is not user

25   friendly."

Ex. Y-1736

```
 1                    REPORTER'S CERTIFICATION

 2          I, Katherine Lenti, Certified Shorthand Reporter and

 3    Notary Public for the State of Illinois, do hereby certify

 4    the following:

 5          That the foregoing is a correct transcript of

 6    the digitally-recorded audio of the deposition of

 7    SCOTT REINECKE, DDS, in the above-entitled matter;

 8          That the amount of time used by each party at the

 9    deposition is as follows:

10          Ms. Hannah Chartoff      - 04:45
            Ms. Susan Coleman        - 00:00
11          Mr. Aaron Fischer        - 00:00

12          That pursuant to information given to the

13    deposition officer at the time said testimony was taken,

14    the following includes all parties of record.

15          I further certify that I am neither counsel for,

16    related to, nor employed by any of the parties or attorneys

17    in the action in which this proceeding was taken, and

18    further that I am not financially or otherwise interested

19    in the outcome of the action.

20          Certified to by me this 9th day of December, 2024.

21

22          _Katherine Lenti_____
            KATHERINE LENTI
23          Illinois CSR 084.004958
            Expiration Date:  05/31/25
24          Steno Agency
            Concierge@steno.com
25          (888) 707-8366
```

Ex. Y-1737