GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone: (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone:   (858) 677-1400
Facsimile:    (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**VOLUME I – EXHIBITS TO REPLY DECLARATION OF RICHARD M. PEARL IN SUPPORT OF PLAINTIFFS' MOTION FOR INTERIM ATTORNEYS' FEES AND COSTS**

Judge:  Hon. Anthony J. Battaglia

Date:   May 8, 2025
Time:   2:00 p.m.
Crtrm.:  4A

[4672401.1]

# TABLE OF CONTENTS

## EXHIBITS TO REPLY DECLARATION OF RICHARD M. PEARL IN SUPPORT OF PLAINTIFFS' MOTION FOR INTERIM ATTORNEYS' FEES AND COSTS

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| **VOLUME I** | | |
| State Court Orders Rejecting Mr. O'Connor's Opinions | A | 1-69 |
| **VOLUME II** | | |
| Continued State Court Orders Rejecting Mr. O'Connor's Opinions | A | 70-135 |
| Amended Rebuttal Declaration of John O'Connor, *Duran, et al. v. U.S. Bank National Assoc.*, Case No. 2001-035537, Cal. Sup. Ct. (dated August 31, 2010) | B | 136-172 |
| Declaration of John O'Connor, *Johnson v. Sear, Roebuck and Co, et al.,* Case No. 34-2009-00054053, Cal. Sup. Ct. (dated February 29, 2012) | C | 173-200 |
| Declaration of John O'Connor in Rebuttal to Opp. To Fee Petition, *Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, Case No. CGC-05-437680, Cal. Sup. Ct. (dated September 16, 2011) | D | 201-250 |
| Corrected Declaration of Guy B. Wallace, *Nevarez v. Forty Niners Football Company, LLC*, Case No. 4:16-cv-07013-HSG, N.D. Cal. (dated June 25, 2020) | E | 251-310 |

# EXHIBIT A

*Oswald v. Landmark Builders Inc.,* Contra Costa County
Superior Ct. No. SCV259044

FILED

MAY 18 2023

Clerk of Superior Court of California,
County of Sonoma
By
Deputy Clerk

RECEIVED

MAY 2 5 2023

1   HON. JENNIFER V. DOLLARD
    JUDGE OF THE SUPERIOR COURT
2   Courtroom 23
    3055 Cleveland Avenue
3   Santa Rosa, CA 95403
    (707) 521-6836
4

5

6

7

8                  SUPERIOR COURT OF CALIFORNIA

9                      COUNTY OF SONOMA

10                                          Case No. SCV259044

11  JACK OSWALD, et al.

12  Plaintiffs,                             **RULING ON LANDMARK BUILDER'S**
                                            **MOTION FOR ATTORNEY FEES AND**
13  v.                                      **COSTS**

14  **LANDMARK BUILDERS, et al.**

15  Defendants.

16

17       This matter came on for hearing on May 16, 2023 on the motion of Defendant Stewart-

18  McAlvain Construction Corp., dba Landmark Builders, Inc. [Landmark Builders] for attorney

19  fees and costs.  Counsel Jeffrey Chadic and Ron Berestka appeared for Defendant Stewart-

20  McAlvain Construction Corp., dba Landmark Builders, Inc., and counsel Scott Freedman

21  appeared for Plaintiffs, Jack Oswald and Ann Seley, individually and as trustees of the

22  Oswald-Seley Revocable Trust.  After hearing oral argument, the matter was submitted to the

23  Court for decision.  The Court now rules as follows.

24       Defendant Landmark Builders' motion for attorney fees and costs is GRANTED in the

25  amount of $841,346.93.

26       Defendant's objection to the entire declaration of John O'Connor filed September 14,

27  2022 is SUSTAINED as the declaration constitutes improper expert opinion and lacks

28  foundation.

                                   -1-

**Ex. A - 3**

1    Plaintiffs' objections to the November 11, 2022 declaration of Richard Pearl are

2  SUSTAINED on the basis of improper expert opinion.  Plaintiffs' objection to the April 3,

3  2023 declaration of Jeffrey Chadic is SUSTAINED as to objection number 7 and are

4  OVERRULED as to the rest.

5    All requests for judicial notice are GRANTED.

6    This motion has been continued twice previously for Defendant to submit further

7  calculations and evidence as ordered by the Court. The Court issued tentative rulings before

8  each hearing in which the Court ruled on specific issues that were capable of disposition at the

9  time. Each tentative ruling was adopted as the ruling of the Court and reflected in the minute

10 orders for each hearing. Each of these minute orders is incorporated into this final ruling on the

11 motion; specifically, the Court refers to the September 28, 2022 and December 14, 2022

12 minute orders.

13    The hearing was initially continued for Defendant to submit an updated fees calculation

14 reflecting the reasonable hourly rates approved by the Court on September 28, 2022, and for

15 Defendant to submit a new memorandum of costs reflecting only the costs approved by the

16 Court on that same day. The Court also determined that Plaintiffs are entitled to an offset of the

17 fees awarded to Defendant based on the settlement agreements Defendant reached with the

18 subcontractors. Accordingly, the Court ordered Defendant to submit evidence of each

19 settlement agreement reached. Defendant subsequently submitted the updated fees calculation

20 and some, but not all, of the settlement agreements reached with the subcontractors. Defendant

21 also did not file an updated memorandum of costs, arguing that it would be moot to do so. The

22 hearing was again continued to allow Defendant time to finalize the remaining settlements

23 with the subcontractors and provide the Court with evidence of each settlement. Defendant has

24 now done so.

25    Analysis:

26 I.    Reasonable Fee Award

27    A. Fees for Underlying Case

28    The standard for calculating attorney fee awards under California law,

Ex. A - 4

1    [O]rdinarily begins with the 'lodestar,' i.e., the number of hours reasonably
     expended multiplied by the reasonable hourly rate...The lodestar figure may
2    then be adjusted, based on consideration of factors specific to the case, in
     order to fix the fee at the fair market value for the legal services provided.
3    [Citation.] Such an approach anchors the trial court's analysis to an objective
     determination of the value of the attorney's services, ensuring that the amount
4    awarded is not arbitrary.

5        (*PLCM Group, Inc. u. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM Group*); see also

6    *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131-1132.) In calculating the lodestar, "The

7    reasonable hourly rate is that prevailing in the community for similar work." (*Ibid.*) "[T]he trial

8    court has broad authority to determine the amount of a reasonable fee." (*PLCM Group, supra*,

9    22 Cal.4th at p. 1095.) "The determination of what constitutes reasonable attorney fees is

10   committed to the discretion of the trial court. [Citation.] The experienced trial judge is the best

11   judge of the value of professional services rendered in his or her court. [Citation.]" (*Rey v.*

12   *Madera Unified School Dist.* (2012) 203 Cal.App.4th 1223, 1240.)

13       In the Court's September 28, 2022 minute order, the Court found the hourly rates

14   requested to be reasonable for the year 2020 to the present. However, the Court found that the

15   hourly rate should be reduced by $25 per hour each year preceding 2020. Defendant has

16   provided the Court with a matrix, attached as Exhibit S to the November 16, 2022 declaration

17   of Robert F. Berestka, Jr. The matrix reflects the proper hourly rates ordered by the Court

18   multiplied by the number of hours billed by each firm. The number of hours billed amounts to

19   3,012. The total fees amount to $1,329,810.00.

20       The Court finds the number of hours and fees reflected in the matrix to be reasonable

21   given the fact that the case involved over six years of litigation, several motions, and

22   significant discovery. The Court has previously found that no apportionment will be necessary

23   between time spent defending against Plaintiffs' causes of action and time spent pursuing the

24   cross action. Accordingly, the fees award shall be $1,329,810 prior to any offset or adjustment

25   for fees incurred on this motion, which is analyzed below.

26       *B. Fees for Motion*

27       Defendant initially sought $45,420 for drafting the moving papers, which was

28   calculated at 75.7 hours at $600 per hour, as well as an estimated $24,000 for replying to the

-3-

1  opposition, which was calculated at 40 hours at $600 per hour. The Court indicated in its

2  September 28, 2022 minute order that the Court was of the tentative view that such a request

3  was unreasonable. Thus, if Defendant wanted the Court to award such an apparently inflated

4  amount, Defendant would need to support the request by establishing why spending this

5  amount of time on the motion was "necessary and reasonable."

6      Defendant represents that such hours were necessary because this is not a routine

7  motion but required compilation and analysis of approximately 6 years' worth of billing

8  records for multiple firms and required significant legal research. Defendant also submits in its

9  supplemental brief that the number of hours awarded for replying should be 104.9 hours,

10  instead of the original 40 hours estimated, because Plaintiffs' opposition was voluminous.

11      Only 25.7 of these hours were spent by an associate attorney. Defendant submits that

12  the remaining work done on this motion was by senior partners at a rate of $600 per hour.

13      Defendant also adds that an additional 48.5 hours at $600 per hour should be awarded

14  for the time spent preparing the additional briefing requested by the Court for the December

15  14th hearing, and an additional 43.8 hours of time for "recovering costs and opposing

16  Plaintiffs' motion to tax costs." Defendant has not provided any authority supporting an award

17  of attorney fees for opposing a successful motion to tax costs. It is also not explained why

18  these hours are separate from the time spent on the ultimate motion for attorney fees *and costs*.

19  The 43.8 hours requested for this will not be awarded.

20      Furthermore, while the Court agrees that additional time should be awarded for work

21  on the supplemental briefing requested by the Court, the Court finds that the amount of time

22  requested for the supplemental briefing—as well as overall for the entire motion—is

23  unreasonably inflated. The Court also notes that Defendant stated it would be adjusting its fee

24  request at the hearing to account for any additional work done that is not reflected in the

25  supplemental briefing, however no number was provided at that time.

26      The Court finds that 201 hours at a rate of $600 per hour ($120,600), plus 25.7 hours at

27  a rate of $450 per hour ($11,565) is reasonable and sufficient to compensate Defendant for *all*

28  of the work done on this motion. Accordingly, $132,165 in fees is granted for this motion.

-4-

**Ex. A - 6**

*C. Interest*

Defendant argues that if the Court calculates the fees at the hourly rates ordered by the Court, rather than those originally requested, then the Court should add 10% to the award for interest. Defendant has not provided any authority that is on point to support this assertion that if the Court adjusts the hourly rates to reflect reasonable market rates, the Court should then add 10% for interest. While a defendant may be entitled to post-judgment interest at the legal rate of interest (10%), such interest does not begin accruing until the Court enters an order entitling the Defendant to recover such funds. (*Felczer v. Apple, Inc.* (2021) 63 Cal.App.5th 406, 418; Civil Code § 3287.) The Court also notes that this issue was not raised in a manner that allowed both sides to be fully heard on it.

The Court denies the request to order that interest accrue on the reduced market rates it set. The Court does not pass on the issue of interest accruing from March 18, 2022, other than to note the general rule above, as neither side raised this question for resolution.

II.    Offset of Fees and Costs

Defendant has provided evidence of the settlements reached with the subcontractors sued by Defendant as Cross-Defendants. These settlements amount to a total of $699,000. The settling Cross-Defendants are Leo's Roofing, Inc., Sweet Water Plumbing, Acacia Glass Co., JR Excavating, Inc., Northcoast Waterproofing, Panda Windows & Doors, LLC, Windows Express, Inc. Spoor Masonry, Inc., Jarak Stone & Tile, Inc., AAA Energy Systems, Inc., Coast Insulation Contractors, Inc., and Pacific Plastering, Inc. The Cross-Complaint alleged Express Indemnity, Implied Indemnity, Comparative Contribution, and Total Equitable Indemnity against all Cross-Defendants.

Though the settlement funds received by Defendant equal $699,000, Defendant argues that the offset should only be $204,709.27. Defendant argues that the offset should be reduced because Defendant incurred $127,873.50 in post-dismissal attorney fees in prosecuting its Cross-Complaint against Windows Express, Panda Windows, and Pacific Plastering. However, Defendant has not provided any explanation for how this figure was reached. There is no evidence supporting the assertion that these fees were incurred post-dismissal other than

-5-

1   Defendant's counsel's own declaration that they were, which in this case, the Court finds

2   insufficient to support Defendant's burden of proving that such funds should not offset the fees

3   award.

4       Defendant further argues that $366,417.23 (later corrected to $365,295.38) should be

5   reduced from the offset because this figure represents the costs incurred in this litigation and

6   Defendant is no longer seeking costs from Plaintiffs because such costs were satisfied through

7   the settlements. Defendant has not provided sufficient foundation for how the $366,417.23

8   figure was reached. Nor has the newly made claim been raised in a manner that fully allows

9   the parties to address it. Defendant has also not filed an amended memorandum of costs as

10   ordered by the Court, arguing that doing so is unnecessary. The operative memorandum of

11   costs filed April 13, 2022 provides foundation for $78,371.93 in costs. (Defendants requested

12   $104,936.27 and the Court taxed $26,564.34 on Plaintiffs' motion.) Accordingly, $78,371.93

13   will be reduced from the total offset. The fees award will be offset by $620,628.07.

14   III.    Final Award

15       The fees award of $1,329,810 shall be offset by $620,628.07 for a total of $709,181.93.

16   Fees for this motion are awarded in the amount of $132,165. Plaintiffs shall pay Defendant

17   $841,346.93.

18   IT IS SO ORDERED.

19   DATED: May 17, 2023

20

21                               _____

22                              JENNIFER V. DOLLARD
                                 Judge of the Superior Court

23

24

25

26

27

28

SCV-259044

PROOF OF SERVICE BY MAIL

I certify that I am an employee of the Superior Court of California, County of Sonoma, and that my business address is 600 Administration Dr., Room 107-J, Santa Rosa, California, 95403; that I am not a party to this case; that I am over the age of 18; that I am readily familiar with this office's practice for collection and processing of correspondence for mailing with the United States Postal Service; and that on the date shown below I placed a true copy of ***RULING ON LANDMARK BUILDER'S MOTION FOR ATTORNEY FEES AND COSTS*** in an envelope, sealed and addressed as shown below, for collection and mailing at Santa Rosa, California, first class, postage fully prepaid, following ordinary business practices.

Date: May 18, 2023

Robert Oliver
Clerk of the Court

By: *Luce Gonzalez*_____
Luce Gonzalez, Deputy Clerk

-ADDRESSEES-

ANN E ANNEKE SELEY
2165 TOYON DRIVE
HEALDSBURG CA  95448

JULYN M PARK
LOCKHART PARK LLP
4655 OLD IRONSIDES DRIVE SUITE 250
SANTA CLARA CA  95054

JEFFREY A LOEW
555 12TH ST SUITE 1800
OAKLAND CA 94604-2925

ROBERT A BELLAGAMBA
CASTLE DEKKER & BELLAGAMBA
30 OAK CT
DANVILLE CA  94526

CHRISTOPHER E BRUMFIEL
BURKE WILLIAMS & SORENSEN LLP
1999 HARRISON ST STE 1650
OAKLAND CA  94612-3520

BOBBY PEREZ
5076 NEW ENGLAND COURT
SAN JOSE CA  95136

ROBERT MARK MALTZ
STRATMAN SCHWARTZ & WILLIAMS-
ABREGO
PO BOX 258829
OKLAHOMA CITY OK  73125-8829

ROBERT NIELSON PAIGE
LAW OFFICE OF PATRICK J
CAMPBELL
3880 ATHERTON ROAD
ROCKLIN CA  95765

PAUL BRADLEY WALSH
MCNAMARA NEY BEATTY SLATTERY
BORGES & AMBACHER LLP
3480 BUSKIRK AVENUE SUITE 250
PLEASANT HILL CA  94523

AYHAN M MENEKSHE
MENEKSHE LAW FIRM
15940 CONCORD CIR
MORGAN HILL CA  95037

**Ex. A - 9**

PHILIP ANDREW KRAFT
SOBEL & ASSOCIATES
2100 PALOMAR AIRPORT RD STE 206
CARLSBAD CA  92011

CARLA VASQUES DOS SANTOS-
MOORE
300 FRANK H OGAWA PLAZA STE 355
OAKLAND CA  94612

JEAN ANN DALMORE
MURCHISON & CUMMING LLP
2175 N CALIFORNIA BLVD STE 900
WALNUT CREEK CA  94596

RAYMOND MEYER JR
BREMER WHYTE BROWN & OMEARA
2033 NORTH MAIN ST STE 600
WALNUT CREEK CA  94596

LINDA L LAY
HURTIK LAW & ASSOCIATES
6767 W TROPICANA AVENUE
SUITE 200
LAS VEGAS NV  89103

KASEY C TOWNSEND
MURCHISON AND CUMMING LLP
2010 CROW CANYON PL STE 380
SAN RAMON CA  94583-4634

DEBORAH A CORRELL
PO BOX 293328
SACRAMENTO CA 95829

REBECCA DRATVA MARTINO
LOCKHART PARK LLP
4655 OLD IRONSIDES DRIVE SUITE 250
SANTA CLARA CA  95054-1854

KURT D BRIDGMAN
VOGL MEREDITH & BURKE
456 MONTGOMERY ST. 20TH FLOOR
SAN FRANCISCO CA 94104

JEFFERY ALLEN CHADIC
BORBELY & ASSOCIATES
JEFFERY A CHADIC
2855 MITCHELL DR STE 245
WALNUT CREEK CA  94598

JILL J LIFTER
RYAN & LIFTER
2000 CROW CANYON PL STE 400
SAN RAMON CA 94583

BOBBY DALE SIMS JR
SIMS LAWRENCE & BROGHAMMER
2261 LAW RIDGE COURT
ROSEVILLE CA  95661

VERONIKA JACQUELINE ZAPPELLI
LAW OFFICES OF ADRIENNE D COHEN
18300 VON KARMN AVENUE SUITE 410
IRVINE CA  92612

GREGORY WILLIAM MARKS
SOBEL & ASSOCIATES
2100 PALOMAR AIRPORT RD STE 206
CARLSBAD CA  92011

SCOTT ARIEL FREEDMAN
ZACKS FREEMAN & PATTERSON PC
601 MONTGOMERY ST STE 400
SAN FRANCISCO CA  94111

JASON SCOTT DIGIOIA
BREMER WHYTE BROWN & OMEARA
JASON S DIGIOIA
2033 N MAIN ST STE 600
WALNUT CREEK CA  94596

SAMANTHA L WEINSTEIN
WOLFE & WYMAN LLP
980 9TH ST SUITE 1750
SACRAMENTO CA  95814

*Hansen Intellectual Property Trust v. The Coca Cola Co.,* San Diego County Superior Ct. No. 37-2016-0002104637-2016-CU-MC-CTL

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SAN DIEGO
CENTRAL**

**MINUTE ORDER**

DATE: 06/22/2020                    TIME: 02:25:00 PM          DEPT:  C-72

JUDICIAL OFFICER PRESIDING: Timothy Taylor
CLERK:  Bernice Orihuela
REPORTER/ERM: Not Reported
BAILIFF/COURT ATTENDANT:  O. Godoy

CASE NO: **37-2016-00021046-CU-MC-CTL** CASE INIT.DATE: 06/22/2016
CASE TITLE: **Hubert Hansen Intellectual Property Trust vs The Coca Cola Company [IMAGED]**
CASE CATEGORY: Civil - Unlimited      CASE TYPE: Misc Complaints - Other

**EVENT TYPE**: Motion Hearing (Civil)

**APPEARANCES**

The Court, having taken the above-entitled matter under submission on 06/19/2020 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

See attached Court's Rulings on Post-Trial Motions (Attorneys' Fees and Costs).

Ex. A - 12

F I L E D
Clerk of the Superior Court

JUN 2 2 2020

By: B. Orihuela, Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| Hubert Hansen Intellectual Property Trust, *etc.*, *et al.*, | ) Case No. 2016-21046 |
| | ) |
| | ) |
| Plaintiffs, | ) Department C-72 |
| | ) |
| vs. | ) **Rulings on Post-Trial Motions** |
| | ) **(Attorneys' Fees and Costs)** |
| The Coca-Cola Company, *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |

Phase 1 trial: November 18-25, 2019, Dept. 72
SOD: January 14, 2020
Phase 2 trial: January 6 – February 14, 2020, Dept. 72
Judgment: February 19, 2020
New Trial/JNOV denied: May 8, 2020
Argued and submitted: June 19, 2020, 3:00 p.m., Dept. 72 – Telephonic*

1

**Ex. A - 13**

1. **Overview and Procedural Posture.**

This is an action by the grandchildren of fresh juice entrepreneur Hubert Hansen, who died in 1951. The plaintiffs are: The Hubert Hansen Intellectual Property Trust; and Jeanne Hansen, Timothy Hansen, and Maureen Hansen Todd (all in their roles as trustees of the Trust). They seek a share of the profits from defendants' beverage sales using the "Hubert's" brand under the California Celebrities Rights Act, Civil Code section 3344.1. The central focus of the dispute is reflected in Appendix A to the Statement of Decision Following Phase One Bench Trial (SOD), filed January 14, 2020. ROA 1039. The SOD is incorporated herein fully. Counsel informed the court this was the first case under Civil Code section 3344.1 ever to go to trial. [As it turned out, it was also one of the last civil cases to go to trial in California before the COVID-19 pandemic essentially shut down the San Diego Superior Court for more than two months.*]

Following completion of phase 1 of the trial, phase 2 went forward. On December 26, 2019, plaintiffs filed two more motions *in limine*, bringing their total MIL count to 20. ROA 988-991. Defendants filed opposition. ROA 994-995. The court read the papers, and provided tentative rulings to the parties at the January 3 trial call. The court heard argument on Monday, January 6, and then decided the MIL. Due to the press of other court business, the Jury Commissioner was unable to provide a panel of prospective jurors on January 6; a panel of 56 was finally delivered to Dept. 72 in the late morning of January 7. Jury selection began, and continued that afternoon and the following morning. A jury and four alternates were selected, and on the afternoon of January 8, opening statements were given and evidence began. As of January 30, when plaintiffs rested, the jury had heard from 37 witnesses and had been exposed to dozens of exhibits including juice and lemonade bottles, emails, contracts, packaging labels, and numerous financial documents.

Defendants sought a judgment of nonsuit as to the punitive damages claims only. The court heard argument from both sides on January 30, outside the presence of the jury. Defendants filed a brief focused on the punitive damages claims (ROA 1110), which the court read. Plaintiffs referenced their earlier briefing and presented argument. The court granted the motion in a detailed ruling (ROA 1114), and the defense case in chief began.

The defense rested on February 5, 2020. There was a rebuttal case. In total, the jury heard from some 49 witnesses. The jury was instructed on February 6 (ROA 1295), and the following Monday heard arguments from counsel. ROA 1134. The jury got the case on the afternoon of February 10, deliberated at length, and returned special verdicts on the morning of February 14 in favor of the plaintiffs. ROA 1124, 1125, 1158, 1159, 1271. The jury awarded over $9 million. The parties waived CCP section 664, and the court directed plaintiffs' counsel to prepare and submit a proposed form of judgment consistent with the jury's verdict. The proposed judgment came to hand on February 19; the court examined it, found it wanting in several respects (ROA 1126), and prepared its own Judgment which was signed and filed February 19, 2020. ROA 1127. The following day, defendants filed an objection to plaintiff's version of the judgment (ROA 1128-1129), but never calendared a hearing to raise those objections with the court.

Notice of entry of the Judgment was given on February 25, 2020. ROA 1130.

Plaintiffs filed a memorandum of costs on March 2, and another (with detailed backup) on March 10, 2020. ROA 1131, 1153. Plaintiffs sought $474,325.19 in costs. It is the largest cost bill the court has been exposed to in over 15 years on the bench.

The parties submitted, and the court signed, two stipulations regarding a May 8 hearing date for post-trial motions. ROA 1157, 1258. As this was occurring, the public health emergency described in the first footnote below began to play itself out. During the ensuing court closure, counsel contacted the court as allowed by the Court's press release of 3/16/20 (available on the SDSC website), and notified the court that they felt the court would lose jurisdiction to rule on the motions for a new trial/JNOV on May 11, 2020. The court's research revealed that neither the Chief Justice's statewide orders nor the administrative orders made by the Presiding Judge of the SDSC contained an explicit exception for the jurisdictional time limits of CCP sections 629 *et seq.* or 660. *See* General Order 041720-44, filed April 17, 2020. This gave rise to a telephonic hearing with counsel on April 17, 2020, of which there is a reporter's transcript. During that hearing, the court set a briefing schedule for the new trial/JNOV motions, arranged for extraordinary receipt of briefs, and set May 8, 2020 at 1:30 p.m. for a telephonic hearing on the motions for new trial and JNOV. ROA 1183.

Following extensive briefing and a telephonic hearing, the court denied the motion for a new trial/JNOV in a detailed ruling. ROA 1201, 1202, 1208. Defendants have filed a notice of appeal. ROA 1267, 1272.

Presently, two more post-trial motions are before the court:

A. Defendants' motion to strike/tax costs. ROA 1236-1237. In the moving papers, defendants contended the cost award should not exceed $27,326.12 (a proposed haircut of $446,991.07). Plaintiffs filed opposition. ROA 1259-1266. They agreed to a reduction of $3,895.30, revising their request downward to $470,429.89. Defendants filed reply. ROA 1268-1270. Defendants now concede a cost recovery of $133,430.07 is appropriate (an increase of over $106,000.00 from their previous position).

B. Plaintiffs initially sought an award of statutory attorneys' fees in the amount of $14,271,670.35. ROA 1238-1250. This consisted of a claimed lodestar of $8,480,634.25, plus a 1.75 multiplier on most (but not all) of the lodestar. The lodestar is based on a total of almost 18,000 hours at rates ranging from $150/hr. for law clerks to $975/hr. for the senior Mr. Johnson (who was admitted to the Bar in 1975). Defendants filed opposition, suggesting no fees should be awarded, but if anything fees should not exceed $4,706,226.08. ROA 1253-1256. Plaintiffs filed reply. ROA 1273-1278. In the reply submissions, they acceded to several thousand dollars in reductions based on a few concededly erroneous time entries; the revised request is for a lodestar plus multiplier of $14,255,374.33.

These motions were initially set for hearing May 8, then for May 29, and then for 1:30 p.m. on June 9. ROA 1157, 1183, 1209-1210, 1258. They were argued at 3:00 p.m. on June 19, 2020, without a court reporter. ROA 1220-1221. The first two changes are explained by the pandemic court closure. June 9 was arrived at when defendants requested that day for the costs motion,

expressing concern regarding statutory deadlines. They then approached the court on May 29 seeking additional time, which the court allowed over plaintiffs' objection. ROA 1222-1235. The change in time (from 1:30 to 3:00) simply has to do with how the court's schedule has been set up following the resumption of court services. The court reviewed the papers, which are extensive, and published a detailed tentative ruling on the morning of June 18. ROA 1297. Counsel thoughtfully addressed the tentative ruling in their comments; neither side was wholly satisfied. The court took the motions under submission, and now decides them.

## 2. Applicable Standards.

**A.** "Technically, a motion to strike challenges the entire cost bill (*e.g.*, on the ground the claimant is not the 'prevailing party'), whereas a motion to tax challenges particular items or amounts. But the terms are often used interchangeably and there is no difference in the procedural rules." *See* Wegner, Fairbank, Epstein & Chernow, *Cal. Prac. Guide: Civil Trial & Evidence* (The Rutter Group 2018), § 17:137.

**B.** The right to recover costs is based entirely on statute. In the absence of an authorizing statute, neither party is entitled to costs. *Garcia v. Hyster Co.* (1994) 28 Cal.App.4th 724, 732. One such statute is Code of Civil Procedure section 1032(b), which provides that a *prevailing party* is entitled to recover costs as a matter of right in any action or proceeding. *See Bank of San Pedro v. Superior Court* (1992) 3 Cal.4th 797, 800. Generally speaking, under Code of Civil Procedure section 1032(a)(4), the party with the net monetary recovery is the prevailing party; absent the impact of section 998 or section 1033, the court lacks discretion to deny prevailing party status to such a litigant. *See Chinn v. KMR Prop. Mgmt.* (2008) 166 Cal.App.4th 175, 188. Plaintiffs clearly prevailed in the litigation; defendants do not suggest otherwise.

A party claiming costs must submit a verified memorandum of costs to the court. CRC Rule 3.1700(a). "There is no requirement that copies of bills, invoices, statements, or any other such documents be attached to the memorandum. Only if the costs have been put in issue via a motion to tax costs must supporting documentation be submitted." *Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1267. Merely objecting to a cost that appears proper on its face does not mean that the party claiming the cost must prove that it was reasonable and necessary.

CRC Rule 3.1700(a) provides:

A prevailing party who claims costs must serve and file a memorandum of costs within 15 days after the date of mailing of the notice of entry of judgment ... or the date of service of written notice of entry of judgment or dismissal, or within 180 days after entry of judgment, whichever is first. The memorandum of costs must be verified by a statement of the party, attorney, or agent that to the best of his or her knowledge the items of cost are correct and were necessarily incurred in the case.

**C.** California follows the "American rule," under which each party to a lawsuit ordinarily must pay his, her or its own attorney fees. *Trope v. Katz* (1995) 11 Cal.4th 274, 278; *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 504. Code of Civil Procedure section 1021 codifies the rule, providing that the measure and mode of attorney compensation is left to the agreement of the parties "[e]xcept as attorney's fees are specifically provided for by statute."

4

**Ex. A - 16**

Civil Code section 3344.1(a) is one such statute; it entitles the "prevailing party or parties to attorneys' fees and costs." The determination of "prevailing party" for an award of costs does not determine who is the "prevailing party" for purposes of a statutory award of attorneys' fees. *MacQuiddy v. Mercedes Benz USA* (2015) 233 Cal.App.4th 1036, 1047; *Salehi v. Surfside III HOA* (2011) 200 Cal.App.4th 1146, 1153. When a statute does not define "prevailing party" for the purpose of awarding attorney's fees, the determination is a practical one, focusing on a comparison between what the plaintiff sought to accomplish, and what it did accomplish. *Galan v. Wolfriver Holding Corp.* (2000) 80 Cal.App.4th 1124, 1128; *Salehi*, 200 Cal.App.4th at 1153; *Heather Farms Homeowners Assn. v. Robinson* (1994) 21 Cal. App.4th 1568, 1574 ("declin(ing) to adopt a rigid interpretation of the term 'prevailing party' and, instead, analyz(ing) which party had prevailed on a practical level'").

It is quite clear to the court that plaintiffs prevailed in the litigation, by any measure. Defendants do not contend otherwise.

**D.** A trial court has broad discretion in determining a reasonable amount of attorney fees. *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095. "[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. . . . The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided. [Citation.] Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary." *Id.*

The court must consider such factors as the nature and complexity of the case, the results obtained, the amount of work involved, the available resources, the nature of the issues and the burden of discovery, the skill required and the time consumed, the court's own knowledge and experience, the time spent, and rates charged in the community for similar work. *See Contractors Labor Pool, Inc. v. Westway Contractors* (1997) 53 Cal.App.4th 152, 168; *see also Ghirardo v. Antonioli* (1993) 14 Cal.App.4th 215, 219.

The court has also taken into account the very interesting and learned discussion of the Fourth District Court of Appeal, Div. 1, in *569 East County Boulevard LLC v. Backcountry Against the Dump* (2016) 6 Cal.App.5th 426, which discusses the factors properly considered by the courts in taking up fee applications.

The case law is clear that fees for seeking fees are properly awarded. *Graham v. Daimler Chrysler* (2004) 34 Cal.4th 553, 580; *Ketchum v. Moses* (2001) 24 Cal.4th 122, 133-34. Yet in the reply papers, plaintiffs expressly foreswear such a request. Of this more below.

Generally, a trial court is not required to provide a detailed explanation of how it arrived at a fee award. *See, e.g., Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294-95; *Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 65-67. California courts have explicitly departed from federal law requiring district courts to explain their fee awards with particularity. *See, e.g., Gorman*, 178 Cal.App.4th at 66-67; *Californians for Responsible Toxics Management v. Kizer* (1989) 211 Cal.App.3d 961, 970. However, "where the trial court decides to depart

5

**Ex. A - 17**

from the lodestar attorney fee approach to select and apply a multiplier, it must make appropriate findings on the factors recognized by case law to explain this discretionary determination in such a manner as to make meaningful appellate review possible." *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 629.

Courts of Appeal presume a trial court's attorney fee award is correct unless the appellant demonstrates the trial court abused its discretion. *Rhule v. WaveFront Technology, Inc.* (2017) 8 Cal.App.5th 1223, 1229.

The Johnson and Hamideh firms worked on a contingency basis. In *Reynolds v. Ford Motor Company* (2020) 47 Cal. App. 5th 1105, a case arising under the so-called "lemon law," the Court of Appeal held that a contingent fee agreement "had no relevance" to the proper calculation of a statutory fee award and reiterated that a trial court's duty in these circumstances is to calculate a reasonable fee based on "actual hours expended that were reasonably incurred for the particular litigation" multiplied by "reasonable hourly rates." 261 Cal. Rptr. 3d at 469. To the extent defendants suggest otherwise (oppo. 15:26-27; O'Connor Declaration at ¶ 117), the court disregards this argument in light of *Reynolds*.

### 3. Evidentiary Objections.

Defendants objected to the Pearl declaration. ROA 1257. Most of the objections are based on a purported lack of foundation. But as the jurors in this case were instructed, experts are entitled to express opinions about matters in his or her field of expertise even if he or she has not witnessed any of the events involved in the trial. CACI 219. The points raised by defendants regarding the Pearl declaration go to weight, not admissibility, and it appears to the court that Mr. Pearl has received at least as much background on the case and the trial as have the defense experts Jardini and O'Connor. The objections are overruled.

Not to be outdone, plaintiffs objected at great length to the Jardini and O'Connor fee-related declarations. ROA 1277-1278. The objections assert that the opinions of Jardini and O'Connor:

• Lack foundation. (Cal. Evid. Code § 403(a)(2) & (3).)
• Lack Personal Knowledge. (Evid. Code § 702.)
• Are Irrelevant. (Cal. Evid. Code §§ 210, 350.)
• Are Based on Hearsay (Cal. Evid. Code § 1200.)
• Are Based on Multiple hearsay. (Cal. Evid. Code § 1201.)
• Seek to recite hearsay evidence into the trial record under the guise of expert opinion. (*See People v. Coleman* (1985) 38 Cal. 3d 69, 92; *see also People v. Sanchez* (2016) 63 Cal.4th 665, 686.)
• Violate various rules and guidelines regarding professionalism.

The objections are overruled. Reciprocally, the points raised by plaintiffs go to weight, not admissibility, and it appears to the court that Jardini and O'Connor have received at least as much background on the case and the trial as Mr. Pearl.

6

**Ex. A - 18**

The court disregards the Jardini declaration regarding the costs motion, filed in connection with the reply (ROA 1270). If defendants were going to rely on Mr. Jardini's expertise regarding costs, they should have done so in their moving papers. As the court held in the summary judgment context in *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316, consideration of evidence offered for the first time in a reply violates the non-moving party's right to know "what issues it was to meet in order to oppose the motion. Where a remedy as drastic as summary judgment is involved, due process requires a party be fully advised of the issues to be addressed and be given adequate notice of what facts it must rebut in order to prevail." Similarly, here, where so many dollars are at stake, plaintiffs had the right to expect that defendants would lay all of their evidentiary cards on the table in the opening papers. It is noteworthy that the same rule applies in federal court (*see Zamani v. Carnes,* 491 F.3d 990, 997 (9th Cir.2007) ("[T]he district court need not consider arguments raised for the first time in a reply brief."), and in the courts of appeal (*see American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ["Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument."]; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335 fn. 8 ["'[T]he rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.'"]).

The alternative open to the court when confronting new arguments in the reply would be to continue this hearing and allow further briefing. The court does not find this alternative at all appetizing. This ruling is being issued four years to the day after the case was commenced. A notice of appeal has already been filed. The court exercises its discretion to allow no further delay, so that all issues may proceed immediately to the very able Fourth District Court of Appeal, Division 1. Because the trial courts are not final, it is important that they be prompt. Although it has been a struggle in this case, this court has always tried to carry out this obligation.

Defendants argued on June 19 that motions to tax costs are different, which takes them out of the rule expressed in *San Diego Watercrafts*. The court disagrees. As paragraph 4 of Ms. Thigpen's opposition declaration makes clear, the second memorandum of costs contained a detailed spreadsheet with far more information that is typically included, and despite the passage of three months, defendants "never asked for any backup or support." Simply put, it was not "impossible" for Mr. Jardini to address these issues on the front end (as defendants argued on June 19).

### 4. Discussion and Rulings.

A. The court rules as follows on the motion to tax costs:

The motion is granted in part. "In ruling upon a motion to tax costs, the trial court's first determination is whether the statute expressly allows the particular item and whether it appears proper on its face." *Foothill-De Anza Community College Dist. v. Emerich* (2007) 158 Cal.App.4th 11, 29. "If so, the burden is on the objecting party to show [the costs] to be unnecessary or unreasonable." *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 131. "[I]t is not enough for the losing party to attack submitted costs by arguing that he thinks the costs were not

necessary or reasonable." *Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550, 1557.
"Rather, the losing party has the burden to present evidence and prove that the claimed costs are
not recoverable." *Id.* However, "[w]here costs are not expressly allowed by the statute, the
burden is on the party claiming the costs to show that the charges were reasonable and
necessary." *Foothill-De Anza*, 158 Cal.App.4th at 29.

### Item 1, Filing Fees:

Motion and filing fees are recoverable in the amount of $2,709. Code Civ. Proc. § 1033.5(a)(1).
Plaintiffs have substantiated the filing fees for January 7, 2019, June 5, 2019, July 12, 2019, July
15, 2019, and August 29, 2019. (Thigpen Decl., Exs. 3, 8.) The January and July fees were
incurred in connection with discovery motions (ROA 277, 282, 643) and an *ex parte* application
(ROA 662). The August fee was incurred to obtain an out-of-state commission. ROA 744.
While it appears that the June filing was actually an opposition brief rather than moving papers
(ROA 543), plaintiffs were still charged – and paid – the $60 filing fee. (*See* Thigpen Decl., Ex.
3.) Defendants do not dispute the reasonableness of that fee or its necessity to the litigation.

The court strikes the fees for the out-of-state commissions filed on July 11, 2019 ($30), July 17,
2019 ($30), and October 3, 2019 ($60). The Register of Actions does not reflect the issuance of
any commissions on or around these dates and plaintiffs have not shown that such discovery was
reasonably necessary to the conduct of the litigation.

As noted above, the court will not consider the new argument raised for the first time in
defendants' reply brief that plaintiffs are seeking a double recovery with respect to certain
unidentified filing fees. (Reply at 10:3-9.) Plaintiffs have not had an opportunity to respond to
this argument. *See American Drug Stores*, 10 Cal.App.4th at 1453; *Neighbours*, 217 Cal.App.3d
at 335 fn. 8.

### Item 4, Deposition Costs:

Deposition costs are recoverable in the amount of $113,707.85. A prevailing party may recover
the cost of "[t]aking, video recording, and transcribing necessary depositions, including an
original and one copy of those taken by the claimant and one copy of depositions taken by the
party against whom costs are allowed." Code Civ. Proc. § 1033.5(a)(3)(A). However, the Code
does not authorize the recovery of costs for "litigation packages," realtime services, rough drafts,
or additional copies of videos and transcripts. Plaintiffs have not demonstrated that these costs
were reasonably necessary to the conduct of the litigation, except with respect to expedited
transcripts. On reflection, some of these transcript expedition costs were necessary in the
circumstances of this case, due to the time schedule of the depositions. The court awards $2,200.

In addition, the court is not awarding costs for the depositions of Thomas Hicks or David
Franklyn. Although plaintiffs submitted invoices for Hicks in the amount of $3,395.05, these
costs were not initially claimed in the memorandum of costs. *See* ROA 1153, Ex. 1 at p. 5. As
for Franklin, plaintiffs concede there is no invoice for his deposition. Nevertheless, they contend
they should still be awarded $3,735 as the cost of "ordering videos of several witnesses...for

**Ex. A - 20**

presentation at trial." (Thigpen Decl., ¶ 22.) Plaintiffs have not identified these witnesses and the court has not located an invoice in the amount of $3,735. (*See* Thigpen Decl., Ex. 4.)

**Item 4, Deposition Travel:**

Deposition travel expenses are recoverable in the amount of $25,063.63. Travel expenses to attend depositions are recoverable costs. Code Civ. Proc. § 1033.5(a)(3)(C). In addition, meal expenses may be reasonably necessary where an out-of-state attorney must travel to the deposition. *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 468, 541. Plaintiffs adequately support the claimed costs and have shown that the costs were reasonable in amount given the scope of discovery and the logistical hurdles of deposing 66 witnesses in ten states over the course of ten months. (*See* Thigpen Decl., ¶¶ 16-17.) As for the remaining challenged deposition travel charges, the court is not persuaded that travel insurance, baggage fees, airplane wifi, and additional costs incurred for cancelled/rescheduled flights were reasonably necessary to the conduct of the litigation.

As already discussed, the court will ordinarily not consider the new argument raised for the first time in defendants' reply brief that plaintiffs are seeking a "double recovery" with respect to the deposition costs and travel expenses for three third-party printers. (Reply at 10:10-18.) Plaintiffs have not had an opportunity to respond to this argument. *See American Drug Stores*, 10 Cal.App.4th at 1453; *Neighbours*, 217 Cal.App.3d at 335 fn. 8. Here, however, Ms. Thigpen generously conceded on June 19 that $2,200 of costs in this category were already awarded by the discovery referee.

**Item 11, Court Reporter Fees:**

Plaintiffs seek court reporter fees in the amount of $27,577.65. Court reporter fees as established by statute are allowable as costs. Code Civ. Proc. §1033.5(a)(11). Defendants move to tax this item in its entirety, arguing that Code of Civil Procedure § 1033.5(b)(5) does not permit charges for "transcripts of court proceedings not ordered by the court."

The evidence before the court shows that the court reporter charged each side a flat daily fee between $695 and $745. (*See* Thigpen Decl., Ex. 6.) These were not charges for transcripts; they were the court reporter's daily fees. *See Chaaban v. Wet Seal, Inc.* (2012) 203 Cal.App.4th 49, 58 ("The parties have to pay the court reporter regardless of whether anyone orders transcripts."). Plaintiffs adequately support the court reporter fees with the exception of the fee from the 402 evidentiary hearing on December 30, 2019. (Thigpen Decl., Ex. 6.) As such, court reporter fees are recoverable in the amount of $12,404.00.

The evidence before the court also shows that plaintiffs are attempting to recover "transcript costs" in the amount of $14,730.65. (*See* ROA 1153, Ex. 1 at p. 15; *see also* Thigpen Decl., Ex. 6.) As noted above, transcripts of court proceedings are only recoverable when "ordered by the court." Code Civ. Proc. § 1033.5(b)(5). No such order was made in this case. Thus, the "transcript costs" are not allowable.

**Item 12, Copies of Exhibits:**

**Ex. A - 21**

Plaintiffs seek $30,754.74 for photocopies of exhibits. Defendants move to tax $24,345.12 from this category. Expenses for photocopies of exhibits are recoverable if they "were reasonably helpful to aid the trier of fact." Code Civ. Proc. § 1033.5(a)(13). Other "photocopying charges" are not allowable as costs. Code Civ. Proc. § 1033.5(b)(3).

The court awards costs for trial exhibits, binders, and tabs in the amount of $15,004.58. Costs incurred in preparing photocopies of exhibits may be awarded under section 1033.5(a)(13) or section 1033.5(c)(4) even if the exhibits are not used at trial. *See Segal v. Asics America Corporation* (June 15, 2020) __ Cal.App.5th __, 2020 WL 3169376, at *3; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 856-57; *Applegate v. St. Francis Lutheran Church* (1994) 23 Cal.App.4th 361, 364. This was a document intensive case. Nearly 50 witnesses testified. Although only 554 of the 1,248 possible exhibits were admitted at trial, nothing indicates plaintiffs or their counsel could have anticipated that the remaining exhibits would not be used. *See Benach,* 149 Cal.App.4th at 856 ("An experienced trial judge would recognize that it would be inequitable to deny as allowable costs exhibits any prudent counsel would prepare in advance of trial."); *see also Segal,* 2020 WL 3169376, at *3 ("Given that trials are unpredictable...it is difficult for even the most experienced trial lawyers to divine which exhibits...will in fact be used."). Moreover, the court's own policies and procedures required the parties to submit "[t]wo exhibit binders (original for the witness, premarked with Court Exhibit tags, and one copy for the Court)" on the day trial commenced.

The court recognizes that other appellate courts have disallowed costs for exhibits not used at trial. *See, e.g., Seever,* 141 Cal.App.4th at 1557-58; *Ladas v. California State Automobile Assn.* (1993) 19 Cal.App.4th 761, 775. However, the court agrees with reasoning in *Segal, Benach,* and *Applegate* that counsel's pretrial preparation of exhibit binders allows trials to proceed more quickly by allowing for efficient examination of witnesses and prompt resolution of evidentiary issues. *See Segal,* 2020 WL 3169376, at *3 ("The meaning of the phrase 'reasonably helpful to the trier of fact' is broader than the limited notion of helpfulness in the specific task of finding facts, and encompasses as well the more general concept of helpfulness in the form of efficiency in the trial in which the trier of fact is asked to perform that task."). Thus, the court finds that the binders, tabs, and unused trial exhibits were reasonably necessary to the conduct of the litigation.

The court, however, declines to award costs for the delivery of exhibits and binders to the courthouse ($50) or the 7.75% tax charged by Litivate Reporting & Trial Services for preparing the exhibits and binders. (Thigpen Decl., Ex. 7.) Such costs are not authorized by section 1033.5(a) and plaintiffs have not shown that they were reasonably necessary to the conduct of the litigation.

In addition, the court is not persuaded that photocopies of deposition exhibits constitute recoverable costs. Section 1033.5(a)(13) explicitly references the "trier of fact." The trier of fact is not present at depositions. Plaintiffs have not cited any authoring holding that section 1033.5(a)(13) applies to deposition exhibits. As such, they are non-recoverable "photocopying charges" under section 1033.5(b)(3). To the extent that photocopies of deposition exhibits may be awarded in the court's discretion, the court declines to do so here.

**Item 14, Electronic Filing Fees:**

The motion is granted as to electronic filing fees. A party may recover fees for the electronic filing or service of documents through an electronic service provider if a court requires or orders electronic filing or service of documents. Code Civ. Proc. § 1033.5(a)(14). Although in retrospect it perhaps should have been, this case was not subject to mandatory eFiling. *See* Electronic Filing Requirements of the San Diego Superior Court – Civil Division at p. 2 ("The case types that shall be subject to mandatory eFiling are: civil class actions, consolidated and coordinated actions where all cases involved are imaged cases, and actions that are provisionally complex under CRC 3.40 – 3.403[.]"). Nor did the court issue an order directing the parties to use electronic filing. Instead, as plaintiffs concede, "e-filing was voluntary...for the majority of this litigation." (Oppo. at 15:12.)

Plaintiffs argue that even though the costs may not be recoverable under section 1033.5(a)(14), the court should nevertheless exercise its discretion to award costs under the "catch-all" provision of section 1033.5(c)(4). The court disagrees. "An item not specifically allowable under subdivision (a) nor prohibited under subdivision (b) may nevertheless be recoverable in the discretion of the court[.]" *Ladas*, 19 Cal.App.4th at 774. Electronic filing fees are expressly allowable if the court requires or orders electronic filing. Thus, the court has no discretion to award voluntary electronic filing fees pursuant to section 1033.5(c)(4). *See Seever*, 141 Cal.App.4th at 1559-60 ("Because the Legislature has expressly stated...what is allowable...and implicitly what is not, the discretion granted in section 1033.5, subdivision (c)(4), to award costs for items not mentioned in section 1033.5 is simply inapplicable."). This is an application of two time-honored canons of statutory interpretation: *ejusdem generis* and *expressio unius est exclusio alterius*. *See* Scalia and Garner, *Reading Law* at 107 and 199.

**Item 16, Other Costs -- Web Hosting/Database:**

Plaintiffs seek $17,909.70 in costs associated with "processing, storing, preparing, and hosting electronic documents for use as exhibits" and $1,950 for utilizing a website preservation service. (Thigpen Decl., ¶ 48.) Defendants contend these costs should be taxed in their entirety.

Fees for the hosting of electronic documents are allowable if "a court order requires or orders a party to have documents hosted by an electronic filing service provider." Code Civ. Proc. § 1033.5(a)(15). The court did not order the use of a host for electronic documents. Thus, the claimed costs are not recoverable under section 1033.5(a)(15). Plaintiffs argue that the court can award such costs in its discretion pursuant to *El Dorado Meat Co. v. Yosemite Meat and Locker Service, Inc.* (2007) 150 Cal.App.4th 612. However, *El Dorado* is distinguishable because it predates the amendment to section 1033.5 authorizing the recovery of fees for the hosting of electronic documents. See Stats. 2016, ch. 461, § 2. Moreover *El Dorado* involved costs for "equipment to project documents on a screen" at trial pursuant to section 1033.5(a)(13) (formerly section 1033.5(a)(12)). *See El Dorado*, 150 Cal.App.4th at 619. Plaintiffs do not suggest that the electronic hosting services were utilized at trial.

Turning to the website preservation service, the court declines to exercise its discretion to award such costs. Plaintiffs have not met their burden of showing that it was reasonably necessary to "preserve copies of Defendants' own website and that of their witnesses." (Thigpen Decl., ¶ 84.)

Accordingly, the motion to tax costs for hosting electronic documents and utilizing a website preservation service is granted.

### Item 16, Other Costs – Messenger Services:

Plaintiffs seek $4,346.23 in delivery and messenger charges. The costs statute expressly prohibits a party from recovering postage charges. Code Civ. Proc. § 1033.5(b)(3). This includes amounts paid to mailing services such as Federal Express. *Ripley v. Pappadopoulos* (1994) 23 Cal.App.4th 1616, 1627. Thus, the FedEx, UPS, and Golden State Overnight charges are not allowed.

Turning to courier or messenger fees, such costs may be allowed in the discretion of the court. *Benach*, 149 Cal.App.4th at 858. Plaintiffs have established that messenger services were necessary with respect to motions and other documents submitted to the discovery referee. (*See* Thigpen Decl., ¶ 54.) However, plaintiffs have only substantiated such costs in the amount of $1,363.95. (*See* Thigpen Decl., Ex. 10.) This is the amount that is allowed.

### Item 16, Other Costs – Courtroom Presentation Services:

Plaintiffs seek $91,839.55 for trial and courtroom presentation costs. Defendants initially moved to tax this entire amount on grounds that no supporting documentation had been provided. Plaintiffs submitted invoices from vendors substantiating the amount claimed. (Thigpen Decl., Ex. 11.) Defendants do not challenge this evidence on reply. Thus, the court awards costs for courtroom presentation services in the requested amount.

### Item 16, Other Costs – Mediation:

Plaintiffs seek to recover $4,088.20 in costs for voluntary mediation. Mediation costs are not listed among the costs that are expressly allowable or expressly not allowable. *Berkeley Cement, Inc. v. Regents of University of California* (2019) 30 Cal.App.5th 1133, 1140. As such, mediation costs fall within the category of costs that may be awarded in the trial court's discretion. *See* Code Civ. Proc. § 1033.5(c)(4). The question whether mediation fees should be awarded as costs in a particular matter must be determined based on the facts and circumstances of the particular action. *Berkeley Cement*, 30 Cal.App.5th at 1143.

In this case, there is no dispute that the parties participated in voluntary mediation several months before trial. Moreover, there is evidence that the mediation fee was paid. (*See* Thigpen Decl., Ex. 15.) Plaintiffs contend that the mediation was "for nothing" because defendants "did not attempt to mediate in good faith." There is circumstantial evidence to support this conclusion. As such, the court, in the exercise of its discretion, awards mediation fees as costs in the amount of $4,055. (There is no evidence to substantiate the parking and mileage expenses allegedly incurred by Douglas Johnson to attend mediation.)

**Item 16, Other Costs – Fees for Court Appearances and Trial:**

Plaintiffs seek to recover $4,953.38 for "court/motion appearances," $608 for CourtCall, and $45,298.47 for trial travel expenses. "The only travel expenses authorized by section 1033.5 are those to attend depositions." *Ladas*, 19 Cal.App.4th at 775. As such, whether to award expenses for non-deposition travel is a matter of court discretion. *See* Code Civ. Proc. § 1033.5(c)(4).

The court finds that CourtCall fees were reasonably necessary for plaintiffs' attorneys, based out of Los Angeles, to appear at motion hearings in San Diego. However, in light of the availability of services such as CourtCall, the court declines to award costs for in-person court appearances as they were not reasonably necessary to the conduct of the litigation.

Turning to counsel's travel expenses to attend trial, the court, in the exercise of its discretion, awards $23,608.65. As noted above, trial took place in two phases. Phase one lasted two weeks; phase two was upwards of six weeks. Given the time demands of trial and the realities of Southern California traffic, the court is persuaded that it was reasonably necessary for plaintiffs' Los Angeles-based counsel to obtain lodging in San Diego during both phases of trial.

The court disallows the lodging charges from January 23, 2020 ($2,790), February 10, 2020 ($855), and February 14, 2020 ($418.02) as they have not been substantiated. In addition, no documentation was provided to support counsel's claimed mileage and parking costs. Finally, attorney meals, travel insurance, Airbnb service fees, and the services of a law clerk appear to be matters of convenience. *See, e.g.*, *Ladas*, 19 Cal.App.4th at 774 ("[A]ttorneys have to eat, whether they are conducting litigation or not.").

Accordingly, plaintiffs may recover $24,216.65 from this category.

**Item 16, Other Costs – RealTime Costs:**

Plaintiffs seek $4,125 for Realtime reporting services during trial. Defendants argue that such costs are not allowable pursuant to Code of Civil Procedure § 1033.5(b)(5). The court disagrees. Realtime is a service that does not produce a transcript. Rather, it is among the technological services for which a court reporter may charge a separate fee, in addition to transcript charges. *See* Gov. Code § 69952(b) ("When the daily transcript is prepared by a single reporter, an additional fee for technological services, as set by the court with the agreement of the reporter, may be imposed."). The court finds that the Realtime service was helpful to the court's evidentiary rulings. Moreover, plaintiffs adequately support the charges with the exception of the fee from the 402 evidentiary hearing on December 30, 2019. As such, the court, in its discretion, awards Realtime costs in the amount of $4,000. Code Civ. Proc. § 1033.5(c)(4).

**Item 16, Other Costs – Photocopying Court Records:**

The motion is granted as to photocopying court records. These costs are not expressly allowable under Code of Civil Procedure § 1033.5(a). Moreover, the court declines to exercise its discretion to award such costs. Plaintiffs have not shown that it reasonably necessary to the

conduct of the litigation to purchase the documents from the Register of Actions. Instead, it appears that such expenses were "merely convenient or beneficial" to counsel.

**Item 16, Other Costs – Faber 402 Hearing:**

Plaintiffs seek $24,078.14 in costs for the appearance and travel fees of Jonathan Faber, who appeared at the 402 evidentiary hearing on December 30, 2019. Plaintiffs contend that Faber was ordered to appear at the hearing by the court. Defendants move to tax this cost in its entirety.

Code of Civil Procedure § 1033.5(a)(8) allows a prevailing party to recover the "[f]ees of expert witnesses ordered by the court." However, Code of Civil Procedure § 1033.5(b)(1) prohibits the recovery of "fees of experts not ordered by the court." The California Supreme Court has interpreted these provisions to mean that experts must be "appointed" by the court. *See Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1149 ("Section 1033.5, subdivision (b)(1) provides that, unless expressly authorized by law, the fees of experts not appointed by the court are not allowable as costs."). In this case, Faber was merely ordered to appear at a hearing to determine whether he could testify at trial about license fees for the use of Hubert Hanson's name. He was not "appointed" by the court.

Plaintiffs argue that the court should ignore the "stray reference" to the word "appointed" in the high court's opinion because it is not in the language of the statute. Plaintiffs do not cite any authority supporting their position. Moreover, "[e]ven if properly characterized as dictum, statements of the Supreme Court should be considered persuasive." *United Steelworkers of America v. Board of Education* (1984) 162 Cal.App.3d 823, 835. Thus, Faber's expert fees are not allowable.

In summary, plaintiffs are entitled to recover a total of $307,224.11 in costs as follows:

| Item 1: | $2,709.00 |
|---|---|
| Item 2: | $2,980.37 |
| Item 3: | $0 |
| Item 4: | $138,771.48, less $2,200 conceded at oral argument, plus $2,200 awarded for expedited transcripts; thus, these adjustments from the tentative ruling cancel each other out |
| Item 5: | $9,412.17 |
| Item 6: | $0 |
| Item 7: | $0 |
| Item 8: | $467.36 |
| Item 9: | $0 |
| Item 10: | $0 |
| Item 11: | $12,404.00 |
| Item 12: | $15,004.58 |
| Item 13: | $0 |
| Item 14: | $0 |
| Item 15: | $0 |
| Item 16: | $125,475.15 |

14

The clerk is directed to interlineate a cost award of $307,224.11 on page 6, line 6 of the Judgment filed February 19, 2020 (ROA 1127).

**B.** Turning to the fee motion: the shoe was on the other foot in the sole reported decision under Civil Code section 3344.1 to consider an award of attorneys' fees. *Cairns v. Franklin Mint Co.* (9th Cir. 2002) 292 F.3d 1139, was the action brought by the successors of Princess Diana of Wales over the unauthorized of Diana's name and likeness on jewelry, plates and dolls. The District Court granted summary judgment in favor of the defendant, and awarded Franklin Mint $2,308,000 in attorneys' fees (115 F. Supp. 2d 1185). On appeal, the Ninth Circuit noted "California's post-mortem right of publicity statute provides that '[t]he prevailing party or parties in any action under this section *shall* also *be entitled* to attorneys' fees and costs.'" Reviewing the award for an abuse of discretion, the Court affirmed. The Court's discussion of the award begins at part IV of the opinion of Circuit Judge Pregerson, 292 F.3d at 1156. The court noted that the prevailing defendant had "requested $3,124,121.85 in attorneys' fees for over 10,900 hours of work by forty-five timekeepers," and had "allocated some hours exclusively to the right of publicity claim." The District Court "reduced the fee request by approximately twenty-six percent from $3,124,121.85 to $2,308,000 based on ... four findings." 292 F.3d at 1157. The losing plaintiffs complained that the trial court had failed, among other things, to consider awards in similar cases. *Id.* at 1158. Surprisingly, neither the moving papers nor the opposition briefing discuss *Cairns v. Franklin Mint.*

The fees initially requested in this case can be summarized (based on the court's own analysis) as follows:

| Firm | Source | Hours | Lodestar Fees Req. | Firm Blended Rate |
|------|--------|-------|--------------------|--------------------|
| Johnson | N. Johnson Decl. p. 11 | 14,262.3 | $6,663,919.50 | $467.24/hr. |
| Hamideh | Hamideh Decl. ¶ 36-38 | 2,744.3 | $1,451,068.00 | $528.75/hr. |
| Harder | Frackman Decl. ¶ 8 | 862.5 | $339,813.75 | $393.98/hr. |
| Higgs | Hoisington Decl. ¶ 6 | 61.7 | $25,833.00 | $419.49/hr. |

The total hours expended are thus 17,930.8. The total lodestar fees sought are $8,480,634.00. This yields a blended rate, for all timekeepers, of $473/hr. The Harder and Higgs firms (which worked on the case in its earliest stages) do not seek a lodestar enhancement, so backing out their fees (and some other post trial fees) yields an adjusted requested lodestar of $8,114,987.00. As already noted, the Johnson and Hamideh firms seek a lodestar enhancement of at least 1.75, using this $8,114,987.00 as the point of departure.

1. Rates.

The court finds (with one exception discussed below) that the hourly rates sought by plaintiffs' attorneys are in the ballpark of reasonableness. *Children's Hosp. & Med. Ctr. v. Bonita* (2002) 97 Cal.App.4th 740, 783. The court makes these observations having supervised this case from its inception and having practiced law in San Diego County, Orange County, Los Angeles County (and elsewhere) for 20+ years prior to 2005. In those days, the court ran cases on both the plaintiff and defense side; handled appellate work in the state courts of appeal and the Ninth

15

Circuit; supervised other attorneys and legal assistants; reviewed, sent out and collected bills; made fee applications; and (in the later years) helped run a law firm. In the 15+ years since leaving the practice of law, the court has ruled on hundreds of fee applications in a variety of settings. This experience has allowed the court to keep current on prevailing rates charged by attorneys in San Diego and Southern California for similar work during the relevant timeframe. *See 569 East County Boulevard, LLC, supra*, 6 Cal.App.5th at 436-37 ("the trial court is in the best position to value the services rendered by the attorneys in his or her courtroom … the court may rely on its own knowledge and familiarity with the legal market, as well as the experience, skill, and reputation of the attorney requesting fees").

The court's conclusions in this regard are cemented by the very thorough and persuasive discussion contained in paragraphs 21-28 of the first declaration of Richard Pearl, and in paragraphs 2-12 of his reply declaration. He is probably the leading authority in California on the subject of court-awarded attorneys' fees. The court believes it likely that Messrs. Jardini and O'Connor have his treatise. He has conducted a careful survey of awards in other cases, and the hourly rates approved by other courts in California in recent years. The unadjusted all-biller blended rate sought here ($473) is well within the range of what this and other courts have found reasonable, and indeed is close to the $450/hr. rate defendants claim is the norm in San Diego (Oppo. at 7:3, citing Jardini Decl. at ¶ 88).

The exception referred to above is with regard to the hourly rate of Mr. Hamideh. Without denigrating in any way his "behind the scenes" contribution to the success enjoyed by plaintiffs here, Mr. Hamideh's years in practice, when compared to those of Ms. Thigpen and Ms. Gonzales, make it hard to justify an hourly rate of $528.75 (when the other blended rates are well below $500 as shown in the court's table above). Other factors, including his relative silence during depositions and trial, confirm this impression. The court elects to address this by reducing his hourly rate to $467/hr., which places him on an even footing with the Johnson lawyers. For all intents and purposes, he became a *de facto* member of that firm during the litigation of this case. Mr. Jardini agrees with the court's conclusion in this regard at paragraph 43 of his declaration, and paragraph 5 of the Hamideh reply declaration also suggests the correctness of this view. It strikes the court as appropriate to treat him in this fashion for purposes of analyzing a reasonable fee award.

2. Hours.

In *Cairns, supra*, the Ninth Circuit affirmed the District Court's decision to reduce the fees requested by 26% based on four findings. 292 F.3d at 1157. The court elects, in this case, to reduce the compensable hours of the Johnson firm by 15%, and the Hamideh hours by 20%. While this does not achieve the mathematical precision proffered by defendants, the court believes these are fair estimations of the duplicative and over-recorded hours. Moreover, as the discussion below makes clear, the court agrees with some, but not all, of the reduction rationales suggested by the defense experts.

The court has commented already, in the Phase 1 SOD and again in the order denying the new trial/JNOV motions, regarding the no-holds barred, take no prisoners, leave no stone unturned nature of this case. The moving papers also stress the contentious nature of the litigation. The

16

**Ex. A - 28**

discovery referee held forth on this subject several times; putting it mildly, his conclusions were not favorable to the defense side. Having approached the dispute in this way, defendants cannot now be heard to complain that plaintiffs' counsel expended many hours prosecuting this case. The court need not dwell much further on which side is more blameworthy for the failure to reach stipulations which might have resulted in less bloodshed in discovery, given rise to economies for all concerned,** expedited the order of proof, and shortened the trial. The fact is these stipulations were not reached. This was an expensive case to prepare and try, and it cannot be gainsaid that defendants' strategic and tactical decisions were a substantial factor in this.

The defense experts criticize plaintiffs' approach to discovery, noting by way of example that motions to compel were scheduled before responses were even due. (O'Connor Decl. at ¶ 78.) This is not a valid criticism in this case, because defense counsel behaved, with regard to discovery, in a fashion in which any careful opposing lawyer would doubt their forthcomingness and have the suspicion that a game of "hide-the-ball" was under way. This is not, as Mr. O'Connor would have it at paragraph 86 of his declaration, "litigious paranoia." It is a foreseeable and wholly preventable reaction to a decision by defendants to refuse even minimal cooperation in discovery. In other words, defense counsel's actions very understandably obscured what Mr. O'Connor refers to in paragraph 74 of his declaration as a "sensible stopping point."

Beyond the well documented difficulties encountered in the discovery phase, the court must observe the challenges associated with trying the case. Both sides were in trial or gearing up for trial in a city not their own more or less constantly from mid-November to mid-February. This was a significant undertaking. Plaintiffs' counsel states this effort came at no small personal cost, and the court does not doubt this is true. It is a little surprising that Mr. Jardini and Mr. O'Connor, both experienced trial lawyers, would seek to minimize these factors. Perhaps their seniority and the transition of their practices from the courtroom to the office has caused their memories to fade regarding what it is like to be in deposition and trial away from one's family for weeks and months at a time.

One defense expert suggests the court cut the time spent opposing the defense MSJ. (Jardini Decl. at ¶ 61.) Yet Mr. O'Connor incongruously opines (¶ 120) the plaintiffs "had a very good chance of getting to the jury." This is Monday morning quarterbacking at its worst. The motion for summary judgment either should never have been brought, or plaintiffs' counsel should be fully reimbursed for defeating this existential challenge to the case.

Defendants claim no more than 12,093 hours should be reimbursed (of the nearly 18,000 claimed). The court concludes that some of the hours spent were not appropriate. The principal basis for this determination is the court's impression that there was some duplication and wheel-spinning. The plaintiffs had a practice of sending two or three lawyers to hearings when only one attorney addressed the court in any meaningful way. (*See* Ex. C to Miles Decl. and ¶ 4 thereof.) The same pattern was followed at numerous depositions; avoidance of this is one of the reasons we have transcripts and video. There is evidence of excessive inter-lawyer conferencing. There is also some evidence that clerical and administrative tasks were undertaken at attorney rates (indicative of suboptimal leverage). An hours reduction is called for in light of some of the

17

points raised in paragraphs 32-48 and 57-89 of the O'Connor Declaration and paragraphs 47-50, 55-60, 63-70, 77, and 102-105 of the Jardini Declaration.

Mr. Pearl finds it ironic that O'Connor complains about lack of senior partner involvement "when fee auditors usually complaint that cases are 'top-heavy.'" (Pearl Reply Decl. at 10:9-10.) The problem here is a little more nuanced.

Although it is an oversimplification, there is a saying in law firm management that there are three kinds of lawyers: finders, minders, and grinders. "Finders" bring in the clients, often because their long experience gives rise to a reputation as someone who is able to see the "big picture" of how a case will play with a jury, and is able to make important strategic decisions accordingly. Some finders are not good with the details, or client hand-holding. That is where the minders come in. Minders take care of the client and the case, and carry out the strategic vision of the finders. Minders also exercise their judgment in delegating tasks to the grinders (typically junior lawyers learning to become either finders or minders). Some lawyers have *some* skills in two or maybe even three of these areas; very few excel in all three. That's one of the reasons we have law firms: lawyers with complementary skills can do more in this regard than just a sole practitioner.

In this case, the mid-case stepping away of the senior members of the prosecution team left some instances in which lawyers in mid-career (Hamideh and Thigpen) had to make strategic and important tactical decisions without the input of lawyers with more years dragging the plow. This caused some furrows to be dug that need not have been, because the crop yield in those areas was likely to be poor. The challenge in this area is to staff a case with the right mix of senior lawyers, "up and comers" like Ms. Thigpen, and junior billing units. What goes missing when senior lawyers are not present is the judgment and discernment that can only come with time-in-grade.

There is some initial appeal to defendants' position (Jardini at ¶ 73 *ff.*) that the bifurcation request led to duplication, not the promised time savings. The court previously expressed regret at the bifurcation decision. What the experts do not clarify, however, is to what extent Ms. Thigpen's bifurcation motion was based on her failure to apprehend the likelihood of what turned out to be duplicative proof, or instead was the result of defendants' failure to lay their cards on the table as to their intentions in this regard. The court went back to the papers filed last November. The moving papers were ROA 865. They argued bifurcation would be "conducive to judicial economy and efficiency," because the issue of ownership of Hubert Hansen's right of publicity could be expeditiously decided. The opposition was ROA 904. It focused entirely on the right to a jury trial. Nowhere did defendants argue the court should deny bifurcation because the economies claimed by plaintiffs were ephemeral. Nowhere did defendants argue that the court should deny bifurcation because the "ownership" evidence would have to be gone back over under the "permission/consent" heading in a phase 2. The court's decision is ROA 950. The court noted then that "neither side's briefing was particularly helpful to the court in analyzing the legal issues presented by this motion." The court also observed "defendants do not argue that the trial time savings suggested in the moving papers are unrealistic."

18

Defendants argued on June 19 that they did make the omitted arguments in connection with another motion *in limine*. But even the passages recited to the court on June 19 focused on the Secretary of State Registration, not the ownership/permission issue.

In all events, the fact that defendants got two bites at the ownership/consent apple (once with the court, once with a jury, with the same result) likely removes some issues for appeal. So the time was not all wasted. The court concludes that this tactical decision by plaintiffs does not warrant the $225,000.00 reduction advocated by Jardini. The court properly exercised its discretion in granting the bifurcation request, based on what we now know was imperfect information. The fact that bifurcation did not end up saving time is not a valid reason to deny fees for phase 1.

Attorneys may offer declarations regarding the time they spent, but contemporaneous time records such as those submitted here "eclipse other proofs" of lawyers' labors. *Taylor v. Traylor* (June 10, 2020) ___ Cal.App.5th ___, 2020 WL 3071543. Defendants take the moving declarants to task for redacting their time records. (*See, e.g.*, Jardini Decl. at ¶¶ 34, 45, 49, 90; O'Connor Declaration at ¶ 61, line 11.) The court does not share this view. Plaintiffs' counsel are entitled to protect privileged and work product information from defendants' eyes, as defendants will no doubt be asking the Court of Appeal to send the case back for another trial. Defendants are not entitled to know plaintiffs' counsels' advice to their clients or peek inside their mental processes in the guise of calling the redacted supporting bills vague or unintelligible.

Equally unpersuasive are defendants' contentions regarding so-called "block billing" (more accurately "block time recordation"). The chief shortcoming of this practice in this setting is that is does not allow a court to differentiate between tasks that are properly the subject of statutory attorneys' fees and those which are not. This problem arises in cases in which there are some claims subject to a fee award and some claims which are not, and the court is called upon to make an allocation. We do not have that situation here. The entire case is one brought under Civil Code section 3344.1, which contains a fee award provision.

3. Enhancement.

The request for a multiplier -- even the fallback .25 multiplier suggested at the June 19 argument -- is denied. Fee enhancements by means of multipliers or otherwise are well recognized in California. *See, e.g., Serrano v. Priest* (1977) 20 Cal.3d 25 (*Serrano III*); *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1407; *City of Oakland v. Oakland Raiders* (1988) 203 Cal.App.3d 78; *Kern River Public Access Com. v. City of Bakersfield* (1985) 170 Cal.App.3d 1205. Under California law, the trial court begins by fixing the "lodestar" or "touchstone" reflecting a compilation of the time spent and reasonable hourly compensation of each attorney or legal professional involved in the presentation of the case. The court then adjusts this figure in light of a number of factors that militate in favor of *augmentation or diminution. Serrano III*, 20 Cal.3d at 48-49 (emphasis by this court).

The purpose of a fee enhancement is not to reward attorneys for litigating certain kinds of cases, but to fix a reasonable fee in a particular action. Section 3344.1 of the Civil Code, like every other statutory fee-shifting provision, authorizes an award of *reasonable* attorney fees, not an award of reasonable fees plus an enhancement. (Plaintiffs acknowledge this at 9:21 of the

19

moving brief.) Nonetheless, the courts recognize that some form of fee enhancement may be appropriate and necessary to attract competent representation in cases meriting legal assistance. In *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322, our Supreme Court implicitly found that it would be appropriate to enhance an award by means of a multiplier " 'to reflect the broad public impact of the results obtained and to compensate for the high quality of work performed and the contingencies involved in undertaking this litigation.'" This does not mean, however, that the trial courts should enhance the lodestar figure in every case of uncertain outcome or where the work performed was of high quality. The challenge for the trial courts is to make an award that provides fair compensation to the attorneys involved in the litigation at hand and encourages litigation of claims that in the public interest and merit litigation, without encouraging the unnecessary litigation of claims of little public value.

The classic situation justifying an upward adjustment of the lodestar figure was seen in the *Serrano* cases [*Serrano v. Priest* (1971) 5 Cal.3d 584 (*Serrano I*), *Serrano* v. *Priest* (1976) 18 Cal.3d 728 (*Serrano II*), and *Serrano III, supra,* 20 Cal.3d 25]. The litigation there revolved around California's system for financing public schools. The plaintiffs succeeded in overturning the existing system, obtaining an order that it be replaced by a system designed to provide an equitable distribution of state funds between all public schools. The litigation resulted in no fund of money from which attorney fees might be paid, nor did it result in any monetary recovery by the plaintiffs. The plaintiffs were under no obligation to pay their attorneys for their efforts. It appears that the attorneys did, however, receive some funding from charities or public sources for the purposes of prosecuting cases of the character involved in that action--a factor the court found to be relevant in determining the size of an award of fees. *Serrano III, supra,* 20 Cal.3d at 49 fn. 24. Finally, an award of fees was uncertain not only because of the complexity and difficulty of the legal issues involved, but because there was no clear statutory authority for shifting attorney fees to the defendant.

The court in *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, contrasted that case with the situation in *Serrano III*: "[T]he present case is in essence a personal injury action, brought by a single plaintiff to recover her own economic damages. Weeks and her attorneys had a fee agreement by which her attorneys were assured of a portion of any recovery. In addition, because of the availability of attorney fees under the FEHA, the attorneys had reason to assume that the amount of Weeks's recovery would not limit the amount of fees they ultimately received. Thus, the risk that Weeks's attorneys would not be compensated for their work was no greater than the risk of loss inherent in any contingency fee case; however, because of the availability of statutory fees the possibility of receiving full compensation for litigating the case was greater than that inherent in most contingency fee actions." 63 Cal.App.4th at 1174.

This case is a lot more like *Weeks* than *Serrano*. The jury's verdict benefitted the plaintiff Trust and the extended Hansen family only; it conferred no benefit on the public generally.*** The litigation resulted (at least at the trial court level) in a sizeable monetary recovery by the plaintiffs, from which attorney fees might be paid. Moreover, there was always clear statutory authority for an award of fees if plaintiffs prevailed. The Johnson and Hamideh firms knew this from the outset; they knew that if they prevailed, there would be a reasonable fee award. The plaintiff's lawyers in *Serrano* had no such assurance.

The court recognizes that *Ketchum, supra,* and *Graham, supra,* were decided after *Weeks,* and give more weight to contingent risk than perhaps the *Weeks* court did. But no case holds that a lodestar multiplier is appropriate just because the fee agreement was contingency-based. Plaintiffs conceded this at the June 19 argument. And the court is not holding today that an enhancement should be denied simply because it conferred no public benefit. *Press* makes clear that contingent risk, public benefit and work quality are all part of the mix, and the court has considered all three.

The court has already found, based on its own experience and the Pearl declaration, that the hourly rates are within the appropriate range. But contrary to the short argument near the bottom of page 20 of the moving brief, an important part of rate design is the risk of non-payment or delayed payment. In other words, in setting their rates where they did, the lawyers built in not only their expertise, their years in practice, their judgment, their occupancy costs, Westlaw fees, their employment expenses, and all the other things that go with keeping a law firm in business, but also the fact that in this case, they were going to wait awhile to get paid. Paragraph 17 of the N. Johnson Declaration suggests this conclusion is accurate. As the *Weeks* court noted, the risk that Johnson and Hamideh would not be compensated for their work was no greater than the risk of loss inherent in any contingency fee case. And the case law is clear that a multiplier is not warranted in every contingent fee case.

Nor is the court convinced that the vigorous "Goliath" defense to the "David" presented by plaintiffs rendered the case so risky that a multiplier is warranted. (Pearl Reply Decl. at ¶ 27.) Defendants were entitled to defend the case vigorously, so long as they stayed within the bounds of the law. When they transgressed these boundaries, they were sanctioned, and they paid the sanctions. The vigor of the defense created the need for many hours of work by plaintiffs' counsel – hours which, in the main, they are being compensated for in this order.

This is not a case in which plaintiffs struggled to attract competent representation. They had *de facto* in-house counsel, Mr. Drasco. The initial volleys were fired by one of the oldest and finest law firms in San Diego (Higgs, Fletcher & Mack). The Harder firm took over, drafting the charging pleadings, resisting removal, and beginning discovery. Then the Johnson and Hamideh firms substituted in, and saw the case through to the end of trial court activities. The D. Johnson Declaration makes clear at paragraph 7 these lawyers are highly selective about the cases they take; the Hamideh Declaration reveals at paragraph 33 just how careful they are.

While it is true that plaintiffs' counsel have waited several years for recompense (and in light of the appeal, will likely wait several more), it bears noting that a sizeable part of the delay is chargeable to plaintiffs' own motion for a trial continuance in June of 2017. ROA 55. The court granted the request with some reluctance. This, combined with the subsequent withdrawal of the Harder firm (ROA 77), ended up costing the court and the parties an entire year.

The court takes very seriously plaintiffs' contention that this case became all-consuming. There is substantial evidence that this is true. But this kind of dedication to clients is required of all lawyers, particularly trial lawyers. And although it is nuanced, there is a difference between the "all nighters" and other sacrifices described by plaintiffs' counsel and the preclusion of other engagements that the case law indicates may give rise to lodestar enhancements. Counsel claim

**Ex. A - 33**

their commitment to this case precluded other employment, but none of the declarations offer detailed support for this claim (*i.e.* identity of client turned away, estimate of fees foregone). Not paragraph 16 of the N. Johnson Declaration; not paragraph 18 of the Hamideh Declaration; not paragraph 15 of the D. Johnson Declaration; and not paragraph 57 of the Thigpen Declaration. And we know from *Simmons v. Bauer Media Group*, ___ Cal. App. 5th ___, No. B296220 (6/19/20) that the Johnson firm was able to work on other matters during the relevant timeframe.

Further support for the court's conclusion that a multiplier is not warranted comes from paragraph 106 *ff.* of the Jardini declaration and paragraphs 114 *ff.* of the O'Connor Declaration. On the subject of hourly rates, the court finds the Pearl declaration more persuasive than those of the defense experts; but on the subject of a multiplier, the court finds Jardini and O'Connor more persuasive than Pearl.

None of the foregoing should be interpreted as a suggestion by the court that the work done by plaintiffs' counsel was not of high quality. To the contrary, while the court did not agree with every tactical decision taken by plaintiffs' counsel, the results speak for themselves and the court has already expressed its view that plaintiffs were very well served by their trial attorneys. In particular, Ms. Thigpen and Ms. Gonzales impressed the court as dedicated, passionate, vigorous, committed, and increasingly able advocates (and Mr. O'Connor even agrees at paragraph 57 of his declaration with some of these adjectives). The court finds that the fees awarded in this order are "fully compensatory" of their and their co-counsels' dogged pursuit of this matter over the course of three years.

The immediately preceding sentence is only true if the court awards fees incurred by counsel in connection with pursuing the fee application and resisting defendants' efforts to have the court deny recoverable costs. The court has already noted that, although the initial moving papers said they would be asking for them (e.g. ROA 1247 at 13:25-27), in the reply plaintiffs decided not to pursue fees for seeking fees. ROA 1274 at paragraph 9. Ms. Thigpen raised it again in the course of her June 19 argument. Again, the law is clear that such fees are recoverable. *Graham,* 34 Cal.4th at 580; *Ketchum,* 24 Cal.4th at 133-34. The court awards $40,000.00, allocated $30,000.00 to the Johnson firm and $10,000.00 to Hamideh. At the aforementioned blended rate of $467/hr., this would suggest about 85 hours of work. This may very well understate the actual time spent, but strikes the court as a just award inasmuch as the papers filed in connection with the motions resolved in this order are extensive and represent a lot of very necessary effort.

4. Summary.

Defendants' request for an award of zero is wholly lacking in merit and is denied. The court acknowledges *Ellis v. Toshiba America Information Systems* (2013) 218 Cal.App.4th 853, wherein fees were denied entirely. The case is an outlier, and beyond that is chasmally dissimilar from this one.

The court makes the following fee award (and allocates the award as follows):****

Johnson:   As noted above, the Johnson firm requests $6,663,919.50. The firm blended rate of $467/hr. is reasonable. The court determines that a reduction of 2,140 hours is appropriate, for

the reasons stated above. This equates to 15% of the claimed Johnson hours of 14,262. The award is therefore $5,690,974.00 (12,122 x $467, plus $30,000.00).

Hamideh: As noted above, Hamideh requests $1,451,068.00. The downward adjustment in Mr. Hamideh's hourly rate discussed above reduces this to $1,295,600.00 (2774.3 x $467). The court finds an additional reduction is also appropriate in light of the fact that there were overlapping and duplicative tasks undertaken by Hamideh that were already being handled by the Johnson lawyers of a similar vintage. The court finds this duplication is about 555 hours, or about 20%. This is substantiated by portions of paragraphs 49-56 of the O'Connor Declaration and portions of paragraphs 43-44 and 93 of the Jardini Declaration. The resulting award is $1,046,413.00 (2219.3 x $467, plus $10,000.00).

Harder: The court awards $266,800.00. This eliminates the time of transitory billers Kurtz, Stonerock, and Mirell; it also eliminates the amorphous fees incurred for 175.75 hours of "case management" and "experts – work or consult." With respect to the latter category, the court has the distinct impression the Harder firm's few hours of unspecified work with experts, long before experts were designated in the case, did not really contribute materially to the success of the litigation. The court has little doubt that whatever work was done in this regard had to be re-done by Johnson and/or Hamideh. Approaching the Harder fees in this fashion also removes any suggestion of a duplicative recovery of fees already collected. The award is somewhat higher than the amount proposed by Jardini, but in the same ballpark.

Higgs: The court awards $24,335.00. This eliminates time of transitory billers Ferrell and O'Brien. The presence of transitory billers is often indicative of inefficiency. It is slightly more than the amount proposed by Jardini.

\*\*\*

The clerk is directed to interlineate an attorneys' fee award of $7,028,522.00 on page 6, line 7 of the Judgment filed February 19, 2020 (ROA 1127). Defendants are jointly and severally liable for this award, as they presented a completely unified defense. The same is true of the cost award ordered above. The clerk must also send copies of this ruling to both sides via USMail.

The court once again acknowledges counsel for their vigorous efforts on behalf of their respective clients over the past four years.

**IT IS SO ORDERED.**

June 22, 2020

Timothy B. Taylor
Judge of the Superior Court

23

*As these matters were originally to have been briefed, the Presiding Judge of the SDSC signed, with the consent of the Chief Justice, the first in a series of administrative general orders closing the SDSC for all but emergency matters due to the coronavirus/COVID-19 public health emergency. The administrative orders are available on the SDSC website, as are the Chief Justice's orders authorizing them. They are incorporated herein by this reference, and the court takes judicial notice of them. Judicial notice is considered appropriate in light of Justice Guerrero's opinion for the Court filed April 29, 2020 in *Ayala v. Superior Court*, 48 Cal.App.5th 387. There, the Court of Appeal recounted additional background facts giving rise to the emergency orders. The Presiding Judge's general order of May 13, 2020, reopening the civil division [No. 051220-51(A)], calls for remote hearings in all instances.

**Just one example of an economy withheld from the court: the constant practice of the parties, right up through the motions *in limine*, of submitting supposedly secret or competitively sensitive documents under seal. E.g. ROA 1279-1290, representing just the tip of the iceberg. It was, in the words of one court faced with a similar situation, "brute litigation overkill." *Overstock.com, Inc. v. Goldman Sachs Group, Inc.* (2014) 231 Cal.App.4th 471, 499. And it was almost exclusively defendants who were insisting upon this treatment. Yet how many times during the trial was the court requested to clear the courtroom or admonish the jury about the confidential nature of these same papers? Exactly zero times.

***The appellate review now being undertaken may lead to the establishment of new common law, and this may well benefit future lawyers and litigants in decedent right of publicity matters (whether in the entertainment business or otherwise). But the ultimate result will affect the pecuniary concerns of the parties and their counsel only, and not a wider public. Contrast this with the *Serrano* cases: schoolchildren throughout the state continue to feel the impact of these decisions, many years after they were handed down.

****Some figures are rounded.

24

*Kaku v. City of Santa Clara*, No. 17CV319862, 2019 WL
331053, at *3 (Santa Clara Cty. Super. Ct. Jan. 22, 2019), *aff'd*
59 Cal. App. 5th 385, 431 (2020)

1

2

3

4

5

6

7

8

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 1/22/2019 3:45 PM
Reviewed By: R. Walker
Case #17CV319862
Envelope: 2412187**

9         **SUPERIOR COURT OF CALIFORNIA**

10         **COUNTY OF SANTA CLARA**

11

12

13   LADONNA YUMORI KAKU, et al.,

14         Plaintiffs,

15   vs.

16   CITY OF SANTA CLARA; and DOES 1 to 50, inclusive,

17

18         Defendants.

Case No. 17CV319862

**ORDER RE: MOTION FOR ATTORNEYS' FEES**

19      The above-entitled matter came on regularly for hearing on Friday, January 4, 2019, at

20   9:00 a.m. in Department 5 (Complex Civil Litigation), the Honorable Thomas E. Kuhnle

21   presiding. After listening to arguments made by counsel, the Court continued the hearing to

22   January 22, 2019 at 9:00 a.m. and requested supplemental briefing. Having reviewed and

23   considered the written submissions of the parties, and having listened carefully to arguments of

24   counsel, the Court rules as follows:

25   **I.**     **INTRODUCTION**

26      Plaintiffs alleged that defendant City of Santa Clara's (the "City") at-large method of

27   election violated the California Voting Rights Act ("CVRA"). This action was tried in two

28   phases – liability and remedies. In the liability phase of trial, the Court found Plaintiffs proved

**Ex. A - 38**

1    by a preponderance of the evidence that the at-large method of election used by the City

2    impaired the ability of Asians to elect candidates as a result of the dilution and abridgment of

3    their voting rights.  In the remedies phase, the Court ordered that six city council members be

4    elected in district-based elections, and the mayor be elected in an at-large election.

5        Before the Court is Plaintiffs' motion for attorneys' fees.  Plaintiffs are prevailing parties

6    and are entitled to recover attorneys' fees and costs under applicable law.  Plaintiffs assert their

7    attorneys and paralegals have spent 4,672.35 hours working on the case.  (Corrected Declaration

8    of Anne Bellows in Support of Plaintiffs' Supplemental Brief ("Bellows Decl."), Ex. B.)

9    Plaintiffs then delete certain time entries and apply an across-the-board reduction of five percent

10   of the time billed.  Plaintiffs then multiply the remaining 4,189.55 hours by the hourly rates of

11   attorneys and paralegals.  This results in an attorneys' fees "lodestar" of $2,524,201.06.

12   Plaintiffs then argue the skill of counsel, the significant contingency risk, the preclusion of other

13   employment, and the success in vindicating the voting rights of Asian voters compels an

14   enhanced recovery – what California law calls a "multiplier" – of 1.8 times the lodestar amount

15   for pre-judgment work.  Based on these calculations, Plaintiffs seek an attorneys' fee award of

16   $4,239,055.75.

17       The City objects to the attorneys' fees requested by Plaintiffs.  The City argues that

18   Plaintiffs are seeking recovery of fees for "blatant overstaffing at all levels, as well as inefficient

19   and duplicative staff utilization" including the "overuse of partner time in this case."

20   (Defendant's Opposition to Plaintiffs' Motion for Attorney's Fees and Costs ("Opp."), at 7.)  The

21   City also contends that the "unjustifiable multiplier, inefficient overstaffing and excessive hourly

22   rates, taken together, would result in an improper windfall for Plaintiffs." (*Ibid.*)  The reasonable

23   fee for the work of Plaintiffs' counsel, the City argues, should be no more than $1,031,007.00.

24   (*Ibid.*)

25   **II.    BACKGROUND**

26       To provide context, below the Court briefly discusses three issues:  the earlier CVRA

27   action filed against the City by Wesley Kazuo Mukoyama and other plaintiffs; Measure A, which

28   was proposed by the City to change its election system; and the pace of this litigation.

A. **The *Mukoyama* Action**

On August 10, 2017, Wesley Kazuo Mukoyama, Umar Kamal, Michael Kaku, and Herminio Hernando brought an action under the CVRA challenging the City's at-large election system for council members and the mayor. The case was captioned *Mukoyama v. City of Santa Clara,* Case No. 2017-1-CV-308056 (the "*Mukoyama* action"). The attorneys who filed the *Mukoyama* action are the same attorneys who filed this action, and the claims in both actions are nearly identical. The City demurred to the complaint based on the failure of the plaintiffs to comply with the notice requirements set forth in Elections Code section 10010. On December 1, 2017, the Court sustained the demurrer without leave to amend.

B. **The "Santa Clara District Election and Voting Method Measure"**

On March 6, 2018, the City's council members and mayor voted unanimously to place the "Santa Clara District Election and Voting Method Measure," known as Measure A, on the June 5, 2018 ballot. Measure A proposed changing the way the City's voters elect council members and the mayor. In particular, council members would be elected through two voting districts, with voters electing three council members per district. The mayor would be elected by voters throughout the City. In addition, Measure A prescribed a voting process known as "ranked choice voting" for council members and the mayor.

Measure A did not pass. Approximately 52 percent of the votes cast were "no" and approximately 48 percent were "yes."

C. **The Pace of this Litigation**

This action was filed on November 30, 2017. Judgment was entered on July 24, 2018. The parties, and the Court, were mindful of the election on November 6, 2018 in which voters would elect council members. As noted in the Court's June 26, 2018 Order:

> The parties have discussed the concern that if an appropriate remedy is not selected for the November 2018 elections, those elections may be jeopardized. Just a few years ago this happened in Palmdale, California, when CVRA violations were not corrected before its 2013 elections. (*Jauregui v. City of Palmdale* (2014) 226 Cal.App.4th 781, 791.) There, the court enjoined Palmdale from certifying the results of its City Council elections. The Court and the parties are committed to avoiding that result here.

1  In other words, it was in the best interest of both sides to resolve the case quickly so that if

2  CVRA violations were found, the voting system for the November 2018 election could be

3  corrected. Without changes, the City risked having to hold costly new elections.

4  **III.    APPLICABLE LAW**

5       The CVRA provides that prevailing plaintiffs are entitled to receive "a reasonable

6  attorney's fee." In particular, it states:

7       In any action to enforce Section 14027 and Section 14028, the court shall allow
        the prevailing plaintiff party, other than the state or political subdivision thereof, a
8       reasonable attorney's fee consistent with the standards established in *Serrano v.*
        *Priest* (1977) 20 Cal.3d 25, 48-49, and litigation expenses including, but not
9       limited to, expert witness fees and expenses as part of the costs. Prevailing
        defendant parties shall not recover any costs, unless the court finds the action to
10      be frivolous, unreasonable, or without foundation.

11

12  (Elec. Code § 14030.)

13       The *Serrano* case cited in Elections Code section 14030 concerned entitlement to, and

14  calculation of, fees that could be recovered by plaintiffs who prevailed in a case involving the

15  constitutional requirements for funding public schools. The California Supreme Court concluded

16  that attorneys' fees could be recovered under the "private attorney general" doctrine if:

17       the litigation has resulted in the vindication of a strong or societally important
        public policy, that the necessary costs of securing this result transcend the
18      individual plaintiff's pecuniary interest to an extent requiring subsidization, and
        that a substantial number of persons stand to benefit from the decision. . . .
19

20  (*Serrano v. Priest,* (1977) 20 Cal.3d 25, 45.)

21       To calculate recoverable attorneys' fees, *Serrano* first requires "a careful compilation of

22  the time spent and reasonable hourly compensation of each attorney. . . ." (*Serrano v. Priest,*

23  *supra,* 20 Cal.3d at p. 48.) This calculation is known as the "lodestar." The lodestar is then

24  subject to augmentation or diminution based on a number of factors:

25       (1) the novelty and difficulty of the questions involved, and the skill displayed in
        presenting them; (2) the extent to which the nature of the litigation precluded
26      other employment by the attorneys; (3) the contingent nature of the fee award,
        both from the point of view of eventual victory on the merits and the point of
27      view of establishing eligibility for an award; (4) the fact that an award against the
        state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in
28      question received public and charitable funding for the purpose of bringing law

**Ex. A - 41**

1  suits of the character here involved; (6) the fact that the monies awarded would
2  inure not to the individual benefit of the attorneys involved but the organizations
   by which they are employed; and (7) the fact that in the court's view the two law
3  firms involved had approximately an equal share in the success of the litigation.

4  (*Id.* at p. 49.)

5      The prevailing party bears the burden of proving entitlement to an award of attorneys'

6  fees through evidence showing reasonable amounts of time and reasonable hourly rates, and

7  evidence relating to the *Serrano* factors. The trial court must first decide if the amount of time

8  and hourly rates are reasonable, and then it must weigh the *Serrano* factors to arrive at a final

9  award. "The determination of what constitutes reasonable attorney fees is committed to the

10 discretion of the trial court." (*Rey v. Madera United School Dist.* (2012) 203 Cal.App.4th 1223,

11 1240 ("*Rey*").) "The experienced trial judge is the best judge of the value of professional

12 services rendered in his court, and while his judgment is of course subject to review, it will not

13 be disturbed unless the appellate court is convinced that it is clearly wrong." (*Serrano v. Priest,*

14 *supra,* 20 Cal.3d at p. 49, citations omitted.)

15 **IV.    DISCUSSION**

16     The City does not dispute that Plaintiffs are prevailing parties and are entitled to

17 attorneys' fees. The City vigorously objects, however, to the amount requested. The Court

18 therefore has the initial task of determining whether the hours worked, and hourly rates charged,

19 by Plaintiffs' attorneys and paralegals are reasonable. After that, it must decide if a multiplier

20 should be applied.

21     **A.    Evidence Submitted by the Parties**

22     Plaintiffs submitted the Declaration of Morris J. Baller in Support of Plaintiff's Motion

23 for an Award of Reasonable Attorney Fees ("Baller Decl.") with their initial moving papers. It

24 provides a summary of the issues raised in the case, the number of hours worked by the attorneys

25 and paralegals, billing rates, the attorneys' qualifications, and several ways in which the billing

26 entries can be categorized. Plaintiffs also submitted declarations from other attorneys – Robert

27 Rubin and Richard Konda – who summarize their qualifications and experience, and describe

28 their respective roles in this litigation. In addition, Plaintiffs submitted the Declaration of

**Ex. A - 42**

1  Richard M. Pearl in Support of Plaintiff's Motion for an Award of Reasonable Attorneys' Fees

2  ("Pearl Decl."). Mr. Pearl is an expert witness who provides opinions on whether the Plaintiffs'

3  attorneys billing rates and amounts of time are reasonable and whether or not a multiplier should

4  be applied to Plaintiffs' lodestar. With their reply brief Plaintiffs submitted supplemental

5  declarations from Messrs. Baller, Rubin and Konda. Plaintiffs later submitted the Bellows

6  declaration cited above.

7       In opposing the motion, the City submitted the declaration of Steven G. Churchwell

8  regarding developments in both this case and the *Mukoyama* action. (Declaration of Steven G.

9  Churchwell in Support of Defendant's Opposition to Motion for Attorney's Fees and Costs

10  ("Churchwell Decl.").) The City also submitted the declarations of two experts on attorneys'

11  fees, John O'Connor and Brand Cooper. (See Declaration of John D. O'Connor in Support of

12  Defendant's Opposition to Motion for Attorney's Fees and Costs ("O'Connor Decl.") and

13  Declaration of Brand Cooper in Support of Defendant's Opposition to Motion for Attorney's

14  Fees and Costs ("Cooper Decl.").) The City later submitted the Declaration of Vincent M. Vu in

15  Support of Defendant's Supplemental Opposition to Motion for Attorney's Fees ("Vu Decl.").

16       Timesheets showing the time spent, and rates charged, by Plaintiffs' attorneys and

17  paralegals are attached to the Churchwell Declaration, Ex. F, the Supplemental Declaration of

18  Morris J. Baller in Support of Plaintiff's Motion for an Award of Reasonable Attorney Fees

19  ("Supp. Baller Decl."), Ex. 6, and the Bellows Decl., Ex. A.

20       **B.    Plaintiffs' Lodestar**

21       As previously discussed, "In determining a reasonable attorney fee award under

22  fee-shifting statutes, the trial court begins by calculating a lodestar figure based on the hours

23  reasonably spent and the prevailing hourly rate for private attorneys in the community

24  conducting litigation of the same type." (*Rey, supra,* 203 Cal.App.4th at p. 1240.) Below the

25  Court evaluates the evidence submitted for and against Plaintiffs' lodestar.

26       **1.    The Number of Hours Worked**

27       An attorneys' fee award should include compensation for all hours reasonably spent.

28  (*Rey, supra,* 203 Cal.App.4th at p. 1243.) "A plaintiff is not automatically entitled to all hours

1    claimed in the fee request.  Rather, the plaintiff must prove the hours sought were reasonable and

2    necessary." (*Id.* at 1243-44, citing *El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007)

3    154 Cal.App.4th 1337.)

4         Plaintiffs initially submitted evidence showing 4004.50 hours of work by their attorneys

5    and paralegals. (Baller Decl., Exh. 4.)  This total did not include time spent in 2011 and 2012 in

6    connection with sending CVRA demand letters to the City, or more recent work of junior staff

7    not directly tied to their principal assignments. (*Id.* at ¶ 84.)  To account for "any potential

8    residual inefficiencies" Plaintiffs applied a five percent across-the-board reduction, which

9    reduced the fees by approximately $121,000.  The remaining time for which Plaintiffs' motion

10   sought compensation was 3803.85 hours.

11        On reply Plaintiffs submitted evidence showing they spent an additional 315.75 hours

12   preparing the motions seeking attorneys' fees and costs, resulting in additional fees of

13   $173,820.55. (Supp. Baller Decl., Ex. 8.)

14        At the January 4, 2019 hearing the Court requested that Plaintiffs clarify how they

15   calculated the number of hours for which they seek compensation.  The Court also requested that

16   Plaintiffs submit any additional billing records showing time spent working on post-judgment

17   matters.  Plaintiffs complied with this request. (Bellows Decl., Ex. C.)  The final tally of hours

18   shows Plaintiffs' attorneys and paralegals spent 4,672.35 hours working on this case.  Plaintiffs

19   then exercised "billing judgment" and deleted entries for 262.30 hours of their time.  Plaintiffs

20   then reduced the remaining number of hours by five percent to account for "any potential

21   residual redundancies." (Plaintiffs' Memorandum of Points and Authorities in Support of

22   Motion for Award of Reasonable Attorneys' Fees ("Plts. Memo."), at 6.)  This results in

23   4,189.55 hours which Plaintiffs argue should be used in the lodestar. (Bellows Decl., Ex. C.)

24        The City argues Plaintiffs are not entitled to recover all of their fees.  They argue that

25   time recorded by Plaintiffs' attorneys and paralegals is not compensable, including time in the

26   following categories:  (1) time spent on the *Mukoyama* action; (2) time spent on Plaintiffs'

27   preliminary injunction motion; (3) vague and redacted time descriptions; (4) time spent on

28   political and media activities; (5) administrative time; and (6) overstaffing and inefficiencies.

**Ex. A - 44**

1    (Opp. at 10-18.)  The City's experts reviewed Plaintiffs bills and identified suspect entries.  They

2    then grouped the entries that are shown on tables attached to Mr. Cooper's declaration.  The City

3    then argues that amounts Plaintiffs seek in each group of suspect entries cannot be recovered.[1]

4                           a.    **Time Spent on the *Mukoyama* Action**

5         The City states: "The Court dismissed the *Mukoyama* action without leave to amend

6    because Plaintiffs failed to comply with the simple pre-filing procedures in Elections Code

7    section 10010."  (Opp. at 11.)  The City argues that time spent on unsuccessful or unrelated

8    claims may be excluded from the lodestar calculation.  (Opp. at 12, citing *Hensley v. Eckerhart*

9    (1983) 461 U.S. 424, 440.)  The City also argues that a reduced fee award is appropriate when a

10   prevailing party achieves partial success.  (*Id.*, citing *Rey, supra,* 203 Cal.App.4th at p. 1239.)

11   More broadly, the City argues that "Plaintiffs' futile efforts in litigating the doomed *Mukoyama*

12   action and opposing the demurrer were predictably unreasonable, unsuccessful, and unrelated to

13   their success" in this action.  (*Id.*)  The City's expert states that $191,000 in fees related to the

14   *Mukoyama* action should be excluded from recovery.  (Cooper Decl., Ex. N.)

15        The attorneys representing the plaintiffs in the *Mukoyama* action are the same as those in

16   this action.  The complaint filed in this action repeats the claims in the *Mukoyama* action.  It

17   makes sense to the Court that the time spent on foundational work in the *Mukoyama* action that

18   was reused in this action can be recovered.  The Court agrees with the City, however, that the

19   time spent on the demurrer in the *Mukoyama* action did nothing to advance the issues raised in

20   this action.  As noted in the Court's order sustaining the City's demurrer, "Plaintiffs have not

21   alleged compliance with the notice provision in Elections Code section 10010.  Plaintiffs do not

22   assert in their papers that proper notice was sent on or after January 1, 2017 and at least 45 days

23   prior to filing the Complaint, and they do not argue that such an allegation could be added to an

24   amended pleading."  For these reasons, the demurrer was sustained without leave to amend.  In

25   this action, Plaintiffs addressed the notice issues flagged in the *Mukoyama* action and thus this

26   action moved forward to trial.

27

28

---

[1] Many entries appear in more than one group.  In assessing whether the entries represent reasonable work, the Court
has been careful not to double-count entries.

**Ex. A - 45**

1        The Court finds Plaintiffs' work related to the demurrer filed in the *Mukoyama* action

2    cannot be recovered. That work did nothing to advance the substantive issues in this action.

3    After reviewing the contested time entries, the Court strikes $77,300.00 of time relating to the

4    demurrer. The fees incurred for other work in the *Mukoyama* action can be recovered, including

5    initial client meetings, factual research, and legal research unrelated to the issues raised by the

6    demurrer.

7                                **b.    Plaintiffs' Preliminary Injunction Motion**

8        The City's Opposition brief states: "On July 16, 2018, at or around 5:00 p.m., a day and

9    half before the remedies phase hearing was set to begin, Plaintiffs filed a motion for preliminary

10   injunction to enjoin the City from conducting further at-large elections for City Council." (Opp.

11   at 13.) The City argues that filing for a preliminary injunction was "patently unreasonable" and

12   procedurally infirm. (*Ibid.*) The City concludes: "Plaintiffs should not be rewarded for

13   improper litigation tactics and filing late motions on the eve of trial." (*Ibid.*) The City's expert

14   stated that the fees associated with the preliminary injunction motion totaled approximately

15   $71,000. (Cooper Decl., Ex. J.) In response, Plaintiffs argue that "[t]he brief served the same

16   function as a trial brief and was intended to provide guidance to the Court in shaping injunctive

17   relief that could be immediately implemented." (Reply at 4.)

18       The Court agrees with the City that it was somewhat bizarre for Plaintiffs to submit a

19   motion for preliminary injunction on the eve of the remedies trial. The Court agrees with

20   Plaintiffs, however, that the content of the preliminary injunction motion matched up with many

21   of the issues presented at the remedies trial. Moreover, the City provided a trial brief of similar

22   length with similar content. There were, however, some unique tasks associated with preparing

23   the motion for preliminary injunction that would have been unnecessary for a trial brief. Time

24   was spent preparing Jose Moreno's declaration when, in fact, he was a testifying witness at trial.

25   The declaration of Ginger Grimes that accompanied the preliminary injunction too was

26   unnecessary. There were also boilerplate sections on law pertaining only to preliminary

27   injunction motions. After reviewing all of the contested time entries, the Court strikes $2,750.00

28   of time relating to the motion for preliminary injunction.

**Ex. A - 46**

1              c.    **Vague and Redacted Time Descriptions**

2          The City highlights time entries it asserts are vague. (Cooper Decl., Ex. M.)  They

3   account for approximately $73,000 in fees.  (*Ibid.*)  The City argues that "[v]ague billing entries

4   should be reduced because such entries may obscure the nature of the work claimed and inflate

5   the amount of non-compensable hours."  (Opp. at 13.)  The City also argues that entries totaling

6   approximately $32,000 are obscured by redactions. (Cooper Decl., Ex. O.)  It argues that while

7   some redactions may be necessary to protect various privileges, redactions that "include the

8   names of individuals" go beyond any recognized privilege.  (Opp. at 14.)

9          In response, Plaintiffs argue that specific time entries are not required; that California law

10  allows attorneys' fees to be recovered on the basis of declarations that summarize attorney tasks.

11  (Reply at 7.)  Plaintiffs state that "task codes" shown in their bills reveal "the nature of the

12  underlying work."  (*Id.* at 8.)  Plaintiffs state that redactions are entirely appropriate.  Finally,

13  Plaintiffs provide more information about these entries with their reply brief.  (Baller Supp.

14  Decl., Ex. 2.)

15         With hundreds of pages of billing records, and thousands of entries, it is not surprising

16  the City was able to find vague time entries.  And when they are presented as a separate list, it is

17  true that many appear vague, such as:  "PC with Wes M."; "Add to memo"; "meeting with

18  clients"; "email to Alex M."; "Meeting over lunch"; and "Signature collection."  These entries

19  are better understood, however, when they are alongside contemporaneous billing entries.  The

20  City's list of suspect entries also includes many that are sufficiently specific, including "review

21  and respond to Court and Churchwell memos re sequencing"; "Review/edit 5/10 mtg agenda";

22  and "Confer with G. Grimes re: mootness, legal strategy, and campaign issues."  Many "calls

23  with counsel" are also listed.  Such entries may concern attorney-client communications or other

24  privileged matters that cannot be disclosed without violating the California Rules of Professional

25  Responsibility.

26         Based on its review of the entries identified as vague or redacted, and being mindful of

27  the Plaintiffs' challenge of meeting their burden of proof without disclosing privileged

28  information, the Court strikes $7,850.00 of time.

**Ex. A - 47**

1              **d.    Time Spent on Political and Media Activities**

2       Plaintiffs challenged the City's use of city-wide elections for each council member and

3  the mayor.  As noted above, on March 6, 2018 the Santa Clara City Council voted unanimously

4  to place Measure A on the June 5, 2018 ballot.  Had Measure A passed, it too would have

5  changed the City's use of city-wide elections for each council member (though the mayor would

6  still be elected city-wide).  In particular, council members would be elected through two voting

7  districts, with voters electing three council members per district.

8       The City's expert contends that Plaintiffs' counsel incurred approximately $50,000 in

9  fees participating in political activities to oppose Measure A.  (Cooper Decl., Ex. L.)  The City's

10 expert contends an additional $14,000 of time was spent on media activities.  Citing *Crawford v.*

11 *Board of Education* (1988) 200 Cal.App.3d 1397 ("*Crawford*"), the City argues that lobbying

12 and political activities are not generally compensable under California law.  (Opp. at 15.)  That

13 case states: "As we see it, the private attorney general doctrine limits awards of fees to litigants

14 who successfully utilize the *judicial process* to achieve their aims.  The doctrine simply does not,

15 nor should it, encompass successful lobbying efforts by those who seek to influence the

16 Legislature or the electorate on any particular issue." (*Crawford, supra,* 200 Cal.App.3d at

17 p. 1408, italics in original.)  Citing *Godinez v. Schwarzenegger* (1995) 132 Cal.App.4th 73, 93,

18 the City acknowledges that a Court can award attorneys' fees for certain political activities if the

19 success of those activities is causally connected or triggered by the litigation.  But the City

20 argues nothing like that happened here.  It states: "In the instant case, Plaintiffs engaged in

21 political activity concurrently with the litigation, before any court ordered remedy.  Their

22 political activities were not necessary to effectuate any court order or remedy." (Defendant's

23 Supplemental Briefing in Opposition to Plaintiffs' Motion for Attorneys' Fees ("Def. Supp."),

24 at 8).

25      Plaintiffs state that neither *Crawford* nor *Godinez* "has any bearing here." (Reply at 3.)

26 They assert: "Plaintiffs unquestionably vindicated their voting rights in court and are seeking

27 compensation for political and media work intimately connected with the litigation which

28 contributed to its successful outcome." (*Ibid.*)  Plaintiffs rely on federal authorities for the

**Ex. A - 48**

1   proposition that political and media work "intimately related to the successful representation of a

2   client" can be recovered. (Plts. Memo. at 10, citing *Davis v. City & County of San Francisco*

3   (9th Cir. 1992) 976 F.2d 1536, 1545.) Plaintiffs further argue that "[p]reventing Measure A's

4   implementation was one of Plaintiff's core litigation goals." (*Id.* at 11.)

5       One problem with Plaintiffs' argument is that Measure A was never litigated; it was not a

6   "core litigation goal" because it was never before this Court. Had it been, Plaintiffs stated

7   consistently it would have violated the CVRA. That issue, however, was not litigated. The

8   Court recognizes that Plaintiffs did present legal arguments related to "the City's two

9   multimember district plans" at the remedies trial, but that was after Measure A was defeated and

10  is not the type of "political activity" the City is challenging. Another problem is that unlike other

11  cases, including *Jenkins by Agyei v. State of Missouri*, 862 F.2d 677 (8th Cir. 1988), this is not a

12  situation where a plaintiff scored an early victory and subsequent legislative changes allowed it

13  to accomplish its litigation goals without further court action.

14      Many billing entries highlighted by the City's expert did not, however, relate to

15  Measure A. Some concern legal analyses of strategic voting by minorities. Some concern

16  consulting with experts regarding remedies. Some concern public meetings on district-based

17  elections that were required under California law. And some concern the review of federal cases

18  on alternative voting systems. Time for those activities should not be excluded.

19      Other entries, however, are clearly political and cannot be recovered under any theory.

20  Examples include entries for "Democratic Party Meeting"; "Research South Bay Labor Council

21  endorsements for past Santa Clara city council elections"; "SCCDA Meeting"; "Review and edit

22  proposed facebook post opposing 2x3 system"; "Sierra Club meeting"; "Review Measure A

23  website"; "ballot measure opposition statement"; and "Present to APA democrats on No on

24  Measure [A]".

25      The Court has reviewed the Plaintiffs' billing records and strikes $47,750.00 of time

26  involving political and media activities.

27

28

**Ex. A - 49**

| | |
|---|---|
| 1 | **e.  Administrative Time** |
| 2 | The City cites hornbook law that administrative time cannot be recovered.  (Opp. at 17.) |
| 3 | This is because most clerical and other overhead expenses are ordinarily embedded in an |
| 4 | attorney's hourly rates.  (*Ibid.*)  It is unreasonable for attorneys to charge hundreds of dollars per |
| 5 | hour for work that can be performed by clerical staff.  The City's expert concludes that |
| 6 | Plaintiffs' lawyers and paralegals charged $34,423.50 to perform administrative work.  (Cooper |
| 7 | Decl., Ex. N.) |
| 8 | Plaintiffs do not dispute the legal principles at issue.  They argue, however, that the |
| 9 | City's "categorization of such tasks . . . is vastly overbroad, encompassing many hours of work |
| 10 | that courts have held to be compensable at attorney and paralegal hourly rates, including time |
| 11 | spent supervising work on the case by other legal personnel, researching local rules, compiling |
| 12 | documents and exhibits for deposition and trial. . . ."  (Reply at 8.)  Plaintiffs concede that |
| 13 | $11,129.50 of the work identified by the City's expert should be withdrawn.  (*Ibid.*)  Plaintiffs |
| 14 | argue the rest, however, is compensable. |
| 15 | The Court has reviewed the disputed billing entries identified by the City's expert.  Some |
| 16 | entries concern purely clerical work that is not compensable (e.g., reviewing office supplies and |
| 17 | collecting binders).  Some entries concern activities that should be billed at a paralegal hourly |
| 18 | rate instead of an attorney hourly rate (e.g., preparing an evidence appendix with new Bates |
| 19 | ranges).  And some entries reflect tasks appropriate for attorneys to undertake (e.g., revisions to |
| 20 | documents filed with the court).  In addition to the administrative time deducted by Plaintiffs, the |
| 21 | Court strikes $17,125.00 of time spent on administrative or clerical activities and amounts that |
| 22 | should have been billed at attorney, not paralegal, hourly rates. |
| 23 | **f.  Overstaffing and Inefficiencies** |
| 24 | The City argues that Plaintiffs' time should be reduced because the case was overstaffed, |
| 25 | which resulted in duplicative and unnecessary hours of work.  (Opp. at 10-11.)  The City cites |
| 26 | the declarations of both of its experts to support this argument.  (See Cooper Decl., ¶¶ 45-47; |
| 27 | O'Connor Decl., ¶¶ 68-71, 77, 84-90.)  Those experts express concerns about the number of |
| 28 | attorneys attending case management conferences, depositions, and each phase of trial.  They |

**Ex. A - 50**

1    also express concerns over partners working on lower-level tasks, excessive conferencing,

2    excessive internal communications, and other inefficiencies. Mr. Cooper argues that the court

3    "should take no less than a 10% to 15% reduction of the fees. . . ." (Cooper Decl., ¶ 49.)

4         Plaintiffs argue that staffing levels were appropriate in nearly all instances. (Supp. Baller

5    Decl., ¶¶ 3-49.) They agree, however, to reduce their request for attorneys' fees for trial

6    attendance by Ms. Ho and Mr. Kuwada. Plaintiffs also highlight their five percent across-the-

7    board reduction which takes into account certain inefficiencies highlighted by Messrs. Cooper

8    and O'Connor, a reduction other courts have found sufficient. (Plts. Memo. at 7, citing

9    *Ridgeway v. Wal-Mart Stores, Inc.* (N.D. Cal. 2017) 269 F.Supp.3d 975, 990 ["Plaintiffs have

10   volunteered to exercise a five percent across-the-board reduction of their lodestar . . . Such a

11   reduction accounts for just the sort of excess and redundancy that Wal–Mart targets."].)

12        The Court finds the staffing decisions, and overall staffing structure, were reasonable.

13   This was fast-moving litigation. It featured a greater percentage of work requiring specialized

14   knowledge and expertise. There was less low level work than most actions because the case

15   focused on trials, not pre-trial work such as discovery and law-and-motion practice. Mr. Cooper

16   argues the Court should reduce the number of hours by 10 to 15 percent. On their own Plaintiffs

17   deducted five percent of their fees for "any potential residual redundancies" which is similar to

18   the reasons given by Mr. Cooper. And after all that, the Court has further reduced the fees as

19   explained in the sections above. In sum, the Court finds that any unreasonable fees for

20   overstaffing and other inefficiencies have already been stricken – first by the Plaintiffs

21   themselves, and later by the Court.

22                 **g.**    **Bills Submitted on Reply**

23        Plaintiffs submitted additional bills from their attorneys with their reply papers. (Baller

24   Supp. Decl., Ex. 6.) The City argues there are certain entries that reflect unreasonable time.

25   (Vu Decl., ¶¶ 2-5 & Ex. A.) The Court agrees with the City, in part, and will reduce the lodestar

26   by an additional $2,787.50.

27

28

**Ex. A - 51**

1          h.      **Conclusion**

2          In both anticipating, and responding to, the City's arguments that its fees were not

3   reasonable, Plaintiffs eliminated certain line-items and imposed a five percent across-the-board

4   cut in their fees which reduced their lodestar by $266,519.19.  The Court finds the lodestar should

5   be further reduced by $155,562.50 ($77,300 + $2,750 + $7,850 + $47,750 + $17,125 +

6   $2,787.50).

7          Consequently, the pre-judgment lodestar is the amount claimed ($2,143,568.36) minus the

8   unrecoverable amount ($152,775.00) which totals **$1,990,793.36**.  The post-judgment lodestar is

9   the post-judgment amount claimed in the opening brief ($98,211.95) plus the amount claimed in

10   the reply ($234,004.18) plus the amount claimed in the supplemental brief ($48,416.28) minus the

11   unrecoverable amount ($2,787.50) which totals **$377,844.91**.

12          2.      **Reasonableness of the Hourly Rates Charged**

13          Generally, in calculating the lodestar, "[t]he reasonable hourly rate is that prevailing in

14   the community for similar work." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

15   The Court must take into account the "experience, skill, and reputation of the attorney requesting

16   fees." (*Heritage Pac. Fin., LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1009.)

17          Plaintiffs argue the rates charged by their attorneys and paralegals are reasonable.  They

18   provide information about the experience, skill, and reputation of their attorneys.  The billing

19   rates for attorneys range from a high of $975 per hour to a low of $375 per hour charged by less

20   experienced attorneys.  Plaintiffs note that their rates have been approved in other voting rights

21   cases filed in both federal and state courts.  Plaintiffs also provide declaration from an expert

22   who offers an opinion that the rates charged by Plaintiffs' attorneys and paralegals are reasonable

23   under applicable standards. (Pearl Decl., ¶¶ 39-40.)

24          The City argues the rates charged by Plaintiffs' attorneys and paralegals are far too high.

25   The City's expert cites much lower rates charged by local law firms, and states "the best cohort

26   for excellent San Jose litigation . . . is the prestigious firm of Hopkins & Carley" which charges

27   at most $495 an hour for its attorneys. (O'Connor Decl., Ex. Y & ¶¶ 96, 120.)  The City's expert

28

**Ex. A - 52**

1  cites a number of other data points and methodologies that suggest the hourly rates for Plaintiffs'

2  attorneys are unreasonably high.

3      The Court has a clear idea of the rates charged by local attorneys. This case was filed in

4  a courtroom designated for complex litigation and nearly every week this Court reviews class

5  action settlements – a legal process that requires the Court to evaluate billing rates of the

6  attorneys who appear before it. This Court also regularly adjudicates motions in which parties

7  seek to recover reasonable attorneys' fees under "prevailing party" fee provisions in contracts.

8  While every type of case requires different skills and sophistication, the Court is well-equipped

9  to calibrate local rates with work comparable to litigating the CVRA issues that were tried before

10  this Court.

11      Based on the evidence submitted by the parties, especially the declaration of Mr. Pearl,

12  and based on the Court's own experience reviewing attorneys' fees, the Court finds the rates

13  charged by Plaintiffs' attorneys and paralegals are reasonable. They are comparable to rates

14  charged by other local attorneys with specialized skills that are necessary for litigating complex

15  cases involving novel issues. This is not standard litigation with many choices for counsel. As

16  the City admits, "there are [] few CVRA attorneys within California. . . ." (Def. Supp., at 12.)

17      **C.    Lodestar Multiplier**

18      "Once the lodestar is fixed, the court may increase or decrease that amount by applying a

19  positive or negative 'multiplier' to take other factors into account." (*Rey, supra,* 203

20  Cal.App.4th at p. 1240.) As noted above, factors that may be considered include those listed in

21  *Serrano.* "The trial court is not required to include a fee enhancement for exceptional skill,

22  novelty of the questions involved, or other factors. Rather, applying a multiplier is discretionary.

23  Further, the party seeking the fee enhancement bears the burden of proof." (*Id.* at p. 1242, citing

24  *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1138.)

25      The Court finds a multiplier is warranted in this action for three reasons. First, Plaintiffs'

26  counsel secured a complete victory. The complaint filed on November 30, 2017 sought a finding

27  that the City's at large method of election violated the CVRA and that the City must use district-

28  based elections. Plaintiffs obtained the relief they requested.

1    Second, the legal questions at issue were both novel and difficult.  The CVRA borrows,

2  in part, from the federal Voting Rights Act of 1965 and federal case law including the seminal

3  U.S. Supreme Court case *Thornburg v. Gingles* (1986) 478 U.S. 30.  The CVRA, however, has

4  clear difference from federal law and few California cases provide guidance on how the CVRA

5  should apply in certain circumstances.  As noted in the Court's Statement of Decision for the

6  liability phase:

7         The CVRA was enacted in 2002.  It has been amended several times since then.
          But while more than fifteen years has passed, there are only three published cases
8         interpreting its provisions:  *Sanchez, supra,* 145 Cal.App.4th 660, *Rey v. Madera
          Unified School Dist.* (2012) 203 Cal.App.4th 1223, and *Jauregui v. City of
9         Palmdale, supra,* 226 Cal.App.4th 781.  None of these cases addressed issues in

10        dispute here.

11  Proving the CVRA violations at issue here was difficult.  It involved complicated statistical

12  techniques that involved both bivariate and trivariate analyses to evaluate political cohesion and

13  the occurrence of racially polarized voting.

14    Third, compensation for the attorneys in this case was contingent and came with

15  significant risks.  Plaintiffs incurred costs totaling approximately $200,000.  Without a victory,

16  those costs could not be recovered.  Litigating this case required a substantial amount of time and

17  commitment and would have been uncompensated had the claims not been proven.  The

18  attorneys also put their reputations at risk.

19    The other *Serrano* factors are a mixed bag.  None add significant weight in favor of, or

20  against, a multiplier.

21    Plaintiffs ask for a multiplier, or lodestar adjustment, of 1.8.  The City notes that "[t]he

22  purpose of a lodestar adjustment is to 'fix a fee at the fair market value for the particular

23  action.'"  (Opp. at 25, citing *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 579.)

24  In considering an appropriate multiplier, a court must take into account the extent to which the

25  lodestar already encompasses contingent risk, extraordinary skill, and other factors.  (*Ketchum v.

26  Moses, supra,* 24 Cal.4th at p. 1138.)  Plaintiffs' counsel have significant skills and experience

27  that are, in turn, reflected in their hourly rates.  Likewise, the contingent risk was lower after

28  June 6, 2018 when the Statement of Decision on liability issues was filed.  Therefore, while the

**Ex. A - 54**

1  relevant *Serrano* factors warrant a multiplier, the Court finds that to calculate the fair market

2  value for the attorneys who represented the Plaintiffs the multiplier should be 1.4 for work

3  completed before judgment was entered on July 24, 2018. Plaintiffs did not seek a multiplier for

4  later work.

5      **D.**    **Recovery of Costs Incurred in Seeking Attorneys' Fees**

6      Plaintiffs seek $8,712.50 in costs associated with the work of Mr. Pearl, an expert who

7  submitted a declaration supporting Plaintiffs' position that the hourly rates charged by its

8  attorneys were reasonable. The parties have reached a private agreement regarding recovery of

9  these costs. For purposes of this motion, the request to recover Mr. Pearl's costs is denied.

10  **V.**    **DISPOSITION**

11      Based on the foregoing, Plaintiffs' motion for attorneys' fees is GRANTED. However,

12  the Court finds that fees incurred by Plaintiffs' attorneys and paralegals totaling $155,562.50 are

13  unreasonable and cannot be recovered. Judgment was entered on July 24, 2018. Of the fees

14  found to be unreasonable, $152,775.00 were incurred pre-judgment and $2787.50 were incurred

15  post-judgment.

16      As noted above, the pre-judgment lodestar is the amount claimed ($2,143,568.36) minus

17  the unrecoverable amount ($152,775.00), which totals **$1,990,793.36**. The post-judgment

18  lodestar is the post-judgment amount claimed in the opening brief ($98,211.95) plus the amount

19  claimed in the reply ($234,004.18) plus the amount claimed in the supplemental brief

20  ($48,416.28) minus the unrecoverable amount ($2,787.50), which totals **$377,844.91**.

21      Plaintiffs requested a multiplier of 1.8. The Court finds this multiplier is too high and

22  that a multiplier of 1.4 is reasonable for fees incurred on or before July 24, 2018 when judgment

23  was entered. No multiplier will be applied to fees incurred after July 24, 2018. The recoverable

24      ///

25      ///

26      ///

27      ///

28

**Ex. A - 55**

1   pre-judgment attorneys' fees are the product of 1.4 and $1,990,793.36, which equals

2   $2,787,110.70. The recoverable post-judgment attorneys' fees are $377,844.91. The sum of

3   these numbers is the total attorneys' fees granted to Plaintiffs: **$3,164,955.61**.

5   Dated: January 22, 2019

                                    Thomas E. Kuhnle
                                    Judge of the Superior Court

*Rea v. Blue Shield of California,* Los Angeles Superior Ct. No.
BC468900

E-Served: Nov 13 2020  4:21PM PST  Via Case Anywhere

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Central District, Spring Street Courthouse, Department 7

**BC468900**                                                November 13, 2020
**MARISSA REA ET AL VS BLUE SHIELD OF CALIFORNIA**            4:07 PM

Judge: Honorable Amy D. Hogue          CSR: None
Judicial Assistant: A. Morales          ERM: None
Courtroom Assistant: T. Bivins          Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Ruling on Submitted Matter

The Court, having taken the matter under submission on 11/13/2020, now rules as follows: The Application for an Award of Attorney's Fees, Service Award to Class Representative, and Reimbursement of Expenses filed by Marissa Rea on 07/24/2020 is Granted in Part.

The Order Granting In Part Plaintiffs' Motion for Attorney's Fees and a Class Representative Service Award and Denying Plaintiff's Request for Costs Without Prejudice is signed and filed this date.

The clerk is to give notice. Clerk's Certificate of Service By Electronic Service is attached.

Ex. A - 58

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

Reserved for Clerk's File Stamp

COURTHOUSE ADDRESS:

Spring Street Courthouse

312 North Spring Street, Los Angeles, CA 90012

PLAINTIFF:

Marissa Rea et al

DEFENDANT:

Blue Shield of California et al

**FILED**
Superior Court of California
County of Los Angeles

11/13/2020

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ A. Morales _____ Deputy

| **CERTIFICATE OF ELECTRONIC SERVICE**<br>**CODE OF CIVIL PROCEDURE 1010.6** | CASE NUMBER:<br>BC468900 |
|---|---|

I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I
am not a party to the cause herein, and that on this date I served one copy of
the  Minute Order and Order

entered herein, on ___11/13/2020___, upon each party or counsel of record in the above entitled action, by

electronically serving the document(s) on _____ Case Anywhere _____ at

_secure.caseanywhere.com_____ on ___11/13/2020___ from my place of

business, Spring Street Courthouse  312 North Spring Street, Los Angeles, CA 90012

in accordance with standard court practices.


Sherri R. Carter, Executive Officer / Clerk of Court


Dated: _11/13/2020_____          By: _A. Morales_____

                                              Deputy Clerk

**CERTIFICATE OF ELECTRONIC SERVICE**
**CODE OF CIVIL PROCEDURE 1010.6**

CODE Civ. Proc. § 1013(f)

**Ex. A - 59**

1
2
3
4
5
6
7

FILED
Superior Court of California
County of Los Angeles

NOV 13 2020

Sherri R. Carter, Executive Officer/Clerk
_alfredo Morales_ dep.
ALFREDO MORALES

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               FOR THE COUNTY OF LOS ANGELES

10

11  MARISSA REA and KERRY                    )  Case No.:  BC468900
12  MELACHOURIS, on behalf of themselves     )
    and all others similarly situated,        )  ORDER GRANTING IN PART
13                                            )  PLAINTIFFS' MOTION FOR
14                                            )  ATTORNEY'S FEES AND A CLASS
                        Plaintiffs,           )  REPRESENTATIVE SERVICE AWARD
15                                            )  and DENYING PLAINTIFF'S REQUEST
16       vs.                                  )  FOR COSTS WITHOUT PREJUDICE
17                                            )
    CALIFORNIA PHYSICIANS' SERVICE           )
18  dba BLUE SHIELD OF CALIFORNIA,           )
19  and DOES 1-25, inclusive,                )  Hearing Date:  November 13, 2020
20                                            )  Time: 2:00 p.m.
                        Defendants.           )  Dept.: 7
21                                            )
22                                            )
23                                            )

24       In late 2018, Plaintiffs Marissa Rea (in her representative capacity) and Kerry Melachouris
25  (in her individual capacity) moved the Court to summarily adjudicate their declaratory relief cause
26  of action against Defendant Blue Shield of California ("Blue Shield").  The Court granted
27  Plaintiffs' motion in part on May 23, 2019 and declared "Blue Shield's residential treatment
28

- 1 -

**Ex. A - 60**

exclusion violated California's Mental Health Parity Act as applied to persons suffering from anorexia nervosa or bulimia nervosa.   Blue Shield may not rely on that unlawful exclusion to refuse to reimburse any new or resubmitted claim for medically necessary residential treatment of any class member's anorexia nervosa or bulimia nervosa." (Declaration of Sarah E. Gettings in Opposition ("Gettings Decl."), Exh. 9, p. 2 (original in bold).)

Plaintiff Rea ("Plaintiff")[1] now moves the Court to award her attorney's fees and an award for her service as class representative, and to reimburse her expenses.  Blue Shield opposes Plaintiff's motion.

The Court, for the following reasons, GRANTS IN PART Plaintiff's motion for fees, GRANTS Plaintiff's motion for a class representative service award, and DENIES without prejudice Plaintiff's motion to award costs.

I.   Case History

The 1999 California Mental Health Parity Act ("Parity Act") addressed the "imbalance between medical coverage for physical illnesses and mental illnesses" by mandating that "every health care service plan contract 'provide coverage for the diagnosis and medically necessary treatment of severe mental illnesses … under the same terms and conditions applied to other mental illnesses…'." (*Rea v. Blue Shield of California* (2014) 226 Cal.App.4th 1209, 1214 (*Rea*).) *Rea*, an appeal in this case, summarized its key issue: "whether the Parity Act requires coverage for residential treatment for the eating disorders anorexia nervosa and bulimia nervosa even where the health plan does not provide coverage." (*Ibid.*)

The Ninth Circuit Court of Appeals first addressed this issue in *Harlick v. Blue Shield of California* (9th Cir. 2012) 686 F.3d 699, 703-704, 710 (*Harlick*) and held the Parity Act "mandated that a plan within the scope of the Act provide 'all medical necessary treatment' for 'severe mental

---

[1] The Court's order denying Plaintiffs' motion for summary judgment found that Plaintiff Melachouris "could proceed with an individual case only." (Declaration of Kathryn M. Trepinski in Support ("Trepinski Decl."), ¶ 22.) Her case was "resolved" and a dismissal entered on March 11, 2020; Rea is thus the only remaining plaintiff. (Trepinski Decl., ¶ 2.)  "Plaintiffs" as used in the Case History herein (section I) refers to both Rea and Melachouris.

- 2 -

1  illnesses'" and plaintiff Harlick's outpatient residential care for anorexia nervosa was "medically
2  necessary."

3      Following *Harlick,* on September 2, 2011 Plaintiffs filed this lawsuit alleging defendant
4  Blue Shield, as their insurer, had denied them "residential treatment for their severe mental
5  illnesses." (Declaration of Lisa S. Kantor in Support ("Kantor Decl."), ¶ 20.) Plaintiffs' December
6  2011 First Amended Complaint alleged breach of contract, breach of the implied covenant of good
7  faith and fair dealing, declaratory relief, unfair business practices, and an Unruh Act violation.
8  (Kantor Decl., ¶ 21.)

9      Blue Shield demurred to Plaintiffs First Amended Complaint, and the Court sustained Blue
10  Shield's demurrer over Plaintiffs' opposition, which extensively discussed the Parity's Act's
11  legislative history. (Kantor Decl., ¶¶ 22-24.) The Court entered judgment in Blue Shield's favor;
12  Plaintiffs then moved for a new trial, which the Court denied. (Kantor Decl., ¶¶ 27-28.) Plaintiffs
13  appealed and won — the June 10, 2014 Court of Appeal decision *Rea, supra,* 226 Cal.App.4th at
14  p. 1239 reversed the trial's court judgment. (Kantor Decl., ¶¶ 29, 34.)

15      On remand at the April 22, 2015 Initial Status Conference, the Court lifted the stay on
16  discovery and granted Plaintiffs leave to file a Second Amended Complaint. (Kantor Decl., ¶¶56-
17  57.) Plaintiffs sought to discover information regarding their proposed class, namely the number
18  of Blue Shield insureds who "were denied authorization for residential treatment of anorexia
19  nervosa or bulimia nervosa on the grounds that their policy did not provide coverage for residential
20  treatment, and who obtained the residential treatment." (Kantor Decl., ¶ 58.) Plaintiffs detail their
21  extended efforts to obtain this information, including serving multiple interrogatory sets and meet
22  and confer letters and deposing Blue Shield's Person Most Qualified witness. (Kantor Decl., ¶¶
23  65-78.) In sum, Rea took two depositions (in addition to Blue Shield's PMQ, Rea deposed Blue
24  Shield's third-party mental health service administrator), propounded 18 special interrogatories,
25  35 document requests, one request for admission, and one set of form interrogatories; Melachouris
26  propounded 30 interrogatories. (Gettings Decl., ¶¶ 8-9.) In turn, Blue Shield propounded 33
27  document requests each on Rea and Melachouris. (Gettings Decl., ¶ 10.) The parties exchanged
28  between 10,000 and 12,000 pages of documents. (Gettings Decl., ¶ 10.)

- 3 -

1    The Court set an early 2017 briefing schedule for Plaintiffs' motion for class certification,
2    which was continued by stipulation to July 21, 2017. (Kantor Decl., ¶¶ 79, 81.) The parties
3    disagreed on whether the deadline to bring the case to trial was approaching; Plaintiffs ultimately
4    filed their motion for class certification on May 1, 2017, and simultaneously moved for leave to
5    file a Third Amended Complaint. (Kantor Decl., ¶ 85.) The TAC seeks "only injunctive and
6    declaratory relief requiring Blue Shield to 'reprocess' the requests for authorization or claims that
7    had been improperly denied in violation of the Parity Act, modified the relief sought to injunctive
8    relief seeking the reprocessing of Class members claims." (Kantor Decl., ¶ 105.) Plaintiffs
9    amended because "a series of cases that had denied class certification in cases challenging an
10   insurer's use of unlawful guidelines if the relief sought would require the trial court to make
11   individualized determinations of medical necessity." (Kantor Decl., ¶ 105.)

12       Blue Shield ultimately did not oppose Plaintiffs' motion for leave. (Kantor Decl., ¶ 89.)
13   After additional continuances, the Court heard Plaintiffs' motion for class certification on January
14   8, 2018 and on May 1 issued an order granting in part and denying in part the motion. (Kantor
15   Decl., ¶¶ 88, 90.) The Court certified a class as to Plaintiffs' declaratory relief and unfair
16   competition causes of action only, a class defined as "[a]ll persons who were covered under a Blue
17   Shield non-ERISA health plan issued, amended or renewed in California during the period
18   September 2, 2007 through December 31, 2015 and who were denied authorization or
19   reimbursement for residential treatment of anorexia nervosa or bulimia nervosa on the grounds
20   that their plan did not provide coverage for residential treatment during that time period." (Kantor
21   Decl., ¶ 90.)

22       The parties generally agreed on the form of class notice; they disagreed on whom would
23   receive it and how. (Kantor Decl., ¶ 92.) In certifying the class, the Court accepted Plaintiffs'
24   proposed method of notifying all Blue Shield non-ERISA plan members who requested any
25   treatment for anorexia or bulimia; these members would then "self-identify" if they had requested
26   or requested and been denied residential treatment. (Kantor Decl., ¶ 93.) Blue Shield maintained
27   its databases did not allow a search to obtain this information. (Kantor Decl., ¶ 96.) The Court
28   permitted Blue Shield an opportunity to propose a different method for ascertaining the class; after

- 4 -

briefing by both parties, the Court ultimately rejected Blue Shield's alternative proposals and ordered class notice per its certification order, to be completed by October 1, 2018. (Kantor Decl., ¶ 102.) Blue Shield provided the names and addresses of 2,630 insureds to the class notice administrative by the October 1 deadline. (Kantor Decl., ¶ 103.)

In the final stage of litigation, mid-2018 to early-2019, both parties moved simultaneously for summary judgment. (Gettings Decl., ¶ 14.) Blue Shield's motion, in part, asserted plaintiff Melachouris had not been treated for a "severe mental illness" covered by the Parity Act. (Kantor Decl., ¶ 108.) Both parties submitted expert testimony on the issue. (Kantor Decl., ¶¶ 108-112.) To support their motion and in opposition to Blue Shield's motion, Plaintiffs submitted 11 declarations. (Kantor Decl., ¶ 113.) They did not oppose Blue Shield's motion for summary judgment or adjudication of their breach of contract, bad faith, and Unruh Act causes of action, and instead dismissed these three claims on June 14, 2019. (Gettings Decl., ¶ 17.) After hearing argument on May 23, 2019, the Court denied both parties' motions for summary judgment, but granted in part and denied in part both of their motions for summary adjudication. The Court granted Blue Shield's motion to summarily adjudicate Plaintiffs' prayer for punitive damages, and noted Plaintiffs in opposition "state that they intend to seek leave of Court to dismiss their First, Second, and Fifth causes of action." (Gettings Decl., Exh. 9 [Order Denying Defendant's Motion for Summary Judgment and Granting in Part Defendant's Motion for Summary Adjudication (May 23, 2019) 3].) And as discussed above, the Court granted Plaintiffs' motion to summarily adjudicate their declaratory relief cause of action. (Gettings Decl., Exh. 9 [Order Denying Plaintiffs' Motion for Summary Judgment and Granting in Part Plaintiffs' Motion for Summary Adjudication (May 23, 2019) 2].)

Following the summary judgment cross-motions, the parties participated in a private mediation, negotiated class notice issues, dismissed Plaintiff Melachouris's individual claims, and sought to continue trial dates. (Gettings Decl., ¶ 19.) Blue Shield "agreed" to reprocess requests for authorization of claims that were improperly denied based on the unlawful residential exclusion. (Kantor Decl., ¶¶ 119-121.) The parties agreed upon, and the Court approved, a Class Notice and Claim Form. (Kantor Decl., ¶ 120.) The Notice and Form were mailed to 2,626 Blue

- 5 -

1   Shield insureds during the second week of March 2020; Blue Shield mailed a reminder letter on

2   July 1, 2020. (Kantor Decl., ¶ 121; Gettings Decl., ¶ 23.) Class members had until September 1,

3   2020 to submit their claims to Blue Shield for reprocessing. (Kantor Decl., ¶ 121; Gettings Decl.,

4   ¶ 23.)

5

6   II.    Legal Standard

7          The "general American rule" is parties bear the costs of their own attorneys. (*Laffitte v.*

8   *Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488.) One exception is the fee-shifting "private

9   attorney general" statute, Code of Civil Procedure section 1021.5. (*Id.* at p. 489.) Upon motion,

10  a court may award attorneys' fees to a "successful party" against one or more opposing parties in

11  any action which has resulted in the "enforcement of an important right affecting the public

12  interest" if:

13         (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the

14              general public or a large class of persons,

15         (b) the necessity and financial burden of private enforcement, or of enforcement by one

16              public entity against another public entity, are such as to make the award appropriate,

17              and

18         (c) such fees should not in the interest of justice be paid out of the recovery, if any.

19  (Code Civ. Proc., § 1021.5.) "The party seeking attorney fees has the burden of proving that the

20  litigation warranted an award of attorney fees and that the hours expended and the fees sought

21  were reasonable." (*Save Our Uniquely Rural Community Environment v. County of San*

22  *Bernardino* (2015) 235 Cal.App.4th 1179, 1184 (*Save Our*).)

23

24  III.   Fees Requested

25         Plaintiff moves the Court for attorney's fees and costs totaling <u>$6,861,010.15</u> divided

26  between two law firms, Kantor & Kantor and Trepinski Firm. Counsel represented Plaintiff on a

27  fully contingent basis. (Kantor Decl., ¶ 142.) A written retainer agreement grants Kantor & Kantor

28  75% of total fees awarded and Trepinski Firm the remaining 25%. (Kantor Decl., ¶ 130.)

- 6 -

1       The total requested attorneys' fee award is $6,747,300. Kantor & Kantor's $2,982,150

2  lodestar represents 3,313.50 hours collectively accrued by counsel Lisa S. Kantor and J. David

3  Oswalt at their $900 current hourly rates. (Kantor Decl., ¶ 142.) Trepinski Firm's $391,500

4  lodestar represents 435 hours accrued by co-counsel Kathryn Trepinski at her current $900 hourly

5  rate. (Kantor Decl., ¶ 143; Trepinski Decl., ¶ 26.) The two lodestars summed is $3,373,650, which

6  Plaintiffs request the Court increase by a multiplier of 2 (i.e., double) for a $6,747,300 total fee

7  award. (Kantor Decl., ¶ 146.)

8       The total requested cost award is $113,710.15 — $1,474.20 to Trepinski Firm and

9  $112,235.92 to Kantor & Kantor. Plaintiff also requests $10,000 for serving as class

10  representative.

11

12  IV.   <u>The Court Awards $3,800,000 in Attorney Fees.</u>

13       The parties do not dispute Plaintiff meets the section 1021.5 elements; Blue Shield "does

14  not begrudge Plaintiff's counsel being awarded appropriate fees for obtaining the appellate ruling

15  [*Rea*] and for fashioning the declaratory relief that ultimately resulted...." (Opposition, 1:9-10.)

16  Instead, Blue Shield argues Plaintiff's requested fee award should be either denied outright or

17  reduced because, among other reasons, she does not submit evidence sufficient to support her

18  proposed award.

19       Plaintiff submits declarations by counsel detailing the case history in narrative form. (See

20  Kantor Decl., ¶¶ 2-128.) Oswalt describes the work he performed on certain aspects of the case.

21  (Oswalt Decl., ¶¶ 2-3.) Counsel and experts also opine on the reasonableness of their hourly rates

22  and discuss their education and experience. (Kantor Decl., ¶¶ 131-148; Trepinski Decl., ¶¶ 26-28;

23  Oswalt Decl., ¶¶ 4-11; Declaration of Richard M. Pearl in Support ("Pearl Decl."), ¶ 13-16.) In

24  an exhibit, Plaintiff submits a three-column table; the first column divides the case into general

25  time periods, the second column states the total hours expended by counsel in each period, and

26  third column lists the total fees accrued during each general time period:

27

28

- 7 -

**EXHIBIT A**
**PLAINTIFF'S LODESTAR**

| TIME PERIOD | HOURS | TOTAL |
|---|---|---|
| File Opening through Motion for New Trial (9.24.10 - 9.1.12) | 291.10 (K&K) | $261,990 |
| Appeal (9.26.12 - 9.17.14) | 448.70 (K&K) | $401,130 |
| Remand and Discovery (9.27.14 - 4.18.17) | 802.20 (K&K) 26.0 (Trepanski) | $721,980 $23,400 |
| Class Certification (4.19.17 - 8.30.18) | 948.20 (K&K) 196.50 (Trepanski) | $853,380 $170,850 |
| Motions for Summary Judgment (8.31.18 - 5.23.19) | 481.20 (K&K) 69.0 (Trepanski) | $433,080 $62,100 |
| Post-Motions for Summary Judgment (5.24.19 - 6.15.20) | 345.10 (K&K) 43.50 (Trepanski) | $310,590 $129,150 |
| **TOTALS** | **3,748.50** | **$3,373,650** |

(Kantor Decl., Exh. A.) Plaintiff also submits an Appendix of Evidence consisting of briefs and documents filed in the case, discovery documents, and correspondence between the parties, among other documents. (See Plaintiff's Appendix of Evidence in Support.) Aside from the table above, Plaintiff does not submit any time records, contemporaneous or reconstructed, nor has she provided any time records to Blue Shield. (Gettings Decl., ¶ 2.)

A court assessing section 1021.5 attorney's fees "begins with the touchstone or lodestar figure," which is based on a "careful compilation of the time spent and reasonable hourly compensation of each attorney ... involved in the presentation of the case." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131-1132 (*Ketchum*) [citing *Serrano v. Priest* (1977) 20 Cal.3d 25, 48].) To determine whether the lodestar itself is "reasonable," the California Supreme Court has instructed trial courts to "carefully review attorney documentation of hours expended" because "'padding' in the form of inefficient or duplicative efforts is not subject to compensation." (*Ketchum*, at p. 1132.)

The Court cannot conduct a detailed analysis of the lodestar "reasonableness" based on Plaintiff's presented evidence. Plaintiff's table can be described as "block billing" — "assign[ing] a block of time to multiple tasks rather than itemizing the time spent on each task." (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1010 (*Heritage*).) While not "objectionable per se," block billing can "exacerbate[] the vagueness" of a fee request — a "risky

- 8 -

1   choice since the burden of proving entitlement to fees rests on the moving party" — or justify

2   reducing an award if it prevents courts from "discerning which tasks are compensable and which

3   are not." (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1325; *Heritage,* at

4   pp. 1010-1011.)

5         Without a detailed showing of time records, the Court agrees with Defendant that it should

6   impose a percentage reduction of the hours billed to account for billing errors and time expended

7   on tasks that did not further the policies of section 1021.5. The Court also agrees with Defendant

8   that the Court should not consider the supplemental evidence Plaintiff provides for the first time

9   in her Reply.

10        The Court finds the $900 hourly rate is a reasonable proxy for an award of fees plus interest

11  notwithstanding the lower rates charged by Plaintiff's counsel in the past. However, to address

12  billing errors and time expended on matters later abandoned by Plaintiff, the Court concludes that

13  a 25% reduction — reducing the lodestar to $2,530,237.50 — is fair. The Court is also persuaded

14  that a multiplier of approximately 1.5 is reasonable and necessary to compensate counsel for the

15  risks and contingencies of prosecuting the case. Applying a multiplier of approximately 1.5, the

16  Court awards total fees of $3,800,000.

17        The Court awards $10,000 to the plaintiff for her services as class representative.

18        The Court denies Plaintiff's request for costs without prejudice to Plaintiffs filing a

19  Memorandum of Costs and Defendant filing a motion to tax costs. The Court requires the parties

20  to first meet and confer, via telephone or videoconference, in an effort to agree on recoverable

21  costs. The parties must discuss each item of costs requested, mindful that items allowable as costs

22  are "governed strictly" by Code of Civil Procedure section 1033.5. (*Ladas v. California State Auto*

23  *Assn.* (1993) 19 Cal.App.4th 761, 774.)

24

25

26

27

28

- 9 -

V.    Conclusion

The Court GRANTS Plaintiff's motion for attorney's fees in the amount of $3,800,000. The Court awards $10,000 to Plaintiff as class representative. The Court denies, without prejudice, Plaintiff's request for costs.

Dated:    NOV 1 3 2020

AMY D. HOGUE
AMY D. HOGUE THE SUPERIOR COURT

- 10 -

Ex. A - 69