1   GAY C. GRUNFELD – 121944
    VAN SWEARINGEN – 259809
2   MICHAEL FREEDMAN – 262850
    ERIC MONEK ANDERSON – 320934
3   HANNAH M. CHARTOFF – 324529
    BEN HOLSTON – 341439
4   ROSEN BIEN
    GALVAN & GRUNFELD LLP
5   101 Mission Street, Sixth Floor
    San Francisco, California  94105-1738
6   Telephone:   (415) 433-6830
    Facsimile:    (415) 433-7104
7   ggrunfeld@rbgg.com
    vswearingen@rbgg.com
8   mfreedman@rbgg.com
    eanderson@rbgg.com
9   hchartoff@rbgg.com
    bholston@rbgg.com
10
    AARON J. FISCHER – 247391
11  LAW OFFICE OF
    AARON J. FISCHER
12  1400 Shattuck Square Suite 12 - #344
    Berkeley, California  94709
13  Telephone:  (510) 806-7366
    Facsimile:   (510) 694-6314
14  ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

15  Attorneys for Plaintiffs and the
    Certified Class and Subclasses

16

17              UNITED STATES DISTRICT COURT

18              SOUTHERN DISTRICT OF CALIFORNIA

19  DARRYL DUNSMORE, ANDREE                Case No. 3:20-cv-00406-AJB-DDL
    ANDRADE, ERNEST ARCHULETA,
20  JAMES CLARK, ANTHONY EDWARDS,          **REPLY DECLARATION OF**
    REANNA LEVY, JOSUE LOPEZ,              **VAN SWEARINGEN IN**
21  CHRISTOPHER NORWOOD, JESSE             **SUPPORT OF PLAINTIFFS'**
    OLIVARES, GUSTAVO SEPULVEDA,           **MOTION FOR INTERIM**
22  MICHAEL TAYLOR, and LAURA              **ATTORNEYS' FEES AND**
    ZOERNER, on behalf of themselves and all  **COSTS**
23  others similarly situated,
                                           Judge:    Hon. Anthony J. Battaglia
24           Plaintiffs,

              v.                           Date:     May 8, 2025
25                                         Time:     2:00 p.m.
    SAN DIEGO COUNTY SHERIFF'S             Crtrm:    4A
26  DEPARTMENT, COUNTY OF SAN
    DIEGO, SAN DIEGO COUNTY
27  PROBATION DEPARTMENT, and DOES
    1 to 20, inclusive,
28           Defendants.

I, Van Swearingen, declare:

1.    I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs and the Certified Class and Subclasses.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Motion for Interim Attorneys' Fees and Costs.

**Plaintiffs Prevailed on Discovery Disputes that Defendants Claim Were Unsuccessful**

2.    Defendants' Opposition to Plaintiffs' Motion for Interim Attorneys' Fees and Costs ("Opposition" or "Opp.") contends that "the Court made specific findings that plaintiffs' requests were overbroad, wasteful, unnecessary and not calculated to lead to the discovery of admissible evidence."  Opp. at 14.  The Court never found that Plaintiffs' requests were "wasteful" or "unnecessary."  In any event, Plaintiffs obtained the majority of the discovery sought in relation to their ADA claim.  The Court even granted Plaintiffs' *expedited* discovery request to inspect Rock Mountain and Central Jail, to depose Defendants' Rule 30(b)(6) witnesses, and to propound ten written discovery requests—all related to Plaintiffs' ADA claim.  *See* Dkt. 258.  The Court also granted Plaintiffs' requests in contested discovery motions.  For example, in response to Plaintiffs' Motion to Compel Production of Privilege Log (Dkt. 456-1), the Court ordered Defendants to produce the privilege log pertaining to the notes Commander Bavencoff took regarding ADA services and areas for potential change.  *See* Dkt. 478 at ECF p. 3.

3.    Defendants contend that "[e]very informal discovery conference ('IDC'), with possibly two non-ADA related exceptions, was initiated by Plaintiffs pursuing unreasonable requests.  Every time, either through Plaintiffs' capitulation or Court order, Plaintiffs were denied their overbroad original ask."  Opp. at 14.  This is incorrect.  For example, the Court held an informal discovery conference on

October 30, 2023.  At that hearing, Plaintiffs sought the ability to have their ADA and other experts talk to correctional staff during the jail inspections.  Defendants' counsel acknowledged that "the major issue, I think, that we need help with first is interviewing employees and incarcerated people during the inspections.  And the defense has always objected to that."  Tr. at 7.  A true and correct copy of the October 30, 2023 hearing transcript is attached as **Exhibit A**.  The Court held another informal discovery conference on November 6, 2023.  A true and correct copy of the November 6, 2023 hearing transcript is attached as **Exhibit B**.  At that hearing, Plaintiffs requested the ability to have counsel and their ADA and other experts speak with incarcerated people.  Tr. at 49.  Plaintiffs also asked for rosters of incarcerated person at each facility during Plaintiffs' expert inspections.  Tr. at 55. The Court granted Plaintiffs' requests to have their ADA and other experts pose questions to employees during inspections, to speak privately with consenting incarcerated people, and to receive floor plans and a roster of incarcerated persons "that notes the incarcerated persons with disabilities and the type of disability." Dkt. 478 at ECF p. 3.

4.      With respect to Plaintiffs' Motion to Compel Production of Documents and Interrogatory Response (Dkt. 489-1), Defendants' Opposition contends that "[t]he Court denied the motion as to every disability-related request except No. 167, and narrowed it significantly to nothing more than a participation log and list of programs."  Opp. at 16.  This is incorrect.  Plaintiffs' discovery motion was directed at over 50 individual Requests for Production ("RFPs"); however, only three of those 50 requests were focused on ADA issues (RFPs 164, 166, and 167).  *See* Dkt. 489-1.  Of those three requests, Judge Leshner specifically ordered Defendants to produce some responsive documents as to two of the three RFPs (164 and 167) because Defendants refused to produce any responsive documents.  *See* Dkt. 536 at ECF 17.  Beyond the documents the Court ordered to be produced for two of the three ADA RFPs at issue, Judge Leshner denied further discovery on those three

requests because Defendants' counsel represented that all responsive training bulletins, green sheets, policies and procedures, audits, and quality assurance documents had been produced as to those requests at the February 6, 2024 discovery hearing.  Tr. at 37-38; Dkt. 536 at ECF 8.  A true and correct copy of the February 6, 2024 discovery hearing transcript is attached as **Exhibit C**.  Notably, Defendants' written response to these three RFPs said that no further documents would be produced beyond the policies and procedures already provided, which is why Plaintiffs had to pursue further documents.  *See* Defs' November 10, 2023 response to RFP Set 5.  In any event, given that only three of the 50+ discovery requests at issue in the Court's order related to ADA issues, Plaintiffs' counsel did not claim any time in the instant fee motion for work on the discovery motion or attending the discovery hearing.

**Defendants Complain About Time Entries That Were Not Claimed or Are Negligible**

5.      Defendants' Opposition suggests that RBGG attorneys "had to make a special trip down" to San Diego for a hearing ordered by Judge Leshner (Dkt. 518) regarding Plaintiffs' Limited Reply in Support of Motion to Compel Addressing False Statement in Defendants' Opposition (Dkt. 516-1).  Opp. at 14-15.  It is unclear why Defendants make this argument, as no time was claimed in the instant fee motion as to any Plaintiffs' counsel's attendance at this hearing.

6.      Defendants' Opposition also contends that "Plaintiffs should not be allowed to recover attorney fees for motions that were unnecessarily filed or opposed by their counsel, such as Plaintiffs' Notice of Deposition of Sheriff Martinez, and resulting pursuit of obtaining her deposition via Motion to Compel, all related meeting and conferring involved therewith."  Opp. at 18.  The only time included in Plaintiffs' Motion for Interim Attorneys' Fees and Costs ("Motion") for any work related to the deposition notice of Sheriff Martinez were two inadvertent entries:  one on April 9, 2024 for 0.2 hours (GCG entry "Revise Martinez deposition

notice and oversee service of same") and a second on June 7, 2024 entry for 0.3 hours (GCG entry "Conf w/ JM re Martinez deposition order, ADA order and overdose reporting"). As I stated in my initial declaration, I reviewed over 30,000 entries and tried to separate out ADA-specific entries for inclusion in Plaintiffs' Motion from those that will be claimed at a later time. *See* Dkt. 807-3 ¶¶ 7-10. Apparently, I inadvertently included these two entries, which total to 0.5 hours, for work related in any way to the Sheriff Martinez deposition notice. I believe I accidentally included this time because Defendants' ADA expert Julian Martinez shares Sheriff Martinez' last name, and we had separately noticed the deposition of ADA expert Julian Martinez. This 0.5 hours of inadvertently-included time amounts to less than two one-hundredths of a percent of claimed time (0.018%). As I stated in my initial declaration, Plaintiffs applied a 5% across-the-board reduction to account for any time that might possibly be considered incorrectly included.

7.    Defendants argue that "Plaintiffs should not recover any fees related to their unsuccessful Seventh Claim for Overincarceration of Disabled People." Opp. at 20. In reviewing time entries for inclusion in the fees motion, I generally excluded or reduced to zero any time for work on Plaintiffs' Seventh claim, the "Olmstead claim." Having reviewed the time entries submitted to the Court, I see that Plaintiffs included several entries for work on this claim that were reduced to zero hours (1/3/23 entry discounted by 0.8 hours to claim 0.0 hours, 1/11/23 entry discounted by 0.2 hours to claim 0.0 hours, 1/11/23 entry discounted by 0.3 hours to claim 0.0 hours, 1/15/23 entry discounted by 0.1 hours to claim 0.0 hours, and 1/16/23 entry discounted by 0.2 hours to claim 0.0 hours). Apparently, I inadvertently included three entries totaling 1.1 hours that are claimed in Plaintiffs' fee motion (11/22/21 entry for 0.7 hours, 2/7/22 entry for 0.2 hours, 1/4/23 entry for 0.2 hours). This 1.1 hours of inadvertently-included time amounts to four one-hundredths of a percent of claimed time (0.041%). As stated in my initial declaration, Plaintiffs applied a 5% across-the-board reduction to account for any

1    time that might possibly be considered incorrectly included.

2        8.    Defendants' expert John O'Connor claims that Plaintiffs' counsel's

3    work during the period from the beginning of the matter until August 15, 2022 was

4    "largely unsuccessful."  Dkt. 831-3 ¶ 68.  As demonstrated by Plaintiffs' counsel's

5    time records, this period included research related to Plaintiffs' ADA claim,

6    interviewing and corresponding with incarcerated persons with disabilities,

7    researching components of Plaintiffs' ADA claim, identifying and working with

8    Plaintiffs' ADA expert, and drafting expert and incarcerated person declarations for

9    Plaintiffs' first preliminary injunction motion.  Mr. O'Connor does not identify

10   what, among these tasks, was unsuccessful.  Although Plaintiffs did not prevail on

11   their first preliminary injunction motion, Mr. O'Connor does not make any showing

12   that the ADA work on that motion—including drafting expert and incarcerated

13   person declarations—was unrelated to Plaintiffs' ADA claim.  Nor could he, given

14   that the common core of facts and legal theories are part and parcel of Plaintiffs'

15   ADA claim.  Mr. O'Connor proposes discounting by 20% Plaintiffs' claimed time

16   from the beginning of the matter until August 15, 2022 because he estimates "that

17   somewhere between 20% and 40% of this time relates to matters other than ADA

18   issues given the scope of the claims for relief in the Third Amended Complaint."

19   Dkt. 831-3 ¶ 68.  As the person who vetted the time records and separated out ADA-

20   specific entries for inclusion in Plaintiffs' Motion from those that will be claimed at

21   a later time, I strongly disagree with Mr. O'Connor's contention.  It is notable that

22   he did not identify a single entry that does not relate to ADA issues.

23   **Plaintiffs Did Not Overstaff the Case and Often Had the Same Number of
     Attorneys as Defendants at Key Events**

24

25       9.    Defendants' Opposition states that Burke, Williams & Sorensen LLP

26   attorneys Elizabeth Pappy and Susan Coleman "took and defended all but the

27   Plaintiffs' depositions."  Opp. at 4.  This is incorrect.  Deann Rivard, an attorney at

28   Burke, Williams & Sorensen LLP, conducted numerous depositions, including

depositions of Plaintiffs as well as the depositions of several of Plaintiffs' experts. Attached as **Exhibit D** are true and accurate copies of portions of the deposition transcripts of Gary Raney, Christine Scott-Hayward, and Karen Snell.  Ms. Rivard also prepared Defendants' witnesses for depositions.  Attached as **Exhibit E** is a true and accurate copy of a portion of the deposition of Commander Christopher Buchanan (Commander Buchanan stating that Ms. Rivard prepared him for his deposition).

10.    Defendants' Opposition contends that "[t]he billing records submitted by Plaintiffs demonstrate too many attorneys attending depositions, court hearings, settlement conferences and at site inspections."  Opp. at 17.  Defendants do not identify any attorneys other than Burke, Williams & Sorensen LLP partners Elizabeth Pappy and Susan Coleman working on behalf of or with Defendants. Opp. at 4-6.  However, numerous other attorneys assisted Ms. Pappy and Ms. Coleman in the defense of this case, including in depositions, court hearings, settlement conferences, court filings, and at site inspections.  These include Burke, Williams & Sorensen LLP partner Martin Kosla, who has not made an appearance but is in Defendants' pleading captions (*see, e.g.*, Dkt. 855), and associate attorneys Salayha Ghoury and Deann Rivard, both of whom made appearances in the case. *See* Dkts. 457 and 622.  Senior Deputy County Counsel Steven Inman is also counsel of record in this case.  *See* Dkt. 261.  Mr. Inman has appeared at court hearings.  As noted in Mr. Inman's notice of appearance, Senior Deputy County Counsel Fernando Kish has also been responsible for litigation in this case.  *Id.* at ECF p. 2.  Plaintiffs' counsel personally met with Mr. Kish to discuss this case, and also conferred with Deputy County Counsel attorneys Matthew O'Sullivan and Ronald Lenert on multiple occasions—neither of whom filed a notice of appearance. Mandy Kamphoefner is a Legal Advisor at the San Diego Sheriff's Department, and according to her web bio, is responsible for providing legal advice to the Department related to the Americans with Disabilities Act (ADA) and related state

laws. Attached as **Exhibit F** is a true and correct copy of Ms. Kamphoefner's website bio. *See* https://www.sdsheriff.gov/bureaus/about-us/command-staff/mandy-kamphoefner-legal-advisor (accessed March 19, 2025). Ms. Kamphoefner attended numerous Plaintiffs' inspections of the Jail facilities, including ADA-specific inspections. Numerous Sheriff's Office ("SDSO") personnel joined Ms. Coleman and Ms. Kamphoefner during Jail inspections, often with three to five SDSO personnel joining the inspection at any given time. During every Jail inspection, the number of people on Defendants' side outnumbered the number of attorneys and experts from Plaintiffs' side. Ms. Kamphoefner also attended the majority of the seventeen Court-supervised settlement conferences related to Plaintiffs' Third Claim for Relief. In addition to Ms. Pappy and Ms. Kamphoefner, Defendants typically had at least one Sheriff's Department representative at each settlement conference, meaning that the number of attendees on the Defendants' side was typically the same as the number of attendees on the Plaintiffs' side. SDSO has over 4,000 full-time employees, many of whom are available to assist Defendants' counsel in collecting and organizing relevant evidence, drafting declarations, responding to questions about Defendants' policies and practices, and to otherwise assist Defendants' counsel in this case. *See* https://www.sdsheriff.gov/bureaus/about-us.

11. In contrast, Plaintiffs must rely on attorneys, paralegals, and support staff to collect and organize relevant evidence, draft declarations, review evidence of Defendants' policies and practices, correspond with difficult-to-reach incarcerated class members, and to otherwise assist in the prosecution of this case. During this litigation, Plaintiffs' counsel communicated with numerous attorneys for NaphCare, a medical contractor at the Jail, including Manning & Kass, Ellrod, Ramirez, Trester LLP attorneys Natalie Ortiz, Craig Smith, Alison De Young, David Fleck, Eugene Ramirez, Marguerite Jonak, Mark Wilson, Angela Thompson, Julie Contreras, Holly Thomas, Robert Murphy, and Deann Rivard (who has worked

1  on this case as both NaphCare and Defendants' counsel).  During this litigation,

2  Plaintiffs' counsel also interacted with numerous attorneys for Correctional Health

3  Partners, a medical contractor at the Jail, including Michael Dailey, Craig Mariam,

4  and Lara Garner.

5        12.    Defendants' fees expert suggests that nine timekeepers on Plaintiffs'

6  Fees Motion is excessive, and that "fees for co-counsel and expert communications

7  is clearly excessive."  Dkt. 831-3 ¶ 84.  As explained by the Declaration of Gay

8  Crosthwait Grunfeld, I led the efforts on this interim fees motion and supporting

9  declarations, including by coordinating projects with relevant personnel, reviewing

10  and preparing the time records, and drafting and revising substantial portions of the

11  supporting declarations.  Dkt. 807-2 ¶ 119.  My partner and lead counsel, Gay

12  Grunfeld, contributed to the drafting of her declaration as well as the declarations of

13  myself, Mr. Fischer, and Mr. Young.  *Id.* ¶ 120.  Mr. Nunez was the primary drafter

14  of Plaintiffs' memorandum of points and authorities in support of our application,

15  researched the relevant legal cases and secondary sources, and assisted with the

16  preparation of the supporting Richard Pearl, Claudia Center and Shawna Parks

17  declarations, filed herewith.  *Id.* ¶ 121.  Mr. Rosen's significant experience with fees

18  motions was essential to providing high-level strategy as well as edits and comments

19  to the moving papers and supporting declarations.  *Id.* ¶ 118; Reply Declaration of

20  Sanford Jay Rosen, filed herewith, ¶¶ 4-22.  RBGG Associates Hannah Chartoff and

21  Eric Monek Anderson contributed to the drafting of Ms. Grunfeld's declaration,

22  given their extensive hands-on experience with the case and knowledge of the facts

23  included in the 36 exhibits attached thereto.  Dkt. 807-2 ¶ 122.  Plaintiffs' counsel

24  relied on Mr. Nunez, Ms. Chartoff, and Mr. Anderson in part because of their lower

25  rates.  It was essential and necessary to communicate with Mr. Fischer to coordinate

26  the presentation of time entries (including discussion of the methodology used to

27  separately present ADA time from non-ADA time), costs, and his declaration.  For

28  the same reason, it was essential to coordinate and communicate with DLA Piper's

Christopher Young and his associate, Oliver Kiefer.

**Plaintiffs' Motion for Expedited Discovery Provided Evidence Necessary to Prosecute Plaintiffs' Motion for Preliminary Injunction**

13.    Plaintiffs filed a motion to expedite discovery on September 7, 2022. *See* Dkt. 212.  The Court's September 27, 2022 tentative ruling was to grant in part and deny in part the motion.  A true and correct copy of the Court's tentative ruling is attached hereto as **Exhibit G**.  However, Judge Leshner denied the motion as moot the day after his tentative ruling, on September 28, 2022, because Judge Battaglia dismissed the Second Amended Complaint with leave to amend.  Dkt. 221. After filing a Third Amended Complaint, Plaintiffs filed a second motion to expedite discovery on December 14, 2022.  Dkt. 243.  Defendants claim that the two motions for expedited discovery are "almost identical."  Opp. at 7.  In fact, other than sharing similar case law regarding expedited discovery, the two motions are completely different and contain almost no overlap whatsoever.  A true and correct copy of a Microsoft Word comparison of the two motions is attached as **Exhibit H**. Judge Leshner granted in part Plaintiffs' second motion for expedited discovery, permitting Plaintiffs to propound RFPs, notice Rule 30(b)(6) depositions, and conduct inspections of Defendants' jail facilities—all related to Plaintiffs' ADA claim.  Dkt. 258 at ECF pp. 5-6.  Plaintiffs' second motion to expedite discovery specifically stated that "Plaintiffs seek discovery about the Jail's current ADA policies and practices to evaluate the need for and scope of a potential renewed motion for a preliminary injunction."  Dkt. 243-1 at ECF p. 3.

**Defendants Rejected an ENE on All ADA Issues Until Plaintiffs Filed Their Motion for Preliminary Injunction**

14.    Defendants' Opposition contends that "Plaintiffs' counsel obviously delayed agreeing to an actual date for the ENE that defendants agreed to in December 2022—until they had billed for and filed the renewed injunction request in April of 2023."  Opp. at 8.

15.    Plaintiffs' counsel sought to target specific issues in an ENE at the December 7, 2022 discovery hearing, suggesting that the parties "try one or two topics to start."  Dkt. 831-2 at ECF pp. 41-42.

16.    In the parties' December 28, 2022 Joint Case Status Statement, Defendants' proposal for an ENE would not have resolved all of the issues in Plaintiffs' ADA claim.  Defendants refused to participate on an ENE as to the entirety of Plaintiffs' ADA claim and instead agreed to an ENE only as to physical barriers at just one of the seven jail facilities:  "the parties should meet and confer to narrow down the physical barriers at issue before an ENE. Defendant is amenable to an ENE regarding physical barriers at Rock Mountain, if any, after this process between the parties is completed."  Dkt. 249 at ECF p. 3.  In contrast, Plaintiffs proposed that the "most efficient use of the ENE process would be to address all [ ] ADA issues together"—not only "physical barriers at all Defendants' currently occupied facilities," but also the "significant ADA violations occurring within the Jail system with respect to multiple disabilities, including hearing, vision, mental health, substance use, and mobility," including "with respect to program access, assistive devices, [and] grievances."  Dkt. 249 at ECF p. 4.  Plaintiffs also proposed another ENE that would result in "cost savings and efficiencies" by having Defendants "retain mutually agreed-upon neutral experts with subject matter expertise on the relevant case issues. Neutral expert reports and recommendations would provide a useful guide to negotiations and the drafting of a remedial plan if the parties reach a class-wide settlement, and may assist in narrowing issues in the case."  *Id.* at ECF p. 6.  Defendants rejected this approach.  *Id.* at ECF p. 10.

17.    At the January 9, 2023 discovery hearing on Plaintiffs' second motion for expedited discovery, Defendants acknowledged that Plaintiffs were seeking discovery on an expedited basis to support a preliminary injunction on their ADA claim.  Dkt. 256 at 57:20–21.  At the hearing, Plaintiffs' counsel reiterated their interest in having an ENE on all ADA violations at issue in their Third Claim for

REPLY DECLARATION OF VAN SWEARINGEN IN SUPPORT OF
MOTION FOR INTERIM ATTORNEYS' FEES AND COSTS

1  Relief:  "What we would like to see is a court-supervised process for remediating

2  ADA violations and not just physical structures, which are important. But also how

3  the practices -- how are they accommodating our clients?"  *See* Dkt. 256 at 83:11–

4  14.  Defendants did not agree.  Plaintiffs also proposed having the ENE after

5  completing their initial expedited discovery.  *Id* at 83:15–18.

6      18.    After conducting discovery in January, February, and March 2023—

7  including inspections of the Central Jail and Rock Mountain facilities with the

8  parties' ADA experts—Plaintiffs sent a letter to Defendants on March 20, 2023,

9  stating that "we are preparing a motion for preliminary injunction."  A true and

10  correct copy of this letter is attached as **Exhibit I**.

11      19.    Three weeks prior to filing Plaintiffs' motion for preliminary injunction

12  as to ADA issues, on April 4, 2023, Plaintiffs sent a letter to Defendants stating that

13  Plaintiffs would forgo litigating their preliminary injunction as to ADA issues on the

14  condition that Defendants agree to an ENE:  "In order to avoid litigation on these

15  important issues, please let us know no later than April 10, 2023 if Defendants will

16  agree to an ENE process that includes the simultaneous mutual exchange of expert

17  [ADA] reports, the filing of a joint statement identifying points of agreement to be

18  included in a remedial plan and any points of disagreement, and the development of

19  a[n ADA] plan to timely remedy, at minimum, all points of agreement that would

20  result in a stipulated order to be submitted to the Court with Court oversight of the

21  process."  *See* Dkt. 281-2 (Grunfeld Decl., Ex. D) at ECF pp. 65–67.  This letter also

22  recounted some of the earlier efforts Plaintiffs made to engage Defendants on

23  resolution of the ADA claim.  *See id.* at ECF p. 66.

24      20.    Defendants again refused to participate in an ENE on anything but

25  physical barriers at a subset of the Jail's facilities and refused Court supervision of

26  the parties' negotiations.  In Ms. Pappy's April 4, 2023 email responding to

27  Plaintiffs' letter of the same day, Ms. Pappy reiterated Defendants' position that

28  they would focus on "what barriers exist" at the Central Jail and Rock Mountain

REPLY DECLARATION OF VAN SWEARINGEN IN SUPPORT OF
MOTION FOR INTERIM ATTORNEYS' FEES AND COSTS

facilities, and that the parties' experts and attorneys should try to resolve the issues first, without Court oversight.  *See* Dkt. 831-2 at ECF p. 54.

21.    Plaintiffs responded by letter dated April 11, 2023, stating that "The concept of having our 'experts … talk about what they found at the facilities, directly, and without attorney interference …' is unlikely to be productive in addressing multiple barriers at two large facilities in a timely manner."  *See* Dkt. 831-2 at ECF p. 58.  Plaintiffs' letter indicated that it would be helpful to see Defendants' experts' measurements and findings, *id.*; however, Defendants did not provide those to Plaintiffs until well over a year later, on August 21, 2024, the date of expert disclosures.  Plaintiffs' April 11, 2023 letter indicated that "Plaintiffs will participate in an ENE regarding Defendants' failure to comply with the ADA and related statutes.  As we informed you in December 2022 and more recently, for an ENE to be successful, there needs to be Court supervision of remedial efforts . . . You did not respond to this proposal to avoid motion practice. We therefore understand that Defendants are not amenable to this proposal."  *See id.* at ECF pp. 57.  Defendants responded the same day, again rejecting Plaintiffs' proposal for an ENE on ADA issues.  *See* Dkt. 831-2 at ECF pp. 59-60 ("Just as your proposal about ENE was rejected last December, it is once again rejected").

22.    Plaintiffs filed their Motions for Preliminary Injunction and Provisional Class Certification as to ADA issues on April 25, 2023.  *See* Dkt. 281.  On May 17, 2023, Defendants filed an opposition to Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification as to ADA issues.  Dkt. 311.  A hearing on the 2023 Preliminary Injunction Motion was scheduled for June 29, 2023.  *Id.*

23.    On June 5, 2023, Plaintiffs' counsel received a call from the chambers of this Court, asking for clarification regarding Exhibit Z to Gay Grunfeld's declaration in support of the 2023 Preliminary Injunction Motion, Dkt. 284-2. Exhibit Z comprised two rosters, produced by Defendants in connection with

1   Plaintiffs' inspection of Central Jail, documenting the housing placements of people

2   with disabilities at Central Jail as of February 27, 2023 and March 10, 2023.  The

3   Court clerk asked whether, in column E ("Bed") of the rosters, the entry "T"

4   indicates a top bunk.  Plaintiffs' counsel responded that it did. Exhibit Z reflected

5   that multiple people with mobility disabilities were housed inaccessibly in the

6   middle and top bunks of three-tiered beds. *See, e.g.*, Dkt. 284-2 at Z-423–425.  In

7   other words, people who needed wheelchairs, walkers, and canes were sometimes

8   housed on the top bunk of a triple bunk bed—a dangerous practice in clear violation

9   of the ADA.  As requested by the Court, Plaintiffs' counsel filed a supplemental

10  declaration with further explanation of Exhibit Z.  Dkt. 329.  Notably, Ms. Pappy

11  had informed the Court at the January 9, 2023 discovery hearing that "there's

12  nobody in three bunks anywhere in the facility."  Dkt. 256 at 65:9–10.

13          24.     The parties appeared in front of Judge Leshner at a status conference on

14  May 3, 2023, a true and correct copy of the transcript of that conference is attached

15  hereto as **Exhibit J**.  In that status conference, Judge Leshner stated that "I would

16  really like to hear from the parties, you know, what we can do -- you know, sort of

17  working on a parallel track -- to try to start working on some of these issues in the

18  case through the ENE process."  Tr. at 5:11–14.  Plaintiffs' counsel responded that

19  "We are happy to go to an ENE on the ADA issues. We have always been happy to

20  do that. And we have our calendars open for the earliest date that the Court has time

21  for us."  Tr. at 6:6–8.  Defendants' counsel indicated their preference to "get the

22  experts on a call with each other, come up with a list…. and see if they can hash out

23  what can be agreed to and what's not….  before we go to the ENE. And then spend

24  the time at the ENE discussing the things that we can't agree about."  Tr. at 8:20–

25  9:14.  Plaintiffs' counsel responded that Defendants' proposal "is unrealistic," in

26  part because Defendants already "have our expert's report [and] were with us during

27  these inspections."  Tr. at 10:4–8.  Plaintiffs' counsel added:

28          We're also happy to go to an ENE.  We've presented to them our

proposed order. These are the orders that we're seeking from the Court.
And they're not just about barriers. We're seeking identification and
tracking and better policies and procedures. Better grievance process.
That will address all of these issues; the ones we've brought up in the --
in the motion and -- of course, those are not the only ADA issues in the
third claim for relief. There's numerous others, on behalf of numerous
different people and types of disabilities.

*Id.* 10:23–11:8.  Defendants' counsel reiterated that they would like the experts to

talk "before the ENE." Tr. at 16:13–15.  Judge Leshner proposed that the parties

"participate in a discussion with their respective experts, to see where any areas of

agreement are. And then have an ENE with me." Tr. at 17:22–18:7.  Both parties

agreed to the process, and Judge Leshner requested that the parties do so before

having an ENE on May 24. *Id.* at 17:22-18:10, 20:4–22.

     25.     On May 10, 2023, the Court set an ENE for May 24, 2023, requiring

lead trial counsel and the parties' ADA experts to appear in person at the ENE.  Dkt.

302 at ECF p. 2.  The Court ordered counsel and their respective ADA compliance

experts to meet and confer by May 22, 2023 to determine the specific ADA issues

on which the parties believe they could make progress at the ENE.  *Id.*  The parties'

experts and their attorneys met via Zoom but were not able to resolve Plaintiffs'

ADA claim without further assistance by the Court.  After the May 24, 2023 ENE,

the Court set a further, counsel-only settlement conference for June 5, 2023.  Dkt.

317.  Over the course of the next year and a half, the parties participated in at least

seventeen additional Court-supervised settlement conferences related to Plaintiffs'

ADA claim.  *See* Dkt. 776 at ECF pp. 5-6.  These occurred simultaneously with

active litigation.  Indeed, when the parties were still negotiating a settlement, Judge

Leshner agreed to postpone the ADA expert depositions to allow negotiations to

progress, but only by approximately two weeks.  Dkts. 758, 759.

**Plaintiffs Will Supplement Their Merits and Fees Time at a Later Time**

     26.     In Plaintiffs' Fees Motion and in my supporting declaration, Plaintiffs'

counsel indicated our intent to supplement the claim for merits work, fees work, and

1  costs since January 20, 2025 with our reply papers or at such time as the Court may

2  direct.  Fees Motion at 23; Swearingen Decl. ¶ 6.

3      27.    Plaintiffs' counsel have incurred merits time since January 20, 2025.

4  This is because Plaintiffs' counsel is presently engaged in activities related to the

5  2023 ADA Order (Dkt. 355).  These include responding to the reports of the neutral

6  expert and a January 28, 2025 inspection of Central Jail.   Enforcement of the ADA

7  Settlement Agreement will begin in earnest after final Court approval of the ADA

8  Settlement Agreement.  *See* Dkt. 776 ¶¶ 132–144.  The ADA Settlement Agreement

9  provides that "Class Counsel are entitled to reasonable attorneys' fees, litigation

10 expenses, and costs for post-settlement date work performed in conjunction with the

11 Third Claim for Relief in Plaintiffs' Third Amended Complaint including the 2023

12 ADA Order and this ADA Settlement and Order. Class Counsel's bills shall be

13 reviewed and approved by the County on a quarterly basis." Dkt. 776 ¶ 161.

14     28.    The Court will hear the parties' joint motion for final approval of the

15 ADA Settlement Agreement on July 31, 2025.  *See* Dkt. 828 at ECF p. 13.  To avoid

16 multiple supplemental motions for interim attorneys' fees with respect to Plaintiffs'

17 merits time since January 20, 2025, Plaintiffs propose that Plaintiffs make a single

18 motion for supplemental merits time after the Court enters an order as to final

19 approval of the ADA Settlement Agreement.  This will allow Plaintiffs to present a

20 single motion for all outstanding merits time at one time, and all subsequent requests

21 for attorneys' fees will follow the quarterly billing requirements indicated in

22 Paragraph 161 of the ADA Settlement Agreement.  Should the Court direct

23 Plaintiffs' counsel to make a supplemental application for merits time since

24 January 20, 2025 at an earlier date, Plaintiffs' counsel will do so.

25     29.    Plaintiffs' counsel have incurred fees-for-fees time since January 20,

26 2025, including for work finalizing the Fees Motion and supporting declarations as

27 well as work on the Reply brief and supporting declarations.  The Court will hear

28 the instant interim fees motion on May 8, 2025.  *See* Dkt. 845.  To avoid multiple

1  supplemental motions for interim attorneys' fees with respect to Plaintiffs' fees-for-

2  fees time since January 20, 2025, Plaintiffs propose that Plaintiffs make a single

3  motion for supplemental fees time after the Court enters an order on the instant

4  interim fees motion.  This will allow the parties an opportunity to review the Court's

5  guidance as to key issues in dispute, and to meet and confer to see if the remaining

6  fees can be resolved by stipulation.  If not, Plaintiffs intend to present a single

7  motion for all outstanding fees time at one time.  Doing so will obviate the need for

8  multiple supplements, as it is not possible for Plaintiffs' counsel to include with this

9  Reply brief all fees-for-fees time through the March 20, 2025 Reply brief filing as

10  well as oral argument and any subsequent work on the instant interim fees motion.

11  Should the Court direct Plaintiffs' counsel to make a supplemental application for

12  fees-for-fees time since January 20, 2025 at an earlier date, Plaintiffs' counsel will

13  do so.

14       I declare under penalty of perjury under the laws of the United States of

15  America that the foregoing is true and correct, and that this declaration is executed

16  at San Francisco, California this 20th day of March, 2025.

Van Swearingen

[4662553.3]

Case No. 3:20-cv-00406-AJB-DDL

REPLY DECLARATION OF VAN SWEARINGEN IN SUPPORT OF
MOTION FOR INTERIM ATTORNEYS' FEES AND COSTS

# TABLE OF CONTENTS
## EXHIBITS TO REPLY DECLARATION OF VAN SWEARINGEN IN SUPPORT OF PLAINTIFFS' MOTION FOR INTERIM ATTORNEYS' FEES AND COSTS

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| Transcript of Discovery Conference held on October 30, 2023 | A | 1 |
| Transcript of Discovery Conference held on November 6, 2023 | B | 49 |
| Transcript of Discovery Hearing held on February 6, 2024 | C | 135 |
| Excerpts from Transcripts of Depositions of Gary Raney (October 29, 2024), Christine Scott-Hayward (October 10, 2024, and Karen Snell (October 31, 2024) | D | 315 |
| Excerpt from Transcript of Deposition of Commander Christopher Buchanan (April 23, 2024) | E | 330 |
| Mandy Kamphoefner Profile from San Diego Sheriff's Office website | F | 334 |
| Tentative Ruling dated September 27, 2022 | G | 336 |
| Redline of Plaintiffs' Motion for Limited Expedited Discovery to Plaintiff's Second Motion for Limited Expedited Discovery | H | 339 |
| Letter from Eric Monek Anderson to Elizabeth M. Pappy dated March 20, 2023 | I | 361 |
| Transcript of Telephonic Status Conference held on May 3, 2023 | J | 366 |

# EXHIBIT A

1                  UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   DARRYL DUNSMORE, ERNEST        )
    ARCHULETA, ANTHONY EDWARDS, REANNA)
4   LEVY, JOSUE LOPEZ, CHRISTOPHER  )
    NELSON, CHRISTOPHER NORWOOD, and )
5   LAURA ZOERNER, on behalf of     )
    themselves and all others       )
6   similarly situated,             )
                                    )  No. 20-CV-00406-AJB-DDL
7              Plaintiffs,          )
                                    )
8   v.                              )  October 30, 2023
                                    )
9   SAN DIEGO COUNTY SHERIFF'S      )
    DEPARTMENT; COUNTY OF SAN DIEGO; )
10  CORRECTIONAL HEALTHCARE PARTNERS, )
    INC.; LIBERTY HEALTHCARE, INC.;   )
11  MID-AMERICA HEALTH, INC.; LOGAN  )
    HAAK, M.D., INC.; SAN DIEGO COUNTY)
12  PROBATION DEPARTMENT, and DOES 1  )
    to 20 inclusive,                 )
13                                   )
               Defendants.          )
14  _____)  San Diego, California

15

    TRANSCRIPT OF DIGITALLY RECORDED VIDEOCONFERENCED PROCEEDINGS
16                     (Discovery Conference)

17

18      BEFORE THE HONORABLE DAVID D. LESHNER, MAGISTRATE JUDGE

19

20

21

22

23  COURT REPORTER:        AMANDA M. LeGORE
                           RDR, CRR, CRC, FCRR, CACSR
24                         U.S. District Court
                           333 West Broadway, Suite 420
25                         San Diego, CA 92101
                           amanda_legore@casd.uscourts.gov

**Ex. A - 2**

2

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:        RICHARD VAN SWEARINGEN
                                Rosen Bien Galvan & Grunfeld LLP
 3                              101 Mission Street, Sixth Floor
                                San Francisco, CA  94105-1738
 4                              (415)433-6830
                                vswearingen@rbgg.com
 5
                                AARON FISCHER
 6                              Law Offices of Aaron Fischer
                                1400 Shattuck Avenue, Suite 12 - #344
 7                              Berkeley, CA  94709
                                (510)806-7366
 8                              ajf@aaronfischerlaw.com

 9

10
     FOR DEFENDANT COUNTY OF
11   SAN DIEGO:                 ELIZABETH PAPPY
                                Burke Williams & Sorenson LLP
12                              501 W. Broadway, Suite 1600
                                San Diego, CA  92101
13                              (619)814-5800
                                epappy@@bwslaw.com
14

15

16

17                                    -0-

18

19

20

21

22

23

24

25
```

**Ex. A - 3**

3

1                    (Monday, October 30, 2023)

2

3                    P R O C E E D I N G S

4

5          THE COURT:  All right.  Good morning, everyone.  This

6    is Dunsmore versus County of San Diego, et al., Case Number

7    20-CV-406.

8          May I have appearances from counsel, beginning with

9    the plaintiffs.

10          ATTORNEY FISCHER:  Aaron Fischer for plaintiffs.

11   Good morning.

12          THE COURT:  Thank you.  Good morning.

13          ATTORNEY SWEARINGEN:  Good morning.  Van Swearingen

14   for plaintiffs.

15          THE COURT:  Okay.  Thank you.

16          ATTORNEY PAPPY:  And good morning.  Elizabeth Pappy

17   appearing on behalf of defendants.

18          THE COURT:  Okay.  Give me just one sec, Counsel.

19          (Pause.)

20          THE COURT:  Okay.  Thank you.

21          All right.  I have Mr. Swearingen's email in front of

22   me, and I'm looking through it.

23          Do I understand correctly that you all are still

24   planning to do the inspection of the Central jail on Wednesday,

25   Mr. Swearingen?

**Ex. A - 4**

4

1          ATTORNEY SWEARINGEN:  Unfortunately, we are not.  We

2     took those off calendar because we could not come to agreement

3     on a lot of issues that were important to pin down before the

4     inspections took place.

5          I also want to let you know that -- that my

6     colleague, Mr. Fischer, plans to -- you know, he's been in

7     communication with Ms. Pappy on all of these issues, along with

8     me.  And he plans to lead this discussion today.

9          THE COURT:  Okay.  No problem.

10          All right.  So what -- well, why don't we do this.

11     Why don't -- Mr. Fischer, tell me what's going on, big picture.

12     Then I want to hear from Ms. Pappy.  And then I want to know

13     what you all need me to help you resolve.

14          ATTORNEY FISCHER:  That sounds great.  Thanks very

15     much, Judge.

16          Yeah.  So, unfortunately, because of the uncertainty

17     with a few core and critical pieces to these inspections, we

18     had to take these off calendar.  It was -- we did it -- we did

19     not take that issue -- doing so lightly, because it took a lot

20     of doing.  This is the second time we've scheduled these

21     inspections.  The first inspections were first noticed for

22     August, with a few of our experts.

23          At that point we had a -- in July, we had some meet

24     and confer.  Just -- this is just some quick background, so you

25     kind of have -- I'll try and keep this kind of neutral, but

**Ex. A - 5**

 1 | just so you have the landscape.

 2 |          There are -- there were a few disputes, including

 3 | whether -- because we have multiple experts in this case with

 4 | very, very busy schedules, we -- we were going to do them in --

 5 | have groups.  And have one or two experts at a time.  That's

 6 | pretty standard, in my experience.  Makes it kind of -- the

 7 | inspections more efficient.

 8 |          Defendants took the position that all experts -- we

 9 | only had one -- one inspection to go, which was -- which we

10 | didn't agree with.  But we said, let's do our best to work with

11 | it in the time that we had in 2023, where we could get all of

12 | our experts in San Diego at the same time.  Was starting this

13 | week.  And we're already hard at work on trying to find an

14 | alternative period.

15 |          It is unlikely to happen in this calendar year

16 | with -- based on expert schedules.  Which is frustrating, but

17 | also an opportunity for us to resolve these things, and maybe

18 | make for the inspections to be a bit more productive and even

19 | efficient, I'll daresay.  So --

20 |          THE COURT:  I like your optimism, Mr. Fischer.

21 |          ATTORNEY FISCHER:  Right.

22 |          So that's kind of -- that's kind of where we are.

23 | It's going to -- I will say I can't tell you, right now, that

24 | we have found a date where all of our experts can come out;

25 | which is going to complicate, further, the demand that we only

6

1   get one -- or the position of the County that we only get one

2   inspection with our experts.  We had jumped through hoops to

3   make that happen.  And I don't know if we'll be able to -- to

4   align those stars again.  But we're trying.  I will say we are

5   trying.

6           Our hope, here, is to maybe just crystallize some of

7   the issues.  And then our suggestion is to brief -- brief the

8   issues for you.  If there's an opportunity for further

9   meet-and-confer to narrow them, we'll certainly do that.

10  And -- but I do think there are a handful, both with respect to

11  documents and then also in terms of process and timing,

12  logistics of the inspections that we have to sort through.  So

13  that -- that's kind of the high level.

14          I'm happy to jump into any of it, but I want to

15  let -- I want to let Ms. Pappy sort of weigh in.

16          THE COURT:  No, I appreciate that, Mr. Fischer.

17  Thank you for the high level.

18          Go ahead, Ms. Pappy.

19          ATTORNEY PAPPY:  Sure.  Thank you, your Honor.

20          I think that was a pretty fair assessment.  I mean,

21  there's obviously some insinuation it's the County's fault that

22  these didn't go forward, which I always seem to disagree with.

23          But I would say that the high-level issues and why we

24  all agreed that today would be helpful is that it's sort of

25  like if you resolve one issue in plaintiffs' favor or defense

1  favor, it leads to us a certain outcome.  And then if you

2  resolve the next issue, it leads us to a certain outcome.  And

3  it may help us.

4             THE COURT:  Okay.

5             ATTORNEY PAPPY:  But the question -- the major issue,

6  I think, that we need help with first is interviewing employees

7  and incarcerated people during the inspections.

8             And the defense has always objected to that.  We

9  objected to it in the expedited.  I've been provided no case

10  law or legal authority for that concept.  The one case that's

11  been provided to me is a -- is a COVID case, where millions of

12  people were dying, you know, every ten minutes across the

13  world.  And so I think that case isn't quite this situation.

14            If we get rid of the question -- the interviews

15  issue, however your Honor decides it, it certainly weighs into

16  how we're going to get these all done in one day.  My client is

17  currently taking the position that you get one shot at this.

18            The second issue is number of people.  The plaintiffs

19  want to bring nine people, including three attorneys and a

20  whole bunch of experts.

21            The three attorneys is problematic.  The client

22  wanted a max of three.  Their internal counsel said that's

23  unreasonable.  We need to let more than that in.  They came up

24  with six.  That was still not acceptable to the plaintiffs

25  because of these three attorneys, which I have issue with and

 1    have taken issue with this particular issue before.

 2            And then, recently, my client just made a decision --

 3    which I emailed counsel but we haven't talked about it yet --

 4    is that the department has made a decision that it is not going

 5    to house anyone in a wheelchair at Vista, at George Bailey, and

 6    there's one other one.

 7            So we -- as part of our meet-and-confer, we have not

 8    talked about that.  But it's sort of like we need to take this

 9    stepped.  Are you interviewing people?  What's the number of

10    people that can come in?

11            The other thing that I had asked for, and I have thus

12    far been refused by plaintiffs' counsel, I said, can you

13    please -- by expert -- just give me a sentence or two about

14    what they want to look at, so that I can push the client to say

15    more than one day is appropriate.  Let's put this group of

16    people together, so that we can do it on this track.  And let's

17    put this group of people -- like Ms. Sanossian, she needs to

18    measure.  She's going to take a long time.  And she needs time

19    to do that, and she needs to be able to have access to do that.

20    Whereas the rest of the folks don't need to be there the length

21    of time that Ms. Sanossian's there.  But I have thus far not

22    been given that information

23            And, with that, I'll be quiet.

24            THE COURT:  Mr. Fischer, do you really object to

25    giving Ms. Pappy a brief description of the names of the

**Ex. A - 9**

1   experts, their field, their expertise, and what they're going

2   to be inspecting?

3          ATTORNEY FISCHER:  So let me respond.

4          So she does have all of the names.  She does have the

5   field of the experts.  And we have given, in writing and

6   verbally, a statement as to what -- what needs -- what we would

7   like to be inspected.

8          Just to get -- just to finish the timeline, part of

9   the frustration that we've had and all of the work that --

10  expense that -- we had plane tickets that were lost because of

11  this snafu.  Experts had already booked plane tickets and those

12  are lost.  I had booked plane tickets.

13         The notices went out back at the end of August, and

14  the objections came in more than a week -- week late.  We got

15  written objections.  Some of the objections we knew were

16  coming.  Some were surprises, were new to us.  And then in

17  meet-and-confer, after that -- which just happened in the last

18  week or so -- is when we heard we're not going to let everybody

19  in.  So that means --

20         THE COURT:  Okay.

21         ATTORNEY FISCHER:  The goalposts seem to be shifting.

22  I understand it's coming from the client.  Ms. Pappy is

23  managing it.  But these are shifting goalposts.  And --

24         THE COURT:  Okay.

25         ATTORNEY FISCHER:  -- the response for the more

1    detail -- expert by expert -- that just came a few days ago.

2    That wasn't something that we've --

3             THE COURT:  All right.

4             ATTORNEY FISCHER:  That's new.

5             We're happy to do that.  What we requested was, can

6    you give us an overview -- can you give us the floor plans of

7    each facility and where things are?  And then once we have

8    that, we can sit down and come up with -- we can sort of come

9    up with an itinerary for each.  But the -- the high level, sort

10   of like what we want -- what we want to see -- the order of

11   what -- how we want to see things, we -- I mean, that was in

12   the notice, and we provided -- we have provided that.  So this

13   is kind of like an extra demand which we're willing to work

14   with, but it's not something that we've stonewalled at all.

15            THE COURT:  Well, I'm glad to hear that.  There would

16   seem to be no purpose in that.  That would be contrary to the

17   way that I've seen you all working together over the course of

18   this case.  But --

19            ATTORNEY FISCHER:  Okay.

20            THE COURT:  -- look, here's what -- I understand why

21   you requested this.  I'm really -- it is, I'm sure,

22   disappointing for everyone that these inspections did not go

23   forward as planned.  But, look, I'm going to come at this from

24   Mr. Fischer's sense of optimism.  That we can use this as an

25   opportunity to -- to reset and for me to provide you with

**Ex. A - 11**

1   the -- the guidance that you -- you want as to the ground rules

2   for the inspection, so that you all can go ahead and go forward

3   with them.

4         Look, I really want to save you all additional

5   briefing where I can, and I don't know that this needs like a

6   full -- you know, full motion and an opposition, as opposed to

7   maybe a joint filing where each party provides their positions.

8   But I -- I -- I'm not sure how I do this without at least

9   something in writing from the parties.

10        Mr. Fischer, you had suggested that.

11        So, Ms. Pappy, look, I -- I want to give you the

12   guidance that I think would be helpful to move forward.

13        Is there a way for me to do it, saving you the -- the

14   time of putting something in writing?

15        ATTORNEY PAPPY:  Well, I -- two things.  Is if

16   they're not entitled to question or interview people, then that

17   resolves a lot.

18        And I still need -- I understand that -- that

19   plaintiffs believe they have sent me a -- a sufficient enough

20   explanation of what these folks are going to look at, but I

21   don't.  And so maybe it's me not being smart enough, but I

22   don't think that I have that.  And so I think that those two

23   things would be very important.  And I just want to note that I

24   told them about the limit on the number of people two weeks

25   ago, not last week.

1    THE COURT:  Okay.  Well, look, got it.  Focusing on

2  moving forward.

3    Let me ask you this, Mr. Fischer.  When I issued the

4  order on expedited discovery on January 17th, I -- I did note

5  that the inspections for the ADA issues would not include

6  interviews of detainees or employees.  However, I directed that

7  defendants' counsel would facilitate providing information to

8  plaintiffs' counsel and Ms. Sanossian during the inspections.

9  That's Document Number 258.

10    Do you have authority for the proposition that the

11  plaintiffs should be allowed to conduct informal -- or just

12  interviews of employees and detainees during these visits,

13  Mr. Fischer?

14    ATTORNEY FISCHER:  Yeah, so the answer is yes.

15  But --

16    THE COURT:  Okay.

17    ATTORNEY FISCHER:  -- but just to be -- just to be

18  clear, we're not asking for long interviews or even structured

19  interviews.  What we've been -- what the notice has said, and

20  what I've been asking for is to -- from the experts, that

21  the -- the weight of the case law says that these firsthand

22  inspections are the best way for a -- evidence; for a court to

23  get the information it needs to make an informed decision

24  about --

25    THE COURT:  Um-hmm.

1    ATTORNEY FISCHER:  -- whatever the issue is.  And

2  there is a place for depositions.  This does not replace

3  depositions at all.

4    What the -- the basic language is -- for example,

5  I'll still go with mental health.  I know it very well.  The

6  mental health expert comes through as what -- who's in this

7  unit?  Who gets housed in this unit?

8    Oh, this is the outpatient step-down unit.  These are

9  people who come from -- wherever it is.  It's orientation-type

10  information.  Oh, there's 40 people in here.  Everyone's single

11  cell.

12    It's the very basic, like, logistical.  It's not --

13  it's not deposition-type information.  It's orientation

14  information:  Who's in here?  What happens in here?  That sort

15  of thing.  My experience is it's very brief --

16    I have no doubt that Ms. Pappy or Ms. Coleman -- or

17  both -- if the experts start asking more questions, will say,

18  "Naw, that's not for here.  That's for depositions."

19    THE COURT:  But how is that basic information about

20  orientation outside the scope of what I directed back in

21  January by saying that defendants' counsel will facilitate the

22  provision of information to plaintiffs' counsel and expert

23  during inspections?

24    I mean, it sounds like that is -- you're not talking

25  about depositions.  Who's here?  How many people are here?

**Ex. A - 14**

```
 1            I mean, let me ask questions of Ms. Pappy.

 2            If that question were posed during the inspection,

 3    to -- you know, would -- would defense counsel, you know,

 4    object, necessarily, to providing that information to the

 5    plaintiffs' expert during the inspection, so they know what

 6    they're looking at and who's there?

 7            ATTORNEY PAPPY:  No.  That's something that we spoke

 8    about in meet-and-confer.  And I said same as last time.  Just

 9    if they have a question about where are we, what is this, how

10    many.  That all went very smoothly with both -- I think it was

11    Ms. Coleman at both of those inspections.  No issues were

12    reported back to us.

13            THE COURT:  Yeah, and that's why I'm a little bit, I

14    mean, candidly surprised to get this dispute.  Because it

15    seemed to me that the ADA inspections went so smoothly.  And I

16    didn't hear anything afterward, and it seemed like they went

17    well.  So, you know, it is what it is.  And I'm not, I guess --

18    in legal terms -- throwing shade at anybody for that.

19            But I -- this seems to me like issues that can be --

20    that can be figured out.

21            ATTORNEY FISCHER:  I think that's right.  I think we

22    sent over another -- another California district court case

23    that had an order that had language that said, essentially,

24    what you just stated.  And Ms. Pappy said that case -- that

25    case holds no weight, and we're not going to follow it.  So I'm
```

**Ex. A - 15**

1   not quite sure where we're going to land.

2          I think some clarity from -- with the assistance of

3   the Court -- maybe we can just move forward.  But when we sent

4   that case over, that has the same language that's in our

5   inspection, that they objected to, Ms. Pappy said, "No, that is

6   not going to happen here."

7          So I'm just -- you know, trust but verify, trust but

8   confirm.  I just want to -- maybe we can figure -- I'm hopeful

9   we can figure it out.

10         THE COURT:  I think you can.  But my initial

11  inclination is to provide you with the benefit of my tentative

12  thinking, without having reviewed any of the authorities that

13  may be provided to me, is that docket number -- it's 258, you

14  know, would seem to apply here.  And I'm looking specifically

15  at the language on page -- page 6 of that.

16         So, you know, that -- I think that worked before, and

17  I think -- if -- I can't imagine why it wouldn't work now, so

18  that, Mr. Fischer, you and your colleagues can get the

19  information.  You know, the big picture that you need.  But

20  you're not -- you're not taking -- you're not disposing or

21  sitting down and doing interviews with folks in the mental

22  health -- I really think that that's -- I would encourage you

23  to look at that specific language.

24         And if you agree with it, great.  And it sounds like

25  it worked just fine for the last inspection.

16

1        Obviously, I'm going to -- I'm going to give you time

2   to file a joint motion, if you need it.  And I'll read any

3   briefing you submit and look at the cases.  But that seems to

4   make sense to me.

5        Here's what I think -- well, number two.  Look, I'm

6   not sure what -- what's the disconnect with respect to the --

7   who's going to be going to the facilities and what their areas

8   of expertise are?  I'm going to chalk that up to sometimes

9   there's a miscommunication.

10        But, look, Mr. Fischer, just whatever you sent

11  before, send it to Ms. Pappy again, please.  And hopefully

12  that's going to give her what she needs to really make a

13  considered recommendation to the County as to whether these

14  inspections truly can happen within one day.

15        I want to hear who all of the experts are.  But,

16  Ms. Pappy, I can tell you if it's -- if you've got five experts

17  that are going to jails, that could be really hard to do an

18  entire inspection of the Central jail in one day.  Again, I'm

19  not prejudging it.  I really want to look and be thoughtful

20  about it.  But I want -- I want to understand it.  And --

21        ATTORNEY PAPPY:  And what I'm looking for, Judge, is

22  I need to be able to articulate to the client, "This is why you

23  should allow this to happen in two days."

24        Counsel and I were working on ideas of having some

25  experts come in for a couple of hours, and then shoveling them

**Ex. A - 17**

 1   out the door and bringing the others in.

 2          I mean, and -- and if I were plaintiffs, I would be

 3   concerned about this.  Is Ms. Sanossian takes -- it takes a

 4   while to do her work.

 5          THE COURT:  Yeah.

 6          ATTORNEY PAPPY:  I mean, we have an expert, too.  It

 7   takes a while to do her work.

 8          And -- and having her and maybe -- I'm just -- off

 9   the top of my head, the environmental person who wants to see

10   if the place is clean -- you know, something like that, with

11   information about what these people want to look at, gives me

12   ammunition to go back to the client and say, "This is

13   reasonable.  And it's reasonable to me, and the judge just

14   might order it."  That's what I'm looking for.

15          THE COURT:  Right.  Look, that makes sense to me, and

16   I get it.

17          Mr. Fischer, understanding that your -- plaintiffs'

18   frustration in having to reschedule this, I would ask you to

19   dig in with Ms. Pappy on that.  And give her --

20          What would be the most helpful for you, Ms. Pappy?

21   Would it be to have a proposal for who's coming when?  Like,

22   you know, and how -- how they should fit together?  Like,

23   who's --

24          ATTORNEY PAPPY:  Yes.

25          THE COURT:  Which experts should be --

18

1          ATTORNEY PAPPY:  And I'm happy to get -- I'm happy to

2   get them the floor plan.  You know, hopefully I can get them by

3   the end of this week, and get them to them.  Because they've

4   indicated, now, that they would like to see those, to be able

5   to figure out -- that's fine.

6          THE COURT:  Yeah.

7          ATTORNEY FISCHER:  So could I just get some clari --

8   sorry, Judge.

9          THE COURT:  No.  Go ahead, Mr. Fischer.

10          ATTORNEY FISCHER:  I'm very pleased to hear

11  Ms. Pappy's, like, approach to trying to take -- to navigate

12  this with her client.  Which, I'm sure, is -- can be

13  challenging with any client and not specific to this county,

14  you know.

15          But the logistic -- the language of the objections

16  were, if our experts spoke with anyone, we would be thrown out

17  of the facility.  So we do need some clarity and some, like,

18  certainty that when we get there, there's -- there's sufficient

19  guidance and mutual understanding that we're going to have a

20  successful, productive visit.

21          So I -- I just -- you know, I don't want to -- I want

22  to move -- be forward-looking.  I think you know me to be

23  forward-looking.  But that -- that type of language gives us

24  great concern about moving forward, just with kind of a "let's

25  hope it works out."

**Ex. A - 19**

19

1           In terms of this process that you're suggesting, I

2    think that sounds great.  It would be helpful to have some --

3    for our working with the experts, I can -- gears are just

4    turning right now.  We could come up with kind of a healthcare

5    team; and then, like Ms. Pappy was saying, like an other-group

6    team.  But I'm not going to -- it's hard for us to do that if

7    we're told there's just no way that we're letting groups of --

8    different groups of people; you get one shot, and that's it.

9           We still don't know if we're going to be allowed into

10   Central again.  The response was, "You can't come back to

11   Central."  So --

12          THE COURT:  On the -- ultimately, that's my call.

13   Right?

14          ATTORNEY FISCHER:  That's right.  But it's just going

15   to be hard for us to come up with a coherent plan without some

16   idea of where -- of what's possible, in terms of the County.

17          If -- you know, of course, we can brief it, and we're

18   happy to do that.  We encourage it but --

19          THE COURT:  But I think -- I think what I hear

20   Ms. Pappy saying is there's a bit of a chicken-and-an-egg

21   issue, right now.

22          ATTORNEY FISCHER:  Yeah.

23          THE COURT:  I think if you can come up -- what I

24   would ask you to do is this, Mr. Fischer.

25          ATTORNEY FISCHER:  Yeah.

1    THE COURT:  It sounds to me -- like, would it be the

2    plaintiffs' preference to try -- to do, like, the Central jail

3    inspection, would you prefer not to have to do the entire

4    inspection with all of your experts in one day?

5    ATTORNEY FISCHER:  I think it would be great if we

6    could split them up into two -- two days.  And we can be

7    strategic about -- for example, if -- if it's the healthcare

8    experts together -- if we're lucky enough to get those folks

9    together again -- that could be -- that could be an efficiency,

10    as opposed to, like, Ms. Sanossian, an environment-of-care

11    person, who's going to be looking -- they're not looking at

12    healthcare services and how it's delivered, or anything like

13    that, and the process.  They're looking at cleanliness and more

14    of physical plan type of stuff.

15    ATTORNEY PAPPY:  But, remember, Ms. Sanossian is not

16    coming.  Right?

17    ATTORNEY FISCHER:  (Indiscernible.)

18    ATTORNEY PAPPY:  Yeah.  Yeah.  She's not coming

19    back --

20    ATTORNEY FISCHER:  She's not coming back to Central.

21    But the other ones, we can --

22    THE COURT:  Okay.  Well, and I think what I hear

23    Ms. Pappy asking is for you to give her what -- you know, the

24    proposal that you think makes sense, to allow you to be as

25    efficient as possible.  And she can provide it to the County,

21

1  and they'll give her an answer.  And then if there's not an

2  agreement, I'll decide.

3         ATTORNEY FISCHER:  Yeah, okay.  I think that's a good

4  process.

5         THE COURT:  And let's -- we can -- you know, I want

6  to help you do this in a way that moves things along.  You

7  know, rel -- you know, with efficiency but not jamming anyone

8  up too badly.

9         And I think that would then resolve the issue of, you

10 know, the number of people who are -- who are coming.

11        Go ahead, Mr. Swearingen.

12        ATTORNEY SWEARINGEN:  Thank you, your Honor.

13        I just want to point out that our notices served on

14 September 1st do identify each expert we want at each facility

15 on each day.  So the County already has that information.  The

16 notice says that we want to inspect all areas of the jail.

17        With respect, for example, to -- so I think it's

18 important to understand what Ms. Pappy is missing because she's

19 not missing which individuals we want at the jail each day.  We

20 provided that to her more than two months in advance.

21        THE COURT:  Yeah.  Okay.

22        ATTORNEY SWEARINGEN:  What she's saying, I

23 understand.  She wants to know what areas of the jail each

24 expert wants to -- to review.

25        From our perspective, some of that is legitimate.  We

1   need the floor plans, to better understand which areas the

2   mental health experts really want to go into.  It depends on

3   which areas of the jail people with mental illness are housed.

4   Both -- with respect, for example, to our environmental expert,

5   we know that the jail cleans up the facility before we go in.

6   So we don't want to, you know, inform the jail of every single

7   cell or which particular area we want to go because we don't

8   want them to just clean that up right before we go because that

9   won't be particularly helpful for us.

10          So I think that there should be some balance.  And I

11  think that the balance that we originally arrived on is

12  informing the -- at Ms. Pappy's request, that we can only go to

13  one facility one time.  So we schedule all of our experts, for

14  example, to go to George Bailey on November 2nd.  When we said

15  each of our experts wants access to all areas of the facility

16  where people are housed and receive care, et cetera.

17          So it was identified to the County.  It's not clear

18  to me what more is necessary for us to provide at this stage.

19  And I think it would be helpful, your Honor, if you could chime

20  in on that.

21          THE COURT:  Well, it's kind of hard for me to chime

22  in on it right now, Mr. Swearingen, when I don't have all of

23  the notices in front of me.  I don't know who's scheduled for

24  what day.  But I hear you're saying not right now, but for

25  later.

23

1          Look, here's what I think we should do.  And, again,

2     I would really like to help you all avoid extensive motion

3     practice.  Because, ultimately, these inspections are -- I

4     think everyone agrees they're going to happen, so it's a

5     question of how do we make it as efficient as possible.

6          Look, let me ask this.  You all are -- you all are

7     going to be meeting with me on November 6th.  Correct?

8          ATTORNEY PAPPY:  Um-hmm.  Yes.

9          THE COURT:  Do you need more than a week to at least

10    figure out where -- where you can agree and where you disagree?

11         ATTORNEY PAPPY:  I will try to get the floor plans to

12    them ASAP because I understand that that's a part of the

13    additional explanation about where the experts want.  I will

14    tell them tomorrow.  And what else can I give?  Tomorrow.  And

15    then let me -- I will try to work on the County for two

16    separate dates.  You know, like if you were to be -- if it were

17    to be two dates, when would be best for you?  Because maybe

18    that's a better way I can present it to them, to convince them

19    to do it.

20         THE COURT:  Look, I understand that the -- the

21    inspection notices laid out who -- who you want, when,

22    Mr. Swearingen.

23         I think for purposes of just trying to move this

24    forward, what I would ask you to do is send Ms. Pappy an email

25    with your proposal for the facilities.

**Ex. A - 24**

24

1    And maybe -- maybe it's just summarizing the Rule 34

2    notices.  Regardless, I don't think it's a big lift and -- in

3    terms of what you think makes sense for how you can accomplish

4    this most efficiently.  I would ask you to give that to

5    Ms. Pappy.

6        I mean, if you can get it to her by -- by tomorrow --

7        Ms. Pappy, I would ask you to consult with the

8    County, and tell them I may resolve all of this on Monday, the

9    6th.

10       ATTORNEY PAPPY:  I will do that.

11       THE COURT:  And I will -- you know, I -- I want to be

12   thoughtful about it, but I really want to give you all the

13   guidance that you are seeking, going forward.  And if you can

14   agree on everything, great.  We can do a stipulation about how

15   the inspection should happen, if you would like to have that.

16   But I want to help you resolve this quickly.

17       What I would -- if we were going to do this, what I

18   would like to know is by -- by Friday, whether there are any --

19   any outstanding disputes as to how the inspections should take

20   place.  Because we're going to -- I have blocked out the day

21   for you all next Monday.  And I want to make good use of it.  I

22   want to resolve this.  I want -- and I really want to help you

23   all move forward with, you know, settlement discussions that

24   we, you know, were planning to have, and keep our momentum

25   going with that.

**Ex. A - 25**

25

1          So let me ask this.  We're starting with Mr. Fischer

2    and Mr. Swearingen.  Is -- is that too ambitious?  For you to

3    get Ms. Pappy sort of your proposal by tomorrow?  And for the

4    parties to meet and confer and tell me, by Friday, whether

5    there are any disagreements that I need to resolve on Monday?

6          ATTORNEY FISCHER:  Van, please feel free to jump in.

7          I think what would be helpful is if we could get

8    those floor plans as soon as possible.  We're not going to wait

9    to start working.  I think we want to see them and see if

10   there's anything we missed, because we know this is our one

11   shot.

12         THE COURT:  Well, maybe --

13         ATTORNEY FISCHER:  Maybe.  Yeah.  Okay.  Fair.  I'll

14   take that.

15         But I think we can commit to, say, by mid-week --

16   maybe tomorrow -- getting something over.  I think it will be

17   some -- it will be something like be an itinerary.  And I can't

18   guarantee that we'll have the groupings down by then, with our

19   experts.  So that might be a bit up in the air.  But maybe it's

20   not necessary.  Maybe it's just two days, and we can make it

21   work.

22         THE COURT:  Look, what I'm looking to understand

23   is -- is just, you know, sort of some thoughtful reasons behind

24   positions.

25         I mean, it -- and I'm not suggesting that one -- the

**Ex. A - 26**

26

1    one day for each facility is unreasonable.

2            But if it turns out it's arbitrary, then that is

3    going to be a little bit harder to justify, for me, if there

4    really is a thoughtful reason and a considered reason why, you

5    know, the experts should be grouped the way they are.  And it

6    would be -- take place on -- gets back-to-back days; maybe not.

7    And I realize that there are some scheduling issues.  And I

8    think, you know, that's going to be a challenge, Mr. Fischer.

9    But I --

10           ATTORNEY FISCHER:  It's our problem.

11           THE COURT:  We're going to have to work through that.

12           ATTORNEY FISHER:  Yeah, I agree.

13           I guess the one request I would make is in terms of

14   resolving things, we -- before you make decisions on some of

15   the sort of core disputes around speaking with incarcerated

16   persons, observing processes, that sort of thing, we would like

17   an opportunity to present the case law; because we do think it

18   supports our position.  So I would just like to leave space for

19   that.  I don't think we have had the opportunity to present

20   that full-throatedly in this context.  ADA ruler -- somewhat of

21   a ruler -- very important.  It is different than a doctor.

22           THE COURT:  Understood.

23           ATTORNEY FISCHER:  So (indiscernible) space for that.

24           THE COURT:  If there are any -- what I want to

25   understand, by Friday, is if there are any disagreements.  And,

1    if so, what they are.  And then I will give some thought,

2    before we meet next Monday, to the best way to address it.

3            And if you believe there's authority to support your

4    position, Mr. Fischer, or if Ms. Pappy believes there's

5    authority that supports hers, I will be -- you know, I'll --

6    I'll give thought to having a briefing schedule.  Whether it's

7    going to be -- what -- what that briefing schedule is, I'm not

8    sure yet; if it's necessary.  But, yeah, I understand.

9            Just let me know if you think there's a disagreement;

10   we think the law supports our position.  I got it.  I'm not

11   going to prevent you from providing with authority.

12           ATTORNEY FISCHER:  Thank you.  Appreciate that.

13           ATTORNEY PAPPY:  (Indiscernible.)

14           THE COURT:  And I -- I am hopeful that you all can

15   figure much of this out, if not all of it.

16           Ms. Pappy, were you going to say something?

17           ATTORNEY PAPPY:  Yes.  One question -- or suggestion,

18   rather.  Is that the defendants are not going to agree to allow

19   the incarcerateds to be interviewed for the same reasons you've

20   ruled in the previous motion; because of their right to

21   representation, their right to privacy, and in addition to the

22   fact these sessions will take hours.  And they're not proper

23   depos.

24           So what I would suggest that we do, as a part of our

25   meet-and-confer, is have -- almost work on two proposals.

28

1          If your Honor -- because a lot of the timing of this

2   and the scheduling of these is going to be -- is easy if

3   there's none of these interviews going on.  It becomes more

4   difficult and longer if these interviews are taking place.

5          I think we can do it.  I think we can work on two

6   tracks and report to the Court on Friday:  If this, then that;

7   and if this, then this.

8          THE COURT:  Mr. Fischer, is it correct that -- that

9   the plaintiffs seek the ability to interview or speak with

10  incarcerated individuals?

11         ATTORNEY FISCHER:  Yeah.  So that -- let me speak to

12  that.

13         And, Mr. Swearingen, feel free to chime in.

14         So the way this -- in every tour that I've been on,

15  in cases where there were -- that were structured negotiations

16  (indiscernible) and where there were notice inspections --

17  both -- is that the experts come through and walk into a mental

18  health unit and want to see how it works.  They want their --

19  and they want to see what the processes are that happen.

20  Not -- not -- nothing gets observed without people having an

21  informed consent, knowing what's being -- knowing who's there,

22  knowing what the purpose of it is.

23         By the time we have these tours, now, I expect that

24  we will be class counsel, so we will be their representatives.

25  So at least we'll be kind of over that gray zone hurdle, which

1   is helpful, I hope; I think.

2          But then what happens is they walk through, and

3   there's someone who says, "Hey, I -- I've been in the safety

4   cell for" -- just making this up, because I've seen it

5   elsewhere -- "I've been here for two days, and I don't know

6   why.  And I'm not" -- or whatever it is.

7          And then the expert says, "Okay.  Well, where were

8   you before?"

9          "I was here.  I came in through intake," whatever it

10  is.

11         "What's your name?  What's your number?  We make take

12  you out for a professional visit later."

13         And so they're not these, like, full-throated sort of

14  long group interviews.  But it's a way for us to identify

15  people.  Because it's not like other cases where we can --

16  where we had access to them.

17         So that is kind of how it works.  They're brief

18  interactions.  It's also fair for people who -- when people

19  walk into the facility, and we represent them, for them just to

20  know who we are.  So I might go up and say, "Here's who we are,

21  here's why we're here.  And this is what's going on."  So

22  that's -- that's just part of the kind of the class -- the

23  nature of these sort of class cases.

24         THE COURT:  Ms. Pappy, does the County's position

25  depend -- or change at all if their motion for class

```
 1   certification has been granted?
 2           ATTORNEY PAPPY:  No.
 3           THE COURT:  With -- okay.  Then I think what I --
 4   look, I -- you've got -- I understand why this is a -- a key
 5   issue, then.
 6           What I will probably end up doing, when we talk on
 7   Monday, is requesting that you all provide me with your
 8   authorities on this.
 9           Because I do want to make a considered decision on
10   it, and I don't want to just give you a ruling that -- without
11   the benefit of whatever cases you want me to read.
12           ATTORNEY FISCHER:  Great.  Thank you.
13           THE COURT:  All right.  So what we'll do is this.
14   I'll be seeing you all in person on next Monday.  We will -- we
15   will deal with this issue.
16           And then I have received the -- you know, the topics
17   for the parties to -- that we're hoping to address with respect
18   to, you know, settlement discussions.
19           Are we in a position, next Monday, to -- to dig in on
20   some of these issues and make some meaningful progress?
21           Because I realize I'm asking you all to come to San
22   Diego, and that's, you know, time and expense for you all.  And
23   I want to make sure that it's worth everyone's time.  I figure
24   I would just ask while I've got you all.
25           ATTORNEY SWEARINGEN:  Your Honor, if I could start,
```

```
 1   your Honor.
 2              THE COURT:  Sure.
 3              ATTORNEY SWEARINGEN:  We've sent over to defendants,
 4   with respect to substance use issues, a -- a very, very
 5   high-level roadmap of areas where we want more information on
 6   and to discuss about; with my colleagues' understanding that
 7   you wanted to be privy to what we wanted to discuss with
 8   substance use issues.
 9              The County asked strongly that we not present those
10   to you, and that we not send the email that we sent to
11   defendants on those issues to you.
12              We think that it would -- it would benefit everyone
13   to have those issues out in the open and to discuss, in part,
14   to -- to set the stage.  And, in part, to let everyone know
15   that we still need some information, before digging in more
16   deep to the substance use issues.
17              My colleague, Aaron Fischer, can talk more about the
18   ADA issues that were previously discussed, and where we are
19   with respect to those.
20              THE COURT:  Before we get to Mr. Fischer, Ms. Pappy,
21   look, I -- I want to help you where I can, but I don't want to
22   dive in prematurely.
23              Are there issues that the parties need to discuss
24   further before we talk more about a settlement conference
25   regarding, for example, substantive -- substance use issues?
```

**Ex. A - 32**

1    Excuse me.

2              ATTORNEY PAPPY:  Yeah, there are.  We had requested

3    things from the plaintiffs' that we haven't gotten yet.

4              So I think ADA is ripe for discussion.

5              And so I think that -- that absolutely -- and I can

6    bring -- probably have a discussion maker with me about some of

7    the ADA issues, if you want.

8              But the drug issue, we -- we'll talk about it, but

9    we're still waiting for information from the plaintiffs.  So

10   I'm not sure now is the time to talk about that.

11             THE COURT:  Okay.  Well --

12             ATTORNEY FISCHER:  One thing that would be very

13   helpful, Judge -- sorry to interrupt.  But on the substance use

14   issues, a major issue is the withdrawal observation space and

15   protocols.  We had expected to have had the benefit of having

16   had that as part of the inspection before embarking on

17   discussions.

18             One thought that we had would be to have an extremely

19   targeted, far-less-than-full-day visit to -- I guess we could

20   probably do a couple of the facilities, that would just focus

21   on that particular issue.  Which I think would give, like, a

22   lot of momentum to -- to conversations.  We identify what the

23   issues are, what issues there are not.

24             But so looking at kind of intake withdrawal protocols

25   and space, medical housing for those types of things, I think

1   that would be like a very useful exercise.  And as Ms. Grunfeld

2   suggested last time, we would welcome for you to come to that,

3   even if it's just to Central, down the street from where you

4   are.  We would probably like to see the women's -- for example,

5   the women's withdrawal observation space and protocol, as well.

6   But that might be one suggestion to try and sort of kickstart,

7   with a common understanding of those issues.

8           THE COURT:  Okay.  Give me just a second.

9           (Pause.)

10          THE COURT:  All right.  Here's what I have on my list

11  of things that we are going to cover on Monday.  Because I

12  really do want to be respectful of your time and the fact that

13  all three of you are traveling, if you can be attending.

14          It will be to discuss and hopefully resolve the

15  protocols for inspections of the facilities.  And if there are

16  any outstanding disputes after the additional meet-and-confers

17  that will happen this week, I will set a -- a briefing schedule

18  on those.

19          And I will issue a ruling as quickly as possible.

20          I -- we will deal with the -- whatever remaining

21  discovery disputes there are that you all outlined for me in

22  Docket Number 419, which were the plaintiffs' requests for

23  production.

24          It looked like there were a number of RFPs as to

25  which the parties were still meeting and conferring, so it

 1    may -- there may not be -- there may be less to resolve than is

 2    listed in there.

 3              ATTORNEY PAPPY:  And, Judge --

 4              THE COURT:  Yeah.

 5              ATTORNEY PAPPY:  -- Ms. Chartoff and I will be

 6    updating you.  We're meeting tomorrow morning.  And we agreed

 7    that we would get you something tomorrow afternoon, to take off

 8    and that we've resolved.

 9              THE COURT:  Okay.  Great.  That will help me to

10    understand what we need to talk about.

11              And then, look, in terms of -- look, are there any

12    other -- aside from the motion to compel on the CIRB reports,

13    which is pending with me, are there any other discovery-related

14    issues that we need to talk about on Monday?

15              ATTORNEY PAPPY:  Depositions.

16              THE COURT:  Is that the 30(b)(6) that you mentioned

17    in the report?

18              ATTORNEY PAPPY:  Yes.

19              THE COURT:  Okay.  Can you -- can you include that in

20    what you provide me?

21              ATTORNEY PAPPY:  We will.

22              ATTORNEY SWEARINGEN:  Your Honor, in addition, the

23    parties' written responses to the final sets of written

24    discovery are due for both sides tomorrow.  After tomorrow,

25    both parties will have an understanding of the parties'

**Ex. A - 35**

 1   responses and objections to those discoveries, including

 2   plaintiffs' discovery RFPs sets 4 and 5.

 3         I think that we will have more information about

 4   where the parties stand as to that remaining discovery, and we

 5   can discuss those in real time on November 6th.

 6         THE COURT:  All right.  That's fine.

 7         And what -- all I would ask is that you all talk

 8   before you raise an issue with me, just to make good use of our

 9   time.

10         ATTORNEY FISCHER:  Yeah.

11         THE COURT:  But I am -- I am going to resolve the

12   discovery disputes as much as I possibly can with you, next

13   Monday, to get you aligned and move forward.

14         ATTORNEY PAPPY:  Can I ask you a question?

15         THE COURT:  Sure.

16         ATTORNEY PAPPY:  What -- Mr. Swearingen, what

17   requests (indiscernible) that are due tomorrow that we'll be

18   talking about Monday?

19         ATTORNEY SWEARINGEN:  Tomorrow, it -- plaintiffs have

20   the obligation to serve responses to County's written

21   discovery.  And County has the obligation to respond to

22   plaintiffs' written discovery.

23         ATTORNEY PAPPY:  Oh, you mean, the discovery that

24   had -- the responses haven't even been served yet?

25         ATTORNEY SWEARINGEN:  That is correct.

 1              ATTORNEY PAPPY:  I mean, responses.

 2              Judge, I did not agree to discuss those on Monday.  I

 3     mean, how are we going to have meet-and-confer between now and

 4     Monday on responses that are due tomorrow?  So -- I don't

 5     understand why we're talking about it on Monday.

 6              THE COURT:  Well, I -- I don't know what's

 7     outstanding.  And I have no idea of the topics that are at

 8     issue.  But if we're going to be -- look, if you're going to be

 9     coming to San Diego and there are objections to discovery --

10     whether your objections to the plaintiffs' or the plaintiffs'

11     objections to the County's -- at the very least, I want to be

12     able to provide you with my tentative thoughts on the

13     discovery.  If we need to have a -- if we need to have, you

14     know, formal motions to compel, so be it.  But my goal is to

15     avoid formal motion practice for you all wherever we can.

16              ATTORNEY PAPPY:  Oh, sure.  But this is new

17     discovery.  This isn't anything that's had any meet-and-confer

18     IDC.  God forbid we need meet-and-confer.  We haven't even --

19     this is new discovery.

20              THE COURT:  No, I get it.

21              ATTORNEY PAPPY:  Okay.  Okay.

22              THE COURT:  And I'm not asking you -- if there are

23     disputes, talk about them.  And, look, if we all need to come

24     back again the following week, we will.

25              ATTORNEY PAPPY:  Okay.  Sounds good.

37

1          THE COURT:  But I do want to understand if there

2   are -- look, I -- again, I don't know how many disputes are --

3   there are going to be.  Maybe there are going to be none.  Who

4   knows?

5          But -- okay.  I don't -- again, I'm trying to -- I'm

6   trying to strike a balance, everyone, between requiring you all

7   to file a bunch of stuff with me before next Monday and also

8   having me come in, sort of without a sense of where things are

9   and do stuff on the fly, which also isn't helpful.

10         So I think -- let's just do this.  I think --

11  here's -- here's what I would like to do.  I know that you're

12  going to meet and confer with Ms. Chartoff on a number of

13  issues, Ms. Pappy.  I think what I would ask you all to do is

14  this.

15         By Friday, file a -- a joint filing from the parties

16  with respect to the -- the issue that you all agree should be

17  raised at -- and determined at the discovery hearing on Monday.

18  I would like to work through those with you all, and then

19  really dig in on the settlement stuff, to the extent we can.

20         But I am going to resolve your discovery matters

21  first, to the extent I can, so that you will have some guidance

22  from me moving forward.

23         And that would include -- just for the Docket Number

24  419 that you're going to update, Ms. Pappy, you can just do

25  that on Friday.  You don't need to rush and do it right after

1    you meet with Ms. Chartoff tomorrow.

2             But I think it would be more helpful to have a joint

3    filing.  If you have different positions, look, just --

4    Ms. Pappy will provide your position to Mr. Swearingen and

5    Mr. Fischer.  They'll include it in a filing.  And then I'll at

6    least know what we want to try to cover.  And that would be

7    both for discovery disputes, as well as for settlement.

8             Let's make -- I want to make good use of your time.

9             ATTORNEY PAPPY:  That's fine.  I'm just -- I'm a

10   little concerned because there are 151 document requests to the

11   defendants included in this latest round and --

12            THE COURT:  How many total document requests have you

13   had?

14            ATTORNEY PAPPY:  They have served on us 89, plus 151;

15   whatever that is.

16            THE COURT:  Hmm.  Okay.

17            ATTORNEY PAPPY:  So I'll do my best.  Be prepared to

18   discuss them all.

19            THE COURT:  All right.  So does that sound about

20   right, Mr. Fischer?  About 240 RFPs from the plaintiffs?

21            ATTORNEY SWEARINGEN:  I think in the -- between 250

22   and 300 sounds right to me, your Honor.

23            THE COURT:  Do you intend to serve any more?

24            ATTORNEY SWEARINGEN:  The -- I anticipate that we

25   would like to but we haven't asked leave for Court to.  And

```
 1   the -- the time -- the deadline for written discovery has

 2   passed, so we would need to seek leave from the Court to do so.

 3              THE COURT:  Okay.  No, I -- understood.  And I'm not

 4   foreclosing that.  I just want to make sure I know where things

 5   stand now.

 6              ATTORNEY FISCHER:  A couple of questions about

 7   Monday, when we're ready, just so I understand what we should

 8   expect.

 9              I understand teeing things up as best we can, pre --

10   pre-motion practice, so we have something to talk about on

11   discovery issues.

12              With respect to the ENEs, would it be helpful for the

13   Court to see something about the -- the topics to be covered?

14   Or some further -- that's what we had discussed at the last

15   ENE, that we would be providing something to you.  I want --

16              THE COURT:  Yeah, I -- no, I think it would be.

17              Look, let me ask you all this.  I -- I set this

18   because I saw the number of discovery disputes that were coming

19   up, and I just thought it would be more efficient for us to

20   resolve them --

21              ATTORNEY FISCHER:  Right.

22              THE COURT:  -- in person.  And I do still.

23              But, frankly, if -- if we're going to be spending the

24   majority of our time on discovery issues -- which was not -- my

25   hope was to spend more time on -- on settlement-related topics,
```

1    which I do believe are much more effective in person.

2    Discovery issues, not necessarily as much.

3            I want to give some thought as to whether this should

4    be in person or -- or remote, given the time and expense for

5    you all.  Do -- it just -- I've blocked out the day.  And I

6    don't love spending all morning on Zoom.  It's just -- when we

7    can really sit down and get in a room and talk.  And my

8    preference is still oftentimes to do things in person.  But

9    I -- I want -- I want to give some additional thoughts to this.

10   So --

11           ATTORNEY PAPPY:  Judge, if you want me to have

12   decision makers, I just need to know sooner, than later, what

13   time and on what issues.

14           THE COURT:  Yeah.  And that's -- that's where I'm --

15   you know, honestly, Ms. Pappy, I don't like the idea that --

16   we're -- you know, we're still talking about what issues we're

17   even going to be talking about.  And having decision makers --

18   decision makers present -- because I do think, for example,

19   from the ADA ENE that we did, it was really helpful to have

20   representatives from the County there who knew what was going

21   on.  And I think that facilitated the discussion.  Having

22   Ms. Sanossian there was helpful.

23           I guess I'm -- I'm -- there are more discovery

24   disputes that we need to take time to resolve than I think I

25   appreciated at the time.  And I -- I don't have a good enough

1  sense, candidly, right now where we can best be spending our

2  time on settlement.

3      And the last thing I want is for you all to make a

4  trip to San Diego, and then have an unproductive discussion

5  about settlement because it's too -- it's too vague.

6      So I think -- I'm inclined to keep this in person

7  because I think we'll get more done.

8      Let me ask -- but let me ask this.

9      Mr. Fischer, do you think that we are ripe to talk

10  about the specific settlement discussions that are -- the

11  settlement issues, I should say, that were addressed in -- in

12  what you -- I think it was from September 25th, that you sent

13  to me?

14      I'm looking at what you -- your proposed topics for

15  ENE discussion --

16      ATTORNEY FISCHER:  (Indiscernible.)  Uhm, I'll say

17  less than I had hoped because I thought we would have had

18  inspected the facilities at that point.  And I think it would

19  be great for us to have that, even -- even if it's something

20  that's under a settlement privilege type of inspection;

21  limited, so we can just be talking about the same thing.

22      I'm certain that that would make things more

23  productive, both from the substance use -- on the substance use

24  topic and on the ADA topic.

25      We are more hamstrung because Ms. Sanossian hasn't

42

```
1   visited the other facilities.  So that -- that slows us down a

2   bit as well.

3              THE COURT:  Okay.

4              ATTORNEY FISCHER:  So I just -- I would like to do a

5   little bit of thinking and conferring with my co-counsel about

6   it.

7              I think getting these -- these discovery issues

8   resolved, so we kind of have a sense of where -- where things

9   are, I think, would be very useful.

10             And, Ms. Pappy, I think we could also -- if you're

11  willing, we can talk a little more about how to order the ENE,

12  just in terms of process, to make the -- the actual ENE as

13  productive as possible.  If you wanted to meet and confer, just

14  among counsel, I think we would be able to do that, too.

15             THE COURT:  Let me ask this.  Right now we are

16  starting, I think, at 9:00 a.m.

17             Would it be helpful to have a later start time, so

18  you all can fly down in the morning and not have to spend the

19  night on Sunday.

20             ATTORNEY PAPPY:  It doesn't matter to me.

21             I'm having dinner with Ms. Coleman, so (laughing) --

22             THE COURT:  Okay.

23             ATTORNEY FISCHER:  My -- if it's -- if you'll allow

24  me, I'm supposed to be back in the Bay Area that evening to

25  coach my son's first basketball practice.  So that's the
```

43

```
 1    only --

 2              ATTORNEY PAPPY:  Very important.

 3              ATTORNEY FISCHER:  I can see -- I don't -- if we have

 4    momentum, I do not want to -- I'll adjust.

 5              THE COURT:  Okay.  So you would want to start at 9:00

 6    a.m., to finish earlier?

 7              ATTORNEY FISCHER:  Yeah.  And -- I don't know.  I

 8    also -- let's see what progress we make this week, I guess.

 9              ATTORNEY PAPPY:  And basketball is far more important

10    than baseball, Judge.  So I vote with Mr. Fischer.

11              THE COURT:  Okay.  Fair enough.

12              ATTORNEY FISCHER:  I'm sorry to do that.  I didn't

13    realize --

14              THE COURT:  No, I --

15              ATTORNEY FISCHER:  I love -- I am so appreciative

16    that you give us all day.  But I need to (indiscernible).

17              THE COURT:  I think, at the end of the day,

18    Mr. Fischer, if you're the coach and it's your team's first

19    practice, it is really important that you are there to do it.

20    And so it is no problem with me, if we are still going, if you

21    need to take off to make that practice.  That is the stuff that

22    matters.  So don't worry about that.  You'll be there for the

23    practice.

24              ATTORNEY FISCHER:  My co-counsel can certainly

25    (inaudible) as well.
```

1          THE COURT:  Yeah, absolutely.

2          All right.  Well, look, let's -- as I think through

3    this now, let's do keep it in person.  I think we're going to

4    make some progress.

5          What I would ask for you to do is just file something

6    with -- give me a joint status report by Friday, letting me

7    know where you want to focus for Monday.  And specifically with

8    respect to the remaining -- any discovery disputes.  Other than

9    the CIRB report, which is fully briefed.  And then where you

10   all think we can at least start talking about settlement.

11         I don't know that it makes sense for me to have

12   decision makers present, Ms. Pappy.  If you talk to Mr. Fischer

13   and you think there's some progress we can make -- I also want

14   to figure out how we're going to do that because I am going to

15   address discovery issues first, and I don't want them sitting

16   through that.

17         So I think we're probably going to be best served

18   with counsel, and having decision makers -- people with

19   knowledge -- on standby, perhaps.  But I'm going to defer to

20   you on that.

21         I don't want to order people to be there when

22   they're -- you know, we -- I don't have a good sense, as of

23   yet, how much progress we're going to make.

24         ATTORNEY PAPPY:  Okay.  Sounds good.

25         THE COURT:  All right.  And I will ask you all to

```
 1    work off of the September 25th proposed topics, as to where you
 2    think we can -- we can start talking.
 3            I mean, I -- what I would like to do is figure out if
 4    there is -- you know, frankly, reduced topics.  If they're --
 5    if the County has implemented procedures that deal with some of
 6    these topics, let's start -- let's start going through those.
 7    And if we can scratch them out, like this is already good to
 8    go; or how you can get to a place where the plaintiffs
 9    understand that it's good to go.  If it is, great.  Then figure
10    out where do we really need to spend the time talking.  I think
11    that will actually be a good use of our time.  Because the --
12    the substance abuse issues are a big one.
13            ATTORNEY FISCHER:  We -- plaintiffs absolutely
14    welcome that, Ms. Pappy.  If there -- ENEs are -- all
15    settlement privilege.  If there's someone who can speak to, you
16    know, here's where we are on the NARCAN, and here's what it is.
17    Then we can say, all right.  We can ask a couple of questions.
18    All under settlement privilege.  And understand what can be --
19    what we still have concerns about, what can be taken off -- we
20    would welcome that.
21            ATTORNEY PAPPY:  Yeah.  I mean, some of this I have
22    communicated to you.  So let's -- let's talk through that more
23    because I -- we have given you some of this information.  So
24    maybe we can cross some of those off the list.
25            THE COURT:  I will defer to you, Ms. Pappy, when you
```

1  talk to Mr. Fischer and Mr. Swearingen and their colleagues.

2  If you all decide, look, the plaintiffs would like to, you

3  know, hear it directly from somebody at the County, do you

4  think there's somebody that could be there on Monday -- I'm not

5  going to order it right now because I don't know enough, and I

6  don't want to do that.  But to the extent that would be

7  helpful, you think, in really narrowing the topics that we need

8  to talk about, they're welcome to be there.  Or be available by

9  phone.

10        ATTORNEY PAPPY:  Okay.  Sounds good.

11        THE COURT:  All right.  Well, look, thank you all for

12  the time.  I look forward to speaking with you in person on

13  Monday.  We'll keep it as set for 9:00 a.m.

14        And I -- as I am looking at the calendar, I think

15  we're -- let's -- we're going to start, I believe, in -- in

16  Courtroom 3D.  And we'll decide there if we want to stay there.

17  I'll be there for the discovery issues, on the record.  And

18  then we can decide if we want to stay there for the settlement

19  issues; or if we want to go to a conference room, like we did

20  before.

21        ATTORNEY PAPPY:  Okay.  Thank you.

22        THE COURT:  You bet.  Anything else we should

23  discuss, Mr. Fischer, Mr. Swearingen?

24        ATTORNEY SWEARINGEN:  No, your Honor.

25        ATTORNEY FISCHER:  Thank you, Judge.

47

1          THE COURT:  You bet.  My pleasure.

2          Ms. Pappy, how about you?

3          ATTORNEY PAPPY:  No.  Thank you, your Honor.

4          THE COURT:  Okay.  Hope you all have a great weekend.

5   Look forward to seeing you next Monday.  See you soon.

6          ATTORNEY PAPPY:  Thank you.

7          ATTORNEY FISCHER:  Okay.  Take care.  Bye.

8          (Conclusion of proceedings.)

9

10                      --oOo--

11   I certify, by signing below, that the foregoing is a correct
     stenographic transcript, to the best of my ability, of the
12   digital recording of the audio proceedings had in the
     above-entitled matter this 1st day of November, 2023.  A
13   transcript without an original signature or conformed signature
     is not certified.  I further certify that the transcript fees
14   and format comply with those prescribed by the Court and the
     Judicial Conference of the United States.

15
          /S/ Amanda M. LeGore
16        _____

17        AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

18

19

20

21

22

23

24

25

**Ex. A - 48**

# EXHIBIT B

1                UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF CALIFORNIA

3

4  DUNSMORE,                    )  Case No. 20CV0406-AJB-DDL
                                )
5          Plaintiff,           )  San Diego, California
                                )
6  vs.                          )  Monday,
                                )  November 6, 2023
7  STATE OF CALIFORNIA, et al., )  1:30 p.m.
                                )
8          Defendants.          )
                                )
9  _____)

10            TRANSCRIPT OF DISCOVERY CONFERENCE
          BEFORE THE HONORABLE DAVID D. LESHNER
11             UNITED STATES MAGISTRATE JUDGE

12 APPEARANCES:

13 For the Plaintiff:          HANNAH M. CHARTOFF, ESQ.
                               RICHARD VAN SWEARINGEN, ESQ.
14                             PRIVAH KAUL, ESQ.
                               Rosen Bien Galvan &
15                               Grunfeld, LLP
                               101 Mission Street
16                             Sixth Floor
                               San Francisco, California
17                               94105
                               (415) 433-6830
18
   For the Defendants:         ELIZABETH MARIE PAPPY, ESQ.
19                             Burke Williams & Sorensen, LLP
                               60 South Market Street
20                             Suite 1000
                               San Jose, California 95113
21                             (408) 606-6300

22 Transcript Ordered by:

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

ii

1  Transcriber:                    Dee Gregory
                                   Echo Reporting, Inc.
2                                  9711 Cactus Street, Suite B
                                   Lakeside, California 92040
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1    SAN DIEGO, CALIFORNIA MONDAY, NOVEMBER 6, 2023 1:30 P.M.

2                        --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  Calling matter 20CV0406, Dunsmore versus

5    the State of California, et al.

6            And please be sure that everyone is speaking into

7    the mics.

8            THE COURT:  Good afternoon, everyone.

9            Could I have appearances from counsel, beginning

10   with Plaintiffs.

11           MS. CHARTOFF:  Hannah Chartoff from Rosen, Bien,

12   Galvan and Grunfeld, your Honor.

13           THE COURT:  Thank you.

14           MR. SWEARINGEN:  Van Swearingen for Plaintiffs.

15           MS. KAUL:  Priyah Kaul for the Plaintiffs.

16           THE COURT:  Thank you.

17           MS. PAPPY:  Elizabeth Pappy for Defendants.

18           THE COURT:  Okay.  Thank you all.

19           Is Mr. Fischer joining by Zoom?

20           MR. SWEARINGEN:  He is available if we go into the

21   ENE territory today, but he's not necessary to the discovery

22   portion of today's conference.

23           THE COURT:  Okay.  I appreciate that.  And I

24   think -- well, even before some of the travel issues came up

25   for everyone, in reviewing what was submitted to me, I think

2

1 our time is going to be best spent dealing with the discovery

2 issues.  There are frankly more than I had realized, and I

3 have a number of things that I want to discuss with you all.

4        Let's start with this.  I was copied on some email

5 correspondence that was, frankly, surprising and

6 disappointment, both with respect to the Plaintiffs'

7 submission of their portion of the joint status report by

8 email that did not have input from the Defendants -- I was

9 also provided copies of emails regarding disputes over whether

10 discovery responses would be due on October 31st or November

11 7th or whether that also included responsive documents.

12        I don't want to spend our time this afternoon

13 talking about that unless it is necessary.  I'm just going to

14 note this.  I read everything that you all submit to me.  And

15 to the extent that things are being provided to me, a portion

16 of a status report that does not have the Defendants' input --

17 I really hope that we haven't lost some of the positive

18 momentum that you all had working together in quite admirable

19 fashion on the ADA stipulation and the class certification

20 motion, because frankly, the emails that I've seen going back

21 and forth -- which were just provided to me for whatever

22 reason -- are surprising, given the counsel that I'm dealing

23 with in this case.

24        Candidly, other cases, I wouldn't be at all

25 surprised to see them.  I am here, and I'm going to leave it

3

1 at that, and hope that everyone gets some grace in an email on

2 a Friday afternoon, and maybe there was a decision it would be

3 a good idea to submit by email to me a joint report that I had

4 specifically requested come from both parties.

5          Let's move forward, and let's move forward in a way

6 that is constructive.

7          I have a number of questions for you all about

8 issues in the case, having reviewed the joint status report

9 that is docket number 436.

10          And here's what I would like to do.  I'm going to

11 address the issues in the report.  I want to talk first about

12 the status of written discovery, and I want to understand what

13 written discovery has been propounded and when it is going to

14 be responded to.

15          I want to talk second about the parties' joint

16 motion regarding protected health information because I did

17 not sign off on that, given that I had some questions for you

18 all about it.

19          I want to talk third about the Rule 30(b)(6)

20 depositions and how we're going to go about resolving issues

21 with those.

22          I want to talk fourth about issues relating to the

23 jail inspections and identifying disputes and how we're going

24 to resolve those.

25          And, fifth, I want to talk to you about the

**Ex. B - 54**

4

1  pretrial schedule, because before you leave here today, I

2  intend to give you tentative dates through trial in this case

3  so that you can move forward.

4         And if we have any time left, we can talk about

5  settlement.  But candidly, as much as I would love to sit down

6  with you informally off the record and talk settlement, this

7  case needs some work from all of us on discovery issues first.

8         So with that being said, let me begin with the

9  Plaintiffs with respect to your discovery.

10        I understand that the Plaintiffs have served five

11  sets of requests for production; is that correct?

12        MS. CHARTOFF:  Yes, your Honor, including the early

13  discovery.

14        THE COURT:  Right.  So the discovery that is

15  outstanding -- well, my understanding is the third, fourth and

16  fifth set of requests for production; is that correct?

17        MS. CHARTOFF:  Yes.  I think there may be a couple

18  of documents that are trickling in from requests -- set two of

19  the requests for production.  Those are as they become

20  available, as medical examiner reports, for example, become

21  available.  I think there are a couple, but we have no

22  concerns about those being produced as they are available.

23        THE COURT:  All right.  So I understand that there

24  was a third set of requests for production served by the

25  Plaintiffs on June 15th.  That was request numbers 25 to 83;

5

1 is that correct?

2          MS. CHARTOFF:  Yes, your Honor.

3          THE COURT:  And I understand there is a fourth set

4 of requests for production served on August 16th, numbers 84

5 to 87; is that correct?

6          MS. CHARTOFF:  Correct, yes, your Honor.

7          THE COURT:  And then I understand that there is a

8 fifth set of requests for production that you all provided to

9 me -- thank you very much -- set five that was served on

10 September 1st.  I don't think I've seen that before, but I do

11 see the parties providing me with a courtesy copy.  And that

12 is request numbers 88 to 247; is that correct?

13          MS. CHARTOFF:  Correct, your Honor.

14          THE COURT:  Okay.  Have the Defendants responded to

15 either the third, fourth or fifth sets of requests for

16 production?

17          MS. CHARTOFF:  Yes, to three and four.  Not yet to

18 five.

19          THE COURT:  All right.  Do I understand correctly

20 that the Plaintiffs served the first set of interrogatories on

21 June 15th?

22          MS. CHARTOFF:  Yes, your Honor.

23          THE COURT:  All right.  And how many

24 interrogatories were in that set, Ms. Chartoff?

25          MS. CHARTOFF:  Ten, your Honor.

6

1          THE COURT:  And then there was a second set that

2 was served?

3          MS. CHARTOFF:  Yes.

4          THE COURT:  And when was that?

5          MS. CHARTOFF:  Also on September 1st.

6          THE COURT:  And how many are in that set?

7          MS. CHARTOFF:  11 through 25.

8          THE COURT:  Have the Plaintiffs served requests for

9 admission?

10          MS. CHARTOFF:  Yes.  Only in June I believe, and

11 those have been responded to.  And there are no -- you have

12 not seen that in your joint status report, because there are

13 no outstanding issues as to those.

14          THE COURT:  I do see a second set of RFAs that were

15 served on September 1st as well.  And this is not a memory

16 test for you.

17          MS. CHARTOFF:  Yes.

18          THE COURT:  That's okay.  I just want to get my

19 arms around this.

20          MS. CHARTOFF:  No, that's -- apologies, yes.  RFAs

21 are due, and then those would still be -- those have not yet

22 been responded to.

23          THE COURT:  Okay.  Ms. Pappy, is all that correct?

24          MS. PAPPY:  Yes, your Honor.

25          THE COURT:  All right.  Let's turn to the discovery

7

1 that the Defendants have propounded, and then I want to talk

2 about the actual document production.

3        I understand from the briefing that the Defendants

4 propounded a first set of requests for production on September

5 1st; is that correct, Ms. Pappy?

6        MS. PAPPY:  Yes, your Honor.

7        THE COURT:  And how many requests were in that --

8 again, not a memory test.  I'm just trying to get my arms

9 around this.

10       MS. PAPPY:  Twenty-five.

11       THE COURT:  Did you propound interrogatories?

12       MS. PAPPY:  Yes.  When I originally propounded

13 them, I mistakenly didn't pay attention to the Court's order

14 and I propounded a set of 25 on each Plaintiff.

15       Counsel asked me -- well, I offered to re-issue

16 them as one set of 25 with the preface "For each Plaintiff,

17 state."  So I did that.  So 25, and then -- let me see,

18 requests for admissions, two.  And they were only to three

19 Plaintiffs.

20       THE COURT:  Have you received responses to any of

21 the written discovery that you've propounded as of yet?

22       MS. PAPPY:  Yes, the 31st.  On the 31st.  Actually,

23 your Honor, I take that back.  They responded to the requests

24 for admission and the requests for production of documents on

25 the 31st.  I don't remember when the response to the special

8

1 interrogatories is due because they asked that I re-serve them

2 as one set of 25, so I think those responses are due sometime

3 next week.

4          THE COURT:  Okay.  Staying with you, Ms. Pappy,

5 have the Defendants responded to the third, fourth or fifth

6 sets of requests for production to date?

7          MS. PAPPY:  Written responses to three and four,

8 yes.  Our written responses to five are due tomorrow.

9          And in terms of production of documents, I think

10 almost everything has been responded to.  There are some

11 overbroad issues that we're still grappling with, I think as

12 you see in here.

13          THE COURT:  And from the Defendants' perspective,

14 do the documents produced include substantially all of the ESI

15 that you are contemplating producing, or is that a current

16 issue between the parties?

17          MS. PAPPY:  That's a good question.  When the

18 Plaintiffs asked us to do ESI searches, they didn't ask us to

19 produce ESI.  The ESI searches, probation and the County --

20 and their search was last week -- all the documents were

21 segregated, but they didn't run a hit list, which is what

22 Plaintiffs requested from me.

23          So they finished their hit list last week.

24 Sheriff's completed 90 percent of their hit list last Friday.

25 I was supposed to get a final run of the ESI hits today.  We

9

1 are -- I'm working with Plaintiffs to provide them more detail

2 they've asked for on the hit list.

3          Now, separate and apart from that, when they ask me

4 a document production request, we search everything.  So that

5 universe of documents plus anywhere and everywhere else that

6 documents are stored, because what they gave me was custodian

7 email addresses and then they said search these -- segregate

8 these, put a litigation hold on them -- we did that -- and

9 search these email addresses.

10          So the hit lists are those people's emails.

11          The system -- people do not and are not supposed to

12 store anything on their hard drives.  The rest of the

13 information is in GMS, Tech Care -- I'm trying to think of the

14 rest of the names.  Those are the two that pop into my mind.

15 PCMS which is Probation.  And those things have litigation

16 holds on them.

17          Hit lists were not performed on those non-email

18 systems.

19          THE COURT:  As I was preparing for today's hearing,

20 I was looking at the docket and the prior orders that I

21 issued, and it appeared to me that I initially ordered that

22 the parties resolve any -- or raise any disputes regarding ESI

23 and search terms by late June and then I subsequently granted

24 the parties' request to continue that deadline I think to July

25 10th.

10

1        Was there a later request to continue that deadline

2 that you're aware of, Ms. Pappy?

3        MS. PAPPY:  There was not.  And I wasn't aware that

4 there was a dispute until I got the status conference

5 statement.  I've been working with them.  The response has

6 been slow on my side of it, getting those hit lists.

7        THE COURT:  Okay.  All right.  Let me turn to the

8 Plaintiffs then.

9        With respect to issues regarding search terms and

10 custodians, is my recollection correct that the initial

11 deadline for the parties to raise any disputes on those two

12 areas was -- I think it was June 26th, and subsequently

13 extended to July 10th?

14        MS. CHARTOFF:  That's correct, your Honor.

15        THE COURT:  Was there a subsequent extension of

16 that?

17        MS. CHARTOFF:  No, your Honor.

18        THE COURT:  So with respect to the portion of the

19 joint status report where there's a page or so -- on pages one

20 and two at docket number 436.  And let me refer to ECF page

21 numbers for the record.  It's ECF page numbers three and four.

22        Is there anything for me to resolve on that, given

23 that that date has passed?

24        MS. CHARTOFF:  Yes, your Honor, there is.  We

25 approached -- you know, we sent our search terms to Ms. Pappy

11

1 in June to Defendants and said:  These are our search terms.

2 Please provide us a hit report, and we will -- so that we can

3 see if there's anything to narrow here.

4          And we followed up and said:  Please provide a hit

5 report.

6          And Ms. Pappy represented that all of the documents

7 had been collected, and we agreed that that would be the

8 universe of documents that for those searches would be

9 conducted from as it relates to ESI.

10         And when we pressed and tried to make progress on

11 narrowing the search terms, the response from Defendants was:

12 None of your document requests are -- our deadline to respond

13 to them hasn't arisen yet, so there's nothing for us to talk

14 about here.

15         So we waited and continued to press and told

16 Defendants -- I mean we understand the Court's order to mean

17 we need to resolve what the universe of documents that will be

18 reviewed is.  And our understanding from Defendants was:

19 We've identified that universe with the custodians and the

20 search terms that you've provided and further narrowing can be

21 done once we've responded to your document requests.

22         So we brought this up again in August:  Why haven't

23 you conducted ESI searches for these -- for this material?

24         And that's where we are right now.  And we have

25 asked for hit reports for unique hits of these documents and

12

1 have been asking for that information and haven't received

2 complete information, as Ms. Pappy just said.  It's something

3 that Defendants are still working on gathering.

4        THE COURT:  The reason why I had a deadline for the

5 parties to raise any disputes over search terms and custodians

6 was so that we could resolve any disputes over the summer, and

7 we're now four months later and approaching -- well, we're

8 past the date for substantial completion of document

9 production, and we are approaching the fact discovery cutoff

10 that I'm going to set at the end of this hearing.

11        So what disputes remain between the parties with

12 respect to the production of ESI, Ms. Chartoff?

13        MS. CHARTOFF:  We have not agreed -- Defendants

14 have not agreed to search all and manually review all of the

15 documents that are currently in that universe of documents

16 that was originally provided by the search terms that we

17 provided in June and the custodians.

18        And Plaintiffs have repeatedly offered to narrow

19 those search terms to create a smaller universe of documents

20 for Defendants to review each document manually.  But we can't

21 do that until we have concrete information about how many

22 documents are in that joint repository, which custodians those

23 documents are from and which of the search terms are

24 generating the most unique hits.

25        And we've had this discussion several times now

13

1 with Ms. Pappy and we still haven't gotten that complete

2 information.  And it's very difficult for us.  And without

3 knowing the complete number of documents in this saved search

4 that I understand the Defendants have put together, I don't

5 know how we can offer any more narrow search terms.

6          THE COURT:  Was there ever a discovery conference

7 requested of me on this issue?  Because I have to tell you

8 that I know that it may have been noted in a prior status

9 report, but we're in a position now where I think Ms. Pappy

10 believes their production is substantially complete.  The

11 Plaintiffs are saying that you don't believe that it is.  And

12 we are well beyond the time period where I had expected this

13 to be raised.

14          Was it ever raised with me in a prior discovery

15 conference, Ms. Chartoff?

16          MS. CHARTOFF:  It wasn't, your Honor, but the

17 reason for that is because we have been waiting on this more

18 detailed information from Plaintiffs -- or, sorry, excuse

19 me -- from Defendants.

20          And the message that we have gotten when we have

21 repeatedly discussed this with Defendants is:  We are working

22 on it and it's not appropriate for you to raise the issue

23 before the responses for these document requests are even due.

24          And I will say, your Honor, I have been surprised

25 at the delay that it has taken Defendants to provide some of

14

1 this basic -- what seems to me from other cases, basic data

2 points like the total number of documents in the search, like

3 the number of unique hits.  That's information that I would

4 expect to be provided within a couple of hours by an

5 e-discovery vendor.

6           And my understanding is that whatever system

7 Defendants are using, they aren't in a position to provide

8 that information.

9           THE COURT:  Ms. Pappy, from your position, is there

10 a dispute between the parties regarding the production of ESI?

11 I guess specifically emails is really what we're talking

12 about.

13           MS. PAPPY:  No.

14           THE COURT:  I appreciate a direct answer to a

15 direct question.

16           MS. PAPPY:  No.

17           THE COURT:  So what's the status of it?  So you

18 have a hit report, and you plan to -- do you plan to share

19 that with the Plaintiffs?

20           MS. PAPPY:  We already gave it to them.

21           THE COURT:  All right.  So what's the next step,

22 from your perspective?

23           MS. PAPPY:  Well, what I'm hearing today is brand

24 new.  And I don't -- I'm going to take your comments to heart

25 at the beginning, and I'm not going to go into whether I agree

15

1 with them or not.

2        I gave this hit report to them, the first one,

3 which concededly, my clients are behind.  I'm not going to sit

4 here and tell anybody they weren't.  But no, it wasn't raised

5 to the Court.  And I gave them that hit list last week, so --

6 and said, "Hey, listen, this is" -- remember, the hit list is

7 emails.  They gave us people's names, the client -- so the

8 Sheriff's Department has its own email system and then County

9 and Probation have another.  And so there's two hit lists.

10        They gave me a list of people.  They gave me a list

11 of search terms, 86 search terms.  Both entities ran the hit

12 list -- with speed or not speed, I am not commenting on -- and

13 generated hit lists from those custodians' emails.

14        THE COURT:  How many custodians' emails were there?

15        MS. PAPPY:  I don't --

16        THE COURT:  Approximately.

17        MS. PAPPY:  Thirty? 30 --

18        MS. CHARTOFF:  I think there maybe have been 50.

19        MS. PAPPY:  A hundred and fifty?

20        MS. CHARTOFF:  No, no.  Maybe it has been 50.

21        MS. PAPPY:  Fifty custodians.

22        THE COURT:  So approximately 50 custodians and

23 approximately 86 search terms?

24        MS. PAPPY:  And 86 search terms.

25        THE COURT:  Okay.

16

1          MS. PAPPY:  That took a while since I started it,

2 and that's all I'll say on that.  And I finally got the search

3 terms.  I provided -- or the hit lists.  And some of the hit

4 lists show up with 500 documents and some of them show up with

5 150,000 documents.  And that was provided to counsel.

6          I had thought that they were going to get back to

7 me with:  Okay, try to narrow by -- and in fact we talked

8 about it last week -- can you give me three search terms to

9 combine together?  Give me like the highlights, five of them

10 that you want me to re-run.  Let's see if we can narrow it

11 down.

12          They asked me for hits by custodian, which I just

13 haven't had time to get them before coming here today.  But

14 that was my next step, was they had asked for that hits by

15 custodian so they could see if one custodian had more

16 information than another one, maybe we focus on production of

17 that person's documents.

18          The first time I heard that they wanted us to

19 review some, I don't know, some half-million, million

20 documents, was Friday in the joint status report.  And

21 obviously the County doesn't agree to do that.

22          There seems to be a misunderstanding, which I have

23 had conversations repeatedly about, that this is not like a

24 business where the whole computer system is centralized and

25 you can -- like at my law firm, you might -- well, actually

17

1 probably wouldn't in my law firm -- run one whole systemwide

2 search.  And I thought they understood that because they gave

3 me email addresses.

4        The GMS system which you hear all about is not

5 electrically or network-system connected to emails.  So if

6 they're saying that they want to limit document productions to

7 just those emails -- I hate to skewer myself -- but they're

8 not going to capture all the responsive documents.

9        They need us to search GMS, they need us to search

10 Offender 360, they need us in Probation to search PCMS.  To

11 collect all electronically stored information, all of those

12 systems have to be searched as well.

13        So I'm a little unclear about what it is that they

14 want.  When they serve me a document production request, I

15 don't limit the search to the custodians.  We do a systemwide

16 search of every system that exists where these documents may

17 be stored.

18        THE COURT:  So which understanding is -- the

19 obligation of the responding party is to look at a requests

20 for production and determine where to find responsive

21 documents.  And search terms and custodians are designed to

22 allow the parties, ideally, to work collaboratively to narrow

23 that universe.

24        So you're saying, Ms. Pappy, that when we're

25 talking about electronically stored information, it's not just

18

1 limited to emails but it includes -- responsive documents may

2 be found on the GMS system and this PCMS system?

3        MS. PAPPY:  PCMS is Probation.  GMS you've got Tech

4 Care, which is where the medical information is kept.  I don't

5 know if GMS contains custodian files, but wherever those

6 custodian files -- which are a lot of what has been requested.

7        And so I had sort of viewed them as separate --

8 this bucket of ESI custodian emails for their ESI search, but

9 we don't just limit the search to any of that.  We don't even

10 limit it to the custodians.  We search everything.

11        And that's one of the things that I have been

12 providing them.  I don't want to get ahead, but just for

13 example, on number 28, we searched the word "memo and."  I

14 picked out a bunch of things and I sent them the search --

15 what it came up with and said:  Okay.  Now can you narrow this

16 down a little?

17        And they came back and said, "Yeah.  How about

18 captains directives."  I haven't had time to run that.

19        But that's how we've been doing it, so I hope that

20 doesn't confuse or belabor the point.  But that's where the

21 County and the Sheriff's Department and Probation have been

22 coming from and the way we've been conducting searches.

23        THE COURT:  So am I understanding correctly that

24 the Defendants have been searching through different databases

25 of electronically stored information for documents that are

19

1 responsive to the -- I guess we're now up to 247 RFPs?

2          MS. PAPPY:  Absolutely.  Every time.  We search all

3 the databases.

4          THE COURT:  So --

5          MS. PAPPY:  And we -- let me rephrase that.  We

6 don't search it if we know there's not going to be anything in

7 it.  So I'm trying to -- policies and procedures is a bad

8 example, but something that might be stored in GMS that is not

9 going to be stored in Tech Care, we aren't going to search

10 Tech Care for it.

11          THE COURT:  Understood.

12          So what is the dispute, Ms. Chartoff?

13          MS. CHARTOFF:  I have factual disputes with many of

14 the things that Ms. Pappy just said, unfortunately.

15          So, first of all, I do not think we have seen a

16 single email that has been produced in response to RFP Set

17 Three or RFP Set Four.

18          And on the substance of what we are asking for, I

19 think there are many places where we have received very, very

20 little information.  So as an example -- and I think the

21 representation that we only recently provided some of this new

22 information or new direction to Defendants is inaccurate, in

23 my view.

24          So to take number 28, the Sheriff's memoranda, for

25 example, we had requested memoranda from the Sheriff's

20

1 Department in June and were told that term is too broad, when

2 we got the response in August.

3          On August 24th, I sent a letter saying:  Please now

4 search for documents, including captains directives and

5 indicating a specific document that we had received from one

6 of the expedited discovery requests that was titled "Captains

7 Directive" and said "Please search for documents that are

8 captains directives," and then only within the last couple of

9 days did Ms. Pappy agree to, and Defendants agreed, to search

10 for captains directives.

11          So from our perspective, the complete search that

12 Defendants are talking about as being currently conducted has

13 not been happening.  There has not been a complete search at

14 all.

15          I'll also say that in our view, ESI and email

16 correspondence is particularly important in this case.  And I

17 don't want to say that we are not interested in documents from

18 GMS and medical records, because we certainly are interested

19 in that information as well.

20          But as we've been meeting and conferring about some

21 of our more targeted requests that do not call for ESI, there

22 are circumstances where we're finding that Defendants don't

23 keep records on certain issues, or formal records on certain

24 issues that we would expect them to be keeping records on.  Or

25 they don't track information on certain points that we would

21

1 expect them -- we would expect that they would track.

2          So an example of that is the deployment of tactical

3 teams.  We asked for all logs relating to the deployment of

4 tactical teams within the jail and were told that -- that's

5 request number 82.  And we were told that there are no written

6 records.  There is no tracking that's created for each time a

7 tactical team is being used.

8          So there is no way for us to search for that

9 without application of search terms and agreement to review a

10 large quantity of documents.

11          A similar example is disciplinary reports regarding

12 improper or inadequate healthcare.  That was request for

13 production number 43.  Defendants have told us, "We do not

14 have some kind of unified tracking mechanism."  So doing a

15 search term type search where an attorney or reviewer of some

16 kind would then go through all documents hit on by a certain

17 set of search terms is necessary to generate that information.

18          And I have other similar examples.  Court orders

19 for medical care, for example.  Defendants have recently

20 produced all of the court orders pertaining to medical care in

21 jail they received, but I understand that there is no

22 centralized tracking mechanism when such orders come in.

23          So without, again, applying some kind of global ESI

24 search, it's not clear that we would get the follow-up

25 documents to that.

22

1          And I'll also note that from other documents that
2  we have received, including for the documents in response to
3  some of our PRA requests that we made before this litigation
4  began, I understand that there actually are -- there is a lot
5  of conversation about the care of incarcerated people or the
6  housing and those kinds of decisions that are communicated
7  through email.  And I've seen emails that talk about a
8  specific incarcerated person by name and booking number in an
9  email and then some information that follows up.

10          It's very hard to tell in many of the PRA
11 documents.  A lot is redacted.  But there are various
12 indications that that information is going to be very
13 important for us, particularly when Defendants don't track
14 that information on some higher level.

15          So we are still waiting for Defendants to agree to
16 review by hand every single document that hits on this
17 universe of search terms that, again, we are willing to narrow
18 if we even know the total number of documents that are
19 currently hit on.

20          And I think, again, we still don't have the
21 complete hit list.  Ms. Pappy yesterday very kindly emailed me
22 the most updated one, but she still said it's only 90 percent
23 complete, from the Sheriff's Department, which is particularly
24 concerning because I understood that all of those documents
25 had already been gathered as of July.

23

1          And although these hits are returned, I think the

2 de-duplicated information is really what we're still missing

3 here.

4          A hit report without the de-duplication is somewhat

5 useful, but if we get those unique hits, only the number of

6 documents that are turned on by a specific search term, then

7 we actually can do the iterative process and go back and forth

8 and figure out how to narrow this apparently very large

9 collection of documents to something that Defendants and their

10 attorneys can review every single document and determine

11 responsiveness.

12          And finally, my last note is, my understanding is

13 that we have not gotten any documents responsive to Request

14 for Production Set Five and it's -- at this point, absent

15 Defendants' response -- which as you know, your Honor, we

16 disagree that the deadline for responses was tomorrow.  But

17 absent that information, it's not even clear to us if

18 Defendants are agreeing to produce anything in response to

19 that.

20          So I don't think it's a fair statement that things

21 are well and good and on the way to complete production in

22 response to all of our document requests.

23          THE COURT:  I understand both parties' positions.

24 Here's what I'm inclined to do, and I would welcome input from

25 both of you before I make a final decision.

24

1          We'll talk later about the fact discovery cutoff.
2 But with respect specifically to written discovery, here is
3 what I am inclined to do.
4          The deadline for all parties to serve responses to
5 written discovery will be this Friday, November 10th.  That
6 includes any outstanding discovery that has been served to the
7 Defendants and any outstanding discovery that has been served
8 to the Plaintiffs.
9          The parties will have one week to meet and confer
10 regarding any outstanding discovery issues and will file a
11 joint status report with respect to any outstanding discovery
12 issues by November 17th.
13          I will hold a hearing to address those written
14 discovery disputes on November 21st at 4:00 p.m.  To the
15 extent we need to carry over, I will carry over to the
16 following day.  And I plan to resolve all discovery disputes
17 during that conference.  And the deadline for all parties to
18 produce all responsive documents will be December 22nd.
19          And I realize that the holidays are in the middle
20 of that, but we are where we are.  I thought this would be
21 resolved earlier, and I'm not suggesting anyone has been
22 acting in bad faith.  But it just -- it needs to get done,
23 because I'm going to set other dates for you all, and you both
24 need to have each other's documents so that you can take
25 depositions and provide them to your experts and go forth with

25

1 the case.

2          Do you wish to be heard on that, Ms. Chartoff?

3          MS. CHARTOFF:  Yes, your Honor.

4          In principle, I think this schedule makes sense to

5 us.  The one thing I'll say is, on this -- I think on the

6 issue of ESI discovery and number of documents approaching how

7 to identify this universe of documents that Defendants are

8 going to review to ensure that there are responsive documents

9 to all of our discovery requests, in the ESI.  If we can get

10 from Defendants de-duped information about the number of

11 documents that are currently in this saved collection of

12 documents in a timely manner -- and by that I mean within a

13 day from asking -- from providing revised search terms, to

14 get, yes, this is how many documents are hit on by those

15 search terms, I don't know that we can finish meeting and

16 conferring within a week to identify that review universe.

17          And that's because in my experience this is always

18 an iterative process.  It's much more an art than a science.

19 And we're going to provide revised search terms.  Maybe

20 they'll narrow it to some documents.  Maybe they won't be as

21 effective as we intend them to be.  And if it's taking

22 Defendants a week to even get a complete hit report, which at

23 this point -- at this point, I think it's been taking several

24 months.  But now I trust Defendants that they're focused on

25 this more now -- then I don't think that we'll be able to

26

1 complete that review within a week -- or complete that meet

2 and confer, I should say, within a week.

3          THE COURT:  I agree with you that this can and

4 should be an iterative process, as you are working together to

5 figure out proportionality issues.  Ultimately, it's the

6 responding party's decision to make as to what documents they

7 believe are responsive to requests for production and are

8 proportional.

9          And if there are documents that the County says,

10 "Those aren't proportional.  We're not going to produce them,"

11 this would not preclude you from seeking relief from me.  It's

12 going to be yet another series of motions that I very much

13 hope to work with you to avoid and, more important, hope that

14 you can all work together to avoid.

15          But ultimately I hear what you're saying, Ms.

16 Chartoff.

17          Let me hear from Ms. Pappy.

18          MS. PAPPY:  The County -- well, my clients are fine

19 with that deadline because I think proportionality is one of

20 the huge issues here.  And this notion that the County is

21 obligated to review what is probably a million documents is

22 going to be a sticking point.

23          So hopefully your deadline will cause your people

24 to get real, my clients included.  I'm fine with the deadline.

25          THE COURT:  Well, and you agree, Ms. Pappy, that it

27

1 would be the propounding party's burden to establish relevance

2 and if there's a claim of proportionality and undue burden,

3 that would be on the responding party?

4        MS. PAPPY:  Yes, absolutely.  I have -- and I have

5 been sending hit lists regarding -- not the hit list, but I've

6 been sending hit lists to demonstrate that we're trying to

7 work with them to reduce the scope.

8        THE COURT:  I'm still not exactly sure what

9 happened that prevented the parties from dealing with this

10 issue months ago.

11        It does sound to me, Ms. Pappy, like there was a

12 delay by the County in providing you with a hit list.  I don't

13 have that information before me yet.

14        I certainly hope it's not necessary for me to dig

15 in and determine that issue, because I am going to be working

16 very hard at allocating costs as appropriate under Rule 37 if

17 there is a motion to compel, because this issue, for whatever

18 reason, has carried on, in my respectful view, for far too

19 long.  And I do think that it is -- you all need an answer

20 from me on this if it comes to that, but more important, from

21 the County in terms of producing the documents that it

22 believes are responsive.

23        And there is a difference, as I see it, between the

24 obligations of the parties to work together to determine what

25 the appropriate search parameters are, which you're doing

28

1 right now through this iterative process by providing hit

2 reports as opposed to after documents are produced and there

3 is case law for the proposition that the party receiving the

4 documents needs to show that there's some sort of deficiency

5 in the production.

6          I do want in this case to understand that if it

7 becomes necessary, exactly what searches the County ran and if

8 there's an issue of proportionality and the County is taking

9 the position that this tranche of documents should not be

10 reviewed, I'm going to be looking at the County to tell me

11 exactly how many documents there are.

12          And hopefully that's not going to be an issue, but

13 I'm going to leave it to you all to figure that out.

14          MS. PAPPY:  Can I make a request?

15          THE COURT:  You may.

16          MS. PAPPY:  And we do have -- I've been keeping

17 records of the proportionality issue, so the County is

18 prepared to respond to that.

19          THE COURT:  Okay.

20          MS. PAPPY:  But with regard to these PRA requests,

21 one of the, from my perspective, issues that I have had in

22 trying to focus my client in on what to look for -- Ms.

23 Chartoff references PRA requests, and there has been little to

24 no willingness to send me documents even when I ask, "Well, we

25 saw this in a PRA request.  Can you send it to me so I can

29

1 send it to my client," which is an organization of thousands

2 of people "and say 'They found it.  Why can't you?'"

3          It would be nice if I could call one voice and say

4 "You have praecipe and search for this," but that is not the

5 situation that I'm in.  That is not the way the County is set

6 up.

7          All I would ask is that going forward under these

8 very strict deadlines there's a little more forthcomingness

9 about -- like here's an example.  Go tell your client.

10 Certainly, I would expect to see that in a motion to compel

11 anyways.

12          MS. CHARTOFF:  I disagree that we haven't been

13 cooperative to this point, but we continue -- we certainly

14 intend to continue being cooperative.  And all of the

15 documents that we have received through PRA requests will be

16 produced anyway as part of our production, so you are soon to

17 have all of them.  Defendants are soon to have all of the

18 documents that we have produced.

19          Again, I really think that what we are talking

20 about here is email correspondence, and that shouldn't be

21 difficult to find or identify.  It really is a matter of

22 narrowing the universe to which documents are going to be

23 reviewed.  And from our perspective, I think, again, we want

24 to be collaborative and cooperative to narrow the set of

25 documents.  But if Defendants can't provide us unique hits and

30

1 de-duped information about how many documents they're even

2 talking about, it's very difficult for us to make -- move

3 forward.

4          THE COURT:  I appreciate your collective focus on

5 relentlessly looking forward and figuring this out now,

6 because I am setting tight deadlines and I'm doing so after

7 giving this quite some thought over the weekend and again this

8 morning as to how I can help you move this forward.

9          Is there an issue with the County providing

10 information regarding unique hits, Ms. Pappy?  Because I

11 understand from Ms. Chartoff why that is something that's

12 important for Plaintiffs.

13          MS. PAPPY:  No, absolutely not.  I told her no

14 problem last Wednesday when we talked and it's now the next

15 Monday.

16          THE COURT:  All right.  You have your answer, Ms.

17 Chartoff.

18          MS. CHARTOFF:  Great.  We look forward to receiving

19 them because --

20          THE COURT:  Yes.

21          MS. CHARTOFF:  -- we haven't received them yet.

22          THE COURT:  You will.

23          All right.  I think this was clear in our

24 conversation during the last status conference, but to be

25 extra clear, there will be no further written discovery in the

31

1 form of requests for production, requests for production

2 admission, or interrogatories served by either party absent

3 leave of Court and showing of good cause.  We need to figure

4 out the discovery that you call have right now.

5          And I don't think that anybody has plans to serve

6 additional discovery at this point, but just to be clear, not

7 before we talk about it first and exactly why a party believes

8 they need it.

9          The next -- before we move on, anything further

10 that we should discuss on that issue, Ms. Chartoff?

11          MS. CHARTOFF:  No, your Honor.

12          THE COURT:  And, I'm sorry, "Chartoff."  I think I

13 pronounced it "Chartoff."  I apologize.

14          MS. CHARTOFF:  Yes.  Thank you.

15          THE COURT:  Ms. Pappy, how about from you?

16          MS. PAPPY:  No.

17          THE COURT:  Okay.  Let's talk about the joint

18 motion.  And I wasn't trying to ghost you on this one, but I

19 kept looking at it and I thought it would benefit from a

20 conversation between us about it, because -- I think I

21 understand the reason why probably the County wants an order

22 that this information be produced.  But the form of the order

23 is a little bit different to me in that, as I read this, I'm

24 ordering the County to produce this information subject to the

25 protective order, but not really because they get to keep

32

1 their other objections.  So it's a sort of, kind of, not

2 really type order, which is not what I'm used to issuing.

3          So what do you really need from me to move this

4 forward, especially given the deadlines that I've set, Ms.

5 Pappy?

6          MS. PAPPY:  I need something that says that nobody

7 can sue my clients for violating their privacy rights by

8 disclosing this information.

9          THE COURT:  And do you believe that --

10         MS. PAPPY:  Can you give me that?

11         THE COURT:  Do you believe that you require that

12 assurance when you are producing information subject to a

13 protective order?

14         MS. PAPPY:  I am concerned about it.  If the Court

15 were to order me to produce the documents attorneys' eyes only

16 or confidential, I would comply.

17         THE COURT:  But what am I ordering you to produce?

18         MS. PAPPY:  I don't know.  I mean, let me give you

19 an example.  One of the issues is -- proportionality is part

20 of it -- but medical records for every person who has been in

21 the jail for the last, at this point, three years.  If I

22 recall, we have an agreement to shorten that to two years, so

23 back to January 1st of 2022.

24         We haven't quite agreed on it, but assuming we

25 agree to January 1st of 2022 to the present, then your order

33

1 would say -- I think it might be 87 or 88, one of those

2 requests for all of the people in the subclass, the order

3 would reference that specific document production request.

4          If you're uncomfortable ruling on it today, what I

5 would suggest is that as part of our joint status statement on

6 the 17th, we specifically identify requests that it would

7 relate to.

8          Would that make the Court more comfortable?

9          THE COURT:  Partially.  But even asking me to

10 direct that you shall produce information responsive to these

11 requests -- I guess I have them now so I can look at what they

12 are -- it just strikes me that the parties agree that under

13 the relevant CFR provision, the protective order in this case

14 constitutes a qualified protective order.  And everyone

15 further agrees that the protective order is adequate to

16 protect from public disclosure the private information of

17 incarcerated people.

18          And I understand your desire to make sure that that

19 is crystal clear, Ms. Pappy.  And to that extent, I would

20 certainly consider signing off on a stipulation between the

21 parties, even though I'm not sure it's truly necessary.

22          Where I start to have hesitation is in ordering the

23 County to produce documents where I don't really know exactly

24 what they are and then secondarily ordering them to produce

25 the documents but still allowing the County to maintain its

34

1 objections, because then I -- that's my concern.

2          If you believe a stipulation would be important,

3 would a stipulation that the protective order in this case

4 constitutes a qualified protective order under the relevant

5 CFR provision do the trick for you?

6          MS. PAPPY:  Yes.

7          THE COURT:  I think that might be something where

8 I'm not then ordering you to produce unspecified documents

9 subject to additional objections.  That may be the way to go

10 about this.

11          Ms. Chartoff, what's your position on this?

12          MS. CHARTOFF:  We don't have any objection to a

13 stipulation that the protective order is a qualified

14 protective order.  I mean the only other thing that I would

15 note that is different now is now we are class counsel.  So I

16 don't know if that changes Ms. Pappy's position on any of this

17 and whether the production of our clients' medical records to

18 us is different in that case.

19          But we wouldn't object to a stipulation.

20          MS. PAPPY:  I would request a stipulation because

21 they don't have the specific authority of 4,000 people.

22          THE COURT:  Here's what I'm going to do.  I'm going

23 to respectfully deny the joint motion that's docket number 415

24 without prejudice to the parties resubmitting a more narrowly

25 tailored stipulation.

35

1           And, Ms. Pappy, I think -- I'm looking at page two

2 of docket number 415, and it sounds like what we are talking

3 about is the information that is contained on lines 16 to 27

4 of page two, which would be in a stipulation and would not be

5 then tied to the unspecified documents and unspecified

6 objections and I think would satisfy you and would satisfy my

7 desire to have an order that at least I can understand it.

8           MS. PAPPY:  That's fine.  And I think I understand

9 you to say that the language from lines 16 to 27 is

10 acceptable -- would be acceptable were we to submit it?

11           THE COURT:  It does appear to be narrowly tailored

12 and acceptable.

13           MS. PAPPY:  Okay.

14           THE COURT:  And I don't think Ms. Chartoff is going

15 to have a problem with that from what she's saying, so --

16           MS. PAPPY:  Then we'll resubmit it.

17           THE COURT:  -- if you wish to resubmit that, I

18 would be happy to consider it the new.

19           Let's talk now -- any further issues on the joint

20 motion, Ms. Chartoff?

21           MS. CHARTOFF:  No, your Honor.

22           THE COURT:  Ms. Pappy?

23           MS. PAPPY:  No, your Honor.

24           THE COURT:  All right.  Let's talk about the Rule

25 30(b)(6) depositions.  Let me grab the notice of deposition.

36

1        Thank you for sending this, and thank you to

2 whoever on your staffs prepared the binders that you provided

3 to me.  I really do appreciate it.  And I know that you all

4 hauling them down from Northern California was not easy, so

5 thank you.

6        All right.  Ms. Pappy, what do you want to talk

7 about first, Rule 30(b)(6) or the jail inspections?

8        MS. PAPPY:  30(b)(6) since I turned to that page.

9 Okay?

10        THE COURT:  All right.  As you understand it, Ms.

11 Pappy, what are the issues, if any, that I should resolve with

12 respect to the 30(b)(6) depositions that the Plaintiffs wish

13 to take?

14        MS. PAPPY:  Sure.  I want you to gently convince

15 Plaintiffs that my set of categories as I rewrote them -- I

16 provided this to them.  It's been -- I provided it to them

17 back in July.  As part of meet and confer, I just sent them a

18 sort of summary.

19        What I did with the categories -- because they were

20 too broad for me to be able to identify the correct person,

21 and I asked that they narrow them.  Let me give you an example

22 to just the first issue.

23        Policies, procedures and practices relating to

24 healthcare at the jail.

25        Policies, procedures and practices relating to

37

1 hiring and vacancy levels of healthcare staff.

2          That is subsumed within category number one as the

3 Plaintiffs wrote it.

4          If you look through the entire list of categories,

5 nowhere in any of them -- but let's just look at one -- is the

6 word "document" or "communications."

7          So my problem with the way that they wrote it is

8 twofold, and this applies to most of the categories, is that

9 there were disputes that I'm happy to say were resolved after

10 the last 30(b)(6) deposition about the breadth of these

11 categories.  They're written, from my perspective, more like

12 document production requests than a category of deposition.

13          I'd rather that they have the 26 categories that I

14 wrote out than the 11 that they have, because it leads to too

15 many possibilities for arguments.

16          The person for healthcare at the jail and the

17 person for hiring relating to healthcare are two different

18 people.

19          I also have a sheet that is my work product -- and

20 I'm happy to share it with the Court -- where we've identified

21 the persons most knowledgeable.  And generally speaking, I

22 don't have any problem having two or three people be the

23 person most knowledgeable for one category.  But the way those

24 are written -- I'm going to go out on a ledge here -- it's

25 going to lead to fights.

38

1          And then you take the "document" definition and

2 "communications," which Ms. Grunfeld told me -- I said:  How

3 do I interpret those as it relates to these issues you've

4 identified to know who to identify?  Does the person have to

5 know every document that might relate to this topic, every

6 communication that might exist related to this?

7          And the answer was basically yes.  And that's not a

8 proper way to write a 30(b)(6) notice.  I didn't object to it

9 the first time around.  It led to objections.  And so this

10 time, I'm putting my foot down that I need to make sure that I

11 get the right people, we don't have disputes.

12          And on this list with the names, I have 15

13 different people listed for those 26 categories as I wrote

14 them.

15          The only other issue then, your Honor, from my

16 perspective, is the amount of time.  We had offered I think 50

17 hours or 55, somewhere around there.  That was -- there was a

18 sense from Plaintiffs that that was going to be acceptable,

19 and now that has increased to 93 hours.

20          I have asked for -- can you look at the categories

21 as I've written them, tell me which ones you think are going

22 to take longer.  Let's try to go back and forth and come up

23 with some rational thing.  Ninety-three hours is 12 days, 13

24 days of deposition?  And I don't consider that to be

25 reasonable.

39

1              THE COURT:  Just so we're clear for the record,

2 because the 30(b)(6) notice is not in the docket, we're

3 talking about the July 20, 2023 30(b)(6) notice that has 14

4 topics; is that correct, Ms. Pappy?

5              MS. PAPPY:  Yes, that's correct.

6              THE COURT:  The 30(b)(6) deposition that you

7 referenced occurring earlier, Ms. Pappy, is that the

8 definition regarding policies and procedures for reasonable

9 accommodations for incarcerated persons with disabilities that

10 I wrote --

11             MS. PAPPY:  I think --

12             THE COURT:  -- or that was in my order which is

13 docket number 258?

14             MS. PAPPY:  Yeah, the issue.  Yes, the issues that

15 you wrote, not the definitions.  The definitions were in

16 addition to those, and that's where we have problems.

17             THE COURT:  Are you addressing this, Ms. Chartoff?

18             MS. CHARTOFF:  Mr. Swearingen is.

19             THE COURT:  Okay.  Great.

20             Well, Mr. Swearingen I would appreciate hearing

21 from you, because I will tell you that, as I read through

22 this, I had some of the same concerns that Ms. Pappy is

23 raising.  And that is that this reads like a request for

24 production, including definition of "communications" and

25 definition of "documents" that I wouldn't ordinarily expect to

40

1  see in a 30(b)(6) notice.  They're not in the 30(b)(6) topic

2  that I authorized for the expedited discovery at docket number

3  258.

4          I would prefer that the parties be able to work

5  this out among themselves, but if you can't, I'm not going to

6  wait and let it fester either, and I will rule on this if

7  necessary.

8          What do you think is the best path forward?

9          MR. SWEARINGEN:  Thank you, your Honor.

10          THE COURT:  Sure.

11          MR. SWEARINGEN:  I think the best path forward is

12  for the parties meet and confer on the rewritten categories

13  that Ms. Pappy provided.

14          THE COURT:  Can I see those?

15          MR. SWEARINGEN:  Say again?

16          THE COURT:  I don't have them now, do I?

17          MR. SWEARINGEN:  No, you don't.

18          THE COURT:  Are they on these nifty yellow sheets

19  of paper?

20          MS. PAPPY:  It was the only draft paper I had.

21          THE COURT:  Do you mind if I take a look, Mr.

22  Swearingen?

23          MR. SWEARINGEN:  No.  No, I have a copy as well.

24          THE COURT:  Okay.  Good.

25          MS. PAPPY:  Go ahead.

41

1          THE COURT:  Ms. Pappy, to orient me, can you tell

2 me whether or not those are the 15 categories that you

3 provided to us or the 26 categories that you provided to us on

4 Thursday?

5          MS. PAPPY:  They are the same ones I provided in

6 July, but not in this format when I red-lined the notice.  And

7 they're the same format that Ms. Chartoff asked me for, which

8 I sent to her.

9          THE COURT:  So there's 26 topics, but they are --

10         MR. SWEARINGEN:  Yes, those are --

11         MS. PAPPY:  My --

12         THE COURT:  -- I think put into subparts.

13         MS. PAPPY:  My version, right.

14         THE COURT:  Yes, okay.

15         Go ahead, Mr. Swearingen.

16         MR. SWEARINGEN:  Thank you.  So we received an

17 earlier iteration of that document that had 15 categories of

18 documents.  And we went through those 15 categories and

19 estimated that based on the 15 categories that Ms. Pappy

20 identified, our best estimate for the length of time for the

21 deposition would be 93 hours.

22         We have not had an opportunity to do that yet with

23 the 26 categories that you have in front of you, because we

24 received those on Thursday.  We are happy to do so.

25         We note that some of those categories have been

42

1 rewritten.  For example, instead of having policies and

2 procedures and practices related to ADA issues, instead it's

3 been rewritten to "green sheets," without the provision of

4 inquiry on practices, for example.

5          So we would need to meet and confer and make sure

6 that we agree on the language so that the witnesses can be

7 adequately prepared.

8          THE COURT:  Didn't you already have a 30(b)(6)

9 deposition on policies, practices and procedures relating to

10 ADA issues or is your category now more broad?

11          MR. SWEARINGEN:  The category is broader because

12 the expedited discovery that was issued -- or that was allowed

13 earlier this year was only as it relates to people with

14 mobility disabilities in Central Jail and the provision of

15 SLI.

16          MS. PAPPY:  Yeah, I don't want to shoot myself in

17 the foot, but we don't -- I don't have a dispute with the

18 appropriateness of these categories.

19          THE COURT:  Okay.  No, I appreciate that.

20          Go ahead, Mr. Swearingen.

21          And you're correct.  I looked at it again.  Thank

22 you for refreshing my memory.

23          MR. SWEARINGEN:  I think that we will end up having

24 a dispute about the number of hours.  I think that we can meet

25 and confer about what is appropriate, but we may end up having

43

1 a dispute, given the difference that we have.

2          I would disagree with Ms. Pappy's contention that
3 my colleague, Ms. Grunfeld, said that each deponent is
4 responsible for knowing what is in every single document and
5 every single contention.

6          What we did when we served these deposition notices
7 was used the same format that we used across all written
8 discovery and using the defined terms.  And as my colleague,
9 Ms. Grunfeld, explained to Ms. Pappy, the definitions of
10 "communications" and "document" may be at issue that to the
11 extent that only if -- if somebody doesn't understand what a
12 document is or a communication is, these are the definitions
13 that we would use for that.

14          Ms. Grunfeld did not represent that the deponent
15 would need to know the content of every single document that
16 could possibly be at issue with respect to a given topic.

17          THE COURT:  Okay.  So is it the Plaintiffs' request
18 to conduct the 93 hours of 30(b)(6) depositions and then take
19 nine additional depositions?

20          MR. SWEARINGEN:  Yes, your Honor.

21          THE COURT:  Who?

22          MR. SWEARINGEN:  At this point, we do not have
23 sufficient information, and we have not made that
24 determination yet.  Part of that determination will be made
25 upon having the opportunity to review documents in this case.

44

1          THE COURT:  So your proposal would result in there

2  being over 150 hours of depositions being taken by the

3  Plaintiffs.

4          MR. SWEARINGEN:  Possibly.

5          THE COURT:  I would consider everything with an

6  open mind and subject to the specific reasons that are

7  proffered.  I will tell you, just to the extent, it's helpful,

8  Mr. Swearingen, I would have to be convinced based on specific

9  facts provided by the Plaintiffs that 156 hours of deposition

10  testimony would truly be proportional to the needs of the

11  case.

12          Again, I'm not saying it's not, because I don't

13  have the specifics in front of me, but that is weeks' worth of

14  depositions in this case.  And I understand there are a number

15  of issues and the case is a large one, but I would urge you

16  all, at least initially, to work hard at the topics that Ms.

17  Pappy provided, because even aside from the definition of

18  "documents" and "communications" that may not really be an

19  issue -- and I understand you're saying, Mr. Swearingen, that

20  you wouldn't expect the designee to know of every

21  communication ever written on a single topic -- they are

22  broad.

23          So what do you think we should do with respect to

24  timing?  Because I can tell you that I'm inclined to set a

25  fact discovery cutoff of February 16th in this case, to give

45

1 you approximately two months to conclude your inspections and

2 take depositions.

3          MS. PAPPY:  Did you say 15 or 16?  I'm sorry.

4          THE COURT:  16.

5          MS. PAPPY:  Thank you.

6          THE COURT:  So I want to work with you all so there

7 are not any last-minute disputes over the 30(b)(6) topics.

8 But I also realize that going through the written discovery

9 and the documents is going to be time consuming.  I want to be

10 realistic.

11          What are your thoughts with respect to how much

12 time the parties would need to meet and confer in a meaningful

13 fashion and then seek resolution if any outstanding issues

14 remain, Mr. Swearingen?

15          MR. SWEARINGEN:  Is your question, your Honor,

16 directed at the 30(b)(6) deposition issue?

17          THE COURT:  It is.

18          MR. SWEARINGEN:  I think that we can resolve this

19 within two weeks.  I think that the first step, like I said,

20 would be to take the categories that Ms. Pappy identified for

21 us to identify if we have any problems with them and to put

22 our best estimates of the time for each of the deponents and

23 to also understand from the Defendants' perspective which

24 witnesses will be designated for each topic, so that we have a

25 better understanding of how many new individuals there will be

46

1 and whether or not the -- the background information that seek

2 and then the depositions will take extra time.

3          And just to conclude, I think that this process can

4 wrap up in two weeks.

5          THE COURT:  What do you think, Ms. Pappy?

6          MS. PAPPY:  That's fair.  I mean I have the people

7 designated already, and there's a lot of crossover, so

8 hopefully that will help Plaintiffs narrow that time frame

9 they need for the depositions.

10          THE COURT:  Do you have any problem with telling

11 Plaintiffs' counsel at the outset, "These are the people we

12 intend to designate for the particular topics?"

13          MS. PAPPY:  Oh, I can do it.  Let me get home and I

14 will tell them.

15          THE COURT:  I want to save you all further status

16 reports and further briefing where I can.

17          Why don't we do this.  Why don't you plan to tell

18 me at the hearing on November 21st whether there are any

19 disputes, and you can provide me with simply a copy of

20 whatever is in dispute.  If it's going to be the 26 categories

21 that Ms. Pappy suggested, I would ask you to file it just so

22 there's a record of it in case anyone wants to look at it

23 later, but you don't need to brief it for me.  We can just

24 talk it through.

25          And if I can provide with a ruling on the topics on

47

1  November 21st, I will endeavor to do that.  If I think there's

2  an issue that really does require briefing, we can talk about

3  it, but I don't want you to have to do that where I don't

4  think it's necessary.

5          MR. SWEARINGEN:  Thank you, your Honor.  Should it

6  take the form of joint status report?  And if we're in

7  agreement and hopefully there are no disputes, we can just say

8  there are no disputes as to the 30(b)(6) deposition issues.

9          THE COURT:  It can simply say "Yippee."  Okay?

10          MR. SWEARINGEN:  Got it.

11          MS. PAPPY:  So if there's no dispute, you don't

12  want a joint status.

13          THE COURT:  No.  Again, I'm trying to be mindful of

14  the fact that you've got lots of stuff going on, so if you

15  don't have a dispute, you can even email my chambers, "No

16  dispute."  And you can confirm it on the record on the 21st.

17          But if there is a dispute, just file the categories

18  and just tell me what's at issue.  I'll take a look at it

19  before the hearing, and you'll tell me what your decisions

20  are.

21          MS. PAPPY:  Thank you.

22          THE COURT:  Sure.

23          MR. SWEARINGEN:  Before moving on, your Honor, can

24  we go back to that February 16th date, or should we discuss

25  that at a later time in today's conference?

48

1          THE COURT:  Why don't we discuss that at a later
2  time because I want to talk about the inspections as well,
3  which is part of fact discovery, although I know it relates to
4  your experts, but it's still I think properly considered fact
5  discovery.  And I'll be happy -- I'll give you the dates that
6  that I am thinking of setting, including that one, and then
7  I'll be happy to hear from you as well.
8          MR. SWEARINGEN:  Thank you.
9          THE COURT:  Sure.
10          Let's talk about the jail inspections.  I
11 understand that they have been -- were noticed initially, were
12 taken off calendar by the Plaintiffs, were noticed a second
13 time and then taken off calendar because there were some
14 disputes between the parties.
15          I don't think there's a dispute that the Plaintiffs
16 should be allowed to go into each of the facilities, but the
17 specifics of that I understand from our last conversation are
18 disputed.
19          Why don't you tell me this -- is this your issue,
20 Mr. Swearingen?
21          MR. SWEARINGEN:  It is, your Honor.
22          THE COURT:  Okay.  Great.  What do you understand
23 to be the specific issues between the parties with respect to
24 the jail inspections that I should be prepared to resolve?
25          MR. SWEARINGEN:  First, the documents that are --

49

1 the documents included in our inspection notices, whether or

2 not Defendants will be required to produce those documents in

3 advance of the inspections.

4           THE COURT:  Okay.  Let's go -- what's the next one?

5           MR. SWEARINGEN:  The second issue is whether or not

6 Plaintiffs' experts will be allowed to speak with staff, not

7 in a deposition manner, but instead to better orient

8 themselves around the facility, to ask questions like:  "When

9 is yard time?"  "This person is in the safety cell.  Why is

10 this person in the safety cell?"  "What are the safety checks

11 and welfare check requirements for somebody in this type of

12 housing?"  To ask those types of questions to staff.  That's

13 one issue.

14           Another issue is whether or not Plaintiffs' counsel

15 and experts will be allowed to speak with incarcerated people.

16           Another issue, whether or not Plaintiffs' counsel

17 and their experts will be allowed to observe intake, the

18 delivery of medical care, and other normal processes and

19 activities and operations of the jail, including, for example,

20 people participating in therapeutic programs.

21           Another issue relates to -- and a very

22 consequential issue -- relates to the number of Plaintiffs'

23 counsel and experts who will be allowed to attend any given

24 inspection.

25           I have lots to say, your Honor, on each of these,

50

1 but I'm just trying to summarize these at a high level right

2 now.

3          THE COURT:  I appreciate that.

4          MR. SWEARINGEN:  Back in July we were told that

5 Plaintiffs' counsel and their experts would only have one shot

6 at each institution, meaning they must all get on the same

7 schedule so that all inspections of Central Jail or George

8 Bailey happened on a given day.  There will be no re-do's.

9 There will be no second chances.

10          After Defendants served their untimely objections,

11 we learned that they would not permit more than six people on

12 a given tour due to understaffing.

13          So a question for Plaintiffs as we prepare for

14 these and we try to work with experts who have their own very,

15 very demanding schedules, is what days are going to work for

16 everybody and what are the maximum amount of people who can

17 attend any given inspection?  And are we going to need to have

18 more than one inspection at a facility?

19          Attendant to this conversation are issues that may

20 pertain to the ENE.  I don't know if it's appropriate right

21 now to say on the record what those issues are with respect to

22 experts visiting facilities, but given the representations by

23 Defendants in the joint status report that this should be done

24 as expediently as possible, including with Plaintiffs' ADA

25 expert, those experts regarding issues for discussion on the

51

1 ENE, one of those experts should have their own tours in

2 advance and get them working on inspections at an early

3 opportunity that do not preclude Plaintiffs' other experts

4 from inspecting the facilities.

5           And finally, your Honor, I think that the photos

6 are a big issue.  Defendants have said that only Ms.

7 Sanossian, Plaintiffs' ADA expert, is permitted to take photos

8 and that she must turn them over to the Sheriff's Department,

9 and the Sheriff's Department will have discretion to delete

10 whatever photos they want out of security concerns and give

11 them back to us.

12          During the last set of inspections, Ms. Sanossian

13 was permitted -- well, allowed them to take the photos back.

14 At Central she was not.  She gave the photos over.  It turned

15 out that I think well over 100 photos were either collected or

16 missing from the share thumb drive that was returned back to

17 us with no explanation of why those were deleted.

18          In addition, it's not clear why only Ms. Sanossian

19 is permitted to take photos and why other experts are not.

20          THE COURT:  All right.  So the high-level issues

21 that I wrote down are:

22          Production of documents responsive to inspection

23 requests.

24          Whether Plaintiffs' experts should be allowed to

25 speak with staff members, whether Plaintiffs' experts should

52

1 be allowed to speak with detainees.

2        Fourth, whether Plaintiffs' experts should be

3 allowed to observe intake, medical care and therapeutic

4 programs.

5        Fifth issue, the number of counsel and experts who

6 would be allowed to attend, including whether the inspection

7 of each facility should all be on one day.

8        And finally, the procedure for taking photographs

9 and whether photographs should be limited to the Plaintiffs'

10 ADA expert or should include other experts.

11       So I have six categories, Ms. Pappy.  Does that

12 sound right to you?

13       MS. PAPPY:  I have six as well.

14       THE COURT:  All right.  So with that in mind, are

15 there any -- are any of these categories where you believe the

16 parties can work out on their own without my involvement?

17       MS. PAPPY:  Well, I don't quite understand the

18 production of documents.  So with each of these facility

19 inspections, there are eight more requests for production of

20 documents.  So six times another eight requests for production

21 of documents.

22       THE COURT:  Okay.

23       MS. PAPPY:  And like, for example, the map and

24 floor plans.  I've already advised counsel that I don't have a

25 problem with that, that for each of the last two inspections

**Ex. B - 103**

53

1 we gave them and don't have a problem giving them.

2          Organizational chart, you ruled previously that

3 that didn't need to be produced.  We're not willing to give

4 that.  I don't understand why that's relevant.

5          So the document thing, I really don't quite

6 understand why it's an issue.  Some of it is like the complete

7 roster of incarcerated people.  Why do you need that for the

8 inspection unless you intend to talk to people?

9          So if you're not going to let them have that

10 ability to talk to people, then why do they need that roster

11 for the inspection?  I mean they're certainly going to get

12 class lists as a part of class certification.

13          So I don't quite get that one.

14          They ask for documents, rosters or tracking systems

15 which are duplicate of document production requests.  I don't

16 understand why they need that for an inspection.  An

17 inspection is a visual inspection.  You walk by, you look, you

18 take photos if you're the ADA expert.  The doctor wants to

19 observe the medical area, see if it's properly outfitted with

20 what it needs.

21          So some of these documents I simply don't

22 understand why they're necessary, and I would think that we

23 should have been able to resolve the document issues.  They

24 are -- like I said, we've never really talked about them in

25 great detail.

54

1          We talked about the organization chart because you
2  had previously ruled on that, and I already told them they
3  could have the maps and floor plans.  The rest sort of went by
4  the wayside, I think is a fair way to say it, because we got
5  caught up in who you can interview and who you can't.
6          THE COURT:  Sure.  Does anyone have a hard copy of
7  one of the requests for inspections that I can take a look at?
8          MS. CHARTOFF:  Yes, your Honor.
9          THE COURT:  Thanks, Ms. Chartoff.
10          Ms. Pappy, are there identical document requests
11  for each of the facilities?
12          MS. PAPPY:  I don't know.  I'm not sure off the top
13  of my head.
14          THE COURT:  I should ask you that, Ms. Chartoff.
15          MS. PAPPY:  If they can just tell me which one
16  they're giving you, I can pull that up.
17          MS. CHARTOFF:  George Bailey.
18          MS. PAPPY:  These requests are identical to the
19  ones I saw in the East Mesa, so I think they're generally the
20  same.
21          THE COURT:  Did you all provide rosters of
22  detainees with respect to the prior inspection, Ms. Pappy?
23          MS. PAPPY:  No.
24          THE COURT:  I am going to direct that the parties
25  continue to meet and confer on the issue of the document

55

1 production.  There's no dispute that the Defendants will

2 provide the map and floor plans of each facility prior to the

3 inspection, which is document request number 1A.

4        It is not at all clear to me why an organizational

5 chart for supervisory staff or a roster of the incarcerated

6 persons at each facility would be relevant to the inspection.

7 And I haven't looked at every request for production.

8        1D asks for logs, rosters and tracking systems of

9 different types.  Is that contained in requests for

10 production?

11        MR. SWEARINGEN:  The logs, rosters of people on

12 medical, mental health, sick call, for example, on a given day

13 before the tour, no, your Honor.  And if I could explain why

14 that's so helpful for the experts.

15        Rule 34 allows for the inspection of facilities as

16 well as well as the operations.  We think that this issue as

17 to what the experts can observe and who they can talk to needs

18 to be briefed, as we said in our joint status report.

19        The reason why the experts can benefit from having

20 those documents is because the mental health expert, who has

21 tons of experience in correctional health medicine, can go up

22 to those people who are on the mental health sick call list

23 and better understand, you know, what are your issues, have

24 you been seen today, have you repeatedly rescheduled for

25 visits.  They can go to the person on the medical sick call

56

1 list and better ascertain whether that person's hernia has

2 been addressed.  They can see the open wound on somebody's leg

3 and understand whether or not it gets regular re-wrapping.

4        Those lists in proximation to our inspection tours

5 are different from the general full sheets of Excel

6 spreadsheets that we've asked with respect to sick call lists

7 to better understand how frequently people receive treatment

8 as a result of sick call requests and how much time passes

9 between the request and the response time and the actual

10 evaluation by a medical staff member.

11        So they are different in that way, and that's how

12 they can help assist the experts who are on site.

13        THE COURT:  So they would assist the experts in

14 connection with speaking to detained individuals and in that

15 sense would be inextricably intertwined with the issue as to

16 whether Plaintiffs' counsel and experts should be allowed to

17 speak with people in the first instance.

18        MR. SWEARINGEN:  I agree with that, your Honor.

19        THE COURT:  I see.  That's helpful.  Thank you, Mr.

20 Swearingen.

21        What about categories E, F and G.  Those don't seem

22 to be related to the Plaintiffs' request to speak with

23 individuals.  Are those covered by requests for production?

24 And regardless whether they are, why are those essential to

25 the Plaintiffs' ability to inspect the facilities?

57

1          MR. SWEARINGEN:  I'm sorry, your Honor.  I'm

2 turning to that right now.

3          THE COURT:  Sure.  Take your time.

4          MR. SWEARINGEN:  E refers to documents sufficient

5 to show which programs, services and activities are offered to

6 incarcerated people.  That allows our experts to plan in

7 advance which sets of program they would like to observe

8 during the inspection.

9          For example, the mental health expert would want to

10 see the rehabilitative programs and the therapeutic programs

11 offered to people with mental illness.  The ADA expert may

12 want to see rehabilitative programs.  The safety and security

13 person may want to observe different programs still.

14          With respect to request F, this is documentation of

15 temporary or permanent modifications made to physical

16 structures.  This will help our ADA experts better understand

17 what physical alterations have been made at the jail and where

18 to focus their attention.  Request number --

19          THE COURT:  And you're saying it's not covered by

20 requests for production?

21          And, look, I'm not trying to put you on the spot,

22 Mr. Swearingen.  So here's what I would just say.  You see

23 where my concerns are, I think.

24          MR. SWEARINGEN:  Sure.

25          THE COURT:  I think that you all can make some

58

1  meaningful progress on this.  It sounds like there may be

2  disputes between the parties and I recall Mr. Fischer asking

3  for briefing on the issue in particular of speaking with

4  detained individuals, and I can't recall -- he was talking

5  also about speaking with staff members but that was an issue

6  that he said there's case law supporting the Plaintiffs'

7  position.  I would like to see it, coming up with an

8  appropriate order for the inspections.

9          Ms. Pappy, when we were on the last hearing, it

10 seemed to me like there might be agreement between the parties

11 that structuring the inspections with the ADA expert Ms.

12 Sanossian -- it's Ms. Sanossian, correct? -- separately from

13 some of the other experts who are looking at mental healthcare

14 and other medical care might just make sense logistically.

15          Do I recall that correctly?

16          MS. PAPPY:  You do.  But before I forget, F is

17 request for production number 54.  I'm very familiar with it.

18          THE COURT:  That's what you guys are going to talk

19 about.

20          MS. PAPPY:  I'm very familiar with it.

21          THE COURT:  Okay.

22          MS. PAPPY:  So this weekend, I contacted my client

23 and encouraged them that it made a whole heck of a lot of

24 sense to me to do the ADA inspections separately so that --

25 not all the facilities need to be -- we've already done Rock

59

1 Mountain, we've already done Central.  And why, County -- why

2 don't we agree to the ADA ones because the quicker we get

3 those done, the quicker we can start talking about settlement.

4          The County has also made -- the Sheriff's

5 Department, I guess, has made decisions not to house people

6 with wheelchairs simply because they would have to knock down

7 facilities and rebuild them and they don't have the money at a

8 couple of the facilities.

9          So those ADA inspections will be narrow in scope.

10 But the client agreed and said:  Yeah, we're good with that

11 because we do want to get that issue resolved.  We want to get

12 those ADA ones.

13          Ms. Sanossian and her assistant were able to take

14 photographs last time.  I'm not going to -- until you want me

15 to comment about the photograph issue -- but they -- you know,

16 same rules as last time, same Bat channel, same Bat time.

17          I say let's get these ADA ones out of the way, and

18 we can probably do them in, I would say, three or four days.

19 There's only about three or four facilities where there will

20 be full top to bottom, maybe only three top-to-bottom

21 inspections.

22          And the other ones -- like, for example, Vista,

23 they have made a policy decision not to house anyone in a

24 wheelchair there because that's being rebuilt and they cannot

25 afford right now to do the work that's necessary.  They're not

60

1  even going to intake anyone there.

2          But there are other disabilities that have to be

3  addressed by Ms. Sanossian.  So she needs to go there and

4  address the other disabilities.

5          Let's get all of those done forthwith.  I think Ms.

6  Sanossian is in Northern California.

7          Now, as to the rest of these experts, setting aside

8  the interviews, not having the ADA married to the rest of

9  them, the six people is still a problem.  The County wanted

10 three.  The people I deal with pushed it to six, because of

11 safety and security and this notion of people wandering around

12 and looking and talking to people.

13          But medical, dental, mental health, those folks are

14 pretty finite in areas they need to see.  So put them in the

15 morning.

16          Put the health and safety people -- I think there's

17 one about cleanliness.  Put her in the afternoon with general

18 overall safety person, because that would seem to be a more

19 comprehensive need to go everywhere in the facility.

20          Those are my thoughts.

21          THE COURT:  Ms. Chartoff, I asked if I could borrow

22 this.  Could I keep it?

23          MS. CHARTOFF:  Yes, sure.

24          THE COURT:  Thank you.  I'm going to write on it.

25          Who is Robert Cohen?

61

1          MR. SWEARINGEN:  Robert Cohen is Plaintiffs'

2 medical expert.

3          THE COURT:  How about Mr. Stewart (phonetic)?

4          MR. SWEARINGEN:  Plaintiffs' mental health expert.

5          THE COURT:  Mr. Austin?

6          MR. SWEARINGEN:  Safety and security expert.

7          THE COURT:  Mr. Schulman (phonetic)?

8          MR. SWEARINGEN:  Dental expert.

9          THE COURT:  Is Ms. Sanossian -- it's Ms. Sanossian

10 and SZS Engineering.  But does that mean really just Ms.

11 Sanossian?

12          MR. SWEARINGEN:  And her assistant, your Honor.

13          THE COURT:  So there's two people total for that

14 one?

15          MR. SWEARINGEN:  Yes, your Honor.

16          THE COURT:  And Debbie (phonetic) Graham?

17          MR. SWEARINGEN:  Environmental issues expert.

18          THE COURT:  Do you think that there is benefit in

19 the parties meeting and conferring with respect to a schedule,

20 to a framework for the inspections, Mr. Swearingen?  If so,

21 how much time should that take because I also -- if this is

22 going to be something where you think the parties are going to

23 need to brief an issue of whether the Plaintiffs' experts can

24 talk to detainees, for example, I don't want to leave that

25 lingering, especially given that you're going to have to

62

1 conclude these inspection, under my tentative schedule, by

2 mid-February.

3          MR. SWEARINGEN:  I think that given that the

4 parties are meeting and conferring about several issues at

5 once, I think it would be beneficial to have three weeks to

6 discuss this.

7          I would also like to have the opportunity to

8 respond to a couple points raised by Ms. Pappy.

9          THE COURT:  Sure.  Go ahead.

10          MR. SWEARINGEN:  One is the idea that the ADA will

11 be narrow in scope because the County and Sheriff's Department

12 have determined that certain wheelchair users will be confined

13 only to certain institutions.

14          I just want to point out that disability issues go

15 beyond the mere usage of a wheelchair.  So if somebody has,

16 for example, an upper extremity disability, they may be housed

17 in a facility where people with wheelchairs are not housed but

18 still require grab bars for toilets, for example.

19          THE COURT:  Sure.

20          MR. SWEARINGEN:  People with vision disabilities

21 still need emergency exit procedures, or hearing disabilities,

22 for example, to see the lights that show the exit corridor.

23          So it's not just whether or not someone is in a

24 wheelchair that determines whether or not an ADA experts

25 inspection is necessary or not.  So I would push back against

63

1 the contention that ADA inspections will be more limited in

2 scope.

3          That said, I do very much agree with the

4 opportunity to have our ADA expert and other experts go in at

5 an early opportunity, so long as it will not prejudice our

6 other experts' ability to inspect the facilities.

7          I don't disagree with the suggestion that our

8 mental health, medical and dental experts go in on the same

9 day, but I would push back against the idea that they should

10 be limited to just a morning or an afternoon.

11          This is an incredibly expensive endeavor, lining up

12 experts known for their skills who are in high demand.  They

13 should be given the full opportunity to conduct their

14 inspections without being limited to just a portion of the

15 jail or a portion of the day because of Defendants'

16 acknowledged understaffing.

17          We have conducted tours with many more people than

18 six in the past without any security concerns whatsoever,

19 including inspections that had federal judges on the

20 inspections.

21          I'm not going to tell the County how many is the

22 right number for their security concerns, but because of their

23 understaffing, we should not be prejudiced by the amount of

24 time that we have to conduct those inspections.

25          That said, I do think that we can meet and confer

64

1 in between two and three weeks, and I do think it's

2 appropriate to brief some of the issues as it relates to what

3 those experts can observe.  I do believe the case law weighs

4 in Plaintiffs' favor.  The idea that Plaintiffs' counsel --

5 and given Friday's order granting the class classification

6 motion, Plaintiffs' counsel are now counsel for all people

7 detained in the jail.

8         The idea Plaintiffs' counsel would not be allowed

9 to talk to their own clients is somewhat absurd to us in part

10 because Plaintiffs should have a voice in this.  Plaintiffs

11 should be able to participate in this litigation.  Plaintiffs

12 have every ability to say no and not to provide informed

13 consent if they do not want their medical consultation to be

14 watched by others.

15        They don't need to be protected from prying eyes.

16 They are -- the class members are the ones who we represent.

17 It would never be the case that -- I can't imagine the Court

18 would ever make it so that defense counsel couldn't talk with

19 their clients during the inspections.

20        As Defendants noted in the joint status report,

21 they say that we have the opportunity -- "we" being

22 Plaintiffs' counsel -- have the opportunity afterwards to go

23 to a professional visit and talk with the people that we met

24 during the inspections.

25        That does not help with judicial economy or

65

1 efficiency.  We have told Defendants over and over that there

2 very, very long waits for pro visits.  Sometimes we have

3 waited as long as two hours to be able to see a client or one

4 hour to be let out from a client visit.

5        Having the opportunity to talk with the client for

6 not a great length of time -- we're not deposing them -- but

7 to better understand why they're seeking medical care, what

8 the delays are, and have our experts then be able to follow up

9 during those longer visits, is the more appropriate way to go,

10 in our opinion.

11        THE COURT:  I understand that the issue is not

12 whether Plaintiffs' counsel and the experts can have access to

13 the class members at all, but the circumstance under which the

14 access should occur.

15        So to use your example in the criminal case, you're

16 absolutely right, defense counsel have access to their

17 clients.  But they don't go into the client cells to meet with

18 them.  They schedule an appointment and they go to a waiting

19 room.

20        And so, look, I hear what you're hear saying, Mr.

21 Swearingen.  And I think this is something where I would want

22 to hear from the parties in writing about the appropriate way

23 to go about this.  It just strikes me that with a little

24 bit -- well, maybe a little bit -- maybe with a certain degree

25 of willingness to engage in a serious back-and-forth, that

66

1 there may be a way to accommodate these concerns, because I

2 also hear you to be saying, Mr. Swearingen, that you're not

3 asking for an in-depth interview of an individual who is

4 undergoing mental health treatment by your mental health

5 expert, but maybe a few questions and then setting up

6 something for a formal visit later.

7          I also would note that to the extent that the

8 Plaintiffs are concerned about having access to the class

9 representatives and waiting months to schedule a formal visit,

10 may not be necessary if there is a court order directing that

11 individuals be made available within a very specified time

12 frame.

13          So I think this is one where you all would benefit

14 from talking to each other.  There may still be an impasse as

15 to certain issues as to speaking with employees and speaking

16 with detainees, but I'm not convinced that it's an

17 insurmountable problem that requires me to tell you what to

18 do.

19          If there's a two-step process, that might be

20 something the parties can figure out.  And even if you can't,

21 it may inform the way that you all brief the issue for me.

22          So here's what I would like to do.  I don't want to

23 kick this can down the road for an inordinate period of time,

24 but I do want the parties to see what you can figure out in

25 the inspections with the benefit of hearing each other today.

67

1          I do want to discuss that with you all on the 21st.

2 And if there are issues that require briefing, you can brief

3 it and we'll hold a further hearing on it in early December.

4 Let's see if we can avoid that though, or at least narrow the

5 scope of it.

6          What were you saying, Ms. Pappy?

7          MS. PAPPY:  Yes, I would at least like to respond

8 to the arguments that have been made.

9          This isn't just about staffing at the facility.

10 This is about proportionality.

11          THE COURT:  Right.

12          MS. PAPPY:  And I want to make that loud and clear,

13 that yeah, having six people at one time may be a safety issue

14 and understaffing, but this is having somebody who is a

15 medical doctor walk through the kitchen, walk through a

16 housing unit to see beds.  This is about proportionality and

17 wasting time and wasting money on things that don't need to be

18 done.

19          I understand that the Plaintiffs' firm is involved

20 in numerous consent decree cases.  But this is not a consent

21 decree case.  This is a hotly contested case.  And we have

22 successfully resolved issues, and I expect that we will

23 continue to be able to resolve issues.  But as counsel was

24 first explaining this process, this very friendly and informal

25 and we're all just going to get along process of interviewing

68

1 incarcerated people, the first thing that popped into my head

2 was my client's due process right to cross-examine these

3 people.

4          So I've got an expert up on the stand that I'm

5 going to be faced with at trial that says "Well, as the

6 defense attorneys were standing there and all the custody

7 staff were standing there, I asked this gentleperson whether

8 there were delays in his medical care, and he said "Yes, of

9 course there were."

10         How do I defend against that at trial?  It is an

11 entirely different ballgame when you have what your Honor has

12 suggested which is -- I'm not even sure they're going to

13 require a court order -- but the County's willingness to or

14 order availability times that counsel can come in and talk to

15 various class members with their experts there or on the phone

16 or on Zoom.

17         All these niceties of this would be easier, this is

18 about a hotly contested case and my client's due process

19 rights with these informal interviews would be a big problem

20 and something that I couldn't overcome at trial with this

21 expert and the way the jury is going to view the fact that I

22 and all of the defense employees are standing around listening

23 to this conversation.  Do I get to cross-examine the person?

24 I don't want to.  I think it would be inappropriate.

25         But that is a major concern, and then this notion

69

1  about proportionality and why these extremely expensive

2  experts all need to spend hours at this facility looking at a

3  medical observation room.

4         THE COURT:  Okay.  Understood.  And I do think that

5  this is where your collective reasonable minds can work

6  together to figure some of these issues out, particularly the

7  latter issue that you raised, Ms. Pappy, because there's got

8  to be a way for you all to structure the inspections where --

9  you were talking about Ms. Sanossian and her assistant going

10 on a separate set of inspections, doing their thing the way

11 they did it at Central and Rock Mountain.  And then I haven't

12 heard Mr. Swearingen say that the dental expert wants to

13 inspect the housing units.

14        Probably -- I don't know.  Probably not.  But this

15 is something where I think you all can figure it out.  And

16 obviously if I am looking at this and it doesn't seem to make

17 sense to me on a contested motion, then I'll resolve it

18 accordingly.

19        The order that I issued on the expedited discovery

20 request did not allow counsel to conduct interviews, formal or

21 informal, with detained individuals.  I don't have it in front

22 of me, but it said something to the effect of defense counsel

23 shall facilitate providing information to Plaintiffs' counsel.

24        And what I am thinking that might include here

25 would be the names of individuals who are receiving services

70

1 such that Plaintiffs' counsel would be able to speak with them

2 in a private and more structured setting.  Frankly, I don't

3 know how it would work.  How do we know whether an expert --

4 if an expert approaches somebody who is receiving mental

5 healthcare, how does one obtain -- I'd have to think through

6 how does one obtain -- make sure that the consent to speak

7 with that expert is informed.

8         There's just issues that are popping into my head

9 that I would hope the parties can talk about, and if we need

10 to resolve it with the benefit of some briefing, I want to be

11 thoughtful about it, because it's important.  I understand why

12 it's important to the Plaintiffs and I don't want to issue a

13 ruling on that without really thinking it through.

14         So that's an issue that if the parties haven't been

15 able to come to an agreement and there are specific areas of

16 dispute, when we talk on the 21st, I will probably ask for

17 briefing from the parties so that I can come up with an order

18 regarding the inspections that makes sense.

19         MS. PAPPY:  So just on the 21st, we need to provide

20 a status of our meet and confer.

21         THE COURT:  You can.  And you can tell me where you

22 are.  I don't need you to file something in advance.  I'm

23 familiar with the issue.  I've taken Ms. Chartoff's inspection

24 request and I've been taking notes on it, so I'll have that

25 with me.

71

1          You can let me know what are the areas of agreement

2 that will probably be best memorialized in a stipulation

3 regarding the inspection so that there's no ambiguity and what

4 are any areas of disagreement where the parties belief that

5 you need to brief the issue for me to resolve, and I'll do

6 that.

7          MS. PAPPY:  Do you want us here in person that day?

8          THE COURT:  Well, I happen to believe that we

9 accomplish more in person sitting here together than we do

10 otherwise, so I think yes unless you think that the parties

11 are going to really make a bunch of progress and we won't have

12 to spend several hours together drilling down.

13          And, by the way, I'm not saying that just because

14 you all have to travel and I'm trying to coerce you all into

15 agreeing on issues.  I mean that sincerely.  I do think that

16 we accomplish more in person when we can talk through these

17 issues together.  But I also realize that we get to that

18 Thanksgiving holiday and I want to be respectful to you and

19 your families and trying to spend some time with them.

20          So what do you want to do, Ms. Pappy?

21          MS. PAPPY:  I just want to make a plane

22 reservation, so I'm going to make a refundable plane

23 reservation now and --

24          THE COURT:  And hope for no fog.

25          MS. PAPPY:  And hope there's no fog at 4:00 o'clock

72

1 in the afternoon, yes.

2          THE COURT:  What do you want to do, Mr. Swearingen?

3          MR. SWEARINGEN:  I recall you saying earlier this

4 afternoon that you anticipated that starting at 4:00 p.m. and

5 carrying over to the following day if necessary.

6          THE COURT:  If you can't finish.  I have a criminal

7 calendar.  I'm trying to find time for you, and I have a

8 criminal calendar at 2:00 that should be done by 4:00 which is

9 why we could start at 4:00 and go to 5:30 or so and then we

10 could resume the next day if necessary.

11          If you think -- do this.  Talk to one another.  Let

12 me know what you want to do.  You've earned that from me, that

13 I will trust you.  If you tell me we can accomplish as much on

14 Zoom as we can in person, let me know and I will give that

15 serious consideration again.  I really do think it's important

16 for you all to be able to not disrupt your holiday plans with

17 your families, and I have no interest in doing that.  But I

18 really also want to help you resolve these issues in a timely

19 way, especially if I'm going to be setting the deadlines that

20 I'm thinking about.

21          MR. SWEARINGEN:  Can I ask one follow-up to that?

22          THE COURT:  Sure.

23          MR. SWEARINGEN:  What time do you think that 4:00

24 p.m. hearing would conclude if the parties were in person and

25 dedicated to working through the issues?

73

1          THE COURT:  Well, let's see.  Let me see if I have

2 anything -- you want to tell me your concern, Mr. Swearingen?

3 You don't have to.

4          MR. SWEARINGEN:  I just wanted to know whether it

5 would be necessary to stay the night that night.

6          THE COURT:  I have --

7          MS. PAPPY:  Your Honor, can I make a pitch for

8 Zoom?  We are never going to get out of here on Wednesday.  If

9 we have to reschedule flights, we will not get one to get home

10 on Wednesday before Thanksgiving.

11          So I will stay with you on Zoom all night long if

12 that's what it takes.  But I'm going to make a pitch for Zoom

13 because if anybody has to change a flight, we're not getting

14 out of here on Wednesday.  If you want to invite us all over

15 to your place --

16          THE COURT:  That's fine.  No problem.  You would be

17 welcome.

18          Look, sort of looping back to where we started.

19          The honest problem I see sometimes with Zoom is it

20 can just be easy talking to a screen to dig in.  And if I have

21 a commitment from you all to talk to one another and to really

22 approach this with an open mind and trying to figure this

23 stuff out, understanding that you're going to zealously

24 represent your clients -- I'm not asking anyone to make

25 unwarranted concessions -- we can do it by Zoom if that would

74

1 be better for you all otherwise.

2          But I really want to make this productive, and I
3 would hope that we could do so if we do it by Zoom.

4          What's your preference, Mr. Swearingen, if you have
5 one?

6          MR. SWEARINGEN:  I'm open.  Any one works.

7          I think Ms. Pappy makes good arguments about -- the
8 concern I would have is coming back on Wednesday.

9          THE COURT:  Okay.  Let me give that some thought.

10          Let me -- before we move on, we've got a number of
11 items on our plate for November 21st.  If I could start
12 earlier, say around 3:00 o'clock, would that be better for you
13 all?

14          Ms. Pappy?

15          MS. PAPPY:  I'm free.  So I have hearings in the
16 morning, but I'm free all afternoon.  Even if it was last
17 minute, I can just keep it open.

18      (Court conferring with Clerk.)

19          THE COURT:  Go ahead.

20          MR. SWEARINGEN:  I just realized my colleague
21 planned to be on the East Coast already during that time, so
22 Zoom may be preferable.  We are amenable to starting anytime
23 that afternoon.

24          THE COURT:  Yeah, I'd even do it in the morning,
25 but I'm already scheduled to do some naturalization

75

1 ceremonies, and I'm not going to reschedule that.

2         So I probably can start earlier than 4:00 p.m.  Let

3 me work it out with my CRD and if that's the case and it would

4 be better for you all, I certainly don't want you to be stuck

5 in San Diego over Thanksgiving.

6         So we'll do the hearing by Zoom and just hopefully

7 make a bunch of progress.

8         Let me provide you with the other dates that I am

9 inclined to set.

10        And, Mr. Swearingen, you asked to be heard on

11 these, and I certainly will give you the opportunity to do so.

12        If there's a December 22nd deadline for both

13 parties to complete their document productions, I would intend

14 to set a fact discovery cutoff of February 16, 2024 and the

15 following dates would all be 2024.

16        A deadline to exchange expert reports and

17 disclosures of March 15th.

18        A deadline to exchange rebuttal expert reports and

19 disclosures of April 5th.

20        An expert discovery cutoff of May 3rd.

21        And a pretrial motion filing deadline of May 31st.

22 That would include Daubert motions as well as any motions for

23 summary judgment.

24        I would set a series of dates in September for the

25 parties to complete their meeting and conferring regarding the

76

1 pretrial order and set you for a pretrial conference before

2 Judge Battaglia on October 10th.

3          Go ahead, Mr. Swearingen.

4          MR. SWEARINGEN:  Thank you, your Honor.

5          THE COURT:  Sure.

6          MR. SWEARINGEN:  I think that the pretrial

7 conference date is a good one to put on the calendar.  I think

8 it may make sense to have fact discovery cutoff at the end of

9 February, on the 29th instead of the 16th, so that the parties

10 have more time, in part, to review documents.  I know that

11 Plaintiffs would benefit from having more time to review more

12 documents before depositions begin.

13          In addition, I think that -- I know, for example,

14 Mr. Stewart -- Dr. Stewart, our mental health expert is only

15 available to tour the facility in early February, and I just

16 want to make sure that those inspections take place, given

17 that I anticipate that depositions and inspections will be

18 pretty clustered together in February.

19          THE COURT:  So he's not available in the months of

20 November, December, or January?

21          MR. SWEARINGEN:  Not to my understanding, no, your

22 Honor.

23          THE COURT:  That a pretty tough schedule to work

24 around.

25          MR. SWEARINGEN:  It was a very tough schedule to

77

1 get everybody on board for November 1 through 9.

2          THE COURT:  Okay.  So your request would be to set
3 the fact discovery cutoff toward the end of February?

4          MR. SWEARINGEN:  That's right, your Honor.  And I
5 think that the parties may benefit from a little bit more time
6 between the -- I think that Plaintiffs would appreciate one to
7 two months between the end of fact discovery and the drafting
8 of the expert reports and maybe a little bit more time between
9 the exchange of reports and the rebuttal report, maybe one
10 more week.

11          THE COURT:  The issue is that moving those dates
12 out would also require me, I think, to move the pretrial
13 motion filing deadline out that's currently set for May 31st.
14 And that would then affect -- if the Defendants move for
15 summary judgment, for example, if the parties file Daubert
16 motions, it would compress the time for Judge Battaglia to
17 resolve those motions before the pretrial conference so that's
18 what I'm going to have to work through.

19          MR. SWEARINGEN:  If I could respond --

20          THE COURT:  Sure.

21          MR. SWEARINGEN:  -- and ask whether or not the
22 motions really need to be pegged off of the expert reports.

23          Do the pretrial motions depend on the expert
24 testimony?

25          THE COURT:  I'm pretty sure a Daubert motion would.

78

1          MR. SWEARINGEN:  I would agree as to a Daubert

2 motion for sure.  But would summary judgment?

3          THE COURT:  It depends on the issues that you raise

4 on summary judgment and Defendants raise on summary judgment.

5          I would be reluctant to require any party to file

6 all pretrial motions, including motions for summary judgment,

7 while discovery is still ongoing.  That's what I'll have to

8 think through.

9          I appreciate your point, Mr. Swearingen.  I'll give

10 that some additional thought.

11          Is there anything else you would like to raise with

12 respect to the dates I'm considering setting?

13          MR. SWEARINGEN:  No, your Honor.

14          THE COURT:  Okay.  Thank you.

15          How about you, Ms. Pappy?

16          MS. PAPPY:  No comments.

17          THE COURT:  All right.  Let me give this some

18 thought, and if I have additional -- if there's a need for us

19 to talk further about the pretrial schedule, we can do so

20 either on November 21st or an earlier date if I think it's

21 time sensitive.

22          But otherwise, you have a sense of my thinking in

23 terms of how to help you all continue moving forward with the

24 case.  And none of this is to the exclusion of our continued

25 efforts to talk about settlement.

79

1          I would hope to be to do that with you on an

2 ongoing basis to ideally help you resolve the case if we can;

3 if we can't, at least to resolve it as to certain issues the

4 way that you all did with respect to the ADA issues.

5          So I realize that can be challenging when you've

6 got a bunch of deadlines to comply with, but it's also I think

7 unavoidable because I do need to help you continue moving the

8 case forward.

9          But I'll give that some thought, and then we can

10 talk about how best to move forward.

11          Let me ask you this.  It's 3:30.  That clock on the

12 wall really confused me for a second.

13          So I'm happy to talk through some ENE issues if you

14 would like to do so.  I don't know what time you all are

15 trying to catch flights back to San Jose and San Francisco.

16 And we started a little bit later.  So if you've made plane

17 reservations, I don't want you changing anything, but I'm

18 available if you want to start talking through some issues.

19          Or if this is a time where you all want to talk to

20 one another while you're here, that's fine with me as well.

21          What would you like to do?  And if you want to take

22 a minute to think about it and to talk to each other about

23 what you want to do and whether you would rather stop for

24 today or continue on, I will defer to you all on how we can

25 best work together on settlement.

80

1           MR. SWEARINGEN:  I'll start, your Honor, if I may.

2           THE COURT:  Sure.

3           MR. SWEARINGEN: Plaintiffs are ready and very

4 amenable to talking through settlement issues with the Court

5 and opposing counsel.  I think what would benefit those

6 discussions is being able to patch my colleagues, Mr. Fischer

7 and/or Ms. Grunfeld, into the discussion.

8           THE COURT:  Sure.  If we do that, that would be

9 just fine.  We'll probably go to one of the rooms on the fifth

10 floor and you could patch them in no problem.

11          Do you have any travel issues, because we are

12 getting a little bit late in the day.

13          MR. SWEARINGEN:  The earliest flights on our end

14 are at 6:30 today.

15          THE COURT:  Okay.  So you would need to leave

16 here --

17          MR. SWEARINGEN:  By 5:15 at the latest -- 5:00

18 o'clock or 5:15.

19          THE COURT:  5:15 is bold, Mr. Swearingen, but okay.

20          How about you, Ms. Pappy?

21          MS. PAPPY:  I could not get out until tomorrow.

22 But one thing that -- if the Court wants to talk about these

23 issues continuing today, I'm happy -- I'm not going anywhere.

24 So I'm happy to talk about them.

25          The one issue that I continue to harp on and

81

1 everybody is currently harping on is, I want those ADA

2 inspections scheduled ASAP.  There's nothing stopping us from

3 doing those, because I don't think anybody needs to be

4 interviewed.  But getting those on schedule and getting an ENE

5 scheduled relating to those ADA issues as soon thereafter as

6 they can, as soon as their expert can formulate her reports,

7 because those are to me easy pickings.  We have a model of a

8 settlement agreement with regard to those issues.

9           It's not all the ADA issues.  I understand there

10 are programmatic issues and other things.  But the physical

11 barrier issues, those are just so easy.  I want them out of

12 the way.

13           THE COURT:  Okay.  Why don't we do this.  You said

14 6:30, Mr. Swearingen?

15           MR. SWEARINGEN:  6:35 to be precise, your Honor.

16           THE COURT:  That is very precise.  You really

17 should be out of here by 4:45 or so because traffic to the

18 airport can be a bit of a pain.  But you're here.  Let's use

19 the time that we have.

20           What I'd like to do is meet you all up on the fifth

21 floor and let's just spend an hour talking through together

22 the structure of what we're going to do.  I'd like to talk

23 through Ms. Pappy's suggestion for how do we resolve the ADA

24 issues.  I asked for you all to provide me with topics for

25 discussion regarding overdoses in medical care and dental care

82

1 and you provided that, so I appreciate that and I want to at

2 least talk through that as well, because I do think even with

3 respect to settlement, we focused on ADA issues appropriately

4 earlier but maybe there is a way to proceed on multiple tracks

5 with respect to settlement, and I would like to explore that

6 with you all as well.

7             Sound good?

8             MR. SWEARINGEN:  Thank you, your Honor.

9             MS. PAPPY:  Yes.

10            THE COURT:  No problem.  Anything further that we

11 should discuss on the record, Mr. Swearingen?

12            MR. SWEARINGEN:  No, your Honor.

13            THE COURT:  Ms. Chartoff?

14            MS. CHARTOFF:  No, your Honor.

15            THE COURT:  Ms. Kaul, anything you'd like to be

16 heard on?

17            MS. KAUL:  No, your Honor.

18            THE COURT:  Ms. Pappy, how about you?

19            MS. PAPPY:  No, your Honor.

20            THE COURT:  Okay.  Great.

21            If you all -- take your time to gather your things.

22 Meet me up on the fifth floor, and let's just talk together as

23 a group and we can go into separate rooms if we need to, and

24 start talking through the best way to deal with some of the

25 settlement issues.

83

1          Thanks.

2      (Proceedings concluded.)

3

4

5

6

7          I certify that the foregoing is a correct

8 transcript from the electronic sound recording of the

9 proceedings in the above-entitled matter.

10

11 /s/Dee Gregory                    11/16/2023
   Transcriber                       Date
12
   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
13

14 /s/L.L. Francisco
   L.L. Francisco, President
15 Echo Reporting, Inc.

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

**Ex. B - 134**

# EXHIBIT C

Pages 1 - 178

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable David D. Leshner, Magistrate Judge

DARRYL DUNSMORE, et al.,           )
                                   )
            Plaintiffs,            )
                                   )
  VS.                              )        NO. 20-CV-00406-AJB-DDL
                                   )
STATE OF CALIFORNIA, et al.,       )
                                   )
            Defendants.            )
_____)


San Diego, California
Tuesday, February 6, 2024

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

Zoom Recording 9:13 a.m. - 1:43 p.m. = 4 hours and 30 minutes

**APPEARANCES:**

For Plaintiffs:
                        DLA PIPER LLP (US)
                        4365 Executive Drive, Suite 1100
                        San Diego, California 92121
                BY:  **CHRISTOPHER M. YOUNG, ESQ.**
                     **ISABELLA MARIA NEAL, ESQ.**
                     **OLIVER M. KIEFER, ESQ.**


                        ROSEN BIEN GALVAN & GRUNFELD, LLP
                        101 Mission Street, Sixth Floor
                        San Francisco, California 94105
                BY:  **GAY CROSTHWAIT GRUNFELD, ESQ.**
                     **RICHARD VAN SWEARINGEN, ESQ.**
                     **PRIYAH KAUL, ESQ.**
                     **ERIC D. MONEK ANDERSON, ESQ.**
                     **HANNAH M. CHARTOFF, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Transcribed by:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                 Official Court Reporter

**Ex. C - 136**

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:
                     LAW OFFICE OF AARON J. FISCHER
 3                   1400 Shattuck Avenue, Suite 12, Number 344
                     Berkeley, California 94709
 4              BY:  AARON J. FISCHER, ESQ.

 5
     For Defendants:
 6                   BURKE, WILLIAMS & SORENSEN LLP
                     60 South Market Street, Suite 1000
 7                   San Jose, California 95113
                BY:  ELIZABETH MARIE PAPPY, ESQ.
 8
                     BURKE, WILLIAMS & SORENSEN LLP
 9                   444 South Flower Street, Suite 2400
                     Los Angeles, California 90071-2953
10              BY:  SUSAN E. COLEMAN, ESQ.

11                   OFFICE OF COUNTY COUNSEL
                     1600 Pacific Highway, Room 355
12                   San Diego, California 92101
                BY:  STEVEN PAUL INMAN, II, ESQ.
13
     For Third Party NaphCare of San Diego, LLC:
14                   MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
                     801 South Figueroa Street, 15th Floor
15                   Los Angeles, California 90017-3012
                BY:  G. CRAIG SMITH, ESQ.
16

17

18

19

20

21

22

23

24

25
```

**Ex. C - 137**

| | |
|---|---|
| 1 | **Tuesday - February 6, 2024**                    **9:13 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  The Honorable David D. Leshner now |
| 5 | presiding. |
| 6 | **THE COURT:**  Good morning, everyone. |
| 7 | **ALL:**  Good morning, Your Honor. |
| 8 | **THE CLERK:**  Please be seated and come to order. |
| 9 | Calling Matter 1, 20-CV-406, Dunsmore versus State of |
| 10 | California, et al. |
| 11 | **THE COURT:**  Melissa, can you make sure that everyone |
| 12 | who's on the Zoom is muted, please. |
| 13 | **THE CLERK:**  Everyone's connected by Zoom. |
| 14 | **THE COURT:**  Okay.  Since we're recording here, I want |
| 15 | to make sure we've got a clean recording. |
| 16 | Okay.  Thanks. |
| 17 | All right.  Good morning, everyone. |
| 18 | May I have appearances from counsel, beginning with the |
| 19 | plaintiffs. |
| 20 | **MS. GRUNFELD:**  Good morning, Your Honor.  Gay Grunfeld |
| 21 | for the plaintiff certified class and subclasses. |
| 22 | **THE COURT:**  Thank you. |
| 23 | **MR. SWEARINGEN:**  Good morning, Your Honor. |
| 24 | Van Swearingen for the plaintiffs. |
| 25 | **THE COURT:**  Thank you. |

**Ex. C - 138**

```
1          MR. YOUNG:  Good morning, Your Honor.
2    Christopher Young for plaintiffs.
3          THE COURT:  Thank you.
4          MS. KAUL:  Good morning, Your Honor.  Priyah Kaul for
5    the plaintiffs.
6          THE COURT:  Thank you.
7          MR. ANDERSON:  Good morning, Your Honor.
8    Eric Anderson for the plaintiffs.
9          THE COURT:  Thank you.
10         MR. FISCHER:  Aaron Fischer for plaintiffs.
11      Good morning, Judge.
12         THE COURT:  Thank you.  Good morning.
13         MS. CHARTOFF:  Good morning, Your Honor.
14   Helen Chartoff for the plaintiffs.
15         THE COURT:  Thank you, Ms. Chartoff.
16         MS. NEAL:  Good morning, Your Honor.  Isabella Neal
17   for the plaintiffs.
18         THE COURT:  Good morning.
19         MR. KIEFER:  Good morning, Your Honor.  Oliver Kiefer
20   for plaintiffs.
21         THE COURT:  Good morning.
22      Thank you-all.
23         MS. PAPPY:  Good morning, Your Honor.  Elizabeth Pappy
24   on behalf of defendants.
25         THE COURT:  Thank you.
```

**Ex. C - 139**

1    **MS. COLEMAN:** Good morning, Your Honor. Susan Coleman

2  for defendants.

3    **THE COURT:** Thank you.

4    **MR. INMAN:** Good morning, Your Honor. Steven Inman,

5  from County Counsel, for defendants.

6    **THE COURT:** Thank you.

7    All right. First, thank you-all for your patience as we

8  dealt with some technical issues. Also, thank you to those of

9  you who traveled here today. I realize that the conditions

10  were not ideal, and I'm glad to see that everyone made it

11  safely.

12    I know that there is an inspection of the jail that is

13  going to be starting as soon as we are finished. So what I

14  would like to do is begin by -- I'm informed that there is

15  counsel of record who's not here, Salayha Ghoury.

16    Who's that?

17    **MS. PAPPY:** Oh. Ms. Ghoury is no longer with my firm.

18    **THE COURT:** Okay. Fair enough. Thank you.

19    So what I'd like to do is begin by addressing the matter

20  that led to me requesting you-all be here today, and then I'll

21  proceed to the remaining matters with those counsel who are

22  going to be here for the rest of the proceedings.

23    I did not likely -- lightly request that you-all appear

24  this morning. I realize that you are busy professionals. You

25  have many other obligations that you are attending to, personal

1  and professional, including, as I mentioned, other obligations

2  in this case that are scheduled to -- well, that are being

3  delayed for purposes of this proceeding.

4      But as I thought about what has happened in this case over

5  the past several months, I was convinced that the circumstances

6  of this case do require everyone to be here.

7      This isn't just about the ex parte motion for leave to

8  file a reply alleging a false statement.  It really is the

9  culmination of a number of events, over the course of the past

10  few months, that has led me to really question the willingness

11  and the ability of counsel in this case to move the case

12  forward in a constructive and productive manner, in a way that

13  demonstrates the civility and the professionalism that,

14  honestly, sitting here today, I see throughout this room.

15      You-all are familiar with our local civil rules, Rule 83.3

16  and Rule 2.1, which talk about the way in which counsel are

17  required to deal with one another, the expectation that lawyers

18  resolve disputes promptly, fairly, and reasonably but resort to

19  the Court for judicial relief only if necessary.

20      And we expect lawyers to not impugn the integrity of its

21  proceedings or its members, not to impugn -- or to treat

22  adverse witnesses, litigants, and opposing counsel with

23  courtesy, fairness, and respect and particularly, in a case

24  such as this, where you have a wide range of lawyers with --

25  some with vast professional experience and some with less, to

1    encourage other lawyers to conform to the standards that are

2    set forth in the Code of Conduct and, ultimately, with the goal

3    being that, at the end of the case, the lawyers may part

4    amicably.

5         The matters that are before me today, that we are going to

6    spend a substantial amount of time resolving, unfortunately

7    reflect an apparent unwillingness to engage in meaningful

8    efforts to, among other things, meet and confer with one

9    another.

10        Those efforts are not measured in terms of the length of

11   the letters and the emails that are sent back and forth but, in

12   my view, are measured by the willingness of the parties to

13   engage in an open and honest dialogue before raising issues

14   with the Court.

15        On December 11th, in reviewing the parties' joint

16   statement that was submitted prior to the December 20th

17   hearing, I looked, with some surprise, at Footnote Number 1,

18   which was a back-and-forth describing counsel's complaint, from

19   the plaintiffs' side, that the defendants have returned their

20   portion two hours after the close of business and that the

21   defendants' portion was too long and requesting that everything

22   beyond the first two sentences be stricken.

23        On December 20th, Mr. Swearingen, Ms. Pappy, and I spent

24   about three and a half hours together trying to make progress

25   through requests for production, including, at one point, me

1  leaving the bench for about 15 minutes so that Ms. Pappy and

2  Mr. Swearingen could try to talk to one another about the

3  additional requests for production related to Cause of Action

4  Number 9.

5      No progress was made during that conversation, and it

6  really is a microcosm of something that I think is happening in

7  a larger sense that, really, is a problem in this case that I

8  see, which is the inability to listen to each other and to

9  engage in constructive dialogue.

10     And I realize that I only see the tip of the iceberg when

11 it comes to your interactions with one another, and I

12 appreciate that.  I've got a lot of emails that were submitted

13 to me today in the number of pages that were provided by the

14 parties, but I realize that is a fraction of what you-all

15 correspond with each other on, but I was struck by that

16 inability to make any progress when you were together.

17     And our progress on December 20th, despite the length of

18 time we spent together, left me hopeful.  And I -- as I was

19 reviewing the -- the transcript of that hearing and preparing

20 for today, you know, we finished about -- you know, by

21 essentially saying that we hope that 2024 would be both

22 constructive and productive because 2023 was -- for a period of

23 time, you-all really did make progress.  And it was, and still

24 is, a pleasure to work with you on this case, the current

25 circumstances notwithstanding.

Ex. C - 143

```
 1        You-all made true efforts to figure out the ADA
 2   stipulation in a manner that didn't leave anyone totally happy
 3   but really was a testament to what you were able to do
 4   together.
 5        On the class certification issues, you know, frankly,
 6   kudos to the County for stipulating to that because that could
 7   have built in more delay into this case, months of briefing to
 8   get to a result that may well have been the same if there had
 9   been a contested motion.
10        And I'm not sure exactly what has happened, but I was --
11   "disappointed," I think, is a mild word -- to see the first
12   three pages of the plaintiffs' motion to compel basically
13   throwing defense counsel under the bus, plaintiffs being
14   stymied in efforts to meet and confer, conflicting statements
15   by the County, which really leads only to the inference that
16   the County is up to something no good and specifically counsel
17   for the County.
18        I then see the opposition filed on January 24th, and what
19   I see is the first line, that the plaintiffs believe they are,
20   quote, "exempt from all legal restraints on discovery," end
21   quote.
22        I mean, none of that helps me resolve your disputes.  None
23   of that makes you-all look any better.  And frankly, to anybody
24   else reading that, it is not indicative of the level of
25   professionalism, civility, and, frankly, zealous representation
```

1   of your respective clients that I have been privileged to

2   witness over the entire time that I've been working with you on

3   this case.

4        We spent a substantial amount of time on December 20th

5   talking about the new requests for production that the

6   plaintiffs wanted to serve because they were inadvertently left

7   out of the requests.

8        And I provided an opportunity for the parties to meet and

9   confer, the whole point being talk to each other, figure out

10  the specific data sets that the County maintains to allow the

11  plaintiff to propound RFPs that will be targeted and that will

12  not be the subject of dispute.

13       Maybe you did that, but I'm going to be listening really

14  carefully to what meet-and-confer efforts happened before the

15  plaintiffs propounded the new RFPs because I'm now told that

16  there's not an agreement on it.

17       I'm told that the parties cannot agree on the medical and

18  custody records, and I realize that I'm the one who denied the

19  motion to give you additional time.  But, frankly, I denied

20  that motion because I did not have good reason to believe that

21  you-all would be able to figure this out on your own and that

22  further efforts would only create more delay.

23       And finally -- well, second-to-last, I'm told that there's

24  an inability of the parties to agree on dates for inspections

25  of the jail, and my first reaction to that was, "Really?"

1          Really, that's how we're spending our time in this case,

2     not figuring out the truly serious issues that are involved in

3     this case, which everyone agrees are important to the County,

4     to the people who are incarcerated, to the citizens of our

5     community?

6          We are going to be bickering about whose expert's

7     available when, who's flying in from South Carolina when, and

8     we can't figure that out?  That, to me, tells me something is

9     really off.

10         And then, of course, there is this ex parte motion for

11    leave to file a reply, which ultimately comes down to a fight

12    about a statement by Ms. Pappy that documents have been

13    produced or documents will be produced because she thought they

14    were going to be produced at the time she wrote it.  And,

15    ultimately, it leads to a filing with the intentionally

16    inflammatory caption regarding false statements.

17         So we're going to talk a lot later today about meeting and

18    conferring, and I'm going to be drilling in with you-all about

19    specifically the meet-and-confer efforts that have occurred

20    both with respect to the motion to compel on the discovery to

21    the defendants as well as the motion to compel with respect to

22    NaphCare.

23         While I have you-all here, here's what I want from

24    you-all.  I actually am looking to you for guidance.  Where do

25    things go from here, and how do we get this case back on track?

1    And I would actually, you know, appreciate hearing from some of

2    you who have been on all of the emails and all of the

3    correspondence but I haven't been hearing from as much

4    recently.

5         Mr. Fischer, Mr. Young, you're on all of these emails back

6    and forth, but you are not sending and receiving them -- or

7    sending them directly.  I'd like to hear from you-all.  What do

8    we do?

9         Go ahead, Mr. Fischer.  If you're willing to tell me, I'm

10   really willing to listen, and I'm not asking you to throw

11   anybody under the bus.  I really want to know, how do we get

12   this back on track?

13        You're welcome to stand there or stand at the lectern, if

14   you wish.

15        **MR. FISCHER:**  I'll stand here, if that's okay.  You

16   caught me a little off guard, but I appreciate the opportunity.

17        I -- I think that the key approach is what you already

18   said, which is the case is not about us.  It's not about any of

19   us.  It's about really serious issues that affect people at the

20   jail, the staff, the community, and so forth.

21        So I would -- you've put me on the spot.  So I don't have

22   a quick answer --

23        **THE COURT:**  I did.

24        **MR. FISCHER:**  -- but I think that the more that we can

25   focus on those issues -- and maybe even having some check-ins,

 1    if Your -- Your Honor would allow, with -- on particular

 2    issues, not as disputed motions but as status conferences.

 3    They can be briefed.  They can be by Zoom.

 4         But I think some of that -- my impression is that when

 5    the -- you're -- I'll just say I think you're right to keep

 6    schedules tight because I think, if things get extended, things

 7    sometimes get more complicated than they should, and it gets

 8    stuck on issues that we shouldn't be stuck on.  So maybe having

 9    periodic static -- status conferences on a particular issue, so

10    we can nip things in the bud, might be productive.

11         I know it's imposing on your time, but that might be one

12    suggestion.  The more structure that we can -- that we can work

13    off of, the better.  I am hopeful, very hopeful, that this week

14    will be very productive on the inspections because we have a

15    structure now.

16         I know that was a long process, but we have a structure.

17    We have some guidance from the Court.  It doesn't always have

18    to be an order.  Your words are very -- taken very seriously by

19    counsel.

20         So even if you just talk through issues with us -- but I'm

21    confident that, with the structure that we have in place this

22    week, we're going to have a productive few days of inspections.

23    And it's going to be helpful for the case just to develop the

24    facts and get to what's important.

25         So those are my general thoughts.  I'd be glad to

1    (Inaudible) further, and I appreciate the opportunity.

2        **THE COURT:**  I know I put you on the spot, and I

3    appreciate that.

4      So take some time.  If you have additional thoughts, I

5    really would be happy to hear them.

6        **MR. FISCHER:**  Thanks for calling me up.

7        **THE COURT:**  You didn't really mean that --

8                    (Laughter.)

9        **THE COURT:**  -- but I got you.

10        **MR. YOUNG:**  And, Your Honor, let me echo what

11    Mr. Fischer said.  I do appreciate both this hearing and the

12    opportunity to speak at it because I do have a couple of things

13    I'd like to say, and I appreciate the opportunity to do so.

14      As I said, thank you to Your Honor for calling this

15    hearing.  It's not easy.  People had to come in from all over,

16    myself closer than others but still not close, and I think it's

17    frankly overdue in some respects.

18      I'm a partner with the DLA Piper firm here in San Diego,

19    as Your Honor knows.  I've practiced in this district for my

20    entire career, over 30 years now.  I'm very familiar with the

21    civil rules -- the local civil rules and take those very

22    seriously.

23      And it -- as Your Honor has noted, both myself and

24    Mr. Fischer have been on many of the emails, probably most, if

25    not all, but haven't been as directly involved.  I've been

**Ex. C - 149**

1   directly involved with some of the back-and-forth on the issues

2   but not as much.

3       And I have frankly been disappointed, since last year, to

4   see the tone.  Things really took a turn about six or eight

5   months ago, maybe longer -- in fact, longer, probably close to

6   a year ago.  And I have been uncertain as to sort of how to

7   turn that around.

8       And, certainly, I will offer to both sides, if there's

9   anything I can do -- obviously, I'm on the plaintiffs' side,

10  and I'll zealously represent the class.  But, you know, as

11  someone who hasn't been as involved, I'm happy to get more

12  involved, to the extent that will help.

13      One thing I -- sort of building up something I just

14  thought of that -- building up something that Mr. Fischer said,

15  I do think some of it is due to the sort of scattered nature of

16  late-night emails, when there are many, many issues going on,

17  you know, emails sort of flying back and forth on sort of

18  Issue 1, Issue 2, maybe other ones on Issues 1 and 3, and then

19  there's one on Issue 2.

20      And so I think that regularizing meet-and-confer and the

21  exchange of information a little bit, sort of having more

22  comprehensive communications, sort of, "Here's the list of

23  currently outstanding issues, 1 through 12.  Here's where we

24  are on all of them" -- that could be done between counsel.

25      I also -- and this is the part that builds on something

```
1   Mr. Fischer said.  Whether or not there are regular discovery
2   status hearings, I do think those are a good idea, but I think
3   interspersed much more frequently than those should frankly be
4   just a report to the Court listing that sort of Issues 1
5   through 12 or whatever it is that I just mentioned with, you
6   know, a truly joint statement of, you know, no more than a
7   couple sentences on each one on sort of what the -- well, maybe
8   a paragraph -- on sort of what the progress has been on each
9   issue since the last report to the Court.
10       And maybe there can be a monthly, you know, at the
11  discretion of the Court, Zoom hearing where the Court takes
12  Issues 1 through 12, looks at the previous three weekly reports
13  and says, "Okay.  This is where we're at.  You're making
14  progress.  This is where you need to do more."
15       Maybe that -- and now I'm thinking out loud, but perhaps
16  that would assure both parties that they're getting access to
17  the Court when needed, the Court's aware of what's going on in
18  a -- you know, in an objective fashion rather than sort of one
19  party coming in -- you know, one side coming in and discussing
20  all the bad things the other side has done and the other side
21  replying in kind.
22       So that's just an idea.  I may have more as I think on it,
23  and I'm happy to report further to the Court.
24       Thank you, Your Honor.
25           THE COURT:  Thank you.
```

1          Ms. Pappy, one of the suggestions, in your opposition to

2     the motion to compel, is that this case merits a discovery

3     referee or, you know, a special master for purposes of

4     discovery.

5          Do you think that would be advisable?

6          **MS. PAPPY:**  Yes.  Unfortunately, I think that it

7     would.

8          I mean, one of the things that I -- I would say, in

9     response to Your Honor's question, is we need to stop attacking

10    each other.  We need to stop making this personal between the

11    attorneys, and that includes myself.

12         And for my part in that, I apologize to the Court and to

13    opposing counsel because, really, this is about the plaintiffs

14    and their claims.  And, yes, I'm a zealous advocate for my

15    client, but I need to stop doing it, and I commit to this Court

16    that I will.

17         I think that a discovery referee and the informity --

18    informal nature of that and the ability to call them up and

19    say, "Hey, can we talk to you tomorrow?  I feel like I'm" --

20    you know, "The other side is doing this, and I need some help.

21    Defense counsel is doing this.  We need some help."  I think

22    that quick availability will help us move along quicker without

23    burdening the Court.

24         So the very long answer is yes.

25         **THE COURT:**  Ms. Grunfeld, do you wish to be heard on

1  that?

2      **MS. GRUNFELD:**  Yes, Your Honor.  Thank you.

3      I share my colleagues' appreciation for today's

4  opportunity.  I too am familiar with the local rules and will

5  strive to ever do better at the goal of civility and

6  professionalism, which is what I and my team attempt to

7  practice at that level at all times.

8      I apologize for my voice.  I'm coming in from Texas, and I

9  may have picked a little something up.

10     As far as the discovery referee and the conference ideas,

11 I'm all for whatever will expedite and make things better.  My

12 concern with the discovery referee is, frankly, costs.  It is

13 very challenging to pursue an ambitious case like this.  We all

14 agree that it's a very important case.  People are literally at

15 risk of dying.  We've had our third death this year, just

16 Sunday, at Central Jail.

17     On the other hand, if we could do some kind of situation

18 where the County were to pay for the discovery referee, that

19 would be strongly preferable to the plaintiffs, who are

20 indigent, of course.

21     So those are my thoughts, Your Honor, and the experts are

22 here.  We're very pleased to get the opportunity to have them

23 tour Central today, and I'm happy to answer any questions.

24     **THE COURT:**  Sure.

25     My question -- I'm not interested in revisiting the past

1    with you.  You understand what I've seen over the past few

2    months that, to me, has been a marked departure from what was

3    happening in terms of the progress that you made earlier this

4    year.

5         And my question to you is:  How do we turn this around?

6    What do we -- we do?  And I mean "we" with a capital W.

7              **MS. GRUNFELD:**  Yes, Your Honor.

8         And, again, a discovery referee may be helpful.  My

9    concern is the cost.  I would be happy to brief whether that's

10   something that a defendant could pay for in this situation,

11   also the check-ins.

12        And I do appreciate the apology that was just made.  That

13   means a lot.  And I also apologize for anything I've said

14   that's incivil or inappropriate, either in writing or here in

15   this court or in conferences.

16             **THE COURT:**  Do you think that there has been

17   meaningful communication between the parties regarding the

18   outstanding discovery?  Because one thing that Mr. Young said

19   that resonates with me, you know, is just the sheer volume of

20   emails going back and forth.  And there appears to be a huge

21   volume going to Ms. Pappy, for example.

22        And I'm not saying that any of them are sent in bad faith,

23   but what can be done to -- in that regard that may well help

24   turn down the temperature in this case?

25             **MS. GRUNFELD:**  My style and preference is letters that

1  summarize a number of issues.  I agree with you.  I have never

2  seen so many emails.  It is very difficult to keep up with them

3  and later to find what was said and represented in those

4  emails.

5      So I've created folders, and I'm taking steps -- and we

6  all are -- to trace where we are with the various issues, but

7  it is -- I'm not saying no emails, but I'm suggesting that

8  summary letters of the positions that are exchanged from time

9  to time is a useful technique that was -- has been done in many

10  other cases that I've been involved in.

11      THE COURT:  You may not be sticking around for the

12  motion to compel.  I understand you will probably be attending

13  the inspection; is that correct, Ms. Grunfeld?

14      MS. GRUNFELD:  I was going to go to the inspection

15  while Ms. Kaul argues the NaphCare, and then she will be

16  attending.

17      THE COURT:  Okay.  Then maybe you will be here for

18  part of this.

19      But one thing that concerns me is, given the number of

20  disputed requests for production between the plaintiffs and the

21  defendants, as well as between the plaintiffs and NaphCare, do

22  you believe that there has been a genuine effort by the

23  parties, on a request-by-request basis, to talk through the

24  issues?

25      MS. GRUNFELD:  I do not believe there has been an

1  exchange.  I do believe that we have tried our best, but I

2  don't think there has been the kind of meet-and-confer and

3  exchange of ideas that I think would benefit all of us.

4      **THE COURT:**  One solution that has been utilized in

5  other cases, that I frankly have never had to utilize before,

6  is a requirement that meet-and-confers occur in person or by

7  Zoom and that they be transcribed and that, for every discovery

8  conference, the Court is provided with a transcript of the

9  meet-and-confer to ensure that requests are addressed on a

10 request-by-request basis.

11     Because I have to tell you, Ms. Grunfeld, I looked very

12 carefully at each of the RFPs at issue here, and I have serious

13 concerns as to whether each of them was the subject of a

14 meet-and-confer as I ordered.  And I would like to know how we

15 can do better with that in the future.

16     **MS. GRUNFELD:**  Thank you, Your Honor.

17     There were long phone calls, and I was part of some of

18 them, and other counsel here were part of others.  We took

19 notes, and we did try to carry out, as best we could, the

20 Court's order.

21     Clearly, if the meet-and-confers were recorded, then the

22 Court would understand perhaps better what was happening.

23     **THE COURT:**  Do you think that's a good idea?

24     **MS. GRUNFELD:**  Maybe.  It's a little -- little hard to

25 say.  Sometimes, that might intimidate a free discussion,

1    but -- but on the other hand, given where we're at, it could be

2    useful.

3            **THE COURT:**  What do you think, Ms. Pappy?

4    Ms. Coleman?

5            **MS. PAPPY:**  I don't -- I don't think it's a

6    (Inaudible) use of time.  I think that a discovery referee is

7    quicker.  It's cheaper.

8        I think that email -- I don't like the idea of writing

9    letters.  It's -- it's -- you can't talk.  You can't have a

10   free exchange of information and, "Well, what about this, and

11   what about this compromise?"  And, understandably, we have not

12   been great about that when we talk to each other, but that's

13   why I see the discovery referee as the most economical way.

14       I understand the plaintiffs are suggesting that they do

15   not have the money, but wouldn't it be cheaper than flying down

16   here for in-person hearings and constantly appearing before

17   Your Honor via Zoom at all of our hourly rates, to pay some

18   money to a discovery referee to have them at the other end of a

19   phone call 24 hours (Inaudible) help us resolve some of these

20   things?

21       I -- that's my thinking, is I want the most -- the

22   quickest, most efficient way without having -- I'm sure you

23   enjoy reading our briefs, but multiple briefs coming back to

24   the Court.  I just see the discovery referee as the best, most

25   efficient way to accomplish what really plaintiffs want to

1    accomplish, get the information.

2          THE COURT:  What about Ms. Grunfeld's suggestion that

3    it should be the County who pays for the discovery referee?

4          MS. PAPPY:  I don't agree with that.  I mean, I think

5    that if you're willing to send multiple attorneys down to

6    hearings down here in San Diego from Northern California, then

7    why not put that money to a discovery referee?  They are

8    well-funded to this litigation.  They have numerous experts.

9          And, quite frankly, I don't think the expert is going

10   to -- or the discovery referee is going to cost that much

11   because I'm hoping that it helps us move discovery along and we

12   stop having disputes.  I may be wrong about that.

13         THE COURT:  Then, Ms. Grunfeld, with respect to the

14   suggestion that we have more regular status conferences, I

15   actually have a binder now of the number of discovery

16   conferences that we've held already and the orders that I've

17   issued.

18         What, if anything, would be helpful to the parties with

19   respect to my involvement in discovery beyond that which is

20   already taking place?

21         MS. GRUNFELD:  I like the idea of more frequent

22   meetings, as Mr. Young suggested, and perhaps helping us

23   through a few places where we're stuck, which -- many may be

24   resolved today, by the way -- I mean, hopefully.  But that

25   would be -- we'd be very open to that.  And, of course, either

1   with that or the meet-and-confers, Zoom is -- is a good

2   mechanism.  We don't have to fly down here.

3       I take a little issue with the concept that we're

4   well-funded and -- et cetera.  But frequent meetings, I think,

5   could be good.  Transcribing the meet-and-confers or recording

6   them could be good.

7       **THE COURT:**  Mr. Fischer, having had a chance to

8   collect your thoughts, anything -- oh.  Go ahead first,

9   Ms. Coleman.

10                      (Laughter.)

11      **MS. COLEMAN:**  Well, Your Honor, I don't know if the

12  Court was suggesting that you get more involved in this case

13  than you've already been.  You've already offered us a lot of

14  your time, and we do appreciate it.

15      I think we could do better, and we just -- you know,

16  hopefully, this is a wake-up call to everyone that we need to

17  read over our emails before we send them or -- you know, to

18  make sure they are a civil tone and that we hopefully can

19  compromise on some things.  There hasn't been a lot of

20  compromise and -- you know, on some of these discovery issues.

21      And I'm not going to lay blame on what -- who's doing that

22  and/or who's not, but there hasn't been a lot of compromise

23  lately, and maybe we just need to talk more or switch up some

24  of the players that are involved in the discovery or, you know,

25  do what we can.

1          **THE COURT:**  Thank you.

2      Mr. Fischer, having had a chance to collect your thoughts,

3   anything else you'd like to add?

4          **MS. COLEMAN:**  Sure, please.

5          **MR. FISCHER:**  I'm trying to summon up some other

6   similar cases that I've worked on with other complex jail

7   conditions/matters, multi-agencies, and outside counsel and so

8   forth.  I mean, every case is different, of course.  This one,

9   I think, is, in some ways, particularly complex, and it's -- it

10  is heavily contested, which is -- which is fine.  That's the

11  process.

12      I -- I'll (Inaudible) that I don't know that a discovery

13  referee is going to be helpful.  I think you know the issues

14  very well.  Getting that person up to speed, learning the

15  parties -- I mean, I guess we can make another copy.  There's

16  voluminous binders, but there's a lot that a discovery referee

17  would have to get up to speed, and we're already on a very

18  tight schedule to get through this case.

19      I do think that recording, in some form or fashion, our

20  meet-and-confers is useful.  I think it will have a salutary

21  effect.  Whether that comes to you or not, I think that would

22  be useful.

23      I am strongly in favor of reducing the amount of emails.

24  And if defense counsel doesn't want to have letters, I do think

25  some type of a reporting to the Court in writing -- one -- you

1   know, one document that sort of includes everything -- that

2   tends to cut out the -- I'm reluctant to use the word, but the

3   snark and kind of these personal attacks.  It does exist.  I've

4   been -- I've been a target of -- of it.  It doesn't feel good,

5   and it's distracting.

6       So I do think some -- some structure guided by you as to

7   how we are going to herd the cats at the different disputes,

8   whether it's through summary letters that each counsel needs

9   to -- or required to engage in this part of the meet-and-confer

10  or a report to the Court -- I think that is the strongest way

11  to -- we are all professionals.  Defense counsel has a ton of

12  experience and is professional and knows what they're doing.

13      So it's not -- there's not a lack of capacity here.  I

14  really don't think that's the case, and --

15          **THE COURT:**  It's clearly not the case.

16          **MR. FISCHER:**  -- same thing for my -- my co-counsel,

17  to be sure.

18          **THE COURT:**  Clearly.

19          **MR. FISCHER:**  So I -- but I do think that capping the

20  emails, stopping the emails, some type of summary -- I'm not

21  sure -- a written summary of disputes, I think, would be very

22  helpful.  And I'm open to different ways, depending on the

23  level of involvement that the -- that the Court wants for this

24  case.

25      So -- but that's -- that's my further thinking, and thank

1    you, Judge.

2         **THE COURT:**  No.  I appreciate that, and I appreciate

3    all of the suggestions.  I really do.

4         I -- part of this involves the fact that I'm thinking

5    through, you know, suggestions for more regular status

6    conferences and hearings.  I -- I am willing to give you as

7    much time as this case needs, understanding that the case is

8    really important, and the other cases that I have before me are

9    very important to those litigants for -- for other reasons.

10        And I would say only this.  I will think through that

11    suggestion to give you-all more time.  However, it has got to

12    be a two-way street.  It has got to be a situation where, when

13    we get together, there is -- that is preceded by an honest and

14    open dialogue about issues in the case and where we are not

15    spending time arguing about things that should be resolved

16    between counsel because we're here today.

17        And I do intend to rule on every dispute that's before

18    me -- before me, and I really have -- I question very much

19    whether many of these issues could have been resolved by a

20    point-by-point, "This RFP asks for this.  What do you have?

21    What can you produce?  What will you not?"

22        And maybe you're going to tell me that's all happened, but

23    I strongly suspect otherwise, based on my review of everything

24    before me.  And, ultimately, you're asking me to make a call,

25    and I'm going to do my absolute best to do it, but it almost

1    never is as satisfying to the parties as figuring it out among

2    yourselves.

3        And I would note only this as well.  You talk about the

4    experience of counsel, Mr. Fischer, and you're a hundred

5    percent right.  I mean, I look at counsel for the County and

6    counsel for the plaintiffs, and you-all have vast experience.

7    And I was, you know, as I said, privileged to be a part of that

8    through the negotiations regarding the ADA stipulations and the

9    negotiations regarding class certification.

10        And you also have very talented attorneys on your --

11    particularly on the plaintiffs' side with less experience who

12    are copied on, you know, these unnecessary emails, who are

13    perhaps themselves tasked with sending truly unnecessary emails

14    that don't further the cause for anybody.

15        And one of my chambers' rules, you know, encourages

16    attorneys with less than ten years' experience who want to

17    argue to get the opportunity to do so.  And I'm not suggesting

18    that anyone in this room, particularly on the plaintiffs' side,

19    needs more experience because you're not.

20        But the idea is to, you know, foster the growth of

21    attorneys, you know, in our court.  And that's not only through

22    arguing in court, which is what I can control, you know,

23    providing those opportunities for oral argument.  But it also

24    comes from the more experienced lawyers and the way that they

25    litigate the cases and the way that they handle cases and the

1    way that they are treating one another on emails or in these

2    meet-and-confer conversations that -- I think every one of us,

3    as a new lawyer, had those experiences.  But positive and,

4    unfortunately, sometimes negative -- they really do shape the

5    way that we practice law later in our careers.

6        And I -- this case really does present a terrific

7    opportunity for everyone to do that and to do so in a way that

8    preserves everyone's ability to zealously advocate for their

9    clients while also demonstrating for the community and maybe

10   for some of the less experienced lawyers, you know, what it

11   really means to have, you know, the honor and dignity of

12   practicing law.

13       I'm going to give some further thought to how we can best

14   go forward.

15       Yeah.  Go ahead, Mr. Fischer.

16       **MR. FISCHER:**  I just -- I just want to state for -- on

17   the record that, certainly, co-counsel -- my co-counsel in the

18   second row -- they have -- I just wanted you to know because

19   you also don't see it, and I don't think defense counsel also

20   sees it.

21       But they are deep in the weeds.  They know this case so

22   well.  They articulate disputes, talk about the -- both

23   sides -- how they can find their way to compromise.  Just so --

24   I think you're -- you're intuitive, but their capacity to

25   analyze a very complex set of issues is extremely impressive,

```
1    and they have been -- to the extent that we've made progress on

2    a lot of issues, I give them a lot of the credit.

3         So I just want to state that.

4              THE COURT:  You should.

5              MR. FISCHER:  Okay.

6              THE COURT:  I have read a number of Ms. Chartoff's

7    emails that have come before me, and I will tell you this.

8    Every single one of those emails is polite.  It is

9    professional, and it is to the point in terms of raising issues

10   for further discussion.

11        And so I absolutely agree with you --

12             MR. FISCHER:  I understand.

13             THE COURT:  -- Mr. Fischer.  We are on the same page,

14   and thank you for raising that.

15             MR. FISCHER:  Thank you.

16        I'll sit down.

17             THE COURT:  Sure.

18        Does anybody else wish to be heard before we turn to the

19   other matters that are before me this morning?

20             MS. PAPPY:  No, Your Honor.

21             MS. GRUNFELD:  Yes, Your Honor.

22             THE COURT:  Sure.  Go ahead.

23             MS. GRUNFELD:  Just -- just, again, thank you for

24   having us today.

25        May the people involved in the inspection be excused?
```

**Ex. C - 165**

1         **THE COURT:**  Yes.  Absolutely.

2         **MS. GRUNFELD:**  Thank you very much.

3         **THE COURT:**  Thank you, Ms. Grunfeld.

4     And to those of you who are leaving for the inspection,

5  thank you for being here.  I very much appreciate it.

6         **MS. GRUNFELD:**  Thank you, Your Honor.

7         **MR. YOUNG:**  Your Honor, to be clear, if --

8  hypothetically, when we're neither involved in the inspections

9  nor in these specific issues to be heard, would those folks be

10  excused as well?

11         **THE COURT:**  Yes.

12         **MR. YOUNG:**  Thank you, Your Honor.

13         **THE COURT:**  Thank you, Mr. Young.

14         **MR. YOUNG:**  It actually was a hypothetical.

15         **THE COURT:**  No.  I understand.

16         **UNIDENTIFIED SPEAKER:**  Hypothetically.

17                 (Laughter.)

18         **THE COURT:**  You okay, Ms. Kaul?

19         **MS. KAUL:**  I'm going to do my best.

20         **THE COURT:**  All right.  If you need to step out to get

21  some water or anything, please feel free.

22         **MS. KAUL:**  I appreciate that.

23     Thank you, Your Honor.

24         **THE COURT:**  All right, Counsel.  We've got about an

25  hour before we're going to have Mr. Smith on for the NaphCare

**Ex. C - 166**

1    motion to compel, and here's the order in which I am planning

2    to handle these issues with you.  I have 11 items on my to-do

3    list with you, and they are as follows:

4         The first item, we have already covered.

5         The second will be plaintiffs' ex parte motion to file a

6    reply brief.

7         The third issue, which is a series of issues, will be the

8    plaintiffs' motion to compel.

9         Issue Number 4 will be the motion to seal.

10        Issue Number 5 will be the dispute regarding Requests for

11   Production Numbers 250 to 252.

12        Issue 6 will be the jail inspection dates.

13        Issue 7, or whenever we get to the 11:00 o'clock, will be

14   plaintiffs' motion to compel regarding the NaphCare subpoena.

15        Issue Number 8 will be defendants' motion to stay

16   regarding the production of CIRB reports.

17        Issue Number 9 will be the completeness of the CIRB

18   reports with respect to the order that I issued and the

19   additional reports that I received following that order.

20        Issue Number 10 will be the status of plaintiffs'

21   responses to defendants' interrogatories.

22        And Issue 11 will be regarding the mandatory -- or excuse

23   me -- the case scheduling order that I issued at the end of

24   December and whether it makes sense to schedule a further

25   settlement conference to get those back on track.

1      So with respect to the ex parte application to file a

2  reply regarding an alleged false statement, Docket Number 516,

3  Ms. Pappy, my question to you is this:  Have all of the audit

4  reports identified in the plaintiffs' -- or excuse me --

5  defendants' amended response to Interrogatory Number 24 been

6  produced as of today's date?

7      **MS. PAPPY:**  Yes, Your Honor.  They were -- all -- the

8  rest of them were produced on January 30th.

9      **THE COURT:**  Should those reports have been produced on

10 December 22nd?  That was the deadline for production of what I

11 thought was going to be production of everything.

12     **MS. PAPPY:**  They should have been.

13     **THE COURT:**  Okay.  Mr. Swearingen, Ms. Kaul, do you

14 wish to be heard on this?

15     **MR. SWEARINGEN:**  No, Your Honor.

16     **THE COURT:**  I'm denying the ex parte application to

17 file a reply brief.  I -- it is moot for all of the reasons

18 that we have discussed.

19     Turning now to the plaintiffs' motion to compel further

20 responses to request for productions -- requests for production

21 and interrogatories, which is Docket Number 489, I am going to

22 provide you with a tentative ruling.  That will include a

23 number of questions to Ms. Pappy.

24     And then what I would do, Mr. Swearingen, Ms. Kaul, is

25 provide you an opportunity to, of course, be heard and address

1    any issues that you wish me to consider.  And I will either --

2    well, I will probably then take the matter under submission and

3    issue a written order that may simply confirm my tentative; or

4    if I decide to change any aspects of my tentative, we'll do

5    that as well.

6        Beginning with my tentative ruling, Federal Rule of Civil

7    Procedure 26 provides that the parties may obtain discovery

8    regarding any non-privileged matter that is relevant to any

9    party's claim or defense and proportionate to the needs of the

10   case, considering the importance of the issues at stake in the

11   action, the amount in controversy, the parties' relative access

12   to relevant information, the parties' resources, the importance

13   of the discovery in resolving the issues, and whether the

14   burden or expense of the proposed discovery outweighs its

15   likely benefit.

16       Courts have interpreted this rule as imposing a duty of

17   good faith and a reasonable inquiry on all attorneys involved

18   in litigation who rely on discovery responses executed by

19   another attorney.  In particular, Rule 34 requires the

20   requesting party to describe the items to be produced with

21   reasonable particularity.

22       And the test for reasonable particularity is whether the

23   request places a party upon reasonable notice of what is called

24   for and what is not.  It requires the parties to tailor their

25   requests to the needs of the case, and where they fail to do

1    so, Rule 26 provides that the Court must limit the discovery.

2        We talked through a number of these issues on

3    December 20th, and my order following that discovery

4    conference, at Docket Number 478, gave plaintiffs leave to file

5    a motion to compel as to Interrogatory Number 24 and/or any of

6    the requests for production identified in the parties' joint

7    list.

8        I will discuss this further, but it appears to me that the

9    plaintiffs' motion includes multiple requests for production,

10   Numbers 82 and 231, that were not included in the joint list,

11   and Interrogatory Number 25, which was also not included in the

12   joint list.  And I want to hear from the parties as to whether

13   or not they have waived their right to seek relief as to those

14   discovery requests.

15       In addition, Mr. Swearingen's declaration, Exhibit A,

16   contains multiple requests for production that are not

17   mentioned in the motion.  I will discuss those separately after

18   we go through all of the ones that are mentioned in the motion.

19       As I noted, on December 20th, we held an approximately

20   three-and-a-half-hour discovery hearing regarding the requests

21   for production in dispute.  During the course of that hearing,

22   I expressed my view that the requests were exceptionally broad.

23       And plaintiffs' counsel stated that, although the requests

24   were broad as drafted, they anticipated, through

25   meet-and-confers, that the parties would be able to discuss

1 "what types of documents we're looking for and what kinds of

2 documents exist."  That's from the December 20th transcript at

3 Pages 106 to 107.

4  Among other things, the requests that we talked about

5 included Request Number 28, which sought every memorandum

6 relating to the jail from January 1st, 2021, to the present.  I

7 understand that Request Number 28 is no longer at issue, as are

8 a number of other requests that were raised in the

9 December 11th list of discovery in dispute.

10  However, it is unfortunately indicative of the very broad

11 nature of the requests that were propounded by the plaintiffs,

12 which -- many -- well, many of which demand all documents,

13 including, but not limited to, logs, audits, training

14 materials, and summaries relating to, which itself is defined

15 very broadly, a host of different topics.

16  This approach is not consistent with the principles

17 articulated above -- earlier and does not comply with the

18 plaintiffs' obligations, under Rule 26, to reasonably and

19 thoughtfully tailor their discovery.  It rather shifts the

20 burden to their opponents to figure out what documents the

21 plaintiffs require and builds delay into what has already been

22 a lengthy course of discovery.

23  I appreciate the plaintiffs may not have known what types

24 of documents the defendants maintain or their precise names,

25 but the defendants do point out that a Rule 30(b)(6) deposition

1    on those issues would have saved time and resources.

2        As they did at the December 20th hearing, the plaintiffs,

3    in their current motion, state they substantially limited

4    discovery requests at issue to four categories of documents:

5    Policies and procedures, training, evidence of practice, and

6    quality assurance or audits.

7        This proposal does not answer the question of why the

8    requests were actually drafted more broadly than these four

9    categories of documents by utilizing the phrase "including, but

10   not limited to," which made the requests vastly more broad.

11       However, I have reviewed each of the disputed requests

12   that are contained in the chart attached to Mr. Swearingen's

13   declaration and the plaintiffs' proposed narrowing of those

14   requests and the defendants' responses, and I am prepared to

15   give you tentative rulings on all of them.  I'm going to

16   utilize the same four categories that the parties did in their

17   briefs with respect to the RFPs.

18       First, with respect to policies and procedures, Ms. Pappy,

19   you represented, at the December 20th hearing, that all

20   policies and procedures at issue would be produced.  Have they

21   all been produced?

22       **MS. PAPPY:**  Yes, Your Honor.  Whether they're at issue

23   or not, we sent every single policy the county detention has,

24   medical and operations.

25       **THE COURT:**  You also represented that all training

1    materials would be produced; is that correct?

2            **MS. PAPPY:**  Yes, I did make that representation.

3            **THE COURT:**  And were they?

4            **MS. PAPPY:**  Yes, they were.

5            **THE COURT:**  And what did that include, generally

6    speaking?

7            **MS. PAPPY:**  I would say that the vast majority of them

8    are policies, procedures, and green sheets.  And then some of

9    them are what one would consider traditional training

10   materials, like a bulletin that says, "Training Bulletin" or

11   a -- I think there might have been some -- I don't know what

12   the class is, but presentations.  I don't think there were many

13   of those.

14       Most of their trainings in the Sheriff's Department are

15   green sheets, policies, and procedures.

16           **THE COURT:**  You also represented, at the December 20th

17   hearing, that all audits and quality assurance documents would

18   be produced.  Have they been?

19           **MS. PAPPY:**  Yes.

20           **THE COURT:**  And that, you already represented,

21   includes the audits that are at issue in the amended response

22   to Interrogatory 24?

23           **MS. PAPPY:**  Yes.

24           **THE COURT:**  All right.  And, Mr. Swearingen, I will

25   give you an opportunity to be heard on all of this.  I want to

1    make sure I understand where things are.

2        And I want to go through every request for production with

3    the understanding that, from the defendants' perspective,

4    policies and procedures, training materials, and audits and

5    quality assurance documents have been produced.  The most

6    difficult category of documents is evidence of practice.

7        And I understand, from the defendants' brief, that the

8    word "practice" does not appear in the requests for production.

9    However, I understand that that is what the plaintiffs are

10   generally getting at when they are seeking, for example, lists

11   and logs.

12       And where I am denying a request for production is based

13   on my considered determination that the request is overbroad

14   and that the scope of the documents sought is not proportional

15   to the needs of the case.

16       But with respect to that, my first question for you,

17   Mr. Swearingen, is -- I've got -- I don't know how many

18   specific RFPs are at issue, but there are a lot.  Did the

19   parties comply with my December 22nd order at Page 4 to meet

20   and confer in person or over Zoom about each of these RFPs and

21   the interrogatory?

22           **MR. SWEARINGEN:**  We -- I -- we met and conferred, I

23   believe, over Zoom.  I don't believe that I participated in

24   those meet-and-confers, but I believe it did happen.  I believe

25   that it was a truncated event.

1          **THE COURT:**  My December 22nd order, Docket Number 478,

2    at Page 4, states, "Subsequent to December 22nd, 2023, the

3    parties shall promptly meet and confer in person or via Zoom

4    regarding defendants' document production.  If the parties

5    cannot resolve these issues through good-faith meet-and-confer

6    efforts, plaintiffs may file a motion to compel as to

7    Interrogatory Number 24 and/or any of the requests for

8    production identified in the parties' joint list by not later

9    than January 17th."

10         The clear expectation was that the parties would go

11   through each of the disputed requests and decide whether

12   there's a dispute, if they can be narrowed, and what any

13   agreement would be.

14         Do I understand you to be saying, Mr. Swearingen, that

15   although there was some sort of a meet-and-confer, it did not

16   go through each of the requests at issue?

17         **MR. SWEARINGEN:**  I believe that to be the case,

18   Your Honor.  I believe that the issues -- I apologize,

19   Your Honor, but I don't believe that I was on the

20   meet-and-confer.

21         So I -- I'm unable, at this time, to represent what

22   occurred on that meet-and-confer call.

23         **THE COURT:**  No.  I appreciate your honest answer, but

24   if the -- but if the -- if the parties did not comply with the

25   order that I issued and go through each of the requests, you're

1    now asking me to do that.

2        And just to give you an example, your Request for

3    Production Number 32 seeks all documents and communications

4    relating to, identifying, responding to housing, treating,

5    monitoring, and/or tracking incarcerated persons covered by

6    Sheriff's Department alcohol and opiate withdrawal protocols

7    from January 1st, 2021, to the present.  "All documents and

8    communications" includes literally every piece of paper on that

9    topic, which is vast.

10        And then I'm told plaintiffs seek training materials,

11    audits, and documents reflecting evidence of practice, in

12    particular other documents produced reference continuous

13    quality improvement studies regarding detox charting.

14        And so, as I am reading that, I am thinking to myself,

15    well, during the meet-and-confer, was there a question posed by

16    plaintiffs' counsel to Ms. Pappy as to whether or not the

17    County maintained continuous quality improvement studies, or is

18    this just something that the plaintiffs think they should have,

19    and they'd never asked -- specifically asked about it?

20        **MR. SWEARINGEN:**  It's a good question, Your Honor.

21        Again, as I sit here, I'm sorry.  I don't recall being on

22    the meet-and-confer.  So I can't answer the question

23    specifically.

24        What I can say, Your Honor, is historically -- and this

25    goes to the first part of today's hearing -- there's been a

1    difficulty in information-sharing, and the parties have

2    previously gone through every single RFP one by one.

3        And since then, it is plaintiffs' perspective that -- that

4    little or no more information would be shared by defendants

5    regarding the specific requests for evidence of practice.

6        **THE COURT:**  But -- but understanding that, the phrase

7    "evidence of practice" is, in and of itself, very, very broad.

8    It could relate to virtually -- you know, it's just not subject

9    to being limited in a meaningful way.  And that is precisely

10   what I would have expected between September 1st, when the last

11   RFPs were propounded, and today, you know, five months ago,

12   that that would have happened.

13       So I understand you don't know what happened during the

14   meet-and-confer, if you weren't there, Mr. -- sorry --

15   Mr. Swearingen, but this just throws it in my lap to say,

16   "Well, you figure it out now."  And how is that possibly a -- a

17   constructive endeavor?

18       I'm going to try, and I'm going to do my absolute best,

19   but -- and I'm not complaining to you, like, "Look at all the

20   work you're making me do" because it's -- my job is to resolve

21   disputes where you can't resolve them.  But that is exactly why

22   there is a meet-and-confer requirement.

23       **MR. SWEARINGEN:**  I hear your concern, Your Honor.  I

24   think it's very valid.  I think the process has been

25   inefficient.  I think that -- as you think about some of the

1  suggestions that were made earlier this morning, my primary

2  concern is information-sharing.

3      In most instances, in the pre- -- in the meet-and-confers

4  that I've been involved with, with the RFPs, unless plaintiffs

5  are able to identify a specific document by name, many times,

6  defendants are unwilling to identify what types of documents

7  are kept in the normal practice that relates to logs or lists

8  that occur as part of the jail's treatment and processing of

9  individuals who are incarcerated within it.

10      There's no meaningful -- there's been very little

11  meaningful discussion about where that rubber meets -- meets

12  the road.  So as a result, we are in this position, Your Honor,

13  where plaintiffs don't know and have not been able to further

14  narrow.

15      You know, if, for example -- there's a dispute, for

16  example, about safety logs.  Every jail that I have seen

17  records from, and that I'm aware of from my practice, maintains

18  safety logs -- safety check logs.  Defendants have claimed that

19  those don't exist.

20      If we were to have a meaningful discussion about those

21  safety logs, which I can only presume do exist, we'd be more

22  capable of actually narrowing.  You know, if we have them from

23  all seven facilities, maybe this time period would work and

24  satisfy their -- their request and make it not so broad.

25      But we have not had that level of discussion for just

1  about any RFP at issue.

2      **THE COURT:**  Ms. Pappy, do you know if the County

3  maintains quality improvement studies regarding detox charting?

4      **MS. PAPPY:**  Your Honor, anything that we have about

5  quality improvement from medical was produced, anything and

6  everything, not limited to any specific topics.  So if we have

7  it, we produced it.

8      One comment is I believe that Mr. Swearingen is just

9  confused about our meet-and-confer.  There was no

10  meet-and-confer about this -- the documents that are included

11  in the motion after that hearing.

12      The meet-and-confer we had was about 250, 251, and 252,

13  which are in Request for Production of Documents Number 6.

14      **THE COURT:**  This is a serious concern to me as to

15  whether or not there was compliance with the order that I

16  issued on December 22nd and the -- whether or not the parties

17  met and conferred, which was specifically intended to allow you

18  to reduce the number of RFPs and interrogatories -- or the

19  interrogatory in dispute, and instead has produced --

20  apparently has resulted in no meet-and-confer and however many

21  RFPs are in dispute.

22      Who participated in that meet-and-confer, as directed by

23  my order, Mr. Swearingen?  Do you know?

24      **MR. SWEARINGEN:**  I believe -- I believe that I saw an

25  email from my colleague, Hannah Chartoff, setting up that

```
 1   email -- setting up that meet-and-confer.  I was out of the
 2   office due to personal reasons for a couple weeks, off and on.
 3            THE COURT:  Okay.
 4            MR. SWEARINGEN:  So I can't tell you, Your Honor --
 5            THE COURT:  No.  I appreciate that.
 6            MR. SWEARINGEN:  -- but I do believe that -- that I
 7   saw a meet-and-confer set up.  I don't know if it was
 8   actually -- if the participants actually participated in the
 9   meet-and-confer.
10            THE COURT:  Okay.  Thank you.
11        And, Ms. Kaul, I -- if you don't know, either, I
12   understand.  I'm not trying to put you on the spot, but I do
13   want to make sure that I have all of the information that's
14   available to me before I make a decision.
15            MS. KAUL:  I don't have any addition- -- additional
16   information about that, Your Honor.
17            THE COURT:  Okay.  Thank you, Ms. Kaul.
18        Ms. Pappy, was there a meet-and-confer subsequent to
19   December 22nd regarding the RFPs and the defendants' document
20   production, as I ordered on December 22nd?
21            MS. PAPPY:  Your Honor --
22            THE COURT:  On December 20th.  Excuse me.
23            MS. PAPPY:  Apologies.
24        There was a meet- -- there was a meet-and-confer with
25   Mr. Swearingen on the 11th about 250, and then there was a
```

```
1    meet-and-confer with Ms. Chartoff later that afternoon, but --

2    I want to tell you exactly what this was about.  So if you'll

3    give me a moment, I want to pull up the email so I can recite

4    (Inaudible) what the topic was.

5             THE COURT:  And while you're looking, just so the

6    record is clear, I think I erroneously referred to my order

7    date as December 20th.  That was the date of our hearing.  The

8    order which I am referring to is dated December 22nd.  It's

9    Docket Number 478 on Page 4, as I mentioned earlier.

10            MS. PAPPY:  I found the email.  I can read you the

11   topics that plaintiff -- that Ms. Chartoff actually sent to me.

12            THE COURT:  Go ahead.

13            MS. PAPPY:  No metadata produced with regard to the

14   ESI, no medical -- custody or medical records, no text messages

15   or instant messages -- "message ESI" is how Ms. Chartoff

16   describes it.  The ESI production does not include all of the

17   plaintiffs' search terms.

18            THE COURT:  What's the date of that email?  Because I

19   believe I saw it in the papers.

20            MS. PAPPY:  The 9th of January.  It was sent to me,

21   and then I responded at 12:46 p.m., and then I -- quality

22   training materials, audits, quality assurance, and practices

23   with regard to some of the items in here, in the papers.  I can

24   read them off to the Court; or, if it's in the papers, maybe

25   you have the email.
```

1    It does not include staffing plans as to two of the items

2  in the motion.  Contractor productivity reports -- that is not

3  included in the motion.  It was just -- it's something that I

4  had overlooked, so it's not (Inaudible) in the motion, and then

5  designation of documents as confidential that plaintiff doesn't

6  think should be confidential.

7    **THE COURT:**  Okay.  Is that in the motion papers?  I

8  can't remember exactly where.

9    Go ahead, Mr. Swearingen.

10    **MR. SWEARINGEN:**  Your Honor, it's Exhibit RR, Page 735

11  to the Swearingen declaration.

12    **THE COURT:**  Thank you.

13    So I appreciate that there was an email sent on

14  January 9th, consistent with the discussion at the (Inaudible)

15  hearing about the limited effectiveness of long emails.  And my

16  order had required the parties to meet and confer, in person or

17  by Zoom, if you could talk through these issues.

18    Did that ever happen, Ms. Pappy?

19    **MS. PAPPY:**  It did as to these issues.

20    And in our defense, the most efficient way that

21  Ms. Chartoff and I find to work through all of the issues is

22  she will send me an email bullet-pointing them, and then I will

23  respond to them and give her sort of our position, and then we

24  talk so that we can -- or she'll say, "Hey, can you follow up

25  on this?"

1       So in that respect, Ms. Chartoff and I have actually been

2  pretty successful in at least preparing for the

3  meet-and-confer.  We may not agree at the meet-and-confer,

4  but -- but -- so please don't make us stop doing that.  It

5  makes it very organized to have our positions in one space.

6  Email allows us to do that.

7       **THE COURT:**  No.  I -- I understand, but, for

8  example -- I mean, I keep coming back to the first request

9  that's disputed, Number 32.  That asks me to order the County

10  to produce continuous quality improvement studies regarding

11  detox charting.

12       That's really specific, and I would expect that to have

13  arisen because the County was specifically asked to provide

14  those studies and specifically said, "No," as opposed to not

15  being asked or being asked and saying, "I don't" -- "we don't

16  have them."

17       It's -- it is asking me to rule in a vacuum, and that is

18  precisely the difficulty with both the very broad nature of the

19  requests, in a general matter, as well as what appears to be a

20  meet-and-confer that did not accomplish what I was directing

21  the parties to do.

22       **MS. PAPPY:**  We did not address 32 directly or 33.  The

23  first one on the list is 47.

24       **THE COURT:**  So is the first time that you saw a

25  mention of continuous quality improvement studies when you

1  received the motion on January 17th?

2      MS. PAPPY:  Well, I wouldn't -- I don't think that's

3  quite a fair characterization because I'm sure, at some point

4  in -- in the past, plaintiffs had brought this up.  And I can't

5  remember off the top of my head, but in terms of your order and

6  specifically what you ordered us to do, it was not raised in

7  the meet-and-confer.

8      I recognize this, and I think, as I put in the opposition,

9  one of the frustrations was trying to pluck out something that

10  may be responsive to 15 different requests.  We just produced

11  all of them.

12      THE COURT:  Isn't --

13      MS. PAPPY:  I suppose I could amend the written

14  response.

15      THE COURT:  We're doing things on the record today,

16  and there will be a transcript of all of this.

17      It does appear to me, unfortunately, that, notwithstanding

18  the good faith of Ms. Chartoff, who sent the email at issue,

19  and the subsequent meet-and-confer regarding general categories

20  or general issues with respect to the County's production --

21  that there was not a meaningful meet-and-confer regarding the

22  requests for production that are now the subject of the motion

23  to compel.

24      With that in mind, I am going to give you my tentatives on

25  every request for production, with a number of questions to

1    Ms. Pappy, keeping in mind that, unfortunately, a number of

2    these issues perhaps could have been resolved through a

3    meaningful meet-and-confer.  But they're before me now, and I

4    intend to resolve them.

5        Request for Production Number 32.  If I say "denied," it

6    is a shorthand way of saying the motion to compel is denied.

7    It is denied and -- in particular in light of Ms. Pappy's

8    representation that all quality improvement documents have been

9    produced.

10       Request Number -- and these are all the -- I should

11   clarify.  These are all of the requests that are categorized as

12   practice because I have a representation from Ms. Pappy that

13   quality control and audit documents, training documents, and

14   policy and practice documents have been produced.

15       Request for Production Number 49.  Ms. Pappy, it seeks,

16   according to plaintiffs, documents related to the psychiatric

17   stabilization unit.

18       Are there any logs from the psychiatric stabilization

19   unit?

20       **MS. PAPPY:**  Yes.  (Inaudible) looking for logs of

21   people, and we've provided logs.  We did not provide them as

22   far back as they wanted them.

23       **THE COURT:**  How far back did you provide logs?

24       **MS. PAPPY:**  Three months, six months.

25       **THE COURT:**  Is there any reason why you didn't go back

1    further?

2          **MS. PAPPY:**  We just picked a reasonable amount of

3    going back.  I don't have a problem going back a little

4    farther, but the -- but my concern has always been the

5    January 1st, 2021, because we're talking about current issues.

6          **THE COURT:**  Right, but I understand that the

7    plaintiffs are alleging a policy and practice of the County.

8          **MS. PAPPY:**  Understood.

9          **THE COURT:**  I --

10         **MS. PAPPY:**  Whatever you want to order is fine with

11   me.

12         **THE COURT:**  Okay.  Given -- given that the claims,

13   under Section 1983, do allege a policy and practice, I do find

14   it appropriate generally that the requests go back to

15   January 1st, 2021.  You will hear that from me throughout this.

16       I am directing the County, in response to Request for

17   Production Number 49, to provide psychiatric stabilization unit

18   logs from January 1st, 2021, to the present.

19       The next request for production regarding practice is

20   Number 82.  It was not raised in the parties' prior joint chart

21   and is not properly before me.  That is waived.

22       Request for Production Number 97.  Ms. Pappy, this seeks

23   documents showing a time between a person's arrival at the jail

24   and intake screening.

25       Does the County maintain logs showing that time period?

```
 1              MS. PAPPY:  They do not.
 2              THE COURT:  That request is denied.
 3         Request Number 99 is denied.
 4         Request Number 100.  Ms. Pappy, does the County maintain
 5    logs regarding continuing health care treatments for
 6    incarcerated people upon their arrival at the jail?
 7              MS. PAPPY:  As phrased, no.
 8              THE COURT:  What do you mean by that?
 9              MS. PAPPY:  It states "logs, audits, lists, and
10    summaries related to continuing health care treatments."  They
11    have sick call logs.  They have logs for people who were sent
12    out to a specialist.  They have logs for people sent to ER,
13    which really is just an emergency situation, probably doesn't
14    cover this.  They have medication logs.
15         To me, all of those are subsumed within this request, and
16    all of those have been produced.  The other most responsive
17    thing would be all of the medical records for the entire
18    history of the --
19              THE COURT:  Do you need some water, Ms. Kaul?  We can
20    grab you some.  I feel bad for you.
21              MS. KAUL:  I'm okay.
22         Thank you, Your Honor.
23              THE COURT:  Okay.  But we will talk about sick call
24    logs and specialist logs and medication logs in connection with
25    some of the other requests.
```

1    But while we're talking about it now, Ms. Pappy, were --

2  were all of those logs produced?

3         **MS. PAPPY:**  Yes, they were.

4         **THE COURT:**  For what time period?

5         **MS. PAPPY:**  A limited time period.

6         **THE COURT:**  Okay.  I'm going to direct the County to

7  produce -- I'm going to call them sick call logs, specialist

8  logs, and medication logs.

9     Does that all make sense to you?

10        **MS. PAPPY:**  Yes, it does.

11        **THE COURT:**  From -- for the relevant time period that

12 we discussed earlier, January 1st, 2021, to the present.

13    And, Mr. Swearingen, I'm not ignoring you.  I just -- I

14 want to get through this, and I'll hear anything you have to

15 say, sir.

16    Request Number 105.  The County produced a spreadsheet of

17 canceled and refused sick calls for the period June to

18 August 2023.

19    Ms. Pappy, I am directing the County to produce those for

20 the relevant time period.

21    Does that make sense?

22        **MS. PAPPY:**  Yes, Your Honor.

23        **THE COURT:**  Request Number 106 is denied.

24    Request Number 109.  We already talked about specialty

25 care referrals.  This also includes emergency transport,

1    specialty care appointments, and I think that is it.

2        The County is directed to produce spreadsheets for the

3    time period beginning January 1st, 2021.

4        Does that make sense, Ms. Pappy?

5            **MS. PAPPY:**  Yes.

6            **THE COURT:**  Request Numbers 110 and 111 are denied.

7        With respect to 113, Ms. Pappy, does the County maintain a

8    log or -- or a list reflecting when individuals received

9    eyeglasses, or does that require the County to go and get every

10   individual medical file?

11           **MS. PAPPY:**  No, they don't have lists.  Yes, it would

12   require a view of medical files.

13           **THE COURT:**  Number 113 is denied.

14       114 is denied.

15       Ms. Pappy, for 119, does the County maintain a log or a

16   list that would show the waiting time between when a person is

17   prescribed medication and when the person receives the

18   medication?

19           **MS. PAPPY:**  No.  It would require the medication list

20   and then going through the medical records.

21           **THE COURT:**  Number 119 is denied.

22       121 is denied as moot because it is the same information

23   that we discussed with respect to RFP 109.

24       Number 125.  Ms. Pappy, does the County maintain a log or

25   a list of individuals receiving chronic care with the

1    conditions described in the RFP?

2         MS. PAPPY:  It does not maintain it.  It can create

3    it.

4         THE COURT:  What does that mean?

5         MS. PAPPY:  If there is somebody in JIMS that has --

6    "chronic care," I don't know how to define.  I mean, the best

7    way that we tried to back into that was sick call logs for, I

8    think, a year back to show who goes to the doctor all the time.

9         But specific to diabetes, hypertension, hepatitis, AIDS,

10   TB, cancer, some of these are -- are -- have a flag in JIMS

11   that they can just identify, "Ah, this person has a flag" and

12   print out a list of names.

13        OB/GYN -- it's not going to show up.  It would just be a

14   woman unless they're pregnant.  I think pregnancy will show up

15   as a flag.

16        And then mental health -- it won't necessarily be a flag

17   unless it's, you know, suicide or something really serious.

18   So, I mean, mental health, to me, could be anything from

19   anxiety and depression.

20        So -- so the general answer is no.

21        THE COURT:  The middle column for 125 states that

22   defendants produced a spreadsheet of people with chronic

23   conditions as well as a list of pending psychiatry sick calls.

24        MS. PAPPY:  Yes.

25        THE COURT:  Do -- do those spreadsheets include the

1    entire period that we've been discussing?

2         **MS. PAPPY:**  I doubt it.

3         **THE COURT:**  I'm directing the County to produce those

4    spreadsheets for the relevant time period that we've been

5    discussing, starting on January 1st, 2021, and the --

6    Request Number 125 is otherwise denied.

7         Request Number 126 is denied.

8         Request Number 127.  Ms. Pappy, does the County maintain

9    logs reflecting the discharge of people from outside hospitals

10   to the jail?

11        **MS. PAPPY:**  No.  This one asks for documents relating

12   to the process and criteria, and that's a policy and a

13   procedure.  I'm not sure they're asking for logs.  Oh, no.

14   You're right.  They are.

15        No, there's no such log.  It's just a policy and procedure

16   question.

17        **THE COURT:**  Request Number 127 is denied.

18        Request Number 128.  Ms. Pappy, does the County keep logs

19   of delays in admissions of incarcerated persons into specialty

20   clinics or other health care providers?

21        **MS. PAPPY:**  They don't keep statistics about delays,

22   but what we produced was a chart showing the timing of the

23   scheduling appointment, when the appointment is.

24        So I guess you could -- somebody could -- it could be open

25   to debate whether that's a delay or not.

**Ex. C - 191**

1          **THE COURT:**  Okay.  But it shows the date the

2     appointment was scheduled and the date the person was actually

3     seen?

4          **MS. PAPPY:**  Correct, or the scheduled appointment.  It

5     may be a future appointment for them.

6          **THE COURT:**  From what relevant time period is that

7     spreadsheet?

8          **MS. PAPPY:**  I'm going to say limited.

9          **THE COURT:**  I'm going to direct the County, in

10     response to Number 128, to provide that information for the

11     relevant time period.

12        Does that make sense, Ms. Pappy?

13          **MS. PAPPY:**  Yes.

14          **THE COURT:**  The request is otherwise denied beyond

15     that.

16        Request Number 129 seeks -- well, let me ask this:  Does

17     the County keep logs of cancellations of health care

18     appointments?

19          **MS. PAPPY:**  They -- the sick call logs have

20     cancellations listed on them.  But to the extent that you've

21     ordered me to produce -- you can just order it, again, with

22     regard to this.  But the sick call logs show when somebody

23     cancels it.

24          **THE COURT:**  That information, you're saying, is

25     already on the sick call logs that --

1        **MS. PAPPY:**  Yes.

2        **THE COURT:**  -- were being produced for the relevant

3   time period?

4        **MS. PAPPY:**  Yes.

5        **THE COURT:**  Then I'm going to deny, with respect to

6   Number 129, as moot.

7        Request Number 130.  Does the County keep logs of

8   treatment orders?

9        **MS. PAPPY:**  They do not.

10        **THE COURT:**  That request is denied.

11        Number 138.  Does the County keep logs of medications

12   provided to individuals at the time of their discharge?

13        **MS. PAPPY:**  They do not.

14        **THE COURT:**  That request is denied.

15        Request Number 141.  Given what the -- that the County has

16   produced this spreadsheet showing the individuals in the

17   Outpatient Step Down Unit from January -- well, from 2021 to

18   the present, my tentative is to deny that request.

19        But, Ms. Pappy, did this spreadsheet go back to

20   January 1st, 2021?

21        **MS. PAPPY:**  It did not.

22        **THE COURT:**  All right.  Then I am going to grant the

23   motion to compel insofar as I'm directing the County to provide

24   that spreadsheet for the relevant time period.

25        Request Number 146.  Does the County keep logs of delayed

1    admissions to outside hospitals or other facilities for mental

2    health care?

3         **MS. PAPPY:**  Not specifically to delays, but as with

4    med- -- outside medical appointments, it would be the same log

5    showing when the referral was made and when they're scheduled

6    to go.

7         **THE COURT:**  In light of that information that's

8    available in -- on the other -- on the -- I'm sorry.  What log

9    were you referring to, Ms. Pappy?

10        **MS. PAPPY:**  The other log was, I think, just generic

11   to medical appointments.

12        **THE COURT:**  And that's the same log that would show

13   when appointments were canceled?

14        **MS. PAPPY:**  No.  No.  There are -- there was -- there

15   was a previous request about specialty clinics, 128.  And I

16   would -- I would compare 146 to 128.  Because these are outside

17   referrals, the cancellations would be on internal sick call

18   lists.

19        **THE COURT:**  All right.

20        **MS. PAPPY:**  When I was talking about cancellations,

21   those are internal sick calls, going to see the doctor in the

22   jail.

23        **THE COURT:**  And how would -- how would one determine,

24   with respect to 140- -- excuse me -- 146 --

25        **MS. PAPPY:**  Yeah.

```
 1          THE COURT:  -- whether there's a delayed admission of

 2   someone into an outside hospital or psychiatric care facility?

 3          MS. PAPPY:  You would have to look at -- well,

 4   "delayed" is subject to interpretation.

 5          THE COURT:  Understood --

 6          MS. PAPPY:  You'd have to look at --

 7          THE COURT:  -- but just the dates -- the dates of

 8   that.

 9          MS. PAPPY:  Oh, yeah.  You would have to look -- you

10   would have to look at the medical records to determine when the

11   recommendation was made or when the referral was made -- was

12   made.  It would probably line up with the date in the log that

13   we did give them.  That's a -- and a referral date, and then it

14   would show when they were supposed to go.

15       I specifically remember one instance where the hospital

16   wouldn't take him, and so there was a "supposed to go" and then

17   an "actually went" date.

18          THE COURT:  Okay.

19          MS. PAPPY:  Same log -- same concept with the log.

20          THE COURT:  And this is the log that you've already

21   been directed to produce going back to January 1st, 2021?  Is

22   it the same log?

23          MS. PAPPY:  You're going to -- it is not.  You're

24   going to order me to --

25          THE COURT:  But what is this log?  I want to be very
```

1  precise -- as precise as I can in terms of what I'm directing

2  you to do.

3       **MS. PAPPY:**  Mental disorders -- I would just say

4  "outside providers."  I think that that captures all that -- if

5  they have outside hospitals, forensic facilities, or other

6  psychiatric facilities.

7       **THE COURT:**  All right.  I am going to order the County

8  to produce the log regarding appointments and other information

9  that you just referenced, Ms. Pappy, concerning outside

10  providers, including -- so that includes, but is not limited

11  to, mental health care providers?

12       **MS. PAPPY:**  I would take out the word "appointments."

13  These are actually transfers for admission to mental health

14  care facilities.

15       **THE COURT:**  You are correct.  I appreciate that.

16     So -- but, otherwise, it includes -- is what you're going

17  to produce limited to mental health care facilities, or does it

18  include all outside providers?

19       **MS. PAPPY:**  The one responsive to 146 will be a

20  separate log.  It is not combined with a log for referrals to

21  outside specialty medical care providers.

22       **THE COURT:**  That's the one we discussed previously.

23       **MS. PAPPY:**  Correct.

24       **THE COURT:**  All right.  Then the outside provider logs

25  shall be provided by the County for the relevant time period.

**Ex. C - 196**

1          Does that make sense, Ms. Pappy?

2          **MS. PAPPY:**  Yes, it does.

3          **THE COURT:**  For Request Number 147, Ms. Pappy, I

4   understand that the County produced a report of pending mental

5   health sick calls on a single date.

6          Do you happen to know the date in question?

7          **MS. PAPPY:**  I do not have 147 in my binder.

8          **THE COURT:**  It says, "All documents including, but not

9   limited to, logs, audits, lists, training materials, and

10  summaries relating to the identification, tracking, and/or

11  treatment of incarcerated persons' mental health care needs."

12         **MS. PAPPY:**  "Mental health care needs."

13         **THE COURT:**  And what I --

14         **MS. PAPPY:**  Sick -- it would be sick call lists with

15  regard to mental health care needs, which were produced.  There

16  is no log that says someone is going to be seen for X.

17         **THE COURT:**  Is that the same sick call list that we

18  discussed earlier in this hearing?

19         **MS. PAPPY:**  I don't know if it's the same document,

20  but I include it within sick call lists for medical -- there's

21  medical and mental.

22         **THE COURT:**  And we are clear that the County is

23  producing this sick call list for medical and mental for the

24  relevant time period?

25         **MS. PAPPY:**  Yes.

**Ex. C - 197**

```
1          I want to make sure that the prior one for medical care --

2     yeah.  I'd -- I'd hate to shoot myself in the foot, but I think

3     you should, to be clear, limited-grant 147 because the previous

4     one talks about health care staff.  147 is specific to mental

5     health.

6          THE COURT:  It is specific to mental health.  You're

7     right, but I want to make sure that -- and I will grant it for

8     that, but I want to make sure I understand what the County is

9     producing.

10         And I understand that there are two separate lists -- two

11    separate sick care lists.  One is for --

12         MS. PAPPY:  Yeah.

13         THE COURT:  -- medical, and one is for mental health;

14    is that correct?

15         MS. PAPPY:  Yes.

16         THE COURT:  And to be clear, I am directing the County

17    to produce both for the relevant time period.

18         MS. PAPPY:  Yes.

19         THE COURT:  Does that make sense?

20         MS. PAPPY:  If I may, Counsel, you don't happen to

21    have an extra copy of Page 11 and 12, do you?

22         MR. SWEARINGEN:  11 and 12 of what?

23         MS. PAPPY:  Of your Exhibit A.  I have every other

24    page but not this one.

25         MR. SWEARINGEN:  (Inaudible).
```

```
 1          MS. PAPPY:  Go ahead.
 2      It's okay.  I'll meddle in --
 3          THE COURT:  Here, I'll make you a copy.
 4      You mean -- well, are you -- which page number -- page
 5  numbers are you using, ECF page numbers or the page numbers in
 6  the bottom middle?
 7          MS. PAPPY:  In the bottom.
 8          THE COURT:  Because I'm only -- okay.
 9      So why don't we do this.  Can you please show this to --
10  can you please show this to Mr. Swearingen, make sure he's okay
11  with us making a copy of this for Ms. Pappy, Melissa?  Thanks.
12      Do you mind, Melissa?
13          MS. PAPPY:  You don't -- you don't need to make a copy
14  of it.  I just -- if I can just have the request in front of
15  me, I can take notes.  Don't -- I wouldn't (Inaudible) on the
16  time.
17          THE COURT:  Oh, but I kind of need to, yeah.
18          MS. PAPPY:  You do?  Oh.
19          THE COURT:  There's that.
20          MS. PAPPY:  Yeah.
21      And there's you.
22                      (Laughter.)
23          THE COURT:  All right.  Thanks.
24      Thank you, Melissa.
25          THE CLERK:  You're welcome.
```

**Ex. C - 199**

1          **MS. PAPPY:**  I have a lot of pages but not that one.

2          **THE COURT:**  No problem.

3      All right.  That was 147.

4      I can't -- 148 is denied.

5      150.  Ms. Pappy, does the County maintain logs showing the

6  time between a referral for mental health care evaluations or

7  care and the time a person received that evaluation or care?

8          **MS. PAPPY:**  They do not.

9          **THE COURT:**  That request is denied.

10     152 is denied.

11     155 is denied.

12     156.  Ms. Pappy, did the County produce documents showing

13  mental health programming that is available at the jails?

14         **MS. PAPPY:**  Your Honor, if it's in the policies and

15  procedures, yes.  This -- these requests were given to the

16  clients, and I don't believe that there is anything like a

17  separate list.  All -- the medical policies and procedures

18  include all of what services are provided -- mental health

19  services are provided to incarcerated persons.

20     I'm happy to, again, take a limited grant, but I'll go

21  back and confirm that there's nothing separate and apart.  I

22  think I've done that once, but I'm happy to do it again

23  because, off the top of my head, I'm not -- I'm not confident

24  about this one.  We didn't spend lot of time talking about this

25  specifically.

1      **THE COURT:**  And I will -- with respect to Request for

2    Production Number 156, I will grant the motion insofar as I am

3    directing the County to ascertain whether there are any

4    documents showing mental health programming available at the

5    jails beyond what's in the policies and procedures.

6      And I want to be clear that I'm not ordering the County to

7    produce every single piece of paper with respect to every

8    single mental health program that's been provided over the past

9    three years necessarily.  I want to understand what the

10   universe is, and to the extent you can locate documents, they

11   should be produced.

12     If there is an issue with respect to undue burden, given

13   that I don't know the scope of the documents that might be

14   responsive, you can raise that with me.

15     **MS. PAPPY:**  Thank you.

16     **THE COURT:**  This is not talking about individuals --

17   going through individual files.  This is talking about what is

18   available.

19     **MS. PAPPY:**  Understood.

20     Thank you.

21     **THE COURT:**  With respect to Request Number 157, does

22   the County utilize a level of care system, Ms. Pappy?  I don't

23   know what that is.

24     **MS. PAPPY:**  I don't know what that is.  It provides

25   care, as outlined in the mental -- medical -- medical policies

1    and procedures.  That includes mental health.

2          **THE COURT:**  Mr. Swearingen, I am going to -- again,

3    I'm going to give you time to address all of these, but do you

4    know what a level of care system is?

5          **MR. SWEARINGEN:**  Yes, Your Honor.  It's -- it's

6    assigning people with different levels of mental health needs,

7    different priorities in levels of care.

8          So, for example, somebody with extreme schizophrenia may

9    have -- or somebody with a suicidal risk may have a higher

10   level of care than somebody who has mild depression.

11         **MS. PAPPY:**  To the extent there is any such process,

12   it would be in policies and procedures.  Otherwise, it would be

13   in the person's medical records as to what level they were

14   classified as.

15         **THE COURT:**  There are not separate general logs or

16   lists pertaining to that?

17         **MS. PAPPY:**  No.

18         **THE COURT:**  I'm denying Number 157 based on that

19   information.

20         158 is denied.

21         159.  I'm told, Ms. Pappy, that the defendants produced

22   logs showing -- I believe that's -- "EOH" is Enhanced

23   Observation Housing.

24         Is that correct, Mr. Swearingen?

25         **MR. SWEARINGEN:**  It is, Your Honor.

1    **THE COURT:** I'm told that the defendants produced

2    monthly logs for Enhanced Observation Housing and safety cell

3    actions for a limited time period.

4    I am directing the defendants to provide those logs for

5    the relevant time period that we have discussed today.

6    Does that make sense, Ms. Pappy?

7    **MS. PAPPY:** Yes, Your Honor.

8    **THE COURT:** With respect to Request for Production

9    Number 161, does the County maintain logs for follow-up care

10   for individuals who are discharged from the Inmate Safety

11   Program?

12   **MS. PAPPY:** They do not.

13   **THE COURT:** That request is denied.

14   162 is denied.

15   164.  Ms. Pappy, does the County keep logs showing

16   individuals with mental health disorders or intellectual

17   disabilities who are held in administrative segregation?

18   **MS. PAPPY:** They do.

19   **THE COURT:** Have those been produced?

20   **MS. PAPPY:** They have.

21   **THE COURT:** For the relevant time period?

22   **MS. PAPPY:** No.

23   **THE COURT:** I'm directing the County to produce those

24   logs for the relevant time period.

25   Does that make sense, Ms. Pappy?

 1            **MS. PAPPY:**  Yes.

 2            **THE COURT:**  With respect to 165, does the County

 3   maintain logs related to the provision of mental health care

 4   for individuals in administrative segregation or other

 5   isolation housing?

 6            **MS. PAPPY:**  They provide -- they -- they maintain logs

 7   of people in ad seg, and those were produced for a limited time

 8   period.

 9            **THE COURT:**  What would one need to do to determine

10   whether the individuals on the log for administrative

11   segregation are also receiving mental health care or were in

12   need of mental health care?

13            **MS. PAPPY:**  You'd have to review their medical

14   records.  If it was a mental health situation such that it was

15   in JIMS, you could look in the JIMS.

16            **THE COURT:**  But you'd have to look it up by each

17   person?

18            **MS. PAPPY:**  You'd have to look it up by person.

19            **THE COURT:**  Has the County produced logs showing the

20   identities of the individuals in administrative segregation for

21   the relevant time period?

22            **MS. PAPPY:**  A limited time period.

23            **THE COURT:**  I'm directing the County to produce the

24   administrative segregation log for the relevant time period.

25         Does that make sense, Ms. Pappy?

1              **MS. PAPPY:**  Yes.

2              **THE COURT:**  Number 167, documents relating to programs

3       and services for incarcerated persons with disabilities.

4          I understand that there is a policy and a list of programs

5       as of November 2023, but the plaintiffs are seeking, you know,

6       a log or a document that would be used to track participation

7       in those programs.

8          Does the County maintain that data, you know, on a -- in a

9       list or a log, or would it require going to individual inmates'

10      files?

11             **MS. PAPPY:**  I -- I actually don't know because we

12      never talked about participation.  We just produced the

13      policies, which is what the request was.  I can -- I'm

14      certainly happy to follow up on whether there's participation

15      logs.

16             **THE COURT:**  I'm going to direct the County to produce

17      participation logs related to programs and services for

18      incarcerated people with disabilities, to the extent any such

19      logs exist.

20         Again, I am compelled to note that this, for example, is

21      something that should have been the -- the subject of a very

22      direct conversation as to what exists and what doesn't, and we

23      wouldn't even be talking about it.

24         Number 172.  I don't recall if we discussed this on

25      December 20th.  That's a request for production that asks for

1    every single document in the possession of the County relating

2    to laundry, clothes, and linens.  It is -- it is actually

3    overbroad, even as narrowed, and it is denied.

4         Ms. Pappy, for Number 175, does the County maintain lists

5    or logs regarding trash collection and removal from housing

6    units at the jail?

7         **MS. PAPPY:**  They do not.  What -- what they have is

8    janitorial contracts that show the frequency with which they

9    pick up the trash.  So we produced those.

10        **THE COURT:**  Number 175 is denied with that

11   information.

12        For Number 176, it appears that the defendants produced

13   invoices for cell decontamination services.  I am directing the

14   County to produce those invoices for the relevant time period.

15        Does that make sense, Ms. Pappy?

16        **MS. PAPPY:**  Yes.

17        **THE COURT:**  Number 179.  Again, I am compelled to

18   point out that a request for every single document relating to

19   contraband narcotics is vastly overbroad.  It is denied.

20        180.  Does -- Ms. Pappy, does the County maintain logs

21   regarding safety checks?

22        **MS. PAPPY:**  They do.

23        **THE COURT:**  Have those been produced?

24        **MS. PAPPY:**  I am not sure.

25        What request were you looking at?

1          **THE COURT:**  I'm looking at 180.

2          **MS. PAPPY:**  I'm not sure whether they have or not.  I

3    know that audits of safety checks have been produced.

4          **THE COURT:**   To the extent the County maintains logs of

5    safety checks, I am directing the County to produce those for

6    the relevant time period.

7       Does that make sense, Ms. Pappy?

8          **MS. PAPPY:**  Yes.

9          **THE COURT:**  Number 182.  Does the County maintain logs

10    regarding response times to emergency intercom use?

11          **MS. PAPPY:**  They do not.

12          **THE COURT:**  That request is denied.

13       Number 193 seeks every single document related to the use

14    of body scanners at the jail, including, but not limited to,

15    documents relating to body-scanning software, maintenance and

16    repair of body scanners, contracts related to body -- body

17    scanners, policies and procedures related to the use of body

18    scanners, and internal and/or third-party reports regarding the

19    efficacy and/or utility of body scanners.

20       As framed, that request is, again, respectfully, vastly

21    overbroad, and it is denied.

22       Number 195 is also vastly overbroad, and it is denied.

23       221.  Ms. Pappy, does the County maintain logs of

24    individuals who are prescribed antibiotic medications for

25    dental pain?

1          **MS. PAPPY:**  They are not specific to antibiotics.

2   They are those medication logs that we talked about earlier.

3          **THE COURT:**  And --

4          **MS. PAPPY:**  Whoever is given a medication has to be

5   logged.

6          **THE COURT:**  That includes dental?

7          **MS. PAPPY:**  Anything -- yes, everything.

8          **THE COURT:**  With that additional information,

9   Request Number 221 is denied because the information is already

10  being provided.

11      Number 230- -- I don't think 231 is at issue.  I don't see

12  it in the -- in the chart, but I thought I saw it in the

13  motion.  So, to the -- to the extent it is at issue, I don't

14  have any information regarding it, and it is denied.

15      Number 230- -- Number 232.  Ms. Pappy, does the County

16  maintain spreadsheets of attorney callback requests prior to

17  August 2023?

18          **MS. PAPPY:**  They -- we produced -- what you see in

19  the -- in the documents produced -- spreadsheets showing

20  facility notifications --

21          **THE COURT:**  Right.

22          **MS. PAPPY:**  -- including -- that's what we have, and

23  we went back to August 31st of 2023.

24          **THE COURT:**  I'm directing the County to produce that

25  information going back -- for the relevant time period.

1    Does that make sense, Ms. Pappy?

2        **MS. PAPPY:**  Yes.

3        **THE COURT:**  Number 233 appears to relate to wait times

4    for professional visits, including the time it takes to release

5    visitors from the waiting room.  That is denied.

6    234.  Ms. Pappy, does the -- does the County have a list

7    showing law library hours of availability?

8        **MS. PAPPY:**  Whatever we have was -- is in the policies

9    and procedures and green sheets.

10       **THE COURT:**  So the --

11       **MS. PAPPY:**  If it --

12       **THE COURT:**  Sorry.  I interrupted you.

13   Go ahead.

14       **MS. PAPPY:**  No.  No.  As it -- green sheets are

15   specific to a facility.  So for every single one of those

16   facilities, the policies, procedures, and green sheets would

17   include this information, and those were all produced for every

18   facility.

19       **THE COURT:**  It includes the hours and availability?

20       **MS. PAPPY:**  I don't know.

21       **THE COURT:**  Okay.

22       **MS. PAPPY:**  I don't -- off the top of my head, I don't

23   know.

24       **THE COURT:**  I am directing the -- with respect to

25   Number 234, I am directing the County to provide documents

1    sufficient to show the law library hours of availability.

2        Does that --

3        **MS. PAPPY:**  If they are not in the policies and

4    procedures and green sheets?

5        **THE COURT:**  To the extent they don't -- they haven't

6    been produced, that's correct.

7        **MS. PAPPY:**  Thank you.

8        **THE COURT:**  Does that make sense, Ms. Pappy?

9        **MS. PAPPY:**  Yes.

10       **THE COURT:**  Number 235 is denied.

11       All documents -- Number 236 is all documents relating to

12   legal mail.

13       Ms. Pappy, is there a -- is there a policy governing legal

14   mail, or is it more generally incarcerated person mail?

15       **MS. PAPPY:**  I'm not sure if it's specific to legal

16   mail, but it's -- it's -- all mail, no matter who it's from, is

17   included in policies and procedures.

18       **THE COURT:**  Is there a separate set of procedures or

19   policies that applies to legal mail?

20       **MS. PAPPY:**  I don't know.  If -- remember, we produced

21   every policy, not just limited ones.  If -- if there is one,

22   it's in the plaintiffs' possession.

23       What number is this, Your Honor?

24       **THE COURT:**  That's Number 236.

25       **MS. PAPPY:**  Okay.

**Ex. C - 210**

1      **THE COURT:**  And that request is denied based on the

2  information provided by Ms. Pappy.

3      Before I hear from Mr. Swearingen, the following requests

4  were identified in the chart that is Exhibit A to

5  Mr. Swearingen's declaration but were not specifically

6  addressed in the motion.

7      Those are Numbers 101, 102, 103, 135, 136, 137, 139, 168,

8  173, 174, 185, 187, 188, 192, 194, 196, 197, 199, 200, 201,

9  202, 203, 204, 205, 206, 207, 222, 223, 238, 239, 241, 242,

10  243, 244, 245, and 247.

11      It is not clear if these requests are truly in dispute or

12  were simply not removed from the earlier joint discovery chart

13  from December 2023.

14      To the extent the plaintiffs are seeking to move to compel

15  production of additional documents responsive to these

16  requests, they -- plaintiffs have not met their burden, as the

17  moving party, to demonstrate these requests seek documents that

18  are relevant to a claim or defense.

19      Given that they are not at all addressed in the motion,

20  and to the extent that the motion does pertain to these

21  requests, it is denied.

22      It is 11:00 o'clock now, and I know that Mr. Smith is

23  going to be on at about 11:00.

24      Mr. Swearingen, let me ask you this.  I know that that's a

25  lot to digest, and I'm going to give you some time to digest

1    that.  If you would like, I can turn to the motion involving

2    NaphCare; or, if you'd like to be heard on this motion while

3    it's all fresh in your mind, I'll give you the chance to be

4    heard, sir.

5         It's your choice.

6         **MR. SWEARINGEN:**  Given that Mr. Smith is here, I would

7    appreciate the time to collect my thoughts and respond

8    afterwards.

9         **THE COURT:**  Yeah.  Sure thing.

10        **MR. SWEARINGEN:**  Thank you.

11        **MS. PAPPY:**  Your Honor, may I step out of the

12   courtroom for five minutes?

13        **THE COURT:**  Sure.

14        Mr. Smith, we've been going for a couple of hours.  So

15   give us just a moment, and we'll turn to your matter.

16        **MR. SMITH:**  I've got all day for this.  So take your

17   time, please.

18        Thank you for accommodating me as well.

19        **THE COURT:**  Anybody who wants to take a short break,

20   feel -- we've been going for two hours.  Feel free to do so.

21        Ms. Kaul, are you sure you don't want some water or

22   anything?

23        **MS. KAUL:**  I'm okay.

24        Thank you.

25        **THE COURT:**  I'd offer you one of these chocolate

**Ex. C - 212**

```
 1   things that are on the bench, but I don't know that they taste

 2   very good, how long they've been there.  So --

 3          MS. KAUL:  I've been popping cough drops.

 4          THE COURT:  Okay.

 5          MS. KAUL:  I can do with that.

 6                        (Recess taken.)

 7          THE COURT:  All right.  Mr. Smith, can you hear us?

 8          MR. SMITH:  I can hear and see you.

 9          THE COURT:  Great.

10      Good morning to you.

11          MR. SMITH:  Good morning.

12          THE COURT:  Before you state your appearance, have you

13   filed a notice of appearance in this case?

14          MR. SMITH:  I filed an opposition with my pleading on

15   it.  We represent --

16          THE COURT:  I know.

17          MR. SMITH:  (Inaudible).  So I don't know who I would

18   be appearing on behalf of other than --

19          THE COURT:  Okay.  But you did receive your pro hac

20   vice?

21          MR. SMITH:  Oh.  Yes.  I'm in California.  I am

22   admitted to the Southern District.

23          THE COURT:  I meant -- I'm sorry -- your admission to

24   this district.  That's what I meant to say.

25          MR. SMITH:  Yes, that's --
```

**Ex. C - 213**

1      **THE COURT:**  We did discuss -- that's fine.

2      **MR. SMITH:**  That's correct.  I am admitted.  I've got

3  the certificate.  Everything's squared away.

4      **THE COURT:**  But you -- if you -- are you receiving ECF

5  notices in this case?

6      **MR. SMITH:**  At this point, I am, since the filing of

7  the opposition.

8      **THE COURT:**  All right.  If that's -- as long as you're

9  receiving ECF notices, I -- and you -- you have your admission,

10  I think we're -- we're squared away.

11      All right.  Then what we are going to do, Counsel, is I am

12  going to stop there with respect to the plaintiffs' motion to

13  compel.  There are a number of other issues that are raised in

14  the motion that I do want to -- I need to address with you-all.

15      But Mr. Smith is here on behalf of NaphCare, and we are

16  turning now to the plaintiffs' motion to compel with respect to

17  NaphCare, which is Docket Number 488.

18      And, Mr. Smith, we have -- plaintiffs' counsel already

19  stated their appearances.  Why don't you go ahead and state

20  your appearance for the record, please.

21      **MR. SMITH:**  Good morning.  Craig Smith on behalf of

22  Third Party NaphCare.

23      **THE COURT:**  Thank you, Mr. Smith.

24      Ms. Kaul, let me start with you, if I could.  My order

25  dated December 22nd, 2023, at Page 2, directed the parties to

1    meet and confer, in person or over Zoom, regarding NaphCare's

2    document production and any assertion of privilege, and then it

3    provided the plaintiffs an opportunity to file a motion to

4    compel with respect to any issues.

5        My understanding, at the December 20th hearing, was that

6    NaphCare really wasn't objecting to the subpoena -- or the

7    documents sought in the subpoena, really, with the exception of

8    the attorney-client privilege objection.

9        So I must tell you, I was surprised to see the number of

10   requests that are at issue.  And I'm not saying -- that is what

11   it is, but it really called into question for me whether there

12   was a meaningful meet-and-confer between the plaintiffs and

13   NaphCare, as required by my order.

14       So the question out of the box, Ms. Kaul, is:  Was there a

15   meet-and-confer with respect to each of these RFPs?

16       **MS. KAUL:**  So there was a meet-and-confer by Zoom,

17   pursuant to the Court's order, and I -- I checked my calendar

18   while -- during the first portion of this hearing, and it

19   occurred -- it was on the -- January 10th, so following the

20   most -- the last (Inaudible) production of documents from

21   NaphCare --

22       **THE COURT:**  Right.

23       **MS. KAUL:**  -- which occurred on the 4th or 5th.  We

24   did not, at that -- during that meet-and-confer, discuss these

25   on an RFP-by-RFP basis.  That previously had occurred in

**Ex. C - 215**

conversations with Mr. Smith in terms of going through each of

our requests, explaining (Inaudible) the types of documents we

believed exist -- exist, but that did not occur during the

January meet-and-confer.

I just jumped ahead a bit.  I take the Court's point about

the number of RFPs involved, you know, in our motion to compel.

I think, in part, what's happening there, Your Honor, is, at

previous meet-and-confers, we've tackled what we see is the

deficiency in different ways, including by identifying dozens

of types of documents.

You'll see, in my November emails, where I outlined

documents referenced in the County's contract with NaphCare

that we believed should have been produced.  It wasn't on an

RFP-by-RFP basis, but a number of those documents are

responsive to multiple RFPs.

So the motion -- you know, we raised every single RFP

where we saw that there were deficiencies but understanding

that certain documents will be responsive to multiple

defendants.

**THE COURT:**  Understood.

My concern with the RFPs, as framed, is the same concern

that I have expressed on -- with respect to the RFPs to the

County on December 20th and then during my -- during this

hearing, and that is that they are very broad.

But what you're telling me, Ms. Kaul, is that you did

1  provide NaphCare's counsel with a list saying, "Hey, these are

2  the specific types of documents we're looking for"; is that

3  right?

4       MS. KAUL:  At our -- during our first meet-and-confer

5  phone call in September -- and this was -- Mr. Swearingen was

6  on that call as well -- we went through on an RFP-by-RFP basis,

7  and -- and this was -- this was the nature of the discussion

8  where, you know, Mr. Smith expressed some uncertainty and, I

9  think, an interest in speaking to his client about what

10  documents we were looking for.

11      I believe that that conversation happened in good faith,

12  and we provided as much specificity as we could.  I will say

13  that I think that we have been -- we've learned more even in

14  the course of time since September, in part, because of the

15  defendants' production.  So, for example, on December 21st, we

16  received a production that included the corrective action

17  notice that was attached to my declaration.

18      That is the kind of document we wouldn't have known to ask

19  for, but it's one that, when we saw it, we -- we would have

20  expected it would have been one of the first things to come to

21  mind for a NaphCare custodian who was asked about, you know,

22  who was -- who was -- who sought out a request.  And so,

23  certainly, the extent of the deficiency, I think, has been

24  crystallized since September.

25      But to answer your question, yes, the first phone call

 1    that we had about -- about the request went on a

 2    request-by-request basis and tried to identify what we believed

 3    (Inaudible) off what we believed existed.

 4           **THE COURT:**  I guess I'm puzzled and -- Ms. Kaul,

 5    because I'm looking at Page 9 of NaphCare's opposition,

 6    specifically Line 18, and Mr. Smith says that these corrective

 7    action notices were never raised in your meet-and-confers.  And

 8    I understand that maybe the plaintiffs didn't know about these

 9    corrective actions when you served the subpoena.

10        But at any point, did you tell Mr. Smith, in a

11    meet-and-confer, before you filed your motion, "Hey, you need

12    to produce these" or "We think these corrective action notices

13    are responsive to the subpoena"?

14           **MS. KAUL:**  Yes, Your Honor.

15        So that production -- that document was produced to us on

16    December 21st.

17           **THE COURT:**  Right.

18           **MS. KAUL:**  I found that -- that document in my own

19    keyword search for that production somewhere around

20    Christmastime, and I sent that document to Mr. Smith on

21    January 4th, and this is Exhibit K to my declaration.  The

22    attachment isn't included, but you can see that there are

23    documents attached here.

24        And I highlighted that these were the types of documents

25    that we were surprised were not produced, we expected to be

1  produced.  And this was also where I outlined, in detail,

2  again, all of the RFPs that -- that ended up being in our

3  motion to compel and, again, tried to articulate, in different

4  ways, the kinds of documents we were looking for.

5      But, yes, the corrective action notice, as well as the

6  cover email showing that it was transmitted to NaphCare, was

7  provided to NaphCare's counsel on January 4th.  And if I

8  recall, I think we had a phone conversation around that time

9  about that document as well.

10          **THE COURT:**  Is that correct, Mr. Smith?

11          **MR. SMITH:**  That is correct, and I'm -- that might be

12  an incorrect statement in the motion, but I think what I was

13  trying to express was the corrective action notices were not

14  specifically requested as part of the request for production of

15  documents.

16      The request for production of documents, on their face,

17  wouldn't cause NaphCare to believe that they were asking for

18  corrective action notices or documents related thereto, and it

19  wasn't part of our ongoing meet-and-confer discussion.

20      It wasn't until this informal discovery conference was

21  about to take place and moving towards motion to compel that

22  plaintiffs' counsel indicated, "Well, look, this is why we

23  think that there are deficiencies in your responses because, in

24  defendants' production, we found a few documents that relate to

25  NaphCare, including a corrective action notice that we would

1    have expected to be part of your production."

2        I'd like to note that it is a very small amount of records

3    that they obtained from defendants, that they would have

4    (Inaudible) our production, and a corrective action notice --

5    I'm not sure where that squarely fits into what requests for

6    production of documents that they're indicating.

7        I'd like to note, too, that we did submit objections with

8    our responses to their requests for production of documents.

9    And so, at the discovery conference, I was not trying to

10   indicate that we don't have any objections.

11       Rather, the indication was -- is that we have been working

12   to comply, and we have complied, and we have a declaration from

13   the general counsel as to the reasonable and diligent search

14   that was conducted and the compliance pursuant to the

15   stipulation of the parties.

16       **THE COURT:**  I appreciate that, and it is apparent that

17   a number of documents have been produced.  And I don't look

18   solely at the, you know, 31,000 pages and conclude that that

19   must be sufficient because, of course, it depends on the nature

20   of the requests and the nature of the case.

21       But it did strike me, Mr. Smith, that -- you said, in your

22   brief, correction action -- corrective action notices, meeting

23   minutes, and email exchanges were never raised by plaintiffs in

24   meet-and-confer discussions.  And I'm not trying to get too

25   stuck on a single sentence, but I read that meaning that

1    corrective -- corrective action notices were never raised, and

2    it sounds like they were raised by Ms. Kaul.  And you've had a

3    number of discussions over a period of months.

4        So if that was a slip on -- on your part, I understand

5    that, but it does sound like there was a -- a meaningful

6    meet-and-confer.

7            **MR. SMITH:**  Yes.

8            **THE COURT:**  Is that -- go ahead, Mr. Smith.

9            **MR. SMITH:**  Well, I apologize because of the way that

10   that was worded.  I didn't mean to mislead the Court.  It -- it

11   can be, you know, determined to be as a slip.

12       But the meaning I was trying to bring to it was -- is that

13   the multiple meet-and-confer discussions that we had prior to

14   the Court's order -- these issues weren't raised until then.

15   You know, it became a new issue that plaintiffs had and now are

16   saying that these are the type of documents they expect to see.

17       So I didn't (Inaudible) that statement.

18           **THE COURT:**  I understand.  I -- I understand, and I'm

19   not suggesting that you were trying to do anything wrong,

20   Mr. Smith.  I appreciate the clarification.

21       Let me ask this:  Have all policies and procedures

22   promulgated by NaphCare been produced?

23           **MR. SMITH:**  Yes.

24           **THE COURT:**  Has NaphCare produced all internal and

25   external audits and other quality assurance documents

```
 1    pertaining to medical care and mental health care at the
 2    San Diego County jails?
 3          MR. SMITH:  Yes.  And, unfortunately, there aren't
 4    any.  I mean, they may -- they should be doing them, but the
 5    issue is -- is that we don't have audits to produce.
 6       So what has been produced is -- is what exists as -- as to
 7    the extent you can refer to them as audits.
 8          THE COURT:  But whether they should have been
 9    generated or not is perhaps an issue for a different time, but
10    you're telling me that there -- there are no audits to produce;
11    is that correct, Mr. Smith?
12          MR. SMITH:  That's correct.
13          THE COURT:  Are there any quality assurance documents
14    generated by NaphCare pertaining to its provision of medical
15    care or mental health care services at the jails?
16          MR. SMITH:  As for quality assurance documents, I'm
17    not sure exactly the definition you're -- you're giving me with
18    respect to that, but there are no meeting minutes.  To the
19    extent there were quality assurance meetings with the County,
20    the County would have taken minutes, but we don't have -- so we
21    don't have documents that reflect that.
22          THE COURT:  No.  I understood, from your brief, that
23    you don't have any meeting minutes to produce.  I'm speaking
24    more generally as to quality assurance documents, and I don't
25    have a specific definition for you.  I've been using that
```

Ex. C - 222

definition with the County, and everyone seems to have

understood it.

So I'm talking about sort of the common definition of --

you know, are there any such documents that NaphCare maintains?

Have you -- have you asked them if they have those documents, I

should say?

**MR. SMITH:**  Yes, and I'm willing to follow up with

that specific -- specific request.  I -- there wasn't an RFP,

that I'm aware of, that asks specifically for quality assurance

documents.

So I don't want to get that wrong, but I don't believe

they have any responsive records.

**THE COURT:**  Okay.  Ms. Kaul, here's what I'm thinking:

I can go through each of these RFPs, as I did for the RFPs

that the defendants propounded to the County, and I'll be

looking at the scope of the RFPs and giving you rulings.  I've

told you I'm prepared to do it.  You understand my -- my views

on the breadth of the RFPs.

Alternatively, do you think there would be value in you

providing Mr. Smith with a specific list of the documents that

you are seeking?  And when I say "list," I want to be careful.

I'm not talking about, respectfully, every email, text,

Teams message in the phrasing that appears throughout the --

your chart, but corrective action notices, quality assurance

documents, something -- something that is meaning- --

1    meaningful and has given NaphCare the ability to say, "These

2    are the discrete types of documents that we are looking for."

3         And maybe the answer is going to be that some or all of

4    those documents are not in NaphCare's possession, custody, or

5    control.  But at least it would provide the plaintiffs and

6    NaphCare with the ability to have that discussion that I know

7    you tried to have, it sounds like, in good faith, back and

8    forth in September rather than me giving you rulings right now.

9         I'll leave it up to you.  Which would you prefer?

10        **MS. KAUL:**  I'm open to Your Honor's suggestion of us

11   essentially continuing to meet and confer on these.

12        I do want to express a concern about --

13        **THE COURT:**  Sure.

14        **MS. KAUL:**  -- that, which is -- I think the -- the --

15   the declaration that was submitted or -- along with the

16   opposition described -- it's the reason that I didn't know

17   about the process that NaphCare undertook, which they say

18   demonstrates their diligence.

19        And they -- they said, essentially, they searched files

20   maintained by legal.  They reached out to HR, accreditation

21   compliance, IT, software implementation.  None of those people

22   are on the ground in the jail.  None of them are providers.

23   None of them are in charge of policies and procedures.

24        As far as I can tell, those are -- those are

25   administrative tasks and then -- and then participated in --

1  individuals from legal participated in meetings with the

2  house -- help services administrator for the jail.  As far as I

3  can tell, that is the only person who is actually interacting

4  with the County and the Sheriff's Department about what's

5  happening substantively in the jail.

6       And so I am -- I am concerned about that -- the extent of

7  that search.  And, you know, if -- if that is the extent of the

8  discussion that's happening on NaphCare's side, it is no wonder

9  that -- frankly, Mr. Smith -- you know, these meet-and-confer

10 efforts have been not very substantive.  There hasn't been an

11 understanding of what the company actually has.

12      And so I -- I worry that we are going to be in a cycle of

13 that, even if we provide more specifics.  And -- and so I'm

14 open to doing this.

15      And the other thing I would say is, you know, we can --

16 the opposition also says that even now, in our motion, we

17 haven't identified, with specificity, what the discrepancies

18 are.  These charts -- in addition to the previous

19 meet-and-confers, the chart that was attached to Exhibit A to

20 my declaration was (Inaudible) attempt to encapsulate that.

21      So I feel that we've -- we've -- we may be late to the --

22 to the game, but we've tried to really climb the distance to

23 bridge that gap and the communication of what we're looking

24 for.  I don't want us to be up against the gun -- another

25 concern I have is, obviously, the deadlines in this case.  I

1   don't want us to be pushing up against those.  We have a

2   deposition to get done as well.

3       With those concerns stated, I am -- I am open to one more

4   effort to get this done, but I think it would -- one thing that

5   could be helpful is the tight deadlines, again, from Your Honor

6   about -- about that, the opportunity to come back if we are

7   still in the same place unfortunately.

8       And then -- I don't know what the solution is but -- but

9   some kind of -- you know, I think it would -- what I would even

10  propose is that, depending on how the meet-and-confer process

11  goes from hereon out -- that NaphCare provides a supplemental

12  declaration of some sort that allows the Court to understand,

13  with specificity, what the search was.

14          THE COURT:  I would propose to go a step further than

15  that because, in connection with the motion to compel the

16  morbidity reviews, there is the declaration from NaphCare's

17  general counsel, Mr. -- Mr. Barkley.

18      I'm going to set that for an evidentiary hearing and

19  provide the plaintiffs with an opportunity to cross-examine

20  Mr. Barkley because I think that will provide a better record.

21  We'll talk about that in a moment.

22      And what is Ms. Tejura's title, Mr. Smith?

23          MR. SMITH:  Say that again.

24          THE COURT:  What is Ms. Tejura's title?  The declarant

25  is Seetal Tejura, Docket Number 503-10.

1      **MR. SMITH:**  I'm still not understanding.  What is --
2  what is what?

3          **THE COURT:**  What is her job title?

4          **MR. SMITH:**  Oh.  Seetal?

5          **THE COURT:**  Uh-huh.

6          **MR. SMITH:**  She's a -- she's --

7          **THE COURT:**  "Ms. Tejura" to me, but --

8          **MR. SMITH:**  Yeah.  Yeah.

9      Okay.  I'm sorry.  That's her last name.  Yes, that's
10  correct.  She's the chief legal officer.

11         **THE COURT:**  All right.  Well, she said that in a
12  declaration about their -- NaphCare's efforts to comply with
13  the subpoena.

14     So I would --

15         **MR. SMITH:**  Sure.

16         **THE COURT:**  If -- if there is a disagreement over
17  the -- the scope of NaphCare's search, I would provide the
18  plaintiffs with an opportunity to -- to cross-examine
19  Ms. Tejura about the content of her declaration at the same
20  evidentiary hearing where I'll be hearing from Mr. Barkley
21  regarding the death reviews.  So -- because I do understand
22  Ms. Kaul's point.

23     Let me ask you some questions, Mr. Smith.  Ms. Tejura's
24  declaration states that a paralegal reached out to people in
25  certain departments within NaphCare.  Were those individuals

**Ex. C - 227**

 1  located in San Diego, or were they located in Birming- --

 2  Birmingham, Alabama, or somewhere else?

 3          MR. SMITH:  The people that were reached out to are in

 4  San Diego.  The paralegal -- I'm not sure exactly where her

 5  location is, but she is part of the internal NaphCare company.

 6  She's not a paralegal from our office.

 7          THE COURT:  But the people who were contacted to

 8  gather responsive documents were the people on the ground, so

 9  to speak, at the San Diego facilities?

10          MR. SMITH:  That -- that's correct, and mainly the

11  health services administrators from San Diego -- the San Diego

12  facility.

13          THE COURT:  All right.  Let me ask you some more

14  questions, Mr. Smith, and then --

15          MR. SMITH:  Yes.

16          THE COURT:  -- I'll make a determination regarding how

17  best to proceed.

18      As I mentioned, I am prepared to go through these RFPs on

19  a request-by-request basis.  I do have tentative rulings for

20  each of them.

21      Let me ask this:  For Request Number 23, I see that

22  NaphCare has produced policies and procedures and blank forms

23  and unspecified TechCare reports.

24      What TechCare reports were produced?

25          MR. SMITH:  One second.

1    This --

2        **THE COURT:**  Do you want me to (Inaudible)?

3        **MR. SMITH:**  This -- I -- I mean, the TechCares

4    reports -- I think we had to do screenshots in order to get

5    them the information.  It may relate to the protocols.  I'm

6    looking at the list of documents.

7        **THE COURT:**  Well, hang on, Mr. Smith.

8    Ms. Kaul, do you know what TechCare reports were produced?

9        **MS. KAUL:**  I do, Your Honor.

10   The TechCare reports are charts that are presumably

11   generated on TechCare that -- in this instance, with respect to

12   RFP 23, I believe there was a line item showing, for a

13   particular month, the number of patients who were pregnant or

14   flagged as pregnant or something like that.

15   So it's just not, you know, a month -- there were a series

16   of monthly columns for, and I don't know -- I apologize.  We

17   don't know what time period was covered, but it was a portion

18   of 2022 to 2023 and then a line item for a number of patients

19   who fell into various categories, including one for pregnancy.

20       **THE COURT:**  Okay.  That's helpful.  Thank you.

21   Turning to Number 68, Mr. Smith, which seeks studies and

22   analyses regarding adequacy of staffing, are there any

23   responsive documents?

24       **MR. SMITH:**  No.  There -- there are not -- the

25   contract was produced that lists the employees.  That's

1    arguably responsive because it includes what employees, you

2    know, would be staffed, but there's not any other responsive

3    document.

4         **MS. KAUL:**  Your Honor, the corrective action notice

5    refers to staffing as well.  Even that -- it just exemplifies

6    the -- I just -- I think it just exemplifies the inadequacy of

7    the (Inaudible) of production, but I've made my point on that.

8         **THE COURT:**  No.  I understand.  I appreciate that,

9    Ms. Kaul.

10        Mr. Smith, for Number -- go ahead, Mr. Smith.

11        **MR. SMITH:**  I -- I just -- I mean -- and we don't --

12   we are -- not "we," but NaphCare is unable to locate any other

13   responsive documents.  And, you know, they did a diligent

14   search into that.

15        So I don't know what else can be done, but I can -- I can

16   look into it, but let's proceed.

17        **THE COURT:**  Okay.  Number 70.  Mr. Smith, did NaphCare

18   object to producing the licensing credentials of employees at

19   the jail?

20        **MR. SMITH:**  There was an objection.  That was not one

21   of the -- I'm looking at meet-and-confer correspondence with

22   plaintiffs' counsel that I think they had an issue with.  I

23   think we produced these employee -- the employee information.

24   You know, I'll turn to Ms. Kaul and see if that's actually an

25   issue.  It wasn't on my list.

**Ex. C - 230**

1          **THE COURT:**  Well, candidly, I'd prefer that you turn

2     to Ms. Kaul at a different time and place to --

3          **MR. SMITH:**  Okay.

4          **THE COURT:**  -- have that conversation.

5       So --

6          **MR. SMITH:**  I'm sorry, Your Honor.

7          **THE COURT:**  That's okay.  No, no, no.  I'm not looking

8     for an apology.  I want to make good use of your time and ours,

9     given the number of issues we have to address.

10         **MR. SMITH:**  Okay.

11         **THE COURT:**  Let me -- one more question for you,

12    Mr. Smith.

13       One of the issues between -- one of the -- one of the

14    issues I see is that the parties did reach some agreements,

15    which I commend you for doing, and that the -- NaphCare was to

16    provide the plaintiffs with a list of trainings, and the

17    plaintiffs were to go through that document and pick the

18    specific documents they want.

19       I'm told that it was a 396-page PDF file that had columns

20    spilling over from one page to the next, which is challenging

21    to read, which I would understand.

22       Was there an objection to giving the plaintiffs that PDF

23    in native form?

24         **MR. SMITH:**  There's -- no, there's not an objection.

25    I -- I'm not sure what type of native form it would be, but we

1  could -- we could --

2          **THE COURT:**  How about PDF?

3          **MR. SMITH:**  The PDF is what they had.

4          **THE COURT:**  You gave them the PDF file?

5          **MR. SMITH:**  So --

6          **THE COURT:**  Okay.  Ms. Kaul, go ahead.

7          **MR. SMITH:**  No.  I gave them -- I gave them a list --

8  we gave them a list of all of the training, which -- it clearly

9  indicates that there's a lot of training.  It's a voluminous

10  amount of training.

11          **THE COURT:**  Okay.

12          **MR. SMITH:**  And then my understanding was -- is that

13  they were going to identify which training records they wanted,

14  and we would produce training records that were relevant to

15  avoid the burden.  We are not in objection to providing them a

16  more user-friendly list -- and that hasn't been a big topic of

17  our meet-and-confer until recently -- as to the training

18  information.

19      But from the PDF, you can identify different training that

20  they feel they need or would be relevant, and we're willing to

21  provide them with the training (Inaudible).

22          **THE COURT:**  Go ahead, Ms. Kaul.

23          **MS. KAUL:**  A PDF was produced to us.  It was very

24  difficult to understand.  We requested a number of times

25  whether an Excel document could be produced because it's

**Ex. C - 232**

1    sortable, and it allows us to remove duplicates and really

2    narrow down to the trainings that are -- are also provided.

3        I never received an answer about whether that could or

4    could not be produced.  So I said, "Alternatively, could we

5    just get a list, even in an email form, about the trainings

6    that are provided?"  That wasn't provided, either.

7        If we have to use the PDF, frankly, that was produced and

8    take the time to go through it, it's burdensome, in our view.

9    But if that's where we are, that's where we are.  I think the

10   difficulty was just understanding, because that's really the

11   last resort, but I don't think -- I do think this is one on

12   which we can figure this out if -- if we work together on it.

13       **THE COURT:**  Here's what we are going to do:

14       My tentative ruling, on the RFPs at issue and the motion

15   to compel, was to deny the motion as to each of them based on

16   overbreadth grounds.  I can go through and give you specific

17   examples.

18       But even looking at the documents that are allegedly

19   missing, for every one of these RFPs, it was -- I was not able

20   to find good cause to order the production of, generally

21   speaking, text messages, Teams chats, and so forth on very,

22   very broad topics.

23       Some of the topics, in addition, such as every single

24   document relating to the contract negotiations, which was

25   Request for Production Number 2, are, respectfully, very, very

broad.

The one -- I should have backed up.  The two requests as
to which I was going to -- my tentative is to conduct further
proceedings are Request Numbers 80- -- 85 and 77, which I
believe are the requests pertaining to deaths in -- no.  Excuse
me.  77 and -- I was wrong -- 28, which pertain to in-custody
deaths.  And I -- I don't have sufficient information before me
to give you a ruling on that.

Here is how we are going to proceed:

Ms. Kaul, you understand, from being here for the last
couple of hours, my concerns with respect to the RFPs.  I have,
you know, listened to the efforts that you have made and that
are described as well in your declaration to meet and confer
and drill down on the specific documents that the plaintiffs
are seeking.

And with -- you know, understanding my view that any Teams
message, in any way, relating to these very broad categories of
documents, I am not going to be inclined to order NaphCare to
produce.

I would provide you with an opportunity to engage with
Mr. Smith and give him, as targeted as you can, a list of the
types of documents that you are seeking.  And we've been
talking a lot about the correction -- corrective action
notices, for example.  That would be just -- just one.

And to the extent you-all can agree, wonderful.  If you

1   cannot, I'm going to set this motion for a further evidentiary

2   hearing on the -- the death reviews.

3       Mr. Smith, we're going to pick a date today for that

4   evidentiary hearing.  Two weeks before that hearing, NaphCare

5   will lodge, for my in-camera review, the documents that are

6   contained in its privilege log.  That is Docket 488-4.

7       And given that the -- or that NaphCare is relying on the

8   declaration of Justin Barkley to establish that the documents

9   pertaining to these death reviews are privileged, I would

10  provide the plaintiffs with an opportunity to cross-examine

11  Mr. Barkley, if they wish.

12      Is that something you would wish to do, Ms. Kaul?

13          **MS. KAUL:**  I think we would, Your Honor.

14          **THE COURT:**  I would not limit the examination solely

15  to cross-examination.  To the extent, Mr. Smith, that you would

16  wish to elicit additional direct examination testimony from

17  Mr. Barkley, I would allow you to do that.

18      But Mr. Barkley should be present at the evidentiary

19  hearing and be prepared to testify, given that it is, of

20  course, NaphCare's burden to establish that the requirements

21  for the privilege have all been met.  And between Mr. Barkley's

22  testimony and my review of the in-camera documents, I will be

23  able to, I believe, make a principled ruling.

24      The parties, I'm sure, are aware of my ruling with respect

25  to the CIRB reports.  I am not suggesting that ruling controls,

```
1   but I would suggest that, Mr. Smith, you review that, to the

2   extent you have not, given that it may provide some -- some

3   guidance on the issues that will be significant to this

4   determination.

5        Let's pick a date for the evidentiary hearing.

6        The earliest I can do it, Counsel, is going to be

7   Wednesday, March 6th.  I can give you the morning on that date.

8            MR. SMITH:  That works for NaphCare.

9            MS. KAUL:  Your Honor, I am out of the country that

10  week, but --

11           THE COURT:  I know this is your issue that you've been

12  working on, Ms. Kaul.  So let me see what we can do.

13           MS. KAUL:  I appreciate that.  I was going to offer

14  coverage, but it's the ideal --

15           THE COURT:  No.  I understand.

16       Hey, Melissa, can we move, for the last week in

17  February -- are you available the week before then?

18           MS. KAUL:  It's those two weeks (Inaudible).

19           THE COURT:  Okay.  Okay.  No.  I understand.

20       You'll be back the following week, Ms. Kaul?

21           MS. KAUL:  Yes, Your Honor.

22           THE COURT:  Melissa, can we, on March 12th, close our

23  criminal calendar and move everything to -- well, actually, I

24  can give you -- I can give you March 12th, if that would work

25  for you.
```

1          **MS. KAUL:**  That's okay with -- with me, Your Honor.

2          **THE COURT:**  How about you, Mr. Smith?

3          **MR. SMITH:**  That works for my -- my calendar.

4     Thank you.

5          **THE COURT:**  Sure.

6     March 12th at 9:00 a.m.  We will hold an evidentiary

7     hearing on the attorney-client privilege issue.

8          Melissa, is that okay with you?

9          **THE CLERK:**  Yes.

10          **THE COURT:**  Great.

11     By not later than February 27th, NaphCare shall lodge

12     copies of the documents on its privilege log for my in-camera

13     review.  Mr. Barkley will be expected to be here in person to

14     testify at the hearing.  I will also hear further argument on

15     the motion to compel, if necessary.

16          How long do you think it would take for you to give

17     Mr. Smith a list of the specific documents you're seeking,

18     Ms. Kaul, to really figure if there's going to be a dispute or

19     not?

20          **MS. KAUL:**  With inspections this week, I think by the

21     end of the week.

22          **THE COURT:**  No.  I understand.  I'm not trying to rush

23     you.

24     So --

25          **MR. SWEARINGEN:**  Next week.

1          THE COURT:  Mr. Swearingen is maybe suggesting next

2     week?

3          MS. KAUL:  I'll try to do it this week, but -- but,

4     yes, next week would be helpful.

5          THE COURT:  Why don't you do it within a week.

6          MS. KAUL:  Okay.  Thank you, Your Honor.

7          THE COURT:  Sure.

8       Ms. Kaul, you'll provide Mr. Smith with a list of the

9     specific types of documents that you're seeking, and hopefully

10    I've given you as much of my thinking as is helpful to you

11    about what I would be inclined to agree is appropriate and what

12    is not.

13      So corrective action notices, yes; general Teams messages,

14    no.  But I'm not precluding you from including whatever you

15    deem appropriate on the list.  You'll provide that to Mr. Smith

16    by 2/13.

17      And then, Mr. Smith, you'll take that to your client, and

18    you'll respond to Ms. Kaul by February 20th with respect to

19    whether NaphCare is willing to produce -- or any or all of

20    those documents for the time period requested.

21      And then I will ask you to -- so you're gone the end of

22    February; right, Ms. Kaul?

23          MS. KAUL:  That's correct.

24          THE COURT:  All right.  If there's going to be a joint

25    report filed with me the week of the -- the last week in

1    February, is that something that somebody else can handle on

2    behalf of plaintiffs?

3          **MS. KAUL:**  Yes.  I can figure that out.

4          **THE COURT:**  I would like to see the fruits of the

5    parties' labors by February 27th in terms of a joint status

6    report, just whether there are agreements or disagreements, and

7    attach for me the documents that are requested and what's been

8    agreed to.  And let's not -- I don't need argument.

9          **MS. KAUL:**  Understood.

10         **THE COURT:**  And if I look at that and determine that

11   it's going to be necessary to have witness testimony regarding

12   that issue, I'll issue an order.

13         So Ms. Tejura does not need to otherwise plan to be here,

14   but I will issue an order if I'm going to need testimony from

15   her regarding those search efforts.

16         Any questions, Mr. Smith?

17         **MR. SMITH:**  No, Your Honor.

18         Thank you for the reasonable approach.  We'll work with

19   plaintiffs' counsel and hope to minimize as much issues as

20   possible for the Court, and I've really got to thank you for

21   accommodating my travel this morning.  I really appreciate it.

22         **THE COURT:**  No problem.

23         Ms. Kaul, what else can we do to make this issue proceed

24   as smoothly as possible?  Do you have any thoughts?

25         **MS. KAUL:**  I think we have our marching orders.

1    And for what it's worth, I think, taking Your Honor's

2    comments this morning -- I mean, the tone of the

3    meet-and-confer with NaphCare has been, I think, not an issue.

4    It's more about substance.

5        **THE COURT:**  No.  I appreciate that, and that's clear

6    from your declaration and from Mr. Smith's comments.

7        And, look, Mr. Smith, this -- I take what you're saying at

8    face value, that people in San Diego and the people on the

9    ground have been consulted on this.  That really is what I

10   expect.

11       If people are otherwise in Birmingham, okay.  Fine, but I

12   really am going to want to hear as to what efforts were made to

13   determine whether these categories of documents exist.  And if

14   there is a contention regarding burden, that will be on

15   NaphCare to justify as to why certain documents are just too

16   expansive to be produced.

17       I have a feeling that you'll be able to figure this out

18   with Ms. Kaul.  At least I hope you can narrow the issues in

19   dispute.  And then if you are not able to, we will address it

20   on March 12th at the conclusion of the evidentiary hearing on

21   the privilege issue.

22       **MR. SMITH:**  Yes.

23   Thank you, Your Honor.

24       **THE COURT:**  Thank you, Mr. Smith.

25   Anything further we should discuss on the NaphCare issue,

**Ex. C - 240**

1   Ms. Kaul?

2           **MS. KAUL:**  I don't think so, Your Honor.

3       Thank you.

4           **THE COURT:**  Okay.  Thank you, Mr. Smith.  You're

5   welcome to stay on, but you do not have to, if you'd prefer to

6   do something else.

7           **MR. SMITH:**  Okay.

8           **MS. KAUL:**  And, Your Honor, may I be excused?

9           **THE COURT:**  Sure.

10          **MS. KAUL:**  Thank you.

11          **THE COURT:**  Have a good day.  I hope you feel better.

12          **MS. KAUL:**  Thank you.  I appreciate that.

13          **THE COURT:**  Now, Mr. Swearingen, turning back to you

14  to address my tentative rulings on the requests for production.

15          **MR. SWEARINGEN:**  Yes, Your Honor.

16      I'd like to go through them, for the ones that you'd like

17  to discuss, just in numerical order, if I may.

18          **THE COURT:**  Sure.

19          **MR. SWEARINGEN:**  But before I go, I'd like to say two

20  things, the first of which is there was a colloquy between the

21  Court and defense counsel regarding whether or not responsive

22  lists or logs exist in certain instances.

23      Would the Court order defendants to amend their responses

24  to indicate where no responsive documents regarding evidence of

25  practice exists, or is the record sufficient in Your Honor's

1    eyes?

2          **THE COURT:**  I believe the record is sufficient in my

3    eyes, in part, because, Mr. Swearingen, I -- the phrase

4    "evidence of practice" is amorphous, and I'm not comfortable

5    requiring Ms. Pappy to say that every -- there are no possible

6    documents regarding evidence of practice.

7          I've made my views clear on relevance and proportionality,

8    and I do believe that the current record that we have, as to

9    what is available and maintained by the County, should suffice.

10          **MR. SWEARINGEN:**  Thank you, Your Honor.

11          The second preliminary point that I'd like to raise is

12    that you denied a number of plaintiffs' requests on the basis

13    that they did not appear in plaintiffs' moving papers in the

14    motion to compel.  And I just wanted to highlight Page 1 of

15    plaintiffs' motion to compel at Lines 11 through 14.

16          Given that we were capped at page -- at 15 pages, we

17    included Exhibit A to my declaration, which is the list of

18    disputed items.  And in so doing, we stated specifically,

19    quote, "This memorandum broadly describes the category" --

20    "categories of missing documents, and the request-by-request

21    summary of documents outstanding is attached as Exhibit A to

22    the declaration of Van Swearingen filed herewith."

23          Some of the requests that I will be going through

24    numerically do pertain to those that you identified as not

25    being specifically identified -- identified in the motion to

1   compel.  I think, for some instances, that was probably just a

2   simple oversight on our part, whereas we did include it in

3   Exhibit A to my declaration.

4       In other instances, it may not have fallen neatly into

5   those categories.  For example, one of the requests that I'll

6   ask the Court to consider ordering defendants to produce

7   documents for is a request for blank exemplars.  It's not

8   really clear if blank exemplars are policies and procedures,

9   evidence of practice, audits, or trainings, but they are

10  relevant.

11      And all of the requests that include -- that are included

12  in Exhibit A to my declaration are ones that were included in

13  the joint status report to the Court as disputed items back in

14  December and ones where I included, in my follow-up letter

15  following the joint status report to defendants on

16  December 18th, identifying the continued disputed items that

17  were in the joint status report and explaining plaintiffs'

18  expectation of what types of responsive documents would exist.

19          **THE COURT:**  Okay.

20          **MR. SWEARINGEN:**  With that, and unless the Court has

21  any questions, I'm prepared to go through the Court's order --

22  tentative order as to the specific RFPs.

23          **THE COURT:**  That would be fine, Mr. Swearingen.

24      To the -- well -- and to the extent there is a request for

25  production you believe is at issue that is not referenced in

1    the motion, I would note that your motion included the types of

2    documents that -- or the list -- you listed the RFPs that I

3    understood were truly at issue, and you did that with your

4    headers for each category.

5        I didn't see anything in your motion explaining to me why

6    any other RFP that is not stated in the motion is relevant or

7    seeks relevant information.  I'll hear you out on it, if you

8    want to go through it, and -- but I did want to note that that

9    was my understanding, that if it was in the motion, that's what

10   you were seeking to move on.

11       Go ahead.  Why don't you walk me through them, and I'll

12   make the call.

13              **MR. SWEARINGEN:**  Thank you, Your Honor.

14              **THE COURT:**  Sure.

15              **MR. SWEARINGEN:**  RFP 32 was denied, and I'd like to --

16   the Court to consider the request for just whether or not there

17   are logs of welfare checks of people who are on withdrawal

18   protocols.  Typically, people who are on withdrawal protocols

19   are in severe medical distress.

20       Most jails have a welfare check of those individuals

21   every, say, four hours.  They conduct welfare checks of things

22   like vital signs, weight, blood pressure, heart rate,

23   et cetera.  And we would appreciate the narrow inquiry into

24   whether or not there are logs of welfare checks of people who

25   are on withdrawal protocols.

1    **THE COURT:**  Can I ask you a question first?

2    **MR. SWEARINGEN:**  Yes, Your Honor.

3    **THE COURT:**  Why didn't you put that in an RFP asking

4    for logs of welfare checks?  I mean, we've had this discussion,

5    but I specifically agreed with Ms. Pappy's request not to limit

6    the number of RFPs that the plaintiffs could serve.

7    So if you didn't, and there's nothing to talk about, I

8    just -- I would welcome you to help me understand.

9    **MR. SWEARINGEN:**  I think, for this RFP and for all

10   RFP's, Your Honor, we generally crafted them in, I think, what

11   Your Honor would describe as an overly broad way, in part, to

12   capture ESI, to ensure that the ESI search terms would be broad

13   enough to consider all documents -- "all documents" would

14   include things like emails and texts -- and that the

15   meet-and-confer process would have been more productive and

16   would have involved an exchange of information and an

17   opportunity for plaintiffs' counsel to narrow in and identify

18   documents like this.

19   That, unfortunately, didn't happen, and we are here where

20   we are.

21   **THE COURT:**  Okay.  Ms. Pappy, can I ask you a

22   question?

23   **MS. PAPPY:**  Yes.

24   **THE COURT:**  Does the County maintain logs of welfare

25   checks for individuals who are in withdrawal protocol?

1          **MS. PAPPY:**  They do not.  They requested a list of

2     people in MAT -- MAT protocols, and that was just provided, its

3     withdrawal protocol.  It is a list of people.

4          **THE COURT:**  So to the extent there is a list involving

5     individuals who are in withdrawal protocols, it would be

6     contained in the list of medication-assisted-therapy

7     individuals?

8          **MS. PAPPY:**  Yes.

9          **THE COURT:**  Go ahead, Mr. -- there's your answer,

10    Mr. Swearingen.

11        Go ahead.

12         **MR. SWEARINGEN:**  Thank you, Your Honor.

13         **THE COURT:**  Sure.

14         **MR. SWEARINGEN:**  For Number 3, that is the list of MAT

15    participants.

16         **THE COURT:**  Number what?

17         **MR. SWEARINGEN:**  We would -- for RFP 33.

18         **THE COURT:**  Oh.  33.

19         **MR. SWEARINGEN:**  This segues into the list of RF- --

20    of M-A-T -- MAT participants.

21         **THE COURT:**  Okay.

22         **MR. SWEARINGEN:**  We would respectfully ask the Court

23    to order production of documents, to extend to the full time

24    period since January 1st, 2021.

25         **THE COURT:**  Do you object, Ms. Pappy?

**Ex. C - 246**

1          **MS. PAPPY:**  No.

2          **THE COURT:**  Okay.  The County will provide the

3    spreadsheets of MAT, M-A-T, participants for the time period

4    January 1st, 2021, to the present.

5          Go ahead, Mr. Swearingen.

6          **MR. SWEARINGEN:**  With respect to RFP 82, we would

7    respectfully request the production of all watch commander

8    logs.  An example of the watch commander log is identified at

9    Exhibit JJ to my declaration.

10          **THE COURT:**  Could I interrupt?  I'm sorry.  I will let

11    you continue.

12          Ms. Pappy, you told me, at the hearing on December 20th,

13    that all watch commander logs had been produced.

14          **MS. PAPPY:**  Watch commander logs?

15          **THE COURT:**  I believe that's what my notes indicated.

16    If that's not correct, just tell me.

17          **MS. PAPPY:**  Well, I don't remember watch commander

18    logs.

19          I want to point out that this isn't included in the

20    motion.  You've ordered that it was waived.  It wasn't

21    something that was on the joint list, and I'd ask you not to --

22    not to change that ruling.

23          But I also communicated to Counsel via an email months ago

24    that they don't keep -- they have whatever is in policies and

25    procedures, but they don't keep logs relating to tactical teams

1    or any such --

2        **THE COURT:**  I was wrong.  You mentioned captain's

3    directives, and I was -- I was thinking -- I got that mixed up

4    (Inaudible).

5        **MS. PAPPY:**  They all sound the same.

6        **THE COURT:**  That was my -- my mistake.

7        **MS. PAPPY:**  Yeah.

8        We don't -- they don't keep logs of -- of when tactical

9    teams are deployed.  A tactical team being deployed would

10   appear in an incident report, and I've never been provided a --

11   these dates or names that we could do any sort of logical

12   search.  And Counsel was notified of that months ago.

13       **THE COURT:**  All right.  Based on all of that, I'd

14   respectfully deny the motion to compel a further response to

15   Request Number 82.

16       **MR. SWEARINGEN:**  Mr. -- sorry, Your Honor.  May I

17   respond?

18       **THE COURT:**  Sure.

19       **MR. SWEARINGEN:**  I do agree with Ms. Pappy that this

20   was not included on the disputed items, in part, because of the

21   representation from opposing counsel that there are no logs

22   regarding tactical teams.

23       But the watch commander logs do discuss the deployment of

24   tactical teams, and the watch commander logs -- logs are highly

25   relevant not only to tactical teams generally but what occurs

1    during -- during a day that's notable as it relates to

2    incarcerated persons' safety and health.

3         So, for example, watch commander logs include things like

4    use of tactical teams, imposition of restricted movement and

5    lockdown, intercoms not working, medical emergencies, use of

6    force incidents.  And these -- these costs apply to other RFPs

7    that are at issue.

8         And that's why I'm asking the Court to consider not the

9    granting of all documents related to tactical teams but instead

10   the narrow request for all watch commander logs because they

11   are such a rich source of information.

12        THE COURT:  Why are they -- why is there not a request

13   for production seeking watch commander logs?

14        MR. SWEARINGEN:  Because we did not know what they

15   were called.  I haven't seen something called a watch commander

16   log in -- you know, in Monterey County Jail, for example.

17        THE COURT:  When did you find out about watch

18   commander logs in this case?

19        MR. SWEARINGEN:  Since the December 22nd production.

20        THE COURT:  What are watch commander logs, Ms. Pappy?

21        MS. PAPPY:  I have absolutely no idea.  I've never

22   discussed it.  I don't know.  I don't know how burdensome it

23   is, I don't know what they are, I don't know what information

24   they include, nothing.

25        THE COURT:  Did you -- when you received the

1    production on December 22nd, and you saw that it referenced or

2    contained a watch commander log, that -- this is exactly why I

3    directed the parties to meet and confer to determine what are

4    the alleged deficiencies and what you could agree on or agree

5    to disagree on.

6        Was this raised with the defense counsel, Mr. Swearingen,

7    specifically watch commander logs?

8            **MR. SWEARINGEN:**  I do not know, Your Honor.  I do know

9    that there was a gigantic amount of volume of data that was

10   produced on December 20th and December 22nd, leading into the

11   holiday week, in which many of the attorneys at our firm were

12   on vacation.  And I believe some of the staff at DLA Piper who

13   ingested the data into our system was also on -- on holiday or

14   vacation.

15       I think that it wasn't until early January.  So we had

16   about two weeks to go through every single document and create

17   an index of the types of documents that existed.  We had

18   numerous people working on this project, and I think that the

19   watch commander logs came out -- or came to our attention

20   shortly before and -- as we were drafting this motion to

21   compel.

22           **THE COURT:**  When they came to your attention, did you

23   ever reach out to Ms. Pappy?

24           **MR. SWEARINGEN:**  I'm not -- I'm not aware of a

25   specific conversation about the watch commander logs.

1          **THE COURT:**  Do you see why that is of concern to me?

2          **MR. SWEARINGEN:**  I do, Your Honor.

3      I also understand that meet-and-confers have been very

4   difficult.  I appreciate both parties' representations about

5   how it will change going forward.  But we were truly, I think,

6   at a nadir in our meet-and-confer perspectives and, with

7   respect to -- to other ongoing meet-and-confers, their refusal

8   to meet and confer.

9      And I think that those could -- could have been in our

10  minds, but there were a lot of responsive documents,

11  Your Honor, for us to ingest.  And I'm not sure, during that

12  time, we could have met and conferred about each.

13         **THE COURT:**  Well, I will say only this.  The record

14  before me does not reflect intransigence by counsel for the

15  County with respect to meeting and conferring.

16      It does reflect frustration, and perhaps that frustration

17  is borne out by, or caused by, the fact that these RFPs are so

18  broad and the difficulty attendant to responding to RFPs that

19  are so broad and the fact that, when RFPs are so broad, the

20  party who is propounding the RFPs then has the opportunity,

21  during a meet-and-confer, to redefine what they want, including

22  any manner they wish.  And that is challenging, to say the

23  least, for the party who is responding.

24      That being said, Ms. Pappy, will you attempt to ascertain

25  the existence of watch commander logs and what they are?  I

don't know what they are.

    **MS. PAPPY:**  If you are inclined to order the County to do that, I will absolutely follow your order.  I am extremely frustrated by this.  I think it was waived.  But whatever Your Honor orders, I will respect.

    **THE COURT:**  I am not ordering you to produce them.  I am ordering you to find out what they are --

    **MS. PAPPY:**  I will do so.

    **THE COURT:**  -- and what is -- what is the scope of these watch commander logs because I do agree with you.  It is not raised in the motion.  It is -- I've already made a finding that this is waived, and I'm not changing that finding.  I am directing you to simply inquire as to what they are and what is their volume.

    **MS. PAPPY:**  I will do so.

    **THE COURT:**  Thank you.

    But, Mr. Swearingen, I take you at your word that we're not going to be talking about new categories of documents, honestly, for the first time in court going forward because this is truly not -- in some ways, not fair to Ms. Pappy.  But I'm directing her to look at documents for the first time, sitting in court.

    And it's something that, really, I am confident, will be discussed by the parties on an item-by-item basis, to the extent there's any future discovery like this in the case,

1    which there may not be.

2         So go ahead, Mr. Swearingen.

3         **MR. SWEARINGEN:**  Thank you, Your Honor.

4         RFP 101 was to help to statistics, and I would point out

5    that Policy and Procedure A62 -- they said statistics may be

6    kept for certain information, including, but not limited to,

7    things like the number of sick call visits by physicians,

8    nursing staff, dentists, mental health staff, health

9    screenings, food service worker screening, laboratory tests

10   performed, prescriptions, and the list goes on and on.

11        And we did not meet and confer about this, Your Honor, but

12   I would request that the -- a limited number of health

13   statistics -- a limited number of statistics be produced in

14   response to RFP 101, consistent with the types of statistics

15   that may be collected pursuant to Policy A62.

16        **THE COURT:**  It was not the subject of the parties'

17   meet-and-confer.  I am denying that request.

18        Go ahead, Mr. Swearingen.

19        **MR. SWEARINGEN:**  Numbers -- RFP Numbers 102 and 103

20   are grievances and responses to grievances.  These are highly

21   relevant to the issues in plaintiffs' third amended complaint,

22   and we would ask for production of those.

23        **THE COURT:**  Every grievance submitted by every

24   incarcerated person for a one-year period?

25        **MR. SWEARINGEN:**  Yes, Your Honor.

**Ex. C - 253**

1       **THE COURT:**  And this was not referenced in your

2   motion, was it?

3       **MR. SWEARINGEN:**  Other than Page 1, Lines 11 through

4   14, no, Your Honor.

5       **THE COURT:**  How many requests are you going through,

6   Mr. Swearingen?

7       **MR. SWEARINGEN:**  I was guess -- I would estimate maybe

8   three dozen.

9       **THE COURT:**  All right.  I ask because we have got a

10  hard stop at 1:30 to allow me to get back for an early neutral

11  evaluation in another case that begins at 2:00, and we'll need

12  to -- I want to finish this issue, Mr. Swearingen, and then see

13  how much time we've got left.

14      So with that being said, (Inaudible), these were not

15  addressed in the motion.  They're included in the chart.  I

16  don't have the RFPs in front of me because I did not prepare

17  for these.

18      What is the defendants' position with respect to producing

19  inmate grievances, both in terms of relevance as well as

20  proportionality?

21      **MS. PAPPY:**  Well, if you look on the chart, under

22  "Documents Produced," we did produce them and sick call

23  requests, and then -- and plaintiffs represent that in the --

24  in their Exhibit A.

25      So I don't -- I don't know how to respond.  I don't know

1  what the issue is.  It was never raised.

2         THE COURT:  Was this ever raised by the plaintiffs,

3  Mr. Swearingen?

4         MR. SWEARINGEN:  And I will use, in my one example, my

5  December 18th letter to defendants.

6         THE COURT:  No.  I mean either in person or via Zoom,

7  as I ordered.

8         MR. SWEARINGEN:  I believe probably on the

9  November 16th meet-and-confer.

10        THE COURT:  Do you know, Ms. Pappy?

11        MS. PAPPY:  Are you talking about the January 11th

12  conference that Ms. Chartoff and I had?

13        THE COURT:  I don't know --

14        MS. PAPPY:  Okay.

15        THE COURT:  -- which meet-and-confers you had.  I

16  ordered you-all to meet and confer --

17        MS. PAPPY:  Yeah.

18        THE COURT:  -- regarding this following the production

19  on December 22nd.

20     Was this ever raised?

21        MS. PAPPY:  I don't -- I'm sorry.  I don't remember,

22  and I was -- because -- and I didn't focus on it in the motion

23  because it's not in the motion.  I don't know what the issue

24  is.

25        THE COURT:  It's not in the motion.  It is -- there's

1    no evidence that it is -- was properly raised between the

2    parties through a meet-and-confer.  It is overbroad, and it is

3    respectfully denied as to both.

4        And I would note that certain grievances were produced.  I

5    don't have a -- any specificity as to what grievances were

6    produced and what additional grievances should have been

7    produced other than the request to produce every grievance in

8    the jail, regardless of subject matter, for a one-year period.

9        So I will respectfully deny the motion -- any motion to

10   compel as to 102 and 103.

11       Go ahead, Mr. Swearingen.

12           MR. SWEARINGEN:  On RFP 105, as the Court went through

13   this, I did not -- I did not capture in my notes whether or not

14   the Court ordered production of the canceled and refused sick

15   calls that have been produced for June and August 2023 for the

16   relevant time period.

17           THE COURT:  I was using the phrase "relevant time

18   period" to refer to January 1st, 2021, through December 31st,

19   2023.

20       And you understand that as well, Ms. Pappy?

21           MS. PAPPY:  Yes.

22           THE COURT:  So I think the answer to your question is

23   they will all be produced for that time period.

24           MR. SWEARINGEN:  Understood.

25       And I just didn't know if it would be produced for that

1    specific RFP 105.  That was what was missing from my notes.

2         **THE COURT:**  Oh, I understand.  Yes.  Well, hang on.

3         Yes, but the -- there's not a specific spreadsheet showing

4    only canceled and refused sick calls.  It's a -- it's a broader

5    sick call spreadsheet, I understood Ms. Pappy to be saying,

6    that includes notations where sick calls were canceled.  I

7    don't recall what Ms. Pappy said with respect to any refused

8    sick calls.

9         But, Ms. Pappy, why don't you go ahead and correct me if I

10   said anything that was incorrect.

11        **MS. PAPPY:**  No, not incorrect.  I do -- I remember

12   seeing "refused" on some of the columns.  So I know they're in

13   there, in the same chart.

14        **THE COURT:**  Okay.  With that clarification,

15   Mr. Swearingen, I think we're good on 105.

16        **MR. SWEARINGEN:**  Thank you, Your Honor.

17        Regarding RFP 113, defense counsel, earlier this morning,

18   discussed how this request would require individual hand review

19   of medical records.  And I recall that Dr. Hawk provided

20   services for eyeglasses prior to NaphCare coming in in 2022.

21        And I understand, from NaphCare's contract with the

22   County, that they are responsible for producing contractor

23   activity reports.

24        And in our interview with a dentist from Mid-America, they

25   talked about the contractor productivity reports, what they

1  produced for the County prior to their contract being replaced

2  by NaphCare.  And they discussed how those basic metrics that

3  were included regarding patient care -- that were filled out on

4  a regular basis.

5      And the question would be whether there are similar

6  contractor productivity reports regarding eyeglasses that were

7  maintained either by Dr. Hawk or by NaphCare that would be

8  responsive to this particular RFP.

9          **THE COURT:**  When did you interview Dr. Hawk?

10          **MR. SWEARINGEN:**  We did not interview Dr. Hawk.  We

11  interviewed Mid-America.

12          **THE COURT:**  When did you interview Mid-America?

13          **MR. SWEARINGEN:**  Prior to dismissing them.

14          **THE COURT:**  When was that?

15          **MR. SWEARINGEN:**  I would think back in 2022.

16          **THE COURT:**  Is there a reason why you didn't ask for

17  contractor productivity reports in your request for production?

18          **MR. SWEARINGEN:**  We didn't know -- there's no good

19  answer, Your Honor.

20          **THE COURT:**  I would respectfully stand on my ruling on

21  113.

22          **MR. SWEARINGEN:**  For 114, I just wanted to clarify

23  because I did not capture this in my notes, and I don't want to

24  waive this argument going forward.  I just want to -- to see

25  whether or not the denial of 114 was on the basis that no lists

1   or logs exist regarding discharge planning.

2           **THE COURT:**  It was based on my determination that it

3   was overbroad and not proportional to the needs of the case in

4   that the missing documents, in particular, are generally

5   described as evidence of practice, summaries, and training.

6       You have a representation from Ms. Pappy that training

7   documents have been provided, and the phrase "evidence of

8   practice" does not shed any meaningful light for me on the

9   documents that are requested, and it was denied on that basis.

10          **MR. SWEARINGEN:**  Would Your Honor consider inquiring

11  whether or not lists or logs exist with respect to discharge

12  planning?

13          **THE COURT:**  Do you know, Ms. Pappy?

14          **MS. PAPPY:**  You did ask me, and I said they don't.

15          **THE COURT:**  I don't recall asking you.  So I

16  appreciate the reminder.

17          **MS. PAPPY:**  Okay.

18          **THE COURT:**  With that in mind, Mr. Swearingen, that

19  there are no such lists or logs, I would respectfully stand on

20  my ruling on 114.

21          **MR. SWEARINGEN:**  Thank you both.

22          **THE COURT:**  Sure.

23          **MR. SWEARINGEN:**  RFP 135.  Plaintiffs seek only any

24  memoranda drafted analyzing CLERB policy proposals.

25          **MS. PAPPY:**  I'm sorry.  What number is this?

1    **MR. SWEARINGEN:**  135.

2        **THE COURT:**  Mr. Swearingen, this is one that

3    absolutely should have been briefed for me in terms of what

4    CLERB documents exist and whether there are any privilege

5    issues that -- that arise from this.

6       Why was this not addressed in the moving papers?  This

7    just appears on a chart.  This is a -- this is a real issue.

8        **MR. SWEARINGEN:**  I think, ultimately, because there

9    are over, I believe, a hundred disputed items, and we focused

10   our energies on -- in the motion on certain categories of

11   information.  And this didn't neatly fit into one of these

12   categories of information.

13       **THE COURT:**  So why didn't you ask me for extra pages,

14   if you really felt like you have important RFPs that don't fit

15   into one of your four categories and you need more pages?

16       **MR. SWEARINGEN:**  I think that -- that plaintiffs'

17   counsel is working on a lot of tasks in realtime, and in

18   hindsight, we should have done so.

19       **THE COURT:**  What's CLERB policy proposals?  I mean,

20   the Citizens' Law Enforcement Review Board is not limited to

21   conditions in the jail, is it?

22       **MR. SWEARINGEN:**  We would ask for CLERB proposals

23   related to issues in the third amended complaint, including,

24   but not limited to, the ability to investigate medical care at

25   the jail, contraband at the jail, body scanner use at the jail,

1   and deaths at the jail.

2         THE COURT:  That's not what the RFP asks for.  It was

3   never the subject of a meet-and-confer between the parties.

4      And on that basis, I'm not going to compel the County to

5   respond to 135, even as narrowed here in court by the

6   plaintiffs.

7         MR. SWEARINGEN:  For RFP 137, Your Honor, we've

8   discussed corrective action notices today.  We would

9   respectfully request the defendants produce only the corrective

10  action notices and communications about those notices in

11  response to RFP 137.

12        THE COURT:  Was this topic of corrective action

13  notices ever discussed with defense counsel?

14        MR. SWEARINGEN:  We did not receive corrective action

15  notices until, I believe, the December 22nd production.  And

16  I -- I -- again, I cannot represent what was discussed at

17  the -- I believe the January 11th meet-and-confer.

18        THE COURT:  Are the corrective action notices specific

19  to NaphCare, or do they refer to any contractor?

20        MR. SWEARINGEN:  I do not know the answer to the

21  question.  I -- I get the sense that the jail has corrective

22  action notices and would have issued corrective action notices,

23  were they warranted, in the past to Drs. [sic] Hawk and

24  Mid-America, for example, when they were providers.

25        THE COURT:  Do you (Inaudible), Ms. Pappy?

**Ex. C - 261**

1    **MS. PAPPY:** No. I do have input or a response to this

2 request, if you would like to hear it.

3    **THE COURT:** I would like to hear it.

4    **MS. PAPPY:** This -- I -- this issue is limited to --

5 by their own chart. Defendants have produced some email ESI.

6 Plaintiffs seek all forms of communication but not limited --

7 but not limited to text messages and instant message. It has

8 nothing to do with notices of corrective action.

9   Emails -- email communications with MAT care were

10 produced, which is where they got these notices of corrective

11 action. I think they also got them from NaphCare.

12   So I don't -- I'm -- again, because there was no

13 meet-and-confer specific to just notices of corrective action,

14 I -- I don't know what they're missing. I don't know what

15 additional they're asking for. And on that basis, I would ask

16 that it be denied because of the representation to the Court

17 that this is about ESI.

18    **MR. SWEARINGEN:** May I respond, Your Honor?

19    **THE COURT:** Go ahead, Mr. Swearingen.

20    **MR. SWEARINGEN:** I believe the corrective --

21 corrective action notices came to our attention through ESI,

22 and that's the reason why this statement is written the way

23 that it is.

24    **THE COURT:** Ms. Pappy, your position is well-taken.

25 I'm going to ask you to do the same thing that I asked you to

1    do with respect to the watch commander log and ascertain what

2    is the volume of those documents.

3        I don't have any idea.  They were not raised with you.

4    They should have been raised with you.  They should have been

5    the subject of a meet-and-confer.  It should not be fleshed out

6    for the first time on the fly before me at this hearing, when

7    we have -- when we have had the ample opportunity to do so at

8    any point between December 22nd.

9        And I will also say, in the present, this was filed on

10   January 17th.  Nothing has prevented the parties, in

11   particular, Mr. Swearingen, if this is something you want, from

12   picking up the phone and asking Ms. Pappy to look into

13   corrective action notices.  And if she said, "No, I'm not going

14   to do it," you tell me that, and that would be certainly a

15   (Inaudible).

16       But I am mindful, Ms. Pappy, that this was never asked of

17   you in the past.

18       **MS. PAPPY:**  Your Honor, I just want to make sure I'm

19   clear on what the order is.

20       Look for, capital N, notices of correction -- corrective

21   action.

22       **THE COURT:**  Whether it's notices of correct -- notice

23   of corrective action or corrective action notice.  I don't know

24   the actual title of the document.

25       **MS. PAPPY:**  I know what you're talking about.

```
 1              THE COURT:  It's similar to watch commander logs.  I
 2    don't know exactly what they are --
 3              MS. PAPPY:  Yes.
 4              THE COURT:  -- or how vast that is or how easy it is
 5    to retrieve.  I would like you to look into that.
 6              MS. PAPPY:  I will.
 7              THE COURT:  And I am not making any determination how
 8    I am ruling on this because this is something that is
 9    frankly -- it's not even -- you would agree that the corrective
10    action notices are nowhere in your motion; is that correct,
11    Mr. Swearingen?
12              MR. SWEARINGEN:  I believe that's correct.  There may
13    be a representation to them in one of the exhibits, but I --
14    but to the best of my knowledge, the answer is no.
15              THE COURT:  Go ahead, Mr. Swearingen.
16              MR. SWEARINGEN:  For 139, if you look at the middle
17    column, it states the defendants produced PA -- PSU, EOH, and
18    safety cell rosters from two facilities from a single day.  We
19    would ask whether the Court would order production of documents
20    for the same relevant time period.
21              THE COURT:  I think we did, did I not, Ms. Pappy?
22    Psychiatric Stabilization Unit?  Enhanced -- Enhanced
23    Observation Housing?
24              MS. PAPPY:  I thought -- EOH, definitely, and --
25              THE COURT:  What -- the PSU may have been in -- that
```

**Ex. C - 264**

1  was Number 49.  I don't know if we talked about that.

2       **MS. PAPPY:**  You -- you did, safety cells and EOH, and

3  you asked -- you ordered -- limited-grant to produce back to

4  1/1/2021.

5       **THE COURT:**  And that would be for safe -- spreadsheet

6  log (Inaudible) placement of safety cells and Extended

7  Observation -- or Enhanced Observation Housing.  Excuse me.  I

8  did not specifically reference Psychiatric Stabilization Unit.

9  Again, it does not appear that this was actually covered in the

10 parties' meet-and-confer efforts.

11      But, Ms. Pappy, for Number 49 --

12      **MS. PAPPY:**  Yes.

13      **THE COURT:**  -- I will respectfully direct the County

14 to include Psychiatric Stabilization Unit logs, in addition to

15 the safety cell and EOH logs, for the relevant time period.

16      **MS. PAPPY:**  Yes.

17      And then are you going to deny their request?  I can't --

18 I can't remember what it was now.

19      **THE COURT:**  139?

20      **MS. PAPPY:**  Yes.

21      Thank you.

22      **THE COURT:**  Yes.  It is denied as moot.

23      Go ahead, Mr. Swearingen.

24      **MR. SWEARINGEN:**  With respect to RFP 146, there was a

25 discussion between the Court and Ms. Pappy earlier today, and I

**Ex. C - 265**

1    believe the colloquy ended by discussing the -- a list with

2    respect to outside providers would be produced.

3        And I would anticipate that the responsive documents to

4    RFP 146 would be in a different list.  This is individuals who

5    are awaiting transfer to the Department of State hospitals or

6    other psychiatric facilities.

7        There's a long backlog in beds -- for available bed spaces

8    in DSH, and this particular request is asking for lists with

9    respect to those awaiting transfer to DSH and other hospitals,

10   not to outside specialty care providers.

11           **THE COURT:**  So for the long term, you mean?

12           **MR. SWEARINGEN:**  Yes, Your Honor.

13           **THE COURT:**  Okay.  Well, that makes sense.

14       **MS. PAPPY:**  And this is -- that -- we talked about the

15   distinction between medical specialties and then transfer to

16   outside facilities.  You covered this, and you ordered the

17   County to produce going back to 1/1/2021 for those transfers.

18           **THE COURT:**  And we're talking about, just for clarity,

19   actual transfers for perhaps an extended period of time, not

20   just to outside providers for psychiatric appointments?

21       **MS. PAPPY:**  No.  No.  I think I clarified earlier that

22   they are -- they are leaving the jail, and they are going to

23   a -- that's where they're going to live.

24           **THE COURT:**  Does that satisfy you, Mr. Swearingen,

25   that clarification?

1          **MR. SWEARINGEN:**  If that list includes people who are

2     going to the state hospital, then yes.

3          **THE COURT:**  It's going to, more generally, include

4     transfers.  So I don't know what is going to be on the list,

5     but it's responsive to your concern, and I would stand on my

6     ruling on 136.

7        Go ahead, Mr. Swearingen.

8          **MR. SWEARINGEN:**  For RFP 167, the middle column

9     indicates the defendants produced policies regarding programs

10    and a list of programs as revised November 2023.  We would ask

11    for the list of programs for the relevant time period.

12          **THE COURT:**  Didn't -- didn't I discuss this,

13    Ms. Pappy?

14          **MS. PAPPY:**  We did, and you ordered me to produce --

15    you ordered the County to produce participant logs, to the

16    extent that they exist.

17          **THE COURT:**  Does that satisfy you, Mr. Swearingen?

18          **MR. SWEARINGEN:**  I believe -- I appreciate that --

19    that order, but we would also appreciate a list of the programs

20    that are available at the jails for the relevant time period.

21          **MS. PAPPY:**  And that's -- well, when we talk about the

22    relevant time period, there is no time period in 167, and the

23    program list was provided as revised in November of 2023.  So I

24    don't know what the relevant time period is.

25          **THE COURT:**  Does that -- so that list is a set list as

1  of November 2023 (Inaudible) programs?

2      **MS. PAPPY:**  What they asked, yes.

3      **THE COURT:**  All right.  Here's what I would ask you to

4  do, Ms. Pappy:  Provide a list of the programs that is

5  effective in November of 2022 and a list of programs that is

6  effective as of November 2021.

7      **MS. PAPPY:**  I will do so.

8      **THE COURT:**  Thank you.

9    I will amend my order to include those.

10    Does that satisfy you on 167, Mr. Swearingen?

11      **MR. SWEARINGEN:**  Yes, Your Honor.

12      **THE COURT:**  Okay.  What's your next one?

13      **MR. SWEARINGEN:**  RFP 172.  Your Honor denied this as

14  overbroad, and we would ask whether the Court would consider

15  ordering only lists of laundry exchange dates at the jails.

16      **THE COURT:**  What does that mean?

17      **MR. SWEARINGEN:**  Every week, people incarcerated at

18  the jail should receive fresh linens and clothes.  I have,

19  Your Honor, spoken to an individual who was in (Inaudible)

20  clothes, had medical issues requiring him to change a catheter,

21  and he had told me that he didn't receive regular clothes.

22    And we would ask that the Court consider ordering only

23  lists or logs of laundry exchange, if those documents exist.

24      **THE COURT:**  I'm not going to do that, Mr. Swearingen.

25  This particular request for production is so broad.  Every

1    single document in the possession of the County relating to

2    laundry, clothes, and linens that -- even as narrowed to every

3    document pertaining to laundry exchanges over the course of a

4    three-year period, I respectfully find is -- it does not fall

5    within the scope of Rule 26.

6        Go ahead.

7        **MR. SWEARINGEN:**  For RFP 174, plaintiffs seek

8    production of the spreadsheets that were produced for the

9    longer -- what we are calling the relevant period, going back

10   to January 1st, 2021.

11       **THE COURT:**  This document was not included as one of

12   your documents relating to practices; is that correct?  I don't

13   see it anywhere in your motion.

14       **MR. SWEARINGEN:**  It's -- it's -- again, it may have

15   been an oversight that it did not make it into a section

16   heading.  But I would, again, reference Page 1, Lines 11

17   through 14 of the motion.

18       **THE COURT:**  Ms. Pappy, did you produce a spreadsheet

19   showing past inspection visits from June 2023 to the present?

20       **MS. PAPPY:**  Yes.

21       **THE COURT:**  All right.  I am going to direct the

22   County to produce spreadsheets showing past inspection visits

23   for the relevant time period, which we have defined as

24   January 1st, 2023, to the present, for RFP Number 174, noting,

25   again, that this is not truly raised in the motion and appears

**Ex. C - 269**

1   only in the chart.

2       I am informed that I misspoke.  The relevant time period

3   begins January 1st, 2021.  I may have given you the wrong year,

4   but we're talking about the same time period.  I just want to

5   make sure we're all clear on that.

6           **MS. PAPPY:**  I wrote down the wrong thing.  I wrote

7   down "2021."  So I don't know what you said.

8           **THE COURT:**  Well, neither do I.

9       So we're all on the same page.

10          **MS. PAPPY:**  2021.

11          **THE COURT:**  We all agree on the relevant time period.

12      Okay.  Go ahead, Mr. Swearingen.

13          **MR. SWEARINGEN:**  Thank you, Your Honor.

14          **THE COURT:**  Sure.

15          **MR. SWEARINGEN:**  RFP 179.  We would ask the Court to

16  consider ordering logs or lists regarding contraband collected

17  at the jail for the relevant time period.

18          **THE COURT:**  Do you know if such a log exists,

19  Ms. Pappy?

20          **MS. PAPPY:**  I have absolutely no idea.  I don't know.

21  Our meet-and-confer is focused on training and "What do you do?

22  Drug interdiction.  How do you stop it from coming in?"

23          **THE COURT:**  I am going to ask you to look at this one,

24  Ms. Pappy.

25      The RFP itself is, frankly, overbroad.  I -- every single

1    piece of paper relating to contraband narcotics, staff,

2    inmates, anyone -- to the extent it is now requesting to be

3    narrowed, that should have happened weeks ago and not putting

4    us here.

5         However, Ms. Pappy, without ordering you to produce it, I

6    would ask you to determine whether there are any logs showing

7    contraband narcotic seizures.

8              **MS. PAPPY:**  I will do so.

9              **THE COURT:**  Go ahead, Mr. Swearingen.

10             **MR. SWEARINGEN:**  RFP 185.  Plaintiff seeks blank

11   examples of forms that are used for classification, including

12   defendants' decision tree regarding classification.  This has

13   been requested by our security expert, who regularly performs

14   classification reviews on jails.

15             **THE COURT:**  Is that Mr. Austin?

16             **MR. SWEARINGEN:**  It is, Your Honor.

17             **THE COURT:**  Well, I don't have any more information,

18   Ms. Pappy, because it wasn't raised in the moving papers.

19             **MS. PAPPY:**  I don't -- to the extent that

20   classification documents are in-custody files, we've produced

21   custody files.  I don't -- I really can't say anything more

22   than that because this was never specifically discussed.

23             **THE COURT:**  It was not.  I -- and it was not raised in

24   the motion.  If it was simply seeking blank forms, I would ask

25   you to look into that, Ms. Pappy.

1        **MS. PAPPY:**  Yes, Your Honor.

2        **THE COURT:**  Go ahead, Mr. Swearingen.

3        **MR. SWEARINGEN:**  RFP 187 seeks incident reports

4    related to assaults at the jail from January 1st, 2021.

5    Incident reports are documents.  They're regularly created in

6    the normal course of business that, in other cases, show very,

7    very relevant information with respect to alarming incidents of

8    violence, deaths, suicides, et cetera, at the jail.

9        We would request those be produced since January 1st,

10   2021.

11       **THE COURT:**  It's not in your motion.  This absolutely

12   should be something that was the subject of explanation as to

13   its relevance.  It is every single document relating to any

14   assaults, the use of weapons in that insult -- assaults.

15       I -- all documents, including, but not limited to, logs,

16   audits, lists, and summaries, showing the number of assaults,

17   dates of assaults, use of any weapons in assaults, involvement

18   of employees or incarcerated persons in assaults, the nature of

19   injuries sustained in assaults, and cause of injuries sustained

20   in assaults for every assault involving an incarcerated person

21   for a three-year period.

22       It is compound, it is overbroad, and it is respectfully

23   denied.  And it is also not in your motion, with no explanation

24   as to how it might reasonably be narrowly tailored, and

25   apparently it is not the subject of any meaningful

1    meet-and-confer discussion between the parties.

2        Go ahead, Mr. Swearingen.

3        **MR. SWEARINGEN:**  RFP 191 -- and this seeks staffing

4    plans.  Defendants produced daily deployment spreadsheets but

5    only for Central Jail.  They also did not produce the total

6    number of allocated positions and the number of vacant

7    positions.

8        **THE COURT:**  That's information you can gather at a

9    Rule 30(b)(6) deposition, is it not?

10       **MR. SWEARINGEN:**  Daily deployments, no, Your Honor.

11   Those are documents, again, that are spreadsheets that were

12   produced for Central Jail but no other facility.  I would

13   anticipate that we can get the number --

14       **THE COURT:**  You're asking for staffing plans.  You're

15   saying that a daily deployment is the same as a staffing plan?

16       **MR. SWEARINGEN:**  It -- it is responsive to the call

17   for documents in 191, which show the number of hours required

18   for each position and defendants' staffing plan or plan for

19   staffing those positions.

20       **THE COURT:**  For every facility for three years?

21       **MS. PAPPY:**  If I may.

22       **THE COURT:**  You may.

23       **MS. PAPPY:**  We did not ever specifically discuss these

24   number of allocated positions, but my client produced all

25   staffing plans, everything that it had, any -- any staffing

```
1   plan, in response to 191.

2       And I would ask that it be denied.

3       THE COURT:  I'm denying your request to compel a

4   further response to RFP Number 191, given Ms. Pappy's

5   representation that the staffing plans have been produced.

6       Go ahead, Mr. Swearingen.

7       MR. SWEARINGEN:  RFP 197 seeks grievances and

8   complaints filed by the Deputy Sheriffs' Association regarding

9   overtime, supervisory practices, staffing, retaliation, and

10  safety concerns.

11      THE COURT:  Well, it seeks that with respect to every

12  matter of jail employment, and then you have narrowed it

13  somewhat.

14      Again, was this the subject of a meet-and-confer,

15  Ms. Pappy?

16      MS. PAPPY:  No.

17      THE COURT:  There was no meet-and-confer.  It's not

18  raised in the motion to explain to me why this is relevant.  It

19  simply appears in a chart.  As drafted, it is overbroad and not

20  proportional to the needs of the case.

21      I am respectfully denying the motion to compel any further

22  response to 197.

23      MR. SWEARINGEN:  For RFP 219, plaintiffs' third

24  amended complaint talks at length about areas of the jail that

25  are unsafe and prone to inmate violence due to the lack of
```

1   safety cameras.  And plaintiffs would ask the Court,

2   respectfully, to consider ordering production of schematics

3   showing where cameras are located within each facility.

4        **THE COURT:**  That's not what the RFP asks for.  You

5   agree with that; right?  And, actually, that's not what you

6   were even saying is missing.

7        The RFP Number -- RFP 219 asks for every document and

8   communication that refers to any location in the jail that

9   incarcerated persons may access but is not monitored by video

10  cameras, including, but not limited to, the area described as,

11  quote/unquote, "the pocket."

12       And your -- the missing documents, according to your

13  chart, are documents relating to the pocket, including

14  trainings or analyses of how to avoid incidents of violence in

15  the pocket.

16       What you're asking me to produce -- or the County to

17  produce isn't mentioned in the RFP or any allegedly missing

18  documents, is it?

19       **MR. SWEARINGEN:**  I'm trying to get the most narrowed

20  responsive document possible, Your Honor.

21       **THE COURT:**  I'm understanding that -- oh.  Go ahead.

22  I interrupted you.  Go ahead.

23       **MR. SWEARINGEN:**  No.  I'm finished now.

24       **THE COURT:**  No.  Go ahead.

25       **MR. SWEARINGEN:**  Again, understanding that I wasn't

1    part of the meet-and-confer on January 11th.

2         **MS. PAPPY:**  It wasn't discussed.  I would also suggest

3    that a 30(b)(6), which we have somebody on security, is

4    probably the best way to get this information.

5         We've produced policies about video systems, and -- and we

6    produced ESI on the subject.  I don't -- we tried to search ESI

7    regarding "the pocket," and anything that showed up was

8    produced.  Nothing specific was ever asked about it.  So I

9    just -- I don't know what there is.  I don't know what I should

10    go look for.

11         I just -- I have, really, nothing more to say.

12         **THE COURT:**  We're going to talk about ESI, well,

13    hopefully today.  But I think "the pocket" was a disputed ESI

14    search term.

15         So leaving ESI aside --

16         **MS. PAPPY:**  Yeah.

17         **THE COURT:**  -- the locations of the video cameras at

18    every one at the facilities is not requested in this RFP.

19         **MS. PAPPY:**  Correct.

20         **THE COURT:**  And it's also not requested in the

21    allegedly missing documents.  So it's being raised for the

22    first time today with all of us.  I don't know the relevance of

23    every location of every camera in the jails.

24         What's your position?

25         **MS. PAPPY:**  They should be -- you should deny it, and

1    they should ask these questions in a 30(b)(6).

2        **THE COURT:**  What is the relevance of the plaintiff in

3    understanding the location of every security camera in every

4    San Diego County Jail facility, Mr. Swearingen?

5        **MR. SWEARINGEN:**  It really should be narrowed to the

6    housing units.  And the relevance is because, in housing units

7    that don't have video cameras -- because there's a lot of

8    violence in the jail to begin with --

9        **THE COURT:**  Uh-huh.  Right.

10       **MR. SWEARINGEN:**  -- and violence often occurs in

11   places where incarcerated people know that area is not

12   monitored either by eyesight or by video camera.

13       And knowing where -- having that list of where video

14   cameras exist in housing units and don't exist would be helpful

15   to our safety and security expert's analysis of the safety of

16   those housing units.

17       **MS. PAPPY:**  That same expert has done an in-person

18   inspection.  So he knows where all of them are located.  I

19   don't know that there is a list of where they are specifically

20   located.  I have no idea.

21       **THE COURT:**  I understand your point, Ms. Pappy.

22       And whether there's a list or not, given that the safety

23   and security expert has performed an inspection of the

24   facilities, I'm going to deny what is functionally a new

25   request for production, given that it's not contained in

1   RFP 219 and also is not contained in the -- the -- the

2   allegedly missing documents.

3       Go ahead, Mr. Swearingen.

4       **MR. SWEARINGEN:**  RFP 223.  Dental sick call lists for

5   a log from 2023 was produced.  Plaintiffs would respectfully

6   ask that the dental sick call logs be produced for the relevant

7   time period, if that hasn't already been ordered and I missed

8   it.

9       **THE COURT:**  I think we already ordered it, but I

10  appreciate you raising it again, Mr. Swearingen.  Maybe we

11  discussed specifically medical, mental health, and I don't know

12  that we specifically discussed dental sick call logs.

13      I would direct the County to include dental sick call

14  logs, if that is, in fact, a separate log from medical, for the

15  relevant time period.

16      Does that make sense, Ms. Pappy?

17      **MS. PAPPY:**  Yes, and it is a separate log that was

18  produced just for 2023.

19      **THE COURT:**  All right.  Well, I appreciate that

20  clarification, Mr. Swearingen, and you will have that document

21  for the relevant time period.

22      **MR. SWEARINGEN:**  Thank you, Your Honor.

23      **THE COURT:**  Sure.

24      **MR. SWEARINGEN:**  RFP 233 seeks documents tracking the

25  wait time for professional visits.  Our third amended complaint

1    has a Sixth Amendment claim for access to counsel.  Numerous

2    plaintiffs' attorneys and myself have waited extremely long

3    times to see incarcerated people during professional visits.

4        I understand that the time that attorneys seeking

5    professional visits into the jail is logged into the JIMS

6    system.  I don't know whether or not the time the person whom

7    we seek to speed with -- speak with is also logged into the

8    JIMS system.

9        But I do know that, in contrast to the professional visits

10   that we have to wait through extremely long times to visit our

11   clients, Public Defenders in this county can request scheduled

12   Microsoft Team meetings with their clients and don't have to

13   wait any period of time whatsoever.

14       And we would respectfully ask the Court to consider asking

15   whether or not the tracking of waiting times for professional

16   visits is kept by the County.

17           **THE COURT:**  I'll ask.

18       I mean, I would also note that you also had requested to

19   know how long it takes to release visitors from the waiting

20   room after a request has been made.  Was it including the time

21   it takes to release visitors from the professional visiting

22   room after a request has been made, meaning after the attorney

23   has met with his or her client?

24           **MR. SWEARINGEN:**  That's correct, Your Honor.

25   Afterwards, usually, the normal course of conduct is for the

1   attorney to press a button and ask the person down at reception

2   to be let out, and we have experienced exceedingly long times

3   to be let out in order to see the next person on our list who

4   we wish to communicate with.

5       And sometimes we have even been trapped in the vestibule,

6   the security doors between the professional visiting room and

7   the hallway they're letting us out -- it's a small room, maybe

8   a little bit bigger than the size of this desk -- for over half

9   an hour.  So it requests that time, too.

10      **THE COURT:**  Ms. Pappy, do you know whether the County

11  maintains logs documenting wait times for professional visits?

12      **MS. PAPPY:**  They do not.  What we maintain is what we

13  produced.  We limited it to August 31st of 2023, and Your Honor

14  has already ordered us to go back to January 1st of 2021.  I

15  would ask that that be the only order with regard to this

16  request.

17      **THE COURT:**  It's what you have, and I stand on my

18  order in that regard.

19      All right.  Next, Mr. Swearingen?

20      **MR. SWEARINGEN:**  RFP 238.  Plaintiffs seek production

21  of SANDAG, County, Probation Department, and Sheriff's

22  Department reports evaluating access to alternatives.

23      **THE COURT:**  Again, this is a serious RFP.  It doesn't

24  appear in a motion.  There's no explanation as to the relevance

25  of it, proportionality.  It is -- the County has not had a

1    meaningful opportunity to respond to it.

2        And that's another part of this that is very challenging,

3    Mr. Swearingen, is the County is reading your memorandum and

4    responding to the arguments in it.  It is decidedly not fair to

5    expect the County to read through the memorandum, respond to

6    the arguments in the memorandum, and then go pick through the

7    charts, figure out what's in the chart that's not in the

8    memorandum, and then respond to the arguments in the chart.

9        I mean, it -- I didn't even look at this one because I

10    didn't see it anywhere in your motion.  And it's not all about

11    me, but I want to give these consideration and really think

12    through them.

13        And now I'm -- you're talking about Probation

14    Department/Sheriff's Department reports evaluating access to

15    alternatives to incarceration, reentry programming,

16    proposals -- proposals for expansion.  The expansion of the

17    jails?

18        **MR. SWEARINGEN:**  The expansion of the alternative

19    programs.

20        **THE COURT:**  Okay.  And analyses of cost savings that

21    can be achieved by routing people into services instead of

22    jail.

23        Are there specific reports that you're aware of that

24    you're asking the -- the County to look for?

25        **MR. SWEARINGEN:**  We understand that the County

1  generally has been investigating these issues.  I do not know

2  the names of the reports or the dates of the reports,

3  Your Honor.

4      **THE COURT:**  And that was the purpose of speaking to

5  Ms. Pappy about it at a time where this could have actually

6  been fruitful.

7      **MR. SWEARINGEN:**  Your Honor, could I say a little bit

8  more about that, about the meeting and conferring on RFP Set 5,

9  because we've been denied numerous requests on the basis of not

10 meeting and conferring?

11     But RFP Set 5 -- Set 5 was served on September 1st, 2023.

12 Pursuant to the parties' agreement, defendants had two months

13 to respond.  We did not get their response until November.

14 Shortly thereafter, the Court ordered the parties to meet and

15 confer.

16     Within two days of the Court's ordering the parties to

17 meet and confer before our November 17th joint status report,

18 we repeatedly requested from defendants times to meet and

19 confer, and defendants said that they would not meet and confer

20 with us until the day before the JSR.  That JSR, on

21 November 17th, was the disputed items list.

22     We did not have -- so we were basically stonewalled to

23 meeting and conferring from November -- from September 1st

24 until November 16th, the day before the joint disputed list.

25 Thereafter, we had an in-person hearing on that.

```
 1        On December 18th, I sent a long letter to defense counsel
 2   asking them to meet and confer.  I repeatedly asked them to
 3   meet and confer on the December 18th letter.  That's one of my
 4   exhibits to the declaration.  They said, "No.  You'll have to
 5   wait until after the production."
 6        Again, the production came over the holiday, and we did
 7   not meaningfully get to it, if you will, until early January,
 8   at which time, we had a lot of attorneys reviewing documents
 9   extremely quickly because there were hundreds of thousands of
10   documents.
11        It was very hard for us to put together a list of what was
12   produced and to create this chart in realtime and also draft
13   the motion to compel because the deadline for doing so was so
14   short.
15        At the same time, I tried to meet and confer numerous
16   times on RFP Set 6.  I have -- I have the emails with me.  I
17   will be happy to show them to you.  And Counsel repeatedly
18   refused to meet and confer.
19        I held a phone call meet-and-confer.  Defense counsel
20   never appeared on that phone call, and we've taken,
21   collectively, defendants' refusal to meet and confer and
22   generate throughout this process as an understanding that
23   they're not going to meaningfully confer -- meet and confer
24   about these issues.
25        There is documentation in my declaration showing that,
```

1    subsequent to our November 16th meet-and-confer, defendants'

2    counsel said that they are not going to search for anything

3    unless plaintiffs agree in advance to a more limited set of

4    documents.  The defendants mandated, and unless we did so, no

5    documents would be searched for.

6         So respectfully, Your Honor, many of the requests at

7    issue -- I understand Your Honor's rationale for denying them.

8    I'm not going to argue with that rationale, but I would

9    respectfully ask the opportunity to seek leave to file an

10   RFP Set 7 for a much more narrowed set of documents, one that

11   we anticipate that exists, whether we have names of those

12   specific documents or whether we're much more precise in our

13   language, because we are where we are, because many of the

14   requests that you are presently denying are highly relevant to

15   defendant -- to plaintiffs' claims.

16        And without these documents, there will be no evidentiary

17   record for which the Court -- to have a full and fair hearing

18   on whether or not plaintiffs' claims are meritorious or not.

19             **THE COURT:**  Ms. Pappy, do you wish to respond?

20             **MS. PAPPY:**  I do.

21        Focusing on the question at hand, if you look at

22   Request for Production 238, it bears absolutely no resemblance

23   to the, quote/unquote, "limited requests" and -- under "Missing

24   Document."

25        The missing document category is actually broader than the

1    original RFP.  There was never any specific conversation about

2    this in any of our requests for production, never any attempt

3    to say, "Hey, can you get us this information or that

4    information?" such that I could go look and see what it was.

5         And I take exception to the things that were said about

6    meet-and-confer.  But that said, the time is now.  The time was

7    now to bring you things to the Court.  They've had since

8    January 17th, when they filed this, to call me to say, "Hey, we

9    never talked about 238."

10        Your directives were clear.  There has to be an end to

11   this.  The notion that they should be given leave to serve yet

12   another request for production, given what has transpired thus

13   far, is -- is highly objectionable and extremely prejudicial to

14   the defendants.

15        **THE COURT:**  Mr. Swearingen, I -- I have to agree with

16   Ms. Pappy with respect to -- even if -- even if there were

17   difficulties in meeting and conferring, that was not a reason

18   to not comply with my order on December 22nd, at any point

19   between then and now, to try to raise these issues with defense

20   counsel.

21        And I realize that there were problems, and I'm not making

22   any finding about anybody doing anything wrong at this point,

23   but Ms. Pappy is correct.  The -- if the plaintiffs wanted to

24   have these reports, at any point, even after the filing of the

25   motion, there could be an effort to meet and confer and get

1    together and say, "We're raising it now."

2        The first time it's actually being discussed is in court

3    on a motion to compel, where the request, as Ms. Pappy points

4    out, is actually -- looks to be narrower than the purported

5    missing documents.

6        So -- and it's -- the -- the requests are not simply being

7    denied for failure to meet and confer.  They're being denied

8    for the reasons stated on the record, including my findings

9    that they are overbroad and, based on the information presently

10   before me, not proportional to the needs of the case.

11       So with -- I'm not, at this point, going to authorize a

12   seventh set of requests for production.

13       Ms. Pappy, do you -- do you even know what documents the

14   County has that -- well, are there any analyses or evaluations

15   of the alternative to incarceration and reentry programs, to

16   the extent they do (Inaudible) those documents exist?

17           **MS. PAPPY:**  I have no idea.

18           **THE COURT:**  I am going to respectfully ask you, for

19   Number 238, to look at whether there are any analyses or

20   evaluations.

21       And I'm not talking about stray emails.  I am talking

22   about something that is an actual analysis -- analysis or

23   evaluation of alternatives to incarceration and reentry

24   programming.

25           **MS. PAPPY:**  For what time period?

1        **THE COURT:**  For the relevant time period that we've

2  discussed.

3        **MS. PAPPY:**  I will do so.

4        **THE COURT:**  Go ahead, Mr. Swearingen.

5        **MR. SWEARINGEN:**  On my request for motion for leave to

6  file an RFP Set 7, I am disinclined to proffer or ask the Court

7  to file evidence of more emails about plaintiffs' efforts to

8  meet and confer, whether it be on RFP Set 5 or others,

9  especially given this morning's conversation, which I thought

10 was very productive.

11       But I do want to highlight how important, I think, certain

12 documents are to plaintiffs' request.  They are being denied on

13 the basis that we did not meet and confer over the past, you

14 know, month that we were trying to meet and confer on other

15 areas and being consistently shut down on.

16       I -- it's not clear how a limited set of additional

17 requests -- given Your Honor's perception that our requests for

18 production are drafted in an overly broad way and that we

19 didn't meet and confer on them, I don't understand how it would

20 prejudice defendants to have one more set of limited RFPs on

21 certain, specific document requests that are highly relevant to

22 plaintiffs' claims for which no documents have been produced or

23 few documents.

24       **THE COURT:**  Give me an example.

25       **MR. SWEARINGEN:**  The alternatives to custody

documents.  These are relevant to plaintiffs' Claim 9.  I

understand what you just ordered, Your Honor, and I don't have

a list in front of me.

    But there are numerous other RFPs, including 239, 240,

241, 242, relevant to -- to RFP Set 9, for which defendants did

not produce documents, for which plaintiffs' counsel put in a

lot of hours, again, trying to ingest and understand what has

been produced over a two-week period and getting that index

together and, at the same time, struggling to meeting and

conferring on other issues with opposing counsel.

    I do understand your concern about the drafting of many

requests and how we could have done so in a much more narrowly

tailored way, and we seek the opportunity to do so, and we

would be happy to -- to brief that through a motion for leave.

        **THE COURT:**  How many additional RFPs are you talking

about?

        **MR. SWEARINGEN:**  I would need to go back through the

list.  I don't have it off the top of my head, but I would -- I

would assume well under 50.

        **THE COURT:**  Well under 50?

        **MR. SWEARINGEN:**  Yes, Your Honor.

        **THE COURT:**  Mr. Swearingen, we are at the point where

this is prejudicial to the defendants and their ability to

prepare for these depositions and expert discovery that is

coming up.

```
 1        I did not put limits on your ability to serve requests for
 2   production.  That was at the plaintiffs' request.  You have
 3   served 200 and -- how many?
 4             MR. SWEARINGEN:  -52.
 5             THE COURT:  252.
 6             MS. PAPPY:  252 plus 68 in the inspection request.
 7             THE COURT:  And at this point, Mr. Swearingen,
 8   respectfully, I am going to deny the request.  I'm not going to
 9   further amend the pretrial schedule, which this would almost
10   certainly require, based on my findings that the requests for
11   production were not narrowly tailored.
12        They -- there may have been issues with meeting and
13   conferring between the parties, but it does appear to me that,
14   at the very least, there has not been meaningful effort to meet
15   and confer regarding the RFPs that are the subject of this
16   motion, as required by my order.
17        I understand that people are busy.  You have a team of
18   approximately nine lawyers that is working on this case, and
19   I'm not saying that that takes care of it all, but the
20   resources are there.  Handling these matters the way they are,
21   your requests are being changed in court, and new requests are
22   being given to me in court.  This all should have happened long
23   ago, Mr. Swearingen.
24        I'm going to respectfully deny the request to serve -- for
25   leave to file additional requests for production, and I --
```

1  well, I'll leave it at that.

2  Go ahead, Mr. Swearingen.  You left off at 238.

3  **MR. SWEARINGEN:**  RFP 239.  Defendants maintain

4  demographic characteristics of participants in

5  alternative-to-incarceration programs, and plaintiffs seek

6  those reports.

7  **THE COURT:**  Do you maintain these copies?  They're not

8  subsequent --

9  **MS. PAPPY:**  Yeah.

10  I would actually like to be heard on this because this --

11  239 is duplicative of an earlier request, where we produced the

12  racial identification of the people that were participating in

13  alternatives-to-incarceration programs.

14  I don't even think it was in Set 5.  I think it was in one

15  of the earlier requests, and this -- you're right.  We didn't

16  produce anything in response to this because we had already

17  produced it.

18  I don't -- you know, now this notion of demographics, in

19  general, is different than racial demographics, but they

20  already have it as to racial demographics.

21  **THE COURT:**  Is that correct, Mr. Swearingen?

22  **MR. SWEARINGEN:**  Not -- I'm unaware of that and

23  certainly not for the relevant time period.

24  **THE COURT:**  When you say you're -- Ms. Pappy is

25  telling me that it was requested previously.

1       **MR. SWEARINGEN:**  I -- I'm not aware it was.  I'm not

2  aware that demographic care -- the demo- -- the racial

3  demographics of participants -- of all participants in

4  alternative-to-incarceration pro- -- and reentry programs was

5  requested.

6       **MS. PAPPY:**  I specifically remember looking at the

7  document, and it has race on it.  Specifically, it was provided

8  to me by Probation, who manages the alternatives to

9  incarceration.  I can identify it for the Court so that you're

10  not put in a position of having to make a credibility call

11  here.

12       **THE COURT:**  Oh, I'm not making a credibility call.

13  Mr. Swearingen told me he doesn't -- he's not aware of it, as

14  he sits here.  He's not representing, definitely, it didn't

15  happen.  I appreciate that.

16     Ms. Pappy, I'm -- I'm taking you at your word that these

17  documents were already produced in response to an earlier RFP.

18  Again, the difficulty that I'm having is that these aren't

19  raised in a motion beyond this chart.  So I have no other

20  information to go by.

21     But I accept your representation, Ms. Pappy, and I would

22  deny the request to compel a further response to RFP 239.

23     Mr. Swearingen, what cause of action are we talking about

24  with respect to the alternatives to incarceration?

25       **MR. SWEARINGEN:**  I believe it's part of our ninth

1   claim, Your Honor.

2           **THE COURT:**  All right.  Here's what we're going to do:

3        With respect to Requests for Production Numbers 238 to

4   244, I'm going to take the parties at your word that there is

5   going to be a renewed spirit of good-faith dialogue and

6   cooperation with respect to meet-and-confers going forward.

7        All of these requests appear to relate to the plaintiffs'

8   ninth cause of action.  They were not briefed in the motion.

9   The only information I have about them is that very summary

10  information contained in the chart, and I understand why they

11  are not contained in the defendants' opposition.

12       They also were not the subject of a meet-and-confer

13  between the parties at any point between September, apparently,

14  and the present.  In particular, they were not the subject of a

15  meet-and-confer, as required by my December 22nd order.

16       That being said, given Mr. Swearingen's representations

17  regarding the significance of these requests to the issues

18  raised in the ninth cause of action, I am directing the parties

19  to meet and confer, in generally, about document production

20  pertaining to the alternatives-to-incarceration programs and

21  what documents the County is willing to produce, understanding

22  that it has not had an opportunity to speak with the plaintiffs

23  about that.

24       I am directing the parties to prepare and file a joint

25  status report with each party's position on generally documents

1    relating to alternative-to-incarceration programming within two

2    weeks from today.  And then I will issue a ruling, if I find

3    that any further production is warranted, but that is in

4    addition to my earlier findings regarding the fact that this

5    really is not properly raised before me.

6        I do want to provide the parties an opportunity to meet

7    and confer on these documents because it does strike me that

8    there is room for agreement between the parties.

9        Is that clear, Mr. Swearingen?

10        **MR. SWEARINGEN:**  It is, Your Honor.

11    Thank you.

12        **THE COURT:**  Ms. Pappy, is that clear?

13        **MS. PAPPY:**  Yes, Your Honor.

14        **THE COURT:**  All right.  What's next, Mr. Swearingen?

15        **MR. SWEARINGEN:**  That's through 234.

16        I would respectfully ask Your Honor include RFPs 246 and

17    247 in the order regarding alternatives to incarceration.

18        **THE COURT:**  I agree with that.  They're part of the

19    same topic.  I'm not requiring the County to produce any

20    additional documents yet, and there may be document requests

21    that are -- as drafted, are too broad, but I also believe there

22    is a more limited universe of documents that would probably be

23    appropriate.

24        Again, that should have been handled well before today,

25    but we are where we are.

 1          **MS. PAPPY:**  Can I be heard on that 246 and -47

 2   briefly?

 3          **THE COURT:**  Of course.

 4          **MS. PAPPY:**  Your Honor, if you look at 246 and -47, it

 5   is all data sets, all documents.  And -- and I think that, if

 6   you look at 238 to 234, these overbroad requests should not be

 7   included in that.

 8       And we should be focusing on 38 through -- 238 through

 9   244, which are actually more specific than 246 and 247, which

10   seem to be the "Give me all data relating to this topic."

11          **THE COURT:**  I understand your position on that, and

12   I'm going to include those in the topics for the parties to

13   discuss, but I'm not mandating what position the plaintiffs

14   must take or what position the County must take.

15       It may be that the County decides that producing all data

16   sets, as these RFPs request, is not appropriate under Rule 26,

17   in which case, you're going to tell me that in two weeks.  But

18   it may also be possible that you-all agree that, with respect

19   to this universe of -- really, universe of requests for

20   production, that additional documents -- there is some

21   additional, more narrowly tailored universe of documents that

22   can be produced.

23          **MS. PAPPY:**  Understood.

24          **THE COURT:**  I think that takes us to the end of the

25   (Inaudible); is that correct, Mr. Swearingen?

**MS. PAPPY:** Yes. Oh. I'm sorry. You didn't say "Ms. Pappy."

**THE COURT:** I did not. Sorry.

Do you think that's it, Mr. Swearingen? Is that right?

**MR. SWEARINGEN:** I -- I believe I may have skipped one set of documents. I just want to go back through my list, if you'd permit me the time to do so.

**THE COURT:** Sure.

**MR. SWEARINGEN:** RFPs 203 through 207 seeks investigation of defendants' staff, and these, I believe, were specifically discussed at the November 16th meet-and-confer and have been carried through in the joint disputed items in my December 18th letter regarding disputed items.

I do recall, from the meet-and-confer, defendants stated that they would produce the sustained allegations but not the unsustained allegations, and we seek both.

**THE COURT:** Is that correct, Ms. Pappy?

**MS. PAPPY:** Yes, and we produced the -- the sustained, but this is a little more complicated when you're talking about sworn peace officer records.

**THE COURT:** On or before February 13th, 2024, the plaintiffs shall file a brief, not to exceed five pages, regarding Requests for Production Numbers 203 through 207. Defendants are to respond on or before February 20th, not to exceed five pages.

```
1        I'm not going to order the production of these types of

2   documents based solely on an entry in a chart.  These

3   absolutely should have been raised before me in a briefing that

4   would have explained to me why they are relevant, whether there

5   are any privileges that apply.  And, instead, they're just

6   included in a chart that -- and nowhere mentioned in the

7   motion.

8            MS. PAPPY:  Your Honor, just for the Court's

9   information, which you probably know -- is, at least in state

10  court, it's called a Pitchess motion, when you want to get

11  sworn peace officer records.  And that process has to be

12  followed.  The County does not have the right to turn those

13  records over.

14           THE COURT:  Does that apply in federal court as well?

15           MS. PAPPY:  I'm not sure.  I need to figure it out

16  because we've never talked about these before.

17       So I don't --

18           THE COURT:  Well --

19           MS. PAPPY:  I mean, we talked about -- generally

20  speaking, I said, "I'll give you the public record stuff,"

21  which we did, but we -- they never met and conferred about the

22  unsustained stuff beyond just saying, "We want it."

23           THE COURT:  Do you need more time, then, than a week?

24           MS. PAPPY:  Absolutely.  I mean, it could be

25  subject -- they may have to file separate motions.
```

**Ex. C - 296**

```
 1              THE COURT:  Well, right now, Ms. Pappy, I'll give you
 2   two weeks to respond, to February 27th.  And --
 3              MS. PAPPY:  Thank you.
 4              THE COURT:  -- if you need more time, you can tell me.
 5              MS. PAPPY:  Thank you.
 6              THE COURT:  All right.  Anything further,
 7   Mr. Swearingen, on your motion to compel the RFPs?
 8              MR. SWEARINGEN:  Just for my note-taking purposes,
 9   could you repeat plaintiffs' deadline?
10              THE COURT:  Sure.  February 13th.
11        Do you need more time?  I'm not trying to jam you up,
12   either, Mr. Swearingen.
13              MR. SWEARINGEN:  I think another week would be --
14   would be helpful to research the issue.
15              THE COURT:  I'll give you two weeks, February 20th.
16   And I'll give the County two weeks, March 5th.
17              MS. PAPPY:  Thank you.
18              THE COURT:  You're welcome.
19        We've been going for almost four and a half hours, and I
20   have parties who are expecting me for an early neutral
21   evaluation at 2:00 p.m.  I want to make whatever progress we
22   can until 1:30, and then I am going to continue this hearing.
23        It's going to have to be -- I can't do it at 1:00 p.m.
24   anymore.  It's going to have to be after that, but we've got
25   more issues to cover.
```

1    So I will -- actually, given -- given the number of issues

2  that we have to cover, we'll keep the hearing at 1:00 o'clock,

3  and I'm going to move some other stuff around.  So we'll keep

4  it at 1:00 o'clock on Friday.

5    All right.  Let's turn to the issue of the individual

6  custody and medical records.

7    Ms. Pappy, I -- as I understood the parties' positions in

8  the joint status report, essentially, what the defendants are

9  doing is taking Ms. Chartoff's December 7th, 2023, email that

10  is at Docket Number 512, Page 52 and 53, and you are utilizing

11  that as your template for pulling samples of medical records

12  for inmates; is that correct?

13    **MS. PAPPY:**  That's correct.

14    **THE COURT:**  Is there anything in Ms. Chartoff's email

15  that the County is not willing to provide?

16    **MS. PAPPY:**  I'm going to pull it up, but on -- based

17  on memory, if it doesn't exist, we -- we're not providing it.

18  But because there were certain -- no.  I'm sorry.  That's not

19  right.

20    If we can't search it -- I told you that there was a JIMS

21  flag.  We relied on the head nurse's memory of who's pregnant,

22  who's not, you know, women who have been seen for OB/GYN

23  issues.

24    If there was no way for us to identify the condition

25  identified in those emails -- in that email by one of those

1    methods -- methods, without going through medical records

2    themselves, then it is not being produced.

3              **THE COURT:**  Right.

4        Do you -- do you want us -- would you like me to make you

5    a copy?

6              **MS. PAPPY:**  I'm going to find it.  I know I have it.

7              **THE COURT:**  That's okay.

8        Melissa, is that okay?  Is that okay?

9              **MS. PAPPY:**  Here I go again.

10       Oh.  Thank you.  Sorry.

11       The withdrawal protocol is -- the people that we selected

12   aren't specific to alcohol, opiates, and Benzodiazepines.  It's

13   just people on withdrawal protocol.

14             **THE COURT:**  What criteria -- so which one is that?

15             **MS. PAPPY:**  It's the second dot, the second bullet

16   point.

17             **THE COURT:**  Okay.  So for the -- each of these

18   categories, what criteria are you using to decide which ten

19   custodial and medical files?

20             **MS. PAPPY:**  Most recent, just the people that are on

21   the list currently, and then pull those files.

22             **THE COURT:**  The ten most recent for everyone --

23             **MS. PAPPY:**  Ten most recent, to the best that they

24   could.  And the most recent, in some instances, went back to

25   the beginning of 2023.  There haven't been many pregnant women

1    in that time period.

2         **THE COURT:**  So for -- and for each of those

3    individuals, does the production -- or will it include their

4    complete custody and -- file and medical records?

5         **MS. PAPPY:**  Yes.

6         **THE COURT:**  And so, looking at the 13 bullet points

7    under "Medical," do you agree with each of those categories?

8         **MS. PAPPY:**  Yes.  There isn't one that was refused.

9    There isn't a single one that was refused.

10        **THE COURT:**  Not --

11        **MS. PAPPY:**  (Inaudible) some of them -- back into them

12   in different ways.

13        **THE COURT:**  All right.  And that is correct for the

14   separate 13 bullets points for mental health as well

15   (Inaudible)?

16        **MS. PAPPY:**  Yes.  Yes.

17        **THE COURT:**  And there were five -- four bullet points

18   for dental; is that correct?

19        **MS. PAPPY:**  Yes.

20        **THE COURT:**  It sounds to me, Mr. Swearingen, like the

21   defendants are doing what you asked them to do.

22        **MR. SWEARINGEN:**  What's being represented in the

23   courtroom today, I agree.

24        **THE COURT:**  I read the joint report to say that.

25        **MR. SWEARINGEN:**  I -- when I look at the email

**Ex. C - 300**

1    communication between the parties, I was --

2          THE COURT:  (Inaudible) the report.

3          MR. SWEARINGEN:  So --

4          THE COURT:  No.  It's okay.  I'm not saying you're

5    wrong.  I'm just saying, do you agree that right now, like,

6    that's -- this is -- you're getting what you wanted?

7          MR. SWEARINGEN:  It -- yes.  If we get the bullet

8    points -- ten records from each of the bullet points, as

9    Ms. Pappy just indicated, if they're sorted by the ten most

10   recent -- that was one of our concerns.

11         THE COURT:  Sure.

12         MR. SWEARINGEN:  You know, one of our experts

13   expressed a lot of concern about these being cherry-picked,

14   about the ways in which there are communications.  Certain

15   records have been chosen, for example, by somebody's memory,

16   but defense counsel wouldn't say whose memory.

17         THE COURT:  Can you -- can we just really do this in a

18   positive way?

19         MR. SWEARINGEN:  Yes.

20         THE COURT:  You're getting the ten most recent.  Does

21   that satisfy the plaintiffs?

22         MR. SWEARINGEN:  It does.  We -- we would love a

23   declaration or -- yes.  If it's the ten most recent, yes.  It

24   would be -- it would be helpful for our experts to understand

25   the criteria of selection.

1      **MS. PAPPY:**  Number 1, we didn't produce ten for each

2  because it would -- that adds hundreds more.  We've produced

3  about five for each of the medical, and dental -- I think they

4  produced 20 each.  Mental health -- there were five in some

5  instances, but I think mental health produced (Inaudible) more.

6      It is -- my problem with the full ten is that this is

7  going to take weeks of download.  I actually had my client tell

8  me exactly how long it took to download everything that we need

9  for 173 records, which is what the defendants are willing to

10  pull.

11      I object to any declaration from my clients about how they

12  were pulled.  It was work product.  It, again, suggests that my

13  client is lying and going through medical records and reviewing

14  them and then looking for the ones that have the healthiest

15  people, and that is simply not true and based upon nothing.

16      **THE COURT:**  So, Ms. Pappy, the categories that are

17  discussed in Ms. Chartoff's December 7th email are all

18  acceptable to the County.

19      But what you are saying, as I understand it, is that,

20  rather than ten records in every category that's requested, for

21  certain categories, certain bullet points, there will be five

22  records?

23      **MS. PAPPY:**  That's correct --

24      **THE COURT:**  And you --

25      **MS. PAPPY:**  -- with some more, none less.

**Ex. C - 302**

1          **THE COURT:**  All right.  Here's what -- how long do you

2    think this is going to take?

3          **MS. PAPPY:**  Well, they're -- they're done -- I'm

4    pretty sure they're done with the medical.  I instructed them

5    to do medical and mental health first -- and that includes

6    dental -- and then custody.

7       So I think I've still seen custody records coming in.  The

8    173 that, to date, took -- eight hours -- took about 225 hours

9    for staff to pull and upload -- I'm sorry.  More than that,

10   about 300 hours.

11         **THE COURT:**  Then what I would request that you do is

12   when you produce -- when are you going to produce those

13   records?

14         **MS. PAPPY:**  Medical is done, I think.  I think all

15   that's gone out.  The custody records are all we're working on,

16   and I think some of those might have gone out yesterday.

17         **THE COURT:**  But what I want to understand, Ms. Pappy,

18   is what changes were made by the County to Ms. Chartoff's

19   proposal?  It sounds like what -- it sounds like the change

20   would be in the number of records produced.

21         **MS. PAPPY:**  That is right.

22         **THE COURT:**  I want to understand what that is.  Maybe

23   the plaintiffs will be okay with that.  Maybe they won't.

24   I'm -- I don't want to make that determination until I hear

25   from Mr. Swearingen after he's had a chance to look at

1    everything.

2        Based on the number of records you were providing,

3    Ms. Pappy, when do you expect the medical records and custody

4    records production to be complete?

5        **MS. PAPPY:**  Medical is done.  Custody should be

6    complete within the next week.

7        **THE COURT:**  Then here is what I would say:

8        You are on track, it sounds like, to comply, in large

9    part, with what plaintiffs requested.  There may be a reason

10   why the plaintiffs believe they needed ten instead of five.  I

11   don't know what that is right now.  Maybe the -- maybe they'll

12   be satisfied with what you've produced.  I don't know.

13       How long do you need to evaluate the records that you're

14   getting, Mr. Swearingen, and determine if you need additional

15   records for one or more discrete categories?

16       **MR. SWEARINGEN:**  That will depend on -- on how it is

17   produced and what information is produced in connection with

18   those medical and custody records.

19       It would be very helpful to identify -- for example, if we

20   take the first bullet point for medical health, ten records of

21   people identified as having an opioid use disorder, if

22   defendants will identify which records are responsive to that

23   so we don't have to sort through each one -- defendants

24   obviously know that information.

25       If they would produce that as well as the selection

**Ex. C - 304**

1  criteria -- the selection criteria that they've told us is

2  different from what I understand is being told today.  If they

3  would produce what is their selection criteria, that would be

4  extremely helpful as well for our experts because they need to

5  be able to represent this is the methodology for how the

6  records that we are reviewing were produced.

7          **MS. PAPPY:**  There -- I'm sorry.  I apologize.

8          **THE COURT:**  I think the request to know which records

9  correspond with which bullet point -- does that sound

10  reasonable, Ms. Pappy?

11         **MS. PAPPY:**  Absolutely.

12     I have the names, and I can provide them -- you know, if I

13  get back home today, I can provide them probably tomorrow or

14  the next day.  They were already provided with the criteria.

15  So there's nothing more needed on that front.

16         **THE COURT:**  I think, to assist the plaintiffs in

17  reviewing the records in a timely manner, simply providing, you

18  know, this bullet point, "Here are the opioid use disorder

19  individuals" --

20         **MS. PAPPY:**  Uh-huh.

21         **THE COURT:**  -- "1 through 10" -- agreed.

22     I'm not going to -- I'm not going to set this for a

23  further hearing right now.  Obviously, if there's a dispute,

24  you're welcome to raise it with me after you meaningfully meet

25  and confer.  But it sounds like this issue is -- there's

1  nothing for me to rule on at this point.  I do find that the

2  defendants utilizing the plaintiffs' proposal is appropriate.

3      All right.  The next issue is contractor activity reports,

4  which is RFP Number 78.

5      I understand, from the defendants' opposition, that this

6  is moot; is that correct, Mr. Swearingen?

7      **MR. SWEARINGEN:**  No, Your Honor.  It's our

8  understanding that defendants have produced one contract --

9  contractor activity report.  That report identifies, by

10  provider, the count of booking numbers and the count of

11  completion dates, and that's it.

12      In contrast, when you look at defendants' contract with

13  NaphCare, it requires various types of reports, including

14  statistical daily reports pertaining to medical services

15  rendered, daily hospitalization reports, dental reports, in

16  order to analyze NaphCare's failure to effectively respond to

17  annual period cleanings and refusal to authorize root canals.

18  This is in Exhibit MM to my declaration at Page 677 through

19  678.

20      So I think that there are many other contractor activity

21  reports that exist but have not been produced, Your Honor.

22      **MS. PAPPY:**  That is incorrect.

23      In Request for Production of Documents Number 3, they

24  requested health care -- those health care reports, which were

25  produced.  Number 78 was a duplicate, slash, catch-all of all

```
 1   contractors.  We did not reproduce the medical ones.

 2        THE COURT:  Is that correct, Mr. Swearingen, that you

 3   received these contractor -- or medical contractor reports in

 4   your response to RFP 3?

 5        MR. SWEARINGEN:  RFP 3?  I'm going to pull it up.  If

 6   you give me one minute, I can do so.  But that was, I recall,

 7   during early expedited discovery as it related to ADA issues.

 8      And, actually, I don't think I have -- I'm sorry.  RFP

 9   Number 3 or RFP Set 3?

10        MS. PAPPY:  RFP Set 3.

11        THE COURT:  I had misspoke.  That was my fault,

12   Mr. Swearingen.

13        MR. SWEARINGEN:  Okay.

14        THE COURT:  I said "Number 3" and not meaning to.

15        MR. SWEARINGEN:  Okay.  This was --

16        THE COURT:  Okay.  And you know what, Mr. Swearingen?

17   I'm not trying to put you on the spot.  Hang on real quick.

18      Let me ask just -- let me just ask you, in the limited

19   time before I have to leave you to get to my other matter --

20   there may be an issue with contractor activity reports.  Talk

21   to Ms. Pappy.  Figure this out before Friday.  Okay?

22        MR. SWEARINGEN:  Yes, Your Honor.

23        THE COURT:  All right.

24        MS. PAPPY:  Yes, Your Honor.

25        THE COURT:  Staffing plans.
```

**Ex. C - 307**

1        Is that one moot, Mr. Swearingen?

2            **MR. SWEARINGEN:**  We discussed that earlier in the

3   line-by-line review.

4            **THE COURT:**  Is it moot based on my rulings?

5            **MR. SWEARINGEN:**  I'd have to go back to your rulings,

6   Your Honor.  I'm sorry.  I don't have that in front of me.

7            **THE COURT:**  Okay.  Think about that one, and you'll

8   tell me on Friday.  Okay?

9            **MR. SWEARINGEN:**  Yes, Your Honor.

10            **THE COURT:**  With respect to text messages -- and I'm

11   not going to rush this.  We're going to pick up again on Friday

12   at 1:00 p.m.

13        But, Ms. Pappy, what have the defendants agreed to provide

14   in terms of text messages?

15            **MS. PAPPY:**  We did not agree to produce any text

16   messages.  You saw in the briefing that the conversation

17   started about -- about staff in the -- nonmedical staff.

18            **THE COURT:**  Right.

19            **MS. PAPPY:**  And if there are any, they are

20   inconsequential.  That is not the way they communicate with

21   each other because of IT problems and the urgent need to use

22   walkie-talkies.

23        They produced, at the last hearing, this email from

24   Dr. Montgomery.  I have since had the opportunity to -- to get

25   information about what Dr. Montgomery was talking about in

**Ex. C - 308**

1    that.  He was pushing back on NaphCare, who was saying that

2    they were having problems getting payments made because of IT

3    issues, and Dr. Montgomery said, "You could have communicated

4    with us in any of these various different ways, including text

5    messages."

6        Dr. Montgomery says that when he has a need to talk to

7    management at NaphCare, not specific to a patient, he may use

8    text message.  There is -- in TechCare, Tech instant messaging

9    alerts are built into the EHR.  I'm not sure what "EHR" stands

10   for, but it's something to do with the medical.  And they are

11   notes that are not -- they don't automatically go into

12   somebody's medical records.

13       So there are these instant messages, which is what

14   Dr. Montgomery was talking about in, I think, another section

15   of that email.  They are required to be printed out en masse

16   and reviewed, if they're responsive to something, because

17   they're not -- you can't search them by person or condition

18   or --

19           THE COURT:  Have the TechCare instant messages been

20   reviewed in connection with the document production in this

21   case?

22           MS. PAPPY:  No.  I just got the -- this information in

23   response to them bringing that email to the Court's attention

24   in December.  So I investigated what -- what is Dr. Montgomery

25   talking about, and I just got this information about this

1    instant messaging that they use in TechCare.  So it's in a

2    computer system.

3                **THE COURT:**  That needs to be searched for manually?

4                **MS. PAPPY:**  Yes.

5        I would also point that if any chairs are provided to

6    somebody in response to one of those messages, it goes into

7    their medical record.

8                **THE COURT:**  And -- Mr. Swearingen?

9                **MR. SWEARINGEN:**  The -- the origin of the

10   meet-and-confer did not start with text messages being

11   constrained only to deputies.

12       Exhibit Q to my declaration, I believe, is the one that

13   has -- I'm sorry.  Maybe it's a different document, but in my

14   declaration is the meet-and-confer document stating that --

15   stating the parties' positions on text messages,

16   meet-and-confer from several months ago.

17       Since then, we have reviewed documents and ESI

18   suggesting -- well, stating that staff use -- jail staff use

19   text-messaging to communicate internally and with NaphCare.  At

20   the deposition of Christina Ralph, who is the commander of

21   detention operations -- earlier -- well, actually last month,

22   she confirmed that text messages are used to communicate work

23   matters.

24               **MS. PAPPY:**  This is the first I'm hearing of any of

25   this.

1          **THE COURT:**  Is that -- is any of this in your motion?

2          **MR. SWEARINGEN:**  It's in a -- it's in our filing from

3     January 30th on Thursday.  The deposition transcript, I

4     believe, is attached to that.

5          I have -- I think it may be as Exhibit P -- Exhibit PP, at

6     705, to my declaration as well.

7          **THE COURT:**  Where is it in the January 30th filing?

8          **MR. SWEARINGEN:**  Your Honor, it's -- it's actually

9     Exhibit PP to the motion to compel, Page 705.

10         **MS. PAPPY:**  What was filed on January 30th?

11         **THE COURT:**  It's your joint report.

12         **MS. PAPPY:**  Oh.

13         **MR. SWEARINGEN:**  I was referring to the -- to the

14    ex parte motion.

15         **THE COURT:**  Oh.  On the ex parte motion?

16         **MR. SWEARINGEN:**  Yes.

17         **THE COURT:**  All right.

18         **MR. SWEARINGEN:**  But it's in our motion to compel,

19    Exhibit PP, at 705.

20         Ms. Chartoff, at Line 13, asks, "How do you communicate

21    with other staff in the Sheriff's Department?"

22         Commander Ralph responds, "Verbally, through email,

23    through text messages, through Teams.  I think that's about

24    it."

25         Ms. Chartoff asks her, "When you text with people in the

1   Sheriff's Department, is that about work issues?"

2       Commander Bavencoff responds, "Yes."

3       Chartoff --

4       **THE COURT:**  So the testimony is -- go ahead.  You're

5   reading.  Go ahead.

6       **MR. SWEARINGEN:**  Ms. Chartoff continues, "And when you

7   communicate on Teams, do you communicate about work issues?"

8       Ms. -- I'm sorry.  Commander Ralph responds, "Yes."

9       **THE COURT:**  And, Ms. Pappy, it's the County's position

10  that, with respect to the requests for production -- that there

11  should not be any effort by the County to inquire as to whether

12  anybody has responsive text messages?

13      **MS. PAPPY:**  I don't -- I'm -- can somebody tell me

14  where we're reading?

15      **THE COURT:**  No.  I think -- I want you-all to talk

16  about this before Friday because I have to go to my other

17  hearing now, and I'm already going to be late to it.  And, you

18  know, we've been going for almost five hours.

19      So I will see you again on Zoom at 1:00 o'clock on Friday,

20  and we will finish the remainder of the issues that are before

21  me.

22      **MS. PAPPY:**  Thank you.

23      **THE COURT:**  Thank you, everyone.

24      **MR. SWEARINGEN:**  Thank you, Your Honor.

25      **THE CLERK:**  That concludes our hearing.

**Ex. C - 312**

1        We're now in recess.

2                (Proceedings adjourned at 1:43 p.m.)

1

2

3                        **CERTIFICATE OF TRANSCRIBER**

4          I certify that the foregoing is a true and correct

5    transcript, to the best of my ability, of the above pages of

6    the official electronic sound recording provided to me by the

7    U.S. District Court, Southern District of California, of the

8    proceedings taken on the date and time previously stated in the

9    above matter.

10         I further certify that I am neither counsel for,

11   related to, nor employed by any of the parties to the action in

12   which this hearing was taken, and further that I am not

13   financially nor otherwise interested in the outcome of the

14   action.

15

16   DATE:  Friday, February 9, 2024

17

18

19

20           _____/S/ James C. Pence-Aviles_____

21        James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                      U.S. Court Reporter
22

23

24

25

**Ex. C - 314**

# EXHIBIT D

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3

4

5    DARRYL DUNSMORE, ANDREE        )
     ANDRADE, ERNEST ARCHULETA,     )
6    JAMES CLARK, ANTHONY           )
     EDWARDS, LISA LANDERS,         )
7    REANNA LEVY, JOSUE LOPEZ,      )
     CHRISTOPHER NELSON,            )
8    CHRISTOPHER NORWOOD, JESSE     )
     OLIVARES, GUSTAVO SEPULVEDA,   )
9    MICHAEL TAYLOR, and LAURA      )
     ZOERNER, on behalf of          )
10   themselves and all others     )
     similarly situated,            )
11                                  )
             Plaintiffs,            )
12                                  )          Case No.
     vs.                            )
13                                  )     3:20-cv-00406-AJB-DDL
     SAN DIEGO COUNTY SHERIFF'S     )
14   DEPARTMENT, COUNTY OF SAN      )
     DIEGO, SAN DIEGO COUNTY        )
15   PROBATION DEPARTMENT, and      )
     DOES 1 to 20, inclusive,       )
16                                  )
             Defendants.            )
17   _____)

18      VIDEOCONFERENCE DEPOSITION OF GARY L. RANEY, taken on

19   behalf of the defendants via ZOOM web conferencing, all

20   parties attending from their respective locations,

21   deponent located in McCall, Idaho, commencing at 11:04

22   o'clock a.m. Pacific time on Tuesday, October 29, 2024,

23   before TAMARA D. WICKHAM, CSR No. 4117, RMR, CRR,

24   pursuant to Notice.

25                         --o0o--

**Ex. D - 316**

```
 1                  APPEARANCES OF COUNSEL

 2

 3   For the Plaintiffs:

 4        ROSEN BIEN GALVAN & GRUNFELD LLP
          BY:  VAN SWEARINGEN, ESQ.
 5        101 Mission Street
          Sixth Floor
 6        San Francisco, California 94105
          (415) 433-6830
 7        Vswearingen@rbgg.com

 8

 9   For the Defendants:

          BURKE, WILLIAMS & SORENSEN
10        BY:  DEANN RIVARD, ESQ.
          444 South Flower Street
11        Suite 2400
          Los Angeles, California 90017
12        (213) 236-0600
          Drivard@bwslaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ex. D - 317

1                          I N D E X

2    WITNESS

3    GARY L. RANEY

4

5    EXAMINATION BY                                    PAGE

6         Ms. Rivard                                     5

7

8

9

10

11                       E X H I B I T S

12   DEFENDANT'S                                        PAGE

13   Exhibit 1    Expert report of Gary Raney          11

14   Exhibit 2    Curriculum Vitae for Gary Raney      12

15   Exhibit 3    Excerpts from ACA                    106

16   Exhibit 4    Declaration of F. Hunting            159

17   Exhibit 5    PowerPoint presentation entitled
                  "Drugs in Jail"                      171
18
     Exhibit 6    Rebuttal Expert Report of Gary Raney  175
19
     Exhibit 7    Article entitled "Mass Incarceration:
20                The Whole Pie 2024"                  179

21

22

23

24

25

Ex. D - 318

1          McCall, Idaho; Tuesday, October 29, 2024

2            At 11:04 o'clock a.m. Pacific time

3                      --o0o--

4

5

6

7              GARY L. RANEY,

8        having been first duly placed under oath

9       remotely by the Certified Shorthand Reporter,

10          was examined and testified as follows:

11

12                   EXAMINATION

13    BY MS. RIVARD:

14       Q.   Good morning, Mr. Raney.

15       A.   Good morning.  How are you?

16       Q.   I'm well.  How are you?

17       A.   I'm great.

18       Q.   My name is Deann Rivard.  I work with Burke,

19    Williams & Sorensen.  We represent all of the County

20    defendants in this matter, and I will be taking your

21    deposition today.

22          Mr. Swearingen is also on this Zoom video.  And

23    is it correct to say that Mr. Swearingen is representing

24    you for the purposes of this deposition?

25       A.   Yes.

**Ex. D - 319**

<u>REPORTER'S CERTIFICATE</u>

I, TAMARA D. WICKHAM, Certified Shorthand Reporter No. 4117, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition, to wit, GARY L. RANEY, was duly sworn to testify the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to computer-aided transcription under my direction.

That the foregoing transcript, as typed, is a true record of the said proceedings.

I further certify that I am not interested in the event of this action.

Executed at Los Angeles, California, this 15th day of November, 2024.

_Tamara D. Wickham_
TAMARA D. WICKHAM, CSR No. 4117

NORMAN SCHALL & ASSOCIATES————184

(800) 734-8838

**Ex. D - 320**

**CERTIFIED COPY**

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4

5

6   DARRYL DUNSMORE, ANDREE          )
    ANDRADE, ERNEST ARCHULETA,       )
7   JAMES CLARK, ANTHONY             )
    EDWARDS, LISA LANDERS,           )
    REANNA LEVY, JOSUE LOPEZ,        ) CASE NO.
8   CHRISTOPHER NELSON,              ) 3:20-cv-00406-AJB-DDL
    CHRISTOPHER NORWOOD, JESSE       )
9   OLIVARES, GUSTAVO                )
    SEPULVEDA, MICHAEL TAYLOR,       )
10  And LAURA ZOERNER, on behalf     )
    of themselves and all others     )
11  similarly situated,              )
                                     )
12                   Plaintiffs,     )
                                     )
13          vs.                      )
                                     )
14  SAN DIEGO COUNTY SHERIFF'S       )
    DEPARTMENT, COUNTY OF SAN        )
15  DIEGO, SAN DIEGO COUNTY          )
    PROBATION DEPARTMENT, and        )
16  DOES 1 to 20, inclusive,         )
                                     )
17                   Defendants.     )
    ─────────────────────────────────)

18

19

20

21          ZOOM CONFERENCE DEPOSITION OF

22         CHRISTINE SCOTT-HAYWARD, PH.D.

23           THURSDAY, OCTOBER 10, 2024

24

25  ROBIN E. KIBBE
    CSR No. 7507

**Ex. D - 321**

1    APPEARANCES OF COUNSEL:

2

3

4    For the Plaintiffs, DARRYL DUNSMORE, ANDREE
     ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY
5    EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ,
     CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE
6    OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and
     LAURA ZOERNER, on behalf of themselves and all
7    others similarly situated:

8

9

10           ROSEN BIEN GALVAN & GRUNFELD LLP
             BY:  VAN SWEARINGEN, ESQ.
11           101 Mission Street
             Sixth Floor
12           San Francisco, CA 94105-1738
             vswearingen@rbgg.com
13           (APPEARING via ZOOM conference)

14

15

16

17   For the Defendants, SAN DIEGO COUNTY SHERIFF'S
     DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY
     PROBATION DEPARTMENT, and DOES 1 to 20,
18   inclusive:

19

20           BURKE, WILLIAMS & SORENSEN, LLP
             BY:  DEANN RIVARD, ESQ.
21           501 West Broadway
             Suite 1600
22           San Diego, CA 92101-8474
             drivard@bwslaw.com
23           (APPEARING via ZOOM conference)

24

25

**Ex. D - 322**

1                          **I N D E X**

2

3   **WITNESS**                                          **PAGE**

4   CHRISTINE SCOTT-HAYWARD, PH.D.

5

6

7                  EXAMINATION BY MS. RIVARD        7

8

9

10                      **E X H I B I T S**

11  **DEFENDANT'S**          **DESCRIPTION**              **PAGE**

12  1                NOTICE OF VIDEO CONFERENCE      16

13                   DEPOSITION OF PLAINTIFFS'

14                   RETAINED EXPERT WITNESS

15                   CHRISTINE SCOTT-HAYWARD,

16                   PH.D. AND REQUEST TO

17                   PRODUCE DOCUMENTS AT

18                   DEPOSITION

19  2                EXPERT REPORT OF               21

20                   CHRISTINE SCOTT-HAYWARD,

21                   PH.D.

22  3                DECLARATION OF CHRISTINE S.    93

23                   SCOTT-HAYWARD, PH.D.

24  4                DOCUMENT TITLED "SHERIFF'S     122

25                   PRETRIAL SERVICES"

**Ex. D - 323**

1    **Upland, California, Thursday, October 10, 2024**

2    **at 9:02 a.m.**

3    **---o0o---**

4

5

6

7

8    **CHRISTINE SCOTT-HAYWARD, PH.D.**

9    **called as a witness herein by the**

10    **deposing party and the said witness,**

11    **being by me first duly administered the**

12    **affirmation, was thereupon examined and**

13    **testified as is hereinafter set forth:**

14

15

16

17    **EXAMINATION**

18

19    BY MS. RIVARD:

00:01  20    Q.   Good morning.  My name is

21    Deann Rivard.  I represent the San Diego County

22    Sheriff's Department, the County of San Diego

23    and the San Diego County Probation Department

24    in this matter; *Darryl Dunsmore, et al. versus*

00:01  25    *San Diego County Sheriff's Department, et al.*

**Ex. D - 324**

```
1   STATE   OF   CALIFORNIA      )
                                  ) ss.
2   COUNTY OF SAN BERNARDINO      )

3     I, ROBIN E. KIBBE, Certified Shorthand

4   Reporter, License No. 7507, for the State of

5   California, do hereby certify:

6     That, prior to being examined, the witness

7   named in the foregoing deposition, to wit,

8   CHRISTINE SCOTT-HAYWARD, was by me duly sworn to

9   testify the truth, the whole truth and nothing

10  but the truth;

11    That said deposition was taken down by me in

12  shorthand at the time and place therein named

13  and thereafter reduced to computer-aided

14  transcription under my direction.

15    That the foregoing transcript, as typed, is a

16  true record of the said proceedings.

17    I further certify that I am not interested in

18  the event of the action.

19

20    WITNESS my hand this ___24TH___ day of

21  _____OCTOBER_____, 2024.

22

23

24

25
             ROBIN E. KIBBE, C.S.R. NO. 7507
```

**Ex. D - 325**

**CERTIFIED COPY**

1        **UNITED STATES DISTRICT COURT**

2        **SOUTHERN DISTRICT OF CALIFORNIA**

3

4

5

6
     DARRYL DUNSMORE, ANDREE        )
7    ANDRADE, ERNEST ARCHULETA,     )
     JAMES CLARK, ANTHONY           )
8    EDWARDS, LISA LANDERS,         )
     REANNA LEVY, JOSUE LOPEZ,      ) CASE NO.
9    CHRISTOPHER NELSON,            ) 3:20-cv-00406-AJB-DDL
     CHRISTOPHER NORWOOD, JESSE     )
10   OLIVARES, GUSTAVO              )
     SEPULVEDA, MICHAEL TAYLOR,     )
11   And LAURA ZOERNER, on behalf   )
     of themselves and all others   )
12   similarly situated,            )
                                    )
13                    Plaintiffs,   )
                                    )
14          vs.                     )
                                    )
15   SAN DIEGO COUNTY SHERIFF'S     )
     DEPARTMENT, COUNTY OF SAN      )
16   DIEGO, SAN DIEGO COUNTY        )
     PROBATION DEPARTMENT, and      )
17   DOES 1 to 20, inclusive,       )
                                    )
18                    Defendants.   )
     ──────────────────────────────)────────
19

20

21    **ZOOM CONFERENCE DEPOSITION OF KAREN SNELL, ESQ.**

22          **THURSDAY, OCTOBER 31, 2024**

23

24

25    ROBIN E. KIBBE
      CSR No. 7507

**Ex. D - 326**

1

2                    ZOOM CONFERENCE DEPOSITION OF

3       KAREN SNELL, ESQ., taken by the Defendant,

4       SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY

5       OF SAN DIEGO, SAN DIEGO COUNTY PROBATION

6       DEPARTMENT, and DOES 1 to 20, inclusive

7       utilizing ZOOM platform to host all

8       participants from their respective locations,

9       commencing at 9:09 a.m., Thursday,

10      October 31, 2024, before Robin E. Kibbe,

11      Certified Shorthand Reporter, License No. 7507,

12      for the State of California, pursuant to

13      Notice.

14

15

16

17

18

19

20

21

22

23

24                        ---oOo---

25

**Ex. D - 327**

```
 1   APPEARANCES OF COUNSEL:

 2

 3

 4   For the Plaintiffs, DARRYL DUNSMORE, ANDREE
     ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY
 5   EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ,
     CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE
 6   OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and
     LAURA ZOERNER, on behalf of themselves and all
 7   others similarly situated:

 8

 9
             ROSEN BIEN GALVAN & GRUNFELD LLP
10           BY:  HANNAH M. CHARTOFF, ESQ.
             101 Mission Street
11           Sixth Floor
             San Francisco, CA 94105-1738
12           hchartoff@rbgg.com
             (APPEARING via ZOOM conference)
13

14

15   For the Defendant, SAN DIEGO COUNTY SHERIFF'S
     DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO
16   COUNTY PROBATION DEPARTMENT, and DOES 1 to 20,
     inclusive:
17

18

19           BURKE, WILLIAMS & SORENSEN, LLP
             BY:  ELIZABETH M. PAPPY, ESQ.
20               DEANN RIVARD, ESQ.
             60 South Market Street
21           Suite 1000
             San Jose, CA 95113-2336
22           epappy@bwslaw.com
             (APPEARING via ZOOM conference)
23

24

25
```

**Ex. D - 328**

```
 1   STATE   OF   CALIFORNIA      )
                                  ) ss.
 2   COUNTY OF SAN BERNARDINO      )

 3     I, ROBIN E. KIBBE, Certified Shorthand

 4   Reporter, License No. 7507, for the State of

 5   California, do hereby certify:

 6     That, prior to being examined, the witness

 7   named in the foregoing deposition, to wit,

 8   KAREN SNELL, ESQ., was by me duly sworn to

 9   testify the truth, the whole truth and nothing

10   but the truth;

11     That said deposition was taken down by me in

12   shorthand at the time and place therein named

13   and thereafter reduced to computer-aided

14   transcription under my direction.

15     That the foregoing transcript, as typed, is a

16   true record of the said proceedings.

17     I further certify that I am not interested in

18   the event of the action.

19

20     WITNESS my hand this ___21ST___ day of

21   _____NOVEMBER_____, 2024.

22

23

24

25
             ROBIN E. KIBBE, C.S.R. NO. 7507
```

**Ex. D - 329**

# EXHIBIT E

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3                      ---o0o---

 4   DARRYL DUNSMORE, ANDREE        )Case No.
     ANDRADE, ERNEST ARCHULETA,     )3:20-cv-00406-AJB-DDL
 5   JAMES CLARK, ANTHONY EDWARDS,  )
     LISA LANDERS, REANNA LEVY,     )
 6   JOSUE LOPEZ, CHRISTOPHER       )
     NELSON, CHRISTOPHER NORWOOD,   )
 7   JESSE OLIVARES, GUSTAVO        )
     SEPULVEDA, MICHAEL TAYLOR, and )
 8   LAURA ZOERNER, on behalf of    )
     themselves and all others      )
 9   similarly situated,            )
                                    )
10              Plaintiffs,         )
                vs.                 )
11                                  )
                                    )
12   SAN DIEGO COUNTY SHERIFF'S     )
     DEPARTMENT, COUNTY OF SAN      )
13   DIEGO, SAN DIEGO COUNTY        )
     PROBATION DEPARTMENT, and DOES )
14   1 to 20, inclusive,           )
                                    )
15              Defendants.         )
     _____)
16

17

18       Deposition of Christopher Buchanan, PMK, taken at

19   501 West Broadway, Suite 1600, San Diego, California,

20   commencing at 11:03 A.M. PST on Tuesday, April 23, 2024,

21   before NICOLE O'NEIL, Certified Shorthand Reporter 10774,

22   in and for the State of California.

23

24   STENO
     Concierge@Steno.com
25   (888)707-8366 APPEARANCES VIA STENO CONNECT
```

Ex. E - 331

CHRISTOPHER BUCHANAN - PMK                                    JOB NO. 950088
APRIL 23, 2024

1      Q.    Thank you.  Who do you report to?

2      A.    I report to Assistant Sheriff Dustin Lopez.

3      Q.    Do you understand that you've been designated by

4   the Sheriff's Department to testify about all policies,

5   procedures and practices relating to alternatives to

6   incarceration at the jail?

7      A.    Yes.

8      Q.    And are you the appropriate person to testify

9   about this information?

10     A.    Yes.

11     Q.    Did you do anything to prepare for your

12  deposition today?

13     A.    Just met with her.  Just reviewed the deposition

14  notice, Item 12, and just did a preview yesterday with

15  Dean.

16     Q.    How about long did that last?

17     A.    About 30 or 40 minutes.

18     Q.    Dean is an attorney?

19     A.    Yes.

20          MS. COLEMAN:  Rivard is the last name,

21  R-i-v-a-r-d.

22  BY MR. SWEARINGEN:

23     Q.    Did you talk anyone else?

24     A.    No.

25     Q.    Have you read the third amended complaint in

CHRISTOPHER BUCHANAN - PMK                                    JOB NO. 950088
APRIL 23, 2024

```
1                    CERTIFICATE OF REPORTER

2                         ---o0o---

3          I, the undersigned, a Certified Shorthand

4    Reporter, Licensed by the State of California, being

5    empowered to administer oaths and affirmations do hereby

6    certify:

7          That the foregoing proceedings were taken at the

8    time and place herein set forth; that any witness in the

9    foregoing proceedings, prior to testifying, were placed

10   under oath; that a verbatim record of the proceedings was

11   made by me using machine shorthand which was thereafter

12   transcribed under my direction; further, that the

13   foregoing is an accurate transcription thereof.

14         I further certify that I am neither financially

15   interested in the action nor a relative or employee of

16   any attorney or any of the parties.

17         Before completion of the deposition, review of

18   the transcript [  ] was [ X ] was not requested.  If

19   requested, any changes made by the deponent (and provided

20   to the reporter) during the period allowed, are appended

21   hereto. (Fed. R. Civ. P. 30(e)).

22         IN WITNESS WHEREOF, I have this date subscribed

23   my name.

24   DATED: 25th of April, 2024. _____

                                Nicole O'Neil, CSR No. 1077444
25
```

Ex. E - 333

# EXHIBIT F

## Mandy Kamphoefner, Legal Advisor

Mandy Kamphoefner was appointed as a Legal Advisor to Sheriff Bill Gore in 2018. She is responsible for providing legal advice to the Department related to the Americans with Disabilities Act (ADA) and related state laws.  She previously advised the Law Enforcement Services Bureau and was also responsible for providing legal advice on requests concerning the California Public Records Act, subpoenas, and discovery.



Mandy earned her Juris Doctor degree from the University of San Diego School of Law.  She earned a Bachelor of Arts in Criminal Justice and Political Science with minors in English and History from Gonzaga University.  During law school, Mandy interned at the United States Attorney's Office, the San Diego City Attorney's Office, and a civil law firm.  She also worked as an Advanced Legal Writing Teaching Assistant, and a Research Assistant.  After graduation, Mandy served as a certified graduate law clerk in the Domestic Violence and Sex Crimes Unit of the San Diego City Attorney's Office.

Mandy is a member of the California State Bar and is also admitted to practice before the United States District Court, Southern District of California.

*Return to Command Staff*

Ex. F - 335

# EXHIBIT G

**From:** CASDdb_efile Leshner <efile_leshner@casd.uscourts.gov>
**Sent:** Tuesday, September 27, 2022 1:19 PM
**To:** lhardisty@ldrlaw.com; shightower@ericksenarbuthnot.com;
marilyn.moriarty@lewisbrisbois.com; lsgarner@grsm.com; mdailey@grsm.com;
cmariam@gordonrees.com; scoleman@bwslaw.com; matthew.o'sullivan@sdcounty.ca.gov; Van
Swearingen <VSwearingen@rbgg.com>; Priyah Kaul <pkaul@rbgg.com>; Hannah Chartoff
<HChartoff@rbgg.com>; eanderson@rbgg.com; Aaron Fischer <ajf@aaronfischerlaw.com>;
oliver.kiefer@us.dlapiper.com; isabella.neal@us.dlapiper.com; Gay C. Grunfeld
<GGrunfeld@rbgg.com>; Christopher Young <christopher.young@dlapiper.com>
**Subject:** Dunsmore et al. v. County of San Diego et al., Case No. 20-cv-406

Dear Counsel,

Judge Leshner has asked me to advise you that his tentative ruling on the Motion for Expedited
Discovery would be to grant in part and deny in part. To facilitate tomorrow's argument, he has
asked that you be prepared to address the following issues:

1. What is the time period that will be covered by plaintiff's discovery requests? Is there any
   reason it needs to go farther back in time than January 2021?

2. What is the purpose and scope of the request for production of "practices" and "investigative
   materials" as related to discovery "regarding drug overdoses and overdose deaths"?

3. What is the purpose and scope of the request for production of "practices," "investigative
   materials," "logs," "audits" and "staff disciplinary records" as related to discovery "regarding
   the scope and adequacy of safety checks"?

4. What is the purpose and scope of the request for production of "practices," "investigative
   materials," "logs," "audits" and "staff disciplinary records" as related to discovery "regarding
   the locations, functionality, testing, and repair/replacement of the audio intercom and video
   surveillance systems and related staff responses to emergencies"?

5. If the court grants the motion for expedited discovery with respect to the foregoing three
   issues only:

   a. How much time would the County defendants need to produce the requested
      documents?

   b. Which facilities would plaintiffs seek to inspect and which experts would perform the

**Ex. G - 337**

inspections?

    c. How many deponents would the County defendants designate to testify on these issues?

6. Have the parties reached any agreements as to the logistics and timing of any site inspections?  While not addressed in plaintiffs' brief, the supporting exhibits appear to indicate some agreements, and some unresolved disagreements, regarding interviews with staff and inmates, photography, the presence of defendants' counsel (or at a minimum the County's counsel) during the entirety of the inspection, and the production of maps and org charts in advance of the inspections.  (Dkt. No. 212-2 at 12-13.) The parties should be prepared to address any lingering disagreements as to these matters.

7. Plaintiffs' supporting exhibits also indicate that their proposed 30(b)(6) topics would mirror their document requests.  (Dkt. No. 212-2 at 13.) What does this mean for the County in terms of the number of witnesses to prepare?  Are there any topics that are unclear and if so, have the parties met and conferred such that a witness can be prepared to testify as to an agreed-upon scope of the topic? Are there any topics the County believes are not appropriate for deposition testimony?

8. What is the position of all defendants with respect to advancing the Rule 26(f) conference?

9. Have the parties met and conferred regarding the issue(s) that should be addressed at an ENE?

Regards,
Susannah R. Conn
Law Clerk to the Honorable David D. Leshner

Ex. G - 338

# EXHIBIT H

1  ~~GAY CROSTHWAIT GRUNFELD – 121944~~
   ~~VAN SWEARINGEN – 259809~~
2  ~~PRIYAH KAUL – 307956~~
   ~~ERIC MONEK ANDERSON – 320934~~
3  ~~HANNAH M. CHARTOFF – 324529~~
   ~~ROSEN BIEN GALVAN & GRUNFELD LLP~~
4  ~~101 Mission Street, Sixth Floor~~
   ~~San Francisco, California 94105-1738~~
5  ~~Telephone: (415) 433-6830~~
   ~~Facsimile: (415) 433-7104~~
6  ~~Email: ggrunfeld@rbgg.com~~
   ~~vswearingen@rbgg.com~~
7  ~~pkaul@rbgg.com~~
   ~~eanderson@rbgg.com~~
8  ~~hchartoff@rbgg.com~~

9  ~~AARON J. FISCHER – 247391~~
   ~~LAW OFFICE OF AARON J. FISCHER~~
10 ~~1400 Shattuck Avenue, Suite 12 - #344~~
   ~~Berkeley, California 94709-1474~~
11 ~~Telephone: (510) 806-7366~~
   ~~Facsimile: (510) 694-6314~~
12 ~~Email: ajf@aaronfischerlaw.com~~

13 ~~(additional counsel on following page)~~

14 GAY C. GRUNFELD – 121944          CHRISTOPHER M. YOUNG – 163319
   VAN SWEARINGEN – 259809           ISABELLA NEAL – 328323
15 PRIYAH KAUL – 307956              OLIVER KIEFER – 332830
   ERIC MONEK ANDERSON – 320934      DLA PIPER LLP (US)
16 HANNAH M. CHARTOFF – 324529       401 B Street, Suite 1700
   ROSEN BIEN                        San Diego, California 92101-4297
17 GALVAN & GRUNFELD LLP             Telephone: (619) 699-2700
   101 Mission Street, Sixth Floor   Facsimile: (619) 699-2701
18 San Francisco, California 94105-1738   christopher.young@dlapiper.com
   Telephone: (415) 433-6830         isabella.neal@dlapiper.com
19 Facsimile: (415) 433-7104         oliver.kiefer@dlapiper.com
   ggrunfeld@rbgg.com
20 vswearingen@rbgg.com
   pkaul@rbgg.com
21 eanderson@rbgg.com
   hchartoff@rbgg.com
22
   AARON J. FISCHER – 247391
23 LAW OFFICE OF
   AARON J. FISCHER
24 1400 Shattuck Square Suite 12 - #344
   Berkeley, California 94709
25 Telephone: (510) 806-7366
   Facsimile: (510) 694-6314
26 ajf@aaronfischerlaw.com

27 Attorneys for Plaintiffs

28                   UNITED STATES DISTRICT COURT

[4183731.8]                         Case No. 3:20-cv-00406-AJB-DDL
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR
                      LIMITED EXPEDITED DISCOVERY

**Style Definition:** Comment Text
**Style Definition:** Unresolved Mention

SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, CORRECTIONAL HEALTHCARE PARTNERS, INC., LIBERTY HEALTHCARE, INC., MID-AMERICA HEALTH, INC., LOGAN HAAK, M.D., INC., SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

Defendants.

Case No. 3:20-cv-00406-AJB-DDL

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR LIMITED EXPEDITED DISCOVERY.**

Mag. Judge: Hon. Anthony J. Battaglia Magistrate: Hon. David D. Leshner

Trial Date: None Set

**NO HEARING DATE PER DKT. 211240**

[4183731.8]                    Case No. 3:20-cv-00406-AJB-DDL

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR LIMITED EXPEDITED DISCOVERY

**Ex. H - 341**

## I.     INTRODUCTION

Defendants San Diego County Sheriff's Department and the County of San Diego ("Jail Defendants") systemically and willfully discriminate against Plaintiffs and incarcerated people with disabilities and fail to provide reasonable accommodations in running the San Diego County Jail's programs, services, and activities.  Plaintiffs seek expedited discovery related to these matters, in anticipation of a renewed motion for preliminary injunctive relief.

The systemic mistreatment of people with disabilities is unlawful under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("Rehab Act"), and causes serious and irreparable harm.  For example, Anthony Edwards missed an eye appointment with a specialist to assess treatment for ongoing vision problems from glaucoma—it was not rescheduled for months—because he could not attend the appointment without a cane or wheelchair, which the Sheriff's Department failed to provide him.  Dkt. 176 ¶ 17 & Ex. K.  Christopher Nelson, who uses a wheelchair, was housed in a cell with a stool bolted in front of the desk, which meant he could not roll his wheelchair to use the desk.  While trying to transfer from his wheelchair to the stool, Nelson fell and hurt his wrist so badly he could not move it.  Dkt. 176-2 ¶ 8 & Ex. C.  Ernest Archuleta missed a hearing in his criminal case after Jail staff refused to provide him a wheelchair for court, and he fell and struck his head when forced to take the stairs for a family visit.  Dkt. 176-7 ¶¶ 13-14.

The disability-related legal violations at the Jail are pervasive, as evidenced by the declarations already submitted in this case.  The Sheriff's Department's deficient systems and policies for identifying people with disabilities, tracking their accommodations, and providing assistive devices or effective communication contributed to James Clark falling out of a broken wheelchair that the Sheriff's Department had failed to promptly repair or replace, Dkt. 175-12 ¶ 9, deprived Darryl Dunsmore of accommodations that allow him to eat, ambulate, and communicate, Dkt. 175-7 ¶¶ 16, 19, 22-24, and left Josue Lopez unable to

Ex. H - 342

1  effectively communicate during many medical appointments and interactions with
2  deputies who appeared not to know that Lopez is Deaf. Dkt. 119-28 ¶¶ 12-13. One
3  person testified that they could not safely use the toilet at Central Jail because their
4  toilet had no grab bar, Dkt. 162-12 ¶ 10, and another person could not access
5  veterans' programming at Vista on account of his disability. Dkt. 162-10 at ¶ 4. *See*
6  *also* Dkt. 119-9 ¶¶ 39-58; Dkt. 162-6 at ¶¶ 14-17 (ADA expert describing harm
7  from ADA violations at the Jail). These declarations likely only scratch the surface
8  of problems at the Jail.

9  Plaintiffs seek discovery about the Jail's current ADA policies and practices to
   evaluate the need for and scope of a potential renewed motion for a preliminary
10 injunction. Systemic violations of the rights of incarcerated people with disabilities
   constitutes irreparable harm to warrant preliminary injunctive relief. *See, e.g.,*
11 *Hernandez v. Cty. of Monterey*, 110 F. Supp. *(counsel continued from preceding*
   *page)*

12 CHRISTOPHER M. YOUNG   163319
13 ISABELLA NEAL   328323
   OLIVER KIEFER   332830
14 DLA PIPER LLP (US)
   401 B Street, Suite 1700
15 San Diego, California  92101-4297
   Telephone:   (619) 699-2700
16 Facsimile:   (619) 699-2701
   Email:   christopher.young@dlapiper.com
17         isabella.neal@dlapiper.com
           oliver.kiefer@dlapiper.com
18
   Attorneys for Plaintiffs
19

20

21

22

23

24

25

26

27

28

[388374.1]

**Formatted:** Font color: Auto

**Ex. H - 343**

1   ~~Plaintiffs Darryl Dunsmore, Ernest Archuleta, Anthony Edwards, Reanna~~

2   ~~Levy, Josue Lopez, Christopher Nelson, Christopher Norwood, and Laura Zoerner~~

3   ~~("Plaintiffs") move this Court, pursuant to Federal Rule of Civil Procedure 26(d),~~

4   ~~for an order permitting expedited discovery of Defendants San Diego County~~

5   ~~Sheriff's Department and the County of San Diego ("County Defendants") related to~~

6   ~~six issues at the San Diego County Jail ("Jail"): (1) drug overdoses and overdose~~

7   ~~deaths; (2) the adequacy and timeliness of safety checks; (3) audio intercom and~~

8   ~~video surveillance systems, and related staff responses to emergencies; (4) the~~

9   ~~consideration given to mental health staff's clinically-based recommendations for~~

10  ~~incarcerated people with mental health needs; (5) the provision of mental health care~~

11  ~~in confidential settings; and (6) the provision of safe and accessible housing and~~

12  ~~programming to incarcerated people with mobility disabilities.~~

13  ~~These issues are directly tethered to causes of action raised in the operative~~

14  ~~second amended complaint ("SAC"): the first five issues relate to Counts 1 and 2~~

15  ~~for violations of the Eighth and Fourteenth Amendments, and the sixth issue relates~~

16  ~~to Count 5 for violation of the Americans with Disabilities Act ("ADA").~~ 3d 929,

17  956-57 (N.D. Cal. 2015).

18  Specifically, Plaintiffs seek ~~Dkt. 81. The issues also were the subject of~~

19  ~~Plaintiffs' preliminary injunction motion.¹ Dkt. 119. The Court's order denying the~~

20

---

21  ~~¹ Plaintiffs' preliminary injunction motion is divided into sections discussing each of~~
    ~~these six issues.  See Dkt. 119. Within each section, Plaintiffs described various~~

22  ~~County Defendant failures and requested specific remedies to address these failures.~~
    ~~Id.  At a greater level of specificity, Plaintiffs' preliminary injunction motion and~~

23  ~~proposed order addressed the following topics: (i) the interdiction of drugs; (ii) body~~
    ~~scanners; (iii) medication-assisted treatment (MAT); (iv) naloxone; (v) the adequacy~~

24  ~~of safety checks; (vi) the frequency of safety checks in administrative segregation~~
    ~~units; (vii) audits of safety checks; (viii) the repair and testing of intercoms and~~

25  ~~emergency buttons; (ix) plans to ensure prompt repair of inoperable intercoms and~~
    ~~emergency buttons in the future; (x) the timeliness of staff responses to~~

26  ~~emergencies; (xi) the replacement of video surveillance systems; (xii) plans to~~
    ~~ensure prompt repair of non-functional video surveillance systems in the future;~~

27  ~~(xiii) the placement of incarcerated people in housing units without video~~
    ~~surveillance; (xiv) the placement of people with mental illness in segregated housing~~

28  ~~units; (xv) the placement of people with mental illness in mental-health designated~~

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR
LIMITED EXPEDITED DISCOVERY

**Ex. H - 344**

1  motion without prejudice acknowledged the "seriousness of the allegations brought

2  by Plaintiffs regarding the conditions and high death rates" in the Jail, but concluded

3  that Plaintiffs "fail[ed] to meet their burden at this time" of showing a likelihood of

4  success on the merits. *Id.* at 2, 6-10. The Court stated that "[d]iscovery will no

5  doubt edify the merits of Plaintiffs' claims … and will assist the Court in

6  understanding the true depths of the problems alleged as well as the remedies

7  available." *Id.* at 10.

8      Plaintiffs seek permission to propound three types of discovery related to the

9  above-listed issues. First, Plaintiffs request that the four experts who submitted

10  declarations in connection with the preliminary injunction motion be permitted to

11  conduct the following early discovery: (1) Approximately 35 document requests;

12  (2) ADA expert inspections of five Jail facilities. Plaintiffs ask that their disabilities

13  expert inspect the Central and Rock Mountain facilities, and that their medical,

14  mental health, and security experts inspect at the Central, George Bailey, Vista, and

15  Las Colinas facilities. Second, Plaintiffs seek to serve document requests related to

16  the specific issues identified in the preliminary injunction motion, including County

17  Defendants' policies, practices, and plans as to those issues. Third, Plaintiffs seek to

18  conduct Las Colinas, Rock Mountain, and Vista facilities; and (3) Rule 30(b)(6)

19  depositions of persons most knowledgeable about the six specific issues identified

20  above, with County Defendants designating one or more persons as needed to

21  provide complete and meaningful testimony as to each issue. Plaintiffs seek an

22  order requiring ADA issues. Plaintiffs request that the Court's order require

23

24  programs or housing units; (xvi) the provision of mental health care in confidential

25  spaces; (xvii) the offering of programs, services, and activities in areas that do not

26  require incarcerated people to climb stairs and the prompt repair of any elevator

    used by incarcerated people to access such programs, services, and activities;

27  (xviii) the accessibility of the Jail, including housing units; and (xix) training staff

    on the rights of incarcerated people to use assistive devices. These nineteen "sub-

28  issues" can reasonably be grouped together into, and directly relate to, the six issues

    discussed in the instant motion. Plaintiffs do not seek expedited discovery as to any

    issue not referenced in the preliminary injunction motion.

**Formatted:** Font: Italic

1  document productions within 30 days of service of requests, inspections within 45

2  days of service of notices, and depositions within 60 days of service of notices.

3  Plaintiffs do not believe this early discovery will impact case management, other

4  than to make an early neutral evaluation conference on ADA issues more

5  productive.  Separately, Plaintiffs request that the Rule 26(f) conference be

6  advanced to help the parties move this case toward resolution.  Given the issues this

7  lawsuit seeks to address—which cause increasing harm to those incarcerated at the

8  Jail with each passing day—the action is unique in its urgency.  Plaintiff Dunsmore

9  filed this case almost three years ago, but no discovery has been exchanged to date.

10  The parties met and conferred prior to filing and reached tentative agreements

11  on many of the issues.  *See* Declaration of Van Swearingen in Support of Plaintiffs'

12  Motion for Limited Expedited Discovery ("Swearingen Decl.") ¶ 3, Ex. B.

13  At the discovery conference held prior to the filing of this motion, the Court

14  also raised the possibility of advancing the Rule 26(f) conference in this case.

15  Plaintiffs are amenable to this approach, which would facilitate the just and efficient

16  resolution of their claims, but not in lieu of the requested expedited discovery.  The

17  Rule 26(f) conference should be advanced **and** Plaintiffs should be granted a

18  discrete schedule for expedited discovery of the above-listed issues.[2]

19  I.    INTRODUCTION

20  II.    PROCEDURAL HISTORY

21  Plaintiffs previously moved for expedited discovery on six different issues in

22

_____

23  [2] At the conference, the Court also asked the parties to consider what issues should

24  be addressed at early neutral evaluations ("ENEs").  Plaintiffs propose that the

25  parties commit to participating in three ENEs focused on discrete topics—class

certification, ADA claims, and claims related to policies and practices for the

provision of mental health in the Jail—on which Plaintiffs believe the parties may

26  be able to make progress at an ENE.  *See* Swearingen Decl. ¶ 3, Ex. B.  Plaintiffs

propose that the first ENE be held one month after completion of expedited

27  discovery, as such discovery will help illuminate the issues in this case.  If the first

ENEs are unsuccessful, Plaintiffs believe further ENEs would be a waste of judicial

and party resources.  If the first ENEs are successful, however, Plaintiffs are

28  amenable to the Court ordering additional ENEs on other issues and claims.

[3888374.14 1183731.8]                                   3                    Case No. 3:20-cv-00406-AJB-DDL

Formatted: Space After:  12 pt, Line spacing:  Exactly 12 pt

their preliminary injunction motion filed May 2, 2022.  Dkt. 119; *see* Dkt. 212

(discovery motion).  On September 27, 2022, this Court issued a tentative ruling

indicating it was inclined to grant Plaintiffs discovery on three of the six issues.

Later the same day, the District Court dismissed Plaintiffs' Second Amended

Complaint, *see* Dkt. 219,[3] thereby mooting Plaintiffs' expedited discovery motion.

Dkt. 221.  Plaintiffs filed a Third Amended Complaint ("TAC") on November 18,

2022.  Dkt. ~~This case seeks to address unconstitutional and unlawful conditions at~~

~~the Jail that for years have led to serious harm suffered by incarcerated~~

~~individuals~~231.

      Plaintiffs bring this renewed, more narrow motion to seek discovery related to

the issue of Jail Defendants' compliance with the ADA and Rehab Act under Count

3 of the TAC.  Thirteen of the fourteen Plaintiffs have disabilities, including eight

with mobility disabilities.  TAC ¶¶ 18-31.  Plaintiffs' original preliminary injunction

motion included this issue, and Plaintiffs seek early discovery to better identify the

scope of the problems as they consider a forthcoming preliminary injunction motion.

~~. Dkt. 81.  Certain of County Defendants' most shocking and deadly~~

~~practices, however, are far too urgent to be litigated in the normal course – they~~

~~require immediate remedial action.  Faced with Jail policies and practices that~~

~~regularly expose them to substantial risk of serious harm, Plaintiffs had no choice~~

~~but to move for a limited preliminary injunction.  Dkt. 119.  The Court denied the~~

~~motion without prejudice, and in the course of litigating these issues, one thing~~

~~became clear:  discovery is urgently needed in this case.  County Defendants'~~

~~counsel acknowledged as much on the record, calling the motion "premature" but~~

~~stating the parties could "certainly do more discovery and revisit" the issues.~~

~~Swearingen Decl. ¶ 4, Ex. C [18:12-16].  The Court agreed that discovery would~~

~~educate it as to the issues raised in the preliminary injunction motion, which it called~~

---

[3] The District Court did not find Plaintiffs' ADA allegations lacked merit, but rather dismissed the entire complaint on the basis of "shotgun pleading." *Id.* at 7.

Ex. H - 347

1  "serious[]."  Dkt. 203 at 2, 9.  Plaintiffs need access to information about the Jail's
2  current practices, which is in County Defendants' exclusive possession, in order to
3  evaluate the need for and scope of a potential renewed motion for a preliminary
4  injunction and/or other appropriate injunctive relief.⁴  The discovery sought will
5  need to be exchanged in this case in any event, but doing so now will expedite
6  resolution of whether particular reforms are needed now to save lives and prevent
7  serious harms.

8  II.III.  ARGUMENT

9       This Court has discretion to authorize discovery to take place prior to the Rule
10  26(f) conference of the parties required by Rule 26(f).  *See Semitool, Inc. v. Tokyo*
11  *Electron America, Inc.,* 208 F.R.D. 273, 275-76 (N.D. Cal. 2002); *Citizens for*
12  *Quality Educ. San Diego v. San Diego Unified Sch. Dist.,* No. 17-cvCV-1054-BAS-
13  JMAHMA, 2018 WL 1150836, at *2 (S.D. Cal. Mar. 5, 2018).  Courts in the Ninth
14  Circuit apply a "good cause" standard in deciding whether to allow expedited
15  discovery.  *Semitool, Inc.,* 208 F.R.D. at 276.  Good cause may be found "where the
16  need for expedited discovery, in consideration of the administration of justice,
17  outweighs the prejudice to the responding party." *Id.* at 276.  A court must examine
18  the requested discovery based on "the entirety of the record and the reasonableness
19  of the request in light of all surrounding circumstances." *Id.* at 275.  Courts consider
20  the followingfive non-exhaustive factors in determiningto determine whether good
21  cause justifies expedited discovery:  "(1) whether a preliminary injunction is
22  pending; (2) the breadth of the discovery requests; (3) the purpose for requesting
23  the expedited discovery; (4) the burden on the defendants to comply with the
24  requests; and (5) how far in advance of the typical discovery process the request
25  was made." *Apple Inc. v. Samsung Elecs. Co., Ltd.,* 2011 WL 1938154, at *1768 F.

27  ⁴ Before and after filing their motion, Plaintiffs' counsel made numerous requests of
   County Defendants in an effort to move this case forward.  County Defendants
28  consistently rebuffed these efforts.  *See, e.g.,* Swearingen Decl. ¶¶ 7-8, Exs. E, G.

**Ex. H - 348**

Formatted: Bullets and Numbering

Formatted: Font: Not Italic

Formatted: Font: Not Italic

Formatted: Font: Not Italic

Formatted: Font: Not Italic

Supp. 2d 1040, 1044 (N.D. Cal. May 18, 2011) (citation omitted); *see also Light Salt Invs., LP v. Fisher*, No. 13-cvCV-1158-MMA-DHB, 2013 WL 3205918, at *1 (S.D. Cal. June 24, 2013).

### A. Plaintiffs Have Good Cause for Expedited Discovery

Each of the factors set forth abovefactor weighs in favor of a finding that good cause exists for the Court to permit the commencement of this limited pre-Rule 26(f) conference discovery related to the issues raised in Plaintiffs' preliminary injunction motion.

### 1. Plaintiffs Seek Discovery as to the Issuesan Issue Raised in Their Preliminary Injunction Motion, Which May Be Renewed.

Expedited discovery is appropriate in cases "such as those involving requests for a preliminary injunction." Fed. R. Civ. P. 26(d), Advisory Committee's Note to 1993 Amendment. Even where, as here, a preliminary injunction motion is not pending, expedited discovery may be appropriate, such as to "allow [a] plaintiff to determine whether to seek an early injunction." *Interserve, Inc. v. Fusion Garage PTE, Ltd.*, No. C 09-05812 JW PVT, 2010 WL 143665, at *2 (N.D. Cal. Jan. 7, 2010); *see also Light Salt Invs.*, 2013 WL 3205918, at *2; *Ibarra v. City of Chicago*, 816 F. 09-CV-05812-JW-PVT, 2010 WL 143665, at *2 (N.D. Cal. Jan. 7, 2010). Supp. 2d 541, 555 (N.D. Ill. 2011). Plaintiffs seek expedited discovery as to the urgent issues raised in their preliminary injunction motion to evaluate the need for and scope of a renewed motion for injunctive relief. Discovery as to these issues will also enable the parties to provide the Court with the evidence it needs to evaluate such a motion, including determining appropriate remedies.

Plaintiffs previously sought a preliminary injunction related to Jail Defendants' violations of disability laws. *See* Dkt. 119-1 at 16-18, 26-28. The District Court recognized the "seriousness of the allegations brought by Plaintiffs regarding the conditions" in the Jail and stated that "[d]iscovery will no doubt edify

**Ex. H - 349**

the merits of Plaintiffs' claims … and will assist the Court in understanding the true depths of the problems alleged as well as the remedies available." Dkt. 203 at 10. Jail Defendants' ongoing ADA and Rehab Act violations constitute irreparable harm and warrant a preliminary injunction. *See Hernandez*, 110 F. Supp. 3d at 956-57 (denial of access to programs including exercise, religious services, substance use programming, and reentry classes constitutes irreparable harm meriting preliminary injunction); *D.R. v. Antelope Valley Union High Sch. Dist.*, 746 F. Supp. 2d 1132, 1145-46 (C.D. Cal. 2010) (denial of access to programs and services due to non-functioning elevator constitutes ongoing irreparable harm meriting preliminary injunction); *Lonberg v. City of Riverside*, 2007 WL 2005177, at *8 (C.D. Cal. May 16, 2007) (holding that non-compliant architectural features cause "a real and immediate threat of substantial and irreparable harm"). The evidence already submitted in this case demonstrate that the prospective harms Plaintiffs face are in many ways more serious than the above-cited cases.

**2.    The Requested Discovery Is Limited and Narrowly Tailored.**

Expedited discovery is permissible when it has a "narrow focus," *Sambreel Holdings LLC v. Facebook, Inc.*, No. 12-cv-CV-668-CAB-KSC, 2012 WL 13175902, at *4 (S.D. Cal. June 18, 2012), or where it is "relatively limited," *Light Salt Invs.*, 2013 WL 3205918, at *2. The requested discovery is far more limited than the discovery Plaintiffs requested in their first discovery motion. Dkt. Here, Plaintiffs' discovery requests are 212. It is more limited than the initial set of discovery that the Court was tentatively inclined to grant in response to that motion. And it is narrowly tailored in a manner that Jail Defendants previously implied would be sufficient. *See* Dkt. , going no further than what is needed for Plaintiffs to determine whether and 213 at 8 (Jail Defendants' prior opposition noting that prior request for expedited discovery would be more narrowly tailored if focused "on what bases to move again for injunctive relief, and for the Court to resolve any one subject area, such motion. The inspections would require the admission of four

Ex. H - 350

1  experts to five facilities where the risks of harm identified in Plaintiffs' preliminary

2  injunction motion appear most pressing. Plaintiffs seek to obtain documents and

3  depose persons most knowledgeable about the Jail's current policies and practices

4  regarding six discrete issues only.as ADA-compliance for example").

Formatted: Font color: Text 1

5        **3.**    ~~Allowing~~**The** Discovery Is Necessary for Plaintiffs to

6         Evaluate ~~Any~~a Renewed Motion for Injunctive Relief and for
       the Court to Rule on Such a Motion~~.~~

7      In its order denying without prejudice the preliminary injunction motion, the

8  Court acknowledged the "seriousness of the allegations brought by Plaintiffs

9  regarding the conditions and high death rates" in the Jail. Dkt. 203 at 2. Eighteen

10  people died in the Jail last year, approximately three times the national death rate in

11  jails. Dkt. 119-1 at 1. Sixteen people have already died in custody in the first eight

12  months of this year. Swearingen Decl. ¶ 5. The day after the Court issued its order

13  denying without prejudice the preliminary injunction motion, another person died in

14  the Jail. Swearingen Decl. ¶ 6. Three weeks ago, Pedro Rodriquez, an incarcerated

15  person seeking to intervene in this case, filed a document describing a recent suicide

16  attempt and explaining that he is being housed in conditions where his mental health

17  continues to deteriorate. Dkt. 205. The urgency of the issues alone supports a

18  finding of good cause for expedited discovery. *See U.S. v. Erie County, N.Y.*, No.

19  09-cv-849, Dkt. 42, at 8 (W.D.N.Y. Mar. 6, 2010) ("frequency of suicides and

20  suicide attempts" "coupled with the historical allegations in the complaint"

21  supported finding of good cause for expedited discovery regarding jail practices).

22      Further, Plaintiffs seek evidence that is directly relevant to the issues raised in

23  their preliminary injunction motion. County Defendants' counsel agreed on the

24  record that discovery would shed light on the issues raised in that motion.

25  Swearingen Decl. ¶ 4, Ex. C [18:12-16] (counsel stating that "it's premature,

26  without doing some discovery, to determine what is actually the case," and stating

27  that County Defendants could "certainly do more discovery and revisit this issue").

28  The Court found that "[d]iscovery will no doubt edify the merits of Plaintiffs'

**Ex. H - 351**

1  ~~claims … and will assist the Court in understanding the true depths of the problems~~
2  ~~alleged as well as the remedies available."  Dkt. 203 at 10.~~  Plaintiffs seek evidence
3  that is directly relevant to a potential renewed preliminary injunction motion.  This
4  evidence is necessary in part to address contradictions and open questions in the
5  record, and to respond directly to the District Court's statement that discovery may
6  reveal the depths of the problem at the Jail and available remedies.  Dkt. 203 at 10.
7  As this Court aptly noted, there is "a lot of anecdotal stuff flying around."  Dec. 7
8  IDC Trans. at 15:15-16.

9         Jail Defendants have made inconsistent unsworn representations about
10  improving ADA compliance at the Jail, but only discovery can test whether those
11  claims are supported by evidence.  In August, Jail Defendants' counsel told this
12  Court about "the Rock Mountain facility that's going to be open *this fall*, which is
13  entirely ADA compliant."  Aug. 31 IDC Trans. at 17:6-9 (emphasis added).  Now,
14  Jail Defendants represent that the Rock Mountain facility is still not ADA-compliant
15  and will not be "done and operational [until] the first quarter of 2023."  Dec. 7 IDC
16  Trans. at 9:17-19.  Left unsaid is that Rock Mountain's opening has repeatedly been
17  promised and then delayed since at least 2019.  *See, e.g.*, Dkt. 119-3 ¶ 13, Ex. L at
18  598 (grand jury report stating in May 2019 that "Rock Mountain … is projected to
19  open soon, but the completion date continues to be delayed").

20         Meanwhile, incarcerated people continue to be irreparably harmed in Jail
21  Defendants' non-ADA compliant facilities.  Even if some males with disabilities are
22  eventually moved to Rock Mountain, the Sheriff's Department houses (and will
23  continue to house) people with disabilities at other facilities in the Jail system.  *See,*
24  *e.g.*, Dkt. 119-19 ¶¶ 2-7; TAC ¶¶ 243-44, 251, 270, 272 (describing problems with
25  accessibility and reasonable accommodations at George Bailey, Las Colinas, and
26  Vista).  A Sheriff's Department official testified that Central will remain the primary
27  booking facility for males, meaning that people with disabilities will still be housed
28  at Central, even if some later transfer to Rock Mountain.  *See* Dkt. 153-8 ¶ 11.

**Ex. H - 352**

1       Jail Defendants' counsel also represented that once Rock Mountain is open,

2  the Sheriff's Department plans to—at some unspecified future time—upgrade

3  "Central Jail and some of the other facilities that need some updates," an implicit

4  admission that those facilities are not ADA-compliant.  Dec. 7 IDC Trans. at 9:20-

5  24.  Plaintiffs' ADA expert is "very skeptical" that Rock Mountain will be ADA-

6  compliant if the Sheriff's Department remodeled Rock Mountain based on the site

7  accessibility evaluation available to her.  Dkt. 162-6 ¶ 11.  "Wait for Rock

8  Mountain" is a hollow refrain to the many incarcerated people that are presently

9  subjected to unsafe facilities without adequate accommodations.

10       There are also factual disputes between Plaintiffs' ADA expert and Sheriff's

11  Department declarants about accessibility features at the Jail, such as about stools in

12  front of desks in cells housing people with mobility disabilities.  Compare Dkt. 119-

13  9 ¶ 44 with Dkt. 153-3 ¶¶ 4, 11.  Plaintiff declarations show how broken elevators at

14  Central result in missed court hearings or people with mobility disabilities being

15  forced to try and take the stairs.  Dkt. 119-9 ¶¶ 40-41.  By contrast, the Sheriff's

16  Department's declarant claims that "[t]here has never been an instance when all of

17  the elevators in the Central facility were out of service," and that staff elevators

18  would be used instead of forcing incarcerated people to use stairs.  Dkt. 153-3 ¶ 9.

19  Plaintiffs' ADA expert describes factual disputes with Sheriff's Department

20  declarants about grab bars for toilets, shower chairs for people with mobility

21  disabilities, and stools blocking wheelchair users from using telephones, as well as

22  how inspections can help resolve the disputes.  Dkt. 162-6 ¶¶ 7-10.  The Sheriff's

23  Department also concedes some architectural features are non-compliant but claims

24  they will be addressed (without providing any deadline).  Dkt. 153-3 ¶¶ 11-13.

25  Plaintiffs' discovery requests aim to resolve these factual disputes and gaps in the

26  record, and to assess whether the Sheriff's Department's promises to act have come

27  to fruition.

28       Plaintiffs' ADA expert also detailed systemic problems with the Sheriff's

Ex. H - 353

Department's policies and procedures for, *inter alia*, identifying and accommodat-
ing people with disabilities, Dkt. 119-9 ¶¶ 17-20; providing and replacing assistive
devices, *id.* ¶¶ 24-28; evacuating incarcerated individuals with mobility disabilities
in the case of an emergency, *id.* ¶ 30; and tracking individuals with disabilities. *Id.*

~~Moreover, County Defendants' central argument in opposition to the preliminary~~
~~injunction motion was that after the state audit report was issued six months ago,~~
~~"changes were made in the jail system." Swearingen Decl. ¶ 4, Ex. C [12:13-15].~~
~~The examples offered on the record by County Defendants' counsel—including that~~
~~staff now "can no longer mute" audio intercoms; MAT "has been initiated," such~~
~~that incarcerated people can get "methadone, suboxone, and all of the things that~~
~~Plaintiffs were seeking with the MAT program"; "scanners [are] working at all of~~
~~the intake facilities"; safety checks "are done," "logged," and "now audited~~
~~regularly"; and confidential mental health visits are "accommodated" "[u]pon~~
~~request"—paint a rosy picture of conditions at the Jail. *Id.* [12:16-17:13]. These~~
~~claims, however, are not reflected **anywhere** in the record and indeed are **directly**~~
~~**contradicted** by the record evidence¶ 31.~~ Plaintiffs' discovery requests seek
unredacted policies and information about their implementation in practice in order
to understand why and to what extent the Sheriff's Department is failing to provide
reasonable accommodations, effective communication, and assistive devices.

~~*See* Dkt. 153 at 10-11 (in opposition to preliminary injunction motion,~~
~~County Defendants representing that they prohibit muting of audio intercoms *at two*~~
~~*floors of Central Jail only*—not any of the other jail facilities); Dkt. 153-10, ¶ 11~~
~~(Jail Medical Director stating that defendants provide MAT for "exceptional cases"~~
~~only and have no timeline for developing full MAT program); Dkt. 119 at 5~~
~~(Plaintiffs citing evidence of inadequate body scanner policies and practices,~~
~~unrebutted in County Defendants' opposition), 7-8 (Plaintiffs citing evidence of~~
~~insufficient safety checks, unrebutted in County Defendants' opposition); Dkt. 119-~~
~~11 at 16 (Jail mental health clinician stating that "clinical contacts with [] patients~~

**Ex. H - 354**

1  were non-confidential 99% of the time" for reasons unrelated to security and despite

2  patient requests, undermining adequacy of care). The evidence needed to examine

3  the veracity of County Defendants' unsupported claims about "recent changes" in

4  the Jail is in the possession, custody, and control of County Defendants only and is

5  not available through any other means. Swearingen Decl. ¶ 4, Ex. C [12:10-12;

6  18:3-5].[5]

7       In ruling on motions like this one, "[c]ourts also consider whether the

8  requested 'expedited discovery would ultimately conserve party and court resources

9  and expedite the litigation.'" *Rose v. Seamless Fin. Corp.*, No. 3:11-cv CV-00240-

10  AJB-KSC, 2012 WL 6052006, at *2 (S.D. Cal. Dec. 4, 2012) (quoting *Semitool*,

11  208 F.R.D. at 276); *see also Eric County*, No. 09-cv-849;). This Dkt. 42, at 8

12  (finding good cause for early discovery into jail's suicide prevention protocols that

13  were "necessary for the [plaintiff] to determine whether it should seek a preliminary

14  injunction to impose immediate remedial measures to decrease the number of

15  preventable suicides"). Here, the requested discovery will help Plaintiffs to

16  determine whether it is appropriate to narrow the scope of a renewed preliminary

17  injunction motion. Commencing discovery now and puttingprovide better factual

18  information if/when the Court in the best position to addresshears such a motion for

19  injunctive relief will afford a measure of clarity to the parties and facilitate effective

20  . This evidence is not available through any other means.[6] Jail Defendants have

21  _____

22  [5] County Defendants have noted that Plaintiffs have received documents through
    submitting California Public Records Act ("CPRA") requests. The CPRA is no

23  substitute for discovery, however. Plaintiffs seek expedited discovery of more than
    just documents. Plaintiffs' experts cannot assess the conditions of the Jail without

24  inspections, and Plaintiffs need to depose persons most knowledgeable who can
    explain relevant policies and practices. Even as to documents, County Defendants

25  have already refused to provide many categories of documents, including drafts and
    revisions of policies, investigative records, security files, and medical or personnel

26  files, and Plaintiffs have experienced months-long delays in receiving documents.

27  [6] Jail Defendants previously argued that Plaintiffs have received documents through
    California Public Records Act ("CPRA") requests. The CPRA is no substitute for

28  discovery. Of course, CPRA does not provide for inspections and depositions.
    Even as to documents, the Sheriff's Department has refused to provide many

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR
LIMITED EXPEDITED DISCOVERY

Ex. H - 355

conceded that discovery will clarify issues raised in Plaintiffs' first preliminary injunction motion.  Dkt. 204 at 18:12-16 (counsel stating that "it's premature, without doing some discovery, to determine what is actually the case management.").

### 4. ~~Responding to Plaintiffs' Requests~~This Discovery Would Not Impose an Undue Burden ~~on County Defendants.~~

~~Any burden imposed on County Defendants in responding to Plaintiffs'~~Courts in this district have granted requests for expedited discovery ~~requests would be minimal relative to discovery as to all issues in this case.~~of a similar nature and scope.  *See, e.g., NobelBiz, Inc. v. Wesson*, No. 14-~~cv~~CV-0832-W-JLB, 2014 WL 1588715, at *2 (S.D. Cal. Apr.~~ ~~18, 2014) (ordering expedited discovery including requests for production, a deposition, interrogatories, and a third-party subpoena); *U.S. v. Erie County, N.Y.*, No. 09-~~cv~~CV-849, Dkt. 42, at 10 (W.D.N.Y. Mar. 6, 2010) (ordering expedited discovery including interrogatories, requests for production, and an inspection of jail).  ~~Plaintiffs seek documents that are directly relevant to six discrete issues.  These issues already have been the subject of extensive briefing, and at the hearing on the preliminary injunction motion, County Defendant's counsel indicated they had recently searched for any available and relevant documents.  Swearingen Decl. ¶ 4, Ex. C [16:22-18:5] (County Defendants' counsel that they "tried hard to find any record" that incarcerated person with mobility disability was forced to climb the stairs to meet with counsel, and "did [their] best to determine if [] facts [asserted in Plaintiffs' declarations] were accurate"); see also OMG Fidelity, Inc. v. Sirius Techs., Inc.*, 239 F.R.D. 300, 304-05 (N.D.N.Y. 2006) (expedited discovery appropriate if "the burden of responding to [document requests] would not be particularly onerous").~~Notably, Plaintiffs'

_____

categories of documents and delayed for months in providing documents—which are often heavily redacted.  Defendants have failed to produce any materials responsive to the 27 ADA-related requests submitted almost two months ago.

**Ex. H - 356**

1   discovery requests would impose a lesser burden than the discovery the Court was

2   previously inclined to grant before Judge Battaglia dismissed the then-operative

3   complaint.

*[Formatted: Font color: Custom Color(RGB(7,10,10))]*

4   **RFPs.**  Plaintiffs ~~further~~ provided draft document requests to Jail Defendants

5   last month, well in advance of this motion.  Jail Defendants have already sought

6   clarification on most of the RFPs, the majority of which are limited to the past two

7   years.[7]  In meet and confer discussions, Jail Defendants have stated that they may

8   not be able to respond within 30 days.  But at the hearing on Plaintiffs' preliminary

9   injunction motion, Jail Defendants' counsel indicated they had searched for any

10   available and relevant ADA documents.  Dkt. 204 at 16:22-18:5.  Jail Defendants

11   have had nearly two months to start collecting responsive documents, as their

12   counsel has acknowledged that Plaintiffs' October CPRA requests are "very similar"

13   to what Plaintiffs propose for document discovery.

14   **Inspections.**  Plaintiffs request that ~~four of~~ their ~~experts be permitted to~~ ADA

15   expert inspect ~~the~~ five ~~of the seven~~ Jail facilities ~~that comprise the Jail.  Plaintiffs are~~

16   ~~amenable to having multiple experts at~~ where incarcerated people with disabilities

17   are housed (or will be housed).  The parties have tentatively agreed that if the

18   motion is granted, such inspections would include no more than two people from

19   Plaintiffs' counsel, would be limited to a ~~particular~~ half-day per facility ~~on the same~~

20   ~~day (subject to each expert's availability).  Because Plaintiffs seek to observe the~~

21   ~~Jail's normal operations, no other preparation is required.~~, that Plaintiffs' expert

22   could conduct limited staff interviews, that Sheriff's Department's counsel will not

23   ask questions of incarcerated people, and that Jail Defendants would review any

24   photos Plaintiffs' counsel takes.

25   **PMK Depositions.**  Plaintiffs ~~also~~ seek to depose persons most

26   knowledgeable about ~~the specific issues raised in the preliminary injunction motion,~~

27

28

---

[7] Plaintiffs are willing to work together with Jail Defendants to specify the precise documents sought, to the extent necessary.

**Ex. H - 357**

1 and unlike typical fact and expert witnesses, they likely require minimal preparation

2 to testify about fundamental aspects of their work at the Jail.  Plaintiffs, of course,

3 remain willing to continue to meet and confer with County Defendants as ADA

4 issues.  Jail Defendants have expressed concern that Plaintiffs' topics will require a

5 large number of PMK deponents, which will take longer than the 60 days Plaintiffs

6 propose.  Plaintiffs are amenable to the Court providing Jail Defendants more time

7 to the timing and parameters of complete the inspections and depositions to

8 minimize any burden. if and as necessary.

9      **5.**    **County Defendants' A Motion to Dismiss Will Not Eliminate**

10 **the Need for the RequestedObviate This Discovery and There**

    **Are Urgent Risks of Irreparable Harm Without Such**

11 **Discovery.**

12     CountyIt is unclear when Jail Defendants' anticipated motion to dismiss the

13 SAC was filed on May 9, 2022.  TACDkt. 133.  The motion is fully briefed but

14 remains pending,[8] and it is unclear when it will be resolved and the Rule 26(f)

15 conference will be scheduled.  Moreover, the Court's decision[9]  Jail Defendants'

16 prior motion to dismiss did not specifically seek to dismiss the claim on the motion

17 will not eliminate the need for discovery as to the six issues identified.  The only

18 grounds on which County Defendants which Plaintiffs currently seek dismissal are

19 ones the Court already rejected, *see* Dkt. 203, at 6-9 (rejecting County Defendants'

20 mootness and exhaustion arguments), or limited ADA theories that are unrelated to

21 the issues on which Plaintiffs seek expedited discovery, *see.*  Limited Dkt. 203, at

22 22-23 (moving to dismiss Plaintiffs' ADA claim only as to "integration mandate"

23 issues).

24 _____

25 [8] Courts routinely grant motions for expedited discovery even with motions to
dismiss pending.  *See, e.g., Quintero Fam. Tr. v. Onewest Bank, F.S.B.*, No. 09-cv-
1561-IEG-AJB, 2009 WL 3381804, at *1 (S.D. Cal. Oct. 16, 2009); *Hardie v.*
26 *N.C.A.A.*, No. 13-cv-346-W-DHB, 2013 WL 1399333, at *2 (S.D. Cal. Apr. 5,
2013) (same).

27 [9] Courts routinely grant motions for expedited discovery even with motions to
dismiss pending.  *See, e.g., Quintero Fam. Tr. v. Onewest Bank, F.S.B.*, No. 09-cv-
28 1561-IEG-AJB, 2009 WL 3381804, at *1 (S.D. Cal. Oct. 16, 2009).

Formatted: Font color: Text 1

**Ex. H - 358**

1    ~~Permitting limited~~ discovery now ~~would~~is not ~~be~~ too far in advance of when
2    discovery may commence in the normal course. *See Bona Fide Conglomerate Inc.*
3    *v. SourceAmerica*, No. 14-~~cv~~CV-0751-GPC-DHB, 2014 WL 12515242, at *2 (S.D.
4    Cal. Nov. 7, 2014) ~~(granting discovery two months before opening of discovery~~
5    ~~was not too remote in time). The parties, however, are currently in a position of~~
6    ~~indefinite waiting, which~~ ). Waiting severely prejudices Plaintiffs, ~~for whom time is~~
7    ~~of the essence~~as every instance of irreparable~~. *See* Dkt. 162 at 1. Each death or~~
8    ~~serious~~ harm that occurs between now and the opening of discovery ~~in this case~~
9    ~~and there already have been many since the filing of the preliminary injunction~~
10   ~~motion, *see* Swearingen Decl. ¶ 5~~ is one that potentially could be prevented.
11   ~~County~~Jail Defendants would be unharmed by an expedited discovery schedule on
12   ~~narrow issues, while delay can be a matter of life and death~~this discrete issue in the
13   case.
14   **~~III.    CONCLUSION~~**
15   ~~Plaintiffs have made the requisite showing of good cause for limited,~~
16   ~~expedited discovery on issues related to their preliminary injunction motion and a~~
17   ~~potential future motion for injunctive relief. Plaintiffs are amenable to the Court~~
18   ~~advancing the Rule 26(f) conference in addition to ordering expedited discovery on~~
19   ~~the preliminary injunction issues. Plaintiffs respectfully request that the Court grant~~
20   ~~their motion, and enter the Proposed Order attached as Exhibit A to the Declaration~~
21   ~~of Van Swearingen, filed herewith.~~
22
23
24
25
26
27
28

**Formatted:** Font color: Text 1
**Formatted:** Font: Italic, Font color: Text 1
**Formatted:** Font color: Text 1

Ex. H - 359



DATED: ~~September 7~~December 14, 2022

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: ~/s/ Van Swearingen~

Van Swearingen

Attorneys for Plaintiffs
Email:  vswearingen@rbgg.com

**Formatted:** Font: Italic

Ex. H - 360

# EXHIBIT I



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Eric Monek Anderson
Email: eanderson@rbgg.com

March 20, 2023

VIA ELECTRONIC MAIL ONLY

Elizabeth M. Pappy
Burke, Williams & Sorensen, LLP
60 South Market Street, Suite 1000
San Jose, CA  95113-2336
epappy@bwslaw.com

      Re:    *Dunsmore et al. v. San Diego County Sheriff's Department et al.*,
             S.D. Cal. No. 3:20-cv-00406-AJB-DDL
             ADA PMK Depositions and ADA Document Production
             Our File No. 1730-01

Dear Beth:

      We write to follow up on the 30(b)(6) depositions that occurred March 14 and 15, 2023 and Defendants' responses to our First Request for Production of Documents.

      Defendants' designees as the Person Most Knowledgeable ("PMK") testified about several documents that are responsive to Plaintiffs' first set of requests for production and that Defendants failed to produce in response to those requests.  We may have further examples once the transcripts are available, but at a minimum, please produce the below documents or explain why they are not responsive:

- The training binder on the Purple system that Sergeant Jensen discussed during his testimony.  This training is responsive to Plaintiffs' Request No. 1 for POLICIES and PROCEDURES "relating to physical accessibility of facilities, housing, programs, services, activities, and assistive devices for INCARCERATED PERSONS with disabilities, including but not limited to the accessibility of telephones…"  The definition of POLICIES and PROCEDURES includes "policies, procedures, handbooks, advice, directives, <u>training materials</u>, forms, instructions, and guidelines that comprise established standards, regardless of the author" (emphasis added).

- The orientation video shown to incarcerated people, which Captain Bibel testified includes a sign language interpreter.  This orientation video is responsive to Plaintiffs' Request No. 1 and Plaintiffs' Request No. 3.

[4254366.3]

**Ex. I - 362**

Elizabeth M. Pappy
March 20, 2023
Page 2

- Any other trainings responsive to Requests 1, 2, 3, 4, 7, 9 and 10. That includes but is not limited to any training kept on the Sheriff's Department's Learning Management System ("LMS"). Specifically, Captain Bibel testified about reviewing and/or searching for an unidentified ADA training before his presentation to a community group on the ADA approximately six or seven months ago. And some training documents were provided pursuant to Public Records Act requests but not in connection with the Requests For Production.

- The Operation Status Board logs for the Purple system referred to by Sergeant Jensen and referenced in San Diego Central Jail Green Sheet P.11.C.1, bates SD000411. These logs are DOCUMENTS responsive to Plaintiffs' Request No. 1.

- The lower bunk and lower tier logs referred to in San Diego Central Jail Green Sheet M.39.C.1, bates SD000306, which we understand Captain Bibel testified are kept in the Area Activity Log Section of JIMS. These logs are DOCUMENTS responsive to Plaintiffs' Request No. 1.

- Captain Bibel also testified that housing deputies log many other aspects of their work in JIMS, that the sergeants check those logs at least twice per shift, and that lieutenants do so once per shift. To the extent any other logs – encompassed within the definition of DOCUMENTS – are responsive to Plaintiffs' Requests 1, 2, 6, 7, 8, 9, and 10, please produce them.

- Any logs relating to the provision of sign language interpretation that the Reentry Services Division creates in Offender 360 or JIMS, or logs of receipts for use of any in-person sign language interpreter by the Jail. These logs are DOCUMENTS responsive to Plaintiffs' Request No. 1.

- Captain Bibel indicated that the term "grievance" could include inmate request forms, medical request forms, handwritten notes on scrap paper, and the J-22 grievance form. With respect to Requests 2, 3, and 8, please produce all responsive responses to inmate request forms, medical request forms, and any other form of grievance submitted to the Sheriff's Department, not limited to responses to J-22 grievances.

- San Diego Central Jail Green Sheet I.51.C.4 titled "Incarcerated Person Movements – Facility Elevators." The redacted version of this green sheet is available on the Sheriff's Department's public website, but Defendants did not produce the unredacted version, which is responsive to Plaintiffs' Request No. 2.

[4254366.3]

**Ex. I - 363**

Elizabeth M. Pappy
March 20, 2023
Page 3

Please also produce the below documents discussed in the depositions:

- The six responses to the County's Request for Proposals for the new telephone system at the Jail, referred to in Lieutenant Williamson's testimony.

- The presentation on the ADA that Captain Bibel stated he gave to a community group approximately six or seven months ago.

As noted on the record, we left the PMK deposition open due to the failure to produce these documents and to produce qualified deponents. We object to Captain Bibel's designation as the person most knowledgeable for the topic as it relates to Central Jail. Captain Bibel repeatedly testified that he did not know about the provision of in-person sign language interpretation ("SLI") (claiming that is within the purview of the Reentry Services Division), did not know if in-person SLI is required in various settings, did not know how many people at the jail need SLI, did not know whether health care staff document the differences in hearing disabilities people experience, did not know if people with walkers receive special cell placement, did not know what an ADA transition plan was, did not know how many people at the jail use wheelchairs or have a mobility disability, did not know who the MSD ADA case manager is, claimed that the Sheriff's Department is planning renovations to two holding cells at Central Jail but did not know what those renovations entailed, claimed only the transportation department could provide information about accessible vans and transport, and did not know the definitions of "ADA mobility" or "assistive device," terms used by the Sheriff's Department regarding people with mobility and hearing disabilities.

Captain Bibel testified about specific individuals more knowledgeable than him about reasonable accommodations and the provision of assistive devices for people with mobility and hearing disabilities at Central Jail. Specifically, Captain Bibel testified that Patricia Ceballos is manager of the Reentry Services Division, which is responsible for assessing people for reasonable accommodations, including sign language interpretation. Captain Bibel did not mention Ms. Ceballos among the people he spoke with to prepare for his deposition. Captain Bibel also referred to the MSD ADA case manager as another person responsible for providing reasonable accommodations, as alluded to in DSB Policy M.39 (SD000322-324). Captain Bibel did not speak to the MSD ADA case manager to prepare for his deposition, nor did he know that person's name. Captain Bibel also failed to inquire of the transportation department how many wheelchair accessible vans the county has and what the policies are with respect to this issue. Finally, Captain Bibel testified that Scott Bennett is responsible for the planned renovations to the two holding cells at Central Jail and other recent renovations at Central Jail.

[4254366.3]

**Ex. I - 364**

Elizabeth M. Pappy
March 20, 2023
Page 4

Please provide dates as soon as possible when you will produce Ms. Ceballos, Mr. Bennett, the MSD ADA case manager, and the head of the transportation department for their depositions.

Finally, certain of your instructions not to answer fell outside the narrow scope of when such instructions are permitted. Counsel may only instruct the witness not to answer when necessary to preserve a privilege, enforce a court order, or present a motion. Fed. R. Civ. Proc. 30(c)(2). Your instructions not to answer on relevance grounds or because a question was allegedly outside the noticed topic were improper. *See also F.C.C. v. Mizuho Medy Co. Ltd.*, 257 F.R.D. 679, 682 (S.D. Cal. 2009) (holding that in a 30(b)(6) deposition, the deponent may be examined on matters outside the noticed topic). In order to avoid forcing Captain Bibel to return to the deposition room, we would agree to an interrogatory response to the questions on which you instructed, including with regard to the Board of State and Community Corrections report on triple bunking. Please let us know if this compromise is acceptable and we will serve interrogatories that match the questions for which you issued improper instructions.

We previously asked you to provide an amended written response to the Requests for Production, any supplemental production, and a privilege log by March 17, 2023. We have not received a response to that request. Please provide the documents specified herein, as well as your amended written response, any other responsive documents, and a privilege log, by March 23, 2023. It is important that we receive these documents promptly because we are preparing a motion for preliminary injunction.

If these issues cannot be promptly resolved we will request an informal discovery conference with Judge Leshner.

Thank you for your ongoing courtesy and cooperation.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Eric Monek Anderson*

By:   Eric Monek Anderson

EMA:cg

[4254366.3]

**Ex. I - 365**

# EXHIBIT J

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   DARRYL DUNSMORE, ERNEST        )
    ARCHULETA, ANTHONY EDWARDS, REANNA)
4   LEVY, JOSUE LOPEZ, CHRISTOPHER )
    NELSON, CHRISTOPHER NORWOOD, and )
5   LAURA ZOERNER, on behalf of    )
    themselves and all others      )
6   similarly situated,            )
                                   )   No. 20-CV-00406-AJB-DDL
7             Plaintiffs,          )
                                   )
8   v.                             )   May 3, 2023
                                   )
9   SAN DIEGO COUNTY SHERIFF'S     )
    DEPARTMENT; COUNTY OF SAN DIEGO; )
10  CORRECTIONAL HEALTHCARE PARTNERS, )
    INC.; LIBERTY HEALTHCARE, INC.; )
11  MID-AMERICA HEALTH, INC.; LOGAN )
    HAAK, M.D., INC.; SAN DIEGO COUNTY)
12  PROBATION DEPARTMENT, and DOES 1 )
    to 20 inclusive,,              )
13                                 )   Courtroom 14A
              Defendants.          )
14  _____)   San Diego, California

15
                 TRANSCRIPT OF PROCEEDINGS
16               (Telephonic Status Conference)

17

18    BEFORE THE HONORABLE DAVID D. LESHNER, MAGISTRATE JUDGE

19

20

21

22  COURT REPORTER:          AMANDA M. LeGORE
                             RDR, CRR, CRC, FCRR, CACSR
23                           U.S. District Court
                             333 West Broadway, Suite 420
24                           San Diego, CA 92101
                             amanda_legore@casd.uscourts.gov
25

2

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:        VAN SWEARINGEN
                                GAY GRUNFELD
 3                              Rosen Bien Galvan & Grunfeld LLP
                                101 Mission Street, Sixth Floor
 4                              San Francisco, CA  94105-1738
                                (415)433-6830
 5                              vswearingen@rbgg.com
                                ggrunfeld@rbgg.com
 6

 7
     FOR DEFENDANT COUNTY OF
 8   SAN DIEGO:                 SUSAN COLEMAN
                                ELIZABETH PAPPY
 9                              Burke Williams & Sorenson LLP
                                501 W. Broadway, Suite 1600
10                              San Diego, CA  92101
                                (619)814-5800
11                              scoleman@bwslaw.com

12

13

14                                    -0-

15

16

17

18

19

20

21

22

23

24

25
```

**Ex. J - 368**

```
 1                    (Wednesday, May 3, 2023; 4:00 p.m.)

 2

 3                       P R O C E E D I N G S

 4

 5            THE COURT:  Good afternoon, everyone.  This is

 6    Dunsmore versus the County of San Diego, et al., Case Number

 7    20-CV-406.  We are on calendar for a status conference.

 8            May I have appearances from counsel, beginning with

 9    the plaintiff.

10            ATTORNEY GRUNFELD:  Good afternoon, your Honor.  Gay

11    Grunfeld for the plaintiffs and the putative class.

12            THE COURT:  Thank you.

13            ATTORNEY VAN SWEARINGEN:  Good afternoon, your Honor.

14    Van Swearingen for the plaintiffs and the putative class.

15            THE COURT:  Thank you.

16            ATTORNEY COLEMAN:  Good afternoon, your Honor.  Susan

17    Coleman for the County of San Diego.

18            THE COURT:  Thanks, Ms. Coleman.

19            ATTORNEY PAPPY:  And good afternoon.  Elizabeth Pappy

20    on behalf of the County of San Diego.

21            THE COURT:  Okay.  Thank you.  Thank you all.  And I

22    appreciate you all being here on -- I guess it's relatively

23    short notice.  But I received the email from Ms. Coleman on

24    April 27th, and I did think it made sense to convene a status

25    conference to discuss, you know, my efforts to work with you
```

Ex. J - 369

4

1   all to try to resolve as much of this case as we can, in light

2   of the recent developments.

3         So, as I understand it, Judge Battaglia granted the

4   motion to dismiss the plaintiffs' ADA claim with leave to amend

5   and denied the motion to dismiss in other respects.  And there

6   is, of course, a preliminary injunction motion that has been

7   filed.

8         And as I looked at the docket, I think -- as of

9   now -- the defendants' deadline to respond is May 10th, with a

10  date for a reply and a hearing on June 29th.

11        Is that generally accurate?  If I got something

12  wrong, let me know.

13        ATTORNEY GRUNFELD:  Well, your Honor, Gay Grunfeld.

14  The only slightly different point is that the Court dismissed

15  one of our ADA causes of action, not both.

16        THE COURT:  Got it.  Fair point.  Okay.

17        ATTORNEY GRUNFELD:  And you may have seen on the

18  docket that defendants just filed a joint motion for additional

19  time on the briefing on the preliminary injunction.

20        THE COURT:  I did not see that but now I do.  Okay.

21  So that's helpful to know.

22        All right.  So what are -- okay.  So you're asking up

23  until May 17th, Ms. Coleman?

24        ATTORNEY COLEMAN:  Correct.  For the opposition.  And

25  then a few -- a few extra days for the reply.  It won't

**Ex. J - 370**

1  necessarily change the hearing date.

2          THE COURT:  Right.

3          All right.  Well, look, I understand the first

4  paragraph about -- from your email, Ms. Coleman, that you had

5  wanted to avoid motion practice while the parties worked on

6  possible settlement.

7          I mean, that ship has sailed, at least in part.  The

8  motion is filed, and you've got your briefing schedule from

9  Judge Battaglia.  And let's assume the joint motion is going to

10 be granted, and you'll get an extra week.

11         I would really like to hear from the parties, you

12 know, what we can do -- you know, sort of working on a parallel

13 track -- to try to start working on some of these issues in the

14 case through the ENE process.

15         I don't think this case is amenable to having one ENE

16 to resolve every issue that the plaintiffs are alleging.  I

17 just -- I don't think that's going to be realistic.  But I do

18 think we can try to make some progress on discrete issues.

19         And what I -- I know we've spoken about, as I recall,

20 was working on the ADA issues following the expedited

21 discovery, including the inspections; and then turning to the

22 medical and mental health issues.

23         So what can we do to move this case forward?  You all

24 know the case better than anybody.  And I would be really

25 interested in hearing, you know, if you have any -- if there's

6

1    been any discussion between the parties; what agreements you

2    all have; as to how we can try to move forward.  If not, what

3    your thoughts are.

4              Why don't you start, Ms. Grunfeld and Mr. Swearingen.

5              ATTORNEY GRUNFELD:  Thank you, your Honor.

6              We are happy to go to an ENE on the ADA issues.  We

7    have always been happy to do that.  And we have our calendars

8    open for the earliest date that the Court has time for us.

9              We did propose joint experts some time ago.  That

10   proposal was rejected.  So we did retain our own experts.  And,

11   unfortunately, for the people incarcerated in this jail, our

12   expert has concluded that there are serious problems with

13   respect to ADA compliance.  That is all laid out in our motion.

14             THE COURT:  Right.

15             ATTORNEY GRUNFELD:  So I would say that what we can

16   do to move the case forward is two things.

17             We would ask that the Court set a CMC, since the case

18   is going to be at issue in the near future.  Plaintiffs are not

19   amending their complaint.  We will stand on our third amended

20   complaint.  And we will expect the defendants to answer in the

21   near future.

22             So we need a CMC, and we need an ENE within 45 days

23   of the answer; as required by the court's local rules.

24             THE COURT:  Okay.  Well, I'm open to giving you an

25   ENE earlier than that, which is one thing we've been talking

1   about.

2           And I guess what I would like to know is how do you

3   think an ENE on the ADA issues should proceed?

4           I understand your expert filed a lengthy declaration

5   in support of the preliminary injunction motion.  Is there

6   anything that we can do in this case to make that ENE as

7   productive as possible?

8           So, question:  Should the initial ENE be limited to

9   the ADA issues, Ms. Grunfeld?

10          ATTORNEY GRUNFELD:  It could be.  That's fine with

11  us.  Yes.

12          THE COURT:  I -- I need a little bit more than that.

13  And I'm asking that because you -- it sounds like the scope of

14  the issues is going to be pretty broad.

15          And so I don't know that it's going to be even

16  possible to have everybody prep up for an ENE that addresses

17  additional issues.  It sounds like the number of issues is such

18  that we may want to have an ENE limited to the ADA issues.  But

19  you know it better than I do, so what do you think?

20          ATTORNEY GRUNFELD:  Well, I certainly think having

21  several ENEs on the different causes of action is a great plan.

22          We have filed our motion for preliminary injunction

23  with respect to the issues that we consider most urgent and

24  serious.

25          And if we limited our A -- our ENE to those issues,

8

1    that could be productive as long as the schedule for the

2    preliminary injunction does not move.

3         THE COURT:  That's -- that's above my pay grade.  So

4    that will be -- Judge Battaglia is going to be dealing with

5    that.

6         And I -- to be clear, if we're holding an ENE, it

7    wouldn't be as though -- holding a series of ENEs, my intent

8    would not be to wait to issue the scheduling order pending

9    completion of all of the ENEs.  I want to do that -- issue the

10   scheduling order and continue working with you all in the

11   meantime, because I do think this case lends itself to that.

12        Ms. Coleman, Ms. Pappy, what do you think about

13   beginning with an ENE on the ADA issues?

14        If you agree with that, how should we structure the

15   ENE to try to maximize the chances of success?

16        ATTORNEY COLEMAN:  Sure.  Your Honor, so if you

17   recall, last January I suggested a very specific ENE process;

18   which I have subsequently suggested to the plaintiffs two more

19   times before the injunction was filed.

20        And what I had suggested was get the experts on a

21   call with each other, come up with a list.  I suppose you could

22   say we have their list in the form of the declaration.

23   Which -- which I would like Ms. Sanossian and Mr. Joelsen to

24   get on the phone and see if they can hash out what can be

25   agreed to and what's not.

1    Because as much as I may think I know about this

2    stuff, it's their -- they're the people who are going to

3    convince the Court what needs to be fixed and what doesn't.

4    And, in that way, pare down the ENE to, "All right, you have

5    this agreed list.  How fast can you get these things done?  Are

6    these things already ordered?"  You know, "Yeah, that will be

7    here in three months."  And simply check off the list the

8    things they can't agree to.  I would consider that first part

9    to be a very short part of the ENE.  Maybe even counsel and I

10   can -- can agree to something -- a schedule for repairs -- some

11   of which has been in process since November and January,

12   especially, you know -- before we go to the ENE.  And then

13   spend the time at the ENE discussing the things that we can't

14   agree about.

15       Either we don't think there's a violation and they

16   do, under the law.  Or they want something structural done that

17   we contend is not readily achievable because you can't take a

18   load-bearing wall down.  Something to that effect.  So spend

19   the time to argue about the things that we really disagree

20   about.  And we still stand ready to do that, and before the

21   injunction.

22       THE COURT:  Right.

23       Understanding that the ENE we're talking about is

24   going to proceed separately from the briefing and hearing on

25   the preliminary injunction motion.

1          Ms. Grunfeld, what are your thoughts about that

2    proposal?

3          ATTORNEY GRUNFELD:  I think that proposal is

4    unrealistic, your Honor.  This is not something where you,

5    quote, get on the phone, close quote.

6          If -- we have presented our list.  They have our

7    expert's report.  They were with us during these inspections.

8    There was no discussion during the inspections of, oh, I

9    disagree with this or that.  So -- and, in fact, they've

10   instructed all of their witnesses not to answer questions about

11   what their expert is recommending.

12         So it's time for their expert to come forward and

13   provide us with information in writing about the disagreements.

14   This is normal to do.  They have our report.  So that's one

15   part of this.  The two experts on the phone is not really a

16   workable solution.

17         However, we're open to reading what their expert is

18   saying.  He was present on both inspections.  And to learning

19   what their position is.  To this day, we do not know whether

20   they are claiming that these facilities are accessible in part

21   or in whole.

22         So if they have something in writing they want to

23   give us about that, we're happy to read it.  We're also happy

24   to go to an ENE.

25         We've presented to them our proposed order.  These

**Ex. J - 376**

1    are the orders that we're seeking from the Court.  And they're

2    not just about barriers.  We're seeking identification and

3    tracking and better policies and procedures.  Better grievance

4    process.  That will address all of these issues; the ones we've

5    brought up in the -- in the motion and -- of course, those are

6    not the only ADA issues in the third claim for relief.  There's

7    numerous others, on behalf of numerous different people and

8    types of disabilities.  But, of course, the Court's expedited

9    discovery was limited to two jails and two disabilities.  So

10   that is what we have received to date, and that is what we have

11   put in our motion.

12            ATTORNEY COLEMAN:  And just to respond to that

13   quickly, your Honor -- this is Susan Coleman -- we did not

14   instruct witnesses not to talk about Mr. Joelsen's

15   recommendations.  In fact, that was a topic of discussion at

16   one of the -- one or more of the recent depositions on ADA

17   issues and renovations that are planned.

18            Mr. Bennett testified that he had gotten

19   recommendations from Mr. Joelsen.  Talked to him.  Worked on a

20   list with him.  So there was -- there has been information

21   sharing about that.

22            At the site inspections, I was there and

23   Ms. Grunfeld.  And her expert, Ms. Sanossian was not openly

24   discussing things.  She had an assistant who was noting down

25   measurements and stuff.  There wasn't any open -- there wasn't

 1   any statement about "This needs to be done.  This needs" -- you

 2   know, I had only asked that discussion go through me, if there

 3   were questions, so that they weren't -- as they had initially

 4   proposed questioning inmates at the facility, and things like

 5   that.  So to keep some control over the proceedings.  It wasn't

 6   to stop our expert or their expert from talking.

 7            THE COURT:  What's the name of your expert,

 8   Ms. Coleman?

 9            ATTORNEY COLEMAN:  Paul Joelsen is -- is the

10   structural ADA expert.

11            THE COURT:  And how do you spell that?

12            ATTORNEY PAPPY:  J --

13            ATTORNEY COLEMAN:  P-A-U-L, Paul.  And then Joelsen,

14   J-O-E-L-S-E-N.

15            THE COURT:  And how do you pronounce your expert's

16   name, Ms. Grunfeld?  Is it Sanossian?

17            ATTORNEY GRUNFELD:  Yes, your Honor.

18            ATTORNEY PAPPY:  And, your Honor, I wanted to add one

19   comment to what Ms. Coleman said, which is that I handled a

20   class action across the street from Central jail for the GEO

21   facility, and we had fantastic success having our experts talk

22   on the phone and resolving -- you know, coming up with a list

23   of things we agreed to and didn't agree to.  And we actually

24   never had to mediate those issues.  We only focused on money

25   because we were very successful and efficient in getting those

 1   thing done over the phone.

 2          So I have to disagree with that, because I've had

 3   personal experience.

 4          THE COURT:  And I understand.

 5          And what -- is it your intent as of right now --

 6   Ms. Coleman and Ms. Pappy, to the extent you're comfortable

 7   sharing it -- to have Mr. Joelsen prepare some sort of a report

 8   about accessibility issues at the two facilities that were

 9   inspected; whether it's a standalone report or a response to

10   Dr. Sanossian's report?

11          ATTORNEY COLEMAN:  Well, basically in opposition to

12   the motion for preliminary injunction, he will be providing a

13   declaration and responses to all the different repairs that she

14   suggested.  A lot of the things that Ms. Sanossian came up with

15   are hypertechnical, and some do not take into account

16   correctional facility concerns such as antiligature, you know.

17   For example, having a whole grasp around the grab bar, that's

18   not always possible when you take into account the antiligature

19   rules.  And, really, if push comes to shove, we would rather

20   have someone fall down than hang themselves from a grab bar.

21   You know, not that we want either to happen.  But, you know,

22   that's -- that's the higher priority, is preventing suicide.

23          THE COURT:  When -- do you think that before there is

24   a -- any communication between Ms. Sanossian and Mr. Joelsen,

25   that it would be helpful to have Mr. Joelsen's declaration in

1    hand, so that they can know what the other is thinking about?

2            I mean, I think -- and that sort of gets to what

3    Ms. Grunfeld is saying.  I think she's -- I don't want to put

4    words in your mouth, Ms. Grunfeld.  But their expert's prepared

5    a report.  And so they would like to see something in writing

6    from Mr. Joelsen, so that everyone, you know, has something

7    that they -- that they can aim at.

8            And the reason I ask is because I don't know when you

9    intend to get a declaration from Mr. Joelsen.  But maybe

10   that's -- maybe that's the way to really start this off is

11   with -- if the declaration is ready before the motion is

12   filed -- again, I realize that the preliminary injunction

13   motion may change things a little bit.  But as I'm thinking out

14   loud, Mr. Joelsen's declaration is prepared.  It's provided --

15   formally or informally -- to the plaintiffs and Ms. Sanossian.

16           If that happens, Ms. Grunfeld, would you object to a

17   meet and confer between the experts, so they can see if they

18   can, you know, agree on some issues or agree to disagree on

19   other issues?

20           ATTORNEY GRUNFELD:  With appropriate protections,

21   your Honor.  For example, I would need to be present,

22   obviously.  And I think we would have to decide what -- what

23   the time period would be, and, you know, what the admissibility

24   of these discussions would be.

25           I mean, during the inspection, I was not allowed to

1    speak to the expert or to any of the people there.  So I --

2    this is the total turnaround from the way these things have

3    been conducted to date.  So I -- I -- I think what we're

4    referring to is called a hot tub, where the experts discuss

5    among themselves.  And it's a new procedure.  And I'm open to

6    discussing it, if there are appropriate protections.

7                THE COURT:  I'm sorry.  I've got to back up.  A hot

8    tub?

9                ATTORNEY GRUNFELD:  Yes.  That's what I learned --

10               THE COURT:  Is this something with the ADA?  What

11   rule?  Or is this something that I should know about but I

12   don't?

13               ATTORNEY GRUNFELD:  This is a Northern District of

14   California procedure, where experts come into the room and talk

15   to each other directly prior to a court ruling on *Daubert*

16   motions.

17               THE COURT:  And you call it a "hot tub"?

18               ATTORNEY GRUNFELD:  Yes, that's what they call it up

19   here.

20               THE COURT:  All right.  I guess I learned something

21   new.

22               ATTORNEY GRUNFELD:  In a jocular fashion.  Not in

23   open court.

24               THE COURT:  Understood.

25               ATTORNEY PAPPY:  So I would --

1           ATTORNEY GRUNFELD:  I mean, I've never done it

2    because it's pretty new.  And this would not be leading up to

3    *Daubert* motions, obviously.  This is leading up to an ENE.  So

4    when you hear hesitancy in my voice, it's not usually done,

5    that experts speak to each other.

6           THE COURT:  I understand.

7           Okay.  What were you going to say, Ms. Pappy?

8           ATTORNEY PAPPY:  Well, I was going to say that,

9    obviously, it would be protected by the mediation privilege.

10   No question about it.  And we don't meet -- I don't -- I find

11   lawyers to be a problem.  But -- no self-insult intended.

12   But -- if Ms. Grunfeld wanted us both to be on the phone while

13   they talked, I don't care.  That's fine.  But I would like to

14   see that happen before the ENE and not while they're sitting in

15   the courtroom, waiting for a ruling.  Because I want the ENE to

16   be productive.  I want us all to use our time and the Court's

17   time productively and try to pare the issues down before we get

18   there.

19          THE COURT:  So I think we agree on one thing, is that

20   the -- we are proceeding on a parallel track to what's

21   happening in the preliminary injunction motion.  And for

22   purposes of our ENE proceedings, yes, they would all be

23   confidential.  And whatever informal discussions are taking

24   place between Mr. Joelsen and Ms. Sanossian would be

25   confidential.

**Ex. J - 382**

1          Now, again, I -- this is a little bit unusual,

2    Ms. Grunfeld.  Again, I'm not going to hold you to this right

3    now.  I want you to be able to think through this because you

4    have experts who may be testifying as to something, and that is

5    a little bit tricky.  Right?  Where they're going to be talking

6    confidentially for purposes of an ENE but then perhaps

7    testifying later and not testifying about what they -- what

8    they discussed.  So I -- I'm not trying to force something on

9    anyone right now.

10          But it does seem to me that at least -- my first

11    thought is it would be helpful for the experts to talk with

12    appropriate protections.  And, Ms. Grunfeld, if you want to be

13    there, then sure, of course, that would be --

14          ATTORNEY GRUNFELD:  And, your Honor, I don't know

15    that we'll have time before May 17th, to do this process, given

16    what plaintiffs have filed.

17          THE COURT:  Okay.

18          ATTORNEY GRUNFELD:  But as of May 17th, when we file

19    our opposition, they will have basically Mr. Joelsen's response

20    to Ms. Sanossian, so they can compare and see where the -- the

21    disputes lie.

22          THE COURT:  So you were -- okay.  So if you file your

23    opposition by May 17th, that includes Mr. Joelsen's

24    declaration.  And everybody knows what Ms. Sanossian thinks and

25    what Mr. Joelsen thinks.  And the parties would be in a

1    position, thereafter, to participate in a discussion with their

2    respective experts, to see where any areas of agreement are.

3    And then have an ENE with me.

4            Is that just -- again, this is a conceptual

5    framework.

6            Would that be something that you think might be

7    workable, Ms. Grunfeld?

8            ATTORNEY GRUNFELD:  Yes, your Honor.

9            THE COURT:  Ms. Coleman?

10           ATTORNEY COLEMAN:  Yes, your Honor.  Although I would

11   state that as to a series of ENEs, I would like to see how this

12   first one goes.  And, also, we are -- as of last week and this

13   week -- providing them with mountains of information about all

14   of the deaths that have happened in custody:  Suicides,

15   homicides, medical, including a ton of records, video, audio.

16           If they're going to use that to file another motion

17   and we're going to be responding to that, then it's going to

18   hamper the ENE process.  And the reason I sent the email was I

19   thought we were doing some early discovery and some talking

20   about things that we, you know, could agree that needed to be

21   fixed and what we can do about them.  But, you know, it's -- if

22   we're going to be in litigation on the one hand, it makes it

23   difficult to -- to engage in that process at the same time.

24           THE COURT:  I understand.

25           And we're going to -- I don't need a response from

1  the plaintiffs on that.  The motion is filed, and I -- I'm not

2  going to condition this on additional motions.  But I also

3  understand where you're coming from, Ms. Coleman.

4        Let me see what we've got.  (Pause.)  I just need a

5  moment.

6        Give me just a sec, everyone.  I want to check

7  something on my calendar.

8        (Pause.)

9        THE COURT:  All right.  My -- my schedule is not

10  great right now to give you a prompt ENE on the ADA issues, but

11  I really want to try to do that.

12        I might be able to move something else -- but I'm not

13  sure yet -- on Wednesday, May 24th.

14        Would that date work for you all to have an ENE on

15  the ADA issues?

16        ATTORNEY GRUNFELD:  Your Honor, it might need to be a

17  little further out just because if we have Mr. Joelsen's filed

18  on the 17th and then a conversation by the experts on the 17th

19  but before the ENE, it cuts it a little close.  But I

20  appreciate you --

21        THE COURT:  I know it does, and I -- my issue, in all

22  honesty, is I schedule, you know, half-day blocks for all of my

23  ENEs and MSCs, and I'm filling them all up right now.  So

24  that's my -- that's my concern.  And --

25        ATTORNEY PAPPY:  You know, we'll make it work.  We'll

1    make it work.  It's worth the effort.

2            ATTORNEY COLEMAN:  Your Honor, could we have the

3    afternoon slot, so that we could fly in the morning?

4            THE COURT:  Yes.  And what I'm going to do is -- yes.

5    Absolutely.  It would be in the afternoon, starting at 1:30.

6    And then -- but I -- right now I have another MSC that's set

7    for that same time.

8            I think that case may resolve, and I need to look

9    into that to figure it out.  And there is some time sensitivity

10   here, given the pending preliminary injunction motion.  I

11   really do want to start working with you all.  And it's going

12   to give me a sense of what progress we can make on the other

13   issues, as Ms. Coleman mentioned.

14           So, yes, the afternoon of May 24th.  But, again, I'm

15   not going to set a minute order setting that date yet.  I just

16   want to make sure that's available, if I can set it.  And let

17   me see what I can do in that regard.  But I'll figure that out

18   before the end of the week.  And if I can't, for some reason,

19   I'll send you all some additional -- other potential dates.  I

20   just -- I don't want to go into July on this, which I might

21   have to.  Otherwise, I really want to get started with you all,

22   and see if we can make some progress on this.

23           ATTORNEY GRUNFELD:  Thank you, your Honor.  I just

24   wanted to, though, mention that our goal is to have

25   court-supervised remedial action.  We are seeking an order for

1   reform.

2           So I don't want anyone to be surprised that that is

3   our position.  That the ENE will only be beneficial from

4   plaintiffs' perspective if it results in stipulated orders for

5   reform and change.  It doesn't have to be everything we want,

6   of course, but that is what we are seeking.

7           THE COURT:  Okay.

8           ATTORNEY GRUNFELD:  Also, would your Honor be able to

9   set our CMC at this time?

10          THE COURT:  Ms. Coleman, Ms. Pappy, I would

11  ordinarily set the ENE and CMC after an answer is filed, given

12  the representation from Ms. Grunfeld that the plaintiffs intend

13  to stand on their answer -- excuse me, on their complaint.

14          Do you have any objection to setting the CMC with the

15  ENE on the same date, even if that may precede your answer?

16          ATTORNEY GRUNFELD:  No, your Honor.

17          ATTORNEY COLEMAN:  No.

18          THE COURT:  We'll do that then, Ms. Grunfeld.

19          ATTORNEY GRUNFELD:  We'll have it with the ENE?

20          THE COURT:  That's right.  But -- and I'll issue an

21  order detailing the CMC requirements.  And we'll set that for

22  the same date as the ENE, which I hope -- my goal is to do the

23  ENE on May 24th, if I can figure it out.  Even if I cannot, I'm

24  going to hold the CMC on an earlier date because you need

25  dates.  So if it has to be a standalone CMC, we can do that.

**Ex. J - 387**

1  But I would prefer to do it with the ENE.  So let me see what I

2  can do on my end.

3            ATTORNEY GRUNFELD:  Thank you, your Honor.

4            THE COURT:  Right.  And I was just reminded that --

5  to make clear that if it's the CMC only, I'll do it by Zoom, so

6  that you don't have to come to San Diego for the CMC.  But if

7  it's an ENE -- if it's an ENE, I think it's worth the

8  investment of everyone's time to try to get this done in

9  person.

10           ATTORNEY GRUNFELD:  Thank you.

11           ATTORNEY PAPPY:  Agreed.

12           THE COURT:  All right.  Thank you, everyone.  Look, I

13 appreciate your time, and I realize there's a lot going on with

14 the case.  And I continue to believe that the way we're going

15 to make progress is by breaking it down into at least -- I

16 hesitate to call them manageable pieces.  But more manageable

17 pieces than otherwise.  So thank you for your flexibility, in

18 that.  I will figure out on my end if I can make May 24th work.

19 And I will issue an appropriate order as soon as I can.

20           ATTORNEY COLEMAN:  Thank you.

21           ATTORNEY GRUNFELD:  Thank you, your Honor.

22           THE COURT:  Thanks.  Have a good day, everyone.

23           ATTORNEY VAN SWEARINGEN:  Thank you, your Honor.

24           THE COURT:  Take care.

25           (Conclusion of proceedings.)

23

1

2

3

4                                --oOo--

5   I certify, by signing below, that the foregoing is a correct

6   stenographic transcript, to the best of my ability, of the

7   digital recording of the audio proceedings had in the

8   above-entitled matter this 8th day of May, 2023.  A transcript

9   without an original signature or conformed signature is not

10  certified.  I further certify that the transcript fees and

11  format comply with those prescribed by the Court and the

12  Judicial Conference of the United States.

13

            /S/ Amanda M. LeGore
14         _____

15      AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

16

17

18

19

20

21

22

23

24

25