GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
ERIC MONEK ANDERSON – 320934
HANNAH M. CHARTOFF – 324529
BEN HOLSTON – 341439
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
eanderson@rbgg.com
hchartoff@rbgg.com
bholston@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California  94709
Telephone:  (510) 806-7366
Facsimile:   (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPÚLVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>     v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>        Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**REPLY DECLARATION OF RICHARD M PEARL IN SUPPORT OF PLAINTIFFS' MOTION FOR INTERIM ATTORNEYS' FEES AND COSTS**<br><br>Judge:   Hon. Anthony J. Battaglia<br><br>Date:     May 8, 2025<br>Time:     2:00 p.m.<br>Crtrm.:   4A |

[4661725.16]

I, Richard M. Pearl, declare:

1.      I am a member in good standing of the California State Bar.  I am in private practice as the principal of my own law firm, the Law Offices of Richard M. Pearl, in Berkeley, California.  I specialize in issues relating to court-awarded attorneys' fees.  A full description of my professional background and expert witness experience is set forth in my initial declaration in this matter, dated February 3, 2025.  *See* Dkt. 807-6 ("Pearl Decl.") ¶¶ 3-13 & Ex. A.  If called as a witness, I could and would competently testify to the following.  I make this Reply Declaration in support of Plaintiffs' Motion for Interim Attorneys' Fees and Costs.

2.      I offer this declaration to supplement my initial declaration and to rebut Defendants' Opposition to Plaintiffs' interim fee motion, more particularly the Declaration of John O'Connor in support of the Opposition.  As I will show, Mr. O'Connor's opinion is based almost entirely on imperfect hindsight and speculation.  In this declaration, I explain that, on the one hand, my opinion is more credible and may be relied on by this Court; on the other hand, Mr. O'Connor's opinion is largely based on a) purported standards that he knows or should know are legally invalid, and b) factual assertions, assumptions and speculations that are unsupported by the record and/or the realities of the legal marketplace. Mr. O'Connor's proposed reductions are largely arbitrary, as he offers scant evidence or analysis.

3.      In addition to the materials I reviewed for my February 3, 2025 declaration, I have reviewed Defendants' Opposition to Plaintiffs' Motion for Interim Attorneys' Fees and Costs (Dkt. 831, hereinafter "Opp."); Elizabeth M. Pappy's Declaration and exhibits (Dkts. 831-1, 831-2); and John O'Connor's Declaration in support of the Opposition (Dkt. 831-3, hereinafter "O'Connor Decl.") and exhibits (Dkt. 831-4).  I have also reviewed the Reply Declarations of Gay C. Grunfeld, Van Swearingen, Sanford Jay Rosen, Christopher Young, Claudia Center, Shawna Parks, and Margot Mendelson, which will be filed concurrently with this

declaration.  In addition, I have further consulted with RBGG lawyers about the fee motion and the underlying facts and history of the case.

### A SUMMARY OF MY OPINION

4.    Mr. O'Connor's declaration offers scant support for the opinions he offers.  He ignores or disregards almost all of the evidence supporting Plaintiffs' fee request.  He inexplicably ignores my expert declaration in support of the interim fee motion, not mentioning it once.

5.    Mr. O'Connor opines, in direct contradiction to my Opinion, that Plaintiff's Counsel should be paid at rates far below their actual billing rates to their pay-for-service clients, far below their rates that have been approved and awarded in similar matters, and far below the prevailing rates in either the San Diego or San Francisco Bay Area legal markets in light of their levels of experience, expertise, and skill.  The lynchpin of Mr. O'Connor's recommended lowball hourly rates is his incorrect and unsupported claim that Plaintiffs' Counsel's rates in this case should be pegged to "the market rates for straightforward ADA 'access' cases."  O'Connor Decl. ¶ 31.  This view is patently wrong for several reasons:

a.    In my experience, opining that the underlying case is simple and straightforward is part of Mr. O'Connor's standard playbook that many courts have soundly criticized and rejected for lacking factual foundation.

b.    Mr. O'Connor's rates opinion does not appear to have any factual basis.  My opinion that the litigation pertaining to the Third Claim for Relief was extremely complex and hard-fought is buttressed by testimony from Plaintiffs' Counsel and other prominent advocates specializing in disability rights and complex class actions, explaining that disability rights work in jails and prisons is extremely challenging, requires intensive factual development and expert input, and necessitates ongoing monitoring and enforcement.

c.    Mr. O'Connor's only source for his proposed ADA fee scale in San Diego is a single firm, Potter Handy.  I am aware that this firm typically brings

ADA actions on behalf of a single plaintiff to challenge an ADA physical barrier at a single site (e.g., an individual alleging a Peet's Coffee failed to provide wheelchair-accessible outdoor dining tables). Potter Handy has been repeatedly sanctioned and even prosecuted by the San Francisco District Attorney for bringing allegedly fradulent ADA claims against small businesses. It is entirely inappropriate to equate this case and Plaintiffs' Counsel's skill, experience, and experience to Potter Handy's.

        d.     Contrary to how the legal marketplace works, Mr. O'Connor makes the absurd suggestion that this Court should apply separate alternative rate scales for every claim in this case, if/when other claims are successful.

6.     Mr. O'Connor's hourly rates opinion is flawed for several additional reasons. For example, he ignores Plaintiffs' evidence for why it was necessary to retain out-of-forum counsel for this action and misstates the legal standard for determining the relevant geographic market. Nothing about his declaration changes my opinion that no other attorney in the San Diego market was willing to take on the lead role to bring this type of challenge to the San Diego jail system, and thus RBGG and Mr. Fischer should recover their San Francisco Bay Area home office rates. Also, the specific rates he recommends for timekeepers do not make sense to me. For example, he recommends the same rate for Ms. Grunfeld and Mr. Fischer, even though Ms. Grunfeld was admitted to the Bar 20 years before Mr. Fischer.

7.     On the reasonable number of hours issue, it is my opinion that the hours for which Plaintiffs' Counsel request compensation are consistent with the range of hours I would expect to be necessary to secure their victory on the Third Claim for Relief. Mr. O'Connor, however, assigns arbitratary across-the-board reductions, primarily based on his unfounded assumptions of what other hypothetical attorneys might have charged had the matter been handled differently, but which bear no relation to the actual litigation necessary in this case. He makes the unsupported assertion that Plaintiffs could have settled this case earlier but were

motivated by private gain.  Mr. O'Connor's biased opinion also squarely contradicts opinions he has offered in other cases on behalf of fee applicants.  It also improperly adopts wholesale Defendants' views of this lawsuit and of Plaintiffs' Counsel in lieu of an objective appraisal of what the record shows and how the legal marketplace operates.

8.    Finally, Mr. O'Connor does not distinguish between merits work hours and fees work hours when he proposes an arbitrary 30% across-the-board reduction to all time claimed since June 2023.  He offers no basis for his opinion that the fee motion work is excessive, again ignoring the evidence I offered in my initial declaration.  Nothing in Mr. O'Connor's declaration changes my opinion that Plaintiffs' Counsel's fee motion work has been reasonable.

9.    In summary and as a whole, Mr. O'Connor's declaration is factually and legally flawed, and is neither credible nor probative of the issues relevant to the reasonableness of Plaintiff's Counsel's interim fee request.

### THE WEIGHT OF MR. O'CONNOR'S OPINION

10.    Intially, I offer the following information to assist the Court in determining the weight to give Mr. O'Connor's opinions in this matter.  As I show below, Mr. O'Connor's testimony has been strongly criticized by other courts, especially his hourly rates testimony.  Moreover, many of his opinions in this case directly contradict opinions he provided in other cases.

### Courts Frequently Reject Mr. O'Connor's Hourly Rate Testimony

11.    I submit that my testimony on hourly rates is far more credible than Mr. O'Connor's, in part because Mr. O'Connor's testimony on the issues he raises here has been rejected on numerous occasions.  The fact is that he routinely opines a) that the underlying case is simple, routine, and/or not complex; b) that prior awards supporting the requested rates are inapplicable because they ostensibly rely on the wrong market; c) that lower-priced lawyers could have handled the case; and d) that the successful attorneys are asking for "BigFirm" rates.  This playbook has

1    been rejected on many occasions by federal and state courts throughout California.

2    12.    In *Perfect 10 v. Giganews*, CV 11-07098-AB SHX, 2015 WL 1746484,

3    at *16 (C.D. Cal. Mar. 24, 2015), *aff'd* 847 F.3d 657 (9th Cir. 2015), Mr. O'Connor

4    made the same unsupportable arguments he makes here: that although Giganews,

5    the prevailing defendant, was represented by "pre-eminent" and "competent" firms,

6    the case was a "relatively standard" intellectual property case that did not require the

7    "caliber of lawyering" Giganews received; that lawyers who worked for "smaller

8    firms and spin-offs" could have handled the case at lower rates; and that the

9    prevailing attorneys' rates should be governed by cases that awarded lower rates.

10   *See id.* at *16-19.

11   13.    Each of these arguments was expressly rejected by the district court.

12   *See id.*  The court found his opinion that the case was not complex to be "not

13   supported by the record."  *Id.* at *19.  The court found that the lower fee awards

14   cited by plaintiff Perfect 10 "all involved issues of significantly less complexity with

15   substantially lower amounts at stake and substantially less evidence of the attorneys'

16   reputation, skill, and experience."  *Id.* at *20.  Likewise, the court was also "not

17   persuaded" by O'Connor's opinion that the requested hourly rates were "excessive."

18   *Id.* at *18.  Each of those findings squarely apply here as well.

19   14.    Since *Perfect 10*, I have been an expert witness in numerous cases in

20   which Mr. O'Connor's attempt to support lower rates on the same grounds were

21   either wholly or mainly rejected.  For example, in *Oswald v. Landmark Builders*

22   *Inc.*, Contra Costa County Superior Ct. No. SCV259044, Ruling on Landmark

23   Builders' Motion for Attorneys' Fees and Costs, filed March 18, 2023, the court

24   sustained an objection to Mr. O'Connor's entire declaration on the grounds that "it

25   constitutes improper expert opinion and lacks foundation."  In *Hansen Intellectual*

26   *Property Trust v. The Coca Cola Co.*, San Diego County Superior Ct. No. 37-2016-

27   0002104637-2016-CU-MC-CTL, 37-2016, Court's Rulings on Post-Trial Motions,

28   filed June 22, 2020, at 17, the court called Mr. O'Connor's testimony "Monday

1   morning Quarterbacking at its worst."

2       15.    Other examples abound: *K.M. v. Tustin Unified School District*, 78

3   F.Supp.3d 1289 (C.D. Cal. 2015); *Kaku v. City of Santa Clara*, No. 17CV319862,

4   2019 WL 331053, at *3 (Santa Clara County Super. Ct. Jan. 22, 2019), *aff'd* 59 Cal.

5   App. 5th 385, 431 (2020); *Rea v. Blue Shield of Cal.*, Los Angeles Superior Ct.

6   No. BC468900, Order Granting in Part Plaintiffs' Motion for Attorneys' Fees etc.,

7   filed November 13, 2020; *Guinnane Construction Co. v. Chess et al.*, Alameda

8   County Superior Ct. No. RG18932289, Tentative and Proposed Statement of

9   Decision, filed July 3, 2024; *Young v. Leland Stanford Jr. Univ.*, Alameda County

10  Superior Ct. No. 17877051, Ruling on Submitted Matter filed December 4, 2024.

11  True and correct copies of the state court orders are attached hereto as **Exhibit A.**

12  Mr. O'Connor trots out the same standard objections here but their validity is as

13  lacking as they were in the cases cited above.

14  **Mr. O'Connor's Shifting and Contradictory Opinions**

15      16.    Mr. O'Connor also flip-flops on many of the key issues regarding fee

16  motions, depending on whether he has been engaged by a fee applicant or a fee

17  opponent.  As the attached Exhibits B-D show, Mr. O'Connor's declaration in the

18  instant case squarely contradicts the opinions he has offered in other cases on a

19  number of issues, including how the importance of the litigation could support

20  higher rates, how smaller plaintiff-side firms can still receive "Big Law" rates, the

21  necessity of collaborating and assigning multiple attorneys to certain tasks, and

22  more.  In his declaration in this case, he neither acknowledges nor justifies his

23  conflicting positions.

24      17.    Attached as **Exhibit B** is a true copy of the Amended Rebuttal

25  Declaration of John D. O'Connor filed in *Duran v. U.S. Bank Nat'l Assn.*, Alameda

26  County Superior Court No. 2001-035537, dated August 31, 2010.  As **Exhibit B**

27  indicates, I joined that case as counsel for the plaintiffs' fee motion.  Our team hired

28  Mr. O'Connor as an expert witness on attorneys' fees in that case, in part because of

1  his extensive experience rebutting the defendant Bank's fee expert.

2      18.   In *Duran*, Mr. O'Connor declared among other things:

3          a.   "[S]pecial, one-off cases" or "important litigation" support

4  higher rates.  (¶ 46).

5          b.   "The notion that the hourly rate of an attorney should be

6  determined by the size of his firm is simply not correct." (¶ 54).

7          c.   "Most plaintiff firms in fee-shifting cases are smaller plaintiff

8  firms, since most large institutional firms eschew contingency fee litigation," and an

9  argument that an attorney successfully litigating a case would warrant a higher rate

10  if he or she did so while employed at a larger law firm is "nonsensical" and "absurd,

11  and shows a lack of understanding of the market for legal services." (¶ 59).

12          d.   "In fact, it is true that single practitioners and small firms can

13  and often do charge high rates, depending on the nature of their practices." (¶ 60).

14          e.   "[A]n experienced judge or trial lawyer knows that an artful

15  jettisoning of claims will often strengthen a case by narrowing the focus on the most

16  appealing claims." (¶ 79).

17          f.   Mr. O'Connor acknowledged "black-letter principles that all

18  intertwined claims need not prove successful in order to justify collection of all legal

19  fees." (¶ 81).

20          g.   "[A]ny good lawyer should … try[] to maximize the benefits" of

21  pursuing claims.  (¶ 89).  Counsel's "aggressive pursuit … of every claim that could

22  benefit his clients," with mixed success, is praiseworthy; in a case where "the outer

23  limits of the 'envelope' were not clear," counsel "should be applauded for pushing

24  to ascertain them." (¶ 90).

25          h.   The fee claimant's billing of 14,000 attorney hours (in nine years

26  of litigation) "was highly efficient." (¶ 41).

27          i.   The fee opponent's billing of 22,000 hours was "within

28  customary parameters for complex litigation." (¶ 41).

1          j.      Mr. O'Connor decried another fee expert's "search for 'gotcha,'

2   without understanding or wishing to understand the tactical value" of counsel's

3   activity and evidence.  (¶ 98).

4          19.     Attached as **Exhibit C** is a true copy of the Declaration of John D.

5   O'Connor filed in *Johnson v. Sears, Roebuck and Co.*, Sacramento County Superior

6   Court No. 34-2009-00054053, dated February 29, 2012, in which Mr. O'Connor

7   made the following statements, including repeating some of the points above:

8          a.      "The notion that the hourly rate of an attorney should be

9   determined by the size of his firm is simply not correct." (¶ 55).

10          b.      "To say that no small firm deserves or charges prevailing top-tier

11  rates, as [the opposing fees expert] appears to do, is incorrect for other reasons.

12  Most Plaintiff firms in fee-shifting cases are smaller Plaintiff firms, since most large

13  institutional firms eschew contingency fee litigation.  To say that a smaller firm can

14  never achieve the same rates as a larger firm in fee-shifting litigation would mean

15  that a small film could never get prevailing rates, no matter how skilled its lawyers.

16  It would also produce a nonsensical conclusion: If [plaintiffs' counsel] had

17  performed exactly the same litigation as successfully as they have here, but

18  happened to be employees of, say, the Jackson Lewis or Orrick firm, according to

19  [the opposing fees expert] they would deserve higher rates than they would if

20  employed as they are.  This is absurd, and shows a lack of understanding of the

21  market for legal services." (¶ 59).

22          c.      "In my opinion, [the opposing fees expert's] recommendation

23  that fees be allocated for partial success is absurd in the extreme. As has been

24  emphasized in Plaintiff's moving papers, it is quite common to add Defendants and

25  numerous causes of action to a case for various strategic purposes.  But the fact here

26  is that the result was unalloyed success for the Plaintiff and unalloyed defeat for the

27  Defendant."  (¶ 85).

28          20.     Attached as **Exhibit D** is a true copy of the Declaration of John D.

O'Connor filed in *Nadaf-Rahrov v. Nieman Marcus Group*, San Francisco County Superior Court No. CGC-05-437680, dated September 16, 2011, an individual FEHA discrimination claim against Nieman Marcus.  As **Exhibit D** shows, I joined that case as fees counsel as well.  Our team hired Mr. O'Connor for the same reasons I said above regarding *Duran*.  Again, his testimony was directly contrary to many of the opinions he expresses here.  In *Nadaf-Rahrov*, Mr. O'Connor testified among other things:

a.    "The instant case was difficult one [sic] for the Plaintiff to attract counsel, and that difficulty, which reflects risk, should be factored into the multiplier." (¶ 36).

b.    "Collaborative work between colleagues … is not considered duplicative." (¶ 41).

c.    "The notion that the hourly rate of an attorney should be determined by the size of his firm is simply not correct." (¶ 56).

d.    "[I]t is quite common to add individual Defendants and numerous causes of action to a case for various strategic purposes.  But the fact here is that the result was an unalloyed success for the Plaintiff…." (¶ 83).

e.    "There is nothing unusual or below standard about" a staffing structure in which "the same document or legal research may be viewed by four or five lawyers, all related to the same objective…. Unless this duplication is excessive or unreasonable under the circumstances, the legal billings for this activity are considered reasonable." (¶ 89).

f.    The fact that one lawyer "with knowledge of the law" and another "with knowledge of the facts, confer constantly in a 'back-and-forth' manner, is not duplication.  It is collaboration." (¶ 90).

g.    "There is nothing unusual or excessive about the deployment of three lawyers for phone calls by" a law firm.  (¶ 93).

h.    "[S]ometimes it is appropriate to have two or three lawyers

REPLY DECLARATION OF RICHARD M PEARL IN SUPPORT OF PLAINTIFFS' MOTION FOR
INTERIM ATTORNEYS' FEES AND COSTS

1  attending to one task, often because the client or his firm perceives the task as

2  crucial or lawyer knowledge as differential." (¶ 102).

3      21.    Also in *Nadaf-Rahrov*, Mr. O'Connor positively reviewed my expert

4  credentials: "The law of attorney's fees is a specialty area of practice, and Mr. Pearl

5  literally wrote the book on this area of the law."  Exhibit D, ¶ 121.  In his

6  declaration in the instant case, he did not question my expertise in fees matters.

7  **Mr. O'Connor's Numerous Basic Factual and Computations Errors**

8      22.    Aside from his mischaracterization of Plaintiffs' Counsel's motivations

9  and misleading portrayal of this case's history, which I address below,

10  Mr. O'Connor's declaration is replete with basic errors.  Some examples include:

11      a.    Mr. O'Connor significantly undercounts Plaintiffs' Counsel's

12  years of experience.  It is unclear how he even calculated the "Years of Experience"

13  columns in his summary exhibit, as it does not match the law school class years for

14  timekeepers presented with Plaintiffs' Counsel's motion.  *Compare* O'Connor Decl.,

15  Ex. B (Dkt. 831-4 at 6-7), *with* Motion at 14.  For example, Sanford Rosen has 63

16  years of experience, not 50; Priyah Kaul (Senior Counsel) has 10 years of

17  experience, not 1; and Oliver Kiefer has 13 years of experience, not 4.

18      b.    Mr. O'Connor incorrectly refers to Ms. Grunfeld and

19  Ms. Chartoff as male.  O'Connor Decl. ¶¶ 58, 71, 79.

20      c.    Ms. Grunfeld was admitted to the Bar 20 years before

21  Mr. Fischer, who previously worked for her as an associate.  Grunfeld Decl. ¶ 5;

22  Fischer Decl. ¶ 3.  Assigning the same hourly rate to the two attorneys does not

23  make sense.  *See* O'Connor Decl. ¶ 55.  Nor does assigning Mr. Rosen and

24  Mr. Young, who have 44 years and 14 years more experience than Mr. Fischer,

25  respectively, lower rates than Mr. Fischer.  *See id.* ¶¶ 55-56, 60.

26      d.    Mr. O'Connor's categorization of time entries is at times

27  imprecise.  For example, he lists some billing entries under the category "Motion for

28  Attorneys' Fees – Communications" where there is no indication from the time

1  entry that the work necessarily involved communicating with another member of the

2  team. *See, e.g.*, O'Connor Decl., Ex. F-4 (Dkt. 831-4 at 130) (7/15/24 GCG "Initial

3  review of fees and costs."; 9/13/24 GCG "Draft filing checklist.").  And he includes

4  time entries where conferencing was only one of multiple activities. *See, e.g.*, *id.*, at

5  130, 133 (7/23/24 SJR "Review, comment on settlement language."; 7/30/24 VS

6  "Analyze timing and procedural issues re time records and fee application, and

7  discuss same w/ GCG."; 1/10/25 Christopher Young "Analysis regarding interim

8  fees motion, eventual final fees motion, and related issues.  Correspond with co-

9  counsel.").

10       23.    In sum, Mr. O'Connor's mistakes suggest an inattention to detail and/or

11  an only cursory review of the record, undermining the value of his opinions.

## PLAINTIFFS' COUNSEL'S RATES ARE REASONABLE

13       24.    My opinion is that Plaintiffs' Counsel's hourly rates are readily in line

14  with the range of rates charged by and awarded to comparably qualified attorneys

15  for comparable services in both the San Diego and San Francisco Bay Area legal

16  community.  Pearl Decl. ¶¶ 19-43.  Mr. O'Connor's declaration does not change or

17  undermine that opinion in any way.  Indeed, he does not even address my expert

18  opinion or the rates evidence I offered.  It is also important to recognize that

19  Mr. O'Connor's testimony on hourly rates has been rejected on numerous occasions,

20  as I explained above.

21       25.    As I show below, Mr. O'Connor's proposed lowball rates for Plaintiffs'

22  Counsel are based on the wrong legal standards and an incomplete and biased view

23  of this case's factual and procedural history.

24  **Mr. O'Connor Concedes 2025 Rates Are Appropriate**

25       26.    My initial declaration explained that Plaintiffs' Counsel's request for a

26  fees award based on 2025 rates is consistent with the common and accepted practice

27  of determining fee awards based on the attorneys' rates at the time the fee motion is

28  made, to account for delay in payment.  Pearl Decl. ¶ 22.  Mr. O'Connor did not

criticize this approach.  By virtue of his silence, Mr. O'Connor validates that current rates are appropriate.

27.    Mr. O'Connor has expressly taken this position in numerous past fee matters, including in his *Johnson v. Sears* declaration discussed above.  *See* Exhibit C, ¶ 34 ("It is customary, in my experience, for courts … to award rate prevailing at the time of the fee award, not at the time of the work performed.").

**Mr. O'Connor's Geographic-Market Opinion Is Flawed**

28.    Mr. O'Connor's declaration is full of factual and legal errors and does not change my opinion that, under the circumstances of this case, it was entirely appropriate and reasonable for Plaintiffs to retain out-of-forum counsel and for those attorneys (RBGG and the Law Office of Aaron J. Fischer) to recover their San Francisco Bay Area home office rates.  Pearl Decl. ¶ 17.

29.    Mr. O'Connor is wrong that "Plaintiffs submitted no declaration to support their claims of unavailability of local counsel, instead relying on conclusory statements by Plaintiffs' counsel."  O'Connor Decl. ¶ 43.  Plaintiffs' Counsel submitted three declarations with sufficient evidence.  First, DLA Piper's Christopher Young submitted a declaration explaining why RBGG became lead counsel.  Young Decl. ¶ 7.  He explained that he is not aware of any law firms in the Southern District which have the necessary background and experience to take the lead role in a case like this.  *Id.*  He testified that his firm could not make the time commitment to serve as lead counsel.  *Id.*  Mr. Young also explained that conditions at the San Diego County Jail were widely reported in the local community, yet no San Diego-based attorney brought claims like the Third Claim for Relief here.  *Id.* Second, Ms. Grunfeld's declaration explained that, as part of RBGG's early investigation into conditions at the Jail, she reached out to a nonprofit specializing in jail litigation, but they informed her they did not have the resources to bring this case; a large law firm in San Diego, which also declined; and although another nonprofit did join the case, it later withdrew.  Grunfeld Decl. ¶ 42; *see also* Dkt.

210.  Third, my initial declaration explained that I was also unaware of any San Diego firm that has comparable experience in complex class actions about prison or jail conditions, including disability discrimination and access issues.  Pearl Decl. ¶ 17.  After reviewing Plaintiffs' evidence, it was clear to me that no other attorney in the San Diego market was willing to take on the lead role.  *Id.*  Mr. O'Connor ignores all of this evidence and bases his opinion that the relevant market is San Diego solely on his perceived absence of evidence.  O'Connor Decl. ¶ 43.

30.    I have also reviewed the reply declaration of Margot Mendelson, the Executive Director of the Prison Law Office, to be filed concurrently with this declaration, and note that she explains that she has been aware of the community concerns with the operation of the San Deigo County jails for years, and previously investigated issues at the jails herself, but ultimately declined to file a lawsuit because her firm lacked sufficient resources to bring the litigation.  Mendelson Decl. ¶ 13.  She explained that, aside from her firm, RBGG, and the ACLU (which withdrew), she was unaware of any other law firm that could have successfully brought this type of challenge to the San Diego County's jail system.  *Id.* ¶ 14.

31.    Mr. O'Connor misstates the legal standard for determining the geographic market.  O'Connor ¶ 43.  He mentions *Nichols* and *Horsford* and asserts that a fee petitioner's burden is to show extensive efforts to find local counsel.  *Id.* However, in *Ctr. for Biological Diversity v. Cnty. of San Bernardino*, 188 Cal. App. 4th 603, 618 (2010), *as modified* (Oct. 18, 2010), the Court of Appeal explained and applied *Nichols* and *Horsford*, clarifying that the "threshold showing of impracticability … is not onerous."  The appellate court found that plaintiff's declaration stating that he was familiar with the local market and that no local attorney was able to take on the case or had sufficient experience to represent plaintiffs was "sufficient and competent evidence that plaintiffs acted in good faith and hiring qualified counsel in the San Bernardino area was impracticable."  *Id.*

32.    Mr. O'Connor did not rebut any of my geographic market analysis or

evidence, including the Ninth Circuit case I cited awarding San Francisco rates to an earlier incarnation of RBGG, for a Sacramento-based prison condition case, *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).  Pearl Decl. ¶ 17.  The evidence supporting my opinion that Counsel are entitled to home office rates is essentially undisputed.

**Mr. O'Connor Did Not Propose Alternative San Francisco Area Rates**

33.    Mr. O'Connor is silent as to the hourly rates that should apply if the Court determines that home office rates are appropriate for RBGG and Mr. Fischer. His only mention of a San Francisco Bay Area rate is his own, stating his rate "is $635 per hour, perhaps a bit low for the market."  O'Connor Decl. ¶ 57.

34.    Mr. O'Connor fails to address any of the San Francisco Bay Area rates evidence in my initial declaration.  My opinion that RBGG's and Mr. Fischer's hourly rates are in line with and well within the range of the noncontingent market rates charged by San Francisco Bay Area attorneys of reasonably comparable experience, skill, and reputation for reasonably comparable services was based upon: (1) Plaintiffs' Counsel's impressive credentials and experience; (2) numerous findings of reasonable hourly rates made by San Francisco Bay Area courts; (3) stated non-contingent hourly rates charged by numerous San Francisco Bay Area law firms that regularly engage in civil rights litigation and other civil litigation of comparable complexity; and (4) testimony of other highly skilled public interest lawyers.  Pearl Decl. ¶¶ 37-43 & Ex. C.  I also found the fact that courts have awarded RBGG's requested rates in numerous prior fee awards for work similar to the work performed in the instant matter to be strong evidence that their current rates are reasonable.  Pearl Decl. ¶¶ 31-32.

**Counsel's Rates Are Reasonable and In Line with San Diego Area Rates**

35.    Nothing about Mr. O'Connor's declaration changes my opinion that the hourly rates Plaintiffs' Counsel request are also within the range of the non-contingent market rates charged by San Diego-based attorneys of reasonably

1  comparable experience, skill, and reputation for reasonably comparable services.

2  *See* Pearl Decl. ¶¶ 19-36.[1]

3      36.    O'Connor states that rates in the Southern District of California legal

4  markets are only "modestly below those of … the Northern District," (O'Connor

5  Decl. ¶ 31), but he then proposes rates that are dramatically below the rates RBGG

6  charges fee-paying clients and has been awarded in the Northern District in

7  numerous cases.  *See* Grunfeld Decl. ¶¶ 14-19.

8      37.    I strongly disagree with Mr. O'Connor's unfounded suggestion to peg

9  Plaintiffs' Counsel's hourly rates to fees to what he characterizes as run-of-the-mill

10  ADA "access" cases.  O'Connor Decl. ¶¶ 22-35, 44-51.  As I explained above, this

11  type of criticism is part of Mr. O'Connor's playbook that he has employed in many

12  cases before, calling the underlying case "simple", "routine" and/or "not complex"

13  when it is patently not.

14      38.    As I opined in my initial declaration, this was an especially hard-fought

15  and complex case that demanded a voluminous amount of work to obtain a complete

16  victory on Plaintiff's Third Claim for Relief, especially given Defendants' vigorous

17  defense.  Pearl Decl. ¶¶ 46-51.  I have reviewed Plaintiffs' Counsel declarations,

18  including Ms. Grunfeld's summary of how Plaintiffs' Counsel battled to get critical

19  evidence covering seven different facilities, each with hundreds of barriers and

20

21  ─────────────────────
[1]      Since my initial declaration, additional listed billing rates and published
22  articles show that attorney hourly rates are growing rapidly.  *See, e.g.*, David
    Thomas & Mike Scarcella, *More lawyers join the $3,000-an-hour lawyer club, as other*
23  *firms close in*, Reuters (Feb. 27, 2025),
    https://www.reuters.com/legal/legalindustry/3000-an-hour-lawyer-isnt-unicorn-
24  anymore-2025-02-27/ (top partners at Quinn Emanuel Urquhart & Sullivan and
    Susman Godfrey charging $3,000 an hour, with several other firms charging hourly
25  rates above $2,500); Matt Hamilton & David Zahniser, *DWP secures law firm, at up*
    *to $1,975 an hour, to defend against Palisades fire lawsuits*, LA Times (Feb. 14,
26  2025), https://www.latimes.com/california/story/2025-02-14/law-firm-1975-an-
    hour-defend-against-palisades-fire-lawsuits (Los Angeles Department of Water and
27  Power approved $10-million contract with Munger, Tolles & Olson to defend
    against lawsuits from residents of homes destroyed in Palisades fire, with partners
28  charging $1,975 an hour).

1  many different policies and procedures.  Grunfeld Decl. ¶¶ 37-105.  Ms. Grunfeld

2  also explained how the Third Claim for Relief was heavily litigated, including

3  catching that although Defendants claimed that they had sign language interpreters,

4  they really did not.  *Id.*; *see also id.* ¶¶ 70, 82, 92-93.

5      39.    Moreover, contrary to Mr. O'Connor's opinion (at ¶¶ 22-28), the fact

6  that the Court's supervision was necessary at seventeen settlement conferences

7  related to one ADA claim is strong evidence that the ADA claim was substantively

8  complex.  *See* Swearingen Reply Decl. ¶ 10, 25; *see also* Grunfeld Decl. ¶¶ 87-88,

9  98-102, 113 (explaining settlement conferences).

10     40.    Mr. O'Connor is not an expert in the field of ADA law, prison/jail law,

11 or complex class action litigation.  Mr. O'Connor states he "personally ha[s]

12 defended 'access' ADA claims for a single cite." O'Connor Decl. ¶ 46.  At least one

13 court has discredited his opinion on reasonable hourly rates in an ADA action,

14 finding it unpersuasive that "[h]e states that he has litigated (unsuccessfully) one

15 ADA case in 2000," and explaining that his "own litigation career and experience

16 with attorneys' fees[] … focuses primarily on non-disability, non-civil rights

17 actions."  *Johnson v. Baird Lands, Inc.*, No. 18-CV-05365-VKD, 2020 WL

18 3833278, at *3 (N.D. Cal. July 8, 2020).  The *Johnson* court determined that,

19 overall, "Mr. O'Connor's declaration is not helpful here."  *Id.*

20     41.    Defendants did not submit any declarations from any ADA or complex

21 civil rights litigators in support of their opposition.  In contrast, Plaintiffs' motion is

22 supported by prominent advocates specializing in disability rights and complex class

23 actions.  I have reviewed the declarations from Claudia Center and Shawna Parks

24 submitted with the fee motion, and Ms. Center's reply declaration and the

25 declaration of Margot Mendelson that are filed concurrently with this reply

26 declaration.  As a result, my opinion is buttressed by their testimony that disability

27 rights work in jails is extremely complex and challenging, including that

28 (1) disability laws and regulations look at both physical accessibility and program

access, and this work in correctional settings requires intensive factual development

and expert input (Mendelson Decl. ¶¶ 5-10; Center Reply Decl. ¶ 3); (2) monitoring

and ensuring programmatic compliance is especially difficult in correctional settings

due to complex issues relating to identifying and tracking incarcerated people with

disabilities and ever-changing staff  (Center Reply Decl. ¶ 3); and (3) the nature of

challenging legally deficient conditions of confinement often requires bringing

disability law claims alongside other claims in the same action (*id*. ¶ 4).

42.    I am aware that courts have awarded attorneys settling ADA class

actions their full hourly rates.  For example, *Nevarez v. Forty Niners Football Co.,*
*LLC*, Case No. 5:16-cv-07013-LHK, was a systemic disability access class action.

After settling, the district court awarded the full requested billing rates of the

attorneys, paralegals, and litigation support staff at each of the firms representing

plaintiffs.  *Nevarez*, 474 F. Supp. 3d 1041, 1050 (N.D. Cal. 2020).  The plaintiffs'

counsel's declaration in that case confirm that these rates, now five years old,

included $925 per hour for lead counsel who was a 1993 law school graduate and

$275-325 for paralegals.  *See* Corrected Declaration of Guy Wallace, No. 5:16-cv-

07013-LHK (SVK), Dkt. 408-1 at 47-48 (attached hereto as **Exhibit E**).

43.    In my initial declaration, I opined that Counsel's hourly rates here are

well within the range of rates found reasonable in multiple recent decisions by San

Diego courts, as well as the rates found reasonable in many older cases when

adjusted for annual increases in the legal marketplace.  Pearl Decl. ¶¶ 33(a)-(j), 34.

Mr. O'Connor addresses only one of the many exemplar cases I offered, claiming it

was more complex than *Dunsmore*:  *Bloom v. City of San Diego*, 2024 U.S. Dist.

LEXIS 18751817 (S.D. Cal. No. cv-02324-AJB-17 DEB Oct. 15, 2024).  O'Connor

Decl. ¶¶ 23-24.  He does not explain the basis for his opinion that this case is less

complex than *Bloom*.  I have reviewed the reply declaration of Shawna Parks, to be

concurrently filed with this declaration, who is the Chief Litigation Officer at

Disability Rights Advocates, the organization that represented plaintiffs in *Bloom*.

1  Parks Reply Decl. ¶¶ 1-2.  I am persuaded by her explanation that both the litigation

2  concerning Plaintiffs' Third Claim for Relief and the litigation in *Bloom* involved

3  extensive motion practice, highly detailed expert reports on hundreds of ADA

4  barriers, and more, and thus it appears entirely reasonable for the instant manner to

5  be compared to DRA's rates in *Bloom*.  *Id.* ¶¶ 3-4.

6       44.    The only source for what Mr. O'Connor characterizes as the relevant

7  ADA fee scale in San Diego are the rates of a single firm, Potter Handy.  O'Connor

8  Decl. ¶¶ 45, 47, 49-50.  I do not think it is appropriate to equate Plaintiffs'

9  Counsels' skill, expertise, and experience with Potter Handy's.  I note that

10 Ms. Mendelson is familiar with the Potter Handy firm and explains that it typically

11 brings ADA actions on behalf of a single individual plaintiff to challenge ADA

12 barriers at a single site, where the remedy is a physical change that does not require

13 ongoing monitoring.  Mendelson Decl. ¶ 9.  I agree with Ms. Mendelson that such

14 cases are vastly different than litigation to bring an entire jail system into

15 compliance with the ADA.

16      45.    I also reviewed Ms. Center's explanation that the Potter Handy cases

17 cited by Mr. O'Connor (at ¶¶ 49-50) involved single plaintiffs who challenged

18 discrete barriers at particular locations, which in her experience is not comparable to

19 systemic class action challenges under the ADA and Rehabilitation Act against

20 large, complex, multi-facility incarceration systems.  Center Reply Decl. ¶ 5

21 (discussing *Schutza v. Costco Wholesale Corp.*, No. 19-CV-00990 DMS (WVG),

22 2022 U.S. Dist. LEXIS 57745 (S.D. Cal. Mar. 29, 2022); *Duarte v. Flores*, No. LA

23 CV18-00484-JAK (PJWx), 2024 U.S. Dist. LEXIS 128234 (C.D. Cal. July 11,

24 2024); *Langer v. Four Stars Enter. Inc.*, No. 19-cv-01058-AJB-LL, 2022 U.S. Dist.

25 LEXIS 248739 (S.D. Cal. Aug. 22, 2022)).  I agree with Ms. Center that these single

26 plaintiff Potter Handy cases are of little relevance here.

27      46.    I also am aware that, unlike Plaintiffs' Counsel, Potter Handy has been

28 repeatedly sanctioned.  *See, e.g.*, *Whitaker v. Peet's Coffee, Inc.*, No. 21-CV-07698-

VC, 2022 WL 6698328, at *5, *7 (N.D. Cal. Oct. 11, 2022) (liable "based on their concerted misconduct," displaying that "they were willing to peddle whatever lie they thought necessary to allow their lawsuit to survive"); *Garcia v. Pine Grant Inv. Co., Ltd*, No. 21-CV-04916-JST, 2022 WL 472176, at *2 (N.D. Cal. Jan. 21, 2022) ("Potter Handy has intentionally failed to comply with the requirements in General Order 56"); *Santos v. Ferguson Enterprises, Inc.*, No. 317CV00814CABNLS, 2019 WL 1227964, at *1 (S.D. Cal. Mar. 15, 2019) (failure to appear in violation of court order). I am also aware that the San Francisco District Attorney brought litigation accusing Potter Handy of filing fraudulent ADA cases against small businesses, stating in a press release, "California law does not allow attorneys to illegally exploit the Americans with Disabilities Act in this fashion." *See* Han Li, *DA Jenkins revives Boudin's fight against firm behind 'fraudulent' ADA lawsuits*, The San Francisco Standard (Oct. 20, 2022).

47. I also want to bring to the Court's attention that Mr. O'Connor previously testified as an attorney fee expert on behalf of Mr. Potter and Mr. Handy after they secured a default judgment on behalf of one individual plaintiff in a simple ADA case involving "an accessible path of travel to the store entrance and accessible parking spaces at the Olsen Nolte Saddle Shop." *Johnson v. Baglietto*, No. 19-CV-06206-TSH, 2020 WL 3065939, at *1, *10 (N.D. Cal. May 21, 2020), *report and recommendation adopted*, 2020 WL 3060902 (N.D. Cal. June 9, 2020). For that case, Mr. O'Connor opined that the appropriate rates for their ADA services ranged as high as $750 an hour in 2020. *Id.* at *10. Here, Mr. O'Connor's proposed hourly rates for Plaintiffs' Counsel in this vehemently opposed and highly complex class action, five years later, is at its highest just $10 more ($760 for Ms. Grunfeld and Mr. Fischer). O'Connor Decl. ¶ 55. This is yet another example of Mr. O'Connor's shifting opinions, depending on which side he is on.

48. Mr. O'Connor cites no authority to support his suggestion that the Court should apply lower rates for work to secure a victory on the Third Claim for

1  Relief, and then later determine "alternative fee scales" for each of the other claims

2  in this action. O'Connor Decl. ¶ 28. In addition to the obvious impracticality of this

3  and the burden on the Court, I am not aware of any authority for this. There is the

4  general practice of charging different rates for pre-litigation or pre-trial work from

5  trial work, but it would be unusual to charge different rates for different claims.

6  This is not how the legal marketplace works. When an attorney agrees to take a

7  case, they take the full case. Also, there is often common work essential to all

8  claims. Here, there are not two different cases for the ADA and non-ADA claims.

9      49.    Mr. O'Connor relies almost exclusively on National Association of

10  Legal Fee Analysis ("NALFA") survey data in support of his proposed rates.

11  O'Connor Decl. ¶¶ 52-59 & Ex C. As an initial matter, NALFA is an organization

12  primarily consisting of fee opponents and auditors. Mr. O'Connor is deeply

13  involved in NALFA. *See* Our Network, NALFA,

14  https://www.thenalfa.org/network-directory/ (Mr. O'Connor listed as the first of

15  only five members); Connor Decl. ¶ 16 & Ex. A (his "nationwide" work for

16  NALFA "[f]or the past several years"). There are several other reasons why the

17  NALFA survey does not undermine Plaintiffs' requested rates: 1) it has no bearing

18  on Counsel's home office rates; 2) it generally excludes rates charged by large law

19  firms for complex civil litigation; however, these firms *are* part of the legal

20  marketplace (see ¶¶ 58-59 infra) and would raise the rates significantly; 3)

21  Mr. O'Connor's assignment of "Tiers" and rates within the Tiers for Plaintiffs'

22  attorneys appears to be quite random, like throwing darts at a dart board – which

23  "Tier" they belong in and which of the five rates in each Tier applies to that attorney

24  is never explained or justified.

25      50.    On the other hand, the NALFA Survey does offer some support for

26  *Plaintiffs'* Counsel's rates. The relevant issue is whether Counsel's requested rates

27  are "in line with" the rates charged by comparably qualified attorneys for reasonably

28  comparable services. *See Blum v Stenson*, 465 U.S. 886, 895 n. 11 (1984). Here,

the NALFA survey shows that of the 652 plaintiffs' lawyers handling complex litigation surveyed in 2024, 92 of those attorneys charged $951 per hour or more and 20 charged over $1300. Given that not all higher end lawyers are counted, there are certainly significantly more than 92 and 20 attorneys in each of these categories among the attorneys who were not in the survey – 14.11% and 3.07% of those would be a low estimate. Given Counsel's exceptional credentials, prior awards, and the rates paid by their fee-paying clients, their requested rates here appear to clearly be "in line with" the rates suggested by the NALFA survey.

51.    Similarly, O'Connor's reliance on the Wolters Kluwer Real Rate Report (O'Connor Decl. ¶ 53 & Ex. D) is also misplaced: 1) It does not apply to Counsel's San Francisco-based rates, and, indeed, the Third Quartile rate for San Francisco litigators is $1,208, meaning 25% of San Francisco litigators charge $1,208 or more; and 2) the same is true of the San Diego entry – the Third Quartile rate for litigators is $907 per hour, meaning 25 % of San Diego litigators charge $907 or more. In my opinion, the fact that both RBGG and DLA Piper actually charge fee-paying clients the requested rates for work throughout the State, which O'Connor largely ignores, shows that their rates are more than likely within the upper range of that 25%.

52.    The Opposition brief also suggests that because Plaintiffs' Counsel could have used the Real Rate Report but did not, it does not support them. Opp. 11. That is untrue. It was not cited in my declaration largely because of the ambiguity regarding the upper 25%, and the fact that Plaintiffs were able to offer more specific supporting evidence of San Diego rates. *See* Pearl Decl. ¶¶ 25-43. And, I note that even the Real Rate Report data for San Diego supports rates that are far higher than Mr. O'Connor suggests.

**Mr. O'Connor's Recommended Rates For Specific Billers Are Flawed**

53.    In addition to the aforementioned problems with Mr. O'Connor's rates analysis about the relevant geographic market and the complexity of this case, his

1  opinion as to specific timekeepers is plagued with errors.

2      54.    Mr. O'Connor refuses to award Ms. Grunfeld and Mr. Fischer rates that

3  he claims would only be appropriate "for the most part [for] partners in large

4  national or regional firms."  O'Connor Decl. ¶ 55.  As I explained above, this

5  contradicts his opinions in past declarations that the size of firms is not

6  determinative, and how highly skilled plaintiff attorneys in smaller firms can be

7  awarded rates on the higher end of the range.  It also is factually wrong: attorneys

8  with Ms. Grunfeld's and Mr. Fischer's experience would be billed by BigLaw firms

9  at rates that are least 50-75% higher than are being requested here.

10     55.    Nor does Mr. O'Connor cite any valid authority, state or federal, to

11 support his opinion on firm size.  To the contrary, any distinction between large and

12 small firms with regard to the reasonableness of prevailing rates has been rejected

13 repeatedly.  *See, e.g. Cruz v. Starbucks,* 2013 WL 2447862, at *5 fn. 8 (N.D. Cal.

14 June 5, 2013) ("The Court finds no authority from the Ninth Circuit that supports

15 [defendant's expert's] assertion that attorneys who practice at small firms should be

16 awarded fees at lower rates than are awarded to attorneys who practice at large

17 firms.  Nor does the Court find Defendants' position on this question persuasive.");

18 *Charlebois v Angels Baseball, LP*., 993 F.Supp.2d 1109, 1120 (same).  *See also*

19 California Attorney Fee Awards, 3d ed. (Cont. Ed. Bar 2010, March 2024 Supp.)

20 § 9.108, pp. 9-100-9-102 (collecting cases).  Simply put, costs, overhead, and the size

21 of the firm are irrelevant factors in determining what is a reasonable rate for fee-

22 shifting purposes.  Indeed, the factors used by the California State Bar to determine

23 whether a lawyer's fee is conscionable (Cal Rules of Professional Conduct, Rule 1.5

24 (b)(1)–(13)), include no reference to the firm's size or overhead costs.

25     56.    Mr. O'Connor offers no explanation for why Ms. Grunfeld, class of

26 1984, should receive the same rate ($760) as Mr. Fischer, class of 2006.  *See*

27 Grunfeld Decl. ¶ 32; Fischer Decl., Ex. A.  He does not explain why Ms. Grunfeld's

28 rate should be so far below the rates that she has sought and been awarded by

1  numerous courts, including a judge in the Northern District of California approving

2  RBGG's uncontested 2024 stipulated rates in an ADA class action on behalf of

3  people incarcerated in California prisons ($1,250 for Ms. Grunfeld, $575 for

4  associate Eric Monek Anderson, $550 for associate Hannah Chartoff, and paralegal

5  rates of $335 to $450).  Grunfeld Decl. ¶ 19(g).

6        57.    Mr. O'Connor's statements concerning Mr. Rosen are laughable and

7  completely unsupported.  Mr. Rosen is a 1962 law school graduate, but

8  Mr. O'Connor proposes a rate ($725) lower than the rate he recommends for

9  Mr. Grunfeld and Mr. Fischer.  O'Connor Decl. ¶ 27.  He states Mr. Rosen made

10  "no showing that he has experience in drafting fee motions."  *Id*. ¶ 56.  I reviewed

11  Counsel's moving papers, and was persuaded by Mr. Rosen's extensive experience

12  in attorneys' fees litigation as described in Ms. Grunfeld's declaration.  Grunfeld

13  Decl. ¶¶ 6, 19, 117-18 & Ex. B.  I have also reviewed Mr. Rosen's declaration to be

14  filed simultaneously with this declaration, which details his long career resulting in

15  numerous fee awards in federal and state courts.  *See* Rosen Decl. ¶¶ 8-18.  I also

16  have worked numerous times with and against Mr. Rosen on fee applications, with

17  respect to RBGG's fee motions, my fee motions, and my clients'.  I consider him

18  among the top three experts in attorney fees in California, both as a litigator of

19  RBGG's and other firms' fee motions, and as an expert witness on fee motions.  For

20  Mr. O'Connor to claim that Mr. Rosen is not an "expert" on attorney fees seems to

21  me to be a graphic illustration of the weak foundation on which his opinion is based.

22        58.    Mr. O'Connor provides no basis for his statement that Mr. Rosen

23  should not receive his usual hourly rate because his only participation is this case is

24  in the attorney fees litigation.  O'Connor Decl. ¶ 29.  Mr. Rosen's declaration

25  explains that, to the best of Mr. Rosen's recollection, he has always received his full

26  rate for fees recovery work, including on cases where he was retained as special fees

27  counsel after the merits of the case.  Rosen Decl. ¶ 7.  This is consistent with my

28  understanding of the legal marketplace and my own experience, in which I generally

1   was awarded my full market rate for fee motion work.

2       59.    Mr. O'Connor provides no basis for his statement that fee motions are

3   typically prepared by junior partners or senior associates. O'Connor Decl. ¶ 29.

4   Mr. Rosen's declaration explains that he is regularly retained and paid his full rate

5   as special fees counsel, and that such expertise is necessary to make and prevail on

6   substantial fee requests. Rosen Decl. ¶¶ 7, 19-22. In my experience, while some

7   work on fee motions can be done by junior partners or senior associates, it usually

8   involves preparing initial drafts that describe the underlying litigation. For the fee

9   motion argument, the strategies involved, the most helpful authorities, and the best

10   responses to anticipated or actual objections are most efficiently and effectively left

11   to fee experts like Mr. Rosen.

12       60.    The rates Mr. O'Connor says other RBGG attorneys "deserve" (at ¶ 58)

13   appear to be simply plucked out of thin air, "justified" only by reference to some

14   arbitrary "percentiles" ranging from 18th to 60th. As I have addressed above,

15   Mr. O'Connor's supposed reliance on the two surveys he seems to be citing is

16   misplaced and arbitrary. As one court said of a similar misuse of surveys, "garbage

17   in, garbage out." *United States v. City & County of San Francisco,* 748 F.Supp.

18   1416, 1422 (N.D. Cal. 1990), *aff'd in relevant part sub nom*, *Davis v. City & County*

19   *of San Francisco,* 976 F.2d 1536, 1545 (9th Cir. 1992).

20       61.    Mr. O'Connor provides no basis for his proposed "modest" rates for

21   DLA Piper attorneys. O'Connor Decl. ¶ 60. He states that their role was mainly as

22   facilitating as local counsel and that the firm has no experience in this field. *Id.* In

23   doing so, Mr. O'Connor completely neglects to consider DLA Piper's time records

24   or the declaration of DLA Piper's Christopher Young, which show that DLA Piper

25   attorneys worked on substantive tasks including assisting with FRCP Rule 30(b)(6)

26   depositions, interviewing class members, drafting and obtaining declarations, and

27   providing analysis for Plaintiffs' preliminary injunction motion. Young Decl.

28   ¶ 9 & Ex. I. Mr. Young's reply declaration, filed concurrently, further explains his

1  firm's contributions, as well as his own experience prosecuting similar claims

2  regarding conditions of confinement in an action against another state's prison

3  system.  Young Reply Decl. ¶¶ 2-4.  In comparable situations, pro bono counsel

4  from big firms like DLA Piper have been awarded their full market rates.  For

5  example, in *Campbell v. Barnes,* Orange County Superior Court No. 30-2020-

6  01141117-CU-WM-CXC, Order Granting Petitioners' Motion for an Award of

7  Attorneys' Fees, filed January 20, 2022, a case challenging inadequacies in the

8  County jail's response to the Covid epidemic in which I also testified as the

9  plaintiffs' fee expert, the court found the following hourly rates reasonable:

| LAW SCHOOL GRADUATION YEAR | RATES |
|---|---|
| **Munger, Tolles & Olson LLP** | |
| 2003 | $1,210 |
| 2013 | $850 |
| 2015 | $750 |
| 2016 | $700 |
| 2017 | $650 |
| 2018 | $550 |
| **ACLU** | |
| 1988, 2000, and 2003 | $1,210 |
| 2007 | $950 |
| 2009 | $900 |
| 2015 | $750 |
| 2016 | $700 |
| 2017 | $650 |

19  62.    On paralegal rates, Mr. O'Connor again plucks his recommended lower

20  rates out of thin air.  O'Connor Decl. ¶ 59.  He provides no basis for this arbitrary

21  reduction to Plaintiffs' well-supported request.  Nor does he address the evidence

22  supporting my opinion supporting Counsel's paralegal rates, which includes

23  paralegal rates (1) approved by San Diego courts, (2) awarded to RBGG in past fee

24  decisions, and (3) charged by other local firms.  Pearl Decl. ¶¶ 33(a), (c)-(e), (j), 38-

25  39 & Exs. B, C, D.

26              **PLAINTIFFS' COUNSEL'S HOURS ARE REASONABLE**

27  63.    My opinion is that the hours for which Plaintiffs' Counsel request

28  compensation appears to be consistent with the range of hours I would expect to

1   have been spent in litigating the Third Claim for Relief given the nature of this case.

2   As I explained in my initial declaration, I reviewed a meaningful sample of

3   Plaintiffs' Counsel's evidence, including their declarations and time records, and I

4   based my opinion on multiple factors, including their thorough documentation, the

5   intensity and demands of the litigation, Defendants' vigorous resistance, the

6   necessity of having over a dozen Court-supervised settlement conferences, and the

7   fact that Plaintiffs secured all the relief they sought in their Third Claim for Relief.

8   Pearl Decl. ¶¶ 44-55.

9       64.   Mr. O'Connor's declaration does not change my opinion.

10  Mr. O'Connor does not identify any specific time entries that he objects to as non-

11  compensable.  Instead, Mr. O'Connor proposes large across-the-board reductions

12  with little to no information about how he came up with those numbers.  As I show

13  below, Mr. O'Connor's arbitrary discounts are based on a biased, unsupported view

14  of the history of this case and are contrary to applicable legal standards.

15      65.   Mr. O'Connor also did not address Plaintiffs' Counsel's substantial

16  discrete billing judgment reductions and 5% across-the-board reduction to account

17  for any time that might possibly be duplicative, administrative, or excessive.  These

18  discounts total 13.2% of the lodestar value of the total time spent on the merits.  To

19  fail to take those discounted hours into account seems to me inexcusable.

20  **Mr. O'Connor Did Not Criticize Counsel's Documentation**

21      66.   The criticisms Mr. O'Connor offers about Plaintiffs' Counsel's time

22  records, though inapt, lack several categories of criticisms which Mr. O'Connor, in

23  my experience, often employs to challenge counsel's hours.

24      67.   Notably, Mr. O'Connor did not raise any criticism about Plaintiffs'

25  Counsel's billing practices; any concern over the type of activities billed, such as

26  possibly non-billable administrative time; or any type of objection to the time

27  records' form, such as block billing.  By his silence, Mr. O'Connor validates

28  Plaintiffs' Counsel's time records in these areas.

68.     Defendants' Opposition brief asserts that some time records are "vague," but does not provide any examples.  Opp. 23-24.  I reviewed a meaningful sample of Plaintiffs' Counsel's time records when I prepared my initial declaration, and nothing in the Opposition changes my opinion that Plaintiffs' Counsel fully documented their time in detailed time records, consistent with federal and California law.  Pearl Decl. ¶ 45.  Counsel's complete documentation is a primary factor supporting my opinion that the hours Counsel spent on the Third Claim for Relief are within a reasonable range.  *Id.*

**O'Connor's Recommended Stage-by-Stage Discounts Are Arbitrary and Factually and Legally Flawed**

69.     Mr. O'Connor breaks Plaintiffs' Counsel's time records into three stages, then proposes significant, arbitrary across-the-board discounts for each stage.  O'Connor Decl. ¶ 62-85.  I am puzzled why he even provides Exhibits E (E-1 through E-4), F (F-1 through F-4), and G.  These exhibits slice and dice Plaintiffs' Counsel's time records in different ways by stage, timekeeper, and task, but Mr. O'Connor does not utilize them to propose any discrete reductions.  As I explain below, his proposed discounts seem to be based on a flawed view of the facts and are contrary to the applicable legal standards.

*"Stage 1: Beginning – August 15, 2022"*

70.     For the first stage, covering the time spent on this case from its inception up through the denial of the first Motion for Preliminary Injunction and Class Certification, Mr. O'Connor recommends an arbitrary 20% across-the-board discount.  O'Connor Decl. ¶¶ 68-70.  His only basis for his recommended reduction for this stage is his opinion that Plaintiffs are charging for time spent on the ADA claim that possibly also involved other issues in this case.  *Id.*

71.     Mr. O'Connor provides no basis for his estimate that at least 20% of this time relates to matters other than ADA issues.  *Id.* ¶ 70.  He does not identify a single time record that does not pertain to the Third Claim.  He confirms all time

REPLY DECLARATION OF RICHARD M PEARL IN SUPPORT OF PLAINTIFFS' MOTION FOR
INTERIM ATTORNEYS' FEES AND COSTS

claimed "refer to the ADA access ultimately achieved." *Id*. ¶ 68. He also confirms the time records reflect that "Plaintiffs' counsel have made an effort to excise other time." *Id.* ¶ 70. He does not identify any specific records that are "interwoven" with other issues. *Id.* ¶ 68. It is entirely unclear what he means by pointing to "the scope of the claims for relief in the Third Amended Complaint." *Id.* ¶ 70.

72.    I have reviewed Mr. Swearingen's declaration, which explains the multiple steps he took to carefully limit the time claimed in the interim fees motion to the Third Claim for Relief. Swearingen Decl. ¶¶ 7-10. He states that RBGG decided to not claim at this time entries that describe both ADA-related work and substantial amounts of work on other claims, such that the vast majority of the "intermingled" time entries were not presented. *Id.* ¶ 7. Based on his explanation and my review of a meaningful sample of the time records, is my opinion that Plaintiffs' Counsel sufficiently claim only time necessary to securing their complete victory on their Third Claim for Relief.

73.    Earlier in his declaration, Mr. O'Connor states that the first Motion for Preliminary Injunction and Class Certification "only glancingly dealt with ADA issues." O'Connor Decl. ¶ 33. He does not identify any corresponding time records, and he does not propose any reductions specific to this project. In fact, I have reviewed Plaintiffs' time records and am informed that the vast majority of time spent on this motion was not included in Plaintiffs' fees motion, and only discreet portions of time that specifically related to work on Plaintiffs' ADA claim were included in Plaintiffs' time records accompanying their fees motion. I am further informed that over thirty declarations were filed in support of the first preliminary injunction motion, including a comprehensive declaration from ADA expert Syroun Sanossian, which addressed ADA concerns. Mr. Swearingen's declaration explained how he excised time spent drafting the non-ADA portions of this motion. Swearingen Decl. ¶ 7. I also reviewed Ms. Grunfeld's declaration, which explains that the Court's order denying the motion indicated that discovery

REPLY DECLARATION OF RICHARD M PEARL IN SUPPORT OF PLAINTIFFS' MOTION FOR
INTERIM ATTORNEYS' FEES AND COSTS

1    would be helpful, and this statement helped precipitate successful discovery

2    efforts—including expedited jail inspections, Rule 30(b)(6) depositions, and written

3    discovery—that uncovered evidence critical to Counsel's ultimate success on the

4    Third Claim for Relief.  Grunfeld Decl. ¶¶ 48-49, 57.  Mr. O'Connor does not

5    address Mr. Swearingen's or Ms. Grunfeld's declarations nor these procedural facts.

6        74.    Mr. O'Connor's opinion is also contrary to the legal standard.  Under

7    California and federal law, all time spent on common work is compensable.  For

8    example, the Ninth Circuit in *Padgett v. Loventhal*, 706 F.3d 1205, 1209 (9th Cir.

9    2013), explained that "where attorney work proves beneficial to a successful claim,

10   district courts should generally award these fees in full, even if the work is also

11   useful to an unsuccessful claim.  In other words, the district court must award fees

12   for the work that contributed to a successful result as if the successful claims were

13   the only ones litigated."  In light of the correct legal standard, it is my opinion that

14   Mr. Swearingen was at most underinclusive in the time records he presented to this

15   Court, by limiting them to time spent specifically on ADA issues as described

16   above, and applying an additional 5% across-the-board reduction.

17       75.    Mr. O'Connor does not raise this objection concerning intermingling

18   with the remaining two stages of this action.

19       ***"Stage 2: August 16, 2022 – June 21, 2023"***

20       76.    For this stage, covering the time spent on Counsel's successful Motion

21   up until the settlement of the Third Claim for Relief, Mr. O'Connor again does not

22   identify discrete reductions and instead proposes an arbitrary 40% across the board

23   reduction.  O'Connor Decl. ¶¶ 71-81.  He again fails to identify any specific time

24   records or otherwise propose discrete discounts.  He raises what seems to be three

25   criticisms of this time, each of which is directly contrary to my opinions in this case.

26       77.    First, Mr. O'Connor states that "half" of the hours in this period were

27   unnecessarily spent because this matter could have settled sooner.  *Id*. ¶ 79.  This

28   arbitrary figure is the only number he provides as a basis for his 40% proposed

1  reduction.  *Id.* ¶¶ 79-81.  It is based solely on his wholesale adoption of the

2  defense's narrative of this action, including his incorrect and unsupported

3  assumption that Plaintiffs' Counsel had ulterior motives.  *See id.* ¶¶ 34-39, 71-73.

4          78.    I have reviewed Plaintiffs' Counsel's declarations, and it is my opinion

5  based on this evidence and the additional material I reviewed for this matter that the

6  time claimed from August 2022 through June 2023 was necessary to secure the

7  outcome here.  Ms. Grunfeld's declaration explained the need for seeking expedited

8  discovery after Defendants repeatedly declined to provide such discovery; that

9  expedited ADA discovery led to critical information, including expert reports

10  identifying hundreds of barriers; that Plaintiffs' Counsel's continued their

11  investigation through interviewing incarcerated people; that Defendants' declined

12  Plaintiffs' offer to resolve ADA issues without litigation; and that the work

13  performed was necessary to bring a second PI motion regarding disability access.

14  Grunfeld Decl. ¶¶ 49-67.  Mr. O'Connor does not address this declaration.

15          79.    Mr. O'Connor states, citing absolutely nothing, that Plaintiffs' Counsel

16  ignored overtures from the County to resolve ADA issues and instead sought to bill

17  for a renewed injunction request.  O'Connor Decl. ¶ 71.  He appears to be parroting

18  the same contention in Defendants' Opposition that Plaintiffs' Counsel delayed

19  agreeing to an ENE date.  *See* Opp. 8-9.  In addition to the declaration from

20  Ms. Grunfeld, discussed immediately above, that explained why the time spent

21  during this stage was necessary, I have reviewed the reply declaration of

22  Mr. Swearingen.  Mr. Swearingen explains how Plaintiffs proposed an efficient use

23  of the ENE process and offered to forego litigating their preliminary injunction as to

24  ADA issues on the condition Defendants agree to an ENE, but Defendants refused

25  to engage with Plaintiffs until Plaintiffs filed their motion for a preliminary

26  injunction on the ADA issues in April 2023.  Swearingen Reply Decl. ¶¶ 14-15.

27          80.    Based on my review of the relevant declarations, the time records, and

28  my extensive experience with comparable civil actions, my opinion remains that the

1  net number of hours for which Plaintiffs' Counsel request compensation appears to

2  be consistent with the range of hours I would expect to have been spent in litigation

3  of a claim in a case of this duration, intensity, complexity, and results.

4      81.    Second, Mr. O'Connor states that the number of timekeepers was high.

5  O'Connor Decl. ¶ 78.  As I explained above, this criticism directly contradicts his

6  prior testimony in other cases about the importance of multiple plaintiffs' attorneys

7  working and collaborating in order to prevail.  And again, his objection is

8  aspirational: the use of multiple attorneys in cases of this nature is the norm and is

9  commonly paid by fee-paying clients and found reasonable by the courts.  *See, e.g.*,

10 *Jefferson v. Chase Home Fin.*, C 06- 6510 THE, 2009 WL 2051424, at * 4 (N.D.

11 Cal. Jul. 10, 2009) (rejecting arguments concerning duplication and overstaffing

12 where bulk of hours were from a few attorneys); *Horsford v. Board of Trustees*, 132

13 Cal. App. 4th 359, 396 ( 2005) (noting some duplication is acceptable).

14     82.    This vague objection to the number of timekeepers also fails to address

15 Ms. Grunfeld's detailed accounting for how Counsel each performed different roles

16 in the litigation throughout the various stages.  *See* Grunfeld Decl. ¶¶ 25-31, 37-105.

17 I note that Mr. Swearingen's reply declaration further explains how Plaintiffs often

18 had the same number of attorneys as Defendants did at key events throughout this

19 litigation.  Swearingen Reply Decl. ¶¶ 9-12.  General allegations of overstaffing are

20 not sufficient to demonstrate unreasonable duplication.  In my opinion, Counsel's

21 use of multiple counsel for the briefing and other projects of this complex case—

22 including communicating with and at times interviewing and obtaining declarations

23 from numerous class members—was entirely proper.

24     83.    Mr. O'Connor provides just one cherry-picked example of overstaffing

25 out of tens of thousands of time entries:  his criticism that three attorneys attended

26 the March 14-15 PMK depositions.  O'Connor Decl. ¶ 79.  Mr. O'Connor does not

27 propose a discrete reduction for this time.  Ms. Grunfeld's reply declaration, filed

28 concurrently, highlights the corresponding entries for herself and Mr. Anderson, and

1  calculates this amounts to 29 hours, or around 1.08% of total claimed merits time.

2  Grunfeld Reply Decl. ¶¶ 9-10.  Mr. O'Connor again does not acknowledge that

3  Plaintiffs reduced the lodestar value of their total merits time by 13.2%, after billing

4  judgment reductions and a 5% across-the-board reduction.  *See* Pearl Decl. ¶ 44.

5       84.    I am also persuaded by Ms. Grunfeld's explanation that Plaintiffs'

6  Counsel believed they needed to use these depositions for their motion before the

7  court reporters could produce the transcripts, and having more than one attorney at

8  the first three Rule 30(b)(6) depositions allowed the attorneys to review documents

9  to use as exhibits by the deposition taker and to take detailed notes of the testimony.

10  Grunfeld Reply Decl. ¶ 8.  In addition, Ms. Grunfeld was in the best position to

11  assess whether the individuals were appropriate persons most knowledgeable, which

12  in fact they were not, as these deponents were unable to testify regarding critical

13  portions of topics noticed.  Grunfeld Decl. ¶ 56.  Plaintiffs therefore deposed two

14  additional Rule (30)(b)(6) witnesses, and RBGG associate Mr. Anderson attended

15  these depositions alone.  *See id.*; O'Connor Decl., Ex. F-3 (Dkt. 831-4 at 62).

16       85.    Third, Mr. O'Connor objects to time devoted to specific projects as

17  excessive.  O'Connor Decl. ¶ 79.  He asserts that discovery during this time was

18  narrowed by the Court.  *Id.*  Again, he does not identify discrete time entries that

19  should not be compensated.  Ms. Grunfeld explains that although the Court

20  narrowed the initial discovery requests to exclude certain facilities and disabilities,

21  Plaintiffs' Counsel expended significant time preparing for and conducting

22  inspections and depositions and reviewing and following up on document

23  productions.  Defendants' initial PMK witnesses were inadequate and had to be

24  replaced, resulting in two additional depositions.  Grunfeld Decl. ¶ 56.

25       86.    Mr. O'Connor also speculates that briefing on the second Motion for

26  Preliminary Injunction could have been more efficient.  O'Connor Decl. ¶ 79.  He

27  incorrectly states that Plaintiffs spent more than 500 hours "drafting" the Motion

28  and Reply.  *Id.*  As Mr. O'Connor's Exhibit reflects, work for this Motion included

1  preparing declarations for over a dozen incarcerated people.  *See* O'Connor Decl.,

2  Ex. F-3 (Dkt. 831-4 at 67-80).  As Ms. Grunfeld explains, the contents of this

3  Motion required Counsel to meet at great time and expense, often more than once,

4  with class members.  Grunfeld Decl. ¶¶ 57-65.  I am also persuaded by

5  Ms. Grunfeld's explanation that Defendants would not agree to a more streamlined

6  process of video interviews, resulting in Counsel often having to wait at the Jail in

7  person for multiple hours for an interview room to become available.  *Id*. ¶¶ 58-59.

8       87.    In sum, in my opinion, the nature of the case and the division of roles

9  among Counsel during this time period are entirely consistent with how similar

10  cases are commonly handled in this legal community.

11      **"Stage 3: June 22, 2023 - End"**

12       88.    For the final stage, Mr. O'Connor refers to both merits and fees motion

13  work, and recommends a blunt across-the-board 30% reduction with little to no

14  analysis.  O'Connor Decl. ¶ 85.  He does not say how he arrives at this number,

15  other than an unsupported sweeping assertion that Counsel billed "twice" the

16  number of hours."  *Id.*  I do not see a way the Court could rely on this analysis when

17  he does not support it with any specific time records or further analysis.  Again, I do

18  not understand why Mr. O'Connor even presented exhibits if he does not make

19  objections to specific tasks.

20       89.    I have reviewed Ms. Grunfeld's explanation of the work necessary to

21  succeed on the Third Claim for Relief during this period, including negotiating and

22  litigating Defendants' proposed ADA Plan; monitoring and enforcing of the 2023

23  ADA Order and Defendants' Amended ADA Plan; litigating the remainder of

24  Plaintiffs' Third Claim for Relief, including conducting fact and expert discovery;

25  and more.  Grunfeld Decl. ¶¶ 72-105.  It is my opinion that fully compensating this

26  time is consistent with the facts of this case, the applicable law, and the practices in

27  this legal community.  In the legal marketplace, even though settlement negotiations

28  are proceeding, both plaintiffs' and defendants' attorneys must prepare their case for

1   trial in the event a settlement is not achieved.  Fee-paying clients expect this and pay

2   for that work, as do the courts determining reasonable fees.  *See, e.g.*, *Roberts v.*

3   *City & County of Honolulu*, 938 F.3d 1020, 1025 (9th Cir. 2019) (reversing denial

4   of fees for time spent while attempting to settle; on remand, trial court "should

5   consider in light of the entire record whether a reasonable attorney with his client's

6   interests in mind would have" performed the claimed work).

7       90.    Mr. O'Connor broadly asserts that there was excessive "duplication."

8   O'Connor Decl. ¶ 82.  He favorably "note[s] that the defense was able to participate

9   in these sessions with only two lawyers."  O'Connor Decl. ¶ 82.  I have reviewed

10  the statements in Mr. Swearingen's reply declaration that Ms. Pappy and

11  Ms. Coleman were aided in this matter by other attorneys from Burke,

12  Williams & Sorensen LLP, County Counsel, and the San Diego Sheriffs' Office

13  ("SDSO") as well as SDSO personnel.  *See* Swearingen Reply Decl. ¶¶ 9-10.

14  Mr. Swearingen also explains that Plaintiffs' Counsel interacted with numerous

15  attorneys representing the medical contractors for the Jail.  *Id*. ¶ 11.  This is

16  consistent in my experience with litigation with public entity defendants, which

17  often employ their own attorneys as well as retain outside counsel.

18      91.    It is my opinion that Counsel's fees work hours are within a reasonable

19  range and necessarily required a massive effort to review and carefully vet the

20  voluminous time entries.  *See* Pearl Decl. ¶¶ 54-55.  Mr. O'Connor raises only two

21  criticisms to the fees for fee motion work.  First, he negatively states that nine

22  timekeepers contributed to this work.  O'Connor Decl. ¶ 84.  I have reviewed

23  Mr. Swearingen's description of the division of labor among each of these

24  timekeepers, and why it was essential to coordinate and communicate with co-

25  counsel and other declarants.  Swearingen Reply Decl. ¶ 12.  Based on this

26  information and my own experience, I believe that the staffing for the fees motion

27  here was appropriate.

28      92.    Second, Mr. O'Connor asserts that the total fees for fees claim "is

1    clearly excessive." O'Connor Decl. ¶ 84. He offers absolutely no basis for this

2    opinion, and again ignores my evidence offered in my initial declaration. My

3    opinion is that the time spent thus far preparing the fee application was within a

4    reasonable range, and I base my opinion on (1) Ms. Grunfeld's detailed description

5    of the years of work that went into obtaining the settlement, which translated into

6    voluminous time entries; (2) Mr. Swearingen's declaration describing this review of

7    each of the 30,000+ time entries across three law firms and how he prepared the

8    records to be presented to the Court; and (3) my review of Plaintiffs' Counsel's

9    claimed fees-for-fees time records. Pearl Decl. ¶¶ 54-55.

10        93.    I also agree with Mr. Rosen's explanation that a contested fees motion

11   like this one requires hands-on work of senior attorneys who know the intricacies of

12   attorneys' fees law and can review with great care the billing records. Rosen Decl.

13   ¶¶ 19-21. The stakes involved in fee motions like this one are to say the least,

14   substantial. The days of simply submitting invoices to the court are long gone:

15   articulated standards must be met, and extensive oppositions anticipated. Counsel

16   have fully documented the time this motion required so far, and in my opinion, it is

17   perfectly appropriate to the stakes involved and the factors that must be proven.

18                                **CONCLUSION**

19        94.    In my opinion, for the reasons stated above, nothing in Defendants'

20   Opposition or Mr. O'Connor's declaration changes my opinion that the interim

21   attorneys' fees requested by Plaintiffs' Counsel here are reasonable.

22        I declare under penalty of perjury under the laws of the United States of

23   America that the foregoing is true and correct, and that this declaration is executed

24   at Berkeley, California this 20th day of March, 2025.

25

26

27                                    Richard M. Pearl

28