1  GAY C. GRUNFELD – 121944
   VAN SWEARINGEN – 259809
2  MICHAEL FREEDMAN – 262850
   ERIC MONEK ANDERSON – 320934
3  HANNAH M. CHARTOFF – 324529
   BEN HOLSTON – 341439
4  ROSEN BIEN
   GALVAN & GRUNFELD LLP
5  101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
6  Telephone:  (415) 433-6830
   Facsimile:   (415) 433-7104
7  ggrunfeld@rbgg.com
   vswearingen@rbgg.com
8  mfreedman@rbgg.com
   eanderson@rbgg.com
9  hchartoff@rbgg.com
   bholston@rbgg.com
10
   AARON J. FISCHER – 247391
11 LAW OFFICE OF
   AARON J. FISCHER
12 1400 Shattuck Square Suite 12 - #344
   Berkeley, California  94709
13 Telephone:  (510) 806-7366
   Facsimile:   (510) 694-6314
14 ajf@aaronfischerlaw.com

15 Attorneys for Plaintiffs and the
   Certified Class and Subclasses
16

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California  92121-2133
Telephone:  (858) 677-1400
Facsimile:   (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

17              UNITED STATES DISTRICT COURT

18            SOUTHERN DISTRICT OF CALIFORNIA

19 | DARRYL DUNSMORE, ANDREE | Case No. 3:20-cv-00406-AJB-DDL |
| ANDRADE, ERNEST ARCHULETA, | |
20 | JAMES CLARK, ANTHONY EDWARDS, | **VOLUME II – EXHIBITS TO** |
| REANNA LEVY, JOSUE LOPEZ, | **REPLY DECLARATION OF** |
21 | CHRISTOPHER NORWOOD, JESSE | **RICHARD M. PEARL IN** |
| OLIVARES, GUSTAVO SEPÚLVEDA, | **SUPPORT OF PLAINTIFFS'** |
22 | MICHAEL TAYLOR, and LAURA | **MOTION FOR INTERIM** |
| ZOERNER, on behalf of themselves and all | **ATTORNEYS' FEES AND** |
23 | others similarly situated, | **COSTS** |
24 | Plaintiffs, | Judge:  Hon. Anthony J. Battaglia |
| v. | |
25 | SAN DIEGO COUNTY SHERIFF'S | Date:   May 8, 2025 |
| DEPARTMENT, COUNTY OF SAN | Time:   2:00 p.m. |
26 | DIEGO, SAN DIEGO COUNTY | Crtrm.:  4A |
| PROBATION DEPARTMENT, and DOES | |
27 | 1 to 20, inclusive, | |
| Defendants. | |
28

[4672402.1]

# TABLE OF CONTENTS

## EXHIBITS TO REPLY DECLARATION OF RICHARD M. PEARL IN SUPPORT OF PLAINTIFFS' MOTION FOR INTERIM ATTORNEYS' FEES AND COSTS

| DESCRIPTION | EXHIBIT NO. | PAGE NO. |
|---|---|---|
| **VOLUME I** | | |
| State Court Orders Rejecting Mr. O'Connor's Opinions | A | 1-69 |
| **VOLUME II** | | |
| Continued State Court Orders Rejecting Mr. O'Connor's Opinions | A | 70-135 |
| Amended Rebuttal Declaration of John O'Connor, *Duran, et al. v. U.S. Bank National Assoc.*, Case No. 2001-035537, Cal. Sup. Ct. (dated August 31, 2010) | B | 136-172 |
| Declaration of John O'Connor, *Johnson v. Sear, Roebuck and Co, et al.,* Case No. 34-2009-00054053, Cal. Sup. Ct. (dated February 29, 2012) | C | 173-200 |
| Declaration of John O'Connor in Rebuttal to Opp. To Fee Petition, *Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, Case No. CGC-05-437680, Cal. Sup. Ct. (dated September 16, 2011) | D | 201-250 |
| Corrected Declaration of Guy B. Wallace, *Nevarez v. Forty Niners Football Company, LLC*, Case No. 4:16-cv-07013-HSG, N.D. Cal. (dated June 25, 2020) | E | 251-310 |

[4672187.2]

*Guinnane Construction Co. v. Chess et al,* Alameda County
Superior Ct. No. RG18932289

**FILED**
Superior Court of California
County of Alameda

07/03/2024

Chad Finke, Executive Officer/Clerk of the Court

By: _D. Fisher_  Deputy

D. Fisher

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ALAMEDA

| | |
|---|---|
| GUINNANE CONSTRUCTION CO., INC., | No.    RG18932289 |
| Plaintiff, | **TENTATIVE AND PROPOSED STATEMENT OF DECISION AFTER TRIAL** |
| v. | |
| STEPHEN MARC CHESS, CHESS CONNECT INC., a California corporation doing business as TOWNSEND COMMERCIAL REAL ESTATE, EDMUN JIN aka EDMUND JIN and DOES 1-20, | |
| Defendants(s). | |

## I.    INTRODUCTION

This action concerns round two of a dispute regarding 2120 Greenville Road, Livermore, California ("Greenville Property").  Previously, in *Guinnane Construction Co., Inc. v. Peterson*, Alameda County Superior Court Case No. RG17861212 ("*Peterson Action*"), Guinnane Construction Co., Inc. ("Guinnane" or "Guinnane Construction") obtained a judgment entered on August 15, 2018, against Russell Peterson, Janet Peterson, Christie Hibner and Yong Lu ordering the Greenville Property to be conveyed to Guinnane.  Afterwards, Guinnane initiated this action on December 14, 2018, against defendants Edmund Jin, Stephen Marc Chess, and Chess Connect Inc. (dba Townsend Commercial Real Estate) (Mr. Chess and Chess Connect collectively "Chess defendants"), alleging that the defendants tortiously interfered with the contract that Guinnane specifically enforced in the *Peterson Action*.  Plaintiff asserts four causes of action against the defendants: (1) inducing breach of contract; (2) intentional interference with contractual relations; (3) intentional interference with prospective economic advantage; and (4) negligent

interference with prospective economic advantage.  At the outset of this action, the Court denied the Chess defendants' Anti-SLAPP motion to strike in a ruling affirmed by the Court of Appeal. *See Guinnane Constr. Co. v. Chess*, No. A157781, 2020 WL 7640216 (Cal. Ct. App. Dec. 22, 2020).

The matter came on for bench trial, jury having been waived, on March 5, 2024. Jonathan Hughes and Andrew Hanneman represented Guinnane; Robert Ward and Roey Rahmil represented Mr. Jin; and Peter Catalanotti represented the Chess defendants.  The Court heard testimony from Roy Guinnane, Richard Pearl, Stephen Chess, Samuel Chuck, William Hensley, Edmund Jin, and John O'Conner.  The Court also received numerous exhibits in evidence.  After evidence closed, the parties submitted post-trial closing briefs, with the plaintiff filing its initial closing brief on April 1, 2024, the defendants filing their oppositions on April 22, 2024, and the plaintiff filing a reply on May 2, 2024.

This is the Court's Tentative and Proposed Statement of Decision.  It is subject to the parties' objections under California Rule of Court 3.1590(g).  Pursuant to Code of Civil Procedure § 632 and California Rule of Court 3.1590(c), this Tentative and Proposed Statement of Decision will be the Court's Final Statement of Decision unless a party (1) within 10 days files and serves specified controverted issues or makes proposals not covered in the Tentative and Proposed Statement of Decision or (2) within 15 days files and serves objections to this Tentative and Proposed Statement of Decision.

## II.    FACTUAL BACKGROUND

### A.    The Greenville Property, the Parties and Players, and Polo

The Greenville Property comprises about 80 acres in the City of Livermore next to the National Lawrence Livermore Laboratory.  Clifford DeLima, who was about 92-years-old as of

**Ex. A - 72**

the trial date, and Barbara DeLima purchased the Greenville Property in or around 1981 with another individual. The DeLimas constructed a residence and have lived on the property since then. They also constructed two horse barns and a hay shed and maintained horses on the property. The property contains a racetrack and open space for horses to wander. Mr. DeLima's daughter, Jennifer Ratto, now lives on the property with her three children.

Robert G. Hibner was a veterinarian who cared for the DeLimas' horses. In consideration for that care, he obtained an interest in the Greenville Property. He later built a veterinary clinic that currently sits on the property. Before events relevant here, Mr. Hibner and his spouse Christine Hibner and Russell Peterson, who also is a veterinarian, and his spouse Janet Peterson collectively acquired a 50% undivided interest in the Greenville Property. By December 2002, the DeLimas (through a trust), on the one hand, and the Hibners and the Petersons, on the other, each owned a 50% undivided interest in the Greenville Property. They entered a Tenants in Common Agreement ("TIC") dated December 30, 2022. (Ex. 1.) The TIC contains a right of first refusal ("ROFR") under which any co-owner had the right to purchase the portion of any of the other co-owners' interest in the property on the same terms that the co-owner was willing to sell. (Ex. 1, ¶ 27.) The TIC provides that it "begins as of December 30, 2002 and shall continue for Ten (10) Years or until dissolved by mutual agreement of all the parties or under the provisions provided herein." (Id., ¶4.)

Roy Guinnane is a general contractor and businessman who owns Guinnane Construction. Mr. Guinnane also owns horses. In the 1980s, he met Mr. DeLima at Bay Meadows Racetrack in San Mateo, California, where Mr. DeLima was a horse trainer. They became close friends. Mr. Guinnane eventually transferred his horses to Mr. DeLima's care and

has stabled them at the Greeneville Property.  By 2016, Mr. DeLima maintained about 100 horses on the property.

In or around 2016, the Petersons and Ms. Hibner (Mr. Hibner having passed) wanted to sell their 50% interest.  The DeLimas, in contrast, did not.  On this issue, Mr. Guinnane advocated for the DeLimas and told Mr. Peterson that, if the DeLimas "sell the way you are suggesting they will not have enough money to purchase another property to live out the remaining years of their life."  Mr. Guinnane looked for another property that the DeLimas could purchase and carry on their work with livestock but was unable to find one.  (85:4-9.)[1] Mr. Guinnane negotiated with the Petersons for Mr. Guinnane to purchase the Peterson-Hibner 50% interest in the property, but the parties were unable to reach an agreement.

Edmund Jin immigrated to the United States in the 1980s.  While visiting the United States, he and his family found themselves opposed to the Chinese government amid the political turmoil surrounding the Tiananmen Square massacre.  Unable to return to China, Mr. Jin learned English, studied, and worked hard.  He ultimately developed a textile-based import business that became very successful.  He and his family now own E&E Co. Ltd., which provides household products to large retailers and consumers around the United States and engages in other diversified businesses.  Mr. Jin operates E&E with his spouse, his sister, and his brother-in-law Yong Lu.  As part of his business, Mr. Jin regularly negotiates the acquisition and sales of businesses and real estate.  He has engaged in about 100 real estate transactions.

Steve Chess has been Mr. Jin's long-term real estate agent, having handled over 20 real estate transactions for Mr. Jin over the course of 30 years.  Along with his wife, Mr. Chess owns

---

[1] The trial transcripts are consecutively paginated except for March 11, 2024.  Page and line numbers refer to the consecutive pagination, while the March 11 transcript reference are dated.

Chess Connect, Inc., and Townsend Commercial Real Estate.  Chess Connect functions as

Townsend Commercial's broker, and Mr. Chess is its principal agent.

Mr. Jin is an avid sportsman.  Among other activities, he learned polo and became a polo

enthusiast with a desire to promote the sport.  He primarily played at the Menlo Polo Club in

Atherton, California.  That club, however, lacks a full-sized polo field.  Mr. Jin soon learned that

the San Francisco Bay Area lacks a full-sized operational polo field,[2] with the closest ones in

Gilroy and Petaluma.  Mr. Jin discussed the matter with his polo instructor, Eric Wright, who

explained that a full-sized polo field requires a large swath of flat land as well as other

requirements that are expensive and rare in the Bay Area.  Mr. Jin then asked Mr. Wright to find

a place for Mr. Jin and his family to invest in to build a regulation sized polo field.

### B.     Mr. Jin Attempts to Purchase the Entirety of the Greenville Property

After some research and with Mr. Wright's help, Mr. Jin identified the Greeneville

Property as viable land to support a full-sized polo field.  He set out to acquire it intending to

build a polo facility on it.  Mr. Jin's plan was not necessarily to create a lucrative business, and

the details of how the polo facility would operate were never fully decided.  He intended,

however, that Mr. Wright would run the polo field, sell membership, and earn a profit from the

operations.  He anticipated that the polo field would generate revenue at some level.  (664:4-16.)

Although he personally might not make much profit, Mr. Jin did not want to take a loss.  (662:6-

20.)  He also intended to use the racetrack on the Greeneville Property to the exclusion of

DeLimas.  (3/11/24 Tx at 16:8-13.)

---

[2] Apparently, the Polo Fields at Golden Gate Park is not so used.

5

Mr. Jin engaged Mr. Chess to help acquire the Greenville Property.   At all relevant times, the Chess defendants acted as Mr. Jin's agent.   To begin negotiations, Mr. Wright referred Mr. Chess to Mr. Peterson.   After some back and forth, on December 15, 2016, Mr. Chess extended an offer to Mr. Peterson for Mr. Jin to purchase the entire property, including the DeLimas' interest, for $3 million.   Mr. DeLima learned of the offer, told Mr. Guinnane about it, and asked Mr. Guinnane to respond to Mr. Peterson regarding the offer.   After some back and forth, Mr. Guinnane informed Mr. Peterson that the DeLimas were not interested in selling and did not intend to move.   The $3 million offer did not result in a sale.

### C.   Messrs. Jin, Chess, and Wright Consider Options

Messrs. Jin, Chess, and Wright continued to consider ways to acquire the Greeneville Property.   On January 31, 2017, Mr. Chess sent Mr. Jin an aerial picture of the property that showed "how [Mr. Jin] could cut th[e] property up."   The image shows the property with a hand-drawn dotted line separating areas with structures, including the DeLimas' residence, from areas without structures that includes the racetrack.   Mr. Chess shared the images with Mr. Wright and stated, "I'm talking to our attorney to see if we can file a petition to force him to sell the other half . .  old guy doesn't want to move.   I believe we can force the sale of his half though."   (Ex. 12.)

Mr. Wright responded that the area with the racetrack "would be the most useful to us in the near term, but we need the whole thing to make it commercially viable for us."   (Id.)   He suggested ways to deal with the DeLimas.

On February 8, Mr. Chess told Mr. Wright, "[Mr. Jin] approved the idea of buying out the lower 40 acre partner that owns half the property.   Then filing a partition sale to force the other owner to sell."   (Id.)   Mr. Chess further summarized his plans: "First step is to make an

offer with timeframe contingencies and get the 50% owner tied up in escrow.  The[n] we go

through the due diligence of making sure everything can be done on the property that you want

to do the[re].  If everything comes out clean th[en] we close on the 50% ownership and file[] a

partition sale to get the entire property.  My next step is to talk to that owner and negotiate the

price." (Id.)  Mr. Chess testified that this "was the agreed upon plan." (325:23-24.)  When asked

if he approved that plan, Mr. Jin testified, "I believe so."  (3/11/24 Tx. at 22:18-24.)

     **D.**     **Mr. Jin Enters a Contract with the Petersons and Ms. Hibner to
Acquire Their 50% Interest with a Condition that They Extend a
ROFR to the DeLimas**

     In 2017, Mr. Jin through Mr. Chess negotiated with Mr. Peterson to purchase the

Petersons and Ms. Hibner's 50% interest.  During the negotiations, an issue arose regarding the

ROFR in the 2002 TIC.  Mr. Chess was uncertain whether the TIC had expired by 2017 or was

still enforceable.  Erring on the side of caution, Mr. Chess wanted Mr. Peterson to extend a

ROFR to the DeLimas as part of the transaction.  On March 19, 2017, Mr. Chess informed

Mr. Peterson that Mr. Jin will not start any due diligence on the property until after the DeLimas

waive a right to purchase the Petersons and Ms. Hibner's interest.  (Ex. 18.)  He added, "[Mr.

Jin] can't spend time and money until he knows that DeLima is out of the deal.  Otherwise if we

work on this and DeLima moves forward to purchase we will have wasted all that time/money

for nothing." (Id.)

     In March 2017, Mr. Jin extended a written offer to the Petersons and Ms. Hibner to

purchase their interest for $1.2 million, and the parties then entered a contract dated April 1,

2017.  (Ex. 21.)  Consistent with the negotiations, the April 1 contract called for a 60-day due

diligence period and included a contingency that this period would not begin until after

the DeLimas have waived or declined a ROFR.  It provides: "The 60 [day] Buyer Due Diligence

Period shall not commence until this 30 day Right of First Refusal from the DeLima Trust

waives its purchase option or upon written decline of said option [sic]." (Ex. 21 at 7.) Mr. Jin

agreed to put the ROFR condition in the April 1 contract to procure a "clean deal" and

understood that a "clean deal" required giving the DeLimas an offer to buy the Petersons and

Ms. Hibner's interest on the terms that Mr. Jin proposed. (668-69.) Mr. Chess agreed that the

contract required the sellers to send a letter to the DeLimas to address the ROFR. (420:22-26.)

### E.    Mr. Peterson Offers a ROFR, and the DeLimas Accept

After they executed the April 1 contract, the Petersons and Ms. Hibner retained Samuel

Chuck, a real estate lawyer. Mr. Chuck prepared a letter dated April 4, 2017, for the Petersons

and Ms. Hibner to extend a ROFR to the DeLimas. (Ex. 24.) The letter states that the Petersons

and Ms. Hibner entered a contract to sell their interest to Mr. Jin for $1.2 million under the terms

set forth in the April 1 contract. The letter then states:

> Although we have no obligation to provide any type of right of first refusal since
> the Tenants-in-Common Agreement has expired by its own terms, we want to
> offer you the courtesy of being able to purchase the property for the same
> purchase price as being sold to Mr. Jin. To allow for this option, a 30 day first
> right of refusal is written into the purchase agreement. If you would like to
> purchase the property for that price, notify me in writing within 7 days so the sale
> can be completed within the 30 day provision (i.e. Monday, May 2, 2017).

The letter includes provisions for Mr. DeLima to acknowledge receipt of the letter and to waive

the ROFR. The letter does not include a parallel provision for Mr. DeLima to accept the ROFR.

Mr. Chuck testified that the letter extended a bona fide offer to the DeLimas. His intent was, "if

you want to buy this [at $1.2 million], let us know; and we will put that deal together" and his

clients would work with the DeLimas to close the deal. (396:6-22.) Mr. Chuck and Mr. Chess,

however, expected the DeLimas to decline and to waive the ROFR. (397:5-10.)

8

Mr. Peterson delivered the April 4 letter to Mr. Guinnane and Mr. DeLima personally at the Greenville Property on April 8, 2017.  Mr. DeLima signed the acknowledgement of receipt but did not sign the waiver.

On April 11, 2017, the DeLimas accepted the offer unconditionally and exercised their ROFR.  Mr. DeLima and Barbara DeLima as trustees of the relevant trust executed a letter dated April 11, 2017, stating that they "would like to purchase the [Petersons/Hibner's] interest in the [Greeneville Property] on the terms set forth in the letter."  (Ex. 26.)  Because neither Mr. Guinnane nor the DeLimas used email, they enlisted the DeLimas' daughter, Ms. Ratto, to use her computer and email to communicate with Mr. Peterson.  On April 11, 2017, Ms. Ratto emailed the DeLima's acceptance letter to Mr. Peterson by a cover email stating, "Please find attached letter signed by Clifford and Barbara De Lima exercising their right of first refusal." (Ex. 26.)

Mr. Peterson acknowledged receipt of the DeLimas' April 11 letter by a handwritten note also dated April 11, 2017.  The note states, "Terms were stipulated in letters dated April 4, 2017, and April 10, 2017, stating the transaction must close on or before May 1, 2017, for the full cash value of $1.2 million."  (Id.)[3]

After the DeLimas sent their response, Mr. Chess learned that the DeLimas responded to the ROFR letter and wanted to move forward at the same price.  (423:5-8.)  Mr. Chess saw both the April 4 offer letter and the April 11 acceptance letter in 2017 as the events were unfolding.  (473:23-74:18.)  Mr. Chess informed Mr. Jin about the exchange of documents between Mr. Peterson and the DeLimas.  (435:1-8.)  Mr. Jin learned that the DeLimas accepted the ROFR

---

[3] The "April 10" date was most likely a typo, and Mr. Peterson intended April 11.

offer.  (669:16-20.)  He testified that he "might" have seen the correspondence between

Mr. Peterson and the DeLimas.  (643.)

      F.    **After Acceptance, the Petersons and Ms. Hibner Ghosted**
             **Mr. Guinnane and the DeLimas, and Guinnane filed the *Peterson***
             ***Action***

After the DeLimas sent their April 11 acceptance letter, Mr. Guinnane took steps to close

by the May 1 deadline.  He sent Mr. Peterson a proposed CAR Form real estate contract dated

April 12, 2017.  (Ex. 28.)  Later, on April 21, 2017, the DeLimas assigned "all right, title and

interest in and to the TIC Right of First Refusal and the April 4 Letter" to Guinnane

Construction.  (Ex. 30.)  Mr. Guinnane set up escrow with a title company, deposited $25,000,

and instructed that closing must happen by May 1.  Towards the end of April 2017, in

Mr. Guinnane's presence, the escrow officer asked Mr. Peterson for information necessary to

close.  Mr. Peterson stated that he would get back to the escrow officer quickly and stated his

understanding that closing by May 1 was not possible.  Mr. Peterson, however, did not follow up

with the escrow officer.  Mr. Guinnane then attempted to contact Mr. Peterson multiple times but

received no response.  He followed up with an email on May 11, 2017, through Ms. Ratto asking

Mr. Peterson to call him.  (Ex. 42.)  Still, he received no response.  The Petersons and

Ms. Hibner ghosted Mr. Guinnane and the DeLimas.

Believing that something was amiss, Mr. Guinnane engaged counsel.  On May 22, 2017,

Guinnane filed the *Peterson Action*, seeking specific performance of what Mr. Guinnane

believed was the Petersons and Ms. Hibner's obligation to sell their interest in the Greenville

Property to Guinnane Construction.

10

G.    **Messrs. Jin and Chess Continue to Negotiate**

Meanwhile, after Messrs. Jin and Chess learned that the DeLimas accepted the offer of a ROFR, including the exchange of the April 4 and April 11 documents, Mr. Chess discussed options with Mr. Jin, including the option to stand down and allow the Petersons and Ms. Hibner to sell to the DeLimas.  (432:3-6.)  Messrs. Jin and Chess, however, made multiple new offers with escalating consideration to purchase the Petersons and Ms. Hibner's interest in the Greenville Property.  (See 425:13-20; 431:3-6; 429:12-27; 26:19-27:1.)

On April 28, 2017, Mr. Chess texted Mr. Peterson stating, "My client is now at 1,500,000."  (Ex. 32.)

The Petersons and Ms. Hibner were initially reluctant to renegotiate with Mr. Jin.  On May 3, Mr. Chuck responded: "[S]ince the co-owner has elected to exercise its right of first refusal to purchase the property at the price in Mr. Jin's prior offer, my client has elected to proceed with that buyer.  Accordingly, we'll need to terminate Mr. Jin's escrow and wire your client his deposit of $25,000."  (Ex. 36.)  Upon receipt, Mr. Chess understood that Mr. Chuck represented that the Petersons and Ms. Hibner decided to proceed with the lower value deal rather than Mr. Jin's higher value deal.  (436:26-437:2.)

Later that day, Mr. Chess responded that Mr. Jin still wants to buy the property and had instructed Mr. Chess to continue to negotiate.  (Ex. 37.)  Messrs. Chess and Jin declined to cancel escrow.  (437.)

On May 4, 2017, Mr. Chess texted Mr. Peterson directly, "We will also indemnify you from future possible [Mr. DeLima] issues."  (Ex. 32.)  Mr. Jin testified that he offered to indemnify the Petersons and Ms. Hibner to make his offer to purchase more attractive.  (3/11/2024 Tx. at 34.)

Mr. Chess followed up with an email to Mr. Chuck and Mr. Peterson stating that Mr. Jin is willing to pay a $1.5 million "all-cash closing immediately with no contingencies and indemnify your client for any future issues regarding [Mr. DeLima's] potential challenges. My attorney says all you have to do is cancel the deal with those guys and wait a couple days-and we're good. We can close very quickly and will pay more if absolutely necessary to get this property. My client is very determined to buy the property." (Ex. 38.)

The Petersons and Ms. Hibner decided to negotiate further with Mr. Jin. On May 5, 2017, at 8:29 am, Mr. Chuck responded to Mr. Chess that the Petersons and Ms. Hibner would agree to the following: $1.7 million; "Fully indemnity, hold harmless and defense of any claims from other potential buyers"; close within 10 days; no contingencies; non-refundable deposit of $200,000; and Mr. Jin to close even if Mr. DeLima files suit. (Ex. 38.) Also on May 5, 2017, at about 1:21 pm on a separate email chain, Mr. Chuck forwarded to Mr. Chess Ms. Ratto's April 11, 2017, email that transmitted DeLima's acceptance of the ROFR. (Ex. 41.) Mr. Chess, in any event, had already seen those documents. (446:11-12.)

Later, on May 8, 2017, Mr. Chuck informed Mr. Chess that the Petersons and Ms. Hibner rejected a $1.5 million purchase price but would be agreeable to $1.6 million subject to the terms in his prior email. He added, "Let me know if we have a deal. If not, my clients intend to proceed with the sale to [Mr. Guinnane and Mr. DeLima]." (Ex. 41.) Mr. Chess responded stating that Mr. Jin agreed to pay $1.6 million, to close as soon as possible, to provide a $200,000 non-refundable deposit upon signing, and to indemnify the sellers from future issues from Messrs. Guinnane and DeLima. (Ex. 41.)

A few days later on May 12, 1017, Mr. Chess emailed Mr. Peterson directly, stating that about 50 to 90 horses will be on the property if Mr. Jin buys it and that Mr. Peterson "would be

the top horse veterinarian to be considered for any treatment or upkeep of these horses and obviously would be lot of great business for you." (Ex. 43.)

Mr. Chess followed up on May 16, 2017, by emailing Mr. Chuck a draft letter written for Mr. Peterson's signature that he requested Mr. Chuck send to the DeLimas stating that the Petersons and Ms. Hibner were no longer going to proceed to sell the property to the DeLimas. (Ex. 49; 449:10-13.) In his email, Mr. Chess also listed points that someone on his side believed constituted legal defenses that the Petersons and Ms. Hibner could assert against a contract claim by the DeLimas. (Id.)

Mr. Chuck testified that Mr. Chess wanted him to terminate the deal with the DeLimas, stating that there was no contract and that his side was proceeding with another buyer. Mr. Chuck, however, was unwilling at that point to expose his clients to the legal risk of the DeLimas enforcing their contract rights without some upside from Mr. Jin. (358:20-23.) In his reply email, he declined to send any letters, at least until "they reached an agreement" with Mr. Jin.

Mr. Chuck followed up with a detailed email to Mr. Chess and Mr. Jin's counsel where he set forth his position on behalf of the Petersons and Ms. Hibner. He stated,

> My concern[s] in this matter are simple and straightforward. It is obvious that Cliff DeLima and Roy Guinnane believe they have an enforceable right of first refusal to purchase the property for $1,200,000. It's also obvious they believe they properly exercised it. Whether they did or not is a question of law that would have to be resolved by a court. Regardless, it is also clear to me that should we proceed with the sale to the DeLima Trust or its assignee, my client will have no further contractual rights to Mr. Jin. However, to date, Mr. Jin and Mr. Chess have not confirmed that fact in writing. Rather, they've asked us to create a scenario in which we attempt to terminate any relationship with Cliff DeLima without an affirmative binding agreement with Mr. Jin. That is not acceptable.

(Ex. 49.)

13

On May 23, 2017, Mr. Chuck informed Mr. Chess and Mr. Jin's counsel that the *Peterson Action* had been filed.

Later that day, Mr. Chess told Mr. Chuck that he and Mr. Peterson agreed to a purchase price of $1.5 million and that Mr. Jin wanted "assistance from the seller's side before he was willing to move forward." (Ex. 50.)

After all this, on May 24, 2017, Mr. Chuck informed Mr. Chess and Mr. Jin's counsel that the Petersons and Ms. Hibner "elected to complete the sale with" Messrs. Guinnane and DeLima and asked them to cancel escrow. (Ex. 52.) Mr. Chuck testified that his statements accurately reflected the Petersons and Ms. Hibner's choice at that stage. (369:9-10.)

That same day on May 24, Mr. Chess texted Mr. Peterson, "Russ please consider this I will eliminate my commission therefore you . . . will clear a true $150,000 extra each. You have nothing to lose here my client is paying for everything. Why would [you] not want an extra $150k?" (Ex. 32.)

On May 30, 2017, Mr. Chess texted Mr. Peterson: "What is up with you? We need a response by 12 noon Tuesday. You have nothing to lose we indemnify you and you make extra money please respond." (Id.)

### H. The Petersons and Ms. Hibner Elect to Sell to Mr. Jin, and The Parties Enter an Indemnity and Joint Defense Agreement

By July 7, 2017, Mr. Peterson and Ms. Hibner elected to sell to Mr. Jin. Mr. Jin and the Petersons and Ms. Hibner executed a Purchase and Sale Agreement and Escrow Instructions dated July 7, 2017, for Mr. Jin to purchase the Petersons and Ms. Hibner's interest in the Greenville Property for $1.5 million "as is." In the July 7 contract, Mr. Jin agreed to pay Mr. Chess' broker commissions.

14

Mr. Jin, Mr. Peterson, Ms. Peterson, and Ms. Hibner also executed an Indemnity and

Joint Defense Agreement dated July 7, 2017, with Mr. Jin as the indemnitor and the Petersons

and Ms. Hibner as the indemnitees.  (Ex. 58.)  It provide the following in the recitals:

- Mr. Jin is "a highly experienced and sophisticated real estate investor."

- Mr. Jin was represented by Mr. Chess and Townsend Commercial as his real
  estate broker.

- Mr. Chess prepared a Standard Offer, Agreement and Escrow Instructions for
  purchase of the Greeneville Property dated March 10, 2017 ("Original PSA"), on
  Mr. Jin's behalf to purchase the Petersons' and Ms. Hibner's 50% tenant in
  common interest.[4]  "One of the conditions provided for in the Original PSA
  drafted by [Mr. Chess] and [Mr. Jin] was a requirement that the Original PSA was
  conditioned upon DeLima waving its ROFR to purchase [the Petersons and
  Ms. Hibner's] 50% interest in the [Greeneville] Property."

- "[O]n or about April 4, 2017, pursuant to the Original PSA, Russ Peterson
  delivered a notice of ROFR to DeLima.  On or about April 11, 2017, DeLima
  accepted the ROFR and elected to purchase the Property under the terms and
  conditions of the Original PSA.  The parties understand that DeLima assigned
  their purchase rights to Guinnane Construction Company, Inc. ('Guinnane')."

- On May 22, 2017, Guinnane filed the *Peterson Action* "seeking to specifically
  enforce the acceptance of the ROFR" and recorded a Lis Pendens.

- Despite the *Peterson Action*, Mr. Jin desires to buy the Petersons and
  Ms. Hibner's "50% tenant in common interest in the Property subject to the
  ROFR, the Lawsuit and the Lis Pendens for an increased purchase price" of $1.5
  million.

- Mr. Jin believes that the that the TIC Agreement and the ROFR are not
  enforceable.

- As a requirement for a new contract with Mr. Jin, the Petersons and Ms. Hibner
  required Mr. Jin to enter into the indemnity agreement.

---

[4] This refers to the April 1, 2017, contract.

**Ex. A - 85**

Under the indemnity agreement, Mr. Jin agreed to indemnify, defend, and hold harmless the

Petersons and Ms. Hibner against all claims against them connected with the *Peterson Action*,

the TIC Agreement or ROFR, the Greenville Property, and related matters.

Afterwards, Mr. Jin assigned his rights to purchase the Petersons and Ms. Hibner's

interest in the Greenville Property to his brother-in-law Mr. Lu, and Mr. Lu became a co-

indemnitor under the indemnity agreement.

The Petersons and Ms. Hibner sold their 50% interest in the Greenville Property to

Mr. Lu for $1.5 million.

## I.    In the *Peterson Action*, the Court Orders the Petersons, Ms. Hibner, and Mr. Lu to Convey the Greenville Property to Guinnane

The *Peterson Action* was fully litigated through final judgment after a bench trial. The

Court, the Hon. Ronni MacLaren presiding, issued an Order After Court Trial on July 30, 2018,

that set forth the factual and legal basis for its decision finding in favor of Guinnane and ordering

specific performance.

In its Order After Trial, the Court identified two principal issues: (1) Whether the

Petersons and Ms. Hibner entered a valid contract with the DeLimas to sell their interest in the

Greeneville Property; and (2) if so, whether the contract satisfies the statute of frauds.

The Court discussed the principal documents exchanged between the parties set forth

above. The Court found that Mr. Peterson's April 4, 2017, letter was an offer, open for seven

days, to sell the Petersons and Ms. Hibner's interest in the Greenville property for $1.2 million.

The Court rejected the argument that the letter was only an invitation to negotiate and various

other arguments that the defendants asserted to challenge contract formation. Among other

things, the Court found "multiple text messages exchanged between Defendants Janet Peterson

and Christie Hibner in April and May 2017 in which the two expressed their understanding that

16

the DeLimas had exercised the right of first refusal and that the Property was being sold to the

DeLimas, not to Jin." (Order at 7:15-19.)

The Court found that the statute of frauds under Civil Code § 1642 was satisfied. The

April 4, 2017 letter that Mr. Peterson delivered to the DeLimas and his April 11 handwritten note

acknowledging receipt of Mr. DeLima's acceptance constituted writings subscribed to by

Mr. Peterson. The Court found that Ms. Peterson and Ms. Hibner as signatories to the indemnity

agreement adopted the factual representations therein. The Court pointed to the language quoted

above in the indemnity agreement stating that, pursuant to the contract between Mr. Jin and the

Petersons and Ms. Hibner, Mr. Peterson delivered the notice of ROFR to the DeLimas and that

the DeLimas accepted the ROFR and elected to purchase their interests on the same terms is their

contract with Mr. Jin. The Court found that the recitals show on their face or by implication and

ratification that Ms. Peterson and Ms. Hibner authorized Mr. Peterson to deliver the April 4,

2017, letter on their behalf. The Court ruled that the indemnity agreement constituted a writing

subscribed to by Ms. Peterson and Ms. Hibner.

The Court further found that the April 4, 2017, offer and the DeLimas' acceptance

contained all the material terms for sale of real property in that they identified the seller, the

buyer, the price, the manner of payment, and the property to be transferred.

The Court entered Judgment on August 15, 2018, ordering the Petersons and Ms. Hibner

to deliver all records regarding the Greenville Property, including the veterinary clinic and to

vacate the property. The Court ordered Mr. Lu to transfer his interests in the Greenville Property

that he obtained from the Petersons and Ms. Hibner to Guinnane Construction in consideration

for $1.2 million. He did so. No appeal was taken from the Judgment.

III.    **DISCUSSION**

In this action, Guinnane seeks its attorneys' fees and costs incurred in the *Peterson Action* to enforce the DeLimas' contract with the Petersons and Ms. Hibner as damages under the "tort of another" doctrine based on the interference torts asserted here.

A.    **Inducing Breach of Contract and Intentional Interference with Contractual Relations**

The First and Second Causes of Action assert claims for inducing breach of contract and tortious interference with contractual relations.  The tort of inducing breach of contract requires a plaintiff to prove: "'(1) he had a valid and existing contract; (2) the defendant had knowledge of the contract and intended to induce its breach; (3) the contract was in fact breached by the contracting party; (4) the breach was caused by the defendant's unjustified or wrongful conduct; and (5) the plaintiff has suffered damage.'" *Shamblin v. Berge*, 166 Cal. App. 3d 118, 122 (1985) (quoting *Dryden v. Tri-Valley Growers*, 65 Cal. App. 3d 990, 995 (1977).  The tort of interference with contractual relationship is slightly broader and protects against acts that do not necessarily result in breach but disrupt the contractual relationship.  *Id.*  It has the same first, second, and fifth elements, but elements (3) and (4) require the plaintiff to prove that "(3) defendant committed intentional and unjustified acts designed to interfere with or disrupt the contract" and "(4) actual interference with or disruption of the relationship." *Id.* (*citing Manor Investment Co. v. F. W. Woolworth, Inc.*, 159 Cal. App. 3d 586, 593, fn.3 (1984)); *see also Pac. Gas & Elec. Co. v. Bear Stearns & Co.* 50 Cal.3d 1118, 1126 (1990) (elements of intentional interference with contractual relations are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."

18

**Ex. A - 88**

*PG&E* explained that the interference torts protect a contractual relationship, not any term of the contract—against outside interference. *Id.* at 1127. "As Justice Tobriner said in the context of voidable contracts: 'The actionable wrong lies in the inducement to break the contract or to sever the relationship, not in the kind of contract or relationship so disrupted, whether it is written or oral, enforceable or not enforceable.'" *Id.* (citing *Zimmerman v. Bank of America*, 191 Cal. App. 2d 55, 57 (1961)).

The Court finds that Guinnane has proven these two torts.

**B.      Whether a Valid Contract Existed**

The Court finds that Guinnane proved the existence of a valid contract. The Petersons and Ms. Hibner's April 11 letter was an offer of a ROFR. The DeLimas formed a valid and enforceable contract with the Petersons and Ms. Hibner on April 11 when they communicated their unconditional acceptance of that offer.[5] On April 21, 2017, the DeLimas assigned their contract rights to Guinnane.

**a)  The Order After Trial and Judgment in the *Peterson Action* Have Collateral Estoppel Effect Against Mr. Jin**

Mr. Jin concedes that Judge MacLaren's Order After Trial finding that the DeLimas and the Petersons and Ms. Hibner formed an enforceable contract and that the DeLimas assigned their contract rights to Guinnane has collateral estoppel effect here as to him.[6] Mr. Jin was in

---

[5] The Chess defendants' arguments regarding a purported contract for "$850,000/$903,000" misses the point. The referenced testimony does not concern the contract at issue in this action or the *Peterson Action*.

[6] "Collateral estoppel applies when (1) the party against whom the plea is raised was a party or was in privity with a party to the prior adjudication, (2) there was a final judgment on the merits in the prior action and (3) the issue necessarily decided in the prior adjudication is identical to the one that is sought to be relitigated." See *Smith v. ExxonMobil Oil Corp.*, 153 Cal. App. 4th 1407, 1414 (2007). California law describes privity for purposes of collateral estoppel as follows:

privity with Mr. Lu. Mr. Jin was the principal proponent whose interest in developing a polo

facility on the Greenville Property served as the impetus to defend the *Peterson Action* even

though Mr. Lu held title and paid defense fees. Mr. Lu, the Petersons, and Ms. Hibner were

represented by Shartsis Friese LLP in the *Peterson Action*, the firm that represents Mr. Jin here.

     The parties dispute whether the Chess defendants are in privity with the Petersons and

Ms. Hibner or Mr. Lu. This is a close question, and the Court does not reach this issue because

the evidence here establishes a contract.

### b) The Court Independently Finds an Enforceable Contract Based on the Evidence at Trial

     Judge MacLaren's decision and analysis on contract formation was correct. Based on the

evidence submitted in this trial, the Court independently finds that the Petersons and Mr. Hibner

formed an enforceable contract with the DeLimas when the DeLimas communicated their

acceptance of the ROFR. And, the DeLimas assigned their contract rights to Guinnane.

---

    "'"'The concept of privity ... refers 'to a mutual or successive relationship to the same rights of property, or to such an identification in interest of one person with another as to represent the same legal rights....'"''' [Citation.] "Over time, courts have embraced a somewhat broader, more practical concept of privity. ' "[T]o maintain the stability of judgments, insure expeditious trials," prevent vexatious litigation, and "to serve the ends of justice," courts are expanding the concept of privity beyond the classical definition to relationships " 'sufficiently close to afford application of the principle of preclusion.'"' [Citation.] For example, more recently our Supreme Court explained the basic tenets of privity in broader terms: 'As applied to questions of preclusion, privity requires the sharing of "an identity or community of interest," with "adequate representation" of that interest in the first suit, and circumstances such that the nonparty "should reasonably have expected to be bound" by the first suit. [Citation.] A nonparty alleged to be in privity must have an interest so similar to the party's interest that the party acted as the nonparty's " ' "virtual representative" ' " in the first action.' " [Citation.] "Put another way, privity, ' "as used in the context of res judicata or collateral estoppel, does not embrace relationships between persons or entities, but rather it deals with a person's relationship to the subject matter of the litigation." ' " [Citation.]

*Atwell v. City of Rohnert Park*, 27 Cal. App. 5th 692, 702–03 (2018).

**Ex. A - 90**

All elements are present here in a textbook example of contract formation. The April 4 letter was a definite offer of a ROFR as Judge MacLaren found. The DeLimas' April 11 letter and email constituted an unconditional acceptance of the ROFR in the manner and within the time requested by the offer. No one disputes adequate consideration. The parties reached a meeting of the minds that the Petersons and Ms. Hibner would sell their interest in the Greenville Property to the DeLimas for $1.2 million cash and the other material terms to which Mr. Jin had agreed. A valid contract was formed when Ms. Ratto transmitted the April 11 acceptance to Mr. Peterson. *See* Civ. Code § 1583.[7]

That Mr. Peterson received the acceptance is undisputed given his handwritten note acknowledging receipt. His note further specified that the terms were in the April 4 and April 11 letters. Mr. Jin, the Petersons, and Ms. Hibner all confirmed the existence of the contract in their indemnity agreement in which they acknowledged that: "On or about April 11, 2017, DeLima accepted the ROFR and elected to purchase the Property under the terms and conditions of the Original PSA. The parties understand that DeLima assigned their purchase rights to Guinnane Construction Company, Inc. ('Guinnane')."

The exchanged letters included all the material terms necessary for a valid and enforceable real estate contract under long-standing California law. *See, e.g.*, *King v. Stanley*, 32 Cal. 2d 584, 588 (1948) ("An agreement for the purchase or sale of real property does not have to be evidenced by a formal contract drawn with technical exactness in order to be binding" and a memorandum of the agreement is sufficient and may be found in an exchange of letters); *Patel*

---

[7] This basic contract principle of when a contract is formed is confirmed by the "mailbox rule." As Witkins summarized: "The general rule that a contract is made when the acceptance is posted, even though the letter of acceptance is lost and never reaches the offeror, is covered by C.C. 1583." Witkin, Summary of California Law (10th ed. 2005) Contracts, § 191 at 225.

*v. Liebermensch*, 45 Cal. 4th 344, 349 (2008) (quoting *King* and holding "In the absence of express conditions, custom determines incidental matters relating to the opening of an escrow, furnishing deeds, title insurance policies, prorating of taxes, and the like. [Citations.] The material factors to be ascertained from the written contract are the seller, the buyer, the price to be paid, the time and manner of payment, and the property to be transferred, describing it so it may be identified. [Citations.]"); *Blackburn v. Charnley*, 117 Cal.App.4th 758, 766 (2004) ("The material factors to be ascertained to support a contract for the sale of real property are: (1) the seller; (2) the buyer; (3) the price; (4) time and manner of payment; and (5) description of the property sufficient to identify it."). The exchanged letters here identified the sellers—the Petersons and Ms. Hibner, the buyer—the DeLimas, the price—$1.2 million, the time and manner of payment—cash and closing by May 1, and a description of the property—the Petersons and Ms. Hibner's 50% interest in the Greenville Property. All other reasonable terms could be inferred by a Court if the parties were unable to agree. Courts regularly enforce real estate agreements under similar circumstances.

### c) The Chess defendants' contract formation defenses lack merit

The Chess defendants raise the December 2002 TIC and claim that its provisions prevented the DeLimas from forming a contract with the Petersons and Ms. Hibner and prevented the DeLimas from assigning their interest in that contract to Guinnane. By that argument, the defendants are attempting to enforce the TIC. But the Chess defendants and Mr. Jin are strangers to the TIC and have no colorable claim to be third party beneficiaries. They lack standing to enforce the TIC's terms and have cited no authority permitting an exception. *See, e.g., Berclain Am. Latina v. Baan Co.*, 74 Cal. App. 4th 401, 405 (1999) (contract claim

generally requires party to be a signatory or a third-party beneficiary); *Eastern Aviation Group, Inc. v. Airborne Express, Inc.* 6 Cal.App.4th 1448, 1452 (1992.)

In any event, whether the TIC expired or was in effect as of April 2017 is irrelevant. Mr. Peterson—at Messrs. Chess and Jin's demand—extended a ROFR through the April 4 letter that was independent and not contingent on the TIC's continued validity. Mr. Peterson represented in the April 4 letter that the TIC had expired. He nonetheless extended an offer of a ROFR. For the same reason, whether the DeLimas obtained the Petersons and Ms. Hibner's permission under the TIC to assign their rights to the ROFR, an issue raised by the Chess defendants, is also irrelevant—the April 4 offer of a ROFR was independent of the TIC. Regardless, no evidence showed that the Petersons or Ms. Hibner objected to the assignment. The Chess defendants cite no legal authority that precludes the DeLimas from assigning their contract rights.

The Chess defendants point out that the CAR Form draft that Mr. Guinnane sent dated April 12, 2017, differed from the April 1 contract. But they provide no legal authority or analysis to explain its legal impact. (Chess Brief at 18:4-26.) The Court finds none. As noted, the contract between the Petersons and Ms. Hibner and the DeLimas was formed on April 11 when the DeLimas' communicated their acceptance. The proposed CAR Form draft was sent on or after April 12. The draft was not some type of "counteroffer" that rejected April 11 offer, as the Chess defendants seem to imply. Acceptance had already occurred. Further, as Judge MacLaren noted, Mr. Guinnane sent that CAR Form draft before the DeLimas assigned their rights to him. He was a stranger to the contract between the Petersons and Ms. Hibner, on the one hand, and the DeLimas, on the other, at that point. No evidence suggests that the DeLimas intended to withdraw their acceptance.

23

The Chess defendants raise the statute of frauds.  But they may not assert the statute of frauds as a defense to the torts at issue here.  *See Zimmerman*, 191 Cal. App. 2d at 56 (holding that statute of frauds is no defense to torts of inducing breach of oral contract or interference with contractual relations).[8]  As Justice Tobriner wrote:  "[W]e see no good reason why the protection against the dangers of oral agreements, which the statute affords to parties to a transaction, should inure to a stranger who seeks the destruction of the transaction and whose status fundamentally differs from that of the party whom the statute seeks to protect."  *Id.* at 61.  In any event, Judge MacLaren correctly addressed this issue, and the Court adopts her analysis and conclusions that the April 4 and 11 letters and the indemnity agreement suffice to satisfy the statute of frauds.

### 2.    Whether the Defendants had Knowledge of the Contract and Intended to Induce its Breach

#### a)  Knowledge

A central issue is whether the defendants had knowledge of a valid contract for purposes of the interference torts.

The Court finds that Messrs. Jin and Chess knew that Mr. Peterson, on behalf of the Petersons and Ms. Hibner, delivered the April 4 letter offering a ROFR to the DeLimas.  They also knew that the DeLimas accepted the offer of a ROFR by transmitting the April 11 acceptance letter to Mr. Peterson.  The indemnity agreement alone establishes that they knew these facts.  Both Mr. Jin and Mr. Chess knew that the DeLimas accepted the ROFR to purchase

---

[8] *See also Golden v. Anderson*, 256 Cal. App. 2d 714, 719 (1967) (holding that statute of frauds may not be asserted by "defendants, being strangers to such contract" as a defense to tortious interference with contractual relations); *Friedman v. Jackson*, 266 Cal. App. 2d 517 (1968) (same).  The statute of frauds, when violated, makes a contract voidable, not void. *See, e.g., Safarian v. Govgassian*, 47 Cal. App. 5th 1053, 1069 (2020).

the Petersons and Ms. Hibner's interest for $1.2 on the same terms that Mr. Jin had offered. (Chess Br. at 21:27-28.) Messrs. Jin and Chess required the Petersons and Ms. Hibner to extend the ROFR to the DeLimas as a condition of the April 1 contract, and they had seen the correspondence between the two sides that Judge MacLaren found and this Court finds constituted a contract. (Jin Br. at 12:17-18.; Chess Br. at 21:1-2.)

Messrs. Jin and Chess's argument that they lacked "knowledge" for purposes of these torts claims, in essence, that they did not "know" or "believe" that the contract was enforceable during the relevant events in 2017. Both claim an understanding of contract formation at odds with California law. They claim that they did not see a written contract signed by all the parties. (Jin Br. at 12.) Mr. Jin testified that he viewed the exchanged letters as similar to a non-binding letter of intent.[9] Mr. Chess claims that his "understanding of a valid contract included, at a minimum, a signature from all parties; and inclusion of price, terms, escrow instructions, how taxes would be paid, who would pay closing costs, and any contingencies." (Chess Br. at 21:11-14.) In short, Messrs. Jin and Chess claim that they believed that the Petersons and Ms. Hibner had litigable defenses to a contract claim by the DeLimas and Guinnane and that they did not appreciate the validity of the contract until Judge MacLaren ruled in the *Peterson Action*.

The issue here is whether the defendants' mistake of law or, more precisely, mistake of an application of contract law to the undisputed facts here constitutes a defense to inducing breach of contract and tortious interference with contractual relations.

In discussing interference torts, the Supreme Court explained that "the expectation that the parties will honor the terms of the contract is protected against officious intermeddlers. Since people "'usually honor their promises no matter what flaws a lawyer can find, the offender

---

[9] Letters of intent can, depending on the circumstances, bind parties.

should not be heard to say that the contract ... meddled with could not have been enforced.'"

*Pac. Gas & Elec. Co.*, 50 Cal. 3d 1118, 1128 (quoting *Buckaloo v. Johnson*, 14 Cal.3d 515, 826

(1975)).

Later, *Quelimane Co. v. Stewart Title Guar. Co.* looked to Restatement Second of Torts,

§ 766, in describing the intent standard for the tort of interference with contractual relations.  19

Cal. 4th 26, 56 (1998); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003).

*Little v. Amber Hotel Co.* then adopted § 766 in addressing the knowledge standard for

inducing a breach of contract.  202 Cal. App. 4th 280 (2011).  In *Little*, the plaintiff was an

attorney who had a retainer agreement with his client that included a deferred fee provision and

that gave the attorney rights to court awarded fees.  In a prior action between the plaintiff's client

and the defendant, the court awarded attorneys' fees, and the plaintiff had an attorney's lien

based on his retainer agreement.  The defendant, however, entered a settlement with the

plaintiff's client that resulted in the client abandoning the fee award and not disclosing the

settlement funds to the plaintiff.  The jury found that the defendant induced the client to breach

its retainer agreement with the plaintiff.

On appeal, the defendant claimed a lack of evidence that he knew of the attorney's lien

and the deferred fee provision in the retainer agreement.   The court held:

> To recover damages for inducing a breach of contract, the plaintiff need not establish that
> the defendant had full knowledge of the contract's terms.  Comment i to Restatement of
> Second of Torts, section 766, pages 11–12, states: "To be subject to liability [for inducing
> a breach of contract], the actor must have knowledge of the contract with which he is
> interfering and of the fact that he is interfering with the performance of the contract.
> Although the actor's conduct is in fact the cause of another's failure to perform a contract,
> the actor does not induce or otherwise intentionally cause that failure if he has no
> knowledge of the contract. *But it is not necessary that the actor appreciate the legal*
> *significance of the facts giving rise to the contractual duty, at least in the case of an*
> *express contract. If he knows those facts, he is subject to liability even though he is*
> *mistaken as to their legal significance and believes that the agreement is not legally*

26

*binding or has a different legal effect from what it is judicially held to have."*

*Id.* at 302 (emphasis added). This rule in *Little* is consistent with *PG&E's* assertion that an

offender "should not be heard" to claim that the contract "meddled with could not have been

enforced." *Little* found that the plaintiff told the defendant that he had a contractual attorney's

lien that entitled him to retain any attorney fee award and that his clients showed the defendant a

letter from the plaintiff stating that he had an agreement entitling him to the award. The court

held that this sufficed to support a finding that the defendant had knowledge of the contract. *Id;*

*see also I-CA Enterprises, Inc. v. Palram Americas, Inc.,* 235 Cal. App. 4th 257, 290 (2015)

(holding that jury's finding that defendant knew of the contractual relationship with which they

interfered is sufficient).

Here, Mr. Jin's and Mr. Chess's claim of mistake of an application of law to facts does

not constitute a defense to the interference torts under *Little* and *PG&E.* They had knowledge of

the facts and the communications that constituted a valid contract between the Petersons and

Ms. Hibner and the DeLimas. They also had knowledge of the contractual relationship.

Messrs. Chess and Jin profess to have held idiosyncratic and incorrect understandings of

California contract law. Whether reasonable or not, their mistake as to the legal significance of

the facts and any belief "that the agreement is not legally binding or has a different legal effect

from what it is judicially held to have" is no defense here.[10] Because they believed that they

could litigate the enforceability of the contract and that the Petersons and Ms. Hibner had

potential defenses does not constitute a defense to the interference torts. As "offenders," they

---

[10] The Chess defendants assert that Mr. Chuck was equivocal as to whether the Petersons and Ms. Hibner had a contract with the DeLimas. But Mr. Chuck's beliefs and assertions on this point are beside the point. Neither Mr. Jin nor Mr. Chess assert an advice of counsel defense. More importantly, Mr. Chuck was not their counsel. Mr. Chuck's responsibility was to protect the interests of the Petersons and Ms. Hibner, not to give Messrs. Jin and Chess legal advice.

"should not be heard to say that the contract" between the DeLimas and the Petersons and Ms. Hibner that they "meddled with could not have been enforced."

A rule otherwise would legitimize a host of abusive and meddling conduct against which the tort was intended to protect. Tortfeasors would attempt to justify tampering with contractual relationships on the grounds that they believed incorrectly that a contract was unenforceable based on their own incorrect and idiosyncratic beliefs.

The result makes sense here. This was a simple factual scenario. Messrs. Jin and Chess required the Petersons and Ms. Hibner to extend to the DeLimas an offer of a ROFR to purchase their interest on the same terms agreed to by Mr. Jin as a condition of the April 1, 2017 contract; the Petersons and Ms. Hibner did so; and the DeLimas accepted unconditionally. Messrs. Jin and Chess knew that the Petersons and Ms. Hibner and the DeLimas formed a "deal." Mr. Chess even told Mr. Chuck that his lawyer said that all Mr. Chuck had to do was cancel the "deal." Given their sophistication and extensive business experience, it is difficult to believe Mr. Jin and Mr. Chess did not reasonably understand that the Petersons and Ms. Hibner formed a contract with the DeLimas when the DeLimas accepted.

*Springer v. Singleton*, upon which Mr. Jin and Mr. Chess rely, does not require a different outcome. 256 Cal. App. 2d 184 (1967). There, the plaintiff and defendant agreed to buy certain property together. The plaintiff then cut the defendant out of a deal by putting the contract solely in his name, but he was unable to generate the funds to close. The defendant in turn then cut the plaintiff out of the deal and acquired the property for himself. The plaintiff then sued the defendant for inducing breach of his contract with the seller. The trial court ruled that the defendant did not induce sellers to break their agreement with the plaintiff. In its ruling, the "trial court did not make a specific finding as to the existence of a valid contract" at the time of

28

**Ex. A - 98**

the interference. *Id.* at 188.  But the trial court "assumed" a breach although "not completely satisfied."  The trial court denied the claim on grounds of knowledge and causation.   In addressing "knowledge," the Court of Appeal explained: "[W]hile [defendant] knew of the contract between [plaintiff] and the [seller], he also knew that the contract had an expiration date and that [plaintiff] had not performed within the time fixed." *Id*. at 89.  Further, after the time for plaintiff's performance had passed, the seller told the defendant's agent that the plaintiff "was 'out of it'."  The Court of Appeal further held, "The evidence fully supports an implied finding that [defendant] did not have knowledge of the existence of the contract between [plaintiff] and [seller] at the time [defendant] is alleged to have cause its breach." *Id.*

The Court of Appeal simply affirmed an implied finding by the trial court that the defendant lacked knowledge of a contract because there was evidence that the contract between the plaintiff and the seller had expired when the alleged interference occurred.  The Court of Appeal did not find that the defendant's understanding was mistaken. *Springer* does not stand for the broad proposition that a mistaken belief as to the enforceability of a contract means that the defendant lacks knowledge of a contract for purposes of inducing its breach. *Springer* has not been cited for that proposition in the developing case law.  To the extent a conflict exists, *Little* is more in line with the Supreme Court and legal developments after *Springer*.

**b)  Intentional Acts Designed to Induce Breach and Interfere**

The intent element "requires the plaintiff to plead and prove the "'defendant's intentional acts [were] designed to induce a breach or disruption of the contractual relationship' . . . Specific intent is not required.   Instead, the plaintiff need only show 'interference is certain or substantially certain to occur as a result of [the defendant's] action.'" *Jenni Rivera Enterprises,*

29

**Ex. A - 99**

*LLC v. Latin World Ent. Holdings, Inc.*, 36 Cal. App. 5th 766, 788 (2019) (quoting and summarizing *Quelimane* and *Korea Supply*).

Here, Mr. Jin and his agent Mr. Chess extended multiple offers with escalating consideration to the Petersons and Ms. Hibner and prodded them not to sell to the DeLimas and Guinnane. The very purpose of these increased offers and prodding was to interfere with the contract between the Petersons and Ms. Hibner and the DeLimas. Interference was certain or substantially certain to occur.

### 3.    Breach and Interference with Contractual Relation

The Petersons and Ms. Hibner breached their contract with the DeLimas and, as the assignee of that contract, with Guinnane, by refusing to sell to them. The relationship between the DeLimas and Guinnane, on the one hand, and the Petersons and Ms. Hibner on the other, was ruptured.

### 4.    Causation

The substantial factor test applies to whether the interference caused the breach and disruption of the contractual relationship—*i.e.*, whether the defendants conduct was a substantial factor in causing the breach or disruption in the contractual relations. *Jenni Rivera Enterprises*, 36 Cal. App. 5th at 792–93. *Jenni Rivera Enterprises* explained, "In the context of a cause of action for inducing interference with contractual relations, some courts have stated that causation exists where the plaintiff can show the contract would have been performed in the absence of the defendant's alleged inducements. *Id.* (citations.)

Here, Messrs. Jin and Chess first increased the purchase price to $1.5 million. Mr. Chuck then immediately confirmed that the DeLimas accepted the ROFR and that the Petersons and Ms. Hibner elected to sell to the DeLimas and asked Mr. Jin to cancel escrow. Messrs. Jin and

Chess, however, refused to cancel escrow and upped the purchase price. They then offered to indemnify the Petersons and Ms. Hibner against any harm arising from not selling to the DeLimas. They then waived contingencies and suggested that additional cash was available. At that point, the Petersons and Ms. Hibner waivered and counter-offered at $1.7 million and later $1.6 million. Messrs. Jin and Chess then offered $1.6 million, with a $200,000 non-refundable deposit, and full indemnity. They then dangled additional veterinarian business for Mr. Peterson to care for all the horses that would be on the property if Mr. Jin were the owner. Despite all that, on May 24, 2017, Mr. Chuck again told them that the Petersons and Ms. Hibner elected to sell to the DeLimas and Guinnane. The next day, Messrs. Jin and Chess offered to absorb Mr. Chess's commissions in a manner that would net the Petersons and Ms. Hibner at least an additional $150,000. Mr. Chess summarized the net effect of their increased consideration in attempting to convince the Petersons and Ms. Hibner to sell to Mr. Jin: "You have nothing to lose we indemnify you and you make extra money please respond."

Messrs. Jin and Chess's interference was, at least, a substantial factor in inducing the Petersons and Ms. Hibner to breach their contract with the DeLimas. Mr. Chuck told Mr. Chess twice in the middle of Messrs. Jin and Chess's prodding and escalating offers that the Petersons and Ms. Hibner intended to sell their interest to the DeLimas. The evidence shows that they changed their minds after much prodding by Mr. Chess and his clarifying that their offer to indemnify coupled with increased consideration gave the Peterson's and Ms. Hibner no economic downside in breaching their contract with the DeLimas and only economic upside. The Court finds that the Petersons and Ms. Hibner would have honored their contract with the DeLimas by selling their interest to Guinnane if the defendants had not interfered by their prodding and their escalating offers.

**Ex. A - 101**

5.      Damages

Guinnane seeks his fees and costs in prosecuting the *Peterson Action* as damages under the "tort of another" doctrine.  Under that doctrine, "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred."  *Prentice v. N. Am. Title Guar. Corp., Alameda Div.*, 59 Cal. 2d 618, 620 (1963) (land seller obtained fees against escrow holder for negligence requiring quite title action against buyer).  Some decisions, including *Prentice*, describe "tort of another" as an exception to the American Rule, while other decisions more accurately describe the doctrine, not an "exception," but an application of the usual measure of damages.  *See Sooy v. Peter*, 220 Cal. App. 3d 1305, 1310, (1990); *Mai v. HKT Cal, Inc.*, 66 Cal. App. 5th 504, 512 (2021) ("It is better to conceptualize these cases as claims for compensatory damages where the facts happen to permit the plaintiff to seek attorney's fees as a type of compensatory award").

The "tort of another" doctrine applies here.  Messrs. Jin and Chess induced the Petersons and Ms. Hibner to breach their contract with the DeLimas and their assignee Guinnane.  With that relationship ruptured, Guinnane was required to file and prosecute the *Peterson Action* to protect his contract rights to purchase the Petersons and Ms. Hibner's interest.  As damages, Guinnane is entitled to "compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred" under *Prentice* and related cases.

Mr. Jin's argument that the "tort of another" doctrine requires that the tort involve a fiduciary relationship or breach of fiduciary duty is unsupported.  No cited decision imposes this requirement.  While multiple decisions affirming "tort of another" damages involve fiduciary relationships, the doctrine has been applied in other contexts.  *See, e.g.*, *Vanguard Recording*

32

*Soc'y, Inc. v. Fantasy Recs., Inc.*, 24 Cal. App. 3d 410, 419 (1972) (plaintiffs permitted to

recover attorney's fees incurred in bringing injunctive actions against third parties in order to

prevent the distribution and sale of defendants' record caused by defendant's interference);

*Slaughter v. Legal Process & Courier Servic*e (1984) 162 Cal.App.3d 1236, 1243 (1984) (tenant

may seek fees in defending unlawful detainer action that went to default based on false affidavit

of service against defendant process server).

 "Exceptional circumstances" need not be demonstrated in addition to the torts' elements.

The California Supreme Court specifically rejected the contention that the "tort of another"

doctrine requires "exceptional circumstances."  *Gray v. Don Miller & Assocs., Inc.*, 35 Cal.3d

498, 509 (1984).  *Gray* explained away and limited statements to the contrary in *Davis v. Air*

*Technical Industries, Inc.* 22 Cal.3d 1 (1972).  *UMET Tr. v. Santa Monica Med. Inv. Co.*, 140

Cal. App. 3d 864 (1983), cited by Mr. Jin for the proposition that "exceptional circumstances"

are required relies on *Davis* and predates *Gray*.  In contrast, *Sooy* explained that the "tort of

another" doctrine requires only a violation of a traditional torty duty.  *Sooy*, 220 Cal. App. 3d

1310.

 The result in *Sooy*, cited by Mr. Jin, is inapposite.  There the court held that the "tort of

another" did not apply because the defendant owed no duty to the plaintiff, so there was no

liability that caused the claimed attorneys' fees as damages.  *Sooy*, 220 Cal. App. 3d at 1314

("Since [defendant] owed no duty of due care to [plaintiff], there is no basis for awarding

attorney fees as damages under *Prentice*).

 The Chess defendants' reliance on *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th

34 (1992), and *Gorman v. Tassajara Dev. Corp.*, 178 Cal. App. 4th 44 (2009), is misplaced.

*Vacco* and *Gormon* involved actions against multiple tortfeasors where the plaintiffs sought

attorneys' fees under "tort of another" against one tortfeasor for prosecuting the same action against both. Those cases did not involve a separate action in which the plaintiff was required to incur fees because of the tort of any of the defendants; nor did they involve a plaintiff who was required to sue one of the defendants because of the tort of another defendant as opposed to because of each individual defendant's own wrongdoing. So, the "tort of another" doctrine did not apply. In contrast, Guinnane was required to prosecute the *Peterson Action* because of the torts committed by Messrs. Jin and Chess. *Vacco* and *Gormon* do not hold that multiple defendants cannot be jointly and severally liable for damages under a "tort of another" doctrine, just like any other viable damages theory, when that doctrine applies. Put another way, when multiple defendants jointly commit a tort that requires a plaintiff to sue a third party and thus incur attorneys' fees as damages, neither *Vacco*, *Gormon*, nor any other cited decision prevents the plaintiff from pursuing "tort of another" damages against all the defendants jointly and severally.[11]

### C.    Malicious Prosecution Standard as an Additional Element

Mr. Jin argues that *PG&E v. Bear Sterns* requires Guinnane to prove an additional element—that the Petersons and Ms. Hibner's defense of the *Peterson Action* was frivolous and without probable cause—and thereby meet the standard for malicious prosecution as applied to a defense.[12] In that action, PG&E held a long-term power purchase agreement to buy power from the Placer County Water Agency. As energy prices rose, the now defunct Bear Sterns & Company prodded the water agency to terminate its power purchase agreement so that it could

---

[11] The amount of damages is discussed below in Section IV.

[12] Mr. Jin casts the defense to contract formation in the *Peterson Action* as belonging to Mr. Lu. But Mr. Lu was not a party to the contract between the Petersons and Ms. Hibner and the DeLimas.

**Ex. A - 104**

sell power at better rates on the open market and to litigate the matter against PG&E. Bear Sterns agreed to fund the litigation. Moved to do so, the water agency initiated arbitration on whether it could terminate the power purchase agreement. PG&E then filed suit. The water agency then withdrew its arbitration demand and sought declaratory relief that the power purchase agreement could be terminated early. While that action was pending, PG&E sued Bear Sterns for interference with contractual relations and with prospective economic advantage.

On appeal from a demurrer sustained without leave to amend, the Supreme Court addressed the question "whether actual interference is adequately alleged when the interference consists of inducing litigation on the contract." *Id.* at 1126. The court reasoned that the only common law tort claim that treats the filing of a lawsuit as an actionable injury is malicious prosecution. The actionable harm is in forcing the individual to expend financial and emotional resources to defend against a baseless claim. A plaintiff in a malicious prosecution action must prove that the action was brought without probable cause—*i.e.*, not a colorable claim. "Obviously if the bringing of a colorable claim were actionable, tort law would inhibit free access to the courts and impair our society's commitment to the peaceful, judicial resolution of differences." *Id.* at 1131.

The court expressed "concern with assuring free access to the courts" and discussed the underlying policies, including the First Amendment right to petition, the litigation privilege, and the *Noerr-Pennington* doctrine.[13] "Our concern not to chill the right to petition the courts for

---

[13] *Noerr-Pennington* is a federal doctrine based on the First Amendment right to petition, first established in the anti-trust context but later expanded to apply generally, that insulates (with exceptions) statements made in litigation from liability. *See, e.g., Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993). The doctrine's effect is similar to California's litigation privilege.

redress of grievances must inform our view of whether the act of inducing litigation is a tort."

*Id.* at 1136.  The court held:

> We are satisfied that the malicious prosecution cases strike the appropriate
> balance between the right to free access to the court and the interest in being free
> from the cost of defending litigation.  We conclude that a plaintiff seeking to state
> a claim for intentional interference with contract or prospective economic
> advantage because defendant induced another to undertake litigation, must allege
> that the litigation was brought without probable cause and that the litigation
> concluded in plaintiff's favor.

*Id.* at 1137.  Thus, to state a tortious interference claim where the interference is inducing a party

to a contract to undertake litigation, a plaintiff must prove the elements of malicious

prosecution—a tort that balances "the freedom of an individual to seek redress in the courts and

the interest of a potential defendant in being free from unjustified litigation."  *Id.* at 1131 (citing

*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal.3d 1157, 1169

(1986).

Mr. Jin argues that Guinnane's action here similarly attempts to circumvent the malicious

prosecution standard.  He argues that Guinnane's claim, in essence, is that Mr. Jin induced the

Petersons and Ms. Hibner to defend against the *Peterson Action,* and that, because the damages

Guinnane asserts here are attorneys' fees and costs in prosecuting the *Peterson Action*, the

wrongful conduct Guinnane complains about is that the Petersons and Ms. Hibner, with the help

of Mr. Jin, defended that litigation.  Mr. Jin argues, "What aligns this case with *PG&E* is that Jin

allegedly induced, encouraged, participated or was otherwise a substantial factor in Lu's decision

to defend Guinnane's specific performance lawsuit."  (Jin Brief at 9:19-21.)  He argues that there

is no material difference between initiating litigation by filing a declaratory relief claim seeking

permission to terminate a contract (as in *PG&E*) and defending an action on the grounds that an

asserted contract is not enforceable (as the Petersons and Ms. Hibner did here).  Mr. Jin does not

36

cite any authority expanding *PG&E's* holding to the context here and appears to assert a novel argument to expand the law.

The Court declines to apply *PG&E* to require Guinnane to prove that the Petersons and Ms. Hibner lacked probable cause to defend the *Peterson Action*. Although a defendant who asks a court to uphold an affirmative defense (and perhaps also to affirm a general denial) is similar to a plaintiff asking for affirmative relief in that both are petitioning a court for a decision, Mr. Jin's liability is not based on inducing the Petersons and Ms. Hibner to file an answer, assert an affirmative defense, or otherwise defend the *Peterson Action*. Mr. Jin's liability is based on making escalating offers and prodding the Petersons and Ms. Hibner not to sell to DeLimas and Guinnane and to sell to him instead. Although the damages caused by that interference include fees Guinnane incurred to recoup his lost property rights, the defense of the *Peterson Action* is not the basis for Mr. Jin's liability.

Material differences exist between inducing a party to initiate litigation, as in *PG&E*, and inducing a party to breach a contract that triggers litigation by the aggrieved party. The first more directly seeks access to the courts, implicates petition rights, and invokes the litigation privilege and *Noerr-Pennington*. Inducing a breach outside the judicial process and waiting for the injured party to sue does not seek judicial protection. Nor does it involve communications in the context of litigation protected by the litigation privilege, *Noerr-Pennington*, or petition rights. Mr. Jin's conduct here—extending escalating offers to convince the sellers to sell to him— neither sought to access the courts nor to petition the government. It did not constitute petition or speech rights protected under the Anti-SLAPP statute as the Court of Appeal has held as discussed further below. *See Guinnane Constr. Co.*, 2020 WL 7640216 at *6. Nor did it implicate the litigation privilege, *see* Section II.D.3 below. Inducing litigation seeks help from a

court, while inducing breach directly disrupts a contractual relationship outside of the judicial process. Inducing breach and then bracing for a lawsuit is more akin to "self-help."

Mr. Jin's Closing Brief argues that the Petersons, Ms. Hibner, and Mr. Lu had a right to defend the *Peterson Action*. They did. And, Mr. Lu and/or Mr. Jin's funding of that defense, in and of itself, does not appear wrongful. But they did not have the right to induce breach of the contract through prodding and making escalating offers, including the *offer* to indemnify. Mr. Jin's central argument on this issue conflates these matters.[14]

> **D.    Other Defenses**
>
> **1.    Justification and Competition Defenses**

Mr. Jin asserts a justification defense under *Richardson v. La Rancherita*, 98 Cal. App. 3d 73 (1979). *Richardson* recognized that "justification is the narrow protection afforded to a party where (1) he has a legally protected interest, (2) in good faith threatens to protect it, and (3) the threat is to protect it by appropriate means." 98 Cal. App. 3d at 81. "Something other than sincerity and an honest conviction by a party in his position is required before justification for his conduct on the grounds of 'good faith' can be established. There must be an objective basis for the belief . . . ." *Id.* at 82.

This defense is unconvincing. First, Mr. Jin's threat or purported interference must have been directed to protect a legally protected interest. This fails here. Although Mr. Jin had an interest in the April 1 contract to purchase the Petersons and Ms. Hibner's interest for $1.2 million, his interference was not targeted to protect that contract right. Mr. Jin's interference—

---

[14] Further, proving that a defendant has no colorable basis for defending an action is not a concept found in any cited cases. No cause of action for "malicious defense" exists; there is no cause of action against a defendant for defending without probable cause. A civil defendant generally has a right to hold a plaintiff to its burden of proof.

38

prodding and offering escalating consideration—sought to secure a new contract after the

Petersons and Ms. Hibner entered a deal with the DeLimas. The interference led to the July 7

contract—a new contract with new rights and obligations—not to protect the April 1 contract.

 The defendants' course of conduct shows that Mr. Jin abandoned the April 1 contract.

Mr. Jin could have stood his ground and attempted to enforce the April 1 contract for $1.2

million. If he believed it was enforceable, there was no reason to offer $1.5 million and

additional consideration and then enter a new contract. He did not sue on the April 1 contract,

however, most likely because he understood that its ROFR condition failed. Mr. Jin admitted in

the indemnity agreement that the April 1 agreement "was conditioned upon DeLima waving its

ROFR to purchase [the Petersons and Ms. Hibner's] 50% interest in the [Greeneville]

Property."[15] On a similar note, Mr. Jin's and the Chess defendants' claim that the ROFR

condition in the April 1 contract was a contingency that Mr. Jin could have waived is beside the

point because he never attempted to waive it and enforce the April 1 contract.

 Second, the Court does not find that Mr. Jin acted in good faith. The Petersons and

Ms. Hibner extended the ROFR to the DeLimas *at Mr. Jin's behest*. Yet, when the DeLimas

accepted, Mr. Jin refused to honor the ROFR. Most likely this was because Mr. Jin expected the

DeLimas to waive the ROFR, and he never intended to honor the ROFR if accepted by the

DeLimas. That state of mind is consistent with Messrs. Jin and Chess's overarching plan to

purchase the Peterson and Ms. Hibner's interest and then file a partition action to force the

DeLimas to sell so that Mr. Jin could control of the entire Greenville Property.[16] Controlling the

---

[15] Chess's claim that the April 1 contract was not conditioned on the Petersons and
Ms. Hibner extending a ROFR to the DeLimas is belied by the indemnity agreement.

[16] The Court finds by a preponderance of the evidence that both Mr. Chess and Mr.
Jinn agreed on this plan.

entire property was necessary, as Mr. Wright stated, to establish a polo facility. The DeLimas'

acceptance of the ROFR did not match Mr. Jin's plans, so he refused to honor it.

The same analysis applies to the Chess defendants, to the extent they make this

argument.[17] The Court does not find that Mr. Chess acted in good faith. In addition to the

foregoing, Mr. Chess knows not to interfere with a buyer and seller who are in contract by

submitting offers with higher consideration. He testified that, when a buyer and seller are in

contract, and his client wants to purchase the property, his client needs to "buy the contract out"

from the buyer or submit a "backup" offer, which would be effective if the "deal" between the

buyer and seller "dies." (See 469:25-470:25.) Under California law as set forth above, no

meaningful distinction exists between two parties who have signed a standard form contract and

two parties who have reached a meeting of the minds to sell property by exchanging written

letters as is the case here. Both situations create enforceable contracts. Mr. Chess knew or

should have known that any new offer by Mr. Jin should have been a "backup" offer or Mr. Jin

would need to buy the DeLimas out of their acceptance of the ROFR.

In general, while the interference torts have been criticized for inhibiting competition,

they help establish the parameters of legitimate competition. "[A] person is not justified in

inducing a breach of contract simply because he is in competition with one of the parties to the

contract and seeks to further his own economic advantage at the expense of the other." *Imperial

Ice Co. v. Rossier* (1941) 18 Cal.2d 33, 36 (1941). This is because, "[w]hatever interest society

has in encouraging free and open competition by means not in themselves unlawful, contractual

stability is generally accepted as of greater importance than competitive freedom." *Id.* A party

---

[17] The Chess defendants' argument that Mr. Chess engaged in "lawful competition" is
difficult to comprehend. (Chess Br. at 26:4-27:5.) They cite B.E. Witkin regarding contracts
"terminable at will," but no such contracts are at issue here.

may not, "under the guise of competition actively and affirmatively induce the breach of a competitor's contract." *Id.* at 37; *see also I-CA Enterprises, Inc. v. Palram Americas, Inc.*, 235 Cal. App. 4th 257, 290 (2015).

### 2.    Manager's Privilege

The Chess defendants have no protection under the "manager's privilege." That doctrine provides that a manger or agent, with disinterested motives, may protect the interests of "his principal by counseling the breach of a contract with a third party which he reasonably believes to be harmful to his employer's best interest." *Huynh v. Vu*, 111 Cal. App. 4th 1183, 1194 (2003) (holding that husband who acted as agent of wife may assert the privilege against a broker alleging interference with broker's contract with wife). Mr. Chess's liability does not turn on counseling his principal, Mr. Jin, to breach a contract, but on his prodding of the Petersons and Ms. Hibner, who were not Mr. Chess's principal or employer, to breach their contract with the DeLimas. *See Klein v. Oakland Raiders, Ltd.*, 211 Cal. App. 3d 67, 81 (1989) ("Where neither the employer nor his employee is a party to the contract with which the employee is interfering, there is no privilege.")

True that Mr. Chess acted as Mr. Jin's agent. He acted principally for Mr. Jin's benefit in interfering with the Petersons and Ms. Hibner's contract with the DeLimas but also his own benefit as he would earn commissions from the transaction—whether paid by Mr. Jin or the sellers. In any event, agents, such as Mr. Chess, are liable for torts committed within the scope of their agency. *See, e.g.*, *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone*, 107 Cal. App. 4th 54, 68–69 (2003).

Ex. A - 111

### 3.    Litigation Privilege

The Chess defendants argue that Guinnane's claims are barred by the litigation privilege.

The litigation privilege protects statements made in any legislative, judicial, or other official

proceeding authorized by law.  Civ. Cod § 47(b).  The privilege,

> "applies to any publication required or permitted by law in the course of a judicial
> proceeding to achieve the objects of the litigation, even though the publication is made
> outside the courtroom and no function of the court or its officers is involved." [citation]
> "The usual formulation is that the privilege applies to any communication (1) made in
> judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by
> law; (3) to achieve the objects of the litigation; and (4) that have some connection or
> logical relation to the action." [citation]

*Jacob B. v. Cnty. of Shasta*, 40 Cal. 4th 948, 955–56 (2007); *see also Silberg v. Anderson*, 50

Cal. 3d 205, 213 (1990).  Statements made before litigation or official proceedings commence

that logically relate to the anticipated matter fall within the privilege.  *See, e.g., Lerette v. Dean

Witter Org., Inc.*, 60 Cal. App. 3d 573 (1976) (pre-litigation demand letter protected by litigation

privilege).

In their Closing Brief, the Chess defendants fundamentally and materially misstate the

litigation privilege.  They argue that "communications made in connection with the validity of

the contract between Peterson/Hibner and the DeLimas/Plaintiff *actually considered* by Judge

MacLaren are litigation privileged and cannot be used as a basis for liability. . . .  Since the

Indemnity agreement was actually considered by Judge MacLaren, it cannot be the basis for

liability for Chess."  (Chess Br. at 54:21-55:5 (emphasis in original).)  This is not the rule.

Communications do not become protected from serving as the basis of tort liability under the

litigation privilege merely upon being submitted as evidence.  Put another way, the litigation

privilege does not attach to statements made outside of official proceedings merely because those

statements were considered by a court as evidence in litigation.

The Chess defendants, however, also argue that Mr. Chess' "communication relating to offering indemnity to Peterson/Hibner would have to been seen as relating to an imminent lawsuit." (Id. at 55:22-24.)  This argument, which is buried in their closing brief, at least posits a cognizable theory.

The Court of Appeal touched on this issue on review of the Court's denial of the Chess defendants' Anti-SLAPP motion to strike.  The Court of Appeal held that the claims here do not arise from acts in furtherance of the right to petition or free speech under Code of Civil Procedure § 425.16(e)(1).  *Guinnane Constr. Co. v. Chess*, No. A157781, 2020 WL 7640216 (Cal. Ct. App. Dec. 22, 2020).  The issue there was whether the escalating offers, including the offer and later agreement to indemnify, constituted protected activity under the first prong of the Anti-SLAPP test.  The Chess defendants contended that they fell within 425.16(e)(1) as statements made during judicial proceedings, meaning "statements made before a legislative, executive, or judicial proceeding or any other official proceeding authorized by law" and "was designed to further[ ] the effective exercise of the petition right[ ]."  *Id.* at *5.  They claimed that "the offers were protected petitioning activity because they were made to the Peterson/Hibners shortly before or after Guinnane filed suit against the Peterson/Hibners for specific performance.  *Id*.  In ruling that the "series of offers to" the Petersons and Ms. Hibner fell outside of § 425.16(e)(1), the Court of Appeal held:

> Contrary to Chess's arguments, the fact that Chess and Jin anticipated their acts might precipitate litigation *does not demonstrate their offers to the Peterson/Hibners were communications preparatory to or in anticipation of litigation* within subdivision (e)(1) of the anti-SLAPP statute.  *The offers of increased monetary and other consideration to purchase the property were not initial steps pertaining to potential litigation*, such as sending a demand letter, providing legal advice to prospective litigants or undertaking an investigation of circumstances relevant to potential litigation. [citation.]  Nor were the offers made in response to or defense against the specific performance action. [citation.]  Rather, *they were simply an effort on Chess's and Jin's part to effectuate a business transaction, nothing more and nothing less*.  In essence, Chess's argument conflates an

43

underlying tort or wrongdoing that may provoke a lawsuit with petitioning activity related to that lawsuit.

*Guinnane Constr. Co. v. Chess*, No. A157781, 2020 WL 7640216, at *6 (Cal. Ct. App. Dec. 22, 2020) (emphasis added). The Court further explained that the "offer to indemnify the sellers was not an exercise by Chess or Jin of petitioning activity . . . . Rather, Chess and Jin promised to defend and indemnify the Peterson/Hibners as an inducement to encourage them to sell their interest in the Property to Jin. In other words, their offer was part of the negotiation of a real estate transaction and not protected speech." (*Id.* at *7.)

On Guinnane's cross-appeal, the Court of Appeal addressed Guinnane's argument that the litigation privilege did not bar the claims under the second prong of the Anti-SLAPP test but did not decide the issue. After discussing *PG&E v. Bear Sterns*, the Court of Appeal explained:

> Here, the offer of indemnity was also made as part of a course of conduct, one that included offering to pay a higher price and to waive the seller's commission for the Property. The plain purpose of all three was to encourage or induce the Peterson/Hibners to sell the Property to Jin rather than proceeding with the sale to Guinnane. The question is not whether funding litigation is communicative speech or noncommunicative conduct, but rather, into which of those categories Chess and Jin's *offer to indemnify* falls. Further, even if the offer constitutes communicative speech, there remains the question, for purposes of determining whether the litigation privilege applies, whether the offer was "made in the course of a judicial proceeding" and "to achieve the objects of the litigation."

*Id.* at *10 (emphasis in original). The Court stated that "Guinnane has made a strong argument that the litigation privilege does not bar its claims . . . While we might find that argument persuasive if we reached it," the trial court did not abuse its discretion in concluding that Chess's contrary argument was not frivolous. *Id.* Thus, the Court of Appeal, at least, left open the issue whether the *offer* to indemnify is protected by the litigation privilege.

The Chess defendants in their Closing Brief, however, provide no meaningful analysis on the two questions the Court of Appeal identified. Nor do they cite any authority applying the

litigation privilege to an offer to indemnify in any context.  Given that their argument is buried in their brief and that they led with their mistaken recitation of the litigation privilege, it is understandable that Guinnane did not address this in its Reply Brief.

The principal issue is whether the escalating offers, including the offer to indemnify, constitute a noncommunicative tortious course of conduct not protected by the litigation privilege.  *See Kimmel v. Goland*, 51, Cal. 3d 202 (1990).  The distinction between communicative acts and noncommunicative conduct ultimately hinges on the gravamen of the action.  *Navellier v. Sletten*, 106 Cal. App. 4th 763, 771 (2003).  *PG&E* is instructive.  As noted, that case involved claims against Bear Sterns for taking steps to persuade the water agency to sue to terminate a contract, including agreeing to fund the litigation.  As discussed in the Court of Appeal's decision in this case, the Supreme Court stated that the litigation privilege did not protect Bear Sterns: "The privilege does not apply to bar liability here . . . because the gravamen of the complaint was not a communication but a course of conduct.  [citations.]  Thus, while it could be argued that an exhortation to sue might be privileged, financing and otherwise promoting the litigation would not be."  50 Cal. 3d at 1132 n.12.

Along these same lines, courts have held that statements analogous to those here made in the course of tortious conduct or contract negotiations/performance are not protected by the litigation privilege even though litigation looms overhead.  *See Haneline Pac. Properties, LLC v. May*, 167 Cal. App. 4th 311 (2008) (holding that property owner's communications with co-owner not to sell to plaintiff/lessee but rather to terminate lease and obtain higher market rent with specter of litigation looming was not within § 47 litigation privilege); *LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997) (holding that litigation privilege did not bar claim "because it is based upon an alleged tortious course of conduct, including the defendant preparing and having

45

third party execute documents creating a security interest settlement proceeds and filing a notice of lien; "While the isolated act of filing Security's notice of lien was communicative, it was only one act in the overall course of conduct"); *Stacy & Witbeck, Inc. v. City & Cnty. of San Francisco*, 47 Cal. App. 4th 1, 54 (1996) (cause of action under False Claims Act based on claim submitted to a city identifying damages and stating that its purpose is to avoid litigation not protected by litigation privilege because it constituted tortious conduct).

As the Court of Appeal here noted, *Haneline* held, "Negotiations and persuasion are part of any business deal. To suggest that nearly any attempt at negotiation is covered by the privilege, especially when attorneys are involved, is unduly overbroad. We do not find the purposes of the privilege stretch that far, and thus, neither should the privilege." *Haneline*, 167 Cal. App. 4th at 320. Similarly, *Stacy & Whitbeck* held, "The paper trail of contractual performance and course of dealing between parties under a contract cannot be immunized from use in later judicial proceedings just because that paper trail is also a publication that serves a litigation purpose. If that same paper trail amounts to wrongful performance or conduct under the contract, it escapes section 47(b). The litigation privilege encompasses only the communicative act; it does not privilege tortious courses of conduct." 47 Cal. App. 4th at 7–8 (citing *Kimmel v. Goland*, 51, Cal. 3d 202 (1990).)

Here, after Messrs. Jin and Chess learned that the DeLimas' accepted the Petersons and Ms. Hibner's offer of a ROFR, they first offered an increased purchase price ($1.5 million); then they offered to indemnify; then they offered to waive all contingencies; then they agreed to $1.6 million; and then they agreed to absorb the broker's commission. The offer to indemnify was one of a series of escalating consideration made as part of contract negotiations between Mr. Jin and the Petersons and Ms. Hibner. Offering to pay to defend an anticipated lawsuits from the

46

DeLimas was materially the same as increasing the purchase price for the Greenville Property or eliminating broker commissions—it constituted additional financial consideration to the Petersons and Ms. Hibner to persuade them to sell to Mr. Jin and not to the DeLimas. Those escalating offers, including the offer to indemnify, constituted a course of tortious conduct. They are not protected by the litigation privilege.

This conclusion is consistent with the Court of Appeal's ruling that the escalating offers, including the offer to indemnify, were not "communications preparatory to or in anticipation of litigation within" § 425.16(e)(1) as quoted above. While section 425.16(e)(1) and section 47(b) have different purposes and the analyses under each statute differ, there is a relationship between the two statutes, and courts have looked to the litigation privilege to aid in construing § 425.16(e)(1). *See Flatley v. Mauro*, 39 Cal. 4th 299, 322-325 (2006). For purposes of this action and on the facts of this case, the Court does not see good reason why the results under the two statutes should differ. If the escalating offers, including the offer to indemnify, do not constitute communications made preparatory to or in anticipation of litigation under § 425.16(e)(1), as the Court of Appeal has found, the Court sees no reason why they would be preparatory to or in anticipation of litigation for purposes of § 47(b). The defendants do not provide any good explanation for why different results are warranted here.[18]

> **E.      Intentional and Negligent Interference with Prospective Economic Advantage**

The elements of the tort of intentional interference with prospective economic advantage are: "(1) an economic relationship between the plaintiff and some third party, with the

---

[18] The Court does not reach the question of whether the offer and agreement to indemnify were "made in the course of a judicial proceeding" and "to achieve the objects of the litigation." Neither party addressed this issue.

probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co*., 29 Cal. 4th at 1153. The elements of negligent interference with prospective economic advantage are similar, except that elements 3 and 4 are: "(3) the defendant's knowledge (actual or construed) that the relationship would be disrupted if the defendant failed to act with reasonable care"; and "(4) the defendant's failure to act with reasonable care." *Redfearn v. Trader Joe's Co.*, 20 Cal. App. 5th 989, 1005 (2018).

In addition, a plaintiff must prove that the defendant also "engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc*., 11 Cal. 4th 376, 393 (1995); *see Redfearn*, 20 Cal. App. 5th at 1006 (same rule for negligent interference). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co.*, 29 Cal. 4th at 1159. "[A] defendant's wrongful actions [need not be] be directed towards the plaintiff seeking to recover." *Id*. at 1163. This element must also be established to prove negligent interference with prospective economic advantage. *Redfearn v. Trader Joe's Co.*, 20 Cal. App. 5th 989, 1006 (2018).[19]

---

[19] Here, Guinnane had an economic relationship with the Petersons and Ms. Hibner as the assignee of their contract with the DeLimas, Messrs. Jin and Chess were aware of that relationship, they offered increased consideration and agreed to indemnify to disrupt that relationship, which was disrupted, and Guinnane had to sue to obtain its expectancy. Guinnane had a probability of future economic benefit. He would own 50% of the Greenville Property. Property ownership constitutes an economic benefit. Although a principal concern for Mr. Guinnane was to protect the DeLimas from eviction, he also maintains horses on the Greenville Property under the DeLimas' case, so owning land on which to maintain his horses constitutes an economic benefit.

The Court does not find that Mr. Jin or Mr. Chess engaged in any independently wrongful conduct.  Guinnane's principal argument is that Messrs. Jin and Chess' engaged in financial abuse under the Elder Abuse Act, Welf. & Inst. Code § 15600-75, by wrongfully obtaining Mr. DeLima's property rights.  Financial abuse of an elder includes taking, appropriating, or obtaining "property" of an elder for "a wrongful use or with intent to defraud" as well as assisting in that conduct.  Welf. & Inst. Code § 15610.30(a).  "[W]rongful use" means "among other things, the person takes [appropriates, or obtains] the property and the person or entity knew or should have known that th[e] conduct is likely to be harmful to the elder or dependent adult." *Id.*, § 15610.30(b).  A person takes, appropriates, or obtains "property when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult." *Id.*, § 15610.30(c).[20]

Guinnane argues that Messrs. Jin and Chess took Mr. DeLima's property rights in his contract with the Petersons' and Ms. Hibner by interfering with that contract and convincing the

---

[20] "Property" under the Elder Act is broadly construed. *Cameron v. Las Orchidias Properties, LLC*, 82 Cal. App. 5th 481, 507 (2022) (holding that "property" includes "intangible" right to re-rent an apartment under the Ellis Act).  "Knew or should have known" under § 15610.30(a) means actual or constructive knowledge. *Paslay v. State Farm Gen. Ins. Co.*, 248 Cal. App. 4th 639, 657–58 (2016).  Constructive knowledge "means knowledge 'that one using reasonable care or diligence should have, and therefore is attributed by law . . . [and] encompasses a variety of mental states, ranging from one who is deliberately indifferent in the face of an unjustifiably high risk of harm [citation] to one who merely should know of a dangerous condition [citation]." *Id.*  "The existence of constructive knowledge is assessed by reference to an objective "reasonable person." *Id. Paslay* held that, when the taking constitutes a "deprivation of property due an elder under a contract," "wrongful conduct occurs only when the party who violates the contract actually knows that it is engaging in a harmful breach, or reasonably should be aware of the harmful breach." *Paslay*, 248 Cal. App. 4th at 658 (holding that carrier denial of insurance policy benefits was not "wrongful use" under the Elder Abuse Act).

Petersons and Ms. Hibner to sell to Mr. Jin instead of the DeLimas.[21]  Mr. DeLima was 86-years-old at the time and an elder under the statute.[22]

The flaw here, as correctly pointed out by Mr. Jin, is that the DeLimas assigned all their rights under the TIC and the April 4 letter, which includes the ROFR, to Guinnane on April 21, 2017.  (Ex. 30.)  The DeLimas reserved no property rights under that assignment.  (Id.)  And, the Petersons and Ms. Hibner had neither breached their contract with the DeLimas nor decided not to sell to the DeLimas before the assignment.  Closing, *i.e.*, performance, was not to occur until May 1, 2017.  And, as of May 30, 2017, Mr. Chess was still trying to convince the Petersons and Ms. Hibner to sell to Mr. Jin.  (Ex. 32 ("What is up with you?  We need a response by 12 noon Tuesday.")  The Petersons and Ms. Hibner elected not to sell to the DeLimas at some point between May 30 and July 7, 2017.  (Ex. 58.)  By that point, the DeLimas had transferred their property rights at issue to Guinnane.  So, the defendants did not take Mr. DeLima's property.

Guinnane claims that it held the DeLimas' contract rights as a "representative of the estate of the elder or dependent adult" under § 15610.30(d)(1).  While Mr. Guinane acted as Mr. DeLima's advocate in dealing with the Petersons, Ms. Hibner, and Mr. Jin at various times, the evidence does not show that Guinnane Construction—the assignee—held the DeLimas' interest in the contract as Mr. DeLima's representative.  Guinnane does not cite any evidence in its Reply Brief on this point to support its assertion.  (See Guinnane Reply at 9:8-21.)

While Guinnane and the DeLimas' interests were aligned, the distinction regarding whose property rights were taken is material.  The April 21 assignment had teeth.  It gave

---

[21] At no point did the defendants take or obtain the DeLimas' own 50% interest in the Greenville Property.

[22] For purposes of the act, an elder is a person 65-years-old or older.  Welf. & Inst. Code § 15610.27.  The evidence did not establish Barbara DeLima's age.

**Ex. A - 120**

Guinnane standing to sue in the *Peterson Action* and here.  Guinnane needed to own the property rights in the contract to force the conveyance of the Petersons and Ms. Hibner's interest to Guinnane.  And, Judge MacLaren relied on the terms and the timing of the assignment.  A ruling now that Guinnane was actually holding the contract rights for Mr. DeLima despite the assignment would be anomalous and contradict the evidence.

Guinnane proposes a second theory of wrongful conduct, arguing that Mr. Chess, on or about May 16, 2017, drafted and sent to Mr. Chuck a letter prepared for Mr. Peterson's signature falsely stating that the Petersons and Ms. Hibner had decided not to sell to the DeLimas.  (See Ex. 40.)  The Court is not persuaded that the assertion in the letter that the Petersons and Ms. Hibner decided not to sell to the DeLimas was a false statement of fact given the context in which it was written.  Mr. Chess drafted the letter for Mr. Peterson to adopt and send to the DeLimas, but Mr. Chuck declined on his client's behalf.  A reasonable inference from the context is that Mr. Chess was hoping that Mr. Chuck would persuade the Petersons to adopt the letter and send it to the DeLimas.  The statements in the letter were proposed for adoption, not representations of fact.  Further, the asserted misrepresentation was never made directly or indirectly to the DeLimas or to Guinnane.  Ghost-writing a letter containing a proposed statement for another to adopt in this context, without more, does not constitute fraud or deceit or a wrongful act under any legal measure.[23]

## IV.    DAMAGES AMOUNT

The parties agree that Guinnane incurred attorneys' fees and costs to prosecute the *Peterson Action* but dispute their reasonableness.  Mr. Guinnane engaged Arnold & Porter Kaye Scholer LLP to prosecute the *Peterson Action*, having had an existing relationship with the firm

---

[23]The Chess defendants' comparative fault argument is moot.

through one of its attorneys, Kenneth Hausman.  The firm litigated the *Peterson Action* from the outset through trial and final judgment and prevailed.  The firm's timekeepers—assigned attorneys and legal assistants—maintained contemporaneous time notes, and the firm regularly billed Guinnane.  (Ex. 89 (redacted billing statements); Ex. 93 (spreadsheet of redacted time entries).)  The firm billed a total of $1,333,379 in attorneys' fees and $125,165 in costs and disbursements.  The firm wrote off $45,915 of fees.  Guinnane paid all the billed amounts out of pocket.  After the *Peterson Action*, the defendants paid Guinnane $101,953 for statutorily reimbursable costs.  Guinnane now seeks the fees and costs he paid, less the reimbursed, costs as well as prejudgment interest.

The Court gives great weight to the fact that Guinnane paid all the fees that Arnold & Porter billed for work in the *Peterson Action*.  This is credible evidence that fees and costs were incurred and are reasonable.  *Mai v. HKT Cal, Inc.*, 66 Cal. App. 5th 504, 519–20 (2021) ("A prima facie case as to the costs incurred and their reasonableness can be established by the plaintiff's testimony that bills for the services were paid.")  "[A] person who receives a bill has 'every interest to dispute its accuracy or reasonableness if there is reason to do so.  Thus, if a bill or invoice is paid, the court is assured of the accuracy and reasonableness of the charges.'"  *Jones v. Dumrichob*, 63 Cal. App. 4th 1258, 1268 (1998).

The Court heard opinions from three experts, Richard Pearl, Willam Hensley, and John O'Connor, regarding reasonableness of the fees.  All the experts relied on Arnold & Porter's invoices in forming their opinions—Ex. 89.[24]  The Court has independently reviewed those invoices.

---

[24] The Chess defendants' evidentiary objection in the Closing Brief that the invoices were not authenticated is not well taken.  (Chess Brief at 3.)  Not only is this wrong, but evidentiary issues were addressed during trial.  Mr. Guinnane testified that he received, reviewed, and paid Arnold & Porter's invoices.  (133:1-135:15) "[O]nce the plaintiff testifies

Each expert made some valid points, but the Court does not adopt any of the experts' opinions wholesale.  The Court accepts Mr. Pearl's general opinion that the fees were reasonable, particularly given that Guinnane paid them, but finds that deductions for certain matters are appropriate.

Arnold & Porter gave Guinnane a 10% discount at the outset and then a 20% discount beginning with the February 2018 bills.  Arnold & Porter's blended hourly rate was $575 as Mr. O'Connor acknowledged.  This was a reasonable rate for the *Peterson Action*.  Although Mr. O'Connor opined that less expensive counsel would have been more appropriate, hiring Arnold & Porter was reasonable, particularly given Mr. Guinnane's relationship and trust in the firm and given that Shartsis Friese LLP, Mr. Jin's counsel here, represented the defendants. Arnold & Porter discharged its duties in the *Peterson Action* ably and obtained the desired result.

In terms of difficulty, the *Peterson Action*[25] was neither overly difficult nor complex, but neither was it simple.  There were issues.  But it was vigorously defended from the outset, as Mr. Jin and Yu had a right to do, and the defense was well funded by Mr. Jin and/or Mr. Yu with substantial resources behind.  Guinnane needed a firm with resources and experience to adequately meet a vigorous defense.  An opinion that another firm with lower billing rates would have reached the same result is speculative.  Mr. Guinnane's choice of counsel should be respected under the facts here.

Both sides appeared to have conducted exhaustive discovery, including extensive written discovery and about 12 fact depositions and additional expert depositions.  Both sides engaged in

---

(based on personal knowledge) that a bill in a particular amount was received and paid, the invoice itself can be introduced to explain and support the plaintiff's testimony as well as show the amount was reasonable." *Mai*, 66 Cal. App. 5th 521.

[25] The Court takes judicial notice of the documents in the register of action in the *Peterson Action*. Cal. Evid. Code § 452.

**Ex. A - 123**

substantial law and motion practice. Multiple discovery motions were necessary. Guinnane was required to press for a privilege log and then file a motion to compel to obtain the indemnity agreement, which the defense initially withheld on a claim of privilege. The indemnity agreement was critical evidence upon which Judge MacLaren relied. Another firm might not have obtained the indemnity agreement. Both sides filed summary judgment motions and extensive pre-trial motions.

The matter was not over-staffed. Mr. Hausman served as the senior partner on the pleadings, at least for pre-trial litigation. He provided advice and strategy as reflected in the bills, but he did not bill for his time, other than for one de minimus entry. That reduced the fees meaningfully. A senior associate was assigned to manage the matter on a day-to-day basis and took the laboring oar for pre-trial matters, which was appropriate. Other associates and legal assistants billed for assigned tasks and provided support. Mr. Hughes entered the action close to trial and led the trial team.

The Court, however, agrees with Mr. Hensley that some of the principal senior associate's time was excessive and adopts his reduction of that time by 5% totaling $43,483.

The Court does not find appropriate Mr. Hensley's suggestion to deduct $474,000 for vague, excessive time entries, bad delegation, clerical and duplicative work.

Guinnane or its counsel, however, elected to redact many entries, particularly the description of the legal research, even though no appeal is pending. This made determining that those billings were necessary and reasonable difficult, although some of it certainly was. The Court deducts 22 hours at the blended rate of $575 totaling $12,650 on this issue.

The Court also agrees that 103.6 hours for opposing the 3-5 page single fact summary judgment motion is a bit excessive and will deduct 23.6 hours here totaling $13,570.

**Ex. A - 124**

Mr. Hensley suggested a substantial deduction—over $160,000—because Arnold &
Porter employed block billing.  Block billing is permitted by law and not unusual, and whether a
firm use that method is a matter between the firm and its clients.  The Court finds nothing
improper about block billing and declines to reduce the fees on that account.

The parties raise proportionality in the testimony and the briefs.  While proportionality
has a place in attorney fee analysis, the fees here were not clearly disproportionate to the stakes.
The stakes were not just the value of the Petersons and Ms. Hibner's 50% interest, which even
Mr. Jin agrees is worth at least $1.5 million.  The stakes included the possibility that the
DeLimas, their daughter, and grandchildren would be forced out of their long time home with
nowhere to go.  Mr. Guinnane's testimony that the DeLimas had nowhere to go was
uncontradicted.  Further, real estate is unique, and Mr. Guinnane stabled his own horses on the
property.  Guinnane's decision to pay over $1.3 million in fees and costs to enforce Guinnane's
contract rights to obtain unique property to which Guinnane was entitled under these
circumstances was not unreasonable.[26]

In sum, the Court deducts $69,703 from Arnold & Porter's bills but otherwise finds the
firms' fees and costs reasonable.  Other than the hours deducted above, the Court finds that the
hours reflected in the invoices were reasonable.  The damages the Court finds total: **$1,286,888.**
($1,333,379 + $125,156 - $101,953 -$69,703.)

---

[26] The Chess defendants' argument that the special benefit doctrine mitigates
Guinnane's damages is unpersuasive.  (Chess Brief at 43:8-16.)  The defendants' inducing the
Petersons and Ms. Hibner to breach and their tortious interference provided no benefit to
Guinnane.

**Ex. A - 125**

### A. Prejudgment Interest

Prejudgment interest under Civil Code § 3288 is appropriate to make Guinnane whole. Arnold & Porter's invoices identified the amounts due, so the damages are certain or capable of being made certain. The Court sees no reason Guinnane should be prejudiced because of the time necessary to bring this action to trial and reach final judgment. Upon considering all the evidence and legal issues, the Court exercises its discretion to award prejudgment interest at 7%. *See Michelson v. Hamada*, 29 Cal. App. 4th 1566 (1994).

Mr. Jin's description of Guinnane as a "volunteer," even if accepted, does not change Guinnane's right to enforce the contract with the Petersons and Ms. Hibner. Nor does it change loss of use of the money Guinnane paid to prosecute the *Peterson Action*. None of the Chess defendants' arguments against awarding prejudgment interest are persuasive.

To arrive at appropriate prejudgment interest, the Court orders Guinnane to prorate a deduction of $69,703 from the "Payment" column in the prejudgment interest chart at page 39 of its Closing Brief and to rerun the interest calculations at 7% as of April 1, 2024. Guinnane is to submit a revised chart within 15 days of this Tentative and Proposed Statement of Decision.

### B. Punitive Damages

The Court does not find oppression, fraud, or malice and awards no punitive damages.

### V. CONCLUSION AND ORDERS

Based on the foregoing and having considered all the evidence submitted at trial and argument of counsel, the Court rules as follows:

A.  The Court finds in favor of Plaintiff and against all Defendants on Plaintiff's First Cause of Action for inducing breach of contract and

Second Cause of Action for tortious interference with contractual
relations.

B.    The Court finds in favor of Defendants on Plaintiff's Third Cause of
Action for Interference with Prospective Economic Advantage and Fourth
Cause of Action for Negligent Interference with Prospective Economic
Advantage.

C.    Defendants shall jointly and severally pay Plaintiff the sum of **$1,286,888**
for compensatory damages.

D.    Defendants shall pay Plaintiff prejudgment interest at 7% simple interest
based on formula set forth above in Section IV.

E.    Plaintiff shall submit a proposed judgment in conformity with this
Statement of Decision within 10 days of this Statement of Decision
becoming final and in compliance with the California Rules of Court.

F.    The Court retains jurisdiction over any timely filed motion for fees or
costs.

**IT IS HEREBY ORDERED.**

Dated: July 3, 2024

By: _____
          Somnath Raj Chatterjee
      Judge of the California Superior Court

57

Ex. A - 127

| SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>07/03/2024<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _D. Fisher_ Deputy<br>D. Fisher |
| PLAINTIFF/PETITIONER:<br>Guinnane Construction Co. Inc. | |
| DEFENDANT/RESPONDENT:<br>Stephen Marc Chess et al | |
| CERTIFICATE OF ELECTRONIC SERVICE CODE OF CIVIL PROCEDURE 1010.6 | CASE NUMBER:<br>RG18932289 |

**I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served one copy of the Tentative and Proposed Statement of Decision After Trial entered herein upon each party or counsel of record in the above entitled action, by electronically serving the document(s) from my place of business, in accordance with standard court practices.**

Kenneth Gibbs Hausman
Arnold & Porter Kaye Scholer LLP
kenneth.hausman@arnoldporter.com

Peter C. Catalanotti
Freeman Mathis & Gary LLP
peter.catalanotti@wilsonelser.com

Chad Finke, Executive Officer / Clerk of the Court

Dated: 07/03/2024

By:

D. Fisher, Deputy Clerk

**CERTIFICATE OF ELECTRONIC SERVICE
CODE OF CIVIL PROCEDURE 1010.6**

**Ex. A - 128**

*Young v. Leland Stanford Jr. Univ,* Alameda County Superior Ct.
No. 17877051

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
### Rene C. Davidson Courthouse

| | |
|---|---|
| Qiqiuia Young et al | No.    RG17877051 |
| Plaintiff/Petitioner(s) | |
| vs. | Date:   12/04/2024 |
| The Leland Stanford Junior University et al | Time:   4:32 PM |
| Defendant/Respondent (s) | Dept:   20 |
| | Judge:  Karin Schwartz |
| | ORDER re: Ruling on Submitted Matter |

The Court, having taken the matter under submission on 10/25/2024, now rules as follows:

The hearing on Plaintiff's motion for attorneys' fees took place on October 24 and 25, 2024. Having considered the parties' written submissions and oral arguments, the Court now rules as follows:

Plaintiff Qiqiuia Young's Motion for Attorneys' Fees is GRANTED IN PART and DENIED IN PART.

After a 6-week jury trial and various post-trial motions, Plaintiff Qiqiuia Young ("Plaintiff") was awarded a verdict of $10,000,000 in this employment action against Defendants The Board of Trustees of The Leland Stanford Junior University ("SU"), Stanford Health Care ("SHC"), and Chanrath Flores ("Flores") (collectively, "Defendants"). Plaintiff moves for attorneys' fees pursuant to Government Code § 12965, subdivision (c)(6).

In civil actions brought under the Fair Employment and Housing Act ("FEHA"), the court, in its discretion, may award to the prevailing party reasonable attorneys' fees and costs. (Gov. Code § 12965, subd. (c)(6).) Attorney fees awarded under the FEHA are intended to provide fair compensation to attorneys involved and encourage litigation of claims that, in the public interest, merit litigation. (Chavez v. City of Los Angeles (2010) 47 Cal.4th 970, 984 ("Chavez").)

A prevailing plaintiff should recover attorneys' fees unless special circumstances render such an award unjust. (Vines v. O'Reilly Auto Enterprises, LLC (2022) 74 Cal.App.5th 174, 182.) A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce or deny the award. (Id., citing Chavez at p. 990.)

Plaintiff as the moving party bears the burden to prove that the fees sought are reasonable. (Vines, supra, 74 Cal.App.5th at p. 184.) However, the challenging party bears the burden to point to specific challenged items as excessive, with sufficient argument and citations to evidence. (Id.)

Plaintiff's counsel requests a total fee award of $24,772,741.85, based on a total lodestar of

Ex. A - 130

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
### Rene C. Davidson Courthouse

$16,572,782.90 for 16,745.3 hours, with a 1.5 multiplier ($8,173,709.95.) Defendants argue the fees sought are excessive because (1) the requested hourly rates are excessive; (2) Plaintiff includes work performed on claims that were not brought under FEHA and therefore not subject to the fee award; and (3) the fees incurred are unreasonable because they contain duplicative entries and reflect unnecessary work.

The primary method for establishing the amount of reasonable attorney fees is the lodestar method. (Consumer Privacy Cases (2009) 175 Cal.App.4th 545, 556.) The lodestar is produced by multiplying the number of hours reasonably expended by counsel at a reasonable hourly rate. (Id.) In evaluating the reasonableness of an attorney fee request, the trial court may consider whether the case was overstaffed; how much time the attorneys spent on particular claims; and whether the hours were reasonably expended. (Reck v. FCA US LLC (2021) 64 Cal.App.5th 682, 699-700.)

"[T]rial courts have discretion to award fees based on declarations of counsel describing the work they have done and the court's own view of the number of hours reasonably spent." (Syers

Properties III, Inc. v. Rankin (2014) 226 Cal.App.4th 691, 699.) Regarding the amount of the reasonable rate, the court considers the evidence and its own knowledge and familiarity with the legal market. (Meridian Financial Services, Inc. v. Phan (2021) 67 Cal.App.5th 657, 709.)

Plaintiff retained three different law firms throughout the course of this litigation: Villarreal Hunter PC ("Villarreal"), Peck Law ("Peck"), and the Law Offices of Christopher Whelan ("Whelan"). Villarreal requests a lodestar of $7,002,762.90 for 9,426.1 hours, with hourly rates for four attorneys ranging from $875 - $1,100 and a paralegal rate of $175. (Villareal Dec. ¶ 60.) Peck requests a lodestar of $1,662,315, with hourly rates for three attorneys ranging from $850 to $1,200. (Peck Dec. ¶ 65.) Whelan requests a lodestar of $7,907,705 for 5,720 hours, with hourly rates for two attorneys ranging from $625 - $1,600. (Whelan Dec. ¶ 56.)

Defendants argue that Plaintiff should receive $2,582,500 in attorneys' fees with no multiplier enhancement. Defense fees expert John D. O'Connor opines that based upon his judgment, experience, and market knowledge, Ms. Villarreal's rate should be reduced to $600/hour and Mr. Whelan's and Ms. Peck's rate should both be reduced to $800/hour. (O'Connor Dec. ¶¶ 48, 51, 121, 123.) For the associate attorneys, O'Connor proposes a reduction to $500/hour. (Id. ¶ 55.)

In consideration of the parties' arguments and evidence, with the Court's knowledge and familiarity of both the legal market and the litigation of this action, and considering the nature of the legal work performed by each firm, the Court finds it reasonable to apply the following blended rates, representing all professionals at each of the three firms who worked on the case: Villarreal - $850/hour; Peck $1,050/hour; and Whelan $880/hour. (Espejo v. Copley Press, Inc. (2017) 13 Cal.App.5th 329, 337 [blended rate of $500/hour]; 569 East County Boulevard LLC v. Backcountry Against the Dump (2016) 6 Cal.App.5th 426, 436-438 [blended rate of $275/hour].) As noted, these rates do not reflect work done by any one attorney or professional at any given firm. Rather, in developing these rates, the Court considered, inter alia: (1) the reasonable rate for each professional who performed work on the case, considering both the requested rate and local market conditions; (2) the proportion of work done by each type of professional; (3) the substantive nature of the compensable work done (e.g., pretrial motions, pretrial discovery, other

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
### Rene C. Davidson Courthouse

pretrial work, trial work, etc.); and (4) the contingent nature of the work performed. Thus, for example, if a firm utilized more paralegals and/or junior lawyers than another firm, that staffing ratio would be reflected in the blended rate.

Defendants argue that the hours sought are unreasonable because Plaintiff can only seek attorneys' fees for work performed in litigation of her FEHA claims against SHC, pursuant to Gov. Code § 12965, subd. (c)(6). Defendants contend that Plaintiff cannot seek fees related to her claims for battery, retaliation under Labor Code § 1102.5, or defamation, nor can she seek fees regarding litigation against SU or Flores. Defendants further argue that fees related to work regarding the alter ego and joint employer theories are not recoverable, nor fees for work related to the anti-SLAPP motion and appeal related to Plaintiff's defamation claim. Plaintiff has not identified what time was incurred solely on her FEHA claims or as to each defendant.

Plaintiff argues that her non-FEHA claims were not distinctly different in both fact and law from her FEHA claims such that the work need not be apportioned; she contends the defamation, assault, and battery claims were factually related to her retaliation and harassment claims.

Plaintiff further argues that her joint employment and alter ego theories relate to the FEHA actions.

Where a plaintiff prevails on some claims but not others, attorney fees are not awarded for time spent litigating claims unrelated to the successful claims, and the court should only award reasonable fees related to the results obtained. (Simers v. Los Angeles Times Communications LLC (2024) 104 Cal.App.5th 940, 946.) Fees are not awarded if the "unsuccessful forays" address discrete unrelated claims pursued in bad faith or claims that a reasonably competent lawyer would not have pursued. (Id. at p. 947.)

In this case, Plaintiff was unsuccessful in pursuing her claims of joint employer and alter ego liability and claims against Flores. Plaintiff's FEHA claims prevailed only as to SHC. The Court finds that Plaintiff's fee award should be limited to work related to her FEHA claims against SHC, along with work inextricably linked to same and/or that would reasonably have been incurred in pursuit of such claims. In that respect, the Court does not adopt Plaintiff's contention that the defamatory letter distributed by both SHC and SU represented the "pinnacle" of her retaliation claims, such that all work performed on the defamation case is compensable as inextricably linked.

The Court also finds that the fact that the case was highly publicized did not translate into overly complicated employment litigation. Although the defamation, joint employer, and alter ego issues were complex and hard fought, Plaintiff's FEHA claims were relatively straightforward, although they extended over several years and incorporated multiple events. Significant discovery disputes required the intervention of a discovery referee. Based upon the Court's review of the discovery referee's reports, it appears that after the first year, there were mutual issues with discovery and Plaintiff bore at least some responsibility for the protracted discovery. Ultimately, some aspects of the case were over litigated.

O'Connor proposes either (1) an estimation of the rough approximation of the excessive or unreasonable hours billed and reduced based on excess; or (2) estimate the number of hours the

---

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
### Rene C. Davidson Courthouse

case should have taken, allotting for necessary and reasonable time and allocation of the non-compensable, non-FEHA claims. (O'Connor Dec. ¶ 59.) O'Connor opines that a reasonable total maximum number of litigation hours here should have been 6,000 hours, adjusted by one third for non-FEHA work to 4,000 hours. (Id. ¶¶ 141, 157.) Plaintiff objects that these numbers lack foundation. The Court declines to adopt O'Connor's estimates.

Accordingly, the Court awards reasonable fees of $10,037,500 as follows: (1) Villareal: $5,100,000 (6000 hours x $850/hour); (2) Peck: $1,417,500 (1350 hours x $1050/hour); and (3) Whelan: $3,520,000 (4000 hours x $880/hour).

The Court declines to apply the requested 1.5 multiplier. (Kennedy Commission v. City of Huntington Beach (2023) 91 Cal.App.5th 436, 466-67 [application of a multiplier is a discretionary matter largely left to the trial court].) The FEHA claims were hard fought and fact intensive, a fact reflected in the number of hours for which compensation is allowed. The rates adequately account for litigation risk.

Plaintiff's motion for attorneys' fees is GRANTED IN PART, for a total award of $10,037,500.

Evidentiary Objections

Beyond what is noted above, the Court declines to rule Defendants' evidentiary objections. The Court does not consider them material to the Court's determination of the instant motion and the Court is not making any dispositive determinations that require it to consider only admissible evidence.

Clerk is directed to serve copies of this order, with proof of service, to counsel and to self-represented parties of record.

Dated :  12/04/2024

*Karin S. Schwartz*

**Karin Schwartz / Judge**

---

ORDER re: Ruling on Submitted Matter                                    Page 4 of 5

**Ex. A - 133**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**
Rene C. Davidson Courthouse

**Ex. A - 134**

| SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>12/04/2024<br>Chad Finke , Executive Officer / Clerk of the Court<br>By: _____ Deputy<br>D. Kinney |
| PLAINTIFF/PETITIONER:<br>Qiqiuia Young  et al | |
| DEFENDANT/RESPONDENT:<br>The Leland Stanford Junior University et al | |
| **CERTIFICATE OF ELECTRONIC SERVICE CODE OF CIVIL PROCEDURE 1010.6** | CASE NUMBER:<br>RG17877051 |

**I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served one copy of the Order re: Ruling on Submitted Matter entered herein upon each party or counsel of record in the above entitled action, by electronically serving the document(s) from my place of business, in accordance with standard court practices.**

Brian C. Coolidge
brian.c.coolidge@gmail.com

Elizabeth M. Peck
PECK-LAW, Employment & Civil Rights
lisa@peck-law.com

Jordanna Gabrielle Thigpen
Of Counsel, Villarreal Hutner, PC
jt@thigpenlegal.com

Lara Alise Villarreal Hutner
VILLARREAL HUTNER PC
lhutner@vhattorneys.com

Michael David Bruno
Gordon & Rees
mbruno@grsm.com

Chad Finke, Executive Officer / Clerk of the Court

Dated: 12/04/2024                    By:

D. Kinney, Deputy Clerk

**CERTIFICATE OF ELECTRONIC SERVICE
CODE OF CIVIL PROCEDURE 1010.6**

**Ex. A - 135**

# EXHIBIT B

# ORIGINAL 


*8727122*

EDWARD J. WYNNE (State Bar #165819)
J. E. B. PICKETT (State Bar #154294)
WYNNE LAW FIRM
100 Drakes Landing Road, Suite 275
Greenbrae, CA 94904
Telephone: (415) 461-6400
Facsimile: (415) 461-3900

RICHARD M. PEARL (State Bar #46351)
LAW OFFICES OF RICHARD M. PEARL
1816 Fifth Street
Berkeley, CA 94710
Telephone: (510) 649-0810
Facsimile: (510) 548-5074

Attorneys for Plaintiffs and the Class


**FILED**
ALAMEDA COUNTY

AUG 31 2010

CLERK OF THE SUPERIOR COURT
By _____
Deputy

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF ALAMEDA – NORTHERN DIVISION

| | |
|---|---|
| SAM DURAN, MATT FITZSIMMONS, individually and on behalf of other members of the general public similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. BANK NATIONAL ASSOC. and DOES 1-50, inclusive,<br><br>Defendant. | Case No.: 2001-035537<br><br>**AMENDED DECLARATION OF JOHN D. O'CONNOR IN REBUTTAL TO OPPOSITION TO FEE PETITION**<br><br>**[CLASS ACTION]**<br><br>Date: February 25, 2010<br>Time: 2:00 p.m.<br>Dept.: 20<br>Hon. Robert B. Freedman |

I, John D. O'Connor do hereby declare as follows:

### EDUCATION, EXPERIENCE AND WORK HISTORY

1.    I am an attorney licensed to practice in all courts in the State of California, and have been so licensed December, 1972.

2.    I am the principal of O'Connor and Associates, a law firm consisting of the undersigned and one associate, and engaged primarily in litigation practice since 1972.

1

**AMENDED DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

**Ex. B - 137**

3.      I attended The University of Notre Dame in South Bend, IN. where I graduated *magna cum laude* in 1968.  I attended the University of Michigan Law School where I graduated *cum laude* in 1972, and was a member of the *Order of the Coif*, and Associate Editor of the *Michigan Law Review*.

4.      From June 1972 until January 1, 1974, I was employed as an associate with the firm of Belli, Ashe & Choulos as a litigation associate.  In that capacity, I tried several cases with senior partner Melvin L. Belli, Esq. and tried several cases by myself.

5.      From January, 1974 through January, 1980, I was an Assistant United States Attorney for the Northern District of California in San Francisco, California.  In that capacity, I tried white collar criminal cases as well as a variety of civil matters, including medical malpractice, employment discrimination, challenges to governmental actions, and a wide range of other cases.

6.      In 1980 and 1981, I was Senior Associate at the San Francisco law firm of Brobeck, Phleger & Harrison, where I worked on complex business litigation matters.  From 1982 through 2001, I was a principal with and managing partner of the law firm of Tarkington, O'Connor & O'Neill, where our clients were mainly major insurance companies, corporate risk management departments, and governmental entities.  Among the governmental entities we served were not only local and State agencies, but also the FDIC, FSLIC, RTC, the NCUA (National Credit Union Administration), and the United States government itself.

7.      I have tried approximately 70 cases in state and federal courts throughout California, as well as in courts located in Nevada, Pennsylvania and Arizona.

8.      From late 2001 through July, 2006, I was employed with the San Francisco firm of Howard Rice as a Special Counsel and Director, practicing within the litigation department. At Howard Rice, my litigation work consisted of tobacco/asbestos defense litigation on behalf of R. J. Reynolds company, intellectual property litigation, and a variety of commercial litigation.

9.      Since July of 2006, I have practiced on my own under the name of O'Connor and Associates.  In that capacity, I associated as a trial lawyer with the Downey Brand firm of Sacramento in trying a two-month jury trial in Douglas County, Nevada, on behalf of landowner

2

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

1    Park Cattle Company against the lessee of a casino ground lease in Stateline, Nevada. Before the

2    jury returned, the case settled in favor of the Plaintiffs for $165 million.

3        10.    I successfully arbitrated as co-counsel a case in Dallas, Texas against the Dallas

4    Mavericks, where my client was awarded $7.1 million; and recently tried a case in Marin County

5    Superior Court in which we achieved $2.5 million settlement on behalf of two homeowners

6    while the case was being tried to a jury before Judge Michael Dufficy. I have over thirty eight

7    years of significant trial experience, including current jury trial experience.

8        11.    I have consulted or have been retained as a fee expert on approximately fifty

9    occasions, most of them since 1992, and many involving rebuttal of opinions offered by James

10   Schratz.

11       12.    In addition, I have significant experience dealing with fee issues in other contexts.

12       13.    I litigated fees in a number of civil rights and other "fee-shifting" cases on behalf

13   of the United States government while acting as Assistant United States Attorney for the

14   Northern District of California.

15       14.    I litigated a large fee case with the Tarkington firm in or around 1984 against the

16   Heller Ehrman firm, on behalf of Sonoma County, in a class action prison case involving the

17   constitutionality of various conditions of confinement in the Sonoma County jail.

18       15.    I was also the counsel charged by the United States government to assess and

19   negotiate significant counsel feels for different firms prevailing in a class action labor

20   discrimination case brought against the Naval Air Rework facility for the Honorable William H.

21   Orrick.

22       16.    As a managing partner of the Tarkington firm, it was my responsibility to work

23   with several large institutional clients, such as insurers, corporate legal departments and

24   governmental entities such as the FDIC and RTC to discuss and enforce billing guidelines for

25   those entities.

26       17.    While at the Tarkington firm, I consulted with numerous insurance claims

27   professionals regarding billing issues surrounding the retention of CUMIS counsel, paid by the

28   insurer but selected by the insured.  The insurer billing guidelines for "panel" counsel were

3

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1  generally inapplicable to such outside counsel, I frequently advised as to applicable billing

2  standards prevalent within the Bay Area legal community.

3      18.    I also monitored legal billing counsel throughout California, when representing

4  excess carriers.

5      19.    As a managing partner for twenty years at the Tarkington firm, I reviewed

6  numerous bills of lawyers under my supervision, as well as lawyers in my firm but outside my

7  direct supervision. On my own volition, or in discussions with clients, I frequently analyzed and

8  adjusted billings for efficiency and competence where appropriate.

9      20.    Practicing as a Senior Associate at Brobeck, Phleger and Harrison (1980-1981)

10  and as a Senior Counsel and Director at Howard Rice (2001-2006), I became aware of the

11  appropriate billing customs and practices enforced at these reputable firms.

12      21.    I have on several occasions examined fee billings on behalf of clients and, where

13  appropriate, sought reductions.

14      22.    In 2005-2006, I served as a JAMS arbitrator on an asbestos fee dispute involving

15  over $2 million in billings.

16      23.    Based upon the foregoing, and my 38 years of litigation and trial experience, I

17  consider myself to be an expert capable of assessing the reasonableness of litigation fees for

18  complex California litigation. I also have extensive knowledge of the background, experience,

19  bias and competence of James Schratz.

20      24.    In this case, I have reviewed pleadings and motions, trial transcripts and billings

21  of the Wynne firm; have studied the opposition to the fee application herein; have analyzed the

22  Declaration of James Schratz; and have formed opinions about the reasonableness of fees

23  charged by the Wynne firm in this case, and rebuttal to criticisms raised by James Schratz. I also

24  have formed opinions about the background, bias and competence of Mr. Schratz.

## ASSIGNMENT, RATES AND HOURS

26      25.    I was retained to review the documents and billing in this case and to formulate an

27  expert opinion regarding the reasonableness of the fees. I was also retained to review the

28  Declaration of James Schratz filed with Defendant's Opposition to Plaintiffs' Motion for

4

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1     Attorney Fees and provide opinions in response to Mr. Schratz.

2          26.     In order to formulate an opinion, I reviewed the following documents: the

3     Declaration of James Schratz filed in this matter as well as the considerable amount of other

4     material I have relevant to Mr. Schratz discussed in more detail *infra.*; Plaintiffs' Motion For

5     Attorneys' Fees and supporting documents; Defendant's Opposition to Motion for Attorney Fees

6     and supporting documents; the Statements of Decision for Phases I and II; the Judgment;

7     selected court reporter transcripts; and selected pleadings and motions.    I also determined if the

8     rates charged are reasonable in this area for this king of work. Finally, I had to draft and edit this

9     lengthy declaration. A true and correct copy of my billing in this case is attached hereto as

10     Exhibit A. The time I have invested in this matter is reasonably necessary in light of all the

11     issues raised by Mr. Schratz in his declaration.

12          **SUMMARY OF OPINIONS ABOUT BILLING ISSUES**

13          27.     My opinions about the billing issues and criticisms raised by Mr. Schratz are as

14     follows:

15             A)     The billing rates charged by Mr. Wynne and Mr. Pickett are standard for

16     top-tier firms, large and small, for general employment-related litigation;

17             B)     The rates charged by Mr. Wynne and Mr. Pickett, in my opinion, do not

18     properly take into account their expertise in class action and classification issues, and therefore, I

19     believe the appropriate rates for Mr. Wynne and Mr. Pickett are $750 and $625 per hour,

20     respectively;

21             C)     The litigation risk factors, without regard to efficiency or expertise of the

22     Wynne firm, entailed a 25% chance of success at the outset of the litigation, and thus support a

23     multiplier of 4;

24             D)     The work of Mr. Wynne and Mr. Pickett, who together performed

25     approximately 90% of billed tasks, was efficient in the extreme; in comparable litigation it would

26     be customary for four to five attorneys to perform 70% of the work, and 20-30 lawyers to

27     perform the other 30%, as occasional billers performing research, document review, motions,

28     and the like;

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1     E)  The hours billed are less than those of Wynne's opposing counsel, whose

2 hours, in my opinion, were not unreasonable;

3     F)  Adjusting for 2010 rates and omitted paralegal hours, the Carlton DiSante

4 firm billings, even at lower rates than Wynne, would be, with appropriate adjustment, higher

5 than those charged by the Wynne firm;

6     G)  The Carlton DiSante firm was paid for the majority of these hours in

7 earlier years when prevailing rates were lower, and likely involved more paralegal time than the

8 Wynne firm billed;

9     H)  Adjusting for the paralegal hours and inflation, Wynne's opposition billed

10 more than $10 million on this litigation, as adjusted to an "apples to apples" basis;

11     I)  Arbitrary billing standards proposed by Schratz, such as the claimed

12 "block" billing prohibition, do not reflect community norms or standard custom and practice;

13     J)  The Wynne decision to dismiss legal claims, thus avoiding a jury trial, was

14 an excellent strategy, resulting in litigation success and cost savings;

15     K)  Both technically and strategically, the performance of the Wynne firm was

16 excellent in all respects.

17      __OPINIONS REGARDING THE BACKGROUND__

18      __AND QUALIFICATION OF JAMES SCHRATZ__

19  28.  Opinions about Mr. Schratz's approach can be summarized as follows:

20     A)  Mr. Schratz is only minimally qualified, by virtue of his law license, to

21 opine about fee matters in complex cases;

22     B)  Mr. Schratz has minimal and checkered experience as a junior litigator,

23 and is incompetent to judge complex litigation skills, or to opine about litigation judgment, in a

24 complex case;

25     C)  In his experience in "auditing," Mr. Schratz has displayed extreme bias,

26 consistent with his opinions here, which are designed to drive down the fees awarded the Wynne

27 firm without any objectivity or real-world perspective;

28     D)  Mr. Schratz lacks a history of intellectual honesty, during the twenty one

6

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

Ex. B - 142

1 years I have known him and his activities regarding legal fees;

2        E)   The criticisms he offers here, inapt though they may be, lack several

3 categories of criticism which Schratz invariably employs, such as inefficient staffing and excess

4 paralegal activity, validating Wynne's bills in these areas by virtue of this uncharacteristic

5 silence.

6     29.   In this Declaration, I intend to offer extended opinions in these general areas: 1)

7 the appropriate billing rate for Mr. Wynne, including the proper cohort of comparison; 2) the

8 relative efficiency of the Wynne office in this litigation relative to both billings I have reviewed

9 in other cases, and to opinions and "audits" involving Mr. Schratz; 3) the risk inherent in this

10 case for the Wynne office; 4) the trial, litigation and strategic skill and abilities demonstrated by

11 the Wynne firm; and 5) the background, experience and capabilities of Mr. Schratz regarding

12 legal fee issues.

### BILLING RATES

14     30.   I have knowledge of billing rates throughout the Bay Area for the various types

15 and classes of litigation, and have had such knowledge since 1980.

16     31.   It is true that there is a wide range of rates charged throughout the Bay Area for

17 employment litigation counsel, from insurance rates on the low end ($175-$300 per hour, often

18 charged as a "blended" rate for all lawyers within the firm) to mid-range rates ($275-$475 per

19 hour for partners, some blended on the lower end) to top-tier rates (in employment work $500-

20 $750 per hour for partners).

21     32.   This broad range of rates also holds true for, and is quite similar to, what is

22 generally termed "defense" litigation, which, like "employment" work, is a common form of

23 litigation, and promises great volume for firms that prove successful, especially at lower and

24 middle range rates. It is also a form of litigation that is necessary for many larger firms to handle

25 as a service to their clients.

26     33.   In the course of my thirty eight years of practice, I have handled a number of

27 labor cases such as wage, discrimination and wrongful termination litigation, and have tried at

28 least five such cases that I can presently recall, one of which was before Judge Ronald Sabraw of

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1   Alameda County Superior Court. I tried one eight-plaintiff wage/hour case in San Francisco

2   Municipal Court. I recently served as a mediator on a twelve-plaintiff wage-and-hour case set

3   for trial in Alameda County. I have also tried lengthy cases to completion before Hon.

4   Demetrios Agretelis and Hon. Benjamin Travis.

5        34.   Even though I consider myself quite capable of handling most labor disputes, and

6   in spite of the fact that I defended one large class action discrimination case while with the

7   government, and several other class actions, I do not consider myself to be expert in the field of

8   class action litigation, and especially not in the highly specialized area of wage and hour class

9   action litigation. As I will explain later in this Declaration, wage and hour class action litigation

10   is a highly specialized area, a practice unto itself.

11        35.   On the other hand, labor counseling and labor litigation, such as discrimination

12   and wrongful termination litigation, is work that can be competently handled by thousands of

13   employment litigators, and even general litigators such as the undersigned.

14        36.   At the Tarkington firm, where much of our work was assigned by insurance

15   carriers, we engaged in both defense litigation and employment litigation at insurance defense

16   rates, while at Howard Rice, we engaged in "defense" litigation and employment litigation only

17   if paid top-tier rates. Clients such as R.J. Reynolds Tobacco Company, which felt the need for

18   and demanded superior work, paid these rates to Howard Rice and comparable firms throughout

19   the country. It was the firm philosophy, as in many top-tier firms, not to accept employment,

20   products liability or toxic tort litigation (such as asbestos defense litigation) at middle-market

21   rates. In 2004 through 2006, these middle-market rates for defense and employment litigation

22   were approximately $425 to $450 per hour for partners. On the other hand, my rate for defense

23   litigation for R. J. Reynolds was $615 per hour in 2006, and employment litigation involved

24   similar rates. A fellow Director (partner-level lawyer), Joseph Escher, who specialized in

25   Section 17200 class action work, charged in excess of $700 per hour in 2006. Those rates, of

26   course, would be higher in 2010.

27        37.   This same tiered rate structure holds true in conventional employment litigation,

28   by which I mean wrongful termination and discrimination litigation not involving class-action

8

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1   issues.  Thus, firms like Gibson, Dunn & Crutcher, O'Melveny & Myers and Howard Rice

2   charge these same top-tier premium rates for employment work.  On the other hand, a competent

3   firm such as Jackson, Lewis, which specializes in employment litigation and needs to attract a

4   high volume of business across a wide sector of clientele, charges hourly rates slightly lower

5   than the corporate firms named.  In my opinion, the rates being charged by the Wynne firm fit

6   squarely into the top-tier rate structure for employment litigation at the top firms.

7        38.    In determining prevailing rates in any one area of employment litigation, it is

8   appropriate to consider two aspects of pricing ignored by some of the declarants in this litigation:

9   volume and leverage.

10        39.    A client that promises a high volume of employment litigation year after year,

11   employing a number of firm attorneys, can often obtain very competent representation for

12   partner rates of between $425 and $475 per hour.  However, in addition to providing volume,

13   this type of litigation also provides the firm leverage, that is to say, a great amount of work that

14   can be performed by associates and lower-level partners without raising client concerns.

15   Examples of high-volume litigation would be representing a large employer with high turnover

16   and a regular flow of wrongful termination litigation, much of it requiring little skill to defend, or

17   little skill in performing certain necessary tasks.  Carlton DiSante may be such a firm, based

18   upon my review of its website.

19        40.    Thus, obtaining such volume referrals from a client would enable the firm to have

20   "leverage" of three or four associates to one partner.  If the average associate is paid $200,000 in

21   compensation and bills $600,000 per year, the work is highly profitable to the firm, while the

22   firm can appear to the client to be "economical" because its lead partner is charging $425-$450

23   per hour, less than the top-tier firms.

24        41.    An example of this is the billings of the Carlton firm, which are within customary

25   parameters for complex litigation.  The firm billed 22,000 hours for Carlton attorneys *only*, albeit

26   at lower rates than Wynne, in contrast to Wynne's 14,000 hours for attorneys and paralegals.

27   Thus, the Wynne firm's work was highly efficient, since the tasks performed were roughly equal

28   between the two firms.

9

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

42.    Moreover, the Carlton DiSante firm has not provided, I understand, its paralegal hours, which should be well in excess of 10,000 hours if the firm followed normal staffing patterns.  The Wynne firm billed an unusually low number of paralegal hours, meaning that much document organization was left unbilled and considered part of firm overhead, resulting in lower than customary billings.

43.    Thus, the claimed defense billings of $6.6million are not comparable "apples to apples" with the Wynne billings.

44.    To compare, one should add at least $1.5million for paralegal work, and increase the $6.6million billed by a minimum of 25%, since the Carlton firm's billings were paid on average four years ago.   Since 2001, rates have increased 55%, or, put differently, were approximately 37.5% lower in 2001.  Thus, Wynne's billings for a "lodestar" of $8.8million should be compared with approximately $10 million of defense billings, when those billings are adjusted for inflation and missing paralegal time.  Moreover, such a comparison does include the in-house counsel time of Defendant.

45.    In any case, as shown by defense counsel billings, such highly leveraged litigation, in my experience, is often not cost-effective for the client, since less-experienced lawyers tend to be less efficient as well as less confident about tasks that can be safely ignored. But whether it is a bargain for the client or not, high-volume, multi-referral litigation presents a different economic model from that involved in a case singly assigned by a client because of its importance.

46.    Thus, for special, one-off cases, such as the instant matter, a sophisticated employer, who may customarily pay mid-level rates for wrongful termination litigation, will often hire a higher-rate firm for its defense.  In my opinion and experience, competent though the Carlton DiSante firm may be, a sophisticated client more often than not will select a firm in the class of Gibson, Dunn or O'Melveny & Myers for important litigation such as *Duran.*

47.    The rates that Mr. Wynne and Mr. Pickett are seeking in this litigation hit the market rates squarely in the middle of the applicable top-tier range at $640 and $580 per hour. These rates are within $10-$20 either way of rates that would be charged by the higher-level

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

1   firms I have described.

2        48.   I am familiar with the rate structure presently charged by Howard Rice. Mr.

3   Wynne's rate is quite comparable to that of, for example, Mr. David Reis, an employment

4   partner at Howard Rice, formerly a partner at O'Melveny & Myers with a similar amount of

5   litigation experience.  However, given the above opinion, looking only at market rates for

6   "employment" litigation is not completely valid.  If I were a corporation's general counsel or

7   advising a corporate general counsel, I would not recommend most higher-rate employment

8   litigators for the instant litigation (and certainly would not recommend most middle and lower

9   level litigators), for want of two necessary skill sets: 1) class action expertise; 2) classification

10   expertise.

11        49.   What is impressive about Mr. Wynne's experience is not only that he has

12   concentrated on employment litigation for eighteen years, but also that he has concentrated on

13   *class action employment litigation dealing with classification issues.*

14        50.   If I were a general counsel and reviewing firms to represent my company in a

15   class action classification case, I opine, there would only be a handful of lawyers with experience

16   equivalent to that of Mr. Wynne, out of the thousands and thousands of lawyers who could

17   competently handle other employment litigation.

18        51.   In other areas of litigation, the market may consist of a number of lawyers with

19   twenty five to thirty five years of experience.  But in the field of class action classification

20   litigation, which Mr. Wynne, along with his former partner, Mr. Righetti, helped to develop in

21   recent years, there simply aren't any lawyers with that length of experience of which I know.

22   Most lawyers in the field have entered in the past five years, as it became "hot."

23        52.   Mr. Wynne's skill in developing facts, displayed in deposition, motion and trial, is

24   superior.  I have often reviewed, and am professionally quite interested in, the work of other

25   lawyers in adducing and proving facts.  Mr. Wynne's deposition and trial work taught me much

26   about proof of facts in this specialized area.  My view, upon which I will elaborate more fully

27   below, is that he consistently out-lawyered his opponents factually and legally.

28        53.   I make the above observations to support my view that Mr. Wynne is clearly due

11

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

**Ex. B - 147**

1  a rate above the standard rate schedule for top-tier employment litigators, and in my view, Mr.

2  Wynne could command $750 to $800 per hour for his unique skill set if he were seeking

3  retention by a sophisticated corporate clientele. I would ask rhetorically: who, other than

4  perhaps Mr. Righetti and a few others, possesses the same level of skill and experience in this

5  particular type of litigation?

6      54.    The notion that the hourly rate of an attorney should be determined by the size of

7  his firm is simply not correct.

8      55.    It is true that there is a very rough direct correlation between the size of a firm and

9  rates, but, as in many areas, statistical association does not prove causation. Size should be

10  viewed as an effect and correlative of high rates, more than it should be adjudged a factor

11  justifying high rates. I will explain.

12      56.    If a litigator at a prestigious larger firm were to develop a clientele which paid

13  him an middle-level hourly rate of $400-$475 per hour, he may not be allowed to bring that

14  client into the firm unless he could convince the firm management of high leverage, and in some

15  cases would not be allowed to accept the assignment at all, even if there were high leverage.

16      57.    In any case, it would be the natural tendency of lawyers in top-tier firms with such

17  clients to move to a firm with lower overhead, or to a firm who charged similar rates.

18      58.    Conversely, a solo practitioner or small-firm lawyer who developed a premium

19  rate corporate practice would often find it attractive to move to a larger, high-rate firm, so that

20  the lawyer could access the larger firm's corporate clientele for his practice. Additionally, high-

21  rate, top-tier firms are constantly recruiting such lawyers to their practice. Today, legal

22  newspapers frequently announce single lawyers or small firms with top-tier practices merging

23  into larger firms. In short, like begets like, and birds of a feather flock together. So, while there

24  is a correlation between size and rates, the size of the firm has nothing to do with the merits of

25  establishing a rate, and of bringing value to the client.

26      59.    To say that no small firm deserves or charges premium rates, as Mr. Schratz

27  appears to do, is incorrect for other reasons. Most plaintiff firms in fee-shifting cases are smaller

28  plaintiff firms, since most large institutional firms eschew contingency fee litigation. To say that

12

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1    a smaller firm can never achieve the same rates as a larger firm in fee-shifting litigation would

2    mean that a small firm could never get top prevailing rates, no matter how skilled its lawyers. It

3    would also produce a nonsensical conclusion: if Mr. Wynne had performed the exact same

4    litigation as successfully as he has here, but happened to be an employee of, say, the Orrick firm,

5    according to Mr. Schratz he would deserve a higher rate than he would if employed as he is.

6    This is absurd, and shows a lack of understanding of the market for legal services.

7       60.    In fact, it is true that single practitioners and small firms can and often do charge

8    high rates, depending on the nature of their practices.

9       61.    For instance, in 1990 the Tarkington firm hired Mr. William Brockett, a partner in

10    the firm of Keker & Brockett, shortly after Mr. Brockett was hired by Mr. Schratz on behalf of

11    Fireman's Fund. The Keker firm was just then passing the size of ten lawyers. Mr. Brockett's

12    rate was then $330 per hour, the rough equivalent of $800 today.

13       62.    Generally speaking, a litigation attorney with class action expertise can command

14    a higher rate than a general litigator, as exemplified by the rate differential between Mr. Escher

15    and the undersigned while at Howard Rice.

16       63.    In my opinion, the appropriate rate for Mr. Wynne is $750 per hour, and $625 per

17    hour for Mr. Pickett, based upon the above factors.

18                       **LITIGATION RISK FACTORS**

19       64.    In my opinion, the Wynne firm undertook a serious risk in two areas of the *Duran*

20    litigation: 1) the legal decision on class certification; 2) the factual decision by the trier of fact

21    concerning classification.

22       65.    Had I been presented the *Duran* case at the outset, I would have evaluated it as

23    having had a 25% change of overall success, based upon a 50-50 chance of success on the legal

24    issue, and 50-50 chance of success on the key factual issue.

25       66.    The competent lawyers from Carlton DiSante firm obviously felt there was a

26    significant chance of defense success in each of these two areas, based upon its exhaustive

27    litigation of each one, and its briefs and opposition to the Wynne firm's speak far more

28    eloquently than I on these issues.

13

DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION

**Ex. B - 149**

67.     Indeed, when I read various Carlton DiSante briefs on each of these areas without having first read the corresponding Wynne brief, I was in some cases persuaded to its point of view, until studying the contrary Wynne brief on point.

68.     Accordingly, just on risk alone, given that competent lawyers would have adjudged Wynne's chance of success to be 25%, my opinion is that the appropriate multiplier in this case on risk alone should be 4 to 1.

69.     However, I would add some amount to this multiplier of 4 based upon a) extraordinary skill not reflected in the rate analysis; and b) extreme and virtually unique efficiency.. These factors I will discuss more fully below, but for present purposes it suffices to say that they should drive the multiplier above four.  Accordingly, even though a multiplier above four would at first blush seem outlandish, a level-headed analysis would support it.

70.     Since 1990, I have read numerous Declarations, articles, speeches and letters of Mr. Schratz, and also have deposed him and attended his deposition on several occasions.

71.     One general area on which I agree with Mr. Schratz is the idea that a factor in high litigation costs is a high number of billing personnel.  Mr. Schratz has publicly cited one case, apocryphal or otherwise, in which 180 billing personnel worked on the case.  Often times it is true that a lawyer who has built up significant knowledge of a case leaves the firm or is assigned off the litigation, and the client loses the efficiency of his work.  On cases that are factually complex and intensive, where each lawyer must know a great amount of detail in order to participate meaningfully is one where multiple billing personnel can cause great billing inefficiency. Yet some inefficiency of this sort is to be expected in complex litigation, caused in part by inevitable associate turnover.  In one Schratz case in which I was an expert, a fee application by the Nernberg firm in a Pittsburgh, PA eminent domain case, Mr. Schratz noted that 21 billing personnel were involved in $132,000 in billings.

72.     For a case the size and length of *Duran*, the assignment of lawyers would be efficient if no more than five lawyers on each side performed 70% of the litigation, and no more than 20-30 other personnel performed the other 30% of the work.  I suspect that Carlton DiSante had a similar assignment efficiency.  Indeed, the recently produced declaration of Amy Wright

14

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1 identifies 42 different attorney have worked on this case at Carlton DiSante since inception

2 through 2009.

3     73.    Accordingly, the staffing on this case is remarkable in its efficiency because just

4 two lawyers, Mr. Wynne and Mr. Pickett performed 90% of the billed work over a nine year

5 period.

6     74.    I have reviewed or witnessed at least 25-30 separate analyses of attorneys fee

7 billings performed by Mr. Schratz, expressed either in a declaration or in testimony. None of

8 these cases has assignment efficiency even approaching that of the Wynne office. Whether as an

9 insurance coverage or insurance monitoring counsel, as a fee expert or litigator, or as a managing

10 partner reviewing my firm's bills, I have never seen anything close to this efficient utilization of

11 lawyers. Indeed, highlighting the extreme efficiency of the Wynne Law Firm, it is virtually

12 unprecedented – and I am not aware of a previous instance – for Mr. Schratz not to criticize, as

13 he customarily is wont to do, a claim of allegedly inefficient utilization of lawyers. Mr.

14 Schratz's silence on this issue is deafening.

15     75.    Mr. Schratz claims to have "audited" hundreds of cases, many of them involving

16 declarations that are matters of public record, and which Mr. Schratz could therefore produce

17 herein. I would be surprised if Mr. Schratz could produce any attorney's fee billings which show

18 such efficient utilization for a case requiring more than a few hundred thousand dollars in billing,

19 and I have personally seen none.

20                   **DEMONSTRATED SKILL**

21     76.    My opinions about the Wynne firm and that of Mr. Schratz could not be further

22 apart than they are on our respective analyses of Wynne's decision to drop the legal claims.

23     77.    It is the view of Mr. Schratz that the Wynne firm shouldn't be paid for some of its

24 time because of this decision. To me, the decision exemplifies excellence in both the art and

25 science of practicing law, and justifies a rate increase or multiplier, not a penalty.

26     78.    To an inexperienced or inartful lawyer, or to a non-lawyer observer, it may appear

27 that the jettisoning legal claims means weakening ones case, reasoning apparently logically by

28 analogy that shedding ordnance would weaken an army's firepower. Moreover, an

15

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1    inexperienced lawyer would think, incorrectly, that a jury is more likely to find for the plaintiff

2    than a judge, even though experienced defense counsel rarely waive a jury at the outset.

3        79.    But an experienced judge or trial lawyer knows that an artful jettisoning of claims

4    will often strengthen a case by narrowing the focus on the most appealing claims. There is,

5    however, no textbook telling the trial lawyer when, how or what to drop.

6        80.    Before making that decision, a trial lawyer has to understand his case, his

7    opponent's case, his judge and his potential jury. In my view, Wynne did this masterfully,

8    showing that the firm deserves both a high rate and a rewarding multiplier.

9        81.    Prefatorily, I would note that when Wynne dropped his legal claims, there was as

10   a result no significant "wasted" time, since the same evidence in the Section 17200 claims

11   supported the legal claims. Moreover, while Schratz purports to apply the case law of legal fees

12   in his analysis (itself a dubious undertaking for an expert, seemingly a matter within the Court's

13   province), he ignores black-letter principles that all intertwined claims need not prove successful

14   in order to justify collection of all legal fees.

15       82.    At the point Mr. Wynne dropped his legal claims, he obviously had gained a feel

16   for the Court's view of the law, as well as a sense of the factual approach to be pursued by his

17   opponents. Thus, he was faced with a key decision, and information on which to base it, to wit:

18   who should be the trier of fact – the Court or a jury? Plaintiffs' case, in my view, was not

19   particularly attractive to a jury, for reasons obvious to the competent Carlton DiSante defense

20   counsel in this case. Hard-working jurors from San Leandro, Oakland, Hayward and Livermore

21   would not likely sympathize with well-paid "yuppy" bankers who knew and agreed "going in"

22   that they would not be paid overtime, and in fact were rewarded well for their efforts.

23       83.    For this reason, Carlton DiSante clearly was hitting on these gut-level themes and

24   would have done so quite effectively before a jury, in my opinion, notwithstanding the lack of

25   relevance to the ultimate liability decision. This factual approach would not only affect liability,

26   but also would tend to depress damages as well.

27       84.    On the other hand, a rational, non-emotional view of the law, which the Court

28   would more likely embrace, would ignore whether the bankers thought they were to receive

16

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1   overtime.  It is my understanding and belief that the underlying statute Wynne was prosecuting

2   this case under has, as a matter of public policy, the protection of employee rights and the issues

3   Carlton DiSante were likely to seize upon are entirely irrelevant to this analysis.  In my view

4   Wynne correctly saw that a Court with a reasoned approach would ignore visceral equities.

5       85.     So, in one of several shrewd strategic decisions, Wynne dropped his legal claims,

6   winning an award that would have been an excellent jury result.  More importantly, Wynne did

7   not give up any of the overtime owed to the Class because restitution under the B&P Sec. 17200

8   claim is measured in the same way as damages under the Labor Code.

9       86.     In short, any experienced lawyer should praise Wynne for his decision to drop the

10  legal claims, which I do, and not criticize it, as Schratz has.

11      87.     Mr. Schratz's analysis absolutely ignores the cost savings Wynne achieved in not

12  pursuing a jury trial.  A jury trial would likely have taken twice as long as a Court trial, for

13  reasons which are obvious.  Moreover, even pre-trial development of facts is usually expedited

14  when one is anticipating a Court trial.

15      88.     And, of course, the battling over admissible evidence, jury instructions, motions

16  in limine, the proper role of jury and Court, and legal issues on appeal, would have been far more

17  intense and time-consuming than the procedure that actually played out.  In my estimation, the

18  decision by Wynne could have easily saved each side half a million to a million dollars in fees,

19  and perhaps more than that.

20      89.     Mr. Schratz also reveals, in my view, a lack of understanding of the litigation

21  process, when he criticizes Wynne for pursuit of the rest and meal break claims.  As a good

22  lawyer should, Wynne was clearly trying to maximize the benefits of his successful class

23  certification.

24      90.     This was an example of the aggressive pursuit by Wynne of every claim that

25  could benefit his clients.  In this case, the outer limits of the "envelope" were not clear, and

26  Wynne should be applauded for pushing to ascertain them.  Moreover, although a class was not

27  certified on these issues, Wynne was successful in pursuit of the individual claims, for which

28  fees are recoverable.

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

91.    I will add one additional observation about the skill demonstrated by Wynne. Although I thought Mr. Wynne was artful and skillful in his questioning, what was more impressive to me was the framing of his case.

92.    This framing rested upon an analysis of what was needed to counter the main thrust of the Defendants' case. Wynne did this astutely, in my judgment, and put the Defendants in a box from which they never escaped.

93.    Going into the trial, the strength of Defendants' case, as I see the matter, rested upon some interrelated facts: 1) the salesmen were encouraged to make cold calls, and indeed outside cold calls were well within accepted sales techniques; 2) in fact, salesmen made cold calls; and 3) salesmen who did not do well and were subject to improvement plan, were usually told to make outside cold calls.

94.    Plaintiffs' counsel obviously understood that, as far as it went, this testimony would not be substantially refuted. But counsel also understood that if they framed the factual issue correctly, this testimony would not be outcome determinative.

95.    Mr. Wynne astutely answered that, while the foregoing was generally true, the only criterion for measuring job performance was sales success. Thus, if a salesman could do well without a single outside call, such was perfectly acceptable performance. This Wynne did brilliantly.

96.    The main thrust of Plaintiffs' case, then, was to accept much of the facts which the defense proved well, while skillfully framing them within the Plaintiffs' narrative. A less experienced lawyer may have let defense counsel frame the factual issue, and may have attempted simply to fight on the ground chosen by defense counsel.

96.    Plaintiffs' also put Defense counsel in the proverbial box regarding damages and damage testimony, a fact which has eluded Mr. Schratz when he criticized the development of expert survey testimony.

98.    Mr. Schratz criticizes and deducts for the survey of Dr. Krosnick. Again, Mr. Schratz does this in his typical search for "gotcha," without understanding or wishing to understand the tactical value of this survey.

18

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

99.     First, as Mr. Schratz suggests, the Krosnick survey was used by Dr. Drogin as a basis to buttress and test his opinion. Experts can rely on inadmissible hearsay testimony if it is type of information upon which an expert would normally rely. This seems to have been the case with Dr. Drogin's opinion, which Mr. Schratz conveniently omits.

100.    Moreover, as Mr. Schratz emphasizes, the survey evidence was held by the Court to be admissible only for rebuttal or impeachment purposes. Again, by so doing he shows that he does not understand the litigation underlying the billings he is reviewing, and, accordingly, has no solid basis for determining whether the fees are in fact reasonable.

101.    The importance of the survey was not its direct admissibility. Rather, it was its role in overcoming the constitutional challenge of *Bell v. State Farm*, where, briefly stated, a margin or error in a damage estimate of 30% was held to be unconstitutional under the facts of that case absent additional showing of reliability. The Krosnick survey helped to overcome the reliability challenges to Drogin's estimate, based upon factors enumerated in *Bell*. Accordingly, Mr. Schratz's criticism of the Krosnick survey shows the extremely superficial analysis that is typical of the many Schratz opinions I have reviewed.

102.    In essence, the survey evidence Mr. Schratz claims worthless both buttressed and protected from assault Dr. Drogin's opinion. Defense counsel had nowhere to go in its potential *Bell* challenge. A less skilled and inexperienced counsel may have lost the Plaintiffs' damage award by failing to anticipate a *Bell* challenge.

103.    Once again in his ignorance, Mr. Schratz criticizes a highly laudable and effective tactic which contributed to Plaintiffs' success.

## BLOCK BILILNG

104.    It is simply not true that a prohibition against "block billing" is the norm in the Bay Area legal community, or, to my knowledge, anywhere in the country. The standard prohibiting "block billing" is a fiction invented by the insurance industry, and largely a product of auditors such as those employed by Fireman's Fund in the 1990s. At that time, Fireman's Fund found that all of its most trusted defense firms regularly engaged in what Mr. Schratz terms "block billing," or more than one description per time entry.

19

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

105.    Using arbitrary and fictitious standards, Fireman's Fund's auditors then claimed that trusted panel counsel, whose bills had regularly been scrutinized by claims professionals, routinely "overbilled" by 20-30%. I have personal knowledge of these audit results, which I reviewed in Fireman's Fund documents.  These same arbitrary standards usually resulted in claims of "overbilling" (by Mr. Schratz and his auditors) in the bills of non-panel counsel in amounts of 30-50%.  In short, the standards guarantee a claim "overbilling," they are arbitrary, and do not reflect the true custom and practice.

106.    Although the auditing program of Fireman's Fund caused its regular panel defense counsel to "unblock" their time, the norm in the community remained that so-called block billing was not only allowed, but was and is prevalent.

107.    The standard for most firms is and has been that all of the time a lawyer spent on one case for a particular day would be subsumed into one time entry, even if time was spent on different activities.  It is also a less prevalent alternative practice to have a one time entry, with many descriptive phrases, for all work in a day that is inter-connected.  For example, if a lawyer were opposing a summary judgment motion, he might bill in one time entry only to interrelated items such as, "perform legal research on statute of limitations; draft Declaration of John Doe Re: Statute of Limitations; review documents; prepare brief re statute of limitations."

108.    In any case, it is clear that some form of multiple descriptive phrases in one time entry is the norm.  I have read no declaration or opinion of Mr. Schratz in his review of other law firms in which he has not criticized so-called "block billing."   What is missing from Mr. Schratz's Declaration is any statement to the Court as to how many of his hundreds of "audits" contained so-called "block billing."  If, as I suspect, and have witnessed in the sample of audits I have reviewed, all of them involve "block billing," then this would be proof that the widespread custom and practice is indeed "block billing."

109.    "Blocked" time is often a wealth of description for one activity, as described above in the hypothetical statute of limitations work.  On the other hand, a single description not involving multiple descriptors, such as "preparation of statute of limitations opposition" will usually be criticized as "vague."

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**



110.    Legal auditing, as practiced by Mr. Schratz and his ilk, is a disingenuous program to cut costs without regard to the reasonableness or efficiency of the billings. The most skillful, reasonable in cost, and efficient legal work is still "overbilled" according to his "auditing" standards, when the time entries have semicolons, and also when they don't.

111.    I have reviewed billings of Mr. Schratz, and as well have reviewed billings of Mr. Schratz and Schratz's auditors used at Fireman's Fund, the Stuart, Maue firm of St. Louis, and state that each contained numerous "blocked" entries. I have also reviewed legal bills of work performed by Fireman's Fund attorneys under the direct supervision of Mr. Schratz, and note that most of the entries involved so-called "block billing." Mr. Schratz, acting as an expert for a southern California law firm, supported its billings, most of them "blocked."

112.    The greater part of the *Duran* litigation involved activities which each involved large blocks of time, such as preparation of motions or oppositions to motions, appellate briefs, depositions, preparation for depositions, and trials.

113.    If much of the work here involved discrete tasks involving small and finite amounts of time, such as isolated phone calls and letters, the "block billing" nature of the bills might make it difficult to determine whether the overall time for each small task was reasonable. However, given the nature of the work in the *Duran* case, the reasonableness of the billings can be assessed in large part by the total amount of time spent on a large project, e.g. preparation of a motion for summary judgment. Put differently, it does not aid a fee analysis to break up into small increments the time spent on such a motion. What is important is whether the overall time is reasonable.

114.    In many, if not most, of the opinions of Mr. Schratz which I have read, Mr. Schratz uses his computerized billing program to analyze how much *total* time was spent on a particular activity, such as an opposition to a motion for summary judgment, whereupon he often opines that the activity viewed as a whole took an excessively long time. I do not believe I have ever read an opinion of Mr. Schratz where he opined that the time was reasonable, except where he was working as an expert for a law firm. But my point is simply that it is the total time that Mr. Schratz claims, and I agree, is important.

DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION

115.   In this case, the Wynne firm seems to have lumped time together for particular tasks, and therefore the overall reasonableness can be easily assessed by the Court or an expert. If the Wynne firm had not "blocked billed" its time, and had produced billing records with time broken down in smaller increments day by day, Mr. Schratz, if he were true to his custom, would add up all the time over multiple days for a particular activity in order to assess its reasonableness. In this case, the Wynne firm has already done that.

116.   Obviously, if a lawyer were to have "padded" his time, that would result in the overall time for an activity appearing to be unreasonably long. What is startling in its absence from Mr. Schratz's Declaration any meaningful effort by Mr. Schratz to suggest that activities by the Wynne firm took an excessively long time or was inefficient. I believe that even Mr. Schratz cannot claim such, precisely because the Wynne firm did not employ numerous attorneys for a single task, and because most work was done by one or two highly skilled and experienced lawyers with intimate knowledge of the details of the case and the applicable law. In fact, the Carlton attorneys went to great lengths recently in conjunction with their so-far unsuccessful effort to avoid turning over their hours and bills in arguing that they were not contesting the specific amount of time Wynne spent on any particular activity. The amount of time spent on the tasks in this case is efficient in the extreme, in my opinion, and by his unusual silence on this topic Mr. Schratz seems to agree. Given the number of lawyers on each defense brief, I expect that the time of the Wynne firm will be lower in comparison.

### EXPERIENCE, COMPETENCE, BIAS

### AND INTEGRITY OF JAMES SCHRATZ

### SUMMARY

117.   I have extensive knowledge of the experience, competence, bias and integrity of Mr. James Schratz. I have had direct knowledge of Mr. Schratz and his activities for over 21 years. From his depositions, I also have knowledge of his background before 1988, when I first met him. Accordingly, I believe I am highly qualified to render opinions on these subjects.

118.   In short, my opinions can be summarized as follows: 1) as a litigator, Mr. Schratz only has minimal, junior-level litigation experience at which he was adjudged by his employers

22

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

**Ex. B - 158**

1  to be incompetent; 2) he has demonstrated no meaningful understanding, in this case or

2  otherwise, of the complexities of large litigation cases or sophisticated legal thinking; 3)

3  throughout his career he has exhibited an extreme bias in favor of the entity hiring him, which in

4  virtually every case is the fee payor; and 4) his opinions lack intellectual integrity and honesty.

5      119.    Having said that, Mr. Schratz has examined a number of legal billings, and has

6  information in the public domain that could assist the Court herein, including numerous

7  declarations he has filed in the Courts regarding other fee billings he has examined.  These

8  reports would demonstrate whether or not the Wynne firm efficiently utilized personnel in

9  comparison to other firms, and whether block billing is the norm in the legal community or a

10  deviation therefrom.  And they would demonstrate whether time spent on discrete tasks by the

11  Wynne firm was reasonable in comparison.  However, Mr. Schratz has chosen not to provide that

12  information to the Court in this case.

13      **BACKGROUND AND QUALIFICATIONS OF JAMES SCHRATZ**

14      120.    The undersigned was an attorney "supervised" by Mr. Schratz and his underlings

15  starting in 1988, and also was the managing partner a firm subject to several "audits" by an

16  outside "auditor" supervised by Mr. Schratz.

17      121.    I have read what has been represented by Fireman's Fund to be all of the articles,

18  correspondence and written speeches authored by Mr. Schratz while at Fireman's Fund dealing

19  with attorney fee billing issues, and have read numerous articles and speeches authored by Mr.

20  Schratz since then.  I have read internal memos of Mr. Schratz authored while at Fireman's Fund

21  regarding "CUMIS" litigation and outside counsel.  I have read newspaper quotes, speeches and

22  articles of Mr. Schratz suggesting that all, or most, or a high number, of lawyers were unethical

23  and criminally dishonest in charging attorneys fees.

24      122.    I have spoken with and/or deposed virtually everyone who worked significantly

25  with Mr. Schratz at Fireman's Fund in the early 1990s, including the head of the Claims

26  Department, the attorney succeeded Mr. Schratz in using outside auditors regarding outside non-

27  panel counsel, and another attorney who supervised Fireman's Fund's internal auditors used for

28  trusted panel counsel; and numerous claims executives reporting to or working with Mr. Schratz,

23

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

1    most of whom were highly experienced, and of significant tenure with Fireman's Fund.

2        123.   I have spoken with numerous lawyers in the Bay Area and around the country

3    who were subject to "audits" by the Schratz-hired auditors at Fireman's Fund (Mr. Schratz did

4    no "auditing" at Fireman's Fund). I also spoke with numerous fee counsel representing firms

5    who have had disputes with Mr. Schratz, including lawyers representing prestigious firms such

6    as Thelen of San Francisco and Fagre & Benson of Minneapolis, both during and after his tenure

7    at Fireman's Fund.

8        124.   I have also spoken with lawyers with or representing prestigious firms such as

9    Latham & Watkins and Wilson, Sonsini regarding false and scurrilous publicity about their firms

10   engendered by Mr. Schratz.

11       125.   I have read approximately 25 to 30 reports, Declarations or opinions of Mr.

12   Schratz since the inception of his firm of Jim Schratz & Associates. I have as well read several

13   "audits," consisting of both the audits he commissioned at Fireman's Fund and "audits" prepared

14   by him for his own firm. I have also read audits prepared by his outside auditors at the behest of

15   entities other than Fireman's Fund or Mr. Schratz.

16       126.   I have deposed or interviewed several "auditors" of the outside auditing firm used

17   by Mr. Schratz at Fireman's Fund. I have learned the "methodology" of the outside auditors Mr.

18   Schratz used at Fireman's Fund and the present methods Mr. Schratz uses to "audit" firms on

19   behalf of his own firm.

20       127.   I have engaged in fee litigation with Mr. Schratz; deposed him on several

21   occasions and observed his deposition and testimony in court.

22       128.   I have also read legal bills of Fireman's Fund employee lawyers working directly

23   for Mr. Schratz or lawyers chosen by Mr. Schratz. I have read bills of Mr. Schratz himself and

24   bills of outside auditors which he has approved and paid.

25       129.   I have interviewed several witnesses, and heard one witness testify, as to

26   inducements made or directed by Mr. Schratz for the witness to testify favorably to the position

27   of Mr. Schratz in fee disputes.

28       130.   I have newspaper and magazine articles about Mr. Schratz, attributing to him

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1    claims about lawyer overbilling, which based upon my other independent knowledge, I believe

2    to have been untrue.

3        131.    I have sued Mr. Schratz and Fireman's Fund on behalf of my former law firm,

4    successfully, for defamation on the basis of statements he caused to be made in local and

5    national publications.

6        132.    I was co-counsel in two trials, one for liability and damages, the second one

7    damages only, against Fireman's Fund based upon false and defamatory statements made about

8    my former firm by Mr. Schratz. I was present in court as co-counsel in 1996 and 1998 to receive

9    verdicts in favor of my former firm, and against Fireman's Fund for $3.0 million and $3.6

10    million, respectively, for defamation published or caused to be published by Mr. Schratz.

11        133.    On behalf of my firm and the named partners, I obtained a confidential settlement

12    with Mr. Schratz based upon defamatory statements he made about my firm after he departed

13    Fireman's Fund.

14        134.    I have reviewed a cover story in the *American Lawyer* published in or around

15    March, 1993 about Mr. Schratz entitled, "Litigation MISmanagement at Fireman's Fund,"

16    (emphasis in the original) detailing Mr. Schratz's dealings with our firm on an asbestos litigation

17    fee dispute.

18        135.    I was the principal lawyer at Tarkington on two prior large cases which Mr.

19    Schratz caused to be audited by his outside auditors, but which cases were controlled by other

20    claims personnel.    After two time-consuming and painstaking "audits," my firm received

21    payments from Fireman's Fund for more than the amounts billed to Fireman's Fund, with

22    apologies.

23        136.    Since 1992, I estimate that I have not gone more than four or five months at a

24    time without receiving some complaint from a lawyer, or a request for consultation, regarding

25    what the lawyer claimed were false, distorted, or incompetent assertions by Mr. Schratz of

26    attorney overbilling.

27        137.    I have also served as an expert or consultant on several Bay Area cases since I

28    formed O'Connor and Associates, in which the plaintiff firm received from the Court 100% of its

25

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1   billings, notwithstanding vehement criticism to the contrary by Mr. Schratz.

2        138.   As a result of the foregoing, I believe that I have direct knowledge of Mr.

3   Schratz's fee dispute activities from 1988 through the present, and also have knowledge of his

4   background and experience prior to that time. I believe that this information can assist the Court

5   in assessing the weight to be given Mr. Schratz's opinions.

6        **EXPERIENCE OF JAMES SCHRATZ**

7        139.   After his good scholastic record at USF Law School, Mr. Schratz was hired by

8   Heller Ehrman and fired at his first annual review, unusual when Heller Ehrman was expanding.

9   Mr. Schratz told me on deposition he was terminated by Heller Ehrman for being "too happy."

10        140.   He then worked for Rosenblum Parish, a smaller, reputable San Francisco firm

11   where he was dismissed after a year of employment. It is unclear, but Mr. Schratz may have

12   tried one or two real estate broker fee cases in a trial or trials of one half to one day.

13        141.   His subsequent work for corporate counsel at Fireman's Fund consisted of a mix

14   of litigation work and non-litigation work, the former mostly "monitoring" of outside counsel

15   hired by Fireman's Fund throughout the country, often with corporate counsel's name on the

16   pleadings.

17        142.   From my knowledge of Fireman's Fund's structure as a Fireman's Fund panel

18   counsel, I can state that Mr. Schratz's subsequent assignment to the Claims Department was a

19   step down career-wise from his position in the Corporate Counsel office.

20        143.   The work his group performed in Major Claims belies the name, because it dealt

21   mainly with garden-variety construction defect litigation. I know this because our firm received

22   case assignments from the group, and were generally supervised by the functional head of the

23   group, Mr. Robert Hill, a competent and experienced claims manager.

24        144.   Mr. Schratz's main occupation while working for Major Claims was

25   implementing his own unique solution to what insurers at the time referred to as the "CUMIS

26   problem" at the time besetting carriers throughout California, and to a lesser degree, throughout

27   the country.

28        145.   CUMIS counsel, as discussed above, refers to lawyers selected by the insured that

26

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1    the insurer must pay, because of the potential conflict of interest that arises when coverage may

2    be decided or influenced by facts proven in the underlying litigation.  The CUMIS doctrine is

3    now embodied in part in C.C.P. §2860.

4         146.    Two problems for insurers arose in the 1980's regarding CUMIS counsel: a) fee

5    rates and litigation methods were usually not as economical as those of "panel" counsel

6    customarily retained by the insurer; b) where coverage limits could be exhausted, but where, as

7    is standard, the defense obligation is unlimited, the insured is incentivized, in, for example,

8    environmental or toxic tort litigation, to pay millions for defense but nothing for tribute, contrary

9    to the insurer's financial interest.

10        147.    Some insurers began in the 1980s a program of closely scrutinizing CUMIS

11   counsel bills, including on-site visits to examine the underlying files, to challenge inefficiencies

12   and discourage unnecessary work.  As Mr. Schratz was beginning his career in claims, having

13   left his position in the corporate counsel's office, he saw legal auditing as a method to advance

14   his career, by using legal auditing, not just as a method to discourage inefficiencies or to bargain

15   down bills, but also to end the costly underlying litigation altogether.

16        148.    Mr. Schratz saw that legal "auditing," or close examination of defense counsel

17   bills, could be used for more than just cutting a bill by a few percentage points.  He saw that he

18   could use legal "auditing" results to threaten counsel with unfavorable publicity and damage

19   their reputation by reason of alleged "overbilling," which would in turn incentivize counsel,

20   under Schratz's thinking, to end the litigation or modify the insured's demands upon the carrier.

21   One such method of intimidating defense counsel would be for Mr. Schratz or one of his

22   investigators to call the clients of the defense firm to tell them that the company was

23   investigating overbilling by the firm and ask if the client had experienced similar overbilling.

24   Such phone calls, of course, could greatly harm the firm with institutional litigation clients.  I

25   know that Schratz did this to several firms, including mine.

26        149.    Another threat employed by Schratz would be of unfavorable publicity in a legal

27   publication.  Such unfavorable publicity was used by Schratz as an example with which to

28   threaten another audited firm  Schratz also did this to the Tarkington Firm..

27

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

**Ex. B - 163**

150.    While employed by Fireman's Fund, Mr. Schratz did no auditing himself, but learned about "auditing" by working closely with his outside auditor, the Stuart, Maue, Mitchell and James firm of St. Louis, Missouri.

151.    The person heading the Stuart Maue firm, Mr. Harry Maue, attended neither a legitimate college nor legitimate law school and received mail order "degrees" for both of these claimed degrees.  The other three names in the firm name, Stuart, Mitchell and James, do not represent real persons in being.  Mr. Maue falsely represented to the American Lawyer in 1990 that the names did represent individual who had once been with the firm.  See Exhibit B attached hereto in which the article discusses Mr. Maue's prevarication on the issue:

> "Despite its name, Stuart, Maue is a corporation and not a partnership.  Maue and Ernie James, a rumpled Air Force veteran who is the company's resident computer jock, are the only 'name partners' in evidence.  Asked about the other two, Maue first claims that he parted ways acrimoniously with 'Stuart' and 'Mitchell' a number of years ago.  He declines to give their current whereabouts, saying 'You can't talk to them.'  The fact, as Maue ultimately confides, is that no one can talk to them because they do not exist:  They are fictitious.  'The names 'Stuart' and 'Mitchell' [do not] represent the names of former partners,' Maue writes in response to a written query.  'The name Stuart, Maue, Mitchell & James, Ltd. simply represent the name I chose to give this company when it was formed.'  Maue angrily maintains there is nothing inappropriate about his letterhead."

152.    After the publication of this article, Mr. Maue commenced claiming publicly that these names were always meant to be fictitious, and refer to his heroes Jeb Stuart, the Confederate war general, Billie Mitchell, the WWI pilot, and Jesse James, the famous outlaw.

153.    Mr. Schratz would invariably use the Maue firm for legal "audits," because the Maue firm in essence guaranteed "finding" a substantial amount of "overbilling," usually 20-50%.  These "findings" of a Maue audit would then be used by Schratz as a basis to threaten publicity if the audited firm did not act in accordance with Mr. Schratz's wishes.

154.    In short, legal auditing, including attendant publicity based thereon, was one of the methods Mr. Schratz used as part of a whole array of bullying and coercive tactics designed to end CUMIS litigation for his company.

155.    My firm learned of this operation of Mr. Schratz early in the program.  After my partners, Mr. Tarkington and Mr. O'Neill called upon Mr. Schratz and learned of his program,

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

1 we made the decision not to actively solicit the business of Mr. Schratz, which we considered to

2 be a rogue "black bag" operation, even though we worked extensively for claims executives

3 throughout Fireman's Fund.

4   156. Unfortunately, this decision did not keep us away from Mr. Schratz, whom we

5 encountered in our work for the FDIC, as counsel for the FDIC as Receiver of the Golden Valley

6 Bank of Turlock, California.

7   157. After this bank was closed by the FDIC in or around 1985, our firm immediately

8 became counsel for the Receiver and inherited a multitude of litigation, all of it insured by the

9 insurer for the Bank, Fireman's Fund. We also sued on behalf of the FDIC various directors and

10 officers, also insured by Fireman's Fund.

11   158. For several years, we worked in harmony with Fireman's Fund claims executives

12 out of Fresno, California, who acknowledged Fireman's Fund's obligation to defend the cases,

13 and pronounce themselves pleased with our economical handling of the litigation. Although we

14 regularly did work for Fireman's Fund as panel counsel, in this case we were "CUMIS" counsel

15 on behalf of the FDIC and the Bank.

16   159. However, this litigation was shifted to Mr. Schratz's Major Claims group in late

17 1988, where upon Mr. Schratz demanded that the firm seek payment for defense costs from the

18 government, not from Fireman's Fund.

19   160. I met with Mr. Schratz in November, 1988 and explained to him that Fireman's

20 Fund indeed had an obligation to the Receiver of the Bank just as he did to the Bank itself. He

21 then proposed that for a token payment, we should consider the insurance policy "exhausted," so

22 inform our client the FDIC, and then importune the FDIC to pay our bills, releasing Fireman's

23 Fund.

24   161. Since the Bank had $5.5million in coverage from Fireman's Fund and a limitless

25 defense reimbursement right from Fireman's Fund, we felt obliged by our duties to politely

26 refuse Mr. Schratz's request.

27   162. Thereafter, we were told by his assistant Mr. Hill that Mr. Schratz had issued an

28 order that we could receive no further cases from Fireman's Fund until the Golden Valley Bank

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

1    matter had been resolved.  Eventually we were subject by Schratz to numerous time-consuming

2    audits, which we resolved successfully when the cases were controlled by other claims

3    executives.

4         163.    Eventually, we were audited in the asbestos litigation and certain asbestos

5    litigation where Fireman's Fund was one of seven carriers.  We quickly resolved the matter with

6    six other carriers, but fought with Mr. Schratz, who eventually began issuing scurrilous publicity

7    suggesting fraud and criminality on the part of our firm.  We were forced to sue Fireman's Fund

8    and Mr. Schratz, for which we obtained verdicts of $3.0 million and $3.6 million, and settled

9    confidentially with Mr. Schratz.

10        164.    After our fee case was arbitrated, Mr. Schratz left Fireman's Fund under

11   circumstances suggesting less than a voluntary departure.  Mr. Schratz claimed to a local legal

12   newspaper that he left Fireman's Fund as a way of cutting the company's expenses.

13        165.    Before he left Fireman's Fund, Mr. Schratz issued numerous articles and

14   speeches, and courted publicity whenever and wherever he could get it, suggesting that there was

15   rampant "overbilling" by attorneys in defense litigation, that much of the defense bar should be

16   subject to State Bar discipline or criminal proceedings, and that the amounts involved were

17   usually 30%-50% of the bills, and that it occurred in 70% of the cases.

18        166.    While making these scurrilous remarks publicly and demeaning and tarnishing the

19   entire reputable litigation Bar, in more confidential settings it became clear that the claimed

20   "overbilling" usually consisted of technical objections to form for time actually spent, rather than

21   substantive objections to the amount of time claimed.  For instance, in our case, Schratz falsely

22   and publicly "leaked" that our firm's lawyers billed 785 hours in a month and 33 hours in a day.

23   Behind closed doors, he spent millions to make highly technical complaints as to how we

24   described and allocated our time over 5000 cases, when most of the work was performed in

25   common; one partner admittedly used his paralegal to bill out his burdensome timesheet

26   allocations to hundreds of cases.

27        167.    Schratz's (and his former auditors') criticisms were similarly technical in all other

28   cases.  If a lawyer, was and is the custom, submitted a time entry with various descriptions of,

30

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

1    say, trial preparation activities, separated by semi-colons, such was considered by Schratz and

2    his auditors to be "block billing" and thus, "overbilling;" if a lawyer billed only one entry, e.g.,

3    "trial preparation," that entry, on the other hand, was "vague" and also "overbilling." The work

4    of paralegals was usually criticized as being mostly "clerical," and therefore not worthy of

5    reimbursement, thus constituting "overbilling"; mundane tasks performed by partner-level

6    personnel was criticized for not being assigned to lower-level personnel with lower billing rates;

7    work performed by lower-level personnel, and not partners, was often criticized as being not

8    efficient because of lack of experience; multiple "billers" were criticized; inter-office

9    conferences were routinely determined arbitrarily to constitute "overbilling"; the list goes on.

10        168.    I will give to the Court two examples of Mr. Schratz's tactics in this regard. The

11   first involves the reputable California firm of Latham & Watkins, which was defending a school

12   in San Diego sued for wrongful termination and insured by Fireman's Fund. The defense was

13   paid for by Fireman's Fund and the settlement made by Fireman's Fund. However, after the case

14   ended, Mr. Schratz sued Latham & Watkins for malpractice for overbilling and sought the fees

15   and indemnity payments to be returned.

16        169.    I happened to depose the lead outside auditor for Mr. Schratz auditing the work

17   performed by Latham & Watkins, who highly praised the firm's work and also its billings. I also

18   interviewed a lead lawyer for Latham & Watkins.

19        170.    However, publicly Mr. Schratz generated great publicity claiming that Latham &

20   Watkins had significantly overbilled the case, suggesting fraud or abuse. The publicity

21   continued until Latham & Watkins relented and settled the case, where upon Mr. Schratz

22   trumpeted his victory.

23        171.    The Court in this case has also received from Mr. Schratz part of the publicity he

24   generated to force the Wilson, Sonsini firm into a settlement regarding its fees for the Pelican

25   Bay Prison litigation which Wilson, Sonsini pursued successfully and admirably as a public

26   service, only to be publicly calumniated, dishonestly in my opinion, by Mr. Schratz.

27        172.    Wilson, Sonsini staffed its prison litigation in an admittedly liberal way, by

28   allowing sometimes summer interns and idealistic young lawyers to be involved in a duplicative

31

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

**Ex. B - 167**

1 or observational capacity, for which they duly recorded time.  The firm was justifiably proud of

2 its commitment to public service, and advertised this to their young lawyers.

3      173.    Although the firm gave its entire computerized billing records to the State after its

4 success in the litigation, it never expected 100% payment for duplicative or observational time,

5 and made that clear to the State from the outset of fee discussions.  I know this because I

6 consulted with fee counsel who represented Wilson, Sonsini.

7      174.    However, in typical fashion, Mr. Schratz generated scurrilous publicity about

8 Wilson, Sonsini's "overbilling" of the Pelican Bay litigation, in the process tarnishing dedicated,

9 public-spirited lawyers who deserved to be praised.  Attached as Exhibit C is one example of this

10 publicity appearing to defame the firm, in an article appearing in the local legal newspaper.

11      175.    There is no doubt but that this scurrilous publicity caused Wilson, Sonsini to settle

12 the fee matter, and then to return to its law business, rather than sue Mr. Schratz for defamation.

13 Generation of such publicity was Mr. Schratz's main contribution to attorney fee issues.

## AUDIT METHODOLOGY

15      176.    As a result of the foregoing, I became quite familiar with the "methodology" of

16 the Maue outside auditors used by Mr. Schratz while at Fireman's Fund.  Without getting into all

17 the details of the methodology, it suffices to say that one admirable aspect of that firm's auditing

18 process was that every time entry was examined, every piece of paper related to the time entry

19 was examined, and each lawyer questioned as to any claimed uncertainties regarding the time

20 entry.  Thus, while the methodology was otherwise completely biased in an arbitrary fashion to

21 cut down the "verified" portion of the bill, it at least had the virtue of thoroughness.

22      177.    Not coincidently, the practice also cost the audited firm great amounts in

23 unbillable time.  Mr. William J. F. Roll of Sherman & Sterling was quoted and paraphrased by

24 the *Wall Street Journal* on July 21, 1992 (as repeated in the *Marin Independent Journal* of July

25 26, 1992, attached as Exhibit D) as complaining about the intrusive and costly nature of being

26 audited by Schratz and his auditors:

27      "And, speaking for many attorneys, he says he found an audit ordered up by
        Schratz to be intrusive and demeaning.  As he described it, 'They went through
28      our files, virtually every piece of paper that was not privileged, and they read it,
        and they had lots of questions.  A lot of our people, including myself, had to

32

**DECLARATION OF JOHN D. O'CONNOR  IN SUPPORT OF FEE PETITION**

**Ex. B - 168**

spend an awful lot of time explaining what had happened.' And, of course, the time was unbillable."

178.    During his tenure at Fireman's Fund and shortly after starting Jim Schratz and Associates, Mr. Schratz frequently criticized as inadequate any "audit" that was not a full field audit performed in the fashion described. One such example of this is Mr. Schratz's article attached as Exhibit E hereto, "The Need for Legal Audits."

179.    However, such audits are expensive and in fee-shifting cases, where the parties seek to oppose fees merely by motion without extensive litigation, the method described by Mr. Schratz is impossible and impractical.

180.    Accordingly, it is Mr. Schratz's current practice to shortcut any meaningful study or analysis in favor of superficial, selective and facile observations. His practice is to scan legal bills into a computer system and use software for certain types of analyses determining, for example, the amount of time considered "block billing," spent on particular motions, on pleadings, and on conferencing and the like, so that negative observations can be made under the guise of applying objective criteria.

181.    Such computerized reports could provide the basis for a knowledgeable and experienced attorney to make helpful observations. But the converse is also true, that without expertise and experience, computerized breakdowns mean very little. In any case, there is no such thing as "legal auditing" other than what a particular "auditor" arbitrarily deems it to be. If the auditor doesn't understand the complex litigation, or doesn't want to, there results a serious "garbage in, garbage out" defect in the "audit" method.

182.    In any case, Mr. Schratz is not performing the kind of thorough legal auditing he and his outside auditors had for many years championed, and is using the term "audit" to convey falsely to the reader that he has performed some type of disciplined, rigorous and artful analysis superior to that could be performed by a person not claiming to be an auditor.

183.    Indeed, the use of the term "audit" is used to mask the fact that Mr. Schratz is doing far less by way of review and analysis than an experienced litigator would perform when acting as an expert witness in a fee case.

DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION

**Ex. B - 169**

184.    Even where Mr. Schratz claims to have performed such an analysis himself, in my opinion, he has only the most minimal competence, by virtue of his status as a licensed attorney, to perform such an analysis.

185.    I personally have witnessed stunning examples of Mr. Schratz's lack of knowledge of litigation.

186.    In the Golden Valley Bank litigation, Mr. Schratz persisted over several months to claim that my firm was acting in conflict of interest in that litigation, even though we represented but one party, the FDIC as Receiver in several different pieces of litigation. However, Mr. Schratz claimed that, even though we consistently represented the same party in these various cases, we were in conflict because in some cases we were paid by the carrier, Fireman's Fund, and in some case we were bringing suit against parties whose defense was paid by the carrier, Fireman's Fund. To be fair, it was difficult for me to determine how much of this was incompetence and how much was simply intellectual dishonesty.

187.    In several other instances, Mr. Schratz has written and spoken publicly about the lack of necessity for written interrogatories when counsel can simply phone the opposing attorney to find out the information. Such statements show a profound lack of understanding of the litigation process. See Exhibit F, an article containing such a statement by Schratz.

188.    I have indeed found Mr. Schratz to be intellectually dishonest as well as incompetent. To give just one example, when he acted as fee expert for a prominent law firm in Southern California, he justified the very same billing practices which he criticized in other cases. Moreover, I have reviewed bills of lawyers working directly for Mr. Schratz (which were to be shared by or billed to another carrier for payment) filled with entries of the type that Mr. Schratz had consistently condemned as being "overbilling," when he was being retained by the fee payor and against its law firm.

189.    Until Mr. Schratz left the insurance industry at the end of 1993, he had a poor reputation within the industry, both for lack of integrity and for the potential liability of his activities. Within his own company, Fireman's Fund, he had the same reputation. Even Mr. Schratz's major supporter at Fireman's Fund, the Executive Vice President of Claims, Mr. Gary

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

**Ex. B - 170**

1   Black, was quoted by the *Wall Street Journal* as admitting that Schratz had a "very biased view"

2   of billing issues. Mr. Black told me on deposition essentially the same thing.

3       190.   Therefore, at the very least, putting aside questions of honesty or competence, Mr.

4   Schratz is certainly biased. In his article, "The Need for Legal Audits," he recommends

5   widespread use of legal auditing, a field he helped promote and which he was soon to enter in

6   private practice. In any case, his bias has always been well-known. The article describes an

7   extremely adversarial approach by Schratz:

> "Over the years Schratz, whose personal code was neatly summarized last March
> entitled, Ready, Fire, Aim, has had to do some explaining himself when his
> aggressive tactics backfired. After the Tarkington firm was knocked off the
> asbestos case, Fireman's Fund's hand-picked successor, hired at relatively low
> pay, lost two major decisions in court.
> ANGRY PHONE CALLS
> Some other lawyers see Schratz as a publicity hound or an alarmist. Gary
> Black…says he gets angry phone calls about Schratz fairly regularly."

       191.   Mr. Schratz's criticism of tactics and strategies of the Wynne firm in this

litigation demonstrate, in my opinion, the same lack of credibility of Mr. Schratz that I have

witnessed for the last twenty-one years. When Mr. Schratz criticizes Mr. Wynne for waiving a

jury, an excellent and artful gambit under the circumstances, obviously proven successful, it is

difficult for me to determine if this criticism is the result of his raging bias, his extreme

incompetence or his patent intellectual dishonesty. The conclusion to any of three possibilities is

the same: Mr. Schratz's testimony should be afforded no weight by this Court.

       192.   This is not to say that all legal bills criticized by Mr. Schratz are unworthy of

criticism. Sometimes, as they say, a blind squirrel gets an acorn. For example, in *Rios v.*

*Rowand*, a public interest lawyer visited a prison frequently and consulted with the female

inmates, including those with children. The lawyer knew well the prison's policy for allowing

visitation by the children. After successfully litigating this policy, the lawyer attempted to bill

the government for the thousands of hours she spent visiting the jail in performance of her

normal duties as a prison advocate, most of which, of course, were unnecessary to the litigation,

and not performed primarily for the sake of the litigation.

       193.   In *Rios v. Rowand*, the court initially approved only a small portion of the fees

**DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF FEE PETITION**

**Ex. B - 171**

1    claimed, and after an appeal, the fee question was remanded to the same court for more specific

2    factual findings, at which point Mr. Schratz was hired and the matter litigated. The court

3    thereafter issued a similar result but with more detailed findings.

4        194.    *Rios v. Rowand*, then, is an example of a court awarding fees roughly conforming

5    to Mr. Schratz's opinion, but which opinion has little or no causative relationship to the law

6    award.

7        195.    Mr. Schratz's opinions that I have reviewed are always wildly favorable to the

8    entity hiring him. In the Golden Eagle matter to which Mr. Schratz refers, he was hired to give

9    Golden Eagle a basis to pay a claim in a receivership context, not to fight payment. When he has

10   been hired by law firms to support their bills, he has done so in complete reversal of views and

11   principles he expressed contrarily when hired by the fee-paying client. I have never witnessed

12   Mr. Schratz giving due deference, or any complimentary comment, to the opposing side.

13       196.    In short, I would assert that the determination of the reasonableness of the fee to

14   be paid the Wynne firm should not be based on anything that Mr. Schratz has said, because any

15   opinion of Mr. Schratz is necessarily biased, superficial and incompetent.

16       197.    I have agreed to serve as an expert witness in this matter with Mr. Wynne at a rate

17   of $700 per hour. As of the date of this Declaration, I have expended 79 hours in reviewing the

18   file and transcript and preparing this Declaration, for a total fee of $55,300.

19                                    **SUMMARY**

20       198.    In summary, it is my opinion that the services performed by the Wynne firm were

21   excellent in all respects, performed extremely efficiently and billed at a rate that is reasonable.

22   In my opinion, considerations of skill, efficiency and risk each militate in favor of a significant

23   multiplier.

24       I declare under penalty of perjury under the law of California that the foregoing is true

25   and correct. Executed this 27 day of July, 2010, at San Francisco, California.

26

27

28                                    JOHN D. O'CONNOR

                                         36

**Ex. B - 172**

# EXHIBIT C

1
2
3
4
5
6
7
8        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9        **COUNTY OF SACRAMENTO**
10       UNLIMITED JURISDICTION
11
12

| | |
|---|---|
| MEDRO JOHNSON, | No. 34-2009-00054053 |
| Plaintiff, | **DECLARATION OF JOHN D. O'CONNOR IN REBUTTAL TO OPPOSITION TO FEE PETITION** |
| v. | |
| SEARS, ROEBUCK AND CO., SEARS HOME IMPROVEMENT PRODUCTS, INC., PAUL ST. HILAIRE, and DOES 1 through 50, inclusive, | Date:  March 9, 2012 Time: 1:30 p.m. Location: 125 |
| Defendants | Complaint Filed: July 27, 2009 Trial Date: September 19, 2011 |

I, John D. O'Connor do hereby declare as follows:

**EDUCATION, EXPERIENCE AND WORK HISTORY**

1.      I am an attorney licensed to practice in all courts in the State of California, and have been so licensed since December, 1972.

2.      I am the principal of O'Connor and Associates, a law firm consisting of the undersigned and one associated, and I have been engaged primarily in litigation practice since 1972.

3.      I attended The University of Notre Dame in South Bend, Indiana, where I graduated *magna cum laude* in 1968.  I attended the University of Michigan Law School where

---

**DECLARATION OF JOHN D. O'CONNOR**
1

Ex. C - 174

1    in graduated *cum laude* in 1972, and was a member of the *Order of the Coif*, and Associate

2    Editor of the *Michigan Law Review*.

3        4.    From June 1972 until January 1, 1974, I was employed as an associate with the

4    firm of Belli, Ashe & Choulos as litigation associated.  In that capacity, I tried several cases with

5    senior partner Melvin L. Belli, Esq. and tried several cases by myself.

6        5.    From January 1974 through January 1980, I was an Assistant United States

7    Attorney for the Northern District of California in San Francisco, California.  In that capacity, I

8    tried white collar criminal cases as well as a variety of civil matters, including medical

9    malpractice, employment discrimination, challenges to governmental actions, and a wide range

10   of other cases.

11       6.    In 1980 and 1981, I was a Senior Associate at the San Francisco law firm of

12   Brobeck, Phleger & Harrison, where I worked on complex business litigation matters.  From

13   1982, through 2001, I was a principal with and managing partner of the law firm of Tarkington,

14   O'Connor & O'Neill, where our clients were mainly major insurance companies, corporate risk

15   management departments, and governmental entities.  Among the governmental entities we

16   served were not only local and State agencies, but also the FDIC, FSLIC, RTC, the NCUA

17   (National Credit Union Administration), and the United States government itself.

18       7.    From late 2001 through July 2006, I was employed with the San Francisco firm of

19   Howard Rice as a Special Counsel and Director, practicing with the litigation department.  At

20   Howard Rice, my litigation work consisted of tobacco/asbestos defense litigation on behalf of

21   R.J. Reynolds Company, intellectual property litigation, and a variety of commercial litigation.

22       8.    I have tried approximately 70 cases in state and federal courts throughout

23   California, as well as in courts located in Nevada, Pennsylvania and Arizona.  I have also

24   litigated cases venued in Hawaii, Texas, Alaska and Illinois.

25       9.    Since July of 2006, I have practiced on my own under the name of O'Connor and

26   Associates.  In that capacity, I associated as a trial lawyer with the Downey Brand firm of

27   Sacramento in trying a two-month jury trial in Douglas County, Nevada, on behalf of landowner

28

**DECLARATION OF JOHN D. O'CONNOR**
2

1   Park Cattle Company against the lessee of a casino groundlease in Stateline, Nevada. Before the

2   jury returned, the case settled in favor of my clients for $165 million.

3          10.    I successfully arbitrated as co-counsel a case in Dallas, Texas against the Dallas

4   Mavericks, where my client was awarded $7.1 million; and recently tried a case in Marin County

5   Superior in which we achieved $2.5 million settlement on behalf of two homeowners while the

6   case was being tried to a jury before Judge Michael Dufficy. I have over thirty-nine years of

7   significant trial experience, including current jury trial experience.

8          11.    I have consulted or have been retained as a fee expert on approximately fifty

9   occasions, most of them since 1992, and many involving rebuttal of opinions offered by James

10  Schratz. I have reviewed approximately twenty-five to thirty reports of Mr. Schratz. These

11  matters involved billing disputes throughout the country.

12         12.    In addition, I have significant experience dealing with fee issues in other contexts.

13         13.    I litigated fees in a number of civil rights and other "fee-shifting" cases on behalf

14  of the United States government while acting as Assistant United States Attorney for the

15  Northern District of California.

16         14.    I litigated a large fee case with the Tarkington firm in or around 1984 against

17  Heller Ehrman firm, on behalf of Sonoma County, in a class action prison case involving

18  constitutionality of various conditions of confinement in the Sonoma County jail. As part of this

19  litigation, I reviewed in detail the billings of attorneys in the Richard Goff litigation group at

20  Heller, for which Mr. Schratz had worked during his brief stint there.

21         15.    I was also the counsel charged by the United States government to assess and

22  negotiate significant counsel fees for different firms prevailing in a class action labor

23  discrimination case brought against the Naval Air Rework facility for the Honorable William H.

24  Orrick.

25         16.    As managing partner of the Tarkington firm, it was my responsibility to work

26  with several large institutional clients, such as insurers, corporate legal departments and

27  governmental entities such as FDIC and RTC, to discuss and enforce billing guidelines for those

28  entities.

DECLARATION OF JOHN D. O'CONNOR
3

**Ex. C - 176**

17.    While at the Tarkington firm, I consulted with numerous insurance claims professionals regarding billing issues surrounding the retention of CUMIS counsel, paid by the insurer but not selected by the insured. The insurer billing guidelines for "panel" counsel were generally inapplicable to such outside counsel, and accordingly, I frequently advised as to applicable billing standards prevalent within the Bay Area legal community.

18.    I also monitored legal billing counsel throughout California, when representing excess carriers. I frequently consulted with insurance carriers about billing practices in the legal community.

19.    As a managing partner for twenty years at the Tarkington firm, I reviewed numerous bills of lawyers under my supervision, as well as lawyers in my firm but outside my direct supervision. On my own volition, or in discussions with clients, I frequently analyzed and adjusted billing for efficiency and competence where appropriate. As part of my duties, I frequently conferred with other managing partners about billing standards.

20.    Practicing as a Senior Associate at Brobeck, Phleger and Harrison (1980-1981) as a Senior Counsel and Director at Howard Rice (2001-2006), I became aware of the billing customs and practices enforced at these reputable firms.

21.    I have on several occasions examined fee billings on behalf of clients and, where appropriate, sought reductions.

22.    In 2005-2006, I served as a JAMS arbitrator on an asbestos fee dispute involving over $2 million in billings.

23.    Based upon the foregoing, and my 39 years of litigation and trial experience, I consider myself to be an expert cap[able of assessing the reasonableness of litigation fees for complex litigation. I also have extensive knowledge of the background, experience, reputation, bias and competence of James Schratz.

24.    Having reviewed billing and billing standards of law firms numbering in the hundreds, I know well the customs and practices throughout the country regarding multi-entry billing, termed "block" billing by Mr. Schratz; billing for multi-lawyer task assignment; and the billing of paralegal services.

Ex. C - 177

25.     I therefore believe I am competent to render an opinion that, with very few exceptions, it is the universal practice within the legal profession for a lawyer to record multiple task descriptions within one time entry; assignment of more than one lawyer to a hearing, mediation or other project is within accepted billing norms; some occasional lawyer time is appropriately used and billed for incidental document management.

26.     Recently, representing a large national firm, I sought approximately $4.8 million in contested litigation fees in front of a panel of three arbitrators in Los Angeles.  The firm was awarded the full amount of fees sought.

27.     I have also have had experience both as a Fireman's fund regularly retained insurance defense counsel, and an independent counsel named by the insured and paid by Fireman's Fund, and supervised by Mr. Schratz.

28.     In the cases of *Miller v. Vicorp Restaurants, Inc.* (N.D. Cal. 2006) 2006 U.S. Dist. LEXIS 2210 and *Gober v. Ralph's Markets,* I was retained as an expert witness to rebut opinions of Mr. Schratz, who opined quite similarly to the case at bar, about the impropriety of block billings, duplicative work and clerical entries.  In both cases the reviewing Court awarded the applicant firm 100% of the amount sought, contrary to the recommendation of Mr. Schratz.  Indeed in *Miller,* federal judge Ronald Whyte expressly stated that he did "not find Mr. Schratz's declaration helpful: and had not relied on it."  2006 U.S. Dist. LEXIS 2210, fns.2 and 3.

29.     I was also an expert retained to rebut Mr. Schratz's opinion in *Duran v. US Bank* where Mr. Schratz recommended a fee award of approximately $3 million in a "fee-shifting" case, and the Court awarded $18.8 million.

30.     In *Duran,* Judge Freedman of the Alameda Superior Court, as part of a 41 page opinion (awarding a $640 hourly rate to Mr. Wynne, a twenty-year lawyer with less trial experience than Mr. Whalen), made the following comments about the credibility of the analysis presented by Mr. Schratz, as well as the credibility of my analysis in rebuttal:

> …The Court finds that Plaintiffs have presented extensive evidence that the hourly rates their attorneys have requested are within the range of rates charged by and awarded to attorneys of comparable experience, reputation, and ability for comparable complex litigation.  CHMC, 97 Cal.App4th 740, 783.  That evidence includes: (1) the sworn testimony of four highly respected local attorneys who

DECLARATION OF JOHN D. O'CONNOR
5

**Ex. C - 178**

handle comparable complex class action litigation; (2) extensive data on the current rates charged by many other Bay Area law firms that handle complex litigation; (3) testimony as to the rates awarded in comparable cases; (4) rates previously found reasonable-indeed, the Court notes, at higher rates than requested here-for Plaintiffs' counsel Mr. Wynne; and, (5) **persuasive expert testimony expressed by Mr. John D. O'Connor.**

…Based on the enormous volume of paper in terms of billing records, briefing, **analysis by Defendant's expert Mr. Schratz and Plaintiffs' expert Mr. O'Connor, the supporting and opposing declaration of others with expertise (or purported expertise), the Court find that the number of hours spent by Plaintiffs' counsel also is reasonable…**

**…3. Defendant's Arguments that Plaintiffs' Counsel's Hours Should Be Reduced Are Rejected.**

As an initial matter, the **Court notes the competing declarations of James P. Schratz, Esq. in support of Defendant's opposition and supplemental opposition and the declarations of John D. O'Connor, Esq. submitted on behalf of Plaintiffs.**

**With respect to Mr. Schratz, the Court derived modest benefit, at most, from Mr. Schratz' analysis. There can be no doubt as to his partisanship. He does not come before the Court in any way that can be described as an independent witness. Mr. Schratz brought minimal value to the process.** Mr. Schratz's experience is substantial in areas which are not pertinent to the issues before the Court, including the billing practices of firms that serve as panel counsel for insurance companies or staff counsel for insurance companies. The Court finds it interesting but of little value in making an award in a wage and hour class action in which counsel are compensated entirely on a contingent fee basis as an exercise of the court's discrimination. The consequence of the Court's findings in this regard is that the Court affords little weight to Mr. Schratz' evaluation and rejects his arguments that Plaintiff's counsel's fees should be reduced for any reasons he articulated.
**In marked contrast to the Court's findings with respect to Mr. Schratz, the Court finds Mr. O'Connor's declaration to be considerably more persuasive in assessing the relevant issues before this Court.** The Court finds Mr. O'Connor's opinions related to the lodestar analysis to be useful, insightful and well-reasoned…

## SUMMARY OF OPINIONS

31.    The rates here sought by the petitioning lawyers ("Whelan group") are well within the top-tier of the market for both Bay Area and California lawyers of similar experience.

32.    The top tier of rates for one of Mr. Christopher Whelan's ability and experience, if charged by a top tier firm, would be $700-$800 per hour, as exemplified by rates of lawyers of

1    similar experience at firms such as Gibson Dunn, O'Melveny, Howard Rice, and other

2    comparable firms.

3         33.    Perhaps some discount to reflect the Sacramento market is appropriate, even

4    though firms from San Francisco and Los Angeles do not lower their rates for Sacramento

5    litigation. Thus, $650 per hour for Christopher Whelan is not unreasonable.

6         34.    It is customary, in my experience, for courts, as in <u>Duran</u> above, to award rates

7    prevailing at the time of the fee award, not at the time of the work performed.

8         35.    The rates suggested by defendant's expert are below the relevant market, other

9    than the market for volume corporate litigation counsel, which has wholly different economics

10   than a "one off" assignment in an important case.

11        36.    The instant case was one in which Plaintiff needed to attract counsel, and that

12   difficulty, which reflects risk, should be factored into the multiplier.

13        37.    The instant case was of questionable outcome from the outset and deserves a

14   multiplier of two for risk, difficulty and staffing efficiency.

15        38.    So-called "block billing" is the norm in the legal services industry, not the

16   exception, and the petitioning lawyers billed a very low percentage of true "block" entries

17   relative to the market.  Indeed, most entries are not "block" billings, because time is inserted

18   separately for each entry.

19        39.    The instant litigation, in which Plaintiff's counsel billed only two lawyers for all

20   the attorney hours, and none for paralegals, was pursued in an extremely efficient manner, and

21   this fact should bear both upon rates and multiplier.

22        40.    The amount of hours expended on appearances by multiple attorneys was

23   unusually low relative to the normal practice, and trial staffing was more efficient than normal.

24        41.    A rate of $345 for Brian Whelan is reasonable, as is his billing of travel time, a

25   standard practice.

26   ///

27   ///

28

---

**DECLARATION OF JOHN D. O'CONNOR**
7

**BILLING RATES**

42.     I have knowledge of billing rates throughout the Bay Area, which with minor adjustments are applicable to Sacramento, for the various types and classes of litigation, and have had such knowledge since 1980.

43.     It is true that there is a wide range of rates charged throughout the Bay Area for employment litigation counsel, from insurance defense rates on the low end ($175-$300 per hour, often charged as a "blended" rate for all lawyers within the firm) to mid-range rates ($300-$500) per hour for litigation partners, some blended on the lower end) to top-tier rates (in employment work $500-$750 per hour for litigation partners).  For "one off" or single assignment referrals from corporations and small businesses, as opposed to "volume" arrangements for steady referrals, partner rates range in the middle tier of rates from $375-$575 per hour and with highly experienced lawyers (of over 25 years litigating), the range is $475-$575.  For "one off" assignments the top tier rates remain the same, that is $500-$750.

44.     This broad range of rates also holds true for, and is quite similar to, what is generally termed "defense" litigation, which, like "employment" work, is a common form of litigation, and promises great volume for firms that prove successful, especially at lower and middle range rates.   It is also a form of general litigation that is necessary for many larger firms to handle as a service to their clients.

45.     In the course of my thirty-nine years of practice, I have handled a number of labor cases such as wage, discrimination and wrongful termination litigation, and have tried at least six such cases that I can presently recall, one of which was a disability discrimination case before Judge Ronald Sabraw of Alameda County Superior Court in 2001.  I tried one eight-Plaintiff wage/hour case in San Francisco Municipal Court.  I recently served as a mediator on a twelve-Plaintiff wage-and-hour case set for trial in Alameda County.  I have also tried one wrongful termination case in Arizona, and three discrimination cases in U.S. District Court in San Francisco. I have also tried various cases in San Francisco Superior Court, with my first trial in December 1972 before Judge Carpeneti.  I have tried cases in recent years in San Francisco Superior Court before Judges Mitchell, Munter, Chiantelli, Mellon and Conway, to name a few.

DECLARATION OF JOHN D. O'CONNOR
8

46.     Even though I consider myself quite capable of handling most labor cases, and in spite of the fact that I defended one large class action discrimination case while with the government, and numerous employment discrimination and wrongful termination cases in government and private practice, I do not consider myself to be "expert" in the field of employment litigation. However, for an employment matter that might be tried, I would be considered more valuable to the market than many employment specialists without great trial experience. Mr. Christopher Whelan, who has a long history of employment trial work, and has tried other types of cases as well, should be valued highly in the employment litigation market.

47.     At the Tarkington firm, where much our work was assigned by banks, the government or insurance carriers, we engaged in both defense litigation and employment litigation at insurance defense or government rates, while at Howard Rice, we engaged in "defense" litigation and employment litigation only if paid top-tier rates. Clients such as R.J. Reynolds Tobacco Company, which felt the need for and demanded superior work, paid these rates to Howard Rice and comparable firms throughout the country. It was the firm philosophy, as in many top-tier firms, not to accept employment, products liability or toxic tort litigation (such as asbestos defense litigation) at middle-market rates. In 2004 through 2006, these middle-market rates for defense and employment litigation were approximately $425 to $475 per hour for partners, today having increased up to a ceiling of $550 to $575 for "one off" litigation assignments. On the other hand, my rate for defense litigation for R.J. Reynolds was $615 per hour in 2006, and employment litigation involved similar rates. A fellow Director (partner-level lawyer), Joseph Escher, who specialized in appellate work and Section 17200 class action work, charged in excess of $700 per hour in 2006. Those rates, of course, would be higher in 2011, approximately $740 to $900 for such a specialist with thirty years experience. At a top-tier San Francisco firm, Brian Whelan's associate rate would be around $400 per hour.

48.     This same tiered rate structure holds true in conventional employment litigation, by which I mean wrongful termination and discrimination litigation not involving class-action issues. Thus, firms like Gibson, Dunn & Crutcher, O'Melveny & Myers and Howard Rice charge these same top-tier premium rates for employment work. On the other hand, a competent

1   firm such as Jackson, Lewis, which specializes in employment litigation and seeks to attract a

2   high volume of business across a wide sector of clientele, charges hourly rates slightly lower

3   than the top-tier corporate firms named. In my opinion, the rates being charged by the Whelan

4   group fit squarely into the middle of the top tier structure for employment litigation, for "one

5   off" or single assignment referrals.

6       49.     In determining prevailing rates in anyone area of employment litigation, it is

7   appropriate to consider two aspects of pricing ignored by some of the declarants in this litigation:

8   volume and leverage.

9       50.     A client that promises a high volume of employment litigation year after year,

10  employing a number of firm attorneys, can often obtain very competent representation for

11  litigation partner rates of between $425 and $475 per hour. However, in addition to providing

12  volume, this type of litigation also provides the firm leverage, that is to say, a great amount of

13  work that can be performed by associates and lower-level partners without raising client

14  concerns, often as high as 4 or 5 to 1. Examples of high-volume litigation would be representing

15  a large employer with high turnover and a regular flow of wrongful termination litigation, much

16  of it requiring little skill to defend, or little skill in performing certain necessary tasks. Jackson,

17  Lewis is such a firm, based upon my review of its website, and my knowledge of its lawyers.

18      52.     Thus, obtaining such volume referrals from a client would enable the firm to have

19  "leverage" of three or four associates, plus one non-equity junior partner, to one partner. If the

20  average associate is paid $200,000 in compensation and bills $600,000 per year, the work is

21  highly profitable to the firm, while the firm can appear to the client to be "economical" because

22  its lead partner is charging $425-$475 per hour, less than the top-tier firms. Yet in essence, the

23  billing partner is making in his rate plus profit, totaling as much as $1,000-$1,200 per hour.

24      53.     In any case, as shown by defense counsel billings I have reviewed, such highly

25  leveraged litigation, in my experience, is often not cost-effective for the client, since less-

26  experienced lawyers tend to be less efficient as well as less confident about tasks that can be

27  safely ignored. But whether it is a bargain for the client or not, high-volume, multi-referral

28

**DECLARATION OF JOHN D. O'CONNOR**
**10**

Ex. C - 183

1  litigation presents a different economic model from that involved in a case singly assigned by a

2  client because of its importance.

3      54.    Thus for "one-off" cases, such as the instant matter, a sophisticated employer,

4  who may customarily pay mid-level rates for wrongful termination litigation, will pay more than

5  a "volume" rate for a "one-off" referral to an experienced trial lawyer, from an excellent top-tier

6  firm, ranging from $600 to $800 for such a top-tier lawyer, equivalent in my opinion to

7  Christopher Whelan.

8      55.    The notion that the hourly rate of an attorney should be determined by the size of

9  his firm is simply not correct.

10     56.    It is true that there is a very rough direct correlation between the size of a firm and

11 rates, but as in many areas, statistical association does not prove causation.  Size should be

12 viewed as an effect and correlative of rates, more than it should be adjudged a factor justifying

13 high rates.  I will explain.

14     57.    If a solo litigator were to develop a clientele which paid him an hourly rate of

15 $250-$300 per hour, he may not be allowed to bring that client into a larger firm, unless he could

16 increase the rate above $400, and convince the firm management of high leverage, and in some

17 cases would not be allowed to join the larger firm at all, even if there were high leverage.

18     58.    A solo practitioner or small-firm lawyer who developed a good employment

19 practice often will wish to move to a larger firm, so the lawyer could access the larger firm's

20 corporate clientele for his practice.  Moreover, larger firms are constantly recruiting such lawyers

21 to their practice.  When they do, it is because their rates are high enough. Today, legal

22 newspapers frequently announce single lawyers or small firms with good practices merging into

23 larger firms.  In short, like begets like, and birds of a feather flock together.  So, while there is a

24 correlation between size and rates, the size of the firm has nothing to do with the merits is

25 establishing a rate, and of bringing value to the client.  Small defense firms often charge

26 substantial rates, but then become recruitment targets, in other words.

27     59.    To say that no small firm deserves or charges prevailing top-tier rates, as Mr.

28 Schratz appears to do, is incorrect for other reasons.  Most Plaintiff firms in fee-shifting cases are

**DECLARATION OF JOHN D. O'CONNOR**
11

smaller Plaintiff firms, since most large institutional firms eschew contingency fee litigation.  To

say that a smaller firm can never achieve the same rates as a larger firm in fee-shifting litigation

would mean that a small firm could never get prevailing rates, no matter how skilled its lawyers.

It would also produce a nonsensical conclusion:  If Messrs. Whelan and Whelan had performed

exactly the same litigation as successfully as they have here, but happened to be employees of,

say, the Jackson Lewis or Orrick firm, according to Mr. Schratz they would deserve higher rates

than they  would if employed as they are.  This is absurd, and shows a lack of understanding of

the market for legal services.

60.    In fact, it is true that single practitioners and small firms can and often do charge

high rates, depending on the nature of their practices.

61.    For instance, in 1990 the Tarkington firm hired Mr. William Brockett, a partner

in the firm of Keker & Brockett, shortly after Mr. Brockett was hired by Mr. Schratz on behalf of

Fireman's Fund.  The Keker firm was just then passing the size of ten lawyers.  Mr. Brockett's

rate was then $330 per hour, the rough equivalent of $800 today.

62.    In my opinion, the appropriate rate for Mr. Christopher Whelan is $600-$700 per

hour and $320-400 per hour for Mr. Brian Whelan, based upon the above factors.  The rates they

are here seeking are therefore reasonable.

### LITIGATION RISK FACTORS, EFFICIENCY AN MULIPLIERS

63.    On just risk alone, since competent lawyers would have adjudged the chances of

success at the outset to be 60-70%, my opinion is that the appropriate multiplier in this case on

risk alone should be 1.5.

64.    However, I would add some amount to this multiplier of 1.5 based upon a)

extraordinary skill not reflected into the rate analysis; and b) extreme and virtually unique

efficiency.  These factors I will discuss more fully below, but for present purposes it suffices to

say that they should drive the multiplier above two.

65.    Since 1990, I have read numerous Declarations, articles, speeches and letters of

Mr. Schratz, and also have deposed him and attended his deposition on several occasions.

66.     One general area on which I agree with Mr. Schratz is the idea that a factor in high litigation costs is a high number of billed personnel. Mr. Schratz has publicly cited one case, apocryphal or otherwise, in which 180 billing personnel worked on the case. Often times it is true that a lawyer who has built up significant knowledge of a case leaves the firm or is assigned off the litigation, and the client loses the efficiency of his work. On cases that are factually complex and intensive, each lawyer must know a great amount of detail in order to participate meaningfully, but multiple billing personnel can cause great billing inefficiency. Some inefficiency of this sort is to be expected in complex litigation, caused in part by inevitable associate turnover. In one Schratz case in which I was an expert, a fee application by the Nernberg firm in a Pittsburgh, PA eminent domain case, Mr. Schratz noted that 21 billing personnel were involved in $132,000 in billings.

67.     For a case the size and length of <u>Johnson</u> the assignment of lawyers would be efficient if no more than three lawyers (with some lawyer substitution at the lower levels) on each side performed 70% - 80% of the litigation, and no more than 5-10 other personnel performed the other 20% - 30% of the work. I suspect that here counsel had similar assignment efficiency.

68.     Accordingly, the staffing on this case is remarkable in its efficiency because only two lawyers, and apparently no paralegals, performed the work.

69.     I have reviewed or witnessed at least 25-30 separate analyses of attorneys fee billings performed by Mr. Schratz, expressed either in a declaration or in testimony. Only one firm in these cases has assignment efficiency near that of the Whelan lawyers, and that was the Wynne firm in <u>Duran</u>. Whether as an insurance coverage or insurance monitoring counsel, as a fee expert or litigator, or as a managing partner reviewing my firm's bills, I as well have myself witnessed only this one firm close to this efficient utilization of lawyers. Indeed, the extreme efficiency of the Whelan group, is virtually unprecedented for Mr. Schratz not to criticize, as he customarily is wont to do, a claim of allegedly inefficient utilization of lawyers. Accordingly, Mr. Schratz's silence on this issue is deafening. The only efficiency criticism Mr. Schratz offers is examples of work that should have been, according to Schratz, performed by paralegals.

Ex. C - 186

70.     Mr. Schratz claims to have "audited" hundreds of cases, many of them involving Declarations that are matters of public record, and which Mr. Schratz could therefore produce herein.  I would be surprised if Mr. Schratz could, other than in one case, produce attorneys' fee billings which show such efficient utilization for a case requiring more than a few hundred thousand dollars in billing.

## BLOCK BILILNG

71.     I first note that the Whelan group did not engage in true "block billing", because time was inserted for each "sub-entry" within the billing block for a day.

72.     In any case, it is simply not true that a prohibition against "block billing" is the norm in the Bay Area or California legal community, or, to my knowledge, anywhere in the country.  The standard prohibiting "block billing" is a fiction invented by the insurance industry, and largely a product of auditors such as those employed by Fireman's Fund in the 1990s.  At that time, Fireman's Fund found that all of its most trusted defense firms regularly engaged in what Mr. Schratz terms "block billing," or more than one description per time entry.

73.     Using arbitrary and fictitious standards, Fireman's Fund's auditors then claimed that trusted panel counsel, whose bills had regularly been scrutinized by claims professionals, routinely "overbilled" by 20-30%.  I have personal knowledge of these audit results, which I reviewed in Fireman's Fund documents.  These same arbitrary standards usually resulted in claims of "overbilling" (by Mr. Schratz and his auditors) in the bills of non-panel counsel in amounts of 30-50%.  In short, the standards guarantee a claim of "overbilling," they are arbitrary, and do not reflect the true custom and practice.

74.     Although the auditing program of Fireman's Fund caused its regular panel defense counsel to "unblock" their time, the norm in the community remained that so-called block billing was not only allowed, but was and is prevalent.

75.     The standard for most firms is and has been that all of the time a lawyer spent on one case for a particular day would be subsumed into one time entry, even if time was spent on different activities.  It is also a less prevalent alternative practice to have a one time entry, with many descriptive phrases, for all work in a day that is inter-connected.  For example, if a lawyer

were opposing a summary judgment motion, he might bill in one time entry only to interrelated items such as, "perform legal research on statute of limitations; draft Declaration of John Doe Re: Statute of Limitations; review documents; prepare brief re statute of limitations." The Whelan practice is more detailed than the normal practice, since sub-entries have time noted.

76.    In any case, it is clear that some form of multiple descriptive phrases in one time entry is the norm. I have read no declaration or opinion of Mr. Schratz in his review of other law firms in which he has not criticized so-called "block billing." What is missing from Mr. Schratz's Declaration is any statement to the Court as to how many of his hundreds of "audits" contained so-called "block billing." If, as I suspect, and have witnessed in the sample of audits I have reviewed, all of them involve "block billing," then this would be proof that the widespread custom and practice is indeed "block billing."

77.    "Blocked" time is often a wealth of description for one activity, as described above in the hypothetical statute of limitations work. On the other hand, a single description not involving multiple descriptors, such as "preparation of statute of limitations opposition" will usually be criticized as "vague."

78.    Legal auditing, as practiced by Mr. Schratz and his ilk, is a disingenuous program to cut costs without regard to the reasonableness or efficiency of the billings. The most skillful, reasonable in cost, and efficient legal work is still "overbilled" according to his "auditing" standards, when the time entries have semicolons, and also when they don't.

79.    I have reviewed billings of Mr. Schratz, and as well have reviewed billings of Mr. Schratz and Schratz's auditors used at Fireman's Fund, the Stuart, Maue firm of St. Louis, and state that each contained numerous "blocked" entries. I have also reviewed legal bills of work performed by Fireman's Fund attorneys under the direct supervision of Mr. Schratz, and note that most of the entries involved so-called "block billing." Mr. Schratz, acting as an expert for a southern California law firm, supported its billings, most of them "blocked."

80.    The greater part of the Johnson litigation involved activities which each involved large blocks of time, such as preparation of motions or oppositions to motions, briefs, depositions, preparation for depositions, and trials.

81.     If much of the work here involved discrete tasks involving small and finite amounts of time, such as isolated phone calls and letters, the "block billing" nature of the bills might make it difficult to determine whether the overall time for each small task was reasonable. However, given the nature of the work in the <u>Johnson</u> case, the reasonableness of the billings can be assessed in large part by the total amount of time spent on a large project, e.g. preparation of an opposition to summary judgment. Put differently, it does not aid a fee analysis to break up into small increments the time spent on such a motion. What is important is whether the overall time is reasonable.

82.     In many, if not most, of the opinions of Mr. Schratz which I have read, Mr. Schratz uses his computerized billing program to analyze how much *total* time was spent on a particular activity, such as an opposition to a motion for summary judgment, whereupon he often opines that the activity viewed as a whole took an excessively long time. I do not believe I have ever read an opinion of Mr. Schratz where he opined that the time was reasonable, except where he was working as an expert for a law firm. But my point is simply that it is the total time that Mr. Schratz claims, and I agree, is important.

83.     In this case, the Whelan group seems to have lumped time together for particular tasks, and therefore the overall reasonableness can be easily assessed by the Court or an expert. If the Whelan group had not "blocked billed" its time, and had produced billing records with time broken down in smaller increments day by day, Mr. Schratz, if he were true to his custom, would add up all the time over multiple days for a particular activity in order to assess its reasonableness. In this case, the Whelan group has already done that.

84.     Obviously, if a lawyer were to have "padded" his time, that would result in the overall time for an activity appearing to be unreasonably long. What is startling in its absence from Mr. Schratz's Declaration any meaningful effort by Mr. Schratz to suggest that activities by the Whelan group took an excessively long time or was inefficient. I believe that even Mr. Schratz cannot claim such, precisely because the Whelan group did not employ numerous attorneys for a single task, and because most work was done by one or two highly skilled lawyers with intimate knowledge of the details of the case and the applicable law. The amount of time

1   spent on the tasks in this case is efficient in the extreme, in my opinion, and by his unusual

2   silence on this topic Mr. Schratz seems to agree.  Given the number of lawyers on each defense

3   brief, I expect that the time of the Whelan will be lower in comparison.

4                                    **ALLOCATION**

5          85.    In my opinion, Mr. Schratz's recommendation that fees be allocated for partial

6   success is absurd in the extreme.  As has been emphasized in Plaintiff's moving papers, it is

7   quite common to add Defendants and numerous causes of action to a case for various strategic

8   purposes.  But the fact here is that the result was unalloyed success for the Plaintiff and

9   unalloyed defeat for the Defendant.  In employment cases I have acted almost exclusively as a

10  Defendant's counsel.  No competent defense counsel would consider this anything other than a

11  complete loss, plain and simple.  There was no partial success on the part of Defendant, since

12  removing individual Defendants and certain causes of action did nothing to lessen or mitigate the

13  ultimate result.

14                  **EXPERIENCE, COMPETENCE, BIAS**

15                  **AND INTEGRITY OF JAMES SCHRATZ**

16                              **SUMMARY**

17         86.    I have extensive knowledge of the experience, competence, bias and integrity of

18  Mr. James Schratz.  I have had direct knowledge of Mr. Schratz and his activities for over 21

19  years.  From his depositions, I also have knowledge of his background before 1988, when I first

20  met him.  Accordingly, I believe I am highly qualified to render opinions on these subjects.

21         87.    In short, my opinions can be summarized as follows: 1) as a litigator, Mr. Schratz

22  only has minimal, junior-level litigation experience at which he was adjudged by his employers

23  to be incompetent; 2) he has demonstrated no meaningful understanding, in this case or

24  otherwise, of the complexities of large litigation cases or sophisticated legal thinking; 3)

25  throughout his career he has exhibited an extreme bias in favor of the entity hiring him, which in

26  virtually every case is the fee payor; and 4) his opinions lack intellectual integrity and honesty.

27         88.    Having said that, Mr. Schratz has examined a number of legal billings, and has

28  information in the public domain that could assist the Court herein, including numerous

                        **DECLARATION OF JOHN D. O'CONNOR**
                                        17

**Ex. C - 190**

1   declarations he has filed in the Courts regarding other fee billings he has examined.  These

2   reports would demonstrate whether or not the Whelan group efficiently utilized personnel in

3   comparison to other firms, and whether block billing is the norm in the legal community or a

4   deviation therefrom.  And they would demonstrate whether time spent on discrete tasks by the

5   Whelan group was reasonable in comparison.  However, Mr. Schratz has chosen not to provide

6   that information to the Court in this case.

### BACKGROUND AND QUALIFICATIONS OF JAMES SCHRATZ

8       89.    The undersigned was an attorney "supervised" by Mr. Schratz and his underlings

9   starting in 1988, and also was the managing partner a firm subject to several "audits" by an

10  outside "auditor" supervised by Mr. Schratz.

11      90.    I have read what has been represented by Fireman's Fund to be all of the articles,

12  correspondence and written speeches authored by Mr. Schratz while at Fireman's Fund dealing

13  with attorney fee billing issues, and have read numerous articles and speeches authored by Mr.

14  Schratz since then.  I have read internal memos of Mr. Schratz authored while at Fireman's Fund

15  regarding "CUMIS" litigation and outside counsel.  I have read newspaper quotes, speeches and

16  articles of Mr. Schratz suggesting that all, or most, or a high number, of lawyers were unethical

17  and criminally dishonest in charging attorneys fees.

18      91.    I have spoken with and/or deposed virtually everyone who worked significantly

19  with Mr. Schratz at Fireman's Fund in the early 1990s, including the head of the Claims

20  Department, the attorney succeeded Mr. Schratz in using outside auditors regarding outside non-

21  panel counsel, and another attorney who supervised Fireman's Fund's internal auditors used for

22  trusted panel counsel; and numerous claims executives reporting to or working with Mr. Schratz,

23  most of whom were highly experienced, and of significant tenure with Fireman's Fund.

24      92.    I have spoken with numerous lawyers in the Bay Area and around the country

25  who were subject to "audits" by the Schratz-hired auditors at Fireman's Fund (Mr. Schratz did

26  no "auditing" at Fireman's Fund).  I also spoke with numerous fee counsel representing firms

27  who have had disputes with Mr. Schratz, including lawyers representing prestigious firms such

28

1     as Thelen of San Francisco and Fagre & Benson of Minneapolis, both during and after his tenure

2     at Fireman's Fund.

3           93.    I have also spoken with lawyers with or representing prestigious firms such as

4     Latham & Watkins and Wilson, Sonsini regarding false and scurrilous publicity about their firms

5     engendered by Mr. Schratz.

6           94.    I have read approximately 25 to 30 reports, Declarations or opinions of Mr.

7     Schratz since the inception of his firm of Jim Schratz & Associates. I have as well read several

8     "audits," consisting of both the audits he commissioned at Fireman's Fund and "audits" prepared

9     by him for his own firm. I have also read audits prepared by his outside auditors at the behest of

10    entities other than Fireman's Fund or Mr. Schratz.

11          95.    I have deposed or interviewed several "auditors" of the outside auditing firm used

12    by Mr. Schratz at Fireman's Fund. I have learned the "methodology" of the outside auditors Mr.

13    Schratz used at Fireman's Fund and the present methods Mr. Schratz uses to "audit" firms on

14    behalf of his own firm.

15          96.    I have engaged in fee litigation with Mr. Schratz; deposed him on several

16    occasions and observed his deposition and testimony in court.

17          97.    I have also read legal bills of Fireman's Fund employee lawyers working directly

18    for Mr. Schratz or lawyers chosen by Mr. Schratz. I have read bills of Mr. Schratz himself and

19    bills of outside auditors which he has approved and paid.

20          98.    I have interviewed several witnesses, and heard one witness testify, as to

21    inducements made or directed by Mr. Schratz for the witness to testify favorably to the position

22    of Mr. Schratz in fee disputes.

23          99.    I have read newspaper and magazine articles about Mr. Schratz, attributing to him

24    claims about lawyer overbilling, which based upon my other independent knowledge, I believe

25    to have been untrue.

26         100.    I have sued Mr. Schratz and Fireman's Fund on behalf of my former law firm,

27    successfully, for defamation on the basis of statements he caused to be made in local and

28    national publications.

**DECLARATION OF JOHN D. O'CONNOR**
19

101.    I was co-counsel in two trials, one for liability and damages, the second one damages only, against Fireman's Fund based upon false and defamatory statements made about my former firm by Mr. Schratz.  I was present in court as co-counsel in 1996 and 1998 to receive verdicts in favor of my former firm, and against Fireman's Fund for $3.0 million and $3.6 million, respectively, for defamation published or caused to be published by  Mr. Schratz.

102.    On behalf of my firm and the named partners, I obtained a confidential settlement with Mr. Schratz based upon defamatory statements he made about my firm after he departed Fireman's Fund.

103.    I have reviewed a cover story in the *American Lawyer* published in or around March, 1993 about Mr. Schratz entitled, "Litigation MISmanagement at Fireman's Fund," (emphasis in the original) detailing Mr. Schratz's dealings with our firm on an asbestos litigation fee dispute.

104.    I was the principal lawyer at Tarkington on two prior large cases which Mr. Schratz caused to be audited by his outside auditors, but which cases were controlled by other claims personnel.   After two time-consuming and painstaking "audits," my firm received payments from Fireman's Fund for more than the amounts billed to Fireman's Fund, with apologies.

105.    Since 1992, I estimate that I have not gone more than four or five months at a time without receiving some complaint from a lawyer, or a request for consultation, regarding what the lawyer claimed were false, distorted, or incompetent assertions by Mr. Schratz of attorney overbilling.

106.    I have also served as an expert or consultant on several California cases since I formed O'Connor and Associates, in which the plaintiff firm received from the Court 100% of its billings, notwithstanding vehement criticism to the contrary by Mr. Schratz.

107.    As a result of the foregoing, I believe that I have direct knowledge of Mr. Schratz's fee dispute activities from 1988 through the present, and also have knowledge of his background and experience prior to that time.  I believe that this information can assist the Court in assessing the weight to be given Mr. Schratz's opinions.

DECLARATION OF JOHN D. O'CONNOR
20

## EXPERIENCE OF JAMES SCHRATZ

108.   After his good scholastic record at USF Law School, Mr. Schratz was hired by Heller Ehrman and fired at his first annual review, unusual when Heller Ehrman was expanding. Mr. Schratz told me on deposition he was terminated by Heller Ehrman for being "too happy."

109.   He then worked for Rosenblum Parish, a smaller, reputable San Francisco firm where he was dismissed after a year of employment.  It is unclear, but Mr. Schratz may have tried one or two real estate broker fee cases in a trial or trials of one half to one day.

110.   His subsequent work for corporate counsel at Fireman's Fund consisted of a mix of litigation work and non-litigation work, the former mostly "monitoring" of outside counsel hired by Fireman's Fund throughout the country, often with corporate counsel's name on the pleadings.

111.   From my knowledge of Fireman's Fund's structure as a Fireman's Fund panel counsel, I can state that Mr. Schratz's subsequent assignment to the Claims Department was a step down career-wise from his position in the Corporate Counsel office.

112.   The work his group performed in Major Claims belies the name, because it dealt mainly with garden-variety construction defect litigation.  I know this because our firm received case assignments from the group, and were generally supervised by the functional head of the group, Mr. Robert Hill, a competent and experienced claims manager.

113.   Mr. Schratz's main occupation while working for Major Claims was implementing his own unique solution to what insurers at the time referred to as the "CUMIS problem" at the time besetting carriers throughout California, and to a lesser degree, throughout the country.

114.   CUMIS counsel, as discussed above, refers to lawyers selected by the insured that the insurer must pay, because of the potential conflict of interest that arises when coverage may be decided or influenced by facts proven in the underlying litigation.  The CUMIS doctrine is now embodied in part in C.C.P. §2860.

115.   Two problems for insurers arose in the 1980's regarding CUMIS counsel: a) fee rates and litigation methods were usually not as economical as those of "panel" counsel

Ex. C - 194

1   customarily retained by the insurer; b) where coverage limits could be exhausted, but where, as

2   is standard, the defense obligation is unlimited, the insured is incentivized, in, for example,

3   environmental or toxic tort litigation, to pay millions for defense but nothing for tribute, contrary

4   to the insurer's financial interest.

5       116.   Some insurers began in the 1980s a program of closely scrutinizing CUMIS

6   counsel bills, including on-site visits to examine the underlying files, to challenge inefficiencies

7   and discourage unnecessary work.  As Mr. Schratz was beginning his career in claims, having

8   left his position in the corporate counsel's office, he saw legal auditing as a method to advance

9   his career, by using legal auditing, not just as a method to discourage inefficiencies or to bargain

10  down bills, but also to end the costly underlying litigation altogether.

11      117.   Mr. Schratz saw that legal "auditing," or close examination of defense counsel

12  bills, could be used for more than just cutting a bill by a few percentage points.  He saw that he

13  could use legal "auditing" results to threaten counsel with unfavorable publicity and damage

14  their reputation by reason of alleged "overbilling," which would in turn incentivize counsel,

15  under Schratz's thinking, to end the litigation or modify the insured's demands upon the carrier.

16  One such method of intimidating defense counsel would be for Mr. Schratz or one of his

17  investigators to call the clients of the defense firm to tell them that the company was

18  investigating overbilling by the firm and ask if the client had experienced similar overbilling.

19  Such phone calls, of course, could greatly harm the firm with institutional litigation clients.  I

20  know that Schratz did this to several firms, including mine.

21      118.   Another threat employed by Schratz would be of unfavorable publicity in a legal

22  publication.  Such unfavorable publicity was used by Schratz as an example with which to

23  threaten another audited firm  Schratz also did this to the Tarkington Firm..

24      119.   While employed by Fireman's Fund, Mr. Schratz did no auditing himself, but

25  learned about "auditing" by working closely with his outside auditor, the Stuart, Maue, Mitchell

26  and James firm of St. Louis, Missouri.

27      120.   The person heading the Stuart Maue firm, Mr. Harry Maue, attended neither a

28  legitimate college nor legitimate law school and received mail order "degrees" for both of these

Ex. C - 195

claimed degrees. The other three names in the firm name, Stuart, Mitchell and James, do not represent real persons in being. Mr. Maue falsely represented to the <u>American Lawyer</u> in 1990 that the names did represent individual who had once been with the firm. See below:

> "Despite its name, Stuart, Maue is a corporation and not a partnership. Maue and Ernie James, a rumpled Air Force veteran who is the company's resident computer jock, are the only 'name partners' in evidence. Asked about the other two, Maue first claims that he parted ways acrimoniously with 'Stuart' and 'Mitchell' a number of years ago. He declines to give their current whereabouts, saying 'You can't talk to them.' The fact, as Maue ultimately confides, is that no one can talk to them because they do not exist: They are fictitious. 'The names 'Stuart' and 'Mitchell' [do not] represent the names of former partners,' Maue writes in response to a written query. 'The name Stuart, Maue, Mitchell & James, Ltd. simply represent the name I chose to give this company when it was formed.' Maue angrily maintains there is nothing inappropriate about his letterhead."

121.    After the publication of this article, Mr. Maue commenced claiming publicly that these names were always meant to be fictitious, and refer to his heroes Jeb Stuart, the Confederate war general, Billie Mitchell, the WWI pilot, and Jesse James, the famous outlaw.

122.    Mr. Schratz would invariably use the Maue firm for legal "audits," because the Maue firm in essence guaranteed "finding" a substantial amount of "overbilling," usually 20-50%. These "findings" of a Maue audit would then be used by Schratz as a basis to threaten publicity if the audited firm did not act in accordance with Mr. Schratz's wishes.

123.    In short, legal auditing, including attendant publicity based thereon, was one of the methods Mr. Schratz used as part of a whole array of bullying and coercive tactics designed to end CUMIS litigation for his company.

## AUDIT METHODOLOGY

124.    As a result of the foregoing, I became quite familiar with the "methodology" of the Maue outside auditors used by Mr. Schratz while at Fireman's Fund. Without getting into all the details of the methodology, it suffices to say that one admirable aspect of that firm's auditing process was that every time entry was examined, every piece of paper related to the time entry was examined, and each lawyer questioned as to any claimed uncertainties regarding the time entry. Thus, while the methodology was otherwise completely biased in an arbitrary fashion to cut down the "verified" portion of the bill, it at least had the virtue of thoroughness.

Ex. C - 196

125.    During his tenure at Fireman's Fund and shortly after starting Jim Schratz and Associates, Mr. Schratz frequently criticized as inadequate any "audit" that was not a full field audit performed in the fashion described.

126.    However, such audits are expensive and in fee-shifting cases, where the parties seek to oppose fees merely by motion without extensive litigation, the method described by Mr. Schratz is impossible and impractical.

127.    Accordingly, it is Mr. Schratz's current practice to shortcut any meaningful study or analysis in favor of superficial, selective and facile observations. His practice is to scan legal bills into a computer system and use software for certain types of analyses determining, for example, the amount of time considered "block billing," spent on particular motions, on pleadings, and on conferencing and the like, so that negative observations can be made under the guise of applying objective criteria.

128.    Such computerized reports could provide the basis for a knowledgeable and experienced attorney to make helpful observations. But the converse is also true, that without expertise and experience, computerized breakdowns mean very little. In any case, there is no such thing as "legal auditing" other than what a particular "auditor" arbitrarily deems it to be. If the auditor doesn't understand the complex litigation, or doesn't want to, there results a serious "garbage in, garbage out" defect in the "audit" method.

129.    In any case, Mr. Schratz is not performing the kind of thorough legal auditing he and his outside auditors had for many years championed, and is using the term "audit" to convey falsely to the reader that he has performed some type of disciplined, rigorous and artful analysis superior to that could be performed by a person not claiming to be an auditor.

130.    Indeed, the use of the term "audit" is used to mask the fact that Mr. Schratz is doing far less by way of review and analysis than an experienced litigator would perform when acting as an expert witness in a fee case.

131.    Even where Mr. Schratz claims to have performed such an analysis himself, in my opinion, he has only the most minimal competence, by virtue of his status as a licensed attorney, to perform such an analysis.

DECLARATION OF JOHN D. O'CONNOR
24

132. I personally have witnessed stunning examples of Mr. Schratz's lack of knowledge of litigation.

133. In the Golden Valley Bank litigation, Mr. Schratz persisted over several months to claim that my firm was acting in conflict of interest in that litigation, even though we represented but one party, the FDIC as Receiver in several different pieces of litigation. However, Mr. Schratz claimed that, even though we consistently represented the same party in these various cases, we were in conflict because in some cases we were paid by the carrier, Fireman's Fund, and in some case we were bringing suit against parties whose defense was paid by the carrier, Fireman's Fund. To be fair, it was difficult for me to determine how much of this was incompetence and how much was simply intellectual dishonesty.

134. In several other instances, Mr. Schratz has written and spoken publicly about the lack of necessity for written interrogatories when counsel can simply phone the opposing attorney to find out the information. Such statements show a profound lack of understanding of the litigation process.

135. I have indeed found Mr. Schratz to be intellectually dishonest as well as incompetent. To give just one example, when he acted as fee expert for a prominent law firm in Southern California, he justified the very same billing practices which he criticized in other cases. Moreover, I have reviewed bills of lawyers working directly for Mr. Schratz (which were to be shared by or billed to another carrier for payment) filled with entries of the type that Mr. Schratz had consistently condemned as being "overbilling," when he was being retained by the fee payor and against its law firm.

136. Until Mr. Schratz left the insurance industry at the end of 1993, he had a poor reputation within the industry, both for lack of integrity and for the potential liability of his activities. Within his own company, Fireman's Fund, he had the same reputation. Even Mr. Schratz's major supporter at Fireman's Fund, the Executive Vice President of Claims, Mr. Gary Black, was quoted by the *Wall Street Journal* as admitting that Schratz had a "very biased view" of billing issues. Mr. Black told me on deposition essentially the same thing.

**DECLARATION OF JOHN D. O'CONNOR**
25

**Ex. C - 198**

137.    Therefore, at the very least, putting aside questions of honesty or competence, Mr. Schratz is certainly biased.  In any case, his bias has always been well-known.  The article describes an extremely adversarial approach by Schratz:

> "Over the years Schratz, whose personal code was neatly summarized last March entitled, Ready, Fire, Aim, has had to do some explaining himself when his aggressive tactics backfired.  After the Tarkington firm was knocked off the asbestos case, Fireman's Fund's hand-picked successor, hired at relatively low pay, lost two major decisions in court.
> ANGRY PHONE CALLS
> Some other lawyers see Schratz as a publicity hound or an alarmist.  Gary Black…says he gets angry phone calls about Schratz fairly regularly."

138.    Mr. Schratz's criticism of tactics and strategies of the Whelan group in this litigation demonstrate, in my opinion, the same lack of credibility of Mr. Schratz that I have witnessed for the last twenty-one years.

139.    This is not to say that all legal bills criticized by Mr. Schratz are unworthy of criticism.  Sometimes, as they say, a blind squirrel gets an acorn.  For example, in *Rios v. Rowand*, a public interest lawyer visited a prison frequently and consulted with the female inmates, including those with children.  The lawyer knew well the prison's policy for allowing visitation by the children.  After successfully litigating this policy, the lawyer attempted to bill the government for the thousands of hours she spent visiting the jail in performance of her normal duties as a prison advocate, most of which, of course, were unnecessary to the litigation, and not performed primarily for the sake of the litigation.

140.    In *Rios v. Rowand*, the court initially approved only a small portion of the fees claimed, and after an appeal, the fee question was remanded to the same court for more specific factual findings, at which point Mr. Schratz was hired and the matter litigated.  The court thereafter issued a similar result but with more detailed findings.

141.    *Rios v. Rowand*, then, is an example of a court awarding fees roughly conforming to Mr. Schratz's opinion, but which opinion has little or no causative relationship to the law award.

142.    Mr. Schratz's opinions that I have reviewed are always wildly favorable to the entity hiring him.  In the Golden Eagle matter to which Mr. Schratz refers, he was hired to give

Ex. C - 199

1  Golden Eagle a basis to pay a claim in a receivership context, not to fight payment.  When he has

2  been hired by law firms to support their bills, he has done so in complete reversal of views and

3  principles he expressed contrarily when hired by the fee-paying client.  I have never witnessed

4  Mr. Schratz giving due deference, or any complimentary comment, to the apposing side.

5      143.    In short, I would assert that the determination of the reasonableness of the fee to

6  be paid the Whelan group should not be based on anything that Mr. Schratz has said, because

7  any opinion of Mr. Schratz is necessarily biased, superficial and incompetent.

8      144.    I have a few additional comments.  By not using paralegals, the Whelan group

9  saved significant time and expense for the fee payor.  Brian Whelan's knowledge of the

10  documents likely decreased what would have been charged as paralegal time.  I find it difficult to

11  criticize a practice that promotes efficiency and saved on fees.

12      145.    The propriety of travel time has nothing to do with whether Brian Whelan

13  actually moved to Sacramento.  This is not a case of a contractual arrangement with a client that

14  is now being breached, but an issue of reasonableness.  The travel time here is reasonable, and of

15  the type commonly billed throughout California and the nation.

16      I declare under penalty of perjury that the foregoing is true and correct.

17

18  Dated: February 29, 2012                    O'CONNOR AND ASSOCIATES

19

20                                              JOHN D. O'CONNOR
_____

21

22

23

24

25

26

27

28

**DECLARATION OF JOHN D. O'CONNOR**
27

**Ex. C - 200**

# EXHIBIT D

Daniel Ray Bacon (SBN 103866)
LAW OFFICE OF DANIEL RAY BACON
234 Van Ness Avenue
San Francisco, CA 94102
Telephone:  (415) 864-0907
Facsimile:  (415) 864-0989

RICHARD M. PEARL (SBN 46351)
LAW OFFICES OF RICHARD M. PEARL
1816 Fifth Street
Berkeley, CA 94710
Telephone: (510)649-0810
Facsimile: (510)548-5074

Attorney for Plaintiff
FOROUGH NADAF-RAHROV

Attorneys for Petitioners

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION

| | |
|---|---|
| FOROUGH NADAF-RAHROV | CASE NO. CGC-05-437680 |
| Plaintiff, | **DECLARATION OF JOHN D. O'CONNOR IN REBUTTAL TO OPPOSITION TO FEE PETITION** |
| vs. | **Date:** **September 28, 2011** |
| THE NEIMAN MARCUS GROUP, INC., | **Time:** **9:30 am** |
| | **Dept:** **503** |
| Defendants. | **Judge:** **Honorable Teri L. Jackson** |

I, John D. O'Connor do hereby declare as follows:

## EDUCATION, EXPERIENCE AND WORK HISTORY

1.      I am an attorney licensed to practice in all courts in the State of California, and have been so licensed since December, 1972.

Ex. D - 202

2.     I am the principal of O'Connor and Associates, a law firm consisting of the undersigned and one associate, and I have been engaged primarily in litigation practice since 1972.

3.     I attended The University of Notre Dame in South Bend, Indiana, where I graduated *magna cum laude* in 1968.  I attended the University of Michigan Law School where in graduated *cum laude* in 1972, and was a member of the *Order of the Coif*, and Associate Editor of the *Michigan Law Review*.

4.     From June 1972 until January 1, 1974, I was employed as an associate with the firm of Belli, Ashe & Choulos as litigation associated.  In that capacity, I tried several cases with senior partner Melvin L. Belli, Esq. and tried several cases by myself.

5.     From January 1974 through January 1980, I was an Assistant United States Attorney for the Northern District of California in San Francisco, California.  In that capacity, I tried white collar criminal cases as well as a variety of civil matters, including medical malpractice, employment discrimination, challenges to governmental actions, and a wide range of other cases.

6.     In 1980 and 1981, I was a Senior Associate at the San Francisco law firm of Brobeck, Phleger & Harrison, where I worked on complex business litigation matters.  From 1982, through 2001, I was a principal with and managing partner of the law firm of Tarkington, O'Connor & O'Neill, where our clients were mainly major insurance companies, corporate risk management departments, and governmental entities.  Among the governmental entities we served were not only local and State agencies, but also the FDIC, FSLIC, RTC, the NCUA (National Credit Union Administration), and the United States government itself.

7.     From late 2001 through July 2006, I was employed with the San Francisco firm of Howard Rice as a Special Counsel and Director, practicing with the litigation department.  At Howard Rice, my litigation work consisted of tobacco/asbestos defense litigation on behalf of R.J. Reynolds Company, intellectual property litigation, and a variety of commercial litigation.

**Ex. D - 203**

8.      I have tried approximately 70 cases in state and federal courts throughout California, as well as in courts located in Nevada, Pennsylvania and Arizona.  I have also litigated cases venued in Hawaii, Texas, Alaska and Illinois.

9.      Since July of 2006, I have practiced on my own under the name of O'Connor and Associates.  In that capacity, I associated as a trial lawyer with the Downey Brand firm of Sacramento in trying a two-month jury trial in Douglas County, Nevada, on behalf of landowner Park Cattle Company against the lessee of a casino groundlease in Stateline, Nevada.  Before the jury returned, the case settled in favor of my clients for $165 million.

10.     I successfully arbitrated as co-counsel a case in Dallas, Texas against the Dallas Mavericks, where my client was awarded $7.1 million; and recently tried a case in Marin County Superior in which we achieved $2.5 million settlement on behalf of two homeowners while the case was being tried to a jury before Judge Michael Dufficy.  I have over thirty-nine years of significant trial experience, including current jury trial experience.

11.     I have consulted or have been retained as a fee expert on approximately fifty occasions, most of them since 1992, and many involving rebuttal of opinions offered by James Schratz.  I have reviewed approximately twenty-five to thirty reports of Mr. Schratz.  These matters involved billing disputes throughout the country.

12.     In addition, I have significant experience dealing with fee issues in other contexts.

13.     I litigated fees in a number of civil rights and other "fee-shifting" cases on behalf of the United States government while acting as Assistant United States Attorney for the Northern District of California.

14.     I litigated a large fee case with the Tarkington firm in or around 1984 against Heller Ehrman firm, on behalf of Sonoma County, in a class action prison case involving constitutionality of various conditions of confinement in the Sonoma County jail.  As part of this litigation, I reviewed in detail the billings of attorneys in the Richard Goff litigation group at Heller, for which Mr. Schratz had worked during his brief stint there.

**Ex. D - 204**

15.      I was also the counsel charged by the United States government to assess and negotiate significant counsel fees for different firms prevailing in a class action labor discrimination case brought against the Naval Air Rework facility for the Honorable William H. Orrick.

16.      As managing partner of the Tarkington firm, it was my responsibility to work with several large institutional clients, such as insurers, corporate legal departments and governmental entities such as FDIC and RTC, to discuss and enforce billing guidelines for those entities.

17.      While at the Tarkington firm, I consulted with numerous insurance claims professionals regarding billing issues surrounding the retention of CUMIS counsel, paid by the insurer but not selected by the insured.  The insurer billing guidelines for "panel" counsel were generally inapplicable to such outside counsel, and accordingly, I frequently advised as to applicable billing standards prevalent within the Bay Area legal community.

18.      I also monitored legal billing counsel throughout California, when representing excess carriers.  I frequently consulted with insurance carriers about billing practices in the legal community.

19.      As a managing partner for twenty years at the Tarkington firm, I reviewed numerous bills of lawyers under my supervision, as well as lawyers in my firm but outside my direct supervision.  On my own volition, or in discussions with clients, I frequently analyzed and adjusted billing for efficiency and competence where appropriate.  As part of my duties, I frequently conferred with other managing partners about billing standards.

20.      Practicing as a Senior Associate at Brobeck, Phleger and Harrison (1980-1981) as a Senior Counsel and Director at Howard Rice (2001-2006), I became aware of the billing customs and practices enforced at these reputable firms.

21.      I have on several occasions examined fee billings on behalf of clients and, where appropriate, sought reductions.

**Ex. D - 205**

22.     In 2005-2006, I served as a JAMS arbitrator on an asbestos fee dispute involving over $2 million in billings.

23.     Based upon the foregoing, and my 39 years of litigation and trial experience, I consider myself to be an expert capable of assessing the reasonableness of litigation fees for complex litigation.  I also have extensive knowledge of the background, experience, reputation, bias and competence of James Schratz.

24.     Having reviewed billing and billing standards of law firms numbering in the hundreds, I know well the customs and practices throughout the country regarding multi-entry billing, termed "block" billing by Mr. Schratz; billing for multi-lawyer task assignment; and the billing of services for document management, here labeled "clerical" work by Mr. Schratz.

25.     I therefore believe I am competent to render an opinion that, with very few exceptions, it is the universal practice within the legal profession for a lawyer to record multiple task descriptions within one time entry; assignment of more than one lawyer to a hearing, mediation or other project is within accepted billing norms; some occasional lawyer time is appropriately used and billed for incidental document management.

26.     Recently, representing a large national firm, I sought approximately $4.8 million in contested litigation fees in front of a panel of three arbitrators in Los Angeles.  The firm was awarded the full amount of fees sought.

27.     I have also have had experience both as a Fireman's fund regularly retained insurance defense counsel, and an independent counsel named by the insured and paid by Fireman's Fund, and supervised by Mr. Schratz.

28.     In the cases of *Miller v. Vicorp Restaurants, Inc.* (N.D. Cal. 2006) 2006 U.S. Dist. LEXIS 2210 and *Gober v. Ralph's Markets,* I was retained as an expert witness to rebut opinions of Mr. Schratz, who opined quite similarly to the case at bar, about the impropriety of block billings, duplicative work and clerical entries.  In both cases the reviewing Court awarded the applicant firm 100% of the amount sought, contrary to the recommendation of Mr. Schratz.

**Ex. D - 206**

Indeed in *Miller*, federal judge Ronald Whyte expressly stated that he did "not find Mr. Schratz's declaration helpful: and had not relied on it. 2006 U.S. Dist. LEXIS 2210, fns.2 and 3.

29.     I was also an expert retained to rebut Mr. Schratz's opinion in *Duran v. US Bank* where Mr. Schratz recommended a fee award of approximately $3 million in a "fee-shifting" case, and the Court awarded $18.8 million.

30.     In *Duran*, Judge Freedman of the Alameda Superior court, as part of a 41 page opinion (a copy of which is attached to Mr. Pearl's Reply Declaration), made the following comments about the credibility of the analysis presented by Mr. Schratz, as well as the credibility of my analysis in rebuttal:

> …The Court finds that Plaintiffs have presented extensive evidence that the hourly rates their attorneys have requested are within the range of rates charged by and awarded to attorneys of comparable experience, reputation, and ability for comparable complex litigation.  CHMC, 97 Cal.App4th 740, 783.  That evidence includes: (1) the sworn testimony of four highly respected local attorneys who handle comparable complex class action litigation; (2) extensive data on the current rates charged by many other Bay Area law firms that handle complex litigation; (3) testimony as to the rates awarded in comparable cases; (4) rates previously found reasonable-indeed, the Court notes, at higher rates than requested here-for Plaintiffs' counsel Mr. Wynne; and, (5) **persuasive expert testimony expressed by Mr. John D. O'Connor.**

> …Based on the enormous volume of paper in terms of billing records, briefing, **analysis by Defendant's expert Mr. Schratz and Plaintiffs' expert Mr. O'Connor, the supporting and opposing declaration of others with expertise (or purported expertise), the Court find that the number of hours spent by Plaintiffs' counsel also is reasonable…**

> **…3.  Defendant's Arguments that Plaintiffs' Counsel's Hours Should Be Reduced Are Rejected.**

> As an initial matter, the **Court notes the competing declarations of James P. Schratz, Esq. in support of Defendant's opposition and supplemental opposition and the declarations of John D. O'Connor, Esq. submitted on behalf of Plaintiffs.**

> **With respect to Mr. Schratz, the Court derived modes benefit, at most, from Mr. Schratz' analysis.  There can be no doubt as to his partisanship.  He does not come before the Court in any way that can be described as an independent witness.  Mr. Schratz brought minimal value to the process.** Mr. Schratz's experience is substantial in areas which are not pertinent to the issues before the Court, including the billing practices of firms

**Ex. D - 207**

that serve as panel counsel for insurance companies or staff counsel for insurance companies. The Court finds it interesting but of little value in making an award in a wage and hour class action in which counsel are compensated entirely on a contingent fee basis as an exercise of the court's discrimination. The consequence of the Court's findings in this regard is that the Court affords little weight to Mr. Schratz' evaluation and rejects his arguments that Plaintiff's counsel's fees should be reduced for any reasons he articulated.

**In marked contrast to the Court's findings with respect to Mr. Schratz, the Court finds Mr. O'Connor's declaration to be considerably more persuasive in assessing the relevant issues before this Court.** The Court finds Mr. O'Connor's opinions related to the lodestar analysis to be useful, insightful and well-reasoned…

## SUMMARY OF OPINIONS

31. The rates here sought by the petitioning lawyers ("Bacon group") are well within the mid-range of the market for Bay Area lawyers of similar experience.

32. For Mr. Bacon, the mid-range of the market for Bay Area lawyers of similar experience is $475-$550 per hour for a 30-year lawyer in the mid-level "non-premium" tier of good firms, for single or "one off" assignments, as opposed to "volume" large scale contractual arrangements.

33. The appropriate range of fees for an appellate specialist of Mr. Rusky's experience is $600-$800 per hour, again for a non-premium specialist.

34. The top tier of rates for one of Mr. Bacon's ability and experience, if charged by a top tier firm, would be $600-$800 per hour, as exemplified by rates of lawyers of similar experience at firms such as Gibson Dunn, O'Melveny, Howard Rice, and other comparable firms.

35. The rates suggested by defendant's expert are well below any relevant market other than the market for general insurance defense counsel, which has wholly different economics than the regular commercial market for employment defense counsel.

36. The instant case was difficult one for the Plaintiff to attract counsel, and that difficulty, which reflects risk, should be factored into the multiplier.

37. The instant case was of questionable outcome from the outset and deserves a multiplier of two to three for risk, difficulty and staffing efficiency.

**Ex. D - 208**

38.     So-called "block billing" is the norm in the legal services industry, not the exception, and the petitioning lawyers billed a low percentage of "block" entries relative to the market.

39.     The instant litigation, in which Plaintiff's counsel used only three lawyers for over 90% of the attorney hours, was pursued in an extremely efficient manner, and this fact should bear both upon rates and multiplier.

40.     Collaborative work between colleagues, including interaction between lead litigation counsel and lead appellate counsel, is not considered duplicative.

41.     The amount of hours expended on appearances by multiple attorneys was unusually low relative to the normal practice, and far less than that of Jackson Lewis.

42.     The trial and appellate work by Plaintiff's counsel was necessarily excellent, in order for Plaintiff to have prevailed against a reputable Defendant represented by an excellent law firm, Jackson Lewis.

## BILLING RATES

43.     I have knowledge of billing rates throughout the Bay Area for the various types and classes of litigation, and have had such knowledge since 1980.

44.     It is true that there is a wide range of rates charged throughout the Bay Area for employment litigation counsel, from insurance defense rates on the low end ($175-$300 per hour, often charged as a "blended" rate for all lawyers within the firm) to mid-range rates ($300-$500) per hour for litigation partners, some blended on the lower end) to top-tier rates (in employment work $500-$750 per hour for litigation partners).  For "one off" or single assignment referrals from corporations and small businesses, as opposed to "volume" arrangements for steady referrals, partner rates range in the middle tier of rates from $375-$575 per hour and with highly experienced lawyers (of over 25 years litigating), the range is $475-$575.   For "one off" assignments the top tier rates remain the same.

45.     This broad range of rates also holds true for, and is quite similar to, what is generally termed "defense" litigation, which, like "employment" work, is a common form of

litigation, and promises great volume for firms that prove successful, especially at lower and middle range rates.   It is also a form of general litigation that is necessary for many larger firms to handle as a service to their clients.

46.     In the course of my thirty-nine years of practice, I have handled a number of labor cases such as wage, discrimination and wrongful termination litigation, and have tried at least six such cases that I can presently recall, one of which was a disability discrimination case before Judge Ronald Sabraw of Alameda County Superior Court in 2001.  I tried one eight-Plaintiff wage/hour case in San Francisco Municipal Court.  I recently served as a mediator on a twelve-Plaintiff wage-and-hour case set for trial in Alameda County.  I have also tried one wrongful termination case in Arizona, and three discrimination cases in U.S. District Court in San Francisco. I have also tried various cases in San Francisco Superior Court, with my first trial in December 1972 before Judge Carpeneti.  I have tried cases in recent years in San Francisco Superior Court before Judges Mitchell, Munter, Chiantelli, Mellon and Conway, to name a few.

47.     Even though I consider myself quite capable of handling most labor cases, and in spite of the fact that I defended one large class action discrimination case while with the government, and numerous employment discrimination and wrongful termination cases in government and private practice, I do not consider myself to be "expert" in the field of employment litigation. However, for an employment matter that might be tried, I would be considered more valuable to the market than many employment specialists without great trial experience.  Mr. Bacon, who has a long history of employment work, and has tried other types of cases as well, should be valued highly in the employment litigation market.

48.     At the Tarkington firm, where much our work was assigned by banks, the government or insurance carriers, we engaged in both defense litigation and employment litigation at insurance defense or government rates, while at Howard Rice, we engaged in "defense" litigation and employment litigation only if paid top-tier rates.  Clients such as R.J. Reynolds Tobacco Company, which felt the need for and demanded superior work, paid these rates to Howard Rice and comparable firms throughout the country.  It was the firm philosophy,

1

2

3    as in many top-tier firms, not to accept employment, products liability or toxic tort litigation

4    (such as asbestos defense litigation) at middle-market rates.  In 2004 through 2006, these

5    middle-market rates for defense and employment litigation were approximately $425 to $475 per

6    hour for partners, today having increased up to a ceiling of $550 to $575 for "one off" litigation

7    assignments.  On the other hand, my rate for defense litigation for R.J. Reynolds was $615 per

8    hour in 2006, and employment litigation involved similar rates.  A fellow Director (partner-level

9    lawyer), Joseph Escher, who specialized in appellate work and Section 17200 class action work,

10   charged in excess of $700 per hour in 2006.  Those rates, of course, would be higher in 2011,

11   approximately $740 to $900 for such a specialist with thirty years experience.

12        49.    This same tiered rate structure holds true in conventional employment litigation,

13   by which I mean wrongful termination and discrimination litigation not involving class-action

14   issues.  Thus, firms like Gibson, Dunn & Crutcher, O'Melveny & Myers and Howard Rice

15   charge these same top-tier premium rates for employment work.  On the other hand, a competent

16   firm such as Jackson, Lewis, which specializes in employment litigation and seeks to attract a

17   high volume of business across a wide sector of clientele, charges hourly rates slightly lower

18   than the top-tier corporate firms named.  In my opinion, the rates being charged by the Bacon

19   firm fit squarely into middle-tier rate structure for employment litigation at the mid-level firms,

20   for "one off" or single assignment referrals.

21        50.    In determining prevailing rates in anyone area of employment litigation, it is

22   appropriate to consider two aspects of pricing ignored by some of the declarants in this litigation:

23   volume and leverage.

24        51.    A client that promises a high volume of employment litigation year after year,

25   employing a number of firm attorneys, can often obtain very competent representation for

26   litigation partner rates of between $425 and $475 per hour.  However, in addition to providing

27   volume, this type of litigation also provides the firm leverage, that is to say, a great amount of

     work that can be performed by associates and lower-level partners without raising client

     concerns, often as high as 4 or 5 to 1.  Examples of high-volume litigation would be representing

**DECLARATION OF JOHN D. O'CONNOR**

10

**Ex. D - 211**

a large employer with high turnover and a regular flow of wrongful termination litigation, much of it requiring little skill to defend, or little skill in performing certain necessary tasks. Jackson, Lewis is such a firm, based upon my review of its website, and my knowledge of its lawyers.

52.     Thus, obtaining such volume referrals from a client would enable the firm to have "leverage" of three or four associates, plus one non-equity junior partner, to one partner. If the average associate is paid $200,000 in compensation and bills $600,000 per year, the work is highly profitable to the firm, while the firm can appear to the client to be "economical" because its lead partner is charging $425-$475 per hour, less than the top-tier firms. Yet in essence, the billing partner is making in his rate plus profit, totaling as much as $1,000-$1,200 per hour.

53.     In any case, as shown by defense counsel billings I have reviewed, such highly leveraged litigation, in my experience, is often not cost-effective for the client, since less-experienced lawyers tend to be less efficient as well as less confident about tasks that can be safely ignored. But whether it is a bargain for the client or not, high-volume, multi-referral litigation presents a different economic model from that involved in a case singly assigned by a client because of its importance.

54.     Thus for "one-off" cases, such as the instant matter, a sophisticated employer, who may customarily pay mid-level rates for wrongful termination litigation, will pay slightly more than a "volume" rate for a "one-off" referral to an experienced trial lawyer, paying from $475 to $575 per hour. Appellate specialists invariably have higher rates than these, $100-$150 more per hour higher than a litigator's rate.

55.     The rates that Mr. Bacon and Mr. Rusky are seeking in this litigation hit the market rates squarely in the middle of the applicable middle-tier at $500 per hour for a trial litigator and $650 for an appellate specialist. These rates are within $25-$50 either way of rates that would be charged by good middle-tier firms. At Howard Rice, Gibson Dunn and similar firms, top appellate counsel often charge between $900-$1,000 per hour, and a thirty year litigator $750-$800.

**Ex. D - 212**

56.     The notion that the hourly rate of an attorney should be determined by the size of his firm is simply not correct.

57.     It is true that there is a very rough direct correlation between the size of a firm and rates, but as in many areas, statistical association does not prove causation.  Size should be viewed as an effect and correlative of rates, more than it should be adjudged a factor justifying high rates.  I will explain.

58.     If a solo litigator were to develop a clientele which paid him an hourly rate of $250-$300 per hour, he may not be allowed to bring that client into a larger firm, unless he could increase the rate above $400, and convince the firm management of high leverage, and in some cases would not be allowed to join the larger firm at all, even if there were high leverage.

59.     A solo practitioner or small-firm lawyer who developed a good employment practice often will wish to move to a larger firm, so the lawyer could access the larger firm's corporate clientele for his practice.  Moreover, larger firms are constantly recruiting such lawyers to their practice.  When they do, it is because their rates are high enough. Today, legal newspapers frequently announce single lawyers or small firms with good practices merging into larger firms.  In short, like begets like, and birds of a feather flock together.  So, while there is a correlation between size and rates, the size of the firm has nothing to do with the merits is establishing a rate, and of bringing value to the client.  Small defense firms often charge substantial rates, but then become recruitment targets, in other words.

60.     To say that no small firm deserves or charges prevailing rates, as Mr. Schratz appears to do, is incorrect for other reasons.  Most Plaintiff firms in fee-shifting cases are smaller Plaintiff firms, since most large institutional firms eschew contingency fee litigation.  To say that a smaller firm can never achieve the same rates as a larger firm in fee-shifting litigation would mean that a small firm could never get prevailing rates, no matter how skilled its lawyers.  It would also produce a nonsensical conclusion:  If Messrs. Bacon and Rusky had performed exactly the same litigation as successfully as they have here, but happened to be employees of, say, the Jackson Lewis or Orrick firm, according to Mr. Schratz they would deserve higher rates

**Ex. D - 213**

than they would if employed as they are. This is absurd, and shows a lack of understanding of the market for legal services.

61. In fact, it is true that single practitioners and small firms can and often do charge high rates, depending on the nature of their practices.

62. For instance, in 1990 the Tarkington firm hired Mr. William Brockett, a partner in the firm of Keker & Brockett, shortly after Mr. Brockett was hired by Mr. Schratz on behalf of Fireman's Fund. The Keker firm was just then passing the size of ten lawyers. Mr. Brockett's rate was then $330 per hour, the rough equivalent of $800 today.

63. Generally speaking, a litigation attorney with employment experience can command less than an experienced appellate lawyer, as exemplified by the rate differential between Mr. Escher and the undersigned while at Howard Rice.

64. The kerfluffles Mr. Schratz dredges up from Mr. Bacon's past have nothing to do with his skill and experience as a litigating lawyer, nor would they be so well known and significant as to affect his rate. Mr. Schratz has a far more checkered record, while none the less has little effect on his marketability.

65. In my opinion, the appropriate rate for Mr. Rusky is $600-$700 per hour and $475-$575 per hour for Mr. Bacon, based upon the above factors. The rates they are here seeking are therefore reasonable. Mr. Soto-Suver's proposed rates are market rates, in my opinion.

## LITIGATION RISK FACTORS, EFFICIENCY AND MULIPLIERS

66. On just risk alone, since competent lawyers would have adjudged Bacon's chance of success to be 40-50%, my opinion is that the appropriate multiplier in this case on risk alone should be 2 to 1.

67. However, I would add some amount to this multiplier of 2 based upon a) extraordinary skill not reflected into the rate analysis; and b) extreme and virtually unique efficiency. These factors I will discuss more fully below, but for present purposes it suffices to say that they should drive the multiplier above two.

68. Since 1990, I have read numerous Declarations, articles, speeches and letters of Mr. Schratz, and also have deposed him and attended his deposition on several occasions.

69. One general area on which I agree with Mr. Schratz is the idea that a factor in high litigation costs is a high number of billed personnel. Mr. Schratz has publicly cited one case, apocryphal or otherwise, in which 180 billing personnel worked on the case. Often times it is true that a lawyer who has built up significant knowledge of a case leaves the firm or is assigned off the litigation, and the client loses the efficiency of his work. On cases that are factually complex and intensive, each lawyer must know a great amount of detail in order to participate meaningfully, but multiple billing personnel can cause great billing inefficiency. Some inefficiency of this sort is to be expected in complex litigation, caused in part by inevitable associate turnover. In one Schratz case in which I was an expert, a fee application by the Nernberg firm in a Pittsburgh, PA eminent domain case, Mr. Schratz noted that 21 billing personnel were involved in $132,000 in billings.

70. For a case the size and length of *Nadaf* the assignment of lawyers would be efficient if no more than five lawyers (with some lawyer substitution at the lower levels) on each side performed 70% of the litigation, and no more than 20-30 other personnel performed the other 30% of the work. I suspect that Jackson Lewis had similar assignment efficiency.

71. Accordingly, the staffing on this case is remarkable in its efficiency because just three lawyers, Messrs. Rusky, Bacon and Soto-Suver, performed 90% of the billed work over a seven year period.

72. I have reviewed or witnessed at least 25-30 separate analyses of attorneys fee billings performed by Mr. Schratz, expressed either in a declaration or in testimony. Only one firm in these cases has assignment efficiency near that of the Bacon group. Whether as an insurance coverage or insurance monitoring counsel, as a fee expert or litigator, or as a managing partner reviewing my firm's bills, I as well have myself witnessed only one firm close to this efficient utilization of lawyers. Indeed, the extreme efficiency of the Bacon group, is virtually unprecedented – there is the one instance of which I know – for Mr. Schratz not to criticize, as

he customarily is wont to do, a claim of allegedly inefficient utilization of lawyers. Accordingly, Mr. Schratz's silence on this issue is deafening. The only efficiency criticism Mr. Schratz offers is very wan examples of multiple lawyer assignment, very low in relationship to common Bay Area practice.

73.    Mr. Schratz claims to have "audited" hundreds of cases, many of them involving Declarations that are matters of public record, and which Mr. Schratz could therefore produce herein. I would be surprised if Mr. Schratz could, other than in one case, produce attorneys' fee billings which show such efficient utilization for a case requiring more than a few hundred thousand dollars in billing.

///

## DEMONSTRATED SKILL

74.    I will add perhaps a duplicative opinion about the skills demonstrated by Mr. Bacon and Mr. Rusky, in addition to the Declarations attached to the moving papers herein.

75.    It suffices to say that the Jackson Lewis firm is an excellent employment litigation firm, skilled in pursuing every conceivable vulnerability, legal and factual, in a plaintiff's employment case.

76.    Here the Jackson Lewis firm pushed Plaintiff's counsel on a wide variety of factual and legal issues, and came close to succeeding.

77.    However, Mr. Bacon did an excellent job protecting his record for a potential appeal, and Mr. Rusky did an excellent job of pursing the appeal. The hard-fought trial win is testament not only to Mr. Bacon's trial skills, but also to his work in discovery and motions.

78.    In short, in this case the proof is in the pudding regarding the demonstrated skill of Messrs. Bacon and Rusky. They fought an excellent employment litigation firm on a number of issues, which resulted in a clear victory for the plaintiff.

79.    Based on the settlement discussions, and the actions of Jackson Lewis, it is clear that in the view of the Jackson Lewis lawyers, the defense had a better than 50% chance of

prevailing in this case.  Certainly the settlement offers of Jackson Lewis do not reflect an evaluation of this as a likely Plaintiff's win.

80.    I have been reviewing published jury verdicts since June of 1972.  A reviewer of these jury verdict reports can determine which counsel "won" the trial by comparing the trial result to the pretrial offers and demands.

81.    If, for example, defense counsel in a rear-end collision case offered $75,000, and the jury gave a verdict of $50,000 for the Plaintiff, such as result would be a "win" for the defense lawyer who obviously accurately evaluated his case.

82.    Our purpose here is not to suggest for a moment that the Jackson Lewis counsel were not skillful and diligent.  They were.  The fact that Plaintiff's counsel prevailed here, though, necessarily demonstrates the skill of the petitioning lawyers.

///

## ALLOCATION

83.    In my opinion, Mr. Schratz's recommendation that fees be allocated for partial success is absurd in the extreme.  As has been emphasized in Plaintiff's moving papers, it is quite common to add individual Defendants and numerous causes of action to a case for various strategic purposes.  But the fact here is that the result was unalloyed success for the Plaintiff and unalloyed defeat for the Defendant. In employment cases I have acted almost exclusively as a Defendant's counsel.  No competent defense counsel would consider this anything other than a complete loss, plain and simple.  There was no partial success on the part of Defendant, since removing individual Defendants and certain causes of action did nothing to lessen or mitigate the ultimate result.

84.    In contrast, there are cases in which Plaintiff loses in the sense that he or she does not get the thrust of the relief sought, but instead only gets a small part of it.

85.    One example of this is the *Guckenberger* case cited by Mr. Schratz.  In that case, Mr. Sidney Wolinsky achieved success in only a small corner of the discrimination case he brought against a college in Boston, MA.  In that case, the award of half of Mr. Wolinsky's

**Ex. D - 217**

claimed fees was generous under the circumstances.  It is my understanding that the cut in claimed fees had nothing to do with the formal criticisms that Mr. Schratz made of Mr. Wolinsky's legal billings, and, indeed, I was informed by Mr. Wolinsky that the Court's comments on the record were not laudatory of Mr. Schratz.

86.    In any case, this case should be considered a total success for the Plaintiff, unlike *Guckenberger*.

## **ALLEGED DUPLICATION**

87.    I have reviewed Mr. Schratz's claims regarding alleged duplication, and feel they are weak indeed.

88.    In the typical hierarchical staffing that is the normal custom and practice in this type of litigation, some amount of duplication is to be expected in the sense that I will describe. Often times a junior associate will review documents, such as for potential use in deposition, or perform legal research for use in a motion. This work product will customarily be reviewed by a senior associate, or perhaps a mid-level associate, and then on to the junior partner for final preparation and inclusion either in deposition materials or in a motion.  The senior partner will thereafter use those materials in deposition or review a brief including research and writing.

89.    There is nothing unusual or below standard about this staffing pattern, and yet, as can be seen by the example, the same document or legal research may be viewed by four or five lawyers, all related to the same objective, i.e., the motion or deposition.  Unless this duplication is excessive or unreasonable under the circumstances, the legal billings for this activity are considered reasonable and an obligation of the client to pay..

90.    In this case, what Mr. Schratz cites as prime examples of duplication does not involve duplication at all.  The fact that Mr. Rusky, an appellate lawyer with knowledge of the law, and Mr. Bacon, a litigation lawyer with knowledge of the facts, confer constantly in a "back-and-forth" manner, is not duplication.  It is collaboration.  This is to be expected in such a situation, since the work at an appellate level must necessarily be collaborative, analogous to the interplay between a solicitor and barrister in British practice.

91.     The other examples Mr. Schratz provides of duplication of effort involved a few occasions in which two or three or lawyers were engaged in one activity.  These instances are few and far between.  For example, the three lawyers associated with the Bacon group all attended a mediation, quite understandable given that three lawyers would have been helpful in the mediation discussion, because each was efficiently assigned different tasks leading up to the mediation.

92.     What is most interesting to me about Mr. Schratz's analysis is that there is so little "duplication" of effort that he can cite, especially when compared to the custom and practice of competent firms practicing in the Bay Area.  Just one example of common practice in this regard is exemplified by correspondence found at Exhibit 23 to Mr. Schratz's Declaration. The enclosed correspondence, written by Soto-Suver, is addressed to attorneys Jones, Burnett, Bradshaw and Egbert, four lawyers within Jackson Lewis, and all but Bradshaw were on conference calls with Mr. Soto-Suver, acting alone, to schedule depositions, and discuss other routine litigation matters.  I also understand from Mr. Soto-Suver that this staffing pattern was common for Jackson Lewis.

93.     There is nothing unusual or excessive about the deployment of three lawyers for phone calls by Jackson Lewis.  According to Mr. Soto-Suver there are many other examples of three or more Jackson Lewis lawyers working on the same project at the same time, or conferring about matters of common interest.

94.     Parenthetically, this is just one example of the inconsistency, hypocrisy and intellectual dishonesty I've witnessed from Mr. Schratz since 1988.  I will give the Court one example of Mr. Schratz's intellectual inconsistency regarding duplication of effort.

95.     In the fee arbitration Mr. Schratz conducted against the Tarkington firm regarding its asbestos billings, Mr. Schratz challenged $3 million in firm billings.

96.     After an audit largely concerned with formal quibbles about billing protocols regarding time allocation between and among 5,000 cases, six of the seven carriers settled with the firm for a standard 10% reduction in billings. Only Mr. Schratz of Fireman's fund challenged

the billings. He admitted publically and to me on deposition to spending $3 million in legal and auditing fees to challenge $3 million in firm billings.

97. In conducting this challenge, Mr. Schratz employed three separate law firms with no distinct separation of tasks. As opposing counsel in this litigation, I often spoke to lawyers from three separate firms to deal with the single issue, such as a standard discovery dispute.

98. Hearings in this case were usually attended by at least three separate lawyers from three separate firms.

99. During the arbitration hearing, I was questioning Mr. Schratz about the Tarkington's firm lack of duplication of effort, seeking the obvious admission that the firm usually assigned one lawyer to a task, unlike other firms, and never assigned three.

100. Mr. Schratz refused to answer the question directly, demanding instead to know when three lawyers would ever be needed at a hearing or trial. He then declared that three lawyers were never, ever needed for any hearing or trial, pounding his fist on the conference table for emphasis.

101. At the time he made the statement, under oath, he was flanked by three partner-level lawyers that he had hired, from three separate firms. I then pointed to his three lawyers and asked Mr. Schratz, "Never?" The laughter in the conference room was too loud and prolonged to allow Mr. Schratz any response.

102. My first point here is that sometimes it is appropriate to have two or three lawyers attending to one task, often because the client or his firm perceives the task as crucial or lawyer knowledge as differential.

103. The second point I would make is that the use of multiple attorneys by the Bacon group was the rare exception, not the rule, and was far below the staffing levels I witnessed as having been employed by Mr. Schratz himself.

104. Later, when the Tarkington firm brought its defamation claim against Fireman's Fund, based upon inaccurate comments of Mr. Schratz, two law firms tried the case, including a Houston, Texas based trial specialty firm that had not been previously involved in the fee

litigation, making it the fourth firm hired. During trial, the defense at all times had a least three lawyers in Court.

105.    After the Tarkington firm won a $3 million award based upon Mr. Schratz's conduct, Fireman's Fund engaged a fifth firm for the appeal, the Sonnenschein firm, and a sixth, Gibson Dunn, for petition to the U.S. Supreme Court.

106.    The lawyer arguing for the Sonnenschein firm had four firm lawyers with him in Court for the argument, three of whom were listed on the brief with him. So when Mr. Schratz suggests that the limited multiple lawyer assignments by Bacon are unreasonable, the claim is belied by Mr. Schratz's own actions in staffing cases that are important to him.

107.    In summary, Mr. Schratz simply does not present any example of multiple assignments that appear to be unnecessary or ill considered, and certainly the few multiple assignments here shown are well below the norm.

## ALLEGED CLERICAL BILLINGS

108.    In almost every report of Mr. Schratz that I have read, he criticizes what he calls "clerical" billings, declaiming without support that any "clerical' billings are supposed to be part of overhead. Historically, it is simply not true at all "clerical" tasks were not billable. Rather, the standard is and was that those functions that would expect normally to be performed by a legal secretary are not normally billed. Routine functions performed incidentally to the practice of law are, however, billable.

109.    There are many tasks that don't require a law degree which are routinely billable to the client, even though they could be described as "clerical," when such performance is incidental to the practice of law.

110.    One common example of this would be the lawyer at trial or deposition who must pull documents from his briefcase to impeach a witness, gather the copies for witness, clerk and opponent, and have the documents marked in evidence.

**Ex. D - 221**

111.    None of these functions require a law degree, and could be described as "clerical," but nonetheless are performed incidental to the regular practice of law and the time is billable.

112.    When I began practicing law in 1972, it was quite common for lawyers at prestigious firms to spend much of their time in document management, reviewing, collating and copying documents contained, for example, in the warehouse of an opponent.

113.    Today, for efficiency's sake many of these tasks are performed by paralegals and case clerks and billable to the client at lower rates.  But they have always been considered billable services.

114.    The examples cited by Mr. Schratz as improper "clerical" billings all involved references to faxing or copying a document incidental to a number of related tasks properly performed by the lawyer.  It is simply inefficient in many cases for a lawyer to stop what he is doing, walk across the office and hand a document to a secretary to fax somewhere, when it would be simpler and easier to fax a document himself, or put it in the copier.

115.    Common sense and good judgment should prevail in such instances, and there is nothing in the examples cited by Mr. Schratz to suggest lack of good billing judgment.

///

///

## EXCESSIVE TIME

116.    There are very few examples of excessive time offered by Mr. Schratz, and the ones he does offer as the worst examples of excessive time are not meaningful.

117.    I've read many reports of Mr. Schratz, and it is his custom to search for the worst "gotcha" items he can find, after which he claims that such an item, rather than being an exception to the rule, is supposedly indicative of a widespread practice, and thus, the basis for a large fee reduction.

118.    The examples he offers here are hardly the "gotcha" items I have seen him grasp in the past.  For example, Mr. Schratz first suggests that Mr. Soto-Suver spent 3.50 hours

preparing form interrogatories.  Mr. Schratz apparently realized, of course, that the 3.50 hours were really not billed for propounding form interrogatories, but that time was spent, along with other time, in responding to form interrogatories, for a total of 7 hours in preparing responses.

119.     In criticizing this amount of time, Mr. Schratz apparently made no effort, and certainly made no showing, that there was something particularly simple or simplistic about these form interrogatories, which would have allowed for preparing responses in less than 7 hours.   In this case, simply reviewing the billing entries suggests that part of the responses, involved the delicate issue of setoffs or mitigation of income.  It is likely as well that the Jackson Lewis firm propounded form interrogatories that required a massive response, including personal background, detailing of witnesses, calculation of damages and explication of liability claims. Seven hours is completely reasonable for the tasks, indeed efficient.

120.     Mr. Schratz criticizes Mr. Soto-Suver for spending four hours to prepare for a hearing.  I do not find this amount of time, for a junior or senior lawyer, excessive in the least, especially when Plaintiff at the hearing.  It is an obligation of a litigation lawyer, as an officer of the Court, to be well prepared for any Court hearing, and Mr. Soto-Suver should be praised, not castigated, for preparing adequately for a hearing.  Again, this criticism of Mr. Schratz displays a bias and a need to gin up any and all conceivable objections to the bills of petitioning lawyers, whether the criticisms are fair or otherwise.

///

**BILLINGS OF MR. PEARL**

121.     It is ironic in the extreme that Mr. Schratz would criticize the Bacon group for needing "an expert to explain what the attorneys did."  The law of attorney's fees is a specialty area of practice, and Mr. Pearl literally wrote the book on this area of the law.  It is far more efficient for the Bacon group to hire Mr. Pearl to present the attorneys fees case then to delve themselves into the area.  There is no showing by Mr. Schratz that a competent litigator such as Mr. Bacon could have put together the attorney's fees petition more efficiently than Mr. Pearl. Indeed, Mr. Schratz himself has been hired as an "expert to explain what the attorneys did."

Indeed, Schratz's entire livelihood is based upon the notion that it is wise for a law firm which wishes to challenge fees to hire an expert such as Mr. Schratz. Mr. Schratz, in performing his role as a self- proclaimed "auditor," sees fit to opine on matters of law such as applicable case law relating to attorneys fees.  In the guise of offering expert opinion, Mr. Schratz spends much of his Declaration opining on matters of law which, if he is correct, should be performed by the Jackson Lewis firm.  Our point is that attorneys' fees is a specialized area, as Mr. Schratz's advertised specialty profession speaks loudly.

122.    Clearly the area of attorneys fees is a specialized area, and the hiring of specialized experts like Mr. Schratz, or specialized attorneys such as Mr. Pearl, is quite within the custom and practice in this area.  Indeed, Mr. Pearl was compensated at his full market rate for similar services in numerous other Schratz cases, including *Miller v. Vicorp* and *Duran v. U.S. Bank*.

## BLOCK BILLING

123.    The area of Mr. Schratz's criticisms upon which he bases the bulk of his reductions is his formal criticisms of so-called "block billing."  Since Mr. Schratz holds himself out to be an "auditor," and makes much of the purported standard disallowing "block billing," it is important to understand the history of "legal auditing," the prohibition by auditors of "block billing," and the background of Mr. Schratz himself.

124.    In short, block billing is an invention of self-proclaimed, unlicensed "auditors," which industry is itself a fiction created by the insurance industry in an effort to whittle down cost, and also to incentivize defense counsel to settle costly suits.

125.    In fact "block billing" is the norm in the legal industry, and the degree to which it was practiced by the lawyers petitioning here for fees is far less prevalent than the custom and practice.

126.    In any case, since I am witness to the creation of the auditing industry, and Mr. Schratz's place within it, I would provide the following background for the Court's consideration.

## **BACKGROUND REGARDING LEGAL AUDITING AND BLOCK BILLING**

127. It is simply not true that a prohibition against "block" billing is the norm in the legal profession anywhere in the country. The standard prohibiting "block" billing is a fiction invented by the insurance industry, and largely a product of auditors such as those employed by Fireman's Fund in the late 1980's and 1990's, when Mr. Schratz was employed there.

128. So-called "legal auditing" is itself a procedure invented by the insurance industry, starting in the late 1980's, in an attempt to control legal fees, the major component of an insurer's cost. The applicable rule of thumb discussed throughout the insurance industry has been that a 10% decrease in legal cost would increase an insurer's net profits by a percentage point, a significant increase.

129. There was and is now no accepted standard or methodology for legal auditing, as there is, for example, for the accounting auditing of businesses under Generally Accepted Auditing Standards ("GAAS").

130. It is true that Mr. Schratz customarily claims that he follows federal law in fee-shifting cases. However, to the extent a Court acts as a finder of fact in a fee petition, each factual finding is necessarily case-specific. To the extent of the Court in any such case acts in its legal role, an expert should not, in my opinion, invade the province of the Court by enunciating and applying the law.

131. There is no licensing or training required for one to hold himself out to be a legal "auditor," and the opinion of such an "auditor" should be judged like any other opinion.

132. I have interviewed Fireman Fund's in-house auditors who worked contemporaneously with Mr. Schratz in the 1980's and early 1990's, and I have deposed some of its outside auditors. I have spoken in depth with Mr. Douglas Martin, a Fireman Fund's lawyer in charge of the company's in-house legal auditing of Fireman's Fund's regular panel counsel and deposed Mr. Gary Black, the Vice President in charge of Fireman's Fund's claims. I have also consulted with the firm of Davidson McKinnon, a group of former Fireman's Fund auditors who started an independent business in the early 1990's after their auditing work at Fireman's

**Ex. D - 225**

Fund was determined by Messrs. Martin and Black to be no longer necessary.  I have also spoken with numerous panel counsel subject to these audits.  The Tarkington firm was itself panel counsel subject to Fireman's Fund's billing guidelines and auditing program. Additionally, I have deposed Mr. Schratz about the Fireman's Fund auditing program. Accordingly, my statements regarding auditing standards and history are based on my actual knowledge, and thus are founded upon information upon which an expert may reliably base his opinion.

133.    Although there is no set of commonly accepted standards for legal audits, audits in the insurance industry which gave birth to this practice involved on-site examination of a law firm's files, including notes, memoranda and drafts, followed by questioning of lawyers both about case tactics and strategies, and about individual billing entries.

134.    The goal of this thorough approach is to gain a basis on which to verify the reasonableness of the billing entries.  Even if many of the auditors were not themselves skilled litigators, nor particularly knowledgeable in the type of litigation reviewed, at least its methodology had the virtue of thoroughness.

135.    Mr. Schratz has himself on several occasions in speeches and articles criticized any audit that does not follow this thorough approach.  To cite just one example, in Mr. Schratz's written speech for presentation in Dallas, Texas on November 24, 1992 **(Exhibit F, page 6)**, he addresses that audits should follow his recommended thorough, on-site approach:

In deciding which outside auditors to use, look at the following criteria:
> Do the auditors conduct an on-site review of the bills in the attorney's office?
> Do the auditors interview all the attorneys and paralegals who entered their time on the bills?
> Do the auditors review the entire claims file and legal file instead of merely reviewing the bills?
> Does the audit team consist of both attorneys and accountants or CPAs?
> What is the trial experience of the attorneys on the auditing team?

136.    In the "Need for Legal Audits" **(Exhibit C, page 6)**, Mr. Schratz details the typical manpower used: "Most in-house audits have 6-8 persons and a full audit lasts five days."

**Ex. D - 226**

137.    Mr. Schratz in this case has not engaged in thorough "audit" he has advocated in the past.  Therefore, he is acting in this case simply as an expert witness, who should be judged on his litigation experience, knowledge, judgment and objectivity.  For reasons I will explain later, he is severely lacking in each of these areas.

138.    When the Fireman's Fund auditing program began during Mr. Schratz's employment there, Fireman's Fund auditors found that most billing entries of their trusted regularly-retained panel counsel were "blocked."  This purportedly prevented the auditors from examining discrete tasks in order to analyze efficiency or accuracy of the time claimed for a particular task.

139.    Auditors also found that many entries that were not blocked were generally or summary in nature, "vague," such as "legal research for summary judgment motion" or "preparation for deposition."  Again, auditors determined that such entries made it difficult for them to determine accuracy or efficiency.

140.    Accordingly, law firm billings were often criticized by auditors as having "blocked" and "vague" entries, and a certain percentage of these billings were thus by various formulae considered to constitute "overbilling," because they did not meet a presumed standard prohibiting same.

141.    I have reviewed summaries of what Fireman's Fund's auditors in the first two years of its auditing program claimed to be "overbilling," generally averaging slightly more than 20% of the legal billings reviewed.  The average resolution of these claims with Fireman's Fund was just over 10%.

142.    As Mr. Black has testified under oath, and Mr. Schratz has recognized in a published article, panel counsel, including my own firm, complained that the rules had been changed in the middle of the game and that the process was unfair.

143.    Once the Fireman's Fund billing guidelines were changed and panel counsel had notice of them, and were able to adhere to them, the average audit claim of "overbilling"

dropped to 6%.  Mr. Black then declared the billing "problem" solved and the in-house auditing program disbanded.

144.    Mr. Schratz summarized this history in "The Need for Legal Audits" **(Exhibit C, page 6)**:

> Some firms then accused us of changing the rules of the game in mid-stream.  To answer this charge we developed and published a <u>Litigation Guide for Defense Counsel</u> setting out our philosophy and reporting requirements…

> The guide also discusses the Company's audit program and states that excessive or unnecessary charges are to be repaid.  The audit and guide greatly reduced legal fee misunderstandings.  During the first two years of the program, our overbilling averaged 20 percent.  Today it's less than 6 percent.

145.    Several conclusions may be drawn from this experiment of Fireman's Fund in auditing its panel counsel.  First, "overbilling," as determined by the arbitrary, formalistic and technical standards of auditors, is not the same as "overcharging," either by reason of inefficiency or dishonesty.

146.    Panel counsel, that is, regularly retained counsel, were, prior to the auditing program, necessarily adjudged by claims executives to have been reasonable in their billings, failing which they would have ceased being panel counsel.  It is therefore highly doubtful that the overall billings decreased as a result of the newly imposed standards.  So another conclusion that could be drawn is that "blocked" and "vague" billings do not equate to "overcharging," or inefficiency.  The standards imposed against "blocked" and "vague" billings may assist an auditor, but violation of them does not mean that the firm is charging excessively.

147.    Another conclusion drawn from this is that, absent billing guidelines to the contrary, the customary practice of the legal industry is that billings are "blocked." Billing entries by general or summary task description, which auditors often term "vague, "are as well within accepted billing practice.

148.    As I explain elsewhere, Mr. Schratz deemed it useful to publicly equate formal "overbilling" with "overcharging," for purposes of intimidating law firms with bad publicity.  But they are not the same.

DECLARATION OF JOHN D. O'CONNOR

**Ex. D - 228**

149.    Mr. Schratz's method of determining what is "blocked" billing is subject to criticism.  Mr. Schratz uses his computer program to determine the use of semicolons in a billing entry.  Such semicolon use is deemed by Mr. Schratz to reflect discrete and separate tasks being lumped together, thereby constituting in his view "blocked" billing.  In fact, often semicolons simply reflect a wealth of descriptions of activities.

150.    Thus, a billing attorney can be criticized under Mr. Schratz's methodology for describing his activities well, such as, for example, by billing "deposition preparation; assemble exhibits; outline questions; review prior Declarations."  This would be claimed improper "blocked" billing, whereas in fact it constitutes a wealth of description.

151.    However, if the same lawyer avoided semicolons, and simply billed "deposition preparation," an auditor would likely view these entries as improperly "vague."

152.    Perhaps the best description of the distinction between formal "overbilling" and true "overcharging" was expressed by the California Court of Appeals in upholding the libel verdict (damages were retried) in the case of *Tarkington v. Fireman's Fund*, based on defamation through false and scurrilous publicity leaked by Mr. Schratz about the Tarkington firm:

> Mr. Schratz himself distinguished between fraud on the one hand, and overbilling on the other.  Mr. Schratz and Mr. Black of Fireman's Fund testified that overbilling was common.  Regularly hired "panel counsel" for Fireman's Fund overbilled by an average of 20 percent before the Tarkington dispute became public.  Fireman's Fund's own in-house firm which took over the Plant litigation from Tarkington was found in an audit to have overbilled Commercial Union $153,881.96 out of $1,401,579.15, or approximately 11 percent…

> The arbitrator did not rule that the overbilling uncovered by the audit was fraudulent.  The arbitrator concluded that Tarkington did not overcharge Fireman's Fund for the legal services provided defending Plant.  His findings state that Fireman's Fund "adduced no evidence to dispute adequacy of [Tarkington's] representation of the client, Plant, or that over all charges were reasonable.  And a number of prominent opposing (Plaintiff) asbestos counsel opined that [Tarkington] was among the top asbestos defense firms in the area of competence, integrity and economy of use of staff.  Evidence was also offered tending to show that while [Tarkington] handled the cases the cost of defense per case was lower than average in the area.

1

2

3
(*Tarkington v. Fireman's Fund*, A077091, June 17, 1998, Opinion, pp. 19-21)

4
153    In fact, while Mr. Schratz always (in the 25-30 reports I have reviewed) has

5
criticized "block" and "vague" or "clerical" billings, when representing the fee payor, he himself

6
has sanctioned multiple billing entries and clerical task descriptions when it is in his interest to

7
do so.

8
154.    I have reviewed his billings to his client in one case in which he served as an

9
expert in Southern California, in which he frequently lumped several task descriptions in one

10
billing entry separated by semicolons, thus constituting "block" billings under his definition.

11
155.    I have also reviewed billings of Mr. Schratz with general or summary descriptions

12
of tasks.  Again, while I believe Mr. Schratz's billing entries in this regard are within standard

13
billing practice, entries I have examined are similar to entries he criticizes elsewhere as "vague"

14
or "clerical."

15
156.    I also have recently viewed the billings of outside auditors hired and paid by Mr.

16
Schratz while employed by Fireman's Fund in which the auditor blocked his billings and made

17
vague and identically repetitive entries.  I have reviewed entries from a unit headed by a

18
Fireman's Fund attorney associated with Mr. Schratz, Mr. Michael Bolechowski of the

19
Fireman's Fund in-house counsel firm, in which Mr. Bolechowski worked on cases in which Mr.

20
Schratz was involved.  One was a case against Pacific Gas & Electric for indemnity in which

21
Fireman's Fund sought another party to pay for its legal bills.  One was the representation by the

22
Fireman's Fund in-house firm of an insured in 1,000 asbestos cases taken from our firm at the

23
recommendation of Mr. Schratz, in which six other insurance carriers paid Fireman's Fund

24
counsel.

25
157.    In each of these cases, the Fireman's Fund firm sought payment for "blocked"

26
and "vague" billing, as those terms are defined by Mr. Schratz, and charged paralegal time for

27
routine document management tasks that Mr. Schratz criticized here as "clerical."  I know this

because my firm deposed the billing paralegals, I have read their depositions and I have

reviewed these bills myself, line by line.

**DECLARATION OF JOHN D. O'CONNOR**

**Ex. D - 230**

158.    In fact, Fireman's Fund counsel was not overcharging or acting wrongfully by so charging clients, but was billing per standard practice within the legal profession.

159.    I have reviewed the so-called "blocked" billings in this case, and can opine both on the basis of my 39 years of litigation, and on my review over the years of hundreds of billings of large law firms, that the billings of the firms in this case are consistent with the practice of law firms, large and small, throughout the American legal profession.

160.    In summary, I opine that so-called "block" billing is the norm in the legal profession. The "clerical" entries criticized reflect properly billable document management services, incidental to normal practice of law, and minimal in amount.

161.    There is no question but that the rates here charged are clearly reasonable for firms of similar competence.

162.    A related question presented by Mr. Schratz's report is whether the client for which he is advocating in fact refuses to pay its own counsel for multiple-entry or "block" bills. The same question could be asked regarding what rates it paid in the most important litigation against the company, and also whether they paid for what has been described as "clerical" billings. It would seem inconsistent for the company not to pay counsel for Plaintiff if they have paid their own firms, such as Jackson Lewis, in large litigation for the same type of billings at similar rate.

163.    Indeed, Mr. Schratz has not told the Court whether the bills of Defendant's counsel in this very case contain "blocked" or "clerical" entries, or show multiple assigned lawyers on one task. Neither has Mr. Schratz told the Court how many hours Jackson Lewis billed in this case, by comparison with Bacon.

164.    Mr. Schratz's criticisms in this case are those he invariably renders in every case in which I have reviewed, lending support for my opinion that the practices he routinely criticizes reflect the prevailing customs and practices of the legal industry. The exception to this which I would note is Mr. Schratz's sanctioning of bills of a reputable Southern California firm, in a case in which he was an expert on its behalf, where the firm billed with so-called blocked

Ex. D - 231

and clerical entries, which he approved for the firm hiring him. The firm also billed in minimum quarter-hour increments, a practice now disfavored, but which Mr. Schratz approved.

### JAMES SCHRATZ SUMMARY

165.    I have extensive knowledge of the experience, competence, bias and integrity of Mr. James Schratz. I have gained direct knowledge of Mr. Schratz and his activities for over 23 years, as a Fireman's Fund lawyer working on cases supervised by Mr. Schratz; as a lawyer litigating fee disputes with Mr. Schratz; as a lawyer deposing Mr. Schratz; as an opposing expert; and as one who had read internal memos, speeches and papers authored by Mr. Schratz. From his depositions, I also have knowledge of his background before 1988, when I first met him, and possess knowledge of his background gained from Mr. Schratz himself on deposition. Accordingly, I believe I am highly qualified to render opinions on these subjects.

166.    In short, my opinions can be summarized as follows: 1) as a litigator, Mr. Schratz only has minimal, junior-level litigation experience at which he was adjudged by his employers to have been incompetent; 2) he has demonstrated, in cases in which I have been involved with Mr. Schratz on the same side or on opposing sides, no meaningful understanding of the complexities of large litigation cases or sophisticated legal thinking; 3) throughout his career he has exhibited an extreme bias in favor of the entity hiring him, which in most cases is the fee payor; and 4) his opinions lack intellectual integrity and honesty.

167.    Having said that, Mr. Schratz has examined a number of legal billings, and has information in the public domain that could assist the Court herein, including numerous declarations he has filed in the Courts regarding other fee billings he has examined. Specifically, on the basis of his reviews of 800 sets of law firm billings, Mr. Schratz would be able to tell the Court how many of these contained significant "blocked," multi-lawyer, or "clerical" entries. In my opinion, most, if not all, would, if consistent with industry standards, contain significant blocked, multi-lawyer and so-called clerical entries.

### BACKGROUND AND QUALIFICATIONS OF JAMES SCHRATZ

168.    The undersigned was an attorney "supervised" by Mr. Schratz and his underlings starting in 1988, and also was the managing partner of a firm subject to several "audits" by an outside "auditor" supervised by Mr. Schratz.

169.    I have read what has been represented by Fireman's Fund as of August, 1996, to be all of the articles, correspondence and written speeches authored by Mr. Schratz while at Fireman's Fund dealing with attorney fee billing issues, and have read numerous articles and speeches authored by Mr. Schratz since then. I have read internal memos of Mr. Schratz authored while at Fireman's Fund regarding "CUMIS" litigation and outside counsel. I have read newspaper quotes, speeches and articles of Mr. Schratz regarding billing issues.

170.    I have interviewed and/or deposed virtually everyone who worked significantly with Mr. Schratz at Fireman's Fund in the late 1980's and early 1990s, including the head of the Claims Department, Mr. Gary Black; the attorney who succeeded Mr. Schratz in using outside auditors regarding outside non-panel counsel, Mr. Robert Buckley; and another attorney who supervised Fireman's Fund's internal auditors used for trusted panel counsel, Mr. Douglas Martin; and numerous claims executives reporting to or working with Mr. Schratz, most of whom were highly experienced, and of significant tenure with Fireman's Fund.

171.    I have read approximately 25 to 30 reports, Declarations or opinions of Mr. Schratz since the inception of his firm of Jim Schratz & Associates after his termination from Fireman's Fund. I have as well read several "audits," consisting of both the audits he commissioned at Fireman's Fund and "audits" prepared by him for his own firm. I have also read audits prepared by his outside auditors at the behest of entities other than Fireman's Fund or Mr. Schratz.

172.    I have deposed or interviewed several "auditors" of the outside auditing firm used by Mr. Schratz at Fireman's Fund. I have learned the "methodology" of the outside auditors Mr. Schratz used at Fireman's Fund and the present methods Mr. Schratz uses to "audit" firms on behalf of his own firm.

**Ex. D - 233**

173.    I have engaged in fee litigation with Mr. Schratz; deposed him on several occasions and observed both his deposition testimony and testimony in court.

174.    I have also read legal bills of Fireman's Fund employee lawyers working directly for Mr. Schratz or lawyers chosen by Mr. Schratz.  I have read bills of Mr. Schratz himself and bills of outside auditors which he has approved and paid.

175.    I have read newspaper and magazine articles about Mr. Schratz, quoting or paraphrasing him about legal "overbilling."

176.    I have sued Mr. Schratz and Fireman's Fund on behalf of my former law firm, successfully, for defamation on the basis of statements he caused to be made in local and national publications about legal fee billing.

177.    I was co-counsel in two trials, one on both liability and damages, the second one damages only, against Fireman's Fund, based upon false and defamatory statements made about my former firm by Mr. Schratz.  I was present in court as co-counsel in 1996 and 1998 to receive verdicts in favor of my former firm, and against Fireman's Fund, for $3.0 million and $3.6 million, respectively, for defamation published or caused to be published by Mr. Schratz.

178.    On behalf of my firm and the named partners, I obtained a confidential settlement with Mr. Schratz based upon defamatory statements he made about my firm after he departed Fireman's Fund.

179.    I have reviewed a cover story in the *American Lawyer* published in or around March, 1993 about Mr. Schratz entitled, "Litigation MISmanagement at Fireman's Fund," (emphasis in the original) detailing Mr. Schratz's ill-advised, destructive dealings with our firm on an asbestos litigation fee dispute.

180.    I was the principal lawyer at Tarkington on two prior large cases which Mr. Schratz caused to be audited by his outside auditors, but which cases were controlled by other claims personnel.  After two time-consuming and painstaking "audits," my firm received payments from Fireman's Fund for more than the amounts billed to Fireman's Fund, with apologies from the claims executives involved, for audits that exalted form over substance.  The

insurer agreed to pay more, because my firm had consistently cut its time from pre-bills to curry the favor of an economy-minded insurer.  When Fireman's fund subjected my firm to the grueling demands of an audit, seeking to find and deduct for any overcharging, we asked for reimbursement of the time we had cut from pre-bills, on the theory that the audit found undercharging.  The honest claims executives in charge of the cases agreed with us, and paid us more than our billing in those cases.

181.    Since 1992, I have consulted with numerous lawyers across the nation, many from reputable, well-known firms, about what they perceive to be biased or unrealistic criticism from Mr. Schratz.

182.    I have also served as an expert or consultant on several Bay Area cases since I formed O'Connor and Associates, in which the Plaintiff firm received from the Court 100% of its billings, notwithstanding vehement criticism to the contrary by Mr. Schratz.

183.    As a result of the foregoing, I believe that I have direct knowledge of Mr. Schratz's fee dispute activities from 1988 through the present, and also have knowledge of his background and experience prior to that time.  I believe that this information can assist the Court in assessing the weight to be given Mr. Schratz's opinions.

## EXPERIENCE OF JAMES SCHRATZ

184.    After his good scholastic record at USF Law School, Mr. Schratz was hired by Heller Ehrman and fired at his first annual review.  Mr. Schratz testified in a deposition he was terminated by Heller Ehrman for being "too happy."

185.    He then worked for Rosenblum Parish, a smaller, reputable San Francisco firm where he was admittedly dismissed after one year of employment.  Mr. Schratz has testified in my presence that he tried one or two real estate broker fee cases in a trial or trials of one half to one day.

186.    His subsequent work for corporate counsel at Fireman's Fund consisted of a mix of litigation work and non-litigation work, the former mostly "monitoring" of outside counsel

hired by Fireman's Fund throughout the country, often with corporate counsel's name on the pleadings along with that of the outside firm.

187.    From my knowledge of Fireman's Fund's structure as a Fireman's Fund panel counsel, I can state that Mr. Schratz's subsequent assignment to the Claims Department was a step down career-wise from his position in the Corporate Counsel office.

188.    The work his group performed in Major Claims belies the name, because it dealt mainly with garden-variety construction defect litigation.  I know this because our firm received case assignments from the group, and were generally supervised by the functional head of the group, Mr. Robert Hill, a competent and experienced claims manager.

189.    Mr. Schratz's main occupation while working for Major Claims was implementing his own unique solution to what insurers at the time referred to as the "CUMIS problem" at the time besetting carriers throughout California, and to a lesser degree, throughout the country.

190.    CUMIS counsel, as discussed above, refers to lawyers selected by the insured that the insurer must pay, because of the potential conflict of interest that arises when coverage may be decided or influenced by facts proven in the underlying litigation.  The CUMIS doctrine is now embodied in part in C.C.P. §2860.

191.    Two problems for California insurers arose in the 1980's regarding CUMIS counsel: a) fee rates and litigation methods were usually not as economical as those of "panel" counsel customarily retained by the insurer; b) where coverage limits could be exhausted, but where, as is standard, the defense obligation is unlimited, the insured is incentivized, in, for example, environmental or toxic tort litigation, to pay millions for defense but nothing for tribute, at odds with the insurer's financial interest.

192.    Some insurers began in the 1980s a program of closely scrutinizing CUMIS counsel bills, including on-site visits to examine the underlying files, to challenge inefficiencies and discourage unnecessary work.  As Mr. Schratz was beginning his career in claims, having left his position in the corporate counsel's office, he saw legal auditing, not just as a method to

**Ex. D - 236**

discourage inefficiencies or to bargain down bills, but also to end the costly underlying litigation altogether.

193.    Mr. Schratz saw that legal "auditing," or close examination of defense counsel bills, could be used for more than just cutting a bill by a few percentage points.  He saw that he could use legal "auditing" results to threaten counsel with a burdensome process, which would in turn incentivize counsel, under Schratz's thinking, to end the litigation or modify the insured's demands upon the carrier.  In a copy of an ABA Speech **(Exhibit E)** which Mr. Schratz produced in litigation with my firm, he frankly states that auditing is to be used to force independent counsel to settle cases:

> Audits can result in substantial savings in indemnity payments.  When independent counsel realizes that their bills are going to be scrutinized every month by independent auditors, and that legal fees are not going to be as high as anticipated, there is increased motivation to settle the case.

194.    Another threat employed by Schratz was of unfavorable publicity, threats he made to me.  Such unfavorable publicity has been used by Schratz to threaten other audited firms.  In a draft of a PLI speech **(Exhibit F, page 4)** produced to my firm, Mr. Schratz revealed his motives:

> Through publicizing our victories Fireman's Fund has incurred the wrath of some law firms and developed a "tough guy" image within some circles.  We don't especially welcome such a reputation.  However, given the wide ranging abuses and the reluctance of the authorities to get involved, we have little choice.  While I seriously doubt that Fireman's Fund can stop these abuses entirely, at the very least we may be able to discourage firms from engaging in them when they are billing Fireman's Fund.

195.    In a speech of October 31, 1991, a transcript attached as **Exhibit G,** Mr. Schratz recommended that insurance claims personnel follow his practice of leaking billing investigations to the media:

> Through the media we can get our point of view and our work victories across.  In addition, cumis claims people should work very closely with the media.  Do not leave it up to your public relations department.  It is important to coordinate with that department and if possible you should take some media training.  However, it has been my experience that reporters want to talk to claims people who are working on the file, not the public relations person, even though they are the experts.

**Ex. D - 237**

If you are working on a big fraud investigation, bring the media early
into the case.  Develop a personal relationship with the reporter.  You could insist
that all information be off the record until the investigation is completed.  I am
currently working with the Wall Street Journal on an investigation, and am going
to be talking to Sander Vanoaker on ABC Business World later on next week on
an investigation that we are doing.  They will keep your confidences.  I think you
will be pleasantly surprised at how the media can work with you.

("Controlling Claims Costs", October 31, 1991, page 6)

196.    There should be nothing objectionable about an insurer publicizing a victory

against fraudulent practices.  However, Mr. Schratz has defined fraud to include standard billing

practices:

While Fireman's Fund is willing to pay high hourly rates for exemplary legal
service, it will not tolerate abusive billing.  On occasion we have spent more than
the value of the underlying dispute to investigate a law firm's charges.  Our
results prove that this approach not only saves us money in the long term but
ultimately saves money for our insureds.  We want law firms to know we will not
accept the following fraudulent practices:
"Blocked billing" – combining two or more time entries into a single paragraph –
or vague billing entries…
Excessive minimal billing entries and office conference.  Fireman's Fund has
reviewed some bills listing intra-office conference as 50 percent of the total
amount charged.
Excessive billing for paralegals or law clerks.  Secretaries are not paralegals;
paralegals are not lawyers; and lawyers who have not yet passed the bar exam are
not entitled to bill at the hourly rates of State Bar members.

("Do The Right Thing", *California Lawyer,* June, 1992, page 40)

197.    While claiming that a firm commits fraud by billing excessive paralegal and clerk

time, Mr. Schratz also recommends that paralegals and clerks draft complaints, motions and

deposition questions:

Use paralegals and law clerks to draft complaints or prepare motions and
deposition questions.  Properly trained legal assistants are less costly and just as
efficient as first- or second-year lawyers.

("Do The Right Thing", *supra*, page 40)

198.    So it has been Mr. Schratz's position that billing more than one task, separated by

semicolons is fraud because his billing is "blocked."  But a lawyer who seeks to avoid blocked

billing by entering a summary description of his activities is in danger of being accused of fraud for a "vague" entry.

199.    A lawyer who, to avoid a charge of "blocked" billing, disaggregates tasks such as reviews of correspondence and short telephone calls risks being accused of fraud for excessive "minimal" entries, for example, a two minute phone call billed in minimum increment of .1 hour.  Mr. Schratz has stated this practice is fraudulent.

200.    A lawyer who uses paralegals and clerks expansively can be accused of fraud, but one who doesn't is billing inefficiently, and subject to criticism.

201.    In short, the auditing process was used by Mr. Schratz to chill independent counsel from vigorously defending their insured clients.

202.    While employed by Fireman's Fund, Mr. Schratz did no auditing himself, but learned about "auditing" by working closely with his outside auditor, the Stuart, Maue, Mitchell and James firm of St. Louis, Missouri ("Stuart Maue").  Stuart Maue audited my firm on behalf of Mr. Schratz on several occasions.

203.    The person heading the Stuart Maue firm, Mr. Harry Maue, attended neither a legitimate college nor legitimate law school and received mail order "degrees" for both of these claimed education levels.  The other three names in the firm name, Stuart, Mitchell and James, do not represent real persons in being.  Mr. Maue falsely represented to the American Lawyer in 1990 that the names did represent individual who had once been with the firm.  See Exhibit B attached hereto, in which the article discusses Mr. Maue's prevarication on the issue:

> "Despite its name, Stuart, Maue is a corporation and not a partnership. Maue and Ernie James, a rumpled Air Force veteran who is the company's resident computer jock, are the only 'name partners' in evidence.  Asked about the other two, Maue first claims that he parted ways acrimoniously with 'Stuart' and 'Mitchell' a number of years ago.  He declines to give their current whereabouts, saying 'You can't talk to them.'  The fact, as Maue ultimately confides, is that no one can talk to them because they do not exist:  They are fictitious.  'The names 'Stuart' and 'Mitchell' [do not] represent the names of former partners,' Maue writes in response to a written query.  'The name Stuart, Maue, Mitchell & James, Ltd. simply represent the name I chose to give this company when it was formed.'  Maue angrily maintains there is nothing inappropriate about his letterhead."

204.    After the publication of this article, Mr. Maue commenced claiming publicly that these names were always meant to be fictitious, and refer to his heroes Jeb Stuart, the Confederate war general, Billie Mitchell, the WWI pilot, and Jesse James, the famous outlaw.

205.    Mr. Schratz would invariably use the Maue firm for legal "audits." The audit "findings" of a Maue audit would then be used by Schratz as a basis to threaten publicity if the audited firm did not act in accordance with Mr. Schratz's wishes, as he did to the Tarkington firm.

206.    In short, legal auditing, including attendant publicity based thereon, was one of the methods Mr. Schratz used as part of a whole array of bullying and coercive tactics designed to end CUMIS litigation for his company.

207.    My firm learned of this operation of Mr. Schratz early in the program.  After my partners, Mr. Tarkington and Mr. O'Neil, called upon Mr. Schratz and learned of his program, we made the decision not to actively solicit the business of Mr. Schratz, even though we worked extensively for claims executives throughout Fireman's Fund.

208.    Unfortunately, this decision did not keep us away from Mr. Schratz, whom we encountered in our work for the FDIC, as counsel for the FDIC as Receiver of the Golden Valley Bank of Turlock, California.

209.    After this bank was closed by the FDIC in or around 1985, our firm immediately became counsel for the Receiver and inherited a multitude of litigation, all of it insured by the insurer for the Bank, Fireman's Fund.  We also sued on behalf of the FDIC various directors and officers, also insured by Fireman's Fund.

210.    For several years, we worked in harmony with Fireman's Fund claims executives out of Fresno, California, who acknowledged Fireman's Fund's obligation to defend the cases, and pronounce themselves pleased with our economical handling of the litigation.  Although we regularly did work for Fireman's Fund as panel counsel, in this case we were "CUMIS" counsel on behalf of the FDIC and the Bank.

**Ex. D - 240**

211.    However, this litigation was shifted to Mr. Schratz's Major Claims group in late 1988, where upon Mr. Schratz demanded that the firm seek payment for defense costs from the government, not from Fireman's Fund.

212.    I met with Mr. Schratz in November, 1988 and explained to him that Fireman's Fund indeed had an obligation to the Receiver of the Bank just as he did to the Bank itself.  He then proposed that for a token payment, we should consider the insurance policy "exhausted," so inform our client the FDIC, and then importune the FDIC to pay our bills, releasing Fireman's Fund.

213.    Since the Bank had $5.5 million in coverage from Fireman's Fund and a limitless defense reimbursement right from Fireman's Fund, we felt obliged by our duties to our client to politely refuse Mr. Schratz's request.

214.    Thereafter, we were told by his assistant Mr. Hill that Mr. Schratz had issued an order that we could receive no further cases from Fireman's Fund until the Golden Valley Bank matter had been resolved.  Eventually we were subject by Schratz to numerous time-consuming audits, which we resolved successfully when the cases were controlled by other claims executives.

215.    Eventually, we were audited in the asbestos litigation and certain asbestos litigation where Fireman's Fund was one of seven carriers.  We quickly resolved the matter with six other carriers, but fought with Mr. Schratz, who eventually began issuing scurrilous publicity suggesting fraud and criminality on the part of our firm.  We were forced to sue Fireman's Fund and Mr. Schratz, for which we obtained verdicts of $3.0 million and $3.6 million, and settled confidentially with Mr. Schratz.

216.    After our fee case was arbitrated, Mr. Schratz left Fireman's Fund under circumstances suggesting less than a voluntary departure.  I reviewed an article in which Mr. Schratz claimed to a local legal newspaper that he left Fireman's Fund as a way of cutting the company's expenses.

Ex. D - 241

217.    Before he left Fireman's Fund, Mr. Schratz issued numerous articles and speeches, and courted publicity whenever and wherever he could get it, suggesting that there was rampant "overbilling" by attorneys in defense litigation, that much of the defense bar should be subject to State Bar discipline or criminal proceedings, and that the amounts involved were usually 30%-50% of the bills, and that it occurred in 70% of the cases.

218.    While making these scurrilous remarks publicly and demeaning and tarnishing the entire reputable litigation Bar, in more confidential settings it became clear that the claimed "overbilling" usually consisted of technical objections to form for time actually spent, rather than substantive objections to the amount of time claimed.  For instance, in our case, Schratz falsely and publicly "leaked" to the *Wall Street Journal* and *The Recorder*, a San Francisco legal publication, that our firm's lawyers billed 785 hours in a month and 33 hours in a day, all false. Behind closed doors, he spent millions to make highly technical complaints as to how we described and allocated our time over 5000 cases, when most of the work was performed in common; one partner admittedly used his paralegal to bill out his burdensome time allocations to hundreds of cases.

219.    I will explain this comment more fully, because it bears directly upon Mr. Schratz's claim that I am biased, somehow, because Mr. Tarkington, my former partner, was understandably upset with Mr. Schratz.

220.    Mr. Tarkington worked hard and long supervising defense of 5,000 asbestos cases, most venued in San Francisco, where the firm enjoyed an excellent reputation for integrity.  When a lawyer did "general" work, he was forced for the convenience of the insurers to allocate time over individual cases based on case activity, rather than billing to one "general" file.

221.    Mr. Tarkington had his paralegal spread *a portion* of his time to the most active cases.  The total time he billed was far less than the time he spent, and he was too busy to bill the rest using numerous billing numbers.  *He admitted that, because he trusted his paralegal, he never reviewed each allocation for accuracy.*  Thus, these were negligently false statements,

**Ex. D - 242**

albeit intentionally made, because, technically, he was not making them, but they were listed as

his statement of billings. Thus, this constituted a technical breach of fiduciary duty, or

"constructive" fraud, for which the Arbitrator disallowed his time. Judge Chiantelli on the

record called this "let's pretend fraud."

222.    However, as the Court of Appeals found, even though technically he "overbilled,"

he and other lawyers "undercharged" for their services:

> Tarkington presented substantial evidence that, in the aggregate, it
> undercharged Fireman's Fund for its legal services on the Plant case. The firm
> customarily reduced charges on its invoices before billing, up to 30 percent for
> Fireman's fund. In one year, Tarkington cut about $1,000,000 from its prebills.
> The firm typically would assign only one attorney to a particular set of tasks,
> when other firms might customarily use four or five. A former Tarkington
> asbestos attorney, Ms. Donna Cropp Bechman, testified that she was told to
> record less time than the actual time spent on one asbestos trial. Fireman's
> Fund's own expert, Mr. Gene Brown, testified that the cause of the firm's
> financial troubles was that it charged too little for its services. In fact, before the
> Plant dispute, Fireman's Fund claims department personnel complimented
> Tarkington on its economic resolution of cases. Tarkington also presented
> evidence of underbilling caused directly by the spread of billing system.

(Opinion, p. 22)

223.    It is true that Tarkington was personally upset at Mr. Schratz, because

Schratz sent investigators to "question" witnesses, reportedly suggesting to the subjects

that Mr. Tarkington committed certain personal moral misdeeds, an absurd suggestion for

anyone who knows Mr. Tarkington.

224.    I have no personal quarrel with Mr. Schratz, but do have serious

professional disagreement with Mr. Schratz's tactics, which I consider to fall below the

high standards applicable to officers of the Court, and which inaccurately put honest

members of the profession in disrepute.

## AUDIT METHODOLOGY

225.    As a result of the foregoing, I became quite familiar with the "methodology" of

the Maue outside auditors used by Mr. Schratz while at Fireman's Fund. Without getting into all

the details of the methodology, it suffices to say that one admirable aspect of that firm's auditing

process was that every time entry was examined, every piece of paper related to the time entry was examined, and each lawyer questioned as to any claimed uncertainties regarding the time entry. Thus, while the methodology was otherwise completely biased in an arbitrary fashion to cut down the "verified" portion of the bill, it at least had the virtue of thoroughness.

226.    Not coincidentally, the practice also cost the audited firm great amounts in unbillable time. Mr. William J. F. Roll of Sherman & Sterling was quoted and paraphrased by the *Wall Street Journal* on July 21, 1992 (as repeated in the *Marin Independent Journal* of July 26, 1992, attached as Exhibit D) as complaining about the intrusive and costly nature of being audited by Schratz and his auditors:

> "And, speaking for many attorneys, he says he found an audit ordered up by Schratz to be intrusive and demeaning. As he described it, 'They went through our files, virtually every piece of paper that was not privileged, and they read it, and they had lots of questions. A lot of our people, including myself, had to spend an awful lot of time explaining what had happened.' And, of course, the time was unbillable."

227.    During his tenure at Fireman's Fund and shortly after starting Jim Schratz and Associates, Mr. Schratz frequently criticized as inadequate any "audit" that was not a full field audit performed in the fashion described. One such example of this is Mr. Schratz's article attached as Exhibit E hereto, "The Need for Legal Audits."

228.    However, such audits are expensive and it is Mr. Schratz's current practice to shortcut any meaningful study or analysis in favor of superficial, selective and facile observations. His practice is to scan legal bills into a computer system and use software for certain types of analyses determining, for example, the amount of time considered "block" billing, spent on particular motions, on pleadings, and on conferencing and the like, so that negative observations can be made under the guise of applying objective criteria.

229.    Such computerized reports could provide the basis for a knowledgeable and experienced attorney to make helpful observations. But the converse is also true, that without expertise and experience, computerized breakdowns mean very little. In short, there is no such thing as "legal auditing" other than what a particular "auditor" arbitrarily deems it to be. If the

auditor doesn't understand the complex litigation, or doesn't want to, there results a serious defect in the "audit" method.

230.    In any case, Mr. Schratz is not performing the kind of thorough legal auditing he and his outside auditors had for many years championed, and is using the term "audit" to convey falsely to the reader that he has performed some type of disciplined, rigorous and artful analysis superior to that could be performed by a person not claiming to be an auditor.

231.    Indeed, the use of the term "audit" is used to mask the fact that Mr. Schratz is doing far less by way of review and analysis than an experienced litigator would perform when acting as an expert witness in a fee case.

232.    Even where Mr. Schratz claims to have performed such an analysis himself, in my opinion, he has only the most minimal competence, by virtue of his status as a licensed attorney, to perform such an analysis.

233.    I personally have witnessed examples of Mr. Schratz's lack of knowledge of litigation.

234.    In the Golden Valley Bank litigation, Mr. Schratz persisted over several months to claim that my firm was acting in conflict of interest in that litigation, even though we represented but one party, the FDIC as Receiver, in several different pieces of litigation. However, Mr. Schratz claimed that, even though we consistently represented the same party in these various cases, we were in conflict because in some cases we were paid by the carrier, Fireman's Fund, and in some case we were bringing suit against parties whose defense was paid by the carrier, Fireman's Fund.

235.    In several other instances, Mr. Schratz has written and spoken publicly about the lack of necessity for written interrogatories when counsel can simply phone the opposing attorney to find out pertinent information. Such statements show a profound lack of understanding of the litigation process. See Exhibit J, page 2, an article containing such a statement by Schratz.

236.    I have indeed found Mr. Schratz to be intellectually dishonest as well as incompetent.  To give just one example, when he acted as fee expert for a prominent law firm in Southern California, he justified the very same billing practices which he criticized in other cases.  I reviewed bills which Mr. Schratz defended, containing "blocked" billing, general descriptions that he has in other instances termed "vague," and "clerical" entries for document management.  Moreover, I have reviewed bills of lawyers working directly for Mr. Schratz (which were to be shared by or billed to another carrier for payment) filled with entries of the type that Mr. Schratz had consistently condemned as being "overbilling."

237.    Until Mr. Schratz left the insurance industry at the end of 1993, he had a poor reputation within the industry, both for lack of integrity and for extreme bias.  Within his own company, Fireman's Fund, he had the same reputation.  Even Mr. Schratz's major supporter at Fireman's Fund, the Executive Vice President of Claims, Mr. Gary Black, was quoted by the *Wall Street Journal* as admitting that Schratz had a "very biased view" of billing issues.  Mr. Black testified in deposition to essentially the same thing.

238.    Therefore, at the very least, putting aside questions of honesty or competence, Mr. Schratz is certainly biased.  In his article, "The Need for Legal Audits," he recommends widespread use of legal auditing, a field he helped promote and which he was soon to enter in private practice.  In any case, his bias has always been well-known.  The July 21, 1992 *Wall Street Journal*, Exhibit I, article describes an extremely adversarial approach by Schratz:

> "Over the years Schratz, whose personal code was neatly summarized last March entitled, Ready, Fire, Aim, has had to do some explaining himself when his aggressive tactics backfired.  After the Tarkington firm was knocked off the asbestos case, Fireman's Fund's hand-picked successor, hired at relatively low pay, lost two major decisions in court.
> ANGRY PHONE CALLS
> Some other lawyers see Schratz as a publicity hound or an alarmist.  Gary Black…says he gets angry phone calls about Schratz fairly regularly."

(Exhibit I)

239.    Mr. Schratz's criticism of the billings of counsel in this litigation demonstrate, in my opinion, the same lack of credibility of Mr. Schratz that I have witnessed for the last twenty-three years.

240.    This is not to say that all legal bills criticized by Mr. Schratz are unworthy of criticism.  On rare occasions, when there is in fact overbilling, Mr. Schratz's opinion will turn out to be correct.  For example, in *Rios v. Rowand* cited by Mr. Schratz, a public interest lawyer visited a prison frequently and consulted with the female inmates, including those with children. The lawyer knew well the prison's policy for allowing visitation by the children.  After successfully litigating this policy, the lawyer attempted to bill the government for the thousands of hours she spent visiting the jail in performance of her normal duties as a prison advocate, most of which, of course, were unnecessary to the litigation, and not performed primarily for the sake of the litigation.

241.    In *Rios v. Rowand*, the court initially approved only a small portion of the fees claimed, and after an appeal, the fee question was remanded to the same court for more specific factual findings, at which point Mr. Schratz was hired and the matter litigated.  The court thereafter issued a similar result but with more detailed findings.

242.    *Rios v. Rowand*, then, is an example of a court awarding fees roughly conforming to Mr. Schratz's opinion, but which opinion has little or no causative relationship to the award.

243.    Mr. Schratz's opinions that I have reviewed are always wildly favorable to the entity hiring him.  In the Golden Eagle matter to which Mr. Schratz refers, he was hired to give Golden Eagle a basis to pay a claim in a receivership context, not to fight payment.  When he has been hired by law firms to support their bills, he has done so in complete reversal of views and principles he expressed contrarily when hired by the fee-paying client.  I have never witnessed Mr. Schratz giving due deference, or any complimentary comment, to the opposing side.

244.    I have reviewed all the moving and opposing papers herein, including the Declaration of James P. Schratz with Exhibits.  I have also reviewed other writings and

**Ex. D - 247**

1

2

3    Declarations of Mr. Schratz. I have spent 39.8 hours on this project. My normal billing rate for

4    this work is $700, but here I agreed with Mr. Pearl to reduce it to $600.

### **SUMMARY**

5

6       245.    In summary, it is my opinion that the rates charged by Plaintiff's counsel are

7    reasonable; that multiple-entry, or "blocked" billing is the norm in the legal profession; that the

8    limited collaborative work occasionally deemed necessary and Mr. Pearl's limited assignment

9    were within standard billing practice; and that limited document management work by lawyers

10   constitutes billable services. Finally, I opine that Mr. Schratz's extreme bias renders his

11   opinions suspect on these subjects.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**Ex. D - 248**

1

2

3      I declare under penalty of perjury under the laws of the State of California that the

4  foregoing is true and correctly.

5  Dated:  September 16, 2011                    O'CONNOR AND ASSOCIATES

6

7                                                      _____

8                                                      JOHN D. O'CONNOR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**DECLARATION OF JOHN D. O'CONNOR**

**Ex. D - 249**

49

# EXHIBIT E

Guy B. Wallace (SBN 176151)
gwallace@schneiderwallace.com
Mark Johnson (SBN 76904)
mjohnson@schneiderwallace.com
SCHNEIDER WALLACE
COTTRELL KONECKY, LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105

Linda M. Dardarian (SBN 131001)
ldardarian@gbdhlegal.com
Andrew P. Lee (SBN 245903)
alee@gbdhlegal.com
GOLDSTEIN BORGEN
DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, California 94612
Telephone: (510) 763-9800
Facsimile: (510) 835-1417

Attorneys for Plaintiffs and the Certified
Classes

Adam B. Wolf (SBN 215914)
awolf@prwlegal.com
Catherine Cabalo (SBN 248198)
ccabalo@prwlegal.com
PEIFFER WOLF CARR & KANE,
A PROFESSIONAL LAW CORP.
4 Embarcadero Center, 14th Floor
San Francisco, CA 94104
Telephone: (415) 766-3592
Facsimile: (415) 402-0058

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ABDUL NEVAREZ, PRISCILLA NEVAREZ, and SEBASTIAN DEFRANCESO, on behalf of themselves and similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>FORTY NINERS FOOTBALL COMPANY, LLC, a Delaware limited liability company, *et al.*,<br><br>Defendants. | Case No.: 5:16-cv-07013-LHK (SVK)<br><br>**[CORRECTED] DECLARATION OF GUY B. WALLACE IN SUPPORT OF PLAINTIFFS' MOTION FOR REASONABLE ATTORNEYS' FEES, COSTS AND EXPENSES**<br><br>Judge: Hon. Lucy H. Koh<br>Date: July 16, 2020<br>Time: 1:30 p.m.<br>Ctrm: 8, 4th Floor |

DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR REASONABLE FEES AND COSTS
*Nevarez et al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

Ex. E - 252

I, Guy B. Wallace, declare as follows:

1.         I am a senior partner at the law firm of Schneider Wallace Cottrell Konecky LLP ("Schneider Wallace" or "SWCK").  I am a member in good standing of the bar of the State of California.  I am lead counsel for named Plaintiffs and class representatives Abdul Nevarez, Priscilla Nevarez and Sebastian DeFrancesco, on behalf of themselves and all others similarly situated (collectively referred to as "Plaintiffs"). I have personal knowledge of the facts set forth in this Declaration and could and would testify competently to them.

2.         I am providing this Declaration in response to this Court's Order of June 24, 2020, Dkt. No. 407, directing Plaintiffs to refile their Motion for Reasonable Attorneys' Fees, Costs and Expenses.

3.         This Declaration describes the nature of Plaintiffs' claims and provides a procedural history of this case and the defense of the case put on by Defendants. It also discusses the discovery that Plaintiffs undertook regarding the accessibility to persons with mobility disabilities of Levi's Stadium, its parking lots and the pedestrian right of way serving the Stadium, as well as regarding Defendants' policies, procedures and practices regarding disability access. This Declaration discusses the proposed settlement and explains why it provides substantial relief to the Plaintiff classes with respect to all of the deficiencies identified by Plaintiffs through their discovery in this case.  Finally, this Declaration provides a summary of Plaintiffs' application for reasonable attorneys' fees, costs and expenses.

## QUALIFICATIONS OF COUNSEL

4.         I graduated from Harvard Law School in 1993.  From 1993 to 1994, I was a Skadden Fellow at the Disability Rights Education and Defense Fund ("DREDF").  From 1994 to 1998, I was a Skadden Fellow and then Staff Attorney at Disability Rights Advocates.  Between March 1998 and June 2000, I was a Staff Attorney at the Legal Aid Society of San Francisco/ Employment Law Center ("ELC") and served as head of the disability rights practice at ELC.  I became a partner in the firm then known as Schneider & Wallace in June 2000 and have held that position since that time.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

1

Ex. E - 253

5.        During my twenty-five (25) years of practice I have had extensive
experience in class actions and other complex litigation.  In particular, I have specialized in
disability civil rights class actions as well as wage and hour, employment and other consumer
class action matters.  I have served as lead counsel, co-lead counsel, or class counsel in more than
twenty class actions, and have done so through trial and on appeal.  These cases have included,
among others, the following:

- _Willits v. City of Los Angeles_, Case No. 10-05782 CBM (RZx) (C.D. Cal.): lead
  counsel in systemic, disability access class action involving claims under Title II of
  the Americans with Disabilities Act of 1990.  This case settled for $1.4 billion in
  injunctive relief remedying physical access barriers to persons with mobility
  disabilities in the City's pedestrian rights of way, the largest systemic disability
  access settlement in United States history.

- _Winans v. Emeritus Corp._, Case No. 3:13-cv-03962-SC (N.D. Cal.): co-lead
  counsel in consumer class action involving claims for violations of California's
  Consumer Legal Remedies Act and violations of California's elder financial abuse
  statute.  This case settled for $13 million and injunctive relief.

- _Kirola v. City and County of San Francisco_, Case No. 4:07-cv-03685 SBA (EMC)
  (N.D. Cal.): lead counsel in systemic, disability access class action involving
  claims under the Americans with Disabilities Act.

- _Shemaria v. County of Marin_, Case No. CV 082718 (Marin County, Sup. Ct.): lead
  counsel in disability access class action involving claims under Title II of the
  Americans with Disabilities Act of 1990 and California Government Code §
  11135, et seq.  This case settled for $15 million in injunctive relief remedying
  physical access barriers to persons with mobility disabilities in the County's Civic
  Center, parks, swimming pools, libraries and pedestrian right of way.

- _Williams v. H&R Block_, Case No. RG08366506 (Alameda County, Sup. Ct.,
  Complex Cases Dept.): co-lead counsel in state-wide wage and hour class action on

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
_Nevarez, et. al._ v. _49ers, et al._, Case No. 5:16-cv-07013-LHK (SVK)

2

Ex. E - 254

1   behalf of managers at H&R Block alleging misclassification and failure to pay

2   overtime hours and all hours worked.  This case settled for $6.4 million.

3   • Holloway v. Best Buy, Case No. C-05-5056 PJH (MEJ) (N.D. Cal.): class counsel

4   in Title VII pattern or practice class action settlement regarding race and gender

5   discrimination.  This case settled for injunctive relief regarding the company's

6   policies, procedures and practices regarding promotions and compensation.

7   • Rosa v. Morrison Homes, Case No. 373059 (Stanislaus County, Sup. Ct., Complex

8   Cases Dept.): co-lead counsel in construction defect class action involving 400

9   homes.  This case settled for $5.9 million including repairs to the subject homes.

10  • Wren v. RGIS, Case No. C-06-05778 JCS (N.D. Cal.): lead counsel in wage and

11  hour national class action involving federal FLSA violations.  This class included

12  over 62,000 RGIS employees.  This case settled for $27 million in addition to

13  injunctive relief regarding company policies and procedures regarding payment for

14  all employee hours worked.

15  • Chau v. CVS, Case No. BC349224 (Los Angeles County, Sup. Ct., Complex Cases

16  Dept.): co-lead counsel in wage and hour settlement on behalf of state-wide class

17  of pharmacists alleging meal and rest period violations as well as overtime pay

18  violations.  This case settled for $19.75 million.

19  • Satchell v. FedEx Express, Inc., Case No. C-03-2659 SI (N.D. Cal.): co-lead

20  counsel in Title VII pattern or practice class action regarding race discrimination.

21  This case settled for over $38 million and injunctive relief regarding the company's

22  employment policies, procedures and practices.

23  • Cherry v. City College of San Francisco, Case No. C-04-4981 WHA (N.D. Cal.):

24  lead counsel in class action regarding physical and programmatic access to the San

25  Francisco Community College District on behalf of students with mobility

26  disabilities.  This case led to a Stipulated Judgment that resulted in the expenditure

27  of over $20 million in injunctive relief remedying physical access barriers to

28  persons with mobility disabilities in numerous campuses of City College.

---

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

3

**Ex. E - 255**

- <u>Lopez v. San Francisco Unified School District</u>, Case No. C-99-3260 SI (N.D. Cal.): lead counsel in class action regarding physical and programmatic access to the San Francisco public schools on behalf of students and adults with mobility and/or vision disabilities. This case resulted in a Stipulated Judgment against the school district requiring over $400 million in injunctive relief remedying physical access barriers to persons with mobility disabilities in 100 of the district's schools.

- <u>Lenahan v. Sears, Roebuck & Co.</u>, Case No. 3-02-CV-000045 (SRC) (TJB) (D.N.J.): class counsel in wage and hour collective action challenging failure to pay employees for all hours worked as required by the Fair Labor Standards Act. This case settled for $15 million.

- <u>Singleton v. Regents of the University of California</u>, Case No. 807233-1 (Alameda County, Sup. Ct., Complex Cases Dept.): class counsel in employment discrimination action against Lawrence Livermore National Laboratory for gender discrimination against women in promotion, compensation and other terms and conditions of employment. This case settled for $10.6 million and injunctive relief regarding the Laboratory's employment policies, procedures and practices.

- <u>Bates v. United Parcel Service</u>, Case No. C-99-02216 TEH, 204 F.R.D. 440 (N.D. Cal. 2001): class counsel on behalf of nationwide class of deaf and hard of hearing employees of UPS. This case settled for $5.8 million.

- <u>Siddiqi v. Regents of the University of California</u>, Case No. C 99-0970 SI, 2000 WL 33190435, 81 F. Supp. 2d 972 (N.D. Cal. 1999): lead counsel in class action against two campuses of the University of California for failing to adopt and implement appropriate policies and procedures regarding auxiliary aids and services for students who are deaf or hard of hearing as required by the Americans with Disabilities Act. This case settled for injunctive relief including changes to the Universities' policies, procedures and practices for accommodating students who are deaf or hard of hearing, as well as the remediation of communications

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

4

**Ex. E - 256**

access barriers in University lecture halls and classrooms through the installation of
assistive listening systems and other access equipment and features.

- Weissman v. Trustees of the California State University, Case No. Civ. 97-02326
  MMC (MEJ), 1998 U.S. Dist. LEXIS 22615, 1999 WL 1201809 (N.D. Cal.): co-
  lead counsel in class action on behalf of students and faculty members with
  mobility and/or visual impairments against the San Francisco State University for
  denial of programmatic access.  This case settled for $5 million in injunctive relief
  requiring the removal of physical access barriers to persons with mobility and/or
  visual impairments at San Francisco State University.

- Gustafson v. Regents of the University of California, Case No. C-97-4016 BZ
  (N.D. Cal.): co-lead counsel in class action on behalf of students with mobility
  and/or vision disabilities against the Regents of the University of California for
  denial of physical and programmatic access at the University of California at
  Berkeley campus.

- C.P. v. City and County of San Francisco, Case No. 976437 (San Francisco
  County, Sup. Ct.): lead counsel in class action challenge to policy cutting off child
  care benefits to foster children with disabilities.  This case was resolved with the
  entry of a permanent injunction against the policy after the plaintiffs obtained a
  TRO from the court.

- Guckenberger v. Boston University, 974 F. Supp. 106 (D. Mass. 1997); 957 F.
  Supp. 306 (D. Mass. 1997): class counsel in action on behalf of students with
  learning disabilities against a private university for policies limiting access to
  reasonable accommodations.  This case was tried with plaintiffs obtaining
  substantial changes in defendants' policies and damages for the named plaintiffs.

- Thomas v. BASS, Case No. 733496-8 (Alameda County, Sup. Ct.): class counsel in
  class action on behalf of all BASS Tickets patrons in Northern California with
  mobility disabilities denied equal access to defendant's ticket selling services.  This

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

5

Ex. E - 257

1    action settled with plaintiffs obtaining changes in defendant's policies and

2    damages.

3    • Putnam v. Oakland Unified School District, Case No. Civ. 93-3772 CW, 1995 US

4    Dist. LEXIS 22122, 1995 WL 873734 (N.D. Cal.): class counsel in class action

5    against large urban school district under state and federal law for the District's

6    failure to make its programs and facilities accessible to students with mobility

7    disabilities. Plaintiffs' motion for summary judgment was granted. The case was

8    settled requiring the defendant to make at least 25 of its schools fully accessible.

9    6.        I serve as a member of the Board of Directors of The San Francisco Trial

10    Lawyers Association. I have served as a member of the Board of Directors of the Bar Association

11    of San Francisco. I have also served on the Board of Directors of Disability Rights California, a

12    section 501(c)(3) organization committed to protecting the civil rights of persons with disabilities.

13    I am a member of the bar of the Ninth Circuit Court of Appeals and of the United States Supreme

14    Court. I have served as counsel in both of those courts on matters relating to employment and

15    disability civil rights. I have been named a "Super Lawyer" in the area of civil rights by Northern

16    California Super Lawyers magazine for the past nine years.

17    7.        The firm of Schneider Wallace Cottrell Konecky LLP has an extensive

18    practice in the areas of race discrimination, gender discrimination, wage and hour violations,

19    disability civil rights (including both employment discrimination and access to public entities and

20    public accommodations), and actions brought on behalf of consumers under both federal and state

21    law. Class action litigation is the major focus of the firm. Todd Schneider founded the firm in

22    1993. Schneider Wallace employs between 15 and 20 attorneys and has acted or is acting as class

23    counsel on numerous cases, including those identified on the firm resume. The firm has

24    represented plaintiffs at all levels including the federal and state trial courts, the California Courts

25    of Appeal, the California Supreme Court, the Ninth Circuit Court of Appeals, and the United

26    States Supreme Court.

27    8.        Class Counsel also includes Linda M. Dardarian, a senior partner in the firm

28    of Goldstein, Borgen, Dardarian & Ho ("GBDH"). Ms. Dardarian and her firm have extensive

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

**Ex. E - 258**

class action experience and have served as class counsel in numerous cases.  Ms. Dardarian is a nationally-recognized leader in advancing the rights of people with disabilities to fully and equally access the programs, services, and activities of public entities and the goods and services of public accommodations.  In addition to her role with respect to various discrete litigation tasks, Ms. Dardarian played an integral role in the settlement negotiations, including both the formal mediations and the separate meetings with counsel for Defendants.

9. Class Counsel includes Adam Wolf, a Shareholder in the law firm of Peiffer Wolf Carr & Kane ("Peiffer Wolf" or "PWCK").  Mr. Wolf and his firm have extensive class action experience and have served as class counsel in numerous cases. Mr. Wolf is nationally recognized for his civil-rights cases and other cutting-edge litigation. Mr. Wolf's firm played an instrumental role in working with Plaintiffs' experts and identifying and tracking access barriers in the Stadium, and also played a significant role in the settlement negotiations.

## **HISTORY OF THE CASE AND SETTLEMENT NEGOTIATIONS**

**The Complaint**

10. Plaintiffs commenced this class action on December 7, 2016, asserting claims for both injunctive relief and damages against the Forty Niners Football Company, LLC, the National Football League, the City of Santa Clara ("the City"), the Santa Clara Stadium Authority (the "Stadium Authority") and Ticketmaster Entertainment, Inc. ("Ticketmaster") based on alleged violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973, California Government Code Section 11135, the California Disabled Persons Act (California Civil Code §§ 54 *et seq*.) and the California Unruh Act (California Civil Code §§ 51 *et seq*.). *See* Complt. (ECF 1).  Thereafter, the Complaint was amended to add the Forty Niners Stadium Management Company LLC as a Defendant (ECF 9).

11. On April 13, 2017, pursuant to Stipulation of the Parties approved by this Court, Plaintiffs filed their Second Amended Complaint limiting their claims to the alleged violation of Titles II and III of the ADA and California's Unruh Act. (ECS 47, 50). On August 1, 2017, the Court dismissed the named Plaintiffs' claims for individual damages against the City and Stadium Authority, except for the Nevarez's claim for damages based on their visit to the

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

7

**Ex. E - 259**

Stadium on April 2, 2016. On August 15, 2017 the Court dismissed without prejudice Plaintiffs

claims against Ticketmaster, finding that those claims were subject to mandatory arbitration. (ECF

85).

         12.       Plaintiffs filed a Third Amended Complaint on August 8, 2017 (ECF No. 78)

and the operative Fourth Amended Complaint on July 27, 2018 (ECF 195). The Fourth Amended

Complaint includes and incorporates exhibits identifying all of the alleged disability access

barriers, numbering in the thousands, which form the basis for the alleged violations of the ADA

and the Unruh Act. (ECF 195-1 – 195-4).

**Class Certification**

         13.       On July 12, 2018, this Court granted in part and denied in part Plaintiffs'

motion for class certification. *Nevarez v. Forty Niners Football Company, LLC,* 326 F.R.D. 562,

592 (2018). The Court certified the following three classes pursuant to Federal Rule of Civil

Procedure 23:

> **Injunctive Relief Class:** 1. All persons with mobility disabilities who
> use wheelchairs, scooters, or other mobility aids who will attempt to
> purchase accessible seating for a public event at Levi's Stadium and
> who will be denied equal access to the Stadium's facilities, services,
> accessible seating, parking, amenities, and privileges, including
> ticketing, during the three years prior to the filing of the Complaint
> herein through the conclusion of this action.

> **Companion Injunctive Relief Class:** 2. All persons who are
> companions of persons with mobility disabilities who use wheelchairs,
> scooters or other mobility aids and who have used or will use
> companion seating for public events located at Levi's Stadium during
> the three years prior to the filing of the Complaint herein through the
> conclusion of this action.

> **Damages Class**: 3. All persons with mobility disabilities who use
> wheelchairs, scooters or other mobility aids who have purchased,
> attempted to purchase, or for whom third parties purchased accessible
> seating and who have been denied equal access to Levi's Stadium's
> facilities, services, accessible seating, parking, amenities, and
> privileges at an event controlled by the Forty Niners Football
> Company, LLC, Forty Niners SC Stadium Company, LLC, or Forty
> Niners Stadium Management Company, LLC, during the two years
> prior to the filing of the Complaint herein through the conclusion of
> this action.

The first and second classes seek declaratory and injunctive relieve pursuant to Title II and Title III

of the ADA and the Unruh Act and were certified pursuant to Rule 23(b)(2). The third class seeks

---

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

1   statutory damages under the Unruh Act and was certified pursuant to Rule 23(b)(3). The Court

2   appointed Abdul Nevarez as representative of the first and third classes, appointed Priscilla

3   Nevarez as representatives of the second class, and later appointed Mr. DeFrancesco as a class

4   representative for the first class (ECF 392).

5   **Discovery**

6           14.        The parties engaged in extensive discovery prior to reaching an agreement to

7   resolve this case informally through the Settlement Agreement that is the subject of this motion.

8   Such discovery included 13 sets of document requests (11 propounded by Plaintiffs; 2 propounded

9   by Defendants), 6 sets of document subpoenas (all propounded by Plaintiffs); 13 sets of

10  interrogatories (9 propounded by Plaintiffs; 4 propounded by Defendants), and 15 sets of requests

11  for admission (all propounded by Plaintiffs).

12          15.        In response to Plaintiffs' document requests and subpoenas, Defendants and

13  third parties produced approximately 3.4 million pages of documents, including thousands of

14  sheets of oversize construction drawings of the Stadium and its related facilities, most of which

15  were searched and/or reviewed for fact gathering or use as deposition or trial exhibits.

16          16.        Schneider Wallace reviewed the vast majority of the *3,400,000* pages of

17  documents that Class Counsel received from Defendants and third parties, while Peiffer Wolf and

18  GBDH reviewed specific groups of documents.  The documents included thousands of oversized

19  construction drawings that counsel and their experts needed to analyze.  In light of the volume of

20  discovery, all three firms contributed significantly to the discovery efforts, but each was assigned

21  different responsibilities to avoid duplication of effort.

22          17.        Over the course of fourteen days—spanning a period of fifteen months—

23  Plaintiffs' counsel and their multiple experts meticulously inspected the Stadium, parking lots

24  serving the Stadium, and nearby pedestrian rights-of-way.  The inspections revealed that almost all

25  areas of the Stadium, its parking lots, and the paths of travel from the parking lots to the Stadium

26  contained access barriers that violated the ADA and the Unruh Act.  Peiffer Wolf took the lead for

27  Class Counsel to work with experts regarding the inspection of the Stadium and identification of

28  its thousands of barriers.  GBDH took the lead in working with experts on access barriers in the

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

9

**Ex. E - 261**

pedestrian right of way.   The results of these inspections were set forth in six detailed and highly technical expert reports and further addressed in six more rebuttal expert reports in support of Plaintiffs' claims.  The experts included engineers, architects, and statisticians, among other specialized fields.  Counsel from all three firms worked with the expert reports on different parts of their reports.

18.      Cataloguing the precise location and nature of thousands of access barriers, as well as potential remedies for the barriers, was equally crucial and painstaking. GBDH headed up this vital task, including updating Plaintiffs' master barrier spreadsheet with new barriers and measurements taken by both Plaintiffs' and Defendants' experts—compiling and organizing the evidence necessary for dispositive motions, trial, and settlement.  With regard to identifying potential fixes for most of these barriers, Peiffer Wolf and Schneider Wallace worked closely with Plaintiffs' experts to arrive at suggested alterations that would remedy the barriers fully.

19.      Plaintiffs took or defended a took a total of 48 depositions, including 15 Rule 30(b)(6) depositions, 16 expert depositions, several depositions of third parties like the Stadium's Architect of Record, consultants to Defendants in the design and construction of the Stadium, and representatives of Ticketmaster, and the named Plaintiffs.  Most of the fifteen Rule 30(b)(6) depositions and sixteen expert depositions were handled by Schneider Wallace. Generally, only one attorney was responsible for each deposition; most of the depositions were attended by only one attorney, even though multiple attorneys often attended for Defendants and Third Party Defendant Turner Devcon, with both attorneys questioning the witness or making objections.  Schneider Wallace took or defended thirty-seven depositions, Peiffer Wolf took or defended seven depositions, and GBDH took or defended four depositions.  A true and correct copy of the deposition control log from this case is attached as Exhibit A.

20.      Plaintiffs also conducted outreach to the Classes; conducted numerous interviews of Class Members to investigate the access barriers, policies and practices at issue; and submitted 32 Class Member declarations to support the motion for class certification.

---

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

10

**Motion Practice**

21.          The parties engaged in extensive motion practice in this case, including Defendants' motions challenging the pleadings, Plaintiffs' motion for class certification, numerous discovery motions via letter briefs addressed to Magistrate Judge van Keulen, and cross motions for summary judgment.

22.          On February 7, 2107, Defendants filed a motion to dismiss the Complaint in its entirety based on the alleged failure to state a claim and the alleged lack of standing on the part of Plaintiff Priscilla Nevarez. (ECF 28, 32). Following the filing of a Second Amended Complaint, Defendants filed a new motion to dismiss on the same grounds. (ECF 58). The Court denied these motions in relevant part, finding that Ms. Nevarez had alleged sufficient facts to establish standing under both Titles II and III of the ADA and under the Unruh Act. (ECF 76 at 14, 16, 17). The City also moved to dismiss Plaintiff Sebastian DeFrancesco's claim against the City for damages under the Unruh Act based on the failure to exhaust the City's claim process, which the Court granted. *Id.* at 20.  Schneider Wallace took the lead for Plaintiffs in opposing the motions to dismiss Plaintiffs' federal and state disability-rights claims, with GBDH addressing the sufficiency of Plaintiffs' government tort claims under California law.

23.          During the discovery phase of the case, the parties litigated 18 separate discovery disputes, submitting letter briefs to Magistrate Judge van Keulen for resolution of those disputes.  Plaintiffs obtained relief in 13 of those disputes, and another two were not resolved by the Court at the time of settlement.  Most of Plaintiffs' motions to compel were prepared by Schneider Wallace.

24.          Plaintiffs moved to certify classes for both injunctive and monetary relief. The class certification motion was extensive and vigorously opposed by Defendants. The briefing in support of and in opposition to class certification and related procedural motions spanned 131 pages, not including numerous declarations, voluminous exhibits, and detailed expert reports submitted in support of the parties' briefs. Schneider Wallace took the laboring oar with respect to class certification briefing.  GBDH prepared Plaintiffs' response to the opposition to class

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.,* Case No. 5:16-cv-07013-LHK (SVK)

11

**Ex. E - 263**

1  certification that was filed by Third Party Defendant Turner/Devcon. All three firms assisted the

2  experts and the class members regarding their declarations in support of class certification.

3        25.        Ancillary litigation then resulted from Defendants' refusing to produce

4  complete contact information for class members or agreeing to the wording of the class

5  certification notices. GBDH led the briefing regarding notice to the class.

6        26.        The parties filed cross motions for partial summary judgment on December

7  20, 2019. (ECF 282, 288).  On February 5, 2019, this Court issued an Order denying both motions

8  without prejudice, staying the case for case narrowing at the next case management conference,

9  and directing the parties select up to 6 physical access barriers to litigate through summary

10  judgment, the pre-trial conference and trial. ECF 328.

11        27.        On June 20, 2019, the parties filed their narrowed motions for partial

12  summary judgment limited to 6 physical access barriers. The motions were fully briefed and set

13  for hearing for August 29, 2019, but the hearing was vacated by the Court on August 22, 2019

14  (ECF 367).  The motions were pending when the parties informed the Court that a proposed

15  settlement agreement had been reached.

16        28.        GBDH took the lead on Plaintiffs' motions for partial summary judgment,

17  and on opposing Defendants' motion for partial summary judgment.

18  **Mediation and Settlement Negotiations**

19        29.        The parties engaged in extensive settlement negotiations in order to reach a

20  final informal resolution of this matter, including eight formal mediation sessions and many more

21  informal sessions. The first sessions were conducted with JAMS Mediator Michael A. Loeb, Esq.

22  in the first half of 2018. The parties subsequently engaged in more sessions with Mr. Rudy from

23  December 2018 through August 29, 2019. In February 2019, Mr. Rudy made a mediator's

24  proposal regarding the amount of damages to be paid by Defendants which was accepted by the

25  parties and which called for the creation of a $24 million damages fund for damages class

26  members.

27        30.        Mr. Rudy also supervised the parties' discussions regarding injunctive relief,

28  although he became unavailable during the period of March through the beginning of August due

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

12

**Ex. E - 264**

to illness and related treatment. During that time the parties continued to engage in arms-length negotiations, including several face-to-face meetings and numerous telephone calls and exchanges of draft agreements and exhibits describing proposals and counterproposals for the equitable relief at issue.

31.     On August 29, 2019, Mr. Rudy supervised a mediation session at which the parties engaged in negotiations on the amount of reasonable attorneys' fees, costs and expenses Defendants would pay to Plaintiffs. Before conducting this mediation regarding fees and costs (or even discussing fees and costs), Mr. Rudy and Class Counsel ensured that all major issues regarding injunctive relief had been resolved.  At the close of the August 29 mediation session, Mr. Rudy made a mediator's proposal regarding reasonable attorneys' fees and costs in the amount of $13,457,152.40. Both sides accepted that proposal two weeks later, at which time they advised the Court that a settlement had been reached.

32.     The negotiations described above took into account the parties' positions on the merits of the case and each of the individual access barriers at issue, involved detailed discussions of the scope of the barrier remediation that would be required of Defendants under the Settlement Agreement, the specifications of the work to be performed as displayed in exhibits to the Agreement, and the measures to be taken for reporting on, monitoring and enforcing the obligations created by the Agreement. The negotiations were arms-length, intensive and ultimately successful in resolving this action.

## TERMS OF THE PROPOSED SETTLEMENT

**Equitable Relief**

33.     The specific relief afforded by the Settlement Agreement to members of the Injunctive Relief Class and the Companion Injunctive Relief Class is set forth principally in Section III of the Settlement Agreement, entitled "Equitable Relief," and in Exhibits A through J to the Settlement Agreement, which are incorporated therein by reference. Together these provisions describe and illustrate, using detailed descriptions, references to design standards, and architectural drawings, specific work that Defendants are required to perform to remediate close to 2,700 conditions at the Stadium and surrounding area that Plaintiffs have alleged are in violation

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

13

**Ex. E - 265**

of applicable federal and state disability access standards and that constitute access barriers for persons with mobility disabilities. In all cases, express deadlines are set forth in the Settlement Agreement for the completion of the specified remediation work to be undertaken. Although these deadlines vary depending on the scope of the work and other factors identified during the settlement negotiations, all of the remedial work must be completed within a three year compliance period. Settlement Agreement, § II.D.

34.     Any work that Defendants undertake as part of the Settlement is required to comply with the accessibility standards set forth in the 2010 ADA Standards for Accessible Design or the 2019 version of Title 24 of the California Building Code, whichever provides greater protection or access to persons with mobility disabilities.  See Settlement at § II.A. In addition, to the extent that any new construction or alterations to the Stadium or the Pedestrian Right of Way not required by the Settlement Agreement is undertake during the term of the Agreement, it, too, shall be performed in compliance with the 2010 ADAS and 2019 CBC. Settlement Agreement, § IV.

-     **Remediation of Access Barriers in the Stadium**

35.     The Settlement Agreement provides comprehensive relief with respect to alleged violations of the ADA and state disability access standards throughout the interior of Levi's Stadium that were identified by Plaintiffs' experts and set forth in the operative Complaint, including the "barrier lists" attached to the Fourth Amended Complaint as Exhibits A through D. These include the remedial access work summarized below addressing conditions in the following areas:

a.     <u>The Stadium Box Office</u> – to ensure an accessible box office and approach to the box office at the Stadium, Defendants are required to remediate the specific box office-related conditions identified in Exhibit A to the Settlement Agreement in the manner specified therein and in § III.A.1.c. and Exhibit C of the Settlement Agreement. This includes removing the foot bar at the base of the designated accessible ticket window to allow a forward approach by wheelchair users, raising the existing grade to provide a level accessible area in front of the

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

14

**Ex. E - 266**

1  window, using accessible queuing plans, providing signage for the accessible window and

2  providing all services at the accessible window that are offered to the public. Id., Ex. C notes 8, 11.

3          b.      <u>Accessible Seating</u> – Slopes in the seating areas and aisle exceeding 2.1%

4  will be eliminated except at area drains and drain covers, where the slope shall not exceed 3%. The

5  number of accessible and companion seats shall comply with the 2010 ADAS standards. Arm rests

6  and cup holders will be provided for companion seats to make them equivalent to standard seating.

7  Settlement Agreement § III.A.1.f.; Exhs. A, E.

8          c.      <u>Drink Rails</u> – Stadium drink rails shall be modified to provide access to

9  persons with mobility disabilities in accordance with the specifications set forth in Exhibit F to the

10  Settlement Agreement. Settlement Agreement § III.A.1.g; Ex. F

11          d.      <u>Counters and Bars</u> – the counters and bars throughout the Stadium, including

12  those in the United Club, BNY Mellon Club East and West, the NRGZ Solar Terrace, the Yahoo

13  Club, and the 501 Club shall be retrofitted to provide a lowered section accessible to persons with

14  mobility disabilities that is compliant with specified applicable federal and state standards and with

15  the configuration set forth in Exhibit G of the Settlement Agreement. Settlement Agreement §

16  III.A.1.h.; § III.A.1.q.; Ex. G.

17          e.      <u>Restrooms</u> – all non-compliant elements of the Stadiums restrooms,

18  identified in Exhibit A to the Settlement Agreement, will be remediated in the specific manner

19  described therein. This includes, but is not limited to, the replacement of inaccessible door

20  hardware on wheelchair accessible and ambulatory stalls, overhead signage to permit easy

21  identification of such stalls, the removal of video advertisement displays on mirrors that interfere

22  with a wheelchair user's ability to see in the mirror, and other conditions identified in Exhibit A.

23  Settlement Agreement § III.A.1.i.; Ex. A at items 823 through 1502.1.

24          f.      <u>Drinking Fountains</u> – those fountains identified in Exhibit A to the

25  Settlement Agreement will be remediated in the manner described therein. Settlement Agreement §

26  III.A.l.j; Ex. A.

27          g.      <u>Shops and Concessions</u> – various conditions in the Stadium's shops and

28  concession areas, identified in Exhibit A to the Settlement Agreement, are alleged by Plaintiff's be

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

15

**Ex. E - 267**

non-compliant with applicable disability access standards and constitute barriers to access for class members. The Settlement Agreement requires that these be remediated in the manner described in the "remedial measures" column of Exhibit A. Settlement Agreement §§ III.A.1.k, m; Exhibit A.

h. <u>Stadium Suites and Boxes</u> – Levi's Stadium offers dozens of suites of various sizes and configurations that can be purchased by guests to provide private seating and viewing opportunities and other amenities for a group of guests attending Stadium events. Under the terms of the Settlement Agreement, significant modifications will be made to these suites to improve accessibility. These include replacing all non-compliant dining surfaces or tables in the suites with an accessible table or with one high inaccessible table and one accessible table, providing accessible closets, shelves and clothes hanging areas of the appropriate height where such items are provided for non-disabled guests, providing at least one wheelchair accessible seating area of a minimum width of 36 inches with a line of sight of the field must be provided for each suite.  Where a removable seat is placed in the accessible seating area, it will be accompanied by a sign indicating that it can be removed to provide wheelchair seating with a telephone or text number by which assistance in removing the seats can be obtained and the seat removed within 15 minutes. Signage informing nondisabled patrons not to stand up during events in such a way that obstructs the line of sight for persons with mobility disabilities, and an accessible dining surface shall be provided at the wheelchair seating.  Settlement Agreement § III.A.1.l., see, also, Exhibit A.

i. <u>Stairs and handrail extensions</u> – the Settlement Agreement requires that Defendants provide handrail extensions at all ramps and stairways in the stadium that extend horizontally the full length of the direction of travel as required by the 2010 ADAS Section 505.10 and/or the 2019 CBC. Settlement Agreement Section § III.A.1.n. Plaintiffs and their experts will be given the opportunity to review the plans for this work, including the location and design, before the work is undertaken. Id. In addition, although not expressly identified as access barriers in the Fourth Amended Complaint, Defendants have agreed under the terms of the Settlement Agreement to remediate certain specified sets of stairs in the Stadium to address access and safety issues, including the stairs at Gate A and Gate C, the stairs in the United Club, the interior stairs at the Toyota Gate F and the stairs throughout the outdoor seating areas within the Stadium. Such

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

16

Ex. E - 268

remediation will include bringing the nosings at the stair treads into compliance with ADAS Section 504.5 and ensuring that the slope of the risers do not exceed 2.1%. Settlement Agreement § III.A.1.s.

j.  <u>First Aid and Breastfeeding areas</u> – These specialized areas of the Stadium will both be made accessible under the terms of the Settlement Agreement. Work required to make the Dignity Health First Aid Room on Level 300 (Main Concourse) accessible are specified in Exhibit A and in § III.a.1.p. of the Settlement Agreement and includes reposition of furniture and other obstacles to create clear maneuvering space and accessible routes, providing level clear floor spaces at the lavatory and water closet, and replacing or relocating toilet paper dispensers  to comply with ADAS and the 2019 CBC. Id. to the first aid station Settlement Agreement § III.A.1.o, p. Under § III.A.1.p of the Settlement Agreement, Defendants will also be required to remediate the conditions described therein and in Exhibit A with respect to all breastfeeding stations in the Stadium. These include equipping the doors with locks that can be operated with one hand without requiring tight grasping, pinching, or twisting of the wrist; providing stable, unmovable floor surfaces and an adequate clear floor space within the station, providing the required maneuvering clearance at the push side of the door, among other items. *Id.*

k.  <u>Auditorium</u> – Section § III.A.1.r. of the Settlement Agreement requires that Defendants provide an accessible means for gaining access to the stage and integrated accessible and companion seating in the Stadium's Auditorium.

l.  <u>Stadium Restaurants</u> – In addition to its bars, clubs and suites, Levi's Stadium has three restaurants, known as the Bourbon Pub, the Bourbon Steak and the Tailgate. The Settlement Agreement requires that Defendants ensure that these facilities are accessible to class members by requiring that at least 5% of the seating and standing spaces and any and all types of dining surfaces, tables, counter and bars are accessible to persons with mobility disabilities. Settlement Agreement § III.A.2. It also requires the remediation of the specific barriers identified in Exhibit A in the manner described therein.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

17

**Ex. E - 269**

- **Accessible Stadium Parking**

36.       The Settlement Agreement allows Defendants to locate all of the required accessible parking for the Stadium in the Stadium's "Main Lot," also known as "Red Lot 1" and "Green Lot 1," rather than remove the access barriers from the various off-site or remote lots the Forty Niners leased from third parties to provide Stadium parking. This aggregation of parking in a single lot is acceptable under the 2010 ADAS and other applicable standards and, in fact, may be preferable from an access perspective, as long as the number of designated accessible spaces and van accessible spaces is properly calculated based on the number of spaces provided in each lot and the single lot used provides equivalent or greater access. Section A.3. of the Settlement Agreement assures this by requiring that Defendants provide a minimum of 282 accessible spaces in the Main Lot, 47 of which must be van accessible spaces, and increase of 84 accessible spaces over that currently provided. All such spaces must be closer the accessible Stadium entrances than any standard spaces and compliant in all respects with the applicable provisions of the 2010 ADAS and the 2019 CBC. The specific configuration of the accessible parking in the Main Lot is set forth in Exhibit J to the Settlement Agreement which was prepared by Plaintiffs' disability access expert, approved by Defendants and expressly incorporated by reference in the Settlement Agreement.

- **An Accessible Interior and Exterior Path of Travel**

37.       The Settlement Agreement obligates Defendants to take extensive remedial measures to provide an accessible path of travel for persons with mobility disabilities both inside and outside the Stadium. Beginning with the main parking lot in which the accessible parking will be expanded and reconfigured, a new accessible path of travel will be created, fully compliant with 2010 ADAS and the 2019 CBC, which leads from the accessible parking spaces to the nearest accessible security gates at the canopy locations and then to the nearest accessible Stadium entrances. Settlement Agreement §§ III.A.3.a, III.A.1.a, III.A.1.b., Exhs. A, B, J. The accessible path of travel in the parking lot is to be configured so that persons with mobility disabilities are not required to travel behind parked cars. § III.A.3.a

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

18

Ex. E - 270

38.          An accessible path of travel of at least eight feet in width shall be established in the area of the main entrance plaza at Gate A, connecting Gate A to several other locations in the plaza area, including the entrances to the team store, the elevator at SAP tower, the directional and information signage in the Plaza, the "catch" statutes of Joe Montana and Dwight Clark, the gates and path of travel connecting the plaza to the Forty Niners Museum, to the accessible Box Office windows and to the Bourbon Steak, Bourbon Pub and Tailgate restaurants. Settlement Agreement Section §§ III.A.1.b. The specifications for this remedial work are set forth in the drawings comprising Exhibit B (for the Plaza area and exterior entrances to the Stadium) and Exhibit J (for the path of travel from the parking lot) to the Settlement Agreement. The accessible path of travel to be established and maintained leading to and between the Bourbon Steak, Bourbon Pub and Tailgate restaurants is described in further detail at Section §§ III.A.2 of the Settlement Agreement.

39.          As to the interior of the Stadium, the Settlement Agreement ensures that class members will have an accessible path of travel throughout. Defendants are required to remediate the specific conditions in the interior path of travel identified in Exhibits A and D in the manner specified therein, and no ramps in the path of travel will be permitted to have excessive running slopes or cross slopes. Settlement Agreement Section §§ III.A.1.e. The location and specifications of the accessible interior path of travel, for all levels of the Stadium, are set forth in Exhibit D.

40.          For both the exterior and interior path of travel, the Settlement Agreement requires that Defendants provide prominently featured signage (including but not limited to overhead signage and painted or other markings on the ground) that permits persons with mobility disabilities and their companions to easily identify the accessible path of travel. See, Settlement Agreement § III.A.1.b and notes to Exhibit B (entrance plaza at Gate A and exterior path of travel); Settlement Agreement §III.A.1.e and notes to Ex. D (interior circulation).

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

19

**Ex. E - 271**

- **Making the Pedestrian Right of Way in the Area Surrounding the Stadium Accessible**

41.    Levi's Stadium is served by fifteen off-site parking lots.  The pedestrian right of way connecting those off-site parking lots to the Stadium contain numerous barriers to access, including curb ramps that lack a flush transition to the street and have excessive running, cross, counter, and side-flare slopes; sidewalks with excessive running and cross slopes, surface gaps, and abrupt changes in level; and pedestrian signals that fall outside of reach range for persons using wheelchairs and scooters.  The proposed settlement requires the City of Santa Clara to make these portions of the pedestrian right of way fully accessible to persons with mobility disabilities.  In total, the Settlement Agreement requires the remediation of 454 non-compliant conditions, including 236 curb ramps barriers present on 97 curb ramps, 203 sidewalk barriers, and 15 barriers related to inaccessible pedestrian signals.  Settlement Agreement § III.A.4.

42.    The Settlement Agreement prioritizes barrier removal along street segments that connect the Stadium to the largest and most used off-site parking lots, including Blue Lot 1, Green Lots 1 and 2, and Red Lots 4 and 5.  Settlement Agreement § III.A.4.a & Ex. H.  Pedestrian right of way barriers along those streets will be remediated by no later than two years after the Effective Date.  Id.  The remaining pedestrian right of way barriers, which are present along street segments that connect Yellow Lots 1-3, Red Lots 3 and 7, and Green Lots 4 and 5, will be remediated by no later than six months before the end of the Compliance Period or two and a half years after the Effective Date.  Settlement Agreement § III.A.4.b & Ex. I.

- **Other Equitable Relief**

43.    In addition to the physical modifications to the Stadium and related facilities described above, the Settlement Agreement requires that Defendants undertake numerous other actions to provide or ensure access for class members. These include the implementation of specific policies and procedures for the ongoing, periodic inspection and maintenance of accessible features as described at §§ III.B.1-12; significant modifications in the ticketing policies and procedures for Stadium events to assure that persons with mobility disabilities are accommodated and provided with full and equal access to the Stadium's facilities and services, including the ability to exchange standard tickets for tickets for accessible seating without having

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

20

Ex. E - 272

to do so in person (Settlement Agreement §§ II.C.1-3); the creation and distribution of an "Access Map and Guide" to assist class members in identifying and locating accessible features and the accessible path of travel throughout the Stadium and its parking lot (Settlement Agreement § III.D);  the provision of accessible vans, shuttles and golf carts, to the extent that such modes of transportation are used to service the Stadium, and the training of operators of such equipment in the proper operation of lifts or ramps on the vans or shuttles; (Settlement Agreement § III.E); the development of a training manual and the training of all Stadium and Forty Niners Personnel having responsibility in specific areas for implementation or compliance with the Settlement Agreement (Settlement Agreement § III.F); and the establishment of a written policy and procedure for handling complaints or grievances regarding the accessibility of Levi's Stadium and its related parking and Pedestrian Right of Way facilities, and ticketing and transportation services to Persons with Mobility Disabilities. Settlement Agreement § X.

**Monitoring**

44.        The Settlement Agreement includes periodic reporting requirements for Defendants to provide specific information regarding their progress and the status of scheduled access work, among other items. Settlement Agreement § X.B.  In some cases, plans for particular remediation must be provided to Class counsel prior to the work being undertaken. The parties are required to confer on a semi-annual basis to review Defendants' efforts to implement the Agreement and to resolve any disputes. Defendants are obligated to designate, within 90 days of the effective date of the Settlement Agreement, a liaison authorized to communicate with Class Counsel and provide information pertaining to Defendants' compliance with the agreement. Class Counsel are entitled to review designs, drawings, plans and specifications for the access work and to conduct semi-annual inspections to monitor compliance with the required remedial measures. Settlement Agreement § X.B.; XI. The Settlement Agreement provides for reasonable attorneys' fees for Class Counsel and for reasonable expert costs on an annual basis in connection with these monitoring and enforcement activities. Settlement Agreement, § 14.B.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

21

Ex. E - 273

**Dispute Resolution**

45.        Enforcement of the proposed Agreement will be subject to the continuing jurisdiction of this Court.  Prior to seeking Court enforcement, the parties will meet and confer to discuss and resolve any dispute that arises regarding compliance with the Agreement.  See Settlement at § XII. If, within 45 days, the parties are still unable to resolve the dispute through the meet-and-confer process, they will engage in mediation through a mediator jointly selected by the parties, or, in the event that the parties cannot reach an agreement as to a mediator, by the Court. Id. Upon certification from the mediator that the parties are unable to resolve the dispute through mediation, either may file a motion with the Court to resolve the issue. *See id.*

**Damages**

46.        In consideration for the Damages Release contained in Section XIII.A. of the Settlement Agreement, the Forty Niners Defendants will establish a Damages Fund of Twenty-Four Million Dollars ($24,000,000) to be paid to Damages Class members for satisfaction of their statutory damages claims under the California Unruh Civil Rights Act, Cal. Civ. Code § 51, et seq. Settlement Agreement § VII.  This represents 34.3% of the approximate $70 million maximum exposure estimated by Plaintiffs' damages expert, but that maximum figure represents a best-case scenario that assumes that each and every  accessible seat included in the analysis was  actually sold to and occupied by Class Members who encountered at least one barrier that caused them "difficulty, discomfort or embarrassment" on each occasion  they attended an event, and also includes  $9 million based on a rate of 10% interest -- a rate that is likely to have been challenged by Defendants at trial. Class Members will be eligible to receive a monetary award from this fund upon submission of a valid claim form. The form and content of the claim form to be used for this purpose has been negotiated by the Parties and is attached to this Declaration as Exhibit 2 and to the Proposed Preliminary Approval Order as Exhibit 3. By the terms of the Agreement, this form will be available for download in .pdf format from the Settlement Internet Website and will also be mailed to Damages Class Members on request. Settlement Agreement §§ V.C.3, V.C.4. Completed claim forms can be returned by mail or submitted electronically via a fillable form that will be available on, and may be submitted through the Internet Website.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

22

Ex. E - 274

47.        The validity of the claim forms and the eligibility for and amount of each Damages Class Member's award will be determined by the Settlement Administrator in accordance with the claims process set forth in § VII.C-K of the Settlement Agreement and the damages allocation and distribution provisions of the Agreement at § VII. Under those provisions, Damages Class members who submit a valid claim form will receive a minimum of $4,000 (unless a large the number of claims require a proportional reduction of this amount) and, depending on the number of eligible claims submitted, a maximum of $80,000. To the extent that any amount remains in the fund after the initial distribution, it will either be redistributed to eligible Damages Class members on a pro rata basis or, if $100,000.00 or less, paid as a cy pres award. No part of the Damages Fund will be returned to Defendants.

**Service Awards to Class Representatives**

48.        Subject to Court approval, the Settlement Agreement provides that Defendants shall pay the sum of $7,500.00 as a service award to each Named Plaintiff.  Settlement Agreement § XIII.B.  Plaintiffs have moved the Court for an award of reasonable service awards in the amount of $5,000 for each of the three Class Representatives.  These service awards will not come out of the Damages Fund. The relatively small service awards were negotiated, subject to approval by the Court, in order to compensate the Named Plaintiffs for the important role they played for the benefit of the Classes, and the substantial time, effort, and risks they undertook to secure the result obtained on behalf of the Classes.  In agreeing to serve as Class Representatives, they accepted the responsibility of representing the interests of all Class Members.  All three of the Named Plaintiffs provided information during lengthy interviews, responded to extensive written discovery, provided documents, identified witnesses, assisted Class Counsel in preparing for depositions and in seeking discovery, and prepared for and sat for their own depositions.  They also assisted in preparing and evaluating the case for mediation, and in the settlement process itself.  As will be discussed in the motion for service awards that Class Counsel will file during the class notice period, the amount sought here is reasonable under the circumstances.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

23

Ex. E - 275

**The Release of Claims**

49.    In exchange for the equitable relief provided for by the Agreement, Class Members and Plaintiffs release "any and all claims that are the subject of, included within, and/or arise from this lawsuit, including without limitation, all claims, liabilities, obligations, demands, actions, and claims under Title II and Title III of the ADA, California Civil Code § 51, et seq., and their accompanying regulations that were brought or could have been brought based on the facts alleged in the Complaint against the Released Parties for injunctive or declaratory relief only relating to Conditions that allegedly deny access to the facilities specified in Exhibit A and access to Defendants' ticketing services for wheelchair accessible and companion seating." Settlement Agreement § XIII.A.1. This release only applies for the duration of the agreement, i.e. three and a half years after it becomes effective. Id., Settlement Agreement § XVI. The scope of the release for the Damages Class is essentially the same, except that it only releases claims for statutory damages that were brought or could have been brought based on the facts alleged in the Complaint for the period of time up to the date on which the Court grants Preliminary Approval of the Settlement Agreement. Settlement Agreement §XIII.A.2. Both releases exclude the Stadium Museum. § XIII.A.3.

**Reasonable Attorneys' Fees, Costs and Expenses**

50.    On August 29, 2019,  after damages and all major injunctive relief issues were resolved, a separate mediation was conducted with Mediator Mark S. Rudy, Esq. in an effort to reach agreement as to the amount of attorneys' fees, costs and expenses to be paid by Defendants as part of the Settlement.  It was agreed, and the proposed Settlement provides, that Class Counsel will apply to the Court for an award of reasonable attorneys' fees, costs and expenses in an amount not to exceed $13,457,152.40. See Settlement Agreement at § XIV. Like the named Plaintiffs' service awards, Class Counsel's attorneys' fees, expenses, and costs will not be paid from the $24 million Damages Fund, but will instead be paid separately by the Defendants. The proposed award of fees and costs includes approximately $1,200,000.00 in costs and a modest lodestar multiplier of approximately 1.5 (to the extent that it does not exceed the cap) on Class Counsel's lodestar, for which Class Counsel are eligible under California law.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

24

**Ex. E - 276**

51.    The payment of fees, costs and expenses to Class Counsel will not diminish the injunctive relief or damages that the Settlement guarantees to the Plaintiff Classes.

**Alleged Barriers for Which No Remediation is Provided**

52.    Of the 2,699 access barriers alleged in the Fourth Amended Complaint and its Exhibits, only 25 are not identified for remediation in the Settlement Agreement. This represents less than 1% of the barriers identified in the Complaint. These alleged barriers include: 18 alleged barriers regarding the lack of clear space on counters in the Stadium concessions; 4 alleged barriers regarding the location of the accessible toilet compartment door openings and whether they were located too far from the side wall or partition; an alleged barrier regarding the lack of wheelchair maneuvering space at urinals; and 2 alleged barriers regarding the existence of dirt sections of the pedestrian right of way serving the remote parking lots.

53.    Plaintiffs compromised regarding the clear space on the counters because of a recent U.S. Access Board interpretive guidance in which the Board stated that this type of condition did not violate the 2010 ADAS.  Similarly, the parties' experts had a good-faith disagreement regarding the correct interpretation of the requirement regarding the location of accessible toilet compartment door openings and the side walls or partitions.  The lack of clear space for wheelchair users at urinals was not remediated because the Stadium's restrooms have designated accessible wheelchair stalls and the Settlement provides comprehensive remediation regarding same. Settlement at § III.A.1.i.; Ex. A at items 823 through 1502.1.  Finally, it was not necessary to remediate the two dirt sections in the pedestrian right of way because the Settlement provides compliant accessible parking in the Main Lot immediately adjacent to the Stadium, and compliant paths of travel from the Main Lot to the Stadium's entrances.

## PLAINTIFFS' APPLICATION FOR REASONABLE ATTORNEYS'
## FEES, COSTS AND LITIGATION EXPENSES

54.    Class Counsel seek a determination that their reasonable lodestar is $11,605,473, that their out-of-pocket costs and litigation expenses are $1,198,390.14, and that their total lodestar plus costs and expenses is $12,803,863.14.  In addition, Class Counsel seek a multiplier on their reasonable lodestar that is sufficient to bring them up to the cap of

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

25

**Ex. E - 277**

$13,457,152.40 specified in the Settlement Agreement, and seek a total award of fees, costs and expenses in that amount. *See* Settlement Agreement § XIV. The amount is reasonable considering the enormous expenditure of time and resources that this factually and legally complex matter required on a contingency basis over the course of three years of hard-fought litigation.

55.     This litigation challenged the accessibility of the entirety of the newly-constructed Levi's Stadium, its parking lots, and connecting paths of travel, as well as the ticketing policies and practices of the Stadium operators. It represents a hard-fought solution to a problem that affects thousands of sports fans and concert-goers with mobility disabilities who desire to attend events at this major Bay Area venue. Such large-scale, systemic disability access cases are unusual and difficult to litigate. The work involved in litigating this case was intensive because of the size of the facility at issue, the number of access barriers involved, the number of complex questions of law and facts at issue, and because of the Defendants' scorched earth defense. The fees, costs and litigation expenses incurred in this matter are the direct result of these factors.

**SUMMARY AND OVERVIEW OF WORK PERFORMED**

**BY THE SCHNEIDER WALLACE FIRM IN THIS CASE**

56.     Schneider Wallace served as the lead firm for the Plaintiff Classes in this matter. Our firm had an integral role in representing the Plaintiff Classes at each stage of the proceedings in this case, including the pleading stage, discovery, class certification, expert discovery, dispositive motions, trial preparation and settlement. SWCK either took the lead in preparing, or assisted the co-counsel firms in preparation of, all major motions. In addition, Schneider Wallace attorneys took or defended 38 out of the 48 depositions in this case, including 11 of the 16 expert depositions. We also played a critical role regarding document discovery, preparing and serving most of Plaintiffs' requests for production of documents to Defendants, as well as to third-party persons and entities who had relevant information about the claims and defenses herein. SWCK created and maintained the document database that contained the various productions of documents that were made by Defendants, Third Party Defendant Turner-Devcon

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

26

Ex. E - 278

and numerous third party entities, and that was used by Class Counsel for purposes of deposition and trial preparation.  Our firm also played a central role in the mediation process, including the drafting of the Settlement Agreement and the detailed remedial measures specified therein.

**Motions**

57.        SWCK prepared Plaintiffs' opposition to Defendants' two motions to dismiss, with GBDH preparing Plaintiffs' response to Defendants' contention that Plaintiffs did not comply with California's government tort claim requirements.   Plaintiffs prevailed in major part, and this Court issued a significant opinion regarding Ms. Nevarez's standing under Article III to bring claims for associational discrimination as the companion of a disabled person. *Nevarez v. Forty Niners Football Co., LLC*, 2017 WL 3288634, at ** 5-8 (N.D. Cal. Aug. 1, 2017).

58.        SWCK prepared Plaintiffs' opening and reply briefs with respect to the successful motion for class certification.  SWCK worked with co-counsel to prepare the class member and expert declarations that were submitted in support of class certification.  GBDH prepared Plaintiffs' reply to the opposition to class certification that was filed by Third Party Defendant Turner Devcon.  SWCK also prepared the declarations of many class members in support of class certification, and worked extensively on the Declarations submitted by access experts Gary Waters, Jeff Mastin and Scott McBrayer.

59.        SWCK prepared several motions to compel of particular significance in this case.  Among others, SWCK prepared a motion to compel Plaintiffs' site inspection of the Stadium.  That motion was granted (ECF 105).  SWCK also prepared Plaintiffs' first motion to compel class member contact information.  That motion was also granted (ECF 114).  It provides some indication of the obdurate manner in which this case was defended that our co-counsel at GBDH were later forced to file a *second* motion to compel a complete production of class member contact information despite the Court's prior Order.  Further, SWCK prepared a motion to compel the production of electronically stored information (ESI), including the emails and attachments of Defendants' officials, which was granted (ECF 241).  As discussed above, there were many other motions to compel that were granted in whole or in part by Magistrate Judge van Keulen, and which were prepared by SWCK.  The foregoing is merely illustrative.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

27

Ex. E - 279

**Depositions**

60.        SWCK deposed 36 witnesses, including 11 expert witnesses and 16 Rule 30(b)(6) witnesses.  These witnesses included, but were not limited to, the following:

a. <u>Jim Mercurio</u>:  Mr. Mercurio was the Vice President of Stadium Operations and General Manager for the Forty Niners Stadium Operations Company. He was designated by Defendants as a 30(b)(6) witness for policies and practices regarding disability access complaints, applicable disability access standards and remediation of access barriers at the Stadium and its parking lots and was deposed both in that capacity on those topics and in his individual capacity He submitted a declaration in opposition to Plaintiffs' Motion for Class Certification stating that he "was involved in the planning related to the construction and design of Levi's Stadium related to multiple issues including accessibility issues" and was involved and consulted on access issues during construction. His testimony was critical to establishing certain admissions on the part of the Forty Niner Defendants with respect to the inaccessibility of the parking lots used by the Stadium and the Forty Niners' policies and procedures with respect to access issues.

b. <u>David Tran</u>: Mr. Tran is a program manager for the City of Santa Clara who served as the head of the City's permit center and also performed the functions of a Senior Plan Examiner for the City in connection with the design and construction of Levi's Stadium. He was identified as a 30(b)(6) witness on issues that included access improvements or alterations to the Stadium impacting disability access, the means by which such work is documented or tracked, the results of any surveys, evaluations, inspections or other efforts to evaluate the accessibility of the Stadium, and the designs, plans, close out procedures and approval process for the Stadium. Mr. Tran was also produced as a witness on behalf of the City to testify at as separate session with respect to similar topics pertaining to parking lots.

c. <u>Dennis Ng</u>: Mr. Ng was a Program Manager for the City of Santa Clara who was designated by the City Defendants to testify on their behalf with respect to the pedestrian right of way leading from the relevant parking lots to the Stadium, including the history of construction of and alterations to the sidewalks and curb ramps, the design standards used for right-of-way construction and repairs, and surveys undertaken to determine the condition of the right-of-way.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

28

Ex. E - 280

1   His testimony was instrumental in establishing the scope of Plaintiffs' pedestrian right-of-way

2   claims and the access standards to be applied.

3          d. <u>Craig Mobeck</u>: Mr. Mobeck was the Director of Public Works for the City of Santa

4   Clara. Class Counsel took his deposition as the City's designated Rule 30(b)(6) witness on the

5   City's policies and procedures for ensuring that the City's pedestrian right-of-way and City parking

6   lots were accessible to persons with disabilities, and the extent to which the City took any steps to

7   ensure that the off-site parking lots used by the Forty Niners for Levi's Stadium events through the

8   City's off-site parking program are accessible.

9          e. <u>Kevin Riley</u>: Mr. Riley is the Director of the Planning Department for the City of

10  Santa Clara and was designated to testify as the City's Rule 30(b)(6) witness on topics related to

11  the off-site parking permitting program adopted by the City to enable the Forty Niners to lease off-

12  site parking lots to provide parking for Levi's Stadium. Testimony provided by Mr. Riley covered

13  the identity and terms of each off-site permit obtained by the Forty Niners and allowed Class

14  Counsel to identify, on a yearly basis, the many off-site lots used by Defendants, the number of

15  spaces available to Defendants in each of those lots and the extent to which any of those spaces

16  could be considered accessible. His testimony was key to Plaintiffs' claim that the Forty Niner

17  Defendants failed to provide the required number of accessible parking spaces for persons with

18  mobility disabilities.

19         1.     <u>Jonathan Harvey</u>: Plaintiffs serve a deposition subpoena on the principal

20  construction contractor for Levi's Stadium, Third Party Defendant Turner/Devcon Joint Ventures,

21  seeking Rule 30(b)(6) testimony within the firm's knowledge on 10 separate topics related to the

22  design and construction of the Stadium, including, among others, the policies and practices for

23  ensuring compliance with disability access requirements, design standards used, the accessibility of

24  the Stadium's suites, the location and scope of any access improvements made, the documentation

25  of the construction work performed, the identity and responsibilities of subcontractors, consultants,

26  employees and vendors with any responsibility for access for persons with mobilities at the

27  Stadium, and the design, drawings, plans, specifications, and close out procedures for the Stadium.

28  Mr. Harvey was designated as the sole witness for each of the topics specified in the deposition

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

29

**Ex. E - 281**

subpoena and Rule 30(b)6 notice, and was examined on those topics over the course of three separate days. His testimony provided important background information on the construction of the Stadium and included several admissions and information that enabled Plaintiffs to perform important follow-up discovery.

f. <u>Robert Jay Harrison</u>: Mr. Harrison was the City Building Inspector responsible for the inspection of the Stadium. He was deposed on the inspection process and documentation of the results, the extent to which the Stadium was inspected for disability access, and the criteria and standards used for the inspections.

g. <u>Lanson Nichols</u>: Mr. Nichols is the Vice President of Sports Architecture for the architectural firm HNTB, which served as the architect of record for Levi's Stadium. Mr. Nichols was deposed as a Rule (30)(b)(6) witness to obtain testimony about the firm's role in the design of the Stadium, the disability access standards used in the design of the Stadium, the basis for various design decisions and the possible use of alternative access designs, products or technologies that might result in equivalent or greater access, and the firm's communications with Defendants and other consultants or contractors involved in the design and construction of the Stadium. Mr. Nichols testified on all of these topics and also provided important testimony concerning the failure to employ an access expert consultant throughout the full design phase of the Stadium Project and the lack of in-house expertise in disability access issues.

h. <u>Jim Terry</u>: Mr. Terry is the principal of Evan Terry Associates, a disability access consulting firm that was engaged by HNTB, pursuant to its contract with Defendants, to provide disability access advice and consultation services, including the review of official design drawings at two phases of the design process. Class Counsel elicited important testimony from Mr. Terry concerning the advice he provided to Defendants during the design of Levi's Stadium and his communications with Defendants' representatives and other consultants regarding access issues.

i. <u>Ed Roether</u>: Mr. Roether was a disability access expert engaged by Defendants both as a consultant in the design phase of the construction of Levi's Stadium and as a rebuttal expert witness in the litigation. Plaintiffs deposed Mr. Roether both in his personal capacity and as an expert witness. During the course of his deposition testimony, Class Counsel was able to elicit

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

30

Ex. E - 282

1  several important concessions from Mr. Roether on access issues that were otherwise contested by

2  Defendants.

3          j.  <u>Kim Blackseth</u>: Mr. Blackseth was Defendants' principal disability access expert

4  and was examined by Mr. Wallace on the opinions set forth in both his opening and rebuttal

5  reports and his basis for those opinions. The examination resulted in dozens of important

6  admissions concerning the inaccessibility of the Stadium.

7          k.  <u>John Wasson</u>: Mr. Wasson was the construction agent/project manager on the

8  Stadium for much of the period of time prior to completion of the Stadium and continued to serve

9  as a consultant to the Forty Niners through the litigation. Mr. Wasson communicated regularly

10  with the Stadium's architect of record and access consultants Evan Terry Associates throughout

11  this period. Pursuant to subpoena, he produced a large cache of documents related to the

12  development of the Stadium and was deposed by Class Counsel on those documents and the

13  discussions and decisions bearing on the accessibility of the Stadium.

14          l.  <u>Jamie Brandt</u>: Mr. Brandt was the Vice President of Sales and Service for the Forty

15  Niner Defendants. They designated Mr. Brandt as the Rule 30(b)(6) witness regarding ticketing

16  policies and practices.  He submitted a declaration in opposition to Plaintiffs' Motion for Class

17  Certification stating that he was responsible for creating and implementing ticketing policies and

18  practices, including ticketing for accessible seating. He was also designated to testify on behalf of

19  the Forty Niner Defendants on the subject of the ticketing database and the production of the data

20  made available to Plaintiffs for their expert's damages analysis. He was deposed on two separate

21  dates and examined on those topics during the course of the litigation. His testimony was

22  instrumental to Plaintiffs' understanding of Defendants' ticketing policies and procedures and the

23  recordkeeping and data maintenance with respect to ticketing and seating.

24          61.         Defendants deposed 12 of Plaintiffs' witnesses, including the named

25  Plaintiffs.  Along with Ms. Cabalo, I defended the depositions of Plaintiffs Abdul Nevarez and

26  Priscilla Nevarez.  Defendants deposed 9 of Plaintiffs' expert witnesses.  SWCK defended 7 of

27  those depositions.

28          62.         Altogether, the parties took more than 45 days of deposition.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

**Experts**

63.         SWCK, along with co-counsel, worked closely with Plaintiffs' experts to prepare their Rule 26 reports and their declarations regarding class certification and summary judgment.  SWCK, along with Ms. Cabalo of Peiffer Wolf, worked with Plaintiffs' experts Gary Waters and Scott McBrayer to prepare their reports and declarations regarding the Stadium.  We also assisted co-counsel GBDH in working with Jeff Mastin to prepare his reports and declarations regarding the Stadium's parking lots, and the pedestrian rights running between those lots and the Stadium. SWCK also worked with Plaintiffs' rebuttal experts, Dr. Steinfeld and Barry Atwood, to prepare their Rule 26 reports.

64.         SWCK worked with ticketing services experts Matt Gasser and William Michael Rafael in the preparation of their Rule 26 reports regarding Plaintiffs' claims that Defendants' ticketing services did not provide full and equal access to persons with mobility disabilities.

65.         Finally, SWCK, along with Adam Wolf, worked with Plaintiffs' damages expert, David Breshears of Hemming Morse, in the preparation of Plaintiffs' damages analysis.

**Document Discovery and Analysis**

66.         SWCK served requests for production of documents regarding the following subject areas, among others: the design and construction of the Stadium (including the dates thereof); groundbreaking and the start of construction; the disability access standards used in the construction of the Stadium; ADA compliance; documents regarding accessibility that were prepared by the architect of record, HNTB; disability access plan review by the City of Santa Clara; field inspections of the Stadium during construction and at the close-out and permit stages; construction tolerances or dimensional tolerances regarding the built features of the Stadium; policies and procedures regarding disability access to the Stadium; disability access to ticketing and seating services; the accessibility of the Stadium's various parking lots; access to transportation services running from the parking lots to the Stadium; policies and procedures regarding the maintenance of disability access features; complaints by or on behalf of visitors with mobility disabilities; any remedial measures undertaken by Defendants during the course of this

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

32

Ex. E - 284

1  litigation; and Defendants' affirmative defenses.  All of these subject areas were important to the

2  claims and defenses herein.

3       67.       Defendants and Third-Party Defendant Turner Devcon produced over 3.4

4  million pages of documents in response to Plaintiffs' written discovery.  In addition, Plaintiffs

5  obtained, by subpoena or informally, substantial productions of documents from a large number of

6  third parties who had been involved in the planning or construction of Levi's Stadium or who

7  provided services to the Forty Niner Defendants of a type that impacted Plaintiffs' disability

8  access claims. These included HNTB, Evan Terry Associates, AMB Industry Groups, Bauer

9  Transportation, Corinthian Transportation, Ed Roether, Elite Security Services, GHD Construction

10  Services, Jack Hill, Landmark Parking Services, Ticketmaster-LiveNation, and John Wasson.

11       68.       Much of Defendants' production was made without Bates Stamp

12  Numbering, including a very large production of ESI that was produced shortly before the close of

13  discovery under a deadline imposed by Judge van Keulen and that appeared not to have been

14  reviewed for relevance or responsiveness.  This mass of documents needed to be organized and

15  reviewed by Class Counsel for purposes of ascertaining their relevance to the claims and defenses

16  at issue, and their usefulness to obtain admissions.  As documents were produced by Defendants

17  or other third-party entities, they were uploaded to the document database that was maintained by

18  SWCK.  The database was maintained in Relativity, so that counsel were able to use term searches

19  to identify documents that were relevant to Plaintiffs' claims.  Those documents were then used in

20  deposition to obtain admissions, or for purposes of follow-up questions regarding foundational

21  facts or Defendants' affirmative defenses (such as dimensional tolerances).

22       69.       SWCK organized and conducted the bulk of Plaintiffs' analysis of the

23  documents in this case.  Ms. Avilucea, who managed electronic discovery and document

24  management for SWCK, ensured that Defendants had produced these documents to Plaintiffs in a

25  usable format, troubleshooted problems with the document production when they arose, and acted

26  as the liason with representatives of JND eDiscovery, the firm engaged by SWCK to upload and

27  host the documents as they were produced and provide access to them through Relativity. Ms.

28  Avilucea also worked with Mark Johnson and Travis Close to design and update a detailed

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

33

**Ex. E - 285**

document review protocol, train document reviewers in the use of that protocol, and oversee and provide direction with respect to the analysis and review process and specific searches to be conducted. As discussed below, SWCK attorneys then searched this database to identify documents with potential admissions.  Memoranda were prepared regarding potentially important documents that might need to be used or explored in deposition with particular witnesses, or that required follow-up discovery from Defendants or other third-party entities involved in the construction of the Stadium or disability access to the Stadium.

**Mediation and Settlement Efforts**

70.        Class Counsel worked collaboratively on all aspects of settlement.  Working with co-counsel, SCWK prepared numerous mediation briefs for the eight formal mediations that took place in this case, as well as numerous drafts of the Settlement Agreement and its voluminous exhibits, including Exhibits A-L, which identified each of the more than 2,500 access barriers identified by Plaintiffs' experts and provide the detailed drawings and specifications for the access work to be performed pursuant to the Settlement.  Because this case involved such a wide range of physical access and operational issues regarding the Stadium, its parking lots, and the pedestrian rights of way connecting them, Class Counsel took primary responsibility for different issues and types of barriers during the settlement discussions.  As a result of these joint efforts, we achieved an excellent settlement that included both comprehensive injunctive relief and substantial money damages on behalf of the Plaintiff Classes.

**Trial Preparation**

71.        At the time of settlement, the experienced class action trial attorneys at SWCK were in the process of trial preparation.  This included organizing and preparing for a focus group with the National Jury Project.  In addition, SWCK had begun work on jury instructions and a proposed verdict form.

**Minimization of Inefficiencies and Duplication of Efforts**

72.        Class Counsel made reasonable efforts to litigate in an efficient manner. Although three firms were involved in the prosecution of this case, the resources devoted to the case from each firm were reasonable, and projects and tasks were generally divided among the

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

34

Ex. E - 286

1  firms in a manner designed to avoid duplication of effort or inefficiencies. This was accomplished

2  through periodic team meetings, scheduled as needed and usually conducted by telephone, at

3  which agendas and task lists were distributed. In this way, specific work assignments were made

4  to each firm, and duplication of efforts was minimized. Examples of this are described above.

5        73.     Within the Schneider Wallace firm, work was performed in an efficient

6  manner.  I acted as the primary decision maker.  As a general matter, legal theories, model

7  pleadings, and deposition outlines were developed by myself in the first instance, and then

8  circulated to the associates for adaptation.  Large projects and assignments were also given to of

9  counsel and senior associates, including Mark T. Johnson and Sarah Colby. The time-intensive

10  process of contacting and interviewing class members, developing, reviewing and analyzing the

11  voluminous factual record, and propounding and responding to discovery and meet and confer

12  regarding same, was performed mostly by associates and paralegals.  This internal allocation of

13  work ensured that all litigation tasks were performed at the most appropriate billing rate.

14  **Summary of Attorneys' Fees, Costs and Litigation Expenses**

15  **Rates (Including "Historic Rate" Information)**

16        74.     Class Counsel have reviewed the rates sought for the attorneys, law clerks

17  and paralegals for whom compensation is sought in this Motion.  Based on our experience and

18  knowledge of the market, the rates sought are reasonable and fall within the market range for

19  attorneys of comparable experience, expertise and reputation who provide similar services in the

20  Northern District of California.  Class Counsel make their application based on 2019 rates even

21  though work on this matter has continued into 2020.

22        75.     Plaintiffs also submit the Declaration of Richard M. Pearl, Esq., an expert

23  and recognized authority on rates and attorneys' fees in California.  Mr. Pearl has reviewed the

24  2019 rates sought by Class Counsel, and it is his expert opinion that those rates are reasonable and

25  fall within the market range for attorneys of comparable experience, expertise and reputation who

26  provide similar services in the Northern District of California.

27        76.     Plaintiffs also have submitted the Declaration of José R. Allen, Esq.  Mr.

28  Allen has reviewed the 2019 rates sought by Class Counsel. It is his experience and understanding

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

35

Ex. E - 287

that those rates are reasonable and fall within the market range for attorneys of comparable experience, expertise and reputation who provide similar services in the Northern District of California.

77.    SWCK's hourly rates are routinely approved by federal and state courts within the Bay Area. The 2019 rates requested herein for SWCK represent only a modest increase over the rates that were approved by other courts as being reasonable in 2018, 2016 and 2015. SWCK's 2018 rates were recently approved in the matter of *Shaw v. AMN Services, LLC*, Case No. 3:16-cv-02816 JCS (N.D. Cal. May 31, 2019). In its Order Granting Plaintiffs' Motion for Reasonable Attorneys' Fees and Costs, the Court approved SWCK's rates and found "[t]he hourly rates of Class Counsel Schneider Wallace Cottrell Konecky Wotkyns LLP also have consistently and recently been approved as reasonable by the courts. *See, e.g., Villalpando v. Exel Direct Inc.*, 2016 WL 7740854, at *1 (N.D. Cal. Dec. 12, 2016); *see also Knapp v. Art.com, Inc.*, No. 3:16-cv-00768-WHO (N.D. Cal. October 24, 2018); *Janssen v. Square, Inc.*, Case No. CGC-16-549980, Superior Court of California, County of San Francisco, Order dated September 26, 2018; *Winans v. Emeritus Corp.*, 2016 WL 107574, at *8 (N.D. Cal. Jan. 11, 2016); *Carnes v. Atria Senior Living Inc.*, Case No. 14-cv-02727-VC, Dkt. No. 115, at 4-5 (N.D. Cal. July 12, 2016); *Meza v. S.S. Skikos, Inc.*, Case No. 3:15-cv-01889-THE, Dkt. No. 58, at 4 (N.D. Cal. May 25, 2016)." *Id.* at ¶ 8. A true and correct copy of this Order and the Declaration Of Joshua Konecky In Support Of Plaintiffs' Motion For Reasonable Attorneys' Fees And Costs identifying the rates that were approved at ¶¶ 37-46 is attached as Exhibit B.

78.    SWCK's 2018 rates were also approved by Judge Thomas Kuhnle of Santa Clara Superior Court in the matter of *Asalati v. Intel Corp.*, No. 2016-1-CV-302615 (Santa Clara Cnty. Super. Ct., Oct. 29, 2018). A true and correct copy of this Order and of the Declaration of Carolyn Hunt Cottrell In Support Of Plaintiff's Motion For Final Approval Of Class And Collective-Action Settlement identifying the rates that were approved at ¶ 125 and Ex. 2 are attached as Exhibit C. SWCK's 2019 rates are only modestly higher than the 2018 rates, and are also reasonable.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

36

**Ex. E - 288**

79.        SWCK's 2016 rates were approved by Judge Winifred Smith of Alameda County Superior Court in the matter of *Marine v. Interstate Distributor Corp.*, No. RG07358277 (Ala. Cnty. Super. Ct., November 18, 2016).  A true and correct copy of Judge Smith's Order of Final Approval and Judgment and the Plaintiffs' motion for fees and costs showing the rates that she approved are attached as Exhibit D.

80.        SWCK's 2015 rates were approved by Judge Consuelo B. Marshall in *Willits v. City of Los Angeles*, No. CV 10-5782 CBM (RZx), 2016 WL 11678643, at *3 (C.D. Cal. Aug. 26, 2016).  SWCK's 2015 rates were also approved by the District Court in *Winans v. Emeritus Corp.*, Case No. 13-cv-03962-HSG, 2016 WL 107574, at *8 (N.D. Cal. Jan. 11, 2016) ("The Court further finds that the billing rates used by class counsel to calculate the lodestar are reasonable and in line with prevailing rates in this district for personnel of comparable experience, skill and reputation.").

81.        Many firms increase their hourly rates by anywhere from five (5) to ten (10) percent per year.  Courts have recognized that this is appropriate.  For example, a ten percent (10%) increase in 2016 rates over 2015 rates was found reasonable in *Our Children's Earth Foundation v. National Marine Fisheries Service*, No. 14-cv-01130-WHO, 2017 WL 783490, at *11 (N.D. Cal. Mar. 1, 2017) (absent "specific justification" supporting higher increase, plaintiff's attorneys entitled to 10 percent increase in 2016 rates over 2015 rates").  SWCK maintained the same billing rates in 2017 and 2018.  However, in early 2019, upon review of the prevailing rates in the Bay Area, our firm decided to raise its rates to accord with increases in the prevailing range of market rates for complex litigation, including class action matters.  As part of this increase, we raised our senior partner rates by approximately 10%.

82.        The following chart show the "historic rates" for SWCK's attorneys and paralegals who performed work on the above-captioned matter:

| Hourly Rates History of Schneider Wallace Cottrell Konecky LLP | | | | | | |
|---|---|---|---|---|---|---|
| Attorney / Paralegal | Law School / Year of Graduation | 2019 Rate | 2018 Rate | 2017 Rate | 2016 Rate | 2015 Rate |
| Guy B. Wallace | Harvard Univ., 1993 | $925 | $835 | $835 | $795 | $750 |

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

37

**Ex. E - 289**

| Mark T. Johnson | U.C.L.A., 1977 | $875 | $825 | $825 | $775 | $700 |
|---|---|---|---|---|---|---|
| Sarah Colby | U.C. Hastings, 1997 | $840 | $775 | $775 | $700 | N/A |
| Travis Close | Northeastern Univ., 2015 | $680 | $650 | $600 | N/A | N/A |
| Ryan Bonner | Southwestern Univ., 2014 | $625 | $600 | $600 | N/A | N/A |
| Abigail Avilucea | Suffolk Univ., 2014 | $680 | $625 | $625 | $500 | N/A |
| Edgar Olivares | St. John's Univ., 2007 | $625 | $600 | N/A | N/A | N/A |
| Justin Proctor | Temple Univ., 2007 | $625 | $600 | N/A | N/A | N/A |
| William Stewart | U.C.S.F., 2017 | $575 | $575 | N/A | N/A | N/A |
| Jennifer Uhrowczik | New York Univ., 2009 | $725 | $675 | $675 | $550 | $450 |
| Sam Marks | N/A | $300 | $300 | $300 | $225 | $200 |

### The Schneider Wallace Attorneys and Their Role

The backgrounds and hourly rates of Plaintiffs' attorneys and staff who worked on this matter are as follows:

83.     Guy Wallace is a 1993 graduate of Harvard Law School.  He has been practicing law for 25 years.  From 1993 to 1994, he was a Skadden Fellow at the Disability Rights Education and Defense Fund.  From 1994 to 1998, he was a Skadden Fellow and then Staff Attorney at Disability Rights Advocates.  Between March 1998 and June 2000, he was a Staff Attorney at the Legal Aid Society of San Francisco/ Employment Law Center and served as head of the disability rights practice. Mr. Wallace became a partner in the firm then known as Schneider & Wallace in June 2000.  Mr. Wallace is recognized as one of the best disability rights litigators in the nation, and courts have found that he has special expertise in disability rights and class action litigation. *See, e.g., Lopez v. S.F. Unified Sch. Dist.*, 385 F. Supp. 2d 981, 991 (N.D. Cal. 2005). Mr. Wallace serves on the Board of the San Francisco Trial Lawyers Association. He has been a "Super Lawyer" for the past ten years.

84.     Mr. Wallace served as lead counsel for Plaintiffs' in this case.  His work on this case included almost all aspects of the litigation, including work on the pleadings, opposing

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)
38

Ex. E - 290

1    Defendants' multiple motions to dismiss, the preparation of the class certification motion, expert

2    reports, taking and defending thirteen full day depositions including Rule 30(b)(6) depositions and

3    expert witness depositions, as well as defending the depositions of Mr. Nevarez and Ms. Nevarez

4    (with Ms. Cabalo), particular motions to compel, summary judgment, trial preparation and

5    settlement.

6        85.        The 2019 hourly rate that my law firm seeks for my own services in this case

7    is $925.00 per hour.  Having reviewed the market, my firm has determined that my rate is within

8    the market range charged by attorneys of comparable experience, expertise, and reputation for

9    similar services in the Northern District of California.  My background and experience are

10   described *supra* at ¶¶ 4-6.  Courts have recognized that I have special expertise in disability rights

11   and class action litigation. *See, e.g., Lopez v. S.F. Unified Sch. Dist.*, 385 F. Supp. 2d 981, 991

12   (N.D. Cal. 2005).

13       86.        <u>Mark Johnson</u> is of counsel at SWCK.  He received his J.D. from the

14   University of California, Los Angeles in 1977 and his B.A. in political science from the University

15   of California at Berkeley in 1974.  He has extensive experience in representing plaintiffs in the

16   areas of consumer protection, ERISA, employment and disability discrimination, and has

17   specialized in class action litigation for more than twenty (20) years. Before relocating to the Bay

18   Area in 1999, Mr. Johnson was the Director of the Western Law Center for Disability Rights in

19   Los Angeles and the disability rights clinical law program at Loyola Law School.

20       87.        Mr. Johnson's work on this case included taking fifteen deposition and

21   defending three. He was responsible for taking the depositions of key Rule 30(b)(6) witnesses

22   from both the City and Stadium Defendants and of  the Forty-Niner Defendants on topics that

23   included, among others, the design standards used and new construction and alterations performed

24   to the pedestrian right of way leading to the stadium, the parking lots and spaces leased by the

25   Forty Niners to provide parking for Levi's Stadium, and the Forty Niners ticketing database and

26   records of class member attendance. Mr. Johnson also prepared for and took the Rule 30(b)(6)

27   deposition of the Architect of Record for the Stadium, HNTB. He also took the depositions of two

28

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

39

**Ex. E - 291**

1    of Defendants' access experts and defended the depositions of two of Plaintiffs' access experts at

2    deposition and Plaintiffs' damages expert.

3    88.    In addition to the above-described work, Mr. Johnson took the lead on all

4    aspects of Plaintiffs' claims involving the accessibility of parking and the pedestrian right of way

5    for the Stadium, worked extensively on the issue of class damages, worked with the firm's

6    document management attorney to develop the protocol for reviewing, analyzing and coding

7    documents produced by Defendants and third parties and, with Ms. Avilucea, oversaw the

8    document review effort. Mr. Johnson also developed document requests for service on

9    Defendants, assumed primary responsibility for Plaintiffs' multiple motions to compel, and

10   actively participated in all of the mediations and settlement negotiations. Mr. Johnson's 2019

11   hourly rate is $875.

12   89.    Sarah Colby was an associate at SWCKW. Ms. Colby received her J.D.

13   from the University of California, Hastings in 1997 and her B.A. from Princeton University in

14   1990. She clerked for the Hon. Charles A. Legge (Ret.) of the Northern District of California from

15   1997-87. She was a Skadden Fellow at the Legal Aid Society of San Francisco—Employment

16   Law Center form 1998-2000.

17   90.    Ms. Colby's work on this case included taking and defending eight

18   depositions (including Rule 30(b)(6) depositions and expert depositions), drafting portions of the

19   motion for class certification, preparation of expert reports and declarations, preparation of several

20   motions to compel, as well as work on various aspects of discovery and trial preparation. Ms.

21   Colby worked on several issues in this case, but had a particular focus on Plaintiffs' claims that

22   Defendants' policies and procedures regarding ticketing and access to seating services violated the

23   ADA and the Unruh Act. Ms. Colby's 2019 hourly rate is $840.

24   91.    Jennifer Uhrowczik was an associate at SWCKW. Ms. Uhrowczik received

25   her J.D. from the New York University School of Law in 2009 and her B.A. from Indiana

26   University in 2004. At Schneider Wallace, Ms. Uhrowczik's practice focused on systemic

27   disability access, employment and consumer class actions.

28

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

40

**Ex. E - 292**

1    92.         Ms. Uhrowczik worked on Plaintiffs' oppositions to Defendants' various

2  motions to dismiss the pleadings, with a particular focus on Defendants' contention that Ms.

3  Nevarez, as a companion to Mr. Nevarez, lacked associational standing under Article III.  Ms.

4  Uhrowczik also helped to prepare the initial written discovery that Plaintiffs served upon

5  Defendants.  Ms. Uhrowczik's 2019 hourly rate is $725.

6    93.         Travis Close is an associate at SWCKW.  He received his J.D. from

7  Northeastern University School of Law in 2014.  Mr. Close's practice focuses on systemic

8  disability access, elder abuse and consumer class actions.

9    94.         Mr. Close worked on discovery and preparation for depositions (assisting

10 Mr. Wallace with document intensive depositions, including the deposition of Defendants'

11 primary access expert, Kim Blackseth), expert reports and declarations, and motions to compel.

12 Mr. Close had a particular focus on all aspects of the issue of dimensional or field tolerances.

13 Defendants contended that the deviations from the federal and state access standards within the

14 Stadium, the parking lots and the pedestrian right of way, fell within such tolerances.  Analyzing

15 this issue required the review and analysis of thousands of pages of construction documents

16 regarding the issue of construction tolerances for materials such as concrete, asphalt, and various

17 metals and other materials.  The subject matter is technical.  Mr. Close assisted in the analysis of

18 this issue for purposes of both expert and Rule 30(b)(6) witnesses.  Mr. Close also worked on the

19 preparation of class member declarations, class outreach and responding to class member

20 inquiries.  Mr. Close's 2019 hourly rate is $680.

21   95.         Abigail Avilucea was an associate at SWCK who managed and oversaw the

22 e-discovery division of the firm.  She was admitted to the Massachusetts and Maryland bars in

23 2014. Ms. Avilucea oversaw the receipt, review, analysis and distribution of documents produced

24 in litigation.  She is trained and experienced in the efficient and effective management,

25 organization, analysis and retrieval of documents and was responsible for assisting in the

26 development of document review protocols and supervising document reviewers. Ms. Avilucea

27 attended Suffolk University Law School in Boston, Massachusetts where she graduated with Pro

28

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

41

**Ex. E - 293**

1   Bono Honors.  Ms. Avilucea attended undergrad at Miami University (Ohio) where she obtained

2   her Bachelor of Arts in International Studies with a minor in Anthropology.

3        96.        Ms. Avilucea's work on this case included the supervision of e-discovery

4   and document management and analysis for discovery and trial preparation.  Her work on this case

5   included extensive communications with Defendants and third parties regarding electronic

6   discovery production and management. She coordinated with the firm's e-discovery vendor to host

7   over 1 million documents and to resolve numerous issues that arose along the way concerning

8   corrupted material and incompatible document formats. She managed advanced analytics and de-

9   duplication efforts to reduce the volume of hosted material and hone-in on documents likely to be

10  used for exhibits at depositions. She prepared potential exhibits for trial and oversaw the analysis

11  of specific barriers as part of Plaintiffs' renewed motion for summary judgement. Ms. Avilucea's

12  2019 hourly rate is $680.

13       97.        William Stewart is an associate attorney at SWCK.  His practice focuses on

14  antitrust litigation, including pharmaceutical pay-for-delay actions. He graduated from the

15  University of San Francisco School of Law in 2017 and was admitted to the California Bar in

16  2018. While at USF School of Law, he was a member of the Internet and Intellectual Property

17  Law Clinic and a senior editor of the Intellectual Property and Technology Law Journal.

18       98.        Mr. Stewart's work on this case included document review and analysis for

19  purposes of trial preparation. Mr. Stewart analyzed complaints from class members regarding

20  accessible ticket purchasing policies, parking lots and rights-of-way to the stadium, and seating

21  inside the stadium. He reviewed and analyzed internal event audits to determine whether

22  Defendants may have violated accessibility guidelines for ticketing policies by removing

23  accessible seating during certain events. He prepared strategic memos for prioritizing access

24  barriers on which to focus during trial preparation. He summarized Defendants' policies regarding

25  accessible parking and transportation to determine whether they complied with federal and state

26  law, which aided negotiations for injunctive relief at settlement. Mr. Stewart's 2019 hourly rate is

27  $575.

28

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

42

**Ex. E - 294**

99.    <u>Ryan Bonner</u> is a staff attorney who joined SWCK in December of 2017 as a member of the firm's attorney document review team and who has also worked on drafting motions and other legal documents.  He obtained his Juris Doctorate from Southwestern School of Law in Los Angeles in 2014 and was admitted to the California Bar in July of 2015. Prior to joining SWCKW he held a variety of positions with other law firms as a contract attorney and document reviewer. Mr. Bonner received his undergraduate degree in political science from the University of California Los Angeles.

100.    Mr. Bonner's work on this case included an extensive review and analysis of construction blueprints to prepare exhibits for numerous 30(b)(6) depositions. He analyzed third-party document productions to gather evidence of the date of initial stadium construction, and thus whether the 1991 or 2010 standards under the ADA properly applied, which had potentially dramatic consequences regarding the scope of injunctive relief available. Mr. Bonner reviewed numerous sets of design documents from vendors and subcontractors, analyzing them for applications of disability access standards to specific design elements within the stadium. In addition, Mr. Bonner interpreted numerous seating charts to determine where accessible seating was designed and then subsequently removed at the Stadium following Defendants' decision to use .5% accessible seating instead of 1%.  Mr. Bonner also prepared analysis memoranda on these subjects that were used for purposes of deposition and for follow-up discovery.  Mr. Bonner's 2019 hourly rate is $625.

101.    <u>Justin Proctor</u> is a staff attorney at Schneider Wallace.  Mr. Proctor received his Juris Doctorate from Temple University Beasley School of Law in 2007 and has been a member of the California Bar since July of 2017. He joined Schneider Wallace as a member of its attorney document review team in August of 2018 and has extensive experience in reviewing, analyzing and coding documents produced in document intensive class action cases, both as a contract attorney and paralegal. Prior to attending law school Justin obtained a paralegal certification from Villanova University in 2001.  He worked for 14 years as a certified paralegal and law school graduate at a number of law firms, specializing in document management and

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

43

Ex. E - 295

1  review in large class actions and other cases and performing other advanced paralegal tasks. Justin

2  attended the University of Chicago as an undergraduate, receiving B.A. in Philosophy in 1998.

3      102.      Mr. Proctor's work on this case included document review and analysis to

4  prepare for depositions and trial.  Mr. Proctor was the primary document analysis attorney for

5  Plaintiffs in this case.  As discussed, Defendants' and Third-Party Defendant Turner-Devcon

6  produced over 3.4 million pages of documents, most of which were not Bates Numbered or

7  organized.  Mr. Proctor used targeted searches to analyze this vast number of documents and

8  identify key exhibits for deposition and trial.  In particular, Mr. Proctor's work included searching

9  for documents pertaining to the depositions of Ed Roether (one of Defendants' access

10  consultants), Mr. Jim Terry (another of Defendants' access consultants), Lanson Nichols (the

11  architect of record for the Stadium), and John Wasson (Project Executive for Levi's Stadium).

12  Mr. Proctor's work also included analyzing the document database to identify exhibits regarding

13  disability access design and/or construction defects with respect to the Stadium and its restaurants,

14  restrooms, seating areas, signage, drink rails, and handrails, as well as the pedestrian right of way

15  serving the Stadium.  Mr. Proctor prepared summary memoranda identifying key documents that

16  contained admissions in these areas, which were then used in deposition.  Mr. Proctor's 2019

17  hourly rate is $625.

18      103.      Edgar Olivares is a staff attorney at Schneider Wallace.  He received his

19  juris doctorate in 2007 from St. John's University School of Law in New York and is a member of

20  the New York State Bar. He has worked for Schneider Wallace since May of 2019 as a member of

21  the firm's document review team and has also conducted class member outreach. Prior to coming

22  to Schneider Wallace, Edgar was employed as a staff attorney for seven years with the New York

23  firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP and worked as a contract attorney and

24  discovery staff attorney for two other New York firms before that. Prior to attending law school,

25  Edgar received a Bachelor of Science in Foreign Service, with a specialization in International

26  History and Diplomacy from Georgetown University School of Foreign Service.

27      104.      Mr. Olivares's work on this case included document review and analysis for

28  purposes of trial preparation. Mr. Olivares conducted targeted analysis Defendants' documents

---

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

44

**Ex. E - 296**

1    with a particular focus on issues regarding services for persons with disabilities, including

2    Defendants' policies, procedures and practices regarding ticketing, seating, sightlines, mobility

3    services, mobility shuttles, companion seating and parking, as well as other specific access issues.

4    Mr. Olivares' 2019 hourly rate is $625.

5                          **The Schneider Wallace Firm Paralegals and Their Role**

6        105.         <u>Sam Marks</u> was a senior paralegal at Schneider Wallace.  He is a 2007

7    graduate of the University of California, Santa Barbara.  Mr. Marks' work on this case included

8    interviewing class members, responding to their inquiries and assisting with the preparation of

9    their declarations.  He also assisted with general document review and analysis, performed

10   research, developed organizational tools and compilations of information to assist the firms'

11   attorneys in the litigation and in preparing for depositions and hearings, and prepared drafts of

12   subpoenas', deposition notices and other documents.  Mr. Marks worked at our firm as a paralegal

13   for eleven years, and he assisted with these types of tasks in many wage and hour cases and

14   systemic disability access cases.  His 2019 hourly rate is $300.

15       106.   I have reviewed various sources of information about the prevailing market rates in

16   the Bay Area for the staff identified above.  I am also familiar with case law regarding reasonable

17   market rates in the Northern District of California.  In my opinion, the rates that our firm seeks for

18   the staff members identified above are within the market range for staff with similar qualifications

19   and experience who do similar types of work in the Northern District of California.

20                                  **Method of Recording Time**

21       107.         The practice of both myself and the attorneys at my firm is to record time in

22   tenth of an hour increments, and to do so as contemporaneously as possible with the expenditure

23   of the time by the attorney.

24                          **Appropriate Billing Judgment Was Exercised**

25       108.         In the exercise of billing judgment I have reviewed and revised the billing

26   records on an entry-by-entry basis to eliminate inefficiencies and other billing entries that should

27   not be claimed.  The remaining time was all reasonable and necessary for the prosecution of this

28   case.

---

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

45

**Ex. E - 297**

109.    To the extent that particular time entries by Schneider Wallace legal staff reflect arguably unproductive or duplicative hours, we have not requested fees based thereon.  In this matter I made the following exercise of billing judgment in which I either excluded or reduced particular time entries.

110.    First, I generally deleted all time expended on the matter by attorneys, paralegals and law clerks who worked on this matter for less than eighty (80) hours so as to eliminate any potential inefficiencies arising from the use of lawyers, paralegals or law clerks who were unfamiliar with the litigation and who would require the expenditure of time to achieve working familiarity with the claims.  Second, I also deleted time with respect to other billers based on the exercise of billing judgment during my review of the file in connection with the preparation of this Declaration.  I excluded or reduced time entries in my own records that I concluded to be non-billable, or other entries that were excessive, clerical, erroneous or otherwise non-compensable.  I followed the same process with the entries made by other attorneys and paralegals for whom we seek compensation.

111.    In the exercise of billing judgment, Class Counsel have eliminated all time spent in connection with the motion for a temporary restraining order, their opposition to Ticketmaster's motion to compel arbitration, and most of the time spent in connection with requests for admission that were the addressed in Defendants' motion for a protective order.  Counsel have also billed for the presence of only two attorneys at Case Management Conferences.  *Id.*

112.    The foregoing exercises of billing judgment eliminated $870,708.50 from the Schneider Wallace lodestar in this matter, or 11.4%.

113.    Despite the diligent efforts of counsel in reviewing these billing records, given the nature of this litigation and the number of time entries at issue, it is possible that the billing records still contain a very minor number of entries that Class Counsel intended to delete on the bases described above. True and correct copies of the Schneider Wallace billing records for this case up through May 15, 2020 and following the exercise of billing judgment are attached as Exhibit E to this Declaration.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

46

114.     The chart shown below reflects the total billing judgment deductions made by Class Counsel herein.

| Total Exercise of Billing Judgment for All Firms | | |
|---|---|---|
| *Nevarez v. Forty Niners, et al.* | | |
| Schneider Wallace Cottrell Konecky LLP | Attorneys' Fees | $870,708.50 |
| Goldstein, Borgen, Dardarian, & Ho | Attorneys' Fees | $305,409.00 |
| Peiffer Wolf Carr and Kane | Attorneys' Fees | $212,930.50 |
| Total Attorneys' Fees Reduced | | $1,389,048.00 |

### Requested Fees

115.     Class Counsels' total lodestar in this matter is $11,605,473.00.  The total number of hours for which Class Counsel seek compensation is 16,850.4.  Class Counsels' hours are reasonable given the scope of this litigation, which involved three classes comprised of several thousand persons; Defendants' aggressive defense of this litigation; the fundamental importance of the civil rights at stake; and the excellent results achieved by Class Counsel in vindicating those rights.  Class Counsel also seek a multiplier with respect to their lodestars for this litigation, but only up to the cap for fees and costs permitted by the Settlement Agreement.

116.     Class Counsel's lodestar is current through May 15, 2020.  However, our work on this matter is ongoing.  Class Counsel will provide the Court with updated lodestar information just prior to the hearing on Plaintiffs' Motion for Reasonable Attorneys' Fees, Costs and Expenses.

### Schneider Wallace Cottrell Konecky LLP

117.     Schneider Wallace submits the following application for fees, costs and expenses in this case:

| Schneider Wallace Cottrell Konecky LLP | | | | |
|---|---|---|---|---|
| Nevarez v. Forty Niners | | | | |
| Attorney | Law School Grad Date | Hourly Rate | Hours | Total Fees |
| Guy B. Wallace | 1993 | $925 | 2,203 | $2,037,775.00 |
| Mark T. Johnson | 1977 | $875 | 1,146.2 | $1,002,925.00 |

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

47

Ex. E - 299

| Sarah Colby | 1997 | $840 | 1,303.9 | $1,095,276.00 |
|---|---|---|---|---|
| Travis Close | 2015 | $680 | 1,021.1 | $694,348.00 |
| Ryan Bonner | 2014 | $625 | 84.1 | $52,562.50 |
| Abigail Avilucea | 2014 | $680 | 524.7 | $356,796.00 |
| Edgar Olivares | 2007 | $625 | 242.4 | $151,500.00 |
| Justin Proctor | 2007 | $625 | 1,485.4 | $928,375.00 |
| William Stewart | 2017 | $575 | 415.5 | $238,912.50 |
| Jennifer Uhrowczik | 2009 | $725 | 162.1 | $117,522.50 |
| Paralegals and Law Clerks | | | | |
| Sam T. Marks | N/A | $300 | 321.8 | $96,540.00 |
| **Subtotal of Hours** | | | 8,910.2 | |
| **Total of Attorneys' Fees** | | | | **$6,722,532.50** |
| **Total of Costs and Litigation Expenses** | | | | **$ 527,503.82** |
| **Total** | | | | **$7,250,036.32** |

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

48

Ex. E - 300

1

### Goldstein, Borgen, Dardarian & Ho

2    118.        The GBDH lodestar is $3,115,006.00 for 5,549.3 hours worked after the

3    exercise of billing judgment.  GBDH also seeks $360,655.61 for reimbursement of all other

4    litigation related expenses necessarily incurred in this litigation.  GBDH seeks a total of

5    $3,475,661.61 for its lodestar, costs and expenses in this litigation.

6

| Goldstein, Borgen, Dardarian, & Ho | | | | |
|---|---|---|---|---|
| Nevarez v. Forty Niners City of Los Angeles | | | | |
| Attorney | Law School Grad Date | Hourly Rate | Hours | Total Fees |
| Linda M. Dardarian | 1987 | $925 | 891.4 | $824,545.00 |
| Andrew P. Lee | 2006 | $710 | 1,449.6 | $1,028,435.00 |
| Megan Ryan | 2008 | $595 | 122.2 | $72,709.00 |
| Raymond Wendell | 2013 | $475 | 250.3 | $118,892.50 |
| Katharine Fisher | 2015 | $450 | 1,345.5 | $605,475.00 |
| Alan Romero | 2017 | $400 | 120.7 | $48,280.00 |
| Paralegals and Law Clerks | | | | |
| Mengfei Sun | N/A | $300 | | |
| Jacqueline Thompson | N/A | $325 | | |
| Scott G. Grimes | N/A | $325 | | |
| Damon Valdez | N/A | $295 | | |
| Stuart Kirkpatrick | N/A | $275 | | |
| **Subtotal of Hours** | | | 5,549.3 | |
| **Total of Attorneys' Fees** | | | | **$3,115,006.00** |
| **Total of Costs and Litigation Expenses** | | | | **$360,655.61** |
| **Total** | | | | **$3,475,661.61** |

### Peiffer Wolf Carr & Kane

19    119.        The lodestar after the exercise of billing judgment for Peiffer Wolf Carr &

20    Kane is $1,767,934.50 for 2,390.9 hours of work expended in prosecuting this case.  PWCK seeks

21    reimbursement of $310,230.71 for litigation-related costs expenses.  PWCK seeks $2,078,165.21

22    for its lodestar, costs and expenses in this litigation.

| Peiffer Wolf Carr and Kane LLP | | | | |
|---|---|---|---|---|
| Nevarez v. Forty Niners, et al. | | | | |
| Attorney | Law School Grad Date | Hourly Rate | Hours | Total Fees |
| Joseph Peiffer | 1999 | $975 | 39.2 | $38,220.00 |
| Adam Wolf | 2001 | $830 | 526.1 | $436,663.00 |
| Catherine Cabalo | 2001 | $785 | 1,394.1 | $1,094,368.50 |

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

49

**Ex. E - 301**

| | | | | |
|---|---|---|---|---|
| Tracey Cowan | 2006 | $710 | 56.9 | $38,761.00 |
| Brandon Wise | 2014 | $510 | 76.0 | $38,760.00 |
| Drew Morock | 2015 | $435 | 238.4 | $103,704.00 |
| Paralegals and Law Clerks | | | | |
| Tien Le | N/A | $290 | 60.2 | $17,458.00 |
| | | | | |
| **Subtotal of Hours** | | | 2,390.9 | |
| **Total of Attorneys' Fees** | | | | **$1,767,934.50** |
| **Total of Costs and Litigation Expenses** | | | | **$310,230.71** |
| **Total** | | | | **$2,078,165.21** |

//

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

50

**Ex. E - 302**

1

### SUMMARY OF APPLICATION FOR FEES, COSTS AND EXPENSES

120.     The following chart summarizes the reasonable attorneys' fees, costs and expenses incurred by Plaintiffs' Counsel herein for their work.

| Total Fees, Costs, and Litigation Expenses for All Firms | | |
|---|---|---|
| Nevarez v. Forty Niners | | |
| Schneider Wallace Cottrell Konecky LLP | Attorneys' Fees | $6,722,532.50 |
| | Hours Billed | 8,910.2 |
| | Costs | $ 527,503.82 |
| Goldstein, Borgen, Dardarian, & Ho | Attorneys' Fees | $3,115,006.00 |
| | Hours Billed | 5,549.3 |
| | Costs | $360,655.61 |
| Peiffer Wolf Carr and Kane LLP | Attorneys' Fees | $1,767,934.50 |
| | Hours Billed | 2,390.9 |
| | Costs | $310,230.71 |
| Total Attorneys' Fees | | $11,605,473.00 |
| Total Number of Hours | | 16,850.40 |
| Total of Costs and Litigation Expenses | | $1,198,390.10 |
| Total | | $12,803,863.14 |

121.     The total amount of reasonable attorneys' fees incurred by Class Counsel for their work herein after the exercise of billing judgment is $11,605,473.  This lodestar reflects a reduction of $ 1,389,048, thus reducing the total amount of fees claimed by 10.69%.

### Plaintiffs' Requested Costs and Litigation Expenses in This Motion

122.   Plaintiffs submit an application for reimbursement of costs and litigation expenses in this matter in the amount of $ 1,198,390.16.  As discussed herein, and in the accompanying Declarations of Jennifer A. Perez, Linda M. Dardarian and Adam B. Wolf, the vast majority of these costs and litigation expenses were for expert fees, deposition transcripts, document production, storage and copying costs, process servers, witness fees, and mediation.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

51

Ex. E - 303

123.   The following chart summarizes the costs and litigation expenses incurred by Class

Counsel in this matter, and for which reimbursement is sought:

| Total Costs and Litigation Expenses for All Firms | |
|---|---|
| Nevarez v. Forty Niners | |
| Schneider Wallace Cottrell Konecky LLP | $527,503.82 |
| Goldstein, Borgen, Dardarian, & Ho | $360,655.61 |
| Peiffer Wolf Carr and Kane LLP | $310,230.71 |
| Total Costs & Litigation Expenses | $1,198,390.10 |

124.   The Schneider Wallace firm submits an application for costs and litigation

expenses incurred in the amount of $527,503.82.  As discussed in the accompanying Declaration

of Jennifer Perez In Support of Plaintiffs' Motion for an Award of Reasonable Attorneys' Fees,

Costs and Expenses ("Perez Decl."), the vast majority of these costs were for expert fees,

deposition transcripts, document production, storage and copying costs, process servers, witness

fees, and mediation.  A true and correct copy of a detailed itemized list of our firm's costs and

expenses, as well as the costs and expenses incurred by GBDH and PWCK, are set forth in the

separate Appendix of Costs in support of this Motion. Also included in that Appendix are copies

of all invoices, bills and statements reflecting those costs for which Plaintiffs are seeking

reimbursement.

125.   In the opinion of the undersigned, the foregoing costs and expenses were

reasonably incurred by Class Counsel and were necessary to the successful prosecution of this

litigation.

### Comparison of Total Hours Expended By Class Counsel in This Case With
### the Total Hours Approved in Other Systemic Disability Access Class Actions

126.   Class Counsel's hours herein are less than those that were awarded in similar

systemic disability access cases in which I was class counsel, or that I am familiar with from my

work in this field.  For example, the district court found the following hours to be reasonable in

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

52

Ex. E - 304

*Lopez v. San Francisco Unified School District, Californians for Disability Rights, Inc. v. Cal. Dept. of Transp.*, and *Willits v. City of Los Angeles*:

| Hours Approved in Prior Disability Access Class Actions | | |
|---|---|---|
| **Californians for Disability Rights, Inc. v. California Department of Transportation, Case No.: C-06-5125 SBA (N.D. Cal. 2010)** | | |
| **Attorney** | **Firm** | **Hours** |
| Daniel B. Kohrman | AFL | 266.75 |
| Julie Nepveu | AFL | 690.95 |
| Summer Associates | AFL | 223.75 |
| Jose R. Allen | Skadden | 1838.2 |
| Sheryl Wu Leung | Skadden | 132.4 |
| Jason Breeding | Skadden | 324.3 |
| Nathaniel Fisher | Skadden | 179.3 |
| Legal Assistants | Skadden | 454.75 |
| Legal Technology Manager | Skadden | 61.1 |
| Legal Technology Analyst | Skadden | 3.6 |
| Lawrence Paradis | DRA | 3,814.6 |
| Ron Elsberry | DRA | 743.3 |
| Jennifer Bezoza | DRA | 42.5 |
| Roger Heller | DRA | 590.2 |
| Kevin Knestrick | DRA | 234 |
| Alexius Markwalder | DRA | 90.1 |
| Kasey Corbit | DRA | 201.8 |
| Mary-Lee Kimber | DRA | 4,395.8 |
| Stephanie Biedermann | DRA | 483.6 |
| Becca von Behren | DRA | 1052.4 |
| Stephanie Enyart | DRA | 145.8 |
| Senior Paralegals | DRA | 485 |
| Summer Associates | DRA | 541.1 |
| Paralegals | DRA | 996.5 |
| Law Clerks | DRA | 2,226.9 |
| Case Clerks | DRA | 181.5 |
| | | **TOTAL HOURS = 20,400.2** |
| **Willits et al v. City of Los Angeles, Case No. 10-cv-05782 (C.D. Cal. 2016)** | | |
| Guy Wallace | SWCK | 3591.2 |
| Mark Johnson | SWCK | 2213 |
| Andrew Lee | SWCK | 1103.8 |
| Jennifer Uhrowczik | SWCK | 331.4 |
| Kiran Prasad | SWCK | 285.7 |
| Michelle Nguyen | SWCK | 101.3 |
| Katharine White | SWCK | 76.0 |
| Amanda Riley | SWCK | 217.7 |
| Chris Springer | SWCK | 277.5 |

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

53

Ex. E - 305

| Charles Green | SWCK | 545.7 |
| Scott Gordon | SWCK | 100.1 |
| Sam Marks | SWCK | 1031.1 |
| David A. Borgen | GBDH | 113.8 |
| Linda Dardarian | GBDH | 1276.1 |
| Andrew Lee | GBDH | 576.3 |
| Jason Tarricone | GBDH | 278 |
| Katrina Eiland | GBDH | 207.3 |
| Nancy Hanna | GBDH | 44.4 |
| Raymond Wendell | GBDH | 133.7 |
| Scott E. Grimes | GBDH | 372.2 |
| Elizabeth Kramer | GBDH | 63.3 |
| Damon Valdez | GBDH | 946.4 |
| Wendy E. Whitt | GBDH | 329.3 |
| Charlotte Nguyen | GBDH | 100.3 |
| Stuart Kirkpatrick | GBDH | 178.5 |
| Jinny Kim | LAAW | 859.4 |
| Rachael Langston | LAAW | 180.2 |
| Alexis Alvarez | LAAW | 28.6 |
| Mary Broughton | LAAW | 567.9 |
| Michael Hsueh | LAAW | 77.4 |
| Shawna Parks | DRLC | 225.5 |
| Ronald Elsberry | DRLC | 63.7 |
| Surisa E. Rivers | DRLC | 896.4 |
| Trevor Finneman | DRLC | 114.3 |
| Unnamed Law Clerk | DRLC | 257.8 |
| Debra J Patkin | DRLC | 410.2 |
| Sage Reeves | DRLC | 236.9 |
| Shawna L Parks | Law Office of Shawna L. Parks | 15.2 |
| Jose R. Allen | Skadden | 560.2 |
| | **TOTAL HOURS = 18,987.8** | |

**Lopez v. San Francisco Unified School District, No. C99-03260, 385 F.Supp.2d 981 (N.D. Cal 2005)**

| Jose Allen | Skadden | 1846.5 |
| Scott Birkey | Skadden | 88.8 |
| Benjamin Ostapuk | Skadden | 80.5 |
| Carita Shanklin | Skadden | 55.55 |
| Summer Associate | Skadden | 55.7 |
| Legal Assistants | Skadden | 1352.28 |
| Paralegals | Skadden | 225.95 |
| Todd Schneider | SWCK | 26.8 |
| Guy Wallace | SWCK | 3380.6 |
| Clint Brayton | SWCK | 61.2 |
| Sarah Colby | SWCK | 256.4 |
| Jinny Kim | SWCK | 165.6 |
| Josh Konecky | SWCK | 29.5 |

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

54

**Ex. E - 306**

| | | |
|---|---|---|
| Elisa Laird | SWCK | 2004.7 |
| Galin Luk | SWCK | 149 |
| Wendy Musell | SWCK | 2159.5 |
| William Wilson | SWCK | 15 |
| Law Clerks/Paralegals | SWCK | 735.7 |
| Lewis Bossing | Legal Aid | 2752.98 |
| Claudia Center | Legal Aid | 223.6 |
| Sarah Colby | Legal Aid | 59.8 |
| Mary K. Gillespie | Legal Aid | 2128.8 |
| Jinny Kim | Legal Aid | 82.88 |
| Elizabeth Kristen | Legal Aid | 47.27 |
| William C. McNeil, III | Legal Aid | 13.37 |
| Patricia Shiu | Legal Aid | 795.82 |
| Guy Wallace | Legal Aid | 213.8 |
| Diane Webb | Legal Aid | 122.63 |
| Law Clerks | Legal Aid | 1025.87 |
| Paralegals | Legal Aid | 1359.7 |
| | **TOTAL HOURS = 21,515.8** | |

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

55

**Ex. E - 307**

**Class Counsel Undertook Substantial Risks in Their**

**Representation of the Plaintiff Class, and a**

**Contingent Risk Multiplier is Warranted**

127.     The prosecution of this litigation required an extraordinary effort from Class Counsel, and exposed Class Counsel, who all litigated this case without any advance, concurrent, or other guarantee of payment, to substantial risk.  These risks included the risk of not prevailing on their claims, or a substantial part of their claims.  For example, the parties disputed whether the 2010 ADAS or the 1991 ADAAG applied to the Stadium, and the case law is undeveloped in this area which focused on when groundbreaking for the Stadium took place.  If Class Counsel had lost on this issue, a significant number of alleged access barriers would have been eliminated from the case, thus limiting the scope of injunctive relief available to the Class and resulting in only partial success.  Similarly, there was little case law regarding Plaintiffs' claims regarding access to ticketing services, and the outcome in this area was therefore uncertain.  Further, as this Court is aware, numerous disability access standards regarding particular physical elements of the Stadium were disputed by the parties, and were the subject of competing expert opinions and interpretations, thus raising additional uncertainty and risk regarding the ultimate outcome of significant parts of Plaintiffs' case.

128.     This litigation also required an extraordinary expenditure of out of pocket costs and expenses by Class Counsel.  Class Counsel were required to expend $1,199,141.87 to fund the out-of-pocket costs and expenses of this litigation, thus making this litigation burdensome and risky.  This sum had to be advanced by Class Counsel for the length of the litigation with no guarantee of ultimate success. In the experience of Class Counsel, relatively few firms that work in the area of disability civil rights, or Plaintiffs'-side litigation more generally, would be either able to, or willing to, advance such a high level of costs and expenses.

129.     Notwithstanding the foregoing risks, burdens and obstacles, which were formidable, Class Counsel achieved an extraordinary result in this litigation.  Class Counsel achieved a Settlement that will make the Stadium, its parking lots and the pedestrian rights of way that serve the Stadium fully accessible to persons with mobility disabilities.  This outcome

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al. v. 49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

56

Ex. E - 308

1  vindicates the core purposes of the ADA of achieving the independence, equality and social

2  integration of persons with mobility disabilities.  In short, the result achieved by Class Counsel is

3  truly excellent, and fully supports the award of the requested multiplier.

4       130.     Finally, the multiplier requested by Class Counsel is modest.  This multiplier is

5  also important to compensate my firm for work that I was forced to decline during the pendency of this

6  litigation because of the extraordinary time and resource demands of this litigation.  Specifically,

7  because of this litigation, I declined or deferred requests for representation regarding disability access

8  regarding numerous private and public entities. Many cases I declined likely would have generated

9  substantial fees on a shorter timeframe.

10       131.     In summary, taking into account the novelty and difficulty of the issues

11  presented, the massive scope this litigation, its protracted multi-year duration, the Defendants'

12  intransigent opposition, the great expense of conducting discovery herein and litigating this

13  matter, as well as the resultant extraordinary burdens (including almost $1.2 million in costs and

14  litigation expenses that Class Counsel actually paid out of their own pockets, with no guarantee of

15  recovery) and risk of loss borne by Class Counsel over the past three years, the requested

16  multiplier should be granted as part of a fair and reasonable award of attorneys' fees given the

17  excellent results achieved by Class Counsel on behalf of the Plaintiff Classes.

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

57

**Ex. E - 309**

**CONCLUSION**

132.      As described above and set forth in the Settlement Agreement itself, this Settlement provides extraordinary relief for Class Members. The injunctive relief is comprehensive, and I believe the damages fund is by far the largest ever obtained in a physical access case under Titles II or III of the ADA.  Considering the totality of this relief, the substantial risk and delay of continued litigation, and the importance of the accessibility of the Stadium and its related facilities to the Class Members, the proposed Settlement constitutes an excellent result.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed on June 25, 2020, in Emeryville, California.



/s/ *Guy B. Wallace*
Guy B. Wallace
Attorneys for Plaintiffs

[CORRECTED] DECLARATION OF GUY B. WALLACE ISO PLTFS' MOT. FOR FEES AND COSTS
*Nevarez, et. al.* v. *49ers, et al.*, Case No. 5:16-cv-07013-LHK (SVK)

58

**Ex. E - 310**