UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>                         Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>                         Defendants. | Case No.: 20-cv-00406-AJB-DDL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERTS**<br><br>**(Doc. No. 779)** |

Before the Court is Plaintiffs' Motion to Exclude Opinions of Defendants' Experts ("Motion"). (Doc. No. 779.) The motion has been fully briefed. (Doc. Nos. 779; 795; 804.) On July 24, 2025, the Court held a hearing on Plaintiffs' Motion. (Doc. No. 939.) For the

1

reasons set forth below, the Court **GRANTS IN PART and DENIES IN PART** Plaintiffs' Motion to Exclude. (Doc. No. 779.)

## I.    BACKGROUND

The facts of this case have been recited in previous orders. (*See* Doc. No. 219.) Plaintiffs are current or former inmates of San Diego County Jail facilities (the "Jail"), operated by Defendants San Diego County Sheriff's Department ('SDSO") and the County of San Diego ("the County") (collectively, "Defendants"). The Jail consists of seven facilities: (1) East Mesa Reentry Facility; (2) George Bailey Detention Facility; (3) Las Colinas Detention and Reentry Facility; (4) Rock Mountain Detention Facility; (5) San Diego Central Jail; (6) South Bay Detention Facility; and (7) Visa Detention Facility.

Plaintiffs bring this action on behalf of "themselves and the approximately 4,000 incarcerated people who are similarly situated on any given day" to "remedy the dangerous, discriminatory, and unconstitutional conditions in the Jail." (Third Amended Complaint ("TAC"), Doc. No. 231, ¶ 4.) Specifically, Plaintiffs contend Defendants' policies and practices contribute to the high death rates in the Jail, which "has for years exceeded the rates nationally and in other large California jails, [and] it reached chilling heights in 2021 when 18 people died, amounting to a death rate of 458 incarcerated people per 100,000." (*Id.* ¶ 1.)

An abbreviated procedural history of this case is as follows. In November 2023, the Court certified a Class and Subclasses. (Doc. No. 435.) Fact discovery closed in May 2024, (*see* Doc. Nos. 470; 636; 654), and expert discovery closed in November 2024 (Doc. No. 721). In December 2024, the parties reached a settlement as to Plaintiffs' third claim alleging violations of the Americans with Disabilities Act. (Doc. Nos. 776; 777; 792.) On December 16, 2024, Plaintiffs filed the instant Motion to Exclude the Opinions of Defendants' Experts. (Doc. No. 779.)

## II.    PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINIONS

Plaintiffs move to exclude all testimony of Defendants' medical, mental health, dental, and racial discrimination experts and portions of the testimony of Defendants'

2

safety and security and environmental experts. (Doc. No. 779-1 at 6.)[1] Defendants filed an opposition (Doc. No. 795), to which Plaintiffs replied (Doc. No. 804).

## A.    Legal Standard

Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02-CV-2258 JM(AJB), 2007 WL 935703, at *4 (S.D. Cal. Mar. 7, 2007).

Prior to admitting expert testimony, the trial court "must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). The trial court acts as a "gatekeeper" by making a preliminary determination of whether the expert's proposed testimony is not only relevant but reliable. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014). This two-step assessment requires consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether the reasoning or methodology properly can be applied to the facts in issue (the relevance prong). *Daubert*, 509 U.S. at 592–93; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998).

The proponent of the expert testimony has the burden of proving that the proposed expert testimony is admissible under Federal Rule of Evidence 702, *Daubert*, and its

---

[1]    Citations to the record refer to the CM/ECF system page number stamped in blue at the top of each page rather than the page numbers at the bottom of each filing.

progeny. *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). This means "the district court can exclude an expert's opinion if the expert fails to identify and defend the reasons" for his conclusions. *Id.* Where the expert's testimony is not the product of peer-reviewed research produced outside the course of litigation, "the expert 'must explain precisely how [he] went about reaching [his] conclusions and point to some objective source . . . to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field.'" *Id.* at 597 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318–19 (9th Cir. 1995) ("*Daubert II*")) (formatting in original).

In general, the *Daubert* analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's ultimate conclusions. *Daubert*, 509 U.S. at 595. However, the Supreme Court has cautioned that "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). As such, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

## B. Discussion

Plaintiffs move to exclude the testimony of:

(1) Defendants' medical expert, Dr. Owen Murray,

(2) Defendants' mental health expert, Dr. Joseph Penn,

(3) Defendants' dental expert, Dr. Scott Reinecke,

(4) Defendants' racial discrimination excerpt, Dr. Brian Withrow,

(5) Defendants' safety and security expert, Lenard Vare,

(6) Defendants' environmental expert, Henrietta Peters, and

(7) all expert testimony opining on whether Defendants complied with the Constitution or were deliberately indifferent. (*See generally* Doc. No. 779-1.)

/ / /

/ / /

/ / /

4

1      **1.    Dr. Owen Murray**

2          Plaintiffs move to exclude all of Dr. Owen Murray's opinions, alleging his analysis

3      suffers from "profound methodological flaws."[2] (Doc. No. 779-1 at 8.) Dr. Murray has

4      been retained as a medical expert by Defendants and has "more than 29 years of experience

5      in correctional medicine." (*Id.* at 4.) For the past 25 years, Dr. Murray has worked for the

6      University of Texas Medical Branch Offender Health Services Program and serves as the

7      Vice President of Offender Health Services. (*Id.*) Dr. Murray also currently serves as a

8      Commissioner for Accreditation for the American Correctional Association. (*Id.*)

9          **i.    Adequate Medical Care**

10         Dr. Murray's expert report contains multiple opinions stating the Jail provides

11     adequate medical care.[3] For example, Dr. Murray provides:

12         > Our review of the [San Diego Sheriff's Office] SDSO healthcare delivery
           > system demonstrated unequivocally that the SDSO is providing a level and
13         > quality of healthcare that is consistent with and, in many aspects, exceeds
           > community standards. There is a clear and definite commitment on the part of
14         > the SDSO to ensure that timely and quality healthcare is available to all
15         > [incarcerated persons] IPs within their jail facilities.

16     (Murray Report at 43.)

17         Plaintiffs assert these opinions are inadmissible because Dr. Murray offered them

18     without reviewing evidence related to in-custody deaths, which are "critically relevant to

19     the provision of medical care at the Jail." (Doc. No. 779-1 at 8.) Plaintiffs contend that

20     deaths in the Jail are a paramount issue in this litigation and are directly related to the

21     adequacy of medical care at the Jail. (*Id.* at 9.) Similarly, Dr. Murray did not review any

22     materials related to the Jail's mortality and morbidity committee, which analyzes whether

23     failures in care contributed to an in-custody death. (*Id.* at 10.) Plaintiffs rely on two cases

24     from this Court in support. (*Id.* at 8–10.) First, Plaintiffs assert that when an expert has only

---

[2]      Plaintiffs offer Dr. Murray's expert report with the instant Motion to Exclude. (Doc. No. 781 at 3–154, Expert Report of Dr. Owen Murray ("Murray Report").)
[3]      As discussed below, *infra* § II.B.7, several of these opinions are excluded because they are improper legal opinions.

5

a "constricted and somewhat biased world view" to base their opinion on, this Court has explained that conclusions may not be "reliably drawn." (*Id.* at 8 (quoting *San Diego Comic Convention v. Dan Farr Productions*, No.: 14-cv-1865 AJB (JMA), 2017 WL 4227000 (S.D. Cal. 2017) (J. Battaglia)).) Moreover, Plaintiffs cite *In re Incretin-Based Therapies Products Liability Litigation*, 524 F. Supp. 3d 1007 (S.D. Cal. 2021) (J. Battaglia), asserting this Court has excluded expert opinions because they were based on a "cherry-picked selection of favorable data" which led to opinions that were "unduly results-driven, [and] not good science . . . ." (*Id.* at 9.) Plaintiffs contend, "[n]otwithstanding the available evidence of serious and systemic problems with the medical care at the Jail highlighted by the deaths that have occurred, Dr. Murray did not offer any opinions regarding the medical care related to *any* in-custody death." (*Id.* at 10.)

In response, Defendants assert there is no legal support for the assertion that Dr. Murray's opinions are unreliable because he did not review in-custody death records, and that Plaintiffs' assertion that the records are "critically relevant to the provision of medical care at the Jail" is unsupported. (Doc. No. 795 at 8.) Defendants also assert, as raised by Plaintiffs, that "Dr. Murray does not offer any opinions regarding the medical care related to *any* in custody death." (*Id.* at 10 (quoting Doc. No. 779-1 at 10).) Defendants also contend the cases cited by Plaintiffs are inapplicable because Dr. Murray selected the criteria for which records he wanted to consider, unlike the experts in *San Diego Comic Convention* and *In re Incretin*. (*Id.* at 9–10.)

In *San Diego Comic Convention*, this Court found the defendants failed to establish the contested expert's opinions were sufficiently reliable to be admissible for several reasons. 2017 WL 4227000, at *6–7. First, the Court found the majority of the materials on which the expert based his opinions were provided to him by defendants' counsel. *Id.* at *7. The Court noted it was "unpersuaded that [the expert's] conclusion could be reliably drawn from the constricted and somewhat biased world view that [the expert] basis [sic] his opinion on." *Id.* Moreover, the expert's report failed to explain the reasoning or methodology behind his opinions. *Id.*

6

Similarly, in *In re Incretin*, this Court granted a motion to exclude the expert testimony of Dr. Wells "because his methodology has been unreliably applied due to his 'cherry-picking of studies . . . .'" 524 F. Supp. 3d at 1037–38. Dr. Wells had excluded a study from his report but "offered no reason as to why it would be scientifically sound" to exclude the study. *Id.* at 1038. The Court ultimately found the "circumstances support a finding that Dr. Wells 'developed [his] opinions expressly for purposes of testifying,' and that his analysis was unduly results-driven." *Id.* at 1038 (quoting *Daubert*, 43 F.3d at 1317, 1319 (noting that if an expert's testimony does not stem from research independent of litigation, the expert must point to some objective source "to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field")).

Here, Defendants assert Dr. Murray selected the criteria for which records he wanted to consider, rather than receiving a majority of the materials from Defendants' counsel. (Doc. No. 795 at 9.) However, Defendants do not address whether Dr. Murray "cherry-picked" the types of records on which he bases his opinions. Rather, Defendants assert Plaintiffs' reliance on *In re Incretin* is inapplicable because "[c]linical studies are not at issue in this case" and "Defendants did not decide what records to provide Dr. Murray for review." (*Id.* at 9–10.)

In Dr. Murray's report, he states:

> [San Diego Sheriff's Office] SDSO deaths in custody has been a metric central in the evolution of the Dunsmore litigation. In 2022 the San Diego County Citizens' Law Enforcement Review Board (CLERB) contracted with Analytica Consulting (AC) to analyze in-custody death data over the prior ten years. AC's report and the historical in-custody death data are used, in part, to support the Plaintiffs' claim that SDSO has a broken healthcare delivery system, and it is this broken system that is responsible for the increased death rates compared to other comparably sized California municipalities.

(Murray Report at 41.) Dr. Murray goes on to state that "[i]n-custody mortality is an important metric that should be reviewed in all jail healthcare systems." (*Id.* at 43.) Dr. Murray's report states there were five non-homicide, non-suicide, in-custody deaths in

2024, and that "[t]hese medical records were provided and reviewed." (*Id.* at 42.) Dr. Murray had a reviewer draft summaries of these five medical records but Dr. Murray did not offer any opinions regarding these five deaths. (*See id.* at 149–51; Deposition of Dr. Owen Murray ("Murray Depo."), Doc. No. 781-1 at 702–49, 725–26 (confirming the summaries of the five deaths did not include any analysis or recommendations, and that no other decedent records were reviewed).) Dr. Murray further discusses in-custody deaths at the Jail, including synopses of his conversations with Dr. Peter Freedland and Dr. Nas Rafi, presumably employees of Defendants. (Murray Report at 43–44.) Dr. Murray does not explain why he did not review in-custody death records.

Moreover, neither Dr. Murray nor anyone on his team reviewed any materials related to the Jail's mortality and morbidity committee ("M&M committee"), which analyzes whether failures in care contributed to an in-custody death. (*See* Murray Depo. at 722–23.)

While Plaintiffs contend Dr. Murray's opinion must be excluded because he did not review the records of in-custody deaths or materials from the M&M committee, this does not warrant exclusion under Rule 702. *See United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994) ("The impact of imperfectly conducted laboratory procedures might therefore be approached more properly as an issue not going to the admissibility, but to the weight of the . . . evidence."), *overruled in part by United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014). To the extent Plaintiffs argue Dr. Murray never viewed the records of in-custody deaths, such contentions and possible flaws in Dr. Murray's testimony can be addressed through the presentation of contrary evidence and vigorous cross-examination. *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (stating that "shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not by exclusion"); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *United States v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2005) ("As long as the

process is generally reliable, any potential error can be brought to the attention of the jury through cross-examination and the testimony of other experts.").

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Murray's testimony on this basis.

### ii.    Appendix J to Expert Report

Next, Plaintiffs move to exclude Appendix J to Dr. Murray's expert report and any opinions stemming therefrom. (Doc. No. 779-1 at 11–15.) Appendix J contains summaries of the care provided to 81 current and former incarcerated people in the Jail and opinions regarding whether that care met the "standard of care." (Murray Report at 60–120.) Plaintiffs assert these summaries and opinions should be excluded because they were performed by reviewers hired by Dr. Murray, each using a standard Dr. Murray described as "unique" and "subjective," without Dr. Murray taking any steps to confirm that the findings and opinions were accurate. (Doc. No. 779-1 at 12.)

Plaintiffs first assert the conclusions in Appendix J that the care provided to 81 individual patients met the "standard of care" must be excluded because Dr. Murray improperly "parrot[ed] the opinions of other experts without independently investigating the underlying evidence." (Doc. No. 779-1 at 12 (quoting *McCoy v. DePuy Orthopaedics, Inc.*, No.: 22-CV-2075 JLS (SBC), 2024 WL 1705952, at *16 (S.D. Cal. Apr. 19, 2024)).) The 81 summaries and opinions were prepared by five reviewers hired by Dr. Murray, none of whom Defendants have sought to introduce as experts in this case. (Doc. No. 779-1 at 12.) The reviewers opined that the care provided met the standard of care for 73 class members, met the standard of care "with reservations" for two class members, and did not meet the standard of care for six class members. (*See* Murray Report at 60–120.) Plaintiffs argue that Dr. Murray did not independently investigate whether the summaries were accurate based on the underlying medical records or whether he agreed with the reviewers' opinion regarding the standard of care:

Q.    You didn't substantively review the records to evaluate the care provided to patients, did you?

9

1    A.    I did not, no.

2    . . .

    Q.    Are the opinions regarding whether the standard of care was met for the individual patients in Appendix J, are those your opinions as well?

    A.    Well, they're the individual reviewers', whose opinions I trust.

    Q.    But, again, you didn't review the file substantively to confirm whether you agree with their conclusions that the standard of care was met. Right?

    A.    No. I did not review the medical record files.

(Murray Depo. at 708–09, 717.) Plaintiffs assert that the opinions of the reviewers and any of Dr. Murray's opinions that rest on the reviewers' opinions should be excluded on this basis.

Defendants respond that experts "can appropriately rely on the opinions of others if other evidence supports [their] opinion, and the record demonstrates that the expert conducted an independent evaluation of that evidence." (Doc. No. 795 at 13 (quoting *Walker v. Conagra Brands, Inc.*, No. 8:20-cv-01679-FWS-KES, 2023 WL 8885148, at *10 (C.D. Cal. Sept. 21, 2023)).) Defendants additionally claim that expert opinions may find a basis in part "on what a different expert believes on the basis of expert knowledge not possessed by the first expert." (*Id.* at 13 (quoting *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002)).) The Seventh Circuit explains, "the Committee Notes to the 1972 Proposed Rule 703 give the example of a physician who, though not an expert in radiology, relies for a diagnosis on an x-ray." *Dura Auto. Sys. of Indiana, Inc.*, 285 F.3d at 613. "We too do not 'believe that the leader of a clinical medical team must be qualified as an expert in every individual discipline encompassed by the team in order to testify as to the team's conclusions.'" *Id.* (quoting *Walker v. Soo Line R.R.,* 208 F.3d 581, 589 (7th Cir. 2000)).

Here, Defendants satisfy both elements of the two-part test laid out in *Walker*: (1) other evidence supports Dr. Murray's opinion; and (2) the record demonstrates that Dr. Murray conducted an independent evaluation of the evidence. *See Walker*, 2023 WL 8885148, at *10. First, "other evidence" supports Dr. Murray's expert opinion including his "personal review of the medical records of the named Plaintiffs" and "personal

inspection of each of the Jail facilities—accompanied by subject matter experts in the areas of nursing services (Mr. Kirk Abbott), pharmacy and medical records (Dr. Melanie Roberts), and administration (Mr. Kelly Coates)." (Doc. No. 795 at 7); *see McCoy*, 2024 WL 1705952, at *12 (S.D. Cal. Apr. 19, 2024) (finding expert's opinions to be "her own" because she "did not rely solely on [other expert's] opinions" but "[i]nstead . . . considered additional evidence, such as Plaintiff's medical records, deposition transcripts, expert reports, scientific literature," etc.). Second, Defendants present evidence that Dr. Murray conducted an independent evaluation of the medical records summaries in Appendix J. In the Declaration of Dr. Owen Murray, filed with Defendants' opposition, Dr. Murray attests:

> I understand that Plaintiffs claim in their motion that I did not do anything to confirm that I agreed with the reviewer determinations of "standard of care" as evidenced in Appendix J to my report. This is untrue and not what I testified to in my deposition. Plaintiffs cut out portions of my testimony relevant to this topic, and did not ask me specifically whether I independently reviewed the summaries of medical records or whether I agreed with their conclusions. I did conduct such a review. . . . To be clear, as a result of my independent review of both the summaries of care and opinions of standard of care espoused by each reviewer as to each medical chart reviewed, I agreed with each reviewer's opinions regarding standard of care provided to the incarcerated patient.

(Declaration of Dr. Owen Murray ("Murray Decl."), Doc. No. 795-1, ¶ 7.) Because Defendants have demonstrated other evidence supports Dr. Murray's opinion, and Dr. Murray conducted an independent evaluation of the evidence at issue, the Court declines to exclude Appendix J on the first basis argued by Plaintiffs.

Plaintiffs further assert the reviewers' opinions regarding the standard of care should be excluded because the reviewers did not apply a definable methodology. (Doc. No. 779-1 at 13.) Specifically, Plaintiffs assert Dr. Murray's reviewers did not rely on any principles or standards in opining that care at the Jail met the standard of care. (*Id.*) Moreover, Plaintiffs contend that in *Plata v. Newsom*, No. 01-cv-1351-JST, 2021 WL 5410608 (N.D. Cal. Nov. 17, 2021), a class action regarding medical care provided by the California Department of Corrections and Rehabilitation, Dr. Murray rejected the same methodology

11

his reviewers used here. (Doc. No. 779-1 at 14 (citing Declaration of Dr. Owen Murray in *Plata v. Newsom* ("*Plata* Murray Decl."), Doc. No. 779-3 at 8–15, ¶¶ 14–16).) In *Plata*, Dr. Murray criticized the opposing party's experts on the grounds that a "subjective review of care provided to a particular patient . . . is not a statistically valid or sound method of evaluating the overall quality of correctional healthcare that is delivered at a specific institution or system." (*Plata* Murray Decl. ¶ 16.) Dr. Murray goes on to state that "to properly evaluate the quality of correctional healthcare that is delivered at a specific institution or system wide, an objective process must be used where critical processes are identified along with an expected outcome." (*Id.*) Dr. Murray concluded that the opposing party's "reliance on a subjective approach, however, is designed to and does lead to a slanted report that (at best) identifies a difference of opinion with another care provider." (*Id.*) Indeed, Dr. Murray stated that while "there is no 'adequate' standard or generally known 'standard of care' for all forms of medical care provided in a correctional setting . . . the standards that should be referenced, and which should guide this type of subjective evaluation of patient care, would be studies and/or recent medical publications specific to the particular issue reviewed." (*Id.* ¶ 15.)

Defendants respond that Dr. Murray clearly defined his methodology, which is distinguishable from the critiqued methodology at issue in *Plata*, and if Plaintiffs still have concerns, Plaintiffs can impeach Dr. Murray through cross-examination. (Doc. No. 795 at 14–15.) Here, the patient files reviewed by Dr. Murray's team "were selected utilizing a blind random-selection software tool" and the "medical records were copied in their entirety and provided in PDF format." (*Id.* at 8.) Dr. Murray's report details, "[f]or all chart analyses, a random selection methodology was employed to best represent the population, eliminate bias, facilitate inference, and enhance credibility." (Doc. No. 781 at 9.) By contrast, in *Plata*, Dr. Murray opined that hand-selected "records of 'medium to high-risk patients with chronic diseases and other serious medical conditions . . . is not consistent with . . . most state correctional health systems' quality assurance indicators." (Doc. No. 795 at 15 (citing Doc. No. 937-1 at 12).) Additionally, in the present case, Dr. Murray

12

testified that he informed the reviewers to assess the level of care provided to the patients on a scale of 0 to 100 and to indicate that the care met the standard of care if the score was 80 or higher. (Doc. No. 937-2 at 464.) This methodology is definite and clear. While Dr. Murray acknowledges that human reviewers' analysis of care contains inherent subjectivity, "a subjective approach, . . . identifies a difference of opinion with another care provider[,]" which might be useful information, even if the approach is "slanted." (*Id.*)

Here, the Court finds Dr. Murray's methodology has "sufficient factual grounds on which to draw conclusions." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025–26 (9th Cir. 2022). The patient records analyzed were randomly selected. (Doc. No. 937-2 at 296–98.) Additionally, all reviewers evaluated the medical care on the same 0 to 100 scale. (*See generally id.*) To the extent Defendants acknowledge the reviewers' analyses may be inherently subjective, Plaintiffs may examine any weaknesses regarding this subjectivity through vigorous cross examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Appendix J to Dr. Murray's report.

### iii.    The Jail's Compliance with NCCHC Standards

Plaintiffs further contend Dr. Murray's opinions regarding the Jail's compliance with the standards promulgated by the National Commission on Correctional Health Care ("NCCHC") are unreliable. (Doc. No. 779-1 at 15.) Specifically, Plaintiffs assert Dr. Murray failed to apply the facts of the case to establish whether and how the Jail met NCCHC standards. (*Id.* at 16.) NCCHC's standards are comprised of "compliance indicators" that guide decisions on whether to grant NCCHC accreditation. (*Id.* (citing Technical Assistance Report—San Diego Sheriff's Department, NCCHC Resources Inc. ("NCCHC Report"), Doc. No. 779-3 at 151–289, at 160).) Plaintiffs assert that in 2017, NCCHC issued an exhaustive 139-page report concluding that the Jail failed to meet nearly all of the standards for adequate medical care. (*Id.* (citing NCCHC Report).)

Defendants respond that Plaintiffs fail to inform the Court of the fact that the NCCHC revised their Jail Standards. (Doc. No. 795 at 15.) Defendants also assert Dr. Murray's report denotes the basis for his opinion on compliance was "determined through information obtained on facility inspections, medical record reviews, interviews with SDSO healthcare and sworn staff, review of healthcare policy procedure, institutional directives, training bulletins, and observation of health care delivery." (*Id.* (quoting Murray Report at 34).)

Plaintiffs reply that Defendants do not dispute that NCCHC standards have multiple compliance indicators a correctional facility must satisfy to demonstrate compliance, and that Dr. Murray did not list those indicators. (Doc. No. 804 at 9.) Further, Plaintiffs contend Dr. Murray did not provide analysis for how he determined that the Jail met the indicators. (*Id.*) Plaintiffs also assert that Defendants' assertions that the NCCHC revised its standards in 2018 is irrelevant because there is no evidence that the process for determining compliance has changed. (*Id.* n.5.)

In Dr. Murray's report, he explains that NCCHC accreditation is not a requirement for jails in the United States, and that most jails in the United States do not have NCCHC accreditation. (Murray Report at 33.) In 2017, NCCHC Resources Inc. ("NRI")—at the request of the Sheriff's Office—was selected to provide guidance to the Department regarding how to accomplish NCCHC accreditation. (*Id.*) "At that time, NCCHC had 40 Essential standards and 27 Important of which 100% of the Essential and 85% of the Important were required to be met for accreditation." (*Id.* at 33–34.) Based on NRI's review, the Sheriff's Office was found to be compliant with 31% (26/38) of the Essential standards and 24% (6/25) of Important standards. (*Id.* at 34.)

Dr. Murray and his team, "experienced with the NCCHC accreditation process, thought it appropriate to evaluate SDSO's compliance with the current NCCHC 2018 standards for Health Services in Jails." (*Id.*) Dr. Murray determined compliance "through information obtained on facility inspections, medical record reviews, interviews with SDSO healthcare and sworn staff, review of healthcare policy procedure, institutional

14

directives, training bulletins, and observation of health care delivery." (*Id.*) The results of Dr. Murray's review found the Sheriff's Office was "compliant with 93% (33/39) of the Essential and 100% (20/20) of the Important 2018 Standards as is shown below." (*Id.*) Thereafter, Dr. Murray's report identifies a standard and then states its conclusion. (*See id.* at 34–40.) For example:

> **J-A-01 Access to Care – Essential**
> Standard: Inmates have access to care for their serious medical, dental, and mental health needs.
> Conclusion: SDSO meets the compliance indicators for this standard.

(*Id.* at 34.)  Dr. Murray also confirmed during deposition that he did not offer the evidence to support his findings in his report:

> Q.    In your [NCCHC] analysis, you did not list out any of the compliance indicators. Right?
> A.    No. As I said, this - - this was just a general review of the standards based on what I lined out there, what we had seen, what we had reviewed, who we talked to. So, as I said, I mean, it wasn't faux, but we didn't get into all of the standards laying out all of the particulars of each one.
> Q.    And you did not list the evidence that supported your findings for specific indicators, did you?
> A.    No, other than to the extent that it could be generated out of what we've done. But no, it was not - - we didn't lay out the evidence.

(Murray Depo. at 748.)

Here, Dr. Murray made an assessment through "information obtained on facility inspections, medical record reviews, interviews with SDSO healthcare and sworn staff, review of healthcare policy procedure, institutional directives, training bulletins, and observation of health care delivery." (*Id.* (quoting Murray Report at 34).) "Trained experts commonly extrapolate from existing data[,]" *Joiner*, 522 U.S. at 146, and in the Court's view that's what Dr. Murray did here. Plaintiffs may reveal any weaknesses of Dr. Murray's assessment, including the failure to consider the specific NCCHC compliance indicators, through vigorous cross examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Murray's opinions on NCCHC accreditation compliance.

### iv.     Medical Screening and Sick Call Processes

Plaintiffs next contend Dr. Murray's opinions about medical screening and sick call processes—in particular, the charts contained in Appendices G, H, and I, as well as any conclusions based on those Appendices—should be excluded under Rules 702 and 703. (Doc. No. 779-1 at 17.) Appendices G and H purport to analyze the Jail's intake and medical screening process and initial health assessment process. (*Id.*) Appendix I purports to analyze the Jail's sick call process; specifically, whether incarcerated people who submit requests for medical care are seen by a nurse within 24 hours of their request being received. (*Id.*) Plaintiffs assert Dr. Murray did not review or evaluate these jail processes himself, nor did he familiarize himself with the review performed by his reviewer. (*Id.*)

Defendants do not address this argument in their response brief. (*See generally* Doc. No. 795.) At the July 24, 2025 hearing, Defendants' counsel noted Defendants' opposition. (Doc. No. 940.) Dr. Murray's report provides that Appendix G was comprised from "[a] random selection process" "to audit 75 IP [incarcerated person] health records from a pool of 121 records." (Murray Report at 14.) Appendix H includes an analysis of "the same 75 IP [incarcerated person] health records" which "were reviewed to ascertain if the initial health assessment, which includes a health history and physical examination, was performed with 14 days from initial intake date." (*Id.* at 15.) Finally, Appendix I is composed of another "random selection process" "involving 25 IP [incarcerated person] records selected from a pool of 120 to verify the timely access to care for nurse sick call requests." (*Id.* at 16.)

As determined above, the randomized selection of health records appears of sound methodology. While Dr. Murray's deposition testimony reflects that Dr. Murray would need to confer with his colleagues as to discrepancies in the appendices, discrepancies in the data that Dr. Murray could not immediately explain during his deposition does not warrant exclusion under Rule 702. *See Chischilly*, 30 F.3d at 1154 ("The impact of

16

imperfectly conducted laboratory procedures might therefore be approached more properly as an issue not going to the admissibility, but to the weight of the . . . evidence."), *overruled in part by Preston*, 751 F.3d at 1008. To the extent Plaintiffs argue Dr. Murray never completed the audits in Appendices G, H, and I, or reviewed the underlying records making up the appendices, such contentions and possible flaws in Dr. Murray's testimony can be addressed through the presentation of contrary evidence and vigorous cross-examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Murray's opinions on medical screening and sick call processes.

### v.     Treatment of Substance Use Disorders

Finally, Plaintiffs move to exclude Dr. Murray's opinions regarding treatment for substance use because Dr. Murray admits he is not a substance use disorder expert. (Doc. No. 779-1 at 19.) Defendants respond that Plaintiffs narrowly read Federal Rule of Evidence 702 and Plaintiffs' "assertion that Dr. Murray needs to be an expert in all areas of medicine and medical treatment in order to opine that the provision of such medicine and medical treatment occurs in the Jail as part of 'adequate medical care' is incorrect." (Doc. No. 795 at 16.) Defendants contend Dr. Murray "was made aware of the existence of and efficacy of the Jail's MAT [Medication Assisted Treatment] program during his interview of Dr. Rafi, a Jail physician" and that Dr. Murray could reasonably rely on information obtained from Dr. Rafi. (*Id.*)

In Dr. Murray's report, he opines the following:

*The Sheriff's Department fails to provide adequate medical care including, medication assisted treatment (MAT) for incarcerated people with substance abuse disorder.*
Response: **FALSE**

. . .

*The Sheriff's Department fails to provide adequate medical care for incarcerated people entering the jail under the influence of alcohol and drugs.*
Response: **FALSE**

17

(Murray Report at 44.) At his deposition, Dr. Murray testified that he is "not a substance use disorder expert . . . ." (Murray Depo. at 727.)

    Here, the Court finds Dr. Murray's interview of Dr. Rafi provides a sufficient factual basis for Dr. Murray's opinions on the Jail's treatment of substance use disorders. *See Dura Auto. Sys. of Indiana, Inc.*, 285 F.3d at 613 ("We too do not 'believe that the leader of a clinical medical team must be qualified as an expert in every individual discipline encompassed by the team in order to testify as to the team's conclusions.'") (quoting *Soo Line R.R.,* 208 F.3d at 589). To the extent Dr. Murray already admitted that he is not a substance use disorder expert, such admissions and possible flaws in Dr. Murray's testimony can be addressed through vigorous cross-examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Murray's opinions on the medication assisted treatment (MAT) program and opinions regarding treatment for substance use.

### 2.        Dr. Joseph Penn

Plaintiffs move to exclude the entirety of the expert report of Dr. Joseph Penn, Defendants' mental health expert, "because of multiple, serious methodological flaws with his work that undermine the foundation of his opinions and render his testimony unreliable." (Doc. No. 779-1 at 19–20.) The Court addresses Plaintiffs' arguments in turn.

### i.      Dr. Penn's Review of Records Related to In-Custody Suicides and Mental Health-Related Deaths

Dr. Penn's report states the following regarding in-custody suicides and mental health-related deaths:

> The SDSO Sheriff's Office Has Adequate Policies and Procedures to Identify, Treat, Track, and Supervise IPs [Incarcerated Persons] at Risk for Suicide and Provides Clinically Appropriate Mental Health and Psychiatric Services to SDSO IPs Who are Potentially Suicidal and/or Engaging in Self-Harm[.]

(Doc. No. 781 at 156–380, Expert Report of Dr. Joseph V. Penn, "Penn Report" at 201.)

18

1  2     The Sheriff's Department Provides Adequate care to IPs [Incarcerated Persons] with Acute Mental Health Needs[.]

3  (*Id.* at 205.)

4     As with Dr. Murray, Plaintiffs assert Dr. Penn's conclusions about the adequacy of
5  mental health care at the Jail should be excluded as unreliable because he failed to review
6  records or assess substantive information related to any in-custody deaths. (Doc. No. 779-
7  1 at 20.) Moreover, Plaintiffs state that Dr. Penn reviewed patient records for only the
8  twelve named Plaintiffs. (*Id.* at 21.) In support, Plaintiffs cite *Jensen v. Shin*, 609 F. Supp.
9  3d 789 (D. Ariz. 2022) ("*Jensen*"), in which the court found "Dr. Penn's methodology was
10 deeply flawed" and that numerous aspects of his testimony had "no merit," were "of no
11 value," were "appalling and overwhelmingly contradicted by the evidence," and "ma[de]
12 no sense." *Id.* at 843, 851, 853, 856–57, 862. The *Jensen* court concluded "[i]t is difficult
13 to overstate Dr. Penn's lack of credibility. . . . His ignorance of fundamental aspects of
14 Defendants' health care system was obvious and his testimony contradicted the undisputed
15 evidence at trial." *Id.* at 856 n.28. Plaintiffs assert Dr. Penn used the same methodology in
16 this case as he used in *Jensen*. (Doc. No. 779-1 at 22 (citing Deposition of Dr. Joseph Penn,
17 Doc. No. 781, at 110:11–13).)

18    Defendants respond the Court should not exclude Dr. Penn's report because there is
19 no factual or legal support for the assertion that a non-review of in-custody death records
20 leaves Dr. Penn's analysis lacking. (Doc. No. 795 at 16.) Moreover, Defendants note that
21 in *Jensen*, while the court found fault with Dr. Penn's opinions and methodology, it noted
22 that any *Daubert* challenges would have failed. (*Id.* at 17); *see Jensen*, 609 F. Supp. 3d at
23 800 ("Here, the parties waived any *Daubert* challenges to the opposing party's expert
24 witnesses. But even if they had not, any such challenge would have failed.").

25    As discussed above with respect to Dr. Murray's report, the Court finds Dr. Penn's
26 failure to review the records of in-custody deaths does not warrant exclusion under Rule
27 702. *See Chischilly*, 30 F.3d at 1154. Furthermore, while the *Jensen* court's analysis of Dr.
28 Penn's report is concerning, the particular facts of the *Jensen* case are different than those

here, and Dr. Penn's report at issue in *Jensen* was not provided to the Court for comparison. Additionally, the Court agrees with the *Jensen* court's analysis that it would be improper to exclude Dr. Penn's report on a *Daubert* motion, *see Jensen*, 609 F. Supp. 3d at 800, as "[d]isputes as to the strength of an expert's credentials, faults in his use of a particular methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." (Doc. No. 795 at 19 (quoting *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1019 (C.D. Cal. 2018)).) To the extent Plaintiffs argue Dr. Penn never viewed the records of in-custody deaths, such contentions and possible flaws in Dr. Penn's testimony can be addressed through the presentation of contrary evidence and vigorous cross-examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153 (9th Cir. 2005).

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Penn's testimony on this basis.

> ### ii.    Dr. Penn's Review of Whether Patients Had Timely Access to Care

Plaintiffs next move to exclude the entirety of Dr. Penn's opinion on the basis that his opinion relies on a medical record review contained in Appendix D to his report, which was conducted by three board-certified correctional forensic psychiatrists ("consulting psychiatrists"). (Doc. No. 779-1 at 23; *see also* Penn Report at 164.) Appendix D is comprised of evaluation summaries of the mental healthcare provided to 81 incarcerated individuals. (Penn Report at 311–360.) Each patient summary in Appendix D includes a conclusion from one of the consulting psychiatrists as to whether "the incarcerated person had access to care" where "access to care means . . . in a timely manner, seen by a qualified MH [mental health] professional, is rendered a clinical judgment, and receives MH care that is ordered." (*See generally* Penn Report at 311–60.) Plaintiffs argue exclusion is proper because (1) Dr. Penn did not conduct a review of the underlying patient records himself; (2) Dr. Penn failed to independently verify the work performed by the consulting

20

psychiatrists; and (3) the consulting psychiatrists' conclusions are "methodologically unreliable." (Doc. No. 779-1 at 23.)

First, Plaintiffs assert Dr. Penn's opinions must be excluded because Dr. Penn improperly "parrot[ed] the opinions of other experts without independently investigating the underlying evidence." (Doc. No. 779-1 at 23 (quoting *McCoy*, 2024 WL 1705952, at *16).) Plaintiffs point to deposition testimony where Dr. Penn testified that after providing instructions to the consulting psychiatrists regarding the initial assignment, he did not have any other communication with them up to the date he submitted his report. (*Id.*) In response, Defendants represent that "Dr. Penn conducted a review of the summaries that were compiled by three board-certified correctional forensic psychiatrists . . . and [the] standard of care opinions upon which his own opinions were based." (Doc. No. 795 at 18.)

The Court agrees with Defendants. Here, as with Appendix J. in Dr. Murray's opinion, *see* Sec. II(B)(1)(ii) *supra*, Defendants satisfy both elements of the *Walker* test used to determine when an expert "can appropriately rely on the opinions of others." *See Walker*, WL 8885148, at *10. First, "other evidence" supports Dr. Penn's opinion. *See id.* His report states it is based on "[a]ll materials provided for review" in Appendix C, (including Naphcare policy and procedure manuals (Penn Report at 222), pharmacist inspection reports (*id.* at 227–29), and mental health staffing plans (*id.* at 283), amongst other documents), "[i]nterviews of various SDSO mental health, nursing, medical, legal staff, and sworn custody staff," and "tours of SDSO facilities, observation of healthcare activities and custody staff interactions with a focus on mental health care, access to care, and continuity of care." (*id.*; *see also* Penn Report at 163). Second, Dr. Penn's report states that he independently reviewed the summaries. (Doc. No. 781 at 164 (The "individual summaries, comments, and findings were reviewed and incorporated into my overall analysis . . . [.]")) Because other evidence supports Dr. Penn's opinion, and Dr. Penn conducted an independent evaluation of the evidence at issue, the Court declines to exclude Appendix D on the first basis argued by Plaintiffs.

Second, Plaintiffs argue the consulting psychiatrists' opinions regarding the standard of care should be excluded because they did not apply a reliable methodology. (Doc. No. 779-1 at 23–24.) Specifically, Plaintiffs contend that "Dr. Penn stated that he never discussed . . . what (if any) standard of care they should apply" and there exist "contradictions within many of the summaries themselves." (Doc. No. 779-1 at 24.) In response, Defendants state that Dr. Penn's opinions "were not all favorable to the County, which tends to support that his methodology—and instruction to the assisting [consulting psychiatrists]—were clear, sound and unbiased." (Doc. No. 795 at 17.) Defendants also note "this is a topic for cross-examination." (*Id.*)

Upon review of the consulting psychiatrists' opinions, each summary states: "access to care means that, in a timely manner, seen by a qualified MH [mental health] professional, is rendered a clinical judgment, and receives MH care that is ordered." (*See generally* Penn Report at 311–360.) These four indicators used to evaluate "access to care" are clear and definite. While "timely manner" might inherently be somewhat subjective, Plaintiffs may examine any weaknesses regarding this subjectivity through vigorous cross examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Furthermore, Plaintiffs take issue with medical record summaries that indicate care was not "timely" but nevertheless conclude the patient had "access to care." (Doc. No. 779-1 at 24.) Noting that an individual eventually got access to mental healthcare is not necessarily inconsistent with the care being untimely. To the extent Plaintiffs seek to address further contradictions within the summaries, Plaintiffs may examine contradictory evidence through vigorous cross examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153. Dr. Penn's methodology does not warrant exclusion of his opinion.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Penn's testimony regarding whether incarcerated individuals had timely access to care.

/ / /

/ / /

### iii.    Dr. Penn's Opinions Regarding Staffing

Plaintiffs next argue Dr. Penn offered opinions on mental health staffing without a reliable methodology. (Doc. No. 779-1 at 25.) Specifically, Plaintiffs claim, "Dr. Penn relies only on the existence of Jail staffing plans; he fails to conduct any review or assessment as to whether the number of staff for each clinical position is adequate to meet the mental health needs of the Jail's population, including whether the Jail maintains sufficient staff across different shifts." (*Id.*) Plaintiffs cite to Dr. Penn's deposition where he states that he did not conduct a staffing analysis (Doc. No. 781-1 at 762:9–14), he did not review staffing numbers at all facilities (*id.* at 769:19–770:23), and he did not evaluate NaphCare staffing data (*id.* at 772:15–773:25). In response, Defendants state, "Dr. Penn personally observed examples of access to care and continuity of care throughout the on-site tours, verified practices, policies, and procedures with staff with whom he interacted and interviewed at the Jail facilities." (Doc. No. 795 at 17–18.)

In his deposition, Dr. Penn testified he based his finding that the mental health care staffing levels at SDSO are sufficient by looking at "both the number of authorized positions as well as filled positions" and through consideration of "other variables." (Doc. No. 781-1 at 762:2-8.) These variables included: "all the medical charts from the named Plaintiffs"; "sick-call requests"; "the mental health notes that were written"; "the mental health evaluations"; "suicide precautions"; and "the totality of all of the medical record documentation." (*Id.* at 763:14–764:1.) He also "interviewed numerous of the staff, of custody and mental health staff" and "verified . . . that three of the intake facilities—Vista, Los Colinas, and the Central Jail—have 24-hour onsite, 7 days a week onsite mental health staff, in addition to after hours, on-call, and weekend coverage." (*Id.* at 764:2-19.) Moreover, he reviewed the "staffing reporting, the vacancies" (*id.* at 764:20-22), and "interviewed the NaphCare mental health director" (*id.* at 765:9-10).

Here, Dr. Penn's Jail visits, interviews with mental health and Jail staff, and review of patient medical records and staffing positions provide a sufficient factual basis for his opinions on the adequacy of mental health care staffing at the Jail. Additionally, the Court

finds Dr. Penn's opinion falls within "Rule 702's 'broad parameters of reliability, relevancy, and assistance to the trier of fact.'" *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) *as amended* (Nov. 12, 1998) (quoting *Desrosiers v. Flight Int'l of Fla. Inc.,* 156 F.3d 952, 960–61). To the extent Plaintiffs argue Dr. Penn did not conduct a staffing analysis or has gaps in his analysis of staffing at other Jail facilities, such contentions and possible flaws in Dr. Penn's testimony can be addressed through the presentation of contrary evidence and vigorous cross-examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Penn's opinions on mental healthcare staffing at the Jail.

### iv.    Portions of Dr. Penn's Report from *Jensen*

Plaintiffs assert "[p]arts of Dr. Penn's report were copied and pasted directly from his report in *Jensen*, including sections containing information applicable to the Arizona prisons, but with no discernable relationship to the San Diego County jails." (Doc. No. 779-1 at 26.) Plaintiffs provide two examples in their Motion. (*Id.* at 26–27.) First, Plaintiffs state "Dr. Penn based a finding regarding the involvement of mental health staff in the use of clinical restraints on 'numerous interviews with nursing and mental health care staff ***across the state***,' which makes no sense in the context of his review of the Jail." (*Id.* (citing Doc. No. 781-1 at 190–191; Doc. No. 781 at 196).) Second, Plaintiffs indicate that Dr. Penn listed policies and practices he purported to review which is "identical to the list of policies in his *Jensen* report and includes policies that do not exist for the Jail." (Doc. No. 779-1 at 27 (citing No. 781-1 at 192).) Specifically, Dr. Penn lists "heat precaution" and "use of chemical agents with prisoners with mental illness" as practices he reviewed, which Dr. Pablo Stewart, Plaintiffs' mental health expert, states to his knowledge are not practices used in San Diego's jails. (*Id.*) Dr. Stewart, who also served as the opposing mental health expert to Dr. Penn in the *Jensen* case (Doc. No. 781-1 at 190), identifies copied-and-pasted sections from Dr. Penn's *Jensen* report on pages 28, 41, 49, and 51 of Dr. Penn's report in this case. (*See id.* at 189–92, 222–23, 238.)

At the July 24, 2025, hearing on this Motion, Defendants' counsel responded to Plaintiffs' contentions by arguing the fact that Dr. Penn copy-and-pasted portions of his report in *Jensen* to his report here does not merit exclusion because those portions may still be relevant to the present case. (Doc. Nos. 939; 940.)

Dr. Stewart's opinion elicits concerns regarding portions of Dr. Penn's report that may pertain to Arizona prisons and not to San Diego County jails. However, these portions of Dr. Penn's report do not explicitly reference Arizona prisons, and because Defendants' counsel purports they may be relevant to this case, any weaknesses of Dr. Penn's credibility and the applicability of certain portions of his report would be better addressed through vigorous cross examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** excluding Dr. Penn's report on the basis that he copy-and-pasted from his expert report in a different case.

### v.    Contradictory Portions of Dr. Penn's Report

Plaintiffs attempt to poke holes in Dr. Penn's report by arguing that it "is rife with contradictory or erroneous testimony that demonstrates that his overall conclusions are not based on a reliable application of principles and methods to the facts of the case." (Doc. No. 779-1 (citing Fed. R. Evid. 702(d)).) Defendants do not directly respond to Plaintiffs' argument. (*See generally* Doc. No. 795.)

In support of their assertion, first, Plaintiffs raise that Dr. Penn's report states, "every [Incarcerated Person] receives a comprehensive mental health evaluation upon entry . . ." (Doc. No. 779-1 at 27–28), but at his deposition, Dr. Penn testified that "evaluation" was a "a typo" and it "actually should be" a "comprehensive mental health assessment." (*id.*; *see also* Doc. No. 781-1 at 792:16 –793:14). Second, Dr. Penn's report states, "there has been no concentration of completed suicides at any particular SDSO Complex (or custody level)" (Doc. No. 779-1 at 28 (citing Penn Report at 204)), but Plaintiffs assert "Dr. Penn's own report . . . indicates that, across San Diego County's seven jail facilities, the majority of completed suicides since 2019 (60%) have occurred at one jail facility— Central Jail."

25

(*id.* (citing Penn Report at 204 –05)). Plaintiffs also note this "erroneous statement may be yet another example of Dr. Penn improperly copying from his report in *Jensen . . . .*" (*Id.* n. 9.) Finally, Plaintiffs assert "Dr. Penn's opinions are also directly contradicted by his own psychiatric helpers' findings" including findings of "delays and deficiencies in continuity of care," examples of expiring medications in patient charts, gaps in care, and the lack of confidentiality in care. (Doc. No. 779-1 at 28.) Plaintiffs cite to their own expert's rebuttal report that summarizes these deficiencies in care identified by Dr. Penn's consulting psychiatrists. (*Id.* (citing Rebuttal Expert Report of Pablo Stewart, M.D.).)

In consideration of Plaintiffs' evidence, the Court declines to exclude Dr. Penn's entire report on what Dr. Penn testified was a "typo," and because the Court already addressed Plaintiffs' arguments regarding the copy-and-pasted portions of Dr. Penn's report, it will not do so again here, *see* Sec. II(B)(2)(iv), *supra*. The discrepancies Plaintiffs' expert, Dr. Stewart, identified between Dr. Penn's overall conclusions, and the specific observations of his consulting psychiatrists regarding expiring medications, gaps in care, and the lack of confidentiality in consults, are undoubtedly weaknesses in Dr. Penn's report. (*See* Doc. No. 779-1 at 28.) However, it is unclear the extent to which the consulting psychiatrists' findings identified by Dr. Stewart are outliers. The Court therefore finds Plaintiffs' proffered evidence insufficient to merit excluding Dr. Penn's entire report. Plaintiffs may investigate any contradictions and erroneous statements in Dr. Penn's report through vigorous cross examination and through submission of their expert's rebuttal report. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Penn's report on the basis that it includes errors and contradicts other sections of his report.

### vi.    Dr. Penn's Testimony on Housing Placements

Plaintiffs next move to exclude two portions of Dr. Penn's report on the use of restrictive housing and isolation due to Dr. Penn's lack of expertise regarding housing placements for people with mental illness. (Doc. No. 779-1 at 29.) Defendants do not directly respond to Plaintiffs' argument. (*See generally* Doc. No. 795.)

26

Specifically, Plaintiffs seek to exclude Dr. Penn's responses to Allegation 7 (Penn Report at 199–200), and Allegation 10 (*id.* at 207–08). Dr. Penn's response to Allegation 7 is titled, "The Sheriff's Department Does Not House IPs [Incarcerated Persons] at Risk of Suicide in Punitive Isolation: Strategies Are Employed to Avoid Unnecessary and Undue Risk of Decompensation and Harm." (*Id.* at 199.) His response to Allegation 10 is: "The Sheriff's Department Does Not Discriminate and Unfairly Punish IPs [Incarcerated Persons] with Mental Illness in Housing Placements." (*Id.* at 207.)

Plaintiffs argue, "Dr. Penn repeatedly testified that he lacked expertise in relation to 'housing' or 'placements' for individuals with mental illness." (*Id.*) In support, Plaintiffs cite to portions of Dr. Penn's deposition. For example, Dr. Penn testified, "I don't consider myself to be a custody expert." (Doc. No. 781-1 at 776:20–21; *see also id.* at 788:2–8 ("I don't consider myself to be an expert in custody or classification or housing or placement. And I would defer to, you know, custody or custody expert or custody leadership to make those determinations."); *see also id.* at 790:19–22 ("I'm not a custody expert, so I wouldn't routinely review that sort of documentation [out-of-cell logs for the restrictive housing units for Ad Sep units in San Diego County Jail] as part of a mental health psychiatric evaluation.").)

To note, in response to a question if he "look[ed] at whether they [incarcerated persons] were appropriately housed based on their level of care needs," he testified:

> So I'm not sure if you're trying to ask if I thought it was appropriate—if somebody needed to be inpatient, the PSU, the psychiatric stabilization unit or not, yes I think I did look at that. If someone was suicidal, were they in a safety cell or were they in an advanced observation housing. Yes. And so I did look at those.

(*Id.* at 777:3-13.) Additionally, while Dr. Penn's responses to Allegations 7 and 10 undoubtedly address "the overall safety and appropriateness of housing decisions," (Penn Report at 200), they also address the provision of mental health care to incarcerated individuals in various housing settings which does fall within Dr. Penn's stated expertise. (*see id.* at 199–200; 207–08).

Here, Dr. Penn's "interviews of various SDSO mental health, nursing, medical, legal staff, and sworn custody staff," as well as "[t]ours of SDSO facilities and observation of healthcare activities . . . with a focus on mental health care, access to care, and continuity of care" (Penn Report at 163), provide a sufficient factual basis for Dr. Penn's opinions on the provision of mental health care in the Jail's different housing placements for individuals with mental illness. *See Dura Auto. Sys. of Indiana, Inc.*, 285 F.3d at 613 ("We too do not 'believe that the leader of a clinical medical team must be qualified as an expert in every individual discipline encompassed by the team in order to testify as to the team's conclusions.'") (quoting *Soo Line R.R.,* 208 F.3d at 589). Additionally, Dr. Penn's responses to Allegation 7 and Allegation 10 fall within "Rule 702's 'broad parameters of reliability, relevancy, and assistance to the trier of fact.'" *Sementilli*, 155 F.3d at 1134 (quoting *Desrosiers,* 156 F.3d at 960–61); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (holding that a district court has broad latitude in deciding how to measure reliability and in making the ultimate reliability determination). To the extent Dr. Penn admits he is not a custody or housing expert, Plaintiffs may investigate any weaknesses regarding the limits of his testimony through vigorous cross examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Penn's opinion on the Jail's housing for individuals with mental illness.

### vii.    Dr. Penn's Testimony on Substance Use Treatment

Plaintiffs move to exclude Dr. Penn's opinions regarding (1) an overdose he observed during a Jail inspection; (2) screening for substances during intake; (3) withdrawal assessments; (4) treatment of opioid use disorder including the MAT program; and (5) provision of Narcan at discharge on the basis of "his lack of knowledge of the facts in the case related to substance use treatment[,]" which also makes his testimony on substance use "unreliable." (Doc. No. 779-1 at 29–30.) Defendants do not directly respond to Plaintiffs' argument (*see generally* Doc. No. 795), but generally note, "Dr. Penn personally observed examples of access to care and continuity of care throughout the on-

28

site tours, verified practices, policies, and procedures with staff with whom he interacted and interviewed at the Jail facilities" as the basis for his decisions. (Doc. No. 795 at 17–18.)

In support of their argument, Plaintiffs cite to Dr. Penn's deposition testimony where he states he did not review the report of Plaintiffs' substance use expert, Dr. Kelly Ramsey (Doc. No. 781-1 at 794:2–11), and that he "did not do a detailed, deep dive into COWS [Clinical Opiate Withdrawal Scale] and CIWA [Clinical Institute Withdrawal Assessment] and detox protocols for the jail," but "referred that to Dr. Murray[.]" (*id.* at 803:11–14). Dr. Penn also testified, "I would not call myself an expert in addiction psychiatry, but I do have the requisite knowledge of the evaluation, diagnosis, [and] treatment of substance use disorders in correctional setting." (*Id.* at 796:20–24.) Moreover, he testified that he "asked the intake nursing staff of how . . . they screened for substance abuse and dependence and . . . where those individuals are housed and placed." (*Id.* at 803:6–10.) He also mentioned that he "toured the medical facility." (*Id.*).

Here, Dr. Penn's "interviews of various SDSO mental health, nursing, medical, legal staff, and sworn custody staff," as well as "[t]ours of SDSO facilities and observation of healthcare activities . . . with a focus on mental health care, access to care, and continuity of care" (Penn Report at 163), provide a sufficient factual basis for Dr. Penn's limited opinions regarding substance use treatment at the Jail. *See Dura Auto. Sys. of Indiana, Inc.*, 285 F.3d at 613 ("We too do not 'believe that the leader of a clinical medical team must be qualified as an expert in every individual discipline encompassed by the team in order to testify as to the team's conclusions.'") (quoting *Soo Line R.R.*, 208 F.3d at 589). Additionally, Dr. Penn's opinions regarding various substance use treatments fall within "Rule 702's 'broad parameters of reliability, relevancy, and assistance to the trier of fact.'" *Sementilli*, 155 F.3d at 1134 (quoting *Desrosiers,* 156 F.3d at 960–61); *see also Kumho Tire Co.*, 526 U.S. at 142 (holding that a district court has broad latitude in deciding how to measure reliability and in making the ultimate reliability determination). To the extent Dr. Penn admits he is not a substance use treatment expert, Plaintiffs may investigate any

29

weaknesses regarding the limits of his testimony through vigorous cross examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Penn's opinions regarding substance use treatment.

### 3.    Dr. Scott Reinecke

Plaintiffs move to exclude all opinions of Dr. Reinecke, Defendants' dental expert, asserting Dr. Reinecke's opinions are unreliable because he failed to apply an articulable methodology and did not consider sufficient facts and data to support his opinions.[4] (Doc. No. 779-1 at 30.) Dr. Reinecke is a regionally licensed general dentist who has "considerable expertise in correctional healthcare, with 30 total years of experience in dentistry." (*Id.* at 382.) For the past 26 years, Dr. Reinecke has worked for the University of Texas Medical Branch Offender Health Services Program and currently serves as the Region IV Dental Director for Correctional Managed Care and the Youth Health Services Dental Director for the Texas Juvenile Justice Department. (*Id.*)

### i.    Methodology

Plaintiffs first assert Dr. Reinecke's opinions regarding the adequacy of dental care are unreliable because they do not rest on any articulable methodology. (Doc. No. 779-1 at 30.) Plaintiffs contend Dr. Reinecke made broad assertions about the quality of dental care at the Jail, including, but not limited to, the following:

- "Dental needs identified that required referral to an off-site specialty provider were documented and scheduled in a timely manner." (Reinecke Report at 384.)
- "It is evident in the dental records I reviewed, as well as the specialty referral data, that the SDSO, through NaphCare, has access to and provides adequate dental treatment to the incarcerated population." (*Id.* at 386.)

---

[4]    Plaintiffs filed the expert report written by Dr. Reinecke in their Motion to Exclude. (Expert Report of Dr. Scott Reinecke ("Reinecke Report"), Doc. No. 781 at 381–97.)

- "In my professional opinion, the SDSO has the necessary physical plant, infrastructure, staff, and equipment to deliver adequate dental care that aligns with community standard." (*Id.* at 387.)
- "SDSO through its vendor NaphCare is providing industry and community standard dental services at each facility." (*Id.*)

Plaintiffs argue these opinions are inadmissible because (1) Dr. Reinecke did not apply any defined standard of care, and (2) he did not explain how his analysis of dental records led him to his conclusions. (Doc. No. 779-1 at 31.)

Defendants respond that Dr. Reinecke clearly identified his methodology employed to evaluate whether the overall delivery of dental care to incarcerated persons in the custody of the Jails is adequate and meets the standard of care.[5] (Doc. No. 795 at 19.) Defendants also list the documents Dr. Reinecke relied on in coming to his conclusions. (*See id.* at 19–20.)

In his expert report, Dr. Reinecke explains his methodology:

An evaluation was requested to determine whether the overall delivery of dental care to IPs [incarcerated persons] in the custody of the SDSO is constitutionally adequate and meets the standard of care. To do so, site visits were conducted, staff were interviewed, three conference calls were held with local dentists and the NaphCare Dental Director, and chart entries and associated documents were reviewed. Staff interviews were conducted without the presence of senior leadership to promote free discussion. A random selection of IP [incarcerated person] charts were requested to assess treatment for various conditions, appropriate referrals, episodic care, and documentation. An analysis of this data was conducted from the perspective of the systemic delivery of healthcare, including certain outcome measures found useful for comparing across populations.

(Reinecke Report at 383.) Dr. Reinecke reviewed 30 patient dental records, creating a "summary of care" for each record. (*See id.* at 388–97.) Dr. Reinecke states the dental

---

[5]    In their Opposition brief, Defendants contend Dr. Reinecke explained his methodology to find the delivery of dental care is "constitutionally adequate." (Doc. No. 795 at 19.) However, as discussed below, *infra* § II.B.7, this is an improper legal opinion which must be excluded.

31

records were reviewed and evaluated in three areas: quality of documentation, quality and continuity of care, and timeliness of care. (*Id.* at 385.)

During deposition, Dr. Reinecke stated there is no applicable standard of care that could apply to this case:

> Q.    So it's your testimony that you are unable to opine on what the appropriate timeframe is in San Diego for someone complaining of pain to be seen by a dentist?
> A.    That's correct. I do not feel I am able to opine on that, because I do not have enough information.

(Deposition of Dr. Scott Reinecke ("Reinecke Depo."), Doc. No. 781-1 at 806–27, at 813.)

> Q.    Did you have a standard of care in mind that you would expect to see in each of these charts?
> A.    I would say, ideally, I would like to see that once diagnosed, a condition that required treatment was seen or addressed or referred within a timeframe that was not grossly outside what a standard would be.
> And again, the standard is in flux. You know, you have numbers, but we don't know all the variables on site.

(*Id.* at 814–15.)

> Q.    . . . Your opinion is that based on the information you have received to date and that you reviewed, you are not able to opine on whether those 30 patients were treated within the standard of care?
> A.    I would have to request for a more clear understanding of standard of care because there's variations depending on who you talk to. So which standard of care are you using as a reference? Because there is no policy and procedure that I've seen. So you have to give me an example of a standard of care.

(*Id.* at 817–18.)

> A.    . . . And I believe with all of my being that there is no one true standard that can be applied to the dental profession.

(*Id.* at 822.)  To contrast the statements of Dr. Reinecke, Plaintiffs offer the report of their own dental expert, Dr. Jay Shulman, who identified specific timeliness standards for various dental complaints and analyzed whether each patient whose chart he reviewed was provided care within that timeframe. (*See* Doc. No. 781-1 at 660–63.)

32

Moreover, when Dr. Reinecke was asked whether the care provided to the 30 patients whose records he reviewed met his own standard of practice, he replied: "On occasion, yes; and on occasion, no. I've seen examples of both within these 30 charts." (*Id.* at 819–20; *see also id.* at 816 ("Q: So four months is not an acceptable wait in your opinion? A. I cannot answer that with any certainty because I feel I don't have enough information.").)

Upon review of the records and Dr. Reinecke's report, the Court finds Dr. Reinecke's opinion falls within "Rule 702's 'broad parameters of reliability, relevancy, and assistance to the trier of fact.'" *Sementilli*, 155 F.3d at 1134 (quoting *Desrosiers*, 156 F.3d at 960–61). While Plaintiffs take issue with Dr. Reinecke's noncommittal testimony regarding the appropriate timeframe for a patient to receive dental care, Dr. Reinecke's response that the "standard is in flux" depending on the "variables on site" may be relevant to the trier of fact's analysis of dental care at the Jail. Dr. Reinecke also sufficiently stated his methodology of reviewing patient records by analyzing "quality of documentation, quality and continuity of care, and timeliness of care." (Reinecke Report at 385.)

To the extent Plaintiffs argue Dr. Reinecke fails to articulate a specific standard of care, such contentions and possible flaws in Dr. Reinecke's testimony can be addressed through the presentation of contrary evidence and vigorous cross-examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Reineck's testimony on this basis.

### ii.    Sufficient Facts or Data

Plaintiffs contend additional opinions of Dr. Reinecke are unreliable because they are not based on sufficient facts or data. (Doc. No. 779-1 at 32.)

First, Dr. Reinecke opines that Plaintiffs' allegations that "[t]he Sheriff's Department's policies and procedures for preventive dental care are inadequate" is "**FALSE**." (Reinecke Report at 386.) To support this conclusion, Dr. Reinecke explains that "[t]he SDSO provides IPs [incarcerated persons] with annual dental cleanings." (*Id.*) However, during deposition, Dr. Reinecke stated the following:

33

1     Q.     So we - - you said you visited facilities and you reviewed charts. Did
2               you review policies or procedures?
3     A.     I did not.
     Q.     Why not?
4     A.     They were not provided to me.
     Q.     Did you ask for them to be provided to you?
5     A.     I did.

Q. So we - - you said you visited facilities and you reviewed charts. Did you review policies or procedures?
A. I did not.
Q. Why not?
A. They were not provided to me.
Q. Did you ask for them to be provided to you?
A. I did.

(Reinecke Depo. at 809.)  Plaintiffs assert that Dr. Reinecke's opinions related to the Jail's policies and procedures are therefore inadmissible. (Doc. No. 779-1 at 32.)

Defendants do not dispute that Dr. Reinecke did not receive Defendants' dental care policies and procedures in advance of his deposition. (Doc. No. 795 at 20.) Defendants contend, however, that Dr. Reinecke reviewed the in-place procedures at each Jail facility that had dental care facilities by speaking with dental staff, reviewing the deposition transcripts of Assistant Sheriff Theresa Adams and Dr. Jon Montgomery, the Jail Medical Director, and chart review, "all of which document the Jail procedures in real-world practice." (*Id.* at 21.)

Upon review of the records and Dr. Reinecke's report, the Court finds Dr. Reinecke's opinion falls within "Rule 702's 'broad parameters of reliability, relevancy, and assistance to the trier of fact.'" *Sementilli*, 155 F.3d at 1134 (quoting *Desrosiers,* 156 F.3d at 960–61). Because Dr. Reineck reviewed the in-place procedures at each Jail facility that had dental care facilities by speaking with dental staff, reading the deposition transcripts of Assistant Sheriff Theresa Adams and Dr. Jon Montgomery, the Jail Medical Director, and reviewing dental chart review documentation, the Court finds there is a sufficient factual basis for Dr. Reineck's opinions.

Next, Dr. Reinecke offered a number of opinions regarding the adequacy of dental staffing at the Jail, including that "SDSO does maintain a sufficient number of dental professionals to provide adequate dental services to the IPs [incarcerated persons] in its care." (*See* Reinecke Report at 386.) During deposition, Dr. Reinecke testified that in order to offer an opinion regarding the actual staffing levels at the Jail, he would need access to at least one month of staffing data. (Reinecke Depo. at 821.) However, when asked if he

34

had asked for staffing plans reflecting a month, Dr. Reinecke testified that he had not. (*Id.*) Plaintiffs assert that Dr. Reinecke's opinions related to staffing are therefore inadmissible.

Defendants respond that Dr. Reinecke testified at deposition that he was provided staffing levels by one of the dentists with whom he spoke, as well as a dental schedule. (Doc. No. 795 at 21 (citing Reinecke Depo. at 809).) Defendants contend Plaintiffs did not offer the full relevant deposition transcript which further illuminates Dr. Reinecke's knowledge of staffing levels. (*Id.*) In Dr. Reinecke's full deposition, he explains he bases his understanding of the staffing level at the Jail on a visit to the Jail and on a phone conversation with Dr. Pandit, NaphCare's off-site dental director. (Defendants' Deposition Transcript of Dr. Reinecke ("Reinecke Depo."), Doc. No. 795-2, at 8.)

Here, the Court finds Dr. Reinecke's opinion falls within "Rule 702's 'broad parameters of reliability, relevancy, and assistance to the trier of fact.'" *Sementilli*, 155 F.3d at 1134 (quoting *Desrosiers,* 156 F.3d at 960–61). His opinion has a sufficient factual basis based on his visit to the Jail and interview with Dr. Pandit.

Lastly, Dr. Reinecke opined that "[t]he quality monitoring of all providers who serve at the seven SDSO facilities is appropriate." (Reinecke Report at 384.) Dr. Reinecke later testified that he did not review any quality assurance documents; rather, he explained that his "response was based on what Dr. Pandit [NaphCare's off-site dental director] told [him], because [Dr. Reinecke] did not see any evidence of that. So he reported he did annual reviews." (Reinecke Depo. at 825–26.) Dr. Reinecke clarified that "if that's true, [the Jail's dental quality monitoring] could be considered adequate if it's comprehensive enough." (*Id.* at 826.) Dr. Reinecke confirmed that he did not review the annual reviews conducted by Dr. Pandit. (*Id.*)

Defendants respond Dr. Reinecke's opinion is admissible because he personally spoke with a Jail dentist regarding quality assurance and based his opinion thereon, which is proper. (Doc. No. 795 at 21.) For the purpose of evaluating Plaintiffs' *Daubert* motion, the Court agrees. Dr. Reinecke's opinion has a sufficient, albeit limited, factual basis. To the extent Plaintiffs argue Dr. Reinecke failed to review the Jail's formal dental care

35

policies and procedures, staffing plans reflecting a full month, and quality assurance documents and only based his opinion on an interview with NaphCare's dental director, such contentions and flaws in Dr. Reinecke's testimony can be addressed through the presentation of contrary evidence and vigorous cross-examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Reineck's testimony due to insufficient facts or data.

### 4.    Dr. Brian Withrow

Plaintiffs next move to exclude the opinions of Defendants' statistical expert, Dr. Brian Withrow.[6] (Doc. No. 779-1 at 33–34.) Dr. Withrow is a professor of criminal justice at Texas State University and has authored three books and numerous articles and reports regarding racial profiling. (Withrow Report at 667.)

In his report, Dr. Withrow explained the scope of his opinion:

> The primary purpose of this expert opinion is to determine whether a pattern or practice of racial discrimination might exist within the routine enforcement activities of the San Diego County Sheriff's Office. This report contains a statistical analysis of the data describing these activities from the same data sets provided to the plaintiffs in this case.

(Withrow Report at 667.) Based on this analysis, Dr. Withrow opined that policing data produced by Defendants did not show that the Sheriff's Department racially profiled or racially discriminated against certain racial minorities under the standard for "racial profiling" established by Assembly Bill 953, codified at California Penal Code § 13519.4. (*Id.* at 669, 686.) Plaintiffs assert this opinion is irrelevant to Plaintiffs' discrimination claims under California Government Code § 11135—and not brought under California Penal Code § 13519.4—which are set forth in Plaintiffs' Ninth Claim for relief and which

---

[6]    With their Motion to Exclude, Plaintiffs offer Dr. Withrow's expert report. (Expert Report of Dr. Withrow ("Withrow Report"), Doc. No. 781-1 at 666–86.)

only requires Plaintiffs to establish that Defendants are engaging in a practice that has a disparate impact on racial minorities. (Doc. No. 779-1 at 33.)

Plaintiffs' Ninth Claim asserts a discriminatory racial impact under California Government Code Section 11135, which prohibits race-based discrimination by recipients of state funds. (TAC ¶¶ 501–07.) To state a claim under Section 11135, plaintiffs must show "defendant's facially neutral practice causes a disproportionate adverse impact on a protected class . . . ." *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519 (9th Cir. 2011). Specifically, Plaintiffs contend Defendants violate Section 11135 by causing a disproportionate adverse effect on the basis of race, color, national origin, or ethnic group identification in carrying out their policing programs, alternatives to pre-trial custody programs, early release programs, and re-entry programs. (TAC ¶¶ 501–07.)

Defendants first respond that this motion is inappropriate because Plaintiffs only challenge the relevance of Dr. Withrow's testimony—Plaintiffs do not challenge whether Dr. Withrow's testimony "reflects scientific knowledge," whether his findings are "derived by the scientific method," and whether his work product amounts to "good science." (Doc. No. 795 at 22.) Defendants counter Plaintiffs' relevance attack by arguing Dr. Withrow's testimony regarding the basis for arrests is directly relevant to the issue pled in the TAC regarding disproportionate arrests of Black and Latinx persons. (*Id.*) Specifically, Defendants contend Dr. Withrow's testimony provides an evidence-based explanation as to why Plaintiffs' disparate impact statistics alone are inappropriate to determine if the San Diego County Sheriff's stop and arrest policies are discriminatory. (*Id.* at 23.)

In support, Defendants cite *Darensburg v. Metropolitan Transportation Commission*, 636 F.3d 511 (9th Cir. 2011), in which the court held that for a disparate impact claim under Section 11135, "[a]n appropriate statistical measure must . . . take into account the correct population base and its racial makeup." 636 F.3d at 520. In *Darensburg*, the plaintiffs challenged the San Francisco Bay Area's municipal transit expansion plan as racially discriminatory because the plan had allocated more money for rail projects than it had for bus projects. *Id.* at 514. The court held the plaintiffs failed to make a prima facie

case of disparate impact because their statistics looked at rail riders and bus riders as individual groups, and had failed to consider "the entire integrated transit system's users." *Id.* at 520. In reply, Plaintiffs assert Defendants' reliance on *Darensburg* is misplaced because Dr. Withrow's "prior knowledge" criterion is not relevant to the population base in his analysis (residents of San Diego County). (Doc. No. 804 at 15–16.)

Because Dr. Withrow's testimony challenges Plaintiffs' methodology and the reliability of Plaintiffs' analysis used in establishing the existence of disparate impact (Doc. No. 795 at 23), which is the first element of Plaintiffs' claim, the Court finds Dr. Reinecke's opinion falls within "Rule 702's 'broad parameters of reliability, relevancy, and assistance to the trier of fact.'" *Sementilli*, 155 F.3d at 1134 (quoting *Desrosiers,* 156 F.3d at 960–61).

To the extent Plaintiffs challenge Dr. Withrow's testimony as irrelevant, such contentions and flaws in Dr. Withrow's testimony can be addressed through the presentation of contrary evidence and vigorous cross-examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Dr. Withrow's testimony.

### 5.    Lenard Vare

Plaintiffs next move to exclude specified opinions of Lenard Vare, Defendants' safety and security expert, as follows:

1. That the Jail adequately addresses staffing shortages with the use of overtime;

2. That the Jail provides adequate treatment for substance use disorder; and

3. That the County prevented 857 people from further harming themselves or completing a suicide.

(Doc. No. 779-1 at 35–38.)[7] Vare's "opinions in this case are based on [his] education, training, and experience working in jails and prisons for over 26 years" and serving as a corrections consultant. (Vare Report at 401.)

### i.    Custody Staffing

In Opinion 11, Vare provides the following opinion:

> Plaintiffs have made a number of statements in the operative complaint about a variety of events that were either caused by or worsened by the issue of staffing shortages. I do not find this to be true. Staff shortages are largely covered by the use of overtime and other measures as described below.
> The San Diego County Sheriff's Office been diligent [sic] and working hard to address staffing shortages at the jail with the use of overtime. Additionally, I found no evidence from any of the plaintiffs' deposition testimony suggesting that any of them were ever impacted personally by staffing shortages.

(Vare Report at 510.) In forming his opinions, Vare based his opinion regarding staffing on a review of the named Plaintiffs' deposition testimony, Sheriff's Office Policy C.1 – Minimum Staffing, the testimony of Former Assistant Sheriff Adams-Hydar, interviews with staff on his tours of the Jail, a review of Former Commander Christina Bavencoff's deposition, and the deposition of Sheriff's Human Resources Administrator Michael Alvarado. (Doc. No. 795 at 24; *see* Vare Report at 508–12.)

Plaintiffs assert the Court should exclude Vare's opinion because it is not based on sufficient facts or data; specifically, that Vare failed to review and analyze available documents that would confirm whether his opinion was accurate. (Doc. No. 779-1 at 35.) Plaintiffs contend that Vare testified during deposition that he did not review documents or any staffing data produced in discovery to determine actual staffing levels at the Jail. (*Id.*) Instead, he relied solely on statements by Defendants' employees about using overtime to cover all shifts. (*Id.*) Thus, assert Plaintiffs, Vare's opinions are predicated on an unsound methodology. (*Id.*)

---

[7]    Plaintiffs offer Vare's expert report in their Motion to Exclude. (Expert Report of Lenard Vare ("Vare Report"), Doc. No. 781 at 399–553.)

Plaintiffs offer the deposition transcript of Vare in support of their motion. (Deposition Transcript of Lenard Vare ("Vare Depo."), Doc. No. 779-4 at 572–84.) During his deposition, Vare confirmed that he did not review any data produced in discovery regarding staffing levels:

> Q.    Did you review any data at all with respect to custody level staffing?
> A.    Not - - not - - not like day-by-day data. Again, when I was doing my jail tours, I asked about minimum staffing and what happens when there aren't enough staff to cover the shift and I was informed that they were using mandatory overtime to make up the deficiencies.
> . . .
> Q.    Did you do anything to independently verify that?
> A.    No.
> Q.    Did you request any data to look at to see whether or not shifts are being filled at or above minimum staffing levels?
> A.    No.

(*Id.* at 575–76.)

Defendants respond, "[w]ritten reports about numbers do nothing to educate the opinion of an expert who is testifying about what actually happens in the jails, in specific areas, how emergencies are handled, and the impacts of national shortages in law enforcement personnel." (Doc. No. 795 at 24.) Defendants further contend, "Plaintiffs cite to no legal authority to support their assertion that none of the evidence reviewed by Mr. Vare is sufficient because he did not review paper reports that show numbers and not staffing in real time on the floor of the jails." (*Id.*)

Under Federal Rule of Evidence 702(a), expert testimony is admissible if it is based on "scientific, technical, or other specialized knowledge" that "will help the trier of fact [ ] understand the evidence or [ ] determine a fact in issue[.]" Fed. R. Evid. 702(a); *see also Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009) ("Under Rule 702, expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading."); *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002) ("Expert testimony is admissible under Fed. R. Evid. 702 if it addresses an issue

40

'beyond the common knowledge of the average layperson.'") (quoting *United States v. Morales*, 108 F.3d 1031, 1039 (9th Cir. 1997) (en banc)).

Here, the Court finds Vare's opinions on custody staffing fall within "Rule 702's 'broad parameters of reliability, relevancy, and assistance to the trier of fact.'" *Sementilli*, 155 F.3d at 1134 (quoting *Desrosiers*, 156 F.3d at 960–61). His opinions have a sufficient factual basis based on his review of the named Plaintiffs' deposition testimony, Sheriff's Office Policy C.1 – Minimum Staffing, the testimony of Former Assistant Sheriff Adams-Hydar, interviews with staff on his tours of the Jail, a review of Former Commander Christina Bavencoff's deposition, and the deposition of the Sheriff's Human Resources Administrator Michael Alvarado. (Doc. No. 795 at 24; *see* Vare Report at 508–12.) While Plaintiffs contend Vare's opinion must be excluded because he did not review staffing data produced during discovery, this does not warrant exclusion under Rule 702. *See Chischilly*, 30 F.3d at 1154 ("The impact of imperfectly conducted laboratory procedures might therefore be approached more properly as an issue not going to the admissibility, but to the weight of the . . . evidence."), *overruled in part Preston*, 751 F.3d at 1008.

### ii. Adequacy of Treatment for Substance Use Disorder

Plaintiffs challenge Opinion 5 of Vare's report, which states the following: "Plaintiffs' claims that the Sheriff's Office failed to provide adequate medical care including medicated assisted treatment for incarcerated persons with substance abuse disorders is inaccurate." (Vare Report at 461.) He further opines that data provided to him by Defendants regarding the use of Clinical Institute Withdrawal Assessment Alcohol Scale ("CIWA") and Clinical Opiate Withdrawal Scale ("COWS") protocols (protocols for assessing and treating withdrawal from alcohol and opioids) is "suggestive of a proactive program to identify and provide treatment to all individuals who meet alcohol and opiate withdrawal criteria at the time of booking . . . ." (*Id.* at 464–65.) Based on five letters from current and/or formerly incarcerated people (four are anonymous) who completed the Medication Assisted Treatment ("MAT") program, he opines, "[t]he experiences and

41

sentiments expressed by program participants in the letters written to staff provide direct evidence about the accomplishments of the program." (*Id.* at 468.)

Plaintiffs move to exclude these opinions because Vare has admitted he is not a medical expert and thus lacks the expertise to offer such opinions. (Doc. No. 779-1 at 36.) Indeed, Vare concedes in his report that he is not a medical expert:

> My opinion in this section is not focused on the treatment itself and I have not considered whether MAT is medically necessary or appropriate as I am not a medical expert. This opinion only considers the existence of treatment programs and whether incarcerated persons have access to such services.

(Vare Report at 461.) During deposition, Vare further confirmed he is not a medical expert:

> Q.    Approximately what percent of people who require MAT treatment are provided MAT treatment at the jails?
> A.    That would be something that someone who was doing a medical expert can look at and see what percentage. I did not look at the percentages to know the answer to that.
> . . .
> Q.    Other than knowing there's a process in place, do you have any other information on the adequacy of the MAT program at the jails?
> A.    I - - I'm not a medical expert so I don't know if I can speak to that.

(Vare Depo. at 578–80.)

In response, Defendants assert Vare does not provide an opinion as to the adequacy or quality of the care being provided. (Doc. No. 795 at 25.) Rather, Defendants assert, Vare's "only opinion is that there is in fact a program and he cites to evidence to support the fact that the program exists and evidence of 'its accomplishments.'" (*Id.* at 26.)

Plaintiffs additionally argue Vare's opinions predicated on the letters from incarcerated individuals about the efficacy of the MAT program should be excluded because they are based on biased data. (Doc. No. 779-1 at 37.) Specifically, Vare admitted the letters do not constitute a representative sample and may have been cherry-picked by Defendants' counsel to include only individuals who had "positively benefited" from their experience. (*Id.*) In his expert report, Vare states he "was provided copies of several hand-written letters from incarcerated persons who had participated in the MAT program and

42

had positively benefited from the experience." (Vare Report at 465.) Moreover, during deposition, Vare stated:

> Q.  For whom were the letters written?
> A.   I mean I don't know for whom. They were just written and - - and I got them. I don't know anything else about it.
> . . .
> Q.  And how were the five letters in your report selected?
> A.  I did not select them. I asked for those letters from the conversations that there were, you know, people felt positively about the program, at least when I was doing the tour. I asked about it and I think then the letters were just sent to me through counsel.
> Q.  Did you ask for any letters from people who thought negatively about the program?
> A.  I don't believe there were letters that - - that I saw that were negative about the program.
> Q.  Did you ask to see letters from people who described the program in negative ways?
> A.  Well, I think they're involving the lawsuit so I don't - - I don't know if I was gonna look for something to prove the opposite. I mean I got letters. I used the letters because I thought that that's what was - - I was looking at.
> Q.  How many letters in total were written by IPs about the MAT program?
> A.  I - - I don't know. Four or five letters I think it was in my report.
> Q.  Not just in your report, but how many letters total were written by IPs about the MAT program?
> A.  I do not know.
> Q.  How were the ones you obtained selected?
> A.  I don't know.
> . . .
> Q.  Is the sample of letters that you identified in your report representative of all people who have written letters to jail staff about the jails' MAT program?
> A.  I don't know.

(Vare Depo. at 581–83.)

In response, Defendants assert "[t]here is no dispute that the letters harm Plaintiffs' case but their existence is evidence of a program and that at least five folks had positive experiences." (Doc. No. 795 at 26.)

43

The Court agrees with Defendants. Vare is not holding himself out to be a medical expert in substance use disorder treatment. His testimony regarding MAT is fairly limited to the facts that MAT exists, and some individuals found the treatment to be constructive. While the foundation of Vare's conclusion is generated from a narrow field of documents, most of which were provided to him by Defendants, the Court finds Vare's opinion falls within "Rule 702's 'broad parameters of reliability, relevancy, and assistance to the trier of fact.'" *Sementilli*, 155 F.3d at 1134 (quoting *Desrosiers,* 156 F.3d at 960–61); *see also Kumho Tire Co.*, 526 U.S. at 142 (holding that a district court has broad latitude in deciding how to measure reliability and in making the ultimate reliability determination). To the extend Vare admits he is not a medical expert, Plaintiffs may investigate any weaknesses regarding the limits of his testimony regarding MAT through vigorous cross examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude Vare's opinion on the adequacy of treatment for substance use disorder.

### iii. Prevention of 857 People From Further Harming Themselves or Completing a Suicide

Finally, Plaintiffs move to exclude Vare's opinion that "857 individuals in the care and custody of the San Diego County jails were prevented from further harming themselves or completing their suicidal intent" from 2021 to 2023. (Doc. No. 779-1 at 37 (quoting Vare Report at 425).) Vare bases this opinion on data from the County showing there were 857 incidents of self-harm and attempted suicides during that time frame, and five suicides. (Vare Report at 424–25.) Plaintiffs contend Vare provides no explanation for his conclusion that the Jail took some action in all 857 cases to "prevent" a suicide. (Doc. No. 779-1 at 37.) Plaintiffs further assert their expert, Dr. Pablo Stewart, explains in his rebuttal report that "[t]here are individuals almost certainly reflected on this chart who in fact *did* further harm themselves and even committed suicide during this three-year period[.]" (*Id.* at 38 (quoting Rebuttal Report of Dr. Stewart, Doc. No. 781-1 at 169–247, ¶ 11).) Plaintiffs

44

assert this opinion should thus be excluded because "there is simply too great an analytical gap between the data and the opinion proffered." (*Id.* (quoting *Joiner*, 522 U.S. at 146.)

Defendants respond, "[t]here is no dispute by Plaintiffs that there were 857 individuals who were identified as considering self-harm and contemplating suicide but did not engage in either conduct." (Doc. No. 795 at 26.) Defendants further assert Vare accurately stated that five individuals committed suicide, but 857 others did not either engage in self-harm or follow through on suicidal thoughts. (*Id.* at 27.) Defendants claim that testimony from Plaintiffs' expert, Dr. Stewart, is "intentionally misleading by refusing to include the reference in Mr. Vare's report acknowledging the 5 deaths by suicide in the jails in the three year time period separate and apart from the 857 figure[.]" (*Id.* at 26–27.) Finally, Defendants argue, "[i]t is not Court['s] responsibility to determine whose conclusion is correct at this stage." (*Id.* at 26.)

The Court agrees with Defendants. While Vare's phrasing may be interpreted in different ways, the Court leaves to the trier of fact to evaluate the experts' analyses of available data. To the extent Plaintiffs challenge Vare's testimony as inaccurate or lacking, such contentions and flaws in Vare's testimony can be addressed through the presentation of contrary evidence and vigorous cross-examination. *See Primiano*, 598 F.3d at 564; *Daubert*, 509 U.S. at 596; *Prime*, 431 F.3d at 1153.

Accordingly, the Court **DENIES** Plaintiffs' Motion to Exclude this opinion from Vare's report.

### 6. Henrietta Peters

Plaintiffs also move to exclude four paragraphs of the report of Defendants' environmental expert, Henrietta Peters, that rest on improper *ex parte* interviews with class members. (Doc. No. 779-1 at 38–39.) Specifically, Plaintiffs move to exclude Peters' opinions describing the Jail's Healthcare Service Assistant Training ("HSAT") Program,

which consist of two paragraphs, copied twice (four total paragraphs).[8] (*Id.* at 38; Doc. No. 804 at 18 n.11.) During Peters' deposition, Plaintiffs learned that, during her Jail inspections between March 11 to 14, 2024, she conducted *ex parte* interviews of four class members outside the presence of Plaintiffs' counsel and with an attorney from the County present. (Doc. No. 779-1 at 38; *see* Deposition Transcript of Henrietta Peters ("Peters Depo."), Doc. No. 779-4 at 428–45, at 438.) Plaintiffs argue these *ex parte* interviews violated the parties' agreement and California Rule of Professional Conduct 4.2 to refrain from contacting a represented party. (Doc. No. 779-1 at 38 (citing Doc. No. 779-3 at 18–22 (Notes from Parties' March 7, 2024 Meet and Confer), and *Coleman v. Brown*, 938 F. Supp. 2d 955, 962, 968 (E.D. Cal. 2013)).)

In response, Defendants contend "[t]here is no evidence whatsoever to suggest that the only attorney present for the County was anywhere near the conversations or that any attorney for the defense knew they were happening." (Doc. No. 795 at 27.) Defendants also assert that in *Coleman*, the court focused on the conduct of the attorneys and the severe prejudice to the plaintiffs, neither of which are at issue here. (*Id.* at 28.)

California Rule of Professional Conduct 4.2, formerly Rule 2-100, governs an attorney's communications with a represented party. It holds that:

> In representing a client, a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer.

Cal. Rul. Prof'l Conduct 4.2(a). The rule's proscription against attorneys' "indirect" contact with represented parties encompasses contact between retained experts and an adverse represented party. *See Coleman*, 938 F. Supp. 2d at 962–69; *In re Katrina W.*, 31 Cal. App. 4th 441, 447–48 (1994).

---

[8]    At the July 24, 2025, hearing, Plaintiffs' counsel indicated that these four paragraphs consist of (1) the last paragraph at Doc. No. 781-1 at 692 (Ex. U-1584), (2) the first paragraph at Doc. No. 781-1 at 693 (Ex. U-1585), (3) the third paragraph at Doc. No. 781-1 at 694 (Ex. U-1586), and (4) the fourth paragraph at Doc. No. 781-1 at 694 (Ex. U-1586).

Here, it is undisputed that (1) Defendants' counsel had actual knowledge that the incarcerated persons were class members represented by counsel at the time of the *ex parte* contacts; (2) the contacted class members were "parties" for the purposes of Rule 4.2; and (3) Defendants' expert, Peters, had direct *ex parte* contact with four class members. (Doc. No. 795 at 27–29); *see United States v. Kernen Constr.*, No. 2:17-cv-01424 WBS DMC, 2018 WL 5023411, at *2 (E.D. Cal. Oct. 16, 2018) ("To determine whether a violation of Rule 2-100 occurred, the Court must consider both whether defendants' counsel had actual knowledge that the plaintiff was represented by counsel at the time of the ex parte contacts, and whether the employees contacted were 'parties' for the purposes of Rule 2-100."). During deposition, Peters confirmed the following:

> Q.   Did you speak with any incarcerated persons during your inspections?
> A.   Yes.
> . . .
> Q.   At which facilities did you speak with incarcerated persons?
> A.   All of them.
> . . .
> Q.   So, Ms. Peters, at the time you had these conversations, you had been retained as an expert by Burke Williams & Sorenson. Is that correct?
> A.   Yes.
> Q.   And you had been retained as an expert in connection with this litigation. Is that correct?
> A.   Yes.

(Peters Depo. at 433–34.) Peters stated these conversations were "not long conversations other than, can you explain to me what you're doing, what are the procedures, but not asking questions other than whatever job task they were assigned to. (*Id.* at 433.) Peters was also questioned as to whether any of these conversations affected the conclusions in her expert report:

> Q.   Did you base any of your conclusions on those conversations [with incarcerated persons]?
> A.   For the barbershop, when I talked to the barber IP [incarcerated person] workers, yes. I - - yes, there are some documents of where I said that either - - yes, they did this - - they were knowledgeable in whatever their job description was. Because I was only asking - - talking to them in reference to what they're doing as position of their job.

47

. . .

Q.   So how did the conversation you had with the incarcerated worker at
     Central [Jail] who is in that [HSAT] program influence what you wrote
     about that program in your report?

A.   I don't think what I asked them questions about influenced it; I think it
     was more of understanding the program and the training that they
     received as part of that program.

(*Id.* at 434–36.)

Based on the foregoing, the Court finds Peters' communications with class members violated Rule 4.2 of the California Rules of Professional Conduct because they were communications about the subject of the representation with persons known to be represented by an attorney without the other attorney's consent. Cal. R. Prof'l Conduct 4.2(a). Even Defendants acknowledge, "Peters should not have asked the questions to the IPs [incarcerated persons] but rather to staff who were standing there to explain what the individuals were doing." (Doc. No. 795 at 29.) That Defendants may not have been "anywhere near the conversations or that any attorney for the defense knew they were happening" does not obviate the violation, particularly as Peters toured the seven Jail facilities with Defendants' counsel.

Accordingly, the Court **GRANTS IN PART** Plaintiffs' motion. The Court precludes any reliance on the four paragraphs of Peters' report identified in note 8 related to the HSAT program.

### 7.   Legal Opinions

Lastly, Plaintiffs move to exclude Defendants' experts' opinions on the ultimate legal issues in this case, such as whether Defendants complied with the Constitution and/or were deliberately indifferent. (Doc. No. 779-1 at 39.) Defendants respond that experts are allowed to testify to an ultimate issue of fact and that this issue is not a *Daubert* analysis but should rather be decided on a motion in limine. (Doc. No. 795 at 29.) The Court notes Defendants' proposition that this issue is not one for a *Daubert* analysis is unsupported by law.

48

"Though expert testimony is appropriate where 'scientific, technical, or other specialized knowledge will assist the trier of fact,' expert testimony consisting of legal conclusions is generally inappropriate." *CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1233 (E.D. Cal. 2005) (quoting *Aguilar v. Int'l Longshoremen's Union Local # 10*, 966 F.2d 443, 447 (9th Cir. 1992) (upholding district court's exclusion of expert legal opinion as "utterly unhelpful")). Additionally, an expert witness may not testify to the ultimate legal question in a claim of "deliberate indifference" or whether conduct was "intentional, reckless[,] and dangerous," but may testify to objective issues predicate to that question, including circumstantial evidence. *See Cotton ex rel. McClure v. City of Eureka,* No. C 08-04386 SBA, 2011 WL 4047490, at *2 (N.D. Cal. Sept. 8, 2011).

The Court finds Dr. Owen Murray's, Dr. Joseph Penn's, Henrietta Peters', and Lenard Vare's opinions are impermissible to the extent they purport to establish that Defendants did not act with "deliberate indifference" or that Defendants meet constitutional requirements. Plaintiffs cite several examples of such opinions. (*See* Doc. No. 779-1 at 39 (citing Murray Report at 6, 43, 47; Penn Report at 175, 210, 214–15; Vare Report at 409, 421, 423, 441, 480–81, 492, 517–18; Peters Report at 689, 701).) These opinions impermissibly address the ultimate issues of law as to Plaintiffs' First, Second, Fourth, and Fifth claims: whether Defendants were deliberately indifferent to a substantial risk of harm to Plaintiffs and class members, and whether Defendants' policies and procedures are constitutionally adequate. *See Vincent v. Reyes*, No. 19-cv-00329-RMI, 2021 WL 4262289, at *2 (N.D. Cal. Sept. 20, 2021) (holding the expert "may not state Deputy Tauscher 'callously disregarded' Plaintiff's safety because the phrase 'callous disregard' is analogical to 'deliberate indifference,' which if asserted against the deputy would establish an element of Plaintiff's Fourteenth Amendment claim"); *see, e.g.*, *A.B. v. Cnty. of San Diego*, No.: 18cv1541-MMA-LL, 2020 WL 4431982, at *5 (S.D. Cal. July 31, 2020) (finding expert opinions "inadmissible to the extent they purport to establish the

49

conduct at issue was 'in accordance with the law' or consistent with 'clearly established law'").

Accordingly, the Court **GRANTS** Plaintiffs' Motion to Exclude the "legal opinions" of Dr. Murray, Dr. Penn, Peters, and Vare.

## III.   CONCLUSION

Based on the foregoing, the Court:

1. **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motion to Exclude, (Doc. No. 779).  Specifically, the Court:

   i.   **DENIES** Plaintiffs' Motion to Exclude Dr. Murray's opinions;

   ii.  **DENIES** Plaintiffs' Motion to Exclude the entirety of Dr. Joseph Penn's opinions;

   iii. **DENIES** Plaintiffs' Motion to Exclude Dr. Reinecke's opinions;

   iv.  **DENIES** Plaintiffs' Motion to Exclude Dr. Withrow's opinions;

   v.   **DENIES** Plaintiffs' Motion to Exclude Lenard Vare's opinions;

   vi.  **GRANTS** Plaintiffs' Motion to Exclude evidence or testimony of communications between Ms. Peters and class members, especially pertaining to the HSAT program; and

   vii. **GRANTS** Plaintiffs' Motion to Exclude the legal conclusions or opinions of Dr. Murray, Dr. Penn, Ms. Peters, and Mr. Vare.

**IT IS SO ORDERED.**

Dated:  August 8, 2025

Hon. Anthony J. Battaglia
United States District Judge