UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

Defendants.

Case No.:  20-cv-00406-AJB-DDL

**ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**(Doc. No. 782)**

Before the Court is Defendants' Motion for Partial Summary Judgment, or in the alternative, for an Order Treating Specified Facts as Established ("Motion"). (Doc. No. 782.) The motion has been fully briefed. (Doc. Nos. 796, 806, 809, 838.) On July 24, 2025,

1

the Court held a hearing on Defendants' Motion. (Doc. No. 939.) For the reasons set forth below, the Court **DENIES** Defendants' Motion for Partial Summary Judgment (Doc. No. 782).

## I.    BACKGROUND

Plaintiffs Darryl Dunsmore, Andree Andrade, Ernest Archuleta, James Clark, Anthony Edwards, Reanna Levy, Josue Lopez, Christopher Norwood, Jesse Olivares, Gustavo Sepulveda, Michael Taylor, and Laura Zoerner (collectively, "Plaintiffs") are current or former incarcerated individuals of San Diego County Jail facilities (the "Jail"), operated by Defendants San Diego County Sheriff's Department ("Sheriff's Department" or "SDSO") and County of San Diego (the "County"). (Third Amended Complaint ("TAC"), Doc. No. 231, ¶¶ 18–34.) The San Diego County Probation Department ("Probation Department") is also a named Defendant (collectively with SDSO and the County, "Defendants"). (*Id.* ¶ 35.) The Jail consists of seven facilities: (1) East Mesa Reentry Facility ("East Mesa"); (2) George Bailey Detention Facility ("George Bailey"); (3) Las Colinas Detention and Reentry Facility ("Las Colinas"); (4) Rock Mountain Detention Facility ("Rock Mountain"); (5) San Diego Central Jail ("Central"); (6) South Bay Detention Facility ("South Bay"); and (7) Visa Detention Facility ("Vista"). (*Id.* ¶ 34.)

Plaintiffs bring this action seeking declaratory and injunctive relief on behalf of "themselves and the approximately 4,000 incarcerated people who are similarly situated on any given day" to "remedy the dangerous, discriminatory, and unconstitutional conditions in the Jail." (TAC ¶ 4.) Specifically, Plaintiffs contend Defendants' policies and practices contribute to the high death rates in the Jail, which "has for years exceeded the rates nationally and in other large California jails, [and] it reached chilling heights in 2021 when 18 people died, amounting to a death rate of 458 incarcerated people per 100,000." (*Id.* ¶ 1.) In November 2023, the Court certified a Class and Subclasses. (Doc. No. 435.) Fact discovery closed in May 2024, (*see* Doc. Nos. 470; 636; 654), and expert discovery closed in November 2024 (Doc. No. 721). In December 2024, the parties reached a settlement as to Plaintiffs' Third Claim alleging violations of the Americans with

2

Disabilities Act. (Doc. Nos. 776; 777; 792.) On December 17, 2024, Defendants filed the instant motion as to all Plaintiffs' remaining claims except for one regarding mental health care. (Doc. No. 782.)

Defendants move for summary judgment on the following six claims as alleged by Plaintiffs in the TAC:

1.    Failure to provide adequate medical care in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 7 of the California Constitution (Claim 1) (TAC ¶¶ 442–47);

2.    Failure to provide adequate dental care in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 7 of the California Constitution (Claim 6) (*id.* ¶¶ 481–86);

3.    Failure to ensure adequate environmental conditions to protect against undue health and safety risks in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 7 of the California Constitution (Claim 4) (*id.* ¶¶ 469–74);

4.    Failure to ensure the safety and security of incarcerated people in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 7 of the California Constitution (Claim 5) (*id.* ¶¶ 475–80);

5.    Denial of access to counsel and the courts in violation of the Sixth and Fourteenth to the U.S. Constitution and Article 1, Section 15 of the California Constitution Amendments (Claim 8) (*id.* ¶¶ 496–500); and

6.    Discriminatory racial impact pursuant to Cal. Govt. Code § 11135 (Claim 9) (*id.* ¶¶ 501–07).[1]

---

[1]    Defendants do not move for relief as to Plaintiffs' Second Claim regarding mental health care, (*see* Doc. No. 782-1), the Court previously dismissed Plaintiffs' seventh cause of action regarding overincarceration of people with disabilities, (Doc. No. 287 at 8–13), and the Parties settled Plaintiffs' third cause of action regarding failure to provide reasonable accommodations to incarcerated people with disabilities (Doc. No. 792).

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standards

#### 1.    Summary Judgment Legal Standard

A court may grant summary judgment when it is demonstrated that there exists no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the nonmoving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the nonmoving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the nonmoving party's claim. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of the adverse party's pleading but must instead produce

4

evidence that sets forth specific facts showing that there is a genuine issue for trial." *See Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks, alterations, and citation omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party. *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1159 (C.D. Cal. 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Further, a motion for summary judgment may not be defeated by evidence that is "merely colorable, or is not significantly probative . . . ." *See Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006) (same). If the nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment. *See Nissan Fire & Marine*, 210 F.3d at 1103.

### 2.     Municipal Liability under 42 U.S.C. § 1983

Section 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. A § 1983 claim must contain "two essential elements": "(1) that a right secured by the Constitution or laws of the United States was violated; and (2) that the alleged violation was committed by a person acting under color of State law." *Long*, 442 F.3d at 1185. "The term 'persons' encompasses state and local officials sued in their individual capacities, private individuals, and entities which act under the color of state law and local governmental entities." *Vance v. Cnty. of Santa Clara*, 928 F. Supp. 993, 995–96 (N.D. Cal. 1996).

5

"[M]unicipalities and other local governmental units . . . [are] among those persons to whom § 1983 applies." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 688, 690 (1978); *see also Duarte v. City of Stockton*, 60 F.4th 566, 573–74 (9th Cir. 2023); *Streit v. County of Los Angeles*, 236 F.3d 552, 565–66 (9th Cir. 2001). However, § 1983 does not employ a theory of *respondeat superior* liability; a municipal entity cannot be held liable for the actions of its agents or employees alone. *Board of Cnty. Com'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Municipalities and their entities may be held liable as "persons" under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694.

To demonstrate liability, § 1983 compels a plaintiff to allege some municipal policy or custom affected the alleged civil rights violation as opposed to the individual actions of those employed by the entity. *Brown*, 520 U.S. at 403; *see Daniel v. Contra Costa Cnty. Sheriff's Dept.*, No. 16-cv-02037-EMC, 2016 WL 5109992, at *2 (N.D. Cal. Sept. 21, 2016) ("To impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: (1) that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy is the moving force behind the constitutional violation."). "A plaintiff cannot demonstrate the existence of a municipal policy or custom based solely on a single occurrence of unconstitutional action by a non-policymaking employee." *McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000).

Additionally, a municipality may be held liable for a policy of inaction or omission. *Long*, 442 F.3d at 1185–86. "To impose liability against a county for its failure to act, a plaintiff must show: (1) that a county employee violated the plaintiff's constitutional rights; (2) that the county has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights." *Id.* at 1186. A municipal policy is the "moving force" behind a

6

constitutional violation if there is "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). "Under *Canton,* a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Long,* 442 F.3d at 1185–86.

### 3.    Eighth Amendment and Fourteenth Amendment Claims (Claims 1, 4, 5, 6)

"Eighth Amendment protections apply only once a prisoner has been convicted of a crime, while pretrial detainees are entitled to the potentially more expansive protections of the Due Process Clause of the Fourteenth Amendment." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5 (9th Cir. 2016). "The Eighth Amendment's prohibition on cruel and unusual punishment prevents government officials from acting with deliberate indifference to a prisoner's health and safety, or serious medical needs." *Id.* at 1248 (citing *Hope v. Pelzer*, 536 U.S. 730, 737–38 (2002), and *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "To prove a violation of the Eighth Amendment, a plaintiff must show that the defendant: (1) exposed her to a substantial risk of serious harm; and (2) was deliberately indifferent to her constitutional rights." *Id.* at 1248. While an Eighth Amendment claim is evaluated under the "deliberately indifferent standard," *id.*, a Fourteenth Amendment Due Process claim, which can be brought by pretrial detainees against an entity defendant, are evaluated under the "reckless disregard" standard. *See Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071, 1076 (9th Cir. 2016); *see also Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (finding pretrial detainees must establish "more than negligence but less than subjective intent—something akin to reckless disregard.")

/ / /

/ / /

### 4. California Constitution

Article 1, Section 17 of the California Constitution prohibits the imposition of cruel or unusual punishment. Cal. Const. art. I, § 17. The California Supreme Court has found "no basis to find a different meaning of 'punishment' for state purposes than would apply under the Eighth Amendment." *In re Alva*, 33 Cal. 4th 254, 291 (2004).

Article 1, Section 15 of the California Constitution provides that the defendant in a criminal cause has the right "to have the assistance of counsel for the defendant's defense," amongst other rights. Cal. Const. art. I, § 15. The California Supreme Court interprets Article 1, Section 15 of the California Constitution synonymously with the right to counsel under the Sixth Amendment. *See e.g., In re Valdez*, 49 Cal. 4th 715, 729 (2010); *People v. Douglas,* 61 Cal. 2d 430, 434 (1964) ("The right to trial counsel is guaranteed by the Sixth Amendment, which is applicable in criminal trials in the state courts, and by section 13 of article I of the California Constitution.") (internal citations omitted).

### B. Plaintiffs' Request to Strike Defendants' Declarations

In Plaintiffs' opposition, Plaintiffs request the Court to strike four expert declarations filed in support of Defendants' Motion including the declarations of (1) Dr. Owen J. Murray (medical), (2) Dr. Scott E. Reinecke (dental), (3) Ms. Henrietta Peters (environmental), and (4) Dr. Brian Withrow (racial discrimination), as well as any portion of Defendants' Motion relying on those declarations. (*See* Doc. No. 796 at 9–13.)[2] In Plaintiffs' sur-reply, Plaintiffs request to strike a second declaration from Dr. Withrow, and any portion of Defendants' reply that relies on his declaration, as well as select paragraphs from the declaration of Susan Coleman, one of Defendants' attorneys, filed in support of Defendants' reply. (Doc. No. 838 at 7–9.)

/ / /

/ / /

---

[2] Citations to the record refer to the CM/ECF system page number stamped in blue at the top of each page rather than the page numbers at the bottom of each filing.

20-cv-00406-AJB-DDL

### 1.    Defendants' Expert Declarations

Plaintiffs object to Defendants' expert declarations as untimely and prejudicial on the basis that they "were filed well after the close of expert discovery, include a substantial number of new opinions not previously disclosed in this case, and lack any disclosure of the materials upon which the experts relied." (Doc. No. 796 at 10; *see also* Doc. No. 838 at 8.) Plaintiffs assert that Defendants' new expert declarations violate Federal Rule of Civil Procedure 26(a)(2)(D), which provides that a party must make expert testimony disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Plaintiffs further argue, "Defendants cannot offer a justification for the belated reports given that they did not submit rebuttal and/or supplemental reports by the Court's deadlines" and Plaintiffs are prejudiced because they did not have an opportunity to "test these new opinions through discovery." (Doc. No. 796 at 12.)

In response, Defendants assert the experts' declarations "are consistent with the experts' reports and their depositions[,]" and "[r]ebuttal reports are not required for experts to merely express their disagreement with the opposing expert . . . ." (Doc. No. 806 at 6.) Moreover, Defendants argue "it is not an abuse of discretion to consider new arguments or evidence if the opposing party had an opportunity to respond." (*Id.* (citing *El Pollo Loco, Inc. v. Hashim,* 316 F.3d 1032 (9th Cir. 2003)).) Finally, Defendants note that Plaintiffs filed nine declarations from their own experts. (*Id.*)

The Court declines to strike Defendants' experts' declarations. Federal Rule of Civil Procedure 26(e) provides:

> [T]he party's duty to supplement extends both to information included in the [expert's] report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2). In Defendants' Motion, Defendants note several instances where there have been "significant changes" at the Jail since the beginning of litigation. (*See e.g.*, Doc. No. 782-1 at 8 (changes to medical staffing), 18 (changes to drug interdiction), 20 (ongoing upgrades to surveillance video systems and intercoms).) Given the purported

changes, and that pretrial deadlines have been continued until 30 days after a written decision is issued on Defendants' Motion (Doc. No. 850), the Court finds that Defendants may provide supplemental information from experts pursuant to Federal Rule of Civil Procedure 26(e). Furthermore, the Court finds any prejudice to Plaintiffs minimal given that Plaintiffs responded to Defendants' declarations in their opposition (*see* Doc. No. 796), and the Court provided Plaintiffs the opportunity to respond to any new evidence Defendants proffered in their reply brief (Doc. No. 824), which Plaintiffs did in their sur-reply (Doc. No. 838). Finally, the Court finds that striking Defendants' declarations (or Plaintiffs' experts' declarations) would not best serve the purpose of compiling a complete record.

For the foregoing reasons, the Court **DENIES** Plaintiffs' request to strike Defendants' expert declarations filed in support of Defendants' Motion.

### 2. Defendants' Counsel's Declaration

Plaintiffs seek to strike paragraphs 5, 6, and 11 of the Amended Declaration of Susan E. Coleman In Support of Defendants' Reply (Doc. No. 809, "Amended Coleman Decl."). (Doc. No. 838 at 9.) Plaintiffs assert paragraphs 5, 6, and 11 "consist of improper factual or legal argument that should have been included in Defendants' brief" and are non-compliant with this Court's Civil Case Procedures, which require that all objections to evidence be contained in a party's brief. (*Id.* (citing Hon. Anthony Battaglia Civil Case Procedures, § II.A).) Defendants did not respond to Plaintiffs' objection.

The Court agrees with Plaintiffs. This Court's Civil Case Procedures provide: "Objections relating to the motion should be set forth in the parties' opposition or reply. Separate statement of objections will NOT be allowed. The inclusion of objections does not expand the page limits set." (Anthony Battaglia Civil Case Procedures, § III.A (last updated April 2025).) In paragraph 5, Coleman responds to Plaintiffs' counsel's declaration by arguing that expert rebuttal reports are not required. (Doc. No. 809 ¶ 5.) In paragraph 6, she comments on the updates to the Jail and why Defendants submitted new evidence in support of their Motion. (*Id.* ¶ 6.) In paragraph 11, she argues that certain news articles

Plaintiffs filed as exhibits in support of their opposition brief should be excluded. (*Id.* ¶ 11.) Each of these paragraphs contains attorney argument that should have been included in Defendants' briefs pursuant to this Court's Civil Case Procedures § III.A. Because the Court may strike portions of declarations that contain improper argument, *see Fuchs v. State Farm. Gen. Ins. Co.*, No. CV-16-01844-BRO-GJS, 2017 WL 4679272, at *2 (C.D. Cal. Mar. 6, 2017), the Court strikes the portions of the Amended Coleman Declaration that contain improper argument.

Accordingly, for the foregoing reasons, the Court **GRANTS** Plaintiffs' request to strike paragraphs 5, 6, and 11 of the Amended Coleman Declaration.

## C.    Inadequate Medical Care (Claim 1)

Plaintiffs' First Claim is that Defendants' "policies, practices, and failures to train staff," subjected Plaintiffs "to a substantial risk of serious harm and injury from inadequate medical care at the Jail" in violation of the Eighth and Fourteenth Amendments and California Constitution. (TAC ¶¶ 443–45.) As stated above, *see* Sec. II(2)(A)(2), Plaintiffs' Eighth Amendment claim on behalf of individuals convicted of a crime is evaluated under the "deliberate indifference standard," whereas Plaintiffs' Fourteenth Amendment claim on behalf of pretrial detainees is reviewed under the "reckless disregard" standard.[3] *See Mendiola-Martinez*, 836 F.3d at 1246, 1248; *Castro*, 833 F.3d at 1071, 1076; *see also Gordon*, 888 F.3d at 1124–25.

Where a plaintiff alleges a prison's systemic deficiencies violate the Eighth Amendment, the Court assesses the claim through a two-prong inquiry. *Disability Rts. Montana, Inc. v. Batista*, 930 F.3d 1090, 1097 (9th Cir. 2019). "The first, objective, prong requires that the plaintiff show that the conditions of the prison pose 'a substantial risk of serious harm.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). "The second, subjective, prong requires that the plaintiff show that a prison official was deliberately

---

[3]    The Court interprets Plaintiffs' claims brought pursuant to the California Constitution under the same standards applicable to claims brought under the U.S. Constitution.

indifferent by being 'aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' and 'also draw[ing] the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

In Defendants' opening brief, Defendants present evidence to negate the objective prong of the Eighth Amendment test, that the Jail's conditions do not pose a "substantial risk of serious harm." (*See* Doc. No. 782-1 at 1–11); *see also Disability Rts. Montana, Inc.*, 920 F.3d at 1097. Specifically, Defendants outline the composition of the Jail's medical personnel, including its contracts with NaphCare and Correctional Healthcare Partners, Inc. ("CHP"), a private company that contracts with Defendants to deliver healthcare, as well the Jail's intake screening procedures, electronic health record system, new substance use disorder and mental health programming, and several updated policies to address training medical personnel and notifying incarcerated individuals of available medical services. (Doc. No. 782-1 at 1–8; *see generally* Doc. No. 782-2.[4]) In turn, Plaintiffs assert that Defendants' medical system is "plagued by preventable deaths" and that Defendants' medical system exposes class members to a substantial risk of serious harm. (Doc. No. 796 at 7, 15.) Plaintiffs also dispute Defendants' characterization of ten aspects of the Jail's

---

[4]     Doc. No. 782-2 is Defendants' Appendix, which is comprised of 14 declarations. The declarations are by: (1) Dr. Owen J. Murray, Defendants' medical expert; (2) Dr. Scott E. Reinecke, Defendants' dental expert; (3) Dr. Jon Montgomery, Medical Director, SDSO's Detention Services Bureau; (4) Dr. Peter J. Feedland, CEO of CHP; (5) Serina Roglien-Hood, SDSO's Deputy Director of Residential Inpatient Care Facilities; (6) Sergio Sanchez, Assistant Manager of Sheriff's Food Service; (7) Scott Bennett, a Project Manager at SDSO; (8) Francis Gardiner, Sergeant, Las Colinas Contraband Narcotics Interdiction Team; (9) Rebecca Cardenas, Program Coordinator at SDSO; (10) Mike Binsfield, Lieutenant, SDSO; (11) Dr. Brian Withrow, Defendants' racial discrimination expert; (12) David Blackwell, Lieutenant, SDSO; (13) Henrietta Peters, Defendants' environmental and sanitation expert; and (14) Susan Coleman, counsel for Defendants. (*See* Doc. No. 782-2.)

healthcare system: (1) mortality rates and preventable deaths at the Jail; (2) staffing; (3) intake screening; (4) records management; (5) pharmacy/medication system; (6) Medication-Assisted Treatment ("MAT") program; (7) sub-specialty services; (8) "Wellness Rounds"; (9) quality management; and (10) chronic care management. (*See id.* at 13–23.)

The Court first outlines the Parties' evidence as to these ten issues under the purview of the objective prong, ie. whether the evidence presented demonstrates that the medical conditions at the Jail pose "a substantial risk of serious harm." The Court then addresses Plaintiffs' evidence of "deliberate indifference" under the subjective prong.

### 1. Mortality Rate & Preventable Deaths

In their Motion, Defendants assert, "[t]he mortality rate at the Jail has decreased significantly since the filing of the operative complaint in this lawsuit." (Doc. No. 782-1 at 12 (citing Doc. No. 782-2 at 6–24, Declaration of Owen J. Murray, D.O. "Murray Decl.," at 23 ¶ 88).) Reported in-custody deaths reached a high in 2022 with 19 deaths, which decreased to 13 in-custody deaths in 2023, and 9 in-custody deaths in 2024.[5] (Murray Decl. at 23 ¶¶ 89–90; Doc. No. 796 at 23.) At the time of the issuance of this Order, the San Diego County Sheriff's Office In-Custody Deaths Transparency Report identifies 7 in-custody deaths in 2025: one due to natural causes, and six with unstated reasons for the manner of death.[6] The last known suicide at the time of Defendants' filing of the Partial Motion for Summary judgement was in June 2023. (Murray Decl. at 23 ¶ 93.) Defendants' medical expert, Dr. Murray, states that CHP "intends to participate in . . . mortality reviews, which should further assist in decreasing the mortality rate at the Jail." (*Id.* at ¶ 91.) Dr.

---

[5] Defendants' opening brief states, "[I]n 2024, there were only 7 in-custody deaths." (Doc. No. 782-1 at 12–13.) Plaintiffs respond that Defendants' website totaled 9 in-custody deaths in 2024, which Defendants accepted as factually accurate in their reply brief. (*See* Doc. No. 806 at 14 ("There were 9 in-custody deaths in 2024 . . . .").)

[6] *See Homicide, In-Custody Deaths, Officer Involved Shootings*, San Diego County Sheriff's Office, https://www.sdsheriff.gov/resources/transparency-reports ("In-Custody Deaths Transparency Report").

Murray's Declaration does not address any specific in-custody deaths other than noting the change in mortality rate over time. (*See generally id.* at 6–24.)

In response, Plaintiffs first dispute Defendants' statistics on the reported mortality rate. Plaintiffs' medical expert, Dr. Jeffrey E. Keller, rebuts the presumption that the only in-custody Jail deaths are those reported. (*See generally* Doc. No. 937-3[7] at 6–265, "Keller Report".) He contends that deaths are improperly excluded from Defendants' reports, including those occurring outside of the Jail, when medically compromised incarcerated individuals are sent away for treatment and later die. (*See e.g.*, Doc. No. 937-3 at 267–400, "Keller Rebuttal," at 296 ¶ 81 (Jose Cervantes Conejo died at Palomar Medical Center on April 12, 2024, from facial and head trauma suffered at the Jail approximately three hours after he was booked on March 29, 2024, but his death is not listed on SDSO's website of in-custody deaths).)[8]

Second, Plaintiffs present evidence of preventable in-custody deaths, which Defendants do not dispute. For example, the San Diego County Medical Examiner classified two in-custody deaths as homicides due to medical neglect in the autopsy reports—in 2022, an incarcerated individual lost 60 pounds of body weight over three months and did not receive medical treatment, and in 2023, Defendants failed to refill a Type-1 diabetic individual's insulin pump, despite repeated requests for the medication. (*See* Doc. No. 796-1, "Swearingen Decl.," at 4, ¶ 13; *see also* Doc. No. 796-2 (Ex. E to Swearingen Decl.) at 102, 124.) Plaintiffs' medical expert, Dr. Keller, also outlines seven of ten in-custody deaths he argues were avoidable but-for the inadequacies in the Jail's

---

[7] Pursuant to the Parties' request and Court Order, Plaintiffs refiled previously submitted documents with updated redactions to protect privileged information. Doc. No. 937-3 was previously submitted as Doc. No. 796-3.

[8] Plaintiffs also cite to two published news articles indicating unreported deaths at the Jail. (*See* Doc. No. 796-2 at 412–19; *see also id.* at 542–44.) The Court *sua sponte* takes judicial notice of both articles, but not for the truth of the matters asserted therein. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.")

medical system. (*See* Keller Report at 46–74; Keller Rebuttal at 277–87.) Some illustrative examples include: the September 2022 death of Raymond Dix, who had a medical history of congestive heart failure and chronic obstructive pulmonary disease, whom the Jail failed to provide his prescribed heart and lung medications for six days following his booking into the Jail (Keller Report at 52–55); the November 2022 death of Aaron Bonin, a mentally-ill person who did not receive consistent dialysis treatment (*id.* at 61–64); the May 2023 death of Patricia Adamson, who, upon her return to the Jail from the hospital where she had been vomiting blood, never received another complete medical examination despite continued abdominal distress and vomiting (*id.* at 46–52); and the July 2024 death of Chase Mitchell, who died of sepsis after not receiving any specialized care for an abscess on his back, despite losing 25 pounds in one month (Keller Rebuttal at 277–81).

For each death, the Keller Report analyzes failures in the Jail's medical management that contributed to the death. (*See* Keller Report at 52 ¶¶ 153–58 (Dix), *id.* at 63 ¶¶ 188–92 (Bonin), *id.* at 50–52 ¶¶ 134–42 (Adamson), Keller Rebuttal Report at 280 ¶¶ 30–31 (Mitchell).) For example, one of many medical factors Dr. Keller notes is that neither Dix, nor Adamson, nor Mitchell received a physical exam from a Jail medical practitioner, who could have more quickly identified and then addressed critical, urgent medical problems. (*See* Keller Report at 54 ¶ 155 (Dix), *id.* at 50 ¶ 137 (Adamson), Keller Rebuttal at 280 ¶ 30 (Mitchell).) In the case of Mitchell, Dr. Keller posits, "One reason a physical examination did not occur at the Jail is because of the County's reliance on remote STATCare practitioners, who cannot perform physical examinations because the are not present at the Jail." (Keller Rebuttal at 280 ¶ 30.)

Defendants do not respond to these case studies or address remote STATCare in their reply brief. (*See generally* Doc. No. 806.)

By just considering the mortality rate evidence and sample case studies of what Plaintiffs contend are preventable in-custody deaths, there exist genuine disputes of material fact that could lead a reasonable trier of fact to conclude that the medical conditions at the Jail, including the failures to offer in-person medical examinations,

expose incarcerated individuals to a substantial risk of serious harm. First, the parties dispute the number of in-custody Jail deaths. (Keller Rebuttal at 296 ¶ 81.) This factual dispute is material because if the number of deaths that occur due to precipitating events at the Jail far exceeds the number of in-custody deaths currently reported, a factfinder may reasonably conclude that the sheer number of deaths is indicative of a substantial risk of serious harm. Second, Defendants maintain Plaintiffs "rely on stale evidence" and therefore fail to prove the Jail's medical system continues to cause any harm, (Doc. No. 806 at 7), but viewing Dr. Keller's evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that insufficient staffing at the Jail was the moving force behind the Jail's failure to conduct in-person medical exams of at least three individuals (Dix, Adamson, and Mitchell) who might not have died had they received one, and which continues to contribute to deaths at the Jail. Whether there exists a triable issue of fact that Defendants were deliberately indifferent to a substantial risk of harm is addressed below.

### 2.    Healthcare Contracts and Staffing

Defendants' medical expert, Dr. Murray, states SDSO uses a "hybrid model" to administer health care to incarcerated individuals at the Jail, meaning that it employs both San Diego County employees as well as contracted or subcontracted professional staff. (Murray Decl. at 10 ¶¶ 12–13.) SDSO is responsible for nurse staffing, (Doc. No. 782-2 at 33–48, Declaration of Jon Montgomery, D.O., "Montgomery Decl.," at 35 ¶ 9), while the County has contracted with NaphCare, a private correctional healthcare company, to oversee dental and mental health staffing, the MAT [medication assisted treatment] program, pharmacy operations, and specialty medical services (*id.* at 35 ¶¶ 22–24). Additionally, the County entered into a separate contract with CHP, a correctional healthcare company, to oversee all on-site medical provider services at the Jail, which commenced June 1, 2024. (*Id.* at 35 ¶ 10.)

Pursuant to the CHP contract, there are 30.5 Full Time Employee (FTE) medical providers at the Jail, which Dr. Murray contends is approximately two-and-a-half times more than the level in place at the time the lawsuit was filed. (Murray Decl. at 10–11

¶¶ 15–16.) There are also currently 359 nursing positions at the Jail comprised of 265 registered nurses ("RN") and 94 licensed vocation nurses ("LVN"). (*Id.* at 12 ¶ 27.) The nursing vacancy rate from January to April 2024 was approximately 25%. (*Id.* ¶ 28.)

Plaintiffs respond that Defendants have not provided any staffing analyses to establish that the number of medical practitioners is now sufficient to provide adequate care. (Doc. No. 796 at 18 (citing Doc. No. 937-3 at 1–4, "Keller Decl.," at 2 ¶ 5; Keller Rebuttal at 325–26 ¶ 164).) Plaintiffs additionally take issue that Defendants stipulate, without further evidence, that its 25% average nursing vacancy rate is "generally similar to or slightly lower than that of other healthcare facilities in Southern California." (Doc. No. 796 at 18–19.) Plaintiffs note "a 25% vacancy rate does not mean that patients are not harmed by the vacancies." (Doc. No. 796 at 19 (citing Keller Rebuttal at 325 ¶ 162).) Moreover, Plaintiffs point to Dr. Keller's findings that a medical system comprised of the County, NaphCare, and CHP, is overly-convoluted and "places incarcerated people at risk because it is unclear who reports to whom and whose policies govern." (Doc. No. 796 at 19 (citing Keller Report at 141–42).) Finally, Plaintiffs assert Defendants fail to rebut Plaintiffs' expert's evidence that "CHP's new contract with the [C]ounty provides no oversight of the STATCare practitioners, even by the CHP Medical Director at the Jail." (*See* Keller Report at 140 ¶ 435.)

In reply, Defendants state "the shift of some services to CHP was [] directly [the] result of a proactive desire to have more accountability than was being provided by Naphcare who was, at the time, subcontracting with CHP. The change shows proactive steps and not deliberate indifference." (Doc. No. 806 at 9.)

Without a staffing analysis, the parties' dueling expert opinions regarding the sufficiency (or insufficiency) of the Jail's staffing model create a genuine dispute of material fact as to whether the Jail has enough staff to provide constitutionally adequate medical care, or whether medical staff vacancies and convoluted staffing structures expose incarcerated individuals to a substantial risk of serious harm.

/ / /

### 3.    Intake Screening

Registered nurses conduct medical intake screenings at the Jail. (Murray Decl. at 13 ¶ 35.) At intake screenings, the Jail purports to screen for tuberculosis, pregnancy, past and present substance use, and known chronic medical conditions. (Doc. No. 782-2 at 123–28, Declaration of Serina Roglien-Hood, "Roglien-Hood Decl.," at 127 ¶¶ 24, 25, 27; *see also* Montgomery Decl. at 38, ¶¶ 29–30.) Defendants also highlight a new pilot program initiated by CHP that allows incarcerated individuals with chronic care needs to be evaluated by medical providers at Central "upfront upon acceptance into the Jail" (Doc. No. 782-1 at 6 (citing Murray Decl. at 22 ¶ 84)), rather than waiting the standard fourteen days for an "initial health assessment" (Murray Decl. at 15 ¶ 43).

In response, Plaintiffs respond that "screenings are cursory" (Doc. No. 796 at 20 (citing Keller Report at 79–92)), and whether due to the screenings themselves, or a lack of staff training, result in missed and/or untreated conditions, both acute and chronic. (Keller Report at 90 ¶ 278).) Plaintiffs further dispute that the initial health assessments often do not occur within the fourteen-day timeframe, placing incarcerated people at increased risk. (*See* Keller Report at 91 ¶ 283; Roglien-Hood Decl. at 127 ¶ 27 (SDSO's Deputy Director of Residential Inpatient Care Facilities stating that initial health assessment is "normally done within 14 days"); *see also* Doc. No. 796-2 (Ex. T) at 518:12–520:21.) Dr. Keller specifically opines that if SDSO instituted health assessments at booking, rather than later, "the mortality and morbidity at the Jail would decrease." (Keller Report at 91–92 ¶ 284.)

Defendants do not dispute the facts presented by Plaintiffs. Instead, Defendants make a legal argument that "Plaintiffs' reliance on isolated incidents where initial assessment screenings were not done within 14 days to demonstrate deliberate indifference . . . do[es] not amount to a constitutional violation under *Monell*." (Doc. No. 806 at 9 (citing *McDade,* 223 F. 3d at 1141).)

Here, Plaintiffs do not rely solely on isolated incidents, which the Court agrees with Defendants would be improper. *See McDade*, 223 F.3d at 1141 (9th Cir. 2000). Rather, a

18

trier of fact could rely on Dr. Keller's expert report that failures to conduct timely health assessments are increasing the mortality and morbidity rates at the Jail. (*See* Keller Report at 91–92 ¶ 284.) Accordingly, a genuine dispute of material fact exists as to whether the Jail's screening procedures, in practice, create a substantial risk of serious harm. *See e.g.*, *Gibson v. County of Washoe*, 290 F.3d 1175, 1194–96 (9th Cir. 2002), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (jury could find a constitutional violation by an intake nurse who "knew that [the plaintiff] was in the throes of a manic state" but "fail[ed] to provide for the identification of [his urgent mental health] needs" due to "omission in the County's policy regarding the handling of prescription medication").

### 4.    Medical Records Management

To record and manage incarcerated individuals' medical care, SDSO utilizes TechCare, an Electronic Health Record ("EHR") software for correctional facilities, which also interfaces with Surescripts, which connects to a patient's medication history stored in community pharmacies. (Montgomery Decl. at 35–36 ¶¶ 11–14.) Defendants assert TechCare "provides the SDSO with a platform for managing patient health information, facilitating clinical workflow and decision making, and promoting quality care." (Doc. No. 782-1 at 9.)

Plaintiffs dispute that TechCare promotes quality care. (Doc. No. 796 at 20.) Plaintiffs proffer evidence where Defendants' employees conceded that because TechCare is difficult to use, there is a risk that information is "not followed up [on] creating potential liability to the [C]ounty." (Doc. No. 796-2 at 432 (May 12, 2023, Corrective Action Notice from SDSO to NaphCare, Inc. stating: "In some cases, [C]ounty staff is faced with screens and cues they no [sic] nothing about and have no idea how to complete. This can lead to information being entered into the system that is not followed up [on] creating p[o]tential liability to the [C]ounty.").) Plaintiffs' expert, Dr. Keller, also reported on medical staff's failure to adequately document patients' medical care. (Keller Report at 217 ¶ 703 ("[M]edical records and other documents produced by the Sheriff's Department suggest

that staff do not always provide complete documentation of encounters with incarcerated people.").)

Defendants do not further dispute Plaintiffs' facts regarding records management.

Although conflicting evidence about the efficacy of the Jail's records management system is insufficient itself to illustrate a substantial risk of serious harm to incarcerated individuals, the parties' disagreement about whether or not staff are properly trained in using the medical record system, and whether accurate and reliable medical records are created and logged, are facts that could support or undermine a fact finder's evaluation of whether conditions at the Jail pose a substantial risk of serious harm to incarcerated individuals.

### 5.    Pharmacy/Medication Management

Defendants report that the Jail uses Surescripts, a system that "connects to a patient's medication history stored in the databases of community pharmacies[,]" which allows Jail staff "to verify a patient's medication history quickly and easily." (Doc. No. 782-1 (citing Murray Decl. at 15–16 ¶¶ 46–48).) Plaintiffs dispute that Defendants adequately manage patients' pharmaceutical prescriptions. Specifically, Plaintiffs present evidence of Defendants' substantial delays in administering "non-formulary" medications, resulting in patient harm and even death. (*See* Keller Report at 95 ¶ 295 ("Even if non-formulary meds are eventually approved, the verification process can take days during which time the patients are not receiving these medications. This delay can and does harm patients.").) In 2022, Raymond Dix was not able to receive two non-formulary drugs for his congestive heart failure and chronic lung disease. (Keller Report at 96–97 ¶¶ 300, 301.) He received only one medication on the seventh day after he was booked and died that day from a heart attack. (*Id.; see also id.* at 97–99 ¶¶ 302, 303 (describing instances of Jail staff discontinuing diabetic patients' prescriptions for non-formulary medications and substituting them with "totally different medication" or medication outside the "generally accepted clinical practice pattern").) Defendants do not further respond to these facts.

Here, a fact finder could rely on Dr. Keller's expert report outlining Mr. Dix's death and other medical ailments experienced by others caused by deficiencies in the Jail's medication management and find a substantial risk of serious harm. (*See* Keller Report at 91–92 ¶ 284.) Accordingly, a genuine dispute of material fact exists as to whether the Jail's medication management create a substantial risk of serious harm.

### 6.    Medication-Assisted Treatment ("MAT") Program

Defendants represent "[i]t is true th[at] when this lawsuit was filed, the Sheriff's Office did not have a MAT program at the Jail." (Murray Decl. at 17 ¶ 58.) However, "SDSO now operates a dedicated MAT program at the Jail through NaphCare that "combines medication treatment with behavioral therapies to provide a more comprehensive approach to treating substance use disorders." (Doc. No. 782-1 at 10 (citing Murray Decl. at 16 ¶¶ 50–51).) Additionally, as part of the MAT program, incarcerated individuals are screened for Opioid Use Disorder ("OUD") at intake and if medically indicated, upon release, can receive a 30-day supply of medication to "help facilitate continuity of care and reduce the risk of relapse and overdose upon release." (*Id.* (citing Murray Decl. at 17 ¶¶ 56–57).)

Plaintiffs respond with evidence from one of Plaintiffs' medical experts and addiction medicine specialists, Dr. Kelly Ramsey, that Defendants "fail to adequately diagnose OUD," and "even when they do diagnose OUD, [they] fail to provide adequate medication for OUD, including by underdosing and improperly discontinuing medication." (Doc. No. 796 at 21 (citing Doc. No. 937-4[9] at 4–153, "Ramsey Report," at 34–37, 73–96; *id.* at 155–254, "Ramsey Rebuttal Report," at 185–98).)  Further, Dr. Ramsey opines that "stunning failures in withdrawal management . . . likely" caused the June 2024 death of a man at Central Jail, who was "never [clinically] assessed" and did not receive

---

[9]    Pursuant to the Parties' request and Court Order, Plaintiffs refiled previously submitted documents with updated redactions to protect privileged information. Doc. No. 937-4 was previously submitted as Doc. No. 796-4.

individualized treatment for daily opioid use. (*See* Ramsey Rebuttal Report at 181–82, ¶¶ 56–64.)

Defendants respond that Plaintiffs' expert reports are "clearly outdated," fail to account for the Jail's "dedicated MAT program," and "[t]here is no evidence to dispute any of the changes even if the outdated evidence is all true." (Doc. No. 806 at 7.)

Here, Plaintiffs provide sufficient evidence through the expert report of Dr. Ramsey, that even after Defendants implemented the MAT program, failures to properly address incarcerated individuals' withdrawals, like in the case of the June 2024 death at Central, create a substantial risk of serious harm. *See Sandoval v. Cnty. of San Diego,* 985 F.3d 657 (9th Cir. 2021).

### 7.    Sub-Specialty Services

Plaintiffs alleged the Sheriff's Department fails to appropriately refer incarcerated people to outside specialists when necessary. (TAC ¶ 104.) In Defendants' Motion, Defendants provide that SDSO contracts with NaphCare for the management of sub-specialty and hospital services. (Doc. No. 782-1 at 10.) NaphCare in turn, "utilizes contracts with the University of California San Diego, as well as several independent practitioners to provide specialty services locally." (Murray Decl. at 18–19 ¶ 61.) Defendants further declare that between March 2023 to April 2024, SDSO "completed over 2,500 sub-specialty referrals" and the average time from consult to completion for sub-specialty referrals was "approximately 25 days." (*Id.* at 19 ¶¶ 62, 63.) Defendants' medical expert, Dr. Murray, claims, "I have not seen any evidence that the sub-specialty providers are currently not providing services due to delays in payment that might have previously existed." (*Id.* at 18 ¶ 64.)

In response, Plaintiffs contend that the volume of referrals "do[es] not establish that incarcerated people actually receive the specialty care they need." (Doc. No. 796 at 21.) Plaintiffs cite to the Keller Report's summary of patients who experienced months-long delays before they were referred to specialists. (*See* Keller Report at 146–58.) Additionally, Plaintiffs submit declarations from class members, including James Clark, who spent five

months in 2024 waiting for surgery for a condition that required him to use diapers due to incontinence, (Doc. No. 796-16, "Clark Decl.," ¶¶ 2–4) and Amie Stanley, who had to wait several months for a biopsy of a painful skin tag the size of a quarter, that she learned was cancerous, requiring chemotherapy or radiation (Doc. No. 796-17, "Stanley Decl.," ¶¶ 3–10).

In reply, Defendants assert that the class member declarations provide an "incomplete picture." (Doc. No. 806 at 7.) Defendants claim James Clark's hydrocele surgery was delayed because "the continuity of care was repeatedly interrupted by the fact that Mr. Clark is a repeat criminal offender and has been and out of custody on numerous occasions" and that Ms. Stanley's physician recommended chemotherapy and radiation, not due to a concern of metastasis, but due to the skin tag's anatomical location. (Doc. No. 806 at 7–8.)

Construing all evidence in the light most favorable to Plaintiffs, Plaintiffs' evidence of incarcerated individuals experiencing months-long delays before receiving specialty medical care, including for cancer treatment (in Amie Stanley's case) or to address incontinence (in James Clark's case) raises a genuine dispute of material fact as to whether the Jail's management of sub-specialty services poses a substantial risk of serious harm.

### 8. Wellness Rounds

Defendants present evidence that SDSO has established weekly "Wellness Rounds" in the Jail's Administrative Separation Unit, which consist of medical and mental health staff walking into each administrative separation ("AdSep") cell, attempting to engage the incarcerated individual, and assessing the individual's medical and mental status. (Murray Decl. at 19 ¶¶ 69–71.) Defendants suggest the intent of the program is to "lead to better overall health outcomes and safety." (Doc. No. 782-1 at 11 (citing Murray Decl. at 20 ¶ 72).) Citing to the rebuttal report of their mental health expert, Dr. Pablo Stewart, Plaintiffs respond that the "Wellness Rounds" are not in writing as Jail policy, and are inadequate because they lack confidentiality and do not include any "meaningful clinical

evaluation or treatment." (Doc. No. 796 at 21–22 (citing Doc. No. 937-5 at 4–194, "Stewart Report," at 257–59).)

Although conflicting evidence about the wellness rounds is not sufficient by itself to show any kind of constitutional violation, the parties' disagreement about whether or not policies regarding wellness rounds even exist, both officially (in writing) (*see* Stewart Report at 257–59) and in practice, are facts that could support or undermine a trier of fact's evaluation of whether the Jail's medical system poses a substantial risk of serious harm.

### 9. Quality Management

Following initiation of this lawsuit, SDSO revised and updated its policies and procedures ("P&P") related to provision of medical care at the Jail. In June 2024, SDSO released P&P No. A.1.3, a policy to identify healthcare services for incarcerated individuals, and P&P No. C.9.1, a policy to train new staff. (Montgomery Decl. at 39 ¶¶ 33–34; *see also id.* at 41–48.) Defendants report that SDSO's Quality Assurance/Quality Improvement ("QA/QI") committee meets quarterly. (*Id.* at 40 ¶¶ 35–36.)

Further, Defendants assert CHP "has been in the process of developing a set of Disease Management Guidelines . . . to help standardize chronic care management at the Jail." (Murray Decl. at 22 ¶ 83.) In November 2024, CHP also started a triage pilot program at one of the seven Jail facilities, designed for "higher risk individuals (e.g., with HIV, diabetes, etc.) and/or those with chronic care needs [to] receive an evaluation by a medical provider" upon acceptance into the Jail. (*Id.* ¶ 84.)

Plaintiffs respond that the fact that the quality assurance committee "meets quarterly and holds an annual meeting" suggests that "Defendants concede that necessary improvements have not been implemented." (Doc. No. 796 at 22.) Plaintiffs admit the quality assurance committee meetings may be a "marginal improvement," but also contend that the initiation of the quality assurance program is insufficient to moot an Eighth Amendment claim for inadequate medical care. (*Id.* (citing *Armstrong v. Newsom*, 58 F.4th 1283, 1295 (9th Cir. 2023).)

1    Based on the evidence presented, whether or not the Jail's new training policies and
2   quality management program sufficiently address individuals' medical care is a dispute of
3   fact that could support or undermine a finder of facts evaluation of whether the Jail's
4   medical system poses a substantial risk of serious harm.

5                    **10.    Chronic Care**

6    Defendants report the Jail assesses incarcerated individuals for any known chronic
7   medical conditions during intake screenings at the time of booking. (Doc. No. 782-1 at 12
8   (citing Murray Decl. at 21 ¶¶ 79–80).) Defendants' chronic care system also includes
9   referrals to ENTs, ophthalmologists, and cardiologists as well annual scheduling of
10  optometry and foot exams for all diabetics. (*Id.*) Finally, Defendants describe that CHP has
11  been in the process of developing Disease Management Guidelines ("DMGs") to help
12  standardize chronic care management at the Jail, which will include practice standards for
13  asthma, gout, HIV, hyperlipidemia, hypertension, and skin and soft tissue infections. (*Id.*
14  at 22 ¶¶ 81–83.) Defendants also discuss CHP's pilot program to permit incarcerated
15  individuals with chronic care needs to be evaluated by medical providers up-front at intake,
16  discussed at Section I(b)(3).

17   Plaintiffs contest the sufficiency of Defendants' chronic care program and present
18  evidence in the form of the Keller Report regarding observed systemic problems, including
19  "failing to conduct or review diagnostic test results, failing to take vital signs, failing to
20  ensure nurses do not provide care outside their scope of practice, and failing to follow up
21  after medication changes." (Doc. No. 796 at 22 (citing Keller Rebuttal at 371–80); *id.* at
22  340 (App'x A)).) The Keller Rebuttal outlines examples of patients whose chronic
23  hypertension went unaddressed for eleven months (Keller Rebuttal at 371), who should
24  have been screened for Hepatitis C infection but were not (*id.*), and who should have
25  received specific peak expiratory flow tests to control asthma at each chronic care visit but
26  did not receive any (*id.* at 377). Plaintiffs also identify that the DMGs are not yet complete
27  and that once they become complete, there could be "major problem[s]" of training on
28  policies and procedures across the County. (*Id.* (citing Stewart Report at 145 ¶ 378).)

Although conflicting evidence about chronic care management may not be sufficient by itself to show any kind of constitutional violation, the parties' disagreement about whether or the Jail adequately manages chronic care for incarcerated individuals are facts that could support or undermine a fact finder's evaluation of whether the Jail's medical system poses a substantial risk of serious harm.

Based on the totality of the evidence of these ten factors, and construing the evidence in the light most favorable to Plaintiffs, Plaintiffs have adduced sufficient evidence to demonstrate genuine disputes of facts regarding whether medical care conditions at the Jail, especially with regard to the Jail's medication management, withdrawal management, and levels of medical staffing, which Plaintiffs' experts contend have led to numerous preventable deaths, place incarcerated individuals at "a substantial risk of serious harm."

### 11.    Deliberate Indifference Analysis

In support of satisfying the second, subjective prong of the Eighth Amendment test, that Defendants were aware of a substantial risk, but were deliberately indifferent, Plaintiffs identify a series of published reports created by independent third parties or consultants hired by Defendants, that evaluated medical conditions at the Jail. Plaintiffs first point to a 2017 report authored by the National Commission on Correctional Health Care ("NCCHC"), an entity which promulgates standards that guide decisions on whether to grant NCCHC accreditation, which concluded that the Jail failed to meet nearly all standards for adequate medical care. (*See* Swearingen Decl. (Ex. B) at 139–277; *see also* Keller Report at 18–21 ¶¶ 33–41.) The 2017 NCCHC report identified the Jail's deficiencies in failing to timely screen and treat individuals with preexisting health conditions during booking and its delays in examining individuals who requested medical attention. (*Id.*) In response, Defendants state the report is "clearly outdated and refer[s] to conditions that existed prior to the numerous improvements that Defendants have recently made to the medical system at the Jail." (Doc. No. 806 at 7.) Yet, Defendants do not dispute that they were aware of the NCCHC report when it was published in 2017 and that they

did not take substantive actions to improve the Jail's medical conditions until this action was filed in 2020. (*See generally* Doc. Nos. 782-1; 806.)

Next, Plaintiffs identify that in 2020, the County retained a consultant, Dr. Homer Venters, to evaluate the Jail and make recommendations of how to reduce the rate of mortality and morbidity at the Jail. (Doc. Nos. 796 at 17; Keller Report at 21–22 ¶¶ 42–44.) Plaintiffs contend that Dr. Venters' recommendations have not been implemented. (*See* Doc. No. 796 at 17.) Defendants do not dispute any of Plaintiffs' factual evidence as to Dr. Venters' report, and do not address Dr. Venters' report at all. (*See generally* Doc. Nos. 782-1; 806).

Furthermore, in 2022, the California State Auditor's investigation, which focused on an in-depth review of 30 in-custody deaths, with an emphasis of cases between 2016 and 2020, determined that "deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals" had "likely contributed to in-custody deaths" and that the Sheriff's Department had "not consistently taken meaningful action when such deaths have occurred." (Swearingen Decl. (Ex. A) at 14 (State Auditor Letter); Keller Report at 22–25 ¶¶ 45–51.) That same year, a consultant retained by the County stated that San Diego "is the only [large] county [in California] with a statistically significant number of excess deaths. . . . This finding corroborates previous reporting suggesting that in-custody deaths are the most acute in San Diego County." (Doc. No. 796-2 (Ex. C) at 9.) Again, Defendants do not dispute the findings of the California State Auditor's investigation or that Defendants were aware of the findings when the audit was published. (*See generally* Doc. No. 806.)

In Defendants' reply, Defendants attempt to rebut Plaintiffs' reliance on these investigative reports by claiming that "Plaintiffs rely on stale evidence" from 2017 to 2022, and that Plaintiffs fail to account for "the numerous improvements . . . recently made to the medical system at the Jail[,]" including the expenditure of "millions of dollars on medical care[.]" (Doc. No. 806 at 7, 9.) The Court acknowledges Defendants' significant

27

investment in improving medical care at the Jail, but is unpersuaded that Defendants'
improvement moots Plaintiffs' inadequate medical care claim for two reasons.

First, Plaintiffs principally rely on these investigative reports to demonstrate that
Defendants were aware of the severe deficiencies in the Jail's medical system at the time
they were published, not necessarily that those *exact* conditions remain today. (*See
generally* Doc. No. 796); *see also Sandoval,* 985 F.3d at 682–83 ("[T]o establish deliberate
indifference, Plaintiff must prove that the County had actual or constructive knowledge
that the failure to implement protocols necessary to ensure that nurses knew when inmates
. . . required medical care was 'substantially certain' to result in inmates failing to receive
the proper treatment, creating a likelihood of serious injury or death.").

Second, Defendants have not shown that their improvements merit mooting
Plaintiffs' claim. "Voluntary cessation of an illegal course of conduct does not render moot
a challenge to that course of conduct unless (1) there is no reasonable expectation that the
wrong will be repeated, and (2) interim relief or events have completely and irrevocably
eradicated the effects of the alleged violation." *Barnes v. Healy*, 980 F.2d 572, 580 (9th
Cir. 1992). Here, Defendants have not presented sufficient evidence that either of the two
*Barnes* factors are met. While the Court recognizes Defendants' efforts to enhance
accountability through new healthcare contracts, an increase in medical providers at the
Jail, new weekly "Wellness Rounds," and a dedicated MAT program, amongst other new
initiatives, Defendants have still not adduced evidence to show how, or that, these efforts
have improved medical care to such an extent that incarcerated individuals no longer face
a substantial risk of serious harm, or how long the Jail intends to maintain these new
programs. *See Barnes*, 980 F.2d at 580 ("The court's power to grant injunctive relief
survives discontinuance of the illegal conduct."); *see also Armstrong*, 58 F.4th at 1295
(dismissing defendants' argument that the district court "erroneously failed to focus on the
period after [d]efendants implemented corrective measures" in part because "no reliable
inferences could be drawn from the data").

Accordingly, viewing the evidence in the light most favorable to Plaintiffs, and considering the totality of the Parties' evidence and arguments, Plaintiffs have adduced sufficient evidence to demonstrate a genuine dispute of material fact as to whether incarcerated individuals at the Jail face a "substantial risk of suffering serious harm" as a result of deficiencies in the Jail's medical system, including delays in intake screening, pharmaceutical delivery, and access to specialty care. *See Gordon*, 888 F.3d at 1124–25.

Furthermore, Plaintiffs proffered sufficient evidence from the 2017 NCCHC report, Dr. Venters' 2020 report, and the 2022 California State Auditor's investigation to demonstrate a genuine dispute of material fact as to whether Defendants knew of medical care deficiencies since 2017 and were deliberately indifferent to or recklessly disregarded the substantial risk of serious harm. *See Mendiola-Martinez*, 836 F.3d at 1246 n.5; *see also Castro*, 833 F.3d at 1071, 1076.

For the reasons stated above, the Court **DENIES** summary judgment as to Plaintiffs' First Claim for inadequate medical care.

### D.    Inadequate Dental Care (Claim 6)

Plaintiffs' Sixth Claim is that Defendants have "a policy and practice of failing to provide adequate dental care to people incarcerated in the Jail[,]" in violation of the Eighth and Fourteenth Amendments and California Constitution. (TAC ¶ 356; *see also id.* ¶¶ 482–84.) Plaintiffs specifically allege the Jail's dental policies represent a substantial risk of serious harm, including (1) "providing tooth extractions as the only option for dental care," (2) failing to provide non-emergent dental care, such as regular cleanings and check-ups, and (3) refusing to refer patients to external providers for needed dental care. (*Id.* ¶ 484.)

"[T]he [E]ighth [A]mendment requires that prisoners be provided with a system of ready access to adequate dental care." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). "Although delay in providing a prisoner with dental treatment, standing alone, does not constitute an [E]ighth [A]mendment violation," *id.,* a party may prevail on an Eighth Amendment inadequate dental care claim by demonstrating "deliberate indifference" if

29

correctional officers knowingly delayed dental care to incarcerated people suffering "severe pain," *id.*, or have a policy of only offering tooth extractions, rather than offering fillings or a choice of other dental care. *See Shorter v. Baca*, 101 F. Supp. 3d 876, 902 (C.D. Cal. 2015), *rev'd in part on other grounds*, 895 F.3d 1176 (9th Cir. 2018) ("[P]ersistent and significant dental pain over a several-week period is sufficient to establish a serious condition for the purposes of the Eight Amendment."); *see also Baughman v. Garcia*, 254 F. Supp. 3d 848, 878 (S.D. Tex. 2017); *Finley v. Parker*, 253 F. App'x 634, 635 (9th Cir. 2007).

In support of their Motion, Defendants identify improvements to the Jail's dental services, which are provided by NaphCare. (Doc. No. 782-2 at 25–31, "Reinecke Decl.," at 28 ¶ 11.) Defendants assert "at the time this lawsuit was filed, the dental staffing was significantly lower. However, since that time, additional dentists and hygienists have been added to the staffing matrix of NaphCare." (Doc. No. 782-1 at 13, 29–30.) NaphCare now employs four dentists, two hygienists, and two dental assistants, who travel to the seven different Jail facilities over the course of each week, (Reinecke Decl. at 28–29 ¶¶ 11–15), and the dental clinic hours are "6:30 a.m. to 3:00 p.m., Monday through Friday" (Doc. No. 782-1 at 13 (citing Reinecke Decl. at 30 ¶ 19)). The Jail also "has a procedure for quality assurance monitoring of all the dental staff . . . including monthly chart reviews . . . [and] weekly virtual meetings with all clinical staff." (Doc. No. 782-1 at 30; *see also* Reinecke Decl. at 30–31 ¶¶ 22–23.)

Defendants also present evidence that the Jail's dental care includes a range of services, including preventive services (gross scales and prophies), restorative services (fillings and crowns), endodontics (root canals, referred to an offsite provider), dentures, and oral surgery. (Reinecke Decl. at 29 ¶ 16.) SDSO also now offers annual teeth cleanings, (*Id.* at 29–30 ¶¶ 17–18), which Defendant's expert, Dr. Scott E. Reinecke, states "is not a dental service most jails routinely provide to incarcerated individuals due to the abbreviated time such individuals spend in a jail facility." (*Id.* ¶ 17). The Jail utilizes TechCare to track dental health encounters. (Doc. No. 782-1 at 30; Reinecke Decl. at 31

¶ 24.) In sum, Dr. Reinecke, who has 26 years of experience in correctional healthcare and 30 years in dentistry, toured the seven Jail facilities and found SDSO (through NaphCare) is providing dental services which meet industry and community standards. (Reinecke Decl. at 31 ¶ 26.) Defendants do not directly address Plaintiffs' allegations or evidence of incarcerated individuals' waiting in pain for weeks prior to receiving an evaluation. (*See* 782-1.)

In response, Plaintiffs turn to reports authored by Plaintiffs' dental expert, Dr. Jay D. Shulman, who opined on the deficiencies in the Jail's dental care system. (*See* Doc. No. 796-6 at 4–221, "Shulman Report"; *id.* at 222–280, "Shulman Rebuttal.") First, Dr. Schulman found through examination of incarcerated individuals' medical records that incarcerated individuals routinely wait weeks to see a dentist after notifying Defendants of severe tooth pain. (*See* Shulman Report at 22–27, 32–41; *id.* at 102 (Ex. C to Schulman Report) ¶ 19 (75-day delay in treatment for a "very painful" tooth); *id.* at 121 (Ex. C to Schulman Report) ¶ 60 (84-day delay in treatment for a painful condition); *id.* at 201 (Ex. C to Schulman Report) ¶ 273 (85-day delay in treatment for a person tasting "blood in [his] mouth all day").)

Second, Dr. Shulman opines that the Jail has a "*de facto* extraction only policy" because by not conducting periodontal exams or using intraoral x-rays tests that can identify decaying teeth, the Jail fails to identify decayed teeth that could be restored in the appropriate timeframe before extraction is necessary. (Shulman Report at 54 ¶ 146.) He identifies three incidents to illustrate this theory. On October 9, 2023, in response to a call request for a cleaning, the Jail responded: "No. Dental only does extractions." (*Id.* at 56 ¶ 153.) Additionally, Plaintiff Jesse Olivares, who was incarcerated at the Jail from 2021 to 2023, testified that after informing the Jail that he had a broken tooth, he was informed by the Jail's medical staff that "they don't do fillings" and "all they do is pull them out." (*Id.*) Finally, Dr. Shulman recounted the experience of an incarcerated individual who originally received a temporary filling, but who experienced extensive delays, resulting in tooth decay requiring extraction. (*Id.* at 55 ¶ 149.)

Dr. Shulman opines the Jail "does not have enough dentists to treat painful dental conditions and provide routine care to longer-term incarcerated people given the average daily population" (*Id.* at 11 ¶ 21), and its "dental program is inadequately monitored" (*Id.* at 11–12 ¶ 22), resulting in unidentified deficiencies and delayed care. He also asserts "San Diego County's and NaphCare's policies and practices show lack of routine care and inadequate diagnosis and treatment of dental conditions, all of which combine into a system that fails to adequately identify, or properly and timely treat, dental issues experiences by incarcerated people." (*Id.* at 9 ¶ 10).

In Defendants' reply, Defendants argue that Plaintiffs ignore the current conditions and improvements that have been made to the Jail's dental system since the filing of the lawsuit and rely on stale data. (Doc. No. 806 at 10.)

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could conclude from the medical records and Dr. Shulman's report that Defendants may be aware of incarcerated individuals' severe dental pain but at times require individuals to wait weeks for dental care (Shulman Report Ex. C at 102 ¶ 19; *id.* at 121 ¶ 60; *id.* at 201 ¶ 273), or substandard care, like an unnecessary tooth extraction (Shulman Report at 55 ¶ 149). The weeks-long delays to receive care after notification of pain create a triable issue of fact as to whether Defendants were deliberately indifferent to Plaintiffs' serious dental conditions. *See Shorter*, 101 F. Supp. 3d at 902; *see also Hunt*, 865 F.2d at 201 (reversing summary judgment for defendant where plaintiff waited "nearly three months" after filing a grievance about severe tooth pain because the evidence "could support a finding of deliberate indifference to [plaintiff's] serious dental needs."). Finally, Plaintiffs present sufficient evidence through Dr. Shulman's report to create a genuine dispute of material fact as to whether the County's and NaphCare's policies, insufficient staffing, and lack of monitoring served as the "moving force" or "direct causal link" behind any constitutional deficiencies. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

Again, the Court acknowledges Defendants' stated improvements in dental care that have transpired over the course of the litigation. However, based on the data proffered by Defendants, Defendants have not satisfied the "heavy" burden of demonstrating mootness under the *Barnes* test at this time. *See Barnes*, 980 F.2d at 580 ("The burden of demonstrating mootness is a heavy one."). Absent a showing that there "is no reasonable expectation that the wrong will be repeated," and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," *id.,* the Court declines to grant Defendants summary judgment on Plaintiffs' inadequate dental care claim.

For the reasons stated above, the Court **DENIES** summary judgment as to Plaintiffs' sixth claim for inadequate dental care.

### E.    Failure to Ensure Adequate Environmental Conditions (Claim 4)

Plaintiffs' Fourth Claim is that "by [Defendants'] policies, practices, and failures to train staff . . . Defendants subject Plaintiffs . . . to a substantial risk of serious harm and injury from inadequate environmental health and safety conditions" in violation of the Eighth and Fourteenth Amendments and California Constitution. (TAC ¶ 472; *see also id.* ¶¶ 295–307.) Plaintiffs specifically allege that the Jail's policies and practices pertaining to environmental health and safety include (1) "allowing the jail to become filthy such that it foments the spread of disease," (2) "[r]efusing to remedy dangerous electrical and plumbing hazards," and (3) "[f]ailing to provide incarcerated people with clean clothes and linens[.]" (*Id.* ¶ 472.)

The "pertinent inquiry" in assessing whether environmental conditions violate the Eighth Amendment is whether the conditions "constitute[] an infliction of pain or a deprivation of the basic human needs, such as adequate food, clothing, shelter, sanitation, and medical care" and if so, whether prison officials acted with deliberate indifference with regard to those conditions. *Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1312–13 (9th Cir.), *opinion amended on denial of reh'g,* 75 F.3d 448 (9th Cir. 1995). "[S]ubjection of a prisoner to lack of sanitation that is severe or prolonged can constitute an infliction of pain

33

within the meaning of the Eighth Amendment." *Id.* Additionally, inadequate lighting, plumbing in such disrepair "as to deprive inmates of basic elements of hygiene and seriously threaten their physical and mental well-being," vermin infestations, substandard fire prevention, "lack of adequate ventilation and air flow," safety hazards in occupational areas, and inadequate cell cleaning supplies can each amount to a violation of the Eighth Amendment. *See Hoptowit v. Spellman*, 753 F.2d 779, 783–84 (9th Cir. 1985). Rather than conduct a "totality of conditions" analysis in evaluating the constitutional sufficiency of environmental conditions, a court must "consider each finding and decide whether each condition amounts to an unnecessary and wanton infliction of pain." *Id.* at 783.

### 1.    Trash and Sanitation

Unsanitary conditions and "overall squalor" can amount to a violation of incarcerated persons' Eighth Amendment rights. *Hoptowit*, 753 F.2d at 784.

Here, Defendants assert that their environmental health and safety policies are constitutionally adequate. (Doc. No. 782-1 at 14.) Defendants first rely on the testimony of Mike Binsfield, a Lieutenant in the Detention Support Division of SDSI who has worked for the Sheriff's Office for 18 years. (*See* Doc. No. 787-2 at 175–186, "Binsfield Decl." at 175–76 ¶ 1), who summarizes the Jail's cleaning protocols and practices. (*Id.* at 181–83 ¶¶ 25–30.) Binsfield outlines that pursuant to Policy I.13, Facility Commanders or Assistant Facility Commanders personally conduct facility inspections at least once every two weeks to check for health and hygiene problems and maintenance issues. (*Id.* at 183 ¶ 29.) Additionally, "[e]ach watch commander performs an inspection of housing and operational areas at least three times per pay period [every two weeks]" and "[e]ach shift sergeant conducts inspections of their assigned housing or operational areas once per shift." (*Id.*)

He further states that "Policy L.5 specifically addresses trash[,]" which "provides that trash pickup will occur at facility-designated times and from housing areas and medical at least twice a day." (*Id.* ¶ 30.) Binsfield explains, "incarcerated persons can remove all trash they do not want in their cells and deposit it in the large dayroom trash cans." (*Id.*)

34

Additionally, "[h]ygiene inspections are done weekly by deputies in housing areas." (*Id.*)
Binsfield admits, "[t]here are times when holding cells have trash strewn on the floors
where a group of incarcerated persons are being held pending their housing assignments."
(*Id.* ¶ 31.) However, he states "[t]his captures a moment in time and is not a long-term
condition in holding cells." (*Id.* ¶ 31.) Finally, he reports, "[t]here are daily cleanings
throughout the dayroom facilities and there are cleaning supplies available to incarcerated
persons." (*Id.* at 185 ¶ 36.)

Defendants also cite to the declaration of their environmental expert, Henrietta
Peters, who is an Environmental Health and Safety Compliance Officer employed by the
Nevada State Department of Corrections and who previously worked as the Environmental
Manager at the Alabama State Department of Corrections. (Doc. No. 782-2 at 395–404,
"Peters Decl.," at 396 ¶ 1.) Overall, she states that SDSO's "Detention Facilities are of
average or above average condition for adult location detention facilities in the areas of
environmental health safety." (*Id.* ¶ 3.) She notes that "[t]here are issues that can be
corrected with additional training but . . . the existing policies and practices provide a solid
foundation." (*Id.*) One area for improvement included "[t]he garbage compactor areas
[that] should receive a more detailed cleaning . . . [to] eliminate collected trash underneath,
reducing rodents, pests, and other public health nuisances." (*Id.* ¶ 8.)

In response, Plaintiffs present evidence from the expert report of Debra Graham,
who worked for Miami-Dade Corrections and Rehabilitation for over thirty years and held
the position of Chief Compliance Officer. (*See* Doc. No. 796-7 at 5–321, "Graham Report,"
at 8, 109.) She opines that overall, the Sheriff's Department policies and procedures at the
Jail "are inadequate to ensure that the basic human needs of incarcerated persons are met,
including a safe and healthy environment, and protection from exposure to harm." (Graham
Report at 13–14 ¶ 18.) While she acknowledges the Jail's sanitation and hygiene program
is "meant to protect the health and safety of staff and incarcerated persons," she notes a
lack of compliance with the policies and that SDSO officials are "aware of these
conditions." (*Id.* at 14 ¶ 18; *id.* at 15 ¶ 23.) For example, at her visits to the Jail (including

35

at George Bailey, Vista, and Central), she observed stains, scum, excrement, and filth "in and on toilets[,]" including 47 of the 59 toilets she photographed. (*Id.* at 3, 20, 25, 34.) At Las Colinas, she observed a "systemic issue with feminine sanitary pads being stuck to stainless steel toilet seats[,] which can lead to infection (*id.* at 28–29 ¶¶ 55, 56). She also took note of the lack of sanitation in food service areas (particularly the kitchen dumpster areas at Vista and East Mesa) (*id.* at 61–77 ¶¶ 141–167), the significant volume of trash in designated housing areas (*id.* at 38–39 ¶ 80), and the growth of mold in showers, water fountains, and housing units (*id.* at 30–34 ¶¶ 63–74, 37 ¶ 76, 73–76 ¶¶ 162, 165).

Provided that both Plaintiffs and Defendants' experts opined on sanitation hazards, including deficiencies in excess trash and trash disposal that can attract excess vermin, (*see* Graham Report at 61–77 ¶¶ 141–167, 38–39 ¶ 80; Peters Decl. at 396 ¶ 8), sufficient evidence of a genuine dispute of material facts exist as to whether the Jail may lack adequate sanitation procedures and overall levels of cleanliness in violation of the Eighth and Fourteenth Amendments, *see Hoptowit*, 753 F.2d at 784, whether Defendants failed to train staff regarding how to maintain sanitary facilities, and if Defendants were deliberately indifferent to, or recklessly disregarded, any such violations given the obviousness of surrounding trash or filth in the facilities. *See Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

### 2. Laundry

Deprivation of adequate clothing and linens can constitute an Eighth Amendment violation. *Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1312–13 (9th Cir.), *opinion amended on denial of reh'g,* 75 F.3d 448 (9th Cir. 1995).

Defendants assert "[f]resh laundry is provided on a schedule" (Doc. No. 782-1 at 15) pursuant to policy L.1 (Binsfield Decl. at 181–82 ¶¶ 26–27), and "laundry operations are good overall" (Doc. No. 782-1 at 15 (citing Peters Decl. at 401–02 ¶ 28)). Yet, Defendants' environmental expert, Peters, noted her observations of "stains and grime [on laundry carts,

36

which] indicates the need for a more thorough cleaning with soap, water, and sanitizer." (Peters Decl. at 402 ¶ 29.) She states her concern lies with "cross-contamination between soiled carts and clean linen[.]" (*Id.* at 403 ¶ 34.) She also stated "[f]acility upgrades are underway at Central Jail, where the laundry area is being enhanced with the installation of three new washers and three new dryers . . . [but]. . . [t]he new laundry area was not operational at the time of inspection." (*Id.* at 402 ¶ 30.)

Plaintiffs' environmental expert, Graham, also observed the "unsanitary practice" of towels and/or bed linens "on the floor in the bathroom areas, in individual cells, and at cell doors to absorb water from showers, leaking sinks and toilets, and other leaks, which "can harbor and promote bacteria and fungus growth." (Graham Report at 36–37 ¶ 76.) Additionally, Plaintiffs submit the declaration of Jaxen Dolan, an incarcerated individual, at George Bailey, who reports he "was not provided clean underwear in [his] size for weeks beginning in October 2024" and that he received dirty clothes including "shirts with yellow staining, dried blood, or what appear to be coffee stains." (*See* Doc. No. 796-18, "Dolan Decl.," at 2.) In response to Dolan's declaration, Defendants filed a declaration from Jesus Lizarraga, a Lieutenant in the Detention Services Bureau of SDSO, working at George Bailey. (Doc. No. 806-1, "Lizarraga Decl.," at 5–8.) Lizarraga responds that the George Bailey laundry records from October 2024 reveal that laundry exchange was conducted "on a consistent weekly basis" and "[i]f Dolan chose to keep his laundry and not exchange it, that is his choice but the opportunity to exchange his clothing is afforded weekly, per Title 15 standards." (*Id.* at 6.) Lizarraga also reports on the laundering protocol at George Bailey:

> All dirty laundry gets picked up daily (Monday-Friday) and washed at the East Mesa Central Laundry. After all items get washed, they get sorted, inspected, and redistributed . . . . I have personally distributed laundry myself, and when incarcerated persons bring up a discrepancy or problem with a particular laundry item, that item gets replaced instantly.

(*Id.* at 6–7.) The environmental experts' observations of soiled laundry cross-contaminating with clean laundry (*see* Peters Decl. at 403 ¶ 34), unsanitary linens used to

mop up leaking sinks and toilets (Graham Report at 36–37 ¶ 76), in addition to the Dolan
Declaration reporting on the inability to get clean laundry for weeks, present sufficient
evidence of a genuine dispute of material fact as to whether the Jail fails to consistently
make clean laundry available for incarcerated individuals in violation of the Eighth
Amendment, *see Anderson*, 45 F.3d at 1312–13, and if there is such a violation, whether
Defendants were deliberately indifferent to or in reckless disregard of the violation.

### 3.     Air Ventilation & Maintenance

"[A] lack of adequate ventilation and air flow undermines the health of inmates and
the sanitation of the penitentiary" that can "violate[] the minimum requirements of the
Eighth Amendment." *Hoptowit*, 753 F.2d at 784. Here, Binsfield reports on behalf of
Defendants that "[a]ir filters are changed every three months in all facilities and the filters
within a facility are changed on a staggered schedule." (Binsfield Decl. at 185 ¶ 36.) He
admits that incarcerated individuals cover air vents "if they are cold or hot, to conceal
contraband, and/or to reduce noise" (*id.* ¶ 32), but notes that permitting the covering of air
vents is not Defendants' policy, and "Deputies instruct incarcerated persons to remove the
vent coverings" and may use discipline if removal is refused. (*Id.*) Defendants'
environmental expert, Peters, also noted, "[e]vidence of [incarcerated persons] covering
vents with paper items was observed in several areas and can be identified as a contributing
cause to any ventilation issues within the facility." (Peters Decl. at 399 ¶ 17.) She also
observed "some [air] filters and sprinkler heads with excessive dust, which can pose health
and fire hazards." (*Id.* ¶ 18.)

In response, Plaintiffs' environmental expert, Graham, provides photographic and
descriptive evidence that "[i]nside incarcerated persons' housing units, ceilings, ceiling
tiles, and walls around, above, and below air vents are beyond filthy with accumulated
dust, dirt, and grime." (Graham Report at 89–90.) She further elaborates, "Air quality is
continuously at risk due to filthy air vents and air returns. Air vents are so dirty that they
project dust, dirt, and filth across ceilings, along walls, and into the open air continuously."
(*Id.* at 93.) She also reports that the air vents "blocked with paper and various other

38

materials, preclude[e] proper airflow and allow[] for the growth and spread of bacteria, viruses, and fungi." (*Id.*)

Given evidence from both Plaintiffs' and Defendants' environmental experts of health and fire hazards caused by covered air filters (Peters Decl. at 399 ¶¶ 17–18; Graham Report at 93), and Binsfield's admission that coverage of air filters occurs with some regularity which Jail officers can observe (Binsfield Decl. at 185 ¶ 32), sufficient evidence of a genuine dispute of material fact exists as to whether the Jail may lack adequate ventilation in violation of the Eighth and Fourteenth Amendments, *Hoptowit*, 753 F.2d at 784, whether Defendants failed to train staff how to maintain sanitary facilities, and if Defendants were deliberately indifferent to, or recklessly disregarded, any such violations.

### 4. Pest Control

Vermin infestations, including rodents, pests, or insects, throughout a prison are inconsistent with the level of adequate sanitation required by the Eighth Amendment. *Hoptowit*, 753 F.2d at 783. Defendants present evidence of the Jail's cleaning and pest control policies to prevent vermin, as well as the testimony of Defendants' environmental expert, Peters, regarding the status of pests at the Jail. Peters declares, "I found the facilities to be fairly clean and for the most part free of vermin and insects." (Peters Decl. at 399, ¶ 13.) Additionally, most Jail facilities have policies regarding pest control that mandate monthly pest inspections. (*See, e.g.,* Doc. No. 782-2 at 313 (Vista's policy requires monthly inspections by licensed professionals); *id.* at 377 (same with Central); *id.* at 333 (South Bay inspections are conducted by the administrative/operations deputy); *id.* at 352 (Rock Mountain's Detention Facility Operations Deputy oversees a technician to conduct monthly vermin inspections).

In response, Plaintiffs present evidence from their environmental expert, Graham, who found evidence of birds, rodents, and droppings in the food service areas and housing units, as well as drain sewer flies in the Jail shower facilities. (*See* Graham Report at 23 ¶ 41 (bird feces observed on the television screen and floor in the George Bailey housing unit), 64 ¶ 148 (Vista kitchen dumpster area had grease bin/trap with a dead rat lying on

top of bin), 18 ¶ 28 (drain flies observed at George Bailey, Central, and South Bay)). Graham described the Vista kitchen dumpster area as "unacceptable, unsanitary, and a huge attractant for rodents, cockroaches, and other pests." (*Id.* at 64 ¶ 148.) She also opined that drain flies "cause health issues because they can carry pathogens from contaminated areas such as drains to areas that need to be kept clean." (*Id.* at 21 ¶ 36.)

Defendants' own expert, Peters, made similar observations. She "observed grease bins (outside tallow containers) that require more frequent cleaning to prevent pests attracted by wasted grease." (Peters Decl. at 398 ¶ 10.) Peters also found "[t]he presence of sewer flies in the shower area of Vista Detention Facility suggests a need for drain cleaning, such as enzyme removal or high-power jetting." (*Id.* at 399 ¶ 15.) Finally, she also recommended "more detailed cleaning" of garbage compactor areas and "a more frequent removal schedule" of recycling products to "reduc[e] rodents, pests, and other public health nuisances." (*Id.* at 398 ¶¶ 8–9.)

In sum, sufficient evidence exists of a triable issue of fact as to whether vermin infestations at the Jail facilities, perhaps exacerbated by the ventilation and trash problems, are inconsistent with adequate sanitation required by the Eighth and Fourteenth Amendments, whether Defendants failed to train staff how to maintain sanitary facilities, and whether Defendants were deliberately indifferent to, or recklessly disregarded, any such violations. *Hoptowit*, 753 F.2d at 783.

### 5. Chemical Control & Safety Hazards

"Persons involuntarily confined by the state have a constitutional right to safe conditions of confinement." *Hoptowit*, 753 F.2d at 784. While "[n]ot every deviation from ideally safe conditions amounts to a constitutional violation . . . the Eighth Amendment entitles inmates in a penal institution to an adequate level of personal safety." *Id.* "Safety hazards" found throughout a prison can constitute an Eighth Amendment violation. *Id.*

Here, Plaintiffs assert, "[b]oth Plaintiffs' and Defendants' experts observed unsafe chemical control practices during their respective inspections of the Jail facilities." (Doc. No. 796 at 29.) Specifically, Defendants' expert, Peters, states she "found secondary

40

containers used by the Incarcerated Population (IP) for chemicals in living areas that were improperly labeled. Ensuring proper labeling of chemicals within the facilities, particularly secondary container labels as mandated by OSHA, is essential." (Peters Decl. at 400 ¶ 20.) Plaintiffs' expert, Graham, states, "[t]hroughout observations during on-site visits to the San Diego County jails, chemicals were in multiple areas unsupervised, chemical bottles were open, chemicals were in unlabeled containers, and cleaning carts were often unattended and dirty." (Graham Report at 94 ¶ 213.) She found "[m]ultiple instances" of OSHA violations and unlabeled bottles with chemicals in housing units, bathrooms, under bunks, and along windowsills. (*Id.* ¶¶ 213–14.) Finally, Dolan, an incarcerated individual housed at George Bailey, states, "In order to clean my cell, I have been provided with what is known as "floor cleaner" in an unlabeled bottle. I do not know what chemicals are in that bottle." (Dolan Decl. at 2–3.)

In response, Defendants argue, "[a] lack of proper labeling of cleaning supplies hardly rises to the level of deliberate indifference." (Doc. No. 806 at 12.) Following disclosures of these reports, Defendants' witness, Binsfield, provided a non-committal response as to whether the Jail had moved the chemicals to a safer location, stating, "I am informed that chemicals that were stored outside during Ms. Peters' inspections have been moved indoors and that facilities that needed better labeling of cleaning chemicals have either addressed the labeling issue or are in the process of doing so." (Doc. No. 782-2 at 185 ¶ 36.) Lizarraga, a Lieutenant in the Detention Services Bureau of SDSO, working at George Bailey, also responds:

> As of December 13, 2024, all [George Bailey] housing units were distributed clearly labeled bottles which contained cleaning products . . . All cleaners and other chemicals used at GBDF [George Bailey] now include corresponding data information sheets. The data information provided for the cleansers distributed to GBDF [George Bailey] incarcerated persons confirms that harmful chemicals or additives are not present.

(Lizarraga Decl. at 7, ¶ 6.)

Given evidence from both Plaintiffs' and Defendants' environmental experts of the safety hazards of unlabeled and unidentified chemicals found throughout the Jail, sufficient

41

evidence of a genuine dispute of material fact exists as to whether the Jail may have violated the Eighth and Fourteenth Amendments by compromising incarcerated people's safety and by failing to train staff how to maintain sanitary and safe facilities, and if Defendants were deliberately indifferent to, or recklessly disregarded, any such violation.

Defendants' principal objection to all of Plaintiffs' environmental and sanitary complaints is that Plaintiffs' environmental expert, Graham, only "took a snapshot in time to reach her conclusions," which Defendants assert does not demonstrate deprivation of humane conditions of confinement. (Doc. Nos. 782-1 at 31; 806 at 12.) Plaintiffs refute Defendants' characterization by stating that "filthy and unsanitary conditions were documented during multiple inspections . . . and show up repeatedly in patient records and in investigative findings related to in-custody deaths." (Doc. No. 796 at 30 (citing Stewart Report at 48–49, 53, 59–62, 74–75, 78–79, 105, 109, 116–15).)

Again, the Court acknowledges Defendants' stated improvements in environmental and sanitary conditions at the Jail. However, based on the data proffered by Defendants, including Defendants' expert's report indicating significant concerns with sanitation, hygiene, vermin, access to chemicals, and overall cleanliness, Defendants have not satisfied the "heavy" burden of demonstrating mootness under the *Barnes* test at this time. *See Barnes*, 980 F.2d at 580. Absent a showing that there "is no reasonable expectation that the wrong will be repeated," and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," *id.,* the Court declines to grant Defendants summary judgment on Plaintiffs' inadequate environmental conditions claim. *See Jones v. City & Cnty. of San Francisco*, 976 F. Supp. 896, 913 (N.D. Cal. 1997) ("Defendants argue that these efforts [testing plexiglass window covers, making funding available for repairs in heating system, and ordering parts to improve ventilation in cells] reveal the lack of deliberate indifference on their part, but the fact that none of the improvements has been implemented or verified raises significant questions of fact that the Court cannot resolve by summary adjudication.")

42

For the reasons stated above, the Court **DENIES** summary judgment as to Plaintiffs' fourth claim for failure to ensure adequate environmental and sanitation conditions.

### F.    Safety and Security (Claim 5)

Plaintiffs' Fifth Claim is that Defendants' "policies, practices, and failures to train staff," subjected Plaintiffs "to a substantial risk of serious harm and injury from inadequate safety and security measures at the Jail" in violation of the Eighth and Fourteenth Amendments and California Constitution. (TAC ¶¶ 475–78.) Specifically, Plaintiffs allege that the Jail (1) inappropriately classifies and assigns people to housing locations where they are at an unreasonable risk of violence and injury; (2) fails to implement adequate systems for interdicting fentanyl and other contraband; (3) fails to maintain functioning safety features like security video cameras, intercoms, and elevators in the Jail; [10] (4) fails to provide timely and adequate safety checks and respond to people in distress, (5) fails to prevent and address misconduct by custody staff; and (6) fails to ensure adequate independent oversight of the Jail. (*Id.* ¶¶ 338, 478.)

The Court first outlines the Parties' evidence as to these issues under the purview of the objective prong, i.e., whether the evidence presented demonstrates that the security conditions at the Jail pose "a substantial risk of serious harm." The Court then addresses Plaintiffs' evidence of "deliberate indifference" under the subjective prong.

#### 1.    Classification For Placement in Housing

Misclassification of incarcerated individuals in a manner that is deliberately indifferent to the risk of serious harm can constitute a constitutional violation. *Barnard v. Gibbons*, No. CV0505611GAFFMOX, 2011 WL 13213599, at *4 (C.D. Cal. Aug. 5, 2011). Here, Defendants put forth evidence that the Jail has policies, principally governed by DSB Policy R.1, that task the Jail Population Management Unit (JPMU) with

---

[10]    The TAC also alleges that the Jail delays responses to emergency calls placed by incarcerated people in distress. (TAC ¶ 478.) Because this allegation is related to intercom and technological functionality, the Court addresses both allegations together.

classification assessments, assigning classification, and determining housing for all incarcerated persons. (Doc. No. 782-1 at 17–18.) Defendants assert pursuant to DSB Policy R.1, the classification process considers factors such as booking charges, criminal history, medical and psychiatric conditions, and information gathered during interviews with the incarcerated individual. (*Id.*) If an incident occurs, JPMU is responsible for potential reclassification and the Jail runs reclassification reports that would identify factors used in reclassification four times a day. (Doc. No. 782-2 at 437–39 (Rule 30(b)(6) Depo. of Rita Diaz)). Defendants also identify additional policies involving classification: R.3 (descriptor definitions), J.3 (separation of persons), and R.11 (Incarcerated Person Facility Assignment Criteria). Defendants do not directly address Plaintiffs' allegations of harm derived from misclassification of incarcerated persons. (*See* Doc. Nos. 782-1; 806.)

In response, Plaintiffs reference the report of Plaintiffs' classification expert, Dr. James Austin, who asserts that the Jail's classification errors and lack of sufficient staff in the housing units contributed to three in-custody homicides. (Doc. No. 796-10 at 5–41, "Austin Report," at 39–41.) For example, he details that in 2022, a 56-year-old man arrested for failing to register as a sex offender was murdered by his cellmate who had been arrested for attempted murder, assault, and elder abuse causing injury or death. (*Id.* at 39.) In another instance in December 2021, one man arrested for drug possession and drug trafficking charges was in a cell with a man who had been arrested for three charges including assault with a deadly weapon. (*Id.* at 40.) There was only one mattress in the cell, over which a fight ensued, where the man arrested for violent crimes killed the other. (*Id.*) Plaintiffs additionally argue Defendants present no evidence that SDSO properly classifies incarcerated people. (Doc. No. 796 at 32.) In reply, Defendants do not address Dr. Austin's Report or specifically address Plaintiffs' classification allegations. (*See generally* Doc. No. 806.)

Based on the evidence before the Court, a reasonable trier of fact could rely on Dr. Austin's expert report referencing three in-custody homicides that could have been prevented but-for errors in classifying incarcerated individuals. (*See* Austin Report at 39–

41.) This evidence could suggest a systemic issue which Plaintiffs' will need to establish to ultimately prevail. Accordingly, a genuine dispute of material fact exists as to whether the Jail's classification system creates a substantial risk of serious harm.

## 2. Drug Interdiction

Failure to enact policies and practices to protect incarcerated individuals from overdoses, along with failure to train staff to drug screen and administer overdose treatment, can violate the Eighth and Fourteenth Amendments. *See Turner v. Cook Cnty. Sheriff's Off. by & through Dart*, No. 19 CV 5441, 2020 WL 1166186, at *5 (N.D. Ill. Mar. 11, 2020) (plaintiffs stated constitutional claim against sheriff's office by alleging that jail's policies do not adequately address the problem of regular inmate overdoses and that jail's staff was not appropriately trained or supervised as to drug screening or overdose treatment, leading to substantial risk of harm); *see also Sandoval,* 985 F.3d at 667–68 (evaluating individual's constitutional right to adequate medical treatment under the Eighth and Fourteenth Amendment in case where incarcerated person died of a methamphetamine overdose at San Diego Central Jail).

In response to Plaintiffs' claim that the Jail fails to adequately protect people at risk of overdose, Defendants attest that "[t]here have been significant changes in the last few years." (Doc. No. 782-1 at 18.) Defendants rely on the Declaration of F. Gardiner, Sergeant in the Las Colinas Contraband Narcotics Interdiction Team (CNIT) of the Detention Services Bureau of SDSO, who details CNIT's practices to keep the Jail "free of drugs and contraband through information-led policing and technology screening." (Doc. No. 782-2 at 138–42, "Gardiner Decl.," at 139 ¶ 3.) Specifically, Gardiner reports that CNIT teams are stationed at each intake facility, and that pursuant to Policy I.50, body scanners are used on each incarcerated person during the intake process (and can be used upon return from court or a social or professional visit), to detect any foreign objects secreted in a body cavity. (*Id.* at 139–40 ¶¶ 4, 7, 8.) Further, Gardiner states, "If a body scan is refused by the incarcerated person, they are to be strip searched and/or put on contraband watch." (*Id.* at 140 ¶ 8.) The Binsfield Declaration also reports that in July 2024, SDSO began randomized

45

screening of sworn and professional staff, contractors, volunteers, and professional visitors across the Jail. (Binsfield Decl. at 179–80 ¶ 19.)

Moreover, Gardiner outlines the Jail's screening for narcotics sent via mail:

All mail is sent directly to the mail processing center . . . located at the Las Colin[a]s Detention and Reenty Facility. . . All mail is opened and inspected unless it is identified as 'legal mail.' The non-legal mail is scanned for . . . narcotics or contraband . . . done with personal protective equipment . . . [.] If mail is deemed . . . suspicious, then it is screened further with the use of investigative lighting, TruNarc, Narcotic Identified Kit (NIK), and potentially by K9s.

(Gardiner Decl. at 140 ¶¶ 10, 11.) K9s also "conduct sniffs of the exterior of the facility" and "are trained to detect odors of fentanyl, cocaine, meth, heroin and derivates." (*Id.* at 141 ¶ 15.) Finally, Garinder reports that Narcan units have been installed in every dayroom area and holding/intake room, with an alarm sounding so that deputies and medical staff respond if someone accesses the Narcan and at the same time, the unit is searched for illegal drugs, often with K-9 assistance. (*Id.*)

Plaintiffs respond with evidence from expert, Gary L. Raney, who has served as Sheriff of Ada County, Idaho, and is the federal court appointed Independent Compliance Director for the Miami-Dade Corrections and Rehabilitation Department. (*See* Doc. No. 937-6[11] at 8–79, "Raney Report," at 9 ¶ 2.) Raney declares that the Jail's changes are vague and insufficient to protect incarcerated people from substantial risk of serious harm. (Doc. No. 796 at 32 (citing Doc. No. 937-6 at 1–6, "Raney Decl.," at 2 ¶ 4(d)).) Specifically, Raney reports that (1) the overdose rate at the Jail remains "very high," (Raney Decl. ¶ 4(d)): (2) the Jail's new randomized screening policy is inadequate (there have only been six screens in six months) (*id.* ¶ 4(c) (citing Raney Report at 27); (3) the Jail lacks high-volume drug contraband scanning equipment for mail, packages and supplies, (Raney

---

[11]    Pursuant to the Parties' request and Court Order, Plaintiffs refiled previously submitted documents with updated redactions to protect privileged information. Doc. No. 937-6 was previously submitted as Doc. No. 796-11.

Report at 18, 21–23); (4) Defendants do not scan all incarcerated people when returning from court or other appointments, (*id.* at 19, 27–33 (discussing at least three deaths resulting from lack of scanning outlined in a 2022 San Diego's Citizens' Law Enforcement Review Board ("CLERB") report)); (5) the K9s used for drug interdiction are insufficient to address the crisis at the seven Jail facilities, (*id.* at 34); and (6) Defendants have not updated their drug interdiction policies since March 2023, (*id.* 23–25, 29–30, *see, e.g.,* Doc. No. 782-2 at 139–40 ¶ 7 (discussing Policy I.50, which Plaintiffs state is not updated)). Raney highlights a single instance emblematic of scanning deficiencies featured in a CLERB report of a person who died in his holding cell at Central after staff failed to identify "a visible anomaly" that appeared on the body scanner and necessarily failed to take action. (Raney Report at 27; *see also id.* at 27–28 (2022 death of man who died from toxic effects of cocaine and methylenedioxymethamphetamine had body scan that showed a "potential balloon size foreign object" anomaly in his abdomen).)

In Defendants' reply, Defendants argue Plaintiffs' reliance on CLERB's 2022 report is faulty because the report "focused on past practices and pre-dates the host of changes in drug interdiction, including scanning of arrestees, K9 drug searches, use of intelligence, prosecution of smugglers, random screening of staff, hi-tech mail processing, and Narcan in every unit and on each deputy, to name a few." (Doc. No. 806 at 14.) Defendants also argue Plaintiffs fail to tie the overdose deaths at the Jail to any specific actions or inactions of Defendants, asserting a causation problem. (*Id.*)

Construing the evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could rely on Raney's expert report that discusses a 2022 CLERB finding of at least three deaths that may have been preventable if the Jail had properly scanned them (*see* Austin Report at 19, 27–33), to find that the Jail's drug interdiction policies and screening practices are insufficient in preventing a substantial risk of serious harm.

### 3.    Safety Technology (Video, Intercoms)

A "[c]ounty's failure to train, supervise, or discipline jail staff to respond to medical emergencies on the intercom" may amount to a constitutional violation. *See Greer v. Cnty.*

47

*of San Diego*, 726 F. Supp. 3d 1058, 1078 (S.D. Cal. 2023). Here, Plaintiffs allege "[a]s a result of inadequate training and a lack of video coverage in the Jail, when incarcerated people are in danger, custody staff fail to timely render aid." (TAC ¶ 9; *see also id.* ¶¶ 325–29.) Plaintiffs additionally allege that Defendants' policies and procedures for maintaining functioning emergency call buttons are inadequate, and Defendants fail to adequately train staff how to maintain and respond to functioning emergency call buttons, which create an unreasonable risk that incarcerated people will suffer at length before receiving assistance. (*See id.* ¶¶ 330–36.)

In their Motion, Defendants present evidence of the Jail's modernization efforts to install and implement better surveillance cameras, infrastructure for body worn cameras, and new intercoms throughout the Jail. To do so, Defendants rely on the separate Declarations of (1) Darren Scott Bennett, Project Manager for the SDSO, who oversees all maintenance issues and construction projects at the Jail (*see* Doc. No. 782-2 at 134–36, "Bennett Decl.," at 134–35), (2) David Blackwell, Lieutenant in the Detention Services Unit of SDSO (Doc. No. 782-2 at 391), and (3) Lieutenant Mike Binsfield (*see id.* at 175).

Bennett states that the George Bailey remodel, involving new intercoms and security cameras, with a cloud-based recording system for longer video retention "is estimated to be completed in early 2026." (Bennett Decl. at 135 ¶ 2.) At Central, implementation of new surveillance cameras, intercoms, and recording systems is estimated to be completed in June 2026. (*Id.* ¶ 3.) Rock Mountain has new surveillance cameras and intercoms installed. (*Id.* at 136 ¶ 4.) At East Mesa, "infrastructure for Body Worn Cameras will be installed by February 2025" and "[f]unding has been requested to install new surveillance cameras and new intercoms at both East Mesa and Las Colinas." (*Id.* ¶ 5.) Finally, at Vista, "the County is in [the] process of re-doing the interiors" to incorporate surveillance cameras and intercoms with cloud storage for surveillance video, which Bennett estimates taking 6–8 months. (*Id.* ¶ 6.)

Binsfield provides an overview of the Jail's maintenance policies of intercoms. (*See id.* at 180 ¶ 20.) He attests, "[e]ach facility checks their intercom systems in each cell at

least weekly to ensure they are operational." (*Id.*) If a cell intercom is broken and cannot be quickly repaired, the cell will be taken out of service. (*Id.*) He additionally states, "[i]t is the practice of SDSO not to house any incarcerated persons in cells without a minimally operational intercom." (*Id.*)

Blackwell reports that "Axon Body Worn Cameras (BWC) are fully deployed for all sworn staff at the Las Colinas, Central, Rock Mountain, Vista, and South Bay Jails." (*Id.* at 392, ¶ 3.) He additionally states that BWC have been partially deployed at George Bailey, "with approximately 80 personnel having been recently trained and issued devices." (*Id.* ¶ 5.) Finally, East Mesa is the only facility remaining to deploy BWC and be trained on its use. (*Id.* at 392–93, ¶ 6.) Sheriff's Department Policy 6.131 on BWC and the Detention Services Bureau Policy I.20 governs their use. (*Id.* ¶ 8.)

Plaintiffs respond that the Raney Report "demonstrates that the Jail's cameras are aging, unreliable, and lack coverage" and that besides Rock Mountain, all remaining facilities still have intercom and video systems in need of updating. (Doc. No. 796 at 33 (citing Raney Report at 59–66).) The Raney Report details that on June 1, 2017, a San Diego County Grand Jury found that "[h]alf of the security cameras throughout the [George Bailey Detention Facility] appeared nonfunctional[,]" which was a follow up to a May 14, 2014 Grand Jury report similarly finding "an urgent need" for SDSO to update its cameras. (Doc. No. 937-6 at 60.) On December 6, 2021, SDSO's Kelly Martinez sent an email stating, "[t]he cameras throughout the jail system are aging and are not always reliable." (*Id.*) The Raney Report also highlights a "selected sampling from recent CLERB reports" of in-custody deaths where poor video quality obscured observations of incarcerated individuals who died in or outside of their cells. (*Id.* at 64–65.) To this point, Defendants respond, "jails are not constitutionally required to have the most up to date equipment. The question is safety." (Doc. No. 806 at 15.)

Plaintiffs also take issue with the Jail's staff's alleged practice of "ignor[ing] and mut[ing] intercom calls. (Doc. No. 796 at 33 (citing Raney Report at 51–58).) The Raney Report recounts three in-custody deaths involving either muted or inoperable intercoms

49

that delayed deputies' responses to incarcerated persons' attempts to call for assistance. For example, on April 11, 2022, an incarcerated individual died at Central from pulmonary thromboemboli, with COVID-19 as a contributing factor. (Doc. No. 937-6 at 57.) CLERB reported on this death:

> According to interviews with the Detentions Investigations Unit (DIU), several IPs [incarcerated persons] stated they hit the callbox for an extended period before deputies responded. IP [incarcerated person], Bryan Meyers said they attempted to get medical attention for 30 minutes before deputies arrived. IP, David Johnson stated the callbox didn't work and a group of IPs yelled to get the deputies attention. In an interview with DIU, IP, Kevin Freeman stated it took approximately 45 minutes to get deputies to respond.

(*Id.*) CLERB's investigation into a February 12, 2015, suicide indicated that the decedent's cellmate "pressed the intercom button 4–10 times to call for help, but no one answered." (*Id.* at 56.) It took approximately 10–20 minutes before deputies arrived. (*Id.*) The deputy reported that "the audio alert function of the IP intercom system had been muted, with the volume turned all the way down [which] prevented him from hearing the cellmate's attempted contact." (*Id.*) In response, Defendants state Policy I.2 on intercom systems (updated in December 2024) does not permit intercoms to be silenced or muted. (Doc. No. 806 at 15.)

In evaluating the evidence before the Court, the Court agrees with Defendants that the Jail is not constitutionally required "to have the most up to date equipment." (Doc. No. 806 at 15.) Nevertheless, the 2014 and 2017 San Diego Grand Jury reports indicate that Defendants were on notice of inadequate safety equipment, and a triable issue of fact exists as to whether Defendants were deliberately indifferent to, or recklessly disregarded, how outdated technology was contributing to a substantial risk of harm for incarcerated persons. Additionally, Plaintiffs have put forward sufficient evidence of a triable issue of fact as to whether the Jail adequately trained staff to check if intercoms were properly functioning, and whether any noncompliance in the Jail's policies amounted to deliberate indifference of causing a substantial risk of harm. *See Greer*, 726 F. Supp. 3d at 1078 (denying summary judgment to County where "[t]he totality of the . . . evidence [including failure of jail

50

employee to respond to the calls from the emergency intercom] is sufficient to create a genuine dispute [of material fact] as to whether the County's failure to train the medical staff and custodial staff to effectively communicate and coordinate . . . emergency help was the 'moving force' behind Plaintiff's injuries.")

Finally, while the Court notes the considerable undertaking of remodeling each of the Jail's facilities to install modern and more functional intercoms and security camera equipment, especially given that these remodels are not yet complete with the exception of Rock Mountain, Defendants have not carried the "heavy burden" under *Barnes* of showing that there "is no reasonable expectation that the wrong will be repeated," and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *See Barnes*, 980 F.2d at 580.

### 4. Safety Checks

Failure to conduct regular safety checks on incarcerated individuals can amount to an Eighth Amendment violation. *See Frary v. Cnty. of Marin*, 81 F. Supp. 3d 811, 837 (N.D. Cal. 2015) ("[A] reasonable jury could conclude that failure to provide regular monitoring was evidence of the County's deliberate indifference to substantial risks to inmates."); *see also Estate of Abdollahi v. Cnty. of Sacramento,* 405 F.Supp.2d 1194, 1206 (E.D. Cal. 2005) (denying county's summary judgment motion where a reasonable jury could find the jail's failure to conduct regular safety checks as stated in Title 15, section 1027 posed a substantial risk to inmates). Additionally, "pre-trial detainees . . . have a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." *Gordon*, 6 F.4th 961, 973 (9th Cir. 2021).

Defendants put forth evidence in the Binsfield Declaration that the Jail adheres to Policy I.43, regarding "counts" and Policy I.62 regarding "safety checks." (Doc. No. 782-2 at 180–81 ¶¶ 21–24.) Specifically, Binsfield declares that Policy I.43 on "counts" provides:

> Sworn staff will physically conduct counts of IPs [incarcerated persons]. All counts require sworn staff to verify each IP's well-being through "verbal or physical acknowledgment" from the IP and looking for any obvious signs of medical or physical distress (e.g., asthma attack, chest pain, etc.), trauma (e.g.,

bleeding, ligature marks, etc.), and/or criminal activity (e.g., drug usage, fighting, etc.).”

(*Id.* at 180 ¶ 21.) Binsfield further declares that to properly conduct a “count,” deputies are trained to verify each incarcerated person’s wellbeing through verbal or physical acknowledgement by the incarcerated person. (*Id.* ¶ 22.) “Safety checks,” by contrast, are conducted in accordance with California Board of State and Community Corrections (BSCC) Title 15 and require “direct visual observation” of the incarcerated person. (*Id.* ¶ 23.) The Jail’s frequency of “safety checks” must be every thirty minutes for individuals in the Medical Observation Beds and in Psychiatric Stabilization Units, and otherwise every sixty minutes. (*Id.*)[12] Binsfield states that supervisors audit safety checks by checking logs and watching surveillance video “to determine if the deputy went to each cell front and looked in the window.” (*Id.* at 180 ¶ 24.) He further declared that violations are subject to progressive discipline. (*Id.*)

In response, Plaintiffs point to evidence adduced from one of their safety experts, Raney. (Doc. No. 937-6.) Raney opines that “[w]hile most jails also rely on emergency intercom buttons to notify deputies of crises, the SDSD (San Diego Sheriff’s Department) lacks that ability in many areas and, therefore, becomes reliant upon safety checks.” (*Id.* at 35.) He found that Defendants’ audits from October 2023 illustrate that only 35% of Defendants’ safety checks complied with Defendants’ written policy. (*Id.* at 43–44.) He also summarized a sampling of CLERB findings from six in-custody Jail deaths from January 26, 2020 to February 4, 2023, which found deficiencies in safety checks involved in those deaths. (*See id.* at 45–48.)

In response, Defendants reply that Plaintiffs’ evidence regarding safety checks is “stale” and “ignore[s] the current conditions at the Jails.” (Doc. No. 806 at 14.)

---

[12] The Court notes that the definition of “safety check” in the Binsfield Declaration differs slightly from the definition found in the report of Plaintiffs’ expert, Mr. Gary Raney. (*Compare* Doc. No. 782 at 180 (Binsfield Decl.) *with* Doc. No. 937-6 at 36 (Raney Report).)

The Court finds that a reasonable trier of fact could rely on evidence in the Raney Report that a 35% safety check compliance rate is insufficient to adequately protect the safety of incarcerated individuals where six in-custody Jail deaths occurred from January 26, 2020 to February 4, 2023, in part due to deficient safety checks. (*See* Raney Report at 44–48.) More broadly, sufficient evidence exists of triable issues of fact as to (1) the degree of the Jail's compliance with Policies I.43 and I.62; (2) whether the Jail's employees were sufficiently trained to comply with Policies I.43 and I.62; (3) whether any non-compliance rises to the level of an Eighth and Fourteenth Amendment violation; (4) whether the Jail was deliberately indifferent to, or recklessly disregarded, a substantial risk of serious harm to incarcerated individuals; and (5) whether any such noncompliance could have been a "moving force" behind any in-custody deaths at the Jail.

### 5.     Staff Misconduct, Training, and Discipline

Defendants assert, without citation to the record, that SDSO custody staff are trained on the Jail's policies and procedures at Detentions Bureau Academy and "have ongoing training while working in the Detentions." (Doc. No. 782-1 at 22.) Additionally, Defendants state the Jail's Internal Affairs investigates matters where allegations exist of a policy violation by sworn staff, and use "progressive discipline . . . in consideration of the seriousness of the offense. (*Id.*)

Plaintiffs present evidence that Jail staff engage in misconduct. For example, Plaintiffs cite to the Declaration of Tyler Hamilton, who identifies as transgender female, is incarcerated at Central, and who in October 2024, was hit by Jail staff 10–15 times, including in the face, stomach and back, while Jail staff made disparaging remarks about Hamilton's transgender identity. (Doc. No. 796-20 at 2.) Hamilton attests that they were not resisting. (*Id.*) Following the assault, Hamilton filed a grievance but has not received a written response. (*Id.* at 3.)

In response to Hamilton's declaration, Defendants filed a second declaration from Sergeant James Parent. (Doc. No. 806-1 at 52–57.) He states that after reviewing the Jail Information Management System (JIMS), the Watch Commander's Log for Central, and

NicheRMS (the Jail's case report repository), he was unable to find mention of any attack of Hamilton in October 2024, or any staff response to an incident involving Hamilton. (*Id.* at 53.) He attests that Hamilton was not housed at Central in October 2024, but rather was at Vista. (*Id.*) He also states he did not review surveillance video from the housing unit where Hamilton was housed on October 14, 2024. (*Id.*)

The conflicting declarations from Hamilton and Parent indicate a dispute of fact as to whether Hamilton was attacked by Jail staff in October 2024. Given Defendants' attestation that staff are trained on Jail's policies at the Detentions Bureau Academy, (Doc. No. 782-1 at 22), Jail staff are on notice that the kind of attack Hamilton describes violates the Jail's policies.

However, "a plaintiff cannot demonstrate the existence of a municipal policy or custom caused based solely on a single occurrence of unconstitutional action by a non-policymaking employee." *McDade*, 223 F.3d at 1141. If considered alone, Plaintiffs' evidence of Hamilton's attack is insufficient to allege a Jail policy or custom of staff misconduct. *Id.* Nevertheless, if the Court considers Hamilton's declaration as one piece of evidence amongst other evidence Plaintiffs have proffered regarding Jail staff misconduct in muting intercoms, conducting insufficient safety checks, or failing to adequately evaluate intake body scans that led to a possibly preventable overdose death, Plaintiffs have adduced sufficient evidence that a genuine dispute of material fact exists as to whether (1) Defendants adequately train their staff in basic policies to prevent constitutional safety violations; (2) Defendants discipline Jail staff when staff violate Jail policy (particularly in instances that could amount to Eighth and Fourteenth Amendment violations); and (3) Defendants were deliberately indifferent to, or recklessly disregarded, any such violations.

### 6.    Independent Oversight

Plaintiffs allege that the County has failed to ensure adequate independent oversight of the Jail, exacerbating delays in implementing reform to reduce in-custody deaths in violation of incarcerated individuals' constitutional rights. (*See* TAC ¶¶ 353–355 (citing

54

*Est. of Silva v. City of San Diego*, No. 3:18-CV-2282-L-MSB, 2020 WL 6946011, at *20
(S.D. Cal. Nov. 25, 2020) (denying dismissal of constitutional claim in part because
"[a]lthough [the County] has established a board [Citizen Law Enforcement Review Board
("CLERB")] to investigate the widely known problem of in-custody deaths, it has also
failed to enable the board to carry out its stated responsibilities")).)

In support of Defendants' Motion, Defendants note that in December 2024, the
County Board of Supervisors voted 4-0 "to give CLERB greater power to investigate
in-custody deaths, allowing CLERB to investigate any employee or contractor working
under [the] [S]heriff's or [P]robation [D]epartment['s] direction." (Doc. No. 782-1 at 22.)
Defendants also state the "Jails are regularly inspected by the Board of State and
Community Corrections (BSCC) and the County's Grand Jury" (*id.* at 16), and other
oversight review processes exist including State Audits, internal reviews, and disciplinary
processes (Doc. No. 806 at 16). Given these reviewing entities, Defendants state, "it cannot
be said that there is a lack of oversight of the Jails tantamount to deliberate indifference."
(*Id.*)

In response, Plaintiffs dispute that the County actually bestowed CLERB with
greater power to investigate in-custody deaths. (*See* Doc. No. 796 at 34 ("Defendants
incorrectly contend that the County Board of Supervisors recently voted to give CLERB
greater power to investigate in-custody deaths.").) Citing to the Declaration of Paul Parker,
Plaintiffs' non-retained expert who is a former Executive Officer of San Diego County's
CLERB, Plaintiffs assert "The Board did not expand CLERB jurisdiction; rather, it voted
to take initial steps that may, upon further Board vote, result in expansion of CLERB
jurisdiction over time." (Doc. No. 796-12 at 2 ¶ 4.)

Plaintiffs also rely on Parker's opinion to highlight the County's failure to provide
adequate oversight over the Sheriff's Department and Probation Department, which Parker
asserts "contributes to the County's excessively high death rates for people incarcerated in
Jail as well as those on probation." (*Id.* at 10.) Specifically, he offers that the County fails
to timely fill CLERB positions, leaving vacancies that lead to cancelations of CLERB

55

meetings due to lack of a quorum. (*Id.* at 11.) He also attests that while CLERB asked the County Board of Supervisors four times to give it power to investigate Jail medical staff and contractors, it refused, leaving CLERB without jurisdiction to adequately investigate "the vast majority of in-custody deaths." (*Id.* at 11–12.) Finally, Plaintiffs present evidence of the 2022 California State Audit Report, which found for years, 'the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody[,]'" and also "critiqued CLERB's at times ineffective investigation of these deaths," which Parker attests to CLERB's lack of funding, manpower, and jurisdictional authority. (*Id.* at 9, 11.) Defendants do not dispute Parker's testimony. (*See generally* Doc. No. 806.)

Plaintiffs have adduced sufficient evidence to create a triable issue of fact as to whether Defendants were on notice of, and therefore deliberately indifferent to or recklessly disregarded, CLERB's limited investigatory power and vacancies that severely curtailed CLERB's ability to enact reforms, thereby increasing incarcerated persons' risk of serious harm in violation of their constitutional rights. Parker notes that he asked the County "four times" to give CLERB power to investigate Jail medical staff and contractors, and the 2022 State Audit report could have put Defendants on notice of CLERB's oversight failings. (Doc No. 796-12 at 11 ¶ 14.) There also exists a genuine dispute of material fact as to whether, following the County Board of Supervisor's December 2024 vote, CLERB has greater investigatory power to investigate in-custody deaths. This is material because if CLERB does not have greater authority to investigate in-custody deaths, a reasonable trier of fact could find that SDSO's failure to implement and adhere to oversight put incarcerated individuals at substantial risk of serious harm. Furthermore, the evidence adduced does not persuade the Court that the December 2024 vote moots Plaintiffs' claim under the *Barnes* test. *See Barnes*, 980 F.2d at 580.

Defendants challenge each component of Plaintiffs' Fifth Claim, stating Plaintiffs "rely upon stale evidence . . . and ignore the current conditions at the Jails." (Doc. No. 806 at 14.) Defendants specifically reference that CLERB's 2022 report cautioning of the "risk of dying from overdose" in San Diego County Jails "focused on past practices and

56

pre-dates the host of changes in drug interdiction, including scanning of arrestees, K9 drug searches, use of intelligence, prosecution of smugglers, random screening of staff, hi-tech mail processing, and Narcan in every unit and on each deputy, to name a few." (*Id.*) The Court finds the Jail's new practices notable. However, "[a] jury could view [Defendants' new practices] as an acknowledgement by the County that its prior practices . . . were insufficient." *Sandoval*, 985 F.3d at 683. As for Defendants' modernization efforts to install new surveillance cameras, intercoms, and recording systems, the remodels at most Jail facilities are not complete and may not be fully implemented and operational for many months. (*See* Doc. No. 782-2 at 135–36 ¶¶ 1–7.) Absent satisfying the "heavy burden" of showing that there "is no reasonable expectation that the wrong will be repeated," and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," Defendants have not proved mootness. *See Barnes*, 980 F.2d at 580.

For the reasons stated above, the Court **DENIES** summary judgment as to Plaintiffs' Fifth Claim for failure to ensure the safety and security of incarcerated people.

### G.    Interference with Access to Counsel and Courts (Claim 8)

Plaintiffs' Eighth Claim is that "by [Defendants'] policies, practices, and failures to train staff . . . Defendants deprive Plaintiffs . . . of their rights to adequate representation by an attorney and to access the courts and counsel to prosecute their claims and defenses" in violation of the Sixth and Fourteenth Amendments. (TAC ¶ 499.) Plaintiffs specifically allege that Defendants deny incarcerated people (1) access to counsel by failing to provide any reliable and confidential mechanism for attorneys to speak to their clients, and (2) access to courts for those defending themselves in their criminal cases or litigating an individual conditions of confinement case *pro per* (without outer counsel). (*See id.* ¶¶ 409–424.) The Court addresses each challenged right sequentially. Plaintiffs bring their Eighth Claim under the Sixth Amendment on behalf of incarcerated individuals who have been convicted of a crime and under the Fourteenth Amendment for pretrial detainees. (*Id.* ¶ 498.)

/ / /

### 1.     Right to Access Counsel

"A criminal defendant's ability to communicate candidly and confidentially with his lawyer is essential to his defense. In American criminal law, the right to privately confer with counsel is nearly sacrosanct." *Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014). "When the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel, that interference violates the Sixth Amendment right to counsel if it substantially prejudices the criminal defendant." *Williams v. Woodford*, 384 F.3d 567, 584–85 (9th Cir. 2004). In the context of "a civil rights lawsuit aimed at enjoining the continuation of an unconstitutional practice," the chilling of an incarcerated individual's "right to private consultation with counsel" constitutes sufficient prejudice to state a Sixth Amendment claim. *Nordstrom*, 762 F.3d at 911 ("The harm Nordstrom alleges is not that tainted evidence was used against him but that his right to privately confer with counsel has been chilled. This is a plausible consequence of the intentional reading of his confidential legal mail."); *see also Nordstrom v. Ryan*, 856 F.3d 1265, 1269 (9th Cir. 2017) ("[Plaintiff's] standing did not arise from alleged prejudice that he suffered related to his conviction; rather it was an interest in enjoining a practice that chilled his Sixth Amendment rights."). Additionally, "[f]orcing prisoners to conduct their meetings with their attorneys in the open or to yell over the phone obviously compromises the consultation." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989); *see also Jones v. City & Cty. of San Francisco*, 976 F. Supp. 896, 913 (N.D. Cal. 1997) ("[s]erious deficiencies . . . with regard to privacy in attorney-client consultations, due to the lack of space and the absence of sound barriers"). Courts have also found Sixth Amendment violations where attorneys "routinely face unpredictable, substantial delays in meeting with [detained] clients[,]" where the delays run "between 45 minutes and two hours." *Benjamin v. Fraser,* 264 F.3d 175, 181 (2d Cir. 2001) (affirming judge's finding that jail's policies leading to delays "led to unconstitutional burdens to inmate access to counsel and courts").

Here, Defendants present the attestations of Lieutenant Binsfield, who outlines the Jail's policies permitting incarcerated people's access to their counsel. For example,

58

Binsfield represents, "The County jails permit incarcerated persons to have video visits with their public defenders, and these can be scheduled in advance. For in person attorney visits (whether civil or criminal), access to their clients (incarcerated persons) occurs on demand on a first come, first served basis at the facility." (Binsfield Decl. at 176 ¶ 2.) He further states, "Professional visits are conducted in separate rooms with no cameras, for privacy. A deputy is stationed nearby for reasons of security but does not listen to the conversations." (*Id.* ¶ 3.) He also summarizes the policy for incarcerated individuals to receive attorney calls:

> When an attorney calls the Facility to speak to their client, the information clerk takes the message, and it is relayed to the assigned deputy for the incarcerated person's housing unit to provide the name and number of the attorney to the incarcerated person, who then is given the opportunity to call their attorney using a dayroom phone. These phones are free to use for incarcerated persons. If the attorney registers their number, it is saved in the Smart Communication system as an attorney number and it is not recorded (unlike other phone calls made in the jails).

(*Id.* ¶ 5.) Defendants additionally cite to their policies that require staff adherence, and attest that "[i]n the instances where callback or other policies are not followed, staff who fail to follow policy receive additional training to ensure compliance[.]" (Doc. No. 782-1 at 23–24 (citing Binsfield Decl. at 185–86 ¶ 39; Doc. No. 782-2 at 466:5–467:24 (testimony of Jesse Johns, Captain of Central Jail, regarding Jail's call logging mechanism)).)

In response, Plaintiffs dispute the accuracy of Defendants' attestations and present additional evidence of compromised attorney-client interactions. Plaintiffs primarily rely on the expert opinion of Karen L. Snell to refute Defendants' evidence. (*See* Doc. No. 796-13). Snell first opines that in-person visitations at the Jail facilities are not confidential. (*See* Doc. No. 796-13 at 5–105, "Snell Report," at 51 ¶ 131 ("[T]hroughout the professional visiting areas, there are microphones connecting those rooms to Sheriff's deputies, and attorneys have no way of knowing whether the microphones are on when they meet with clients.") Defendants' person-most-knowledgeable about these policies, Captain Jesse Johns at Central Jail, confirmed in his testimony, "[t]here's no visual lights or anything on

59

that intercom system that would suggest that . . . line is open." (Doc. No. 782-2 at 461–476, "Johns Depo. Tr.," at 463:3–8.) Snell also raises concerns with the SDSO recording attorney-client communications and using them at trial against incarcerated individuals. (*See id.* at 51–52 ¶ 132 ("[T]he Sheriff's Department recorded dozens of privileged attorney-client conversations between December 2020 and May 2021 and between August 2021 and October 2021 . . . at least one was used at a trial.").) Moreover, she presents evidence that most incarcerated individuals' return calls to their counsel are completed in the dayroom, which is not confidential, and the Sheriff's Department has not considered providing a confidential space for people to complete attorney callbacks. (*See* Johns Depo. Tr. at 469:10–13 ("Q. Has the [S]heriff's [D]epartment considered providing a confidential space to people to complete their attorney callbacks? A. No.").)

Second, she evaluates the Jail's attorney callback procedure and concludes it is unreliable and inconsistent. She notes instances when the Jail fails to notify incarcerated individuals of receipt of an attorney call (*id.* at 64–65 ¶¶ 178–182), and testimony from SDSO that that it is aware of incidents in which attorney callbacks have not been completed. (*Id.* at 65–66 ¶ 183; *see also* Johns Dep. Tr. at 468:14–16 ("Q. Is the department aware of incidents where attorney callbacks have not been completed? A. Yes."). In practice, attorneys she interviewed "reported only a 10-20% chance that a client will get the message" left by the attorney. (*Id.* at 65 ¶ 180.) She also declares that "[t]here is no tracking mechanism for attorney callback compliance." (*Id.* at 63 ¶ 175; *see also* Johns Depo. Tr. at 468:12–13 ("There's currently no tracking mechanism for attorney callback compliance.").)

Finally, Plaintiffs present additional evidence of attorneys experiencing significant hours-long delays in visiting in-custody clients, which have led to instances where incarcerated individuals were not able to see their counsel. (*See* Snell Report at 27 ¶ 66 (four-hour delay), 30 ¶ 72 (two-hour delay), 39 ¶ 95 (four-hour delay without appointment), 40 ¶ 99 (two-hour delay), 48 ¶ 122 (three-hour delay), 54 ¶ 139 (delay of "many hours"); *see also* Doc. No. 796-21, Declaration of Arameh Vartomian, "Vartomian Decl.,"

60

(Plaintiffs' counsel experiencing 3-hour delay to meet with class member).) In her report, Snell declares, "Every attorney I interviewed said there have been times they had to leave without seeing their client because of the length of the wait." (*Id.* at 30 ¶ 71.)

Defendants respond that Plaintiffs cite "dated policies and procedures" and that "Smart Communications tablets are imminently being rolled out" that will "allow attorney-client emailing and messages." (Doc. No. 806 at 17.) Defendants similarly claim, without citation to evidence, that "Plaintiffs also rely on outdated information regarding attorney callback requests." (*Id.*) Finally, Defendants challenge the content of the Vartomian Declaration by stating that the "actual wait time was approximately 1 hour and 4 minutes per written logs and CCTV footage." (Doc. No. 806 at 17 n.1.) In turn, Plaintiffs dispute the accuracy of Plaintiffs' statement, stating that the video footage is consistent with Mr. Vartomian waiting an hour, leaving the Jail after staff told him to return at 2:30 p.m. when rooms might be available, and then showing Mr. Vartomian entering the secure part of the facility at 3:34 p.m., more than three hours after his entrance at 12:16 p.m. (Doc. No. 838 at 5.)

Viewing the totality of evidence in the light most favorable to Plaintiffs, a reasonable trier of fact could conclude that Plaintiffs' evidence—demonstrating (1) the lack of confidentiality afforded to communications between incarcerated individuals and their counsel at the Jail (Snell Report at 51 ¶ 131, Johns Depo. Tr. at 469:10–13); (2) the Jail's unreliable and inconsistent attorney callback practices and inability to track and report callback compliance (*id.* at 63–66 ¶¶ 173–183); and (3) the Jail's visitation policies resulting in attorneys' hours-long waits which have prevented counsel from seeing their clients (*id.* at 30 ¶ 71)—amount to a Sixth Amendment violation of unconstitutionally chilling incarcerated individuals' "right to private consultation with counsel." *See Nordstrom*, 762 F.3d at 911.

Again, while the Court acknowledges Defendants' efforts to better secure incarcerated individuals' access to counsel, Defendants have not adduced sufficient evidence to illustrate that no dispute of material fact exists as to the current status of

attorney-client access and communications at the Jail. The Court is also not persuaded that the evidence produced meets the *Barnes* standard of showing that there "is no reasonable expectation that the wrong will be repeated," and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *See Barnes*, 980 F.2d at 580.

Accordingly, Plaintiffs' dispute of Defendants' facts and proffered evidence raises a genuine issue of material fact as whether Defendants' practices interfere with Plaintiffs' Sixth Amendment right to confidential attorney-client communications and access to counsel, and whether such interference prejudices Plaintiffs.

### 2.    Access to the Courts

"[T]he Sixth Amendment right to self-representation . . . includes a right of access to law books, witnesses, and other tools necessary to prepare a defense." *Taylor v. List*, 880 F.2d 1040, 1047 (9th Cir. 1989). However, the "right is not unlimited" and "[s]ecurity considerations and avoidance of abuse by opportunistic or vacillating defendants may require special adjustments." *Milton v. Morris*, 767 F.2d 1443, 1446 (9th Cir. 1985), *abrogated in part on other grounds by Kane v. Garcia Espitia*, 546 U.S. 9 (2005). "If the evidence offered by [incarcerated plaintiff] is sufficient to raise a genuine issue of material fact as to whether the defendants prevented [his] access to law books and witnesses, entry of summary judgment on [plaintiff's] Sixth Amendment claim was improper." *Taylor*, 880 F.2d at 1047.

In support of their Motion, Defendants present evidence of the Jail's legal research services, law library, and provision of writing supplies through the Declaration of Rebecca Cardenas, Program Coordinator in the Reentry Services Division of SDSO. (*See* Doc. No. 782-2, "Cardenas Decl.," at 157–59.) She states that all *pro per* male incarcerated persons are housed at the San Diego Central Jail (unless special housing is required) and are provided a minimum of 3 hours per week research time at the Central Jail law library with an average of 6 hours per week that may fluctuate with demand. (*Id.* at 158 ¶ 2.) Five individuals are permitted in the Central library at one time. (*Id.*) All *pro per* female

incarcerated persons are housed at the Las Colinas Jail and are provided a minimum of 3 hours per week research time at the Las Colinas law library facility. (*Id.* ¶ 3.) All *pro per* incarcerated individuals are provided "weekly supplies including papers, pencils, erasers, and envelopes." (*Id.* ¶ 4.) Additionally, Lexis/Nexis research is available in the law libraries. (*Id.*)

Defendants also adduce evidence that the County has a contract with an outside service, Legal Research Associates (LRA), which pursuant to the contract, will provide *pro per* incarcerated persons in criminal cases with up to 5 items or 50 pages per month, and the incarcerated individuals can make one request per calendar month. (*Id.* ¶ 5.) Persons representing themselves in a civil lawsuit in a conditions of confinement case can have 2 LRA requests per month limited to 50 pages per request. (*Id.* at 158–59 ¶ 6.) These practices are governed by SDSO's Detention Services Bureau policies N.6 (conditions of confinement incarcerated persons), N.7 (in propria persona status (*pro per* incarcerated persons)), T.3 (legal research area rules), and T.7 (legal assistance to incarcerated persons). (*Id.* at 159 ¶ 7.)

Plaintiffs dispute Defendants' evidence. First, Plaintiffs' expert, Snell, disputes that individuals are "provided a minimum of 3 hours per week" in the law library based on the testimony of Captain Johns, who testified that there is no minimum number of hours that the Department guarantees to *pro per* incarcerated people. (Snell Report at 82 ¶ 234 (citing Johns Depo. Tr. at 36:17–20).) Johns testified that individuals could get less than three hours a week depending on demand or security issues. (*Id.*) Plaintiffs additionally challenge the efficacy of the LRA contractual arrangement and whether incarcerated individuals can access the documents they seek. Snell reports, "one incarcerated person I interviewed in late March 2024 reported that he still had not received a response to the LRA request he submitted in February 2024." (*Id.* at 89 ¶ 257.) One of Defendants' experts, Lenard Vare, also "find[s] that access to law library services could be improved," especially the two LRA requests per month limitation for persons representing

themselves in civil lawsuits. (Doc. No. 796-13 at 107–18, "Snell Rebuttal Report," at 115–16 ¶¶ 30–34.)

Plaintiffs also assert "the legal research assistance provided to incarcerated people [who are litigating civil cases on a *pro per* basis] is overly restrictive, making it impossible for incarcerated people even to file and respond to pleadings." (Doc. No. 796 at 37 (citing Snell Report at 87–90.) To illustrate, SDSO Manual, No. N.6 does not initially provide any resources to individuals seeking to file a civil conditions of confinement case. (*Id.* at 87 ¶ 251.) Snell points to the text of Section N.6, "Conditions of Confinement Status," which is only granted after an incarcerated person has successfully filed a complaint and the Jail has been served with the court order by the County Counsel, leaving incarcerated individuals seeking to file a civil conditions of confinement case in a Catch-22. (*Id.* at 87–88 ¶ 252; *id.* at 89–90 ¶ 258 (Snell opining the LRA "legal research process is unreasonably burdensome and slow and may—considering the six-month Government Claims deadline and the two-year statute of limitations potentially governing such claims—ultimately have the effect of prohibiting [an incarcerated person] from filing his complaint at all.").) Moreover, incarcerated individuals litigating civil conditions of confinement are not permitted time in the legal research area and must rely on LRA requests. (*Id.* at 88 ¶ 253.)

In response, Defendants argue that Plaintiffs' expert opinion "relies on stale policies and procedures" and fails to account for the recent improvements and additions. (Doc. No. 806 at 16.) Defendants assert "[s]ince the filing of this lawsuit, and after expert discovery—the improvements that Defendants instituted amount[] to constitutional access to counsel and the courts." (*Id.*) Furthermore, Defendants offer that they "are currently providing legal research access to *all IPs* [incarcerated persons] through facility kiosks." (Doc. No. 806 (citing Doc. No. 806-1, Declaration of Sergeant Arturo Bernal Perales, "Perales Decl.," at 71–72).) Perales declares that "[l]aw library access is now active in the kiosks, such that all incarcerated persons have access to the electronic law library resources available through Fastcase, Inc. from the kiosk just as each incarcerated person has access to his/her commissary, phone, video visitation, personal accounts, etc." (Perales Decl. at 72.)

While Plaintiffs do not dispute that some video kiosks exist, Plaintiffs contend that Perales's Declaration "fails to explain how many video kiosks, if any, are in each housing unit; the process for an incarcerated person accessing the kiosks, including whether advance scheduling is required; the scope of services available through the kiosks; how long a person can spend at the kiosk; other uses of the kiosks, such as family video calls, which may limit their availability for legal research; whether a person can print material from the kiosks; or any other details necessary to understand whether the kiosks in fact provide meaningful access to legal research services." (Doc. No. 838 at 6.)

Given the factual disputes as to the number of hours incarcerated individuals are actually permitted in the Jail's law libraries per week (*see* Snell Report at 82 ¶ 234), the efficacy of the LRA service (*id.* at 87–90 ¶¶ 250–58), and the status and effectiveness of the accessing legal research through facility kiosks (Doc. No. 838 at 6), Plaintiffs have adduced sufficient evidence to show that there are material questions of fact as to the whether incarcerated individuals have sufficient access to courts pursuant to the Sixth Amendment, and whether individuals experience prejudice as a result of any violation (Snell Report at 89–90, ¶ 258).

For the reasons stated above, the Court **DENIES** summary judgment as to Plaintiffs' Eighth Claim for denial of access to counsel and the courts.

## H.   Discriminatory Racial Impact (Claim 9)

Plaintiffs' Ninth Claim asserts a discriminatory racial impact claim under California Government Code Section 11135, which prohibits discrimination "under[] any program or activity that . . . receives any financial assistance from the state." Cal. Gov't Code § 11135. Specifically, Plaintiffs contend Defendants violate Section 11135 by causing a disproportionate adverse effect on the basis of race, color, national origin, or ethnic group identification in carrying out their policing programs, alternatives to pre-trial custody programs, early release programs, and re-entry programs. (TAC ¶¶ 501–07.) To state a claim under Section 11135, a plaintiff must show "defendant's facially neutral practice causes a disproportionate adverse impact on a protected class . . . ." *Darensburg v. Metro.*

*Transp. Comm'n*, 636 F.3d 511, 519 (9th Cir. 2011). To rebut, the defendant must justify the challenged practice, and if the defendant meets its rebuttal burden, the plaintiff may still prevail by establishing a less discriminatory alternative. *Id.*

The Court first considers Plaintiffs' Section 11135 claim as applied to SDSO's patrol activities, and then to Defendants' alternatives to incarceration programs.

### 1. Patrol Activities

Both Plaintiffs' and Defendants' experts present evidence that the SDSO disproportionately arrests Black and Latinx individuals. First, Defendants' racial profiling and police system expert, Dr. Brian Withrow, analyzed two datasets: (1) data collected by SDSO's employees and maintained locally by the SDSO, which he claims primarily contains records of arrests ("Arrest Dataset");[13] and (2) data collected by SDSO employees in compliance with the Racial and Identity Profiling Act of 2015 (RIPA), which "contains a broader measure of enforcement activity, *i.e.* contacts between individuals and SDSO deputies" (the "RIPA dataset"). (Doc. No. 782-2 at 382–389, "Withrow Decl.," at 384–86 ¶¶ 5–8.) Withrow found that within the Arrest Dataset, "Black and Hispanic individuals may be overrepresented in arrests when compared to their proportions within the residential population." (*Id.* at 385 ¶ 7.) Within the RIPA dataset, his analysis returned, "Black individuals are slightly overrepresented in contacts when compared to their proportion within the residential population" and "Hispanic individuals are slightly underrepresented in contacts when compared to their proportion within the residential population." (*Id.* at 385 ¶¶ 7, 8.) Plaintiffs' expert, Dr. Matthew B. Ross, found that Latinx and Black people were, respectively, 28.6% and 16.2% more likely to be arrested by SDSO than non-Latinx white people. (Doc. No. 796-14 at 24.) At minimum, the evidence illustrates that SDSO

---

[13] Plaintiffs' expert, Matthew B. Ross, states, "Despite being provided CAD and RIPA data as well as arrest data, force data, and criminal cases (including information about victims, witnesses, and suspects, as well as keywords from a narrative report about each case), Dr. Withrow only analyzed the RIPA and arrest data. He repeatedly conflates the arrest and CAD data, but these are distinct databases." (Doc. No. 796-14 at 2 –3.)

disproportionately arrests Black and Latinx individuals. Accordingly, Plaintiffs have satisfied their initial burden as to their patrol disparate impact claim. *See Darensburg*, 636 F.3d at 519.

The burden then shifts to Defendants to justify the challenged practice of SDSO disproportionately arresting Black and Latinx individuals. *Id*. Rather than attempt to justify the disparate impact findings of both experts, Defendants try to negate elements of Plaintiffs' claim and critique Plaintiffs' expert's methodology.

First, Defendants argue that Plaintiffs lack evidence of intentional discrimination (Doc. No. 782-1 at 37), but "intent" is not an element of a Section 11135 disparate impact claim, which Defendants also recognize in their briefing. (*See* Doc. No. 782-1 at 36 ("Plaintiffs instead rely on disparate impact, defined as occurring, ' . . . when a facially neutral act or practice, *regardless of intent*,' has a disproportionate impact on members of a protect class . . . .") (emphasis added).)

Second, Defendants assert only 26% of bookings are from SDSO arrests, while other arresting agencies are responsible for the remaining 74%. (Doc. No. 782-2 at 32.) However, this argument is of no import in either justifying SDSO's disproportionate arrests of Black and Latinx individuals, or of negating an element of Plaintiffs' Section 11135 claim regarding patrol activities. Regardless of what percentage of the Jails' bookings originate from SDSO arrests, analysis from both Defendants' and Plaintiffs' experts illustrate that SDSO disproportionately arrests Black and Latinx individuals, which is one of the central bases of Plaintiffs' Section 11135 claim. (*See* TAC ¶ 505 ("In carrying out their policing programs . . . [Defendants] violate Section 11135 by causing a disproportionate adverse effect on the basis of race, color, national origin, or ethnic group identification. As a result of the County's Sheriff's Department's, and Probation Department's policing practices, disproportionate numbers of Black and Latinx persons are *arrested*.") (emphasis added).)

Third, Defendants argue that "policing in stopping and arresting people, is not funded by and does not receive any financial assistance from the State[,]" so SDSO's

policing practices cannot be subject to a Section 11135 claim, which specifically applies only to state-funded programs and activities. (Doc. No. 806 at 18.) In support, Defendants cite to the Declaration of Eunice Ramos, SDSO's Chief Financial Officer, who lists fourteen SDSO programs that receive California state funding, including two narcotics task forces. (*See* Doc. No. 806-1 at 77–81, "Ramos Decl.," at 78–79.) In response, Plaintiffs challenge Defendants' assertion that SDSO policing receives no state funding. Plaintiffs argue the Ramos Declaration never states that patrol activities receive no state funding. (Doc. No. 838 at 7.) Additionally, Plaintiffs proffer evidence that the SDSO's 30(b)(6) witness testified that SDSO's policing programs receive state funding. (*See* Doc. No. 838-1 at 100–103, Depo Tr. of Thomas Seiver, at 101:12–102:3.) Plaintiffs have adduced sufficient evidence to create a triable issue of fact as to whether SDSO's policing program receives state funds.

Fourth, Defendants make several challenges to Dr. Ross's methodology, all of which Plaintiffs dispute. Defendants claim Dr. Ross "did not assess the actual race of the people stopped[,]" (Doc. No. 272-1 at 38), which is not relevant to Plaintiffs' claim of disparate impact regarding arrests, not stops. Defendants also assert that Dr. Ross failed to account for the socioeconomic status of arrestees, (*id.* at 37), which Plaintiffs dispute, and argue is irrelevant to Dr. Ross's conclusions and to Plaintiffs' claims. (Doc. No. 796 at 40 n.20).

Finally, Defendants' last challenge to Dr. Ross's methodology is that "Plaintiffs are comparing general population statistics of the County as a whole[,] failing to take into account that a different number of deputies are assigned to different areas, the racial makeup of the areas with the most patrol resources allocated is not tracked by Defendants, and the physical boundaries of patrol beats and census statics are seldom synonymous." (Doc. No. 806.) Defendants continue, "[a]n accurate analysis must compare apples to apples by looking at the level of allocation of policing resources (e.g. patrol officers) to a patrol beat and comparing it to the proportional representation of residents by race or

ethnicity within that sample patrol beat." (Doc. No. 806 at 20.) Defendants' expert, Dr. Withrow, elaborates on this theory:

> Police resources are routinely assigned on the basis of demand, often measured by citizen calls for service, a measure of victimization. Sometimes this inadvertently results in an increased presence of police resources (e.g. patrol officers) in neighborhoods that experience high crime and which may also be populated principally by racial and ethnic minorities.

(Doc. No. 806-1 at 83–93, "Withrow Reply Decl.," at 86.) Defendants further claim this analysis "cannot be done [] because that data does not exist." (Doc. No. 806 at 20.) In response, Plaintiffs state that the issues Defendants raised "related to calls for service, causal models on temporal ordering, neighborhood- and beat-level data, and census data" are "irrelevant." (Doc. No. 796 at 40 n. 20.)

The Court does not find Defendants' statements regarding police resources and allocation "irrelevant." If SDSO's police officers are required to respond to calls for service or domestic violence calls (and perhaps are even required to make arrests in the case of domestic violence (*see* Withrow Reply Decl. at 86 ¶ 6(c) ("Arrests required by California law (*e.g.* domestic violence) are not discretionary[]")), and if SDSO receives calls more frequently from certain neighborhoods or beats, disproportionate arrests in those neighborhoods could possibly provide a race-neutral justification for the parties' experts findings of disproportionate arrests of Black and Latinx individuals. Here, however, the Court is not presented with any evidence supporting Defendants' theory (for example, the number of calls SDSO receives from certain beats and the nature of those calls.)

Accordingly, Defendants do not carry their burden of justifying the findings of their expert, that SDSO disproportionately arrests Black and Latinx individuals. Even if Defendants dispute their expert's findings, Plaintiffs adduce sufficient evidence creating a triable issue of fact as to whether SDSO disproportionately arrests Black and Latinx individuals, whether SDSO's policing programs that make arrests receive state funding, and if so, whether SDSO's arrests could be justified. Defendants' motion for summary

69

judgment as to Plaintiffs' Ninth Claim as it relates to Defendants' patrolling practices is **DENIED**.

## 2. Alternatives to Incarceration Programs

Defendants do not affirmatively present any data or evidence to challenge Plaintiffs' claim that Defendants deny Black and Latinx individuals equal access to alternatives to pre-trial custody programs, early release programs, and re-entry programs.[14] (*See* Doc. No. 782-1.) Instead, Defendants jump to the second step of the Section 11135 analysis, to justify any adverse impact against Black and Latinx individuals.

First, Defendants justify their alternatives to incarceration programs by stating that the risk assessment tools used to evaluate an incarcerated person's eligibility for early release or probation, and the appropriate level of supervision, is determined by assessing risk based on race-neutral factors including an individual's "criminal history, prior incarcerations, [] commitment offense, attitudes/core values, substance abuse, employment status, and the company kept by the person." (Doc. No. 782-1 at 39.) Without citation to evidence, Defendants further state that basing eligibility for programs on neutral risk factors serves the purpose of "preventing violence and violent incidents." (*Id.*)

In response, Plaintiffs present evidence from Dr. Christine Scott-Hayward that the eligibility criteria used by SDSO to evaluate individuals for alternatives to incarceration programs likely has a racially disparate impact. (Doc. No. 796-15 at 4–53, "Scott-Hayward Report," at 34 ("[A] review of the role played by risk assessment in admissions decision[s] might lead to increased participation in CPAC programs, particularly given how risk assessment tools over predict risk, especially for people of color.") For example, Dr. Scott-Hayward opines that "research shows that Black people tend to get charged with and

---

[14] Plaintiffs' expert, Dr. Christine Scott-Hayward, summarized a February 2024 report by SANDAG (San Diego Association of Governments) that found in San Diego County, Black people make up 17% of arrestees, but 21-22% of the Jail population (in the first quarter of 2024), and Hispanic people made up 41% of arrests, but 43–45% of the Jail population (also in the first quarter of 2024). (Doc. No. 796-15 at 20–21 ¶¶ 36, 37.)

convicted of more serious offenses than white people and so using offenses to exclude people from program participation likely has a racially disparate impact." (*Id.* at 34–35.) Moreover, she states, "in the pretrial context, there is no evidence that the seriousness of criminal charges has any relationship to failure to appear or new criminal activity by people on pretrial release [so] barring people charged with (or convicted of) a serious offense likely excludes people who might otherwise benefit from programming." (*Id.*)

Based on the record before the Court, without presentation of any evidence, Defendants do not carry their burden to show that the race-neutral assessment criteria used to determine eligibility for alternatives to incarceration prevents or reduces violence.

Second, Defendants attempt to negate an element of Plaintiffs' Section 11135 claim by arguing that alternatives to custody programs are not state-funded, and therefore Plaintiffs cannot sustain a Section 11135 claim. (Doc. No. 806 at 19 (citing Ramos Decl.).) In response, Plaintiffs cite to a SDSO February 18, 2025, written response to a Public Records Act request submitted by Plaintiffs' counsel that the Sheriff's County Parole and Alternative Custody program ("CPAC"), which Plaintiffs assert encompasses several alternative programs to incarceration, "was implemented as part of Public Safety Realignment and is funded by AB109-Community Corrections funding from the State . . ." (*See* Doc. No. 838-1 at 3 ¶ 9; *id.* at 107.) Because Plaintiffs have adduced sufficient evidence to create a triable issue of fact as to whether SDSO's CPAC program receives state funds, summary judgment is improper.

For the reasons stated above, the Court **DENIES** summary judgment as to Plaintiffs' Ninth Claim for violation of California Government Code Section 11135.

## III.    CONCLUSION

Based on the foregoing, the Court **DENIES** Defendants' Motion for Partial Summary Judgment in its entirety. (Doc. No. 782.) The Court also **DENIES** Plaintiffs' request to strike Defendants' expert declarations filed in support of Defendants' Motion (Doc. No. 796), and **GRANTS** Plaintiffs' request to strike paragraphs 5, 6, and 11 of the

71

Amended Coleman Declaration (Doc. No. 838). On this record the Court also **DENIES**

Defendants' request for an Order Treating Specified Facts as Established.

     **IT IS SO ORDERED.**

Dated:  August 11, 2025

Hon. Anthony J. Battaglia
United States District Judge

20-cv-00406-AJB-DDL