Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
Deann Rivard (SBN 177482)
drivard@bwslaw.com
Martin Kosla (SBN 247224)
E-mail: mkosla@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600
San Diego, CA 92101-8474
Tel: 619.814.5800    Fax: 619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA 95113-2336
Tel: 408.606.6300    Fax: 408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S DEPARTMENT and
SAN DIEGO COUNTY PROBATION
DEPARTMENT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**DECLARATION OF SUSAN E. COLEMAN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND PROVISIONAL CLASS CERTIFICATION**<br><br>Date: November 20, 2025<br>Time: 2:00 p.m.<br>Ctrm: 4A<br><br>Judge: Anthony J. Battaglia |

I, SUSAN E. COLEMAN, declare as follows:

1. I am an attorney licensed to practice law before this Court, and a Partner with the law firm of Burke, Williams & Sorensen, LLP, counsel of record in this matter for Defendant COUNTY OF SAN DIEGO. Unless otherwise stated, the following statements are true of my own personal knowledge, and if called upon to testify, I could and would testify competently thereto.

2. In January 2017, the Sheriff's Department contacted with the National Commission on Correctional Health Care (NCCHC) to provide technical assistance to help San Diego County Sheriff's Department to assess operational policies and practices for 4 of their jails and to recommend how the county may deliver health care to inmates and improve their physical and behavioral health outcomes. Recommendations were made on 26 standards; however, some items were complimented and no recommendations were made. Attached as **Exhibit A** is a true and correct copy of the Technical Assistance Report.

3. The Disability Rights California (DRC) issued a report in April 2018 entitled "Suicides in San Diego County Jail: A System Failing People with Mental Illness." *See* Exhibit F to Van Swearingen Decl. [Dkt. 119-3]. Plaintiffs provided this report, but not any responses by the Sheriff's Department.

4. Attached as **Exhibit B** is a true and correct copy of Dr. Colleen Kelly's response to the suicide rate cited in DRC Report, dated April 6, 2018. Dr. Kelly has a Ph.D from the University of California, San Diego and is an Accredited Professional Statistician with over 20 years of experience. In her response, Dr. Kelly demonstrates that the DRC's statistical analysis is flawed and inaccurate. In contrast to DRC's report, which contends San Diego County had the highest suicide incidence among various counties for the period from 2010-2017, Dr. Kelly notes that <u>Los Angeles County</u> actually had the highest reported <u>total</u> –34 compared to 30 in San Diego. The largest counties will generally have the largest number of suicides.

5. Dr. Kelly notes that, in order to properly compare jail systems, the suicide rate should be calculated using the number of suicides divided by the number of inmates in the jail system. Dr. Kelly also noted that the DRC report uses the average daily population (ADP) rather than the number of inmates at risk, which yields an average which is higher than the actual suicide rate. The ADP suicide rate also uses a denominator of an inmate year, *i.e.* one inmate in the jail system for an entire year; however, the average length of stay for 2011-2017 in the San Diego County jails was 22 days, requiring 16.6 inmates strung together to make up each inmate-year in the denominator of the ADP suicide rate. Using the ADP suicide rate yields numbers approximately 17 times the at-risk suicide rates. And because most suicides occur within the first 30 days of incarceration, it is not reasonable to compare the risk of suicide for one inmate in custody 365 days to the risk for 16.6 inmates in custody during that same year for shorter periods of time. Additionally, the demographics of the county jail systems differ throughout California. San Diego has the highest percentage of Caucasian inmates (46%) of the 10 largest jail systems in California from 2010-2016 (based on arrest data) but Caucasian inmates are 6 times more likely to commit suicide than African-American inmates and 3 times more likely than Hispanic inmates. The DRC rates fail to standardize by age, race and gender to foster better comparisons. The DRC also used a 3 year period (2014-2016) instead of the larger 7 year period (2010-2017) available, despite its notation at page 4 of the report that "suicide rates are most meaningful when viewed over a sustained period of time."

6. Dr. Kelly also notes that suicide rates in jails and prisons are not comparable because of the different length of stay and the higher risk at the beginning of incarceration. Further, the county resident population is not comparable to the jail population; inmates are predominantly male and younger than the general population, which correlates to higher suicide risks. The DRC compares the suicide rates of the San Diego jail system to (1) other California

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4885-7206-1217 v1

- 3 -

3:20-CV-00406-AJB-DDL
COLEMAN DECL. ISO OPPOSITION

1  county jail systems, (2) the California prison system, (3) the national jail suicide
2  rate, and (4) to the general San Diego population, and uses the flawed ADP suicide
3  rate.  This comparison is not a fair (apples-to-apples) comparison, nor do the DRC
4  suicide rates demonstrate any correlation between suicide prevention policies and
5  suicide rates since the suicide prevention policies of the different jail systems are
6  not discussed or compared, making any causal relationship purely speculative.

7.  As Dr. Kelly points out, the statistics cited in the DRC report originated in a series of CityBeat articles, which were then generated by the Grand Jury Report and then the DRC report, without recognizing the length-of-stay, demographic, or cultural differences between San Diego jail inmates and other comparators, and without actually correlating the suicide rates to deficient policies. The logical fallacy in concluding there is a suicide prevention problem based solely on a difference in suicide rates is comparable to concluding that the USA was deficient in its Olympic Winter Training Program because Norway dominated the 2018 Winter Olympics.

8.  Sheriff Gore also issued a letter response to the DRC report on April 24, 2018, a true and correct copy of which is attached as **Exhibit C.**

9.  On the same date (April 24, 2018), the Sheriff's Department issued a Press Release entitled "Taking a Proactive Approach to Treating the Mentally-Ill in Jail."  A true and correct copy of this press release is attached as **Exhibit D**.

10.  The County retained Lindsay Hayes, an expert in the field of suicide prevention in correctional facilities, to evaluate its suicide prevention policies.  His report is cited by Plaintiffs  (Ex. G to Van Swearingen Declaration, Dkt. 119-3.)

11.  Following Mr. Hayes' report, the Sheriff's Department worked diligently to address each of his 32 recommendations.  The County issued a synopsis as to what the Sheriff's Department has done to implement Mr. Hayes' recommendations, and the current status of recommendations yet to be completed; a true and correct copy of this summary is attached as **Exhibit E**.  For example, the

1  Department added annual training on suicide detection and prevention for new and
2  existing staff, using Mr. Hayes' training curricula.  This includes custody staff,
3  mental health, and medical staff.  The Department also added additional questions
4  to the suicide risk inquiry on intake, following Mr. Hayes' specific
5  recommendations. Service hours of mental health clinicians were expanded for
6  greater coverage and plans were made to have mental health staff available 24/7 at
7  the intake facilities.  The Department now verifies in the JIMS database whether the
8  inmate was previously on suicide precautions during a prior confinement, and alert
9  flags advise nursing staff of previous in custody suicide attempts and PSU housing.
10 Nursing audits by supervising nurses were adjusted to include periodic audits of the
11 intake screening process. There were additional changes made, pursuant to the
12 recommendations of Mr. Hayes, as set forth in the Exhibit E - Response.

13      10.    In October 2019, the County published a list of improvements that
14 have been made following the Technical Assistant Report issued by the National
15 Commission on Correctional Health Care (MCCHC Resources, Inc.) in 2017.  It
16 noted that the NCCHC had updated and revised their standards in 2018, and the
17 County's implementation plan was adapted to meet these new standards.  Attached
18 as **Exhibit F** is a true and correct copy of the recommendations that had been
19 addressed and the specific changes made.  The Department indicated is was
20 undergoing a complete policy and procedure review process to ensure all required
21 NCCHC standards were covered and that the policies are site specific.  The
22 Sheriff's Department created an infection control plan and employed an infection
23 control nurse.  A peer review process was already in place for nursing staff, but a
24 process to implement a peer review process for medical and psychiatric contract
25 providers was initiated. There were additional changes made, pursuant to NCCHC
26 recommendations, as set forth in the Exhibit F - Response.

27      11.    In response to media about drug issues in the jail, the Sheriff's
28 Department issued a press release about their interdiction issues in December 2020.

1  Attached as **Exhibit G** is a true and correct copy of this press release. This release
2  explained the dangers of fentanyl, and measures at the jails to prevent entry of
3  drugs into the facilities or to locate them such as body scanners, information
4  provided during booking, screening of inmates and flagging of potential smugglers,
5  a mail processing center with specialized equipment and trained deputies, drug-
6  sniffing K-9s, an anonymous tip line, surprise cell searches, and other measures, as
7  set forth in Exhibit G.

8  12. In February 2022, the California State Auditor issued a report critical
9  of the San Diego County Sheriff's Department efforts to prevent and respond to
10 deaths of individuals in custody. Plaintiffs cite this report heavily. (Ex. B to Van
11 Swearingen Decl., Dkt. 119-3.)

12 13. The County responded to the Auditor's report, and noted changes that
13 were in the process of being made as well as recommendations they agreed with.
14 Attached as **Exhibit H** is a true and correct copy of this response. For example, the
15 County agreed that qualified mental health providers (QMHP) should to the mental
16 health screening portion of the intake process, and it is recruiting and hiring
17 clinicians to fill these positions. Having a QMHP in the intake process will also
18 permit review and consideration of each individual's medical and mental health
19 history from the county health system. The County also stated it was planning to
20 integrate body worn cameras into the custodial setting, which would help show the
21 point of view of each deputy during the safety checks, and that video audits be
22 conducted of random safety checks as well as reviewing electronic log entries.

23 14. Attached as **Exhibit** I is a true and correct copy of an expert report by
24 Andrew Hildreth, Ph.D., from Resolution Economics. This report demonstrates
25 that the California State Auditor's report fails to take into account differences
26 between counties, omits the County of Los Angeles (the closest in size to San
27 Diego) as a comparator, and artificially inflates the death rate by using ADP
28 (average daily population) method which fails to take into account the turnover of

1  the San Diego County jail population. The average number of days each inmate is
2  in custody in San Diego county jails is 22.02, whereas in Los Angeles it is 47.39, in
3  Orange County it is 36.22, and in San Bernardino it is 29.28. Without controlling
4  for the turnover in population, it is not equitable to compare the statistics in terms
5  of the bald numbers and conclude there is any statistically higher risk of death in
6  custody in San Diego; here, there are more inmates coming in and out of the jails.
7  Additionally, as Mr. Hildreth explains, the age of inmates is higher than many other
8  counties, leading to a higher natural death rate.

9        15. Michael Keavney (booking #17104761) asserts that he filed a small
10 claims lawsuit in 2020 against the jail concerning the loss of his personal property.
11 (Keavney Decl. ¶ 9.) Mr. Keavney states he was unable to prosecute his federal
12 lawsuit (No. 20-cv-1443-MMA-MSB) because the County delayed delivery of the
13 court's order dismissing his case with 60 days leave to amend, and he did not
14 receive it until nearly 10 months later. (Keavney Decl. ¶ 10.) However, based on
15 the court docket, it appears that Mr. Keavney's case was dismissed because he
16 failed to state a claim or identify individual defendants by name, and not because he
17 failed to timely amend his complaint. Keavney appealed the dismissal of the action
18 to the Ninth Circuit, and that appeal is currently pending. Attached as **Exhibit J** is
19 a true and correct copy of the district court docket for Mr. Keavney's federal
20 lawsuit; attached as **Exhibit K** is a true and correct copy of the Ninth Circuit docket
21 for the same case on appeal.

22       16. Mr. Keavney asserts that Exhibit C to his declaration is an envelope
23 from the United States District Court showing "a note by the custody officer
24 indicating that it was delivered March 1, 2022." (Keavney Decl. at ¶ 10.) Mr.
25 Keavney fails to mention that the envelope also has several crossed out notations on
26 it, indicating the envelope may have been sent to other facilities for delivery.
27 ///
28 ///

1  ///

2  ///

3    17. On June 9, 2020, Mr. Lopez appeared via video conference with his attorneys Herbert Weston and Tanya Weston before Judge Harry M. Elias, in the Superior Court of California, County of San Diego in Mr. Lopez' aggravated child molest matter, People v. Josue Lopez, CN405969. (Lopez Decl. [Dkt.119-28], Exh. A.) In a bid to have Mr. Lopez released from custody, Mr. Lopez' attorneys argued that they were unable to effectively meet with Mr. Lopez because the jails were shut down due to the COVID-19 pandemic. (Lopez Decl., Exh. A, 2548:11-13; 2544: 13-17.) Mr. Weston admitted the jail was not at fault. (Lopez Decl., Exh. A, 2548:15-18.) Contrary to Mr. Lopez' claims that he had problems communicating with his attorney beginning Dec. 12, 2019, Mr. Weston admitted that he "had good contact with my client" up until the March 20, 2020 COVID shutdown. *Id.* Also, contrary to Mr. Lopez' claims herein, Mr. Weston relayed to the Court that Mr. Lopez was able to talk to his family. (Lopez Decl., Exh. A, 2545:1-4; Exh. B, 2558:20-21.)

  18. Two days later on June 11, 2020, the San Diego's Sheriff's Department's legal counsel, Acting Lieutenant of the George Bailey Detention Facility, as well as the Sergeant in Charge of Supplemental Services appeared before Judge Elias and resolved all of Mr. Lopez' complaints to the satisfaction of Mr. Lopez and the Court. (Lopez Decl., Exh. B [Dkt. 119-28].) The Sheriff's Department informed Mr. Weston that he would be able to go to GBDF with a Sign Language Interpreter and have confidential visits with Mr. Lopez, despite COVID restrictions. (Lopez Decl., Exh. B, 2559:2-9; 2561:22-27.) The Lieutenant of the Bailey Facility offered to accommodate any visits at any time, and further offered to provide a large room where social distancing could be practiced, as well as glass partitions for further safety, or any other configuration. (Lopez Decl., Exh. B, 2562:8-24 ["I'm happy to accommodate whatever makes everyone feel

1  comfortable"])   Mr. Weston declined noting his reservations due to COVID, which
2  was his right to do, but cannot be attributed to any wrongdoing on the part of the
3  Jails.  (Lopez Decl., Exh. B, 2559:12-26)  Mr. Lopez' attorney Mr. Weston again
4  did not blame the jail.  (Lopez Decl., Exh. B, 2557:10-13  ["I know that the Sheriff
5  tries as best as they can…."]  The Lieutenant of GBDF further relayed that although
6  deputies remain close to computers for telecommunications due to safety concerns,
7  Mr. Lopez, due to his hearing disability, would be provided with special
8  accommodations wherein Mr. Lopez could be alone in a room where a deputy
9  would stand outside.  (Lopez Decl., Exh. B, 2565:5-21.)   Mr. Lopez' attorney
10 agreed the accommodations provided by the Sheriff's Department would be
11 satisfactory and the matter was resolved.  (Lopez Decl., Exh. B, 2566:6-18.)

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on October 28, 2025, at San Diego, California.

                   /s/  *Susan E. Coleman*
                   Susan E. Coleman