1  Susan E. Coleman (SBN 171832)
   E-mail: scoleman@bwslaw.com
2  Martin Kosla (SBN 247224)
   E-mail: mkosla@bwslaw.com
3  BURKE, WILLIAMS & SORENSEN, LLP
   501 West Broadway, Suite 1600
4  San Diego, CA 92101-8474
   Tel: 619.814.5800 Fax: 619.814.6799
5
   Elizabeth M. Pappy (SBN 157069)
6  E-mail: epappy@bwslaw.com
   BURKE, WILLIAMS & SORENSEN, LLP
7  60 South Market Street, Ste. 1000
   San Jose, CA 95113-2336
8  Tel: 408.606.6300 Fax: 408.606.6333

9  Attorneys for Defendants
   COUNTY OF SAN DIEGO, SAN DIEGO
10 COUNTY SHERIFF'S DEPARTMENT and
   SAN DIEGO COUNTY PROBATION
11 DEPARTMENT

12                    UNITED STATES DISTRICT COURT

13                   SOUTHERN DISTRICT OF CALIFORNIA

14

15 DARRYL DUNSMORE, ANDREE            Case No. 3:20-cv-00406-AJB-DDL
   ANDRADE, ERNEST ARCHULETA,
16 JAMES CLARK, ANTHONY               **DECLARATION OF SUSAN E.**
   EDWARDS, REANNA LEVY, JOSUE        **COLEMAN IN SUPPORT OF**
17 LOPEZ, CHRISTOPHER NORWOOD,        **DEFENDANTS' OPPOSITION TO**
   JESSE OLIVARES, GUSTAVO            **PLAINTIFFS' MOTION FOR**
18 SEPULVEDA, MICHAEL TAYLOR,         **PRELIMINARY INJUNCTION**
   and LAURA ZOERNER, on behalf of    **TO LIMIT ADMINISTRATIVE**
19 themselves and all others similarly **SEPARATION FOR CLASS**
   situated,                          **MEMBERS WITH SERIOUS**
20                                     **MENTAL ILLNESS**
                   Plaintiffs,
21                                     Date:      November 20, 2025
           v.                          Time:      2:00 p.m.
22                                     Courtroom: 4A
   SAN DIEGO COUNTY SHERIFF'S
23 DEPARTMENT, COUNTY OF SAN          Judge:  Anthony J. Battaglia
   DIEGO, SAN DIEGO COUNTY            Magistrate Judge David D. Leshner
24 PROBATION DEPARTMENT, and
   DOES 1 to 20, inclusive,
25
                   Defendants.
26

27      I, SUSAN E. COLEMAN, declare as follows:

28      1.    I am an attorney licensed to practice law before this Court, and a

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4917-7190-7189 v1                        1                Case No. 3:20-cv-00406-AJB-DDL
                                                          DECLARATION OF SUSAN E. COLEMAN ISO
                                                          DEFTS' OPPOSITION TO MOTION FOR PI

1  Partner with the law firm of Burke, Williams & Sorensen, LLP, counsel of record in

2  this matter for Defendant COUNTY OF SAN DIEGO. Unless otherwise stated, the

3  following statements are true of my own personal knowledge, and if called upon to

4  testify, I could and would testify competently thereto.

5         2.      Counsel for Defendants notes for the Court that the parties are presently

6  engaged in good-faith settlement discussions, and it is anticipated that these

7  discussions may narrow or resolve the issues addressed in Plaintiffs' Proposed

8  Order (**Attachment A** to the Declaration of Gay C. Grunfeld, hereinafter "Grunfeld

9  Decl."). Plaintiffs' counsel has obviously been involved in and is well aware of

10  these negotiations as well as some of the County's plans for improvements.

11         3.      Plaintiffs allege that they "have also made Defendants aware of the

12  deficiencies of their policies and practices through this litigation, but Defendants

13  have refused to implement necessary reforms," citing Exhibit B in support of this

14  contention. (Memo. of Points and Authorities, ECF No. 979-1, p. 20:20-21.)

15  **Exhibit B** to the Grunfeld Declaration is the letter Plaintiffs' counsel sent to my

16  office on July 18, 2025, primarily concerning their request for records regarding the

17  July 2025 death of Corey Dean, remains under investigation and occurred long after

18  the fact cut-off date of February 3, 2025. Plaintiffs' request to reopen fact discovery

19  was denied.

20         4.      **Exhibit C** attached to Gay C. Grunfeld's declaration is not cited as

21  evidence in support of any argument in the accompanying Memorandum of Points

22  and Authorities. The exhibit consists solely of two inadmissible news articles that

23  contain hearsay out of court statements made by Plaintiffs' counsel concerning the

24  case. The only reference to these articles appears in the Declaration of Melissa

25  Dean, Corey Dean's sister, who merely states that she read one of them. These

26  articles are wholly irrelevant to the issues before the Court and have no evidentiary

27  value. Plaintiffs' counsels' efforts to publicize and argue this case through the media

28  is improper and should cease immediately. The Court should make clear that such

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
SAN DIEGO

4917-7190-7189 v1                        2             Case No. 3:20-cv-00406-AJB-DDL
DECLARATION OF SUSAN E. COLEMAN ISO
DEFTS' OPPOSITION TO MOTION FOR PI

1    attempts to litigate in the press, particularly through the submission of extrajudicial

2    commentary disguised as evidence, have no place in these proceedings.

3         5.     **Exhibit D** to Gay C. Grunfeld's declaration consists of the following

4    records Corey Dean's family gave to Plaintiffs' counsel, selected from the 649

5    pages total that she references having received from the family: (1) the Receiving

6    Screening dated June 15, 2025; (2) QMHP Progress Notes dated June 22, 2025, June

7    26, 2025, and July 10, 2025; (3) BH Assessment dated July 3, 2025; (4) ADSEP

8    Templates for MHC dated July 3, 2025 and July 10, 2025; (5) Psychiatric

9    Evaluation dated June 22, 2025; (6) Mental Health Evaluation dated June 19, 2025;

10   and (7) lab results reported on July 1, 2025. Plaintiffs' counsel indicates that she

11   provided these records to Dr. Stewart. (Grunfeld Decl. at ¶ 12–13.) They offer no

12   relevant evidence about Mr. Dean's incarceration in Administrative Separation

13   having anything to do with his death – which is still under investigation -- and are

14   simply more evidence of Plaintiffs' attempt to litigate the case through

15   sensationalism.

16        6.     **Exhibit E** to the Grunfeld Declaration is a two-paragraph email from

17   Plaintiffs' counsel to my office on August 1, 2025, primarily concerning their

18   request for records regarding the July 2025 death of Karim Talib, which remains

19   under active investigation and occurred well after the fact cut-off date of February 3,

20   2025. Consistent with our response to Plaintiffs' other post-discovery cutoff

21   requests for documents, Defendants declined to produce the requested materials on

22   the grounds that they concern events outside the discovery period and remain the

23   subject of an ongoing investigation. The email serves no purpose in any

24   determination on the merits in this case but is yet another example of Plaintiffs'

25   counsel trying to sensationalize the case and support their theories.

26        7.     Plaintiffs reference the NCCHC Resources, Inc. Technical Assistance

27   Report (Grunfeld Decl., **Exhibit G**) from 2017–now nearly nine years old–in

28   support of their argument for the imposition of a Preliminary Injunction. Plaintiffs

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4917-7190-7189 v1       3      Case No. 3:20-cv-00406-AJB-DDL
DECLARATION OF SUSAN E. COLEMAN ISO
DEFTS' OPPOSITION TO MOTION FOR PI

1   have omitted reference to the numerous changes Defendants implemented in

2   response to the report. In October 2019, the County published a list of

3   improvements made following the Technical Assistant Report issued by the

4   National Commission on Correctional Health Care (MCCHC Resources, Inc.) in

5   2017.  It noted that the NCCHC had updated and revised their standards in 2018,

6   and the County's implementation plan was adapted to meet these new standards.

7   Attached hereto as *Exhibit A* is a true and correct copy of the recommendations that

8   had been addressed and the specific changes made by the County.  The Sheriff's

9   Office indicated it was undergoing a complete policy and procedure review process

10  to ensure all required NCCHC standards were covered and that the policies are site-

11  specific.  The Sheriff's Office created an infection control plan and employed an

12  infection control nurse. A peer review process was already in place for nursing staff,

13  but a process to implement a peer review process for medical and psychiatric

14  contract providers was initiated. There were additional changes made, pursuant to

15  NCCHC recommendations, as set forth in *Exhibit A*.

16          8.      Likewise, Plaintiff's reference to Mr. Hayes's 2018 report (Grunfeld

17  Decl., **Exhibit H**) is also dated and omits reference to the changes implemented in

18  response to it. Following Mr. Hayes' report, the Sheriff's Office worked diligently

19  to address each of his 32 recommendations.  The County issued a synopsis as to

20  what the Sheriff's Office has done to implement Mr. Hayes' recommendations, and

21  the current status of recommendations yet to be completed; a true and correct copy

22  of this summary is attached hereto as *Exhibit B*.  For example, the Sheriff's Office

23  added annual training on suicide detection and prevention for new and existing staff,

24  using Mr. Hayes' training curricula.  This includes custody staff, mental health, and

25  medical staff.  The Sheriff's Office also added additional questions to the suicide

26  risk inquiry on intake, following Mr. Hayes' specific recommendations. Service

27  hours of mental health clinicians were expanded for greater coverage and plans were

28  made to have mental health staff available 24/7 at the intake facilities.  The Sheriff's

Burke, Williams &
Sorensen, LLP
Attorneys at Law
San Diego

4917-7190-7189 v1                                    4                    Case No. 3:20-cv-00406-AJB-DDL
DECLARATION OF SUSAN E. COLEMAN ISO
DEFTS' OPPOSITION TO MOTION FOR PI

Office now verifies in the JIMS database whether the inmate was previously on suicide precautions during a prior confinement, and places alert flags to advise nursing staff of previous in custody suicide attempts and PSU housing. Nursing audits by supervising nurses were adjusted to include periodic audits of the intake screening process. There were additional changes made, pursuant to the recommendations of Mr. Hayes, as set forth in *Exhibit B*.

9.     **Exhibit K** to the Grunfeld declaration is Plaintiffs' counsel's letter dated August 13, 2025, requesting the San Diego County Sheriff's Office revise its policy to require safety checks at least every 30 minutes, at staggered intervals, but neglects to address the fact that the current safety check policy complies with CCR Title 15 regulations. NCCHC regulations do not require the implementation of the policy changes suggested by Plaintiffs' counsel.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on October 28, 2025, at San Diego, California.


/s/ Susan E. Coleman
SUSAN E. COLEMAN

Burke, Williams &
Sorensen, LLP
Attorneys at Law
san diego

4917-7190-7189 v1                                      5                    Case No. 3:20-cv-00406-AJB-DDL
DECLARATION OF SUSAN E. COLEMAN ISO
DEFTS' OPPOSITION TO MOTION FOR PI

# EXHIBIT A

In January, 2017, the San Diego County Sheriff's Department contracted with the National Commission on Correctional Health Care (NCCHC) to conduct a technical review of our jails' medical and mental health delivery to compare our current model to their national standards. This review culminated in a report to the Sheriff's Department identifying several areas of improvement needing to be addressed to meet the NCCHC standards. We used this report, as well as the NCCHC "Standards for Health Services in Jails" book, to develop an implementation plan to start the process of moving toward gaining accreditation from NCCHC. NCCHC updated and revised their standards in 2018 and we adapted our implementation plan to the new standards. We have worked to steadily enhance our medical and mental health service delivery. Below are the descriptions of the standards and where we are in the implementation process, as of October 14, 2019.

NCCHC STANDARDS

SECTION A – GOVERNANCE AND ADMINISTRATION

1. **J-A-01   Access to Care –**

   ***Inmates have access to care for their serious medical, dental, and mental health needs.***

   The Sheriff's Department has always provided access to medical and mental health care. Policy and procedure changes, including the triaging of medical sick call requests and scheduling follow-up appointments, were made to ensure the compliance indicators for this standard are being met. We currently meet all compliance indicators for this standard.

2. **J-A-02   Responsible Health Authority –**

   ***The responsible health authority (RHA) ensures that the facility maintains a coordinated system for health care delivery.***

   After further consultation with NCCHC, we have designated the Chief Medical Officer (CMO) as the Responsible Health Authority (RHA) and the individual facility Supervising Registered Nurses (SRN) act as his designee. The policy has been updated to meet the compliance indicators for this standard.

3. **J-A-03   Medical Autonomy –**

   **Health care decisions are made by qualified health care professionals for clinical purposes.**

   The Sheriff's Department met all the compliance indicators for this standard. No further recommendations were provided.

4. **J-A-04   Administrative Meetings and Reports –**

   **The facility's health and correctional administrators coordinate the health care delivery system through joint monitoring, planning, and problem resolution.**

Each facility conducts a Patient Care Coordinating Committee (PCCC) meeting monthly where statistics are shared and problems solved. In addition, bi-weekly Multi-Disciplinary Group (MDG) meetings are held to share information about patient needs, care, and follow up. Policy and procedure for the standardization of these meetings was written and is in place. We currently meet all compliance indicators for this standard.

5. **J-A-05  Policies and Procedures –**

   **The responsible health authority (RHA) ensures that health care policies and procedures are developed, documented, and readily available to the staff.**

   The Medical Services Division is undergoing a complete policy and procedure review process to ensure all required NCCHC standards are covered. The requirement that the policies be site specific will follow the review. The Chief Medical Officer is responsible to review all policy and procedure. This process is ongoing.

6. J-**A-06  Continuous Quality Improvement Program –**

   **A continuous quality improvement (CQI) program monitors and improves health care delivered in the facility.**

   The Sheriff's Department has a Quality Improvement Committee that meets quarterly. The committee chairperson is developing a process to comply with all compliance indictors. Policy revisions are being drafted. This process is ongoing.

7. **J-A-07  Privacy of Care –**

   **Health care encounters and exchanges of information remain private.**

   The Sheriff's Department meets many of the compliance indicators for this standard. A capital improvement project is slated for the Vista Detention Facility to add private interview space at intake. All other facilities allow for private interview space currently.

8. **J-A-08  Health Records –**
   **A confidential health record is created and maintained** using a standardized format.

   The Sheriff's Department met all the compliance indicators for this standard. No further recommendations were provided.

9. **J-A-09  Procedure in the Event of an Inmate Death –**

   **The responsible health authority conducts a thorough review of all deaths in custody in an effort to improve care and prevent future deaths.**

The Sheriff's Department conducts several levels of review following an inmate death.  There is a mortality review completed by the Chief Medical Officer, an administrative review at the Patient Care Coordinating Committee meeting, a review by the Critical Incident Review Board, and a clinical suicide report following a completed suicide.  Policy was put in place and we currently meet all compliance indicators for this standard.

10. **J-A-10   Grievance Process for Heath Care Complaints –**

   **The facility protects a patient's right to disagree with or question the health care system.**

   The Sheriff's Department maintains a robust grievance process that is documented in Policy and Procedure.  This policy meets all the compliance indicators to meet the NCCHC standard.

SECTION B – HEALTH PROMOTION, SAFETY, AND DISEASE PREVENTION

11. **J-B-01   Health Lifestyle Promotion –**

   **Health care policies, procedures, and practices emphasize health promotion, wellness, and recovery.**

   The Sheriff's Department meets the compliance indicators for this standard.

12. **J-B-02   Infectious Disease Prevention and Control –**

   **There is a comprehensive institutional program that includes surveillance, prevention, and control of communicable disease.**

   The Sheriff's Department employs an Infection Control Nurse (ICN) who works under the direction of our Managed Care Unit.  The ICN is a member of the quality assurance committee and participates in all issues related to infection control.  The ICN is currently finalizing the Department's Infection Control Plan that will be reviewed by the Chief Medical Officer.  This process is ongoing.

13. **J-B-03   Clinical Preventive Services –**

   **Inmates are provided with clinical preventive services as medically indicated.**

   The Sheriff's Department meets many of the compliance indicators for this standard.  The completion of this process is dependent on the development of the preventative services program by the Chief Medical Officer, policy and procedure changes and the application of resources.

14. **J-B-04   Medical Surveillance of Inmate Workers –**

   **The health and safety of the inmate worker populations are protected.**

Occupational injury or exposure of inmate workers was added to the monthly Patient Coordination Care Committee agenda. Documentation of injuries is being entered into the health record. The Quality Assurance committee will review and discuss steps in prevention and education for the inmate worker program. The Sheriff's Department is revamping its inmate worker orientation and training to include education on the prevention of illness and injury due to the health hazards they may experience while performing their duties. This committee is currently in the process of completing the training and education for the inmate worker population. This process is ongoing.

15. **J-B-05   Suicide Prevention and Intervention –**

**Suicides are prevented when possible by implementing prevention efforts and intervention.**

The Sheriff's Department has been diligently working toward improving our prevention and intervention efforts. The department has created and implemented curriculum on suicide detection and prevention which is required training for all sworn, professional and contracted staff to attend. The department revised policies to reflect national standards and added specific questions in our receiving screening to flag inmates with the potential for suicidal ideations or in need of acute mental health treatment. The department is compliant with the indicators in this standard.

16. J-**B-06   Contraception –**

**Contraception is made available as clinically indicated**.

A procedure has been developed for continuing birth control and providing emergency contraceptives at our female facilities. Policy for this standard has been drafted and once completed will satisfy full compliance with this standard.

17. **J-B-07   Communication on Patient's Health Needs –**

**Communication occurs between the facility administration and treating health staff regarding inmates' significant health needs that must be considered in classification decisions in order to preserve the health and safety of that inmate, other inmates, or staff.**

The Sheriff's Department met all the compliance indicators for this standard. No further recommendations were provided.

18. **J-B-08   Patient Safety –**

**Facility staff implement systems to reduce risk and prevent harm to patients.**

The Sheriff's Department's Medical Services Division went through a complete change in medication dispensing in the effort to prevent adverse clinical events. The division started a

Process Improvement Team to discuss improving systems and maintaining a safe environment for patients.

19. **J-B-09   Staff Safety –**

**Facility staff implement measures to ensure a safe environment.**

The Sheriff's Department has always been dedicated to providing a safe and healthy environment for its staff.  The department continually evaluates methods to improve staff safety.  A recent example of this is improving radio communication coverage for medical and mental health staff.  This aids in their overall awareness of facility operations as well as improves communication and response in the event of an emergency. The department meets all compliance indicators for this standard.

SECTION C – PERSONNEL AND TRAINING

20. **J-C-01   Credentials –**

**The facility's qualified health care professionals are legally eligible to perform their clinical duties.**

The Sheriff's Department met all the compliance indicators for this standard.  No further recommendations were provided.

21. **J-C-02   Clinical Performance Enhancement –**

**Individuals delivering patient care are reviewed through a clinical performance enhancement process.**

A peer review process was implemented in 2018 for Sheriff's nursing staff.  Our Chief Medical Officer is in the process of implementing a peer review process for both our Medical and Psychiatric contract providers.  This process is ongoing.

22. **J-C-03   Professional Development –**

**The facility's qualified health care professionals maintain current clinical knowledge and skills.**

The Sheriff's Department met all the compliance indicators for this standard.  No further recommendations were provided.

23. **J-C-04   Health Training for correctional Officers –**

**Correctional officers are trained to recognize the need to refer an inmate to a qualified health care professional.**

Training for sworn staff was developed and incorporated in the Detention Services Bureau annual training plan.  Health related training for all sworn staff that works with inmates is required every two years.  The department meets all compliance indicators for this standard.

24. **J-C-05   Medication Administration Training –**

**Personnel who administer or deliver prescription medication are appropriately trained.**

New nursing staff members receive an orientation to medication administration during their new employee orientation. They are taught how to navigate the electronic health record for this function and are introduced to policies surrounding medication administration. The orientation to medication administration continues at the facility level. The department meets all compliance indicators for this standard.

25. **J-C-06   Inmate Workers –**

**Health services are provided by health staff and not inmate workers.**

The Sheriff's Department met all the compliance indicators for this standard.  No further recommendations were provided.

26. **J-C-07   Staffing –**

**The responsible health authority (RHA) ensures sufficient numbers and types of health staff to care for the inmate population.**

The Sheriff's Department conducted a staffing study and workload analysis which was submitted for approval.

27. **J-C-08   Health Care Liaison –**

**Health care services continue to be coordinated via a health care liaison when qualified health care professionals are not available for an extended period of time.**

The Sheriff's Department maintains full time staffing of health care professionals, therefore this standard is not applicable.

28. **J-C-09   Orientation for Health Staff –**

**Health staff are properly acclimated to work in the correctional environment and understand their roles and responsibilities.**

All new health staff receives a basic orientation from the Medical Services Training Unit prior to their assignment in a detention facility related to the overall Medical Services Division, safety & security and electronic health record.  In depth training continues at the facility level covering all functional areas based on job classification.  The department meets all compliance indicators for this standard.

SECTION D – ANCILLARY HEALTH CARE SERVICES

29. **J-D-01   Pharmaceutical Operations –**

**Pharmaceutical operations meet the needs of the facility and conform to legal requirements.**

The Sheriff's Department's contract supplier of medication complies with the NCCHC standards for the administration of medications.  Medications are packaged as patient specific in unit dose which assists with inventory and control and minimizes potential for errors.  The department is continuing to review our processes to meet all compliance indicators for this standard.

30. **J-D-02   Medication Services**-

*Medications are provided in a timely, safe, and sufficient manner.*

The Medical Services Division policy is currently being revised which identifies expected timeframes from ordering to administration of medication.  Contingency plans are also in place for time sensitive medication ordering.  Notifications are currently being made to the prescriber of any impending expiration of orders. The department already had established policies regarding all prescription medications administered or delivered as well as procedures to ensure continuity of medication services.  This process is ongoing.

31. **J-D-03   Clinic Space, Equipment, and Supplies**-

*Sufficient and suitable space, supplies, and equipment are available for the facility's medical, dental, and mental health services.*

The Sheriff's Department met all compliance indicators for this standard.   No further recommendations were provided.

32. **J-D-04   On-Site Diagnostic Services-**

*The facility provides the necessary on-site diagnostic services for patient care.*

The Medical Services Division requires documentation that contracted on-site diagnostic services are certified and licensed to provide that service.  The division created procedure and calibration manuals for all equipment to include protocols for the calibration of testing devices to ensure accuracy.  The Sheriff's Department maintains a supply of diagnostic supplies such as, multiple-test dipstick urinalysis, finger-stick blood glucose tests, peak flow meters and

pregnancy test kits.  Policy for this standard is currently being drafted and once completed will satisfy full compliance with this standard.

33. **J-D-05    Medical Diets-**
**Medical diets are provided that enhance patients' health.**

The Sheriff's Department met all compliance indicators for this standard.  No further recommendations were provided.

34. **J-D-06    Patient Escort-**

***The facility staff ensure that patients can meet scheduled health care appointments***.

The Sheriff's Department met all compliance indicators for this standard.  No further recommendations were provided.

35. **J-D-07    Emergency Services and Response Plan –**

***Planning for emergency health care ensures that all staff are prepared to effectively respond during emergencies.***

The Sheriff's Department met all compliance indicators for this standard.  No further recommendations were provided.

36. **J-D-08    Hospital and Specialty Care –**

***Hospitalization and specialty care are available to patients who need these services.***

The Sheriff's Department met all compliance indictors for this standard.  No further recommendations were provided.

SECTION E- PATIENT CARE AND TREATMENT

37. **J-E-01    Information on Health Services-**

***Upon arrival at the facility, inmates are informed of the availability of health care services and how to access them.***

The Sheriff's Department shows an inmate orientation video once a day to ensure inmates are informed of the facilities health care services and how to access these services.  Signage and inmate handbooks are being finalized to allow for additional information on resources and how to access them. This process is ongoing.

38. **J-E-02    Receiving Screening-**

*Screening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met.*

The Sheriff's Department has always utilized a comprehensive medical and mental health intake screening process.  The implementation of the new electronic health record now allows for more efficient screening which complies with this standard.

39. **J-E-03    Transfer Screening-**

*Inmates who are transferred within the same correctional system continue to receive appropriate health services.*

Medical staff reviews each transferred inmate's health record or summary to ensure continuity of care and medications.  The electronic health record assists with tracking and allows compliance with this standard.

40. **J-E-04    Initial Health Assessment-**

*Inmates receive initial health assessments.*

This standard will require expanded contractual staffing to ensure a full clinical follow up can be completed on each inmate within 14 days of their initial booking.  This process is ongoing.

41. **J-E-05    Mental Health Screening and Evaluation-**

*Mental health screening is performed to ensure that urgent mental health needs are met.*

A comprehensive mental health screening is conducted during receiving screening. Inmates identified with mental health needs are referred to a qualified mental health professional for further evaluation.  Patients who require acute mental health services beyond  those  available on-site are transferred to an appropriate facility.  This process is ongoing.

42. **J-E-06    Oral Care-**

*Inmates' dental needs are addressed.*

Oral care is currently provided by a licensed dentist to inmates when clinically indicated.  The department is working toward screening every inmate within 14 days of admission as well as an oral examination within 12 months of admission into custody.  Both of these standards require the addition of contractual staffing/hours.  This process is ongoing.

43. **J-E-07    Nonemergency Health care Requests and Services-**

*Inmates' nonemergent health care needs are met.*

All inmates, regardless of housing assignment are given the opportunity to submit oral and written health care requests on a daily basis. Nurses are responsible for reviewing inmate requests.  They triage and schedule follow up appointments based on acuity level.  The department is working toward a process to allow a face-to-face encounter for the health care request within 24 hours of receipt by medical staff. This will be implemented as we continue to increase our staffing levels.  This process is ongoing.

44. **J-E-08    Nursing Assessment Protocols and Procedures-**

*Nursing assessment protocols and procedures are appropriate to the level of competency and preparation of the nursing personnel and comply with the relevant state practice acts.*

Nursing assessment protocols and procedures were revised to comply with this standard. Protocols and procedures are being reviewed annually based on the level of care provided in the facilities.  All protocols and procedures are accessible to all nursing staff.  Training is tracked for compliance and there is retraining when protocols or procedures are revised.  All compliance indicators for the standard have been met.

45. **J-E-09    Continuity, Coordination, and Quality of Care During Incarceration-**

*Patient medical, dental, and mental health care is coordinated and monitored from admission to discharge.*

With the implementation of the electronic health record, monitoring of patient care is more comprehensive. The Quality Assurance Committee will oversee a multi-disciplinary approach to patient care.  The new electronic health record  assists with compliance and tracking.  Primary Care nursing will enhance the timeliness of care and familiarize staff of patient needs in  the housing units. This process is ongoing.

46. **J-E-10    Discharge Planning-**

*Discharge planning is provided for inmates with serious health needs whose release is imminent.*

The Sheriff's Department currently provides discharge prescriptions for those inmates who are prescribed psychotropic medications.  The new electronic health record will assist with compliance and tracking of those with serious health needs and prepare staff to educate and supply the necessary resources and prescriptions upon their release.  Protocols and policies need to be revised for compliance.  This process is ongoing.

SECTION F- SPECIAL NEEDS AND SERVICES

47. **J-F-01    Patients With Chronic Disease and Other Special Needs-**

*Patients with chronic disease, other significant health conditions, and disabilities receive ongoing multidisciplinary care aligned with evidence- based standards.*

The Sheriff's Department currently has clinical protocols in place for the identification and management of chronic diseases or other special needs.  The Chief Medical Officer (CMO) is in the process of developing a program according to the standard.

48. **J-F-02    Infirmary-Level Care-**

*Infirmary-level care, when provided, is appropriate to meet the health care needs of patients.*

Infirmary-level care is care provided to patients with an illness or diagnosis that requires daily monitoring, medication and/or therapy, or assistance with activities of daily living at a level needing  nursing intervention.  The Medical Services Division is working toward developing an acuity scale and an admission and discharge procedure in the electronic health record.  Protocols and policies need to be revised for compliance.

49. **J-F-03    Mental Health Services-**

*Mental health services are available for all inmates who require them.*

The department ensures that a comprehensive mental health screening is conducted upon admission into custody.  Those in need of mental health services are referred to a qualified mental health provider for an assessment.  Inmates in need of mental health services are addressed on-site or referred to an appropriate alternative facility.  The department currently has 7 day QMHP coverage at our four main facilities and is working to recruit clinicians to provide 24 hour coverage.  The department is currently recruiting for a Chief Mental Health Officer and has  requested approval to increase the number of our current authorized positions.

50. **J-F-04    Medically Supervised Withdrawal and Treatment-**

*Inmates who are intoxicated or undergoing withdrawal are appropriately managed and treated.*

The Sheriff's Department currently has protocols in place for managing inmates under the influence of or undergoing withdrawal from alcohol and other substances.  The department has acquired an evidence-based assessment tool in treating inmates undergoing withdrawal which will be  implemented in the near future.  The department is currently receiving training on how to effectively implement a Medication Assistance Treatment (MAT) program in our facilities.

51. **J-F-05    Counseling and Care of the Pregnant Inmate-**

*Pregnant inmates are given comprehensive counseling and care in accordance with national standards and their expresses desires regarding their pregnancy.*

The Sheriff's Department met all compliance indicators for this standard.    No further recommendations were provided.

52. **J-F-06    Response to Sexual Abuse-**

*Facility staff ensure that victims of sexual abuse receive appropriate intervention.*

The Sheriff's Department met all compliance indicators for this standard. No further recommendations were provided.

53. **J-F-07  Care for the Terminally Ill-**

*The facility addresses the needs of terminally ill inmates, including protecting their rights regarding end of life decisions.*

The Medical Services Division made updates to nursing protocols to provide guidance and instruct procedures to follow when a terminally ill inmate is identified.  The department is compliant with this standard.

SECTION G- MEDICAL LEGAL ISSUES

54. **J-G-01  Restraint and Seclusion-**

*The responsible health authority ensures that when restraints are used for clinical or custody reasons, the inmate is not harmed by the intervention.*

Medical Services Division policy and procedures were updated for compliance with this standard.

55. **J-G-02    Segregated Inmates-**

*Any practice of segregation should not adversely affect an inmate's health.*

Detentions and Medical policy and procedures are being updated to reflect practices and compliance with this standard.

56. **J-G-03    Emergency Psychotropic Medication-**

*Health staff follow policies developed for the emergency use of forces psychotropic medications as governed by the laws applicable in the jurisdiction.*

The Sheriff' Department's policy and procedures are currently in compliance with the laws of the state.  Protocols on medications administered and policies to comply with this standard are under revision.

57. **J-G-04    Therapeutic Relationship, Forensic Information, and Disciplinary Actions-**

*Health staff protect the integrity of the therapeutic partnership with their patients.*

The Sheriff's department was already in compliance with this standard. No further recommendations were provided.

58. **J-G-05    Informed Consent and Right to Refuse**

*Inmates have the right to make informed decisions regarding health care, including the right to refuse care.*

The Sheriff's department was already in compliance with this standard.  No further recommendations were provided.

59. **J-G-06    Medical and Other Research**

*Biomedical, behavioral, or other research using inmates as subjects is consistent with established ethical, medical, legal, and regulatory standards for human research.*

Medical Services Division policy and procedures were updated for compliance with this standard.

# EXHIBIT B

In April of 2018, the San Diego Office of County Counsel requested Lindsay Hayes to independently assess suicide prevention practices within the Sheriff's Jail system, as well as, to offer any appropriate recommendations for the revision of suicide prevention policies and procedures.  Mr. Hayes is nationally regarded as an expert in the field of suicide prevention within jails, prisons and juvenile facilities, and has been appointed as a Federal Court Monitor (and expert to special masters/monitors) in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction.  Mr. Hayes conducted an on-site assessment at four Sheriff's jail facilities from April 23 thru April 28, 2018.

In June of 2018, the Sheriff's Department received Mr. Hayes report entitled "Report on Suicide Prevention Practices within the San Diego County Jail System." The report focused on eight (8) critical components of a suicide prevention policy which include staff training, identification/screening, communication, housing, levels of supervision/management, intervention, housing, and follow-up/mortality-morbidity review.   Based on his on-site assessment, as well as a review of various San Diego County Sheriff's Department policies and procedures related to suicide prevention, Mr. Hayes' produced a report containing 32 actionable recommendations.

Since receiving Mr. Hayes' report, the Sheriff's Department has been diligently working to address each of the recommendations.  The following is a list of the recommendations contained within the Hayes report, as well as a synopsis as to what the Sheriff's Department has done to implement the recommendations, and the current status of those recommendations that have yet to be completed.  The italicized and bolded language below is taken from the "Summary of Recommendations" from the Lindsay Hayes report.

## Mr. Lindsay Hayes' full report begins on page 15.

### *Staff Training*

***1) It is strongly recommended that the ISP policy be revised to include a more robust description of the requirements for both pre-service and annual suicide prevention training, to include the duration of each workshop and an overview of the required topics.***

Detentions Policy and Procedure was updated to require "Suicide Detection and Prevention" training annually.  This is accomplished in an 8 hour initial training as well as a 2 hour refresher course.  In addition, professional staff members receive training on "Suicide Detection and Prevention" as part of their orientation.

***2) It is strongly recommended that the joint efforts of the Medical Services Division (MSD) and Detention In-Service Training unit (DTU) to consolidate this writer's 10-hour Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison***

*Facilities into an 8-hour classroom training for all current SDCSD deputies be expanded to include all new employees (i.e., medical and mental health personnel) working within the San Diego County Jail System.*

This recommendation was implemented through a collaborative effort between the Detentions Training Unit, Sheriff's mental health staff, and contracted mental health staff to create a curriculum of training utilizing the Lindsay Hayes program guide. This course is required for all Sheriff's Detention assigned staff.

*3) It is strongly recommended that the MSD and DTU jointly collaborate on the development of a 2-hour annual suicide prevention curriculum based upon this writer's Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities. At a minimum, the curriculum should include a review of: 1) avoiding obstacles (negative attitudes) to prevention, 2) predisposing risk factors, 3) warning signs and symptoms, 4) identifying suicidal inmates despite the denial of risk, and 5) review of any changes to the ISP policy. The annual training should also include general discussion of any recent suicides and/or serious suicide attempts in the San Diego County Jail System.*

This recommendation was implemented. A two hour curriculum was separated into four 30 minute parts and will be required briefing training to meet the refresher training recommendation.

*4) It is strongly recommended that the annual suicide prevention training be required for all custody, medical, and mental health personnel (including LHC contracted psychologists and psychiatrists). Suicide prevention is all about collaboration, and requiring custody, medical, and mental health personnel to sit together in a classroom environment is not only symbolically appropriate, but instills the philosophy that all professionals, regardless of credentials, have an equal responsibility for inmate suicide prevention and can learn from one another's backgrounds, insights, and experiences.*

This recommendation was implemented. All staff listed above are required to attend the course that was collaboratively designed utilizing the Lindsay Hayes curriculum.

### *Intake Screening/Assessment*

*5) It is strongly recommended that Detention Services Bureau (DSB) and MSD officials look at options to better ensure reasonable sound privacy in the booking areas of the three intake facilities when multiple nurses are conducting intake screening at the same time. As demonstrated in the SDCJ, if the inmate is secured within the nursing booth and the door is closed with the officer stationed outside, reasonable privacy and confidentiality can occur while ensuring staff safety.*

This recommendation has been partially implemented. The only remaining booking facility that does not allow for private interview space at booking is the Vista Detention Facility (VDF). The project is currently on the capital improvement list.

*6) It is strongly recommended that the current suicide risk inquiry contained in the "Medical Intake Questions" form embedded in the JIMS be revised to include the following:*

- *Have you recently experienced a significant loss (relationship, death of family member/close friend, job, etc.)?*

- *Has a family member/close friend ever attempted or committed suicide?*

- *Do you feel there is nothing to look forward to in the immediate future (inmate expressing helplessness and/or hopelessness)?*

This recommendation has been implemented. The questions listed above were added to the Jail Information Management System and are asked during the booking process by nursing staff.

*7) It is strongly recommended that MSD officials reconsider the utility of the Columbia-Suicide Severity Rating Scale (C-SSRS) during the intake screening process. Although the C-SSRS has become a popular screening form in some jail facilities throughout the country, its effectiveness remains questionable. It is this writer's opinion that the structure of the questions creates awkwardness between the screener and inmate, and more importantly, questions that limit responses to the "past month" are potentially very dangerous (e.g., the suicidal ideation of an inmate that was experienced more than a month ago would not be captured during the screening process). Intake screening questions by nursing staff should be open-ended and not time-sensitive; it is responsibility of a mental health clinician during a subsequent assessment to determine the degree of relevancy of prior suicide risk to current risk. With addition of the three questions offered above, the current intake screening form would be more than adequate without the necessity of the C-SSRS.*

This recommendation has been completed. The Sheriff's Department has reconsidered the utility of the Columbia-Suicide Severity Rating Scale (C-SSRS) during the intake process and determined that it will continue to utilize the C-SSRS, in addition to the questions added in the previous recommendation. The C-SSRS has been normed for the correctional environment and is a tool to drive further assessment by a qualified mental health provider. Further, the C-SSRS is part of the County of San Diego suicide prevention strategic plan and utilized by other justice partners.

*8) Although this writer would defer to MSD officials as to whether to designate either a charge nurse or mental health clinician to be the ISP gatekeeper, it is strongly recommended that, if the charge nurse is a gatekeeper, they should always immediately notify an on-site mental health clinician when an inmate has been identified as potentially suicidal. The clinician, in turn, should respond and conduct the suicide risk assessment and determine the appropriateness of suicide precautions. Unless exigent circumstances exist and/or mental health personnel are not on-site, the determination of placing a potentially suicidal inmate in either a safety cell and/or the EOH unit should be made by the mental health clinician.*

Detentions Policy and Procedure has been updated to reflect the recommendation related to the roles of a qualified mental health provider. The service hours of the mental health clinicians have been expanded for greater coverage and plans to have mental health staff available 24/7 at the intake facilities (San Diego Central Jail, Vista Detention Facility and Las Colinas Detention and Reentry Facility) are in the works and will be accomplished through the hiring of new staff as well as through expanded hours of contract staff.

*9) It is strongly recommended that DSB and MSD officials revise the "automatic triggers" criteria contained within the ISP policy to require only criteria No. 3 ("The inmate states he/she is suicidal and or made suicidal statements to sworn staff, medical, family, etc.) to result in placement on suicide precautions. Although the other four criteria could be potential suicide risk factors, they should be considered criteria for a mental health referral, and not necessarily automatic placement on suicide precautions.*

This recommendation is not necessary. The "automatic triggers" referred to in the recommendation report were not triggers for placement on suicide precautions. They were triggers to require an assessment for the need for placement on suicide precautions. These triggers give both sworn and medical staff a tool in determining if a referral for assessment is needed, and are consistent with the recommendation.

*10) Consistent with the SDCSD philosophy that a previous suicide attempt documented in JIMS could be a factor for current suicide risk, an inmate's previous placement on suicide precautions within the San Diego County Jail System is equally important. As such, regardless of the inmate's behavior or answers given during intake screening, a mental health referral should always be initiated based on documentation reflecting possible serious mental illness and/or suicidal behavior during an inmate's prior confinement within the San Diego County Jail System. As such, it is strongly recommended that determination of whether the inmate was "on suicide precautions during prior confinement in a SDCSD facility?" should be independently verified through review of the JIMS by nursing staff. An "alert" screen on JIMS and protocol should be created according to the following procedures:*

- *Any inmate placed on suicide precautions should be tagged on the JIMS "alert" screen by mental health staff (e.g., "ISP June 2018");*

- *Nursing staff conducting intake screening should always review the inmate's "alert" screen to verify whether they were previously confined in a SDCSD facility and had any history of suicidal behavior/placement on suicide precautions during a prior confinement; and*

- *Regardless of the inmate's behavior or answers given during intake screening, further assessment by mental health staff should always be initiated based on documentation reflecting suicidal behavior/ placement on suicide precautions during the inmate's prior SDCSD confinement.*

Changes to Detentions Policy and Procedure are in process to reflect the recommendation regarding a mental health referral for a previous suicide attempt during an inmate's prior confinement in the San Diego County Jail system.   Alert flags in the Jail Information Management System advise nursing staff of previous in custody suicide attempts, and Psychiatric Stabilization Unit housing, which will alert nursing staff to schedule an urgent Qualified Mental Health Provider assessment.  These flags, in addition to a newly created flag for those previously housed within the Inmate Safety Program will be within the Electronic Health Record system once operational in mid-September.   These flags will alert both nursing and mental health providers of the patient's prior and current mental health status.

*11) It is strongly recommended that MSD officials initiate a continuous quality assurance plan to periodically audit the intake screening process to ensure that nursing staff are accurately completing the "Medical Intake Questions" form, and not using abbreviated inquiry, as well as soliciting responses to the four arresting officer questions.*

This recommendation has been implemented.  Nursing audits by supervising nurses have been adjusted to include periodic audits of the intake screening process at intake facilities.  The results of these audits are reported at  quarterly quality assurance meetings.

*12) It is strongly recommended that MSD officials develop a mental health triage and referral protocol. Although there is no standard of care that consistently specifies time frames to respond to mental health referrals, one suggested schedule would be as follows: <u>Emergent</u> - immediate or within 1 hour; <u>Urgent</u> - within 24 hours; and <u>Routine</u> - within 72 hours.   In addition, mental health leadership should develop a mental health triage policy that defines response levels, sets timetables for each level, and defines the acuity of behavior(s) that dictates a specific response level. Of course, any inmate expressing current suicidal ideation*

*and/or current suicidal/self-injurious behavior should result in an <u>Emergent</u> mental health referral.*

An acuity referral system for mental health treatment and Inmate Safety Program already exist in policy and will be built into the Electronic Health Record system. Mental Health staff will continue operating under the current protocols as we continue to evaluate and enhance our mental health services.

*13) Given the strong association between inmate suicide and special management (e.g., disciplinary and/or administrative segregation, etc.) housing unit placement, it is strongly recommended that medical personnel review the medical section of JIMS to determine whether existing medical and/or mental health needs contraindicate the placement or require accommodation. In addition, a "best practice" would be that any inmate assigned to such a special management housing unit receive a brief assessment for suicide risk by nursing staff upon admission to such placement. The following are recommended questions for the brief assessment:*

- *Are you currently having thoughts of harming yourself?*

- *Have you previously tried to harm yourself because of a segregation placement?*

- *Is the inmate speaking incoherently; expressing bizarre thoughts; unable to sit still or pay attention; or is disoriented to time, place, or person?*

*Affirmative responses to any of these questions should result in an Emergent mental health referral.*

Business processes are being developed, and policies are being updated, to provide for real time notification to Qualified Mental Health Providers so assessments can be accomplished in a timely manner.

<u>Communication</u>

*14) It is strongly recommended that the MSD establish a weekly mental health team meeting at each facility that includes MSD mental health clinicians and LHC psychologists and psychiatrists. The primary purpose of the weekly meeting is to identify and manage the treatment needs of suicidal and/or seriously mentally ill patients.*

This recommendation will not be implemented. The NCCHC recommendation relating to mental and medical health patient care meetings between staff is that they are to occur once per month. The San Diego County Sheriff's Department exceeds this standard by holding bi-

weekly Multi-Disciplinary Group (MDG) meetings at the San Diego Central Jail, George Bailey Detention Facility, Vista Detention Facility, and Las Colinas Detention and Reentry Facility. In addition, each of these facilities also have monthly Patient Care Coordinating Committee meetings, daily Psychiatric Stabilization Unit meetings (SDCJ, LCDRF), and weekly outpatient stepdown unit meetings (SDCJ,LCDRF). Additionally, ad hoc meetings can be called when urgent inmate care issues arise.

### *Housing*

**15) As this writer inspected a vast array of differing physical environments for the housing of suicidal inmates in the four jail facilities (i.e., safety cells, EOH single cells and dormitories, MOB, and PSU observation cells, etc.), it is strongly recommended that DSB officials conduct a comprehensive physical plant review of all jail cells utilized for the housing of suicidal inmates to ensure that they are reasonably suicide-resistant. This writer's "Checklist for the 'Suicide-Resistant' Design of Correctional Facilities," included as Appendix A of this report, can be utilized as a guideline for such an inspection.**

A comprehensive physical plant review of all specialty and segregated housing was conducted. Construction plans for modifications to these housing areas were submitted to General Services for implementation.

**16) Due to the limited positive attributes of safety cell use, it is strongly recommended that, if utilized, the maximum length of stay in a safety cell be limited to no more than six (6) hours. In addition, use of a safety cell should not be the first option available, rather it should only be utilized in exigent circumstances in which the inmate is out of control and at immediate, continuing risk to self and others. Current SDCSD policies should be appropriately revised.**

Revisions were made to the Inmate Safety Cell policy to ensure safety cells are not the first option of placement for those identified as having a suicide risk. The placement criteria was changed in the policy to use safety cells only for inmates who are actively self-harming or actively assaultive. The policy now requires a Qualified Mental Health Provider assessment for retention in a safety cell to be conducted every 4 hours.

**17) It is strongly recommended that MSB officials instruct their clinical staff on the appropriate use of safety smocks, i.e., they should not be utilized as a default, and not to be used as a tool in a behavior management plan (i.e., to punish and/or attempt to change perceived manipulative behavior). Rather, safety smocks should only be utilized when a clinician believes that the inmate is at high risk for suicide by hanging. Should an inmate be placed in a safety smock, the goal should be to return full clothing to the inmate prior to their discharge from suicide precautions. Finally, custody personnel should never place an inmate**

*in a safety smock unless it had been previously approved by medical and/or mental health personnel. Current SDCSD policies should be appropriately revised.*

This recommendation has not yet been implemented. The Sheriff's Department has changed the criteria for admission into a safety cell. As a result of these changes, there are fewer placements into a safety cell, and inmates are spending significantly less time. The Department is seeking additional clarification from Mr. Hayes as it relates to the changes and this recommendation.

*18) It is strongly recommended that possessions and privileges provided to inmates on suicide precautions should be individualized and commensurate with their level of risk. As such, current SDCSD policies should be appropriately revised, as follows:*

- *All decisions regarding the removal of an inmate's clothing, bedding, possessions (books, slippers/sandals, eyeglasses, etc.) and privileges shall be commensurate with the level of suicide risk as determined on a case-by-case basis by mental health clinicians and documented in JIMS;*

- *If a mental health clinician determines that an inmate's clothing needs to be removed for reasons of safety, the inmate shall always be issued a safety smock and safety blanket;*

- *A mattress shall be issued to all inmates on suicide precautions unless the inmate utilizes the mattress in ways in which it was not intended (i.e., attempting to tamper with/destroy, utilize to obstruct visibility into the cell, etc.);*

- *All inmates on suicide precautions shall be allowed all routine privileges (e.g., family visits, telephone calls, recreation, etc.), unless the inmate has lost those privileges as a result of a disciplinary sanction;*

- *All inmates on suicide precautions shall be allowed to attend court hearings unless exigent circumstances exist in which the inmate is out of control and at immediate, continuing risk to self and others, and*

- *Inmates on suicide precautions shall not automatically be locked down. They should be allowed dayroom and/or out-of-cell access commensurate with their security level and clinical judgment of mental health clinicians.*

This recommendation has been implemented in part. Inmates placed in safety cells are not allowed privileges since the only inmates placed in safety cells are those who are actively self-harming or actively assaultive. Inmates placed in Enhanced Observation Housing (EOH) are

allowed dayroom time, television time, and social phone calls.  Additionally, inmates in EOH have access to reading materials such as books and periodicals.  Inmates who are designated as low risk in EOH may attend court.  This recommendation is still being reviewed for its efficacy in our system.

*19) Although SDCSD Policy J.4: Enhanced Observation Housing (EOH), Definition and Use requires that "EOH units shall be clean and disinfected using facility approved disinfectants or bleach solution after every use or as needed,"  this writer's inspection of cells in several facilities found them to be quite dirty and unsanitary. As such, it is strongly recommended that DSB officials reinforce the above directive and that shift supervisors at each facility ensure that cells utilized to house suicidal inmates are reasonably clean and sanitary.*

Enhanced Observation Housing policy was updated to add a daily cleaning as well as after each use.  Facility supervisor and management staff are required to check for compliance.

*Levels of Supervision/Management*

*20) It is strongly recommended that all DSB and MSD suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation. A proposed revision is offered as follows:*

- *Close Observation is reserved for the inmate who is not actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a specific plan) and/or has a recent prior history of self-destructive behavior and would be considered a low risk for suicide. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, should be placed under close observation. This inmate should be observed by staff at staggered intervals not to exceed every 10-15 minutes, and should be documented as it occurs.*

- *Constant Observation is reserved for the inmate who is actively suicidal, either by threatening (with a plan) or engaging in self-injury, and considered a high risk for suicide.  This inmate should be observed by an assigned staff member on a continuous, uninterrupted basis. The observation should be documented at 15-minute intervals.*

This recommendation has been implemented in part.  Close observation is conducted for those inmates in Enhanced Observation Housing and in Safety Cells.  Constant Observation can be utilized for those inmates in the Psychiatric Stabilization Units when warranted.

*21) It is strongly recommended that, with the adaption of the two-level observation system as offered above, reference to the ill-defined "high" and "low" suicide risk categories are no longer necessary and should be deleted from all SDCSD policies.*

Levels of observation are currently outlined in policy.  After internal discussion and review of this recommendation, SDSD has opted to keep both "high and "low" risk indicators.

*22) It is strongly recommended that the narrative of "twice every 30 minutes" currently contained within some SDCSD policies be replaced with "staggered intervals that do not exceed 10-15 minutes."*

This recommendation was implemented to include language in Detention Policy and Procedure regarding staggered safety checks not to exceed 15 minutes.

*23) It is strongly recommended that SDCSD policies should be revised to eliminate the necessity of "a minimum of two assessments by mental health provider with time interval between assessments and for clearance based on high/low risk designation after first assessment." In other words, consistent with the standard of care, an inmate identified as potentially suicidal (or placed on suicide precautions after hours by non-mental health personnel) should be immediately referred to a mental health clinician for completion of a suicide risk assessment. The assessment should be completed immediately if mental health personnel are on-site or during the next business day morning if they are off-site at the time of the referral. Should the clinician's initial suicide risk assessment find that the inmate is not suicidal and does not require either initiation/continuation of suicide precautions, the inmate should be released to appropriate rehousing. Should the clinician's suicide risk assessment find that the inmate is suicidal, the inmate should be placed on suicide precautions and seen on a daily basis by a mental health clinician until a determination is made that they are no longer suicidal. Daily assessments of suicide risk should be documented in SOAP-formatted progress notes. When the clinician determines that an inmate is no longer suicidal and can be discharged from suicide precautions, documentation of such clinical judgment should occur in a suicide risk assessment form. In addition, the MSD document entitled "ISP Clarifications, March 29, 2018" (which speaks to "two consecutive low risk assessments by two different providers," as well as assessments occurring between 4 and 6 hours of each other) should also be deleted from SDCSD policies as it will no longer be relevant.*

This recommendation was implemented in part.  Policy and Procedure revisions were made to require an assessment to be completed immediately if mental health personnel are on-site or during the next business day morning if they are off-site at the time of the referral. As it relates to a second assessment, the second assessment will occur within 12-24 hours but no more than 24 hour intervals between assessments.

*24) It is strongly recommended that the MSD utilize only one version of the suicide risk assessment forms currently being utilized by MSD mental health clinicians and LHC psychologists (i.e., LMHC ISP Risk Assessment Form, Psychologist EOH Evaluation, Psychologist ISP Evaluation, etc.). The Psychologist ISP Evaluation template that this writer reviewed at GBDF appears to be the most comprehensive. As recommended above, the selected suicide risk assessment form template should be utilized as justification for an inmate's initial placement on suicide precautions, as well as justification for an inmate's discharge from suicide precautions.*

The Chief Mental Health Clinicians developed a standardized suicide risk assessment template which will be embedded into the Electronic Health Record system.  Training was provided to all QMHP's and contracted mental health staff.

*25) It is strongly recommended that, consistent with NCCHC and other national correctional standards, all clinicians develop treatment plans for inmates discharged from suicide precautions that describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur. A treatment plan should be contained in the discharging suicide risk assessment.*

The Chief Mental Health Clinicians developed a standardized treatment plan template which will be embedded into the Electronic Health Record system.  Training was provided to all QMHP's and contracted mental health staff.

*26) It is strongly recommended that reasonable efforts should be made, particularly when considering the discharge of an inmate from suicide precautions, to avoid a cell-side encounters; rather, suicide risk assessments should be made in a private and confidential setting. Should an inmate refuse a private interview, the reason(s) for the refusal should be documented in JIMS.*

This recommendation has been implemented in part Policy and procedure changes were made to eliminate cell-side encounters except in situations where doing so could jeopardize the safety of the inmate or staff.   There is a pending construction project at the Vista Detention Facility that will provide additional confidential setting options in the booking area.

*27) It is strongly recommended that, in order to safeguard the continuity of care for suicidal inmates, all inmates discharged from suicide precautions should remain on the mental health caseload and receive regularly scheduled follow-up assessments by clinicians until their release from custody.  As such, unless an inmate's individual circumstances directs otherwise (e.g., an inmate inappropriately placed on suicide precautions by non-mental health staff and released less than 24 hours later following an assessment), it is recommended that the follow-*

*up schedule be simplified and revised as follows: follow-up within 24 hours, again within 72 hours, again within 1 week, and then periodically as determined by the clinician until release from custody.*

This recommendation has been implemented. All inmates placed into and subsequently released from the Inmate Safety Program are maintained on a Qualified Mental Health Provider's caseload and are followed up with as clinically indicated.

*28) Given the strong association between inmate suicide and segregation housing and consistent with national correctional standards, it is strongly recommended that DSB officials give strong consideration to increasing deputy rounds of such housing units from 60-minute to 30-minute intervals.*

This recommendation has been implemented. The Sheriff Department has given strong consideration to increasing deputy rounds of restricted housing units from 60 minutes to 30 minute intervals. However, given the challenges regarding the physical layout of jail facilities, the numbers of inmates, and care necessary to properly conduct these checks, the Department has determined that it would not be feasible at this time to make this change. This recommendation requires the potential of cohorting inmates in administrative segregation, and disciplinary isolation areas of facilities to make implementation feasible. The Department continues to assess the feasibility of this recommendation.

*29) It is strongly recommended that both mental health and nursing personnel be instructed to refrain from utilizing terms such "contracting for safety" or "vouching for his safety" with patients when assessing suicide risk. SDCSD policy should also be revised accordingly to prohibit its use.It is strongly recommended that both the SCSD and JPS suicide prevention policies be revised to include two levels of observation that specify descriptions of behavior warranting each level of observation. A proposed revision is offered as follows:*

This recommendation was implemented by a directive to contract mental health staff and Sheriff's mental health clinicians to eliminate the use of "contracted for safety" or "vouching for his safety" practices and verbiage from their clinical notes.

*Intervention*

*None*

*Reporting*

*None*

*Follow-Up/Mortality-Morbidity Review*

*30) It is strongly recommended that either the Critical Incident Review Board (CIRB) or the Suicide Prevention and Focused Response Team (SPFRT) be responsible for conducting mortality reviews of any inmate suicide, as well as morbidity reviews of any serious suicide attempts (defined as necessitating medical treatment outside the facility). Such reviews should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training received by involved staff; 4) review of pertinent medical and mental health services/reports involving the victim; 5) review of any possible precipitating factors that may have caused the victim to commit suicide or suffer a serious suicide attempt; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. When recommendations are accepted for implementation, a corrective action plan should be created that identifies each recommendation, followed by identified responsible staff, status(s) and deadline(s) for implementation. Every effort should be made to complete mortality-morbidity review process within 30 days of the incident. As such, should the mortality-morbidity review process become the responsibility of the CIRB, review of the suicide should be moved from the current 14-day deadline to a more reasonable 30-day deadline. Both the DSB's Policy M.7: Inmate Deaths and MSD's Policy Death of an Inmate On-Site should be revised to reflect the above 6-step review process. To assist either of the CIRB or SPRFT in these processes, this writer's "Mortality-Morbidity Review of Inmate Suicides/Serious Suicide Attempts Checklist" is offered for consideration in Appendix B.*

MSD's Policy titled "Death of an Inmate On-Site" has been revised to require a mortality review within 30 days as recommended for cases involving suicide and serious suicide attempts.

*31) It is strongly recommended MSD's clinical review of an inmate suicide that is currently entitled "psychological autopsy" be renamed as either a "suicide report" or "clinical suicide report." In the alternative, should MSD officials decide to commit to a psychological autopsy process, consistent with NCCHC standards, the review should include the MSD chief mental health clinician's prompt examination of the suicide site (including cell contents), as well as interviews with relevant staff, inmates, and family members of the decedent (when appropriate).  Every effort should be made to complete the psychological autopsy within 30 days of the incident for presentation at the mortality review meeting.*

The Chief Mental Health Clinicians will be collaborating with the Sheriff's Homicide Unit in conducting and completing a "suicide death report" within 30 days.  In the event that the 30 day timeline cannot be adhered to, at a minimum, an administrative mortality review will be conducted.

*32) It is strongly recommended that SDCSD officials consider slightly revising the SPFRT responsibility to "track and review all self-harm incidents, attempt suicides and suicides."*

*Although it would be reasonable to "track" all incidences of self-harm and attempted suicides, given the large size of the San Diego County Jail system, it would be unreasonable to expect that the SPRFT could adequately "review" all incidents of self-harm and attempted suicide. As such, the following revision is offered: "Track all incidents of self-harm and attempted suicide; Review all serious suicide attempts (defined as incidents of self-harm and/or attempted suicide that result in medical treatment outside of the jail facility) and suicides."*

The Detention Services Bureau Policy and Procedure was revised to reflect the recommendation.

While it is impossible to prevent all suicides, the Sheriff's Department is committed to reducing suicide risk and self-harm incidents in our jail system.  It is important to note that the Sheriff's Department has always been compliant with meeting State standards related to the operation of our detention facilities and that we remain steadfast in our pursuit of implementing best practices for a safe and humane environment.  The assessment by Lindsay Hayes and his ensuing report, as well as the changes made by the Department based on his recommendations, are examples of the Department's ongoing commitment to continuously improve how we manage our jails and work to enhance the safety of our inmate population.