UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,

                                        Plaintiffs,

v.

SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,

                                        Defendants.

Case No.:  20-cv-00406-AJB-DDL

**ORDER:**

**(1) DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**(2) DENYING PLAINTIFFS' EX PARTE MOTION TO FILE A SUPPLEMENTAL DECLARATION**

**(3) DENYING AS MOOT PLAINTIFFS' MOTION TO SEAL**

**(Doc. Nos. 979, 1007, 1008)**

Five years after initiating this action, and after the Court denied Defendant's Motion for Summary Judgment finding significant questions of fact on all the claims presented, Plaintiffs now seek a preliminary injunction (the "Motion"). (Doc. No. 979.) Under Federal

1

Rule of Civil Procedure 65, Plaintiffs seek a court order preliminarily enjoining Defendants from housing people with serious mental illness ("SMI")[1] in Administration Separation ("Ad-Sep") units but for limited exigent circumstances. (Doc. No. 979-1 at 8.)

Plaintiffs contend that such an order is warranted under the Eighth and Fourteenth Amendments of the U.S. Constitution. (*Id.* at 8.) Defendants opposed the Motion (Doc. No. 998), and Plaintiffs replied (Doc. No. 992). For the reasons set forth below, the Court **DENIES** the Motion.

## I.     BACKGROUND

The facts of this case have been recited in previous orders. (*See* Doc. No. 219.) The Court briefly recounts the facts pertinent to the instant Motion. Plaintiffs are current or former inmates of San Diego County Jail facilities (the "Jail"), operated by Defendants San Diego County Sheriff's Department and the County of San Diego. Plaintiffs bring this action on behalf of "themselves and the approximately 4,000 incarcerated people who are similarly situated on any given day" to "remedy the dangerous, discriminatory, and unconstitutional conditions in the Jail." (Doc. No. 231 ¶ 4.) Specifically, Plaintiffs contend Defendants' policies and practices contribute to the high death rates in the Jail, which "has for years exceeded the rates nationally and in other large California jails, [and] it reached chilling heights in 2021 when 18 people died, amounting to a death rate of 458 incarcerated people per 100,000." (*Id.* ¶ 1.)

---

[1] For purposes of this Motion, the Court accepts the American Psychiatric Association's definition of SMI as follows: "Serious mental illness is a mental, behavioral or emotional disorder (excluding developmental and substance use disorders) resulting in serious functional impairment, which substantially interferes with or limits one or more major life Activities. Examples of serious mental illness include major depressive disorder, schizophrenia and bipolar disorder." *See What is Mental Illness?*, AM. PSYCH. ASS'N, https://www.psychiatry.org/patients-families/what-is-mental-illness (July 2025) [https://perma.cc/PA5E-MU2T]. SMI is not a diagnosis but rather a subset of mental illness generally. Serious mental illness is a broader term than severe mental illness and is usually defined by impairment rather than by specific illnesses. *See What is SMI?*, TREATMENT ADVOC. CTR., https://www.tac.org/what-is-smi/ [https://perma.cc/3AFF-U4UP].

Relevant to the instant Motion, Plaintiffs contend that Defendants have a policy and practice of regularly placing pre-trial and convicted individuals with SMI in Ad-Sep cells. (Doc. No. 979-1 at 25.) Plaintiffs allege that this policy exposes those individuals to a substantial risk of serious harm. (*Id.* at 25.) According to Plaintiffs, since 2021, at least seven people with mental illness have died in the Jail's Ad-Sep units, by suicide or by not receiving adequate care. (*Id.* at 8.)

Plaintiffs purport to bring this Motion in response to two recent deaths that occurred in the Jail. According to Plaintiffs, both individuals had SMI and passed away while in Ad-Sep units. (*Id.* at 28–29.) On July 13, 2025, Corey Dean, a man with SMI, died in a Vista Detention Facility Ad-Sep unit. (*Id.* at 28.) On July 28, 2025, 82-year-old Karim Talib, also a person with SMI, died in a Central Jail Ad-Sep unit. (*Id.* at 29.) Although there in nothing in the record establishing a connection between the deaths of these men and their placement in Ad-Sep, Plaintiffs suggest that their placement in Ad-Sep, while presenting with SMI, is the likely cause of death. (*Id.* at 28–29.) Generally, Plaintiffs allege that "individuals experience psychiatric deterioration in Ad-Sep" and "many have witnessed others in Ad-Sep decompensate." (*Id.* at 27, 28.) Thus, Plaintiffs urge the court to enjoin the use of Ad-Sep for incarcerated persons who present with an SMI but for limited exigent circumstances and not to exceed 72 hours. (*Id.* at 31.)

### A.    Plaintiffs' Expert Dr. Pablo Stewart

In support of their Motion, Plaintiffs rely heavily on the Declaration and Expert Reports of Dr. Pablo Stewart. (*See* Doc. No. 979-6.) Dr. Stewart is a board-certified Psychiatrist and Clinical Professor at the University of Hawaii, John A. Burns School of Medicine. (Doc. No. 979-6 ¶ 1.) Dr. Stewart claims to have more than thirty-five years of experience in correctional mental health care, including serving as the court's expert in class action cases challenging the provision of mental health care to incarcerated people. (Doc. No. 979-6 ¶ 1.) For this matter, Dr. Stewart was asked to provide his opinion regarding Defendants' policies and practices as they relate to the mental health care of incarcerated people in the Jail. (Doc. No. 979-6 ¶ 2.) To do so, Dr. Stewart inspected three

3

of San Diego's jail facilities in February 2024: San Diego Central Jail, George Bailey Detention Facility, and Las Colinas Detention and Reentry Facility. (Doc. No. 979-6 ¶ 2.) Dr. Steward did not visit the Vista Detention Facility. (*Id.*) During the inspections, Dr. Stewart spoke to individuals with SMI in the Ad-Sep units at the three facilities. (*Id.*) Based on the declarations he reviewed, Dr. Stewart claims that the Ad-Sep units at the Vista Detention Facility appear to follow a similar practice to the other three jails he visited. (Doc. No. 979-6 ¶ 2.)

Dr. Stewart states that he is "deeply troubled by [Defendants'] widespread and extreme use of solitary confinement-type housing for incarcerated persons with serious mental illness." (Doc. No. 979-6 ¶ 7.) Dr. Stewart claims the conditions in Ad-Sep are "extraordinarily restrictive, harsh, and damaging to a person's mental health—particularly for someone with preexisting, serious mental illness." (Doc. 979-6 ¶ 7.) Dr. Stewart states that "San Diego's Administrative Separation units constitute some of the harshest, most restrictive forms of solitary confinement I have ever witnessed in a jail system." (*Id.* ¶ 8.) Based on his inspection of the "jail system's solitary confinement-type units, [his] interactions with incarcerated persons with serious mental illness in those units, and [his] review of records, declarations, and documents," Dr. Stewart asserts that the "Jail's system of Administrative Separation has caused, and currently is causing, serious and unjustified harm on a broad scale, up to and including death." (*Id.*)

By policy, incarcerated people in San Diego County Jail, including in the Ad-Sep units, are afforded 10 hours of out-of-cell time distributed over a period of seven days. (*Id.* ¶ 10.) However, Dr. Stewarts states that he understands that, in practice, people in Ad-Sep are often not permitted to leave their cells for over 23 hours per day and sometimes even 24 hours per day. (*Id.*) Often, they are let out after daylight hours, including in the middle of night, such that they are unable to contact outside individuals by phone. (*Id.*) Dr. Stewart's declaration states that due to mental health decompensation, many incarcerated people in Ad-Sep live in cells filled with urine, feces, and food waste. (*Id.* ¶ 16.) Further compounding the harsh conditions in those units, Dr. Stewart alleges that

4

Defendants fail to provide mental health treatment or support that is "urgently and clearly necessary to meet the needs of the incarcerated population with mental illness." (*Id.* ¶ 18.) Dr. Stewart asserts that incarcerated people in the Jail Ad-Sep units are deprived of mental stimulation or any means of distracting themselves and passing the time, and that Defendants fail to provide structured out-of-cell programming, such as group therapy, to individuals in Ad-Sep. (*Id.* ¶ 12.) Dr. Stewart also claims that individuals in Ad-Sep are denied in-cell stimulation such as books, workbooks, radios, or tablets. (*Id.* ¶ 12.) According to Dr. Stewart, in some of the Jail Ad-Sep units, incarcerated people spend their brief out of cell time alone in a caged area in the dayroom. (*Id.* ¶ 12.)

### B. Declarations of Incarcerated Person's

Plaintiffs also submit fourteen declarations of currently incarcerated persons that claim to suffer from one or more mental illness and have spent time in Ad-Sep. (*See* Doc. Nos. 979-8–979-20.) None of the named Plaintiffs submitted a declaration in support of the Motion. (*See id.*) The declarations speak of having limited out-of-cell time, limited access to telephones or showers, and limited use of the dayroom. (*See, e.g.*, Doc. Nos. 979-8 ¶¶ 3–4; 979-9 ¶ 6; 979-10 ¶ 3–4.) The declarants state that the long hours of isolation, and the frequent inability to communicate with others, has a negative effect on their mental health. (*See, e.g.*, 979-10 ¶ 7; 979-11 ¶ 9.)

### C. Defendants' Expert Dr. Joseph Penn

Defendants' expert, Dr. Joseph Penn, paints quite a different picture of the Ad-Sep units at the Jail. (*See* Doc. No. 988-7.) He asserts that he "did not identify any widespread or extreme use of restrictive housing in any of the San Diego County Jail facilities." (*Id.* ¶ 61.)

Dr. Penn is a "triple residency and fellowship-trained and triple board-certified Psychiatrist and a Clinical Professor at the University of Texas Medical Branch (UTMB) School of Medicine, Galveston, Texas." (*Id.* ¶ 1.) Dr. Penn claims to "have extensive background, clinical practice and 'real world' clinical and administrative oversight and responsibilities in the provision of psychiatric and mental health services and care in state

prisons, state jails, county jails, and other short- and long-term detention settings." (*Id.*) Dr. Penn states that he has "more than 30 years of direct clinical and administrative experience and full-time employment working as a correctional psychiatrist and overseeing the provision and delivery of correctional mental health care in different settings." (*Id.*)

In 2024, Dr. Penn toured and met with custody and health care staff at all of San Diego's jail facilities. (*Id.* ¶ 8.) Dr. Penn asserts that "[u]nlike plaintiffs' mental health expert Dr. Pablo Stewart, I also toured and met with custody and health care staff at the Vista Detention Facility." (*Id.*) However, during his tours, Dr. Penn was not permitted to speak with any incarcerated individuals regardless of the individual's mental disorders, or lack thereof, "because their attorneys objected to it." (*Id.*) Dr. Penn states that he "reviewed numerous documents regarding the provision of psychiatric and mental health care and other medical and nursing care in the San Diego jails, including [San Diego Sheriff's Office] policies and procedures." (*Id.*)

According to Dr. Penn, "[w]hen the implementation of administrative separation is required due to a variety of custody driven safety issues, there are ample qualified mental health, nursing, and medical staff and clinical interventions to mitigate any potential risk from housing an incarcerated jail inmate in administrative separation." (*Id.* ¶ 61.) "[T]here are currently ongoing efforts to ensure the prompt and timely identification of individuals with mental disorders and those with serious mental illness, and to ensure access to care, continuity of care, and the provision of timely mental health and psychosocial treatment interventions and to further reduce this population." (*Id.*) Dr. Penn claims he is "impressed with the measures being taken by the San Diego County Jail to shift their jail populations in order to create more space in the Outpatient Step Down Program (OPSD), to permit more persons with serious mental illness who would otherwise be housed in Administrative Separation for behavioral reasons to obtain more treatment and out of cell time." (*Id.* ¶ 62.) Based his tours of Ad-Sep units at the Jail, his interviews of custody and health care staff, and direct observation of the Jail's treatment team meetings and interactions with incarcerated individuals across a variety of housing settings, Dr. Penn claims that none of

the Ad-Sep units demonstrated conditions that were "extraordinarily restrictive, harsh, and damaging to a person's mental health." (Doc. No. 988-7 ¶ 27.)

In summary, it is Dr. Penn's opinion that the Jail "currently employs policies, procedures, and has medical and mental health staff to identify individuals who demonstrate medical or mental health deterioration." (*Id.* ¶ 56.) "Any decisions regarding the placement and housing and duration in administrative separation is a decision made by custody staff with expertise in the identification and management of incarcerated persons who present with serious assault and safety risks, pose imminent risks to institutional and staff safety." (*Id.*) Dr. Penn notes that there is a careful balancing of the facility's custody needs, the needs of the individual incarcerated person and others, and the safety of both custody and health-care staff. (*Id.*)

Finally, Dr. Penn challenges Dr. Stewart's qualifications to provide an expert opinion. (*See* Doc. No. 988-7 ¶¶ 12–62.) Dr. Penn states that "[i]t is my opinion that [Dr. Stewart] is not qualified to render the opinions in his report, and that his opinions are devoid of any sound methodology." (*Id.* ¶ 12.) Although Dr. Stewart lists employment as an "attending psychiatrist, John A. Burns School of Medicine" and that his "current duties include supervising psychiatric residents in their provision of acute and chronic care to the mentally ill population housed at the Oahu Community Correctional Center," Dr. Penn challenges the "frequency, hours, and amount of direct patient care, clinical services per week or month, and the actual clinical contact that Dr. Stewart has with jail inmates versus faculty supervision of psychiatry trainees." (*Id.* ¶ 13.) According to Dr. Penn, it "remains unclear if Dr. Stewart provides direct on-site in person evaluation and treatment to inmates at the Oahu Community Correctional Center, if he routinely evaluates, diagnoses, and treats incarcerated individuals, orders psychotropic medications, conducts suicide risk evaluations, places individuals on and/or removes them from suicide watches, performs direct clinical—or provides any clinical—administrative oversight of inmates housed in restrictive housing settings." (*Id.* ¶ 14.) Or alternatively, if Dr. Stewart "serves only as a faculty supervisor, providing medication management recommendations and clinic

7

supervision to psychiatry residents who are working at the center, seeing inmate patients, and then verbally presenting and discussing certain cases with Dr. Stewart." (*Id.* ¶ 14.) Moreover, Dr. Penn challenges whether Dr. Stewart has ever been directly responsible, within a clinical or administrative capacity, for the provision of "correctional psychiatry" of any county jail, ICE detention facility, state, or federal prison system, or for any state or federal prisoners. (*Id.* ¶ 15.)

### D.    Declaration of Sergeant Shannon Huard

Defendants submit the declaration of Sergeant Shannon Huard, which leads the Court to question the veracity of the incarcerated persons' declarations. (*See* Doc. No. 988-12.) Sergeant Huard's declaration is illustrative of some of the violent behaviors that led to the incarcerated individuals' placement in Ad-Sep. (*See* Doc. No. 988-12 at 2 ("On May 11, 2024, Sterling was involved in an unprovoked assault on another incarcerated person; he stood over the 73-year-old victim and repeatedly struck him in the head and face, causing serious bodily injur[y] that required emergency treatment."), *id.* at 3 (Serrano's arrest involved battery on a peace officer with injury, so he was placed in Administrative Separation based on his propensity for violence and assaultive behavior. Serrano has multiple prior offenses involving violence and threats.").

### E.    Declaration of Commander Jesse Johns

Defendants also submit the Declaration of Jesse Johns, Commander of the Detention Services Bureau of the San Diego County Sheriff's Department in support of their opposition to the Motion. (*See* Doc. No 988-5.) Prior to his role as Commander, Johns was the Captain of the San Diego Central Jail, where he oversaw sworn operations for eighteen years. (*Id.* ¶ 1.) According to Commander Johns, regular wellness checks as a multi-disciplinary team are conducted at all Jail facilities. (*Id.* ¶ 6.) The wellness checks include nursing, mental health, reentry services, and custody staff. (*Id.*) The goal is to observe the patient in their environment to assess the condition of the environment, offer medical and mental health resources, and plan services for reintegration back into the community. (*Id.*) Commander Johns asserts that these rounds are done as a supplementary

8

program to increase the number of interactions clinicians and nurses have with incarcerated persons in order to proactively address any issues. (*Id.*)

Commander Johns provides that during wellness checks, safety checks, or any rounds in the housing units, including Ad-Sep, if a deputy, Sergeant, or other sworn staff observes an incarcerated person who appears disheveled or un-showered, interventions are made to offer mental health services, provide hygienic opportunities, and clean the housing space. (*Id.* ¶ 7.) Commander Johns qualifies this by stating that incarcerated persons cannot be forced to practice cleanliness, but it is regularly encouraged, and the lack of cleanliness can potentially indicate a mental health concern. (*Id.*) Commander Johns provides that if sworn staff sees an incarcerated person in any unit, including Ad-Sep, who has evident feces in their cell and/or flooding of their cell with water, it is protocol to remove the incarcerated person to another location temporarily (such as a shower) while the cell is cleaned and a change of bedding and clothing is provided before rehousing him/her. (*Id.* ¶ 8.)

Commander Johns' declaration states that the Jails have regular daily cleaning rounds in all the housing units. (*Id.* ¶ 9.) If security permits, incarcerated persons occupying the housing unit are offered cleaning supplies to clean their housing area. (*Id.*) If security concerns exist, incarcerated workers are used to clean the housing areas. (*Id.*) In units where incarcerated persons are served meals in their cells, such as Ad-Sep, custody staff go by each cell after the mealtimes to collect trash. (*Id.*)

According to Commander Johns, Defendants "have revised many of the Detention Services Bureau and Medical Services Division policies (including those applicable to medical and mental health) to meet NCCHC 2025 Jail standards, and [ ] are actively working toward accreditation." (*Id.* ¶ 10.) And Defendants currently "meet California Code of Regulations, Title 15 (corrections) and Title 24 (building code) provisions that apply to County Jails for adult offenders, including the hourly requirements for Administrative Separation out of cell time." (*Id.*) Commander Johns states that Defendants are "in the midst of dramatically increasing the amount of beds in Out-Patient Step-Down (OPSD)

9

units in order to move the Incarcerated Persons with serious mental illness who are eligible to be housed in OPSD to those units." (*Id.* ¶12.) This will provide additional therapy and programming to an acute population that was not previously eligible for OPSD. (*Id.*) The expansion of OPSD beds to incorporate Ad-Sep incarcerated people will begin on November 14, 2025. (*Id.*)

Commander Johns provides that one challenge in housing is that incarcerated persons in Ad-Sep are deemed "protective custody" for different reasons, such as high-notoriety crimes, those with sex offenses involving minors, those who have testified against co-defendants, or gang drop-outs. (*Id.* ¶ 13.) Some incarcerated persons in Ad-Sep for disciplinary reasons—such as assaulting staff or others—may be difficult to safely program with others. (*Id.* ¶ 14.) Thus, some of these incarcerated persons who are in danger and/or pose a danger to others may have to be single-celled and attend the dayroom or the yard on their own. (*Id.*)

Finally, Commander Johns states that in all Ad-Sep units, there are books available to incarcerated persons in the dayroom. (*Id.* ¶ 19.) Books are exchanged on a monthly basis or by request to counseling staff. (*Id.*) The units also have a large television in the dayroom which can be seen from many cells. (*Id.*) Board games are also provided via the inmate welfare fund and placed inside the dayroom. (*Id.*) Tablets have already been purchased by San Diego Sheriff's Office for all incarcerated persons, and WiFi is installed in the Jails for this purpose. (*Id.* ¶ 20.) Additional infrastructure items need to be completed before full distribution of the tablets. (*Id.*)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctive relief. Plaintiffs seeking a preliminary injunction must show that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The moving party bears the burden of meeting all prongs of the *Winter* test. *See DISH Network*

10

*Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011). However, the Ninth Circuit has applied a "sliding scale" approach where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).

The Ninth Circuit recognizes an alternative "serious questions" test. Under this approach, a court may issue a preliminary injunction where there are "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (internation quotes omitted); *All. for the Wild Rockies*, 632 F.3d at 1131 (this test has often been referred to as the "serious questions" test). However, the Ninth Circuit has rejected using this approach when the plaintiff alleges a constitutional violation. *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023) ("Because of how a finding that a plaintiff is likely to succeed on the merits of a constitutional claim impacts the other *Winter* factors, a district court necessarily abuses its discretion when it skips analyzing the likelihood of success factor in a case involving such a claim.")

"A preliminary injunction is an extraordinary remedy never awarded as a right." *Winter*, 555 U.S. at 24; *All. for the Wild Rockies*, 632 F.3d at 1131. The burden to achieve injunctive relief is particularly high when a party seeks a mandatory injunction. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Mandatory injunctions go beyond an injunction preventing a party from acting, and thus beyond mere maintenance of the *status quo*. *See id.* Mandatory injunctions require a party to act. *Id.* District courts must deny requests for mandatory injunctions unless the law and facts clearly favor a moving party. *Id.* The Court will not grant such requests in doubtful cases. *Id.* Because an injunction is an exercise of a court's equitable authority, it should be invoked "only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010).

Under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(2) ("PRLA"), courts in "any civil action with respect to prison conditions" may enter preliminary injunctive relief only if it is "narrowly drawn, extend[s] no further than necessary to correct the harm the court finds requires preliminary relief, and [is] the least intrusive means necessary to correct that harm." Congress enacted the PLRA to "revive the hands-off doctrine" and restore "judicial quiescence derived from federalism and separation of powers concerns" to remove the judiciary from prison management. *Gilmore v. California*, 220 F.3d 987, 996–97 (9th Cir. 2000). Accordingly, the PRLA requires courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief . . . ." *Id.* at 998 (quoting 18 U.S.C. § 3626(a)(2)).

## III.    DISCUSSION

### A.    Evidentiary Objections

Both parties filed a voluminous set of declarations and exhibits in support of their positions. In response to Plaintiffs' evidence, Defendants filed 35 pages of evidentiary objections. (Doc. No. 988-1.) Plaintiffs address Defendants' evidentiary objections in their reply brief. (*See* Doc. No. 992 at 9.)

As a threshold matter, the Court's Civil Case Procedures provide that "***[o]bjections relating to the motion should be set forth in the parties' opposition or reply. Separate statements of objections will NOT be allowed. The inclusion of objections does not expand the page limits set.***" J. Battaglia Civ. Case Proc. § III.A (emphasis in original). The Civil Local Rules provide that "[b]riefs or memoranda in support of or in opposition to all motions noticed for the same motion day must not exceed a total of twenty-five (25) pages in length, per party, for all such motions without leave of the judge who will hear the Motion." CivLR 7.1.h. Defendants' objections were filed as a separate statement and far exceed the requisite 25-page brief limit. Defendants did not seek leave of Court to file excess pages. The Court finds it disheartening that, five years into this litigation, Defendants have filed a brief that does not comply with the Court's Rules or the Local Rules.

Moreover, "the Federal Rules of Evidence do not strictly apply to preliminary injunction proceedings." *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017) (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc) (holding that it was within the district court's discretion to accept hearsay evidence for purpose of a preliminary injunction motion); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (holding that district courts "may give even inadmissible evidence some weight" when deciding whether to issue a preliminary injunction). For example, a district court may "consider hearsay in deciding whether to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (citations omitted). However, "'[w]hile district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to [a preliminary injunction] proceeding. Such issues, however, properly go to weight rather than admissibility.'" *Disney Enters.*, 224 F. Supp. 3d at 966 (quoting *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015)).

Accordingly, based on Defendants' failure to comply with the rules, and the more lenient standard in considering evidence on a motion for preliminary injunction, the Court overrules Defendants' evidentiary objections. Notwithstanding this ruling, where evidence bearing on the resolution of the instant motion lacks, or is of limited evidentiary value, the Court will so note.

## B.    Standing

As a threshold matter, Defendants argue that Plaintiffs do not have standing to pursue the requested preliminary injunction. (*See* Doc. No. 988 at 11.) Defendants claim Plaintiffs lack standing because they do not provide evidence that any class representative suffers from a serious mental illness or has suffered harm from being housed in Ad-Sep because of that serious mental illness. (*Id.*) Defendants contend that without such evidence, Plaintiffs cannot demonstrate that they have individual standing to seek the requested equitable remedy. (*Id.*)

Plaintiffs counter that Defendants already made this standing argument in their motion to dismiss, and the Court already concluded that Plaintiffs sufficiently alleged standing. (Doc. No. 992 at 6.)

"In order to assert claims on behalf of a class, a named plaintiff must have personally sustained or be in immediate danger of sustaining 'some direct injury as a result of the challenged statute or official conduct.'" *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974)). Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief. *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999). Under Ninth Circuit precedent, "system-wide injunctive relief is not available based on alleged injuries to unnamed members of a proposed class." *Id.* And "any injury unnamed members of [a] proposed class may have suffered is simply irrelevant to the question whether the named plaintiffs are entitled to the injunctive relief they seek." *Id.* Moreover, where "a plaintiff seeks prospective injunctive relief, he must demonstrate 'that he is realistically threatened by a repetition of the violation.'" *Armstrong*, 275 F.3d at 860 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

It is true that the Court found Plaintiffs have standing to pursue their Constitutional claims. Quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993), the Court stated, "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." (Doc. No. 287 at 5.) The Court found that "Plaintiffs' TAC 'contains detailed factual allegations concerning the existence of uniform, statewide policies and practices' in the Jail which 'expose all incarcerated people to a substantial risk of harm,' as well as 'allegations that demonstrate the kinds of serious harm to which members of the proposed class are exposed by [those] policies and practices.'" (*Id.* at 6.)

In *Parsons v. Ryan*, the Ninth Circuit held that a claim based on "policies and practices of statewide and systemic application[, which] expose all inmates . . . to a substantial risk of serious harm . . . is firmly established in our constitutional law." 754

14

F.3d at 676. In *Brown v. Plata,* the Supreme Court distinguished the kind of systemic, future-oriented Eighth Amendment claim from claims in which a past instance of mistreatment is alleged to have violated the Constitution:

> Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay—or any other particular deficiency in medical care complained of by the plaintiffs—would violate the Constitution under *Estelle v. Gamble,* 429 U.S. 97, 104–105 (1976), if considered in isolation. Plaintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to "substantial risk of serious harm" and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society.

*Brown,* 563 U.S. 493, 505 n. 3 (2011) (citation omitted).

Here, the specific relief sought in this preliminary injunction does not affect "all incarcerated people." Plaintiffs submitted fourteen declarations from incarcerated individuals in support of their Motion. (Doc. Nos. 979-8–979-21.) These declarations include individuals who are "members of the *Dunsmore* class," who suffer from various mental illnesses, and have spent significant time in Ad-Sep. (*See id.*) However, none of the named Plaintiffs submitted a declaration in support of the Motion. Plaintiffs do not submit any evidence to show that any of the named Plaintiffs have personally sustained an injury by suffering from an SMI and being placed in Ad-Sep.

Because the Court finds, for the reasons discussed below, that the Motion fails under the *Winter* factors, the Court declines to address Defendants' standing argument.[2]

---

[2] The Court held a hearing on the Motion on November 20, 2025. (*See* Doc. No. 997.) After the hearing, Plaintiffs filed an *ex parte* motion to submit a supplemental declaration responding to the Court's questions regarding standing. (Doc. No. 1007.) Defendants opposed the *ex parte* motion. (Doc. No. 1011.) As it relates to this Motion, the Court specifically stated that sur-replies will not be accepted. (Doc. No. 981.) Moreover, Plaintiffs' supplemental declaration is not needed for the analysis of this Motion; accordingly, Plaintiffs' *ex parte* motion is **DENIED**. (Doc. No. 1007.) Plaintiffs' corresponding motion to seal is **DENIED AS MOOT**. (Doc. No. 1008.) The documents lodged at Document Number 1009 are **STRICKEN** from the record.

However, Defendants' standing argument does raise the question of whether the named Plaintiffs are suitable representatives for the mental health class. The Court intends to address potential decertification of the mental health class by way of a separate order to show cause.

### C.    Exhaustion of Administrative Remedies

Defendants contend Plaintiffs failed to exhaust their administrative remedies under the Prison Litigation Reform Act ("PLRA"). (Doc. No. 998 at 13.) The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

The Court previously rejected this argument finding that "[w]hen prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies." (Doc. No. 203 at 8–9.) Defendants do not provide a new argument nor cite to any evidence or caselaw to establish why the Court should now reach a different conclusion. Accordingly, the Court finds that Plaintiffs have exhausted their administrative remedies.

### F.    Mootness

Next, Defendants contend that Plaintiffs' request for injunctive relief is moot because of the changes that Defendants have already made, changes that are in process, and changes already planned with defined timelines for implementation. (Doc. No. 988 at 12.) Defendants contend that the ongoing changes to the mental health system—including additional OPSD housing, treatment, and programming—are substantial. (*Id.*)

Defendants list eleven reasons why they contend the request for preliminary injunction is moot: (1) Defendants have been working on increasing sworn staff in order to increase the ability to remove incarcerated persons from their cells for confidential mental health evaluations, and Defendants have also been working on identifying additional spaces available for confidential mental health sessions (Doc. No. 988 at 12); (2) multi-disciplinary wellness checks are being done weekly and include nursing, mental

16

health, reentry services and custody staff (*id.* at 13); (3) Defendants have revised many of the Detention Services Bureau and Medical Services Division policies (including those applicable to medical and mental health) to meet NCCHC 2025 Jail standards and are actively working toward accreditation (*id.*); (4) Defendants are in the midst of dramatically increasing the amount of beds in OPSD units in order to move the incarcerated persons with SMI who are eligible to be housed in OPSD to those units (*id.*); (5) staffing for mental health has been increased (*id.* at 15); (6) a County Registered Nurse does an initial receiving screening for medical and mental health issues including suicide risk assessment (*id.* at 16); (7) after the initial screening during and booking, the incarcerated person is taken to see either a Nurse Practitioner or a Doctor from Correctional Health Partners, who performs a full 14-day medical screening during intake (*id.* at 16–17); (8) Mental Health staff performs weekly rounds in Administrative Separation (*id.* at 17); (9) Mental Health staff have been actively collaborating with custody staff to create more rooms/locations to use for confidential mental health sessions as well as to increase available custody staff to escort incarcerated persons to such sessions and to provide supervision from outside the room (*id.*); (10) there is programming and clinical therapy provided in OPSD (*id.* at 18.); and (11) Defendants are working on identifying patients who have been placed in Ad-Sep based on behavioral symptomology for reassessment by the jail population management unit as to their classification status, which potentially could result in incarcerated persons being removed from Ad-Sep (*id.* at 18).

Plaintiffs counter that Defendants' "plan lacks critical components including formal policies, training plans, divisions of responsibility, treatment planning, out-of-cell time, and oversight." (Doc. No. 992 at 5.)

"[T]he standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). Defendants have not met this burden. Although Defendants outline several

17

measures they are taking to address the allegedly wrongful conduct, Defendants have not made "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *See id.* Accordingly, the Court finds that the request for injunctive relief is not moot.

### G.    The *Winter* Factors

To obtain a preliminary injunction the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The first *Winter* factor, likelihood of success, is a "threshold inquiry" and "the most important factor" in the analysis. *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). This is especially true where, as here, a plaintiff seeks a preliminary injunction based on an alleged constitutional violation. *Baird v. Bonta*, 81 F.4th at 1042 (.

"[A]n Eighth Amendment claim is made out if prisoners with serious mental illnesses face a substantial risk of serious harm" from a correctional policy or practice, "and this [risk] is met with deliberate indifference to their condition." *Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019). Such claims are inherently fact-specific. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 794 (9th Cir. 2019); *see Patel v. Kent Sch. Dist.*, 648 F.3d 965, 975 (9th Cir. 2011) ("Deliberate-indifference cases are by their nature highly fact-specific . . . ."); *see also Rachel v. Troutt*, 820 F.3d 390, 394 (10th Cir. 2016) ("Each step of this [deliberate indifference] inquiry is fact-intensive.") (quoting *Hartsfield v. Colburn*, 491 F.3d 394, 397 (8th Cir. 2007)).

Where a plaintiff alleges systemwide deficiencies—policies or practices that expose all inmates to a substantial risk of serious harm—courts apply a two-pronged inquiry. *Disability Rts. Montana, Inc. v. Batista*, 930 F.3d 1090, 1097 (9th Cir. 2019). The objective prong requires a showing that the prison conditions pose "a substantial risk of serious harm." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The subjective prong requires that the plaintiff show that a prison official was deliberately indifferent by being

18

"aware of facts from which the inference could be drawn of that substantial risk of serious harm exists," and actually drawing that inference. *Farmer*, 511 U.S. at 837; *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) ("To establish an Eighth Amendment violation, a prisoner 'must satisfy both the objective and subjective components of a two-part test.'") If the circumstances suggest that the prison officials were exposed to information about the risk, and therefore must have known of the risk, that evidence could be sufficient to allow a trier of fact to find actual knowledge. *Farmer*, 511 U.S. at 842. However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. Deliberate indifference requires a "state of mind more blameworthy than negligence," akin to criminal recklessness. *Id.* at 835, 839–40.

Both Plaintiffs and Defendants focus their analysis on the subjective, deliberate indifference prong, and so does the Court. "Demonstrating deliberate indifference requires a substantial showing." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 618 (9th Cir. 2021). Plaintiffs fail to make that showing here.

Since this lawsuit was initiated five years ago, Defendants have undertaken significant efforts to address the needs of incarcerated individuals with mental illness. Defendants are working on increasing sworn staff to increase the ability to remove incarcerated persons from their cells for confidential mental health evaluations and to identify additional spaces for such evaluations. (Doc. No. 988 at 12.) Defendants have instituted multi-disciplinary wellness checks, increased mental health staff, and revised numerous Detention Services Bureau and Medical Services Division policies to align with NCCHC 2025 Jail standards, while actively pursuing accreditation. (*Id.* at 13, 15.) Incarcerated persons receive an initial screening for medical and mental health issues including suicide risk assessment. (*Id.* at 16.) After the initial screening, the incarcerated person is taken to see either a Nurse Practitioner or a Doctor from Correctional Health Partners, who performs a full 14-day medical screening during intake. (*Id.* at 16–17.)

Defendants are also reassessing individuals placed in administrative separation based on behavioral symptomology to determine whether reclassification, including removal from Ad-Sep, is appropriate. (*Id.* at 18.)

Although it could be argued that Defendants should be making greater changes, or that the changes should be implemented more quickly, the record reflects ongoing, concrete efforts to address mental health risks. Based on the efforts that Defendants have made, Plaintiffs cannot show that Defendants have acted with deliberate indifference.

This conclusion is reinforced by the deference courts owe to prison administrators. The Supreme Court has recognized that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 546–48 (1979). "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Id.* (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974). In *Bell*, the Supreme Court stated the following:

> Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. Finally, as the Court of Appeals correctly acknowledged, the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Bell*, 441 U.S. at 546–48 (1979) (citations omitted).

Plaintiffs rely on several cases where courts restricted the use of segregated housing for inmates with mental illness, including *Madrid v. Gomez*, 889 F. Supp. 1146, 1267 (N.D. Cal. 1995); *Coleman v. Wilson*, 912 F. Supp. 1282, 1320–21 (E.D. Cal. 1995); *Jensen v. Shinn*, 609 F. Supp. 3d 789, 903, 913 (D. Ariz. 2022), *amended*, 2022 WL 2910835 (D. Ariz. July 18, 2022); and *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1247 (M.D. Ala. 2017). Those cases are distinguishable.

In *Madrid*, the district court found an Eight Amendment violation when the mental health care was "grossly inadequate," "manifestly deficient," failing even the "most minimal standards for adequate psychiatric care." *Madrid*, 889 F. Supp. at 1214. Here, by contrast, Defendants provide evidence that they have revised many of their policies (including those applicable to medical and mental health) to meet NCCHC 2025 Jail standards. Because Defendants' policies meet industry standards, the Court finds that the conditions at the Jail likely cannot be classified as "grossly inadequate" or "manifestly deficient."

In *Coleman,* the district court found the segregated housing policies unconstitutional where "mentally ill inmates are placed in administrative segregation . . . without any evaluation of their mental status, . . . and . . . are denied access to necessary mental health care." *Coleman*, 912 F. Supp. 3d at 1320–21. That is not the case here. At best, the evidence is conflicting. Although Plaintiffs allege that incarcerated persons with SMI are not provided adequate mental health care, Defendants counter and assert that individuals at the Jails are frequently evaluated and have regular access to mental health care. And while Plaintiffs may contend that the mental health care at the Jail is inadequate, they do not allege that anyone has been placed in Ad-Sep without *any* evaluation of their mental status, as was the case in *Coleman*.

Finally, *Jensen* and *Braggs* involved findings of deliberate indifference only after full bench trials, where courts heard testimony, evaluated competing experts, and made credibility determinations. *Jensen*, 609 F. Supp. 3d at 841 ("The parties presented competing experts on the issue of mental health care. Again, Plaintiffs' expert was far more

21

credible."); *Braggs*, 257 F. Supp. 3d at 1190 ("Furthermore, the court heard testimony from multiple prisoners, both named plaintiffs and class members, who clearly exhibited serious mental-health needs."). This case has a very different procedural posture. Here, the Court has not heard testimony or assessed credibility, and the written record is disputed. Thus, the determinations made in those cases cannot be made here.

For the reasons stated above, Plaintiffs have not carried their burden in showing deliberate indifference or a likelihood of success on the merits of their Eighth Amendment claim. Because Plaintiffs fail to satisfy this threshold requirement, the Court need not address the remaining *Winter* factors. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (quoting *DISH Network*, 653 F.3d at 776); *see also Garcia*, 786 F.3d at 740.

## H. Scope of the Proposed Injunction

In addition to Plaintiffs' request for injunctive relief failing under the *Winter* factors, it is also not sufficiently narrow as required by the PLRA. "Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). As the Ninth Circuit has previously observed, the PLRA places significant limits upon a court's power to grant preliminary injunctive relief to inmates, and "operates simultaneously to restrict the equity jurisdiction of federal courts and to protect the bargaining power of prison administrators—no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Gilmore*, 220 F.3d at 998–99 (9th Cir. 2000). A district court may not "'enmesh[] [itself] in the minutiae of prison operations,' beyond what is necessary to vindicate plaintiffs' federal rights." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010) (quoting *Lewis v. Casey*, 518 U.S. 343 at 362 (1996).

Plaintiffs' proposed injunction does not comply with the PLRA's requirements. (*See* Doc. No. 979-2 at Ex. A.) Plaintiffs seek a court order requiring Defendants to "develop a plan" "within 45 days." (*Id.*) That plan includes revising the County Jail policies,

22

procedures, practices, and training to ensure that no incarcerated person with serious mental illness be placed into Ad-Sep unless for exigent circumstances, but then only up to seventy-two hours, and only if those circumstances are documented and reviewed, and during which time mental and medical care is provided, and the alternatives reviewed in order to provide a clinically therapeutic alternative. *Id.* The proposed injunction also seeks to require any person in Ad-Sep who is physically or mentally deteriorating or has "any other signs or reports of symptoms of failing health," to be moved out of Ad-Sep immediately and to receive "clinically indicated care commensurate with the needs of the incarcerated person or to a hospital in the community."

As Defendants point out, Plaintiffs' proposed injunction does not define "failing health" or "deterioration." (*See* 988 at 24.) Does it mean failing physical health or mental health? (*Id.*) It is unclear what would constitute "failing" or "deterioration." Moreover, Plaintiffs do not provide a basis for limiting the amount to time in Ad-Sep to seventy-two hours. There is no evidence in the record establishing that these specific requirements "correspond to the constitutional floor." *Rasho v. Jeffreys*, 22 F.4th 703 (7th Cir. 2022) ("[T]he PLRA demands that injunctive relief 'extend no further' than necessary to remedy the constitutional violation.") Plaintiffs' proposed injunction is sweeping and would extend well beyond affecting those incarcerated individuals with SMI. Accordingly, Plaintiffs' Motion does not satisfy the PLRA's narrow-tailoring requirement.

## IV.    CONCLUSION

Death is undoubtedly tragic, but it can occur even under the best of circumstances. To warrant legal redress, however, the law requires adherence to governing legal standards and sufficient proof. Here, the proof falls short. The evidence is disputed—some of it arguably inadmissible—and its credibility cannot be meaningfully assessed on the written record alone. The material facts remain unsettled. Plaintiff has not established a causal link between the recent deaths (or any prior deaths) and Defendants' alleged policy or practice failures. Instead, Plaintiffs assume that deaths occurred because of deficient policies, including the use of Ad-Sep, and that individuals in Ad-Sep necessarily decompensate due

to inadequate clinical care. This is a significant overstatement unsupported by competent medical evidence.

Plaintiffs ask the Court to accept their evidence while disregarding Defendants' and to resolve all evidentiary objections in their favor. The Court cannot do so on this record. The evidence is conflicting, and numerous issues—including witness credibility—are plainly triable. Absent trial or settlement, these questions cannot be resolved. Cross-examination—long recognized as the crucible through which testimony is tested— is essential to assessing credibility and determining the reliability of disputed evidence. Only a trier of fact, after the adversarial process has run its course, can make those determinations. Accordingly, for the reasons stated herein, Plaintiffs' Motion is **DENIED**.

**IT IS SO ORDERED.**

Dated:  December 30, 2025

Hon. Anthony J. Battaglia
United States District Judge