GAY C. GRUNFELD – 121944
VAN SWEARINGEN – 259809
MICHAEL FREEDMAN – 262850
MARC J. SHINN-KRANTZ – 312968
ERIC MONEK ANDERSON – 320934
ERIC HO – 359738
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
ggrunfeld@rbgg.com
vswearingen@rbgg.com
mfreedman@rbgg.com
mshinn-krantz@rbgg.com
eanderson@rbgg.com
eho@rbgg.com

AARON J. FISCHER – 247391
LAW OFFICE OF
AARON J. FISCHER
1400 Shattuck Square Suite 12 - #344
Berkeley, California 94709
Telephone:  (510) 806-7366
Facsimile:  (510) 694-6314
ajf@aaronfischerlaw.com

CHRISTOPHER M. YOUNG – 163319
ISABELLA NEAL – 328323
OLIVER KIEFER – 332830
DLA PIPER LLP (US)
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Telephone:  (858) 677-1400
Facsimile:  (858) 677-1401
christopher.young@dlapiper.com
isabella.neal@dlapiper.com
oliver.kiefer@dlapiper.com

Attorneys for Plaintiffs and the
Certified Class and Subclasses

(*defense counsel on following page*)

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>    v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>       Defendants. | Case No. 3:20-cv-00406-AJB-DDL<br><br>**JOINT MOTION AND ORDER RE: MENTAL HEALTH ISSUES AND RESOLVING SECOND CLAIM FOR RELIEF**<br><br>Judge:     Hon. Anthony J. Battaglia<br>Magistrate: Hon. David D. Leshner |

[4814395.3]

*(counsel continued from preceding page)*

Susan E. Coleman (SBN 171832)
E-mail: scoleman@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
501 West Broadway, Suite 1600,
San Diego, CA 92101-8474
Tel: 619.814.5800 Fax: 619.814.6799

Elizabeth M. Pappy (SBN 157069)
E-mail: epappy@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Ste. 1000
San Jose, CA 95113-2336
Tel: 408.606.6300 Fax: 408.606.6333

Attorneys for Defendants
COUNTY OF SAN DIEGO, SAN DIEGO
COUNTY SHERIFF'S OFFICE and SAN DIEGO COUNTY PROBATION
DEPARTMENT

[4814395.3]

Case No. 3:20-cv-00406-AJB-DDL

JOINT MOTION AND ORDER RESOLVING SECOND CLAIM FOR RELIEF

# TABLE OF CONTENTS

I.      PROCEDURAL HISTORY ................................................................................. 1

II.     DEFINITIONS ................................................................................................ 2

III.    FINDINGS ..................................................................................................... 3

IV.     MENTAL HEALTH CARE CHANGES ............................................................. 5

        A.      Intake ..................................................................................................... 5

        B.      Levels of Care ...................................................................................... 6

        C.      Safety Cell & Enhanced Observation Housing ................................. 7

        D.      PSU – Psychiatric Stabilization Unit – Inpatient ........................... 10

        E.      OPSD – Outpatient Step Down .......................................................... 13

        F.      OP – Outpatient .................................................................................. 15

        G.      Medical Isolation ................................................................................ 16

        H.      Administrative Separation ................................................................. 16

        I.      Needs Assessment, Benchmarks For Implementation ...................... 18

        J.      Suicide Prevention ............................................................................. 19

        K.      Continuity of Care .............................................................................. 20

        L.      Continuous Quality Improvement ..................................................... 22

        M.      Training ............................................................................................... 23

        N.      Oversight ............................................................................................. 24

V.      COMPLIANCE ............................................................................................. 24

        A.      Neutral Expert ................................................................................... 24

        B.      Dispute Resolution ............................................................................. 28

VI.     MISCELLANEOUS RELIEF .......................................................................... 30

VII.    DURATION AND TERMINATION .................................................................. 30

VIII.   AMENDMENTS ............................................................................................ 31

IX.     JURISDICTION AND ENFORCEMENT ........................................................ 31

        A.      Court Approval ................................................................................... 31

B.    Court Jurisdiction ................................................................31

X.    ATTORNEYS' FEES AND COSTS ..........................................................32

[PROPOSED] ORDER..................................................................................34

1.    Plaintiffs Darryl Dunsmore, Andree Andrade, Ernest Archuleta, James Clark, Anthony Edwards, Reanna Levy, Josue Lopez, Christopher Norwood, Jesse Olivares, Gustavo Sepulveda, Michael Taylor, and Laura Zoerner (collectively, "Plaintiffs"), on behalf of themselves and the Certified Class and Disabilities Subclass, and Defendants San Diego County and San Diego County Sheriff's Office (formerly known as "Sheriff's Department") (collectively, "the County") jointly seek entry of an Order approving the parties' settlement of all mental health issues regarding Plaintiffs' Second Claim for Relief, as set forth in detail below.

## I.    PROCEDURAL HISTORY

2.    On November 3, 2023, the District Court entered an Order Granting Joint Motion for Class Certification and Approval of Proposed Class Action Notice Plan, Dkt. No. 435, a copy of which is attached hereto as **Exhibit A** and incorporated herein by reference. This Order certified a class of "All adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ('Incarcerated People Class')" and a subclass of "All adults who have a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ('Incarcerated People with Disabilities Subclass')." Ex. A at 10. The Order approved Rosen Bien Galvan & Grunfeld, Law Office of Aaron J. Fischer, and DLA Piper LLP (US) as Class Counsel. *Id.* at 10-11.

3.    On February 5, 2025, February 28, 2025, March 7, 2025, March 21, 2025, March 28, 2025, April 3, 2025, April 10, 2025, April 21, 2025, April 30, 2025, May 2, 2025, May 16, 2025, June 30, 2025, August 1, 2025, August 29, 2025, September 17, 2025, September 26, 2025, October 10, 2025, November 10, 2025, December 5, 2025, December 10, 2025, December 19, 2025, December 23, 2025, and January 5, 2026, the parties conducted settlement conferences under the supervision of the Honorable David Leshner, Magistrate Judge of the United States

District Court for the Southern District of California. Pursuant to the parties' Mental Health – Settlement Neutral Appointment Agreement dated April 21, 2025, the County hired Dr. Timothy Belavich, a psychologist, to serve as a Mental Health Neutral Expert for the sole purpose of assisting in settlement negotiations. As part of his engagement he conducted an independent assessment of the County's jail mental health system, and assisted the parties and Judge Leshner in settlement negotiations on the mental health cause of action. Dr. Belavich conducted four full-day tours of the County's correctional facilities and has met regularly with the parties and Judge Leshner. The parties also conducted settlement discussions without the involvement of Judge Leshner. As a result of these discussions, the parties have reached the following agreements regarding the mental health claim.

## II.    DEFINITIONS

4.    "Jail" means any correctional facility operated by the County. As of the effective date of this Agreement, there are seven correctional facilities operated by the County: East Mesa Reentry Facility; George Bailey Detention Facility; Las Colinas Detention and Reentry Facility; Rock Mountain Detention Facility; San Diego Central Jail; South Bay Detention Facility; and Vista Detention Facility. As of January 5, 2026, the daily population of the Jail is 4,111.

5.    "Mental health care staff" means any person who provides mental health care to incarcerated people in the custody of the Sheriff's Office and includes, but is not limited to, psychiatric physicians, nurse practitioners, psychologists, nurses, licensed clinical social workers, marriage and family therapists, and recreational therapists.

6.    "Qualified Mental Health Professional" or QMHP means psychiatrists, psychologists, clinical social workers, licensed professional counselors, psychiatric nurse practitioners, psychiatric nurses, and others who by their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients.

7.    "Qualified Health Care Professional" or QHCP means physicians, physician assistants, nurses, nurse practitioners, dental professionals, licensed mental health professionals, and others who by their education, credentials, and experience are permitted by law to evaluate and care for patients.

8.    "Out-of-Cell Clinical Encounter" means any confidential scheduled or unscheduled appointment or interaction between a QMHP and patient for the purpose of providing mental health care.  It does not include rounding or medication distribution.

9.    "Rounding" means a QMHP conducts an in-person encounter with the incarcerated individual to ascertain mental health status, providing an opportunity to request mental health care, and monitor the effects of their current housing on the incarcerated person.  Rounding can be done through a door, including but not limited to a cell or module door.

10.    "Safety Checks" means direct, visual observation performed at random intervals within established timeframes to provide for the health and welfare of incarcerated persons.

## III.    FINDINGS

11.    The parties agree that the Eighth and Fourteenth Amendments of the United States Constitution, as well as Article 1, Sections 7 and 17 of the California Constitution, require the County to provide adequate mental health care to incarcerated people.

12.    On March 2, 2020, Plaintiff Darryl Dunsmore filed this case as an individual action.  Dkt. 1. On February 9, 2022, Plaintiff Dunsmore, joined by additional named plaintiffs, filed the Second Amended Complaint raising class claims.  Dkt. 81. Plaintiffs filed their Third Amended Complaint, Dkt. 231, on November 18, 2022.

13.    The parties started discussing the potential for settlement of issues related to mental health issues described in the Second Claim for Relief of the Third

Amended Complaint in November 2024.

14.    Discovery has taken place, including three on-site facility inspections by Plaintiffs' qualified mental health expert, several Rule 30(b)(6) depositions, document production, exchange of expert reports, and depositions of the parties' respective experts.  The parties are fully informed regarding the mental health issues raised by Plaintiffs' Third Amended Complaint.

15.    The County has taken significant and consequential steps over the last three years to better serve incarcerated persons with mental health issues including hiring additional mental health staff, implementing dedicated medication assisted treatment ("MAT") clinicians, executing a contract for Early Access Stabilization Services ("EASS"), developing the Case Manager position, recertifying the Las Colinas Detention Facility ("LCDRF") and San Diego Central Jail Lanterman-Petris-Short ("SDCJ LPS") facilities, and expanding Outpatient Step Down ("OPSD") beds.  Additionally, the San Diego County Sheriff's Office ("SDSO") Detention Services Bureau has been in the process of revising its Manual of Policies and Procedures for Medical and Health Care Services, M.1—48, its Medical Services Division Operations Manual number A.1.1—W.2, and its Green Sheets regarding provision of medical, mental health and dental care.  The County has also signed a contract with third-party provider Correctional Health Care Partners in addition to the existing contract with NaphCare.[1]

16.    These changes represent important steps in the improvement of mental health services for mentally ill incarcerated persons.  The parties agree that additional changes will be beneficial to the jail mental health delivery system, including additional care for incarcerated persons with mental health issues and

---

[1] "Maintain, develop, and implement" is used throughout this Agreement, including but not limited to paragraphs 25, 26, 27, 30, 43, 58, and 106. The phrase is intended to be neutral and shall not be interpreted to indicate that the County was or was not maintaining and/or had or had not developed or implemented the process or procedure being referenced, prior to negotiation of this Agreement.

more access to mental health services.

17.    The Sheriff's Office and County have been and continue to be committed to improving the mental health system and committing the maximum amount of resources to more improvements rather than litigation.

## IV.    MENTAL HEALTH CARE CHANGES.

18.    The Sheriff's Office and County agree to implement changes to the mental health care system, as specified below in this Joint Motion and Order (henceforth, "MH Settlement Agreement and Order"):

### A.    Intake

19.    **Processing** – The County shall have Registered Nurses complete Receiving Screening and make appropriate referrals to a Qualified Mental Health Professional (QMHP).  Referrals shall be made as follows:

a.    Emergent:  within 4 hours or sooner if clinically indicated, and close or constant observation (as clinically indicated) is maintained until evaluation occurs[2]

b.    Priority:  within 24 hours

c.    Routine:  within 7 calendar days to a QMHP who completes a Mental Health Intake Evaluation and assigns the incarcerated person to an appropriate Level-of-Care (LOC)

20.    **Inability or Refusal to Complete Receiving Screening:**  The County shall ensure the process in place such that if an incarcerated person refuses or is unable to complete the Receiving Screening, re-attempts shall be made daily. Nursing staff shall also make appropriate referrals to Mental Health in these

---

[2] The Sheriff's Office's EHR currently has "priority" and "routine" appointment options. If a referral is "emergent", staff uses the "priority" option and notates that it was an emergency and verbal notification was made to staff. The County will continue this process until an "emergent" appointment option is created. An "emergent" appointment option will be created in the EHR within 12 months of the signing of this Agreement.

instances, based on the information they gather from collateral sources and observation of the incarcerated person.

21. **Records Availability** – Available outside records shall be reviewed by an intake nurse and QMHP to include available previous jail records and community records (i.e., County health care resources/record systems).

22. **Medication Continuity** – The County shall have health care staff verify and bridge medications at intake. If the person is on psychiatric medication, health care staff shall schedule the incarcerated person with a psychiatric provider, via in-person or telehealth, within 4 hours of intake (or sooner if clinically indicated) if deemed "Emergent", within 24 hours of intake if deemed "Priority", or within 7 calendar days if deemed "Routine". All incarcerated persons receiving bridged medication shall also be referred to a QMHP for evaluation by a QMHP for placement in a LOC.

23. **Placement and Referral** – A QMHP shall assign the Level of Care ("LOC") at intake, via in-person or telehealth. JPMU or designee shall determine and assign the appropriate housing consistent with the LOC designation.

24. **Mental Health Staffing** – SDSO shall provide at least one QMHP staff at all intake facilities to cover intake, available 24/7 onsite or via telecare. Psychiatry shall be available 24/7 at all intake facilities, via telecare or onsite methods.

25. **Outside Hospital/Facility** – Returnees identified on behavioral health caseload before leaving custody shall come through Intake for medication continuity and placement, as clinically indicated and determined by the QMHP.

**B.     Levels of Care**

26. **Criteria for Levels of Care ("LOC")** – The County shall maintain, develop, and implement clinically appropriate criteria for each LOC identified below (Safety Cell, EOH, PSU, OPSD, OP) and implement clinically indicated mental health programming for each LOC. The County shall deliver appropriate

LOC programming and treatment, consistent with clinically developed individualized treatment plans, regardless of security classification, housing placement, sex, or any other jail designation.

27. The County shall maintain, develop, and implement policies, procedures, and training to ensure that incarcerated people who meet criteria for a level of mental health care are housed in a clinically appropriate housing unit and receive clinically adequate treatment based on their individual treatment needs.

28. The County shall maintain, develop, and implement policies, procedures, and training to ensure that incarcerated people who return or transfer to the Jail from a setting outside the Jail—including from a local hospital, from another jail or prison system, from a state psychiatric hospital, or from a state developmental treatment center (for people with intellectual disabilities)—receive adequate and timely mental health care consistent with LOC need, with appropriate treatment continuity.

29. The County shall ensure that health care staff review an individual's available mental health records and incorporate relevant diagnostic and treatment information into the individual's individualized jail treatment plan.

30. The County shall provide clinically appropriate care consistent with the provisions set forth below and on the timelines as set forth below.

**C.    Safety Cell & Enhanced Observation Housing**

31. The County shall maintain, develop, and implement policies that ensure the following standards in safety cells and Enhanced Observation Housing (EOH).

32. **Psychiatry** – An initial psychiatry out-of-cell clinical encounter shall take place (in-person whenever possible, but via telehealth if needed) within 24 hours of placement. Additional psychiatric out-of-cell clinical encounters shall occur as necessary, and follow up upon provider determination, but no less than once every 5 days while in safety cell or EOH. Psychiatry out-of-cell clinical encounters shall be done by a psychiatrist or psychiatric nurse practitioner via in

person or telehealth.

33.    **Clinician (QMHP)** – Daily out-of-cell clinical encounters shall be performed by QMHP in safety cell and EOH.  If the QMHP determines that a psychiatry out-of-cell clinical encounter is clinically indicated, such encounter shall occur within the clinically indicated timeline, and in all cases within 24 hours, via in person or telehealth.

34.    **Confidentiality** – Out-of-cell clinical encounters shall be held in confidential out-of-cell settings unless individualized clinical or security factors prevent it.  This is individually evaluated for each encounter and included in the clinical note.  This applies to safety cell and EOH.  The County shall continue to work on confidentiality, with current interim steps ongoing and full implementation within 24 months of the signing of this Agreement.[3]

35.    **Out-of-cell Structured** – At least 1 hour structured treatment shall be offered 1 x per day (5 days/week) in EOH unless clinically contraindicated or current security factors prevent it based on an individualized evaluation that is documented.  Structured out-of-cell treatment activities include out-of-cell therapeutic treatment provided individually or in a clinically appropriate group setting, as clinically indicated.  This treatment occurs out-of-cell and occurs in a size appropriate to the group.

36.    **Out-of-cell Unstructured** – At least 2 hours unstructured shall be offered daily (7 days/week) in EOH for showers, phone, recreation, and individual/small group recreation as appropriate for clinical and security level, unless individualized clinically contraindicated or current security factors prevent it based on an individualized evaluation that is documented.  Unstructured out-of-cell

---

[3] The County shall maintain, develop and implement a policy requiring that all individual mental health Out-of-Cell Clinical Encounters take place in a confidential setting. The policy shall require that mental health Out-of-Cell Clinical Encounters are either designated as "confidential" or "non-confidential" and the policy may be a standalone policy or incorporated into another policy.

JOINT MOTION AND ORDER RESOLVING SECOND CLAIM FOR RELIEF

time includes time in the dayroom or recreation yard, and includes activities that promote socialization and physical activities (i.e., phone, puzzles/games, paper/writing/art supplies).

37.    **Admission/Discharge** – The County shall utilize Suicide Risk Assessment, Safety Planning, and clinical evaluation to determine placement into appropriate LOC. Once a patient is found appropriate for discharge from DSP, they shall be promptly moved to a placement providing the identified LOC. The County shall remove the requirement for two "low" risk evaluations before release. This applies to safety cell and EOH.

38.    **Safety Cell Time Limit** – Within 4 hours of safety cell placement, an evaluation shall be completed to determine LOC, with appropriate placement within 2 hours of the evaluation. Placement in a safety cell shall be limited to no more than 12 hours, absent exigent circumstances that are documented in each case and with notification to supervisory custody and clinical staff for review and any indicated follow up.

39.    **Safety Cell Conditions** – Because Safety Cells are dry cells, water or other liquid nourishment shall be offered at least every 2 hours and upon reasonable request of the individual. Upon reasonable request, individuals shall also be brought out of a Safety Cell to utilize a toilet (including a portable toilet), while under constant supervision. However, the County is not required to escort an individual if they are actively assaultive.

40.    **Safety Cell and EOH Conditions** – Custody shall ensure cleaning of cells and that Healthcare staff assist with hygiene for patients in this LOC who are unable to perform cell cleaning or personal hygiene activities without assistance. Access to showers is available in EOH and shall be included as a consideration by QMHP on the Allowable Property/Privileges Form.

41.    **Safety Cell and EOH Observation** – Close observation (every 15 minutes) shall be performed in EOH by staff. Close observation (every 15 minutes)

or Constant observation shall be performed in safety cells by staff, as clinically indicated.

a.    MH rounding for Safety Cells shall take place at least every 4 hours.  MH rounding for EOH shall take place at least every 12 hours.

b.    The QMHP out-of-cell clinical encounter set forth in paragraph 30 may stand in for one of the rounding contacts pursuant to this provision.

42.    **Safety Checks** – Shall be performed in safety cells by custody staff according to then current policy.  Shall be performed in EOH by custody staff according to then current policy.[4]

43.    **Allowable Property/Privileges Form** – A form shall be completed by QMHP for EOH cells and updated at least daily to inform treatment team of allowable property and privileges.  The form shall be fully implemented within 12 months of the signing of this agreement.

**D.    PSU – Psychiatric Stabilization Unit – Inpatient**

44.    The County shall maintain, develop, and implement policies that ensure the following standards in the Psychiatric Stabilization Unit (PSU).

45.    **Psychiatry** – Initial psychiatry out-of-cell clinical encounter shall take place (in-person whenever possible, but via telehealth if needed) within 24 hours of placement.  Additional psychiatry out-of-cell clinical encounters shall be timely,

---

[4] The inclusion of Safety Checks and any reference thereto, including but not limited to, Paragraphs 10, 42, 55, 71 and 85, is deemed to be a full and final settlement of the issue of any aspect of Safety Checks for any and every remaining cause of action in Plaintiffs' Third Amended Complaint (Dkt.231). Plaintiffs may not challenge or in any way try the adequacy of Safety Checks in any regard, whether related to Mental Health or otherwise, except to enforce the MH Settlement Agreement and Order. The issue of Safety Checks is fully and finally resolved for all purposes in this litigation in including every remaining cause of action in the Third Amended Complaint (Dkt.231). The neutral appointed pursuant to this Mental Health Settlement Agreement shall not have any responsibility for enforcement of the above-referenced paragraphs.  A separate neutral shall be appointed within six months of the signing of this Agreement who is responsible for enforcement of Safety Checks in EOH, Safety Cells, PSU, OPSD, Administrative Separation, Protective Custody, and Holding/Booking, consistent with then current policy.

consistent with individual patient need, at least every 3 days. Psychiatry out-of-cell clinical encounters shall be done by a psychiatrist or psychiatric nurse practitioner via in person or telehealth. A psychiatrist shall be the primary medical provider assigned to PSU.

46. **Clinician (QMHP)** – Confidential out-of-cell clinical encounters by QMHP 5 days/week (with reasonable efforts to avoid two consecutive days without individual contacts).

47. **Confidentiality** – Out-of-cell clinical encounters shall be held in confidential out-of-cell settings unless individualized clinical or security factors prevent it. This is individually evaluated for each encounter and included in the clinical note. Full implementation of this provision shall be achieved within 24 months of the signing of this Agreement.

48. **Out-of-cell Structured** – Shall be offered at least 2 hrs. x 5 days/week, and consistent with individualized treatment plan, unless clinically contraindicated or current security factors prevent it based on an individualized evaluation that is documented.

49. **Out-of-cell Unstructured** – Shall be offered at least 2 hrs. x 7 days/week, unless clinically contraindicated or current security factors prevent it based on an individualized evaluation that is documented. May provide additional in-cell unstructured activities (tablets, workbooks, journals).

50. **Treatment Team** – The treatment team meets weekly. The treatment team shall meet with patient present at least once per month and document this fact. Initial treatment team meeting with patient present shall occur within 7 days of patient's admission. The treatment team shall consist of QMHP, psychiatric provider, nurse, recreation therapist, and PSU deputy and/or sergeant.

51. If mental health staff determine that a patient's current condition prevents them from participating in certain PSU level of care treatment or congregate activities, an alternative individualized treatment plan shall be developed

and updated weekly (including modifications to medication or other treatment, as clinically indicated).

52.   Unit infractions shall generally be addressed through the available clinician and custody staff.  This provision does not prevent jail staff from taking appropriate action to protect against actual or threatened violence.  Patients shall not be subjected to discipline in any manner that prevents the delivery of mental health treatment or adaptive supports.  Patients shall not be subject to discipline for refusing treatment or medication, or for engaging in self-injurious behavior or threats of self-injurious behavior.

53.   **Admission/Discharge** – Daily huddle of available PSU psychiatrist, QMHP, and custody staff shall occur 5 days per week for referral and discharge review either in person or via telehealth.

54.   **Referrals** – The PSU shall utilize a centralized referral and triage system that is available for taking referrals 24/7. Those referred and who are accepted for admission shall be placed[5] in the PSU within 24 hours from acceptance for admission.  Time between referral and acceptance shall be no more than 48 hours.  Patients shall be placed in an Observation Cell prior to receiving a bed in PSU, as clinically indicated.

55.   **Safety Checks**– Shall be performed by custody staff according to then current policy.

56.   **PSU Observation** - Patients in PSU shall receive Close or Constant observation by appropriate staff in cases where such observation is clinically indicated.  This observation can occur in any appropriate location.

---

[5] The County will work to meet housing placement timelines, including but not limited to the timelines identified in paragraphs 51, 66, and 79, on an ongoing basis, with full implementation to occur with completion of the Needs Assessment and Implementation process set forth in Section I, below, subject to the County's right to apply to the Court for modification of the implementation schedule if the needs assessment requirements cannot be met within two (2) years of completion of the needs assessment.

57.    **Designated Custody Staff** – Staff assigned to the PSU are expected to be generally dedicated to that unit so that they are available to facilitate programming in the unit, and will not be diverted to other Sheriff's Office duties unless operational needs or emergency security incidents so require.

58.    **Restraints** – The County shall utilize a clinical restraint policy with clinical safeguards, which includes the required elements of Title 15 of the C.C.R. and California Welfare & Institutions Code § 5150.

**E.    OPSD – Outpatient Step Down**

59.    The County shall maintain, develop, and implement policies that ensure the following standards in the Outpatient Step Down Unit (OPSD).

60.    **Psychiatry** – Monthly psychiatry out-of-cell clinical encounter. A follow-up psychiatry out-of-cell clinical encounter shall occur within one (1) week after a significant change in psychiatric medication or dose adjustment. Psychiatry out-of-cell clinical encounters shall be done by a psychiatrist or psychiatric nurse practitioner via in person or telehealth.

61.    **Clinician (QMHP)**– Weekly out-of-cell clinical encounters with a QMHP.

62.    **Confidentiality** –Out-of-cell clinical encounters shall be held in confidential out-of-cell settings unless individualized clinical or security factors prevent it. This is individually evaluated for each encounter and included in the clinical note. This applies to OPSD and shall be fully implemented within 24 months of signing this Agreement.

63.    **Out-of-cell Structured** – Shall offer at least 2 hrs. x 5 days/week and consistent with individualized treatment plan, unless clinically contraindicated or current security factors prevent it based on an individualized evaluation that is documented. Structured activity and needs to take into consideration the ability for patients to have jobs within the facility or on the unit. These opportunities should be incorporated into individualized treatment plans.

64.     **Out-of-cell Unstructured** – Shall offer at least 3 hrs. x 7 days/week unless clinically contraindicated or current security factors prevent it based on an individualized evaluation that is documented.  May provide additional in-cell unstructured (tablets, workbooks, journals, chalkboards/chalk).  The County will make best efforts to offer 4 hrs. x 7 days/week in non-high level OPSD.

65.     **Treatment Team** – The treatment team meets weekly.  The treatment team shall meet to discuss each patient at least once every 45 days, the patient shall be present for their scheduled meeting.  Initial treatment team meeting with patient present shall occur within 7 days of patient's admission.  The treatment team shall consist of at least a QMHP, psychiatric provider, classification, nurse, and OPSD deputy and/or sergeant; attending participants, including the patient, shall be documented in the meeting notes.

66.     If mental health staff determine that a patient's current condition prevents them from participating in certain OPSD level of care treatment or congregate activities, an alternative individualized treatment plan shall be developed and updated weekly (including modifications to medication or other treatment, as clinically indicated).

67.     Unit infractions shall generally be addressed through the available clinician and custody staff.  This provision does not prevent jail staff from taking appropriate action to protect against actual or threatened violence.  Patients shall not be subjected to discipline in any manner that prevents the delivery of mental health treatment or adaptive supports.  Patients shall not be subject to discipline for refusing treatment or medication, or for engaging in self-injurious behavior or threats of self-injurious behavior.

68.     **Daily Huddle** – At least five days a week, there shall be a daily huddle of mental health and custody staff for interdisciplinary review of patient issues, recent incidents, and interventions for the upcoming shift.

69.     **Admission/Discharge** – Daily huddle of available OPSD clinician and

custody staff shall occur 5 days/week for referral and discharge review.

70.    **Referrals** – OPSD shall utilize a centralized referral and triage system that is available for accepting and triaging referrals 5 days/week. Those referred and accepted for admission shall be placed in OPSD within 6 calendar days from the date of acceptance. Time between referral and acceptance shall be no more than 72 hours. This section shall be fully implemented no later than 24 months from the signing of this Agreement.

71.    **Safety Checks** – Shall be performed by custody staff according to current policy.

F.    **OP – Outpatient**

72.    **Psychiatry** – After initial psychiatry out-of-cell clinical encounter, the patient shall be seen again by a prescriber, including but not limited to a psychiatrist or psychiatric nurse practitioner within 21 days, based on clinical judgment of the prescriber, and at least every 90 days subsequently or more often as clinically indicated. A follow-up psychiatry out-of-cell clinical encounter shall occur within 14 days after a significant change in psychiatric medication or dose adjustment, and sooner if clinically indicated. Psychiatry out-of-cell clinical encounters shall be done by a psychiatrist or psychiatric nurse practitioner via in person or telehealth. This section shall be implemented within 24 months of the signing of this Agreement.

73.    **Clinician (QMHP)** – Out-of-cell clinical encounter at least every 60 days, and more often if clinically indicated.

74.    **Confidentiality** – Out-of-cell clinical encounters shall be held in confidential out-of-cell settings unless individualized clinical or security factors prevent it. This is individually evaluated for each encounter and included in the clinical note. This section shall be fully implemented within 24 months of the signing of this Agreement.

75.    **Out-of-cell Structured** – Programming needs to be available and

directed by the individual treatment plan.

76. **Treatment Plan** – Review and update with patient present, at least every 6 months, and sooner if clinically indicated based on patient's condition, and include recommended frequency of clinical and psychiatry sessions.

77. **Admission/Discharge** – Referrals to higher levels of care made through staff or self-referral as well as other sources.

78. **Safety Checks** – Shall be performed by custody staff according to then current policy in Protective Custody and Holding/Booking.

**G.    Medical Isolation**

79.    Daily Mental Health rounding as clinically appropriate.

**H.    Administrative Separation**

80.    The County shall track incarcerated people who have serious mental illness.

81.    The County shall not place incarcerated people with mental illness in more restrictive settings, including Administrative Separation, based solely on their diagnosis of a mental illness. Incarcerated people diagnosed with mental illness shall be housed in the most integrated setting appropriate to their individual treatment needs.

82.    **Clearance Procedure** – The procedures in the next paragraph apply in cases where:

(1)    the incarcerated person:

(a)    meets criteria for any mental health Level of Care in the County's Level of Care system; or

(b)    is observed as exhibiting unusual or bizarre behavior that may be related to serious mental illness such as head banging, smearing human excrement, extreme uncleanliness or severe lack of personal hygiene;

and

(2)    the incarcerated person is being considered for placement in Administrative Separation.

83.    A QMHP shall review the incarcerated person's mental health needs and history and shall conduct a clinical evaluation of the individual for contraindications for placement prior to being placed in Administrative Separation. The evaluation occurs in a confidential setting and the QMHP relays their findings to custody staff. If the QMHP indicates that placement in Administrative Separation is contraindicated, an alternative placement is provided based on the QMHP recommendation, absent exigent circumstances. If custody staff do not follow the mental health input, custody staff shall document why it was not followed and shall be timely reviewed by supervisory mental health and custody staff to ensure the patient is in an appropriate placement.

84.    If, after placement in Administrative Separation, an individual is identified who is suspected to be decompensating in the unit a referral shall be made to Mental Health. A QMHP shall respond to it as an Emergent or Priority referral, consistent with the patient's condition. If a clinical recommendation is made for removal from Administrative Separation, the individual shall promptly be placed in the appropriate LOC unless custody staff disagree for current, individualized safety and security reasons. If custody staff do not follow the mental health recommendation, custody staff shall document why it was not followed, which shall be timely reviewed by supervisory mental health and custody staff to ensure proper LOC and placement within 24 hours.

85.    **Mental Health Rounding** – Rounding shall occur weekly by a QMHP, and daily by a QHCP. Rounding shall be documented by individual chart notes summarizing interaction, cell status, and whether an offer of out-of-cell clinical encounter was accepted. Out-of-cell clinical encounter shall occur within a

reasonable amount of time (i.e., Emergent, Priority, Routine).[6]

86.    **Safety Checks** – Shall be performed by custody staff according to current policy.

87.    **Programming and Services** – In accordance with paragraph 26, the County shall deliver appropriate LOC programming and treatment including for incarcerated persons in Administrative Separation, consistent with clinically indicated individualized treatment plans, regardless of security classification, housing placement, sex, or any other jail designation.

## I.    Needs Assessment, Benchmarks For Implementation

88.    **Needs Assessment** – Within 1 year of the signing of this Agreement, the County shall, with the input of the neutral expert, complete a systemwide needs assessment based on the defined LOC, to include data reflecting the system's classification designations, security levels, male/female, and any other identified factors including mental health and custody staffing.  The finding of the systemwide needs assessment shall be used to develop a bed plan and staffing plan to meet the needs of the mental health population through the defined LOC, and shall be implemented within two years of completion of the needs assessment.

89.    The Parties recognize that the Jail Mental Health system may require increased functional capacity at the PSU and OPSD levels of care.  Accordingly, the County shall proceed with Mental Health Program development consistent with the benchmarks set forth below.

90.    **OPSD Benchmarks Pending Needs Assessment:** The County implemented a plan prior to the signing of this Agreement that individuals in OPSD shall be moved from OPSD currently at George Bailey, to OPSD at Rock Mountain by January 31, 2026. The available beds at Rock Mountain shall be as follows:

---

[6] Plaintiffs agree that they will not seek rounding in Administrative Separation in pursuing resolution to the First Claim for Relief in their Third Amended Complaint.

Housing Module 4A- 68 beds

Housing Module 4B- 32 beds - High Security 16 IPs

Housing Module 4C- 32 beds - High Security 16 IPs

Housing Module 4D - 68 bed

With this OPSD program expansion, the County shall continue to integrate individuals designated as Protective Custody into OPSD treatment and OPSD housing placement. The Sheriff's Office shall notify Plaintiffs' counsel if the January 31, 2026 date is delayed due to construction or other circumstances, and shall make best efforts to address those circumstances promptly.

91.    Additionally, the County implemented a plan prior to the signing of this Agreement that by March 2027, one additional OPSD module shall be opened at Rock Mountain and it shall have up to 68 beds depending upon patient need. These beds shall be for high-security IPs unless they are needed for a different level of IPs at the time of implementation.

92.    In September 2025, prior to this Agreement, the County moved LCDRF OPSD patients from House 5B to House 3B. House 5B has 32 beds. House 3B has 56 beds, increasing the effective LCDRF OPSD population.

93.    In November 2025, prior to this Agreement, the County converted GBDF module 4C into an OPSD module that houses half protective custody incarcerated persons (up to 34 incarcerated persons) and half Administrative Separation incarcerated persons (up to 17 incarcerated persons), for an effective population of up to 51 incarcerated persons.

**J.    Suicide Prevention**

94.    **Suicide Risk Assessment** – The County shall use a suicide risk assessment tool. It may be utilized at multiple times, as needed (e.g., changing LOC), to direct treatment planning.

95.    **Treatment Plan** – Identify signs and triggers for recurrence of suicidal thoughts and ways to address them completed upon discharge from DSP or LOC

change to include Suicide Risk Assessment administration. The Treatment Plan also includes at least 24-hour and 7-day follow-up as part of protocol and patients remain on caseload.

96. **Property and Privileges** – In EOH and PSU observation cells, QMHP determines clothing, property and privileges at least every 24 hours, or more frequently if appropriate, and a document communicates this to unit custody staff. The clinical goal is to step patients down to fewer restrictions as soon as clinically appropriate.

97. **Clinical decisions for suicidal IPs** – QMHPs determine LOC appropriate housing to include contraindications for Ad-Sep placement. This is addressed in the Administrative Separation clearance procedure, referral system, and rounding protocols above.

98. **Observation** – Constant (1:1) and close (15 minute). Video monitoring is not a substitute for observation. QMHP orders the level of observation. Higher levels of Observation should be available in PSU Observation Cells, Safety Cells, and EOH.

99. **Suicide Prevention Training** – Custody and all healthcare staff receive at least 3 hours of pre-service suicide prevention training. Mental health staff shall receive an additional hour for suicide risk evaluation. Custody and all healthcare staff receive at least 2 hours of annual suicide prevention training. The training should include Jail suicide research, guiding principles of suicide prevention, staff attitudes about suicide, pre-disposing factors to suicide, warning signs and symptoms, identification of suicide risk despite denial, high risk times, review of County suicide prevention policy, and roles of staff when responding to suicide attempts.

**K.   Continuity of Care**

100. **Referral Triage system** – A sick-call system shall include triage of self or staff referrals for care as Emergent, Priority, or Routine. Triage shall occur

by a registered nurse within 24-hours of the referral being received. There is a system in place for sick-call slips to be obtained in all housing units and upon request during rounding activities. There is a protocol for them to be submitted confidentially. The registered nurse shall address and triage the referral as follows:

    a.    Emergent: within 4 hours or sooner if clinically indicated

    b.    Priority: within 24-hours

    c.    Routine: within 7 calendar days for provision of care

101. **Refusals** – The County shall refer incarcerated persons refusing consecutive doses of any psychiatric medication or required psychiatric treatment during a specified time period and increase the referral frequency as follows: incarcerated persons refusing 3 consecutive doses of any psychiatric medication or required psychiatric treatment 50% or greater times in a 7-day period shall be referred for follow-up with a psychiatric provider to receive counseling and determine issues impacting medication compliance. If an incarcerated individual refuses medications, they shall remain on the Mental Health caseload and receive clinical visits in compliance with their assigned LOC.

102. **Grievances** – The County shall maintain its grievance process by having all mental health grievances forwarded to a healthcare staff. An RN (or higher) shall triage all healthcare grievances within one business day or receipt to determine whether the healthcare grievance requires clinical intervention, to determine if the grievance warrants expedited processing (within 5 days), and to determine whether the grievance is administrative or clinical. Mental health clinical staff shall review all mental health grievances and conduct an interview if necessary and requested by the patient. All non-expedited mental health grievances shall be responded to in writing within 14 days of receipt. Healthcare staff shall resolve incarcerated person grievances in compliance with CCR Title 15, section 1073 and the Prison Rape Elimination Act of 2003, Section 115-52.

103. **Medication Administration** – There are set times for medication

distribution at therapeutically appropriate times (e.g., morning, midday, at bedtime). Compliance with medication administration shall be monitored on a continuous basis. A system is in place to administer medications for those who are leaving the facility (e.g., going to court, outside appointments, transfers) and will not be available during traditional medication administration times.

104. The County shall have a system in place to alert psychiatric providers to expiring medications with enough lead-time to arrange for the scheduling of the patient for a psychiatric out-of-cell clinical encounter. The scheduling system needs to ensure that those receiving significant medication changes or new medications receive follow-up within one week to evaluate issues or concerns around the medication change or new medication.

105. **Release Planning** – All incarcerated individuals in OPSD, PSU, EOH and safety cell LOC at the time of release from jail shall receive Release Planning services consistent with the individual's needs, including proper linkages with community providers. The Release Plan shall be shared with the incarcerated individual.

106. All incarcerated persons receiving psychotropic medications shall receive a supply for at least 30 days.

**L.    Continuous Quality Improvement**

107. **Structure of CQI** – The County shall develop a robust Continuous Quality Improvement system that collects and analyzes data on multiple jail processes and procedures for mental health care services. Based on regular review of this data corrective action plans shall be developed and monitored internally to ensure compliance with the identified issue. These mental health processes include but are not limited to Intake, LOC programming, Medication practices, Administrative Separation, suicide prevention, clinical treatment, adherence to timelines, mortality and morbidity, confidentiality, and release planning.

108. **Sentinel Events** – The County shall review mental health related

sentinel events (in custody mental health related deaths, serious self-harm events, and events requiring emergency mental healthcare response).

**M.    Training**

109.    **MH staff training** – All MH staff, regardless of employer, shall receive the same orientation, initial training, and annual training.  Orientation and initial training on suicide prevention and de-escalation skills and protocol shall be in real time and facilitated by an instructor.  Training should include all County Mental Health policies, suicide prevention, signs and symptoms of mental illness, and de-escalation skills and protocol.  There should be no distinction between a County employee and non-County employee in terms of orientation or training expectations.  The County is responsible for maintaining the training records of all staff, including contractors, working in the jails.  A method shall be implemented to ensure supervisors are made aware of staff who are non-compliant with training and timely remediation occurs.  Real time training can be in person or virtual.  Implementation of real time training, as required by this section, shall be achieved within 12 months of the signing of this Agreement.

110.    **De-escalation** – Mental health and custody staff shall receive training in de-escalation for pre-planned use-of-force incidents.  The County shall maintain, develop, and implement a protocol for QMHP participation in pre-planned use-of-force with SMI and ID/DD incarcerated persons, which includes de-escalatory verbal persuasion, avoiding cell extractions, utilization of "cool down" periods, audio and videotaping and review, and clinical engagement with the incarcerated person.

111.    **Custody training** – Custody staff assigned fulltime to PSU and OPSD units shall receive 8 hours of training in Mental Health First Aid or coursework similar and additional refresher training of at least 2 hours annually.  Training should be offered jointly for MH staff working on those units when possible.  The initial 8 hours of training shall be real time and facilitated by an instructor.  Real

time training can be in person or virtual. Implementation of real time training, as required by this section, shall be achieved within 12 months of the signing of this Agreement.

### N.    Oversight

112. **Clinical Oversight** – A licensed psychiatrist shall be employed by the County with relevant clinical experience who has oversight of all MH staff (County and Contractor) working in the jail with authority to direct the activities of all staff within 18 months. This person ensures that all licensed mental health staff, including non-psychiatric QMHPs, are required to participate in peer review.

113. **Administrative Oversight** – A County employee or department shall have administrative authority over all healthcare related staff working in the jails, regardless of employer. This oversight includes gathering regular reports on scheduling, vacancies, hours worked, and staff productivity. Oversight and data analysis should be presented at regular meetings that include leadership, to ensure effective oversight of contractors and effective contractor-county staff coordination.

114. **Clinical staff supervision** – All mental health clinical staff, regardless of employer, receive the same amount and type of clinical supervision, attend required meetings, and trainings.

115. **Policy and Procedure** – All mental healthcare staff shall follow County policies and procedures. All employees (contractor and county) should sign acknowledgements they have been trained on and are aware of the policies governing healthcare in the jails.

116. **Contract Oversight** – The County shall develop metrics around their healthcare contracts and carry out quarterly audits of their healthcare contracts.

### V.    COMPLIANCE

#### A.    Neutral Expert

117. The parties agree that there shall be a neutral expert retained to ensure compliance with this MH Settlement Agreement and Order, including regarding

policies, practices, procedures, and training relating to this MH Settlement Agreement and Order.

118. The parties shall meet and confer on the process for selecting the MH neutral expert. If the expert is not selected within 30 days of Court approval of this MH Settlement Agreement and Order, the parties shall submit names to the Magistrate Judge for selection. The County shall sign a contract with the chosen neutral expert within 30 days of their selection.

119. If the neutral expert becomes unavailable, the parties shall meet and confer, and assign a new expert. The parties may agree at any time to remove and replace a neutral expert. If the parties do not agree on removal, either party may refer the matter to the Magistrate Judge, and, if necessary, to the Court to determine whether the neutral expert should be retained or removed.

120. The neutral expert shall work with the County to ensure timely and appropriate implementation of this MH Settlement Agreement and Order.

121. The neutral expert may engage in *ex parte* communications with the parties. All of the neutral expert findings and recommendations shall be set forth in writing in reports.

122. The neutral expert, accompanied by one Class Counsel representative and the County's counsel, shall have access to all Jail facilities upon reasonable notice. All site visits shall take place on consecutive days. There shall be two (2) site visits per year that this Agreement is in effect, unless otherwise agreed by the parties.

    a.    The neutral expert shall have reasonable access to meet and interview personnel whose duties pertain to the provision of services and/or who work with incarcerated persons in the area of the expert's expertise.

    b.    The neutral expert shall have a reasonable opportunity to conduct interviews of incarcerated persons to assess whether the County is in compliance with the terms of this MH Settlement Agreement and Order. Class Counsel shall be

able to advise these class members at the time of the proposed interviews to ensure informed consent to participate. Class Counsel may remain with the expert while he/she is conducting interviews of class members if Defense Counsel, limited to one lawyer, is also permitted to be present for the interview. Whether Counsel may be present is subject to final decision by the neutral however any such decision to include Counsel shall include both Class and Defense Counsel.

123. The neutral expert may request to review County documents, except those documents protected by attorney-client or work product privileges, or by state or federal law, to assess the County's compliance with the terms of this MH Settlement Agreement and Order as the neutral deems appropriate. If these documents are requested in conjunction with a site visit, the County shall provide these documents to the extent feasible within ten (10) days prior to the visit. All materials produced to the neutral expert(s) must be shared with counsel for Plaintiffs. The County must, on a monthly basis, produce to the neutral expert(s) and Class Counsel a housing roster from the first day of the month, for each incarcerated person identified as being on the mental health caseload, and shall include identification of LOC and the person's cell or housing unit. These rosters shall be provided monthly for the twelve months following all counsel signing this MH Settlement Agreement and Order, and quarterly thereafter until Substantial Compliance with this MH Settlement Agreement and Order is achieved. All rosters and all documents provided to the neutral by either party are deemed to be confidential as follows: A document is not deemed confidential because it was provided to the neutral unless a party otherwise designates or previously designated it confidential pursuant to the Protective Order; The fact that any particular document(s) were provided to the neutral shall remain confidential unless the neutral refers to a document in a report. All communications with the neutral shall remain confidential and may only be disclosed in Court filings as necessary to any motion practice to enforcement the terms of this Agreement and including with

respect to any reports issued by the neutral pursuant to Paragraph 123.

124. The neutral expert shall issue a report following the inspection(s) which take place as provided in Paragraph 122 addressing the County's progress toward implementation of the requirements set forth in this MH Settlement Agreement and Order. Draft reports shall be provided to the Parties within 30 days of the later of the expert's site inspection and the expert(s)' receipt of all requested documents and information, and in no case later than 45 days after the inspection. Each report shall contain a determination of whether the County is "substantially complying" with each provision of the MH Settlement Agreement and Order required at the time of the report. If the neutral expert concludes that the County is not substantially in compliance with the terms of any provision or provisions of this MH Settlement Agreement and Order required as of the time of the report, the neutral expert shall make recommendations as to actions the County should take to comply with the terms of the provision or provisions or that additional time is warranted to achieve substantial compliance. Either party may submit comments within 15 days for review by the neutral expert(s), who shall thereafter issue the report in final form. The neutral expert shall ensure that individual incarcerated person or staff names are not included in the reports. Counsel for both sides shall review to determine and implement any additional necessary redactions, including for safety and security reasons. With such proper redactions, the final reports shall be public documents. Reports shall not be filed with the district court unless attached to a motion seeking relief under this MH Settlement Agreement and Order, or by order of the Court. The County shall pay reasonable fees for work performed by the neutral expert to fulfill her/his obligations under this Agreement. If the County believes that Class Counsel is requiring the neutral expert(s) to expend excessive and unwarranted time on the matter, the parties shall first meet and confer; if there remain disputes, the issue may be brought to Judge Leshner pursuant to the Dispute Resolution process below.

125.   The neutral expert shall also issue reports in each instance where the neutral has determined that the County has achieved substantial compliance with specific provisions of this MH Settlement Agreement and Order for 12 consecutive months, thereby terminating the neutral's work as to said area of substantial compliance.

126.   The neutral expert shall be permitted to attend trainings as the neutral expert deems appropriate.  If the neutral expert attends, the training shall be videotaped and made available to Class Counsel.  The faces and/or names of attendees shall be redacted as necessary to protect employee anonymity.

127.   The neutral expert shall be provided with and agree to be bound by any protective or Court orders entered in this case to protect the confidentiality of incarcerated persons' records and security-sensitive information.

128.   To facilitate Class Counsel's ability to communicate with their clients, the County agrees to facilitate one day (8 hours) of confidential interviews virtually at a single facility every four months between Class Counsel and the class members. Class Counsel shall, at least 10 days before the interview, identify the facility and provide the County a list of no more than 20 class members housed at that facility to interview so that the County can facilitate the interviews.  The County shall provide a confidential room at the requested jail facility where the virtual interviews can take place.  The County shall produce the previously identified class members who are housed at the facility in an expeditious manner, as reasonably possible.  This provision shall terminate upon substantial compliance as determined by the neutral expert.  Nothing in this provision shall prevent Class Counsel from interviewing their clients through the usual professional visit process.

**B.     Dispute Resolution**

129.   Any disputes between the parties about a matter governed by this MH Settlement Agreement and Order shall be subject to these dispute resolution procedures and those set forth above regarding neutral experts.  This provision along

with Paragraphs 129-131 are the sole and exclusive means to address disputes, and shall cover any dispute prior to issuance of a Substantial Compliance report, and any dispute regarding alleged failure of the County to maintain compliance with the terms of this MH Settlement Agreement and Order following a finding of Substantial Compliance, other than seeking relief from the District Court. A party may initiate the dispute resolution process with respect to any matter covered by this MH Settlement Agreement and Order by providing written notice of a dispute ("Dispute Notice") to the other party within 10 days of becoming aware of any such dispute. Following service of the Dispute Notice, the parties shall undertake good faith negotiations in person or via video conference at such times and places as they deem sufficient in an effort to resolve the dispute informally between them.

130. If, within 30 days after service of the Dispute Notice, the parties have failed to resolve the dispute, the parties shall next seek the assistance of Magistrate Judge David Leshner. Any party may request that a settlement conference be scheduled within 30 days of requesting the Magistrate Judge's assistance, unless the parties mutually agree upon an alternative schedule or the Court schedule does not allow for presentation of the issue to Magistrate Judge Leshner within 30 days. The content of the settlement conference discussions shall not be offered in evidence in any subsequent judicial proceeding in this case.

131. If a dispute cannot be resolved after conducting a settlement conference with Magistrate Judge Leshner or his designee, either party may seek the assistance of the District Court through the filing of a motion for relief.

132. In cases of particular urgency or irreparable harm related to provisions in this MH Settlement Agreement and Order, a party may opt to bring disputes directly to the District Court, or both parties may consent to bypass the Magistrate Judge if the parties agree the issue should be briefed to the Court, with prior notice to the Magistrate Judge.

/ / /

## VI.    MISCELLANEOUS RELIEF

133.    Class counsel may bring concerns in writing about individual incarcerated persons with mental health concerns exclusively to the attention of the Mental Health Staff Liaison and/or Unit.  Any contacts made by Class Counsel to in house or outside attorneys for the County with individual incarcerated person's grievances and/or concerns may not be included in any request for attorney fees related to post-settlement date work.  The Mental Health Staff Liaison and/or Unit shall investigate and respond to Class counsel within 10 business days of receipt. This process is not meant to replace or circumvent the existing processes for requesting mental health assistance, or following the existing request and grievance processes in the Jail.  Incarcerated persons in the Jail shall be encouraged by Plaintiffs' counsel to make use of those processes.

134.    Before contacting the Mental Health Staff Liaison and/or Unit, Class Counsel shall attempt to verify that the concerns of individual class members are accurate, substantive, and not frivolous through questioning of class members.

## VII.    DURATION AND TERMINATION

135.    The duration of this MH Settlement Agreement and Order is until such time that the County has demonstrated Substantial Compliance for a period of at least twelve months for the provisions set forth herein.

136.    Consistent with the foregoing paragraph, the County may move for termination of any portion of this MH Settlement Agreement and Order pursuant to 18 U.S.C. section 3626(b)(1)(A)(i) after a finding of Substantial Compliance at any point after the Court's approval of this MH Settlement Agreement and Order, after conferring with Plaintiffs' counsel to attempt to reach agreement on whether substantial compliance has been achieved up to and including full and complete compliance of the entire Settlement Agreement and Order.  Unless otherwise ordered by the Court, such a finding shall result in a termination of the relevant neutral's work as to the particular area of Substantial Compliance or, upon full

compliance, as to the entire scope of the neutral's work and retention of that neutral.

137. If Plaintiffs form the good faith belief prior to final termination of the entire Settlement Agreement and Order, that the County is no longer in substantial compliance with any component(s) of this MH Settlement Agreement and Order previously found to be in substantial compliance and as to which the neutral's work has concluded as set forth in Paragraph 124, Plaintiffs shall promptly so notify the County in writing. Within 30 days, the County shall serve a written response stating whether they agree or disagree. In the event the County disagrees, the parties shall proceed with the Dispute Resolution process set forth in Section V.B.

138. Nothing in this MH Settlement Agreement and Order shall limit the parties' rights to challenge or appeal any finding as to whether the County is or is not in substantial compliance with this MH Settlement Agreement and Order or consequent orders entered by the District Court.

## VIII. AMENDMENTS

139. By mutual agreement, the parties may change the terms of this MH Settlement Agreement and Order, including, but not limited to, the timetables for taking specific actions, provided that such mutual agreement is memorialized in writing, signed by the parties, and approved by the Court.

## IX.     JURISDICTION AND ENFORCEMENT

### A.     Court Approval

140. This Joint Motion will be subject to approval by the District Court, pursuant to Federal Rule of Civil Procedure 23, with notice to the Class and a Fairness Hearing; the parties shall file a joint motion for preliminary approval within 30 days of all counsel signing this MH Settlement Agreement and Order.

### B.     Court Jurisdiction

141. For the purposes of jurisdiction and enforcement of this MH Settlement Agreement and Order only, the parties jointly request that the Court find this MH Settlement Agreement and Order satisfies the requirements of 18 U.S.C.

§ 3626(a)(1)(A) in that it is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means to correct the violation of the Federal right of the Plaintiffs and the Class. In the event the Court finds that the County has not substantially complied with the MH Settlement Agreement and Order, it shall in the first instance require the County to submit a plan for approval by the Court to remedy the deficiencies identified by the Court. In the event the Court subsequently determines that the County's plan did not remedy the deficiencies, the Court shall retain the power to enforce this MH Settlement Agreement and Order through all remedies provided by law and equity.

142.   The Court retains jurisdiction to enforce the terms of this MH Settlement Agreement and Order during the duration of the MH Settlement Agreement and Order, as set forth in Paragraphs 134-137.

143.   The Court shall be the sole forum for enforcement of this MH Settlement Agreement and Order.  Any order to achieve substantial compliance with the provisions of this MH Settlement Agreement and Order shall be subject to the applicable provisions of the Prison Litigation Reform Act, 18 U.S.C. Section 3626.

## X.    ATTORNEYS' FEES AND COSTS

144.   The parties agree that Plaintiffs and the Class are entitled to reasonable attorneys' fees and costs on all issues covered by the Second Claim for Relief in Plaintiffs' Third Amended Complaint.  Class Counsel may move for an award of reasonable attorneys' fees, litigation expenses, and costs for obtaining relief for the Plaintiff subclass pursuant to the Eighth Amendment of the U.S. Constitution, the Fourteenth Amendment of the U.S. Constitution, Article I, Sections 7 and 17 of the California Constitution, 42 U.S.C. § 1988, Cal. Code. Civ. Proc. § 1021.5 or any other applicable law.  Plaintiffs will seek reasonable attorneys' fees, litigation expenses, and costs  after the Court issues final approval of the MH Settlement Agreement and Order, or later in the ongoing case, at Class Counsel's discretion.

145.   The parties further agree that Class Counsel are entitled to reasonable

attorneys' fees, litigation expenses, and costs for post-settlement date work performed in conjunction with the Second Claim for Relief in Plaintiffs' Third Amended Complaint including the MH Settlement and Order. Class Counsel's bills shall be reviewed and approved by the County on a quarterly basis.

146. Class Counsel agrees to reduce their hourly rates by 10% for all post-settlement date work and apply the rates set forth in Dkt. 959. The benchmark for Class Counsel's post-settlement date work (other than work preparing for and filing enforcement motions or otherwise engaging in litigation) shall be $65,000.00 per quarter (including fees and costs). For any quarter in which attorneys' fees and costs exceed the benchmark, either party may request a settlement conference before Magistrate Judge Leshner. If the parties are unable to resolve any such dispute before Judge Leshner, Class Counsel may apply to the Court for the additional reasonable attorneys' fees, litigation expenses, and costs, and the County may oppose such a request. Class Counsel's work preparing for and filing enforcement motions or otherwise engaging in litigation shall not be subject to the above-referenced benchmark, nor to the 10% rate reduction referenced above.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

147.   For all travel costs in connection with post-settlement date work, Class Counsel shall be limited to the California State travel reimbursement rates in effect on the date of travel.  The current rates are described here: https://www.calhr.ca.gov/about-calhr/divisions-programs/benefits/travel-reimbursements/.

IT IS SO STIPULATED.

Respectfully submitted,

DATED:  January 29, 2026      ROSEN BIEN GALVAN & GRUNFELD LLP

By: _____
Gay Crosthwait Grunfeld

Attorneys for Plaintiffs and the Certified Class

DATED:  February 12, 2026      BURKE, WILLIAMS & SORENSEN, LLP

By: _____
Elizabeth M. Pappy

Attorneys for Defendants

## SIGNATURE CERTIFICATION

Pursuant to the Court's Electronic Case Filing Procedures Manual Section 2(f)(4), I certify that I have obtained the consent of all signatories to the electronic filing of the foregoing document.

DATED:  February 12, 2026          ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Gay Crosthwait Grunfeld*
Gay Crosthwait Grunfeld

Attorneys for Plaintiffs and the Certified Class

## [PROPOSED] ORDER

1.      The remedies and actions described above are all consistent with the Prison Litigation Reform Act's requirement that the Court's orders be narrowly drawn, extend no further than necessary to correct the violation of a federal right, and be the least intrusive means necessary to correct the violation.  *See* 18 U.S.C. § 3626(a)(1)(A).

2.      The Court certified a Class of all adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities; and a Subclass of all qualified individuals with disabilities, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (i), and who are now, or will be in the future, incarcerated in all San Diego County Jail facilities.  The Court appointed Plaintiffs as the class representatives for the Class and Subclass.  The Court appointed Plaintiffs' counsel—Gay Crosthwait Grunfeld and Van Swearingen of Rosen Bien Galvan & Grunfeld LLP, Aaron J. Fischer of the Law Office of Aaron J. Fischer, and Christopher M. Young of DLA Piper LLP (US)—as class counsel.  Fed. R. Civ. P. 23(g)(1) and (4).  *See* Order, Dkt. No. 435.

3.      This Order shall apply to the County, their agents, contractors, employees, successors in office, and all persons with knowledge of it.  No person who has notice of this order shall fail to comply with it, nor shall any person subvert the order by any sham, indirection, or other artifice.

4.      The bond requirement is waived.

5.      The Court shall retain jurisdiction to enforce the terms of this MH Settlement Agreement and Order, including through specific performance and all other remedies permitted by law or equity.

6.      Within 30 days of entry of this order, the parties shall jointly move for preliminary approval of the MH Settlement Agreement and Order and Notice to the

Class.  A fairness hearing shall occur within 30 days of the Class being notified of the terms of the MH Settlement Agreement and Order.

DATED: _____, 2026

_____

Honorable Anthony J. Battaglia

# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL DUNSMORE, ANDREE ANDRADE, ERNEST ARCHULETA, JAMES CLARK, ANTHONY EDWARDS, LISA LANDERS, REANNA LEVY, JOSUE LOPEZ, CHRISTOPHER NELSON, CHRISTOPHER NORWOOD, JESSE OLIVARES, GUSTAVO SEPULVEDA, MICHAEL TAYLOR, and LAURA ZOERNER, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>SAN DIEGO COUNTY SHERIFF'S DEPARTMENT, COUNTY OF SAN DIEGO, SAN DIEGO COUNTY PROBATION DEPARTMENT, and DOES 1 to 20, inclusive,<br><br>       Defendants. | Case No.: 20-cv-00406-AJB-DDL<br><br>**ORDER GRANTING JOINT MOTION FOR CLASS CERTIFICATION AND APPROVAL OF PROPOSED CLASS ACTION NOTICE PLAN**<br><br>**(Doc. No. 423)** |

Presently pending before the Court is Plaintiffs Darryl Dunsmore, Andree Andrade, Ernest Archuleta, James Clark, Anthony Edwards, Lisa Landers, Reanna Levy, Josue Lopez, Christopher Nelson, Christopher Norwood, Jesse Olivares, Gustavo Sepulveda,

1

Michael Taylor, and Laura Zoerner (collectively, "Plaintiffs") and Defendants San Diego County Sheriff's Department, County of San Diego, and San Diego County Probation Department (collectively, "Defendants") joint motion for class certification and for approval of their proposed class notice plan. (Doc. No. 423.) For the reasons set forth below, the motion is **GRANTED**.

## I.   BACKGROUND

The facts of this case have been recited in previous orders. (*See* Doc. No. 219.) Plaintiffs are current or former inmates of San Diego County Jail facilities (the "Jail"), operated by Defendants San Diego County Sheriff's Department and the County of San Diego. Plaintiffs bring this action on behalf of "themselves and the approximately 4,000 incarcerated people who are similarly situated on any given day" to "remedy the dangerous, discriminatory, and unconstitutional conditions in the Jail." (Third Amended Complaint ("TAC"), Doc. No. 231, ¶ 4.) Specifically, Plaintiffs contend Defendants' policies and practices contribute to the high death rates in the Jail, which "has for years exceeded the rates nationally and in other large California jails, [and] it reached chilling heights in 2021 when 18 people died, amounting to a death rate of 458 incarcerated people per 100,000." (*Id.* ¶ 1.)

The Parties now jointly seek class certification pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. (Doc. No. 423.) In particular, the parties seek to certify the following class of individuals pursuant to Federal Rule of Civil Procedure 23(b)(2):

> All adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated People Class").

(*Id.* at 9.) The Parties also seek certification of three subclasses under Federal Rule of Civil Procedure 23(b)(2), specifically:

> All adults who have a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated People with Disabilities Subclass");

2

20-cv-00406-AJB-DDL

All adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities and have private counsel or are pursuing state or federal claims on a pro per basis ("Incarcerated People with Private Counsel or Pro Per Claims Subclass"); and

All Black and Latinx adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated Black and Latinx Persons Subclass").

(*Id.*)

The Parties also propose a class notice plan to ensure that all members of the class and subclasses are individually identified. (*Id.* at 24.) The Parties have agreed to the form and substance of the notice, and request the Court to order copies of the notice to be posted throughout the Jails in English and Spanish, and that Defendant Sheriff's Department read the Class Notice to individuals who are illiterate or have a disability that may affect their ability to read the Notice. (*Id.*) In addition, the Parties stipulate and ask the Court to order that copies of the TAC be provided by Defendant Sheriff's Department to class members upon request. (*Id.*)

## II.    LEGAL STANDARD

Class actions are the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To depart from this rule, the "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citation and internal quotation marks omitted). The proponent of class treatment, usually the plaintiff, bears the burden of demonstrating the propriety of class certification. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014). This burden requires the plaintiff to provide sufficient facts to satisfy the four requirements of Rule 23(a) and at least one subsection of Rule 23(b) of the Federal Rules of Civil Procedure. *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

3

20-cv-00406-AJB-DDL

Under Rule 23(a), a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These requirements are commonly referred to as numerosity, commonality, typicality, and adequacy. "If the court finds the action meets the requirements of Rule 23(a), the court then considers whether the class is maintainable under Rule 23(b)." *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 451 (S.D. Cal. 2014).

In the instant matter, Plaintiffs seek certification pursuant to Rule 23(b)(2) for injunctive and declaratory relief classes. Rule 23(b)(2) permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

When entertaining a class certification motion, the court is obligated to conduct a rigorous analysis of whether the requirements of Rule 23 are satisfied. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). While the court must not go on a freewheeling inquiry into the merits of the plaintiff's claims, "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Falcon*, 457 U.S. at 160). Accordingly, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). The court must therefore limit its inquiry "to those aspects relevant to making the certification decision on an informed basis." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 499 (S.D. Cal. 2013).

## III.   DISCUSSION

### A.   Rule 23(a) Requirements

4

The Court will first start with an analysis of whether the Parties have satisfied the Rule 23(a) elements of numerosity, commonality, typicality, and adequacy.

### 1. Numerosity

Under Rule 23(a)(1), a lawsuit may only proceed via a class if the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the Parties stipulate that between October 1, 2022 and September 30, 2023, the average daily population of the Jails was 3,946 individuals. (Joint Stipulation of Facts ("Stip."), Doc. No. 423-1, ¶ 1.) During this timeframe, an average of 1,363 of those individuals received psychotropic medication for mental health disabilities. (*Id.*) Additionally, over 60% of the incarcerated individuals at the Jails were Black or Latinx. (*Id.*) Accordingly, the Court finds this requirement has been satisfied. *See Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763, at *6 (S.D. Cal. Sept. 5, 2013) (finding the numerosity requirement satisfied where the class was "indisputably in the thousands" and the defendants stipulated to the numerosity requirement).

### 2. Commonality

The commonality factor "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 157). The "claims must depend upon a common contention" and "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution . . . ." *Id.* For purposes of Rule 23(a)(2), even a single common question will suffice. *Id.* at 359.

In a civil-rights suit, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005). "In such circumstance, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Id.*

The Parties assert commonality is satisfied because all putative class members are

5

20-cv-00406-AJB-DDL

subject to the same policies and practices and suffered the same injuries. (Doc. No. 423 at 17–18.) Specifically, the Parties contend the proposed class and subclasses share, at minimum, the following common questions:

- Whether Defendants fail to provide minimally adequate medical care to incarcerated people in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 17, of the California Constitution;

- Whether Defendants fail to provide minimally adequate mental health care to incarcerated people in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 17, of the California Constitution;

- Whether Defendants fail to make their programs, services, and activities available to persons with disabilities, and otherwise discriminating against persons with disabilities, in violation of the ADA, 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and California Government Code Section 11135;

- Whether Defendants impose filthy, unhealthy, and dangerous conditions of confinement on incarcerated people in violation of the Article 1, Sections 7 and 17, of the California Constitution;

- Whether Defendants fail to protect incarcerated people from violence and injury in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 17, of the California Constitution;

- Whether Defendants fail to provide minimally adequate dental care to incarcerated people in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 17, of the California Constitution;

- Whether Defendants fail to ensure incarcerated people have access to counsel and the courts in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution and Article 1, Sections 7 and 15 of the California Constitution; and

- Whether Defendants disproportionately incarcerate people based on race, ethnicity,

6

and/or national original in violation of California Government Code Section 11135. (*Id.*)

The Court agrees with the Parties that there are questions of law and fact common to the proposed class members. Accordingly, the Court finds Rule 23(a)(2) satisfied.

### 3.    Typicality

Rule 23(a)(3)'s typicality requirement provides that "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156 (quoting *E. Tex. Motor Freight Sys.*, 431 U.S. at 403) (internal quotation marks omitted). The purpose of the requirement is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "[T]he typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (internal citations omitted). However, a court should not certify a class if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508 (internal quotation marks and citation omitted).

The Court finds that Plaintiffs' claims are typical of the class and subclasses. Plaintiffs each allege they have experienced the same or similar harm, rely on the same legal theories, and seek the same injunctive relief that is broadly applicable to all members of the proposed class and subclasses. (*See* Doc. No. 423 at 19–21.) All of the Named Plaintiffs have been or are currently incarcerated in the Jails. As to the Plaintiffs who have been transferred or released from the Jails, the record contains compelling evidence they likely will be reincarcerated at the Jails, particularly through being rearrested, or, if they are currently incarcerated in state prison, housed at the Jails while out-to-court from prison for resentencing, habeas petitions, or to testify in another case. (*Id.* at 19.) Accordingly, the Court finds the Parties have satisfied typicality.

### 4.    Adequacy

20-cv-00406-AJB-DDL

Rule 23(a)(4) requires the class representative to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing this requirement, courts within the Ninth Circuit apply a two-part test, asking the following questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members? and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

The Parties assert Plaintiffs and their counsel do not have any conflicts with the class or subclasses, and agree to protect the rights of all proposed class members. (Doc. No. 423 at 22.) Additionally, Plaintiffs' counsel ensure they will fairly and adequately protect the interests of the class and subclasses, as they have performed extensive work investigating the claims in this action and are well-versed in prisoners' rights, disability law, and class actions. (*Id.* at 22–23.) Based on the foregoing, the Court finds Plaintiffs and their counsel are adequate class representatives.

## B. Rule 23(b)(2) Requirements

If a proposed class satisfies Rule 23(a)'s requirements, then the proposed class must also qualify as one of the types of class actions Rule 23(b) identifies. Fed. R. Civ. P. 23(b); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). Plaintiffs seek certification of the class and subclasses pursuant to Rule 23(b)(2). (Doc. No. 423 at 23.)

Rule 23(b)(2) permits class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Ninth Circuit has held that "'it is sufficient' to meet the requirements of Rule 23(b)(2) [when] 'class members complain of a pattern or practice that is generally applicable to the class as a whole.'" *Rodriguez*, 591 F.3d at 1125 (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)). "The rule does not require [the Court] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Id.*; *see also Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible

8

nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (internal quotation marks omitted).

The Court finds that Rule 23(b)(2)'s requirements are plainly met. Plaintiffs seek broad declaratory and injunctive relief—system-wide improvements in Defendants' policies, procedures, and programs in the Jails—on behalf of a large class and subclasses of incarcerated individuals. (TAC ¶¶ 425, 433.) All members of the classes are allegedly exposed to a substantial risk of harm due to Defendants' alleged policies and practices. The requested relief would benefit the Named Plaintiffs as well as all members of the proposed class and subclasses in the same manner in a single stroke. *See Parsons v. Ryan*, 754 F.3d 657, 689 (9th Cir. 2014) ("[E]very inmate in the proposed class is allegedly suffering the same (or at least a similar) injury and that injury can be alleviated for every class member by uniform changes in . . . policy and practice.").

### C. Approval of Proposed Class Notice Plan

"[I]n a Rule 23(b)(2) class action, notice may be given but is not required, and there is no requirement that a class member be given an opportunity to exclude himself or herself from the lawsuit." *Lyon v. U.S. Immigr. & Customs Enf't*, 300 F.R.D. 628, 635 (N.D. Cal. 2014). When certifying a class under Rule 23(b)(2), "the court may direct appropriate notice to the class." Fed. R. Civ. P. 23(c)(2)(A). Notice should be given to class members in the "best" form "that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

Here, the Parties have agreed to the form and substance of the notice to all members of the class and subclass, attached as Exhibit F to the Grunfeld Declaration, (Doc. No. 423-2 at 41–42). To ensure that all members of the class be individually identified, the Parties ask the Court to order that copies of the notice be posted throughout the Jails in English and Spanish, and that Defendant Sheriff's Department shall read the Class Notice to individuals who are illiterate or have a disability that may affect their ability to read the

9

Notice. In addition, the Parties ask the Court to order that copies of the TAC shall be provided by Defendant Sheriff's Department to class members upon request.

Because 23(b)(2) classes are being certified, notice to the classes are not required but is appropriate here. *See* Fed. R. Civ. P. 23(c)(2) (providing that, "[f]or any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class"). The Parties have reached an agreement that notice should be given, what the terms of that notice should be, and how the notice should be distributed to the classes. As such, the Parties' request for approval of proposed class notice plan is **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, the Court hereby:

1. **GRANTS** the Parties' joint motion for class certification. The Court certifies a class consisting of:

> All adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated People Class").

The Court also certifies the following three subclasses:

> All adults who have a disability, as that term is defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated People with Disabilities Subclass");

> All adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities and have private counsel or are pursuing state or federal claims on a pro per basis ("Incarcerated People with Private Counsel or Pro Per Claims Subclass"); and

> All Black and Latinx adults who are now, or will be in the future, incarcerated in any of the San Diego County Jail facilities ("Incarcerated Black and Latinx Persons Subclass").

2. **GRANTS** the Parties' request to appoint Named Plaintiffs as class representatives;

3. **GRANTS** the Parties' request to appoint Rosen Bien Galvan & Grunfeld

10

20-cv-00406-AJB-DDL

LLP, the Law Office of Aaron J. Fischer, and DLA Piper LLP (US) as class counsel; and

    4. **GRANTS** the Parties' request for approval of the proposed class notice plan. The Court **ORDERS** the following:

- Copies of the notice shall be posted throughout the Jails in English and Spanish;
- Defendant Sheriff's Department shall read the Class Notice to individuals who are illiterate or have a disability that may affect their ability to read the Notice
- Copies of the Third Amended Complaint shall be provided by Defendant Sheriff's Department to class members upon request.

    **IT IS SO ORDERED.**

Dated: November 3, 2023

_____
Hon. Anthony J. Battaglia
United States District Judge

11

20-cv-00406-AJB-DDL